**BROWN RUDNICK LLP**
David J. Molton
Daniel J. Saval
Marek P. Krzyzowski
Seven Times Square
New York, New York 10036
(212) 209-4800

**KELLOGG, HANSEN, TODD,**
**FIGEL & FREDERICK, P.L.L.C.**
Michael K. Kellogg (admitted *pro hac vice*)
Aaron M. Panner (admitted *pro hac vice*)
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C.  20036
Telephone: (202) 326-7900

*Counsel for the Foreign Representatives*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 Case |
| FAIRFIELD SENTRY LIMITED, et al., | Case No: 10-13164 (SMB) |
| Debtors in Foreign Proceedings. | Jointly Administered |
| FAIRFIELD SENTRY LTD. (IN LIQUIDATION), et al., | |
| Plaintiffs, | Adv. Pro. No. 10-03496 |
| -against- | |
| THEODOOR GGC AMSTERDAM, et al., | Administratively Consolidated |
| Defendants. | |

## DECLARATION OF DAVID J. MOLTON
## IN FURTHER SUPPORT OF MOTION FOR LEAVE TO AMEND
## AND IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

I, David J. Molton, do hereby declare, under penalty of perjury under the laws of the United States of America, that the following is true and correct to the best of my knowledge and belief:

1.     I am a member of the law firm of Brown Rudnick LLP, counsel for Kenneth Krys and Charlotte Caulfield, (together, the "Liquidators" or "Foreign Representatives"), in their capacities as the duly appointed Liquidators and Foreign Representatives of Fairfield Sentry Limited (In Liquidation), Fairfield Sigma Limited (In Liquidation), and Fairfield Lambda Limited (In Liquidation).   I submit this Declaration in support of Plaintiffs' Opposition to Defendants' Motion to Dismiss filed in the above-captioned actions.

2.     Attached as Exhibit A is a true and correct copy of a long form Subscription Agreement between HSBC Private Bank Suisse (SA) and Fairfield Sentry Limited, with certain account and identifying information redacted.

3.     Attached as Exhibit A-1 is a true and correct copy of a short form Subscription Agreement between HSBC Private Bank Suisse (SA) and Fairfield Sentry Limited, with certain account and identifying information redacted.

4.     Attached as Exhibit B is a true and correct copy of a long form Subscription Agreement between Banca Profilo (SPA) and Fairfield Sigma Limited, with certain account and identifying information redacted.

5.     Attached as Exhibit B-1 is a true and correct copy of a short form Subscription Agreement between Banca Profilo (SPA) and Fairfield Sigma Limited, with certain account and identifying information redacted.

6.     Attached as Exhibit C is a true and correct copy of a Private Placement Memorandum for Fairfield Sentry Limited, dated August 14, 2006.

7.     Attached as <u>Exhibit D</u> is a true and correct copy of a Private Placement Memorandum for Fairfield Sigma Limited, dated December 1, 2008.

8.     Attached as <u>Exhibit E</u> is a true and correct copy of the revised proposed Fourth Amended Complaint in *Fairfield Sentry Limited et al. v. ABN Amro Schweiz AG et al* ., Adv. Pro. No. 10-3635 (Bankr. S.D.N.Y.), which contains certain additional factual allegations (in red-line).

9.     Attached as <u>Exhibit F</u> is a true and correct copy of the revised proposed Fourth Amended Complaint in *Fairfield Sentry Limited et al. v. ABN Amro Schweiz AG et al* ., Adv. Pro. No. 10-3636 (Bankr. S.D.N.Y.), which contains certain additional factual allegations (in red-line).

10.     Attached as <u>Exhibit G</u> is a true and correct copy of a Brokerage and Custody Agreement dated July 26, 2004 and executed by a Citco Customer/Beneficial Owner (whose name had been redacted from the copy obtained by the Liquidators), Citco Banking Corporation N.V. and Citco Global Custody (N.A.) N.V., with certain account and identifying information redacted.

11.     Attached as <u>Exhibit H</u> is a true and correct copy of a Brokerage and Custody Agreement dated April 29, 2005 and executed by a Citco Customer/Beneficial Owner (whose name had been redacted from the copy obtained by the Liquidators), Citco Bank Nederland N.V. Dublin Branch and Citco Global Custody N.V., with certain account and identifying information redacted.

12.     Attached as <u>Exhibit I</u> is a true and correct copy of a Brokerage and Custody Agreement dated February 3, 2000 and executed by a Citco Customer/Beneficial Owner (whose

name had been redacted from the copy obtained by the Liquidators), Citco Bank Nederland N.V.

and Citco Global Custody N.V., with certain account and identifying information redacted.

Executed on March 31, 2017.

_____ */s/ David J. Molton*_____
DAVID J. MOLTON

REDACTED WITH REDACT-IT

**EXHIBIT A**

Name of Subscriber HSBC Private Bank (Suisse) SA————

Amount of Subscription USD $147'000.--

## SUBSCRIPTION AGREEMENT

### (NON-UNITED STATES OF AMERICA SUBSCRIBERS ONLY)

### FAIRFIELD SENTRY LIMITED

Fairfield Sentry Limited
c/o Citco Fund Services (Europe) B.V.
Telestone 8 - Teleport
Naritaweg 165
1043 BW Amsterdam
The Netherlands
Telephone: █████████
Facsimile: █████████

Dear Sirs:

1.    Subscription.  The undersigned ("Subscriber") hereby subscribes for voting, participating shares, each with a par value U.S. $0.01 per share (the "Shares") of Fairfield Sentry Limited (the "Fund"), an international business company organized under the laws of the Territory of the British Virgin Islands ("BVI").  The Shares will be offered at the net asset value ("Net Asset Value") per Share as of the opening of business on the effective date of purchase.  The Shares have identical rights and privileges in all respects (including the right to one vote per Share).  All capitalized terms used in this Subscription Agreement (the "Agreement") that are not defined herein have the meanings set forth in the Fund's Confidential Private Placement Memorandum dated October 1, 2004 (as amended from time to time, the "Memorandum").  Subscriber subscribes for that number of Shares that can be purchased for the subscription amount above.  Subscriber subscribes for the Shares pursuant to the terms herein, the Memorandum, and the Fund's Memorandum of Association and Articles of Association (collectively, the "Fund Documents").  All references herein to "dollars" or "$" are to U.S. dollars.

2.    Acceptance or Rejection.  If the Fund accepts this subscription, Subscriber shall become a shareholder of the Fund and be bound by the Fund Documents.  The minimum initial subscription is $100,000.  The Board of Directors, in consultation with Fairfield Greenwich (Bermuda) Ltd. (the "Investment Manager"), may reject a subscription for any reason or no reason.  Subscriptions shall become irrevocable to the subscriber on the third to the last business day of the month in which such subscription is received by the Fund.  If rejected, the Fund shall promptly return the subscription funds, with any interest actually earned thereon, and this Agreement shall be void.

3.    Payment of Subscription Funds.  Subscription funds should be wired to the Fund at the following account, concurrently with the delivery of this Agreement to the Fund.  In order to comply with anti-money laundering regulations applicable to the Fund and Citco Fund Services (Europe) B.V. (the "Administrator"), the sample bank letter attached hereto as Schedule A MUST be completed by the financial institution which will be remitting the subscription moneys on behalf of the subscriber.

1

*Intermediary Bank -* ▮▮▮▮
HSBC Bank, New York

*Account with Institution -* ▮▮▮▮
Account Name: Citco Bank Nederland N.V. Dublin Branch

*Beneficiary Customer -* ▮▮▮▮
Beneficiary Account Name: Fairfield Sentry Limited

*Reference – SWIFT Field 70:* Name and Full Address of Subscriber

4.    Delivery of Subscription Agreement.   Subscriber should fax and mail an executed, completed copy of this Agreement to the Administrator at the above facsimile number and address, with a copy to the Manager at Fairfield Greenwich (Bermuda) Ltd., 12 Church Street, Suite 606, Hamilton, Bermuda, fax (441) 292-5413.

5.    Status Representations.

a.    SEC Regulation S.   Subscriber is not a "U.S. Person" under Regulation S of the U.S. Securities and Exchange Commission (adopted under the U.S. Securities Act of 1933, as amended (the "1933 Act")) because (a) if an individual, Subscriber is not a resident of the United States of America or its territories or possessions (the "U.S.") or "resident alien" as defined under the U.S. income tax laws, and (b) if an entity, Subscriber is not any of the following: (i) a partnership or corporation organized or incorporated under U.S. law; (ii) an estate of which any executor or administrator is a U.S. Person; (iii) a trust of which a trustee is a U.S. Person; (iv) any agency or branch of a foreign entity located in the U.S.; (v) a partnership or corporation organized under non-U.S. law but formed by a U.S. Person principally for the purpose of investing in securities not registered under the 1933 Act (unless organized and incorporated, and owned, by accredited investors as defined in Rule 501 under the 1933 Act who are not natural persons, estates or trusts); (vi) a non-discretionary or similar account (other than an estate or trust) held by a dealer or other fiduciary for a U.S. Person; or (vii) a discretionary or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated or (if an individual) resident in the U.S.

Subscriber acknowledges that, except with the consent of the Fund, the Shares may not be owned by a U.S. Person, that the Shares will not at any time be held for the account or benefit, directly or indirectly, of any U.S. Person, and that, except with the consent of the Fund, the Subscriber will not resell, reoffer or transfer any Shares or any interest therein to any person, including a U.S. Person or any non-U.S. Person subject to the above restrictions. Subscriber acknowledges that reoffers, resales or any transfer of the Shares is subject to the limitations imposed by the Fund's Articles of Association and may be made only in compliance with applicable securities laws and only with the prior written consent of the Board of Directors which may, in its sole discretion, decline to issue any Shares to, or register Shares in the name of, any person, and the Subscriber will not transfer any of its Shares except on the books of the Fund and acknowledges that the Shares shall be transferable only to investors who are eligible to purchase Shares in

2

the Fund as described above and in the Memorandum.  Subscriber understands that the Fund may compulsorily repurchase such Shares in accordance with the Fund Documents.

      b.    <u>CFTC Regulation 4.7</u>.  Subscriber is not a "U.S. Person" under Regulation 4.7 of the U.S. Commodity Futures Trading Commission (adopted under the U.S. Commodity and Exchange Act of 1974, as amended) ("Rule 4.7") because (a) if an individual, Subscriber is not a resident of the U.S., and (b) if an entity, Subscriber is not (i) a partnership, corporation or other entity (other than an entity organized principally for passive investment) organized under U.S. law or with its principal place of business in the U.S.; (ii) an entity (whether organized under U.S. or non-U.S. law) that is organized principally for passive investment and that is beneficially owned 10% or more by U.S. Persons or persons who are not otherwise "qualified eligible persons", as defined in Rule 4.7;  (iii) an estate or trust the income of which is subject to U.S. income taxation regardless of source; or (iv) a pension plan for the employees, officers or principals of an entity organized or with its principal place of business in the U.S.

      c.    <u>Professional Investor Status</u>.  Subscriber is a "Professional Investor" within the meaning of the BVI Mutual Funds Act of 1996 of the BVI and the Irish Stock Exchange, because Subscriber's net worth (in the case of a natural person, either individually or jointly with spouse) exceeds US$1,000,000 or, (in the case of an institution) $5,000,000, and Subscriber consents to being treated as a Professional Investor for the purpose of investing in the Fund, and Subscriber warrants that he has such knowledge and expertise in financial matters sufficient to evaluate the risks involved in an investment in the Fund, that he is aware of the risks and can bear the loss of the entire investment in the Fund.

      d.    <u>Employee Benefit Plans</u>. Investment in the Fund by "Employee Benefit Plans", as defined under the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), may be limited to less than 25% of the total capital of the Fund (excluding investments by the Investor). To help determine whether investment by Subscriber is included in the 25% limitation, Subscriber has initialed here (_____) if it is an Employee Benefit Plan (such as a retirement account, corporate pension or profit sharing plan, or governmental retirement plan). If the Subscriber at any time becomes an Employee Benefit Plan, the Subscriber shall forthwith inform this to the Fund.

If the Subscriber is an insurance company investing the assets of its general account in the Fund, less than 25% of the Subscriber's general account constitutes assets of an Employee Benefit Plan (as determined under Section 401(c) of ERISA).  If the Subscriber is such an entity and at any time 25% or more of its general account constitute assets of an Employee Benefit Plan, the Subscriber shall forthwith disclose to the Fund the amount of Employee Benefit Plan assets held in its general account.  By signing this Subscription Agreement, the Subscriber expressly acknowledges that the Fund may require that the Subscriber redeem its Shares and withdraw from the Fund if 25% or more of the Subscriber's general account constitutes assets of an Employee Benefit Plan.

    6.    <u>Related Professionals</u>.
        (Subscriptions cannot be accepted if this section is not completed)

Please indicate the name of the person at the Fairfield Greenwich Group with whom this subscription is associated
Name: _____

Please indicate the name, if applicable, of the person and/or entity who acts as an advisor with respect to this subscription.

Name of Advisor: _____

_____

Name of Advisor's firm or organization:

Not Applicable: _____

7.    Receipt of Fund Documents and Other Documents. Subscriber has received and read a copy of the Memorandum. Subscriber acknowledges that in making a decision to subscribe for Shares, Subscriber has relied solely upon the Fund Documents and independent investigations made by Subscriber and has not relied on any representation inconsistent with the information in the Fund Documents. Subscriber is not relying on the Fund, the Fund's Board of Directors, administrator, the Investment Manager, or any other person or entity with respect to the legal, tax and other economic considerations involved in this investment other than the Subscriber's own advisers. The Subscriber's investment in the Shares is consistent with the investment purposes, objectives and cash flow requirements of the Subscriber and will not adversely affect the Subscriber's overall need for diversification and liquidity.

8.    Subscriber Sophistication and Financial Condition. Subscriber has such knowledge and experience in financial and business matters that it is capable of evaluating the risks of this investment. Subscriber has obtained sufficient information from the Fund or its authorized representatives to evaluate such risks and has consulted with the Subscriber's own advisors and is fully informed as to the legal and tax requirements within the Subscriber's own country (countries) regarding a purchase of the Shares. Subscriber is not relying on the Fund or the Board of Directors, or any other person or entity with respect to the legal, tax and other economic considerations involved in this investment other than the Subscriber's own advisers. Subscriber has not relied on any person as a purchaser representative in connection with that evaluation. Subscriber has evaluated the risks of investing in the Fund, understands there are substantial risks of loss incidental to the purchase of Shares and has determined that the Shares are a suitable investment for the Subscriber. Subscriber's investment is consistent with its investment purposes and objectives and cash flow requirements, and will not adversely affect Subscriber's overall need for diversification and liquidity.

Subscriber understands that (a) the Fund's operating history is not a prediction of its future success; (b) no governmental agency has passed upon the Shares or made any findings or determination as to the fairness of this investment; and (c) the representations, warranties, agreements, undertakings and acknowledgments made by the Subscriber in this Agreement will be relied upon by the Fund, the Board of Directors, the Investment Manager and the Administrator in determining the Subscriber's suitability as a purchaser of Shares and the Fund's compliance with various securities laws, and shall survive the Subscriber's becoming a shareholder of the Fund.

All information which the Subscriber has provided to the Fund or the Administrator concerning the Subscriber, the Subscriber's status, financial position and knowledge and experience of financial, tax and business matters, or, in the case of a Subscriber that is an entity, the knowledge and experience of financial, tax and business matters of the person making the investment decision on behalf of such entity, is correct and complete as of the date set forth herein.

The Subscriber irrevocably authorizes the Fund and/or the Administrator to disclose, at any time, any information held by the Fund or the Administrator in relation to the Subscriber or his investment in the Fund to the Investment Manager or any affiliate of the Investment Manager or the Administrator.

4

REDACTED WITH REDACT-IT

9.      <u>Redemptions</u>.  Subscriber is aware of the limited provisions for redemptions and has read the section in the Memorandum entitled "Transfers, Redemptions and Termination."  Subscriber has no need for liquidity in this investment, can afford a complete loss of the investment in the Shares and can afford to hold the Shares for an indefinite period of time.  Subscriber understands that the Fund will generally redeem Shares as of the last day of each month (the "Redemption Date"); provided that the redemption request is received by the Administrator in proper form no later than 5:00 p.m. Amsterdam time on a date that is at least 15 calendar days prior to the Redemption Date.

10.     <u>Valuations</u>.  Subscriber understands that the value of its Shares and redemptions thereof, and the performance of the Fund, may be based on unaudited and in some cases, estimated, valuations of the Fund's investments and that any valuation provided in Subscriber's account statement may be an unaudited, estimated value.

11.     <u>Beneficial Owner</u>.  Subscriber acknowledges, or if the Subscriber is acting as agent, representative or nominee for a subscriber (a "Beneficial Owner"), the Subscriber has advised the Beneficial Owner that (a) the Investment Manager, on behalf of the Fund, may enter into agreements with placement agents or other sales relationships to market the Fund providing for a payment from the Investment Manager to the particular placement agent for the introduction, out of the fees the Investment Manager receives from the Fund.

12.     <u>Investment Intent</u>.  Subscriber is buying the Shares solely for investment purposes and not with a view to distribute, subdivide or resell the Shares.

13.     <u>Subsequent Subscriptions</u>.  If Subscriber subscribes for additional Shares at a later date, Subscriber shall be deemed to have re-executed this Agreement in subscribing for those Shares.

14.     <u>Registration of Shares; Certificates</u>.  The Shares issued to Subscriber will be registered on the Fund's books in the name of Subscriber and not any nominee.  Shares will be issued in registered, book-entry form.

15.     <u>Binding Nature of Agreement</u>.  This Agreement shall be binding upon Subscriber and its heirs, representatives, successors and permitted assigns, and shall inure to the benefit of the Fund's successors and assigns.  The Agreement shall survive the acceptance of the subscription.  If Subscriber consists of more than one person, the Agreement shall be the joint and several obligation of each person.

16.     <u>Governing Law</u>.  This Agreement shall be governed and enforced in accordance with the laws of New York, without giving effect to its conflict of laws provisions.

17.     <u>Legal Representation</u>.  Subscriber understands that the Law Offices of Andrew E. Goldstein acts as U.S. counsel to the Fund, and as counsel to the Investment Manager and its affiliates.  Subscriber also understands that, in connection with this offering of Shares and subsequent advice to the Fund, the Law Offices of Andrew E. Goldstein will not be representing the shareholder, and no independent counsel has been engaged by the Fund to represent the shareholders.

18.     <u>Authority</u>.  Subscriber's execution, delivery and performance of this Agreement are within its powers, have been duly authorized and will not constitute or result in a breach or default under or conflict with any order, ruling or regulation of any court or other tribunal or of any governmental commission or agency, or any agreement or other undertaking, to which Subscriber is a party or by which it is bound; and, if Subscriber is not an individual, will not violate any provision of the incorporation papers, by-laws, indenture of trust or partnership agreement, as may be applicable, of the Subscriber.  The signature on this Agreement is genuine, and the signatory, if Subscriber is an individual, has legal

REDACTED WITH REDACT-IT

competence and capacity to execute the Agreement, or, if Subscriber is not an individual, the signatory has been duly authorized to execute the Agreement, and the Agreement constitutes a legal, valid and binding obligation of Subscriber, enforceable in accordance with its terms.

19.    <u>New York Courts</u>. Subscriber agrees that any suit, action or proceeding ("Proceeding") with respect to this Agreement and the Fund may be brought in New York.  Subscriber irrevocably submits to the jurisdiction of the New York courts with respect to any Proceeding and consents that service of process as provided by New York law may be made upon Subscriber in such Proceeding, and may not claim that a Proceeding has been brought in an inconvenient forum.  Subscriber consents to the service of process out of any New York court in any such Proceeding by the mailing of copies thereof, by certified or registered mail, return receipt requested, addressed to Subscriber at the address of Subscriber then appearing on the Fund's records.  Nothing herein shall affect the Fund's right to commence any Proceeding or otherwise to proceed against Subscriber in any other jurisdiction or to serve process upon Subscriber in any manner permitted by any applicable law in any relevant jurisdiction.

20.    <u>Office of Foreign Assets Control</u>. (A)   Subscriber understands and agrees that the Fund prohibits the investment of funds by any persons or entities that are acting, directly or indirectly, (i) in contravention of any applicable laws and regulations, including anti-money laundering regulations or conventions, (ii) on behalf of terrorists or terrorist organizations, including those persons or entities that are included on the List of Specially Designated Nationals and Blocked Persons maintained by the U.S. Treasury Department's Office of Foreign Assets Control[1] ("OFAC"), as such list may be amended from time to time, (iii) for a senior foreign political figure, any member of a senior foreign political figure's immediate family or any close associate of a senior foreign political figure[2], unless the Fund, after being specifically notified by Subscriber in writing that it is such a person, conducts further due diligence, and determines that such investment shall be permitted, or (iv) for a foreign shell bank[3] (such persons or entities in (i) – (iv) are collectively referred to as "Prohibited Persons").

(B)     Subscriber represents, warrants and covenants that: (i) it is not, nor is any person or entity controlling, controlled by or under common control with Subscriber, a Prohibited Person, and (ii) to the extent Subscriber has any beneficial owners[4] or is acting as agent or nominee in connection with this investment, (a) it has carried out thorough due diligence to establish the identities of such

---

[1] The OFAC list may be accessed on the web at http://www.treas.gov/ofac.

[2] Senior foreign political figure means a senior official in the executive, legislative, administrative, military or judicial branches of a foreign government (whether elected or not), a senior official of a major foreign political party, or a senior executive of a foreign government-owned corporation.  In addition, a senior foreign political figure includes any corporation, business or other entity that has been formed by, or for the benefit of, a senior foreign political figure.  The immediate family of a senior foreign political figure typically includes the political figure's parents, siblings, spouse, children and in-laws.  A close associate of a senior foreign political figure is a person who is widely and publicly known internationally to maintain an unusually close relationship with the senior foreign political figure, and includes a person who is in a position to conduct substantial domestic and international financial transactions on behalf of the senior foreign political figure.

[3] Foreign shell bank means a foreign bank without a physical presence in any country, but does not include a regulated affiliate.  A post office box or electronic address would not be considered a physical presence.  A regulated affiliate means a foreign shell bank that: (1) is an affiliate of a depository institution, credit union, or foreign bank that maintains a physical presence in the United States or a foreign country, as applicable; and (2) is subject to supervision by a banking authority in the country regulating such affiliated depository institution, credit union, or foreign bank.

[4] Beneficial owners will include, but shall not be limited to: (i) shareholders of a corporation; (ii) partners of a partnership; (iii) members of a limited liability company; (iv) investors in a fund of funds; (v) the grantor of a revocable or grantor trust (vi) the beneficiaries of an irrevocable trust; (vii) the individual who established an IRA; (viii) the participant in a self-directed pension plan; (ix) the sponsor of any other pension plan; and (x) any person being represented by the Subscriber in an agent, representative, intermediary, nominee or similar capacity.  If the beneficial owner is itself an entity, the information and representations set forth herein must also be given with respect to its individual beneficial owners.  If Subscriber is a publicly-traded company, it need not conduct due diligence as to its beneficial owners.

REDACTED WITH REDACT-IT

beneficial owners, **(b)** based on such due diligence, Subscriber reasonably believes that no such beneficial owners are Prohibited Persons, **(c)** it holds the evidence of such identities and status and will maintain all such evidence for at least five years from the date of Subscriber's complete redemption from the Fund, and **(d)** it will make available such information and any additional information requested by the Fund that is required under applicable regulations.

(C)    If any of the foregoing representations, warranties or covenants ceases to be true or if the Fund no longer reasonably believes that it has satisfactory evidence as to their truth, notwithstanding any other agreement to the contrary, the Fund may, in accordance with applicable regulations, freeze Subscriber's investment, either by prohibiting additional investments, declining or suspending any redemption requests and/or segregating the assets constituting the investment, or Subscriber's investment may immediately be redeemed by the Fund, and the Fund may also be required to report such action and to disclose Subscriber's identity to OFAC or other authority. In the event that the Fund is required to take any of the foregoing actions, Subscriber understands and agrees that it shall have no claim against the Fund, the Investment Manager, the Administrator, and their respective affiliates, directors, members, partners, shareholders, officers, employees and agents for any form of damages as a result of any of the aforementioned actions.

(D)    Subscriber understands and agrees that any redemption proceeds paid to it will be paid to the same account from which Subscriber's investment in the Fund was originally remitted, unless the Fund, in its sole discretion, agrees otherwise.

(E)    If any of the foregoing representations cease to be true, Subscriber will promptly notify the Fund of the facts pertaining to such changed circumstances.

21.    **Anti-Money Laundering**. Subscriber represents that the subscription funds are not the direct or indirect proceeds of drug trafficking or other such criminal conduct or activity. Subscriber understands that, as part of the responsibility of the Fund and Administrator for protection against money laundering, the Administrator may require a detailed verification of Subscriber's identity. Depending on the circumstances of each application, a detailed verification might not be required where Subscriber makes the payment from an account held in Subscriber's name at a recognized financial institution; or the application is made through a recognized intermediary. These exceptions will only apply if the financial institution or intermediary referred to above is within a country recognized as having sufficient anti-money laundering regulations. For example, an individual may be required to produce a copy of a passport or identification card duly certified by a notary public, together with evidence of his/her address such as a utility bill or bank statement and date of birth. In the case of entity subscribers, this may require production of a certified copy of the certificate of incorporation (and any change of name), memorandum and articles of association (or the equivalent), and the names, occupations, dates of birth and residential and business addresses of all directors. The Administrator and the Fund reserve the right to request such information as is necessary to verify the identity of Subscriber. In the event of delay or failure by Subscriber to produce any information required for verification purposes, the Administrator may refuse to accept the subscription and the subscription monies relating thereto or in the case where the Shares have already been issued, the Subscriber acknowledges and agrees that it will not be able to redeem any Shares so issued until proper identification information has been provided. Subscriber further agrees that the Fund and any other service provider shall be held harmless and indemnified against any loss arising as a result of a failure to process the subscription or redemption or Subscriber's rejection if such information as has been required by the parties referred to has not been provided by Subscriber.

REDACTED WITH REDACT-IT

22.    _Confidentiality._    The Fund may disclose the information about Subscriber that is contained herein as the Fund deems necessary to comply with applicable law or as required in any suit, action, or proceeding.

23.    _Indemnification._    Subscriber agrees to indemnify and hold harmless the Fund and any of its service providers, and any partner, manager, officer, director, shareholder, agent, employee or affiliate thereof, against any loss, liability or expense relating to (a) any misrepresentation or breach of covenant by Subscriber herein or in any other document furnished by Subscriber in connection with its subscription or (b) any action for securities law violations instituted by Subscriber which is finally resolved by judgment against Subscriber.

Subscriber acknowledges that each director and officer of the Fund is entitled to be indemnified out of the assets of the Fund against all costs, losses or expenses arising from mistakes of judgement or any action or inaction that the person reasonably believed to be within the scope of the authority granted to him, provided that such actions or inactions did not constitute gross negligence, willful misconduct or breach of fiduciary duty.

24.    _Enforceability._    If any provision hereof is invalid or unenforceable under any applicable law, it shall be deemed inoperable to that extent (and modified to the extent necessary to comply with that law) and its invalidity or unenforceability shall not affect any other provision hereof.

25.    _Currencies._    If Subscriber subscribes in a currency other than U.S. Dollars, Subscriber agrees that the Fund may sell such subscription funds at the market rate for that currency and that the Shares will be issued to the value of the proceeds, minus the reasonable costs relating to the sale.

26.    _Appointment of Revocable Proxy._    Subscriber hereby designates and appoints the Administrator, with full power of substitution, as its true and lawful proxy and attorney-in-fact for the purpose of voting the Shares subscribed for herein or otherwise acquired as said proxy may determine on any and all matters which may arise at any meeting of shareholders and upon which such Shares could be voted by shareholders present in person at that meeting. This proxy may be revoked by the owner of record of the Shares hereby subscribed for, either personally or by presentation of a subsequently executed proxy at any meeting of Shareholders, or by written notice to the Administrator at the above address (or such other address as the Fund or the Administrator shall furnish in writing to a shareholder) received before the meeting.

27.    _If Subscriber is acting as a Representative._    If Subscriber is subscribing as trustee, agent, representative, or nominee for another person (the "Beneficial Shareholder"), Subscriber agrees that the representations and agreements herein are made by Subscriber with respect to itself and the Beneficial Shareholder. Subscriber has all requisite authority from the Beneficial Shareholder to execute and perform the obligations hereunder. Subscriber also agrees to indemnify the Fund, the Investment Manager and the Administrator and their respective directors, members, partners, officers and agents for any and all costs, fees and expenses (including legal fees and disbursements, fines and amounts paid in settlement) in connection with any damages resulting from Subscriber's misrepresentation or misstatement contained herein, or the assertion of Subscriber's lack of proper authorization from the Beneficial Shareholder to enter into this Agreement or perform the obligations hereof.

If the Subscriber enters into a swap, structured note or other derivative instrument, the return from which is based in whole or in part on the return of the Fund (the "Swap") with a third party (a "Third Party"), the Subscriber represents and warrants that with respect to a Third Party entering into a Swap: (a) the Third Party is authorized under its constitutional documents (_e.g._, certificate of incorporation, by-laws,

REDACTED WITH REDACT-IT

partnership agreement or trust agreement) and applicable law to enter into the Swap and would also be so authorized to invest directly into the Fund; (b) the Third Party has received and reviewed a copy of the Memorandum and the Agreement; (c) the Third Party acknowledges that the Fund and its affiliates are not responsible for the legality, suitability or tax consequences of the Swap and that the Subscriber is not an agent of the Fund; and (d) the Third Party is an "eligible swap participant" and a "qualified eligible person" under Commodity Futures Trading Commission rules, and an "accredited investor" under Regulation D promulgated under the 1933 Act and a "qualified purchaser" under the Investment Company Act of 1940. Subscriber also agrees to indemnify the Fund, the Investment Manager and their respective officers and agents for any and all costs, fees and expenses (including legal fees and disbursements, fines, and amounts paid in settlement) in connection with any damages resulting from the Subscriber's misrepresentation or misstatement contained herein. Nothing herein constitutes an agreement or statement by the Fund as to the legality of a Swap or the suitability of a Swap for the Third Party.

28.   Country-Specific Disclosures.   Subscriber has reviewed the country-specific disclosures in the Memorandum.

29.   Additional Information.   The Fund may request from the Subscriber such additional information as it may deem necessary to evaluate the eligibility of the Subscriber to acquire Shares, and may request from time to time such information as it may deem necessary to determine the eligibility of the Subscriber to hold Shares or to enable the Fund to determine its compliance with applicable regulatory requirements or its tax status, and the Subscriber agrees to provide such information as may reasonably be requested.

Subscriber agrees to notify the Fund promptly if there is any change with respect to any of the information or representations made herein and to provide the Fund with such further information as the Fund may reasonably require.

This Agreement may be executed through the use of separate signature pages or in any number of counterparts. Each counterpart shall, for all purposes, constitute one agreement binding on all the parties, notwithstanding that all parties do not execute the same counterpart.

30.   Subscriber Information and Execution.

a.   Amount of Subscription.  USD $47'000.--

b.   Registration of Shares.   The Shares issued to Subscriber are to be registered in the Fund's books in the name of (insert name and address):

HSBC Private Bank (Suisse) SA

9

c.      Written Communications.   All written communications from the Fund to Subscriber should be sent to Subscriber at the following address (insert address):

_____

_____

d.      Telephone, Fax and Email.   Tele███████████

██████████         ███████████████████

e.      Domicile, Etc.    Subscriber, if an individual, is a citizen of _____ and a resident of _____.   Subscriber, if an entity, is organized under the laws of _____ and has its principal place of business in _____.

f.      Authorized Persons (for Subscribers that are not corporate entities).   The names of the persons authorized by Subscriber to give and receive instructions between the Fund and Subscriber, together with their signatures, are set forth below.  Such persons are the only persons so authorized by Subscriber until further notice to the Fund by any one of such persons:

| Print Name | Signature |
| --- | --- |
| 1. | |
| 2. | |
| 3. | |
| 4. | |
| 5. | |
| 6. | |
| 7. | |
| 8. | |
| 9. | |
| 10. | |

The Administrator and the Fund are each hereby authorized and instructed to accept and execute any instructions in respect of the Shares to which this Agreement relates given by Subscriber in written form or by facsimile.  If instructions are given by Subscriber by facsimile, Subscriber undertakes to send the original letter of instructions to the Administrator and the Fund, and Subscriber agrees to keep each of them indemnified against any loss of any nature whatsoever arising as to any of them as a result of any of them acting upon facsimile instructions.  The Administrator and the Fund may rely conclusively upon and shall incur no liability in respect of any action taken upon any notice, consent, request, instructions or other instrument believed in good faith to be genuine or to be signed by properly authorized persons.

For corporate entities, please provide an authorized signatory list which must include the name(s) and specimen signature(s) of the person(s) who are authorized by Subscriber to give and receive instructions between the Fund and Subscriber.

REDACTED WITH REDACT-IT

g.    **Redemption Payments**.  Until further notice from Subscriber to the Fund, signed by any authorized person listed above, redemption or other payments by the Fund to Subscriber should be wired only to Subscriber and only as follows (please print or type):

Bank name: _____

Bank address: _____
HSBC BANK USA - New York

ABA/ CHIPS/ BIC Codes: _____

Account name: _____
HSBC Private Bank (Suisse) SA

Account number: _____

For further credit: _____

h.    **Financial Institution Wiring/Paying Subscription Monies**.
HSBC Private Bank (Suisse) SA

Name of account at financial institution being debited for subscription payment: _____

Number of such account: _____

i.    **Execution**.  In witness whereof, Subscriber has executed this Agreement on the date set forth below:

Date: 30 October, 2006 _____ 200_

For individuals

Print name: _____

Signature: _____

For entities

Print name: _____ rivate Bank (Suisse)

_____ uthorized signatory: _____

_____ horized signatory: _____

11

**EXHIBIT A-1**

## SHORT FORM SUBSCRIPTION AGREEMENT

**THIS APPLICATION IS TO BE USED ONLY BY EXISTING REGISTERED SHAREHOLDERS OF FAIRFIELD SENTRY LIMITED PURCHASING ADDITIONAL SHARES IN THE SAME REGISTERED NAME. IT MAY NOT BE USED BY NEW SUBSCRIBERS.**

The undersigned Subscriber (1) is an existing shareholder in Fairfield Sentry Limited ("Fund"), (2) has previously delivered a fully executed Subscription Agreement to the Fund, and (3) desires to subscribe for additional shares in the Fund. By executing in the space below, the undersigned shareholder hereby (1) requests that the Fund accept this short form subscription in lieu of completing an entirely new Subscription Agreement for the additional Shares, (2) reaffirms each and every representation and covenant made by the undersigned in the original Subscription Agreement as of the date hereof, subject only to the changed information set forth below, and (3) represents that if the Subscriber is an entity, the person executing this Agreement has the full power and authority under the Subscriber's governing instruments and has been authorized to do so and the Subscriber has the full power and authority under its governing instruments to acquire Shares of the Fund.

**Please contact the Administrator prior to sending documents or funds to ascertain whether the Fund is accepting additional capital.   New Subscription Information:**

Subscriber:

Contribution Date:                                                     200

Additional Contribution Amount: U.S. $   USD 200'000.--

Changes to Subscription Agreement:   [X] None
                                     [ ] Yes, as follows:


IN WITNESS WHEREOF, the undersigned has executed this Subscription Agreement on this ___ day of 200

| Corporate, Partnership, Trust or Account Subscribers | Individual Subscribers |
|---|---|
| Name of Entity (Print)   HSBC Private Bank (Suisse) SA | Name (Print) |
| By:   Signature | Signature |
| Name (Print) | Name of Joint Purchaser, If Any (Print) |
| Title | Signature |
| Telephone: | Telephone: |
| Fax: | Fax: |

SUBSCRIPTION ACCEPTED AS OF                    200_

FAIRFIELD SENTRY LIMITED

By:
    Name:
    Title:

21 December, 2007

REDACTED WITH REDACT-IT

# EXHIBIT B

595

Name of Subscriber: ███████████████

Amount of Subscription: € 1'700'000,00        EUR

## SUBSCRIPTION AGREEMENT

## FAIRFIELD SIGMA LIMITED

Fairfield Sigma Limited
c/o Citco Fund Services (Europe) B.V.
Telestone 8 - Teleport
Naritaweg 165
1043 BW Amsterdam
The Netherlands

████████████████

Dear Sirs:

1.    **Subscription.** The undersigned ("Subscriber") hereby subscribes for redeemable, voting, participating shares, each with a par value 0.01EUR per share (the "Shares"), of Fairfield Sigma Limited (the "Fund"), an international business company organized under the laws of the British Virgin Islands (the "BVI"). The Shares will be offered at a subscription price per Share equal to the Fund's Net Asset Value per Share as of the opening of business on the effective date of purchase. The Shares have identical rights and privileges in all respects (including the right to one vote per Share). All capitalized terms used in this Agreement that are not defined herein have the meanings set forth in the Fund's Confidential Private Placement Memorandum, as amended from time to time (the "Memorandum"). Subscriber subscribes for that number of Shares that can be purchased for the subscription amount above. Subscriber subscribes for the Shares pursuant to the terms herein, the Memorandum, and the Fund's Memorandum of Association and Articles of Association (collectively, the "Fund Documents").

2.    **Acceptance or Rejection.** If the Fund accepts this Subscription, Subscriber shall become a shareholder of the Fund and bound by the Fund Documents. The minimum initial subscription is 200,000 EUR. The Board of Directors, in it sole discretion, may accept subscriptions of a lesser amount or establish different minimums in the future. The Board of Directors, in consultation with Fairfield Greenwich (Bermuda) Ltd. (the "Investment Manager"), may reject this subscription, in whole or in part, for any reason. Subscriptions shall become irrevocable to the subscriber on the fifth to the last business day of the month in which such subscription is received by the Fund. If rejected, the Fund will promptly return the subscription funds, with any interest actually earned thereon, and this Agreement will be void.

3.    **Payment of Subscription Funds.** Subscription funds should be wired to the Fund at the following account, concurrently with the delivery of this Agreement to the Fund. In order to comply with anti-money laundering regulations applicable to the Fund and Citco Fund Services (Europe) B.V. (the "Administrator"), the sample letter attached hereto as Schedule A MUST be completed by the financial institution which will be remitting the subscription moneys on behalf of the subscriber.

1

███████████████████████████████

*Intermediary Bank* - ████████████
KBC Bank N.V., Brussels
████████████████

*Account with Institution* - ████████████████
Account Name: Citco Bank Nederland N.V. Dublin Branch
International Bank Account Number: ████████████

*Beneficiary Customer* - ████████████████
Beneficiary Account Name: Fairfield Sigma Limited
Beneficiary International Bank Account Number (IBAN): ████████████

*Reference – SWIFT Field 70*: Name and Full Address Subscriber:

4.   Delivery of Subscription Agreement.  Subscriber should fax and mail an executed,
completed copy of this Agreement to the Fund at the above facsimile number and address, with a
copy to the Manager at the following address: Fairfield Greenwich(Bermuda) Ltd., 12 Church street,
Suite 606, Hamilton, Bermuda, fax no. 441-292-5413.

5.   Status Representations.

a.   SEC Regulation S.  Subscriber is not a "U.S. Person" under Regulation S
promulgated under the Securities Act of 1933, as amended (the "1933 Act"), because (a) if an
individual, Subscriber is not a resident of the United States of America or its territories or
possessions (the "U.S.") or a "resident alien" as defined under the U.S. income tax laws, and (b) if
an entity, Subscriber is not any of the following:  (i) a partnership or corporation organized or
incorporated under U.S. law; (ii) an estate of which an executor or administrator is a U.S. Person;
(iii) a trust of which a trustee is a U.S. Person; (iv) any agency or branch of a foreign entity located
in the U.S.; (v) a partnership or corporation organized under non-U.S. law but formed by a U.S.
Person principally for the purpose of investing in securities not registered under the 1933 Act
(unless organized and incorporated, and owned, by accredited investors, as defined in Rule 501
promulgated under the 1933 Act who are not natural persons, estates or trusts); (vi) a non-
discretionary or similar account (other than an estate or trust) held by a dealer or other fiduciary for
a U.S. Person; or (vii) a discretionary or similar account (other than an estate or trust) held by a
dealer or other fiduciary organized, incorporated or (if an individual) resident in the U.S.

b.   Subscriber acknowledges that, except with the consent of the Fund, the
Shares may not be owned by a U.S. Person, that the Shares will not at any time be held for the
account or benefit, directly or indirectly, of any U.S. Person, and that, except with the consent of
the Fund, the Subscriber will not resell, reoffer or transfer any Shares or any interest therein to any
person, including a U.S. Person or any non-U.S. Person subject to the above restrictions.
Subscriber acknowledges that reoffers, resales or any transfers of the Shares is subject to the
limitations imposed by the Fund's Articles of Association and may be made only in compliance
with applicable securities laws and only with the prior written consent of the Board of Directors,
which may, in its sole discretion, decline to issue any shares to, or register shares in the name of
any person, and the Subscriber will not transfer any of its shares except on the books of the Fund
and acknowledges that the Shares shall be transferable only to investors who are eligible to

2

REDACTED WITH REDACT-IT

purchase shares in the Fund as described above and in the Memorandum. Subscriber understands that the Fund may compulsorily repurchase such Shares in accordance with the Fund Documents.

c.    CFTC Regulation. Subscriber is not a "U.S. Person" under Regulation Sec. 4.7 promulgated under the U.S. Commodity Exchange Act of 1974, as amended, ("Rule 4.7") because (a) if an individual, Subscriber is not a resident of the U.S., and (b) if an entity, Subscriber is not (i) a partnership, corporation or other entity (other than an entity organized principally for passive investment) organized under U.S. law or with its principal place of business in the U.S.; (ii) an entity (whether organized under U.S. or non-U.S. law) that is organized principally for passive investment and that is beneficially owned 10% or more by U.S. Persons or persons who are not otherwise "qualified eligible persons" as defined in Rule 4.7; (iii) an estate or trust, the income of which is subject to U.S. income taxation regardless of source; or (iv) a pension plan for the employees, officers or principals of an entity organized or with its principal place of business in the U.S.

d.    Professional Investor Status. Subscriber is a "Professional Investor" within the meaning of the BVI Mutual Funds Act of 1996 of the BVI, because (i) Subscriber declares that his ordinary business involves, whether for his own account or the account of others, the acquisition or disposal of property of the same kind as the property, or a substantial part of the property, of the Fund, or (ii) Subscriber's net worth (in the case of a natural person, either individually or jointly with spouse) exceeds US$1,000,000, or its equivalent in the Subscriber's local currency, and Subscriber consents to being treated as a Professional Investor for the purpose of investing in the Fund.

e.    Employee Benefit Plans.   Investment in the Fund by "Employee Benefit Plans", as defined under the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), may be limited to less than 25% of the total capital of the Fund (excluding investments by the Investor.   To help determine whether investment by Subscriber is included in the 25% limitation, Subscriber has initialed here (_____) if it is an Employee Benefit Plan (such as a retirement account, corporate pension or profit sharing plan, or governmental retirement plan).  If the Subscriber at any time becomes an Employee Benefit Plan, the Subscriber shall forthwith inform this to the Fund.

If the Subscriber is an insurance company investing the assets of its general account in the Fund, less than 25% of the Subscriber's general account constitute assets of an Employee Benefit Plan (as determined under Section 401(c) of ERISA). If the Subscriber is such an entity and at any time 25% or more of its general account constitute assets of an Employee Benefit Plan, the Subscriber shall forthwith disclose to the Fund the amount of Employee Benefit Plan assets held in its general account.  By signing this Subscription Agreement, the Subscriber expressly acknowledges that the Fund may require that the Subscriber redeem its Shares and withdraw from the Fund if 25% or more of the Subscriber's general account constitutes assets of an Employee Benefit Plan.

6.   Related Professionals.
     (Subscriptions cannot be accepted if this section is not completed.)

    (i)   Please indicate, if applicable, the name of the person at Fairfield Greenwich Group with whom this subscription is associated.

Name ████████████████████████

Not Applicable: _____

    (ii)  Please indicate, if applicable, the name of the person and/or entity who acts as an advisor with respect to this subscription.

Name: _____

Not Applicable: _____

7.   **Receipt of Fund Documents and Other Documents.** Subscriber has received and read a copy of the Memorandum. Subscriber acknowledges that in making a decision to subscribe for Shares, Subscriber has relied solely on the Fund Documents and any independent investigation of the Subscriber, and has not relied upon any representation inconsistent with the information in the Fund Documents. Subscriber is not relying on the Fund, the Fund's Board of Directors, administrator, Investment Manager, or any other person or entity with respect to the legal, tax, and other economic considerations involved in this investment other than the Subscriber's own advisers. The Subscriber's investment in the Shares is consistent with the investment purposes, objectives and cash flow requirements of the Subscriber and will not adversely affect the Subscriber's overall need for diversification and liquidity.

8.   **Subscriber Sophistication and Financial Condition.** Subscriber has such knowledge and experience in financial and business matters that it is capable of evaluating the risks of this investment. Subscriber has obtained sufficient information from the Fund or its authorized representatives to evaluate such risks and has consulted with the Subscriber's own advisors and is fully informed as to the legal and tax requirements of the Subscriber's own country regarding the purchase of the Shares. Subscriber is not relying on the Board of Directors, or any other person or entity with respect to the legal, tax and other economic considerations involved in this investment other than the Subscriber's own advisers. Subscriber has not relied on any person as a purchaser representative in connection with that evaluation. Subscriber has evaluated the risks of investing in the Fund, understands there are substantial risks of loss incidental to the purchase of the Shares and has determined that the Shares are a suitable investment for it. Subscriber's investment is consistent with its investment purposes and objectives and cash flow requirements, and will not adversely affect Subscriber's overall need for diversification and liquidity. Subscriber can afford a complete loss of this investment, and can afford to hold the Shares for an indefinite time.

Subscriber understands that (a) no governmental agency has passed upon the Shares or made any findings or determination as to the fairness of this investment; and (b) the representations, warranties, agreements, undertakings and acknowledgments made by the Subscriber in this Subscription Agreement will be relied upon by the Fund, the Board of Directors, the Investment Manager and the Administrator in determining the Subscriber's suitability as a purchaser of Shares and the Fund's

4

compliance with various securities laws, and shall survive the Subscriber's becoming a shareholder of the Fund.

All information which the Subscriber has provided to the Fund or the Administrator concerning the Subscriber, the Subscriber's status, financial position and knowledge and experience of financial, tax and business matters, or, in the case of a Subscriber that is an entity, the knowledge and experience of financial, tax and business matters of the person making the investment decision on behalf of such entity, is correct and complete as of the date set forth herein.

The Subscriber irrevocably authorizes the Fund and/or the Administrator to disclose, at any time, any information held by the Fund or the Administrator in relation to the Subscriber or his investment in the Fund to the Investment Manager or any affiliate of the Investment Manager or the Administrator.

9.    Redemptions.  Subscriber is aware of the limited provisions for redemptions and has read the sections in the Memorandum entitled "Transfers, Redemptions and Termination." Subscriber has no need for liquidity in this investment, can afford a complete loss of the investment in the Shares and can afford to hold the Shares for an indefinite period of time.  Subscriber understands that the Fund will generally redeem Shares as of the last day of each month (the "Redemption Date"); provided that the redemption request is received by the Administrator in proper form no later than 5:00 p.m. Amsterdam time on a date that is at least 15 calendar days prior to the Redemption Date.

10.    Valuations.  Subscriber understands that the value of its Shares and redemptions thereof, and the performance of the Fund, may be based on unaudited and in some cases, estimated, valuations of the Fund's investments and that any valuation provided in Subscriber's account statement may be an unaudited, estimated value.

11.    Beneficial Owner.  Subscriber acknowledges, or if the Subscriber is acting as agent, representative or nominee for a subscriber (a "Beneficial Owner"), the Subscriber has advised the Beneficial Owner that (a) the Investment Manager, on behalf of the Fund, may enter into agreements with placement agents or other sales relationships to market the Fund providing for a payment from the Investment Manager to the particular placement agent for the introduction, out of the fees the Investment Manager receives from the Fund.

12.    Investment Intent.  Subscriber is buying the Shares solely for investment purposes and not with a view to distribute, subdivide or resell the Shares.

13.    Subsequent Subscriptions.  If Subscriber subscribes for additional Shares at a later date, Subscriber shall be deemed to have re-executed this Agreement in subscribing for those Shares.

14.    Registration of Shares; Certificates.  The Shares issued to Subscriber will be registered on the Fund's books in the name of Subscriber and not any nominee.  Share certificates will not be issued to Subscriber unless it so requests in writing.

15.    Pledge of Underlying Fund Assist.  The Subscriber hereby agrees that the assets underlying his/its Shares (the "Pledged Assets") shall be pledged as collateral to the entity extending credit to the Fund in connection with the line of credit and the currency trading account described in the Memorandum (the "Pledgee").  The undersigned further agrees that such Pledgee may take any

-5-

and all action with respect to the Pledged Assets, in the event the Fund fails to pay any amounts owed to such Pledgee on account of the Shares, without notice, including, but not limited to ordering the sale of any of the Pledged Assets at any time that there is a default in the Fund's obligations and applying the proceeds of such sale in payment of any debt owed by the Fund, to such Pledgee on account of the Shares, and that any action taken by the Pledgee with respect to such Pledged Assets shall not be deemed a waiver as to any other action available to the Pledgee with respect to such obligations.

16.    Binding Nature of Agreement.  This Agreement shall be binding upon Subscriber and its heirs, representatives, successors and permitted assigns, and shall inure to the benefit of the Fund's successors and assigns.  The Agreement shall survive the acceptance of the subscription.  If Subscriber consists of more than one person, the Agreement shall be the joint and several obligation of each person.

17.    Governing Law.  This Agreement shall be governed and enforced in accordance with New York law, without giving effect to its conflict of laws provisions.

18.    Legal Representation.  Subscriber understands that the Law Offices of Andrew E. Goldstein acts as U.S. counsel to the Fund, and as counsel to the Investment Manager and its affiliates. Subscriber also understands that, in connection with this offering of Shares and subsequent advice to the Fund, the Law Offices of Andrew E. Goldstein will not be representing the shareholder, and no independent counsel has been engaged by the Fund to represent the shareholders.

19.    Authority. Subscriber's execution, delivery and performance of this Agreement are within its powers, have been duly authorized and will not constitute or result in a breach or default under or conflict with any order, ruling or regulation of any court or other tribunal or of any governmental commission or agency, or any agreement or other undertaking, to which Subscriber is a party or by which it is bound, and, if Subscriber is not an individual, will not violate any provision of the incorporation papers, by-laws, indenture of trust or partnership agreement, as may be applicable, of the Subscriber.  The signature on this Agreement is genuine, and the signatory, if Subscriber is an individual, has legal competence and capacity to execute the Agreement, or, if Subscriber is not an individual, the signatory has been duly authorized to execute the Agreement, and the Agreement constitutes a legal, valid and binding obligation of Subscriber, enforceable in accordance with its terms.

20.    New York Courts. Subscriber agrees that any suit, action or proceeding ("Proceeding") with respect to this Agreement and the Fund may be brought in New York. Subscriber irrevocably submits to the jurisdiction of New York courts with respect to any Proceeding and consents that service of process as provided by New York law may be made upon Subscriber in such Proceeding, and may not claim that Proceeding has been brought in an inconvenient forum. Subscriber consents to the service of process out of any New York court in any such Proceeding, by the mailing of copies thereof, by certified or registered mail, return receipt requested, addressed to Subscriber at the address of Subscriber then appearing on the Fund's records.  Nothing herein shall affect the Fund's right to commence any Proceeding or otherwise to proceed against Subscriber in any other jurisdiction or to serve process upon Subscriber in any manner permitted by any applicable law in any relevant jurisdiction.

21.    Office of Foreign Assets Control. (A) Subscriber understands and agrees that the Fund prohibits the investment of funds by any persons or entities that are acting, directly or

6

indirectly, (i) in contravention of any applicable laws and regulations, including anti-money laundering regulations or conventions, (ii) on behalf of terrorists or terrorist organizations, including those persons or entities that are included on the List of Specially Designated Nationals and Blocked Persons maintained by the U.S. Treasury Department's Office of Foreign Assets Control[1] ("OFAC"), as such list may be amended from time to time, (iii) for a senior foreign political figure, any member of a senior foreign political figure's immediate family or any close associate of a senior foreign political figure[2], unless the Fund, after being specifically notified by Subscriber in writing that it is such a person, conducts further due diligence, and determines that such investment shall be permitted, or (iv) for a foreign shell bank[3] (such persons or entities in (i) – (iv) are collectively referred to as "Prohibited Persons").

(B)    Subscriber represents, warrants and covenants that: (i) it is not, nor is any person or entity controlling, controlled by or under common control with Subscriber, a Prohibited Person, and (ii) to the extent Subscriber has any beneficial owners[4] or is acting as agent or nominee in connection with this investment, (a) it has carried out thorough due diligence to establish the identities of such beneficial owners, (b) based on such due diligence, Subscriber reasonably believes that no such beneficial owners are Prohibited Persons, (c) it holds the evidence of such identities and status and will maintain all such evidence for at least five years from the date of Subscriber's complete redemption from the Fund, and (d) it will make available such information and any additional information requested by the Fund that is required under applicable regulations.

(C)    If any of the foregoing representations, warranties or covenants ceases to be true or if the Fund no longer reasonably believes that it has satisfactory evidence as to their truth, notwithstanding any other agreement to the contrary, the Fund may, in accordance with applicable regulations, freeze Subscriber's investment, either by prohibiting additional investments, declining or suspending any redemption requests and/or segregating the assets constituting the investment, or Subscriber's investment may immediately be redeemed by the Fund, and the Fund may also be required to report such action and to disclose Subscriber's identity to OFAC or other authority. In the event that the Fund is required to take any of the foregoing actions, Subscriber understands and agrees that it shall have no claim against the Fund, the Investment Manager, the Administrator, and their respective affiliates, directors, members, partners, shareholders, officers, employees and agents for any form of damages as a result of any of the aforementioned actions.

---

[1]    The OFAC list may be accessed on the web at http://www.treas.gov/ofac.

[2]    Senior foreign political figure means a senior official in the executive, legislative, administrative, military or judicial branches of a foreign government (whether elected or not), a senior official of a major foreign political party, or a senior executive of a foreign government-owned corporation. In addition, a senior foreign political figure includes any corporation, business or other entity that has been formed by, or for the benefit of, a senior foreign political figure. The immediate family of a senior foreign political figure typically includes the political figure's parents, siblings, spouse, children and in-laws. A close associate of a senior foreign political figure is a person who is widely and publicly known internationally to maintain an unusually close relationship with the senior foreign political figure, and includes a person who is in a position to conduct substantial domestic and international financial transactions on behalf of the senior foreign political figure.

[3]    Foreign shell bank means a foreign bank without a physical presence in any country, but does not include a regulated affiliate. A post office box or electronic address would not be considered a physical presence. A regulated affiliate means a foreign shell bank that: (1) is an affiliate of a depository institution, credit union, or foreign bank that maintains a physical presence in the United States or a foreign country, as applicable; and (2) is subject to supervision by a banking authority in the country regulating such affiliated depository institution, credit union, or foreign bank.

[4]    Beneficial owners will include, but shall not be limited to: (i) shareholders of a corporation; (ii) partners of a partnership; (iii) members of a limited liability company; (iv) investors in a fund of funds; (v) the grantor of a revocable or grantor trust (vi) the beneficiaries of an irrevocable trust; (vii) the individual who established an IRA; (viii) the participant in a self-directed pension plan; (ix) the sponsor of any other pension plan; and (x) any person being represented by the Subscriber in an agent, representative, intermediary, nominee or similar capacity. If the beneficial owner is itself an entity, the information and representations set forth herein must also be given with respect to its individual beneficial owners. If Subscriber is a publicly-traded company, it need not conduct due diligence as to its beneficial owners.

(D)    Subscriber understands and agrees that any redemption proceeds paid to it will be paid to the same account from which Subscriber's investment in the Fund was originally remitted, unless the Fund, in its sole discretion, agrees otherwise.

(E)    If any of the foregoing representations cease to be true, Subscriber will promptly notify the Fund of the facts pertaining to such changed circumstances.

22.    Anti Money-Laundering.  Subscriber represents that the subscription funds are not the direct or indirect proceeds of drug trafficking or other such criminal activity, including actions that contravene the anti-money laundering laws and regulations of any country.    Subscriber understands that, as part of the responsibility of the Fund and Administrator for protection against money-laundering, the Administrator may require a detailed verification of Subscriber's identity. Depending on the circumstances of each application, a detailed verification might not be required where Subscriber makes the payment from an account held in Subscriber's name at a recognized financial institution; or the application is made through a recognized intermediary.  These exceptions will only apply if the financial institution or intermediary referred to above is within a country recognized as having sufficient anti money-laundering regulations.  For example, an individual may be required to produce a copy of a passport or identification card duly certified by a notary public, together with evidence of his/her address such as a utility bill or bank statement and date of birth.  In the case of entity subscribers, this may require production of a certified copy of the certificate of incorporation (and any change of name), memorandum and articles of association (or the equivalent), and the names, occupations, dates of birth and residential and business addresses of all directors.  The Administrator and the Fund reserve the right to request such information as is necessary to verify the identity of Subscriber.  In the event of delay or failure by Subscriber to produce any information required for verification purposes, the Administrator may refuse to accept the subscription and the subscription monies relating thereto or in the case where the Shares have already been issued, the Subscriber acknowledges and agrees that it will not be able to redeem any Shares so issued until proper identification information has been provided.  Subscriber further agrees that the Fund and any other service provider shall be held harmless and indemnified against any loss arising as a result of a failure to process the subscription or redemption if such information as has been required by the parties referred to has not been provided by Subscriber.

23.    Confidentiality.  The Fund may disclose the information about Subscriber that is contained herein as the Fund deems necessary to comply with applicable law or as required in any suit, action, or proceeding.

24.    Indemnification.  Subscriber agrees to indemnify and hold harmless the Fund and any other service provider to it, and any partner, manager, officer, director, shareholder, agent, employee or affiliate thereof, against any loss, liability or expense relating to any misrepresentation or breach of covenant by Subscriber herein or in any other document furnished by Subscriber in connection with its subscription.

25.    Enforceability.  If any provision hereof is invalid or unenforceable under any applicable law, it shall be deemed inoperable to that extent (and modified to the extent necessary to comply with that law) and its invalidity or unenforceability shall not affect any other provision hereof.

26.    Currencies.  Subscriber acknowledges that it is subscribing in a currency other than U.S. Dollars. Subscriber agrees that the Fund may sell such subscription funds at the market rate for

8

that currency and that the Shares will be issued to the value of the proceeds, minus the reasonable costs relating to the sale.

27.  **Appointment of Revocable Proxy.**  Subscriber hereby designates and appoints the Administrator with full power of substitution, as its true and lawful proxy and attorney-in-fact for the purpose of voting the Shares subscribed for herein or otherwise acquired as said proxy may determine on any and all matters which may arise at any meeting of shareholders and upon which such Shares could be voted by Shareholders present in person at that meeting.  This proxy may be revoked by the owner of record of the Shares hereby subscribed for, either personally or by presentation of a subsequently executed proxy at any meeting of Shareholders, or by written notice to the Administrator at the above address (or such other address as the Fund or the Administrator shall furnish in writing to a Shareholder) received before the meeting.

28.  **If Subscriber is acting as a Representative.**  If Subscriber is subscribing as trustee, agent, representative, or nominee for another person (the "Beneficial Shareholder"), Subscriber agrees that the representations and agreements herein are made by Subscriber with respect to itself and the Beneficial Shareholder.  Subscriber has all requisite authority from the Beneficial Shareholder to execute and perform the obligations hereunder.  Subscriber also agrees to indemnify the Fund, the Administrator and their directors, members, partners, officers and agents for any and all costs, fees and expenses (including legal fees and disbursements, fines and amounts paid in settlement) in connection with any damages resulting from Subscriber's misrepresentation or misstatement contained herein, or the assertion of Subscriber's lack of proper authorization from the Beneficial Shareholder to enter into this Subscription Agreement or perform the obligations hereof.

If the Subscriber enters into a swap, structured note or other derivative instrument, the return from which is based in whole or in part on the return of the Fund (the "Swap") with a third party (a "Third Party"), the Subscriber represents and warrants that with respect to a Third Party entering into a Swap:  (a) the Third Party is authorized under its constitutional documents (*e.g.*, certificate of incorporation, by-laws, partnership agreement or trust agreement) and applicable law to enter into the Swap and would also be so authorized to invest directly into the Fund; (b) the Third Party has received and reviewed a copy of the Memorandum and the Subscription Agreement; (c) the Third Party acknowledges that the Fund and its affiliates are not responsible for the legality, suitability or tax consequences of the Swap and that the Subscriber is not an agent of the Fund; and (d) the Third Party is an "eligible swap participant" and a "qualified eligible person" under Commodity Futures Trading Commission rules; and an "accredited investor" under Regulation D. Subscriber also agrees to indemnify the Fund, the Investment Manager and their officers and agents for any and all costs, fees and expenses (including legal fees and disbursements, fines, and amounts paid in settlement) in connection with any damages resulting from the Subscriber's misrepresentation or misstatement contained herein. Nothing herein constitutes an agreement or statement by the Fund as to the legality of a Swap or the suitability of a Swap for the Third Party.

29.  **Country-Specific Disclosures.**  Subscriber has reviewed the country-specific disclosures contained in the Memorandum.

30.  **Additional Information.**  The Fund may request from the Subscriber such additional information as it may deem necessary to evaluate the eligibility of the Subscriber to acquire Shares, and may request from time to time such information as it may deem necessary to determine the eligibility of the Subscriber to hold shares or to enable the Fund to determine its compliance with

9

REDACTED WITH REDACT-IT

applicable regulatory requirements or its tax status, and the Subscriber agrees to provide such information as may reasonably be requested.

Subscriber agrees to notify the Fund promptly if there is any change with respect to any of its information or representations made herein and to provide the Fund with such further information as the Fund may reasonably require.

This Agreement may be executed through the use of separate signature pages or in any number of counterparts. Each counterpart shall, for all purposes, constitute one agreement, binding on all parties, notwithstanding that all parties do not execute the same counterpart.

31.    Subscriber Information and Execution.

a.    Amount of Subscription.    1 700 000 00 EUR.

b.    Registration of Shares.    The Shares issued to Subscriber are to be registered in the Fund's books in the name of (insert name and address):

c.    Written Communications.    All written communications from the Fund to Subscriber should be sent to Subscriber at the following address (insert address):

d.    Telephone, Fax and Email:  Telephone:

Fax:                        Email:

e.    Domicile, Etc.    Subscriber, if an individual, is a citizen of

_____ and a resident of _____. Subscriber,

if an entity, is organized under the laws of _____ and has its principal

place of business in _____

f.    Authorized Persons (for Subscribers that are not corporate entities).    The names of the persons authorized by Subscriber to give and receive instructions between the Fund and Subscriber, together with their signatures, are set forth below. Such persons are the only persons so authorized by Subscriber until further notice to the Fund by any one of such persons:

10

| Print Name | Signature |
|---|---|
| 1. ███████████ | ████████████ |
| 2. ███████████ | ████████████ |
| 3. | |
| 4. | |
| 5. | |
| 6. | |
| 7. | |
| 8. | |
| 9. | |
| 10. | |

The Administrator and the Fund are each hereby authorized and instructed to accept and execute any instructions in respect of the Shares to which this Agreement relates given by Subscriber in written form or by facsimile. If instructions are given by Subscriber by facsimile, Subscriber undertakes to send the original letter of instructions to the Administrator and the Fund, and Subscriber agrees to keep each of them indemnified against any loss of any nature whatsoever arising to any of them as a result of any of them acting upon facsimile instructions. The Administrator and the Fund may rely conclusively upon and shall incur no liability in respect of any action taken upon any notice, consent, request, instructions or other instrument believed in good faith to be genuine or to be signed by properly authorized persons.

For corporate entities, please provide an authorized signatory list which must include the name(s) and specimen signature(s) of the person(s) who are authorized by Subscriber to give and receive instructions between the Fund and Subscriber.

g.   Redemption Payments.   Until further notice from Subscriber to the Fund, signed by any authorized person listed above, redemption or other payments by the Fund to Subscriber should be wired only to Subscriber and only as follows (please print or type):

Bank name: BANCA PRORIO SPA ████████████

Bank address: CORSO ITALIA 49 — 20122 MILAN

ABA/CHIPS/BIC Codes: _____

Account name: ████████████████

Account number: ████████████████

For further credit: _____

    h.   Financial Institution Wiring/Paying Subscription Monies.

Name: _____

Address: _____

Name of account at financial institution being debited for subscription

payment: _____

Number of such account: _____

    i.   Execution. In witness whereof, Subscriber has executed this Agreement on
the date set forth below:

Date: 25th July, 2007

For individuals

Print name: _____

Signature: _____

For entities

Print name: ████████████████

Print name of authorized signatory: ████████████

Print title of █████████

Signature: ████████████

**EXHIBIT B-1**

REDACTED WITH REDACT-IT

## SHORT FORM SUBSCRIPTION AGREEMENT

**THIS APPLICATION IS TO BE USED ONLY BY EXISTING REGISTERED SHAREHOLDERS OF FAIRFIELD SIGMA LIMITED PURCHASING ADDITIONAL SHARES IN THE SAME REGISTERED NAME. IT MAY NOT BE USED BY NEW SUBSCRIBERS.**

The undersigned Subscriber (1) is an existing shareholder in Fairfield Sigma Limited ("Fund"), (2) has previously delivered a fully executed Subscription Agreement to the Fund, and (3) desires to subscribe for additional shares in the Fund. By executing in the space below, the undersigned shareholder hereby (1) requests that the Fund accept this short form subscription in lieu of completing an entirely new Subscription Agreement for the additional shares, (2) reaffirms each and every representation and covenant made by the undersigned in the original Subscription Agreement as of the date hereof, subject only to the changed information set forth below, and (3) represents that if the Subscriber is an entity, the person executing this Agreement has the full power and authority under the Subscriber's governing instruments and has been authorized to do so and the Subscriber has the full power and authority under its governing instruments to acquire shares of the Fund.

Please contact the Administrator prior to sending documents or funds to ascertain whether the Fund is accepting additional capital. New Subscription Information:

Subscriber:

Contribution Date: _____ 22|10 _____, 2007

Additional Contribution Amount: 150,000.00 EUR

Changes to Subscription Agreement: [X] None
[ ] Yes, as follows:

_____

IN WITNESS WHEREOF, the undersigned has executed this Subscription Agreement on this 22 day of OCTOBER 200_.

**Corporate, Partnership, Trust or Account Subscribers**     **Individual Subscribers**

Name of Entity (Print)                           Name (Print)

By: _____

Signature                                        Signature

Name (Print)                                     Name of Joint Purchaser, If Any (Print)

RR-5

████████████████████

Title                                    Signature _____

Telephone:  ████████████              Telephone:  _____

Fax:  _____          Fax:  _____

E-mail:_____

SUBSCRIPTION ACCEPTED AS OF _____, 200_.

FAIRFIELD SIGMA LIMITED

By:    _____

Name: _____

Title: _____

RR-6

████████████████████████████████

**EXHIBIT C**

*Private Placement Memorandum*

### FAIRFIELD SENTRY LIMITED

*A British Virgin Islands International Business Company*

*Securities Offered: Redeemable, Voting Shares*

*Minimum Investment per Subscriber: U.S. $100,000*

*Purchase Price per Share: Net Asset Value per Share*

**Investment Manager**
*Fairfield Greenwich (Bermuda) Ltd.*

**Administrator**
*Citco Fund Services (Europe) B.V.*

**Placement Agent**
*Fairfield Greenwich Limited*

*SHARES OF THE FUND MAY BE OFFERED TO PERSONS WHO ARE NEITHER CITIZENS NOR RESIDENTS OF THE UNITED STATES AND TO A LIMITED NUMBER OF UNITED STATES INVESTORS CONSISTING OF PENSION AND PROFIT SHARING TRUSTS, CHARITIES AND OTHER TAX-EXEMPT ENTITIES.*

*THE SHARES OFFERED HEREBY ARE SPECULATIVE AND INVOLVE A HIGH DEGREE OF RISK. THEY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES LAWS OF ANY JURISDICTION AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF SUCH LAWS. THE SHARES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE FUND'S ARTICLES OF ASSOCIATION. THE SHARES HAVE NOT BEEN APPROVED OR DISAPPROVED BY ANY REGULATORY AUTHORITY, NOR HAS ANY SUCH AUTHORITY PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM.*

*The date of this Private Placement Memorandum is as of August 14, 2006.*

**Fairfield Greenwich (Bermuda) Ltd.**

**COMMODITY POOL OPERATOR NO-ACTION RELIEF**

THE INVESTMENT MANAGER HAS FILED A CLAIM OF EXEMPTION FROM REGISTRATION AS A COMMODITY POOL OPERATOR ("CPO") WITH THE UNITED STATES COMMODITY FUTURES TRADING COMMISSION ("CFTC") IN CONNECTION WITH PRIVATE INVESTMENT FUNDS WHOSE PARTICIPANTS ARE ACCREDITED INVESTORS, AS DEFINED IN REGULATION D UNDER THE SECURITIES ACT OF 1933, CERTAIN FAMILY TRUSTS AND CERTAIN PERSONS AFFILIATED WITH THE INVESTMENT MANAGER. AT ALL TIMES, THE FUND WILL UTILIZE FUTURES SUCH THAT EITHER (1) NO MORE THAN 5% OF ITS ASSETS ARE USED TO ESTABLISH COMMODITY INTEREST POSITIONS OR (2) THE NOTIONAL VALUE OF ITS COMMODITY INTEREST POSITIONS DOES NOT EXCEED 100% OF THE FUND'S LIQUIDATION VALUE.

UNLIKE A REGISTERED CPO, THE INVESTMENT MANAGER IS NOT REQUIRED TO DELIVER A DISCLOSURE DOCUMENT AND A CERTIFIED ANNUAL REPORT TO PARTICIPANTS IN THE FUND. THE CFTC HAS NOT REVIEWED OR APPROVED THIS OFFERING OR ANY DISCLOSURE DOCUMENT FOR THE FUND.

FSL00001162

FSL00001161

## CERTAIN GENERAL INFORMATION

The Shares offered hereby (the "Shares") will be issued only on the basis of the information in this Private Placement Memorandum and any attachments hereto (the "Memorandum").   No other information about Fairfield Sentry Limited (the "Fund") has been authorized.  Any investment in the Fund on the basis of information that is not contained, or which is inconsistent with, the information herein shall be solely at your risk.  The delivery of this Memorandum does not imply that any information herein is correct at any time after the date hereof.

You should inform yourself of the legal requirements and tax consequences within the countries of your residence or domicile for the purchase, holding or sale of the Shares, and any foreign exchange restrictions.  Shares that are bought by persons not entitled to hold them in accordance with the provisions herein may be compulsorily redeemed.  No Shares may be transferred without the prior written consent of the Directors.

The distribution of this Memorandum may be restricted by law in certain countries.  You must inform yourself of and observe any such restrictions.  You should review the Country-Specific Notices contained herein for any applicable notices for your countries of residence or domicile.   This Memorandum does not constitute an offer or solicitation to any person in any jurisdiction in which the offer or solicitation is not authorized, or to any person to whom it is unlawful to make the offer or solicitation.

No person is authorized to give any information with respect to the Fund unless authorized by the Directors.  This Memorandum supersedes any written or verbal information relating to the Fund.

You should not construe this Memorandum as legal or investment advice.  You should consult your own attorneys, accountants and other advisers regarding this investment.

This Memorandum describes certain documents relating to this investment, including various executed and unexecuted documents and certain statutes, rulings and regulations.  Such summaries do not purport to be complete and are qualified in their entirety by reference to the full text of those documents, statutes, rulings and regulations.

You and your investment representatives are invited to ask questions of and to obtain additional information from the Administrator (Citco Fund Services (Europe) B.V.) or Investment Manager (Fairfield Greenwich (Bermuda) Ltd.) concerning the Fund, including additional information to verify the completeness or accuracy of the information in this Memorandum.

All references herein to $ are to United States dollars.

FSL00001163

FSL00001161

The Fund is incorporated as an International Business Company under the International Business Companies Act of the British Virgin Islands. The Fund constitutes a "professional fund" as defined in the Mutual Funds Act, 1996 (as amended) of the British Virgin Islands (the "BVI Act") and as such is required to be and is recognized as a "professional fund" under the provisions of the BVI Act. Such recognition does not entail supervision of the investment performance or portfolio of the Fund by the Financial Services Commission of the British Virgin Islands (the "BVI"), which accepts no responsibility for the financial soundness of the Fund or the correctness of any statements or opinions expressed herein. There is no financial obligation or compensation scheme imposed on or by the Financial Services Commission of the BVI in favor of or available to the investors in the Fund.

As an entity regulated under the BVI Act, the Fund will be subject to the supervision of the Financial Services Commission in the BVI, which is authorized by the BVI Act to direct the Fund to furnish information or provide access to any records, books or other documents which it deems necessary to ascertain compliance with the BVI Act or any regulations made under the BVI Act.

The BVI Act provides that the Fund's certificate of recognition may be cancelled if, among other things, the Fund has breached the BVI Act or any regulations or codes of conduct, or conditions of its certificate, has been convicted of an offense, is carrying on business in a manner detrimental to its investors or to the public interest, or is declared bankrupt or is being wound up or dissolved.

Because the Fund is a professional fund under the BVI Act, whose shares are listed on the Irish Stock Exchange, the Shares may be held only by persons who are "professional investors" within the meaning of the BVI Act and the Irish Stock Exchange, and on the basis that the initial investment in the Fund by each of its shareholders is not less than $100,000. A professional investor is any person whose ordinary business involves, whether for his own account or for the account of others, the acquisition or disposal of property of the same kind as the property, or a substantial part of the property, of the Fund (in this case, investment instruments), or who has signed a declaration that he, whether individually or jointly with his spouse, has a net worth in excess of $1,000,000, or, if an institution, $5,000,000 or its equivalent in any other currency, and that he consents to being treated as a professional investor. In addition, in order to comply with rules of the Irish Stock Exchange, an investor will have to represent that he has knowledge and expertise in financial matters sufficient to evaluate the risks involved in an investment in the Fund, that he is aware of such risks and can bear the loss of the entire investment.

This Memorandum may not be reproduced or used for any other purpose other than making an investment in the Fund. Any distribution of this Memorandum in whole or in part, or the divulgence of any of its contents, is unauthorized. By accepting delivery of this Memorandum, you agree to return it to the Fund if you do not invest.

FSL00001164

FSL00001161

## TABLE OF CONTENTS

Page

CERTAIN GENERAL INFORMATION ................................................................................................ iii

FUND DIRECTORY ........................................................................................................................ vi

MANAGEMENT OF THE FUND AND OTHER RELATIONSHIPS ........................................................ 6

INVESTMENT POLICIES ................................................................................................................ 9

OFFERING OF THE SHARES .......................................................................................................... 11

FEES, COMPENSATION AND EXPENSES ........................................................................................ 14

BANK, CUSTODIAN AND BROKERAGE ........................................................................................ 16

ADMINISTRATOR, REGISTRAR AND TRANSFER AGENT ............................................................. 17

RISK FACTORS ............................................................................................................................ 17

POTENTIAL CONFLICTS OF INTEREST .......................................................................................... 22

DESCRIPTION OF SHARES ............................................................................................................ 23

DIVIDEND POLICY ...................................................................................................................... 23

TRANSFERS, REDEMPTIONS AND TERMINATION ........................................................................ 23

ANTI-MONEY LAUNDERING REGULATIONS ............................................................................... 25

ANTI-MONEY LAUNDERING POLICIES ........................................................................................ 25

TAX CONSIDERATIONS AND EXCHANGE CONTROL AND ERISA ............................................. 27

LEGAL MATTERS ........................................................................................................................ 32

MISCELLANEOUS ........................................................................................................................ 32

COUNTRY-SPECIFIC NOTICES ...................................................................................................... 36

APPENDIX A        INVESTMENT MANAGERS FORM ADV PART II

APPENDIX B        SUBSCRIPTION DOCUMENTS

FSL00001165

FSL00001161

## FUND DIRECTORY

| | |
|---|---|
| THE FUND | Fairfield Sentry Limited<br>c/o Codan Trust Company (B.V.I.) Ltd.<br>P.O. Box 3140<br>Romasco Place, Wickhams Cay<br>Road Town, Tortola<br>British Virgin Islands |
| INVESTMENT MANAGER | Fairfield Greenwich (Bermuda) Ltd.<br>12 Church Street<br>Suite 606<br>Hamilton, Bermuda<br>Telephone: 441-292-5401<br>Facsimile: 441-292-5413 |
| PLACEMENT AGENT | Fairfield Greenwich Limited<br>c/o Offices of Charles Adams, Ritchie & Duckworth<br>Second Floor, Zephyr House, Mary Street<br>P.O. Box 709<br>George Town, Grand Cayman<br>Cayman Islands |
| ADMINISTRATOR; REGISTRAR AND TRANSFER AGENT | Citco Fund Services (Europe) B.V.<br>Telestone 8 -Teleport<br>Naritaweg 165<br>1043 BW Amsterdam<br>The Netherlands<br>Telephone: (31-20) 572-2850<br>Facsimile: (31-20) 572-2610 |
| U.S. COUNSEL | Law Offices of Andrew E. Goldstein<br>488 Madison Avenue, 16th Floor<br>New York, New York 10022<br>USA |
| BRITISH VIRGIN ISLANDS COUNSEL | Conyers Dill & Pearman<br>Romasco Place, Wickhams Cay 1<br>P.O. Box 3140<br>Road Town, Tortola<br>British Virgin Islands |
| AUDITORS | PricewaterhouseCoopers<br>Marten Meesweg 25<br>3068 AV Rotterdam<br>Amsterdam<br>The Netherlands |

FSL00001166

FSL00001161

CUSTODIAN BANK

Citco Bank Nederland, N.V. Dublin Branch
Custom House Plaza, Block 6
International Financial Services Centre
P.O. Box 6639
Dublin 1
Ireland

DEPOSITORY

Citco Global Custody N.V.
Telestone 8 – Teleport
Naritaweg 165
1043 BV Amsterdam
The Netherlands
Telephone: (31-20) 572-2200
Telecopier: (31-20) 572-2625

FSL00001167

FSL00001161

# SUMMARY

*The following Summary is intended to highlight certain basic information which is set forth more fully elsewhere in this Private Placement Memorandum and in the Memorandum of Association and Articles of Association of the Fund. This should be read in conjunction with such detailed information.*

## THE OFFERING

| | |
|---|---|
| **Issuer** | Fairfield Sentry Limited (the "Fund") is organized as an international business company under the laws of the Territory of the British Virgin Islands ("BVI"). The registered office of the Fund is located in the BVI. |
| **Securities Offered** | The Fund's redeemable, voting shares (the "Shares") were offered on November 30, 1990 at an initial offering price of U.S. $200 per Share and thereafter have been offered at a price equal to the Net Asset Value (as hereinafter defined) as of the opening of business on the date of issuance. |
| **Offerees** | Shares may be offered only to experienced and sophisticated investors who are neither citizens nor residents of the United States ("Non-U.S. Persons") and to a limited number of United States investors that are tax-exempt entities ("U.S. Tax Exempt Investors"). See "OFFERING OF THE SHARES". |
| **Minimum Subscription** | The minimum initial subscription per investor is U.S. $100,000. Following his initial investment, a shareholder may make additional investments in amounts of not less than U.S. $50,000. |
| **Maximum Capitalization** | The Fund will not accept a subscription tendered at a time when the number of its outstanding Shares is 10,000,000. |
| **Subscription Procedures** | It is preferable that subscriptions be made by wire transfer. However, subscriptions may be made by mail if necessary. Subscriptions received during any monthly period prior to the third to the last business day of the month will ordinarily be accepted, subject to the sole discretion of the Investment Manager (as defined below), as of the first business day of the following monthly period, i.e., subscriptions received between December 28 and January 28, assuming the 29th-31st are business days, will be accepted as of February 1. Subscriptions will become irrevocable to the subscriber on the third to the last business day of the month in which such subscription is received by the Fund. |

1

FSL00001168

FSL00001161

| | |
|---|---|
| **Solicitation of Subscriptions** | The Fund may use the assistance of affiliated or unaffiliated placement agents and money managers, including FGL (as defined below), to place the Shares. Such placement agents and intermediaries may charge their clients a placement fee of up to 5% of the total amount of the subscription for Shares sold with their assistance, and/or share in the fees earned from the Fund, which they may rebate to their clients. Placement fees charged directly by FGL will not exceed 3%. In certain instances, the Fund may deduct the amount of the placement fee from the subscription amount to pay to the placement agent and such amounts will not constitute part of the assets of the Fund. |
| **Business Objective** | The Fund seeks to obtain capital appreciation of its assets principally through the utilization of a nontraditional options trading strategy described as "split strike conversion", to which the Fund allocates the predominant portion of its assets. See "INVESTMENT POLICIES". |
| **Investment Manager** | Fairfield Greenwich (Bermuda) Ltd. ("FGBL" or the "Investment Manager"), a corporation organized under the laws of Bermuda, serves as the Fund's investment manager. It is the wholly-owned subsidiary of Fairfield Greenwich Limited which previously served as the investment manager of the Fund and currently serves as the Fund's Placement Agent. Jeffrey H. Tucker, Walter M. Noel, Jr. and Andres Piedrahita are the main principals of FGL. Mr. Noel is also a Director of the Fund (see "MANAGEMENT OF THE FUND AND OTHER RELATIONSHIPS"). Effective April 20, 2006, FGBL registered as an investment adviser with the United States Securities and Exchange Commission pursuant to the Investment Advisers Act of 1940, as amended. The Investment Manager has claimed an exemption under Commodity Futures Trading Commission ("CFTC") Rule 4.13(a)(3) from registration with the CFTC as a commodity pool operator and, accordingly, is not subject to certain regulatory requirements with respect to the Fund that would otherwise be applicable absent such an exemption. |
| **Placement Agent** | Fairfield Greenwich Limited, an exempted company incorporated under the laws of the Cayman Islands "FGL" or the "Placement Agent"), is the Fund's Placement Agent. FGL oversees the marketing of the Shares and is an affiliate of the Investment Manager. FGBL and FGL are member companies of the Fairfield Greenwich Group ("FGG"), which was established in 1983 and had, as of May 1, 2006, more than $9.0 billion employed in alternative asset management funds. Throughout its history, FGG has internally managed its own alternative asset funds and selectively identified external managers for affiliations where it serves as a managerial and distribution partner. |
| **Directors** | Walter M. Noel, Jr., Jan R. Naess and Peter P. Schmid are the Directors of the Fund. Mr. Noel is also a Director of FGL, an affiliate of the Investment Manager. |

2

| | |
|---|---|
| **Citco** | Citco Fund Services (Europe) B.V., an affiliate of The Citco Group Ltd., acts as administrator, registrar and transfer agent for the Fund. The Fund's escrow account is maintained at Citco Bank Nederland, N.V. Dublin Branch. Pursuant to a custodial services agreement, Citco Bank Nederland N.V., Dublin Branch and Citco Global Custody N.V. have agreed to provide custodial services to the Fund. |
| **Dividend Policy** | It is anticipated that the Fund will not declare any dividends; rather, income will be reinvested and will be reflected in the Net Asset Value of the Shares. |

## SALE AND REDEMPTION OF SHARES

| | |
|---|---|
| **Redemption at the Option of a Shareholder** | A shareholder of the Fund, on fifteen (15) calendar days' notice, may cause his Shares to be redeemed as of the last business day (being any day not a Saturday or a Sunday, that is not a public holiday or a day on which banks are generally authorized or obliged by law or regulation to close in the Netherlands, the Republic of Ireland, Canada or the United States of America) of any month. There is no minimum period of time that Shares must be held in order for a shareholder to redeem his Shares. |
| **Compulsory Redemption** | The Fund reserves the right to call all or a part of a shareholder's Shares for redemption at any time. This right will only be exercised as to Shares where the continued holding of which would result in regulatory, pecuniary, legal, taxation, or material administrative disadvantage for the Fund or the shareholders as a whole. |
| **Sales** | Subscriptions received during any monthly period prior to the third to the last business day of the month will ordinarily be accepted, subject to the sole discretion of the Investment Manager, as of the first business day of the following monthly period, i.e., subscriptions received between December 28 and January 28 will be accepted as of February 1. Subscriptions will become irrevocable to the subscriber on the third to the last business day of the month in which such subscription is received by the Fund. |
| **Exchange Listing** | The Fund was admitted to the Official List of the Irish Stock Exchange in Dublin, Ireland on January 12, 1995 and has been issued SEDOL number 0330934. It is unlikely that a public trading market will develop for the Fund's shares and none has developed to date. Shareholder redemption rights are not affected by this listing. |

3

FSL00001170

FSL00001161

## COMPENSATION AND EXPENSES

**Expenses**

The Fund will bear, for each year, all continuing offering costs; all ordinary legal and auditing fees; all registrar, transfer agent and administration fees; all insurance expenses; all expenses in maintaining the Fund's office and all other expenses incurred in the operation of the Fund, if any, including any legal and auditing fees that relate to extraordinary circumstances, such as tax examinations or litigation involving the Fund, as well as all fees and all ordinary and necessary expenses related to the Fund's investment and trading activities.

FGL will pay the Investment Manager a fixed fee for providing certain managerial services to the Fund, as more fully described in the Investment Manager's Form ADV Part II, which is attached to this Memorandum as Appendix B.

**Management Fee**

FGL will receive a monthly management fee in an amount equal to one-twelfth of one percent (0.0833%) (approximately 1% per annum) of the Net Asset Value of the Fund before Performance Fees (as hereinafter defined) as calculated at the opening of the first day of the month, which will include subscriptions for Shares accepted by the Fund as of the first day of such month. This fee is payable monthly in arrears. FGL may pay a portion of the Management Fee to an affiliate of FGL and the Investment Manager in consideration of the affiliate providing certain administrative services and back-office support to the Fund.

**Performance Fee**

FGL will receive, for each calendar quarter, a performance fee (the "Performance Fee") with respect to each Share outstanding during such calendar quarter in an aggregate amount equal to 20% of the net realized and net unrealized appreciation in the Net Asset Value of each Share in such calendar quarter ("Net Profits"), if any; subject to reduction in connection with certain offsets with respect to each Share, provided, however, that if a Share has a loss chargeable to it during any calendar quarter or quarters ("Unrecouped Loss") and during any succeeding calendar quarters there are Net Profits allocable to the Share, there will be no Performance Fee payable with respect to such Share until the amount of the Unrecouped Loss allocated to such Share has been recouped. If Shares are redeemed during a calendar quarter, the Unrecouped Loss relating to such Shares will be reduced in the same proportion as the reduction in the Net Asset Value of such Shares caused by such redemption. Shares which are either purchased or redeemed during a calendar quarter shall be subject to the payment of a Performance Fee only for the portion of the calendar quarter during which such Shares were outstanding. The Performance Fee will only be paid on "new appreciation" in the Fund's Net Asset Value allocable to the Shares.

4

FSL00001171

FSL00001161

In certain circumstances, the Performance Fee may be reduced for particular calendar quarters and the amount of the reduction repaid in subsequent calendar quarters (see "FEES, COMPENSATION AND EXPENSES – Performance Fee").

FGL and the Fund may enter into an agreement pursuant to which FGL may elect to defer payment of all or a portion of its Management Fees and/or Performance Fees.

5

FSL00001172

FSL00001161

## THE FUND

Description

The Fund was incorporated in the Territory of the British Virgin Islands ("BVI") as an international business company on October 30, 1990. The registered office of the Fund is located in Road Town, Tortola, British Virgin Islands.

Shareholders will have the right to redeem part or all of their Shares as of the last business day of any month (See "TRANSFERS, REDEMPTIONS AND TERMINATION").

## MANAGEMENT OF THE FUND AND OTHER RELATIONSHIPS

The Fund

The Fund's Board of Directors has overall management responsibility for the Fund, including establishing investment, dividend and distribution policy, and having the authority to select and replace the Fund's administrator, registrar and transfer agent, custodian, any officers of the Fund and other persons or entities with management or administrative responsibilities to the Fund. None of the Fund's Directors own an equity interest in the Fund.

The Directors of the Fund are as follows:

**Walter Noel** has over thirty years of experience in the investment business. From 1959 to 1972, he was associated with the Management Services Division of Arthur D. Little Inc., an industrial and management consulting firm. From 1972 to 1974, Mr. Noel was President of Bahag Banking Ltd., in Lausanne, Switzerland. In 1974, Mr. Noel became Vice President of the International Private Banking Department of Citibank, N.A., where he remained until 1977 when he became Senior Vice President of the International Private Banking Department of Chemical Bank. Mr. Noel remained at Chemical Bank until 1983, where he shared primary responsibility for developing its international private banking business. He founded The Fairfield Greenwich Group, an affiliate of the Fund's investment manager, Fairfield Greenwich (Bermuda) Ltd., in 1983. Since founding The Fairfield Greenwich Group, Mr. Noel has been a director or general partner for a variety of its funds.

**Jan R. Naess** received a Bachelor of Arts degree in 1981 and a Masters degree in Economics in 1983 from the University of Oslo. From 1983 to 1987, he was employed in the Economic Research Department of R.S. Platou a.s. in Oslo, a leading shipbrokering firm. In 1987, Mr. Naess joined with R.S. Platou a.s. to form R.S. Platou Asset Management a.s., which was instrumental in the sale and purchase of 15 bulk carriers from 1987 to 1989. In 1989, Mr. Naess liquidated his interest in R.S. Platou Asset Management a.s. and formed PAN Shipping Ltd., a shipowning/operating and project development fund, which merged with Northern Navigation International Limited ("NNI") in 1991. Mr. Naess is a Vice President of NNI, a Liberian corporation, which is in the business of investing in and managing shipping assets.

**Peter P. Schmid** received a Swiss Federal Certificate of Capacity in 1968. Mr. Schmid was employed by Credit Suisse from 1968 to 1986. From 1975 to 1977, he was employed in Credit Suisse's International Portfolio Management Department in Zurich. After a brief posting in Credit Suisse's New York office, Mr. Schmid was in charge of the bank's representative office in Rio de Janeiro from 1977 to 1984. From 1984 to 1986, Mr. Schmid was Vice President in charge of Credit Suisse's Latin American Private Banking Desk in Geneva. Mr. Schmid has been an independent investment adviser since April 1986. He

6

FSL00001173

FSL00001161

is President of Peter Schmid (Portfolio Management), P. Schmid & Associés, S.A. and Armor S.A. Mr. Schmid is a Director of Inter Asset Management Inc.

## The Investment Manager

The Fund's investment manager is Fairfield Greenwich (Bermuda) Ltd., a corporation organized under the laws of Bermuda ("FGBL" or the "Investment Manager"), which was incorporated on June 13, 2003. It is responsible for the management of the Fund's investment activities, the selection of the Fund's investments, monitoring its investments and maintaining the relationship between the Fund and its custodian, administrator, registrar and transfer agent. The Investment Manager is the wholly-owned subsidiary of Fairfield Greenwich Limited, an exempted company organized under the laws of the Cayman Islands ("FGL"), which previously served as the investment manager of the Fund and currently serves as the Fund's Placement Agent.

FGBL and FGL are member companies of the Fairfield Greenwich Group ("FGG"), which was established in 1983 and had, as of May 1, 2006, more than $9.0 billion employed in alternative asset management funds. Throughout its history, FGG has internally managed its own alternative asset funds and selectively identified external managers for affiliations where it serves as a managerial and distribution partner.

The Investment Manager and its affiliates currently serve as investment or administrative manager to more than twenty funds, and have exclusive distribution arrangements with several others. FGG maintains its principal office in New York, with a significant presence in London and Bermuda. Marketing and client support offices exist in other locations in the United States, Europe, and Latin America. FGG's London entity is licensed and subject to the supervision of the United Kingdom Financial Services Authority (the "FSA"). An affiliate of FGG is registered as a broker-dealer in the United States.

Effective April 20, 2006, the Investment Manager registered as an investment adviser with the Securities and Exchange Commission under the Investment Advisers Act of 1940, as amended. In addition, the Investment Manager has claimed an exemption under Commodity Futures Trading Commission ("CFTC") Rule 4.13(a)(3) from registration with the CFTC as a commodity pool operator and, accordingly, is not subject to certain regulatory requirements with respect to the Fund that would otherwise be applicable absent such an exemption.

Pursuant to the Investment Management Agreement between the Fund and the Investment Manager, the Investment Manager and the Placement Agent is not liable for any error of judgment or for any loss incurred by the Fund, except a loss resulting from willful malfeasance, bad faith or gross negligence in the performance of its duties under such agreement. The Investment Management Agreement further provides that the Investment Manager, the Placement Agent, their directors, officers, employees, agents and counsel will be indemnified and held harmless by the Fund against any and all claims, liability and expenses for any loss suffered by the Fund arising out of any act or omission of such indemnified party, except to the extent an act or omission constitutes willful misconduct or reckless disregard of the duties of such indemnified party. The Investment Management Agreement may be terminated by either party thereto on ten days' written notice prior to the end of any calendar quarter.

## The Placement Agent

Fairfield Greenwich Limited ("FGL" or the "Placement Agent"), the Fund's placement agent, oversees the marketing of the Shares.

FSL00001174

FSL00001161

The Fund may use the assistance of affiliated or unaffiliated placement agents and money managers, including FGL, to place the Shares. Such placement agents and intermediaries may charge their clients a placement fee of up to 5% of the total amount of the subscription for Shares sold with their assistance, and/or share in the fees earned from the Fund, which they may rebate to their clients. Placement fees charged directly by FGL will not exceed 3%. In certain instances, the Fund may deduct the amount of the placement fee from the subscription amount to pay to the placement agent and such amounts will not constitute part of the assets of the Fund.

Following is biographical information on the founders, principal officers and certain other key employees of FGG:

**Walter M. Noel, Jr.** His background is summarized above under "MANAGEMENT OF THE FUND AND OTHER RELATIONSHIPS - The Fund".

**Andres Piedrahita** founded Littlestone Associates in 1991, which merged with FGG in 1997. Mr. Piedrahita directs FGG's European and Latin American activities. Mr. Piedrahita has over fifteen years of experience in the investment business. Prior to the merger, Mr. Piedrahita was the Director and President of Littlestone Associates, Inc. (1991-1997). He was previously a Vice President at Shearson Lehman Hutton, specializing in money management consulting for non-U.S. institutions and individuals (1987-1990). Before joining Shearson, Mr. Piedrahita was a financial consultant with Prudential Bache Securities Inc. in New York (1981-1987). He received his Bachelor of Arts degree from Boston University's School of Communications.

**Jeffrey Tucker** has over thirty years of experience in investment related businesses. Mr. Tucker was an attorney with the Securities and Exchange Commission from 1970 to 1978. From 1975 to 1978, he was an Assistant Regional Administrator of the SEC's New York regional office, with supervisory responsibility for approximately half of its enforcement program. Mr. Tucker entered private practice in 1978 as a partner in the law firm Tucker, Globerman & Feinsand, where he remained until 1987. He specialized in securities and transactional matters, with a principal focus on limited partnership offerings. Mr. Tucker entered the securities industry in 1987 as a general partner of Fred Kolber & Co. ("Kolber"), a registered broker-dealer. At Kolber, Mr. Tucker was responsible for the development and administration of the firm's private investment funds. FGG began its association with Kolber at that time as a marketing agent, and the firms subsequently merged activities. Throughout FGG's development, Mr. Tucker has been responsible for directing its business and operational development and has been a director or general partner for a variety of its investment funds. Mr. Tucker received his Bachelor of Arts degree from Syracuse University and his JD from Brooklyn Law School.

FGL and certain of its principals have beneficial interests in the Fund.

The backgrounds of the Directors and key officers of the Investment Manager are set forth below:

**Andres Piedrahita** is a Director and the President of the Investment Manager. His background is set forth above under "MANAGEMENT OF THE FUND AND OTHER RELATIONSHIPS-The Investment Manager".

**Brian Francoeur** is a Director of the Investment Manager. Mr. Francoeur joined Citco Fund Services (Bermuda) Limited in 2001 and currently serves as its Managing Director. From 1999 until joining Citco, he was the Chief Financial Officer of CCS Group Limited, a computer cabling and network company based in Hamilton, Bermuda, and from 1997 to 1999 was a Senior Portfolio Manager with Olympia Capital (Bermuda) Limited, a fund administration company in Bermuda. Mr. Francoeur qualified as a chartered accountant in 1994 and was employed by Ernst & Young in Bermuda from 1995 to 1997.

8

FSL00001161

**Amit Vijayvergiya** is Managing Director of the Investment Manager and focuses on manager selection and risk management for the Fund. He has been employed by the Investment Manager since 2003. Mr. Vijayvergiya has over 12 years of experience in asset management, risk management and operations research. Prior to joining the Investment Manager, from 2000 to 2003, Mr. Vijayvergiya managed MAV Hedge Advisors, a family office investing in traditional and alternative investment managers. From 1998 to 2000, he was the General Manager of LOM Asset Management ("LOM AM"), where he oversaw the management of $160 million in assets. At LOM AM, Mr. Vijayvergiya structured and managed several multi-manager funds and served on the firm's management and investment committees. He began his business career in 1994 with a position in operations research at Canadian National Railways. Mr. Vijayvergiya received a Masters in Business Administration from Schulich School of Business at York University, a Bachelors of Science in Statistics from the University of Manitoba and a Bachelors of Arts in Economics from the University of Western Ontario. Mr. Vijayvergiya holds the Chartered Financial Analyst designation and the Financial Risk Manager certification.

## INVESTMENT POLICIES

The Fund seeks to obtain capital appreciation of its assets principally through the utilization of a nontraditional options trading strategy described as "split strike conversion", to which the Fund allocates the predominant portion of its assets. Set forth below is a description of the "split strike conversion" strategies ("SSC Investments").

The establishment of a typical position entails (i) the purchase of a group or basket of equity securities that are intended to highly correlate to the S&P 100 Index, (ii) the purchase of out-of-the-money S&P 100 Index put options with a notional value that approximately equals the market value of the basket of equity securities, and (iii) the sale of out-of-the-money S&P 100 Index call options with a notional value that approximately equals the market value of the basket of equity securities. An index call option is out-of-the-money when its strike price is greater than the current price of the index; an index put option is out-of-the-money when the strike price is lower than the current price of the index. The basket typically consists of between 35 to 50 stocks in the S&P 100 Index.

The primary purpose of the long put options is to limit the market risk of the stock basket at the strike price of the long puts. The primary purpose of the short call options is to largely finance the cost of the put hedge and to increase the stand-still rate of return.

This position in its entirety could be characterized as a bull spread which, presuming the stock basket highly correlates to the S&P 100 Index, is intended to work as follows: (i) it sets a floor value below which further declines in the value of the stock basket is offset by gains in the put options, (ii) it sets a ceiling value beyond which further gains in the stock basket are offset by increasing liability of the short calls, and (iii) defines a range of potential market gain or loss, depending on how tightly the options collar is struck.

The degree of bullishness of the strategy can be expressed at implementation by the selection of the strike prices in the S&P 100 Index put and call options. The farther away the strike prices are from the price of the S&P 100 Index, the more bullish the strategy.

The Split Strike Conversion strategy is implemented by Bernard L. Madoff Investment Securities LLC ("BLM"), a broker-dealer registered with the Securities and Exchange Commission, through accounts maintained by the Fund at that firm. The accounts are subject to certain guidelines which, among other things, impose limitations on the minimum number of stocks in the basket, the minimum market

9

FSL00001176

FSL00001161

capitalization of the equities in the basket, the minimum correlation of the basket against the S&P 100 Index, and the permissible range of option strike prices. Subject to the guidelines, BLM is authorized to determine the price and timing of stock and option transactions in the account. The services of BLM and its personnel are essential to the continued operation of the Fund, and its profitability, if any.

The options transactions executed for the benefit of the Fund may be effected in the over-the-counter market or on a registered options exchange.

## Other Investments

The Investment Manager, in its sole and exclusive discretion, may allocate a portion of the Fund's assets (never to exceed, in the aggregate, 5% of the Fund's Net Asset Value, measured at the time of investment) to alternative investment opportunities other than its "split strike conversion" investments (the "Non-SSC Investments"). It is anticipated that the Non-SSC Investments will be allocated to new investment vehicles managed by experienced management teams establishing themselves in new investment businesses ("Emerging Managers"), with no single allocation exceeding $50 million, measured at the time of investment. These arrangements may include "lock-up" provisions of varying durations of these assets in such investments, subject to early release for breach of risk control or performance guidelines, or for cause. FGBL and the Fund generally share in fees received by Emerging Managers from investors other than the Fund. The Fund will pay fees with respect to the Emerging Managers at a rate that will not exceed the Fund's rate of fees (in certain cases, this may be accomplished by FGBL subsidizing, from its own moneys, the fees charged on these assets by Non-SSC Investment managers). Non-SSC Investments may also include strategic allocations to experienced managers in established funds.

In certain circumstances, the Performance Fee may be reduced for particular calendar quarters for certain Non-SSC Investment Losses. See "POTENTIAL CONFLICTS OF INTEREST" and "FEES, COMPENSATION AND EXPENSES –Performance Fee".

In order to ensure that the Fund will not be subject to United States federal income taxation on trading gains from the disposition of certain investments, it is expected that the Fund will not invest in any "United States real property interest" (including, for example, certain interests in any U.S. Corporation that is a "United States real property holding corporation"), as such terms are defined under the U.S. Internal Revenue Code of 1986 (the "Code") and the Treasury Regulations promulgated thereunder. (See "TAX CONSIDERATIONS AND EXCHANGE CONTROL.")

The Fund may invest some of its assets in short-term U.S. government obligations, certificates of deposit, short-term high grade commercial paper and other money market instruments, including repurchase agreements with respect to such obligations, money market mutual funds and short term bond funds. In order to ensure that substantially all of the interest earned by the Fund will not be subject to United States federal withholding taxes, any investment in an obligation of a U.S. person or entity (other than in certificates of deposits in banks) primarily will be in an instrument (i) which is issued and purchased at a discount from its face amount, which is not otherwise interest bearing, and which has a term of no more than 183 days from the date of issuance or (ii) which is in registered form and which is issued after July 18, 1984. (See "TAX CONSIDERATIONS AND EXCHANGE CONTROL.")

## Investment Restrictions

The Fund will observe the investment restrictions set forth in the Fund's Articles of Association which are summarized here:

FSL00001177

FSL00001161

a)  no more than 10% of the Net Asset Value of the Fund will be invested in the securities of any one issuer (other than any government or governmental agency);

b)  the Fund may not hold more than 10% of the issued securities of any one class of securities in any issuer (other than any government or governmental agency);

c)  no more than 10% of the gross assets of the Fund may be exposed to the creditworthiness or solvency of a single counterparty (other than any government or governmental agency), in each case calculated at the time of investment;

d)  no more than 10% of the Net Asset Value of the Fund may be invested in securities of countries where immediate repatriation rights are not available;

e)  the Fund will not invest in the securities of any issuer if the directors and officers of the Fund and the Investment Manager collectively own in excess of 5% of such securities;

f)  the Fund will not take or seek to take legal or management control of the issuer of underlying investments;

g)  the Fund will adhere to the general principle of diversification in respect of all of its assets;

h)  the Fund will not invest directly in real property;

i)  the Fund will not make any loans (except to the extent that the acquisition of any investment in securities or commodity interests described herein may constitute a loan) to any one issuer (other than any government or governmental agency) except with the consent of the custodian of the Fund's assets; and

j)  no more that 10% of the Net Asset Value of the Fund will be invested in physical commodities.

The investment restriction set out in (c) above will not apply to transactions with any counterparty which advances full and appropriate collateral to the Fund in respect of such transactions.

**OFFERING OF THE SHARES**

The Fund is offering up to 10,000,000 Shares. The initial offering price was U.S. $200 per Share on November 30, 1990. The Shares are currently offered at a price equal to the Net Asset Value per Share (as hereinafter defined) as of the opening of business on the date of issuance.

Shares may be offered only to experienced and sophisticated investors who are neither citizens nor residents of the United States ("Non-U.S. Investors") and to a limited number of United States investors that are tax-exempt entities ("U.S. Tax-Exempt Investors").

The minimum initial purchase by each subscriber is U.S. $100,000. The Fund may reject any subscription, in whole or in part, in its discretion. All subscriptions, once made, are irrevocable to the subscriber.

All proceeds from the sale of Shares will be received by the Fund in trust and will be deposited by the Fund into a segregated interest bearing account in the Fund's name at the Fund's bank, Citco Bank Nederland N.V. Dublin Branch. There are no underwriting arrangements with respect to the offering of Shares. The Fund may use the assistance of affiliated or unaffiliated placement agents and money

11

FSL00001178

FSL00001161

managers, including FGL, to place the Shares. Such placement agents and intermediaries may charge their clients a placement fee of up to 5% of the total amount of the subscription for Shares sold with their assistance, and/or share in the fees earned from the Fund, which they may rebate to their clients. Placement fees charged directly by FGL will not exceed 3%. In certain instances, the Fund may deduct the amount of the placement fee from the subscription amount to pay to the unaffiliated placement agent and such amounts will not constitute part of the assets of the Fund.

The Fund will offer its Shares on a continuous basis at a price equal to its Net Asset Value as of the opening of business on the date of issuance of such Shares. Subscriptions received during any month prior to the third to the last business day of the month will be accepted, subject to the sole discretion of the Investment Manager, as of the first business day of the following month. Thus, for example, subscriptions received between January 1 and January 28 shall be accepted as of February 1, assuming the 29th-31st are business days. The Fund reserves the right, in its discretion, to accept any subscription prior to such first day. Subscriptions shall become irrevocable to the subscriber on the third to the last business day of the month in which such subscription is received by the Fund.

The Fund was admitted to the Official List of the Irish Stock Exchange, Dublin, Ireland on January 12, 1995 and has been issued SEDOL number 0330934. It is unlikely that a trading market in the Fund's Shares will develop and none has developed to date. The listing does not affect shareholder redemption rights.

### Net Asset Value Defined

The Net Asset Value of the Shares is the value of the Fund's assets as calculated in accordance with the International Financial Reporting Standards and the Memorandum and Articles of Association of the Fund.

Notwithstanding the foregoing:

(i)     in the case of extraordinary circumstances which warrant a different valuation of any securities, such as an inability to liquidate existing positions, such securities will be valued at such prices as the Directors shall determine; and

(ii)    the amount of any distribution or dividend made shall be a liability of the Fund from the day when the distribution or dividend is declared until it is paid.

All decisions on the valuation of assets and liabilities and determination of Net Asset Value shall be made by the Fund's Board of Directors.

Net Asset Value per Share is defined as the Net Asset Value divided by the number of Shares then outstanding.

The Net Asset Value of the Fund will be calculated on a monthly basis by the Fund's administrator, Citco Fund Services (Europe) B.V., which will promptly notify the Irish Stock Exchange of the results of each such Net Asset Value calculation.

Pursuant to the Fund's Articles of Association, the Fund may suspend the calculation of its Net Asset Value for the whole or any part of any period:

(a)    during which any stock exchange or over-the-counter market on which any significant portion of the investments of the Fund are listed, quoted, traded or dealt

12

FSL00001179

FSL00001161

in is closed (other than customary weekend and holiday closing) or trading on any such stock exchange or over-the-counter market is restricted; or

(b)    when circumstances exist as a result of which in the opinion of the Directors it is not reasonably practicable for the Fund to dispose of investments or as a result of which any such disposal would be materially prejudicial to the shareholders; or

(c)    when a breakdown occurs in any of the means normally employed in ascertaining the value of investments or when for any other reason the value of any of the investments or other assets of the Fund cannot reasonably or fairly be ascertained; or

(d)    during which the Fund is unable to repatriate funds required for the purpose of making payments due on redemption of Shares or during which any transfer of funds involved in the realization or acquisition of investments or payments due on redemptions of Shares cannot in the opinion of the Directors be effected at normal rates of exchange.

Any such suspension shall take effect at such time as the Directors shall declare but not later than the close of business on the business day next following the declaration, and thereafter there shall be no determination of the Net Asset Value per Share of the Fund until the Directors shall declare the suspension at an end, except that such suspension shall terminate in any event on the first business day on which (a) the condition giving rise to the suspension shall have ceased to exist; and (b) no other condition under which suspension is authorized under the Fund's Articles of Association shall exist. Each declaration by the Directors pursuant to this paragraph shall be consistent with such official rules and regulations (if any) relating to the subject matter thereof as shall have been promulgated by any authority having jurisdiction over the Fund and as shall be in effect at the time. To the extent not inconsistent with such official rules and regulations, the determination of the Directors shall be conclusive. Whenever the Directors shall declare a suspension of the determination of the Net Asset Value per Share, then as soon as may be practicable after any such declaration, the Directors shall give notice to all shareholders stating that such declaration has been made. At the end of any period of suspension as aforementioned the Directors shall give notice to all shareholders stating that the period of suspension has ended.

### Who Should Purchase/Subscription Procedure

This offering is limited to non-U.S. persons and to a limited number of United States investors that are tax-exempt entities all of whom have the ability to speculate in high risk securities and for whom such a purchase is suitable in light of such person's financial condition. The Fund will require as a condition to the acceptance of a subscription that the subscriber represent and warrant that he has a net worth in excess of U.S. $1,000,000.

Prospective subscribers should inform themselves as to the legal requirements within their own countries for the purchase of Shares and any foreign exchange or tax considerations relevant to such purchase.

As part of the Fund's responsibility for the prevention of money laundering, the Fund will require detailed verification of a prospective investor's identity to be included with its subscription application.

An individual will be required to produce a certified copy of a passport or identification card. Corporate applicants will be required to produce a certified copy of the certificate of incorporation (and any change of name), memorandum and articles of association (or other documents evidencing the existence of the

13

legal entity), the register of directors or an excerpt from the trade register held at the relevant chamber of commerce and the signatory card verifying the authority of officers to sign on behalf of the corporate entity. Trusts and other entities which subscribe to the Fund must demonstrate organizational documents which verify the existence of the entity and which verify the authority of one or more signatories to sign subscriptions on behalf of the entity.

The Fund reserves the right to request such further information as is necessary to verify the identity of an applicant. In the event of delay or failure by the applicant to produce any information required for verification purposes, the Fund may refuse to accept the application and the subscription moneys relating thereto.

In order to subscribe for Shares, subscribers must complete and sign the Subscription Agreement included in the Subscription Documents which accompany this Private Placement Memorandum (the "Memorandum"), and mail them to Fairfield Sentry Limited, c/o Citco Fund Services (Europe) B.V., Telestone 8-Teleport, Naritaweg 165, 1043BW Amsterdam, The Netherlands; fax number (31-20) 572-2610. Subscription funds should be wire transferred to the Fund's escrow account at:

>*Intermediary Bank - Field 56*
>HSBC Bank, New York
>BIC: MRMDUS33
>Fed Wire: 021001088

>*Account with Institution - Field 57*
>Account Name: Citco Bank Nederland N.V. Dublin Branch
>Account Number: 000306487
>BIC: CITCIE2D

>*Beneficiary Customer - Field 59*
>Beneficiary Account Name: Fairfield Sentry Limited
>Beneficiary International Bank Account Number (IBAN):
>IE23CITC00000035810501

>*Reference - SWIFT Field 70*: Name and Full Address of Subscriber:

## FEES, COMPENSATION AND EXPENSES

**Expenses**

The Fund will bear, for each year, all continuing offering costs; all ordinary legal and auditing fees; all registrar, transfer agent and administration fees; all insurance expenses; all expenses in maintaining the Fund's office and all other expenses incurred in the operation of the Fund, if any, including any legal and auditing fees that relate to extraordinary circumstances, such as tax examinations or litigation involving the Fund, as well as all fees and all ordinary and necessary expenses related to the Fund's investment and trading activities.

FGL will pay the Investment Manager a fixed fee for providing certain managerial services to the Fund, as more fully described in the Investment Manager's Form ADV Part II, which is attached to this Memorandum as Appendix B.

14

FSL00001181

FSL00001161

**Management Fee**

FGL will receive for each month a management fee (the "Management Fee") in an amount equal to one-twelfth of one percent (0.0833%) (approximately 1% per annum) of the Net Asset Value of the Fund before Performance Fees (as hereinafter defined) as calculated at the open of the first day of the month (which would include any subscriptions for Shares accepted by the Fund as of the first day of such month). The Management Fee is payable monthly in arrears. FGL may pay a portion of the Management Fee to an affiliate of FGL and the Investment Manager in consideration of the affiliate providing certain administrative services and back-office support to the Fund.

**Performance Fee**

FGL will receive, for each calendar quarter, a performance fee (the "Performance Fee") in an amount equal to 20% of the net realized and net unrealized appreciation in the Net Asset Value of each Share in such calendar quarter ("Net Profits"), if any; provided, however, that if a Share has a loss chargeable to it during any calendar quarter or quarters ("Unrecouped Loss") and during any succeeding calendar quarters there are Net Profits allocable to the Share, there will be no Performance Fee payable with respect to such Share until the amount of the Unrecouped Loss allocated to such Share has been recouped. If Shares are redeemed during a calendar quarter, the Unrecouped Loss relating to such Shares will be reduced in the same proportion as the reduction in the Net Asset Value of such Shares caused by such redemption. No Share will be subject to the payment of a Performance Fee until such Share has recouped its loss carryover, i.e., until the Net Asset Value of such Shares is at least as high as the previous highest Net Asset Value per Share. IN OTHER WORDS, PERFORMANCE FEES WILL ONLY BE PAID ON "NEW APPRECIATION" IN THE NET ASSET VALUE OF THE SHARES. Shares which were either purchased or redeemed during a calendar quarter will be subject to the payment of a Performance Fee only for the portion of the calendar quarter during which such shares were outstanding. FGL will reduce any Performance Fees otherwise payable to it by offsetting it against an amount equal to the "Shared Cash Flow Amount" as defined in "POTENTIAL CONFLICTS OF INTEREST", below) attributable to Non-SSC Investments.

Notwithstanding the foregoing, in the event that, as at the end of any calendar year, the aggregate amount of original investments in Non-SSC Investment vehicles exceeds the aggregate net asset value of the Fund's interests in Non-SSC Investment vehicles (before deduction of the Fund's share of fees payable by the Non-SSC Investment vehicles) (such excess being the "Non-SSC Investment Loss") FGL will reduce its Performance Fee payable at subsequent quarter-end by an amount equal to the Non-SSC Investment Loss. The portion of the Performance Fee that is reduced to cover the Non-SSC Investment Loss will be carried forward. In the event that the Non-SSC Investment Loss is, in part or in whole, subsequently recouped by Non-SSC Investment vehicles, the Fund will pay FGL such portion of the Performance Fee that was previously reduced to cover Non-SSC Investment Losses in addition to Performance Fees otherwise payable for any quarter.

Pursuant to its agreement with the Fund, FGL may elect to defer payment of all or a portion of its Performance Fee.

**Salaries and Other Personnel Expenses**

Mr. Noel will not be compensated for serving as a Director of the Fund, but he and representatives of the Investment Manager will be reimbursed by the Fund for any out-of-pocket expenses they may incur in attending meetings of the Board of Directors or of shareholders. The Directors not affiliated with the Investment Manager, of which there are at the present time two, will each be paid a fee of $25,000 per

FSL00001182

FSL00001161

annum by the Fund together with his out-of-pocket expenses in attending meetings of the Board of Directors or of shareholders.

## BANK, CUSTODIAN AND BROKERAGE

### Bank and Custodian

Pursuant to a custodian agreement (the "Custody Agreement"), Citco Bank Nederland N.V., Dublin Branch ("Citco Bank") and Citco Global Custody N.V. ("Citco Depository") have agreed to provide custodial services to the Fund. Citco Bank shall, to the extent it deems necessary, appoint and Citco Depository shall make use of sub-custodians with respect to certain securities of the Fund. Citco Bank will not be liable for any act or omission or for the solvency of such sub-custodians, provided Citco Bank exercised due care in selecting the sub-custodians. Citco Depository will not be liable for any act or omission or for the solvency of such sub-custodians. Citco Bank will exercise reasonable skill, care and diligence in the selection of a suitable sub-custodian and shall be responsible to the Fund for the duration of the sub-custody arrangement for satisfying itself as to the ongoing suitability of the sub-custodian to provide custodial services to the Fund. Citco Bank will maintain an appropriate level of supervision over the sub-custodian(s) and make appropriate enquiries, periodically, to confirm that the obligations of the sub-custodian(s) continue to be competently discharged.

As a result of the Investment Manager's selection of Bernard L. Madoff Investment Securities, LLC ("BLM") as execution agent of the split strike conversion strategy, substantially all of the Fund's assets will be held in segregated accounts at BLM, a U.S. registered broker-dealer and qualified custodian. Accordingly, BLM will be a sub-custodian of the Fund.

The underlying assets of the Non-SSC Investments are held pursuant to custodial arrangements with other qualified entities.

### Brokerage

It is expected that the Investment Manager and the Non-SSC Investment managers will generally allocate brokerage business on the basis of best available execution and in consideration of such brokers' provision of brokerage and research services. The Investment Manager and the Non-SSC Investment managers may also utilize brokers with which the Non-SSC Investment managers are affiliated.

In selecting brokers or dealers to execute transactions, the Investment Manager and the Non-SSC Investment managers typically will not solicit competitive bids and will not have an obligation to seek the lowest available commission cost. It generally will not be the practice of the Investment Manager or the Non-SSC Investment managers to negotiate "execution only" commission rates, and thus the Fund may be deemed to be paying for research and other services provided by the broker which are included in the commission rate. Research furnished by brokers may include, but is not limited to, written information and analyses concerning specific securities, companies or sectors; market, financial and economic studies and forecasts; financial publications; statistic and pricing services, as well as discussions with research personnel, along with hardware, software, data bases and other technical and telecommunication services and equipment utilized in the investment management process. Research services obtained by the use of commissions arising from such transactions may be used by the Investment Manager or the Non-SSC Investment managers in their other investment activities.

The Investment Manager and the Non-SSC Investment managers may also be paying for services other than research that are included in the commission rate. These other services may include, without limitation, office space, facilities and equipment; administrative and accounting support; supplies and

16

FSL00001183

FSL00001161

stationery; telephone lines, usage and equipment and other items which might otherwise be treated as an expense of the Investment Manager or the Non-SSC Investment managers. To the extent the Investment Manager or the Non-SSC Investment managers utilize commissions to obtain items which would otherwise be an expense of the Investment Manager or the Non-SSC Investment managers, such use of commissions in effect constitutes additional compensation to the Investment Manager or the Non-SSC Investment managers, as the case may be. Certain of the foregoing commission arrangements are outside the parameters of Section 28(e) of the Securities Exchange Act of 1934, as amended which permits the use of commissions or "soft dollars" to obtain "research and execution" services. Finally, since commission rates are generally negotiable, selecting brokers on the basis of considerations which are not limited to applicable commission rates may result in higher transaction costs than would otherwise be obtainable.

## ADMINISTRATOR, REGISTRAR AND TRANSFER AGENT

Pursuant to an administration agreement, dated February 20, 2003, between Citco Fund Services (Europe) B.V. ("Citco") and the Fund (the "Administration Agreement"), Citco serves as the administrator for the Fund, under the overall direction of the Fund's Board of Directors. As administrator, Citco has the responsibility for furnishing the day-to-day administrative services which the Fund may require, such as: accounting services; maintaining the Fund's books and records; preparation of reports and accounts; calculation of Net Asset Value and fees; communications with shareholders and/or governmental bodies; paying the Fund's expenses; providing suitable facilities and procedures for handling dividends and distributions (if any) and the orderly liquidation and dissolution of the Fund, if required. In consideration of its services, Citco receives a monthly fee based on the Net Asset Value of the Fund as of the last business day of each month at a commercially reasonable rate.

To the extent that Citco relies on information supplied by the Fund, any investee fund of the Fund or any brokers engaged by the Fund, in connection with making any of the aforementioned calculations, Citco's liability for the accuracy of such calculations is limited to the accuracy of its computations. Citco shall not be liable for the accuracy of the underlying data provided to it.

Pursuant to the Administration Agreement, the Fund has agreed to indemnify Citco, its subsidiaries, affiliates, directors and other officers, shareholders, servants, employees, agents and permitted delegates under the Administration Agreement, against any and all liabilities, obligations, losses, judgments and expenses of any kind or nature whatsoever (collectively, the "Claims" and, individually, a "Claim") which may be imposed on, incurred by or asserted against any of them arising (other than by reason of negligence, bad faith, fraud or dishonesty on the part of Citco or such other indemnified party) out of the provision of services under the Administration Agreement. Similarly, Citco will indemnify the Fund from and against any Claim which arises directly out of the negligence, bad faith, fraud or dishonesty of its obligations on the part of Citco in connection with its provision of services under the Administration Agreement. The Administration Agreement may be terminated by either party on 90 days' prior written notice; provided, however, that the Administration Agreement may be terminated forthwith by notice in writing by either party if the other party (a) commits a material breach of the Administration Agreement and fails to cure such breach within 30 days after notice from the non-defaulting party; or (b) enters into involuntary liquidation or if a receiver is appointed over any of its assets.

## RISK FACTORS

The purchase of Shares in the Fund involves substantial risks that are incident to the Fund's allocation of assets to SSC and Non-SSC Investments.

17

FSL00001184

FSL00001161

1.    **Trading Risks**.  Substantial risks are involved in the trading of equity securities and options.  Market movements can be volatile and are difficult to predict.  U.S. Government activities, particularly those of the Federal Reserve Board, can have a profound effect on interest rates which, in turn, substantially affect securities and options prices, as well as the liquidity of such markets.  Politics, recession, inflation, employment levels, trade policies, international events, war and other unforeseen events can also have significant impact upon the prices of securities and options.  A variety of possible actions by various government agencies also can inhibit the profitability of the Fund's business or can result in losses.  Such events, which can result in huge market movements and volatile market conditions, create the risk of catastrophic losses for the Fund.

Various techniques are employed to attempt to reduce a portion of the risks inherent in the trading strategies utilized by or on behalf of the Fund.  The ability to achieve the desired effect through a particular technique is dependent upon many factors, including the liquidity of the market at the desired time of execution.  Thus, substantial risk remains that the techniques employed by or on behalf of the Fund cannot always be implemented or effective in reducing losses.  At various times, the markets for exchange-listed equity securities and options and/or other securities may be "thin" or illiquid, making purchases or sales of securities at desired prices or in desired quantities difficult or impossible.  In addition, options prices are extremely volatile.  The volume and volatility of trading in these markets depends in part on general public interest and public opinion concerning economic conditions as well as the liquidity provided by market-makers and specialists.  The liquidity of the market may also be affected by a halt in trading on a particular futures or securities exchange or exchanges.  Illiquid markets may make it difficult to get an order executed at a desired price.

2.    **Trading Strategies May Not be Successful**.  There can be no assurance that any trading method employed by or on behalf of the Fund will produce profitable results, and the past performance of the Fund is not necessarily indicative of its future profitability.  In that regard, certain of the managers receiving Non-SSC Investment allocations may not have investment records compiled while managing assets on their own.  Profitable trading is often dependent on anticipating trends or trading patterns.  In addition, markets experiencing random price fluctuations, rather than defined trends or patterns, may generate a series of losing trades.  There have been periods in the past when the markets have been subject to limited and ill-defined price movements, and such periods may recur.  Any factor which may lessen major price trends (such as governmental controls affecting the markets) may reduce the prospect for future trading profitability.  Any factor which would make it difficult to execute trades, such as reduced liquidity or extreme market developments resulting in prices moving the maximum amount allowed in a single day, could also be detrimental to profits or cause losses.

3.    **Dependence upon Principals and Key Employees of the Investment Manager and BLM**.  The services of the Investment Manager's principals and key employees and BLM are essential to the continued operations of the Fund.  If their services were no longer available, their absence would have an adverse impact upon an investment in the Fund. The key employees of the Investment Manager will allocate a small portion of the Fund's assets between and among the Non-SSC Investment managers.  The Fund will be dependent on the continued presence of these key employees in connection with identification of the recipients of these allocations and the monitoring of the Non-SSC Investments.

4.    **Incentive Compensation**.  The payment of a percentage of the Fund's net profits to FGL (an affiliate of the Investment Manager) may create an incentive for the Investment Manager to cause the Fund to make investments that are riskier or more speculative than would be the case if this payment were not made.  Since the fee is calculated on a basis that includes unrealized appreciation of assets, such fee may be greater than if it were based solely on realized gains.

18

FSL00001185

FSL00001161

In addition, the Non-SSC Investment managers will generally be compensated through incentive arrangements. Under these arrangements, the Non-SSC Investment managers may benefit from appreciation, including unrealized appreciation in the value of the Non-SSC Investment, but may not be similarly penalized for decreases in the value of such investment vehicle. Such fee arrangements may create an incentive for the Non-SSC Investment managers to make purchases that are unduly risky or speculative. In most cases, however, the Fund anticipates that it will invest in Non-SSC Investments where the manager is required to recoup prior losses before any performance-type fee is payable in respect of current gains.

To the extent that an accrual for an incentive fee is reflected in the net asset value of shares of a Non-SSC Investment vehicle, then if such accrual is reversed by the Non-SSC Investment vehicle as a result of subsequent depreciation, all of the Shares of the Fund will benefit from the reversal of the accrual, including Shares purchased after the Non-SSC Investment vehicle made the accrual. Further, to the extent that the Performance Fee is reduced by the Non-SSC Investment Loss amount, then if such reduction is repaid in part or in whole by the Fund due to recoupment of losses by Non-SSC Investment vehicles, the Net Asset Value of all Shares of the Fund then outstanding will be reduced, including Shares purchased after the reduction of the Performance Fee.

5.  **Conflicts of Interest**. The Investment Manager and the Non-SSC Investment managers receiving allocations of the Fund's assets, and their respective principals and affiliates, are presently affiliated with and may in the future form and manage, or provide other services to, other investment entities (including without limitation investment partnerships, investment companies and mutual funds) with substantially the same or different objectives as those of the Fund. They may also make investments in securities for their own accounts. In addition, the Investment Manager functions as the investment manager for private investment funds in addition to the Fund. Such activities could detract from the time that the Investment Manager and its principals allocate to the affairs of the Fund. The Investment Manager will obtain certain business and financial benefits from the Fund's investments in the Non-SSC Investments which may result in a conflict of interest between the Investment Manager and the Fund in the selection of, and allocation of assets between and among, the Non-SSC Investments. See "POTENTIAL CONFLICTS OF INTEREST".

6.  **Custodian/Clearing Firm Loss or Insolvency**. If a custodian or clearing firm utilized in connection with accounts maintained on behalf of the Fund were to become insolvent, the Fund could have some or all of these positions closed out without its consent. In addition, all of the Fund's positions may not be closed out under these circumstances, yet delays or other difficulties may be experienced in attempting to close out or exercise options positions. Widespread insolvency among clearing firms that clear securities options could also impair the ability of the Options Clearing Corp. (the "OCC") to honor all exercises, in spite of the system of safeguards which the OCC has in place. Such widespread insolvency, or of a particular custodian, could result in substantial losses to the Fund.

7.  **Competition**. The securities industry, including market-making activities and transactions effected in connection therewith, are very competitive. Competition from other persons or entities involved in activities similar to those of the Fund can restrict the ability of the Fund to acquire positions at the prices deemed most beneficial to its overall trading strategies. Many such competing persons or entities are better capitalized and have more experience in trading than the Fund. Moreover, the widespread use of computer-assisted trading systems for trading strategies can alter trading patterns or affect execution of trades to the detriment of the Fund.

8.  **Over-the-Counter Options Transactions.** Options transactions effected on behalf of the Fund may utilize the over-the-counter market for their execution. Trading index options in

19

FSL00001186

FSL00001161

the over-the-counter market is subject to counter-party risk and is without the protections afforded by transactions effected through the OCC, a registered options exchange.

9.    **Option Buyer's Risk of Loss of Entire Investment**.  An option is a wasting asset which becomes worthless when the option expires.  As the remaining life of an option shortens with the passage of time, its value is reduced until it reaches zero upon expiration.  This means that the option buyer who neither sells it in the secondary market nor exercises it prior to expiration will lose his entire investment in the option.

10.    **Arbitrage Transactions**.  Among the many risks of arbitrage transactions are that two or more buy or sell orders may not be able to be executed simultaneously at the desired prices, resulting in a loss being incurred on both sides of a multiple trade arbitrage transaction.  Also, the transaction costs of arbitrage transactions can be especially significant because separate costs are incurred on each component of the combination.  Consequently, a substantial favorable price movement may be required before a profit can be realized.

11.    **Combination Transactions**.  At various times, the Fund may engage in spreads or other combination options transactions involving the purchase and sale of related options contracts, in various combinations.  Such transactions are considerably more complex than the purchase or writing of a single option.  The following are among the many risks of combination option transactions: the difficulty that may be involved in attempting to execute simultaneously two or more buy or sell orders at the desired prices; the possibility that a loss could be incurred on both sides of a multiple options transaction; and the possibility of significantly increased risk exposure resulting from the hedge against loss inherent in most spread positions being lost as a result of the assignment of an exercise to the short leg of a spread while the long leg remains outstanding.  Also, the transaction costs of combination options transactions can be especially significant because separate costs are incurred on each component of the combination.  This can have the effect of requiring a substantial favorable price movement before a profit can be realized.

12.    **Trading Decisions Based on Trend Analysis**.  Certain of the trading decisions of the Fund are based on the use of computer pricing models to identify apparently overpriced or underpriced options in relationship to an assumed norm.  In addition, analyses of price and other fluctuations over time may be relied upon which utilize charts and computers in order to discern and predict trends.  Trading based on such analyses is subject to the risks that options premiums will not increase or decrease as predicted by the analyses, or that trades dictated by the analyses may not be executed in time to take advantage of the price disparities.  This latter risk is likely to materialize when numerous market makers use similar analyses, all of which dictate the desirability of executing identical or similar contracts.  In the past, there have been periods without identifiable trends and, presumably, such periods will continue to occur.  Trading models or analyses that depend upon the forecasting of trends will not be profitable if there are not identifiable trends of the kind that the models or analyses seek to follow.  Any factor which would make it more difficult to execute trades in accordance with the models or analyses signals, such as a significant lessening of liquidity in a particular market, would also be detrimental to profitability.

13.    **Assignment of Puts or Calls**.  Substantial losses may result under certain circumstances if a hedged position becomes a long or short position due to the assignment of the short put or short call portion of the hedged position.  Under normal market conditions, the remaining portion of the previously hedged portion may be liquidated or otherwise adjusted to limit exposure to price changes.  Suspension of trading of the option class or underlying securities followed by a price gap at the reopening of trading might result in substantial losses.  The same would be true given an illiquid market such as that of October 1987.

20

FSL00001187

FSL00001161

14.    **Prohibition of Exercise Rights**.  The options markets have the authority to prohibit the exercise of particular options. If a prohibition on exercise is imposed at a time when trading in the option has also been halted, holders and writers of that option will be locked into their positions until one of the two restrictions has been lifted.

15.    **Absence of Regulatory Oversight**.  While the Fund may be considered similar to an investment company, it does not intend to register as such under the U.S. Investment Company Act of 1940, as amended, in reliance upon an exemption available to privately offered investment companies, and, accordingly, the provisions of that Act (which, among other matters, require investment companies to have disinterested directors, require securities held in custody to at all times be individually segregated from the securities of any other person and marked to clearly identify such securities as the property of such investment company and regulate the relationship between the adviser and the investment company) will not be afforded to the Fund or the shareholders.  Effective April 20, 2006, the Investment Manager registered as an investment adviser under the Advisers Act.

16.    **Risks of Leverage**.  The Non-SSC Investment vehicles in which the Fund invests may borrow funds in connection with their investment strategies.  A particular Non-SSC Investment vehicle may not be subject to any limitation in the amount of its borrowings, and the amount of borrowings that the Non-SSC Investment vehicle may have outstanding at any time may be substantial in comparison to its capital.

The use of leverage may provide the Non-SSC Investment vehicle with the opportunity for greater capital appreciation, but at the same time will increase the Non-SSC Investment vehicle's, and indirectly the Fund's, exposure to capital risk and higher current expenses.  Moreover, if the assets of the Non-SSC Investment vehicle are not sufficient to pay the principal of, and interest on, the Non-SSC Investment vehicle's debt when due, the Fund could sustain a total loss of its investment in the Non-SSC Investment vehicle.

17.    **Possibility of Misappropriation of Assets**.  When the Fund invests utilizing the "split strike conversion" strategy or in a Non-SSC Investment vehicle, it will not have custody of the assets so invested.  Therefore, there is always the risk that the personnel of any entity with which the Fund invests could misappropriate the securities or funds (or both) of the Fund.

18.    **Sole Proprietor Non-SSC Investment Managers**.  Some of the Non-SSC Investment vehicles to which the Fund may allocate capital may consist of investment operations with only one principal.  In such cases, if that individual's services became unavailable to the Non-SSC Investment vehicle, the Fund might sustain losses.

19.    **Experience of Non-SSC Investment Managers**.  While certain of the Non-SSC Investment managers have had extensive experience in trading securities generally and within their specific investment strategies, they may have had little experience in investing and trading on behalf of a pooled investment vehicle, in utilizing certain of the investment strategies to be employed on behalf of the Fund or in managing an account as large as that anticipated for the Non-SSC Investments.  In that regard, as the assets of the Non-SSC Investment vehicles increase, it is not known what effect, if any, this will have on the trading strategies utilized on their behalf or their investment results.

20.    **Emerging Managers**.  As the Non-SSC Investment vehicles generally will be in an early stage of formation or operation, this can pose a number of operational and other issues.  For example, in its early stages the Non-SSC Investment manager may have little capital available to cover expenses and, accordingly, may have difficulty attracting qualified personnel.  Competing investment

21

FSL00001161

managers have a larger number of qualified management and technical personnel and benefit from a larger capital base.

21.    **Lack of Liquidity**.    Certain of the Fund's investments in the Non-SSC Investments will be subject to lock-up provisions any of which will limit the ability of the Fund to withdraw capital from such investment.  While such lock-up period may be subject to early release for breach of risk control or performance guidelines or for cause, there can be no assurance that the Fund will not sustain additional losses while such lock-up period remains in effect.

22.    **Non-Disclosure of Positions**. In an effort to protect the confidentiality of its positions, the Fund generally will not disclose all of its positions to shareholders on an ongoing basis, although the Fund, in its sole discretion, may permit such disclosure on a select basis to certain shareholders, if it determines that there are sufficient confidentiality agreements and procedures in place.

23.    **Exchange Rate Risk**.  The Fund will maintain its assets in U.S. dollars.  The Net Asset Value per Share is determined in U.S. dollars.  Non-dollar investors are subject to possible reduction in the value of their Shares due to changes in the rate of exchange between the U.S. dollar and their native currency.  In addition, a hedge may be established in anticipation of new subscribers.  In the event such subscriptions are not made, the hedge position will be unwound and the transactions will be borne by the existing shareholders.

## POTENTIAL CONFLICTS OF INTEREST

The Investment Manager, the Non-SSC Investment managers and their respective affiliates, officers and employees may form and manage other investment entities (including without limitation investment partnerships, investment companies, mutual funds and offshore funds) and provide investment services to clients other than the Fund in the future with substantially the same or different objectives as those of the Fund.  They may also make investments in securities for their own accounts.  Such activities could detract from the time they allocate to the affairs of the Fund and negatively impact the Fund's investment opportunities.  Similarly, Messrs. Naess and Schmid, the non-affiliated Directors, have other business interests and will not devote their entire time to the Fund's affairs.

The Investment Manager and its related persons might have an incentive to favor one or more of their other clients over the Fund, for example with regard to the selection of certain investments for those clients because those clients might pay the Investment Manager more for its services than the Fund.  The Investment Manager and its related persons will act in a fair and reasonable manner in allocating suitable investment opportunities among their client and proprietary accounts.  No assurance can be given, however, that (i) the Fund will participate in all investment opportunities in which other client or proprietary accounts of such persons participate, (ii) particular investment opportunities allocated to client or proprietary accounts other than the Fund will not outperform investment opportunities allocated to the Fund, or (iii) equality of treatment between the Fund, on the one hand, and other client and proprietary accounts of such persons, on the other hand, will otherwise be assured.

In connection with the investment of Fund assets in Non-SSC Investments, the Investment Manager and its affiliates may obtain financial and business benefits, including but not limited to: (i) additional investment capacity in Non-SSC Investments, which may be made available to other clients of the Investment Manager, (ii) compensation from Emerging Managers in connection with placement of such additional investment capacity, and/or (iii) sharing in the equity or cash flows of the entire investment business (Fund and non-Fund related) of such Emerging Managers.  The Investment Manager, or an affiliate, will share with the Fund annually, through Performance Fee offset, an amount equal to the greater of (i) 50% of cash flows generated by equity held by the Investment Manager or an affiliate

22

FSL00001189

FSL00001161

thereof in the businesses of Emerging Managers or (ii) 10% of all revenues accruing to the Investment Manager or an affiliate thereof directly from its association with Non-SSC Investment vehicles (the "Shared Cash Flow Amount").  Despite this sharing, however, the arrangements described in this paragraph may result in a conflict of interest between the Investment Manager and the Fund.

Because the Fund was organized by affiliates of FGL, the fees paid by the Fund to FGL were not the result of arms-length negotiation.

The Fund may engage other placement agents and enter into other sales relationships to market the Fund. If a shareholder is introduced to the Fund by an agent, such shareholder should expect the agent to be paid by FGL for the introduction out of the fees FGL receives from the Fund. The agent will have an incentive to recommend that such shareholder remain an investor in the Fund, since the agent will likely be paid a portion of FGL's fees each year that the shareholder remains an investor.

Because Mr. Noel is a principal of FGL, an affiliate of the Investment Manager, as well as a Director of the Fund, he may have an incentive to take actions as a Director that favors the Investment Manager over the Fund.

Each service provider to the Fund shall pay regard to its obligation to act in the best interest of the Fund and the Directors of the Fund will ensure that all such potential conflicts of interest are resolved fairly and in the interest of the shareholders.  When allocating investment opportunities, the Investment Manager will ensure that all such investments are allocated in a fair and equitable manner.

## DESCRIPTION OF SHARES

The Fund is authorized to issue up to 10,000,000 shares in one class, with a par value of U.S. $.01.  The Fund has an authorized share capital of U.S. $100,000.  The Shares will be issued in registered form. Each Share, when issued, will be fully paid and non-assessable.

Holders of Shares are entitled to one vote per Share and will participate on a pro rata basis in the assets of the Fund on liquidation and in dividends and other distributions as declared.

## DIVIDEND POLICY

Since the business objective of the Fund is directed toward achieving capital appreciation, it is anticipated that the Fund will not declare any dividends or make any distributions to its shareholders.  Subject to the foregoing and to applicable law, the Fund's Board of Directors will have sole discretion in determining the amount and frequency of dividend distributions, if any.  Any distributions made will be in accordance with the policies of the Irish Stock Exchange, which provide that a dividend payment  may only be made out of the Fund's accumulated net income plus the net of accumulated realized and unrealized capital gains and accumulated net realized and unrealized capital losses.

## TRANSFERS, REDEMPTIONS AND TERMINATION

**Transfers**

NO SALE OR TRANSFER OF SHARES WILL BE PERMITTED WITHOUT THE FUND'S CONSENT; HOWEVER, SHARES MAY BE REDEEMED AS OF THE LAST DAY OF EACH MONTH ON FIFTEEN (15) CALENDAR DAYS' NOTICE TO THE FUND.

23

FSL00001190

FSL00001161

Any sale or transfer of a shareholder's entire interest in any Shares or any transfer of Shares by operation of law must be submitted to the Fund for consent and will not be effective until such consent is given by the Fund. Any other dealing with Shares by way of assignment, pledge, mortgage or otherwise is prohibited unless consented to by the Fund and any attempt to do so without first obtaining the consent of the Fund will constitute grounds for compulsory redemption of the Shares concerned. Such consent may only be withheld if the transfer would result in regulatory, pecuniary, legal, taxation or material administrative disadvantages for the Fund or its shareholders as a whole. Any application to record a transfer of Shares, including an application to record a transfer by operation of law, if not approved by the Fund within 30 days, also will be treated as an application to redeem the Shares in question as of the next permissible redemption date and will be subject to a processing charge per share of 2% of the Net Asset Value per Share. The processing charge will be retained by the Fund.

THE DISPOSITION OF SHARES TO U.S. PERSONS (INCLUDING U.S.TAX-EXEMPT INVESTORS AS DEFINED UNDER "OFFERING OF THE SHARES") WITHOUT THE PRIOR WRITTEN APPROVAL OF THE FUND IS EXPRESSLY PROHIBITED, AND THE FUND SHALL HAVE THE RIGHT TO COMPULSORILY AND IMMEDIATELY REDEEM ANY SHARES HELD FOR ANY REASON BY U.S. PERSONS.

### Redemptions at the Option of the Shareholders

A shareholder may cause part or all of his Shares to be redeemed as of the last business day (i.e., any day not a Saturday or a Sunday, that is not a public holiday or a day on which banks are generally authorized or obliged by law or regulation to close in the Netherlands, the Republic of Ireland, Canada or the United States of America) of any month, provided that the Fund shall be in receipt of written notice of redemption for at least fifteen (15) calendar days prior to such redemption date. In the Fund's discretion, a shareholder requesting redemption of part of his Shares may be required to redeem all of his Shares unless such shareholder notifies the Fund to cancel the redemption.

### Compulsory Redemption

The Fund reserves the right to make compulsory redemptions where the holding of Shares may result in regulatory, pecuniary, legal, taxation or material administrative disadvantages for the Fund or its shareholders as a whole. Except as set forth above, no processing charge will be imposed with respect to any Shares so compulsorily redeemed.

### Redemptions - General Information

Redemptions will be at the Net Asset Value per Share, subject to any applicable processing charge, as described above. If notice of intent to voluntarily redeem is not received by the Fund within the prescribed period of time, then, in the Fund's discretion, the redemption date may be deferred to the end of the next following permissible redemption period, unless the shareholder notifies the Fund to cancel the redemption and the Directors consent to such cancellation. With respect to a total redemption of Shares, except in the case of extraordinary circumstances, such as an inability to liquidate existing positions, or the default or delay in payments due the Fund from brokers, banks or other persons, payment on redemptions will be made within 30 days after the redemption date. The Fund will not pay interest to the redeeming shareholders on any payment.

Partial redemptions will be paid in full within 30 days after the redemption date.

Shareholders bear the risk of any decline in Net Asset Value from the date notice of intent to redeem is given until the redemption date. In addition, the Fund may temporarily suspend any redemption during

24

FSL00001191

FSL00001161

any period that the Fund has suspended the calculation of its Net Asset Value (see "OFFERING OF THE SHARES- Net Asset Value Defined"). Requests for redemption can be made by use of the form included in the Subscription Documents which accompany this Memorandum.

## Termination

The shareholders may, by a majority vote, elect to wind up and dissolve the Fund at any time. If the Fund's Board of Directors determines that it would be in the best interests of the Fund to wind up and dissolve the Fund at any time, it will recommend to the shareholders that they vote to do so, and will submit a plan of dissolution for approval by the shareholders.

## ANTI-MONEY LAUNDERING REGULATIONS

As part of the Fund's or Administrator's responsibility for the prevention of money laundering, the Investment Manager and its affiliates, subsidiaries or associates may require a detailed verification of a shareholder's identity, any beneficial owner underlying the account and the source of the payment.

The Investment Manager reserves the right to request such information as is necessary to verify the identity of a subscriber and the underlying beneficial owner of a subscriber's or a shareholder's Shares in the Fund. In the event of delay or failure by the subscriber or shareholder to produce any information required for verification purposes, the Investment Manager may refuse to accept a subscription or may cause the redemption of any such shareholder from the Fund. The Fund, without notice, may suspend the redemption rights of such shareholder if the Fund or the Investment Manager reasonably deems it necessary to do so to comply with anti-money laundering regulations applicable to the Fund, the Investment Manager or any of the Fund's other service providers.

Each subscriber and shareholder shall be required to make such representations to the Fund as the Fund and the Investment Manager shall require in connection with such anti-money laundering programs, including without limitation, representations to the Fund that such subscriber or shareholder is not a prohibited country, territory, individual or entity listed on the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC") website and that it is not directly or indirectly affiliated with, any country, territory, individual or entity named on an OFAC list or prohibited by any OFAC sanctions programs. Such shareholder shall also represent to the Fund that amounts contributed by it to the Fund were not directly or indirectly the proceeds of criminal conduct or derived from activities that may contravene U.S. federal, state or international laws and regulations, including anti-money laundering laws and regulations.

## ANTI-MONEY LAUNDERING POLICIES

To ensure compliance with statutory and other generally accepted principles aimed at the prevention of money-laundering, the Fund and/or the Administrator may require a detailed verification of a prospective investor's identity. Although the Fund and/or the Administrator reserve the right to request a detailed verification of a prospective investor's identity, a detailed verification should not be necessary if:

- the prospective investor makes a subscription payment from an account held in their own name at a Qualified Financial Institution (a "QFI"); or

- the prospective investor is introduced by a QFI and that QFI provides written assurance to the Fund and/or the Administrator that it has established the identity of the prospective investor and holds evidence of that identity.

25

FSL00001192

FSL00001161

A QFI is defined as a financial institution which is:

- established in a European Union (EU) member state and subject to the EU Money Laundering Directives; or

- established in one of the countries which make up the Financial Action Task Force ("FATF") and/or is subject to regulation which complies with the FATF Recommendations. Such countries are Argentina, Australia, Austria, Belgium, Brazil, Canada, Denmark, Finland, France, Germany, Greece, Hong Kong, Ireland, Italy, Japan, Luxembourg, Mexico, the Netherlands, New Zealand, Norway, Portugal, Russian Federation, Singapore, South Africa, Spain, Sweden, Switzerland, Turkey, the United Kingdom, and the United States.

Subscription payments will not be accepted unless made from an account held in the name of the prospective investor. In addition, prospective investors who DO NOT make the subscription payment from an account held at a QFI and who are NOT introduced by a QFI will be required to provide the following documentation, as relevant to their status.

**Individual Investors** will be required to provide the following information:

- full name;

- permanent address;

- a certified copy of their passport or national identity card;

- a bank reference letter; and

- verification of address.

**Partnerships** will be required to provide the following information:

- a mandate from the partnership authorizing the subscription and conferring authority on those persons executing the subscription agreement; and

- the identities of at least two partners and of all those authorized to issue instructions.

**Corporate entities** that are quoted on a stock exchange in an EU member country or in one of the QFI prescribed countries or that are known to be the subsidiary of such a quoted company will be required to provide the following information:

- the original or certified copy of the certificate of incorporation or similar document;

- a list of the directors' names, occupations, addresses and dates of birth; and

- properly authorized mandate of directors authorizing the subscription and conferring authority on those persons executing the subscription form.

Where the prospective investor to the transaction is a corporation that is a private company, the following additional information will need to be provided:

26

FSL00001193

FSL00001161

- certified passport copies or national identity card copies of at least two directors; and

- a list of names and addresses of shareholders holding 10% or more of the issued share capital of the company and in the case of individual shareholders, their occupations and dates of birth.

When a significant shareholder of a private company (25% or more) is a body corporate, information will need to be provided from the company regarding the ultimate beneficial ownership of that particular body corporate. If the ultimate beneficial owner(s) of that particular body corporate is (are) individual(s), such individual(s) will need to provide the information that is required from individual investors and outlined above.

Furthermore, subscriptions will be cross checked against lists held by various international agencies in order to establish that the persons or entities subscribing have not been blacklisted or wanted in connection with a criminal investigation. Such international agencies include the Bahamas Financial Intelligence Unit, the Central Bank of Ireland, the FBI, the Bank of England and the US Treasury Department's Office of Foreign Assets Control (OFAC). Other agencies will be consulted as and when appropriate.

Finally, it should be noted that redemption payments will only be paid to a bank account held in the name of the registered owner of the Shares and that any transferee will have to furnish the same information (and enter into a subscription agreement) which would be required in connection with a direct subscription in order for a transfer application to be considered by the Administrator.

Pending the provision of evidence satisfactory to the Administrator as to the identity of any prospective investor, the evidence of title in respect of Shares may be retained at the absolute discretion of the Administrator. If, within a reasonable period of time following a request for verification of identity, the Administrator has not received evidence satisfactory to it as aforesaid, it may, in its absolute discretion, refuse to allot the Shares applied for in which event application moneys will be returned without interest to the account from which such moneys were originally debited.

Financial institutions which have been duly qualified and authorized to exercise their activity in their respective countries as a bank and which are subject to internationally recognized anti money-laundering legislation may subscribe for Shares on behalf of their clients.

## TAX CONSIDERATIONS AND EXCHANGE CONTROL AND ERISA

**CIRCULAR 230 NOTICE. THE FOLLOWING NOTICE IS BASED ON U.S. TREASURY REGULATIONS GOVERNING PRACTICE BEFORE THE U.S. INTERNAL REVENUE SERVICE: (1) ANY U.S. FEDERAL TAX ADVICE CONTAINED HEREIN, INCLUDING ANY OPINION OF COUNSEL REFERRED TO HEREIN, IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING U.S. FEDERAL TAX PENALTIES THAT MAY BE IMPOSED ON THE TAXPAYER; (2) ANY SUCH ADVICE IS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS DESCRIBED HEREIN (OR IN ANY SUCH OPINION OF COUNSEL); AND (3) EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

THE DISCUSSION HEREIN IS FOR INFORMATIONAL PURPOSES ONLY AND IS A DISCUSSION PRIMARILY OF THE U.S. TAX CONSEQUENCES TO PROSPECTIVE

27

FSL00001194

FSL00001161

SHAREHOLDERS.    EACH PROSPECTIVE SHAREHOLDER SHOULD CONSULT ITS PROFESSIONAL TAX ADVISER WITH RESPECT TO THE TAX ASPECTS OF AN INVESTMENT IN THE FUND.  TAX CONSEQUENCES MAY VARY DEPENDING UPON THE PARTICULAR STATUS OF A PROSPECTIVE SHAREHOLDER.  IN ADDITION, SPECIAL CONSIDERATIONS (NOT DISCUSSED HEREIN) MAY APPLY TO PERSONS WHO ARE NOT DIRECT SHAREHOLDERS IN THE FUND BUT WHO ARE DEEMED TO OWN SHARES AS A RESULT OF THE APPLICATION OF CERTAIN ATTRIBUTION RULES.

The Fund has not sought a ruling from the U.S. Internal Revenue Service (the "Service") or any other U.S. federal, state or local agency with respect to any of the tax issues affecting the Fund, nor has the Fund obtained an opinion of counsel with respect to any tax issues.

The following is a summary of certain potential U.S. federal tax consequences which may be relevant to prospective shareholders.  The discussion contained herein is not a full description of the complex tax rules involved and is based upon existing laws, judicial decisions and administrative regulations, rulings and practices, all of which are subject to change, retroactively as well as prospectively.  A decision to invest in the Fund should be based upon an evaluation of the merits of the trading program, and not upon any anticipated U.S. tax benefits.

BASED ON THE STRUCTURE AND OPERATIONS OF THE FUND, THE FUND GENERALLY SHOULD NOT BE SUBJECT TO U.S. INCOME TAX, EXCEPT AS PROVIDED BELOW.

U.S. Trade or Business

Section 864(b)(2) of the U.S. Internal Revenue Code of 1986, as amended (the "IRC"), provides a safe harbor (the "Safe Harbor") applicable to a non-U.S. corporation (other than a dealer in securities) that engages in the U.S. in trading securities (including contracts or options to buy or sell securities) for its own account pursuant to which such non-U.S. corporation will not be deemed to be engaged in a U.S. trade or business.  The Safe Harbor also provides that a non-U.S. corporation (other than a dealer in commodities) that engages in the U.S. in trading commodities for its own account is not deemed to be engaged in a U.S. trade or business if "the commodities are of a kind customarily dealt in on an organized commodity exchange and if the transaction is of a kind customarily consummated at such place."

The Fund intends to conduct its business in a manner so as to meet the requirements of the Safe Harbor. Thus, the Fund's securities and commodities trading activities should not constitute a U.S. trade or business and, except in the case of certain U.S. real estate investments that the Fund does not intend to make, the Fund should not be subject to the regular U.S. income tax on any of its trading profits.

The Fund's gains from its investments in or trading in stocks, options or other investments should not be subject to United States federal income, branch or withholding taxes because the Fund expects that it will not be engaged (or treated as engaged) in a "trade or business" in the United States, or treated as a personal holding company, for United States federal income tax purposes.  Any dividend income received by the Fund from U.S. corporations generally will be subject to United States federal withholding taxes. Although substantially all of the interest earned by the Fund from sources within the United States is expected to be of the type which will not be subject to United States federal income, branch or withholding taxes, the Fund may earn interest from time to time that could be subject to United States federal income, branch or withholding taxes (although it is not expected that the amount of such taxes would be material).  In addition, with respect to Shares held by non-U.S. persons who are not engaged in a "trade or business" in the United States (as defined under the Code), such persons should not be subject to United States federal income, branch or withholding taxes (i) on dividends paid to them by the Fund and (ii) on the redemption of their Shares by the Fund.  The Fund expects that it will not be subject to

28

FSL00001195

FSL00001161

state and local taxes in the United States on its income or capital. Because of the absence of full guidance under state and local law, however, this result is not entirely clear. The conclusions in this paragraph are based on the Code and existing laws, judicial decisions and administrative regulations, rulings and practice in the United States, all of which are subject to change.

U.S. Withholding Tax

In general, under Section 881 of the IRC, a non-U.S. corporation which does not conduct a U.S. trade or business is nonetheless subject to tax at a flat rate of 30% (or lower tax treaty rate) on the gross amount of certain U.S. source income which is not effectively connected with a U.S. trade or business, generally payable through withholding. Income subject to such a flat tax rate is of a fixed or determinable annual or periodic nature, including dividends and certain interest income. There is presently no tax treaty between the U.S. and the Cayman Islands.

Certain types of income are specifically exempted from the 30% tax and thus withholding is not required on payments of such income to a non-U.S. corporation. The 30% tax does not apply to U.S. source capital gains (whether long or short-term) or to interest paid to a non-U.S. corporation on its deposits with U.S. banks. The 30% tax also does not apply to interest which qualifies as portfolio interest. The term "portfolio interest" generally includes interest (including original issue discount) on an obligation in registered form which has been issued after July 18, 1984 and with respect to which the person who would otherwise be required to deduct and withhold the 30% tax receives the required statement that the beneficial owner of the obligation is not a U.S. person within the meaning of the IRC. Under certain circumstances, interest on bearer obligations may also be considered portfolio interest.

Redemption of Shares

Gain realized by shareholders who are not U.S. persons within the meaning of the IRC ("non-U.S. shareholders") upon the sale, exchange or redemption of Shares held as a capital asset should generally not be subject to U.S. federal income tax provided that the gain is not effectively connected with the conduct of a trade or business in the U.S. However, in the case of nonresident alien individuals, such gain will be subject to the 30% (or lower tax treaty rate) U.S. tax if (i) such person is present in the U.S. for 183 days or more during the taxable year (on a calendar year basis unless the nonresident alien individual has previously established a different taxable year) and (ii) such gain is derived from U.S. sources.

Generally, the source of gain upon the sale, exchange or redemption of Shares is determined by the place of residence of the shareholder. For purposes of determining the source of gain, the IRC defines residency in a manner that may result in an individual who is otherwise a nonresident alien with respect to the U.S. being treated as a U.S. resident only for purposes of determining the source of income. Each potential individual shareholder who anticipates being present in the U.S. for 183 days or more (in any taxable year) should consult his tax adviser with respect to the possible application of this rule.

Gain realized by a non-U.S. shareholder engaged in the conduct of a U.S. trade or business will be subject to U.S. federal income tax upon the sale, exchange or redemption of Shares if such gain is effectively connected with its U.S. trade or business.

Non-U.S. shareholders may be required to make certain certifications to the Fund as to the beneficial ownership of the Shares and the non-U.S. status of such beneficial owner, in order to be exempt from U.S. information reporting and backup withholding on a redemption of Shares.

29

FSL00001161

Tax-Exempt U.S. Persons

The term "Tax-Exempt U.S. Person" means a U.S. person within the meaning of the IRC that is exempt from payment of U.S. federal income tax. Generally, a Tax-Exempt U.S. Person is exempt from federal income tax on certain categories of income, such as dividends, interest, capital gains and similar income realized from securities investment or trading activity. This type of income is exempt even if it is realized from securities trading activity which constitutes a trade or business. This general exemption from tax does not apply to the "unrelated business taxable income" ("UBTI") of a Tax-Exempt U.S. Person. Generally, except as noted above with respect to certain categories of exempt trading activity, UBTI includes income or gain derived from a trade or business, the conduct of which is substantially unrelated to the exercise or performance of the Tax-Exempt U.S. Person's exempt purpose or function. UBTI also includes (i) income derived by a Tax-Exempt U.S. Person from debt-financed property and (ii) gains derived by a Tax-Exempt U.S. Person from the disposition of debt-financed property.

In 1996, Congress considered whether, under certain circumstances, income derived from the ownership of the shares of a non-U.S. corporation should be treated as UBTI to the extent that it would be so treated if earned directly by the shareholder. Subject to a narrow exception for certain insurance company income, Congress declined to amend the IRC to require such treatment. Accordingly, based on the principles of that legislation, a Tax-Exempt U.S. Person investing in a non-U.S. corporation such as the Fund should not realize UBTI with respect to an unleveraged investment in Shares. Tax-Exempt U.S. Persons are urged to consult their own tax advisors concerning the U.S. tax consequences of an investment in the Fund.

There are special considerations which should be taken into account by certain beneficiaries of charitable remainder trusts that invest in the Fund. Charitable remainder trusts should consult their own tax advisers concerning the tax consequences of such an investment on their beneficiaries.

Reporting Requirements for U.S. Persons

Any U.S. person within the meaning of the IRC owning 10% or more (taking certain attribution rules into account) of either the total combined voting power or total value of all classes of the shares of a non-U.S. corporation such as the Fund will likely be required to file an information return with the Service containing certain disclosure concerning the filing shareholder, other shareholders and the corporation. The Fund has not committed to provide all of the information about the Fund or its shareholders needed to complete the return. In addition, a U.S. person within the meaning of the IRC that transfers cash to a non-U.S. corporation will likely be required to report the transfer to the Service if (i) immediately after the transfer, such person holds (directly, indirectly or by attribution) at least 10% of the total voting power or total value of such corporation or (ii) the amount of cash transferred by such person (or any related person) to such corporation during the twelve-month period ending on the date of the transfer exceeds $100,000.

Furthermore, certain U.S. persons within the meaning of the IRC will have to file Form 8886 ("Reportable Transaction Disclosure Statement") with their U.S. tax return, and submit a copy of Form 8886 with the Office of Tax Shelter Analysis of the Service if the Fund engages in certain "reportable transactions" within the meaning of recently issued U.S. Treasury Regulations. Shareholders required to file this report include a U.S. person within the meaning of the IRC if the Fund is treated as a "controlled foreign corporation" and such U.S. person owns a 10% voting interest. In certain situations, there may also be a requirement that a list be maintained of persons participating in such reportable transactions, which could be made available to the Service at its request. Moreover, if a U.S. person within the meaning of the IRC recognizes a loss upon a disposition of Shares, such loss could constitute a

30

FSL00001161

"reportable transaction" for such shareholder, and such shareholder would be required to file Form 8886. Under new legislation, a significant penalty is imposed on taxpayers who fail to make the required disclosure. The penalty is generally $10,000 for natural persons and $50,000 for other persons (increased to $100,000 and $200,000, respectively, if the reportable transaction is a "listed" transaction). Shareholders who are U.S. persons within the meaning of the IRC (including Tax-Exempt U.S. Persons) are urged to consult their own tax advisors concerning the application of these reporting obligations to their specific situations and the new penalty discussed above.

<u>Estate and Gift Taxes</u>

Individual holders of Shares who are neither present or former U.S. citizens nor U.S. residents (as determined for U.S. estate and gift tax purposes) are not subject to U.S. estate and gift taxes with respect to their ownership of such Shares.

**<u>BVI Tax Considerations and Exchange Control</u>**

As of the date of this Memorandum, the Fund is exempt from all provisions of the Income Tax Act of the BVI, including with respect to all dividends, interests, rents, royalties, compensation and other amounts payable by the Fund to persons who are not persons resident in the BVI. Capital gains realized with respect to any shares, debt obligation or other securities of the Fund by persons who are not persons resident in the BVI are also exempt from the provisions of the Income Tax Act of the BVI. No estate, inheritance, succession or gift tax, rate, duty, levy or other charge is payable by persons who are not persons resident in the BVI with respect to any shares, debt obligations or other securities of the Fund.

There are no exchange control restrictions in the BVI. Accordingly, the Fund will be free to acquire, to hold and to sell any foreign currency and securities without restriction.

**<u>ERISA</u>**

The Fund may accept subscriptions from individual retirement accounts ("IRAs"), Keogh plans, pension or profit-sharing plans, governmental plans, entities that invest the assets of such accounts or plans and/or other benefit plan investors (all such entities are herein referred to as "Benefit Plan Investors"). The Fund does not anticipate that its assets will be subject to ERISA because it intends to limit the investments in the Fund by Benefit Plan Investors (both U.S. and non-U.S.) to less than 25% of the value of any class of equity interests of the Fund, excluding from this calculation any non-Benefit Plan Investor interest of that class held by the Investment Manager, persons affiliated with the Investment Manager or their employees. No subscriptions for Shares made by Benefit Plan Investors will be accepted and no transfers of Shares will be permitted to the extent that the investment or transfer would result in the Fund exceeding this 25% limit. In addition, because the 25% limit is to be calculated upon every subscription to or redemption from the Fund, the Fund has the authority to require the redemption of all or some of the Shares held by any Benefit Plan Investor if the continued holding of such Shares, in the opinion of the Directors, could result in the Fund being subject to ERISA.

**PROXY VOTING POLICY**

The Fund invests a portion of its assets in equity securities offered by publicly traded entities. From time to time, such entities may ask their investors to vote their interests in the entities with regard to

31

FSL00001161

corporate governance and other matters. The Investment Manager, as the investment manager of the Fund has authority to vote such proxies and other securities on behalf of the Fund and may delegate such authority to custodians or sub-custodians of its assets. In addition, the managers of the Non-SSC Investments will vote proxies relating to those investments.

The Fund and the Investment Manager have developed a proxy voting policy which they believe ensures that the Investment Manager votes proxy proposals, amendments, consents or resolutions relating to the Fund's securities (collectively, "proxies") in a manner that best serves the interests of the Fund. They have reviewed the proxy voting policies of the custodians, sub-custodians and Non-SSC Investments managers. The following factors are elements of the proxy voting policies of each of the foregoing:

- the impact on short-term and long-term value;
- the preservation and increase in capital of the Fund;
- the costs and benefits associated with the proposal;
- the effect on the liquidity of the Fund; and
- the customary industry and business practices.

With respect to proxies, the Investment Manager will:

- maintain accurate records as to voting proxies;
- with the Fund, periodically review voting procedures employed and actions taken on individual voting situations;
- have procedures in place for reconciling proxies;
- take reasonable steps to ensure that proxies for which it is responsible are received and, where appropriate, voted; and
- comply with all current applicable proxy laws, rules and regulations.

## LEGAL MATTERS

Legal matters in connection with this offering have been passed upon for the Fund in the United States by Andrew E. Goldstein, Esq., 488 Madison Avenue, 16th Floor, New York, New York 10022. Matters with respect to the laws of the British Virgin Islands have been passed upon by Conyers Dill & Pearman, Romasco Place, Wickhams Cay 1, P.O. Box 3140, Road Town, Tortola, British Virgin Islands.

## MISCELLANEOUS

### Reports and Financial Statements

The Fund's fiscal year will end on December 31, except that the Fund's final fiscal year will terminate on the date the Fund commences to wind up and dissolve. The Fund will keep its books on an accrual basis. Audited financial statements of the Fund will be mailed to shareholders at their registered addresses and the Irish Stock Exchange, normally within 120 days after year-end. At the same time, each shareholder shall be furnished with an annual report of the Fund, which will include the Net Asset Value of the Fund and the Net Asset Value per Share at the end of the year, and such other information as the Fund, in its discretion, determines to be necessary or appropriate. Shareholders also will receive an unaudited interim report with respect to the Fund's financial performance within four months from the end of June of each year.

### 1) General

32

FSL00001161

a) No Share or loan capital of the Fund is under option or agreed, conditionally or unconditionally, to be put under option.

b) Shares in the Fund are in registered form. Temporary documents of title will not be issued.

c) Except for their ownership of Shares, none of the Directors or any connected person has any interest in the Shares or loan capital of the Fund, the existence of which is known to, or could with reasonable diligence be ascertained by, the relevant Director.

d) None of the Directors has a service contract with the Fund and no such contract is proposed, although, Walter M. Noel, Jr. is a principal of FGL, an affiliate of the Investment Manager.

e) No loan or guarantee has been granted or provided by the Fund to or for the benefit of any Director.

f) None of the Directors or any member of their respective immediate families has or has had any interest in any transaction or transactions which are or were unusual in their nature or conditions or significant in the business of the Fund and which have been effected by the Fund since its incorporation.

g) As of the date of this Memorandum, the Fund has commenced operations, but no dividends have been declared.

h) The Fund has no loan capital outstanding, no loan capital created but unissued, no loans or any other borrowing or indebtedness or any contingent liabilities, nor has it given any guarantees.

**2) Litigation and Arbitration**

The Fund is not engaged in any legal or arbitration proceedings and no legal or arbitration proceedings are known to the Directors to be threatened by or against the Fund.

**3) Memorandum and Articles of Association**

Pursuant to Paragraph 4 of the Fund's Memorandum of Association, the Fund may engage in any act or activity that is not prohibited under any law for the time being in force in the BVI. As such, the Fund may carry on business as a investment company. The Fund's Memorandum and Articles of Association may be amended by a resolution of Directors or a resolution of shareholders.

The Memorandum and Articles of Association of the Fund provide that no director or officer of the Fund shall be liable for the acts, receipts, neglects or defaults of any other director or officer, or for joining in any receipt or act for conformity, or for any loss or expense happening to the Fund through the insufficiency of deficiency of title to any property acquired by order of the directors for or on behalf of the Fund, or for the insufficiency or deficiency of any security in or upon which any of the moneys of the Fund shall be invested, or for any loss or damage arising from the bankruptcy, insolvency, or tortious act of any person with whom any moneys, securities or effects shall be deposited, or for any loss occasioned by any error of judgment, omission, default, or oversight on his part, or for any other loss, damage, or misfortune whatever which shall happen in relation to the execution of the duties of his office or in relation thereto, to the extent permitted by law.

The Memorandum and Articles of Association of the Fund further provide that each director or officer of the Fund shall be indemnified by the Fund against, and it shall be the duty of the directors

33

FSL00001200

FSL00001161

out of the funds of the Fund to pay, all costs, losses, and expenses which any director or officer may incur or become liable for by reason of any contract entered into, or act or thing done by him as such director or officer, or in any way in the discharge of his duties, and the amount for which such indemnity is provided shall immediately attach as a lien on the property of the Fund, and have priority as between the shareholders over all other claims but only if such director or officer acted honestly and in good faith with a view to the best interests of the Fund and, in the case of criminal proceedings, the person had no reasonable cause to believe that his conduct was unlawful.

**4) Directors**

a)  The number of Directors shall not be less than one (1) or more than twenty (20).

b)  The remuneration of Directors shall be fixed from time to time by the Board.    Currently the Director who is affiliated with the Investment Manager does not receive compensation as a Director.  The two Directors not affiliated with the Investment Manager are each paid $25,000 per annum.

c)  None of the Directors has a service contract, existing or proposed with the Fund, although Walter M. Noel, Jr. is a principal of FGL, an affiliate of the Investment Manager.

d)  There is no retirement age for Directors.

e)  The Directors may vote on any transaction in which they have a material interest if they first disclose the nature of their interest to the Fund.

f)  The Directors may, by resolution of Directors, fix the emoluments of the Directors with respect to services to be rendered in any capacity to the Fund.

g)  The Directors may exercise the powers of the Fund to borrow money and to mortgage or charge its undertakings, property and uncalled capital or any part thereof, to issue debentures, debenture stock and offer securities whenever money is borrowed as security for any debt, liability or obligation of the Fund.

h)  No Director has

- any unspent convictions in relation to indictable offenses;

- been adjudged a bankrupt, entered into a voluntary arrangement with creditors or had a receiver appointed to oversee any asset of such Director;

- been the director of any company which, while he was a director with an executive function or after 12 months after he ceased to be director with an executive function, had a receiver appointed or went into compulsory liquidation, creditors voluntary liquidation, administration or company voluntary arrangements, or made a composition or arrangements with its creditors generally or with any class of its creditors;

- been a partner of any partnership which, while he was partner or within 12 months after he ceased to be a partner, went into compulsory liquidation, administration or partnership voluntary arrangement or had a receiver appointed to oversee any partnership asset;

34

FSL00001201

FSL00001161

- had any public criticism by statutory or regulatory authorities (including recognized professional bodies); or

- been disqualified by a court from acting as a director or from acting in the management or affairs of any company.

## 5) Borrowing Powers

The Board may exercise all the powers of the Fund to borrow money, give guarantees and to mortgage, pledge or charge all or part of its undertaking, property and uncalled capital and to issue debentures and other securities, whether outright or as collateral security for any liability or obligation of the Fund.

## Documents Available for Inspection

Copies of the following documents will be available for inspection at the offices of the Fund's registered office in the British Virgin Islands and the offices of the sponsoring broker during usual business hours on any weekday (Saturdays, Sundays and holidays excepted):

a) the Memorandum and Articles of Association of the Fund;

b) the material contracts of the Fund with the Investment Manager, the Administrator, Registrar and Transfer Agent;

c) the British Virgin Islands Mutual Funds Act, 1996;

d) when available, the latest financial statements of the Fund;

e) audited accounts as of the close of the last immediately fiscal year;

f) Auditors letter of consent; and

g) a list of all past and present directorships and partnerships held by each Director over the past five years.

35

FSL00001202

FSL00001161

## COUNTRY-SPECIFIC NOTICES

Australia.  No offer for subscription or purchase of the Shares offered hereby, nor any invitation to subscribe for or buy such Shares, has been made or issued in Australia, otherwise than by means of an excluded issue, excluded offer or excluded invitation within the meaning of Section 66(2) or 66(3) of the Corporations Law.  Accordingly, the Memorandum has not been lodged with the Australian Securities Commission.  Further, the Shares offered hereby may not be resold in Australia within a period of six (6) months after the date of issue otherwise than by means of an excluded offer or excluded invitation as described above.

Bahamas.  The Shares may not be offered or sold or otherwise disposed of in any manner to persons deemed by the Central Bank of the Bahamas as resident for exchange control purposes, unless such persons deemed as resident obtain the prior approval of the Central Bank of the Bahamas.

Belgium.  The information in this Memorandum may not be disclosed to the public in Belgium, the Shares may not be offered, sold, transferred or delivered in or from Belgium as part of their initial distribution or at any time thereafter, directly or indirectly, other than to persons or entities mentioned in Article 3 of the Royal Decree of January 9, 1991 Relating to the Public Characteristic of Operations Calling for Savings and on the Assimilation of Certain Operations to a Public Offer (Belgian Official Journal of January 12, 1991).  Therefore, the Shares are exclusively designed for credit institutions, stock exchange companies, collective investment funds, companies or institutions, insurance companies, and/or pension funds acting for their own account only.

Brazil.  The Shares have not been, and will not be, registered with the Comissao de Valores Mobiliarios and may not be offered or sold in Brazil except in circumstances which do not constitute a public offering or distribution under Brazilian laws and regulations.

British Columbia and Ontario, Canada.  The Memorandum constitutes an offering of the securities described therein only in those jurisdictions and to those persons where and to whom they may be lawfully offered for sale, and therein only by persons permitted to sell such securities. The Memorandum is not, and under no circumstances is to be construed as, an advertisement or a public offering of the securities described therein in Canada.  No securities commission or similar authority in Canada has reviewed or in any way passed upon the Memorandum or the merits of the securities described therein, and any representation to the contrary is an offense.  If the Memorandum, together with any amendment thereto, contains an untrue statement of a material fact or omits to state a material fact that is required to be stated or is necessary in order to make any statement therein not misleading in the light of the circumstances in which it was made (a "Misrepresentation") and it was a Misrepresentation on the date of purchase, purchasers in British Columbia and Ontario to whom the Memorandum was sent or delivered and who purchase Shares shall have a right of action against the Fund for rescission (while still the owner of such shares) or alternatively, for damages, exercisable on written notice given not more than 90 days subsequent to the date of purchase, provided that the Fund will not be liable: (a) if the purchaser purchased such Shares with knowledge of the Misrepresentation; (b) for all or any portion of any damages that the Fund proves do not represent the depreciation in value of such Shares as a result of the Misrepresentation; and (c) for amounts in excess of the price at which such Shares were sold to the purchaser.  The foregoing summary is subject to the express provisions of either the Securities Act (British Columbia) or the Securities Act (Ontario), whichever the case may be, and reference is made to the complete text of such provisions.

36

FSL00001203

FSL00001161

British Virgin Islands. The Shares offered hereby may not be sold to or purchased by persons resident in the British Virgin Islands, but may be sold to British Virgin Islands international business companies.

Cayman Islands. No invitation may be made to the public in the Cayman Islands to subscribe for the Shares unless the Fund is listed on the Cayman Islands stock exchange. Cayman Islands exempted and ordinary non-resident companies and certain other persons engaged in offshore business, however, may be permitted to acquire Shares.

Chile. The Shares have not been, and will not be, registered with the Superintendencia de Valores y Seguros (the Chilean Securities Commission) and may not be offered and sold in Chile except in circumstances which do not constitute a public offering or distribution under Chilean laws and regulations.

Republic of China. No invitation to offer for, or sale of, the Shares shall be made to the public in China or by any means that would be deemed public under the laws of China. The offer of Shares is personal to the investor to whom the Memorandum has been addressed by the Fund. Business entities incorporated under the laws of China (excluding foreign investment business entities) shall apply for approval from the Chinese government authorities before purchasing the Shares. Furthermore, all business entities incorporated under the laws of China and Chinese citizens residing in China shall obtain prior approval from the Chinese Foreign Exchange Authority before purchasing Shares.

Costa Rica. The Shares have not been, and will not be, registered with the Comision Nacional de Valores (the Costa Rican Securities Commission) and may not be offered or sold in Costa Rica except in circumstances which do not constitute a public offering or distribution under Costa Rican laws and regulations.

Ecuador. The Shares have not been, and will not be, registered with the Superintendencia de Companias del Ecuador (the Ecuadorian Securities and Exchange Commission) and may not be offered and sold in Ecuador except in circumstances which do not constitute a public offering or distribution under Ecuadorian laws and regulations. This communication is for informative purposes only; it does not constitute a public offering of any kind.

France. "Cette note d'information n'a pas été soumise au visa de la Commission des Opérations de Bourse. Par conséquent, ni cette note d'information, ni tout autre document promotionnel se rapportant aux intérêts ne pourront être communiqués au public ou utilisés dans la cadre de toute offre de souscription ou de vente des intérêts en France et les intérêts ne peuvent être émis, offerts ou cédés de toute facon en France. Les investisseurs doivent agir pour leur propre compte. Le vente, directe ou indirecte, au public des instruments financiers acquis sera faite conformément aux dispositions les concernant." This Memorandum has not been submitted to the Commission des Operations de Bourse in France. Accordingly, neither this Memorandum nor any other offering materials relating to the Shares may be available to the public or used in connection with any other offer for subscription or sale of the Shares in France, and the Shares may not be issued, offered or otherwise sold in France, investors should act for their own account. The sale, direct or indirect, in the public of the purchased financial instruments will be made in compliance with all requirements in relation thereto.

Germany. Any person who is in possession of the Memorandum understands that no action has or will be taken which would allow an offering of the Shares to the public in Germany. Accordingly, the Shares may not be offered, sold or delivered and neither the Memorandum nor any other offering materials relating to the Shares may be distributed or made available to the public in Germany. Individual

37

FSL00001204

FSL00001161

sales of the Shares to any person in Germany may only be made according to German securities, tax and other applicable laws and regulations.

Greece. The Shares may not be offered or sold in any manner that constitutes an offer or sale to the public in the Hellenic Republic within the laws and regulations from time to time applicable to public offers or sales of securities.

Hong Kong. No action has been taken to permit an offering of the Shares to the public in Hong Kong and, accordingly, no copy of this Memorandum may be issued, circulated or distributed in Hong Kong other than (i) exclusively to persons whose business involves the acquisition, disposal or holding of securities, whether as principal or agent, or (ii) otherwise in circumstances that do not constitute an invitation to the public for the purpose of the Protection of Investors Ordinance (Chapter 335 of the Laws of Hong Kong).

Ireland. It is not the intention of the Fund to advertise or market the Shares in Ireland, and no such marketing will take place without the prior approval in writing of the Central Bank of Ireland.

Isle of Man. The Fund is not a recognized collective investment scheme for the purposes of Sections 12 or 13 of the Financial Services Act 1988 (the "FS Act") of the Isle of Man and is accordingly subject to the prohibition on the promotion of collective investment schemes as contained in Section 1(1) of the FS Act. Accordingly, the Memorandum may only be issued or passed on to any person in the Isle of Man by way of the two limited exceptions to this general prohibition contained in Section 1(2) of the FS Act and the Financial Supervision (Promotion of Unregulated Schemes (Exemption)) FS Regulations 1992 (the "Exemption Regulations"). Under Regulation 3(2) of the Exemption Regulations, any advertisement issued in the Isle of Man in connection with the Fund must contain a statement either (a) that participants in the Fund are not protected by any statutory compensation scheme; or (b) that participants in the Fund are protected by a statutory compensation scheme and particulars sufficient to identify the compensation arrangements.

Israel. The Shares are offered to a limited number of sophisticated investors, in all cases under circumstances designed to preclude a distribution which would be other than a private placement. The Memorandum may not be reproduced or used for any other purpose, nor be furnished to any other person other than those to whom copies have been sent. Israeli residents, other than those considered "exemption holders" under the General Currency Control Permit, 1978, require a special permit from the Israeli Controller of Foreign Currency in order to purchase the Shares.

Italy. This Memorandum may not be distributed to members of the public in Italy. The Italian Commission Nazionale per la Societa e la Borsa has not authorized any offering of the subscription of Shares in the Fund; accordingly, Shares may not be offered or sold in Italy or to residents thereof except as permitted by Italian law. With respect to any potential purchaser or transaction subject to Italian law, this Memorandum is for the sole use of the person who has requested it and whose name appears on the cover page hereof (the "Prospective Buyer") and may not be disclosed, in whole or in part, to any person other than the Prospective Buyer and the Prospective Buyer's authorized agents. This Memorandum may not be copied in whole or in part. The Prospective Buyer, by accepting delivery of the Memorandum, agrees to return it to the Fund if such Prospective Buyer does not undertake to purchase the securities offered hereby.

Japan. Under Article 23-14 Paragraph 1 of the Securities Exchange Law (the "SEL"), the purchase of Shares cannot be made unless the purchaser agrees to the condition that it will not make an assignment of the Shares to any person other than a non-resident of Japan (having the same meanings as defined in Article 6, Paragraph 1(6) of the Foreign Exchange and Foreign Trade Control Laws), except

FSL00001205

FSL00001161

for the case that all the Shares (excluding the Shares assigned to non-residents of Japan) are assigned to one person. Furthermore, disclosure under the SEL has not been made. The Shares will not be registered under the SEL. The offer and sale of the Shares in Japan may be made only in accordance with an exemption available under the SEL and with all other applicable laws and regulations of Japan.

Jersey. The Memorandum relates to a private placement and does not constitute an offer to the public in Jersey to subscribe for the Shares offered hereby. No regulatory approval has been sought for the offer in Jersey. The offer of the Shares is personal to the person to whom the Memorandum is being delivered by or on behalf of the Fund, and a subscription for the Shares will be accepted only from such person. The Memorandum may not be produced or used for any other purpose, nor be furnished to any other person other than those to whom it has been so delivered.

Korea. The Memorandum is not, and under no circumstance is to be construed as, a public offering of securities in Korea. Neither the Fund nor the investment manager is making any representation with respect to the eligibility of any recipients of the Memorandum to acquire the Shares under the laws of Korea, including without limitation the Foreign Exchange Management Act and regulations thereunder. The Shares have not been registered under the Securities and Exchange Act of Korea and none of the Shares may be offered, sold or delivered, or offered or sold to any person for re-offering or resale, in Korea or to any resident of Korea except pursuant to applicable laws and regulations of Korea.

Liechtenstein. The Shares are offered to a narrowly defined category of investors, in all cases under circumstances designed to preclude a public solicitation. The Memorandum may not be reproduced or used for any other purpose, nor be furnished to any other person other than those to whom copies have been sent.

Luxembourg. The Shares are offered to a limited number of sophisticated investors, in all cases under circumstances designed to preclude a distribution that would be other than a private placement. The Memorandum may not be reproduced or used for any other purpose, nor be furnished to any other person other than those to whom copies have been sent.

Netherlands. The Shares may not be solicited, acquired or offered, directly or indirectly, in or from the Netherlands, and this Memorandum may not be circulated in the Netherlands to any individuals or legal entities as part of the initial distribution or anytime thereafter, except to individuals or legal entities who or which trade or invest in subjects of investment ("Beleggingsobjecten") in the conduct of a profession or trade, including banks, brokers, securities institutions, insurance companies, pension funds, investment institutions, other institutional investors and other parties, including treasury departments of commercial enterprises and finance companies which are regularly active in the financial markets in a professional manner (a "Professional Market Party" and/or "Professional Market Parties") investing in subjects of investment as described in Article 1 of the Exemption Regulation of October 9, 1990 issued pursuant to Article 14 of the Investment Institutions Supervision Act (Wet Toezicht Beleggingsinstellingen) of June 27, 1990, as amended from time to time (the "Investment Institutions Act"), and the respective accompanying Memoranda thereto of the Minister of Finance of the Netherlands. In the event of a solicitation, acquisition or offering made to or by Professional Market Parties and therefore exempt from the general prohibition as provided for in the Investments Institutions Act, no subsequent offering of the Shares in a "secondary offering" by such Professional Market Parties to persons other than such Professional Market Parties may be made.

39

FSL00001206

FSL00001161

New Zealand.  The Memorandum has been prepared solely for and the offer made in it is made solely to habitual investors (being persons defined in Section 3(2)(a)(ii) of the New Zealand Securities Act 1978).

Norway.  The Memorandum has not been filed with the Oslo Stock Exchange in accordance with the Norwegian Securities Trading Act, Section 5-1, and may therefore not be distributed to more than fifty potential investors in Norway.

Oman.  The Memorandum and the Shares are not available to any member of the public and are restricted to investors having an existing business relationship with the Fund.  Application for the Shares made by or on behalf of investors not having an existing relationship with the investment manager will not be accepted.  Any investor that considers purchasing the Shares offered by the Memorandum should consult a professional adviser before doing so.

Panama.  The Shares have not and will not be registered with the Comision Nacional de Valores (the National Securities Commission) of the Republic of Panama under Cabinet Decree No. 247 of 1970 ("Panama's Securities Laws") and may not be offered or sold in a primary offering within Panama, except in certain transactions exempt from the registration requirements of Panama's Securities Laws.

Russia.  The Shares are not intended to be sold or offered in (or on the territory of) the Russian Federation or to Russian residents and the Memorandum has not been registered with, and will not be registered with, the Federal Securities Markets Commission of the Russian Federation.

Singapore.  The Memorandum has not been registered with the Registrar of Companies in Singapore and the Shares will be offered in Singapore pursuant to an exemption invoked under Sections 106c and 106d of the Companies Act, Chapter 50 of Singapore ("Singapore Act").  Accordingly, the Shares may not be offered or sold, nor may the Memorandum or any other offering document or material relating to the Shares be circulated or distributed, directly or indirectly, to the public or any member of the public other than (1) to an institutional investor or other body or person specified in Section 106c of the Singapore Act, or (2) to a sophisticated investor specified in Section 106d of the Singapore Act, or (3) otherwise pursuant to, and in accordance with the conditions of, Section 106e(2) of the Singapore Act or any other applicable exemption invoked under Division 5a of Part IV of the Singapore Act.

South Africa.  The Shares are for your acceptance only and may not be offered or become available to persons other than yourself and may not be publicly offered, sold or advertised in South Africa and the Memorandum may only be circulated to selected individuals.

Spain.  This Memorandum has not been and will not be registered with la Comision Nacional del Mercado de Valores of Spain and may not be distributed in Spain in connection with the offering and sale of participations without complying with all legal and regulatory requirements in relation thereto.

Switzerland.  This Memorandum has been prepared for private information purposes of interested investors only.  It may not be used for and shall not be deemed a public offering of Shares.  No application has been made under Swiss law to publicly market the Fund in or out of Switzerland.  The Shares are not subject to the Swiss Investment Fund Act and are therefore not subject to supervision by the Federal Banking Commission and, accordingly, may not be advertised publicly.  Therefore, no public offer of the Shares or public distribution of this Memorandum may be made in or out of Switzerland.  This Memorandum is strictly for private use by its holders and may not be passed on to third parties.

United Kingdom.  The Fund is an unrecognized collective investment scheme for the purposes of the Financial Services and Markets Act 2000 of the United Kingdom (the "Act").  The promotion of the

40

Fund and the distribution of this Memorandum in the United Kingdom is consequently restricted by law.

This Memorandum is being issued by the Fund where permitted by applicable law to persons who are of a kind to whom the Fund may lawfully be promoted by a person authorized under the Act by virtue of the Financial Services and Markets Act 2000 (Promotion of Collective Investment Schemes (Exemptions) Order 2001 and Annex 5 to Chapter 3 of the FSA's Conduct of Business Sourcebook or as otherwise permitted by applicable law and regulation.

The Fund is not regulated by the FSA and investors will not have the benefit of the Financial Services Compensation Scheme and may not have the benefit of other protections afforded by the Act or any of the rules and regulations made thereunder.

The Shares are not dealt in on a recognized or designated investment exchange for the purposes of the Act, and it may therefore be difficult for an investor to dispose of his Shares otherwise than by way of redemption or to obtain reliable information about the extent of the risks to which his investment is exposed.

Acquiring Shares may expose an investor to a significant risk of losing all of the amount invested. The Fund is a limited liability company and any person who acquires Shares will not thereby be exposed to any significant risk of incurring additional liability. Any person who is in any doubt about investing in the Fund should consult an authorized person specializing in advising on such investments.

<u>Uruguay</u>. The Shares correspond to a private issue and are not registered with the Central Bank of Uruguay.

41

FSL00001208

FSL00001161

**APPENDIX A**

**FORM ADV PART II**

FSL00001209

FSL00001161

**FORM ADV**

**Uniform Application For Investment Adviser Registration**

OMB APPROVAL

| | |
|---|---|
| OMB Number | 3235-0049 |
| Expires: | July 31 2008 |
| Estimated average burden hours per response: | 9.402 |

**Part II - Page 1**

| |
|---|
| **Name of Investment Adviser:** |
| **Fairfield Greenwich (Bermuda) Ltd.** |

| | |
|---|---|
| **Address:**     (Number and Street)     (City)    (State)    (Zip Code) | **Telephone Number:** |
| **Principal Office:** 131 Front Street, 1ˢᵗ Floor, Hamilton, Bermuda HM 11 | **(441) 292-5401** |
| **Mailing Address:** 12 Church Street, Suite 606, Hamilton, Bermuda HM 11 | |

This part of Form ADV gives information about the investment adviser and its business for the use of clients.
The information has not been approved or verified by any governmental authority.

**Table of Contents**

| Item Number | Item | Page |
|---|---|---|
| 1 | Advisory Services and Fees | 2 |
| 2 | Types of Clients | 2 |
| 3. | Types of Investments | 3 |
| 4. | Methods of Analysis, Sources of Information and Investment Strategies | 3 |
| 5. | Education and Business Standards | 4 |
| 6. | Education and Business Background | 4 |
| 7. | Other Business Activities | 4 |
| 8. | Other Financial Industry Activities of Affiliations | 4 |
| 9. | Participation or Interest in Client Transactions | 5 |
| 10. | Conditions for Managing Accounts | 5 |
| 11. | Review of Accounts | 5 |
| 12. | Investment or Brokerage Discretion | 6 |
| 13. | Additional Compensation | 6 |
| 14. | Balance Sheet | 6 |
| | Continuation Sheet | Schedule F |
| | Balance Sheet, if required | Schedule G |

(Schedules A, B. C. D and E are included with Part I of this Form, for the use of regulatory bodies, and are not distributed to clients.)

Potential persons who are to respond to the collection of information contained in this form are not
required to respond unless the form displays a currently valid OMB control number.

FSL00001161

**FORM ADV**

**Part II – Page 2**

| Applicant: | SEC File Number: | Date: |
|---|---|---|
| Fairfield Greenwich (Bermuda) Ltd. | 801-66439 | March 27, 2008 |

---

**1.   A.   Advisory Services and Fees.** (check the applicable boxes)     For each type of service provided, state the approximate % of total advisory billings from that service. (See instruction below.)

Applicant:

☒  (1)   Provides investment supervisory services ......................................................................   __100__ %

☐  (2)   Manages investment advisory accounts not involving investment supervisory services ...............   _____ %

☐  (3)   Furnishes investment advice through consultations not included in either service described above ...   _____ %

☐  (4)   Issues periodicals about securities by subscription .........................................................   _____ %

☐  (5)   Issues special reports about securities not included in any service described above....................   _____ %

☐  (6)   Issues, not as part of any service described above, any charts, graphs, formulas, or other devices which clients may use to evaluate securities ...................................................................................................   _____ %

☐  (7)   On more than an occasional basis, furnishes advice to clients on matters not involving securities .....   _____ %

☐  (8)   Provides a timing service ...........................................................................................   _____ %

☐  (9)   Furnishes advice about securities in any manner not described above.....................................   _____ %

(Percentages should be based on applicant's last fiscal year.  If applicant has not completed its first fiscal year, provide estimates of advisory billings for that year and state that the percentages are estimates.)

---

                                                                                                     Yes     No

**B.**   Does applicant call any of the services it checked above financial planning or some similar term?         ☐      ☒

---

**C.**   Applicant offers investment advisory services for:  (check all that apply)

☒  (1)  A percentage of assets under management            ☐  (4)  Subscription fees

☐  (2)  Hourly charges                                      ☐  (5)  Commissions

☒  (3)  Fixed fees (not including subscription fees)         ☒  (6)  Other

---

**D.**   For each checked box in A above, describe on Schedule F:

- the services provided, including the name of any publication or report issued by the adviser on a subscription basis or for a fee

- applicant's basic fee schedule, how fees are charged and whether its fees are negotiable

- when compensation is payable, and if compensation is payable before service is provided, how a client may get a refund or may terminate an investment advisory contract before its expiration date

---

**2.   Types of Clients.**  Applicant generally provides investment advice to:  (check those that apply)

☐  A.  Individuals                                    ☐  E.  Trusts, estates, or charitable organizations
☐  B.  Banks or thrift institutions                   ☐  F.  Corporations or business entities other than those listed above
☐  C.  Investment companies                           ☒  G.  Other (Describe on Schedule F)
☐  D.  Pension and profit sharing plans

---

**Answer all items.  Complete amended pages in full, circle amended items and file with execution page (page 1).**

FSL00001211

FSL00001161

| FORM ADV | Applicant: | SEC File Number: | Date: |
|---|---|---|---|
| Part II - Page 3 | Fairfield Greenwich (Bermuda) Ltd. | 801-66439 | March 27, 2008 |

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

---

**3.**    **Types of Investments.** Applicant offers advice on the following: (check those that apply) –

A. Equity securities
    ☒ (1) exchange-listed securities
    ☒ (2) securities traded over-the-counter
    ☒ (3) foreign issuers

☒ B. Warrants

☒ C. Corporate debt securities
    (other than commercial paper)

☒ D. Commercial paper

☒ E. Certificates of deposit

☐ F. Municipal securities

G. Investment company securities:
    ☐ (1) variable life insurance
    ☐ (2) variable annuities
    ☒ (3) mutual fund shares

☒ H. United States government securities

I. Options contracts on:
    ☐ (1) securities
    ☒ (2) commodities

J. Futures contracts on:
    ☒ (1) tangibles
    ☒ (2) intangibles

K. Interests in partnerships investing in:
    ☐ (1) real estate
    ☐ (2) oil and gas interests
    ☐ (3) other (explain on Schedule F)

☒ L. Other (explain on Schedule F)

---

**4.**    **Methods of Analysis, Sources of Information, and Investment Strategies.**

A. Applicant's security analysis methods include: (check those that apply)

   (1) ☐ Charting
   (2) ☐ Fundamental
   (3) ☐ Technical
   (4) ☐ Cyclical
   (5) ☒ Other (explain on Schedule F)

B. The main sources of information applicant uses include: (check those that apply)

   (1) ☐ Financial newspaper and magazines
   (2) ☐ Inspections of corporate activities
   (3) ☐ Research materials prepared by others
   (4) ☐ Corporate rating services
   (5) ☐ Timing services
   (6) ☐ Annual reports, prospectuses, filings with the Securities and Exchange Commission
   (7) ☐ Company press releases
   (8) ☒ Other (explain on Schedule F)

C. The investment strategies used to implement any investment advice given to clients include: (check those that apply)

   (1) ☐ Long term purchases
      (securities held at least a year)
   (2) ☐ Short term purchases
      (securities sold within a year)
   (3) ☐ Trading (securities sold within 30 days)
   (4) ☐ Short sales
   (5) ☐ Margin transactions
   (6) ☐ Option writing, including covered options, uncovered options or spreading strategies
   (7) ☒ Other (explain on Schedule F)

---

**Answer all items. Complete amended pages in full, circle amended items and file with execution page (page 1).**

FSL00001212

FSL00001161

| FORM ADV | Applicant: | SEC File Number: | Date: |
|---|---|---|---|
| Part II – Page 4 | Fairfield Greenwich (Bermuda) Ltd. | 801-66439 | March 27, 2008 |

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

---

**5.   Education and Business Standards.**

Are there any general standards of education or business experience that applicant requires of those involved in determining                    Yes    No
or giving investment advice to clients?.........................................................................................................................................   ☒    ☐

(If yes, describe these standards on Schedule F.)

---

**6.   Education and Business Background.**

For:
- each member of the investment committee or group that determines general investment advice to be given to clients, or
- if the applicant has no investment committee or group, each individual who determines general investment advice given to clients (if more than five, respond only for their supervisors)
- each principal executive officer of applicant or each person with similar status or performing similar functions.

On Schedule F, give the:
- name
- year of birth
- formal education after high school
- business background for the preceding five years

---

**7.   Other Business Activities.**  (Check those that apply)

☐  A.   Applicant is actively engaged in a business other than giving investment advice.

☐  B.   Applicant sells products or services other than investment advice to clients.

☐  C.   The principal business of applicant or its principal executive officers involves something other than providing investment advice.

(For each checked box describe the other activities, including the time spent on them, on Schedule F.)

---

**8.   Other Financial Industry Activities or Affiliations.**  (check those that apply)

☐  A.   Applicant is registered (or has an application pending) as a securities broker/dealer.

☐  B.   Applicant is registered (or has an application pending) as a futures commission merchant, commodity pool operator or commodity trading adviser.

C.   Applicant has arrangements that are material to its advisory business or its clients with a related person who is a:

☒   (1)   broker-dealer
☐   (2)   investment company
☒   (3)   other investment adviser
☐   (4)   financial planning firm
☒   (5)   commodity pool operator, commodity trading adviser or futures commission merchant
☐   (6)   banking or thrift institution

☐   (7)   accounting firm
☐   (8)   law firm
☐   (9)   insurance company or agency
☐   (10)   pension consultant
☐   (11)   real estate broker or dealer
☐   (12)   entity that creates or packages limited partnerships

(For each checked box in C, on Schedule F identify the related person and describe the relationship and the arrangements.)

                                                                                                                                                                  Yes    No
D.   Is applicant or a related person a general partner in any partnership in which clients are solicited to invest?                          ☒    ☐

(If yes, describe on Schedule F the partnerships and what they invest in)

---

**Answer all items.  Complete amended pages in full, circle amended items and file with execution page (page 1).**

FSL00001213

FSL00001161

| **FORM ADV** | Applicant: | SEC File Number: | Date: |
|---|---|---|---|
| **Part II - Page 5** | **Fairfield Greenwich (Bermuda) Ltd.** | **801-66439** | **March 27, 2008** |

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

---

**9.**    **Participation or Interest in Client Transactions.**

Applicant or a related person: (check those that apply)

☒    A.    As principal, buys securities for itself from or sells securities it owns to any client.

☐    B.    As broker or agent effects securities transactions for compensation for any client.

☐    C.    As broker or agent for any person other than a client effects transactions in which client securities are sold to or bought from a brokerage customer.

☒    D.    Recommends to clients that they buy or sell securities or investment products in which the applicant or a related person has some financial interest.

☒    E.    Buys or sells for itself securities that it also recommends to clients.

(For each box checked, describe on Schedule F when the applicant or a related person engages in these transactions and what restrictions, internal procedures, or disclosures are used for conflicts of interest in those transactions.)

Describe, on Schedule F, your code of ethics, and state that you will provide a copy of your code of ethics to any client or prospective client upon request.

---

**10.**    **Conditions for Managing Accounts.**  Does the applicant provide investment supervisory services, manage investment advisory accounts or hold itself out as providing financial planning or some similarly termed services *and* impose a minimum dollar value of assets or other conditions for starting or maintaining an account?

Yes ☒    No ☐

(If yes, describe on Schedule F.)

---

**11.**    **Review of Accounts.**  If applicant provides investment supervisory services, manages investment advisory accounts, or holds itself out as providing financial planning or some similarly termed services:

A.    Describe below the reviews and reviewers of the accounts.  **For reviews,** include their frequency, different levels, and triggering factors.
**For reviewers,** include the number of reviewers, their titles and functions, instructions they receive from applicant on performing reviews, and number of accounts assigned each.

## See Schedule F.

B.    Describe below the nature and frequency of regular reports to clients on their accounts.

## See Schedule F.

---

**Answer all items.  Complete amended pages in full, circle amended items and file with execution page (page 1).**

FSL00001214

FSL00001161

| FORM ADV<br>Part II – Page 6 | Applicant:<br>**Fairfield Greenwich (Bermuda) Ltd.** | SEC File Number:<br>**801-66439** | Date:<br>**March 27, 2008** |
|---|---|---|---|

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

---

**12.**   **Investment or Brokerage Discretion.**

   A.   Does applicant or any related person have authority to determine, without obtaining specific client consent, the:

   (1)   securities to be bought or sold? ............................................................................................... Yes ☒   No ☐

   (2)   amount of the securities to be bought or sold? ..................................................................... Yes ☒   No ☐

   (3)   broker or dealer to be used? ....................................................................................................... Yes ☒   No ☐

   (4)   commission rates paid? ................................................................................................................ Yes ☒   No ☐

   B.   Does applicant or a related person suggest brokers to clients? ....................................................... Yes ☒   No ☐

   For each yes answer to A describe on Schedule F any limitations on the authority.  For each yes to A(3), A(4) or B, describe on Schedule F the factors considered in selecting brokers and determining the reasonableness of their commissions.  If the value of products, research and services given to the applicant or a related person is a factor, describe:

   •   the products, research and services

   •   whether clients may pay commissions higher than those obtainable from other brokers in return for those products and services

   •   whether research is used to service all of applicant's accounts or just those accounts paying for it; and

   •   any procedures the applicant used during the last fiscal year to direct client transactions to a particular broker in return for products and research services received.

**13.**   **Additional Compensation.**

Does the applicant or a related person have any arrangements, oral or in writing, where it:

   A.   is paid cash by or receives some economic benefit (including commissions, equipment or non-research services) from a non-client in connection with giving advice to clients? ............................................... Yes ☒   No ☐

   B.   directly or indirectly compensates any person for client referrals? ............................................... Yes ☒   No ☐

(For each yes, describe the arrangements on Schedule F.)

**14.**   **Balance Sheet**.  Applicant must provide a balance sheet for the most recent fiscal year on Schedule G if applicant:

   •   has custody of client funds or securities (unless applicant is registered or registering only with the Securities and Exchange Commission); or

   •   requires prepayment of more than $500 in fees per client and 6 or more months in advance

   Has applicant provided a Schedule G balance sheet? ....................................................................... Yes ☐   No ☒

---

**Answer all items.  Complete amended pages in full, circle amended items and file with execution page (page 1).**

FSL00001215

FSL00001161

| Schedule F of FORM ADV Continuation Sheet for Form ADV Part II | Applicant: Fairfield Greenwich (Bermuda) Ltd. | SEC File Number: 801-66439 | Date: March 27, 2008 |
|---|---|---|---|

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

| 1. | Full name of applicant exactly as stated in Item 1A of Part I of Form ADV: **Fairfield Greenwich (Bermuda) Ltd.** | IRS Empl. Ident. No.: |
|---|---|---|

| Item of Form (identify) | Answer |
|---|---|
| **Items 1.D. and 2.G.** | Fairfield Greenwich (Bermuda) Ltd. ("FGBL" or "Applicant"), an exempted company incorporated under the laws of Bermuda on June 13, 2003, provides managerial services to three (3) private investment funds established in the British Virgin Islands (the "Offshore Funds"), and serves as the general partner to two (2) private investment funds established in the U.S., (the "Onshore Funds"), (collectively, the "FGBL Funds").

FGBL is a wholly-owned subsidiary of Fairfield Greenwich Limited ("FGL", collectively with other affiliates listed in Schedule F, Item 8, Fairfield Greenwich Group, or "FGG"), an exempted company incorporated in the Cayman Islands on October 24, 2001. FGL serves as placement agent for the Offshore Funds and generally is paid by the applicable Offshore Fund (i) an annual management fee of up to 1% of net assets, payable quarterly, and (ii) a performance fee of 20% of the net profits, charged quarterly or annually subject to adjustment for unrecouped losses.

Another wholly-owned subsidiary of FGL, Fairfield Heathcliff Capital LLC ("FHC"), a limited liability company incorporated in the state of Delaware, and an affiliate of FGBL, serves as placement agent for the Onshore Funds.  FGBL does not provide tailored investment advice to individual investors for a fee.

Similar to the Offshore Funds, FGBL generally is paid by the Onshore Funds (i) an annual management fee of up to 1% of net assets, payable quarterly, and (ii) an incentive allocation of 20% of net profits, charged quarterly or annually subject to adjustment for unrecouped losses.   Some or all of such fees can be waived at the discretion of the general partner.

Investors in the FGBL Funds generally have the right to redeem all or a portion of their investment in an FGBL Fund at least quarterly, subject to applicable advance notice requirements. If an investor redeems or withdraws from an FGBL Fund, the investor will be entitled to any unearned, prepaid portion of the management fee.  To the extent required under the U.S. Investment Advisers Act of 1940, performance-based compensation payable to FGBL, or any of its affiliates, will be in compliance with Rule 205-3 under such Act. |
| **Item 3.L.** | The establishment of a typical position in the FGBL Funds entails (i) the purchase of a group or basket of equity securities that are intended to highly correlate to the S&P 100 Index, (ii) the purchase of out-of-the-money S&P 100 Index put options with a notional value that approximately equals the market value of the basket of equity securities, and (iii) the sale of out-of-the-money S&P 100 Index call options with a notional value that approximately equals the market value of the basket of equity securities (i.e., the "Split-Strike Conversion strategy").  The Offshore Funds also utilize a small portion of their assets (up to 5%) away from the Split Strike Conversion strategy to seed a small number of hedge fund management groups with varying and diverse types of investments. These various types of investments and investment strategies are noted under Item 3. Certain of the hedge fund managers allocated to may be managed by an affiliate of FGBL. For a more detailed explanation, see **Item 4.C.(7)** below. |
| **Items 4.A.(5) and 4.B.(8)** | An affiliate of FGBL, Fairfield Risk Services Ltd. ("FRS"), also a wholly owned subsidiary of FGL, shares office space with FGBL and serves as FGG's Risk Management team, which, as noted, includes FGBL. A Director of FGBL, Amit Vijayvergiya, serves both FGBL and FRS and manages both teams. FRS primarily conducts both the pre- and post-investment quantitative analyses of hedge fund managers, monitors the market risk and provides the quantitative analyses supporting the asset allocation decisions across the firm's multi-strategy funds. The risk infrastructure at FRS supporting these activities incorporates a number of systems and tools – including internally developed systems, off the shelf vendor solutions, and some customized applications built to meet FGG's business needs. An important component |

FSL00001216

FSL00001161

**Schedule F of FORM ADV**
**Continuation Sheet for Form**
**ADV Part II**

| Applicant: | SEC File Number: | Date: |
|---|---|---|
| Fairfield Greenwich (Bermuda) Ltd. | 801-66439 | March 27, 2008 |

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

| 1. | Full name of applicant exactly as stated in Item 1A of Part I of Form ADV: | IRS Empl. Ident. No.: |
|---|---|---|
| | **Fairfield Greenwich (Bermuda) Ltd.** | |

| Item of Form (identify) | Answer |
|---|---|
| | of the FGG product platform is the position level transparency that we receive from all single managers which are included in our multi-strategy funds. Position information is transmitted via secure channels to our systems. |
| | FRS's core risk management engine utilizes the flexible ASP version of the RiskManager product from RiskMetrics. This system is populated by detailed position information and further supplemented by an extensive market and terms and conditions database. The FRS team regularly evaluates the market risk of its single and multi-strategy funds by producing strategy and fund specific risk reports. These reports are customizable to present risk measures and tests most appropriate to each portfolio's strategy. The FRS team prepares a monthly suite of reports using RiskManager that are carefully reviewed and discussed by FGG's Investment Committee at a formal monthly risk meeting. The reports organized along the following dimensions: Exposures, Sensitivities, Scenarios and Stress Tests, VaR, Correlations Analysis and Attribution Analysis. The review includes the full suite of VaR analytics (including marginal, incremental and relative VaR) and careful evaluation of the sensitivity of our managers to important risk factors (such as increasing or decreasing equity markets, volatilities, interest rate shocks/twists, FX movements and other factors). |
| **Item 4.C.(7)** | FGBL's core product business model is the investment management and oversight of the split strike conversion strategy, implemented through an Offshore Fund (with two currency feeder funds), and two Onshore Funds. The Offshore Fund also utilizes a small portion of its assets (up to 5%) away from the Split Strike Conversion strategy to seed a small number of hedge fund management groups with varying and diverse investment methodologies. Working with one of its affiliates (Fairfield Greenwich Advisors LLC, SEC registrant 801-62504), FGBL conducts a detailed manager selection and due diligence process, analyzing such important issues as liquidity management, market and credit risks, management quality (which includes on-site visit(s), background, and reference checks), and operational, compliance, and regulatory risks. At the conclusion of the manager selection process, allocation of assets from the Offshore Fund to a successful hedge fund manager (which may be managed by an affiliate of FGBL) candidate will be determined based on a qualitative and quantitative analysis of each manager's potential for long-term risk-adjusted performance, relationship with other manager's previously seeded, and expected contribution to the targeted risk/return profile. |
| **Item 5** | FGBL generally requires a college degree and preferably an advanced degree for its professional personnel. Along with these educational requirements, FGBL prefers relevant securities industry experience. |
| **Item 6** | Anthony Dell'Arena<br>Chief Compliance Officer<br>YOB: 1964 | **Business Background for Past 5 Years**:<br><br>Mr. Dell'Arena joined FGG in 2005. Prior to such, he was employed by JPMorgan Chase & Co.'s Private Banking division, where he was a Vice President and Assistant General Counsel from 2002 to 2005.<br><br>**Education**:<br><br>Mr. Dell'Arena was awarded his Juris Doctor degree from the University of Arkansas School of Law, and holds Master's and Bachelor's degrees in History from Rutgers University. He is admitted to the bar of New Jersey, and is based in the New York office. Mr. Dell'Arena holds FINRA licenses |

Answer all items. Complete amended pages in full, circle amended items and file with execution page (page 1).

FSL00001217

FSL00001161

| Schedule F of FORM ADV | Applicant: | SEC File Number: | Date: |
|---|---|---|---|
| Continuation Sheet for Form ADV Part II | **Fairfield Greenwich (Bermuda) Ltd.** | **801-66439** | **March 27, 2008** |

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

| 1. | Full name of applicant exactly as stated in Item 1A of Part I of Form ADV: | | IRS Empl. Ident. No.: |
|---|---|---|---|
| | **Fairfield Greenwich (Bermuda) Ltd.** | | |

| Item of Form (identify) | Answer |
|---|---|
| | Series 7, 24, 63, and 65, and is a member of National Society of Compliance Professionals. |
| Daniel E. Lipton<br>Asst Secretary and Chief Financial Officer<br>YOB: 1971 | **Business Background for Past 5 Years:**<br><br>Mr. Lipton joined FGG in 2002 after nine years at Ernst & Young, where he was a Senior Manager in the Financial Services Assurance and Advisory Business Services Department, in charge of auditing and consulting engagements, specializing in alternative assets, private equity, venture capital, and domestic and offshore funds.<br><br>**Education:**<br><br>Mr. Lipton received his Bachelor of Arts degree in Economics from Tufts University and his Master of Business Administration dual degrees in Accounting and Finance from New York University's Stern School of Business; he is also a Certified Public Accountant. |
| Mark J. McKeefry<br>Director, Asst Secretary and Chief Legal Officer<br>YOB: 1961 | **Business Background For Past 5 Years:**<br><br>Mr. McKeefry joined FGG in 2003. Prior, he was an Associate at Buchalter Nemer, where he advised broker-dealers and investment advisors on regulatory and compliance issues for onshore and offshore funds.<br><br>**Education:**<br><br>Mr. McKeefry received his Bachelor of Science degree from Carnegie Mellon University and his Juris Doctor degree from Fordham University, where he was a member of the Law Review. Prior to attending law school, he was a professional engineer, licensed by the State of California as a civil engineer. Mr. McKeefry is admitted to the bars of California and New York. He holds FINRA licenses Series 7, 24, 63, 65 and 3. |
| Andrés Piedrahita<br>Director and President<br>YOB: 1959 | **Business Background for Past 5 Years:**<br>Mr. Piedrahita has been with FGBL since 1997.<br><br>**Education:**<br><br>Mr. Piedrahita received his Bachelor's Degree from the Boston University School of Communications. |
| Amit Vijayvergiya<br>Director, Vice President and Chief Risk Officer<br>YOB: 1969 | **Business Background for Past 5 Years:**<br><br>Mr. Vijayvergiya has over 12 years of experience in asset management, risk management, finance, and operations research. Prior to joining FGBL, from 2000 to 2003 Mr. Vijayvergiya managed a family office investing in traditional and alternative investment managers.<br><br>**Education:** |

Answer all items.  Complete amended pages in full, circle amended items and file with execution page (page 1).

FSL00001218

FSL00001161

| Schedule F of FORM ADV Continuation Sheet for Form ADV Part II | Applicant:<br>Fairfield Greenwich (Bermuda) Ltd. | SEC File Number:<br>801-66439 | Date:<br>March 27, 2008 |
|---|---|---|---|

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

| 1. | Full name of applicant exactly as stated in Item 1A of Part I of Form ADV:<br>**Fairfield Greenwich (Bermuda) Ltd.** | IRS Empl. Ident. No.: |
|---|---|---|

| Item of Form (identify) | Answer |
|---|---|
|  | Mr. Vijayvergiya received a Masters in Business Administration from Schulich School of Business at York University, a Bachelors of Science in Statistics from the University of Manitoba, and a Bachelors of Arts in Economics from the University of Western Ontario. Mr. Vijayvergiya holds the Chartered Financial Analyst designation and the Financial Risk Manager certification. |
| **Item 8.C.(1) and 8.D.** | An affiliate of FGBL, Fairfield Heathcliff Capital LLC ("FHC"), is registered with the Securities and Exchange Commission as a broker-dealer and is a member of the Financial Industry Regulatory Authority. It does not have a trading desk, nor does it open broker-dealer accounts or custody cash or securities. FHC's license is limited to selling limited partnership interests.   FHC serves as U.S. placement agent for the FGG Funds and will bear its costs associated with such activities. |
| **Item 8.C.(3) and 8.D.** | FGBL, Fairfield Greenwich (UK) Limited ("FGUK"), and Fairfield Greenwich Advisors LLC ("FGA"), are each wholly-owned subsidiaries of Fairfield Greenwich Limited ("FGL", and collectively, FGG). FGA is based in the U.S. and is registered with the Securities and Exchange Commission as a registered investment adviser (SEC File No. 801-62504).   FGUK is authorized and regulated by the Financial Services Authority, and serves as investment manager to a Luxembourg-registered SICAV and offshore fund-of-funds. FGG has also entered into a joint venture with Lion Capital Management Limited to create Lion Fairfield Capital Management ("LFC"), a hedge fund management and client servicing platform in Asia.  LFC holds a capital markets services license issued by the Monetary Authority of Singapore under the provisions of the Securities and Futures Act (Cap 289). FGA is the general partner of four (4) Delaware limited partnerships. No fund on the FGG platform is solicited to invest in any of them. FGBL is the general partner of two (2) Delaware limited partnerships. Certain other FGG funds have been solicited to invest in them. |
| **Item 8.C.(5)** | FGL is registered with the Commodity Futures Trading Commission as a commodity pool operator and is a member of the National Futures Association. |
| **Item 9.A.** | While FGBL does not as a matter of course engage in principal transactions, a related person of FGBL, an affiliate, Fairfield Greenwich (UK) Limited ("FGUK"), as Investment Manager of the Chester Global Strategy Fund Limited (the "Chester Fund"), has in February 2008 transferred certain securities held by the Chester Fund (i.e., interests in underlying hedge funds) to the Banif Fairfield Impala Fund (the "Banif Fund"), which is domiciled in Spain. Another affiliate of FGBL and FGUK, Fairfield Greenwich Advisors LLC ("FGA"), serves as the Banif Fund's sub-adviser. To establish the Banif Fund, FGA arranged for the parent of both it and FGUK, Fairfield Greenwich Limited ("FGL"), to contribute approximately half of the Banif Fund's initial capital, approximately $5 million Euro. The remaining initial seed money of $5 million Euro was contributed by Banco Banif S.A. As a result of this proprietary ownership, (i) the Banif Fund is deemed a principal account for certain U.S. regulatory purposes, (ii) FGUK is deemed to have acted as principal when selling the Assets from the Chester Fund to the Banif Fund and (iii) FGUK had to obtain consent from the Chester Fund in connection with the proposed transfer of Assets. In order to mitigate the conflict of interest inherent in the principal transaction, and to address the potential for self dealing, the consent of the Chester Fund shareholders was obtained prior to settlement of the transactions, who determined that the transactions served their best interest. Should FGBL seek to engage in a principal transaction, this same methodology would be followed. |

| Answer all items.  Complete amended pages in full, circle amended items and file with execution page (page 1). |
|---|

FSL00001219

FSL00001161

| Schedule F of FORM ADV Continuation Sheet for Form ADV Part II | Applicant: | SEC File Number: | Date: |
|---|---|---|---|
| | Fairfield Greenwich (Bermuda) Ltd. | 801-66439 | March 27, 2008 |

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

| 1. | Full name of applicant exactly as stated in Item 1A of Part I of Form ADV: | IRS Empl. Ident. No.: |
|---|---|---|
| | **Fairfield Greenwich (Bermuda) Ltd.** | |

| Item of Form (identify) | Answer |
|---|---|
| | |

| **Item 9.D.** | FGBL and its affiliates may solicit clients to invest in the FGBL Funds, or those funds of FGBL's affiliates (collectively, the "FGG Funds"). In the event of limited capacity in a particular FGG Fund, FGBL and its affiliates are committed to allocating investment opportunities and dispositions in the particular FGG Fund fairly among clients or vehicles. FGBL and certain of its affiliates and their officers may have financial interests as general partners, limited partners, shareholders, directors, investment managers, administrative manager, investment adviser or otherwise in such FGG Funds. Management and/or performance fees for such individuals and their family members may be waived in certain instances. |
|---|---|
| **Item 9.E.** | FGBL and its affiliates may purchase or sell shares or interest of a single manager fund for the accounts of multi-strategy funds. FGBL and certain of its affiliates and other multi-strategy funds may have a position in such Single Manager Fund.

With respect to standards of professional conduct, a Code of Ethics (the "Code") has been adopted by FGBL in order to comply with Rule 204A-1 (the "Rule") promulgated under the Investment Advisers Act of 1940, as amended. Rule 204A-1 requires every Investment Adviser registered with the Securities and Exchange Commission to adopt and enforce a written code of ethics applicable to its supervised persons. The Rule was designed to prevent fraud by reinforcing fiduciary principles that must govern the conduct of advisory firms and their personnel. The Code contains a provision reminding employees of their obligations to clients as well as a provision requiring the reporting of personal securities transactions and holdings. In order to ensure that FGBL 's employees are made aware of its standards, the Rule requires FGBL to obtain (and keep) a written acknowledgement from each employee confirming that he or she received a copy of the Code and any amendments.

Further, pursuant to the Rule, FGBL has deemed certain of its employees to be "Access Persons." An "Access Person" is an employee of FGBL who has access to nonpublic information regarding any clients' purchase or sale of securities, or nonpublic information regarding the portfolio holdings of any reportable fund, or who is involved in making securities recommendations to clients, or who has access to such recommendation that are nonpublic. FGBL Access Persons are required to provide FGBL with personal (which includes household) securities account information and FGBL thus arranges for the delivery to its office for its review duplicate copies of confirmations and statements of any personal trading activity. FGBL Access Persons are not free to trade without having first pre-cleared trades with FGBL. In all cases, FGBL will attempt of resolve any conflicts of interest by exercising the good faith required of fiduciaries. FGBL reviews the personal investment activities of its Access Persons to ensure that the following general fiduciary principles are met:

    (a)  the duty at all times to place the interests of clients of FGBL first;
    (b)  the duty to prevent the misuse of material nonpublic information which includes client securities holdings and transactions;
    (c)  the requirement that all personal securities transactions be conducted in such a manner as to avoid any actual or potential conflict of interest or any abuse of an individual's position of trust and responsibility; and
    (d)  the fundamental standard that FGBL personnel may not take inappropriate advantage of their position.

Investors may request a copy of the Code by contacting FGBL at the address or telephone number listed on the first page of this document. |

**Answer all items. Complete amended pages in full, circle amended items and file with execution page (page 1).**

**Schedule F of FORM ADV**
**Continuation Sheet for Form**
**ADV Part II**

| Applicant: | SEC File Number: | Date: |
|---|---|---|
| Fairfield Greenwich (Bermuda) Ltd. | 801-66439 | March 27, 2008 |

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

| 1. | Full name of applicant exactly as stated in Item 1A of Part I of Form ADV: | IRS Empl. Ident. No.: |
|---|---|---|
| | **Fairfield Greenwich (Bermuda) Ltd.** | |

| Item of Form (identify) | Answer |
|---|---|

| **Item 10** | The FGBL Funds impose various initial minimum investment amounts, ranging between US$100,000 and US$1,000,000, and in equivalent amounts in different currencies including Euro and Swiss Franc. The FGG Funds may accept investment in lesser amounts. Generally, investors are required to have a net worth of at least US$1,500,000. |
|---|---|
| **Item 11.A.** | Portfolios are reviewed at the individual security level from independent sources discussed among members of the FRS team, FGBL and FGA several times each month (see, e.g., Schedule F, Item 4.B.8). FRS, FGBL and FGA utilize a number of independent, sophisticated quantitative measurement tools to monitor the performance of its managers, compliance with investment guidelines, and risk analysis. FRS, FGBL and FGA personnel review changes in a variety of factors, including changes in organization, investment process, the manager's view of the relevant markets, and their portfolio's position with respect to those views. The findings are discussed at regular meetings. |
| **Item 11.B.** | Investors will receive audited financial statements of the applicable Fund annually, and unaudited performance reports at least monthly. In addition, investors may also receive quarterly or semi-annual letters regarding their investments.<br><br>FGBL is committed to maintaining the privacy of our clients and to the safeguarding of their personal information. Our privacy policy is distributed to clients in accordance with Regulation S-P on an initial and annual basis, to help clients understand what personal information we collect, how that information is protected, and why, in certain cases, the information may be shared. |
| **Item 12** | For certain of the FGG Funds, FGBL or an affiliate has full discretion and authority to make all investment decisions with respect to the types of securities to be bought and sold, and the amount of securities to be bought or sought for such Fund, and there are no limitations as to which broker dealer is used or as to the commission rates paid. However, portfolio transactions will be allocated to brokers on the basis of best execution and in consideration of brokerage and research services (e.g., research ideas, investment strategies, special execution and block positioning capabilities, clearance, settlement and custodial services), financial stability, reputation and efficiency of such broker-dealers. Broker-dealers providing such services may be paid commissions in excess of those that other broker-dealers not providing such services might charge. |
| **Item 13.A.** | A related person of FGBL receives research reports from various brokers, but neither the related person nor FGBL currently have any "soft dollar" arrangements outside the parameters of Section 28(e) of the Securities Exchange Act of 1934, as amended, in effect. |
| **Item 13.B.** | From time to time, FGL, or an affiliate, may enter into agreements to compensate third party and/or certain internal agents, providing for cash compensation for securing clients which may be in the form of a placement fee or participation in the sharing of the management and/or performance fees. |

**Answer all items. Complete amended pages in full, circle amended items and file with execution page (page 1).**

FSL00001221

FSL00001161

# EXHIBIT D

For the Exclusive Use of: _____     Copy No. _____

*Confidential Private Placement Memorandum*

### FAIRFIELD SIGMA LIMITED
*A British Virgin Islands Business Company*

*Euro, Singapore Dollar and Yen Shares*

*Securities Offered:  Redeemable, Voting Shares*

*Minimum Investment per Subscriber: €200,000; SGD $375,000 or ¥ 2,000,000*

*Purchase Price per Share: Net Asset Value per Share*

**Investment Manager:**
*Fairfield Greenwich (Bermuda) Ltd.*

**Administrator:**
*Citco Fund Services (Europe) B.V.*

*THE DIRECT OR INDIRECT SALE OF SHARES OF FAIRFIELD SIGMA LIMITED TO CITIZENS, NATIONALS OR RESIDENTS OF, OR INSTITUTIONS OR OTHER ENTITIES ORGANIZED, CHARTERED OR RESIDENT IN THE UNITED STATES OF AMERICA IS EXPRESSLY PROHIBITED.*

*THE SHARES OFFERED HEREBY ARE SPECULATIVE AND INVOLVE A HIGH DEGREE OF RISK.  THEY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES LAWS OF ANY JURISDICTION AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF SUCH LAWS.  THE SHARES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE FUND'S ARTICLES OF ASSOCIATION. THE SHARES HAVE NOT BEEN APPROVED OR DISAPPROVED BY ANY REGULATORY AUTHORITY, NOR HAS ANY SUCH AUTHORITY PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM.*

*This Confidential Private Placement Memorandum is dated as of December 1, 2008*

**Fairfield Greenwich (Bermuda) Ltd.**

**COMMODITY POOL OPERATOR EXEMPTION**

THE INVESTMENT MANAGER HAS FILED A CLAIM OF EXEMPTION FROM REGISTRATION AS A COMMODITY POOL OPERATOR ("CPO") WITH THE UNITED STATES COMMODITY FUTURES TRADING COMMISSION ("CFTC") IN CONNECTION WITH PRIVATE INVESTMENT FUNDS WHOSE PARTICIPANTS ARE ACCREDITED INVESTORS, AS DEFINED IN REGULATION D UNDER THE SECURITIES ACT OF 1933, CERTAIN FAMILY TRUSTS AND CERTAIN PERSONS AFFILIATED WITH THE INVESTMENT MANAGER. AT ALL TIMES, THE FUND WILL UTILIZE FUTURES SUCH THAT EITHER (1) NO MORE THAN 5% OF ITS ASSETS ARE USED TO ESTABLISH COMMODITY INTEREST POSITIONS OR (2) THE NOTIONAL VALUE OF ITS COMMODITY INTEREST POSITIONS DOES NOT EXCEED 100% OF THE FUND'S LIQUIDATION VALUE.

UNLIKE A REGISTERED CPO, THE INVESTMENT MANAGER IS NOT REQUIRED TO DELIVER A DISCLOSURE DOCUMENT AND A CERTIFIED ANNUAL REPORT TO PARTICIPANTS IN THE FUND. THE CFTC HAS NOT REVIEWED OR APPROVED THIS OFFERING OR ANY DISCLOSURE DOCUMENT FOR THE FUND.

## CERTAIN GENERAL INFORMATION

The voting redeemable shares offered hereby will be issued only on the basis of the information in this Confidential Private Placement Memorandum and any attachments hereto (the "Memorandum").  No other information about Fairfield Sigma Limited (the "Fund") has been authorized.  Any investment in the Fund on the basis of information that is not contained, or which is inconsistent with, the information herein shall be solely at your risk.  The delivery of this Memorandum does not imply that any information herein is correct at any time after the date hereof.

Currently, the Fund has three classes of shares, a Euro class of shares (the "Euro Shares"), a Singapore dollar class of shares (the "SGD Shares") and a Yen class of shares (the "Yen Shares", and collectively with the Euro Shares and SGD Shares, the "Shares").  All Shares within a class have the same rights per Share, including the right to one vote per Share.

You should inform yourself of the legal requirements and tax consequences within the countries of your residence or domicile for the purchase, holding or sale of the Shares, and any foreign exchange restrictions.  Shares that are bought by persons not entitled to hold them in accordance with the provisions herein may be compulsorily redeemed.  No Shares may be transferred without the prior written consent of the Fund's Directors.

The distribution of this Memorandum may be restricted by law in certain countries.  You must inform yourself of and observe any such restrictions.  You should review the Country-Specific Notices contained in the Memorandum for any applicable notices for your countries of residence or domicile.  This Memorandum does not constitute an offer or solicitation to any person in any jurisdiction in which the offer or solicitation is not authorized, or to any person to whom it is unlawful to make the offer or solicitation.

No person is authorized to give any information with respect to the Fund unless authorized by the Directors.  This Memorandum supersedes any written or verbal information relating to the Fund.

You should not construe this Memorandum as legal or investment advice.  You should consult your own attorneys, accountants and other advisers regarding this investment.

This Memorandum describes certain documents relating to this investment, including various executed and unexecuted documents and certain statutes, rulings and regulations.  Such summaries do not purport to be complete and are qualified in their entirety by reference to the full text of those documents, statutes, rulings and regulations.

You and your investment representatives are invited to ask questions of and to obtain additional information from the Administrator (Citco Fund Services (Europe) B.V.) or Investment Manager (Fairfield Greenwich (Bermuda) Ltd.) concerning the Fund, including additional information to verify the completeness or accuracy of the information in this Memorandum.

The Fund is a Business Company under the BVI Business Companies Act, 2004.  The Fund constitutes a "professional fund" as defined in the Mutual Funds Act, 1996 (as amended) of the British Virgin Islands (the "BVI Act") and as such is required to be and is recognized as a "professional fund" under the provisions of the BVI Act. Such recognition does not entail supervision of the investment performance or portfolio of the Fund by the Financial Services Commission of the

British Virgin Islands (the "BVI") which accepts no responsibility for the financial soundness of the Fund or the correctness of any statements or opinions expressed herein. There is no financial obligation or compensation scheme imposed on or by the Financial Services Commission of the BVI in favor of or available to the investors in the Fund.

As an entity regulated under the BVI Act, the Fund will be subject to the supervision of the Financial Services Commission in the BVI, which is authorized by the BVI Act to direct the Fund to furnish information or provide access to any records, books or other documents which it deems necessary to ascertain compliance with the BVI Act or any regulations made under the BVI Act.

The BVI Act provides that the Fund's certificate of recognition may be cancelled if, among other things, the Fund has breached the BVI Act or any regulations or codes of conduct or conditions of its certificate, has been convicted of an offense, is carrying on business in a manner detrimental to its investors or to the public interest, or is declared bankrupt or is being wound up or dissolved.

Because the Fund is a professional fund under the BVI Act, the Shares may be held only by persons who are "professional investors" within the meaning of the BVI Act and on the basis that the initial investment in the Fund by each of its shareholders is not less than U.S. $100,000 or its equivalent in any other currency. A professional investor is any person whose ordinary business involves, whether for his own account or for the account of others, the acquisition or disposal of property of the same kind as the property, or a substantial part of the property, of the Fund, or who has signed a declaration that he, whether individually or jointly with his spouse, has a net worth in excess of U.S. $1,000,000 or its equivalent in any other currency and that he consents to being treated as a professional investor.

This is a private offering, made only on delivery of this Memorandum to the prospective investor whose name appears on the cover hereof. This Memorandum may not be reproduced or used for any other purpose. Any distribution of this Memorandum in whole or in part, or the divulgence of any of its contents, is unauthorized. By accepting delivery of this Memorandum, you agree to return it to the Fund if you do not invest.

iv

## FUND DIRECTORY

*THE FUND*
      Fairfield Sigma Limited
      c/o Codan Trust Company (B.V.I.) Ltd.
      P.O. Box 3140
      Romasco Place, Wickhams Cay
      Road Town, Tortola
      British Virgin Islands

*INVESTMENT MANAGER*
      Fairfield Greenwich (Bermuda) Limited
      37 Reid Street
      1st Floor
      Hamilton, Bermuda
      Telephone:  441-292-5401
      Facsimile:  441-292-5413

*ADMINISTRATOR; REGISTRAR*
*AND TRANSFER AGENT*
      Citco Fund Services (Europe) B.V.
      Telestone 8 - Teleport
      Naritaweg 165
      1043 BW  Amsterdam
      The Netherlands
      Telephone: (31-20) 572-2850
      Facsimile:  (31-20) 572-2610

*U.S. COUNSEL*
      Seward & Kissel LLP
      One Battery Park Plaza
      New York, New York  10004

*BRITISH VIRGIN ISLANDS COUNSEL*
      Conyers Dill & Pearman
      Romasco Place, Wickhams Cay 1
      P.O. Box 3140
      Road Town, Tortola
      British Virgin Islands

*AUDITORS*
      PriceWaterhouseCoopers
      Marten Meesweg 25
      3068 AV Rotterdam
      The Netherlands

*PAYMENT BANK*
      Citco Bank Nederland, N.V. Dublin Branch
      Custom House Plaza, Block 6
      International Financial Services Centre
      P.O. Box 6639
      Dublin 1
      Ireland
      Telephone: 353 (0) 1 636 7100
      Facsimile: 353 (0) 1 636 7102

*CUSTODIAN*                              Citco Global Custody N.V.
                                        Telestone 8 – Teleport
                                        Naritaweg 165
                                        1043 BV Amsterdam
                                        The Netherlands
                                        Telephone: (31-20) 572-2200
                                        Facsimile: (31-20) 572-2625

## TABLE OF CONTENTS

FUND DIRECTORY ............................................................................................................... v
SUMMARY ........................................................................................................................... 1
THE FUND ........................................................................................................................... 5
MANAGEMENT OF THE FUND AND OTHER RELATIONSHIPS ........................................... 5
INVESTMENT POLICIES ....................................................................................................... 9
OFFERING OF THE SHARES ................................................................................................. 12
FEES, COMPENSATION AND EXPENSES .............................................................................. 15
CUSTODIAN AND BROKERAGE ........................................................................................... 16
ADMINISTRATOR, REGISTRAR AND TRANSFER AGENT ..................................................... 18
RISK FACTORS .................................................................................................................... 19
POTENTIAL CONFLICTS OF INTEREST ................................................................................ 26
DESCRIPTION OF SHARES ................................................................................................... 27
DIVIDEND POLICY .............................................................................................................. 27
TRANSFERS, REDEMPTIONS AND TERMINATION ............................................................... 28
ANTI-MONEY LAUNDERING REGULATIONS ....................................................................... 29
ANTI MONEY-LAUNDERING POLICIES ............................................................................... 30
TAX CONSIDERATIONS AND EXCHANGE CONTROL AND ERISA ....................................... 32
LEGAL MATTERS ................................................................................................................ 33
MISCELLANEOUS ............................................................................................................... 33

## SUMMARY

The following Summary is intended to highlight certain basic information which is set forth more fully elsewhere in this Confidential Private Placement Memorandum and in the Memorandum of Association and Articles of Association of the Fund. This should be read in conjunction with such detailed information. All references herein to "U.S. $" are to United States dollars, all references herein to "€" herein are to Euro, all references herein to "SGD $" are to Singapore dollars and all references herein to "¥" are to Yen.

<u>The Offering</u>

Issuer

Fairfield Sigma Limited (the "Fund") is organized as a Business Company under the laws of the Territory of the BVI. The registered office of the Fund is located in the BVI.

Securities Offered

The Fund's redeemable voting shares, denominated in Euros, Singapore dollars and Yen (the "Shares"), are being offered hereby at a price equal to the Net Asset Value (as hereinafter defined) as of the opening of business on the date of such issuance (generally the first business day of every month).

The Shares will be offered to subscribers who desire to invest in Fairfield Sentry Limited and to hedge the currency exposure to the Euro, Singapore dollar and Yen resulting from the Fund holding assets (i.e., shares in Fairfield Sentry Limited) denominated in U.S. dollars.

Offerees

Purchasers who are not citizens, nationals or residents of, or institutions or other entities organized, chartered or resident in, the United States. See "OFFERING OF THE SHARES."

Minimum Subscription

The minimum initial subscription per investor is €200,000, SGD $375,000 or ¥2,000,000, as the case may be, unless the Fund deems it advisable to permit subscriptions for a lesser amount provided that such lesser amount shall at all times be no less than the Euro, Singapore dollar or Yen equivalent, as the case may be, of US $100,000. Following his initial investment, a shareholder may make additional investments in amounts of not less than €75,000, SGD $125,000 or ¥750,000, as the case may be.

Maximum Capitalization

The Fund will not accept a subscription tendered at a time when the number of its outstanding Shares is 15,000,000.

Subscription Procedures

It is preferable that subscriptions be made by wire transfer. However, subscriptions may be made by mail if necessary. Subscriptions received during any calendar month prior to the fifth to the last business day of the month will ordinarily be accepted, subject to the sole discretion of the Investment Manager (as defined below), as of the first business day of the following month, i.e., subscriptions received between March 1 and March 25  will be

1

accepted as of April 1.  Subscriptions will become irrevocable to the subscriber on the fifth to the last business day of the month in which such subscription is received by the Fund.

| | |
|---|---|
| Solicitation of Subscriptions | There are no underwriting arrangements with respect to the offering of Shares.  All solicitations of subscriptions will be made directly by the Fund or through the assistance of unaffiliated placement agents and money managers.   Such unaffiliated placement agents and money managers may charge their clients a placement fee of up to 5% of the total amount of the subscription for Shares sold with their assistance, and/or share in the fees earned by Fairfield Greenwich (Bermuda) Ltd. ("FGBL"), as Investment Manager, which they may rebate to their clients.   FGBL or an affiliate may also charge a placement fee of up to 3% on such subscriptions, provided that total placement fees do not exceed 5%.  In certain instances, the Fund may deduct the amount of the placement fee from the subscription amount to pay to the unaffiliated placement agent or FGBL and such amounts will not constitute part of the assets of the Fund. |
| Business Objective of the Fund | The Fund will seek to obtain capital appreciation of its assets by purchasing shares in Fairfield Sentry Limited ("FSL"), a British Virgin Islands Business Company, which principally utilizes a non-traditional options trading strategy described as "split strike conversion" to which FSL allocates the predominant portion of its assets. FSL is an affiliate of the Fund and the investment manager, Fairfield Greenwich (Bermuda) Ltd.   See "INVESTMENT POLICIES".  The Fund will allocate a small portion of its assets to a nonaffiliated bank (the "Bank") to provide a currency overlay program designed to hedge the currency exposure of its shareholders resulting from the Fund holding assets denominated in U.S. Dollars. The Fund's obligations to the Bank with respect to the currency hedging activities may be collateralized from time to time through a pledge of the assets underlying the Shares (i.e., the Fund's shares in FSL).  In order to perfect this pledge of assets, the Fund's shares in FSL may be held in the name of the Bank.  In that event, the Bank will be permitted to take any and all appropriate action with respect to these FSL shares at any time in the event of a default on the part of the Fund with respect to its obligations to the Bank. |
| Investment Manager | Fairfield Greenwich (Bermuda) Ltd. ("FGBL" or the "Investment Manager"), a corporation organized under the laws of Bermuda, serves as the Fund's investment manager and is the Investment Manager of FSL.  It is an affiliate of Fairfield Greenwich Limited ("FGL"), an exempted company organized under the laws of the Cayman Islands, which previously served as the investment manager of the Fund.  FGL's main principals are Walter M. Noel, Jr., Jeffrey H. Tucker, and Andres Piedrahita.  Mr. Noel is also a Director of the Fund  (see  "MANAGEMENT OF THE FUND AND OTHER RELATIONSHIPS").  FGBL is registered as an investment adviser |

with the United States Securities and Exchange Commission pursuant to the Investment Advisers Act of 1940, as amended. The Investment Manager has claimed an exemption under Commodity Futures Trading Commission ("CFTC") Rule 4.13(a)(3) from registration with the CFTC as a commodity pool operator and, accordingly, is not subject to certain regulatory requirements with respect to the Fund that would otherwise be applicable absent such an exemption.

| | |
|---|---|
| Directors | Walter M. Noel, Jr., Jan R. Naess and Peter P. Schmid are the Directors of the Fund. They are also the Directors of FSL and Mr. Noel is also a Director of FGL. |
| Citco | Citco Fund Services (Europe) B.V., an affiliate of The Citco Group Ltd., acts as administrator, registrar and transfer agent for the Fund. |
| Dividend Policy | It is anticipated that the Fund will not declare any dividends; rather, income will be reinvested and will be reflected in the Net Asset Value of the Shares. |

Sale, Redemption and Exchange Of Shares

| | |
|---|---|
| Redemption at the Option of a Shareholder | A shareholder of the Fund, on fifteen (15) calendar days' notice, may cause his Shares to be redeemed as of the last business day of any month. A shareholder is not required to hold his Shares for any minimum period of time in order to exercise his redemption privilege. |
| Compulsory Redemption | The Fund reserves the right to call all or a part of a shareholder's Shares for redemption at any time for any reason or for no reason. |
| Sales | The Fund will offer its Shares on a continuous basis. Subscriptions received during any calendar month prior to the fifth to the last business day of the month will ordinarily be accepted, subject to the discretion of the Investment Manager, as of the first business day of the following month, i.e., subscriptions received between March 1 and March 25 will be accepted as of April 1. Subscriptions will become irrevocable to the subscriber on the fifth to the last business day of the month in which such subscription is received by the Fund. |

Compensation and Expenses

| | |
|---|---|
| Expenses | The Fund will bear, for each year, all continuing offering costs; all ordinary legal and auditing fees; all registrar, transfer agent and administration fees; all insurance expenses; and all expenses in maintaining the Fund's office and all other expenses incurred in the operation of the Fund, if any, including any legal and auditing fees that relate to extraordinary circumstances, such as tax examinations or litigation involving the Fund, as well as all fees and all ordinary and necessary expenses related to the Fund's investment and trading |

activities.  Transactional costs will be included in FSL's calculation of profit and loss and therefore will be indirectly borne by the Fund.  The costs incident to the currency hedging program will be borne by the Fund.  Fairfield Greenwich Advisors LLC, an affiliate of the Investment Manager, will receive an annual expense reimbursement from the Fund, payable quarterly, in an amount equal to 0.0375% of the Fund's Net Asset Value (0.15% on an annual basis) as of the last day of each calendar quarter, for providing certain administrative services and back-office support to the Fund.

Management Fee

The Fund does not directly pay the Investment Manager a management fee.  However, as investment manager of FSL (in which substantially all of the Fund's assets are invested), the Investment Manager will receive from FSL a monthly management fee in an amount equal to one-twelfth of one percent (0.0833%) (1.0% per annum) of FSL's net asset value before the FSL Performance Fee (as defined), as calculated at the opening of the first day of each calendar month, which will include subscriptions for shares accepted by FSL as of the first day of the month.  This fee is payable monthly in advance.

Performance Fee

The Fund does not directly pay the Investment Manager a performance fee.  However, as investment manager of FSL (in which substantially all of the Fund's assets are invested), the Investment Manager will receive from FSL, for each calendar quarter, a performance fee (the "FSL Performance Fee") with respect to each share outstanding during such calendar quarter in an aggregate amount equal to 20% of the net realized and net unrealized appreciation in the net asset value, allocable to each share ("Net Profits) in such calendar quarter, if any; subject to reduction in connection with certain offsets with respect to each share provided, however, that if a share has a loss chargeable to during any calendar quarter or quarters ("Unrecouped Loss") and during any succeeding calendar quarters there are Net Profits allocable to the share, there will be no FSL Performance Fee payable with respect to such share until the amount of the Unrecouped Loss allocated to such share has been recouped.  If shares are redeemed during a calendar quarter, the Unrecouped Loss relating to such shares will be reduced in the same proportion as the reduction in the net asset value of such shares caused by such redemption..  FSL shares which are either purchased or redeemed during a calendar quarter shall be subject to the payment of a FSL Performance Fee only for the portion of the calendar quarter during which such shares were outstanding.  The FSL Performance Fee will only be paid on "new appreciation" in FSL's net asset value allocable to the shares.

4

# THE FUND

Description

The Fund was incorporated in the Territory of the British Virgin Islands ("BVI") as a Business Company on March 19, 1997. The registered office of the Fund is located in Road Town, Tortola, British Virgin Islands.

     Shareholders will have the right to redeem part or all of their voting Shares, or purchase additional Shares, on a monthly basis (See "TRANSFERS, REDEMPTIONS AND TERMINATION").

## MANAGEMENT OF THE FUND AND OTHER RELATIONSHIPS

The Fund

     The Fund's Board of Directors has overall management responsibility for the Fund, including establishing investment, dividend and distribution policy, and having the authority to select and replace the Fund's administrator, registrar and transfer agent, custodian, any officers of the Fund and other persons or entities with management or administrative responsibilities to the Fund. None of the Fund's Directors own an equity interest in the Fund.

     The Directors of the Fund are as follows:

     **Walter M. Noel, Jr.**, has over 30 years of experience in the investment business. From 1959 to 1972, he was associated with the Management Services Division of Arthur D. Little Inc., an industrial and management consulting firm. From 1972 to 1974, Mr. Noel was President of Bahag Banking Ltd., in Lausanne, Switzerland. In 1974, Mr. Noel became Vice President of the International Private Banking Department of Citibank, N.A., where he remained until 1977 when he became Senior Vice President of the International Private Banking Department of Chemical Bank. Mr. Noel remained at Chemical Bank until 1983, where he shared primary responsibility for developing its offshore private banking business. Since founding The Fairfield Greenwich Group, an affiliate of the Fund's investment manager, Fairfield Greenwich (Bermuda) Ltd., in 1983, Mr. Noel has been a director or general partner for a variety of its funds, including Fairfield Sentry Limited, directing marketing activity, and originating various of The Fairfield Greenwich Group's business opportunities. Mr. Noel graduated from Vanderbilt University in 1952, received an MA in Economics from Harvard University in 1953, and graduated from Harvard Law School in 1959.

     **Jan R. Naess**, received a Bachelor of Arts degree in 1981 and a Masters degree in Economics in 1983 from the University of Oslo. From 1983 to 1987, he was employed in the Economic Research Department of R.S. Platou a.s. in Oslo, a leading shipbrokering firm. In 1987, Mr. Naess joined with R.S. Platou a.s. to form R.S. Platou Asset Management a.s., which was instrumental in the sale and purchase of 15 bulk carriers from 1987 to 1989. In 1989, Mr. Naess liquidated his interest in R.S. Platou Asset Management a.s. and formed PAN Shipping Ltd., a shipowning/operating and project development fund, which merged with Northern Navigation International Limited ("NNI") in 1991. Mr. Naess is a Vice-President of NNI, a Liberian corporation, which is in the business of investing in and managing shipping assets. He serves as a Director of several funds with which The Fairfield Greenwich Group is affiliated, including Fairfield Sentry Limited.

**Peter P. Schmid**, received a Swiss Federal Certificate of Capacity in 1968.  Mr. Schmid was employed by Credit Suisse from 1968 to 1986.  From 1975 to 1977, he was employed in Credit Suisse's International Portfolio Management Department in Zurich.  After a brief posting in Credit Suisse's New York office, Mr. Schmid was in charge of the bank's representative office in Rio de Janeiro from 1977 to 1984.  From 1984 to 1986, Mr. Schmid was Vice President in charge of Credit Suisse's Latin American Private Banking Desk in Geneva.  Mr. Schmid has been an independent investment adviser since April 1986.  He is President of Peter Schmid (Portfolio Management), P. Schmid & Associés, S.A. and Armor S.A.  Mr. Schmid is a Director of Inter Asset Management Inc. and several funds with which The Fairfield Greenwich Group is affiliated, including Fairfield Sentry Limited.

The Investment Manager

The Fund's investment manager is Fairfield Greenwich (Bermuda) Ltd. ("FGBL or the "Investment Manager"), a corporation organized under the laws of Bermuda, which was incorporated on June 13, 2003.  It is responsible for managing the Funds' investment activities, the selection of the Fund's investments, monitoring its investments and maintaining the relationship between the Fund and Fairfield Sentry Limited and with its escrow agent, custodian, administrator, registrar and transfer agent.  The Investment Manager is an affiliate of Fairfield Greenwich Limited, an exempted company organized under the laws of the Cayman Islands ("FGL"), which previously served as the investment manager of the Fund and Fairfield Sentry Limited.

FGBL and FGL are member companies of the Fairfield Greenwich Group ("FGG") which was established in 1983 and had, as of December 1, 2008, more than U.S. $14 billion employed in alternative asset management funds.  Throughout its history, FGG has internally managed its own alternative asset funds and selectively identified external managers for affiliations where it serves as a managerial and distribution partner.

The Investment Manager and its affiliates currently serve as investment or administrative manager to more than 20 funds, and have exclusive distribution arrangements with several others. FGG maintains its principal office in New York, with a offices in London and Bermuda.  Marketing and client support offices exist in other locations in the United States, Europe, and Latin America. FGG's London entity is licensed and subject to the supervision of the United Kingdom Financial Services Authority (the "FSA"). An affiliate of FGG is registered as a broker-dealer in the United States.

The Investment Manager is registered as an investment adviser with the United States Securities and Exchange Commission under the Investment Advisers Act of 1940, as amended.  In addition, the Investment Manager has claimed an exemption under Commodity Futures Trading Commission ("CFTC") Rule 4.13(a)(3) from registration with the CFTC as a commodity pool operator and, accordingly, is not subject to certain regulatory requirements with respect to the Fund that would otherwise be applicable absent such an exemption.

Following is biographical information on the founders, principal officers and certain other key employees of FGG and its affiliates:

**Walter M. Noel Jr.,** Non-executive Director, co-founded FGG in 1983.  Biographical information for Mr. Noel is set forth in the section titled "MANAGEMENT OF THE FUND AND OTHER RELATIONSHIPS -The Fund".

6

Andres Piedrahita, Executive Director and Chairman, founded Littlestone Associates in 1991, which merged with FGG in 1997. Mr. Piedrahita directs the Group's European and Latin American activities. Mr. Piedrahita has over 15 years of experience in the investment business. Prior to the merger, Mr. Piedrahita was the Director and President of Littlestone Associates, Inc. (1991-1997). He was previously a Vice President at Shearson Lehman Hutton, specializing in money management consulting for non-U.S. institutions and individuals (1987-1990). Before joining Shearson, Mr. Piedrahita was a financial consultant with Prudential Bache Securities Inc. in New York (1981-1987). He received his BA from Boston University's School of Communications.

Jeffrey Tucker, Non-executive Director, is a co-founder of FGG. He has over 30 years of experience in investment related businesses. Mr. Tucker was an attorney with the SEC from 1970 to 1978. From 1975 to 1978, he was an Assistant Regional Administrator of the SEC's New York regional office, with supervisory responsibility for approximately half of its enforcement program. Mr. Tucker entered private practice in 1978 as a partner at the law firm Tucker, Globerman & Feinsand, where he remained until 1987. He specialized in securities and transactional matters, with a principal focus on limited partnership offerings. Mr. Tucker entered the securities industry in 1987 as a general partner of Fred Kolber & Co. ("Kolber"), a broker-dealer. At Kolber, Mr. Tucker was responsible for the development and administration of the firm's options company. FGG began its association with Kolber at that time as a marketing agent, and the firms subsequently merged activities. Throughout FGG's development, Mr. Tucker has been responsible for directing its business and operational development and has been a director or general partner for a variety of its investment funds. In 1989, Mr. Tucker introduced the Madoff Securities relationship to FGG, which became the basis for FGG's Fairfield Sentry Fund. Mr. Tucker received his BA from Syracuse University and his Juris Doctor degree from Brooklyn Law School.

Jeffrey Tucker, Non-executive Director, is a co-founder of FGG. He has over 30 years of experience in investment related businesses. Mr. Tucker was an attorney with the SEC from 1970 to 1978. From 1975 to 1978, he was an Assistant Regional Administrator of the SEC's New York regional office, with supervisory responsibility for approximately half of its enforcement program. Mr. Tucker entered private practice in 1978 as a partner at the law firm Tucker, Globerman & Feinsand, where he remained until 1987. He specialized in securities and transactional matters, with a principal focus on limited partnership offerings. Mr. Tucker entered the securities industry in 1987 as a general partner of Fred Kolber & Co. ("Kolber"), a broker-dealer. At Kolber, Mr. Tucker was responsible for the development and administration of the firm's options company. FGG began its association with Kolber at that time as a marketing agent, and the firms subsequently merged activities. Throughout FGG's development, Mr. Tucker has been responsible for directing its business and operational development and has been a director or general partner for a variety of its investment funds. In 1989, Mr. Tucker introduced the Madoff Securities relationship to FGG, which became the basis for FGG's Fairfield Sentry Fund. Mr. Tucker received his BA from Syracuse University and his Juris Doctor degree from Brooklyn Law School.

Richard Landsberger, Executive Director, is Head of Sales. Mr. Landsberger is responsible for business development and general management issues in Europe, Asia and the Middle East, and directly markets products to a global institutional client base. He has over 20 years of experience in capital markets. Prior to joining FGG in 2001, Mr. Landsberger was Managing Director of Fixed Income Sales at PaineWebber (1993-2000). He was previously Managing Director and Head of Fixed Income Government Trading & Sales at Citicorp Securities (1989-1992). Mr. Landsberger received his BA from Boston University in 1976 and his Master in Business Administration from Cornell University in 1979.

**Mark McKeefry**, Executive Director, is Chief Operating Officer and General Counsel of FGG. Mr. McKeefry joined FGG in 2003, after eight years in private practice in New York and California, where he advised broker-dealers and investment advisers on regulatory and compliance issues for onshore and offshore funds. He is the author of several articles on hedge fund compliance issues and investment adviser trading practices. Mr. McKeefry received his Bachelor of Science degree from Carnegie Mellon University and his Juris Doctor degree from Fordham University, where he was a member of the Law Review. Prior to attending law school, he was a professional civil engineer, licensed by the State of California. Mr. McKeefry is admitted to the bars of California and New York.

**Charles Murphy**, Executive Director, is responsible for strategy and capital markets business. Mr. Murphy has over 20 years of banking experience, most recently from 2005 to 2007 as co-Head of the European Financial Institutions Group at Credit Suisse. From 2001 to 2005 he was at Deutsche Bank as Head of European Financial Institutions. From 2000 to 2001, he was a founder and CFO of Antfactory, an Internet incubator. Mr. Murphy was with Morgan Stanley through the 1990's, having moved from New York to London in 1993, as Head of the European Financial Institutions Group until 2000. He started his career in 1985 as an Associate in Corporate Finance at Goldman Sachs in New York, joining their financial institutions group in 1987. Mr. Murphy has a JD degree from Harvard Law School (1985), an MBA from MIT's Sloan School (1984), and a BA from Columbia College (1981).

**Andrew Smith**, Executive Director, is the Portfolio Manager who oversees all operations for the Chester Global Strategy Funds, Irongate Global Strategy Fund, and Chester Horizons Fund for FGG. He is also a member of FGG's Investment Committee. He has over 15 years experience in finance, asset management, private equity, and real estate. Prior to joining FGG, Mr. Smith was a Partner at Chester Investments (unaffiliated), a private investment firm/family office, where he was responsible for alternative investments including hedge funds, private equity, income-producing real estate, and real estate development in the U.S. and in Europe. Mr. Smith also was responsible for corporate strategy and business development. Prior to Chester, Mr. Smith worked in the private client group at CIBC World Markets. Mr. Smith co headed a group responsible for advising high-net worth clients' portfolios within CIBC Oppenheimer. Prior to CIBC, Mr. Smith founded and built a private consumer services and real estate company to over 3,000 employees and $110 million in annual revenues. Prior to founding that company, Mr. Smith spent three years with Cantor Fitzgerald in New York as an Associate. Mr. Smith is a graduate of Dartmouth College.

**Philip Toub**, Executive Director, markets FGG's offshore funds and assists in the development of new products. He is responsible for business development in Brazil and the Middle East. He has over 15 years of investment experience. Prior to joining FGG in 1997, Mr. Toub worked at Moore Capital (1995-1997) primarily on the Asian and European Trading desk. He previously worked at Goldman Sachs and Bear Stearns & Co. (1987-1989) on the brokerage side. Mr. Toub received his Bachelor of Arts degree from Middlebury College and is based in the New York office.

The Investment Manager will not have any beneficial interest in the Fund, although FGL and certain of its principals have beneficial interests in Fairfield Sentry Limited, with which the Fund will invest.

Pursuant to the Investment Management Agreement between the Fund and the Investment Manager, the Investment Manager is not liable for any error of judgment or for any loss incurred by the Fund unless such loss resulted from the Investment Manager's willful misfeasance, bad faith, gross negligence or reckless disregard of its obligations and duties. The Investment Management

Agreement further provides that the Investment Manager, its directors, officers, employees, agents and counsel will be indemnified and held harmless by the Fund against any and all claims, liability and expenses for any loss suffered by the Fund arising out of any act or omission of such indemnified party, except to the extent an act or omission constitutes willful misfeasance, bad faith, gross negligence or reckless disregard of such indemnified party's obligations and duties. The Investment Management Agreement may be terminated by either party thereto on ten days' written notice prior to the end of any calendar quarter. (See "RISK FACTORS").

## INVESTMENT POLICIES

The Fund seeks to obtain capital appreciation of its assets by primarily investing in Fairfield Sentry Limited, a British Virgin Islands corporation ("FSL"). FSL principally utilizes a nontraditional options trading strategy described as "split strike conversion", to which FSL allocates the predominant portion of its assets. Set forth below is a description of the "split strike conversion" strategies ("SSC Investments").

The establishment of a typical position entails (i) the purchase of a group or basket of equity securities that are intended to highly correlate to the S&P 100 Index, (ii) the purchase of out-of-the-money S&P 100 Index put options with a notional value that approximately equals the market value of the basket of equity securities, and (iii) the sale of out-of-the-money S&P 100 Index call options with a notional value that approximately equals the market value of the basket of equity securities. An index call option is out-of-the-money when its strike price is greater than the current price of the index; an index put option is out-of-the-money when the strike price is lower than the current price of the index. The basket typically consists of between 35 to 50 stocks in the S&P 100 Index.

The primary purpose of the long put options is to limit the market risk of the stock basket at the strike price of the long puts. The primary purpose of the short call options is to largely finance the cost of the put hedge and to increase the stand-still rate of return.

This position in its entirety could be characterized as a bull spread which, presuming the stock basket highly correlates to the S&P 100 Index, is intended to work as follows: (i) it sets a floor value below which further declines in the value of the stock basket is offset by gains in the put options, (ii) it sets a ceiling value beyond which further gains in the stock basket are offset by increasing liability of the short calls, and (iii) defines a range of potential market gain or loss, depending on how tightly the options collar is struck.

The degree of bullishness of the strategy can be expressed at implementation by the selection of the strike prices in the S&P 100 Index put and call options. The farther away the strike prices are from the price of the S&P 100 Index, the more bullish the strategy.

The Split Strike Conversion strategy is implemented by Bernard L. Madoff Investment Securities LLC ("BLM"), a broker-dealer registered with the Securities and Exchange Commission, through accounts maintained by FSL at that firm. The accounts are subject to certain guidelines which, among other things, impose limitations on the minimum number of stocks in the basket, the minimum market capitalization of the equities in the basket, the minimum correlation of the basket against the S&P100 Index, and the permissible range of option strike prices. Subject to the guidelines, BLM is authorized to determine the price and timing of stock and option transactions in the account. The services of BLM and its personnel are essential to the continued operation of the Fund, and its profitability, if any.

9

The options transactions executed for the benefit of FSL may be effected in the over-the-counter market or on a registered options exchange.

Currency Hedge

In an effort to manage the U.S. Dollar exposure of the Fund's shareholders, the Investment Manager has established an account at a nonaffiliated bank (the "Bank") to hedge the currency exposure of the shareholders resulting from the Fund holding assets denominated in U.S. Dollars. Generally, the Investment Manager will apply a passive strategy designed to immunize investors against U.S. Dollar declines by seeking to continuously hedge the currency exposure utilizing foreign exchange instruments. The Fund may hedge its currency exposure through the purchase or sale of any foreign exchange instrument including forward contracts, currency option transactions and other derivatives. Obligations owed to the Bank may be collateralized from time to time by a pledge of the assets underlying the Shares (i.e., the Fund's FSL shares). The cost incident to managing the currency exposure of the shareholders will be reflected in the Net Asset Value of the Shares.

Other Investments

The Investment Manager, as the investment manager of FSL, may in its sole and exclusive discretion allocate a portion of FSL's assets (never to exceed, in the aggregate, 5% of FSL's net asset value, measured at the time of investment) to alternative investment opportunities other than FSL's "split strike conversion" investments (the "Non-SSC Investments"). It is anticipated that the Non-SSC Investments will be allocated to new investment vehicles managed by experienced management teams establishing themselves in new investment businesses ("Emerging Managers"), with no single allocation exceeding U.S. $50 million, measured at the time of investment. These arrangements may include "lock-up" provisions of varying durations of these assets in such investments, subject to early release for breach of risk control or performance guidelines or for cause. The Investment Manager and FSL generally share in fees received by Emerging Managers from investors other than FSL. FSL will pay fees with respect to the Emerging Managers at a rate that will not exceed FSL's rate of fees (in certain cases, this may be accomplished by the Investment Manager subsidizing, from its own moneys, the fees charged on these assets by Non-SSC Investment managers). Non-SSC Investments may also include strategic allocations to experienced managers in established funds.

In certain circumstances, the performance fee paid at the FSL level may be reduced for particular calendar quarters for certain Non-SSC Investment Losses, as defined below. See "POTENTIAL CONFLICTS OF INTEREST" and "FEES, COMPENSATION AND EXPENSES-Performance and Management Fees".

In order to ensure that the Fund will not be subject to United States federal income taxation on trading gains from the disposition of certain investments, it is expected that the Fund will not invest in any "United States real property interest" (including, for example, certain interests in any U.S. Corporation that is a "United States real property holding corporation"), as such terms are defined under the U.S. Internal Revenue Code of 1986 (the "Code") and the Treasury Regulations promulgated thereunder. See "TAX CONSIDERATIONS AND EXCHANGE CONTROL AND ERISA."

The Fund may invest some of its assets in short-term U.S. government obligations, certificates of deposit, short-term high grade commercial paper and other money market instruments, including repurchase agreements with respect to such obligations, money market mutual funds and

short term bond funds. In order to ensure that substantially all of the interest earned by the Fund will not be subject to United States federal withholding taxes, any investment in an obligation of a U.S. person or entity (other than in certificates of deposits in banks) primarily will be in an instrument (i) which is issued and purchased at a discount from its face amount, which is not otherwise interest bearing, and which has a term of no more than 183 days from the date of issuance or (ii) which is in registered form and which is issued after July 18, 1984. See "TAX CONSIDERATIONS AND EXCHANGE CONTROL AND ERISA."

### Investment Restrictions

With the exception of the Fund's investment in FSL, which will be on an unrestricted basis, the Fund will observe the investment restrictions set forth in the articles of association which are summarized here:

a)  no more than 10% of the Net Asset Value of the Fund will be invested in the securities of any one issuer (other than any government or governmental agency);

b)  the Fund may not hold more than 10% of the issued securities of any one class of securities in any issuer (other than any government or governmental agency);

c)  no more than 10% of the gross assets of the Fund may be exposed to the creditworthiness or solvency of a single counterparty (other than any government or governmental agency), in each case calculated at the time of investment;

d)  no more than 10% of the Net Asset Value of the Fund may be invested in securities of countries where immediate repatriation rights are not available;

e)  the Fund will not invest in the securities of any issuer if the directors and officers of the Fund and the Investment Manager collectively own in excess of 5% of such securities;

f)  the Fund will not take or seek to take legal or management control of the issuer of underlying investments;

g)  the Fund will adhere to the general principle of diversification in respect of all of its assets;

h)  the Fund will not invest directly in real property;

i)  the Fund will not make any loans (except to the extent that the acquisition of any investment in securities or commodity interests described herein may constitute a loan) to any one issuer (other than any government or governmental agency) except with the consent of the custodian of the Fund's assets; and

j)  no more that 10% of the Net Asset Value of the Fund will be invested in physical commodities.

The investment restriction set out in (c) above will not apply to transactions with any counterparty which advances full and appropriate collateral to the Fund in respect of such transactions.

## OFFERING OF THE SHARES

The Fund is offering up to 15,000,000 voting shares, denominated in Euros (5,000,000), Singapore dollars (5,000,000) and Yen (5,000,000) (the "Shares"), at a price equal to the Net Asset Value per Share (as defined) as calculated as of the opening of business on the date of issuance (generally the first business day of every month).

The Shares may not be sold directly or indirectly to (i) natural persons who are citizens, nationals, or residents of, or institutions or other entities organized, created, formed, chartered or resident in, the United States of America, (ii) entities as to which any person or entity described in (i) above is, directly, or indirectly, a beneficiary, fiduciary, grantor or decedent, or (iii) institutions or other entities owned, in whole or in part, directly or indirectly by the persons or entities described in (i) or (ii) above ("U.S. persons"). No Shares may be subject to an option held by a U.S. person. Any transfer of Shares to a U.S. person is prohibited and will be subject to immediate and compulsory redemption by the Fund. (See "TRANSFERS, REDEMPTIONS AND TERMINATION - Transfers").

The minimum initial purchase by each subscriber is €200,000, SGD $375,000 or ¥2,000,000, as the case may be, unless the Fund deems it advisable to permit subscriptions for a lesser amount provided that such lesser amount shall at all times be no less than the Euro, Singapore dollar or Yen equivalent of US $100,000. The Fund may reject any subscription, in whole or in part, in its discretion. All subscriptions, once made, are irrevocable to the subscriber.

All proceeds from the sale of Shares will be received by the Fund in trust and will be deposited by the Fund into a segregated interest bearing account in the Fund's name at the Fund's bank, Citco Bank Nederland N.V. Dublin Branch.

After the initial closing, the Fund will offer its Shares on a continuous basis at a price equal to the Net Asset Value per Share as calculated as of the opening of business on the date of issuance of such Shares. Subscriptions received during any calendar month prior to the fifth to the last business day of the month will be accepted, in the sole discretion of the Investment Manager, as of the first business day of the following month. Thus, for example, subscriptions received between January 1 and January 25 will be accepted as of February 1, assuming the 29th-31st are business days. The Fund reserves the right, in its discretion, to accept any subscription prior to such first day. Subscriptions shall become irrevocable to the subscriber on the fifth to the last business day of the month in which such subscription is received by the Fund.

There are no underwriting arrangements with respect to the offering of Shares. All solicitations of subscriptions will be made directly by the Fund or through the assistance of unaffiliated placement agents and money managers, who may charge a placement fee of up to 5% of the total amount of the subscriptions for Shares sold, and/or share in the fees earned by the Investment Manager, which they may rebate to their clients. FGBL or an affiliate thereof may also charge a placement fee of up to 3% on such subscriptions, provided that total placement fees do not exceed 5%. In certain instances, the Fund may deduct the amount of the placement fee from the subscription amount to pay to the unaffiliated placement agent and such amounts will not constitute part of the Fund's assets.

<u>Net Asset Value Defined</u>

The Net Asset Value of the Shares is the value of the Fund's assets as calculated in

accordance with the International Financial Reporting Standards and the Memorandum and Articles of Association of the Fund.

Notwithstanding the foregoing:

(i)    in the case of extraordinary circumstances which warrant a different valuation of any securities, such as an inability to liquidate existing positions, such securities will be valued at such prices as the Directors shall determine; and

(ii)    the amount of any distribution or dividend made shall be a liability of the Fund from the day when the distribution or dividend is declared until it is paid.

All decisions on the valuation of assets and liabilities and determination of Net Asset Value shall be made by the Fund's Board of Directors.

Net Asset Value per Share is defined as the Net Asset Value divided by the number of Shares then outstanding.

The value of the Fund's interest in FSL will be valued based on the latest financial statements or interim net asset value reports of FSL. The difference between the Net Asset Value of the Fund and the Net Asset Value of FSL will be directly related to the results of, and charges incident to, the currency hedging trading account maintained with respect to the Fund's Shares.

The Net Asset Value of the Fund will be calculated on a monthly basis by the Fund's administrator, Citco Fund Services (Europe) B.V.

Pursuant to the Fund's Articles of Association, the Fund may suspend the calculation of its Net Asset Value for the whole or any part of any period:

(a)    during which any stock exchange or over-the-counter market on which any significant portion of the investments of the Fund are listed, quoted, traded or dealt in is closed (other than customary weekend and holiday closing) or trading on any such stock exchange or over-the-counter market is restricted; or

(b)    when circumstances exist as a result of which in the opinion of the Directors it is not reasonably practicable for the Fund to dispose of investments or as a result of which any such disposal would be materially prejudicial to the shareholders; or

(c)    when a breakdown occurs in any of the means normally employed in ascertaining the value of investments or when for any other reason the value of any of the investments or other assets of the Fund cannot reasonably or fairly be ascertained; or

(d)    during which the Fund is unable to repatriate funds required for the purpose of making payments due on redemption of Shares or during which any transfer of funds involved in the realization or acquisition of investments or

13

payments due on redemptions of Shares cannot in the opinion of the Directors be effected at normal rates of exchange.

Any such suspension shall take effect at such time as the Directors shall declare but not later than the close of business on the business day next following the declaration, and thereafter there shall be no determination of the Net Asset Value per Share of the Fund until the Directors shall declare the suspension at an end, except that such suspension shall terminate in any event on the first business day on which (a) the condition giving rise to the suspension shall have ceased to exist; and (b) no other condition under which suspension is authorized under the Fund's Articles of Association shall exist. Each declaration by the Directors pursuant to this paragraph shall be consistent with such official rules and regulations (if any) relating to the subject matter thereof as shall have been promulgated by any authority having jurisdiction over the Fund and as shall be in effect at the time. To the extent not inconsistent with such official rules and regulations, the determination of the Directors shall be conclusive. Whenever the Directors shall declare a suspension of the determination of the Net Asset Value per Share, then as soon as may be practicable after any such declaration, the Directors shall give notice to all shareholders stating that such declaration has been made. At the end of any period of suspension as aforementioned the Directors shall give notice to all shareholders stating that the period of suspension has ended.

Who Should Purchase/Subscription Procedure

This offering is limited to non-U.S. persons who have the ability to speculate in high risk securities and for whom such a purchase is suitable in light of such person's financial condition. The Fund will require as a condition to the acceptance of a subscription that the subscriber represent and warrant that he is not a U.S. person.

Prospective subscribers should inform themselves as to the legal requirements within their own countries for the purchase of Shares and any foreign exchange or tax considerations relevant to such purchase.

As part of the Fund's responsibility for the prevention of money laundering, the Fund will require detailed verification of a prospective investor's identity to be included with its subscription application.

An individual will be required to produce a certified copy of a passport or identification card. Corporate applicants will be required to produce a certified copy of the certificate of incorporation (and any change of name), memorandum and articles of association (or other documents evidencing the existence of the legal entity), the register of directors or an excerpt from the trade register held at the relevant chamber of commerce and the signatory card verifying the authority of officers to sign on behalf of the corporate entity. Trusts and other entities which subscribe to the Fund must demonstrate organizational documents which verify the existence of the entity and which verify the authority of one or more signatories to sign subscriptions on behalf of the entity.

The Fund reserves the right to request such further information as is necessary to verify the identity of an applicant. In the event of delay or failure by the applicant to produce any information required for verification purposes, the Fund may refuse to accept the application and the subscription moneys relating thereto.

14

In order to subscribe for Shares, subscribers must complete and sign the Subscription Agreement included in the Subscription Documents which accompany this Memorandum.

## FEES, COMPENSATION AND EXPENSES

Expenses

The Fund bears all of the continuing offering costs and all other expenses incurred in the operation of the Fund, if any, including the ordinary and necessary expenses directly related to its investment and trading activities (including the costs incident to the currency trading hedging account), all administration fees, all insurance expenses and all legal and auditing fees, including any legal and auditing fees that relate to extraordinary circumstances, such as tax examinations or litigation involving the Fund.  Transactional costs will be included in FSL's compensation of profit and loss and will, accordingly, be indirectly borne by the Fund.  The Fund pays Fairfield Greenwich Advisors LLC, an affiliate of the Investment Manager, an annual expense reimbursement charge of 0.15% of the Fund's Net Asset Value, payable quarterly in an amount equal to 0.0375% of the Fund's Net Asset Value as of the last day of each calendar quarter, for providing certain administrative services and back-office support to the Fund.

Performance and Management Fees

The Investment Manager does not receive either a management fee or a performance fee from the Fund.  The Investment Manager does receive a monthly management fee from FSL (in which substantially all of the Fund's assets are invested) in an amount equal to one-twelfth of one percent (0.0833%) (1.0% per annum) of FSL's net asset value before the FSL Performance Fee (as defined), as calculated at the open of the first day of the month, which will include any subscriptions for shares accepted by FSL as of the first business day of the month.  This fee is payable monthly in advance.

In addition, the Investment Manager receives a quarterly performance fee from FSL in an amount equal to twenty percent (20%) of the net realized and net unrealized appreciation in the net asst value, allocable to each share (the "Net Profits") in such calendar quarter, earned by FSL (the "FSL Performance Fee").  Notwithstanding the foregoing, if a share has a loss chargeable to it during any calendar quarter or quarters ("Unrecouped Loss") and during any succeeding calendar quarters there are Net Profits allocable to the share, there will be no FSL Performance Fee payable with respect to such share until the amount of the Unrecouped Loss allocated to such share has been recouped.  If shares are redeemed during a calendar quarter, the Unrecouped Loss relating to such shares will be reduced in the same proportion as the reduction in the Net Asset Value of such shares caused by such redemption.  No share will be subject to the payment of an FSL Performance Fee until such share has recouped its loss carryover, i.e., until the net asset value of such shares is at least as high as the previous highest net asset value per share.  IN OTHER WORDS, FSL PERFORMANCE FEES WILL ONLY BE PAID ON "NEW APPRECIATION" IN THE NET ASSET VALUE OF THE FSL SHARES.  Shares which were either purchased or redeemed during a calendar quarter will be subject to the payment of an FSL Performance Fee only for the portion of the calendar quarter during which such shares were outstanding.  The Investment Manager will reduce any FSL Performance Fees otherwise payable to it by offsetting it against an amount equal to the "Shared Cash Flow Amount" as defined in "POTENTIAL CONFLICTS OF INTEREST", below) attributable to Non-SSC Investments.

15

Salaries and Other Personnel Expenses

Mr. Noel will not be compensated for serving as a director of the Fund, but he and representatives of the Investment Manager will be reimbursed by the Fund for any out-of-pocket expenses they may incur in attending meetings of the Board of Directors or of shareholders. The directors not affiliated with the Investment Manager, of which there are two at the present time, will each be paid a fee of U.S. $5,000 per annum by the Fund together with their out-of-pocket expenses in attending meetings of the Board of Directors or of shareholders.

## CUSTODIAN AND BROKERAGE

### **Custodian**

Citco Global Custody N.V. has been appointed as Custodian by the Fund.

The Custodian will be entrusted with the safe custody of certain financial investments of the Fund pursuant to a custody agreement made and entered into between the Fund and the Custodian. The Custodian shall exercise only custody functions on behalf of the investments of the Fund. It does not act as sponsor of the Fund or assume special controlling duties other than those related to its custody functions. The Custodian does not warrant the contents of this Memorandum, nor is it involved in the management, administration or Net Asset Value calculation of the Fund. The Custodian may make use of sub-custodian and depositories in the exercise of its functions. The Fund may appoint other custodians to provide custody services to the Fund. The services of the Custodian to the Fund may be terminated by either the Fund or the Custodian, inter alia, at any time, subject to 90 days prior written notice.

The Custodian shall have no responsibility to initiate, appear in, prosecute or defend any legal or equitable proceedings relating to the stocks, bonds, other securities or property held by the Custodian on behalf of the Fund under the custody agreement. The Custodian shall have no responsibility to initiate any proceeding or engage the services of any third party for the collection of overdue amounts owing to the Fund in connection with any stocks, bonds or other property held by the Custodian under the custody agreement. If, at the request of the Fund, the Custodian agrees to appear in, prosecute or defend any such legal or equitable proceedings, either in the Custodian's name or in the name of its nominee, the Custodian shall first be indemnified to its satisfaction against damages and expenses (including attorney's fees) which may be sustained or incurred by the Custodian in so acting.

Where sub-custodians are appointed, the Custodian must exercise reasonable skill, care and diligence in the selection of sub-custodians and is responsible to the Fund for the duration of the appointment of each sub-custodian, for satisfying itself as to the ongoing suitability of the sub-custodians to provide custodial services to the Fund. In addition, the Custodian must maintain an appropriate level of supervision over the sub-custodians and make appropriate enquiries, from time to time, to confirm that the obligations of the sub-custodians continue to be completely discharged.

As a result of the Investment Manager's selection of Bernard L. Madoff Investment Securities, LLC ("BLM") as execution agent of the split strike conversion strategy, substantially all of FSL's assets will be held in segregated accounts at BLM, a U.S. registered broker-dealer and qualified custodian. Accordingly, BLM will be a sub-custodian of FSL.

16

The underlying assets of the Non-SSC Investments are held pursuant to custodial arrangements with other qualified entities. FSL reserves the right, in its sole discretion, to change its custodial arrangements without further notice to shareholders.

**Brokerage**

BLM, the Non-SSC investment managers and the Investment Manager, to the extent that the Investment Manager invests directly in securities on behalf of the Fund and/or FSL, are authorized to determine the broker or dealer to be used for each securities transaction on behalf of FSL (and the Fund in the case of the Investment Manager). Except for investments made directly in securities by the Investment Manager on behalf of the Fund and/or FSL, the Fund, FSL and the Investment Manager have no direct control over the selection of brokers. It is not BLM's, the Non-SSC investment managers or the Investment Manager's practice to negotiate "execution only" commission rates, thus the Fund and/or FSL may be deemed to be paying for research, brokerage or other services which are included in the commission rate. In selecting brokers or dealers to execute transactions, BLM, the Non-SSC investment managers or the Investment Manager need not solicit competitive bids and do not have an obligation to seek the lowest available commission cost.

BLM, a broker dealer, intends to act as broker-dealer to execute all of the transactions for the SSC Investments and will receive brokerage commissions for such transactions. As a result of this arrangement, the Investment Manager cannot guarantee that the best execution will be obtained for the Fund and FSL with respect to these transactions. BLM will determine the commissions to be charged for each transaction. The commissions charged by BLM will typically exceed the cost incurred by BLM in executing the transactions, and, accordingly, BLM's activities in executing transactions on behalf of the SSC Investments will be profitable for BLM. It is anticipated that such commissions will be the same as those charged to other institutional client accounts for similar transactions.

Section 28(e) of the Securities Exchange Act of 1934, as amended, is a "safe harbor" that permits an investment manager to use commissions or "soft dollars" to obtain research and brokerage services that provide lawful and appropriate assistance in the investment decision-making process. The Investment Manager will limit the use of "soft dollars" to obtain research and brokerage services to services which constitute research and brokerage within the meaning of Section 28(e). Research services within Section 28(e) may include, but are not limited to, research reports (including market research); certain financial newsletters and trade journals; software providing analysis of securities portfolios; corporate governance research and rating services; attendance at certain seminars and conferences; discussions with research analysts; meetings with corporate executives; consultants' advice on portfolio strategy; data services (including services providing market data, financial data and economic data); advice from brokers on order execution; and certain proxy services. Brokerage services within Section 28(e) may include, but are not limited to, services related to the execution, clearing and settlement of securities transactions and functions incidental thereto (i.e., connectivity services between an investment manager and a broker-dealer and other relevant parties such as custodians); trading software operated by a broker-dealer to route orders; software that provides trade analytics and trading strategies; software used to transmit orders; clearance and settlement in connection with a trade; electronic communication of allocation instructions; routing settlement instructions; post trade matching of trade information; and services required by the Securities and Exchange Commission or a self regulatory organization such as comparison services, electronic confirms or trade affirmations.

In some instances, the Investment Manager may receive a product or service that may be used only partially for functions within Section 28(e) (e.g. an order management system, trade analytical software or proxy services). In such instances, the Investment Manager will make a good faith effort to determine the relative proportion of the product or service used to assist the Investment Manager in carrying out its investment decision-making responsibilities and the relative proportion used for administrative or other purposes outside Section 28(e). The proportion of the product or service attributable to assisting the Investment Manager in carrying out its investment decision-making responsibilities will be paid through brokerage commissions generated by client transactions and the proportion attributable to administrative or other purposes outside Section 28(e) will be paid for by the Investment Manager from its own resources.

Research and brokerage services obtained by the use of commissions arising from the Fund's portfolio transactions and/or FSL's portfolio transactions may be used by the Investment Manager in its other investment activities and thus, the Fund and/or FSL may not necessarily, in any particular instance, be the direct or indirect beneficiary of the research or brokerage services provided.

Although the Investment Manager will make a good faith determination that the amount of commissions paid is reasonable in light of the products or services provided by a broker, commission rates are generally negotiable and thus, selecting brokers on the basis of considerations that are not limited to the applicable commission rates may result in higher transaction costs than would otherwise be obtainable. The receipt of such products or services and the determination of the appropriate allocation in the case of "mixed use" products or services creates a potential conflict of interest between the Investment Manager and its clients.

In selecting brokers and negotiating commission rates, the Investment Manager will take into account the financial stability and reputation of brokerage firms, and the research, brokerage or other services provided by such brokers.

When appropriate, the Investment Manager may, but is not required to, aggregate client orders to achieve more efficient execution or to provide for equitable treatment among accounts. Clients participating in aggregated trades will be allocated securities based on the average price achieved for such trades. It is anticipated that BLM and the Non-SSC investment managers will have similar policies regarding trade aggregation.

### ADMINISTRATOR, REGISTRAR AND TRANSFER AGENT

Pursuant to an administration agreement dated February 20, 2003, between Citco Fund Services (Europe) B.V. ("Citco" or the "Administrator") and the Fund (the "Administration Agreement"), Citco serves as the administrator for the Fund, under the overall direction of the Fund's Board of Directors. As administrator, Citco has the responsibility for furnishing the day to day administrative services which the Fund may require, such as: accounting services; maintaining the Fund's books and records; preparation of reports and accounts; calculation of Net Asset Value and fees; communications with shareholders and/or governmental bodies; paying the Fund's expenses; providing suitable facilities and procedures for handling dividends and distributions (if any) and the orderly liquidation and dissolution of the Fund, if required. In consideration of its services, Citco receives a monthly fee based on the Net Asset Value of the Fund as of the last business day of each month at a commercially reasonable rate.

To the extent that Citco relies on information supplied by the Fund, any investee fund of the Fund or any brokers engaged by the Fund, in connection with making any of the aforementioned calculations, Citco's liability for the accuracy of such calculations is limited to the accuracy of its computations. Citco shall not be liable for the accuracy of the underlying data provided to it.

Pursuant to the Administration Agreement the Fund has agreed to indemnify Citco, its subsidiaries, affiliates, directors and other officers, shareholders, servants, employees, agents and permitted delegates under the Administration Agreement, against any and all liabilities, obligations, losses, judgments and expenses of any kind or nature whatsoever (collectively, the "Claims" and, individually, a "Claim") which may be imposed on, incurred by or asserted against any of them arising (other than by reason of negligence, bad faith, fraud or dishonesty on the part of Citco or such other indemnified party) out of the provision of services under the Administration Agreement. Similarly, Citco will indemnify the Fund from and against any Claim which arises directly out of the negligence, bad faith, fraud or dishonesty of its obligations on the part of Citco in connection with its provision of services under the Administration Agreement. The Administration Agreement may be terminated by either party on 90 days' prior written notice; provided, however, that the Administration Agreement may be terminated forthwith by notice in writing by either party if the other party (a) commits a material breach of the Administration Agreement and fails to cure such breach within 30 days after notice from the non-defaulting party; or (b) enters into involuntary liquidation or if a receiver is appointed over any of its assets.

## RISK FACTORS

The purchase of Shares in the Fund involves substantial risks that are incident to FSL's allocation of assets to SSC and Non-SSC Investments.

1. **Trading Risks**. Substantial risks are involved in the trading of equity securities and options. Market movements can be volatile and are difficult to predict. U.S. Government activities, particularly those of the Federal Reserve Board, can have a profound effect on interest rates which, in turn, substantially affect securities and options prices, as well as the liquidity of such markets. Politics, recession, inflation, employment levels, trade policies, international events, war and other unforeseen events can also have significant impact upon the prices of securities and options. A variety of possible actions by various government agencies also can inhibit the profitability of the Fund's business or can result in losses. Such events, which can result in huge market movements and volatile market conditions, create the risk of catastrophic losses for the Fund.

Various techniques are employed to attempt to reduce a portion of the risks inherent in the trading strategies utilized by or on behalf of the Fund. The ability to achieve the desired effect through a particular technique is dependent upon many factors, including the liquidity of the market at the desired time of execution. Thus, substantial risk remains that the techniques employed by or on behalf of the Fund by FSL and the Non-SSC Investment managers cannot always be implemented or effective in reducing losses. At various times, the markets for exchange-listed equity securities and options and/or other securities may be "thin" or illiquid, making purchases or sales of securities at desired prices or in desired quantities difficult or impossible. In addition, options prices are extremely volatile. The volume and volatility of trading in these markets depends in part on general public interest and public opinion concerning economic conditions as well as the liquidity provided by market-makers and specialists. The liquidity of the market may also be affected by a halt in trading on a particular futures or securities exchange or exchanges. Illiquid markets may make it difficult to get an order executed at a desired price.

19

2.  **Trading Strategies May Not be Successful.**  There can be no assurance that any trading method employed by or on behalf of FSL will produce profitable results, and the past performance of FSL is not necessarily indicative of its future profitability.  In that regard, certain of the managers receiving Non-SSC Investment allocations may not have investment records compiled while managing assets on their own.  Profitable trading is often dependent on anticipating trends or trading patterns.  In addition, markets experiencing random price fluctuations, rather than defined trends or patterns, may generate a series of losing trades.  There have been periods in the past when the markets have been subject to limited and ill-defined price movements, and such periods may recur.  Any factor which may lessen major price trends (such as governmental controls affecting the markets) may reduce the prospect for future trading profitability.  Any factor which would make it difficult to execute trades, such as reduced liquidity or extreme market developments resulting in prices moving the maximum amount allowed in a single day, could also be detrimental to profits or cause losses.

3.  **Dependence upon Principals and Key Employees of the Investment Manager and BLM**.  The services of the Investment Manager's principals and key employees and BLM are essential to the continued operations of FSL and the Fund.  If their services were no longer available, their absence would have an adverse impact upon an investment in the Fund. The key employees of the Investment Manager will allocate a small portion of FSL's assets between and among the Non-SSC Investment managers.  The Fund will be dependent on the continued presence of these key employees in connection with identification of the recipients of these allocations and the monitoring of the Non-SSC Investments.

4.  **Non Diversification.**  Substantially all of the Fund's assets (through its investment in FSL) will be invested in accounts managed by BLM that will utilize a nontraditional options trading strategy described as "split strike conversion".  It is anticipated the SSC Investments will be primarily in U.S. equity securities and options.  The SSC Investments will generally not be widely diversified among a wide range of issuers, industries, geographic areas, capitalizations or types of securities.  Accordingly, the accounts with BLM may be subject to more rapid changes in value than would be the case if the account were required to maintain a wide diversification among issuers, industries, geographic areas, capitalizations or types of securities.

5.  **Incentive Compensation.**  The payment of a percentage of FSL's net profits to the Investment Manager may create an incentive for the Investment Manager to cause FSL to make investments that are riskier or more speculative than would be the case if this payment were not made.  Since the fee is calculated on a basis that includes unrealized appreciation of assets, such fee may be greater than if it were based solely on realized gains.

In addition, the Non-SSC Investment managers will generally be compensated through incentive arrangements.  Under these arrangements, the Non-SSC Investment managers may benefit from appreciation, including unrealized appreciation in the value of the Non-SSC Investment, but may not be similarly penalized for decreases in the value of such investment vehicle.  Such fee arrangements may create an incentive for the Non-SSC Investment managers to make purchases that are unduly risky or speculative.  In most cases, however, FSL anticipates that it will invest in Non-SSC Investments where the manager is required to recoup prior losses before any performance-type fee is payable in respect of current gains.

To the extent that an accrual for an incentive fee is reflected in the net asset value of shares of a Non-SSC Investment vehicle, then if such accrual is reversed by the Non-SSC Investment vehicle as a result of subsequent depreciation, all of the Shares of the Fund will benefit from the reversal of the accrual, including Shares purchased after the Non-SSC Investment vehicle made the accrual.  Further, to the extent that the FSL Performance Fee is reduced by the Non-SSC Investment Loss amount, then if such reduction is repaid in part or in whole by the Fund due to recoupment of losses by Non-SSC

20

Investment vehicles, the net asset value of all shares of FSL then outstanding will be reduced, including shares purchased after the reduction of the FSL Performance Fee.

6.     **Conflicts of Interest**.  The Investment Manager and the Non-SSC Investment managers receiving allocations of FSL's assets, and their respective principals and affiliates, are presently affiliated with and may in the future form and manage, or provide other services to, other investment entities (including without limitation investment partnerships, investment companies and mutual funds) with substantially the same or different objectives as those of the Fund.  They may also make investments in securities for their own accounts.  In addition, the Investment Manager functions as the investment manager for private investment funds in addition to the Fund.  Such activities could detract from the time that the Investment Manager and its principals allocate to the affairs of FSL and the Fund.  The Investment Manager will obtain certain business and financial benefits from FSL's investments in the Non-SSC Investments which may result in a conflict of interest between the Investment Manager and FSL in the selection of, and allocation of assets between and among the Non-SSC Investments.  See "POTENTIAL CONFLICTS OF INTEREST".

7.     **Brokerage and Custodial Arrangements.**  There are risks involved in dealing with the custodians and prime brokers who settle Fund trades and FSL trades.  Although the Investment Manager will monitor the Fund's and FSL's custodians, there is no guarantee that any custodian will not become bankrupt or insolvent.  While both the U.S. Bankruptcy Code and the Securities Investor Protection Act of 1970 seek to protect customer property in the event of a bankruptcy, insolvency, failure, or liquidation of a broker-dealer, there is no certainty that, in the event of a failure of a broker-dealer that has custody of Fund assets, the Fund would not incur losses due to its assets being unavailable for a period of time, the ultimate receipt of less than full recovery of its assets, or both.  Securities and other assets deposited with a custodian may not be clearly identified as being assets of the Fund and hence the Fund could be exposed to credit risk with regard to such custodian.

Further, the Fund, FSL and/or its custodians may appoint sub-custodians in certain non-U.S. jurisdictions to hold the assets of the Fund or assets of FSL.  The Fund's and FSL's primary custodian may not be responsible for cash or assets which are held by sub-custodians in certain non-U.S. jurisdictions, nor for any losses suffered by the Fund and FSL as a result of the bankruptcy or insolvency of any such sub-custodian.  The Fund and FSL may therefore have a potential exposure on the default of any sub-custodian and, as a result, many of the protections which would normally be provided to a fund by a custodian will not be available to the Fund or FSL.  Custody services in certain non-U.S. jurisdictions remain undeveloped and, accordingly, there is a transaction and custody risk of dealing in certain non-U.S. jurisdictions.  Given the undeveloped state of regulations on custodial activities and bankruptcy or mismanagement in certain non-U.S. jurisdictions, the ability of the Fund or FSL to recover assets held by a sub-custodian in the event of the sub-custodian's bankruptcy would be in doubt.

Finally, it is anticipated that BLM will execute all of the trades for the SSC Investments and therefore there is no guarantee that the brokerage fees charged by BLM will be fair and reasonable in light of the services being provided.  Further, the Investment Manager cannot guarantee that best execution will be obtained for the Fund as a result of this arrangement.

8.     **Competition**.    The securities industry, including market-making activities and transactions effected in connection therewith, are very competitive.  Competition from other persons or entities involved in activities similar to those of the Fund can restrict the ability of the Fund to acquire positions at the prices deemed most beneficial to its overall trading strategies.  Many such competing persons or entities are better capitalized and have more experience in trading than the Fund. Moreover,

the widespread use of computer-assisted trading systems for trading strategies can alter trading patterns or affect execution of trades to the detriment of the Fund.

9. **Over-the-Counter Options Transactions**. Options transactions effected on behalf of the Fund may utilize the over-the-counter market for their execution. Trading index options in the over-the-counter market is subject to counter-party risk and is without the protections afforded by transactions effected through the OCC, a registered options exchange.

10. **Option Buyer's Risk of Loss of Entire Investment**. An option is a wasting asset which becomes worthless when the option expires. As the remaining life of an option shortens with the passage of time, its value is reduced until it reaches zero upon expiration. This means that the option buyer who neither sells it in the secondary market nor exercises it prior to expiration will lose his entire investment in the option.

11. **Options on Indexes**. FSL (through its investment in SSC Investments) intends to purchase put and call options on the S&P 100 Index to hedge against risks of market-wide price movements. An index measures the movement of a certain group of assets by assigning relative values to the assets included in the index. Options on an index are similar to options on securities. Because no underlying security can be delivered, however, the option represents the holder's right to obtain from the writer, in cash, a fixed multiple of the amount by which the exercise price exceeds (in the case of a put) or is less than (in the case of a call) the closing value of the underlying index on the exercise date. The advisability of using index options to hedge against the risk of market-wide movements will depend on the extent of diversification of FSL's investments and the sensitivity of its investments to factors influencing the underlying index. The effectiveness of purchasing or writing index options as a hedging technique will depend upon the extent to which price movements in FSL's investments correlate with price movements in the index selected. In addition, successful use by FSL of options on indices will be subject to the ability of BLM to predict correctly changes in the relationship of the underlying index to the Fund's portfolio holdings. No assurance can be given that BLM's judgment in this respect will be correct.

12. **Arbitrage Transactions**. Among the many risks of arbitrage transactions are that two or more buy or sell orders may not be able to be executed simultaneously at the desired prices, resulting in a loss being incurred on both sides of a multiple trade arbitrage transaction. Also, the transaction costs of arbitrage transactions can be especially significant because separate costs are incurred on each component of the combination. Consequently, a substantial favorable price movement may be required before a profit can be realized.

13. **Combination Transactions**. At various times, the Fund, through its investments in FSL and the Non-SSC Investments, may engage in spreads or other combination options transactions involving the purchase and sale of related options contracts, in various combinations. Such transactions are considerably more complex than the purchase or writing of a single option. The following are among the many risks of combination option transactions: the difficulty that may be involved in attempting to execute simultaneously two or more buy or sell orders at the desired prices; the possibility that a loss could be incurred on both sides of a multiple options transaction; and the possibility of significantly increased risk exposure resulting from the hedge against loss inherent in most spread positions being lost as a result of the assignment of an exercise to the short leg of a spread while the long leg remains outstanding. Also, the transaction costs of combination options transactions can be especially significant because separate costs are incurred on each component of the combination. This can have the effect of requiring a substantial favorable price movement before a profit can be realized.

14. **Trading Decisions Based on Trend Analysis**. Certain of the trading decisions of the Fund are based on the use of computer pricing models to identify apparently overpriced or underpriced

options in relationship to an assumed norm. In addition, analyses of price and other fluctuations over time may be relied upon which utilize charts and computers in order to discern and predict trends. Trading based on such analyses is subject to the risks that options premiums will not increase or decrease as predicted by the analyses, or that trades dictated by the analyses may not be executed in time to take advantage of the price disparities. This latter risk is likely to materialize when numerous market makers use similar analyses, all of which dictate the desirability of executing identical or similar contracts. In the past, there have been periods without identifiable trends and, presumably, such periods will continue to occur. Trading models or analyses that depend upon the forecasting of trends will not be profitable if there are not identifiable trends of the kind that the models or analyses seek to follow. Any factor which would make it more difficult to execute trades in accordance with the models or analyses signals, such as a significant lessening of liquidity in a particular market, would also be detrimental to profitability.

15. **Assignment of Puts or Calls**. Substantial losses may result under certain circumstances if a hedged position becomes a long or short position due to the assignment of the short put or short call portion of the hedged position. Under normal market conditions, the remaining portion of the previously hedged portion may be liquidated or otherwise adjusted to limit exposure to price changes. Suspension of trading of the option class or underlying securities followed by a price gap at the reopening of trading might result in substantial losses. The same would be true given an illiquid market such as that of October 1987.

16. **Prohibition of Exercise Rights**. The options markets have the authority to prohibit the exercise of particular options. If a prohibition on exercise is imposed at a time when trading in the option has also been halted, holders and writers of that option will be locked into their positions until one of the two restrictions has been lifted.

17. **Risks of Leverage**. The Non-SSC Investment vehicles in which the Fund invests may borrow funds in connection with their investment strategies. A particular Non-SSC Investment vehicle may not be subject to any limitation in the amount of its borrowings, and the amount of borrowings that the Non-SSC Investment vehicle may have outstanding at any time may be substantial in comparison to its capital.

The use of leverage may provide the Non-SSC Investment vehicle with the opportunity for greater capital appreciation, but at the same time will increase the Non-SSC Investment vehicle's, and indirectly the Fund's, exposure to capital risk and higher current expenses. Moreover, if the assets of the Non-SSC Investment vehicle are not sufficient to pay the principal of, and interest on, the Non-SSC Investment vehicle's debt when due, the Fund could sustain a total loss of its investment in the Non-SSC Investment vehicle.

Additionally, in the current unsettled credit environment, the Non-SSC Investment Managers may find it difficult or impossible to obtain leverage for the Non-SSC Investment vehicle. If leveraging its assets is an integral part of the investment strategy of the Non-SSC investment vehicle, in such event the Non-SSC Investment vehicle could find it difficult to implement its strategy. In addition, any leverage obtained, if terminated on short notice by the lender, could result in a Non-SSC Investment Manager being forced to unwind positions quickly and at prices below what the Non-SSC Investment Manager deems to be fair value for the positions.

18. **Possibility of Misappropriation of Assets**. When FSL invests utilizing the "split strike conversion" strategy or in a Non-SSC Investment vehicle, it will not have custody of the assets so invested. Therefore, there is always the risk that the personnel of any entity with which the Fund invests could misappropriate the securities or funds (or both) of the Fund.

19.    **Sole Proprietor Non-SSC Investment Managers**.  Some of the Non-SSC Investment vehicles to which FSL may allocate capital may consist of investment operations with only one principal. In such cases, if that individual's services became unavailable to the Non-SSC Investment vehicle, the Fund might sustain losses.

20.    **Experience of Non-SSC Investment Managers**.  While certain of the Non-SSC Investment managers have had extensive experience in trading securities generally and within their specific investment strategies, they may have had little experience in investing and trading on behalf of a pooled investment vehicle, in utilizing certain of the investment strategies to be employed on behalf of the Fund or in managing an account as large as that anticipated for the Non-SSC Investments.  In that regard, as the assets of the Non-SSC Investment vehicles increase, it is not known what effect, if any, this will have on the trading strategies utilized on their behalf or their investment results.

21.    **Emerging Managers**.  As the Non-SSC Investment vehicles generally will be in an early stage of formation or operation, this can pose a number of operational and other issues.  For example, in its early stages the Non-SSC Investment manager may have little capital available to cover expenses and, accordingly, may have difficulty attracting qualified personnel. Competing investment managers have a larger number of qualified management and technical personnel and benefit from a larger capital base.

22.    **Portfolio Turnover; Expenses**  The investment strategy of FSL may involve the taking of frequent trading positions, and, as a result, it is anticipated that turnover and brokerage commission expenses of FSL may exceed those of other investment entities of comparable size.  BLM will execute all of the trades for the SSC Investments and BLM's sole compensation for its services will be the receipt of brokerage commissions.  The compensation of BLM through the payment of brokerage commissions may create an incentive for BLM to cause FSL to trade positions in more frequently than necessary to generate greater compensation to the Portfolio Manager.

23.    **Absence of Regulatory Oversight.**  While the Fund and FSL may be considered similar to an investment company, it does not intend to register as such under the U.S. Investment Company Act of 1940, as amended, in reliance upon an exemption available to privately offered investment companies, and, accordingly, the provisions of that Act (which, among other matters, require investment companies to have disinterested directors, require securities held in custody to at all times be individually segregated from the securities of any other person and marked to clearly identify such securities as the property of such investment company and regulate the relationship between the adviser and the investment company) will not be afforded to the Fund, FSL or the shareholders.   The Investment Manager registered as an investment adviser under the Advisers Act.

24.    **Lack of Liquidity**.  Certain of FSL's investments in the Non-SSC Investments will be subject to lock-up provisions any of which will limit the ability of FSL to withdraw capital from such investment.  While such lock-up period may be subject to early release for breach of risk control or performance guidelines or for cause, there can be no assurance that FSL, and therefore the Fund, will not sustain additional losses while such lock-up period remains in effect.

25.    **Limited Redemption and Transfer Rights.**  A shareholder generally will be permitted to redeem Shares subject to the limitations as described herein.  Transfers of Shares will be permitted only with the written consent of the Fund.  Accordingly, an investment in the Fund is a relatively illiquid investment and involves a high degree of risk.  Furthermore, if a substantial number of shareholders were to redeem from the Fund and the Fund did not have a significant amount of cash or liquid securities in the case of extraordinary circumstances, including the inability to liquidate existing positions or the default or delay in payment due to the Fund from brokers, banks or other persons, there is a possibility that the Fund not meet such redemptions in a timely manner.  In light of the foregoing, a subscription for Shares should

24

be considered only by persons who are financially able to maintain their investment for an extended period of time and who can accept a loss of all of their investment.

26.     **Non-Disclosure of Positions.**  In an effort to protect the confidentiality of its positions, FSL and the Fund generally will not disclose portfolio information to shareholders on an ongoing basis, although FSL and the Fund, in their sole discretion, may permit such disclosure to shareholders, if it determines that there are sufficient confidentiality agreements and procedures in place.

27.     **Exchange Rate Risk**.  The Fund will maintain its assets in U.S. dollars.  The Fund has established an account which will effect transactions in the currency market in an effort to hedge against such risks as they pertain to the Euro, Singapore dollar and Yen, which are the functional currencies of the Fund.  There can be no assurance that such transactions will be successful in protecting the shareholders against this exchange rate risk.  In addition, a hedge may be established in anticipation of new subscriptions. In the event such new subscriptions are not made, the hedge positions will be unwound and the transaction costs will be borne by the existing shareholders.

28.     **Business and Regulatory Risks of Hedge Funds**.  Legal, tax and regulatory changes could occur during the term of the Fund that may adversely affect the Fund and FSL.  The regulatory environment for hedge funds is evolving, and changes in the regulation of hedge funds may adversely affect the value of investments held by FSL and the ability of FSL to obtain the leverage it might otherwise obtain or to pursue its trading strategies.  In addition, securities and futures markets are subject to comprehensive statutes, regulations and margin requirements.   Regulators and self-regulatory organizations and exchanges are authorized to take extraordinary actions in the event of market emergencies.  The regulation of derivative transactions and funds that engage in such transactions is an evolving area of law and is subject to modification by government and judicial actions.  The effect of any future regulatory change on the Fund and FSL could be substantial and adverse including, for example, increased compliance costs, the prohibition of certain types of trading and/or the inhibition of FSL's ability to pursue certain of its investment strategies as described herein.

29.     **Modification of Terms.**  The Fund may enter into agreements ("Side Letters") with certain prospective or existing shareholder(s) whereby such shareholder(s) may be subject to terms and conditions that are more advantageous than those set forth in this Memorandum.  For example, such terms and conditions may provide for special rights to make future investments in the Fund, other investment vehicles or managed accounts; special redemption rights relating to frequency, notice, a reduction or rebate in fees or redemption penalties to be paid by the shareholder and/or other terms; rights to receive reports from the Fund on a more frequent basis or that include information not provided to other shareholder(s) (including, without limitation, more detailed information regarding portfolio positions) and such other rights as may be negotiated by the Fund and such shareholders.  The modifications are solely at the discretion of the Fund and may, among other things, be based on the size of the shareholder's investment in the Fund or affiliated investment entity, an agreement by a shareholder to maintain such investment in the Fund for a significant period of time, or other similar commitment by a shareholder to the Fund.  Other shareholders shall have no recourse against the Fund, the Directors, the Investment Manager and/or any of their respective affiliates in the event that certain shareholders receive additional and/or different rights and/or terms as a result of Side Letters.

30.     **No Separate Counsel; No Independent Verification.**  Seward & Kissel LLP acts as United States counsel to the Investment Manager and the Fund.  Conyers Dill & Pearman acts as British Virgin Islands counsel to the Fund.  The Fund does not have United States counsel separate and independent from counsel to the Investment Manager.  Neither Seward & Kissel LLP nor Conyers Dill & Pearman represent investors in the Fund, and no independent counsel has been retained to represent investors in the Fund.  This Memorandum was prepared based on information furnished by the

Investment Manager; neither Seward & Kissel nor Conyers Dill & Pearman has independently verified such information.

## POTENTIAL CONFLICTS OF INTEREST

The Investment Manager, the Non-SSC Investment managers and their respective affiliates, officers and employees may form and manage other investment entities (including without limitation investment partnerships, investment companies, mutual funds and offshore funds) and provide investment services to clients other than the Fund in the future with substantially the same or different objectives as those of the Fund. They may also make investments in securities for their own accounts. Such activities could detract from the time they allocate to the affairs of the Fund and negatively impact FSL's investment opportunities. Similarly, Messrs. Naess and Schmid, the non-affiliated directors, have other business interests and will not devote their entire time to the Fund's affairs.

The Investment Manager and its related persons might have an incentive to favor one or more of their other clients over the Fund and FSL, for example with regard to the selection of certain investments for those clients because those clients might pay the Investment Manager more for its services than the Fund or FSL. The Investment Manager and its related persons will act in a fair and reasonable manner in allocating suitable investment opportunities among their client and proprietary accounts. No assurance can be given, however, that (i) FSL will participate in all investment opportunities in which other client or proprietary accounts of such persons participate, (ii) particular investment opportunities allocated to client or proprietary accounts other than FSL will not outperform investment opportunities allocated to FSL, or (iii) equality of treatment between the Fund and FSL, on the one hand, and other client and proprietary accounts of such persons, on the other hand, will otherwise be assured.

In connection with FSL's Non-SSC Investments, the Investment Manager and its affiliates may obtain financial and business benefits, including but not limited to: (i) additional investment capacity in Non-SSC Investments, which may be made available to other clients of the Investment Manager, (ii) compensation from Emerging Managers in connection with placement of such additional investment capacity, and/or (iii) sharing in the equity or cash flows of the entire investment business (FSL and non-FSL related) of such Emerging Managers. The Investment Manager or an affiliate will share with FSL annually, through FSL Performance Fee offset, an amount equal to the greater of (i) 50% of cash flows generated by equity held by the Investment Manager or an affiliate thereof in the businesses of Emerging Managers or (ii) 10% of all revenues accruing to the Investment Manager or an affiliate thereof directly from its association with Non-SSC Investment vehicles (the "Shared Cash Flow Amount"). Despite this sharing, however, the arrangements described in this paragraph may result in a conflict of interest between the Investment Manager and the Fund.

Because FSL and the Fund were organized by affiliates of the Investment Manager, the fees paid by the Fund to the Investment Manager were not the result of arms-length negotiation.

The Fund may engage placement agents and enter into sales relationships to market the Fund. If a shareholder is introduced to the Fund by an agent, such shareholder should expect the agent to be paid by the Investment Manager for the introduction, out of the fees the Investment Manager receives from the Fund. The agent will have an incentive to recommend that such shareholder remain an investor in the Fund, since the agent will likely be paid a portion of the Investment Manager's fees each year that the shareholder remains an investor.

26

Because Mr. Noel is a principal of FGL, an affiliate of the Investment Manager as well as a Director of the Fund, he may have an incentive to take actions as a Director that favors the Investment Manager over the Fund.

Each service provider to the Fund shall pay regard to its obligation to act in the best interest of the Fund and the Directors of the Fund will ensure that all such potential conflicts of interest are resolved fairly and in the interest of the shareholders. When allocating investment opportunities, the Investment Manager will ensure that all such investments are allocated in a fair and equitable manner.

BLM will generally be subject to many of the same conflicts of interest as those outlined above. Further, as noted in the "Brokerage" discussion above, BLM, a broker-dealer, intends to act as broker-dealer to execute all transactions for the SSC Investments. Where transactions are effected by BLM, BLM will be entitled to compensation or receive other benefits for its services, which presents potential conflicts of interest. BLM has an incentive to trade FSL's securities more frequently to generate brokerage commissions, which are BLM's sole source of compensation from FSL. The commissions charged by BLM will typically exceed the cost incurred by BLM in executing the transactions, and, accordingly, BLM's activities in executing transactions on behalf of FSL will be profitable for BLM. Further, the fact that BLM is a broker-dealer may present additional conflicts of interest. While it is anticipated BLM will manage its activities with a view toward avoiding conflicts of interest, the fact that BLM is a broker-dealer may result in BLM not purchasing a security it would otherwise purchase or not selling a security it would otherwise sell if necessary to avoid the appearance of a conflict of interest in its activities on behalf of FSL and its other activities as a broker-dealer. Further, BLM will determine the commissions to be charged for each transaction. Such commissions may exceed the amount that would be charged by another broker-dealer.

## DESCRIPTION OF SHARES

The Fund is authorized to issue up to 15,000,000 shares in three classes, with a par value of €01 (the "Euro Shares"), SGD $.01 (the "SGD Shares") and ¥.01 (the "Yen Shares" and together with the Euro Shares and SGD Shares, the "Shares"). The Fund has an authorized Share capital of €50,000, SGD $50,000 and ¥50,000. The Shares will be issued in book entry form, unless delivery of the Fund Shares in registered form is requested. Fund Shares will not be issued in bearer form. Each Fund Share, when issued, will be fully paid and non-assessable.

Holders of Shares are entitled to one vote per Share and will participate on a pro rata basis in the assets of the Fund on liquidation and in dividends and other distributions as declared.

## DIVIDEND POLICY

Since the business objective of the Fund is directed toward achieving capital appreciation, it is anticipated that the Fund will not declare any dividends or make any distributions to its shareholders. Subject to the foregoing and to applicable law, the Fund's Board of Directors will have sole discretion in determining the amount and frequency of dividend distributions, if any.

## TRANSFERS, REDEMPTIONS AND TERMINATION

Transfers

NO SALE OR TRANSFER OF SHARES WILL BE PERMITTED WITHOUT THE FUND'S CONSENT; HOWEVER, SHARES MAY BE REDEEMED AS OF THE LAST BUSINESS DAY OF EACH CALENDAR MONTH OF EACH YEAR ON 15 CALENDAR DAYS' NOTICE TO THE FUND.

Any sale or transfer of a shareholder's entire interest in any Shares or any transfer of Shares by operation of law must be submitted to the Fund for consent and will not be effective until such consent is given by the Fund. Any other dealing with Shares by way of assignment, pledge, mortgage or otherwise is prohibited unless consented to by the Fund and any attempt to do so without first obtaining the Fund's consent, which may be withheld in the sole and exclusive discretion of the Fund, will constitute grounds for compulsory redemption of the Shares concerned as of the next permissible redemption date (as described below) and the imposition of a processing charge of 2% of the Net Asset Value with respect to such redemption. Any application to record a transfer of Shares, including an application to record a transfer by operation of law, if not approved by the Fund within 30 days, also will be treated as an application to redeem the Shares in question as of the next permissible redemption date and will be subject to a processing charge per Share of 2% of the Net Asset Value per Share. The processing charge will be retained by the Fund.

THE DISPOSITION OF SHARES TO U.S. PERSONS (AS DEFINED UNDER "OFFERING OF THE SHARES") WITHOUT THE PRIOR WRITTEN APPROVAL OF THE FUND IS EXPRESSLY PROHIBITED, AND THE FUND SHALL HAVE THE RIGHT TO COMPULSORILY AND IMMEDIATELY TO REDEEM ANY SHARES HELD FOR ANY REASON BY U.S. PERSONS.

Redemptions at the Option of the Shareholders

A shareholder may cause part or all of his Shares to be redeemed as of the last business day (i.e., any day not a Saturday or a Sunday, that is not a public holiday or a day on which banks are generally authorized or obliged by law or regulation to close in the Netherlands, Canada, the Republic of Ireland or the United States of America) of each calendar month of each year, provided that the Fund shall be in receipt of written notice of redemption for at least fifteen (15) calendar days prior to such redemption date. In the Fund's discretion, a shareholder requesting redemption of part of his Shares may be required to redeem all of his Shares unless such shareholder notifies the Fund to cancel the redemption. A shareholder is not required to hold his Shares for any minimum period of time to exercise his redemption privilege.

Compulsory Redemption

The Fund reserves the right to call all or a part of a shareholder's Shares for redemption at any time for any reason or no reason. Except as set forth above, no processing charge will be imposed with respect to any Shares so compulsorily redeemed.

Redemptions - General Information

Redemptions will be at the Net Asset Value per Share calculated as of the last business day of the month of redemption, subject to any applicable processing charge, as described above. If

notice of intent to voluntarily redeem is not received by the Fund within the prescribed period of time, then in the Fund's discretion, the redemption date may be deferred to the end of the next following permissible redemption period, unless the shareholder notifies the Fund to cancel the redemption and the Directors consent to such cancellation.  Except in the case of extraordinary circumstances, such as an inability to liquidate existing positions, or the default or delay in payments due the Fund from brokers, banks or other persons, payment on redemptions will be made within 30 days after the redemption date.  The Fund will not pay interest to the redeeming shareholder on any payment.  The redemption of Euro Shares will be paid in Euro, the redemption of SGD Shares will be paid in Singapore dollars and the redemption of Yen Shares will be paid in Yen.

Shareholders bear the risk of any decline in Net Asset Value from the date notice of intent to redeem is given until the redemption date.  In addition, the Fund may temporarily suspend any redemption during any period that the Fund has suspended the calculation of its Net Asset Value (see "OFFERING OF THE SHARES-Net Asset Value Defined").  Requests for redemption can be made by use of the form included in the Subscription Documents which accompany this Memorandum.

<u>Termination</u>

The shareholders may, by a majority vote, elect to wind up and dissolve the Fund at any time.  If the Fund's Board of Directors determines that it would be in the best interests of the Fund to wind up and dissolve the Fund at any time, it will recommend to the shareholders that they vote to do so, and will submit a plan of dissolution for approval by the shareholders.

## ANTI-MONEY LAUNDERING REGULATIONS

As part of the Fund's or the Administrator's responsibility for the prevention of money laundering, the Investment Manager and its affiliates, subsidiaries or associates may require a detailed verification of a shareholder's identity, any beneficial owner underlying the normal ownership of the Shares and the source of the payment for the Shares.

The Investment Manager reserves the right to request such information as is necessary to verify the identity of a subscriber and the underlying beneficial owner of a subscriber's or a shareholder's Shares in the Fund.  In the event of delay or failure by the subscriber or shareholder to produce any information required for verification purposes, the Investment Manager may refuse to accept a subscription or may cause the redemption of any such shareholder from the Fund.  The Fund, without notice, may suspend the redemption rights of such shareholder if the Fund or the Investment Manager reasonably deems it necessary to do so to comply with anti-money laundering regulations applicable to the Fund, the Investment Manager or any of the Fund's other service providers.

Each subscriber and shareholder shall be required to make such representations to the Fund as the Fund and the Investment Manager shall require in connection with such anti-money laundering programs, including without limitation, representations to the Fund that such subscriber or shareholder is not a prohibited country, territory, individual or entity listed on the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC") website and that it is not directly or indirectly affiliated with, any country, territory, individual or entity named on an OFAC list or prohibited by any OFAC sanctions programs.  Such shareholder shall also represent to the Fund that amounts contributed by it to the Fund were not directly or indirectly the proceeds of criminal conduct or derived from activities that may contravene U.S. federal, state or international laws and regulations, including anti-money laundering laws and regulations.

# ANTI MONEY-LAUNDERING POLICIES

To ensure compliance with statutory and other generally accepted principles aimed at the prevention of money-laundering, the Fund and/or the Administrator may require a detailed verification of a prospective investor's identity. Although the Fund and/or the Administrator reserve the right to request a detailed verification of a prospective investor's identity, a detailed verification should not be necessary if:

- the prospective investor makes a subscription payment from an account held in their own name at a Qualified Financial Institution (a "QFI"); or

- the prospective investor is introduced by a QFI and that QFI provides written assurance to the Fund and/or the Administrator that it has established the identity of the prospective investor and holds evidence of that identity.

A QFI is defined as a financial institution which is:

- established in a European Union (EU) member state and subject to the EU Money Laundering Directives; or

- established in one of the countries which make up the Financial Action Task Force ("FATF") and/or is subject to regulation which complies with the FATF Recommendations. Such countries are Argentina Australia, Austria, Belgium, Brazil Canada, Denmark, Finland, France, Germany, Greece, Hong Kong, Ireland, Italy, Japan, Luxembourg, Mexico, the Netherlands, New Zealand, Norway, Portugal, Russian Federation, Singapore, South Africa, Spain, Sweden Switzerland, Turkey, the United Kingdom, and the United States.

Subscription payments will not be accepted unless made from an account held in the name of the prospective investor. In addition, prospective investors who DO NOT make the subscription payment from an account held at a QFI and who are NOT introduced by a QFI will be required to provide the following documentation, as relevant to their status.

**Individual Investors** will be required to provide the following information:

- full name;

- permanent address;

- a certified copy of their passport or national identity card;

- a bank reference letter; and

- verification of address.

**Partnerships** will be required to provide the following information:

- a mandate from the partnership authorizing the subscription and conferring authority on those persons executing the subscription agreement; and

30

- the identities of at least two partners and of all those authorized to issue instructions.

**Corporate entities** that are quoted on a stock exchange in an EU member country or in one of the QFI prescribed countries or that are known to be the subsidiary of such a quoted company will be required to provide the following information:

- the original or certified copy of the certificate of incorporation or similar document;

- a list of the directors' names, occupations, addresses and dates of birth; and

- properly authorized mandate of directors authorizing the subscription and conferring authority on those persons executing the subscription form.

Where the prospective investor to the transaction is a corporation that is a private company, the following additional information will need to be provided:

- certified passport copies or national identity card copies of at least two directors; and

- a list of names and addresses of shareholders holding 10% or more of the issued share capital of the company and in the case of individual shareholders, their occupations and dates of birth.

When a significant shareholder of a private company (25% or more) is a body corporate, information will need to be provided from the company regarding the ultimate beneficial ownership of that particular body corporate. If the ultimate beneficial owner(s) of that particular body corporate is (are) individual(s), such individual(s) will need to provide the information that is required from individual investors and outlined above.

Furthermore, subscriptions will be cross checked against lists held by various international agencies in order to establish that the persons or entities subscribing have not been blacklisted or wanted in connection with a criminal investigation. Such international agencies include the Bahamas Financial Intelligence Unit, the Central Bank of Ireland, the FBI, the Bank of England and the US Treasury Department's Office of Foreign Assets Control (OFAC). Other agencies will be consulted as and when appropriate.

Finally, it should be noted that redemption payments will only be paid to a bank account held in the name of the registered owner of the Shares and that any transferee will have to furnish the same information (and enter into a subscription agreement) would be required in connection with a direct subscription in order for a transfer application to be considered by the Administrator.

Pending the provision of evidence satisfactory to the Administrator as to the identity of any prospective investor, the evidence of title in respect of Shares may be retained at the absolute discretion of the Administrator. If, within a reasonable period of time following a request for verification of identity, the Administrator has not received evidence satisfactory to it as aforesaid, it may, in its absolute discretion, refuse to allot the Shares applied for in which event application moneys will be returned without interest to the account from which such moneys were originally debited.

31

Financial institutions which have been duly qualified and authorized to exercise their activity in their respective countries as a bank and which are subject to internationally recognized anti money-laundering legislation may subscribe for Shares on behalf of their clients.

## TAX CONSIDERATIONS AND EXCHANGE CONTROL AND ERISA

### Tax Considerations and Exchange Control

As of the date of this Memorandum, the Fund is exempt from all provisions of the Income Tax Act of the British Virgin Islands, including with respect to all dividends, interests, rents, royalties, compensation and other amounts payable by the Fund to persons who are not persons resident in the BVI. Capital gains realized with respect to any shares, debt obligation or other securities of the Fund by persons who are not resident in the BVI are also exempt from the provisions of the Income Tax Act of the British Virgin Islands. No estate, inheritance, succession or gift tax, rate, duty, levy or other charge is payable by persons who are not persons resident in the BVI with respect to any shares, debt obligations or other securities of the Fund.

There are no exchange control restrictions in the BVI. Accordingly, the Fund will be free to acquire, to hold and to sell any foreign currency and securities without restriction.

Prospective subscribers should consult their professional advisors on the possible tax consequences of subscribing for, buying, holding, selling, transferring or redeeming Shares under the laws of their country of citizenship, residence or domicile.

### ERISA

The following is a summary of certain aspects of the U.S. federal laws and regulations applicable to retirement plan investments as in existence on the date hereof, all of which are subject to change. This summary is general in nature and does not address every issue that may be applicable to the Fund or a particular investor.

The Fund may accept subscriptions from pension and profit-sharing plans maintained by U.S. corporations and/or unions, individual retirement accounts and Keogh plans, entities that invest the assets of such accounts or plans and other entities investing plan assets (all such entities are herein referred to as "Benefit Plan Investors"). The Investment Manager does not anticipate that the Fund's assets will be subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or the prohibited transaction provisions of Section 4975 of the IRC, because the Investment Manager intends to limit the investments in the Fund by Benefit Plan Investors. Under ERISA and the regulations thereunder, the Fund's assets will not be deemed to be plan assets subject to Title I of ERISA or Section 4975 of the IRC if less than 25% of the value of each class of the Fund's Shares is held by Benefit Plan Investors, excluding from this calculation any non-Benefit Plan Investor interests held by the Investment Manager and certain affiliated persons or entities. The Fund will not knowingly accept subscriptions for Shares or permit transfers of Shares to the extent that such investment or transfer would subject the Fund's assets to Title I of ERISA or Section 4975 of the IRC. In addition, because the 25% limit is determined after every subscription to or redemption from the Fund, the Fund has the authority to require the redemption of all or some of the Shares held by any Benefit Plan Investor if the continued holding of such Shares, in the opinion of the Directors, could result in the Fund being subject to Title I of ERISA or Section 4975 of the IRC.

Certain duties, obligations and responsibilities are imposed on persons who serve as fiduciaries with respect to employee benefit plans or accounts ("Plans"); for example, ERISA and the IRC prohibit acts of fiduciary self-dealing and certain transactions between Plans and "parties-in-interest" or "disqualified persons" (as such terms are defined in ERISA and the IRC). In the Fund's Subscription Agreement, each Plan investor will be required to represent that its fiduciary has independently made the decision to invest in the Fund and has not relied on any advice from the Fund, the Investment Manager, any placement agent associated with the Fund, or any of their affiliates with respect to the investment in the Fund. Accordingly, fiduciaries of Plans should consult their own investment advisors and their own legal counsel regarding the investment in the Fund and its consequences under applicable law, including ERISA and the IRC.

## LEGAL MATTERS

Legal matters in connection with this offering have been passed upon for the Fund in the United States by Seward & Kissel LLP, One Battery Park Plaza, New York, New York 10004. Matters with respect to the laws of the BVI have been passed upon by Conyers Dill & Pearman, Romasco Place, Wickhams Cay 1, P.O. Box 3140, Road Town, Tortola, BVI.

## MISCELLANEOUS

Reports and Financial Statements

The Fund's fiscal year will end on December 31, except that the Fund's final fiscal year will terminate on the date the Fund commences to wind up and dissolve. The Fund will keep its books on an accrual basis. Audited financial statements of the Fund will be mailed to shareholders at their registered addresses, normally within 120 days after year-end. At the same time, each shareholder shall be furnished with an annual report of the Fund, which will include the Net Asset Value of the Fund and the Net Asset Value per Share at the end of the year, and such other information as the Fund, in its discretion, determines to be necessary or appropriate. Shareholders also will receive unaudited quarterly letters with respect to the Fund's financial performance.

1) **General**

   a) No Share or loan capital of the Fund is under option or agreed, conditionally or unconditionally, to be put under option.

   b) Shares in the Fund are in registered form. Temporary documents of title will not be issued.

   c) Except for their ownership of Shares, none of the Directors or any connected person has any interest in the Shares or loan capital of the Fund, the existence of which is known to, or could with reasonable diligence be ascertained by, the relevant Director.

   d) None of the Directors has a service contract with the Fund and no such contract is proposed, although, Walter M. Noel, Jr. is a principal of FGL, an affiliate of the Investment Manager.

   e) No loan or guarantee has been granted or provided by the Fund to or for the benefit of any Director.

   f) None of the Directors or any member of their respective immediate families has or has had any interest in any transaction or transactions which are or were unusual in their nature or

33

conditions or significant in the business of the Fund and which have been effected by the Fund since its incorporation.

g) As of the date of this Memorandum, the Fund has commenced operations, but no dividends have been declared.

h) The Fund has no loan capital outstanding, no loan capital created but unissued, no loans or any other borrowing or indebtedness or any contingent liabilities, nor has it given any guarantees except as disclosed herein.

## 2) Litigation and Arbitration

The Fund is not engaged in any legal or arbitration proceedings and no legal or arbitration proceedings are known to the Directors to be threatened by or against the Fund.

## 3) Memorandum and Articles of Association

Pursuant to Paragraph 4 of the Fund's Memorandum of Association, the Fund may engage in any act or activity that is not prohibited under any law for the time being in force in the BVI. As such, the Fund may carry on business as an investment company. The Fund's Memorandum and Articles of Association may be amended by a resolution of Directors or a resolution of shareholders.

The Memorandum and Articles of Association of the Fund provide that no director or officer of the Fund shall be liable for the acts, receipts, neglects or defaults of any other director or officer, or for joining in any receipt or act for conformity, or for any loss or expense happening to the Fund through the insufficiency of deficiency of title to any property acquired by order of the directors for or on behalf of the Fund, or for the insufficiency or deficiency of any security in or upon which any of the moneys of the Fund shall be invested, or for any loss or damage arising from the bankruptcy, insolvency, or tortious act of any person with whom any moneys, securities or effects shall be deposited, or for any loss occasioned by any error of judgment, omission, default, or oversight on his part, or for any other loss, damage, or misfortune whatever which shall happen in relation to the execution of the duties of his office or in relation thereto, to the extent permitted by law.

The Memorandum and Articles of Association of the Fund further provide that each director or officer of the Fund shall be indemnified by the Fund against, and it shall be the duty of the directors out of the funds of the Fund to pay all costs, losses, and expenses which any director or officer may incur or become liable for by reason of any contract entered into, or act or thing done by him as such director or officer, or in any way in the discharge of his duties, and the amount for which such indemnity is provided shall immediately attach as a lien on the property of the Fund, and have priority as between the shareholders over all other claims but only if such director or officer acted honestly and in good faith with a view to the best interests of the Fund and, in the case of criminal proceedings, the person had no reasonable cause to believe that his conduct was unlawful.

## 4) Directors

a) The number of Directors shall not be less than one (1) or more than twenty (20).

34

b)  The remuneration of Directors shall be fixed from time to time by the Board.   Currently the director who is affiliated with the Investment Manager does not receive compensation as a Director.  The two Directors not affiliated with the Investment Manager are each paid U.S. $25,000 per annum.

c)  None of the Directors has a service contract, existing or proposed with the Fund, although Walter M. Noel, Jr. is a principal of FGL, an affiliate of the Investment Manager.

d)  There is no retirement age for Directors.

e)  The Directors may vote on any transaction in which they have a material interest if they first disclose the nature of their interest to the Fund.

f)  The Directors may, by resolution of Directors, fix the emoluments of the Directors with respect to services to be rendered in any capacity to the Fund.

g)  The Directors may exercise the powers of the Fund to borrow money and to mortgage or charge its undertakings, property and uncalled capital or any part thereof, to issue debentures, debenture stock and offer securities whenever money is borrowed as security for any debt, liability or obligation of the Fund.

h)  No Director has

- any unspent convictions in relation to indictable offenses;

- been adjudged a bankrupt, entered into a voluntary arrangement with creditors or had a receiver appointed to oversee any asset of such Director;

- been the director of any company which, while he was a director with an executive function or after 12 months after he ceased to be director with an executive function, had a receiver appointed or went into compulsory liquidation, creditors voluntary liquidation, administration or company voluntary arrangements, or made a composition or arrangements with its creditors generally or with any class of its creditors;

- been a partner of any partnership which, while he was partner or within 12 months after he ceased to be a partner, went into compulsory liquidation, administration or partnership voluntary arrangement or had a receiver appointed to oversee any partnership asset;

- had any public criticism by statutory or regulatory authorities (including recognized professional bodies); or

- been disqualified by a court from acting as a director or from acting in the management or affairs of any company.

## 5) **Borrowing Powers**

The Board may exercise all the powers of the Fund to borrow money, give guarantees and to mortgage, pledge or charge all or part of its undertaking, property and uncalled capital and to issue

debentures and other securities, whether outright or as collateral security for any liability or obligation of the Fund.

<u>**Documents Available for Inspection**</u>

Copies of the following documents will be available for inspection at the offices of the Fund's registered office in the British Virgin Islands during usual business hours on any weekday (Saturdays, Sundays and holidays excepted):

a) the Memorandum and Articles of Association of the Fund;

b) the material contracts of the Fund with the Investment Manager, the Administrator, Registrar and Transfer Agent;

c) the British Virgin Islands Mutual Funds Act, 1996;

d) the BVI Business Companies Act, 2004;

e) when available, the latest financial statements of the Fund;

f) audited accounts as of the close of the last immediately fiscal year;

g) Auditors letter of consent; and a list of all past and present directorships and partnerships held by each director over the past five years.

## COUNTRY-SPECIFIC NOTICES

<u>Australia</u>.  No offer for subscription or purchase of the Shares offered hereby has been made or issued in Australia, otherwise than by means of an offer in respect of which disclosure under Part 6D.2 of the Corporations Act 2001 is not required.  Accordingly, this Memorandum has not been lodged with the Australian Securities and Investments Commission.

<u>Bahamas</u>.  The Shares may not be offered or sold or otherwise disposed of in any manner to persons deemed by the Central Bank of the Bahamas as resident for exchange control purposes, unless such persons deemed as resident obtain the prior approval of the Central Bank of the Bahamas.

<u>Belgium</u>.  The information in this Memorandum may not be disclosed to the public in Belgium, the Shares may not be offered, sold, transferred or delivered in or from Belgium as part of their initial distribution or at any time thereafter, directly or indirectly, other than to persons or entities mentioned in Article 3 of the Royal Decree of January 9, 1991 Relating to the Public Characteristic of Operations Calling for Savings and on the Assimilation of Certain Operations to a Public Offer (Belgian Official Journal of January 12, 1991).  Therefore, the Shares are exclusively designed for credit institutions, stock exchange companies, collective investment funds, companies or institutions, insurance companies, and/or pension funds acting for their own account only.

<u>Brazil</u>.  The Shares have not been, and will not be, registered with the Comissão de Valores Mobiliarios and may not be offered or sold in Brazil except in circumstances which do not constitute a public offering or distribution under Brazilian laws and regulations.

<u>British Columbia and Ontario, Canada</u>.  The Memorandum constitutes an offering of the securities described therein only in those jurisdictions and to those persons where and to whom they may be lawfully offered for sale, and therein only by persons permitted to sell such securities. The Memorandum is not, and under no circumstances is to be construed as, an advertisement or a public offering of the securities described therein in Canada.  No securities commission or similar authority in Canada has reviewed or in any way passed upon the Memorandum or the merits of the securities described therein, and any representation to the contrary is an offense.

Each purchaser of Shares in Canada will be deemed to have represented that they (a) are resident in British Columbia or Ontario and are an "accredited investor" as defined in National Instrument 45-106 ("NI 45-106"), are not a person created or being used solely to purchase or hold securities as an accredited investor and, if in Ontario, are not an individual unless purchasing from a fully registered dealer within the meaning of Section 204 of the Regulation to the Securities Act (Ontario) and (b) are purchasing Shares as principal for their own account, or are deemed to be purchasing Shares as principal for their own account by virtue of being either (i) a trust company or trust corporation as further described in subsection (p) of the "accredited investor" definition of NI 45-106; or (ii) a person acting on behalf of a fully managed account managed by that person as further described in subsection (q) of the "accredited investor" definition of NI 45-106.  If the Memorandum, together with any amendment thereto, contains an untrue statement of a material fact or omits to state a material fact that is required to be stated or is necessary in order to make any statement therein not misleading in the light of the circumstances in which it was made (a "Misrepresentation") and it was a Misrepresentation on the date of purchase, prospective purchasers in Ontario to whom this Memorandum was sent or delivered and who purchase Shares shall have a statutory right of action against the Fund for rescission (while still the owner of such Shares) or alternatively, for damages, exercisable on written notice given not more than 90 days subsequent to

the date of purchase, provided that the Fund will have no right of action for damages, or, while still the owner of the securities, for rescission (in which case, if the purchaser elects to exercise the right of rescission, the purchaser will have no right of action for damages) provided that: (a) no action shall be commenced more than, in the case of an action for rescission, 180 days after the date of the transaction that gave rise to the cause of action; or, in the case of any other action, the earlier of: (i) 180 days after the plaintiff first had knowledge of the facts giving rise to the cause of action, or (ii) three years after the date of the transaction that gave rise to the cause of action; (b) the purchaser will have no right of action if the purchaser purchased such Shares with knowledge of the Misrepresentation; (c) the purchaser will have no right of action for all or any portion of any damages that the Fund proves do not represent the depreciation in value of such Shares as a result of the Misrepresentation; (d) the purchaser will have no right of action for amounts in excess of the price at which such Shares were sold to the purchaser; and (e) the statutory right of action for rescission or damages is in addition to and does not derogate from any other rights or remedies the purchaser may have at law. The foregoing summary is subject to the express provisions of the Securities Act (Ontario) and reference is made to the complete text of such provisions.

The statutory right of action referred to above is applicable to any investor to whom securities are distributed in reliance upon the "accredited investor" prospectus exemption in Section 2.3 of NI 45-106, unless the prospective purchaser is:

(a)     a Canadian financial institution, meaning either:

(i)     an association governed by the Cooperative Credit Associations Act (Canada) or a central cooperative credit society for which an order has been made under section 473(1) of that Act; or

(ii)     a bank, loan corporation, trust company, trust corporation, insurance company, treasury branch, credit union, caisse populaire, financial services corporation, or league that, in each case, is authorized by an enactment of Canada or a jurisdiction of Canada to carry on business in Canada or a jurisdiction in Canada;

(b)     a Schedule III bank, meaning an authorized foreign bank named in Schedule III of the Bank Act (Canada),

(c)     The Business Development Bank of Canada incorporated under the Business Development Bank of Canada Act (Canada), or

(d)     a subsidiary of any person referred to in paragraphs (a), (b) or (c), if the person owns all of the voting securities of the subsidiary, except the voting securities required by law to be owned by the directors of the subsidiary.

The distribution of the Shares in Canada is being made on a private placement basis. Accordingly, any resale of the securities must be made: (i) through an appropriately registered dealer or pursuant to an exemption from the dealer registration requirements of applicable provincial securities laws; and (ii) in accordance with, or pursuant to an exemption from, the prospectus requirements of applicable provincial securities laws. These resale restrictions may in some circumstances apply to resales made outside of Canada. Purchasers of Shares in Canada are advised to seek legal advice prior to any resale of the Shares.

This Memorandum does not address the Canadian tax consequences of ownership of the Shares. Prospective purchasers of Shares should consult their own tax advisors with respect to the Canadian and other tax considerations applicable to them.

By purchasing these Shares, the purchaser acknowledges that personal information such as the purchaser's name will be delivered to the Ontario Securities Commission ("OSC") and that such personal information is being collected indirectly by the OSC under the authority granted to it in securities legislation for the purposes of the administration and enforcement of the securities legislation of Ontario. By purchasing these Shares, the purchaser shall be deemed to have authorized such indirect collection of personal information by the OSC. Questions about such indirect collection of personal information should be directed to the OSC's Administrative Assistant to the Director of Corporate Finance, Suite 1903, Box 5520 Queen Street West, Toronto, Ontario M5H 3S8 or to the following telephone number: (416) 593-8086.

British Virgin Islands. The Shares offered hereby may not be sold to or purchased by persons resident in the British Virgin Islands, but may be sold to British Virgin Islands Business Companies.

Cayman Islands. This Memorandum does not constitute an offer of the Shares of the Fund to the members of the Public in the Cayman Islands, for so long as the Shares of the Fund are not listed on the Cayman Islands Stock Exchange. "Public" for these purposes does not include a sophisticated person, a high net worth person, a company, partnership or trust of which the shareholders, unit holders or limited partners are each a sophisticated person, a high net worth person any exempted or ordinary non-resident company registered under The Companies Law (2007 Revision) or a foreign company registered pursuant to Part IX of The Companies Law (2007 Revision) or any such company acting as general partner of a partnership registered pursuant to Section 9(1) of the Exempted Limited Partnership Law (2003 Revision) or any director or officer of the same acting in such capacity or the Trustee of any trust registered or capable of registering pursuant to Section 74 of The Trusts Law (2001 Revision).

Chile. The Shares have not been, and will not be, registered with the Superintendencia de Valores y Seguros (the Chilean Securities Commission) and may not be offered and sold in Chile except in circumstances which do not constitute a public offering or distribution under Chilean laws and regulations.

Republic of China. No invitation to offer for, or sale of, the Shares shall be made to the public in China or by any means that would be deemed public under the laws of China. The offer of Shares is personal to the investor to whom the Memorandum has been addressed by the Fund. Business entities incorporated under the laws of China (excluding non-U.S. investment business entities) shall apply for approval from the Chinese government authorities before purchasing the Shares. Furthermore, all business entities incorporated under the laws of China and Chinese citizens residing in China shall obtain the prior approval from the Chinese Foreign Exchange Authority before purchasing Shares.

Costa Rica. The Shares have not been, and will not be, registered with the Comision Nacional de Valores (the Costa Rican Securities Commission) and may not be offered or sold in Costa Rica except in circumstances which do not constitute a public offering or distribution under Costa Rican laws and regulations.

Ecuador.  The Shares have not been, and will not be, registered with the Superintendencia de Companias del Ecuador (the Ecuadorian Securities and Exchange Commission) and may not be offered and sold in Ecuador except in circumstances which do not constitute a public offering or distribution under Ecuadorian laws and regulations.  This communication is for informative purposes only; it does not constitute a public offering of any kind.

France.  "Cette note d'information n'a pas été soumise au visa de la Commission des Opérations de Bourse.  Par conséquent, ni cette note d'information, ni tout autre document promotionnel se rapportant aux intérêts ne pourront être communiqués au public ou utilisés dans la cadre de toute offre de souscription ou de vente des intérêts en France et les intérêts ne peuvent être émis, offerts ou cédés de toute facon en France.  Les investisseurs doivent agir pour leur propre compte.  Le vente, directe ou indirecte, au public des instruments financiers acquis sera faite conformément aux dispositions les concernant."  This Memorandum has not been submitted to the Commission des Operations de Bourse in France.  Accordingly, neither this Memorandum nor any other offering materials relating to the Shares may be available to the public or used in connection with any other offer for subscription or sale of the Shares in France, and the Shares may not be issued, offered or otherwise sold in France, investors should act for their own account.  The sale, direct or indirect, in the public of the purchased financial instruments will be made in compliance with all requirements in relation thereto.

Germany.  Any person who is in possession of the Memorandum understands that no action has or will be taken which would allow an offering of the Shares to the public in Germany. Accordingly, the Shares may not be offered, sold or delivered and neither the Memorandum nor any other offering materials relating to the Shares may be distributed or made available to the public in Germany.  Individual sales of the Shares to any person in Germany may only be made according to German securities, tax and other applicable laws and regulations.

Greece.  The Shares may not be offered or sold in any manner that constitutes an offer or sale to the public in the Hellenic Republic within the laws and regulations from time to time applicable to public offers or sales of securities.

Hong Kong.  No action has been taken to permit an offering of the Shares to the public in Hong Kong and, accordingly, no copy of this Memorandum may be issued, circulated or distributed in Hong Kong other than (i) exclusively to persons whose business involves the acquisition, disposal or holding of securities, whether as principal or agent, or (ii) otherwise in circumstances that do not constitute an invitation to the public for the purpose of the Protection of Investors Ordinance (Chapter 335 of the Laws of Hong Kong).

Ireland.  It is not the intention of the Fund to advertise or market the Shares in Ireland, and no such marketing will take place without the prior approval in writing of the Central Bank of Ireland.

Isle of Man.  The Fund is not a recognized collective investment scheme for the purposes of Sections 12 or 13 of the Financial Services Act 1988 (the "FS Act") of the Isle of Man and is accordingly subject to the prohibition on the promotion of collective investment schemes as contained in Section 1(1) of the FS Act.  Accordingly, the Memorandum may only be issued or passed on to any person in the Isle of Man by way of the two limited exceptions to this general prohibition contained in Section 1(2) of the FS Act and the Financial Supervision (Promotion of Unregulated Schemes (Exemption)) FS Regulations 1992 (the "Exemption Regulations").  Under Regulation 3(2) of the Exemption Regulations, any advertisement issued in the Isle of Man in

connection with the Fund must contain a statement either (a) that participants in the Fund are not protected by any statutory compensation scheme; or (b) that participants in the Fund are protected by a statutory compensation scheme and particulars sufficient to identify the compensation arrangements.

Israel.  The Shares are offered to a limited number of sophisticated investors, in all cases under circumstances designed to preclude a distribution which would be other than a private placement.  The Memorandum may not be reproduced or used for any other purpose, nor be furnished to any other person other than those to whom copies have been sent.  Israeli residents, other than those considered "exemption holders" under the General Currency Control Permit, 1978, require a special permit from the Israeli Controller of Foreign Currency in order to purchase the Shares.

Italy.  This Memorandum may not be distributed to members of the public in Italy.  The Italian Commission Nazionale per la Societa e la Borsa has not authorized any offering of the subscription of Shares in the Fund; accordingly, Shares may not be offered or sold in Italy or to residents thereof except as permitted by Italian law.  With respect to any potential purchaser or transaction subject to Italian law, this Memorandum is for the sole use of the person who has requested it and whose name appears on the cover page hereof (the "Prospective Buyer") and may not be disclosed, in whole or in part, to any person other than the Prospective Buyer and the Prospective Buyer's authorized agents.  This Memorandum may not be copied in whole or in part. The Prospective Buyer, by accepting delivery of the Memorandum, agrees to return it to the Fund if such Prospective Buyer does not undertake to purchase the securities offered hereby.

Japan.  Shares have not been and will not be registered under Article 4, Paragraph 1 of the Financial Instruments and Exchange Law of Japan ("FIEL"), by virtue of the fact that the Shares are being offered in accordance with Article 2, Paragraph 3, Item 2(B) of the FIEL.  Accordingly, no Shares may be offered or sold, directly or indirectly, in Japan, except pursuant to an exemption from the registration requirements of, and otherwise in compliance with, the FIEL and any other applicable law, regulations and ministerial guidelines of Japan.  Specifically, the Shares are being offered in Japan pursuant to the small number private placement exemption from the registration requirements (as set forth in Article 2, Paragraph 3, Item 2(B) of the FIEL).  Accordingly, no solicitation of orders for subscriptions for the Shares or offer for sale of the Shares may be made to 50 or more persons in Japan; provided, however, that qualified institutional investors (as defined in Article 10 of the Cabinet Ordinance Concerning Definitions under Article 2 of the FIEL) (the "QIIs") shall not be counted for the purpose of calculating such 50 persons, on the condition that all of the requirements (as set forth in Article 1-4, Item 1 of the Enforcement Order of the FIEL) are satisfied.

Jersey.  The Memorandum relates to a private placement and does not constitute an offer to the public of Jersey to subscribe for the Shares offered hereby.  No regulatory approval has been sought to the offer in Jersey. The offer of the Shares is personal to the person to whom the Memorandum is being delivered by or on behalf of the Fund, and a subscription for the Shares will be accepted only from such person. The Memorandum may not be produced or used for any other purpose, nor be furnished to any other person other than those to whom it has been so delivered.

Korea.  The Memorandum is not, and under no circumstance is to be construed as, a public offering of securities in Korea.  Neither the Fund nor the Investment Manager is making any representation with respect to the eligibility of any recipients of the Memorandum to acquire the Shares under the laws of Korea, including without limitation the Foreign Exchange Management Act and regulations thereunder.  The Shares have not been registered under the Securities and Exchange Act of Korea and none of the Shares may be offered, sold or delivered, or offered or sold to any

person for re-offering or resale, in Korea or to any resident of Korea except pursuant to applicable laws and regulations of Korea.

Liechtenstein.  The Shares are offered to a narrowly defined category of investors, in all cases under circumstances designed to preclude a public solicitation.  The Memorandum may not be reproduced or used for any other purpose, nor be furnished to any other person other than those to whom copies have been sent.

Luxembourg.  The Shares are offered to a limited number of sophisticated investors, in all cases under circumstances designed to preclude a distribution that would be other than a private placement.  The Memorandum may not be reproduced or used for any other purpose, nor be furnished to any other person other than those to whom copies have been sent.

Netherlands.  The Shares may not be solicited, acquired or offered, directly or indirectly, in or from the Netherlands, and this Memorandum may not be circulated in the Netherlands to any individuals or legal entities as part of the initial distribution or anytime thereafter, except to individuals or legal entities who or which trade or invest in subjects of investment ("Beleggingsobjecten") in the conduct of a profession or trade, including banks, brokers, securities institutions, insurance companies, pension funds, investment institutions, other institutional investors and other parties, including treasury departments of commercial enterprises and finance companies which are regularly active in the financial markets in a professional manner (a "Professional Market Party" and/or "Professional Market Parties") investing in subjects of investment as described in Article 1 of the Exemption Regulation of October 9, 1990 issued pursuant to Article 14 of the Investment Institutions Supervision Act (Wet Toezicht Beleggingsinstellingen) of June 27, 1990, as amended from time to time (the "Investment Institutions Act"), and the respective accompanying Memoranda thereto of the Minister of Finance of the Netherlands.  In the event of a solicitation, acquisition or offering made to or by Professional Market Parties and therefore exempt from the general prohibition as provided for in the Investments Institutions Act, no subsequent offering of the Shares in a "secondary offering" by such Professional Market Parties to persons other than such Professional Market Parties may be made.

New Zealand.  The Memorandum has been prepared solely for and the offer made solely to, persons whose principal business is the investment of money or who, in the course of and for the purposes of their business, habitually invest money, or who are otherwise persons to whom the making of an offer of these securities would not constitute an offer of securities to the public under section 3(2)(a ) of the Securities Act 1978 (New Zealand).

Norway.   The Memorandum has not been filed with the Oslo Stock Exchange in accordance with the Norwegian Securities Trading Act, Section 5-1, and may therefore not be distributed to more than fifty prospective investors in Norway.

Oman.  The Memorandum and the Shares are not available to any member of the public and are restricted to investors having an existing business relationship with the Fund.  Application for the Shares made by or on behalf of investors not having an existing relationship with the Investment Manager will not be accepted.  Any investor that considers purchasing the Shares offered by the Memorandum should consult a professional adviser before doing so.

Panama.  The Shares have not and will not be registered with the Comision Nacional de Valores (the National Securities Commission) of the Republic of Panama under Cabinet Decree No. 247 of 1970 ("Panama's Securities Laws") and may not be offered or sold in a primary offering

Case 1:09-cv-00118-VM Document 303-3 Filed 12/22/09 Page 83 of 293

within Panama, except in certain transactions exempt from the registration requirements of Panama's Securities Laws.

Russia. The Shares are not intended to be sold or offered in (or on the territory of) the Russian Federation or to Russian residents and the Memorandum has not been registered with, and will not be registered with, the Federal Securities Markets Commission of the Russian Federation.

Singapore. The offer or invitation which is the subject of this Memorandum is not allowed to be made to the retail public. This Memorandum is not a prospectus as defined in the Securities and Futures Act, Chapter 289 of Singapore ("**SFA**"). Accordingly, statutory liability under that Act in relation to the content of the prospectuses would not apply. You should consider carefully whether the investment is suitable for you.

The offer or invitation which is the subject of this Memorandum may also be made to institutional investors specified in Section 304 of the SFA.

This Memorandum has not been registered as a prospectus with the Monetary Authority of Singapore. Accordingly, this Memorandum and any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of Shares may not be circulated or distributed, nor may Shares be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to persons in Singapore other than (i) to an institutional investor under Section 304 of the SFA, (ii) to a relevant person, or any person pursuant to Section 305(2), and in accordance with the conditions, specified in Section 305 of the SFA or (iii) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA.

Where Shares are subscribed or purchased under Section 305 by a relevant person which is:

(a)     a corporation (which is not an accredited investor) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor; or

(b)     a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary is an accredited investor, shares, debentures and units of shares and debentures of that corporation or the beneficiaries' rights and interest in that trust shall not be transferable for 6 months after that corporation or that trust has acquired the Shares under Section 305 except:

> (1)     to an institutional investor or to a relevant person, or to any person pursuant to an offer that is made on terms that such rights or interests are acquired at a consideration of not less than S$200,000 (or its equivalent in foreign currency) for each transaction, whether such amount is to be paid in cash or by exchange of securities or other assets;

> (2)     where no consideration is given for the transfer; or

> (3)     by operation of law.

An investment in a hedge fund carries risk of a different nature from other types of collective investment schemes which invest in listed securities and do not engage in short-selling. A

hedge fund may not be suitable for persons who are averse to such risks. There can be no assurance that a hedge fund's investment objective will be achieved and investment results may vary substantially over short periods of time. Investors may lose all or a large part of their investment in a hedge fund. An investment in hedge funds is not intended to be a complete investment programme for any investor and prospective investors should carefully consider whether an investment in a hedge fund is suitable for them in the light of their own circumstances, financial resources and entire investment programme.

South Africa. The Shares are for your acceptance only and may not be offered or become available to persons other than yourself and may not be publicly offered, sold or advertised in South Africa and the Memorandum may only be circulated to selected individuals.

Spain. This Memorandum has not been and will not be registered with la Comision Nacional del Mercado de Valores of Spain and may not be distributed in Spain in connection with the offering and sale of participations without complying with all legal and regulatory requirements in relation thereto.

Switzerland. This Memorandum is provided to persons who: (a) have declared to be qualified investors pursuant to art. 10 par. 3 CISA*; or (b) have declared to accept it exclusively on behalf of one or more qualified investors whom this Memorandum is exclusively meant for. In particular, the person being represented is a wealthy private person pursuant to art. 10 par. 3 letter (e) CISA, or is a qualified investor according to art. 10 par. 3 letter (f) CISA or to art. 6 par. 2 CISO**. For no reason whatsoever, therefore, is this Memorandum intended for unqualified investors according to the CISA.

Taiwan. The Shares have not been and will not be registered with the Securities and Exchange Commission of the Republic of China (Taiwan) pursuant to relevant securities laws and regulations and may not be offered, sold or delivered in the Republic of China (Taiwan) through a public offering or in circumstances which constitute an offer within the meaning of the Securities and Exchange Law of the Republic of China (Taiwan) that requires a registration or approval of the Securities and Futures Commission of the Republic of China (Taiwan).

United Kingdom. The Fund is an unrecognized collective investment scheme for the purposes of the Financial Services and Markets Act of 2000 of the United Kingdom (the "Act"). The promotion of the Fund and the distribution of this Memorandum in the United Kingdom is consequently restricted by law.

This Memorandum is being issued by the Company where permitted by applicable law to persons who are of a kind to whom the Company may lawfully be promoted by a person authorized under the Act by virtue of the Financial Services and Markets Act 2000 (Promotion of Collective Investment Schemes (Exemptions) Order 2001 and Annex 5 to Chapter 3 of the United Kingdom Financial Services Authority's Conduct of Business Sourcebook or as otherwise permitted by applicable law and regulation.

The Company is not regulated by the United Kingdom Financial Services Authority and investors will not have the benefit of the Financial Services Compensation Scheme and may not have the benefit of other protections afforded by the Act or any of the rules and regulations made thereunder.

Case 1:09-cv-00118-VM    Document 363-3    Filed 12/22/09    Page 85 of 293

The Shares are not dealt in on a recognized or designated investment exchange for the purposes of the Act, and it may therefore be difficult for an investor to dispose of his Shares otherwise than by way of redemption or to obtain reliable information about the extent of the risks to which his investment is exposed.  Acquiring Shares may expose an investor to a significant risk of losing all of the amount invested.  The Fund is a limited liability company and any person who acquires Shares will not thereby be exposed to any significant risk of incurring additional liability.  Any person who is in any doubt about investing in the Fund should consult an authorized person specializing in advising on such investments.

Uruguay.  The Shares correspond to a private issue and are not registered with the Central Bank of Uruguay.

**FORM ADV**

**Uniform Application For Investment Adviser Registration**

**Part II - Page 1**

| OMB APPROVAL | |
| --- | --- |
| OMB Number | 3235-0049 |
| Expires: | July 31 2008 |
| Estimated average burden hours per response: | 9.402 |

| | |
| --- | --- |
| **Name of Investment Adviser:**<br><br>**Fairfield Greenwich (Bermuda) Ltd.** | |
| **Address:** (Number and Street) (City) (State) (Zip Code)<br><br>**Principal Office:** 131 Front Street, 1st Floor, Hamilton, Bermuda HM 11<br>**Mailing Address:** 12 Church Street, Suite 606, Hamilton, Bermuda HM 11 | **Telephone Number:**<br><br>**(441) 292-5401** |

**This part of Form ADV gives information about the investment adviser and its business for the use of clients. The information has not been approved or verified by any governmental authority.**

**Table of Contents**

| Item Number | Item | Page |
| --- | --- | --- |
| 1 | Advisory Services and Fees | 2 |
| 2 | Types of Clients | 2 |
| 3. | Types of Investments | 3 |
| 4. | Methods of Analysis, Sources of Information and Investment Strategies | 3 |
| 5. | Education and Business Standards | 4 |
| 6. | Education and Business Background | 4 |
| 7. | Other Business Activities | 4 |
| 8. | Other Financial Industry Activities of Affiliations | 4 |
| 9. | Participation or Interest in Client Transactions | 5 |
| 10. | Conditions for Managing Accounts | 5 |
| 11. | Review of Accounts | 5 |
| 12. | Investment or Brokerage Discretion | 6 |
| 13. | Additional Compensation | 6 |
| 14. | Balance Sheet | 6 |
| | Continuation Sheet | Schedule F |
| | Balance Sheet, if required | Schedule G |

**(Schedules A, B. C. D and E are included with Part I of this Form, for the use of regulatory bodies, and are not distributed to clients.)**

**Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.**

| FORM ADV | Applicant: | SEC File Number: | Date: |
|---|---|---|---|
| Part II - Page 2 | Fairfield Greenwich (Bermuda) Ltd. | 801-66439 | March 27, 2008 |

**1.  A.  Advisory Services and Fees.**  (check the applicable boxes)

For each type of service provided, state the approximate % of total advisory billings from that service.  (See instruction below.)

Applicant:

☒ (1)  Provides investment supervisory services ........................................................................... __100__ %

☐ (2)  Manages investment advisory accounts not involving investment supervisory services ...................... _____ %

☐ (3)  Furnishes investment advice through consultations not included in either service described above .......... _____ %

☐ (4)  Issues periodicals about securities by subscription ................................................................ _____ %

☐ (5)  Issues special reports about securities not included in any service described above ......................... _____ %

☐ (6)  Issues, not as part of any service described above, any charts, graphs, formulas, or other devices which clients may use to evaluate securities ......................................................................................................... _____ %

☐ (7)  On more than an occasional basis, furnishes advice to clients on matters not involving securities ........... _____ %

☐ (8)  Provides a timing service ............................................................................................. _____ %

☐ (9)  Furnishes advice about securities in any manner not described above ........................................... _____ %

(Percentages should be based on applicant's last fiscal year.  If applicant has not completed its first fiscal year, provide estimates of advisory billings for that year and state that the percentages are estimates.)

B.  Does applicant call any of the services it checked above financial planning or some similar term?

Yes ☐   No ☒

C.  Applicant offers investment advisory services for:  (check all that apply)

☒ (1)  A percentage of assets under management        ☐ (4)  Subscription fees

☐ (2)  Hourly charges        ☐ (5)  Commissions

☒ (3)  Fixed fees (not including subscription fees)        ☒ (6)  Other

D.  For each checked box in A above, describe on Schedule F:

• the services provided, including the name of any publication or report issued by the adviser on a subscription basis or for a fee

• applicant's basic fee schedule, how fees are charged and whether its fees are negotiable

• when compensation is payable, and if compensation is payable before service is provided, how a client may get a refund or may terminate an investment advisory contract before its expiration date

**2.  Types of Clients.**  Applicant generally provides investment advice to:  (check those that apply)

☐ A. Individuals        ☐ E. Trusts, estates, or charitable organizations

☐ B. Banks or thrift institutions        ☐ F. Corporations or business entities other than those listed above

☐ C. Investment companies        ☒ G. Other (Describe on Schedule F)

☐ D. Pension and profit sharing plans

Answer all items.  Complete amended pages in full, circle amended items and file with execution page (page 1).

| FORM ADV | Applicant: | | SEC File Number: | Date: |
|---|---|---|---|---|
| Part II - Page 3 | Fairfield Greenwich (Bermuda) Ltd. | | 801-66439 | March 27, 2008 |

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

**3.** **Types of Investments.** Applicant offers advice on the following: (check those that apply) –

A. Equity securities
- ☒ (1) exchange-listed securities
- ☒ (2) securities traded over-the-counter
- ☒ (3) foreign issuers

☒ B. Warrants

☒ C. Corporate debt securities
(other than commercial paper)

☒ D. Commercial paper

☒ E. Certificates of deposit

☐ F. Municipal securities

G. Investment company securities:
- ☐ (1) variable life insurance
- ☐ (2) variable annuities
- ☒ (3) mutual fund shares

☒ H. United States government securities

I. Options contracts on:
- ☒ (1) securities
- ☒ (2) commodities

J. Futures contracts on:
- ☒ (1) tangibles
- ☒ (2) intangibles

K. Interests in partnerships investing in:
- ☐ (1) real estate
- ☐ (2) oil and gas interests
- ☐ (3) other (explain on Schedule F)

☒ L. Other (explain on Schedule F)

**4.** **Methods of Analysis, Sources of Information, and Investment Strategies.**

A. Applicant's security analysis methods include: (check those that apply)

- ☐ (1) Charting
- ☐ (2) Fundamental
- ☐ (3) Technical
- ☐ (4) Cyclical
- ☒ (5) Other (explain on Schedule F)

B. The main sources of information applicant uses include: (check those that apply)

- ☐ (1) Financial newspaper and magazines
- ☐ (2) Inspections of corporate activities
- ☐ (3) Research materials prepared by others
- ☐ (4) Corporate rating services
- ☐ (5) Timing services
- ☐ (6) Annual reports, prospectuses, filings with the Securities and Exchange Commission
- ☐ (7) Company press releases
- ☒ (8) Other (explain on Schedule F)

C. The investment strategies used to implement any investment advice given to clients include: (check those that apply)

- ☐ (1) Long term purchases
(securities held at least a year)
- ☐ (2) Short term purchases
(securities sold within a year)
- ☐ (3) Trading (securities sold within 30 days)
- ☐ (4) Short sales
- ☐ (5) Margin transactions
- ☐ (6) Option writing, including covered options, uncovered options or spreading strategies
- ☒ (7) Other (explain on Schedule F)

**Answer all items. Complete amended pages in full, circle amended items and file with execution page (page 1).**

| FORM ADV<br>Part II - Page 4 | Applicant:<br><br>**Fairfield Greenwich (Bermuda) Ltd.** | SEC File Number:<br><br>**801-66439** | Date:<br><br>**March 27, 2008** |
|---|---|---|---|

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

---

**5.** **Education and Business Standards.**

Are there any general standards of education or business experience that applicant requires of those involved in determining
or giving investment advice to clients?...........................................................................................................................  Yes ☒  No ☐

*(If yes, describe these standards on Schedule F.)*

---

**6.** **Education and Business Background.**

For:
- each member of the investment committee or group that determines general investment advice to be given to clients, or
- if the applicant has no investment committee or group, each individual who determines general investment advice given to clients (if more than five, respond only for their supervisors)
- each principal executive officer of applicant or each person with similar status or performing similar functions.

On Schedule F, give the:
- name
- year of birth
- formal education after high school
- business background for the preceding five years

---

**7.** **Other Business Activities.**  (Check those that apply)

- ☐ A.  Applicant is actively engaged in a business other than giving investment advice.
- ☐ B.  Applicant sells products or services other than investment advice to clients.
- ☐ C.  The principal business of applicant or its principal executive officers involves something other than providing investment advice.

*(For each checked box describe the other activities, including the time spent on them, on Schedule F.)*

---

**8.** **Other Financial Industry Activities or Affiliations.**  (check those that apply)

- ☐ A.  Applicant is registered (or has an application pending) as a securities broker/dealer.
- ☐ B.  Applicant is registered (or has an application pending) as a futures commission merchant, commodity pool operator or commodity trading adviser.
- C.  Applicant has arrangements that are material to its advisory business or its clients with a related person who is a:

| | | | | | |
|---|---|---|---|---|---|
| ☒ | (1) | broker-dealer | ☐ | (7) | accounting firm |
| ☐ | (2) | investment company | ☐ | (8) | law firm |
| ☒ | (3) | other investment adviser | ☐ | (9) | insurance company or agency |
| ☐ | (4) | financial planning firm | ☐ | (10) | pension consultant |
| ☒ | (5) | commodity pool operator, commodity trading adviser or futures commission merchant | ☐ | (11) | real estate broker or dealer |
| ☐ | (6) | banking or thrift institution | ☐ | (12) | entity that creates or packages limited partnerships |

*(For each checked box in C, on Schedule F identify the related person and describe the relationship and the arrangements.)*

- D.  Is applicant or a related person a general partner in any partnership in which clients are solicited to invest?   Yes ☒  No ☐

*(If yes, describe on Schedule F the partnerships and what they invest in)*

---

Case 1:09-cv-08118-VM Document 384-3 Filed 12/22/09 Page 3 of 293

| **FORM ADV** | Applicant: | | SEC File Number: | Date: |
|---|---|---|---|---|
| **Part II - Page 5** | **Fairfield Greenwich (Bermuda) Ltd.** | | **801-66439** | **March 27, 2008** |

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

---

**9.**   **Participation or Interest in Client Transactions.**

Applicant or a related person: (check those that apply)

☒   A.   As principal, buys securities for itself from or sells securities it owns to any client.

☐   B.   As broker or agent effects securities transactions for compensation for any client.

☐   C.   As broker or agent for any person other than a client effects transactions in which client securities are sold to or bought from a brokerage customer.

☒   D.   Recommends to clients that they buy or sell securities or investment products in which the applicant or a related person has some financial interest.

☒   E.   Buys or sells for itself securities that it also recommends to clients.

   (For each box checked, describe on Schedule F when the applicant or a related person engages in these transactions
   and what restrictions, internal procedures, or disclosures are used for conflicts of interest in those transactions.)

Describe, on Schedule F, your code of ethics, and state that you will provide a copy of your code of ethics to any client or prospective client upon request.

---

**10.**   **Conditions for Managing Accounts**.  Does the applicant provide investment supervisory services, manage investment advisory accounts or hold itself out as providing financial planning or some similarly termed services *and* impose a minimum dollar value of assets or other conditions for starting or maintaining an account?

Yes   No
☒   ☐

(If yes, describe on Schedule F.)

---

**11.**   **Review of Accounts.**   If applicant provides investment supervisory services, manages investment advisory accounts, or holds itself out as providing financial planning or some similarly termed services:

   A.   Describe below the reviews and reviewers of the accounts.  **For reviews**, include their frequency, different levels, and triggering factors.
   **For reviewers**, include the number of reviewers, their titles and functions, instructions they receive from applicant on performing reviews, and number of accounts assigned each.

## See Schedule F.

   B.   Describe below the nature and frequency of regular reports to clients on their accounts.

## See Schedule F.

---

Case 1:09-cv-00118-VM   Document 304-3   Filed 11/22/09   Page 91 of 293

**12.    Investment or Brokerage Discretion.**

A.    Does applicant or any related person have authority to determine, without obtaining specific client consent, the:

| | | | Yes | No |
|---|---|---|---|---|
| (1) | securities to be bought or sold? | | ☒ | ☐ |
| (2) | amount of the securities to be bought or sold? | | ☒ | ☐ |
| (3) | broker or dealer to be used? | | ☒ | ☐ |
| (4) | commission rates paid? | | ☒ | ☐ |

| | | Yes | No |
|---|---|---|---|
| B. | Does applicant or a related person suggest brokers to clients? | ☒ | ☐ |

For each yes answer to A describe on Schedule F any limitations on the authority. For each yes to A(3), A(4) or B, describe on Schedule F the factors considered in selecting brokers and determining the reasonableness of their commissions. If the value of products, research and services given to the applicant or a related person is a factor, describe:

- the products, research and services

- whether clients may pay commissions higher than those obtainable from other brokers in return for those products and services

- whether research is used to service all of applicant's accounts or just those accounts paying for it; and

- any procedures the applicant used during the last fiscal year to direct client transactions to a particular broker in return for products and research services received.

**13.    Additional Compensation.**

Does the applicant or a related person have any arrangements, oral or in writing, where it:

| | | Yes | No |
|---|---|---|---|
| A. | is paid cash by or receives some economic benefit (including commissions, equipment or non-research services) from a non-client in connection with giving advice to clients? | ☒ | ☐ |
| B. | directly or indirectly compensates any person for client referrals? | ☒ | ☐ |

(For each yes, describe the arrangements on Schedule F.)

**14.    Balance Sheet.** Applicant must provide a balance sheet for the most recent fiscal year on Schedule G if applicant:

- has custody of client funds or securities (unless applicant is registered or registering only with the Securities and Exchange Commission); or

- requires prepayment of more than $500 in fees per client and 6 or more months in advance

| | Yes | No |
|---|---|---|
| Has applicant provided a Schedule G balance sheet? | ☐ | ☒ |

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

| 1. | Full name of applicant exactly as stated in Item 1A of Part I of Form ADV:<br><br>**Fairfield Greenwich (Bermuda) Ltd.** | IRS Empl. Ident. No.: |
|---|---|---|

| Item of Form (identify) | Answer |
|---|---|
| **Items 1.D. and 2.G.** | Fairfield Greenwich (Bermuda) Ltd. ("FGBL" or "Applicant"), an exempted company incorporated under the laws of Bermuda on June 13, 2003, provides managerial services to three (3) private investment funds established in the British Virgin Islands (the "Offshore Funds"), and serves as the general partner to two (2) private investment funds established in the U.S., (the "Onshore Funds"), (collectively, the "FGBL Funds").<br><br>FGBL is a wholly-owned subsidiary of Fairfield Greenwich Limited ("FGL", collectively with other affiliates listed in Schedule F, Item 8, Fairfield Greenwich Group, or "FGG"), an exempted company incorporated in the Cayman Islands on October 24, 2001. FGL serves as placement agent for the Offshore Funds and generally is paid by the applicable Offshore Fund (i) an annual management fee of up to 1% of net assets, payable quarterly, and (ii) a performance fee of 20% of the net profits, charged quarterly or annually subject to adjustment for unrecouped losses.<br><br>Another wholly-owned subsidiary of FGL, Fairfield Heathcliff Capital LLC ("FHC"), a limited liability company incorporated in the state of Delaware, and an affiliate of FGBL, serves as placement agent for the Onshore Funds. FGBL does not provide tailored investment advice to individual investors for a fee.<br><br>Similar to the Offshore Funds, FGBL generally is paid by the Onshore Funds (i) an annual management fee of up to 1% of net assets, payable quarterly, and (ii) an incentive allocation of 20% of net profits, charged quarterly or annually subject to adjustment for unrecouped losses. Some or all of such fees can be waived at the discretion of the general partner.<br><br>Investors in the FGBL Funds generally have the right to redeem all or a portion of their investment in an FGBL Fund at least quarterly, subject to applicable advance notice requirements. If an investor redeems or withdraws from an FGBL Fund, the investor will be entitled to any unearned, prepaid portion of the management fee. To the extent required under the U.S. Investment Advisers Act of 1940, performance-based compensation payable to FGBL, or any of its affiliates, will be in compliance with Rule 205-3 under such Act. |
| **Item 3.L.** | The establishment of a typical position in the FGBL Funds entails (i) the purchase of a group or basket of equity securities that are intended to highly correlate to the S&P 100 Index, (ii) the purchase of out-of-the-money S&P 100 Index put options with a notional value that approximately equals the market value of the basket of equity securities, and (iii) the sale of out-of-the-money S&P 100 Index call options with a notional value that approximately equals the market value of the basket of equity securities (i.e., the "Split-Strike Conversion strategy"). The Offshore Funds also utilize a small portion of their assets (up to 5%) away from the Split Strike Conversion strategy to seed a small number of hedge fund management groups with varying and diverse types of investments. These various types of investments and investment strategies are noted under Item 3. Certain of the hedge fund managers allocated to may be managed by an affiliate of FGBL. For a more detailed explanation, see **Item 4.C.(7)** below. |
| **Items 4.A.(5) and 4.B.(8)** | An affiliate of FGBL, Fairfield Risk Services Ltd. ("FRS"), also a wholly owned subsidiary of FGL, shares office space with FGBL and serves as FGG's Risk Management team, which, as noted, includes FGBL. A Director of FGBL, Amit Vijayvergiya, serves both FGBL and FRS and manages both teams. FRS primarily conducts both the pre- and post-investment quantitative analyses of hedge fund managers, monitors the market risk and provides the quantitative analyses supporting the asset allocation decisions across the firm's multi-strategy funds. The risk infrastructure at FRS supporting these activities incorporates a number of systems and tools – including internally developed systems, off the shelf vendor solutions, and some customized applications built to meet FGG's business needs. An important component |

**ADV Part II**

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

| 1. | Full name of applicant exactly as stated in Item 1A of Part I of Form ADV: | IRS Empl. Ident. No.: |
|---|---|---|
| | **Fairfield Greenwich (Bermuda) Ltd.** | |

| Item of Form (identify) | Answer |
|---|---|
| | of the FGG product platform is the position level transparency that we receive from all single managers which are included in our multi-strategy funds. Position information is transmitted via secure channels to our systems. |
| | FRS's core risk management engine utilizes the flexible ASP version of the RiskManager product from RiskMetrics. This system is populated by detailed position information and further supplemented by an extensive market and terms and conditions database. The FRS team regularly evaluates the market risk of its single and multi-strategy funds by producing strategy and fund specific risk reports. These reports are customizable to present risk measures and tests most appropriate to each portfolio's strategy. The FRS team prepares a monthly suite of reports using RiskManager that are carefully reviewed and discussed by FGG's Investment Committee at a formal monthly risk meeting. The reports organized along the following dimensions: Exposures, Sensitivities, Scenarios and Stress Tests, VaR, Correlations Analysis and Attribution Analysis. The review includes the full suite of VaR analytics (including marginal, incremental and relative VaR) and careful evaluation of the sensitivity of our managers to important risk factors (such as increasing or decreasing equity markets, volatilities, interest rate shocks/twists, FX movements and other factors). |
| **Item 4.C.(7)** | FGBL's core product business model is the investment management and oversight of the split strike conversion strategy, implemented through an Offshore Fund (with two currency feeder funds), and two Onshore Funds.  The Offshore Fund also utilizes a small portion of its assets (up to 5%) away from the Split Strike Conversion strategy to seed a small number of hedge fund management groups with varying and diverse investment methodologies.  Working with one of its affiliates (Fairfield Greenwich Advisors LLC, SEC registrant 801-62504), FGBL conducts a detailed manager selection and due diligence process, analyzing such important issues as liquidity management, market and credit risks, management quality (which includes on-site visit(s), background, and reference checks), and operational, compliance, and regulatory risks. At the conclusion of the manager selection process, allocation of assets from the Offshore Fund to a successful hedge fund manager (which may be managed by an affiliate of FGBL) candidate will be determined based on a qualitative and quantitative analysis of each manager's potential for long-term risk-adjusted performance, relationship with other manager's previously seeded, and expected contribution to the targeted risk/return profile. |
| **Item 5** | FGBL generally requires a college degree and preferably an advanced degree for its professional personnel.  Along with these educational requirements, FGBL prefers relevant securities industry experience. |
| **Item 6** | Anthony Dell'Arena<br>Chief Compliance Officer<br>YOB: 1964 | **Business Background for Past 5 Years**:<br><br>Mr. Dell'Arena joined FGG in 2005.  Prior to such, he was employed by JPMorgan Chase & Co.'s Private Banking division, where he was a Vice President and Assistant General Counsel from 2002 to 2005.<br><br>**Education**:<br><br>Mr. Dell'Arena was awarded his Juris Doctor degree from the University of Arkansas School of Law, and holds Master's and Bachelor's degrees in History from Rutgers University. He is admitted to the bar of New Jersey, and is based in the New York office.   Mr. Dell'Arena holds FINRA licenses |

## ADV Part II

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

| 1. | Full name of applicant exactly as stated in Item 1A of Part I of Form ADV: | IRS Empl. Ident. No.: |
|---|---|---|
| | **Fairfield Greenwich (Bermuda) Ltd.** | |

| Item of Form (identify) | | Answer |
|---|---|---|
| | | Series 7, 24, 63, and 65, and is a member of National Society of Compliance Professionals. |
| | Daniel E. Lipton<br>Asst Secretary and Chief Financial Officer<br>YOB: 1971 | **Business Background for Past 5 Years**:<br><br>Mr. Lipton joined FGG in 2002 after nine years at Ernst & Young, where he was a Senior Manager in the Financial Services Assurance and Advisory Business Services Department, in charge of auditing and consulting engagements, specializing in alternative assets, private equity, venture capital, and domestic and offshore funds.<br><br>**Education**:<br><br>Mr. Lipton received his Bachelor of Arts degree in Economics from Tufts University and his Master of Business Administration dual degrees in Accounting and Finance from New York University's Stern School of Business; he is also a Certified Public Accountant. |
| | Mark J. McKeefry<br>Director, Asst Secretary and Chief Legal Officer<br>YOB: 1961 | **Business Background For Past 5 Years**:<br><br>Mr. McKeefry joined FGG in 2003. Prior, he was an Associate at Buchalter Nemer, where he advised broker-dealers and investment advisors on regulatory and compliance issues for onshore and offshore funds.<br><br>**Education**:<br><br>Mr. McKeefry received his Bachelor of Science degree from Carnegie Mellon University and his Juris Doctor degree from Fordham University, where he was a member of the Law Review. Prior to attending law school, he was a professional engineer, licensed by the State of California as a civil engineer. Mr. McKeefry is admitted to the bars of California and New York. He holds FINRA licenses Series 7, 24, 63, 65 and 3. |
| | Andrés Piedrahita<br>Director and President<br>YOB: 1959 | **Business Background for Past 5 Years**:<br>Mr. Piedrahita has been with FGBL since 1997.<br><br>**Education**:<br><br>Mr. Piedrahita received his Bachelor's Degree from the Boston University School of Communications. |
| | Amit Vijayvergiya<br>Director, Vice President and Chief Risk Officer<br>YOB: 1969 | **Business Background for Past 5 Years**:<br><br>Mr. Vijayvergiya has over 12 years of experience in asset management, risk management, finance, and operations research. Prior to joining FGBL, from 2000 to 2003 Mr. Vijayvergiya managed a family office investing in traditional and alternative investment managers.<br><br>**Education**: |

## ADV Part II

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

| 1. | Full name of applicant exactly as stated in Item 1A of Part I of Form ADV: | IRS Empl. Ident. No.: |
|----|------|------|
| | **Fairfield Greenwich (Bermuda) Ltd.** | |

| Item of Form (identify) | Answer | |
|---|---|---|
| | | Mr. Vijayvergiya received a Masters in Business Administration from Schulich School of Business at York University, a Bachelors of Science in Statistics from the University of Manitoba, and a Bachelors of Arts in Economics from the University of Western Ontario. Mr. Vijayvergiya holds the Chartered Financial Analyst designation and the Financial Risk Manager certification. |
| **Item 8.C.(1) and 8.D.** | | An affiliate of FGBL, Fairfield Heathcliff Capital LLC ("FHC"), is registered with the Securities and Exchange Commission as a broker-dealer and is a member of the Financial Industry Regulatory Authority. It does not have a trading desk, nor does it open broker-dealer accounts or custody cash or securities. FHC's license is limited to selling limited partnership interests.  FHC serves as U.S. placement agent for the FGG Funds and will bear its costs associated with such activities. |
| **Item 8.C.(3) and 8.D.** | | FGBL, Fairfield Greenwich (UK) Limited ("FGUK"), and Fairfield Greenwich Advisors LLC ("FGA"), are each wholly-owned subsidiaries of Fairfield Greenwich Limited ("FGL", and collectively, FGG). FGA is based in the U.S. and is registered with the Securities and Exchange Commission as a registered investment adviser (SEC File No. 801-62504).  FGUK is authorized and regulated by the Financial Services Authority, and serves as investment manager to a Luxembourg-registered SICAV and offshore fund-of-funds.  FGG has also entered into a joint venture with Lion Capital Management Limited to create Lion Fairfield Capital Management Limited ("LFC"), a hedge fund management and client servicing platform in Asia.  LFC holds a capital markets services license issued by the Monetary Authority of Singapore under the provisions of the Securities and Futures Act (Cap 289). FGA is the general partner of four (4) Delaware limited partnerships. No fund on the FGG platform is solicited to invest in any of them. FGBL is the general partner of two (2) Delaware limited partnerships. Certain other FGG funds have been solicited to invest in them. |
| **Item 8.C.(5)** | | FGL is registered with the Commodity Futures Trading Commission as a commodity pool operator and is a member of the National Futures Association. |
| **Item 9.A.** | | While FGBL does not as a matter of course engage in principal transactions, a related person of FGBL, an affiliate, Fairfield Greenwich (UK) Limited ("FGUK"), as Investment Manager of the Chester Global Strategy Fund Limited (the "Chester Fund"), has in February 2008 transferred certain securities held by the Chester Fund (i.e., interests in underlying hedge funds) to the Banif Fairfield Impala Fund (the "Banif Fund"), which is domiciled in Spain. Another affiliate of FGBL (and of FGUK), Fairfield Greenwich Advisors LLC ("FGA"), serves as the Banif Fund's sub-adviser. To establish the Banif Fund, FGA arranged for the parent of both it and FGUK, Fairfield Greenwich Limited ("FGL"), to contribute approximately half of the Banif Fund's initial capital, approximately $5 million Euro. The remaining initial seed money of $5 million Euro was contributed by Banco Banif S.A. As a result of this proprietary ownership, (i) the Banif Fund is deemed a principal account for certain U.S. regulatory purposes, (ii) FGUK is deemed to have acted as principal when selling the Assets from the Chester Fund to the Banif Fund and (iii) FGUK had to obtain consent from the Chester Fund in connection with the proposed transfer of Assets. In order to mitigate the conflict of interest inherent in the principal transaction, and to address the potential for self dealing, the consent of the Chester Fund shareholders was obtained prior to settlement of the transactions, who determined that the transactions served their best interest. Should FGBL seek to engage in a principal transaction, this same methodology would be followed. |

**Answer all items.  Complete amended pages in full, circle amended items and file with execution page (page 1).**

Case 1:09-cv-08118-VM Document 303-3 Filed 11/27/09 Page 96 of 293

# ADV Part II

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

| 1. | Full name of applicant exactly as stated in Item 1A of Part I of Form ADV: | IRS Empl. Ident. No.: |
|---|---|---|
| | **Fairfield Greenwich (Bermuda) Ltd.** | |

| Item of Form (identify) | Answer |
|---|---|
| | |
| **Item 9.D.** | FGBL and its affiliates may solicit clients to invest in the FGBL Funds, or those funds of FGBL's affiliates (collectively, the "FGG Funds"). In the event of limited capacity in a particular FGG Fund, FGBL and its affiliates are committed to allocating investment opportunities and dispositions in the particular FGG Fund fairly among clients or vehicles. FGBL and certain of its affiliates and their officers may have financial interests as general partners, limited partners, shareholders, directors, investment managers, administrative manager, investment adviser or otherwise in such FGG Funds. Management and/or performance fees for such individuals and their family members may be waived in certain instances. |
| **Item 9.E.** | FGBL and its affiliates may purchase or sell shares or interest of a single manager fund for the accounts of multi-strategy funds. FGBL and certain of its affiliates and other multi-strategy funds may have a position in such Single Manager Fund. |
| | With respect to standards of professional conduct, a Code of Ethics (the "Code") has been adopted by FGBL in order to comply with Rule 204A-1 (the "Rule") promulgated under the Investment Advisers Act of 1940, as amended. Rule 204A-1 requires every Investment Adviser registered with the Securities and Exchange Commission to adopt and enforce a written code of ethics applicable to its supervised persons. The Rule was designed to prevent fraud by reinforcing fiduciary principles that must govern the conduct of advisory firms and their personnel. The Code contains a provision reminding employees of their obligations to clients as well as a provision requiring the reporting of personal securities transactions and holdings. In order to ensure that FGBL 's employees are made aware of its standards, the Rule requires FGBL to obtain (and keep) a written acknowledgement from each employee confirming that he or she received a copy of the Code and any amendments. |
| | Further, pursuant to the Rule, FGBL has deemed certain of its employees to be "Access Persons." An "Access Person" is an employee of FGBL who has access to nonpublic information regarding any clients' purchase or sale of securities, or nonpublic information regarding the portfolio holdings of any reportable fund, or who is involved in making securities recommendations to clients, or who has access to such recommendation that are nonpublic. FGBL Access Persons are required to provide FGBL with personal (which includes household) securities account information and FGBL thus arranges for the delivery to its office for its review duplicate copies of confirmations and statements of any personal trading activity. FGBL Access Persons are not free to trade without having first pre-cleared trades with FGBL. In all cases, FGBL will attempt of resolve any conflicts of interest by exercising the good faith required of fiduciaries. FGBL reviews the personal investment activities of its Access Persons to ensure that the following general fiduciary principles are met:

(a) the duty at all times to place the interests of clients of FGBL first;
(b) the duty to prevent the misuse of material nonpublic information which includes client securities holdings and transactions;
(c) the requirement that all personal securities transactions be conducted in such a manner as to avoid any actual or potential conflict of interest or any abuse of an individual's position of trust and responsibility; and
(d) the fundamental standard that FGBL personnel may not take inappropriate advantage of their position.

Investors may request a copy of the Code by contacting FGBL at the address or telephone number listed on the first page of this document. |

**Answer all items. Complete amended pages in full, circle amended items and file with execution page (page 1).**

# ADV Part II

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

| 1. | Full name of applicant exactly as stated in Item 1A of Part I of Form ADV: | IRS Empl. Ident. No.: |
|---|---|---|
| | **Fairfield Greenwich (Bermuda) Ltd.** | |

| Item of Form (identify) | Answer |
|---|---|
| | |
| **Item 10** | The FGBL Funds impose various initial minimum investment amounts, ranging between US$100,000 and US$1,000,000, and in equivalent amounts in different currencies including Euro and Swiss Franc. The FGG Funds may accept investment in lesser amounts. Generally, investors are required to have a net worth of at least US$1,500,000. |
| **Item 11.A.** | Portfolios are reviewed at the individual security level from independent sources discussed among members of the FRS team, FGBL and FGA several times each month (see, e.g., Schedule F, Item 4.B.8). FRS, FGBL and FGA utilize a number of independent, sophisticated quantitative measurement tools to monitor the performance of its managers, compliance with investment guidelines, and risk analysis. FRS, FGBL and FGA personnel review changes in a variety of factors, including changes in organization, investment process, the manager's view of the relevant markets, and their portfolio's position with respect to those views. The findings are discussed at regular meetings. |
| **Item 11.B.** | Investors will receive audited financial statements of the applicable Fund annually, and unaudited performance reports at least monthly. In addition, investors may also receive quarterly or semi-annual letters regarding their investments. |
| | FGBL is committed to maintaining the privacy of our clients and to the safeguarding of their personal information. Our privacy policy is distributed to clients in accordance with Regulation S-P on an initial and annual basis, to help clients understand what personal information we collect, how that information is protected, and why, in certain cases, the information may be shared. |
| **Item 12** | For certain of the FGG Funds, FGBL or an affiliate has full discretion and authority to make all investment decisions with respect to the types of securities to be bought and sold, and the amount of securities to be bought or sought for such Fund, and there are no limitations as to which broker dealer is used or as to the commission rates paid. However, portfolio transactions will be allocated to brokers on the basis of best execution and in consideration of brokerage and research services (e.g., research ideas, investment strategies, special execution and block positioning capabilities, clearance, settlement and custodial services), financial stability, reputation and efficiency of such broker-dealers. Broker-dealers providing such services may be paid commissions in excess of those that other broker-dealers not providing such services might charge. |
| **Item 13.A.** | A related person of FGBL receives research reports from various brokers, but neither the related person nor FGBL currently have any "soft dollar" arrangements outside the parameters of Section 28(e) of the Securities Exchange Act of 1934, as amended, in effect. |
| **Item 13.B.** | From time to time, FGL, or an affiliate, may enter into agreements to compensate third party and/or certain internal agents, providing for cash compensation for securing clients which may be in the form of a placement fee or participation in the sharing of the management and/or performance fees. |

**Answer all items. Complete amended pages in full, circle amended items and file with execution page (page 1).**

**APPENDIX A**

**SUBSCRIPTION DOCUMENTS**

Name of Subscriber: _____

Amount of Subscription: $_____

## SUBSCRIPTION AGREEMENT

## (NON-UNITED STATES OF AMERICA SUBSCRIBERS ONLY)

## FAIRFIELD SIGMA LIMITED

Fairfield Sigma Limited
c/o Citco Fund Services (Europe) B.V.
Telestone 8 - Teleport
Naritaweg 165
1043 BW Amsterdam
The Netherlands
Telephone: (31-20) 572-2850
Facsimile: (31-20) 572-2610

Dear Sirs:

1.    <u>Subscription.</u>    The undersigned ("Subscriber") hereby subscribes for voting, participating shares, each with a par value €01, SGD $.01 and ¥.01 per share (the "Shares") of Fairfield Sigma Limited (the "Fund"), a Business Company organized under the laws of the Territory of the British Virgin Islands ("BVI"). The Shares will be offered at the net asset value ("Net Asset Value") per Share as of the opening of business on the effective date of purchase. The Shares have identical rights and privileges in all respects (including the right to one vote per Share). All capitalized terms used in this Subscription Agreement (the "Agreement") that are not defined herein have the meanings set forth in the Fund's Confidential Private Placement Memorandum (as amended from time to time, the "Memorandum"). Subscriber subscribes for that number of Shares that can be purchased for the subscription amount above. Subscriber subscribes for the Shares pursuant to the terms herein, the Memorandum, and the Fund's Memorandum of Association and Articles of Association (collectively, the "Fund Documents"). All references herein to "U.S. $" are to United States dollars, all references herein to "€" herein are to Euro, all references herein to "SGD $" are to Singapore dollars and all references herein to "¥" are to Yen.

2.    <u>Acceptance or Rejection.</u>    If the Fund accepts this subscription, Subscriber shall become a shareholder of the Fund and be bound by the Fund Documents. The minimum initial subscription is €200,000; SGD $375,000 or ¥ 2,000,000], as the case may be. The Board of Directors, in consultation with Fairfield Greenwich (Bermuda) Ltd. (the "Investment Manager"), may reject a subscription for any reason or no reason. Subscriptions shall become irrevocable to the subscriber on the third to the last business day of the month in which such subscription is received by the Fund. If rejected, the Fund shall promptly return the subscription funds, with any interest actually earned thereon, and this Agreement shall be void.

3.    <u>Payment of Subscription Funds.</u>    Concurrently with the delivery of this Agreement to the Fund, subscription funds, in the appropriate currency, should be wired to the Fund pursuant to the

1

instructions in Section A if the Subscriber wishes to purchase Euro Shares (as defined in the Memorandum), Section B if the Subscriber wishes to purchase SGD $ Shares (as defined in the Memorandum) and Section C if the Subscriber wishes to purchase Yen Shares (as defined in the Memorandum). In order to comply with anti-money laundering regulations applicable to the Fund and Citco Fund Services (Europe) B.V. (the "Administrator"), the sample bank letter attached hereto as Schedule A MUST be completed by the financial institution which will be remitting the subscription moneys on behalf of the subscriber.

    **A**    Euro Shares Currency: Euro

        *Intermediary Bank – SWIFT Field 56*
        KBC Bank N.V., Brussels
        BIC: KREDBEBB
        *Account with Institution - SWIFT Field 57*
        Account Name: Citco Bank Nederland N.V. Dublin Branch
        International Bank Account Number (IBAN): BE96 4809 5884 4705
        BIC: CITCIE2D
        *Beneficiary Customer -SWIFT Field 59*
        Beneficiary Account Name: Fairfield Sigma Limited
        Beneficiary IBAN**:** IE95 CITC 0000 0020 8584 01
        *Reference – SWIFT Field 70*: Name and Full Address Subscriber

    **B**    SGD Shares Currency: Singapore dollars

        *Intermediary Bank - Field 56*
        The Hongkong and Shanghai Banking Corp. Ltd., Singapore
        BIC: HSBCSGSG
        *Account with Institution - Field 57*
        Account Name: Citco Bank Nederland N.V. Dublin Branch
        Account Number: 141-454785-001
        BIC: CITCIE2D
        *Beneficiary Customer - Field 59*
        Beneficiary IBAN: IE36 CITC 0000 0021 7340 15
        Beneficiary Account Name and Full Address: Fairfield Sigma Ltd SGD

    **C**    Yen Shares Currency: Yen

        [TO BE PROVIDED BY THE ADMINISTRATOR]

    4.    <u>Delivery of Subscription Agreement</u>. Subscriber should fax and mail an executed, completed copy of this Agreement to the Administrator at the above facsimile number and address, with a copy to the Investment Manager at Fairfield Greenwich (Bermuda) Ltd., 12 Church Street, Suite 606, Hamilton, Bermuda, fax (441) 292-5413.

5.     <u>Status Representations</u>.

      a.     <u>SEC Regulation S</u>. Subscriber is not a "U.S. Person" under Regulation S of the U.S. Securities and Exchange Commission (adopted under the U.S. Securities Act of 1933, as amended (the "1933 Act")) because (a) if an individual, Subscriber is not a resident of the United States of America or its territories or possessions (the "U.S.") or "resident alien" as defined under the U.S. income tax laws, and (b) if an entity, Subscriber is not any of the following: (i) a partnership or corporation organized or incorporated under U.S. law; (ii) an estate of which any executor or administrator is a U.S. Person; (iii) a trust of which a trustee is a U.S. Person; (iv) any agency or branch of a foreign entity located in the U.S.; (v) a partnership or corporation organized under non-U.S. law but formed by a U.S. Person principally for the purpose of investing in securities not registered under the 1933 Act (unless organized and incorporated, and owned, by accredited investors as defined in Rule 501 under the 1933 Act who are not natural persons, estates or trusts); (vi) a non-discretionary or similar account (other than an estate or trust) held by a dealer or other fiduciary for a U.S. Person; or (vii) a discretionary or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated or (if an individual) resident in the U.S.

Subscriber acknowledges that, except with the consent of the Fund, the Shares may not be owned by a U.S. Person, that the Shares will not at any time be held for the account or benefit, directly or indirectly, of any U.S. Person, and that, except with the consent of the Fund, the Subscriber will not resell, re-offer or transfer any Shares or any interest therein to any person, including a U.S. Person or any non-U.S. Person subject to the above restrictions. Subscriber acknowledges that re-offers, re-sales or any transfer of the Shares is subject to the limitations imposed by the Fund's Articles of Association and may be made only in compliance with applicable securities laws and only with the prior written consent of the Board of Directors which may, in its sole discretion, decline to issue any Shares to, or register Shares in the name of, any person, and the Subscriber will not transfer any of its Shares except on the books of the Fund and acknowledges that the Shares shall be transferable only to investors who are eligible to purchase Shares in the Fund as described above and in the Memorandum. Subscriber understands that the Fund may compulsorily repurchase such Shares in accordance with the Fund Documents.

      b.     <u>CFTC Regulation 4.7</u>. Subscriber is not a "U.S. Person" under Regulation 4.7 of the U.S. Commodity Futures Trading Commission (adopted under the U.S. Commodity and Exchange Act of 1974, as amended) ("Rule 4.7") because (a) if an individual, Subscriber is not a resident of the U.S., and (b) if an entity, Subscriber is not (i) a partnership, corporation or other entity (other than an entity organized principally for passive investment) organized under U.S. law or with its principal place of business in the U.S.; (ii) an entity (whether organized under U.S. or non-U.S. law) that is organized principally for passive investment and that is beneficially owned 10% or more by U.S. Persons or persons who are not otherwise "qualified eligible persons", as defined in Rule 4.7; (iii) an estate or trust the income of which is subject to U.S. income taxation regardless of source; or (iv) a pension plan for the employees, officers or principals of an entity organized or with its principal place of business in the U.S.

      c.     <u>Professional Investor Status</u>. Subscriber is a "Professional Investor" within the meaning of the BVI Mutual Funds Act of 1996 of the BVI, because (i) Subscriber declares that his ordinary business involves, whether for his own account or the account of others, the acquisition or disposal of property of the same kind as the property, or a substantial part of the property of the Fund, or (ii) Subscriber's net worth (in the case of a natural person, either individually or jointly with

3

spouse) exceeds US$1,000,000, or its equivalent in the Subscriber's local currency, and Subscriber consents to being treated as a Professional Investor for the purpose of investing in the Fund.

        d.    <u>Benefit Plan Investor Status</u>

In order for the Fund to accurately monitor its "Benefit Plan Investor" participation, please review the following definition of a "Benefit Plan Investor" and make the appropriate representations by checking all applicable boxes following the definition.

A "Benefit Plan Investor" is (i) any employee benefit plan subject to the fiduciary responsibility provisions of Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), (ii) any individual retirement plan or account subject to the prohibited transaction rules of Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code") or (iii) any entity whose underlying assets include "plan assets" (as defined by ERISA and the regulations thereunder) by reason of a plan's investment in the entity.

The Subscriber represents that it is (please check all applicable boxes):

      A.   ☐   <u>not</u> a Benefit Plan Investor; or

      B.   ☐   a Benefit Plan Investor that is:

          1.   ☐   subject to Part 4 of Title I of ERISA;

          2.   ☐   subject to Section 4975 of the Code (that has not checked B1);

          3.   ☐   an entity whose underlying assets include "plan assets". The Subscriber also represents that the percentage of its "plan assets" compared to the value of its total assets or included in its general account is not more than:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ☐ | 10% * | ☐ | 20% * | ☐ | 30% | ☐ | 40% |
| ☐ | 50% | ☐ | 60% | ☐ | 70% | ☐ | 80% |
| ☐ | 90% | ☐ | 100%; | | | | |

(* applicable to entities with multiple classes, one of which exceeds the 25% threshold for Benefit Plan Investors and to U.S. insurance company general accounts)

          4.   ☐   a group trust, a bank common or collective trust or an insurance company separate account.

The Subscriber further agrees (i) to notify the Investment Manager 30 days prior to this representation (or any part thereof) no longer being true or likely to become untrue and (ii) to provide the Investment Manager upon request such information as may be required to confirm and/or refine the representations provided above.

      6.   <u>ERISA & Related Representations</u>.

Any Subscriber that is investing the assets of a benefit plan or account and the person executing

this Agreement on behalf of such Subscriber acknowledge that it is intended that the Fund will not hold "plan assets" subject to Title I of ERISA or Section 4975 of the Code (i.e., less than 25% of each class of the Fund's equity interests will be held by Benefit Plan Investors). Accordingly, the Subscriber acknowledges that the Fund has the authority to require the retirement or redemption of all or some of the Shares held by any Benefit Plan Investor if the continued holding of such Shares, in the opinion of the Board of Directors, could result in the Fund being subject to Title I of ERISA or Section 4975 of the Code. Further, the Subscriber and the person executing this Agreement represent and warrant to the Fund and the Investment Manager that:

(a)    With respect to the investment in the Fund, it has been determined that the purchase of Shares is consistent with the fiduciary responsibilities under applicable law, including ERISA and the Code, and that (i) the investment in the Fund is prudent, (ii) the structure, operation and incentives of the fee arrangements have been adequately disclosed, (iii) the calculation of the net asset value of the Shares as described in the Memorandum represents the fair market value of the Shares, (iv) the Subscriber's current and anticipated liquidity needs will be met, given the limited rights to redeem or transfer the Shares, (v) the investment will permit the Subscriber's overall portfolio to remain adequately diversified and (vi) the investment and investment program described in the Memorandum are permitted under the laws, rules and documents governing the Subscriber.

(b)    The persons executing this Agreement (i) are responsible for the decision to invest in the Fund; (ii) in making the decision to invest in the Fund, have not relied on any advice or recommendation from the Fund, the Investment Manager, any placement agent associated with the Fund, or any of their affiliates with respect to the investment in the Fund and (iii) are qualified to make such investment decision and, to the extent deemed necessary, have consulted their own investment advisors and legal counsel regarding the investment in the Fund.

7.    <u>Related Professionals</u>. (Subscriptions cannot be accepted if this section is not completed)

Please indicate the name of the person at the Fairfield Greenwich Group with whom this subscription is associated.

Name: _____

Please indicate the name, if applicable, of the person and/or entity who acts as an advisor with respect to this subscription.

Name of Advisor:
_____

Name of Advisor's firm or organization:
_____

Not Applicable: _____

8.    <u>Receipt of Fund Documents and Other Documents</u>.  Subscriber has received and read a copy of the Memorandum.  Subscriber acknowledges that in making a decision to subscribe for Shares, Subscriber has relied solely upon the Fund Documents and independent investigations made by Subscriber and has not relied on any representation inconsistent with the information in the Fund

Documents. Subscriber is not relying on the Fund, the Fund's Board of Directors, the Administrator, the Investment Manager, or any other person or entity with respect to the legal, tax and other economic considerations involved in this investment other than the Subscriber's own advisers. The Subscriber's investment in the Shares is consistent with the investment purposes, objectives and cash flow requirements of the Subscriber and will not adversely affect the Subscriber's overall need for diversification and liquidity.

9.     Subscriber Sophistication and Financial Condition. Subscriber has such knowledge and experience in financial and business matters that it is capable of evaluating the risks of this investment. Subscriber has obtained sufficient information from the Fund or its authorized representatives to evaluate such risks and has consulted with the Subscriber's own advisors and is fully informed as to the legal and tax requirements within the Subscriber's own country (countries) regarding a purchase of the Shares. Subscriber is not relying on the Fund or the Board of Directors, or any other person or entity with respect to the legal, tax and other economic considerations involved in this investment other than the Subscriber's own advisers. Subscriber has not relied on any person as a purchaser representative in connection with that evaluation. Subscriber has evaluated the risks of investing in the Fund, understands there are substantial risks of loss incidental to the purchase of Shares and has determined that the Shares are a suitable investment for the Subscriber. Subscriber's investment is consistent with its investment purposes and objectives and cash flow requirements, and will not adversely affect Subscriber's overall need for diversification and liquidity.

Subscriber understands that (a) the Fund's operating history is not a prediction of its future success; (b) no governmental agency has passed upon the Shares or made any findings or determination as to the fairness of this investment; and (c) the representations, warranties, agreements, undertakings and acknowledgments made by the Subscriber in this Agreement will be relied upon by the Fund, the Board of Directors, the Investment Manager and the Administrator in determining the Subscriber's suitability as a purchaser of Shares and the Fund's compliance with various securities laws, and shall survive the Subscriber's becoming a shareholder of the Fund.

All information which the Subscriber has provided to the Fund or the Administrator concerning the Subscriber, the Subscriber's status, financial position and knowledge and experience of financial, tax and business matters, or, in the case of a Subscriber that is an entity, the knowledge and experience of financial, tax and business matters of the person making the investment decision on behalf of such entity, is correct and complete as of the date set forth herein.

The Subscriber irrevocably authorizes the Fund and/or the Administrator to disclose, at any time, any information held by the Fund or the Administrator in relation to the Subscriber or his investment in the Fund to the Investment Manager or any affiliate of the Investment Manager or the Administrator.

10.     Redemptions. Subscriber is aware of the limited provisions for redemptions and has read the section in the Memorandum entitled "Transfers, Redemptions and Termination." Subscriber has no need for liquidity in this investment, can afford a complete loss of the investment in the Shares and can afford to hold the Shares for an indefinite period of time. Subscriber understands that the Fund will generally redeem Shares as of the last day of each month (the "Redemption Date"); provided that the redemption request is received by the Administrator in proper form no later than 5:00 p.m. Amsterdam time on a date that is at least 15 calendar days prior to the Redemption Date. If a Subscriber redeems shares in the Fund, the Subscriber acknowledges that the initial payment of redemption proceeds may be based on an estimate of the Fund's net asset value as of such

6

redemption date.  In the event that the Fund's final net asset value as of such redemption date is less than the estimate and therefore results in an overpayment of redemption proceeds to the Subscriber, the Fund will send the Subscriber an invoice for the overpayment.  The Subscriber agrees to repay the Fund the amount of any overpayment within 30 days after receipt of the invoice.  The Subscriber agrees that its obligation to make the repayment in the event of an overpayment as described herein and in the Memorandum will endure notwithstanding the performance by it of all other obligations under this Agreement.

11.    Valuations.  Subscriber understands that the value of its Shares and redemptions thereof, and the performance of the Fund, may be based on unaudited and in some cases, estimated, valuations of the Fund's investments and that any valuation provided in Subscriber's account statement may be an unaudited, estimated value.

12.    Beneficial Owner.  Subscriber acknowledges, or if the Subscriber is acting as agent, representative or nominee for a subscriber (a "Beneficial Owner"), the Subscriber has advised the Beneficial Owner that (a) Fairfield Greenwich Limited ("FGL"), on behalf of the Fund, may enter into agreements with placement agents or other sales relationships to market the Fund providing for a payment from FGL to the particular placement agent for the introduction, out of the fees FGL receives from the Fund.  If the Subscriber is acting as agent, representative or nominee for a Beneficial Owner, Subscriber represents that such Beneficial Owner is not a U.S Person under Regulation S, as set forth in Paragraph 5(a) of this Agreement, and if such Beneficial Owner is a corporation, partnership or other business entity, that its principal office and place of business are not in the United States.

13.    Investment Intent.  Subscriber is buying the Shares solely for investment purposes and not with a view to distribute, subdivide or resell the Shares.

14.    The Subscriber acknowledges receipt of Part II of the Investment Manager's Form ADV at least 48 hours prior to executing this Agreement.

15.    Subsequent Subscriptions.  The Subscriber hereby agrees that (i) any statements, representations, warranties or covenants made hereunder will be deemed to be reaffirmed by it at any time it purchases additional Shares by completion of the annexed Additional Subscription Form and such additional contribution will be evidence of such reaffirmation, and (ii) if any of the statements, representations, warranties or covenants made herein become untrue or inaccurate, the undersigned shall immediately notify the Fund.

16.    The Subscriber recognizes that the Investment Manager does not disclose nonpublic personal information about current or former investors in the Fund to third parties other than as described below.  The Investment Manager collects information about investors (such as name, address, social security number, assets and income) from its discussions with the investors, from documents that the investor may deliver to the Investment Manager and in the course of providing services for the investor.  The Investment Manager may use this information to provide services to the investor, to cause the issuance of Shares of the Fund to the investor or otherwise in furtherance of the Investment Manager's business. In order to effect transactions on behalf of the investor, the Investment Manager may provide such personal information to its affiliates and to firms that assist the Investment Manager or its affiliates in servicing the Fund or other private investment funds managed by the Investment Manager or an affiliate and have a need for such information, such as a

7

broker or fund administrator. The Investment Manager may also disclose such information to service providers. The Investment Manager requires third party service providers to protect the confidentiality of such information and to use the information only for the purposes for which they disclose the information to them. The Investment Manager does not otherwise provide information about the undersigned to outside firms, organizations or individuals except to their attorneys, accountants and auditors or as required or permitted by law. The Investment Manager restricts access to nonpublic personal information about the investor to its employees who need to know that information to provide products or services to the investor. The Investment Manager maintains physical, electronic and procedural safeguards to guard personal information.

17. <u>Registration of Shares; Certificates</u>. The Shares issued to Subscriber will be registered on the Fund's books in the name of Subscriber and not any nominee. Shares will be issued in registered, book-entry form.

18. <u>Binding Nature of Agreement</u>. This Agreement shall be binding upon Subscriber and its heirs, representatives, successors and permitted assigns, and shall inure to the benefit of the Fund's successors and assigns. The Agreement shall survive the acceptance of the subscription. If Subscriber consists of more than one person, the Agreement shall be the joint and several obligation of each person.

19. <u>Governing Law</u>. This Agreement shall be governed and enforced in accordance with the laws of New York, without giving effect to its conflict of laws provisions.

20. <u>Legal Representation</u>. Subscriber understands that Seward & Kissel LLP acts as U.S. counsel to the Fund, and as counsel to the Investment Manager and its affiliates. Subscriber also understands that, in connection with this offering of Shares and subsequent advice to the Fund, Seward & Kissel LLP will not be representing the shareholder, and no independent counsel has been engaged by the Fund to represent the shareholders.

21. <u>Authority</u>. Subscriber's execution, delivery and performance of this Agreement are within its powers, have been duly authorized and will not constitute or result in a breach or default under or conflict with any order, ruling or regulation of any court or other tribunal or of any governmental commission or agency, or any agreement or other undertaking, to which Subscriber is a party or by which it is bound, and, if Subscriber is not an individual, will not violate any provision of the incorporation papers, by-laws, indenture of trust or partnership agreement, as may be applicable, of the Subscriber. The signature on this Agreement is genuine, and the signatory, if Subscriber is an individual, has legal competence and capacity to execute the Agreement, or, if Subscriber is not an individual, the signatory has been duly authorized to execute the Agreement, and the Agreement constitutes a legal, valid and binding obligation of Subscriber, enforceable in accordance with its terms.

22. <u>New York Courts</u>. Subscriber agrees that any suit, action or proceeding ("Proceeding") with respect to this Agreement and the Fund may be brought in New York. Subscriber irrevocably submits to the jurisdiction of the New York courts with respect to any Proceeding and consents that service of process as provided by New York law may be made upon Subscriber in such Proceeding, and may not claim that a Proceeding has been brought in an inconvenient forum. Subscriber consents to the service of process out of any New York court in any such Proceeding by the mailing of copies thereof, by certified or registered mail, return receipt

8

Case 1:09-cv-00818-VM Document 369 Filed 11/22/09 Page 10 of 293

requested, addressed to Subscriber at the address of Subscriber then appearing on the Fund's records. Nothing herein shall affect the Fund's right to commence any Proceeding or otherwise to proceed against Subscriber in any other jurisdiction or to serve process upon Subscriber in any manner permitted by any applicable law in any relevant jurisdiction.

23. <u>Office of Foreign Assets Control</u>. (A) Subscriber understands and agrees that the Fund prohibits the investment of funds by any persons or entities that are acting, directly or indirectly, (i) in contravention of any applicable laws and regulations, including anti-money laundering regulations or conventions, (ii) on behalf of terrorists or terrorist organizations, including those persons or entities that are included on the List of Specially Designated Nationals and Blocked Persons maintained by the U.S. Treasury Department's Office of Foreign Assets Control[1] ("OFAC"), as such list may be amended from time to time, (iii) for a senior foreign political figure, any member of a senior foreign political figure's immediate family or any close associate of a senior foreign political figure[2], unless the Fund, after being specifically notified by Subscriber in writing that it is such a person, conducts further due diligence, and determines that such investment shall be permitted, or (iv) for a foreign shell bank[3] (such persons or entities in (i) – (iv) are collectively referred to as "Prohibited Persons").

(B) Subscriber represents, warrants and covenants that: (i) it is not, nor is any person or entity controlling, controlled by or under common control with Subscriber, a Prohibited Person, and (ii) to the extent Subscriber has any beneficial owners[4] or is acting as agent or nominee in connection with this investment, (a) it has carried out thorough due diligence to establish the identities of such beneficial owners, (b) based on such due diligence, Subscriber reasonably believes that no such beneficial owners are Prohibited Persons, (c) it holds the evidence of such identities and status and will maintain all such evidence for at least five years from the date of Subscriber's complete redemption from the Fund, and (d) it will make available such information and any additional information requested by the Fund that is required under applicable regulations.

(C) If any of the foregoing representations, warranties or covenants ceases to be true or if the Fund no longer reasonably believes that it has satisfactory evidence as to their truth, notwithstanding any other agreement to the contrary, the Fund may, in accordance with applicable regulations, freeze Subscriber's investment, either by prohibiting additional investments, declining or suspending any redemption requests and/or segregating the assets constituting the investment, or

---

[1] The OFAC list may be accessed on the web at http://www.treas.gov/ofac.

[2] Senior foreign political figure means a senior official in the executive, legislative, administrative, military or judicial branches of a foreign government (whether elected or not), a senior official of a major foreign political party, or a senior executive of a foreign government-owned corporation. In addition, a senior foreign political figure includes any corporation, business or other entity that has been formed by, or for the benefit of, a senior foreign political figure. The immediate family of a senior foreign political figure typically includes the political figure's parents, siblings, spouse, children and in-laws. A close associate of a senior foreign political figure is a person who is widely and publicly known internationally to maintain an unusually close relationship with the senior foreign political figure, and includes a person who is in a position to conduct substantial domestic and international financial transactions on behalf of the senior foreign political figure.

[3] Foreign shell bank means a foreign bank without a physical presence in any country, but does not include a regulated affiliate. A post office box or electronic address would not be considered a physical presence. A regulated affiliate means a foreign shell bank that: (1) is an affiliate of a depository institution, credit union, or foreign bank that maintains a physical presence in the United States or a foreign country, as applicable; and (2) is subject to supervision by a banking authority in the country regulating such affiliated depository institution, credit union, or foreign bank.

[4] Beneficial owners will include, but shall not be limited to: (i) shareholders of a corporation: (ii) partners of a partnership; (iii) members of a limited liability company; (iv) investors in a fund of funds; (v) the grantor of a revocable or grantor trust (vi) the beneficiaries of an irrevocable trust; (vii) the individual who established an IRA; (viii) the participant in a self-directed pension plan; (ix) the sponsor of any other pension plan; and (x) any person being represented by the Subscriber in an agent, representative, intermediary, nominee or similar capacity. If the beneficial owner is itself an entity, the information and representations set forth herein must also be given with respect to its individual beneficial owners. If Subscriber is a publicly-traded company, it need not conduct due diligence as to its beneficial owners.

Case 1:09-cv-08818-VM Document 369 Filed 11/22/09 Page 100 of 293

Subscriber's investment may immediately be redeemed by the Fund, and the Fund may also be required to report such action and to disclose Subscriber's identity to OFAC or other authority. In the event that the Fund is required to take any of the foregoing actions, Subscriber understands and agrees that it shall have no claim against the Fund, the Investment Manager, the Administrator, and their respective affiliates, directors, members, partners, shareholders, officers, employees and agents for any form of damages as a result of any of the aforementioned actions.

(D)      Subscriber understands and agrees that any redemption proceeds paid to it will be paid to the same account from which Subscriber's investment in the Fund was originally remitted, unless the Fund, in its sole discretion, agrees otherwise.

(E)      If any of the foregoing representations cease to be true, Subscriber will promptly notify the Fund of the facts pertaining to such changed circumstances.

24.      <u>Anti-Money Laundering</u>.  Subscriber represents that the subscription funds are not the direct or indirect proceeds of drug trafficking or other such criminal conduct or activity. Subscriber understands that, as part of the responsibility of the Fund and Administrator for protection against money laundering, the Administrator may require a detailed verification of Subscriber's identity.  Depending on the circumstances of each application, a detailed verification might not be required where Subscriber makes the payment from an account held in Subscriber's name at a recognized financial institution; or the application is made through a recognized intermediary.  These exceptions will only apply if the financial institution or intermediary referred to above is within a country recognized as having sufficient anti-money laundering regulations.  For example, an individual may be required to produce a copy of a passport or identification card duly certified by a notary public, together with evidence of his/her address such as a utility bill or bank statement and date of birth.  In the case of entity subscribers, this may require production of a certified copy of the certificate of incorporation (and any change of name), memorandum and articles of association (or the equivalent), and the names, occupations, dates of birth and residential and business addresses of all directors.  The Administrator and the Fund reserve the right to request such information as is necessary to verify the identity of Subscriber.  In the event of delay or failure by Subscriber to produce any information required for verification purposes, the Administrator may refuse to accept the subscription and the subscription monies relating thereto or may refuse to process a redemption request until proper information has been provided.  Subscriber further agrees that the Fund and any other service provider shall be held harmless and indemnified against any loss arising as a result of a failure to process the subscription or redemption or Subscriber's rejection if such information as has been required by the parties referred to has not been provided by Subscriber.

25.      <u>Indemnification</u>.  Subscriber agrees to indemnify and hold harmless the Fund and any of its service providers, and any partner, manager, officer, director, shareholder, agent, employee or affiliate thereof, against any loss, liability or expense relating to (a) any misrepresentation or breach of covenant by Subscriber herein or in any other document furnished by Subscriber in connection with its subscription or (b) any action for securities law violations instituted by Subscriber which is finally resolved by judgment against Subscriber.

Subscriber acknowledges that each director and officer of the Fund is entitled to be indemnified out of the assets of the Fund against all costs, losses or expenses arising from mistakes of judgment or any action or inaction that the person reasonably believed to be within the scope of the authority

granted to him, provided that such actions or inactions did not constitute gross negligence, willful misconduct or breach of fiduciary duty.

26. <u>Enforceability</u>. If any provision hereof is invalid or unenforceable under any applicable law, it shall be deemed inoperable to that extent (and modified to the extent necessary to comply with that law) and its invalidity or unenforceability shall not affect any other provision hereof.

27. <u>Currencies</u>. Subscriber acknowledges that it is subscribing in a currency other than U.S. Dollars, Subscriber agrees that the Fund may sell such subscription funds at the market rate for that currency and that the Shares will be issued to the value of the proceeds, minus the reasonable costs relating to the sale.

28. <u>Appointment of Revocable Proxy</u>. Subscriber hereby designates and appoints the Administrator, with full power of substitution, as its true and lawful proxy and attorney-in-fact for the purpose of voting the Shares subscribed for herein or otherwise acquired as said proxy may determine on any and all matters which may arise at any meeting of shareholders and upon which such Shares could be voted by shareholders present in person at that meeting. This proxy may be revoked by the owner of record of the Shares hereby subscribed for, either personally or by presentation of a subsequently executed proxy at any meeting of shareholders, or by written notice to the Administrator at the above address (or such other address as the Fund or the Administrator shall furnish in writing to a shareholder) received before the meeting.

29. <u>If Subscriber is acting as a Representative</u>. If Subscriber is subscribing as trustee, agent, representative, or nominee for another person (the "Beneficial Shareholder"), Subscriber agrees that the representations and agreements herein are made by Subscriber with respect to itself and the Beneficial Shareholder. Subscriber has all requisite authority from the Beneficial Shareholder to execute and perform the obligations hereunder. Subscriber also agrees to indemnify the Fund, the Investment Manager and the Administrator and their respective directors, members, partners, officers and agents for any and all costs, fees and expenses (including legal fees and disbursements, fines and amounts paid in settlement) in connection with any damages resulting from Subscriber's misrepresentation or misstatement contained herein, or the assertion of Subscriber's lack of proper authorization from the Beneficial Shareholder to enter into this Agreement or perform the obligations hereof.

If the Subscriber enters into a swap, structured note or other derivative instrument, the return from which is based in whole or in part on the return of the Fund (the "Swap") with a third party (a "Third Party"), the Subscriber represents and warrants that with respect to a Third Party entering into a Swap: (a) the Third Party is authorized under its constitutional documents (*e.g.,* certificate of incorporation, by-laws, partnership agreement or trust agreement) and applicable law to enter into the Swap and would also be so authorized to invest directly into the Fund; (b) the Third Party has received and reviewed a copy of the Memorandum and the Agreement; (c) the Third Party acknowledges that the Fund and its affiliates are not responsible for the legality, suitability or tax consequences of the Swap and that the Subscriber is not an agent of the Fund; (c) if the Third Party is subject to ERISA or Section 4975 of the Code, it has represented its Benefit Plan Investor status in Section 5(d); and (d) the Third Party is an "eligible swap participant" and a "qualified eligible person" under Commodity Futures Trading Commission rules, and an "accredited investor" under Regulation D promulgated under the 1933 Act and a "qualified purchaser" under the Investment

Case 1:09-cv-00818-VM Document 369 Filed 11/22/09 Page 114 of 293

Company Act of 1940, as amended. Subscriber also agrees to indemnify the Fund, the Investment Manager and their respective officers and agents for any and all costs, fees and expenses (including legal fees and disbursements, fines, and amounts paid in settlement) in connection with any damages resulting from the Subscriber's misrepresentation or misstatement contained herein. Nothing herein constitutes an agreement or statement by the Fund as to the legality of a Swap or the suitability of a Swap for the Third Party.

30. <u>Country-Specific Disclosures</u>. Subscriber has reviewed the country-specific disclosures in the Memorandum.

31. <u>Additional Information</u>. The Fund may request from the Subscriber such additional information as it may deem necessary to evaluate the eligibility of the Subscriber to acquire Shares, and may request from time to time such information as it may deem necessary to determine the eligibility of the Subscriber to hold Shares or to enable the Fund to determine its compliance with applicable regulatory requirements or its tax status, and the Subscriber agrees to provide such information as may reasonably be requested.

Subscriber agrees to notify the Fund promptly if there is any change with respect to any of the information or representations made herein and to provide the Fund with such further information as the Fund may reasonably require.

This Agreement may be executed through the use of separate signature pages or in any number of counterparts. Each counterpart shall, for all purposes, constitute one agreement binding on all the parties, notwithstanding that all parties do not execute the same counterpart.

32. <u>Subscriber Information and Execution</u>.

a. <u>Amount of Subscription</u>.

☐ **Euro Shares:** _____(Euro)

☐ **SGD Shares:** _____(Singapore dollar)

☐ **Yen Shares:** _____(Yen)

b. <u>Registration of Shares</u>. The Shares issued to Subscriber are to be registered in the Fund's books in the name of (insert name and address):

_____

_____

12

       c.     <u>Written Communications</u>.  All written communications from the Fund to Subscriber should be sent to Subscriber at the following address (insert address):

_____

_____

       d.     <u>Telephone, Fax and Email</u>.  Telephone: _____

Fax: _____ Email: _____

       e.     <u>Domicile, Etc</u>.  Subscriber, if an individual, is a citizen of _____

_____ and a resident of _____. Subscriber, if an entity, is organized under the laws of _____ and has its principal place of business in _____.

       f.     <u>Authorized Persons</u>.  The names of the persons authorized by Subscriber to give and receive instructions between the Fund and Subscriber, together with their signatures, are set forth below.  Such persons are the only persons so authorized by Subscriber until further notice to the Fund by any one of such persons:

| Print Name | Signature |
|---|---|
| 1. | |
| 2. | |
| 3. | |
| 4. | |
| 5. | |
| 6. | |
| 7. | |
| 8. | |
| 9. | |
| 10. | |

      The Administrator and the Fund are each hereby authorized and instructed to accept and execute any instructions in respect of the Shares to which this Agreement relates given by Subscriber in written form or by facsimile.  If instructions are given by Subscriber by facsimile, Subscriber undertakes to send the original letter of instructions to the Administrator and the Fund, and Subscriber agrees to keep each of them indemnified against any loss of any nature whatsoever arising as to any of them as a result of any of them acting upon facsimile instructions.  The Administrator and the Fund may rely conclusively upon and shall incur no liability in respect of any action taken upon any notice, consent, request, instructions or other instrument believed in good faith to be genuine or to be signed by properly authorized persons.

g.   <u>Redemption Payments</u>.   Until further notice from Subscriber to the Fund, signed by any authorized person listed above, redemption or other payments by the Fund to Subscriber should be wired only to Subscriber and only as follows (please print or type):

Bank name: _____

Bank address: _____

ABA/ CHIPS/ BIC Codes: _____

Account name: _____

Account number: _____

For further credit: _____

h.   <u>Financial Institution Wiring/Paying Subscription Monies</u>.

Name: _____

Address: _____

Name of account at financial institution being debited for subscription payment: _____

Number of such account: _____

i.   <u>Execution</u>.   In witness whereof, Subscriber has executed this Agreement on the date set forth below:

Date: _____, 200_

<u>For individuals</u>

Print name: _____

Signature: _____

<u>For entities</u>

Print name: _____

Print name of authorized signatory: _____

Print title of authorized signatory: _____

Signature: _____

14

## SCHEDULE A

PLEASE GIVE THIS LETTER TO YOUR FINANCIAL INSTITUTION AND HAVE THEM RETURN IT TO THE ADMINISTRATOR AT THE SAME TIME THAT THE SUBSCRIPTION MONIES ARE WIRED.

## SAMPLE LETTER

[to be placed on letterhead of the financial institution remitting payment]

Date

**Via mail and facsimile:** (31-20) 572-2610
Fairfield Sigma Limited
Citco Fund Services (Europe) B.V.
Telestone 8 - Teleport
Naritaweg 165
1043 BW Amsterdam
The Netherlands

Dear Sirs

## RE:    FAIRFIELD SIGMA LIMITED (the "Fund")

1.      Name of Remitting Financial Institution:
2.      Address of Remitting Financial Institution:
3.      Name of Customer:
4.      Address of Customer:
5.      We have credited your account at [Bank], Account Number [number] for [amount] by order of [subscriber] on [date].

      **The above information is given in strictest confidence for your own use only and without any guarantee, responsibility or liability on the part of this institution or its officials.**

      **Yours faithfully,**

Signed:       _____

Full Name:   _____

Position:      _____

For additional information, please contact the Administrator at Citco Fund Services (Europe) B.V., Telestone 8 – Teleport, Naritaweg 165, 1043 BW Amsterdam, The Netherlands, Telephone:  (31-20) 572-2850, Facsimile:  (31-20) 572-2610.

A-1

## REDEMPTION REQUEST FORM
## INSTRUCTIONS

This form should be saved and may be used by a shareholder wishing to redeem shares in the Fund. Redeeming shareholders should complete and return this form, including the information on page RR-3.

> FAIRFIELD SIGMA LIMITED
> c/o Citco Fund Services (Europe) B.V.
> Telestone 8 – Teleport
> Naritaweg 165
> 1043 BW Amsterdam
> The Netherlands
> Telephone:  (31-20) 572-2850; Fax:  (31-20) 572-2610
> **Dated (month, day, year):  _____,_____,_____**

Dear Sirs:

I hereby request redemption, as defined in and subject to all of the terms and conditions of the Confidential Private Placement Memorandum, as it may be amended from time to time (the "Memorandum"), of Fairfield Sigma Limited (the "Fund"), of ____ shares, (the "Shares") representing [part/all] of my Shares in the Fund.  I understand that redemption will only be effective as of the close of business on the last day of any month, upon at least fifteen (15) calendar days' prior written notice.  Except as otherwise provided in the Memorandum, payment of the redemption proceeds will be made within thirty (30) days after the effective date of redemption.

I hereby represent and warrant that (i) I am the true, lawful and beneficial owner of the Shares of the Fund to which this Request relates, with full power and authority to request redemption of such Shares; and (ii) I am not a "U.S. Person" (as that term is defined in the Memorandum).  These Shares are not subject to any pledge or otherwise encumbered in any fashion. My signature has been guaranteed by a commercial bank acceptable to the Fund.

**Wire Transfer Instructions (to be completed by redeeming shareholder):**

_____
Bank Name


_____
Bank Address


_____
ABA /CHIPS/ BIC Codes


_____
Account Name


_____
Account Number

RR-1

**SIGNATURES MUST BE IDENTICAL TO NAME(S) IN WHICH SHARES ARE REGISTERED**

**ENTITY SHAREHOLDER** (OR ASSIGNEE)

**INDIVIDUAL SHAREHOLDER(S)**
PARTNERSHIP, CORPORATION (OR ASSIGNEE) OR TRUST

_____
Name of Registered Owner of Shares

_____
Name of Subscriber

_____
Address

_____
Address

_____
Signature (of individual or assignee)

_____
Signature (of partner, authorized corporate officer or trustee)

_____
Name and Title

_____
Please Print Name and Title

_____
Date

_____
Date

_____
Signature (of individual or assignee)

_____
Signature (of partner, authorized corporate officer or trustee)

_____
Name and Title

_____
Please Print Name and Title

_____
Date

_____
Date

_____
Signatures guaranteed by:

RR-2

## REDEMPTION INFORMATION

**SHARE REGISTRATION**

**MAILING (POST) INFORMATION**
(if other than address of registration)

_____

Name

_____

Address

_____

Country of Residence

_____

Telephone

_____

Telephone (Evenings)

_____

Fax

_____

Name

_____

Address

_____

Country of Residence

_____

Telephone

_____

Telephone (Evenings)

_____

Fax

**BANK FOR TRANSFER OF REDEMPTION**

_____

Name

_____

Address

_____

Country of Residence

_____

Telephone

_____

Telephone (Evenings)

_____

Fax

========================================================================

[To be completed by the Fund]

THIS SUBSCRIPTION APPLICATION IS HEREBY ACCEPTED BY FAIRFIELD
SIGMA LIMITED

Date: _____, 200_

Name of authorized signatory: _____

Title of authorized signatory: _____

Signature: _____

Subscriber's name: _____

========================================================================

Short Form Subscription Agreement
For Existing Shareholders

## FAIRFIELD SIGMA LIMITED

c/o Citco Fund Services (Europe) B.V

Telestone 8 - Teleport

Naritaweg 165

1043 BW Amsterdam

The Netherlands

Telephone: (31-20) 572-2850

Facsimile: (31-20) 572-2610

# SHORT FORM SUBSCRIPTION AGREEMENT

**THIS APPLICATION IS TO BE USED ONLY BY EXISTING REGISTERED SHAREHOLDERS OF FAIRFIELD SIGMA LIMITED PURCHASING ADDITIONAL SHARES IN THE SAME REGISTERED NAME. IT MAY NOT BE USED BY NEW SUBSCRIBERS.**

The undersigned Subscriber (1) is an existing shareholder in Fairfield Sigma Limited ("Fund"), (2) has previously delivered a fully executed Subscription Agreement to the Fund, and (3) desires to subscribe for additional shares in the Fund. By executing in the space below, the undersigned shareholder hereby (1) requests that the Fund accept this short form subscription in lieu of completing an entirely new Subscription Agreement for the additional Shares, (2) reaffirms each and every representation and covenant made by the undersigned in the original Subscription Agreement as of the date hereof, subject only to the changed information set forth below, and (3) represents that if the Subscriber is an entity, the person executing this Agreement has the full power and authority under the Subscriber's governing instruments and has been authorized to do so and the Subscriber has the full power and authority under its governing instruments to acquire Shares of the Fund.

Please contact the Administrator prior to sending documents or funds to ascertain whether the Fund is accepting additional capital. New Subscription Information:

Subscriber: _____

Contribution Date: _____, 200_

Additional Contribution Amount:

[ ]    Euro Shares: _____(Euro)

[ ]    SGD Shares: _____(Singapore dollar)

[ ]    Yen Shares: _____(Yen)

Changes to Subscription Agreement:   [ ] None; [ ] Yes, as follows:

_____

RR-5

IN WITNESS WHEREOF, the undersigned has executed this Subscription Agreement on this ___ day of _____, 200_.

**Corporate, Partnership, Trust or Account Subscribers**   **Individual Subscribers**

_____          _____
Name of Entity (Print)                    Name (Print)

By: _____          _____
       Signature                          Signature

       _____           _____
       Name (Print)                       Name of Joint Purchaser, If Any (Print)

       _____           _____
       Title                              Signature

Telephone: _____          Telephone: _____

Fax: _____           Fax: _____

SUBSCRIPTION ACCEPTED AS OF _____, 200_.

FAIRFIELD SIGMA LIMITED

By: _____
       Name: _____
       Title: _____

SK 25528 0001 938469 v2

RR-6

**EXHIBIT E**

**BROWN RUDNICK LLP**
Seven Times Square
New York, New York 10036
David J. Molton
212-209-4800

*Attorneys for the Foreign Representatives*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>**FAIRFIELD SENTRY LIMITED, et al.,**<br><br>    Debtors in Foreign Proceedings. | ) **Chapter 15 Case**<br>)<br>) **Case No. 10-13164**<br>) **(SMB)**<br>)<br>) **Jointly Administered**<br>) |
| **FAIRFIELD SENTRY LIMITED (IN LIQUIDATION) and FAIRFIELD SIGMA LIMITED (IN LIQUIDATION)**, acting by and through the Foreign Representatives thereof, and **KENNETH KRYS and CHARLOTTE CAULFIELD**, solely in their capacities as Foreign Representatives and Liquidators thereof,<br><br>                              **Plaintiffs,**<br><br>                    -against- | )<br>)<br>)<br>)<br>) **Adv. Pro. No. 10-03635**<br>) **(SMB)**<br>)<br>)<br>) **FOURTH AMENDED**<br>) **COMPLAINT**<br>) |
| ABN AMRO SCHWEIZ AG a/k/a ABN AMRO (SWITZERLAND) AG, ADLER AND CO PRIVATBANK AG, ALLIANZBANK SPA/UNIFORTUNE CONSERVATIVE SIDE POCKET, ALTERNATIVE INVESTMENT STRATEGIES, ARSENAL SPC, ARSENAL SPC OBO GLASGOW SEG PORT, BANCA ARNER SA, BANCA UNIONE DI CREDITO, BANK HAPOALIM SWITZERLAND LTD., BANK JULIUS BAER & CO. LTD., BANK SARASIN & CIE, BANQUE CANTONALE VAUDOISE, BANQUE CRAMER & CIE SA, BBVA (SUISSE) SA, BCV AMC DEFENSIVE AL FUND, BNP PARIBAS (SUISSE) SA, BNP PARIBAS (SUISSE) SA EX FORTIS, BNP PARIBAS (SUISSE) SA PRIVATE, BSI AG, BSI EX BANCA DEL GOTTARDO, CACEIS BANK LUXEMBOURG, CBB (BVI)/ THE ALKIMA FUND, CBT GEMS LOW VOL REG, COMPAGNIE BANCAIRE HELVETIQUE, CENTRUM BANK AG (AMS), CLARIDEN LEU LTD., CORNER BANCA SA, CREDIT SUISSE AG | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**ZURICH, DEXIA BANQUE INTERNATIONAL A** )
**LUXEMBOURG, DRESDNER BANK SCHWEIZ, EFG** )
**BANK SA SWITZERLAND, EFG EUROFINANCIER** )
**D'INVEST MCL, ENDURANCE ABSOLUTE LTD.** )
**MASTER, FAIRFIELD INVESTMENT GCI, FAIRFIELD** )
**INVESTMENT FUND LTD., FALCON PRIVATE BANK,** )
**FIF ADVANCED LTD., FINTER BANK ZURICH,** )
**HARMONY CAPITAL FUND LTD., HSBC, IHAG** )
**HANDELSBANK AG, INCORE BANK AG, KARASEL** )
**ENHANCED PORTFOLIO, KARLA MULTISTRATEGIES** )
**LTD., KBC INVESTMENTS LTD., LGT BANK IN** )
**LIECHTENSTEIN AG, LIECHTENSTEINISCHE LB** )
**REINVEST AMS, LLOYDS TSB BANK GENEVA,** )
**LOMBARD ODIER DARIER HENTSCH & CIE,** )
**LONGBOAT LTD., MASTER CAPITAL AND HEDGE** )
**FUND, NATIONAL BANK OF KUWAIT, NBK BANQUE** )
**PRIVEE SUISSE SA, PICTET & CIE, PKB PRIVATBANK** )
**AG, PRIVATE SPACE LTD., QUASAR FUNDS SPC a/k/a** )
**QUASAR FUND SPC CLASS A AND CLASS B CGCNV,** )
**RBC DEXIA INVESTOR SERVICE JULIUS BAER SICAV,** )
**RBS COUTTS BANK LTD., RICHOURT AAA** )
**MULTISTRATEGIES, ROTHSCHILD BANK AG ZURICH** )
**(DUBLIN) a/k/a ROTHSCHILD BANK AG, ROTHSCHILD** )
**BANK GENEVA (DUBLIN), ROTHSCHILD LUGANO** )
**DUBLIN a/k/a BANCA PRIVATA EDMOND DE** )
**ROTHSCHILD LUGANO S.A., SELLA BANK AG, SIS** )
**SEEGANINTERSETTLE, SIX SIS LTD., SOCIETE** )
**GENERALE BANK & TRUST, SOUNDVIEW FUND,** )
**SWISSCANTO FD CENTRE CLIENTS A/C, T1 GLOBAL** )
**FUND LTD., UBS AG NEW YORK, UBS AG ZURICH, UBS** )
**JERSEY NOMINEES, VERWALTUNGS UND PRIVAT-** )
**BANK AG AKTIENGESELLSCHAFT (AMS),** )
**VORARLBERGER LANDES UND HYPOTHEKENBANK** )
**AKTIENGESELLSCHAFT and BENEFICIAL OWNERS OF** )
**ACCOUNTS HELD IN THE NAME OF CGC NA 1-1000,** )

                                        **Defendants.** )
                                                        )

Fairfield Sentry Limited ("Sentry"), and Fairfield Sigma Limited ("Sigma"), by

and through Kenneth Krys and Charlotte Caulfield (together with their predecessors, the

"Foreign Representatives"), and Kenneth Krys and Charlotte Caulfield (together with Sentry and

Sigma, the "Plaintiffs"), solely in their capacities as the Liquidators of Sentry and Sigma and the

Foreign Representatives of the liquidation proceedings involving Sentry, Sigma, and Fairfield Lambda Limited ("Lambda," together with Sentry and Sigma, the "Funds" or the "Debtors") pending before the Commercial Division of the Eastern Caribbean High Court of Justice, British Virgin Islands (the "BVI Court"), for their complaint against Defendants, allege the following based on personal knowledge or information derived from the Funds' books and records or from other sources, including, *inter alia*, court filings and statements of governmental agencies and other parties.

## PRELIMINARY STATEMENT

1.      This action and similar actions are brought by the Plaintiffs, with the approval of the foreign court having jurisdiction over the matter, to recover payments made to shareholders for the redemption of shares in the Funds prior to December 2008.

2.      The Funds were created as a means for private investment in managed accounts with Bernard L. Madoff Investment Securities LLC ("BLMIS"), the brokerage business that Bernard L. Madoff used to perpetrate his massive Ponzi scheme.  Sentry was the largest of all so-called "feeder funds" to maintain accounts with BLMIS.  Sigma and Lambda were indirect BLMIS feeder funds established for foreign currency investments (respectively, Euro and Swiss Franc investments) through purchases of shares of Sentry.  Sentry's account statements with BLMIS as of the end of October 2008 showed in excess of $6 billion of assets supposedly held by BLMIS for Sentry.  As stated in their offering materials, the Funds' investment objective was to achieve capital appreciation of assets through investments in BLMIS (directly, in the case of Sentry; and indirectly, through Sentry, in the cases of Sigma and Lambda).

3.      It is now known that these types of feeder funds were essential to the perpetration of Madoff's Ponzi scheme.  In order for the Ponzi scheme to operate, Madoff required a

2

continuous flow of new investors and investments to be able to satisfy redemption requests from early investors. Feeder funds, such as Sentry (which was a direct feeder fund into BLMIS), and Sigma and Lambda (which were indirect feeder funds, through Sentry, into BLMIS), brought new investors into this scheme, allowing Madoff to make payments to early investors and thereby creating and perpetuating the illusion that BLMIS was engaged in a successful investment strategy and actively trading securities.

4.      From the Funds' inception until the disclosure of Madoff's fraud in December 2008, during most relevant times, substantially all cash, net of fees and expenses, raised by the Funds through the sale of their shares was transferred (either directly in the case of Sentry or indirectly through Sentry in the cases of Sigma and Lambda) to BLMIS for investment in accounts managed by Madoff. Prior to December 2008, the voting, participating shares of Sentry ($.01 par value per share), Sigma (€.01 par value per share), and Lambda (CHF.01 par value per share) (the "Shares"), were redeemable for a price equal to the applicable Fund's "Net Asset Value." Net Asset Value was to be determined, in accordance with applicable accounting standards, as the value of the respective assets of Sentry, Sigma, and Lambda divided by the number of shares outstanding in each Fund, net of certain expenses ("Net Asset Value").

5.      From time to time, in order to make payments to investors for the redemption of Shares ("Redemption Payments"), Sentry generally made withdrawals from its BLMIS accounts. On occasion, Sentry made Redemption Payments directly from amounts on hand invested by other subscribers in the Funds. At all relevant times, the Funds believed payments that Sentry received from BLMIS represented the proceeds of sales of securities and/or investments held by BLMIS for Sentry. The amount, per share, paid by the Funds to shareholders for each Share redeemed was to be equal to the per share Net Asset Value, which was calculated based

principally on the assets that the Funds believed were being held, and investments that were being made, by BLMIS for Sentry's account.

6.        As the world now knows, Madoff was operating a massive Ponzi scheme through BLMIS. Thus, at all relevant times, the money that Sentry transferred to BLMIS was not invested, but, rather, was used by Madoff to pay other BLMIS investors or was otherwise misappropriated by Madoff for unauthorized uses. Further, none of the securities shown on statements provided to Sentry by BLMIS were in fact purchased for Sentry. Additionally, none of the amounts withdrawn by Sentry from its accounts with BLMIS were proceeds of sales of securities or other investments. Instead, such amounts represented the monies of more recent investors into the Madoff scheme.

7.        In light of the fraudulent nature of BLMIS and its operation as a massive Ponzi scheme, at all relevant times the assets purportedly held at BLMIS for Sentry were non-existent, and the Funds were insolvent at the time Redemption Payments were made or they were rendered insolvent by those payments. As a result, at all relevant times, the Net Asset Value of the Shares redeemed was miscalculated, and Redemption Payments were mistakenly made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at any relevant time.

8.        At all relevant times, all payments made from BLMIS to Sentry and other feeder funds and investors were made by Madoff to perpetuate his Ponzi scheme and avoid detection of his fraud. Similarly, the Redemption Payments that the Funds made to redeeming shareholders were not made in the ordinary course of any business or for any legitimate purposes. Those Redemption Payments did not conform to or follow the terms of the Funds' Subscription Agreements, Articles of Association and/or other offering documents, as they were based upon

4

Net Asset Values that were not calculated based upon the true facts existing at any relevant time, and because, more generally, the Redemption Payments represented the proceeds arising from investment in BLMIS (or a substitute therefor, in the form of subscription monies from other investors in the Funds, used as a shortcut to investing subscription monies with BLMIS and simultaneously withdrawing monies from BLMIS), which the world now knows was operated by Madoff as a Ponzi scheme. These payments were crucial in perpetuating the Ponzi scheme and maintaining the illusion that Madoff was making actual investments and employing a successful investment strategy.

9.  During the period from and after April 20, 2004, through November 19, 2008, following the receipt by Sentry and Sigma of notices of redemption, Sentry and Sigma made Redemption Payments to accounts held in the name of CGC NA (the "Citco Record Subscriber") aggregating USD $51,929,665.41. As set forth herein, in connection with, *inter alia*, Defendants' desire to invest in the Funds through Citco as described herein, (1) the Defendants hereto, (2) the Citco Record Subscriber and (3) the Citco Bank Nederland N.V., Citco Bank Nederland N.V. Dublin Branch (a wholly owned subsidiary of Citco Bank Nederland N.V.) or the Citco Banking Corporation N.V. (all of which banks were affiliates of each other, the Citco Record Subscriber and all other Citco entities referred to herein; collectively, the "Citco Banks") entered Brokerage and Custody Agreements (the "B&C Agreements"). With respect to the B&C Agreements, at all relevant times (1) the Citco Record Subscriber acted as, *inter alia*, an agent of and nominee for the Citco Banks with respect to subscriptions and investments in the Funds for the benefit of Defendants, (2) both the Citco Record Subscriber and the Citco Banks (collectively, the "Citco Subscriber") were agents of the Defendants with respect to the B&C Agreements and investments in the Funds for the benefit of Defendants.

5

10.    At the time such payments were made, Sentry and Sigma mistakenly believed that such payments were in the amount of the Net Asset Value of the Shares tendered at the time of redemption.  In fact, however, as stated, the Redemption Payments made to the Citco Subscriber far exceeded the Net Asset Value of Shares redeemed that would have been calculated based on the true facts existing at that time or any relevant time.  Moreover, these Redemption Payments did not, as Sentry and Sigma intended, represent the proceeds arising from the profitability of or to continue investment in BLMIS.  Instead, any amounts obtained directly or indirectly by Sentry and Sigma from BLMIS to make Redemption Payments to the Citco Subscriber generally were proceeds of Madoff's Ponzi scheme, obtained from other BLMIS investors or other Sentry investors invested in BLMIS.

11.    Accordingly, the Funds' actual assets are, and at relevant times were, far less than the amount needed to satisfy their liabilities and the claims that have been or may be asserted against them, and, at all relevant times, the Funds were unable to pay their debts as they fell or would fall due.  Indeed, at the time the Redemptions Payments were made, the Funds had insufficient assets from which to pay debts as they fell or would fall due.

12.    In particular, claims had been previously asserted against the Funds in actions commenced by Irving H. Picard, the Trustee appointed by the United States District Court for the Southern District of New York for the liquidation of BLMIS (the "BLMIS Trustee"), in an adversary proceeding pending before the United States Bankruptcy Court of the Southern District of New York, Picard v. Fairfield Sentry Limited, et al., No. 08-01789 (SMB) (the "BLMIS Adversary Proceeding").  As set forth in the complaint filed in the BLMIS Adversary Proceedings, the BLMIS Trustee sought to recover from the Funds, on preference and fraudulent transfer grounds, approximately $3.2 billion.  This amount was alleged to have been transferred

6

to the Funds from BLMIS, directly (in the case of Sentry), or indirectly (in the cases of Sigma and Lambda), during the six years preceding the December 2008 disclosure of the Madoff fraud. The BLMIS Trustee alleged that the monies transferred from BLMIS to the Funds were the misappropriated assets of other BLMIS investors.  At all relevant times, monies that the Funds received from BLMIS, net of fees and expenses, were transferred to shareholders as Redemption Payments.

13.    On July 13, 2011, pursuant to an agreement between the Foreign Representatives and the BLMIS Trustee dated May 9, 2011, the United States Bankruptcy Court for the Southern District of New York entered judgments against each of the Funds on the claims against the Funds asserted in the BLMIS Adversary Proceeding (the "Judgments") in the amount of $3,054,000,000 with respect to Sentry, $752,300,000 with respect to Sigma, and $52,900,000 with respect to Lambda.  The Redemption Payments rendered the Funds unable to satisfy their liabilities to the BLMIS customers, the BLMIS Trustee, including on account of the Judgments, and other creditors of the Funds, and further increased the amount of those liabilities.  In this way, the Redemption Payments caused the Funds to become insolvent and/or deepened their existing insolvency, in that, among other things, at all relevant times the Funds were unable to pay their debts as they fell or would fall due.

14.    Upon information and belief, the Citco Subscriber has paid all or some portion of such payments to or for the account of persons or entities, including, but not limited to, ABN AMRO Schweiz AG a/k/a ABN AMRO Switzerland AG, Adler and Co Privatbank AG, Allianzbank SPA/Unifortune Conservative Side Pocket, Alternative Investment Strategies, Arsenal SPC, Arsenal SPC OBO Glasgow SEG Port, Banca Arner SA, Banca Unione Di Credito, Bank Hapoalim Switzerland Ltd., Bank Julius Baer & Co. Ltd., Bank Sarasin & CIE,

Banque Cantonale Vaudoise, Banque Cramer & CIE SA, BBVA (Suisse) SA, BCV AMC Defensive AL Fund, BNP Paribas (Suisse) SA, BNP Paribas (Suisse) SA Ex Fortis, BNP Paribas (Suisse) SA Private, BSI AG, BSI Ex Banca Del Gottardo, Caceis Bank Luxembourg, CBB (BVI)/ The Alkima Fund, CBT Gems Low Vol Reg, Compagnie Bancaire Helvetique, Centrum Bank AG (AMS), Clariden Leu Ltd., Corner Banca SA, Credit Suisse AG Zurich, Dexia Banque International A Luxembourg, Dresdner Bank Schweiz, EFG Bank SA Switzerland, EFG Eurofinancier D'Invest MCL, Endurance Absolute Ltd. Master, Fairfield Investment GCI, Fairfield Investment Fund Ltd., Falcon Private Bank, FIF Advanced Ltd., Finter Bank Zurich, Harmony Capital Fund Ltd., HSBC, IHAG Handelsbank AG, Incore Bank AG, Karasel Enhanced Portfolio, Karla Multistrategies Ltd., KBC Investments LTD., LGT Bank In Liechtenstein AG, Liechtensteinische LB Reinvest AMS, Lloyds TSB Bank Geneva, Lombard Odier Darier Hentsch & CIE, Longboat Ltd., Master Capital and Hedge Fund, National Bank of Kuwait, NBK Banque Privee Suisse SA, Pictet & CIE, PKB Privatbank AG, Private Space Ltd., Quasar Funds SPC a/k/a Quasar Fund SPC Class A and Class B CGCNV, RBC Dexia Investor Service Julius Baer SICAV, RBS Coutts Bank Ltd., Richourt AAA Multistrategies, Rothschild Bank AG Zurich (Dublin) a/k/a Rothschild Bank AG, Rothschild Bank Geneva (Dublin), Rothschild Lugano Dublin a/k/a Banca Privata Edmond de Rothschild Lugano S.A., Sella Bank AG, SIS Seeganintersettle, Six SIS Ltd., Societe Generale Bank & Trust, Soundview Fund, Swisscanto FD Centre Clients A/C, T1 Global Fund Ltd., UBS AG New York, UBS AG Zurich, UBS Jersey Nominees, Verwaltungs UND Privat-Bank AG Aktiengesellschaft (AMS), Vorarlberger Landes UND Hypothekenbank Aktiengesellschaft, and Beneficial Owners of the Accounts Held in the Name of CGC NA 1-1000, for whom the Citco Subscriber may have subscribed for shares of the Funds in the capacity of trustee, agent, representative, nominee or

custodian (individually, a "Beneficial Shareholder" and collectively, the "Beneficial Shareholders" or the "Defendants").

15.     Following the revelation of Madoff's fraud in December 2008, the Funds' boards of directors suspended any further redemptions of the Funds' shares and the calculation of each of the Funds' Net Asset Value.  As of December 2008 and presently, Sentry, Sigma, and Lambda have, respectively, approximately 4.7 million, 3.9 million, and 0.2 million shares outstanding.

16.     Unless Redemption Payments paid to shareholders are recovered for the Funds' estates, the Funds will be unable to satisfy their liabilities and claims that have been made or may be made against them; further, recoveries of Redemption Payments will increase distributions to the Funds' investors who have been harmed.  Moreover, to the extent such liabilities and claims must be satisfied solely from the Funds' current assets, Defendants will have been unjustly enriched as they will not bear their proportionate share of such liabilities and claims, but rather will retain a windfall at the expense of other shareholders and creditors of the Funds.

## JURISDICTION AND VENUE

17.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 157(b) and 1334(b), as this adversary proceeding and the claims asserted by the Foreign Representatives herein arise under, arise in and/or relate to the Chapter 15 proceedings of the above-captioned Debtors, In re Fairfield Sentry Limited, et al., No. 10-13164 (SMB), pending in this Court.  Additionally, pursuant to section 78eee(b)(2)(A)(iii) of the Securities Investor Protection Act ("SIPA"), which incorporates 28 U.S.C. § 1334(b) and applicable provisions of Title 11 of the United States Code, jurisdiction is also proper in this Court because this action also relates to the consolidated liquidation proceedings of BLMIS and Bernard L. Madoff, pending in this Court under the caption Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC,

SIPA Liquidation No. 08-1789 (SMB).  Pursuant to the Amended Standing Order of reference of

the United States District Court for the Southern District of New York, dated January 31, 2012,

all proceedings arising in, arising under and/or related to cases under Title 11 of the United

States Code (as amended, the "Bankruptcy Code") are referred to this Court for adjudication.

18.    This is a core proceeding under 28 U.S.C. §§ 157(b)(2).[1]  Should the Court

determine this to be a non-core proceeding, Plaintiffs consent to entry of final judgment and

order by this Court.

19.    This Court has jurisdiction over the Beneficial Shareholders pursuant to Rules

7004(d) and (f) of the Federal Rules of Bankruptcy Procedure and New York Civil Practice Law

& Rules § 302 (McKinney 2008) because the Beneficial Shareholders purposely availed

themselves of the laws of the United States and the State of New York by, among other things,

investing money with the Funds, knowing and intending that the Funds would invest

substantially all of that money in New York-based BLMIS.  The Beneficial Shareholders thus

knowingly accepted the rights, benefits, and privileges of conducting business and/or

transactions in the United States and New York, derived significant revenue from New York, and

maintained minimum contacts and/or general business contacts with the United States and New

York in connection with the claims alleged herein.  The Beneficial Shareholders should therefore

reasonably expect to be subject to United States jurisdiction.

20.    Moreover, this Court has jurisdiction over the Beneficial Shareholders by virtue

of the legally binding and valid agreements and representations set forth in one or more

---

[1]    Although the District Court, in In re Fairfield Sentry Ltd., No. 1:11-mc-00224-LAP, 458 B.R. 665 (S.D.N.Y. 2011), held that causes of action alleged by the Plaintiffs in other cases before this Court—causes of action that are similar or the same as those alleged in this complaint—are not core proceedings, this determination may be subject to appeal.  In any event, plaintiffs submit that the causes of action in this complaint, which include, inter alia, allegations regarding transfers of property that were directed into the territorial jurisdiction of the United States, render the claims asserted in this complaint core in accordance with the District Court's decision.

agreements for the subscription of Shares that the Citco Subscriber entered into with Sentry and Sigma.

21.    The Citco Subscriber, upon information and belief, entered into a Subscription Agreement with Sentry on or about September 27, 2004 (the "Initial Subscription Agreement") pursuant to which the Citco Subscriber subscribed for Shares.  Subsequent to entering into the Initial Subscription Agreement, the Citco Subscriber, upon information and belief, entered into additional agreements (the "Subsequent Subscription Agreements") with Sentry and Sigma between February 4, 2005 and August 27, 2008, pursuant to which it subscribed for additional Shares on the same terms and conditions as those shares subscribed for pursuant to the Initial Subscription Agreement.  The Initial Subscription Agreement and Subsequent Subscription Agreements are collectively referred to herein as the "Subscription Agreements."

22.    The Subscription Agreements provide for, *inter alia*, the irrevocable submission by the Citco Subscriber to the jurisdiction of the New York courts with respect to any proceeding with respect to said agreement and Sentry and Sigma and the Citco Subscriber's consent to service of process by the mailing of such process, as provided therein.  In particular, the Subscription Agreements provide as follows:

> New York Courts.  Subscriber agrees that any suit, action or proceeding ("Proceeding") with respect to this Agreement and the Fund may be brought in New York.  Subscriber irrevocably submits to the jurisdiction of the New York courts with respect to any Proceeding and consents that service of process as provided by New York law may be made upon Subscriber in such Proceeding, and may not claim that a Proceeding has been brought in an inconvenient forum.  Subscriber consents to the service of process out of any New York court in any such Proceeding by the mailing of copies thereof, by certified or registered mail, return receipt requested, addressed to Subscriber at the address of Subscriber then appearing on the Fund's records.  Nothing herein shall affect the Fund's right to commence any Proceeding or otherwise to proceed against Subscriber in any other jurisdiction or to serve process upon Subscriber in any manner permitted by any applicable law in any relevant jurisdiction.

11

23.    Furthermore, by executing the Subscription Agreements, the Citco Subscriber agreed to all terms and conditions contained therein, including the express provision that any agreement made by the Citco Subscriber in the Subscription Agreement would also apply to any other person for whom the Citco Subscriber was subscribing as trustee, agent, representative, or nominee – i.e., all Beneficial Shareholders.    Moreover, by executing the Subscription Agreements, the Citco Subscriber represented that it had all requisite authority from Beneficial Shareholders to execute and perform any and all obligations on their behalf, and also agreed to indemnify Sentry and Sigma for any damages resulting from an assertion by a Beneficial Shareholder that the Citco Subscriber lacked proper authorization to enter into the Subscription Agreement or perform the obligations thereof.    Specifically, the Subscription Agreements provide as follows:

> If Subscriber is acting as a Representatives.    If Subscriber is subscribing as trustee, agent, representatives, or nominee for another person (the "Beneficial Shareholder"), Subscriber agrees that the representations and agreements herein are made by Subscriber with respect to itself and the Beneficial Shareholder. Subscriber has all requisite authority from the Beneficial Shareholder to execute and perform the obligations hereunder.    Subscriber also agrees to indemnify the Fund . . . for any and all costs, fees and expenses (including legal fees and disbursements, fines and amounts paid in settlement) in connection with any damages resulting from Subscriber's misrepresentation or misstatement contained here, or the assertion of Subscriber's lack of proper authorization from the Beneficial Shareholder to enter into this Agreement or perform the obligations hereof.

24.    Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

## PARTIES

**Plaintiffs**

25.    Sentry, a British Virgin Islands company, was organized in 1990 under the International Business Company Act of the British Virgin Islands and was subsequently re-registered as a business company under the BVI Business Companies Act 2004. Sentry's

12

registered agent is Codan Trust Company (B.V.I.) located at Romasco Place, Wickhams Cay 1, Road Town, Tortola, BVI. Sentry is currently in liquidation in proceedings commenced on April 21, 2009 in the BVI Court.

26.    Sigma, a British Virgin Islands company, was organized in 1990 under the International Business Company Act of the British Virgin Islands and was subsequently re-registered as a business company under the BVI Business Companies Act 2004. Sigma's registered agent is Codan Trust Company (B.V.I.) located at Romasco Place, Wickhams Cay 1, Road Town, Tortola, BVI. Sigma is currently in liquidation in proceedings commenced on April 23, 2009, in the BVI Court.

27.    The Foreign Representatives were appointed by the BVI Court as Liquidators of the Funds to supervise the liquidation of the Funds' estates and, where necessary, commence proceedings in the name of and on behalf of the Funds or in their own official names. On April 23, 2009, the BVI Court issued an order appointing Christopher Stride as liquidator of Lambda (the "Lambda Appointment Order"). On July 21, 2009, the BVI Court issued an order appointing Kenneth Krys and Mr. Stride as joint liquidators of Sentry and Sigma (the "Sentry & Sigma Appointment Order"). On September 6, 2010, the BVI Court issued notices acknowledging Mr. Stride's resignation and the appointment of Joanna Lau as joint liquidator with Mr. Krys of all three Funds (the "Supplemental Appointment Order"). On November 23, 2011, Ms. Lau resigned as joint liquidator of the Funds. On June 24, 2014, the BVI Court issued an order appointing Charlotte Caulfield as joint liquidator, with Mr. Krys, of all three Funds (the "Second Supplemental Appointment Order" and, together with the Lambda Appointment Order, the Sentry & Sigma Appointment Order, and the Supplemental Appointment Order, the "BVI Appointment Orders"). The Foreign Representatives, in their capacities as Foreign

13

Representatives and liquidators of the Funds, have been authorized by the foreign court having jurisdiction over the matter to bring this action and the claims herein, including the avoidance claims herein under the BVI Insolvency Act of 2003 (the "BVI Insolvency Act").

28.    Pursuant to the BVI Appointment Orders, the Foreign Representatives are responsible for all aspects of the Funds' businesses, including, among other things, custody and control of the Funds' assets, the power to do all acts and execute, in the name and on behalf of the Funds, any deeds, receipts or other documents, and the power to compromise claims, commence litigation and to dispose of property.    After obtaining BVI Court approval, the Foreign Representatives filed petitions in this Court in June of 2010, under Chapter 15 of Title 11 of the United States Code, seeking recognition of the BVI Liquidation Proceedings as "foreign main proceedings" under Chapter 15.  On July 22, 2010, this Court issued an order (the "Recognition Order") granting that recognition.

29.    Pursuant to the Recognition Order, the Foreign Representatives were automatically afforded relief available under 11 U.S.C. § 1520, including application of the Bankruptcy Code's automatic stay to the Funds and their property located in the United States, as well as the ability to operate the Funds' business and exercise the rights and powers of a trustee under Sections 363 and 552 of the Bankruptcy Code.  Moreover, the Bankruptcy Court specifically granted additional relief in the Recognition Order to the Foreign Representatives pursuant to 11 U.S.C. § 1521(a).  Such relief includes, but is not limited to: (i) staying any actions, proceedings or execution against the Funds' assets to the extent not stayed under Section 1520; (ii) authorizing the Foreign Representatives to seek leave to conduct discovery concerning the Funds' assets, affairs, rights, obligations or liabilities; (iii) entrusting the Foreign Representatives with the administration and realization of the Funds assets that are located

14

within the United States, including all claims and causes of action belonging to the Funds; and (iv) otherwise giving full force and effect to the Proceedings before the BVI Court.

**<u>Defendants</u>**

30.     Defendants "Beneficial Owners of the Accounts Held in the Name of CGC NA 1-1000" are, as noted, any persons or entities having a beneficial ownership or interests in Shares of Sentry and Sigma issued to the Citco Subscriber and on whose behalf the Citco Subscriber was acting as trustee, agent, representative, or nominee (individually, a "<u>Beneficial Shareholder</u>").

31.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with ABN AMRO Schweiz AG a/k/a ABN AMRO (Switzerland) AG.  Upon information and belief, ABN AMRO Schweiz AG a/k/a ABN AMRO (Switzerland) AG is a corporate entity organized under the laws of Switzerland and has its registered address at Beethovenstrasse 33, CH-8002 Zurich, Switzerland.

32.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with Adler and Co Privatbank AG.  Upon Information and belief, Adler and Co Privatbank AG is a corporate entity organized under the laws of Switzerland and has its registered address at Claridenstreasse 22, CH-8022 Zurich, Switzerland.

33.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with Allianzbank SPA/Unifortune Conservative Side Pocket.   Upon information and belief,

15

Allianzbank SPA/Unifortune Conservative Side Pocket is a corporate entity organized under the laws of Italy and has its registered address at Via Donizetti 53, Milan 20128, Italy.

34.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with Alternative Investment Strategies.    Upon information and belief, Alternative Investment Strategies is a corporate entity organized under the laws of Bermuda and has its registered address c/o Absolute Performance Ltd., Bamboo Gate, 11 Harbour Road, Paget PG 03, Bermuda.

35.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with Arsenal SPC.    Upon information and belief, Arsenal SPC is a corporate entity organized under the laws of the Cayman Islands and has its registered address at Corporate Centre West Bay Road, P.O. Box 31106, SMB, Grand Cayman, Cayman Islands.

36.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with Arsenal SPC Obo Glasgow SEG Port.    Upon information and belief, Arsenal SPC Obo Glasgow SEG Port is a corporate entity organized under the laws of Switzerland and has its registered address at Rue de la Croiz 19, 1203 Geneva, Switzerland.

37.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with Banca Arner SA.    Upon information and belief, Banca Arner SA is a corporate entity organized under the laws of Switzerland and has its registered address at Piazza Manzoni 8, CH-6901 Lugano, Switzerland.

16

38.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with Banca Unione di Credito.  Upon information and belief, Banca Unione di Credito is a corporate entity organized under the laws of Switzerland and has its registered address at Piazza Dante 7, CH-6901 Lugano, Switzerland.

39.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with Bank Hapoalim Switzerland Ltd.  Upon information and belief, Bank Hapoalim Switzerland Ltd. is a corporate entity organized under the laws of Luxembourg and has its registered address at 18 Boulevard Royal, 2449 Luxembourg.

40.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with Bank Julius Baer & Co. Ltd.  Upon information and belief, Bank Julius Baer & Co. Ltd. is a corporate entity organized under the laws of Switzerland and has its registered address at Hohlstrasse 602, CH-8010 Zurich, Switzerland.

41.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with Bank Sarasin & Cie.  Upon information and belief, Bank Sarasin & Cie is a corporate entity organized under the laws of Switzerland and has its registered address at Elizabethenstrasse 62, CH-4002 Basel, Switzerland.

42.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with Banque Cantonale Vaudoise.  Upon information and belief, Banque Cantonale Vaudoise is a

17

corporate entity organized under the laws of Switzerland and has its registered address at Place
St. Francois 14, CH-1001 Lausanne, Switzerland.

43.     Based on Sentry and Sigma records, some or all of the Redemption Payments
made to the Citco Subscriber may have been paid to an account holder or holders associated with
Banque Cramer & Cie SA.  Upon information and belief, Banque Cramer & Cie is a corporate
entity organized under the laws of Switzerland and has its registered address at 20-22 Avenue de
Miremont, P.O. Box 403, CH-1211 Geneva 12, Switzerland.

44.     Based on Sentry and Sigma records, some or all of the Redemption Payments
made to the Citco Subscriber may have been paid to an account holder or holders associated with
BBVA (SUISSE) SA.  Upon information and belief, BBVA (Suisse) SA is a corporate entity
organized under the laws of Switzerland and has its registered address at P.O. Box 3930, Zeltweg
63, 8021 Zurich, Switzerland.

45.     Based on Sentry and Sigma records, some or all of the Redemption Payments
made to the Citco Subscriber may have been paid to an account holder or holders associated with
BCV AMC Defensive AL Fund.  Upon information and belief, BCV AMC Defensive AL Fund
is a corporate entity organized under the laws of Switzerland and has its registered address at
Place St. Francois, CH-1001 Lausanne, Switzerland.

46.     Based on Sentry and Sigma records, some or all of the Redemption Payments
made to the Citco Subscriber may have been paid to an account holder or holders associated with
BNP Paribas (Suisse) SA.  Upon information and belief, BNP Paribas (Suisse) SA is a corporate
entity organized under the laws of Switzerland and has its registered address at 2 Place de
Hollande, Case Postale, CH-1211 Geneva, Switzerland.

47.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with BNP Paribas (Suisse) SA Ex Fortis.  Upon information and belief, BNP Paribas (Suisse) SA Ex Fortis is a corporate entity organized under the laws of Switzerland and has its registered address at 2 Place de Hollande, Case Postale, CH-1211 Geneva, Switzerland.

48.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with BNP Paribas (Suisse) SA Private.  Upon information and belief, BNP Paribas (Suisse) SA Private is a corporate entity organized under the laws of Switzerland and has its registered address at 2 Place de Hollande, Case Postale,  CH-1211 Geneva, Switzerland.

49.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with BSI AG.  Upon information and belief, BSI AG is a corporate entity organized under the laws of Switzerland and has its registered address at Via Peri 23, CH-6901 Lugano, Switzerland.

50.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with BSI Ex Banca Del Gottardo.  Upon information and belief, BSI Ex Banca Del Gottardo is a corporate entity organized under the laws of Switzerland and has its registered address at Viale S Franscini 8, CH-6900 Lugano, Switzerland.

51.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with Caceis Bank Luxembourg.  Upon information and belief, Caceis Bank Luxembourg is a

19

corporate entity organized under the laws of Luxembourg and has its registered address at 5

Allee Scheffer, Luxembourg L-2520, Luxembourg.

52.     Based on Sentry and Sigma records, some or all of the Redemption Payments

made to the Citco Subscriber may have been paid to an account holder or holders associated with

CBB (BVI)/ The Alkima Fund.

53.     Based on Sentry and Sigma records, some or all of the Redemption Payments

made to the Citco Subscriber may have been paid to an account holder or holders associated with

CBT Gems Low Vol Reg.  Upon information and belief, CBT Gems Low Vol Reg is a corporate

entity organized under the laws of the Bahamas and has its registered address at One Montague

Place 1st Floor, East Bay Street, P.O. Box N-4906, Nassau, Bahamas.

54.     Based on Sentry and Sigma records, some or all of the Redemption Payments

made to the Citco Subscriber may have been paid to an account holder or holders associated with

Compagnie Bancaire Helvetique.  Upon information and belief, Compagnie Bancaire Helvetique

is a corporate entity organized under the laws of Switzerland and has its registered address at

Route de Chancy 6B, Case Postale 64, CH-1211 Geneva 8, Switzerland.

55.     Based on Sentry and Sigma records, some or all of the Redemption Payments

made to the Citco Subscriber may have been paid to an account holder or holders associated with

Centrum Bank AG (AMS).  Upon information and belief, Centrum Bank AG (AMS) is a

corporate entity organized under the laws of Liechtenstein and has its registered address at

Kirchstrasse 3, Postfach 1168, Vaduz FL 9490, Liechtenstein.

56.     Based on Sentry and Sigma records, some or all of the Redemption Payments

made to the Citco Subscriber may have been paid to an account holder or holders associated with

Clariden Leu Ltd.  Upon information and belief, Clariden Leu Ltd. is a corporate entity

organized under the laws of Switzerland and has its registered address at Bahnhofstrasse 32, CH-8001, Zurich, Switzerland.

57.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with Corner Banca SA.    Upon information and belief, Corner Banca SA is a corporate entity organized under the laws of Switzerland and has its registered address at Via Canova 16, CH-6901 Lugano, Switzerland.

58.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with Credit Suisse AG Zurich.    Upon information and belief, Credit Suisse AG Zurich is a corporate entity organized under the laws of Switzerland and has its registered address at P.O. Box 300, Uetlibergstrasse 231, CH-8070 Zurich, Switzerland.

59.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with Dexia Banque International A Luxembourg.    Upon information and belief, Dexia Banque International A Luxembourg is a corporate entity organized under the laws of Luxembourg and has its registered address at 69 Route D'Esch, Luxembourg L-2953, Luxembourg.

60.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with Dresdner Bank Schweiz.    Upon information and belief, Dresdner Bank Schweiz is a corporate entity organized under the laws of Liechtenstein and has its registered address at LGT Bank In Liechtenstein AG ex DBS, Herrengasse 12, Vaduz FL-9490, Liechtenstein.

61.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with EFG Bank SA Switzerland.   Upon information and belief, EFG Bank SA Switzerland is a corporate entity organized under the laws of Switzerland and has its registered address at 24 Quai du Seujet, CH-1211 Geneva 2, Switzerland.

62.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with EFG Eurofinancier D'Invest MCL.   Upon information and belief, EFG Eurofinancier D'Invest MCL is a corporate entity organized under the laws of Monaco and has its registered address at Villa les Aigles, 15 Avenue D'Ostenede, Monaco MC 9800.

63.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with Endurance Absolute Ltd. Master.   Upon information and belief, Endurance Absolute Ltd. Master is a corporate entity organized under the laws of the United Kingdom and has its registered address c/o Argyle Investment Advisors, Iveagh Ltd., 21 Queen Anne's Gate, London SW1H 9BU, United Kingdom.

64.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with Fairfield Investment GCI.   Upon information and belief, Fairfield Investment GCI is a corporate entity organized under the laws of New York and has as its registered address the Fairfield Greenwich Group, Finance Group, 919 Third Avenue, New York 10022.

65.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with

Fairfield Investment Fund Ltd. Upon information and belief, Fairfield Investment Fund Ltd. is a corporate entity organized under the laws of New York and has as its registered address the Fairfield Greenwich Group, Finance Group, 919 Third Avenue, New York 10022.

66. Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with Falcon Private Bank. Upon information and belief, Falcon Private Bank is a corporate entity organized under the laws of Switzerland and has its registered address at Pelikanstrasse 37, P.O. Box 1376, CH-8021, Zurich, Switzerland.

67. Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with FIF Advanced Ltd. Upon information and belief, FIF Advanced Ltd. is a corporate entity organized under the laws of New York and has as its registered address the Fairfield Greenwich Group, Finance Group, 919 Third Avenue, New York 10022.

68. Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with Finter Bank Zurich. Upon information and belief, Finter Bank Zurich is a corporate entity organized under the laws of Switzerland and has as its registered address Corso S Gottardo 35, CH-6830 Chiasso, Switzerland.

69. Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with Harmony Capital Fund Ltd. Upon information and belief, Harmony Capital Fund Ltd. is a corporate entity organized under the laws of the United Kingdom and has its registered address c/o Jason Capital Partners LLP, 28 Grosvenor Street, London W1K 4QR, United Kingdom.

70.      Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with HSBC.  Upon information and belief, HSBC is a corporate entity organized under the laws of the United Kingdom and has its registered address 8 Canada Square, Canary Wharf, London, United Kingdom.

71.      Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with IHAG Handelsbank AG.  Upon information and belief, IHAG Handelsbank AG is a corporate entity organized under the laws of Switzerland and has as its registered address Bleicherweg 18, 8022- Zurich, Switzerland.

72.      Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with Incore Bank AG.  Upon information and belief, Incore Bank AG is a corporate entity organized under the laws of Switzerland and has as its registered address Dreikoenigstr 8, CH-8022 Zurich, Switzerland.

73.      Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with Karasel Enhanced Portfolio.

74.      Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with Karla Multistrategies Ltd.  Upon information and belief, Karla Multistrategies Ltd. is a corporate entity organized under the laws of The Netherlands and has as its registered address Naritaweg 165, 1043 BW Amsterdam, The Netherlands.

24

75.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with KBC Investments Ltd.  Upon information and belief, KBC Investments Ltd. is a corporate entity organized under the laws of New York and has as its registered address 140 East 45th Street, 42nd Floor, New York 10017.

76.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with LGT Bank In Liechtenstein AG.  Upon information and belief, LGT Bank In Liechtenstein AG is a corporate entity organized under the laws of Liechtenstein and has as its registered address Herrengasse 12, Vaduz FL 9490, Liechtenstein.

77.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with Liechtensteinische LB Reinvest AMS.  Upon information and belief, Liechtensteinische LB Reinvest AMS is a corporate entity organized under the laws of Liechtenstein and has as its registered address Liechtensteinische Landesbank AG, Staedtle 44, Vaduz FL-9490, Liechtenstein.

78.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with Lloyds TSB Bank Geneva. Upon information and belief, Lloyd's TSB Bank Geneva is a corporate entity organized under the laws of Switzerland and has as its registered address Place Bel-Air 1, CH-1211 Geneva 2, Switzerland.

79.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with

Lombard Odier Darier Hentsch & Cie. Upon information and belief, Lombard Odier Darier Hentsch & Cie is a corporate entity organized under the laws of Switzerland and has as its registered address Rue de la Corraterie 11, 1204 Geneva, Switzerland.

80.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with Longboat Ltd.

81.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with Master Capital and Hedge Fund. Upon information and belief, Master Capital and Hedge Fund is a corporate entity organized under the laws of The Netherlands and has its registered address c/o Citco Fund Services Europe BV, Naritaweg 165, 1043 BW Amsterdam, The Netherlands.

82.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with National Bank of Kuwait. Upon information and belief, National Bank of Kuwait is a corporate entity organized under the laws of Kuwait and has its registered address P.O. Box 95 Safat, 13001 Kuwait, Abdullah Al Ahmad Street, Sharq, State of Kuwait.

83.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with NBK Banque Privee Suisse SA. Upon information and belief, NBK Banque Privee Suisse SA is a corporate entity organized under the laws of Switzerland and has as its registered address Quai du Mont Blanc 21, P.O. Box 1923, Geneva 1, Switzerland.

84.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with

26

Pictet & Cie.  Upon information and belief, Pictet & Cie is a corporate entity organized under the laws of Switzerland and has as its registered address Route Des Acacias 60, 1211 Geneva 73, Switzerland.

85.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with PKB Privatbank AG.  Upon information and belief, PKB Privatbank AG is a corporate entity organized under the laws of Switzerland and has as its registered address Via Balestra 1, CH-6901 Lugano, Switzerland.

86.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with Private Space Ltd.  Upon information and belief, Private Space Ltd is a corporate entity organized under the laws of Monaco and has as its registered address 7 Rue du Gabian, MC 98000, Monaco.

87.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with Quasar Funds SPC a/k/a Quasar Fund SPC Class A and Class B CGCNV.  Upon information and belief, Quasar Funds SPC a/k/a Quasar Fund SPC Class A and Class B CGCNV is a corporate entity organized under the laws of The Netherlands and has its registered address c/o Citco Fund Services Europe BV, Naritaweg 165, 1043 BW Amsterdam, The Netherlands.

88.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with RBC Dexia Investor Service Julius Baer SICAV.  Upon information and belief, RBC Dexia Investor Service Julius Baer SICAV is a corporate entity organized under the laws of

Luxembourg and has as its registered address Dexia Fund Services, 69 Route D'Esch, Luxembourg L-2953, Luxembourg.

89.      Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with RBS Coutts Bank Ltd.  Upon information and belief, RBS Coutts Bank Ltd. is a corporate entity organized under the laws of Switzerland and has as its registered address P.O. Box 2200, Stauffacherstrasse 1, CH-8022 Zurich, Switzerland.

90.      Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with Richourt AAA Multistrategies.  Upon information and belief, Richourt AAA Multistrategies is a corporate entity organized under the laws of The Netherlands and has as its registered address Telstone 8 Teleport, 1043 BW Amsterdam, The Netherlands.

91.      Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with Rothschild Bank AG Zurich (Dublin) a/k/a Rothschild Bank AG.  Upon information and belief, Rothschild Bank AG Zurich (Dublin) a/k/a Rothschild Bank AG is a corporate entity organized under the laws of Switzerland and has as its registered address Zollikerstrasse 181, CH-8034 Zurich, Switzerland.

92.      Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with Rothschild Bank Geneva (Dublin).  Upon information and belief, Rothschild Bank Geneva (Dublin) is a corporate entity organized under the laws of Switzerland and has as its registered address Banca Privee Edmond de Rothschild, 18 rue de Hesse, CH-1204 Geneva, Switzerland.

28

93.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with Rothschild Lugano Dublin a/k/a Banca Privata Edmond de Rothschild Lugano S.A.   Upon information and belief, Rothschild Lugano Dublin a/k/a Banca Privata Edmond de Rothschild Lugano S.A. is a corporate entity organized under the laws of Switzerland and has as its registered address Via Ginevra 2, CH-6900 Lugano, Switzerland.

94.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with Sella Bank AG.   Upon information and belief, Sella Bank AG is a corporate entity organized under the laws of Switzerland and has as its registered address Corso Elvezia 9, CH-6900 Lugano, Switzerland.

95.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with SIS Seeganintersettle.   Upon information and belief, SIS Seeganintersettle is a corporate entity organized under the laws of Switzerland and has as its registered address Baslerstrasse 100, CH-4601 Olten, Switzerland.

96.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with Six SIS Ltd.  Upon information and belief, Six SIS Ltd. is a corporate entity organized under the laws of Switzerland and has as its registered address Baslerstrasse 100, CH-4601 Olten, Switzerland.

97.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with

29

Societe Generale Bank & Trust. Upon information and belief, Societe Generale Bank & Trust is a corporate entity organized under the laws of Luxembourg and has as its registered address 11-13 Avenue Emile Reuter, Luxembourg L-2420, Luxembourg.

98.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with Soundview Fund. Upon information and belief, Soundview Fund is a corporate entity organized under the laws of The Netherlands and has as its registered address Naritaweg 165, 1043 BW Amsterdam, The Netherlands.

99.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with Swisscanto FD Centre Clients A/C. Upon information and belief, Swisscanto FD Centre Clients A/C is a corporate entity organized under the laws of the United Kingdom and has as its registered address 4th Floor, 51 Moorgate, London EC2R 6BH, United Kingdom.

100.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with T1 Global Fund Ltd. Upon information and belief, T1 Global Fund Ltd. is a corporate entity organized under the laws of Switzerland and has its registered address c/o Trust and Gain Asset Management, Corso San Gottardo 46, 6830 Chiasso, Switzerland.

101.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with UBS AG New York. Upon information and belief, UBS AG New York is a corporate entity organized under the laws of New York and has as its registered address 101 Park Avenue, New York 10178.

102.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with UBS AG Zurich.  Upon information and belief, UBS AG Zurich is a corporate entity organized under the laws of Switzerland and has as its registered address UBS Wealth Management, Badenerstrasse 574/C, CH-8098 Zurich, Switzerland.

103.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with UBS Jersey Nominees.  Upon information and belief, UBS Jersey Nominees is a corporate entity organized under the laws of the United Kingdom and has as its registered address P.O. Box 350, 24 Union Street, St Helier JE4 8UJ, Jersey, United Kingdom.

104.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with Verwaltungs UND Privat-Bank AG Aktiengesellschaft (AMS).  Upon information and belief, Verwaltungs UND Privat-Bank AG Aktiengesellschaft (AMS) is a corporate entity organized under the laws of Liechtenstein and has as its registered address Im Zentrum, Vaduz FL-9490, Liechtenstein.

105.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscriber may have been paid to an account holder or holders associated with Vorarlberger Landes Und Hypothekenbank Aktiengesellschaft.  Upon information and belief, Vorarlberger Landes Und Hypothekenbank Aktiengesellschaft is a corporate entity organized under the laws of Austria and has as its registered address Hypo-Passage 1, Bregenz 6900, Austria.

31

**The Relationship Between the Defendants and the Citco Subscriber**

106.    Published materials by Citco companies within Citco Group Limited ("Citco Group" and collectively, "Citco") make clear that the Citco Banks – utilizing the Citco Record Subscriber to be the record holder of shares in the Funds Register of Shares – performed and took the lead role in carrying out record holder duties on behalf of Defendants.  For example, a Citco Fund Services document describing "Fund Administration Operations"[2] explains:

> For institutional clients (primarily banks), the Citco Banks offer a unique custody service to alleviate these institutions from the administrative burden of locating, subscribing in, and keeping track of investments in international funds for their private banking customers.  These services include: locating the fund, placing the subscription/redemption, completing the paperwork, registering the funds in the name of Citco as custodian, addressing corporate actions, providing monthly statements of holdings and most recent NAVs and sending out documentation and information as required.

107.    Consistent with such explanations by Citco, upon information and belief, each of the Defendants entered into the "B&C Agreements" with a Citco Bank and the Citco Record Subscriber.  The B&C Agreements made the Citco Subscriber and other Citco entities agents of the Defendants in connection therewith.  It was under the B&C Agreements that the Citco Subscriber purchased shares in and made redemptions from the Funds for the benefit of the Defendants, which are the subject of this action.  Under the B&C Agreements, the Defendants were required to maintain bank accounts at the Citco Banks from which and into which "all moneys received from or for the account of" the Defendants were deposited (the "B&C Accounts").  Although, there are some differences in the various B&C Agreements, the provisions summarized herein are, upon information and belief, substantially the same in all the agreements.

---

[2]    Citco Fund Services, Fund Administration Operations Using the Ephesus Platform and Related Offshore Investor Relations Services, US Statement on Auditing Standards No. 70 Report on Controls Placed in Operation

108.    Pursuant to the B&C Agreements, the Citco Subscriber had various duties.  For example, the B&C Agreements afforded the Citco Subscriber the power to:

- "register the Securities, other than physically held bearer shares, in the name of the [Citco Record Subscriber] or any sub-custodian";

- "deposit in the [B&C] Account all moneys received from or for the account of the [Defendants]"; and

- ensure that the "[s]ecurities held at any one time by the Custodian or any sub-custodian shall be recorded in and ascertainable from the books and/or ledgers of the [Citco] Banks and the [Citco Record Subscriber]."

109.    Moreover, the Citco Banks were solely responsible for providing brokerage services to the Defendants.  According to the B&C Agreements, these services included:

- "effecting [] transactions of and/or relating to the purchase and sale of and dealing in Securities in the name and for the account of the" Defendants; and

- "effecting [] transactions of and/or relating to the purchase and sale of and dealing in Securities in the name of the Bank, or of the [Defendants], or any nominee for the account of the [Defendants]."

110.    Pursuant to the B&C Agreements, the Defendants provided the Citco Banks "with Instructions in respect to all transactions in Securities to be performed by the Bank on the [Defendants'] behalf," and it provided that the relevant Citco Bank, "may in its absolute discretion refuse to execute any Instructions given by or on behalf of the [Defendants]."

---

and Tests of Operating Effectiveness January 1, 2005 to September 30, 2005.

111.    With respect to the subscription or redemption of Shares in the Funds, the Defendants submitted instructions to the Citco Banks and, upon information and belief, the Citco Banks directed the Citco Record Subscriber to subscribe for or redeem the relevant Shares.

112.    According to the B&C Agreements, in "consideration of the services of the" Citco Banks and the Citco Record Subscriber, the Defendants were required to "pay to the Bank the fees and expenses" in "U.S. dollars." Additionally, while the purchased securities were to be transferred to and registered in the name of the Citco Record Subscriber as the Custodian thereof, if the Defendants were more than five days delinquent in paying in full "all moneys due in connection with such purchase . . . such Securities will not be transferred to nor held by the Custodian [the Citco Record Subscriber] on behalf of the [Defendants], but will be freely available to the Bank."

113.    The B&C Agreements provide: "In the performance of their [custodian service] duties, the Bank and/or the Custodian [the Citco Record Subscriber] may act through agents, subcustodians or any other third party which the Bank and/or Custodian [the Citco Record Subscriber] may, in their absolute discretion deem necessary. The Bank and/or Custodian [the Citco Record Subscriber] are hereby authorized by the [Defendants] to enter into further agreements for the appointment of the aforementioned agents, sub-custodians and/or third parties."

114.    The B&C Agreements also provide: "The [Defendants] recognize[ ] that in certain circumstances in order to preserve or safeguard the Securities or other assets of the [Defendants], the Bank and/or Custodian [the Citco Record Subscriber] may be required to act without first obtaining instructions from the Customer. In such cases, the Bank and/or Custodian [the Citco Record Subscriber] may act at their own absolute and unfettered discretion and shall not be

34

liable, in the absence of negligence, willful misfeasance, reckless disregard or fraud, for any loss to the [Defendants] whatsoever."

115.    The B&C Agreements also provide: "The Bank and Custodian [the Citco Record Subscriber] hereby agree to use their best efforts and judgement and due care [some B&C Agreements modify this language here as follows; "best efforts and judgment and care of a prudent professional custodian"] in performing their obligations and duties pursuant to this Agreement; provided however that the Bank, Custodian[the Citco Record Subscriber], their directors, officers, employees and/or agents shall not be liable for any action taken or failure to act in the course of performing the services hereunder for any loss suffered by the [Defendants] in connection with the subject matter of this Agreement, unless such loss arises from willful misfeasance, fraud, bad faith or negligence in the performance of the Bank's/or Custodian's [the Citco Record Subscriber's] obligations and duties by reason of the Bank's and/or Custodian's [the Citco Record Subscriber's] reckless disregard of their obligations and duties hereunder."

116.    Upon information and belief, the B&C Agreements with the Defendants applied to all subscriptions and redemptions of Shares in the Funds by the Citco Subscriber on behalf of the Defendants, and all Redemption Payments were, upon information and belief, sent by the Citco Banks (upon their receipt from the Funds) to the Defendants' B&C Accounts.

117.    The Citco Banks and the Citco Record Subscriber, per the B&C Agreements and in accordance with the Defendants' use of Citco in connection with investments in the Funds, were agents of Defendants.

**The Relationship Between the Citco Record Subscriber and the Citco Banks**

118.    Consistent with the Citco Fund Services document described in paragraph 106 herein, and as described above in connection with the provisions of the B&C Agreements, the

35

Citco Banks played a lead role in performing and directing record holding duties on behalf of the Defendants.

119.    Pursuant to the B&C Agreements, the Citco Banks and the Citco Record Subscriber had various duties.  For example, the B&C Agreements afforded the Citco Banks and the Citco Record Subscriber the power to:

- "register the Securities, other than physically held bearer shares, in the name of the Custodian [the Citco Record Subscriber] or any sub-custodian";

- "deposit in the [B&C] Account [at the Citco Banks] all moneys received from or for the account of the [Defendants]"; and

- ensure that the "[s]ecurities held at any one time by the Custodian [the Citco Record Subscriber] or any sub-custodian shall be recorded in and ascertainable from the books and/or ledgers of the Banks and the Custodian [the Citco Record Subscriber]."

120.    Moreover, the Citco Banks were solely responsible for providing brokerage services to the Defendants.  According to the B&C Agreements, these services included:

- "effecting [] transactions of and/or relating to the purchase and sale of and dealing in Securities in the name and for the account of the" Defendants; and

- "effecting [] transactions of and/or relating to the purchase and sale of and dealing in Securities in the name of the Bank, or of the [Defendants], or any nominee for the account of the [Defendants]."

121.    Pursuant to the B&C Agreements, the Defendants provided the Citco Banks "with Instructions in respect to all transactions in Securities to be performed by the Bank on the

36

[Defendants'] behalf," and it provided that the Citco Banks "may in [their] absolute discretion refuse to execute any Instructions given by or on behalf of the [Defendants]."

122.    With respect to the subscription or redemption of Shares in the Funds, the Defendants submitted instructions to the Citco Banks, and, upon information and belief, the Citco Banks directed the Citco Record Subscriber to subscribe for or redeem the relevant Shares.

123.    According to the B&C Agreements, in "consideration of the services of the" Citco Banks and the Citco Record Subscriber, the Defendants were required to "pay to the Bank the fees and expenses" in "U.S. dollars."  Additionally, while the purchased securities were to be transferred to and registered in the name of the Citco Record Subscriber, if the Defendants were more than five days delinquent in paying in full "all moneys due in connection with such purchase . . . such Securities will not be transferred to nor held by the Custodian [the Citco Record Subscriber] on behalf of the [Defendants], but will be freely available to the Bank."

124.    Upon information and belief, (i) the Citco Record Subscriber was a wholly owned subsidiary or, at a minimum affiliate, of the Citco Banks and all were affiliates of the Citco Group; (ii) the Citco Record Subscriber operated principally if not solely as a vehicle for the custody of shares purchased for Defendants by the Citco Banks; (iii) the Citco Record Subscriber was and at all times acted as the nominee of and agent for the Citco Banks with respect to such share purchases and custody thereof; (iv) the Citco Record Subscriber accordingly entered into the relevant Subscription Agreements with the Funds for and on behalf of the Citco Banks; and (v) the Citco Banks are, accordingly, real parties in interest to, bound by and parties to the Subscription Agreements.

## NOTICE PURSUANT TO FED. R. CIV. P. 44.1

~~105.~~125.     Certain of the substantive issues to be resolved in this case will be governed by the laws of the British Virgin Islands.  Plaintiffs intend to rely upon the applicable laws of that territory.

## FACTUAL ALLEGATIONS

### A.     Role of Feeder Funds In Madoff Fraud

~~106.~~126.     Sentry was the largest of all the so-called "feeder funds" to maintain accounts with BLMIS.  Sigma and Lambda were indirect BLMIS feeder funds established for foreign currency (respectively, Euro and Swiss franc) investment through purchase of shares of Sentry.  Sentry's account statements with BLMIS as of the end of October 2008 showed in excess of $6 billion of invested assets supposedly held by BLMIS.  As stated in its offering materials, Sentry's investment objective was to achieve capital appreciation through investments in BLMIS.

~~107.~~127.     As discussed above, Sentry, Sigma, and Lambda were established for the purpose of making investments in BLMIS.  It is now known that these types of feeder funds were a crucial part of Madoff's Ponzi scheme.  The feeder funds brought new investors and new investments into the scheme, allowing Madoff to make payments to early investors who sought to liquidate their investments, and in this way, the feeder funds were used by Madoff to continue and perpetuate his fraud by maintaining the illusion that BLMIS was making active investments and engaging in a successful investment strategy.

### B.     Calculation of Net Asset Value and Shareholder Redemption Payments

~~108.~~128.     Substantially all of the money (up to 95%) raised by the Funds from the sale of their Shares, net of fees and expenses, was turned over to and invested in BLMIS (by

and/or through Sentry), and supposedly credited to accounts held in the name of Sentry with BLMIS, purportedly for use in the now infamous "split-strike conversion" investment strategy. In accordance with the Funds' Subscription Agreements, Articles of Association, offering materials and/or other relevant documents, from time to time, the Funds paid to shareholders, for each Share tendered for redemption, an amount that was based on each of the respective Funds' purported Net Asset Value, as it was then calculated.

109.129.    In calculating each of the Funds' Net Asset Value, the Funds' administrators used and relied on account statements provided by BLMIS purportedly showing securities and investments, or interests or rights in securities and investments, held by BLMIS for the account of Sentry.  Generally, all securities identified on BLMIS account statements were traded on public exchanges and had readily ascertainable market values, and those market values (in addition to, among other items, cash on hand that was identified in the Sentry account statement for the relevant time period) were used in accordance with the Funds' Subscription Agreements, Articles of Association, offering materials and/or other documents to calculate the Net Asset Value of the Shares.

110.130.    In fact, at all relevant times, no securities were ever purchased or sold by BLMIS for Sentry and any stated cash on hand in the BLMIS accounts was based on misinformation and fictitious account statements.  None of the transactions shown on the account statements provided by BLMIS to Sentry ever occurred.  Indeed, no investments of any kind were ever made by BLMIS for Sentry.  At all relevant times, all of the account statements that BLMIS provided to Sentry were entirely and utterly fictitious.  Further, all amounts deposited by Sentry (or by Sigma and Lambda through Sentry) with BLMIS for investment and the purchase

of securities to be held by BLMIS for the account of Sentry were used by Madoff to pay other BLMIS investors or were misappropriated by Madoff for other unauthorized uses.

111.131.    From time to time, to make Redemption Payments, Sentry (and Sigma and Lambda through Sentry) made withdrawals from Sentry's BLMIS accounts (or utilized subscription monies of other investors on hand that were directed for investment in BLMIS). The Funds believed that the amounts provided in connection with such withdrawals represented the proceeds arising from the profitability of or to continue investment in BLMIS.  In fact, however, payments made by BLMIS to Sentry purportedly representing the proceeds of sales of securities or other investment positions were nothing other than the deposits of other BLMIS investors or previous deposits made by Sentry, never invested but rather misused and misappropriated as part of Madoff's fraud.  At all relevant times, payments made from BLMIS to Sentry were made by Madoff to continue and perpetuate his Ponzi scheme and avoid detection of his fraud.  The payments from BLMIS to Sentry were not payments made in the ordinary course of or as part of any business, nor did they have a legitimate business purpose.  Similarly, the Redemption Payments were not made for any legitimate purposes or in the ordinary course of any business.

112.132.    Given the fraudulent nature of BLMIS and its operation as a massive Ponzi scheme, the money paid by the Funds (directly in the case of Sentry and indirectly in the cases of Sigma and Lambda) to BLMIS on account of Sentry was, at all relevant times and unknown to the Funds, misused and misappropriated by Madoff as part of his Ponzi scheme.  At all relevant times, the Funds were insolvent when the Redemption Payments were made or were rendered insolvent, and/or their insolvency was deepened, as a result of the Redemption Payments.

40

**C.**    **Redemption Payments Made or Transferred to Defendants**

~~113.~~133.    During the period from and after April 20, 2004, through November 19, 2008, the Beneficial Shareholders received Redemption Payments totaling USD $51,929,665.41 from Sentry and Sigma in respect of Shares tendered for redemption.

~~114.~~134.    At Defendants' directions and instructions, some or all of the Redemption Payments were received at, upon information and belief, designated United States-based bank accounts.

~~115.~~135.    The dates and amounts of each Redemption Payment received by the Beneficial Shareholders from Sentry, and the bank accounts to which each Redemption Payment was made, are set forth on Exhibit A.  The dates and amounts of each Redemption Payment received by the Beneficial Shareholders from Sigma, and the bank accounts to which each Redemption Payment was made, are set forth on Exhibit B.

~~116.~~136.    At the time those Redemption Payments were made, the Funds had insufficient assets and were unable to pay their debts as they would fall due.  In exchange for each Redemption Payment, each of which constitutes or forms part of a transaction between the Beneficial Shareholders and Sentry and Sigma, Sentry and Sigma received no consideration or consideration of a value that, in money or money's worth, was significantly less than the value, in money or money's worth, of the consideration provided by Sentry and Sigma.

~~117.~~137.    Upon information and belief, the Beneficial Shareholders received Redemption Payments in excess of amounts paid by such person(s) for purchase of their Shares.

**D.**    **Citco Did Not Issue Any Certifications of Net Asset Value in "Good Faith"**

~~118.~~138.    Article 11 of the Funds' Articles provides that "[a]ny certificate as to the Net Asset Value per Share . . . given in good faith by or on behalf of the Directors shall be

41

binding on all parties."  During the relevant period, statements of the Net Asset Value were issued by the Funds' administrators, Citco Fund Services (Europe) B.V. and its delegatee Citco (Canada) Inc. (the "Administrators").  On April 16, 2014, the Judicial Committee of the Privy Council (the "Privy Council") issued a decision in which it held that certain statements of Net Asset Value, in particular, certain monthly emails, contract notes, and monthly account statements issued by the Administrators, constituted "certificates" for the purposes of Article 11 (the "Certificates").   The Privy Council did not, however, address whether such Certificates were given "in good faith."  In carrying out this responsibility, the Administrators and affiliated Citco entities~~Citco companies within Citco Group Limited (collectively, "Citco")~~ acted with a lack of good faith in giving the Certificates.

~~119.~~139.      Over the course of fifteen years, in its capacity as service providers to the Funds, Citco reviewed information concerning BLMIS not available to the general public, and expressed internal alarm about what that information showed with respect to the likelihood of fraud at BLMIS, but turned a blind eye to the reality reflected in the information and instead proceed with issuing the Certificates as if there were no problem.

~~120.~~140.      So grave were the Administrators' internal concerns that they expressed doubts—many years before the fraud was made public—that the Funds' assets with BLMIS even existed, with one employee stating "I will not change my [opinion] as long as I [do] not see evidence that the portfolio exists."  The Administrators also expressed repeated concern over the fact there was no segregation of duties at BLMIS—i.e., BLMIS (i) had discretion over which investments to make and when to make them, such that BLMIS was de facto investment manager, (ii) had actual custody of the Funds' assets, such that BLMIS was de facto custodian, and (iii) was also the broker.  Based upon the proprietary information they reviewed, Citco

42

expressed concern—internally—that BLMIS would be a repeat of the notorious Manhattan Investment Fund fraud of the 1990s "multiplied by a factor of five." Ultimately, unable to resolve their grave concerns, Citco, rather than withdrawing, ceasing to issue Certificates, or sounding a public alarm, made a corporate decision to continue on as service providers—in exchange for an 800% increase in fees.

### 1. Citco Expressed Doubt as to Whether the Funds' Assets at BLMIS Even Existed.

121. 141.        Beginning in 2000, the Administrators ran into trouble with the basic task of verifying the existence of the Funds' assets with Madoff. Initially, Citco expressed serious concerns regarding whether the Funds' Treasury bond transactions actually matched those transactions reported by Madoff because of an apparent "rhythm of trading" each month. The rhythm of trading within Sentry's portfolio appeared too consistent to be true, as the assets included only a limited number of Treasury bonds by each month's end. At the beginning of each month, Madoff would purchase shares and put options and would sell call options, but, like clockwork, would then liquidate all of Sentry's holdings by the 20th of each month. Thus the Administrators wanted to check whether the Treasury bonds even existed at all.

122. 142.        The Administrators could not verify the existence of the assets because the Funds' custodians, Citco Bank Nederland N.V. Dublin Branch and Citco Global Custody (individually, the "Fund Custodian", and collectively, the "Fund Custodians"), did not actually hold them. Instead, Madoff served as his own custodian. Therefore, the custody statements that the Fund Custodians were supposed to generate based on assets in their possession, were instead merely copied, or "shadow booked," from BLMIS account statements. The Fund Custodians were "only the custodian[s] on paper, not in reality" and did not place any trades for the Funds.

43

123.143.    Management within Citco, including Ruud Bodewes ("Bodewes"), the head of internal audit for all of Citco Group, and Ger Jan Meijer ("Meijer"), the head of internal audit for the Administrators, expressed concern about the operations at BLMIS.  In May 2000, Bodewes expressed his concern to the general counsel and manager of Citco Bank Nederland, as well as Meijer, that "[w]ith [the] Manhattan [Investment Fund fraud] in the back of our minds, we, as Citco, may very well be in a potential dangerous situation, since we do not seem to have an independent source to verify the information from BLMIS."  Indeed, Meijer had raised these concerns to Bodewes weeks earlier, warning that Madoff could be "a Manhattan multiplied by a factor of five."

124.144.    In addition to warning Bodewes, Meijer also warned Citco Group's Chief Executive Officer, Christopher Smeets ("Smeets") in May 2000 that "[t]o not react or to react too late does indeed mean that investors once again faithfully deposit tens of millions of USD in the Madoff well (for which we do not know if there is a bottom to it) at month's end," with the understanding that Citco could "already be held personally responsible insofar as we have allowed the subscriptions to take place as of May without a fight."  Smeets acknowledged receipt of Meijer's emails and concerns.  At that time, Meijer emphasized that "with the current knowledge and Citco as asset protector, Citco has a legal obligation to obtain more assurance" of the Funds' assets.

125.145.    However, in what became a familiar pattern, Citco turned a blind eye to the documents and information in their possession.  Citco Group did not address the Administrators' concerns raised in May 2000, and a few months later, Meijer stated:  "[i]t seemed that this affair [was] being put on the back burner and hushed."

44

126.146.    A year later, Meijer again reiterated his concerns about BLMIS's operations, which "remain[ed] unsolved." Meijer warned that "Citco has a risk exposure of more than USD3 billion" and that "[p]robably there are no options to restore this situation from a worst case scenario." He stated: "I will not change my [opinion] as long as I [do] not see evidence that the portfolio exists." Five months later, in January 2002, the Administrators again emphasized that the issues concerning BLMIS posed severe risks to Citco and the Funds' investors. Meijer told Bodewes: "I have been worried about this situation for 2 years (including the risk to the continued existence of Citco), however the same was not taken seriously by certain gentlemen. . . . My intuition (combined with the business that I have seen) tells me that things are not right."

127.147.    In January 2002, Meijer insisted to Bodewes that: "Citco must now seriously take the possibility that everything is really wrong with [the Funds'] account, as well as the possibility that everything will come into view within 2 years. . . . Personally I think the chance [that something is wrong] is at least 50%." Meijer persisted that there was "still the opportunity to more or less direct the whole process, and search out the best way out with the help of good lawyers (legal contingency plan). Otherwise you run the risk that the scene will later be determined by others." However, in response Citco Group's management, and Bodewes in particular, failed to undertake a meaningful investigation into Meijer's doubts regarding the existence of the Funds' assets, and instead continued acting as a service provider for the Funds for over six more years.

128.148.    In fact, multiple members of the Administrator's management tried to prevent Meijer from asking questions. John Verhooren ("Verhooren"), a member of Citco's administration services management team, actually knew that Meijer had raised concerns about

45

the existence of the Funds' assets for years, but deliberately ignored those concerns. For example, in May 2000, Verhooren acknowledged that the lack of segregation of duties and trading patterns at Madoff were not new discoveries, and many people at Citco had already recognized these phenomena. Later, in response to concerns raised in 2001, Verhooren again rebuffed Meijer's insistence that Citco was facing "an enormous risk exposure." Instead, Verhooren told Meijer to stop raising the issue and claimed that Citco would try to meet with Madoff to investigate. However, neither Verhooren nor any member of the Administrator's staff ever gained sufficient evidence that the Funds' assets existed from Madoff.

### 2.    Citco Failed To Obtain Evidence Of the Existence of the Funds' Assets.

129.149.    Citco not only expressed internal concern regarding whether the Funds' assets with BLMIS even existed—it knew that BLMIS would not confirm their existence for Citco as the Funds' service providers.

130.150.    The Administrators' audit reports designated Sentry as a non-compliant fund on their "watch list" as a result of the lack of segregation of duties at BLMIS. Each year from 2000 through 2006, the Administrators recommended that Citco either confirm the existence of the Funds' assets held by BLMIS or resign as service providers. On three occasions between May 2000 and December 2002, Citco attempted to verify the existence of the Funds' assets at BLMIS. All attempts failed.

131.151.    In May 2000, Citco set up a meeting with Madoff to gain "independent confirmation of the[] existence" of the Funds' assets, particularly the Treasury bills, and to determine how Madoff derived share prices from the markets. However, this effort failed. BLMIS did not verify the existence of the assets, and Citco concluded internally that the meeting had not provided "a full disclosure of [the] assignment."

46

132.152.    In July 2001, Bodewes had attempted to assess the concerns raised by Meijer in an internal due diligence memorandum. However, Bodewes's due diligence was limited to a review of Citco's proprietary documents because Citco was concerned that permitting "an on-site audit at [BLMIS] premises may hurt the relationship with [the Fund], resulting in a possible loss of [a] USD 1.5 million dollar fee income." Even so, based on the documents and information in Citco's possession, Bodewes shared Meijer's concerns about BLMIS's operations, and concluded that losses at BLMIS could be hidden, leaving Citco ultimately liable to the Funds' shareholders. Bodewes also noted that the two man audit firm used by BLMIS did not "match up" with the size of BLMIS's business. Indeed, multiple Administrator employees acknowledged that the small size of Madoff's accounting firm posed a risk, given that the size of the firm was not large enough to audit the amount of assets purportedly managed by BLMIS.

133.153.    Smeets, Citco Group's CEO, received Bodewes' memo regarding the issues at BLMIS, including the issues posed by the size of Madoff's audit firm. Citco Group's management responded that they would like to "work this out" with Madoff, but never met with him in 2001. By an email dated 6 February 2002, Unternaehrer of Citco Group stated that Citco wanted evidence the T Bills existed. In December 2002, Citco once again "attempt[ed] to get conclusive proof" from Madoff that Sentry's portfolio was in BLMIS custody and to have "Madoff . . . provide evidence of the existence/custody of the positions." Before the meeting, Meijer directed a member of the internal audit group at Citco to "[p]roperly record what you have done and what you have not been able to determine. . . . It is a troublesome task insofar as Madoff is not known for his openness." However, the meeting did not include any meaningful discussion with Madoff regarding the holdings purported to be in his custody. The employee,

Albert van Nijen, reported back that the Administrators' "mission" to increase "Citco's comfort level with respect to the existence of the assets in relation to [Citco's] responsibilities as [Fund] Custodian[s]" had again failed.   On 27 December 2002 Bodewes reported to the executive committee of Citco Group that as long as the position of Sentry with BLMIS was not independently verified "there will be doubts".

134.154.    After Citco's third failed attempt, Citco never again tried to gain evidence from Madoff that the Funds' assets existed until his fraud was ultimately exposed in December 2008.    In addition, Meijer noted that "Madoff [was] no[t] known" to Citco's external traders, even though his investment strategy required selling major quantities of call options each month. In an email to Bodewes, Meijer stated, "I visited the Madoff website. . . . According to the investment policy, the fund needs to sell major quantities of call options on the market each month.  I absolutely do not trust it!!!!"

135.155.    Meanwhile, through the entire period, Citco continued to issue the Certificates.

### 3.    Citco Negotiated For Higher Fees As Reimbursement For the "Risks" of Doing Business With Madoff.

136.156.    Facing grave concerns regarding the Funds' assets placed with BLMIS, Citco put its financial interests ahead of its duties to the Funds and the Funds' investors.

137.157.    By 2002, Citco knew that the Funds' holdings could not be verified, knew that BLMIS cleared its own trades, and knew that Citco's efforts to reconcile Madoff's operations had failed.  That year, Citco's executive committee put credit line requests from the Funds "on hold until . . . the 'investigation' on Fairfield" was complete, because Citco was concerned about its exposure to liabilities well beyond the loans in the case of fraud.  Smeets and

Citco's management were aware that the credit line requests were on hold while Citco tried to "get as much comfort as possible" that BLMIS was not a fraud.

138.158.    Two years later, in February and March 2004, the Fund Custodian decided to cancel one of its credit facilities with Sentry following its discovery that AIG had pulled its investments from BLMIS altogether.  Specifically, the Administrator's management, including Meijer, Verhooren, and William Keunen—who was responsible for the entire division of administration services at Citco—found out that "the risk team of AIG took the decision to get out from all Madoff exposure . . . [t]hey are scared with the structure . . . ."  It appears that at least some Citco Group management wanted the Fund Custodian to resign: by an email of 6 February 2004, Keunen informed the Administrator that Unternaehrer of Citco Group had decided the Fund Custodian should step down as custodian.  At this time, Smeets was kept informed and aware of Citco's concerns regarding AIG's withdrawal from Madoff.  A few months later, in or about September 2004, Citco's board of directors made the decision to place the Fund Custodians' and Administrators' business with the Funds "under scrutiny" and "to close down all credit relationships . . . to decrease [Citco's] exposure."  Citco knew that its credit relationship with the Funds would expose it to liability because of BLMIS's role as custodian, among other reasons.

139.159.    By 2006, Citco considered resigning as service providers.  The Fund Custodians told Citco Group's management, including Smeets: "We are taking a risk and we only get US$60K per year!"

140.160.    Instead, Citco negotiated a new fee arrangement. The new arrangement calculated the Custodians' rate as one basis point (one hundredth of one percent) of the Funds' total Net Asset Value.  In other words, Citco's fees for the Fund Custodians' services were now

49

directly tied to the Net Asset Value as determined by the Administrators. Citco decided "[o]n that basis" to stay on as Fund Custodians because Sentry's Net Asset Value at that time, based principally on the assets purportedly at BLMIS, was approximately "$5bn, i.e., fees of $500k."

~~141.~~161.    Simply put, Citco accepted dramatically higher fees—tied directly to the Net Asset Value certified by Citco—in exchange for the risks to Citco of doing business with BLMIS, as well as its continued silence regarding BLMIS's role as custodian of the Funds' assets. Ultimately, Citco's fees increased by 800%.

~~142.~~162.    Internally, Citco knew that: (i) the Administrators did not consistently price the Funds' portfolios independently and typically relied exclusively on the share pricing information supplied by Madoff; and (ii) the Fund Custodians did not have custody of the Funds' portfolios.

~~143.~~163.    Citco failed to verify the pricing information for the Funds' portfolio from independent sources and instead relied on BLMIS statements, even though it knew that such account statements contained incorrect information. Accountants working for the Administrators discovered on numerous occasions that the trades reported by BLMIS contradicted the public daily price ranges for corresponding trades. When the Administrators' personnel discovered that the reported share or option prices reported by Bloomberg and Madoff differed, they used the public price in calculating the Net Asset Value reflected in the Certificates. Citco thus turned a blind eye to its knowledge that BLMIS issued account statements with incorrect pricing information.

~~144.~~164.    Citco acted with a lack of good faith by issuing Certificates in spite of its knowledge that: (1) BLMIS's transactions were likely impossible, given its awareness that "Madoff always [knew] precisely when to buy and sell;" (2) Madoff was the only broker-dealer

50

Citco worked with that provided settlement date transaction confirmations only, rather than trade date confirmations; and (3) Madoff insisted that Citco book all trades for the Funds manually, rather than through automated or electronic means, which directly contradicted Citco's own "policy to set up [electronic] reconciliation programs for each fund and to avoid manual entries as much as possible;" and, within its own records, "there [were] differences between the custody statements of Citco Bank and Madoff that [were] not being analyzed" by Citco.

145.165.       This lack of good faith permeated the entire Citco organization.  Until 2008, the Administrators and the Fund Custodians worked hand-in-hand with multiple other "Citco" entities to generate the Certificates for the Funds and served as the intermediaries for all subscription funds invested by Defendants under the Subscription Agreements.  Under Citco Group's direction and control, the Administrators issued Certificates without good faith and with willful blindness to the fact that they could not confirm whether the Funds' assets actually existed.

146.166.       From the top down, Citco saw and appreciated, but consciously disregarded, the risks to the Fund's investors posed by Madoff's operations.  The Administrators and all other "Citco" subsidiaries served at the whim of Citco Group Ltd., which controlled the day-to-day operations of the Administrators and the issuance of Certificates showing an inaccurate and inflated Net Asset Value under the Administration Agreements (as amended from time to time) with the Funds.  Irrespective of which "Citco" entity the Funds' engaged, at all relevant times the Funds' were provided services from and on behalf of "Citco" as a whole from at least eighteleven separate entities, including: Citco Group Ltd.; Citco Global Custody NV; Citco Global Custody (NA) NV; CGC (NA); Citco Fund Services (BVI); Citco Fund Services

(Europe) B.V.; Citco (Canada) Inc.; ~~and~~ Citco Global Security Services; Citco Bank Nederland N.V. and Citco Bank Nederland N.V. Dublin Branch, and Citco Banking Corporation N.V..

167.   By virtue of the foregoing conduct, Citco issued the Certificates without good faith.  The Funds were the primary victims of Citco's conduct and its lack of good faith in issuing the Certificates.

**E.    The Citco Subscribers Themselves Knew of or Consciously Disregarded the BLMIS Fraud**

168.   Upon information and belief, all of the foregoing information related to BLMIS was conveyed to Citco Bank Nederland N.V.  At all relevant times, Citco Bank Nederland N.V. Dublin Branch was a wholly owned subsidiary of Citco Banking Corporation N.V., and, upon information and belief, Citco Bank Nederland N.V. worked with Citco Bank Nederland N.V. Dublin Branch and Citco Banking Corporation N.V. with respect to their work for the Funds. The Citco Banks knew of or consciously disregarded the BLMIS fraud and the bases thereof.  In addition to the foregoing:

- In May 2000, Bodewes and Meijer emailed Renger Boonstra, the general counsel of Citco Bank Nederland N.V., recognizing that the lack of segregation of duties in BLMIS posed a unique issue because they could not "be sure" that the Fund actually owned the reported holdings.  Boonstra warned that "[w]ith [the] Manhattan [Investment Fund Fraud] in the back of our minds, we as Citco, may very well be in a potential dangerous situation, since we do not seem to have an independent source to verify the information from BLMIS."  His proposed salutation involved resignation or obtaining segregation of duties.

- Meijer responded to Bodewes and Boonstra observing that BLMIS should have a FED book entry account for treasury bonds and proposed that someone should

check whether the transactions for the Funds matched the transactions as they appeared on FED statements or FED confirmations received by BLMIS. He expressed the view that Citco was selling asset protection that was not covered by sufficient evidence. No evidence suggests that anybody checked the FED statements.

- On August 28, 2000, Meijer emailed Bodewes expressing his concern that the issues with BLMIS were "being put on the back burner and being hushed." On September 13, 2000, Bodewes forwarded the email from Meijer to representatives from Citco Bank Nederland N.V. and the Administrator. In a separate email to Laurens Luckmann, a supervisory director of Citco Banking Corporation, Bodewes stated that Meijer was "a bit concerned for a second Manhattan case" [a fraud case] and also noted that a managing director of Citco Bank Nederland N.V., Willem Holst, was not comfortable with the situation.

- On September 18, 2000, Holst replied to Bodewes' September 13 email stating support for Meijer's proposal that PricewaterhouseCoopers confirm the existence of assets in BLMIS's custody, but indicated that it should be done not once a year but every six months.

- In an internal memorandum circulated on July 13, 2001, Bodewes concluded that the two-man audit firm being used by BLMIS did not "match up" to the size of the company. He added that there was a "concrete" risk that losses were being hidden and the custody statements overstated. On July 27, 2001 Luckmann forwarded the memo to all Citco executive directors requesting that it be

discussed at their next meeting. After this meeting, however, new administration and custodian agreements were executed between Citco and the Funds.

- On or about February 5, 2004, Unternaehrer was advised that AIG had decided to exit their investments with BLMIS citing concerns over the structure. That led Luckmann (by email dated February 6, 2004, and following consultation with Smeets) to give instructions for Citco companies to redeem their own shares in Sentry.

- In emails dated February 6, 2004, Keunen advised the Administrator and Citco Group management that Unternaehrer had decided that Citco Bank Nederland N.V. would step down as the Fund Custodian.

- On August 25, 2004, Holst emailed Luckmann acknowledging that there had been a problem with the position of BLMIS from the beginning because the Administrator and the Fund Custodian totally depend on BLMIS. That email led Luckmann to email Scott Case (another managing director of Citco Bank Nederland N.V.), who responded the same day observing that he had no idea why Citco Bank Nederland N.V. continued to fulfill a "shadow" custody function.

- In an email dated September 9, 2004, Ronald Irausquin of Citco Bank Nederland N.V. confirmed that all business with Sentry, both on the part of the Administrator and the Fund Custodian, was meant to have been placed under scrutiny by "the Board" and that a decision had been made to close down all credit relationships with Sentry.

- In an email dated September 16, 2004 to the executive committee members and to Keunen and Luckmann, Unternaehrer stated that he had met with Cornelis Boele

54

of Fairfield Greenwich Limited and that there had also been a conference call with legal counsel and Case of Citco Bank Nederland N.V., at which agreement had been reached to make changes to the custody agreement, the Private Placement Memorandum and sub-custody agreement in order to make "everybody comfortable with the structure."  When Luckmann queried whether the custody fee could be changed from a fixed fee to a basis points structure, Unternaehrer replied "the main purpose here is to take away possible liabilities while maintaining CFS business."

- In an email dated October 14, 2004 to Keunen and Luckmann, William DeRosa, general manager at Citco Bank Nederland N.V., stated "Regarding Fairfield, a discussion took place wherein the question was posed as to what was going on with it because we thought we were resigning as custodians.  [Unternaehrer] met with them and it now appears we are restructuring the relationship.  The concern was that even if we restructured the legal agreement to meet the reality of how this account is processed, we still had some risk."

- On or about November 2, 2004, Boonstra noticed that BLMIS's role as custodian and investment manager contravened clause 2.38 of the Irish Stock Exchange's Listing Requirements and Procedures.

- On an October 6, 2005 email between Holst, DeRosa, Boonstra, and others, Boonstra stated that "we are not really the custodian for Fairfield Sentry, just a sub-custodian."

55

- A review by Citco Bank Nederland N.V.'s audit division in December 2007 concluded that it was not able to validate that client instructions were correctly processed by BLMIS.

- As late as 2008, Citco Bank Nederland N.V. employees, including Boonstra and DeRosa, claimed that the structure between the Funds and BLMIS was a "curious anomaly" and that Citco felt uncomfortable.

- In December 2009, Boonstra, DeRosa, Case, and others were part of an email exchange, which recapped a discussion with Mark McKeefry regarding the bank's preference to stop down as Fund Custodian after a finding that the Fund said it complied with the requirements of the Irish Stock Exchange after misrepresenting that the custodian and investment manager were separate.

169.    As alleged *supra*, all Citco entities worked collaboratively with respect to their work for the Funds.  The free flow of information and co-ordination of action between the various Citco entities, including the Citco Banks and the Citco Record Subscriber, demonstrate that all Citco entities worked in collaboration with each other.  Additionally, at all relevant times, the Citco Record Subscriber and the Citco Banks were wholly-owned subsidiaries of the Citco Group, and all the Citco entities worked under the ultimate direction of the Citco Group's executive committee.  At all relevant times, the Citco Group was aware of or consciously disregarded the potential fraudulent activity, and still directed or consented to the Administrator's and the Fund Custodians' involvement with BLMIS.

- Following the emails and reports from the Administrator regarding the visit to BLMIS, Smeets (Chief Executive Officer of Citco Group) arranged an executive committee meeting on January 31, 2002 to discuss BLMIS.

- The revised administration agreement between the Funds and the Administrator dated April 10, 2002, was executed with either the agreement of or at the direction of the Citco Group because an executive director at the Citco Group, Unternaehrer, sent an email dated February 6, 2002 to the Administrator that the Funds and BLMIS were under investigation.

- A report was forwarded to the Citco Group's executive committee on December 27, 2002 regarding the Administrator's visit to BLMIS expressing the Administrator's concerns with BLMIS, but a revised administration agreement was still executed between the Administrator and the Funds on February 20, 2003.

- In early 2002, Citco Group's executive committee closed some of the Fund's credit facilities to limit its exposure, and then put the credit line requests from the Funds "on hold until . . . the 'investigation' on Fairfield [the Fund]" was complete because the executive committee was concerned that the Fund Custodian and Administrator were exposed to liabilities well beyond the loans in the case of fraud.  This issue arose again in 2004 when the Funds Custodian decided to cancel on of its credit facilities with the Fund following the discovery by the Citco Group's executive committee that another investor had pulled its investments from BLMIS.  At all times, the executive committee was in charge of the investigation and either permitted or ordered the Citco entities to proceed.

- In relation to the dispute as to whether BLMIS's role as custodian and investment manager contravened the Irish Stock Exchange's Listing Requirements and Procedures, counsel for Citco Group told the Administrator that it was prepared to

tolerate potentially misleading or inaccurate information being provided to the Irish Stock Exchange to continue its relationship with the Funds.

170.    Through the above-alleged conduct, the Citco Subscriber knew, as early as 2000, that there was no segregation of duties at BLMIS, and that the Citco Subscriber did not have an independent source to verify information received from BLMIS.  The Citco Subscriber identified this risk internally for at least seven consecutive years and flagged it as a known and recognized problem in internal reports.

171.    Employees of the Citco Subscriber expressed concerns about whether the Funds' assets with BLMIS even existed.  Further, the Citco Subscriber recognized a pattern of trading with BLMIS, whereby BLMIS purchased shares and put options and sold call options at the beginning of each month, but liquidated all positions towards the end of the month.  The Citco Subscriber learned that BLMIS did not welcome inquiries regarding its practices and also acknowledged internally that this lack of transparency posed a significant risk to investors. However, upon information and belief, the Citco Subscriber did not make any efforts after 2002 to verify the existence of the assets, establish a line of communication with BLMIS or investigate BLMIS' trading practices.  Further, the Citco Subscriber expressed concerns regarding potential similarities between BLMIS and the Manhattan Investment Fund fraud exposed in 2000.

~~147.~~172.    In an effort to limit their own exposure and risk, the Citco Subscriber, including the Citco Banks, considered resigning as the Funds' service providers.  However, they ultimately decided to stay on, in exchange for dramatically increased fees.

~~148.~~173.    As set forth above, and in accordance with the B&C Agreements between the Defendants and the Citco Subscriber, t~~T~~he Citco Subscriber served as trustee, agent, representative, nominee or custodian for the ~~Beneficial Shareholders~~Defendants in connection

with ~~their~~ investments in the Funds~~, including, by: subscribing to Shares of Sentry and Sigma on behalf of the Beneficial Shareholders, maintaining custody of the Shares as record shareholders, paying redemption proceeds from the Shares of Sentry and Sigma to the Beneficial Shareholders,~~ and otherwise exercis~~ing~~ control, and as per the B&C Agreements, specific direction over the Shares of Sentry and Sigma on behalf of the Defendants.

~~149.~~174.    Further, each of the Subscription Agreements, executed by the Citco Subscriber, manifested the ~~Beneficial Shareholders'~~Defendants' consent for the Citco Subscriber to act on behalf of and subject to the ~~Beneficial Shareholders~~Defendants' control in accordance with the B&C Agreements.

~~150.~~175.    In executing the Subscription Agreements, the Citco Subscriber accepted and agreed to act on behalf of the ~~Beneficial Shareholders~~Defendants.

176.    As described above, the Citco Record Subscriber and the Citco Banks were aware of the irregularities at BLMIS at all relevant times during which they acted on behalf of the Defendants pursuant to the Subscription Agreements and the B&C Agreements in connection with Defendants' investments in the Funds that ultimately were invested in BLMIS. They performed these services for the Defendants while possessing the knowledge of the irregularities at BLMIS. As set forth above, and in accordance with the B&C Agreements, at all times this knowledge was relevant if not material to Defendants' investing in the Funds to participate in the Funds' investments in BLMIS.

~~151.~~177.    Accordingly, the Defendants/Beneficial Shareholders, except for Sigma and Lambda, who were primary victims of Citco's conduct, had the same knowledge as Citco, the Citco Record Subscriber and the Citco Banks regarding all relevant matters relating to BLMIS and the Funds' Net Asset Values at all relevant times.

59

**E.F.    Exposure of Madoff's Fraud**

152.178.    On December 11, 2008, federal agents arrested Madoff for violation of federal securities laws.  On that same day, the United States Attorney brought criminal charges against Madoff, alleging that Madoff ran a multi-billion dollar Ponzi scheme.  See United States v. Madoff, No. 08-mj-2735 (S.D.N.Y., filed Dec. 11, 2008).  Upon arrest, Madoff was reported to have told the agents that "there is no innocent explanation" for the fraudulent scheme he had orchestrated and confessed that he "paid investors with money that wasn't there."

153.179.    On December 11, 2008, the United States Securities and Exchange Commission ("SEC") filed an emergency action in the Southern District of New York to halt ongoing fraudulent offerings of securities and investment advisory fraud by Madoff and BLMIS. See SEC v. Madoff, No. 08-cv-10791 (S.D.N.Y. filed Dec. 11, 2008). On February 9, 2009, the SEC submitted to the Court a proposed partial judgment, to which Madoff consented, imposing a permanent injunction and continuing relief against him, including a permanent freezing of his assets.

154.180.    In March 2009, Madoff pleaded guilty to the criminal charges brought against him.  In his plea allocution, Madoff confessed: "for many years up until my arrest on December 11, 2008, I operated a Ponzi scheme through the investment advisory side of my business, Bernard L. Madoff Securities LLC."  As Madoff himself described how the scheme worked:

> The essence of my scheme was that I represented to clients and prospective clients who wished to open investment advisory and individual trading accounts with me that I would invest their money in shares of common stock, options and other securities of large well-known corporations, and upon request, would return to them their profits and principal.  Those representations were false because for many years up and until I was arrested on December 11, 2008, I never invested those funds in the securities, as I had promised.  Instead, those funds were deposited in a bank account at Chase Manhattan Bank.  When clients wished to

receive the profits they believed they had earned with me or to redeem their principal, I used the money in the Chase Manhattan bank account that belonged to them or other clients to pay the requested funds.

~~155.~~181.    Madoff further confessed to covering up his fraud by fabricating false trade confirmation and account statements:

> To further cover-up the fact that I had not executed trades on behalf of my investment advisory clients, I knowingly caused false trading confirmations and client account statements that reflected the bogus transactions and positions to be created and sent to clients purportedly involved in the split strike conversion strategy, as well as other individual clients I defrauded who believed they had invested in securities through me. The clients receiving trade confirmations and account statements had no way of knowing by reviewing these documents that I had never engaged in the transactions represented on the statements and confirmations.

~~156.~~182.    Madoff is now serving a 150-year sentence in federal prison.

## ~~F.~~G.    The Funds' Estates in Liquidation

~~157.~~183.    Following the revelation of Madoff's fraud, the Funds' boards of directors suspended any further redemptions of Shares and the calculation of the Funds' Net Asset Values. As of December 2008 and presently, Sentry, Sigma, and Lambda had, respectively, approximately 4.7 million, 3.9 million, and 0.2 million shares outstanding.

~~158.~~184.    In 2009, the Funds were put into liquidation proceedings in the BVI.

~~159.~~185.    On February 27, 2009, a secured creditor of Lambda commenced proceedings in the BVI Court pursuant to the BVI Insolvency Act seeking the appointment of a liquidator over Lambda (the "Lambda Proceeding"). The Lambda Proceeding is pending in the BVI Court as claim number BVIHC(COM)2009/74.

~~160.~~186.    On April 21, 2009, ten shareholders applied to the BVI Court for the appointment of a liquidator over Sentry (the "Sentry Proceeding"). The Sentry Proceeding is pending in the BVI Court under claim number BVIHC(COM)2009/136.

161.187.    On April 23, 2009, a shareholder applied to the BVI Court for the appointment of a liquidator over Sigma (the "Sigma Proceeding" and collectively with the Lambda Proceeding and the Sentry Proceeding, the "BVI Liquidation Proceedings"). The Sigma Proceeding is pending in the BVI Court under claim number BVIHC(COM)2009/139.

162.188.    As alleged above, the BVI Court issued orders – the BVI Appointment Orders – appointing the Foreign Representatives as liquidators of the Funds. Pursuant to the BVI Appointment Orders, the Foreign Representatives are responsible for all aspects of the Funds' business, including protecting, realizing, and distributing assets for the Funds' estates.

163.189.    The Redemption Payments that were made to Defendants were mistaken payments and constituted or formed part of avoidable transactions, and generally represent assets of Sentry and Sigma's estates that Defendants are not entitled to keep.

## FIRST CLAIM
### *(Unjust Enrichment- Against All Defendants)*

164.190.    Sentry and Sigma (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma) repeat and allege again the allegations contained in paragraphs 1 through 164189 above as if set forth herein.

165.191.    Upon information and belief, the Citco Subscriber may have subscribed to all or some portion of the Shares issued to it under the Subscription Agreements in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

166.192.    Upon information and belief, the Citco Subscriber may have paid to or credited some or all of the Redemption Payments received by it from Sentry and Sigma to accounts of the Beneficial Shareholders. These Redemption Payments did not, as Sentry and Sigma mistakenly believed, represent the proceeds arising from the profitability of or to continue

investment in BLMIS.  Instead, Redemption Payments were made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

167.193.    Neither the Citco Subscriber nor the Beneficial Shareholders provided valuable consideration to Sentry and Sigma in exchange for the Redemption Payments or any portion thereof received by them, in that they received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

168.194.    To the extent that a Beneficial Shareholder received any portion of the Redemption Payments paid to the Citco Subscriber in its capacity as trustee, agent, representative, or nominee for a Beneficial Shareholder, such Beneficial Shareholder has been unjustly enriched to the detriment of Sentry and Sigma and other shareholders and creditors of Sentry and Sigma.

169.195.    It would offend principles of equity and good conscience to permit any Beneficial Shareholders to retain the Redemption Payments made by Sentry and Sigma.

170.196.    The Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma, are entitled to recover from any Beneficial Shareholders an amount equal to any portion of any Redemption Payments received by them, or, in the alternative, an amount equal to the amount of all Redemption Payments received by any Beneficial Shareholders less the amount of redemption payments that such Beneficial Shareholders would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## SECOND CLAIM
### (Money Had and Received-Against All Defendants)

~~171.~~197.        Sentry and Sigma (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma) repeat and allege again the allegations contained in paragraphs 1 through ~~171~~196 above as if set forth herein.

~~172.~~198.        Upon information and belief, the Citco Subscriber may have subscribed to all or some portion of the Shares issued to it under the Subscription Agreements in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

~~173.~~199.        Upon information and belief, the Citco Subscriber may have paid to or credited some or all of the Redemption Payments received by it to accounts of the Beneficial Shareholders.  As alleged above, to the extent amounts were withdrawn from BLMIS to make Redemption Payments to the Citco Subscriber, each of such payments consisted of monies deposited with BLMIS for investment, but never invested and instead misappropriated as part of Madoff's fraud.  The source of these Redemption Payments did not, as Sentry and Sigma mistakenly believed, represent the proceeds arising from the profitability of or to continue investment in BLMIS.

~~174.~~200.        Neither the Citco Subscriber nor the Beneficial Shareholders provided valuable consideration to Sentry and Sigma in exchange for the Redemption Payments or any portion thereof received by them, in that they received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

~~175.~~201.        To the extent that a Beneficial Shareholder received any portion of the Redemption Payments paid to the Citco Subscriber in its capacity as trustee, agent,

representative, or nominee for the Beneficial Shareholders, such Beneficial Shareholders have been unjustly enriched to the detriment of Sentry and Sigma and other shareholders and creditors of Sentry and Sigma.

176.202.    Furthermore, the Beneficial Shareholders were not entitled to receive the Redemption Payments paid to the Citco Subscriber upon the redemption of Shares issued to it in its capacity as trustee, agent, representative, or nominee for the Beneficial Shareholders because the amounts transferred by Sentry with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value which caused the payment received for redemption of Shares to be in excess of the Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

177.203.    To the extent the Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma, the loss will be disproportionately and unjustly borne by Sentry and Sigma and other shareholders and creditors of Sentry and Sigma.

178.204.    It would offend principles of equity and good conscience to permit the Beneficial Shareholders to retain the Redemption Payments made by Sentry and Sigma.

179.205.    The Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma, are entitled to recover from the Beneficial Shareholders an amount equal to any portion of any Redemption Payments received by them, or, in the alternative, an amount equal to the amount of all Redemption Payments received by the Beneficial Shareholders less the amount of redemption payments that such Beneficial Shareholders would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

### THIRD CLAIM
*(Mistaken Payment-Against All Defendants)*

~~180.~~206.        Sentry and Sigma (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma) repeat and allege again the allegations contained in paragraphs 1 through ~~180~~205 above as if set forth herein.

~~181.~~207.        As described above, Sentry and Sigma made each of the Redemption Payments to the Citco Subscriber under the mistaken belief that the amounts paid to the Citco Subscriber represented the proceeds arising from the profitability of or to continue investment in BLMIS and were based upon the Net Asset Value of Shares redeemed based upon the true facts at that time.

~~182.~~208.        However, upon information and belief, BLMIS did not hold any securities or interests of securities on account for Sentry and the payments made by BLMIS to Sentry to fund Redemption Payments to the Citco Subscriber represented, in fact, money deposited with BLMIS by other BLMIS investors or previous deposits made by Sentry with BLMIS, never invested but rather misused and misappropriated as part of Madoff's fraud.

~~183.~~209.        Upon information and belief, the Citco Subscriber may have paid to or credited some or all of the Redemption Payments received by it to accounts of the Beneficial Shareholders.  These Redemption Payments did not, as Sentry and Sigma mistakenly believed, represent the proceeds arising from the profitability of or to continue investment in BLMIS.

~~184.~~210.        Additionally, the Beneficial Shareholders were not entitled to receive the Redemption Payments received by the Citco Subscriber upon the redemption of Shares issued to it in their capacity as trustee, agent, representative, or nominee for the Beneficial Shareholders because, as was unknown to Sentry and Sigma, the amounts transferred with respect to these

66

Redemption Payments were based on a miscalculated and inflated Net Asset Value, which caused the Redemption Payments received by the Citco Subscriber for its redemption of Shares to be in excess of the Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

185.211.    Neither the Citco Subscriber nor the Beneficial Shareholders provided valuable consideration to Sentry and Sigma in exchange for the Redemption Payments or any portion thereof received by them, in that they received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

186.212.    The Redemption Payments, while benefiting any Beneficial Shareholder receiving any portion thereof, were made to the detriment of Sentry and Sigma and other shareholders and creditors of Sentry and Sigma.

187.213.    To the extent the Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma, the loss will be disproportionately and unjustly borne by Sentry and Sigma and other shareholders and creditors of Sentry and Sigma.

188.214.    It would thus offend principles of equity and good conscience to permit any Beneficial Shareholder to retain the Redemption Payments.

189.215.    The Foreign Representatives in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma are entitled to recover from any Beneficial Shareholders an amount equal to any portion of any Redemption Payments received by them, or, in the alternative, an amount equal to the amount of all Redemption Payments received by any Beneficial Shareholders less the amount of redemption payments that such Beneficial

67

Shareholders would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## FOURTH CLAIM
### *(Constructive Trust-Against All Defendants)*

~~190.~~216.    Sentry and Sigma (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma) repeat and allege again the allegations contained in paragraphs 1 through ~~190~~215 above as if set forth herein.

~~191.~~217.    As described above, upon receipt of a redemption request, Sentry and Sigma made each of the Redemption Payments to the Citco Subscriber based on a miscalculated and inflated Net Asset Value, which caused those Redemption Payments to be in excess of the Net Asset Value of redeemed Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

~~192.~~218.    As alleged above, the Redemption Payments generally represented the proceeds arising from or to continue investment in what the world now knows was Madoff's Ponzi scheme.    Accordingly, these Redemption Payments did not, as Sentry and Sigma mistakenly believed, represent the proceeds arising from the profitability of (or to continue investment in) BLMIS.

~~193.~~219.    Upon information and belief, the Citco Subscriber may have paid some or all of the Redemption Payments it received to the Beneficial Shareholders.

~~194.~~220.    By reason of their receipt of some or all of the Redemption Payments, the Beneficial Shareholders have been unjustly enriched to the detriment of Sentry and Sigma and other shareholders and creditors of Sentry and Sigma.

68

195.221.      Furthermore, the Beneficial Shareholders were not entitled to receive the Redemption Payments because the amounts transferred with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payment received by the Citco Subscriber for its redemption of Shares to be in excess of the Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

196.222.      It would offend principles of equity and good conscience to permit the Beneficial Shareholders to retain the Redemption Payments.

197.223.      By reason of the foregoing, a constructive trust should be imposed on the Redemption Payments that were received by the Beneficial Shareholders from Sentry and Sigma for the benefit of the Foreign Representatives and Sentry and Sigma and other shareholders and creditors of Sentry and Sigma.

## FIFTH CLAIM
### (Unfair Preference Pursuant to Section 245 of the BVI Insolvency Act - Against All Defendants)

198.224.      The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry, repeat and allege again the allegations contained in paragraphs 1 through 198223 above as if set forth herein.

199.225.      Section 245 of the BVI Insolvency Act provides:

(1) Subject to subsection (2), a transaction entered into by a company is an unfair preference given by the company to a creditor if the transaction (a) is an insolvency transaction; (b) is entered into within the vulnerability period; and (c) has the effect of putting the creditor into a position which, in the event of the company going into insolvent liquidation, will be better than the position he would have been in if the transaction had not been entered into.

(2) A transaction is not an unfair preference if the transaction took place in the ordinary course of business;

(3) A transaction may be an unfair preference notwithstanding that it is entered into pursuant to the order of a court or tribunal in or outside the Virgin Islands.

(4) Where a transaction entered into the by the company within the vulnerability period has the effect specific in subsection 1(c) in respect of a creditor who is a connected person, unless the contrary is proved, it is presumed that the transaction was an insolvency transaction and that it did not take place in the ordinary course of business.

~~200.~~226.    A creditor is defined in Section 9 of the BVI Insolvency Act as follows:

(1) A person is a creditor of another person (the debtor) if he has a claim against the debtor, whether by assignment or otherwise, that is, or would be, an admissible claim in (a) the liquidation of the debtor, in the case of a debtor that is a company or a foreign company; or (b) the bankruptcy of the debtor, in the case of a debtor who is an individual.

~~201.~~227.    The BVI Insolvency Act further defines an "insolvency transaction" as a transaction that: "(a) is entered into at a time when the company is insolvent; or (b) . . . causes the company to become insolvent."  BVI Insolvency Act § 244(2).

~~202.~~228.    For the purposes of assessing unfair preferences under Section 245 of the BVI Insolvency Act and undervalue transactions under Section 246 of the BVI Insolvency Act, a company is "insolvent" if: "(c). . . (ii) the company is unable to pay its debts as they fall due." BVI Insolvency Act §§ 8, 244(3).

~~203.~~229.    For purposes of Section 245 and Section 246 of the BVI Insolvency Act, "vulnerability period" means "in the case of a transaction entered into with, or a preference given to, a connected person, the period commencing two years prior to the onset of insolvency and ending on the appointment of the administrator or, if the company is in liquidation, the liquidator . . . ."  BVI Insolvency Act § 244(1).

~~204.~~230.    The "onset of insolvency" is defined as: "the date on which the application for the appointment of the liquidator was filed."  BVI Insolvency Act § 244(1).  Thus, the vulnerability period, for each of the Funds, is the period commencing two years prior to the

70

application for the appointment of the Liquidators for each Fund and ending on the date of the appointment of the liquidators of each Fund.

205.231.        A "connected person" is:

(1) . . . one or more of the following

(a) a promoter of the company;

(b) a director or *member of the company* or of a related company;

(c) a beneficiary under a trust of which the company is or has been a trustee;

(d) a related company;

(e) another company one of whose directors is also a director of the company;

(f) a nominee, relative, spouse or relative of a spouse of a person referred to in paragraphs (a) to (c);

(g) a person in partnership with a person referred to in paragraphs (a) to (c); and

(h) a trustee of a trust having as a beneficiary a person who is, apart from this paragraph, a connected person.

BVI Insolvency Act § 5 (emphasis added).

206.232.        Redemption Payments aggregating $12,718,111.47 were made by Sentry to the Citco Subscriber during the two-year period prior to the application for appointment of the Liquidators of Sentry in the BVI Liquidation Proceedings (the "Sentry Vulnerability Period").

207.233.        During the Sentry Vulnerability Period, Sentry was insolvent or was rendered insolvent by the making of Redemption Payments.

208.234.        Each of the Redemptions and/or Redemption Payments made during the Sentry Vulnerability Period ("Vulnerability Period Payments") was an "insolvency transaction" within the meaning of Section 245 of the BVI Insolvency Act.

71

209.235.      The Citco Subscriber was a shareholder (i.e., a member) of Sentry during the Sentry Vulnerability Period and was, accordingly, a "connected person" as defined in the BVI Insolvency Act.

210.236.      Each of the Vulnerability Period Payments put the Citco Subscriber in a better position than it would have been in had such Payment not been made.

211.237.      Because the Citco Subscriber was a "connected person" as defined in the BVI Insolvency Act, there is a statutory presumption that the Redemptions and/or Vulnerability Period Payments were "insolvency transactions."  Further, even were this not presumed, the Redemptions and/or Vulnerability Period Payments were "insolvency transactions" because at all material times the Funds were insolvent.  This is because the Funds' assets were up to 95% invested with BLMIS and were only able to pay debts falling due either (i) with payments (including fictitious profits) from the Ponzi scheme BLMIS, i.e. using the proceeds of fraud, or (ii) by using incoming subscription monies (as a shortcut for investing those monies and also withdrawing monies from BLMIS to pay redeemers).  Each time the Funds withdrew monies from BLMIS an equivalent liability immediately arose to the creditors of and investors in BLMIS.  On any commercial basis the Funds were insolvent on a cash flow basis at all material times

212.238.      In addition, there is a statutory presumption that the Vulnerability Period Payments were "not made in the ordinary course of any business" of Sentry.  even were this not presumed, the same would follow in that, among other things, each Vulnerability Period Payment represented a distribution of monies (including fictitious profits) from Madoff's Ponzi scheme or incoming subscription monies (which merely represented a shortcut for investing

72

those monies and also withdrawing monies from BLMIS to pay redeemers), and it was no part of the ordinary course of business of the Funds to invest in and distribute profits of a Ponzi scheme.

213.239.    Each of the Vulnerability Period Payments was made following receipt by Sentry of a notice of redemption in respect of Shares, which triggered the redemption process under the Articles.  Following the receipt by Sentry of a notice of redemption by the Citco Subscriber, the Citco Subscriber became a contingent creditor.  Upon the subsequent redemption of the Beneficial Shareholders' shares and until such time as the Citco Subscriber received the Vulnerability Period Payment, the Citco Subscriber was a "creditor" of Sentry with an admissible claim against Sentry in any subsequent liquidation of Sentry had payment of the Redemption Price not been made, albeit that post-liquidation Citco Subscriber would have been deferred to outside creditors.

214.240.    Upon information and belief, the Citco Subscriber may have subscribed to all or some portion of the Shares issued to it under the Subscription Agreement in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

215.241.    Upon information and belief, the Citco Subscriber may have paid to or credited some or all of the Redemption Payments received by it to accounts of the Beneficial Shareholders.

216.242.    To the extent that any money that the Citco Subscriber received in connection with the Vulnerability Period Payments was transferred to the Beneficial Shareholders, the Foreign Representatives, in their capacities as Foreign Representatives and Liquidators of Sentry, are entitled to avoid and set aside such further transfer by the Citco Subscriber to the Beneficial Shareholders and to recover from the Beneficial Shareholders an amount equal to any portion of any Vulnerability Period Payments received by them, and the

73

Foreign Representatives, in their capacities as liquidators of Sentry and Sigma, rely on, inter alia, section 249(2)(b) of the BVI Insolvency Act.

## SIXTH CLAIM
### (Undervalue Transaction Pursuant to Section 246 of the BVI Insolvency Act – Against All Defendants)

217.243.    The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry, repeat and allege again the allegations contained in paragraphs 1 through 217242 above as if set forth herein.

218.244.    Section 246 of the BVI Insolvency Act provides that;

(1) Subject to subsection (2), a company enters into an undervalue transaction with a person if (a) the company makes a gift to that person or otherwise enters into a transaction with that person on terms that provide for the company to receive no consideration; or (b) the company enters into a transaction with that person for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the company; and (c) in either case, the transaction concerned (i) is an insolvency transaction; and (ii) is entered into within the vulnerability period.

(2) A company does not enter into an undervalue transaction with a person if (a) the company enters into the transaction in good faith and for the purposes of its business; and (b) at the time when it enters into the transaction, there were reasonable grounds for believing that the transaction would benefit the company.

(3) A transaction may be an undervalue transaction notwithstanding that it is entered into pursuant to the order of a court or tribunal in or outside the Virgin Islands.

(4) Where a company enters into a transaction with a connected person within the vulnerability period and the transaction falls within subsection (1)(a) or subsection (1)(b), unless the contrary is proved, it is presumed that (a) the transaction was an insolvency transaction; and (b) subsection (2) did not apply to the transaction.

219.245.    During the Sentry Vulnerability Period, all assets purportedly held by BLMIS for Sentry and other investors were non-existent, and Sentry was insolvent or rendered insolvent by the Vulnerability Period Payments, as alleged in paragraph 212238 above.  Thus,

74

each of the Redemptions and/or Vulnerability Period Payments qualifies as an "insolvency transaction" within the meaning of Section 244 of the BVI Insolvency Act and for purposes of Section 246 of the BVI Insolvency Act.

220.246.    Sentry received no consideration for any of the Vulnerability Period Payments, or in the alternative, Sentry received, for each Vulnerability Period Payment, consideration, the value of which, in money or money's worth, was significantly less than the value, in money or money's worth, of the consideration provided by Sentry to the Citco Subscriber for each of the Vulnerability Period Payments.

221.247.    The Citco Subscriber was a shareholder (i.e., a member) of Sentry during the Vulnerability Period and was, accordingly, a "connected person" as defined in the BVI Insolvency Act.

222.248.    Because the Citco Subscriber was a "connected person" as defined in the BVI Insolvency Act, there is a statutory presumption that the Redemptions and/or Vulnerability Period Payments were "insolvency transactions." Further, there is a statutory presumption that the Vulnerability Period Payments were not made good faith and for the purposes of the Funds' business with reasonable grounds to believe that they would benefit the Funds. Even were that not presumed, it is in any event clear that the purpose of the Funds was not to invest in and distribute fictitious profits from a Ponzi scheme such as BLMIS.

223.249.    Upon information and belief, the Citco Subscriber may have subscribed to all or some portion of the Shares issued to it under the Subscription Agreement in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

224.250.      Upon information and belief, the Citco Subscriber may have paid to or credited some or all of the Redemption Payments received by it to accounts of the Beneficial Shareholders.

225.251.      To the extent that any money that the Citco Subscriber received in connection with the Vulnerability Period Payments was transferred to the Beneficial Shareholders, the Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry, are entitled to avoid and set aside such further transfer by the Citco Subscriber to the Beneficial Shareholders and to recover from the Beneficial Shareholders an amount equal to any portion of any Vulnerability Period Payments received by them, and the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma, rely on, inter alia, section 249(2)(b) of the BVI Insolvency Act.

## SEVENTH CLAIM
### *(Breach of Contract - Against All Defendants)*

226.252.      Sentry and Sigma (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma) repeat and allege again the allegations contained in paragraphs 1 through 226251 above as if set forth herein.

227.253.      The Citco Subscriber, upon information and belief, entered into a written agreement or agreements with Sentry between December 31, 1998 and December 30, 2002, pursuant to which the Citco Subscriber subscribed for Shares.  Subsequent to entering into such agreements, the Citco Subscriber, upon information and belief, entered into the Initial Subscription Agreement with Sentry on or about September 27, 2004, pursuant to which the Citco Subscriber subscribed for additional shares.  The Citco Subscriber's subscription for shares was made pursuant to the terms of the Initial Subscription Agreement itself as well as the terms

76

of the other documents referred to therein, namely; (i) Sentry's Private Placement Memorandum (as amended from time to time); and (ii) Sentry's Memorandum of Association and Articles of Association (the "Articles"). Subsequent to entering into the Initial Subscription Agreement, the Citco Subscriber, upon information and belief, entered into the Subsequent Subscription Agreements with Sentry and Sigma between February 4, 2005 and August 27, 2008, pursuant to which it subscribed for additional Shares on the same terms and conditions as those Shares subscribed for pursuant to the Initial Subscription Agreement. The Initial Subscription Agreement, together with the Subsequent Subscription Agreements, including all of the terms and provisions incorporated therein by reference to the Private Placement Memorandum (as amended from time to time) and the Articles, are collectively referred to herein as the "Fund Documents."

228.254.    The Fund Documents provide for the calculation of the redemption price for Shares (the "Redemption Price") based on the "Net Asset Value per Share." Net Asset Value per share is to be determined by the directors of the Funds as of the relevant valuation day "by dividing the value of the net assets of [Sentry/Sigma/Lambda] by the number of Shares then in issue [.]" Articles at 11(1).

229.255.    The Fund Documents provide that in determining the Net Asset Value per share for each class of shares issued, the value of the net assets of the Funds is to be adjusted "to take into account any dividends, distributions, assets or liabilities" attributable to such class of shares. Articles at 11(1). Pursuant to the Fund Documents, each subscriber, including the Citco Subscriber acknowledges that "the value of its Shares and redemptions thereof, and the performance of the Fund, may be based on unaudited and in some cases, estimated, valuations of

the Fund's investment and that any valuation provided in Subscriber's account statement may be an unaudited, estimated value." See Initial Subscription Agreement ¶ 10.

230.256.    With respect to the valuation of different types of assets, the Fund Documents prescribe methods of valuation that are, however, subject to the exercise of the judgment and discretion by the Directors of the Funds.  For example, with respect to the valuation of assets consisting of securities, the Fund Documents prescribe methods of valuation based on price and market data, provided however that "[i]f the Directors determine that [any of the prescribed methods of valuation] does not fairly represent its market value, the Directors shall value such securities as they determine and shall set forth the basis of such valuation in writing in the Company's records[.]"  Articles at 11(3)(b).

231.257.    With respect to the value of any shares of stock held by the Funds in an "investment company," the Fund Documents provide for valuation "in accordance with the manner in which such shares are valued by such investment company" provided however that "the Directors may make such adjustments in such valuations the Directors may from time to time consider appropriate."  Articles at 11(3)(c).

232.258.    With respect to assets that have been "realised or contracted to be realised" the Fund Documents provide for the inclusion of the assets receivable in respect of such realization, provided however that "if the value of such assets is not then known exactly then its value shall be as estimated by the Directors."   Articles at 11(3)(e).

233.259.    Additionally, the Fund Documents provide that "notwithstanding the foregoing, in the case of extraordinary circumstances which, in the Directors' sole discretion, warrant a different valuation of any securities, such securities will be valued at such prices as the Directors shall determine."  Articles at 11(3)(f).

234.260.    The Fund Documents provide that any "certificate" as to the Net Asset Value per Share or as to the Redemption Price that is given in good faith by or on behalf of the Directors "shall be binding on all parties."  Articles at 11(1).

235.261.    No Certificate was provided in good faith by or on behalf of the Directors to the Citco Subscriber in respect of any Net Asset Value determination made while the Citco Subscriber were a member of the Funds or in respect of any Redemption Payment made to the Citco Subscriber.

236.262.    Pursuant to the Fund Documents, at any time prior to the good faith issuance and receipt of a Certificate, the Redemption Price calculated in respect of the redemptions by the Citco Subscriber and paid to the Citco Subscriber remains subject to adjustment, recalculation and redetermination based on, inter alia, the foregoing identified provisions of the Fund Documents.  Upon the true interpretation of the Fund Documents, the same contained an implied term for repayment of any over-payments, and/or such a term is to be implied on the basis of obviousness and/or as being necessary for the business efficacy of the Fund Documents and/or to give effect to the reasonable expectations of the parties.

237.263.    Upon information and belief, the Citco Subscribers may have subscribed to all or some portion of the Shares issued to it under the Fund Documents in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

238.264.    Each Beneficial Shareholder authorized the Citco Subscriber to enter into the Fund Documents on his, her or its behalf and to bind the Beneficial Shareholder to the agreements and representations contained therein to the same extent as had the Beneficial Shareholder executed the Fund Documents on his, her or its, own behalf.

239.265.    Upon information and belief, the Citco Subscriber received the Redemption Payments listed on Exhibit A and Exhibit B in respect of Shares submitted for redemption.

240.266.    Upon information and belief, the Citco Subscriber may have paid to or credited some or all of the Redemption Payments received by it from Sentry and Sigma to accounts of the Beneficial Shareholders.

241.267.    Subsequent to December 8, 2008, Sentry and Sigma have determined that the Net Asset Value calculations upon which Redemption Payments were made to the Citco Subscriber included assets not held by or on behalf of Sentry and Sigma at the time of the making of such payments and, additionally, that such Net Asset Value calculations failed to account for and make appropriate deduction of liabilities of Sentry and Sigma existing at the time of such payments.    For these and other reasons, such Net Asset Value calculation substantially overstated the net asset value of the assets of Sentry and Sigma.

242.268.    To the extent that any Beneficial Shareholder has received Redemption Payments in excess of the Net Asset Value of the Shares redeemed, such Beneficial Shareholder is contractually obligated to return amounts in excess of the Net Asset Value that would have been calculated based upon the true facts existing at the relevant time.

243.269.    Following determination by the Funds that Redemption Payments made to the Citco Subscriber had been calculated on the basis of an overstated Net Asset Value, demand was made on the Beneficial Shareholders by demand on the Citco Subscriber for the return of excess and overpaid Redemption Payments.

244.270.    The Beneficial Shareholders have failed and refused to repay to the Funds the amounts that, under the Fund Documents, they are contractually required to repay to the Funds.

245.271.    The failure of the Beneficial Shareholders to make the repayment requested constitutes a breach of the Fund Documents for which Sentry and Sigma are entitled to the award of damages.

## EIGHTH CLAIM
### *(Breach of Implied Covenant of Good Faith and Fair Dealing - Against All Defendants)*

246.272.    Sentry and Sigma (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma) repeat and allege again the allegations contained in paragraphs 1 through 246271 above as if set forth herein.

247.273.    Upon information and belief, the Citco Subscriber may have subscribed to all or some portion of the Shares issued to it under the Fund Documents in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

248.274.    Upon information and belief, the Citco Subscriber may have paid to or credited some or all of the Redemption Payments received by it from Sentry and Sigma to accounts of the Beneficial Shareholders.

249.275.    Following determination by the Funds that Redemption Payments made to the Citco Subscriber had been calculated on the basis of an overstated Net Asset Value, demand was made on the Beneficial Shareholders by demand on the Citco Subscriber for the return of excess and overpaid Redemption Payments.

81

250.276.    The Beneficial Shareholders have failed and refused to make repayment to Sentry and Sigma.

251.277.    By retaining the Redemption Payments to which they are not entitled, the Beneficial Shareholders have deprived Sentry and Sigma of the benefit of their bargain and have subverted the Fund Documents.

252.278.    The failure of the Beneficial Shareholders to make the repayment requested constitutes a breach of the implied covenant of good faith and fair dealing that inheres in the Fund Documents for which Sentry and Sigma are entitled to the award of damages.

## NINTH CLAIM
### *(Declaratory Judgment - Against All Defendants)*

253.279.    Sentry and Sigma (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma) repeat and allege again the allegations contained in paragraphs 1 through 253278 above as if set forth herein.

254.280.    An actual and justiciable controversy exists between the Plaintiffs and the Defendants with respect to the obligation of the Defendants to repay to the Funds all or a portion of amounts received by them as excess or overpaid Redemption Payments under circumstances where:

(i)    the Net Asset Value per Share calculation upon which the Redemption Price was paid, directly or indirectly, to any Defendant has been subsequently adjusted, recalculated or redetermined in accordance with the Fund Documents;

(ii)    the resulting adjusted, recalculated and redetermined Redemption Price is less than the Redemption Price paid to the Defendant;

(iii)    prior to such adjustment, recalculation or redetermination, no binding Certificate has been issued by the Funds; and

(iv)    Citco issued no Certificates in good faith.

~~255.~~281.    The harm to Sentry and Sigma is real and immediate because, as a result of the failure and refusal of the Defendants to make repayment, Sentry and Sigma have become insolvent and are presently unable to pay their debts as they fall or will fall due.

~~256.~~282.    Plaintiffs have no adequate remedy at law.

~~257.~~283.    Pursuant to 28 U.S.C. § 2201 et. seq., Plaintiffs are entitled to a declaration by this Court declaring that, pursuant to the Fund Documents, each Defendant must repay Sentry and Sigma that portion of the Redemption Payments received by such Defendant representing the amount by which such Redemption Payments exceeded the Redemption Price as it has been subsequently adjusted, recalculated and redetermined by Sentry and Sigma.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs respectfully request the following relief:

A.    On the First, Second, and Third Claims, judgment in favor of Plaintiffs and against the Beneficial Shareholders allowing the Plaintiffs to recover an amount equal to any portion of the Redemption Payments received by the Beneficial Shareholders, plus interest, or, in the alternative, an amount equal to any portion of the Redemption Payments received by the Beneficial Shareholders less the amount of such portion that such Beneficial Shareholders would have received had the Net Asset Value been calculated based upon the true facts existing at the time, plus interest;

B.    On the Fourth Claim, imposition of a constructive trust on Redemption Payments; and;

C.    On the Fifth Claim:

    i.    a declaratory judgment in favor of the Foreign Representatives and against the Beneficial Shareholders that the Redemptions and/or Vulnerability Period Payments constitute Unfair Preferences under Section 245 of the BVI Insolvency Act;

    ii.    judgment pursuant to Section 249 of the BVI Insolvency Act, setting aside and avoiding the Redemptions and/or Vulnerability Period Payments; and

    iii.    judgment pursuant to Section 249 of the BVI Insolvency Act against the Beneficial Shareholders in the amount of the avoided Vulnerability Period Payments received by them or for their benefit, plus interest;

D.    On the Sixth Claim:

    i.    a declaratory judgment in favor of the Foreign Representatives and against the Beneficial Shareholders that the Redemptions and/or Vulnerability Period Payments constitute Undervalue Transactions under Section 246 of the BVI Insolvency Act;

    ii.    judgment pursuant to Section 249 of the BVI Insolvency Act, setting aside and avoiding the Redemptions and/or Vulnerability Period Payments; and

    iii.    judgment pursuant to Section 249 of the BVI Insolvency Act against the Beneficial Shareholders in the amount of the avoided Vulnerability Period Payments received by them or for their benefit, plus interest;

E.    On the Seventh and Eighth Claims, judgment against the Defendants and in favor of the Plaintiffs in an amount to be determined at trial;

F.    On the Ninth Claim, a declaratory judgment against the Defendants and in favor of the Plaintiffs that, under the Fund Documents, the Defendants must repay that portion of the Redemption Payments received by such Defendant representing the amount by which such Redemption Payments exceeded the Redemption Price as it has been subsequently adjusted, recalculated and redetermined by the Funds;

G.    Awarding Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees and accountants' and experts' fees, costs and expenses; and

H.      Granting Plaintiffs such other and further relief as the Court deems just and proper.

Dated: New York, New York
        September 20, 2016

                              BROWN RUDNICK LLP


                              By: /s/ David J. Molton
                                    David J. Molton
                                    May Orenstein
                                    Daniel J. Saval

                              Seven Times Square
                              New York, New York 10036
                              Telephone: 212.209.4800
                              Facsimile: 212.209.4801

                              *Attorneys for the Foreign Representatives*

**EXHIBIT A**

*Redemption Payments Received by Defendants from Sentry*
*From April 21, 2004 Through November 19, 2008*

| **Payment Date** | **Redemption Payment** | **No. of Shares** | **Bank Account to which Redemption Payment Was Made** |
|---|---|---|---|
| April 21, 2004 | $325,094.34 | 334.37 | Citco Global Custody (NA) NV, Netherlands |
| April 21, 2004 | $10,937,878.23 | 11249.96 | Citco Global Custody (NA) NV, Netherlands |
| July 16, 2004 | $147,542.37 | 148.21 | Citco Global Custody (NA) NV, Netherlands |
| August 13, 2004 | $25,000.00 | 25.09 | Citco Global Custody (NA) NV, Netherlands |
| October 19, 2004 | $415,708.68 | 409.61 | Citco Global Custody (NA) NV, Netherlands |
| November 16, 2004 | $304,550.25 | 300 | Citco Global Custody (NA) NV, Netherlands |
| December 13, 2004 | $53,962.38 | 52.74 | Citco Global Custody (NA) NV, Netherlands |
| February 16, 2005 | $25,771.59 | 25 | Citco Global Custody (NA) NV, Netherlands |
| February 16, 2005 | $68,191.63 | 66.15 | Citco Global Custody (NA) NV, Netherlands |
| March 15, 2005 | $105,977.66 | 102.43 | Citco Global Custody (NA) NV, Netherlands |
| April 14, 2005 | $152,343.04 | 146 | Citco Global Custody (NA) NV, Netherlands |
| May 13, 2005 | $168,857.07 | 161.6 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2005 | $44,698.16 | 42.51 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2005 | $566,376.42 | 538.65 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2005 | $1,572,836.72 | 1495.84 | Citco Global Custody (NA) NV, Netherlands |
| July 15, 2005 | $1,354,042.63 | 1281.8 | Citco Global Custody (NA) NV, Netherlands |
| September 15, 2005 | $2,690.99 | 2.54 | Citco Global Custody (NA) NV, Netherlands |
| September 15, 2005 | $4,237.78 | 4 | Citco Global Custody (NA) NV, Netherlands |
| September 15, 2005 | $55,875.10 | 52.74 | Citco Global Custody (NA) NV, Netherlands |
| November 17, 2005 | $584,991.41 | 538.65 | Citco Global Custody (NA) NV, Netherlands |

1

*Redemption Payments Received by Defendants from Sentry*
*From April 21, 2004 Through November 19, 2008*

| Date | Amount | Shares | Account |
|---|---|---|---|
| December 19, 2005 | $319,381.83 | 291.89 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2005 | $792,989.13 | 724.73 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2005 | $113,554.58 | 103.78 | Citco Global Custody (NA) NV, Netherlands |
| January 19, 2006 | $1,495,058.15 | 1359.05 | Citco Global Custody (NA) NV, Netherlands |
| January 19, 2006 | $179,411.38 | 163.09 | Citco Global Custody (NA) NV, Netherlands |
| January 19, 2006 | $1,026,975.86 | 933.55 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2006 | $2,922,356.34 | 2638.07 | Citco Global Custody (NA) NV, Netherlands |
| March 17, 2006 | $4,786,139.73 | 4312.08 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2006 | $1,202,873.58 | 1059.75 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2006 | $505,712.00 | 445.54 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2006 | $258,054.55 | 227.35 | Citco Global Custody (NA) NV, Netherlands |
| June 16, 2006 | $2,191,799.23 | 1917.54 | Citco Global Custody (NA) NV, Netherlands |
| July 20, 2006 | $628,887.98 | 547.41 | Citco Global Custody (NA) NV, Netherlands |
| August 14, 2006 | $56,114.50 | 48.33 | Citco Global Custody (NA) NV, Netherlands |
| August 14, 2006 | $1,131,137.32 | 974.22 | Citco Global Custody (NA) NV, Netherlands |
| September 14, 2006 | $921,808.37 | 787.87 | Citco Global Custody (NA) NV, Netherlands |
| November 14, 2006 | $205,295.78 | 173.55 | Citco Global Custody (NA) NV, Netherlands |
| December 15, 2006 | $129,720.13 | 108.73 | Citco Global Custody (NA) NV, Netherlands |
| January 16, 2007 | $380,529.93 | 316.25 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2007 | $688,899.70 | 570.89 | Citco Global Custody (NA) NV, Netherlands |
| March 16, 2007 | $969,525.04 | 804.35 | Citco Global Custody (NA) NV, Netherlands |
| April 17, 2007 | $138,405.76 | 112.97 | Citco Global Custody (NA) NV, Netherlands |

**Redemption Payments Received by Defendants from Sentry**
**From April 21, 2004 Through November 19, 2008**

| | | | |
|---|---|---|---|
| April 17, 2007 | $231,284.76 | 188.78 | Citco Global Custody (NA) NV, Netherlands |
| April 17, 2007 | $306,288.75 | 250 | Citco Global Custody (NA) NV, Netherlands |
| April 17, 2007 | $329,958.74 | 269.32 | Citco Global Custody (NA) NV, Netherlands |
| May 16, 2007 | $2,721,854.12* | 2200.18 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2007 | $268,180.77* | 215.04 | Citco Global Custody (NA) NV, Netherlands |
| July 19, 2007 | $42,948.49* | 34.32 | Citco Global Custody (NA) NV, Netherlands |
| August 17, 2007 | $277,224.68* | 221.16 | Citco Global Custody (NA) NV, Netherlands |
| August 17, 2007 | $407,689.25* | 325.24 | Citco Global Custody (NA) NV, Netherlands |
| September 19, 2007 | $410,137.62* | 326.18 | Citco Global Custody (NA) NV, Netherlands |
| October 16, 2007 | $322,120.87* | 253.7312 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2007 | $407,022.51* | 319.1359 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2007 | $34,149.12* | 26.5 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2007 | $69,586.89* | 54 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2007 | $732,517.99* | 568.44 | Citco Global Custody (NA) NV, Netherlands |
| January 17, 2008 | $297,807.14* | 230.57 | Citco Global Custody (NA) NV, Netherlands |
| January 17, 2008 | $297,807.14* | 230.57 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2008 | $185,374.88* | 142.6245 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2008 | $190,048.10* | 146.22 | Citco Global Custody (NA) NV, Netherlands |
| March 18, 2008 | $220,396.47* | 169.46 | Citco Global Custody (NA) NV, Netherlands |
| April 14, 2008 | $342,904.8* | 263.17 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2008 | $700,000.00* | 532.2994 | Citco Global Custody (NA) NV, Netherlands |
| June 17, 2008 | $484,617.93* | 365.55 | Citco Global Custody (NA) NV, Netherlands |

### Redemption Payments Received by Defendants from Sentry
### From April 21, 2004 Through November 19, 2008

| | | | |
|---|---|---|---|
| June 17, 2008 | $3,318,920.26* | 2503.48 | Citco Global Custody (NA) NV, Netherlands |
| July 15, 2008 | $73,811.84* | 55.71 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2008 | $66,720.16* | 50 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $186,363.88* | 138.07 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $193,247.74* | 143.17 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $466,658.82* | 345.73 | Citco Global Custody (NA) NV, Netherlands |

* Denotes Redemptions in the Sentry Vulnerability Period.

**EXHIBIT B**

***Redemption Payment Received by Defendants from Sigma***
***On January 27, 2006***

| Payment Date | Redemption Payment | No. of Shares | Bank Account to which Redemption Payment Was Made |
|---|---|---|---|
| January 27, 2006 | $382,764.37 | 1,896.69 | Citco Global Custody (NA) NV, Netherlands |

All $USD amounts are based on the exchange rate as of the date of the Redemption Payment. However, upon application of a different exchange rate, as may be required by applicable law, the amount of damages may be different.

**EXHIBIT F**

**BROWN RUDNICK LLP**
Seven Times Square
New York, New York 10036
David J. Molton
212-209-4800

*Attorneys for the Foreign Representatives*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>**FAIRFIELD SENTRY LIMITED, et al.,**<br><br>    Debtors in Foreign Proceedings. | ) **Chapter 15**<br>) **Case**<br>)<br>) **Case No. 10-**<br>) **13164 (SMB)**<br>)<br>) **Jointly**<br>) **Administered** |
| **FAIRFIELD SENTRY LIMITED (IN LIQUIDATION), FAIRFIELD SIGMA LIMITED (IN LIQUIDATION) and FAIRFIELD LAMBDA LIMITED (IN LIQUIDATION), acting by and through the Foreign Representatives thereof, and KENNETH KRYS and CHARLOTTE CAULFIELD, solely in their capacities as Foreign Representatives and Liquidators thereof,**<br><br>                    Plaintiffs,<br><br>                    -against-<br><br>**ABN AMRO SCHWEIZ AG a/k/a ABN AMRO (SWITZERLAND) AG, ADLER AND CO PRIVATBANK AG, ALLIANZBANK SPA/UNIFORTUNE CONSERVATIVE SIDE POCKET, ALTERNATIVE INVESTMENT STRATEGIES, ARDEN INTERNATIONAL CAPITAL, LTD., ARSENAL SPC, ARSENAL SPC OBO GLASGOW SEG PORT, AURIGA INTERNATIONAL LTD., BANCA ARNER SA, BANCA UNIONE DI CREDITO, BANK HAPOALIM SWITZERLAND LTD., BANK JULIUS BAER & CO. LTD., BANK LEUMI (SWITZERLAND) LTD., BANK SARASIN & CIE, BANQUE CANTONALE VAUDOISE, BANQUE CRAMER & CIE SA, BBH LUX REF FAIRFIELD GRN, BBVA (SUISSE) SA, BCV AMC DEFENSIVE AL FUND, BNP PARIBAS (SUISSE) SA, BNP PARIBAS (SUISSE) SA EX FORTIS, BNP PARIBAS (SUISSE) SA PRIVATE, BSI AG, BSI EX BANCA DEL GOTTARDO, CACEIS BANK LUXEMBOURG, CBB (BVI)/ THE ALKIMA FUND, CBT GEMS LOW VOL REG, COMPAGNIE BANCAIRE HELVETIQUE, CENTRUM BANK AG (AMS), CLARIDEN LEU LTD., CORNER BANCA SA, CREDIT SUISSE AG ZURICH, DEXIA BANQUE** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) **Adv. Pro. No.**<br>) **10-03636**<br>) **(SMB)**<br>)<br>) **FOURTH**<br>) **AMENDED**<br>) **COMPLAINT**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**INTERNATIONAL A LUXEMBOURG, DRESDNER BANK SCHWEIZ,** )
**EFG BANK SA SWITZERLAND, EFG EUROFINANCIER D'INVEST** )
**MCL, ENDURANCE ABSOLUTE LTD. MASTER, FAIRFIELD** )
**INVESTMENT GCI, FAIRFIELD INVESTMENT FUND LTD., FALCON** )
**PRIVATE BANK, FIF ADVANCED LTD., FINTER BANK ZURICH,** )
**GENEVA ABSOLUTE RETURN FUND, HARMONY CAPITAL FUND** )
**LTD., HSBC, IHAG HANDELSBANK AG, INCORE BANK AG,** )
**KARASEL ENHANCED PORTFOLIO, KARLA MULTISTRATEGIES** )
**LTD., KBC INVESTMENTS LTD., LGT BANK IN LIECHTENSTEIN** )
**AG, LIECHTENSTEINISCHE LB REINVEST AMS, LLOYDS TSB** )
**BANK GENEVA, LOMBARD ODIER DARIER HENTSCH & CIE,** )
**LONGBOAT LTD., MASTER CAPITAL AND HEDGE FUND,** )
**NATIONAL BANK OF KUWAIT, NBK BANQUE PRIVEE SUISSE SA,** )
**PAN INTERNATIONAL LIMITED, PICTET & CIE, PKB** )
**PRIVATBANK AG, PRIVATE SPACE LTD., QUASAR FUNDS SPC** )
**a/k/a QUASAR FUND SPC CLASS A AND CLASS B CGCNV, RBC** )
**DEXIA INVESTOR SERVICE JULIUS BAER SICAV, RBS COUTTS** )
**BANK LTD., RICHOURT AAA MULTISTRATEGIES, ROTHSCHILD** )
**BANK AG ZURICH (DUBLIN) a/k/a ROTHSCHILD BANK AG,** )
**ROTHSCHILD BANK GENEVA (DUBLIN), ROTHSCHILD LUGANO** )
**DUBLIN a/k/a BANCA PRIVATA EDMOND DE ROTHSCHILD** )
**LUGANO S.A.,** SABRYN ENTERPRISES SA, SELLA BANK AG, SIS )
**SEEGANINTERSETTLE, SIX SIS LTD., SOCIETE GENERALE BANK** )
**& TRUST, SOUNDVIEW FUND, SWISSCANTO FD CENTRE CLIENTS** )
**A/C, T1 GLOBAL FUND LTD., UBS AG NEW YORK, UBS AG** )
**ZURICH, UBS JERSEY NOMINEES, VERWALTUNGS UND PRIVAT-** )
**BANK AG AKTIENGESELLSCHAFT (AMS), VORARLBERGER** )
**LANDES UND HYPOTHEKENBANK AKTIENGESELLSCHAFT and** )
**BENEFICIAL OWNERS OF ACCOUNTS HELD IN THE NAME OF** )
**CITCO GLOBAL CUSTODY (NA) NV 1-1000, BENEFICIAL OWNERS** )
**OF ACCOUNTS HELD IN THE NAME OF CITCO GLOBAL CUSTODY** )
**NV 1-1000, BENEFICIAL OWNERS OF ACCOUNTS HELD IN THE** )
**NAME OF CITCO FUND SERVICES (BVI) 1-1000, and BENEFICIAL** )
**OWNERS OF ACCOUNTS HELD IN THE NAME OF CITCO FUND** )
**SERVICES (EUROPE) BV 1-1000,** )
                                                                )
        **Defendants.** )
                                                                )
                                                                )
                                                                )
                                                                )
                                                                )
                                                                )
                                                                )

Fairfield Sentry Limited ("Sentry"), Fairfield Sigma Limited ("Sigma") and Fairfield Lambda Limited ("Lambda," together with Sentry and Sigma, the "Funds" or the "Debtors"), by and through Kenneth Krys and Charlotte Caulfield (together with their predecessors, the "Foreign Representatives"), and Kenneth Krys and Charlotte Caulfield (together with the Funds, the "Plaintiffs"), solely in their capacities as the Liquidators of the Funds and the Foreign Representatives of the liquidation proceedings involving the Funds pending before the Commercial Division of the Eastern Caribbean High Court of Justice, British Virgin Islands (the "BVI Court"), for their complaint against Defendants, allege the following based on personal knowledge or information derived from the Funds' books and records or from other sources, including, *inter alia*, court filings and statements of governmental agencies and other parties.

## PRELIMINARY STATEMENT

1.      This action and similar actions are brought by the Plaintiffs, with the approval of the foreign court having jurisdiction over the matter, to recover payments made to shareholders for the redemption of shares in the Funds prior to December 2008.

2.      The Funds were created as a means for private investment in managed accounts with Bernard L. Madoff Investment Securities LLC ("BLMIS"), the brokerage business that Bernard L. Madoff used to perpetrate his massive Ponzi scheme.  Sentry was the largest of all so-called "feeder funds" to maintain accounts with BLMIS.  Sigma and Lambda were indirect BLMIS feeder funds established for foreign currency investments (respectively, Euro and Swiss Franc investments) through purchases of shares of Sentry.  Sentry's account statements with BLMIS as of the end of October 2008 showed in excess of $6 billion of assets supposedly held by BLMIS for Sentry.  As stated in their offering materials, the Funds' investment objective was

to achieve capital appreciation of assets through investments in BLMIS (directly, in the case of Sentry; and indirectly, through Sentry, in the cases of Sigma and Lambda).

3.      It is now known that these types of feeder funds were essential to the perpetration of Madoff's Ponzi scheme.  In order for the Ponzi scheme to operate, Madoff required a continuous flow of new investors and investments to be able to satisfy redemption requests from early investors.  Feeder funds, such as Sentry (which was a direct feeder fund into BLMIS), and Sigma and Lambda (which were indirect feeder funds, through Sentry, into BLMIS), brought new investors into this scheme, allowing Madoff to make payments to early investors and thereby creating and perpetuating the illusion that BLMIS was engaged in a successful investment strategy and actively trading securities.

4.      From the Funds' inception until the disclosure of Madoff's fraud in December 2008, during most relevant times, substantially all cash, net of fees and expenses, raised by the Funds through the sale of their shares was transferred (either directly in the case of Sentry or indirectly, through Sentry, in the cases of Sigma and Lambda) to BLMIS for investment in accounts managed by Madoff.  Prior to December 2008, the voting participating shares of Sentry ($.01 par value per share), Sigma (€.01 par value per share), and Lambda (CHF.01 par value per share) (the "Shares"), were redeemable for a price equal to the applicable Fund's "Net Asset Value."  Net Asset Value was to be determined, in accordance with applicable accounting standards, as the value of the respective assets of Sentry, Sigma, and Lambda divided by the number of shares outstanding in each Fund, net of certain expenses ("Net Asset Value").

5.      From time to time, in order to make the payments to investors for redemption of Shares ("Redemption Payments"), Sentry generally made withdrawals from its BLMIS accounts. On occasion, Sentry made Redemption Payments directly from amounts on hand invested by

other subscribers in the Funds. At all relevant times, the Funds believed payments that Sentry received from BLMIS represented the proceeds of sales of securities and/or investments held by BLMIS for Sentry. The amount, per share, paid by the Funds to shareholders for each Share redeemed was to be equal to the per share Net Asset Value, which was calculated based principally on the assets that the Funds believed were being held, and investments that were being made, by BLMIS for Sentry's account.

6.      As the world now knows, Madoff was operating a massive Ponzi scheme through BLMIS. Thus, at all relevant times, the money that Sentry transferred to BLMIS was not invested, but, rather, was used by Madoff to pay other BLMIS investors or was otherwise misappropriated by Madoff for unauthorized uses. Further, none of the securities shown on statements provided to Sentry by BLMIS were in fact purchased for Sentry. Additionally, none of the amounts withdrawn by Sentry from its accounts with BLMIS were proceeds of sales of securities or other investments. Instead, such amounts represented the monies of more recent investors into the Madoff scheme.

7.      In light of the fraudulent nature of BLMIS and its operation as a massive Ponzi scheme, at all relevant times the assets purportedly held at BLMIS for Sentry were non-existent, and the Funds were insolvent at the time Redemption Payments were made or they were rendered insolvent by those payments. As a result, at all relevant times, the Net Asset Value of the Shares redeemed was miscalculated, and Redemption Payments were mistakenly made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at any relevant time.

8.      At all relevant times, all payments made from BLMIS to Sentry and other feeder funds and investors were made by Madoff to perpetuate his Ponzi scheme and avoid detection of

3

his fraud.  Similarly, the Redemption Payments that the Funds made to redeeming shareholders were not made in the ordinary course of any business or for any legitimate purposes.  Those Redemption Payments did not conform to or follow the terms of the Funds' Subscription Agreements, Articles of Association and/or other offering documents, as they were based upon Net Asset Values that were not calculated based upon the true facts existing at any relevant time, and because, more generally, the Redemption Payments represented the proceeds arising from investment in BLMIS (or a substitute therefor, in the form of subscription monies from other investors in the Funds, used as a shortcut to investing subscription monies with BLMIS and simultaneously withdrawing monies from BLMIS), which the world now knows was operated by Madoff as a Ponzi scheme.  These payments were crucial in perpetuating the Ponzi scheme and maintaining the illusion that Madoff was making actual investments and employing a successful investment strategy.

9.    During the period from and after April 20, 2004, through November 24, 2008, following the receipt by the Funds of notices of redemption, the Funds made Redemption Payments to accounts held in the Funds' registers in the names of Citco Global Custody NV, Citco Global Custody (NA) NV, Citco Fund Services (BVI), and Citco Fund Services (Europe) BV (collectively, "the ~~Citco Subscribers~~Citco Record Subscribers") aggregating USD $1,713,056,327.45.  As set forth herein, in connection with, *inter alia*, Defendants' desire to invest in the Funds through Citco as described herein, (1) the Defendants hereto, (2) one or more of the Citco Record Subscribers and (3) the Citco Bank Nederland N.V., Citco Bank Nederland N.V. Dublin Branch (a wholly owned subsidiary of Citco Bank Nederland N.V.) or the Citco Banking Corporation N.V. (all of which banks were affiliates of each other, the Citco Record Subscribers and all other Citco entities referred to herein; collectively, the "Citco Banks")

4

entered Brokerage and Custody Agreements (the "B&C Agreements"). With respect to the B&C Agreements, at all relevant times (1) the Citco Record Subscribers acted as, *inter alia*, agents of and nominees for the Citco Banks with respect to subscriptions and investments in the Funds for the benefit of Defendants, (2) both the Citco Record Subscribers and the Citco Banks (collectively, the "Citco Subscribers") were agents of the Defendants with respect to the B&C Agreements and investments in the Funds for the benefit of Defendants.

10.    At the time such payments were made, the Funds mistakenly believed that such payments were in the amount of the Net Asset Value of the Shares tendered at the time of redemption. In fact, however, as stated, the Redemption Payments made to the Citco Subscribers far exceeded the Net Asset Value of Shares redeemed that would have been calculated based on the true facts existing at the time or any relevant time. Moreover, these Redemption Payments did not, as the Funds intended, represent the proceeds arising from the profitability of or to continue investment in BLMIS. Instead, any amounts obtained directly or indirectly by the Funds from BLMIS to make Redemption Payments to the Citco Subscribers were proceeds of Madoff's Ponzi scheme, obtained from other BLMIS investors or other Sentry investors invested in BLMIS.

11.    Accordingly, the Funds' actual assets are, and at relevant times were, far less than the amount needed to satisfy their liabilities and the claims that have been or may be asserted against them, and, at all relevant times, the Funds were unable to pay their debts as they fell or would fall due. Indeed, at the time the Redemptions Payments were made, the Funds had insufficient assets from which to pay debts as they fell or would fall due.

12.    In particular, claims had been previously asserted against the Funds in actions commenced by Irving H. Picard, the Trustee appointed by the United States District Court for the

Southern District of New York for the liquidation of BLMIS (the "BLMIS Trustee"), in an adversary proceeding pending before the United States Bankruptcy Court of the Southern District of New York, Picard v. Fairfield Sentry Limited, et al., No. 08-01789 (SMB) (the "BLMIS Adversary Proceeding"). As set forth in the complaint filed in the BLMIS Adversary Proceedings, the BLMIS Trustee sought to recover from the Funds, on preference and fraudulent transfer grounds, approximately $3.2 billion. This amount was alleged to have been transferred to the Funds from BLMIS, directly (in the case of Sentry), or indirectly (in the cases of Sigma and Lambda), during the six years preceding the December 2008 disclosure of the Madoff fraud. The BLMIS Trustee alleged that the monies transferred from BLMIS to the Funds were the misappropriated assets of other BLMIS investors. At all relevant times, monies that the Funds received from BLMIS, net of fees and expenses, were transferred to shareholders as Redemption Payments.

13.    On July 13, 2011, pursuant to an agreement between the Foreign Representatives and the BLMIS Trustee dated May 9, 2011, the United States Bankruptcy Court for the Southern District of New York entered judgments against each of the Funds on the claims against the Funds asserted in the BLMIS Adversary Proceeding (the "Judgments") in the amount of $3,054,000,000 with respect to Sentry, $752,300,000 with respect to Sigma, and $52,900,000 with respect to Lambda. The Redemption Payments rendered the Funds unable to satisfy their liabilities to the BLMIS customers, the BLMIS Trustee, including on account of the Judgments, and other creditors of the Funds, and further increased the amount of those liabilities. In this way, the Redemption Payments caused the Funds to become insolvent and/or deepened their existing insolvency, in that, among other things, at all relevant times the Funds were unable to pay their debts as they fell or would fall due.

14.     Upon information and belief, the Citco Subscribers have paid all or some portion of such payments to or for the account of persons or entities, including, but not limited to, ABN AMRO Schweiz AG a/k/a ABN AMRO Switzerland AG, Adler and Co Privatbank AG, Allianzbank SPA/Unifortune Conservative Side Pocket, Alternative Investment Strategies, Arden International Capital, Ltd., Arsenal SPC, Arsenal SPC OBO Glasgow SEG Port, Auriga International Ltd., Banca Arner SA, Banca Unione Di Credito, Bank Hapoalim Switzerland Ltd., Bank Julius Baer & Co. Ltd., Bank Leumi (Switzerland) Ltd., Bank Sarasin & CIE, Banque Cantonale Vaudoise, Banque Cramer & CIE SA, BBH Lux Ref Fairfield GRN, BBVA (Suisse) SA, BCV AMC Defensive AL Fund, BNP Paribas (Suisse) SA, BNP Paribas (Suisse) SA Ex Fortis, BNP Paribas (Suisse) SA Private, BSI AG, BSI Ex Banca Del Gottardo, Caceis Bank Luxembourg, CBB (BVI)/ The Alkima Fund, CBT Gems Low Vol Reg, Compagnie Bancaire Helvetique, Centrum Bank AG (AMS), Clariden Leu Ltd., Corner Banca SA, Credit Suisse AG Zurich, Dexia Banque International A Luxembourg, Dresdner Bank Schweiz, EFG Bank SA Switzerland, EFG Eurofinancier D'Invest MCL, Endurance Absolute Ltd. Master, Fairfield Investment GCI, Fairfield Investment Fund Ltd., Falcon Private Bank, FIF Advanced Ltd., Finter Bank Zurich, Geneva Absolute Return Fund, Harmony Capital Fund Ltd., HSBC, IHAG Handelsbank AG, Incore Bank AG, Karasel Enhanced Portfolio, Karla Multistrategies Ltd., KBC Investments LTD., LGT Bank In Liechtenstein AG, Liechtensteinische LB Reinvest AMS, Lloyds TSB Bank Geneva, Lombard Odier Darier Hentsch & CIE, Longboat Ltd., Master Capital and Hedge Fund, National Bank of Kuwait, NBK Banque Privee Suisse SA, Pan International Limited, Pictet & CIE, PKB Privatbank AG, Private Space Ltd., Quasar Funds SPC a/k/a Quasar Fund SPC Class A and Class B CGCNV, RBC Dexia Investor Service Julius Baer SICAV, RBS Coutts Bank Ltd., Richourt AAA Multistrategies, Rothschild Bank AG Zurich

(Dublin) a/k/a Rothschild Bank AG, Rothschild Bank Geneva (Dublin), Rothschild Lugano

Dublin a/k/a Banca Privata Edmond de Rothschild Lugano S.A., Sabryn Enterprises SA, Sella

Bank AG, SIS Seeganintersettle, Six SIS Ltd., Societe Generale Bank & Trust, Soundview Fund,

Swisscanto FD Centre Clients A/C, T1 Global Fund Ltd., UBS AG New York, UBS AG Zurich,

UBS Jersey Nominees, Verwaltungs UND Privat-Bank AG Aktiengesellschaft (AMS),

Vorarlberger Landes UND Hypothekenbank Aktiengesellschaft, Beneficial Owners of the

Accounts Held in the Name of Citco Global Custody NV 1-1000, Beneficial Owners of the

Accounts Held in the Name of Citco Global Custody (NA) NV 1-1000, Beneficial Owners of the

Accounts Held in the Name of Citco Fund Services (BVI) 1-1000, and Beneficial Owners of the

Accounts Held in the Name of Citco Fund Services (Europe) BV 1-1000, for whom the Citco

Subscribers may have subscribed for shares of the Funds in the capacity of trustee, agent,

representative, nominee or custodian (individually, a "Beneficial Shareholder" and collectively,

the "Beneficial Shareholders" or the "Defendants").

     15.    Following the revelation of Madoff's fraud in December 2008, the Funds' boards

of directors suspended any further redemptions of the Funds' shares and the calculation of each

of the Funds' Net Asset Value.  As of December 2008 and presently, Sentry, Sigma, and Lambda

have, respectively, approximately 4.7 million, 3.9 million, and 0.2 million shares outstanding.

     16.    Unless Redemption Payments paid to shareholders are recovered for the Funds'

estates, the Funds will be unable to satisfy their liabilities and claims that have been made or may

be made against them; further, recoveries of Redemption Payments will increase distributions to

the Funds' investors who have been harmed.  Moreover, to the extent such liabilities and claims

must be satisfied solely from the Funds' current assets, Defendants will have been unjustly

enriched as they will not bear their proportionate share of such liabilities and claims, but rather will retain a windfall at the expense of other shareholders and creditors of the Funds.

## JURISDICTION AND VENUE

17.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 157(b) and 1334(b), as this adversary proceeding and the claims asserted by the Foreign Representatives herein arise under, arise in and/or relate to the Chapter 15 proceedings of the above-captioned Debtors, In re Fairfield Sentry Limited, et al., No. 10-13164 (SMB), pending in this Court.  Additionally, pursuant to section 78eee(b)(2)(A)(iii) of the Securities Investor Protection Act ("SIPA"), which incorporates 28 U.S.C. § 1334(b) and applicable provisions of Title 11 of the United States Code, jurisdiction is also proper in this Court because this action also relates to the consolidated liquidation proceedings of BLMIS and Bernard L. Madoff, pending in this Court under the caption Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC, SIPA Liquidation No. 08-1789 (SMB).  Pursuant to the Amended Standing Order of reference of the United States District Court for the Southern District of New York, dated January 31, 2012, all proceedings arising in, arising under and/or related to cases under Title 11 of the United States Code (as amended, the "Bankruptcy Code") are referred to this Court for adjudication.

18.     This is a core proceeding under 28 U.S.C. § 157(b)(2).1  Should the Court determine that this is a non-core proceeding, Plaintiffs consent to entry of final judgment and order by this Court.

---

1       Although the District Court, in In re Fairfield Sentry Ltd., No. 1:11-mc-00224-LAP, 458 B.R. 665 (S.D.N.Y. 2011), held that causes of action alleged by the Plaintiffs in other cases before this Court—causes of action that are similar or the same as those alleged in this complaint—are not core proceedings, this determination may be subject to appeal.  In any event, plaintiffs submit that the causes of action in this complaint, which include, inter alia, allegations regarding transfers of property that were directed into the territorial jurisdiction of the United States, render the claims asserted in this complaint core in accordance with the District Court's decision.

19.    This Court has jurisdiction over the Beneficial Shareholders pursuant to Rules 7004(d) and (f) of the Federal Rules of Bankruptcy Procedure and New York Civil Practice Law & Rules § 302 (McKinney 2008) because the Beneficial Shareholders purposely availed themselves of the laws of the United States and the State of New York by, among other things, investing money with the Funds, and knowing and intending that the Funds would invest substantially all of that money in New York-based BLMIS.  The Beneficial Shareholders thus knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York, derived significant revenue from New York, and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein.  The Beneficial Shareholders should therefore reasonably expect to be subject to United States jurisdiction.

20.    Moreover, this Court has jurisdiction over the Beneficial Shareholders by virtue of the legally binding and valid agreements and representations set forth in one or more agreements for the subscription of Shares that the Citco Subscribers entered into with the Funds.

21.    The Citco Subscribers, upon information and belief, entered into a Subscription Agreement with Sentry on or about January 3, 2003 (the "Initial Subscription Agreement") pursuant to which the Citco Subscribers subscribed for Shares.  Subsequent to entering into the Initial Subscription Agreement, the Citco Subscribers, upon information and belief, entered into additional agreements (the "Subsequent Subscription Agreements") with Sentry, Sigma, and Lambda between January 6, 2003 and November 18, 2008, pursuant to which it subscribed for additional Shares on the same terms and conditions as those shares subscribed for pursuant to the Initial Subscription Agreement.    The Initial Subscription Agreement and Subsequent Subscription Agreements are collectively referred to herein as the "Subscription Agreements."

22.    The Subscription Agreements provide for, *inter alia*, the irrevocable submission by the Citco Subscribers to the jurisdiction of the New York courts with respect to any proceeding with respect to said agreement and the Funds and the Citco Subscribers' consent to service of process by the mailing of such process, as provided therein.   In particular, the Subscription Agreements provide as follows:

> New York Courts.    Subscriber agrees that any suit, action or proceeding ("Proceeding") with respect to this Agreement and the Fund may be brought in New York.  Subscriber irrevocably submits to the jurisdiction of the New York courts with respect to any Proceeding and consents that service of process as provided by New York law may be made upon Subscriber in such Proceeding, and may not claim that a Proceeding has been brought in an inconvenient forum. Subscriber consents to the service of process out of any New York court in any such Proceeding by the mailing of copies thereof, by certified or registered mail, return receipt requested, addressed to Subscriber at the address of Subscriber then appearing on the Fund's records.  Nothing herein shall affect the Fund's right to commence any Proceeding or otherwise to proceed against Subscriber in any other jurisdiction or to serve process upon Subscriber in any manner permitted by any applicable law in any relevant jurisdiction.

23.    Furthermore, by executing the Subscription Agreements, the Citco Subscribers agreed to all terms and conditions contained therein, including the express provision that any agreement made by the Citco Subscribers in the Subscription Agreement would also apply to any other person for whom the Citco Subscribers were subscribing as trustee, agent, representative, or nominee – i.e., all Beneficial Shareholders.   Moreover, by executing the Subscription Agreements, the Citco Subscribers represented that each of them had all requisite authority from Beneficial Shareholders to execute and perform any and all obligations on their behalf, and also agreed to indemnify the Funds for any damages resulting from an assertion by a Beneficial Shareholder that the Citco Subscribers lacked proper authorization to enter into the Subscription Agreement or perform the obligations thereof.   Specifically, the Subscription Agreements provide as follows:

If Subscriber is acting as a Representative. If Subscriber is subscribing as trustee, agent, representative, or nominee for another person (the "Beneficial Shareholder"), Subscriber agrees that the representations and agreements herein are made by Subscriber with respect to itself and the Beneficial Shareholder. Subscriber has all requisite authority from the Beneficial Shareholder to execute and perform the obligations hereunder. Subscriber also agrees to indemnify the Fund . . . for any and all costs, fees and expenses (including legal fees and disbursements, fines and amounts paid in settlement) in connection with any damages resulting from Subscriber's misrepresentation or misstatement contained here, or the assertion of Subscriber's lack of proper authorization from the Beneficial Shareholder to enter into this Agreement or perform the obligations hereof.

24.     Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

## PARTIES

**Plaintiffs**

25.     Sentry, a British Virgin Islands company, was organized in 1990 under the International Business Company Act of the British Virgin Islands and was subsequently re-registered as a business company under the BVI Business Companies Act 2004. Sentry's registered agent is Codan Trust Company (B.V.I.) located at Romasco Place, Wickhams Cay 1, Road Town, Tortola, BVI. Sentry is currently in liquidation in proceedings commenced on April 21, 2009 in the BVI Court.

26.     Sigma, a British Virgin Islands company, was organized in 1990 under the International Business Company Act of the British Virgin Islands and was subsequently re-registered as a business company under the BVI Business Companies Act 2004. Sigma's registered agent is Codan Trust Company (B.V.I.) located at Romasco Place, Wickhams Cay 1, Road Town, Tortola, BVI. Sigma is currently in liquidation in proceedings commenced on April 23, 2009, in the BVI Court.

27.     Lambda, a British Virgin Islands company then known as Fairfield Henry Limited, was organized in 1990 under the International Business Company Act of the British

Virgin Islands and was subsequently re-registered as a business company under the BVI
Business Companies Act 2004. Lambda's registered agent is Codan Trust Company (B.V.I.)
located at Romasco Place, Wickhams Cay 1, Road Town, Tortola, BVI. Lambda is currently in
liquidation in proceedings commenced on February 27, 2009, in the BVI Court.

28.     The Foreign Representatives were appointed by the BVI Court as Liquidators of
the Funds to supervise the liquidation of the Funds' estates and, where necessary, commence
proceedings in the name of and on behalf of the Funds or in their own official names. On April
23, 2009, the BVI Court issued an order appointing Christopher Stride as liquidator of Lambda
(the "Lambda Appointment Order").    On July 21, 2009, the BVI Court issued an order
appointing Kenneth Krys and Mr. Stride as joint liquidators of Sentry and Sigma (the "Sentry &
Sigma Appointment Order").    On September 6, 2010, the BVI Court issued notices
acknowledging Mr. Stride's resignation and the appointment of Joanna Lau as joint liquidator
with Mr. Krys of all three Funds (the "Supplemental Appointment Order"). On November 23,
2011, Ms. Lau resigned as joint liquidator of the Funds. On June 24, 2014, the BVI Court issued
an order appointing Charlotte Caulfield as joint liquidator, with Mr. Krys, of all three Funds (the
"Second Supplemental Appointment Order" and, together with the Lambda Appointment Order,
the Sentry & Sigma Appointment Order, and the Supplemental Appointment Order, the "BVI
Appointment Orders").    The Foreign Representatives, in their capacities as Foreign
Representatives and liquidators of the Funds, have been authorized by the foreign court having
jurisdiction over the matter to bring this action and the claims herein, including the avoidance
claims herein under the BVI Insolvency Act of 2003 (the "BVI Insolvency Act").

29.     Pursuant to the BVI Appointment Orders, the Foreign Representatives are
responsible for all aspects of the Funds' businesses, including, among other things, custody and

13

control of the Funds' assets, the power to do all acts and execute, in the name and on behalf of the Funds, any deeds, receipts or other documents, and the power to compromise claims, commence litigation and to dispose of property.   After obtaining BVI Court approval, the Foreign Representatives filed petitions in this Court in June of 2010, under Chapter 15 of Title 11 of the United States Code, seeking recognition of the BVI Liquidation Proceedings as "foreign main proceedings" under Chapter 15.  On July 22, 2010, this Court issued an order (the "Recognition Order") granting that recognition.

30.    Pursuant to the Recognition Order, the Foreign Representatives were automatically afforded relief available under 11 U.S.C. § 1520, including application of the Bankruptcy Code's automatic stay to the Funds and their property located in the United States, as well as the ability to operate the Funds' business and exercise the rights and powers of a trustee under Sections 363 and 552 of the Bankruptcy Code.   Moreover, the Bankruptcy Court specifically granted additional relief in the Recognition Order to the Foreign Representatives pursuant to 11 U.S.C. § 1521(a).   Such relief includes, but is not limited to: (i) staying any actions, proceedings or execution against the Funds' assets to the extent not stayed under Section 1520; (ii) authorizing the Foreign Representatives to seek leave to conduct discovery concerning the Funds' assets, affairs, rights, obligations or liabilities; (iii) entrusting the Foreign Representatives with the administration and realization of the Funds' assets that are located within the United States, including all claims and causes of action belonging to the Funds; and (iv) otherwise giving full force and effect to the Proceedings before the BVI Court.

**Defendants**

31.    Defendants "Beneficial Owners of the Accounts Held in the Name of Citco Global Custody NV 1-1000," "Beneficial Owners of the Accounts Held in the Name of Citco

Global Custody (NA) NV 1-1000," "Beneficial Owners of the Accounts Held in the Name of Citco Fund Services (BVI) 1-1000" and "Beneficial Owners of the Accounts Held in the Name of Citco Fund Services (Europe) BV 1-1000" – i.e., the Beneficial Shareholders, are, as noted, any persons or entities having a beneficial ownership or interests in Shares of the Funds issued to the Citco Subscribers and on whose behalf the Citco Subscribers were acting as trustee, agent, representative, or nominee (individually, a "<u>Beneficial Shareholder</u>").

32.    Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with ABN AMRO Schweiz AG a/k/a ABN AMRO (Switzerland) AG.  Upon information and belief, ABN AMRO Schweiz AG a/k/a ABN AMRO (Switzerland) AG is a corporate entity organized under the laws of Switzerland and has its registered address at Beethovenstrasse 33, CH-8002 Zurich, Switzerland.

33.    Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Adler and Co. Privatbank AG.  Upon Information and belief, Adler and Co. Privatbank AG is a corporate entity organized under the laws of Switzerland and has its registered address at Claridenstreasse 22, CH-8022 Zurich, Switzerland.

34.    Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Allianzbank SPA/Unifortune Conservative Side Pocket.  Upon information and belief, Allianzbank SPA/Unifortune Conservative Side Pocket is a corporate entity organized under the laws of Italy and has its registered address at Via Donizetti 53, Milan 20128, Italy.

35.     Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Alternative Investment Strategies. Upon information and belief, Alternative Investment Strategies is a corporate entity organized under the laws of Bermuda and has its registered address c/o Absolute Performance Ltd., Bamboo Gate, 11 Harbour Road, Paget PG 03, Bermuda.

36.     Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Arden International Capital, Ltd.  Upon information and belief, Arden International Capital, Ltd. is a corporate entity organized under the laws of the United States with its principal place of business at 350 Park Avenue, 29th Floor, New York, NY 10022.

37.     Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Arsenal SPC.  Upon information and belief, Arsenal SPC is a corporate entity organized under the laws of the Cayman Islands and has its registered address at Corporate Centre West Bay Road, P.O. Box 31106, SMB, Grand Cayman, Cayman Islands.

38.     Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Arsenal SPC Obo Glasgow SEG Port.  Upon information and belief, Arsenal SPC Obo Glasgow SEG Port is a corporate entity organized under the laws of Switzerland and has its registered address at Rue de la Croiz 19, 1203 Geneva, Switzerland.

39.     Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Auriga International Ltd.

40.     Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Banca Arner SA.  Upon information and belief, Banca Arner SA is a corporate entity organized under the laws of Switzerland and has its registered address at Piazza Manzoni 8, 6901 Lugano, Switzerland.

41.     Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Banca Unione di Credito.   Upon information and belief, Banca Unione di Credito is a corporate entity organized under the laws of Switzerland and has its registered address at Piazza Dante 7, CH-6901 Lugano, Switzerland.

42.     Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Bank Hapoalim Switzerland Ltd.  Upon information and belief, Bank Hapoalim Switzerland Ltd. is a corporate entity organized under the laws of Luxembourg and has its registered address at  18 Boulevard Royal, 2449 Luxembourg.

43.     Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Bank Julius Baer & Co. Ltd. Upon information and belief, Bank Julius Baer & Co. Ltd. is a corporate entity organized under the laws of  Switzerland and has its registered address at Hohlstrasse 602, CH-8010 Zurich, Switzerland.

44.     Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Bank Leumi (Switzerland) Ltd.   Upon information and belief, Bank Leumi (Switzerland) Ltd. is a

corporate entity organized under the laws of Switzerland and has its registered address at 1, rue de la Tour-de-l'Ile, Case postale 5415, 1211 Geneva 11, Switzerland and Dianastrasse 5, Postach 2090, 8022 Zurich, Switzerland.

45.    Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Bank Sarasin & Cie.  Upon information and belief, Bank Sarasin & Cie is a corporate entity organized under the laws of Switzerland and has its registered address at Elizabethenstrasse 62, CH-4002 Basel, Switzerland.

46.    Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Banque Cantonale Vaudoise.  Upon information and belief, Banque Cantonale Vaudoise is a corporate entity organized under the laws of Switzerland and has its registered address at Place St. Francois 14, CH-1001 Lausanne, Switzerland.

47.    Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Banque Cramer & Cie SA. Upon information and belief, Banque Cramer & Cie SA is a corporate entity organized under the laws of Switzerland and has its registered address at 20-22 Avenue de Miremont, P.O. Box 403, CH-1211 Geneva 12, Switzerland.

48.    Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with BBH Lux Ref Fairfield GRN.  Upon information and belief, BBH Lux Ref Fairfield GRN is a corporate entity organized under the laws of Luxembourg and has its registered address at 33 Boulevard Prince Henri BP 403, Luxembourg L-2014, Luxembourg.

49.     Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with BBVA (Suisse) SA. Upon information and belief, BBVA (Suisse) SA is a corporate entity organized under the laws of Switzerland and has its registered address at P.O. Box 3930, Zeltweg 63, 8021 Zurich, Switzerland.

50.     Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with BCV AMC Defensive AL Fund. Upon information and belief, BCV AMC Defensive AL Fund is a corporate entity organized under the laws of Switzerland and has its registered address at Place St. Francois, CH-1001 Lausanne, Switzerland.

51.     Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with BNP Paribas (Suisse) SA.  Upon information and belief, BNP Paribas (Suisse) SA is a corporate entity organized under the laws of Switzerland and has its registered address at 2 Place de Hollande, Case Postale, CH-1211 Geneva, Switzerland.

52.     Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with BNP Paribas (Suisse) SA Ex Fortis. Upon information and belief, BNP Paribas (Suisse) SA Ex Fortis is a corporate entity organized under the laws of Switzerland and has its registered address at 2 Place de Hollande, Case Postale, CH-1211 Geneva, Switzerland.

53.     Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with BNP Paribas (Suisse) SA Private.  Upon information and belief, BNP Paribas (Suisse) SA Private is a

corporate entity organized under the laws of Switzerland and has its registered address at 2 Place de Hollande, Case Postale,  CH-1211 Geneva, Switzerland.

54.      Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with BSI AG. Upon information and belief, BSI AG is a corporate entity organized under the laws of Switzerland and has its registered address at Via Peri 23, CH-6901 Lugano, Switzerland.

55.      Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with BSI Ex Banca Del Gottardo.  Upon information and belief, BSI Ex Banca Del Gottardo is a corporate entity organized under the laws of Switzerland and has its registered address at Viale S Franscini 8, CH-6900 Lugano, Switzerland.

56.      Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Caceis Bank Luxembourg.  Upon information and belief, Caceis Bank Luxembourg is a corporate entity organized under the laws of Luxembourg and has its registered address at 5 Allee Scheffer, Luxembourg L-2520, Luxembourg.

57.      Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with CBB (BVI)/ The Alkima Fund.

58.      Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with CBT Gems Low Vol Reg.  Upon information and belief, CBT Gems Low Vol Reg is a corporate

entity organized under the laws of the Bahamas and has its registered address at One Montague Place 1st Floor, East Bay Street, P.O. Box N-4906, Nassau, Bahamas.

59.    Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Compagnie Bancaire Helvetique.  Upon information and belief, Compagnie Bancaire Helvetique is a corporate entity organized under the laws of Switzerland and has its registered address at Route de Chancy 6B, Case Postale 64, CH-1211 Geneva 8, Switzerland.

60.    Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Centrum Bank AG (AMS).  Upon information and belief, Centrum Bank AG (AMS) is a corporate entity organized under the laws of Liechtenstein and has its registered address at Kirchstrasse 3, Postfach 1168, Vaduz FL 9490, Liechtenstein.

61.    Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Clariden Leu Ltd.  Upon information and belief, Clariden Leu Ltd is a corporate entity organized under the laws of Switzerland and has its registered address at Bahnhofstrasse 32, CH-8070, Zurich, Switzerland.

62.    Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Corner Banca SA.  Upon information and belief, Corner Banca SA is a corporate entity organized under the laws of Switzerland and has its registered address at Via Canova 16, CH-6901 Lugano, Switzerland.

63.     Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Credit Suisse AG Zurich.  Upon information and belief, Credit Suisse AG Zurich is a corporate entity organized under the laws of Switzerland and has its registered address at P.O. Box 300, Uetlibergstrasse 231, CH-8070 Zurich, Switzerland.

64.     Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Dexia Banque International A Luxembourg.  Upon information and belief, Dexia Banque International A Luxembourg is a corporate entity organized under the laws of Luxembourg and has its registered address at 69 Route D'Esch, Luxembourg L-2953, Luxembourg.

65.     Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Dresdner Bank Schweiz.  Upon information and belief, Dresdner Bank Schweiz is a corporate entity organized under the laws of Liechtenstein and has its registered address at LGT Bank In Liechtenstein AG ex DBS, Herrengasse 12, Vaduz FL-9490, Liechtenstein.

66.     Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with EFG Bank SA Switzerland.  Upon information and belief, EFG Bank SA Switzerland is a corporate entity organized under the laws of Switzerland and has its registered address at 24 Quai du Seujet, CH-1211 Geneva 2, Switzerland.

67.     Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with EFG Eurofinancier D'Invest MCL.  Upon information and belief, EFG Eurofinancier D'Invest MCL

is a corporate entity organized under the laws of Monaco and has its registered address at Villa les Aigles, 15 Avenue D'Ostenede, Monaco MC 9800.

68.     Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Endurance Absolute Ltd. Master.   Upon information and belief, Endurance Absolute Ltd. Master is a corporate entity organized under the laws of the United Kingdom and has as its registered address c/o Argyle Investment Advisors, Iveagh Ltd., 21 Queen Anne's Gate, London SW1H 9BU, United Kingdom.

69.     Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Fairfield Investment GCI.   Upon information and belief, Fairfield Investment GCI is a corporate entity organized under the laws of New York and has as its registered address the Fairfield Greenwich Group, Finance Group, 919 Third Avenue, New York 10022.

70.     Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Fairfield Investment Fund Ltd.   Upon information and belief, Fairfield Investment Fund Ltd. is a corporate entity organized under the laws of New York and has as its registered address the Fairfield Greenwich Group, Finance Group, 919 Third Avenue, New York 10022.

71.     Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Falcon Private Bank.   Upon information and belief, Falcon Private Bank is a corporate entity organized under the laws of Switzerland and has its registered address at Pelikanstrasse 37, P.O. Box 1376, CH-8021, Zurich, Switzerland.

72.    Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with FIF Advanced Ltd..  Upon information and belief, FIF Advanced Ltd. is a corporate entity organized under the laws of New York and has as its registered address the Fairfield Greenwich Group, Finance Group, 919 Third Avenue, New York 10022.

73.    Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Finter Bank Zurich.  Upon information and belief, Finter Bank Zurich is a corporate entity organized under the laws of Switzerland and has as its registered address Corso S Gottardo 35, CH-6830 Chiasso, Switzerland.

74.    Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Geneva Absolute Return Fund.  Upon information and belief, Geneva Absolute Return Fund is a corporate entity organized under the laws of the Cayman Islands and has its registered address Citco Trustees Cayman Limited, P.O. Box 31106, 89 Nexus Way, Camana Bay, Cayman Islands.

75.    Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Harmony Capital Fund Ltd.  Upon information and belief, Harmony Capital Fund Ltd. is a corporate entity organized under the laws of the United Kingdom and has its registered address c/o Jason Capital Partners LLP, 28 Grosvenor Street, London W1K 4QR, United Kingdom.

76.    Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with HSBC. Upon information and belief, HSBC is a corporate entity organized under the laws of the United

Kingdom and has its registered address at 8 Canada Square, Canary Wharf, London, United Kingdom.

77.    Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with IHAG Handelsbank AG.  Upon information and belief, IHAG Handelsbank AG is a corporate entity organized under the laws of Switzerland and has as its registered address Bleicherweg 18, 8022-Zurich, Switzerland.

78.    Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Incore Bank AG.  Upon information and belief, Incore Bank AG is a corporate entity organized under the laws of Switzerland and has as its registered address Dreikoenigstr 8, CH-8022 Zurich, Switzerland.

79.    Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Karasel Enhanced Portfolio.

80.    Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Karla Multistrategies Ltd.  Upon information and belief, Karla Multistrategies Ltd. is a corporate entity organized under the laws of The Netherlands and has as its registered address Naritaweg 165, 1043 BW Amsterdam, The Netherlands.

81.    Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with KBC Investments Ltd.  Upon information and belief, KBC Investments Ltd. is a corporate entity

organized under the laws of New York and has as its registered address 140 East 45th Street, 42nd Floor, New York 10017.

82.    Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with LGT Bank In Liechtenstein AG.    Upon information and belief, LGT Bank In Liechtenstein AG is a corporate entity organized under the laws of Liechtenstein and has as its registered address Herrengasse 12, Vaduz FL 9490, Liechtenstein.

83.    Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Liechtensteinische LB Reinvest AMS.    Upon information and belief, Liechtensteinische LB Reinvest AMS is a corporate entity organized under the laws of Liechtenstein and has as its registered address Liechtensteinische Landesbank AG, Staedtle 44, Vaduz FL-9490, Liechtenstein.

84.    Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Lloyds TSB Bank Geneva. Upon information and belief, Lloyd's TSB Bank Geneva is a corporate entity organized under the laws of Switzerland and has as its registered address Place Bel-Air 1, CH-1211 Geneva 2, Switzerland.

85.    Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Lombard Odier Darier Hentsch & Cie.    Upon information and belief, Lombard Odier Darier Hentsch & Cie is a corporate entity organized under the laws of Switzerland and has as its registered address Rue de la Corraterie 11, 1204 Geneva, Switzerland.

86.     Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Longboat Ltd.

87.     Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Master Capital and Hedge Fund.  Upon information and belief, Master Capital and Hedge Fund is a corporate entity organized under the laws of The Netherlands and has its registered address c/o Citco Fund Services Europe BV, Naritaweg 165, 1043 BW Amsterdam, The Netherlands.

88.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with National Bank of Kuwait.  Upon information and belief, National Bank of Kuwait is a corporate entity organized under the laws of Kuwait and has its registered address P.O. Box 95 Safat, 13001 Kuwait, Abdullah Al Ahmad Street, Sharq, State of Kuwait.

89.     Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with NBK Banque Privee Suisse SA.  Upon information and belief, NBK Banque Privee Suisse SA is a corporate entity organized under the laws of Switzerland and has as its registered address Quai du Mont Blanc 21, P.O. Box 1923, Geneva 1, Switzerland.

90.     Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Pan International Limited.

91.     Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Pictec &

Cie.  Upon information and belief, Pictet & Cie is a corporate entity organized under the laws of Switzerland and has as its registered address Route Des Acacias 60, 1211 Geneva 73, Switzerland.

92.    Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with PKB Privatbank AG.  Upon information and belief, PKB Privatbank AG is a corporate entity organized under the laws of Switzerland and has as its registered address Via Balestra 1, CH-6901 Lugano, Switzerland.

93.    Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Private Space Ltd.  Upon information and belief, Private Space Ltd. is a corporate entity organized under the laws of Monaco and has as its registered address 7 Rue du Gabian, MC 98000, Monaco.

94.    Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Quasar Funds SPC a/k/a Quasar Fund SPC Class A and Class B CGCNV.  Upon information and belief, Quasar Funds SPC a/k/a Quasar Fund SPC Class A and Class B CGCNV is a corporate entity organized under the laws of The Netherlands and has its registered address c/o Citco Fund Services Europe BV, Naritaweg 165, 1043 BW Amsterdam, The Netherlands.

95.    Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with RBC Dexia Investor Service Julius Baer SICAV.  Upon information and belief, RBC Dexia Investor Service Julius Baer SICAV is a corporate entity organized under the laws of Luxembourg and

has as its registered address Dexia Fund Services, 69 Route D'Esch, Luxembourg L-2953, Luxembourg.

96.    Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with RBS Coutts Bank Ltd.  Upon information and belief, RBS Coutts Bank Ltd. is a corporate entity organized under the laws of Switzerland and has as its registered address P.O. Box 2200, Stauffacherstrasse 1, CH-8022 Zurich, Switzerland.

97.    Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Richourt AAA Multistrategies.  Upon information and belief, Richourt AAA Multistrategies is a corporate entity organized under the laws of The Netherlands and has as its registered address Telstone 8 Teleport, 1043 BW Amsterdam, The Netherlands.

98.    Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Rothschild Bank AG Zurich (Dublin) a/k/a Rothschild Bank AG.  Upon information and belief, Rothschild Bank AG Zurich (Dublin) a/k/a Rothschild Bank AG is a corporate entity organized under the laws of Switzerland and has as its registered address Zollikerstrasse 181, CH-8034 Zurich, Switzerland.

99.    Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Rothschild Bank Geneva (Dublin).  Upon information and belief, Rothschild Bank Geneva (Dublin) is a corporate entity organized under the laws of Switzerland and has as its registered address Banca Privee Edmond de Rothschild, 18 rue de Hesse, CH-1204 Geneva, Switzerland.

100.    Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Rothschild Lugano Dublin a/k/a Banca Privata Edmond de Rothschild Lugano S.A.  Upon information and belief, Rothschild Lugano Dublin a/k/a Banca Privata Edmond de Rothschild Lugano S.A. is a corporate entity organized under the laws of Switzerland and has as its registered address Via Ginevra 2, CH-6900 Lugano, Switzerland.

101.    Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Sabryn Enterprises SA.

102.    Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Sella Bank AG.  Upon information and belief, Sella Bank AG is a corporate entity organized under the laws of Switzerland and has as its registered address Corso Elvezia 9, CH-6900 Lugano, Switzerland.

103.    Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with SIS Seeganintersettle.   Upon information and belief, SIS Seeganintersettle is a corporate entity organized under the laws of Switzerland and has as its registered address Baslerstrasse 100, CH-4601 Olten, Switzerland.

104.    Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Six SIS Ltd.  Upon information and belief, Six SIS Ltd. is a corporate entity organized under the laws of Switzerland and has as its registered address Baslerstrasse 100, CH-4601 Olten, Switzerland.

105.    Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Societe Generale Bank & Trust.   Upon information and belief, Societe Generale Bank & Trust is a corporate entity organized under the laws of Luxembourg and has as its registered address 11-13 Avenue Emile Reuter, Luxembourg L-2420, Luxembourg.

106.    Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Soundview Fund.  Upon information and belief, Soundview Fund is a corporate entity organized under the laws of The Netherlands and has as its registered address Naritaweg 165, 1043 BW Amsterdam, The Netherlands.

107.    Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Swisscanto FD Centre Clients A/C.  Upon information and belief, Swisscanto FD Centre Clients A/C is a corporate entity organized under the laws of the United Kingdom and has as its registered address 4th Floor, 51 Moorgate, London EC2R 6BH, United Kingdom.

108.    Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with T1 Global Fund Ltd.  Upon information and belief, T1 Global Fund Ltd. is a corporate entity organized under the laws of Switzerland and has its registered address c/o Trust and Gain Asset Management, Corso San Gottardo 46, 6830 Chiasso, Switzerland.

109.    Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with UBS AG New York.  Upon information and belief, UBS AG New York is a corporate entity organized

under the laws of New York and has as its registered address 101 Park Avenue, New York 10178.

110.    Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with UBS AG Zurich.  Upon information and belief, UBS AG Zurich is a corporate entity organized under the laws of Switzerland and has as its registered address UBS Wealth Management, Badenerstrasse 574/C, CH-8098 Zurich, Switzerland.

111.    Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with UBS Jersey Nominees.  Upon information and belief, UBS Jersey Nominees is a corporate entity organized under the laws of the United Kingdom and has as its registered address P.O. Box 350, 24 Union Street, St. Helier JE4 8UJ, Jersey, United Kingdom.

112.    Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Verwaltungs UND Privat-Bank AG Aktiengesellschaft (AMS).  Upon information and belief, Verwaltungs UND Privat-Bank AG Aktiengesellschaft (AMS) is a corporate entity organized under the laws of Liechtenstein and has as its registered address Im Zentrum, Vaduz FL-9490, Liechtenstein.

113.    Based on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Vorarlberger Landes UND Hypothekenbank Aktiengesellschaft.  Upon information and belief, Vorarlberger Landes Und Hypothekenbank Aktiengesellschaft is a corporate entity organized

under the laws of Austria and has as its registered address Hypo-Passage 1, Bregenz 6900, Austria.

**The Relationship Between the Defendants and the Citco Subscribers**

114.    Published materials by Citco companies within Citco Group Limited ("Citco Group" and collectively, "Citco") make clear that the Citco Banks – utilizing the Citco Record Subscribers to be the record holder of shares in the Funds Register of Shares – performed and took the lead role in carrying out record holder duties on behalf of Defendants.  For example, a Citco Fund Services document describing "Fund Administration Operations"[2] explains:

> For institutional clients (primarily banks), the Citco Banks offer a unique custody service to alleviate these institutions from the administrative burden of locating, subscribing in, and keeping track of investments in international funds for their private banking customers.  These services include: locating the fund, placing the subscription/redemption, completing the paperwork, registering the funds in the name of Citco as custodian, addressing corporate actions, providing monthly statements of holdings and most recent NAVs and sending out documentation and information as required.

115.    Consistent with such explanations by Citco, upon information and belief, each of the Defendants entered into the "B&C Agreements" with a Citco Bank and one or more of the Citco Record Subscribers, usually Citco Global Custody.  The B&C Agreements made the Citco Subscribers and other Citco entities agents of the Defendants in connection therewith.  It was under the B&C Agreements that the Citco Subscribers purchased shares in and made redemptions from the Funds for the benefit of the Defendants, which are the subject of this action.  Under the B&C Agreements, the Defendants were required to maintain bank accounts at the Citco Banks from which and into which "all moneys received from or for the account of" the Defendants were deposited (the "B&C Accounts").  Although, there are some differences in the

---

2    Citco Fund Services, Fund Administration Operations Using the Ephesus Platform and Related Offshore Investor Relations Services, US Statement on Auditing Standards No. 70 Report on Controls Placed in Operation

various B&C Agreements, the provisions summarized herein are, upon information and belief, substantially the same in all the agreements.

116.    Pursuant to the B&C Agreements, the Citco Subscribers had various duties.  For example, the B&C Agreements afforded the Citco Subscribers the power to:

- "register the Securities, other than physically held bearer shares, in the name of the [Citco Record Subscriber] or any sub-custodian";

- "deposit in the [B&C] Account all moneys received from or for the account of the [Defendants]"; and

- ensure that the "[s]ecurities held at any one time by the Custodian or any sub-custodian shall be recorded in and ascertainable from the books and/or ledgers of the [Citco] Banks and the [Citco Record Subscriber]."

117.    Moreover, the Citco Banks were solely responsible for providing brokerage services to the Defendants.  According to the B&C Agreements, these services included:

- "effecting [] transactions of and/or relating to the purchase and sale of and dealing in Securities in the name and for the account of the" Defendants; and

- "effecting [] transactions of and/or relating to the purchase and sale of and dealing in Securities in the name of the Bank, or of the [Defendants], or any nominee for the account of the [Defendants]."

118.    Pursuant to the B&C Agreements, the Defendants provided the Citco Banks "with Instructions in respect to all transactions in Securities to be performed by the Bank on the [Defendants'] behalf," and it provided that the relevant Citco Bank, "may in its absolute discretion refuse to execute any Instructions given by or on behalf of the [Defendants]."

---

and Tests of Operating Effectiveness January 1, 2005 to September 30, 2005.

119.    With respect to the subscription or redemption of Shares in the Funds, the Defendants submitted instructions to the Citco Banks and, upon information and belief, the Citco Banks directed the Citco Record Subscribers to subscribe for or redeem the relevant Shares.

120.    According to the B&C Agreements, in "consideration of the services of the" Citco Banks and the Citco Record Subscribers, the Defendants were required to "pay to the Bank the fees and expenses" in "U.S. dollars."  Additionally, while the purchased securities were to be transferred to and registered in the name of the Citco Record Subscribers as the Custodian thereof, if the Defendants were more than five days delinquent in paying in full "all moneys due in connection with such purchase . . . such Securities will not be transferred to nor held by the Custodian [the Citco Record Subscriber] on behalf of the [Defendants], but will be freely available to the Bank."

121.    The B&C Agreements provide: "In the performance of their [custodian service] duties, the Bank and/or the Custodian [the Citco Record Subscriber] may act through agents, subcustodians or any other third party which the Bank and/or Custodian [the Citco Record Subscriber] may, in their absolute discretion deem necessary. The Bank and/or Custodian [the Citco Record Subscriber] are hereby authorized by the [Defendants] to enter into further agreements for the appointment of the aforementioned agents, sub-custodians and/or third parties."

122.    The B&C Agreements also provide: "The [Defendants] recognize[ ] that in certain circumstances in order to preserve or safeguard the Securities or other assets of the [Defendants], the Bank and/or Custodian [the Citco Record Subscriber] may be required to act without first obtaining instructions from the Customer. In such cases, the Bank and/or Custodian [the Citco Record Subscriber] may act at their own absolute and unfettered discretion and shall not be

liable, in the absence of negligence, willful misfeasance, reckless disregard or fraud, for any loss to the [Defendants] whatsoever."

123.    The B&C Agreements also provide: "The Bank and Custodian [the Citco Record Subscriber] hereby agree to use their best efforts and judgement and due care [some B&C Agreements modify this language here as follows; "best efforts and judgment and care of a prudent professional custodian"] in performing their obligations and duties pursuant to this Agreement; provided however that the Bank, Custodian[the Citco Record Subscriber], their directors, officers, employees and/or agents shall not be liable for any action taken or failure to act in the course of performing the services hereunder for any loss suffered by the [Defendants] in connection with the subject matter of this Agreement, unless such loss arises from willful misfeasance, fraud, bad faith or negligence in the performance of the Bank's/or Custodian's [the Citco Record Subscriber's] obligations and duties by reason of the Bank's and/or Custodian's [the Citco Record Subscriber's] reckless disregard of their obligations and duties hereunder."

124.    Upon information and belief, the B&C Agreements with the Defendants applied to all subscriptions and redemptions of Shares in the Funds by the Citco Subscribers on behalf of the Defendants, and all Redemption Payments were, upon information and belief, sent by the Citco Banks (upon their receipt from the Funds) to the Defendants' B&C Accounts.

125.    The Citco Banks and the Citco Record Subscribers, per the B&C Agreements and in accordance with the Defendants' use of Citco in connection with investments in the Funds, were agents of Defendants.

**The Relationship Between the Citco Record Subscribers and the Citco Banks**

126.    Consistent with the Citco Fund Services document described in paragraph 114 herein, and as described above in connection with the provisions of the B&C Agreements, the

Citco Banks played a lead role in performing and directing record holding duties on behalf of the Defendants.

127. Pursuant to the B&C Agreements, the Citco Banks and the Citco Record Subscribers had various duties. For example, the B&C Agreements afforded the Citco Banks and the Citco Record Subscribers the power to:

- "register the Securities, other than physically held bearer shares, in the name of the Custodian [the Citco Record Subscriber] or any sub-custodian";

- "deposit in the [B&C] Account [at the Citco Banks] all moneys received from or for the account of the [Defendants]"; and

- ensure that the "[s]ecurities held at any one time by the Custodian [the Citco Record Subscriber] or any sub-custodian shall be recorded in and ascertainable from the books and/or ledgers of the Banks and the Custodian [the Citco Record Subscriber]."

128. Moreover, the Citco Banks were solely responsible for providing brokerage services to the Defendants. According to the B&C Agreements, these services included:

- "effecting [] transactions of and/or relating to the purchase and sale of and dealing in Securities in the name and for the account of the" Defendants; and

- "effecting [] transactions of and/or relating to the purchase and sale of and dealing in Securities in the name of the Bank, or of the [Defendants], or any nominee for the account of the [Defendants]."

129. Pursuant to the B&C Agreements, the Defendants provided the Citco Banks "with Instructions in respect to all transactions in Securities to be performed by the Bank on the

[Defendants'] behalf," and it provided that the Citco Banks "may in [their] absolute discretion refuse to execute any Instructions given by or on behalf of the [Defendants]."

130.    With respect to the subscription or redemption of Shares in the Funds, the Defendants submitted instructions to the Citco Banks, and, upon information and belief, the Citco Banks directed the Citco Record Subscribers to subscribe for or redeem the relevant Shares.

131.    According to the B&C Agreements, in "consideration of the services of the" Citco Banks and the Citco Record Subscribers, the Defendants were required to "pay to the Bank the fees and expenses" in "U.S. dollars."  Additionally, while the purchased securities were to be transferred to and registered in the name of the Citco Record Subscribers, if the Defendants were more than five days delinquent in paying in full "all moneys due in connection with such purchase . . . such Securities will not be transferred to nor held by the Custodian [the Citco Record Subscriber] on behalf of the [Defendants], but will be freely available to the Bank."

132.    Upon information and belief, (i) the Citco Record Subscribers were wholly owned subsidiaries or, at a minimum affiliates, of the Citco Banks and were all affiliates of the Citco Group; (ii) the Citco Record Subscribers, including Citco Global Custody, operated principally if not solely as vehicles for the custody of shares purchased for Defendants by the Citco Banks; (iii) the Citco Record Subscribers were and at all times acted as the nominees of and agents for the Citco Banks with respect to such share purchases and custody thereof; (iv) the Citco Record Subscribers accordingly entered into the relevant Subscription Agreements with the Funds for and on behalf of the Citco Banks; and (v) the Citco Banks are, accordingly, real parties in interest to, bound by and parties to the Subscription Agreements.

**NOTICE PURSUANT TO FED. R. CIV. P. 44.1**

113.133.    Certain of the substantive issues to be resolved in this case will be governed by the laws of the British Virgin Islands.  Plaintiffs intend to rely upon the applicable laws of that territory.

**FACTUAL ALLEGATIONS**

A.    **Role of Feeder Funds In Madoff Fraud**

114.134.    Sentry was the largest of all the so-called "feeder funds" to maintain accounts with BLMIS.  Sigma and Lambda were indirect BLMIS feeder funds established for foreign currency (respectively, Euro and Swiss franc) investment through purchase of shares of Sentry.  Sentry's account statements with BLMIS as of the end of October 2008 showed in excess of $6 billion of invested assets supposedly held by BLMIS.  As stated in its offering materials, Sentry's investment objective was to achieve capital appreciation through investments in BLMIS.

115.135.    As discussed above, Sentry, Sigma, and Lambda were established for the purpose of making investments in BLMIS.  It is now known that these types of feeder funds were a crucial part of Madoff's Ponzi scheme.  The feeder funds brought new investors and new investments into the scheme, allowing Madoff to make payments to early investors who sought to liquidate their investments, and in this way, the feeder funds were used by Madoff to continue and perpetuate his fraud by maintaining the illusion that BLMIS was making active investments and engaging in a successful investment strategy.

B.    **Calculation of Net Asset Value and Shareholder Redemption Payments**

116.136.    Substantially all of the money (up to 95%) raised by the Funds from the sale of their Shares, net of fees and expenses, was turned over to and invested in BLMIS (by

and/or through Sentry), and supposedly credited to accounts held in the name of Sentry with BLMIS, purportedly for use in the now infamous "split-strike conversion" investment strategy. In accordance with the Funds' Subscription Agreements, Articles of Association, offering materials and/or other relevant documents, from time to time, the Funds paid to shareholders, for each Share tendered for redemption, an amount that was based on each of the respective Funds' purported Net Asset Value, as it was then calculated.

117.137.    In calculating each of the Funds' Net Asset Value, the Funds' administrators used and relied on account statements provided by BLMIS purportedly showing securities and investments, or interests or rights in securities and investments, held by BLMIS for the account of Sentry.  Generally, all securities identified on BLMIS account statements were traded on public exchanges and had readily ascertainable market values, and those market values (in addition to, among other items, cash on hand that was identified in the Sentry account statement for the relevant time period) were used in accordance with the Funds' Subscription Agreements, Articles of Association, offering materials and/or other documents to calculate the Net Asset Value of the Shares.

118.138.    In fact, at all relevant times, no securities were ever purchased or sold by BLMIS for Sentry and any stated cash on hand in the BLMIS accounts was based on misinformation and fictitious account statements.  None of the transactions shown on the account statements provided by BLMIS to Sentry ever occurred.  Indeed, no investments of any kind were ever made by BLMIS for Sentry.  At all relevant times, all of the account statements that BLMIS provided to Sentry were entirely and utterly fictitious.  Further, all amounts deposited by Sentry (or by Sigma and Lambda through Sentry) with BLMIS for investment and the purchase

of securities to be held by BLMIS for the account of Sentry were used by Madoff to pay other BLMIS investors or were misappropriated by Madoff for other unauthorized uses.

119.139.    From time to time, to make Redemption Payments, Sentry (and Sigma and Lambda through Sentry) made withdrawals from Sentry's BLMIS accounts (or utilized subscription monies of other investors on hand that were directed for investment in BLMIS). The Funds believed that the amounts provided in connection with such withdrawals represented the proceeds arising from the profitability of or to continue investment in BLMIS.  In fact, however, payments made by BLMIS to Sentry purportedly representing the proceeds of sales of securities or other investment positions were nothing other than the deposits of other BLMIS investors or previous deposits made by Sentry, never invested but rather misused and misappropriated as part of Madoff's fraud.  At all relevant times, payments made from BLMIS to Sentry were made by Madoff to continue and perpetuate his Ponzi scheme and avoid detection of his fraud.  The payments from BLMIS to Sentry were not payments made in the ordinary course of or as part of any business, nor did they have a legitimate business purpose.  Similarly, the Redemption Payments were not made for any legitimate purposes or in the ordinary course of any business.

120.140.    Given the fraudulent nature of BLMIS and its operation as a massive Ponzi scheme, the money paid by the Funds (directly in the case of Sentry and indirectly in the cases of Sigma and Lambda) to BLMIS on account of Sentry was, at all relevant times and unknown to the Funds, misused and misappropriated by Madoff as part of his Ponzi scheme.  At all relevant times, the Funds were insolvent when the Redemption Payments were made or were rendered insolvent, and/or their insolvency was deepened, as a result of the Redemption Payments.

**C.**    **Redemption Payments Made or Transferred to Defendants**

~~121.~~141.    During the period from and after April 20, 2004, through November 24, 2008, the Beneficial Shareholders received Redemption Payments totaling USD $1,713,056,327.45 from the Funds in respect of Shares tendered for redemption.

~~122.~~142.    At Defendants' directions and instructions, some or all of the Redemption Payments were received at, upon information and belief, designated United States-based bank accounts.

~~123.~~143.    The dates and amounts of each Redemption Payment received by the Beneficial Shareholders from Sentry, and the bank accounts to which each Redemption Payment was made, are set forth on Exhibit A.  The dates and amounts of each Redemption Payment received by the Beneficial Shareholders from Sigma, and the bank accounts to which each Redemption Payment was made, are set forth on Exhibit B.  The dates and amounts of each Redemption Payment received by the Beneficial Shareholders from Lambda, and the bank accounts to which each Redemption Payment was made, are set forth on Exhibit C.

~~124.~~144.    At the time those Redemption Payments were made, the Funds had insufficient assets and were unable to pay their debts as they would fall due.  In exchange for each Redemption Payment, each of which constitutes or forms part of a transaction between the Beneficial Shareholders and the relevant Fund, the relevant Fund received no consideration or consideration of a value that, in money or money's worth, was significantly less than the value, in money or money's worth, of the consideration provided by the relevant Fund.

145.    Upon information and belief, the Beneficial Shareholders received Redemption Payments in excess of amounts paid by such person(s) for purchase of their Shares.

### D.    Citco Did Not Issue Any Certifications of Net Asset Value in "Good Faith"

~~125.~~146.        Article 11 of the Funds' Articles provides that "[a]ny certificate as to the Net Asset Value per Share . . . given in good faith by or on behalf of the Directors shall be binding on all parties."  During the relevant period, statements of the Net Asset Value were issued by the Funds' administrators, Citco Fund Services (Europe) B.V. and its delegatee Citco (Canada) Inc. (the "Administrators").  On April 16, 2014, the Judicial Committee of the Privy Council (the "Privy Council") issued a decision in which it held that certain statements of Net Asset Value, in particular, certain monthly emails, contract notes, and monthly account statements issued by the Administrators, constituted "certificates" for the purposes of Article 11 (the "Certificates").   The Privy Council did not, however, address whether such Certificates were given "in good faith."  In carrying out this responsibility, the Administrators and affiliated Citco entities ~~Citco companies within Citco Group Limited (collectively, "Citco")~~ acted with a lack of good faith in giving the Certificates.

~~126.~~147.        Over the course of fifteen years, in its capacity as service providers to the Funds, Citco reviewed information concerning BLMIS not available to the general public, and expressed internal alarm about what that information showed with respect to the likelihood of fraud at BLMIS, but turned a blind eye to the reality reflected in the information and instead proceed with issuing the Certificates as if there were no problem.

~~127.~~148.        So grave were the Administrators' internal concerns that they expressed doubts—many years before the fraud was made public—that the Funds' assets with BLMIS even existed, with one employee stating "I will not change my [opinion] as long as I [do] not see evidence that the portfolio exists."  The Administrators also expressed repeated concern over the fact there was no segregation of duties at BLMIS—i.e., BLMIS (i) had discretion over which

investments to make and when to make them, such that BLMIS was de facto investment manager, (ii) had actual custody of the Funds' assets, such that BLMIS was de facto custodian, and (iii) was also the broker. Based upon the proprietary information they reviewed, Citco expressed concern—internally—that BLMIS would be a repeat of the notorious Manhattan Investment Fund fraud of the 1990s "multiplied by a factor of five." Ultimately, unable to resolve their grave concerns, Citco, rather than withdrawing, ceasing to issue Certificates, or sounding a public alarm, made a corporate decision to continue on as service providers—in exchange for an 800% increase in fees.

### 1. Citco Expressed Doubt as to Whether the Funds' Assets at BLMIS Even Existed.

~~128.~~149.    Beginning in 2000, the Administrators ran into trouble with the basic task of verifying the existence of the Funds' assets with Madoff. Initially, Citco expressed serious concerns regarding whether the Funds' Treasury bond transactions actually matched those transactions reported by Madoff because of an apparent "rhythm of trading" each month. The rhythm of trading within Sentry's portfolio appeared too consistent to be true, as the assets included only a limited number of Treasury bonds by each month's end. At the beginning of each month, Madoff would purchase shares and put options and would sell call options, but, like clockwork, would then liquidate all of Sentry's holdings by the 20th of each month. Thus the Administrators wanted to check whether the Treasury bonds even existed at all.

~~129.~~150.    The Administrators could not verify the existence of the assets because the Funds' custodians, Citco Bank Nederland N.V. Dublin Branch and Citco Global Custody (individually, the "Fund Custodian", and collectively, the "Fund Custodians"), did not actually hold them. Instead, Madoff served as his own custodian. Therefore, the custody statements that the Fund Custodians were supposed to generate based on assets in their possession, were instead

44

merely copied, or "shadow booked," from BLMIS account statements.  The Fund Custodians were "only the custodian[s] on paper, not in reality" and did not place any trades for the Funds.

130.151.    Management within Citco, including Ruud Bodewes ("Bodewes"), the head of internal audit for all of Citco Group, and Ger Jan Meijer ("Meijer"), the head of internal audit for the Administrators, expressed concern about the operations at BLMIS.  In May 2000, Bodewes expressed his concern to the general counsel and manager of Citco Bank Nederland, as well as Meijer, that "[w]ith [the] Manhattan [Investment Fund fraud] in the back of our minds, we, as Citco, may very well be in a potential dangerous situation, since we do not seem to have an independent source to verify the information from BLMIS."  Indeed, Meijer had raised these concerns to Bodewes weeks earlier, warning that Madoff could be "a Manhattan multiplied by a factor of five."

131.152.    In addition to warning Bodewes, Meijer also warned Citco Group's Chief Executive Officer, Christopher Smeets ("Smeets") in May 2000 that "[t]o not react or to react too late does indeed mean that investors once again faithfully deposit tens of millions of USD in the Madoff well (for which we do not know if there is a bottom to it) at month's end," with the understanding that Citco could "already be held personally responsible insofar as we have allowed the subscriptions to take place as of May without a fight."  Smeets acknowledged receipt of Meijer's emails and concerns.  At that time, Meijer emphasized that "with the current knowledge and Citco as asset protector, Citco has a legal obligation to obtain more assurance" of the Funds' assets.

132.153.    However, in what became a familiar pattern, Citco turned a blind eye to the documents and information in their possession.  Citco Group did not address the

45

Administrators' concerns raised in May 2000, and a few months later, Meijer stated:  "[i]t seemed that this affair [was] being put on the back burner and hushed."

~~133.~~154.        A year later, Meijer again reiterated his concerns about BLMIS's operations, which "remain[ed] unsolved."  Meijer warned that "Citco has a risk exposure of more than USD3 billion" and that "[p]robably there are no options to restore this situation from a worst case scenario."  He stated: "I will not change my [opinion] as long as I [do] not see evidence that the portfolio exists."  Five months later, in January 2002, the Administrators again emphasized that the issues concerning BLMIS posed severe risks to Citco and the Funds' investors.  Meijer told Bodewes: "I have been worried about this situation for 2 years (including the risk to the continued existence of Citco), however the same was not taken seriously by certain gentlemen. . . . My intuition (combined with the business that I have seen) tells me that things are not right."

~~134.~~155.        In January 2002, Meijer insisted to Bodewes that: "Citco must now seriously take the possibility that everything is really wrong with [the Funds'] account, as well as the possibility that everything will come into view within 2 years. . . . Personally I think the chance [that something is wrong] is at least 50%."  Meijer persisted that there was "still the opportunity to more or less direct the whole process, and search out the best way out with the help of good lawyers (legal contingency plan).  Otherwise you run the risk that the scene will later be determined by others."  However, in response Citco Group's management, and Bodewes in particular, failed to undertake a meaningful investigation into Meijer's doubts regarding the existence of the Funds' assets, and instead continued acting as a service provider for the Funds for over six more years.

135.156.    In fact, multiple members of the Administrator's management tried to prevent Meijer from asking questions.  John Verhooren ("Verhooren"), a member of Citco's administration services management team, actually knew that Meijer had raised concerns about the existence of the Funds' assets for years, but deliberately ignored those concerns.  For example, in May 2000, Verhooren acknowledged that the lack of segregation of duties and trading patterns at Madoff were not new discoveries, and many people at Citco had already recognized these phenomena.  Later, in response to concerns raised in 2001, Verhooren again rebuffed Meijer's insistence that Citco was facing "an enormous risk exposure."  Instead, Verhooren told Meijer to stop raising the issue and claimed that Citco would try to meet with Madoff to investigate.  However, neither Verhooren nor any member of the Administrator's staff ever gained sufficient evidence that the Funds' assets existed from Madoff.

## 2.    Citco Failed To Obtain Evidence Of the Existence of the Funds' Assets.

136.157.    Citco not only expressed internal concern regarding whether the Funds' assets with BLMIS even existed—it knew that BLMIS would not confirm their existence for Citco as the Funds' service providers.

137.158.    The Administrators' audit reports designated Sentry as a non-compliant fund on their "watch list" as a result of the lack of segregation of duties at BLMIS.  Each year from 2000 through 2006, the Administrators recommended that Citco either confirm the existence of the Funds' assets held by BLMIS or resign as service providers.  On three occasions between May 2000 and December 2002, Citco attempted to verify the existence of the Funds' assets at BLMIS.  All attempts failed.

138.159.    In May 2000, Citco set up a meeting with Madoff to gain "independent confirmation of the[] existence" of the Funds' assets, particularly the Treasury bills, and to

determine how Madoff derived share prices from the markets.  However, this effort failed.  BLMIS did not verify the existence of the assets, and Citco concluded internally that the meeting had not provided "a full disclosure of [the] assignment."

139.160.    In July 2001, Bodewes had attempted to assess the concerns raised by Meijer in an internal due diligence memorandum.  However, Bodewes's due diligence was limited to a review of Citco's proprietary documents because Citco was concerned that permitting "an on-site audit at [BLMIS] premises may hurt the relationship with [the Fund], resulting in a possible loss of [a] USD 1.5 million dollar fee income."  Even so, based on the documents and information in Citco's possession, Bodewes shared Meijer's concerns about BLMIS's operations, and concluded that losses at BLMIS could be hidden, leaving Citco ultimately liable to the Funds' shareholders.  Bodewes also noted that the two man audit firm used by BLMIS did not "match up" with the size of BLMIS's business.  Indeed, multiple Administrator employees acknowledged that the small size of Madoff's accounting firm posed a risk, given that the size of the firm was not large enough to audit the amount of assets purportedly managed by BLMIS.

140.161.    Smeets, Citco Group's CEO, received Bodewes' memo regarding the issues at BLMIS, including the issues posed by the size of Madoff's audit firm.  Citco Group's management responded that they would like to "work this out" with Madoff, but never met with him in 2001.  By an email dated 6 February 2002, Unternaehrer of Citco Group stated that Citco wanted evidence the T Bills existed.  In December 2002, Citco once again "attempt[ed] to get conclusive proof" from Madoff that Sentry's portfolio was in BLMIS custody and to have "Madoff . . . provide evidence of the existence/custody of the positions."  Before the meeting, Meijer directed a member of the internal audit group at Citco to "[p]roperly record what you

have done and what you have not been able to determine. . . . It is a troublesome task insofar as Madoff is not known for his openness."  However, the meeting did not include any meaningful discussion with Madoff regarding the holdings purported to be in his custody.  The employee, Albert van Nijen, reported back that the Administrators' "mission" to increase "Citco's comfort level with respect to the existence of the assets in relation to [Citco's] responsibilities as [Fund] Custodian[s]" had again failed.  On 27 December 2002 Bodewes reported to the executive committee of Citco Group that as long as the position of Sentry with BLMIS was not independently verified "there will be doubts".

141.162.    After Citco's third failed attempt, Citco never again tried to gain evidence from Madoff that the Funds' assets existed until his fraud was ultimately exposed in December 2008.    In addition, Meijer noted that "Madoff [was] no[t] known" to Citco's external traders, even though his investment strategy required selling major quantities of call options each month. In an email to Bodewes, Meijer stated, "I visited the Madoff website. . . . According to the investment policy, the fund needs to sell major quantities of call options on the market each month.  I absolutely do not trust it!!!!"

142.163.    Meanwhile, through the entire period, Citco continued to issue the Certificates.

### 3.    Citco Negotiated For Higher Fees As Reimbursement For the "Risks" of Doing Business with Madoff.

143.164.    Facing grave concerns regarding the Funds' assets placed with BLMIS, Citco put its financial interests ahead of its duties to the Funds and the Funds' investors.

144.165.    By 2002, Citco knew that the Funds' holdings could not be verified, knew that BLMIS cleared its own trades, and knew that Citco's efforts to reconcile Madoff's operations had failed.  That year, Citco's executive committee put credit line requests from the

49

Funds "on hold until . . . the 'investigation' on Fairfield" was complete, because Citco was concerned about its exposure to liabilities well beyond the loans in the case of fraud.  Smeets and Citco's management were aware that the credit line requests were on hold while Citco tried to "get as much comfort as possible" that BLMIS was not a fraud.

145.166.    Two years later, in February and March 2004, the Fund Custodian decided to cancel one of its credit facilities with Sentry following its discovery that AIG had pulled its investments from BLMIS altogether.  Specifically, the Administrator's management, including Meijer, Verhooren, and William Keunen—who was responsible for the entire division of administration services at Citco—found out that "the risk team of AIG took the decision to get out from all Madoff exposure . . . [t]hey are scared with the structure . . . ."  It appears that at least some Citco Group management wanted the Fund Custodian to resign: by an email of 6 February 2004, Keunen informed the Administrator that Unternaehrer of Citco Group had decided the Fund Custodian should step down as custodian.  At this time, Smeets was kept informed and aware of Citco's concerns regarding AIG's withdrawal from Madoff.  A few months later, in or about September 2004, Citco's board of directors made the decision to place the Fund Custodians' and Administrators' business with the Funds "under scrutiny" and "to close down all credit relationships . . . to decrease [Citco's] exposure."  Citco knew that its credit relationship with the Funds would expose it to liability because of BLMIS's role as custodian, among other reasons.

146.167.    By 2006, Citco considered resigning as service providers.  The Fund Custodians told Citco Group's management, including Smeets: "We are taking a risk and we only get US$60K per year!"

147.168.    Instead, Citco negotiated a new fee arrangement. The new arrangement calculated the Custodians' rate as one basis point (one hundredth of one percent) of the Funds' total Net Asset Value.  In other words, Citco's fees for the Fund Custodians' services were now directly tied to the Net Asset Value as determined by the Administrators.  Citco decided "[o]n that basis" to stay on as Fund Custodians because Sentry's Net Asset Value at that time, based principally on the assets purportedly at BLMIS, was approximately "$5bn, i.e., fees of $500k."

148.169.    Simply put, Citco accepted dramatically higher fees—tied directly to the Net Asset Value certified by Citco—in exchange for the risks to Citco of doing business with BLMIS, as well as its continued silence regarding BLMIS's role as custodian of the Funds' assets.  Ultimately, Citco's fees increased by 800%.

149.170.    Internally, Citco knew that: (i) the Administrators did not consistently price the Funds' portfolios independently and typically relied exclusively on the share pricing information supplied by Madoff; and (ii) the Fund Custodians did not have custody of the Funds' portfolios.

150.171.    Citco failed to verify the pricing information for the Funds' portfolio from independent sources and instead relied on BLMIS statements, even though it knew that such account statements contained incorrect information.  Accountants working for the Administrators discovered on numerous occasions that the trades reported by BLMIS contradicted the public daily price ranges for corresponding trades.  When the Administrators' personnel discovered that the reported share or option prices reported by Bloomberg and Madoff differed, they used the public price in calculating the Net Asset Value reflected in the Certificates.  Citco thus turned a blind eye to its knowledge that BLMIS issued account statements with incorrect pricing information.

151. 172.      Citco acted with a lack of good faith by issuing Certificates in spite of its knowledge that: (1) BLMIS's transactions were likely impossible, given its awareness that "Madoff always [knew] precisely when to buy and sell;" (2) Madoff was the only broker-dealer Citco worked with that provided settlement date transaction confirmations only, rather than trade date confirmations; and (3) Madoff insisted that Citco book all trades for the Funds manually, rather than through automated or electronic means, which directly contradicted Citco's own "policy to set up [electronic] reconciliation programs for each fund and to avoid manual entries as much as possible;" and, within its own records, "there [were] differences between the custody statements of Citco Bank and Madoff that [were] not being analyzed" by Citco.

152. 173.      This lack of good faith permeated the entire Citco organization.  Until 2008, the Administrators and the Fund Custodians worked hand-in-hand with multiple other "Citco" entities to generate the Certificates for the Funds and served as the intermediaries for all subscription funds invested by Defendants under the Subscription Agreements.  Under Citco Group's direction and control, the Administrators issued Certificates without good faith and with willful blindness to the fact that they could not confirm whether the Funds' assets actually existed.

153. 174.      From the top down, Citco saw and appreciated, but consciously disregarded, the risks to the Fund's investors posed by Madoff's operations.  The Administrators and all other "Citco" subsidiaries served at the whim of Citco Group Ltd., which controlled the day-to-day operations of the Administrators and the issuance of Certificates showing an inaccurate and inflated Net Asset Value under the Administration Agreements (as amended from time to time) with the Funds.  Irrespective of which "Citco" entity the Funds' engaged, at all relevant times the Funds' were provided services from and on behalf of "Citco" as a whole from

at least ~~eight~~ eleven separate entities, including: Citco Group Ltd.; Citco Global Custody NV; Citco Global Custody (NA) NV; CGC (NA); Citco Fund Services (BVI); Citco Fund Services (Europe) B.V.; Citco (Canada) Inc.; ~~and~~ Citco Global Security Services; Citco Bank Nederland N.V. and Citco Bank Nederland N.V. Dublin Branch, and Citco Banking Corporation N.V..

175.    By virtue of the foregoing conduct, Citco issued the Certificates without good faith.  The Funds were the primary victims of Citco's conduct and its lack of good faith in issuing the Certificates.

**E.        The Citco Subscribers Themselves Knew of or Consciously Disregarded the BLMIS Fraud**

176.    Upon information and belief, all of the foregoing information related to BLMIS was conveyed to Citco Bank Nederland N.V.  At all relevant times, Citco Bank Nederland N.V. Dublin Branch was a wholly owned subsidiary of Citco Banking Corporation N.V., and, upon information and belief, Citco Bank Nederland N.V. worked with Citco Bank Nederland N.V. Dublin Branch and Citco Banking Corporation N.V. with respect to their work for the Funds. The Citco Banks knew of or consciously disregarded the BLMIS fraud and the bases thereof.  In addition to the foregoing:

- In May 2000, Bodewes and Meijer emailed Renger Boonstra, the general counsel of Citco Bank Nederland N.V., recognizing that the lack of segregation of duties in BLMIS posed a unique issue because they could not "be sure" that the Fund actually owned the reported holdings.  Boonstra warned that "[w]ith [the] Manhattan [Investment Fund Fraud] in the back of our minds, we as Citco, may very well be in a potential dangerous situation, since we do not seem to have an independent source to verify the information from BLMIS."  His proposed salutation involved resignation or obtaining segregation of duties.

- Meijer responded to Bodewes and Boonstra observing that BLMIS should have a FED book entry account for treasury bonds and proposed that someone should check whether the transactions for the Funds matched the transactions as they appeared on FED statements or FED confirmations received by BLMIS. He expressed the view that Citco was selling asset protection that was not covered by sufficient evidence. No evidence suggests that anybody checked the FED statements.

- On August 28, 2000, Meijer emailed Bodewes expressing his concern that the issues with BLMIS were "being put on the back burner and being hushed." On September 13, 2000, Bodewes forwarded the email from Meijer to representatives from Citco Bank Nederland N.V. and the Administrator. In a separate email to Laurens Luckmann, a supervisory director of Citco Banking Corporation, Bodewes stated that Meijer was "a bit concerned for a second Manhattan case" [a fraud case] and also noted that a managing director of Citco Bank Nederland N.V., Willem Holst, was not comfortable with the situation.

- On September 18, 2000, Holst replied to Bodewes' September 13 email stating support for Meijer's proposal that PricewaterhouseCoopers confirm the existence of assets in BLMIS's custody, but indicated that it should be done not once a year but every six months.

- In an internal memorandum circulated on July 13, 2001, Bodewes concluded that the two-man audit firm being used by BLMIS did not "match up" to the size of the company. He added that there was a "concrete" risk that losses were being hidden and the custody statements overstated. On July 27, 2001 Luckmann

forwarded the memo to all Citco executive directors requesting that it be discussed at their next meeting.  After this meeting, however, new administration and custodian agreements were executed between Citco and the Funds.

- On or about February 5, 2004, Unternaehrer was advised that AIG had decided to exit their investments with BLMIS citing concerns over the structure.  That led Luckmann (by email dated February 6, 2004, and following consultation with Smeets) to give instructions for Citco companies to redeem their own shares in Sentry.

- In emails dated February 6, 2004, Keunen advised the Administrator and Citco Group management that Unternaehrer had decided that Citco Bank Nederland N.V. would step down as the Fund Custodian.

- On August 25, 2004, Holst emailed Luckmann acknowledging that there had been a problem with the position of BLMIS from the beginning because the Administrator and the Fund Custodian totally depend on BLMIS.  That email led Luckmann to email Scott Case (another managing director of Citco Bank Nederland N.V.), who responded the same day observing that he had no idea why Citco Bank Nederland N.V. continued to fulfill a "shadow" custody function.

- In an email dated September 9, 2004, Ronald Irausquin of Citco Bank Nederland N.V. confirmed that all business with Sentry, both on the part of the Administrator and the Fund Custodian, was meant to have been placed under scrutiny by "the Board" and that a decision had been made to close down all credit relationships with Sentry.

- In an email dated September 16, 2004 to the executive committee members and to Keunen and Luckmann, Unternaehrer stated that he had met with Cornelis Boele of Fairfield Greenwich Limited and that there had also been a conference call with legal counsel and Case of Citco Bank Nederland N.V., at which agreement had been reached to make changes to the custody agreement, the Private Placement Memorandum and sub-custody agreement in order to make "everybody comfortable with the structure." When Luckmann queried whether the custody fee could be changed from a fixed fee to a basis points structure, Unternaehrer replied "the main purpose here is to take away possible liabilities while maintaining CFS business."

- In an email dated October 14, 2004 to Keunen and Luckmann, William DeRosa, general manager at Citco Bank Nederland N.V., stated "Regarding Fairfield, a discussion took place wherein the question was posed as to what was going on with it because we thought we were resigning as custodians. [Unternaehrer] met with them and it now appears we are restructuring the relationship. The concern was that even if we restructured the legal agreement to meet the reality of how this account is processed, we still had some risk."

- On or about November 2, 2004, Boonstra noticed that BLMIS's role as custodian and investment manager contravened clause 2.38 of the Irish Stock Exchange's Listing Requirements and Procedures.

- On an October 6, 2005 email between Holst, DeRosa, Boonstra, and others, Boonstra stated that "we are not really the custodian for Fairfield Sentry, just a sub-custodian."

- A review by Citco Bank Nederland N.V.'s audit division in December 2007 concluded that it was not able to validate that client instructions were correctly processed by BLMIS.

- As late as 2008, Citco Bank Nederland N.V. employees, including Boonstra and DeRosa, claimed that the structure between the Funds and BLMIS was a "curious anomaly" and that Citco felt uncomfortable.

- In December 2009, Boonstra, DeRosa, Case, and others were part of an email exchange, which recapped a discussion with Mark McKeefry regarding the bank's preference to stop down as Fund Custodian after a finding that the Fund said it complied with the requirements of the Irish Stock Exchange after misrepresenting that the custodian and investment manager were separate.

177.    As alleged *supra*, all Citco entities worked collaboratively with respect to their work for the Funds.  The free flow of information and co-ordination of action between the various Citco entities, including the Citco Banks and the Citco Record Subscribers, demonstrate that all Citco entities worked in collaboration with each other. Additionally, at all relevant times, all Citco Record Subscribers and the Citco Banks were wholly-owned subsidiaries of the Citco Group, and all the Citco entities worked under the ultimate direction of the Citco Group's executive committee.  At all relevant times, the Citco Group was aware of or consciously disregarded the potential fraudulent activity, and still directed or consented to the Administrator's and the Fund Custodians' involvement with BLMIS.

- Following the emails and reports from the Administrator regarding the visit to BLMIS, Smeets (Chief Executive Officer of Citco Group) arranged an executive committee meeting on January 31, 2002 to discuss BLMIS.

- The revised administration agreement between the Funds and the Administrator dated April 10, 2002, was executed with either the agreement of or at the direction of the Citco Group because an executive director at the Citco Group, Unternaehrer, sent an email dated February 6, 2002 to the Administrator that the Funds and BLMIS were under investigation.

- A report was forwarded to the Citco Group's executive committee on December 27, 2002 regarding the Administrator's visit to BLMIS expressing the Administrator's concerns with BLMIS, but a revised administration agreement was still executed between the Administrator and the Funds on February 20, 2003.

- In early 2002, Citco Group's executive committee closed some of the Fund's credit facilities to limit its exposure, and then put the credit line requests from the Funds "on hold until . . . the 'investigation' on Fairfield [the Fund]" was complete because the executive committee was concerned that the Fund Custodian and Administrator were exposed to liabilities well beyond the loans in the case of fraud. This issue arose again in 2004 when the Funds Custodian decided to cancel on of its credit facilities with the Fund following the discovery by the Citco Group's executive committee that another investor had pulled its investments from BLMIS. At all times, the executive committee was in charge of the investigation and either permitted or ordered the Citco entities to proceed.

- In relation to the dispute as to whether BLMIS's role as custodian and investment manager contravened the Irish Stock Exchange's Listing Requirements and Procedures, counsel for Citco Group told the Administrator that it was prepared to

tolerate potentially misleading or inaccurate information being provided to the Irish Stock Exchange to continue its relationship with the Funds.

178.    Through the above-alleged conduct, the Citco Subscribers knew, as early as 2000, that there was no segregation of duties at BLMIS, and that the Citco Subscribers did not have an independent source to verify information received from BLMIS.  The Citco Subscribers identified this risk internally for at least seven consecutive years and flagged it as a known and recognized problem in internal reports.

179.    Employees of some or all of the Citco Subscribers expressed concerns about whether the Funds' assets with BLMIS even existed.  Further, the Citco Subscribers recognized a pattern of trading with BLMIS, whereby BLMIS purchased shares and put options and sold call options at the beginning of each month, but liquidated all positions towards the end of the month. The Citco Subscribers learned that BLMIS did not welcome inquiries regarding its practices and also acknowledged internally that this lack of transparency posed a significant risk to investors. However, upon information and belief, the Citco Subscribers did not make any efforts after 2002 to verify the existence of the assets, establish a line of communication with BLMIS or investigate BLMIS' trading practices.  Further, some or all of the Citco Subscribers expressed concerns regarding potential similarities between BLMIS and the Manhattan Investment Fund fraud exposed in 2000.

~~154.~~180.        In an effort to limit their own exposure and risk, the Citco Subscribers, including the Citco Banks, considered resigning as the Funds' service providers.  However, they ultimately decided to stay on, in exchange for dramatically increased fees.

~~155.~~181.                                        As set forth above, and in accordance with the B&C Agreements between the Defendants and the Citco Subscribers, the Citco

Subscribers served as trustee, agent, representative, nominee or custodian for the Defendants in connection with ~~their~~ investments in the Funds. ~~, including, by: subscribing to Shares of the Funds on behalf of the Beneficial Shareholders, maintaining custody of the Shares as record shareholders, paying redemption proceeds from the Shares of the Funds to the Beneficial Shareholders,~~ and otherwise exercis~~ing~~ed control, and as per the B&C Agreements, specific discretion over the Shares of the Funds on behalf of the Defendants.

~~156.~~182. _____ Further, each of the Subscription Agreements, executed by the Citco Subscribers, manifested the ~~Beneficial Shareholders~~Defendants' consent for the Citco Subscribers to act on behalf of and subject to the ~~Beneficial Shareholders~~Defendants' control in accordance with the B&C Agreements.

183. ___ In executing the Subscription Agreements, the Citco Subscribers accepted and agreed ~~with the~~ to act on behalf of the ~~Beneficial Shareholders~~Defendants.

~~157.~~184. As described above, the Citco Subscribers were aware of the irregularities at BLMIS at all relevant times during which they acted on behalf of the Defendants pursuant to the Subscription Agreements and the B&C Agreements in connection with Defendants' investments in the Funds that ultimately were invested in BLMIS. The Citco Subscribers performed these services for the Defendants while possessing the knowledge of the irregularities at BLMIS. As set forth above, and in accordance with the B&C Agreements, at all times this knowledge was relevant if not material to Defendants' investing in the Funds to participate in the Funds' investments in BLMIS.

~~158.~~185. Accordingly, the Defendants/Beneficial Shareholders, except for Sigma and Lambda, who were primary victims of Citco's conduct, had the same knowledge as Citco

and the Citco Subscribers regarding all relevant matters relating to BLMIS and the Funds' Net Asset Values at all relevant times.

**E.F.         Exposure of Madoff's Fraud**

159.186.     On December 11, 2008, federal agents arrested Madoff for violation of federal securities laws.  On that same day, the United States Attorney brought criminal charges against Madoff, alleging that Madoff ran a multi-billion dollar Ponzi scheme.  See United States v. Madoff, No. 08-mj-2735 (S.D.N.Y., filed Dec. 11, 2008).  Upon arrest, Madoff was reported to have told the agents that "there is no innocent explanation" for the fraudulent scheme he had orchestrated and confessed that he "paid investors with money that wasn't there."

160.187.     On December 11, 2008, the United States Securities and Exchange Commission ("SEC") filed an emergency action in the Southern District of New York to halt ongoing fraudulent offerings of securities and investment advisory fraud by Madoff and BLMIS. See SEC v. Madoff, No. 08-cv-10791 (S.D.N.Y. filed Dec. 11, 2008). On February 9, 2009, the SEC submitted to the Court a proposed partial judgment, to which Madoff consented, imposing a permanent injunction and continuing relief against him, including a permanent freezing of his assets.

161.188.     In March 2009, Madoff pleaded guilty to the criminal charges brought against him.  In his plea allocution, Madoff confessed: "for many years up until my arrest on December 11, 2008, I operated a Ponzi scheme through the investment advisory side of my business, Bernard L. Madoff Securities LLC."  As Madoff himself described how the scheme worked:

> The essence of my scheme was that I represented to clients and prospective clients who wished to open investment advisory and individual trading accounts with me that I would invest their money in shares of common stock, options and other securities of large well-known corporations, and upon request, would return

61

to them their profits and principal. Those representations were false because for many years up and until I was arrested on December 11, 2008, I never invested those funds in the securities, as I had promised. Instead, those funds were deposited in a bank account at Chase Manhattan Bank. When clients wished to receive the profits they believed they had earned with me or to redeem their principal, I used the money in the Chase Manhattan bank account that belonged to them or other clients to pay the requested funds.

162.189.      Madoff further confessed to covering up his fraud by fabricating false trade confirmation and account statements:

To further cover-up the fact that I had not executed trades on behalf of my investment advisory clients, I knowingly caused false trading confirmations and client account statements that reflected the bogus transactions and positions to be created and sent to clients purportedly involved in the split strike conversion strategy, as well as other individual clients I defrauded who believed they had invested in securities through me. The clients receiving trade confirmations and account statements had no way of knowing by reviewing these documents that I had never engaged in the transactions represented on the statements and confirmations.

163.190.      Madoff is now serving a 150-year sentence in federal prison.

**F.G.          The Funds' Estates in Liquidation**

164.191.      Following the revelation of Madoff's fraud, the Funds' boards of directors suspended any further redemptions of Shares and the calculation of the Funds' Net Asset Values. As of December 2008 and presently, Sentry, Sigma, and Lambda had, respectively, approximately 4.7 million, 3.9 million, and 0.2 million shares outstanding.

165.192.      In 2009, the Funds were put into liquidation proceedings in the BVI.

166.193.      On February 27, 2009, a secured creditor of Lambda commenced proceedings in the BVI Court pursuant to the BVI Insolvency Act seeking the appointment of a liquidator over Lambda (the "Lambda Proceeding"). The Lambda Proceeding is pending in the BVI Court as claim number BVIHC(COM)2009/74.

167.194.    On April 21, 2009, ten shareholders applied to the BVI Court for the appointment of a liquidator over Sentry (the "Sentry Proceeding").  The Sentry Proceeding is pending in the BVI Court under claim number BVIHC(COM)2009/136.

168.195.    On April 23, 2009, a shareholder applied to the BVI Court for the appointment of a liquidator over Sigma (the "Sigma Proceeding" and collectively with the Lambda Proceeding and the Sentry Proceeding, the "BVI Liquidation Proceedings").  The Sigma Proceeding is pending in the BVI Court under claim number BVIHC(COM)2009/139.

169.196.    As alleged above, the BVI Court issued orders – the BVI Appointment Orders – appointing the Foreign Representatives as liquidators of the Funds.  Pursuant to the BVI Appointment Orders, the Foreign Representatives are responsible for all aspects of the Funds' business, including protecting, realizing, and distributing assets for the Funds' estates.

170.197.    The Redemption Payments that were made to Defendants were mistaken payments and constituted or formed part of avoidable transactions, and generally represent assets of the Funds' estates that Defendants are not entitled to keep.

## FIRST CLAIM
### *(Unjust Enrichment- Against All Defendants)*

171.198.    The Funds (acting by the Foreign Representatives, in their capacities as liquidators of the Funds and on behalf of the Funds) repeat and allege again the allegations contained in paragraphs 1 through 172197 above as if set forth herein.

172.199.    Upon information and belief, the Citco Subscribers may have subscribed to all or some portion of the Shares issued to them under the Subscription Agreements in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

173.200.    Upon information and belief, the Citco Subscribers may have paid to or credited some or all of the Redemption Payments received by them from the Funds to accounts

of Beneficial Shareholders.  These Redemption Payments did not, as the Funds mistakenly believed, represent the proceeds arising from the profitability of or to continue investment in BLMIS.  Instead, Redemption Payments were made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

174.201.    Neither the Citco Subscribers nor the Beneficial Shareholders provided valuable consideration to the Funds in exchange for the Redemption Payments or any portion thereof received by them, in that they received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at the time or any relevant time.

175.202.    To the extent that a Beneficial Shareholder received any portion of the Redemption Payments paid to the Citco Subscribers in their capacity as trustee, agent, representative, or nominee for a Beneficial Shareholder, such Beneficial Shareholder has been unjustly enriched to the detriment of the Funds and other shareholders and creditors of the Funds.

176.203.    It would offend principles of equity and good conscience to permit any Beneficial Shareholders to retain the Redemption Payments made by the Funds.

177.204.    The Foreign Representatives, in their capacities as liquidators of the Funds and on behalf of the Funds, are entitled to recover from any Beneficial Shareholders an amount equal to any portion of any Redemption Payments received by them, or, in the alternative, an amount equal to the amount of all Redemption Payments received by any Beneficial Shareholders less the amount of redemption payments that such Beneficial Shareholders would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## SECOND CLAIM
### *(Money Had and Received- Against All Defendants)*

~~178.~~205.        The Funds (acting by the Foreign Representatives, in their capacities as liquidators of the Funds and on behalf of the Funds) repeat and allege again the allegations contained in paragraphs 1 through ~~179~~204 above as if set forth herein.

~~179.~~206.        Upon information and belief, the Citco Subscribers may have subscribed to all or some portion of the Shares issued to them under the Subscription Agreements in the capacity of trustee, agent, representative, or nominee for Beneficial Shareholders.

~~180.~~207.        Upon information and belief, the Citco Subscribers may have paid to or credited some or all of the Redemption Payments received by them to accounts of the Beneficial Shareholders.  These Redemption Payments did not, as the Funds mistakenly believed, represent the proceeds arising from the profitability of or to continue investment in BLMIS.

~~181.~~208.        Neither the Citco Subscribers nor the Beneficial Shareholders provided valuable consideration to the Funds in exchange for the Redemption Payments or any portion thereof received by them, in that they received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

~~182.~~209.        To the extent that a Beneficial Shareholder received any portion of the Redemption Payments paid to the Citco Subscribers in their capacity as trustee, agent, representative, or nominee for the Beneficial Shareholders, such Beneficial Shareholders have been unjustly enriched to the detriment of the Funds and other shareholders and creditors of the Funds.

~~183.~~210.        Furthermore, the Beneficial Shareholders were not entitled to receive any portion of the Redemption Payments paid to the Citco Subscribers upon the redemption of

Shares issued to them in their capacity as trustee, agent, representative, or nominee for the Beneficial Shareholders because the amounts transferred by Sentry with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value which caused the payment received for redemption of Shares to be in excess of the Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

184.211.     To the extent the Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of the Funds and on behalf of the Funds, the loss will be disproportionately and unjustly borne by the Funds and other shareholders and creditors of the Funds.

185.212.     It would offend principles of equity and good conscience to permit the Beneficial Shareholders to retain the Redemption Payments made by the Funds.

186.213.     The Foreign Representatives, in their capacities as liquidators of the Funds and on behalf of the Funds, are entitled to recover from the Beneficial Shareholders an amount equal to any portion of any Redemption Payments received by them, or, in the alternative, an amount equal to the amount of all Redemption Payments received by the Beneficial Shareholders less the amount of redemption payments that such Beneficial Shareholders would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## THIRD CLAIM
### (Mistaken Payment – Against All Defendants)

187.214.     The Funds (acting by the Foreign Representatives, in their capacities as liquidators of the Funds and on behalf of the Funds) repeat and allege again the allegations contained in paragraphs 1 through 188213 above as if set forth herein.

66

188.215.    As described above, the Funds made each of the Redemption Payments to the Citco Subscribers under the mistaken belief that the amounts paid to the Citco Subscribers represented the proceeds arising from the profitability of or to continue investment in BLMIS and were based upon the Net Asset Value of Shares redeemed based upon the true facts at that time.

189.216.    However, upon information and belief, BLMIS did not hold any securities or interests of securities on account for Sentry and the payments made by BLMIS to Sentry to fund Redemption Payments to the Citco Subscribers represented, in fact, money deposited with BLMIS by other BLMIS investors or previous deposits made by Sentry with BLMIS, never invested but rather misused and misappropriated as part of Madoff's fraud.

190.217.    Upon information and belief, the Citco Subscribers may have paid to or credited some or all of the Redemption Payments received by them to accounts of the Beneficial Shareholders.  These Redemption Payments did not, as the Funds mistakenly believed, represent the proceeds arising from the profitability of or to continue investment in BLMIS.

191.218.    Additionally, the Beneficial Shareholders were not entitled to receive the Redemption Payments received by the Citco Subscribers upon the redemption of Shares issued to them in their capacity as trustee, agent, representative, or nominee for the Beneficial Shareholders because, as was unknown to the Funds, the amounts transferred with respect to these Redemption Payments were based on a miscalculated and inflated Net Asset Value, which caused the Redemption Payments received by the Citco Subscribers for their redemption of Shares to be in excess of the Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

192.219.    Neither the Citco Subscribers nor the Beneficial Shareholders provided valuable consideration to the Funds in exchange for the Redemption Payments or any portion thereof received by them, in that they received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

193.220.    The Redemption Payments, while benefiting any Beneficial Shareholder receiving any portion thereof, were made to the detriment of the Funds and other shareholders and creditors of the Funds.

194.221.    To the extent the Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of the Funds and on behalf of the Funds, the loss will be disproportionately and unjustly borne by the Funds and other shareholders and creditors of the Funds.

195.222.    It would thus offend principles of equity and good conscience to permit any Beneficial Shareholder to retain the Redemption Payments.

196.223.    The Foreign Representatives in their capacities as liquidators of the Funds and on behalf of the Funds are entitled to recover from any Beneficial Shareholders an amount equal to any portion of any Redemption Payments received by them, or, in the alternative, an amount equal to the amount of all Redemption Payments received by any Beneficial Shareholders less the amount of redemption payments that such Beneficial Shareholders would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## FOURTH CLAIM
### *(Constructive Trust-Against all Defendants)*

197.224.        The Funds (acting by the Foreign Representatives, in their capacities as liquidators of the Funds and on behalf of the Funds) repeat and allege again the allegations contained in paragraphs 1 through 198223 above as if set forth herein.

198.225.        As described above, upon receipt of a redemption request, the Funds made each of the Redemption Payments to the Citco Subscribers based on a miscalculated and inflated Net Asset Value, which caused those Redemption Payments to be in excess of the Net Asset Value of redeemed Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

199.226.        As alleged above, the Redemption Payments generally represented the proceeds arising from or to continue investment in what the world now knows was Madoff's Ponzi scheme.  Accordingly, these Redemption Payments did not, as the Funds mistakenly believed, represent the proceeds arising from the profitability of (or to continue investment in) BLMIS.

200.227.        Upon information and belief, the Citco Subscribers may have paid some or all of the Redemption Payments they received to the Beneficial Shareholders.

201.228.        By reason of their receipt of some or all of the Redemption Payments, the Beneficial Shareholders have been unjustly enriched to the detriment of the Funds and other shareholders and creditors of the Funds.

202.229.        Furthermore, the Beneficial Shareholders were not entitled to receive the Redemption Payments because the amounts transferred with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payment received by the Citco Subscribers for their redemption of Shares to be in excess of the Net Asset

Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

203.230.    It would offend principles of equity and good conscience to permit the Beneficial Shareholders to retain the Redemption Payments.

204.231.    By reason of the foregoing, a constructive trust should be imposed on the Redemption Payments that were received by the Beneficial Shareholders from the Funds for the benefit of the Foreign Representatives and the Funds and other shareholders and creditors of the Funds.

## FIFTH CLAIM
### (Unfair Preference Pursuant to Section 245 of the BVI Insolvency Act – Against All Defendants)

205.232.    The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of the Funds, repeat and allege again the allegations contained in paragraphs 1 through 206231 above as if set forth herein.

206.233.    Section 245 of the BVI Insolvency Act provides:

(1) Subject to subsection (2), a transaction entered into by a company is an unfair preference given by the company to a creditor if the transaction (a) is an insolvency transaction; (b) is entered into within the vulnerability period; and (c) has the effect of putting the creditor into a position which, in the event of the company going into insolvent liquidation, will be better than the position he would have been in if the transaction had not been entered into.

(2) A transaction is not an unfair preference if the transaction took place in the ordinary course of business;

(3) A transaction may be an unfair preference notwithstanding that it is entered into pursuant to the order of a court or tribunal in or outside the Virgin Islands.

(4) Where a transaction entered into the by the company within the vulnerability period has the effect specific in subsection 1(c) in respect of a creditor who is a connected person, unless the contrary is proved, it is presumed that the transaction was an insolvency transaction and that it did not take place in the ordinary course of business.

207.234.    A creditor is defined in Section 9 of the BVI Insolvency Act as follows:

(1) A person is a creditor of another person (the debtor) if he has a claim against the debtor, whether by assignment or otherwise, that is, or would be, an admissible claim in (a) the liquidation of the debtor, in the case of a debtor that is a company or a foreign company; or (b) the bankruptcy of the debtor, in the case of a debtor who is an individual.

208.235.    The BVI Insolvency Act further defines an "insolvency transaction" as a transaction that: "(a) is entered into at a time when the company is insolvent; or (b) . . . causes the company to become insolvent."  BVI Insolvency Act § 244(2).

209.236.    For the purposes of assessing unfair preferences under Section 245 of the BVI Insolvency Act and undervalue transactions under Section 246 of the BVI Insolvency Act, a company is "insolvent" if: "(c). . . (ii) the company is unable to pay its debts as they fall due." BVI Insolvency Act §§ 8, 244(3).

210.237.    For purposes of Section 245 and Section 246 of the BVI Insolvency Act, "vulnerability period" means "in the case of a transaction entered into with, or a preference given to, a connected person, the period commencing two years prior to the onset of insolvency and ending on the appointment of the administrator or, if the company is in liquidation, the liquidator . . . ." BVI Insolvency Act § 244(1).

211.238.    The "onset of insolvency" is defined as: "the date on which the application for the appointment of the liquidator was filed."  BVI Insolvency Act § 244(1).  Thus, the vulnerability period, for each of the Funds, is the period commencing two years prior to the application for the appointment of the Liquidators for each Fund and ending on the date of the appointment of the liquidators of each Fund.

212.239.    A "connected person" is:

(1) . . . one or more of the following:

(a) a promoter of the company;

(b) a director or *member of the company* or of a related company;

(c) a beneficiary under a trust of which the company is or has been a trustee;

(d) a related company;

(e) another company one of whose directors is also a director of the company;

(f) a nominee, relative, spouse or relative of a spouse of a person referred to in paragraphs (a) to (c);

(g) a person in partnership with a person referred to in paragraphs (a) to (c); and

(h) a trustee of a trust having as a beneficiary a person who is, apart from this paragraph, a connected person.

BVI Insolvency Act § 5 (emphasis added).

213.240.    Redemption Payments aggregating $926,753,133.27 were made by Sentry to the Citco Subscribers during the two-year period prior to the application for appointment of the Liquidators of Sentry in the BVI Liquidation Proceedings (the "Sentry Vulnerability Period").

214.241.    Redemption Payments aggregating $55,775,336.32 were made by Sigma to the Citco Subscribers during the two-year period prior to the application for appointment of the Liquidators of Sigma in the BVI Liquidation Proceedings (the "Sigma Vulnerability Period").

215.242.    Redemption Payments aggregating $1,094,880.47 were made by Lambda to the Citco Subscribers during the two-year period prior to the application for appointment of the Liquidators of Lambda in the BVI Liquidation Proceedings (the "Lambda Vulnerability Period").

216.243.	During the Sentry Vulnerability Period, the Sigma Vulnerability Period and the Lambda Vulnerability Period (the "Funds' Vulnerability Periods") the Funds were insolvent or were rendered insolvent by the making of Redemption Payments.

217.244.	Each of the Redemptions and/or Redemption Payments made during the Funds' Vulnerability Periods ("Vulnerability Period Payments") was an "insolvency transaction" within the meaning of Section 245 of the BVI Insolvency Act.

218.245.	The Citco Subscribers were shareholders (i.e., members) of the Funds during the Funds' Vulnerability Periods and were, accordingly, each a "connected person" as defined in the BVI Insolvency Act.

219.246.	Each of the Vulnerability Period Payments put the Citco Subscribers in a better position than they would have been in had such Payment not been made.

220.247.	Because the Citco Subscribers were each a "connected person" as defined in the BVI Insolvency Act, there is a statutory presumption that the Redemptions and/or Vulnerability Period Payments were "insolvency transactions."  Further, even were this not presumed, the Redemptions and/or Vulnerability Period Payments were "insolvency transactions" because at all material times the Funds were insolvent.  This is because the Funds' assets were up to 95% invested with BLMIS and were only able to pay debts falling due either (i) with payments (including fictitious profits) from the Ponzi scheme BLMIS, i.e. using the proceeds of fraud, or (ii) by using incoming subscription monies (as a shortcut for investing those monies and also withdrawing monies from BLMIS to pay redeemers).  Each time the Funds withdrew monies from BLMIS an equivalent liability immediately arose to the creditors of and investors in BLMIS.  On any commercial basis the Funds were insolvent on a cash flow basis at all material times.

221.248.    In addition, there is a statutory presumption that the Vulnerability Period Payments were "not made in the ordinary course of business" of the Funds.  Even were this not presumed, the same would follow in that, among other things, each Vulnerability Period Payment represented a distribution of monies (including fictitious profits) from Madoff's Ponzi scheme or incoming subscription monies (which merely represented a shortcut for investing those monies and also withdrawing monies from BLMIS to pay redeemers), and it was no part of the ordinary course of business of the Funds to invest in and distribute profits of a Ponzi scheme.

222.249.    Each of the Vulnerability Period Payments was made following receipt by the Funds of a notice of redemption in respect of Shares, which triggered the redemption process under the Articles.  Following the receipt by the Funds of a notice of redemption by the Citco Subscribers, the Citco Subscribers became contingent creditors.  Upon the subsequent redemption of the Citco Subscribers' shares and until such time as the Citco Subscribers received the Vulnerability Period Payment the Citco Subscribers were each a "creditor" of the Funds with an admissible claim against the Funds in any subsequent liquidation of the Funds had payment of the Redemption Price not been made, albeit that post-liquidation Citco Subscribers would have been deferred to outside creditors.

223.250.    Upon information and belief, the Citco Subscribers may have subscribed to all or some portion of the Shares issued to them under the Subscription Agreement in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

224.251.    Upon information and belief, the Citco Subscribers may have paid to or credited some or all of the Redemption Payments received by them to accounts of the Beneficial Shareholders.

225.252.    To the extent that any money that the Citco Subscribers received in connection with the Vulnerability Period Payments was transferred to the Beneficial Shareholders, the Foreign Representatives, in their capacities as Foreign Representatives and Liquidators of the Funds, are entitled to avoid and set aside such further transfer by the Citco Subscribers to the Beneficial Shareholders and to recover from the Beneficial Shareholders an amount equal to any portion of any Vulnerability Period Payments received by them, and the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma, rely on, *inter alia*, section 249(2)(b) of the BVI Insolvency Act.

## SIXTH CLAIM
### *(Undervalue Transaction Pursuant to Section 246 of the BVI Insolvency Act – Against All Defendants)*

226.253.    The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of the Funds, repeat and allege again the allegations contained in paragraphs 1 through 227252 above as if set forth herein.

227.254.    Section 246 of the BVI Insolvency Act provides that;

(1) Subject to subsection (2), a company enters into an undervalue transaction with a person if (a) the company makes a gift to that person or otherwise enters into a transaction with that person on terms that provide for the company to receive no consideration; or (b) the company enters into a transaction with that person for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the company; and (c) in either case, the transaction concerned (i) is an insolvency transaction; and (ii) is entered into within the vulnerability period.

(2) A company does not enter into an undervalue transaction with a person if (a) the company enters into the transaction in good faith and for the purposes of its business; and (b) at the time when it enters into the transaction, there were reasonable grounds for believing that the transaction would benefit the company.

(3) A transaction may be an undervalue transaction notwithstanding that it is entered into pursuant to the order of a court or tribunal in or outside the Virgin Islands.

(4) Where a company enters into a transaction with a connected person within the vulnerability period and the transaction falls within subsection (1)(a) or subsection (1)(b), unless the contrary is proved, it is presumed that (a) the transaction was an insolvency transaction; and (b) subsection (2) did not apply to the transaction.

228.255.    During the Funds' Vulnerability Periods, all assets purportedly held by BLMIS for Sentry and other investors were non-existent, and the Funds were insolvent or rendered insolvent by the Vulnerability Period Payments, as alleged in paragraph 220247 above. Thus, each of the Redemptions and/or Vulnerability Period Payments qualifies as an "insolvency transaction" within the meaning of Section 244 of the BVI Insolvency Act and for purposes of Section 246 of the BVI Insolvency Act.

229.256.    The Funds received no consideration for any of the Vulnerability Period Payments, or in the alternative, the Funds received, for each Vulnerability Period Payment, consideration, the value of which, in money or money's worth, was significantly less than the value, in money or money's worth, of the consideration provided by the Funds to the Citco Subscribers for each of the Vulnerability Period Payments.

230.257.    The Citco Subscribers were shareholders (i.e., members) of the Funds during the Vulnerability Period and were, accordingly, each a "connected person" as defined in the BVI Insolvency Act.

231.258.    Because the Citco Subscribers were each a "connected person" as defined in the BVI Insolvency Act, there is a statutory presumption that the Redemptions and/or Vulnerability Period Payments were "insolvency transactions."  Further, there is a statutory presumption that the Vulnerability Period Payments were not made in good faith and for the purposes of the Funds' business with reasonable grounds to believe that they would benefit the Funds.  Even were that not presumed, it is in any event clear that the purpose of the Funds was not to invest in and distribute fictitious profits from a Ponzi scheme such as BLMIS.

232.259.    Upon information and belief, the Citco Subscribers may have subscribed to all or some portion of the Shares issued to them under the Subscription Agreement in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

233.260.    Upon information and belief, the Citco Subscribers may have paid to or credited some or all of the Redemption Payments received by them to accounts of the Beneficial Shareholders.

234.261.    To the extent that any money that the Citco Subscribers received in connection with the Vulnerability Period Payments was transferred to the Beneficial Shareholders, the Foreign Representatives, in their capacities as Foreign Representatives and liquidators of the Funds, are entitled to avoid and set aside such further transfer by the Citco Subscribers to the Beneficial Shareholders and to recover from the Beneficial Shareholders an amount equal to any portion of any Vulnerability Period Payments received by them, and the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma, rely on, *inter alia*, section 249(2)(b) of the BVI Insolvency Act.

## SEVENTH CLAIM
### *(Breach of Contract - Against All Defendants)*

235.262.    Sentry and Sigma (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma) repeat and allege again the allegations contained in paragraphs 1 through 236261 above as if set forth herein.

236.263.    The Citco Subscribers, upon information and belief, entered into a written agreement or agreements with Sentry, Sigma, and Lambda between April 21, 1998 and December 31, 2002, pursuant to which the Citco Subscribers subscribed for Shares.  Subsequent to entering into such agreements, the Citco Subscribers, upon information and belief, entered into

the Initial Subscription Agreement with Sentry on or about January 3, 2003, pursuant to which the Citco Subscribers subscribed for additional shares.  The Citco Subscribers's subscription for shares was made pursuant to the terms of the Initial Subscription Agreement itself as well as the terms of the other documents referred to therein, namely; (i) Sentry's Private Placement Memorandum (as amended from time to time); and (ii) Sentry's Memorandum of Association and Articles of Association (the "Articles").  Subsequent to entering into the Initial Subscription Agreement, the Citco Subscribers, upon information and belief, entered into the Subsequent Subscription Agreements with Sentry, Sigma, and Lambda between January 6, 2003 and November 18, 2008, pursuant to which it subscribed for additional Shares on the same terms and conditions as those Shares subscribed for pursuant to the Initial Subscription Agreement.  The Initial Subscription Agreement, together with the Subsequent Subscription Agreements, including all of the terms and provisions incorporated therein by reference to the Private Placement Memorandum (as amended from time to time) and the Articles, are collectively referred to herein as the "Fund Documents."

237.264.    The Fund Documents provide for the calculation of the redemption price for Shares (the "Redemption Price") based on the "Net Asset Value per Share."  Net Asset Value per share is to be determined by the directors of the Funds as of the relevant valuation day "by dividing the value of the net assets of [Sentry/Sigma/Lambda] by the number of Shares then in issue [.]"  Articles at 11(1).

238.265.    The Fund Documents provide that in determining the Net Asset Value per share for each class of shares issued, the value of the net assets of the Funds is to be adjusted "to take into account any dividends, distributions, assets or liabilities" attributable to such class of shares.  Articles at 11(1).  Pursuant to the Fund Documents, each subscriber, including the Citco

Subscribers, acknowledges that "the value of its Shares and redemptions thereof, and the performance of the Fund, may be based on unaudited and in some cases, estimated, valuations of the Fund's investment and that any valuation provided in Subscriber's account statement may be an unaudited, estimated value." See Initial Subscription Agreement ¶ 10.

239.266.    With respect to the valuation of different types of assets, the Fund Documents prescribe methods of valuation that are, however, subject to the exercise of the judgment and discretion by the Directors of the Funds.  For example, with respect to the valuation of assets consisting of securities, the Fund Documents prescribe methods of valuation based on price and market data, provided however that "[i]f the Directors determine that [any of the prescribed methods of valuation] does not fairly represent its market value, the Directors shall value such securities as they determine and shall set forth the basis of such valuation in writing in the Company's records[.]"  Articles at 11(3)(b).

240.267.    With respect to the value of any shares of stock held by the Funds in an "investment company," the Fund Documents provide for valuation "in accordance with the manner in which such shares are valued by such investment company" provided however that "the Directors may make such adjustments in such valuations the Directors may from time to time consider appropriate."  Articles at 11(3)(c).

241.268.    With respect to assets that have been "realised or contracted to be realised" the Fund Documents provide for the inclusion of the assets receivable in respect of such realization, provided however that "if the value of such assets is not then known exactly then its value shall be as estimated by the Directors."   Articles at 11(3)(e).

242.269.    Additionally, the Fund Documents provide that "notwithstanding the foregoing, in the case of extraordinary circumstances which, in the Directors' sole discretion,

warrant a different valuation of any securities, such securities will be valued at such prices as the Directors shall determine."  Articles at 11(3)(f).

243.270.      The Fund Documents provide that any "certificate" as to the Net Asset Value per Share or as to the Redemption Price that is given in good faith by or on behalf of the Directors "shall be binding on all parties."  Articles at 11(1).

244.271.      No Certificate was provided in good faith by or on behalf of the Directors to the Citco Subscribers in respect of any Net Asset Value determination made while the Citco Subscribers were a member of the Funds or in respect of any Redemption Payment made to the Citco Subscribers.

245.272.      Pursuant to the Fund Documents, at any time prior to the good faith issuance and receipt of a Certificate, the Redemption Price calculated in respect of the redemptions by the Citco Subscribers and paid to the Citco Subscribers remains subject to adjustment, recalculation and redetermination based on, *inter alia*, the foregoing identified provisions of the Fund Documents.  Upon the true interpretation of the Fund Documents, the same contained an implied term for repayment of any over-payments, and/or such a term is to be implied on the basis of obviousness and/or as being necessary for the business efficacy of the Fund Documents and/or to give effect to the reasonable expectations of the parties.

246.273.      Upon information and belief, the Citco Subscribers may have subscribed to all or some portion of the Shares issued to it under the Fund Documents in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

247.274.      Each Beneficial Shareholder authorized the Citco Subscribers to enter into the Fund Documents on his, her or its behalf and to bind the Beneficial Shareholder to the

agreements and representations contained therein to the same extent as had the Beneficial Shareholder executed the Fund Documents on his, her or its, own behalf.

248.275.    Upon information and belief, the Citco Subscribers received the Redemption Payments listed on Exhibit A and Exhibit B in respect of Shares submitted for redemption.

249.276.    Upon information and belief, the Citco Subscribers may have paid to or credited some or all of the Redemption Payments received by it from Sentry and Sigma to accounts of the Beneficial Shareholders.

250.277.    Subsequent to December 8, 2008, Sentry and Sigma have determined that the Net Asset Value calculations upon which Redemption Payments were made to the Citco Subscribers included assets not held by or on behalf of Sentry and Sigma at the time of the making of such payments and, additionally, that such Net Asset Value calculations failed to account for and make appropriate deduction of liabilities of Sentry and Sigma existing at the time of such payments.    For these and other reasons, such Net Asset Value calculation substantially overstated the net asset value of the assets of Sentry and Sigma.

251.278.    To the extent that any Beneficial Shareholder has received Redemption Payments in excess of the Net Asset Value of the Shares redeemed, such Beneficial Shareholder is contractually obligated to return amounts in excess of the Net Asset Value that would have been calculated based upon the true facts existing at the relevant time.

252.279.    Following determination by the Funds that Redemption Payments made to the Citco Subscribers had been calculated on the basis of an overstated Net Asset Value, demand was made on the Beneficial Shareholders by demand on the Citco Subscribers for the return of excess and overpaid Redemption Payments.

253.280.      The Beneficial Shareholders have failed and refused to repay to the Funds the amounts that, under the Fund Documents, they are contractually required to repay to the Funds.

254.281.      The failure of the Beneficial Shareholders to make the repayment requested constitutes a breach of the Fund Documents for which Sentry and Sigma are entitled to the award of damages.

## EIGHTH CLAIM
### *(Breach of Implied Covenant of Good Faith and*
### *Fair Dealing - Against All Defendants)*

255.282.      Sentry and Sigma (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma) repeat and allege again the allegations contained in paragraphs 1 through 256281 above as if set forth herein.

256.283.      Upon information and belief, the Citco Subscribers may have subscribed to all or some portion of the Shares issued to it under the Fund Documents in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

257.284.      Upon information and belief, the Citco Subscribers may have paid to or credited some or all of the Redemption Payments received by it from Sentry and Sigma to accounts of the Beneficial Shareholders.

258.285.      Following determination by the Funds that Redemption Payments made to the Citco Subscribers had been calculated on the basis of an overstated Net Asset Value, demand was made on the Beneficial Shareholders by demand on the Citco Subscribers for the return of excess and overpaid Redemption Payments.

259.286.    The Beneficial Shareholders have failed and refused to make repayment to Sentry and Sigma.

260.287.    By retaining the Redemption Payments to which they are not entitled, the Beneficial Shareholders have deprived Sentry and Sigma of the benefit of their bargain and have subverted the Fund Documents.

261.288.    The failure of the Beneficial Shareholders to make the repayment requested constitutes a breach of the implied covenant of good faith and fair dealing that inheres in the Fund Documents for which Sentry and Sigma are entitled to the award of damages.

## NINTH CLAIM
### *(Declaratory Judgment - Against All Defendants)*

262.289.    Sentry and Sigma (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma) repeat and allege again the allegations contained in paragraphs 1 through 263288 above as if set forth herein.

263.290.    An actual and justiciable controversy exists between the Plaintiffs and the Defendants with respect to the obligation of the Defendants to repay to the Funds all or a portion of amounts received by them as excess or overpaid Redemption Payments under circumstances where:

    (i)      the Net Asset Value per Share calculation upon which the Redemption Price was paid, directly or indirectly, to any Defendant has been subsequently adjusted, recalculated or redetermined in accordance with the Fund Documents;

    (ii)     the resulting adjusted, recalculated and redetermined Redemption Price is less than the Redemption Price paid to the Defendant;

(iii)    prior to such adjustment, recalculation or redetermination, no binding Certificate has been issued by the Funds; and

(iv)    Citco issued no Certificates in good faith.

264.291.        The harm to Sentry and Sigma is real and immediate because, as a result of the failure and refusal of the Defendants to make repayment, Sentry and Sigma have become insolvent and are presently unable to pay their debts as they fall or will fall due.

265.292.        Plaintiffs have no adequate remedy at law.

266.293.        Pursuant to 28 U.S.C. § 2201 et seq., Plaintiffs are entitled to a declaration by this Court declaring that, pursuant to the Fund Documents, each Defendant must repay Sentry and Sigma that portion of the Redemption Payments received by such Defendant representing the amount by which such Redemption Payments exceeded the Redemption Price as it has been subsequently adjusted, recalculated and redetermined by Sentry and Sigma.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs respectfully request the following relief:

A.     On the First, Second, and Third Claims, judgment in favor of Plaintiffs and against the Beneficial Shareholders allowing the Plaintiffs to recover an amount equal to any portion of the Redemption Payments received by the Beneficial Shareholders, plus interest, or, in the alternative, an amount equal to any portion of the Redemption Payments received by the Beneficial Shareholders less the amount of such portion that such Beneficial Shareholders would have received had the Net Asset Value been calculated based upon the true facts existing at the time, plus interest;

B.     On the Fourth Claim, imposition of a constructive trust on Redemption Payments;

C.     On the Fifth Claim:

    i.     a declaratory judgment in favor of the Foreign Representatives and against the Beneficial Shareholders that the Redemptions and/or Vulnerability Period Payments constitute Unfair Preferences under Section 245 of the BVI Insolvency Act;

    ii.     judgment pursuant to Section 249 of the BVI Insolvency Act, setting aside and avoiding the Redemptions and/or Vulnerability Period Payments; and

    iii.     judgment pursuant to Section 249 of the BVI Insolvency Act against the Beneficial Shareholders in the amount of the avoided Vulnerability Period Payments received by them or for their benefit, plus interest;

D.     On the Sixth Claim:

    i.     a declaratory judgment in favor of the Foreign Representatives and against the Beneficial Shareholders that the Redemptions and/or Vulnerability Period Payments constitute Undervalue Transactions under Section 246 of the BVI Insolvency Act;

    ii.     judgment pursuant to Section 249 of the BVI Insolvency Act, setting aside and avoiding the Redemptions and/or Vulnerability Period Payments; and

      iii.    judgment pursuant to Section 249 of the BVI Insolvency Act against the Beneficial Shareholders in the amount of the avoided Vulnerability Period Payments received by them or for their benefit, plus interest;

E.      On the Seventh and Eighth Claims, judgment against the Defendants and in favor of the Plaintiffs in an amount to be determined at trial;

F.      On the Ninth Claim, a declaratory judgment against the Defendants and in favor of the Plaintiffs that, under the Fund Documents, the Defendants must repay that portion of the Redemption Payments received by such Defendant representing the amount by which such Redemption Payments exceeded the Redemption Price as it has been subsequently adjusted, recalculated and redetermined by the Funds;

G.      Awarding Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees and accountants' and experts' fees, costs and expenses; and

H.      Granting Plaintiffs such other and further relief as the Court deems just and proper.


Dated: New York, New York
      September 20, 2016              BROWN RUDNICK LLP


                          By: /s/ David J. Molton
                             David J. Molton
                             May Orenstein
                             Daniel J. Saval

                          Seven Times Square
                        New York, New York 10036
                        Telephone: 212.209.4800
                        Facsimile: 212.209.4801

                        *Attorneys for the Foreign Representatives*

**EXHIBIT A**

*Redemption Payments Received by Defendants from Sentry*
*From April 20, 2004 Through November 19, 2008*

| **Payment Date** | **Redemption Payment** | **No. of Shares** | **Bank Account to which Redemption Payment Was Made** |
|---|---|---|---|
| April 20, 2004 | $3,170,000.00 | 3,260.45 | Citco Global Custody (NA) NV, Netherlands |
| April 20, 2004 | $4,700,000.00 | 4,834.10 | Citco Global Custody (NA) NV, Netherlands |
| April 20, 2004 | $8,400,000.00 | 8,639.67 | Citco Global Custody (NA) NV, Netherlands |
| April 20, 2004 | $106,931.18 | 98.05 | Citco Global Custody (NA) NV, Netherlands |
| April 20, 2004 | $168,254.39 | 154.28 | Citco Global Custody (NA) NV, Netherlands |
| April 20, 2004 | $749,641.57 | 687.38 | Citco Global Custody (NA) NV, Netherlands |
| April 20, 2004 | $16,708,169.06 | 15,320.47 | Citco Global Custody (NA) NV, Netherlands |
| April 21, 2004 | $20,417.45 | 21.00 | Citco Global Custody (NA) NV, Netherlands |
| April 21, 2004 | $58,335.56 | 60.00 | Citco Global Custody (NA) NV, Netherlands |
| April 21, 2004 | $68,058.15 | 70.00 | Citco Global Custody (NA) NV, Netherlands |
| April 21, 2004 | $78,966.90 | 81.22 | Citco Global Custody (NA) NV, Netherlands |
| April 21, 2004 | $97,225.93 | 100.00 | Citco Global Custody (NA) NV, Netherlands |
| April 21, 2004 | $245,981.60 | 253.00 | Citco Global Custody (NA) NV, Netherlands |
| April 21, 2004 | $290,000.00 | 298.27 | Citco Global Custody (NA) NV, Netherlands |
| April 21, 2004 | $415,951.97 | 427.82 | Citco Global Custody (NA) NV, Netherlands |
| April 21, 2004 | $1,186,156.35 | 1,220.00 | Citco Global Custody (NA) NV, Netherlands |
| April 21, 2004 | $1,356,301.72 | 1,395.00 | Citco Global Custody (NA) NV, Netherlands |
| April 21, 2004 | $1,400,000.00 | 1,439.95 | Citco Global Custody (NA) NV, Netherlands |
| April 21, 2004 | $2,135,081.42 | 2,196.00 | Citco Global Custody (NA) NV, Netherlands |
| April 21, 2004 | $13,157,410.10 | 13,532.82 | Citco Global Custody (NA) NV, Netherlands |

**Redemption Payments Received by Defendants from Sentry**
**From April 20, 2004 Through November 19, 2008**

| | | | |
|---|---|---|---|
| May 14, 2004 | $101,784.60 | 92.99 | Citco Global Custody (NA) NV, Netherlands |
| May 14, 2004 | $529,008.48 | 483.30 | Citco Global Custody (NA) NV, Netherlands |
| May 17, 2004 | $8,788.24 | 9.00 | Citco Global Custody (NA) NV, Netherlands |
| May 17, 2004 | $29,850.73 | 30.57 | Citco Global Custody (NA) NV, Netherlands |
| May 17, 2004 | $48,823.57 | 50.00 | Citco Global Custody (NA) NV, Netherlands |
| May 17, 2004 | $400,000.00 | 409.64 | Citco Global Custody (NA) NV, Netherlands |
| May 17, 2004 | $558,541.64 | 572.00 | Citco Global Custody (NA) NV, Netherlands |
| May 17, 2004 | $1,700,000.00 | 1,740.96 | Citco Global Custody (NA) NV, Netherlands |
| May 17, 2004 | $4,700,000.00 | 4,813.25 | Citco Global Custody (NA) NV, Netherlands |
| May 17, 2004 | $7,700,000.00 | 7,885.54 | Citco Global Custody (NA) NV, Netherlands |
| May 17, 2004 | $112,294.21 | 115.00 | Citco Global Custody (NA) NV, Netherlands |
| June 17, 2004 | $49,145.61 | 50.00 | Citco Global Custody (NA) NV, Netherlands |
| June 17, 2004 | $50,000.00 | 50.87 | Citco Global Custody (NA) NV, Netherlands |
| June 17, 2004 | $50,875.53 | 51.76 | Citco Global Custody (NA) NV, Netherlands |
| June 17, 2004 | $58,974.73 | 60.00 | Citco Global Custody (NA) NV, Netherlands |
| June 17, 2004 | $73,718.41 | 75.00 | Citco Global Custody (NA) NV, Netherlands |
| June 17, 2004 | $100,000.00 | 101.74 | Citco Global Custody (NA) NV, Netherlands |
| June 17, 2004 | $104,680.14 | 106.50 | Citco Global Custody (NA) NV, Netherlands |
| June 17, 2004 | $132,693.13 | 135.00 | Citco Global Custody (NA) NV, Netherlands |
| June 17, 2004 | $152,891.98 | 155.55 | Citco Global Custody (NA) NV, Netherlands |
| June 17, 2004 | $168,156.60 | 171.08 | Citco Global Custody (NA) NV, Netherlands |
| June 17, 2004 | $184,787.47 | 188.00 | Citco Global Custody (NA) NV, Netherlands |
| June 17, 2004 | $196,582.42 | 200.00 | Citco Global Custody (NA) NV, Netherlands |

**Redemption Payments Received by Defendants from Sentry**
**From April 20, 2004 Through November 19, 2008**

| | | | |
|---|---|---|---|
| June 17, 2004 | $282,606.89 | 287.52 | Citco Global Custody (NA) NV, Netherlands |
| June 17, 2004 | $625,132.10 | 636.00 | Citco Global Custody (NA) NV, Netherlands |
| June 17, 2004 | $850,000.00 | 864.78 | Citco Global Custody (NA) NV, Netherlands |
| June 17, 2004 | $1,000,000.00 | 1,017.38 | Citco Global Custody (NA) NV, Netherlands |
| June 17, 2004 | $2,500,000.00 | 2,543.46 | Citco Global Custody (NA) NV, Netherlands |
| June 28, 2004 | $175,000.00 | 175.79 | Citco Global Custody (NA) NV, Netherlands |
| June 28, 2004 | $225,000.00 | 226.02 | Citco Global Custody (NA) NV, Netherlands |
| July 16, 2004 | $28,003.29 | 28.13 | Citco Global Custody (NA) NV, Netherlands |
| July 16, 2004 | $55,697.97 | 55.95 | Citco Global Custody (NA) NV, Netherlands |
| July 16, 2004 | $150,000.00 | 150.68 | Citco Global Custody (NA) NV, Netherlands |
| July 16, 2004 | $1,110,000.00 | 1,115.02 | Citco Global Custody (NA) NV, Netherlands |
| July 16, 2004 | $527,384.62 | 473.24 | Citco Global Custody (NA) NV, Netherlands |
| July 16, 2004 | $2,043,698.98 | 1,833.88 | Citco Global Custody (NA) NV, Netherlands |
| July 16, 2004 | $103,785.25 | 93.13 | Citco Global Custody (NA) NV, Netherlands |
| August 13, 2004 | $19,438.31 | 19.51 | Citco Global Custody (NA) NV, Netherlands |
| August 13, 2004 | $41,845.68 | 42.00 | Citco Global Custody (NA) NV, Netherlands |
| August 13, 2004 | $43,918.04 | 44.08 | Citco Global Custody (NA) NV, Netherlands |
| August 13, 2004 | $44,834.66 | 45.00 | Citco Global Custody (NA) NV, Netherlands |
| August 13, 2004 | $62,379.95 | 62.61 | Citco Global Custody (NA) NV, Netherlands |
| August 13, 2004 | $129,522.34 | 130.00 | Citco Global Custody (NA) NV, Netherlands |
| August 13, 2004 | $498,162.85 | 500.00 | Citco Global Custody (NA) NV, Netherlands |
| August 13, 2004 | $900,000.00 | 903.32 | Citco Global Custody (NA) NV, Netherlands |
| August 13, 2004 | $3,200,000.00 | 3,211.80 | Citco Global Custody (NA) NV, Netherlands |

**Redemption Payments Received by Defendants from Sentry**
**From April 20, 2004 Through November 19, 2008**

| | | | |
|---|---|---|---|
| August 13, 2004 | $322,422.60 | 289.27 | Citco Global Custody (NA) NV, Netherlands |
| August 13, 2004 | $104,951.47 | 94.16 | Citco Global Custody (NA) NV, Netherlands |
| September 15, 2004 | $9,479.68 | 9.39 | Citco Global Custody (NA) NV, Netherlands |
| September 15, 2004 | $50,000.00 | 49.53 | Citco Global Custody (NA) NV, Netherlands |
| September 15, 2004 | $75,716.31 | 75.00 | Citco Global Custody (NA) NV, Netherlands |
| September 15, 2004 | $75,000.00 | 74.29 | Citco Global Custody (NA) NV, Netherlands |
| September 15, 2004 | $115,000.00 | 113.91 | Citco Global Custody (NA) NV, Netherlands |
| September 15, 2004 | $132,877.08 | 131.62 | Citco Global Custody (NA) NV, Netherlands |
| September 15, 2004 | $506,289.73 | 501.50 | Citco Global Custody (NA) NV, Netherlands |
| September 15, 2004 | $850,000.00 | 841.96 | Citco Global Custody (NA) NV, Netherlands |
| September 15, 2004 | $1,225,000.00 | 1,213.41 | Citco Global Custody (NA) NV, Netherlands |
| September 15, 2004 | $2,000,000.00 | 1,981.08 | Citco Global Custody (NA) NV, Netherlands |
| September 15, 2004 | $68,467.74 | 67.82 | Citco Global Custody (NA) NV, Netherlands |
| September 15, 2004 | $72,493.66 | 64.23 | Citco Global Custody (NA) NV, Netherlands |
| September 15, 2004 | $50,000.00 | 44.30 | Citco Global Custody (NA) NV, Netherlands |
| October 19, 2004 | $56,833.78 | 56.00 | Citco Global Custody (NA) NV, Netherlands |
| October 19, 2004 | $150,000.00 | 147.80 | Citco Global Custody (NA) NV, Netherlands |
| October 19, 2004 | $304,466.70 | 300.00 | Citco Global Custody (NA) NV, Netherlands |
| October 19, 2004 | $450,000.00 | 443.40 | Citco Global Custody (NA) NV, Netherlands |
| October 19, 2004 | $507,444.50 | 500.00 | Citco Global Custody (NA) NV, Netherlands |
| October 19, 2004 | $31,075.90 | 30.62 | Citco Global Custody (NA) NV, Netherlands |
| October 19, 2004 | $84,824.69 | 74.81 | Citco Global Custody (NA) NV, Netherlands |
| October 19, 2004 | $103,964.38 | 91.69 | Citco Global Custody (NA) NV, Netherlands |

*Redemption Payments Received by Defendants from Sentry*
*From April 20, 2004 Through November 19, 2008*

| | | | |
|---|---|---|---|
| October 19, 2004 | $105,325.03 | 92.89 | Citco Global Custody (NA) NV, Netherlands |
| November 16, 2004 | $50,717.77 | 49.96 | Citco Global Custody (NA) NV, Netherlands |
| November 16, 2004 | $64,919.96 | 63.95 | Citco Global Custody (NA) NV, Netherlands |
| November 16, 2004 | $130,276.45 | 128.33 | Citco Global Custody (NA) NV, Netherlands |
| November 16, 2004 | $175,000.00 | 172.39 | Citco Global Custody (NA) NV, Netherlands |
| November 16, 2004 | $706,759.61 | 696.20 | Citco Global Custody (NA) NV, Netherlands |
| November 16, 2004 | $517,776.03 | 510.04 | Citco Global Custody (NA) NV, Netherlands |
| December 13, 2004 | $7,150,000.00 | 6,988.04 | Citco Global Custody (NA) NV, Netherlands |
| December 13, 2004 | $200,368.83 | 195.83 | Citco Global Custody (NA) NV, Netherlands |
| December 13, 2004 | $50,000.00 | 48.87 | Citco Global Custody (NA) NV, Netherlands |
| December 13, 2004 | $174,840.55 | 170.88 | Citco Global Custody (NA) NV, Netherlands |
| January 14, 2005 | $13,333.18 | 13.00 | Citco Global Custody (NA) NV, Netherlands |
| January 14, 2005 | $28,574.04 | 27.86 | Citco Global Custody (NA) NV, Netherlands |
| January 14, 2005 | $122,285.79 | 119.23 | Citco Global Custody (NA) NV, Netherlands |
| January 14, 2005 | $536,927.25 | 523.51 | Citco Global Custody (NA) NV, Netherlands |
| January 14, 2005 | $2,235,451.58 | 2,179.59 | Citco Global Custody (NA) NV, Netherlands |
| February 16, 2005 | $1,400,000.00 | 1,358.08 | Citco Global Custody (NA) NV, Netherlands |
| February 16, 2005 | $65,000.00 | 63.05 | Citco Global Custody (NA) NV, Netherlands |
| February 18, 2005 | $181,926.14 | 177.38 | Citco Global Custody (NA) NV, Netherlands |
| March 15, 2005 | $89,237.27 | 86.25 | Citco Global Custody (NA) NV, Netherlands |
| March 15, 2005 | $15,519.53 | 15.00 | Citco Global Custody (NA) NV, Netherlands |
| March 15, 2005 | $35,177.59 | 34.00 | Citco Global Custody (NA) NV, Netherlands |
| March 15, 2005 | $52,487.03 | 50.73 | Citco Global Custody (NA) NV, Netherlands |

### Redemption Payments Received by Defendants from Sentry
### From April 20, 2004 Through November 19, 2008

| | | | |
|---|---|---|---|
| March 15, 2005 | $111,740.58 | 108.00 | Citco Global Custody (NA) NV, Netherlands |
| March 15, 2005 | $537,461.84 | 519.47 | Citco Global Custody (NA) NV, Netherlands |
| March 15, 2005 | $618,422.03 | 597.72 | Citco Global Custody (NA) NV, Netherlands |
| March 15, 2005 | $10,687.78 | 10.33 | Citco Global Custody (NA) NV, Netherlands |
| March 15, 2005 | $103,701.47 | 100.23 | Citco Global Custody (NA) NV, Netherlands |
| April 14, 2005 | $5,217.23 | 5.00 | Citco Global Custody (NA) NV, Netherlands |
| April 14, 2005 | $26,086.14 | 25.00 | Citco Global Custody (NA) NV, Netherlands |
| April 14, 2005 | $50,085.38 | 48.00 | Citco Global Custody (NA) NV, Netherlands |
| April 14, 2005 | $50,000.00 | 47.92 | Citco Global Custody (NA) NV, Netherlands |
| April 14, 2005 | $52,172.28 | 50.00 | Citco Global Custody (NA) NV, Netherlands |
| April 14, 2005 | $147,459.72 | 141.32 | Citco Global Custody (NA) NV, Netherlands |
| April 14, 2005 | $1,300,000.00 | 1,245.87 | Citco Global Custody (NA) NV, Netherlands |
| April 14, 2005 | $7,000,000.00 | 6,708.54 | Citco Global Custody (NA) NV, Netherlands |
| April 14, 2005 | $55,000.00 | 52.71 | Citco Global Custody (NA) NV, Netherlands |
| April 14, 2005 | $75,002.86 | 71.88 | Citco Global Custody (NA) NV, Netherlands |
| May 13, 2005 | $25,000.00 | 23.93 | Citco Global Custody (NA) NV, Netherlands |
| May 13, 2005 | $25,000.00 | 23.93 | Citco Global Custody (NA) NV, Netherlands |
| May 13, 2005 | $103,550.34 | 99.10 | Citco Global Custody (NA) NV, Netherlands |
| May 13, 2005 | $111,230.41 | 106.45 | Citco Global Custody (NA) NV, Netherlands |
| May 13, 2005 | $248,688.01 | 238.00 | Citco Global Custody (NA) NV, Netherlands |
| May 13, 2005 | $978,033.51 | 936.00 | Citco Global Custody (NA) NV, Netherlands |
| May 13, 2005 | $4,029,592.12 | 3,856.41 | Citco Global Custody (NA) NV, Netherlands |
| May 13, 2005 | $4,000,000.00 | 3,828.09 | Citco Global Custody (NA) NV, Netherlands |

### Redemption Payments Received by Defendants from Sentry
### From April 20, 2004 Through November 19, 2008

| | | | |
|---|---|---|---|
| May 13, 2005 | $10,817,249.19 | 10,352.35 | Citco Global Custody (NA) NV, Netherlands |
| May 13, 2005 | $50,000.00 | 47.85 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2005 | $10,914.30 | 10.38 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2005 | $12,617.69 | 12.00 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2005 | $12,880.56 | 12.25 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2005 | $50,000.00 | 47.55 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2005 | $53,341.27 | 50.73 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2005 | $134,641.23 | 128.05 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2005 | $1,100,000.00 | 1,046.15 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2005 | $2,696,452.24 | 2,564.45 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2005 | $3,050,000.00 | 2,900.69 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2005 | $9,450,000.00 | 8,987.38 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2005 | $32,000,000.00 | 30,433.47 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2005 | $5,000,000.00 | 4,755.23 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2005 | $111,740.13 | 106.27 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2005 | $214,511.19 | 204.01 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2005 | $400,000.00 | 380.42 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2005 | $59,934.01 | 57.00 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2005 | $420,589.56 | 400.00 | Citco Global Custody (NA) NV, Netherlands |
| July 15, 2005 | $63,381.62 | 60.00 | Citco Global Custody (NA) NV, Netherlands |
| July 15, 2005 | $10,563.60 | 10.00 | Citco Global Custody (NA) NV, Netherlands |
| July 15, 2005 | $10,563.60 | 10.00 | Citco Global Custody (NA) NV, Netherlands |
| July 15, 2005 | $12,676.32 | 12.00 | Citco Global Custody (NA) NV, Netherlands |

*Redemption Payments Received by Defendants from Sentry*
*From April 20, 2004 Through November 19, 2008*

| | | | |
|---|---|---|---|
| July 15, 2005 | $15,845.40 | 15.00 | Citco Global Custody (NA) NV, Netherlands |
| July 15, 2005 | $21,127.21 | 20.00 | Citco Global Custody (NA) NV, Netherlands |
| July 15, 2005 | $24,296.29 | 23.00 | Citco Global Custody (NA) NV, Netherlands |
| July 15, 2005 | $41,303.69 | 39.10 | Citco Global Custody (NA) NV, Netherlands |
| July 15, 2005 | $44,071.35 | 41.72 | Citco Global Custody (NA) NV, Netherlands |
| July 15, 2005 | $47,536.21 | 45.00 | Citco Global Custody (NA) NV, Netherlands |
| July 15, 2005 | $50,000.00 | 47.33 | Citco Global Custody (NA) NV, Netherlands |
| July 15, 2005 | $52,818.02 | 50.00 | Citco Global Custody (NA) NV, Netherlands |
| July 15, 2005 | $54,930.74 | 52.00 | Citco Global Custody (NA) NV, Netherlands |
| July 15, 2005 | $58,099.82 | 55.00 | Citco Global Custody (NA) NV, Netherlands |
| July 15, 2005 | $77,209.37 | 73.09 | Citco Global Custody (NA) NV, Netherlands |
| July 15, 2005 | $77,241.07 | 73.12 | Citco Global Custody (NA) NV, Netherlands |
| July 15, 2005 | $81,149.60 | 76.82 | Citco Global Custody (NA) NV, Netherlands |
| July 15, 2005 | $107,812.13 | 102.06 | Citco Global Custody (NA) NV, Netherlands |
| July 15, 2005 | $130,988.68 | 124.00 | Citco Global Custody (NA) NV, Netherlands |
| July 15, 2005 | $154,450.44 | 146.21 | Citco Global Custody (NA) NV, Netherlands |
| July 15, 2005 | $212,117.15 | 200.80 | Citco Global Custody (NA) NV, Netherlands |
| July 15, 2005 | $1,115,727.75 | 1,056.20 | Citco Global Custody (NA) NV, Netherlands |
| July 15, 2005 | $4,125,000.00 | 3,904.92 | Citco Global Custody (NA) NV, Netherlands |
| July 15, 2005 | $4,753,515.71 | 4,499.90 | Citco Global Custody (NA) NV, Netherlands |
| July 15, 2005 | $8,300,000.00 | 7,857.17 | Citco Global Custody (NA) NV, Netherlands |
| July 15, 2005 | $250,000.00 | 236.66 | Citco Global Custody (NA) NV, Netherlands |
| July 15, 2005 | $171,225.44 | 162.09 | Citco Global Custody (NA) NV, Netherlands |

*Redemption Payments Received by Defendants from Sentry*
*From April 20, 2004 Through November 19, 2008*

| | | | |
|---|---|---|---|
| July 15, 2005 | $54,951.86 | 52.02 | Citco Global Custody (NA) NV, Netherlands |
| August 15, 2005 | $15,866.14 | 15.00 | Citco Global Custody (NA) NV, Netherlands |
| August 15, 2005 | $15,866.14 | 15.00 | Citco Global Custody (NA) NV, Netherlands |
| August 15, 2005 | $17,981.62 | 17.00 | Citco Global Custody (NA) NV, Netherlands |
| August 15, 2005 | $19,039.36 | 18.00 | Citco Global Custody (NA) NV, Netherlands |
| August 15, 2005 | $25,000.00 | 23.64 | Citco Global Custody (NA) NV, Netherlands |
| August 15, 2005 | $33,371.77 | 31.55 | Citco Global Custody (NA) NV, Netherlands |
| August 15, 2005 | $44,499.22 | 42.07 | Citco Global Custody (NA) NV, Netherlands |
| August 15, 2005 | $50,000.00 | 47.27 | Citco Global Custody (NA) NV, Netherlands |
| August 15, 2005 | $52,887.12 | 50.00 | Citco Global Custody (NA) NV, Netherlands |
| August 15, 2005 | $52,887.12 | 50.00 | Citco Global Custody (NA) NV, Netherlands |
| August 15, 2005 | $380,015.11 | 359.27 | Citco Global Custody (NA) NV, Netherlands |
| August 15, 2005 | $473,350.30 | 447.51 | Citco Global Custody (NA) NV, Netherlands |
| August 15, 2005 | $611,829.94 | 578.43 | Citco Global Custody (NA) NV, Netherlands |
| August 15, 2005 | $703,451.58 | 665.05 | Citco Global Custody (NA) NV, Netherlands |
| August 15, 2005 | $3,942,914.61 | 3,727.67 | Citco Global Custody (NA) NV, Netherlands |
| August 15, 2005 | $1,500,000.00 | 1,418.11 | Citco Global Custody (NA) NV, Netherlands |
| August 16, 2005 | $1,400,000.00 | 1,321.45 | Citco Global Custody (NA) NV, Netherlands |
| September 15, 2005 | $3,284.28 | 3.10 | Citco Global Custody (NA) NV, Netherlands |
| September 15, 2005 | $5,297.22 | 5.00 | Citco Global Custody (NA) NV, Netherlands |
| September 15, 2005 | $10,594.45 | 10.00 | Citco Global Custody (NA) NV, Netherlands |
| September 15, 2005 | $10,869.90 | 10.26 | Citco Global Custody (NA) NV, Netherlands |
| September 15, 2005 | $26,486.11 | 25.00 | Citco Global Custody (NA) NV, Netherlands |

**Redemption Payments Received by Defendants from Sentry**
**From April 20, 2004 Through November 19, 2008**

| | | | |
|---|---|---|---|
| September 15, 2005 | $30,723.89 | 29.00 | Citco Global Custody (NA) NV, Netherlands |
| September 15, 2005 | $30,829.83 | 29.10 | Citco Global Custody (NA) NV, Netherlands |
| September 15, 2005 | $50,000.00 | 47.19 | Citco Global Custody (NA) NV, Netherlands |
| September 15, 2005 | $60,462.50 | 57.07 | Citco Global Custody (NA) NV, Netherlands |
| September 15, 2005 | $71,904.50 | 67.87 | Citco Global Custody (NA) NV, Netherlands |
| September 15, 2005 | $151,362.84 | 142.87 | Citco Global Custody (NA) NV, Netherlands |
| September 15, 2005 | $227,928.89 | 215.14 | Citco Global Custody (NA) NV, Netherlands |
| September 15, 2005 | $1,305,182.65 | 1,231.95 | Citco Global Custody (NA) NV, Netherlands |
| September 15, 2005 | $5,570,000.00 | 5,257.47 | Citco Global Custody (NA) NV, Netherlands |
| September 15, 2005 | $1,750,000.00 | 1,651.81 | Citco Global Custody (NA) NV, Netherlands |
| September 15, 2005 | $70,972.19 | 66.99 | Citco Global Custody (NA) NV, Netherlands |
| September 15, 2005 | $11,113.57 | 10.49 | Citco Global Custody (NA) NV, Netherlands |
| September 15, 2005 | $250,000.00 | 235.97 | Citco Global Custody (NA) NV, Netherlands |
| October 14, 2005 | $12,826.33 | 12.00 | Citco Global Custody (NA) NV, Netherlands |
| October 14, 2005 | $14,333.42 | 13.41 | Citco Global Custody (NA) NV, Netherlands |
| October 14, 2005 | $23,514.93 | 22.00 | Citco Global Custody (NA) NV, Netherlands |
| October 14, 2005 | $37,410.12 | 35.00 | Citco Global Custody (NA) NV, Netherlands |
| October 14, 2005 | $46,409.93 | 43.42 | Citco Global Custody (NA) NV, Netherlands |
| October 14, 2005 | $53,443.03 | 50.00 | Citco Global Custody (NA) NV, Netherlands |
| October 14, 2005 | $115,362.12 | 107.93 | Citco Global Custody (NA) NV, Netherlands |
| October 14, 2005 | $149,683.24 | 140.04 | Citco Global Custody (NA) NV, Netherlands |
| October 14, 2005 | $150,000.00 | 140.34 | Citco Global Custody (NA) NV, Netherlands |
| October 14, 2005 | $180,968.79 | 169.31 | Citco Global Custody (NA) NV, Netherlands |

*Redemption Payments Received by Defendants from Sentry*
*From April 20, 2004 Through November 19, 2008*

| | | | |
|---|---|---|---|
| October 14, 2005 | $187,050.61 | 175.00 | Citco Global Custody (NA) NV, Netherlands |
| October 14, 2005 | $267,215.15 | 250.00 | Citco Global Custody (NA) NV, Netherlands |
| October 14, 2005 | $648,627.37 | 606.84 | Citco Global Custody (NA) NV, Netherlands |
| October 14, 2005 | $678,961.63 | 635.22 | Citco Global Custody (NA) NV, Netherlands |
| October 14, 2005 | $966,688.22 | 904.41 | Citco Global Custody (NA) NV, Netherlands |
| October 14, 2005 | $1,000,000.00 | 935.58 | Citco Global Custody (NA) NV, Netherlands |
| October 14, 2005 | $1,068,860.60 | 1,000.00 | Citco Global Custody (NA) NV, Netherlands |
| October 14, 2005 | $1,246,184.57 | 1,165.90 | Citco Global Custody (NA) NV, Netherlands |
| October 14, 2005 | $1,850,000.00 | 1,730.82 | Citco Global Custody (NA) NV, Netherlands |
| October 14, 2005 | $4,891,373.32 | 4,576.25 | Citco Global Custody (NA) NV, Netherlands |
| October 14, 2005 | $16,450,000.00 | 15,390.22 | Citco Global Custody (NA) NV, Netherlands |
| October 14, 2005 | $33,000,000.00 | 30,874.00 | Citco Global Custody (NA) NV, Netherlands |
| October 14, 2005 | $2,250,000.00 | 2,105.05 | Citco Global Custody (NA) NV, Netherlands |
| October 14, 2005 | $17,347.61 | 16.23 | Citco Global Custody (NA) NV, Netherlands |
| October 14, 2005 | $5,045,022.03 | 4,720.00 | Citco Global Custody (NA) NV, Netherlands |
| October 14, 2005 | $31,595.52 | 29.56 | Citco Global Custody (NA) NV, Netherlands |
| October 14, 2005 | $333,153.16 | 311.69 | Citco Global Custody (NA) NV, Netherlands |
| October 14, 2005 | $252,614.51 | 236.34 | Citco Global Custody (NA) NV, Netherlands |
| October 14, 2005 | $135,000.00 | 126.30 | Citco Global Custody (NA) NV, Netherlands |
| October 14, 2005 | $49,274.47 | 46.10 | Citco Global Custody (NA) NV, Netherlands |
| November 3, 2005 | $3,650,000.00 | 3,360.86 | Citco Global Custody (NA) NV, Netherlands |
| November 17, 2005 | $9,991.50 | 9.20 | Citco Global Custody (NA) NV, Netherlands |
| November 17, 2005 | $11,251.30 | 10.36 | Citco Global Custody (NA) NV, Netherlands |

*Redemption Payments Received by Defendants from Sentry*
*From April 20, 2004 Through November 19, 2008*

| | | | |
|---|---|---|---|
| November 17, 2005 | $21,753.23 | 20.03 | Citco Global Custody (NA) NV, Netherlands |
| November 17, 2005 | $25,000.00 | 23.02 | Citco Global Custody (NA) NV, Netherlands |
| November 17, 2005 | $31,494.94 | 29.00 | Citco Global Custody (NA) NV, Netherlands |
| November 17, 2005 | $38,011.14 | 35.00 | Citco Global Custody (NA) NV, Netherlands |
| November 17, 2005 | $41,106.33 | 37.85 | Citco Global Custody (NA) NV, Netherlands |
| November 17, 2005 | $41,269.24 | 38.00 | Citco Global Custody (NA) NV, Netherlands |
| November 17, 2005 | $50,000.00 | 46.04 | Citco Global Custody (NA) NV, Netherlands |
| November 17, 2005 | $59,590.60 | 54.87 | Citco Global Custody (NA) NV, Netherlands |
| November 17, 2005 | $74,816.78 | 68.89 | Citco Global Custody (NA) NV, Netherlands |
| November 17, 2005 | $74,936.24 | 69.00 | Citco Global Custody (NA) NV, Netherlands |
| November 17, 2005 | $82,625.35 | 76.08 | Citco Global Custody (NA) NV, Netherlands |
| November 17, 2005 | $86,882.60 | 80.00 | Citco Global Custody (NA) NV, Netherlands |
| November 17, 2005 | $97,742.93 | 90.00 | Citco Global Custody (NA) NV, Netherlands |
| November 17, 2005 | $104,965.04 | 96.65 | Citco Global Custody (NA) NV, Netherlands |
| November 17, 2005 | $106,398.60 | 97.97 | Citco Global Custody (NA) NV, Netherlands |
| November 17, 2005 | $108,603.25 | 100.00 | Citco Global Custody (NA) NV, Netherlands |
| November 17, 2005 | $110,449.51 | 101.70 | Citco Global Custody (NA) NV, Netherlands |
| November 17, 2005 | $119,496.16 | 110.03 | Citco Global Custody (NA) NV, Netherlands |
| November 17, 2005 | $162,904.88 | 150.00 | Citco Global Custody (NA) NV, Netherlands |
| November 17, 2005 | $181,367.43 | 167.00 | Citco Global Custody (NA) NV, Netherlands |
| November 17, 2005 | $204,174.11 | 188.00 | Citco Global Custody (NA) NV, Netherlands |
| November 17, 2005 | $225,188.84 | 207.35 | Citco Global Custody (NA) NV, Netherlands |
| November 17, 2005 | $233,996.56 | 215.46 | Citco Global Custody (NA) NV, Netherlands |

12

### Redemption Payments Received by Defendants from Sentry
### From April 20, 2004 Through November 19, 2008

| | | | |
|---|---|---|---|
| November 17, 2005 | $384,455.51 | 354.00 | Citco Global Custody (NA) NV, Netherlands |
| November 17, 2005 | $415,657.22 | 382.73 | Citco Global Custody (NA) NV, Netherlands |
| November 17, 2005 | $457,121.94 | 420.91 | Citco Global Custody (NA) NV, Netherlands |
| November 17, 2005 | $488,551.72 | 449.85 | Citco Global Custody (NA) NV, Netherlands |
| November 17, 2005 | $520,405.05 | 479.18 | Citco Global Custody (NA) NV, Netherlands |
| November 17, 2005 | $636,415.05 | 586.00 | Citco Global Custody (NA) NV, Netherlands |
| November 17, 2005 | $1,664,887.82 | 1,533.00 | Citco Global Custody (NA) NV, Netherlands |
| November 17, 2005 | $2,900,000.00 | 2,670.27 | Citco Global Custody (NA) NV, Netherlands |
| November 17, 2005 | $19,200,000.00 | 17,679.03 | Citco Global Custody (NA) NV, Netherlands |
| November 17, 2005 | $26,000,000.00 | 23,940.35 | Citco Global Custody (NA) NV, Netherlands |
| November 17, 2005 | $115,228.05 | 106.10 | Citco Global Custody (NA) NV, Netherlands |
| November 17, 2005 | $1,422,702.58 | 1,310.00 | Citco Global Custody (NA) NV, Netherlands |
| November 17, 2005 | $6,096,986.46 | 5,614.00 | Citco Global Custody (NA) NV, Netherlands |
| November 17, 2005 | $230,000.00 | 211.78 | Citco Global Custody (NA) NV, Netherlands |
| November 17, 2005 | $310,931.10 | 286.30 | Citco Global Custody (NA) NV, Netherlands |
| November 17, 2005 | $10,214,483.19 | 9,405.32 | Citco Global Custody (NA) NV, Netherlands |
| November 17, 2005 | $108,603.25 | 100.00 | Citco Global Custody (NA) NV, Netherlands |
| November 30, 2005 | $1,631,945.00 | 1,491.47 | Citco Global Custody (NA) NV, Netherlands |
| December 13, 2005 | $7,000,000.00 | 6,397.45 | Citco Global Custody (NA) NV, Netherlands |
| December 15, 2005 | $2,350,000.00 | 2,136.22 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2005 | $2,188.37 | 2.00 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2005 | $6,565.11 | 6.00 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2005 | $21,883.71 | 20.00 | Citco Global Custody (NA) NV, Netherlands |

*Redemption Payments Received by Defendants from Sentry*
*From April 20, 2004 Through November 19, 2008*

| | | | |
|---|---|---|---|
| December 19, 2005 | $24,455.05 | 22.35 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2005 | $25,000.00 | 22.85 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2005 | $32,825.57 | 30.00 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2005 | $32,825.57 | 30.00 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2005 | $47,312.59 | 43.24 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2005 | $99,570.89 | 91.00 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2005 | $115,097.38 | 105.19 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2005 | $138,961.57 | 127.00 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2005 | $250,000.00 | 228.48 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2005 | $253,183.61 | 231.39 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2005 | $399,377.74 | 365.00 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2005 | $584,295.11 | 534.00 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2005 | $875,000.00 | 799.68 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2005 | $7,527,953.16 | 6,879.96 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2005 | $8,250,000.00 | 7,539.85 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2005 | $20,000,000.00 | 18,278.43 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2005 | $290,000.00 | 265.04 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2005 | $31,786.09 | 29.05 | Citco Global Custody (NA) NV, Netherlands |
| January 19, 2006 | $11,000.76 | 10.00 | Citco Global Custody (NA) NV, Netherlands |
| January 19, 2006 | $15,401.06 | 14.00 | Citco Global Custody (NA) NV, Netherlands |
| January 19, 2006 | $24,201.67 | 22.00 | Citco Global Custody (NA) NV, Netherlands |
| January 19, 2006 | $25,000.00 | 22.73 | Citco Global Custody (NA) NV, Netherlands |
| January 19, 2006 | $27,501.90 | 25.00 | Citco Global Custody (NA) NV, Netherlands |

**_Redemption Payments Received by Defendants from Sentry_**
**_From April 20, 2004 Through November 19, 2008_**

| | | | |
|---|---|---|---|
| January 19, 2006 | $27,501.90 | 25.00 | Citco Global Custody (NA) NV, Netherlands |
| January 19, 2006 | $31,902.20 | 29.00 | Citco Global Custody (NA) NV, Netherlands |
| January 19, 2006 | $45,719.15 | 41.56 | Citco Global Custody (NA) NV, Netherlands |
| January 19, 2006 | $53,067.66 | 48.24 | Citco Global Custody (NA) NV, Netherlands |
| January 19, 2006 | $66,004.55 | 60.00 | Citco Global Custody (NA) NV, Netherlands |
| January 19, 2006 | $86,718.98 | 78.83 | Citco Global Custody (NA) NV, Netherlands |
| January 19, 2006 | $91,801.33 | 83.45 | Citco Global Custody (NA) NV, Netherlands |
| January 19, 2006 | $167,508.56 | 152.27 | Citco Global Custody (NA) NV, Netherlands |
| January 19, 2006 | $171,688.85 | 156.07 | Citco Global Custody (NA) NV, Netherlands |
| January 19, 2006 | $400,000.00 | 363.61 | Citco Global Custody (NA) NV, Netherlands |
| January 19, 2006 | $487,036.60 | 442.73 | Citco Global Custody (NA) NV, Netherlands |
| January 19, 2006 | $700,000.00 | 636.32 | Citco Global Custody (NA) NV, Netherlands |
| January 19, 2006 | $815,486.26 | 741.30 | Citco Global Custody (NA) NV, Netherlands |
| January 19, 2006 | $935,064.52 | 850.00 | Citco Global Custody (NA) NV, Netherlands |
| January 19, 2006 | $1,500,000.00 | 1,363.54 | Citco Global Custody (NA) NV, Netherlands |
| January 19, 2006 | $1,540,667.30 | 1,400.51 | Citco Global Custody (NA) NV, Netherlands |
| January 19, 2006 | $15,000,000.00 | 13,635.42 | Citco Global Custody (NA) NV, Netherlands |
| January 19, 2006 | $12,628.87 | 11.48 | Citco Global Custody (NA) NV, Netherlands |
| January 19, 2006 | $920,378.50 | 836.65 | Citco Global Custody (NA) NV, Netherlands |
| January 19, 2006 | $961,235.32 | 873.79 | Citco Global Custody (NA) NV, Netherlands |
| January 19, 2006 | $981,773.74 | 892.46 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2006 | $11,077.63 | 10.00 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2006 | $25,000.00 | 22.57 | Citco Global Custody (NA) NV, Netherlands |

*Redemption Payments Received by Defendants from Sentry*
*From April 20, 2004 Through November 19, 2008*

| | | | |
|---|---|---|---|
| February 15, 2006 | $27,694.08 | 25.00 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2006 | $45,000.00 | 40.62 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2006 | $55,388.15 | 50.00 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2006 | $70,509.11 | 63.65 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2006 | $80,988.55 | 73.11 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2006 | $83,082.23 | 75.00 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2006 | $166,164.45 | 150.00 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2006 | $321,206.96 | 289.96 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2006 | $335,652.19 | 303.00 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2006 | $350,000.00 | 315.95 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2006 | $437,566.39 | 395.00 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2006 | $567,407.29 | 512.21 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2006 | $572,890.71 | 517.16 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2006 | $4,809,962.33 | 4,342.05 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2006 | $8,335,000.00 | 7,524.17 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2006 | $1,373.63 | 1.24 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2006 | $55,388.15 | 50.00 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2006 | $132,931.56 | 120.00 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2006 | $1,271,490.37 | 1,147.80 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2006 | $3,400,000.00 | 3,069.25 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2006 | $485,000.00 | 437.82 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2006 | $22,110.95 | 19.96 | Citco Global Custody (NA) NV, Netherlands |
| March 17, 2006 | $12,398.00 | 11.17 | Citco Global Custody (NA) NV, Netherlands |

16

### Redemption Payments Received by Defendants from Sentry
### From April 20, 2004 Through November 19, 2008

| | | | |
|---|---|---|---|
| March 17, 2006 | $25,284.38 | 22.78 | Citco Global Custody (NA) NV, Netherlands |
| March 17, 2006 | $33,298.13 | 30.00 | Citco Global Custody (NA) NV, Netherlands |
| March 17, 2006 | $48,548.67 | 43.74 | Citco Global Custody (NA) NV, Netherlands |
| March 17, 2006 | $55,496.88 | 50.00 | Citco Global Custody (NA) NV, Netherlands |
| March 17, 2006 | $62,156.51 | 56.00 | Citco Global Custody (NA) NV, Netherlands |
| March 17, 2006 | $63,510.63 | 57.22 | Citco Global Custody (NA) NV, Netherlands |
| March 17, 2006 | $92,224.72 | 83.09 | Citco Global Custody (NA) NV, Netherlands |
| March 17, 2006 | $113,690.91 | 102.43 | Citco Global Custody (NA) NV, Netherlands |
| March 17, 2006 | $114,401.27 | 103.07 | Citco Global Custody (NA) NV, Netherlands |
| March 17, 2006 | $115,311.42 | 103.89 | Citco Global Custody (NA) NV, Netherlands |
| March 17, 2006 | $115,433.51 | 104.00 | Citco Global Custody (NA) NV, Netherlands |
| March 17, 2006 | $122,093.14 | 110.00 | Citco Global Custody (NA) NV, Netherlands |
| March 17, 2006 | $122,093.14 | 110.00 | Citco Global Custody (NA) NV, Netherlands |
| March 17, 2006 | $126,133.31 | 113.64 | Citco Global Custody (NA) NV, Netherlands |
| March 17, 2006 | $155,391.26 | 140.00 | Citco Global Custody (NA) NV, Netherlands |
| March 17, 2006 | $276,640.85 | 249.24 | Citco Global Custody (NA) NV, Netherlands |
| March 17, 2006 | $280,814.21 | 253.00 | Citco Global Custody (NA) NV, Netherlands |
| March 17, 2006 | $290,437.37 | 261.67 | Citco Global Custody (NA) NV, Netherlands |
| March 17, 2006 | $624,484.19 | 562.63 | Citco Global Custody (NA) NV, Netherlands |
| March 17, 2006 | $1,300,000.00 | 1,171.24 | Citco Global Custody (NA) NV, Netherlands |
| March 17, 2006 | $5,000,000.00 | 4,504.76 | Citco Global Custody (NA) NV, Netherlands |
| March 17, 2006 | $24,350,000.00 | 21,938.17 | Citco Global Custody (NA) NV, Netherlands |
| March 17, 2006 | $65,686.11 | 59.18 | Citco Global Custody (NA) NV, Netherlands |

*Redemption Payments Received by Defendants from Sentry*
*From April 20, 2004 Through November 19, 2008*

| | | | |
|---|---|---|---|
| March 17, 2006 | $510,793.28 | 460.20 | Citco Global Custody (NA) NV, Netherlands |
| March 17, 2006 | $250,000.00 | 225.24 | Citco Global Custody (NA) NV, Netherlands |
| March 17, 2006 | $22,198.75 | 20.00 | Citco Global Custody (NA) NV, Netherlands |
| April 18, 2006 | $2,000,000.00 | 1,778.65 | Citco Global Custody (NA) NV, Netherlands |
| April 19, 2006 | $200,000.00 | 177.87 | Citco Global Custody (NA) NV, Netherlands |
| April 20, 2006 | $10,120.02 | 9.00 | Citco Global Custody (NA) NV, Netherlands |
| April 20, 2006 | $12,368.91 | 11.00 | Citco Global Custody (NA) NV, Netherlands |
| April 20, 2006 | $56,222.31 | 50.00 | Citco Global Custody (NA) NV, Netherlands |
| April 20, 2006 | $56,222.31 | 50.00 | Citco Global Custody (NA) NV, Netherlands |
| April 20, 2006 | $56,222.31 | 50.00 | Citco Global Custody (NA) NV, Netherlands |
| April 20, 2006 | $59,595.65 | 53.00 | Citco Global Custody (NA) NV, Netherlands |
| April 20, 2006 | $101,200.16 | 90.00 | Citco Global Custody (NA) NV, Netherlands |
| April 20, 2006 | $103,449.05 | 92.00 | Citco Global Custody (NA) NV, Netherlands |
| April 20, 2006 | $105,742.92 | 94.04 | Citco Global Custody (NA) NV, Netherlands |
| April 20, 2006 | $106,934.83 | 95.10 | Citco Global Custody (NA) NV, Netherlands |
| April 20, 2006 | $140,072.26 | 124.57 | Citco Global Custody (NA) NV, Netherlands |
| April 20, 2006 | $204,997.79 | 182.31 | Citco Global Custody (NA) NV, Netherlands |
| April 20, 2006 | $308,750.44 | 274.58 | Citco Global Custody (NA) NV, Netherlands |
| April 20, 2006 | $843,334.65 | 750.00 | Citco Global Custody (NA) NV, Netherlands |
| April 20, 2006 | $1,600,000.00 | 1,422.92 | Citco Global Custody (NA) NV, Netherlands |
| April 20, 2006 | $1,739,012.27 | 1,546.55 | Citco Global Custody (NA) NV, Netherlands |
| April 20, 2006 | $2,614,753.46 | 2,325.37 | Citco Global Custody (NA) NV, Netherlands |
| April 20, 2006 | $30,000,000.00 | 26,679.80 | Citco Global Custody (NA) NV, Netherlands |

*Redemption Payments Received by Defendants from Sentry*
*From April 20, 2004 Through November 19, 2008*

| | | | |
|---|---|---|---|
| April 20, 2006 | $30,078.94 | 26.75 | Citco Global Custody (NA) NV, Netherlands |
| April 20, 2006 | $33,002.50 | 29.35 | Citco Global Custody (NA) NV, Netherlands |
| April 20, 2006 | $98,895.04 | 87.95 | Citco Global Custody (NA) NV, Netherlands |
| April 20, 2006 | $112,444.62 | 100.00 | Citco Global Custody (NA) NV, Netherlands |
| April 20, 2006 | $213,307.44 | 189.70 | Citco Global Custody (NA) NV, Netherlands |
| April 20, 2006 | $257,115.87 | 228.66 | Citco Global Custody (NA) NV, Netherlands |
| April 20, 2006 | $230,000.00 | 204.55 | Citco Global Custody (NA) NV, Netherlands |
| April 20, 2006 | $25,000.00 | 22.23 | Citco Global Custody (NA) NV, Netherlands |
| May 3, 2006 | $24,220.57 | 21.54 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2006 | $11,350.54 | 10.00 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2006 | $19,795.34 | 17.44 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2006 | $23,586.42 | 20.78 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2006 | $26,775.93 | 23.59 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2006 | $34,051.62 | 30.00 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2006 | $34,051.62 | 30.00 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2006 | $34,278.63 | 30.20 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2006 | $35,810.96 | 31.55 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2006 | $56,752.71 | 50.00 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2006 | $113,505.41 | 100.00 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2006 | $128,522.18 | 113.23 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2006 | $160,962.02 | 141.81 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2006 | $170,258.12 | 150.00 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2006 | $181,608.66 | 160.00 | Citco Global Custody (NA) NV, Netherlands |

*Redemption Payments Received by Defendants from Sentry*
*From April 20, 2004 Through November 19, 2008*

| | | | |
|---|---|---|---|
| May 15, 2006 | $192,959.20 | 170.00 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2006 | $261,062.44 | 230.00 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2006 | $561,204.80 | 494.43 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2006 | $34,051.62 | 30.00 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2006 | $113,505.41 | 100.00 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2006 | $1,313,518.66 | 1,157.23 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2006 | $75,000.00 | 66.08 | Citco Global Custody (NA) NV, Netherlands |
| May 17, 2006 | $174,514.57 | 153.75 | Citco Global Custody (NA) NV, Netherlands |
| May 18, 2006 | $58,336.27 | 51.88 | Citco Global Custody (NA) NV, Netherlands |
| May 24, 2006 | $34,880.21 | 30.73 | Citco Global Custody (NA) NV, Netherlands |
| June 16, 2006 | $11,430.27 | 10.00 | Citco Global Custody (NA) NV, Netherlands |
| June 16, 2006 | $13,487.71 | 11.80 | Citco Global Custody (NA) NV, Netherlands |
| June 16, 2006 | $13,716.32 | 12.00 | Citco Global Custody (NA) NV, Netherlands |
| June 16, 2006 | $22,860.53 | 20.00 | Citco Global Custody (NA) NV, Netherlands |
| June 16, 2006 | $29,055.74 | 25.42 | Citco Global Custody (NA) NV, Netherlands |
| June 16, 2006 | $32,724.85 | 28.63 | Citco Global Custody (NA) NV, Netherlands |
| June 16, 2006 | $45,721.06 | 40.00 | Citco Global Custody (NA) NV, Netherlands |
| June 16, 2006 | $53,619.38 | 46.91 | Citco Global Custody (NA) NV, Netherlands |
| June 16, 2006 | $57,151.33 | 50.00 | Citco Global Custody (NA) NV, Netherlands |
| June 16, 2006 | $68,581.60 | 60.00 | Citco Global Custody (NA) NV, Netherlands |
| June 16, 2006 | $80,011.86 | 70.00 | Citco Global Custody (NA) NV, Netherlands |
| June 16, 2006 | $80,377.63 | 70.32 | Citco Global Custody (NA) NV, Netherlands |
| June 16, 2006 | $81,955.01 | 71.70 | Citco Global Custody (NA) NV, Netherlands |

*Redemption Payments Received by Defendants from Sentry*
*From April 20, 2004 Through November 19, 2008*

| | | | |
|---|---|---|---|
| June 16, 2006 | $108,198.90 | 94.66 | Citco Global Custody (NA) NV, Netherlands |
| June 16, 2006 | $114,302.66 | 100.00 | Citco Global Custody (NA) NV, Netherlands |
| June 16, 2006 | $114,302.66 | 100.00 | Citco Global Custody (NA) NV, Netherlands |
| June 16, 2006 | $119,343.41 | 104.41 | Citco Global Custody (NA) NV, Netherlands |
| June 16, 2006 | $136,020.17 | 119.00 | Citco Global Custody (NA) NV, Netherlands |
| June 16, 2006 | $149,427.87 | 130.73 | Citco Global Custody (NA) NV, Netherlands |
| June 16, 2006 | $171,453.99 | 150.00 | Citco Global Custody (NA) NV, Netherlands |
| June 16, 2006 | $193,320.09 | 169.13 | Citco Global Custody (NA) NV, Netherlands |
| June 16, 2006 | $205,744.79 | 180.00 | Citco Global Custody (NA) NV, Netherlands |
| June 16, 2006 | $249,396.97 | 218.19 | Citco Global Custody (NA) NV, Netherlands |
| June 16, 2006 | $255,306.42 | 223.36 | Citco Global Custody (NA) NV, Netherlands |
| June 16, 2006 | $276,772.46 | 242.14 | Citco Global Custody (NA) NV, Netherlands |
| June 16, 2006 | $320,047.45 | 280.00 | Citco Global Custody (NA) NV, Netherlands |
| June 16, 2006 | $739,903.98 | 647.32 | Citco Global Custody (NA) NV, Netherlands |
| June 16, 2006 | $809,091.38 | 707.85 | Citco Global Custody (NA) NV, Netherlands |
| June 16, 2006 | $27,341.20 | 23.92 | Citco Global Custody (NA) NV, Netherlands |
| June 16, 2006 | $34,290.80 | 30.00 | Citco Global Custody (NA) NV, Netherlands |
| June 16, 2006 | $45,000.00 | 39.37 | Citco Global Custody (NA) NV, Netherlands |
| June 16, 2006 | $924,342.75 | 808.68 | Citco Global Custody (NA) NV, Netherlands |
| June 16, 2006 | $3,257.63 | 2.85 | Citco Global Custody (NA) NV, Netherlands |
| June 16, 2006 | $32,004.74 | 28.00 | Citco Global Custody (NA) NV, Netherlands |
| June 16, 2006 | $552,859.11 | 483.68 | Citco Global Custody (NA) NV, Netherlands |
| June 16, 2006 | $50,000.00 | 43.74 | Citco Global Custody (NA) NV, Netherlands |

*Redemption Payments Received by Defendants from Sentry*
*From April 20, 2004 Through November 19, 2008*

| | | | |
|---|---|---|---|
| June 16, 2006 | $196,086.21 | 171.55 | Citco Global Custody (NA) NV, Netherlands |
| June 16, 2006 | $85,000.00 | 74.36 | Citco Global Custody (NA) NV, Netherlands |
| June 23, 2006 | $11,716.02 | 10.25 | Citco Global Custody (NA) NV, Netherlands |
| June 26, 2006 | $11,850,000.00 | 10,314.73 | Citco Global Custody (NA) NV, Netherlands |
| July 20, 2006 | $22,976.85 | 20.00 | Citco Global Custody (NA) NV, Netherlands |
| July 20, 2006 | $25,274.54 | 22.00 | Citco Global Custody (NA) NV, Netherlands |
| July 20, 2006 | $45,321.84 | 39.45 | Citco Global Custody (NA) NV, Netherlands |
| July 20, 2006 | $103,395.84 | 90.00 | Citco Global Custody (NA) NV, Netherlands |
| July 20, 2006 | $109,140.06 | 95.00 | Citco Global Custody (NA) NV, Netherlands |
| July 20, 2006 | $163,847.95 | 142.62 | Citco Global Custody (NA) NV, Netherlands |
| July 20, 2006 | $178,403.78 | 155.29 | Citco Global Custody (NA) NV, Netherlands |
| July 20, 2006 | $183,527.62 | 159.75 | Citco Global Custody (NA) NV, Netherlands |
| July 20, 2006 | $195,647.91 | 170.30 | Citco Global Custody (NA) NV, Netherlands |
| July 20, 2006 | $275,480.99 | 239.79 | Citco Global Custody (NA) NV, Netherlands |
| July 20, 2006 | $525,000.00 | 456.98 | Citco Global Custody (NA) NV, Netherlands |
| July 20, 2006 | $1,100,000.00 | 957.49 | Citco Global Custody (NA) NV, Netherlands |
| July 20, 2006 | $1,114,377.42 | 970.00 | Citco Global Custody (NA) NV, Netherlands |
| July 20, 2006 | $1,193,073.14 | 1,038.50 | Citco Global Custody (NA) NV, Netherlands |
| July 20, 2006 | $1,688,626.44 | 1,469.85 | Citco Global Custody (NA) NV, Netherlands |
| July 20, 2006 | $2,722,056.40 | 2,369.39 | Citco Global Custody (NA) NV, Netherlands |
| July 20, 2006 | $50,549.08 | 44.00 | Citco Global Custody (NA) NV, Netherlands |
| July 20, 2006 | $259,730.36 | 226.08 | Citco Global Custody (NA) NV, Netherlands |

*Redemption Payments Received by Defendants from Sentry*
*From April 20, 2004 Through November 19, 2008*

| | | | |
|---|---|---|---|
| July 20, 2006 | $12,832.57 | 11.17 | Citco Global Custody (NA) NV, Netherlands |
| July 20, 2006 | $57,442.14 | 50.00 | Citco Global Custody (NA) NV, Netherlands |
| July 20, 2006 | $114,884.27 | 100.00 | Citco Global Custody (NA) NV, Netherlands |
| August 14, 2006 | $40,000.00 | 34.45 | Citco Global Custody (NA) NV, Netherlands |
| August 14, 2006 | $46,442.79 | 40.00 | Citco Global Custody (NA) NV, Netherlands |
| August 14, 2006 | $58,053.49 | 50.00 | Citco Global Custody (NA) NV, Netherlands |
| August 14, 2006 | $60,886.50 | 52.44 | Citco Global Custody (NA) NV, Netherlands |
| August 14, 2006 | $67,864.52 | 58.45 | Citco Global Custody (NA) NV, Netherlands |
| August 14, 2006 | $100,000.00 | 86.13 | Citco Global Custody (NA) NV, Netherlands |
| August 14, 2006 | $120,089.44 | 103.43 | Citco Global Custody (NA) NV, Netherlands |
| August 14, 2006 | $150,000.00 | 129.19 | Citco Global Custody (NA) NV, Netherlands |
| August 14, 2006 | $232,213.94 | 200.00 | Citco Global Custody (NA) NV, Netherlands |
| August 14, 2006 | $352,837.47 | 303.89 | Citco Global Custody (NA) NV, Netherlands |
| August 14, 2006 | $399,396.37 | 343.99 | Citco Global Custody (NA) NV, Netherlands |
| August 14, 2006 | $549,557.51 | 473.32 | Citco Global Custody (NA) NV, Netherlands |
| August 14, 2006 | $116,106.97 | 100.00 | Citco Global Custody (NA) NV, Netherlands |
| August 14, 2006 | $631,679.97 | 544.05 | Citco Global Custody (NA) NV, Netherlands |
| August 14, 2006 | $48,764.93 | 42.00 | Citco Global Custody (NA) NV, Netherlands |
| August 14, 2006 | $1,032,574.12 | 889.33 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2006 | $333,865.59 | 287.55 | Citco Global Custody (NA) NV, Netherlands |
| September 14, 2006 | $8,190.00 | 7.00 | Citco Global Custody (NA) NV, Netherlands |
| September 14, 2006 | $31,613.42 | 27.02 | Citco Global Custody (NA) NV, Netherlands |
| September 14, 2006 | $40,000.00 | 34.19 | Citco Global Custody (NA) NV, Netherlands |

***Redemption Payments Received by Defendants from Sentry***
***From April 20, 2004 Through November 19, 2008***

| | | | |
|---|---|---|---|
| September 14, 2006 | $45,630.02 | 39.00 | Citco Global Custody (NA) NV, Netherlands |
| September 14, 2006 | $45,000.00 | 38.46 | Citco Global Custody (NA) NV, Netherlands |
| September 14, 2006 | $102,960.05 | 88.00 | Citco Global Custody (NA) NV, Netherlands |
| September 14, 2006 | $103,287.65 | 88.28 | Citco Global Custody (NA) NV, Netherlands |
| September 14, 2006 | $109,769.46 | 93.82 | Citco Global Custody (NA) NV, Netherlands |
| September 14, 2006 | $115,256.76 | 98.51 | Citco Global Custody (NA) NV, Netherlands |
| September 14, 2006 | $121,551.36 | 103.89 | Citco Global Custody (NA) NV, Netherlands |
| September 14, 2006 | $5,100,000.00 | 4,358.97 | Citco Global Custody (NA) NV, Netherlands |
| September 14, 2006 | $40,950.02 | 35.00 | Citco Global Custody (NA) NV, Netherlands |
| September 14, 2006 | $119,421.96 | 102.07 | Citco Global Custody (NA) NV, Netherlands |
| September 14, 2006 | $445,898.93 | 381.11 | Citco Global Custody (NA) NV, Netherlands |
| September 14, 2006 | $3,100,290.99 | 2,649.82 | Citco Global Custody (NA) NV, Netherlands |
| September 14, 2006 | $247,478.53 | 211.52 | Citco Global Custody (NA) NV, Netherlands |
| September 14, 2006 | $150,000.00 | 128.21 | Citco Global Custody (NA) NV, Netherlands |
| October 12, 2006 | $26,609.77 | 22.59 | Citco Global Custody (NA) NV, Netherlands |
| October 12, 2006 | $30,838.59 | 26.18 | Citco Global Custody (NA) NV, Netherlands |
| October 12, 2006 | $34,160.39 | 29.00 | Citco Global Custody (NA) NV, Netherlands |
| October 12, 2006 | $35,338.34 | 30.00 | Citco Global Custody (NA) NV, Netherlands |
| October 12, 2006 | $58,897.23 | 50.00 | Citco Global Custody (NA) NV, Netherlands |
| October 12, 2006 | $59,215.28 | 50.27 | Citco Global Custody (NA) NV, Netherlands |
| October 12, 2006 | $102,481.18 | 87.00 | Citco Global Custody (NA) NV, Netherlands |
| October 12, 2006 | $129,279.42 | 109.75 | Citco Global Custody (NA) NV, Netherlands |
| October 12, 2006 | $161,036.81 | 136.71 | Citco Global Custody (NA) NV, Netherlands |

### Redemption Payments Received by Defendants from Sentry
### From April 20, 2004 Through November 19, 2008

| | | | |
|---|---|---|---|
| October 12, 2006 | $186,000.00 | 157.90 | Citco Global Custody (NA) NV, Netherlands |
| October 12, 2006 | $266,745.55 | 226.45 | Citco Global Custody (NA) NV, Netherlands |
| October 12, 2006 | $334,571.60 | 284.03 | Citco Global Custody (NA) NV, Netherlands |
| October 12, 2006 | $409,842.26 | 347.93 | Citco Global Custody (NA) NV, Netherlands |
| October 12, 2006 | $533,502.89 | 452.91 | Citco Global Custody (NA) NV, Netherlands |
| October 12, 2006 | $1,000,310.55 | 849.20 | Citco Global Custody (NA) NV, Netherlands |
| October 12, 2006 | $3,000,000.00 | 2,546.81 | Citco Global Custody (NA) NV, Netherlands |
| October 12, 2006 | $13,322.55 | 11.31 | Citco Global Custody (NA) NV, Netherlands |
| October 12, 2006 | $56,541.34 | 48.00 | Citco Global Custody (NA) NV, Netherlands |
| October 12, 2006 | $70,865.15 | 60.16 | Citco Global Custody (NA) NV, Netherlands |
| October 12, 2006 | $117,794.46 | 100.00 | Citco Global Custody (NA) NV, Netherlands |
| October 12, 2006 | $151,954.85 | 129.00 | Citco Global Custody (NA) NV, Netherlands |
| October 12, 2006 | $313,074.12 | 265.78 | Citco Global Custody (NA) NV, Netherlands |
| October 12, 2006 | $65,000.00 | 55.18 | Citco Global Custody (NA) NV, Netherlands |
| October 16, 2006 | $318,787.15 | 270.63 | Citco Global Custody (NA) NV, Netherlands |
| October 18, 2006 | $459,999.15 | 390.51 | Citco Global Custody (NA) NV, Netherlands |
| November 14, 2006 | $9,818.24 | 8.30 | Citco Global Custody (NA) NV, Netherlands |
| November 14, 2006 | $29,573.00 | 25.00 | Citco Global Custody (NA) NV, Netherlands |
| November 14, 2006 | $40,739.77 | 34.44 | Citco Global Custody (NA) NV, Netherlands |
| November 14, 2006 | $42,407.69 | 35.85 | Citco Global Custody (NA) NV, Netherlands |
| November 14, 2006 | $47,316.80 | 40.00 | Citco Global Custody (NA) NV, Netherlands |
| November 14, 2006 | $49,611.67 | 41.94 | Citco Global Custody (NA) NV, Netherlands |
| November 14, 2006 | $59,146.01 | 50.00 | Citco Global Custody (NA) NV, Netherlands |

### Redemption Payments Received by Defendants from Sentry
### From April 20, 2004 Through November 19, 2008

| | | | |
|---|---|---|---|
| November 14, 2006 | $64,516.46 | 54.54 | Citco Global Custody (NA) NV, Netherlands |
| November 14, 2006 | $113,229.11 | 95.72 | Citco Global Custody (NA) NV, Netherlands |
| November 14, 2006 | $120,267.49 | 101.67 | Citco Global Custody (NA) NV, Netherlands |
| November 14, 2006 | $132,487.05 | 112.00 | Citco Global Custody (NA) NV, Netherlands |
| November 14, 2006 | $147,474.65 | 124.67 | Citco Global Custody (NA) NV, Netherlands |
| November 14, 2006 | $459,008.49 | 388.03 | Citco Global Custody (NA) NV, Netherlands |
| November 14, 2006 | $561,887.05 | 475.00 | Citco Global Custody (NA) NV, Netherlands |
| November 14, 2006 | $712,614.73 | 602.42 | Citco Global Custody (NA) NV, Netherlands |
| November 14, 2006 | $800,000.00 | 676.29 | Citco Global Custody (NA) NV, Netherlands |
| November 14, 2006 | $10,000,000.00 | 8,453.66 | Citco Global Custody (NA) NV, Netherlands |
| November 14, 2006 | $100,548.21 | 85.00 | Citco Global Custody (NA) NV, Netherlands |
| November 14, 2006 | $354,876.03 | 300.00 | Citco Global Custody (NA) NV, Netherlands |
| November 14, 2006 | $514,818.66 | 435.21 | Citco Global Custody (NA) NV, Netherlands |
| November 14, 2006 | $887,036.30 | 749.87 | Citco Global Custody (NA) NV, Netherlands |
| November 14, 2006 | $50,000.00 | 42.27 | Citco Global Custody (NA) NV, Netherlands |
| November 22, 2006 | $132,640.83 | 112.13 | Citco Global Custody (NA) NV, Netherlands |
| December 14, 2006 | $650,000.00 | 540.20 | Citco Global Custody (NA) NV, Netherlands |
| December 15, 2006 | $3,519.49 | 2.95 | Citco Global Custody (NA) NV, Netherlands |
| December 15, 2006 | $20,150.58 | 16.89 | Citco Global Custody (NA) NV, Netherlands |
| December 15, 2006 | $25,054.01 | 21.00 | Citco Global Custody (NA) NV, Netherlands |
| December 15, 2006 | $50,000.00 | 41.91 | Citco Global Custody (NA) NV, Netherlands |
| December 15, 2006 | $54,295.62 | 45.51 | Citco Global Custody (NA) NV, Netherlands |
| December 15, 2006 | $59,652.41 | 50.00 | Citco Global Custody (NA) NV, Netherlands |

*Redemption Payments Received by Defendants from Sentry*
*From April 20, 2004 Through November 19, 2008*

| December 15, 2006 | $107,374.34 | 90.00 | Citco Global Custody (NA) NV, Netherlands |
|---|---|---|---|
| December 15, 2006 | $107,696.46 | 90.27 | Citco Global Custody (NA) NV, Netherlands |
| December 15, 2006 | $124,077.01 | 104.00 | Citco Global Custody (NA) NV, Netherlands |
| December 15, 2006 | $212,362.58 | 178.00 | Citco Global Custody (NA) NV, Netherlands |
| December 15, 2006 | $268,435.85 | 225.00 | Citco Global Custody (NA) NV, Netherlands |
| December 15, 2006 | $3,937.06 | 3.30 | Citco Global Custody (NA) NV, Netherlands |
| December 15, 2006 | $10,260.21 | 8.60 | Citco Global Custody (NA) NV, Netherlands |
| December 15, 2006 | $26,974.82 | 22.61 | Citco Global Custody (NA) NV, Netherlands |
| December 15, 2006 | $29,826.21 | 25.00 | Citco Global Custody (NA) NV, Netherlands |
| December 15, 2006 | $53,973.50 | 45.24 | Citco Global Custody (NA) NV, Netherlands |
| December 15, 2006 | $59,652.41 | 50.00 | Citco Global Custody (NA) NV, Netherlands |
| December 15, 2006 | $121,690.92 | 102.00 | Citco Global Custody (NA) NV, Netherlands |
| December 15, 2006 | $101,969.83 | 85.47 | Citco Global Custody (NA) NV, Netherlands |
| December 15, 2006 | $78,430.99 | 65.74 | Citco Global Custody (NA) NV, Netherlands |
| January 10, 2007 | $178,957.23 | 150.00 | Citco Global Custody (NA) NV, Netherlands |
| January 16, 2007 | $14,439.08 | 12.00 | Citco Global Custody (NA) NV, Netherlands |
| January 16, 2007 | $56,468.84 | 46.93 | Citco Global Custody (NA) NV, Netherlands |
| January 16, 2007 | $63,772.61 | 53.00 | Citco Global Custody (NA) NV, Netherlands |
| January 16, 2007 | $71,882.56 | 59.74 | Citco Global Custody (NA) NV, Netherlands |
| January 16, 2007 | $74,914.76 | 62.26 | Citco Global Custody (NA) NV, Netherlands |
| January 16, 2007 | $115,151.67 | 95.70 | Citco Global Custody (NA) NV, Netherlands |
| January 16, 2007 | $201,894.44 | 167.79 | Citco Global Custody (NA) NV, Netherlands |
| January 16, 2007 | $252,623.74 | 209.95 | Citco Global Custody (NA) NV, Netherlands |

*Redemption Payments Received by Defendants from Sentry*
*From April 20, 2004 Through November 19, 2008*

| | | | |
|---|---|---|---|
| January 16, 2007 | $412,392.17 | 342.73 | Citco Global Custody (NA) NV, Netherlands |
| January 25, 2007 | $118,568.92 | 98.54 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2007 | $11,729.24 | 9.72 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2007 | $48,268.47 | 40.00 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2007 | $82,273.61 | 68.18 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2007 | $86,545.37 | 71.72 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2007 | $99,445.12 | 82.41 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2007 | $108,604.06 | 90.00 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2007 | $301,677.95 | 250.00 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2007 | $350,000.00 | 290.04 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2007 | $452,541.06 | 375.02 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2007 | $463,099.79 | 383.77 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2007 | $679,378.74 | 563.00 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2007 | $1,000,000.00 | 828.70 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2007 | $1,026,935.88 | 851.02 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2007 | $1,694,923.26 | 1,404.58 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2007 | $37,516.67 | 31.09 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2007 | $46,192.93 | 38.28 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2007 | $188,355.64 | 156.09 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2007 | $230,964.64 | 191.40 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2007 | $536,576.47 | 444.66 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2007 | $70,821.92 | 58.69 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2007 | $19,307.39 | 16.00 | Citco Global Custody (NA) NV, Netherlands |

28

**Redemption Payments Received by Defendants from Sentry
From April 20, 2004 Through November 19, 2008**

| | | | |
|---|---|---|---|
| March 16, 2007 | $10,000,000.00 | 8,296.33 | Citco Global Custody (NA) NV, Netherlands |
| March 16, 2007 | $14,464.23 | 12.00 | Citco Global Custody (NA) NV, Netherlands |
| March 16, 2007 | $26,517.75 | 22.00 | Citco Global Custody (NA) NV, Netherlands |
| March 16, 2007 | $60,593.06 | 50.27 | Citco Global Custody (NA) NV, Netherlands |
| March 16, 2007 | $69,910.43 | 58.00 | Citco Global Custody (NA) NV, Netherlands |
| March 16, 2007 | $114,110.69 | 94.67 | Citco Global Custody (NA) NV, Netherlands |
| March 16, 2007 | $122,548.16 | 101.67 | Citco Global Custody (NA) NV, Netherlands |
| March 16, 2007 | $231,463.78 | 192.03 | Citco Global Custody (NA) NV, Netherlands |
| March 16, 2007 | $253,123.96 | 210.00 | Citco Global Custody (NA) NV, Netherlands |
| March 16, 2007 | $409,819.75 | 340.00 | Citco Global Custody (NA) NV, Netherlands |
| March 16, 2007 | $3,503,609.29 | 2,906.71 | Citco Global Custody (NA) NV, Netherlands |
| March 16, 2007 | $9,642.82 | 8.00 | Citco Global Custody (NA) NV, Netherlands |
| March 16, 2007 | $33,050.76 | 27.42 | Citco Global Custody (NA) NV, Netherlands |
| March 16, 2007 | $48,370.78 | 40.13 | Citco Global Custody (NA) NV, Netherlands |
| March 16, 2007 | $51,167.20 | 42.45 | Citco Global Custody (NA) NV, Netherlands |
| March 16, 2007 | $68,464.00 | 56.80 | Citco Global Custody (NA) NV, Netherlands |
| March 16, 2007 | $84,374.65 | 70.00 | Citco Global Custody (NA) NV, Netherlands |
| March 16, 2007 | $87,363.93 | 72.48 | Citco Global Custody (NA) NV, Netherlands |
| March 16, 2007 | $94,234.43 | 78.18 | Citco Global Custody (NA) NV, Netherlands |
| March 16, 2007 | $132,203.03 | 109.68 | Citco Global Custody (NA) NV, Netherlands |
| March 16, 2007 | $1,000,000.00 | 829.63 | Citco Global Custody (NA) NV, Netherlands |
| March 16, 2007 | $50,000.00 | 41.48 | Citco Global Custody (NA) NV, Netherlands |
| March 16, 2007 | $183,611.30 | 152.33 | Citco Global Custody (NA) NV, Netherlands |

*Redemption Payments Received by Defendants from Sentry*
*From April 20, 2004 Through November 19, 2008*

| | | | |
|---|---|---|---|
| April 17, 2007 | $49,006.20 | 40.00 | Citco Global Custody (NA) NV, Netherlands |
| April 17, 2007 | $64,933.22 | 53.00 | Citco Global Custody (NA) NV, Netherlands |
| April 17, 2007 | $117,418.86 | 95.84 | Citco Global Custody (NA) NV, Netherlands |
| April 17, 2007 | $137,682.92 | 112.38 | Citco Global Custody (NA) NV, Netherlands |
| April 17, 2007 | $183,087.16 | 149.44 | Citco Global Custody (NA) NV, Netherlands |
| April 17, 2007 | $200,925.42 | 164.00 | Citco Global Custody (NA) NV, Netherlands |
| April 17, 2007 | $213,789.55 | 174.50 | Citco Global Custody (NA) NV, Netherlands |
| April 17, 2007 | $269,546.35 | 220.01 | Citco Global Custody (NA) NV, Netherlands |
| April 17, 2007 | $335,520.95 | 273.86 | Citco Global Custody (NA) NV, Netherlands |
| April 17, 2007 | $735,093.00 | 600.00 | Citco Global Custody (NA) NV, Netherlands |
| April 17, 2007 | $54,482.64 | 44.47 | Citco Global Custody (NA) NV, Netherlands |
| April 17, 2007 | $117,418.86 | 95.84 | Citco Global Custody (NA) NV, Netherlands |
| April 17, 2007 | $131,410.13 | 107.26 | Citco Global Custody (NA) NV, Netherlands |
| April 17, 2007 | $137,878.94 | 112.54 | Citco Global Custody (NA) NV, Netherlands |
| April 17, 2007 | $220,527.90 | 180.00 | Citco Global Custody (NA) NV, Netherlands |
| April 17, 2007 | $380,692.41 | 310.73 | Citco Global Custody (NA) NV, Netherlands |
| April 17, 2007 | $544,777.42 | 444.66 | Citco Global Custody (NA) NV, Netherlands |
| April 17, 2007 | $69,858.34 | 57.02 | Citco Global Custody (NA) NV, Netherlands |
| April 17, 2007 | $92,000.00 | 75.09 | Citco Global Custody (NA) NV, Netherlands |
| April 17, 2007 | $50,000.00 | 40.81 | Citco Global Custody (NA) NV, Netherlands |
| May 16, 2007 | $20,968.93* | 16.95 | Citco Global Custody (NA) NV, Netherlands |
| May 16, 2007 | $21,030.79* | 17.00 | Citco Global Custody (NA) NV, Netherlands |
| May 16, 2007 | $30,667.84* | 24.79 | Citco Global Custody (NA) NV, Netherlands |

### Redemption Payments Received by Defendants from Sentry
### From April 20, 2004 Through November 19, 2008

| May 16, 2007 | $30,927.63* | 25.00 | Citco Global Custody (NA) NV, Netherlands |
|---|---|---|---|
| May 16, 2007 | $36,185.33* | 29.25 | Citco Global Custody (NA) NV, Netherlands |
| May 16, 2007 | $61,855.26* | 50.00 | Citco Global Custody (NA) NV, Netherlands |
| May 16, 2007 | $62,189.28* | 50.27 | Citco Global Custody (NA) NV, Netherlands |
| May 16, 2007 | $62,201.65* | 50.28 | Citco Global Custody (NA) NV, Netherlands |
| May 16, 2007 | $147,722.73* | 119.41 | Citco Global Custody (NA) NV, Netherlands |
| May 16, 2007 | $153,401.04* | 124.00 | Citco Global Custody (NA) NV, Netherlands |
| May 16, 2007 | $351,337.88* | 284.00 | Citco Global Custody (NA) NV, Netherlands |
| May 16, 2007 | $432,986.82* | 350.00 | Citco Global Custody (NA) NV, Netherlands |
| May 16, 2007 | $854,975.77* | 691.11 | Citco Global Custody (NA) NV, Netherlands |
| May 16, 2007 | $1,085,193.63* | 877.20 | Citco Global Custody (NA) NV, Netherlands |
| May 16, 2007 | $9,769,926.98* | 7,897.41 | Citco Global Custody (NA) NV, Netherlands |
| May 16, 2007 | $12,000,000.00* | 9,700.06 | Citco Global Custody (NA) NV, Netherlands |
| May 16, 2007 | $4,948.42* | 4.00 | Citco Global Custody (NA) NV, Netherlands |
| May 16, 2007 | $70,515.00* | 57.00 | Citco Global Custody (NA) NV, Netherlands |
| May 16, 2007 | $288,245.51* | 233.00 | Citco Global Custody (NA) NV, Netherlands |
| May 16, 2007 | $12,371.05* | 10.00 | Citco Global Custody (NA) NV, Netherlands |
| May 16, 2007 | $125,860.61* | 101.74 | Citco Global Custody (NA) NV, Netherlands |
| May 16, 2007 | $433,815.68* | 350.67 | Citco Global Custody (NA) NV, Netherlands |
| May 22, 2007 | $150,000.00* | 121.25 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2007 | $588,017.27* | 471.50 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2007 | $1,194,092.84* | 957.48 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2007 | $4,976.01* | 3.99 | Citco Global Custody (NA) NV, Netherlands |

*Redemption Payments Received by Defendants from Sentry*
*From April 20, 2004 Through November 19, 2008*

| | | |
|---|---:|---|
| June 15, 2007 | $7,283.18* | 5.84 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2007 | $12,471.20* | 10.00 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2007 | $19,953.93* | 16.00 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2007 | $24,942.41* | 20.00 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2007 | $29,419.57* | 23.59 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2007 | $37,154.21* | 29.79 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2007 | $70,661.84* | 56.66 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2007 | $94,868.45* | 76.07 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2007 | $112,240.84* | 90.00 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2007 | $122,217.80* | 98.00 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2007 | $214,822.72* | 172.26 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2007 | $256,923.01* | 206.01 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2007 | $305,544.50* | 245.00 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2007 | $334,502.63* | 268.22 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2007 | $618,397.12* | 495.86 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2007 | $800,000.00* | 641.48 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2007 | $1,203,588.42* | 965.09 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2007 | $3,750,000.00* | 3,006.93 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2007 | $6,273,489.52* | 5,030.38 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2007 | $36,166.49* | 29.00 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2007 | $86,051.31* | 69.00 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2007 | $154,642.93* | 124.00 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2007 | $637,278.52* | 511.00 | Citco Global Custody (NA) NV, Netherlands |

*Redemption Payments Received by Defendants from Sentry*
*From April 20, 2004 Through November 19, 2008*

| | | | |
|---|---|---|---|
| June 15, 2007 | $2,657,613.57* | 2,131.00 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2007 | $30,000.00* | 24.06 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2007 | $99,769.63* | 80.00 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2007 | $100,000.00* | 80.18 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2007 | $115,000.00* | 92.21 | Citco Global Custody (NA) NV, Netherlands |
| July 19, 2007 | $10,011.30* | 8.00 | Citco Global Custody (NA) NV, Netherlands |
| July 19, 2007 | $12,514.13* | 10.00 | Citco Global Custody (NA) NV, Netherlands |
| July 19, 2007 | $30,284.19* | 24.20 | Citco Global Custody (NA) NV, Netherlands |
| July 19, 2007 | $9,559,543.91* | 7,639.00 | Citco Global Custody (NA) NV, Netherlands |
| July 19, 2007 | $50,000.00* | 39.95 | Citco Global Custody (NA) NV, Netherlands |
| July 19, 2007 | $55,062.17* | 44.00 | Citco Global Custody (NA) NV, Netherlands |
| July 19, 2007 | $73,382.86* | 58.64 | Citco Global Custody (NA) NV, Netherlands |
| July 19, 2007 | $95,032.30* | 75.94 | Citco Global Custody (NA) NV, Netherlands |
| July 19, 2007 | $99,046.84* | 79.15 | Citco Global Custody (NA) NV, Netherlands |
| July 19, 2007 | $107,433.81* | 85.85 | Citco Global Custody (NA) NV, Netherlands |
| July 19, 2007 | $125,141.30* | 100.00 | Citco Global Custody (NA) NV, Netherlands |
| July 19, 2007 | $130,009.30* | 103.89 | Citco Global Custody (NA) NV, Netherlands |
| July 19, 2007 | $161,778.92* | 129.28 | Citco Global Custody (NA) NV, Netherlands |
| July 19, 2007 | $554,213.28* | 442.87 | Citco Global Custody (NA) NV, Netherlands |
| July 19, 2007 | $584,097.02* | 466.75 | Citco Global Custody (NA) NV, Netherlands |
| July 19, 2007 | $707,048.35* | 565.00 | Citco Global Custody (NA) NV, Netherlands |
| July 19, 2007 | $1,129,675.54* | 902.72 | Citco Global Custody (NA) NV, Netherlands |
| July 19, 2007 | $1,251,491.84* | 1,000.06 | Citco Global Custody (NA) NV, Netherlands |

**Redemption Payments Received by Defendants from Sentry**
**From April 20, 2004 Through November 19, 2008**

| | | | |
|---|---|---|---|
| July 19, 2007 | $14,088,201.95* | 11,257.84 | Citco Global Custody (NA) NV, Netherlands |
| July 19, 2007 | $968,593.66* | 774.00 | Citco Global Custody (NA) NV, Netherlands |
| July 19, 2007 | $1,455,393.32* | 1,163.00 | Citco Global Custody (NA) NV, Netherlands |
| July 19, 2007 | $1,804,537.55* | 1,442.00 | Citco Global Custody (NA) NV, Netherlands |
| July 19, 2007 | $25,215.97* | 20.15 | Citco Global Custody (NA) NV, Netherlands |
| July 19, 2007 | $28,138.02* | 22.49 | Citco Global Custody (NA) NV, Netherlands |
| July 19, 2007 | $50,056.52* | 40.00 | Citco Global Custody (NA) NV, Netherlands |
| July 19, 2007 | $395,071.08* | 315.70 | Citco Global Custody (NA) NV, Netherlands |
| July 19, 2007 | $1,273,575.52* | 1,017.71 | Citco Global Custody (NA) NV, Netherlands |
| July 19, 2007 | $900,000.00* | 719.19 | Citco Global Custody (NA) NV, Netherlands |
| July 19, 2007 | $56,313.59* | 45.00 | Citco Global Custody (NA) NV, Netherlands |
| July 23, 2007 | $90,382.05* | 72.22 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2007 | $136,142.94* | 108.61 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2007 | $255,547.86* | 203.87 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2007 | $804,064.39* | 641.45 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2007 | $848,621.40* | 677.00 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2007 | $9,000,000.00* | 7,179.88 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2007 | $50,000.00* | 39.89 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2007 | $2,800,000.00* | 2,233.74 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2007 | $2,263,265.74* | 1,805.55 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2007 | $10,028.02* | 8.00 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2007 | $43,872.60* | 35.00 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2007 | $68,315.90* | 54.50 | Citco Global Custody (NA) NV, Netherlands |

*Redemption Payments Received by Defendants from Sentry*
*From April 20, 2004 Through November 19, 2008*

| August 18, 2007 | $117,829.26* | 94.00 | Citco Global Custody (NA) NV, Netherlands |
|---|---|---|---|
| August 18, 2007 | $7,521.89* | 6.00 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2007 | $25,070.06* | 20.00 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2007 | $55,157.88* | 44.00 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2007 | $82,731.18* | 66.00 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2007 | $83,993.46* | 67.01 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2007 | $108,684.96* | 86.71 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2007 | $225,680.64* | 180.04 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2007 | $238,165.53* | 190.00 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2007 | $251,703.36* | 200.80 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2007 | $296,499.79* | 236.54 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2007 | $1,031,971.25* | 823.27 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2007 | $1,053,882.48* | 840.75 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2007 | $3,964,353.03* | 3,162.62 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2007 | $1,377,348.88* | 1,098.80 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2007 | $106,409.85* | 84.89 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2007 | $36,339.05* | 28.99 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2007 | $170,664.41* | 136.15 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2007 | $6,850.39* | 5.47 | Citco Global Custody (NA) NV, Netherlands |
| September 19, 2007 | $12,500,000.00* | 9,941.18 | Citco Global Custody (NA) NV, Netherlands |
| September 19, 2007 | $25,147.93* | 20.00 | Citco Global Custody (NA) NV, Netherlands |
| September 19, 2007 | $154,081.38* | 122.54 | Citco Global Custody (NA) NV, Netherlands |
| September 19, 2007 | $169,622.80* | 134.90 | Citco Global Custody (NA) NV, Netherlands |

**Redemption Payments Received by Defendants from Sentry**
**From April 20, 2004 Through November 19, 2008**

| | | | |
|---|---|---|---|
| September 19, 2007 | $583,536.39* | 464.08 | Citco Global Custody (NA) NV, Netherlands |
| September 19, 2007 | $100,310.07* | 79.78 | Citco Global Custody (NA) NV, Netherlands |
| September 19, 2007 | $216,211.86* | 171.95 | Citco Global Custody (NA) NV, Netherlands |
| September 19, 2007 | $718,476.42* | 571.40 | Citco Global Custody (NA) NV, Netherlands |
| September 19, 2007 | $293,250.04* | 233.22 | Citco Global Custody (NA) NV, Netherlands |
| September 19, 2007 | $25,147.93* | 20.00 | Citco Global Custody (NA) NV, Netherlands |
| September 19, 2007 | $163,796.03* | 130.27 | Citco Global Custody (NA) NV, Netherlands |
| September 19, 2007 | $100,000.00* | 79.53 | Citco Global Custody (NA) NV, Netherlands |
| September 19, 2007 | $10,059.17* | 8.00 | Citco Global Custody (NA) NV, Netherlands |
| September 19, 2007 | $26,669.38* | 21.21 | Citco Global Custody (NA) NV, Netherlands |
| September 19, 2007 | $47,781.07* | 38.00 | Citco Global Custody (NA) NV, Netherlands |
| September 19, 2007 | $65,233.74* | 51.88 | Citco Global Custody (NA) NV, Netherlands |
| September 19, 2007 | $127,424.57* | 101.34 | Citco Global Custody (NA) NV, Netherlands |
| September 19, 2007 | $346,613.95* | 275.66 | Citco Global Custody (NA) NV, Netherlands |
| September 19, 2007 | $609,887.65* | 485.04 | Citco Global Custody (NA) NV, Netherlands |
| September 19, 2007 | $52,458.59* | 41.72 | Citco Global Custody (NA) NV, Netherlands |
| September 19, 2007 | $369,297.38* | 293.70 | Citco Global Custody (NA) NV, Netherlands |
| September 19, 2007 | $107,469.69* | 85.47 | Citco Global Custody (NA) NV, Netherlands |
| September 19, 2007 | $32,302.52* | 25.69 | Citco Global Custody (NA) NV, Netherlands |
| September 19, 2007 | $121,150.16* | 96.35 | Citco Global Custody (NA) NV, Netherlands |
| September 19, 2007 | $254,094.70* | 202.08 | Citco Global Custody (NA) NV, Netherlands |
| September 19, 2007 | $339,497.08* | 270.00 | Citco Global Custody (NA) NV, Netherlands |
| September 19, 2007 | $470,555.53* | 374.23 | Citco Global Custody (NA) NV, Netherlands |

*Redemption Payments Received by Defendants from Sentry*
*From April 20, 2004 Through November 19, 2008*

| | | |
|---|---:|---|
| September 19, 2007 | $377,218.98* | 300.00 | Citco Global Custody (NA) NV, Netherlands |
| September 19, 2007 | $9,832.84* | 7.82 | Citco Global Custody (NA) NV, Netherlands |
| September 19, 2007 | $129,486.70* | 102.98 | Citco Global Custody (NA) NV, Netherlands |
| September 19, 2007 | $1,488,468.37* | 1,183.77 | Citco Global Custody (NA) NV, Netherlands |
| September 19, 2007 | $231,099.94* | 183.79 | Citco Global Custody (NA) NV, Netherlands |
| September 19, 2007 | $21,375.74* | 17.00 | Citco Global Custody (NA) NV, Netherlands |
| September 19, 2007 | $354,309.21* | 281.78 | Citco Global Custody (NA) NV, Netherlands |
| September 19, 2007 | $533,673.07* | 424.43 | Citco Global Custody (NA) NV, Netherlands |
| September 28, 2007 | $2,255,802.03* | 1,776.87 | Citco Global Custody (NA) NV, Netherlands |
| October 16, 2007 | $434,892.22* | 342.56 | Citco Global Custody (NA) NV, Netherlands |
| October 16, 2007 | $466,033.93* | 367.09 | Citco Global Custody (NA) NV, Netherlands |
| October 16, 2007 | $99,861.69* | 78.66 | Citco Global Custody (NA) NV, Netherlands |
| October 16, 2007 | $32,233.52* | 25.39 | Citco Global Custody (NA) NV, Netherlands |
| October 16, 2007 | $45,578.88* | 35.90 | Citco Global Custody (NA) NV, Netherlands |
| October 16, 2007 | $101,562.87* | 80.00 | Citco Global Custody (NA) NV, Netherlands |
| October 16, 2007 | $209,473.42* | 165.00 | Citco Global Custody (NA) NV, Netherlands |
| October 16, 2007 | $38,289.20* | 30.16 | Citco Global Custody (NA) NV, Netherlands |
| October 16, 2007 | $82,519.83* | 65.00 | Citco Global Custody (NA) NV, Netherlands |
| October 16, 2007 | $82,519.83* | 65.00 | Citco Global Custody (NA) NV, Netherlands |
| October 16, 2007 | $28,158.31* | 22.18 | Citco Global Custody (NA) NV, Netherlands |
| October 16, 2007 | $30,000.00* | 23.63 | Citco Global Custody (NA) NV, Netherlands |
| October 16, 2007 | $104,673.23* | 82.45 | Citco Global Custody (NA) NV, Netherlands |
| October 16, 2007 | $500,000.00* | 393.84 | Citco Global Custody (NA) NV, Netherlands |

**Redemption Payments Received by Defendants from Sentry**
**From April 20, 2004 Through November 19, 2008**

| October 16, 2007 | $1,211,236.27* | 954.08 | Citco Global Custody (NA) NV, Netherlands |
|---|---|---|---|
| October 16, 2007 | $3,491.22* | 2.75 | Citco Global Custody (NA) NV, Netherlands |
| October 16, 2007 | $152,344.31* | 120.00 | Citco Global Custody (NA) NV, Netherlands |
| October 16, 2007 | $100,000.00* | 78.77 | Citco Global Custody (NA) NV, Netherlands |
| October 16, 2007 | $31,738.40* | 25.00 | Citco Global Custody (NA) NV, Netherlands |
| October 16, 2007 | $119,336.37* | 94.00 | Citco Global Custody (NA) NV, Netherlands |
| October 16, 2007 | $4,631,428.19* | 3,648.13 | Citco Global Custody (NA) NV, Netherlands |
| October 31, 2007 | $142,805.34* | 111.97 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2007 | $11,657.06* | 9.14 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2007 | $42,393.94* | 33.24 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2007 | $153,046.72* | 120.00 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2007 | $158,913.51* | 124.60 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2007 | $170,889.41* | 133.99 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2007 | $206,829.88* | 162.17 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2007 | $124,988.15* | 98.00 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2007 | $202,774.14* | 158.99 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2007 | $319,689.08* | 250.66 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2007 | $511,724.45* | 401.23 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2007 | $527,526.52* | 413.62 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2007 | $105,810.12* | 82.96 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2007 | $127,538.93* | 100.00 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2007 | $127,538.93* | 100.00 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2007 | $5,101.56* | 4.00 | Citco Global Custody (NA) NV, Netherlands |

*Redemption Payments Received by Defendants from Sentry*
*From April 20, 2004 Through November 19, 2008*

| | | |
|---|---|---|
| November 19, 2007 | $40,812.46* | 32.00 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2007 | $132,512.95* | 103.90 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2007 | $1,350,137.32* | 1,058.61 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2007 | $409,731.57* | 321.26 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2007 | $441,552.53* | 346.21 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2007 | $537,716.88* | 421.61 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2007 | $292,510.54* | 229.35 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2007 | $109,846.09* | 86.13 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2007 | $31,055.73* | 24.35 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2007 | $126,972.66* | 99.56 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2007 | $96,763.79* | 75.87 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2007 | $81,624.92* | 64.00 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2007 | $39,192.71* | 30.73 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2007 | $49,230.03* | 38.60 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2007 | $75,000.00* | 58.81 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2007 | $1,405,989.16* | 1,102.40 | Citco Global Custody (NA) NV, Netherlands |
| November 23, 2007 | $1,850,000.00* | 1,435.62 | Citco Global Custody (NA) NV, Netherlands |
| November 23, 2007 | $600,000.00* | 465.60 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2007 | $72,834.28* | 56.52 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2007 | $74,999.20* | 58.20 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2007 | $242,059.28* | 187.84 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2007 | $2,339,111.74* | 1,815.17 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2007 | $100,000.00* | 77.60 | Citco Global Custody (NA) NV, Netherlands |

*Redemption Payments Received by Defendants from Sentry*
*From April 20, 2004 Through November 19, 2008*

| | | | |
|---|---|---|---|
| December 19, 2007 | $208,270.98* | 161.62 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2007 | $21,035.86* | 16.32 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2007 | $95,617.54* | 74.20 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2007 | $2,811,774.24* | 2,181.96 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2007 | $61,017.39* | 47.35 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2007 | $32,216.15* | 25.00 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2007 | $579,928.12* | 450.03 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2007 | $758,239.37* | 588.40 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2007 | $72,215.73* | 56.04 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2007 | $243,657.20* | 189.08 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2007 | $14,407.06* | 11.18 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2007 | $3,865.94* | 3.00 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2007 | $38,659.38* | 30.00 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2007 | $48,578.09* | 37.70 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2007 | $167,523.99* | 130.00 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2007 | $53,208.20* | 41.29 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2007 | $19,329.69* | 15.00 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2007 | $400,000.00* | 310.40 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2007 | $172,356.42* | 133.75 | Citco Global Custody (NA) NV, Netherlands |
| January 17, 2008 | $37,600,000.00* | 29,110.89 | Citco Global Custody (NA) NV, Netherlands |
| January 17, 2008 | $16,107.70* | 12.47 | Citco Global Custody (NA) NV, Netherlands |
| January 17, 2008 | $24,321.07* | 18.83 | Citco Global Custody (NA) NV, Netherlands |
| January 17, 2008 | $72,330.31* | 56.00 | Citco Global Custody (NA) NV, Netherlands |

*Redemption Payments Received by Defendants from Sentry*
*From April 20, 2004 Through November 19, 2008*

| | | | |
|---|---|---|---|
| January 17, 2008 | $1,515,088.82* | 1,173.02 | Citco Global Custody (NA) NV, Netherlands |
| January 17, 2008 | $4,147,054.52* | 3,210.76 | Citco Global Custody (NA) NV, Netherlands |
| January 17, 2008 | $40,000.00* | 30.97 | Citco Global Custody (NA) NV, Netherlands |
| January 17, 2008 | $1,240,387.34* | 960.34 | Citco Global Custody (NA) NV, Netherlands |
| January 17, 2008 | $231,360.12* | 179.13 | Citco Global Custody (NA) NV, Netherlands |
| January 17, 2008 | $2,100,000.00* | 1,625.87 | Citco Global Custody (NA) NV, Netherlands |
| January 17, 2008 | $68,252.69* | 52.84 | Citco Global Custody (NA) NV, Netherlands |
| January 17, 2008 | $55,491.56* | 42.96 | Citco Global Custody (NA) NV, Netherlands |
| January 17, 2008 | $669,507.44* | 518.35 | Citco Global Custody (NA) NV, Netherlands |
| January 17, 2008 | $2,114,592.41* | 1,637.17 | Citco Global Custody (NA) NV, Netherlands |
| January 17, 2008 | $30,000.00* | 23.23 | Citco Global Custody (NA) NV, Netherlands |
| January 17, 2008 | $311,976.13* | 241.54 | Citco Global Custody (NA) NV, Netherlands |
| January 17, 2008 | $54,910.33* | 42.51 | Citco Global Custody (NA) NV, Netherlands |
| January 17, 2008 | $125,299.35* | 97.01 | Citco Global Custody (NA) NV, Netherlands |
| January 17, 2008 | $77,496.76* | 60.00 | Citco Global Custody (NA) NV, Netherlands |
| January 17, 2008 | $308,114.21* | 238.55 | Citco Global Custody (NA) NV, Netherlands |
| January 17, 2008 | $324,931.01* | 251.57 | Citco Global Custody (NA) NV, Netherlands |
| January 17, 2008 | $67,099.28* | 51.95 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2008 | $1,502,413.28* | 1,155.93 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2008 | $113,259.41* | 87.14 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2008 | $200,000.00* | 153.88 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2008 | $64,987.04* | 50.00 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2008 | $55,550.92* | 42.74 | Citco Global Custody (NA) NV, Netherlands |

*Redemption Payments Received by Defendants from Sentry*
*From April 20, 2004 Through November 19, 2008*

| | | | |
|---|---|---|---|
| February 15, 2008 | $129,981.88* | 100.01 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2008 | $174,165.27* | 134.00 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2008 | $107,540.55* | 82.74 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2008 | $73,617.32* | 56.64 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2008 | $129,974.08* | 100.00 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2008 | $212,325.66* | 163.36 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2008 | $15,596.89* | 12.00 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2008 | $244,533.23* | 188.14 | Citco Global Custody (NA) NV, Netherlands |
| March 18, 2008 | $90,000.21* | 69.20 | Citco Global Custody (NA) NV, Netherlands |
| March 18, 2008 | $130,058.11* | 100.00 | Citco Global Custody (NA) NV, Netherlands |
| March 18, 2008 | $168,137.82* | 129.28 | Citco Global Custody (NA) NV, Netherlands |
| March 18, 2008 | $1,243,371.14* | 956.01 | Citco Global Custody (NA) NV, Netherlands |
| March 18, 2008 | $45,520.34* | 35.00 | Citco Global Custody (NA) NV, Netherlands |
| March 18, 2008 | $630,807.85* | 485.02 | Citco Global Custody (NA) NV, Netherlands |
| March 18, 2008 | $36,416.27* | 28.00 | Citco Global Custody (NA) NV, Netherlands |
| March 18, 2008 | $110,549.39* | 85.00 | Citco Global Custody (NA) NV, Netherlands |
| March 18, 2008 | $39,017.43* | 30.00 | Citco Global Custody (NA) NV, Netherlands |
| March 18, 2008 | $81,143.25* | 62.39 | Citco Global Custody (NA) NV, Netherlands |
| March 18, 2008 | $208,092.98* | 160.00 | Citco Global Custody (NA) NV, Netherlands |
| March 18, 2008 | $67,000.00* | 51.52 | Citco Global Custody (NA) NV, Netherlands |
| March 18, 2008 | $111,160.67* | 85.47 | Citco Global Custody (NA) NV, Netherlands |
| March 18, 2008 | $202,162.33* | 155.44 | Citco Global Custody (NA) NV, Netherlands |
| March 18, 2008 | $1,040.46* | 0.80 | Citco Global Custody (NA) NV, Netherlands |

*Redemption Payments Received by Defendants from Sentry*
*From April 20, 2004 Through November 19, 2008*

| March 18, 2008 | $25,175.00* | 19.36 | Citco Global Custody (NA) NV, Netherlands |
| March 18, 2008 | $818,597.45* | 629.41 | Citco Global Custody (NA) NV, Netherlands |
| March 18, 2008 | $17,583.86* | 13.52 | Citco Global Custody (NA) NV, Netherlands |
| March 18, 2008 | $464,300.04* | 356.99 | Citco Global Custody (NA) NV, Netherlands |
| March 18, 2008 | $138,723.88* | 106.66 | Citco Global Custody (NA) NV, Netherlands |
| March 18, 2008 | $376,024.01* | 289.12 | Citco Global Custody (NA) NV, Netherlands |
| March 18, 2008 | $1,079,005.00* | 829.63 | Citco Global Custody (NA) NV, Netherlands |
| March 18, 2008 | $45,520.34* | 35.00 | Citco Global Custody (NA) NV, Netherlands |
| April 14, 2008 | $39,089.35* | 30.00 | Citco Global Custody (NA) NV, Netherlands |
| April 14, 2008 | $133,477.10* | 102.44 | Citco Global Custody (NA) NV, Netherlands |
| April 14, 2008 | $445,827.06* | 342.16 | Citco Global Custody (NA) NV, Netherlands |
| April 14, 2008 | $5,775,882.60* | 4,432.83 | Citco Global Custody (NA) NV, Netherlands |
| April 14, 2008 | $5,000,000.00* | 3,837.36 | Citco Global Custody (NA) NV, Netherlands |
| April 14, 2008 | $30,000.00* | 23.02 | Citco Global Custody (NA) NV, Netherlands |
| April 14, 2008 | $108,472.94* | 83.25 | Citco Global Custody (NA) NV, Netherlands |
| April 14, 2008 | $142,024.63* | 109.00 | Citco Global Custody (NA) NV, Netherlands |
| April 14, 2008 | $147,601.38* | 113.28 | Citco Global Custody (NA) NV, Netherlands |
| April 14, 2008 | $37,903.64* | 29.09 | Citco Global Custody (NA) NV, Netherlands |
| April 14, 2008 | $54,725.09* | 42.00 | Citco Global Custody (NA) NV, Netherlands |
| April 14, 2008 | $214,991.42* | 165.00 | Citco Global Custody (NA) NV, Netherlands |
| April 14, 2008 | $42,000,000.00* | 32,233.84 | Citco Global Custody (NA) NV, Netherlands |
| April 14, 2008 | $27,573.63* | 21.16 | Citco Global Custody (NA) NV, Netherlands |
| April 14, 2008 | $28,665.52* | 22.00 | Citco Global Custody (NA) NV, Netherlands |

### Redemption Payments Received by Defendants from Sentry
### From April 20, 2004 Through November 19, 2008

| April 14, 2008 | $71,663.81* | 55.00 | Citco Global Custody (NA) NV, Netherlands |
|---|---|---|---|
| April 14, 2008 | $91,208.48* | 70.00 | Citco Global Custody (NA) NV, Netherlands |
| April 14, 2008 | $104,244.78* | 80.01 | Citco Global Custody (NA) NV, Netherlands |
| April 14, 2008 | $327,412.39* | 251.28 | Citco Global Custody (NA) NV, Netherlands |
| April 14, 2008 | $782,451.50* | 600.51 | Citco Global Custody (NA) NV, Netherlands |
| April 14, 2008 | $200,000.00* | 153.49 | Citco Global Custody (NA) NV, Netherlands |
| April 14, 2008 | $14,332.76* | 11.00 | Citco Global Custody (NA) NV, Netherlands |
| April 14, 2008 | $112,222.26* | 86.13 | Citco Global Custody (NA) NV, Netherlands |
| April 14, 2008 | $75,222.24* | 57.73 | Citco Global Custody (NA) NV, Netherlands |
| April 14, 2008 | $43,670.62* | 33.52 | Citco Global Custody (NA) NV, Netherlands |
| April 14, 2008 | $50,000.00* | 38.37 | Citco Global Custody (NA) NV, Netherlands |
| April 14, 2008 | $72,211.06* | 55.42 | Citco Global Custody (NA) NV, Netherlands |
| April 14, 2008 | $221,506.31* | 170.00 | Citco Global Custody (NA) NV, Netherlands |
| April 14, 2008 | $188,084.92* | 144.35 | Citco Global Custody (NA) NV, Netherlands |
| April 14, 2008 | $50,000.00* | 38.37 | Citco Global Custody (NA) NV, Netherlands |
| April 14, 2008 | $84,198.46* | 64.62 | Citco Global Custody (NA) NV, Netherlands |
| April 14, 2008 | $401,111.32* | 307.84 | Citco Global Custody (NA) NV, Netherlands |
| April 14, 2008 | $109,502.30* | 84.04 | Citco Global Custody (NA) NV, Netherlands |
| April 30, 2008 | $189,805.01* | 144.33 | Citco Global Custody (NA) NV, Netherlands |
| April 30, 2008 | $703,247.60* | 534.77 | Citco Global Custody (NA) NV, Netherlands |
| April 30, 2008 | $100,174.54* | 76.18 | Citco Global Custody (NA) NV, Netherlands |
| April 30, 2008 | $114,935.31* | 87.40 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2008 | $28,000,000.00* | 21,291.98 | Citco Global Custody (NA) NV, Netherlands |

*Redemption Payments Received by Defendants from Sentry*
*From April 20, 2004 Through November 19, 2008*

| | | |
|---|---|---|
| May 15, 2008 | $869,287.04* | 661.03 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2008 | $114,724.90* | 87.24 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2008 | $131,991.50* | 100.37 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2008 | $21,466.86* | 16.32 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2008 | $131,504.93* | 100.00 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2008 | $1,600,000.00* | 1,216.68 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2008 | $394,514.79* | 300.00 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2008 | $84,766.76* | 64.46 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2008 | $163,614.49* | 124.42 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2008 | $64,020.55* | 48.68 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2008 | $70,920.61* | 53.93 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2008 | $79,323.77* | 60.32 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2008 | $231,448.68* | 176.00 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2008 | $1,771,164.94* | 1,346.84 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2008 | $20,362.88* | 15.48 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2008 | $19,725.74* | 15.00 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2008 | $20,450.20* | 15.55 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2008 | $94,056.27* | 71.52 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2008 | $35,453.73* | 26.96 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2008 | $47,341.77* | 36.00 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2008 | $43,449.23* | 33.04 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2008 | $500,000.00* | 380.21 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2008 | $203,832.64* | 155.00 | Citco Global Custody (NA) NV, Netherlands |

*Redemption Payments Received by Defendants from Sentry*
*From April 20, 2004 Through November 19, 2008*

| | | |
|---|---|---|
| May 15, 2008 | $2,519,924.95* | 1,916.22 | Citco Global Custody (NA) NV, Netherlands |
| May 31, 2008 | $147,048.50* | 110.92 | Citco Global Custody (NA) NV, Netherlands |
| June 17, 2008 | $181,252.81* | 136.72 | Citco Global Custody (NA) NV, Netherlands |
| June 17, 2008 | $885,028.61* | 667.58 | Citco Global Custody (NA) NV, Netherlands |
| June 17, 2008 | $40,593.63* | 30.62 | Citco Global Custody (NA) NV, Netherlands |
| June 17, 2008 | $66,286.14* | 50.00 | Citco Global Custody (NA) NV, Netherlands |
| June 17, 2008 | $98,898.91* | 74.60 | Citco Global Custody (NA) NV, Netherlands |
| June 17, 2008 | $137,941.45* | 104.05 | Citco Global Custody (NA) NV, Netherlands |
| June 17, 2008 | $103,406.37* | 78.00 | Citco Global Custody (NA) NV, Netherlands |
| June 17, 2008 | $106,720.68* | 80.50 | Citco Global Custody (NA) NV, Netherlands |
| June 17, 2008 | $840,997.38* | 634.37 | Citco Global Custody (NA) NV, Netherlands |
| June 17, 2008 | $560,356.47* | 422.68 | Citco Global Custody (NA) NV, Netherlands |
| June 17, 2008 | $57,907.57* | 43.68 | Citco Global Custody (NA) NV, Netherlands |
| June 17, 2008 | $312,870.56* | 236.00 | Citco Global Custody (NA) NV, Netherlands |
| June 17, 2008 | $211,876.07* | 159.82 | Citco Global Custody (NA) NV, Netherlands |
| June 17, 2008 | $15,262.65* | 11.51 | Citco Global Custody (NA) NV, Netherlands |
| June 17, 2008 | $52,880.69* | 39.89 | Citco Global Custody (NA) NV, Netherlands |
| June 17, 2008 | $150,000.00* | 113.15 | Citco Global Custody (NA) NV, Netherlands |
| June 17, 2008 | $10,367.15* | 7.82 | Citco Global Custody (NA) NV, Netherlands |
| June 17, 2008 | $51,125.17* | 38.56 | Citco Global Custody (NA) NV, Netherlands |
| June 17, 2008 | $33,143.07* | 25.00 | Citco Global Custody (NA) NV, Netherlands |
| June 17, 2008 | $345,960.60* | 260.96 | Citco Global Custody (NA) NV, Netherlands |
| June 17, 2008 | $132,572.27* | 100.00 | Citco Global Custody (NA) NV, Netherlands |

### Redemption Payments Received by Defendants from Sentry
### From April 20, 2004 Through November 19, 2008

| | | | |
|---|---|---|---|
| June 17, 2008 | $917,241.02* | 691.88 | Citco Global Custody (NA) NV, Netherlands |
| June 17, 2008 | $7,089,832.43* | 5,347.90 | Citco Global Custody (NA) NV, Netherlands |
| June 17, 2008 | $245,245.44* | 184.99 | Citco Global Custody (NA) NV, Netherlands |
| June 30, 2008 | $161,053.70* | 121.56 | Citco Global Custody (NA) NV, Netherlands |
| June 30, 2008 | $1,960,012.51* | 1,479.33 | Citco Global Custody (NA) NV, Netherlands |
| July 15, 2008 | $44,000,000.00* | 33,209.31 | Citco Global Custody (NA) NV, Netherlands |
| July 15, 2008 | $1,757,512.76* | 1,326.50 | Citco Global Custody (NA) NV, Netherlands |
| July 15, 2008 | $40,000.00* | 30.19 | Citco Global Custody (NA) NV, Netherlands |
| July 15, 2008 | $366,515.33* | 276.63 | Citco Global Custody (NA) NV, Netherlands |
| July 15, 2008 | $686,923.10* | 518.46 | Citco Global Custody (NA) NV, Netherlands |
| July 15, 2008 | $998,997.07* | 754.00 | Citco Global Custody (NA) NV, Netherlands |
| July 15, 2008 | $900,000.00* | 679.28 | Citco Global Custody (NA) NV, Netherlands |
| July 15, 2008 | $193,731.24* | 146.22 | Citco Global Custody (NA) NV, Netherlands |
| July 15, 2008 | $239,653.30* | 180.88 | Citco Global Custody (NA) NV, Netherlands |
| July 15, 2008 | $49,022.40* | 37.00 | Citco Global Custody (NA) NV, Netherlands |
| July 15, 2008 | $132,492.98* | 100.00 | Citco Global Custody (NA) NV, Netherlands |
| July 15, 2008 | $1,059,943.84* | 800.00 | Citco Global Custody (NA) NV, Netherlands |
| July 15, 2008 | $110,114.92* | 83.11 | Citco Global Custody (NA) NV, Netherlands |
| July 15, 2008 | $11,907.14* | 8.99 | Citco Global Custody (NA) NV, Netherlands |
| July 15, 2008 | $662,464.90* | 500.00 | Citco Global Custody (NA) NV, Netherlands |
| July 15, 2008 | $1,799,917.13* | 1,358.50 | Citco Global Custody (NA) NV, Netherlands |
| July 15, 2008 | $172,240.87* | 130.00 | Citco Global Custody (NA) NV, Netherlands |
| July 15, 2008 | $270,285.68* | 204.00 | Citco Global Custody (NA) NV, Netherlands |

**Redemption Payments Received by Defendants from Sentry**
**From April 20, 2004 Through November 19, 2008**

| | | | |
|---|---|---|---|
| July 15, 2008 | $5,142,868.84* | 3,881.62 | Citco Global Custody (NA) NV, Netherlands |
| July 15, 2008 | $113,089.38* | 85.36 | Citco Global Custody (NA) NV, Netherlands |
| July 31, 2008 | $93,408.22* | 70.00 | Citco Global Custody (NA) NV, Netherlands |
| July 31, 2008 | $259,514.71* | 194.48 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2008 | $58,549.60* | 43.88 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2008 | $66,720.16* | 50.00 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2008 | $476,888.98* | 357.38 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2008 | $20,000.00* | 14.99 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2008 | $54,246.15* | 40.65 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2008 | $186,816.43* | 140.00 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2008 | $1,006,139.94* | 754.00 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2008 | $10,675.22* | 8.00 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2008 | $313,880.97* | 235.22 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2008 | $352,282.42* | 264.00 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2008 | $691,220.81* | 518.00 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2008 | $26,688.06* | 20.00 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2008 | $20,016.05* | 15.00 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2008 | $40,032.09* | 30.00 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2008 | $20,016.05* | 15.00 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2008 | $134,175.57* | 100.55 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2008 | $40,032.09* | 30.00 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2008 | $56,405.22* | 42.27 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2008 | $266,245.31* | 199.52 | Citco Global Custody (NA) NV, Netherlands |

**Redemption Payments Received by Defendants from Sentry
From April 20, 2004 Through November 19, 2008**

| | | | |
|---|---|---|---|
| August 18, 2008 | $923,246.82* | 691.88 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2008 | $949,264.74* | 711.38 | Citco Global Custody (NA) NV, Netherlands |
| September 16, 2008 | $62,100,000.00* | 46,208.23 | Citco Global Custody (NA) NV, Netherlands |
| September 16, 2008 | $396,445.93* | 294.99 | Citco Global Custody (NA) NV, Netherlands |
| September 16, 2008 | $26,878.33* | 20.00 | Citco Global Custody (NA) NV, Netherlands |
| September 16, 2008 | $341,216.07* | 253.90 | Citco Global Custody (NA) NV, Netherlands |
| September 16, 2008 | $370,000.00* | 275.31 | Citco Global Custody (NA) NV, Netherlands |
| September 16, 2008 | $2,100,000.00* | 1,562.60 | Citco Global Custody (NA) NV, Netherlands |
| September 16, 2008 | $13,439.16* | 10.00 | Citco Global Custody (NA) NV, Netherlands |
| September 16, 2008 | $23,209.44* | 17.27 | Citco Global Custody (NA) NV, Netherlands |
| September 16, 2008 | $149,241.92* | 111.05 | Citco Global Custody (NA) NV, Netherlands |
| September 16, 2008 | $161,269.97* | 120.00 | Citco Global Custody (NA) NV, Netherlands |
| September 16, 2008 | $820,514.72* | 610.54 | Citco Global Custody (NA) NV, Netherlands |
| September 16, 2008 | $104,289.53* | 77.60 | Citco Global Custody (NA) NV, Netherlands |
| September 16, 2008 | $372,264.84* | 277.00 | Citco Global Custody (NA) NV, Netherlands |
| September 16, 2008 | $109,693.55* | 81.62 | Citco Global Custody (NA) NV, Netherlands |
| October 15, 2008 | $9,000,000.00* | 6,663.69 | Citco Global Custody (NA) NV, Netherlands |
| October 15, 2008 | $41,500,000.00* | 30,726.99 | Citco Global Custody (NA) NV, Netherlands |
| October 15, 2008 | $509,692.29* | 377.38 | Citco Global Custody (NA) NV, Netherlands |
| October 15, 2008 | $1,652,466.70* | 1,223.50 | Citco Global Custody (NA) NV, Netherlands |
| October 15, 2008 | $3,844,817.08* | 2,846.74 | Citco Global Custody (NA) NV, Netherlands |
| October 15, 2008 | $75,053.06* | 55.57 | Citco Global Custody (NA) NV, Netherlands |
| October 15, 2008 | $135,060.40* | 100.00 | Citco Global Custody (NA) NV, Netherlands |

**Redemption Payments Received by Defendants from Sentry**
**From April 20, 2004 Through November 19, 2008**

| | | |
|---|---|---|
| October 15, 2008 | $174,254.93* | 129.02 | Citco Global Custody (NA) NV, Netherlands |
| October 15, 2008 | $33,765.10* | 25.00 | Citco Global Custody (NA) NV, Netherlands |
| October 15, 2008 | $631,343.89* | 467.45 | Citco Global Custody (NA) NV, Netherlands |
| October 15, 2008 | $749,989.05* | 555.30 | Citco Global Custody (NA) NV, Netherlands |
| October 15, 2008 | $18,030.56* | 13.35 | Citco Global Custody (NA) NV, Netherlands |
| October 15, 2008 | $821,627.79* | 608.34 | Citco Global Custody (NA) NV, Netherlands |
| October 15, 2008 | $1,091,752.64* | 808.34 | Citco Global Custody (NA) NV, Netherlands |
| October 15, 2008 | $22,960.27* | 17.00 | Citco Global Custody (NA) NV, Netherlands |
| October 15, 2008 | $12,992.81* | 9.62 | Citco Global Custody (NA) NV, Netherlands |
| October 15, 2008 | $332,022.49* | 245.83 | Citco Global Custody (NA) NV, Netherlands |
| October 15, 2008 | $561,232.01* | 415.54 | Citco Global Custody (NA) NV, Netherlands |
| October 15, 2008 | $2,076,923.99* | 1,537.77 | Citco Global Custody (NA) NV, Netherlands |
| October 21, 2008 | $54,395.98* | 40.28 | Citco Global Custody (NA) NV, Netherlands |
| October 24, 2008 | $130,000,000.00* | 96,312.12 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $218,000,000.00* | 161,508.02 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $38,144.73* | 28.26 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $122,829.82* | 91.00 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $223,963.30* | 165.93 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $269,955.64* | 200.00 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $677,696.64* | 502.08 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $15,952,741.04* | 11,818.79 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $15,000.00* | 11.11 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $506,602.80* | 375.32 | Citco Global Custody (NA) NV, Netherlands |

**Redemption Payments Received by Defendants from Sentry**
**From April 20, 2004 Through November 19, 2008**

| | | | |
|---|---|---|---|
| November 19, 2008 | $508,965.73* | 377.07 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $1,369,631.41* | 1,014.71 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $26,995.56* | 20.00 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $30,345.71* | 22.48 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $55,085.80* | 40.81 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $102,811.26* | 76.17 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $137,231.95* | 101.67 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $275,428.99* | 204.06 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $280,443.42* | 207.77 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $292,901.87* | 217.00 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $323,854.98* | 239.93 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $421,526.28* | 312.29 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $20,246.67* | 15.00 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $345,564.82* | 256.02 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $590,392.98* | 437.40 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $33,744.46* | 25.00 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $36,376.52* | 26.95 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $62,913.16* | 46.61 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $69,432.59* | 51.44 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $102,583.14* | 76.00 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $105,741.62* | 78.34 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $108,184.72* | 80.15 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $112,031.59* | 83.00 | Citco Global Custody (NA) NV, Netherlands |

### Redemption Payments Received by Defendants from Sentry
### From April 20, 2004 Through November 19, 2008

| | | |
|---|---|---|
| November 19, 2008 | $128,363.91* | 95.10 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $153,472.48* | 113.70 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $192,933.25* | 142.94 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $4,400,000.00* | 3,259.79 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $236,061.36* | 174.89 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $274,801.34* | 203.59 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $436,423.79* | 323.33 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $590,190.52* | 437.25 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $642,912.85* | 476.31 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $663,092.04* | 491.26 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $40,493.35* | 30.00 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $554,480.25* | 410.79 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $1,191,591.62* | 882.81 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $26,124.96* | 19.36 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $50,936.58* | 37.74 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $52,371.39* | 38.80 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $100,072.56* | 74.14 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $101,874.51* | 75.48 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $103,591.43* | 76.75 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $105,832.06* | 78.41 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $183,791.20* | 136.16 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $215,964.51* | 160.00 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $247,056.65* | 183.04 | Citco Global Custody (NA) NV, Netherlands |

**Redemption Payments Received by Defendants from Sentry**
**From April 20, 2004 Through November 19, 2008**

| | | | |
|---|---|---|---|
| November 19, 2008 | $318,466.67* | 235.94 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $47,242.24* | 35.00 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $104,503.34* | 77.42 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $131,913.82* | 97.73 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $140,241.95* | 103.90 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $141,983.17* | 105.19 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $214,169.31* | 158.67 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $263,841.14* | 195.47 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $283,979.84* | 210.39 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $587,440.48* | 435.21 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $1,411,247.10* | 1,045.54 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $9,448.45* | 7.00 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $57,055.12* | 42.27 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $116,253.02* | 86.13 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $232,506.04* | 172.26 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $2,307,310.86* | 1,709.40 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $513,204.43* | 380.21 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $1,076,808.51* | 797.77 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $562,765.99* | 416.93 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $76,937.36* | 57.00 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $894,361.28* | 662.60 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $6,522,965.12* | 4,832.62 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $134,977.82* | 100.00 | Citco Global Custody (NA) NV, Netherlands |

### Redemption Payments Received by Defendants from Sentry
### From April 20, 2004 Through November 19, 2008

| | | | |
|---|---|---|---|
| November 19, 2008 | $67,488.91* | 50.00 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $148,475.60* | 110.00 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $163,572.87* | 121.19 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $80,986.69* | 60.00 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $286,449.93* | 212.22 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $622,786.58* | 461.40 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $114,704.15* | 84.98 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $411,377.30* | 304.77 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $2,075,654.09* | 1,537.77 | Citco Global Custody (NA) NV, Netherlands |

* Denotes Redemptions in the Sentry Vulnerability Period.

**EXHIBIT B**

*Redemption Payments Received by Defendants from Sigma*
*From April 27, 2004 Through November 21, 2008*

| **Payment Date** | **Redemption Payment** | **No. of Shares** | **Bank Account to which Redemption Payment Was Made** |
|---|---|---|---|
| April 27, 2004 | $82,395.99 | 470.00 | Citco Global Custody (NA) NV, Netherlands |
| April 27, 2004 | $87,960.36 | 501.74 | Citco Global Custody (NA) NV, Netherlands |
| April 27, 2004 | $104,337.87 | 595.16 | Citco Global Custody (NA) NV, Netherlands |
| April 27, 2004 | $110,992.67 | 633.12 | Citco Global Custody (NA) NV, Netherlands |
| April 27, 2004 | $2,964,641.17 | 16,910.79 | Citco Global Custody (NA) NV, Netherlands |
| May 21, 2004 | $57,781.78 | 326.31 | Citco Global Custody (NA) NV, Netherlands |
| May 21, 2004 | $84,111.27 | 475.00 | Citco Global Custody (NA) NV, Netherlands |
| May 21, 2004 | $225,143.73 | 1,271.45 | Citco Global Custody (NA) NV, Netherlands |
| May 21, 2004 | $302,632.35 | 1,709.05 | Citco Global Custody (NA) NV, Netherlands |
| June 23, 2004 | $222,185.88 | 1,229.27 | Citco Global Custody (NA) NV, Netherlands |
| August 20, 2004 | $70,522.55 | 376.39 | Citco Global Custody (NA) NV, Netherlands |
| September 27, 2004 | $150,528.09 | 798.54 | Citco Global Custody (NA) NV, Netherlands |
| November 23, 2004 | $18,714.45 | 92.95 | Citco Global Custody (NA) NV, Netherlands |
| November 23, 2004 | $379,705.07 | 1,885.90 | Citco Global Custody (NA) NV, Netherlands |
| December 22, 2004 | $48,850.45 | 235.00 | Citco Global Custody (NA) NV, Netherlands |
| January 18, 2005 | $36,142.31 | 177.59 | Citco Global Custody (NA) NV, Netherlands |
| March 23, 2005 | $108,080.36 | 526.18 | Citco Global Custody (NA) NV, Netherlands |
| April 25, 2005 | $33,137.13 | 160.33 | Citco Global Custody (NA) NV, Netherlands |
| April 25, 2005 | $217,506.67 | 1,052.38 | Citco Global Custody (NA) NV, Netherlands |
| July 18, 2005 | $49,708.52 | 258.62 | Citco Global Custody (NA) NV, Netherlands |

*Redemption Payments Received by Defendants from Sigma*
*From April 27, 2004 Through November 21, 2008*

| | | | |
|---|---|---|---|
| July 14, 2005 | $97,262.09 | 503.81 | Citco Global Custody (NA) NV, Netherlands |
| July 20, 2005 | $2,515,893.30 | 13,082.99 | Citco Global Custody (NA) NV, Netherlands |
| August 12, 2005 | $12,685.73 | 63.72 | Citco Global Custody (NA) NV, Netherlands |
| August 12, 2005 | $3,075,871.33 | 15,450.00 | Citco Global Custody (NA) NV, Netherlands |
| August 12, 2005 | $72,923.04 | 366.29 | Citco Global Custody (NA) NV, Netherlands |
| August 12, 2005 | $1,071,080.11 | 5,380.00 | Citco Global Custody (NA) NV, Netherlands |
| September 15, 2005 | $32,688.20 | 166.62 | Citco Global Custody (NA) NV, Netherlands |
| September 15, 2005 | $61,219.25 | 312.05 | Citco Global Custody (NA) NV, Netherlands |
| September 15, 2005 | $153,918.17 | 784.56 | Citco Global Custody (NA) NV, Netherlands |
| September 15, 2005 | $1,283,240.04 | 6,541.00 | Citco Global Custody (NA) NV, Netherlands |
| September 15, 2005 | $26,008.12 | 132.57 | Citco Global Custody (NA) NV, Netherlands |
| September 15, 2005 | $167,711.89 | 854.87 | Citco Global Custody (NA) NV, Netherlands |
| September 15, 2005 | $252,422.21 | 1,286.66 | Citco Global Custody (NA) NV, Netherlands |
| September 15, 2005 | $3,031,197.00 | 15,450.78 | Citco Global Custody (NA) NV, Netherlands |
| September 15, 2005 | $1,056,082.43 | 5,383.12 | Citco Global Custody (NA) NV, Netherlands |
| October 25, 2005 | $123,237.99 | 639.14 | Citco Global Custody (NA) NV, Netherlands |
| November 23, 2005 | $18,426.70 | 95.58 | Citco Global Custody (NA) NV, Netherlands |
| November 23, 2005 | $61,424.23 | 318.61 | Citco Global Custody (NA) NV, Netherlands |
| November 23, 2005 | $1,261,027.35 | 6,541.00 | Citco Global Custody (NA) NV, Netherlands |
| November 23, 2005 | $24,644.12 | 127.83 | Citco Global Custody (NA) NV, Netherlands |
| November 23, 2005 | $61,609.31 | 319.57 | Citco Global Custody (NA) NV, Netherlands |
| November 23, 2005 | $134,951.71 | 700.00 | Citco Global Custody (NA) NV, Netherlands |

### Redemption Payments Received by Defendants from Sigma
### From April 27, 2004 Through November 21, 2008

| | | | |
|---|---|---|---|
| November 23, 2005 | $378,057.58 | 1,961.00 | Citco Global Custody (NA) NV, Netherlands |
| December 21, 2005 | $17,674.84 | 89.57 | Citco Global Custody (NA) NV, Netherlands |
| December 21, 2005 | $2,268,714.28 | 11,497.06 | Citco Global Custody (NA) NV, Netherlands |
| December 21, 2005 | $126,121.47 | 639.14 | Citco Global Custody (NA) NV, Netherlands |
| December 21, 2005 | $12,917.22 | 65.46 | Citco Global Custody (NA) NV, Netherlands |
| December 21, 2005 | $28,374.08 | 143.79 | Citco Global Custody (NA) NV, Netherlands |
| January 27, 2006 | $45,008.90 | 223.03 | Citco Global Custody (NA) NV, Netherlands |
| January 27, 2006 | $136,017.58 | 674.00 | Citco Global Custody (NA) NV, Netherlands |
| January 27, 2006 | $135,256.77 | 670.23 | Citco Global Custody (NA) NV, Netherlands |
| January 27, 2006 | $713,274.98 | 3,534.45 | Citco Global Custody (NA) NV, Netherlands |
| January 27, 2006 | $39,352.27 | 195.00 | Citco Global Custody (NA) NV, Netherlands |
| January 27, 2006 | $70,293.24 | 348.32 | Citco Global Custody (NA) NV, Netherlands |
| January 27, 2006 | $382,764.37 | 1,896.69 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2006 | $499,449.76 | 2,535.50 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2006 | $162,380.76 | 824.34 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2006 | $24,683.91 | 125.31 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2006 | $196,982.75 | 1,000.00 | Citco Global Custody (NA) NV, Netherlands |
| March 24, 2006 | $3,590.18 | 18.00 | Citco Global Custody (NA) NV, Netherlands |
| March 24, 2006 | $154,084.69 | 772.53 | Citco Global Custody (NA) NV, Netherlands |
| March 24, 2006 | $600,278.68 | 3,009.60 | Citco Global Custody (NA) NV, Netherlands |
| March 24, 2006 | $5,185.82 | 26.00 | Citco Global Custody (NA) NV, Netherlands |
| March 24, 2006 | $133,122.01 | 667.43 | Citco Global Custody (NA) NV, Netherlands |

*Redemption Payments Received by Defendants from Sigma*
*From April 27, 2004 Through November 21, 2008*

| | | | |
|---|---|---|---|
| March 24, 2006 | $725,017.62 | 3,635.00 | Citco Global Custody (NA) NV, Netherlands |
| March 24, 2006 | $10,413,433.01 | 52,209.53 | Citco Global Custody (NA) NV, Netherlands |
| April 21, 2006 | $20,653.19 | 100.00 | Citco Global Custody (NA) NV, Netherlands |
| April 21, 2006 | $26,103.56 | 126.39 | Citco Global Custody (NA) NV, Netherlands |
| April 21, 2006 | $64,632.07 | 312.94 | Citco Global Custody (NA) NV, Netherlands |
| April 21, 2006 | $104,408.05 | 505.53 | Citco Global Custody (NA) NV, Netherlands |
| April 21, 2006 | $71,588.07 | 346.62 | Citco Global Custody (NA) NV, Netherlands |
| April 21, 2006 | $128,039.43 | 619.95 | Citco Global Custody (NA) NV, Netherlands |
| May 24, 2006 | $105,069.03 | 485.23 | Citco Global Custody (NA) NV, Netherlands |
| May 24, 2006 | $1,100,575.53 | 5,082.68 | Citco Global Custody (NA) NV, Netherlands |
| May 24, 2006 | $39,963.60 | 184.56 | Citco Global Custody (NA) NV, Netherlands |
| May 24, 2006 | $3,359,355.06 | 15,514.18 | Citco Global Custody (NA) NV, Netherlands |
| May 24, 2006 | $19,488.10 | 90.00 | Citco Global Custody (NA) NV, Netherlands |
| May 24, 2006 | $216,534.49 | 1,000.00 | Citco Global Custody (NA) NV, Netherlands |
| May 24, 2006 | $443,776.61 | 2,049.45 | Citco Global Custody (NA) NV, Netherlands |
| May 24, 2006 | $5,600,030.16 | 25,862.07 | Citco Global Custody (NA) NV, Netherlands |
| June 20, 2006 | $192,103.54 | 901.44 | Citco Global Custody (NA) NV, Netherlands |
| June 20, 2006 | $368,187.78 | 1,727.71 | Citco Global Custody (NA) NV, Netherlands |
| June 20, 2006 | $467,154.86 | 2,192.11 | Citco Global Custody (NA) NV, Netherlands |
| June 20, 2006 | $102,155.16 | 479.36 | Citco Global Custody (NA) NV, Netherlands |
| June 20, 2006 | $136,205.47 | 639.14 | Citco Global Custody (NA) NV, Netherlands |
| June 20, 2006 | $18,114.13 | 85.00 | Citco Global Custody (NA) NV, Netherlands |

*Redemption Payments Received by Defendants from Sigma*
*From April 27, 2004 Through November 21, 2008*

| | | | |
|---|---|---|---|
| June 20, 2006 | $30,687.47 | 144.00 | Citco Global Custody (NA) NV, Netherlands |
| June 20, 2006 | $72,857.16 | 341.88 | Citco Global Custody (NA) NV, Netherlands |
| July 24, 2006 | $25,858.70 | 120.00 | Citco Global Custody (NA) NV, Netherlands |
| July 24, 2006 | $35,555.72 | 165.00 | Citco Global Custody (NA) NV, Netherlands |
| July 24, 2006 | $11,966,647.97 | 55,532.47 | Citco Global Custody (NA) NV, Netherlands |
| August 14, 2006 | $117,066.37 | 537.66 | Citco Global Custody (NA) NV, Netherlands |
| August 14, 2006 | $156,876.69 | 720.50 | Citco Global Custody (NA) NV, Netherlands |
| August 14, 2006 | $123,500.39 | 567.21 | Citco Global Custody (NA) NV, Netherlands |
| August 14, 2006 | $1,651,056.94 | 7,582.94 | Citco Global Custody (NA) NV, Netherlands |
| August 21, 2006 | $371,205.60 | 1,690.78 | Citco Global Custody (NA) NV, Netherlands |
| September 18, 2006 | $198,969.79 | 913.24 | Citco Global Custody (NA) NV, Netherlands |
| September 18, 2006 | $303,955.96 | 1,395.11 | Citco Global Custody (NA) NV, Netherlands |
| October 17, 2006 | $68,356.89 | 316.12 | Citco Global Custody (NA) NV, Netherlands |
| October 17, 2006 | $50,167.02 | 232.00 | Citco Global Custody (NA) NV, Netherlands |
| October 17, 2006 | $73,892.56 | 341.72 | Citco Global Custody (NA) NV, Netherlands |
| October 17, 2006 | $5,624.33 | 26.01 | Citco Global Custody (NA) NV, Netherlands |
| November 17, 2006 | $39,965.20 | 180.00 | Citco Global Custody (NA) NV, Netherlands |
| November 17, 2006 | $184,992.25 | 833.19 | Citco Global Custody (NA) NV, Netherlands |
| November 17, 2006 | $1,523,846.44 | 6,863.28 | Citco Global Custody (NA) NV, Netherlands |
| November 17, 2006 | $149,221.18 | 672.08 | Citco Global Custody (NA) NV, Netherlands |
| November 17, 2006 | $629,316.47 | 2,834.39 | Citco Global Custody (NA) NV, Netherlands |
| November 17, 2006 | $195,185.59 | 879.10 | Citco Global Custody (NA) NV, Netherlands |

*Redemption Payments Received by Defendants from Sigma*
*From April 27, 2004 Through November 21, 2008*

| | | | |
|---|---|---|---|
| November 17, 2006 | $838,745.22 | 3,777.64 | Citco Global Custody (NA) NV, Netherlands |
| December 18, 2006 | $47,184.30 | 206.86 | Citco Global Custody (NA) NV, Netherlands |
| December 18, 2006 | $46,203.48 | 202.56 | Citco Global Custody (NA) NV, Netherlands |
| January 19, 2007 | $93,616.47 | 412.00 | Citco Global Custody (NA) NV, Netherlands |
| January 19, 2007 | $57,433.25 | 252.76 | Citco Global Custody (NA) NV, Netherlands |
| January 19, 2007 | $265,852.61 | 1,170.00 | Citco Global Custody (NA) NV, Netherlands |
| January 19, 2007 | $13,633.47 | 60.00 | Citco Global Custody (NA) NV, Netherlands |
| January 19, 2007 | $1,571,257.09 | 6,915.00 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2007 | $195,223.78 | 850.00 | Citco Global Custody (NA) NV, Netherlands |
| March 15, 2007 | $19,873.45 | 85.89 | Citco Global Custody (NA) NV, Netherlands |
| March 15, 2007 | $173,789.16 | 751.09 | Citco Global Custody (NA) NV, Netherlands |
| March 15, 2007 | $46,276.52 | 200.00 | Citco Global Custody (NA) NV, Netherlands |
| March 15, 2007 | $268,683.80 | 1,161.21 | Citco Global Custody (NA) NV, Netherlands |
| April 17, 2007 | $75,479.08 | 313.13 | Citco Global Custody (NA) NV, Netherlands |
| April 17, 2007 | $122,741.19 | 509.20 | Citco Global Custody (NA) NV, Netherlands |
| April 17, 2007 | $451,775.29 | 1,874.22 | Citco Global Custody (NA) NV, Netherlands |
| April 17, 2007 | $142,049.05 | 589.30 | Citco Global Custody (NA) NV, Netherlands |
| April 17, 2007 | $747,246.01 | 3,100.00 | Citco Global Custody (NA) NV, Netherlands |
| April 17, 2007 | $121,441.94 | 503.81 | Citco Global Custody (NA) NV, Netherlands |
| April 17, 2007 | $304,640.14 | 1,263.82 | Citco Global Custody (NA) NV, Netherlands |
| April 17, 2007 | $143,181.98 | 594.00 | Citco Global Custody (NA) NV, Netherlands |
| April 17, 2007 | $120,523.55 | 500.00 | Citco Global Custody (NA) NV, Netherlands |

*Redemption Payments Received by Defendants from Sigma*
*From April 27, 2004 Through November 21, 2008*

| | | | |
|---|---|---|---|
| April 17, 2007 | $94,008.37 | 390.00 | Citco Global Custody (NA) NV, Netherlands |
| May 16, 2007 | $253,705.15* | 1,044.14 | Citco Global Custody (NA) NV, Netherlands |
| May 16, 2007 | $276,374.92* | 1,137.44 | Citco Global Custody (NA) NV, Netherlands |
| May 16, 2007 | $485.96* | 2.00 | Citco Global Custody (NA) NV, Netherlands |
| May 16, 2007 | $110,798.77* | 456.00 | Citco Global Custody (NA) NV, Netherlands |
| May 16, 2007 | $334,682.77* | 1,377.41 | Citco Global Custody (NA) NV, Netherlands |
| May 16, 2007 | $10,205.15* | 42.00 | Citco Global Custody (NA) NV, Netherlands |
| June 19, 2007 | $120,921.73* | 500.00 | Citco Global Custody (NA) NV, Netherlands |
| June 19, 2007 | $60,460.87* | 250.00 | Citco Global Custody (NA) NV, Netherlands |
| June 19, 2007 | $271,585.38* | 1,122.98 | Citco Global Custody (NA) NV, Netherlands |
| June 19, 2007 | $116,084.86* | 480.00 | Citco Global Custody (NA) NV, Netherlands |
| June 19, 2007 | $120,921.73* | 500.00 | Citco Global Custody (NA) NV, Netherlands |
| June 19, 2007 | $248,058.60* | 1,025.70 | Citco Global Custody (NA) NV, Netherlands |
| June 19, 2007 | $399,105.33* | 1,650.26 | Citco Global Custody (NA) NV, Netherlands |
| June 19, 2007 | $48,397.71* | 200.12 | Citco Global Custody (NA) NV, Netherlands |
| June 19, 2007 | $152,900.69* | 632.23 | Citco Global Custody (NA) NV, Netherlands |
| June 19, 2007 | $15,282.09* | 63.19 | Citco Global Custody (NA) NV, Netherlands |
| June 19, 2007 | $62,879.30* | 260.00 | Citco Global Custody (NA) NV, Netherlands |
| July 19, 2007 | $998,721.85* | 4,002.17 | Citco Global Custody (NA) NV, Netherlands |
| July 19, 2007 | $204,864.29* | 820.95 | Citco Global Custody (NA) NV, Netherlands |
| July 19, 2007 | $31,899.38* | 127.83 | Citco Global Custody (NA) NV, Netherlands |
| July 19, 2007 | $142,198.45* | 569.83 | Citco Global Custody (NA) NV, Netherlands |

*Redemption Payments Received by Defendants from Sigma*
*From April 27, 2004 Through November 21, 2008*

| | | | |
|---|---|---|---|
| August 17, 2007 | $69,434.33* | 286.00 | Citco Global Custody (NA) NV, Netherlands |
| August 17, 2007 | $315,610.61* | 1,300.00 | Citco Global Custody (NA) NV, Netherlands |
| August 17, 2007 | $29,133.28* | 120.00 | Citco Global Custody (NA) NV, Netherlands |
| August 17, 2007 | $106,453.03* | 438.48 | Citco Global Custody (NA) NV, Netherlands |
| August 17, 2007 | $576,237.01* | 2,373.52 | Citco Global Custody (NA) NV, Netherlands |
| August 17, 2007 | $273,066.15* | 1,124.76 | Citco Global Custody (NA) NV, Netherlands |
| August 17, 2007 | $34,544.79* | 142.29 | Citco Global Custody (NA) NV, Netherlands |
| September 20, 2007 | $75,495.32* | 298.06 | Citco Global Custody (NA) NV, Netherlands |
| September 20, 2007 | $298,890.64* | 1,180.04 | Citco Global Custody (NA) NV, Netherlands |
| September 20, 2007 | $432,478.35* | 1,707.46 | Citco Global Custody (NA) NV, Netherlands |
| September 20, 2007 | $499,856.55* | 1,973.47 | Citco Global Custody (NA) NV, Netherlands |
| September 20, 2007 | $18,517.74* | 73.11 | Citco Global Custody (NA) NV, Netherlands |
| September 20, 2007 | $163,695.06* | 646.28 | Citco Global Custody (NA) NV, Netherlands |
| September 20, 2007 | $902,767.06* | 3,564.19 | Citco Global Custody (NA) NV, Netherlands |
| September 20, 2007 | $154,505.77* | 610.00 | Citco Global Custody (NA) NV, Netherlands |
| September 20, 2007 | $111,760.86* | 441.24 | Citco Global Custody (NA) NV, Netherlands |
| September 20, 2007 | $87,663.03* | 346.10 | Citco Global Custody (NA) NV, Netherlands |
| September 20, 2007 | $427,332.36* | 1,687.14 | Citco Global Custody (NA) NV, Netherlands |
| October 19, 2007 | $30,438.75* | 116.88 | Citco Global Custody (NA) NV, Netherlands |
| October 19, 2007 | $95,923.07* | 368.32 | Citco Global Custody (NA) NV, Netherlands |
| October 19, 2007 | $71,966.78* | 276.33 | Citco Global Custody (NA) NV, Netherlands |
| October 19, 2007 | $82,328.41* | 316.12 | Citco Global Custody (NA) NV, Netherlands |

### Redemption Payments Received by Defendants from Sigma
### From April 27, 2004 Through November 21, 2008

| | | | |
|---|---|---|---|
| October 19, 2007 | $15,626.04* | 60.00 | Citco Global Custody (NA) NV, Netherlands |
| November 20, 2007 | $45,965.99* | 170.95 | Citco Global Custody (NA) NV, Netherlands |
| November 20, 2007 | $155,219.56* | 577.27 | Citco Global Custody (NA) NV, Netherlands |
| November 20, 2007 | $46,455.36* | 172.77 | Citco Global Custody (NA) NV, Netherlands |
| November 20, 2007 | $314,337.94* | 1,169.04 | Citco Global Custody (NA) NV, Netherlands |
| November 20, 2007 | $151,215.58* | 562.38 | Citco Global Custody (NA) NV, Netherlands |
| November 20, 2007 | $169,908.77* | 631.90 | Citco Global Custody (NA) NV, Netherlands |
| November 20, 2007 | $302,431.43* | 1,124.76 | Citco Global Custody (NA) NV, Netherlands |
| November 20, 2007 | $1,049,393.03* | 3,902.75 | Citco Global Custody (NA) NV, Netherlands |
| December 18, 2007 | $25,270.21* | 94.79 | Citco Global Custody (NA) NV, Netherlands |
| December 18, 2007 | $84,233.68* | 315.95 | Citco Global Custody (NA) NV, Netherlands |
| December 18, 2007 | $7,998.08* | 30.00 | Citco Global Custody (NA) NV, Netherlands |
| December 18, 2007 | $85,200.91* | 319.58 | Citco Global Custody (NA) NV, Netherlands |
| December 18, 2007 | $79,679.57* | 298.87 | Citco Global Custody (NA) NV, Netherlands |
| January 22, 2008 | $25,518.55* | 94.79 | Citco Global Custody (NA) NV, Netherlands |
| January 22, 2008 | $34,024.92* | 126.38 | Citco Global Custody (NA) NV, Netherlands |
| January 22, 2008 | $314,730.59* | 1,169.03 | Citco Global Custody (NA) NV, Netherlands |
| January 22, 2008 | $315,499.48* | 1,171.89 | Citco Global Custody (NA) NV, Netherlands |
| January 22, 2008 | $33,588.08* | 124.76 | Citco Global Custody (NA) NV, Netherlands |
| January 22, 2008 | $1,735,603.86* | 6,446.72 | Citco Global Custody (NA) NV, Netherlands |
| January 22, 2008 | $163,910.90* | 608.83 | Citco Global Custody (NA) NV, Netherlands |
| January 22, 2008 | $340,701.43* | 1,265.50 | Citco Global Custody (NA) NV, Netherlands |

9

*Redemption Payments Received by Defendants from Sigma*
*From April 27, 2004 Through November 21, 2008*

| | | | |
|---|---|---|---|
| February 15, 2008 | $34,375.92* | 126.38 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2008 | $244,800.14* | 900.00 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2008 | $164,361.53* | 604.27 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2008 | $195,750.36* | 719.67 | Citco Global Custody (NA) NV, Netherlands |
| March 18, 2008 | $18,597.26* | 63.19 | Citco Global Custody (NA) NV, Netherlands |
| March 18, 2008 | $1,227,094.98* | 4,169.50 | Citco Global Custody (NA) NV, Netherlands |
| March 18, 2008 | $182,323.32* | 619.51 | Citco Global Custody (NA) NV, Netherlands |
| March 18, 2008 | $94,050.24* | 319.57 | Citco Global Custody (NA) NV, Netherlands |
| March 18, 2008 | $93,034.89* | 316.12 | Citco Global Custody (NA) NV, Netherlands |
| March 18, 2008 | $317,967.02* | 1,080.41 | Citco Global Custody (NA) NV, Netherlands |
| March 18, 2008 | $803,910.71* | 2,731.58 | Citco Global Custody (NA) NV, Netherlands |
| March 18, 2008 | $1,975,567.06* | 6,712.71 | Citco Global Custody (NA) NV, Netherlands |
| April 18, 2008 | $28,751.74* | 96.50 | Citco Global Custody (NA) NV, Netherlands |
| April 18, 2008 | $28,751.74* | 96.50 | Citco Global Custody (NA) NV, Netherlands |
| April 18, 2008 | $668,375.48* | 2,243.28 | Citco Global Custody (NA) NV, Netherlands |
| April 18, 2008 | $1,612,647.63* | 5,412.56 | Citco Global Custody (NA) NV, Netherlands |
| April 18, 2008 | $2,488,294.27* | 8,351.51 | Citco Global Custody (NA) NV, Netherlands |
| April 18, 2008 | $74,486.38* | 250.00 | Citco Global Custody (NA) NV, Netherlands |
| April 18, 2008 | $1,390,809.61* | 4,668.00 | Citco Global Custody (NA) NV, Netherlands |
| April 18, 2008 | $62,568.56* | 210.00 | Citco Global Custody (NA) NV, Netherlands |
| April 18, 2008 | $3,045,181.83* | 10,220.60 | Citco Global Custody (NA) NV, Netherlands |
| April 18, 2008 | $8,938.36* | 30.00 | Citco Global Custody (NA) NV, Netherlands |

*Redemption Payments Received by Defendants from Sigma*
*From April 27, 2004 Through November 21, 2008*

| | | | |
|---|---|---|---|
| May 20, 2008 | $59,320.08* | 201.70 | Citco Global Custody (NA) NV, Netherlands |
| May 20, 2008 | $1,114,964.70* | 3,791.10 | Citco Global Custody (NA) NV, Netherlands |
| May 20, 2008 | $142,509.38* | 484.56 | Citco Global Custody (NA) NV, Netherlands |
| May 20, 2008 | $619,941.23* | 2,107.92 | Citco Global Custody (NA) NV, Netherlands |
| May 20, 2008 | $682,916.98* | 2,322.05 | Citco Global Custody (NA) NV, Netherlands |
| May 20, 2008 | $1,813,412.41* | 6,165.96 | Citco Global Custody (NA) NV, Netherlands |
| May 20, 2008 | $55,779.11* | 189.66 | Citco Global Custody (NA) NV, Netherlands |
| May 20, 2008 | $29,410.06* | 100.00 | Citco Global Custody (NA) NV, Netherlands |
| May 20, 2008 | $10,293.52* | 35.00 | Citco Global Custody (NA) NV, Netherlands |
| May 20, 2008 | $65,813.83* | 223.78 | Citco Global Custody (NA) NV, Netherlands |
| May 20, 2008 | $294,100.58* | 1,000.00 | Citco Global Custody (NA) NV, Netherlands |
| May 20, 2008 | $2,978,618.33* | 10,127.89 | Citco Global Custody (NA) NV, Netherlands |
| May 20, 2008 | $291,362.50* | 990.69 | Citco Global Custody (NA) NV, Netherlands |
| May 20, 2008 | $546,888.85* | 1,859.53 | Citco Global Custody (NA) NV, Netherlands |
| June 18, 2008 | $1,044,002.75* | 3,531.79 | Citco Global Custody (NA) NV, Netherlands |
| July 21, 2008 | $60,308.40* | 199.44 | Citco Global Custody (NA) NV, Netherlands |
| July 21, 2008 | $205,155.57* | 678.45 | Citco Global Custody (NA) NV, Netherlands |
| July 21, 2008 | $258,466.69* | 854.75 | Citco Global Custody (NA) NV, Netherlands |
| July 21, 2008 | $1,777,497.82* | 5,878.19 | Citco Global Custody (NA) NV, Netherlands |
| July 21, 2008 | $77,544.54* | 256.44 | Citco Global Custody (NA) NV, Netherlands |
| July 21, 2008 | $9,071.66* | 30.00 | Citco Global Custody (NA) NV, Netherlands |
| July 21, 2008 | $19,395.21* | 64.14 | Citco Global Custody (NA) NV, Netherlands |

*Redemption Payments Received by Defendants from Sigma*
*From April 27, 2004 Through November 21, 2008*

| | | | |
|---|---|---|---|
| August 15, 2008 | $49,907.12* | 174.26 | Citco Global Custody (NA) NV, Netherlands |
| August 15, 2008 | $99,436.50* | 347.20 | Citco Global Custody (NA) NV, Netherlands |
| August 15, 2008 | $669,434.54* | 2,337.46 | Citco Global Custody (NA) NV, Netherlands |
| August 15, 2008 | $60,142.87* | 210.00 | Citco Global Custody (NA) NV, Netherlands |
| August 15, 2008 | $276,242.50* | 964.55 | Citco Global Custody (NA) NV, Netherlands |
| August 15, 2008 | $177,564.66* | 620.00 | Citco Global Custody (NA) NV, Netherlands |
| August 15, 2008 | $90,535.07* | 316.12 | Citco Global Custody (NA) NV, Netherlands |
| August 15, 2008 | $328,586.27* | 1,147.32 | Citco Global Custody (NA) NV, Netherlands |
| August 15, 2008 | $90,535.07* | 316.12 | Citco Global Custody (NA) NV, Netherlands |
| August 31, 2008 | $123,504.61* | 433.45 | Citco Global Custody (NA) NV, Netherlands |
| August 31, 2008 | $141,794.52* | 497.64 | Citco Global Custody (NA) NV, Netherlands |
| September 19, 2008 | $1,051,752.45* | 3,768.49 | Citco Global Custody (NA) NV, Netherlands |
| September 19, 2008 | $158,844.77* | 569.15 | Citco Global Custody (NA) NV, Netherlands |
| September 19, 2008 | $54,343.25* | 194.72 | Citco Global Custody (NA) NV, Netherlands |
| September 19, 2008 | $878,500.99* | 3,147.72 | Citco Global Custody (NA) NV, Netherlands |
| October 20, 2008 | $40,992.11* | 156.00 | Citco Global Custody (NA) NV, Netherlands |
| October 20, 2008 | $3,322,625.77* | 12,644.62 | Citco Global Custody (NA) NV, Netherlands |
| October 20, 2008 | $398,481.65* | 1,516.47 | Citco Global Custody (NA) NV, Netherlands |
| November 21, 2008 | $64,838.15* | 265.96 | Citco Global Custody (NA) NV, Netherlands |
| November 21, 2008 | $91,936.36* | 377.11 | Citco Global Custody (NA) NV, Netherlands |
| November 21, 2008 | $774,494.86* | 3,176.87 | Citco Global Custody (NA) NV, Netherlands |
| November 21, 2008 | $30,810.42* | 126.38 | Citco Global Custody (NA) NV, Netherlands |

### Redemption Payments Received by Defendants from Sigma
### From April 27, 2004 Through November 21, 2008

| | | | |
|---|---|---|---|
| November 21, 2008 | $70,116.98* | 287.61 | Citco Global Custody (NA) NV, Netherlands |
| November 21, 2008 | $76,406.81* | 313.41 | Citco Global Custody (NA) NV, Netherlands |
| November 21, 2008 | $99,588.98* | 408.50 | Citco Global Custody (NA) NV, Netherlands |
| November 21, 2008 | $129,209.70* | 530.00 | Citco Global Custody (NA) NV, Netherlands |
| November 21, 2008 | $465,642.49* | 1,910.00 | Citco Global Custody (NA) NV, Netherlands |
| November 21, 2008 | $35,349.83* | 145.00 | Citco Global Custody (NA) NV, Netherlands |
| November 21, 2008 | $9,629.78* | 39.50 | Citco Global Custody (NA) NV, Netherlands |
| November 21, 2008 | $89,979.44* | 369.08 | Citco Global Custody (NA) NV, Netherlands |
| November 21, 2008 | $98,211.07* | 402.85 | Citco Global Custody (NA) NV, Netherlands |
| November 21, 2008 | $105,652.08* | 433.37 | Citco Global Custody (NA) NV, Netherlands |
| November 21, 2008 | $133,658.89* | 548.25 | Citco Global Custody (NA) NV, Netherlands |
| November 21, 2008 | $287,859.70* | 1,180.76 | Citco Global Custody (NA) NV, Netherlands |
| November 21, 2008 | $695,106.11* | 2,851.23 | Citco Global Custody (NA) NV, Netherlands |
| November 21, 2008 | $878,156.87* | 3,602.08 | Citco Global Custody (NA) NV, Netherlands |
| November 21, 2008 | $77,067.49* | 316.12 | Citco Global Custody (NA) NV, Netherlands |
| November 21, 2008 | $93,055.73* | 381.70 | Citco Global Custody (NA) NV, Netherlands |
| November 21, 2008 | $26,751.29* | 109.73 | Citco Global Custody (NA) NV, Netherlands |
| November 21, 2008 | $444,920.18* | 1,825.00 | Citco Global Custody (NA) NV, Netherlands |
| November 21, 2008 | $195,277.30* | 801.00 | Citco Global Custody (NA) NV, Netherlands |
| November 21, 2008 | $207,869.14* | 852.65 | Citco Global Custody (NA) NV, Netherlands |
| November 21, 2008 | $508,559.56* | 2,086.04 | Citco Global Custody (NA) NV, Netherlands |
| November 21, 2008 | $387,960.64* | 1,591.36 | Citco Global Custody (NA) NV, Netherlands |

*Redemption Payments Received by Defendants from Sigma*
*From April 27, 2004 Through November 21, 2008*

| November 21, 2008 | $26,133.27* | 107.20 | Citco Global Custody (NA) NV, Netherlands |
|---|---|---|---|
| November 21, 2008 | $64,516.35* | 264.64 | Citco Global Custody (NA) NV, Netherlands |
| November 21, 2008 | $145,787.55* | 598.00 | Citco Global Custody (NA) NV, Netherlands |
| November 21, 2008 | $195,033.50* | 800.00 | Citco Global Custody (NA) NV, Netherlands |

* Denotes Redemptions in the Sigma Vulnerability Period. All $USD amounts are based on the exchange rate as of the date of the Redemption Payment. However, upon application of a different exchange rate, as may be required by applicable law, the amount of damages may be different.

**EXHIBIT C**

*Redemption Payments Received by Defendants from Lambda*
*On July 18, 2008*

| **Payment Date** | **Redemption Payment** | **No. of Shares** | **Bank Account to which Redemption Payment Was Made** |
|---|---|---|---|
| September 24, 2004 | $56,993.13 | 400.00 | Citco Global Custody (NA) NV, Netherlands |
| November 15, 2004 | $17,893.75 | 116.33 | Citco Global Custody (NA) NV, Netherlands |
| December 22, 2004 | $36,759.03 | 233.95 | Citco Global Custody (NA) NV, Netherlands |
| December 22, 2004 | $92,052.32 | 585.86 | Citco Global Custody (NA) NV, Netherlands |
| February 24, 2005 | $19,537.64 | 125.00 | Citco Global Custody (NA) NV, Netherlands |
| March 14, 2005 | $20,762.79 | 131.08 | Citco Global Custody (NA) NV, Netherlands |
| October 25, 2005 | $167,217.21 | 1,163.28 | Citco Global Custody (NA) NV, Netherlands |
| November 22, 2005 | $117,221.79 | 825.64 | Citco Global Custody (NA) NV, Netherlands |
| December 27, 2005 | $74,049.17 | 516.12 | Citco Global Custody (NA) NV, Netherlands |
| March 22, 2006 | $42,335.45 | 290.28 | Citco Global Custody (NA) NV, Netherlands |
| September 15, 2006 | $20,507.55 | 131.70 | Citco Global Custody (NA) NV, Netherlands |
| January 19, 2007 | $80,197.31 | 507.32 | Citco Global Custody (NA) NV, Netherlands |
| January 19, 2007 | $23,712.05 | 150.00 | Citco Global Custody (NA) NV, Netherlands |
| August 16, 2007 | $72,341.09* | 436.54 | Citco Global Custody (NA) NV, Netherlands |
| September 24, 2007 | $418,024.21* | 2,434.38 | Citco Global Custody (NA) NV, Netherlands |
| November 22, 2007 | $60,718.40* | 330.70 | Citco Global Custody (NA) NV, Netherlands |
| January 21, 2008 | $113,286.24* | 608.74 | Citco Global Custody (NA) NV, Netherlands |
| June 18, 2008 | $84,550.56* | 422.83 | Citco Global Custody (NA) NV, Netherlands |
| June 18, 2008 | $68,997.40* | 345.05 | Citco Global Custody (NA) NV, Netherlands |
| June 30, 2008 | $0.21* | 0.00 | Citco Global Custody (NA) NV, Netherlands |

***Redemption Payments Received by Defendants from Lambda***
***On July 18, 2008***

| | | | |
|---|---|---|---|
| August 14, 2008 | $51,686.58* | 268.00 | Citco Global Custody (NA) NV, Netherlands |
| August 14, 2008 | $103,575.66* | 537.05 | Citco Global Custody (NA) NV, Netherlands |
| November 24, 2008 | $121,700.14* | 705.38 | Citco Global Custody (NA) NV, Netherlands |

* Denotes Redemptions in the Lambda Vulnerability Period.  All $USD amounts are based on the exchange rate as of the date of the Redemption Payment.  However, upon application of a different exchange rate, as may be required by applicable law, the amount of damages may be different.

2

REDACTED WITH REDACT-IT

**EXHIBIT G**

REDACTED WITH REDACT-IT



**Dated: July 26, 2004**

**and**

**CITCO BANKING CORPORATION N.V.**

**and**

**CITCO GLOBAL CUSTODY (N.A.) N.V.**

---

# BROKERAGE AND CUSTODY AGREEMENT

---

**CITCO BANKING CORPORATION N.V.**
Kaya Flamboyan 9
P.O. Box 707
Curaçao
Netherlands Antilles

REDACTED WITH REDACT-IT

**THIS AGREEMENT** is made this 26th of July, 2004

**BETWEEN:**

        C/o Citco Fund Services (Bahamas) Ltd.
One Montague Place, 1st Floor
P.O. Box N-4906
Nassau, N.P.,
Bahamas

                                ("the Customer")

**AND:**      **CITCO BANKING CORPORATION N.V.**
Citco Building
Kaya Flamboyan 9
P.O. Box 707
Curaçao,
Netherlands Antilles

                                ("the Bank")

**AND:**      **CITCO GLOBAL CUSTODY** (N.A.) N.V.
Citco Building
Kaya Flamboyan 9
P.O. Box 707
Curaçao,
Netherlands Antilles

                                ("the Custodian")

**WHEREAS:**

(A)    The Customer wishes to be provided with brokerage and custody services and the Bank and the Custodian are willing to provide such brokerage and custody services to the Customer on the terms and subject to the conditions contained in this Agreement.

(B)    The Customer has opened and currently maintains a bank account number       with the Bank.

**NOW THEREFOR, IT IS HEREBY AGREED AS FOLLOWS:**

**1**    **Interpretation**

    1.1    Unless the context otherwise requires:

    "**Account**" means the bank account number      held by the Customer with the Bank.

    "**Agreement**" means this Brokerage and Custody Agreement.

    "**Brokerage Services**" shall include (i) the effecting of transactions of and/or relating to the purchase and sale of and dealing in Securities in the name and for the account of the Customer; (ii) the effecting of transactions of and/or relating to the purchase and sale of and dealing in Securities in the name of the Bank, or of the Custodian, or any nominee for the account of the Customer; and (iii) any services ancillary thereto as set out in this Agreement.

1/12

Brokerage Custody Agr.doc

"Instructions" means instructions provided from time to time to the Bank and/or to the Custodian by the Customer or by such persons as the Customer has authorised to give instructions, as more particularly described in Clause 14 hereof, in respect of the services and duties performed by the Bank and/or the Custodian pursuant to this Agreement.

"Readily Marketable Securities" means shares, units, bonds, futures contracts, currencies, money instruments, options, commodities, any derivative instruments based on the foregoing and any other financial instruments and other assets or property which are freely and publicly traded on a daily basis on a stock exchange or other exchange or recognised market place, and in respect of which the Bank and/or the Custodian agree to provide Brokerage Services and/or other services pursuant to the Agreement.

"Non-Readily Marketable Securities" means shares, units, bonds, futures contracts, currencies, money instruments, options, commodities, any derivative instruments based on the foregoing and any other financial instruments and other assets or property, including shares, units or other financial instruments of any unlisted collective investment schemes, for which there is no publicly available market or which are not freely or publicly traded on a daily basis on a stock exchange or other exchange or recognised market place, and in respect of which the Bank and/or the Custodian agree to provide Brokerage Services and/or other services pursuant to this Agreement.

"Securities" means, where the context so admits, both Readily Marketable Securities and Non-Readily Marketable Securities.

"Regularly Settles Securities" means Securities that normally effect settlement within five business days of the Net Asset Value Date or Trade Date (or equivalent) as defined in its Offering Memorandum (or equivalent).

"Non-Regularly Settled Securities" means Securities that normally effect settlement after five business days of the Net Asset Value Date or Trade Date (or equivalent) as defined in its Offering Memorandum (or equivalent).

"Service Level Agreement" means any agreement between the Bank and the Customer from time to time in force for the service level specified in such agreement and which is expressed to be a Service Level Agreement. Reference herein to the Brokerage and Custody Agreement shall (where the context so permits) be construed as including a reference to all any such Service Level Agreement, a draft of which is set out in Schedule Three to this Agreement.

1.2    References herein to Clauses are references to clauses of this Agreement. Headings are inserted for convenience only and shall not be used in construing this Agreement.

## PART I - BROKERAGE SERVICES

## 2    Appointment and Performance of Brokerage Services

2.1    The Customer hereby appoints and authorises the Bank to provide Brokerage Services on behalf of the Customer which appointment and authorisation are hereby accepted by the Bank, subject to the terms and conditions of this Agreement.

2.2    The Bank shall, on Instructions of the Customer and on the basis of this Agreement, provide Brokerage Services to the Customer. The Customer hereby authorises the Bank to comply with any Instructions given or purported to be given by the Customer and the Bank shall be entitled to act for the Customer upon any such Instructions.

2/12

2.3    The Customer will provide the Bank with Instructions in respect of all transactions in Securities to be performed by the Bank on the Customer's behalf as follows:

2.3.1    for transactions in Readily Marketable Securities, Instructions must be provided to the Bank at least 90 minutes before the dealing deadline for such transactions. Instructions received thereafter will be executed on a best effort basis. In the case where the dealing deadline is after the close of business in the Bank's office on a particular trading day, Instructions should be received at least 30 minutes prior to close of business in the Bank's office. For this purpose close of business shall be 6pm local time on any working day.

2.3.2    for transactions in Non-Readily Marketable Securities, Instructions must be provided to the Bank at least two clear business days prior to the trade date for the applicable transaction in the Non- Readily Marketable Security. However, in case where a market or suitable counterparty is identified by the Customer Clause 2.3.1 shall apply.

2.3.3    for transactions in Non-Readily Marketable Securities, Instructions received by the Bank with less than two clear business days prior to the trade date, will be performed on a best efforts basis.

2.3.4    for transactions in Non-Readily Marketable Securities, which require a prescribed notice period, Instructions received by the Bank with less than two clear business days prior to the notice period date, will be performed on a best efforts basis.

The Bank shall perform all such Instructions which are so given by the Customer provided that sufficient funds or Securities, as applicable, are at the relevant time held by the Bank or by the Custodian or other nominee on behalf of the Customer, or the Customer has made other arrangements for settlement, such arrangements being satisfactory to the Bank.

2.4    The Bank may in its absolute discretion refuse to execute any Instruction given by or on behalf of the Customer and shall use reasonable endeavours to notify the Customer forthwith of any such decision.

2.5    The Customer understands and agrees that:

2.5.1    the Bank shall effect settlement of rights and/or obligations resulting from transactions effected pursuant to the Brokerage Services, such as but not limited to settlement of and payment for and delivery of Securities, in accordance with the laws, regulations and market practices in the jurisdictions in which the transactions occur- and/or in accordance with the terms of the transactions effected hereby;

2.5.2    any losses resulting from the market's failure to settle any transaction to the entire satisfaction of the Bank will be borne solely by the Customer; and

2.5.3    the Bank, in its absolute discretion, may refuse to effect the settlement of and payment for Securities when there are insufficient immediately available moneys recorded as standing to the credit of the Account.

2.6    The Bank hereby agrees to credit the Account or such other account to be agreed from time to time in the event that the Bank receives any dividend and/or interest entitlements on Securities held by or on behalf of the Customer or its nominee/custodian.

2.7    The Bank shall only make delivery of cash and/or any of the property of the Customer:

2.7.1    in the course of settlement of transactions notified to the Bank:

3/12

REDACTED WITH REDACT-IT

2.7.2    on the Instructions of the Customer;

2.7.3    pursuant to any security and/or pledge arrangement agreed hereunder or otherwise between the Customer and the Bank.

2.8    In executing Instructions for the Brokerage Services, the Bank shall be entitled at its option, to deal with itself or with third parties as the other party. Notwithstanding the provisions of Clause 10 hereof, the Bank shall not be liable for any shortcomings of such third parties if it has exercised due care in selecting these third parties.

2.9    The Customer shall be solely responsible for compliance with any investment policies, guidelines, restrictions on ownership or other restrictions whatsoever in relation to Securities, which may from time to time be binding on the Customer and/or the Bank when providing Brokerage Services. The Bank shall at no time be responsible for monitoring the aforementioned investment policies, guidelines or other restrictions.

2.10    The Customer confirms that the Bank's obligations under Part I of this Agreement relate solely to the Brokerage Services and that the Bank is under no obligation to advise the Customer in respect of the suitability of investments and related activities connected to the Brokerage Services.

## 3    Contract Notes and Other Statements

3.1    The Bank shall send to the Customer a contract note in respect of each executed order.

3.2    The Bank shall send to the Customer, whenever appropriate, a confirmation note in respect of any other services rendered to the Customer.

3.3    A contract note (or a confirmation note) shall, in the absence of manifest error, be conclusive and deemed acknowledged by the Customer as correct, unless the Bank receives written notice to the contrary within two business days of delivery of the contract note (or confirmation note) or the Bank notifies the Customer of an error therein within the same period.

3.4    The Bank shall send to the customer a monthly statement in respect of each account of the Customer within 15 business days after the end of each such monthly period, unless no transactions have taken place during such period. The Bank shall in any event send to the Customer such a statement once a year.

3.5    The Bank shall make available to the Customer and its auditors all such information, records and statements as they may reasonably require to the extent that the same relate to the Customer at all reasonable times and on reasonable notice.

## PART II - CUSTODIAN SERVICES

## 4    Appointment of Bank and Custodian

4.1    The Customer hereby appoints the Custodian as custodian of the Customer on the terms and subject to the conditions hereof, which appointment is hereby accepted by the Custodian.

4.2    The Bank and Custodian agree to provide the services herein set out, subject to the provisions of this Agreement.

Brokerage Custody Agr.doc

**5    Appointment of Sub-Custodians**

5.1    In the performance of their duties under this Part II of the Agreement, the Bank and/or Custodian may act through agents, sub-custodians or any other third party which the Bank and/or Custodian may, in their absolute discretion, deem necessary. The Bank and/or Custodian are hereby authorised by the Customer to enter into further agreements for the appointment of the aforementioned agents, sub-custodians and/or third parties.

5.2    The Bank and/or Custodian shall not be responsible for any act or omission or for the solvency of any sub-custodian, agent or third party appointed pursuant to Clause 5.1 hereof, provided that the Bank or Custodian can demonstrate that due care was taken in the selection of any such sub-custodian, agent or third party.

**6    Duties of the Customer**

6.1    Subject to the provisions of, and in addition to any of the services provided by the Bank pursuant to Clause 2 of this Agreement, the Customer shall deliver or cause to be delivered to the Custodian from time to time the following:

6.2    Securities which the Customer now owns or may hereafter acquire, and of which the Custodian agrees to retain custody;

6.2.1    any other property or assets of the Customer of which the Custodian, in its absolute discretion, may agree to accept custody.

6.2.2    The Customer acknowledges that there may be significant delays in the registration or re-registration in the name of the Custodian, or in the name of any sub-custodian or nominee, of
Non-Readily Marketable Securities, which have been delivered to the Bank pursuant to Clause 6.1 hereof. In the absence of any negligence or undue delay on the part of the Bank and/or the Custodian, neither the Bank nor the Custodian shall be under any obligation to execute any instructions by the Customer in respect of such Non-Readily Marketable Securities until registration or re-registration in the name of the Custodian or in the name of any sub-custodian or nominee is completed.

6.3    The Customer shall timely and accurately give Instructions to the Bank or procure that the Bank will be given timely and accurate Instructions of all transactions which involve the Bank and/or Custodian.

6.4    The Customer shall be solely responsible for compliance with any investment policies, guidelines, restrictions on ownership or other restrictions whatsoever in relation to Securities, which may from time to time be binding on the Customer and/or the Custodian when providing Custodian Services. The Bank and/or the Custodian shall at no time be responsible for monitoring the aforementioned investment policies, guidelines or other restrictions.

**7    Powers and Duties of the Bank and Custodian**

7.1    The Bank and Custodian shall have and perform the following powers and duties and such other powers and duties as the parties shall from time to time agree:

7.1.1    to register the Securities, other than physically held bearer shares, in the name of the Custodian or any sub-custodian and to keep the Securities in the custody of the Custodian or procure that they are kept in the custody of any sub-custodian, provided

5/12

Brokerage Custody Agr doc

REDACTED WITH REDACT-IT

however that, if instructed to do so by the Customer, the Bank and/or Custodian may deposit any of the Securities in a depository or clearing system;

7.1.2    to deposit in the Account all moneys received from or for the account of the Customer;

7.1.3    when instructed to do so by the Customer and subject to the provisions of Clause 6.2, to make settlement of transactions undertaken by or for the account of the Customer, delivering or receiving the Securities or other assets of the Customer and making or receiving payments for the account of the Customer. The Bank and/or Custodian are not obliged to deliver securities or assets which cannot be covered by securities or assets which they hold for the Customer or to make any payments other than from the Account;

7.1.4    to collect and deposit in the Account all income and other payments in connection with the Securities;

7.1.5    unless instructed to do so by the Customer, the Bank, Custodian and/or any sub-custodian shall not vote on or in respect of the Securities or deliver any executed form of proxy to vote thereon or in respect thereof;

7.1.6    to employ any legal, financial or other experts which the Bank and/or Custodian deem necessary to comply with their duties and obligations under this Agreement the costs of which will be reimbursed to the Bank and/or Custodian by the Customer, if reasonable and duly evidenced by appropriate documents;

7.1.7    when instructed to do so by or on behalf of the Customer, to remit money to banks or others for the account of the Customer and to pay or procure the payment of any invoices or other financial obligations of the Customer;

7.1.8    to deliver and surrender any bonds or other instruments as and when the same fall due for payment or repayment and to pay all calls and debit the accounts of the Customer accordingly and to effect all necessary or appropriate exchanges of bonds or other instruments;

7.1.9    to deliver to the Customer all forms of proxy and all notices of meetings and any other notices or announcements in connection with the Securities.

7.2    The Securities held at any one time by the Custodian or any sub-custodian shall be recorded in and ascertainable from the books and/or ledgers of the Bank and the Custodian and such books and ledgers shall constitute conclusive evidence of the Securities retained on behalf of the Customer.

7.3    The Customer recognises that in certain circumstances in order to preserve or safeguard the Securities or other assets of the Customer, the Bank and/or Custodian may be required to act without first obtaining instructions from the Customer. In such cases, the Bank and/or Custodian may act at their own absolute
and unfettered discretion and shall not be liable, in the absence of wilful misfeasance, fraud, bad faith, negligence or reckless disregard, for any loss to the Customer whatsoever.

## PART III - GENERAL PROVISIONS

**8**    **Payment for Securities**

8.1    All Securities, which have been purchased for the Customer by the Bank, will be transferred to the Custodian, or to any sub-custodian or nominee, as custodian, or registered in the name of the Custodian or a sub-custodian or nominee, as the case may be. Such transfer and registration will be subject, however, to payment in full of all moneys due in connection with such purchase (including, for the avoidance of doubt, the gross purchase price). If such indebtedness is not satisfied by the Customer within 5 days of the date the same became due, such Securities will not be transferred to nor held by the Custodian on behalf of the Customer, but will be freely available to the Bank.

8.2    If, pursuant to Clause 8.1 hereof, the Securities will not be transferred to or held by the Custodian on behalf of the Customer, the Customer is not released from his obligation to pay the Bank. Such payment obligations will be reduced to the extent that the net proceeds of the sale of such Securities are available to the Bank.

8.3    The Custodian will be under no obligation whatsoever vis-à-vis the Customer in connection with Securities referred to above unless and until the Customer has satisfied its payment obligations vis-à-vis the Bank in full.

**9**    **Representations and Warranties of the Customer**

9.1    The Customer represents and warrants to the Bank and to the Custodian that it will at all times have full power and authority (corporate and otherwise) to enter into this Agreement and to exercise its rights and perform its obligations under the terms and conditions of this Agreement and any contract in connection therewith or pursuant thereto, and that it has obtained and will maintain all authorisations and consents necessary for it so to enter, exercise rights and perform such obligations, and that such authorisations and consents are and will at all times be in full force and effect. The Customer will forthwith upon demand by the Bank from time to time deliver such evidence of such authorisations and consents and compliance therewith as the Bank may reasonably require.

9.2    The Customer furthermore represents and warrants to the Bank that it has full power and authority (i) to authorise third parties to give instructions on behalf of the Customer or its nominee/custodian, and (ii) to perform all its obligations hereunder.

9.3    The Customer hereby expressly declares that it is aware of and that it accepts the investment risks attached to Securities and the consequences entailed by the provision of Brokerage Services.

**10**    **Liability and Indemnification of Bank and Custodian**

10.1    The Customer shall bear all risks of investing in Securities or holding cash denominated in a particular currency and the Customer hereby agrees to be solely responsible for any losses resulting from any transactions in Securities or cash in any currency in connection with transactions effected through the Bank.

10.2    The Bank and Custodian hereby agree to use their best efforts and judgement and due care in performing their obligations and duties pursuant to this Agreement; provided however that the Bank, Custodian, their directors, officers, employees and/or agents shall not be liable for any action taken or failure to act in the course of performing the services hereunder or for any loss

7/12

suffered by the Customer in connection with the subject matter of this Agreement unless such loss arises from wilful misfeasance, fraud, bad faith, negligence or reckless disregard in the performance of the Bank's and/or Custodian's obligations and duties or by reason of the Bank's and/or Custodian's reckless disregard of their obligations and duties hereunder.

10.3    In the absence of wilful misfeasance, fraud, bad faith, negligence or reckless disregard the Bank and/or Custodian shall not be liable for any shortfall in the number of securities held by the Custodian on behalf of the Customer.

10.4    In particular, in the absence of wilful misfeasance, fraud, bad faith, negligence or reckless disregard the Bank and/or Custodian shall not be liable for any losses which may arise howsoever as a result of any of the prices or values for any of the Securities which are provided to or obtained by the Bank and/or Custodian being provisional, inaccurate, false or misleading.

10.5    In the event of any loss to the Customer by reason of the failure of the Bank or the Custodian to utilise reasonable care (including but not limited to, in connection with the Bank and the Custodian acting in accordance with Instructions received from the Customer) the Bank and the Custodian shall be liable to the Customer only to the extent of the Customer's direct damages, to be determined based on the market value of the Securities or other property which is the subject of the loss at the date of discovery of such loss and without reference to any special conditions or circumstances. The Bank and the Custodian shall have no liability whatsoever for any consequential, special, indirect or speculative loss or damages (including, but not limited to, lost profits) suffered by the Customer in connection with the transactions contemplated hereby and the relationship established hereby even if the Bank or the Custodian has been advised as to the possibility of the same and regardless of the form of the action.

10.6    The Bank and Custodian shall be without liability to, and shall be indemnified by, the Customer for any action taken or omitted by them, whether pursuant to Instructions or otherwise, within the scope hereof if such act or omission was in good faith, without wilful misfeasance, fraud, bad faith, negligence or reckless disregard. In performing their obligations hereunder, the Bank and Custodian may rely on the genuineness of any document, which it believes in good faith to have been validly executed by or on behalf of the Customer.

10.7    The Customer shall pay for and hold the Bank and the Custodian harmless from any liability or loss resulting from the imposition or assessment of any taxes or other governmental charges, and any related expenses with respect to any transactions in or income from Securities.

10.8    Without limiting the foregoing, the Bank and the Custodian shall not be liable for any loss which results from: (i) the general risk of investing, or (ii) investing or holding Securities in a particular country including, but not limited to, losses resulting from malfunction, interruption of or error in the transmission of information caused by any machines or system or interruption of communication facilities, abnormal operating conditions, nationalisation, expropriation or other governmental actions, regulation of the banking or securities industry, currency restrictions, devaluations or fluctuations, and market conditions which prevent the orderly execution of Securities transactions or affect the value of the Securities.

10.9    The Customer shall indemnify and hold harmless the Bank and the Custodian, their directors, officers, employees and agents from and against any losses, expenses, liabilities, obligations, damages, penalties, judgements, actions, suits, taxation or costs howsoever imposed on, asserted against or incurred by them in the performance of the Bank's and Custodian's obligations and duties hereunder; provided, however, that none of them shall be indemnified for their wilful misfeasance, fraud, bad faith, negligence or reckless disregard.

10.10    In the event that any document of title relating to a security is lost, the Bank or Custodian shall use reasonable endeavours to obtain a duplicate copy if such a duplicate copy is available.

8/12

Brokerage Custody Agr.doc

When the person or body issuing such a duplicate copy requires an indemnity, the Customer agrees to provide to the Bank or Custodian such counter-indemnity as the Bank or Custodian may require, unless the loss is due to the Custodian's or Bank's wilful misfeasance, fraud, bad faith, negligence or reckless disregard.

## 11    Fees and Expenses

11.1    In consideration of the services of the Bank and Custodian hereunder the Customer shall pay to the Bank the fees and expenses as set out in Schedule One hereto.

11.2    The Bank shall be entitled to charge to the Customer the fees of all sub-custodians, agents and third parties appointed by the Bank and/or Custodian pursuant to Clause 5 hereof together with all other reasonable costs, expenses and disbursements incurred by the Bank and/or Custodian under this Agreement. All transaction fees payable to the Bank shall be in the currency of the executed transaction.

11.3    All other fees payable to the Bank by the Customer shall be paid in US dollars.

11.4    The Customer hereby authorises the Bank to debit from the Account all amounts due to the Bank pursuant to this Agreement.

11.5    In the event of any dispute as to any amounts payable to the Bank under this clause, an excerpt from the Bank's records signed by the Bank shall serve as prima facie evidence of any amounts due subject to rebuttal evidence produced by the Customer. At the Customer's request the Bank shall provide the Customer with the documents and/or information supporting the Bank's records.

## 12    Non-Exclusivity

12.1    The provision of services by the Bank and the Custodian hereunder shall not preclude the Bank and the Custodian from providing similar services to any other third party and the Customer hereby agrees that the Bank will not be liable to account to the Customer for any profit earned from such third party transactions or by such third party.

12.2    Without prejudice to the generality of Clause 12.1 hereof, the Customer agrees that the Bank may match any transactions made on behalf of the Customer with those made by the Bank on behalf of itself or on behalf of any third party.

## 13    Confidentiality

Unless under a legal, regulatory or generally accepted obligation to do so, no party shall divulge or communicate to any person not authorised by any other to receive the same, with the exception of its advisers and accountants, any confidential information of any other party of which it is or shall hereafter become possessed, relating to the Securities or to the business of such other party.

## 14    Instructions

14.1    Receipt of Instructions by the Bank and/or Custodian from the Customer may be deemed by the Bank and/or Custodian to be proper and authorised Instructions in respect of any of their obligations and duties hereunder.

Brokerage Custody Agr.doc

14.2    A signed copy of a power of attorney executed by the authorised representative of the Customer authorising a third party to give Instructions to the Bank and/or Custodian may be accepted by the Bank or Custodian as conclusive evidence of the authority of such a person to so act on behalf of the Customer. The Customer shall deliver or cause to be delivered to the Bank or Custodian a certified copy of the signature of any person authorised to act as aforesaid.

14.3    Instructions by or on behalf of the Customer shall be conveyed to the Bank or Custodian by the following methods only:

14.3.1    registered or recorded delivery mail, tested telex or authenticated SWIFT transmission;

14.3.2    telephone, or facsimile provided that the Customer has entered into an undertaking in the form as set out in Schedule Two hereof.

14.3.3    provided that the Customer has entered into an Online Access Agreement in the form set out in Schedule Four hereof, by electronic transmission through CFN (as defined in the Online Access Agreement) pursuant to the terms thereof.

14.4    The Bank and/or Custodian shall not be liable for any loss arising from:

14.4.1    non-delivery or delay of mail;

14.4.2    non-delivery or mistaken or incomplete transmission of tested telex, facsimile, electronic transmission or authenticated SWIFT transmission;

14.4.3    misunderstanding or misinterpretation of instructions provided by telephone.

14.5    Neither the Bank nor Custodian is obliged to enquire into the validity, genuineness or accuracy of any Instruction properly received from the Customer.

15    **Service Level Agreement**

The Bank and the Customer will enter into a Service Level Agreement, by signing the agreement set out in Schedule Three.

16    **Termination**

16.1    This Agreement shall continue in full force and effect until terminated by any party giving sixty days' prior written notice to the others.

16.2    This Agreement shall terminate with immediate effect in any of the following circumstances:

16.2.1    a material breach by any party of its obligations under this Agreement which, if capable of being remedied, is not remedied within ten (10) days of receipt of notice;

16.2.2    the failure of the Customer to pay its debts to the Bank and/or Custodian when they become due; or

16.2.3    the Customer or the Bank and/or Custodian (i) requests to be or is declared bankrupt (*failliet*), (ii) requests to be or is granted a suspension of payments (*surséance van betaling*), (iii) any similar action is taken as referred to in (i) through (ii) under the laws of the Netherlands Antilles or the laws of any other jurisdiction, (iv) the

10/12

Customer or the Broker (as disappearing entity) will be merged with another entity, or (v) a resolution is adopted to dissolve or liquidate the Customer or the Bank and/or Custodian.

16.3    If the Bank and/or Custodian or Customer is not aware of automatic termination pursuant to Clause 16.2 the automatic termination will be delayed until the day it becomes aware thereof

16.4    On the termination of this Agreement howsoever occasioned the Bank and Custodian shall forthwith deliver up to the Customer all Securities and documents of title thereto in their possession or control pursuant to this Agreement save that they shall not be required to make such delivery until full payment has been made by the Customer to the Bank of all amounts due in respect of transactions which have not been settled at the date of termination and until full payment has been made for all outstanding fees and expenses due to the Bank and Custodian for services provided under the terms of this Agreement.

## 17    Assignment

Neither the benefit nor the burden of this Agreement may be assigned by any party save with the prior written consent of the others.

## 18    Notice

18.1    Any notice given under this Agreement shall be served:

18.1.1    by registered or recorded delivery mail, tested telex , or authenticated SWIFT transmission;

18.1.2    by facsimile transmission;

18.1.3    by any other means which one party specifies by notice to the other.

18.2    Each party's address for the service of notice shall be the above mentioned address or such other address as one party specifies by notice to the others.

18.3    A notice shall be deemed to have been given:

18.3.1    if it was served by post, upon receipt by the party to whom addressed;

18.3.2    if it was served in person, at the time of service;

18.3.3    if it was served by tested telex, or by authenticated SWIFT or facsimile transmission, at the time of receipt by the party to whom addressed.

## 19    Alteration of Provisions

19.1    No variation, amendment, discharge, waiver or discontinuance of any of the provisions of this Agreement shall be valid unless in writing and signed by all parties.

19.2    The Bank or Custodian may amend or vary any provision of this agreement by giving one week's notice to the Customer prior to the date that the variation or amendment is to take effect, in case such an amendment or variation is required due to changes in the law or regulations applicable to the Bank and/or Custodian.

11/12

REDACTED WITH REDACT-IT

**20**    **Recording telephone conversations**

Each party to this Agreement may record telephone conversations with another party or with employees, agents or officers of another party.

**21**    **Incorporation General Conditions**

The General Conditions of the Bank regulating the relationship between the Customer and the Bank as filed at Registrar's office of Curaçao " Gerecht in Eerste Aanleg" Department " Extra Judicieel", as amended from time to time, shall apply correspondingly to the relationship between the Customer and the Bank and Custodian insofar as they do not differ from the terms of this Agreement.

**22**    **Governing Law and Jurisdiction**

22.1    This Agreement shall be governed by and construed in accordance with the laws of the Netherlands Antilles.

22.2    All parties agree that the courts of the Netherlands Antilles are to have jurisdiction to settle any disputes which may arise out of or in connection with this Agreement and that accordingly any suit, action or proceeding arising out of or in connection with this Agreement may be brought in such courts. Any proceedings or claims brought by the Customer against the Bank and/or the Custodian and/or their affiliates, arising out of or related to this Agreement or to the Brokerage Services shall be brought exclusively in Curaçao, Netherlands Antilles.

22.3    Nothing in this Clause 22 shall limit the right of the Bank and/or Custodian to take proceedings against the Customer in any other court of competent jurisdiction, nor shall the taking of proceedings in one or more jurisdictions preclude the taking of proceedings in any other jurisdiction, whether concurrently or not.

**IN WITNESS WHEREOF** the parties hereto have executed this Agreement the day and year first above written.



12/12

Brokerage Custody Agr.doc

REDACTED WITH REDACT-IT

## SCHEDULE ONE

### FEES AND EXPENSES

**Custody fee**

Custody fees will be charged at a rate of 0.05% (5.0 basis points) per annum of the holdings.

The custody fee will be charged on a quarterly basis and is calculated over the average holdings over the past three months.

**Transaction fee**

Per transaction fee a flat fee of US$ 500.00 will be charged.

**Transfer fee**

For a delivery of securities free of payment to another bank or Custodian a fee of US$ 75.00 will be charged.

The transfer in of your world-wide holdings in (offshore) funds can be handled by us. All we need for that is a list of your holdings, exact quantity, registration name and present Custodian. Our Transfer Department will then prepare all necessary stock transfer forms, which should be signed by you. They will take care of all the rest.

For this service we charge US$ 25.—per holding, irrespective of the size.

**Conversion charges**

Where the Customer switches a position of shares within the same group of funds, a transaction fee of ¼ % with the above minimum and maximum will be charged for either the sale or the purchase but not for both transactions.

**Cancellation fee**

In case a transaction or a transfer instruction is cancelled a flat fee of US$ 100.00 will be charged

**Disbursements**

All disbursements and out-of-pocket expenses will be charged separately to the account of the Customer.

**Rebates of Front-load fees**

For the purposes of this paragraph:

"*Arrangement*" shall mean an agreement with a Fund pursuant to which the Customer or the Custodian (as applicable) receives rebates of Front Load Fees;

"*Fund*" shall mean a mutual fund, which issues Securities held in the Account

The Custodian agrees to pay to the Customer on a transaction basis:

- 100% of the rebate on the Front Load Fee received from a Fund with which the Customer has an Arrangement; and
- 75% of the rebate on the Front Load Fee received from a Fund with which the Customer has no Arrangement and where the Custodian has negotiated an Arrangement.

The Customer agrees to notify the Custodian from time to time of the existence of an Arrangement between the Customer and a Fund.

Date:

1/1

Brokerage Custody Schedule 1.doc

## SCHEDULE TWO

**CITCO BANKING CORPORATION N.V.**
Citco Building
Kaya Flamboyan 9
P.O. Box 707
Curaçao,
Netherlands Antilles

### INSTRUCTIONS BY TELEPHONE, TELEX OR FACSIMILE

Dear Sir(s),

In consideration of your agreeing as per our request to act upon un-authenticated telephone or facsimile instructions purporting to be given by me/us or on my/our behalf in respect of our account(s) and/or other dealings with you, I/We hereby:

a)   agree to indemnify you and to keep you indemnified from and against all claims, demands, liabilities, costs, charges, damages, losses, expenses and consequences of whatever nature which may be brought or preferred against you or that you may suffer, incur or sustain by reason or on account of your having so acted whether wrongly or mistakenly or not, or of your failing to act wholly or in part in accordance with such instructions;

b)   agree not to make any claim against you by reason of or on account of your having so acted or of your having acted wrongly or mistakenly or of your failing to act wholly or in part in accordance with such instructions;

c)   confirm that such instructions, if accepted by you, result in agreements which are binding upon me/us;

d)   agree that you may debit any account in my/our name(s) with any sums payable by me/us as a result of such instructions, and

e)   agree that I/we will immediately send you written confirmation of any such instructions.

Date:

1/1

Brokerage Custody Schedule 2.doc

REDACTED WITH REDACT-IT

# SCHEDULE THREE

### Service Level Agreement

**THIS AGREEMENT** is made this 26th day of July, 2004

**BETWEEN**

**CITCO BANKING CORPORATION N.V.**    AND

address: Kaya Flamboyan 9
P.O.Box 707
Curaçao,
Netherlands Antilles

address: ██████████████

phone    : ███████████
fax        : ███████████

phone    :
fax        :
Swift     :

referred to herein as "Bank"

referred to herein as "Customer"

**Operative provision:**

All the terms of the Brokerage and Custody Agreement shall apply to and form part of this Service Level Agreement as if the same were set out in extenso herein. In the event of a conflict between the conditions contained in the Brokerage and Custody Agreement and the conditions contained in the Service Level Agreement the conditions contained in this Service Level Agreement shall prevail.

## 1   Trading

### 1.1    Orders

The Customer via Fax/CFN/XML/Swift sends orders to buy/subscribe or sell/redeem to the Bank. The Customer will supply the following information for each trade:

1/ Full name of Fund
2/ Security identification (ISIN, SSN, Cusip or Telekurs symbol)
3/ *Subscription/purchase* or *Redemption/sale*
4/ Customer reference no. (if any)
5/ Quantity of shares or currency and amount
6/ Cash- or Reinvest option (if nothing is mentioned the Cash option prevails)

The Bank will place the trade in accordance with clause 2.3 of the Brokerage and Custody Agreement.

### 1.2    Order confirmations / Pre-Advice

The Bank issues an order-confirmation by Fax/Swift MT 509(Trade Status Message) within 24 hours upon having received the order, which will include following information:

1/ Full name of Fund

1/5

1.5   Overdue Settlements

The Bank will contact every Fund / Broker in respect of trades which are more than 48 hours overdue from the expected Bank settlement date, reported on the Order Confirmation or on the Pre-Advice. In all cases the Bank will advise the Customer by Fax/Swift of the status of the trade.

## 2   Third party receipts / deliveries

2.1   Instructions to *receive* or *deliver*

The Customer may instruct the Bank by sending Swift messages or faxes.

In case Swift is used the following messages can be handled:

- MT 520 Receive Free
- MT 521 Receive against Payment
- MT 522 Deliver Free
- MT 523 Deliver against payment

2.2   The Bank will issue transfer deeds or instructions within 48 hours from receipt of the MT 52x or Fax, and mail the documentation to the Funds. After 10 business days the Funds are contacted by the Bank to confirm the following:

- Receipt of the instructions
- Correctness of the documentation and instructions
- Receipt of counterparty instructions
- Indication of expected settlement date of the re-registration

2.3   Acknowledgment will be sent to the Customer confirming receipt of their instructions within 24 hours.

2.4   The Bank will send a Status report to the Customer by fax for all receipts/deliveries which have not been executed within 15 business days of receipt of the instructions.

## 3   Settlement

3.1   Settlement Confirmation

The Customer will receive confirmations of settlements by Fax/Swift.

In case Swift is used the following messages can be handled:

- MT 530 Confirmation of Receipt Free
- MT 531 Confirmation of Receipt against Payment
- MT 532 Confirmation of Delivery Free
- MT 533 Confirmation of Delivery against Payment

Brokerage Custody Schedule 3.doc

REDACTED WITH REDACT-IT

## 4    Corporate Actions

### 4.1    Pre Advice

On a best efforts basis, the Bank will send to the Customer a pre-advice by fax detailing the event announced, provided the Bank receives the information in time.

### 4.2    Dividends/distributions to the Customer's "Cash"-account

The Bank will distribute the cash proceeds in accordance with the Customer's standing instructions for that security.

If the dividend or distribution is in the form of shares, the Bank is unable to apply the "Cash" standing instruction and will credit the shares to the Customer's account. Only then is the Customer able to sell these shares by sending an instruction to the bank. The Bank will credit the cash proceeds within three business days after receiving both the corporate action advice and the cash proceeds.

### 4.3    Dividends/distributions to the Customer's "Reinvest"-account

The Bank will distribute the shares in accordance with the Customer's standing instructions for that security.

If the dividend or distribution is in the form of cash, the Bank is unable to apply the "Reinvest" standing instruction and will credit the cash proceeds to the Customer's account. Only then is the Customer able to buy shares by sending an instruction to the Bank. The Bank will credit the shares within three business days of receiving the corporate action advice.

## 5    Reconciliation

The Bank will send each month two statements of holdings to the Customer. The first statement will be sent around the 2nd business day of the month, detailing the Customer's position in each security. The second statement will be sent around the 16th of the month, mentioning both the Customer's position and the latest prices available.

## 6    Cash movements

Cash movements will be booked through the appropriate account(s) and advised by Fax or MT 950 the following day, with good value.

## 7    Amendments

Any provision of this Agreement may be amended only, if such amendment is in writing and signed by both the Bank and the Customer.

## 8    Governing Law and Jurisdiction

This Agreement shall be governed by the laws of the Netherlands Antilles. The exclusive place of jurisdiction shall be Curaçao, Netherlands Antilles.

4/5

Brokerage Custody Schedule 3.doc

REDACTED WITH REDACT-IT

**IN WITNESS WHEREOF** the parties hereto have executed this Agreement the day and year first above

5/5

Brokerage Custody Schedule 3.doc

# SCHEDULE FOUR

## ONLINE ACCESS AGREEMENT

**THIS AGREEMENT** is made this 26th day of July, 2004

**BETWEEN**

**CITCO BANKING CORPORATION N.V.**               **AND**

address: Kaya Flamboyan 9                          address: █████████
P.O.Box 707
Curaçao,
Netherlands Antilles

phone   :                                          phone   :
fax     : █████████                                fax     :
                                                   Swift   :

**Operative provision:**

> All the terms of the Brokerage and Custody Agreement shall apply to and form part of this Online Access Agreement as if the same were set out in extenso herein. In the event of a conflict between the conditions contained in the Brokerage and Custody Agreement and the conditions contained in the Online Access Agreement, the conditions contained in this Online Access Agreement shall prevail.

**WHEREAS:**

(A)   The Customer desires to access and use the Citco Funds Net on the Internet at www.citcofunds.net ("CFN") (i) to receive information on Securities and (ii) to give the Bank instructions in respect of the Customer's account(s) and to have the Bank act upon such instructions as set forth on Exhibit A (the "Online Services"); and

(B)   The Bank is willing to provide such information and accept such instructions through CFN on the terms and conditions set forth herein.

**NOW IT IS HEREBY AGREED** as follows:

1.   Right to Access.  The Bank hereby grants Customer the right to access and use CFN in accordance with the terms and conditions of this Agreement to perform the Online Services. Except as provided herein, the Online Services shall be subject to the same terms, conditions, warranties and representations as all other Brokerage Services.

2.   Authorised Persons.  Customer will select persons authorised to use the Online Services on its behalf ("Authorised Persons") and identify such persons to the Bank. The Bank will assign an identifier and password to each such Authorised Person. The Bank will include means within CFN to limit access to Online Services only to Authorised Persons. Customer and Authorised Persons will maintain such identifiers and passwords in confidence. Customer will familiarise Authorised Persons with all of Customer's obligations under the Brokerage and Custody Agreement, including this Online Access Agreement and will assure that they are qualified to engage in Brokerage Services for the Customer. Customer shall not permit any Authorised Person to engage in any Brokerage Service unless such Authorised Person meets all applicable legal requirements and any eligibility criteria, whether established by the Bank or a third party, including, without limitation, criteria established by the broker or manager of any

1/4

Brokerage Custody Schedule 4 .doc

Security, applicable to such Brokerage Service. Customer understands and agrees that it is responsible for any and all information, including messages and instructions, entered, transmitted or received under identifiers and passwords of Authorised Persons, and for the trading and other consequences thereof. If any third party shall access Customer's account through CFN using the identifier and password of an Authorised Person, Customer will indemnify and hold harmless the Bank against any liability, costs or damages arising out of claims by Customer or such third parties based upon or relating to such access.

3.  **Confidentiality and Ownership.** Customer acknowledges that all information on CFN, including but not limited to the databases thereon, and the selection, co-ordination, and arrangement of the contents thereof (collectively, the "Information"), are trade secrets, proprietary to the Bank. Customer agrees to keep such Information confidential and to utilise such Information solely for its own trading activities. Customer further agrees to take or cause to be taken all reasonable precautions to maintain the secrecy and confidentiality of such Information. Customer shall not disclose, and shall use reasonable efforts not to permit the disclosure of, any part of such Information to any other person. Customer will not use or permit the use of CFN or any of the Information for any illegal purpose. Customer further acknowledges that CFN and all intellectual property rights therein, including the Information, are the property of the Bank, and that Customer will have no right to reproduce, sell, license, or distribute any Information or any portion of CFN without the prior approval thereof by the Bank.

4.  **Website System Changes.** Customer acknowledges and agrees that, without prior notice and without the advice to or consent of Customer, the form and content of any display on CFN may be modified at any time and in any way, including terminating any information or service provided thereon.

5.  **No Online Investment Advice.** Customer understands that the information available on CFN is not investment advice of any kind, nor does CFN purport to offer any opinion with respect to the nature, potential value or suitability of any particular Securities transaction or investment strategy.

6.  **Online Instructions.** With respect to instructions in respect of Customer's account(s) received by the Bank using CFN:

    6.1  Customer shall indemnify and hold the Bank harmless from and against all claims, demands, liabilities, costs, charges, damages, losses, expenses and consequences of whatever nature which may be brought or preferred against the Bank or that may be suffered, incurred or sustained by the Bank by reason or on account of having acted in accordance with such instructions, whether wrongly or mistakenly or not, or of the Bank's failing to act wholly or in part in accordance with such instructions;

    6.2  Customer shall not make any claim against the Bank by reason of or on account of the Bank having so acted or of having acted wrongly or mistakenly or of the Bank failing to act wholly or in part in accordance with such instructions;

    6.3  Customer acknowledges and confirms that such instructions, if accepted by the Bank, result in agreements that are binding upon the Customer; and

    6.4  Customer agrees that the Bank may debit any account in Customer's name(s) with any sums payable by the Customer as a result of such instructions.

7.  **Internet-Related Difficulties.** Customer shall indemnify and hold the Bank harmless from and against all claims, demands, liabilities, costs, charges, damages, losses, expenses and consequences of whatever nature that may be brought or preferred against the Bank or that may be suffered, incurred or sustained by the Bank by reason or on account of equipment failure, communication line failure, system failure, security failure on the Internet,

2/4

unauthorised access, or theft, or any problem, technological or otherwise, that might prevent Customer from accessing CFN. Customer further agrees that it will not be compensated for "lost opportunity," including but not limited to, for inability to enter an order online due to technical difficulties, where the desired Security increased in value or a Security held decreased in value.

8. DISCLAIMER. ALL INFORMATION PROVIDED ON CFN IS "AS IS," WITHOUT WARRANTIES, CONDITIONS, OR REPRESENTATIONS OF ANY KIND, INCLUDING WARRANTIES OF NON-INFRINGEMENT, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. CUSTOMER ACKNOWLEDGES AND AGREES THAT THERE IS NO ASSURANCE THAT INFORMATION ON CFN IS TIMELY, ACCURATE OR COMPLETE. IN PARTICULAR, BUT WITHOUT LIMITING THE FOREGOING, CUSTOMER UNDERSTANDS THAT THE BANK AND THE CUSTODIAN DEPEND, AMONGST OTHER THINGS, ON THE SELLERS OF NON-READILY MARKETABLE SECURITIES OR OTHER THIRD PARTY PROVIDERS FOR MOST OR ALL OF THE INFORMATION CONCERNING THOSE SECURITIES AND THAT ERRORS ALSO OCCUR IN INFORMATION COMPILED OR PREPARED BY THE BANK OR ITS AFFILIATES. CUSTOMER UNDERSTANDS THAT THERE WILL BE A DELAY BETWEEN THE TIME THAT THE CUSTODIAN AND THE BANK RECEIVE CHANGES TO THIS INFORMATION AND THE CORRESPONDING CHANGE TO THE INFORMATION ON CFN, AND THAT THE BANK DOES NOT VERIFY THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION. IN NO EVENT SHALL THE BANK OR THE CUSTODIAN BE LIABLE FOR INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES, INCLUDING, BUT NOT LIMITED TO, LOST DATA OR LOST PROFITS, EVEN IF IT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, ARISING OUT OF OR RELATING TO THIS AGREEMENT.

9. LIMITATION ON LIABILITY. THE BANK'S LIABILITY FOR DAMAGES UNDER THIS AGREEMENT SHALL IN NO EVENT EXCEED THE AMOUNT OF THE TRANSACTION FEE, IF ANY, PAID BY CUSTOMER TO THE BANK FOR THE TRANSACTION GIVING RISE TO SUCH DAMAGES.

10. Amendments. Any provision of this Agreement may be amended only, if such amendment is in writing and signed by both the Bank and the Customer.

11. Governing Law and Jurisdiction. This Agreement shall be governed by the laws of the Netherlands Antilles. The exclusive place of jurisdiction shall be Curaçao, Netherlands Antilles.

IN WITNESS WHEREOF the parties hereto have executed this Agreement the day and year first above written.



3/4

Brokerage Custody Schedule 4 .doc

**Attachment A - Online Services**

**The following services shall be covered by the Online Access Agreement:**

1)

2)

4/4

Brokerage Custody Schedule 4 doc

REDACTED WITH REDACT-IT

# EXHIBIT H



**Dated: April 29, 2005**

**and**

**CITCO BANK NEDERLAND N.V.
DUBLIN BRANCH**

**and**

**CITCO GLOBAL CUSTODY N.V.**

---

**BROKERAGE
AND
CUSTODY AGREEMENT**

---

**CITCO BANK NEDERLAND N.V.
DUBLIN BRANCH
Custom House Plaza Block 3
International Financial Services Centre
Dublin 1
Ireland**



**THIS AGREEMENT** is made this 29th day of April 2005

**BETWEEN:**

(the "Customer")

**AND:**   **CITCO BANK NEDERLAND N.V.**
**DUBLIN BRANCH**
Custom House Plaza Block 3
International Financial Services Centre
Dublin 1
Ireland                                    (the "Bank")

**AND:**   **CITCO GLOBAL CUSTODY N.V.**
c/o Custom House Plaza Block 3
International Financial Services Centre
Dublin 1
Ireland                                    (the "Custodian")

**WHEREAS:**

(A)   The Customer wishes to be provided with brokerage and custody services and the Bank and the Custodian are willing to provide such brokerage and custody services to the Customer on the terms and subject to the conditions contained in this Brokerage and Custody Agreement (the "Agreement").

(B)   The Customer has opened and currently maintains a current account number and may open and maintain further accounts in the future (the "Account") with the Bank.

**NOW IT IS HEREBY AGREED** as follows:

**1    Interpretation**

1.1    Unless the context otherwise requires:

"**Agreement**" means this Brokerage and Custody Agreement.

"**Brokerage Services**" shall include (i) the effecting of transactions of and/or relating to the purchase and sale of and dealing in Securities in the name and for the account of the Customer; (ii) the effecting of transactions of and/or relating to the purchase and sale of and dealing in Securities in the name of the Bank, or of the Custodian, or any nominee for the account of the Customer; and (iii) any services ancillary thereto as set out in this Agreement.

"**Business Day**" means any day other than a Saturday or Sunday or public holiday that the Bank is open for business in Ireland as pre-advised by the Bank.

"**Instructions**" means instructions provided from time to time to the Bank and/or to the Custodian by the Customer or by such persons as the Customer has authorised to give instructions, as more particularly described in Clause 14 hereof, in respect of the services and duties performed by the Bank and/or the Custodian pursuant to this Agreement.

REDACTED WITH REDACT-IT



**"Net Asset Value"** or **"NAV"** means the aggregate of all of the assets after deduction of all the liabilities of a Security calculated in accordance with the Security's Articles of Association and or the Security's memorandum.

**"Readily Marketable Securities"** means open ended collective investment schemes with unrestricted access on clearly defined periodic dealing cycles in addition to shares, units, bonds, futures contracts, currencies, money instruments, options, commodities, any derivative instruments based on the foregoing and any other financial instruments and other assets or property which are freely and publicly traded on a daily basis on a stock exchange or other exchange or recognised market place, and in respect of which the Bank and/or the Custodian agree to provide Brokerage Services and/or other services pursuant to the Agreement.

**"Non-Readily Marketable Securities"** means shares, units, bonds, futures contracts, currencies, money instruments, options, commodities, any derivative instruments based on the foregoing and any other financial instruments and other assets or property, including shares, units or other financial instruments of any unlisted collective investment schemes, for which there is no publicly available market or which are not freely or publicly traded on a daily basis on a stock exchange or other exchange or recognised market place, and in respect of which the Bank and/or the Custodian agree to provide Brokerage Services and/or other services pursuant to this Agreement.

**"Regularly Settled Securities"** means Securities that normally effect settlement within five business days of the Net Asset Value Date or Trade Date (or equivalent) as defined in its Offering Memorandum (or equivalent).

**"Non-Regularly Settled Securities"** means Securities that normally effect settlement after five business days of the Net Asset Value Date or Trade Date (or equivalent) as defined in its Offering Memorandum (or equivalent).

**"Securities"** means, where the context so admits, both Readily Marketable Securities and Non-Readily Marketable Securities.

**"Service Level Agreement"** means any agreement between the Bank and the Customer from time to time in force for the service level specified in such agreement and which is expressed to be a Service Level Agreement. Reference herein to the Brokerage and Custody Agreement shall (where the context so permits) be construed as including a reference to any such Service Level Agreement.

1.2    References herein to Clauses are references to clauses of this Agreement. Headings are inserted for convenience only and shall not be used in construing this Agreement.

## PART I - BROKERAGE SERVICES

**2    Appointment and Performance of Brokerage Services**

2.1    The Customer hereby appoints and authorises the Bank to provide Brokerage Services on behalf of the Customer which appointment and authorisation are hereby accepted by the Bank, subject to the terms and conditions of this Agreement.

2.2    The Bank shall, on Instructions and on the basis of this Agreement, provide Brokerage Services to the Customer. The Customer hereby authorises the Bank to comply with any Instructions and the Bank shall be entitled to act for the Customer upon any such Instructions.

2.3    The Customer will provide the Bank with Instructions in respect of all transactions in Securities to be performed by the Bank on the Customer's behalf as follows:

2.3.1    for transactions in Securities, Instructions must be provided to the Bank at least 90 minutes before the dealing deadline for such transactions. Instructions received after 15:00 CET on any Business Day will be executed on a best effort basis. In the case where the payment deadline set by the fund, is before the official currency deadline for that currency market, then Instructions should be received at least 90 minutes before the payment deadline of the fund.

2.3.2    for transactions in Non-Readily Marketable Securities where the Bank or Custodian has not previously traded in and currently holds no active position. Instructions must be provided to the Bank at least one clear Business Days prior to the trade date for the applicable transaction in the Non-Readily Marketable Security. However, in case where a market or suitable counterparty is identified by the Customer Clause 2.3.1 shall apply. In addition for transactions in Non-Readily Marketable Securities, where the Bank or Custodian has not previously traded in and currently

REDACTED WITH REDACT-IT



holds no active position, the opening/set up of the required new account/relationship may delay the trade execution process. In such instances the Bank will notify the Customer.

2.3.3   for transactions in Non-Readily Marketable Securities where the Bank or Custodian has not previously traded in and currently holds no active position. Instructions received by the Bank with less than one clear Business days prior to the trade date, will be performed on a best efforts basis.

The Bank shall perform all such Instructions which are so given provided that sufficient funds or Securities, as applicable, are at the relevant time held by the Bank or by the Custodian or other nominee on behalf of the Customer, or the Customer has made other arrangements for settlement, such arrangements being satisfactory to the Bank.

2.4   The Bank may in its reasonable discretion refuse to execute any Instruction given by or on behalf of the Customer and shall use reasonable endeavours to notify the Customer forthwith of any such decision. Parties agree that an overview of all circumstances whereby the Bank may refuse Instructions cannot be given, but such an overview may include, but is not limited to situations whereby (i) the customer does not have sufficient securities for a redemption order; or (ii) execution of such an instruction were to result in a breach of applicable law; or (iii) a trade order is given in a currency the Bank does not settle in; or which may otherwise lead to material risk on the part of the Bank.

2.5   The Customer understands and agrees that:

2.5.1   the Bank shall effect settlement of rights and/or obligations resulting from transactions effected pursuant to the Brokerage Services, such as but not limited to settlement of and payment for and delivery of Securities, in accordance with the laws, regulations and market practices in the jurisdictions in which the transactions occur and/or in accordance with the terms of the transactions effected hereby;

2.5.2   any losses resulting from the market's failure to settle any transaction will be borne solely by the Customer ; and

2.5.3   The Customer shall have sufficient monies in the account in order to effect settlement of outstanding transactions. If this is not the case, the Bank shall inform the Customer immediately and the Customer shall either transfer sufficient funds to cover the amount due and provide evidence of same to the Bank or if possible will cancel the Instruction..

2.5.4   In order to avoid unnecessary delays, the Bank, in its absolute discretion, may open any further Accounts in the currency needed to effect settlement of and payment for Securities, without the prior approval of the Customer. The Bank shall promptly notify the Customer of such account opening.

2.6   The Bank hereby agrees to credit the Account or such other account to be agreed from time to time in the event that the Bank receives any dividend and/or interest entitlements on Securities held by or on behalf of the Customer or its nominee/custodian.

2.7   The Bank shall only make delivery of cash and/or any of the property of the Customer:

2.7.1   in the course of settlement of transactions notified to the Bank;

2.7.2   in accordance with Instructions;

2.7.3   pursuant to any security and/or pledge arrangement agreed hereunder or otherwise between the Customer and the Bank.

2.8   In executing Instructions for the Brokerage Services, the Bank shall be entitled at its option, to deal with third parties as the other party as long as the result of the transaction is not less than as it is the Bank who would have dealt directly with the Security itself trading at NAV. Notwithstanding the provisions of Clause 10 hereof, the Bank shall not be liable for any shortcomings of such third parties if it has exercised due care in selecting these third parties.

2.9   The Customer shall be solely responsible for compliance with any investment policies, guidelines, restrictions on ownership or other restrictions whatsoever in relation to Securities, which may from time to

REDACTED WITH REDACT-IT



time be binding on the Customer and/or the Bank when providing Brokerage Services. The Bank shall at no time be responsible for monitoring the aforementioned investment policies, guidelines or other restrictions

2.10    The Customer confirms that the Bank's obligations under Part I of this Agreement relate solely to the Brokerage Services and that the Bank is under no obligation to advise the Customer in respect of the suitability of investments. Upon reasonable request by the Customer, and if available, the Bank shall provide the Customer with any Fund documents

**3       Contract Notes and Other Statements**

3.1     The Bank shall send to the Customer a contract note in respect of each executed order.

3.2     The Bank shall send to the Customer, whenever appropriate, a confirmation note in respect of any other services rendered to the Customer.

3.3     A contract note (or a confirmation note) shall, in the absence of manifest error, be conclusive and deemed acknowledged by the Customer as correct, unless the Bank receives written notice to the contrary. For Regularly Settled Securities the Customer will notify the Bank, depending on the liquidity of the Security, as a rule within 2 Business Days and for Non-Regularly Settled Securities the Customer will notify the Bank, depending on the liquidity of the Security, within 5 Business Days.
The receipt of the advice/confirmation by the Customer shall not alter the liability of the Bank as described in Clause 10 and without altering the liability of the Bank, the Customer is however under a duty of care to bring to the Bank's attention any errors or discrepancies as soon as possible in order to mitigate any losses or damages.
Notwithstanding the provisions of Clause 10 of this Agreement, the Bank shall not be responsible for any increased losses or damages as a consequence of any undue delay by the Customer in bringing any errors or discrepancies to the Bank's attention

3.4     The Bank shall send to the customer a statement in respect of each account of the Customer in accordance with clause 6 of the Service Level Agreement.

3.5     The Bank shall make available to the Customer and its auditors all such information, records and statements as they may reasonably require to the extent that the same relate to the Customer at all reasonable times and on reasonable notice.

**PART II - CUSTODIAN SERVICES**

**4       Appointment of Bank and Custodian**

4.1     The Customer hereby appoints the Custodian as custodian of the Customer on the terms and subject to the conditions hereof, which appointment is hereby accepted by the Custodian

4.2     The Bank and Custodian agree to provide the services herein set out, subject to the provisions of this Agreement.

**5       Appointment of Sub-Custodians**

5.1     In the performance of their duties under this Part II of the Agreement, the Bank and/or Custodian may act through agents, sub-custodians or any other third party which the Bank and/or Custodian may, in their absolute discretion, deem necessary. The Bank and/or Custodian are hereby authorised by the Customer to enter into further agreements for the appointment of the aforementioned agents, sub-custodians and/or third parties A list of the current sub-custodians of the Bank and/or Custodian is attached as Schedule Four and will be updated from time to time.

5.2     The Bank and/or Custodian shall not be responsible for any act or omission or for the solvency of any sub-custodian, agent or third party appointed pursuant to Clause 5.1 hereof, provided that the Bank or Custodian can demonstrate that care of a prudent professional custodian was taken in the selection, instruction and ongoing appropriate level of supervision of any such sub-custodian, agent or third party.

5.3     The Bank and/or Custodian shall not be responsible for any act or omission or for the solvency of any sub-custodian, agent or third party, which the Bank and/or the Custodian is either compelled or directed to appoint by the Customer, the underlying Securities or applicable law.

REDACTED WITH REDACT-IT



**6    Duties of the Customer**

6.1    Subject to the provisions of, and in addition to any of the services provided by the Bank pursuant to Clause 2 of this Agreement, the Customer can deliver or cause to be delivered to the Custodian from time to time the following:

6.1.1    Securities which the Customer now owns or may hereafter acquire, and of which the Custodian agrees to retain custody.

6.1.2    any other property or assets of the Customer of which the Custodian, in its absolute discretion, may agree to accept custody.

6.2    The Customer acknowledges that there may be significant delays in the registration or re-registration in the name of the Custodian, or in the name of any sub-custodian or nominee, of Non-Readily Marketable Securities, which have been delivered to the Bank pursuant to Clause 6.1 hereof. In the absence of any negligence or undue delay on the part of the Bank and/or the Custodian, neither the Bank nor the Custodian shall be under any obligation to execute any instructions by the Customer in respect of such Non-Readily Marketable Securities until registration or re-registration in the name of the Custodian or in the name of any sub-custodian or nominee is completed.

6.3    The Customer shall timely and accurately give Instructions to the Bank or procure that the Bank will be given timely and accurate Instructions of all transactions which involve the Bank and/or Custodian.

6.4    The Customer shall be solely responsible for compliance with any investment policies, guidelines, restrictions on ownership or other restrictions whatsoever in relation to Securities, which may from time to time be binding on the Customer and/or the Bank and/or the Custodian when providing Custodian Services. The Bank shall at no time be responsible for monitoring the aforementioned investment policies, guidelines or other restrictions. This clause is closely linked to the questions already forwarded to Citco e.g. on the handling of fund documents.

**7    Powers and Duties of the Bank and Custodian**

7.1    The Bank and Custodian shall have and perform the following powers and duties and such other powers and duties as the parties shall from time to time agree:

7.1.1    to register the Securities, other than physically held bearer shares, in the name of the Custodian or any sub-custodian and to keep the Securities in the custody of the Custodian or procure that they are kept in the custody of any sub-custodian, provided however that, if instructed to do so by the Customer, the Bank and/or Custodian may deposit any of the Securities in a depository or clearing system;

7.1.2    to deposit in the Account all moneys received from or for the account of the Customer;

7.1.3    when instructed to do so by the Customer and subject to the provisions of Clause 6.2, to make settlement of transactions undertaken by or for the account of the Customer, delivering or receiving the Securities or other assets of the Customer and making or receiving payments for the account of the Customer. The Bank and/or Custodian are not obliged to deliver securities or assets which cannot be covered by securities or assets which they hold for the Customer or to make any payments other than from the Account;

7.1.4    to collect and deposit in the Account all income and other payments in connection with the Securities;

7.1.5    unless instructed to do so by the Customer, the Bank, Custodian and/or any sub-custodian shall not vote on or in respect of the Securities or deliver any executed form of proxy to vote thereon or in respect thereof;

7.1.6    to employ any legal, financial or other experts which the Bank and/or Custodian deem necessary to comply with their duties and obligations under this Agreement the reasonable costs of which will be reimbursed to the Bank and/or Custodian by the Customer, if reasonable and duly evidenced by appropriate documents. The Bank and /or Custodian shall promptly notify the Customer if such employment has occurred;



7.1.7    when instructed to do so by or on behalf of the Customer, to remit money to banks or others for the account of the Customer and to pay or procure the payment of any invoices or other financial obligations of the Customer;

7.1.8    to deliver and surrender any bonds or other instruments as and when the same fall due for payment or repayment and to pay all calls and debit the accounts of the Customer accordingly and to effect all necessary or appropriate exchanges of bonds or other instruments;

7.1.9    to inform the Customer on calls and to debit the accounts of the Customer according to the customer's Instructions;

7.1.10    to deliver to the Customer, on receipt by the Bank, all forms of proxy and all notices of meetings and any other notices or announcements in connection with the Securities; Upon reasonable request by the Customer, and if available, the Bank shall provide the Customer with any Fund documents.

7.2    The Securities held at any one time by the Custodian or any sub-custodian shall be recorded in and ascertainable from the books and/or ledgers of the Bank and the Custodian and such books and ledgers shall constitute conclusive evidence of the Securities retained on behalf of the Customer subject to rebuttal evidence produced by the Customer. At the Customer's request the Bank shall provide the Customer with the documents and/or information supporting the Bank's records.

7.3    The Customer recognises that in certain circumstances in order to preserve or safeguard the Securities or other assets of the Customer, the Bank and/or Custodian may be required to act without first obtaining instructions from the Customer. In such cases, the Bank and/or Custodian may act at their own absolute and unfettered discretion and shall not be liable, in the absence of negligence, wilful misfeasance, reckless disregard or fraud, for any loss to the Customer whatsoever. The Bank and /or Custodian shall promptly notify the Customer if such employment has occurred.

7.4    Neither the Custodian nor the Bank shall have any responsibility to initiate, appear in, prosecute or defend any legal or equitable proceedings relating to the Securities or other property held by the Custodian on behalf of the Customer. The Custodian or the Bank shall use its best efforts to assist the Customer in case of such proceedings.

7.5    Neither the Custodian nor the Bank shall have any responsibility to initiate any proceeding or engage the services of any third party for the collection of overdue amounts owing to the Customer in connection with any stocks, bonds or other property held by the Custodian under this Agreement. The Custodian or the Bank shall use its best efforts to assist the Customer under such circumstances.

7.6    If at the request of the Customer the Bank or the Custodian agrees to appear in, prosecute or defend any such legal or equitable proceedings, either in the Bank or the Custodian's own name or in the name of a nominee, the Customer agrees to indemnify the Bank and/ or the Custodian against damages and expenses (including legal costs) which may be sustained or incurred by the Bank and/or the Custodian in so acting.

## PART III - GENERAL PROVISIONS

**8      Payment for Securities**

8.1    All Securities, which have been purchased for the Customer by the Bank, will be transferred to the Custodian, or to any sub-custodian or nominee, as custodian, or registered in the name of the Custodian or a sub-custodian or nominee, as the case may be. Such transfer and registration will be subject, however, to payment in full of all moneys due in connection with such purchase (including, for the avoidance of doubt, the gross purchase price). If such indebtedness is not satisfied by the Customer within 5 days of the date the same became due, such Securities will not be transferred to nor held by the Custodian on behalf of the Customer, but will be freely available to the Bank.

8.2    If, pursuant to Clause 8.1 hereof, the Securities will not be transferred to or held by the Custodian on behalf of the Customer, the Customer is not released from his obligation to pay the Bank. Such payment obligations will be reduced to the extent that the net proceeds of the sale of such Securities are available to the Bank.

REDACTED WITH REDACT-IT



8.3    The Custodian will be under no obligation whatsoever vis-à-vis the Customer in connection with Securities referred to above unless and until the Customer has satisfied its payment obligations vis-à-vis the Bank in full.

## 9    Representations and Warranties of the Customer

9.1    The Customer represents and warrants to the Bank and to the Custodian that it will at all times have full power and authority (corporate and otherwise) to enter into this Agreement and to exercise its rights and perform its obligations under the terms and conditions of this Agreement and any contract in connection therewith or pursuant thereto, and that it has obtained and will maintain all authorisations and consents necessary for it so to enter, exercise rights and perform such obligations, and that such authorisations and consents are and will at all times be in full force and effect. The Customer will forthwith upon demand by the Bank from time to time deliver such evidence of such authorisations and consents and compliance therewith as the Bank may reasonably require.

9.2    The Customer furthermore represents and warrants to the Bank that it has full power and authority (i) to authorise third parties to give instructions on behalf of the Customer or its nominee/custodian, and (ii) to perform all its obligations hereunder.

9.3    The Customer hereby expressly declares that it is aware of and that it accepts the investment risks attached to Securities and the consequences entailed by the provision of Brokerage Services.

## 10    Liability and Indemnification of Bank and Custodian

10.1    The Customer shall bear all risks of investing in Securities or holding cash denominated in a particular currency and the Customer hereby agrees to be solely responsible for any losses resulting from any transactions in Securities or cash in any currency in connection with transactions effected through the Bank.

10.2    The Bank and Custodian hereby agree to use their best efforts and judgement and care of a prudent professional custodian in performing their obligations and duties pursuant to this Agreement; provided however that the Bank, Custodian, their directors, officers, employees and/or agents shall not be liable for any action taken or failure to act in the course of performing the services hereunder or for any loss suffered by the Customer in connection with the subject matter of this Agreement unless such loss arises from wilful misfeasance, fraud, bad faith or negligence in the performance of the Bank's and/or Custodian's obligations and duties or by reason of the Bank's and/or Custodian's reckless disregard of their obligations and duties hereunder.

10.3    In the absence of wilful misfeasance, fraud, bad faith, negligence or reckless disregard, the Bank and/or Custodian shall not be liable for any shortfall in the number of securities held by the Custodian on behalf of the Customer.

10.4    In particular, in the absence of wilful misfeasance, fraud, bad faith, negligence or reckless disregard, the Bank and/or Custodian shall not be liable for any losses which may arise howsoever as a result of any of the prices or values for any of the Securities which are provided to or obtained by the Bank and/or Custodian being provisional, inaccurate, false or misleading.

10.5    In the event of any loss to the Customer by reason of the failure of the Bank or the Custodian to utilise care of a prudent professional custodian (including but not limited to, in connection with the Bank and the Custodian acting in accordance with Instructions received from the Customer) the Bank and the Custodian shall be liable to the Customer only to the extent of the Customer's direct damages, to be determined based on the market value of the Securities or other property which is the subject of the loss at the date of discovery of such loss and without reference to any special conditions or circumstances. The Bank and the Custodian shall have no liability whatsoever for any consequential, special, indirect or speculative loss or damages (including, but not limited to, lost profits) suffered by the Customer in connection with the transactions contemplated hereby and the relationship established hereby even if the Bank or the Custodian has been advised as to the possibility of the same and regardless of the form of the action. An example of direct damages is, when subscriptions or redemptions due to the Bank's and/or Custodian's wilful misfeasance, fraud, failure to act in good faith, negligence or reckless disregard, are (i) done at a Trade Date in deviation to the Instruction or not at the next available Trade Date or (ii) resulting in a subscription for or a redemption from an incorrect Security, as a result of which the Customer receives less shares, less cash proceeds or the incorrect Security. In such cases the damages will be determined to be the difference between the NAV of the Security on the actual trade date and the NAV of the Security on the Trade Date on which the order was supposed to be executed or the reacquisition cost and any change in the value since such incorrect redemption of incorrectly redeemed securities.



10.6 The Bank and Custodian shall be without liability to, and shall be indemnified by, the Customer for any action taken or omitted by them, whether pursuant to Instructions or otherwise, within the scope hereof if such act or omission was in good faith, without wilful misfeasance, fraud, bad faith, negligence or reckless disregard. In performing their obligations hereunder, the Bank and Custodian may rely on the genuineness of any document, which it believes in good faith to have been validly executed by or on behalf of the Customer.

10.7 The Customer shall pay for and hold the Bank and the Custodian harmless from any liability or loss resulting from the imposition or assessment of any taxes or other governmental charges, and any related expenses with respect to any transactions in or income from Securities.

10.8 Without limiting the foregoing, the Bank and the Custodian shall not be liable for any loss which results from: (i) the general risk of investing, or (ii) investing or holding Securities in a particular country including, but not limited to, losses resulting from malfunction, interruption of or error in the transmission of information caused by any machines or system or interruption of communication facilities, abnormal operating conditions, nationalisation, expropriation or other governmental actions, regulation of the banking or securities industry, currency restrictions, devaluations or fluctuations, and market conditions which prevent the orderly execution of Securities transactions or affect the value of the Securities.

10.9 The Customer shall indemnify and hold harmless the Bank and the Custodian, their directors, officers, employees and agents from and against any direct losses, expenses, liabilities, obligations, damages, penalties, judgements, actions, suits, taxation or costs howsoever imposed on, asserted against or incurred by them in the performance of the Bank's and Custodian's obligations and duties hereunder; provided, however, that none of them shall be indemnified for their wilful misfeasance, fraud, bad faith, negligence or reckless disregard.

10.10 In the event that any document of title relating to a security is lost, the Bank or Custodian shall use reasonable endeavours to obtain a duplicate copy if such a duplicate copy is available. When the person or body issuing such a duplicate copy requires an indemnity, the Customer agrees to provide to the Bank or Custodian such counter-indemnity as the Bank or Custodian may require, unless the loss is due to the Custodian or Bank's wilful misfeasance, fraud, bad faith, negligence or reckless disregard.

10.11 In the event of a loss to the Customer due to acts, omissions or shortcomings of a third party, agent or sub-custodian as referred to in Clause 2.8 and Clause 5 the Bank and/or Custodian shall will (i) subrogate the Customer in the Banks and/or Custodian's rights; and/or (ii) subject to Clause 7.7, assist the Customer as much as reasonably may be expected with initiating, appearing in, prosecuting or defending any legal or equitable proceedings against such third party, agent or sub-custodian.

## 11 Fees and Expenses

11.1 In consideration of the services of the Bank and Custodian hereunder the Customer shall pay to the Bank the fees and expenses as set out in Schedule One hereto.

11.2 The Bank shall be entitled to charge to the Customer the fees of all sub-custodians, agents and third parties appointed by the Bank and/or Custodian pursuant to clause 5 hereof together with all other reasonable costs, expenses and disbursements incurred by the Bank and/or Custodian under this Agreement. All transaction fees payable to the Bank shall be in the currency of the executed transaction.

11.3 The Customer hereby authorises the Bank to debit from the cash account all amounts due to the Bank pursuant to this Agreement. Such amounts due include, but are not limited to, the fees and expenses as outlined in Schedule One. Regarding any claims in connection with damages or losses, whether settled or unsettled, these may only be debited from the cash account of the Customer after approval from the Customer.

11.4 In the event of any dispute as to any amounts payable to the Bank under this clause, an excerpt from the Bank's records signed by the Bank shall serve as prima facie evidence of any amounts due subject to rebuttal evidence produced by the Customer. At the Customer's request the Bank shall provide the Customer with the documents and/or information supporting the Bank's records.

## 12 Non-Exclusivity

12.1 The provision of services by the Bank and the Custodian hereunder shall not preclude the Bank and the Custodian from providing similar services to any other third party and the Customer hereby agrees that



Bank will not be liable to account to the Customer for any profit earned from such third party transactions or by such third party.

12.2    Without prejudice to the generality of Clause 12.1 hereof, the Customer agrees that the Bank may match any transactions made on behalf of the Customer with those made by the Bank on behalf of any third party provided, however, any such transactions are made by the Bank at arms length and are fair and equitable to the Customer.

## 13    Confidentiality

Unless under a legal or regulatory obligation to do so, no party shall divulge or communicate to any person not authorised by any other to receive the same, with the exception of its advisers and accountants, any confidential information of any other party of which it is or shall hereafter become possessed, relating to the Securities or to the business of such other party. The Bank and the Custodian will immediately inform, if possible prior to disclosure, the Client of any duty to divulge or communicate information on the client, except if prevented to do so by applicable law.

## 14    Instructions

14.1    Receipt of Instructions according to 14.2. by the Bank and/or Custodian from the Customer may be deemed by the Bank and/or Custodian to be proper and authorised Instructions in respect of any of their obligations and duties hereunder.

14.2    Instructions by or on behalf of the Customer shall be conveyed to the Bank or Custodian by the following methods only:

    14.2.1    authenticated SWIFT transmission;

14.3    If and only if the media set out above in Clause 14.2 are not functioning, Instructions will be provided to the Bank by mail or by facsimile and the latter only provided that the Customer has entered into an undertaking in the form as set out in Schedule Two hereof and then subject to the terms of that undertaking.

The Customer will advise the Bank in advance when switching from electronic trade placement to manual fax instructions

14.4    The Bank and/or Custodian shall not be liable for any loss arising from:

    14.4.1    non-delivery or delay of mail;

    14.4.2    non-delivery of facsimile, electronic transmission or authenticated SWIFT transmission;

14.5    Neither the Bank nor Custodian is obliged to enquire into the validity, genuineness or accuracy of any Instruction properly received from the Customer.

## 15    Online Inquiry

Provided that the Customer has entered into an Online Access Agreement in the form set out in Schedule Three hereof, the Customer will have electronic inquiry access through CFN (as defined in the Online Access Agreement) pursuant to the terms thereof.

## 16    Service Level Agreement

The Bank and the Customer will enter separately into a Service Level Agreement.

## 17    Termination

17.1    This Agreement shall continue in full force and effect until terminated by any party giving ninety days' prior written notice to the others.

17.2    This Agreement shall terminate with immediate effect in any of the following circumstances:

    17.2.1    a material breach by any party of its obligations under this Agreement which, if capable of being remedied, is not remedied within ten (10) days of receipt of notice;



17.2.2    the failure of the Customer to pay its debts to the Bank and/or Custodian when they become due and is not remedied within ten (10) days of receipt of notice, unless the payment of these debts are still under discussion between the parties hereto; or

17.2.3    the Customer or the Bank and/or Custodian (i) requests to be or is declared bankrupt (*failliet*), (ii) requests to be or is granted a suspension of payments (*surséance van betaling*), (iii) if it is a credit institution, becomes subject to the emergency measures (*bijzondere voorzieningen*) as referred to in Chapter VII of the Credit System Supervision Act 1995 (*Wet Toezicht Effectenverkeer 1995*), (iv) any similar action is taken as referred to in (i) through (iii) under the laws of any other jurisdiction or the laws of The Netherlands respectively, or (vi) a resolution is adopted to dissolve or liquidate the Customer or the Bank and/or Custodian.

17.3    If the Bank and/or Custodian or Customer is not aware of automatic termination pursuant to Clause 17.2 the automatic termination will be delayed until the day it becomes aware thereof;

17.4    On the termination of this Agreement howsoever occasioned the Bank and Custodian shall forthwith deliver up to the Customer, or other party as requested by the Customer, all Securities and documents of title thereto in their possession or control pursuant to this Agreement save that they shall not be required to make such delivery until full payment has been made by the Customer to the Bank of all amounts due in respect of transactions which have not been settled at the date of termination and until full payment has been made for all outstanding fees and expenses due to the Bank and Custodian for services provided under the terms of this Agreement.

## 18    Assignment

Neither the benefit nor burden of this Agreement may be assigned by any party save with the prior written consent of the others.

## 19    Notice

19.1    Any notice given under this Agreement shall be served:

19.1.1    by registered or recorded delivery mail or authenticated SWIFT transmission;

19.1.2    by facsimile transmission;

19.1.3    by any other means which one party specifies by notice to the other.

19.2    Each party's address for the service of notice shall be the above-mentioned address or such other address as one party specifies by notice to the others.

19.3    A notice shall be deemed to have been given:

19.3.1    if it was served by post, upon receipt by the party to whom addressed;

19.3.2    if it was served in person, at the time of service;

19.3.3    if it was served by authenticated SWIFT or facsimile transmission, at the time of receipt by the party to whom addressed.

## 20    Custodian's obligation secured

The Bank guarantees to the Customer that the obligations of the Custodian vis-à-vis the Customer hereunder will be properly fulfilled.

## 21    Alteration of Provisions

21.1    No variation, amendment, discharge, waiver or discontinuance of any of the provisions of this Agreement shall be valid unless in writing and signed by all parties.

21.2    In case an amendment or variation to this agreement is required due to changes in the law or regulations applicable to the Bank and/or Custodian, the Bank or Custodian shall inform the Customer of such changes in the law or regulations as soon as it become aware of any proposed changes or as promptly as pos after the date that such changes are published in the Staatscourant and may accordingly, at any time/



such publication, amend or vary any provision of this Agreement by giving a 14 days prior notice to the Customer. However, in the case where the changes in the law or regulations applicable to the Bank and/or Custodian take effect before the end of the 14 days prior notice to the Customer, the Bank or Custodian may amend or vary any provision of this agreement at the date that such changes take effect.

Notwithstanding the provisions of Clause 17, the Customer, in case they do not agree with the amendment, can terminate this Agreement by giving 10 days' prior written notice.

**22      Incorporation of Schedules**

This Agreement and its Schedules constitutes the entire understanding and agreement of the parties hereto. The Schedules shall apply correspondingly to the relationship between the Customer and the Bank and Custodian insofar as they do not differ from the terms of this Agreement.

**23      Governing Law and Jurisdiction**

23.1      This Agreement shall be governed by and construed in accordance with the laws of The Netherlands.

23.2      All parties agree that the courts of The Netherlands are to have jurisdiction to settle any disputes which may arise out of or in connection with this Agreement and that accordingly any suit, action or proceeding arising out of or in connection with this Agreement may be brought in such courts. Any proceedings or claims brought by the Customer against the Bank and/or the Custodian and/or their affiliates, arising out of or related to this Agreement or to the Brokerage Services shall be brought exclusively in Amsterdam, The Netherlands.

23.3      Nothing in this Clause 23 shall limit the right of the Bank and/or Custodian to take proceedings against the Customer in any competent Swiss or Irish court.

**IN WITNESS WHEREOF** the parties hereto have executed this Agreement the day and year first above written.



**CITCO BANK NEDERLAND N.V.
DUBLIN BRANCH**

**CITCO GLOBAL CUSTODY N.V.**



## SCHEDULE ONE

### FEES AND EXPENSES

**CUSTODY FEE**
**Charged on a monthly basis**

- ❖ Up to US$ 3 billion = 3 ½ bps
- ❖ Between US$ 3 billion to US$ 5 billion = 3 bps
- ❖ Over US$ 5 billion = 2 ½ bps

**TRANSACTION FEES**
**Charged on transactional basis**

- ❖ RTF's US$ 25.-- excl. trailer fees
- ❖ NRTF's US$300.-

**TRANSFER FEES**
**Charged on transactional basis**

- ❖ Transfers In & Out – US$75.-

**CANCELLATION FEES**
**Charged on transactional basis**

- ❖ US$ 100.-

**OUT OF POCKET EXPENSES**
Charged to the Customer when the expense is incurred

Typically "out of pocket" expenses relate to charges associated with related services including:

1) Courier fees (in exceptional circumstances)
2) Delivery of bearer certificates etc

The Customer will be notified in advance for agreement.

REDACTED WITH REDACT-IT



## SCHEDULE TWO

**Citco Bank Nederland N.V.**
**Dublin Branch**
Custom House Plaza Block 3
International Financial Services Centre
Dublin 1
Ireland

April 29, 2005

### INSTRUCTIONS BY FACSIMILE

Dear Sirs,

In consideration of your agreeing as per our request to act upon facsimile Instructions purporting to be given by us or on our behalf in respect of our Custody Account(s) in the following circumstances:

1) Facsimile-transmissions are communications of last resort and shall be accepted only in case of the breakdown of any other usually used system of communication, the nature of which we have informed you about in advance;

2) The facsimile Instruction is signed by two authorized signatories which are included in its latest authorized signatories list;

3) You have verified the facsimile by telephone with one of the settlements contacts from the appropriate department as notified in writing by the Customer to the Custodian from time to time, that has not signed the facsimile, to confirm authenticity of the facsimile Instruction. ("call-back procedure"); and

4) We agree that you are under no obligation to act upon the facsimile Instructions until we have confirmed them as set out in the aforementioned call-back procedure.

We hereby:

a) agree, in the absence of wilful misfeasance, fraud, bad faith, negligence or reckless disregard, to indemnify you and to keep you indemnified from and against all reasonable claims, demands, liabilities, costs, charges, damages, losses, expenses and consequences of whatever nature which may be brought or preferred against you or that you may suffer, incur or sustain by reason or on account of your having so acted wholly or in part in accordance with such Instructions;

b) agree, in the absence of wilful misfeasance, fraud, bad faith, negligence or reckless disregard, not to make any claim against you by reason of or on account of your having so acted wholly or in part in accordance with such Instructions;

c) confirm that such Instructions, if accepted by you, result in agreements which are binding upon us;

d) agree that you may debit any Deposit Account in our name with any sums payable by us as a result of such Instructions, and

e) agree that we will immediately send you written confirmation of any such Instructions.



Yours faithfully,

REDACTED WITH REDACT-IT



## SCHEDULE THREE

## ONLINE ACCESS AGREEMENT

**THIS AGREEMENT** is made this 29th day of April 2005

between

**Citco Bank Nederland N.V. Dublin Branch**               and

address: Custom House Plaza Block 6                    address:
         International Financial Services Centre
         Dublin 1
         Ireland

phone  :  ██████████              phone  :
fax      :                                     fax      :

referred to herein as "Bank"              referred to herein as "Customer"

**Operative provision:**

All the terms of the Brokerage and Custody Agreement shall apply to and form part of this Online Access Agreement as if the same were set out in extenso herein. In the event of a conflict between the conditions contained in the Brokerage and Custody Agreement and the conditions contained in the Online Access Agreement, the conditions contained in this Online Access Agreement shall prevail.

**WHEREAS:**

(A)  The Customer desires to access and use the Citco Funds Net on the Internet at www.citcofunds.net ("CFN") to receive information on Securities (the "Online Inquiry Services"); and

(B)  The Bank is willing to provide such information through CFN on the terms and conditions set forth herein.

**NOW IT IS HEREBY AGREED** as follows:

1.  <u>Right to Access</u>.  The Bank hereby grants Customer the right to access and use CFN in accordance with the terms and conditions of this Agreement to perform the Online Inquiry Services.

2.  <u>Authorised Persons</u>.  Customer will select persons authorised to use the Online Inquiry Services on its behalf ("Authorised Persons") and identify such persons to the Bank. The Bank will assign an identifier and password to each such Authorised Person. The Bank will take all reasonable security measures, including means within CFN to limit access to Online Inquiry Services only to Authorised Persons. Customer and Authorised Persons will maintain such identifiers and passwords in confidence. Customer will familiarise Authorised Persons with all of Customer's obligations under the Online Access Agreement. If any third party shall access Customer's account through CFN using the identifier and password of an Authorised Person, Customer will indemnify and hold harmless the Bank against any liability, costs or damages arising out of claims by Customer or such third parties based upon or relating to such access.

3.  <u>Confidentiality and Ownership</u>.  Customer acknowledges that all information on CFN, including but not limited to databases thereon, and the selection, co-ordination, and arrangement of the contents thereof (collectively, the "Information"), are trade secrets, proprietary to the Bank. Customer agrees to keep such Information confidential and to utilise such Information solely for its own trading activities. Customer further agrees to take or cause to be taken all reasonable precautions to maintain the secrecy and confidentiality of such Information. Customer shall not disclose, and shall use reasonable efforts not to permit the disclosure of, any part of such Information to any other person. Customer w[ ] not use or permit the use of CFN or any of the Information for any illegal purpose. Customer further acknowledges th[ ]

REDACTED WITH REDACT-IT



CFN and all intellectual property rights therein, including the Information, are the property of the Bank, and that Customer will have no right to reproduce, sell, license, or distribute any Information or any portion of CFN without the prior approval thereof by the Bank.

4.  **Website System Changes.** Customer acknowledges and agrees that, without prior notice and without the advice to or consent of Customer, the form and content of any display on CFN may be modified at any time and in any way, including terminating any information or service provided thereon.

5.  **No Online Investment Advice.** Customer understands that the information available on CFN is not investment advice of any kind, nor does CFN purport to offer any opinion with respect to the nature, potential value or suitability of any particular Securities transaction or investment strategy.

6.  **Internet-Related Difficulties.** Customer shall indemnify and hold the Bank harmless from and against all claims, demands, liabilities, costs, charges, damages, losses, expenses and consequences of whatever nature that may be brought or preferred against the Bank or that may be suffered, incurred or sustained by the Bank by reason or on account of equipment failure, communication line failure, system failure, security failure on the Internet, unauthorised access, or theft, or any problem, technological or otherwise, that might prevent Customer from accessing CFN.

7.  **DISCLAIMER.** ALL INFORMATION PROVIDED ON CFN IS "AS IS," WITHOUT WARRANTIES, CONDITIONS, OR REPRESENTATIONS OF ANY KIND, INCLUDING WARRANTIES OF NON-INFRINGEMENT, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. CUSTOMER ACKNOWLEDGES AND AGREES THAT THERE IS NO ASSURANCE THAT INFORMATION ON CFN IS TIMELY, ACCURATE OR COMPLETE. IN PARTICULAR, CUSTOMER UNDERSTANDS THAT THE BANK DEPENDS ON THE SELLERS OF NON-READILY MARKETABLE SECURITIES FOR MOST OR ALL OF THE INFORMATION CONCERNING THOSE SECURITIES. THUS EVEN THOUGH BANK WILL USE REASONABLE EFFORTS TO KEEP SUCH INFORMATION TIMELY ONLINE, CUSTOMER UNDERSTANDS THAT THERE WILL BE A DELAY BETWEEN THE TIME THAT THE BANK RECEIVES CHANGES TO THIS INFORMATION AND THE CORRESPONDING CHANGE TO THE INFORMATION ON CFN, AND THAT THE BANK DOES NOT VERIFY THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION. IN NO EVENT SHALL THE BANK BE LIABLE FOR INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES, INCLUDING, BUT NOT LIMITED TO, LOST DATA OR LOST PROFITS, EVEN IF IT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, ARISING OUT OF OR RELATING TO THIS AGREEMENT.

8.  **Amendments.** Any provision of this Agreement may be amended only, if such amendment is in writing and signed by both the Bank and the Customer.

9.  **Governing Law and Jurisdiction.** This Agreement shall be governed by the laws of the Netherlands. The exclusive place of jurisdiction shall be Amsterdam, The Netherlands.

**IN WITNESS WHEREOF** the parties hereto have executed this Agreement the day and year first above written.



**CITCO BANK NEDERLAND N.V.**
**DUBLIN BRANCH**



## SCHEDULE FOUR

LIST OF SUB-CUSTODIANS PRESENTLY USED BY THE BANK AND/OR CUSTODIAN

| Sub-custodians for Citco Bank Nederland N.V. - Dublin Branch | Market/Security Type |
|---|---|
| Brown Brothers Harriman | US domiciled securities |
| Clearstream | Depository restrictions |
| Euroclear | Depository restrictions |
| CDC Ixis | French local market |
| State Street Bank Frankfurt | German local market |
| HSBC Republic London (Midland) | UK local market (Crest settlement) |
| KBC Belgium | Belgian local market |
| Kas Bank N.V. | Dutch local market/Global brokerage & settlement services |
| Den Norske Bank a/c 7261 | Norwegian local market |
| Danske Bank A/S | Danish local market |
| BMO Nesbitt Burns | Canadian local market |
| Nordea Finland | Finland local market |
| SEB Banken | Sweden local market |

REDACTED WITH REDACT-IT

**EXHIBIT I**

CITCO

Citco Bank Nederland N.V.

**Dated: February 3, 2000**

and

**CITCO BANK NEDERLAND N.V.**

and

**CITCO GLOBAL CUSTODY N.V.**

---

**BROKERAGE
AND
CUSTODY AGREEMENT**

---

**CITCO BANK NEDERLAND N.V.**
**World Trade Centre**
**Tower B, 16th Floor**
**Strawinskylaan 1629**
**1077 XX Amsterdam**
**The Netherlands**

REDACTED WITH REDACT-IT



**THIS AGREEMENT** is made this 3rd day of February 2000

**BETWEEN:**

("the Customer")

**AND:**     **CITCO BANK NEDERLAND N.V.**
World Trade Centre
Tower B, 16th Floor
Strawinskylaan 1629
1077 XX Amsterdam
The Netherlands           ("the Bank")

**AND:**     **CITCO GLOBAL CUSTODY N.V.**
World Trade Centre
Tower B, 16th Floor
Strawinskylaan 1629
1077 XX Amsterdam
The Netherlands           ("the Custodian")

**WHEREAS:**

(A)    The Customer wishes to be provided with brokerage and custody services and the Bank and the Custodian are willing to provide such brokerage and custody services to the Customer on the terms and subject to the conditions contained in this Agreement.

(B)    The Customer has opened and currently maintains a bank account(s) with the Bank.

**NOW IT IS HEREBY AGREED** as follows:

**1**      **Interpretation**

     1.1     Unless the context otherwise requires:

     "**Account**" means the bank account(s) held by the Customer with the Bank.

     "**Agreement**" means this Brokerage and Custody Agreement.

     "**Brokerage Services**" shall include (i) the effecting of transactions of and/or relating to the purchase and sale of and dealing in Securities in the name and for the account of the Customer; (ii) the effecting of transactions of and/or relating to the purchase and sale of and dealing in Securities in the name of the

REDACTED WITH REDACT-IT



Bank, or of the Custodian, or any nominee for the account of the Customer; and (iii) any services ancillary thereto as set out in this Agreement.

"**Instructions**" means instructions provided from time to time to the Bank and/or to the Custodian by the Customer or by such persons as the Customer has authorised to give Instructions, as more particularly described in Clause 14 hereof, in respect of the services and duties performed by the Bank and/or the Custodian pursuant to this Agreement.

"**Readily Marketable Securities**" means shares, units, bonds, futures contracts, currencies, money instruments, options, commodities, any derivative instruments based on the foregoing and any other financial instruments and other assets or property which are freely and publicly traded on a daily basis on a stock exchange or other exchange or recognised market place, and in respect of which the Bank and/or the Custodian agree to provide Brokerage Services and/or other services pursuant to the Agreement.

"**Non-Readily Marketable Securities**" means shares, units, bonds, futures contracts, currencies, money instruments, options, commodities, any derivative instruments based on the foregoing and any other financial instruments and other assets or property, including shares, units or other financial instruments of any unlisted collective investment schemes, for which there is no publicly available market or which are not freely or publicly traded on a daily basis on a stock exchange or other exchange or recognised market place, and in respect of which the Bank and/or the Custodian agree to provide Brokerage Services and/or other services pursuant to this Agreement.

"**Securities**" means, where the context so admits, both Readily Marketable Securities and Non-Readily Marketable Securities.

"**Service Level Agreement**" means any agreement between the Bank and the Customer from time to in force for the service level specified in such agreement and which is expressed to be a Service Level Agreement. Reference herein to the Brokerage and Custody Agreement shall (where the context so permits) be construed as including a reference to any such Service Level Agreement, a draft of which is set out in Schedule Three to this Agreement.

1.2    References herein to Clauses are references to clauses of this Agreement. Headings are inserted for convenience only and shall not be used in construing this Agreement.

## PART 1 - BROKERAGE SERVICES

**2       Appointment and Performance of Brokerage Services**

2.1    The Customer hereby appoints and authorises the Bank to provide Brokerage Services on behalf of the Customer which appointment and authorisation are hereby accepted by the Bank, subject to the terms and conditions of this Agreement.

2.2    The Bank shall, on Instructions of the Customer and on the basis of this Agreement, provide Brokerage Services to the Customer. The Customer hereby authorises the Bank to comply with any Instructions given or purported to be given by the Customer and the Bank shall be entitled to act for the Customer upon any such Instructions.

2.3    The Customer will provide the Bank with Instructions in respect of all transactions in Securities to be performed by the Bank on the Customer's behalf as follows:

2.3.1    for transactions in Readily Marketable Securities, Instructions must be provided to the Bank at least 90 minutes before the dealing deadline for such transactions. Instructions received thereafter will be executed on a best effort basis.

2.3.2    for transactions in Non-Readily Marketable Securities, Instructions must be provided to the Bank at least two clear business days prior to the trade date for the applicable transaction in the Non- Readily Marketable Security.

REDACTED WITH REDACT-IT



2.3.3    for transactions in Non-Readily Marketable Securities, Instructions received by the Bank with less than two clear business days prior to the trade date, will be performed on a best efforts basis.

2.3.4    for transactions in Non-Readily Marketable Securities, which require a prescribed notice period, Instructions received by the Bank with less than two clear business days prior to the notice period date, will be performed on a best efforts basis.

The Bank shall perform all such Instructions which are so given by the Customer provided that sufficient funds or Securities, as applicable, are at the relevant time held by the Bank or by the Custodian or other nominee on behalf of the Customer, or the Customer has made other arrangements for settlement, such arrangements being satisfactory to the Bank.

2.4    The Bank may in its absolute discretion refuse to execute any Instruction given by or on behalf of the Customer and shall use reasonable endeavours to notify the Customer forthwith of any such decision.

2.5    The Customer understands and agrees that:

2.5.1    the Bank shall effect settlement of rights and/or obligations resulting from transactions effected pursuant to the Brokerage Services, such as but not limited to settlement of and payment for and delivery of Securities, in accordance with the laws, regulations and market practices in the jurisdictions in which the transactions occur- and/or in accordance with the terms of the transactions effected hereby;

2.5.2    any losses resulting from the market's failure to settle any transaction to the entire satisfaction of the Bank will be borne solely by the Customer; and

2.5.3    the Bank, in its absolute discretion, may refuse to effect the settlement of and payment for Securities when there are insufficient immediately available moneys recorded as standing to the credit of the Account.

2.6    The Bank hereby agrees to credit the Account or such other account to be agreed from time to time in the event that the Bank receives any dividend and/or interest entitlements on Securities held by or on behalf of the Customer or its nominee/custodian.

2.7    The Bank shall only make delivery of cash and/or any of the property of the Customer:

2.7.1    in the course of settlement of transactions notified to the Bank;

2.7.2    on the Instructions of the Customer;

2.7.3    pursuant to any security and/or pledge arrangement agreed hereunder or otherwise between the Customer and the Bank.

2.8    In executing Instructions for the Brokerage Services, the Bank shall be entitled at its option, to deal with itself or with third parties as the other party. Notwithstanding the provisions of Clause 10 hereof, the Bank shall not be liable for any shortcomings of such third parties if it has exercised due care in selecting these third parties.

2.9    The Customer shall be solely responsible for compliance with any investment policies, guidelines, restrictions on ownership or other restrictions whatsoever in relation to Securities, which may from time to time be binding on the Customer and/or the Bank when providing Brokerage Services. The Bank shall at no time be responsible for monitoring the aforementioned investment policies, guidelines or other restrictions.

2.10    The Customer confirms that the Bank's obligations under Part I of this Agreement relate solely to the Brokerage Services and that the Bank is under no obligation to advise the Customer in respect of the suitability of investments and related activities connected to the Brokerage Services.



CITCO

*Citco Bank Nederland N.V.*

**3    Contract Notes and Other Statements**

3.1    The Bank shall send to the Customer a contract note in respect of each executed order.

3.2    The Bank shall send to the Customer, whenever appropriate, a confirmation note in respect of any other services rendered to the Customer.

3.3    A contract note (or a confirmation note) shall, in the absence of manifest error, be conclusive and deemed acknowledged by the Customer as correct, unless the Bank receives written notice to the contrary within two business days of delivery of the contract note (or confirmation note) or the Bank notifies the Customer of an error therein within the same period.

3.4    The Bank shall send to the customer a monthly statement in respect of each account of the Customer within 15 business days after the end of each such monthly period, unless no transactions have taken place during such period. The Bank shall in any event send to the Customer such a statement once a year.

3.5    The Bank shall make available to the Customer and its auditors all such information, records and statements as they may reasonably require to the extent that the same relate to the Customer at all reasonable times and on reasonable notice.

## PART II - CUSTODIAN SERVICES

**4    Appointment of Bank and Custodian**

4.1    The Customer hereby appoints the Custodian as custodian of the Customer on the terms and subject to the conditions hereof, which appointment is hereby accepted by the Custodian.

4.2    The Bank and Custodian agree to provide the services herein set out, subject to the provisions of this Agreement.

**5    Appointment of Sub-Custodians**

5.1    In the performance of their duties under this Part II of the Agreement, the Bank and/or Custodian may act through agents, sub-custodians or any other third party which the Bank and/or Custodian may, in their absolute discretion, deem necessary. The Bank and/or Custodian are hereby authorised by the Customer to enter into further agreements for the appointment of the aforementioned agents, sub-custodians and/or third parties.

5.2    The Bank and/or Custodian shall not be responsible for any act or omission or for the solvency of any sub-custodian, agent or third party appointed pursuant to Clause 5.1 hereof, provided that the Bank or Custodian can demonstrate that due care was taken in the selection of any such sub-custodian, agent or third party.

**6    Duties of the Customer**

6.1    Subject to the provisions of, and in addition to any of the services provided by the Bank pursuant to Clause 2 of this Agreement, the Customer shall deliver or cause to be delivered to the Custodian from time to time the following:

6.1.1    Securities which the Customer now owns or may hereafter acquire, and of which the Custodian agrees to retain custody.

6.1.2    any other property or assets of the Customer of which the Custodian, in its absolute discretion, may agree to accept custody.

REDACTED WITH REDACT-IT



6.1.3    The Customer acknowledges that there may be significant delays in the registration or re-registration in the name of the Custodian, or in the name of any sub-custodian or nominee, of Non-Readily Marketable Securities, which have been delivered to the Bank pursuant to Clause 6.1 hereof. In the absence of any negligence or undue delay on the part of the Bank and/or the Custodian, neither the Bank nor the Custodian shall be under any obligation to execute any instructions by the Customer in respect of such Non-Readily Marketable Securities until registration or re-registration in the name of the Custodian or in the name of any sub-custodian or nominee is completed.

6.2    The Customer shall timely and accurately give Instructions to the Bank or procure that the Bank will be given timely and accurate Instructions of all transactions which involve the Bank and/or Custodian.

6.3    The Customer shall be solely responsible for compliance with any investment policies, guidelines, restrictions on ownership or other restrictions whatsoever in relation to Securities, which may from time to time be binding on the Customer and/or the Bank and/or the Custodian when providing Custodian Services. The Bank shall at no time be responsible for monitoring the aforementioned investment policies, guidelines or other restrictions.

**7    Powers and Duties of the Bank and Custodian**

7.1    The Bank and Custodian shall have and perform the following powers and duties and such other powers and duties as the parties shall from time to time agree:

7.1.1    to register the Securities, other than physically held bearer shares, in the name of the Custodian or any sub-custodian and to keep the Securities in the custody of the Custodian or procure that they are kept in the custody of any sub-custodian, provided however that, if instructed to do so by the Customer, the Bank and/or Custodian may deposit any of the Securities in a depository or clearing system;

7.1.2    to deposit in the Account all moneys received from or for the account of the Customer;

7.1.3    when instructed to do so by the Customer and subject to the provisions of Clause 6.2, to make settlement of transactions undertaken by or for the account of the Customer, delivering or receiving the Securities or other assets of the Customer and making or receiving payments for the account of the Customer. The Bank and/or Custodian are not obliged to deliver securities or assets which cannot be covered by securities or assets which they hold for the Customer or to make any payments other than from the Account;

7.1.4    to collect and deposit in the Account all income and other payments in connection with the Securities;

7.1.5    unless instructed to do so by the Customer, the Bank, Custodian and/or any sub-custodian shall not vote on or in respect of the Securities or deliver any executed form of proxy to vote thereon or in respect thereof;

7.1.6    to employ any legal, financial or other experts which the Bank and/or Custodian deem necessary to comply with their duties and obligations under this Agreement the costs of which will be reimbursed to the Bank and/or Custodian by the Customer;

7.1.7    when instructed to do so by or on behalf of the Customer, to remit money to banks or others for the account of the Customer and to pay or procure the payment of any invoices or other financial obligations of the Customer;

7.1.8    to deliver and surrender any bonds or other instruments as and when the same fall due for payment or repayment and to pay all calls and debit the accounts of the Customer accordingly and to effect all necessary or appropriate exchanges of bonds or other instruments;

REDACTED WITH REDACT-IT



CITCO
*Citco Bank Nederland N.V.*

7.1.9    to deliver to the Customer all forms of proxy and all notices of meetings and any other notices or announcements in connection with the Securities;

7.2    The Securities held at any one time by the Custodian or any sub-custodian shall be recorded in and ascertainable from the books and/or ledgers of the Bank and the Custodian and such books and ledgers shall constitute conclusive evidence of the Securities retained on behalf of the Customer.

7.3    The Customer recognises that in certain circumstances in order to preserve or safeguard the Securities or other assets of the Customer, the Bank and/or Custodian may be required to act without first obtaining instructions from the Customer. In such cases, the Bank and/or Custodian may act at their own absolute and unfettered discretion and shall not be liable, in the absence of gross negligence or fraud, for any loss to the Customer whatsoever.

## PART III - GENERAL PROVISIONS

**8    Payment for Securities**

8.1    All Securities, which have been purchased for the Customer by the Bank, will be transferred to the Custodian, or to any sub-custodian or nominee, as custodian, or registered in the name of the Custodian or a sub-custodian or nominee, as the case may be. Such transfer and registration will be subject, however, to payment in full of all moneys due in connection with such purchase (including, for the avoidance of doubt, the gross purchase price). If such indebtedness is not satisfied by the Customer within 5 days of the date the same became due, such Securities will not be transferred to nor held by the Custodian on behalf of the Customer, but will be freely available to the Bank.

8.2    If, pursuant to Clause 8.1 hereof, the Securities will not be transferred to or held by the Custodian on behalf of the Customer, the Customer is not released from his obligation to pay the Bank. Such payment obligations will be reduced to the extent that the net proceeds of the sale of such Securities are available to the Bank.

8.3    The Custodian will be under no obligation whatsoever vis-à-vis the Customer in connection with Securities referred to above unless and until the Customer has satisfied its payment obligations vis-à-vis the Bank in full.

**9    Representations and Warranties of the Customer**

9.1    The Customer represents and warrants to the Bank and to the Custodian that it will at all times have full power and authority (corporate and otherwise) to enter into this Agreement and to exercise its rights and perform its obligations under the terms and conditions of this Agreement and any contract in connection therewith or pursuant thereto, and that it has obtained and will maintain all authorisations and consents necessary for it so to enter, exercise rights and perform such obligations, and that such authorisations and consents are and will at all times be in full force and effect. The Customer will forthwith upon demand by the Bank from time to time deliver such evidence of such authorisations and consents and compliance therewith as the Bank may reasonably require.

9.2    The Customer furthermore represents and warrants to the Bank that it has full power and authority (i) to authorise third parties to give instructions on behalf of the Customer or its nominee/custodian, and (ii) to perform all its obligations hereunder.

9.3    The Customer hereby expressly declares that it is aware of and that it accepts the investment risks attached to Securities and the consequences entailed by the provision of Brokerage Services.

**10    Liability and Indemnification of Bank and Custodian**

10.1    The Customer shall bear all risks of investing in Securities or holding cash denominated in a particular currency and the Customer hereby agrees to be solely responsible for any losses resulting from any

REDACTED WITH REDACT-IT



transactions in Securities or cash in any currency in connection with transactions effected through the Bank.

10.2    The Bank and Custodian hereby agree to use their best efforts and judgement and due care in performing their obligations and duties pursuant to this Agreement; provided however that the Bank, Custodian, their directors, officers, employees and/or agents shall not be liable for any action taken or failure to act in the course of performing the services hereunder or for any loss suffered by the Customer in connection with the subject matter of this Agreement unless such loss arises from wilful misfeasance, bad faith or gross negligence in the performance of the Bank's and/or Custodian's obligations and duties or by reason of the Bank's and/or Custodian's reckless disregard of their obligations and duties hereunder.

10.3    In the absence of wilful default or gross negligence, the Bank and/or Custodian shall not be liable for any shortfall in the number of securities held by the Custodian on behalf of the Customer.

10.4    In particular, in the absence of wilful default or gross negligence, the Bank and/or Custodian shall not be liable for any losses which may arise howsoever as a result of any of the prices or values for any of the Securities which are provided to or obtained by the Bank and/or Custodian being provisional, inaccurate, false or misleading.

10.5    In the event of any loss to the Customer by reason of the failure of the Bank or the Custodian to utilise reasonable care (including but not limited to, in connection with the Bank and the Custodian acting in accordance with Instructions received from the Customer) the Bank and the Custodian shall be liable to the Customer only to the extent of the Customer's direct damages, to be determined based on the market value of the Securities or other property which is the subject of the loss at the date of discovery of such loss in case of Readily Marketable Securities and in case of Non-Readily Marketable Securities at the next possible subscription day and without reference to any special conditions or circumstances. The Bank and the Custodian shall have no liability whatsoever for any consequential, special, indirect or speculative loss or damages (including, but not limited to, lost profits) suffered by the Customer in connection with the transactions contemplated hereby and the relationship established hereby even if the Bank or the Custodian has been advised as to the possibility of the same and regardless of the form of the action.

10.6    The Bank and Custodian shall be without liability to, and shall be indemnified by, the Customer for any action taken or omitted by them, whether pursuant to Instructions or otherwise, within the scope hereof if such act or omission was in good faith, without negligence. In performing their obligations hereunder, the Bank and Custodian may rely on the genuineness of any document, which it believes in good faith to have been validly executed by or on behalf of the Customer.

10.7    The Customer shall pay for and hold the Bank and the Custodian harmless from any liability or loss resulting from the imposition or assessment of any taxes or other governmental charges, and any related expenses with respect to any transactions in or income from Securities.

10.8    Without limiting the foregoing, the Bank and the Custodian shall not be liable for any loss which results from: (i) the general risk of investing, or (ii) investing or holding Securities in a particular country including, but not limited to, losses resulting from malfunction, interruption of or error in the transmission of information caused by any machines or system or interruption of communication facilities, abnormal operating conditions, nationalisation, expropriation or other governmental actions, regulation of the banking or securities industry, currency restrictions, devaluations or fluctuations, and market conditions which prevent the orderly execution of Securities transactions or affect the value of the Securities

10.9    The Customer shall indemnify and hold harmless the Bank and the Custodian, their directors, officers, employees and agents from and against any losses, expenses, liabilities, obligations, damages, penalties, judgements, actions, suits, taxation or costs howsoever imposed on, asserted against or incurred by them in the performance of the Bank's and Custodian's obligations and duties hereunder; provided, however, that none of them shall be indemnified for their fraud, gross negligence or wilful misconduct.



10.10    In the event that any document of title relating to a security is lost, the Bank or Custodian shall use reasonable endeavours to obtain a duplicate copy if such a duplicate copy is available. When the person or body issuing such a duplicate copy requires an indemnity, the Customer agrees to provide to the Bank or Custodian such counter-indemnity as the Bank or Custodian may require.

## 11    Fees and Expenses

11.1    In consideration of the services of the Bank and Custodian hereunder the Customer shall pay to the Bank the fees and expenses as set out in Schedule One hereto.

11.2    The Bank shall be entitled to charge to the Customer the fees of all sub-custodians, agents and third parties appointed by the Bank and/or Custodian pursuant to clause 5 hereof together with all other reasonable costs, expenses and disbursements incurred by the Bank and/or Custodian under this Agreement. All transaction fees payable to the Bank shall be in the currency of the executed transaction.

11.3    All other fees payable to the Bank by the Customer shall be paid in US dollars.

11.4    The Customer hereby authorises the Bank to debit from the Account all amounts due to the Bank pursuant to this Agreement.

11.5    In the event of any dispute as to any amounts payable to the Bank under this clause, an excerpt from the Bank's records signed by the Bank shall serve as prima facie evidence of any amounts due subject to rebuttal evidence produced by the Customer.

## 12    Non-Exclusivity

12.1    The provision of services by the Bank and the Custodian hereunder shall not preclude the Bank and the Custodian from providing similar services to any other third party and the Customer hereby agrees that the Bank will not be liable to account to the Customer for any profit earned from such third party transactions or by such third party.

12.2    Without prejudice to the generality of Clause 12.1 hereof, the Customer agrees that the Bank may match any transactions made on behalf of the Customer with those made by the Bank on behalf of itself or on behalf of any third party.

## 13    Confidentiality

Unless under a legal, regulatory or generally accepted obligation to do so, no party shall divulge or communicate to any person not authorised by any other to receive the same, with the exception of its advisers and accountants, any confidential information of any other party of which it is or shall hereafter become possessed, relating to the Securities or to the business of such other party.

## 14    Instructions

14.1    Receipt of Instructions by the Bank and/or Custodian from the Customer may be deemed by the Bank and/or Custodian to be proper and authorised Instructions in respect of any of their obligations and duties hereunder.

14.2    A signed copy of a power of attorney executed by the authorised representative of the Customer authorising a third party to give Instructions to the Bank and/or Custodian may be accepted by the Bank or Custodian as conclusive evidence of the authority of such a person to so act on behalf of the Customer. The Customer shall deliver or cause to be delivered to the Bank or Custodian a certified copy of the signature of any person authorised to act as aforesaid.

14.3    Instructions by or on behalf of the Customer shall be conveyed to the Bank or Custodian by the following methods only:

14.3.1    registered or recorded delivery mail, tested telex or authenticated SWIFT transmission;



14.3.2    telephone, or facsimile provided that the Customer has entered into an undertaking in the form as set out in Schedule Two hereof.

14.3.3    provided that the Customer has entered into an Online Access Agreement in the form set out in Schedule Four hereof, by electronic transmission through CFN (as defined in the Online Access Agreement) pursuant to the terms thereof.

14.4    The Bank and/or Custodian shall not be liable for any loss arising from:

14.4.1    non-delivery or delay of mail;

14.4.2    non-delivery or mistaken or incomplete transmission of tested telex, facsimile, electronic transmission or authenticated SWIFT transmission;

14.4.3    misunderstanding or misinterpretation of instructions provided by telephone.

14.5    Neither the Bank nor Custodian is obliged to enquire into the validity, genuineness or accuracy of any Instruction properly received from the Customer.

## 15    Service Level Agreement

The Bank and the Customer agree, within 7 days of the execution of this Agreement (or within such further period as may be agreed between the parties), to enter into an agreement in the same terms or substantially the same terms as the Service Level Agreement.

## 16    Termination

16.1    This Agreement shall continue in full force and effect until terminated by any party giving fourteen days' prior written notice to the others.

16.2    Any party hereto may terminate this Agreement forthwith by notice to the others if any party or parties shall have committed a breach of this Agreement, which is not remedied within seven days after notification thereof to such party or parties in breach.

16.3    If the Bank and/or Custodian are of the opinion that there has been a breach of any of the terms of this Agreement by the Customer, the Bank and/or Custodian may suspend their duties and obligations hereunder until the aforementioned breach has been remedied by the Customer.

16.4    On the termination of this Agreement howsoever occasioned the Bank and Custodian shall forthwith deliver up to the Customer all Securities and documents of title thereto in their possession or control pursuant to this Agreement save that they shall not be required to make such delivery until full payment has been made by the Customer to the Bank of all amounts due in respect of transactions which have not been settled at the date of termination and until full payment has been made for all outstanding fees and expenses due to the Bank and Custodian for services provided under the terms of this Agreement.

## 17    Assignment

Neither the benefit nor burden of this Agreement may be assigned by any party save with the prior written consent of the others.

## 18    Notice

18.1    Any notice given under this Agreement shall be served:

18.1.1    by registered or recorded delivery mail, tested telex, or authenticated SWIFT transmission;

18.1.2    by facsimile transmission.



  18.1.3  by any other means which one party specifies by notice to the other.

18.2  Each party's address for the service of notice shall be the above mentioned address or such other address as one party specifies by notice to the others.

18.3  A notice shall be deemed to have been given:

  18.3.1  if it was served by post, upon receipt by the party to whom addressed;

  18.3.2  if it was served in person, at the time of service;

  18.3.3  if it was served by tested telex, or by authenticated SWIFT or facsimile transmission, at the time of receipt by the party to whom addressed.

## 19  Alteration of Provisions

19.1  No variation, amendment, discharge, waiver or discontinuance of any of the provisions of this Agreement by the Customer shall be valid unless in writing and signed by the Bank or Custodian.

19.2  The Bank or Custodian may amend or vary any provision of this agreement by giving one week's notice to the Customer prior to the date that the variation or amendment is to take effect.

## 20  Incorporation General Conditions and Schedules

The General Conditions of the Bank regulating the relationship between the Customer and the Bank as filed by the Netherlands Bankers' Association at the Registrar's Office of the Amsterdam District Court on December 22, 1995, as amended from time to time, shall apply correspondingly to the relationship between the Customer and the Bank and Custodian insofar as they do not differ from the terms of this Agreement.

## 21  Governing Law and Jurisdiction

21.1  This Agreement shall be governed by and construed in accordance with the laws of The Netherlands.

21.2  All parties agree that the courts of The Netherlands are to have jurisdiction to settle any disputes which may arise out of or in connection with this Agreement and that accordingly any suit, action or proceeding arising out of or in connection with this Agreement may be brought in such courts. Except as expressly provided in clause 21.3, any proceedings or claims brought by the Customer against the Bank and/or the Custodian and/or their affiliates, arising out of or related to this Agreement or to the Brokerage Services shall be brought exclusively in Amsterdam, The Netherlands.

21.3  Subject to the rules of the respective committees, the Customer retains the right to bring any disputes before the *Klachtencommissie Beursbedrijf* (Committees of Good Offices for the Amsterdam Stock Exchange Business).

21.4  Nothing in this Clause 21 shall limit the right of the Bank and/or Custodian to take proceedings against the Customer in any other court of competent jurisdiction, nor shall the taking of proceedings by the Bank and/or the Custodian in one or more jurisdictions preclude the taking of proceedings in any other jurisdiction, whether concurrently or not.

REDACTED WITH REDACT-IT



**CITCO**

*Citco Bank Nederland N.V.*

**IN WITNESS WHEREOF** the parties hereto have executed this Agreement the day and year first above written.



**CITCO BANK NEDERLAND N.V.**           **CITCO GLOBAL CUSTODY N.V.**

REDACTED WITH REDACT-IT

CITCO

*Citco Bank Nederland N.V.*

### SCHEDULE ONE

### FEES AND EXPENSES

**Custody fee**
Custody fees will be charged quarterly at a rate of 0.08% (8 basis points) per annum of the average holdings over the preceding three months.

**Transaction fee**
A transaction fee of ¼ % of the value of each transaction will be charged, with a minimum of US$ 100.00, and a maximum of US$ 1,500.00.

**Transfer fee**
For a delivery of securities free of payment to another bank or custodian a fee of US$ 75.00 will be charged.

**Dividend / distribution fee**
Dividend commission will be charged on payments by the Bank of dividends or distributions received on behalf of the Customer at a rate of ¾ % of the gross amount of the dividend or distribution, with a minimum of US$ 2.50 and a maximum of US$ 100.00 per dividend or distribution payment made.

**Conversion charges**
Where the Customer switches a position of shares within the same group of funds, a transaction fee of ¼ % with the above minimum and maximum will be charged for either the sale or the purchase but not for both transactions.

**Cancellation fee**
In case a transaction or a transfer instruction is cancelled a flat fee of US$ 100.00 will be charged

**Direction fee**
Where the Customer instructs the Bank to execute a transaction through one of the Customer's own correspondents instead of via the Bank's normal channels, an additional fee of USD 150.00 per item will be charged.

**Disbursements**
All disbursements and out-of-pocket expenses will be charged separately to the account of the Customer.

**Rebates of Front-load fees**
For the purposes of this paragraph:
*"Arrangement"* shall mean an agreement with a Fund pursuant to which the Customer or the Custodian (as applicable) receives rebates of Front Load Fees;
*"Fund"* shall mean a mutual fund, which issues Securities held in the Account
The Custodian agrees to pay to the Customer on a transaction basis:
- 100% of the rebate on the Front Load Fee received from a Fund with which the Customer has an Arrangement; and
- 75% of the rebate on the Front Load Fee received from a Fund with which the Customer has no Arrangement and where the Custodian has negotiated an Arrangement.

The Customer agrees to notify the Custodian from time to time of the existence of an Arrangement between the Customer and a Fund.



## SCHEDULE TWO

**Citco Bank Nederland N.V.**
World Trade Centre
Tower B, 16th Floor
Strawinskylaan 1629
1077 XX Amsterdam
The Netherlands

February 3, 2000

### INSTRUCTIONS BY FACSIMILE

In consideration of your agreeing as per our request to act upon Facsimile Instructions, CITCO is expressly authorized to carry out such instructions provided that any Facsimile Instruction bears two signatures that CITCO believes in good faith to have been given by two Authorized Persons, as regulated in our "List of authorized signatures". We represent and warrant that the transmission of Facsimile Instructions do not contravene to any provision of our Bylaws and organic documents, law and regulation applying to us. We understand that CITCO will not be responsible to carry out any further verification of any Facsimile Instruction.

We therefore agree to indemnify CITCO and hold CITCO harmless from any loss or liability (including without limitation reasonable attorney's fees) incurred by CITCO arising out of the invalidity for whatsoever reason of any Facsimile Instruction which bears the signatures mentioned above. CITCO will not carry out the requested operation if the Facsimile Instructions are unclear and when the Facsimile Instructions are not duly undersigned as provided herein. CITCO assumes no liability or responsibility for the consequences arising out of a delay and/or loss in transit of any Facsimile Instruction, or for delay, mutilations or other errors arising in the transmission of any Facsimile Instruction.

We understand that, except otherwise expressly requested by CITCO, it shall not be necessary to confirm a Facsimile Instruction by means of a written Authorized Instruction.

Very truly yours



# SCHEDULE THREE

SERVICE LEVEL AGREEMENT

**THIS AGREEMENT** is made this 3rd day of February 2000

between

**Citco Bank Nederland N.V.**                    and

  address:  World Trade Center                           address:
            Tower B, 16th floor
            Strawinskylaan 1629
            P.O.Box 7241
            1000 JE Amsterdam

  phone   :  ████████████            phone   :
  fax     :  ████████████            fax     :
  Swift   :  ████████████            Swift   :

referred to herein as "Bank"                    referred to herein as " Customer"

**Operative provision:**

   All the terms of the Brokerage and Custody Agreement shall apply to and form part of this Service Level Agreement as if the same were set out in extenso herein. In the event of a conflict between the conditions contained in the Brokerage and Custody Agreement and the conditions contained in the Service Level Agreement the conditions contained in this Service Level Agreement shall prevail.

1   **Trading**

   1.1   Orders

         Orders to *buy/subscribe* or *sell/redeem* are sent by the Customer to the Bank in accordance with clause 14.3 of the Brokerage and Custody Agreement. The Customer will supply following information for each trade:

         1/ Full name of Fund
         2/ Security identification (ISIN, SSN, Cusip or Telekurs symbol)
         3/ *Subscription/purchase* or *Redemption/sale*
         4/ Customer reference no. (if any)
         5/ Quantity of shares or currency and amount
         6/ Cash- or Reinvest option (if nothing is mentioned the Cash option prevails)

         The Bank will place the trade in accordance with clause 2.3 of the Brokerage and Custody Agreement.

   1.2   Order confirmations / Pre-Advice

         The Bank issues an order-confirmation by Fax/Swift MT 509 (Trade Status Message) within 24 hours upon having received the order, which will include following information:

         1/ Full name of Fund
         2/ Fund's reference (if appropriate)
         3/ Bank's reference

CITCO

*Citco Bank Nederland N.V.*

4/ Securities n/c
5/ Securities Identification
6/ Amount/currency/approx. no. of shares
7/ Expected trade date *
8/ Expected settlement date by the Bank (final booking)*

**\* non-binding information**

<u>Note</u>
**Please check the information contained in this advice and notify us immediately of any errors or discrepancies.**
**Your acceptance of the above transaction will automatically be confirmed if you do not respond to the contrary, within 48 hours after receipt of this confirmation.**

If part of the above information is not available, a preliminary order confirmation will be issued within 24 hours, indicating when a final order confirmation will be issued.

Orders which cannot be placed or executed for reasons such as fiscal, legal, fund ownership restrictions, non-daily traded funds etc. will be advised by the Bank to Customer within 24 hours from the time the order was received by the Bank.

1.3    <u>Pre-advice on subscriptions in Non Daily Traded Funds</u>

In addition to the above MT 509 the Bank will send an MT 599 two business days prior to the preliminary payment being made to the Fund Administrator, provided the order is received at least 3 business days prior to the payment date. If the order is not received in time, an MT 599 will be sent the same date the payment is executed.

1.3.1    Upon receipt of a preliminary trade confirmation from the Fund/Broker the Bank will send a fax / MT 599 confirming the trade details.

**Note: A final confirmation will be sent upon delivery of shares to our nominee or sub-custodian or, in case of a redemption, upon receipt of redemption proceeds and contract note.**

1.4    <u>Final subscription</u>

The final execution will be advised by fax/MT 515 (Customer confirmation) to the Customer within 48 hours from the receipt of the final confirmation from the Fund/Broker.

1.4.1    <u>Partial redemptions</u>

The Bank will confirm partial redemptions by Fax / MT 599 indicating the percentage of the redemption proceeds paid and the estimated Net Asset Value.

1.4.2.    <u>Final redemptions</u>

The final execution will be advised by fax / MT 515 (Customer confirmation) to the Customer within 48 hours from the receipt of both the Fund confirmation and redemption proceeds from the Fund / Broker.

1.5    <u>Overdue Settlements</u>

The Bank will contact every Fund / Broker in respect of trades which are more than 48 hours overdue from the expected Bank settlement date, reported on the Order Confirmation or on the Pre-Advice. In all cases the Bank will advise the Customer by fax / Swift of the status of the trade.

CITCO

*Citco Bank Nederland N.V.*

**2    Third party receipts / deliveries**

2.1    Instructions to *receive* or *deliver*

The Customer may instruct the Bank in accordance with clause 14.3 of the Brokerage and Custody Agreement.

In case Swift is used the following messages can be handled:

- MT 520 Receive Free
- MT 521 Receive against Payment
- MT 522 Deliver Free
- MT 523 Deliver against payment

2.2    The Bank will issue transfer deeds or instructions within 48 hours from receipt of instructions from the Customer, and mail the documentation to the Funds. After 10 business days the Funds are contacted by the Bank to confirm the following:

- Receipt of the instructions
- Correctness of the documentation and instructions
- Receipt of counterparty instructions
- Indication of expected settlement date of the re-registration

2.3    Acknowledgment will be sent to the Customer confirming receipt of their instructions within 24 hours.

2.4    The Bank will send a Status report to the Customer by fax for all receipts / deliveries which have not been executed within 15 business days of receipt of the instructions.

**3    Settlement**

3.1    Settlement Confirmation

The Customer will receive confirmations of settlements by fax / Swift.

In case Swift is used the following messages can be handled:

- MT 530 Confirmation of Receipt Free
- MT 531 Confirmation of Receipt against Payment
- MT 532 Confirmation of Delivery Free
- MT 533 Confirmation of Delivery against Payment

**4    Corporate Actions**

4.1    Pre Advice

On a best efforts basis, the Bank will send to the Customer a pre-advice by fax detailing the event announced, provided the Bank receives the information in time.

4.2    Dividends/distributions to the Customer's "Cash"-account

The Bank will distribute the cash proceeds in accordance with the Customer's standing instructions for that security.

If the dividend or distribution is in the form of shares, the Bank is unable to apply the "Cash" standing instruction and will credit the shares to the Customer's account. Only then is the Customer able to sell these shares by sending an instruction to the bank. The Bank will credit the cash proceeds within three business days after receiving both the corporate action advice and the cash proceeds.

REDACTED WITH REDACT-IT



**CITCO**

*Citco Bank Nederland N.V.*

4.3    Dividends/distributions to the Customer's "Reinvest"-account

The Bank will distribute the shares in accordance with the Customer's standing instructions for that security.

If the dividend or distribution is in the form of cash, the Bank is unable to apply the "Reinvest" standing instruction and will credit the cash proceeds to the Customer's account. Only then is the Customer able to buy shares by sending an instruction to the Bank. The Bank will credit the shares within three business days of receiving the corporate action advice.

**5    Reconciliation**

The Bank will send each month two statements of holdings to the Customer. The first statement will be sent around the 2nd business day of the month, detailing the Customer's position in each security. The second statement will be sent around the 16th of the month, mentioning both the Customer's position and the latest prices available.

**6    Cash movements**

Cash movements will be booked through the appropriate account(s) and advised by fax or MT 950 the following day, with good value.

**7    Amendments**

Any provision of this Agreement may be amended only, if such amendment is in writing and signed by both the Bank and the Customer.

**8    Governing Law and Jurisdiction**

This Agreement shall be governed by the laws of the Netherlands. The exclusive place of jurisdiction shall be Amsterdam, The Netherlands.

**IN WITNESS WHEREOF** the parties thereto have executed this Agreement the day and year first above written.



**CITCO BANK NEDERLAND N.V.**



CITCO

*Citco Bank Nederland N.V.*

## SCHEDULE FOUR

ONLINE ACCESS AGREEMENT

**THIS AGREEMENT** is made this 3rd day of February 2000

between

**Citco Bank Nederland N.V.**                and

address:        World Trade Center                address:
                Tower B, 16th floor
                Strawinskylaan 1629
                P.O.Box 7241
                1000 JE Amsterdam

                phone   :  ▮▮▮▮▮▮▮▮▮          phone   :
                fax                              fax     :
                Swift                            Swift   :

referred to herein as "Bank"              referred to herein as " Customer"

**Operative provision:**

All the terms of the Brokerage and Custody Agreement shall apply to and form part of this Online Access Agreement as if the same were set out in extenso herein. In the event of a conflict between the conditions contained in the Brokerage and Custody Agreement and the conditions contained in the Online Access Agreement, the conditions contained in this Online Access Agreement shall prevail.

**WHEREAS:**

(A)  The Customer desires to access and use the Citco Funds Net on the Internet at www.citcofunds.net ("CFN") (i) to receive information on Securities and (ii) to give the Bank instructions in respect of the Customer's account(s) and to have the Bank act upon such instructions as set forth on Exhibit A (the "Online Services"); and

(B)  The Bank is willing to provide such information and accept such instructions through CFN on the terms and conditions set forth herein.

**NOW IT IS HEREBY AGREED** as follows:

1.    Right to Access.  The Bank hereby grants Customer the right to access and use CFN in accordance with the terms and conditions of this Agreement to perform the Online Services. Except as provided herein, the Online Services shall be subject to the same terms, conditions, warranties and representations as all other Brokerage Services.

2.    Authorised Persons.  Customer will select persons authorised to use the Online Services on its behalf ("Authorised Persons") and identify such persons to the Bank. The Bank will assign an identifier and password to each such Authorised Person. The Bank will include means within CFN to limit access to identifiers and passwords. Customer and Authorised Persons will maintain such Customer's obligations under the Brokerage and Custody Agreement, including this Online Access Agreement and will assure that they are qualified to engage in Brokerage Services for the Customer. Customer shall not permit any Authorised Person to engage in any Brokerage Service unless such Authorised Person meets all applicable legal requirements and any eligibility criteria, whether

CBN (AMSTERDAM) BROKERAGE AND CUSTODY AGREEMENT
PAGE 18



CITCO
Citco Bank Nederland N.V.

established by the Bank or a third party, including, without limitation, criteria established by the broker or manager of any Security, applicable to such Brokerage Service. Customer understands and agrees that it is responsible for any and all information, including messages and instructions, entered, transmitted or received under identifiers and passwords of Authorised Persons, and for the trading and other consequences thereof. If any third party shall access Customer's account through CFN using the identifier and password of an Authorised Person, Customer will indemnify and hold harmless the Bank against any liability, costs or damages arising out of claims by Customer or such third parties based upon or relating to such access

3.    Confidentiality and Ownership.  Customer acknowledges that all information on CFN, including but not limited to the databases thereon, and the selection, co-ordination, and arrangement of the contents thereof (collectively, the "Information"), are trade secrets, proprietary to the Bank. Customer agrees to keep such Information confidential and to utilise such Information solely for its own trading activities. Customer further agrees to take or cause to be taken all reasonable precautions to maintain the secrecy and confidentiality of such Information. Customer shall not disclose, and shall use reasonable efforts not to permit the disclosure of, any part of such Information to any other person. Customer will not use or permit the use of CFN or any of the Information for any illegal purpose. Customer further acknowledges that CFN and all intellectual property rights therein, including the Information, are the property of the Bank, and that Customer will have no right to reproduce, sell, license, or distribute any Information or any portion of CFN without the prior approval thereof by the Bank.

4.    Website System Changes.  Customer acknowledges and agrees that, without prior notice and without the advice to or consent of Customer, the form and content of any display on CFN may be modified at any time and in any way, including terminating any information or service provided thereon.

5.    No Online Investment Advice.  Customer understands that the information available on CFN is not investment advice of any kind, nor does CFN purport to offer any opinion with respect to the nature, potential value or suitability of any particular Securities transaction or investment strategy.

6.    Online Instructions.  With respect to instructions in respect of Customer's account(s) received by the Bank using CFN:

    6.1    Customer shall indemnify and hold the Bank harmless from and against all claims, demands, liabilities, costs, charges, damages, losses, expenses and consequences of whatever nature which may be brought or preferred against the Bank or that may be suffered, incurred or sustained by the Bank by reason or on account of having acted in accordance with such instructions, whether wrongly or mistakenly or not, or of the Bank's failing to act wholly or in part in accordance with such instructions;

    6.2    Customer shall not make any claim against the Bank by reason of or on account of the Bank having so acted or of having acted wrongly or mistakenly or of the Bank failing to act wholly or in part in accordance with such instructions;

    6.3    Customer acknowledges and confirms that such instructions, if accepted by the Bank, result in agreements that are binding upon the Customer; and

    6.4    Customer agrees that the Bank may debit any account in Customer's name(s) with any sums payable by the Customer as a result of such instructions.

7.    Internet-Related Difficulties.  Customer shall indemnify and hold the Bank harmless from and against all claims, demands, liabilities, costs, charges, damages, losses, expenses and consequences of whatever nature that may be brought or preferred against the Bank or that may be suffered, incurred or sustained by the Bank by reason or on account of equipment failure, communication line failure, system failure, security failure on the Internet, unauthorised access, or theft, or any problem, technological or otherwise, that might prevent Customer from accessing CFN. Customer further agrees that it will not be compensated for "lost opportunity," including but not limited to, for inability to enter an order online due to technical difficulties, where the desired Security increased in value or a Security held decreased in value.



### CITCO
*Citco Bank Nederland N.V.*

8. <u>DISCLAIMER.</u>   ALL INFORMATION PROVIDED ON CFN IS "AS IS," WITHOUT WARRANTIES, CONDITIONS, OR REPRESENTATIONS OF ANY KIND, INCLUDING WARRANTIES OF NON-INFRINGEMENT, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. CUSTOMER ACKNOWLEDGES AND AGREES THAT THERE IS NO ASSURANCE THAT INFORMATION ON CFN IS TIMELY, ACCURATE OR COMPLETE. IN PARTICULAR, BUT WITHOUT LIMITING THE FOREGOING, CUSTOMER UNDERSTANDS THAT THE BANK AND THE CUSTODIAN DEPEND, AMONGST OTHER THINGS, ON THE SELLERS OF NON-READILY MARKETABLE SECURITIES OR OTHER THIRD PARTY PROVIDERS FOR MOST OR ALL OF THE INFORMATION CONCERNING THOSE SECURITIES AND THAT ERRORS ALSO OCCUR IN INFORMATION COMPILED OR PREPARED BY THE BANK OR ITS AFFILIATES. CUSTOMER UNDERSTANDS THAT THERE WILL BE A DELAY BETWEEN THE TIME THAT THE CUSTODIAN AND THE BANK RECEIVE CHANGES TO THIS INFORMATION AND THE CORRESPONDING CHANGE TO THE INFORMATION ON CFN, AND THAT THE BANK DOES NOT VERIFY THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION. IN NO EVENT SHALL THE BANK OR THE CUSTODIAN BE LIABLE FOR INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES, INCLUDING, BUT NOT LIMITED TO, LOST DATA OR LOST PROFITS, EVEN IF IT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, ARISING OUT OF OR RELATING TO THIS AGREEMENT.

9. <u>LIMITATION ON LIABILITY.</u>   THE BANK'S LIABILITY FOR DAMAGES UNDER THIS AGREEMENT SHALL IN NO EVENT EXCEED THE AMOUNT OF THE TRANSACTION FEE, IF ANY, PAID BY CUSTOMER TO THE BANK FOR THE TRANSACTION GIVING RISE TO SUCH DAMAGES.

10. <u>Amendments.</u>  Any provision of this Agreement may be amended only, if such amendment is in writing and signed by both the Bank and the Customer.

11. <u>Governing Law and Jurisdiction.</u>  This Agreement shall be governed by the laws of the Netherlands. The exclusive place of jurisdiction shall be Amsterdam, The Netherlands.

**IN WITNESS WHEREOF** the parties hereto have executed this Agreement the day and year first above written.



**CITCO BANK NEDERLAND N.V.**

REDACTED WITH REDACT-IT



## CITCO
*Citco Bank Nederland N.V.*

### Attachment A - Online Services

The following services shall be covered by the Online Access Agreement:

1) to receive information on Securities

2) to give the Bank instructions in respect of the Customer's account