# **EXHIBIT 1**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 15 Case |
| | ) |
| **FAIRFIELD SENTRY LIMITED, et al.,** | ) Case No. 10-13164 (SMB) |
| | ) |
| Debtors in Foreign Proceedings. | ) Jointly Administered |
| | ) |

| | |
|---|---|
| **FAIRFIELD SENTRY LIMITED (IN LIQUIDATION) and** | ) |
| **FAIRFIELD SIGMA LIMITED (IN LIQUIDATION),** | ) |
| acting by and through the Foreign Representatives thereof, | ) |
| and **KENNETH KRYS and CHARLOTTE CAULFIELD,** | ) |
| solely in their capacities as Foreign Representatives and | ) Adv. Pro. No. 10-03635 |
| **Liquidators thereof,** | ) (SMB) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| -against- | ) |
| | ) |
| | ) |
| **ABN AMRO SCHWEIZ AG A/K/A ABN AMRO** | ) |
| **(SWITZERLAND) AG, ADLER AND CO PRIVATBANK** | ) |
| **AG, ALLIANZBANK SPA/UNIFORTUNE** | ) |
| **CONSERVATIVE SIDE POCKET, ALTERNATIVE** | ) |
| **INVESTMENT STRATEGIES, ARSENAL SPC,** | ) |
| **ARSENAL SPC OBO GLASGOW SEG PORT, BANCA** | ) |
| **ARNER SA, BANCA UNIONE DI CREDITO, BANK** | ) |
| **HAPOALIM SWITZERLAND LTD., BANK JULIUS** | ) |
| **BAER & CO. LTD., BANK SARASIN & CIE, BANQUE** | ) |
| **CANTONALE VAUDOISE, BANQUE CRAMER & CIE** | ) |
| **SA, BBVA (SUISSE) SA, BCV AMC DEFENSIVE AL** | ) |
| **FUND, BNP PARIBAS (SUISSE) SA, BNP PARIBAS** | ) |
| **(SUISSE) SA EX FORTIS, BNP PARIBAS (SUISSE) SA** | ) |
| **PRIVATE, BSI AG, BSI EX BANCA DEL GOTTARDO,** | ) |
| **CACEIS BANK LUXEMBOURG, CBB (BVI)/ THE** | ) |
| **ALKIMA FUND, CBT GEMS LOW VOL REG,** | ) |
| **COMPAGNIE BANCAIRE HELVETIQUE, CENTRUM** | ) |
| **BANK AG (AMS), CLARIDEN LEU LTD., CORNER** | ) |
| **BANCA SA, CREDIT SUISSE AG ZURICH, DEXIA** | ) |
| **BANQUE INTERNATIONAL A LUXEMBOURG,** | ) |
| **DRESDNER BANK SCHWEIZ, EFG BANK SA** | ) |
| **SWITZERLAND, EFG EUROFINANCIER D'INVEST** | ) |
| **MCL, ENDURANCE ABSOLUTE LTD. MASTER,** | ) |
| **FAIRFIELD INVESTMENT GCI, FAIRFIELD** | ) |
| **INVESTMENT FUND LTD., FALCON PRIVATE BANK,** | ) |
| **FIF ADVANCED LTD., FINTER BANK ZURICH,** | ) |

| | |
|---|---|
| **HARMONY CAPITAL FUND LTD., HSBC, IHAG** | ) |
| **HANDELSBANK AG, INCORE BANK AG, KARASEL** | ) |
| **ENHANCED PORTFOLIO, KARLA** | ) |
| **MULTISTRATEGIES LTD., LGT BANK IN** | ) |
| **LIECHTENSTEIN AG, LIECHTENSTEINISCHE LB** | ) |
| **REINVEST AMS, LLOYDS TSB BANK GENEVA,** | ) |
| **LOMBARD ODIER DARIER HENTSCH & CIE,** | ) |
| **LONGBOAT LTD., MASTER CAPITAL AND HEDGE** | ) |
| **FUND, NATIONAL BANK OF KUWAIT, NBK BANQUE** | ) |
| **PRIVEE SUISSE SA, PICTET & CIE, PKB** | ) |
| **PRIVATBANK AG, QUASAR  FUNDS SPC A/K/A** | ) |
| **QUASAR FUND SPC CLASS A AND CLASS B CGCNV,** | ) |
| **RBC DEXIA INVESTOR SERVICE JULIUS BAER** | ) |
| **SICAV, RBS COUTTS BANK LTD., RICHOURT AAA** | ) |
| **MULTISTRATEGIES, ROTHSCHILD BANK AG** | ) |
| **ZURICH (DUBLIN) A/K/A ROTHSCHILD BANK AG,** | ) |
| **ROTHSCHILD BANK GENEVA (DUBLIN),** | ) |
| **ROTHSCHILD LUGANO DUBLIN A/K/A BANCA** | ) |
| **PRIVATA EDMOND DE ROTHSCHILD LUGANO S.A.,** | ) |
| **EDMOND DE ROTHSCHILD (SUISSE) S.A., SIS** | ) |
| **SEEGANINTERSETTLE, SIX SIS LTD., SOCIETE** | ) |
| **GENERALE BANK & TRUST, SOUNDVIEW FUND,** | ) |
| **SWISSCANTO FD CENTRE CLIENTS A/C, T1 GLOBAL** | ) |
| **FUND LTD., UBS AG NEW YORK, UBS AG ZURICH,** | ) |
| **UBS JERSEY NOMINEES, VERWALTUNGS UND** | ) |
| **PRIVAT-BANK AG AKTIENGESELLSCHAFT (AMS),** | ) |
| **VORARLBERGER LANDES UND HYPOTHEKENBANK** | ) |
| **AKTIENGESELLSCHAFT AND BENEFICIAL OWNERS** | ) |
| **OF ACCOUNTS HELD IN THE NAME OF CGC NA** | ) |
| **11000, BRUDERER, CAPITALIA, PAN** | ) |
| **INTERNATIONAL LIMITED** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |
| | ) |

## STIPULATED ORDER GRANTING IN PART AND
## DENYING IN PART MOVING DEFENDANTS' MOTIONS TO
## DISMISS AND PLAINTIFFS' MOTION FOR LEAVE TO AMEND

Fairfield Sentry Limited (In Liquidation), and Fairfield Sigma Limited (In Liquidation),

acting by and through the Foreign Representatives thereof, and Kenneth Krys and Charlotte

Caulfield, solely in their capacities as Foreign Representatives and Liquidators thereof

("Plaintiffs") and ABN AMRO Schweiz AG a/k/a ABN AMRO Switzerland AG, Adler and Co Privatbank AG, Allianzbank SPA/Unifortune Conservative Side Pocket, Alternative Investment Strategies, Banca Arner SA, Banca Unione Di Credito, Bank Hapoalim Switzerland Ltd., Bank Julius Baer & Co. Ltd., Bank J. Safra Sarasin AG, f/k/a Bank Sarasin & Cie, Banque Cantonale Vaudoise, Banque Cramer & CIE SA, , BBVA (Suisse) SA, BCV AMC Defensive AL Fund, BNP Paribas (Suisse) SA, BNP Paribas (Suisse) SA Ex Fortis, BNP Paribas (Suisse) SA Private, BSI AG, BSI Ex Banca Del Gottardo, Caceis Bank Luxembourg, CBB (BVI)/ The Alkima Fund, CBT Gems Low Vol Reg, Compagnie Bancaire Helvetique, Centrum Bank AG (AMS), Clariden Leu Ltd., Corner Banca SA, Credit Suisse AG Zurich, Dexia Banque Internationale à Luxembourg , Dresdner Bank Schweiz, EFG Bank SA Switzerland, EFG Eurofinancier D'Invest MCL, Endurance Absolute Ltd. Master, Edmond de Rothschild (Suisse) S.A., Fairfield Investment GCI, Fairfield Investment Fund Ltd., Falcon Private Bank,  FIF Advanced Ltd., Finter Bank Zurich, Harmony Capital Fund Ltd., HSBC, IHAG Handelsbank AG, Incore Bank AG, Karasel Enhanced Portfolio, Karla Multistrategies Ltd., LGT Bank In Liechtenstein AG, Liechtensteinische LB Reinvest AMS, Lloyds TSB Bank Geneva, Lombard Odier Darier Hentsch & CIE, Longboat Ltd., Master Capital and Hedge Fund, National Bank of Kuwait, NBK Banque Privee Suisse SA, Pictet & CIE, PKB Privatbank AG, Quasar Funds SPC a/k/a Quasar Fund SPC Class A and Class B CGCNV, RBC Dexia Investor Service Julius Baer SICAV, RBS Coutts Bank Ltd., Richourt AAA Multistrategies, Rothschild Bank AG Zurich (Dublin) a/k/a Rothschild Bank AG, Rothschild Bank Geneva (Dublin), Rothschild Lugano Dublin a/k/a Banca Privata Edmond de Rothschild Lugano S.A., Edmond de Rothschild (Suisse) S.A., SIS Seeganintersettle, Six SIS Ltd., Societe Generale Bank & Trust, Soundview Fund, Swisscanto FD Centre Clients A/C, T1 Global Fund Ltd., UBS AG (sued herein as UBS AG New York and

3

UBS AG Zurich), UBS Jersey Nominees, Verwaltungs UND Privat-Bank AG Aktiengesellschaft (AMS), Vorarlberger Landes UND Hypothekenbank Aktiengesellschaft and Beneficial Owners of the Accounts Held in the Name of CGC NA 1-1000 (the "Defendants"), to the extent represented by undersigned counsel, state as follows:

**WHEREAS**, on July 20, 2012, Plaintiffs filed a third amended complaint (the "Third Amended Complaint") in the above-captioned action (the "Action"), asserting claims for: (1) unjust enrichment against Defendants (the "First Claim"), (2) money had and received against Defendants (the "Second Claim"), (3) mistaken payment against Defendants (the "Third Claim"), (4) constructive trust against Defendants (the "Fourth Claim," and together with the First Claim, Second Claim, and Third Claim, the "Common Law Claims"), (5) unfair preference pursuant to Section 245 of the BVI Insolvency Act against Defendants (the "Fifth Claim"), and (6) undervalue transaction pursuant to Section 246 of the BVI Insolvency Act against Defendants (the "Sixth Claim," and together with the Fifth Claim, the "BVI Avoidance Claims");

**WHEREAS**, on October 18, 2016, the Court entered a Supplemental Case Management Order,[1] establishing a briefing schedule for (i) Consolidated Plaintiffs'[2] motion for leave to file amended complaints (the "Motion for Leave"), and (ii) the Moving Defendants' opposition to the Motion for Leave and motions to dismiss (such filings, including the Supplemental Briefs defined herein, the "Motions to Dismiss");

**WHEREAS**, on September 20, 2016, Plaintiffs filed a proposed fourth amended complaint in the Action (the "Proposed Fourth Amended Complaint"), asserting claims for: (1)

---

[1] *See* ECF Nos. 918, 920, 1326.

[2] Except where otherwise noted, (i) "Consolidated Plaintiffs" refers to the plaintiffs in all adversary proceedings listed in Exhibit A hereto, (ii) "Moving Defendants" refers to the defendants listed in Exhibit B hereto (comprised of Consolidated Defendants that filed or joined motions to dismiss Plaintiffs' claims in the adversary proceedings against them), and (iii) "Consolidated Defendants" refers to the defendants in all adversary proceedings listed in Exhibit A hereto, whether or not such defendants filed or joined motions to dismiss.

unjust enrichment against Defendants, (2) money had and received against Defendants, (3) mistaken payment against Defendants, (4) constructive trust against Defendants, (5) unfair preference pursuant to Section 245 of the BVI Insolvency Act against Defendants, (6) undervalue transaction pursuant to Section 246 of the BVI Insolvency Act against Defendants, (7) breach of contract against Defendants, (8) breach of the implied covenant of good faith and fair dealing against Defendants, and (9) declaratory judgment against Defendants;

WHEREAS, the Consolidated Plaintiffs and Moving Defendants thereafter briefed the Motion for Leave and the Motions to Dismiss;

WHEREAS, as part of the Motions to Dismiss, and pursuant to the Supplemental Case Management Order, numerous Moving Defendants signed or joined individual or supplemental motions, joinders, or briefs (the "Supplemental Briefs");

WHEREAS, no Defendant in this Action, except for the Moving Defendants, filed or joined a Motion to Dismiss;

WHEREAS, on April 3, 2017, the Consolidated Plaintiffs filed an opposition to the Motion to Dismiss which included a request for leave from the Court to file in this Action the Proposed Fourth Amended Complaint,[3] asserting claims for: (1) unjust enrichment against Defendants (the "Proposed First Claim"), (2) money had and received against Defendants (the "Proposed Second Claim"), (3) mistaken payment against Defendants (the "Proposed Third Claim"), (4) constructive trust against Defendants (the "Proposed Fourth Claim," and together with the Proposed First Claim, Proposed Second Claim and Proposed Third Claim (the "Proposed Common Law Claims"), (5) unfair preference pursuant to Section 245 of the BVI Insolvency Act against Defendants (the "Proposed Fifth Claim"), (6) undervalue transaction

---

[3] Appended as Exhibit E to the Declaration of David Molton in support of the Motion for Leave and in opposition to Motions to Dismiss [ECF 270].

pursuant to Section 246 of the BVI Insolvency Act against Defendants (the "Proposed Sixth
Claim," and together with the Proposed Fifth Claim, the "Proposed BVI Avoidance Claims"), (7)
breach of contract against Defendants (the "Proposed Seventh Claim"), (8) breach of the implied
covenant of good faith and fair dealing against Defendants (the "Proposed Eighth Claim", and
together with the Proposed Seventh Claim, the "Proposed Contract Law Claims"), and (9)
declaratory judgment against Defendants (the "Proposed Ninth Claim");

**WHEREAS,** on January 25, 2018, the Court heard argument on six issues raised in the
Motion for Leave and the Motions to Dismiss;

**WHEREAS**, on August 6, 2018, the Court issued a Memorandum Decision and Order,
holding that the Court had subject matter jurisdiction over the actions listed on Exhibit A hereto,
while not fully resolving the objections to personal jurisdiction or service raised in the Motions
to Dismiss ("August 2018 Decision");

**WHEREAS**, on September 20, 2018, the Court entered an Order and Stipulation (the
"Stipulation") between Consolidated Plaintiffs and numerous Moving Defendants, to enable the
Court to resolve the balance of the Motion for Leave and Motions to Dismiss, without the
signatories to the Stipulation waiving, except as expressly provided in the Stipulation, arguments
or rights in connection with the Motion for Leave or Motions to Dismiss, including, but not
limited to, grounds and arguments in support of dismissal for lack of personal jurisdiction or
service raised by Moving Defendants in their memorandum of law in support of their Motions to
Dismiss and, in some instances, in their Supplemental Briefs;

**WHEREAS**, upon consideration of the foregoing briefing and argument on the Motion
for Leave and Motions to Dismiss, the Court on December 6, 2018 issued a Memorandum

Decision Granting in Part and Denying in Part the Motions to Dismiss and the Motion for Leave

("December 2018 Decision");

**WHEREAS**, in the December 2018 Decision, the Court directed Consolidated Plaintiffs

to "settle or submit a consensual order consistent with this decision" in each adversary

proceeding;

**WHEREAS**, Plaintiffs assert that all of the Defendants in the Action are "Knowledge

Defendants," as defined in the December 2018 Decision, and Moving Defendants expressly

disagree;

**WHEREAS**, Plaintiffs have represented to Moving Defendants that Plaintiffs may seek

further leave to amend to add allegations against certain Defendants;

**WHEREAS**, the Plaintiffs intend to appeal the December 2018 Decision to the extent it

requires the complete dismissal of an adversary proceeding identified on Exhibit A, and Moving

Defendants, having substantially similar claims dismissed and in order to participate as parties in

such appeal, further request that the Bankruptcy Court enter a final judgment as to the First

Claim, Second Claim, and Third Claim (together, the "Dismissed Claims") under Rule 54(b) of

the Federal Rules of Civil Procedure, made applicable in this proceeding by Bankruptcy Rule

7054, on the grounds that an immediate appellate review of the Memorandum Decision will be

efficient for the courts and the Plaintiffs and Moving Defendants, and Plaintiffs, reserving all

rights concerning appeals, do not object to the Moving Defendants' request to use the Rule 54(b)

procedure;

**WHEREAS**, in consideration of (i) the use of Rule 54(b) of the Federal Rules of Civil

Procedure in this Order and other orders arising out of the December 2018 Decision, which will

result in final judgments of dismissal being entered in over two hundred of the consolidated

adversary proceedings, and (ii) the logistical impact that such use of Rule 54(b) has on Consolidated Plaintiffs' burden to file any notices of appeal in the consolidated adversary proceedings, Plaintiffs, pursuant to Rule 8002(d) of the Federal Rules of Bankruptcy Procedure, request the Court grant an extension of time to file any notice of appeal arising out of or relating to this Order, to the maximum time allowable under Rule 8002(d) of the Federal Rules of Bankruptcy Procedure;

**WHEREAS**, Moving Defendants consent to Plaintiffs' extension request pursuant to Rule 8002(d) of the Federal Rules of Bankruptcy Procedure;

**NOW,** for the reasons set forth in the December 2018 Decision, which is incorporated herein and attached hereto as Exhibit C**, IT IS HEREBY STIPULATED, AGREED, AND SO ORDERED, THAT:**

## I.   DISPOSITION OF MOTIONS TO DISMISS AND MOTION FOR LEAVE

A.    The Motions to Dismiss are (i) **GRANTED** as to the Dismissed Claims, and the Dismissed Claims are **DISMISSED** as to all Moving Defendants, with prejudice; and (ii) **DENIED** as to the Fourth Claim and the BVI Avoidance Claims, without prejudice to the filing of further motions to dismiss, subject to the limitations in Paragraph II(A) of this Order.

B.    The Motion for Leave is (i) **DENIED** as to the Proposed First Claim, Proposed Second Claim, Proposed Third Claim, the Proposed Contract Law Claims, and the Proposed Ninth Claim, with prejudice; and (ii) **GRANTED** to permit Plaintiffs leave to amend to assert only (1) constructive trust claims against Knowledge Defendants and (2) the Proposed BVI Avoidance Claims, to the extent consistent with the December 2018 Decision.   By consenting to this Order, no party

concedes, and the Court does not find, that any Defendant in this Action is or is not a Knowledge Defendant or that the Proposed Fourth Claim or any constructive trust claim asserted or proposed by Plaintiffs does or does not state a claim upon which relief can be granted.  Plaintiffs do not assert BVI Avoidance Claims (and will not amend to assert Proposed BVI Avoidance Claims) to recover redemptions that are alleged to have occurred outside of the "vulnerability period," as defined in Sections 244(1) and 5 of the BVI Insolvency Act of 2003.

C.  Except as expressly resolved in the August 2018 Decision or the December 2018 Decision, grounds for dismissal raised by Moving Defendants in the Motions to Dismiss and Supplemental Briefs, if set forth in Paragraph II.A of this Order, are not resolved by this Order.

D.  Except as otherwise provided in this Order, the Motion for Leave and Motions to Dismiss, insofar as filed in or applicable to this Action, are **DENIED**.

E.  Plaintiffs shall file the Proposed Fourth Amended Complaint, which shall remove the Proposed First Claim, Proposed Second Claim, Proposed Third Claim, the Proposed Contract Law Claims, and the Proposed Ninth Claim.  To the extent Plaintiffs seek to further amend the Proposed Fourth Amended Complaint to add new factual allegations, Plaintiffs shall file a motion for leave to amend attaching that proffered further amended complaint.  The Moving Defendants shall have the right to oppose any such request.

F.  Moving Defendants' request that the Bankruptcy Court enter a final judgment as to the Dismissed Claims under Rule 54(b) of the Federal Rules of Civil Procedure, made applicable in this proceeding by Bankruptcy Rule 7054, is

**GRANTED**. The amended complaint in this adversary proceeding alleges multiple claims and names multiple defendants. The entry of a final order and judgment will decide and ultimately dispose of, subject to appellate rights, the Dismissed Claims, which present legal issues that can be adjudicated independently of the remaining claims.

G.     Further, there is no just reason for delay of entry of a final order and judgment on the Dismissed Claims. The December 2018 Decision dismissed the Dismissed Claims in this Action, as well as other claims involving identical legal issues brought by Consolidated Plaintiffs against certain Consolidated Defendants in related actions, some of which have now been finally resolved and are thus subject to appeal pursuant to 28 U.S.C. § 158(a)(1). Such appeal could adjudicate the substantive rights of Moving Defendants without their participation, unless a final order and judgment is entered forthwith. In light of this, and the number of claims and defendants in the Action, the interests of fairness, judicial efficiency and sound judicial administration are served by the entry of this final order and judgment, together with the entry of all other final orders and judgments dismissing other claims brought by the Consolidated Plaintiffs in similar adversary proceedings pursuant to the December 2018 Decision, and the opportunity for an immediate appeal.

H.     Because this order and judgment and the dismissal of the Dismissed Claims, together with the final orders and judgments dismissing other claims brought by Consolidated Plaintiffs in similar adversary proceedings pursuant to the December 2018 Decision, will affect numerous adversary proceedings

10

commenced by the Plaintiffs and hundreds of defendants named in those complaints or proposed amended complaints, an immediate appeal would avoid protracted, expensive, and potentially duplicative litigation proceedings, and would facilitate the prompt resolution of a significant portion of the litigation, which would provide certainty for further proceedings and possible appeals.

I.   Plaintiffs and the undersigned Moving Defendants expressly, knowingly, and voluntarily grant their consent solely for this Court to enter this final order and judgment in this Action as provided above, subject to appellate review, whether the underlying claims in the Action are core under 28 U.S.C. § 157(b)(2) or non-core under 28 U.S.C. § 157(c)(2) and although this Court is not constituted under Article III of the United States Constitution.  Notwithstanding the above grant of consent, Moving Defendants reserve all other jurisdictional, substantive, or procedural rights and remedies in connection with this adversary proceeding, including with respect to the Bankruptcy Court's power to finally determine any other matters in this adversary proceeding.

## II.   ADDITIONAL MOTION TO DISMISS BRIEFING

A.   Moving Defendants that filed or joined a Motion to Dismiss may join the Second Consolidated Motion to Dismiss (as defined herein) and may file or join an Individual Supplemental Brief (as defined herein), insofar as consistent with this Order.   Arguments for dismissal that may be advanced in the Second Consolidated Motion to Dismiss or an Individual Supplemental Brief include only the following issues:  (i) whether any claims asserted against a Moving Defendant in an amended complaint served pursuant to this Order are barred by Section

546(e), Section 546(g), and/or Section 561(d) of the Bankruptcy Code; (ii) whether a Moving Defendant is a Knowledge Defendant as defined in the Court's December 2018 Decision, and to the extent that a Moving Defendant is a Knowledge Defendant, whether Plaintiffs have made allegations sufficient to sustain a constructive trust claim asserted against them in an amended complaint served pursuant to this Order;[4] (iii) whether the Court may exercise personal jurisdiction over a Moving Defendant, including whether service was properly effected; (iv) whether any claim asserted against a Moving Defendant in an amended complaint served pursuant to this Order must be dismissed under the December 2018 Decision; (v) whether any claim asserted against a Moving Defendant must be dismissed because that Moving Defendant is not a proper party to be sued on such claim; (vi) whether a Moving Defendant must be dismissed because an amended complaint served pursuant to this Order fails to adequately plead receipt of redemptions by that Moving Defendant; and (vii) any other argument for dismissal upon consent of the Liquidators or by order of the Court (collectively, the "Second Round Issues").   Moving Defendants shall include in the Second Consolidated Motion to Dismiss and/or an Individual Supplemental Brief all grounds pertaining to the Second Round Issues that they contend are a basis for dismissal at the pleading stage.

B.    Consistent with this Order, the Stipulation, the August 2018 Decision, and the December 2018 Decision:

---

[4] For the avoidance of doubt, this may include arguments regarding whether allegations made as to Citco Global Custody, Citco Fund Services, CGC NA, and related Citco entities may be imputed to Moving Defendants.

(a)     Upon written notice by Consolidated Plaintiffs that they have served amended complaints on each Consolidated Defendant in each of the adversary proceedings listed on Appendix A in which they will serve an amended complaint, Consolidated Defendants shall have sixty (60) days to file a motion to dismiss (the "Second Consolidated Motion to Dismiss") and a consolidated memorandum of law in support of their motion to dismiss (the "Second Consolidated Motion to Dismiss Brief").[5]  On or before ten (10) days after the date on which Consolidated Defendants file the Second Consolidated Motion to Dismiss, any Consolidated Defendant or group of Consolidated Defendants may join the Second Consolidated Motion to Dismiss Brief and may file a notice of joinder and, if such Consolidated Defendant chooses, a supplemental memorandum of law that raises additional grounds or arguments for dismissal that are specific to the particular Consolidated Defendant or group of Consolidated Defendants and have not otherwise been raised in the Second Consolidated Motion to Dismiss Brief (each, an "Individual Supplemental Brief").  With respect to the Individual Supplemental, Opposition, or Reply Briefs, to reduce the administrative burden on the Court, the parties shall undertake reasonable efforts to avoid duplicative filings; such efforts shall include reasonable coordination to ensure that identical grounds or arguments for dismissal are not presented in multiple Individual Supplemental, Opposition, or Reply Briefs.

