IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 15 Case |
| FAIRFIELD SENTRY LIMITED, et al., | Case No. 10-13164 (SMB) |
| Debtor in Foreign Proceedings. | Jointly Administered |
| FAIRFIELD SENTRY LTD. (IN LIQUIDATION), et al., | Adv. Pro. No. 10-03496 (SMB) |
| Plaintiffs, | Administratively Consolidated |
| v. | |
| THEODOOR GGC AMSTERDAM, et al., | |
| Defendants. | |
| FAIRFIELD SENTRY LTD. (IN LIQUIDATION), et al., | Adv. Pro. No. 10-03516 (SMB) |
| Plaintiffs, | |
| v. | |
| MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., et al., | |
| Defendants. | |
| FAIRFIELD SENTRY LTD. (IN LIQUIDATION), et al., | Adv. Pro. No. 10-03622 (SMB) |
| Plaintiffs, | |
| v. | |
| CITIBANK NA LONDON, et al., | |
| Defendants. | |

| | |
|---|---|
| FAIRFIELD SENTRY LTD. (IN LIQUIDATION), et al.,<br><br>   Plaintiffs,<br><br> v.<br><br>BGL BNP PARIBAS S.A., et al.,<br><br>   Defendants. | Adv. Pro. No. 10-03626 (SMB) |
| FAIRFIELD SENTRY LTD. (IN LIQUIDATION), et al.,<br><br>   Plaintiffs,<br><br> v.<br><br>BNP PARIBAS SECURITIES SERVICES LUXEMBOURG, et al.,<br><br>   Defendants. | Adv. Pro. No. 10-03627 (SMB) |
| FAIRFIELD SENTRY LTD. (IN LIQUIDATION), et al.,<br><br>   Plaintiffs,<br><br> v.<br><br>ROBINSON & CO., et al.,<br><br>   Defendants. | Adv. Pro. No. 10-03628 (SMB) |
| FAIRFIELD SENTRY LTD. (IN LIQUIDATION), et al.,<br><br>   Plaintiffs,<br><br> v.<br><br>HSBC SECURITIES SERVICES (LUXEMBOURG) S.A., et al.,<br><br>   Defendants. | Adv. Pro. No. 10-03630 (SMB) |

| | |
|---|---|
| FAIRFIELD SENTRY LTD. (IN LIQUIDATION), et al.,<br><br>      Plaintiffs,<br><br>    v.<br><br>HSBC PRIVATE BANK (SUISSE) SA, et al.,<br><br>      Defendants. | Adv. Pro. No. 10-03633 (SMB) |
| FAIRFIELD SENTRY LTD. (IN LIQUIDATION), et al.,<br><br>      Plaintiffs,<br><br>    v.<br><br>ZURICH CAPITAL MARKETS CO., et al.,<br><br>      Defendants. | Adv. Pro. No. 10-03634 (SMB) |
| FAIRFIELD SENTRY LTD. (IN LIQUIDATION), et al.,<br><br>      Plaintiffs,<br><br>    v.<br><br>ABN AMRO SCHWEIZ AG, et al.,<br><br>      Defendants. | Adv. Pro. No. 10-03635 (SMB) |
| FAIRFIELD SENTRY LTD. (IN LIQUIDATION), et al.,<br><br>      Plaintiffs,<br><br>    v.<br><br>ABN AMRO SCHWEIZ AG, et al.,<br><br>      Defendants. | Adv. Pro. No. 10-03636 (SMB) |

| | |
|---|---|
| FAIRFIELD SENTRY LTD. (IN LIQUIDATION), et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>CITIBANK (SWITZERLAND) AG, et al.,<br><br>    Defendants. | Adv. Pro. No. 10-03640 (SMB) |
| FAIRFIELD SENTRY LTD. (IN LIQUIDATION), et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>ABN AMRO RETAINED NOMINEES (IOM) LIMITED, et al.,<br><br>    Defendants. | Adv. Pro. No. 10-03776 (SMB) |
| FAIRFIELD SENTRY LTD. (IN LIQUIDATION), et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>UBS AG NEW YORK, et al.,<br><br>    Defendants. | Adv. Pro. No. 10-03780 (SMB) |
| FAIRFIELD SENTRY LTD. (IN LIQUIDATION), et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>MERRILL LYNCH BANK (SUISSE) SA, et al.,<br><br>    Defendants. | Adv. Pro. No. 10-03788 (SMB) |

| | |
|---|---|
| FAIRFIELD SENTRY LTD. (IN LIQUIDATION), et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>UBS FUND SERVICES (CAYMAN) LTD., et al.,<br><br>    Defendants. | Adv. Pro. No. 10-04095 (SMB) |
| FAIRFIELD SENTRY LTD. (IN LIQUIDATION), et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>BNP PARIBAS ARBITRAGE SNC, et al.,<br><br>    Defendants. | Adv. Pro. No. 10-04098 (SMB) |
| FAIRFIELD SENTRY LTD. (IN LIQUIDATION), et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>BNP PARIBAS PRIVATE BANK & TRUST CAYMAN LTD., et al.,<br><br>    Defendants. | Adv. Pro. No. 10-04099 (SMB) |
| FAIRFIELD SENTRY LTD. (IN LIQUIDATION), et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>FS/FORTIS BANQUE LUXEMBOURG, et al.,<br><br>    Defendants. | Adv. Pro. No. 11-01242 (SMB) |

| | |
|---|---|
| FAIRFIELD SENTRY LTD. (IN LIQUIDATION), et al., <br><br> Plaintiffs, <br><br> v. <br><br> UBS EUROPE SE LUXEMBOURG BRANCH, et al., <br><br> Defendants. | Adv. Pro. No. 11-01250 (SMB) |
| FAIRFIELD SENTRY LTD. (IN LIQUIDATION), et al., <br><br> Plaintiffs, <br><br> v. <br><br> UBS FUND SERVICES (IRELAND) LTD., et al., <br><br> Defendants. | Adv. Pro. No. 11-01258 (SMB) |
| FAIRFIELD SENTRY LTD. (IN LIQUIDATION), et al., <br><br> Plaintiffs, <br><br> v. <br><br> MERRILL LYNCH INTERNATIONAL, et al., <br><br> Defendants. | Adv. Pro. No. 11-01463 (SMB) |
| FAIRFIELD SENTRY LTD. (IN LIQUIDATION), et al., <br><br> Plaintiffs, <br><br> v. <br><br> BNP PARIBAS SECURITIES NOMINEES LTD., et al., <br><br> Defendants. | Adv. Pro. No. 11-01579 (SMB) |

| | |
|---|---|
| FAIRFIELD SENTRY LTD. (IN LIQUIDATION), et al.,<br><br>Plaintiffs,<br><br>v.<br><br>FORTIS BANK NEDERLAND NV, et al.,<br><br>Defendants. | Adv. Pro. No. 11-01614 (SMB) |
| FAIRFIELD SENTRY LTD. (IN LIQUIDATION), et al.,<br><br>Plaintiffs,<br><br>v.<br><br>FORTIS BANK, SA/NV, et al.,<br><br>Defendants. | Adv. Pro. No. 11-01617 (SMB) |
| FAIRFIELD SENTRY LTD. (IN LIQUIDATION), et al.,<br><br>Plaintiffs,<br><br>v.<br><br>FORTIS GLOBAL CUSTODY SERVS. N.V., et al.,<br><br>Defendants. | Adv. Pro. No. 11-02422 (SMB) |
| FAIRFIELD SENTRY LTD. (IN LIQUIDATION), et al.,<br><br>Plaintiffs,<br><br>v.<br><br>CITIGROUP GLOBAL MARKETS LTD., et al.,<br><br>Defendants. | Adv. Pro. No. 11-02770 (SMB) |

| | |
|---|---|
| FAIRFIELD SENTRY LTD. (IN LIQUIDATION), et al., <br><br> Plaintiffs, <br><br> v. <br><br> BNP PARIBAS ESPANA, et al., <br><br> Defendants. | Adv. Pro. No. 12-01551 (SMB) |
| FAIRFIELD SENTRY LTD. (IN LIQUIDATION), et al., <br><br> Plaintiffs, <br><br> v. <br><br> SOMERS NOMINEES (FAR EAST) LTD., et al., <br><br> Defendants. | Adv. Pro. No. 12-01556 (SMB) |
| FAIRFIELD SENTRY LTD. (IN LIQUIDATION), et al., <br><br> Plaintiffs, <br><br> v. <br><br> FORTIS GLOBAL SERVS. NV, et al., <br><br> Defendants. | Adv. Pro. No. 12-01568 (SMB) |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR LEAVE TO FILE THE FURTHER PROPOSED AMENDED COMPLAINTS IN THE KNOWLEDGE ACTIONS

Date: January 15, 2020

SELENDY & GAY PLLC

David Elsberg
Lena Konanova
Jordan Garman
Kevin Hu
Ronald Krock
1290 Avenue of the Americas
New York, NY 10104
Telephone: 212-390-9000

-and-

BROWN RUDNICK LLP

*Attorneys for Plaintiffs Foreign Representatives*

David J. Molton
Marek P. Krzyzowski
Seven Times Square
New York, NY 10036
Telephone: 212-209-4800

## TABLE OF CONTENTS

**Pages**

PRELIMINARY STATEMENT ....................................................................................1

PROCEDURAL BACKGROUND.................................................................................5

    A.    Initial Proposed Amendments...................................................................5

    B.    The December 2018 Decision And Implementing Orders ......................6

    C.    Further Proposed Amendments.................................................................8

ARGUMENT ................................................................................................................9

I.    THE FURTHER PROPOSED AMENDED COMPLAINTS STATE VIABLE
CLAIMS ...........................................................................................................11

    A.    The BVI "Bad Faith" Standard ..............................................................11

    B.    Attribution Of Knowledge Under BVI Law ...........................................14

    C.    The Further Proposed Amended Complaints Sufficiently Allege One Or
More Individuals Employed By The Knowledge Defendants Turned A
Blind Eye Or Were Reckless As To The Veracity Of The NAVs.........15

        1.    HSBC ...........................................................................................15

        2.    UBS...............................................................................................19

        3.    BNP Paribas .................................................................................22

        4.    Citigroup ......................................................................................24

        5.    Fortis ............................................................................................27

        6.    Merrill Lynch ...............................................................................29

        7.    Zurich Capital Markets ................................................................31

        8.    Third-Party Beneficial Shareholders............................................32

        9.    Beneficial Shareholders of the Citco Entities .............................34

II.    THERE IS NO BAD FAITH, PREJUDICE TO DEFENDANTS, OR UNDUE
DELAY ..............................................................................................................37

CONCLUSION.............................................................................................................40

## TABLE OF AUTHORITIES

**Pages**

### Cases

*Abbatiello v. Monsanto Co.*,
    571 F. Supp. 2d 548 (S.D.N.Y. 2008) ........................................................ 39, 40

*Agerbrink v. Model Serv. LLC*,
    155 F. Supp. 3d 448 (S.D.N.Y. 2016) ...................................... 9, 10, 11, 38, 39

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................ 9

*Barlow Clowes Int'l Ltd. v. Eurotrust Int'l Ltd.*
    [2005] UKPC 37 ............................................................................................... 12

*Block v. First Blood Assocs.*,
    988 F.2d 344 (2d Cir. 1993) ........................................................................ 10, 39

*BPP Illinois, LLC v. Royal Bank of Scotland Grp. PLC*,
    859 F.3d 188 (2d Cir. 2017) .............................................................................. 9

*Cresswell v. Sullivan & Cromwell*,
    *922 F.2d 60 (2d Cir. 1990)* .............................................................................. 11

*Derry v. Peek*
    [1889] 14 App. Cas. 337 (HL) ........................................................................ 11

*Duling v. Gristede's Operating Corp.*,
    265 F.R.D. 91 (S.D.N.Y. 2010) ................................................................. 39, 40

*Eagle Tr. plc v. SBC Secs. Ltd.*
    [1992] 4 All ER ................................................................................................ 13

*Eastman Kodak Co. v. Henry Bath LLC*,
    936 F.3d 86, 98 (2d Cir. 2019) .......................................................................... 9

*El Ajou v. Dollar Land Holdings plc*
    [1993] 3 All ER 717 ........................................................................................ 14

*In re Fairfield Sentry Ltd.*,
    596 B.R. 275 (Bankr. S.D.N.Y. 2018) ................................ 1, 6, 7, 8, 11, 12, 14

