# Exhibit 14

**SELENDY & GAY PLLC**
1290 Avenue of the Americas
New York, NY 10104
David Elsberg
Caitlin Halligan
Andrew Dunlap
Lena Konanova
Ron Krock
212-390-9000

-and-

**BROWN RUDNICK LLP**
Seven Times Square
New York, New York 10036
David J. Molton
Marek P. Krzyzowski
212-209-4800

*Attorneys for the Foreign Representatives*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 15 Case |
| **FAIRFIELD SENTRY LIMITED, et al.,** | Case No. 10-13164 (SMB) |
| Debtors in Foreign Proceedings. | Jointly Administered |
| **FAIRFIELD SENTRY LIMITED (IN LIQUIDATION),** acting by and through the Foreign Representatives thereof, and **KENNETH KRYS** and **GREIG MITCHELL,** solely in their capacities as Foreign Representatives and Liquidators thereof, | Adv. Pro. No. 10-04099 (SMB) |
| Plaintiffs, | |
| -against- | **[PROPOSED] FOURTH AMENDED COMPLAINT** |
| **BNP PARIBAS PRIVATE BANK AND TRUST CAYMAN LTD., LEEDS MASTER FUNDS LTD.** and **BENEFICIAL OWNERS OF ACCOUNTS HELD IN THE NAME OF BNP PARIBAS PRIVATE BANK AND TRUST CAYMAN LTD., 1-1000,** | |

**Defendants.**    )

# TABLE OF CONTENTS

**Pages**

PRELIMINARY STATEMENT ................................................................................................1

JURISDICTION AND VENUE ............................................................................................5

PARTIES ................................................................................................................................8

    A.    Plaintiffs ........................................................................................................ 8

    B.    Defendants ................................................................................................... 10

NOTICE PURSUANT TO FED. R. CIV. P. 44.1 ...............................................................11

FACTUAL ALLEGATIONS .............................................................................................11

    A.    Role Of Feeder Funds In Madoff Fraud ................................................... 11

    B.    Calculation Of Net Asset Value And Shareholder Redemption Payments .......... 12

    C.    Redemption Payments Made Or Transferred To Defendants............................. 15

    D.    BNP Paribas Cayman Knew Of, Was Willfully Blind To, Or Recklessly
        Disregarded The BLMIS Fraud ................................................................. 15

        1.    The BNP Companies' Corporate Structure Ensured That
            Information About Madoff-Related Investments Was Shared
            Between And Among Them ................................................... 17

        2.    The BNP Companies Created And Serviced The "Oreades Fund,"
            Misrepresenting The Fund's Connection To Madoff In The 1990s
            And 2000s ............................................................................. 20

        3.    Other Key Individuals Raised Similar Concerns About The BNP
            Companies' Investments With BLMIS And The BLMIS Feeder
            Funds..................................................................................... 23

        4.    The BNP Companies Developed New Madoff Business Despite
            Known Concerns Raised By Employees Across The BNP
            Companies............................................................................. 25

        5.    The BNP Companies Continued To Disregard The Risks Of
            Investment In BLMIS ........................................................... 29

    E.    The Beneficial Owners Had The Same Knowledge As BNP Paribas
        Cayman ..................................................................................................... 31

F.    Citco Did Not Issue Any Certifications Of Net Asset Value In "Good
      Faith"............................................................................................................. 32

      1.    Citco Expressed Doubt As To Whether The Funds' Assets At
            BLMIS Even Existed ............................................................... 34

      2.    Citco Failed To Obtain Evidence Of The Existence Of The Funds'
            Assets .................................................................................. 37

      3.    Citco Negotiated For Higher Fees As Reimbursement For The
            "Risks" Of Doing Business With Madoff................................... 39

G.    Exposure Of Madoff's Fraud ............................................................ 42

H.    The Funds' Estates In Liquidation .................................................... 44

FIRST CLAIM...............................................................................................45

SECOND CLAIM..........................................................................................48

THIRD CLAIM .............................................................................................52

FOURTH CLAIM..........................................................................................53

FIFTH CLAIM...............................................................................................54

PRAYER FOR RELIEF ................................................................................55

Fairfield Sentry Limited ("Sentry"), by and through Kenneth Krys and Greig Mitchell (together with their predecessors, the "Foreign Representatives" or the "Liquidators"), and Kenneth Krys and Greig Mitchell (together with Sentry, the "Plaintiffs"), solely in their capacities as the Liquidators of Sentry and Fairfield Sigma Limited ("Sigma") and the Foreign Representatives of the liquidation proceedings involving Sentry, Sigma, and Fairfield Lambda Limited ("Lambda," together with Sentry and Sigma, the "Funds" or the "Debtors") pending before the Commercial Division of the Eastern Caribbean High Court of Justice, British Virgin Islands (the "BVI Court"), for their complaint against Defendants, as defined herein, allege the following based on personal knowledge or information derived from the Funds' books and records or from other sources, including, *inter alia*, court filings and statements of governmental agencies and other parties.

## PRELIMINARY STATEMENT

1.      This adversary proceeding, which arises out of a now decade-long effort to recoup assets for the victims of the largest Ponzi scheme in history, seeks recovery of $13,474,090.81 improperly received by Defendant BNP Paribas Private Bank and Trust Cayman Ltd. ("BNP Paribas Cayman").

2.      BNP Paribas Cayman is one of a number of banks that invested, for itself or others, in so-called "feeder funds," which channeled private investments into managed accounts with Bernard L. Madoff and his now-infamous brokerage business, Bernard L. Madoff Securities LLC ("BLMIS").

3.      The Madoff scheme worked seamlessly for decades, apparently netting shareholders handsome returns that far exceeded the market.

4.      Once BLMIS imploded, however, the world learned what some in the investing community, including senior management at BNP Paribas Cayman, had long turned a blind eye

to:  that the payments investors received from the feeder funds in exchange for the redemption of shares were massively overvalued.  In fact, they were non-existent.

5.      The feeder funds, like the Funds in this case, were essential to the perpetration of that scheme.  From their inception until the revelation of Madoff's fraud in December 2008, during most relevant times, the Funds sought out new investment through the sale of shares to investors and transferred (either directly in the case of Sentry or indirectly, through Sentry, in the cases of Sigma and Lambda) substantially all the proceeds of those sales, net of fees and expenses, to BLMIS for investment in accounts managed by Madoff.

6.      However, instead of using investor proceeds collected by the Funds to purchase securities and other investments, BLMIS used those contributions to service the redemption requests of other investors, enriching Madoff and his associates in the process.

7.      The investors lucky enough to redeem their shares in the Funds before the collapse of the Ponzi scheme received payments ("Redemption Payments") at a grossly inflated "Net Asset Value"—the price determined by dividing the value of the respective assets of Sentry, Sigma, and Lambda by the number of shares outstanding in each Fund.  BNP Paribas Cayman is one such investor.

8.      Between February 15, 2006 and December 19, 2007, BNP Paribas Cayman received USD $13,474,090.81 in Redemption Payments from Sentry.  At the time it received these payments, BNP Paribas Cayman had already uncovered multiple indicia that Madoff was engaged in some form of fraud.  But rather than confront the facts before it, BNP Paribas Cayman turned a blind eye, accepting millions of dollars while willfully ignoring or, at the very least, recklessly disregarding the truth in clear violation of the laws of the British Virgin Islands.

9.     At all relevant times, employees of BNP Paribas Cayman was under the supervision of various Functional Groups, consisting of employees from across the BNP Companies, that helped create, market, and service credit facilities and derivative financial instruments such as swaps, notes, and other structured products—including those related to BLMIS.

10.     Among these, one Functional Group of employees from across the BNP Companies helped sponsor the creation in 1997 of a BLMIS feeder fund, Oreades (the "Oreades Fund").  Beginning in July 2003, and likely earlier, senior executives at BNP Paribas Securities Corp.—the Oreades Fund's administrator and a member of one such Functional Group—began expressing serious doubts about the propriety of serving as a fiduciary for the Oreades Fund, because of the difficulty involved with validating BLMIS orders and Madoff's general unwillingness to disclose his involvement with the Oreades Fund, in violation of Luxembourg laws and internal policies at the BNP Companies.  Ultimately, the BNP Companies heeded those warnings, liquidating the Oreades Fund.

11.     However, the BNP Companies soon found a new way to profit from Madoff while reducing their risk and began providing leverage to dozens of BLMIS feeder funds and investors. In that new role, the BNP Companies acquired even further proof of BLMIS's fraud, after assuming three separate investment opportunities from direct competitors who previously declined them in light of the risk posed by Madoff.

12.     By virtue of knowledge it acquired from senior executives at BNP Paribas Securities Services, shared through its involvement with the Functional Group, Defendant BNP Paribas Cayman at a minimum recklessly disregarded that the Net Asset Value was massively overvalued and, therefore, that the Redemption Payments it received were improperly calculated.

13.    At all relevant times, BNP Paribas Cayman knew that the Redemption Payments did not, as Sentry intended, represent the proceeds arising from the profitability of or to continue investment in BLMIS.  Instead, any amounts obtained directly or indirectly by Sentry from BLMIS to make Redemption Payments to BNP Paribas Cayman generally were proceeds of Madoff's Ponzi scheme, obtained from other BLMIS investors or other Sentry investors invested in BLMIS.

14.    Accordingly, the Funds' actual assets are, and at all relevant times were, far less than the amount needed to satisfy their liabilities and the claims that have been or may be asserted against them.  At all relevant times, the Funds were unable to pay their debts as they fell or would fall due.  Specifically, at the time the Redemptions Payments were made, the Funds had insufficient assets from which to pay debts as they fell or would fall due.  The Funds have been unable to satisfy their debts to BLMIS customers, the BLMIS Trustee, and other creditors of the Funds, and further increased the amount of those liabilities.

15.    As a result, the Funds were placed into liquidation by the BVI courts and the Foreign Representatives were appointed, and thereafter commenced ancillary proceedings in this Court pursuant to Chapter 15 of the Bankruptcy Code to recover improper Redemption Payments received by the Funds' investors.

16.    Upon information and belief, BNP Paribas Cayman has either retained the Redemption Payments made to it by Sentry for its own account and benefit or paid all or some portion of such payments to or for the account of persons or entities for whom BNP Paribas Cayman may have subscribed for shares of the Funds in the capacity of trustee, agent, representative, nominee, or custodian (individually, a "Beneficial Shareholder" and collectively, "Beneficial Shareholders," together with BNP Paribas Cayman, the "Defendants").

17.     By this proceeding, Plaintiffs seek to recoup for the benefit of the Funds' estates, Redemption Payments transferred to BNP Paribas Cayman.  Without this recovery, Defendants will have been unjustly enriched, and allowed to retain a windfall at the expense of other shareholders and creditors of the Funds.  Any recoveries will aid the Funds in satisfying their liabilities and redound to the benefit of the Funds' investors who found themselves victims of Madoff's Ponzi scheme.

### JURISDICTION AND VENUE

18.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 157(b) and 1334(b), as this adversary proceeding and the claims asserted by the Foreign Representatives herein arise under, arise in and/or relate to the Chapter 15 proceedings of the above-captioned Debtors, *In re Fairfield Sentry Limited, et al.*, No. 10-13164 (SMB), pending in this Court.  Additionally, pursuant to section 78eee(b)(2)(A)(iii) of the Securities Investor Protection Act ("SIPA"), which incorporates 28 U.S.C. § 1334(b) and applicable provisions of Title 11 of the United States Code, jurisdiction is also proper in this Court because this action also relates to the consolidated liquidation proceedings of BLMIS and Bernard L. Madoff, pending in this Court under the caption *Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC*, SIPA Liquidation No. 08-1789 (SMB).  Pursuant to the Amended Standing Order of Reference of the United States District Court for the Southern District of New York, dated January 31, 2012, all proceedings arising in, arising under and/or related to cases under Title 11 of the United States Code (as amended, the "Bankruptcy Code") are referred to this Court for adjudication.

19.     This is a core proceeding under 28 U.S.C. § 157(b)(2).  Should the Court determine that this is a non-core proceeding, Plaintiffs consent to entry of final judgment and order by this Court.

