# Exhibit 20

**SELENDY & GAY PLLC**
1290 Avenue of the Americas
New York, NY 10104
David Elsberg
Caitlin Halligan
Andrew Dunlap
Lena Konanova
Ron Krock
212-390-9000

-and-

**BROWN RUDNICK LLP**
Seven Times Square
New York, New York 10036
David J. Molton
Marek P. Krzyzowski
212-209-4800

*Attorneys for the Foreign Representatives*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 15 Case |
| **FAIRFIELD SENTRY LIMITED, et al.,** | Case No. 10-13164 (SMB) |
| Debtors in Foreign Proceedings. | Jointly Administered |
| **FAIRFIELD SENTRY LIMITED (IN LIQUIDATION) and FAIRFIELD SIGMA LIMITED (IN LIQUIDATION),** acting by and through the Foreign Representatives thereof, and **KENNETH KRYS and GREIG MITCHELL**, solely in their capacities as Foreign Representatives and Liquidators thereof, | Adv. Pro. No. 10-03776 (SMB) |
| Plaintiffs, | **PROPOSED FOURTH AMENDED COMPLAINT** |
| -against- | |
| **FORTIS (ISLE OF MAN) NOMINEES LIMITED a/k/a ABN AMRO FUND SERVICES (ISLE OF MAN) NOMINEES LIMITED n/k/a ABN AMRO RETAINED** | |

**NOMINEES (IOM) LIMITED, SEVEN SEAS, LP HEDGE,** )
**PLATINUM ALL WEATHER FUND, ODYSSEY** )
**ALTERNATIVE FUND LIMITED, and BENEFICIAL** )
**OWNERS OF ACCOUNTS HELD IN THE NAME OF** )
**FORTIS (ISLE OF MAN) NOMINEES, 1-1000, including** )
**without limitation BENEFICIAL OWNERS OF** )
**ACCOUNTS ASSOCIATED WITH REFERENCE** )
**IDENTIFIER ABZ** )

                              **Defendants.**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

JURISDICTION AND VENUE .................................................................................................5

PARTIES ....................................................................................................................................9

    A.    Plaintiffs ...................................................................................................... 9

    B.    Defendants ................................................................................................ 12

NOTICE PURSUANT TO FED. R. CIV. P. 44.1 ..................................................................14

FACTUAL ALLEGATIONS ...................................................................................................14

    A.    Role Of Feeder Funds In Madoff Fraud ................................................ 14

    B.    Calculation Of Net Asset Value And Shareholder Redemption Payments .......... 15

    C.    Redemption Payments Made or Transferred to Defendants ................................. 17

    D.    Fortis (IOM) Knew Or, Was Willfully Blind To, Or Recklessly Disregarded The Inflation Of Net Asset Values ................................................................................ 18

        1.    Given Its "One Institution" Approach, Fortis' Actions Are Properly Imputed To Fortis (IOM) ........................................................................... 18

        2.    Fortis' Decision To Move The Legal Jurisdictions Of Its BLMIS-Related Funds To Escape Liability If Madoff Was A Fraud ................................. 23

    E.    Fortis' Investment Arm Redeemed Investments In Tremont BLMIS Feeder Funds Based On Its Identification Of Indicia Of Red Flags Of Fraud At BLMIS .......... 33

        1.    Fortis Was Nervous About Madoff And Asked Probing Questions About BLMIS That Tremont Employees Could Not Answer ............................. 33

        2.    Geene's Questions Reveal Fortis' Knowledge Of The Red Flags Surrounding Madoff And BLMIS ........................................................... 38

        3.    Fortis Multi-Management's Concerns Were Echoed By Its Affiliate, Cadogan, Which Had An Anti-Madoff Policy ......................................... 41

    F.    The Beneficial Shareholders Had The Same Knowledge As Fortis (IOM).......... 44

    G.    Citco Did Not Issue Any Certifications Of Net Asset Value In "Good Faith ...... 46

        1.    Citco Expressed Doubt As To Whether The Funds' Assets At BLMIS Even Existed .......................................................................................... 47

i

2.      Citco Failed To Obtain Evidence Of The Existence Of The Funds' Assets ........................................................................................... 50

3.      Citco Negotiated For Higher Fees As Reimbursement For The "Risks" Of Doing Business with Madoff ............................................................... 52

H.      Exposure Of Madoff's Fraud ............................................................... 56

I.      The Funds' Estates In Liquidation ...................................................... 57

FIRST CLAIM ........................................................................................................ 58

SECOND CLAIM ................................................................................................... 60

THIRD CLAIM ...................................................................................................... 64

FOURTH CLAIM ................................................................................................... 65

FIFTH CLAIM ....................................................................................................... 67

PRAYER FOR RELIEF ......................................................................................... 68

Fairfield Sentry Limited ("Sentry") and Fairfield Sigma Limited ("Sigma"), by and through Kenneth Krys and Greig Mitchell (together with their predecessors, the "Foreign Representatives" or the "Liquidators"), and Kenneth Krys and Greig Mitchell (together with Sentry and Sigma, the "Plaintiffs"), solely in their capacities as the Liquidators of Sentry and Sigma and the Foreign Representatives of the liquidation proceedings involving Sentry, Sigma, and Fairfield Lambda Limited ("Lambda," together with Sentry and Sigma, the "Funds" or the "Debtors") pending before the Commercial Division of the Eastern Caribbean High Court of Justice, British Virgin Islands (the "BVI Court"), for their complaint against Defendants, as defined herein, allege the following based on personal knowledge or information derived from the Funds' books and records or from other sources, including, *inter alia*, court filings and statements of governmental agencies and other parties.

## PRELIMINARY STATEMENT

1.      This adversary proceeding, which arises out of a now decade-long effort to recoup assets for the victims of the largest Ponzi scheme in history, seeks recovery of more than Fortis (Isle of Man) Nominees Limited a/k/a ABN AMRO Fund Services (Isle of Man) Nominees Limited ("Fortis (IOM)").

2.      Fortis (IOM) is one of a number of banks that invested, for itself or others, in so-called "feeder funds," which channeled private investments into managed accounts with Bernard L. Madoff and his now-infamous brokerage business, Bernard L. Madoff Securities LLC ("BLMIS").

3.      The Madoff scheme worked seamlessly for decades, apparently netting shareholders handsome returns that far exceeded the market.

1

4.    Once BLMIS imploded, however, the world learned what some in the investing community, including Fortis (IOM), had long turned a blind eye to:  that the payments investors received from the feeder funds in exchange for the redemption of shares were massively overvalued.  In fact, they were non-existent.

5.    The feeder funds, like the Funds in this case, were essential to the perpetration of that scheme.  From their inception until the revelation of Madoff's fraud in December 2008, during most relevant times, the Funds sought out new investment through the sale of shares to investors and transferred (either directly in the case of Sentry or indirectly, through Sentry, in the cases of Sigma and Lambda) substantially all the proceeds of those sales, net of fees and expenses, to BLMIS for investment in accounts managed by Madoff.

6.    However, instead of using investor proceeds collected by the Funds to purchase securities and other investments, BLMIS used those contributions to service the redemption requests of other investors, enriching Madoff and his associates in the process.

7.    The investors lucky enough to redeem their shares in the Funds before the collapse of the Ponzi scheme received payments ("Redemption Payments") at a grossly inflated "Net Asset Value" (or the "NAV")—the price determined by dividing the value of the respective assets of Sentry, Sigma, and Lambda by the number of shares outstanding in each Fund.  Fortis (IOM) is one such investor.

8.    Between July 16, 2004 and November 19, 2008, Fortis (IOM) received USD $119,466,920.13 in Redemption Payments from Sentry and Sigma.  At the time it received these payments, Fortis (IOM) had knowledge of multiple indicia that Madoff was engaged in some form of fraud.  But rather than confront the facts before it, Fortis (IOM) turned a blind eye,

accepting millions of dollars while willfully ignoring or, at the very least, recklessly disregarding the truth in clear violation of the laws of the British Virgin Islands (or the "BVI").

9.    Fortis (IOM) was made aware of the Madoff markings of fraud through its role as part of a global institution of employees, entities, and business groups who worked together as one unified entity ("Fortis") to provide services to clients worldwide, including, among other things, financing, hedge fund services, and asset management services.

10.    Years before Fortis (IOM) entered into the transactions at issue, employees from across various Fortis entities worked together to carry out multiple profitable transactions involving BLMIS, gaining firsthand exposure to Madoff. Since at least 2003, Fortis employees from various entities recognized there was a high probability that BLMIS might be defrauding its customers, and that Madoff might not be engaging in the trades he claimed and/or may have misappropriated customer's assets. In one instance, Fortis employees decided to transfer the jurisdiction of a BLMIS feeder fund from the Bahamas to the Cayman Islands out of a concern that BLMIS's actions could subject Fortis to exposure under newly enacted Bahamian laws. As one Fortis corporate officer put it, "**we need to be very careful**, in that the responsibilities of [Fortis] are very onerous, with somewhat of an overall responsibility … for the Custodian [BLMIS]." What was needed, according to that officer, was "**confirmation as to how the [feeder fund's] assets are held with the broker** …." But Fortis deliberately avoided confirming its suspicion that BLMIS may not have been actually engaged in the trades he claimed, or even have custody of the fund's assets, opting instead to simply move the fund to a different jurisdiction and domicile. And, even after relocating, Fortis employees continued to voice concerns as to the risks to Fortis posed by BLMIS. In another, Fortis repeatedly probed the manager of BLMIS feeder funds in which it invested for information to quell its BLMIS-

related concerns. When the manager could not provide sufficient answers to Fortis' questions, Fortis redeemed $56 million it had invested in one of the manager's feeder funds. Time and time again, despite acknowledging the numerous BLMIS-associated red flags, Fortis employees affirmatively chose to ignore the obvious risks—and they did so in order to maintain profitable relationships with Madoff.

11.     By virtue of its skepticism regarding the source of Madoff's returns, Fortis (IOM) at a minimum recklessly disregarded that the Net Asset Value was massively overvalued and, therefore, that the Redemption Payments it received were improperly calculated.

12.     At all relevant times, Fortis (IOM) knew that the Redemption Payments did not, as Sentry or Sigma intended, represent the proceeds arising from the profitability of or to continue investment in BLMIS. Instead, any amounts obtained directly or indirectly by Sentry and/or Sigma from BLMIS to make Redemption Payments to Fortis (IOM) generally were proceeds of Madoff's Ponzi scheme, obtained from other BLMIS investors or other Sentry and Sigma investors invested in BLMIS.

13.     Accordingly, the Funds' actual assets are, and at all relevant times were, far less than the amount needed to satisfy their liabilities and the claims that have been or may be asserted against them. At all relevant times, the Funds were unable to pay their debts as they fell or would fall due. Specifically, at the time the Redemptions Payments were made, the Funds had insufficient assets from which to pay debts as they fell or would fall due. The Funds have been unable to satisfy their debts to BLMIS customers, the BLMIS Trustee (as defined below), and other creditors of the Funds, and further increased the amount of those liabilities.

14.     As a result, the Funds were placed into liquidation by the BVI courts and the Foreign Representatives were appointed, and thereafter commenced ancillary proceedings in this

Court pursuant to Chapter 15 of the Bankruptcy Code to recover improper Redemption Payments received by the Funds' investors.

15.    Upon information and belief, Fortis (IOM) has either retained the Redemption Payments made to it by Sentry and/or Sigma for its own account and benefit or paid all or some portion of such payments to or for the account of persons or entities for whom Fortis (IOM) may have subscribed for shares of the Funds in the capacity of trustee, agent, representative, nominee or custodian (individually, a "Beneficial Shareholder" and collectively, "Beneficial Shareholders," together with Fortis (IOM), the "Defendants").

16.    By this proceeding, Plaintiffs seek to recoup for the benefit of the Funds' estates, Redemption Payments transferred to Fortis (IOM).  Without this recovery, Defendants will have been unjustly enriched, and allowed to retain a windfall at the expense of other shareholders and creditors of the Funds.  Any recoveries will aid the Funds in satisfying their liabilities and redound to the benefit of the Funds' investors who found themselves victims of Madoff's Ponzi scheme.

## JURISDICTION AND VENUE

17.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 157(b) and 1334(b), as this adversary proceeding and the claims asserted by the Foreign Representatives herein arise under, arise in, and/or relate to the Chapter 15 proceedings of the above-captioned Debtors, *In re Fairfield Sentry Limited, et al.*, No. 10-13164 (SMB), pending in this Court.  Additionally, pursuant to section 78eee(b)(2)(A)(iii) of the Securities Investor Protection Act ("SIPA"), which incorporates 28 U.S.C. § 1334(b) and applicable provisions of Title 11 of the United States Code, jurisdiction is also proper in this Court because this action also relates to the consolidated liquidation proceedings of BLMIS and Bernard L. Madoff, pending in this Court under the

caption *Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC*, SIPA Liquidation No. 08-1789 (SMB).  Pursuant to the Amended Standing Order of Reference of the United States District Court for the Southern District of New York, dated January 31, 2012, all proceedings arising in, arising under and/or related to cases under Title 11 of the United States Code (as amended, the "Bankruptcy Code") are referred to this Court for adjudication.

18.    This is a core proceeding under 28 U.S.C. § 157(b)(2).  Should the Court determine that this is a non-core proceeding, Plaintiffs consent to entry of final judgment and order by this Court.

19.    This Court has jurisdiction over Fortis (IOM) and any Beneficial Shareholders pursuant to Rules 7004(d) and (f) of the Federal Rules of Bankruptcy Procedure and New York Civil Practice Law & Rules § 302 (McKinney 2008) because Fortis (IOM) and the Beneficial Shareholders purposely availed themselves of the laws of the United States and the State of New York by, among other things, investing money with the Funds, knowing and intending that the Funds would invest substantially all of that money in New York-based BLMIS, and, upon information and belief, maintaining bank accounts in the United States, and in fact receiving Redemption Payments in those United States-based accounts.  Fortis (IOM) and the Beneficial Shareholders selected U.S. dollars as the currency in which to invest and execute their transactions in Sentry, upon information and belief, designated United States-based bank accounts to receive their Redemption Payments from the Funds and actively directed Redemption Payments at issue in this action into those bank accounts.  Fortis (IOM) and the Beneficial Shareholders thus knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York, derived significant

6

revenue from New York, and maintained minimum contacts and/or general business contacts
with the United States and New York in connection with the claims alleged herein. Fortis (IOM)
and the Beneficial Shareholders should therefore reasonably expect to be subject to United States
jurisdiction.

20.     Moreover, this Court has jurisdiction over Fortis (IOM) and any Beneficial
Shareholders by virtue of the legally binding and valid agreements and representations set forth
in one or more agreements for the subscription of Shares that Fortis (IOM) entered into with
Sentry and Sigma.

