# Exhibit 28

**SELENDY & GAY PLLC**
1290 Avenue of the Americas
New York, NY 10104
David Elsberg
Caitlin Halligan
Andrew Dunlap
Lena Konanova
Ron Krock
212-390-9000

-and-

**BROWN RUDNICK LLP**
Seven Times Square
New York, New York 10036
David J. Molton
Marek P. Krzyzowski
212-209-4800

*Attorneys for the Foreign Representatives*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) Chapter 15 Case |
| | ) |
| **FAIRFIELD SENTRY LIMITED, et al.,** | ) Case No. 10-13164 (SMB) |
| | ) |
| Debtors in Foreign Proceedings. | ) Jointly Administered |
| | ) |
| **FAIRFIELD SENTRY LIMITED (IN LIQUIDATION), and FAIRFIELD SIGMA LIMITED (IN LIQUIDATION), acting by and through the Foreign Representatives thereof, and KENNETH KRYS and GREIG MITCHELL, solely in their capacities as Foreign Representatives and Liquidators thereof,** | ) |
| | ) |
| | ) Adv. Pro. No. 11-01463 (SMB) |
| | ) |
| Plaintiffs, | ) **[PROPOSED] THIRD** |
| | ) **AMENDED** |
| -against- | ) **COMPLAINT** |
| | ) |
| **MERRILL LYNCH INTERNATIONAL and BENEFICIAL OWNERS OF ACCOUNTS HELD IN THE NAME OF MERRILL LYNCH INTERNATIONAL 1-1000,** | ) |
| | ) |
| Defendants. | ) |
| | ) |

# TABLE OF CONTENTS

**Pages**

PRELIMINARY STATEMENT ............................................................................1

JURISDICTION AND VENUE ........................................................................4

PARTIES ............................................................................................................8

    A.    Plaintiffs ............................................................................... 8

    B.    Defendants ............................................................................ 10

NOTICE PURSUANT TO FED. R. CIV. P. 44.1 ......................................11

FACTUAL ALLEGATIONS ..........................................................................11

    A.    Role Of Feeder Funds In Madoff Fraud ................................ 11

    B.    Calculation Of Net Asset Value And Shareholder Redemption Payments .......... 12

    C.    Redemption Payments Made Or Transferred To Defendants ............................. 15

    D.    Merrill International Knew Or Should Have Known Of The BLMIS Fraud ....... 15

        1.    MLCI Instituted A Practice Against Madoff-Related Investments Based On Its Concerns With Madoff And, Upon Information And Belief, Shared Those Concerns With Relevant Subsidiaries Such As Merrill International ............................................................. 15

        2.    Merrill International Also Repeatedly Refused Trades Involving Madoff Exposure ...................................................... 17

    E.    The Beneficial Shareholder Had The Same Knowledge As Merrill International ................................................................. 20

    F.    Citco Did Not Issue Any Certifications Of Net Asset Value In "Good Faith".................................................................. 21

        1.    Citco Expressed Doubt As To Whether the Funds' Assets At BLMIS Even Existed ................................................ 23

        2.    Citco Failed To Obtain Evidence Of The Existence Of The Funds' Assets ................................................................ 26

        3.    Citco Negotiated For Higher Fees As Reimbursement For The "Risks" Of Doing Business With Madoff................................ 28

G.    Exposure Of Madoff's Fraud ................................................................. 31

H.    The Funds' Estates In Liquidation ...................................................... 33

FIRST CLAIM ................................................................................................34

SECOND CLAIM ...........................................................................................37

THIRD CLAIM ...............................................................................................41

FOURTH CLAIM ...........................................................................................42

FIFTH CLAIM ................................................................................................44

PRAYER FOR RELIEF ..................................................................................44

Fairfield Sentry Limited ("Sentry") and Fairfield Sigma Limited ("Sigma"), by and through Kenneth Krys and Greig Mitchell (together with their predecessors, the "Foreign Representatives" or the "Liquidators"), and Kenneth Krys and Greig Mitchell (together with Sentry and Sigma, the "Plaintiffs"), solely in their capacities as the Liquidators of Sentry and Sigma and the Foreign Representatives of the liquidation proceedings involving Sentry, Sigma, and Fairfield Lambda Limited ("Lambda," together with Sentry and Sigma, the "Funds" or the "Debtors") pending before the Commercial Division of the Eastern Caribbean High Court of Justice, British Virgin Islands (the "BVI Court"), for their complaint against Defendants, allege the following based on personal knowledge or information derived from the Funds' books and records or from other sources, including, *inter alia*, court filings and statements of governmental agencies and other parties.

## PRELIMINARY STATEMENT

1.      This adversary proceeding, which arises out of a now decade-long effort to recoup assets for the victims of the largest Ponzi scheme in history, seeks recovery of $16,077,850 improperly received by Defendant Merrill Lynch International ("Merrill International").

2.      Merrill International is one of a number of banks that invested, for itself or others, in so-called "feeder funds," which channeled private investments into managed accounts with Bernard L. Madoff and his now-infamous brokerage business, Bernard L. Madoff Securities LLC ("BLMIS").

3.      The Madoff scheme worked seamlessly for decades, apparently netting shareholders handsome returns that far exceeded the market.

4.      Once BLMIS imploded, however, the world learned what some in the investing community, including senior management at Merrill International, had long turned a blind eye

to:  that the payments investors received from the feeder funds in exchange for the redemption of shares were massively overvalued.  In fact, they were non-existent.

5.      The feeder funds, like the Funds in this case, were essential to the perpetration of that scheme.  From their inception until the revelation of Madoff's fraud in December 2008, during most relevant times, the Funds sought out new investment through the sale of shares to investors and transferred (either directly in the case of Sentry or indirectly, through Sentry, in the cases of Sigma and Lambda) substantially all the proceeds of those sales, net of fees and expenses, to BLMIS for investment in accounts managed by Madoff.

6.      However, instead of using investor proceeds collected by the Funds to purchase securities and other investments, BLMIS used those contributions to service the redemption requests of other investors, enriching Madoff and his associates in the process.

7.      The investors lucky enough to redeem their shares in the Funds before the collapse of the Ponzi scheme received payments ("Redemption Payments") at a grossly inflated "Net Asset Value" (or "NAV")—the price determined by dividing the value of the respective assets of Sentry, Sigma, and Lambda by the number of shares outstanding in each Fund.  Merrill International is one such investor.

8.      Between August 14, 2006 and November 21, 2008, Merrill International received USD $16,077,850 in Redemption Payments from Sentry and Sigma collectively.  At the time it received these payments, Merrill International had already uncovered multiple indicia that Madoff was engaged in some form of fraud.  But rather than confront the facts before it, Merrill International turned a blind eye, accepting millions of dollars while willfully ignoring or, at the very least, recklessly disregarding the truth in clear violation of the laws of the British Virgin Islands (or "BVI").

9.     At some point before 2006, Merrill International's parent, Merrill Lynch & Co., Inc. ("MLCI" and, collectively with Merrill International and all other MLCI subsidiaries or affiliates, the "Merrill Companies"), instituted a practice across the Merrill Companies to refuse all Madoff-related investments.

10.    Merrill International personnel, including derivatives experts and trading desk employees, consistently refused BLMIS-related trades citing, among other issues, the secrecy surrounding the source of Madoff's returns and the questionable nature of the BLMIS's "split strike conversion" strategy.  Notwithstanding Merrill International's ban on Madoff-related investments, Merrill International still chose to purchase shares in Sentry and Sigma.

11.    By virtue of its skepticism regarding the source of Madoff's returns, Merrill International at a minimum recklessly disregarded that the Net Asset Value was massively overvalued and, therefore, that the Redemption Payments it received were improperly calculated.

12.    At all relevant times, Merrill International knew that the Redemption Payments did not, as Sentry and Sigma intended, represent the proceeds arising from the profitability of or to continue investment in BLMIS.  Instead, any amounts obtained directly or indirectly by Sentry and Sigma from BLMIS to make Redemption Payments to Merrill International generally were proceeds of Madoff's Ponzi scheme, obtained from other BLMIS investors or other Sentry and Sigma investors invested in BLMIS.

13.    Accordingly, the Funds' actual assets are, and at all relevant times were, far less than the amount needed to satisfy their liabilities and the claims that have been or may be asserted against them.  At all relevant times, the Funds were unable to pay their debts as they fell or would fall due.  Specifically, at the time the Redemptions Payments were made, the Funds had insufficient assets from which to pay debts as they fell or would fall due.  The Funds have been

unable to satisfy their debts to BLMIS customers, the BLMIS Trustee, and other creditors of the Funds, and further increased the amount of those liabilities.

14.     As a result, the Funds were placed into liquidation by the BVI courts and the Foreign Representatives were appointed, and thereafter commenced ancillary proceedings in this Court pursuant to Chapter 15 of the Bankruptcy Code to recover improper Redemption Payments received by the Funds' investors.

15.     Upon information and belief, Merrill International has either retained the Redemption Payments made to it by Sentry and Sigma for its own account and benefit or paid all or some portion of such payments to or for the account of persons or entities for whom Merrill International may have subscribed for shares of the Funds in the capacity of trustee, agent, representative, nominee or custodian (individually, a "<u>Beneficial Shareholder</u>" and collectively, "<u>Beneficial Shareholders</u>," together with Merrill International, the "<u>Defendants</u>").

16.     By this proceeding, Plaintiffs seek to recoup for the benefit of the Funds' estates, Redemption Payments transferred to Merrill International.  Without this recovery, Defendants will have been unjustly enriched, and allowed to retain a windfall at the expense of other shareholders and creditors of the Funds. Any recoveries will aid the Funds in satisfying their liabilities and redound to the benefit of the Funds' investors who found themselves victims of Madoff's Ponzi scheme.