---

[5] Unless otherwise specified, all deadlines set by this Order shall be computed in accordance with Rule 9006 of the Federal Rules of Bankruptcy Procedure.

(b)    On or before the date that is sixty (60) days from the date on which

Consolidated Defendants file the Second Consolidated Motion to Dismiss,

Consolidated Plaintiffs shall file a consolidated memorandum of law in

opposition to the Second Consolidated Motion to Dismiss (the

"Consolidated Opposition Brief").  On or before ten (10) days after the

date on which Consolidated Plaintiffs file the Consolidated Opposition

Brief, Consolidated Plaintiffs will file a supplemental memorandum of law

in opposition to each Individual Supplemental Brief that responds to

arguments that are specific to the particular Consolidated Defendant or

group of Consolidated Defendants and have not been otherwise raised in

the Consolidated Opposition Brief (each, an "Individual Opposition

Brief").

(c)    On or before the date that is thirty (30) days from the date on which the

Consolidated Plaintiffs file the Consolidated Opposition Brief,

Consolidated Defendants shall file a consolidated reply memorandum of

law in further support of the Second Consolidated Motion to Dismiss (the

"Consolidated Reply Brief").  On or before ten (10) days after the date on

which Consolidated Defendants file the Consolidated Reply Brief, any

Consolidated Defendant or group of Consolidated Defendants that filed or

joined the Second Consolidated Motion to Dismiss Brief or any Individual

Supplemental Brief may file a supplemental reply memorandum of law

that raises arguments in reply that are specific to the particular

Consolidated Defendant or group of Consolidated Defendants and have

14

not been otherwise raised in the Consolidated Reply Brief (each, an "Individual Reply Brief").

(d)   The Second Consolidated Motion to Dismiss Brief shall not exceed fifty (50) pages in length.

(e)   Each Individual Supplemental Brief shall not exceed five (5) pages in length; provided, however, that if two or more Consolidated Defendants join together in a single Individual Supplemental Brief, such Individual Supplemental Brief shall not exceed ten (10) pages in length.

(f)   The Consolidated Opposition Brief shall not exceed fifty (50) pages in length.

(g)   Each Individual Opposition Brief shall not exceed five (5) pages in length; provided, however, that if two or more Consolidated Defendants joined the Individual Supplemental Brief to which an Individual Opposition Brief corresponds, such Individual Opposition Brief shall not exceed ten (10) pages in length.

(h)   The Consolidated Reply Brief shall not exceed thirty (30) pages in length.

(i)   Each Individual Reply Brief shall not exceed five (5) pages in length; provided, however, that if two or more Consolidated Defendants join together in a single Individual Reply Brief, such Individual Reply Brief shall not exceed ten (10) pages in length.

(j)   Nothing herein shall prevent any party from seeking, for cause shown, relief from the page limits established by this Order.

(k)    All filings contemplated by this Order shall be filed in the main administratively consolidated adversary proceeding. The Second Consolidated Motion to Dismiss and the Second Consolidated Motion to Dismiss Brief, the Consolidated Opposition Brief and the Consolidated Reply Brief shall also be filed in all of the adversary proceedings listed in Exhibit A. In addition, any Individual Supplemental, Opposition and Reply Brief shall be filed in the relevant adversary proceeding(s) involving such Consolidated Defendant or Consolidated Defendants. Provided, however, that for each of: (i) the Second Consolidated Motion to Dismiss and supporting papers, (ii) the Consolidated Opposition Brief and supporting papers, and (iii) the Consolidated Reply Brief and supporting papers, if the filing party files such papers in the main administratively consolidated adversary proceeding by the corresponding date provided for herein, then the filing of such papers in all of the adversary proceedings listed in Exhibit A will be timely if completed within five (5) business days of such deadline.

(l)    The parties shall provide courtesy copies of all filings contemplated by this Order to the Court by hand delivery within five (5) days of their filing.

## III.    <u>FURTHER PROCEEDINGS</u>

A.    The Court will hold oral argument on the Second Consolidated Motion to Dismiss on a date to be fixed by the Court.

B.    Except upon further order of the Court, all discovery is stayed pending the Court's resolution of the Second Consolidated Motion to Dismiss. In the event that a

16

party seeks leave of the Court to serve discovery, the non-moving party shall have the right to oppose any such request.  Following the resolution of the Second Consolidated Motion to Dismiss, in the event that any claim in any adversary proceeding remains, the relevant parties shall promptly request that the Court schedule a status conference to address case management with respect to any such adversary proceedings.

C.    Plaintiffs' request for an extension of time to file notices of appeal under Rule 8002(d) of the Federal Rules of Bankruptcy Procedure is **GRANTED**.  As a result of this Order and other final orders entered in these consolidated adversary proceedings, Consolidated Plaintiffs, should they pursue all appeals, would be required to file notices of appeal in over two hundred consolidated adversary proceedings.  Given the logistical burdens, the Court has determined that it is within its discretion to grant Plaintiffs an extension of time to file notices of appeal in connection with this Order pursuant to Bankruptcy Rule 8002(d).  For the purposes of Bankruptcy Rule 8002(d), Plaintiffs' request for an extension under Rule 8002(d) is deemed to be a motion by Plaintiffs pursuant to Bankruptcy Rule 8002(d).  Pursuant to Bankruptcy Rule 8002(d), Plaintiffs' time to file any notice of appeal arising out of or relating to this Order is hereby extended to and including thirty-five (35) days from the date of entry of this Order.

Dated:    March 20, 2019
New York, New York

By: */s/ David J. Molton*
   David J. Molton
   Marek P. Krzyzowski

**BROWN RUDNICK LLP**
7 Times Square
New York, NY 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801
E-mail: dmolton@brownrudnick.com
E-mail: mkrzyzowski@brownrudnick.com

*Counsel for the Foreign Representatives*
 – and –

**SELENDY & GAY PLLC**
David Elsberg
Ron Krock
1290 Avenue of the Americas
New York, NY 10104
Telephone: (212) 390-9000
E-mail: delsberg@selendygay.com
E-mail: rkrock@selendygay.com

By: */s/ Thomas J. Moloney*
   Thomas J. Moloney

**CLEARY GOTTLIEB STEEN &
HAMILTON LLP**
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999
Email: tmoloney@cgsh.com

*The party sued here as "HSBC"*[6]

By: */s/ Elizabeth Vicens*
   Elizabeth Vicens

**CLEARY GOTTLIEB STEEN &
HAMILTON LLP**
One Liberty Plaza
New York, New York 10006
T: 212-225-2000
F: 212-225-3999
evicens@cgsh.com

*Counsel for Caceis Bank Luxembourg*

By: */s/ Marshall R. King*
   Marshall R. King
   Gabriel Herrmann

**GIBSON, DUNN & CRUTCHER LLP**
200 Park Ave.
New York, NY  10166
(212) 351-4000
mking@gibsondunn.com
gherrmann@gibsondunn.com

*Counsel for UBS AG and UBS Jersey Nominees*

By: */s/ Jeff E. Butler*
   Jeff E. Butler

**CLIFFORD CHANCE US LLP**
31 West 52nd Street

---

[6] Moving Defendants contend the party sued here as "HSBC" is a non-juridical entity, and there is no concession to the contrary by consenting to this Order.

New York, New York 10019
T:  212-878-8000
F:  212-878-8375
(jeff.butler@cliffordchance.com)

*Attorneys for Banque Internationale à
Luxembourg f/k/a Dexia Banque Internationale à
Luxembourg*

By: _/s/ David M. Morris_____
    David M. Morris

**FRIED, FRANK, HARRIS, SHRIVER
  & JACOBSON LLP**
One New York Plaza
New York, NY  10004
(212) 859-8000
david.morris@friedfrank.com

*Counsel for Verwaltungs-und Privat-Bank
Aktiengesellschaft (now known as VP Bank
AG) and Centrum Bank Aktiengesellschaft*

By: _/s/ Anthony L. Paccione_____
    Anthony L. Paccione
    Mark T. Ciani

**KATTEN MUCHIN ROSENMAN LLP**
575 Madison Avenue
New York, New York 10022
Telephone: 212.940.8800
Facsimile: 212.940.8774
E-mail: anthony.paccione@kattenlaw.com
E-mail: mark.ciani@kattenlaw.com

*Counsel for Harmony Capital Fund Ltd., Lloyds
TSB Bank Geneva, RBC Investor Services Bank,
S.A., formerly known as RBC Dexia Investor
Services Bank, S.A., and possibly the entity
intended by plaintiff in naming as a defendant
"RBC Dexia Investor Service Julius Baer
SICAV", and RBS Coutts Bank Ltd., now known
as Coutts & Co. Ltd.*

By: _/s/ Norris D. Wolff_____
    Norris D. Wolff, Esq.

**KLEINBERG KAPLAN WOLFF & COHEN, P.C.**
551 Fifth Avenue, 18th Floor
New York, New York 10176
(212) 986-6000
nwolff@kkwc.com

*Attorneys for Defendant Quasar Fund SPC Class A and Class B CGCNV (sued as Quasarfuns SPC)*

By:  /s/ Christopher Harris
     Christopher Harris
     Thomas J. Giblin

**LATHAM & WATKINS LLP**
885 Third Avenue
New York, New York 10022
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Email: christopher.harris@lw.com
Email: thomas.giblin@lw.com

*Attorneys for Defendant Union Bancaire Privée, UBP SA (sued as ABN AMRO Schweiz AG a/k/a ABN AMRO (Switzerland) AG)*

By: /s/ Eric B. Halper
    Eric B. Halper
    Virginia I. Weber

**MCKOOL SMITH, P.C.**
One Bryant Park, 47th Floor
New York, New York 10036
Tel: (212) 402-9400
Fax: (212) 402-9444
ehalper@mckoolsmith.com
vweber@mckoolsmith.com

*Attorneys for Bank Julius Baer & Co. Ltd.*

By:  /s/ Eric Fishman
     Eric Fishman
     Andrew M. Troop

**PILLSBURY WINTHROP SHAW**

**PITTMAN LLP**
1540 Broadway
New York, NY 10036
(212) 858-1000 (Phone)
(212) 858-1500 (Fax)
eric.fishman@pillsburylaw.com
andrew.troop@pillsburylaw.com

*Counsel for Falcon Private Bank Ltd.*

By:  */s/ Eric Fishman*
      Eric Fishman
      Andrew M. Troop

**PILLSBURY WINTHROP SHAW PITTMAN LLP**
1540 Broadway
New York, NY 10036
(212) 858-1000 (Phone)
(212) 858-1500 (Fax)
eric.fishman@pillsburylaw.com
andrew.troop@pillsburylaw.com

*Counsel for InCore Bank AG*

By:  */s/ George W. Shuster, Jr.*
      George W. Shuster, Jr.
      Charles C. Platt

**WILMER CUTLER PICKERING HALE AND DORR LLP**
250 Greenwich Street
7 World Trade Center
New York, New York 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888
Email:  george.shuster@wilmerhale.com
E-mail:  charles.platt@wilmerhale.com

*Counsel for Corner Banca SA, Finter Bank Zurich, IHAG Handelsbank AG, and PKB Privatbank AG*

By:  */s/ Fletcher W. Strong*
      Fletcher W. Strong
      William A. Maher

**WOLLMUTH MAHER & DEUTSCH LLP**
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
Email: fstrong@wmd-law.com
Email: wmaher@wmd-law.com

*Counsel for Defendants Fairfield Investment
Fund Ltd., Fairfield Investment GCI and FIF
Advanced Ltd.*

By:  /s/ Keith R. Palfin
Keith R. Palfin
Heather Lamberg

**WINSTON & STRAWN LLP**
1700 K Street, NW
Washington, DC 20006
(202) 282-5000
kpalfin@winston.com
hlamberg@winston.com

*Counsel for BBVA (Suisse) SA*
By:  /s/ D. Farrington Yates
D. Farrington Yates
Adam M. Lavine

**KOBRE & KIM LLP**
800 Third Avenue
New York, New York 10022
Telephone: +1 212 488 1200
Email: Farrington.Yates@kobrekim.com
Email: Adam.Lavine@kobrekim.com

*Counsel for EFG Bank SA Switzerland n/k/a
EFG Bank; EFG Eurofinancier D'Invest MCL
n/k/a EFG Bank (Monaco); BSI AG; BSI Ex
Banca del Gottardo; Banca Unione di Credito*

By: /s/ Andreas A. Frischknecht
Andreas A. Frischknecht
Erin E. Valentine

**CHAFFETZ LINDSEY LLP**
1700 Broadway, 33rd Floor

New York, NY 10019
Tel. (212) 257-6960
Fax (212) 257-6950
A.Frischknecht@chaffetzlinsey.com
E.valentine@chaffetzlindsey.com

*Attorneys for  SIX SIS AG f/k/a/ SIS
SegaInterSettle*

By:  /s/ Alexander B. Lees
　　　Alexander B. Lees (AL 7781)
　　　Stacey J. Rappaport (SR9973)

**MILBANK LLP**
55 Hudson Yards
New York, New York 10001
Tel:  (212) 530-5000
alees@milbank.com

*Attorneys for LGT Bank in Liechtenstein AG
n/k/a LGT Bank AG and Dresdner Bank
Schweiz n/k/a LGT Bank (Switzerland) Ltd.*

By:  /s/ William J. Sushon
　　　William J. Sushon

**O'MELVENY & MYERS LLP**
Times Square Tower
7 Times Square
New York, NY 10036-6524
(212) 326-2000
(212) 326-2061 (fax)
Email: wsushon@omm.com

*Counsel for Credit Suisse AG Zurich and
Clariden Leu Ltd.*

By:  /s/ Emil A. Kleinhaus
　　　Emil A. Kleinhaus

**WACHTELL, LIPTON, ROSEN & KATZ**
51 West 52 Street
New York, NY  10017
Telephone: (212) 403-1332
Facsimile: (212) 403-2332
E-mail: eakleinhaus@wlrk.com

23

*Counsel for Bank Pictet & Cie SA*

By:  /s/ Richard Levin
    Richard Levin

**JENNER & BLOCK LLP**
919 Third Avenue
New York, New York 10022
Tel. (212) 891-1600
Fax (212) 891-1699
rlevin@jenner.com

*Counsel for Unifortune Conservative
Side Pocket*[7]

By:  /s/ Rachel Ehrlich Albanese
    Rachel Ehrlich Albanese

**DLA PIPER LLP (US)**
1251 Avenue of the Americas
New York, New York 10020-1104
Tel.: (212) 335-4500
Fax: (212) 335-4501
Rachel.Albanese@dlapiper.com

*Counsel for Defendant Banca Arner S.A.*

By:  /s/ Jonathan D. Cogan
    Jonathan D. Cogan
    Kimberly Perrotta Cole

**KOBRE & KIM LLP**
800 Third Avenue
New York, New York 10022
Tel: +1 212 488 1200
jonathan.cogan@kobrekim.com
kimberly.cole@kobrekim.com

*Counsel for Allianz Bank Financial Advisors,
S.p.A*

By:  /s/ Stephen M. Harnik, Esq
    Stephen M. Harnik, Esq.

---

[7] Moving Defendants contend the party sued here as "Unifortune Conservative Side Pocket" is a non-juridical entity, and there is no concession to the contrary by consenting to this Order.

**HARNIK LAW FIRM**
623 Fifth Avenue, 24th Floor
New York, New York 10022-6831
Telephone: (212) 599-7575
Facsimile : (212) 867-8120
Email: stephen@harnik.com

*Attorneys for Defendant Vorarlberger Landes-
Und Hypothekenbank AG*

By:  /s/ Richard A. Cirillo
Richard A. Cirillo

**KING & SPALDING LLP**
1185 Avenue of the Americas
New York, NY 10036-4003
Direct: 212-556-2337

*Attorneys for National Bank of Kuwait S.A.R.L.
and NBK Banque (Suisse) Privée S.A.*

By:  /s/ Scott Balber
Scott Balber
Jonathan Cross

**HERBERT SMITH FREEHILLS LLP**
450 Lexington Avenue
New York, NY 10017
Telephone: (917) 542-7824
Scott.Balber@hsf.com
Jonathan.cross@hsf.com

*Counsel for Bank Hapoalim Switzerland Ltd.*

By:  /s/ Jascha D. Preuss
Jascha D. Preuss

**WUERSCH & GERING LLP**
100 Wall Street, 10th Floor
New York, NY 10005
Telephone: (212) 509-5050
Facsimile: (212) 509-9559
E-mail: jascha.preuss@wg-law.com

*Counsel for Liechtensteinische Landesbank AG
(sued here as LIECHTENSTEINISCHE LB*

*REINVEST AMS)*

By:  */s/ Andrew J. Finn*
     Andrew J. Finn
     Jeffrey T. Scott

**SULLIVAN & CROMWELL LLP**
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: finna@sullcrom.com
E-mail: scottj@sullcrom.com

*Counsel for Bank J. Safra Sarasin AG, f/k/a*
*Bank Sarasin & Cie*

By:  */s/ Breon S. Peace*
     Breon S. Peace
     Ari D. MacKinnon
     Thomas S. Kessler

**CLEARY GOTTLIEB STEEN &**
**HAMILTON LLP**
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel for BNP Paribas (Suisse) SA, BNP*
*Paribas (Suisse) SA Ex Fortis, BNP Paribas*
*(Suisse) SA Private*

By:  */s/ John F. Zulack*
John F. Zulack

**ALLEGAERT BERGER & VOGEL LLP**
111 Broadway, 20th Floor
New York, New York 10006
jzulack@abv.com
(212) 571-0550

*Attorneys for Banque Cantonale Vaudoise, BCV*
*AMC Defensive Alt Fund, Compagnie Bancaire*
*Helvétique SA, Lombard Odier Darier Hentsch*
*& Cie, Rothschild Bank AG Zurich (Dublin)*

*a/k/a Rothschild Bank AG, Rothschild Bank
Geneva (Dublin), Edmond de Rothschild
(Suisse) S.A., Rothschild Lugano Dublin a/k/a
Banca Privata Edmond de Rothschild Lugano
S.A., Société Générale Bank & Trust*

**SO ORDERED.**

Dated: _____, 2019
              New York, New York

_____
HONORABLE STUART M. BERNSTEIN
UNITED STATES BANKRUPTCY JUDGE

# **<u>EXHIBIT A</u>**

|     | CASE NAME | DOCKET NO. |
|-----|-----------|------------|
| 1.  | Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al. | 10-03635-SMB |
| 2.  | Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al. | 10-03636-SMB |
| 3.  | Fairfield Sentry Ltd. (In Liquidation), et al. v. Abu Dhabi Inv. Auth., et al. | 11-01719-SMB |
| 4.  | Fairfield Sentry Ltd. (In Liquidation), et al. v. Albemar Participation Ltd., et al. | 12-01266-SMB |
| 5.  | Fairfield Sentry Ltd. (In Liquidation), et al. v. All Funds Bank, et al. | 11-01591-SMB |
| 6.  | Fairfield Sentry Ltd. (In Liquidation), et al. v. Almel Ltd., et al. | 10-03789-SMB |
| 7.  | Fairfield Sentry Ltd. (In Liquidation), et al. v. Alok Sama, et al. | 12-01294-SMB |
| 8.  | Fairfield Sentry Ltd. (In Liquidation), et al. v. Alton Alt. Fund Ltd., et al. | 12-01763-SMB |
| 9.  | Fairfield Sentry Ltd. (In Liquidation), et al. v. Alton Select Ltd., et al. | 10-03541-SMB |
| 10. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Andorra Banc Agricol Reig SA, et al. | 11-02611-SMB |
| 11. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Annex Ltd., et al. | 11-02593-SMB |
| 12. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Apollo Nominees, Inc., et al. | 11-01603-SMB |
| 13. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Arden Endowment Advisers Ltd., et al. | 11-01458-SMB |
| 14. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Arden Int'l Capital Ltd., et al. | 10-03870-SMB |
| 15. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Atl. Sec. Bank, et al. | 12-01550-SMB |
| 16. | Fairfield Sigma Ltd. (In Liquidation), et al. v. Avalon Absolute Return Funds PLC, et al. | 11-02530-SMB |
| 17. | Fairfield Sentry Ltd. (In Liquidation), et al. v. AXA Isle of Man, et al. | 10-03623-SMB |
| 18. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banca Carige SPA, et al. | 12-01123-SMB |
| 19. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banca Cesare Ponti SPA, et al. | 12-01140-SMB |
| 20. | Fairfield Sigma Ltd. (In Liquidation), et al. v. Banca Di San Marino SPA, et al. | 11-01572-SMB |
| 21. | Fairfield Sigma Ltd. (In Liquidation), et al. v. Banca Popolare Dell'Alto, et al. | 12-01148-SMB |
| 22. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banca Privada D'Andorra S.A., et al. | 11-01717-SMB |
| 23. | Fairfield Sigma Ltd. (In Liquidation), et al. v. Banca Profilo SPA, et al. | 12-01285-SMB |
| 24. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banc of America Secs. LLC, et al. | 11-01571-SMB |
| 25. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banco Atlantico (Bah.), et al. | 10-03783-SMB |
| 26. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banco Atlantico (Gib.) Ltd., et al. | 10-03787-SMB |
| 27. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banco Bilbao Vizcaya Argentaria, S.A., et al. | 10-03515-SMB |
| 28. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banco di Desio e Della Brianza, et al. | 10-04096-SMB |

| | CASE NAME | DOCKET NO. |
|---|---|---|
| 29. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banco General SA Banca Privada, et al. | 12-01286-SMB |
| 30. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banco Inversis SA, et al. | 10-04089-SMB |
| 31. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banco Itau Europa Int'l, et al. | 12-01124-SMB |
| 32. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banco Itau Europa Lux. SA, et al. | 10-03755-SMB |
| 33. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banco Nominees (IOM) Ltd., et al. | 10-04097-SMB |
| 34. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banco Patagonia (Uruguay) S.A.I.F.E., et al. | 12-01287-SMB |
| 35. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banque Havilland S.A, et al. | 12-01187-SMB |
| 36. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banco Privado Portugues (Cayman) Ltd., et al. | 11-02531-SMB |
| 37. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banco Santander (Suisse) S.A., et al. | 10-03509-SMB |
| 38. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Bank of Am. Nat'l Trust & Sav. Ass'n, et al. | 10-03615-SMB |
| 39. | Fairfield Sigma Ltd. (In Liquidation), et al. v. Bank of Ireland Nominees Ltd., et al. | 12-01135-SMB |
| 40. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Bank Hapoalim  BM, London, et al. | 12-01144-SMB |
| 41. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Bank Hapoalim (Suisse) Ltd., et al. | 10-03510-SMB |
| 42. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Bank Julius Baer & Co. Ltd., Zurich, et al. | 11-01243-SMB |
| 43. | Fairfield Sentry Ltd. (In Liquidation), et al. v. BankMed (Suisse) S.A., et al. | 11-02772-SMB |
| 44. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Bank Morgan Stanley AG, et al. | 10-04212-SMB |
| 45. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Beneficial Owners of Accounts Held in the Name of Bank Sal. Oppenheim Jr. & Cie (Schweiz) Ag 1-1000 | 11-02440-SMB |
| 46. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Bank Sarasin & Cie, et al. | 12-01295-SMB |
| 47. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Bank Sarasin & Cie AG, et al. | 11-01612-SMB |
| 48. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Bank Vontobel AG, et al. | 11-01760-SMB |
| 49. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banque Baring Bros. Sturdza SA, et al. | 12-01157-SMB |
| 50. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banque Degroof Luxembourg S.A., et al. | 12-01147-SMB |
| 51. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banque de Luxembourg, et al. | 10-03616-SMB |
| 52. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banque de Reescompte et de Placement, et al. | 11-01585-SMB |
| 53. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banque et Caisse D'Epargne de L'Etat Luxembourg, et al. | 11-01598-SMB |
| 54. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banque Piguet & Cie S.A., et al. | 10-03514-SMB |
| 55. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banque Privee Edmond De Rothschild (Eur.), et al. | 10-03505-SMB |