*Global-Tech Appliances, Inc. v. SEB S.A.*,
    563 U.S. 769 (2011) ........................................................................................ 13

*Group Seven Ltd. v. Notable Servs. Ltd.* [2019]
   EWCA (Civ) 614 ............................................................... 12

*In re Bernard L. Madoff Inv. Sec. LLC*,
   560 B.R. 208 (Bankr. S.D.N.Y. 2016) ........................................ 9, 38

*Ivey v. Genting Casinos*
   [2017] UKSC 67 .............................................................. 13

*Manifest Shipping Co. Ltd. v. Uni-Polaris Ins. Co. Ltd.*
   [2003] 1 AC 469 (HL) ........................................................ 12

*Matson v. Bd. of Educ. of City Sch. Dist. of New York*,
   631 F.3d 57 (2d Cir. 2011) .................................................. 10

*McCaffery v. McCaffery*,
   2011 WL 13307927 (E.D.N.Y. Dec. 19, 2011) .................................. 10

*Olaf Sööt Design, LLC v. Daktronics, Inc.*,
   299 F. Supp. 395 (S.D.N.Y. 2017) ............................................ 9

*Pasternack v. Shrader*,
   863 F.3d 162 (2d Cir. 2017) ........................................... 10, 39, 40

*Rachman Bag Co. v. Liberty Mut. Ins. Co.*,
   46 F.3d 230 (2d Cir. 1995) .................................................. 39

*Richardson Greenshields Secs., Inc. v. Lau*,
   825 F.2d 647 (2d Cir. 1987) ................................................. 39

*Royal Brunei Airlines Sdn Bhd v. Tan*
   [1995] AV 378 ........................................................... 12, 13

*Scott v. Chipotle Mexican Grill*,
   300 F.R.D. 193 (S.D.N.Y. 2014) .............................................. 38

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
   608 B.R. 181 (Bankr. S.D.N.Y. 2019) ..................................... 12, 13

*State Teachers Ret. Bd. v. Fluor Corp.*,
   654 F.3d 843 (2d Cir. 1981) ................................................. 10

*Three Rivers Dist. Council v. Bank of England (No. 3)*
   [2003] 2 A.C. 1 (HL) ........................................................ 12

*Urban Box Office Network, Inc. v. Interfase Managers, L.P.*,
   232 F.R.D. 169 (S.D.N.Y. 2004) .............................................. 11

*Valentini v. Citigroup, Inc.*,
    2013 WL 4407065 (S.D.N.Y. Aug. 16, 2013) ................................................................... 40

*Williams v. Citigroup Inc.*,
    659 F.3d 208 (2d Cir. 2011) .............................................................................................. 9

**Rules**

Fed. R. Bankr. P. 7015 .......................................................................................................... 1, 9

Fed. R. Civ. P. 15 .................................................................................................................. 1, 9

**Treatises**

*Bowstead and Reynolds on Agency* (20th ed.) ............................................................................. 14

Wright & Miller, Fed. Prac. & Proc. § 1488 (3d ed. 2019) ......................................................... 38

Kenneth M. Krys and Greig Mitchell (the "Liquidators" or "Foreign Representatives"), in

their capacities as the duly appointed Liquidators and Foreign Representatives of Fairfield Sentry

Limited (In Liquidation) ("Sentry"), Fairfield Sigma Limited (In Liquidation) ("Sigma"), and

Fairfield Lambda Limited (In Liquidation) ("Lambda" and, collectively with Sentry and Sigma,

the "Funds") in these consolidated adversary proceedings (the "U.S. Redeemer Actions"),

respectfully submit this memorandum of law in support of their motion for leave to file further

proposed amended complaints (the "Motion") in certain of the Liquidators' knowledge actions

(the "Knowledge Actions")[1], pursuant to this Court's Decision Granting In Part And Denying In

Part Defendants' Motions To Dismiss And Plaintiffs' Motions For Leave To Amend (Dkt. 1743),

*In re Fairfield Sentry Ltd.*, 596 B.R. 275, 283 (Bankr. S.D.N.Y. 2018) (the "Decision"), subsequent

orders entered in the U.S. Redeemer Actions, and Fed. R. Civ. P. 15, made applicable here by Fed.

R. Bankr. P. 7015.

## PRELIMINARY STATEMENT

For decades, Bernard L. Madoff ran the largest Ponzi scheme in history. Its collapse left

relative winners and losers in its wake—investors, like Defendants, who redeemed shares before

Madoff's fraud was revealed and those who did not, losing all or most of their investments in the

Funds once Madoff's scam unraveled. This was not just a matter of luck—some of those

"winners" knew there was a high probability that the Net Asset Values ("NAV") on which the

redemption payments were based were inflated when cashing out. In accordance with the

Decision, the Liquidators seek to recover from those who received overpayments in bad faith so

that they may equitably distribute the money to all creditors pursuant to the British Virgin Islands

---

[1] A schedule of the Knowledge Actions is filed as Exhibit 1 to the January 15, 2020 Declaration
of David Elsberg ISO Motion ("Elsberg Decl."). All terms are defined herein.

(the "BVI") insolvency regime.

The Liquidators now seek leave to amend their complaints to assert knowledge allegations against certain new Knowledge Defendants (the BNP Defendants and Fortis Defendants, as defined below), as well as to supplement existing knowledge allegations against the remaining Knowledge Defendants, pursuant to stipulated orders so-ordered by this Court. The amendments implement this Court's guidance in the Decision, which held that the Liquidators may assert constructive trust claims only against those Defendants who knew the calculation of the Fund assets was incorrect at the time they redeemed their shares (each a "Knowledge Defendant" and, collectively, the "Knowledge Defendants").

The allegations in these Further Proposed Amended Complaints easily meet the extremely liberal amendment standard, under which the burden of establishing a satisfactory reason to deny leave to amend falls on Defendants. Defendants cannot meet their burden of demonstrating that the amendments are futile because the Further Proposed Amended Complaints sufficiently allege bad faith receipt under BVI law—accepting redemption payments while actually knowing, being willfully blind to, or being recklessly indifferent to the fact that the value of the Funds' assets, and the corresponding value of the redemption payments, was wrong:

- The HSBC Defendants—connected to Madoff through long-standing relationships with other BLMIS feeder funds—continuously acknowledged concerns over a lack of independent confirmation whether Madoff-held securities were segregated, or even existed. Employees acknowledged that "[i]t[] [wa]s too big for us to ignore the warning signs." The HSBC Defendants deliberately chose not to pursue further diligence even after a respected auditor identified a laundry list of potential fraud risks associated with BLMIS, all in an effort to avoid reputational and financial fallout. The consequences of further review into Madoff—the type of review that would confirm whether BLMIS was a sham—would have been, according to a top HSBC employee, "both painful and, it would appear, fatal." And though another confessed that he "c[ould] []not countenance this process," he "appreciate[d] [Madoff] [wa]s a major money earner." After Madoff's arrest, HSBC employees also acknowledged they had "suspected [fraud] but never pinned it down" because they were "too afraid to lose the revenue";

- The UBS Defendants identified numerous red flags while conducting extensive due diligence on BLMIS—including BLMIS's lack of transparency, Madoff's suspicious decision to waive management or incentive fees, BLMIS's lack of a prime broker coupled with uncertainty as to BLMIS's trade counterparties—yet disregarded these risks because they could not bear to lose out on significant fees associated with creating and administering two BLMIS feeder funds.  As one senior official put it, after being confronted with such risks, "[b]usiness is business.  We cannot permit ourselves to lose [a] 300 million [client]."  The UBS Defendants subsequently took steps to mislead the feeder funds' investors and Luxembourg regulators about the relationship between BLMIS and the feeder funds.  This conduct surprised multiple employees of the UBS Defendants.  For example, one UBS AG employee pointed out that these delegations did not appear in one of the feeder fund's sales prospectuses and questioned "Should we be at risk in any regulator investigation?"  And another employee later questioned "how one can argue that we are officially the portfolio manager [of the second feeder fund] but do not have a cent posted to our books.";

- The BNP Defendants uncovered multiple warning signs in due diligence, including that the reporting of trades was delayed by BLMIS and the validity of those trades could not be verified.  Notwithstanding, they helped create and administer a BLMIS feeder fund, Oreades, while illegally obscuring from regulators and investors any connection to Madoff.  As one senior executive noted, "if there is a management problem with [BLMIS], the entire responsibility would lie … in the last resort, with the promoter, namely BNP Paribas" since "[i]n the eyes of the [regulators], B. Madoff does not exist."  BNP Defendants recognized this arrangement was "unconscionable" and violated internal policies.  Ultimately, the BNP Defendants concluded they had to exit or "destroy" the Oreades fund.  Even after dissolving the fund, the BNP Defendants embarked on a new profit-seeking endeavor to provide leverage to dozens of BLMIS feeder funds and investors despite their own employees' concerns about Madoff, and repeatedly took steps in violation of their own diligence policies to prevent their employees from contacting or meeting Madoff;

- The Citigroup Defendants were aware that Madoff's investment strategy could not plausibly generate his purported returns and that other major financial institutions had implemented an internal policy of avoiding BLMIS investments due to concerns of fraud and other wrongdoing, and—through due diligence conducted for multiple transactions involving BLMIS feeder funds—uncovered indicia of fraud regarding whether BLMIS maintained segregated customer accounts and/or was actually engaged in options trading.  One employee later recalled thinking "there was something very wrong" with Madoff's purported strategy.  Nevertheless, the Citigroup Defendants continued to involve themselves in BLMIS-related transactions, demanding extraordinary insurance protection in return.  Eventually, one of the Citigroup Defendants redeemed nearly $60 million in positions with the Funds just a month after a new Chief Risk Officer was hired from Morgan Stanley, which had implemented the internal policy of avoiding BLMIS investments due to fraud concerns;

- The Fortis Defendants, recognizing that it was "not possible to obtain independent confirmations on [BLMIS's] trades and positions," nevertheless took drastic measures

3

to maintain their profitable relationships with Madoff and reduce their associated liability. When new Bahamian laws imposed stricter regulations on oversight of fund custodians, Fortis—as administrator of a BLMIS feeder fund—simply moved the fund to the Cayman Islands, covering its eyes from the truth of Madoff's fraud. Moreover, when Fortis acquired a $70 million investment book that included investments in BLMIS feeder funds, Fortis pressed the feeder funds' manager for answers to quell concerns related to BLMIS's fraud risk. But when the manager's responses were lacking, Fortis got cold feet and quickly redeemed $56 million that was invested in a BLMIS's fund operated by that manager. Fortis, a global institution that "operate[d] as one company," communicated risk-related actions across the Fortis entities;

- The Merrill Defendants instituted a firm-wide practice of declining Madoff-related investments after learning of warning signs through due diligence on BLMIS's structure, and several of the Merrill Defendants' own derivatives experts and trading desk employees refused BLMIS-related trades because of the secrecy of the source of Madoff's returns and questions as to his investment strategy. Once the scheme unraveled, employees acknowledged it was "[n]ot a big surprise" and "[w]e all knew there was something wrong at Madoff – … now our suspicions have been confirmed";

- ZCM continued to invest in BLMIS even after being made aware of BLMIS-related concerns when a prospective buyer, SocGen, backed out of purchasing ZCM's assets and blacklisted BLMIS because its purported results were "impossible" and unrealistic;

- The Third-Party Beneficial Shareholders who owned or had interests in shares of Funds issued to the Knowledge Defendants are likewise liable on the basis of knowing receipt for two independent reasons. *First*, knowledge can be imputed to the Third-Party Beneficial Shareholders on the basis of the principal-agent relationship between them and their respective Knowledge Defendants. *Second*, the Funds' Articles of Associations and the Subscription Agreements between the Funds and the Knowledge Defendants provide that the registered shareholders (*i.e.*, the Knowledge Defendants) are to be treated as the parties to the Articles. These provisions bind the Third-Party Beneficial Shareholders to the bad faith of their respective Knowledge Defendants; and

- The Citco Beneficial Shareholders who owned or had interests in shares of Funds issued to the Citco Subscribers are similarly liable on the basis of knowing receipt for the same two reasons. The Citco Subscribers consciously disregarded red flags that the assets at BLMIS did not exist, with one Citco executive explaining that BLMIS was "an important client, so we had to accommodate them," and another telling the head of two Citco entities' internal audit, when raising concerns, "it's not your business."