20.     This Court has jurisdiction over BNP Paribas Cayman and any Beneficial Shareholders pursuant to Rules 7004(d) and (f) of the Federal Rules of Bankruptcy Procedure and New York Civil Practice Law & Rules § 302 (McKinney 2008) because BNP Paribas Cayman and the Beneficial Shareholders purposely availed themselves of the laws of the United States and the State of New York by, among other things, investing money with the Funds, knowing and intending that the Funds would invest substantially all of that money in New York-based BLMIS, and maintaining bank accounts in the United States at BNP Paribas in New York, and in fact receiving Redemption Payments in those United States-based and/or New York-based accounts. BNP Paribas Cayman and the Beneficial Shareholders selected U.S. dollars as the currency in which to invest and execute their transactions in Sentry, designated United States-based and/or New York-based bank accounts to receive their Redemption Payments from the Funds, and actively directed Redemption Payments at issue in this action into those bank accounts. BNP Paribas Cayman and the Beneficial Shareholders thus knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York, derived significant revenue from New York, and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein. BNP Paribas Cayman and the Beneficial Shareholders should therefore reasonably expect to be subject to United States jurisdiction.

21.     Moreover, this Court has jurisdiction over BNP Paribas Cayman and any Beneficial Shareholders by virtue of the legally binding and valid agreements and representations set forth in one or more agreements for the subscription of Shares that BNP Paribas Cayman entered into with Sentry (the "Subscription Agreements").

22.    BNP Paribas Cayman, upon information and belief, entered into the Subscription

Agreements with Sentry pursuant to which BNP Paribas Cayman subscribed for a total of

2,845.85 Shares.

23.    The Subscription Agreements provide for, *inter alia*, the irrevocable submission

by BNP Paribas Cayman to the jurisdiction of the New York courts with respect to any

proceeding with respect to said agreement and Sentry and BNP Paribas Cayman's consent to

service of process by the mailing of such process, as provided therein.    In particular, the

Subscription Agreements provide as follows:

> New York Courts.    Subscriber agrees that any suit, action or proceeding
> ("Proceeding") with respect to this Agreement and the Fund may be brought in
> New York.    Subscriber irrevocably submits to the jurisdiction of the New York
> courts with respect to any Proceeding and consents that service of process as
> provided by New York law may be made upon Subscriber in such Proceeding,
> and may not claim that a Proceeding has been brought in an inconvenient forum.
> Subscriber consents to the service of process out of any New York court in any
> such Proceeding by the mailing of copies thereof, by certified or registered mail,
> return receipt requested, addressed to Subscriber at the address of Subscriber then
> appearing on the Fund's records.    Nothing herein shall affect the Fund's right to
> commence any Proceeding or otherwise to proceed against Subscriber in any
> other jurisdiction or to serve process upon Subscriber in any manner permitted by
> any applicable law in any relevant jurisdiction.

24.    Furthermore, by executing the Subscription Agreements, BNP Paribas Cayman

agreed to all terms and conditions contained therein, including the express provision that any

agreement made by BNP Paribas Cayman in the Subscription Agreements would also apply to

any other person for whom BNP Paribas Cayman was subscribing as trustee, agent,

representative, or nominee—*i.e.*, all Beneficial Shareholders.    Moreover, by executing the

Subscription Agreements, BNP Paribas Cayman represented that it had all requisite authority

from Beneficial Shareholders to execute and perform any and all obligations on their behalf, and

also agreed to indemnify Sentry for any damages resulting from an assertion by a Beneficial

Shareholder that BNP Paribas Cayman lacked proper authorization to enter into the Subscription

Agreements or perform the obligations thereof. Specifically, the Subscription Agreements provide as follows:

> <u>If Subscriber is acting as a Representative</u>. If Subscriber is subscribing as trustee, agent, representative, or nominee for another person (the "<u>Beneficial Shareholder</u>"), Subscriber agrees that the representations and agreements herein are made by Subscriber with respect to itself and the Beneficial Shareholder. Subscriber has all requisite authority from the Beneficial Shareholder to execute and perform the obligations hereunder. Subscriber also agrees to indemnify the Fund … for any and all costs, fees and expenses (including legal fees and disbursements, fines and amounts paid in settlement) in connection with any damages resulting from Subscriber's misrepresentation or misstatement contained here, or the assertion of Subscriber's lack of proper authorization from the Beneficial Shareholder to enter into this Agreement or perform the obligations hereof.

25.    Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

## PARTIES

**A.    Plaintiffs**

26.    Sentry, a British Virgin Islands company, was organized in 1990 under the International Business Company Act of the British Virgin Islands and was subsequently re-registered as a business company under the BVI Business Companies Act 2004. Sentry's registered agent is Codan Trust Company (B.V.I.) located at Romasco Place, Wickhams Cay 1, Road Town, Tortola, BVI. Sentry is currently in liquidation in proceedings commenced on April 21, 2009 in the BVI Court.

27.    The Foreign Representatives were appointed by the BVI Court as Liquidators of the Funds to supervise the liquidation of the Funds' estates and, where necessary, commence proceedings in the name of and on behalf of the Funds or in their own official names. On April 23, 2009, the BVI Court issued an order appointing Christopher Stride as liquidator of Lambda (the "<u>Lambda Appointment Order</u>"). On July 21, 2009, the BVI Court issued an order appointing Kenneth Krys and Mr. Stride as joint liquidators of Sentry and Sigma (the "<u>Sentry &</u>

Sigma Appointment Order"). On September 6, 2010, the BVI Court issued notices acknowledging Mr. Stride's resignation and the appointment of Joanna Lau as joint liquidator with Mr. Krys of all three Funds (the "Supplemental Appointment Order"). On November 23, 2011, Ms. Lau resigned as joint liquidator of the Funds. On June 24, 2014, the BVI Court issued an order appointing Charlotte Caulfield as joint liquidator, with Mr. Krys, of all three Funds (the "Second Supplemental Appointment Order"). On June 21, 2019, Ms. Caulfield resigned as joint liquidator of the Funds. On July 8, 2019, the BVI Court issued an order appointing Greig Mitchell as joint liquidator, with Mr. Krys, of all three Funds (the "Third Supplemental Appointment Order" and, together with the Lambda Appointment Order, the Sentry & Sigma Appointment Order, the Supplemental Appointment Order, and the Second Supplemental Appointment Order, the "BVI Appointment Orders"). The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of the Funds, have been authorized by the foreign court having jurisdiction over the matter to bring this action and the claims herein, including the avoidance claims herein under the BVI Insolvency Act of 2003 (the "BVI Insolvency Act").

28.    Pursuant to the BVI Appointment Orders, the Foreign Representatives are responsible for all aspects of the Funds' businesses, including, among other things, custody and control of the Funds' assets, the power to do all acts and execute, in the name and on behalf of the Funds, any deeds, receipts or other documents, and the power to compromise claims, commence litigation and to dispose of property. After obtaining BVI Court approval, the Foreign Representatives filed petitions in this Court in June of 2010, under Chapter 15 of Title 11 of the United States Code, seeking recognition of the BVI Liquidation Proceedings as

"foreign main proceedings" under Chapter 15. On July 22, 2010, this Court issued an order (the "Recognition Order") granting that recognition.

29.    Pursuant to the Recognition Order, the Foreign Representatives were automatically afforded relief available under 11 U.S.C. § 1520, including application of the Bankruptcy Code's automatic stay to the Funds and their property located in the United States, as well as the ability to operate the Funds' business and exercise the rights and powers of a trustee under Sections 363 and 552 of the Bankruptcy Code. Moreover, the Bankruptcy Court specifically granted additional relief in the Recognition Order to the Foreign Representatives pursuant to 11 U.S.C. § 1521(a). Such relief includes, but is not limited to: (i) staying any actions, proceedings or execution against the Funds' assets to the extent not stayed under Section 1520; (ii) authorizing the Foreign Representatives to seek leave to conduct discovery concerning the Funds' assets, affairs, rights, obligations or liabilities; (iii) entrusting the Foreign Representatives with the administration and realization of the Funds' assets that are located within the United States, including all claims and causes of action belonging to the Funds; and (iv) otherwise giving full force and effect to the proceedings before the BVI Court.

**B.    Defendants**

30.    BNP Paribas Cayman was, at all relevant times, a member of Sentry and a registered holder of Shares. Upon information and belief, BNP Paribas Cayman is a corporate entity organized under the laws of the Cayman Islands and having its registered address at Piccadilly Center, 4th Floor, P.O. Box 10632 APO, Grand Cayman, Cayman Islands or P.O. Box 2003, Buckingham Square, 3rd Floor, 720 West Bay Road, Grand Cayman, KY1-1104, Cayman Islands. BNP Paribas Cayman subscribed for the purchase of Shares by entering into one or more Subscription Agreements with Sentry. All purchases of Shares by BNP Paribas Cayman were subject to the terms of the Subscription Agreements.

10

31.     Defendants "Beneficial Owners of the Accounts Held in the Name of BNP Paribas Private Bank and Trust Cayman Ltd., 1-1000"—*i.e.*, the Beneficial Shareholders, are, as noted, any persons or entities having a beneficial ownership or interests in Shares of Sentry issued to BNP Paribas Cayman and on whose behalf BNP Paribas Cayman was acting as trustee, agent, representative, or nominee.

32.     Based on Sentry records, some or all of the Redemption Payments made to BNP Paribas Cayman may have been paid to an account holder or holders associated with Leeds Master Funds Ltd.

## NOTICE PURSUANT TO FED. R. CIV. P. 44.1

33.     Certain of the substantive issues to be resolved in this case will be governed by the laws of the British Virgin Islands.  Plaintiffs intend to rely upon the applicable laws of that territory.

## FACTUAL ALLEGATIONS

**A.     Role Of Feeder Funds In Madoff Fraud**

34.     Sentry was the largest of all the so-called "feeder funds" to maintain accounts with BLMIS.  Sigma and Lambda were indirect BLMIS feeder funds established for foreign currency (respectively, Euro and Swiss franc) investment through purchase of shares of Sentry. Shares in the Funds had the following par values: $.01 per share (Sentry), €.01 per share (Sigma), and CHF.01 per share (Lambda).  Sentry's account statements with BLMIS as of the end of October 2008 showed in excess of $6 billion of invested assets supposedly held by BLMIS.  As stated in its offering materials, Sentry's investment objective was to achieve capital appreciation through investments in BLMIS.

35.     As discussed above, Sentry, Sigma and Lambda were established for the purpose of making investments in BLMIS.  It is now known that these types of feeder funds were a

crucial part of Madoff's Ponzi scheme. Feeder funds, such as Sentry (which was a direct feeder fund into BLMIS), and Sigma and Lambda (which were indirect feeder funds, through Sentry, into BLMIS) brought new investors and new investments into the scheme, allowing Madoff to make payments to early investors who sought to liquidate their investments, and in this way, the feeder funds were used by Madoff to continue and perpetuate his fraud by maintaining the illusion that BLMIS was making active investments and engaging in a successful investment strategy.

**B.**    **Calculation Of Net Asset Value And Shareholder Redemption Payments**

36.    From the Funds' inception until the disclosure of Madoff's fraud in December 2008, during most relevant times, substantially all of the money (up to 95%) raised by the Funds from the sale of their Shares, net of fees and expenses, was turned over to and invested in BLMIS (by and/or through Sentry), and supposedly credited to accounts held in the name of Sentry with BLMIS, purportedly for use in the now infamous "split-strike conversion" investment strategy. In accordance with the Funds' Subscription Agreements, Articles of Association, offering materials and/or other relevant documents, from time to time, the Funds paid to shareholders, for each Share tendered for redemption, an amount that was based on each of the respective Funds' purported "Net Asset Value"—the value of the respective assets of Sentry, Sigma, and Lambda divided by the number of shares outstanding in each Fund—as it was then calculated.