21.     Fortis (IOM), upon information and belief, entered into a Subscription Agreement
with Sigma on or about March 30, 2004 (the "Initial Subscription Agreement") pursuant to
which Fortis (IOM) subscribed for a total of 1,332.5700 Shares. Subsequent to entering into the
Initial Subscription Agreement, Fortis (IOM), upon information and belief, entered into
additional agreements (the "Subsequent Subscription Agreements") with Sentry and Sigma on or
about July 27, 2006, January 29, 2007, February 26, 2007, March 22, 2007, December 31, 2007,
January 31, 2008, and March 27, 2008 pursuant to which it subscribed for 85,435.8729
additional Shares on the same terms and conditions as those shares subscribed for pursuant to the
Initial Subscription Agreement. The Initial Subscription Agreement and Subsequent
Subscription Agreements are collectively referred to herein as the "Subscription Agreements."

22.     The Subscription Agreements provide for, *inter alia*, the irrevocable submission
by Fortis (IOM) to the jurisdiction of the New York courts with respect to any proceeding with
respect to said agreement and Sentry and Sigma and Fortis (IOM)'s consent to service of process
by the mailing of such process, as provided therein. In particular, the Subscription Agreements
provide as follows:

New York Courts.    Subscriber agrees that any suit, action or proceeding
("Proceeding") with respect to this Agreement and the Fund may be brought in
New York.    Subscriber irrevocably submits to the jurisdiction of the New York
courts with respect to any Proceeding and consents that service of process as
provided by New York law may be made upon Subscriber in such Proceeding,
and may not claim that a Proceeding has been brought in an inconvenient forum.
Subscriber consents to the service of process out of any New York court in any
such Proceeding by the mailing of copies thereof, by certified or registered mail,
return receipt requested, addressed to Subscriber at the address of Subscriber then
appearing on the Fund's records.    Nothing herein shall affect the Fund's right to
commence any Proceeding or otherwise to proceed against Subscriber in any
other jurisdiction or to serve process upon Subscriber in any manner permitted by
any applicable law in any relevant jurisdiction.

23.    Furthermore, by executing the Subscription Agreements, Fortis (IOM) agreed to

all terms and conditions contained therein, including the express provision that any agreement

made by Fortis (IOM) in the Subscription Agreements would also apply to any other person for

whom Fortis (IOM) was subscribing as trustee, agent, representative, or nominee—*i.e.*, all

Beneficial Shareholders.    Moreover, by executing the Subscription Agreements, Fortis (IOM)

represented that it had all requisite authority from Beneficial Shareholders to execute and

perform any and all obligations on their behalf, and also agreed to indemnify Sentry and Sigma

for any damages resulting from an assertion by a Beneficial Shareholder that Fortis (IOM) lacked

proper authorization to enter into the Subscription Agreements or perform the obligations

thereof.    Specifically, the Subscription Agreements provide as follows:

If Subscriber is acting as a Representative.    If Subscriber is subscribing as trustee,
agent, representative, or nominee for another person (the "Beneficial
Shareholder"), Subscriber agrees that the representations and agreements herein
are made by Subscriber with respect to itself and the Beneficial Shareholder.
Subscriber has all requisite authority from the Beneficial Shareholder to execute
and perform the obligations hereunder.    Subscriber also agrees to indemnify the
Fund . . . for any and all costs, fees and expenses (including legal fees and
disbursements, fines and amounts paid in settlement) in connection with any
damages resulting from Subscriber's misrepresentation or misstatement contained
here, or the assertion of Subscriber's lack of proper authorization from the
Beneficial Shareholder to enter into this Agreement or perform the obligations
hereof.

24.    Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

## PARTIES

**A.    Plaintiffs**

25.    Sentry, a British Virgin Islands company, was organized in 1990 under the International Business Company Act of the British Virgin Islands and was subsequently re-registered as a business company under the BVI Business Companies Act 2004. Sentry's registered agent is Codan Trust Company (B.V.I.) located at Romasco Place, Wickhams Cay 1, Road Town, Tortola, BVI.  Sentry is currently in liquidation in proceedings commenced on April 21, 2009 in the BVI Court.

26.    Sigma, a British Virgin Islands company, was organized in 1990 under the International Business Company Act of the British Virgin Islands and was subsequently re-registered as a business company under the BVI Business Companies Act 2004. Sigma's registered agent is Codan Trust Company (B.V.I.) located at Romasco Place, Wickhams Cay 1, Road Town, Tortola, BVI.  Sigma is currently in liquidation in proceedings commenced on April 23, 2009, in the BVI Court.

27.    The Foreign Representatives were appointed by the BVI Court as Liquidators of the Funds to supervise the liquidation of the Funds' estates and, where necessary, commence proceedings in the name of and on behalf of the Funds or in their own official names.  On April 23, 2009, the BVI Court issued an order appointing Christopher Stride as liquidator of Lambda (the "Lambda Appointment Order").  On July 21, 2009, the BVI Court issued an order appointing Kenneth Krys and Mr. Stride as joint liquidators of Sentry and Sigma (the "Sentry & Sigma Appointment Order").    On September 6, 2010, the BVI Court issued notices acknowledging Mr. Stride's resignation and the appointment of Joanna Lau as joint liquidator

with Mr. Krys of all three Funds (the "Supplemental Appointment Order"). On November 23, 2011, Ms. Lau resigned as joint liquidator of the Funds. On June 24, 2014, the BVI Court issued an order appointing Charlotte Caulfield as joint liquidator, with Mr. Krys, of all three Funds (the "Second Supplemental Appointment Order"). On June 21, 2019, Ms. Caulfield resigned as joint liquidator of the Funds. On July 8, 2019, the BVI Court issued an order appointing Greig Mitchell as joint liquidator, with Mr. Krys, of all three Funds (the "Third Supplemental Appointment Order" and, together with the Lambda Appointment Order, the Sentry & Sigma Appointment Order, the Supplemental Appointment Order, and the Second Supplemental Appointment Order, the "BVI Appointment Orders"). The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of the Funds, have been authorized by the foreign court having jurisdiction over the matter to bring this action and the claims herein, including the avoidance claims herein under the BVI Insolvency Act of 2003 (the "BVI Insolvency Act").

28.    Pursuant to the BVI Appointment Orders, the Foreign Representatives are responsible for all aspects of the Funds' businesses, including, among other things, custody and control of the Funds' assets, the power to do all acts and execute, in the name and on behalf of the Funds, any deeds, receipts or other documents, and the power to compromise claims, commence litigation and to dispose of property. After obtaining BVI Court approval, the Foreign Representatives filed petitions in this Court in June of 2010, under Chapter 15 of Title 11 of the United States Code, seeking recognition of the BVI Liquidation Proceedings as "foreign main proceedings" under Chapter 15. On July 22, 2010, this Court issued an order (the "Recognition Order") granting that recognition.

29.    Pursuant to the Recognition Order, the Foreign Representatives were automatically afforded relief available under 11 U.S.C. § 1520, including application of the Bankruptcy Code's automatic stay to the Funds and their property located in the United States, as well as the ability to operate the Funds' business and exercise the rights and powers of a trustee under Sections 363 and 552 of the Bankruptcy Code.    Moreover, the Bankruptcy Court specifically granted additional relief in the Recognition Order to the Foreign Representatives pursuant to 11 U.S.C. § 1521(a).    Such relief includes, but is not limited to: (i) staying any actions, proceedings or execution against the Funds' assets to the extent not stayed under Section 1520; (ii) authorizing the Foreign Representatives to seek leave to conduct discovery concerning the Funds' assets, affairs, rights, obligations or liabilities; (iii) entrusting the Foreign Representatives with the administration and realization of the Funds' assets that are located within the United States, including all claims and causes of action belonging to the Funds; and (iv) otherwise giving full force and effect to the proceedings before the BVI Court.

30.    Claims had been previously asserted against the Funds in actions commenced by Irving H. Picard, the Trustee appointed by the United States District Court for the Southern District of New York for the liquidation of BLMIS (the "BLMIS Trustee"), in an adversary proceeding pending before the United States Bankruptcy Court of the Southern District of New York, *Picard v. Fairfield Sentry Limited, et al.*, No. 08-01789 (SMB) (the "BLMIS Adversary Proceeding").    As set forth in the complaint filed in the BLMIS Adversary Proceedings, the BLMIS Trustee sought to recover from the Funds, on preference and fraudulent transfer grounds, approximately $3.2 billion.    This amount was alleged to have been transferred to the Funds from BLMIS, directly (in the case of Sentry), or indirectly (in the cases of Sigma and Lambda), during the six years preceding the December 2008 disclosure of the Madoff fraud.    The BLMIS Trustee

alleged that the monies transferred from BLMIS to the Funds were the misappropriated assets of other BLMIS investors. At all relevant times, monies that the Funds received from BLMIS, net of fees and expenses, were transferred to shareholders as Redemption Payments.

31.    On July 13, 2011, pursuant to an agreement between the Foreign Representatives and the BLMIS Trustee dated May 9, 2011, the United States Bankruptcy Court for the Southern District of New York entered judgments against each of the Funds on the claims against the Funds asserted in the BLMIS Adversary Proceeding (the "Judgments") in the amount of $3,054,000,000 with respect to Sentry, $752,300,000 with respect to Sigma, and $52,900,000 with respect to Lambda. The Redemption Payments rendered the Funds unable to satisfy their liabilities to the BLMIS customers, the BLMIS Trustee, including on account of the Judgments, and other creditors of the Funds, and further increased the amount of those liabilities. In this way, the Redemption Payments caused the Funds to become insolvent and/or deepened their existing insolvency, in that, among other things, at all relevant times the Funds were unable to pay their debts as they fell or would fall due.

## B.    Defendants

32.    Fortis (IOM) was, at all relevant times, a member of Sentry and Sigma and a registered holder of Shares. Upon information and belief, Fortis (IOM) is a corporate entity organized under the laws of the United Kingdom and having its registered address at 18-20 North Quay, Douglas IM99 1MR, Isle of Man. Fortis (IOM) subscribed for the purchase of Shares by entering into one or more Subscription Agreements with Sentry and Sigma. All purchases of Shares by Fortis (IOM) were subject to the terms of the Subscription Agreements.

33.    Defendants "Beneficial Owners of the Accounts Held in the Name of Fortis (Isle of Man) Nominees Limited"—*i.e.*, the Beneficial Shareholders, are, as noted, any persons or

entities having a beneficial ownership or interests in Shares of Sentry and/or Sigma issued to Fortis (IOM) and on whose behalf Fortis (IOM) was acting as trustee, agent, representative, or nominee. Based on Sentry and Sigma records, some or all of the Redemption Payments made to Fortis (IOM) may have been paid to an account holder or holders associated with reference identifier ABZ.

34.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to Fortis (IOM) may have been paid to an account holder or holders associated with Seven Seas.

35.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to Fortis (IOM) may have been paid to an account holder or holders associated with LP Hedge.

36.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to Fortis (IOM) may have been paid to an account holder or holders associated with Platinum All Weather Fund. Upon information and belief, Platinum All Weather fund is a corporate entity organized under the laws of the Cayman Islands and has its registered address at c/o The Harbour Trust Co. Ltd., One Capital Place, P.O. Box 897, George Town, Grand Cayman KY1-1103, Cayman Islands.

37.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to Fortis (IOM) may have been paid to an account holder or holders associated with Odyssey Alternative Fund Limited. Upon information and belief, Odyssey Alternative Fund Limited is a corporate entity organized under the laws of the Isle of Man and has its registered address at North Quay, Douglas, Isle of Man, IM99 1NR.

## NOTICE PURSUANT TO FED. R. CIV. P. 44.1

38.     Certain of the substantive issues to be resolved in this case will be governed by the laws of the British Virgin Islands.  Plaintiffs intend to rely upon the applicable laws of that territory.

## FACTUAL ALLEGATIONS

### A.    Role Of Feeder Funds In Madoff Fraud

1.     Sentry was the largest of all the so-called "feeder funds" to maintain accounts with BLMIS.  Sigma and Lambda were indirect BLMIS feeder funds established for foreign currency (respectively, Euro and Swiss franc) investment through purchase of shares of Sentry. The Funds had the following par values per share: $.01 per share (Sentry), €.01 per share (Sigma), and CHF.01 per share (Lambda).  Sentry's account statements with BLMIS as of the end of October 2008 showed in excess of $6 billion of invested assets supposedly held by BLMIS.  As stated in its offering materials, Sentry's investment objective was to achieve capital appreciation through investments in BLMIS.

2.     As discussed above, Sentry, Sigma, and Lambda were established for the purpose of making investments in BLMIS.  It is now known that these types of feeder funds were a crucial part of Madoff's Ponzi scheme.  Feeder funds, such as Sentry (which was a direct feeder fund into BLMIS), and Sigma and Lambda (which were indirect feeder funds, through Sentry, into BLMIS) brought new investors and new investments into the scheme, allowing Madoff to make payments to early investors who sought to liquidate their investments, and in this way, the feeder funds were used by Madoff to continue and perpetuate his fraud by maintaining the illusion that BLMIS was making active investments and engaging in a successful investment strategy.

**B.    Calculation Of Net Asset Value And Shareholder Redemption Payments**

3.    From the Funds' inception until the disclosure of Madoff's fraud in December 2008, during most relevant times, substantially all of the money (up to 95%) raised by the Funds from the sale of their Shares, net of fees and expenses, was turned over to and invested in BLMIS (by and/or through Sentry), and supposedly credited to accounts held in the name of Sentry with BLMIS, purportedly for use in the now infamous "split-strike conversion" investment strategy.    In accordance with the Funds' Subscription Agreements, Articles of Association, offering materials and/or other relevant documents, from time to time, the Funds paid to shareholders, for each Share tendered for redemption, an amount that was based on each of the respective Funds' purported "Net Asset Value"—the value of the respective assets of Sentry, Sigma, and Lambda divided by the number of shares outstanding in each Fund—as it was then calculated.

4.    In calculating each of the Funds' Net Asset Value, the Funds' administrators used and relied on account statements provided by BLMIS purportedly showing securities and investments, or interests or rights in securities and investments, held by BLMIS for the account of Sentry.    Generally, all securities identified on BLMIS account statements were traded on public exchanges and had readily ascertainable market values, and those market values (in addition to, among other items, cash on hand that was identified in the Sentry account statement for the relevant time period) were used in accordance with the Funds' Subscription Agreements, Articles of Association, offering materials and/or other documents to calculate the Net Asset Value of the Shares.

5.    In fact, at all relevant times, no securities were ever purchased or sold by BLMIS for Sentry and any stated cash on hand in BLMIS accounts was based on misinformation and

fictitious account statements.    None of the transactions shown on the account statements provided by BLMIS to Sentry ever occurred.    Indeed, no investments of any kind were ever made by BLMIS for Sentry.    At all relevant times, all of the account statements that BLMIS provided to Sentry were entirely and utterly fictitious.    Further, all amounts deposited by Sentry (or by Sigma and Lambda through Sentry) with BLMIS for investment and the purchase of securities to be held by BLMIS for the account of Sentry were used by Madoff to pay other BLMIS investors or were misappropriated by Madoff for other unauthorized uses.