## JURISDICTION AND VENUE

17.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 157(b) and 1334(b), as this adversary proceeding and the claims asserted by the Foreign Representatives herein arise under, arise in and/or relate to the Chapter 15 proceedings of the above-captioned Debtors, *In re Fairfield Sentry Limited, et al.*, No. 10-13164 (SMB), pending in this Court.  Additionally, pursuant to section 78eee(b)(2)(A)(iii) of the Securities Investor Protection Act ("<u>SIPA</u>"), which

incorporates 28 U.S.C. § 1334(b) and applicable provisions of Title 11 of the United States Code, jurisdiction is also proper in this Court because this action also relates to the consolidated liquidation proceedings of BLMIS and Bernard L. Madoff, pending in this Court under the caption *Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC*, SIPA Liquidation No. 08-1789 (SMB).  Pursuant to the Amended Standing Order of Reference of the United States District Court for the Southern District of New York, dated January 31, 2012, all proceedings arising in, arising under and/or related to cases under Title 11 of the United States Code (as amended, the "Bankruptcy Code") are referred to this Court for adjudication.

18.    This is a core proceeding under 28 U.S.C. § 157(b)(2).  Should the Court determine that this is a non-core proceeding, Plaintiffs consent to entry of final judgment and order by this Court.

19.    This Court has jurisdiction over Merrill International and any Beneficial Shareholders pursuant to Rules 7004(d) and (f) of the Federal Rules of Bankruptcy Procedure and New York Civil Practice Law & Rules § 302 (McKinney 2008) because Merrill International and the Beneficial Shareholders purposely availed themselves of the laws of the United States and the State of New York by, among other things, investing money with the Funds, knowing and intending that the Funds would invest substantially all of that money in New York-based BLMIS, and maintaining bank accounts in the United States at JP Morgan Chase, and in fact receiving Redemption Payments in those United States-based and/or New York-based accounts. Merrill International and the Beneficial Shareholders selected U.S. dollars as the currency in which to invest and execute their transactions in Sentry, designated United-States based and/or New York-based bank accounts to receive their Redemption Payments from the Funds, and actively directed Redemption Payments at issue in this action into those bank accounts.  Merrill

International and the Beneficial Shareholders thus knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York, derived significant revenue from New York, and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein. Merrill International and the Beneficial Shareholders should therefore reasonably expect to be subject to United States jurisdiction.

20.    Moreover, this Court has jurisdiction over Merrill International and any Beneficial Shareholders by virtue of the legally binding and valid agreements and representations set forth in one or more agreements for the subscription of Shares that Merrill International entered into with Sentry and Sigma.

21.    Merrill International, upon information and belief, entered into a Subscription Agreement with Sentry on or about July 30, 2005 (the "Initial Subscription Agreement") pursuant to which the Merrill International subscribed for a total of 5,490.55 Shares.  Subsequent to entering into the Initial Subscription Agreement, Merrill International, upon information and belief, entered into additional agreements (the "Subsequent Subscription Agreements") with Sentry and Sigma on or about July 27, 2005, October 26, 2005, February 27, 2006, May 30, 2006, January 26, 2007, April 24, 2007, May 29, 2007, July 13, 2007, August 28, 2007, and December 5, 2007 pursuant to which it subscribed for 28,875.4022 additional shares on the same terms and conditions as those shares subscribed for pursuant to the Initial Subscription Agreement.  The Initial Subscription Agreement and Subsequent Subscription Agreements are collectively referred to herein as the "Subscription Agreements."

22.    The Subscription Agreements provide for, *inter alia*, the irrevocable submission by Merrill International to the jurisdiction of the New York courts with respect to any proceeding

with respect to said agreement and Sentry and Sigma and Merrill International's consent to service of process by the mailing of such process, as provided therein.    In particular, the Subscription Agreements provide as follows:

> New York Courts.    Subscriber agrees that any suit, action or proceeding ("Proceeding") with respect to this Agreement and the Fund may be brought in New York.    Subscriber irrevocably submits to the jurisdiction of the New York courts with respect to any Proceeding and consents that service of process as provided by New York law may be made upon Subscriber in such Proceeding, and may not claim that a Proceeding has been brought in an inconvenient forum.    Subscriber consents to the service of process out of any New York court in any such Proceeding by the mailing of copies thereof, by certified or registered mail, return receipt requested, addressed to Subscriber at the address of Subscriber then appearing on the Fund's records.    Nothing herein shall affect the Fund's right to commence any Proceeding or otherwise to proceed against Subscriber in any other jurisdiction or to serve process upon Subscriber in any manner permitted by any applicable law in any relevant jurisdiction.

    23.    Furthermore, by executing the Subscription Agreements, Merrill International agreed to all terms and conditions contained therein, including the express provision that any agreement made by Merrill International in the Subscription Agreements would also apply to any other person for whom Merrill International was subscribing as trustee, agent, representative, or nominee—*i.e.*, all Beneficial Shareholders.    Moreover, by executing the Subscription Agreements, Merrill International represented that it had all requisite authority from Beneficial Shareholders to execute and perform any and all obligations on their behalf, and also agreed to indemnify Sentry and Sigma for any damages resulting from an assertion by a Beneficial Shareholder that Merrill International lacked proper authorization to enter into the Subscription Agreements or perform the obligations thereof.    Specifically, the Subscription Agreements provide as follows:

> If Subscriber is acting as a Representative.    If Subscriber is subscribing as trustee, agent, representative, or nominee for

another person (the "Beneficial Shareholder"), Subscriber agrees that the representations and agreements herein are made by Subscriber with respect to itself and the Beneficial Shareholder. Subscriber has all requisite authority from the Beneficial Shareholder to execute and perform the obligations hereunder. Subscriber also agrees to indemnify the Fund … for any and all costs, fees and expenses (including legal fees and disbursements, fines and amounts paid in settlement) in connection with any damages resulting from Subscriber's misrepresentation or misstatement contained here, or the assertion of Subscriber's lack of proper authorization from the Beneficial Shareholder to enter into this Agreement or perform the obligations hereof.

24.     Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

**PARTIES**

**A.    Plaintiffs**

25.     Sentry, a British Virgin Islands company, was organized in 1990 under the International Business Company Act of the British Virgin Islands and was subsequently re-registered as a business company under the BVI Business Companies Act 2004. Sentry's registered agent is Codan Trust Company (B.V.I.) located at Romasco Place, Wickhams Cay 1, Road Town, Tortola, BVI.   Sentry is currently in liquidation in proceedings commenced on April 21, 2009 in the BVI Court.

26.     Sigma, a British Virgin Islands company, was organized in 1990 under the International Business Company Act of the British Virgin Islands and was subsequently re-registered as a business company under the BVI Business Companies Act 2004. Sigma's registered agent is Codan Trust Company (B.V.I.) located at Romasco Place, Wickhams Cay 1, Road Town, Tortola, BVI.   Sigma is currently in liquidation in proceedings commenced on April 23, 2009, in the BVI Court.

27.     The Foreign Representatives were appointed by the BVI Court as Liquidators of the Funds to supervise the liquidation of the Funds' estates and, where necessary, commence

proceedings in the name of and on behalf of the Funds or in their own official names. On April 23, 2009, the BVI Court issued an order appointing Christopher Stride as liquidator of Lambda (the "Lambda Appointment Order"). On July 21, 2009, the BVI Court issued an order appointing Kenneth Krys and Mr. Stride as joint liquidators of Sentry and Sigma (the "Sentry & Sigma Appointment Order"). On September 6, 2010, the BVI Court issued notices acknowledging Mr. Stride's resignation and the appointment of Joanna Lau as joint liquidator with Mr. Krys of all three Funds (the "Supplemental Appointment Order"). On November 23, 2011, Ms. Lau resigned as joint liquidator of the Funds. On June 24, 2014, the BVI Court issued an order appointing Charlotte Caulfield as joint liquidator, with Mr. Krys, of all three Funds (the "Second Supplemental Appointment Order"). On June 21, 2019, Ms. Caulfield resigned as joint liquidator of the Funds. On July 8, 2019, the BVI Court issued an order appointing Greig Mitchell as joint liquidator, with Mr. Krys, of all three Funds (the "Third Supplemental Appointment Order" and, together with the Lambda Appointment Order, the Sentry & Sigma Appointment Order, the Supplemental Appointment Order, and the Second Supplemental Appointment Order, the "BVI Appointment Orders"). The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of the Funds, have been authorized by the foreign court having jurisdiction over the matter to bring this action and the claims herein, including the avoidance claims herein under the BVI Insolvency Act of 2003 (the "BVI Insolvency Act").

28.    Pursuant to the BVI Appointment Orders, the Foreign Representatives are responsible for all aspects of the Funds' businesses, including, among other things, custody and control of the Funds' assets, the power to do all acts and execute, in the name and on behalf of the Funds, any deeds, receipts or other documents, and the power to compromise claims,

commence litigation and to dispose of property. After obtaining BVI Court approval, the Foreign Representatives filed petitions in this Court in June of 2010, under Chapter 15 of Title 11 of the United States Code, seeking recognition of the BVI Liquidation Proceedings as "foreign main proceedings" under Chapter 15. On July 22, 2010, this Court issued an order (the "Recognition Order") granting that recognition.

29. Pursuant to the Recognition Order, the Foreign Representatives were automatically afforded relief available under 11 U.S.C. § 1520, including application of the Bankruptcy Code's automatic stay to the Funds and their property located in the United States, as well as the ability to operate the Funds' business and exercise the rights and powers of a trustee under Sections 363 and 552 of the Bankruptcy Code. Moreover, the Bankruptcy Court specifically granted additional relief in the Recognition Order to the Foreign Representatives pursuant to 11 U.S.C. § 1521(a). Such relief includes, but is not limited to: (i) staying any actions, proceedings or execution against the Funds' assets to the extent not stayed under Section 1520; (ii) authorizing the Foreign Representatives to seek leave to conduct discovery concerning the Funds' assets, affairs, rights, obligations or liabilities; (iii) entrusting the Foreign Representatives with the administration and realization of the Funds' assets that are located within the United States, including all claims and causes of action belonging to the Funds; and (iv) otherwise giving full force and effect to the proceedings before the BVI Court.