| | CASE NAME | DOCKET NO. |
|---|---|---|
| 56. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banque SCS Alliance S.A., et al. | 11-01256-SMB |
| 57. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banque Sudameris, et al. | 10-03586-SMB |
| 58. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banque Sudameris, et al. | 10-03749-SMB |
| 59. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banque Syz & Co. S.A., et al. | 10-03513-SMB |
| 60. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Barclays Bank SA Madrid, et al. | 12-01265-SMB |
| 61. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Barclays Bank (Suisse) S.A., et al. | 11-01259-SMB |
| 62. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Barclays Private Bank & Trust (Channel Islands) Limited, et al. | 12-01599-SMB |
| 63. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Barfield Nominees Ltd., et al. | 11-01470-SMB |
| 64. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Bie Bank & Trust Bah. Ltd., et al. | 11-01587-SMB |
| 65. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Bipielle Banke (Suisse), et al. | 11-01568-SMB |
| 66. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Blubank Ltd., et al. | 10-03750-SMB |
| 67. | Fairfield Sentry Ltd. (In Liquidation), et al. v. BNP Paribas Arbitrage SNC, et al. | 10-04098-SMB |
| 68. | Fairfield Sentry Ltd. (In Liquidation), et al. v. BNP Paribas Espana, et al. | 12-01551-SMB |
| 69. | Fairfield Sentry Ltd. (In Liquidation), et al. v. BGL BNP Paribas S.A., et al. | 10-03626-SMB |
| 70. | Fairfield Sentry Ltd. (In Liquidation), et al. v. BNP Paribas Private Bank & Trust Cayman Ltd., et al. | 10-04099-SMB |
| 71. | Fairfield Sentry Ltd. (In Liquidation), et al. v. BNP Paribas Secs. Nominees Ltd., et al. | 11-01579-SMB |
| 72. | Fairfield Sentry Ltd. (In Liquidation), et al. v. BNP Paribas Secs. Servs. Lux., et al. | 10-03627-SMB |
| 73. | Fairfield Sentry Ltd. (In Liquidation), et al. v. BNY AIS Nominees Ltd., Credit Andorra/Crediivest, et al. | 11-01589-SMB |
| 74. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Bordier & Cie, et al. | 10-03873-SMB |
| 75. | Fairfield Sentry Ltd. (In Liquidation), et al. v. BP Alpha S.A., et al. | 11-01245-SMB |
| 76. | Fairfield Sigma Ltd. (In Liquidation), et al. v. Bred Banque Populaire, et al. | 12-01136-SMB |
| 77. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Brown Bros. Harriman & Co., et al. | 10-03752-SMB |
| 78. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Bureau of Labor Ins., et al. | 11-01574-SMB |
| 79. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Caceis Bank EX-IXIS IS, et al. | 10-03871-SMB |
| 80. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Caceis Bank Lux., et al. | 10-03624-SMB |
| 81. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Cais Bank, et al. | 12-01288-SMB |
| 82. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Capital Global Mgmt. Ltd., et al. | 12-01552-SMB |

|      | CASE NAME | DOCKET NO. |
|------|-----------|------------|
| 83.  | Fairfield Sentry Ltd. (In Liquidation), et al. v. Capluck Enters. Ltd., et al. | 11-01573-SMB |
| 84.  | Fairfield Sigma Ltd. (In Liquidation), et al. v. Catalunya Caixa, et al. | 12-01129-SMB |
| 85.  | Fairfield Sentry Ltd. (In Liquidation), et al. v. Cathay Life Ins. Co. Ltd., et al. | 11-01577-SMB |
| 86.  | Fairfield Sentry Ltd. (In Liquidation), et al. v. CDC IXIS, et al. | 10-03754-SMB |
| 87.  | Fairfield Sentry Ltd. (In Liquidation), et al. v. Celfin Int'l Ltd., et al. | 10-03865-SMB |
| 88.  | Fairfield Sentry Ltd. (In Liquidation), et al. v. Centre Coll., et al. | 12-01143-SMB |
| 89.  | Fairfield Sentry Ltd. (In Liquidation), et al. v. Chelsea Trust Co., Ltd., et al. | 12-01138-SMB |
| 90.  | Fairfield Sentry Ltd. (In Liquidation), et al. v. Chen Tyan-Wen, et al. | 11-01611-SMB |
| 91.  | Fairfield Sentry Ltd. (In Liquidation), et al. v. Ching-Jung Fang, et al. | 11-02591-SMB |
| 92.  | Fairfield Sentry Ltd. (In Liquidation), et al. v. Citibank Korea Inc., et al. | 12-01142-SMB |
| 93.  | Fairfield Sentry Ltd. (In Liquidation), et al. v. Citibank NA London, et al. | 10-03622-SMB |
| 94.  | Fairfield Sentry Ltd. (In Liquidation), et al. v. Citibank (Switz.) AG, et al. | 10-03640-SMB |
| 95.  | Fairfield Sentry Ltd. (In Liquidation), et al. v. Citigroup Global Markets Ltd., et al. | 11-02770-SMB |
| 96.  | Fairfield Sentry Ltd. (In Liquidation), et al. v. Citivic Nominees Ltd., et al. | 10-04100-SMB |
| 97.  | Fairfield Sentry Ltd. (In Liquidation), et al. v. Clarks Fork Foundation, et al. | 12-01150-SMB |
| 98.  | Fairfield Sentry Ltd. (In Liquidation), et al. v. Clearstream Banking S.A., et al. | 11-01263-SMB |
| 99.  | Fairfield Sentry Ltd. (In Liquidation), et al. v. Commercial Bank of Kuwait, et al. | 10-04093-SMB |
| 100. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Credit Agricole (Suisse) S.A., et al. | 11-01244-SMB |
| 101. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Credit Agricole Titres, et al. | 11-02787-SMB |
| 102. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Credit Industriel et Commercial Sing. Branch, et al. | 11-01575-SMB |
| 103. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Credit Suisse AG Nassau Branch Wealth Mgmt., et al. | 11-01601-SMB |
| 104. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Credit Suisse (Bah.), et al. | 10-03782-SMB |
| 105. | Fairfield Sigma Ltd. (In Liquidation), et al. v. Credit Suisse Int'l, et al. | 10-03620-SMB |
| 106. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Credit Suisse (Lux.) S.A., et al. | 10-04088-SMB |
| 107. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Credit Suisse Nassau Branch, et al. | 12-01127-SMB |
| 108. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Credit Suisse Nominees, et al. | 10-04236-SMB |
| 109. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Credit Suisse Nominees (Guernsey) Ltd., et al. | 11-02612-SMB |
| 110. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Criterium Capital Funds BV, et al. | 12-01268-SMB |

| | CASE NAME | DOCKET NO. |
|---|---|---|
| 111. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Danobat S. Coop, et al. | 12-01159-SMB |
| 112. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Delta, S.P.A., et al. | 12-01162-SMB |
| 113. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Deltec Bank & Trust Ltd., et al. | 11-02532-SMB |
| 114. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Deutsche Bank AG Singapore, et al. | 10-03747-SMB |
| 115. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Deutsche Bank (Cayman), et al. | 10-03746-SMB |
| 116. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Deutsche Bank Nominees (Jersey) Ltd., et al. | 11-01564-SMB |
| 117. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Deutsche Bank (Suisse) S.A. Geneve, et al. | 10-03745-SMB |
| 118. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Deutsche Bank Trust Co. Am., et al. | 10-03744-SMB |
| 119. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Dexia BIL, et al. | 10-04090-SMB |
| 120. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Dexia Private Bank (Switz.), et al. | 10-04091-SMB |
| 121. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Don Chimango SA, et al. | 12-01298-SMB |
| 122. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Drake & Co., et al. | 11-01246-SMB |
| 123. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Dreadnought Fin. OY, et al. | 12-01289-SMB |
| 124. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Dresdner LateinAmerika AG, et al. | 10-03753-SMB |
| 125. | Fairfield Sentry Ltd. (In Liquidation), et al. v. E. Star Sicavf, et al. | 11-01597-SMB |
| 126. | Fairfield Sentry Ltd. (In Liquidation), et al. v. EC.Com, Inc., et al. | 11-02614-SMB |
| 127. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Eduardo Fernandez de Valderrama Murillo, et al. | 11-01599-SMB |
| 128. | Fairfield Sentry Ltd. (In Liquidation), et al. v. EFG Bank, et al. | 10-03625-SMB |
| 129. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Essex 21 Ltd., et al. | 12-01716-SMB |
| 130. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Field Nominees Ltd., et al. | 12-01133-SMB |
| 131. | Fairfield Sentry Ltd. (In Liquidation), et al. v. First Gulf Bank, et al. | 12-01567-SMB |
| 132. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Fortis Bank, SA/NV, et al. | 11-01617-SMB |
| 133. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Fortis Bank Cayman Limited, et al. | 12-01571-SMB |
| 134. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Fortis Bank Nederland  N.V., et al. | 12-01119-SMB |
| 135. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Fortis Global Custody Servs. N.V., et al. | 11-02422-SMB |
| 136. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Fortis Global Servs. NV, et al. | 12-01568-SMB |
| 137. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Fortis Bank Nederland NV, et al. | 11-01614-SMB |
| 138. | Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Retained Nominees (IOM) Limited, et al. | 10-03776-SMB |

| | CASE NAME | DOCKET NO. |
|---|---|---|
| 139. | Fairfield Sentry Ltd. (In Liquidation), et al. v. FPB Int'l Bank, Inc., et al. | 12-01126-SMB |
| 140. | Fairfield Sentry Ltd. (In Liquidation), et al. v. FS ABN AMRO Global Custody, et al. | 10-03504-SMB |
| 141. | Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/AEB Lux., et al. | 11-01254-SMB |
| 142. | Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/AND Banc Andorra, et al. | 10-03632-SMB |
| 143. | Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/Bank Leumi Israel, et al. | 12-01158-SMB |
| 144. | Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/Banque Degroof Bruxelles, et al. | 11-01569-SMB |
| 145. | Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/BBVA Zurich/Shares, et al. | 11-01600-SMB |
| 146. | Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/BK Hapoalim/B M Tel Aviv, et al. | 11-01467-SMB |
| 147. | Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/BBVA Miami, et al. | 10-03618-SMB |
| 148. | Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/CBESSA, et al. | 10-03756-SMB |
| 149. | Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/Fortis Banque Lux., et al. | 11-01242-SMB |
| 150. | Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/GSCO London, et al. | 12-01569-SMB |
| 151. | Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/HSBC Guyerzeller Zurich, et al. | 11-01594-SMB |
| 152. | Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/HSBC Private Banking Nom, et al. | 10-03629-SMB |
| 153. | Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/ING Lux, et al. | 11-01565-SMB |
| 154. | Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/Israel Disc. Bank, Ltd., Tel Aviv, et al. | 11-01610-SMB |
| 155. | Fairfield Sigma Ltd. (In Liquidation), et al. v. FS/LAB/AXA PM, et al. | 11-01460-SMB |
| 156. | Fairfield Sentry Ltd. (In Liquidation), et al. v. FS Mizrahi Tefahot Bank Ltd., et al. | 10-03512-SMB |
| 157. | Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/MLBS Geneva, et al. | 12-01269-SMB |
| 158. | Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/NBK Kuwait, et al. | 11-01260-SMB |
| 159. | Fairfield Sigma Ltd. (In Liquidation), et al. v. FS/NBP Titres, et al. | 11-01619-SMB |
| 160. | Fairfield Sigma Ltd. (In Liquidation), et al. v. FS Oddo & Cie, et al. | 10-03621-SMB |
| 161. | Fairfield Sigma Ltd. (In Liquidation), et al. v. FS/Procap/Bryan Garnier, et al. | 11-01262-SMB |
| 162. | Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/SG Private Banking (Lugano-Svizzera) SA, et al. | 11-01566-SMB |
| 163. | Fairfield Sentry Ltd. (In Liquidation), et al. v. FS Stichting Stroeve Global Custody, et al. | 10-03867-SMB |
| 164. | Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/Swedclient/IAM, et al. | 11-01253-SMB |
| 165. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Fullerton Capital PTE, Ltd., et al. | 11-02771-SMB |
| 166. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Fund Nominees Ltd., et al. | 10-03525-SMB |

|  | CASE NAME | DOCKET NO. |
|---|---|---|
| 167. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Gates Charitable Trust, et al. | 12-01145-SMB |
| 168. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Global Fund Porvenir, et al. | 11-01567-SMB |
| 169. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Grand Cathay Secs. (H.K.) Ltd., et al. | 11-01462-SMB |
| 170. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Hambros Guernsey Nominees, et al. | 10-03799-SMB |
| 171. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Hansard Europe Ltd., et al. | 10-04238-SMB |
| 172. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Hinduja Bank (Switzerland) SA, et al. | 12-01185-SMB |
| 173. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Hontai Life Ins. Co. Ltd., et al. | 12-01271-SMB |
| 174. | Fairfield Sentry Ltd. (In Liquidation), et al. v. HSBC Int'l Trustee Ltd., et al. | 12-01290-SMB |
| 175. | Fairfield Sentry Ltd. (In Liquidation), et al. v. HSBC Inst. Trust Servs. (Asia) Ltd., et al. | 10-03619-SMB |
| 176. | Fairfield Sentry Ltd. (In Liquidation), et al. v. HSBC Private Bank (Guernsey) Ltd., et al. | 10-03631-SMB |
| 177. | Fairfield Sentry Ltd. (In Liquidation), et al. v. HSBC Private Bank (Suisse) S.A., et al. | 10-03633-SMB |
| 178. | Fairfield Sentry Ltd. (In Liquidation), et al. v. HSBC Secs. (Panama) SA, et al. | 12-01270-SMB |
| 179. | Fairfield Sentry Ltd. (In Liquidation), et al. v. HSBC Secs. Servs. (Lux.) S.A., et al. | 10-03630-SMB |
| 180. | Fairfield Sentry Ltd. (In Liquidation), et al. v. HSBC Seoul Branch, Ltd., et al. | 12-01128-SMB |
| 181. | Fairfield Sentry Ltd. (In Liquidation), et al. v. HSH Nordbank Secs. S.A., et al. | 12-01555-SMB |
| 182. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Hsu, et al. | 11-01247-SMB |
| 183. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Hua Nan Commercial Bank, et al. | 12-01153-SMB |
| 184. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Huang, et al. | 11-01255-SMB |
| 185. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Huang Long-Yin, et al. | 11-01465-SMB |
| 186. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Hui-Liang Tsai & Chien-Hui Tu, et al. | 11-01466-SMB |
| 187. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Hyposwiss Private Bank Geneve, et al. | 12-01600-SMB |
| 188. | Fairfield Sentry Ltd. (In Liquidation), et al. v. ING Bank (Suisse) S.A., et al. | 10-03801-SMB |
| 189. | Fairfield Sentry Ltd. (In Liquidation), et al. v. International Hedge Fund Ltd., et al. | 12-01161-SMB |
| 190. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Investec Bank (Switzerland) AG, et al. | 12-01125-SMB |
| 191. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Irish Life Int'l, et al. | 12-01291-SMB |
| 192. | Fairfield Sigma Ltd. (In Liquidation), et al. v. Istituto Bancario Sammarinese S.P.A., et al. | 12-01292-SMB |
| 193. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Jared Trading Ltd./BVI, et al. | 12-01264-SMB |

| | CASE NAME | DOCKET NO. |
|---|---|---|
| 194. | Fairfield Sentry Ltd. (In Liquidation), et al. v. John E. Niederhuber IRA, et al. | 12-01296-SMB |
| 195. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Judith Cherwinka, et al. | 11-01592-SMB |
| 196. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Judith A. Hansen, et al. | 11-01593-SMB |
| 197. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Kasbank Depositary Trust Co., et al. | 12-01137-SMB |
| 198. | Fairfield Sigma Ltd. (In Liquidation), et al. v. Kasbank Effecten Bewaarbedrijf, N.V., et al. | 12-01163-SMB |
| 199. | Fairfield Sigma Ltd. (In Liquidation), et al. v. KAS Depositary Trust Co., et al. | 11-02533-SMB |
| 200. | Fairfield Sentry Ltd. (In Liquidation), et al. v. KB (CI) Nominees Ltd., et al. | 10-04240-SMB |
| 201. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Kefong Lee, et al. | 11-01596-SMB |
| 202. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Kiangsu Chekiang, et al. | 12-01155-SMB |
| 203. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Kookmin Bank, et al. | 10-03777-SMB |
| 204. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Korea Exch. Bank, et al. | 11-01486-SMB |
| 205. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Kredietbank S.A. Luxembourgeoise, et al. | 10-03868-SMB |
| 206. | Fairfield Sentry Ltd. (In Liquidation), et al. v. KWI, et al. | 11-01595-SMB |
| 207. | Fairfield Sigma Ltd. (In Liquidation), et al. v. La Romana Inversiones SICAV, S.A., et al. | 12-01149-SMB |
| 208. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Lacroze, et al. | 10-03528-SMB |
| 209. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Leyden Dev., et al. | 11-01622-SMB |
| 210. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Lion Global Invs., et al. | 11-02392-SMB |
| 211. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Lombard Odier Darier Hentsch & Cie, et al. | 10-03795-SMB |
| 212. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Lombardy Props. Ltd., et al. | 10-03521-SMB |
| 213. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Loquat Holdings, Inc., et al. | 12-01152-SMB |
| 214. | Fairfield Sigma Ltd. (In Liquidation), et al. v. Lung Yen Life Serv. Co. Ltd., et al. | 11-01608-SMB |
| 215. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Madison Cultural Arts Support Trust, et al. | 12-01121-SMB |
| 216. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Mandalay Invs. SA, et al. | 12-01141-SMB |
| 217. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Maple Key Mkt. Neutral Cayman Islands LP, et al. | 12-01122-SMB |
| 218. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Mario Pacheco Cortes, et al. | 11-02401-SMB |
| 219. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Melguizo, et al. | 11-01607-SMB |
| 220. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Melrose Inv. Ltd., et al. | 11-01461-SMB |
| 221. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Meritz Fire & Marine Ins. Co. Ltd., et al. | 10-03507-SMB |

| | CASE NAME | DOCKET NO. |
|---|---|---|
| 222. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Merrill Lynch Bank (Suisse) S.A., et al. | 10-03788-SMB |
| 223. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Merrill Lynch Int'l, et al. | 11-01463-SMB |
| 224. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., et al. | 10-03516-SMB |
| 225. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Mirabaud & Cie, et al. | 11-01257-SMB |
| 226. | Fairfield Sigma Ltd. (In Liquidation), et al. v. Monte Paschi Ireland Ltd., et al. | 10-03791-SMB |
| 227. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Multi-Strategy Fund Ltd., et al. | 11-01576-SMB |
| 228. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Naidot & Co., et al. | 11-02336-SMB |
| 229. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Natexis Banques Populaires, et al. | 10-04094-SMB |
| 230. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Natixis, et al. | 11-01464-SMB |
| 231. | Fairfield Sigma Ltd. (In Liquidation), et al. v. Natixis Private Banking Int'l, et al. | 10-03864-SMB |
| 232. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Neue Bank AG, et al. | 10-03519-SMB |
| 233. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Nihon Unicom Corp., et al. | 11-01261-SMB |
| 234. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Nomura Int'l PLC, et al. | 10-03793-SMB |
| 235. | Fairfield Sentry Ltd. (In Liquidation), et al. v. NYROY, Royal Bank of Canada, et al. | 11-01578-SMB |
| 236. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Parson Fin. Panama S.A., et al. | 11-01580-SMB |
| 237. | Fairfield Sentry Ltd. (In Liquidation), et al. v. PFPC Bank Ltd., et al. | 11-01604-SMB |
| 238. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Pictet & Cie, et al. | 10-03764-SMB |
| 239. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Pleasant T. Rowland Found., Inc. et al. | 11-01613-SMB |
| 240. | Fairfield Sentry Ltd. (In Liquidation), et al. v. POBT Bank & Trust Ltd., et al. | 11-01248-SMB |
| 241. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Portobelo Advs., Inc., et al. | 12-01146-SMB |
| 242. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Presnow Ltd., et al. | 11-01620-SMB |
| 243. | Fairfield Sentry Ltd. (In Liquidation), et al. v. PRS Inv. Strategies Fund Class 4E, et al. | 10-04101-SMB |
| 244. | Fairfield Sentry Ltd. (In Liquidation), et al. v. P.S.I. Int'l Ltd., et al. | 11-02592-SMB |
| 245. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Public Bank (Hong Kong) Ltd., et al. | 12-01164-SMB |
| 246. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Rahn & Bodmer Banquiers, et al. | 11-01581-SMB |
| 247. | Fairfield Sentry Ltd. (In Liquidation), et al. v. RBC Dexia Inv. Servs. Espana S.A., et al. | 12-01132-SMB |
| 248. | Fairfield Sentry Ltd. (In Liquidation), et al. v. RBC Dominion Sec. Sub A/C, et al. | 10-03502-SMB |
| 249. | Fairfield Sentry Ltd. (In Liquidation), et al. v. RBC Investor Services Bank S.A. f/k/a RBC Dexia Investor Services Bank S.A., et al. | 16-01214-SMB |

| | CASE NAME | DOCKET NO. |
|---|---|---|
| 250. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Robinson & Co., et al. | 10-03628-SMB |
| 251. | Fairfield Sigma Ltd. (In Liquidation), et al. v. Rothschild & Cie Banque Paris, et al. | 12-01131-SMB |
| 252. | Fairfield Sigma Ltd. (In Liquidation), et al. v. Rothschild Trust (Schweiz) AG, et al. | 11-02594-SMB |
| 253. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Royal Bank of Canada, et al. | 11-02253-SMB |
| 254. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Royal Bank of Canada Singapore Branch, et al. | 11-01582-SMB |
| 255. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Royal Bank of Canada (Suisse), et al. | 10-04087-SMB |
| 256. | Fairfield Sigma Ltd. (In Liquidation), et al. v. S. Coop Irizar, et al. | 11-01570-SMB |
| 257. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Samsung Absolute Return Trust M1, et al. | 12-01762-SMB |
| 258. | Fairfield Sigma Ltd. (In Liquidation), et al. v. Societe Europeenne De Banque S.A. et al | 11-01615-SMB |
| 259. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Schroder & Co. (Asia) Ltd., et al. | 10-03508-SMB |
| 260. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Schroder & Co. Bank AG, et al. | 11-01249-SMB |
| 261. | Fairfield Sigma Ltd. (In Liquidation), et al. v. Schroders Italy SIM SPA, et al. | 12-01272-SMB |
| 262. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Select Absolute Strategies Sicav, et al. | 12-01601-SMB |
| 263. | Fairfield Sigma Ltd. (In Liquidation), et al. v. SEI Invs. Trustee, et al. | 12-01134-SMB |
| 264. | Fairfield Sentry Ltd. (In Liquidation), et al. v. SG Private Banking (Suisse) S.A., et al. | 10-03786-SMB |
| 265. | Fairfield Sentry Ltd. (In Liquidation), et al. v. SG Private Banking (Suisse) S.A., et al. | 10-03595-SMB |
| 266. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Sherli Elghanian Krayem, et al. | 10-03614-SMB |
| 267. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Silverado Holdings LDC, et al. | 12-01300-SMB |
| 268. | Fairfield Sigma Ltd. (In Liquidation), et al. v. Simgest SpA, et al. | 11-02534-SMB |
| 269. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Six Sis AG, et al. | 10-03869-SMB |
| 270. | Fairfield Sentry Ltd. (In Liquidation), et al. v. SNS Global Custody B.V., et al. | 10-03757-SMB |
| 271. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Societe Generale Bank & Trust (Lux.), et al. | 11-01584-SMB |
| 272. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Societe Generale Bank & Trust S.A. (Lux.), et al. | 11-02613-SMB |
| 273. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Sofos Capital LLC, et al. | 12-01154-SMB |
| 274. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Somers Nominees (Far East) Ltd., et al. | 12-01556-SMB |
| 275. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Spin City Corp., et al. | 12-01160-SMB |
| 276. | Fairfield Sigma Ltd. (In Liquidation), et al. v. Stichting Stroeve Global Custody, et al. | 11-02615-SMB |
| 277. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Strina, et al. | 10-03798-SMB |

| | CASE NAME | DOCKET NO. |
|---|---|---|
| 278. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Sumitomo Banking & Trust Co. Ltd., et al. | 10-03863-SMB |
| 279. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Swedbank, et al. | 11-01586-SMB |
| 280. | Fairfield Sentry Ltd. (In Liquidation), et al. v. TAIB Bank E.C., et al. | 12-01267-SMB |
| 281. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Tayleigh Trust Co. Ltd., et al. | 12-01130-SMB |
| 282. | Fairfield Sigma Ltd. (In Liquidation), et al. v. Tercas – Cassa di Risparmio della Provincia di Teramo S.P.A., et al. | 10-03503-SMB |
| 283. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Theodoor GGC Amsterdam, et al. | 10-03496-SMB |
| 284. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Torshen, et al. | 10-03866-SMB |
| 285. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Triumph Offshore Fund, et al. | 12-01293-SMB |
| 286. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Tsao, et al. | 11-01468-SMB |
| 287. | Fairfield Sentry Ltd. (In Liquidation), et al. v. UBS AG N.Y., et al. | 10-03780-SMB |
| 288. | Fairfield Sentry Ltd. (In Liquidation), et al. v. UBS Fund Servs. (Cayman) Ltd., et al. | 10-04095-SMB |
| 289. | Fairfield Sentry Ltd. (In Liquidation), et al. v. UBS Fund Servs. (Cayman) Ltd. Ref Greenlake Arbitrage Fund Ltd., et al. | 10-03758-SMB |
| 290. | Fairfield Sentry Ltd. (In Liquidation), et al. v. UBS Fund Servs. (Ir.) Ltd., et al. | 11-01258-SMB |
| 291. | Fairfield Sentry Ltd. (In Liquidation), et al. v. UBS Europe SE, Luxembourg Branch f/k/a UBS Lux. SA, et al. | 11-01250-SMB |
| 292. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Unicorp Bank & Trust Ltd., et al. | 12-01301-SMB |
| 293. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Union Finance Int'l (HK) Ltd., et al. | 12-01139-SMB |
| 294. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Union USD Global Arbitrage A Fund, et al. | 10-03506-SMB |
| 295. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Vontobel Asset Mgmt. Inc., et al. | 10-03540-SMB |
| 296. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Wall Street Secs. S.A., et al. | 10-03778-SMB |
| 297. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Weston Sec. Ltd., et al. | 10-03784-SMB |
| 298. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Winchester Fiduciary Servs. Ltd., et al. | 12-01302-SMB |
| 299. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Woori Bank, et al. | 11-01616-SMB |
| 300. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Yuanta Asset Mgmt. (H.K.) Ltd., et al. | 11-01588-SMB |
| 301. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Zayed, et al. | 10-03790-SMB |
| 302. | Fairfield Sentry Ltd. (In Liquidation), et al. v. ZCM Asset Holding Co. (Berm.) Ltd., et al. | 10-03792-SMB |
| 303. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Zurich Capital Mkts. Co., et al. | 10-03634-SMB |

# **<u>EXHIBIT B</u>**

## LIST OF DEFENDANTS WHO HAVE MOVED TO DISMISS

- ABN AMRO SCHWEIZ AG a/k/a ABN AMRO (Switzerland) AG
- Allianzbank SPA/Unifortune Conservative Side Pocket
- Banca Arner SA
- Banca Unione Di Credito
- Bank Hapoalim Switzerland Ltd.
- Bank Julius Baer & Co. Ltd.
- Bank J. Safra Sarasin AG, f/k/a Bank Sarasin & Cie
- Banque Cantonale Vaudoise
- BBVA (Suisse) SA
- BCV AMC Defensive AL Fund
- BNP Paribas (Suisse) SA
- BNP Paribas (Suisse) SA Ex Fortis
- BNP Paribas (Suisse) SA Private
- BSI AG
- BSI Ex Banca Del Gottardo
- Caceis Bank Luxembourg
- Centrum Bank AG (AMS)
- Clariden Leu Ltd.
- Compagnie Bancaire Helvetique
- Corner Banca SA
- Credit Suisse AG Zurich
- Dexia Banque Internationale à Luxembourg
- Dresdner Bank Schweiz
- EFG Bank SA Switzerland
- EFG Eurofinancier D'Invest MCL
- Edmond de Rothschild (Suisse) S.A.[8]
- Fairfield Investment Fund Ltd.
- Fairfield Investment GCI
- Falcon Private Bank
- FIF Advanced Ltd.
- Finter Bank Zurich
- Harmony Capital Fund Ltd.