Defendants could not show the Further Proposed Amended Complaints would be futile, in bad faith, or would lead to unfair prejudice or undue delay. Defendants stipulated that the Liquidators are able to seek leave to file further proposed amended complaints with new factual allegations (while reserving the right to oppose the amendments) and the Liquidators honored

Defendants' request to certify completion of filing the amended complaints on or before January 15, 2020. The Liquidators have worked diligently to prepare the 29 Further Proposed Amended Complaints despite the intervening death of their foreign law expert. Moreover, the majority of the new allegations supplement and strengthen existing allegations (except in the case of the BNP Defendants and Fortis Defendants, but they were on notice of new planned allegations). As this Court recognized, a shareholder alleged to have received an inflated redemption payment in bad faith cannot keep that payment at the expense of innocent non-redeeming shareholders. This Court should grant the Liquidators' Motion.

## PROCEDURAL BACKGROUND

This Motion arises from a nearly decade-long effort by the Liquidators in this Chapter 15 proceeding and elsewhere to recoup assets for the victims of the largest Ponzi scheme in history, as discussed at length in this Court's Decision; to avoid repetition, this Motion highlights only the most relevant points from that Decision and subsequent developments.

### A.    Initial Proposed Amendments

Through the U.S. Redeemer Actions,[2] the Liquidators have sought to reclaim more than $6 billion in redemption payments made to certain investors (the "Defendants") in the largest Madoff feeder fund, Sentry, and its "funds of funds," Sigma and Lambda. Aug. 6, 2018 Order Re Defs.' Mots. to Dismiss (Dkt. 1723 at 4–6).[3] The Liquidators originally asserted claims of unjust enrichment, mistaken payment, money had and received, and constructive trust (the "Common Law Claims"), and subsequently amended to include avoidance claims for undervalue transactions

---

[2] A list of the relevant U.S. Redeemer Actions follows as Exhibit 2 to the Elsberg Declaration.

[3] Unless otherwise noted, docket citations refer to the consolidated adversary proceeding docket, *Fairfield Sentry Ltd. (In Liquidation), et al. v. Theodoor GGC Amsterdam, et al.*, No. 10-ap-03496 (SMB) (Bankr. S.D.N.Y.), and page citations refer to ECF pagination.

and unfair preferences pursuant to the BVI Insolvency Act of 2003.  Decision, 596 B.R. at 289

(Dkt. 1743 at 16).  The Liquidators were also permitted to amend their complaints as of right in

some actions to add claims for breach of contract and breach of the implied covenant of good faith

and fair dealing (the "Contract Claims").  July 19, 2012 Bench Ruling (Dkt. 799-2 at 3–4);

Oct. 21, 2016 Mot. to Amend (Dkt. 933 at 13–15, 20–21).

      In mid-2014, the Liquidators obtained evidence that the Funds' administrator, Citco Fund

Services (Europe) B.V. (and later, Citco Fund Services Canada (together, "Citco")), had not

executed certain of its duties related to calculating/certifying the NAV in good faith—which, under

the Articles, meant those NAVs and corresponding redemption payments were not binding.  *See*

Oct. 10, 2003 Articles (Dkt. 925-6 § 11(1)); Oct. 21, 2016 Mot. to Amend (Dkt. 933 at 7).  The

Liquidators sought leave to amend their complaints to allege Citco's bad faith ("Initial Proposed

Amended Complaints").  Defendants opposed and moved to dismiss the Common Law and

Contract Claims.  Oct. 21, 2016 Mot. to Amend (Dkt. 933 at 20–21, 31–34); Jan. 13, 2017 Notice

of Mot. to Dismiss (Dkt. 959).

### B.    The December 2018 Decision And Implementing Orders

      On December 6, 2018, this Court held the allegations in the Initial Proposed Amended

Complaints detailing Citco's bad faith—assumed as true—could not afford the Liquidators relief

from the binding nature of the NAVs under BVI common and contract law.  Decision, 596 B.R. at

295–302, 316 (Dkt. 1743 at 27–40, 65).  It denied the Liquidators leave to amend and dismissed

those unamended claims[4]—with an important exception relevant here:  constructive trust claims

against those "Defendant[s] [who] knew the NAV was inflated at the time of redemption."  *Id.*

---

[4] There is no dispute that BVI law governs the substance of all claims, as this Court held.  *See*
Decision, 596 B.R. at 290 (Dkt. 1743 at 18).  This Court did not dismiss the BVI statutory
avoidance claims.  *See id.* at 316 (Dkt. 1743 at 65).

at 295 (Dkt. 1743 at 27); *see also id.* at 297 (Dkt. 1743 at 31) ("The only exception allows the

Liquidators to impose a constructive trust as to any Defendant who received a redemption payment

and knew that the Fund's BLMIS investments were worthless or nearly worthless."); *id.* at 282

(Dkt. 1743 at 4) (the Liquidators may amend to assert constructive trust claims "to the extent the

pleading or proposed amendment adequately alleges that a particular Defendant knew that the

[NAV] as calculated at the time of the redemption payment was mistaken because the Funds'

investments with [BLMIS] were worthless or nearly worthless"); *id.* at 301 (Dkt. 1743 at 38)

(same); *id.* at 316 (Dkt. 1743 at 65) (same).  Thus, the Liquidators could "revisit the redemption

payment[s]" on a restitutionary theory if they allege "bad faith by the redeeming shareholder." *Id.*

at 295 (Dkt. 1743 at 27).[5]  This Court also directed the Liquidators "to settle or submit a consensual

order consistent with th[e] [D]ecision in each adversary proceeding." *Id.* at 316 (Dkt. 1743 at 65).

This Court later so-ordered the parties' stipulated orders or entered the parties' settled

orders in each adversary proceeding, filed between April 2, 2019 and April 18, 2019, "permit[ting]

Plaintiffs leave to amend to assert only … constructive trust claims against Knowledge

Defendants" and dismissing the remainder of the Common Law and Contract Claims.  *See, e.g.*,

Apr. 15, 2019 Stipulated Order (Dkt. 431 at 8 (¶ I.B)) ("Stipulated Order" and, collectively with

all other such orders, the "Orders"), *Fairfield Sentry Ltd. (In Liquidation) v. ABN AMRO Schweiz

AG,* No. 10-ap-03635-SMB (Bankr. S.D.N.Y.).[6]  As directed, *see id.*, the Liquidators have filed

all the Initial Proposed Amended Complaints in compliance with the Orders, Elsberg Decl., Ex. 2.

---

[5] The Liquidators have appealed that portion of the Decision denying the motion for leave to amend
and dismissing the remaining Common Law and Contract Claims. *Fairfield Sentry Ltd. (In
Liquidation) et al. v. Citibank NA London*, No. 19-cv-03911 (VSB) (S.D.N.Y.) (Admin.
Consolidated).

[6] The Orders relevant here are filed in the Knowledge Actions.  *See* Elsberg Decl. Exs. 1, 2.

### C.   Further Proposed Amendments

As to additional factual allegations to support those constructive trust claims, each of the

relevant Orders states in substantially similar terms: "To the extent [the Liquidators] seek to further

amend [an Initial] Proposed … Amended Complaint to add new factual allegations, [the

Liquidators] shall file a motion for leave to amend attaching that proffered further amended

complaint" (collectively, the "Further Proposed Amended Complaints"). *See, e.g.*, *id.* at 9 (¶ I.E).[7]

Previously, the Liquidators focused their complaints mainly on Citco's bad faith, because

Citco's bad faith tainted all Defendants' redemptions.  This Court's Decision, however, held that

such Citco allegations were insufficient and that individualized knowledge allegations must be

made against the Defendants.  *See supra* Proc. Background Section B.  Consistent with that ruling,

the Liquidators now seek leave to file the Further Proposed Amended Complaints to add

individualized knowledge allegations.  Specifically, the Further Proposed Amended Complaints

assert additional allegations in 29 complaints against nine sets of Knowledge Defendants,[8] which

demonstrate that those Defendants accepted redemption payments from the Funds despite

knowing, under BVI law, "that the NAV [upon which the redemption payments were based] was

wrong."  Decision, 596 B.R. at 301 (Dkt. 1743 at 38).  These factual allegations, accepted as true,

enable the Liquidators to recover for equitable distribution among the Funds' creditors and non-

---

[7] In addition, the overwhelming majority of the Orders also state as part of their recitals that the
Liquidators either "intend to seek leave to further amend" (in the case of the relevant BNP
Defendants) or "may seek further leave to amend" (in the case of all but the UBS Defendants,
where the relevant orders still include the stipulation that the Liquidators "shall file a motion for
leave to amend" to the extent they wish to further amend their complaints).

[8] Those are: (1) the HSBC Defendants and their affiliate, Somers Nominees, (2) the UBS
Defendants, (3) the BNP Defendants, (4) the Citibank Defendants, (5) the Fortis Defendants,
(6) the Merrill Lynch Defendants, (7) ZCM, (8) the Third-Party Beneficial Shareholders of the
foregoing Defendants, and (9) the Beneficial Shareholders of the Citco Entities.

redeeming shareholders approximately billions in redemption payments received by the
Knowledge Defendants. *See* Elsberg Decl., Ex. 1.

## ARGUMENT

Federal Rule of Civil Procedure 15(a)(2) provides a court "should freely give leave [to
amend] when justice so requires." Fed. R. Civ. P. 15(a)(2); *see also* Fed. R. Bankr. P. 7015. This
"permissive standard is consistent with [the Second Circuit's] strong preference for resolving dis-
putes on the merits." *Williams v. Citigroup Inc.*, 659 F.3d 208, 212–13 (2d Cir. 2011) (quotation
omitted). It is significantly more "lenient" than the "good cause" standard under Rule 16(b),
"which is based on the 'diligence of the moving party.'" *Olaf Sööt Design, LLC v. Daktronics,
Inc.*, 299 F. Supp. 395, 397 (S.D.N.Y. 2017). Because the Liquidators have not missed any dead-
line to amend and do not seek amendment of an existing scheduling order, *cf. BPP Illinois, LLC
v. Royal Bank of Scotland Grp. PLC*, 859 F.3d 188, 195 (2d Cir. 2017)—and have filed their Mo-
tion on the same day as certifying completion of filing the Initial Proposed Amended Complaints—
the more onerous Rule 16(b) standard does not apply.

Leave to amend should only be denied "for good reason, including futility, bad faith, undue
delay, or undue prejudice to the opposing party." *Eastman Kodak Co. v. Henry Bath LLC*, 936
F.3d 86, 98 (2d Cir. 2019). As this Court has recognized, the burden of demonstrating futility falls
on the non-movant—the Knowledge Defendants. *In re Bernard L. Madoff Inv. Sec. LLC*, 560
B.R. 208, 225 (Bankr. S.D.N.Y. 2016) (Bernstein, J.). Futility is evaluated under the familiar
Rule 12(b)(6) standard and, as with a Rule 12(b)(6) motion, "the court must accept as true all well-
pleaded facts and draw all reasonable inferences in the moving party's favor." *Agerbrink v. Model
Serv. LLC*, 155 F. Supp. 3d 448, 456 (S.D.N.Y. 2016). Following this standard, a court must
determine whether an amended complaint would "contain sufficient factual matter, accepted as
true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009).  Leave to amend should not be denied as futile unless "it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief." *Matson v. Bd. of Educ. of City Sch. Dist. of New York*, 631 F.3d 57, 63 (2d Cir. 2011); *see also McCaffery v. McCaffery*, No. 11-cv-703 (DRH) (WDW), 2011 WL 13307927, at *1 (E.D.N.Y. Dec. 19, 2011) ("If the [movant] has at least colorable grounds for relief, justice ... require[s] that the court grant leave to amend a complaint.") (quotation omitted).