37.    In calculating each of the Funds' Net Asset Value, the Funds' administrators used and relied on account statements provided by BLMIS purportedly showing securities and investments, or interests or rights in securities and investments, held by BLMIS for the account of Sentry. Generally, all securities identified on BLMIS account statements were traded on public exchanges and had readily ascertainable market values, and those market values (in

addition to, among other items, cash on hand that was identified in the Sentry account statement for the relevant time period) were used in accordance with the Funds' Subscription Agreements, Articles of Association, offering materials and/or other documents to calculate the Net Asset Value of the Shares.

38.    In fact, at all relevant times, no securities were ever purchased or sold by BLMIS for Sentry and any stated cash on hand in the BLMIS accounts was based on misinformation and fictitious account statements.    None of the transactions shown on the account statements provided by BLMIS to Sentry ever occurred.    Indeed, no investments of any kind were ever made by BLMIS for Sentry.    At all relevant times, all of the account statements that BLMIS provided to Sentry were entirely and utterly fictitious.    Further, all amounts deposited by Sentry (or by Sigma and Lambda through Sentry) with BLMIS for investment and the purchase of securities to be held by BLMIS for the account of Sentry were used by Madoff to pay other BLMIS investors or were misappropriated by Madoff for other unauthorized uses.

39.    From time to time, to make Redemption Payments, Sentry (and Sigma and Lambda through Sentry) made withdrawals from Sentry's BLMIS accounts (or utilized subscription monies of other investors on hand that were directed for investment in BLMIS).    At all relevant times, the Funds believed that the amounts provided in connection with such withdrawals represented the proceeds arising from the profitability of or to continue investment in BLMIS.    In fact, however, payments made by BLMIS to Sentry purportedly representing the proceeds of sales of securities or other investment positions were nothing other than the deposits of other BLMIS investors or previous deposits made by Sentry, never invested but rather misused and misappropriated as part of Madoff's fraud.    At all relevant times, payments made from BLMIS to Sentry were made by Madoff to continue and perpetuate his Ponzi scheme and

avoid detection of his fraud. The payments from BLMIS to Sentry were not payments made in the ordinary course of or as part of any business, nor did they have a legitimate business purpose. Similarly, the Redemption Payments were not made for any legitimate purposes or in the ordinary course of any business. Those Redemption Payments did not conform to or follow the terms of the Funds' Subscription Agreements, Articles of Association and/or other offering documents, as they were based upon Net Asset Values that were not calculated based upon the true facts existing at any relevant time, and because, more generally, the Redemption Payments represented the proceeds arising from investment in BLMIS (or a substitute therefor, in the form of subscription monies from other investors in the Funds, used as a shortcut to investing subscription monies with BLMIS and simultaneously withdrawing monies from BLMIS), which the world now knows was operated by Madoff as a Ponzi scheme.

40.    Given the fraudulent nature of BLMIS and its operation as a massive Ponzi scheme, the money paid by the Funds (directly in the case of Sentry and indirectly in the cases of Sigma and Lambda) to BLMIS on account of Sentry was, at all relevant times and unknown to the Funds, misused and misappropriated by Madoff as part of his Ponzi scheme. At all relevant times, the Funds were insolvent when the Redemption Payments were made or were rendered insolvent, and/or their insolvency was deepened, as a result of the Redemption Payments.

41.    As a result, at all relevant times, the Net Asset Value of the Shares redeemed was miscalculated, and Redemption Payments were mistakenly made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at any relevant time.

C.    **Redemption Payments Made Or Transferred To Defendants**

42.    During the period from and after February 15, 2006 through December 19, 2007, BNP Paribas Cayman received Redemption Payments totaling USD $13,474,090.81 from Sentry in respect of Shares tendered for redemption.

43.    At BNP Paribas Cayman's directions and instructions, BNP Paribas Cayman received all of its Redemption Payments at its bank account with BNP Paribas in New York.

44.    The dates and amounts of each Redemption Payment received by BNP Paribas Cayman from Sentry, and the BNP Paribas Cayman bank accounts to which each Redemption Payment was made, are set forth on Exhibit A.

45.    At the time those Redemption Payments were made, the Funds had insufficient assets and were unable to pay their debts as they would fall due.    In exchange for each Redemption Payment, each of which constitutes or forms part of a transaction between BNP Paribas Cayman and Sentry, Sentry received no consideration or consideration of a value that, in money or money's worth, was significantly less than the value, in money or money's worth, of the consideration provided by Sentry.

46.    Upon information and belief, BNP Paribas Cayman and/or the Beneficial Shareholders received Redemption Payments in excess of amounts paid by such person(s) for purchase of their Shares.

D.    **BNP Paribas Cayman Knew Of, Was Willfully Blind To, Or Recklessly Disregarded The BLMIS Fraud**

47.    By no later than July 2003, and likely several years earlier, BNP Paribas Cayman acquired knowledge of Madoff's Ponzi scheme from BNP Paribas Securities Services pursuant to a common practice of information sharing among subsidiaries and affiliates of BNP Paribas Cayman's ultimate parent entity, BNP Paribas S.A. (collectively the "BNP Companies"), the

banking and financial services conglomerate with headquarters in Paris, France, and offices in New York, New York. BNP Paribas Securities Services and BNP Cayman, in turn, acquired this knowledge from at least four sources.

48.    *First*, the BNP Companies helped to create and administer a BLMIS feeder fund, the Oreades Fund, while knowingly concealing their affiliations with Madoff from regulators and investors, in violation of Luxembourg law and the BNP Companies' own compliance rules, which required "strict separation" between investment advisory and custodial functions. Those risks were appreciated by at least one senior executive at BNP Paribas Securities Services, Lionel Trouvain, who raised concerns on multiple occasions about the propriety of the BNP Companies' involvement with the Oreades Fund. Trouvain's concerns were ultimately heeded and the BNP Companies agreed to liquidate the Oreades Fund, acknowledging the high probability of fraud at BLMIS.

49.    *Second*, other employees at the BNP Companies who worked on issues unrelated to the Oreades Fund expressed similar concerns about Madoff's business generally, including Paolo Gianferrara (a senior executive) and Fauchier Partners (a joint venture partner), who declined investment opportunities because they were affiliated with Madoff.

50.    *Third*, despite their own employees' concerns about the Oreades Fund and Madoff more broadly, the BNP Companies decided to enter a new line of business providing leverage to dozens of BLMIS feeder funds and investors. But unlike their previous BLMIS investments, the BNP Companies had no corresponding fiduciary responsibilities as they had previously. In the course of developing that business, the BNP Companies learned even further evidence of the underlying fraud when it agreed to replace three separate competitors on an acquisition, as well

as the Legacy and Tremont deals—all opportunities that were rejected because they involved single-manager funds investing in BLMIS.

51.    *Fourth*, up until the fraud was publicly disclosed, the BNP Companies repeatedly violated their own due diligence policies and procedures, which would have confirmed what some in the BNP Companies had turned a blind eye to or, at a minimum, recklessly disregarded.

### 1.    The BNP Companies' Corporate Structure Ensured That Information About Madoff-Related Investments Was Shared Between And Among Them

52.    At all relevant times, BNP Paribas S.A. was structured to facilitate the flow of information between and among the BNP Companies concerning their investments in BLMIS— including those by the Defendant BNP Paribas Cayman.

53.    BNP Paribas S.A. organized its subsidiaries into functional groups to encourage that information sharing.

54.    Three of these functional groups—the Fund Derivatives Group; the Securities Services Group; and the Asset Management Group (collectively, with the Fund Derivatives Group and Securities Services Group, the "Functional Groups")—worked in conjunction to support the BNP Entities' investments in BLMIS:

- The Fund Derivatives Group, situated within the Global Equity & Derivatives Division, was responsible for creating, marketing, and servicing credit facilities and derivative financial instruments such as swaps, notes, and other structured products. At all relevant times, the group was comprised of employees at various BNP Paribas S.A. subsidiaries and affiliates. Among these were: BNP Paribas Arbitrage, an entity responsible for creating and managing most of the group's credit facilities and structured products, including in its capacity as calculation or collateral agent in which it determined the amounts that the BNP Companies should invest or redeem in BLMIS feeder funds; and BNP Paribas Securities Corp., an entity that marketed and monitored those credit facilities and structured products.

- The Securities Services Group, like the Asset Management Group, *infra*, was situated within the Investment Solutions Unit and tasked with providing administrative banking services to clients of the Fund Derivatives Group that

invested with the BLMIS feeder funds. The group is comprised of employees of various BNP Paribas S.A. subsidiaries and affiliates including BNP Paribas Cayman and BNP Paribas Securities Services, both of which facilitated transfers into and out of the relevant BLMIS feeder funds.

- The Asset Management Group, like the Securities Services Group, *supra*, was situated within the Investment Solutions Unit and responsible for overseeing and facilitating investment strategies of the BNP Companies' customers. The group is comprised of employees of various BNP Paribas S.A. subsidiaries and affiliates including BNP Paribas Luxembourg and BNP Paribas (Suisse) S.A. In addition, the group worked with the Fund Derivatives Group to market and sell investment products that referenced the BLMIS feeder funds to the BNP Companies' clients.

55.     These Functional Groups reported to certain oversight committees consisting of senior executives spanning the BNP Companies.

56.     Three committees played roles in BLMIS investments:

- Transaction Approval Committee ("Transaction Committee"), whose review and approval was required for transactions involving structured products proposed by the Fund Derivatives Group;

- The Credit Facility Committee ("Credit Committee"), whose review and approval was required for all transactions involving credit facilities; and

- The Executive Position Committee ("Executive Committee" and, collectively with the Transaction Committee and Credit Committee, the "Group Committees"), whose review and approval was required for large and complex transactions, including ones arising from pre-existing business relationships.

57.     Contrary to historic practice, these Group Committees automatically approved transactions involving the BLMIS feeder funds. Each of the Group Committees was under the oversight of the BNP Entities' Group Risk Management Department ("GRM"), a team comprised of senior management at BNP Paribas S.A. with a "broad scope of competence … responsible for all risks arising in the course of the Group's business."

58.     Unlike other business units within the BNP Companies during the relevant time period, GRM served a "global function." It was "independent from the divisions, business

lines[,] and territories … report[ing] directly to the Group Executive Management." It gathered information via "teams based in the various territories, [and] whenever possible on the same sites as the operating units." GRM maintained its independence "by placing these teams under the direct authority of GRM and by establishing strong central guidance."

59.    In its supervisory role, GRM was responsible for enforcing guidelines for monitoring and managing the BNP Companies' overall risk by "providing assurance that the risks taken by the Bank [we]re compatible with its risk policies and its profitability and credit rating objectives." GRM was also tasked with "report[ing] regularly to the Internal Control Risk Management Committee of the Board on its main findings concerning risks, as well as on the methods used by GRM to measure these risks and consolidate them on a Group-wide basis." Accordingly, GRM "perform[ed] continuous and ex-ante controls that we[re] fundamentally different from the periodic, ex-post examinations of the Internal Auditors."

60.    In particular, GRM supervised approvals for "all lending decisions," which were required to "be approved by a formally designated member of the Risk Management function …. in writing, either by means of a signed approval form or in the minutes of formal meetings of a Credit Committee." Notably, "[c]ertain types of lending commitments, such as loans to banks … and customers operating in certain industries, [we]re required to be passed up to a higher level for approval."

61.    But GRM instituted exceptions for Madoff-related transactions. In addition, that department worked with the Fund Derivatives Group to conduct due diligence on transactions involving hedge funds—including transactions with BLMIS feeder funds. The department would meet with the Fund Derivatives Group monthly to discuss these transactions, and GRM

would report its findings directly to executive management at BNP Paribas S.A.—including the Chairman and CEO.

### 2. The BNP Companies Created And Serviced The "Oreades Fund," Misrepresenting The Fund's Connection To Madoff In The 1990s And 2000s

62.    In 1997, the Securities Services Group partnered with a third-party investment management company, Access International Advisors ("AIA"), to create the Oreades Fund.

63.    During the Oreades Fund's existence, two of the BNP Companies' subsidiaries served as administrators to the fund—BNP Paribas Fund Administration S.A. (from 1997 to 2002) and BNP Paribas Securities Services (from 2002 to 2004).