6.    From time to time, to make Redemption Payments, Sentry (and Sigma and Lambda through Sentry) made withdrawals from Sentry's BLMIS accounts (or utilized subscription monies of other investors on hand that were directed for investment in BLMIS).    At all relevant times, the Funds believed that the amounts provided in connection with such withdrawals represented the proceeds arising from the profitability of or to continue investment in BLMIS.    In fact, however, payments made by BLMIS to Sentry purportedly representing the proceeds of sales of securities or other investment positions were nothing other than the deposits of other BLMIS investors or previous deposits made by Sentry, never invested but rather misused and misappropriated as part of Madoff's fraud.    At all relevant times, payments made from BLMIS to Sentry were made by Madoff to continue and perpetuate his Ponzi scheme and avoid detection of his fraud.    The payments from BLMIS to Sentry were not payments made in the ordinary course of or as part of any business, nor did they have a legitimate business purpose. Similarly, the Redemption Payments were not made for any legitimate purposes or in the ordinary course of any business.    Those Redemption Payments did not conform to or follow the terms of the Funds' Subscription Agreements, Articles of Association and/or other offering documents, as they were based upon Net Asset Values that were not calculated based upon the

true facts existing at any relevant time, and because, more generally, the Redemption Payments represented the proceeds arising from investment in BLMIS (or a substitute therefor, in the form of subscription monies from other investors in the Funds, used as a shortcut to investing subscription monies with BLMIS and simultaneously withdrawing monies from BLMIS), which the world now knows was operated by Madoff as a Ponzi scheme.

7.    Given the fraudulent nature of BLMIS and its operation as a massive Ponzi scheme, the money paid by the Funds (directly in the case of Sentry and indirectly in the cases of Sigma and Lambda) to BLMIS on account of Sentry was, at all relevant times and unknown to the Funds, misused and misappropriated by Madoff as part of his Ponzi scheme.  At all relevant times, the Funds were insolvent when the Redemption Payments were made or were rendered insolvent, and/or their insolvency was deepened, as a result of the Redemption Payments.  As a result, at all relevant times, the Net Asset Value of the Shares redeemed was miscalculated, and Redemption Payments were mistakenly made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at any relevant time.

**C.    Redemption Payments Made or Transferred to Defendants**

39.    During the period from and after July 16, 2004, through November 19, 2008, Fortis (IOM) received Redemption Payments totaling USD $119,466,920.13 from Sentry and Sigma in respect of Shares tendered for redemption.

40.    At Fortis (IOM)'s directions and instructions, some or all of the Redemption Payments were received at, upon information and belief, United States-based bank accounts.

41.    The dates and amounts of each Redemption Payment received by Fortis (IOM) from Sentry, and the bank accounts to which each Redemption Payment was made, are set forth

on Exhibit A.  The dates and amounts of each Redemption Payment received by Fortis (IOM) from Sigma, and the bank accounts to which each Redemption Payment was made, are set forth on Exhibit B.

42.    At the time those Redemption Payments were made, the Funds had insufficient assets and were unable to pay their debts as they would fall due.  In exchange for each Redemption Payment, each of which constitutes or forms part of a transaction between Fortis (IOM) and Sentry and Sigma, Sentry and Sigma received no consideration or consideration of a value that, in money or money's worth, was significantly less than the value, in money or money's worth, of the consideration provided by Sentry and Sigma.

43.    Upon information and belief, Fortis (IOM) and/or the Beneficial Shareholders received Redemption Payments in excess of amounts paid by such person(s) for purchase of their Shares.

## D.    **Fortis (IOM) Knew Or, Was Willfully Blind To, Or Recklessly Disregarded The Inflation Of Net Asset Values**

### 1.    **Given Its "One Institution" Approach, Fortis' Actions Are Properly Imputed To Fortis (IOM)**

#### i.    Fortis Marketed Its Entities As One Institution, Its Employees Acted As One Institution, And The Entities Had One Central Management

44.    In 2005, Fortis was a global financial institution with employees, entities, and business groups who, from their strategic locations around the word, worked together and acted as agents for one another to provide services to Fortis' clients worldwide.  In its 2005 public Annual Review, Fortis described this activity as its "'Act as One' philosophy" to "operate as one company with a strong identity."  The Fortis entities that "acted as one" with regard to the transactions at issue here included entities across all its divisions.

18

45.      In 2005, Fortis announced that it had "bundled all Fortis's fund services—both onshore and offshore—to form a single unit"—Fortis Prime Fund Solutions ("Fortis Fund Solutions")—that offered the fund industry "a combination of administration, custody, banking and financial capabilities." Upon information and belief, Fortis Fund Solutions was comprised of entities in thirteen jurisdictions all over the globe that were ultimately all subsidiaries of Fortis Bank SA/NV a/k/a BNP Paribas Fortis ("Fortis Bank"). Together they carried out Fortis' hedge fund services, namely structuring and managing transactions. Upon information and belief, AMRO Bank (Ireland) Ltd. (f/k/a Fortis Prime Fund Solutions (Ireland) Ltd.) ("Fortis Fund Bank") served as the headquarters of the Fortis Fund Solutions family and was central to its decision-making process.

46.      Upon information and belief, Fortis Fund Solutions employees operated their business with complete disregard for formal corporate affiliate lines and referred to themselves and their business as one Fortis entity.

47.      Fortis Fund Solutions sat in the Fortis' Merchant Banking division. MeesPierson N.V. ("MeesPierson"), later known as Fortis Multi-Management, was part of Fortis Investments—Fortis' asset manager, which served "a global base of local investors, both institutional customers and distribution customers." MeesPierson, a Netherlands based investment bank with offices throughout the world, was purchased by Fortis in 1997. MeesPierson was rebranded in 2000. Fortis Multi-Management itself was a product of crossover, as it was "created through a merger of Fortis Investments' existing business with operations from Fortis group's commercial and private banking arm," according to a press release.

48.    Public filings noted that all of Fortis' business activity was carried out under the bank's "global risk management framework" that was designed to "facilitate communication of risk-related actions across Fortis."  The framework included "one global risk database" and a hierarchy of credit and risk committees that worked together to evaluate potential transactions. Every Fortis entity was subject to this central reporting hierarchy.

49.    As demonstrated in the following chart, taken from a Fortis 2007 Financial Statements filing, all of Fortis' local risk committees reported to business risk committees run by the major Fortis divisions.  Those committees, in turn, reported to corporate risk committees, like the Central Credit Committee, and ultimately to Fortis' board of directors.  No matter which division they sat in, all of the bank's entities reported to the same centralized committee:



      ii.    <u>Fortis Employees From Various Entities Worked As Agents Of Fortis To Set Up And Execute The BLSMIS Feeder Fund Related Transactions And Shared Their Knowledge And Concerns About BLMIS</u>

50.    Executing the "Act as One" philosophy and using the "global risk management framework," employees from numerous Fortis entities across divisions worked together to carry out all responsibilities for the bank's BLMIS-related transactions. Upon information and belief, no BLMIS-related transaction was set up or carried out by employees of a single Fortis entity acting alone.

51.    As described below, several of these transactions involved Tremont Partners, Inc. ("<u>Tremont</u>"), the asset management arm of Tremont Group Holdings, Inc. Tremont managed and controlled a group of BLMIS feeder funds. At all relevant times, those funds were dominated and controlled by Tremont, which managed each of the relevant funds' day-to-day operations, investment management and decision-making.

52.    Upon information and belief, in conducting the Madoff-related transactions at issue, employees, officers, and directors from various Fortis entities worked on behalf of the unified Fortis within the scope of their authority as Fortis' agents. Upon information and belief, they did so by, among other things:

      a.    meeting and/or communicating with Madoff and other BLMIS employees and officers in connection with their administrator duties for Harley International (Cayman) Ltd. ("<u>Harley</u>"), another BLMIS feeder fund;

      b.    exercising discretion to knowingly invest funds with BLMIS through a swap transaction with Tremont's BLMIS feeder funds;

      c.    monitoring the performance of BLMIS;

      d.    conducting due diligence on BLMIS and Tremont;

      e.    preparing credit applications, memoranda and background materials required to seek numerous levels of corporate approval for the transactions with Tremont's BLMIS feeder funds;

    f.   participating in the necessary credit and approval committees, responsible for determining whether to enter into the transactions with Tremont's BLMIS feeder funds;

    g.   negotiating the transactions with Tremont; and

    h.   communicating with Tremont's BLMIS feeder funds regarding investments and redemptions.

53.    Upon information and belief, employees from Fortis (IOM) and other Fortis entities routinely communicated across entity lines about information and concerns about BLMIS that they had gathered in the course of their various duties on behalf of Fortis.

54.    Upon information and belief, as mandated by Fortis' central risk policies, the Fortis employees' concerns about Madoff made their way up the chain of Fortis' credit committees including local credit committees in the Cayman Islands, Curacao, and UK and the Investment Bank Compliance and Central Credit Committees.

    iii.   <u>Employees From Multiple Fortis Entities Worked Together To Fulfill Administrator Duties For Harley And Shared Their Concerns About BLMIS</u>

55.    Upon information and belief, employees from across various Fortis entities worked together to carry out multiple profitable transactions involving BLMIS. Upon information and belief, since the 1990s, a Fortis entity, Fortis Prime Fund Solutions (Bahamas) Limited ("<u>Fortis Fund Bahamas</u>") officially contracted to provide administrator services to Harley. Notwithstanding that the agreements for those services were officially between Fortis Fund Bahamas and Harley, upon information and belief, Fortis employees from various Fortis entities participated in providing those administrator services to Harley.

56.    The administration of Harley exemplifies the unified manner in which the Fortis business operated. Upon information and belief, employees of the Fortis entities operated

collectively even before the Bank officially announced the formation of the one "Fortis Prime Fund Solutions."

57.    Upon information and belief, Fortis Fund Bahamas was the legal administrator to Harley on paper.  Upon information and belief, however, Fortis' internal documents reveal that a great deal of the work conducted by Fortis  employees as administrator to Harley was performed by employees from various Fortis entities, including Fortis N.V., Fortis Fund USA, Fortis Fund Cayman, Fortis Prime Fund Solutions (Isle of Man) and Fortis (Isle of Man) Nominees Limited ("Fortis Fund IOM"), and Fortis Fund Services (Curaçao) NV ("Fortis Fund Curacao").

### 2.    Fortis' Decision To Move The Legal Jurisdictions Of Its BLMIS-Related Funds To Escape Liability If Madoff Was A Fraud

#### i.    A Multitude Of Fortis Entities And Their Employees Worked Directly With BLMIS

58.    When Harley was formed in 1996, Fortis Fund Bahamas entered into an agreement to serve as the fund's administrator.  Upon information and belief, as Harley's administrator, Fortis Fund Bahamas was responsible for many day-to-day administrative duties on behalf of Harley, including among others:  effecting redemptions; computing the Net Asset Value of the fund; account maintenance; distributions; answering the questions of the auditors; and conducting due diligence on behalf of the fund.

59.    Upon information and belief, while Fortis Fund Bahamas served as Harley's administrator, BLMIS served Harley in the triple role of investment advisor, broker-dealer, and custodian.

60.    Fortis Fund Bahamas' employees did not perform the administrator's duties for Harley alone.   Rather, upon information and belief, Harley's administration tasks were

performed in concert by employees from multiple Fortis entities, including Fortis Fund Bahamas, and Fortis Fund Solutions entities in the Cayman Islands, Isle of Man, U.S. and Fortis N.V.

61.    Upon information and belief, employees from these Fortis entities worked collaboratively on behalf of Fortis Fund Bahamas, communicating directly with BLMIS employees and meeting with Madoff and employees at BLMIS's offices in New York from at least 2001 through 2008.

62.    The Fortis employees who provided these hedge fund services to Harley and other funds were sophisticated financial industry professionals.  Upon information and belief, their internal communications indicate their awareness of the unique nature of BLMIS's structure as an investment fund:  specifically, that unlike just about any other fund at the time, there was not a single independent party involved anywhere in the chain of services BLMIS was purportedly providing for customers.  While the securities industry occasionally saw a financial institution serving in dual roles (such as serving both an investment adviser and a broker, or a broker/dealer and a self-custodian), it was unusual, if not unique to BLMIS, that all three roles of investment adviser, broker/dealer and custodian were fulfilled by the same entity.

63.    By 2003, upon information and belief, Fortis employees had become substantially concerned about their inability to independently verify whether BLMIS had custody of Harley's assets and whether it was actually engaging in the trades that appeared on Harley's customer statements.  Upon information and belief, Fortis employees internally identified questions for Madoff and his employees about BLMIS's investment strategy, trade executions, trade processing, how BLMIS cleared its securities transactions, and how BLMIS custodied investors' cash.  As discussed below, to the extent Fortis posed these questions to BLMIS, upon information and belief, the answers Madoff and his employees gave were

evasive, uninformative, and most notably, contained not a single shred of fact-based detail that could enable Fortis to actually verify BLMIS's trades and custody of customer assets.

> ii.    <u>Fortis Employees Were Aware that Under Applicable Bahamian Law, Fortis Fund Bahamas Was Responsible For Verifying The Legitimacy Of BLMIS</u>

64.    Upon information and belief, Harley and Fortis Fund Bahamas were both domiciled in the Bahamas and were subject to Bahamian investment regulations and the authority of the Securities Commission of the Bahamas.

65.    Upon information and belief, in 2003, Fortis employees knew that the Bahamas had passed stricter regulations governing the administration of investment funds—the Investment Funds Act and the Investment Funds Regulations.    Among other things, these Bahamian laws required administrators such as Fortis Fund Bahamas to verify that all of a fund's service providers—including the fund's custodian—were "fit and proper," as determined by the Securities Commission of the Bahamas.

66.    The regulations also imposed on administrators such as Fortis Fund Bahamas ongoing obligations to report, in writing, to the Securities Commission of the Bahamas if it "knows or has reason to believe" that "an investment fund … is carrying on or attempting to carry on business in a manner that is or is likely to be prejudicial to investors or creditors of the investment fund."

67.    Under the foregoing regulations, Fortis Fund Bahamas was obligated to report to the Securities Commission of the Bahamas if it even had suspicions that Harley's custodian— Madoff—was improperly carrying out his duties on behalf of the fund.