**B.    Defendants**

30. Merrill International was, at all relevant times, a member of Sentry and Sigma and a registered holder of Shares. Upon information and belief, Merrill International is a corporate entity organized under the laws of the United Kingdom and having its registered address at 2 King Edward Street, London ECIA 1HQ, United Kingdom. Merrill International subscribed for the purchase of Shares by entering into the Subscription Agreements with Sentry and Sigma. All

purchases of Shares by Merrill International were subject to the terms of the Subscription Agreements.

31.    At all relevant times, non-party MLCI was the ultimate parent company of Merrill International.  MLCI is a Delaware corporation with a principal place of business at 4 World Financial Center, 250 Vesey Street, New York, New York 10080.  MLCI, through its numerous subsidiaries and affiliates, provides financial products and services on a global basis.  MLCI operates as a wholly owned subsidiary of Bank of America Corporation.

32.    Defendants "Beneficial Owners of the Accounts Held in the Name of Merrill Lynch International 1-1000"—*i.e.*, the Beneficial Shareholders—are, as noted, any persons or entities having a beneficial ownership or interests in Shares of Sentry and/or Sigma issued to Merrill International and on whose behalf Merrill International was acting as trustee, agent, representative, or nominee.

## NOTICE PURSUANT TO FED. R. CIV. P. 44.1

33.    Certain of the substantive issues to be resolved in this case will be governed by the laws of the British Virgin Islands.  Plaintiffs intend to rely upon the applicable laws of that territory.

## FACTUAL ALLEGATIONS

### A.    Role Of Feeder Funds In Madoff Fraud

34.    Sentry was the largest of all the so-called "feeder funds" to maintain accounts with BLMIS.  Sigma and Lambda were indirect BLMIS feeder funds established for foreign currency (respectively, Euro and Swiss franc) investment through purchase of shares of Sentry.  Shares in the Funds had the following par values: \$.01 per share (Sentry), €.01 per share (Sigma), and CHF.01 per share (Lambda).  Sentry's account statements with BLMIS as of the end of October 2008 showed in excess of \$6 billion of invested assets supposedly held by

BLMIS. As stated in its offering materials, Sentry's investment objective was to achieve capital appreciation through investments in BLMIS.

35. As discussed above, Sentry, Sigma, and Lambda were established for the purpose of making investments in BLMIS. It is now known that these types of feeder funds were a crucial part of Madoff's Ponzi scheme. The feeder funds brought new investors and new investments into the scheme, allowing Madoff to make payments to early investors who sought to liquidate their investments, and in this way, the feeder funds were used by Madoff to continue and perpetuate his fraud by maintaining the illusion that BLMIS was making active investments and engaging in a successful investment strategy.

**B.**   **Calculation Of Net Asset Value And Shareholder Redemption Payments**

36. From the Funds' inception until the disclosure of Madoff's fraud in December 2008, during most relevant times, substantially all of the money (up to 95%) raised by the Funds from the sale of their Shares, net of fees and expenses, was turned over to and invested in BLMIS (by and/or through Sentry), and supposedly credited to accounts held in the name of Sentry with BLMIS, purportedly for use in the now infamous "split-strike conversion" investment strategy. In accordance with the Funds' Subscription Agreements, Articles of Association, offering materials and/or other relevant documents, from time to time, the Funds paid to shareholders, for each Share tendered for redemption, an amount that was based on each of the respective Funds' purported "Net Asset Value"—the value of the respective assets of Sentry, Sigma, and Lambda divided by the number of shares outstanding in each Fund—as it was then calculated.

37. In calculating each of the Funds' Net Asset Value, the Funds' administrators used and relied on account statements provided by BLMIS purportedly showing securities and investments, or interests or rights in securities and investments, held by BLMIS for the account

of Sentry. Generally, all securities identified on BLMIS account statements were traded on public exchanges and had readily ascertainable market values, and those market values (in addition to, among other items, cash on hand that was identified in the Sentry account statement for the relevant time period) were used in accordance with the Funds' Subscription Agreements, Articles of Association, offering materials and/or other documents to calculate the Net Asset Value of the Shares.

38.    In fact, at all relevant times, no securities were ever purchased or sold by BLMIS for Sentry and any stated cash on hand in the BLMIS accounts was based on misinformation and fictitious account statements. None of the transactions shown on the account statements provided by BLMIS to Sentry ever occurred. Indeed, no investments of any kind were ever made by BLMIS for Sentry. At all relevant times, all of the account statements that BLMIS provided to Sentry were entirely and utterly fictitious. Further, all amounts deposited by Sentry (or by Sigma and Lambda through Sentry) with BLMIS for investment and the purchase of securities to be held by BLMIS for the account of Sentry were used by Madoff to pay other BLMIS investors or were misappropriated by Madoff for other unauthorized uses.

39.    From time to time, to make Redemption Payments, Sentry (and Sigma and Lambda through Sentry) made withdrawals from Sentry's BLMIS accounts (or utilized subscription monies of other investors on hand that were directed for investment in BLMIS). At all relevant times, the Funds believed that the amounts provided in connection with such withdrawals represented the proceeds arising from the profitability of or to continue investment in BLMIS. In fact, however, payments made by BLMIS to Sentry purportedly representing the proceeds of sales of securities or other investment positions were nothing other than the deposits of other BLMIS investors or previous deposits made by Sentry, never invested but rather

misused and misappropriated as part of Madoff's fraud. At all relevant times, payments made from BLMIS to Sentry were made by Madoff to continue and perpetuate his Ponzi scheme and avoid detection of his fraud. The payments from BLMIS to Sentry were not payments made in the ordinary course of or as part of any business, nor did they have a legitimate business purpose. Similarly, the Redemption Payments were not made for any legitimate purposes or in the ordinary course of any business. Those Redemption Payments did not conform to or follow the terms of the Funds' Subscription Agreements, Articles of Association and/or other offering documents, as they were based upon Net Asset Values that were not calculated based upon the true facts existing at any relevant time, and because, more generally, the Redemption Payments represented the proceeds arising from investment in BLMIS (or a substitute therefor, in the form of subscription monies from other investors in the Funds, used as a shortcut to investing subscription monies with BLMIS and simultaneously withdrawing monies from BLMIS), which the world now knows was operated by Madoff as a Ponzi scheme.

40.     Given the fraudulent nature of BLMIS and its operation as a massive Ponzi scheme, the money paid by the Funds (directly in the case of Sentry and indirectly in the cases of Sigma and Lambda) to BLMIS on account of Sentry was, at all relevant times and unknown to the Funds, misused and misappropriated by Madoff as part of his Ponzi scheme. At all relevant times, the Funds were insolvent when the Redemption Payments were made or were rendered insolvent, and/or their insolvency was deepened, as a result of the Redemption Payments.

41.     As a result, at all relevant times, the Net Asset Value of the Shares redeemed was miscalculated, and Redemption Payments were mistakenly made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at any relevant time.

C.    **Redemption Payments Made Or Transferred To Defendants**

42.    During the period from and after August 14, 2006 through November 21, 2008, Merrill International received Redemption Payments totaling USD $16,077,850.00 from Sentry and Sigma in respect of Shares tendered for redemption.

43.    At Merrill International's directions and instructions, Merrill International received $14,200,000 in Redemption Payments at its bank account with JP Morgan Chase in New York and $1,877,850 at its bank account with Citibank London.

44.    The dates and amounts of each Redemption Payment received by Merrill International from Sentry, and the Merrill International bank accounts to which each Redemption Payment was made, are set forth on Exhibit A.    The dates and amounts of each Redemption Payment received by Merrill International from Sigma, and the Merrill International bank accounts to which each Redemption Payment was made, are set forth on Exhibit B.

45.    At the time those Redemption Payments were made, the Funds had insufficient assets and were unable to pay their debts as they would fall due.    In exchange for each Redemption Payment, each of which constitutes or forms part of a transaction between Merrill International and Sentry and Sigma, Sentry and Sigma received no consideration or consideration of a value that, in money or money's worth, was significantly less than the value, in money or money's worth, of the consideration provided by Sentry and Sigma.

46.    Upon information and belief, Merrill International and/or the Beneficial Shareholders received Redemption Payments in excess of amounts paid by such person(s) for purchase of their Shares.

D.    **Merrill International Knew Or Should Have Known Of The BLMIS Fraud**

1.    **MLCI Instituted A Practice Against Madoff-Related Investments Based On Its Concerns With Madoff And, Upon Information And Belief, Shared Those Concerns With Relevant Subsidiaries Such As Merrill International**

47.    In the years before BLMIS's demise, Merrill International and its parent company, MLCI, were each presented with multiple opportunities to invest with Madoff through Madoff Feeder Funds and thus learn about BLMIS.

48.    MLCI, as a global organization, performed due diligence on Madoff and his split-strike conversion ("SSC") Strategy.  Upon information and belief, as a result of its inquiry, MLCI concluded that Madoff's structure—in which BLMIS simultaneously served as the investment adviser, the prime broker, and the custodian of assets—lent itself to fraud and manipulation without adequate independent checks, that Madoff's returns were not generated by the claimed trading strategy, and that Madoff's investment advisory business might very well be fraudulent.

49.    In addition to MLCI's Madoff-related due diligence, Fabio Savoldelli, a former senior executive at Merrill Lynch Investment Management ("MLIM"), a subsidiary of MLCI, sounded the internal warning bell about Madoff across the Merrill Companies many years before BLMIS's collapse.