---

[8] Edmond de Rothschild (Suisse) S.A. was substituted in as a defendant for prior defendant Sella Bank AG on September 25, 2018.  See Adv. Pro 10-03636 [ECF No. 468].   The inclusion of Edmond de Rothschild (Suisse) S.A.  is without prejudice to any positions, arguments, or defenses of Plaintiffs or Edmond de Rothschild (Suisse) S.A. as to whether a motion to dismiss has been filed that is applicable to any liabilities arising from any redemption payments made to Sella Bank AG."

- HSBC
- IHAG Handelsbank AG
- Incore Bank AG
- LGT Bank In Liechtenstein AG
- Liechtensteinische LB Reinvest AMS
- Lloyds TSB Bank Geneva
- Lombard Odier Darier Hentsch & CIE
- National Bank of Kuwait
- NBK Banque Privee Suisse SA
- Pictet & CIE
- PKB Privatbank AG
- Quasar Funds SPC a/k/a Quasar Fund SPC Class A and Class B CGCNV
- RBC Dexia Investor Service Julius Baer SICAV
- RBS Coutts Bank Ltd.
- Rothschild Bank AG Zurich (Dublin) a/k/a Rothschild Bank AG
- Rothschild Bank Geneva (Dublin)
- Rothschild Lugano Dublin a/k/a Banca Privata Edmond de Rothschild Lugano S.A.
- SIS Seeganintersettle
- Six SIS Ltd.
- Societe Generale Bank & Trust
- T1 Global Fund Ltd.[9]
- UBS AG (sued herein as UBS AG New York and
- UBS AG Zurich)
- UBS Jersey Nominees
- Verwaltungs und Privat-Bank AG Aktiengesellschaft (AMS)
- Vorarlberger Landes UND Hypothekenbank Aktiengesellschaft

---

[9] Counsel for T1 Global Fund Ltd. has represented to Plaintiffs that it will be withdrawing as counsel of record for T1 Global Fund Ltd., which is now in liquidation proceedings.

# **<u>EXHIBIT C</u>**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X
                            :

In re:                         :       Chapter 15 Case
                            :

FAIRFIELD SENTRY LIMITED, *et al.*,  :       Case No. 10-13164 (SMB)
                            :

     Debtors in Foreign Proceedings.   :       Jointly Administered

-------------------------------------------------------X

FAIRFIELD SENTRY LIMITED       :
(IN LIQUIDATION), acting by and through the :      Adv. Proc. No. 10-03496 (SMB)
Foreign Representatives thereof,      :
                            :       Administratively Consolidated

            Plaintiffs,       :
                            :

           -against-        :
                            :

THEODOOR GGC AMSTERDAM, *et al.*,  :
                            :

           Defendants.      :

-------------------------------------------------------X

## MEMORANDUM DECISION GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS AND PLAINTIFFS' MOTIONS FOR LEAVE TO AMEND

**A P P E A R A N C E S :**

BROWN RUDNICK LLP
Seven Times Square
New York, NY 10036

     David J. Molton, Esq.
     Marek P. Krzyzowski, Esq.
     Of Counsel

KELLOGG, HANSEN, TODD, FIGEL
& FREDERICK, P.L.L.C.
1615 M. Street, N.W., Suite 400
Washington, D.C. 20036

     Michael K. Kellogg, Esq. (admitted *pro hac vice*)
     Aaron M. Panner, Esq. (admitted *pro hac vice*)
     Of Counsel

*Attorneys for Plaintiffs*

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, NY 10006

    Thomas J. Moloney, Esq.
        Of Counsel

HOGAN LOVELLS US LLP
875 Third Avenue
New York, NY 10022

    Marc J. Gottridge, Esq.
        Of Counsel

MOSES & SINGER LLP
405 Lexington Avenue
New York, NY 10174

    Alan Kolod, Esq.
        Of Counsel

CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, NY 10019

    Jeff Butler, Esq.
        Of Counsel

*Attorneys for Defendants[1]*

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge**

      Plaintiffs Kenneth M. Krys and Charlotte Caulfield (together, the "Liquidators"),[2]

in their capacities as foreign representatives of Fairfield Sentry Limited ("Sentry"),

Fairfield Sigma Limited ("Sigma"), and Fairfield Lambda Limited ("Lambda," and

collectively, the "Funds") seek leave to amend their complaints, (*see Memorandum Of*

*Law in Support of Motion for Leave to Amend*, dated Oct. 21, 2016 ("*Liquidators*

---

[1]      The listed attorneys for the Defendants participated at the oral argument; additional defense counsel are set forth in Appendix E to the *Consolidated Memorandum of Law in Opposition to Plaintiffs' Motion for Leave to Amend and in Support of Defendants' Motion to Dismiss*, dated Jan. 13, 2017 ("*Defendants Motion*") (ECF Doc. # 960).

[2]      Different individuals have served as Liquidators of the Funds. When used in this memorandum decision, the term refers to the individuals serving in that position during the referenced time-period.

Motion") (ECF Doc. # 923)), in 305 adversary proceedings pending in this Court in which the Liquidators seek to recover redemptions paid by the Funds to the defendants (collectively, the "U.S. Redeemer Actions").[3] The defendants in the U.S. Redeemer Actions (collectively, the "Defendants") oppose the amendments and seek dismissal of the U.S. Redeemer Actions on various grounds discussed below.

In a prior decision, the Court concluded that it had subject matter jurisdiction over the U.S. Redeemer Actions, and that the execution of certain Subscription Agreements, without more, did not subject the Defendants to the personal jurisdiction of the Court. *Fairfield Sentry Ltd.* (*In Liquidation*) *v. Theodoor GGC Amsterdam* (*In re Fairfield Sentry Ltd.*), Adv. Proc. No. 10-03496 (SMB), 2018 WL 3756343 (Bankr. S.D.N.Y. Aug. 6, 2018) ("*Prior Decision*"). The Court refrained from addressing the parties' merit-based contentions because the *Prior Decision* did not completely resolve the motions to dismiss for lack of personal jurisdiction. *Id.* at *12. The parties subsequently stipulated to be bound by the merit-based determinations of the motions without prejudice to their jurisdictional objections or the right to seek reconsideration or to appeal. (*Order and Stipulation Between the Liquidators and the Defendants Listed on Appendix A*, "so-ordered" on Sept. 20, 2018 (ECF Doc. # 1735).)

---

[3]    A list of all U.S. Redeemer Actions is attached as Appendix D to the *Foreign Representatives' Memorandum of Law in Opposition to Defendants' Consolidated Memorandum of Law and in Further Support of Foreign Representatives' Motion for Leave to Amend Complaints*, dated Mar. 31, 2017 ("*Liquidators Reply*") (ECF Doc. # 1336). The U.S. Redeemer Actions were administratively consolidated for pretrial purposes. (*See Amended Order Authorizing the Consolidation of Redeemer Actions Pursuant to Federal Rule of Bankruptcy Procedure 7042*, signed Nov. 17, 2010 (ECF Doc. # 25).) Unless otherwise specified, references to docket entries are to documents filed on the electronic docket of the consolidated proceeding, *Fairfield Sentry Limited* (*In Liquidation*) *v. Theodoor GGC Amsterdam*, Adv. Proc. No. 10-03496 (SMB).

For the reasons set forth below, the Liquidators' motions to amend are denied and the Defendants' motions to dismiss are granted with respect to the Contract and Common Law Claims described below except to the extent the pleading or proposed amendment adequately alleges that a particular Defendant knew that the net asset value ("NAV") as calculated at the time of the redemption payment was mistaken because the Funds' investments with Bernard L. Madoff Investment Securities LLC ("BLMIS") were worthless or nearly worthless.  In that situation, the Liquidators may assert a claim to impose a constructive trust on the Defendant.  Separately, the motions to dismiss the BVI Avoidance Claims, also described below, are denied without prejudice to renewal on the basis that the BVI Avoidance Claims (and, possibly, all claims) are barred under 11 U.S.C. §§ 546(e) and 561(d).

## BACKGROUND

The background is set forth in the *Prior Decision* and will be repeated or amplified only to the extent necessary to explain this decision.

The Funds were organized under the laws of the British Virgin Islands ("BVI"). Sentry sold shares to foreign investors and invested 95% of the proceeds with BLMIS. Sigma and Lambda were "funds of funds."  They also sold shares to investors, but invested the proceeds with Sentry which, in turn, invested those funds with BLMIS. Thus, each of the Funds invested virtually all of their assets with BLMIS directly or indirectly, and the value of their assets derived from the value of their BLMIS investments.

The Funds were governed by their respective Articles of Association ("Articles,"
and each provision within the Articles, an "Article").[4]  The Directors of each Fund
(referred to in the Articles as the "Company") were vested with the authority to manage
the Fund.  (Article 52.)  Article 9 described the process for the subscription of shares and
Article 10 addressed the redemption of shares.  With certain exceptions and conditions
that are not relevant, Article 10(1) provided that upon written request specifying the
number and class of Shares to be redeemed, "the Company . . . shall redeem or purchase
all or any portion of the Shares registered in the Applicant's name."  The redemption
payment was due on the Dealing Day which was generally thirty days after the receipt of
the redemption request.  (Article 10(1)(c).)

The redemption price was determined in accordance with Article 11 as of the
Dealing Day.  (Article 10(2).)  The subscription price for investors buying into the Fund
was also determined under Article 11.  (Article 9(2).)  Under Article 11, the Directors
determined the NAV per share by dividing the value of the Fund's net assets by the
number of outstanding shares.  (Article 11(1)(a), (b).)[5]  "Any certificate as to the Net
Asset Value per Share or as to the Subscription Price or the Redemption Price therefor
*given in good faith by or on behalf of the Directors shall be binding* on the parties."
(Article 11(1)(c) (emphasis added).)  The Funds delegated the duty to compute the NAV

---

[4]     A copy of Sentry's Articles is attached as Exhibit F to the *Declaration of William Hare in Support of Motion for Leave to Amend*, signed Oct. 21, 2016 ("*Hare Declaration*") (ECF Doc. # 925).  The Articles for Sigma and Lambda are identical in all material respects to Sentry's and are attached as Exhibits D and E, respectively, to the *Attorney Declaration of Thomas J. Moloney in Opposition to Plaintiffs' Motion for Leave to Amend and in Support of Defendants' Motion to Dismiss*, signed Jan. 13, 2017 ("*Moloney Declaration*") (ECF Doc. # 961).

[5]     The three subparagraphs that comprise Article 11(1) are not numbered or lettered.  For ease of reference, I have assigned letters to each subparagraph.  Article 11(1)(a) refers to the first subparagraph, Article 11(1)(b) to the second and Article 11(1)(c) to the third.

to Citco Fund Services (Europe) BV ("Citco") pursuant to a separate agreement.  *See*

*Fairfield Sentry Ltd.* (*In Liquidation*) *v. Migani*, [2014] UKPC 9 ("*Migani*"), ¶ 14.[6]

Prior to December 2008, the Directors certified the NAV for each subscription

and redemption in the belief that Sentry's investment with BLMIS had substantial value.

In December 2008, however, Madoff admitted to operating the investment advisory

business of BLMIS as a Ponzi scheme, and BLMIS was placed into a liquidation

proceeding pursuant to section 78eee of the Securities Investor Protection Act, 15 U.S.C.

§§ 78aaa, *et seq.*  In hindsight, the Funds had overpaid the earlier redemptions based on

an erroneous view of the value of Sentry's BLMIS investments.  Shortly after Madoff's

arrest and the collapse of BLMIS, the Funds became the subjects of liquidation

proceedings in the BVI.  The British Virgin Island Court ("BVI Court") appointed the

Liquidators, the Liquidators commenced ancillary proceedings in this Court under

Chapter 15 of the Bankruptcy Code to obtain recognition of the BVI liquidation

proceedings as "foreign main proceedings," and the Court granted the Liquidators'

applications on July 22, 2010.

## A.    BVI Redeemer Actions

In or about March 2010, the Liquidators commenced proceedings in the BVI (the

"BVI Redeemer Actions") in the name of Sentry to recover redemption payments made

in 2004.  (*See Statement of Claim* in *Fairfield Sentry Ltd.* (*In Liquidation*) *v. Bank*

---

[6]    A copy of the *Migani* decision is attached as Exhibit Q to the *Hare Declaration*.  An electronic
version of the opinion without paragraph numbers can be found on the Westlaw database at 2014 WL
1219748.

*Julius Baer & Co. Ltd.,* dated Mar. 12, 2010 ("*Statement of Claim*").)[7]  Sentry's theory

was straightforward.  It invested 95% of its assets with BLMIS, (*Statement of Claim* ¶ 4),

the BVI defendants (the "Redeemers") requested redemptions in March 2004, (*id.* ¶ 6),

and Sentry computed the NAV in accordance with the Articles in the aggregate amount

of $135,405,694.70.  (*Id.* ¶¶ 7, 8.)  Because BLMIS operated as a Ponzi scheme and

Sentry's investments were worthless, the actual NAV was nil or nominal at the time of

the redemptions.  (*Id.* ¶¶ 9, 10.)  Accordingly, the NAV was calculated under a mistake of

fact by Sentry (unilateral mistake), and the Redeemers were unjustly enriched and liable

to make restitution in the full amount or the difference between the redemption price

and the actual, nominal amount of the redeemed shares.  (*Id.* ¶¶ 9, 11.)  Alternatively,

Sentry was entitled to set aside the redemptions on the ground of mutual mistake.  (*Id.* ¶

12.)

### 1.    The Preliminary Issues Proceeding

In early 2011, certain Redeemers filed applications requesting that the BVI Court

hold a trial to determine "preliminary issues."  (*See Hare Declaration*, Ex. C.)  A

preliminary issues trial is a mechanism for deciding specific issues that are likely to

resolve the case.  (*Hare Declaration* ¶ 23; *Declaration of Phillip Kite in Opposition to

Plaintiffs' Motion for Leave to Amend and in Support of Defendants' Motion to

Dismiss*, signed Jan. 12, 2017 ("*Kite Declaration*"), at ¶ 9 (ECF Doc. # 963).)  The

Redeemers identified two preliminary issues; the first concerned the calculation of the

NAV (the "Certification Issue").  They argued that if the NAV was calculated in

---

[7]       A copy of the *Statement of Claim* is attached as Exhibit A to the *Hare Declaration*.

accordance with Article 11(1) and "certified," Sentry could not recalculate the NAV after

redemption.  (*Hare Declaration,* Ex. G, ¶¶ 17-19.)  Referring to Article 11(1)(c), (*id.* ¶ 16),

the Redeemers further argued that Sentry's good faith was irrelevant on the Certification

Issue.  Even if the certificates were issue in bad faith, Sentry could not rely on its own

bad faith to defeat the binding nature of the certificates.  (*Id.* ¶¶ 21(1), 22.)

The second, proposed preliminary issue addressed the consideration given by the

Redeemers for the redemption payments (the "Good Consideration Issue").  They

maintained that regardless of the NAV per share, they gave good consideration by

surrendering their shares, and this provided a complete defense to Sentry's clawback

claims.  (*Id.* ¶ 29.)

Sentry opposed the preliminary issues application.  It argued that discovery was

necessary on the Certification Issue, (*id.*, Ex. H, ¶¶ 8-12), but conceded that the Good

Consideration Issue was purely legal though difficult.  (*Id.* ¶¶ 13, 14, 17.)  Sentry did not

contend that a factual issue existed as to whether the NAVs were calculated in bad faith,

but did maintain that it could not say if a factual dispute existed on the "Binding NAV

Issues" without disclosure as it did not yet have Citco's documents.  (*Id.* ¶ 16.)

On April 20, 2011, Judge Bannister of the BVI Court issued a decision and

separate order granting the Redeemers' motion, and ordered a trial on the two

categories of preliminary issues (hereinafter, the "Preliminary Issues").  (*Id.*, Ex. N.)  He

subdivided the Certification Issue into three separate questions which were thereafter

referred to as Preliminary Issues Nos. 1 through 3:

> (1)     Whether [a specific document] is a certificate within the meaning of
> Article 11(1) of the Articles of Association of the Claimant. . . ;

- 8 -

(2)    if the answer to (1) is yes, whether any. . . of the documents is

     (a)    a certificate as to the Net Asset Value per share ("NAV") or

     (b)    a certificate as to Redemption Price within the meaning of the Articles;

(3)    if the answer to (2)(a) or (b) is yes, whether the publication or delivery by the Claimant

     (a) as a matter of information only, or

     (b) in connection with a redemption request

of a document containing substantially the same items of information as a document identified as falling within (2)(a) or (b) above to a redeeming or redeemed Member of the Claimant precludes the Claimant from asserting that money paid to that redeeming or redeemed Member on redemption exceeded the true Redemption Price and as such is recoverable as to the excess from such redeeming Member.

(*Id.*, Ex. N, at ECF pp. 9 of 18.)[8]


Judge Bannister framed the Good Consideration Issue, now Preliminary

Issue No. 4 (containing two subparts), as follows:

> Whether a redeeming Member of the Claimant in surrendering its shares gave good consideration for the payment by the Claimant of the Redemption Price and, if so, whether that precludes the Claimant from asserting that the money paid to that Member on redemption exceeded the true Redemption Price and as such is recoverable as to the excess from such redeeming Member.

(*Id.*)

Acknowledging Sentry's concerns regarding the need for discovery, Judge

Bannister included the following proviso that applied to the Certification Issue but not

to the Good Consideration Issue:

> Determination against the Claimant of any of the questions falling to be determined in issue (1) above [Preliminary Issues Nos. 1, 2 and 3] shall not debar the Claimant from subsequently asserting on the basis of a fact or facts not actually known to the Liquidators of the Claimant at the time of the hearing of issue (1) that notwithstanding the determination of that

---

[8]    "ECF pp." refers to the pagination printed by the Court's CM/ECF system at the top of each page of a filed document.

question a particular defendant is liable to repay to the Claimant all or some part of any redemption monies paid to that defendant.

(*Id.*, Ex. N, at ECF pp. 9-10 of 18.)

The Preliminary Issues proceeded to trial. Prior to trial, the Redeemers submitted their *Skeleton Argument of the Defendants on the Preliminary Issues*, (*Kite Declaration*, Ex. A), in which they repeated their argument that whether the certificates were issued in good faith was irrelevant for two reasons. First, Sentry could not rely on its own bad faith to defeat the binding nature of a certificate. Second, the requirement of good faith was intended to protect the subscribers and redeemers, but was not intended to protect Sentry "by enabling Sentry to escape from the consequences of understating the values in relation to subscriptions, or of overstating the values in relation to redemptions, in circumstances where its Directors have acted in bad faith." (*Id.*, Ex. A, at ECF pp. 21 of 31.)

Judge Bannister rendered his decision on the Preliminary Issues on September 16, 2011. *See Fairfield Sentry Ltd.* (*In Liquidation*) *v. Bank Julius Baer & Co. Ltd.*, Nos. BVIHC (COM) 30-2010, *et al.* ("*BVI Court PI Decision*").[9] He concluded that the various communications sent to investors by or on behalf of the Directors were not certificates within the meaning of Articles. *Id.* ¶¶ 30-33. Accordingly, he answered Preliminary Issues Nos. 1 and 2 in the negative, and

---

[9]    A copy of the *BVI Court PI Decision* is attached as Exhibit B to the *Kite Declaration*.

those answers rendered Preliminary Issue No. 3 moot.  (*Kite Declaration*, Ex. C,

at ECF pp. 16-17 of 212.)

However, he further concluded that the Redeemers gave good

consideration for the redemptions by surrendering their shares.  He reasoned:

> Left to myself I would have held that the redemption of shares in this case
> amounted to a bargain and sale for which the consideration received by
> Sentry was the surrender of the rights of the redeeming shareholder. . . .  I
> further fail to understand how Sentry can recover the redemption price in
> circumstances in which *restitutio in integrum* is no longer possible.[10]

*BVI Court PI Decision* ¶ 34.

Judge Bannister concluded:

> In my judgment, therefore, it is not open to Sentry now to seek to recover
> the price which it paid for the purchase of the shares of redeeming
> investors simply because it calculated the NAV upon information which
> has subsequently proved unreliable for reasons unconnected with any of
> the redeemers.

*Id.* at ¶ 36.  Accordingly, he answered Preliminary Issue No. 4 in the affirmative.

(*Kite Declaration*, Ex. C, at 17 of 212.)  Judge Bannister directed one of the

Redeemers to promptly move for summary judgment.  (*Id.*)

Per the direction, one of the Redeemers filed a motion for summary

judgment, (*Hare Declaration*, Ex. E), and Judge Bannister granted the motion on

October 10, 2011.  (*Id.*, Ex. P.)  Initially, the Good Consideration Issue was

directed at the cause of action based on Sentry's unilateral mistake alleged in

paragraphs 9 and 10 of the *Statement of Claim*, (*id.*, Ex. P, at ¶ 4), and the

Preliminary Issues trial did not decide the claim based on mutual mistake.  (*Id.*,

---

[10]    *Restitutio in integrum* means "[r]estoration to the previous condition or status quo."  BRYAN A.
GARNER, BLACK'S LAW DICTIONARY 1507 (10th ed. 2014).