The non-movant also bears the burden of demonstrating bad faith and undue prejudice. *Pasternack v. Shrader*, 863 F.3d 162, 174 (2d Cir. 2017) ("The rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith.").  Prejudice to the opposing party is "perhaps [the] most important" reason to deny leave to amend.  *State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981).  In evaluating prejudice, courts consider whether an amendment would "(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial," or (ii) "significantly delay the resolution of the dispute." *Pasternack*, 863 F.3d at 174 (quoting *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993)).  If a defendant "asserts … bad faith, there must be something more than mere delay or inadvertence for the court to refuse to allow the amendment." *Agerbrink*, 155 F. Supp. 3d at 454 (citation omitted).  Nor will "complaints of 'the time, effort and money … expended in litigating [the] matter,' without more, constitute prejudice sufficient to warrant denial of leave to amend." *Pasternack*, 863 F.3d at 174 (quoting *Block*, 988 F.2d at 351).  Finally, "[s]imply alleging that the plaintiff could have moved to amend earlier than she did … is insufficient to demonstrate undue delay," and "mere delay, [] absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend." *Agerbrink*, 155 F. Supp. 3d at 452, 454 (quotation omitted).  The non-movant bears the

burden of demonstrating undue delay—and only in extreme circumstances of "inordinate" delay, that burden shifts to the moving party to provide a "satisfactory explanation"  *See Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d Cir. 1990); *see also Urban Box Office Network, Inc. v. Interfase Managers, L.P.*, 232 F.R.D. 169, 172 (S.D.N.Y. 2004) (no inordinate delay despite three years of litigation and lapsed amendment deadline, where intervening jurisdiction challenge, motions to dismiss, and settlement discussions took priority).  But even inordinate delay without a satisfactory explanation is insufficient grounds on which to deny a motion for leave unless the amendment would prejudice other parties.  *See Agerbrink*, 155 F. Supp. 3d at 453.

## I.    THE FURTHER PROPOSED AMENDED COMPLAINTS STATE VIABLE CLAIMS

### A.    The BVI "Bad Faith" Standard

As this Court has held, to plead constructive trust claims under BVI law, the Liquidators must allege that Defendants "knew" the NAV was inflated at the time they redeemed their shares. Decision, 596 B.R. at 295 (Dkt. 1743 at 27).  To meet that threshold for knowledge, Liquidators must allege facts, assumed as true, that are sufficient to conclude "bad faith by the redeeming shareholder[s]."  *Id.*  BVI law's "bad faith" standard is far-reaching (particularly in contrast to its U.S. counterpart).  Under BVI law, a person has "bad faith" (synonymous with "a lack of good faith") if she acted:  (1) actually knowing what she was doing was wrongful ("<u>actual knowledge</u>"); (2) suspecting what she was doing was wrongful but deliberately not taking steps to check the position in order to avoid having her suspicions confirmed (known as "<u>willful blindness</u>"); or (3) recklessly, indifferent as to whether what she was doing was wrongful or lacking any belief what she was doing was wrongful ("<u>recklessness</u>").[9]  *See* Oct. 20, 2016 Decl. of Gabriel Moss QC

---

[9] The BVI concept of bad faith overlaps with those of fraud and dishonesty, and cases applying those legal principles are also relevant here.  *See* Moss Decl. ¶ 41; *Derry v. Peek* [1889] 14 App.

("Moss Decl.") (Dkt. 926 at 12 (¶ 41));[10] *see also Three Rivers Dist. Council v. Bank of Eng. (No. 3)* [2003] 2 A.C. 1 (HL) at 191–92, 230.  This Court has acknowledged that, under BVI law, recklessness suffices to show "bad faith" in the Knowledge Actions.  Decision, 596 B.R. at 293 (Dkt. 1743 at 23–24) ("Under BVI law, lack of good faith, *i.e.* bad faith, includes wrongdoing by one who acts recklessly as well as one who acts with actual knowledge that he is acting wrongfully or willfully blinds himself to that fact.").[11]

To demonstrate willful blindness, a plaintiff must allege facts sufficient to conclude the defendant (1) suspected there was a high probability a fact existed (either because he subjectively believed it to be so or because a reasonable person, possessing the same facts, would objectively have concluded it to be so); and (2) took deliberate steps to avoid having those suspicions confirmed.  *See Manifest Shipping Co. v. Uni-Polaris Ins. Co.* [2003] 1 AC 469 (HL), ¶ 116; *see also Grp. Seven Ltd. v. Notable Servs. Ltd.* [2019] EWCA (Civ) 614, ¶ 58 ("[B]lind-eye knowledge requires two conditions[:] [(1)] the existence of a suspicion that certain facts may exist, and [(2)] a conscious decision to refrain from taking any step to confirm their existence.").

BVI law evaluates willful blindness according to objective—rather than subjective— criteria.  *See Barlow Clowes Int'l Ltd. v. Eurotrust Int'l Ltd.* [2005] UKPC 37, ¶ 10 ("Although a dishonest state of mind is a subjective mental state, the standard by which the law determines whether it is dishonest is objective.  If by ordinary standards a defendant's mental state would be

---

Cas. 337 (HL) at 374 (establishing the same criteria for fraud); *Royal Brunei Airlines v. Tan* [1995] 2 A.C. 378 (PC) at 389–90 (same for dishonesty).

[10] The Liquidators' BVI law expert, Gabriel Moss QC, passed away suddenly on March 15, 2019.

[11] By contrast, this Court has held that U.S. law—which is not applicable here—forecloses evidence of recklessness in that "bad faith" is synonymous only with "knowledge" and "willful blindness." *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* ("*Citibank*"), 608 B.R. 181, 196–97 (Bankr. S.D.N.Y. 2019).

characterised as dishonest, it is irrelevant that the defendant judges by different standards."). The
analysis is two-part: *First*, "[w]hen dishonesty is in question the fact finding tribunal must …
ascertain (subjectively) the actual state of the individual's knowledge or belief as to the facts."
*Ivey v. Genting Casinos* [2017] UKSC 67, ¶ 74. *Second*, "once his actual state of mind as to
knowledge or belief as to facts is established, the question whether his conduct was honest or
dishonest is to be determined by the fact-finder by applying the (objective) standards of ordinary
decent people." *Id.*; *see also id.* ("There is no requirement that the defendant must appreciate that
what he has done is, by those standards, dishonest."); *Royal Brunei Airlines v. Tan* [1995] 2 A.C.
378, 389–90 ("The standard of what constitutes honest conduct is not subjective. Honesty is not
an optional scale, with higher or lower values according to the moral standards of each individual.
If a person knowingly appropriates another's property, he will not escape a finding of dishonesty
simply because he sees nothing wrong in such behaviour.").[12]

Recklessness under BVI law "might be inferred from a failure to take obvious steps to
check the position or in cases falling short of wilful blindness, in which a person suspects that what
he is doing might be wrongful, but fails to take steps to clarify the position for extraneous reasons
beyond mere negligence." Moss Decl. ¶ 41. For example, a wrongdoer has been reckless if his
failure to take steps to clarify whether he was acting wrongfully was motivated by an
"unwilling[ness] to upset an important client or lose a valuable income stream." *Id.* As a result,
courts have long described it as an "objective" standard. *See, e.g.*, *Eagle Tr. plc v. SBC Secs. Ltd.*

---

[12] By contrast, U.S. law, inapplicable here, evaluates "willful blindness" under the more stringent,
subjective criteria: "(1) the defendant must subjectively believe that there is a high probability
that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact."
*Citibank*, 608 B.R. at 196 (quoting *Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769
(2011)). Such willful blindness does ***not*** include "[a]cting in the face of a 'known risk'" (*i.e.*,
recklessness) or acting with "'deliberate indifference' to the risk," (*i.e.*, negligence). *Id.*

[1993] 4 All ER 484, 506 (knowledge "may be inferred if the circumstances are such that an honest and reasonable man would have [so] inferred"); *El Ajou v. Dollar Land Holdings plc* [1993] 3 All ER 717, 739 ("[A] recipient is not expected to be unduly suspicious and is not to be held liable unless he went ahead without further inquiry in circumstances in which an honest and reasonable man would have realised that the money was probably … being misapplied.").

**B.    Attribution Of Knowledge Under BVI Law**

Under BVI law, "[k]nowledge gained by an employee or other agent while acting in the course of his employment for his principal will ordinarily be attributed to his principal."  Moss Decl. ¶ 43 (citing *Bowstead and Reynolds on Agency* (20th ed.) ¶ 8-207).  And under BVI law, an individual can be found to have knowledge belonging to others in a Defendant's organization insofar as it is reasonable to infer that another's knowledge would have been communicated to that individual in the ordinary course.  For example, senior figures in a managerial, audit, or compliance capacity who had reason to suspect that BLMIS was engaged in a fraud could reasonably be expected to communicate that information to other such senior officials.  Here, the Liquidators have alleged individual(s) employed by particular Defendants who reasonably could be said to have had relevant knowledge—*i.e.*, they were, at a minimum, reckless with respect to whether the NAV statements were inaccurate because the Funds' investments in BLMIS were worthless or nearly worthless.  *See* Decision, 596 B.R. at 282 (Dkt. 1743 at 4).

### C.    The Further Proposed Amended Complaints Sufficiently Allege One Or More Individuals Employed By The Knowledge Defendants Turned A Blind Eye Or Were Reckless As To The Veracity Of The NAVs

### 1.    HSBC

The Further Proposed Amended Complaints against the "HSBC Defendants"[13] allege they turned a blind eye or were reckless to the high probability the BLMIS investments were worthless or nearly worthless and took deliberate steps to avoid having those suspicions confirmed:

BLMIS and the feeder funds relied heavily on HSBC's international reputation for their survival. HSBC provided oxygen needed to keep BLMIS's fire burning through its work as marketer, custodian, and/or administrator for major BLMIS feeder funds.[14] The association of the HSBC brand with the feeder funds convinced foreign and American investors to invest billions of dollars into BLMIS. HSBC SSL (Lux) Compl. ¶ 6.[15] By BLMIS's own account, HSBC clients represented one-third of its entire business. *Id.* HSBC received significant fees in return for legitimizing BLMIS to the investors whose capital BLMIS so desperately needed. *Id.* For example:

---

[13] Those are HSBC Securities Services (Luxembourg) SA ("HSBC SSL (Lux)") (Elsberg Decl., Ex. 3 ("HSBC SSL (Lux) Compl.")), HSBC Private Bank (Suisse) SA ("HSBC Suisse") (*id.*, Ex. 4 ("HSBC Suisse Compl.")), Somers Nominees (Far East) Limited ("Somers") (*id.*, Ex. 5 ("Somers Compl.")), and Robinson & Co. and Murdoch & Co. ("Robinson" and "Murdoch," respectively) (*id.*, Ex. 6 ("Robinson Compl.")),. As alleged, Somers, Robinson, and Murdoch possessed the same knowledge as HSBC Bank Bermuda Ltd. ("HSBC Bank Bermuda") because they were shareholding vehicles through which HSBC Bank Bermuda held securities and conducted its business; Somers, Robinson, and Murdoch did not act independently of HSBC Bank Bermuda. Somers Compl. ¶ 43; Robinson Compl. ¶¶ 50–51.

[14] That includes Lagoon Investment Ltd, Hermes International Fund, Alpha Prime, Thema Wise, Thema Fund Ltd., Thema Coral Fund, Primeo Fund, Herald Fund, Herald (Lux), Senator, Square One Fund Ltd., Ascot Fund, Ltd., Kingate Global Fund, Ltd. and Kingate Euro Fund, Ltd. HSBC SSL (Lux) ¶ 6.

[15] For each group of Defendants, one or more illustrative complaints are cited in this Motion.

*First*, as early as 2001, HSBC Bank USA ("HSBC USA") completed at least eight due diligence reports on Sentry, all of which identified numerous fraud risks associated with Sentry's connection to BLMIS. *Id.* ¶¶ 88–111. It acknowledged concerns with BLMIS's "too good to be true" track record, Madoff's refusal to take fees at the fund level, BLMIS's secrecy and lack of transparency, Madoff's role as custodian of the securities, the lack of independent custody and verification of trading activity, the lack of a realistically independent auditor, counterparty risk in the options trading, and the possibility that Madoff was "trad[ing] outside of the stated universe." *See, e.g.*, *id.* ¶¶ 91, 104, 110. Two of the employees who wrote the due diligence reports subsequently transferred from HSBC USA to HSBC Suisse. *Id.* ¶¶ 88, 96.

*Second*, in 2005, and again in 2008, an HSBC parent company engaged KPMG for the purposes of reviewing BLMIS for fraud and related operational risk. *Id.* ¶¶ 113–122. As part of its review in connection with the first report, KPMG consulted with employees across HSBC entities, including members of HSBC SSL (Lux), and non-parties HSBC Securities Services, in London ("HSBC SS (London)") and HSBC Institutional Trust Services (Ireland) Ltd, in Dublin. *Id.* ¶¶ 113, 116. In both reports, KPMG identified a laundry list of fraud and operational "[r]isks and potential issue[s]" related to BLMIS's operations, including: falsification of client mandates, embezzlement of client funds, failure to segregate client funds from BLMIS funds, manipulation of option prices to maximize commissions, failure to hold stocks in client names, execution of sham trades to divert client cash, and falsification of trade confirmations. *Id.* ¶¶ 114, 120. In a call between top HSBC employees across the world and KPMG, a KPMG representative flatly said: "The key thing is we need to test the existence of the actual trade because [that is] the only way you're going to be able to verify that this is not just an elaborate fraud." *Id.* ¶ 77. Yet the HSBC Knowledge Defendants never did so. Rather, they repeatedly ignored

KPMG's warnings and recommendations, opting instead to continue their relationships with BLMIS and pocket the associated fees. *Id.* ¶¶ 117, 122.