64.    From its inception through its ultimate dissolution, the Oreades Fund engaged in an array of false and/or misleading practices vis-à-vis investors and regulators:

- The Oreades Fund claimed that two BNP Paribas S.A. subsidiaries served as its official custodians: BNP Paribas Luxembourg (from 1997 to 2002) and BNP Paribas Securities Services (from 2002 to 2004). In fact, both entities delegated all custodial authority to BLMIS through an undisclosed sub-custodian agreement.

- The Oreades Fund claimed that it charged and received custodial fees for its services, when in reality it did not perform any of those services.

- The Oreades Fund represented to Luxembourg's financial regulator, CSSF, that BNP Paribas S.A. affiliate, Inter Conseil, served as the official investment adviser and manager of Oreades Fund. However, the Oreades Fund failed to inform CSSF that Inter Conseil delegated all of its advisory and management duties to BLMIS through an undisclosed sub-advisory and management agreement.

- Moreover, Inter Conseil charged over $25 million in management and performance fees for essentially functioning as a pass-through entity.

65.    These practices were not only inconsistent with the BNP Companies' own compliance rules, which required "strict separation" between investment advisory and custodial functions, but also violated Luxembourg law, which required a Luxembourg-regulated entity to

serve as the Oreades Fund custodian. Indeed, Inter Conseil's management agreement with BLMIS explicitly provided that their relationship "Must remain 'private' that is, the CSSF … must remain unaware of it."

66.    These departures from internal compliance rules continued when, in May 2003, BNP Paribas Securities Services requested that BLMIS send account statements and trade confirmations to the Oreades Fund via e-mail, per its standard practice. When BLMIS refused, the BNP Companies created an exception to its rule, continuing to accept late, paper statements and confirmations from the Oreades Fund.

67.    The BNP Companies' employees soon raised concerns. On or about July 10, 2003, a senior executive at BNP Paribas Securities Services, Lionel Trouvain, reviewed a BNP Paribas internal audit and compliance report on the Oreades Fund prepared by the Group Risk Management Department and became concerned "that the risk [to] BNP Paribas is very extensive."

68.    Trouvain communicated with AIA and identified as a fraud risk BLMIS's delayed method for reporting trades, warning that "[m]arket practices are really different today and it would seem that B. Madoff does not ever want to improve its order transmission methods." Trouvain also flagged for AIA the inability to confirm the validity of BLMIS's purported trades: "we have no opportunity to consider the true validity of the orders." Although he acknowledged that BLMIS "was audited and it seems that everything is correctly posted," he expressed concern "there is no B. Madoff management company" and concluded that "it is surely very difficult for the auditors to verify that all the deals carried out on behalf of the clients of B. Madoff are correctly indexed to these same clients," noting that "this is a point that our risk and ethics departments found during their internal audit ...."

69.    Trouvain further noted that because BLMIS acted as the Oreades Fund's custodian, broker-dealer, and investment manager, it did not meet the CSSF's requirements that it be registered and disclosed to investors:

> if there is a management problem with [BLMIS], the entire responsibility would lie … in the last resort, with the promoter, namely BNP Paribas private bank" since "[i]n the eyes of the CSSF, B. Madoff does not exist."

70.    Trouvain also expressed concern about the location of the securities being held on behalf of the Oreades Fund's shareholders:

> I get the impression that Bernard Madoff is not a bank and I would therefore like to know where the US Treasury Bills held in the Oreades USD and EUR portfolios are held.  The same thing for the futures positions, who is the clearing broker used and in what establishment are the contracts recorded?

71.    In August 2003, Trouvain and other employees at the BNP Companies met with AIA's management to discuss whether it was possible to bring their expanding relationship with BLMIS into standard compliance with the BNP Companies' internal rules.  According to meeting minutes, BLMIS's hidden role as both custodian and investment adviser for the Oreades Fund was "unconscionable" and violated the BNP Companies' internal "security rules" and Luxembourg law.  As such, the BNP Companies wanted "to be released from liability it ha[d] incurred as a 'sponsor' (initiator of the creation) manager, and custodian of the fund."

72.    Communicating through AIA, the BNP Companies requested that Madoff allow it to disclose him to the CSSF, but Madoff refused.  AIA told the BNP Companies that Madoff's refusal stemmed in part from the fact that BLMIS was not registered as an investment adviser in the United States and deliberately wanted to avoid regulatory scrutiny.

73.    One employee at the BNP Companies warned that "if the CSSF asks me about the precise role of Inter Conseil and of BNP in Oreades [Fund], I will have to tell the truth."

74.     As an alternative, the BNP Companies requested that BNP Paribas Securities Services or AIA be able to confirm the validity of BLMIS's purported trades with real-time access to BLMIS's trade confirmations.   Madoff refused.   By November 2003, the BNP Companies were deliberately measuring the liability they could face as the Oreades Fund's sponsor, administrator, and custodian "in the event of a default on the part of Madoff."

75.     Ultimately, the BNP Companies decided to close the BLMIS accounts and liquidate the Oreades Fund because of the high probability of fraud at BLMIS and its fear that, due to its subsidiaries' roles as purported administrator, purported custodian, and sponsor to Oreades Fund, it could be held liable to the CSSF or Oreades Fund's investors.   In March 2004, BNP Paribas Securities Services closed Oreades Fund's investment accounts with BLMIS.   In May 2004, the BNP Companies, through Inter Conseil, placed the Oreades Fund into liquidation in Luxembourg.

76.     Years later, in January 2008, an employee of AIA recounted the story behind the BNP Companies' liquidation of the Oreades Fund, stating that the BNP Companies did not want to be liable to the Oreades Fund's investors and believed it had to "destroy [the Oreades Fund] or take it over."

### 3.     Other Key Individuals Raised Similar Concerns About The BNP Companies' Investments With BLMIS And The BLMIS Feeder Funds

77.     At the time the BNP Companies closed the Oreades Fund, other key individuals at the BNP Companies were rejecting investments with BLMIS and the BLMIS feeder funds.

78.     For example, Mr. Paolo Gianferrara, a senior executive within the BNP Companies, would not approve any transactions with the BLMIS feeder funds for private banking clients.   Gianferrara served as the Head of Hedge Funds for BNP Paribas Private Wealth in Paris and Geneva, from 2000 to 2006.   According to FGG, Gianferrara was "the gate keeper"

for the BNP Companies' private banking business.  In trying to meet with Gianferrara, Fairfield employees discussed how Gianferrara "hate[d]" Madoff and "BNP always had a problem with Madoff," as well as how the BNP Companies' private banking business would "not even consider[]" investments in FGG's Madoff-related funds.

79.    Additionally, Fauchier Partners, a partner to the BNP Companies, refused to invest with BLMIS or BLMIS feeder funds.

80.    Fauchier Partners was a London-based fund of funds manager that joined with BNP Paribas Asset Management in 2001 to create BNP Paribas Fauchier Partners Ltd.  This joint venture was designed to combine the distribution capacity of BNP Paribas Asset Management with the investing expertise of Fauchier Partners.

81.    Fauchier Partners was founded by Mr. Patrick Fauchier, who also oversaw the BNP Paribas Hedge Fund Centre, a "leading academic authority and focal point for teaching in the hedge fund arena in Europe" led by BNP Paribas S.A., BNP Paribas Securities Services, and BNP Paribas Asset Management, together with the London Business School.  In June 2008, Fauchier told AIA that he had never invested in a fraud, that his due diligence team required a fund to be "legitimate," and that he had squarely rejected BLMIS.

82.    Fauchier further stated that he was concerned that the SEC would not allow BLMIS to continue as a business and that he, like many others, found it "strange" that Madoff was not paid for managing investments.

83.    Fauchier also flagged that BLMIS's FOCUS reports disclosed only 23 investment accounts, when he, as well as the BNP Companies, knew that Madoff was managing many more than 23 separate accounts.

84.    Indeed, the BLMIS Feeder Funds, from which Defendants themselves received transfers, alone held at least 15 separate investment accounts with BLMIS.

85.    As a member of the BNP Companies' Asset Management Group, Fauchier Partners shared its concerns that Madoff was illegitimate, as well as its prohibitions against investing with Madoff, with other senior officials at the BNP Companies.  On December 17, 2008, the former head of research from Fauchier Partners and a manager at the BNP Paribas Hedge Fund Centre, told the New York Times that SocGen "was not the only financial firm to think Mr. Madoff's unfailing records was too good to be true," and that "experienced people," like the professionals at the BNP Companies who dealt with Madoff-related business, "know there are many ways to provide the kind of return stream offered by Madoff, almost like a bank account, and one of them is a Ponzi scheme."

**4.    The BNP Companies Developed New Madoff Business Despite Known Concerns Raised By Employees Across The BNP Companies**

86.    After winding up the Oreades Fund, BNP Paribas S.A. developed an entirely new business line in which it provided leverage to approximately a dozen domestic and foreign BLMIS feeder funds—including the Fairfield Funds—and their respective investors.

87.    However, unlike in its previous relationship to Oreades Fund, the BNP Companies and their subsidiaries no longer served as fiduciaries to shareholders or investors, allowing the BNP Companies to grow their nascent derivatives business to compete with its rivals while minimizing their risk to fraud.  The BNP Companies repeatedly ignored their own policies and previous concerns over the BLMIS investments—concerns that were, in all cases, plausibly known to the BNP Companies—in order to advance the new business.

88.    The BNP Companies entered into at least three such transactions involving BLMIS feeder funds:

- A multi-million-dollar credit facility to Santa Barbara Holdings Ltd. ("Santa Barbara"), acquired by the BNP Companies' in their purchase of assets belonging to ZCM (the "ZCM Acquisition")—an arm of Zurich Financial, a New York-based firm whose acquisition was previously rejected by the BNP Companies' main competitor, SocGen.

- A replacement line of credit to Legacy Capital (the "Legacy Deal"), previously funded by another of the BNP Companies' competitors, Renaissance Technologies Corp. ("Renaissance").

- A replacement credit facility with Tremont Group Holdings, Inc.'s ("Tremont") Insurance Portfolio Fund (the "Tremont Deal"), previously rejected by yet another of the BNP Companies' competitors, Dresdner Kleinwort ("Dresdner").

89.    On information and belief, the BNP Companies learned of the concerns of its three competitors when it agreed to replace them on the ZCM Acquisition, the Legacy Deal, and the Tremont Deal respectively.

### a.  The ZCM Acquisition

90.    In July 2003, the BNP Companies acquired the Santa Barbara credit facility with the BNP Companies' ZCM Acquisition.

91.    In conducting due diligence for the ZCM Acquisition, the BNP Companies learned that Santa Barbara Holdings was entirely invested in a single-manager BLMIS feeder fund, Harley International Ltd.

92.    As with the Oreades Fund, the ZCM Acquisition contravened the BNP Companies' standard policies—this time not to invest in single-manager funds.

93.    Notwithstanding that policy violation, and the BNP Companies' previous concerns with its BLMIS investments, the respective heads of the BNP Companies' Fund Derivatives Group and the Equities and Derivatives Division, Stephane Liot and Yann Gerardin, proceeded with the purchase.

94.    The BNP Companies hailed the ZCM Acquisition, asserting at the time that it "raised [BNP Paribas] to the position of world leader in the fast-moving fund derivatives market" and responded to "increasingly demanding clients and escalating competition."

95.    On February 27, 2004, the BNP Companies' entered into another credit facility with Santa Barbara.  Mr. Trouvain, who had previously identified warning signs as they related to the Oreades Fund, worked on that transaction.

96.    By contrast, the BNP Companies' chief competitor, SocGen, had previously considered purchasing ZCM but declined to do so based on its own "routine" due diligence of the company; it instead chose to blacklist investments in BLMIS altogether.  Notably, those concerns were specifically known to the BNP Companies when at least one individual at ZCM informed the BNP Companies' executives of SocGen's concerns during negotiations over the ZCM acquisition.