68.    Violations of the Bahamian Investment Funds Act and Investment Funds Regulations were punishable by censure, fine, disgorgement of profits or unjust

enrichment, restitution, court order, and suspension, revocation or reclassification of the administrator's license.

        iii.    <u>Fortis Employees Acknowledged That Fortis Fund Bahamas Was At Risk Under Bahamian Law Because They Could Not Independently Verify BLMIS's Trades Or Custody of Harley's Assets</u>

69.    Against the backdrop of the new Bahamian regulations, in July 2003, a Fortis executive, Sue Novo (COO of Fortis Fund Solutions, Managing Director of Fortis Fund Isle of Man), wrote an email to Brenda Buckley (the Global Head of Financing and Risk at Fortis Funds worldwide and Managing Director of Defendant Fortis Fund Bank) about concerns that Buckley had raised about BLMIS that appeared to question what steps Fortis should take as Harley's administrator given Madoff's unique setup that created the capacity for fraud. Novo wrote to Buckley: "You have quite rightly raised the issue of broker dealer accounts [BLMIS] and how [Fortis] can work with them within our principles." Novo told Buckley that she believed Fortis could continue to provide administrator services to Harley, but in order to do so, she indicated Fortis needed greater visibility into BLMIS's trading and custody operations. Novo wrote "**we probably should be trade blotter matching** and also we need to consider the 'control' of the assets with regard to segregation versus pooled accounts, restrictions on money movement/transfers, Insurance cover for the assets should the broker go bust, in particular if we have a lien/charge over them."

70.    Novo's email identified that Fortis Fund Bahamas did not have any visibility into how Madoff actually purported to segregate customer assets. Her email revealed her concern that Fortis could face exposure under Bahamian laws if BLMIS was not in fact segregating its customer's assets as it claimed to be doing. In the event BLMIS became the subject of

bankruptcy or another legal proceeding, BLMIS creditors or others third parties could potentially attach Harley's assets to satisfy their own claims.

71.     In that same email, Novo warned however that Fortis, as Harley's administrator, was responsible under Bahamian law for, among other things, any misconduct by the Fund's custodian, Madoff:

> All in all if these Funds [Harley and other BLMIS feeder funds] still fall under Bahamas securities commission for the present, then **irrespective of anything else we need to be very careful, in that the responsibilities of the Administrator are very onerous, with somewhat of an overall responsibility for the Fund**, responsibility to the investors, responsibility for the actions of the Directors and I believe in the latest legislation, **responsibility for Custodian** [BLMIS].

72.     In follow-up emails to Buckley later that day, Novo pointed out further details about which Fortis lacked any visibility into BLMIS's operations.   Novo identified that Fortis employees could not independently verify prices of BLMIS's "over the counter" option trades. She also noted that while Fortis Fund Bahamas prepared the monthly NAV for Harley based on information provided by BLMIS on customer statements, BLMIS itself did not sign off on the NAV.   Implicit in her email was the fact that Fortis Fund Bahamas was relying completely on BLMIS's representations as to what assets it actually held for Harley and for computing the current value of their worth.   Novo further confirmed that she continued to have concerns about what happens to Harley's investments, "in particular if anything happens to the broker [BLMIS].  **We should also have confirmation as to how the Harley assets are held with the broker** eg. segregated/pooled account and my comment below viz insurance is probably also valid as well."

73.     This email exchange was circulated to numerous other Fortis employees, including Rhonda Eldridge (Managing Director of Fortis Funds Group; Director of Fortis Funds Bahamas and Fortis USA; member of Fortis internal credit committees) in New York.

74.     Upon information and belief, on July 24, 2003, the following day, Eldridge sent a letter directly to BLMIS formally requesting that BLMIS confirm to Fortis Fund Bahamas that it acted as agent for Harley, and that Harley's funds were "segregated" from BLMIS's own assets or other customers' assets.  Upon information and belief, Fortis Fund Bahamas also requested that BLMIS provide a "SAS 70 Report"—which at the time, was an industry standard audit report that was prepared by service providers such as broker dealers and custodians with respect to what controls they had in place to, among other things, protect its customers' securities from fraud.

75.     Upon information and belief, one week later, BLMIS employee Frank DiPascali sent a letter in response to Eldridge's requests that contained only the empty assurance that "all security positions held are segregated for the exclusive benefit of Harley International Limited." Upon information and belief, DiPascali's response contained no other detailed information about BLMIS's trading or custody operations that would enable Fortis Fund Bahamas to independently verify that Harley's assets were actually segregated from BLMIS's funds or those of other customers.

        iv.     <u>Instead Of Pursuing Independent Verification Of BLMIS's Trades And Custody Of Assets, Fortis Sought To Eliminate Its Legal Duty To Do So By Changing Legal Jurisdictions</u>

76.     Upon information and belief, in an email chain dated between August 29 and September 1, 2003, Eldridge, Buckley, and other Fortis employees confirmed that DiPascali's response to their requests did not provide the assurances and information Fortis employees

required in order to independently verify BLMIS's trades and custody of Harley's assets.  Upon

information and belief, these employees also discussed at length Fortis' options going forward

with respect to Harley if they ultimately did not receive the necessary assurances from BLMIS.

77.    Upon information and belief, another Fortis employee, Roger Hanson (Regional

Manager of Prime Fund Solutions for North America and Caribbean), wrote to Buckley on

August 29, 2003 that it was his view that, in light of the fact that Fortis could not obtain

information from Madoff that would enable it to verify Madoff's trades and custody of Harley's

assets, Fortis should seek to "change" the formal administrator of Harley from Fortis Fund

Bahamas to Fortis Prime Fund Solutions (Cayman) Limited ("Fortis Fund Cayman").  Upon

information and belief, he noted that changing jurisdictions of the administrator would require

Fortis Fund Bahamas to first obtain the consent of a Harley investor who had made a loan to the

fund.

78.    Upon information and belief, Hanson continued to list the options available to

Fortis under the circumstances.  One option was to have Fortis Bank's parent company, Fortis

N.V., lend money to the Harley investor to repay the pre-existing loans to facilitate the change in

legal jurisdictions.  But if the jurisdiction change could not be accomplished in this manner, upon

information and belief, Hanson forcefully stated that Fortis Fund Bahamas had to resign as

Harley's administrator:

> Finally, someone in Head Office needs to confirm that Fortis N.V. is satisfied that
> we can lend money to [redacted] who in turn invest in Harley which is managed
> by a broker dealer [BLMIS] with no independent custodian.  If this is not
> forthcoming then we need not take any further action other than to see if we can
> get the admin transferred without making the promises to [redacted].  **If that is
> not possible we will have no alternative than to resign from the engagement.**

79.    Upon information and belief, Buckley responded to Hanson in an email dated

September 1, 2003, confirming that no one at Fortis had obtained the information Fortis Fund

Bahamas needed from Madoff to independently reconcile the purported trades on Harley's customer statements. Upon information and belief, Buckley also indicated that, under those circumstances, she agreed with Hanson that Fortis had no choice but to seek to change the administrator's jurisdiction away from the Bahamas.

80.     But, upon information and belief, Buckley insisted that Fortis N.V. should not lend any of its own money to Harley's investor in order to facilitate the jurisdiction change because Fortis could not actually confirm BLMIS's trades or custody of Harley's assets:

> **I am still extremely uncomfortable** with giving financing to [Redacted] and now possibly [redacted] given their investment in Harley and the broker dealer relationship with Madoff. Before this option can be considered further **we will need some assurance of how the front and back office are separated in Madoff** and if two separate streams of trade information can be provided, that will allow independent reconciliation of trades in Harley. **Without this, I do not support financing by Fortis** to [Redacted].

81.     Upon information and belief, in her email, Buckley noted that she had reported her concerns to senior management personnel and other members of Fortis' Investment Bank Credit Committee. Upon information and belief, she also wrote:

> [I]f financing is to be considered seriously then **I think he should be asked to put pressure on Madoff to give the assurances we need or else appoint another custodian to Harley**. I would agree therefore that the only option at present is to proceed with the transfer of administrator (and possibly pitch [to replace BLMIS] for the custodian work.)

82.     Upon information and belief, a senior Fortis executive responded to Buckley's analysis, "**I do agree, this must be addressed properly.**"

83.     Buckley's email (and her fellow executive's responses to it) establish that Fortis believed that being able to independently verify that Madoff had custody of customers' assets and was engaging in the trades he claimed was a gating issue to be resolved before Fortis could even consider extending financing to Madoff investors. Buckley's statement—that if Fortis cannot get

the necessary "assurances" from Madoff that Fortis' only option was to insist that Madoff use an independent custodian for Harley—shows the strong suspicion that BLMIS did not have custody of Harley's assets or that he was not engaging in the trades he reported.

84.    Upon information and belief, Madoff never gave Fortis or any of its entities the assurances Buckley and others needed, nor did Fortis seek further independent verification of Madoff's trades or custody of Harley's assets.  This is evidenced by the fact that Fortis, upon information and belief, instead decided to transfer the administration of Harley from Fortis Fund Bahamas to Fortis Fund Cayman, just before the new Bahamian regulations were to take effect.

85.    But moving the administration duties for Harley to a Fortis entity outside of the Bahamas did not, by itself, eliminate the operation of Bahamian law.  If Harley and its feeder funds remained in the Bahamas, any Fortis entity performing administrative services—from whatever jurisdiction—would continue to be subject to the Bahamian laws and remain responsible for any misdeeds by Madoff as Harley's investment adviser, broker-dealer and custodian.  Upon information and belief, Fortis employees determined that in order for a Fortis entity to continue as Harley's administrator without risk of liability for potential fraud by Madoff, the jurisdiction of the **entire** Harley fund would need to be transferred.

86.    Transferring Harley's jurisdiction was not simple.  Upon information and belief, some of Harley's feeder funds' investors and their lenders would only agree to the change if, among other things, Fortis agreed to reimburse the parties' expenses.  Ultimately, upon information and belief, Fortis agreed to reimburse up to $25,000 of their expenses.

87.    Upon information and belief, effective October 2003, Fortis transferred the administration of Harley from Fortis Fund Bahamas to Fortis Fund Cayman.  Upon information and belief, Harley, its feeder funds, and Harley's investment manager likewise changed their

jurisdiction to the Cayman Islands.  Upon information and belief, in December 2003, Harley—

then known as Harley International Ltd.—officially changed its name to Harley International

(Cayman) Ltd.

88.    By moving Harley's legal jurisdiction and domicile, Fortis tried to avoid

confirming its suspicion—that Madoff may not actually engage in the trades he purported to or

even have custody of Harley's assets—while at the same time attempting to eliminate any

potential legal liability for administering the fund should that prove to be the case.

89.    Notably, upon information and belief, Fortis Fund Bahamas did not report to the

Securities Commission of the Bahamas the concerns Fortis employees shared internally about

Madoff, either before or after the jurisdiction of Harley was moved to the Cayman Islands.

> v.    <u>Even After Relocating Harley To The Cayman Islands, Fortis Employees
> Continued To Warn That The Risks Of Fraud At BLMIS Posed Risks To
> Fortis</u>

90.    Upon information and belief, emails between the same Fortis employees

discussed above reveal their ongoing concerns about the continued potential risk of fraud at

BLMIS.

91.    In a July 26, 2004 email, Eldridge forwarded an "Excerpt from Compliance

Committee meeting" to another senior Fortis employee.  Upon information and belief, the

discussion in the excerpt concerned whether Fortis entities should continue providing

administration, custody, financing or other services to another investor in Harley:

> As stated in earlier correspondence it appears that Madoff who acts as the Broker
> Dealers as well as the Custodian for Harley effectively is the investment manager
> of the Harley Fund.  The formal investment manager [Redacted] in practice only
> acts as a nominee director.  **Madoffs double role implies that there is no
> guarantee that the trades and positions provided by Madoff to Fortis as the
> Administrator are objective and it is not possible to obtain independent
> confirmations on trades and positions.**

Compliance/Legal Fortis Curacao has recommended negatively on the requested due to the Madoff issue, in particularly given the size of the increased limit [of financing]. …

The IBCoCo [Investment Banking Compliance Committee] deems it however remarkable that:

… Cayman/Curacao and London apparently disagree on whether to keep providing administration services to [Redacted] given the Madoff issue stated above

Given the above, **the committee is not comfortable with accepting the client as presented**, especially as a credit proposal in the pipeline for an increase to USD 160 mln. (bold emphasis added here and throughout).

92.    A full year after moving legal jurisdictions, upon information and belief, the Legal and Compliance Department of Fortis Fund Curacao recommended against Fortis continuing to provide services or financing to any BLMIS feeder funds because of the "Madoff Issue": namely, Fortis' inability to confirm that BLMIS had custody of the assets it claimed to have or that Madoff executed the trades he reported on customer statements.

93.    For the same reason, upon information and belief, Fortis' Investment Banking Compliance Committee refused to sign off on an application to accept a new client seeking financing to invest in Harley.

94.    Upon information and belief, notwithstanding internal warnings about the risk posed to Fortis by the potential for fraud at BLMIS, Fortis Fund Cayman continued to serve as Harley's administrator until 2008, when Madoff confessed to the Ponzi scheme.

**E.    Fortis' Investment Arm Redeemed Investments In Tremont BLMIS Feeder Funds Based On Its Identification Of Indicia Of Red Flags Of Fraud At BLMIS**

   **1.    Fortis Was Nervous About Madoff And Asked Probing Questions About BLMIS That Tremont Employees Could Not Answer**

95.    In addition to Fortis' relationship to BLMIS in connection with Harley and other BLMIS Feeder Funds, upon information and belief, beginning in 2001, Fortis' investment

management arm had selected BLMIS to manage tens of millions of dollars of Fortis customers' investments through Tremont's BLMIS Feeder Funds.

96.    Upon information and belief, MeesPierson was a third-party manager of the investments of Fortis customers.  As such, upon information and belief, MeesPierson owed a duty of care to its investors to exercise diligence in the selection of any investment manager—which in this case was ultimately BLMIS through Tremont's BLMIS Feeder Funds.  Upon information and belief, because Tremont had selected Madoff to manage its investors' assets, Tremont in turn owed those same duties of care.

97.    Upon information and belief, in May 2003, MeesPierson employees met with Madoff and identified additional indicia of fraud at BLMIS that they noted in an internal memorandum in a May 15, 2003 memorandum (the "Mees Memo").  Among other things, upon information and belief, they noted Madoff's secrecy and "zero transparency"; BLMIS's exceptionally stable returns; the fact that these returns were inconsistent with the split strike conversion strategy Madoff purported to execute; the fact that Madoff left all investor relations to the likes of Tremont and Fairfield and hardly granted direct meetings with end investors; and, of course, the continuing fact that BLMIS's trades and assets could not be verified.  Upon information and belief, MeesPierson recognized that the questions they identified went to the legality of Madoff's operations and whether BLMIS had been engaging in broker-dealer "wrongdoing."  Nonetheless, these exceptionally stable returns meant that Tremont remained profitable.

98.    Upon information and belief, in 2006, newly formed Fortis division Fortis Multi-Management assumed control of MeesPierson's investment book, including its customers' investment in Tremont's Feeder Funds, which had grown to over $70 million.  An

October 17, 2005 news article covering the creation of Fortis Multi-Management stated that "Fortis is combining all the existing multi-manager elements of its business, notably those of the MeesPierson private banking arm and the retail funds business of Fortis Investments."