50.    Savoldelli, and others within the global organization of Merrill Companies, spotted numerous red flags indicative of irregular or fictitious lending activities in Madoff's operations, including: (i) impossibly consistent returns with no down years ever; (ii) Madoff's total equity portfolio liquidation at every quarter and year end; (iii) audits of BLMIS by a small, strip mall accountant and tax preparer; (iv) Madoff's purported trading with unidentified options counterparties; and (v) the lack of, and defects in, independent checks and balances—*i.e.*, lack of internal controls as to the existence of actual assets where Madoff simultaneously served as the adviser, broker, and custodian of the assets.  In addition, Madoff's "commission" structure, whereby he left hundreds of millions, if not billions, of dollars in performance and management

fees on the table for others, such as the feeder funds, reminded Savoldelli of other Ponzi schemes.

51.     Upon information and belief, as Merrill International's parent company, MLCI alerted others within the Merrill Companies, including Merrill International, to the results of its due diligence into and internal identification of red flags regarding the Madoff funds.  Moreover, as an affiliate of MLCI, Merrill International is a member the global MLCI organization, and thus received Savoldelli's internal warning bell regarding Madoff.

52.     Sometime before the late 1990s, the highest authorities within MLCI instituted an enterprise-wide practice against the investment of its own money or its clients' money in BLMIS, either directly or indirectly.  MLCI consistently refused to provide leverage to institutional investors seeking to make levered investments in Madoff-related funds through structured products like notes or swaps.  MLCI also regularly refused to direct investments to Madoff through, for example, funds of funds or single hedge fund wrap vehicles.

53.     Upon information and belief, as Merrill International's parent company, MLCI's highest authorities informed Merrill International of this enterprise-wide practice against Madoff-related investments and the reasons for that practice, as evidenced by the fact that—as individuals like Savoldelli have testified—the Merrill Companies did not lose any money on Madoff.

### 2.    Merrill International Also Repeatedly Refused Trades Involving Madoff Exposure

54.     Consistent with the anti-Madoff investment policy of its parent company, MLCI, Merrill International repeatedly refused trades involving Madoff.

55.    In December 2006, Merrill International's London-based fund-linked derivatives solutions group was asked to consider a leveraged transaction involving a Madoff Feeder Fund. A Merrill International London desk employee responded as follows:

> [T]he fund is managed by Bernie Madoff, and the brokerage firm behind the fund is Madoff securities. Madoff is known for keeping the source of his returns a secret. This caused a lot of speculation on Wall Street about the true sources of the admittedly impressive returns. Merrill Lynch has repeatedly looked into Fairfield Sentry and other Madoff funds, which all use the same strategy called 'spit [*sic*] strike conversion.' The decision was taken some time ago that Merrill Lynch does not offer any products on these funds.

56.    Following the December 2006 inquiry, another Merrill International employee sent a follow-up email confirming Merrill International's anti-Madoff investment policy and providing a May 7, 2001 article from *Barron's* by Erin E. Arvedlund entitled, "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks investors to keep mum," which noted the heavy skepticism on Wall Street surrounding Madoff, as well as the lack of transparency around the BLMIS investment advisory business because of Madoff's unwillingness to answer basic due diligence questions about his SSC strategy.

57.    In July 2007, a Vice President for Latin America Structured Products from a "Merrill Lynch" entity contacted the Merrill International London desk asking whether Merrill International would be willing to structure a leveraged trade on Sentry and possibly another fund. A Merrill International London desk employee answered promptly: "Both [funds] are related to Madoff. We can't provide leverage on these funds."

58.    In September 2007, a Paris-based Merrill International employee contacted his colleagues on the Merrill International London desk and informed them that a French client was interested in getting a quote on a three times (3x) leverage structured note on Sentry. Within 24 hours, a Merrill International London desk employee informed his French counterpart that

Merrill International had no appetite for any portion of Sentry risk and would not quote a price on any structured product with leverage on Sentry.

59.    In February 2008, Merrill International was again asked for a quote for a two times (2x) levered note on Sentry.  A Merrill International London desk employee responded as follows:  "We receive a lot of requests for leverage on the Madoff Feeder Funds (Fairfield Sentry, Kingate, etc.) but we aren't prepared to quote on that: [i] We don't have a mandate for single manager HF leverage [ii] [and] There is a lack of transparency into the real strategy employed, and lots of rumors around the funds.  We're pretty much in line with our competitors on that (no-one is really willing to quote)."

60.    Sometime in the second half of 2008, a hedge fund consultant at Financial Risk Management ("FRM"), an independent hedge fund investment specialist in London, who had previously worked at Citigroup Global Markets Limited ("CGML") in London, contacted Merrill International's London desk to inquire whether Merrill International was interested in replacing CGML on a total return swap linked to Sentry for a CGML client because CGML wanted out of the trade.  The FRM employee closed his e-mail with "Madoff risk isn't for everyone – happy to discuss other trades that might be though."  The Merrill International trader replied, "I think we are reluctant to take Madoff risk irrespective of the credit environment e.g[.] even if we find committed [total return swap] financing."

61.    After Madoff's fraud was exposed to the rest of the world in December 2008, as discussed in Section F, *infra*, a Merrill International employee summed up Merrill International's awareness of Madoff's illegal conduct to another of his London-based colleagues in a December 12, 2008 email:  "Not a big surprise … but definitely a bad signal for us all."

62.     Later that same day, a different Merrill International London employee echoed that sentiment in an email to two of his London-based colleagues:  "We all knew there was something wrong at Madoff – I guess now our suspicions have been confirmed."

63.     Given Merrill International's awareness of the results of MCLI's due diligence into Madoff, Savoldelli's internal warning bell, and both MCLI and Merrill International's own practices against Madoff investments due to suspicions regarding Madoff's claimed revenues, Merrill International turned a blind eye or was, at the very least, reckless with respect to the fact that the Net Asset Value calculations were inaccurate.

**E.     The Beneficial Shareholder Had The Same Knowledge As Merrill International**

64.     Merrill International served as trustee, agent, representative, nominee or custodian for the Beneficial Shareholders in connection with their investments in the Funds, including, by: subscribing to Shares of Sentry and Sigma on behalf of the Beneficial Shareholders, maintaining custody of the Shares as record shareholders, paying redemption proceeds from the Shares of Sentry and Sigma to the Beneficial Shareholders, and otherwise exercising control over the Shares of Sentry and Sigma.

65.     Further, each of the Subscription Agreements, executed by Merrill International, manifested the Beneficial Shareholders' consent for Merrill International to act on behalf of and subject to the Beneficial Shareholders' control.  And in executing the Subscription Agreements, Merrill International accepted and agreed to act on behalf of the Beneficial Shareholders.

66.     Accordingly, the Beneficial Shareholders had the same knowledge as Merrill International regarding all relevant matters relating to BLMIS and the Funds' Net Asset Values at all relevant times.

67.     But in the alternative, both the Funds' Articles of Association as well as each of
the Subscription Agreements provide that it is the registered shareholders that are to be treated as
the parties to the Funds' Articles.

68.     Article 8 of the Funds' Articles provides that "The Company shall be entitled to
treat the registered holder of any share as the absolute owner thereof and accordingly shall not be
bound to recognise an equitable or other claim to, or interest in, such share on the part of any
other person."

69.     Paragraph 27 of the Subscription Agreements similarly provides that "If
Subscriber is subscribing as trustee, agent, representative or nominee for another person (the
'Beneficial Shareholder'), Subscriber agrees that the representations and agreements herein are
made by Subscriber with respect to itself and the Beneficial Shareholder.  Subscriber has all the
requisite authority from the Beneficial Shareholder to execute and perform the obligations
hereunder."

70.     Together, these contractual provisions bind the Beneficial Shareholders to Merrill
International's bad faith on all relevant matters relating to BLMIS and the Funds' Net Asset
Values at all relevant times.

**F.     Citco Did Not Issue Any Certifications Of Net Asset Value In "Good Faith"**

71.     Article 11 of the Funds' Articles provides that "[a]ny certificate as to the Net
Asset Value per Share … given in good faith by or on behalf of the Directors shall be binding on
all parties."  During the relevant period, statements of the Net Asset Value were issued by the
Funds' administrators, Citco Fund Services (Europe) B.V. and its delegatee Citco (Canada) Inc.
(the "Administrators").  On April 16, 2014, the Judicial Committee of the Privy Council (the
"Privy Council") issued a decision in which it held that certain statements of Net Asset Value, in
particular, certain monthly emails, contract notes, and monthly account statements issued by the

Administrators, constituted "certificates" for the purposes of Article 11 (the "<u>Certificates</u>").   The

Privy Council did not, however, address whether such Certificates were given "in good faith."   In

carrying out this responsibility, the Administrators and affiliated Citco companies within Citco

Group Limited (collectively, "<u>Citco</u>") acted with a lack of good faith in giving the Certificates.

72.     Over the course of fifteen years, in its capacity as service providers to the Funds,

Citco reviewed information concerning BLMIS not available to the general public, and

expressed internal alarm about what that information showed with respect to the likelihood of

fraud at BLMIS, but turned a blind eye to the reality reflected in the information and instead

proceeded with issuing the Certificates as if there were no problem.

73.     So grave were the Administrators' internal concerns that they expressed doubts—

many years before the fraud was made public—that the Funds' assets with BLMIS even existed,

with one employee stating "I will not change my [opinion] as long as I [do] not see evidence that

the portfolio exists."   The Administrators also expressed repeated concern over the fact there was

no segregation of duties at BLMIS—*i.e.*, BLMIS (i) had discretion over which investments to

make and when to make them, such that BLMIS was de facto investment manager, (ii) had actual

custody of the Funds' assets, such that BLMIS was de facto custodian, and (iii) was also the

broker.   Based upon the proprietary information they reviewed, Citco expressed concern—

internally—that BLMIS would be a repeat of the notorious Manhattan Investment Fund fraud of

the 1990s "multiplied by a factor of five."   Ultimately, unable to resolve their grave concerns,

Citco, rather than withdrawing, ceasing to issue Certificates, or sounding a public alarm, made a

corporate decision to continue on as service providers—in exchange for an 800% increase in

fees.