Ex. P, at ¶¶ 5, 10.)  Nevertheless, the Redeemers were entitled to summary

judgment on the mutual mistake claim.  First, equity would not permit a party to

rescind a contract binding in law on grounds of common mistake.  (*Id.*, Ex. P, at ¶

18.)  Second, rescission was not available where, as in the case before him,

*restitutio in integrum* was impossible.  (*Id.*)

In reaching his decision, Judge Bannister rejected Sentry's request for an

adjournment based on pleadings recently provided by the trustee of BLMIS and

the need for more time to obtain evidence showing that the Redeemers received

the redemptions with knowledge that BLMIS was a fraud.  While acknowledging

the general rule that it may be unconscionable for a party to retain the benefit of a

transaction when it knows that the counterparty is acting under a mistake, Judge

Bannister did not see how that principle could be applied where the parties could

not be restored to their previous positions.  (*Id.*, Ex. P, at ¶ 20.)  Furthermore,

Sentry offered nothing specific to indicate the Redeemers' bad faith, and the

possibility that "something may turn up" did not provide a reason to deny a

summary judgment motion.  (*Id.*, Ex. P, at ¶ 22.)

### 2.    The ECCA Appeal

Both sides appealed to the Eastern Caribbean Court of Appeal ("ECCA"),

the Redeemers on the Certification Issue and Sentry on the Good Consideration

Issue and the subsequent dismissal of its claims pursuant to summary judgment.

On June 13, 2012, the ECCA affirmed on both Preliminary Issues and the grant of

summary judgment, and dismissed the appeals.  *See Quilvest Fin. Ltd. v.

Fairfield Sentry Ltd.* (*In Liquidation*), Nos. HCVAP 2011/041, *et al.* ("*ECCA*

Decision").[11]  Writing for the ECCA on the Good Consideration Issue, Justice

Pereira began with the principle that in a two-party situation where one party

pays money to another party to discharge a contractual obligation, the payor

cannot argue that the payee was unjustly enriched, *id.* ¶ 66 (quoting GOFF &

JONES, THE LAW OF UNJUST ENRICHMENT ¶ 29-19 (8th ed., Sweet & Maxwell

2011)), although the defense may fail where the payee was aware of the payor's

mistake and did not receive the money in good faith.  *Id.* ¶ 69.  However, Sentry

did not allege that the Redeemers had received the redemption payments in bad

faith.  *Id.*

The ECCA further stated that upon receipt of a redemption request, Sentry

was obligated to redeem the shares based on the redemption price computed by

Sentry (not by the shareholder), and notwithstanding any mistake on Sentry's

part.  *Id.* ¶¶ 78-79, 81.  The shareholders paid the initial consideration based on

Sentry's determination of the NAV, Sentry issued the shares in exchange for that

consideration, and when it paid the redemption price it got precisely what it

bargained for.  *Id.* ¶ 81.  Furthermore, predictability is critical in commercial

transactions, a contract reflects the parties' allocation of risks, and restitutionary

remedies such as unjust enrichment necessarily yield to contractual obligations.[12]

*Id.* ¶¶ 83, 85-86.  In her conclusion, Justice Pereira ruled:

---

[11]    A copy of the *ECCA Decision* is attached as Ex. G to the *Kite Declaration*.

[12]    Justice Pereira noted that the Private Placement Memorandum disclosed the risk that Sentry
would invest the subscriber's money and not retain custody of the investment, and "there is always the
risk that the personnel of any entity with which the Fund invests could misappropriate the securities or
funds (or both) of the Fund."  *ECCA Decision* ¶ 76.

10-03635-smb    Doc 9730-1    Filed 08/23/19    Entered 08/23/19 16:51:44    Main Document
Pg 58 of 109

> I agree with the ultimate conclusion arrived at by the learned trial judge that the P I Respondents gave good consideration for the surrender of their shares and Sentry's restitutionary claim would be defeated. It is simply not open to Sentry to recover the redemption prices which it paid for the purchase of the redeemed shares because it has now been discovered that it determined its NAV on unreliable or erroneous information from BLMIS which had nothing to do whatsoever with any of Sentry's shareholders. The shareholders fully performed all their obligations under the contract. Sentry, in paying the redemption price, did so in the discharge of its debt obligations to the redeeming shareholders pursuant to Sentry's Articles which remained perfectly valid and in force. Accordingly, I would dismiss Sentry's appeal on this issue.

*Id.* ¶ 87.

### 3.  *Migani*

The parties appealed to the Privy Council, which rendered the *Migani* decision on April 16, 2014. Writing for the Privy Council, Lord Sumption opined that, whereas the lower courts had reviewed the Certification Issue and the Good Consideration Issue separately, the issues "are closely related and have to be considered together." *Migani* at ¶ 6. In rejecting Sentry's arguments relating to the Certification Issue, the Privy Council considered the provisions of Articles 9, 10 and 11, and concluded that the NAV had to be definitively determined *at the time of* the subscription or redemption; otherwise, the scheme was "unworkable." *Id.* ¶ 21; *accord* ¶ 24 ("If, as the articles clearly envisage, the Subscription Price and the Redemption Price are to be definitively ascertained at the time of the subscription or redemption, then the NAV per share on which those prices are based must be the one determined by the Directors at the time, whether or not the determination was correctly carried out in accordance with Articles 11(2) and (3)."). Interpreting the Articles to permit Sentry to recalculate the NAV at a future date based on new information

would not only expose Members who had redeemed their shares to an open-ended liability to repay part of the price received if it subsequently appeared that the assets were worth less than was thought at the time. It would confer on them an open-ended right to recover more (at the expense of other Members) if it later appeared that they were worth more. Corresponding problems would arise out of the retrospective variation of the Subscription Price long after the shares had been allotted. Indeed, it is difficult to see how the Directors could perform their duty under Article 9(1)(b) not to allot or issue a share at less than the Subscription Price if the latter might depend on information coming to light after the allotment had been made.

*Id.* ¶ 23.

Having concluded that the documents at issue were "certificates" establishing the NAV per share at the time of the subject redemptions, it followed that the redemption payments were not subject to restitution. The payee is not unjustly enriched if he is entitled to receive the sums he was paid, even if the amount paid was mistaken. *Id.* ¶ 18. Sentry was obligated to pay the sum computed as the NAV per share at the time of the redemption rather than in light of subsequent information. The payment of that sum discharged Sentry's obligation under the Articles and "the shares having been surrendered in exchange for the amount properly due under the Articles, the redemption payments are irrecoverable." *Id.* ¶ 19.

Accordingly, the Privy Council reversed the lower courts' on the Certification Issue, and dismissed the appeal of the Good Consideration Issue. The dismissal of the appeal from the Good Consideration Issue "must be taken to have confirmed the conclusion of the courts below that a redeeming member by surrendering its shares gave good consideration for the payment by Sentry of the redemption price." *See ABN AMRO Fund Servs. (Isle of Man) 24 Nominees Ltd. v. Krys,* Nos. BVIHCMAP: 11-16,

23-28 of 2016, at ¶ 5 (ECCA Nov. 20, 2017) (Pereira, J.) ("*ECCA 273 Decision*")[13];

*Skandinaviska Enskilda Banken AB (PUBL) v. Conway* (*In re Weavering Macro Fixed Income Fund Ltd.*), [2016] CICA No. 2 of 2016 ("*Weavering*"), at ¶ 26 (stating that the Privy Council determined the Good Consideration Issue in the Redeemers' favor).[14] However, it is "arguable" that the Good Consideration Issue, affirmed by *Migani*, did not address the possible effect of Citco's alleged bad faith, a question that was not raised or presented.  *ECCA 273 Decision* ¶ 61(iii).

## B.    U.S. Redeemer Actions

Citco's alleged bad faith is the principal issue on the motions before the Court in the 305 U.S. Redeemer Actions.  The Liquidators have filed substantially similar adversary proceedings against the Defendants, and have also amended certain of the complaints in the U.S. Redeemer Actions to assert avoidance claims under sections 245 and 246 of the BVI INSOLVENCY ACT of 2003 ("INSOLVENCY ACT") to claw back redemptions paid with inflated prices as "unfair preferences" and/or "undervalue transactions."

The proposed amended complaint in *Fairfield Sentry Ltd. v. Citigroup Global Mkts. Ltd.*, Adv. Proc. No. 11-02770 (SMB) ("*Proposed Citigroup Complaint*") is typical.[15]  The Liquidators' theory remains unchanged from the BVI Redeemer Actions:

---

[13]    A copy of the *ECCA 273 Decision* is attached to the *Letter of David J. Molton, Esq.* dated Nov. 22, 2017 (ECF Doc. # 1603).

[14]    A copy of the *Weavering* decision is attached as Exhibit 79 to the *Declaration of Gabriel Moss QC in Further Support of Motion for Leave to Amend and in Opposition to Defendants' Motion to Dismiss*, signed Mar. 30, 2017 ("*Moss II Declaration*") (ECF Doc. # 1338).

[15]    A redacted version of the *Proposed Citigroup Complaint* is attached as Exhibit C to the *Declaration of David J. Molton in Support of Motion for Leave to Amend*, signed Oct. 21, 2016 (ECF Doc. # 924), and the redactions were authorized pursuant to Court order.  (*See Order Authorizing the Foreign*

10-03496-smb    Doc 430-1    Filed 08/23/19    Entered 08/23/19 19:29:53    Main Document
Page 17 of 61

the redemption payments were based on inflated NAVs per share resulting from an erroneous belief as to the value of the Funds' investments with BLMIS.  (*Id.* at ¶¶ 7, 10, 33-35, 93.)  The key difference is that the Liquidators now contend that Citco certified the NAV in bad faith at the time of redemption, and accordingly, the certificates fixing the NAV per share issued pursuant to Article 11(1) were not binding under Article 11(1)(c).  (*Id.* at ¶¶ 41, 70.)  The Liquidators seek the return of the redemption overpayments from the Defendants as the registered owners of the shares and/or the Defendants' unknown clients as beneficial owners, based on (i) unjust enrichment (*id.*, First and Second Claims), money had and received (*id.*, Third and Fourth Claims), mistaken payment (*id.*, Fifth and Sixth Claims) and constructive trust (*id.*, Seventh Claim) (collectively, the "Common Law Claims"), (ii) unfair preferences under the INSOLVENCY ACT § 245 (*id.*, Eighth and Ninth Claims), and undervalue transactions under the INSOLVENCY ACT § 246 (*id.*, Tenth and Eleventh Claims) (collectively, the "BVI Avoidance Claims") and (iii) breach of contract (*id.*, Twelfth Claim) and breach of the implied covenant of good faith and fair dealing (*id.*, Thirteenth Claim) (collectively, the "Contract Claims").[16]  The Defendants seek the dismissal of the Common Law Claims

---

*Representatives to File Proposed Amended Complaints in Partially Redacted Form and Unredacted Proposed Amended Complaints Under Seal*, dated Sept. 6, 2016 (ECF Doc. # 909).)  The redactions relate to the allegations of Citco's bad faith.  The Court has not ruled on whether the information is confidential, but the specific allegations do not need to be unsealed for purposes of this omnibus proceeding.

[16]     The *Proposed Citigroup Complaint* also includes a Fourteenth Claim for a declaratory judgment under 28 U.S.C. § 2201.  Since all of the issues raised by the Fourteenth Claim are subsumed by the other claims that seek monetary relief, the separate consideration of the declaratory judgment claim would serve no useful purpose.  Accordingly, I decline in the exercise of discretion to consider it and dismiss the Fourteenth Claim.  *See Broadview Chem. Corp. v. Loctite Corp.*, 417 F.2d 998, 1000-01 (2d Cir. 1969), *cert. denied*, 397 U.S. 1064 (1970).

and the Contract Claims primarily arguing that the Claims are barred by the Privy
Council's decision in *Migani*.

## DISCUSSION

On these motions to dismiss for failure to state a claim and motions for leave to
amend, the threshold issue is whether *Migani* renders Citco's bad faith irrelevant with
respect to the Common Law Claims and the Contract Claims.  These claims are governed
by BVI law, and the support for the parties' respective positions is based on the lengthy
declarations by their experts in BVI law.  The declarations of Gabriel Moss QC and
William Hare,[17] on behalf of the Liquidators, and Simon Mortimore QC and Phillip
Kite,[18] on behalf of the Defendants, span a combined 411 pages (with an additional 7,591
pages of exhibits) and each expert disagrees with the other on numerous areas of BVI
and English law.[19]

These declarations are informative and helpful, but the "[d]etermination of a
foreign country's law is an issue of law." *Itar–Tass Russian News Agency v. Russian
Kurier, Inc.,* 153 F.3d 82, 92 (2d Cir. 1998).  While the Court "may consider any
relevant material or source, including testimony, whether or not submitted by a party or
admissible under the Federal Rules of Evidence," FED. R. CIV. P. 44.1, it is free to

---

[17]     *See Declaration of Gabriel Moss QC in Support of Motion for Leave to Amend*, signed Oct. 20,
2016 ("*Moss I Declaration*") (ECF Doc. # 926); *Moss II Declaration*; *Hare Declaration.*

[18]     *See Declaration of Simon Mortimore, QC in Opposition to Plaintiffs' Motion for Leave to Amend
and in Support of the Defendants' Motion to Dismiss*, signed Jan. 13, 2017 ("*Mortimore I Declaration*")
(ECF Doc. # 962); *Second Declaration of Simon Mortimore, QC in Further Support of the Defendants'
Motion to Dismiss*, signed May 26, 2017 ("*Mortimore II Declaration*") (ECF Doc. # 1456); *Kite
Declaration.*

[19]     The BVI is an autonomous British territory.  Although the BVI has its own legislation, its legal
system is based on English law.  (*Mortimore I Declaration* ¶ 12.)

conduct "[its] own research and interpretation," *Ackermann v. Levine,* 788 F.2d 830,

838 n. 7 (2d Cir. 1986), and "[u]ltimately, the responsibility for correctly identifying and

applying foreign law rests with the court." *Rationis Enters. Inc. of Pan. v. Hyundai*

*Mipo Dockyard Co., Ltd.,* 426 F.3d 580, 586 (2d Cir. 2005), *cert. denied,* 549 U.S. 946

(2006).

## A.      Preclusion Doctrines

The Defendants raise several preclusion doctrines which, they assert, foreclose

any further Common Law and Contract Claims.  In substance, they contend that *Migani*

precludes reliance on Citco's alleged bad faith or challenge to the conclusion that the

Defendants gave good consideration when they redeemed their shares.  (*Defendants*

*Motion* at 44-51.)

### 1.      Choice of Law

Initially, the parties disagree about whether U.S. or BVI law determines the

preclusive effect of *Migani*.  The authorities are split.  *Compare Simmtech Co., Ltd. v.*

*Citibank, N.A.*, No. 13-cv-6768 (KBF), 2016 WL 4184296, at *8 (S.D.N.Y. Aug. 3, 2016)

("[T]he prevailing practice appears to be 'follow[ing] domestic rules of preclusion,

whether they apply those of the applicable federal or state court.'") (quoting *Hurst v.*

*Socialist People's Libyan Arab Jamahiriya*, 474 F. Supp. 2d 19, 32 (D.D.C. 2007)), *aff'd*

697 F. App'x 35 (2d Cir. 2017) (summary order), *cert. denied*, 138 S. Ct. 748 (2018);

*Alfadda v. Fenn*, 966 F. Supp. 1317, 1329 (S.D.N.Y. 1997) ("[A] federal court should

normally apply either federal or state law, depending on the nature of the claim to

determine the preclusive effect of a foreign country judgment.") (footnote omitted), *aff'd*

*on other grounds*, 159 F.3d 41 (2d Cir. 1998); *with Kim v. Co-Operative Centrale*

- 19 -

*Raiffeisen-Boerenleenbank B.A.*, 364 F. Supp. 2d 346, 349 (S.D.N.Y. 2005) (a New York

court would look to the law of Singapore to determine the preclusive effect of a

Singaporean judgment); *Weiss v. La Suisse, Société d' Assurances Sue La Vie*, 293 F.

Supp. 2d 397, 404-05 (S.D.N.Y. 2003) ("Generally, New York courts will give a foreign

court decision no more preclusive effect than it would be accorded by courts of the

jurisdiction that rendered it.") (citations omitted).  The Defendants argue that the Court

must apply U.S. preclusion law; the Liquidators assert that BVI preclusion law

governs.[20]  The Court need not decide which jurisdiction's preclusion law applies

because both lead to the same conclusion.

### 2.    *Res Judicata*/Claim Preclusion

Under the U.S. doctrine of *res judicata*, "a final judgment on the merits of an

action precludes the parties or their privies from relitigating issues that were or could

have been raised in that action." *Allen v. McCurry*, 449 U.S. 90, 94 (1980) (citation

omitted); *Burgos v. Hopkins*, 14 F.3d 787, 789 (2d Cir. 1994).  "Whether or not the first

judgment will have preclusive effect depends in part on whether the same transaction or

series of transactions is at issue, whether the same evidence is needed to support both

claims, and whether the facts essential to the second were present in the first." *NLRB v.*

*United Techs. Corp.*, 706 F.2d 1254, 1260 (2d Cir. 1983) (citations omitted).  The party

asserting *res judicata* must show that "(1) the previous action involved an adjudication

on the merits; (2) the previous action involved the plaintiffs or those in privity with

them; (3) the claims asserted in the subsequent action were, or could have been, raised

---

[20]    The Defendants alluded to both federal and New York preclusion law in their moving brief, (*see Defendants Motion* at 44), but clarified in their *Consolidated Reply Memorandum of Law in Further Support of Defendants' Motion to Dismiss*, dated May 26, 2017 ("*Defendants Reply*") (ECF Doc. # 1457) that they are relying on federal preclusion law.  (*Defendants Reply* at 22.)

in the prior action." *Monahan v. N.Y. City Dep't of Corr.*, 214 F.3d 275, 285 (2d. Cir.), *cert. denied*, 531 U.S. 1035 (2000).

The English form of claim preclusion is similar.  It provides that "once a cause of action has been held to exist or not to exist, that outcome may not be challenged by either party in subsequent proceedings." *Virgin Atl. Airways Ltd. v. Zodiac Seats UK Ltd.,* [2013] UKSC 46, ¶ 17.[21]  It also bars "the raising in subsequent proceedings of points essential to the existence or non-existence of a cause of action which were not decided because they were not raised in the earlier proceedings, if they could with reasonable diligence and should in all the circumstances have been raised." *Id.* ¶ 22.

Both the U.S. and English iterations of the doctrine preclude the relitigation of the same claim.

The parties concede that the claims asserted in the U.S. Redeemer Actions are not the same claims that were asserted in *Migani*.  (*See Defendants Motion* at 8 (The Liquidators claims in the U.S. Redeemer Actions "concerned different time periods than those in the [BVI Redeemer Actions]"); *Liquidators Reply* at 43 (same).)  The BVI Redeemer Actions involved March 2004 redemptions.  The U.S. Redeemer Actions involve later redemptions.  (*E.g., Proposed Citigroup Complaint* ¶ 9 ("During the period from and after October 14, 2005 through November 19, 2008, following the receipt by Sentry of notices of redemption, Sentry made Redemption Payments to accounts held in

---

[21]    A copy of *Virgin Atl. Airways v. Zodiac Seats UK Ltd.* is annexed to the *Moss II Declaration* as Exhibit 92.

the name of Defendant Citigroup Global Markets Limited ("CGML") aggregating USD $130,000,000.").)

Furthermore, the different transfers may involve different evidence relating to Citco's bad faith because Citco's knowledge and conduct must be viewed as of the time that it certified the NAV per share. Citco may have been acting in good faith in 2004, because it learned only after March 2004 that BLMIS was not actually trading securities. Conversely, it may have strongly suspected in March 2004 that the BLMIS investments were worthless, conducted due diligence as a result and determined in good faith that the BLMIS investments were worth what BLMIS said they were worth. Accordingly, neither the U.S. nor the BVI doctrines of claim preclusion prevent the Liquidators from arguing that Citco's bad faith allows them to recover the inflated redemption payments.

### 3.    Collateral Estoppel/Issue Preclusion

"Under federal law, collateral estoppel applies when '(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits.'" *Purdy v. Zeldes*, 337 F.3d 253, 258 (2d Cir. 2003) (footnotes omitted) (quoting *Interoceanica Corp. v. Sound Pilots, Inc.,* 107 F.3d 86, 91 (2d Cir.1997)). Mutuality of the parties is not necessary where collateral estoppel is asserted defensively. *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 329 (1979); *Wilder v. Thomas,* 854 F.2d 605, 621 (2d Cir. 1988), *cert. denied*, 489 U.S. 1053 (1989).

Under BVI law, issue estoppel is more restrictive because it requires mutuality – either the same parties or their privies:

> In order for there to be an issue estoppel there must be (i) a final and conclusive judgment on the merits by a court of competent jurisdiction; (ii) between the same parties or their privies; and (iii) the issue decided in the former case on which the estoppel is sought to be founded must be the same as the issue in the later case and must have been necessary for the earlier decision.

*OJSC Oil Co. Yugraneft v. Abramovich,* [2008] EWHC 2613 (Comm), ¶ 396.[22]

Despite this difference, both U.S. and BVI law require that the issue was litigated and decided.

The Liquidators argue that *Migani* did not consider the question of Citco's bad faith, and hence, the decision does not preclude the Liquidators from arguing in these adversary proceedings that Citco's bad faith certifications allow them to recover the redemptions.  It is true that bad faith was on everyone's mind during the BVI Redeemer Actions.  The Liquidators had already alleged in another adversary proceeding that the Funds' managers and controlling partners were grossly negligent and reckless in failing to supervise Citco and independently verify the NAVs.  (*See Verified Complaint* in *Fairfield Sentry Ltd. v. Fairfield Greenwich Grp.*, dated May 29, 2009, at ¶¶ 79-99 (ECF Adv. Proc. No. 10-03800 Doc. # 1-5).)[23]  Under BVI law, lack of good faith, *i.e.* bad

---

[22]  A copy of *OJSC Oil Co. Yugraneft v. Abramovich* is annexed as Exhibit 40 to the *Mortimore I Declaration*.

[23]  The Defendants also point to the *Anwar* class action – a case to which the Liquidators were not parties – in which shareholders of the Funds sued former Fund managers, executives and service providers, including Citco, asserting various securities law, tort, and breach of contract claims.  *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 387 (S.D.N.Y. 2010).  The shareholders alleged that Citco failed to perform adequate due diligence with respect to the Funds' BLMIS investment, knew that the Funds' risk controls were deficient, and did not inform investors of the deficiencies.  *Id.* at 394.  The Defendants argue that the Liquidators were monitoring the *Anwar* action, and were aware of the allegations regarding Citco's bad faith.  (*Defendants Motion* at 50-51.)

faith, includes wrongdoing by one who acts recklessly as well as one who acts with actual

knowledge that he is acting wrongfully or willfully blinds himself to that fact. (*Moss I*

*Declaration* ¶¶ 40-41.) In addition, the BVI Redeemers had argued in connection with

the Preliminary Issues litigation that the Funds' good faith was irrelevant. Nevertheless,

neither the BVI Court, the ECCA nor the Privy Council mentioned the good faith issue,

and the issue was not actually decided.[24] Accordingly, the doctrine of issue preclusion

under both U.S. and BVI law does not prevent the Liquidators from arguing that a bad

faith certificate permits them to recover the corresponding redemption.

### 4. *Henderson v. Henderson*

The English doctrine of *Henderson v. Henderson*[25] precludes a party from

"raising in subsequent proceedings matters which were not, but could and should have

been raised in the earlier ones." *Virgin Atl.* ¶ 17. Unlike the claim and issue preclusion,

the *Henderson* doctrine may apply where "the parties to the two actions were different,

and neither issue estoppel nor cause of action estoppel could therefore run." *Id.* ¶ 25.

Although the *Henderson* doctrine and claim estoppel share common characteristics, the

parties agree that the *Henderson* doctrine is procedural rather than substantive,

(*Mortimore II Declaration* ¶ 54; *Moss II Declaration* ¶ 38), and is concerned with abuse

---

[24] The Liquidators imply that the BVI Court's proviso to Preliminary Issues Nos. 1, 2 and 3 allows them in these adversary proceedings to rely on newly discovered evidence to show that the certified NAV was incorrect and issued in bad faith. Notably, the BVI Court subsequently denied Sentry's request for an adjournment and granted summary judgment to the BVI Redeemers, meaning Sentry had not identified any factual issues in connection with its claims of mistake to warrant revisiting the Certification Issue. Furthermore, *Migani* reversed on Preliminary Issues Nos. 1, 2 and 3 in 2014 without mentioning the separate proviso. In any event, if the Liquidators conclude that newly discovered evidence allows them to reopen the Certification Issue under the BVI Court's order, they must return to the BVI Court.