*Third*, the HSBC Knowledge Defendants gained extensive knowledge into BLMIS as a result of their fund services work. *Id.* ¶¶ 54–81. For example, Nigel Fielding and Brian Wilkinson, two high-level HSBC SSL (Lux) employees, were privy to and/or expressed strong concerns relating to the lack of independent auditor confirmation that BLMIS assets were not being commingled and the fact that BLMIS's auditor was Madoff's brother-in-law. *See, e.g.*, ¶¶ 60–61, 63. Fielding was told directly that Madoff's role as "manager, broker and custodian to his accounts" was a "red flag," *id.* ¶ 61(c), and Wilkinson explicitly recognized a need for "independent confirmation that all securities held with Madoff are held in segregated accounts," *id.* ¶ 57(d). Fielding and Saverio Fiorino, another top-level HSBC SSL (Lux) employee, were also aware that Ernst & Young ("E&Y"), the auditor of another BLMIS feeder fund, expressed concerns regarding the segregation of assets held by BLMIS, the actual existence of those assets, and the reliability and independence of BLMIS's auditors. *Id.* ¶¶ 66, 68.

*Fourth*, in addition to fund services work, HSBC entities gained exposure and insight into Madoff while marketing multiple BLMIS feeder funds. HSBC Suisse Compl. ¶¶ 50–51, 65–70. HSBC Suisse, for example, began marketing BLMIS feeder funds as early as the late 1990s. *Id.* ¶ 50. In that role, time and again, HSBC Suisse pushed investors towards the feeder funds without disclosing the significant concerns it held regarding Sentry or BLMIS—even claiming that HSBC's own inspectors confirmed that the feeder funds were "operating properly." *Id.* ¶ 68. HSBC Suisse eventually admitted it had "problems" with certain feeder funds and it did not understand BLMIS's investment strategy. *Id.* ¶¶ 67, 70.

*Fifth*, the HSBC Knowledge Defendants deliberately chose to ignore the numerous BLMIS-associated warning signs because they were worried about upsetting Madoff and their own clients, as well as what they perceived as the inevitable negative economic and reputational repercussions. *See, e.g.*, HSBC SSL (Lux) Compl. ¶ 63 (Wilkinson acknowledging that a trustee review of BLMIS would be "both painful and, it would appear fatal"); *id.* ¶ 74(c) (the HSBC SS (London) Global Head writing to Fielding about his BLMIS concerns but also "appreciat[ing] it is a major money earner" and recognizing "Madoff does not like external 'intrusion'"); *see also id.* ¶¶ 61(i)–(k), 72, 74(d). To avoid such fallout and maintain its profitable relationship with BLMIS, the HSBC Knowledge Defendants repeatedly and deliberately failed to confirm their suspicions, instead playing down or concealing their BLMIS-related concerns. *See, e.g.*, *id.* ¶¶ 61(l), 62, 64, 69.

HSBC entities, including HSBC SSL (Lux), HSBC Suisse, HSBC Bank Bermuda, and HSBC USA, as well as non-party HSBC SS (London), worked collaboratively and freely shared information in pursuit of their common business objectives. Somers Compl. ¶¶ 48–55. HSBC has publicly stated the HSBC Group's structured risk management monitoring and reporting framework mandated close coordination across its entities. *Id.* ¶ 53(b). Information regarding BLMIS-associated concerns was no exception to this information sharing practice, as illustrated, for example, by a conference call held to discuss BLMIS's fraud risk with HSBC entities around the world. *Id.* ¶¶ 54, 113–117. And when an HSBC parent entity engaged KPMG to review BLMIS for fraud and related operational risk—twice—the scope of KPMG's focus was not on the exposure of isolated HSBC subsidiaries but rather that of entities across the entire HSBC Group. *Id.* ¶¶ 55, 82, 87.

Thus, for years, specific individuals at the HSBC Knowledge Defendants made clear their

suspicions that BLMIS was engaged in fraud, yet deliberately chose not to take steps to confirm

that suspicion, all to avoid the reputational and economic implications of upsetting Madoff.  These

allegations support a finding of willful blindness and recklessness sufficient to plead bad faith

under BVI law.

### 2.    UBS

The Further Proposed Amended Complaints against the "UBS Defendants"[16] allege they

turned a blind eye or were reckless to the high probability that the BLMIS investments were

worthless or nearly worthless and took deliberate steps to avoid having those suspicions confirmed:

*First*, between November 2000 and September 2008, UBS AG conducted multiple rounds

of extensive due diligence on BLMIS.  UBS Lux. Compl. ¶¶ 55–66.  During these processes, UBS

AG employees identified several red flags, including Madoff's dual roles as broker and depository,

the impossibility of BLMIS's reported returns, and Madoff's repeated refusal to meet with UBS

AG's analysts.  *Id.* ¶¶ 56–57, 60, 62–64.  Between 2007 and 2008, UBS AG analyst, Mary

Kleckner, tasked with obtaining additional information on BLMIS, found out about multiple

"flags" of "things that are odd or different from the norm" about BLMIS, including (1) BLMIS's

lack of a "prime broker" coupled with uncertainty regarding "which dealers are executing the

[over-the-counter] collars for him" and the fact that "no one seems to know who is trading them";

(2) "[t]he compensation for him is just through commission, no m[anagement] or incentive fee";

(3) "the lack of transparency on [BLMIS] [compared to] in many other funds"; and (4) the fact

that "[s]ome folks think [M]adoff could be one of the most successful schemes ever[.]"  *Id.* ¶ 62.

---

[16] Those are UBS AG (Elsberg Decl., Ex. 7), UBS Fund Services (Cayman) Limited ("UBS Fund
Services (Cayman)") (*id.*, Ex. 8), UBS Europe Luxembourg Branch ("UBS Lux") (*id.*, Ex. 9 (the
"UBS Lux Compl.")), and UBS Fund Services (Ireland) Limited ("UBS Fund Services (Ireland)")
(*id.*, Ex. 10).

Kleckner believed she "c[ouldn't] support [her] existence at ubs by giving a positive opinion on something that [she] c[ouldn't] get transparency on." *Id.*  UBS AG ultimately concluded the risks posed by BLMIS were simply too great and "Madoff is not a manager that we are willing to structure products on…." *Id.* ¶¶ 65.  UBS AG therefore sought to limit its own exposure to BLMIS by rejecting multiple opportunities to directly invest in feeder funds and prohibiting the recommendation of these funds to UBS AG's private wealth clients. *Id.* ¶¶ 57–58, 60, 65–66.

*Second*, as early as 2003, UBS AG shared its specific concerns about BLMIS with UBS Lux.  Around that time, UBS Lux was approached to participate in a new feeder fund later known as Luxalpha SICAV ("Luxalpha"), which prompted UBS Lux to conduct its own due diligence on BLMIS, including consulting UBS AG. *Id.* ¶¶ 67–68, 71–72.  The message conveyed by UBS AG and echoed by UBS Lux's non-party affiliate UBS O'Connor was unambiguously negative and specifically highlighted Madoff's dual role as broker and depository, the impossibility of BLMIS's reported returns, and Madoff's notorious lack of transparency. *Id.* ¶¶ 68, 71–72.  For example, in a March 5, 2004 email, Mike Welch of UBS O'Connor cautioned UBS Lux against becoming involved with Madoff:  "[W]e never got enough transparency to truly see how they were generating returns, but our issue is that it could not have been how it was marketed." *Id.* ¶ 71.  In another portion of this email titled "Thoughts and Rationale for NOT Investing," Welch raised additional red flags:  (1) since 1990 there were only a handful of negative months, and that the strategy generated incredibly consistent returns each year; (2) "[i]f Madoff were to run the strategy totally independently from his [broker/dealer business], it would be IMPOSSIBLE to generate the returns that he has produced since 1990"; and (3) Madoff did not charge fees for his hedge fund, which "[m]akes one ask the question of why Madoff would bother to have such a product when the only revenue coming from running outside money is commission dollars." *Id.*  UBS AG employee Tim

Bell echoed these concerns in an email also dated March 5, 2004: "My natural leaning would be negative as well, not because of any-thing against the strategy or Madoff himself, but because of the size, the lack of transparency, [and] the lack of capcity [*sic*] …." *Id.* ¶ 72. UBS Lux acknowledged these risks, but ultimately concluded the sheer magnitude of potential fees warranted ignoring the risk. *Id.* ¶ 69–70, 73. In the words of UBS Lux managing director, Bernard Stiehl, "Business is business. We cannot permit ourselves to lose [a] 300 million [client]." *Id.* ¶ 70.

*Third*, UBS Lux subsequently gained first-hand exposure to the very indicia of Madoff's fraud flagged by UBS AG and UBS O'Connor when it served as the administrator, custodian, and portfolio manager for Luxalpha and a second feeder fund, Luxembourg Investment Fund US Equity Plus. *Id.* ¶¶ 74, 93. UBS Lux not only delegated to BLMIS its custodian and portfolio management duties for both funds, but also failed to disclose that fact to the feeder funds' investors and Luxembourg regulators. *Id.* ¶¶ 75–81, 96–100. UBS Lux even pressured the feeder funds' auditor, E&Y, into removing references to BLMIS from the feeder funds' audit reports. *Id.* ¶¶ 82, 100. Employees of UBS AG recognized that created exposure for both UBS AG and UBS Lux; in an email chain dated May 7, 2004, UBS AG employee, Philippe d'Anterroches, observed Luxalpha "was an alternative [fund] managed by 5 or 6 US hedge fund managers," which "does not appear at all on the prospectus either in guidelines and for any delegation to external managers. Should we be at risk in any regulator investigation?" *Id.* ¶ 80. Another UBS AG employee, Andreas Jacobs, forwarded d'Anterroches' email to UBS Lux employees, noting, "the bottom line seems to be that what the fund does is not in line with what the prospectus says (???)." *Id.* ¶ 81. Although UBS Lux director, Serge Karp, later weighed in to defend the prospectus, Karp notably did not address the failure to disclose the delegation of management authority. *Id.*

Knowledge of the facts underlying these allegations was widely shared among UBS affiliates, including Defendants UBS Fund Services (Cayman) and UBS Fund Services (Ireland), pursuant to a centralized corporate structure for core enterprise functions, which include finance, risk, legal, and compliance, built around UBS AG.  *Id.* ¶ 52–54.  UBS AG utilized this organizational structure to implement a global business strategy by wielding centralized control over all UBS-group companies.  *Id.* ¶ 53.  Pursuant to this organizational structure, the UBS Defendants accumulated and shared the aforementioned knowledge of the Madoff fraud with each other.  *Id.* ¶¶ 54.

Thus, specific individuals at the UBS Defendants uncovered serious indicia of fraud but deliberately avoided taking steps to confirm that BLMIS was in fact engaged in fraud.  These allegations support a finding of willful blindness and recklessness sufficient to plead bad faith under BVI law.

### 3.    BNP Paribas

The Further Proposed Amended Complaints against the "<u>BNP Defendants</u>"[17] (with the parent entity and affiliates, the "<u>BNP Companies</u>") allege the BNP Companies had, for decades, turned a blind eye or were reckless to the high probability that the BLMIS investments were worthless or nearly worthless and took deliberate steps to avoid having those suspicions confirmed:

*First*, the BNP Companies helped to create and administer a BLMIS feeder fund, the Oreades Fund, while knowingly concealing their affiliations with Madoff from regulators and investors, in violation of Luxembourg law and BNP Companies' own compliance rules requiring

---

[17] Those are BNP Paribas (Luxembourg) S.A. (a/k/a BGL BNP Paribas) (Elsberg Decl., Ex. 11), BNP Paribas Securities Services (Luxembourg) (*id.*, Ex. 12), BNP Paribas Arbitrage SNC (*id.*, Ex. 13 (the "<u>BNP Paribas Arbitrage Compl.</u>")), BNP Paribas Private Bank & Trust (Cayman) Limited (*id.*, Ex. 14), BNP Paribas Securities Nominees Limited (a/k/a Harrier Holdings Limited) (*id.*, Ex. 15), BNP Paribas España (f/k/a Fortis Bank) (*id.*, Ex. 16).