97.    SocGen noted several peculiarities, which were passed on to the BNP Companies:

- On the basis of a chart from the Sentry Fund, that showed investment returns in excess of 8% from 2000 to 2002, it was "readily apparent" such returns were "impossible";

- On the basis of BLMIS's trade confirmations, which the BNP Companies already had, BLMIS purported to consistently buy below a stock's average price and sell above a stock's average price by 50 to 100 basis points, thereby outperforming the market nearly 90% of the time; and

- On the basis of BLMIS's representation that it traded securities throughout a trading day, the average price that BLMIS reported on trade confirmations would have trended toward that stock's midpoint or volume weighted average price.

98.    In addition, SocGen was suspicious that it had never seen BLMIS trading in the options market, in which both it and the BNP Companies were active.  It was also apparently suspicious that BLMIS did not charge customary management or performance fees, forgoing

roughly $300 million at the time.  To resolve its concerns, SocGen sent Madoff a list of questions in advance of an investment strategy meeting with BLMIS, but the meeting was abruptly canceled, and the investment never went forward.

99.    The BNP Companies learned of SocGen's concerns when the BNP Companies agreed to replace SocGen on the ZCM Acquisition shortly after SocGen declined to go forward with that purchase.

### b.  The Legacy Deal

100.    In 2004, the BNP Companies agreed to replace Renaissance on the Legacy Deal, despite the fact that Renaissance's sub-fund, Meritage, had previously entered into and promptly exited a total return swap with Legacy Capital following Renaissance's concerns that BLMIS's returns did not correspond to the volatility of the S&P 100 Index.

101.    In particular, one Renaissance principal found that, "market timing was nearly impossible and that the prices at which BLMIS purportedly bought and sold equities could not be a result of a legitimate trading strategy."

102.    When asked about BLMIS after Madoff's arrest, a Renaissance principal explained that "we couldn't figure out how [BLMIS] was making such consistent returns. It just didn't make sense" and that "[a]nyone could have looked and seen that something was screwy."

103.    The BNP Companies learned of Renaissance's concerns when it agreed to replace Renaissance on the Legacy Deal shortly after Renaissance declined to go forward.

### c.  The Tremont Deal

104.    In March 2005, the BNP Companies stepped in to replace yet another competitor, Dresdner, who had explored entering a credit facility with Tremont, a fund that invested in BLMIS.

105.    Ultimately, Dresdner became "concern[ed] … about Madoff," asking:    (a) whether BLMIS segregated its investment accounts; (b) whether an independent, third-party verified the assets held by BLMIS; (c) how BLMIS received compensation for its roles with respect to Tremont's investments; and (d) about Madoff's secrecy regarding BLMIS's operations.

106.    The BNP Companies learned of Dresdner's concerns when it agreed to replace Dresdner on the Tremont Deal shortly after Dresdner declined to go forward.

107.    In particular, at least one employee at the BNP Companies reached out to Madoff directly to request account statements that BNP Paribas required under the credit facility.    In February 2006, May 2006, August 2006, September 2006, January 2007, December 2007, and March 2008, multiple employees at the BNP Companies contacted Tremont to request BLMIS account statements it was supposed to—but had not—received.

**5.    The BNP Companies Continued To Disregard The Risks Of Investment In BLMIS**

108.    Notwithstanding the mounting evidence of fraud, the BNP Companies continued to ignore the warning signs, violating other internal policies and procedures designed to prevent and rout out such fraud.

109.    The Fund Derivatives Group's due diligence team was typically charged with conducting due diligence on fund managers referenced in an ongoing or potential transaction. The due diligence team's standard operating procedure was to collect all relevant public documents, financial documents for the preceding five years, offering memoranda, subscription agreements, account statements, trade confirmations, and all other documents relating to the fund manager's investment strategy.

110. When the transaction would result in significant exposure to BNP Companies, it was standard operating procedure for the due diligence team to conduct on-site visits and memorialize the information learned from them in a memorandum. On-site visits were important because the visits led to increased transparency into the operations and strategy of the underlying fund manager.

111. The Fund Derivatives Group's due diligence team tracked BNP Companies' exposure to different fund managers through a periodic report called the "Heat Map." The Heat Map ranked fund managers according to a risk score assigned by the due diligence team.

112. Madoff was always listed at the top of the Heat Map because BNP Companies' exposure to Madoff was significantly higher than to any other fund manager. With respect to Madoff-related transactions, however, senior management within the Fund Derivatives Group instructed the due diligence team not to contact Madoff or anyone from BLMIS to arrange an on-site due diligence visit.

113. The Fund Derivatives Group apparently made only one site visit to BLMIS, which occurred in March 2008—years after the ZCM acquisition—and no on-site memorandum was ever drafted to memorialize the visit, as was the typical practice.

114. Just prior to the collapse of the Madoff fraud, two other incidents occurred suggesting employees at the BNP Companies intentionally avoided learning the truth.

115. First, in December 2007, when BNP Paribas was negotiating an option agreement referencing a feeder fund, it was instructed by HSBC Bank USA, N.A. to delete any references to Madoff or BLMIS—and complied with the request. Such a reference could, to a savvy investor, suggest potential impropriety that would make it difficult to finalize the agreement.

The most natural inference from this decision to remove the reference is that the BNP Companies shared HSBC Bank's concerns.

116.    Second, in September 2008, Mr. Guy de La Tour du Pin Verclause of AIA asked BNP Paribas S.A. subsidiary, FundQuest, to remove any reference to Bernard Madoff from its marketing materials for Luxalpha since public disclosure of Madoff's role in Luxalpha was a "very sensitive subject for us."  FundQuest complied and deliberately destroyed other marketing material.  Verclause's statement suggests that Luxalpha's investors would balk at the notion that Madoff was involved with the fund.  That FundQuest acceded to the request to remove that reference suggests they agreed with Verclause's conclusion.

**E.    The Beneficial Owners Had The Same Knowledge As BNP Paribas Cayman**

117.    BNP Paribas Cayman served as trustee, agent, representative, nominee or custodian for the Beneficial Owners in connection with their investments in the Funds, including, by:  subscribing to Shares of Sentry on behalf of the Beneficial Owners, maintaining custody of the Shares as record shareholders, paying redemption proceeds from the Shares of Sentry to the Beneficial Owners, and otherwise exercising control over the Shares of Sentry.

118.    Further, each of the Subscription Agreements, executed by BNP Paribas Cayman, manifested the Beneficial Owners' consent for BNP Paribas Cayman to act on behalf of and subject to the Beneficial Owners' control.  And in executing the Subscription Agreements, BNP Paribas Cayman accepted and agreed to act on behalf of the Beneficial Owners.

119.    Accordingly, the Beneficial Owners had the same knowledge as BNP Paribas Cayman regarding all relevant matters relating to BLMIS and the Funds' Net Asset Values at all relevant times.

120.    But in the alternative, both the Funds' Articles of Association as well as each of

the Subscription Agreements provide that it is the registered shareholders that are to be treated as

the parties to the Funds' Articles.

121.    Article 8 of the Funds' Articles provides that "The Company shall be entitled to

treat the registered holder of any share as the absolute owner thereof and accordingly shall not be

bound to recognise an equitable or other claim to, or interest in, such share on the part of any

other person."

122.    Paragraph 27 of the Subscription Agreements similarly provides that "If

Subscriber is subscribing as trustee, agent, representative or nominee for another person (the

'Beneficial Shareholder'), Subscriber agrees that the representations and agreements herein are

made by Subscriber with respect to itself and the Beneficial Shareholder.  Subscriber has all the

requisite authority from the Beneficial Shareholder to execute and perform the obligations

hereunder."

123.    Together, these contractual provisions bind the Beneficial Owners to BNP Paribas

Cayman's bad faith on all relevant matters relating to BLMIS and the Funds' Net Asset Values at

all relevant times.

**F.    Citco Did Not Issue Any Certifications Of Net Asset Value In "Good Faith"**

124.    Article 11 of the Funds' Articles provides that "[a]ny certificate as to the Net

Asset Value per Share … given in good faith by or on behalf of the Directors shall be binding on

all parties."  During the relevant period, statements of the Net Asset Value were issued by the

Funds' administrators, Citco Fund Services (Europe) B.V. and its delegatee Citco (Canada) Inc.

(the "Administrators").  On April 16, 2014, the Judicial Committee of the Privy Council (the

"Privy Council") issued a decision in which it held that certain statements of Net Asset Value, in

particular, certain monthly emails, contract notes, and monthly account statements issued by the

Administrators, constituted "certificates" for the purposes of Article 11 (the "<u>Certificates</u>").   The

Privy Council did not, however, address whether such Certificates were given "in good faith."  In

carrying out this responsibility, the Administrators and affiliated Citco companies within Citco

Group Limited (collectively, "<u>Citco</u>") acted with a lack of good faith in giving the Certificates.

125.    Over the course of fifteen years, in its capacity as service providers to the Funds,

Citco reviewed information concerning BLMIS not available to the general public, and

expressed internal alarm about what that information showed with respect to the likelihood of

fraud at BLMIS, but turned a blind eye to the reality reflected in the information and instead

proceeded with issuing the Certificates as if there were no problem.

126.    So grave were the Administrators' internal concerns that they expressed doubts—

many years before the fraud was made public—that the Funds' assets with BLMIS even existed,

with one employee stating "I will not change my [opinion] as long as I [do] not see evidence that

the portfolio exists."  The Administrators also expressed repeated concern over the fact there was

no segregation of duties at BLMIS—*i.e.*, BLMIS (i) had discretion over which investments to

make and when to make them, such that BLMIS was de facto investment manager, (ii) had actual

custody of the Funds' assets, such that BLMIS was de facto custodian, and (iii) was also the

broker.   Based upon the proprietary information they reviewed, Citco expressed concern—

internally—that BLMIS would be a repeat of the notorious Manhattan Investment Fund fraud of

the 1990s "multiplied by a factor of five."   Ultimately, unable to resolve their grave concerns,

Citco, rather than withdrawing, ceasing to issue Certificates, or sounding a public alarm, made a

corporate decision to continue on as service providers—in exchange for an 800% increase in

fees.

1.    **Citco Expressed Doubt As To Whether The Funds' Assets At BLMIS Even Existed**

127.    Beginning in 2000, the Administrators ran into trouble with the basic task of verifying the existence of the Funds' assets with Madoff.  Initially, Citco expressed serious concerns regarding whether the Funds' Treasury bond transactions actually matched those transactions reported by Madoff because of an apparent "rhythm of trading" each month.  The rhythm of trading within Sentry's portfolio appeared too consistent to be true, as the assets included only a limited number of Treasury bonds by each month's end.  At the beginning of each month, Madoff would purchase shares and put options and would sell call options, but, like clockwork, would then liquidate all of Sentry's holdings by the 20th of each month.  Thus, the Administrators wanted to check whether the Treasury bonds even existed at all.

128.    The Administrators could not verify the existence of the assets because the Funds' custodians, Citco Bank Nederland N.V. Dublin Branch and Citco Global Custody (the "Custodians"), did not actually hold them.  Instead, Madoff served as his own custodian.  Therefore, the custody statements that the Custodians were supposed to generate based on assets in their possession, were instead merely copied, or "shadow book[ed]," from BLMIS account statements.  The Custodians were "only the custodian[s] on paper, not in reality" and did not place any trades for the Funds.

129.    Management within Citco, including Ruud Bodewes ("Bodewes"), the head of internal audit for all of Citco Group, and Ger Jan Meijer ("Meijer"), the head of internal audit for the Administrators, expressed concern about the operations at BLMIS.  In May 2000, Bodewes expressed his concern to the general counsel and manager of Citco Bank Nederland, as well as Meijer, that "[w]ith [the] Manhattan [Investment Fund fraud] in the back of our minds, we, as Citco, may very well be in a potential dangerous situation, since we do not seem to have an

independent source to verify the information from BLMIS." Indeed, Meijer had raised these concerns to Bodewes weeks earlier, warning that Madoff could be "a Manhattan multiplied by a factor of five."