99.     Upon information and belief, in May 2006, Mark Geene of Fortis Multi-Management emailed Tremont and informed it that Fortis had been internally discussing its investments with Madoff "at length," "especially **the opaque structure/process**" surrounding BLMIS and wished to meet with both Tremont and BLMIS personnel.  Upon information and belief, MeesPierson had previously entered into a separate contract with Tremont whereby Tremont agreed to prepare due diligence and operational risk reports for Fortis Multi-Management, and to arrange meetings and onsite due diligence visits with managers.

100.    Despite Tremont's contractual obligation to set up meetings with investment managers such as Madoff, upon information and belief, Tremont employees informed Geene they could not get Madoff to agree to meet, and that Fortis Multi-Management had to settle for a meeting with Tremont executives instead.

101.    Upon information and belief, on May 19, 2006, Geene met with senior Tremont personnel in Rye, New York to pose questions that Fortis Multi-Management had hoped to ask Madoff directly.  Geene was a seasoned securities investment manager with a decade-long background analyzing investment strategies, monitoring management activities, and teaching graduate courses on hedge funds and equities.  Prior to taking a position at Fortis Multi-Management, Geene spent eight years working at pension fund managers in the Netherlands where he focused on the "strategic use of derivatives/protection strategies" and "risk budgeting."

102.    Upon information and belief, ahead of the meeting between Tremont and Fortis Multi-Management, Geene forwarded to Tremont written questions he wished to discuss about Madoff's operations.    Among other things, upon information and belief, Geene questioned BLMIS's purported trading model, including what he perceived as Madoff's inconsistent implementation of the split strike conversion strategy, asking:  "If he [Madoff] can so quickly and efficiently put his trades on just ahead of market rally, **why doesn't he also close out his positions as quickly once the rally has played out and book the gains**? (i.e. they [Fortis Multi-Management] thought he'd be a much more active trader)."  Upon information and belief, Fortis Multi- Management understood that the "precise" market timing advantage that Madoff claimed enabled him to reap his consistent returns was not being implemented equally when buying and selling.  These questions show that Geene perceived that Madoff was leaving profits on the table in timing his equity sales, which was counter-intuitive to all investment advisors' primary goal to maximize investor gains.

103.    Upon information and belief, Geene also asked whether Madoff had "**collateral arrangements with his option counterparties?** (Mark  apparently used to trade options for a pension account and believes Madoff's size is a concern—he used Goldman going bankrupt in a 'what if' scenario)."

104.    This last question by Geene related to a major component of Madoff's purported "split-strike" strategy which involved the purchase and sale of put and call options to purportedly hedge customers' equity securities trades, in order to limit any losses on customers' equity trades.  Upon information and belief, Geene understood that options trades can take place in the marketplace in one of two ways: (i) over an exchange, or (ii) over the counter ("OTC").  If options are purchased over an exchange, then the exchange itself guarantees that the options'

obligations will be performed.   In an OTC options trade, the trade is a private contract between two counterparties, and no one guarantees the performance of either counterparty to the trade. The flexibility for parties to negotiate their own terms in an OTC trade comes at the price of corresponding risk to an investor that the counterparty may fail to fulfill its obligations under the option to buy or sell the specified equity at the agreed upon strike price for whatever reason— for instance, the counterparty reneges on the trade, creditors attach the options as party of the company's assets, or, in the extreme scenario, the counterparty goes bankrupt.

105.   Geene's question was directed at finding out what collateral arrangements Madoff had with the options counterparties to protect BLMIS's investors' assets in the event of default. If BLMIS had twenty billion dollars in assets under management (as, upon information and belief, was speculated previously in the Mees Memo), Madoff needed to trade an enormous volume of options to hedge his investors' equity trades.   Trading that volume exposed BLMIS's investors' assets to massive risk in the event that a major counterparty went bankrupt and failed to perform its option obligations—as, for example, Lehman Brothers did in 2008.

106.   Tremont's inability to answer basic questions about Madoff's purported investment strategy apparently did not sit well with Green.   Upon information and belief, one Tremont executive described the meeting as "challenging."   Upon information and belief, another recounted:

> One issue came very clear—they [Fortis Multi-Management] recently were in New York to meet managers, among those, Madoff.  We didn't get them access to Madoff, and held a meeting internally instead.   The results of that meeting left them **nervous** (we didn't talk details) and they went back and explained their **apprehensions** with Eric.   They have $70m with Madoff, and we derive over $1m in fee from this.   My suggestion was two-fold.   First in the short run, **lets** [sic] **get them comfortable with Madoff**, via Bob and Cynthia.   Second, lets [sic] facilitate a meeting in the Madoff offices.

107.    Subsequently, upon information and belief, Tremont employees reported internally that Geene's questions required "additional support" from Tremont executives to answer.

**2.    Geene's Questions Reveal Fortis' Knowledge Of The Red Flags Surrounding Madoff And BLMIS**

108.    Upon information and belief, leading up to an August 2006 conference call, Geene emailed Tremont a list of questions about Madoff, his split strike conversion strategy, OTC options trading process, and custodial arrangements that Fortis Multi-Management still wanted answered.

109.    Parties to OTC options transactions typically use standardized agreements prepared by the International Swaps and Derivatives Association, Inc. ("ISDA"). These ISDA agreements provide standard material terms of OTC options contracts, including the underlying obligations of the parties, price, amount of securities, timing of payments, provisions governing the exchange of collateral, events of default and termination events. In the absence of an ISDA agreement, the parties must negotiate these terms specifically for each transaction.

110.    Geene's questions to Tremont went to the heart of ascertaining some of these material terms of Madoff's purported OTC options trades. Tremont's inability to answer Fortis Multi-Managements' basic questions about securities transactions to which Tremont was a party—and for which it owed fiduciary duties of diligence and care to its investors—would cause concern to any experienced derivatives trader, like Geene.

111.    For example, upon information and belief, in August 2006, Geene questioned Tremont about Madoff's collateral arrangements with options counterparties, asking for "details with respect to collateral [sic]: how often exchanged (daily/weekly), how conservative are the

haircuts, does Madoff use minimum [thresholds] and **why does Tremont not see the exchange of collateral** [sic]?"

112.    Upon information and belief, Geene knew that, as the account holder of the options in question, Tremont itself should have been directly exchanging collateral with the counterparty.   Geene's observation indicates Fortis Multi-Management was concerned that Tremont itself did not observe or appear to understand how this basic OTC trade logistic was carried out with respect to Tremont's own options trades.   Indeed, Tremont did not appear to even know what the terms of collateral were.   This apparent absence of a necessary and fundamental component of OTC options trades suggests that they were not happening at all.

113.    Geene also appeared to struggle to understand how BLMIS could possibly trade the volume of options Madoff needed to hedge his investors' purported equities trades.   Upon information and belief, Geene continued to seek basic information about the basic components and logistics of Madoff's option trades—for example, he asked Tremont:

> Option grid: do the investment banks quote for puts as well as calls and on both sides (buy/sell)?   **How will he hedge the basis risk**: for instance when hitting Goldman for puts with 2B he cannot instanteniously [sic] trade 2B in equities the same second: does he average is [sic], is he using his time slicing methodology (still: basis risk (or alpha??) remains.   Does he have to do calls with the same investment bank (later that day based upon the same grid?)?

114.    Upon information and belief, Geene also asked Tremont's CEO if he could "elaborate a bit on the 'hiding of trades' between Feeder trades and Madoff Securities trades as he has to trade for the Feeder before his own trading."   It appears that Geene was probing for any verifiable details to confirm the suspicion that Madoff's trading activities might involve a conflict of interest (between his duty to maximize his IA customers' returns before earning profits for BLMIS on the broker-dealer trades) or potential illegal activity.

115.    Upon information and belief, Geene informed Tremont that he wanted a third-party opinion letter that "in case of a default [bankruptcy] of Madoff Sec, the Feeder accounts cannot be touched (Bob mentioned the Depository Account) => … clear indication of separation." This question again targets the very issue that Fortis employee Novo had previously been concerned with in connection with Harley: that Fortis had no verifiable details about how Madoff "custodied" customers' assets, except for BLMIS's empty assurances that they were "segregated," and thus had no ability to assess what could happen to customers' assets if BLMIS went "bust."

116.    In addition, upon information and belief, in August 2006, Geene requested that Tremont provide Fortis Multi-Management with a full due diligence report for Madoff. Due diligence questionnaires ("DDQs") are materials typically prepared by a fund that contain critical, basic information requested by potential investors to consider when determining whether to invest. Upon information and belief, Tremont had a contractual obligation to Fortis Multi-Management to provide such DDQs on various managers, and in fact, in July 2006, Tremont did provide Geene with more than a dozen such reports on different managers.

117.    But in response to Fortis Multi-Management's request for a full DDQ on Madoff, upon information and belief, Tremont employees acknowledged internally in August 2006 that "[w]e **cannot do that for Madoff**." Upon information and belief, it took another four months for Tremont to prepare and complete a full DDQ on BLMIS and provide it to Geene at Fortis Multi-Management. But even then, upon information and belief, Tremont personnel advised that the DDQ on BLMIS would not be as fulsome as other diligence reports Tremont had provided to Fortis Multi-Management for different managers.

118.    At this point in 2006, upon information and belief, Tremont had over $2 billion invested with BLMIS, and according to Tremont, Fortis Multi-Management was contemplating a further investment in a new leveraged Tremont fund.  Upon information and belief, Geene knew that Tremont could not provide one of its standard DDQs on Madoff or answer basic questions about Madoff's operations—ranging from mundane logistics about how securities transactions operate in the real world, to material terms that were required in investors' securities contracts. These facts were indicative that Tremont had not fulfilled its due diligence duties to its investors—particularly given that Geene was asking these very same questions in the pursuit of fulfilling Fortis Multi-Management's own duties of diligence and care to its investors.

119.    Moreover, upon information and belief, Fortis Multi-Management was aware that Tremont itself had a potential conflict of interest.  The Mees Memo prepared by Fortis Multi-Management's predecessors in 2003 and Tremont's private placement memoranda made clear, upon information and belief, that BLMIS itself was earning no fees for serving as investment advisor and custodian services, aside from minimal commissions Madoff charged for trades, while Tremont itself was earning substantial percentage management fees as a result of their Feeder Fund arrangements with BLMIS.

### 3.    Fortis Multi-Management's Concerns Were Echoed By Its Affiliate, Cadogan, Which Had An Anti-Madoff Policy

120.    Upon information and belief, by early October 2006, Mark Geene and others at Fortis Multi-Management made it clear that they were dissatisfied with Tremont's inability to answer their questions about Madoff and his operations.   Upon information and belief, in an internal Tremont email dated October 9, 2006, Darren Johnston (vice president and manager responsible for product line management and oversight) informed CEO Bob Schulman and

others that "MeesPierson [Fortis Multi-Management] may now not be investing in XL after all (concerns with counterparty risk, cost of leverage, liquidity)."

121.    Upon information and belief, not only did Fortis Multi-Management decline to proceed to invest in Tremont's new leveraged fund, but it also proceeded to redeem the entirety of its existing investments with Tremont after a new business partner, Cadogan Management ("Cadogan"), echoed Fortis Multi-Management's suspicions about BLMIS.

122.    Upon information and belief, as part of Fortis' strategy to expand the services it could offer clients, in 2006, Fortis purchased a Cagodan—a U.S. management company that would allow it to conduct its hedge fund due diligence in-house rather than rely on third parties such as Tremont.   Upon information and belief, in November 2006, Fortis acquired a 70% interest in New York-based Cadogan.   Like many other Fortis entities, upon information and belief, Madoff's business troubled Cadogan.   Upon information and belief, Cadogan described Madoff as a "**'black box' investment dilemma** … a phenomenal long-term track record but … meaningful access to meaningful information [was] unavailable."

123.    Upon information and belief, prior to partnering with Fortis Multi-Management, Cadogan had independently identified numerous red flags of fraud at BLMIS, including many of the same red flags identified by numerous other Fortis employees over the years.   Upon information and belief, in correspondence to its investors, Cadogan set out some of the reasons that it was "**highly skeptical**" of Madoff:

- the competitive difficulties of the space;

- the apparent mismatch between Madoff's supposed AUM and the size of the options market which would need to accommodate this capital;

- the immense implied net revenues given the estimated AUM and the reported results;

- the extraordinary complexity and opacity of the Madoff investment vehicles;

- the lack of any spin-off of senior personnel over the years; and,

- the smoothness of returns relative to other traders in the area.

124.    Cadogan's list looked substantially the same as the Mees Memo, Fortis employees' concerns articulated in connection with Harley, and Fortis Multi-Management's observations and questions.    Upon information and belief, none of these entities' personnel could understand Madoff's purported returns, the volume and mechanics of options trades that he would need to make given the billions of dollars of assets he purportedly managed and, most important, the lack of transparency into Madoff's business.

125.    Upon information and belief, Cadogan, likewise, was concerned by what it called the "intellectual mismatch" between Madoff's purported returns and operations and those of his competitors, so much so that it had a policy against investing in any BLMIS Feeder Funds.

126.    Upon information and belief, in December 2006, Geene confirmed Cadogan's anti-Madoff policy to employees at another BLMIS Feeder Fund, Kingate Global Fund Ltd. According to an internal email, Geene told a Kingate Global executive that it would be "politically difficult" for Fortis Multi- Management to invest in another BLMIS Feeder Fund in light of Cadogan's anti-Madoff policy.

127.    Upon information and belief, in February 2007, Fortis Multi-Management redeemed in full the remaining $56 million it had invested in a Tremont-operated BLMIS fund. Upon information and belief, in December 2008, Cadogan wrote to investors that both Cadogan and Fortis Multi-Management had, after discussion, unanimously decided to redeem from the Tremont Feeder Fund because of "[t]he **unwillingness of the Madoff organization to provide**

**sufficient transparency** to evaluate the investment and other merits of that portfolio's investment."

128.    In this instance, upon information and belief, Fortis Multi-Management had a duty to its investors that it could not eliminate in the same way Fortis had sought to do by changing the legal jurisdiction of the Fortis entity providing administrator services to Harley. Upon information and belief, Fortis Multi-Management had to terminate its customers' investment with BLMIS where it could not shift the potential risk away from itself in the event Madoff was engaging in fraud.

129.    Upon information and belief, the potential risks of fraud at BLMIS previously identified by Fortis employees and entities were shared with Fortis (IOM) as part of its "one unified entity" approach to its business.

130.    Given Fortis (IOM)'s awareness of the results of Fortis' due diligence into Madoff and discovery of multiple indicia of fraud in the years leading up to its redemptions, Fortis (IOM) turned a blind eye or was, at the very least, reckless with respect to the fact that the Net Asset Value calculations were inaccurate.