1.    **Citco Expressed Doubt As To Whether the Funds' Assets At BLMIS Even Existed**

74.    Beginning in 2000, the Administrators ran into trouble with the basic task of verifying the existence of the Funds' assets with Madoff.  Initially, Citco expressed serious concerns regarding whether the Funds' Treasury bond transactions actually matched those transactions reported by Madoff because of an apparent "rhythm of trading" each month.  The rhythm of trading within Sentry's portfolio appeared too consistent to be true, as the assets included only a limited number of Treasury bonds by each month's end.  At the beginning of each month, Madoff would purchase shares and put options and would sell call options, but, like clockwork, would then liquidate all of Sentry's holdings by the 20th of each month.  Thus, the Administrators wanted to check whether the Treasury bonds even existed at all.

75.    The Administrators could not verify the existence of the assets because the Funds' custodians, Citco Bank Nederland N.V. Dublin Branch and Citco Global Custody (the "Custodians"), did not actually hold them.  Instead, Madoff served as his own custodian. Therefore, the custody statements that the Custodians were supposed to generate based on assets in their possession, were instead merely copied, or "shadow booked," from BLMIS account statements.  The Custodians were "only the custodian[s] on paper, not in reality" and did not place any trades for the Funds.

76.    Management within Citco, including Ruud Bodewes ("Bodewes"), the head of internal audit for all of Citco Group, and Ger Jan Meijer ("Meijer"), the head of internal audit for the Administrators, expressed concern about the operations at BLMIS.  In May 2000, Bodewes expressed his concern to the general counsel and manager of Citco Bank Nederland, as well as Meijer, that "[w]ith [the] Manhattan [Investment Fund fraud] in the back of our minds, we, as Citco, may very well be in a potential dangerous situation, since we do not seem to have an

independent source to verify the information from BLMIS." Indeed, Meijer had raised these concerns to Bodewes weeks earlier, warning that Madoff could be "a Manhattan multiplied by a factor of five."

77.    In addition to warning Bodewes, Meijer also warned Citco Group's Chief Executive Officer, Christopher Smeets ("Smeets") in May 2000 that "[t]o not react or to react too late does indeed mean that investors once again faithfully deposit tens of millions of USD in the Madoff well (for which we do not know if there is a bottom to it) at month's end," with the understanding that Citco could "already be held personally responsible insofar as we have allowed the subscriptions to take place as of May without a fight." Smeets acknowledged receipt of Meijer's emails and concerns. At that time, Meijer emphasized that "with the current knowledge and Citco as asset protector, Citco has a legal obligation to obtain more assurance" of the Funds' assets.

78.    However, in what became a familiar pattern, Citco turned a blind eye to the documents and information in their possession. Citco Group did not address the Administrators' concerns raised in May 2000, and a few months later, Meijer stated: "[i]t seemed that this affair [was] being put on the back burner and hushed."

79.    A year later, Meijer again reiterated his concerns about BLMIS's operations, which "remain[ed] unsolved." Meijer warned that "Citco has a risk exposure of more than USD3 billion" and that "[p]robably there are no options to restore this situation from a worst case scenario." He stated: "I will not change my [opinion] as long as I [do] not see evidence that the portfolio exists." Five months later, in January 2002, the Administrators again emphasized that the issues concerning BLMIS posed severe risks to Citco and the Funds' investors. Meijer told Bodewes: "I have been worried about this situation for 2 years (including

the risk to the continued existence of Citco), however the same was not taken seriously by certain gentlemen…. My intuition (combined with the business that I have seen) tells me that things are not right."

80.    In January 2002, Meijer insisted to Bodewes that: "Citco must now seriously take the possibility that everything is really wrong with [the Funds'] account, as well as the possibility that everything will come into view within 2 years…. Personally I think the chance [that something is wrong] is at least 50%."  Meijer persisted that there was "still the opportunity to more or less direct the whole process, and search out the best way out with the help of good lawyers (legal contingency plan).  Otherwise you run the risk that the scene will later be determined by others."  However, in response Citco Group's management, and Bodewes in particular, failed to undertake a meaningful investigation into Meijer's doubts regarding the existence of the Funds' assets, and instead continued acting as a service provider for the Funds for over six more years.

81.    In fact, multiple members of the Administrator's management tried to prevent Meijer from asking questions.    John Verhooren ("Verhooren"), a member of Citco's administration services management team, actually knew that Meijer had raised concerns about the existence of the Funds' assets for years, but deliberately ignored those concerns.  For example, in May 2000, Verhooren acknowledged that the lack of segregation of duties and trading patterns at Madoff were not new discoveries, and many people at Citco had already recognized these phenomena.  Later, in response to concerns raised in 2001, Verhooren again rebuffed Meijer's insistence that Citco was facing "an enormous risk exposure."  Instead, Verhooren told Meijer to stop raising the issue and claimed that Citco would try to meet with

Madoff to investigate.  However, neither Verhooren nor any member of the Administrator's staff ever gained sufficient evidence that the Funds' assets existed from Madoff.

### 2.    Citco Failed To Obtain Evidence Of The Existence Of The Funds' Assets

82.    Citco not only expressed internal concern regarding whether the Funds' assets with BLMIS even existed—it knew that BLMIS would not confirm their existence for Citco as the Funds' service providers.

83.    The Administrators' audit reports designated Sentry as a non-compliant fund on their "watch list" as a result of the lack of segregation of duties at BLMIS.  Each year from 2000 through 2006, the Administrators recommended that Citco either confirm the existence of the Funds' assets held by BLMIS or resign as service providers.  On three occasions between May 2000 and December 2002, Citco attempted to verify the existence of the Funds' assets at BLMIS.  All attempts failed.

84.    In May 2000, Citco set up a meeting with Madoff to gain "independent confirmation of the[] existence" of the Funds' assets, particularly the Treasury bills, and to determine how Madoff derived share prices from the markets.  However, this effort failed.  BLMIS did not verify the existence of the assets, and Citco concluded internally that the meeting had not provided "a full disclosure of [the] assignment."

85.    In July 2001, Bodewes had attempted to assess the concerns raised by Meijer in an internal due diligence memorandum.  However, Bodewes's due diligence was limited to a review of Citco's proprietary documents because Citco was concerned that permitting "an on-site audit at [BLMIS] premises may hurt the relationship with [the Fund], resulting in a possible loss of [a] USD 1.5 million dollar fee income."  Even so, based on the documents and information in Citco's possession, Bodewes shared Meijer's concerns about BLMIS's operations, and concluded that losses at BLMIS could be hidden, leaving Citco ultimately liable to the Funds'

shareholders. Bodewes also noted that the two-man audit firm used by BLMIS did not "match up" with the size of BLMIS's business. Indeed, multiple Administrator employees acknowledged that the small size of Madoff's accounting firm posed a risk, given that the size of the firm was not large enough to audit the amount of assets purportedly managed by BLMIS.

86.    Smeets, Citco Group's CEO, received Bodewes' memo regarding the issues at BLMIS, including the issues posed by the size of Madoff's audit firm. Citco Group's management responded that they would like to "work this out" with Madoff, but never met with him in 2001. By an email dated 6 February 2002, Unternaehrer of Citco Group stated that Citco wanted evidence the T Bills existed. In December 2002, Citco once again "attempt[ed] to get conclusive proof" from Madoff that Sentry's portfolio was in BLMIS custody and to have "Madoff … provide evidence of the existence/custody of the positions." Before the meeting, Meijer directed a member of the internal audit group at Citco to "[p]roperly record what you have done and what you have not been able to determine…. It is a troublesome task insofar as Madoff is not known for his openness." However, the meeting did not include any meaningful discussion with Madoff regarding the holdings purported to be in his custody. The employee, Albert van Nijen, reported back that the Administrators' "mission" to increase "Citco's comfort level with respect to the existence of the assets in relation to [Citco's] responsibilities as Custodian[s]" had again failed. On 27 December 2002 Bodewes reported to the executive committee of Citco Group that as long as the position of Sentry with BLMIS was not independently verified "there will be doubts."

87.    After Citco's third failed attempt, Citco never again tried to gain evidence from Madoff that the Funds' assets existed until his fraud was ultimately exposed in December 2008. In addition, Meijer noted that "Madoff [was] no[t] known" to Citco's external traders, even

though his investment strategy required selling major quantities of call options each month. In an email to Bodewes, Meijer stated, "I visited the Madoff website…. According to the investment policy, the fund needs to sell major quantities of call options on the market each month. I absolutely do not trust it!!!!"

88.     Meanwhile, through the entire period, Citco continued to issue the Certificates.

### 3.     Citco Negotiated For Higher Fees As Reimbursement For The "Risks" Of Doing Business With Madoff

89.     Facing grave concerns regarding the Funds' assets placed with BLMIS, Citco put its financial interests ahead of its duties to the Funds and the Funds' investors.

90.     By 2002, Citco knew that the Funds' holdings could not be verified, knew that BLMIS cleared its own trades, and knew that Citco's efforts to reconcile Madoff's operations had failed. That year, Citco's executive committee put credit line requests from the Funds "on hold until … the 'investigation' on Fairfield" was complete, because Citco was concerned about its exposure to liabilities well beyond the loans in the case of fraud. Smeets and Citco's management were aware that the credit line requests were on hold while Citco tried to "get as much comfort as possible" that BLMIS was not a fraud.