[25] The *Henderson* doctrine was first set forth in *Henderson v. Henderson*, (1843) 3 Hare 100, 115.

10-03635-smb    Doc 7430-1    Filed 12/06/19    Entered 12/06/19 16:51:44    Main Document
Pg 25 of 65

of process.  *Virgin Atl.* ¶ 24; *Johnson v. Gore Wood & Co.*, [2001] B.C.C. 820, 834.[26]  In

*Michael Wilson & Partners Ltd. v. Sinclair*, [2017] EWCA (Civ) 3, the Court surveyed

the law and summarized the principles of the *Henderson* doctrine:

> (1) In cases where there is no *res judicata* or issue estoppel, the power to strike out a claim for abuse of process is founded on two interests: the private interest of a party not to be vexed twice for the same reason and the public interest of the state in not having issues repeatedly litigated. . . . These interests reflect unfairness to a party on the one hand, and the risk of the administration of public justice being brought into disrepute on the other. . . .  Both or either interest may be engaged.

> (2) An abuse may occur where it is sought to bring new proceedings in relation to issues that have been decided in prior proceedings.  However, there is no prima facie assumption that such proceedings amount to an abuse, . . . and the court's power is only used where justice and public policy demand it. . . .

> (3) To determine whether proceedings are abusive the Court must engage in a close 'merits based' analysis of the facts.  This will take into account the private and public interests involved, and will focus on the crucial question: whether in all the circumstances a party is abusing or misusing the court's process. . . .

> (4) In carrying out this analysis, it will be necessary to have in mind that: (a) the fact that the parties may not have been the same in the two proceedings is not dispositive, since the circumstances may be such as to bring the case within 'the spirit of the rules' . . . ; thus (b) it may be an abuse of process, where the parties in the later civil proceedings were neither parties nor their privies in the earlier proceedings, if it would be manifestly unfair to a party in the later proceedings that the same issues should be relitigated, . . .  or, . . . if there is an element of vexation in the use of litigation for an improper purpose.

> (5) It will be a rare case where the litigation of an issue which has not previously been decided between the same parties or their privies will amount to an abuse of process. . . .

*Id.* ¶ 48 (citations omitted).[27]

---

[26]    A copy of *Johnson v. Gore Wood & Co.* is annexed to the *Moss II Declaration* as Exhibit 42.

[27]    A copy of *Michael Wilson & Partners Ltd. v. Sinclair* is annexed to the *Moss II Declaration* as Exhibit 50.

I conclude that the *Henderson* doctrine does not preclude the Liquidators'

claims.  First, the doctrine is conceded by all to be procedural rather than substantive.

"In actions where the rights of the parties are grounded upon the law of jurisdictions

other than the forum, it is a well-settled conflict-of-laws rule that the forum will apply

the foreign substantive law, but will follow its own rules of procedure."  *Bournias v. Atl.*

*Mar. Co., Ltd.*, 220 F.2d 152, 154 (2d Cir. 1955); *accord Bakalar v. Vavra*, 550 F. Supp.

2d 548, 551 (S.D.N.Y. 2008); *Hosking v. TPG Capital Mgmt., L.P.* (*In re Hellas*

*Telecomms. (Lux.) II SCA*), 535 B.R. 543, 566 (Bankr. S.D.N.Y. 2015); *see* RESTATEMENT

(SECOND) OF CONFLICT OF LAWS § 122 (1971) ("A court usually applies its own local law

rules prescribing how litigation shall be conducted even when it applies the local law

rules of another state to resolve other issues in the case.").  If the Liquidators have

abused the process of *this* Court, this Court can deal with those abuses under its own

rules (FED. R. BANKR. P. 9011), federal law (28 U.S.C. § 1927) or its inherent authority.

*See Chambers v. Nasco, Inc.*, 501 U.S. 32, 43 (1991)

Second, the issue of Citco's bad faith was never litigated or decided in connection

with the BVI Redeemer Actions, and this is not one of those "rare cases" where "the

litigation of an issue which has not previously been decided between the same parties or

their privies will amount to an abuse of process."  *Michael Wilson & Partners Ltd. v.*

*Sinclair* ¶ 48.  The Defendants contend that even if the Liquidators did not know the

facts necessary to allege Citco's bad faith, they had already alleged the same recklessness

against the Fairfield defendants that they now level against Citco.  Hence, the

Liquidators could have argued that the certificates at issue in the BVI Redeemer Actions

were not binding because of Fairfield's bad faith but chose not to raise the issue.  "It is,

however, wrong to hold that because a matter could have been raised in earlier

proceedings it should have been, so as to render the raising of it in later proceedings

necessarily abusive." *Johnson v. Gore Wood & Co.*, [2001] B.C.C. at 834.  The

allegations against the Fairfield defendants were not directed at any specific

redemptions, and whether a particular certificate was issued in bad faith is a factual

issue that must be determined on a case by case basis.

### B.    The Common Law Claims

Although the Liquidators are not precluded from raising Citco's bad faith, the

persuasive authority of *Migani*, its progeny and the common law principles that

informed those decisions requires the Court to reject the Liquidators' argument that

Citco's bad faith, which I assume for the purposes of analysis, allows them to recover the

redemption payments.  The only exception is where a Defendant knew the NAV was

inflated at the time of redemption (hereinafter, a "Knowledge Defendant").

*Migani*'s emphasis on finality, certainty and workability has been successfully

raised to prevent liquidators from recovering excess redemption payments even where

the NAV was the product of fraud or the redemption payment was illegal.  Once the

redemption price has been paid based on the certified NAV, "the tree must lie as it falls."

*Pearson v. Primeo Fund*, [2017] UKPC 19, [2017] B.C.C. 552, ¶ 20.  Neither fraud nor

illegality nor breach of trust allows either side to revisit the redemption payment in the

absence of bad faith by the redeeming shareholder.  For example, in *Weavering*, the

defendant ("SEB") redeemed its investment in a fund at a price believed at the time to

reflect the NAV per share.  *Weavering* ¶¶ 8-11.  The value of the fund's investments

depended on the value of certain swaps to which it was a party.  *Id.* ¶¶ 5-7.  The fund's

Article 34 provided that "[a]ny valuations made pursuant to these Articles shall be
binding on all persons." *Id.* ¶ 21.

The swaps that formed the basis of the NAV were the product of the fraud of the
controlling director and were worthless. As a result, the NAV per share used to calculate
the redemption payments was inflated. Once the directors discovered the fraud, they
suspended further redemption payments, put the company into liquidation, and the
liquidator commenced a preference action against SEB. *Id.* ¶¶ 1-4, 15. Among other
things, the liquidators had to prove that the fund was unable to pay its debts.

SEB came up with a novel argument. It submitted that the NAVs were the
product of fraud, the fund did not have to pay any redemptions based on the mistaken
NAVs, and accordingly, there were no debts that the fund was unable to pay. *Id.* ¶¶ 18-
19. SEB volunteered that the liquidator *might* have been able to recover the redemption
payments based on a mistaken NAV, presumably under the common law, but that claim
was time-barred. *Id.* ¶ 20. The Liquidators have referred to this unlitigated concession
as authority for the proposition that they can recover redemption payments based on
mistaken NAVs. (*Moss II Declaration* ¶ 67(b).)

The *Weavering* court rejected SEB's argument and hence the principle it
purported to concede. Relying on *Migani*, it concluded that given the related interests
of finality, certainty and workability, the subsequently discovered fraud did not vitiate
the legitimacy of an obligation to pay the NAV computed at the time of the redemption:

> [T]he practical reasons that underlie the decision in *Fairfield Sentry* apply
> equally to a situation in which the NAV is affected by fraud. *It is essential
> to the operation of an investment vehicle such as the Company that
> permits investment through the acquisition and redemption of shares*

- 28 -

*that there should be certainty on a day-to day basis as to the price at
which shares are to be purchased or redeemed.*  It may be that, as in the
present case, the subscription price and the redemption price are largely
or entirely artificial, but it is nevertheless important that they are
calculated on a consistent basis.  That is the purpose of article 34, which is
to be construed as referring to a valuation purportedly made in compliance
with the articles.  Otherwise, the problems identified in paragraph (23) of
the judgment in *Fairfield Sentry* [the open-ended right to recover
excessive redemption payments] will arise.

*Weavering* ¶ 29 (emphasis added); *accord Pearson v. Primeo Fund* ¶¶ 20-21

(shareholder in Madoff feeder fund (Herald) that had redeemed before Madoff's fraud

was discovered but had not yet received the redemption payment when Herald began

winding-up proceedings was entitled to prove its debt against Herald based on the

fraudulently inflated price at which it had redeemed).

  *DD Growth Premium 2X Fund v. RMF Mkt. Neutral Strategies (Master) Ltd.*,

[2017] UKPC 36 ("*DD Growth*"),[28] a decision by the Privy Council, is also instructive.

DD Growth was a feeder fund that had invested in a Master Fund that, in turn, had

invested in correlated stocks.  *Id.* ¶ 9.  Pursuant to the relevant governing document, the

subscription and redemption prices for DD Growth's shares were computed, in the usual

manner, by determining the NAV per share.  *Id.*  RMF was a substantial investor in DD

Growth.  *Id.* ¶ 14.

  The collapse of Lehman Brothers in 2008 resulted in severe losses to the Master

Fund, and hence, to the value of DD Growth's assets.  *Id.* ¶ 15.  However, the investment

manager for both DD Growth and the Master Fund concealed the losses by purchasing

worthless bonds and attributing fictitious values to the bonds sufficient to cover the

---

[28] A copy of *DD Growth* is attached to the *Letter of Thomas J. Moloney*, dated Dec. 22, 2017 (ECF
Doc. # 1608).

actual losses.  *Id.* ¶ 16.  Meanwhile, RMF and other shareholders gave notices of

redemption, and based on the false information provided by the Master Fund, the NAV

per share was calculated at an erroneous, inflated number.  *Id.* ¶¶ 17-18.  DD Growth

paid RMF approximately $23 million, representing less than 40% of the amount due,

before suspending redemptions.  *Id.* ¶¶ 18-19.  After DD Growth was placed in

liquidation, the liquidators sued to recover the payments based on unjust enrichment

and/or constructive trust.  *Id.* ¶¶ 20, 22.

Initially, the Privy Council, per Lord Sumption (the author of *Migani*) and Lord

Briggs, concluded that the redemptions were valid, the redeeming shareholders became

creditors, and although the NAV had been calculated based on false information, it was

valid for fixing the amount of the redeeming shareholders' debt.  *Id.* ¶ 28 (citing

*Migani*).  The Privy Council then concluded that the redemption payments were

unlawful because they were capital payments made by an insolvent company.  *Id.* ¶ 57.

In addition, it was a breach of trust by the directors to authorize the redemption

payments if the company was insolvent.  *Id.* ¶ 59.

It did not follow, however, that the inflated, illegal redemption payments could be

recovered.  The redemption itself was lawful and effective, and the resulting debt was

incurred in consideration of the surrender of the shares and the cancellation of the debt.

*Id.*  The redemption payment, although itself unlawful, discharged a lawful debt owed to

the redeeming shareholders that arose at the time of the redemption.  *Id.* ¶ 61.

Consequently, for the reasons stated in *Migani* and other cases, the payees were not

unjustly enriched.  *Id.* ¶ 62.  Carving out an exception where the payee was aware of the

directors' breach of trust, the Privy Council summarized its holding in the following

manner:

> The Board concludes that the company is not entitled to recover the
> payments at common law on the ground of unjust enrichment. The reality
> of the present case is that a payment has been received from a company for
> lawful consideration but it has been authorised by its directors in breach of
> their duties to the company. This is the proper domain of the law of
> constructive trusts. Not even in return for good consideration can a
> person retain assets which he knows to have been paid to him in breach of
> the statutory duties of the directors.

*Id.* ¶ 64.

The same principles require the dismissal of the Liquidators' Common

Law Claims with the one exception noted by *DD Growth*. A contract arose at the

time that the Defendants served their notices of redemption. At that moment,

they were entitled to be paid the NAV per share computed in accordance with

Article 11(1) in exchange for their shares. If the certificates were issued in bad

faith, the redeemers were free to contest the redemption price and insist on more.

But once the Funds discharged their debts by making the redemption payments

and the Defendants discharged their obligations by surrendering their shares,

neither side could revisit the NAV based on hindsight. To allow otherwise would

create the unworkable situation identified by *Migani*, *Weavering* and *DD

Growth*. The only exception allows the Liquidators to impose a constructive trust

as to any Defendant who received a redemption payment and knew that the

Fund's BLMIS investments were worthless or nearly worthless.

Separately, the Defendants contend that the doctrine *ex turpi causa non oritur

actio* ("*ex turpi*") bars the Liquidators' claims. Over 200 years ago, Lord Mansfield

wrote that "[n]o court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act." *Holman v. Johnson*, (1775) 1 Cowp 341, 343.[29]  *Ex turpi* expresses Lord Mansfield's maxim that, in modern terms, "precludes a party to a contract tainted by illegality from recovering money paid under the contract from the other party under the law of unjust enrichment." *Patel v. Mirza*, [2016] UKSC 42, ¶ 9.[30] According to the Defendants, the success of the Liquidators' claims depends on Citco's dishonest and, possibly, criminal conduct which is attributed to the Funds. (*Mortimore I Declaration* ¶¶ 95, 97.)  The Liquidators respond that there is nothing illegal or immoral in paying a redemption request or seeking to recover it based on the facts alleged regarding Citco's bad faith. (*Moss II Declaration* ¶¶ 95, 96, 99(a).) Furthermore, even if the doctrine *ex turpi* applied, Citco's bad faith would not be attributable to the Funds. (*Id.* ¶ 97(a).)  The primary victims of Citco's bad faith were the Funds and the remaining shareholders; the Defendants actually benefitted from Citco's bad faith. (*Id.* ¶ 99(b).)

Ex turpi is a flexible doctrine.  The party seeking relief must initially show that it is entitled to restitution because the defendant has been unjustly enriched. *Patel* ¶ 116. *Ex turpi* does not itself create a right to restitution.  *DD Growth* ¶ 63.  If the plaintiff establishes its *prima facie* case, the Defendant may then assert the doctrine *ex turpi* to bar recovery, and the Court must consider several factors in determining whether public interest would be harmed by allowing the claim to proceed:

---

[29]    A copy of *Holman v. Johnson* is annexed as Exhibit 36 to the *Moss II Declaration*.

[30]    A copy of *Patel v. Mirza* is annexed as Exhibit 41 of the *Mortimore I Declaration* and as Exhibit 57 to the *Moss II Declaration.*

> In assessing whether the public interest would be harmed in that way, it is
> necessary a) to consider the underlying purpose of the prohibition which
> has been transgressed and whether that purpose will be enhanced by
> denial of the claim, b) to consider any other relevant public policy on
> which the denial of the claim may have an impact and c) to consider
> whether denial of the claim would be a proportionate response to the
> illegality, bearing in mind that punishment is a matter for the criminal
> courts.

*Patel* ¶ 120; *accord id.* ¶ 107 ("I would not attempt to lay down a prescriptive or

definitive list because of the infinite possible variety of cases.  Potentially relevant

factors include the seriousness of the conduct, its centrality to the contract, whether it

was intentional and whether there was marked disparity in the parties' respective

culpability.").

Ex turpi does not bar the Liquidators' claims.  The Defendants were not unjustly

enriched for the reasons already stated, but even if they had been, the Liquidators do

not plead illegal or immoral conduct sufficient to trigger the doctrine.  Clearly, the

contract to redeem under the Articles was not illegal.  Furthermore, although the

Directors were prohibited from paying redemptions out of capital or in breach of trust,

the redemption payments themselves were lawful and discharged the Funds' valid

obligations.[31]  *DD Growth* ¶¶ 58, 61.  That the redemption prices were based on bad

faith certificates did not render the payments unlawful any more than did the fraud and

illegality described in *DD Growth*.

Furthermore, the Liquidators' assertion of Citco's bad faith as a reason to recover

the inflated redemption payments is self-defeating.  The Articles state that for purposes

---

[31]    In a footnote, the Defendants assert that the allegations of Citco's bad faith describe illegal
conduct under two BVI criminal statutes and one UK criminal statute.  (*See Mortimore I Declaration* ¶ 95
n. 100).  They have failed to explain how Citco's alleged bad faith satisfied the elements of these statutes.

of fixing the subscription and redemption prices, the NAV "*shall be determined by the Directors . . . .*" (Article 11(1)(a) (emphasis added).) The Funds delegated this task to Citco, who served as the Funds' administrator "under the overall direction of the Directors," (*Migani* ¶ 14 (quoting Sentry's Private Placement Memorandum)), but the Directors, not Citco, bore the responsibility for calculating the NAV per share. Accordingly, in considering whether the certificates were issued in good faith "by or on behalf of the Directors," and therefore binding, (Article 11(1)(c)), it is the Directors' good faith, not Citco's, that is relevant. Moreover, Citco's knowledge and conduct will be imputed to its principal, *i.e.*, the Funds, and the Funds are bound by its acts even if Citco acted fraudulently or in its own interests. *Bilta (UK) Ltd. v. Nazir*, [2016] AC 1, ¶ 181 ("In most circumstances the acts and state of mind of its directors and agents can be attributed to a company by applying the rules of the law of agency.") (Lords Toulson and Hodge, concurring)[32]; (*Mortimore I Declaration* ¶¶ 76-77 & n. 81 ("An act of an agent within the scope of his apparent authority does not cease to bind his principal merely because the agent was acting fraudulently and in furtherance of his own interests.") (quoting BOWSTEAD AND REYNOLDS ON AGENCY § 8-062 (20th ed. 2016)); *Moss I Declaration* ¶ 43 ("Knowledge gained by an employee or other agent while acting in the course of his employment for his principal will ordinarily be attributed to his principal.") (citing BOWSTEAD AND REYNOLDS ON AGENCY ¶ 8-207 (20th ed.)).)

If the Directors knew the NAVs were inflated based on BLMIS' fraud, either directly or through the imputation of Citco's knowledge, but nonetheless breached their

---

[32]    A copy of *Bilta v. Nazir* is annexed to the *Mortimore I Declaration* as Exhibit 8 and the *Moss II Declaration* as Exhibit 16.

10-03635-jpm   Doc 7430-1   Filed 08/27/19   Entered 08/27/19 19:29:53   Main Document
Pg 79 of 109

fiduciary duties to the other shareholders by authorizing the payment of inflated

redemption prices, the Funds cannot rely on their own misconduct to recover the

inflated redemption payments.[33]  *Weavering* ¶ 29; *Kingate Global Fund Ltd. v. Kingate*

*Mgmt. Ltd.,* [2015] SC (Bda) 65 Com ("*Kingate*") ¶ 157 (discussing the general principle

"that a party will not generally be entitled to take advantage of his own breach of

contract as against the other party.")[34]; *accord Moss II Declaration* ¶ 81 ("It is a

principle of English/BVI law that a contract will generally be construed in such a way as

to prevent a party from taking advantage of its own wrong.").[35]

If, on the other hand, Citco's bad faith is not imputed to the Directors or the

Funds, the Liquidators are still not entitled to recover the redemption payments.  In that

event, the Directors would have been duped by Citco and BLMIS when they authorized

the excessive redemption payments.  This scenario is merely a variation of the "mistake"

---

[33]    The Liquidators allege that the Funds were unaware of the Madoff fraud and inflated NAV at the time of the redemptions.  (*Proposed Citigroup Complaint* ¶¶ 35, 128, 137.)  If the Funds gave the certificates in good faith, the Liquidators cannot argue that they were given in bad faith.

[34]    A copy of *Kingate* is annexed to the *Mortimore I Declaration* as Exhibit 31 and the *Moss II Declaration* as Exhibit 44.

[35]    *Lipkin Gorman v Karpnale*, [1991] 2 AC 548, (a copy of which is annexed to the *Moss II Declaration* as Exhibit 47) which the Liquidators cite for the proposition that the dishonest agent's knowledge is not imputed to defeat a restitution claim, (*see Moss II Declaration* ¶ 89(b)), is wholly inapposite.  There, a partner in a law firm stole the firm's client funds and lost most of what he stole gambling at a London club.  The firm sued the club to recover the stolen funds.  In ruling for the firm, the House of Lords concluded that the partner was a thief, the gambling contract by which the club acquired the money was void under English law and the club gave no consideration for the stolen funds.  It stood in the shoes of an innocent donee that received a contribution consisting of stolen property and had to return the stolen funds less the winnings paid to the partner.  The imputation or attribution of the partner's dishonesty to the law firm was not an issue in the case, and no one suggested that the theft of client funds was an act within the scope of the partner's agency.

In contrast, the contract that required the Funds to redeem the shares at the NAV was a lawful contract.  Furthermore, the computation of the NAV, though erroneous in hindsight, was an authorized act, and the Liquidators cannot dispute the validity and genuineness of the certificate.  *See* BVI BUSINESS COMPANIES ACT, 2004 § 31.  Moreover, the payment of the redemption as computed by the erroneous NAV was an authorized and contractually required act, and the Defendants gave good consideration for their redemptions.  Finally, the Liquidators cannot restore the Defendants to the status quo.

claims rejected by the *Migani* courts. *See Kingate* ¶¶ 153-54 (If the Administrator of
BLMIS feeder funds rather than the funds mistakenly calculated the NAV, "the Funds
mistake was to believe the information supplied by BLMIS was correct.").

*Kingate*, on which the Liquidators rely, (*see Moss II Declaration* ¶ 69), does not
support the proposition that Citco's bad faith allows them to recover the redemption
payments through the Common Law Claims. In *Kingate*, the liquidators of two BLMIS
feeder funds (the "Kingate Funds") sued their manager (KML) and others to recover
excessive management fees. The management fees were determined by the Kingate
Funds' Administrator, a different entity, based on the NAV computed at the time. As
with the Fairfield Funds, the NAV did not reflect the "true" value which only became
apparent after the revelation of BLMIS' fraud.

The relevant agreements provided that the valuations made pursuant to the
articles were binding on all persons in the absence of "bad faith or manifest error." *See
Kingate* ¶ 42. The case proceeded on the trial of seven inter-related preliminary issues.
In each instance, the defendants *conceded* that the Liquidators were entitled to recover
the excess payments if the NAVs were tainted by bad faith or manifest error. *Id.* ¶ 75
("The Defendants submit that . . . absent bad faith or manifest error KML was entitled
to be paid 1.5% of the NAV as determined at the time by the Administrator."); *id.* ¶ 108
(Mr. Boyle, one of the counsel for other defendants, submitted that bad faith or manifest
error were the only circumstances in which valuations would not be binding); *id.* ¶ 120
(accepting the submission of Mr. Lowe, counsel for other defendants, "that absent bad
faith or manifest error the Court should not look behind the ostensible NAV
determination to enquire whether that determination was actual or merely purported.").

The issue was not litigated and the *Kingate* Court declared, adopting the parties'
positions, that "the Administrator's determinations of the NAV were binding on the
Funds for the purpose of calculating the fees due to KML pursuant to the Manager
Agreements in force between the Funds and KML, in the absence of bad faith or
manifest error." *Id.* ¶ 116.

The *Kingate* Court did not rule that bad faith or manifestly erroneous valuations
allowed the liquidators to recover the management fees; instead, the defendants
conceded the point, at least for the purposes of the preliminary issues.  Furthermore, the
*Kingate* Court did not consider whether the Administrator's manifest error (the
liquidators did not plead bad faith) would be imputed, and if so, what that meant.

Each of the Common Law Claims alleging unjust enrichment, money had and
received and mistaken payment (First through Sixth Claims) asserts that because the
Funds overpaid the redemption prices considering the "true facts," the Defendants did
not give "valuable consideration." (*Proposed Citigroup Complaint* ¶¶ 96, 103, 109, 118,
129, 138).)  This assumption is wrong.  The Defendants gave the consideration required
by their contracts with the Funds when they surrendered their shares in exchange for
the Funds' discharge of their contractual redemption obligations.[36]  Moreover, finality
and certainty are necessary to make the redemption scheme "workable," and
accordingly, if a valuation is "purportedly made" in compliance with the redemption
scheme and the transaction is consummated, the valuation cannot be attacked at a
future date based on the subsequent discovery of additional facts.  *See Weavering* ¶ 29

---

[36]    In addition, the Defendants gave "valuable consideration" when they purchased their shares at
inflated subscription prices because of the same BLMIS Ponzi scheme.

("That is the purpose of article 34, which is to be construed as referring to a valuation purportedly made in compliance with the articles. Otherwise, the problems identified in paragraph (23) of the judgment in *Fairfield Sentry* will arise."). The suggestion that the subsequent disclosure of facts indicating that the valuation was made in bad faith vitiates the contract and requires restitution lacks support. The only exception concerns the Knowledge Defendants that received redemption payments with the knowledge that the NAV was wrong. In those circumstances, the Liquidators may seek to impose a constructive trust. *DD Growth* ¶ 64.