"strict separation" between investment advisory and custodial functions. BNP Paribas Arbitrage Compl. ¶ 47, 61–65. Those risks were appreciated by at least one senior executive at BNP Securities Services, Lionel Trouvain, who raised concerns on multiple occasions about the propriety of the BNP Companies' involvement with Oreades. *Id.* ¶¶ 66–70. Trouvain's concerns were ultimately heeded and the BNP Companies liquidated Oreades, acknowledging the high probability of fraud at BLMIS. *Id.* ¶ 74.

*Second*, other employees at and affiliates of the BNP Companies who worked on issues unrelated to Oreades expressed similar concerns about Madoff's business generally, including Paolo Gianferrara (a senior executive) and Patrick Fauchier (a joint venture partner of the BNP Companies through his fund, Fauchier Partners), who declined investment opportunities because they were affiliated with Madoff. *Id.* ¶¶ 76–84.

*Third*, despite their own employees' concerns with Oreades and Madoff more broadly, the BNP Companies decided to enter a new line of business providing leverage to dozens of BLMIS feeder funds and investors. *Id.* ¶ 85. But unlike their previous BLMIS investments, for which the BNP Companies acted as fiduciaries, the BNP Companies had no corresponding duties for leverage clients. *Id.* ¶¶ 86–88. In the course of developing that business, the BNP Companies learned even further evidence of the underlying fraud in agreeing to replace three separate competitors on three transactions rejected for their involvement with BLMIS, as the BNP Companies were aware. *Id.* ¶¶ 89–106.

*Fourth*, up until the fraud was publicly disclosed, the BNP Companies repeatedly violated their own due diligence policies and procedures—by discouraging their own employees from contacting Madoff or arranging an on-site meeting—either of which could have confirmed what some in the BNP Companies had turned a blind eye to or, at minimum, recklessly disregarded. *Id.*

23

¶¶ 107–112. The BNP Companies also agreed on at least two occasions to remove references to Madoff in disclosure materials, in light of "sensitiv[ities]." *Id.* ¶ 113–115. Still, the BNP Companies continued to invest and do business with Madoff-affiliated businesses.

Knowledge of the facts underlying these allegations was shared widely among the BNP Companies, including the BNP Defendants, pursuant to a common practice of information sharing among subsidiaries and affiliates. Functional groups consisting of employees from across the BNP Companies who helped create, market, and service credit facilities and derivative financial instruments (including related to BLMIS) reported to Group Committees and Group Risk Management whose roles were to oversee and approve BLMIS-related investments—all working in conjunction to support the BNP Companies' investments in BLMIS. *Id.* ¶¶ 51–60.

Thus, specific individuals at the BNP Defendants and their affiliates, including senior officials, voiced concerns about investments in BLMIS-related funds, which information was shared widely, but the BNP Defendants merely entered the comparatively less risky leverage business, continuing to profit from Madoff's fraud while minimizing exposure. These allegations support a finding of willful blindness and recklessness sufficient to plead bad faith under BVI law.

### 4.    Citigroup

The Further Proposed Amended Complaints against the "Citigroup Defendants"[18] allege they turned a blind eye or were reckless to the fact that the BLMIS investments were worthless or nearly worthless and took deliberate steps to avoid having those suspicions confirmed:

*First*, between 2005 and 2007, Leon Gross, the Global Head of Options Strategy and Equity Derivatives Research for affiliate and non-party Citigroup Global Markets, Inc. ("Citi Markets

---

[18] Those are Citibank, N.A. (Elsberg Decl., Ex. 17), Citibank (Switzerland) AG ("Citibank Switzerland") (*id.*, Ex. 18), and Citigroup Global Markets Limited ("CGML") (*id.*, Ex. 19 ("CGML Compl.")).

Inc.") acquired knowledge of BLMIS's fraud by undertaking a rigorous investigation of BLMIS.
CGML Compl. ¶¶ 62–71. Prompted by conversations with whistleblower Harry Markopolos,
Gross engaged in a quantitative analysis of BLMIS's signature split-strike conversion strategy and
found it incapable of achieving BLMIS's reported returns. *Id.* ¶¶ 63–64. In addition, Gross could
not find a single Citi Markets Inc. employee who had observed Madoff participating in the options
market, which would have readily apparent if Madoff were actually implementing the split-strike
conversion strategy. *Id.* ¶¶ 67–68. Those observations led Gross to conclude "something is wrong
here." *Id.* ¶ 69 n.2.

*Second*, Brian Leach—the Chief Risk Officer for Citigroup Inc. ("Citigroup"), the non-
party parent company of the Citigroup Defendants—acquired knowledge of BLMIS's fraud during
his prior employment at Morgan Stanley. *Id.* ¶¶ 72–75. While Leach was still an employee,
Morgan Stanley implemented an internal policy of avoiding BLMIS investments due to concerns
of fraud and other wrongdoing. *Id.* ¶ 64. Leach was aware of those concerns and conveyed them
to non-party Citigroup, which contributed to Citigroup's unwinding of its BLMIS trades shortly
after. *Id.* ¶ 74. In fact, although CGML had not redeemed any significant amount of shares from
Sentry between 2006 and 2008, CGML redeemed over $60 million in shares within a mere month
of Leach's arrival at Citigroup and then over $40 million in shares just a week or two before the
Madoff fraud was publicly exposed. *Id.* ¶¶ 75.

*Third*, CGML and Citibank, N.A. acquired knowledge of BLMIS's fraud while Citi
Markets Inc. negotiated and conducted due diligence on their behalf for four transactions involving
BLMIS feeder funds. *Id.* ¶¶ 76–131. In the four transactions: (1) in April 2005, CGML and
Citibank, N.A. executed an offshore swap transaction with Auriga International Limited in which
CGML agreed to pay Auriga two-times the return on a hypothetical investment in Sentry in

25

exchange for fees (the "Fairfield Sentry Leverage Deal"); (2) on or about June 10, 2005, Citibank, N.A. extended a $300 million revolving credit facility to American Masters Broad Market Prime Fund, L.P. to invest in BLMIS's investment advisory business (the "Prime Fund Credit Deal"); (3) in December 2005 and early 2006, Citibank, N.A. considered but ultimately rejected a lending arrangement with Tremont in which Citibank, N.A. would own shares in one of Tremont's BLMIS feeder funds (the "Proposed Tremont Deal"); and (4) between April 12, 2006 and March 26, 2008, Citibank, N.A. temporarily increased the size and renewed the Prime Fund Credit deal before ultimately terminating it (the "Proposed Prime Fund Renewal").  *Id.* ¶¶ 76, 94, 100, 117.  Citi Markets Inc.'s due diligence efforts for these four transactions uncovered two recurring questions: (1) whether BLMIS maintained segregated accounts, and (2) whether BLMIS was actually engaged in options trades; FGG and Tremont, the Citigroup entities' counterparties on these transactions, could not provide satisfying answers.  *E.g.*, *id.* ¶¶ 80–81, 109, 113.

Instead of digging deeper, Citibank, N.A. and Citi Markets Inc. decided to turn a blind eye to the risk of fraud and instead demanded an extraordinary form of protection in the Prime Fund Credit Deal: an indemnity provision obligating Tremont and Prime Fund to cover any financial loss in the event that BLMIS turned out to be a fraud.  *Id.* ¶ 97.  This indemnity provision was supplemented with the "Parent Guarantee," which provided that Tremont's parent company Tremont Capital Management, Inc. "will guarantee … the full and timely payment of all payment obligations of [Tremont and Prime Fund], with the exception of the obligation to support [Prime] Fund's failure to repay Advances that resulted from a decline in the fair market value of the assets purchased in adherence to the Investment Strategy."  *Id.*  That exception demonstrates Citibank, N.A. and Citi Markets Inc. were more concerned with fraud at BLMIS than with bad investments.  *Id.*  When Tremont subsequently refused to grant Citibank, N.A. such indemnification in the

Proposed Prime Fund Renewal, Citibank, N.A. abandoned that deal altogether. *Id.* at ¶¶ 127–130.

Knowledge of the facts underlying these allegations was shared widely within the Citigroup enterprise, which utilized a small number of business segments that shared information, worked together on risk assessment issues, collaborated on transactions, and generally operated as a cohesive unit. *Id.* ¶ 57. By virtue of this close collaboration, information sharing, and general coordination among Citigroup business units, non-party Citigroup and its affiliates, which include the Citigroup Defendants, shared knowledge of the Madoff fraud—and the corresponding inflation of the NAVs—with each other. *Id.* ¶ 61.

Thus, specific individuals at the Citigroup Defendants uncovered serious indicia of fraud but deliberately avoided taking steps to confirm whether BLMIS was in fact engaged in fraud and instead sought to enjoy the lucrative benefits of its involvement with BLMIS risk-free. These allegations support a finding of willful blindness and recklessness sufficient to plead bad faith under BVI law.

### 5. Fortis

The Further Proposed Amended Complaints against the "Fortis Defendants"[19] allege they turned a blind eye or were reckless to the high probability that the BLMIS investments were worthless or nearly worthless and took deliberate steps to avoid having those suspicions confirmed:

*First*, Fortis changed the legal jurisdiction of a BLMIS feeder fund and administrator just to avoid confirming its suspicions about BLMIS-related fraud. A Fortis entity in the Bahamas

---

[19] Those are ABN AMRO Retained Nominees (IOM) Limited (f/k/a Fortis (Isle of Man) Nominees Ltd.) ("Fortis (IOM)") (Elsberg Decl., Ex. 20 (the "Fortis (IOM) Compl.")), Fortis Bank SA/NV ("Fortis Bank") (*id.*, Ex. 21 (the "Fortis Bank Compl.")), FS/Fortis Banque Lux ("Fortis Lux") (*id.*, Ex. 22 (the "Fortis Lux Compl.")), Fortis Bank Nederland NV ("Fortis Nederland") (*id.*, Ex. 23 (the "Fortis Nederland Compl.")), Fortis Global Custody Services N.V. ("Fortis Global Custody") (*id.*, Ex. 24 (the "Fortis Global Custody Compl.")), and Fortis Global Services NV ("Fortis Global") (*id.*, Ex. 25 (the "Fortis Global Compl.")).

initially served as the administrator to the BLMIS feeder fund Harley International (Cayman) Ltd.

("Harley") (Fortis Bank Compl. ¶¶ 54(a), 57, 59, 66) but, following new laws requiring stricter

verification that a fund's custodian was "fit and proper" and reporting of suspected fraud to

regulators (*id.* ¶¶ 67–70), Fortis employees raised concerns.  They flatly acknowledged Fortis was

***not*** taking the proper steps to oversee BLMIS's custodian responsibilities.  *See, e.g.*, *id.* ¶ 71

("[W]e probably should be trade blotter matching ….."); ¶ 74 ("We should also have confirmation

as to how the Harley assets are held with the broker …..").  Yet, rather than confirm their suspicions

or report suspected wrongdoing (*id.* ¶¶ 82–84), in 2003, Fortis instead decided to change Harley's

jurisdiction to a different locale (*id.* ¶¶ 79–89)—all to maintain its profitable relationships with

Madoff.  The concerns were never resolved.  *See, e.g.*, *id.* ¶ 93 ("Madoffs [sic] double role implies

that there is no guarantee that the trades and positions provided by Madoff to Fortis as the

Administrator are objective and it is not possible to obtain independent confirmations on trades

and positions."); *see also id.* ¶¶ 92–96.

    *Second*, in 2006, Fortis acquired an investment book that included more than $70 million

of investments in BLMIS feeder funds, including funds operated by Tremont Partners, Inc.

("Tremont").  *Id.* ¶ 100.  Shortly thereafter, Mark Geene—a sophisticated Fortis employee—began

questioning the feeder funds' reliance on BLMIS.  *Id.* ¶ 101.  Geene repeatedly pressed for answers

to assuage his concerns regarding BLMIS's fraud risk (*id.* ¶¶ 103–118) but, again and again, Geene

and others at Fortis found the responses to be deficient.  *See, e.g.*, *id.* ¶ 108 (after a meeting with

Geene, a Tremont executive recalled that Fortis was "nervous" and that Tremont would have to

"get [Fortis] comfortable with Madoff"); *id.* ¶ 122.   In December 2006, by the time Geene

confirmed that a recently acquired U.S. affiliate, Cagodan, had an anti-Madoff policy, it was

abundantly clear that something was wrong with BLMIS.  *Id.* ¶¶ 122–128.  Two months later,

Fortis redeemed $56 million it had invested in a Tremont-operated BLMIS fund. *Id.* ¶ 129. Fortis never "got comfortable."