130.    In addition to warning Bodewes, Meijer also warned Citco Group's Chief Executive Officer, Christopher Smeets ("Smeets") in May 2000 that "[t]o not react or to react too late does indeed mean that investors once again faithfully deposit tens of millions of USD in the Madoff well (for which we do not know if there is a bottom to it) at month's end," with the understanding that Citco could "already be held personally responsible insofar as we have allowed the subscriptions to take place as of May without a fight." Smeets acknowledged receipt of Meijer's emails and concerns. At that time, Meijer emphasized that "with the current knowledge and Citco as asset protector, Citco has a legal obligation to obtain more assurance" of the Funds' assets.

131.    However, in what became a familiar pattern, Citco turned a blind eye to the documents and information in their possession. Citco Group did not address the Administrators' concerns raised in May 2000, and a few months later, Meijer stated: "[i]t seemed that this affair [was] being put on the back burner and hushed."

132.    A year later, Meijer again reiterated his concerns about BLMIS's operations, which "remain[ed] unsolved." Meijer warned that "Citco has a risk exposure of more than USD3 billion" and that "[p]robably there are no options to restore this situation from a worst case scenario." He stated: "I will not change my [opinion] as long as I [do] not see evidence that the portfolio exists." Five months later, in January 2002, the Administrators again emphasized that the issues concerning BLMIS posed severe risks to Citco and the Funds' investors. Meijer told Bodewes: "I have been worried about this situation for 2 years (including

the risk to the continued existence of Citco), however the same was not taken seriously by certain gentlemen…. My intuition (combined with the business that I have seen) tells me that things are not right."

133.    In January 2002, Meijer insisted to Bodewes that: "Citco must now seriously take the possibility that everything is really wrong with [the Funds'] account, as well as the possibility that everything will come into view within 2 years…. Personally I think the chance [that something is wrong] is at least 50%." Meijer persisted that there was "still the opportunity to more or less direct the whole process, and search out the best way out with the help of good lawyers (legal contingency plan). Otherwise you run the risk that the scene will later be determined by others." However, in response Citco Group's management, and Bodewes in particular, failed to undertake a meaningful investigation into Meijer's doubts regarding the existence of the Funds' assets, and instead continued acting as a service provider for the Funds for over six more years.

134.    In fact, multiple members of the Administrator's management tried to prevent Meijer from asking questions. John Verhooren ("Verhooren"), a member of Citco's administration services management team, actually knew that Meijer had raised concerns about the existence of the Funds' assets for years, but deliberately ignored those concerns. For example, in May 2000, Verhooren acknowledged that the lack of segregation of duties and trading patterns at Madoff were not new discoveries, and many people at Citco had already recognized these phenomena. Later, in response to concerns raised in 2001, Verhooren again rebuffed Meijer's insistence that Citco was facing "an enormous risk exposure." Instead, Verhooren told Meijer to stop raising the issue and claimed that Citco would try to meet with

Madoff to investigate. However, neither Verhooren nor any member of the Administrator's staff ever gained sufficient evidence that the Funds' assets existed from Madoff.

### 2.    Citco Failed To Obtain Evidence Of The Existence Of The Funds' Assets

135.    Citco not only expressed internal concern regarding whether the Funds' assets with BLMIS even existed—it knew that BLMIS would not confirm their existence for Citco as the Funds' service providers.

136.    The Administrators' audit reports designated Sentry as a non-compliant fund on their "watch list" as a result of the lack of segregation of duties at BLMIS. Each year from 2000 through 2006, the Administrators recommended that Citco either confirm the existence of the Funds' assets held by BLMIS or resign as service providers. On three occasions between May 2000 and December 2002, Citco attempted to verify the existence of the Funds' assets at BLMIS. All attempts failed.

137.    In May 2000, Citco set up a meeting with Madoff to gain "independent confirmation of the[] existence" of the Funds' assets, particularly the Treasury bills, and to determine how Madoff derived share prices from the markets. However, this effort failed. BLMIS did not verify the existence of the assets, and Citco concluded internally that the meeting had not provided "a full disclosure of [the] assignment."

138.    In July 2001, Bodewes had attempted to assess the concerns raised by Meijer in an internal due diligence memorandum. However, Bodewes's due diligence was limited to a review of Citco's proprietary documents because Citco was concerned that permitting "an on-site audit at [BLMIS] premises may hurt the relationship with [the Fund], resulting in a possible loss of [a] USD 1.5 million dollar fee income." Even so, based on the documents and information in Citco's possession, Bodewes shared Meijer's concerns about BLMIS's operations, and concluded that losses at BLMIS could be hidden, leaving Citco ultimately liable to the Funds'

shareholders.  Bodewes also noted that the two-man audit firm used by BLMIS did not "match up" with the size of BLMIS's business.  Indeed, multiple Administrator employees acknowledged that the small size of Madoff's accounting firm posed a risk, given that the size of the firm was not large enough to audit the amount of assets purportedly managed by BLMIS.

139.    Smeets, Citco Group's CEO, received Bodewes' memo regarding the issues at BLMIS, including the issues posed by the size of Madoff's audit firm.  Citco Group's management responded that they would like to "work this out" with Madoff, but never met with him in 2001.  By an email dated 6 February 2002, Unternaehrer of Citco Group stated that Citco wanted evidence the T Bills existed.  In December 2002, Citco once again "attempt[ed] to get conclusive proof" from Madoff that Sentry's portfolio was in BLMIS custody and to have "Madoff … provide evidence of the existence/custody of the positions."  Before the meeting, Meijer directed a member of the internal audit group at Citco to "[p]roperly record what you have done and what you have not been able to determine…. It is a troublesome task insofar as Madoff is not known for his openness."  However, the meeting did not include any meaningful discussion with Madoff regarding the holdings purported to be in his custody.  The employee, Albert van Nijen, reported back that the Administrators' "mission" to increase "Citco's comfort level with respect to the existence of the assets in relation to [Citco's] responsibilities as Custodian[s]" had again failed.  On 27 December 2002 Bodewes reported to the executive committee of Citco Group that as long as the position of Sentry with BLMIS was not independently verified "there will be doubts."

140.    After Citco's third failed attempt, Citco never again tried to gain evidence from Madoff that the Funds' assets existed until his fraud was ultimately exposed in December 2008.  In addition, Meijer noted that "Madoff [was] no[t] known" to Citco's external traders, even

though his investment strategy required selling major quantities of call options each month.  In an email to Bodewes, Meijer stated, "I visited the Madoff website…. According to the investment policy, the fund needs to sell major quantities of call options on the market each month.  I absolutely do not trust it!!!!"

141.    Meanwhile, through the entire period, Citco continued to issue the Certificates.

**3.    Citco Negotiated For Higher Fees As Reimbursement For The "Risks" Of Doing Business With Madoff**

142.    Facing grave concerns regarding the Funds' assets placed with BLMIS, Citco put its financial interests ahead of its duties to the Funds and the Funds' investors.

143.    By 2002, Citco knew that the Funds' holdings could not be verified, knew that BLMIS cleared its own trades, and knew that Citco's efforts to reconcile Madoff's operations had failed.  That year, Citco's executive committee put credit line requests from the Funds "on hold until … the 'investigation' on Fairfield" was complete, because Citco was concerned about its exposure to liabilities well beyond the loans in the case of fraud.  Smeets and Citco's management were aware that the credit line requests were on hold while Citco tried to "get as much comfort as possible" that BLMIS was not a fraud.

144.    Two years later, in February and March 2004, the Custodian decided to cancel one of its credit facilities with Sentry following its discovery that AIG had pulled its investments from BLMIS altogether.  Specifically, the Administrator's management, including Meijer, Verhooren, and William Keunen—who was responsible for the entire division of administration services at Citco—found out that "the risk team of AIG took the decision to get out from all Madoff exposure … [t]hey are scared with the structure …."  It appears that at least some Citco Group management wanted the Custodian to resign:  by an email of 6 February 2004, Keunen informed the Administrator that Unternaehrer of Citco Group had decided the Custodian should

step down as custodian.  At this time, Smeets was kept informed and aware of Citco's concerns regarding AIG's withdrawal from Madoff.  A few months later, in or about September 2004, Citco's board of directors made the decision to place the Custodians' and Administrators' business with the Funds "under scrutiny" and "to close down all credit relationships … to decrease [Citco's] exposure."  Citco knew that its credit relationship with the Funds would expose it to liability because of BLMIS's role as custodian, among other reasons.

145.    By 2006, Citco considered resigning as service providers.  The Custodians told Citco Group's management, including Smeets:  "We are taking a risk and we only get US$60K per year!"

146.    Instead, Citco negotiated a new fee arrangement. The new arrangement calculated the Custodians' rate as one basis point (one hundredth of one percent) of the Funds' total Net Asset Value.  In other words, Citco's fees for the Custodians' services were now directly tied to the Net Asset Value as determined by the Administrators.  Citco decided "[o]n that basis" to stay on as Custodians because Sentry's Net Asset Value at that time, based principally on the assets purportedly at BLMIS, was approximately "$5bn, i.e., fees of $500k."

147.    Simply put, Citco accepted dramatically higher fees—tied directly to the Net Asset Value certified by Citco—in exchange for the risks to Citco of doing business with BLMIS, as well as its continued silence regarding BLMIS's role as custodian of the Funds' assets.  Ultimately, Citco's fees increased by 800%.

148.    Internally, Citco knew that: (i) the Administrators did not consistently price the Funds' portfolios independently and typically relied exclusively on the share pricing information supplied by Madoff; and (ii) the Custodians did not have custody of the Funds' portfolios.

149.    Citco failed to verify the pricing information for the Funds' portfolio from independent sources and instead relied on BLMIS statements, even though it knew that such account statements contained incorrect information.  Accountants working for the Administrators discovered on numerous occasions that the trades reported by BLMIS contradicted the public daily price ranges for corresponding trades.  When the Administrators' personnel discovered that the reported share or option prices reported by Bloomberg and Madoff differed, they used the public price in calculating the Net Asset Value reflected in the Certificates.  Citco thus turned a blind eye to its knowledge that BLMIS issued account statements with incorrect pricing information.

150.    Citco acted with a lack of good faith by issuing Certificates in spite of its knowledge that: (1) BLMIS's transactions were likely impossible, given its awareness that "Madoff always [knew] precisely when to buy and sell;" (2) Madoff was the only broker-dealer Citco worked with that provided settlement date transaction confirmations only, rather than trade date confirmations; and (3) Madoff insisted that Citco book all trades for the Funds manually, rather than through automated or electronic means, which directly contradicted Citco's own "policy to set up [electronic] reconciliation programs for each fund and to avoid manual entries as much as possible;" and, within its own records, "there [were] differences between the custody statements of Citco Bank and Madoff that [were] not being analyzed" by Citco.

151.    This lack of good faith permeated the entire Citco organization.  Until 2008, the Administrators and the Custodians worked hand-in-hand with multiple other "Citco" entities to generate the Certificates for the Funds and served as the intermediaries for all subscription funds invested by Defendants under the Subscription Agreements.  Under Citco Group's direction and

control, the Administrators issued Certificates without good faith and with willful blindness to the fact that they could not confirm whether the Funds' assets actually existed.

152.    From the top down, Citco saw and appreciated, but consciously disregarded, the risks to the Fund's investors posed by Madoff's operations.  The Administrators and all other "Citco" subsidiaries served at the whim of Citco Group, which controlled the day-to-day operations of the Administrators and the issuance of Certificates showing an inaccurate and inflated Net Asset Value under the Administration Agreements (as amended from time to time) with the Funds.  Irrespective of which "Citco" entity the Funds' engaged, at all relevant times the Funds' were provided services from and on behalf of "Citco" as a whole from at least eight separate entities, including: Citco Group; Citco Global Custody NV; Citco Global Custody (NA) NV; CGC (NA); Citco Fund Services (BVI); Citco Fund Services (Europe) B.V.; Citco (Canada) Inc.; and Citco Global Security Services.

153.    By virtue of the foregoing conduct, Citco issued the Certificates without good faith.  The Funds were the primary victims of Citco's conduct and its lack of good faith in issuing the Certificates.