F.    **The Beneficial Shareholders Had The Same Knowledge As Fortis (IOM)**

131.    Fortis (IOM) served as trustee, agent, representative, nominee or custodian for the Beneficial Shareholders in connection with their investments in the Funds, including, by: subscribing to Shares of Sentry and Sigma on behalf of the Beneficial Shareholders, maintaining custody of the Shares as record shareholders, paying redemption proceeds from the Shares of Sentry and Sigma to the Beneficial Shareholders, and otherwise exercising control over the Shares of Sentry and Sigma.

132.    Further, each of the Subscription Agreements, executed by Fortis (IOM), manifested the Beneficial Shareholders' consent for Fortis (IOM) to act on behalf of and subject

to the Beneficial Shareholders' control.  And in executing the Subscription Agreements, Fortis (IOM) accepted and agreed to act on behalf of the Beneficial Shareholders.

133.    Accordingly, the Beneficial Shareholders had the same knowledge as Fortis (IOM) regarding all relevant matters relating to BLMIS and the Funds' Net Asset Values at all relevant times.

134.    But in the alternative, both the Funds' Articles of Association as well as each of the Subscription Agreements provide that it is the registered shareholders that are to be treated as the parties to the Funds' Articles.

135.    Article 8 of the Funds' Articles provides that "The Company shall be entitled to treat the registered holder of any share as the absolute owner thereof and accordingly shall not be bound to recognize an equitable or other claim to, or interest in, such share on the part of any other person."

136.    Paragraph 27 of the Subscription Agreements similarly provides that "If Subscriber is subscribing as trustee, agent, representative or nominee for another person (the 'Beneficial Shareholder'), Subscriber agrees that the representations and agreements herein are made by Subscriber with respect to itself and the Beneficial Shareholder.  Subscriber has all the requisite authority from the Beneficial Shareholder to execute and perform the obligations hereunder."

137.    Together, these contractual provisions bind the Beneficial Shareholders to Fortis (IOM)'s bad faith on all relevant matters relating to BLMIS and the Funds' Net Asset Values at all relevant times.

**G.**     **Citco Did Not Issue Any Certifications Of Net Asset Value In "Good Faith**

138.     Article 11 of the Funds' Articles provides that "[a]ny certificate as to the Net Asset Value per Share … given in good faith by or on behalf of the Directors shall be binding on all parties." During the relevant period, statements of the Net Asset Value were issued by the Funds' administrators, Citco Fund Services (Europe) B.V. and its delegatee Citco (Canada) Inc. (the "Administrators"). On April 16, 2014, the Judicial Committee of the Privy Council (the "Privy Council") issued a decision in which it held that certain statements of Net Asset Value, in particular, certain monthly emails, contract notes, and monthly account statements issued by the Administrators, constituted "certificates" for the purposes of Article 11 (the "Certificates"). The Privy Council did not, however, address whether such Certificates were given "in good faith." In carrying out this responsibility, the Administrators and affiliated Citco companies within Citco Group Limited (collectively, "Citco") acted with a lack of good faith in giving the Certificates.

139.     Over the course of fifteen years, in its capacity as service providers to the Funds, Citco reviewed information concerning BLMIS not available to the general public, and expressed internal alarm about what that information showed with respect to the likelihood of fraud at BLMIS, but turned a blind eye to the reality reflected in the information and instead proceed with issuing the Certificates as if there were no problem.

140.     So grave were the Administrators' internal concerns that they expressed doubts—many years before the fraud was made public—that the Funds' assets with BLMIS even existed, with one employee stating "I will not change my [opinion] as long as I [do] not see evidence that the portfolio exists." The Administrators also expressed repeated concern over the fact there was no segregation of duties at BLMIS—*i.e.*, BLMIS (i) had discretion over which investments to make and when to make them, such that BLMIS was de facto investment manager, (ii) had actual

custody of the Funds' assets, such that BLMIS was de facto custodian, and (iii) was also the broker. Based upon the proprietary information they reviewed, Citco expressed concern—internally—that BLMIS would be a repeat of the notorious Manhattan Investment Fund fraud of the 1990s "multiplied by a factor of five." Ultimately, unable to resolve their grave concerns, Citco, rather than withdrawing, ceasing to issue Certificates, or sounding a public alarm, made a corporate decision to continue on as service providers—in exchange for an 800% increase in fees.

### 1.    Citco Expressed Doubt As To Whether The Funds' Assets At BLMIS Even Existed

141.    Beginning in 2000, the Administrators ran into trouble with the basic task of verifying the existence of the Funds' assets with Madoff. Initially, Citco expressed serious concerns regarding whether the Funds' Treasury bond transactions actually matched those transactions reported by Madoff because of an apparent "rhythm of trading" each month. The rhythm of trading within Sentry's portfolio appeared too consistent to be true, as the assets included only a limited number of Treasury bonds by each month's end. At the beginning of each month, Madoff would purchase shares and put options and would sell call options, but, like clockwork, would then liquidate all of Sentry's holdings by the 20th of each month. Thus the Administrators wanted to check whether the Treasury bonds even existed at all.

142.    The Administrators could not verify the existence of the assets because the Funds' custodians, Citco Bank Nederland N.V. Dublin Branch and Citco Global Custody (the "Custodians"), did not actually hold them. Instead, Madoff served as his own custodian. Therefore, the custody statements that the Custodians were supposed to generate based on assets in their possession, were instead merely copied, or "shadow book[ed]," from BLMIS account

statements.  The Custodians were "only the custodian[s] on paper, not in reality" and did not place any trades for the Funds.

143.    Management within Citco, including Ruud Bodewes ("Bodewes"), the head of internal audit for all of Citco Group, and Ger Jan Meijer ("Meijer"), the head of internal audit for the Administrators, expressed concern about the operations at BLMIS.  In May 2000, Bodewes expressed his concern to the general counsel and manager of Citco Bank Nederland, as well as Meijer, that "[w]ith [the] Manhattan [Investment Fund fraud] in the back of our minds, we, as Citco, may very well be in a potential dangerous situation, since we do not seem to have an independent source to verify the information from BLMIS."  Indeed, Meijer had raised these concerns to Bodewes weeks earlier, warning that Madoff could be "a Manhattan multiplied by a factor of five."

144.    In addition to warning Bodewes, Meijer also warned Citco Group's Chief Executive Officer, Christopher Smeets ("Smeets") in May 2000 that "[t]o not react or to react too late does indeed mean that investors once again faithfully deposit tens of millions of USD in the Madoff well (for which we do not know if there is a bottom to it) at month's end," with the understanding that Citco could "already be held personally responsible insofar as we have allowed the subscriptions to take place as of May without a fight."  Smeets acknowledged receipt of Meijer's emails and concerns.  At that time, Meijer emphasized that "with the current knowledge and Citco as asset protector, Citco has a legal obligation to obtain more assurance" of the Funds' assets.

145.    However, in what became a familiar pattern, Citco turned a blind eye to the documents and information in their possession.  Citco Group did not address the Administrators'

concerns raised in May 2000, and a few months later, Meijer stated: "[i]t seemed that this affair [was] being put on the back burner and hushed."

146.    A year later, Meijer again reiterated his concerns about BLMIS's operations, which "remain[ed] unsolved." Meijer warned that "Citco has a risk exposure of more than USD3 billion" and that "[p]robably there are no options to restore this situation from a worst case scenario." He stated: "I will not change my [opinion] as long as I [do] not see evidence that the portfolio exists." Five months later, in January 2002, the Administrators again emphasized that the issues concerning BLMIS posed severe risks to Citco and the Funds' investors. Meijer told Bodewes: "I have been worried about this situation for 2 years (including the risk to the continued existence of Citco), however the same was not taken seriously by certain gentlemen. … My intuition (combined with the business that I have seen) tells me that things are not right."

147.    In January 2002, Meijer insisted to Bodewes that: "Citco must now seriously take the possibility that everything is really wrong with [the Funds'] account, as well as the possibility that everything will come into view within 2 years. … Personally I think the chance [that something is wrong] is at least 50%." Meijer persisted that there was "still the opportunity to more or less direct the whole process, and search out the best way out with the help of good lawyers (legal contingency plan). Otherwise you run the risk that the scene will later be determined by others." However, in response Citco Group's management, and Bodewes in particular, failed to undertake a meaningful investigation into Meijer's doubts regarding the existence of the Funds' assets, and instead continued acting as a service provider for the Funds for over six more years.

148.    In fact, multiple members of the Administrator's management tried to prevent Meijer from asking questions.    John Verhooren ("Verhooren"), a member of Citco's administration services management team, actually knew that Meijer had raised concerns about the existence of the Funds' assets for years, but deliberately ignored those concerns.    For example, in May 2000, Verhooren acknowledged that the lack of segregation of duties and trading patterns at Madoff were not new discoveries, and many people at Citco had already recognized these phenomena.    Later, in response to concerns raised in 2001, Verhooren again rebuffed Meijer's insistence that Citco was facing "an enormous risk exposure."    Instead, Verhooren told Meijer to stop raising the issue and claimed that Citco would try to meet with Madoff to investigate.    However, neither Verhooren nor any member of the Administrator's staff ever gained sufficient evidence that the Funds' assets existed from Madoff.

### 2.    Citco Failed To Obtain Evidence Of The Existence Of The Funds' Assets

149.    Citco not only expressed internal concern regarding whether the Funds' assets with BLMIS even existed—it knew that BLMIS would not confirm their existence for Citco as the Funds' service providers.

150.    The Administrators' audit reports designated Sentry as a non-compliant fund on their "watch list" as a result of the lack of segregation of duties at BLMIS.    Each year from 2000 through 2006, the Administrators recommended that Citco either confirm the existence of the Funds' assets held by BLMIS or resign as service providers.    On three occasions between May 2000 and December 2002, Citco attempted to verify the existence of the Funds' assets at BLMIS.    All attempts failed.

151.    In May 2000, Citco set up a meeting with Madoff to gain "independent confirmation of the[] existence" of the Funds' assets, particularly the Treasury bills, and to

determine how Madoff derived share prices from the markets. However, this effort failed. BLMIS did not verify the existence of the assets, and Citco concluded internally that the meeting had not provided "a full disclosure of [the] assignment."

152.    In July 2001, Bodewes had attempted to assess the concerns raised by Meijer in an internal due diligence memorandum. However, Bodewes's due diligence was limited to a review of Citco's proprietary documents because Citco was concerned that permitting "an on-site audit at [BLMIS] premises may hurt the relationship with [the Fund], resulting in a possible loss of [a] USD 1.5 million dollar fee income." Even so, based on the documents and information in Citco's possession, Bodewes shared Meijer's concerns about BLMIS's operations, and concluded that losses at BLMIS could be hidden, leaving Citco ultimately liable to the Funds' shareholders. Bodewes also noted that the two man audit firm used by BLMIS did not "match up" with the size of BLMIS's business. Indeed, multiple Administrator employees acknowledged that the small size of Madoff's accounting firm posed a risk, given that the size of the firm was not large enough to audit the amount of assets purportedly managed by BLMIS.

153.    Smeets, Citco Group's CEO, received Bodewes' memo regarding the issues at BLMIS, including the issues posed by the size of Madoff's audit firm. Citco Group's management responded that they would like to "work this out" with Madoff, but never met with him in 2001. By an email dated February 6, 2002, Unternaehrer of Citco Group stated that Citco wanted evidence the T Bills existed. In December 2002, Citco once again "attempt[ed] to get conclusive proof" from Madoff that Sentry's portfolio was in BLMIS custody and to have "Madoff … provide evidence of the existence/custody of the positions." Before the meeting, Meijer directed a member of the internal audit group at Citco to "[p]roperly record what you have done and what you have not been able to determine. … It is a troublesome task insofar as

Madoff is not known for his openness."  However, the meeting did not include any meaningful discussion with Madoff regarding the holdings purported to be in his custody.  The employee, Albert van Nijen, reported back that the Administrators' "mission" to increase "Citco's comfort level with respect to the existence of the assets in relation to [Citco's] responsibilities as Custodian[s]" had again failed.  On December 27, 2002 Bodewes reported to the executive committee of Citco Group that as long as the position of Sentry with BLMIS was not independently verified "there will be doubts".

154.    After Citco's third failed attempt, Citco never again tried to gain evidence from Madoff that the Funds' assets existed until his fraud was ultimately exposed in December 2008. In addition, Meijer noted that "Madoff [was] no[t] known" to Citco's external traders, even though his investment strategy required selling major quantities of call options each month.  In an email to Bodewes, Meijer stated, "I visited the Madoff website. … According to the investment policy, the fund needs to sell major quantities of call options on the market each month.  I absolutely do not trust it!!!!"

155.    Meanwhile, through the entire period, Citco continued to issue the Certificates.

**3.    Citco Negotiated For Higher Fees As Reimbursement For The "Risks" Of Doing Business with Madoff**

156.    Facing grave concerns regarding the Funds' assets placed with BLMIS, Citco put its financial interests ahead of its duties to the Funds and the Funds' investors.

157.    By 2002, Citco knew that the Funds' holdings could not be verified, knew that BLMIS cleared its own trades, and knew that Citco's efforts to reconcile Madoff's operations had failed.  That year, Citco's executive committee put credit line requests from the Funds "on hold until … the 'investigation' on Fairfield" was complete, because Citco was concerned about its exposure to liabilities well beyond the loans in the case of fraud.  Smeets and Citco's

management were aware that the credit line requests were on hold while Citco tried to "get as much comfort as possible" that BLMIS was not a fraud.

158.   Two years later, in February and March 2004, the Custodian decided to cancel one of its credit facilities with Sentry following its discovery that AIG had pulled its investments from BLMIS altogether.   Specifically, the Administrator's management, including Meijer, Verhooren, and William Keunen—who was responsible for the entire division of administration services at Citco—found out that "the risk team of AIG took the decision to get out from all Madoff exposure … [t]hey are scared with the structure …."   It appears that at least some Citco Group management wanted the Custodian to resign: by an email on February 6, 2004, Keunen informed the Administrator that Unternaehrer of Citco Group had decided the Custodian should step down as custodian.   At this time, Smeets was kept informed and aware of Citco's concerns regarding AIG's withdrawal from Madoff.   A few months later, in or about September 2004, Citco's board of directors made the decision to place the Custodians' and Administrators' business with the Funds "under scrutiny" and "to close down all credit relationships … to decrease [Citco's] exposure."   Citco knew that its credit relationship with the Funds would expose it to liability because of BLMIS's role as custodian, among other reasons.

159.   By 2006, Citco considered resigning as service providers.   The Custodians told Citco Group's management, including Smeets:  "We are taking a risk and we only get US$60K per year!"

160.   Instead, Citco negotiated a new fee arrangement. The new arrangement calculated the Custodians' rate as one basis point (one hundredth of one percent) of the Funds' total Net Asset Value.   In other words, Citco's fees for the Custodians' services were now directly tied to the Net Asset Value as determined by the Administrators.   Citco decided "[o]n that basis" to stay

on as Custodians because Sentry's Net Asset Value at that time, based principally on the assets purportedly at BLMIS, was approximately "$5bn, i.e., fees of $500k."