91.     Two years later, in February and March 2004, the Custodian decided to cancel one of its credit facilities with Sentry following its discovery that AIG had pulled its investments from BLMIS altogether. Specifically, the Administrator's management, including Meijer, Verhooren, and William Keunen—who was responsible for the entire division of administration services at Citco—found out that "the risk team of AIG took the decision to get out from all Madoff exposure … [t]hey are scared with the structure …." It appears that at least some Citco Group management wanted the Custodian to resign: by an email of 6 February 2004, Keunen informed the Administrator that Unternaehrer of Citco Group had decided the Custodian should

step down as custodian.  At this time, Smeets was kept informed and aware of Citco's concerns regarding AIG's withdrawal from Madoff.  A few months later, in or about September 2004, Citco's board of directors made the decision to place the Custodians' and Administrators' business with the Funds "under scrutiny" and "to close down all credit relationships … to decrease [Citco's] exposure."  Citco knew that its credit relationship with the Funds would expose it to liability because of BLMIS's role as custodian, among other reasons.

92.    By 2006, Citco considered resigning as service providers.  The Custodians told Citco Group's management, including Smeets:  "We are taking a risk and we only get US$60K per year!"

93.    Instead, Citco negotiated a new fee arrangement. The new arrangement calculated the Custodians' rate as one basis point (one hundredth of one percent) of the Funds' total Net Asset Value.  In other words, Citco's fees for the Custodians' services were now directly tied to the Net Asset Value as determined by the Administrators.  Citco decided "[o]n that basis" to stay on as Custodians because Sentry's Net Asset Value at that time, based principally on the assets purportedly at BLMIS, was approximately "$5bn, i.e., fees of $500k."

94.    Simply put, Citco accepted dramatically higher fees—tied directly to the Net Asset Value certified by Citco—in exchange for the risks to Citco of doing business with BLMIS, as well as its continued silence regarding BLMIS's role as custodian of the Funds' assets.  Ultimately, Citco's fees increased by 800%.

95.    Internally, Citco knew that: (i) the Administrators did not consistently price the Funds' portfolios independently and typically relied exclusively on the share pricing information supplied by Madoff; and (ii) the Custodians did not have custody of the Funds' portfolios.

96.    Citco failed to verify the pricing information for the Funds' portfolio from independent sources and instead relied on BLMIS statements, even though it knew that such account statements contained incorrect information.  Accountants working for the Administrators discovered on numerous occasions that the trades reported by BLMIS contradicted the public daily price ranges for corresponding trades.  When the Administrators' personnel discovered that the reported share or option prices reported by Bloomberg and Madoff differed, they used the public price in calculating the Net Asset Value reflected in the Certificates.  Citco thus turned a blind eye to its knowledge that BLMIS issued account statements with incorrect pricing information.

97.    Citco acted with a lack of good faith by issuing Certificates in spite of its knowledge that: (1) BLMIS's transactions were likely impossible, given its awareness that "Madoff always [knew] precisely when to buy and sell;" (2) Madoff was the only broker-dealer Citco worked with that provided settlement date transaction confirmations only, rather than trade date confirmations; and (3) Madoff insisted that Citco book all trades for the Funds manually, rather than through automated or electronic means, which directly contradicted Citco's own "policy to set up [electronic] reconciliation programs for each fund and to avoid manual entries as much as possible;" and, within its own records, "there [were] differences between the custody statements of Citco Bank and Madoff that [were] not being analyzed" by Citco.

98.    This lack of good faith permeated the entire Citco organization.  Until 2008, the Administrators and the Custodians worked hand-in-hand with multiple other "Citco" entities to generate the Certificates for the Funds and served as the intermediaries for all subscription funds invested by Defendants under the Subscription Agreements.  Under Citco Group's direction and

control, the Administrators issued Certificates without good faith and with willful blindness to the fact that they could not confirm whether the Funds' assets actually existed.

99.    From the top down, Citco saw and appreciated, but consciously disregarded, the risks to the Fund's investors posed by Madoff's operations.  The Administrators and all other "Citco" subsidiaries served at the whim of Citco Group, which controlled the day-to-day operations of the Administrators and the issuance of Certificates showing an inaccurate and inflated Net Asset Value under the Administration Agreements (as amended from time to time) with the Funds.  Irrespective of which "Citco" entity the Funds' engaged, at all relevant times the Funds' were provided services from and on behalf of "Citco" as a whole from at least eight separate entities, including: Citco Group; Citco Global Custody NV; Citco Global Custody (NA) NV; CGC (NA); Citco Fund Services (BVI); Citco Fund Services (Europe) B.V.; Citco (Canada) Inc.; and Citco Global Security Services.

100.    By virtue of the foregoing conduct, Citco issued the Certificates without good faith.  The Funds were the primary victims of Citco's conduct and its lack of good faith in issuing the Certificates.

## G.    Exposure Of Madoff's Fraud

101.    On December 11, 2008, federal agents arrested Madoff for violation of federal securities laws.  On that same day, the United States Attorney brought criminal charges against Madoff, alleging that Madoff ran a multi-billion-dollar Ponzi scheme.  *See United States v. Madoff*, No. 08-mj-2735 (S.D.N.Y., filed Dec. 11, 2008).  Upon arrest, Madoff was reported to have told the agents that "there is no innocent explanation" for the fraudulent scheme he had orchestrated and confessed that he "paid investors with money that wasn't there."

102.    On December 11, 2008, the United States Securities and Exchange Commission ("SEC") filed an emergency action in the Southern District of New York to halt ongoing

fraudulent offerings of securities and investment advisory fraud by Madoff and BLMIS. *See SEC v. Madoff*, No. 08-cv-10791 (S.D.N.Y. filed Dec. 11, 2008). On February 9, 2009, the SEC submitted to the Court a proposed partial judgment, to which Madoff consented, imposing a permanent injunction and continuing relief against him, including a permanent freezing of his assets.

103.    In March 2009, Madoff pleaded guilty to the criminal charges brought against him.  In his plea allocution, Madoff confessed: "for many years up until my arrest on December 11, 2008, I operated a Ponzi scheme through the investment advisory side of my business, Bernard L. Madoff Securities LLC."  As Madoff himself described how the scheme worked:

> The essence of my scheme was that I represented to clients and prospective clients who wished to open investment advisory and individual trading accounts with me that I would invest their money in shares of common stock, options and other securities of large well-known corporations, and upon request, would return to them their profits and principal.  Those representations were false because for many years up and until I was arrested on December 11, 2008, I never invested those funds in the securities, as I had promised.  Instead, those funds were deposited in a bank account at Chase Manhattan Bank.  When clients wished to receive the profits they believed they had earned with me or to redeem their principal, I used the money in the Chase Manhattan bank account that belonged to them or other clients to pay the requested funds.

104.    Madoff further confessed to covering up his fraud by fabricating false trade confirmation and account statements:

> To further cover-up the fact that I had not executed trades on behalf of my investment advisory clients, I knowingly caused false trading confirmations and client account statements that reflected the bogus transactions and positions to be created and sent to clients purportedly involved in the split strike conversion strategy, as well as other individual clients I defrauded who believed they had invested in securities through me. The clients receiving trade confirmations and account statements had no way of knowing by reviewing these documents that I had never engaged in the transactions represented on the statements and confirmations.

105.    Madoff is now serving a 150-year sentence in federal prison.

**H.    The Funds' Estates In Liquidation**

106.    Following the revelation of Madoff's fraud, the Funds' boards of directors suspended any further redemptions of Shares and the calculation of the Funds' Net Asset Values. As of December 2008 and presently, Sentry, Sigma, and Lambda had, respectively, approximately 4.7 million, 3.9 million, and 0.2 million shares outstanding.

107.    In 2009, the Funds were put into liquidation proceedings in the BVI.

108.    On February 27, 2009, a secured creditor of Lambda commenced proceedings in the BVI Court pursuant to the BVI Insolvency Act seeking the appointment of a liquidator over Lambda (the "Lambda Proceeding").    The Lambda Proceeding is pending in the BVI Court as claim number BVIHC(COM)2009/74.

109.    On April 21, 2009, ten shareholders applied to the BVI Court for the appointment of a liquidator over Sentry (the "Sentry Proceeding").    The Sentry Proceeding is pending in the BVI Court under claim number BVIHC(COM)2009/136.

110.    On April 23, 2009, a shareholder applied to the BVI Court for the appointment of a liquidator over Sigma (the "Sigma Proceeding" and collectively with the Lambda Proceeding and the Sentry Proceeding, the "BVI Liquidation Proceedings").    The Sigma Proceeding is pending in the BVI Court under claim number BVIHC(COM)2009/139.

111.    As alleged above, the BVI Court issued orders – the BVI Appointment Orders – appointing the Foreign Representatives as liquidators of the Funds.    Pursuant to the BVI Appointment Orders, the Foreign Representatives are responsible for all aspects of the Funds' business, including protecting, realizing, and distributing assets for the Funds' estates.

112.    The Redemption Payments that were made to Defendants were mistaken payments and constituted or formed part of avoidable transactions, and generally represent assets of Sentry and Sigma's estates that Defendants are not entitled to keep.

## FIRST CLAIM
### (Constructive Trust - Against all Defendants)

113.    Sentry and Sigma (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma) repeat and allege again the allegations contained in paragraphs 1 through 112 above as if set forth herein.

114.    In this Court's December 6, 2018 Memorandum Decision, the Liquidators were "granted leave to amend to assert constructive trust claims against Knowledge Defendants." Dkt. 1743 at 65.  The Court clarified that the Liquidators could establish a constructive trust with respect to "the Knowledge Defendants that received redemption payments with the knowledge that the NAV was wrong."  *Id*. at 38.  The Court further recognized that "[u]nder BVI law, lack of good faith, i.e. bad faith, includes wrongdoing by one who acts recklessly as well as one who acts with actual knowledge that he is acting wrongfully or willfully blinds himself to that fact." *Id.* at 23–24.