## C.    The Contract Claims

The Articles do not state that the Funds can recover inflated redemption payments. Instead, the Liquidators argue that the term must be implied. The Twelfth Claim alleges that at any time prior to the issuance of a good faith certificate, the redemption price is subject to adjustment, and the Articles contained an implied term permitting the Fund to recover any overpayments based, *inter alia*, on obviousness, business efficiency and the reasonable expectation of the parties. (*Proposed Citigroup Complaint* ¶ 193.) The Thirteenth Claim, based on breach of the implied covenant of good faith and fair dealing, alleges that the Defendant denied the Fund the benefit of its bargain by retaining the inflated redemption payment. (*Id.* ¶ 203.)

In *Attorney General of Belize v. Belize Telecom Ltd.*, [2009] 1 WLR 1988, Lord Hoffman summarized the principles that govern the implication of terms in a contract:

> The question of implication arises when the instrument does not expressly provide for what is to happen when some event occurs. The most usual inference in such a case is that nothing is to happen. If the parties had intended something to happen, the instrument would have said so. Otherwise, the express provisions of the instrument are to continue to

- 38 -

operate undisturbed.  If the event has caused loss to one or other of the
parties, the loss lies where it falls.

In some cases, however, the reasonable addressee would understand the
instrument to mean something else.  He would consider that the only
meaning consistent with the other provisions of the instrument, read
against the relevant background, is that something is to happen.  The
event in question is to affect the rights of the parties.  The instrument may
not have expressly said so, but this is what it must mean.  In such a case, it
is said that the court implies a term as to what will happen if the event in
question occurs.  But the implication of the term is not an addition to the
instrument.  It only spells out what the instrument means.

. . . . .

It follows that in every case in which it is said that some provision ought to
be implied in an instrument, the question for the court is whether such a
provision would spell out in express words what the instrument, read
against the relevant background, would reasonably be understood to
mean. . . .

*Id.* ¶ 17, 18, 21.

Given the interests identified in *Migani*, it is neither obvious nor efficient nor

consistent with the parties' expectations to imply that subscribers, redeemers or the

Funds agreed to open-ended liability based on hindsight for incorrectly stated NAVs.

The Funds computed the NAV and paid the redemption price, and the Defendants

surrendered their shares.  Each party discharged its contractual obligations under the

Articles, the transaction was consummated and there is no return to the status quo.  The

Liquidators seek to imply a term that would, in *Migani*'s words, render the scheme

unworkable.  *See Weavering* ¶ 23 ("The argument advanced by SEB was equivalent to

an argument rejected in *Fairfield Sentry* as 'impossible.'  Properly construed, the

articles required the published NAV to be binding in respect of both acquisition and

redemption of shares: they could not be construed as conferring on the Company an

ability to adjust the NAV from time to time in the light of new information.  Such an

approach to the articles would render the rights of shareholders entirely uncertain.").

Similarly, there is no basis to imply a term that requires a Defendant to return an

overpayment where the very principles of unjust enrichment invoked by the Liquidators

allow it to keep that payment.  Accordingly, the Contract Claims are dismissed.

### D.    The BVI Avoidance Claims

The Liquidators assert claims under sections 245 and 246 of the INSOLVENCY

ACT.[37]  Section 245 resembles Bankruptcy Code § 547(b) and allows a liquidator to set

aside an unfair preference.  *See* INSOLVENCY ACT § 245 (authorizing avoidance of a

transfer made (i) when the debtor was insolvent or rendered insolvent, (ii) during the

"vulnerability period,"[38] (iii) that put the creditor in a better position than if the transfer

had not been made and the company was liquidated).  Section 246 allows a liquidator to

avoid an undervalue transaction, which is similar to a constructive fraudulent transfer

under state and federal law.  *See* INSOLVENCY ACT § 246 (authorizing avoidance of a

transfer made (i) when the debtor was insolvent or rendered insolvent, (ii) during the

"vulnerability period," (iii) for which the debtor received no consideration or

consideration worth significantly less in value than it provided).  If the transaction is

voidable, the Court "may make an order setting aside the transaction in whole or in

part," INSOLVENCY ACT § 249(1)(a), and "require any person to pay, in respect of benefits

received by him from the company, such sums to the liquidator as the Court may direct."

INSOLVENCY ACT § 249(2)(d).

---

[37]    The pertinent provisions of the INSOLVENCY ACT are attached as Exhibit 97 to the *Moss II Declaration*.

[38]    The "vulnerability period" or length of the reach back period depends on whether the transferee is a "connected person," *i.e.*, an insider.  Unless the transferee is a "connected person," the "vulnerability period" is six months "prior to the onset of insolvency and ending on the appointment of the administrator or, if the company is in liquidation, the liquidator."  INSOLVENCY ACT § 244(1).

The Defendants raise several objections to the BVI Avoidance Claims, but only the objection under the Bankruptcy Code requires an extended discussion.

### 1.   The Court Lacks the Power to Grant Relief

The Defendants contend that this Court cannot grant the statutory remedies available under the Insolvency Act. (*Defendants Motion* at 69-70.) This argument was expressly rejected by the ECCA. *ECCA 273 Decision* ¶¶ 80-81.

### 2.   The Defendants Were Not Creditors

The Defendants argue that the Funds could not have preferred them as creditors under section 245 because they were members rather than creditors when the Funds became obligated to pay them. In addition, the BVI liquidation rules subordinated the members to the creditors. (*Defendants Motion* at 62-63 & n. 43.) As discussed earlier, the Defendants became creditors when they requested redemptions. In addition, the Funds were not in liquidation when they paid the redemptions, and the liquidation priorities are irrelevant.

### 3.   The Defendants Gave Sufficient Consideration

An undervalue transaction requires the plaintiff to plead and ultimately prove, *inter alia*, that the transferor received nothing or "significantly less" in exchange for the value it transferred. INSOLVENCY ACT § 246(1)(b). Relying on a market value approach, the Defendants contend that the redemption prices they received reflected the value of the shares they surrendered. (*Defendants Motion* at 64.) The NAV per share, as calculated at the time, reflected the price that a well-informed purchaser of shares or redeemer of shares would accept to purchase or redeem. Thus, the NAV per share as

calculated at the time represented the open market value of the shares. The Liquidators respond, *inter alia*, that the true value of the Funds' assets and the shares were nil, and the Court can look to subsequent information to determine the true value of the consideration the Funds received in exchange for the redemption payments. (*Liquidators Reply* at 27-30.) The parties' dispute turns on whether value can be determined based on hindsight in connection with the determination of an avoidance claim.

*Phillips v. Brewin Dolphin Bell Lawrie*, [2001] BCC 864 provides a qualified, affirmative answer.[39] There, the debtor sold its business to the defendant. For tax reasons, the price was structured in two parts. First, the defendant assumed certain obligations of the debtor. Second, the defendant's parent agreed to rent the debtor's leased computers and pay four annual installments of rent. The rental payments formed most of the purchase price.

At the time of the transaction, the value of the stream of rental payments was uncertain because the master computer leases absolutely prohibited the debtor from subleasing the computer equipment. *Id.* ¶ 22. After the transaction closed, the master lessors terminated the computer leases based on the unauthorized transfers, and the defendant's parent refused to make the rental payments.

The debtor went into liquidation, and the liquidator sued the defendant, challenging the transfer of the debtor's business as an undervalue transaction pursuant

---

[39]    A copy of *Phillips v. Brewin Dolphin Bell Lawrie Limited* is annexed as Exhibit 43 to the *Mortimore I Declaration* and Exhibit 59 to the *Moss II Declaration*.

to section 238 of the U.K. Insolvency Act.  The House of Lords, per Lord Scott, initially

concluded that the purchase price for the debtor's assets included the obligations

assumed by the defendant and the lease payments the defendant's parent agreed to

make.  *Id.* ¶ 20.  One of the questions was what value to place on the parent's covenant

to make the lease payments which became worthless when the master lessors

repossessed the computers after the sale transaction had closed.

Lord Scott ruled that under the circumstances of the case, he could consider

events that occurred after the closing which shed light on the value of the consideration

given at the time of the closing.  The survival of the sublease covenant was uncertain at

the time it was given because the sublease violated the master lease.  Where the

contingency that rendered value uncertain actually occurs, it is "unsatisfactory and

unnecessary for the court to wear blinkers and pretend that it does not know what has

happened."  *Id.* ¶ 26.  Thus, when considering "the valuation of the consideration for

which a company has entered into a transaction, reality should, in my opinion, be given

precedence over speculation.  I would hold, taking into account of the events that took

place [after the closing] that the value of [the] . . . covenant in the sublease . . . was nil."

*Id.*; *cf. Adelphia Recovery Tr. v. FPL Grp., Inc.* (*In re Adelphia Commc'ns Corp.*), 512

B.R. 447, 495 (Bankr. S.D.N.Y. 2014) ("Though courts must determine solvency free of

impermissible hindsight, courts may consider information originating subsequent to the

transfer date if it tends to shed light on a fair and accurate assessment of the asset or

liability as of the pertinent date, which assures that the valuation is based in reality.

Subsequent discovery of fraud is appropriately considered when determining the real

financial condition of the company at the time of the transfer.") (footnotes, internal

quotation marks and citations omitted), *aff'd*, Civil Case No. 14–CV–5532 (VEC), 2015
WL 1208588 (S.D.N.Y. Mar. 17, 2015), *aff'd*, 652 F. App'x 19 (2d Cir. 2016); *Mishkin v.
Ensminger* (*In re Adler Coleman Clearing Corp.*), 247 B.R. 51, 111 (Bankr. S.D.N.Y.
1999) ("We may consider evidence uncovered after the advent of bankruptcy to
determine the value of the debtor's assets at the time the alleged insolvency occurred."),
*aff'd*, 263 B.R. 406 (S.D.N.Y. 2001).

The *Phillips* case is not directly on point. It dealt with a situation where the value
of the covenant to lease computer equipment was uncertain at the time it was given, and
a post transaction event resolved the uncertainty and rendered the covenant worthless.
It did not establish a general rule that a court may value an asset with the benefit of
hindsight. *See Joiner v. George*, [2003] BCC 298, ¶ 71.[40] The Liquidators' case does not
deal with a post-transaction event that fixed the actual value of consideration that was
uncertain at the time it was given. According to the Liquidators, the Defendants' shares
were always worthless. Instead, it concerns a pre-existing state of facts that was not
discovered until after the redemption transaction was completed.

Nevertheless, *Phillips* implies that when the value of consideration is uncertain at
the time it is given, and a subsequent event eliminates the uncertainty and fixes the
actual value, the Court may consider the value of the consideration with the benefit of
that hindsight in deciding an undervalue avoidance claim. In addition, the uncertainty
must be within the knowledge of the party giving the consideration, although *Phillips*
does not make clear whether the knowledge must be objective or subjective. At one

---

[40]    *Joiner v. George* is annexed as Exhibit 29 to the *Mortimore I Declaration* and Exhibit 43 to the
*Moss II Declaration*.

point, the Court implied that the obligors were aware of the uncertain value of the future

lease payments, *id.* ¶ 22, but at other points, the Court seemed to suggest that objective

uncertainty was sufficient.  *See id.* ¶¶ 25, 26.  Accordingly, to take advantage of the rule

laid down in *Phillips*, the Liquidators must plead, at a minimum, that at the time of a

redemption, a Defendant had reason to believe that the NAVs were inflated and the

Defendant's shares were worthless.  The Liquidators contend that the Knowledge

Defendants knew or should have known that the NAVs were inflated because of

Madoff's fraud, (*see Proposed Citigroup Complaint* ¶¶ 71-81), and if this turns out to be

the case,[41] the Court should not wear "blinkers" and attribute a value that these

Defendants thought was precarious.[42]

### 4.     The Redemptions Did Not Injure the Funds

The Defendants also contend that the redemptions did not injure the Funds.

They argue that the value of their BLMIS portfolio and the subscription and redemption

prices were inflated to the same degree as a result of Madoff's fraud.  Thus, as long as

the BLMIS fraud was ongoing, the Funds could raise more money through equally

inflated subscription payments.  (*Defendants Motion* at 58-61.)  Arguably, Sentry could

also redeem all or part of its investment in its BLMIS account and use those withdrawals

---

[41]     The Court is not passing on the legal sufficiency of these allegations.

[42]     It is important to distinguish between the value of consideration when dealing with the Contract
and Common Law Claims on the one hand, and the BVI Avoidance Claims on the other.  The Defendants
gave sufficient consideration for contract purposes when they surrendered their shares and gave up their
rights as shareholders in the Funds at the time of the redemptions.  The consideration they surrendered
may still be "significantly less" and support an undervalue avoidance claim under INSOLVENCY ACT § 246.
*Cf. In re Asia Global Crossing, Ltd.*, 344 B.R. 247, 253 (Bankr. S.D.N.Y. 2006) (comparing consideration
that will support a contract and "fair consideration" under New York's fraudulent conveyance law and
concluding that the constructively fraudulent nature of an obligation does not render it unenforceable
under non-bankruptcy law).

to satisfy its own investors' redemption requests, including redemptions by Lambda and

Sigma.

The argument is unpersuasive. Although the Funds themselves were not

operated as Ponzi schemes, the withdrawal of money based on inflated NAVs had the

same effect. Each redemption at an inflated price drove the Funds deeper into

insolvency and caused harm to the Funds and the remaining investors that did not

redeem their investments.

### 5.    The Funds Were Not Insolvent

Both BVI Avoidance Claims require the Liquidators to prove that each

redemption was made when the Fund was insolvent or was rendered insolvent. Section

244(3) of the INSOLVENCY ACT incorporates the definition of "insolvent" contained in

INSOLVENCY ACT § 8(1), excluding paragraph (c)(i) of that section. For present purposes,

"insolvent" means "the company is unable to pay its debts as they fall due." INSOLVENCY

ACT § 8(1)(c)(ii). "Liabilities" include future, certain, contingent, fixed or liquidated

liabilities, but do not include illegal or unenforceable liabilities. INSOLVENCY ACT § 10(2),

(3). The excluded subparagraph refers to balance sheet insolvency ("the value

company's liabilities exceeds its assets"). The Defendants argue that the Funds have

alleged that they were able to pay their liabilities as they came due, (*Proposed Citigroup

Complaint* ¶ 164), and hence, have pled themselves out of their claims. (*Defendants

Motion* at 65-66.)

The Defendants mischaracterize the Liquidators' pleadings. In fact, the

Liquidators allege that the Funds were unable to pay their debts as they fell or would fall

due.  (*Proposed Citigroup Complaint* ¶¶ 11, 39.)  The Defendants ignore these

allegations, and quote the portion of the Liquidators' pleading alleging that the Funds

"were only able to pay debts falling due" because they could redeem their investments in

the BLMIS Ponzi scheme or use incoming subscriptions.  (*Id.* ¶ 164.)  Liabilities include

future and contingent debts, including redemption debts (no one invests forever), and

once the BLMIS Ponzi scheme collapsed, as it did, the Funds had few if any assets to pay

any liabilities.  In the end, insolvency is a question of fact.

### 6.  The Liquidators' Plead Complete Defenses

#### a.  Ordinary Course of Business

"[A] complaint can be dismissed for failure to state a claim pursuant to a Rule

12(b)(6) motion raising an affirmative defense if the defense appears on the face of the

complaint."  *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers &*

*Lybrand, LLP*, 322 F.3d 147, 158 (2d Cir. 2003) (internal quotation marks and citation

omitted).  A transaction is not an unfair preference if it took place in the ordinary course

of business.  INSOLVENCY ACT § 245(2).  The Defendants contend that the redemption of

shares and the payment of the redemption price is an ordinary business transaction.

(*Defendants Motion* at 66-67.)

While the Funds may have redeemed shares in the ordinary course of the Funds'

business, it does not follow that they made the redemptions at issue in the ordinary

course of business.  In fact, the Liquidators allege that the Funds made the redemptions

based on bad faith and erroneous valuations.  At bottom, whether each redemption

payment was made in the ordinary course of business is a factual question that cannot

be resolved in the context of motions to dismiss.

10-03635-smb    Doc 947-3    Filed 06/23/19    Entered 06/23/19 16:03    Main Document
Pg 92 of 109

### b.    Good Faith

A company does not enter into an undervalue transaction if enters into the

transaction in good faith, and at the time, there were reasonable grounds to believe that

the transaction would benefit the company.  INSOLVENCY ACT § 246(2).  The Defendants

maintain that the Liquidators' pleadings establish this defense.  The Liquidators plead

that the Funds were victims of the BLMIS fraud, and redeeming shares was part of the

Funds' essential business and basic contractual obligations.  (*Defendants Motion* at 66-

69.)  Having concluded that Citco's bad faith is imputed to the Funds, the Court cannot

conclude that the redemption of shares at inflated NAVs was made in good faith or that

it was reasonable to believe at the time of the redemption payments that they would

benefit the Funds.  At best, this argument is premature.

### D.    Sections 546(e) and 561(d) of the Bankruptcy Code

### 1.    Introduction

The Defendants contend that the safe harbor provision under 11 U.S.C. § 546(e)[43]

is a complete defense to the claims asserted against them in the U.S. Redeemer Actions.

Section 546(e) of the Bankruptcy Code operates as an exception to the bankruptcy

trustee's avoidance powers.  *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct.

883, 893-94 (2018) ("*Merit*").  The safe harbor prevents a trustee from avoiding, *inter*

---

[43]    Section 546(e) of the Bankruptcy Code provides in pertinent part:

Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee
may not avoid a transfer that is a . . . settlement payment, as defined in section 101 or 741
of this title, made by or to (or for the benefit of) a . . . financial institution [or] financial
participant . . . , or that is a transfer made by or to (or for the benefit of) a . . . financial
institution [or] financial participant . . . in connection with a securities contract, as
defined in section 741(7) . . . , that is made before the commencement of the case, except
under section 548(a)(1)(A) of this title.

*alia*, a pre-petition transfer (i) that is a "settlement payment" made by, to or for the

benefit of a financial institution[44] or financial participant,[45] or (ii) made by, to or for the

benefit of a financial institution or financial participant in connection with a "securities

contract," unless the transfer was intentionally fraudulent within the meaning of section

548(a)(1)(A).  *See* 11 U.S.C. § 546(e).  I refer to the type of transfer protected by section

546(e) as a Covered Transaction.

The section 546(e) safe harbor is an affirmative defense as to which the

Defendants bear the burden of proof.  *Tronox Inc. v. Kerr McGee Corp.* (*In re Tronox

Inc.*), 503 B.R. 239, 339 (Bankr. S.D.N.Y. 2013) ("§ 546(e) is a classic affirmative

defense"; "[c]ases construing § 546(e) have uniformly treated it as an affirmative

---

[44]    A "financial institution" means

(A) a Federal reserve bank, or an entity that is a commercial or savings bank, industrial savings bank, savings and loan association, trust company, federally-insured credit union, or receiver, liquidating agent, or conservator for such entity and, when any such Federal reserve bank, receiver, liquidating agent, conservator or entity is acting as agent or custodian for a customer (whether or not a "customer", as defined in section 741) in connection with a securities contract (as defined in section 741) such customer; or

(B) in connection with a securities contract (as defined in section 741) an investment company registered under the Investment Company Act of 1940.

11 U.S.C. § 101(22).

[45]    A "financial participant" means

(A) an entity that, at the time it enters into a securities contract, commodity contract, swap agreement, repurchase agreement, or forward contract, or at the time of the date of the filing of the petition, has one or more agreements or transactions described in paragraphs (1), (2), (3), (4), (5), or (6) of section 561(a) with the debtor or any other entity (other than an affiliate) of a total gross dollar value of not less than $1,000,000,000 in notional or actual principal amount outstanding (aggregated across counterparties) at such time or on any day during the 15-month period preceding the date of filing of the petition, or has gross mark-to-market positions of not less than $100,000,000 (aggregated across counterparties) in one or more such agreements or transactions with the debtor or any other entity (other than an affiliate) at such time or on any day during the 15-month period preceding the date of the filing of the petition; or

(b) a clearing organization (as defined in section 402 of the Federal Deposit Insurance Corporation Improvement Act of 1991).

11 U.S.C. § 101(22A).

defense") (citations omitted); *accord Picard v. Merkin* (*In re BLMIS*), No. 11 MC 0012 (KMW), 2011 WL 3897970, at *12 (S.D.N.Y. Aug. 31, 2011); *Grayson Consulting, Inc. v. Wachovia Sec., LLC* (*In re Derivium Capital, LLC*), 437 B.R. 798, 812 (Bankr. D.S.C. 2010), *aff'd*, 716 F.3d 355 (4th Cir. 2013); *Official Comm. of Unsecured Creditors v. Boveri* (*In re Grand Eagle Cos., Inc.*), 288 B.R. 484, 494-95 (Bankr. N.D. Ohio 2003); *contra SIPC v. BLMIS* (*In re BLMIS*), No. 12 MC 115 (JSR), 2013 WL 1609154, at *4 (S.D.N.Y. Apr. 15, 2013) (placing the burden of proof on the plaintiff to prove the non-application of section 546(e) in actions to avoid and recover pre-petition transfers made to customers of a brokerage in liquidation under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa *et seq.*).

Section 546(e) was designed to protect against the ripple effect of requiring a transferee to "repay amounts received in settled securities transactions," which could leave the transferee with "insufficient capital or liquidity to meet its current securities trading obligations, placing other market participants and the securities markets themselves at risk." *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.* (*In re Enron Creditors Recovery Corp.*), 651 F.3d 329, 334 (2d Cir. 2011); *see also In re Tribune Co. Fraudulent Conveyance Litig.*, 818 F.3d 98, 120-21 (2d Cir. 2016) (Section 546(e)'s "larger purpose was to promote finality and certainty for investors, by limiting the circumstances, e.g., to cases of intentional fraud, under which securities transactions could be unwound") (alterations and quotations omitted),[46] *petition for cert. filed*, No.

---

[46]     Bankruptcy Code § 546(g) provides a similar safe harbor regarding swap agreements. *See Whyte v. Barclays Bank PLC*, 644 F. App'x 60 (2d Cir. 2016) (summary order), *cert. denied*, 137 S. Ct. 2114 (2017).  To the extent that the Liquidators are seeking to avoid and recover redemption payments made in connection with swap agreements, the same principles apply.

16-317 (U.S. Sept. 12, 2016), *cert. deferred*, 138 S. Ct. 1162 (2018), *mandate recalled*,

No. 13-3992(L) (2d Cir. May 15, 2018).

Section 561(d) of the Bankruptcy Code extends the 546(e) safe harbor to

proceedings brought by a foreign representative in a chapter 15 case "to the same extent

as in a proceeding under chapter 7 or 11 of this title."  It provides:

> Any provisions of this title relating to securities contracts, commodity
> contracts, forward contracts, repurchase agreements, swap agreements, or
> master netting agreements shall apply in a case under chapter 15, so that
> enforcement of contractual provisions of such contracts and agreements in
> accordance with their terms will not be stayed or otherwise limited by
> operation of any provision of this title or by order of a court in any case
> under this title, *and to limit avoidance powers to the same extent as in a*
> *proceeding under chapter 7 or 11 of this title (such enforcement not to be*
> *limited based on the presence or absence of assets of the debtor in the*
> *United States).*

11 U.S.C. § 561(d) (emphasis added) (the concluding, italicized parenthetical is referred

to as the "Enforcement Parenthetical").  Relying on the "plain text" of section 561(d), the

Defendants argue that it makes section 546(e) apply extraterritorially to bar the

Liquidators' avoidance claims as well as their common law claims.  (*Defendants Motion*

at 36-37.)

Not surprisingly, the Liquidators disagree.  They acknowledge that the safe

harbor in section 546(e) bars certain avoidance claims brought by a chapter 7 or chapter

11 trustee, but argue that section 546(e) does not apply extraterritorially, and section

561(d) does no more than make section 546(e) equally applicable (or inapplicable) in a

chapter 15.  They reason that since section 546(e) does not apply extraterritorially to an

action by a chapter 7 or a chapter 11 trustee to avoid a foreign transfer, it does not apply

to an action brought by foreign representatives like those brought by the Liquidators in

the U.S. Redeemer Actions.  (*Liquidators Reply* at 61-62.)  Furthermore, even if the

Enforcement Parenthetical extended the enforcement of contractual Close-Out Rights[47]

to collateral located abroad, the Defendants are not seeking to exercise Close-Out

Rights; the Liquidators are seeking to avoid transfers.  The Enforcement Parenthetical

simply clarifies that provisions affecting enforcement of Close-Out Rights apply

irrespective of whether the assets of the foreign debtor are present in the United States,

but property transferred to a third party prior to a bankruptcy case is neither property of

the estate[48] nor property of the debtor when the case is commenced.  Therefore, in the

Liquidators' claim to avoid a transfer made by the debtor, the property transferred is not

an "asset of the debtor" within the Enforcement Parenthetical.  (*Id.* at 62-63.)  Finally,

interpreting section 561(d) to extend the safe harbor to foreign transfers would

undermine chapter 15's goal of granting relief to a foreign main proceeding by allowing a

Defendant who has received a foreign transfer to assert U.S. bankruptcy law to defeat a

BVI avoidance action.  (*Id.* at 63-64.)