Fortis is a global institution of employees, entities, and business groups who worked together as one unified entity to provide services to clients worldwide, including, among other things, financing, hedge fund services, and asset management services. Fortis Bank Compl. ¶ 9. Fortis described this coordination and collaboration as its "'Act as One' philosophy—to "operate as <u>one company</u> with a strong identity." *Id.* ¶ 46. All of Fortis' fund services were bundled into a self-described "single unit"—Fortis Prime Fund Solutions, which carried out Fortis' hedge fund services. *Id.* ¶ 47. Moreover, Fortis employed a "global risk management framework," designed to "<u>facilitate communication of risk-related actions across Fortis</u>." *Id.* ¶ 50.

For years, specific individuals at the Fortis acknowledged its suspicions that BLMIS was engaged in fraud. Yet, rather than take steps to confirm that suspicion, Fortis affirmatively turned a blind eye—going so far as to move the jurisdiction of a feeder fund it administered just to avoid confronting its suspicions, so it could keep profiting from Madoff's scam. These allegations support a finding of willful blindness and recklessness sufficient to plead bad faith under BVI law.

### 6.    Merrill Lynch

The Further Proposed Amended Complaints against the "<u>Merrill Defendants</u>"[20] allege they were reckless to the high probability the BLMIS investments were worthless or nearly worthless:

*First*, at some point prior to 2006, non-party Merrill Lynch & Co., Inc. ("<u>MLCI</u>")—the parent company of Merrill International (together with affiliates, the "<u>Merrill Companies</u>")— instituted a prohibition on Madoff-related investments after conducting due diligence on BLMIS's

---

[20] Those are Merrill Lynch, Pierce, Fenner & Smith, Inc. ("<u>Merrill Lynch</u>") (Elsberg Decl., Ex. 26), Merrill Lynch Bank (Suisse) S.A. ("<u>Merrill Suisse</u>") (*id.*, Ex. 27), and Merrill Lynch International ("<u>Merrill International</u>") (*id.*, Ex. 28 (the "<u>Merrill Int'l Compl.</u>")).

structure and learning of various red flags.  One source of knowledge came from a senior executive, Fabio Savoldelli, working at another MLCI subsidiary, Merrill Lynch Investment Management, who "sounded the internal warning bell" about Madoff many years before BLMIS's collapse. Merrill Int'l Compl. ¶¶ 49–50.  Thereafter, MLCI consistently refused to provide leverage to institutional investors seeking to make levered investments in Madoff-related funds through structured products like notes or swaps.  *Id.* ¶ 52.  MLCI also regularly refused to direct investments to Madoff through, for example, funds of funds or single hedge fund wrap vehicles. *Id.*

*Second*, Merrill International personnel, including derivatives experts and trading desk employees, consistently refused BLMIS-related trades citing, among other issues, the secrecy surrounding the source of Madoff's returns and the questionable nature of BLMIS's "split strike conversion" strategy.  *Id.* ¶ 55.  For example, in one December 2006 email exchange, in which Merrill International's London-based fund-linked derivatives group was asked to consider a potential leverage transaction involving a Madoff feeder fund, another employee indicated that there has been "a lot of speculation on Wall Street about the true sources of the admittedly impressive returns [at BLMIS]" and that although "Merrill Lynch ha[d] repeatedly looked into Fairfield Sentry and other Madoff funds …. [t]he decision was taken some time ago that Merrill Lynch does not offer any products on these funds."  *Id.*  Once the Madoff scheme unraveled, employees from Merrill International were quick to note that it was "[n]ot a big surprise," *id.* ¶ 61, and that "[w]e all knew there was something wrong at Madoff – I guess now our suspicions have been confirmed," *id.* ¶ 62.

Upon information and belief, knowledge of MLCI's concerns and its prohibition on BLMIS-related investments was widely shared within and among the Merrill Companies,

including Merrill International, Merrill Lynch, and Merrill Suisse, as exemplified by Savoldelli's

testimony that the Merrill Companies did not lose any money on Madoff. *Id.* ¶ 53.

Thus, specific individuals at the Merrill Defendants had serious concerns about Madoff

that resulted in an enterprise-wide prohibition on BLMIS-related investments. These allegations,

at a minimum, support a finding of recklessness sufficient to plead bad faith under BVI law.

### 7.    Zurich Capital Markets

The Further Proposed Amended Complaint against Zurich Capital Markets Co. ("ZCM"),

(Elsberg Decl., Ex. 29 (the "ZCM Compl.")), alleges that ZCM, since at least July 2003, was

reckless as to the high probability that the BLMIS investments were worthless or nearly worthless.

ZCM provided a credit facility to a fund, Santa Barbara Holdings Ltd., which was wholly

invested in a single-manager BLMIS feeder fund, Harley International Ltd. *Id.* ¶ 67. Around

2003, ZCM began exploring a sale of certain assets to its competitors, including Société Generale

("SocGen"). *Id.* ¶ 68. After conducting "routine" due diligence on those assets, SocGen declined

to go forward with its purchase and instead chose to blacklist BLMIS investments altogether, citing

concerns that: (1) BLMIS's purported investment returns that were consistently in excess of 8%

were "impossible" (*id.* ¶ 69); (2) BLMIS purported to consistently purchase stocks below the

average price of those stocks, outperforming the market by 50 to 100 basis points nearly 90% of

the time (*id.*); and (3) BLMIS's trading averages did not trend towards the stock's midpoint or

volume weighted average price (*id.*). Those concerns were subsequently shared by SocGen with

specific individuals at ZCM. *See id.* ¶ 68.

Thus, specific individuals at ZCM became aware of various red flags about Madoff's

business during its attempted sale of assets to SocGen. These allegations, at a minimum, support

a finding of recklessness sufficient to plead bad faith under BVI law.

### 8.    Third-Party Beneficial Shareholders

The Further Proposed Amended Complaints additionally allege that certain persons or entities (the "Third-Party Beneficial Shareholders") had beneficial ownership of or interest in shares of the Funds issued to certain Knowledge Defendants.[21]   Those Knowledge Defendants served as trustees, agents, representatives, nominees, or custodians for the Third-Party Beneficial Shareholders by subscribing to the Funds' shares on their behalf, maintaining custody of the shares as record shareholders, paying redemption proceeds from shares to the Third-Party Beneficial Shareholders, and otherwise exercising control over the shares.  *See e.g.*, CGML Compl. ¶ 132. The Further Proposed Amended Complaints allege the Third-Party Beneficial Shareholders turned a blind eye or being reckless to the high probability the BLMIS investments were worthless or nearly worthless and taking deliberate steps to avoid having those suspicions confirmed:

*First*, the Third-Party Beneficial Shareholders are principals and the Knowledge Defendants are agents.  *Id.* ¶¶ 132–134.   Each of the Subscription Agreements between the Fairfield Funds and the Knowledge Defendants manifested the Third-Party Beneficial Shareholders' consent for their respective Knowledge Defendants to act on behalf of and subject to the Third-Party Beneficial Shareholders' control.  *Id.* ¶ 133.   In executing the Subscription Agreements, the Knowledge Defendants accepted and agreed to act on behalf of their respective Third-Party Beneficial Shareholders.  *Id.*  The Third-Party Beneficial Shareholders thus possessed the same knowledge as their respective Knowledge Defendants as to all matters relating to BLMIS and the Funds' NAVs at all times.  *Id.* ¶ 134.

---

[21] Those are (1) HSBC Defendants and affiliate, Somers Nominees *see, e.g.*, HSBC SSL (Lux) Compl. ¶ 130; (2) the UBS Defendants, *see, e.g.*, UBS Lux Compl. ¶ 104; (3) the BNP Defendants BNP Paribas Arbitrage Compl. ¶ 116; (4) the Citigroup Defendants, *see, e.g.*, CGML Compl. ¶ 132; (5) the Merrill Defendants, *see, e.g.*, Merrill Int'l Compl. ¶ 64; and (6) ZCM, *see* ZCM Compl. ¶ 72.

*Second*, both the Funds' Articles of Association as well as each of the Subscription Agreements provide that the registered shareholders are to be treated as the parties to the Funds' Articles. *Id.* ¶ 135. Article 8 of the Funds' Articles provides: "The Company shall be entitled to treat the registered holder of any share as the absolute owner thereof and accordingly shall not be bound to recognise an equitable or other claim to, or interest in, such share on the part of any other person." *Id.* ¶ 136. Paragraph 27 of the Subscription Agreements similarly provides: "If Subscriber is subscribing as trustee, agent, representative or nominee for another person (the 'Beneficial Shareholder'), Subscriber agrees that the representations and agreements herein are made by Subscriber with respect to itself and the Beneficial Shareholder. Subscriber has all the requisite authority from the Beneficial Shareholder to execute and perform the obligations hereunder." *Id.* ¶ 137. Together, these contractual provisions signify that the subscriber's knowledge is sufficient and decisive in determining bad faith because the subscriber is the relevant contracting party. *Id.* ¶ 138.

For the reasons discussed above, specific individuals at each of the Knowledge Defendants either willfully blinded themselves or recklessly disregarded the high probability that the BLMIS investments were worthless or nearly worthless. Under BVI law, the bad faith of these Knowledge Defendants must be imputed to the Third-Party Beneficial Shareholders as a matter of agency law and/or is binding on the Third-Party Beneficial Shareholders pursuant to Articles of Association and the Subscription Agreements. Thus, these allegations support a finding of willful blindness and recklessness sufficient to plead bad faith under BVI law against the Third-Party Beneficial Shareholders.

### 9.    Beneficial Shareholders of the Citco Entities

The Liquidators have also brought claims against the beneficial shareholders (the "Citco Beneficial Shareholders")[22] of accounts held in the name of their agents  who invested in BLMIS on behalf of the Citco Beneficial Shareholders pursuant to certain Brokerage and Custody Agreements.[23]  Those agreements provided that the Citco Subscribers[24] had "absolute discretion [to] refuse to execute any Instructions given by or on behalf of the [Citco Beneficial Shareholders]."  Citco Beneficial Shareholders Compl. ¶ 109.  As agents for the Citco Beneficial Shareholders, the knowledge of the Citco Subscribers binds the Citco Beneficial Shareholders.  *Id.* ¶¶ 16, 176–180, 184.  And, as with the Third-Party Beneficial Owners, Article 8 of the Funds' Articles and Paragraph 27 of the Subscription Agreements demonstrate the Citco Subscribers' knowledge is sufficient and decisive in determining bad faith as the Subscriber is the relevant contracting party.  *Id.* ¶¶ 181–183.

The Further Proposed Amended Complaints allege the Citco Subscribers, their parent company, Citco Group Ltd., and other affiliates (collectively, the "Citco Group") turned a blind eye or were reckless to the high probability the BLMIS investments were worthless or nearly worthless and took deliberate steps to avoid having those suspicions confirmed:

---

[22] Those are No. 10-cv-3635 (Elsberg Decl., Ex. 30 ("Citco Beneficial Shareholders Compl.")), No. 10-cv-3636 (*id.*, Ex. 31).

[23] The Citco Beneficial Shareholders' agents included various recordholder entities like Citco Global Custody NV, Citco Global Custody (NA) NV, Citco Fund Services (BVI), and Citco Fund Services (Europe) BV, and CGC NA (collectively, the "Citco Record Subscribers").

[24] The "Citco Subscribers" are the Citco Record Subscribers, together with Citco Bank Nederland N.V., Citco Bank Nederland N.V. Dublin Branch, and Citco Banking Corporation N.V. ("Citco Banks").

*First*, the Citco Group's executives expressed doubt as to whether the Funds' assets at BLMIS existed.  According to Ger Jan Meijer, head of internal audit for Citco Fund Services (Europe) B.V. and its delegatee Citco (Canada) Inc. (the Citco entity that issued NAV statements for the Funds), the broker statements for the Funds' assets at BLMIS could not be reconciled with the strategy outlined in the offering document.  *See id.* ¶ 140.