## G.    **Exposure Of Madoff's Fraud**

154.    On December 11, 2008, federal agents arrested Madoff for violation of federal securities laws.  On that same day, the United States Attorney brought criminal charges against Madoff, alleging that Madoff ran a multi-billion dollar Ponzi scheme.  *See United States v. Madoff*, No. 08-mj-2735 (S.D.N.Y., filed Dec. 11, 2008).  Upon arrest, Madoff was reported to have told the agents that "there is no innocent explanation" for the fraudulent scheme he had orchestrated and confessed that he "paid investors with money that wasn't there."

155.    On December 11, 2008, the United States Securities and Exchange Commission ("SEC") filed an emergency action in the Southern District of New York to halt ongoing

fraudulent offerings of securities and investment advisory fraud by Madoff and BLMIS. *See SEC v. Madoff*, No. 08-cv-10791 (S.D.N.Y. filed Dec. 11, 2008). On February 9, 2009, the SEC submitted to the Court a proposed partial judgment, to which Madoff consented, imposing a permanent injunction and continuing relief against him, including a permanent freezing of his assets.

156.    In March 2009, Madoff pleaded guilty to the criminal charges brought against him.  In his plea allocution, Madoff confessed: "for many years up until my arrest on December 11, 2008, I operated a Ponzi scheme through the investment advisory side of my business, Bernard L. Madoff Securities LLC."  As Madoff himself described how the scheme worked:

> The essence of my scheme was that I represented to clients and prospective clients who wished to open investment advisory and individual trading accounts with me that I would invest their money in shares of common stock, options and other securities of large well-known corporations, and upon request, would return to them their profits and principal.  Those representations were false because for many years up and until I was arrested on December 11, 2008, I never invested those funds in the securities, as I had promised.  Instead, those funds were deposited in a bank account at Chase Manhattan Bank.  When clients wished to receive the profits they believed they had earned with me or to redeem their principal, I used the money in the Chase Manhattan bank account that belonged to them or other clients to pay the requested funds.

157.    Madoff further confessed to covering up his fraud by fabricating false trade confirmation and account statements:

> To further cover-up the fact that I had not executed trades on behalf of my investment advisory clients, I knowingly caused false trading confirmations and client account statements that reflected the bogus transactions and positions to be created and sent to clients purportedly involved in the split strike conversion strategy, as well as other individual clients I defrauded who believed they had invested in securities through me. The clients receiving trade confirmations and account statements had no way of knowing by reviewing these documents that I had never engaged in the transactions represented on the statements and confirmations.

158.    Madoff is now serving a 150-year sentence in federal prison.

### H.    The Funds' Estates In Liquidation

159.    Following the revelation of Madoff's fraud, the Funds' boards of directors suspended any further redemptions of Shares and the calculation of the Funds' Net Asset Values. As of December 2008 and presently, Sentry, Sigma, and Lambda had, respectively, approximately 4.7 million, 3.9 million, and 0.2 million shares outstanding.

160.    In 2009, the Funds were put into liquidation proceedings in the BVI.

161.    On February 27, 2009, a secured creditor of Lambda commenced proceedings in the BVI Court pursuant to the BVI Insolvency Act seeking the appointment of a liquidator over Lambda (the "Lambda Proceeding"). The Lambda Proceeding is pending in the BVI Court as claim number BVIHC(COM)2009/74.

162.    On April 21, 2009, ten shareholders applied to the BVI Court for the appointment of a liquidator over Sentry (the "Sentry Proceeding"). The Sentry Proceeding is pending in the BVI Court under claim number BVIHC(COM)2009/136.

163.    On April 23, 2009, a shareholder applied to the BVI Court for the appointment of a liquidator over Sigma (the "Sigma Proceeding" and collectively with the Lambda Proceeding and the Sentry Proceeding, the "BVI Liquidation Proceedings"). The Sigma Proceeding is pending in the BVI Court under claim number BVIHC(COM)2009/139.

164.    As alleged above, the BVI Court issued orders – the BVI Appointment Orders – appointing the Foreign Representatives as liquidators of the Funds. Pursuant to the BVI Appointment Orders, the Foreign Representatives are responsible for all aspects of the Funds' business, including protecting, realizing, and distributing assets for the Funds' estates.

165.    The Redemption Payments that were made to Defendants were mistaken payments and constituted or formed part of avoidable transactions, and generally represent assets of Sentry's estate that Defendants are not entitled to keep.

## FIRST CLAIM
### *(Constructive Trust - Against all Defendants)*

166.    Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 165 above as if set forth herein.

167.    In this Court's December 6, 2018 Memorandum Decision, the Liquidators were "granted leave to amend to assert constructive trust claims against Knowledge Defendants." Dkt. 1743 at 65.  The Court clarified that the Liquidators could establish a constructive trust with respect to "the Knowledge Defendants that received redemption payments with the knowledge that the NAV was wrong."  *Id*. at 38.  The Court further recognized that "[u]nder BVI law, lack of good faith, i.e. bad faith, includes wrongdoing by one who acts recklessly as well as one who acts with actual knowledge that he is acting wrongfully or willfully blinds himself to that fact." *Id.* at 23–24.

168.    As detailed above, upon receipt of a redemption request, Sentry made each of the Redemption Payments to BNP Paribas Cayman.   The Redemption Payments generally represented the proceeds arising from what the world now knows was Madoff's Ponzi scheme. Accordingly, these Redemption Payments did not, as Sentry mistakenly believed, represent the proceeds arising from the profitability of (or continued investment in) BLMIS.

169.    Instead, the Redemption Payments were based on a miscalculated and inflated Net Asset Value, which caused those Redemption Payments to be in excess of the Net Asset Value of redeemed Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

170.    At the time of the Redemption Payments, BNP Paribas Cayman had knowledge of the Madoff fraud, and therefore knowledge that the Net Asset Value was inflated.  Between 1997

and 2008, BNP Paribas Cayman ascertained multiple indicia of fraud through its affiliate BNP Securities Services, with whom it worked on the Fund Derivatives Group, as well as through general information sharing amongst the Groups and Committees in which BNP Paribas Cayman participated, leading it to believe that BLMIS was a fraud, and, therefore, that the Net Asset Value could not be accurate.

171.    *First*, Lionel Trouvain, a senior executive at BNP Securities Services, raised concerns about the propriety of the BNP Companies' involvement with and administration of the Oreades Fund, because it was impossible to validate the trades and violated the BNP Companies' internal policies restricting investment in single-manager funds.    Thereafter, the BNP Companies' liquidated the Oreades Fund.    Upon information and belief, BNP Paribas Cayman was aware of that decision to exit the Madoff business.

172.    *Second*, other key employees voiced concerns similar to what individuals like Trouvain had expressed.    These included Gianferrara—the former Head of Hedge Funds for BNP Paribas Private Wealth—who "hate[d]" and would "not even consider[]" investments in FGG's Madoff-related funds as well as Fauchier—the founder of Fauchier Partners and a joint partner of BNP Paribas Asset Management—who declined to invest in BLMIS because he did not believe it to be "legitimate."

173.    *Third*, in spite of their concerns, the BNP Companies decided to enter into a new line of business, this time as a non-fiduciary, providing leverage to BLMIS feeder funds and investors.    In the process of conducting due diligence for at least three of those transactions, the BNP Companies would have learned that their direct competitors had declined to pursue those same transactions out of concerns about Madoff.

174. *Fourth*, the BNP Companies continued to willfully turn a blind eye to the fraud risk by repeatedly ignoring their own internal policies and procedures designed to avoid and rout out potential fraud.

175. Accordingly, at all relevant times, BNP Paribas Cayman had actual knowledge of, was willfully blind to, or recklessly disregarded the fact that the NAV was inflated when it received the Redemption Payments.

176. Upon information and belief, BNP Paribas Cayman may have paid some or all of the Redemption Payments it received to the Beneficial Shareholders.

177. By reason of their receipt of some or all of the Redemption Payments, Defendants have been unjustly enriched to the detriment of Sentry and other shareholders and creditors of Sentry.

178. Furthermore, Defendants were not entitled to receive the Redemption Payments because the amounts transferred with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payment received by BNP Paribas Cayman for its redemption of Shares to be in excess of the Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

179. It would offend principles of equity and good conscience to permit Defendants to retain the Redemption Payments.

180. By reason of the foregoing, a constructive trust should be imposed on the Redemption Payments that were received by Defendants from Sentry for the benefit of the Foreign Representatives and Sentry and other shareholders and creditors of Sentry.

## SECOND CLAIM
### (Unfair Preference Pursuant to Section 245 of the BVI
### Insolvency Act - Against BNP Paribas Cayman)

181.    The Foreign Representatives, in their capacities as Foreign Representatives and

liquidators of Sentry, repeat and allege again the allegations contained in paragraphs 1 through

180 above as if set forth herein.

182.    Section 245 of the BVI Insolvency Act provides:

(1) Subject to subsection (2), a transaction entered into by a company is an unfair
preference given by the company to a creditor if the transaction (a) is an
insolvency transaction; (b) is entered into within the vulnerability period; and
(c) has the effect of putting the creditor into a position which, in the event of the
company going into insolvent liquidation, will be better than the position he
would have been in if the transaction had not been entered into.

(2) A transaction is not an unfair preference if the transaction took place in the
ordinary course of business;

(3) A transaction may be an unfair preference notwithstanding that it is entered
into pursuant to the order of a court or tribunal in or outside the Virgin Islands.

(4) Where a transaction entered into the by the company within the vulnerability
period has the effect specific in subsection 1(c) in respect of a creditor who is a
connected person, unless the contrary is proved, it is presumed that the transaction
was an insolvency transaction and that it did not take place in the ordinary course
of business.

183.    A creditor is defined in Section 9 of the BVI Insolvency Act as follows:

(1) A person is a creditor of another person (the debtor) if he has a claim against
the debtor, whether by assignment or otherwise, that is, or would be, an
admissible claim in (a) the liquidation of the debtor, in the case of a debtor that is
a company or a foreign company; or (b) the bankruptcy of the debtor, in the case
of a debtor who is an individual.

184.    The BVI Insolvency Act further defines an "insolvency transaction" as a

transaction that: "(a) is entered into at a time when the company is insolvent; or (b) … causes the

company to become insolvent."  BVI Insolvency Act § 244(2).

185.    For the purposes of assessing unfair preferences under Section 245 of the BVI Insolvency Act and undervalue transactions under Section 246 of the BVI Insolvency Act, a company is "insolvent" if: "(c) … (ii) the company is unable to pay its debts as they fall due." BVI Insolvency Act §§ 8, 244(3).

186.    For purposes of Section 245 and Section 246 of the BVI Insolvency Act, "vulnerability period" means "in the case of a transaction entered into with, or a preference given to, a connected person, the period commencing two years prior to the onset of insolvency and ending on the appointment of the administrator or, if the company is in liquidation, the liquidator…." BVI Insolvency Act § 244(1).

187.    The "onset of insolvency" is defined as: "the date on which the application for the appointment of the liquidator was filed."  BVI Insolvency Act § 244(1).  Thus, the vulnerability period, for each of the Funds, is the period commencing two years prior to the application for the appointment of the Liquidators for each Fund and ending on the date of the appointment of the Liquidators of each Fund.

188.    A "connected person" is:

(1) … one or more of the following:

(a) a promoter of the company;

(b) a director or *member of the company* or of a related company;

(c) a beneficiary under a trust of which the company is or has been a trustee;

(d) a related company;

(e) another company one of whose directors is also a director of the company;

(f) a nominee, relative, spouse or relative of a spouse of a person referred to in paragraphs (a) to (c);

(g) a person in partnership with a person referred to in paragraphs (a) to (c); and

(h) a trustee of a trust having as a beneficiary a person who is, apart from this paragraph, a connected person.

BVI Insolvency Act § 5 (emphasis added).

189.    Redemption Payments aggregating USD $3,667,293.50 were made by Sentry to BNP Paribas Cayman during the two-year period prior to the application for appointment of the Liquidators of Sentry in the BVI Liquidation Proceedings (the "Sentry Vulnerability Period").

190.    During the Sentry Vulnerability Period, Sentry was insolvent or was rendered insolvent by the making of Redemption Payments.

191.    Each of the Redemptions and/or Redemption Payments made during the Sentry Vulnerability Period ("Vulnerability Period Payments") was an "insolvency transaction" within the meaning of Section 245 of the BVI Insolvency Act.