161.    Simply put, Citco accepted dramatically higher fees—tied directly to the Net Asset Value certified by Citco—in exchange for the risks to Citco of doing business with BLMIS, as well as its continued silence regarding BLMIS's role as custodian of the Funds' assets.  Ultimately, Citco's fees increased by 800%.

162.    Internally, Citco knew that: (i) the Administrators did not consistently price the Funds' portfolios independently and typically relied exclusively on the share pricing information supplied by Madoff; and (ii) the Custodians did not have custody of the Funds' portfolios.

163.    Citco failed to verify the pricing information for the Funds' portfolio from independent sources and instead relied on BLMIS statements, even though it knew that such account statements contained incorrect information.  Accountants working for the Administrators discovered on numerous occasions that the trades reported by BLMIS contradicted the public daily price ranges for corresponding trades.  When the Administrators' personnel discovered that the reported share or option prices reported by Bloomberg and Madoff differed, they used the public price in calculating the Net Asset Value reflected in the Certificates.  Citco thus turned a blind eye to its knowledge that BLMIS issued account statements with incorrect pricing information.

164.    Citco acted with a lack of good faith by issuing Certificates in spite of its knowledge that: (1) BLMIS's transactions were likely impossible, given its awareness that "Madoff always [knew] precisely when to buy and sell;" (2) Madoff was the only broker-dealer Citco worked with that provided settlement date transaction confirmations only, rather than trade date confirmations; and (3) Madoff insisted that Citco book all trades for the Funds manually,

rather than through automated or electronic means, which directly contradicted Citco's own "policy to set up [electronic] reconciliation programs for each fund and to avoid manual entries as much as possible;" and, within its own records, "there [were] differences between the custody statements of Citco Bank and Madoff that [were] not being analyzed" by Citco.

165.    This lack of good faith permeated the entire Citco organization.  Until 2008, the Administrators and the Custodians worked hand-in-hand with multiple other "Citco" entities to generate the Certificates for the Funds and served as the intermediaries for all subscription funds invested by Defendants under the Subscription Agreements.  Under Citco Group's direction and control, the Administrators issued Certificates without good faith and with willful blindness to the fact that they could not confirm whether the Funds' assets actually existed.

166.    From the top down, Citco saw and appreciated, but consciously disregarded, the risks to the Fund's investors posed by Madoff's operations.  The Administrators and all other "Citco" subsidiaries served at the whim of Citco Group, which controlled the day-to-day operations of the Administrators and the issuance of Certificates showing an inaccurate and inflated Net Asset Value under the Administration Agreements (as amended from time to time) with the Funds.  Irrespective of which "Citco" entity the Funds' engaged, at all relevant times the Funds' were provided services from and on behalf of "Citco" as a whole from at least eight separate entities, including: Citco Group; Citco Global Custody NV; Citco Global Custody (NA) NV; CGC (NA); Citco Fund Services (BVI); Citco Fund Services (Europe) B.V.; Citco (Canada) Inc.; and Citco Global Security Services.

167.    By virtue of the foregoing conduct, Citco issued the Certificates without good faith.  The Funds were the primary victims of Citco's conduct and its lack of good faith in issuing the Certificates.

### H.    **Exposure Of Madoff's Fraud**

168.    On December 11, 2008, federal agents arrested Madoff for violation of federal securities laws.  On that same day, the United States Attorney brought criminal charges against Madoff, alleging that Madoff ran a multi-billion dollar Ponzi scheme.  *See United States v. Madoff*, No. 08-mj-2735 (S.D.N.Y., filed Dec. 11, 2008).  Upon arrest, Madoff was reported to have told the agents that "there is no innocent explanation" for the fraudulent scheme he had orchestrated and confessed that he "paid investors with money that wasn't there."

169.    On December 11, 2008, the United States Securities and Exchange Commission ("SEC") filed an emergency action in the Southern District of New York to halt ongoing fraudulent offerings of securities and investment advisory fraud by Madoff and BLMIS.  *See SEC v. Madoff*, No. 08-cv-10791 (S.D.N.Y. filed Dec. 11, 2008). On February 9, 2009, the SEC submitted to the Court a proposed partial judgment, to which Madoff consented, imposing a permanent injunction and continuing relief against him, including a permanent freezing of his assets.

170.    In March 2009, Madoff pleaded guilty to the criminal charges brought against him.  In his plea allocution, Madoff confessed: "for many years up until my arrest on December 11, 2008, I operated a Ponzi scheme through the investment advisory side of my business, Bernard L. Madoff Securities LLC."  As Madoff himself described how the scheme worked:

> The essence of my scheme was that I represented to clients and prospective clients who wished to open investment advisory and individual trading accounts with me that I would invest their money in shares of common stock, options and other securities of large well-known corporations, and upon request, would return to them their profits and principal.  Those representations were false because for many years up and until I was arrested on December 11, 2008, I never invested those funds in the securities, as I had promised.  Instead, those funds were deposited in a bank account at Chase Manhattan Bank.  When clients wished to

receive the profits they believed they had earned with me or to redeem their principal, I used the money in the Chase Manhattan bank account that belonged to them or other clients to pay the requested funds.

171.    Madoff further confessed to covering up his fraud by fabricating false trade confirmation and account statements:

> To further cover-up the fact that I had not executed trades on behalf of my investment advisory clients, I knowingly caused false trading confirmations and client account statements that reflected the bogus transactions and positions to be created and sent to clients purportedly involved in the split strike conversion strategy, as well as other individual clients I defrauded who believed they had invested in securities through me. The clients receiving trade confirmations and account statements had no way of knowing by reviewing these documents that I had never engaged in the transactions represented on the statements and confirmations.

172.    Madoff is now serving a 150-year sentence in federal prison.

## I.    The Funds' Estates In Liquidation

173.    Following the revelation of Madoff's fraud, the Funds' boards of directors suspended any further redemptions of Shares and the calculation of the Funds' Net Asset Values. As of December 2008 and presently, Sentry, Sigma, and Lambda had, respectively, approximately 4.7 million, 3.9 million, and 0.2 million shares outstanding.

174.    In 2009, the Funds were put into liquidation proceedings in the BVI.

175.    On February 27, 2009, a secured creditor of Lambda commenced proceedings in the BVI Court pursuant to the BVI Insolvency Act seeking the appointment of a liquidator over Lambda (the "Lambda Proceeding").  The Lambda Proceeding is pending in the BVI Court as claim number BVIHC(COM)2009/74.

176.    On April 21, 2009, ten shareholders applied to the BVI Court for the appointment of a liquidator over Sentry (the "Sentry Proceeding").  The Sentry Proceeding is pending in the BVI Court under claim number BVIHC(COM)2009/136.

177.    On April 23, 2009, a shareholder applied to the BVI Court for the appointment of a liquidator over Sigma (the "Sigma Proceeding" and collectively with the Lambda Proceeding and the Sentry Proceeding, the "BVI Liquidation Proceedings").    The Sigma Proceeding is pending in the BVI Court under claim number BVIHC(COM)2009/139.

178.    As alleged above, the BVI Court issued orders—the BVI Appointment Orders—appointing the Foreign Representatives as liquidators of the Funds.    Pursuant to the BVI Appointment Orders, the Foreign Representatives are responsible for all aspects of the Funds' business, including protecting, realizing, and distributing assets for the Funds' estates.

179.    The Redemption Payments that were made to Defendants were mistaken payments and constituted or formed part of avoidable transactions, and generally represent assets of Sentry's estate that Defendants are not entitled to keep.

## FIRST CLAIM
### *(Constructive Trust - Against all Defendants)*

180.    Sentry and Sigma (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma) repeat and allege again the allegations contained in paragraphs 1 through 179 above as if set forth herein.

181.    In this Court's December 6, 2018 Memorandum Decision, the Foreign Representatives were "granted leave to amend to assert constructive trust claims against Knowledge Defendants." Dkt. 1743 at 65.    The Court clarified that the Foreign Representatives could establish a constructive trust with respect to "the Knowledge Defendants that received redemption payments with the knowledge that the NAV was wrong."    *Id*. at 38.    The Court further recognized that "[u]nder BVI law, lack of good faith, i.e. bad faith, includes wrongdoing by one who acts recklessly as well as one who acts with actual knowledge that he is acting wrongfully or willfully blinds himself to that fact." *Id.* at 23–24.

182.    As detailed above, upon receipt of a redemption request, Sentry and Sigma made each of the Redemption Payments to Fortis (IOM).   The Redemption Payments generally represented the proceeds arising from what the world now knows was Madoff's Ponzi scheme. Accordingly, these Redemption Payments did not, as Sentry and Sigma mistakenly believed, represent the proceeds arising from the profitability of or to continue investment in BLMIS.

183.    Instead, the Redemption Payments were based on a miscalculated and inflated Net Asset Value, which caused those Redemption Payments to be in excess of the Net Asset Value of redeemed Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

184.    At the time of the Redemption Payments, Fortis (IOM) had knowledge of the Madoff fraud, and therefore knowledge that the Net Asset Value was inflated.

185.    Fortis employees from various entities recognized, as early as 2003, that there was a high probability that BLMIS might be defrauding its customers, and that Madoff might not be engaging in the trades he claimed and/or may have misappropriated customer's assets.  Yet, time and time again, Fortis (IOM) ignored those red flags, took affirmative steps to avoid confirming its suspicions, and continued profiting from Madoff's Ponzi scheme.

186.    Accordingly, at all relevant times, Fortis (IOM) had actual knowledge of, was willfully blind to, or recklessly disregarded the fact that the NAV was inflated when it received the Redemption Payments.

187.    Upon information and belief, Fortis (IOM) may have paid some or all of the Redemption Payments it received to the Beneficial Shareholders.

188.    By reason of their receipt of some or all of the Redemption Payments, Defendants have been unjustly enriched to the detriment of Sentry and Sigma and other shareholders and creditors of Sentry and Sigma.

189.    Furthermore, Defendants were not entitled to receive the Redemption Payments because the amounts transferred with respect to each of the Redemption Payments were based on a miscalculated and inflated Net Asset Value, which caused the payment received by Fortis (IOM) for its redemption of Shares to be in excess of the Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

190.    It would offend principles of equity and good conscience to permit Defendants to retain the Redemption Payments.

191.    By reason of the foregoing, a constructive trust should be imposed on the Redemption Payments that were received by Defendants from Sentry and Sigma for the benefit of the Foreign Representatives and Sentry and other shareholders and creditors of Sentry and Sigma.

## SECOND CLAIM
### (Unfair Preference Pursuant to Section 245 of the BVI
### Insolvency Act - Against Fortis (IOM))

192.    The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry and Sigma, repeat and allege again the allegations contained in paragraphs 1 through 191 above as if set forth herein.

193.    Section 245 of the BVI Insolvency Act provides:

(1) Subject to subsection (2), a transaction entered into by a company is an unfair preference given by the company to a creditor if the transaction (a) is an insolvency transaction; (b) is entered into within the vulnerability period; and (c) has the effect of putting the creditor into a position which, in the event of the company going into insolvent liquidation, will be better than the position he would have been in if the transaction had not been entered into.

(2) A transaction is not an unfair preference if the transaction took place in the ordinary course of business;

(3) A transaction may be an unfair preference notwithstanding that it is entered into pursuant to the order of a court or tribunal in or outside the Virgin Islands.

(4) Where a transaction entered into the by the company within the vulnerability period has the effect specific in subsection 1(c) in respect of a creditor who is a connected person, unless the contrary is proved, it is presumed that the transaction was an insolvency transaction and that it did not take place in the ordinary course of business.

194.    A creditor is defined in Section 9 of the BVI Insolvency Act as follows:

(1) A person is a creditor of another person (the debtor) if he has a claim against the debtor, whether by assignment or otherwise, that is, or would be, an admissible claim in (a) the liquidation of the debtor, in the case of a debtor that is a company or a foreign company; or (b) the bankruptcy of the debtor, in the case of a debtor who is an individual.

195.    The BVI Insolvency Act further defines an "insolvency transaction" as a transaction that: "(a) is entered into at a time when the company is insolvent; or (b) … causes the company to become insolvent."  BVI Insolvency Act § 244(2).

196.    For the purposes of assessing unfair preferences under Section 245 of the BVI Insolvency Act and undervalue transactions under Section 246 of the BVI Insolvency Act, a company is "insolvent" if: "(c) … (ii) the company is unable to pay its debts as they fall due." BVI Insolvency Act §§ 8, 244(3).

197.    For purposes of Section 245 and Section 246 of the BVI Insolvency Act, "vulnerability period" means "in the case of a transaction entered into with, or a preference given to, a connected person, the period commencing two years prior to the onset of insolvency and ending on the appointment of the administrator or, if the company is in liquidation, the liquidator …."  BVI Insolvency Act § 244(1).

198.    The "onset of insolvency" is defined as: "the date on which the application for the appointment of the liquidator was filed."  BVI Insolvency Act § 244(1).  Thus, the vulnerability

period, for each of the Funds, is the period commencing two years prior to the application for the appointment of the Liquidators for each Fund and ending on the date of the appointment of the Liquidators of each Fund.

199.    A "connected person" is:

(1) … one or more of the following:

(a) a promoter of the company;

(b) a director or *member of the company* or of a related company;

(c) a beneficiary under a trust of which the company is or has been a trustee;

(d) a related company;

(e) another company one of whose directors is also a director of the company;

(f) a nominee, relative, spouse or relative of a spouse of a person referred to in paragraphs (a) to (c);

(g) a person in partnership with a person referred to in paragraphs (a) to (c); and

(h) a trustee of a trust having as a beneficiary a person who is, apart from this paragraph, a connected person.

BVI Insolvency Act § 5 (emphasis added).

200.    Redemption Payments aggregating USD $104,605,052.47 were made by Sentry to Fortis (IOM) during the two-year period prior to the application for appointment of the Liquidators of Sentry in the BVI Liquidation Proceedings (the "Sentry Vulnerability Period").

201.    During the Sentry Vulnerability Period Sentry was insolvent or was rendered insolvent by the making of Redemption Payments.

202.    Each of the Redemptions and/or Redemption Payments made during the Sentry and Sigma Vulnerability Periods ("Vulnerability Period Payments") was an "insolvency transaction" within the meaning of Section 245 of the BVI Insolvency Act.

203.    Fortis (IOM) was a shareholder (*i.e.*, a member) of Sentry and Sigma during the Sentry and Sigma Vulnerability Periods and was, accordingly, a "connected person" as defined in the BVI Insolvency Act.

204.    Each of the Vulnerability Period Payments put Fortis (IOM) in a better position than it would have been in had such Payment not been made.