115.    As described above, upon receipt of a redemption request, Sentry and Sigma made each of the Redemption Payments to Merrill International.  The Redemption Payments generally represented the proceeds arising from what the world now knows was Madoff's Ponzi scheme.  Accordingly, these Redemption Payments did not, as Sentry and Sigma mistakenly believed, represent the proceeds arising from the profitability of (or continued investment in) BLMIS.

116.    Instead, the Redemption Payments were based on a miscalculated and inflated Net Asset Value, which caused those Redemption Payments to be in excess of the Net Asset Value of

redeemed Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

117.    Upon information and belief, at the time of the Redemption Payments, Merrill International had knowledge of the Madoff fraud, and therefore knowledge that the Net Asset Value was inflated.  Specifically, for at least several years before 2006, specific individuals at Merrill International ascertained multiple indicia of fraud, both from others within the Merrill Companies and independently, leading it to believe that BLMIS was a fraud and, therefore, that the Net Asset Values could not be accurate.

118.    *First*, Merrill International's parent, MLCI, instituted an enterprise-wide practice across the Merrill Companies against Madoff-related investments following due diligence on BLMIS's structure that raised various red flags and other concerns raised by senior executives like Fabio Savoldelli, an executive at MLCI subsidiary, MLIM, who "sounded the internal warning bell" about Madoff many years before BLMIS's collapse.  Thereafter, MLCI consistently refused to provide leverage to institutional investors seeking to make levered investments in Madoff-related funds through structured products like notes or swaps.  MLCI also regularly refused to direct investments to Madoff through, for example, funds of funds or single hedge fund wrap vehicles.  Upon information and belief, MLCI's concerns and knowledge of the practice against BLMIS-related investments were widely shared within and among the Merrill Companies, including Merrill International, because—as individuals like Savoldelli have testified—the Merrill Companies did not lose any money on Madoff.

119.    *Second*, Merrill International personnel, including derivatives experts and trading desk employees, consistently refused BLMIS-related trades citing, among other issues, the

secrecy surrounding the source of Madoff's returns and the questionable nature of the BLMIS's SSC strategy.

120.    Accordingly, at all relevant times, Merrill International had actual knowledge of, was willfully blind to, or recklessly disregarded the fact that the NAV was inflated when it received the Redemption Payments.

121.    Upon information and belief, Merrill International may have paid some or all of the Redemption Payments it received to Beneficial Shareholders.

122.    By reason of their receipt of some or all of the Redemption Payments, Defendants have been unjustly enriched to the detriment of Sentry and Sigma and other shareholders and creditors of Sentry and Sigma.

123.    Furthermore, Defendants were not entitled to receive the Redemption Payments because the amounts transferred with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payments received by Merrill International for its redemptions of Shares to be in excess of the Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

124.    It would offend principles of equity and good conscience to permit Defendants to retain the Redemption Payments.

125.    By reason of the foregoing, a constructive trust should be imposed on the Redemption Payments that were received by Defendants from Sentry and Sigma for the benefit of the Foreign Representatives and Sentry and Sigma and other shareholders and creditors of Sentry and Sigma.

## SECOND CLAIM

### *(Unfair Preference Pursuant to Section 245 of the BVI*
### *Insolvency Act - Against Merrill International)*

126.    The Foreign Representatives, in their capacities as Foreign Representatives and

liquidators of Sentry and Sigma, repeat and allege again the allegations contained in paragraphs

1 through 125 above as if set forth herein.

127.    Section 245 of the BVI Insolvency Act provides:

(1) Subject to subsection (2), a transaction entered into by a
company is an unfair preference given by the company to a
creditor if the transaction (a) is an insolvency transaction; (b) is
entered into within the vulnerability period; and (c) has the effect
of putting the creditor into a position which, in the event of the
company going into insolvent liquidation, will be better than the
position he would have been in if the transaction had not been
entered into.

(2) A transaction is not an unfair preference if the transaction took
place in the ordinary course of business;

(3) A transaction may be an unfair preference notwithstanding that
it is entered into pursuant to the order of a court or tribunal in or
outside the Virgin Islands.

(4) Where a transaction entered into the by the company within the
vulnerability period has the effect specific in subsection 1(c) in
respect of a creditor who is a connected person, unless the contrary
is proved, it is presumed that the transaction was an insolvency
transaction and that it did not take place in the ordinary course of
business.

128.    A creditor is defined in Section 9 of the BVI Insolvency Act as follows:

(1) A person is a creditor of another person (the debtor) if he has a
claim against the debtor, whether by assignment or otherwise, that
is, or would be, an admissible claim in (a) the liquidation of the
debtor, in the case of a debtor that is a company or a foreign
company; or (b) the bankruptcy of the debtor, in the case of a
debtor who is an individual.

129.    The BVI Insolvency Act further defines an "insolvency transaction" as a transaction that: "(a) is entered into at a time when the company is insolvent; or (b) … causes the company to become insolvent."  BVI Insolvency Act § 244(2).

130.    For the purposes of assessing unfair preferences under Section 245 of the BVI Insolvency Act and undervalue transactions under Section 246 of the BVI Insolvency Act, a company is "insolvent" if: "(c) … (ii) the company is unable to pay its debts as they fall due." BVI Insolvency Act §§ 8, 244(3).

131.    For purposes of Section 245 and Section 246 of the BVI Insolvency Act, "vulnerability period" means "in the case of a transaction entered into with, or a preference given to, a connected person, the period commencing two years prior to the onset of insolvency and ending on the appointment of the administrator or, if the company is in liquidation, the liquidator …."  BVI Insolvency Act § 244(1).

132.    The "onset of insolvency" is defined as: "the date on which the application for the appointment of the liquidator was filed."  BVI Insolvency Act § 244(1).  Thus, the vulnerability period, for each of the Funds, is the period commencing two years prior to the application for the appointment of the Liquidators for each Fund and ending on the date of the appointment of the liquidators of each Fund.

133.    A "connected person" is:

(1) … one or more of the following

(a) a promoter of the company;

(b) a director or *member of the company* or of a related company;

(c) a beneficiary under a trust of which the company is or has been a trustee;

(d) a related company;

(e) another company one of whose directors is also a director of the company;

(f) a nominee, relative, spouse or relative of a spouse of a person referred to in paragraphs (a) to (c);

(g) a person in partnership with a person referred to in paragraphs (a) to (c); and

(h) a trustee of a trust having as a beneficiary a person who is, apart from this paragraph, a connected person.

BVI Insolvency Act, § 5 (emphasis added).

134.    Redemption Payments aggregating USD $13,000,000.00 were made by Sentry to Merrill International during the two-year period prior to the application for appointment of the Liquidators of Sentry in the BVI Liquidation Proceedings (the "Sentry Vulnerability Period").

135.    Redemption Payments aggregating USD $1,877,850.00 were made by Sigma to Merrill International during the two-year period prior to the application for appointment of the Liquidators of Sigma in the BVI Liquidation Proceedings (the "Sigma Vulnerability Period").

136.    During the Sentry Vulnerability Period and the Sigma Vulnerability Period (the "Sentry and Sigma Vulnerability Periods"), Sentry and Sigma were insolvent or were rendered insolvent by the making of Redemption Payments.

137.    Each of the Redemptions and/or Redemption Payments made during the Sentry and Sigma Vulnerability Periods ("Vulnerability Period Payments") was an "insolvency transaction" within the meaning of Section 245 of the BVI Insolvency Act.

138.    Merrill International was a shareholder (i.e., a member) of Sentry and Sigma during the Sentry and Sigma Vulnerability Periods and was, accordingly, a "connected person" as defined in the BVI Insolvency Act.

139.    Each of the Vulnerability Period Payments put Merrill International in a better position than it would have been in had such Payment not been made.

140.    Because Merrill International was a "connected person" as defined in the BVI Insolvency Act, there is a statutory presumption that the Redemptions and/or Vulnerability

Period Payments were "insolvency transactions." Further, even were this not presumed, the Redemptions and/or Vulnerability Period Payments were "insolvency transactions" because at all material times the Funds were insolvent. This is because the Funds' assets were up to 95% invested with BLMIS and were only able to pay debts falling due either (i) with payments (including fictitious profits) from the Ponzi scheme BLMIS, *i.e.*, using the proceeds of fraud, or (ii) by using incoming subscription monies (as a shortcut for investing those monies and also withdrawing monies from BLMIS to pay redeemers). Each time the Funds withdrew monies from BLMIS an equivalent liability immediately arose to the creditors of and investors in BLMIS. On any commercial basis the Funds were insolvent on a cash flow basis at all material times.

141.    In addition, there is a statutory presumption that the Vulnerability Period Payments were "not made in the ordinary course of any business" of Sentry and Sigma. Even were this not presumed, the same would follow in that, among other things, each Vulnerability Period Payment represented a distribution of monies (including fictitious profits) from Madoff's Ponzi scheme or incoming subscription monies (which merely represented a shortcut for investing those monies and also withdrawing monies from BLMIS to pay redeemers), and it was no part of the ordinary course of business of the Funds to invest in and distribute profits of a Ponzi scheme

142.    Each of the Vulnerability Period Payments was made following receipt by Sentry and Sigma of a notice of redemption in respect of Shares, which triggered the redemption process under the Articles. Following the receipt by Sentry and Sigma of a notice of redemption by Merrill International, Merrill International became a contingent creditor. Upon the subsequent redemption of Merrill International shares and until such time as Merrill International received

the Vulnerability Period Payment, Merrill International was a "creditor" of Sentry and Sigma with an admissible claim against Sentry and Sigma in any subsequent liquidation of Sentry and Sigma had payment of the Redemption Price not been made, albeit that post-liquidation Merrill International would have been deferred to outside creditors.