## 2.    Extraterritoriality

The "presumption against extraterritoriality" is a "longstanding principle of

American law that legislation of Congress, unless a contrary intent appears, is meant to

apply only within the territorial jurisdiction of the United States."  *EEOC v. Arabian*

*Am. Oil Co.*, 499 U.S. 244, 248 (1991) ("*Aramco*") (internal quotation marks and

---

[47]    "Close-Out Rights" as used in this decision refers to the non-debtor's contractual right to cause the termination, liquidation, or acceleration of or to offset or net termination values, payment amounts, or other transfer obligations as set forth in 11 U.S.C. § 561.

[48]    The filing of a petition for recognition under chapter 15 does not create an "estate" or "property of the estate."  *See* 11 U.S.C. § 541(a) ("The commencement of a case under sections 301, 302, or 303 of this title creates an estate.").

citation omitted); *accord RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2100
(2016) ("*Nabisco*"); *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010)
("*Morrison*").  The presumption "serves to protect against unintended clashes between
our laws and those of other nations which could result in international discord."
*Aramco*, 499 U.S. at 248.

The presumption against extraterritoriality involves an exercise in statutory
interpretation and calls for a two-step analysis which can be examined in either order.
"At the first step, we ask whether the presumption against extraterritoriality has been
rebutted—that is, whether the statute gives a clear, affirmative indication that it applies
extraterritorially."  *Nabisco*, 136 S. Ct. at 2101; *accord Morrison*, 561 U.S. at 255 ("When
a statute gives no clear indication of an extraterritorial application, it has none.").  The
first step does not impose a "clear statement rule," because even absent a "clear
statement," the context of the statute can be consulted to give the most faithful reading.
*Morrison*, 561 U.S. at 265.  If the first step yields the conclusion that the statute applies
extraterritorially, the inquiry ends.

If it does not, the court must turn to the second step in which the Court must
determine whether the case involves a domestic application of the statute, and we do
this by looking to the statute's "focus."  If the conduct relevant to the statute's focus
occurred in the United States, then the case involves a permissible domestic application
even if other conduct occurred abroad; but if the conduct relevant to the focus occurred
in a foreign country, then the case involves an impermissible extraterritorial application
regardless of any other conduct that occurred in U.S. territory.  *Nabisco*, 136 S. Ct. at

2101; *accord Morrison*, 561 U.S. at 266-67 (court must look to the "'focus' of congressional concern," *i.e.*, the "objects of the statute's solicitude").

### 3.    The Relationship Between sections 546(e) and 561(d)

Asking whether section 546(e) applies extraterritorially is the wrong question.[49] The correct question is whether section 561(d) makes the safe harbor applicable to proceedings brought by foreign representatives in a chapter 15 case seeking to avoid purely foreign transfers under foreign insolvency laws. The plain text indicates that it does. Section 561(d) serves two purposes. First, it prevents a foreign representative or a U.S. bankruptcy court from interfering with the enforcement by a non-debtor counterparty of its Close-Out Rights, and "such enforcement [is] not to be limited based on the presence or absence of assets of the debtor in the United States." In other words, the chapter 15 bankruptcy court cannot enjoin a party over which it has personal jurisdiction from exercising its Close-Out Rights to foreclose on collateral regardless of whether the collateral is located within or without the United States. The Liquidators concede as much. (*Foreign Representatives' Supplemental Memorandum of Law Addressing Bankruptcy Code Section 561(d) pursuant to February 1, 2018 Order of the*

---

[49]    Presumably, section 546(e) will apply extraterritorially to the same extent that the chapter 5 avoidance provisions apply extraterritorially, an issue that has drawn divergent views. *Compare SIPC v. BLMIS* (*In re BLMIS*), 513 B.R. 222, 231 (S.D.N.Y. 2014) (Bankruptcy Code § 550(a) did not apply extraterritorially to permit recovery of foreign transfers), *supplemented by* No. 12-mc-115 (JSR), 2014 WL 3778155 (S.D.N.Y. July 28, 2014); *LaMonica v. CEVA Grp. PLC* (*In re CIL Ltd.*), 582 B.R. 46, 92-93 (Bankr. S.D.N.Y. 2018) ("Congress has not 'clearly expressed' that sections 548 and 550 apply extraterritorially"), *reconsideration granted on other grounds*, Adv. Proc. No. 14-02442 (JLG), 2018 WL 3031094 (Bankr S.D.N.Y. June 15, 2018); *Spizz v. Goldfarb Seligman & Co.* (*In re Ampal-Am. Isr. Corp.*), 562 B.R. 601, 612 (Bankr. S.D.N.Y. 2017) ("the avoidance provisions of the Bankruptcy Code . . . do not apply extraterritorially") *with French v. Liebmann* (*In re French*), 440 F.3d 145, 152 (4th Cir.) ("Congress made manifest its intent that § 548 apply to all property that, absent a prepetition transfer, would have been property of the estate, wherever that property is located."), *cert. denied*, 549 U.S. 815 (2006); *Weisfelner v. Blavatnik* (*In re Lyondell Chem. Co.*), 543 B.R. 127, 155 (Bankr. S.D.N.Y. 2016) (same).

*Court*, dated February 15, 2018 ("*Liquidators Supplemental Memo*") at 9 ("[T]he purpose of the parenthetical is apparent: to make as plain as possible that the provisions protecting netting agreements are fully applicable in ancillary proceedings, *even if* the debtor's assets comprising the collateral subject to netting or off-set are sited abroad.") (emphasis in original) (ECF Doc. # 1656).)

Second, section 561(d) limits the foreign representative's ability to recover property transferred in connection with the earlier exercise of Close-Out Rights.[50]  It provides that the safe harbors under the Bankruptcy Code "shall apply in a case under chapter 15 . . . to limit avoidance powers to the same extent as in a proceeding under chapter 7 or 11 of this title."  A chapter 15 foreign representative cannot exercise the avoidance powers available to a trustee in chapter 7 or chapter 11.  *See* 11 U.S.C. § 1521(a)(7).  Consequently, section 561(d) is necessarily referring to avoidance powers available under non-U.S. law.[51]  The Defendants argue that section 561(d) precludes foreign law avoidance claims brought in the United States even when the property transferred in connection with the enforcement of the Close-Out Rights, *i.e.*, the collateral that was foreclosed, was located outside the United States.[52]  (*Defendants Motion* at 36; *Defendants Reply* at 17.)

---

[50]    Although section 546(e) does not protect against an intentional fraudulent transfer claim under 11 U.S.C. § 548(a)(1)(A), the BVI Avoidance Claims do not allege intentional fraudulent transfers.

[51]    A foreign representative under section 304 (the predecessor to Chapter 15) also lacked the authority to exercise a trustee's avoidance powers.  *See Koreag, Controle et Revision S.A. v. Refco F/X Assocs., Inc.* (*In re Koreag, Controle et Revision S.A.*), 961 F.2d 341, 357 (2d Cir.), *cert. denied*, 506 U.S. 865 (1992).

[52]    The Defendants also contend that the safe harbor bars the Liquidators from bringing common law and other non-bankruptcy law claims that effectively seek the same relief based on the same act.  *See, e.g., Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, 988 (8th Cir. 2009) (common law unjust enrichment and "excessive shareholder distributions" claims barred because they sought "to recover the same

- 55 -

The Court concludes that the Liquidators' interpretation is unreasonable because it severs the provision that protects Close-Out Rights from the clause that limits foreign avoidance claims.  These provisions complement each other and cannot be viewed separately because the same concern — the domino effect of a financial meltdown — animates both clauses.  The foreign representative cannot prevent the enforcement of the Close-Out Rights and cannot avoid the transfers that result from the enforcement of Close-Out Rights.  Yet under the Liquidators' interpretation, they could not prevent the enforcement of the Close-Out Rights but could nonetheless avoid and recover the corresponding transfers.  Their interpretation leads to the absurd result of protecting the transfer at the front end while avoiding it at the back end.

### 4.     The Origins of Section 561(d)

To the extent there is any ambiguity, the history leading to the adoption of section 561(d) confirms the Court's interpretation.  Section 561(d) originated with legislation proposed in 1996 by the International Swaps and Derivatives Association, Inc. ("ISDA") and the Public Securities Association ("PSA") (together, "ISDA/PSA").  At that time, ISDA/PSA focused on the concern that "a failure of one large participant in financial markets or a disruption in one market *could lead to widespread difficulties at other institutions or systemic disruptions in other markets or in the financial system as*

---

payments . . . [that] are unavoidable under Section 546(e)"), *abrogated on other grounds by Merit Mgmt. Grp., LP v. FTI Consulting*, 138 S. Ct. 883 (2018); *AP Servs. LLP v. Silva*, 483 B.R. 63, 71 (S.D.N.Y. 2012) (unjust enrichment claim could not be permitted without "frustrating the purpose of Section 546(e)"); *Official Comm. of Unsecured Creditors of Hechinger Inv. Co. v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co.)*, 274 B.R. 71, 96 (D. Del. 2002) (unjust enrichment claim barred where it "effectively acts as an avoidance claim against the shareholders in a transaction that the court has already found is an unavoidable settlement payment").

*a whole.*" International Swaps and Derivatives Association, Inc. & Public Securities
Association, *Financial Transactions in Insolvency: Reducing Legal Risk Through
Legislative Reform*, at 1 (Apr. 2, 1996) ("*Reducing Legal Risk*") (emphasis added).[53]

Relevant to these adversary proceedings, the ISDA/PSA worried that the
bankruptcy of a counterparty to a qualifying transaction could interfere with the non-
debtor counterparties' ability to enforce its Close-Out Rights. *Id.* at 1-2. According to
the ISDA/PSA, the inability of the non-debtor counterparty to enforce Close-Out Rights
could lead to uncertainty, gridlock, lack of liquidity, spread to other institutions and
markets and prevent determination of credit exposures critical to the implementation of
prudent risk management procedures. *Id.* at 2.

The ISDA/PSA offered a series of legislative proposals one of which addressed
ancillary proceedings under the Bankruptcy Code. Proposed § 106(m) would add §
304(d) to the Bankruptcy Code:

> Any provisions of this title relating to securities contracts, commodity
> contracts, forward contracts, repurchase agreements, swap agreements
> or master netting agreements shall apply in a case ancillary to a foreign
> proceeding under this section, so that enforcement of contractual
> provisions of such contracts and agreements in accordance with their
> terms will not be stayed or otherwise limited by operation of any
> provision of this title or by order of a court in any proceeding under
> this title, and to limit avoidance powers to the same extent as a
> proceeding under Chapters 7 or 11 of this title (such enforcement not to be
> limited based on the presence or absence of assets of the debtor in the
> United States).

---

[53]     A copy of *Reducing Legal Risk* is annexed as Exhibit A to the *Attorney Declaration of William M.
Lemon in Support of Defendants' Supplemental Memorandum of Law Concerning the Legislative
History of 11 U.S.C. § 561(d)*, dated Feb. 15, 2018 ("*Lemon Declaration*") (ECF Doc. # 1658).

*Id.* at A-19.  The ISDA/PSA explained the purpose of the proposed provision in

the following manner:

> Section 106(m) clarifies that the provisions of the Bankruptcy Code related
> to securities contracts, commodity contracts, forward contracts,
> repurchase agreements, swap agreements and master netting agreements
> will apply in a Section 304 proceeding ancillary to a foreign insolvency
> proceeding.  This provision is designed so that a bankruptcy court or
> trustee does not exercise its discretion in a Section 304 proceeding to
> reach a result that would be at odds with the result that would be required
> in a non-Section 304 proceeding for a debtor under the Bankruptcy Code.

*Id.* at 18.

The proposal was prompted by the anxiety over the bankruptcy court's injunctive

powers.  While the automatic stay did not apply in section 304 ancillary proceedings,

bankruptcy courts had broad authority to grant injunctions in favor of foreign

representatives and could potentially bar the exercise of the Close-Out Rights, especially

the right to foreclose on collateral, leading to a meltdown of the financial system.  Fear

over injunctive relief came into greater focus with the insolvency of Long-Term Capital

Management ("LTCM") in 1998.

LTCM, a Delaware limited partnership, operated a fund (the "LTCM Fund")

organized as a Cayman Island partnership.  Beginning in late July 1998, the LTCM Fund

started to sustain substantial losses.  The President's Working Group on Financial

Markets ("Working Group"), which consisted of the Secretary of the Treasury, the

Chairman of the Board of Governors of the Federal Reserve, the Chairman of the SEC

and the Chairperson of the Commodities Futures Trading Commission, issued a study

relating to LTCM's downfall and made certain recommendations to prevent disruptions

in the markets.  President's Working Group, *Hedge Funds, Leverage, and the Lessons of Long-Term Capital  Management* (Apr. 1999) ("*Working Group Report*").[54]

Although the LTCM Fund was ultimately bailed out, the Working Group, among other things, hypothesized the effect of a default on the LTCM Fund's counterparties.  It noted that if the LTCM Fund was the subject of a Cayman Islands insolvency proceeding, "its Cayman receiver could have sought a Section 304 Injunction prohibiting at least temporarily the liquidation of U.S. collateral pledged by LTCM to its counterparties." *Id.* at 28.  This might force U.S. secured creditors to seek the permission of the foreign bankruptcy court to liquidate their collateral, or at least delay them from liquidating any U.S. Treasury securities pledged by the Fund under a master netting agreement. *Id.* at E-8 to E-9.

The Working Group thought an earlier proposal it had submitted to Congress solved the situation and clarified that a U.S. creditor could immediately liquidate its U.S. collateral. *Id.* at E-10.  The proposed legislative fix was included in two bills, S. 1914, § 210 (105th Cong., 2nd Sess. April 2, 1998) ("Grassley Bill"); H.R. 4393 (105th Cong., 2nd Sess. Oct. 4, 1998) ("Leach Bill"). *Id.* at E-8 n. 15.  Section 210 of the Grassley Bill essentially tracked the language of the ISDA/PSA proposal verbatim.[55]  Similarly,

---

[54]    A copy of *Working Group Report* is annexed as Exhibit D to the *Lemon Declaration*.

[55]    Section 210 would have added the following provision to the Bankruptcy Code as section 304(d):

Any provision of this title relating to securities contracts, commodity contracts, forward contracts, repurchase agreements, swap agreements, or master netting agreements shall apply in a case ancillary to a foreign proceeding under this section so that enforcement of contractual provisions of such contracts and agreements in accordance with their terms will not be stayed or otherwise limited by operation of any provision of this title or by order of a court in any proceeding under this title, and to limit avoidance powers to the same extent as a proceeding under chapter 7 or 11 of this title (such enforcement not to be limited based on the presence or absence of assets of the debtor in the United States).

section 8(m) of the Leach Bill tracked the ISDA/PSA proposal with slight immaterial

modifications,[56] and was intended to clarify "that the provisions of the Bankruptcy Code

related to securities contracts, commodity contracts, forward contracts, repurchase

agreements, swap agreements and master netting agreements apply in a section 304

proceeding ancillary to a foreign insolvency proceeding." H.R. REP. NO. 105-688, pt. 1,

at 18 (1998).

These bills were not enacted. Similar proposals relating to ancillary proceedings

were included in bills submitted in the 106th, 107th and 108th Congresses, but these

bills were also not enacted. (*See Liquidators Supplemental Memo* at 5 n. 2 (collecting

bills).)

Section 561(d) was ultimately enacted as part of the Bankruptcy Abuse and

Consumer Protection Act of 2005 ("BAPCPA") along with other provisions that clarified

and expanded the protections afforded to the exercise of Close-Out Rights. *See* Pub. L.

109-8, 119 Stat. 23 § 907 (2005). The House Report explained:

---

Business Bankruptcy Reform Act, S. 1914, 105th Cong. § 210 (1998).

[56]    Section 8(m) proposed to add the following provision to the Bankruptcy Code as section 304(d):

Any provisions of this title relating to securities contracts, commodity contracts, forward
contracts, repurchase agreements, swap agreements, or master netting agreements shall
apply in a case ancillary to a foreign proceeding under this section or any other section of
this title so that enforcement of contractual provisions of such contracts and agreements
in accordance with their terms will not be stayed or otherwise limited by operation of any
provision of this title or by order of a court in any proceeding under this title, and to limit
avoidance powers to the same extent as in a proceeding under chapter 7 or 11 of this title
(such enforcement not to be limited based on the presence or absence of assets of the
debtor in the United States).

Financial Contract Netting Improvement Act of 1998, H.R. 4393, 105th Cong. § 8(m) (1998).

> New section 561 of the Bankruptcy Code clarifies that the provisions of the
> Bankruptcy Code related to securities contracts, commodity contracts,
> forward contracts, repurchase agreements, swap agreements and master
> netting agreements apply in a proceeding ancillary to a foreign insolvency
> proceeding *under new section 304 of the Bankruptcy Code.*

H.R. REP. NO. 109-31, pt. 1, at 133 (2005) (emphasis added).  Of course, there was no

"new" section 304 enacted as part of BAPCPA; BAPCPA abrogated section 304, and

substituted the more comprehensive chapter 15 in its place.  The legislative history

pertaining to section 561(d) was apparently lifted from prior conference reports.

Thus, Section 561(d) traces its lineage to the ISDA/PSA proposal, and its

adoption along with the expansion of the safe harbor protections reflect Congressional

intent to provide broad protection to avoid the spread of financial contagion.  While

Congress and the Working Group were primarily and understandably concerned with

U.S. creditors and U.S. markets, the ISDA/PSA recognized that the financial contagion

they feared did not stop at the border, and neither the statute nor the legislative history

suggests that the safe harbors are limited to U.S. creditors or U.S. markets.

The Liquidators' argument that section 561(d) was simply intended to put

ancillary proceedings on the same footing as plenary bankruptcies is correct but misses

the point.  A chapter 7 or a chapter 11 trustee cannot avoid and recover a transfer that

occurred in connection with the enforcement of a Close-Out Right if the exercise of the

Close-Out Right could not be prevented under the Bankruptcy Code.  The exercise of

Close-Out Rights is exempt from the automatic stay under 11 U.S.C. § 362(b), and except

for certain intentional fraudulent transfers, the safe harbor bars the trustee from

avoiding transfers that occurred in connection with the pre-petition exercise of Close-

Out Rights.  Similarly, a chapter 15 foreign representative (and the bankruptcy court)

cannot prevent the enforcement of Close-Out Rights, even if the exercise of those rights

involves the transfer of collateral located abroad and cannot invoke non-U.S. law to

avoid and recover those transfers if they have already occurred.  Furthermore, the

Liquidators' policy argument that the Defendants' interpretation of section 561(d) will

undermine chapter 15 by placing limitations on the ability of foreign representative to

avoid Covered Transactions involving foreign assets may be true but ignores the policy

rationale underlying the adoption and subsequent expansion of the Bankruptcy Code's

safe harbor provisions to prevent a financial meltdown.

### 5.    The Liquidators' Foreign Avoidance Claims

Through the extant complaints and/or proposed amendments, the Liquidators

seek to avoid and recover "unfair preferences" and "undervalue transactions" pursuant

to the INSOLVENCY ACT §§ 245 and 246, respectively.  As noted earlier, these claims

correspond to claims to avoid preferences under 11 U.S.C. § 547 and constructive

fraudulent transfers under 11 U.S.C. §§ 544(b)(1) (incorporating state avoidance law)

and 548(a)(1)(B).  If the subject redemptions were Covered Transactions, the avoidance

of those transactions would be barred under 11 U.S.C. §§ 546(e) and 561(d).

There does not appear to be any dispute that the redemptions at issue were

Covered Transactions because they were settlement payments made in connection with

securities contracts.  *Cf. Picard v. Ida Fishman Revocable Tr.* (*In re BLMIS*), 773 F.3d

411, 422-23 (2d Cir. 2014) (payments to BLMIS investors were settlement payments on

account of securities contracts), *cert. denied*, 135 S. Ct. 2858 (2015).  The more difficult

question is whether the transferor or the transferee was a covered entity – either a

financial institution or a financial participant.  Within weeks of the parties' submissions,

the Supreme Court issued *Merit*.  It concluded that the transferor or transferee had to be

a qualifying entity under section 546(e), *id.* at 892-95, 897, and abrogated the Second

Circuit's rule in *Official Comm. of Unsecured Creditors of Quebecor World (USA) Inc.*

*v. Am. United Life Ins. Co.* (*In re Quebecor World (USA) Inc.*), 719 F.3d 94 (2d Cir.

2013) under which the safe harbor applied if a qualifying financial entity acted merely as

a conduit or intermediary.  *Id.* at 99.  Because *Quebecor* was the controlling law in the

Second Circuit at the time, neither party had focused on whether the transfer was made

by, to or for the benefit of an enumerated financial entity.  The *Defendants Motion*

argued that the redemptions were sent to "financial institutions" because the

redemptions were received in "bank accounts," (*Defendants Motion* at 43-44), but after

*Merit*, that may not be enough to protect the transfer under section 546(e).

Alternatively, the Defendants argued that Sentry was a "financial participant" and

the redemptions it paid are protected from avoidance by the safe harbor.  (*Defendants*

*Motion* at 43.)[57] For support, they pointed to the Liquidators' allegations that Sentry

held in excess of $6 billion of assets with BLMIS as of October 2008.  (*Id.*)  According to

the Defendants, this admission placed Sentry within the statutory definition of

"financial participant" because it held securities contracts with an aggregate value over

$1 billion within the fifteen-month time period set forth in the statute.  *See* 11 U.S.C. §

101(22A).  However, the statute refers to the "15-month period preceding the date of the

filing of the petition."  *Id.*  Sentry's "petition" was filed on June 14, 2010.[58]  Since

---

[57]    The Defendants did not address this argument to the redemption payments made by Sigma and
Lambda.

[58]    A chapter 15 debtor's "petition" refers to the petition for recognition of a foreign proceeding under
11 U.S.C. § 1504.  *See* 11 U.S.C. § 101(42).

October 2008 was 19 months prior to Sentry's petition, the value of outstanding securities contracts at that time is not dispositive of Sentry's status as a "financial participant."

The change in the law resulting from the Supreme Court's *Merit* decision prompted a flurry of letters from the parties over a two-month span containing new arguments regarding the effect of *Merit* on the Defendants' motions, including whether the redemptions were made by, to or for the benefit of an entity covered by section 546(e).  (*See Letter of David J. Molton*, dated Mar. 8, 2018 (ECF Doc. # 1671); *Letter of Thomas J. Moloney*, dated Mar. 23, 2018 (ECF Doc. # 1687); *Letter of David J. Molton*, dated Apr. 5, 2018 (ECF Doc. # 1690); *Letter of David J. Molton*, dated Apr. 27, 2018 (ECF Doc. # 1692); *Letter of Thomas J. Moloney*, dated Apr. 27, 2018 (ECF Doc. # 1693); *Letter of David J. Molton*, dated May 9, 2017 (ECF Doc. # 1694); *Letter of Thomas J. Moloney*, dated May 10, 2018 (ECF Doc. # 1695).)  Rather than consider the arguments made through the multiple letters, the Court denies the branch of the Defendants' motions seeking dismissal based on sections 546(e) and 561(d) without prejudice to their right to make subsequent motions that the Funds and/or the Defendants were financial participants or financial institutions and without prejudice to the Liquidators' right to oppose those motions.

## CONCLUSION

For the reasons stated, the Defendants' motions to dismiss are granted to the extent of dismissing all of the Common Law Claims and the Contract Claims except to the extent that a complaint alleges a constructive trust claim against a Knowledge Defendant.  The motions to dismiss the BVI Avoidance Claims are denied without prejudice to a renewed motion based on the applicability of 11 U.S.C. §§ 546(e) and 561(d).  Correspondingly, the Liquidators are granted leave to amend to assert constructive trust claims against Knowledge Defendants and BVI Avoidance Claims against all Defendants.  The Court has considered the remaining arguments made by the parties, and to the extent not specifically addressed, concludes that they lack merit or are rendered moot by the disposition of the motions.  The Liquidators are directed to settle or submit a consensual order consistent with this decision in each adversary proceeding.

Dated:   New York, New York
        December 6, 2018

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
United States Bankruptcy Judge