Undeterred by Citco Group's failure to address his concerns, Meijer held a meeting with his direct supervisor, Tony Stocks, during which Meijer explained his concerns, expressed his desire to take immediate action, and suggested the Citco Group cease subscriptions until it had assurance of the Funds' assets.  *Id.* ¶ 144.  Stocks told Meijer that he, not Meijer, was managing the company, and "it's not your business."  *Id.*  Meijer also warned Albert van Nijen, a member of the internal audit group at the Citco Group, in December 2002 that "[e]ven [BLMIS's purported compliance with] the SEC regulation [governing annual account statements] is not a guarantee that everything is OK."  *Id.* ¶ 146.  The Citco Group ignored such red flags.  According to Willem Holst, a managing director of Citco Bank Nederland N.V., the Citco Group "w[as] totally dependent on Madoff for verification of the existence of the assets" and BLMIS "was a structure [that was] out of the ordinary for the bank" but BLMIS was nevertheless "an important client, so we had to accommodate them."  *Id.* ¶ 148.

*Second*, the Citco Group's Chief Executive Officer, Christopher Smeets, was aware of and consciously disregarded the strong suspicions expressed by employees of the Citco Group and affiliates that BLMIS's practices called the existence of the Funds' assets into question.  Not only did Smeets fail to order an investigation of BLMIS and confirm the Funds' assets, he took affirmative steps to avoid learning the truth, including assisting with the Citco Group's decisions to quietly reduce their own exposure to the Funds and BLMIS.  Among other things:

35

- Smeets received and dismissed Meijer's May 2000 concerns that waiting to obtain more assurance of the Funds' assets, would allow additional subscriptions, which would in turn subject the Citco Group to liability. *Id.* ¶¶ 143, 172.

- Smeets received a July 2001 memo from Ruud Bodewes, head of internal audit for the entire Citco Group, regarding the issues at BLMIS, including the issues posed by the size of Madoff's audit firm. *Id.* ¶¶ 154, 172.

- On December 27, 2002, after Citco's third failed attempt to verify the Funds' assets, Bodewes reported to Smeets and the rest of the Citco Group executive committee that as long as the position of Sentry with BLMIS was not independently verified, "there will be doubts." *Id.* ¶¶ 155, 172.

- In 2002, Smeets knew that the Funds' credit line requests were on hold while the Citco Group tried to "get as much comfort as possible" that BLMIS was not a fraud. *Id.* ¶¶ 159, 172.

- In February and March 2004, Smeets knew of the Citco Group's concerns about AIG's withdrawal from BLMIS. Luckmann consulted Smeets before giving instructions for the Citco Group to redeem their own shares in Sentry. *Id.* ¶¶ 160, 170, 172.

- In 2006, Smeets knew that the Citco Group considered resigning as the Funds' service providers. Along with the Citco Group's management, he received an email stating: "We are taking a risk and we only get US$60K per year!" *Id.* ¶¶ 160–161, 172.

The Citco Subscribers chose not to inquire further, and instead negotiated for dramatically higher fees for staying on as agents for the Citco Beneficial Shareholders. *Id.* ¶¶ 139, 162–163.

Knowledge of the facts underlying those allegations was shared widely within the Citco Group, because these entities were, for all practical purposes, part of a single, undifferentiated corporate structure. The Citco entities served at the direction of their parent, which controlled, and directed, through, for example, Citco's executive committee, the operations of the Funds' administrator and the issuance of certificates showing inflated NAVs under the Administration Agreements with the Funds. Knowledge sharing was so widespread, that Citco Group employees often referred to any entity within the Citco Group as, simply, "Citco." *See id.* ¶ 168.

Thus, by virtue of their agency and contractual relationships with the Citco Subscribers, the Citco Beneficial Shareholders are charged with the same knowledge as the Citco Subscribers,

as to which specific individuals within the Citco Group, including its CEO Smeets, were—at a minimum—willfully blind or reckless to the high probability the BLMIS investments were worthless or nearly worthless, but took affirmative steps to avoid having those suspicions confirmed. These allegations support a finding of willful blindness and recklessness sufficient to plead bad faith under BVI law.

## II.    THERE IS NO BAD FAITH, PREJUDICE TO DEFENDANTS, OR UNDUE DELAY

Defendants could not show bad faith, prejudice, or undue delay.

*First*, there is no bad faith on the part of the Liquidators, who have diligently complied with the April 2019 Orders. In June 2019, the Liquidators began filing the Initial Proposed Amended Complaints in each adversary proceeding. *See* Elsberg Decl., Ex. 2. Despite the March 2019 passing of their BVI law expert, who had been steeped in the nuances of this case for years, the Liquidators promptly retained a new expert, necessary for the purposes of filing the Further Proposed Amended Complaints and for the anticipated motion to dismiss briefing, all of which are largely governed by foreign law. In relatively short order, the Liquidators are now ready file the Further Proposed Amended Complaints, with leave of this Court.

*Second*, Defendants are not unfairly prejudiced. Defendants stipulated to substantially identical provisions in each Knowledge Action that, to the extent the Liquidators seek to further amend an initial proposed amended complaint to add new "factual allegations," the Liquidators "shall file a motion for leave to amend attaching that proffered further amended complaint." *See, e.g.*, Stipulated Order at 9 (¶ I.E)).[25] Aside from the BNP Defendants (new Knowledge Defendants

---

[25] An overwhelming majority of those Defendants also recognized, as part of their recitals, that Liquidators either "intend to" or "may seek further leave to amend." Stipulated Order at 7 (Recitals). Only the Orders for the UBS Defendants are missing such recitals, though those Orders still stipulate that the Liquidators "shall file a motion for leave to amend" to the extent they wish

on notice of forthcoming allegations since April 2019), and Fortis Defendants (new Knowledge

Defendants on notice that forthcoming allegations were possible in light of the Orders) the

remaining allegations supplement the pleadings against existing Knowledge Defendants and arise

out of the same overpaid redemption payments over which the parties have been litigating for the

last decade. *See Agerbrink*, 155 F. Supp. 3d at 455 ("Whether a party had prior notice of a claim

and whether the new claim arises from the same transaction as the claims in the original pleading

are central to the undue prejudice analysis."). Defendants need not expend any—much less

"significant"—additional resources to conduct discovery as discovery has not even begun. *See*

Stipulated Order at 16 (¶ III.B) ("[A]ll discovery is stayed pending the Court's resolution of

[Defendants' second set of motions to dismiss]."); *cf. Scott v. Chipotle Mexican Grill, Inc.*, 300

F.R.D. 193, 200 (S.D.N.Y. 2014) ("A court is more likely to find an amendment prejudicial if

discovery has closed."). And the motion for leave to amend briefing can be put on the same

scheduling track as the already-agreed motion to dismiss briefing schedule, introducing no

additional burden. *See* Stipulated Order at 12–15 (¶¶ II.B(a)–(c)).

*Third*, there is no undue delay. "[A] motion to amend should be made as soon as the

necessity for altering the pleading becomes apparent." Wright & Miller, Fed. Prac. & Proc. § 1488

(3d ed. 2019); *see also In re Bernard L. Madoff Inv. Sec. LLC*, 560 B.R. at 225 ("An intervening

change in pleading standards may justify leave to amend."). Here, the Liquidators initially focused

more heavily on Citco's bad faith, which spanned all actions. Until the Decision, the Liquidators

did not know this Court would reject the Citco theory and instead require pleading specific

Defendants had knowledge in order to avoid dismissal. Courts have permitted amendments in

---

to add factual allegations. *See, e.g.*, Stipulated Order at 7–8 (¶ I.E) ((Dkt. 82), *Fairfield Sentry
Ltd. (In Liquidation) v. UBS AG N.Y.*, No. 10-ap-03780-SMB (Bankr. S.D.N.Y. Apr. 15, 2019).
All Knowledge Defendants reserved the right to oppose Liquidators' motion for leave to amend.

similar circumstances. *See, e.g.*, *Rachman Bag Co. v. Liberty Mut. Ins. Co.*, 46 F.3d 230, 235 (2d Cir. 1995) (affirming grant of leave where "principal issue … changed several times during the four years of litigation" and any "tardiness may well have been due to its uncertainty as to what issue to focus on"); *Abbatiello v. Monsanto Co.*, 571 F. Supp. 2d 548, 552 (S.D.N.Y. 2008) (no undue delay in suit over land contamination where plaintiffs "initially focused on PCBs because of the known health and environmental risks" and presence in defendant's plant, but, after discussions with potential experts, acquired a better understanding of additional contaminants to allege); *cf. Duling v. Gristede's Operating Corp.*, 265 F.R.D. 91, 98 (S.D.N.Y. 2010) ("A change in litigation strategy is a legitimate reason for seeking to amend a pleading, as is the correction of potential deficiencies in the complaint." (citations omitted)).

Since the Decision, the Liquidators worked diligently to prepare and file 29 particularized Further Proposed Amended Complaints within nine months of the Orders permitting them, despite the intervening, untimely death of their integral foreign law expert.  "Mere delay … absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend." *Pasternack*, 863 F.3d at 174 (quoting *Block*, 988 F.2d at 350).  Courts have allowed amendments in the face of significantly longer intervals than in this case. *See, e.g.*, *Rachman*, 46 F.3d at 235 (affirming grant of leave to amend answer after interval of four years, despite unclear reasons for delay, where non-movant did not argue prejudice or bad faith); *Agerbrink*, 155 F. Supp. 3d at 452–54, 461 (granting leave to amend after interval of between ten and thirteen months, and while discovery was already underway); *see also id.* at 452 (collecting cases and citing, *e.g.*, *Richardson Greenshields Secs., Inc. v. Lau*, 825 F.2d 647, 653 n.6 (2d Cir. 1987) (collecting cases where leave to amend was granted two to five years after filing of original pleadings, and where parties sought leave "to assert new claims long after they acquired the facts

necessary to support those claims")); *Valentini v. Citigroup, Inc.*, No. 11-cv-1355 (JMF), 2013 WL 4407065, at *7, *9 (S.D.N.Y. Aug. 16, 2013) (delay of eighteen months "insufficient ground to warrant denial," though discovery was already ongoing, where non-movant "failed to establish bad faith or undue prejudice")); *Duling*, 265 F.R.D. at 97–98 ("Although *some* explanation must be provided to excuse a delay, even vague or 'thin' reasons are sufficient, in the absence of prejudice or bad faith." (alteration in original) (citations omitted)).  Here, moreover, Defendants requested that the Liquidators file the last of their amended complaints on or before January 15, 2020, and the Liquidators did so.  Elsberg Decl., Ex. 2.  There is also no delay or prejudice because the Liquidators' new allegations do not introduce new claims, as all Knowledge Defendants have previously been the subject of constructive trust allegations.  *See Abbatiello*, 571 F. Supp. 2d at 553 (no undue delay, including because "[p]laintiffs do not seek to add new claims").

*Finally*, there can be no undue delay when "essentially no discovery has been undertaken"; despite prior briefing, the "proposed amended complaint would be the first complaint to be considered after the district court decided a motion to dismiss"; and there can be no "allegation of untimeliness based on a scheduling order." *Pasternack*, 863 F.3d at 174 (reversing denial of leave to amend for undue delay).  Here, discovery has not begun, the Further Proposed Amended Complaints will be the first complaints to consider after the motions to dismiss are resolved, and the Liquidators have complied with the scheduling order.  This Court should consider the Further Proposed Amended Complaints on their merits.

## CONCLUSION

For the foregoing reasons, the Liquidators respectfully request that the Court grant leave to the Liquidators to file the Further Proposed Amended Complaints, in substantially the form as appended to the Elsberg Declaration accompanying this Motion.

Dated:    New York, NY                    Respectfully submitted,
          January 15, 2020
                                          SELENDY & GAY PLLC


                              By:     /s/  *David Elsberg*
                                      SELENDY & GAY PLLC

                                      David Elsberg
                                      Lena Konanova
                                      Jordan Garman
                                      Kevin Hu
                                      Ronald Krock
                                      1290 Avenue of the Americas
                                      New York, NY 10104
                                      Telephone: 212-390-9000
                                      delsberg@selendygay.com
                                      lkonanova@selendygay.com
                                      jgarman@selendygay.com
                                      khu@selendygay.com
                                      rkrock@selendygay.com

                                      -and-

                                      BROWN RUDNICK LLP

                                      David J. Molton
                                      Marek P. Krzyzowski
                                      Seven Times Square
                                      New York, NY 10036
                                      Telephone: 212-209-4800
                                      dmolton@brownrudnick.com
                                      mkrzyzowski@brownrudnick.com

                                      *Attorneys for Plaintiffs Foreign Representatives*

41