192.    BNP Paribas Cayman was a shareholder (i.e., a member) of Sentry during the Sentry Vulnerability Period and was, accordingly, a "connected person" as defined in the BVI Insolvency Act.

193.    Each of the Vulnerability Period Payments put BNP Paribas Cayman in a better position than it would have been in had such Payment not been made.

194.    Because BNP Paribas Cayman was a "connected person" as defined in the BVI Insolvency Act, there is a statutory presumption that the Redemptions and/or Vulnerability Period Payments were "insolvency transactions."   Further, even were this not presumed, the Redemptions and/or Vulnerability Period Payments were "insolvency transactions" because at all material times the Funds were insolvent.   This is because the Funds' assets were up to 95% invested with BLMIS and were only able to pay debts falling due either (i) with payments (including fictitious profits) from the Ponzi scheme BLMIS, i.e., using the proceeds of fraud, or (ii) by using incoming subscription monies (as a shortcut for investing those monies and also

withdrawing monies from BLMIS to pay redeemers).  Each time the Funds withdrew monies from BLMIS an equivalent liability immediately arose to the creditors of and investors in BLMIS.  On any commercial basis the Funds were insolvent on a cash flow basis at all material times.

195.    In addition, there is a statutory presumption that the Vulnerability Period Payments were "not made in the ordinary course of any business" of Sentry.  Even were this not presumed, the same would follow in that, among other things, each Vulnerability Period Payment represented a distribution of monies (including fictitious profits) from Madoff's Ponzi scheme or incoming subscription monies (which merely represented a shortcut for investing those monies and also withdrawing monies from BLMIS to pay redeemers), and it was no part of the ordinary course of business of the Funds to invest in and distribute profits of a Ponzi scheme.

196.    Each of the Vulnerability Period Payments was made following receipt by Sentry of a notice of redemption in respect of Shares, which triggered the redemption process under the Articles.  Following the receipt by Sentry of a notice of redemption by BNP Paribas Cayman, BNP Paribas Cayman became a contingent creditor. Upon the subsequent redemption of BNP Paribas Cayman's shares and until such time as BNP Paribas Cayman received the Vulnerability Period Payment, BNP Paribas Cayman was a "creditor" of Sentry with an admissible claim against Sentry in any subsequent liquidation of Sentry had payment of the Redemption Price not been made, albeit that post-liquidation BNP Paribas Cayman would have been deferred to outside creditors.

197.    By reason of the foregoing, the Foreign Representatives, in their capacities as Foreign Representatives and Liquidators of Sentry, are entitled to an order avoiding and setting aside the Vulnerability Period Payments and entitling the Foreign Representatives to recover

51

from BNP Paribas Cayman an amount equal to the Vulnerability Period Payments received by
BNP Paribas Cayman from Sentry.

### THIRD CLAIM
*(Unfair Preference Pursuant to Section 245 of the BVI
Insolvency Act - Against Beneficial Shareholders)*

198.    The Foreign Representatives, in their capacities as Foreign Liquidators of Sentry,
repeat and allege again the allegations contained in paragraphs 1 through 197 above as if set
forth herein.

199.    Upon information and belief, BNP Paribas Cayman may have subscribed to all or
some portion of the Shares issued to it under the Subscription Agreements in the capacity of
trustee, agent, representative, or nominee for the Beneficial Shareholders.

200.    Upon information and belief, BNP Paribas Cayman may have paid to or credited
some or all of the Redemption Payments received by it to accounts of the Beneficial
Shareholders.

201.    To the extent that any money that BNP Paribas Cayman received in connection
with the Vulnerability Period Payments was transferred to the Beneficial Shareholders, the
Foreign Representatives, in their capacities as Foreign Representatives and Liquidators of
Sentry, are entitled to avoid and set aside such further transfer by BNP Paribas Cayman to the
Beneficial Shareholders and to recover from the Beneficial Shareholders an amount equal to any
portion of any Vulnerability Period Payments received by them, and the Foreign Representatives,
in their capacities as liquidators of Sentry, rely on, *inter alia*, section 249(2)(b) of the BVI
Insolvency Act.

**FOURTH CLAIM**

*(Undervalue Transaction Pursuant to Section 246 of the
BVI Insolvency Act - Against BNP Paribas Cayman)*

202.    The Foreign Representatives, in their capacities as Foreign Representatives and

liquidators of Sentry, repeat and allege again the allegations contained in paragraphs 1 through

201 above as if set forth herein.

203.    Section 246 of the BVI Insolvency Act provides that;

(1) Subject to subsection (2), a company enters into an undervalue transaction
with a person if (a) the company makes a gift to that person or otherwise enters
into a transaction with that person on terms that provide for the company to
receive no consideration; or (b) the company enters into a transaction with that
person for a consideration the value of which, in money or money's worth, is
significantly less than the value, in money or money's worth, of the consideration
provided by the company; and (c) in either case, the transaction concerned (i) is
an insolvency transaction; and (ii) is entered into within the vulnerability period.

(2) A company does not enter into an undervalue transaction with a person if (a)
the company enters into the transaction in good faith and for the purposes of its
business; and (b) at the time when it enters into the transaction, there were
reasonable grounds for believing that the transaction would benefit the company.

(3) A transaction may be an undervalue transaction notwithstanding that it is
entered into pursuant to the order of a court or tribunal in or outside the Virgin
Islands.

(4) Where a company enters into a transaction with a connected person within the
vulnerability period and the transaction falls within subsection (1)(a) or
subsection (1)(b), unless the contrary is proved, it is presumed that (a) the
transaction was an insolvency transaction; and (b) subsection (2) did not apply to
the transaction.

204.    During the Sentry Vulnerability Period, all assets purportedly held by BLMIS for

Sentry and other investors were non-existent, and Sentry was insolvent or was rendered insolvent

by the Vulnerability Period Payments, as alleged in paragraph 194 above.  Thus, each of the

Redemptions and/or Vulnerability Period Payments qualifies as an "insolvency transaction"

within the meaning of Section 244 of the BVI Insolvency Act and for purposes of Section 246 of

the BVI Insolvency Act.

205.    Sentry received no consideration for any of the Vulnerability Period Payments, or in the alternative, Sentry received, for each Vulnerability Period Payment, consideration, the value of which, in money or money's worth, was significantly less than the value, in money or money's worth, of the consideration provided by Sentry to BNP Paribas Cayman for each of the Vulnerability Period Payments.

206.    BNP Paribas Cayman was a shareholder (*i.e.*, a member) of Sentry during the Vulnerability Period and was, accordingly, a "connected person" as defined in the BVI Insolvency Act.

207.    Because BNP Paribas Cayman was a "connected person" as defined in the BVI Insolvency Act, there is a statutory presumption that the Redemptions and/or Vulnerability Period Payments were "insolvency transactions."  Further, there is a statutory presumption that the Vulnerability Period Payments were not made in good faith and for the purposes of the Funds' business with reasonable grounds to believe that they would benefit the Funds.  Even were that not presumed, it is in any event clear that the purpose of the Funds was not to invest in and distribute fictitious profits from a Ponzi scheme such as BLMIS.

208.    By reason of the foregoing, the Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry, are entitled to an order avoiding and setting aside the Vulnerability Period Payments and to recover from BNP Paribas Cayman an amount equal to the Vulnerability Period Payments received by BNP Paribas Cayman from Sentry.

### FIFTH CLAIM
*(Undervalue Transaction Pursuant to Section 246 of the*
*BVI Insolvency Act - Against Beneficial Shareholders)*

209.    The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry, repeat and allege again the allegations contained in paragraphs 1 through 208 above as if set forth herein.

210.    Upon information and belief, BNP Paribas Cayman may have subscribed to all or some portion of the Shares issued to it under the Subscription Agreements in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

211.    Upon information and belief, BNP Paribas Cayman may have paid to or credited some or all of the Redemption Payments received by it to accounts of the Beneficial Shareholders.

212.    To the extent that any money that BNP Paribas Cayman received in connection with the Vulnerability Period Payments was transferred to the Beneficial Shareholders, the Foreign Representatives, in their capacities as Foreign Representatives and Liquidators of Sentry, are entitled to avoid and set aside such further transfer by BNP Paribas Cayman to the Beneficial Shareholders and to recover from the Beneficial Shareholders an amount equal to any portion of any Vulnerability Period Payments received by them, and the Foreign Representatives, in their capacities as liquidators of Sentry, rely on, *inter alia*, section 249(2)(b) of the BVI Insolvency Act.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs respectfully request the following relief:

A.    On the First Claim, imposition of a constructive trust on Redemption Payments;

B.    On the Second and Third Claims:

      i.    a declaratory judgment in favor of the Foreign Representatives and against BNP Paribas Cayman and the Beneficial Shareholders that the Redemptions and/or Vulnerability Period Payments constitute Unfair Preferences under Section 245 of the BVI Insolvency Act;

      ii.    judgment pursuant to Section 249 of the BVI Insolvency Act, setting aside and avoiding the Redemptions and/or Vulnerability Period Payments; and

      iii.    judgment pursuant to Section 249 of the BVI Insolvency Act against BNP Paribas Cayman and the Beneficial Shareholders in the amount of the

avoided Vulnerability Period Payments received by them or for their benefit, plus interest;

C.    On the Fourth and Fifth Claims:

    i.    a declaratory judgment in favor of the Foreign Representatives and against BNP Paribas Cayman and the Beneficial Shareholders that the Redemptions and/or Vulnerability Period Payments constitute Undervalue Transactions under Section 246 of the BVI Insolvency Act;

    ii.    judgment pursuant to Section 249 of the BVI Insolvency Act, setting aside and avoiding the Redemptions and/or Vulnerability Period Payments; and

    iii.    judgment pursuant to Section 249 of the BVI Insolvency Act against BNP Paribas Cayman and the Beneficial Shareholders in the amount of the avoided Vulnerability Period Payments received by them or for their benefit, plus interest;

D.    Awarding Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees and accountants' and experts' fees, costs and expenses; and

E.    Granting Plaintiffs such other and further relief as the Court deems just and proper.

Dated: New York, New York
      January 15, 2020

                                  **SELENDY & GAY PLLC**
                                  By: */s/ David Elsberg*

                                  David Elsberg
                                  Caitlin Halligan
                                  Andrew Dunlap
                                  Lena Konanova
                                  Ron Krock
                                  1290 Avenue of the Americas
                                  New York, NY 10104
                                  Telephone: 212-390-9000
                                  E-mail: delsberg@selendygay.com
                                  E-mail: challigan@selendygay.com
                                  E-mail: adunlap@selendygay.com
                                  E-mail: lkonanova@selendygay.com
                                  E-mail: rkrock@selendygay.com

-and-

**BROWN RUDNICK LLP**
David J. Molton
Marek P. Krzyzowski
Seven Times Square
New York, New York 10036
Telephone: 212-209-4800
Facsimile: 212-209-4801
E-mail: dmolton@brownrudnick.com
E-mail: mkrzyzowski@brownrudnick.com

*Attorneys for the Foreign Representatives*

**EXHIBIT A**

*Redemption Transaction Received By Certain Defendants from Sentry*
*From February 15, 2006 Through December 19, 2007*

| Payment Date | Redemption Payment | Number of Shares | Bank Account To Which Redemption Payment Was Made, Per Shareholder Direction[+] |
|---|---|---|---|
| February 15, 2006 | $9,000,000.00 | 8,124.48 | BNP Paribas, New York |
| September 27, 2006 | $806,797.31 | 689.57 | BNP Paribas, New York |
| December 19, 2007 | $3,667,293.50* | 2,845.85 | BNP Paribas, New York |

\* Denotes Redemptions in the Sentry Vulnerability Period.

[+] Whether or not Redemption Payments were ultimately directed to bank accounts in the United States, all Redemption Payments from Sentry went through a correspondent bank account that Sentry's administrator maintained in the United States, and to the extent that any such Redemption Payments were directed outside the United States, they went through a correspondent bank account in the United States identified by shareholders for such payments.