205.    Because Fortis (IOM) was a "connected person" as defined in the BVI Insolvency Act, there is a statutory presumption that the Redemptions and/or Vulnerability Period Payments were "insolvency transactions."  Further, even were this not presumed, the Redemptions and/or Vulnerability Period Payments were "insolvency transactions" because at all material times the Funds were insolvent.  This is because the Funds' assets were up to 95% invested with BLMIS and were only able to pay debts falling due either (i) with payments (including fictitious profits) from the Ponzi scheme BLMIS, *i.e.* using the proceeds of fraud, or (ii) by using incoming subscription monies (as a shortcut for investing those monies and also withdrawing monies from BLMIS to pay redeemers).  Each time the Funds withdrew monies from BLMIS an equivalent liability immediately arose to the creditors of and investors in BLMIS.  On any commercial basis the Funds were insolvent on a cash flow basis at all material times.

206.    In addition, there is a statutory presumption that the Vulnerability Period Payments were "not made in the ordinary course of any business" of Sentry and Sigma.  Even were this not presumed, the same would follow in that, among other things, each Vulnerability Period Payment represented a distribution of monies (including fictitious profits) from Madoff's Ponzi scheme or incoming subscription monies (which merely represented a shortcut for investing those monies and also withdrawing monies from BLMIS to pay redeemers), and it was

no part of the ordinary course of business of the Funds to invest in and distribute profits of a Ponzi scheme.

207.    Each of the Vulnerability Period Payments was made following receipt by Sentry and Sigma of a notice of redemption in respect of Shares, which triggered the redemption process under the Articles.  Following the receipt by Sentry and Sigma of a notice of redemption by Fortis (IOM), Fortis (IOM) became a contingent creditor.  Upon the subsequent redemption of Fortis (IOM)'s shares and until such time as Fortis (IOM) received the Vulnerability Period Payment, Fortis (IOM) was a "creditor" of Sentry and Sigma with an admissible claim against Sentry and Sigma in any subsequent liquidation of Sentry and Sigma had payment of the Redemption Price not been made, albeit that post-liquidation Fortis (IOM) would have been deferred to outside creditors.

208.    By reason of the foregoing, the Foreign Representatives, in their capacities as Foreign Representatives and Liquidators of Sentry and Sigma, are entitled to an order avoiding and setting aside the Vulnerability Period Payments and entitling the Foreign Representatives to recover from Fortis (IOM) an amount equal to the Vulnerability Period Payments received by Fortis (IOM) from Sentry and Sigma.

### THIRD CLAIM
*(Unfair Preference Pursuant to Section 245 of the BVI*
*Insolvency Act - Against Beneficial Shareholders)*

209.    The Foreign Representatives, in their capacities as Foreign Liquidators of Sentry and Sigma, repeat and allege again the allegations contained in paragraphs 1 through 208 above as if set forth herein.

210.    Upon information and belief, Fortis (IOM) may have subscribed to all or some portion of the Shares issued to it under the Subscription Agreements in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

211.    Upon information and belief, Fortis (IOM) may have paid to or credited some or all of the Redemption Payments received by it to accounts of the Beneficial Shareholders.

212.    To the extent that any money that Fortis (IOM) received in connection with the Vulnerability Period Payments was transferred to the Beneficial Shareholders, the Foreign Representatives, in their capacities as Foreign Representatives and Liquidators of Sentry and Sigma, are entitled to avoid and set aside such further transfer by Fortis (IOM) to the Beneficial Shareholders and to recover from the Beneficial Shareholders an amount equal to any portion of any Vulnerability Period Payments received by them, and the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma, rely on, *inter alia*, section 249(2)(b) of the BVI Insolvency Act.

### FOURTH CLAIM
***(Undervalue Transaction Pursuant to Section 246 of the
BVI Insolvency Act - Against Fortis (IOM))***

213.    The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry and Sigma, repeat and allege again the allegations contained in paragraphs 1 through 212 above as if set forth herein.

214.    Section 246 of the BVI Insolvency Act provides that;

(1) Subject to subsection (2), a company enters into an undervalue transaction with a person if (a) the company makes a gift to that person or otherwise enters into a transaction with that person on terms that provide for the company to receive no consideration; or (b) the company enters into a transaction with that person for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the company; and (c) in either case, the transaction concerned (i) is an insolvency transaction; and (ii) is entered into within the vulnerability period.

(2) A company does not enter into an undervalue transaction with a person if (a) the company enters into the transaction in good faith and for the purposes of its business; and (b) at the time when it enters into the transaction, there were reasonable grounds for believing that the transaction would benefit the company.

(3) A transaction may be an undervalue transaction notwithstanding that it is entered into pursuant to the order of a court or tribunal in or outside the Virgin Islands.

(4) Where a company enters into a transaction with a connected person within the vulnerability period and the transaction falls within subsection (1)(a) or subsection (1)(b), unless the contrary is proved, it is presumed that (a) the transaction was an insolvency transaction; and (b) subsection (2) did not apply to the transaction.

215.    During the Sentry Vulnerability Period, all assets purportedly held by BLMIS for Sentry and other investors were non-existent, and Sentry was insolvent or rendered insolvent by the Vulnerability Period Payments, as alleged in paragraph 205 above.  Thus, each of the Redemptions and/or Vulnerability Period Payments qualifies as an "insolvency transaction" within the meaning of Section 244 of the BVI Insolvency Act and for purposes of Section 246 of the BVI Insolvency Act.

216.    Sentry received no consideration for any of the Vulnerability Period Payments, or in the alternative, Sentry received, for each Vulnerability Period Payment, consideration, the value of which, in money or money's worth, was significantly less than the value, in money or money's worth, of the consideration provided by Sentry to Fortis (IOM) for each of the Vulnerability Period Payments.

217.    Fortis (IOM) was a shareholder (*i.e.*, a member) of Sentry during the Vulnerability Period and was, accordingly, a "connected person" as defined in the BVI Insolvency Act.

218.    Because Fortis (IOM) was a "connected person" as defined in the BVI Insolvency Act, there is a statutory presumption that the Redemptions and/or Vulnerability Period Payments

were "insolvency transactions."  Further, there is a statutory presumption that the Vulnerability

Period Payments were not made in good faith and for the purposes of the Funds' business with

reasonable grounds to believe that they would benefit the Funds.  Even were that not presumed,

it is in any event clear that the purpose of the Funds was not to invest in and distribute fictitious

profits from a Ponzi scheme such as BLMIS.

219.    By reason of the foregoing, the Foreign Representatives, in their capacities as

Foreign Representatives and liquidators of Sentry and Sigma, are entitled to an order avoiding

and setting aside the Vulnerability Period Payments and to recover from Fortis an amount equal

to the Vulnerability Period Payments received by Fortis from Sentry.

### FIFTH CLAIM
*(Undervalue Transaction Pursuant to Section 246 of the
BVI Insolvency Act - Against Beneficial Shareholders)*

220.    The Foreign Representatives, in their capacities as Foreign Representatives and

liquidators of Sentry and Sigma, repeat and allege again the allegations contained in paragraphs

1 through 119 above as if set forth herein.

221.    Upon information and belief, Fortis (IOM) may have subscribed to all or some

portion of the Shares issued to it under the Subscription Agreements in the capacity of trustee,

agent, representative, or nominee for the Beneficial Shareholders.

222.    Upon information and belief, Fortis (IOM) may have paid to or credited some or

all of the Redemption Payments received by it to accounts of the Beneficial Shareholders.

223.    To the extent that any money that Fortis (IOM) received in connection with the

Vulnerability Period Payments was transferred to the Beneficial Shareholders, the Foreign

Representatives, in their capacities as Foreign Representatives and liquidators of Sentry and

Sigma, are entitled to avoid and set aside such further transfer by Fortis (IOM) to the Beneficial

Shareholders and to recover from the Beneficial Shareholders an amount equal to any portion of

any Vulnerability Period Payments received by them, and the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma, rely on, *inter alia*, section 249(2)(b) of the BVI Insolvency Act.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs respectfully request the following relief:

A.    On the First Claim, imposition of a constructive trust on Redemption Payments;

B.    On the Second and Third Claims:

> i.    a declaratory judgment in favor of the Foreign Representatives and against Fortis (IOM) and the Beneficial Shareholders that the Redemptions and/or Vulnerability Period Payments constitute Unfair Preferences under Section 245 of the BVI Insolvency Act;

> ii.    judgment pursuant to Section 249 of the BVI Insolvency Act, setting aside and avoiding the Redemptions and/or Vulnerability Period Payments; and

> iii.    judgment pursuant to Section 249 of the BVI Insolvency Act against Fortis (IOM) and the Beneficial Shareholders in the amount of the avoided Vulnerability Period Payments received by them or for their benefit, plus interest;

C.    On the Fourth and Fifth Claims:

> i.    a declaratory judgment in favor of the Foreign Representatives and against Fortis (IOM) and the Beneficial Shareholders that the Redemptions and/or Vulnerability Period Payments constitute Undervalue Transactions under Section 246 of the BVI Insolvency Act;

> ii.    judgment pursuant to Section 249 of the BVI Insolvency Act, setting aside and avoiding the Redemptions and/or Vulnerability Period Payments; and

> iii.    judgment pursuant to Section 249 of the BVI Insolvency Act against Fortis (IOM) and the Beneficial Shareholders in the amount of the avoided Vulnerability Period Payments received by them or for their benefit, plus interest;

D.    Awarding Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees and accountants' and experts' fees, costs and expenses; and

E.    Granting Plaintiffs such other and further relief as the Court deems just and proper.

Dated: New York, New York
      January 15, 2020

               **SELENDY & GAY PLLC**

               By: */s/ David Elsberg*
               David Elsberg
               Caitlin Halligan
               Andrew Dunlap
               Lena Konanova
               Ron Krock
               1290 Avenue of the Americas
               New York, NY 10104
               Telephone: 212-390-9000
               E-mail: delsberg@selendygay.com
               E-mail: challigan@selendygay.com
               E-mail: adunlap@selendygay.com
               E-mail: lkonanova@selendygay.com
               E-mail: rkrock@selendygay.com

               -and-

               **BROWN RUDNICK LLP**
               David J. Molton
               Marek P. Krzyzowski
               Seven Times Square
               New York, New York 10036
               Telephone: 212-209-4800
               Facsimile: 212-209-4801
               E-mail: dmolton@brownrudnick.com
               E-mail: mkrzyzowski@brownrudnick.com

               *Attorneys for the Foreign Representatives*

# EXHIBIT A

*Redemption Payments Received by Certain Defendants from Sentry*
*From July 16, 2004 Through November 19, 2008*

| Payment Date | Redemption Payment | Number of Shares | Bank Account To Which Redemption Payment Was Made, Per Shareholder Direction[+] |
|---|---|---|---|
| July 16, 2004 | $1,000,000.00 | 1,004.5200 | Meespierson (Channel Islands) Limited, Channel Islands |
| August 13, 2004 | $1,000,000.00 | 1,003.6900 | Meespierson (Channel Islands) Limited, Channel Islands |
| March 15, 2005 | $1,000,000.00 | 966.5200 | Meespierson (Channel Islands) Limited, Channel Islands |
| April 14, 2005 | $1,000,000.00 | 958.3600 | Fortis Prime Funds Solutions Bank Ireland Ltd., Ireland |
| August 15, 2005 | $1,500,000.00 | 1,418.1100 | Fortis Prime Funds Solutions Bank Ireland Ltd., Ireland |
| September 15, 2005 | $1,000,000.00 | 943.8900 | Fortis Prime Funds Solutions Bank Ireland Ltd., Ireland |
| January 19, 2006 | $500,000.00 | 454.5100 | Fortis Prime Funds Solutions Bank Ireland Ltd., Ireland |
| January 19, 2006 | $1,000,000.00 | 909.0300 | Fortis Prime Funds Solutions Bank Ireland Ltd., Ireland |
| February 15, 2006 | $1,000,000.00 | 902.7200 | Fortis Prime Funds Solutions Bank Ireland Ltd., Ireland |
| March 17, 2006 | $1,000,000.00 | 900.9500 | Fortis Prime Funds Solutions Bank Ireland Ltd., Ireland |
| October 12, 2006 | $2,000,000.00 | 1,697.8700 | Fortis Prime Funds Solutions Bank Ireland Ltd., Ireland |
| December 15, 2006 | $2,000,000.00 | 1,676.3800 | Fortis Prime Funds Solutions Bank Ireland Ltd., Ireland |
| December 15, 2006 | $646,882.66 | 542.2100 | Fortis Prime Funds Solutions Bank Ireland Ltd., Ireland |

*Redemption Payments Received by Certain Defendants from Sentry*
*From July 16, 2004 Through November 19, 2008*

| Payment Date | Redemption Payment | Number of Shares | Bank Account To Which Redemption Payment Was Made, Per Shareholder Direction[+] |
|---|---|---|---|
| September 19, 2007 | $5,000,000.00* | 3,976.4701 | Fortis Prime Funds Solutions Bank Ireland Ltd., Ireland |
| September 19, 2007 | $10,000,000.00* | 7,952.9402 | Fortis Prime Funds Solutions Bank Ireland Ltd., Ireland |
| November 19, 2007 | $2,000,000.00* | 1,568.1486 | Fortis Prime Funds Solutions Bank Ireland Ltd., Ireland |
| December 19, 2007 | $10,000,000.00* | 7,760.0825 | Fortis Prime Funds Solutions Bank Ireland Ltd., Ireland |
| January 17, 2008 | $10,000,000.00* | 7,742.2590 | Fortis Prime Funds Solutions Bank Ireland Ltd., Ireland |
| May 15, 2008 | $3,000,000.00* | 2,281.2833 | Fortis Prime Funds Solutions Bank Ireland Ltd., Ireland |
| June 17, 2008 | $36,000,000.00* | 27,155.0001 | Fortis Prime Funds Solutions Bank Ireland Ltd., Ireland |
| July 15, 2008 | $27,541,099.30* | 20,786.8367 | Fortis Prime Funds Solutions Bank Ireland Ltd., Ireland |
| November 19, 2008 | $1,063,953.08* | 788.2429 | Fortis Prime Funds Solutions Bank Ireland Ltd., Ireland |

* Denotes Redemptions in the Sentry Vulnerability Period.

[+] Whether or not Redemption Payments were ultimately directed to bank accounts in the United States, all Redemption Payments from Sentry went through a correspondent bank account that Sentry's administrator maintained in the United States, and to the extent that any such Redemption Payments were directed outside the United States, they went through a correspondent bank account in the United States identified by shareholders for such payments.

# EXHIBIT B

*Redemption Payments Received by Defendants Sigma*
*On or About February 5, 2007*

| Payment Date | Redemption Payment | Number of Shares | Bank Account To Which Redemption Payment Was Made, Per Shareholder Direction |
|---|---|---|---|
| February 5, 2007 | $214,985.00 | 944.75 | Fortis Prime Funds Solutions Bank Ireland Ltd., Ireland |

All $USD amounts are based on the exchange rate as of the date of the Redemption Payment. However, upon application of a different exchange rate, as may be required by applicable law, the amount of damages may be different.