143.   By reason of the foregoing, the Foreign Representatives, in their capacities as Foreign Representatives and Liquidators of Sentry and Sigma, are entitled to an order avoiding and setting aside the Vulnerability Period Payments and entitling the Foreign Representatives to recover from Merrill International an amount equal to the Vulnerability Period Payments received by Merrill International from Sentry and Sigma.

### THIRD CLAIM
#### *(Unfair Preference Pursuant to Section 245 of the BVI Insolvency Act - Against Beneficial Shareholders)*

144.   The Foreign Representatives, in their capacities as Foreign Liquidators of Sentry and Sigma, repeat and allege again the allegations contained in paragraphs 1 through 143 above as if set forth herein.

145.   Upon information and belief, Merrill International may have subscribed to all or some portion of the Shares issued to it under the Subscription Agreements in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

146.   Upon information and belief, Merrill International may have paid to or credited some or all of the Redemption Payments received by it to accounts of the Beneficial Shareholders.

147.   To the extent that any money that Merrill International received in connection with the Vulnerability Period Payments was transferred to the Beneficial Shareholders, the Foreign Representatives, in their capacities as Foreign Representatives and Liquidators of Sentry and Sigma, are entitled to avoid and set aside such further transfer by Merrill International to the

Beneficial Shareholders and to recover from the Beneficial Shareholders an amount equal to any portion of any Vulnerability Period Payments received by them, and the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma, rely on, *inter alia*, section 249(2)(b) of the BVI Insolvency Act.

## FOURTH CLAIM
### *(Undervalue Transaction Pursuant to Section 246 of the BVI Insolvency Act - Against Merrill International)*

148.    The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry and Sigma, repeat and allege again the allegations contained in paragraphs 1 through 147 above as if set forth herein.

149.    Section 246 of the BVI Insolvency Act provides that;

> (1) Subject to subsection (2), a company enters into an undervalue transaction with a person if (a) the company makes a gift to that person or otherwise enters into a transaction with that person on terms that provide for the company to receive no consideration; or (b) the company enters into a transaction with that person for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the company; and (c) in either case, the transaction concerned (i) is an insolvency transaction; and (ii) is entered into within the vulnerability period.

> (2) A company does not enter into an undervalue transaction with a person if (a) the company enters into the transaction in good faith and for the purposes of its business; and (b) at the time when it enters into the transaction, there were reasonable grounds for believing that the transaction would benefit the company.

> (3) A transaction may be an undervalue transaction notwithstanding that it is entered into pursuant to the order of a court or tribunal in or outside the Virgin Islands.

> (4) Where a company enters into a transaction with a connected person within the vulnerability period and the transaction falls within subsection (1)(a) or subsection (1)(b), unless the contrary is proved, it is presumed that (a) the transaction was an insolvency transaction; and (b) subsection (2) did not apply to the transaction.

150.    During the Sentry and Sigma Vulnerability Periods, all assets purportedly held by BLMIS for Sentry and other investors were non-existent, and Sentry and Sigma were insolvent or rendered insolvent by the Vulnerability Period Payments, as alleged in paragraph 140 above. Thus, each of the Redemptions and/or Vulnerability Period Payments qualifies as an "insolvency transaction" within the meaning of Section 244 of the BVI Insolvency Act and for purposes of Section 246 of the BVI Insolvency Act.

151.    Sentry and Sigma received no consideration for any of the Vulnerability Period Payments, or in the alternative, Sentry and Sigma received, for each Vulnerability Period Payment, consideration, the value of which, in money or money's worth, was significantly less than the value, in money or money's worth, of the consideration provided by Sentry and Sigma to Merrill International for each of the Vulnerability Period Payments.

152.    Merrill International was a shareholder (*i.e.*, a member) of Sentry and Sigma during the Vulnerability Period and was, accordingly, a "connected person" as defined in the BVI Insolvency Act.

153.    Because Merrill International was a "connected person" as defined in the BVI Insolvency Act, there is a statutory presumption that the Redemptions and/or Vulnerability Period Payments were "insolvency transactions." Further, there is a statutory presumption that the Vulnerability Period Payments were not made in good faith and for the purposes of the Funds' business with reasonable grounds to believe that they would benefit the Funds. Even were that not presumed, it is in any event clear that the purpose of the Funds was not to invest in and distribute fictitious profits from a Ponzi scheme such as BLMIS.

154.    By reason of the foregoing, the Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry and Sigma, are entitled to an order avoiding

and setting aside the Vulnerability Period Payments and to recover from Merrill International an amount equal to the Vulnerability Period Payments received by Merrill International from Sentry and Sigma.

### FIFTH CLAIM
#### *(Undervalue Transaction Pursuant to Section 246 of the BVI Insolvency Act - Against Beneficial Shareholders)*

155.    The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry and Sigma, repeat and allege again the allegations contained in paragraphs 1 through 154 above as if set forth herein.

156.    Upon information and belief, Merrill International may have subscribed to all or some portion of the Shares issued to it under the Subscription Agreements in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

157.    Upon information and belief, Merrill International may have paid to or credited some or all of the Redemption Payments received by it to accounts of Beneficial Shareholders.

158.    To the extent that any money that Merrill International received in connection with the Vulnerability Period Payments was transferred to the Beneficial Shareholders, the Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry and Sigma, are entitled to avoid and set aside such further transfer by Merrill International to the Beneficial Shareholders and to recover from the Beneficial Shareholders an amount equal to any portion of any Vulnerability Period Payments received by them, and the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma, rely on, *inter alia*, section 249(2)(b) of the BVI Insolvency Act.

### PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request the following relief:

A.    On the First Claim, imposition of a constructive trust on Redemption Payments;

B.    On the Second and Third Claims:

  i. a declaratory judgment in favor of the Foreign Representatives and against Merrill International and the Beneficial Shareholders that the Redemptions and/or Vulnerability Period Payments constitute Unfair Preferences under Section 245 of the BVI Insolvency Act;

  ii. judgment pursuant to Section 249 of the BVI Insolvency Act, setting aside and avoiding the Redemptions and/or Vulnerability Period Payments; and

  iii. judgment pursuant to Section 249 of the BVI Insolvency Act against Merrill International and the Beneficial Shareholders in the amount of the avoided Vulnerability Period Payments received by them or for their benefit, plus interest;

C.    On the Fourth and Fifth Claims:

  i. a declaratory judgment in favor of the Foreign Representatives and against Merrill International and the Beneficial Shareholders that the Redemptions and/or Vulnerability Period Payments constitute Undervalue Transactions under Section 246 of the BVI Insolvency Act;

  ii. judgment pursuant to Section 249 of the BVI Insolvency Act, setting aside and avoiding the Redemptions and/or Vulnerability Period Payments; and

  iii. judgment pursuant to Section 249 of the BVI Insolvency Act against Merrill International and the Beneficial Shareholders in the amount of the avoided Vulnerability Period Payments received by them or for their benefit, plus interest.

D.    Awarding Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees and accountants' and experts' fees, costs and expenses; and

E.    Granting Plaintiffs such other and further relief as the Court deems just and proper.

Dated: New York, New York
  January 15, 2020

           **SELENDY & GAY PLLC**
           By: _/s/ David Elsberg_

           David Elsberg
           Caitlin Halligan

Andrew Dunlap
Lena Konanova
Ron Krock
1290 Avenue of the Americas
New York, NY 10104
Telephone: 212-390-9000
E-mail: delsberg@selendygay.com
E-mail: challigan@selendygay.com
E-mail: adunlap@selendygay.com
E-mail: lkonanova@selendygay.com
E-mail: rkrock@selendygay.com

-and-

**BROWN RUDNICK LLP**
David J. Molton
Marek P. Krzyzowski
Seven Times Square
New York, New York 10036
Telephone: 212-209-4800
Facsimile: 212-209-4801
E-mail: dmolton@brownrudnick.com
E-mail: mkrzyzowski@brownrudnick.com

*Attorneys for the Foreign Representatives*

# EXHIBIT A

**Redemption Transaction Received by Defendants of Sentry**
*From August 14, 2006 Through November 19, 2008*

| Payment Date | Redemption Payment | Number of Shares | Bank Account To Which Redemption Payment Was Made, Per Shareholder Direction[+] |
|---|---|---|---|
| August 14, 2006 | $1,200,000.00 | 1,033.53 | JP Morgan Chase, New York |
| February 15, 2008 | $2,000,000.00* | 1,538.77 | JP Morgan Chase, New York |
| June 17, 2008 | $3,000,000.00* | 2,262.92 | JP Morgan Chase, New York |
| November 19, 2008 | $3,000,000.00* | 2,222.59 | JP Morgan Chase, New York |
| November 19, 2008 | $5,000,000.00* | 3,704.31 | JP Morgan Chase, New York |

\* Denotes Redemptions in the Sentry Vulnerability Period.

[+] Whether or not Redemption Payments were ultimately directed to bank accounts in the United States, all Redemption Payments from Sentry went through a correspondent bank account that Sentry's administrator maintained in the United States, and to the extent that any such Redemption Payments were directed outside the United States, they went through a correspondent bank account in the United States identified by shareholders for such payments.

# EXHIBIT B

### *Redemption Damages Received by Defendants Sigma*
### *On or About November 21, 2008*

| Payment Date | Redemption Payment | Number of Shares | Bank Account To Which Redemption Payment Was Made, Per Shareholder Direction |
|---|---|---|---|
| November 21, 2008 | $1,877,850.00* | 7,702.68 | Citibank London, London |

\* Denotes Redemptions in the Sigma Vulnerability Period.  All $USD amounts are based on the exchange rate as of the date of the Redemption Payment.  However, upon application of a different exchange rate, as may be required by applicable law, the amount of damages may be different.