**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 Case |
| **Fairfield Sentry Limited, et al.,** | Case No. 10-13164 (SMB) |
| Debtors in Foreign Proceedings. | Jointly Administered |
| **Fairfield Sentry Limited (In Liquidation), et al., acting by and through the Foreign Representatives thereof,** Plaintiffs, | Adv. Pro. No. 10-03496 (SMB) |
| -against- | Administratively Consolidated |
| **Theodoor GGC Amsterdam, et al.,** Defendants. | |
| This declaration applies to the adversary proceedings listed in Appendix A to Defendants' Consolidated Memorandum of Law in Support of Defendants' Renewed Motion to Dismiss Pursuant to 11 U.S.C. §§ 561(d), 546(e), and 546(g) and for Insufficient Service of Process Under the Hague Service Convention, dated March 16, 2020 | |

## ATTORNEY DECLARATION OF JOSEPH M. KAY
## IN SUPPORT OF DEFENDANTS' RENEWED MOTION TO DISMISS

I, Joseph M. Kay, hereby declare under penalty of perjury as follows:

1.      I am duly licensed and admitted to practice law in the State of New York, and I am an associate with the law firm of Cleary Gottlieb Steen & Hamilton LLP, counsel for HSBC Institutional Trust Services (Asia) Limited, Robinson and Company, Murdoch and Company, Republic Nominees Limited (f/k/a HSBC Private Banking Nominee 1 (Jersey) Limited), HSBC Securities Services (Luxembourg) S.A., HSBC Private Bank (C.I.) Limited (f/k/a HSBC Private

Bank (Guernsey) Limited), Republic Nominees Limited, HSBC Private Bank (Suisse) S.A.,

HSBC Bank USA, N.A., HSBC Trust Company AG (f/k/a HSBC Guyerzeller Trust Company

AG), HSBC Latin America Holdings (UK) Limited (successor-in-interest to HSBC Securities

(Panama) S.A.), HSBC International Trustee Limited, Somers Nominees (Far East) Limited, and

HSBC Bank Bermuda Limited (collectively, the "HSBC Defendants"). I respectfully submit this

declaration as a supplement to the Consolidated Memorandum of Law in Support of Defendants'

Consolidated Motion in the Actions.[1]

2.    Attached hereto as Exhibits A-I, for the Court's convenience, are true and correct

copies of the following documents:

| Ex. | Document |
|---|---|
| A | De Nederlandsche Bank, *Information Detail: Citco Bank Nederland NV*, available at https://www.dnb.nl/en/supervision/public-register/WFTKF/detail.jsp?id=26bbcae35848e311b55a005056b672cf |
| B | Central Bank of Ireland, *Financial Service Provider Profile: Citco Bank Nederland NV Dublin Branch*, available at http://registers.centralbank.ie/FirmDataPage.aspx?firmReferenceNumber=C27278 |
| C | Central Bank of Ireland, *Financial Service Provider Register Data, Credit Institution: Citco Bank Nederland NV Dublin Branch*, available at http://registers.centralbank.ie/FirmRegisterDataPage.aspx?firmReferenceNumber=C27278&register=2 |
| D | Confidential Private Placement Memorandum, Fairfield Sentry Limited, October 1, 2004 |
| E | Directors' Report and Financial Statements for the Year Ended December 31, 2004, Fairfield Sentry Limited |
| F | Directors' Report and Financial Statements for the Year Ended December 31, 2005, Fairfield Sentry Limited |

---

[1]    All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Consolidated Memorandum of Law in Support of Defendants' Renewed Motion to Dismiss Pursuant to 11 U.S.C. §§ 561(d), 546(e), and 546(g) and for Insufficient Service of Process Under the Hague Service Convention, dated March 16, 2020.

G          Directors' Report and Financial Statements for the Years Ended December
           31, 2007 and 2006, Fairfield Sentry Limited

H          Directors' Report and Condensed Financial Information for the Period
           January 1, 2008 to June 30, 2008, Fairfield Sentry Limited

I          Financial Statements for the Years Ended December 31, 2007 and 2006,
           Fairfield Sigma Limited


I declare under penalty of perjury that the foregoing is true and correct.


Executed on March 16, 2020, at New York, New York.


                                        */s/  Joseph M. Kay*

                                        JOSEPH M. KAY

# Exhibit A



# Information detail

back (../index.jsp)

Organization

| | |
|---|---|
| Statutory name: | Citco Bank Nederland N.V. |
| Trade name: | |
| Address: | Naritaweg 165 |
| Postal code: | 1043 BW |
| Place of residence: | AMSTERDAM |
| Country: | Netherlands |
| Disclosure: | |

| | |
|---|---|
| Chamber of Commerce | 33185291 |
| Relation number DNB: | B0275 |
| Category | Bank |

| Contacts | Application | EU-passport (out) |
|---|---|---|

## Contacts

Business address

| Address: | Place of residence: | Country: |
|---|---|---|
| Naritaweg 165 | AMSTERDAM | Netherlands |

Mailing address

| Address: | Place of residence: | Country: |
|---|---|---|
| Postbus 7241 | AMSTERDAM | Netherlands |

## Application

| Financial service | Activity / Branche | Date of entrance | Enddate |
|---|---|---|---|
| **2:13(1) Carrying on the business of a bank** | 01. Acceptance of deposits and other repayable funds | 31-12-1985 | |
| | 02. Lending | 31-12-1985 | |
| | 03. Financial leasing | 31-12-1985 | |
| | 04. Payment services as referred to in Article 4(3) of Directive 2015/2366 | 31-12-1985 | |
| | 05. Issuing and administering means of payment (e.g. credit cards, travellers' cheques and bankers' drafts) | 31-12-1985 | |
| | 06. Guarantees and commitments | 31-12-1985 | |
| | 7a. Money market instruments (cheques, bills, certificates of deposit, etc.); | 31-12-1985 | |
| | 7b. Foreign exchange | 31-12-1985 | |
| | 7c. Financial futures and options; | 31-12-1985 | |
| | 7d. Exchange rate and interest rate instruments | 31-12-1985 | |
| | 07e. Transferable securities | 31-12-1985 | |
| | 08. Participation in securities issues and the provision of services related to such issues | 31-12-1985 | |

| Financial service | Activity / Branche | Date of entrance | Enddate |
|---|---|---|---|
| | 09. Advice to undertakings on capital structure, corporate strategy and related questions and advice as well as services relating to mergers and the purchase of undertakings | 31-12-1985 | |
| | 10. Money broking | 31-12-1985 | |
| | 11. Portfolio management and advice | 31-12-1985 | |
| | 12. Safekeeping and administration of securities | 31-12-1985 | |
| | 13. Credit reference services | 31-12-1985 | |
| | 14. Safe custody services | 31-12-1985 | |
| | 15. Issuance of electronic money | 31-12-1985 | |

## EU-passport (out)

| EU passport (out) | Activity | Country into the EEA | Date of entrance | Enddate |
|---|---|---|---|---|
| **2:108 Branch banking to EEA** | 01. Acceptance of deposits and other repayable funds | Ireland | 01-04-1998 | |
| | 02. Lending | Ireland | 01-04-1998 | |
| | 03. Financial leasing | Ireland | 01-04-1998 | |
| | 04. Payment services as referred to in Article 4(3) of Directive 2015/2366 | Ireland | 01-04-1998 | |
| | 05. Issuing and administering means of payment (e.g. credit cards, travellers' cheques and bankers' drafts) | Ireland | 01-04-1998 | |

| EU passport (out) | Activity | Country into the EEA | Date of entrance | Enddate |
|---|---|---|---|---|
| | 06. Guarantees and commitments | Ireland | 01-04-1998 | |
| | 7a. Money market instruments (cheques, bills, certificates of deposit, etc.); | Ireland | 01-04-1998 | |
| | 7b. Foreign exchange | Ireland | 01-04-1998 | |
| | 7c. Financial futures and options; | Ireland | 01-04-1998 | |
| | 7d. Exchange rate and interest rate instruments | Ireland | 01-04-1998 | |
| | 07e. Transferable securities | Ireland | 01-04-1998 | |
| | 08. Participation in securities issues and the provision of services related to such issues | Ireland | 01-04-1998 | |
| | 09. Advice to undertakings on capital structure, corporate strategy and related questions and advice as well as services relating to mergers and the purchase of undertakings | Ireland | 01-04-1998 | |
| | 10. Money broking | Ireland | 01-04-1998 | |
| | 11. Portfolio management and advice | Ireland | 01-04-1998 | |
| | 12. Safekeeping and administration of securities | Ireland | 01-04-1998 | |
| | 13. Credit reference services | Ireland | 01-04-1998 | |
| | 14. Safe custody services | Ireland | 01-04-1998 | |

| EU passport (out) | Activity | Country into the EEA | Date of entrance | Enddate |
|---|---|---|---|---|
| **2:1o8 Branch banking to EEA** | 01. Acceptance of deposits and other repayable funds | Luxembourg | 01-12-2005 | |
| | 02. Lending | Luxembourg | 01-12-2005 | |
| | 03. Financial leasing | Luxembourg | 01-12-2005 | |
| | 04. Payment services as referred to in Article 4(3) of Directive 2015/2366 | Luxembourg | 01-12-2005 | |
| | 05. Issuing and administering means of payment (e.g. credit cards, travellers' cheques and bankers' drafts) | Luxembourg | 01-12-2005 | |
| | 06. Guarantees and commitments | Luxembourg | 01-12-2005 | |
| | 7a. Money market instruments (cheques, bills, certificates of deposit, etc.); | Luxembourg | 01-12-2005 | |
| | 7b. Foreign exchange | Luxembourg | 01-12-2005 | |
| | 7c. Financial futures and options; | Luxembourg | 01-12-2005 | |
| | 7d. Exchange rate and interest rate instruments | Luxembourg | 01-12-2005 | |
| | 07e. Transferable securities | Luxembourg | 01-12-2005 | |
| | 08. Participation in securities issues and the provision of services related to such issues | Luxembourg | 01-12-2005 | |
| | 09. Advice to undertakings on capital structure, corporate strategy and related questions and advice as well as services relating to mergers and the purchase of undertakings | Luxembourg | 01-12-2005 | |

| EU passport (out) | Activity | Country into the EEA | Date of entrance | Enddate |
|---|---|---|---|---|
| | 10. Money broking | Luxembourg | 01-12-2005 | |
| | 11. Portfolio management and advice | Luxembourg | 01-12-2005 | |
| | 12. Safekeeping and administration of securities | Luxembourg | 01-12-2005 | |
| | 13. Credit reference services | Luxembourg | 01-12-2005 | |
| | 14. Safe custody services | Luxembourg | 01-12-2005 | |

Publication Date : 15-03-2020

© De Nederlandsche Bank

# Exhibit B



Banc Ceannais na hÉireann
Central Bank of Ireland

Eurosystem

Financial Service Provider Profile

This page lists what status a financial service provider has with the Central Bank of Ireland. For further information, click on the relevant link.

**Name:**      Citco Bank Nederland NV Dublin Branch      **Reference No:**    C27278

**Trading Name:**      Citco Bank Nederland NV Dublin Branch

| Entity Type | Description |
| --- | --- |
| Credit Institution | Credit Institution means:(a) an undertaking whose business is to receive deposits or other repayable funds from the public and to grant credits for its own account, or (b) an electronic money institution. |
| Service Provider To Funds | A service provider to a fund, which can be either an administrator, trustee or management company, is authorised under the Investment Intermediaries Act, 1995 (as amended) and/or approved under the relevant collective investment scheme legislation, as appropriate. |

# Exhibit C



Banc Ceannais na hÉireann
Central Bank of Ireland

Eurosystem

Financial Service Provider Register Data

## Credit Institution

| | | | |
|---|---|---|---|
| **Name:** | Citco Bank Nederland NV Dublin Branch | **Reference No:** | C27278 |
| **Trading Name:** | Citco Bank Nederland NV Dublin Branch | **Address:** | *(Irish Office)* |
| | | | Custom House Plaza Block 6 |
| | | | International Financial Services Centre |
| | | | Dublin 1 |

Credit Institution authorised in another Member State of the EEA and operating in the State on a branch basis.

**Authorisation Date:**          01 Sep 1998

**Status:**          <u>EEA Branch</u>

**Country of Incorporation:**          Netherlands

Page last updated on:      10 Mar 2020

# Exhibit D

ANWAR, *et al.*,

                              Plaintiffs,

        -against-

FAIRFIELD GREENWICH LIMITED, *et al.*,

                              Defendants.

This Document Relates To:  All Actions

Master File No. 09-cv-118 (VM)

**CONSOLIDATED AMENDED COMPLAINT**

# Exhibit 7

*Confidential Private Placement Memorandum*

### FAIRFIELD SENTRY LIMITED

*A British Virgin Islands International Business Company*

*Securities Offered: Redeemable, Voting Shares*

*Minimum Investment per Subscriber: U.S. $100,000*

*Purchase Price per Share: Net Asset Value per Share*

**Investment Manager**
*Fairfield Greenwich (Bermuda) Ltd.*

**Administrator**
*Citco Fund Services (Europe) B.V.*

*SHARES OF THE FUND MAY BE OFFERED TO PERSONS WHO ARE NEITHER CITIZENS NOR RESIDENTS OF THE UNITED STATES AND TO A LIMITED NUMBER OF UNITED STATES INVESTORS CONSISTING OF PENSION AND PROFIT SHARING TRUSTS, CHARITIES AND OTHER TAX-EXEMPT ENTITIES.*

*THE SHARES OFFERED HEREBY ARE SPECULATIVE AND INVOLVE A HIGH DEGREE OF RISK. THEY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES LAWS OF ANY JURISDICTION AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF SUCH LAWS.    THE SHARES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE FUND'S ARTICLES OF ASSOCIATION.    THE SHARES HAVE NOT BEEN APPROVED OR DISAPPROVED BY ANY REGULATORY AUTHORITY, NOR HAS ANY SUCH AUTHORITY PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM.*

*The date of this Confidential Private Placement Memorandum is as of October 1, 2004.*

*Fairfield Greenwich (Bermuda) Ltd.*

## COMMODITY POOL OPERATOR NO-ACTION RELIEF

PURSUANT TO NO-ACTION RELIEF ISSUED BY THE COMMODITY FUTURES TRADING
COMMISSION, FAIRFIELD GREENWICH (BERMUDA) LTD. ("FGBL") IS NOT REQUIRED
TO REGISTER, AND IS NOT REGISTERED WITH THE COMMISSION AS A CPO. AMONG
OTHER THINGS, THE NO-ACTION RELIEF REQUIRES THIS CPO TO FILE A CLAIM OF
NO-ACTION RELIEF WITH THE NATIONAL FUTURES ASSOCIATION AND THE
COMMISSSION.    IT ALSO REQUIRES THAT AT ALL TIMES EITHER:    (A) THE
AGGREGATE INITIAL MARGIN AND PREMIUMS REQUIRED TO ESTABLISH
COMMODITY INTEREST POSITIONS DOES NOT EXCEED TWO PERCENT OF THE
LIQUIDATION VALUE OF THE POOL'S PORTFOLIO; OR (B) THE AGGREGATE
NOTIONAL VALUE OF THIS POOL'S COMMODITY INTEREST POSITIONS DOES NOT
EXCEED FIFTY PERCENT OF THE LIQUIDATION VALUE OF THE POOL'S PORTFOLIO.
YOU SHOULD ALSO KNOW THAT THIS REGISTRATION NO-ACTION RELIEF IS
TEMPORARY.    IN THE EVENT THE COMMISSION ADOPTS A REGISTRATION
EXEMPTION RULE THAT DIFFERS FROM THE NO-ACTION RELIEF, FGBL MUST
COMPLY WITH THAT RULE TO BE EXEMPT FROM CPO REGISTRATION.    IF FGBL
DETERMINES NOT TO COMPLY WITH THIS RULE, IT MUST EITHER REGISTER WITH
THE COMMISSION OR CEASE HAVING THE POOL TRADE COMMODITY INTERESTS.    A
REASONABLE OPPORTUNITY TO TRADE FOR LIQUIDATION ONLY WILL BE
PROVIDED.

### CERTAIN GENERAL INFORMATION

The Shares offered hereby (the "Shares") will be issued only on the basis of the information in this Confidential Private Placement Memorandum and any attachments hereto (the "Memorandum"). No other information about Fairfield Sentry Limited (the "Fund") has been authorized. Any investment in the Fund on the basis of information that is not contained, or which is inconsistent with, the information herein shall be solely at your risk. The delivery of this Memorandum does not imply that any information herein is correct at any time after the date hereof.

You should inform yourself of the legal requirements and tax consequences within the countries of your residence or domicile for the purchase, holding or sale of the Shares, and any foreign exchange restrictions. Shares that are bought by persons not entitled to hold them in accordance with the provisions herein may be compulsorily redeemed. No Shares may be transferred without the prior written consent of the Directors.

The distribution of this Memorandum may be restricted by law in certain countries. You must inform yourself of and observe any such restrictions. You should review the Country-Specific Notices contained herein for any applicable notices for your countries of residence or domicile. This Memorandum does not constitute an offer or solicitation to any person in any jurisdiction in which the offer or solicitation is not authorized, or to any person to whom it is unlawful to make the offer or solicitation.

No person is authorized to give any information with respect to the Fund unless authorized by the Directors. This Memorandum supersedes any written or verbal information relating to the Fund.

You should not construe this Memorandum as legal or investment advice. You should consult your own attorneys, accountants and other advisers regarding this investment.

This Memorandum describes certain documents relating to this investment, including various executed and unexecuted documents and certain statutes, rulings and regulations. Such summaries do not purport to be complete and are qualified in their entirety by reference to the full text of those documents, statutes, rulings and regulations.

You and your investment representatives are invited to ask questions of and to obtain additional information from the Administrator (Citco Fund Services (Europe) B.V.) or Investment Manager (Fairfield Greenwich (Bermuda) Ltd.) concerning the Fund, including additional information to verify the completeness or accuracy of the information in this Memorandum.

All references herein to $ are to United States dollars.

iii

The Fund is incorporated as an International Business Company under the International Business Companies Act of the British Virgin Islands. The Fund constitutes a "professional fund" as defined in the Mutual Funds Act, 1996 (as amended) of the British Virgin Islands (the "BVI Act") and as such is required to be and is recognized as a "professional fund" under the provisions of the BVI Act. Such recognition does not entail supervision of the investment performance or portfolio of the Fund by the Financial Services Commission of the British Virgin Islands (the "BVI"), which accepts no responsibility for the financial soundness of the Fund or the correctness of any statements or opinions expressed herein. There is no financial obligation or compensation scheme imposed on or by the Financial Services Commission of the BVI in favor of or available to the investors in the Fund.

As an entity regulated under the BVI Act, the Fund will be subject to the supervision of the Financial Services Commission in the BVI, which is authorized by the BVI Act to direct the Fund to furnish information or provide access to any records, books or other documents which it deems necessary to ascertain compliance with the BVI Act or any regulations made under the BVI Act.

The BVI Act provides that the Fund's certificate of recognition may be cancelled if, among other things, the Fund has breached the BVI Act or any regulations or codes of conduct, or conditions of its certificate, has been convicted of an offense, is carrying on business in a manner detrimental to its investors or to the public interest, or is declared bankrupt or is being wound up or dissolved.

Because the Fund is a professional fund under the BVI Act, whose shares are listed on the Irish Stock Exchange, the Shares may be held only by persons who are "professional investors" within the meaning of the BVI Act and the Irish Stock Exchange, and on the basis that the initial investment in the Fund by each of its shareholders is not less than $100,000. A professional investor is any person whose ordinary business involves, whether for his own account or for the account of others, the acquisition or disposal of property of the same kind as the property, or a substantial part of the property, of the Fund (in this case, investment instruments), or who has signed a declaration that he, whether individually or jointly with his spouse, has a net worth in excess of $1,000,000, or, if an institution, $5,000,000 or its equivalent in any other currency, and that he consents to being treated as a professional investor. In addition, in order to comply with rules of the Irish Stock Exchange, an investor will have to represent that he has knowledge and expertise in financial matters sufficient to evaluate the risks involved in an investment in the Fund, that he is aware of such risks and can bear the loss of the entire investment.

This is a private offering made only on delivery of this Memorandum to the prospective investor whose name appears on the cover hereof. This Memorandum may not be reproduced or used for any other purpose. Any distribution of this Memorandum in whole or in part, or the divulgence of any of its contents, is unauthorized. By accepting delivery of this Memorandum, you agree to return it to the Fund if you do not invest.

iv

**TABLE OF CONTENTS**

Page

CERTAIN GENERAL INFORMATION ..................................................................... iii
FUND DIRECTORY ................................................................................................ vi
MANAGEMENT OF THE FUND AND OTHER RELATIONSHIPS .......................... 5
INVESTMENT POLICIES ........................................................................................ 8
OFFERING OF THE SHARES ................................................................................ 10
FEES, COMPENSATION AND EXPENSES ........................................................... 13
ESCROW BANK AND CUSTODIAN ...................................................................... 14
ADMINISTRATOR, REGISTRAR AND TRANSFER AGENT ................................ 15
RISK FACTORS ...................................................................................................... 16
POTENTIAL CONFLICTS OF INTEREST ............................................................. 20
PRIOR TRADING RESULTS ................................................................................... 21
DESCRIPTION OF SHARES ................................................................................... 26
DIVIDEND POLICY ................................................................................................ 26
TRANSFERS, REDEMPTIONS AND TERMINATION .......................................... 26
ANTI-MONEY LAUNDERING REGULATIONS .................................................... 28
ANTI-MONEY LAUNDERING POLICIES ............................................................. 28
TAX CONSIDERATIONS AND EXCHANGE CONTROL ...................................... 30
LEGAL MATTERS .................................................................................................. 33
MISCELLANEOUS .................................................................................................. 33
COUNTRY-SPECIFIC NOTICES ............................................................................ 36

APPENDIX A    FINANCIAL STATEMENTS
APPENDIX B    SUBSCRIPTION DOCUMENTS

v

## FUND DIRECTORY

| | |
|---|---|
| THE FUND | Fairfield Sentry Limited<br>c/o Codan Trust Company (B.V.I.) Ltd.<br>P.O. Box 3140<br>Romasco Place, Wickhams Cay<br>Road Town, Tortola<br>British Virgin Islands |
| INVESTMENT MANAGER | Fairfield Greenwich (Bermuda) Ltd.<br>12 Church Street<br>Suite 606<br>Hamilton, Bermuda<br>Telephone: 441-292-5401<br>Facsimile: 441-292-5413 |
| ADMINISTRATOR; REGISTRAR<br>AND TRANSFER AGENT | Citco Fund Services (Europe) B.V.<br>Telestone 8 -Teleport<br>Naritaweg 165<br>1043 BW Amsterdam<br>The Netherlands<br>Telephone: (31-20) 572-2100<br>Facsimile:  (31-20) 572-2610 |
| U.S. COUNSEL | Law Offices of Andrew E. Goldstein<br>488 Madison Avenue, 16th Floor<br>New York, New York 10022<br>USA |
| BRITISH VIRGIN ISLANDS COUNSEL | Conyers Dill & Pearman<br>Romasco Place, Wickhams Cay 1<br>P.O. Box 3140<br>Road Town, Tortola<br>British Virgin Islands |
| AUDITORS | PricewaterhouseCoopers<br>Marten Meesweg 25<br>3068 AV Rotterdam<br>Amsterdam<br>The Netherlands |
| PAYMENT BANK | Citco Bank Nederland, N.V. Dublin Branch<br>Custom House Plaza, Block 6<br>International Financial Services Centre<br>P.O. Box 6639<br>Dublin 1<br>Ireland<br>Telephone: 353 (0) 1 636 7100<br>Facsimile: 353 (0) 1 636 7102 |

CUSTODIAN

Citco Global Custody N.V.
Telestone 8 – Teleport
Naritaweg 165
1043 BV Amsterdam
The Netherlands
Telephone: (31-20) 572-2200
Telecopier: (31-20) 572-2625

## SUMMARY

*The following Summary is intended to highlight certain basic information which is set forth more fully elsewhere in this Confidential Private Placement Memorandum and, accordingly, should be read in conjunction with such detailed information.*

### THE OFFERING

| | |
|---|---|
| **Issuer** | Fairfield Sentry Limited (the "Fund") is organized as an international business company under the laws of the Territory of the British Virgin Islands ("BVI"). The registered office of the Fund is located in the BVI. |
| **Securities Offered** | The Fund's redeemable, voting shares (the "Shares") were sold on November 30, 1990 at an initial offering price of U.S. $200 per Share and thereafter have been sold at a price equal to the Net Asset Value (as hereinafter defined) as of the opening of business on the date of issuance. |
| **Offerees** | Shares may be offered only to experienced and sophisticated investors who are neither citizens nor residents of the United States ("Non-U.S. Persons") and to a limited number of United States investors that are tax-exempt entities ("U.S. Tax Exempt Investors"). See "OFFERING OF THE SHARES". |
| **Minimum Subscription** | The minimum initial subscription per investor is U.S. $100,000. Following his initial investment, a shareholder may make additional investments in amounts of not less than U.S. $50,000. |
| **Maximum Capitalization** | The Fund will not accept a subscription tendered at a time when the number of its outstanding Shares is 10,000,000. |
| **Subscription Procedures** | It is preferable that subscriptions be made by wire transfer. However, subscriptions may be made by mail if necessary. Subscriptions received during any monthly period prior to the third to the last business day of the month will ordinarily be accepted, subject to the sole discretion of the Manager, as of the first business day of the following monthly period, i.e., subscriptions received between December 28 and January 28 will be accepted as of February 1. Subscriptions will become irrevocable to the subscriber on the third to the last business day of the month in which such subscription is received by the Fund. |

| | |
|---|---|
| **Solicitation of Subscriptions** | There are no underwriting arrangements with respect to the offering of Shares. All solicitations of subscriptions will be made directly by the Fund or through the assistance of unaffiliated placement agents or other intermediaries.  Such unaffiliated placement agents and intermediaries may charge their clients a placement fee of up to 5% of the total amount of the subscription for Shares sold with their assistance, and/or share in the fees earned by Fairfield Greenwich (Bermuda) Ltd. ("FGBL"), as Investment Manager, which they may rebate to their clients. FGBL or an affiliate may also charge a placement fee of up to 3% on such subscriptions, provided that total placement fees do not exceed 5%. In certain instances, the Fund may deduct the amount of the placement fee from the subscription amount to pay to the unaffiliated placement agent or FGBL and such amounts will not constitute part of the assets of the Fund. |
| **Business Objective** | The Fund will seek to achieve capital appreciation of its assets through the purchase and sale of securities principally by utilizing an options trading strategy described as "split strike conversion". See "INVESTMENT POLICIES". |
| **Investment Manager** | Fairfield Greenwich (Bermuda) Ltd. ("FGBL" or the "Manager"), a corporation organized under the laws of Bermuda, serves as the Fund's investment manager. It is the wholly-owned subsidiary of Fairfield Greenwich Limited ("FGL"), an exempted company organized under the laws of the Cayman Islands, which previously served as the investment manager of the Fund. Jeffrey H. Tucker, Walter M. Noel, Jr. and Andres Piedrahita are the main principals of FGL.  Mr. Noel is also a Director of the Fund (see "MANAGEMENT OF THE FUND AND OTHER RELATIONSHIPS").  FGBL expects to make application with the Bermuda Monetary Authority to become licensed as an investment provider and has made a claim for no-action relief from registration as a commodity pool operator with the U.S. Commodity Futures Trading Commission.. |
| **Directors** | Walter M. Noel, Jr., Jan R. Naess and Peter P. Schmid are the Directors of the Fund. Mr. Noel is a Director of the Manager. |
| **Citco** | Citco Fund Services (Europe) B.V., an affiliate of The Citco Group Ltd., acts as escrow agent, administrator, registrar and transfer agent for the Fund.  The Fund's escrow account is maintained at Citco Bank Nederland, N.V. Dublin Branch. |
| **Dividend Policy** | It is anticipated that the Fund will not declare any dividends; rather, income will be reinvested and will be reflected in the Net Asset Value of the Shares. |

## SALE AND REDEMPTION OF SHARES

**Redemption at the Option of a Shareholder**

A shareholder of the Fund, on fifteen (15) calendar days' notice, may cause his Shares to be redeemed as of the last business day (being any day not a Saturday or a Sunday, that is not a public holiday or a day on which banks are generally authorized or obliged by law or regulation to close in the Netherlands, the Republic of Ireland or the United States of America)of any month. There is no minimum period of time that Shares must be held in order for a shareholder to redeem his Shares.

**Compulsory Redemption**

The Fund reserves the right to call all or a part of a shareholder's Shares for redemption at any time. This right will only be exercised as to Shares where the continued holding of which would result in regulatory, pecuniary, legal, taxation, or material administrative disadvantage for the Fund or the shareholders as a whole.

**Sales**

Subscriptions received during any monthly period prior to the third to the last business day of the month will ordinarily be accepted, subject to the sole discretion of the Manager, as of the first business day of the following monthly period, i.e., subscriptions received between December 28 and January 28 will be accepted as of February 1. Subscriptions will become irrevocable to the subscriber on the third to the last business day of the month in which such subscription is received by the Fund.

**Exchange Listing**

The Fund was admitted to the Official List of the Irish Stock Exchange in Dublin, Ireland on January 12, 1995 and has been issued SEDOL number 0330934. It is unlikely that a public trading market will develop for the Fund's shares and none has developed to date. Shareholder redemption rights are not affected by this listing.

## COMPENSATION AND EXPENSES

**Expenses**

The Fund will bear, for each year, all continuing offering costs; all ordinary legal and auditing fees; all registrar, transfer agent and administration fees; all insurance expenses; all expenses in maintaining the Fund's office and all other expenses incurred in the operation of the Fund, if any, including any legal and auditing fees that relate to extraordinary circumstances, such as tax examinations or litigation involving the Fund, as well as all fees and all ordinary and necessary expenses related to the Fund's investment and trading activities.

**Management Fee**

The Manager will receive a monthly management fee in an amount equal to one-twelfth of one percent (0.0833%) (1% per annum) of the Net Asset Value before Performance Fees (as hereinafter defined) of the Shares, as calculated at the opening of the first day of each calendar month, which will include subscriptions for Shares accepted by the Fund as of the first day of the month. This fee is payable monthly in arrears. The Manager will pay a portion of the Management Fee to an affiliate in consideration of the affiliate providing certain administrative services and back-office support to the Fund.

**Performance Fee**

The Manager will receive, for each calendar quarter, a performance fee (the "Performance Fee") with respect to each Share outstanding during such calendar quarter in an aggregate amount equal to 20% of any New High Net Profits (as defined under "FEES, COMPENSATION AND EXPENSES - Performance Fee") allocable to the Shares, subject to reduction in connection with certain offsets with respect to each Share. Shares which are either purchased or redeemed during a calendar quarter shall be subject to the payment of a Performance Fee only for the portion of the calendar quarter during which such Shares were outstanding. The Performance Fee will only be paid on "new appreciation" in the Fund's Net Asset Value allocable to the Shares.

In certain circumstances, the Performance Fee may be reduced for particular calendar quarters and the amount of the reduction repaid in subsequent calendar quarters (see "FEES, COMPENSATION AND EXPENSES – Performance Fee").

The Manager and the Fund may enter into an agreement pursuant to which the Manager may elect to defer payment of all or a portion of its Management Fees and/or Performance Fees.

4

## THE FUND

Description

The Fund was incorporated in the Territory of the British Virgin Islands ("BVI") as an international business company on October 30, 1990. The registered office of the Fund is located in Road Town, Tortola, British Virgin Islands.

Shareholders will have the right to redeem part or all of their Shares as of the last business day of any month, or purchase additional shares as of the first business day of any month (See "TRANSFERS, REDEMPTIONS AND TERMINATION").

## MANAGEMENT OF THE FUND AND OTHER RELATIONSHIPS

The Fund

The Fund's Board of Directors has overall management responsibility for the Fund, including establishing investment, dividend and distribution policy, and having the authority to select and replace the Fund's administrator, registrar and transfer agent, any officers of the Fund and other persons or entities with management or administrative responsibilities to the Fund. None of the Fund's Directors own an equity interest in the Fund.

The Directors of the Fund are as follows:

**Walter Noel** has over thirty years of experience in the investment business. From 1959 to 1972, he was associated with the Management Services Division of Arthur D. Little Inc., an industrial and management consulting firm. From 1972 to 1974, Mr. Noel was President of Bahag Banking Ltd., in Lausanne, Switzerland. In 1974, Mr. Noel became Vice President of the International Private Banking Department of Citibank, N.A., where he remained until 1977 when he became Senior Vice President of the International Private Banking Department of Chemical Bank. Mr. Noel remained at Chemical Bank until 1983, where he shared primary responsibility for developing its international private banking business. He founded The Fairfield Greenwich Group, an affiliate of the Fund's investment manager, Fairfield Greenwich (Bermuda) Ltd., in 1983. Since founding The Fairfield Greenwich Group, Mr. Noel has been a director or general partner for a variety of its funds.

**Jan R. Naess** received a Bachelor of Arts degree in 1981 and a Masters degree in Economics in 1983 from the University of Oslo. From 1983 to 1987, he was employed in the Economic Research Department of R.S. Platou a.s. in Oslo, a leading shipbrokering firm. In 1987, Mr. Naess joined with R.S. Platou a.s. to form R.S. Platou Asset Management a.s., which was instrumental in the sale and purchase of 15 bulk carriers from 1987 to 1989. In 1989, Mr. Naess liquidated his interest in R.S. Platou Asset Management a.s. and formed PAN Shipping Ltd., a shipowning/operating and project development fund, which merged with Northern Navigation International Limited ("NNI") in 1991. Mr. Naess is a Vice President of NNI, a Liberian corporation, which is in the business of investing in and managing shipping assets.

**Peter P. Schmid** received a Swiss Federal Certificate of Capacity in 1968. Mr. Schmid was employed by Credit Suisse from 1968 to 1986. From 1975 to 1977, he was employed in Credit Suisse's International Portfolio Management Department in Zurich. After a brief posting in Credit Suisse's New York office, Mr. Schmid was in charge of the bank's representative office in Rio de Janeiro from 1977 to 1984. From 1984 to 1986, Mr. Schmid was Vice President in charge of Credit Suisse's Latin American Private

5

Banking Desk in Geneva.  Mr. Schmid has been an independent investment adviser since Apr
is President of Peter Schmid (Portfolio Management), P. Schmid & Associés, S.A. and Arm
Schmid is a Director of Inter Asset Management Inc.

### The Investment Manager

The Fund's investment manager is Fairfield Greenwich (Bermuda) Ltd., a corporation organized under the
laws of Bermuda ("FGBL" or the "Manager"), which was incorporated on June 13, 2003. It is responsible
for the management of the Fund's investment activities, the selection of the Fund's investments,
monitoring its investments and maintaining the relationship between the Fund and its escrow agent,
custodian, administrator, registrar and transfer agent.  The Manager is the wholly-owned subsidiary of
Fairfield Greenwich Limited, an exempted company organized under the laws of the Cayman Islands
("FGL"), which previously served as the investment manager of the Fund.

The Fairfield Greenwich Group ("FGG"), of which the Manager is an affiliate, was established in 1983
and has approximately $8 billion employed in alternative asset management funds.  Throughout its
history, the firm has internally managed alternative asset funds and selectively identified external
managers for affiliations where it serves as a marketing and distribution partner, and obtains underlying
portfolio information for monitoring and client communication purposes.

The Manager and its affiliates currently serve as investment or administrative manager to approximately
twenty funds, and have exclusive distribution arrangements with several others.  FGG maintains its
principal office in New York, with a significant presence in London.  Marketing and client support offices
are located elsewhere in the United States, Europe, and Latin America.  FGG's London entity is licensed
and subject to the supervision of FSA, and another FGG-affiliated entity is registered as a broker- dealer
in the United States.

The Manager expects to make application with the Bermuda Monetary Authority to become licensed as a
financial provider and has made a claim for no-action relief from registration as a commodity pool
operator with the U.S. Commodity Futures Trading Commission with respect to its operation of the Fund.

Pursuant to the Investment Management Agreement between the Fund and the Manager, the Manager is
not liable for any error of judgment or for any loss incurred by the Fund, except a loss resulting from
willful malfeasance, bad faith or gross negligence in the performance of its duties under such agreement.
The Investment Management Agreement further provides that the Manager, its directors, officers,
employees, agents and counsel will be indemnified and held harmless by the Fund against any and all
claims, liability and expenses for any loss suffered by the Fund arising out of any act or omission of such
indemnified party, except to the extent an act or omission constitutes willful misconduct or reckless
disregard of the duties of such indemnified party. The Investment Management Agreement may be
terminated by either party thereto on ten days' written notice prior to the end of any calendar quarter.

Following is biographical information on the founders, principal officers and certain other key employees
of FGG:

**Walter M. Noel, Jr.**  His background is summarized above under "MANAGEMENT OF THE FUND
AND OTHER RELATIONSHIPS - The Fund".

**Andres Piedrahita** founded Littlestone Associates in 1991, which merged with FGG in 1997.  Mr.
Piedrahita directs FGG's European and Latin American activities.  Mr. Piedrahita has over fifteen years of
experience in the investment business.  Prior to the merger, Mr. Piedrahita was the Director and President
of Littlestone Associates, Inc. (1991-1997).  He was previously a Vice President at Shearson Lehman

Hutton, specializing in money management consulting for non-U.S. institutions and individuals (1987-1990). Before joining Shearson, Mr. Piedrahita was a financial consultant with Prudential Bache Securities Inc. in New York (1981-1987). He received his Bachelor of Arts degree from Boston University's School of Communications.

**Jeffrey Tucker** has over twenty years of experience in investment related businesses. Mr. Tucker was an attorney with the Securities and Exchange Commission from 1970 to 1978. From 1975 to 1978, he was an Assistant Regional Administrator of the SEC's New York regional office, with supervisory responsibility for approximately half of its enforcement program. Mr. Tucker entered private practice in 1978 as a partner in the law firm Tucker, Globerman & Feinsand, where he remained until 1987. He specialized in securities and transactional matters, with a principal focus on limited partnership offerings. Mr. Tucker entered the securities industry in 1987 as a general partner of Fred Kolber & Co. ("Kolber"), a registered broker-dealer. At Kolber, Mr. Tucker was responsible for the development and administration of the firm's private investment funds. FGG began its association with Kolber at that time as a marketing agent, and the firms subsequently merged activities. Throughout FGG's development, Mr. Tucker has been responsible for directing its business and operational development and has been a director or general partner for a variety of its investment funds. Mr. Tucker received his Bachelor of Arts degree from Syracuse University and his JD from Brooklyn Law School.

**Robert Blum** oversees or assists in all aspects of FGG's activities, and focuses on product creation as well as operational and related matters. Mr. Blum has over fifteen years of directly relevant operational and legal experience in the alternative asset management arena. He previously worked at CIBC Oppenheimer Corp. (1989-1999) where he was a Managing Director, a member of the firm's Management and Operating Committees, and served in various roles during his career, including Deputy General Counsel. At CIBC Oppenheimer, Mr. Blum had extensive business responsibility (including management and operational roles) and legal involvement in the development of a wide range of transactions and businesses in the alternative and conventional asset management areas. Mr. Blum began his career as an associate in the law firm of Fulbright & Jaworski (1984-1989). Mr. Blum received his Bachelor of Arts degree from the University of Pennsylvania and his JD from the University of Chicago Law School.

**Harold Greisman** is the Chief Investment Officer of FGG, focusing on manager selection and risk oversight. Mr. Greisman has over fifteen years of experience in the investment business. Prior to joining FGG in 1990, Mr. Greisman was an Associate in the Capital Markets Group of Continental Bank (1984-1985) and then worked for DNB Capital Corporation (1985-1990), a proprietary private equity and venture capital operation controlled by Den Norske Bank. Mr. Greisman began his career at Johnson & Higgins, a large industrial insurance brokerage (1978-1982). Mr. Greisman received his Bachelor of Arts degree from Tufts University and his MBA degree from the Stern School of Business at New York University.

FGL and certain of its principals have beneficial interests in the Fund.

The backgrounds of the Directors and key officers of the Manager are set forth below:

**Andres Piedrahita** is a Director and the President of the Manager. His background is set forth above under "MANAGEMENT OF THE FUND AND OTHER RELATIONSHIPS-The Investment Manager".

**Ian Pilgrim** is a Director of the Manager and serves as General Counsel of Citco Fund Services. Prior to joining Citco in January 2001, Mr. Pilgrim practiced from the beginning of 1997 until the end of 2000 as a Barrister & Attorney with M.L.H. Quin & Co. in Bermuda, specializing in the structuring and establishment of hedge funds and other collective investment vehicles. From 1994 to 1996, Mr. Pilgrim practiced as a solicitor with Allen & Overy in Hong Kong, where he was involved primarily in banking

and project finance, and, prior to that, from 1991 to 1994, with Deacons in Hong Kong. Before moving to Hong Kong, Mr. Pilgrim practiced as a solicitor with the City of London law firm, Taylor Joynson Garrett. Mr. Pilgrim was admitted to practice as a solicitor in England and Wales in 1989 and in Hong Kong in 1992. He was admitted to the Bar in Bermuda in 1998. He is a member of the Law Societies of England and Wales and Hong Kong and of the Bar of Bermuda.

**Amit Vijayvergiya** is Vice President and the Risk Manager of the Manager and focuses on manager selection and risk management for the Fund. He has been employed by the Manager since 2003. Mr. Vijayvergiya has over 9 years of experience in asset management, risk management and operations research. Prior to joining the Manager, from 2000 to 2003, Mr. Vijayvergiya managed MAV Hedge Advisors, a family office investing in traditional and alternative investment managers. From 1998 to 2000, he was the General Manager of LOM Asset Management ("LOM AM"), where he oversaw the management of $160 million in assets. At LOM AM, Mr. Vijayvergiya structured and managed several multi-manager funds and served on the firm's management and investment committees. He began his business career in 1994 with a position in operations research at Canadian National Railways. Mr. Vijayvergiya received a Masters in Business Administration from Schulich School of Business at York University, a Bachelors of Science in Statistics from the University of Manitoba and a Bachelors of Arts in Economics from the University of Western Ontario. Mr. Vijayvergiya holds the Chartered Financial Analyst designation and the Financial Risk Manager certification.

## INVESTMENT POLICIES

The Fund seeks to obtain capital appreciation of its assets principally through the utilization of a nontraditional options trading strategy described as "split strike conversion", to which the Fund allocates the predominant portion of its assets. This strategy has defined risk and profit parameters, which may be ascertained when a particular position is established. Set forth below is a description of the "split strike conversion" strategies ("SSC Investments").

The establishment of a typical position entails (i) the purchase of a group or basket of equity securities that are intended to highly correlate to the S&P 100 Index , (ii) the sale of out-of-the-money S&P 100 Index call options in an equivalent contract value dollar amount to the basket of equity securities, and (iii) the purchase of an equivalent number of out-of-the-money S&P 100 Index put options. An index call option is out-of-the-money when its strike price is greater than the current price of the index; an index put option is out-of-the-money when the strike price is lower than the current price of the index. The basket typically consists of approximately 35 to 45 stocks in the S&P 100.

The logic of this strategy is that once a long stock position has been established, selling a call against such long position will increase the standstill rate of return, while allowing upward movement to the short call strike price. The purchase of an out-of-the-money put, funded with part or all of the call premium, protects the equity position from downside risk.

A bullish or bearish bias of the positions can be achieved by adjustment of the strike prices in the S&P 100 puts and calls. The further away the strike prices are from the price of the S&P 100, the more bullish the strategy. However, the dollar value underlying the put options always approximates the value of the basket of stocks.

The options transactions executed for the benefit of the Fund may be effected in the over-the-counter market or on a registered options exchange.

### Other Investments

The Manager, in its sole and exclusive discretion, may allocate a portion of (never to exceed, in the aggregate, 5% of the Fund's Net Asset Value at the time of alternative investment opportunities other than its "split strike conversion" investments ("Investments"). It is anticipated that the Non-SSC Investments will be allocated to new vehicles managed by experienced management teams establishing themselves in new investment businesses ("Emerging Managers"), with no single allocation exceeding $50 million at the time it is made. These arrangements may include "lock-up" provisions of varying durations of these assets in such investments, subject to early release for breach of risk control or performance guidelines, or for cause. FGBL and the Fund generally share in fees received by portfolio managers of Non-SSC Investments from investors other than the Fund. The Fund will pay fees with respect to the Non-SSC Investments at a rate that will not exceed the Fund's rate of fees (in certain cases, this may be accomplished by FGBL subsidizing, from its own moneys, the fees charged on these assets by Non-SSC Investment managers).

In certain circumstances, the Performance Fee may be reduced for particular calendar quarters for certain Non-SSC Investment Losses. See "POTENTIAL CONFLICTS OF INTEREST" and "FEES, COMPENSATION AND EXPENSES –Performance Fee".

In order to ensure that the Fund will not be subject to United States federal income taxation on trading gains from the disposition of certain investments, it is expected that the Fund will not invest in any "United States real property interest" (including, for example, certain interests in any U.S. Corporation that is a "United States real property holding corporation"), as such terms are defined under the U.S. Internal Revenue Code of 1986 (the "Code") and the Treasury Regulations promulgated thereunder. (See "TAX CONSIDERATIONS AND EXCHANGE CONTROL.")

The Fund may invest some of its assets in short-term U.S. government obligations, certificates of deposit, short-term high grade commercial paper and other money market instruments, including repurchase agreements with respect to such obligations, money market mutual funds and short term bond funds. In order to ensure that substantially all of the interest earned by the Fund will not be subject to United States federal withholding taxes, any investment in an obligation of a U.S. person or entity (other than in certificates of deposits in banks) primarily will be in an instrument (i) which is issued and purchased at a discount from its face amount, which is not otherwise interest bearing, and which has a term of no more than 183 days from the date of issuance or (ii) which is registered form and which is issued after July 18, 1984. (See "TAX CONSIDERATIONS AND EXCHANGE CONTROL.")

### Investment Restrictions

The Fund will observe the investment restrictions set forth in the Fund's Articles of Association which are summarized here:

  a)  no more than 10 percent of the Net Asset Value of the Fund will be invested in the securities of any one issuer (other than any government or governmental agency);

  b)  the Fund may not hold more than 10 percent of the issued securities of any one class of securities in any issuer (other than any government or governmental agency);

  c)  no more than 10 percent of the gross assets of the Fund may be exposed to the creditworthiness or solvency of a single counterparty (other than any government or governmental agency), in each case calculated at the time of investment;

9

    d)    no more than 10 percent of the Net Asset Value of the Fund may be invested in securities of countries where immediate repatriation rights are not available;

    e)    the Fund will not invest in the securities of any issuer if the directors and officers of the Fund and the Manager collectively own in excess of 5 percent of such securities;

    f)    the Fund will not take or seek to take legal or management control of the issuer of underlying investments;

    g)    the Fund will adhere to the general principle of diversification in respect of all of its assets;

    h)    the Fund will not invest directly in real property;

    i)    the Fund will not make any loans (except to the extent that the acquisition of any investment in securities or commodity interests described herein may constitute a loan) to any one issuer (other than any government or governmental agency) except with the consent of the custodian of the Fund's assets; and

    j)    no more that 10 percent of the Net Asset Value of the Fund will be invested in physical commodities.

The investment restriction set out in (c) above will not apply to transactions with any counterparty which advances full and appropriate collateral to the Fund in respect of such transactions.

### OFFERING OF THE SHARES

The Fund is offering up to 10,000,000 Shares. The initial offering price was U.S. $200 per Share on November 30, 1990. The Shares are currently offered at a price equal to the Net Asset Value per Share (as hereinafter defined) as of the opening of business on the date of issuance.

Shares may be offered only to experienced and sophisticated investors who are neither citizens nor residents of the United States ("Non-U.S. Investors") and to a limited number of United States investors that are tax-exempt entities ("U.S. Tax-Exempt Investors").

The minimum initial purchase by each subscriber is U.S. $100,000. The Fund may reject any subscription, in whole or in part, in its discretion. All subscriptions, once made, are irrevocable to the subscriber.

All proceeds from the sale of Shares will be received by the Fund in trust and will be deposited by the Fund into a segregated interest bearing account in the Fund's name at the Fund's bank, Citco Bank Nederland N.V. Dublin Branch. There are no underwriting arrangements with respect to the offering of Shares. All solicitations of subscriptions will be made directly by the Fund or through the assistance of unaffiliated placement agents and other intermediaries, who may charge a placement fee of up to 5% of the total amount of the subscriptions for Shares sold, and/or share in the fees earned by the Manager, which they may rebate to their clients. FGBL or an affiliate thereof may also charge a placement fee of up to 3% on such subscriptions, provided that total placement fees do not exceed 5%. In certain instances, the Fund may deduct the amount of the placement fee from the subscription amount to pay to the unaffiliated placement agent and such amounts will not constitute part of the assets of the Fund.

The Fund will offer its Shares on a continuous basis at a price equal to its Net Asset Value as of the opening of business on the date of issuance of such Shares. Subscriptions received during any calendar

month prior to the third to the last business day of the month will be accepted, subject to the sole discretion of the Manager, as of the first business day of the following month. Thus, for example, subscriptions received between January 1 and January 28 shall be accepted as of February 1, assuming the 29th-31st are business days. The Fund reserves the right, in its discretion, to accept any subscription prior to such first day. Subscriptions shall become irrevocable to the subscriber on the third to the last business day of the month in which such subscription is received by the Fund.

The Fund was admitted to the Official List of the Irish Stock Exchange, Dublin, Ireland on January 12, 1995 and has been issued SEDOL number 0330934. It is unlikely that a trading market in the Fund's Shares will develop and none has developed to date. The listing does not affect shareholder redemption rights.

## Net Asset Value Defined

The Net Asset Value of the Shares is the value of the Fund's assets as calculated in accordance with the International Financial Reporting Standards and the Memorandum and Articles of Association of the Fund.

Notwithstanding the foregoing:

        (i)    in the case of extraordinary circumstances which warrant a different valuation of any securities, such as an inability to liquidate existing positions, such securities will be valued at such prices as the Directors shall determine; and

        (ii)    the amount of any distribution or dividend made shall be a liability of the Fund from the day when the distribution or dividend is declared until it is paid.

All decisions on the valuation of assets and liabilities and determination of Net Asset Value shall be made by the Fund's Board of Directors.

Net Asset Value per Share is defined as the Net Asset Value divided by the number of Shares then outstanding.

The Net Asset Value of the Fund will be calculated on a monthly basis by the Fund's administrator, Citco Fund Services (Europe) B.V., which will promptly notify the Irish Stock Exchange of the results of each such Net Asset Value calculation.

Pursuant to the Fund's Articles of Association, the Fund may suspend the calculation of its Net Asset Value for the whole or any part of any period:

        (a)    during which any stock exchange or over-the-counter market on which any significant portion of the investments of the Fund are listed, quoted, traded or dealt in is closed (other than customary weekend and holiday closing) or trading on any such stock exchange or over-the-counter market is restricted; or

        (b)    when circumstances exist as a result of which in the opinion of the Directors it is not reasonably practicable for the Fund to dispose of investments or as a result of which any such disposal would be materially prejudicial to the shareholders; or

        (c)    when a breakdown occurs in any of the means normally employed in ascertaining the value of investments or when for any other reason the value of any of the

11

investments or other assets of the Fund cannot reasonably or fairly be ascertained; or

(d)     during which the Fund is unable to repatriate funds required for the purpose of making payments due on redemption of Shares or during which any transfer of funds involved in the realization or acquisition of investments or payments due on redemptions of Shares cannot in the opinion of the Directors be effected at normal rates of exchange.

Any such suspension shall take effect at such time as the Directors shall declare but not later than the close of business on the business day next following the declaration, and thereafter there shall be no determination of the Net Asset Value per Share of the Fund until the Directors shall declare the suspension at an end, except that such suspension shall terminate in any event on the first business day on which (a) the condition giving rise to the suspension shall have ceased to exist; and (b) no other condition under which suspension is authorized under the Fund's Articles of Association shall exist.  Each declaration by the Directors pursuant to this paragraph shall be consistent with such official rules and regulations (if any) relating to the subject matter thereof as shall have been promulgated by any authority having jurisdiction over the Fund and as shall be in effect at the time.  To the extent not inconsistent with such official rules and regulations, the determination of the Directors shall be conclusive.  Whenever the Directors shall declare a suspension of the determination of the Net Asset Value per Share, then as soon as may be practicable after any such declaration, the Directors shall give notice to all shareholders stating that such declaration has been made.  At the end of any period of suspension as aforementioned the Directors shall give notice to all shareholders stating that the period of suspension has ended.

### Who Should Purchase/Subscription Procedure

This offering is limited to non-U.S. persons who have the ability to speculate in high risk securities and for whom such a purchase is suitable in light of such person's financial condition.  The Fund will require as a condition to the acceptance of a subscription that the subscriber represent and warrant that he has a net worth in excess of U.S. $1,000,000 and is not a U.S. person.

Prospective subscribers should inform themselves as to the legal requirements within their own countries for the purchase of Shares and any foreign exchange or tax considerations relevant to such purchase.

As part of the Fund's responsibility for the prevention of money laundering, the Fund will require detailed verification of a prospective investor's identity to be included with its subscription application.

An individual will be required to produce a certified copy of a passport or identification card.  Corporate applicants will be required to produce a certified copy of the certificate of incorporation (and any change of name), memorandum and articles of association (or other documents evidencing the existence of the legal entity), the register of directors or an excerpt from the trade register held at the relevant chamber of commerce and the signatory card verifying the authority of officers to sign on behalf of the corporate entity.  Trusts and other entities which subscribe to the Fund must demonstrate organizational documents which verify the existence of the entity and which verify the authority of one or more signatories to sign subscriptions on behalf of the entity.

The Fund reserves the right to request such further information as is necessary to verify the identity of an applicant.  In the event of delay or failure by the applicant to produce any information required for verification purposes, the Fund may refuse to accept the application and the subscription moneys relating thereto.

In order to subscribe for Shares, subscribers must complete and sign the Subscription Agreement included in the Subscription Documents which accompany this Confidential Private Placement Memorandum, and mail them to Fairfield Sentry Limited, c/o Citco Fund Services (Europe) B.V., Telestone 8-Teleport, Naritaweg 165, 1043BW Amsterdam, The Netherlands; fax number (31-20) 572-2610.  Subscription funds should be wire transferred to the Fund's escrow account at:

*Intermediary Bank - Field 56*
HSBC Bank, New York
BIC:  MRMDUS33
Fed Wire: 021001088

*Account with Institution - Field 57*
Account Name: Citco Bank Nederland N.V. Dublin Branch
Account Number: 000306487
BIC: CITCIE2D

*Beneficiary Customer - Field 59*
Beneficiary Account Name:  Fairfield Sentry Limited
Beneficiary International Bank Account Number (IBAN):
    IE23 CITC 0000 0035 810 501

*Reference - SWIFT Field 70*:  Name and Full Address of Subscriber:

### FEES, COMPENSATION AND EXPENSES

#### Expenses

The Fund bears all of the continuing offering costs and all other expenses incurred in the operation of the Fund, if any, including the ordinary and necessary expenses directly related to its investment and trading activities, all insurance expenses, all administration fees and all legal and auditing fees, including any legal and auditing fees that relate to extraordinary circumstances, such as tax examinations or litigation involving the Fund.

#### Management Fee

The Manager will receive for each calendar month a management fee (the "Management Fee") in an amount equal to one-twelfth of one percent (0.0833%) (1% per annum) of the Net Asset Value of the preceding month before performance fees as calculated at the open of the first day of such month (which would include any subscriptions for Shares accepted by the Fund as of the first day of the month).  The Management Fee is payable monthly in arrears.  The Manager will pay a portion of the Management Fee to an affiliate inconsideration of the affiliate providing certain administrative services and back-office support to the Fund.

#### Performance Fee

The Manager will receive, for each calendar quarter, a performance fee (the "Performance Fee") in an amount equal to 20% of the amount of any New High Net Profits allocable to the Shares.  Shares which are purchased or redeemed during a calendar quarter shall have their Net Asset Value decreased by the payment of the Performance Fee only for the portion of the quarter during which such Shares were

13

outstanding. New High Net Profits are defined as the excess, if any, of, respectively, (A) the Net Asset Value as of the last day of a calendar quarter (before the deduction of the current Performance Fee, if any, paid or payable) over (B) the difference between (i) the sum of (a) the highest Net Asset Value of the Shares as of the last day of any preceding calendar quarter during which such Share was outstanding, or the date of the initial closing of this offering (or if such Share was issued thereafter, as of the date of such issuance, whichever date the Net Asset Value was higher), and (b) the amount of any subscription proceeds for Shares issued as of, or subsequent to, the date thereof, and (ii) the amount of dividends, distributions and redemptions payable as of, or subsequent to, the date thereof and losses, if any, associated with redeemed shares. IN OTHER WORDS, PERFORMANCE FEES WILL ONLY BE PAID ON "NEW APPRECIATION" IN THE NET ASSET VALUE OF THE SHARES. No Share will be subject to the payment of a Performance Fee until all Shares have recouped their respective loss carryovers, i.e., until the Net Asset Value of such Shares is at least as high as the previous highest Net Asset Value per Share. The Manager will reduce any Performance Fees otherwise payable to it by offsetting it against an amount equal to the "Shared Cash Flow Amount" as defined in "POTENTIAL CONFLICTS OF INTEREST", below) attributable to Non-SSC Investments.

Notwithstanding the foregoing, in the event that, as at the end of any calendar year, the aggregate amount of original investments in Non-SSC Investment vehicles exceeds the aggregate net asset value of the Fund's interests in Non-SSC Investment vehicles (before deduction of the Fund's share of fees payable by the Non-SSC Investment vehicles) (such excess being the "Non-SSC Investment Loss") the Manager will reduce its Performance Fee payable at subsequent quarter-end by an amount equal to the Non-SSC Investment Loss. The portion of the Performance Fee that is reduced to cover the Non-SSC Investment Loss will be carried forward. In the event that the Non-SSC Investment Loss is, in part or in whole, subsequently recouped by Non-SSC Investment vehicles, the Fund will pay the Manager such portion of the Performance Fee that was previously reduced to cover Non-SSC Investment Losses in addition to Performance Fees otherwise payable for any quarter.

Pursuant to its agreement with the Fund, the Manager may elect to defer payment of all or a portion of its Performance Fee.

### Salaries and Other Personnel Expenses

Mr. Noel will not be compensated for serving as a director of the Fund, but he and representatives of the Manager will be reimbursed by the Fund for any out-of-pocket expenses they may incur in attending meetings of the Board of Directors or of shareholders. The Directors not affiliated with the Manager, of which there are at the present time two, will each be paid a fee of $25,000 per annum by the Fund together with his out-of-pocket expenses in attending meetings of the Board of Directors or of shareholders.

### ESCROW BANK AND CUSTODIAN

The Fund's escrow account is maintained at Citco Bank Nederland N.V. ("Citco Bank"). Citco Global Custody ("Citco Custody") has agreed to act as custodian of the Fund's assets. Bernard L. Madoff Investment Securities ("BLM" and, together with other qualified entities with which sub-custodial arrangements may be made, the "Sub-Custodians", and each, singularly, a Sub-Custodian") serve as sub-custodians for certain assets of the Fund. The underlying assets of the Non-SSC Investments managers are held pursuant to custodial arrangements with Goldman, Sachs & Co., Refco, LLC and other qualified entities.

Citco Custody has been appointed custodian to the Fund pursuant to a brokerage and custody agreement dated September 20, 1994 between and among the Fund, Citco Bank and Citco Custody (the "Custody

14

Agreement"). Citco Custody currently has U.S.$36 billion under custody. Currently BLM has approximately 95% of the Fund's assets under custody. Citco Custody will be responsible for all of the assets of the Fund, other than the assets deposited with the Sub-Custodians. All assets under custody will be held by Citco Custody and/or a Sub-Custodian, as the case may be, in a separate client account and will be separately designated in the books and records of Citco Custody and the Sub-Custodians. Assets deposited as margin need not be segregated and may become available to the creditors of brokers.

Sub-custodians may be appointed by Citco Custody provided that Citco Custody shall exercise reasonable skill, care and diligence in the selection of a suitable sub-custodian and shall be responsible to the Fund for the duration of the sub-custody agreement for satisfying itself as to the ongoing suitability of the sub-custodians to provide custodial services to the Fund. Citco Custody will also maintain an appropriate level of supervision over the sub-custodians and will make appropriate inquiries periodically to confirm that the obligations of the sub-custodians continue to be competently discharged. Any sub-custodian appointed will be paid at normal commercial rates.

Citco Custody shall not be liable in the event of loss of any assets held by a sub-custodian, provided that such sub-custodian exercised reasonable care and acted without gross negligence or willful misconduct.

The Custody Agreement provides that Citco Bank shall receive an annual fee of $35,000, plus actual sub-custodian charges and out-of-pocket expenses, together with a fee in the amount of $25 per transaction. The Custody Agreement may be terminated by any of the parties thereto on thirty days' prior written notice. Pursuant to the Waiver and Indemnity Agreement between and among the Fund, Citco Bank and Citco Custody, dated April 20, 1995, the Fund has agreed to indemnify Citco Custody and Citco Bank against losses and liabilities arising out of the actions of certain sub-custodians of the Fund's assets which do not involve willful misconduct or gross negligence of Citco Bank or Citco Custody or a claim against a sub-custodian where either Citco Bank or Citco Custody do not carry out their responsibilities to the Fund with respect to such claim as set forth under the Custody Agreement.

### ADMINISTRATOR, REGISTRAR AND TRANSFER AGENT

Pursuant to an agreement between Citco Fund Services (Europe) B.V. ("Citco") and the Fund, Citco serves as the administrator for the Fund, under the overall direction of the Fund's Board of Directors. As administrator, Citco has the responsibility for furnishing the day-to-day administrative services which the Fund may require, such as: accounting services; maintaining the Fund's books and records; preparation of reports and accounts; calculation of Net Asset Value and fees; communications with shareholders and/or governmental bodies; paying the Fund's expenses; providing suitable facilities and procedures for handling dividends and distributions (if any) and the orderly liquidation and dissolution of the Fund, if required. In consideration of its services, Citco receives a monthly fee based on the Net Asset Value of the Fund as of the last business day of each month at a rate of 5 basis points per annum.

To the extent that Citco relies on information supplied by the Fund, any investee fund of the Fund or any brokers engaged by the Fund, in connection with making any of the aforementioned calculations, Citco's liability for the accuracy of such calculations is limited to the accuracy of its computations. Citco shall not be liable for the accuracy of the underlying data provided to it.

Pursuant to the Administration Agreement, dated February 20, 2003, between the Fund and Citco, the Fund has agreed to indemnify Citco, its subsidiaries, affiliates, directors and other officers, shareholders, servants, employees, agents and permitted delegates under the Administration Agreement, against any and all liabilities, obligations, losses, judgments and expenses of any kind or nature whatsoever

(collectively, the "Claims" and, individually, a "Claim")which may be imposed on, incurred by or
asserted against any of them arising (other than by reason of negligence, bad faith, fraud or dishonesty on
the part of Citco or such other indemnified party) out of the provision of services under the
Administration Agreement. Similarly, Citco will indemnify the Fund from and against any Claim which
arises directly out of the negligence, bad faith, fraud or dishonesty of its obligations on the part of Citco in
connection with its provision of services under the Administration Agreement. The Administration
Agreement may be terminated by either party on 90 days' prior written notice; provided, however, that
the Administration Agreement may be terminated forthwith by notice in writing by either party if the
other party (a) commits a material breach of the Administration Agreement and fails to cure such breach
within 30 days after notice from the non-defaulting party; or (b) enters into involuntary liquidation or if a
receiver is appointed over any of its assets.

## RISK FACTORS

The purchase of Shares in the Fund involves substantial risks that are incident to the Fund's allocation of
assets to SSC and Non-SSC Investments.

1.    **Trading Risks.** Substantial risks are involved in the trading of equity securities
and options. Market movements can be volatile and are difficult to predict. U.S. Government activities,
particularly those of the Federal Reserve Board, can have a profound effect on interest rates which, in
turn, substantially affect securities and options prices, as well as the liquidity of such markets. Politics,
recession, inflation, employment levels, trade policies, international events, war and other unforeseen
events can also have significant impact upon the prices of securities and options. A variety of possible
actions by various government agencies also can inhibit the profitability of the Fund's business or can
result in losses. Such events, which can result in huge market movements and volatile market conditions,
create the risk of catastrophic losses for the Fund.

Various techniques are employed to attempt to reduce a portion of the risks inherent in the trading
strategies utilized on behalf of the Fund. The ability to achieve the desired effect through a particular
technique is dependent upon many factors, including the liquidity of the market at the desired time of
execution. Thus, substantial risk remains that the techniques employed by or on behalf of the Fund
cannot always be implemented or effective in reducing losses. At various times, the markets for
exchange-listed equity securities and options and/or other securities may be "thin" or illiquid, making
purchases or sales of securities at desired prices or in desired quantities difficult or impossible. In
addition, options prices are extremely volatile. The volume and volatility of trading in these markets
depends in part on general public interest and public opinion concerning economic conditions as well as
the liquidity provided by market-makers and specialists. The liquidity of the market may also be affected
by a halt in trading on a particular futures or securities exchange or exchanges. Illiquid markets may
make it difficult to get an order executed at a desired price.

2.    **Trading Strategies May Not be Successful.** There can be no assurance that
any trading method employed by or on behalf of the Fund will produce profitable results, and the past
performance of the Fund is not necessarily indicative of its future profitability. In that regard, certain of
the managers receiving Non-SSC Investment allocations may not have investment records compiled while
managing assets on their own. Profitable trading is often dependent on anticipating trends or trading
patterns. In addition, markets experiencing random price fluctuations, rather than defined trends or
patterns, may generate a series of losing trades. There have been periods in the past when the markets
have been subject to limited and ill-defined price movements, and such periods may recur. Any factor
which may lessen major price trends (such as governmental controls affecting the markets) may reduce
the prospect for future trading profitability. Any factor which would make it difficult to execute trades,

16

such as reduced liquidity or extreme market developments resulting in prices moving the
amount allowed in a single day, could also be detrimental to profits or cause losses.

3.    **Dependence Upon Principals and Key Employees of the Mana**
services of the Manager's principals and key employees are essential to the continued operations of the
Fund.  If their services were no longer available, their absence would have an adverse impact upon an
investment in the Fund. The key employees of the Manager will allocate a small portion of the Fund's
assets between and among the Non-SSC Investment managers.  The Fund will be dependent on the
continued presence of these key employees in connection with identification of the recipients of these
allocations and the monitoring of the Non-SSC Investments.

4.    **Conflicts of Interest.**  The Manager and the Non-SSC Investment managers
receiving allocations of the Fund's assets, and their respective principals and affiliates, are presently
affiliated with and may in the future form and manage, or provide other services to, other investment
entities (including without limitation investment partnerships, investment companies and mutual funds)
with substantially the same or different objectives as those of the Fund.  They may also make investments
in securities for their own accounts.  In addition, the Manager functions as the investment manager for
unregistered foreign investment companies in addition to the Fund.  Such activities could detract from the
time that the Manager and its principals allocate to the affairs of the Fund.  The Manager will obtain
certain business and financial benefits from the Fund's investments in the Non-SSC Investments which
may result in a conflict of interest between the Manager and the Fund in the selection of, and allocation of
assets between and among, the Non-SSC Investments.  The broker-deal through which the Fund conducts
its SSC Investments, in its role as a market-maker may effect transactions in equity securities with the
Fund as principal.  This may provide such broker-dealer with the ability to use the Fund's assets to
enhance its securities market-making function.  See "POTENTIAL CONFLICTS OF INTEREST".

5.    **Custodian/Clearing Firm Loss or Insolvency.**  If a custodian or clearing firm
utilized in connection with accounts maintained on behalf of the Fund was to become insolvent, the Fund
could have some or all of these positions closed out without its consent.  In addition, all of the Fund's
positions may not be closed out under these circumstances, yet delays or other difficulties may be
experienced in attempting to close out or exercise options positions.  Widespread insolvency among
clearing firms that clear securities options could also impair the ability of the Options Clearing Corp. (the
"OCC") to honor all exercises, in spite of the system of safeguards which the OCC has in place.  Such
widespread insolvency, or of a particular custodian, could result in substantial losses to the Fund.

6.    **Competition.**  The securities industry, including market-making activities and
transactions effected in connection therewith, are very competitive.  Competition from other persons or
entities involved in activities similar to those of the Fund can restrict the ability of the Fund to acquire
positions at the prices deemed most beneficial to its overall trading strategies.  Many such competing
persons or entities are better capitalized and have more experience in trading than the Fund. Moreover,
the widespread use of computer-assisted trading systems for trading strategies can alter trading patterns or
affect execution of trades to the detriment of the Fund.

7.    **Regulated Industries.**  The securities and commodities industries are highly
regulated.  The Fund will not be directly subject to regulation by the SEC, national securities exchanges,
the CFTC or the Federal Reserve Board. However, the SEC and CFTC regularly review the practices and
procedures of the securities and commodities industries, and the market place in general, and from time to
time revises rules and regulations pertaining thereto.  The exchanges engage in similar reviews and at
times revise their rules.  There can be no assurance whatsoever that any rules and regulations promulgated
by the SEC, the CFTC, the Federal Reserve Board, or the various securities exchanges or statutory

17

amendments to the Securities Exchange Act of 1934 or the Commodity Exchange Act will not adversely impact the Fund.

        8.    **Over-the-Counter Options Transactions.** Options transactions effected on behalf of the Fund may utilize the over-the-counter market for their execution. Trading index options in the over-the-counter market is subject to counter-party risk and is without the protections afforded by transactions effected through the OCC, a registered options exchange.

        9.    **Option Buyer's Risk of Loss of Entire Investment.** An option is a wasting asset which becomes worthless when the option expires. As the remaining life of an option shortens with the passage of time, its value is reduced until it reaches zero upon expiration. This means that the option buyer who neither sells it in the secondary market nor exercises it prior to expiration will lose his entire investment in the option.

        10.    **Arbitrage Transactions.** Among the many risks of arbitrage transactions are that two or more buy or sell orders may not be able to be executed simultaneously at the desired prices, resulting in a loss being incurred on both sides of a multiple trade arbitrage transaction. Also, the transaction costs of arbitrage transactions can be especially significant because separate costs are incurred on each component of the combination. Consequently, a substantial favorable price movement may be required before a profit can be realized.

        11.    **Combination Transactions.** At various times, the Fund may engage in spreads or other combination options transactions involving the purchase and sale of related options contracts, in various combinations. Such transactions are considerably more complex than the purchase or writing of a single option. The following are among the many risks of combination option transactions: the difficulty that may be involved in attempting to execute simultaneously two or more buy or sell orders at the desired prices; the possibility that a loss could be incurred on both sides of a multiple options transaction; and the possibility of significantly increased risk exposure resulting from the hedge against loss inherent in most spread positions being lost as a result of the assignment of an exercise to the short leg of a spread while the long leg remains outstanding. Also, the transaction costs of combination options transactions can be especially significant because separate costs are incurred on each component of the combination. This can have the effect of requiring a substantial favorable price movement before a profit can be realized.

        12.    **Trading Decisions Based on Trend Analysis.** Certain of the trading decisions of the Fund are based on the use of computer pricing models to identify apparently overpriced or underpriced options in relationship to an assumed norm. In addition, analyses of price and other fluctuations over time may be relied upon which utilize charts and computers in order to discern and predict trends. Trading based on such analyses is subject to the risks that options premiums will not increase or decrease as predicted by the analyses, or that trades dictated by the analyses may not be executed in time to take advantage of the price disparities. This latter risk is likely to materialize when numerous market makers use similar analyses, all of which dictate the desirability of executing identical or similar contracts. In the past, there have been periods without identifiable trends and, presumably, such periods will continue to occur. Trading models or analyses that depend upon the forecasting of trends will not be profitable if there are not identifiable trends of the kind that the models or analyses seek to follow. Any factor which would make it more difficult to execute trades in accordance with the models or analyses signals, such as a significant lessening of liquidity in a particular market, would also be detrimental to profitability.

        13.    **Assignment of Puts or Calls.** Substantial losses may result under certain circumstances if a hedged position becomes a long or short position due to the assignment of the short put

or short call portion of the hedged position.  Under normal market conditions, the remaining portion of the previously hedged portion may be liquidated or otherwise adjusted to limit exposure to price changes. Suspension of trading of the option class or underlying securities followed by a price gap at the reopening of trading might result in substantial losses.  The same would be true given an illiquid market such as that of October 1987.

14.    **Prohibition of Exercise Rights**.  The options markets have the authority to prohibit the exercise of particular options. If a prohibition on exercise is imposed at a time when trading in the option has also been halted, holders and writers of that option will be locked into their positions until one of the two restrictions has been lifted.

15.    **Incentive Compensation**.  The Non-SSC Investment managers will generally be compensated through incentive arrangements.  Under these arrangements, the Non-SSC Investment managers may benefit from appreciation, including unrealized appreciation in the value of the Non-SSC Investment, but may not be similarly penalized for decreases in the value of such investment vehicle. Such fee arrangements may create an incentive for the Non-SSC Investment managers to make purchases that are unduly risky or speculative.  In most cases, however, the Fund anticipates that it will invest in Non-SSC Investments where the manager is required to recoup prior losses before any performance-type fee is payable in respect of current gains.

To the extent that an accrual for an incentive fee is reflected in the net asset value of shares of a Non-SSC Investment vehicle, then if such accrual is reversed by the Non-SSC Investment vehicle as a result of subsequent depreciation, all of the Shares of the Fund will benefit from the reversal of the accrual, including Shares purchased after the Non-SSC Investment vehicle made the accrual.  Further, to the extent that the Performance Fee is reduced by the Non-SSC Investment Loss amount, then if such reduction is repaid in part or in whole by the Fund due to recoupment of losses by Non-SSC Investment vehicles, the Net Asset Value of all Shares of the Fund then outstanding will be reduced, including Shares purchased after the reduction of the Performance Fee.

16.    **Risks of Leverage**.  The Non-SSC Investment vehicles in which the Fund invests may borrow funds in connection with their investment strategies.  A particular Non-SSC Investment vehicle may not be subject to any limitation in the amount of its borrowings, and the amount of borrowings that the Non-SSC Investment vehicle may have outstanding at any time may be large in comparison to its capital.

The use of leverage may provide the Non-SSC Investment vehicle with the opportunity for greater capital appreciation, but at the same time will increase the Non-SSC Investment vehicle's, and indirectly the Fund's, exposure to capital risk and higher current expenses.  Moreover, if the assets of the Non-SSC Investment vehicle are not sufficient to pay the principal of, and interest on, the Non-SSC Investment vehicle's debt when due, the Fund could sustain a total loss of its investment in the Non-SSC Investment vehicle.

17.    **Possibility of Misappropriation of Assets**.  When the Fund invests utilizing the "split strike conversion" strategy or in a Non-SSC Investment vehicle, it will not have custody of the assets so invested.  Therefore, there is always the risk that the personnel of any entity with which the Fund invests could misappropriate the securities or funds (or both) of the Fund.

18.    **Sole Proprietor Non-SSC Investment Managers**.  Some of the Non-SSC Investment vehicles to which the Fund may allocate capital may consist of investment operations with only one principal.  In such cases, if that individual's services became unavailable to the Non-SSC Investment vehicle, the Fund might sustain losses.

19

19.    **Experience of Non-SSC Investment Managers**.  While certain of the Non-SSC Investment Managers have had extensive experience in trading securities generally and within their specific investment strategies, they may have had little experience in investing and trading on behalf of a pooled investment vehicle, in utilizing certain of the investment strategies to be employed on behalf of the Fund or in managing an account as large as that anticipated for the Non-SSC Investments.  In that regard, as the assets of the Non-SSC Investment vehicles increase, it is not known what effect, if any, this will have on the trading strategies utilized on their behalf or their investment results.

20.    **Emerging Managers**.  As the Non-SSC Investment vehicles generally will be in an early stage of formation or operation, this can pose a number of operational and other issues.  For example, in its early stages the Non-SSC Investment manager may have little capital available to cover expenses and, accordingly, may have difficulty attracting qualified personnel.  Competing investment managers have a larger number of qualified management and technical personnel and benefit from a larger capital base.

21.    **Lack of Liquidity**.  Certain of the Fund's investments in the Non-SSC Investments will be subject to lock-up provisions any of which will limit the ability of the Fund to withdraw capital from such investment.  While such lock-up period may be subject to early release for breach of risk control or performance guidelines or for cause, there can be no assurance that the Fund will not sustain additional losses while such lock-up period remains in effect.

22.    **Exchange Rate Risk**.  The Fund will maintain its assets in U.S. dollars.  The Net Asset Value per Share is determined in U.S. dollars.  Non-dollar investors are subject to possible reduction in the value of their Shares due to changes in the rate of exchange between the U.S. dollar and their native currency.  In addition, a hedge may be established in anticipation of new subscribers.  In the event such subscriptions are not made, the hedge position will be unwound and the transactions will be borne by the existing shareholders.

## POTENTIAL CONFLICTS OF INTEREST

The Manager, the Non-SSC Investment managers and their respective affiliates, officers and employees may form and manage other investment entities (including without limitation investment partnerships, investment companies, mutual funds and offshore funds) and provide investment services to clients other than the Fund in the future with substantially the same or different objectives as those of the Fund.  They may also make investments in securities for their own accounts.  Such activities could detract from the time they allocate to the affairs of the Fund and negatively impact the Fund's investment opportunities.  Similarly, Messrs. Naess and Schmid, the non-affiliated directors, have other business interests and will not devote their entire time to the Fund's affairs.  See also "RISK FACTORS".

In connection with the investment of Fund assets in Non-SSC Investments, the Manager and its affiliates may obtain financial and business benefits, including but not limited to: (i) additional investment capacity in Non-SSC Investments, which may be made available to other clients of the Manager, (ii) compensation from Emerging Managers in connection with placement of such additional investment capacity, and/or (iii) sharing in the equity or cash flows of the entire investment business (Fund and non-Fund related) of such Emerging Managers.  The Manager will share with the Fund annually, through Performance Fee offset, an amount equal to the greater of (i) 50% of cash flows generated by equity held by the Manager or n affiliate thereof in the businesses of Emerging Managers and (ii) 10% of all revenues accruing to the Manager or an affiliate thereof directly from its association with Non-SSC Investment vehicles (the "Shared Cash Flow Amount").  Despite this sharing, however, the arrangements described in this paragraph may result in a conflict of interest between the Manager and the Fund.

20

Because the Fund was organized by affiliates of the Manager, the fees paid by the Fund to the Manager were not the result of arms-length negotiation.

The Fund may engage placement agents to market the Fund.  If you are introduced to the Fund by an agent, you should expect it to be paid by the Manager for the introduction out of the fees the Manager receives from the Fund.  You should also expect the agent to have an incentive to recommend that you remain an investor in the Fund, since the agent will likely be paid a portion of the Manager's fees each year that you remain an investor.

The broker-dealer through which the fund conducts its SSC Investment activities, in its role as a market-maker, may effect transactions in equity securities with the Fund as principal. This may provide such broker-dealer with the ability to use the Fund's assets to enhance its equities market-making function.

Because Mr. Noel is a principal of the Manager as well as a Director of the Fund, he may have an incentive to take actions as a Director that favors the Manager over the Fund.

Citco Fund Services (Europe) B.V., Citco Bank Nederland N.V. Dublin Branch and Citco Global Custody N.V. are affiliates.

Each service provider to the Fund shall pay regard to its obligation to act in the best interest of the Fund and the Directors of the Fund will ensure that all such potential conflicts of interest are resolved fairly and in the interest of the shareholders.  When allocating investment opportunities, the Manager will ensure that all such investments are allocated in a fair and equitable manner.

### PRIOR TRADING RESULTS

The Fund's securities trading activities are directed by the Manager.   Set forth below in capsule performance summary are the prior trading results of the Fund since its inception on a monthly basis. This performance is shown net of the monthly Management Fee of 0.0833% of Net Asset Value (1% per annum), the quarterly Performance Fee of 20% of New High Net Profits, which has been calculated monthly for purposes of these charts, and other expenses.  Prior to July 1, 2003, the Fund was managed by an affiliate of the Manager.  The trading results of the other entities for which FGBL or its affiliates have directed trading, or with which they have otherwise been affiliated, may be obtained upon request.

### The Fund

The Fund allocates the predominant portion of its assets to a strategy described as "split strike conversion". (See "INVESTMENT POLICIES.") The Fund issued its shares at $200 per share as on November 30, 1990.  As of December 31, 2003, Net Asset Value per Share was $957.84 (subject to audit).  Prior performance is shown below on a monthly basis through December 31, 2003.

| Period | Beginning Net Asset Value (1) | Additions (2) | Withdrawals (3) | Net Profit/Loss (4) | Ending Equity (5) | Rate of Return (6) | Shares Out-standing |
|---|---|---|---|---|---|---|---|
| 1990 | | | | | | | |
| December | 4,363,400 | 8,157,216 | 0 | 123,779 | 12,644,395 | 2.84% | 61,478 |
| 1991 | | | | | | | |
| January | 12,644,395 | 0 | 0 | 388,941 | 13,033,336 | 3.08% | 61,478 |
| February | 13,033,336 | 0 | 0 | 190,582 | 13,223,918 | 1.46% | 61,478 |
| March | 13,223,918 | 605,364 | 315,447 | 77,222 | 13,591,057 | 0.58% | 62,818 |
| April | 13,591,057 | 1,799,968 | 0 | 189,610 | 15,580,635 | 1.40% | 71,023 |
| May | 15,580,635 | 0 | 0 | 293,006 | 15,873,641 | 1.88% | 71,023 |

21

| Period | Beginning Net Asset Value (1) | Additions (2) | Withdrawals (3) | Net Profit/Loss (4) | Ending Equity (5) | Rate of Return (6) | Shares Out-standing |
|--------|------------------------------|--------------|-----------------|---------------------|-------------------|--------------------|--------------------|
| June | 15,873,641 | 4,848,334 | 0 | 58,587 | 20,780,562 | 0.37% | 92,636 |
| July | 20,780,562 | 0 | 0 | 423,819 | 21,204,381 | 2.04% | 92,636 |
| August | 21,204,381 | 0 | 226,959 | 21,431,340 | 21,431,340 | 1.07% | 92,636 |
| September | 21,431,340 | 5,533,746 | 793,533 | 170,115 | 26,341,668 | 0.79% | 112,964 |
| October | 26,341,668 | 0 | 0 | 742,835 | 27,084,503 | 2.82% | 112,964 |
| November | 27,084,503 | 0 | 0 | 21,668 | 27,106,171 | 0.08% | 112,964 |
| December | 27,106,171 | 5,514,647 | 21,703 | 441,219 | 33,040,334 | 1.63% | 135,489 |
| | | | RATE OF RETURN: 18.57% | | | | |
| 1992 | | | | | | | |
| January | 33,040,334 | 0 | 0 | 161,245 | 33,201,579 | 0.49% | 135,489 |
| February | 33,201,579 | 0 | 0 | 925,390 | 34,126,969 | 2.79% | 135,489 |
| March | 34,126,969 | 6,245,218 | 1,891,095 | 343,980 | 38,825,072 | 1.01% | 152,603 |
| April | 38,825,072 | 0 | 0 | 1,110,950 | 39,936,022 | 2.86% | 152,603 |
| May | 39,936,022 | 0 | 0 | -76,302 | 39,859,720 | -0.19% | 152,603 |
| June | 39,859,720 | 9,184,966 | 52,912 | 512,808 | 49,504,582 | 1.29% | 187,121 |
| July | 49,504,582 | 0 | 0 | -1,721 | 49,502,861 | 0.00% | 187,121 |
| August | 49,502,861 | 0 | 0 | 456,575 | 49,959,436 | 0.92% | 187,121 |
| September | 49,959,436 | 20,978,110 | 26,806 | 199,007 | 71,109,787 | 0.40% | 265,279 |
| October | 71,109,787 | 0 | 0 | 995,069 | 72,104,856 | 1.40% | 265,279 |
| November | 72,104,856 | 0 | 0 | 1,026,781 | 73,131,637 | 1.42% | 265,279 |
| December | 73,131,637 | 4,636,235 | 0 | 1,043,369 | 78,811,241 | 1.43% | 281,860 |
| | | | RATE OF RETURN: 14.66% | | | | |
| 1993 | | | | | | | |
| January | 78,811,241 | 0 | 0 | -3,185 | 78,808,056 | 0.00% | 281,860 |
| February | 78,808,056 | 0 | 0 | 1,522,044 | 80,330,100 | 1.93% | 281,860 |
| March | 80,330,100 | 8,400,171 | 174,175 | 1,491,518 | 90,047,614 | 1.86% | 310,197 |
| April | 90,047,614 | 0 | 0 | 49,104 | 90,096,718 | 0.05% | 310,197 |
| May | 90,096,718 | 0 | 0 | 1,550,985 | 91,647,703 | 1.72% | 310,197 |
| June | 91,647,703 | 21,630,468 | 894 | 789,049 | 114,066,326 | 0.86% | 382,781 |
| July | 114,066,326 | 0 | 0 | 98,107 | 114,164,433 | 0.09% | 382,781 |
| August | 114,164,433 | 0 | 0 | 2,028,739 | 116,193,172 | 1.78% | 382,781 |
| September | 116,193,172 | 20,148,879 | 30,460 | 403,068 | 136,714,659 | 0.35% | 448,829 |
| October | 136,714,659 | 0 | 0 | 2,422,330 | 139,136,989 | 1.77% | 448,829 |
| November | 139,136,989 | 0 | 0 | 359,063 | 139,496,052 | 0.26% | 448,829 |
| December | 139,496,052 | 20,144,941 | 5,522,656 | 632,176 | 154,750,513 | 0.45% | 495,664 |
| | | | RATE OF RETURN: 11.66% | | | | |
| 1994 | | | | | | | |
| January | 154,750,513 | 2,499,475 | 0 | 3,373,291 | 160,623,279 | 2.18% | 503,499 |
| February | 160,623,279 | 3,744,520 | 300,070 | -575,550 | 163,492,179 | -0.36% | 514,335 |
| March | 163,492,179 | 11,896,109 | 1,747,663 | 2,478,735 | 176,119,360 | 1.52% | 545,785 |
| April | 176,119,360 | 0 | 0 | 3,198,300 | 179,317,660 | 1.82% | 545,785 |
| May | 179,317,660 | 6,489,179 | 0 | 945,192 | 186,752,031 | 0.53% | 565,536 |
| June | 186,752,031 | 19,912,627 | 10,049,903 | 513,368 | 197,128,123 | 0.27% | 595,215 |
| July | 197,128,123 | 2,644,775 | 3,306,812 | 3,510,400 | 199,976,486 | 1.78% | 593,251 |
| August | 199,976,486 | 3,502,115 | 0 | 838,982 | 204,317,583 | 0.42% | 603,597 |
| September | 204,317,583 | 11,949,985 | 8,944,492 | 1,678,318 | 209,001,394 | 0.82% | 612,412 |
| October | 209,001,394 | 3,009,728 | 165,160 | 3,936,829 | 215,782,791 | 1.88% | 620,593 |
| November | 215,782,791 | 4,272,314 | 1,342,682 | -1,194,329 | 217,518,094 | -0.55% | 629,065 |

22

| Period | Beginning Net Asset Value (1) | Additions (2) | Withdrawals (3) | Net Profit/Loss (4) | Ending Equity (5) | Rate of Return (6) | Shares Outstanding |
|---|---|---|---|---|---|---|---|
| December | 217,518,094 | 8,349,741 | 13,253,982 | 1,437,665 | 214,051,518 | 0.66% | 614,975 |
| | | | RATE OF RETURN: 11.49% | | | | |
| **1995** | | | | | | | |
| January | 214,051,518 | 6,531,360 | 0 | 1,965,645 | 222,548,523 | 0.92% | 633,569 |
| February | 222,548,523 | 4,036,226 | 5,746,065 | 1,690,996 | 222,529,680 | 0.76% | 628,738 |
| March | 222,529,680 | 5,847,319 | 2,605,471 | 1,875,588 | 227,647,116 | 0.84% | 637,821 |
| April | 227,647,116 | 3,703,035 | 541,500 | 3,841,022 | 234,649,673 | 1.69% | 646,532 |
| May | 234,649,673 | 2,689,810 | 19,566 | 4,033,842 | 241,353,759 | 1.72% | 653,765 |
| June | 241,353,759 | 3,704,370 | 6,314,199 | 1,213,061 | 239,956,991 | 0.50% | 646,731 |
| July | 239,956,991 | 2,150,152 | 2,805,737 | 2,598,436 | 241,899,842 | 1.08% | 644,983 |
| August | 241,899,842 | 7,987,906 | 1,397,472 | -381,765 | 248,108,511 | -0.16% | 662,583 |
| September | 248,108,511 | 1,282,270 | 9,927,218 | 4,226,087 | 243,689,650 | 1.70% | 639,883 |
| October | 243,689,650 | 6,278,096 | 5,869,513 | 3,891,193 | 247,989,426 | 1.60% | 640,939 |
| November | 247,989,426 | 11,786,986 | 6,303,763 | 1,259,638 | 254,732,287 | 0.51% | 635,039 |
| December | 254,732,287 | 3,504,248 | 7,797,963 | 2,803,763 | 253,242,335 | 1.10% | 644,118 |
| | | | RATE OF RETURN: 12.96% | | | | |
| **1996** | | | | | | | |
| January | 253,242,335 | 5,112,706 | 8,125,743 | 3,770,800 | 254,000,098 | 1.49% | 636,552 |
| February | 254,000,098 | 4,326,423 | 2,796,660 | 1,852,111 | 257,381,973 | 0.73% | 640,358 |
| March | 257,381,973 | 7,631,216 | 5,905,689 | 3,159,206 | 262,266,706 | 1.23% | 644,599 |
| April | 262,266,706 | 8,582,153 | 1,596,537 | 1,679,848 | 270,932,170 | 0.64% | 661,660 |
| May | 270,932,170 | 14,474,663 | 1,167,224 | 3,811,955 | 288,051,564 | 1.41% | 693,708 |
| June | 288,051,564 | 42,775,784 | 4,014,666 | 623,922 | 327,436,607 | 0.22% | 786,854 |
| July | 327,436,607 | 8,106,296 | 5,108,487 | 6,288,688 | 336,723,104 | 1.92% | 793,922 |
| August | 336,723,104 | 36,219,104 | 2,654,122 | 919,606 | 371,207,692 | 0.27% | 872,846 |
| September | 371,207,692 | 62,038,406 | 3,235,919 | 4,531,387 | 434,541,566 | 1.22% | 1,009,444 |
| October | 434,541,566 | 12,036,849 | 709,111 | 4,782,259 | 450,651,563 | 1.10% | 1,035,472 |
| November | 450,651,563 | 30,780,959 | 6,293,629 | 7,097,233 | 482,236,126 | 1.57% | 1,090,865 |
| December | 482,236,126 | 29,746,295 | 11,515,954 | 2,297,036 | 502,763,503 | 0.48% | 1,131,908 |
| | | | RATE OF RETURN: 12.97% | | | | |
| **1997** | | | | | | | |
| January | 502,763,503 | 43,243,168 | 9,536,924 | 12,300,790 | 548,770,537 | 2.45% | 1,205,981 |
| February | 548,770,537 | 39,643,333 | 1,057,113 | 4,014,291 | 591,371,048 | 0.73% | 1,290,157 |
| March | 591,371,048 | 64,512,292 | 6,494,470 | 5,097,281 | 654,486,151 | 0.86% | 1,415,649 |
| April | 654,486,151 | 42,440,532 | 4,216,998 | 7,629,767 | 700,339,452 | 1.17% | 1,497,373 |
| May | 700,339,452 | 31,659,013 | 787,664 | 4,421,919 | 735,632,720 | 0.63% | 1,562,964 |
| June | 735,632,720 | 69,112,559 | 6,804,423 | 9,893,080 | 807,833,936 | 1.34% | 1,693,613 |
| July | 807,833,936 | 52,481,196 | 8,178,631 | 6,041,458 | 858,177,959 | 0.75% | 1,785,804 |
| August | 858,177,959 | 36,666,097 | 21,752,715 | 2,965,872 | 876,057,213 | 0.35% | 1,816,730 |
| September | 876,057,213 | 27,840,464 | 9,288,074 | 20,947,631 | 915,557,234 | 2.39% | 1,854,305 |
| October | 915,557,234 | 29,687,157 | 4,818,657 | 5,081,365 | 945,507,099 | 0.56% | 1,904,394 |
| November | 945,507,099 | 24,605,224 | 9,721,179 | 14,717,179 | 975,108,323 | 1.56% | 1,933,913 |
| December | 975,108,323 | 30,971,574 | 24,902,843 | 4,122,122 | 985,299,175 | 0.42% | 1,945,897 |
| | | | RATE OF RETURN: 14.00% | | | | |
| **1998** | | | | | | | |
| January | 985,299,175 | 64,128,161 | 4,125,194 | 8,991,182 | 1,054,293,324 | 0.91% | 2,063,329 |
| February | 1,054,293,324 | 54,230,671 | 11,143,328 | 13,636,704 | 1,111,017,371 | 1.29% | 2,146,992 |

| Period | Beginning Net Asset Value (1) | Additions (2) | Withdrawals (3) | Net Profit/Loss (4) | Ending Equity (5) | Rate of Return (6) | Shares Outstanding |
|---|---|---|---|---|---|---|---|
| March | 1,111,017,371 | 95,721,424 | 26,362,202 | 19,466,433 | 1,199,843,026 | 1.75% | 2,278,277 |
| April | 1,199,843,026 | 105,333,505 | 13,744,299 | 5,071,899 | 1,297,504,131 | 0.42% | 2,453,347 |
| May | 1,297,504,131 | 79,146,772 | 10,310,446 | 22,781,809 | 1,389,122,266 | 1.76% | 2,581,258 |
| June | 1,389,122,266 | 116,150,874 | 5,809,650 | 17,825,450 | 1,517,288,940 | 1.28% | 2,783,083 |
| July | 1,517,288,940 | 118,183,377 | 13,707,714 | 12,612,398 | 1,634,377,001 | 0.85% | 2,973,907 |
| August | 1,634,377,001 | 46,389,989 | 36,074,223 | 4,555,854 | 1,649,248,621 | 0.28% | 2,992,510 |
| September | 1,649,248,621 | 40,386,702 | 98,307,437 | 17,204,958 | 1,608,532,844 | 1.04% | 2,888,457 |
| October | 1,608,532,844 | 41,783,296 | 103,128,044 | 31,021,732 | 1,578,209,828 | 1.93% | 2,780,384 |
| November | 1,578,209,828 | 70,996,507 | 17,958,632 | 13,314,829 | 1,644,562,531 | 0.85% | 2,873,218 |
| December | 1,644,562,531 | 104,933,982 | 22,984,058 | 5,415,708 | 1,731,928,163 | 0.33% | 3,013,350 |
| | | | RATE OF RETURN: 13.42% | | | | |
| **1999** | | | | | | | |
| January | 1,731,928,163 | 45,092,968 | 18,524,174 | 35,594,045 | 1,794,091,002 | 2.06% | 3,061,038 |
| February | 1,794,091,002 | 111,903,663 | 20,600,407 | 3,148,148 | 1,888,542,407 | 0.18% | 3,126,576 |
| March | 1,888,542,407 | 91,072,350 | 128,559,324 | 43,277,106 | 1,894,332,539 | 2.29% | 3,154,158 |
| April | 1,894,332,539 | 111,884,699 | 4,451,465 | 6,774,495 | 2,008,540,268 | 0.36% | 3,332,402 |
| May | 2,008,540,268 | 58,868,950 | 18,051,157 | 30,391,176 | 2,079,749,237 | 1.51% | 3,399,115 |
| June | 2,079,749,237 | 62,267,285 | 19,845,772 | 36,687,904 | 2,158,858,654 | 1.76% | 3,466,605 |
| July | 2,158,858,654 | 59,033,926 | 19,938,726 | 9,189,869 | 2,207,143,733 | 0.43% | 3,529,768 |
| August | 2,207,143,733 | 45,330,076 | 9,376,222 | 20,742,718 | 2,263,840,305 | 0.94% | 3,589,145 |
| September | 2,263,840,305 | 42,067,369 | 41,179,552 | 16,517,273 | 2,281,245,395 | 0.73% | 3,587,770 |
| October | 2,281,245,395 | 77,425,625 | 17,954,855 | 25,426,891 | 2,366,143,055 | 1.11% | 3,680,638 |
| November | 2,366,143,055 | 57,783,705 | 31,873,529 | 38,078,419 | 2,430,131,650 | 1.61% | 3,720,304 |
| December | 2,430,131,650 | 47,002,695 | 21,613,195 | 9,506,086 | 2,465,027,236 | 0.39% | 3,759,022 |
| | | | RATE OF RETURN: 14.19% | | | | |
| **2000** | | | | | | | |
| January | 2,465,027,236 | 64,235,939 | 27,573,080 | 54,317,122 | 2,556,007,217 | 2.20% | 3,813,277 |
| February | 2,556,007,217 | 91,327,878 | 113,405,417 | 5,086,674 | 2,539,016,352 | 0.20% | 3,780,849 |
| March | 2,539,016,352 | 108,078,165 | 127,090,606 | 46,758,544 | 2,566,762,455 | 1.84% | 3,753,050 |
| April | 2,566,762,455 | 61,042,682 | 56,082,334 | 8,679,314 | 2,580,402,117 | 0.34% | 3,760,278 |
| May | 2,579,848,257 | 110,459,522 | 52,948,330 | 35,235,908 | 2,672,595,357 | 1.37% | 3,841,931 |
| June | 2,672,595,357 | 101,530,419 | 66,558,421 | 21,295,802 | 2,728,863,156 | 0.80% | 3,892,028 |
| July | 2,729,207,613 | 81,613,273 | 34,447,095 | 17,611,761 | 2,793,985,552 | 0.65% | 3,959,359 |
| August | 2,793,985,552 | 73,391,209 | 30,460,213 | 36,993,561 | 2,879,910,109 | 1.32% | 4,027,863 |
| September | 2,879,910,109 | 104,779,206 | 35,286,623 | 7,288,186 | 2,956,690,877 | 0.25% | 4,124,810 |
| October | 2,956,690,877 | 90,181,025 | 45,966,847 | 27,324,857 | 3,028,229,913 | 0.92% | 4,185,928 |
| November | 3,028,229,913 | 85,384,090 | 71,253,618 | 20,728,720 | 3,063,089,104 | 0.68% | 4,205,328 |
| December | 3,063,089,104 | 67,674,660 | 42,216,458 | 13,044,480 | 3,101,591,786 | 0.43% | 4,240,131 |
| | | | RATE OF RETURN: 11.55% | | | | |
| **2001** | | | | | | | |
| January | 3,101,591,786 | 62,278,433 | 27,649,620 | 68,561,629 | 3,204,782,228 | 2.21% | 4,286,448 |
| February | 3,204,782,228 | 52,531,167 | 33,018,838 | 4,568,911 | 3,228,863,468 | 0.14% | 4,312,508 |
| March | 3,228,863,468 | 79,380,350 | 104,005,191 | 6,575,710 | 3,240,814,337 | 1.13% | 4,279,988 |
| April | 3,240,814,337 | 76,560,499 | 34,333,422 | 42,918,485 | 3,325,959,900 | 1.32% | 4,335,026 |
| May | 3,325,959,900 | 95,021,952 | 45,442,877 | 10,765,692 | 3,386,304,666 | 0.32% | 4,339,439 |
| June | 3,386,304,666 | 9,379,518 | 120,636,949 | 7,919,722 | 3,365,966,958 | 0.23% | 4,362,812 |
| July | 3,365,966,958 | 88,048,536 | 46,396,925 | 14,912,075 | 3,422,530,644 | 0.44% | 4,416,561 |

24

| Period | Beginning Net Asset Value (1) | Additions (2) | Withdrawals (3) | Net Profit/Loss (4) | Ending Equity (5) | Rate of Return (6) | Shares Out-standing |
|---|---|---|---|---|---|---|---|
| August | 3,422,530,644 | 16,431,369 | 38,447,533 | 34,398,818 | 3,434,913,298 | 1.01% | 4,388,433 |
| September | 3,434,913,298 | 11,206,536 | 27,034,199 | 25,001,765 | 3,444,087,399 | 0.73% | 4,368,358 |
| October | 3,444,087,399 | 41,274,678 | 40,829,146 | 44,190,756 | 3,488,723,687 | 1.28% | 4,368,916 |
| November | 3,488,723,687 | 27,125,482 | 27,125,543 | 42,195,913 | 3,530,919,539 | 1.21% | 4,368,916 |
| December | 3,530,919,539 | 47,352,122 | 30,412,928 | 6,646,084 | 3,554,504,763 | 0.19% | 4,389,875 |
| | | | RATE OF RETURN: 10.69% | | | | |
| **2002** | | | | | | | |
| January | 3,554,504,763 | 50,956,862 | 27,476,760 | 1,128,253 | 3,579,113,117 | 0.03% | 4,418,874 |
| February | 3,579,113,117 | 20,411,839 | 22,326,660 | 21,371,287 | 3,598,569,582 | 0.60% | 4,416,510 |
| March | 3,598,569,582 | 37,040,351 | 14,197,008 | 16,499,072 | 3,637,911,997 | 0.46% | 4,444,545 |
| April | 3,637,911,997 | 45,842,039 | 28,057,623 | 42,370,556 | 3,698,066,968 | 1.16% | 4,466,273 |
| May | 3,698,066,968 | 18,283,875 | 76,412,970 | 77,039,592 | 3,716,977,465 | 2.12% | 4,396,071 |
| June | 3,716,977,465 | 32,951,087 | 28,637,145 | 9,665,470 | 3,730,956,877 | 0.26% | 4,401,173 |
| July | 3,730,956,877 | 83,125,986 | 39,604,398 | 126,728,363 | 3,901,206,828 | 3.36% | 4,452,513 |
| August | 3,901,206,828 | 46,046,044 | 64,614,418 | -2,165,035 | 3,880,473,419 | -0.06% | 4,431,320 |
| September | 3,880,473,419 | 104,397,742 | 74,031,004 | 4,902,961 | 3,915,743,118 | 0.13% | 4,465,998 |
| October | 3,915,743,118 | 146,271,626 | 52,713,221 | 29,222,211 | 4,038,523,735 | 0.73% | 4,572,703 |
| November | 4,038,523,735 | 42,572,701 | 50,159,834 | 6,538,396 | 4,037,474,997 | 0.16% | 4,564,112 |
| December | 4,037,474,997 | 33,066,358 | 30,751,706 | 2,536,239 | 4,042,325,888 | 0.06% | 4,566,729 |
| | | | RATE OF RETURN: 9.32% | | | | |
| **2003** | | | | | | | |
| January | 4,042,325,888 | 71,987,001 | 31,851,602 | -11,080,942 | 4,071,380,346 | -0.27% | 4,612,071 |
| February | 4,071,380,346 | 34,780,792 | 15,575,154 | 1,513,057 | 4,092,099,042 | 0.04% | 4,633,827 |
| March | 4,092,099,042 | 29,036,976 | 46,448,391 | 80,177,266 | 4,154,864,891 | 1.97% | 4,614,111 |
| April | 4,154,864,891 | 70,917,092 | 103,023,261 | 4,058,419 | 4,126,817,141 | 0.10% | 4,578,456 |
| May | 4,126,817,141 | 16,396,566 | 80,304,016 | 38,781,347 | 4,101,691,038 | 0.95% | 4,507,554 |
| June | 4,101,691,038 | 29,587,939 | 32,005,392 | 40,858,948 | 4,140,132,533 | 1.00% | 4,507,898 |
| July | 4,140,132,533 | 30,580,921 | 131,655,882 | 58,055,570 | 4,097,113,142 | 1.44% | 4,394,918 |
| August | 4,097,113,142 | 31,029,032 | 31,070,481 | 9,132,540 | 4,106,204,233 | 0.22% | 4,394,873 |
| September | 4,106,204,233 | 7,433,206 | 48,899,193 | 37,913,644 | 4,102,651,890 | 0.93% | 4,350,492 |
| October | 4,102,651,890 | 40,148,868 | 42,705,371 | 54,219,285 | 4,154,314,672 | 1.32% | 4,347,781 |
| November | 4,154,314,672 | 41,014,220 | 36,862,644 | (3,383,166) | 4,155,083,082 | -0.08% | 4,352,126 |
| December | 4,155,083,082 | 16,841,607 | 42,790,299 | 13,482,653 | 4,142,617,043 | 0.32% | 4,324,948 |
| | | | RATE OF RETURN: (8.21%) | | | | |

### NOTES TO TABLE

1)   Beginning Net Asset Value represents the sum of cash, cash equivalents and equity balances in trading accounts accounted for at fair market value. Beginning Net Asset Value is the same as the previous reporting period's Ending Equity.

2)   Additions are the sum of capital contributions as of the last day of the reporting period.

3)   Withdrawals are the sum of partial or total withdrawals of capital as of the last day of the reporting period.

4)   Net Profit/Loss is the sum of the profits and losses realized from trading activities during the reporting period net of the quarterly performance fee (20% of new high net profits) and other expenses for the reporting period, which has been allocated monthly for purposes of this chart.

5) Ending Equity is the sum of Beginning Net Asset Value plus additions, minus withdrawals, and Net Profit/(Loss) for the reporting period. Ending Equity is the Beginning Net Asset Value for the following reporting period.

6) Rate of Return is calculated by dividing Net Profit/(Loss) for the reporting period by the Beginning Net Asset Value for that reporting period. The cumulative Rate of Return figures which appear at the end of each year are calculated by applying on a compound basis each of the monthly or quarterly rates of return for such year to the Beginning Net Asset Value at the beginning of such year, not by adding or averaging the rates of return.

## DESCRIPTION OF SHARES

The Fund is authorized to issue up to 10,000,000 shares in one class, with a par value of U.S. $.01. The Fund has an authorized share capital of U.S. $100,000. The Shares will be issued in registered form. Each Share, when issued, will be fully paid and non-assessable.

Holders of Shares are entitled to one vote per Share and will participate on a pro rata basis in the assets of the Fund on liquidation and in dividends and other distributions as declared.

## DIVIDEND POLICY

Since the business objective of the Fund is directed toward achieving capital appreciation, it is anticipated that the Fund will not declare any dividends or make any distributions to its shareholders. Subject to the foregoing and to applicable law, the Fund's Board of Directors will have sole discretion in determining the amount and frequency of dividend distributions, if any. Any distributions made will be in accordance with the policies of the Irish Stock Exchange, which provide that a dividend payment may only be made out of the Fund's accumulated net income plus the net of accumulated realized and unrealized capital gains and accumulated net realized and unrealized capital losses.

## TRANSFERS, REDEMPTIONS AND TERMINATION

### Transfers

NO SALE OR TRANSFER OF SHARES WILL BE PERMITTED WITHOUT THE FUND'S CONSENT; HOWEVER, SHARES MAY BE REDEEMED AS OF THE LAST DAY OF EACH CALENDAR MONTH ON FIFTEEN (15) CALENDAR DAYS' NOTICE TO THE FUND.

Any sale or transfer of a shareholder's entire interest in any Shares or any transfer of Shares by operation of law must be submitted to the Fund for consent and will not be effective until such consent is given by the Fund. Any other dealing with Shares by way of assignment, pledge, mortgage or otherwise is prohibited unless consented to by the Fund and any attempt to do so without first obtaining the consent of the Fund will constitute grounds for compulsory redemption of the Shares concerned. Such consent may only be withheld if the transfer would result in regulatory, pecuniary, legal, taxation or material administrative disadvantages for the Fund or its shareholders as a whole. Any application to record a transfer of Shares, including an application to record a transfer by operation of law, if not approved by the Fund within 30 days, also will be treated as an application to redeem the Shares in question as of the next permissible redemption date and will be subject to a processing charge per share of 2% of the Net Asset Value per Share.

THE DISPOSITION OF SHARES TO U.S. PERSONS (INCLUDING U.S.TAX-EXEMPT INVESTORS AS DEFINED UNDER "OFFERING OF THE SHARES") WITHOUT THE PRIOR WRITTEN

APPROVAL OF THE FUND IS EXPRESSLY PROHIBITED, AND THE FUND SHALL HAVE THE RIGHT COMPULSORILY AND IMMEDIATELY TO REDEEM ANY SHARES HELD FOR ANY REASON BY U.S. PERSONS.

### Redemptions at the Option of the Shareholders

A shareholder may cause part or all of his Shares to be redeemed as of the last business day (i.e., any day not a Saturday or a Sunday, that is not a public holiday or a day on which banks are generally authorized or obliged by law or regulation to close in the Netherlands, the Republic of Ireland or the United States of America)of any month, provided that the Fund shall be in receipt of written notice of redemption for at least fifteen (15) calendar days prior to such redemption date. In the Fund's discretion, a shareholder requesting redemption of part of his Shares may be required to redeem all of his Shares unless such shareholder notifies the Fund to cancel the redemption.

### Compulsory Redemption

The Fund reserves the right to make compulsory redemption where the holding of such Shares may result in regulatory, pecuniary, legal, taxation or material administrative disadvantages for the Fund or its shareholders as a whole. Except as set forth above, no processing charge will be imposed with respect to any Shares so compulsorily redeemed.

### Redemptions – General Information

Redemptions will be at the Net Asset Value per Share, subject to any applicable processing charge, as described above. If notice of intent to voluntarily redeem is not received by the Fund within the prescribed period of time, then, in the Fund's discretion, the redemption date may be deferred to the end of the next following permissible redemption period, unless the shareholder notifies the Fund to cancel the redemption and the Directors consent to such cancellation. With respect to a total redemption of Shares, except in the case of extraordinary circumstances, such as an inability to liquidate existing positions, or the default or delay in payments due the Fund from brokers, banks or other persons, payment on redemptions will be made within 30 days after the redemption date. The Fund will not pay interest to the redeeming shareholders on any payment.

Partial redemptions will be paid in full within 30 days after the redemption date.

Shareholders bear the risk of any decline in Net Asset Value from the date notice of intent to redeem is given until the redemption date. In addition, the Fund may temporarily suspend any redemption during any period that the Fund has suspended the calculation of its Net Asset Value (see "OFFERING OF THE SHARES- Net Asset Value Defined"). Requests for redemption can be made by use of the form included in the Subscription Documents which accompany this Memorandum.

### Termination

The shareholders may, by a majority vote, elect to wind up and dissolve the Fund at any time. If the Fund's Board of Directors determines that it would be in the best interests of the Fund to wind up and dissolve the Fund at any time, it will recommend to the shareholders that they vote to do so, and will submit a plan of dissolution for approval by the shareholders.

## ANTI-MONEY LAUNDERING REGULATIONS

As part of the Fund's or Administrator's responsibility for the prevention of money laundering, the Manager and its affiliates, subsidiaries or associates may require a detailed verification of a shareholder's identity, any beneficial owner underlying the account and the source of the payment.

The Manager reserves the right to request such information as is necessary to verify the identity of a subscriber and the underlying beneficial owner of a subscriber's or a shareholder's Shares in the Fund. In the event of delay or failure by the subscriber or shareholder to produce any information required for verification purposes, the Manager may refuse to accept a subscription or may cause the redemption of any such shareholder from the Fund. The Fund, without notice, may suspend the redemption rights of such shareholder if the Fund or the Manager reasonably deems it necessary to do so to comply with anti-money laundering regulations applicable to the Fund, the Manager or any of the Fund's other service providers.

Each subscriber and shareholder shall be required to make such representations to the Fund as the Fund and the Manager shall require in connection with such anti-money laundering programs, including without limitation, representations to the Fund that such subscriber or shareholder is not a prohibited country, territory, individual or entity listed on the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC") website and that it is not directly or indirectly affiliated with, any country, territory, individual or entity named on an OFAC list or prohibited by any OFAC sanctions programs. Such shareholder shall also represent to the Fund that amounts contributed by it to the Fund were not directly or indirectly the proceeds of criminal conduct or derived from activities that may contravene U.S. federal, state or international laws and regulations, including anti-money laundering laws and regulations.

## ANTI-MONEY LAUNDERING POLICIES

To ensure compliance with statutory and other generally accepted principles aimed at the prevention of money-laundering, the Fund and/or the Administrator may require a detailed verification of a prospective investor's identity. Although the Fund and/or the Administrator reserve the right to request a detailed verification of a prospective investor's identity, a detailed verification should not be necessary if:

- the prospective investor makes a subscription payment from an account held in their own name at a Qualified Financial Institution (a "QFI"); or

- the prospective investor is introduced by a QFI and that QFI provides written assurance to the Fund and/or the Administrator that it has established the identity of the prospective investor and holds evidence of that identity.

A QFI is defined as a financial institution which is:

- established in a European Union (EU) member state and subject to the EU Money Laundering Directives; or

- established in one of the countries which make up the Financial Action Task Force ("FATF") and/or is subject to regulation which complies with the FATF Recommendations. Such countries are the 15 EU countries as of 1st January 2004, being Austria, Belgium, Denmark, Finland, France, Germany, Greece, Ireland, Italy, Luxembourg, the Netherlands, Portugal, Spain, Sweden and the United Kingdom,

together with Australia, Canada, Guernsey, Hong Kong, Iceland, Isle of Man, Japan, Jersey, New Zealand, Norway, Singapore, Switzerland, Turkey and the United States.

Subscription payments will not be accepted unless made from an account held in the name of the prospective investor. In addition, prospective investors who DO NOT make the subscription payment from an account held at a QFI and who are NOT introduced by a QFI will be required to provide the following documentation, as relevant to their status.

**Individual Investors** will be required to provide the following information:

- full name;

- permanent address;

- a certified copy of their passport or national identity card;

- a bank reference letter; and

- verification of address.

**Partnerships** will be required to provide the following information:

- a mandate from the partnership authorizing the subscription and conferring authority on those persons executing the subscription agreement; and

- the identities of at least two partners and of all those authorized to issue instructions.

**Corporate entities** that are quoted on a stock exchange in an EU member country or in one of the QFI prescribed countries or that are known to be the subsidiary of such a quoted company will be required to provide the following information:

- the original or certified copy of the certificate of incorporation or similar document;

- a list of the directors' names, occupations, addresses and dates of birth; and

- properly authorized mandate of directors authorizing the subscription and conferring authority on those persons executing the subscription form.

Where the prospective investor to the transaction is a corporation that is a private company, the following additional information will need to be provided:

- certified passport copies or national identity card copies of at least two directors; and

- a list of names and addresses of shareholders holding 10% or more of the issued share capital of the company and in the case of individual shareholders, their occupations and dates of birth.

When a significant shareholder of a private company (25% or more) is a body corporate, information will need to be provided from the company regarding the ultimate beneficial ownership of that particular body corporate. If the ultimate beneficial owner(s) of that particular body corporate is (are) individual(s), such

29

individual(s) will need to provide the information that is required from individual investors and outlined above.

Furthermore, subscriptions will be cross checked against lists held by various international agencies in order to establish that the persons or entities subscribing have not been blacklisted or wanted in connection with a criminal investigation. Such international agencies include the Bahamas Financial Intelligence Unit, the Central Bank of Ireland, the FBI, the Bank of England and the US Treasury Department's Office of Foreign Assets Control (OFAC). Other agencies will be consulted as and when appropriate.

Finally, it should be noted that redemption payments will only be paid to a bank account held in the name of the registered owner of the Shares and that any transferee will have to furnish the same information (and enter into a subscription agreement) which would be required in connection with a direct subscription in order for a transfer application to be considered by the Administrator.

Pending the provision of evidence satisfactory to the Administrator as to the identity of any prospective investor, the evidence of title in respect of Shares may be retained at the absolute discretion of the Administrator. If, within a reasonable period of time following a request for verification of identity, the Administrator has not received evidence satisfactory to it as aforesaid, it may, in its absolute discretion, refuse to allot the Shares applied for in which event application moneys will be returned without interest to the account from which such moneys were originally debited. Alternatively, if the Fund has issued Shares to an investor prior to all identification documentation being provided, such investor will not be able to redeem any Shares so issued until it has provided all required identification documents.

Financial institutions which have been duly qualified and authorized to exercise their activity in their respective countries as a bank and which are subject to internationally recognized anti money-laundering legislation may subscribe for Shares on behalf of their clients.

### TAX CONSIDERATIONS AND EXCHANGE CONTROL

As of the date of this Memorandum, the Fund is exempt from all provisions of the Income Tax Act of the BVI, including with respect to all dividends, interests, rents, royalties, compensation and other amounts payable by the Fund to persons who are not persons resident in the BVI. Capital gains realized with respect to any shares, debt obligation or other securities of the Fund by persons who are not persons resident in the BVI are also exempt from the provisions of the Income Tax Act of the BVI. No estate, inheritance, succession or gift tax, rate, duty, levy or other charge is payable by persons who are not persons resident in the BVI with respect to any shares, debt obligations or other securities of the Fund.

There are no exchange control restrictions in the BVI. Accordingly, the Fund will be free to acquire, to hold and to sell any foreign currency and securities without restriction.

The Fund's gains from its investments in or trading in stocks, options or other investments should not be subject to United States federal income, branch or withholding taxes because the Fund expects that it will not be engaged (or treated as engaged) in a "trade or business" in the United States, or treated as a personal holding company, for United States federal income tax purposes. Any dividend income received by the Fund from U.S. corporations generally will be subject to United States federal withholding taxes. Although substantially all of the interest earned by the Fund from sources within the United States is expected to be of the type which will not be subject to United States federal income, branch or withholding taxes, the Fund may earn interest from time to time that could be subject to United States

federal income, branch or withholding taxes (although it is not expected that the amount of such taxes would be material).  In addition, with respect to Shares held by non-U.S. persons who are not engaged in a "trade or business" in the United States (as defined under the Code), such persons should not be subject to United States federal income, branch or withholding taxes (i) on dividends paid to them by the Fund and (ii) on the redemption of their Shares by the Fund.  The Fund expects that it will not be subject to state and local taxes in the United States on its income or capital.  Because of the absence of full guidance under state and local law, however, this result is not entirely clear.  The conclusions in this paragraph are based on the Code and existing laws, judicial decisions and administrative regulations, rulings and practice in the United States, all of which are subject to change.

Non-U.S. Investors

In addition, with respect to Shares held by Non-U.S. Persons who are not engaged in a "trade or business" in the United States (as defined under the Code), such persons should not be subject to United States federal income, branch or withholding taxes (i) on dividends paid to them by the Fund and (ii) on the redemption of their Shares by the Fund.

U.S. Tax-Exempt Investors

As noted above, Shares may be sold to a limited number of U.S. Tax-Exempt Investors which are pension and profit sharing trusts or other tax exempt organizations.  The Fund is a "passive foreign investment company" ("PFIC") as defined in Code Section 1297.  Under present law, assuming a U.S. Tax-Exempt Investor does not borrow money or otherwise utilize leverage in connection with its acquisition of Shares, any dividends from the Fund or gain on the sale or redemption of Shares should not constitute "unrelated debt-financed income" as defined in Code Section 512 to the U.S. Tax-Exempt Investor and should not be subject to United States federal income tax under the PFIC provision of the Code.

ERISA Matters

The Fund will not accept any contributions from investors that are "benefit plan investors" as defined in U.S. Department of Labor Regulation 2510.3-2101, pension plans or similar pension or retirement trusts (all such entities are herein referred to as "Plans") if after such contribution the Shares in the Fund held by the Plan would be 25% or more of the total outstanding shares of any class of shares in the Fund.  If the shares in the class held by the Plans were to exceed this 25% limit, then the Fund's assets would be considered "plan assets" under the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), which could result in adverse consequences to the Manager and the fiduciaries of the Plans.

Prospective subscribers should consult their professional advisors on the possible tax consequences of subscribing for, buying, holding, selling, transferring or redeeming Shares under the laws of their country of citizenship, residence or domicile.

## PRIVACY POLICY

Set forth below is a summary of the policies and practices of the Fund and the Manager with respect to the treatment of nonpublic personal information acquired about the Fund's investors.  The provisions of this policy apply to current and former investors in the Fund and are subject to change.

1. The Fund and the Manager collect nonpublic personal information about investors from the following sources: (i) information received from subscribers in subscription documents and other forms; and (ii) information about an investor's transactions with the Fund, the Manager and their

31

respective affiliates. This information may be received in any manner, including in-person discussions, telephone conversations, and electronic or other written communications.

2. The Fund and the Manager do not disclose any nonpublic personal information about investors to anyone other than the affiliates of the Fund and the Manager and "Service Providers" without permission, except as required or permitted by law (including, without limitation, as required pursuant to applicable US and anti-money laundering laws). Service Providers include third parties that provide the Partnership with services, such as brokers, transfer agents, custodians, accountants, lawyers, bankers, and other professional service providers.

3. The Fund and the Manager restrict access to nonpublic personal information, about investors to those employees and agents who need to know that information in order to provide services. They maintain physical, electronic and procedural safeguards to guard personal information.

4. The Fund and the Manager will continue to adhere to the policies and practices described herein with respect to information acquired about investors, even if such investor has redeemed its Shares from the Fund.

5. The Fund and the Manager reserve the right to change these policies and practices at any time and will provide investors with a notice describing the revised policies. In addition, this privacy policy will be sent to investors annually.

### PROXY VOTING POLICY

The Fund invests a portion of its assets in equity securities offered by publicly traded entities. From time to time, such entities may ask their investors to vote their interests in the entities with regard to corporate governance and other matters. The Manager, as the investment manager of the Fund has authority to vote such proxies and other securities on behalf of the Fund and may delegate such authority to custodians or sub-custodians of its assets. In addition, the managers of the Non-SSC Investments will vote proxies relating to those investments.

The Fund and the Manager have developed a proxy voting policy which they believe ensures that the Manager votes proxy proposals, amendments, consents or resolutions relating to the Fund's securities (collectively, "proxies") in a manner that best serves the interests of the Fund. They have reviewed the proxy voting policies of the custodians, sub-custodians and Non-SSC Investments managers. The following factors are elements of the proxy voting policies of each of the foregoing:

- the impact on short-term and long-term value;
- the preservation and increase in capital of the Fund;
- the costs and benefits associated with the proposal;
- the effect on the liquidity of the Fund; and
- the customary industry and business practices.

With respect to proxies, the Manager will:

- maintain accurate records as to voting proxies;
- with the Fund, periodically review voting procedures employed and actions taken on individual voting situations;
- have procedures in place for reconciling proxies;

32

- take reasonable steps to ensure that proxies for which it is responsible are received and, where appropriate, voted; and
- comply with all current applicable proxy laws, rules and regulations.

## LEGAL MATTERS

Legal matters in connection with this offering have been passed upon for the Fund in the United States by Andrew E. Goldstein, Esq., 488 Madison Avenue, 16th Floor, New York, New York 10022. Matters with respect to the laws of the British Virgin Islands have been passed upon by Conyers Dill & Pearman, Romasco Place, Wickhams Cay 1, P.O. Box 3140, Road Town, Tortola, British Virgin Islands.

## MISCELLANEOUS

### Reports and Financial Statements

The Fund's fiscal year will end on December 31, except that the Fund's final fiscal year will terminate on the date the Fund commences to wind up and dissolve. The Fund will keep its books on an accrual basis. Audited financial statements of the Fund will be mailed to shareholders at their registered addresses and the Irish Stock Exchange, normally within 120 days after year-end. At the same time, each shareholder shall be furnished with an annual report of the Fund, which will include the Net Asset Value of the Fund and the Net Asset Value per Share at the end of the year, and such other information as the Fund, in its discretion, determines to be necessary or appropriate. Shareholders also will receive an unaudited interim report with respect to the Fund's financial performance within four months from the end of June of each year.

1) **General**

   a) No Share or loan capital of the Fund is under option or agreed, conditionally or unconditionally, to be put under option.

   b) Shares in the Fund are in registered form. Temporary documents of title will not be issued.

   c) Except for their ownership of Shares, none of the Directors or any connected person has any interest in the Shares or loan capital of the Fund, the existence of which is known to, or could with reasonable diligence be ascertained by, the relevant Director.

   d) None of the Directors has a service contract with the Fund and no such contract is proposed, although, Walter M. Noel, Jr. is a principal of the Manager.

   e) No loan or guarantee has been granted or provided by the Fund to or for the benefit of any Director.

   f) None of the Directors or any member of their respective immediate families has or has had any interest in any transaction or transactions which are or were unusual in their nature or conditions or significant in the business of the Fund and which have been effected by the Fund since its incorporation.

   g) As of the date of this Confidential Private Placement Memorandum, the Shares have commenced operations, but no dividends have been declared.

33

    h) The Fund has no loan capital outstanding, no loan capital created but unissued, no loan other borrowing or indebtedness or any contingent liabilities, nor has it given any guara

2) **Litigation and Arbitration**

The Fund is not engaged in any legal or arbitration proceedings and no legal or arbitration proceedings are known to the Directors to be threatened by or against the Fund.

3) **Memorandum and Articles of Association**

Pursuant to Paragraph 4 of the Fund's Memorandum of Association, the Fund may engage in any act or activity that is not prohibited under any law for the time being in force in the BVI.  As such, the Fund may carry on business as an investment company.  The Fund's Memorandum and Articles of Association may be amended by a resolution of Directors or a resolution of shareholders.

The Memorandum and Articles of Association of the Fund provide that no director or officer of the Fund shall be liable for the acts, receipts, neglects or defaults of any other director or officer, or for joining in any receipt or act for conformity, or for any loss or expense happening to the Fund through the insufficiency or deficiency of title to any property acquired by order of the directors for or on behalf of the Fund, or for the insufficiency or deficiency of any security in or upon which any of the moneys of the Fund shall be invested, or for any loss or damage arising from the bankruptcy, insolvency, or tortious act of any person with whom any moneys, securities or effects shall be deposited, or for any loss occasioned by any error of judgment, omission, default, or oversight on his part, or for any other loss, damage, or misfortune whatever which shall happen in relation to the execution of the duties of his office or in relation thereto, to the extent permitted by law.

The Memorandum and Articles of Association of the Fund further provide that each director or officer of the Fund shall be indemnified by the Fund against, and it shall be the duty of the directors out of the funds of the Fund to pay, all costs, losses, and expenses which any director or officer may incur or become liable for by reason of any contract entered into, or act or thing done by him as such director or officer, or in any way in the discharge of his duties, and the amount for which such indemnity is provided shall immediately attach as a lien on the property of the Fund, and have priority as between the shareholders over all other claims but only if such director or officer acted honestly and in good faith with a view to the best interests of the Fund and, in the case of criminal proceedings, the person had no reasonable cause to believe that his conduct was unlawful.

4) **Directors**

    a) The number of Directors shall not be less than one (1) or more than twenty (20).

    b) The remuneration of Directors shall be fixed from time to time by the Board.    Currently the Director who is affiliated with the Manager does not receive compensation as a Director.  The two Directors not affiliated with the Manager are each paid $25,000 per annum.

    c) None of the Directors has a service contract, existing or proposed with the Fund, although Walter M. Noel, Jr. is a principal of the Manager.

    d) There is no retirement age for Directors.

    e) The Directors may vote on any transaction in which they have a material interest if they first disclose the nature of their interest to the Fund.

34

f) The Directors may, by resolution of Directors, fix the emoluments of the Directors with respect to services to be rendered in any capacity to the Fund.

g) The Directors may exercise the powers of the Fund to borrow money and to mortgage or charge its undertakings, property and uncalled capital or any part thereof, to issue debentures, debenture stock and offer securities whenever money is borrowed as security for any debt, liability or obligation of the Fund.

h) No Director has

- any unspent convictions in relation to indictable offenses;

- been adjudged a bankrupt, entered into a voluntary arrangement with creditors or had a receiver appointed to oversee any asset of such Director;

- been the director of any company which, while he was a director with an executive function or after 12 months after he ceased to be director with an executive function, had a receiver appointed or went into compulsory liquidation, creditors voluntary liquidation, administration or company voluntary arrangements, or made a composition or arrangements with its creditors generally or with any class of its creditors;

- been a partner of any partnership which, while he was partner or within 12 months after he ceased to be a partner, went into compulsory liquidation, administration or partnership voluntary arrangement or had a receiver appointed to oversee any partnership asset;

- had any public criticism by statutory or regulatory authorities (including recognized professional bodies); or

- been disqualified by a court from acting as a director or from acting in the management or affairs of any company.

5) **Borrowing Powers**

The Board may exercise all the powers of the Fund to borrow money, give guarantees and to mortgage, pledge or charge all or part of its undertaking, property and uncalled capital and to issue debentures and other securities, whether outright or as collateral security for any liability or obligation of the Fund.

**Documents Available for Inspection**

Copies of the following documents will be available for inspection at the offices of the Fund's registered office in the British Virgin Islands and the offices of the Sponsoring Broker during usual business hours on any weekday (Saturdays, Sundays and holidays excepted):

a) the Memorandum and Articles of Association of the Fund;

b) the material contracts of the Fund;

c) the British Virgin Islands Mutual Funds Act, 1996;

35

d) when available, the latest financial statements of the Fund;

e) audited accounts as of the close of the last immediately fiscal year;

f) Auditors letter of consent; and

g) a list of all past and present directorships and partnerships held by each Director over the past five years.

## COUNTRY-SPECIFIC NOTICES

Australia.  No offer for subscription or purchase of the Shares offered hereby, nor any invitation to subscribe for or buy such Shares, has been made or issued in Australia, otherwise than by means of an excluded issue, excluded offer or excluded invitation within the meaning of Section 66(2) or 66(3) of the Corporations Law.  Accordingly, the Memorandum has not been lodged with the Australian Securities Commission.  Further, the Shares offered hereby may not be resold in Australia within a period of six (6) months after the date of issue otherwise than by means of an excluded offer or excluded invitation as described above.

Bahamas.  The Shares may not be offered or sold or otherwise disposed of in any manner to persons deemed by the Central Bank of the Bahamas as resident for exchange control purposes, unless such persons deemed as resident obtain the prior approval of the Central Bank of the Bahamas.

Belgium.  The information in this Memorandum may not be disclosed to the public in Belgium, the Shares may not be offered, sold, transferred or delivered in or from Belgium as part of their initial distribution or at any time thereafter, directly or indirectly, other than to persons or entities mentioned in Article 3 of the Royal Decree of January 9, 1991 Relating to the Public Characteristic of Operations Calling for Savings and on the Assimilation of Certain Operations to a Public Offer (Belgian Official Journal of January 12, 1991).  Therefore, the Shares are exclusively designed for credit institutions, stock exchange companies, collective investment funds, companies or institutions, insurance companies, and/or pension funds acting for their own account only.

Brazil.  The Shares have not been, and will not be, registered with the Comissao de Valores Mobiliarios and may not be offered or sold in Brazil except in circumstances which do not constitute a public offering or distribution under Brazilian laws and regulations.

British Columbia and Ontario, Canada.  The Memorandum constitutes an offering of the securities described therein only in those jurisdictions and to those persons where and to whom they may be lawfully offered for sale, and therein only by persons permitted to sell such securities. The Memorandum is not, and under no circumstances is to be construed as, an advertisement or a public offering of the securities described therein in Canada. No securities commission or similar authority in Canada has reviewed or in any way passed upon the Memorandum or the merits of the securities described therein, and any representation to the contrary is an offense. If the Memorandum, together with any amendment thereto, contains an untrue statement of a material fact or omits to state a material fact that is required to be stated or is necessary to make any statement therein not misleading in the light of the circumstances in which it was made (a "Misrepresentation") and it was a Misrepresentation on the date of purchase, purchasers in British Columbia and Ontario to whom the Memorandum was sent or delivered and who purchase Shares shall have a right of action against the Fund for rescission (while still the owner of such shares) or alternatively, for damages, exercisable on written notice given not more than 90 days subsequent to the date of purchase, provided that the Fund will not be liable: (a) if the purchaser purchased such Shares with knowledge of the Misrepresentation; (b) for all or any portion of any damages

36

that the Fund proves do not represent the depreciation in value of such Shares as a result of the Misrepresentation; and (c) for amounts in excess of the price at which such Shares were sold to the purchaser. The foregoing summary is subject to the express provisions of either the Securities Act (British Columbia) or the Securities Act (Ontario), whichever the case may be, and reference is made to the complete text of such provisions.

British Virgin Islands. The Shares offered hereby may not be sold to or purchased by persons resident in the British Virgin Islands, but may be sold to British Virgin Islands international business companies.

Cayman Islands. No invitation may be made to the public in the Cayman Islands to subscribe for the Shares unless the Fund is listed on the Cayman Islands stock exchange. Cayman Islands exempted and ordinary non-resident companies and certain other persons engaged in offshore business, however, may be permitted to acquire Shares.

Chile. The Shares have not been, and will not be, registered with the Superintendencia de Valores y Seguros (the Chilean Securities Commission) and may not be offered and sold in Chile except in circumstances which do not constitute a public offering or distribution under Chilean laws and regulations.

Republic of China. No invitation to offer for, or sale of, the Shares shall be made to the public in China or by any means that would be deemed public under the laws of China. The offer of Shares is personal to the investor to whom the Memorandum has been addressed by the Fund. Business entities incorporated under the laws of China (excluding foreign investment business entities) shall apply for approval from the Chinese government authorities before purchasing the Shares. Furthermore, all business entities incorporated under the laws of China and Chinese citizens residing in China shall obtain prior approval from the Chinese Foreign Exchange Authority before purchasing Shares.

Costa Rica. The Shares have not been, and will not be, registered with the Comision Nacional de Valores (the Costa Rican Securities Commission) and may not be offered or sold in Costa Rica except in circumstances which do not constitute a public offering or distribution under Costa Rican laws and regulations.

Ecuador. The Shares have not been, and will not be, registered with the Superintendencia de Companias del Ecuador (the Ecuadorian Securities and Exchange Commission) and may not be offered and sold in Ecuador except in circumstances which do not constitute a public offering or distribution under Ecuadorian laws and regulations. This communication is for informative purposes only; it does not constitute a public offering of any kind.

France. "Cette note d'information n'a pas été soumise au visa de la Commission des Opérations de Bourse. Par conséquent, ni cette note d'information, ni tout autre document promotionnel se rapportant aux intérêts ne pourront être communiqués au public ou utilisés dans la cadre de toute offre de souscription ou de vente des intérêts en France et les intérêts ne peuvent être émis, offerts ou cédés de toute facon en France. Les investisseurs doivent agir pour leur propre compte. Le vente, directe ou indirecte, au public des instruments financiers acquis sera faite conformément aux dispositions les concernant." This Memorandum has not been submitted to the Commission des Operations de Bourse in France. Accordingly, neither this Memorandum nor any other offering materials relating to the Shares may be available to the public or used in connection with any other offer for subscription or sale of the Shares in France, and the Shares may not be issued, offered or otherwise sold in France, investors should act for their own account. The sale, direct or indirect, in the public of the purchased financial instruments will be made in compliance with all requirements in relation thereto.

Germany.  Any person who is in possession of the Memorandum understands that no action has or will be taken which would allow an offering of the Shares to the public in Germany.  Accordingly, the Shares may not be offered, sold or delivered and neither the Memorandum nor any other offering materials relating to the Shares may be distributed or made available to the public in Germany.  Individual sales of the Shares to any person in Germany may only be made according to German securities, tax and other applicable laws and regulations.

Greece.  The Shares may not be offered or sold in any manner that constitutes an offer or sale to the public in the Hellenic Republic within the laws and regulations from time to time applicable to public offers or sales of securities.

Hong Kong.  No action has been taken to permit an offering of the Shares to the public in Hong Kong and, accordingly, no copy of this Memorandum may be issued, circulated or distributed in Hong Kong other than (i) exclusively to persons whose business involves the acquisition, disposal or holding of securities, whether as principal or agent, or (ii) otherwise in circumstances that do not constitute an invitation to the public for the purpose of the Protection of Investors Ordinance (Chapter 335 of the Laws of Hong Kong).

Ireland.  It is not the intention of the Fund to advertise or market the Shares in Ireland, and no such marketing will take place without the prior approval in writing of the Central Bank of Ireland.

Isle of Man.  The Fund is not a recognized collective investment scheme for the purposes of Sections 12 or 13 of the Financial Services Act 1988 (the "FS Act") of the Isle of Man and is accordingly subject to the prohibition on the promotion of collective investment schemes as contained in Section 1(1) of the FS Act.  Accordingly, the Memorandum may only be issued or passed on to any person in the Isle of Man by way of the two limited exceptions to this general prohibition contained in Section 1(2) of the FS Act and the Financial Supervision (Promotion of Unregulated Schemes (Exemption)) FS Regulations 1992 (the "Exemption Regulations").  Under Regulation 3(2) of the Exemption Regulations, any advertisement issued in the Isle of Man in connection with the Fund must contain a statement either (a) that participants in the Fund are not protected by any statutory compensation scheme; or (b) that participants in the Fund are protected by a statutory compensation scheme and particulars sufficient to identify the compensation arrangements.

Israel.  The Shares are offered to a limited number of sophisticated investors, in all cases under circumstances designed to preclude a distribution which would be other than a private placement.  The Memorandum may not be reproduced or used for any other purpose, nor be furnished to any other person other than those to whom copies have been sent.  Israeli residents, other than those considered "exemption holders" under the General Currency Control Permit, 1978, require a special permit from the Israeli Controller of Foreign Currency in order to purchase the Shares.

Italy.  This Memorandum may not be distributed to members of the public in Italy.  The Italian Commission Nazionale per la Societa e la Borsa has not authorized any offering of the subscription of Shares in the Fund; accordingly, Shares may not be offered or sold in Italy or to residents thereof except as permitted by Italian law.  With respect to any potential purchaser or transaction subject to Italian law, this Memorandum is for the sole use of the person who has requested it and whose name appears on the cover page hereof (the "Prospective Buyer") and may not be disclosed, in whole or in part, to any person other than the Prospective Buyer and the Prospective Buyer's authorized agents.  This Memorandum may not be copied in whole or in part.  The Prospective Buyer, by accepting delivery of the Memorandum, agrees to return it to the Fund if such Prospective Buyer does not undertake to purchase the securities offered hereby.

Japan.  Under Article 23-14 Paragraph 1 of the Securities Exchange Law (the "SEL"), the purchase of Shares cannot be made unless the purchaser agrees to the condition that it will not make an assignment of the Shares to any person other than a non-resident of Japan (having the same meanings as defined in Article 6, Paragraph 1(6) of the Foreign Exchange and Foreign Trade Control Laws), except for the case that all the Shares (excluding the Shares assigned to non-residents of Japan) are assigned to one person.  Furthermore, disclosure under the SEL has not been made.  The Shares will not be registered under the SEL.  The offer and sale of the Shares in Japan may be made only in accordance with an exemption available under the SEL and with all other applicable laws and regulations of Japan.

Jersey.  The Memorandum relates to a private placement and does not constitute an offer to the public in Jersey to subscribe for the Shares offered hereby.  No regulatory approval has been sought for the offer in Jersey.  The offer of the Shares is personal to the person to whom the Memorandum is being delivered by or on behalf of the Fund, and a subscription for the Shares will be accepted only from such person.  The Memorandum may not be produced or used for any other purpose, nor be furnished to any other person other than those to whom it has been so delivered.

Korea.  The Memorandum is not, and under no circumstance is to be construed as, a public offering of securities in Korea.  Neither the Fund nor the investment manager is making any representation with respect to the eligibility of any recipients of the Memorandum to acquire the Shares under the laws of Korea, including without limitation the Foreign Exchange Management Act and regulations thereunder.  The Shares have not been registered under the Securities and Exchange Act of Korea and none of the Shares may be offered, sold or delivered, or offered or sold to any person for re-offering or resale, in Korea or to any resident of Korea except pursuant to applicable laws and regulations of Korea.

Liechtenstein.  The Shares are offered to a narrowly defined category of investors, in all cases under circumstances designed to preclude a public solicitation.  The Memorandum may not be reproduced or used for any other purpose, nor be furnished to any other person other than those to whom copies have been sent.

Luxembourg.  The Shares are offered to a limited number of sophisticated investors, in all cases under circumstances designed to preclude a distribution that would be other than a private placement.  The Memorandum may not be reproduced or used for any other purpose, nor be furnished to any other person other than those to whom copies have been sent.

Netherlands.  The Shares may not be solicited, acquired or offered, directly or indirectly, in or from the Netherlands, and this Memorandum may not be circulated in the Netherlands to any individuals or legal entities as part of the initial distribution or anytime thereafter, except to individuals or legal entities who or which trade or invest in subjects of investment ("Beleggingsobjecten") in the conduct of a profession or trade, including banks, brokers, securities institutions, insurance companies, pension funds, investment institutions, other institutional investors and other parties, including treasury departments of commercial enterprises and finance companies which are regularly active in the financial markets in a professional manner (a "Professional Market Party" and/or "Professional Market Parties") investing in subjects of investment as described in Article 1 of the Exemption Regulation of October 9, 1990 issued pursuant to Article 14 of the Investment Institutions Supervision Act (Wet Toezicht Beleggingsinstellingen) of June 27, 1990, as amended from time to time (the "Investment Institutions Act"), and the respective accompanying Memoranda thereto of the Minister of Finance of the Netherlands.  In the event of a solicitation, acquisition or offering made to or by Professional Market Parties and therefore exempt from the general prohibition as provided for in the Investments Institutions

Act, no subsequent offering of the Shares in a "secondary offering" by such Professional Market Parties to persons other than such Professional Market Parties may be made.

New Zealand.  The Memorandum has been prepared solely for and the offer made in it is made solely to habitual investors (being persons defined in Section 3(2)(a)(ii) of the New Zealand Securities Act 1978).

Norway.  The Memorandum has not been filed with the Oslo Stock Exchange in accordance with the Norwegian Securities Trading Act, Section 5-1, and may therefore not be distributed to more than fifty potential investors in Norway.

Oman.  The Memorandum and the Shares are not available to any member of the public and are restricted to investors having an existing business relationship with the Fund.  Application for the Shares made by or on behalf of investors not having an existing relationship with the investment manager will not be accepted.  Any investor that considers purchasing the Shares offered by the Memorandum should consult a professional adviser before doing so.

Panama.  The Shares have not and will not be registered with the Comision Nacional de Valores (the National Securities Commission) of the Republic of Panama under Cabinet Decree No. 247 of 1970 ("Panama's Securities Laws") and may not be offered or sold in a primary offering within Panama, except in certain transactions exempt from the registration requirements of Panama's Securities Laws.

Russia.  The Shares are not intended to be sold or offered in (or on the territory of) the Russian Federation or to Russian residents and the Memorandum has not been registered with, and will not be registered with, the Federal Securities Markets Commission of the Russian Federation.

Singapore.  The Memorandum has not been registered with the Registrar of Companies in Singapore and the Shares will be offered in Singapore pursuant to an exemption invoked under Sections 106c and 106d of the Companies Act, Chapter 50 of Singapore ("Singapore Act").  Accordingly, the Shares may not be offered or sold, nor may the Memorandum or any other offering document or material relating to the Shares be circulated or distributed, directly or indirectly, to the public or any member of the public other than (1) to an institutional investor or other body or person specified in Section 106c of the Singapore Act, or (2) to a sophisticated investor specified in Section 106d of the Singapore Act, or (3) otherwise pursuant to, and in accordance with the conditions of, Section 106e(2) of the Singapore Act or any other applicable exemption invoked under Division 5a of Part IV of the Singapore Act.

South Africa.  The Shares are for your acceptance only and may not be offered or become available to persons other than yourself and may not be publicly offered, sold or advertised in South Africa and the Memorandum may only be circulated to selected individuals.

Spain.  This Memorandum has not been and will not be registered with la Comision Nacional del Mercado de Valores of Spain and may not be distributed in Spain in connection with the offering and sale of participations without complying with all legal and regulatory requirements in relation thereto.

Switzerland.  This Memorandum has been prepared for private information purposes of interested investors only.  It may not be used for and shall not be deemed a public offering of Shares.  No application has been made under Swiss law to publicly market the Fund in or out of Switzerland.  The Shares are not subject to the Swiss Investment Fund Act and are therefore not subject to supervision by the Federal Banking Commission and, accordingly, may not be advertised publicly.  Therefore, no public offer of the Shares or public distribution of this Memorandum may be made in or out of Switzerland.  This Memorandum is strictly for private use by its holders and may not be passed on to third parties.

United Kingdom.    The Fund is an unrecognized collective investment scheme for the purposes of the Financial Services and Markets Act of 2000 of the United Kingdom (the "Act"). The promotion of the Fund and the distribution of this Prospectus in the United Kingdom is accordingly restricted by law.

The content of this Prospectus has not been approved by an authorized person and such approval is, save where this Prospectus is directed at or issued to the types of person referred to above, required by Section 21 of the Act. Acquiring Shares may expose an investor to a significant risk of losing all of the amount invested. The Fund is a limited liability company and any person who acquires Shares will not thereby be exposed to any significant risk of incurring additional liability. Any person who is in any doubt about investing in the Fund should consult an authorized person specializing in advising on such investments.

Uruguay.    The Shares correspond to a private issue and are not registered with the Central Bank of Uruguay.

**APPENDIX A**

**FINANCIAL STATEMENTS**

# APPENDIX B

## SUBSCRIPTION DOCUMENTS

**SCHEDULE A**

PLEASE GIVE THIS LETTER TO YOUR FINANCIAL INSTITUTION AND HAVE THEM RETURN
IT TO THE ADMINISTRATOR AT THE SAME TIME THAT THE SUBSCRIPTION MONIES ARE
WIRED.

**SAMPLE LETTER**

[to be placed on letterhead of the financial institution remitting payment]

Date

**Via mail and facsimile: (31-20) 572-2610**
Fairfield Sentry Limited
Citco Fund Services (Europe) B.V.
Telestone 8 - Teleport
Naritaweg 165
1043 BW Amsterdam
The Netherlands

Dear Sirs

<u>**RE:    FAIRFIELD SENTRY LIMITED (the "Fund")**</u>

1. Name of Remitting Financial Institution:
2. Address of Remitting Financial Institution:
3. Name of Customer:
4. Address of Customer:
5. We have credited your account at [Bank], Account Number [number] for [amount] by order of [subscriber]
   on [date].

The above information is given in strictest confidence for your own use only and without any guarantee,
responsibility or liability on the part of this institution or its officials.

Yours faithfully,

Signed:                _____

Full Name:             _____

Position:              _____

**For additional information, please contact the Administrator at Citco Fund Services (Europe)
B.V., Telestone 8 – Teleport, Naritaweg 165, 1043 BW Amsterdam, The Netherlands, Telephone:
(31-20) 572-2100, Facsimile:  (31-20) 572-2610.**

A-1

# Exhibit E

**Directors' report and financial statements**

**for the year ended December 31, 2004**

**Fairfield Sentry Limited**

**Road Town, Tortola**

**British Virgin Islands**

# Contents

| 1 | **Directors and other information** | **2** |
|---|---|---|
| 1.1 | Directors and other information | 3 |
| | | |
| 2 | **Directors' report** | **4** |
| 2.1 | Directors' report | 5 |
| | | |
| 3 | **Financial statements** | **6** |
| 3.1 | Balance sheet as at December 31, 2004 and December 31, 2003 | 7 |
| 3.2 | Income statement for the year ended December 31, 2004 and December 31, 2003 | 8 |
| 3.3 | Statement of changes in shareholders' equity for the year ended December 31, 2004 and December 31, 2003 | 9 |
| 3.4 | Cash flow statement for the year ended December 31, 2004 and December 31, 2003 | 12 |
| 3.5 | Notes to the financial statements | 13 |
| | Auditors' report | |

*Fairfield Sentry Limited,*
*Road Town, Tortola, British Virgin Islands*

**1      Directors and other information**

## 1.1    Directors and other information

*Board of directors*
Mr Walter M. Noel, Jr.
Mr Jan R. Naess (non-executive director)
Mr Peter P. Schmid (non-executive director)

*Registered office*
Fairfield Sentry Limited
c/o Codan Trust Company (B.V.I.) Ltd.
P.O. Box 3140
Romasco Place, Wickhams Cay
Road Town, Tortola
British Virgin Islands

*Administrator, registrar and transfer agent*
Citco Fund Services (Europe) B.V.
Telestone 8 - Teleport
Naritaweg 165
1043 BW Amsterdam
The Netherlands

*Bank*
Citco Bank Nederland N.V., Dublin Branch
Customs House Plaza Block 6
International Financial Services Centre
P.O. Box 6639 Dublin - 1
Ireland

*Investment manager*
Fairfield Greenwich (Bermuda) Ltd.
12 Church Street
Suite 606
Hamilton, Bermuda HM 11

*Auditors*
PricewaterhouseCoopers Accountants N.V.
P.O. Box 8800
3009 AV Rotterdam
The Netherlands

*Legal advisor*
Andrew E. Goldstein, Esq.
488 Madison Avenue, 16th Floor
New York, New York 10022
United States of America

*Custodian*
Citco Global Custody N.V.
6 Customs House Plaza
Harbourmaster Plaza
Dublin - 1
Ireland

*Fairfield Sentry Limited,*
*Road Town, Tortola, British Virgin Islands*

3

## 2    Directors' report

## 2.1    Directors' report

On May 18, 2004, the Board of Directors of Fairfield Sentry Limited ("the Company")
authorized the introduction of a 1% per annum management fee on the Class A shares of the
Company. Commencing October 1, 2004 the Company began charging a 1% per annum
management fee. The fee of the Class B shares remained unchanged. As such Class B
shareholders were issued shares of Fairfield Sentry Limited at the September 30, 2004 net asset
value of the Class A shares. There is only one Class of shares going forward.

Results for the year were satisfactory.  The previous Class A Shares of Fairfield Sentry Limited
returned 7.08% during 2004, compared with a return of 8.21% in 2003. The previous Class B
Shares of Fairfield Sentry Limited returned 6.44% during 2004, compared with a return of
7.27% in 2003.  Expenses for the Company, including performance fees, were 26.4% of gross
income, which is consistent with prior periods.

The Seedling Initiative has been a feature of the Fund since October 2002.  In May 2004,
Fairfield Redstone Fund, Ltd. graduated from the Seedling Initiative after a very successful
period of investment.  Fairfield Schlarbaum Offshore Fund Ltd. was also removed from the
initiative at the end of September 2004 as the Investment Manager became somewhat
disappointed in the evolution of their business model.  In August 2004, the Fund introduced its
newest Seedling manager, Fairfield Briscoe Senior Capital Fund, Ltd.

The strategy performs best in gradually trending markets with an upward bias and with
moderate volatility and good liquidity. A market environment in which the large cap U.S.
equities display a sustained one to two percent move with no pullback is considered quite
favorable. The worst market environment for the strategy is a stagnant to downward trending
market with little volatility and no volume. There were no substantial changes to the strategy
during the year.

**3    Financial statements**

### 3.1 Balance sheet as at December 31, 2004 and December 31, 2003

|  | Notes | 2004 | 2003 |
|---|---|---|---|
| (in thousands) |  | USD | USD |
| **Assets** |  |  |  |
| Cash due from bank and brokers | 3.5.3 | 51,858 | 168,504 |
| Trading securities | 3.5.4 | 5,103,619 | 4,379,401 |
| Receivable for investments sold |  | 143 | 0 |
| Redemptions paid in advance |  | 634 | 2,882 |
| Other receivables | 3.5.7 | 1,606 | 424 |
|  |  | 5,157,860 | 4,551,211 |
| **Liabilities** |  |  |  |
| Subscriptions received in advance |  | 36,390 | 103,426 |
| Fees payable and accrued expenses | 3.5.8 | 33,583 | 20,475 |
|  |  | 69,973 | 123,901 |
| **Total assets less liabilities** |  | 5,087,887 | 4,427,310 |
| **Shareholders' equity** |  |  |  |
| Share capital | 3.5.9 | 50 | 46 |
| Share premium |  | 2,851,059 | 2,472,583 |
| Retained earnings |  | 2,236,778 | 1,954,681 |
| **Total shareholders' equity** |  | 5,087,887 | 4,427,310 |
| **Net asset value per Fairfield Sentry Limited share (in USD)** |  | 1,025.63 | 0.00 |
| **Net asset value per Class A share (in USD)** |  | 0.00 | 957.84 |
| **Net asset value per Class B share (in USD)** |  | 0.00 | 1,076.54 |

The accompanying notes are an integral part of these financial statements.

## 3.2 Income statement for the year ended December 31, 2004 and December 31, 2003

|  | Notes | 2004 | 2003 |
|---|---|---|---|
| (in thousands) |  | USD | USD |
| **Revenue** |  |  |  |
| Interest income |  | 1,357 | 339 |
| Dividend income |  | 33,549 | 40,702 |
| Other income |  | 2 | 50 |
| Net gains on trading securities |  | 407,797 | 389,577 |
| **Total investment income** |  | 442,705 | 430,668 |
| **Expenses** |  |  |  |
| Management fees | 3.5.12 | 21,549 | 5,221 |
| Performance fees | 3.5.12 | 81,278 | 80,515 |
| Administration fees | 3.5.12 | 2,538 | 2,092 |
| Legal and professional fees |  | 144 | 57 |
| Bank charges and commissions |  | 296 | 264 |
| Directors' fees | 3.5.12 | 50 | 50 |
| Other operating expenses |  | 871 | 231 |
| **Total operating expenses** |  | 106,726 | 88,430 |
| **Profit before taxation** |  | 335,979 | 342,238 |
| Withholding tax |  | (10,064) | (12,210) |
| **Profit for the year** |  | 325,915 | 330,028 |
| **Earnings per Fairfield Sentry Limited share (in USD) – 12 month period *** |  | 66.62 | 72.46 |
| **Earnings per Class B share (in USD) – 9 month period *** |  | 55.79 | 67.55 |

The accompanying notes are an integral part of these financial statements.

* As at September 30, 2004 class A and Class B shares were converted into Fairfield Sentry Limited shares. For comparitive reasons the earnings per share of Fairfield Sentry Limited shares is compared to Class A earnings per share for the year ended December 31, 2003.

*Fairfield Sentry Limited,*
*Road Town, Tortola, British Virgin Islands*

8

### 3.3    Statement of changes in shareholders' equity for the year ended December 31, 2004 and December 31, 2003

*3.3.1    Combined*

| (in thousands) | Share capital | Share premium | Retained earnings | Total share-holders' equity |
|---|---|---|---|---|
| | USD | USD | USD | USD |
| Balance as at December 31, 2002 | 46 | 2,417,627 | 1,624,653 | 4,042,326 |
| Subscriptions for the year | 15 | 701,829 | 0 | 701,844 |
| Redemptions for the year | (15) | (646,873) | 0 | (646,888) |
| Net result for the year | 0 | 0 | 330,028 | 330,028 |
| Balance as at December 31, 2003 | 46 | 2,472,583 | 1,954,681 | 4,427,310 |
| Subscriptions for the year * | 18 | 1,884,713 | 0 | 1,884,731 |
| Redemptions for the year * | (14) | (1,506,237) | (43,818) | (1,550,069) |
| Net result for the year | 0 | 0 | 325,915 | 325,915 |
| Balance as at December 31, 2004 | 50 | 2,851,059 | 2,236,778 | 5,087,887 |

* Included in subscriptions and redemptions is the conversion of Class B shares into Fairfield Sentry Limited shares which took place at the net asset value of September 30, 2004. Further reference is made to note 3.5.9.

The accompanying notes are an integral part of these financial statements.

### 3.3.2  Fairfield Sentry Limited shares (formerly Class A shares)

| (in thousands) | Share capital | Share premium | Retained earnings | Total share-holders' equity |
|---|---|---|---|---|
| | USD | USD | USD | USD |
| Balance as at December 31, 2002 | 46 | 2,417,627 | 1,624,653 | 4,042,326 |
| Subscriptions for the year | 12 | 419,742 | 0 | 419,754 |
| Redemptions for the year | (15) | (643,177) | 0 | (643,192) |
| Net result for the year | 0 | 0 | 323,734 | 323,734 |
| Balance as at December 31, 2003 | 43 | 2,194,192 | 1,948,387 | 4,142,622 |
| Subscriptions for the year * | 12 | 1,178,643 | 0 | 1,178,655 |
| Redemptions for the year | (5) | (521,776) | 0 | ($21,781) |
| Net result for the year | 0 | 0 | 288,391 | 288,391 |
| Balance as at December 31, 2004 | 50 | 2,851,059 | 2,236,778 | 5,087,887 |

The reconciliation of the movement in Fairfield Sentry Limited shares (formerly Class A shares) outstanding during the period ended December 31, 2004 and December 31, 2003 is as follows:

| | 2004 | 2003 |
|---|---|---|
| Number of shares outstanding as at beginning of the year | 4,324,948.43 | 4,566,729.01 |
| Shares issued during the year * | 1,166,106.36 | 1,245,595.88 |
| Shares redeemed during the year | (530,308.30) | (1,487,376.46) |
| Number of shares outstanding as at end of the year | 4,960,746.49 | 4,324,948.43 |

* Included in subscriptions is the conversion of Class B shares into Fairfield Sentry Limited shares which took place at the net asset value of September 30, 2004. Further reference is made to note 3.5.9.

The accompanying notes are an integral part of these financial statements.

### 3.3.3   Class B shares

| (in thousands) | Share capital | Share premium | Retained earnings | Total share-holders' equity |
|---|---|---|---|---|
| | USD | USD | USD | USD |
| Balance as at December 31, 2002 | 0 | 0 | 0 | 0 |
| Subscriptions for the year | 3 | 282,087 | 0 | 282,090 |
| Redemptions for the year | 0 | (3,696) | 0 | (3,696) |
| Net result for the year | 0 | 0 | 6,294 | 6,294 |
| Balance as at December 31, 2003 | 3 | 278,391 | 6,294 | 284,688 |
| Subscriptions for the year | 6 | 706,070 | 0 | 706,076 |
| Redemptions for the year * | (9) | (984,461) | (43,818) | (1,028,288) |
| Net result for the year | 0 | 0 | 37,524 | 37,524 |
| Balance as at December 31, 2004 | 0 | 0 | 0 | 0 |

The reconciliation of the movement in Class B shares outstanding during the period ended December 31, 2004 and December 31, 2003 is as follows:

| | 2004 | 2003 |
|---|---|---|
| Number of shares outstanding as at beginning of the year | 264,446.16 | 0.00 |
| Shares issued during the year | 645,275.33 | 273,634.16 |
| Shares redeemed during the year * | (909,721.49) | (9,188.00) |
| Number of shares outstanding as at end of the year | 0.00 | 264,446.16 |

* Included in redemptions is the conversion of Class B shares into Fairfield Sentry Limited shares which took place at the net asset value of September 30, 2004. Further reference is made to note 3.5.9.

The accompanying notes are an integral part of these financial statements.

*Fairfield Sentry Limited,*
*Road Town, Tortola, British Virgin Islands*

### 3.4    Cash flow statement for the year ended December 31, 2004 and December 31, 2003

| (in thousands) | 2004 USD | 2003 USD |
|---|---|---|
| **Profit for the year** | 325,915 | 330,028 |
| *Adjustments for:* | | |
| Interest income | (1,357) | (339) |
| Dividend income | (33,549) | (40,702) |
| **Operating profit before working capital changes** | 291,009 | 288,987 |
| Net increase in trading securities | (724,218) | (350,088) |
| Net decrease/(increase) in prepayments on trading securities | 2,248 | (2,882) |
| Net increase of other receivables | (1,502) | (7) |
| Net increase in fees payable and accrued expenses | 13,108 | 9,888 |
| **Cash used in operations** | (710,364) | (343,089) |
| Interest received | 1,357 | 339 |
| Dividend received | 33,869 | 40,285 |
| Receivable for investments sold | (143) | 0 |
| **Net cash used in operation activities** | (384,272) | (13,478) |
| **Cash flows from financing activities** | | |
| Pending subscriptions for participating shares | (67,036) | 70,801 |
| Proceeds from redeemable participating shares issued | 926,397 | 701,844 |
| Redemptions from redeemable participating shares | (591,735) | (646,888) |
| **Net cash from financing activities** | 267,626 | 125,757 |
| **Net (decrease)/increase in cash and cash equivalents** | (116,646) | 112,279 |
| Cash and cash equivalents at beginning of the year | 168,504 | 56,225 |
| **Cash and cash equivalents at end of the year** | 51,858 | 168,504 |

The accompanying notes are an integral part of these financial statements.

*Fairfield Sentry Limited,*
*Road Town, Tortola, British Virgin Islands*

## 3.5 Notes to the financial statements

### 3.5.1 General

Fairfield Sentry Limited ('the Company') was incorporated in the British Virgin Islands on
October 30, 1990 under the provisions of The Mutual Funds Law of the British Virgin Islands.
The Company commenced operations on December 1, 1990. The first shares were issued against
cash.

The investment manager of the Company utilizes an option trading strategy, known as a "split
strike conversion". In addition, the investment manager has allocated relatively small portions of
the Company's assets to other strategies typically sub-advised by experienced personnel starting
new businesses (the "Seedlings"). Allocations to Seedlings may never exceed, in the aggregate,
5% of the Company's net asset value at the time of the investment. It is anticipated that the other
allocations will be made to new investment vehicles, with no single allocation exceeding USD
50,000,000 at the time of the investment.

On May 18, 2004, the Board of Directors of Fairfield Sentry Limited authorized the introduction
of a 1% per annum management fee on the Class A shares of the Company. Commencing
October 1, 2004 the Company began changing a 1% per annum management fee. The fee of the
Company Class B shares remains unchanged. As such Class B shareholders were issued shares of
Fairfield Sentry Limited at the September 30, 2004 net asset value of the Class A shares. There is
only one Class of shares going forward.

Pursuant to the provisions of the Articles of Association, changes in the net asset value of the
Company are allocated to each share on a monthly basis.

Each share entitles the holder to one vote and to receive such dividends as declared by the
directors and to participate upon liquidation on a proportional basis. Dividend policy is
determined by the directors and current policy is directed towards capital appreciation.

The minimum initial subscription per investor for the shares is USD 100,000, unless the
Company deems it advisable to permit subscriptions for a lesser amount. Following his initial
investment, a shareholder may make additional investments in amounts of not less than USD
50,000. Subscriptions received during any monthly period three business days before the last
business day of the month will be accepted as of the first day of the following
month.

Redemption at the option of the shareholder will be accepted at the end of any month taking into
account fifteen calendar days written notice. The Company reserves the right to call all or a part
of a shareholder's shares for redemption at any time for any reason or for no reason.

The Company's financial statements were authorised for issue on June 23, 2005 by the board of
directors.

*Fairfield Sentry Limited,*                                                      13
*Road Town, Tortola, British Virgin Islands*

### 3.5.2  Accounting policies

The principal accounting policies adopted in the preparation of these financial statements are set out below.

#### Basis of preparation

The financial statements are prepared in accordance with International Financial Reporting Standards (IFRS).

The financial statements are prepared under the historical cost convention as modified by the fair valuation of trading securities, financial assets and financial liabilities held for trading and all derivative contracts.

The preparation of financial statements in conformity with IFRS requires the use of accounting estimates. It also requires management to exercise its judgement in the process of applying the Company's accounting policies.

The areas involving a higher degree of judgement or complexity or areas where assumptions and estimates are significant to the financial statements are disclosed in note 3.5.5.

#### Foreign currency translation

(a) Functional and presentation currency
Items included in the Company's financial statements are measured using the currency of the primary economic environment in which it operates ('the functional currency'). This is the (USD), which reflects the Company's primary activity of investing in USD securities and derivatives.

(b) Transactions and balances
Foreign currency transactions are translated into the functional currency using the exchange rates prevailing at the dates of the transactions. Foreign exchange gains and losses resulting from the settlement of such transactions and from the translation at year-end exchange rates of monetary assets and liabilities denominated in foreign currencies are recognised in the income statement.

Translation differences on non-monetary items, such as equities, held at fair value through profit or loss are reported as part of the fair value gain or loss.

#### Cash and cash equivalents

Cash and cash equivalents includes cash on hand, deposits held with banks, other short-term highly liquid investments with original maturities of three months or less, and bank overdrafts.

#### Due from/to brokers

Amounts due from/to brokers represent payables for securities purchased and receivables for securities sold that have been contracted for but not yet delivered by the end of the year. It also includes deposit amounts with brokers.

*Fairfield Sentry Limited,*                                    14
*Road Town, Tortola, British Virgin Islands*

*Trading securities*

Trading securities are securities, which were either acquired for generating a profit from short-term fluctuations in price or included in a portfolio in which a pattern of short-term profit taking exists.

All investment securities are initially recognised at cost (which includes transaction costs). Trading securities listed and regularly traded on recognised securities exchanges are stated at the last quoted trade price on the day of valuation. If no sales price was reported on any valuation date, long securities held are valued at the last quoted bid price and short securities held at the last quoted ask price.

Other (unlisted) investments are valued at their fair values as determined by management in consultation with the directors in accordance with recognised accounting and financial principles.

Interest earned whilst holding investment and trading securities is reported as interest income. Dividends are recognised when the Company's right to receive payment is established. Dividends received are included separately in dividend income.

All purchases and sales of investments and trading securities that require delivery within the time frame established by regulation or market convention ('regular way' purchases and sales) are recognised at trade date, which is the date on which the Company commits to purchase or sell the asset. In cases which are not within the time frame established by regulation or market convention, such transactions are recognised on settlement date. Any change in fair value of the asset to be received is recognised between the trade date and settlement date.

*Offsetting financial instruments*

Financial assets and liabilities are offset and the net amount is reported in the balance sheet when there is a legally enforceable right to set off the recognised amounts and there is an intention to settle on a net basis, or realise the asset and settle the liability simultaneously.

*Interest income and expense*

Interest income and expense are recognised in the income statement for all debt instruments using the effective interest method.

*Dividend income*

Dividend income is recognised on the ex dividend date. Dividend income received by the Company are subject to foreign withholding taxes.

*Allocation of income and expenses*

Income and expenses are not class specific and therefore allocated on a pro-rata basis to the different classes of shares. Income and expenses that are class specific are allocated to their respective share class.

*Expenses*

Expenses are accounted for on an accrual basis. Expenses are charged to the income statement except for expenses incurred on the acquisition of trading securities which are included within the costs of those trading securities. Expenses arising on the disposal of trading securities are deducted from the disposal proceeds.

*Taxation*

The Company is not subject to any income, withholding or capital gains taxes in the British Virgin Islands. Generally, the Company intends to conduct its affairs so as not to be liable to taxation in any other jurisdiction; however, it does invest in securities whose dividend income is subject to non-refundable foreign withholding taxes.

*Use of estimates*

Because of the inherent uncertainty of valuation for all fair value investments and interests, the estimate of fair value may differ from the values that would have been used had a ready market existed, and the differences could be material.

### 3.5.3   Cash due from bank and brokers

| (in thousands) | Dec 31, 2004 USD | Dec 31, 2003 USD |
|---|---|---|
| Cash at banks | 38,812 | 128,437 |
| Overnight deposit | 13,000 | 40,000 |
| Cash at brokers | 46 | 67 |
| | 51,858 | 168,504 |

As at December 31, 2004 there is no restricted cash.

*Fairfield Sentry Limited,*
*Road Town, Tortola, British Virgin Islands*

16

### 3.5.4    Trading securities

The Company has not sold or re-pledged any collateral during the period.

As at December 31, 2004, the portfolio of trading securities comprised the following positions:

|  | Dec 31, 2004 | Dec 31, 2003 |
|---|---|---|
| (in thousands) | USD | USD |
| Shares and other investments (long) | 65,935 | 71,900 |
| US treasury bills | 5,037,684 | 4,307,501 |
| **Total trading securities** | 5,103,619 | 4,379,401 |
| **Gains/(losses) recognised in relation to trading securities** |  |  |
| Realised | 409,945 | 385,341 |
| Unrealised | (2,148) | 4,236 |
| **Total gains/(losses)** | 407,797 | 389,577 |

As at December 31, 2004 the portfolio of trading securities can be specified as follows:

| | Market value | % of net assets of the Company |
|---|---|---|
| (in thousands) | USD | % |
| *Investment Funds (long)* | | |
| EMF Corporate Bond Arbitrage Class AA1 | 22,437 | 0.5 |
| Fairfield Briscoe Senior Capital Shares | 40,776 | 0.8 |
| Chester Global Strategy Fund L Redeemable Shares | 1,317 | 0.0 |
| FIF Advanced Ltd. Class A Shares | 563 | 0.0 |
| Irongate Global Strategy Fund Shares | 394 | 0.0 |
| Fairfield Greenwich – FFTW DAF Class E Shares | 215 | 0.0 |
| Fairfield Investment Fund | 173 | 0.0 |
| Fairfield Paradigm Fund Ltd. Class I-1 Shares | 25 | 0.0 |
| Fairfield Redstone Fund Ltd. Class A1 Non hot issue Shares | 25 | 0.0 |
| NGA Fairfield Ltd Series 10/01/04 | 5 | 0.0 |
| Arlington International Fund Ordinary Shares | 5 | 0.0 |
| | 65,935 | 1.3 |
| *US treasury bills* | | |
| US 0% treasury bill 04/07/05 | 421,192 | 8.3 |
| US 0% treasury bill 05/05/05 | 420,124 | 8.3 |
| US 0% treasury bill 06/02/05 | 419,196 | 8.1 |
| US 0% treasury bill 06/09/05 | 418,956 | 8.2 |
| US 0% treasury bill 04/14/05 | 420,947 | 8.3 |
| US 0% treasury bill 04/21/05 | 420,595 | 8.3 |
| US 0% treasury bill 04/28/05 | 420,376 | 8.3 |
| US 0% treasury bill 05/12/05 | 419,913 | 8.3 |
| US 0% treasury bill 05/19/05 | 419,699 | 8.3 |
| US 0% treasury bill 05/26/05 | 419,450 | 8.2 |
| US 0% treasury bill 06/16/05 | 418,771 | 8.2 |
| US 0% treasury bill 06/23/05 | 418,465 | 8.2 |
| | 5,037,684 | 99.0 |
| | 5,103,619 | 100.3 |

*Fairfield Sentry Limited,*
*Road Town, Tortola, British Virgin Islands*

18

US treasury bills are stated at the last quoted trade price in Bloomberg as at December 31, 2004. Shares and other funds are valued at net asset values, as calculated by the underlying fund administrators.

As at December 31, 2003 the portfolio of trading securities can be specified as follows:

|  | Market value | % of net assets of the Company |
|---|---|---|
| (in thousands) |  |  |
|  | USD | % |
| *Investment Funds (long)* |  |  |
| EMF Corporate Bond Arbitrage Class AA1 | 21,812 | 0.5 |
| Fairfield GMO market neutral, Class I1 | 35 | 0.0 |
| Fairfield Greenwich FFTW, Class E | 104 | 0.0 |
| Fairfield Masters Fund Ltd, Class I USD | 213 | 0.0 |
| Fairfield Redstone fund Ltd, Class A1 | 20,007 | 0.4 |
| Fairfield Schlarbaum, Class A1 | 29,620 | 0.7 |
| FIF Advanced Ltd Class A | 109 | 0.0 |
|  | 71,900 | 1.6 |
| *US treasury bills* |  |  |
| US 0% treasury bill 04/15/04 | 538,983 | 12.2 |
| US 0% treasury bill 04/29/04 | 150 | 0.0 |
| US 0% treasury bill 05/27/04 | 538,401 | 12.2 |
| US 0% treasury bill 06/03/04 | 538,236 | 12.1 |
| US 0% treasury bill 06/17/04 | 538,015 | 12.1 |
| US 0% treasury bill 06/24/04 | 537,837 | 12.1 |
| US 0% treasury bill 04/22/04 | 150 | 0.0 |
| US 0% treasury bill 05/13/04 | 538,590 | 12.2 |
| US 0% treasury bill 05/20/04 | 538,474 | 12.2 |
| US 0% treasury bill 05/06/04 | 538,665 | 12.2 |
|  | 4,307,501 | 97.3 |
|  | 4,379,401 | 98.9 |

### 3.5.5   *Accounting estimates and judgements in applying accounting policies*

The Company makes estimates and assumptions that affect the reported amounts of assets and
liabilities within the next financial year. Estimates are continually evaluated and based on
historical experience and other factors, including expectations of future events that are believed
to be reasonable under the circumstances.

### 3.5.6   *Risks associated with financial instruments*

The Company's investment activities expose it to the various types of risks taken by the
Company and the money managers of the underlying funds, which are associated with the
financial instruments and markets in which they invest. The following summary is not intended
to be comprehensive of all risks and investors should refer to the Confidential Information
Memorandum for a more detailed discussion of the risks inherent to investing in the Company.

#### *Market price risk*

The Company's interest rate securities, equity securities and trading derivative financial
instruments are susceptible to market price risk arising from uncertainties about future prices of
the instruments.

#### *Credit risk*

Credit risk is the risk that an issuer or counterparty will be unable or unwilling to meet a
commitment that it has entered into with the Company. Financial assets, which potentially
expose the Company to credit risk, consist principally of cash due from brokers and receivables
for investments sold. The Company's cash balances are primarily with high credit quality, well
established financial institutions. The extent of the Company's exposure to credit risk in respect
of these financial assets approximates their carrying value as recorded in the Company's balance
sheet.

#### *Liquidity risk*

The Company's listed securities are considered to be readily realizable as they are listed on the
New York stock exchange. The Company has the option to invest up to 5% of the total net assets
in non-listed alternative investments.

#### *Currency risk*

The Company may invest in assets denominated in currencies other than its reporting currency,
the USD. Consequently, the Company is exposed to risks that the exchange rate of the USD
relative to other currencies may change in a manner, which has an adverse effect on the reported
value of that portion of the Company's assets, which are denominated in currencies other than the
USD.

*Off-balance sheet risks*

An off-balance sheet risk exists when the maximum potential loss on a particular trading
securities is greater than the value of such trading securities. Off-balance sheet credit risk exists,
among other situations, when the collateral received by the Company or the money manager is
insufficient to cover losses, which might result from a counterparty's failure to fulfil its
obligation under contracts with the Company or the money manager.

*3.5.7    Other receivables*

|  | Dec 31, 2004 | Dec 31, 2003 |
|---|---|---|
| (in thousands) | USD | USD |
| Dividends receivable on shares | 97 | 417 |
| Prepaid general expenses | 63 | 7 |
| Other | 1,446 | 0 |
|  | 1,606 | 424 |

*3.5.8    Fees payable and accrued expenses*

|  | Dec 31, 2004 | Dec 31, 2003 |
|---|---|---|
| (in thousands) | USD | USD |
| Management fees | 12,870 | 1,710 |
| Performance fees | 12,837 | 16,244 |
| Administration fees | 222 | 189 |
| Legal and professional fees | 87 | 51 |
| Custody fees | 9 | 9 |
| Other accounts payable and accrued expenses | 7,558 | 2,272 |
|  | 33,583 | 20,475 |

*Fairfield Sentry Limited,*
*Road Town, Tortola, British Virgin Islands*

21

### 3.5.9    Share capital

The authorised share capital of Fairfield Sentry Limited is USD 100,000 divided into
10,000,000 ordinary shares of USD 0.01 each.

Holders of shares are entitled to one vote per share and participate on a pro rata basis in the net
assets of the Company on liquidation and other distributions as declared. As of
December 31, 2004 there were 4,960,746.49 Fairfield Sentry Limited (December 31, 2003:
4,324,948.43 Class A and 264,446.16 Class B) shares issued and fully paid.

In October 2004 Class B shares were converted into Fairfield Sentry Limited shares at the net
asset value to the Class A shares of September 30, 2004. In total USD 958,334,000 in
845,190.31 of Class B shares were converted into 944,275.06 Fairfield Sentry Limited shares.
As of this date Class A shares also go forward as Fairfield Sentry Limited shares.

The Company will not accept a subscription tendered at a time when the number of its
outstanding shares is 10,000,000.

The net asset value of the shares is calculated by dividing the value of the assets, less the
liabilities and appropriate reserves, by the total number of shares outstanding on the valuation
date.

### 3.5.10    Fees

#### Directors' fees

The directors not affiliated with the investment manager, of which there are at the present time
two, will each be paid a fee of USD 25,000 per annum by the Company together with out-of-
pocket expenses made in attending meetings of the board of directors or of shareholders.

#### Performance fees

The investment manager of the Company is Fairfield Greenwich (Bermuda) Ltd., a corporation
organised under the laws of Bermuda. The investment manager receives a performance fee of
20% of the new appreciation in share value each quarter. The performance fees are calculated
and payable quarterly. This fee is payable quarterly in arrears.

Pursuant to a Deferred Fee Agreement dated July 1, 2003 with the Company the investment
manager and Fairfield Greenwich Limited have the option to defer the payment of, all or a
portion of the performance fees and/or management fees. In 2004, the investment manager has
deferred payment of the performance fee for an amount of USD 4,761,205 (2003: USD
1,797,847). The remaining part of the performance fee as stated in the income statement is paid
to the investment manager.

*Management fees*

The investment manager receives a monthly management fee in an amount equal to one-twelfth of one percent (0.0833%) of the net asset value before performance fees, as calculated at the opening of the first day of each calendar month, which will include subscriptions accepted by the Company as of the first day of the month. This fee is payable monthly in arrears. The investment manager will pay a portion of the management fee to an affiliate in consideration of the affiliate providing certain administrative services and back-office support to the Company.

*Administration fees*

The administrator of the Company is Citco Fund Services (Europe) B.V. The Company pays to the administrator a monthly fee based on the net asset value of the Company as of the last business day of the month. The administrator will also be reimbursed for all disbursements and reasonable expenses incurred in the performance of its duties as detailed in the administrative services agreement.

### 3.5.11  Related parties

Parties are considered to be related if one party has the ability to control the other party or exercise significant influence over the other party in making financial or operational decisions.

The Company is managed by Fairfield Greenwich (Bermuda) Ltd. ('the investment manager'), an investment management company incorporated in Bermuda, under the terms of the management agreement dated July 1, 2003 and explained in 3.5.10. In accordance with the investment management agreement, the appointment of Fairfield Greenwich (Bermuda) Ltd. is for an indefinite period of time, which may be terminated on notice ten days prior to the end of any calendar quarter.

Total management fees for the period, including the outstanding accrued fees due to Fairfield Greenwich (Bermuda) Ltd. at the end of the period, are detailed below.

|  | 2004 | 2003 |
|---|---|---|
| (in thousands) | USD | USD |
| Management fees for the period | 21,549 | 5,221 |
| Accrued at the end of period | 12,870 | 1,710 |

Investments made during the year in trading securities related to the Company are as follows:

|  | 2004 | 2003 |
|---|---|---|
| (in thousands) | USD | USD |
| Trading securities bought | 111,571 | 24,689 |
| Trading securities sold | 68,684 | 25,278 |

As at December 31, 2004 related parties held 633,661.12 shares in the Company (December 31, 2003: 455,993.10).

Mr Noel, a director of the Company, is also principal officer and director of the parent company of the Company's investment manager. Mr Noel has waived his fees in the Company as at December 31, 2004 and December 31, 2003.

The directors held no shares in the Company as at December 31, 2004 and December 31, 2003.

*Fairfield Sentry Limited,*                                                   24
*Road Town, Tortola, British Virgin Islands*

### 3.5.12  Earnings per share

The earnings per share are calculated by dividing the net result of USD 325,915,000 attributable to shareholders by the weighted average number of shares outstanding during the year. The weighted average number of Class A shares outstanding for the year ended December 31, 2004 is 4,328,738 (2003: 4,468,004). For Class B shares the weighted average number of shares for the period ended September 30, 2004 (date of conversion to Class A shares) is 672,630 (2003: 93,180.36 for the year). There is no dilution of the earnings per share.

# Exhibit F

ANWAR, *et al.*,

                         Plaintiffs,

       -against-

FAIRFIELD GREENWICH LIMITED, *et al.*,

                         Defendants.

This Document Relates To:  All Actions

Master File No. 09-cv-118 (VM)

**CONSOLIDATED AMENDED COMPLAINT**

# Exhibit 19

Directors' report and financial statements

for the year ended December 31, 2005

Fairfield Sentry Limited

Road Town, Tortola

British Virgin Islands

## Contents

| 1 | Directors and other information | 2 |
|---|---|---|
| 1.1 | Directors and other information | 3 |
| | | |
| 2 | Directors' report | 4 |
| 2.1 | Directors' report | 5 |
| | | |
| 3 | Financial statements | 6 |
| 3.1 | Balance sheet as at December 31, 2005 and December 31, 2004 | 7 |
| 3.2 | Income statement for the year ended December 31, 2005 and December 31, 2004 | 8 |
| 3.3 | Statement of changes in net assets attributable to holders of redeemable participating shares for the year ended December 31, 2005 and December 31, 2004 | 9 |
| 3.4 | Cash flow statement for the year ended December 31, 2005 and December 31, 2004 | 10 |
| 3.5 | Notes to the financial statements | 11 |
| | Auditors' report | |

*Fairfield Sentry Limited,*
*Road Town, Tortola, British Virgin Islands*

1    Directors and other information

1.1    Directors and other information

*Board of directors*
Mr Walter M. Noel, Jr.
Mr Jan R. Naess (non-executive director)
Mr Peter P. Schmid (non-executive director)

*Registered office*
Fairfield Sentry Limited
c/o Codan Trust Company (B.V.I.) Ltd.
P.O. Box 3140
Romasco Place, Wickhams Cay
Road Town, Tortola
British Virgin Islands

*Administrator, registrar and transfer agent*
Citco Fund Services (Europe) B.V.
Telestone 8 - Teleport
Naritaweg 165
1043 BW Amsterdam
The Netherlands

*Bank*
Citco Bank Nederland N.V., Dublin Branch
Customs House Plaza Block 6
International Financial Services Centre
P.O. Box 5639 Dublin - 1
Ireland

*Investment manager*
Fairfield Greenwich (Bermuda) Ltd.
12 Church Street
Suite 606
Hamilton, Bermuda HM 11

*Auditors*
PricewaterhouseCoopers Accountants N.V.
P.O. Box 8800
3009 AV Rotterdam
The Netherlands

*Legal advisor*
Andrew E. Goldstein, Esq.
488 Madison Avenue, 16th Floor
New York, New York 10022
United States of America

*Custodian*
Citco Global Custody N.V.
5 Customs House Plaza
Harbourmaster Plaza
Dublin - 1
Ireland

*Fairfield Sentry Limited,*
*Road Town, Tortola, British Virgin Islands*

3

2    Directors' report

*Fairfield Sentry Limited,*
*Road Town, Tortola, British Virgin Islands*                    4

2.1        Directors' report

Results for 2005 were satisfactory. Fairfield Sentry Limited returned 7.26%, net of fees for the year, compared with a return of 7.08% during 2004. Expenses, including performance and management fees, were 30.51% of gross income.

The Seeding Initiative has been a feature of the Fund since October 1, 2002. As of December 31, 2005, the Fund has made initial allocations totaling USD140 million to five managers, Fairfield Redstone Fund, Ltd., Fairfield Schlarbaum Offshore Fund Ltd., EMF Corporate Bond Arbitrage Fund, Ltd. ("EMF"), Fairfield Briscoe Senior Capital Fund, Ltd. ("Briscoe"), and Fairfield Saxo Global Macro Fund, Ltd. ("Saxo"). At December 31, 2005, the following three managers remained in the Seeding Initiative, EMF, Briscoe, and Saxo which constituted approximately 1.80% of Sentry's portfolio at that time.

In addition to the seedling program, the Fund allocated USD75 million to Farallon Capital Offshore Investors Fund, Inc. ("Farallon") in October 2005. The allocation, unlike previous seeding managers, is with a well established manager. This allocation to Farallon provides a strategic, opportunistic relationship with a manager with the same commitment to low volatility and capital preservation.

The trading strategy of the Company requires a favorable environment for its implementation. The strategy performs best in gradually trending markets with an upward bias and with moderate volatility and good liquidity. A market environment in which large cap US equities displays a sustained one to two percent move with no pullback is considered quite favorable. The worst market environment for the strategy is a stagnant to downward trending market with little volatility and no volume.

## 3    Financial statements

### 3.1    Balance sheet as at December 31, 2005 and December 31, 2004

| | Notes | 2005 | 2004 |
|---|---|---|---|
| (in thousands) | | USD | USD |
| **Assets** | | | |
| Cash due from banks and brokers | 3.5.3 | 38,598 | 51,858 |
| Financial assets at fair value through profit or loss | 3.5.4 | 4,935,170 | 5,103,619 |
| Receivable for financial assets sold | | 2,350 | 143 |
| Redemptions paid in advance | | -- | 624 |
| Other receivables | 3.5.6 | 1,631 | 1,616 |
| **Total assets** | | 4,977,749 | 5,157,860 |
| **Liabilities** | | | |
| Subscriptions received in advance | | 22,541 | 36,390 |
| Fees payable and accrued expenses | 3.5.7 | 63,619 | 23,583 |
| Total liabilities (excluding net assets attributable to holders of redeemable participating shares | | 98,160 | 69,973 |
| Net assets attributable to holders of redeemable participating shares | 3.5.9 | 4,882,589 | 5,087,887 |
| **Total Liabilities** | | 4,977,749 | 5,157,860 |
| Net asset value per Fairfield Sentry Limited share (in USD) | | 1,100.0759 | 1,025.6294 |

The accompanying notes are an integral part of these financial statements.

*Fairfield Sentry Limited,*
*Road Town, Tortola, British Virgin Islands*

3.2    Income statement for the years ended December 31, 2005 and
        December 31, 2004

| | Notes | 2005 | 2004 |
|---|---|---|---|
| (in thousands) | | USD | USD |
| Revenue | | | |
| Interest income | | 3,218 | 1,357 |
| Dividend income | | 47,631 | 33,549 |
| Other income | | 58 | 2 |
| Net gains on financial assets and liabilities at fair value through profit or loss | | 463,433 | 407,797 |
| Total investment income | | 514,340 | 442,705 |
| | | | |
| Expenses | | | |
| Management fees | 3.5.9 | 51,127 | 21,549 |
| Performance fees | 3.5.9 | 87,225 | 81,278 |
| Administration fees | 3.5.9 | 2,697 | 2,538 |
| Legal and professional fees | | 152 | 144 |
| Bank charges and commissions | | 275 | 396 |
| Directors' fees | 3.5.9 | 23 | 50 |
| Other operating expenses | | 1,183 | 871 |
| Total operating expenses | | 142,686 | 106,726 |
| Profit before taxation | | 371,654 | 335,979 |
| | | | |
| Withholding tax | | (14,239) | (10,968) |
| Net increase in net assets attributable to holders of redeemable participating shares from operations | | 357,415 | 325,015 |
| | | | |
| Earnings per Fairfield Sentry Limited share in USD for the 12 month period | | 73.90 | 66.52 |

The accompanying notes are an integral part of these financial statements.

Fairfield Sentry Limited,
Road Town, Tortola, British Virgin Islands

8

3.3    Statement of changes in net assets attributable to holders of
redeemable participating shares for the years ended December 31,
2005 and December 31, 2004

| (in thousands) | USD |
|---|---|
| Net assets attributable to holders of redeemable participating shares as at December 31, 2003 | 4,427,310 |
| Subscriptions of redeemable participating shares for the year 2004 | 1,884,731 |
| Redemptions of redeemable participating shares for the year 2004 | (1,550,069) |
| Net increase in net assets attributable to holders of redeemable participating shares from operations | 325,915 |
| Net assets attributable to holders of redeemable participating shares as at December 31, 2004 | 5,087,887 |
| Subscriptions of redeemable participating shares for the year 2005 | 937,918 |
| Redemptions of redeemable participating shares for the year 2005 | (1,493,631) |
| Net increase in net assets attributable to holders of redeemable participating shares from operations | 357,415 |
| Net assets attributable to holders of redeemable participating shares as at December 31, 2005 | 4,889,589 |

The reconciliation of the movement in Fairfield Sentry Limited redeemable participating shares
outstanding during the year ended December 31, 2005 and December 31, 2004 is as follows:

| | 2005 | 2004 |
|---|---|---|
| Number of shares outstanding as at beginning of the year | 4,960,746.49 | 4,324,948.43 |
| Shares issued during the year | 896,081.52 | 1,166,106.36 |
| Shares redeemed during the year | (1,412,053.03) | (530,308.30) |
| Number of shares outstanding as at end of the year | 4,444,774.98 | 4,960,746.49 |

The accompanying notes are an integral part of these financial statements.

*Fairfield Sentry Limited,*
*Road Town, Tortola, British Virgin Islands*                                  9

3.4     Cash flow statement for the years ended December 31, 2005 and
        December 31, 2004

|  | 2005 | 2004 |
|---|---|---|
| (in thousands) | USD | USD |
| Net increase in net assets attributable to holders of redeemable participating shares from operations | 357,415 | 325,915 |
| *Adjustments for:* | | |
| Interest income | (3,218) | (1,357) |
| Dividend income | (47,631) | (33,549) |
| Withholding tax | 14,239 | 10,064 |
| | | |
| Operating profit before working capital changes | 320,805 | 301,073 |
| | | |
| Net decrease/(increase) in financial assets at fair value through profit or loss | 168,449 | (724,218) |
| Net increase in receivable for financial assets sold | (3,207) | (143) |
| Net decrease/(increase) in other receivables | 1,509 | (1,502) |
| Net increase in fees payable and accrued expenses | 32,036 | 13,108 |
| Cash from/(used in) operations | 520,592 | (411,682) |
| | | |
| Withholding tax | (14,239) | (10,064) |
| Interest received | 3,218 | 1,357 |
| Dividend received | 46,097 | 33,869 |
| Net cash from/(used in) operating activities | 555,668 | (386,520) |
| Cash flows from financing activities | | |
| Subscriptions received in advance | (13,849) | (67,036) |
| Redemptions paid in advance | 634 | 2,248 |
| Proceeds from redeemable participating shares issued | 937,918 | 926,397 |
| Redemptions of redeemable participating shares | (1,493,631) | (591,735) |
| Net cash (used in)/from financing activities | (568,928) | 269,874 |
| | | |
| Net decrease in cash and cash equivalents | (13,260) | (116,646) |
| Cash and cash equivalents at beginning of the year | 51,858 | 168,504 |
| Cash and cash equivalents at end of the year | 38,598 | 51,858 |

The accompanying notes are an integral part of these financial statements.

*Fairfield Sentry Limited,*                                                              10
*Road Town, Tortola, British Virgin Islands*

### 3.5       Notes to the financial statements

#### 3.5.1    General

Fairfield Sentry Limited (the 'Company') was incorporated in the British Virgin Islands on October 30, 1990 under the provisions of The Mutual Funds Law of the British Virgin Islands. The Company commenced operations on December 1, 1990.

The investment manager of the Company utilizes an option trading strategy, known as a "split strike conversion". In addition, the investment manager has allocated relatively small portions of the Company's assets to other strategies typically sub-advised by experienced personnel starting new businesses (the "Seedlings"). Allocations to Seedlings may never exceed, in the aggregate, 5% of the Company's net asset value at the time of the investment. It is anticipated that the other allocations will be made to new investment vehicles, with no single allocation exceeding USD 50,000,000 at the time of the investment.

On May 18, 2004, the Board of Directors of Fairfield Sentry Limited authorized the introduction of a 1% per annum management fee on the Class A shares of the Company. Commencing October 1, 2004 the Company began charging a 1% management fee. The fee of the Company Class B shares remains unchanged. As such Class B shareholders were issued shares of Fairfield Sentry Limited at the September 30, 2004 net asset value of the Class A shares. There is only one class of shares going forward.

Pursuant to the provisions of the Articles of Association, changes in the net asset value of the Company are allocated to each share on a monthly basis.

Each share entitles the holder to one vote and to receive such dividends as declared by the directors and to participate upon liquidation on a proportional basis. Dividend policy is determined by the directors and current policy is directed towards capital appreciation.

The minimum initial subscription per investor for the shares is USD 100,000, unless the Company deems it advisable to permit subscriptions for a lesser amount. Following his initial investment, a shareholder may make additional investments in amounts of not less than USD 50,000. Subscriptions received during any monthly period three business days before the last business day of the month will be accepted as of the first day of the following month.

Redemption at the option of the shareholder will be accepted at the end of any month taking into account fifteen calendar days written notice. The Company reserves the right to call all or a part of a shareholder's shares for redemption at any time for any reason or for no reason.

The Company's financial statements were authorised for issue on June 26, 2006 by the board of directors.

*Fairfield Sentry Limited,*                                                                                11
*Road Town, Tortola, British Virgin Islands*

*3.5.2    Accounting policies*

The principal accounting policies adopted in the preparation of these financial statements are set
out below.

*Basis of preparation*

The financial statements are prepared in accordance with International Financial Reporting
Standards (IFRS).

The financial statements are prepared under the historical cost convention as modified by the fair
valuation of trading securities, financial assets and financial liabilities held for trading and all
derivative contracts.

The preparation of financial statements in conformity with IFRS requires the use of accounting
estimates. It also requires management to exercise its judgement in the process of applying the
Company's accounting policies.

In 2005, the Company adopted all new and revised IFRS standards effective for the period from
January 1, 2005. The accounts have been amended as required, in accordance with the
requirements of the following relevant standards:

- IAS 1 (revised 2003) Presentation of Financial Statements
- IAS 8 (revised 2003) Accounting Policies, Changes in Accounting Estimates and Errors
- IAS 10 (revised 2003) Events after the Balance Sheet Date
- IAS 21 (revised 2003) The Effects of Changes in Foreign Exchange Rates
- IAS 24 (revised 2003) Related Party Disclosures
- IAS 32 (revised 2003) Financial Instruments: Disclosure and Presentation
- IAS 39 (revised 2003) Financial Instruments: Recognition and Measurement

The adoption of IAS 1, 8, 10, 21, 24, 32 and 39 (revised 2003) resulted in some changes to the
Company's accounting policies. In summary:

- IAS 1 (revised 2003) has affected disclosure;
- IAS 8 and IAS 10 (both revised 2003) had no material effect on the Company's policies;
- IAS 21 (revised 2003) had no material effect on the Company's policy. The functional
  currency of the Company has been re-evaluated based on the guidance to the revised
  standard and is still considered appropriate;
- IAS 24 (revised 2003) has affected the identification of related parties and some other
  related-party disclosures;
- IAS 32 (revised 2003) has affected the presentation of redeemable preference shares, now
  classified as a financial liability;
- IAS 39 (revised 2003) affected the categories of financial assets and financial liabilities
  for recognition and measurement purposes. The Company redesignated its available-for-
  sale (AFS) financial instruments as financial assets at fair value through profit or loss on
  adoption of IAS 39 (revised 2003). Fair value gains and losses on AFS instruments were
  previously recognised in the income statement. The Company has not re-designated any
  originated or held-to-maturity instruments as financial assets or liabilities at fair value
  through profit or loss on adoption of IAS 39 (revised 2003).

*Fairfield Sentry Limited.*    12
*Road Town, Tortola, British Virgin Islands*

All changes in the accounting policies have been made in accordance with the transition provisions in the respective standards. All standards adopted by the Company that are relevant to its operations were applied retrospectively. There was no impact on opening net assets at January 1, 2005 from the adoption of any of the above-mentioned standards.

All references to net assets throughout this document refer to net assets attributable to holders of redeemable preference shares unless otherwise stated.

The balance sheet presents assets and liabilities in increasing order of liquidity and does not distinguish between current and non-current items. All the Company's assets and liabilities are held for the purpose of being traded or are expected to be realised within one year.

*Foreign currency translation*
(a) Functional and presentation currency
Items included in the Company's financial statements are measured using the currency of the primary economic environment in which it operates (the 'functional currency'). This is the USD, which reflects the Company's primary activity of investing in USD securities and derivatives. Redeemable participating shares in the Company are denominated in USD.

(b) Transactions and balances
Foreign currency transactions are translated into the functional currency using the exchange rates prevailing at the dates of the transactions. Foreign exchange gains and losses resulting from the settlement of such transactions and from the translation at year-end exchange rates of monetary assets and liabilities denominated in foreign currencies are recognised in the income statement.

When a gain or loss on a non-monetary item is recognized in profit or loss, any exchange component of that gain or loss shall be recognised in profit or loss.

Translation differences on non-monetary items such as equities held at fair value through profit or loss are reported as part of the fair value gain or loss.

*Cash and cash equivalents*
For the purpose of the cash flow statement, cash and cash equivalents include cash on hand, deposits held with banks, other short-term highly liquid investments with original maturities of three months or less, and bank overdrafts.

*Due from/to brokers*
Amounts due from/to brokers represent payables for securities purchased and receivables for securities sold that have been contracted for but not yet delivered by the end of the year. It also includes deposit amounts with brokers.

*Financial assets at fair value through profit or loss*

A financial asset or financial liability at fair value through profit or loss is a financial asset or financial liability that meets either of the following conditions:

(a)    It is classified as held for trading. A financial asset or liability is classified as held for trading if it is:

    (i) acquired or incurred principally for the purpose of selling or repurchasing it in the near term;

    (ii) part of a portfolio of identified financial instruments that are managed together and for which there is evidence of a recent actual pattern of short-term profit taking or

    (iii) a derivative (except for a derivative that is a designated and effective hedging instrument).

(b)    Upon recognition it is designated by the entity as at fair value through profit or loss.

Derivatives are also categorized as held for trading, as the Company does not designate any derivatives as hedges in a hedging relationship. Management designated the Company's investments in bonds/securities/discount papers etc. as held for trading.

Regular-way purchases and sales of investments are recognised on trade date, which is the date the Company commits to purchase or sell the asset. Investments are initially recognized at cost, including transaction costs. Investments are derecognized when the rights to receive cash flows from the investments have expired or the Company has transferred substantially all risks and rewards of ownership.

Listed securities are valued at the last reported bid price if owned and asked price if sold short on the last business day of the valuation period.

Unlisted securities are valued at their fair values as determined by management in consultation with the investment manager in accordance with recognised accounting and financial principles. In this respect, investments in other investment companies are valued at the net asset value per share on the day of valuation as calculated by the related administrators, unless the directors are aware of good reasons why such valuation would not be the most appropriate indicator of fair value.

*Determination of gains or losses on financial assets and liabilities at fair value through profit or loss*

Both realised and unrealised gains and losses on financial assets and liabilities at fair value through profit or loss are taken as income and expenses as incurred. Realised gains and losses on sales of financial assets and liabilities at fair value through profit or loss are calculated on a first-in-first-out basis. The difference between the initial fair value and the fair value of financial assets and liabilities at fair value through profit or loss is reflected in the income statement as the change in unrealised gains or losses on investments.

*Fairfield Sentry Limited,*
*Road Town, Tortola, British Virgin Islands*

14

*Derivative financial instruments*

Derivative financial instruments including foreign exchange contracts, forward rate contracts, contracts for differences and other derivative financial instruments are initially recognised in the balance sheet at fair value on the date on which a derivative contract is entered into and are subsequently re-measured at their fair value. Fair values are obtained from quoted market prices, discounted cash flow models and option pricing models as appropriate. All derivatives are carried in assets when amounts are receivable by the Company and in liabilities when amounts are payable by the Company. Changes in the fair values of derivatives are included in the income statement.

Initial margin deposits are made upon entering into futures contracts and contracts for differences are generally made in cash. During the period the contract is open, changes in the value of the contracts are recognised as unrealised gains or losses by 'marking-to-market' on a daily basis to reflect the market value of the contract at the end of each day's trading.

Variation margin payments are made or received, depending upon whether unrealised losses or gains are incurred. Unrealised gains are reported as an asset and unrealised losses are reported as a liability in the balance sheet. When the contract is closed, the Company records a realised gain or loss equal to the difference between the proceeds from (or cost of) the closing transaction and the Company's basis in the contract.

*Offsetting financial instruments*

Financial assets and liabilities are offset and the net amount is reported in the balance sheet when there is a legally enforceable right to set off the recognized amounts and there is an intention to settle on a net basis, or realize the asset and settle the liability simultaneously.

*Receivables*

Receivables are non-derivative financial assets with fixed or determinable payments that are not quoted in an active market. They arise when the Company sells securities or services directly to a broker with no intention of trading the receivable, or when the Company purchases securities under an agreement to resell ('reverse repos'). Receivables are recognised initially at fair value plus transaction costs that are directly attributable to their acquisition or origination. They are subsequently measured at amortised cost using the effective interest method, less provision for impairment.

*Redeemable participating shares*

A continuous offering of redeemable participating shares is taking place and participating shares will be issued on the first business day of each month at a price equal to the net asset value per participating share computed on the immediately preceding valuation date (being the last business day of each calendar month and such other days as the directors may determine).

Subsequent issues of redeemable participating shares and redemptions of participating shares can be made on the last business day of each month ('the valuation date') at a price equal to the net asset value of that month.

*Fairfield Sentry Limited,*
*Road Town, Tortola, British Virgin Islands*                                          15

The net asset value per share for any valuation date is determined by dividing the value of the assets of the Company less its liabilities at the close of business on such valuation date, by the number of shares outstanding at that date.

Contributions for redeemable participating shares received in advance represent monies received by the Company before the Company's dealing date for redeemable participating shares issued.

*Interest income and expense*
Interest income and expense are recognised in the income statement on an accrual basis.

*Dividend income*
Dividend income is recognised when the right to receive payment is established. Dividend income received by the Company is subject to foreign withholding taxes.

*Expenses*
Expenses are accounted for on an accrual basis. Expenses are charged to the income statement except for expenses incurred on the acquisition of investments which are included within the cost of the investments. Expenses arising on the disposal of investments are deducted from the disposal proceeds.

*Taxation*
Under current laws of the British Virgin Islands, there are no income, estate, transfer, sales or other British Virgin Island taxes payable by the Company. Generally, the Company intends to conduct its affairs so as not to be liable to taxation in any other jurisdiction; however, the Company may invest in securities whose income is subject to non-refundable foreign withholding taxes, which have been separately stated in the income statement.

*Use of Estimates*
Because of the inherent uncertainty of valuation for all fair value instruments and interests, the estimate of fair value may differ from the values that would have been used had a ready market existed and the differences could be material.

These policies have been consistently applied to all years presented, unless otherwise stated below.

*3.5.3    Cash due from banks and brokers*

For the purpose of the cash flow statement, cash and cash equivalent include the following items:

|  | Dec 31, 2005 | Dec 31, 2004 |
|---|---|---|
| (in thousands) | USD | USD |
| Cash at banks | 28,504 | 32,812 |
| Overnight deposit | 10,000 | 15,000 |
| Cash at brokers | 54 | 46 |
|  | 38,598 | 51,858 |

As at December 31, 2005 there is no restricted cash.

*Fairfield Sentry Limited,*
*Road Town, Tortola, British Virgin Islands*                    16

*3.3.4    Financial assets at fair value through profit or loss*

As at December 31, 2005, the portfolio of trading securities comprised the following positions:

|  | Market value | % of net assets of the Company |
|---|---|---|
| (in thousands) |  |  |
|  | USD | % |
| *Shares and other investments (long)* |  |  |
| Fairalon Capital Offshore Fund | 77,485 | 1.58 |
| Fairfield Briscoe Senior Capital Fund | 54,756 | 1.12 |
| EMF Corporate Bond Arbitrage Class AA1 | 24,749 | 0.51 |
| Fairfield Saxo Fund Ltd | 9,701 | 0.20 |
| Cluster Global Strategy Fund Redeemable Shares | 1,510 | 0.03 |
| Fairfield Aerium International Class A | 1,295 | 0.03 |
| FIF Advanced Ltd. Class A Shares | 578 | 0.01 |
| Irongate Global Strategy Fund Shares | 447 | 0.01 |
| Fairfield Investment Fund Class A-1 | 179 | 0.00 |
| Fairfield Redstone Fund Class A1 | 27 | 0.00 |
| Others | 37 | 0.00 |
|  | 170,764 | 3.49 |
| *US treasury bills* |  |  |
| US 0% treasury bill 02/02/06 | 478,226 | 9.78 |
| US 0% treasury bill 02/09/06 | 477,881 | 9.77 |
| US 0% treasury bill 02/16/06 | 477,531 | 9.77 |
| US 0% treasury bill 02/23/06 | 477,171 | 9.76 |
| US 0% treasury bill 03/02/06 | 476,746 | 9.75 |
| US 0% treasury bill 03/09/06 | 476,360 | 9.74 |
| US 0% treasury bill 03/16/06 | 475,990 | 9.73 |
| US 0% treasury bill 03/23/06 | 475,555 | 9.73 |
| US 0% treasury bill 03/30/06 | 475,215 | 9.72 |
| US 0% treasury bill 05/04/06 | 473,338 | 9.68 |
| US 0% treasury bill 05/11/06 | 246 | 0.01 |
| US 0% treasury bill 05/18/06 | 246 | 0.01 |
|  | 4,764,406 | 97.43 |
| Total trading securities | 4,935,170 | 100.91 |

The Company has not sold or re-pledged any collateral during the year.

*Fairfield Sentry Limited,*
*Road Town, Tortola, British Virgin Islands*

17

US treasury bills are stated at the last quoted trade price in Bloomberg  as at December 31, 2003.
Shares and other funds are valued at net asset values, as calculated by the underlying fund
administrators.

As at December 31, 2004 the portfolio of trading securities can be specified as follows:

| | Market value | % of net assets of the Company |
|---|---|---|
| *(in thousands)* | ......... | ......... |
| | USD | % |
| *Shares and other investments (long)* | | |
| EMF Corporate Bond Arbitrage Class AA1 | 22,437 | 0.44 |
| Fairfield Briscoe Senior Capital Shares | 40,776 | 0.80 |
| Chester Global Strategy Fund Redeemable Shares | 1,317 | 0.03 |
| FIF Advanced Ltd. Class A Shares | 563 | 0.01 |
| Irongate Global Strategy Fund Shares | 394 | 0.01 |
| Fairfield Greenwich – FPTW DAF Class E Shares | 215 | 0.0 |
| Fairfield Investment Fund, Class | 173 | 0.0 |
| Fairfield Paradigm Fund Ltd. Class I-1 Shares | 25 | 0.0 |
| Fairfield Redstone Fund Ltd. Class A1 | 25 | 0.0 |
| NGA Fairfield Ltd Series 10/01/04 | 5 | 0.0 |
| Arlington International Fund Ordinary Shares | 5 | 0.0 |
| | 65,935 | 1.29 |
| *US treasury bills* | | |
| US 0% treasury bill 04/07/05 | 421,192 | 8.28 |
| US 0% treasury bill 05/05/05 | 420,124 | 8.26 |
| US 0% treasury bill 06/02/05 | 419,396 | 8.24 |
| US 0% treasury bill 06/09/05 | 418,956 | 8.23 |
| US 0% treasury bill 04/14/05 | 420,947 | 8.27 |
| US 0% treasury bill 04/21/05 | 420,593 | 8.27 |
| US 0% treasury bill 04/28/05 | 420,376 | 8.26 |
| US 0% treasury bill 05/12/05 | 419,913 | 8.25 |
| US 0% treasury bill 05/19/05 | 419,599 | 8.25 |
| US 0% treasury bill 05/26/05 | 419,450 | 8.24 |
| US 0% treasury bill 06/16/05 | 418,771 | 8.23 |
| US 0% treasury bill 06/23/05 | 418,463 | 8.22 |
| | 5,037,684 | 99.00 |
| Total trading securities | 5,103,619 | 100.29 |

*Fairfield Sentry Limited,*
*Road Town, Tortola, British Virgin Islands*

18

### 3.5.5    Risks associated with financial instruments

The Company's investment activities expose it to the various types of risks taken by the Company and the money managers of the underlying funds, which are associated with the financial instruments and markets in which they invest. The following summary is not intended to be comprehensive of all risks and investors should refer to the Confidential Information Memorandum for a more detailed discussion of the risks inherent to investing in the Company.

#### Interest rate risk

The majority of the Company's financial assets and liabilities are non-interest bearing; as a result, the Company is not subject to significant amounts of risk due to fluctuations in the prevailing levels of market interest rates.

The Company is exposed to risks associated with the effects of fluctuations in the prevailing levels of market interest rates on its financial position and cash flows.

#### Market price risk

The Company's investments and financial instruments are susceptible to market price risk arising from uncertainties about future prices of the instruments. The Company's overall market positions are monitored by the Company's investment manager and reviewed monthly by the board of directors.

#### Credit risk

Credit risk is the risk that an issuer or counterparty will be unable or unwilling to meet a commitment that it has entered into with the Company. Financial assets, which potentially expose the Company to credit risk, consist principally of cash due from brokers and receivables for investments sold. The Company's cash balances are primarily with high credit quality, well established financial institutions. The extent of the Company's exposure to credit risk in respect of these financial assets approximates their carrying value as recorded in the Company's balance sheet.

#### Liquidity risk

A lack of liquidity may also result from limited trading opportunities. The Company's listed securities are considered to be readily realisable as they are listed for the major part on European and American stock exchanges. With some hedge funds, investors can sell their units at certain dates, which may occur monthly, quarterly or even annually. A lack of liquidity may also result from limited trading opportunities in alternative investment products.

#### Currency risk

The Company may invest in assets denominated in currencies other than its reporting currency, the USD. Consequently, the Company is exposed to risks that the exchange rate of the USD relative to other currencies may change in a manner, which has an adverse effect on the reported value of that portion of the Company's assets, which are denominated in currencies other than the USD.

*Off-balance sheet risks*

An off-balance sheet market risk exists when the maximum potential loss on a particular investment is greater than the value of such investment as reflected in the Company's balance sheet.

3.5.6   *Other receivables*

| (in thousands) | Dec 31, 2005<br>USD | Dec 31, 2004<br>USD |
|---|---|---|
| Dividends receivable on shares | 1,631 | 97 |
| Prepaid general expenses | 0 | 63 |
| Other | 0 | 1,446 |
| | 1,631 | 1,606 |

3.5.7   *Fees payable and accrued expenses*

| (in thousands) | Dec 31, 2005<br>USD | Dec 31, 2004<br>USD |
|---|---|---|
| Management fees | 14,195 | 12,870 |
| Performance fees | 35,223 | 12,877 |
| Administration fees | 251 | 222 |
| Legal and professional fees | 93 | 87 |
| Custody fees | 9 | 9 |
| Other accounts payable and accrued expenses | 15,849 | 7,558 |
| | 65,610 | 33,583 |

3.5.8   *Participating redeemable shares*

The authorised share capital of Fairfield Sentry Limited is USD 100,000 divided into 10,000,000 ordinary shares of USD 0.01 each.

Holders of shares are entitled to one vote per share and participate on a pro rata basis in the net assets of the Company on liquidation and other distributions as declared. As of December 31, 2005 there were 4,444,774.98 Fairfield Sentry Limited (December 31, 2004: 4,960,740.49) shares issued and fully paid.

The Company will not accept a subscription tendered at a time when the number of its outstanding shares is 10,000,000.

The net asset value of the shares is calculated by dividing the value of the assets, less the liabilities and appropriate reserves, by the total number of shares outstanding on the valuation date.

*Fairfield Sentry Limited,*
*Road Town, Tortola, British Virgin Islands*                                          20

### 3.5.9   Fees

#### Directors' fees

The directors not affiliated with the investment manager, of which there are at the present time two, will each be paid a fee of USD 25,000 per annum by the Company together with out-of-pocket expenses made in attending meetings of the board of directors or of shareholders.

#### Performance fees

The investment manager of the Company is Fairfield Greenwich (Bermuda) Ltd., a corporation organised under the laws of Bermuda. The investment manager receives a performance fee of 20% of the new appreciation in share value each quarter. The performance fees are calculated and payable quarterly. This fee is payable quarterly in arrears.

Pursuant to a Deferred Fee Agreement dated July 1, 2003 with the Company, the investment manager and Fairfield Greenwich Limited have the option to defer the payment of, all or a portion of the performance fees and/or management fees. In 2005, the investment manager has deferred payment of the performance fee for an amount of USD 15,845,694 (2004: USD 4,761,205). The remaining part of the performance fee as stated in the income statement is paid to the investment manager.

#### Management fees

The investment manager receives a monthly management fee in an amount equal to one-twelfth of one percent (0.0833%) of the net asset value before performance fees, as calculated at the opening of the first day of each calendar month, which will include subscriptions accepted by the Company as of the first day of the month. This fee is payable monthly in arrears. The investment manager will pay a portion of the management fee to an affiliate in consideration of the affiliate providing certain administrative services and back-office support to the Company.

#### Administration fees

The administrator of the Company is Citco Fund Services (Europe) B.V. The Company pays to the administrator a monthly fee based on the net asset value of the Company as of the last business day of the month. The administrator will also be reimbursed for all disbursements and reasonable expenses incurred in the performance of its duties as detailed in the administrative services agreement.

### 3.5.10   Related parties

Parties are considered to be related if one party has the ability to control the other party or exercise significant influence over the other party in making financial or operational decisions.

The Company is managed by Fairfield Greenwich (Bermuda) Ltd. ('the investment manager'), an investment management company incorporated under the laws of Bermuda, under the terms of the management agreement dated July 1, 2003 and explained in 3.5.9. In accordance with the investment management agreement, the appointment of Fairfield Greenwich (Bermuda) Ltd. is for an indefinite period of time, which may be terminated on notice ten days prior to the end of any calendar quarter.

*Fairfield Sentry Limited,*
*Road Town, Tortola, British Virgin Islands*                                   21

Total management fees and performance fees for the year, including the outstanding accrued fees
due to Fairfield Greenwich (Bermuda) Ltd. at the end of the year, are detailed below.

|  | 2005 | 2004 |
|---|---|---|
| (in thousands) | USD | USD |
| Management fees for the year | $1,127 | 21,549 |
| Accrued at the end of year | 14,195 | 12,870 |

|  | 2005 | 2004 |
|---|---|---|
| (in thousands) | USD | USD |
| Performance fees for the year | $7,226 | 81,278 |
| Accrued at the end of year | 35,222 | 12,837 |

Investments made during the year in trading securities related to the Company are as follows:

|  | 2005 | 2004 |
|---|---|---|
| (in thousands) | USD | USD |
| Trading securities bought | 31,362 | 111,571 |
| Trading securities sold | 44,179 | 68,684 |

As at December 31, 2005 related parties held 575,989.40 shares in the Company
(December 31, 2004: 633,661.12).

Mr Noel, a director of the Company, is also principal officer and director of the parent company
of the Company's investment manager. Mr Noel has waived his fees in the Company as at
December 31, 2005 and December 31, 2004.

The directors held no shares in the Company as at December 31, 2005 and December 31, 2004.

*Fairfield Sentry Limited,*                                                22
*Road Town, Tortola, British Virgin Islands*

# PRICEWATERHOUSECOOPERS 🄴

PricewaterhouseCoopers
Accountants N.V.
Fascinatio Boulevard 350
3065 WB Rotterdam
P.O. Box 8800
3009 AV Rotterdam
The Netherlands
Telephone +31 (10) 407 55 00
Facsimile +31 (10) 456 45 00
www.pwc.com/nl

To the directors and shareholders of
Fairfield Sentry Limited

## Auditors' report

### Introduction

In accordance with your assignment we have audited the accompanying balance sheet of Fairfield Sentry Limited ("the Company") as at December 31, 2005 and the related statements of income, changes in net assets attributable to holders of redeemable participating shares and cash flows for the year then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

### Scope

We conducted our audit in accordance with International Standards on Auditing. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audit provides a reasonable basis for our opinion.

### Opinion

In our opinion the financial statements give a true and fair view of the financial position of the Company as at December 31, 2005 and of the results of its operations and its cash flows for the year then ended in accordance with International Financial Reporting Standards.

Rotterdam, June 28, 2006

PricewaterhouseCoopers Accountants N.V.

H.F.M. Gerlsen RA

FG-1451tr-bv-20060828200001

PricewaterhouseCoopers is the trade name of among others the following companies: PricewaterhouseCoopers Accountants N.V. (Chamber of Commerce 34180285), PricewaterhouseCoopers Belastingadviseurs N.V. (Chamber of Commerce 34180284), PricewaterhouseCoopers Advisory N.V. (Chamber of Commerce 34180287) and PricewaterhouseCoopers B.V. (Chamber of Commerce 34180289). The services rendered by these companies are governed by General Terms & Conditions, which include provisions regarding our liability. These General Terms & Conditions are filed with the Amsterdam Chamber of Commerce and can also be viewed at www.pwc.com/nl.

# Exhibit G

| | |
|---|---|
| ANWAR, *et al.*,<br><br>                                    Plaintiffs,<br><br>          -against-<br><br>FAIRFIELD GREENWICH LIMITED, *et al.*,<br><br>                                    Defendants.<br><br>This Document Relates To:  All Actions | Master File No. 09-cv-118 (VM) |

**CONSOLIDATED AMENDED COMPLAINT**

# Exhibit 20

**Fairfield Sentry Limited**

**Directors' report and financial statements**
**for the years ended December 31, 2007 and 2006**
**Road Town, Tortola**
**British Virgin Islands**

## Contents

| | | |
|---|---|---|
| **1** | **Directors and other information** | **1** |
| 1.1 | Directors and other information | 2 |
| | | |
| **2** | **Directors' report** | **3** |
| 2.1 | Directors' report | 4 |
| | | |
| **3** | **Financial statements** | **5** |
| 3.1 | Auditors' Report | 6 |
| 3.2 | Balance sheets as at December 31, 2007 and 2006 | 7 |
| 3.3 | Income statements for the years ended December 31, 2007 and 2006 | 8 |
| 3.4 | Statements of changes in net assets attributable to holders of redeemable participating shares for the years ended December 31, 2007 and 2006 | 9 |
| 3.5 | Cash flow statements for the years ended December 31, 2007 and 2006 | 10 |
| 3.6 | Notes to financial statements as at December 31, 2007 and 2006 | 11 |

*Fairfield Sentry Limited,*
*Road Town, Tortola. British Virgin Islands*

**1      Directors and other information**

## 1.1   Directors and other information

**Board of directors**
Mr Walter M. Noel, Jr. *(non-executive director)*
Mr Jan R. Naess *(non-executive director)*
Mr Peter P. Schmid *(non-executive director)*

**Investment manager**
Fairfield Greenwich (Bermuda) Ltd.
12 Church Street
Suite 606
Hamilton, Bermuda HM 11

**Registered office**
Fairfield Sentry Limited
c/o Codan Trust Company (B.V.I.) Ltd.
P.O. Box 3140
Romasco Place, Wickhams Cay
Road Town, Tortola
British Virgin Islands

**Auditors**
PricewaterhouseCoopers LLP
77 King Street, Royal Trust Tower
Toronto, Ontario
M5K 1G8
Canada

**Administrator, registrar and transfer agent**
Citco Fund Services (Europe) B.V.
Telestone 8 - Teleport
Naritaweg 165
1043 BW Amsterdam
The Netherlands

**Legal advisor**
DLA Piper US LLP
1251 Avenue of the Americas
New York, New York 10020-1104
United States of America

**Bank**
Citco Bank Nederland N.V., Dublin Branch
Customs House Plaza Block 6
International Financial Services Centre
P.O. Box 6639 Dublin - 1
Ireland

**Custodian**
Citco Global Custody N.V.
6 Customs House Plaza Harbourmaster Plaza
Dublin 1
Ireland

**B.V.I. Counsel**
Conyers, Dill & Pearman
P.O. Box 3140
Romasco Place, Wickhams Cay
Road Town, Tortola
British Virgin Islands

Case 1:09-cv-00118-VM    Document 116-21    Filed 04/24/09    Page 6 of 30

## 2      Directors' report

## 2.1    Directors' report

Results for the period year ended December 31, 2007 were satisfactory.  Fairfield Sentry Limited ("Sentry") returned 7.34%, net of fees during the year, compared with a return of 9.38% in 2006. Expenses, including performance and management fees, were 28.20% of gross income.

The trading strategy of the Company requires a favorable environment for its implementation.  The strategy performs best in gradually trending markets with an upward bias and with moderate volatility and good liquidity.  A market environment in which large cap US equities displays a sustained one to two percent move with no pullback is considered quite favorable.  The worst market environment for the strategy is a stagnant to downward trending market with little volatility and no volume.

Since October 2002 Sentry has been allocating up to 5% of its assets to new investment vehicles managed by experienced management teams establishing themselves in new investment businesses. These investments may also include strategic allocations to experienced managers in established funds. At December 31, 2007, these investments represented approximately 2.80% of Sentry's portfolio.

**3      Financial statements**

## 3.1    Auditors' Report



PricewaterhouseCoopers LLP
**Chartered Accountants**
PO Box 82
Royal Trust Tower, Suite 3000
Toronto Dominion Centre
Toronto, Ontario
Canada M5K 1G8
Telephone +1 416 863 1133
Facsimile +1 416 365 8215

April 7, 2008

## Report of Independent Auditors

**To the Directors and Shareholders of
Fairfield Sentry Limited**

In our opinion, the accompanying balance sheet and the related income statement, the statement of changes in net assets attributable to holders of redeemable participating shares and the cash flow statement present fairly, in all material respects, the financial position of **Fairfield Sentry Limited** (the "Company") as of December 31, 2007 and the results of its operations, the changes in its net assets attributable to holders of redeemable participating shares and its cash flows for the year then ended in conformity with International Financial Reporting Standards. These financial statements are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements based on our audit. We conducted our audit of these financial statements in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by the Company's management, and evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

*PricewaterhouseCoopers LLP*

**Chartered Accountants, Licensed Public Accountants**

PricewaterhouseCoopers refers to the Canadian firm of PricewaterhouseCoopers LLP and the other member firms of PricewaterhouseCoopers International Limited, each of which is a separate and independent legal entity.

### 3.2    Balance sheet as at December 31, 2007 and 2006
*(All amounts in USD thousands, except per share amounts and unless otherwise
stated)*

|  | Notes | 2007 | 2006 |
|---|---|---|---|
| **Assets** |  |  |  |
| Cash and cash equivalents | 3.6.4 | 103,966 | 622,866 |
| Financial assets at fair value through profit or loss | 3.6.5 | 7,173,165 | 5,555,567 |
| Redemptions for redeemable participating shares paid in advance |  | - | 4,051 |
| Dividends receivable |  | 255 | 3,395 |
| Prepaid subscriptions into financial assets |  | - | 25,087 |
| **Total assets** |  | 7,277,386 | 6,210,966 |
| **Liabilities** |  |  |  |
| Subscriptions for redeemable participating shares received in advance |  | 51,123 | 520,737 |
| Redemptions for redeemable participating shares payable |  | - | 188 |
| Fees payable and accrued expenses | 3.6.7 | 79,204 | 65,326 |
| **Total liabilities (excluding net assets attributable to holders of redeemable participating shares)** |  | 130,327 | 586,251 |
| **Net assets attributable to holders of redeemable participating shares** | 3.6.8 | 7,147,059 | 5,624,715 |
| **Total liabilities** |  | 7,277,386 | 6,210,966 |
| Net asset value per share based on net asset value of 7,147,059 (2006: 5,624,715) and 5,533,438.46 (2006: 4,674,576.45) shares outstanding. | 3.6.8 | 1,291.61 | 1,203.26 |

*The accompanying notes are an integral part of these financial statements.*

**Fairfield Sentry Limited,**
**Road Town, Tortola. British Virgin Islands**                                    7

### 3.3    Income statement for the years ended December 31, 2007 and 2006
*(All amounts in USD thousands, except per share amounts and unless otherwise stated)*

|  | Notes | 2007 | 2006 |
|---|---|---|---|
| **Investment income** | | | |
| Interest income | | 6,073 | 3,685 |
| Dividend income | | 50,426 | 82,563 |
| Other income | | 1,658 | 2,385 |
| Net gains on financial assets and liabilities at fair value through profit or loss | 3.6.5 | 624,752 | 549,938 |
| | | | |
| **Total investment income** | | 682,909 | 638,571 |
| | | | |
| **Expenses** | | | |
| Management fees | 3.6.9 | 67,322 | 50,465 |
| Performance fees | 3.6.9 | 116,157 | 107,779 |
| Administration fees | 3.6.9 | 4,117 | 3,079 |
| Legal and professional fees | | 212 | 113 |
| Bank charges and commissions | | 317 | 215 |
| Directors' fees | 3.6.9 | 103 | 25 |
| Other operating expenses | | 4,325 | 2,319 |
| | | | |
| **Total operating expenses** | | 192,553 | 163,995 |
| | | | |
| **Profit before taxation** | | 490,356 | 474,576 |
| | | | |
| Withholding tax | | (14,973) | (24,622) |
| | | | |
| **Change in net assets attributable to holders of redeemable participating shares resulting from operations** | | 475,383 | 449,954 |

*The accompanying notes are an integral part of these financial statements.*

### 3.4 Statement of changes in net assets attributable to holders of redeemable participating shares for the years ended December 31, 2007 and 2006

*(All amounts in USD thousands, except per share amounts and unless otherwise stated)*

| | Number of shares | USD |
|---|---|---|
| **Balances as at December 31, 2005** | 4,444,774.98 | 4,889,589 |
| Issue of redeemable participating shares | 1,023,548.53 | 1,183,814 |
| Redemption of redeemable participating shares | (793,747.06) | (898,642) |
| Change in net assets attributable to holders of redeemable participating shares resulting from operations | - | 449,954 |
| **Balances at December 31, 2006** | 4,674,576.45 | 5,624,715 |
| Issue of redeemable participating shares | 1,939,455.26 | 2,393,826 |
| Redemption of redeemable participating shares | (1,080,593.25) | (1,346,865) |
| Change in net assets attributable to holders of redeemable participating shares resulting from operations | - | 475,383 |
| **Balances at December 31, 2007** | 5,533,438.46 | 7,147,059 |

*The accompanying notes are an integral part of these financial statements.*

*Fairfield Sentry Limited,*
*Road Town, Tortola. British Virgin Islands*                                             9

### 3.5    Cash flow statement for the years ended December 31, 2007 and 2006
*(All amounts in USD thousands, except per share amounts and unless otherwise stated)*

|  | 2007 | 2006 |
|---|---|---|
| **Increase in net assets attributable to holders of redeemable participating shares from operations** | 475,383 | 449,954 |
| *Adjustments for:* | | |
| Interest income | (6,073) | (3,685) |
| Dividend income | (50,426) | (82,563) |
| Withholding tax | 14,973 | 24,622 |
| | | |
| **Operating profit before working capital changes** | 433,857 | 388,328 |
| | | |
| Net increase in financial assets at fair value through profit or loss | (1,617,598) | (620,397) |
| Net increase/(decrease) in fees payable and accrued expenses | 13,878 | (293) |
| | | |
| **Cash used in operations** | (1,169,863) | (232,362) |
| | | |
| Withholding tax | (14,973) | (24,622) |
| Interest received | 6,073 | 3,685 |
| Dividend received | 53,566 | 80,799 |
| | | |
| **Net cash used in operating activities** | (1,125,197) | (172,500) |
| | | |
| **Cash flows from financing activities** | | |
| (Decrease)/increase in subscriptions for redeemable participating shares received in advance | (469,614) | 498,196 |
| Decrease/(increase) in redemptions for redeemable participating shares paid in advance | 4,051 | (1,701) |
| Decrease/(increase) in prepaid subscriptions into financial assets | 25,087 | (25,087) |
| Issue of redeemable participating shares | 2,393,826 | 1,183,814 |
| Redemptions of redeemable participating shares | (1,346,865) | (898,642) |
| (Decrease)/increase in redemptions for redeemable participating shares payable | (188) | 188 |
| | | |
| **Net cash from financing activities** | 606,297 | 756,768 |
| | | |
| **Net (decrease)/increase in cash and cash equivalents** | (518,900) | 584,268 |
| Cash and cash equivalents at beginning of the year | 622,866 | 38,598 |
| | | |
| **Cash and cash equivalents at end of the year** | 103,966 | 622,866 |

*The accompanying notes are an integral part of these financial statements.*

*Fairfield Sentry Limited,*
*Road Town, Tortola. British Virgin Islands*                                                          10

**3.6    Notes to financials statements as at December 31, 2007 and 2006**
*(All amounts in USD thousands, except per share amounts and unless otherwise stated)*

*3.6.1        General*

Fairfield Sentry Limited (the "Company") is an open-ended investment fund domiciled and incorporated in the British Virgin Islands on October 30, 1990 under the provisions of The Mutual Funds Law of the British Virgin Islands. The Company commenced operations on December 1, 1990. The address of its registered office is P.O. Box 3140, Romasco Place, Wickhams Cay, Road Town, Tortola, British Virgin Islands.

The investment manager of the Company is Fairfield Greenwich (Bermuda) Ltd. (the "Investment Manager"), a corporation organized under the laws of Bermuda. On March 27, 2006 the investment manager filed to become a registered investment advisor with the Securities and Exchange Commission. The registration became effective April 20, 2006.

The Investment Manager utilizes an option trading strategy, known as a "split strike conversion". In addition, the Investment Manager has allocated relatively small portions of the Company's assets to other strategies typically sub-advised by experienced personnel starting new businesses (the "Non-SCC Investments"). Allocations to Non-SCC Investments may never exceed, in the aggregate, 5% of the Company's net asset value at the time of the investment. It is anticipated that the other allocations will be made to new investment vehicles, with no single allocation exceeding USD 50,000,000 at the time of the investment. Non-split strike conversion investments may also include strategic allocations to experienced managers in established funds.

The administrator of the Company is Citco Fund Services (Europe) B.V.

The Company has no employees.

The Company's financial statements were authorised for issue on April 7, 2008 by the Board of Directors.

*3.6.2        Accounting policies*

The principal accounting policies applied in the preparation of these financial statements are set out below. These policies have been consistently applied to all the years presented, unless otherwise stated.

*Basis of preparation*

The Company's financial statements have been prepared in accordance with International Financial Reporting Standards (IFRS).

The financial statements are prepared under the historical cost convention as modified by the revaluation of financial assets and financial liabilities (including derivative financial instruments) at fair value through profit or loss.

### 3.6   Notes to financials statements as at December 31, 2007 and 2006
*(All figures in USD thousands, except per share amounts and unless otherwise stated)*

The preparation of financial statements in conformity with IFRS requires the use of accounting estimates. It also requires management to exercise its judgment in the process of applying the Company's accounting policies. Because of the inherent uncertainty of valuation for all fair value investments and interests, the estimate of fair value may differ from the values that would have been used had a ready market existed, and the differences could be material.

All references to net assets throughout this document refer to net assets attributable to holders of redeemable participating shares unless otherwise stated.

The balance sheet presents assets and liabilities in decreasing order of liquidity and does not distinguish between current and non-current items. All the Company's assets and liabilities are held for the purpose of being traded or are expected to be realized within one year.

IFRS 7, Financial Instruments: Disclosures, and the complementary Amendment to IAS 1, Presentation of Financial Statements - Capital Disclosures, came in to effect in 2007. IFRS 7 introduces new disclosures relating to financial instruments. This standard does not have any impact on the classification and valuation of the Company's financial instruments. In accordance with the requirements of the Amendment to IAS 1, additional disclosures have been provided on the Company's objectives and policies for its capital, which is represented by the net assets attributable to the holders of redeemable shares. There is no impact on the classification of the Company's capital.

*Foreign currency translation*

*(a) Functional and presentation currency*
Items included in the Company's financial statements are measured using the currency of the primary economic environment in which it operates (the "functional currency"). This is the USD, which reflects the Company's primary activity of investing in USD securities and derivatives. Redeemable participating shares in the Company are denominated in USD. The financial statements are presented in USD which is the Company's functional and presentation currency.

*(b) Transactions and balances*
Foreign currency transactions are translated into the functional currency using the exchange rates prevailing at the dates of the transactions. Foreign exchange gains and losses resulting from the settlement of such transactions and from the translation at year-end exchange rates of monetary assets and liabilities denominated in foreign currencies are recognised in the income statement. Translation differences on non-monetary financial assets and liabilities such as equities at fair value through profit or loss are recognized in the income statement within the fair value net gain or loss.

*Cash and cash equivalents*

For the purpose of the cash flow statement, cash and cash equivalents include cash on hand, deposits held with banks, other short-term highly liquid investments with original maturities of three months or less, and bank overdrafts.

*Due from/to brokers*

Amounts due from/to brokers represent payables for securities purchased and receivables for securities sold that have been contracted for but not yet delivered by the end of the year.

*Fairfield Sentry Limited,*
*Road Town, Tortola. British Virgin Islands*                                                    12

### 3.6    Notes to financials statements as at December 31, 2007 and 2006
*(All figures in USD thousands, except per share amounts and unless otherwise stated)*

*Financial assets at fair value through profit or loss*

Management designates the Company's investments in debt and equity securities, and related derivatives as financial assets at fair value through profit or loss.

A financial asset or financial liability at fair value through profit or loss is a financial asset or financial liability that meets either of the following conditions:

(a)    It is classified as held for trading. A financial asset or liability is classified as held for trading if it is:
(i)    acquired or incurred principally for the purpose of selling or repurchasing it in the near term;
(ii)    part of a portfolio of identified financial instruments that are managed together and for which there is evidence of a recent actual pattern of short-term profit taking or
(iii)    a derivative

(b)    Upon recognition it is designated by the entity as at fair value through profit or loss.

All other financial assets are classified as loans and receivables and valued at amortized cost. Other financial liabilities that are not at fair value through profit or loss or redeemable participating shares are classified as other liabilities and are valued at amortized cost using the effective interest rate method.  The effective interest rate method is a method of calculating the amortized cost of a financial asset or financial liability and of allocating the interest income or interest expense over the relevant period. The effective interest rate is the rate that exactly discounts estimated future cash payments or receipts throughout the expected life of the financial instrument, or a shorter period where appropriate, to the net carrying amount of the financial asset or financial liability. When calculating the effective interest rate, the Company estimates cash flows considering all contractual terms of the financial instrument (for example, prepayment options) but does not consider future credit losses. The calculation includes all fees and points paid or received between parties to the contract that are an integral part of the effective interest rate, transaction costs and all other premiums or discounts. Once a financial asset or a group of similar financial assets has been written down as a result of an impairment loss, interest income is recognized using the rate of interest used to discount the future cash flows for the purpose of measuring the impairment loss.  Interest income is presented under net gains and losses on financial assets and liabilities at fair value through profit and loss.

The Company does not designate any derivatives as hedges in a hedging relationship.

Regular-way purchases and sales of investments are recognized on trade date, which is the date the Company commits to purchase or sell the investment. Investments are initially recognized at cost. Transaction costs are expensed as incurred.  Investments are derecognized when the rights to receive cash flows from the investments have expired or the Company has transferred substantially all risks and rewards of ownership.

Listed securities are valued at the last reported bid price if owned and asked price if sold short on the last business day of the valuation period.

### 3.6    Notes to financials statements as at December 31, 2007 and 2006
*(All figures in USD thousands, except per share amounts and unless otherwise stated)*

Unlisted securities are valued at their fair values as determined by management in consultation with the Investment Manager in accordance with recognised accounting and financial principles. In this respect, investments in other investment companies are valued at the net asset value per share on the day of valuation as calculated by the related administrators, unless the directors are aware of good reasons why such valuation would not be the most appropriate indicator of fair value.

*Determination of gains or losses on financial assets and liabilities at fair value through profit or loss*

Both realized and unrealized gains and losses on financial assets and liabilities at fair value through profit or loss are taken as income and expenses as incurred.  Realised gains and losses on sales of financial assets and liabilities at fair value through profit or loss are calculated on a first-in-first-out basis. The difference between the cost and the fair value of financial assets and liabilities at fair value through profit or loss is reflected in the income statement as net gains on financial assets and liabilities at fair value through profit or loss.

*Derivative financial instruments*

Derivative financial instruments including option contracts are initially recognized on the balance sheet at fair value on the date on which a derivative contract is entered into and are subsequently re-measured at their fair value.

Fair values are primarily obtained from quoted market prices.  All derivatives are recorded as assets when amounts are receivable by the Company and as liabilities when amounts are payable by the Company. Changes in the fair values of derivatives are included in the income statement.

Initial margin deposits are made upon entering into forward contracts and are generally made in cash. During the period the contract is open, changes in the value of the contracts are recognized as unrealized gains or losses by 'marking-to-market' on a daily basis to reflect the market value of the contract at the end of each day's trading.

Variation margin payments are made or received, depending upon whether unrealized losses or gains are incurred. Unrealized gains are reported as an asset and unrealized losses are reported as a liability in the balance sheet. When the contract is closed, the Company records a realized gain or loss equal to the difference between the proceeds from (or cost of) the closing transaction and the Company's basis in the contract.

An option is a contractual arrangement under which the seller (writer) grants the purchaser (holder) the right, but not the obligation, to either buy (a call option) or sell (a put option) at or by a set date or during a set period, a specific amount of securities or a financial instrument at a predetermined price. The seller receives a premium from the purchaser in consideration for the assumption of future securities price. The Fund is exposed to credit risk on purchased options only to the extent of their carrying amount, which is their fair value.

*Offsetting financial instruments*

Financial assets and liabilities are offset and the net amount is reported on the balance sheet when there is a legally enforceable right to set off the recognized amounts and there is an intention to settle on a net basis, or realize the asset and settle the liability simultaneously.

*Fairfield Sentry Limited,*
*Road Town, Tortola. British Virgin Islands*                                                          14

### 3.6    Notes to financials statements as at December 31, 2007 and 2006
*(All figures in USD thousands, except per share amounts and unless otherwise stated)*

*Redeemable participating shares*

A continuous offering of redeemable participating shares is taking place and participating shares will be issued on the first business day of each month at a price equal to the net asset value per participating share computed on the immediately preceding valuation date (being the last business day of each calendar month and such other days as the directors may determine). The minimum initial investment per subscriber is USD 100,000. Following this initial investment, a shareholder may make additional investments in amounts of not less than USD 50,000.

Redemptions of redeemable participating shares and can be made on the last business day of each month (the "Valuation Date") at a price equal to the net asset value of that month upon 15 calendar days written notice prior to the Valuation Date.

The net asset value per share for any valuation date is determined by dividing the value of the assets of the Company less its liabilities at the close of business on such Valuation Date, by the number of shares outstanding at that date.

The Company issues redeemable shares, which are redeemable at the holder's option and are classified as financial liabilities. Redeemable shares can be put back to the Company at any time for cash equal to a proportionate share of the Company's net asset value. The redeemable share is carried at the redemption amount that is payable at the balance sheet date if the holder exercises the right to put the share back to the Company.

In accordance with the provisions of the Company's regulations, investment positions are valued based on the last traded market price for the purpose of determining the net asset value per share for subscriptions and redemptions. (Refer to note 3.6.11 Reconciliation of IFRS - US GAAP.)

Subscriptions for redeemable participating shares received in advance represent monies received by the Company before the Company's dealing date for redeemable participating shares issued.

Redemptions for redeemable participating shares paid in advance represent monies paid by the Company before the Company's dealing date for redeemable participating shares. (Refer to note 3.6.3 Redemptions Payable.)

*Interest income and expense*

Interest income and expense are recognized in the income statement on an accrual basis.

*Dividend income*

Dividend income is recognized when the right to receive payment is established. Dividend income received by the Company is subject to foreign withholding taxes.

*Expenses*

Expenses are accounted for on an accrual basis.

### 3.6    Notes to financials statements as at December 31, 2007 and 2006
*(All figures in USD thousands, except per share amounts and unless otherwise stated)*

*Taxation*

Under current laws of the British Virgin Islands, there are no income, estate, transfer, sales or other British Virgin Island taxes payable by the Company. Generally, the Company intends to conduct its affairs so as not to be liable to taxation in any other jurisdiction; however, the Company may invest in securities whose income is subject to non-refundable foreign withholding taxes, which have been separately stated in the income statement.

*3.6.3    Redemptions payable*

The Company has received redemption notices as of December 31, 2007. These amounts are included in net assets attributable to holders of redeemable participating shares and are not reflected as redemptions for redeemable participating shares payable. The amount of net assets attributable to holders of redeemable participating shares at December 31, 2007 subject to redemption notices which have been received is 107,460 (2006: 76,790).

*3.6.4    Cash and cash equivalents*

For the purpose of the cash flow statement, cash and cash equivalents include the following items:

|  | 2007 | 2006 |
|---|---|---|
| Cash at banks | 103,928 | 622,822 |
| Cash at brokers | 38 | 44 |
|  | 103,966 | 622,866 |

As at December 31, 2007 and 2006 there is no restricted cash.

*3.6.5    Financial assets at fair value through profit or loss*

As at December 31, 2007, the Company's financial assets at fair value through profit or loss comprised the following positions:

|  | Market Value | % of net assets of the Company % |
|---|---|---|
| **United States** |  |  |
| USA 02/21/2008 Treasury Bills | 581,792 | 8.14 |
| USA 02/28/2008 Treasury Bills | 581,412 | 8.13 |
| USA 03/06/2008 Treasury Bills | 581,062 | 8.13 |
| USA 03/13/2008 Treasury Bills | 580,664 | 8.13 |
| USA 03/20/2008Treasury Bills | 580,208 | 8.12 |
| USA 03/27/2008 Treasury Bills | 579,799 | 8.11 |
| USA 04/03/2008 Treasury Bills | 297 | 0.01 |
| USA 04/10/2008 Treasury Bills | 579,046 | 8.10 |
| USA 04/17/2008 Treasury Bills | 578,771 | 8.10 |
| USA 04/24/2008 Treasury Bills | 578,356 | 8.09 |

*Fairfield Sentry Limited,*
*Road Town, Tortola. British Virgin Islands*                                                    16

### 3.6    Notes to financials statements as at December 31, 2007 and 2006
*(All figures in USD thousands, except per share amounts and unless otherwise stated)*

| | | |
|---|---:|---:|
| USA 05/01/2008 Treasury Bills | 577,860 | 8.09 |
| USA 05/08/2008 Treasury Bills | 577,515 | 8.08 |
| USA 05/15/2008 Treasury Bills | 577,124 | 8.07 |
| **Total United States** | 6,953,906 | 97.30 |
| **Funds** | | |
| Arlington International Fund Ltd. | 9 | 0.00% |
| Boiro FIF Leveraged Note I | 20,673 | 0.29% |
| Boiro FIF Leveraged Note II | 14,860 | 0.21% |
| Chester Global Emerging markets Fund Ltd. | 857 | 0.01% |
| Chester Global Strategy Fund Ltd. | 5,120 | 0.07% |
| Chester Horizons Fund Ltd. | 3,041 | 0.04% |
| Enhanced Fairfield Investment Fund Ltd. | 17,642 | 0.25% |
| Enhanced Guardian II Fund Ltd. | 5,437 | 0.08% |
| Fairfield Aerium International, SCA | 1,597 | 0.02% |
| Fairfield Argenis Healthcare Fund Ltd. | 4,345 | 0.06% |
| Fairfield Del Mar Fund Ltd. | 1,071 | 0.02% |
| Fairfield Fortitude Australian Absolute Return Fund Ltd. | 6 | 0.00% |
| Fairfield Ichan Fund Ltd. | 39,523 | 0.55% |
| Fairfield ICAP Absolute Return Fund Ltd. | 300 | 0.00% |
| Fairfield Investment Fund Ltd. | 1,010 | 0.01% |
| Fairfield Lion Investment Fund (Asia) Ltd. | 78 | 0.00% |
| Fairfield Lion Japan Equity Fund Ltd. | 4,903 | 0.07% |
| Fairfield Manhasset Offshore Fund Ltd. | 30,694 | 0.43% |
| Fairfield Parabolic Partners Fund Ltd. | 7,753 | 0.11% |
| Fairfield Paradigm Fund Ltd. | 18 | 0.00% |
| Fairfield Raven Credit Opportunities Fund Ltd. | 37 | 0.00% |
| Fairfield Redstone Fund Ltd. | 138 | 0.00% |
| Fairfield Treeline Fund, Ltd | 26,099 | 0.37% |
| Fairfield Wilshire Portable Alpha Fund | 29,137 | 0.41% |
| Irongate Global Strategy Fund Ltd. | 4,893 | 0.07% |
| NGA Fairfield Ltd. | 18 | 0.00% |
| **Total Funds** | 219,259 | 3.07% |
| **Total financial assets at fair value through profit or loss** | 7,173,165 | 100.37 |

As at December 31, 2006, the Company's financial assets at fair value through profit or loss comprised the following positions:

### 3.6   Notes to financials statements as at December 31, 2007 and 2006
*(All figures in USD thousands, except per share amounts and unless otherwise stated)*

| | Market Value | % of net assets of the Company |
|---|---|---|
| **United States** | | |
| USA 02/01/2007 Treasury Bills | 360,819 | 6.41 |
| USA 02/08/2007 Treasury Bills | 360,475 | 6.41 |
| USA 02/15/2007 Treasury Bills | 360,102 | 6.40 |
| USA 02/22/2007 Treasury Bills | 359,758 | 6.40 |
| USA 03/01/2007 Treasury Bills | 359,402 | 6.39 |
| USA 03/08/2007 Treasury Bills | 359,055 | 6.38 |
| USA 03/15/2007 Treasury Bills | 358,721 | 6.38 |
| USA 03/22/2007 Treasury Bills | 358,355 | 6.37 |
| USA 03/29/2007 Treasury Bills | 358,152 | 6.37 |
| USA 04/05/2007 Treasury Bills | 357,796 | 6.36 |
| USA 04/12/2007 Treasury Bills | 357,315 | 6.35 |
| USA 04/19/2007 Treasury Bills | 356,970 | 6.35 |
| USA 04/26/2007 Treasury Bills | 356,615 | 6.34 |
| USA 05/03/2007 Treasury Bills | 356,271 | 6.33 |
| USA 05/10/2007 Treasury Bills | 355,938 | 6.33 |
| **Total United States** | 5,375,744 | 95.57 |
| **Funds** | | |
| Arlington International Fund Ltd. | 287 | 0.01 |
| Chester Global Strategy Fund Ltd. | 6,380 | 0.11 |
| Chester Horizons Fund Ltd. | 494 | 0.01 |
| Enhanced Fairfield Investment Fund Ltd. | 15,708 | 0.28 |
| Enhanced Guardian II Fund Ltd. | 5,050 | 0.09 |
| Fairfield Aerium International, SCA | 1,443 | 0.03 |
| Fairfield Argenis Healthcare Fund Ltd. | 55,532 | 0.99 |
| Fairfield Del Mar Fund Ltd. | 82 | 0.00 |
| Fairfield Fortitude Australian Absolute Return Fund Ltd. | 12 | 0.00 |
| Fairfield ICAP Absolute Return Fund Ltd. | 37 | 0.00 |
| Fairfield Investment Fund Ltd. | 959 | 0.02 |
| Fairfield Lion Investment Fund (Asia) Ltd. | 66 | 0.00 |
| Fairfield Manhasset Offshore Fund Ltd. | 26,345 | 0.47 |
| Fairfield Parabolic Partners Fund Ltd. | 8,191 | 0.15 |
| Fairfield Paradigm Fund Ltd. | 31 | 0.00 |
| Fairfield Raven Credit Opportunities Fund Ltd. | 38 | 0.00 |
| Fairfield Redstone Fund Ltd. | 139 | 0.00 |
| Farallon Capital Offshore Investors, Inc. | 52,340 | 0.93 |
| FIF Advanced Ltd. | 1,909 | 0.03 |
| Irongate Global Strategy Fund Ltd. | 4,755 | 0.08 |
| NGA Fairfield Ltd. | 25 | 0.00 |
| **Total Funds** | 179,823 | 3.20 |
| **Total financial assets at fair value through profit or loss** | $5,555,567 | 98.77 |

*Fairfield Sentry Limited,*
*Road Town, Tortola. British Virgin Islands*                                    18

### 3.6    Notes to financials statements as at December 31, 2007 and 2006
*(All figures in USD thousands, except per share amounts and unless otherwise stated)*

The Company's net gains on financial assets and liabilities at fair value through profit or loss are comprised of the following:

|  | 2007 | 2006 |
|---|---|---|
| Realized | 627,045 | 543,644 |
| Unrealized | (2,293) | 6,294 |
| Total gains | 624,752 | 549,938 |

### 3.6.6    Risks associated with financial instruments

The Company can maintain positions in a variety of derivative and non-derivative financial instruments as dictated by its investment management strategy. The Company's investment portfolio comprises quoted and non-quoted investments, options investments and in other investment funds that it intends to hold for an indefinite period of time.

The Company seeks to obtain capital appreciation of its assets principally through the utilization of a non-traditional options trading strategy described as "split strike conversion," to which the Company allocates the predominant portion of its assets. Set forth below is a description of the SSC Strategy ("SSC Investments"). The establishment of a typical position entails (i) the purchase of a group or basket of equity securities that are intended to highly correlate to the S&P 100 Index, (ii) the purchase of out-of-the-money S&P 100 Index put options with a notional value that approximately equals the market value of the basket of equity securities, and (iii) the sale of out-of-the-money S&P 100 Index call options with a notional value that approximately equals the market value of the basket of equity securities. An index call option is out-of-the-money when its strike price is greater than the current price of the index; an index put option is out-of-the-money when the strike price is lower than the current price of the index.

The Company's investing activities expose it to various types of risk that are associated with the financial instruments and markets in which it invests. The most important types of financial risk to which the Company is exposed are market risk, credit risk and liquidity risk.

Asset allocation is determined by the Company's Investment Manager who manages the distribution of assets to achieve its investment objectives. Divergence from target asset allocations and the composition of the portfolio is closely monitored by the Investment Manager to manage risk exposure.

The nature and extent of the financial instruments outstanding at the balance sheet date and the risk management policies employed by the Company are discussed below.

*Market risk*

Market risk embodies the potential for both loss and gains and includes currency risks, interest rate risk and price risk.

The Company's strategy on the management of investment risk is driven by the Company's investment objective as disclosed in note 3.6.1. The Company's market risk is managed on a daily basis by the Investment Manager in accordance with policies and procedures in place. The Company has defined risk/reward parameters which can be ascertained at the time a position is constructed. The split-strike conversion strategy is executed under a set of strict operating

### 3.6    Notes to financials statements as at December 31, 2007 and 2006
*(All figures in USD thousands, except per share amounts and unless otherwise stated)*

guidelines which serves to limit market risk.

Market risk is measured and monitored both qualitatively and quantitatively using a number of in-house and third party risk tools. The Investment Manager monitors the portfolio and performs checks to monitor the investment compliance to operating guidelines.

Details of the nature of the Company's investment portfolio at the balance sheet date are disclosed in note 3.6.5.

*Currency risk*

The Company may invest in financial instruments and enter into transactions denominated in currencies other than its functional currency. Consequently, the Company is exposed to risks that the exchange rate of the USD relative to other currencies may change in a manner that has an adverse effect on the value of that portion of the Company's assets or liabilities denominated in currencies other than the USD.

At December 31, 2007, the Company did not have any exposure in currencies other than its functional currency.

*Interest rate risk*

The Company's interest rate risk is managed on a daily basis by the Investment Manager in accordance with policies and procedures in place.

As the majority of the Company's investments at December 31, 2007 are US treasury bills with short durations (i.e. less than one year), sensitivity to interest changes and consequent impact on net assets and profit is considered to be not material. Interest rate risk on cash balances is also considered not material.

*Other price risk*

Other price risk comprises the risk that the value of investments will fluctuate as a result of changes in market prices (other than those arising from interest rate risk or currency risk), whether caused by factors specific to an individual investment, its issuer or all factors affecting all financial instruments traded in the market. As the majority of the Company's financial instruments are carried at fair value with fair value changes recognized directly in the income statement, all changes in market conditions will directly affect the Company's net investment income.

Price risk is mitigated by the Company's Investment Manager by constructing a diversified portfolio of instruments traded on various markets.

A typical position in its entirety could be characterized as a bull spread which, presuming the stock basket highly correlates to the S&P 100 Index, is intended to work as follows: (i) it sets a floor value below which further declines in the value of the stock basket is offset by gains in the put options, (ii) it sets a ceiling value beyond which further gains in the stock basket are offset by increasing liability of the short calls, and (iii) defines a range of potential market gain or loss, depending on how tightly the options collar is struck.

*Credit risk*

Credit risk is the risk that counterparty to a financial instrument will fail to discharge an obligation or commitment that it has entered into with the Company.

The carrying amounts of financial assets best represent the maximum credit risk exposure at the balance sheet date. This relates also to financial assets carried at amortized cost, as they have a short-term to maturity.

*Fairfield Sentry Limited,*
*Road Town, Tortola. British Virgin Islands*                                          20

### 3.6    Notes to financials statements as at December 31, 2007 and 2006
*(All figures in USD thousands, except per share amounts and unless otherwise stated)*

As at December 31, 2007, the following financials assets were exposed to credit risk:

|                                                      | 2007      | 2006      |
|------------------------------------------------------|-----------|-----------|
| Cash and cash equivalents                            | 103,966   | 622,866   |
| Financial assets at fair value through profit or loss| 7,173,165 | 5,555,567 |
| Interest, dividends and other receivables            | 255       | 28,482    |
|                                                      | 7,277,386 | 6,206,915 |

Amounts in the above table are based on the carrying value of all accounts.

As a result of the Investment Manager's selection of Bernard L. Madoff Investment Securities, LLC ("BLM") as execution agent of the split strike conversion strategy, substantially all of the Company's assets will be held in segregated accounts at BLM, a U.S. registered broker-dealer and qualified custodian. Accordingly, BLM will be a sub-custodian of the Company. The services of BLM and its personnel are essential to the continued operation of the Company, and its profitability, if any.

The underlying assets of the Non-SSC Investments are held pursuant to custodial arrangements with other qualified entities.

Substantially all of the cash held by the Company is held by Citco Bank Nederland NV. Bankruptcy or insolvency by the bank may cause the Company's rights with respect to the cash held by the bank to be delayed or limited. The Company monitors its risk by monitoring the credit quality and financial positions of the bank.

*Liquidity risk*

The Company's constitution provides for the monthly creation and cancellation of redeemable participating shares and it is therefore exposed to the liquidity risk of meeting shareholder redemptions of redeemable participating shares at any time.

The Company's listed securities are considered to be readily realizable as they are all listed on major stock exchanges.

The Company's liquidity risk is managed on a periodic basis by the Investment Manager. The Company's redemption policy only allows for redemptions on the last day of each month and shareholders must provide 15 calendar days notice.

As of December 31, 2007, the Company's financial liabilities are all due within one month.

*Off-balance sheet risk*

An off-balance sheet risk exists when the maximum potential loss on a particular investment is greater than the value of such investment as reflected in the Company's balance sheet.

Off-balance sheet credit risk exists, among other situations, when the collateral received by the Company is insufficient to cover losses which might result from a counterparty's failure to fulfill its obligation under contracts with the Company.

As at December 31, 2007 and 2006, the Company had no significant off-balance sheet risks.

### 3.6    Notes to financials statements as at December 31, 2007 and 2006
*(All figures in USD thousands, except per share amounts and unless otherwise stated)*

*3.6.7    Fees payable and accrued expenses*

|                                            | 2007   | 2006   |
|--------------------------------------------|--------|--------|
| Management fees                            | 19,944 | 15,709 |
| Performance fees                           | 32,422 | 27,847 |
| Administration fees                        | 365    | 286    |
| Legal and professional fees                | 141    | 95     |
| Custody fees                               | 60     | 46     |
| Deferred fees                              | 26,254 | 21,320 |
| Other accounts payable and accrued expenses | 18    | 23     |
|                                            | 79,204 | 65,326 |

*3.6.8    Redeemable participating shares*

The authorized redeemable participating shares of the Company are USD 100,000 divided into 10,000,000 ordinary shares of USD 0.01 each. As at December 31, 2007 there were 5,533,438.46 (2006: 4,674,576.45) redeemable participating shares issued and fully paid.

Each redeemable participating share entitles the holder to one vote and to receive such dividends as declared by the directors and to participate upon liquidation on a proportional basis. The dividend policy is determined by the directors and the current policy is directed towards capital appreciation.

The Company will not accept a subscription tendered for shares at a time when the number of its outstanding shares is 10,000,000.

*3.6.9    Related parties*

Parties are considered to be related if one party has the ability to control the other party or exercise significant influence over the other party in making financial or operational decisions.

*Management fees*

The Investment Manager receives a monthly management fee in an amount equal to one-twelfth of one percent 0.0833% (2006: 0.0833%) of the net asset value before performance fees, as calculated at the opening of the first day of each calendar month, which will include capital activity as of the first day of the month. This fee is payable monthly in arrears. A portion of this fee may be paid to an affiliate of Fairfield Greenwich Limited ("FGL") and the Investment Manager in consideration of the affiliate providing certain administrative services and back office support to the Company.

*Performance fees*

The Investment Manager receives a performance fee of 20% of the new appreciation in share value each quarter. The performance fees are calculated and payable quarterly in arrears. Shares which are either purchased or redeemed during a calendar quarter shall be subject to the payment of a performance fee only for the portion of the calendar quarter during which such shares were outstanding. The performance fee will only be paid on "new appreciation" in the Company's Net Asset Value allocable to the shares.

*Fairfield Sentry Limited,*
*Road Town, Tortola. British Virgin Islands*                                          22

### 3.6    Notes to financials statements as at December 31, 2007 and 2006
*(All figures in USD thousands, except per share amounts and unless otherwise stated)*

*Deferred Fee*

The Investment Manager and FGL have the option to defer the payment of all or a portion of the performance fees and/or management fees. For 2007, the Investment Manager has deferred, for periods ranging from two to ten years, payment of the performance fees/management fees for an amount of USD 26,253,671 (2006: USD 21,319,809). Deferred fees earn market appreciation through investments in the Company, or in other permissible investments, as defined in the deferred fee agreement dated July 1, 2003. The remaining part of the performance fees/management fees as stated in the income statement are paid to the Investment Manager.

*Directors' fees*

The directors not affiliated with the Investment Manager, of which there are at the present time two, will each be paid a fee of USD 25,000 (2006: USD 25,000) per annum by the Company together with out-of-pocket expenses made in attending meetings of the board of directors or of shareholders.

Mr. Noel, a director of the Company, is also principal officer and director of the parent company of the Company's investment manager. Mr Noel has waived his fees in the Company as at December 31, 2007 and 2006.

The directors held no shares in the Company as at December 31, 2007 and 2006.

*Administration fees*

The Company pays to the administrator a monthly fee based on the net asset value of the Company as of the last business day of the month. The administrator will also be reimbursed for all disbursements and reasonable expenses incurred in the performance of its duties as detailed in the administrative services agreement.

*Custody fee*

The Company pays custody fees quarterly in arrears in accordance with the custody agreement. The custody fee will be accrued on a monthly basis. The custodian will charge the Company a transaction fee per transfer, subscription, purchase, sale or redemption of hedge fund assets.

Investments made during the year in trading securities in related party investment Funds are as follows:

|                          | 2007    | 2006    |
|--------------------------|---------|---------|
| Trading securities bought | 163,885 | 141,530 |
| Trading securities sold   | 73,064  | 127,263 |

As at December 31, 2007 investment funds managed by related parties held 958,832.17 (2006: 707,423.41) shares in the Company.

*Fairfield Sentry Limited,*
*Road Town, Tortola. British Virgin Islands*                                            23

### 3.6    Notes to financials statements as at December 31, 2007 and 2006
*(All figures in USD thousands, except per share amounts and unless otherwise stated)*

*3.6.10    Reconciliation IFRS-US GAAP*

As the Company is managed by an SEC registered investment advisor, it is required that the Company issues its financial statements in accordance with United States generally accepted accounting principles (US GAAP) or otherwise presents a reconciliation to US GAAP in the financial statements.

The Company has elected to prepare the financial statements in accordance with IFRS. Accordingly, a reconciliation of the net assets attributable to holders of redeemable participating shares under US GAAP follows:

|  | 2007 | | | 2006 | | |
|  | Totals (000's) | USD Number of shares | NAV per share | Totals (000's) | USD Number of shares | NAV per share |
|---|---|---|---|---|---|---|
| Net assets attributable to holders of redeemable participating shares based on IFRS | 7,147,059 | 5,533,438.46 | 1,291.61 | 5,624,715 | 4,674,576.45 | 1,203.26 |
| Adjustment for: Valuation of investments against last price | - | - | - | - | - | - |
| Net assets attributable to holders of redeemable participating shares based on US GAAP | 7,147,059 | 5,533,438.46 | 1,291.61 | 5,624,715 | 4,674,576.45 | 1,203.26 |

*Valuation of investments against closing price*

IFRS requires that financial assets are priced at current bid prices, while financial liabilities are priced at current asking prices. US GAAP requires both financial assets as well as financial liabilities to be priced at the last quoted sales prices. As at December 31, 2007 and 2006 there is no difference between net assets attributable to holders of redeemable participating shares based on IFRS and US GAAP.

*3.6.11  Financial Highlights*

Pursuant to the AICPA Audit and Accounting Guide, Audits of Investment Companies, non-public investment companies are required to disclose certain financial highlights related to investment performance and operations. These financial highlights include the total return and net investment income and expense ratios and per share operating performance for the years ended December 31, 2007 and 2006 for the Company based on US GAAP.

### 3.6    Notes to financials statements as at December 31, 2007 and 2006
*(All figures in USD thousands, except per share amounts and unless otherwise stated)*

| Based on US GAAP | 2007 | 2006 |
|---|---|---|
| Ratio of net investment loss to average net assets | (2.22%) | (1.98%) |
| Ratio of operating expenses and performance fees to average net assets: | | |
| Operating expenses | 1.13% | 1.11% |
| Performance fees | 1.72% | 2.14% |
| Total operating expenses and performance fees | 2.85% | 3.25% |

The computation of the above-mentioned ratios based on the amount of operating expenses and performance fees assessed to an individual investor's equity may vary from these ratios based on the timing of capital transactions.

| Based on US GAAP | 2007 | 2006 |
|---|---|---|
| Total return: | | |
| Total return before performance fees | 9.14% | 11.72% |
| Performance fees | (1.80%) | (2.34%) |
| Total return after performance fees | 7.34% | 9.38% |

Total returns stated above are the total returns for the Company as a whole before and after performance fees based on the total capital subscriptions and redemptions and the change in net asset value during the years for the Company.

| Based on US GAAP | 2007 | 2006 |
|---|---|---|
| **Per share operating performance** | | |
| Net asset value, beginning of period | 1,203.26 | 1,100.08 |
| Net investment gain or (loss) | (27.72) | (22.93) |
| Net realised and unrealised gains/(losses) on transactions | 116.07 | 126.11 |
| Total from investment operations | 88.35 | 103.18 |
| Net asset value, end of period | 1,291.61 | 1,203.26 |

The schedule above provides a breakdown of the increase in net asset value per share into the net investment result and net realised and unrealised gain/losses on transactions.

**3.6     Notes to financials statements as at December 31, 2007 and 2006**
*(All figures in USD thousands, except per share amounts and unless otherwise stated)*

*3.6.12     Post balance sheet events*

There were no material post-balance sheet events which have a bearing on the understanding of the financial statements.

# Exhibit H

ANWAR, *et al.*,

       Plaintiffs,

   -against-

FAIRFIELD GREENWICH LIMITED, *et al.*,

       Defendants.

This Document Relates To: All Actions

Master File No. 09-cv-118 (VM)

**CONSOLIDATED AMENDED COMPLAINT**

# Exhibit 21

Fairfield Sentry Limited

Directors' report and condensed financial
information for the period January 1, 2008
to June 30, 2008
Road Town, Tortola
British Virgin Islands

Case 1:09-cv-00118-VM    Document 116-22    Filed 04/24/09    Page 3 of 29

Contents

| | | |
|---|---|---|
| 1 | Directors and other information | 1 |
| 1.1 | Directors and other information | 2 |
| 2 | Directors' report | 3 |
| 2.1 | Directors' report | 4 |
| 3 | Financial statements | 5 |
| 3.1 | Condensed balance sheet as at June 30, 2008 and December 31, 2007 | 6 |
| 3.2 | Condensed income statement for the period January 1, 2008 to June 30, 2008 and January 1, 2007 to June 30, 2007 | 7 |
| 3.3 | Condensed statement of changes in net assets attributable to holders of redeemable participating shares for the period January 1, 2008 to June 30, 2008 and January 1, 2007 to June 30, 2007 | 8 |
| 3.4 | Condensed cash flow statement for the period January 1, 2008 to June 30, 2008 and January 1, 2007 to June 30, 2007 | 9 |
| 3.5 | Selected notes to condensed financial information for the six months ended June 30, 2008 | 10 |

1       Directors and other information

## 1.1    Directors and other information

*Board of directors*
Mr Walter M. Noel, Jr.
Mr Jan R. Naess *(non-executive director)*
Mr Peter P. Schmid *(non-executive director)*

*Investment manager*
Fairfield Greenwich (Bermuda) Ltd.
12 Church Street
Suite 606
Hamilton, Bermuda HM 11

*Registered office*
Fairfield Sentry Limited
c/o Codan Trust Company (B.V.I.) Ltd.
P.O. Box 3140
Romasco Plaza, Wickhams Cay
Road Town, Tortola
British Virgin Islands

*Auditors*
PricewaterhouseCoopers LLP
77 King Street, Royal Trust Tower
Toronto, Ontario
M5K 1G8
Canada

*Administrator, registrar and transfer agent*
Citco Fund Services (Europa) B.V.
Telestone 8 - Teleport
Naritaweg 165
1043 BW Amsterdam
The Netherlands

*Legal advisor*
DLA Piper US LLP
1251 Avenue of the Americas
New York, New York 10020-1104
United States of America

*Bank*
Citco Bank Nederland N.V., Dublin Branch
Customs House Plaza Block 6
International Financial Services Centre
P.O. Box 6639 Dublin - 1
Ireland

*Custodian*
Citco Global Custody N.V.
6 Customs House Plaza Harbourmaster Plaza
Dublin 1
Ireland

*B.V.I. Counsel*
Conyers, Dill & Pearman
P.O. Box 3140
Romasco Plaza, Wickhams Cay
Road Town, Tortola
British Virgin Islands

2       Directors' report

## 2.1    Directors' report

Results for the period January 1, 2008 to June 30, 2008 were satisfactory. Fairfield Sentry Limited ("Sentry") returned 2.58%, net of fees during the period, compared with a return of 4.00% during the same period in 2007. Expenses, including performance and management fees, were 30.77% of gross income.

The trading strategy of the Company requires a favorable environment for its implementation. The strategy performs best in gradually trending markets with an upward bias and with moderate volatility and good liquidity. A market environment in which large cap US equities displays a sustained one to two percent move with no pullback is considered quite favorable. The worst market environment for the strategy is a stagnant to downward trending market with little volatility and no volume.

Since October 2002 Sentry has been allocating up to 5% of its assets to new investment vehicles managed by experienced management teams establishing themselves in new investment businesses. These investments may also include strategic allocations to experienced managers in established funds. At June 30, 2008, these investments represented approximately 2.43% of Sentry's portfolio.

3      Financial Information

3.1    Condensed balance sheet as at June 30, 2008 and December 31,
2007
*(All amounts in USD thousands, except per share amounts and unless otherwise
stated)*

| | Notes | 2008 | 2007 |
|---|---|---|---|
| **Assets** | | | |
| Cash and cash equivalents | 3.5.4 | 164,177 | 103,966 |
| Financial assets at fair value through profit or loss | 3.5.5 | 7,359,359 | 7,173,165 |
| Dividends receivable | | - | 255 |
| Other receivables | | 13 | - |
| Total assets | | 7,523,549 | 7,277,386 |
| **Liabilities** | | | |
| Subscriptions for redeemable participating shares received in advance | | 147,372 | 51,127 |
| Fees payable and accrued expenses | 3.5.7 | 85,334 | 79,204 |
| Total liabilities (excluding net assets attributable to holders of redeemable participating shares) | | 232,706 | 130,327 |
| Net assets attributable to holders of redeemable participating shares | 3.5.8 | 7,290,843 | 7,147,059 |
| Total liabilities | | 7,523,549 | 7,277,386 |
| Net asset value per share based on net asset value of 7,290,843 (December 31, 2007: 7,147,059) and 5,502,816.49 (December 31, 2007: 5,533,438.46) shares outstanding. | 3.5.8 | 1,324.93 | 1,291.61 |

*The accompanying notes are an integral part of these financial statements.*

*Fairfield Sentry Limited,
Road Town, Tortola, British Virgin Islands*

6

3.2 Condensed income statement for the period January 1, 2008 to
June 30, 2008 and January 1, 2007 to June 30, 2007
*(All amounts in USD thousands, except per share amounts and unless otherwise
stated)*

| | Notes | 2008 | 2007 |
|---|---|---|---|
| Investment income | | | |
| Interest income | | 1,108 | 3,012 |
| Dividend income | | 27,603 | 38,384 |
| Other income | | 387 | 259 |
| Net gains on financial assets and liabilities at fair value through profit or loss | 3.3.3 | 249,014 | 323,015 |
| Total investment income | | 278,112 | 364,670 |
| Expenses | | | |
| Management fees | 3.3.9 | 36,134 | 33,393 |
| Performance fees | 3.3.9 | 46,070 | 61,063 |
| Administration fees | 3.3.9 | 2,013 | 1,982 |
| Legal and professional fees | | 108 | 127 |
| Bank charges and commissions | | 125 | 153 |
| Directors' fees | 3.3.9 | 25 | 78 |
| Other operating expenses | | 912 | 1,513 |
| Total operating expenses | | 85,387 | 98,304 |
| Profit before taxation | | 192,524 | 266,366 |
| Withholding tax | | (8,245) | (11,360) |
| Change in net assets attributable to holders of redeemable participating shares resulting from operations | | 184,232 | 255,006 |

*The accompanying notes are an integral part of these financial statements*

*Fairfield Sentry Limited,*
*Road Town, Tortola, British Virgin Islands*                                    7

3.3    Condensed statement of changes in net assets attributable to holders of redeemable participating shares for the period January 1, 2008 to June 30, 2008 and January 1, 2007 to June 30, 2007
*(All amounts in USD thousands, except per share amounts and unless otherwise stated)*

|  | | Number of shares | USD |
|---|---|---|---|
| Balances at January 1, 2007 | | 4,674,576.45 | 6,624,715 |
| Issue of redeemable participating shares | | 1,196,801.16 | 1,455,211 |
| Redemption of redeemable participating shares | | (418,315.13) | (510,899) |
| Change in net assets attributable to holders of redeemable participating shares resulting from operations | | .. | 255,006 |
| Balances at June 30, 2007 | 3.5.8 | 5,453,062.48 | 6,824,033 |
| Balances at January 1, 2008 | | 5,633,638.46 | 7,147,959 |
| Issue of redeemable participating shares | | 583,705.53 | 762,674 |
| Redemption of redeemable participating shares | | (644,529.50) | (802,974) |
| Change in net assets attributable to holders of redeemable participating shares resulting from operations | | .. | 184,282 |
| Balances at June 30, 2008 | 3.5.8 | 5,592,814.49 | 7,290,845 |

*The accompanying notes are an integral part of these financial statements.*

*Fairfield Sentry Limited.*
*Road Town, Tortola. British Virgin Islands*                                   8

### 3.4 Condensed cash flow statement for the period January 1, 2008 to June 30, 2008 and January 1, 2007 to June 30, 2007

*(All amounts in USD thousands, except per share amounts and unless otherwise stated)*

|  | 2008 | 2007 |
|---|---|---|
| Increase in net assets attributable to holders of redeemable participating shares from operations | 184,383 | 258,866 |
| *Adjustments for:* | | |
| Interest income | (1,108) | (3,012) |
| Dividend income | (27,603) | (58,384) |
| Withholding tax | 8,243 | 11,380 |
| | | |
| Operating profit before working capital changes | 163,814 | 226,970 |
| | | |
| Net increase in financial assets at fair value through profit or loss | (186,364) | (1,269,451) |
| Net decrease in prepaid subscriptions into financial assets | – | 25,997 |
| Net increase in other receivables | (13) | (100) |
| Net increase in fees payable and accrued expenses | 6,150 | 14,581 |
| | | |
| Cash used in operations | (16,263) | (1,503,913) |
| | | |
| Withholding tax | (8,243) | (11,360) |
| Interest received | 1,108 | 3,012 |
| Dividend received | 27,858 | 58,365 |
| | | |
| Net cash from/(used in) operating activities | 4,460 | (972,896) |
| | | |
| Cash flows from financing activities | | |
| Increase/(decrease) in subscriptions for redeemable participating shares received in advance | 96,249 | (252,073) |
| Decrease in redemptions for redeemable participating shares paid in advance | – | 535 |
| Issue of redeemable participating shares | 762,476 | 1,455,211 |
| Redemptions of redeemable participating shares | (802,974) | (510,900) |
| Increase in redemptions for redeemable participating shares payable | – | 455 |
| | | |
| Net cash from financing activities | 55,751 | 693,229 |
| | | |
| Net increase/(decrease) in cash and cash equivalents | 60,211 | (279,667) |
| Cash and cash equivalents at beginning of the period | 105,866 | 622,866 |
| | | |
| Cash and cash equivalents at end of the period | 164,177 | 343,199 |

*The accompanying notes are an integral part of these financial statements*

3.5    Selected notes to condensed financial information for the six
months ended June 30, 2008
*(All amounts in USD thousands, except per share amounts and unless otherwise
stated)*

*3.5.1    General*

Fairfield Sentry Limited (the "Company") is an open-ended investment fund domiciled and
incorporated in the British Virgin Islands on October 30, 1990 under the provisions of The Mutual
Funds Law of the British Virgin Islands. The Company commenced operations on December 1,
1990. The address of its registered office is P.O. Box 3140, Romasco Place, Wickhams Cay, Road
Town, Tortola, British Virgin Islands.

The investment manager of the Company is Fairfield Greenwich (Bermuda) Ltd. (the "Investment
Manager"), a corporation organized under the laws of Bermuda. On March 27, 2006, the
Investment Manager filed to become a registered investment adviser with the Securities and
Exchange Commission. The registration became effective April 20, 2006.

The Investment Manager utilizes an option trading strategy, known as a "split strike conversion". In
addition, the Investment Manager has allocated relatively small portions of the Company's assets to
other strategies typically sub-advised by experienced personnel starting new businesses (the "Non-
SSC Investments"). Allocations to Non-SSC Investments may never exceed, in the aggregate, 5%
of the Company's net asset value at the time of the investment. It is anticipated that the other
allocations will be made to new investment vehicles, with no single allocation exceeding USD
50,000,000 at the time of the investment. Non-split strike conversion investments may also include
strategic allocations to experienced managers in established funds.

The administrator of the Company is Citco Fund Services (Europe) B.V.

The Company has no employees.


*3.5.2    Accounting policies*

The principal accounting policies applied in the preparation of this condensed financial information
are set out below and are consistent with those of the annual financial statements for the year ended
December 31, 2007. These policies have been consistently applied to all periods presented, unless
otherwise stated.

*Basis of preparation*

The condensed interim financial information for the six months ended June 30, 2008 has been
prepared in accordance with IAS 34, "Interim Financial Reporting."

The interim condensed financial report should be read in conjunction with the annual financial
statements for the year end December 31, 2007.

*Fairfield Sentry Limited,*
*Road Town, Tortola, British Virgin Islands*                                        10

3.5    Selected notes to condensed financial information for the six
       months ended June 30, 2008
       *(All figures in USD thousands, except per share amounts and unless otherwise
       stated)*

The preparation of financial statements in conformity with IFRS requires the use of accounting estimates. It also requires management to exercise its judgment in the process of applying the Company's accounting policies. Because of the inherent uncertainty of valuation for all fair value investments and interests, the estimate of fair value may differ from the values that would have been used had a ready market existed, and the differences could be material.

All references to net assets throughout this document refer to net assets attributable to holders of redeemable participating shares unless otherwise stated.

The condensed balance sheet presents assets and liabilities in decreasing order of liquidity and does not distinguish between current and non-current items. All the Company's assets and liabilities are held for the purpose of being traded or are expected to be realized within one year.

IFRS 7, Financial Instruments: Disclosures, and the complementary Amendment to IAS 1, Presentation of Financial Statements - Capital Disclosures, came in to effect in 2007. IFRS 7 introduces new disclosures relating to financial instruments. This standard does not have any impact on the classification and valuation of the Company's financial instruments. In accordance with the requirements of the Amendment to IAS 1, additional disclosures have been provided on the Company's objectives and policies for its capital, which is represented by the net assets attributable to the holders of redeemable shares. There is no impact on the classification of the Company's capital.

*Foreign currency translation*

   *(a) Functional and presentation currency*
Items included in the Company's condensed financial information are measured using the currency of the primary economic environment in which it operates (the "functional currency"). This is the USD, which reflects the Company's primary activity of investing in USD securities and derivatives. Redeemable participating shares in the Company are denominated in USD. The financial statements are presented in USD which is the Company's functional and presentation currency.

   *(b) Transactions and balances*
Foreign currency transactions are translated into the functional currency using the exchange rates prevailing at the dates of the transactions. Foreign exchange gains and losses resulting from the settlement of such transactions and from the translation at year-end exchange rates of monetary assets and liabilities denominated in foreign currencies are recognised in the condensed income statement. Translation differences on non-monetary financial assets and liabilities such as equities at fair value through profit or loss are recognized in the condensed income statement within the fair value net gain or loss.

*Cash and cash equivalents*

For the purpose of the condensed cash flow statement, cash and cash equivalents include cash on hand, deposits held with banks, other short-term highly liquid investments with original maturities of three months or less, and bank overdrafts.

3.5    Selected notes to condensed financial information for the six
       months ended June 30, 2008
       *(All figures in USD thousands, except per share amounts and unless otherwise
       stated)*

*Due from/to brokers*

Amounts due from/to brokers represent payables for securities purchased and receivables for
securities sold that have been contracted for but not yet delivered by the end of the year.

*Financial assets at fair value through profit or loss*

Management designates the Company's investments in debt and equity securities, and related
derivatives as financial assets at fair value through profit or loss.

A financial asset or financial liability at fair value through profit or loss is a financial asset or
financial liability that meets either of the following conditions:

(a)    It is classified as held for trading. A financial asset or liability is classified as held for trading
       if it is:

       (i)    acquired or incurred principally for the purpose of selling or repurchasing it in the near
              term;

       (ii)   part of a portfolio of identified financial instruments that are managed together and for
              which there is evidence of a recent actual pattern of short-term profit taking or

       (iii)  a derivative

(b)    Upon recognition it is designated by the entity as at fair value through profit or loss.

All other financial assets are classified as loans and receivables and valued at amortized cost.
Other financial liabilities that are not at fair value through profit or loss or redeemable
participating shares are classified as other liabilities and are valued at amortized cost using the
effective interest rate method. The effective interest rate method is a method of calculating the
amortized cost of a financial asset or financial liability and of allocating the interest income or
interest expense over the relevant period. The effective interest rate is the rate that exactly
discounts estimated future cash payments or receipts throughout the expected life of the financial
instrument, or a shorter period where appropriate, to the net carrying amount of the financial asset
or financial liability. When calculating the effective interest rate, the Company estimates cash
flows considering all contractual terms of the financial instrument (for example, prepayment
options) but does not consider future credit losses. The calculation includes all fees and points
paid or received between parties to the contract that are an integral part of the effective interest
rate, transaction costs and all other premiums or discounts. Once a financial asset or a group of
similar financial assets has been written down as a result of an impairment loss, interest income is
recognized using the rate of interest used to discount the future cash flows for the purpose of
measuring the impairment loss.  Interest income is presented under net gains and losses on
financial assets and liabilities at fair value through profit and loss.

The Company does not designate any derivatives as hedges in a hedging relationship.

Regular-way purchases and sales of investments are recognized on trade date, which is the date the
Company commits to purchase or sell the investment. Investments are initially recognized at cost.
Transaction costs are expensed as incurred.  Investments are derecognized when the rights to
receive cash flows from the investments have expired or the Company has transferred substantially
all risks and rewards of ownership.

*Fairfield Sentry Limited.*
*Road Town, Tortola, British Virgin Islands*                                      12

2.5    Selected notes to condensed financial information for the six
       months ended June 30, 2008
       *(All figures in USD thousands, except per share amounts and unless otherwise
       stated)*

Listed securities are valued at the last reported bid price if owned and asked price if sold short on
the last business day of the valuation period.

Unlisted securities are valued at their fair values as determined by management in consultation with
the Investment Manager in accordance with recognised accounting and financial principles. In this
respect, investments in other investment companies are valued at the net asset value per share on
the day of valuation as calculated by the related administrators, unless the directors are aware of
good reasons why such valuation would not be the most appropriate indicator of fair value.

*Determination of gains or losses on financial assets and liabilities at fair value through
profit or loss*

Both realized and unrealized gains and losses on financial assets and liabilities at fair value through
profit or loss are taken as income and expenses as incurred. Realized gains and losses on sales of
financial assets and liabilities at fair value through profit or loss are calculated on a first-in-first-out
basis. The difference between the cost and the fair value of financial assets and liabilities at fair
value through profit or loss is reflected in the condensed income statement as net gains on financial
assets and liabilities at fair value through profit or loss.

*Derivative financial instruments*

Derivative financial instruments including option contracts are initially recognized on the
condensed balance sheet at fair value on the date on which a derivative contract is entered into and
are subsequently re-measured at their fair value.

Fair values are primarily obtained from quoted market prices. All derivatives are recorded as assets
when amounts are receivable by the Company and as liabilities when amounts are payable by the
Company. Changes in the fair values of derivatives are included in the condensed income
statement.

Initial margin deposits are made upon entering into forward contracts and are generally made in
cash. During the period the contract is open, changes in the value of the contracts are recognized as
unrealized gains or losses by 'marking-to-market' on a daily basis to reflect the market value of the
contract at the end of each day's trading.

Variation margin payments are made or received, depending upon whether unrealized losses or
gains are incurred. Unrealized gains are reported as an asset and unrealized losses are reported as a
liability in the condensed balance sheet. When the contract is closed, the Company records a
realized gain or loss equal to the difference between the proceeds from (or cost of) the closing
transaction and the Company's basis in the contract.

An option is a contractual arrangement under which the seller (writer) grants the purchaser (holder)
the right, but not the obligation, to either buy (a call option) or sell (a put option) at or by a set date
or during a set period, a specific amount of securities or a financial instrument at a predetermined
price. The seller receives a premium from the purchaser in consideration for the assumption of
future securities price. The Company is exposed to credit risk on purchased options only to the
extent of their carrying amount, which is their fair value.

*Fairfield Sentry Limited,*
*Road Town, Tortola, British Virgin Islands*                                                    13

3.5   Selected notes to condensed financial information for the six months ended June 30, 2008
*(All figures in USD thousands, except per share amounts and unless otherwise stated)*

*Offsetting financial instruments*

Financial assets and liabilities are offset and the net amount is reported on the condensed balance sheet when there is a legally enforceable right to set off the recognized amounts and there is an intention to settle on a net basis, or realize the asset and settle the liability simultaneously.

*Redeemable participating shares*

A continuous offering of redeemable participating shares is taking place and participating shares will be issued on the first business day of each month at a price equal to the net asset value per participating share computed on the immediately preceding valuation date (being the last business day of each calendar month and such other days as the directors may determine). The minimum initial investment per subscriber is USD 100,000. Following this initial investment, a shareholder may make additional investments in amounts of not less than USD 50,000.

Redemptions of redeemable participating shares and can be made on the last business day of each month (the "Valuation Date") at a price equal to the net asset value of that month upon 15 calendar days written notice prior to the Valuation Date.

The net asset value per share for any valuation date is determined by dividing the value of the assets of the Company less its liabilities at the close of business on such Valuation Date, by the number of shares outstanding at that date.

The Company issues redeemable shares, which are redeemable at the holder's option and are classified as financial liabilities. Redeemable shares can be put back to the Company at any time for cash equal to a proportionate share of the Company's net asset value. The redeemable share is carried at the redemption amount that is payable at the condensed balance sheet date if the holder exercises the right to put the share back to the Company.

In accordance with the provisions of the Company's regulations, investment positions are valued based on the last traded market price for the purpose of determining the net asset value per share for subscriptions and redemptions. (Refer to note 3.5.10 Reconciliation of IFRS - US GAAP.)

Subscriptions for redeemable participating shares received in advance represent monies received by the Company before the Company's dealing date for redeemable participating shares issued.

*Interest income and expense*

Interest income and expense are recognized in the condensed income statement on an accrual basis.

*Dividend income*

Dividend income is recognized when the right to receive payment is established. Dividend income received by the Company is subject to foreign withholding taxes.

*Expenses*

Expenses are accounted for on an accrual basis.

*Fairfield Sentry Limited,*
*Road Town, Tortola, British Virgin Islands*

14

3.5    Selected notes to condensed financial information for the six
months ended June 30, 2008
*(All figures in USD thousands, except per share amounts and unless otherwise stated)*

*Taxation*

Under current laws of the British Virgin Islands, there are no income, estate, transfer, sales or other British Virgin Island taxes payable by the Company. Generally, the Company intends to conduct its affairs so as not to be liable to taxation in any other jurisdiction; however, the Company may invest in securities whose income is subject to non-refundable foreign withholding taxes, which have been separately stated in the condensed income statement.

3.5.3    *Redemptions payable*

The Company has received redemption notices as of June 30, 2008. These amounts are included in net assets attributable to holders of redeemable participating shares and are not reflected as redemptions for redeemable participating shares payable. The amount of net assets attributable to holders of redeemable participating shares at June 30, 2008 subject to redemption notices which have been received is 141,896 (December 31, 2007: 167,400).

3.5.4    *Cash and cash equivalents*

For the purpose of the cash flow statement, cash and cash equivalents include the following items:

|  | June 30, 2008 | December 31, 2007 |
|---|---|---|
| Cash at banks | 164,662 | 163,928 |
| Cash at brokers | 215 | 38 |
|  | 164,177 | 163,966 |

As at June 30, 2008 and December 31, 2007 there is no restricted cash.

3.5.5    *Financial assets at fair value through profit or loss*

As at June 30, 2008, the Company's financial assets at fair value through profit or loss comprised the following positions:

|  | Market Value | % of net assets of the Company % |
|---|---|---|
| United States |  |  |
| USA 08/14/2008 Treasury Bills | 442,864 | 6.08 |
| USA 08/21/2008 Treasury Bills | 442,730 | 6.07 |
| USA 08/28/2008 Treasury Bills | 442,657 | 6.07 |
| USA 09/04/2008 Treasury Bills | 584,714 | 8.02 |
| USA 09/11/2008 Treasury Bills | 863,383 | 11.84 |
| USA 09/25/2008 Treasury Bills | 821,509 | 11.27 |
| USA 10/02/2008 Treasury Bills | 795,366 | 10.92 |
| USA 10/09/2008 Treasury Bills | 796,035 | 10.92 |

*Fairfield Sentry Limited.*
*Road Town, Tortola, British Virgin Islands*                                    15

3.5    Selected notes to condensed financial information for the six
months ended June 30, 2008
*(All figures in USD thousands, except per share amounts and unless otherwise
stated)*

| | Market Value | % of net assets of the Company % |
|---|---|---|
| United States continued | | |
| USA 10/16/2008 Treasury Bills | 795,781 | 10.92 |
| USA 10/23/2008 Treasury Bills | 583,119 | 8.00 |
| USA 10/30/2008 Treasury Bills | 527,872 | 7.00 |
| | | |
| Total United States | 7,152,637 | 98.10 |
| | | |
| Non-SSC Investments in funds | | |
| Bsho FIF Leveraged Note I | 18,762 | 0.26 |
| Bsho FIF Leveraged Note II | 13,359 | 0.18 |
| Enhanced Fairfield Investment Fund Ltd. | 15,869 | 0.22 |
| Enhanced Guardian II Fund Ltd. | 4,794 | 0.06 |
| Fairfield Argenis Healthcare Fund Ltd. | 3,454 | 0.05 |
| Fairfield Johns Fund Ltd. | 35,942 | 0.49 |
| Fairfield Lion Japan Equity Fund Ltd. | 4,969 | 0.07 |
| Fairfield Mnehassc Offshore Fund Ltd. | 29,681 | 0.41 |
| Fairfield Trading Fund, Ltd | 22,271 | 0.31 |
| Fairfield Wilshire Portable Alpha Fund | 25,298 | 0.35 |
| Lion Fairfield Eastern Star Fund | 9,612 | 0.13 |
| | | |
| Total Non-SSC Investments in funds | 183,566 | 2.53 |
| | | |
| Deferred fees Investments in funds | | |
| Chester Global Emerging Markets Fund Ltd. | 2,332 | 0.02 |
| Chester Global Strategy Fund Ltd. | 5,027 | 0.07 |
| Chester Horizons Fund Ltd. | 4,925 | 0.07 |
| Fairfield Aerium International, SCA | 1,175 | 0.02 |
| Fairfield Del Mar Fund Ltd. | 1,120 | 0.01 |
| Fairfield ICAP Absolute Return Fund Ltd. | 295 | 0.00 |
| Fairfield Investment Fund Ltd | 1,440 | 0.02 |
| Fairfield Lion Investment Fund (Asia) Ltd. | 1,167 | 0.01 |
| Fairfield Raven Credit Opportunities Fund Ltd. | 55 | 0.00 |
| Fairfield Redstone Fund Ltd. | 127 | 0.00 |
| Fairfield Renaissance Institutional Futures Fund Ltd. | 54 | 0.00 |
| Irongate Global Strategy Fund Ltd. | 6,122 | 0.08 |
| NGA Fairfield Ltd. | 3 | 0.00 |
| | | |
| Total deferred fees Investments in funds | 23,756 | 0.31 |
| | | |
| Total financial assets at fair value through profit or loss | 7,359,959 | 100.94 |

3.5   Selected notes to condensed financial information for the six
months ended June 30, 2008
*(All figures in USD thousands, except per share amounts and unless otherwise stated)*

As at December 31, 2007, the Company's financial assets at fair value through profit or loss comprised the following positions:

| | Market Value | % of net assets of the Company % |
|---|---|---|
| United States | | |
| USA 05/21/2008 Treasury Bills | 581,792 | 8.14 |
| USA 02/28/2008 Treasury Bills | 581,411 | 8.15 |
| USA 03/06/2008 Treasury Bills | 581,062 | 8.13 |
| USA 03/13/2008 Treasury Bills | 580,664 | 8.13 |
| USA 03/20/2008 Treasury Bills | 580,203 | 8.12 |
| USA 03/27/2008 Treasury Bills | 579,799 | 8.11 |
| USA 04/03/2008 Treasury Bills | 297 | 0.01 |
| USA 04/10/2008 Treasury Bills | 579,066 | 8.10 |
| USA 04/17/2008 Treasury Bills | 578,771 | 8.10 |
| USA 04/24/2008 Treasury Bills | 578,356 | 8.09 |
| USA 05/01/2008 Treasury Bills | 577,805 | 8.09 |
| USA 05/08/2008 Treasury Bills | 577,515 | 8.08 |
| USA 05/15/2008 Treasury Bills | 577,121 | 8.07 |
| | | |
| Total United States | 6,953,905 | 97.30 |
| | | |
| Non-SSC program investments in funds | | |
| Beire FIF Leveraged Note I | 20,673 | 0.29 |
| Beire FIF Leveraged Note II | 14,860 | 0.21 |
| Enhanced Fairfield Investment Fund Ltd. | 17,642 | 0.25 |
| Enhanced Guardian II Fund Ltd. | 5,437 | 0.08 |
| Fairfield Argenis Healthcare Fund Ltd. | 4,345 | 0.06 |
| Fairfield Ichua Fund Ltd. | 38,523 | 0.55 |
| Fairfield Lion Japan Equity Fund Ltd. | 4,903 | 0.07 |
| Fairfield Manisuset Offshore Fund Ltd. | 30,698 | 0.43 |
| Fairfield Parabolic Partners Fund Ltd. | 7,753 | 0.11 |
| Fairfield Treeline Fund, Ltd | 26,099 | 0.37 |
| Fairfield Wilshire Portable Alpha Fund | 29,137 | 0.41 |
| | | |
| Total Non-SSC program investments in funds | 201,066 | 2.83 |
| | | |
| Deferred fees investments in funds | | |
| Arlington International Fund Ltd. | 9 | 0.00 |
| Chester Global Emerging markets Fund Ltd. | 857 | 0.01 |
| Chester Global Strategy Fund Ltd. | 5,120 | 0.07 |
| Chester Horizons Fund Ltd. | 3,041 | 0.04 |
| Fairfield Aethim International, SCA | 1,597 | 0.02 |
| Fairfield Del Mar Fund Ltd. | 1,071 | 0.02 |
| Fairfield Fortitude Australian Absolute Return Fund Ltd. | 6 | 0.00 |

*Fairfield Sentry Limited,*
*Road Town, Tortola, British Virgin Islands*                                    17

### 3.5    Selected notes to condensed financial information for the six months ended June 30, 2008

*(All figures in USD thousands, except per share amounts and unless otherwise stated)*

| | Market Value | % of net assets of the Company % |
|---|---|---|
| Deferred fees investments in funds continued | | |
| Fairfield ICAP Absolute Return Fund Ltd. | 360 | 0.00 |
| Fairfield Investment Fund Ltd. | 1,010 | 0.01 |
| Fairfield Lion Investment Fund (Asia) Ltd. | 78 | 0.00 |
| Fairfield Paradigm Fund Ltd. | 16 | 0.00 |
| Fairfield Raven Credit Opportunities Fund Ltd. | 37 | 0.00 |
| Fairfield Redeema Fund Ltd. | 135 | 0.00 |
| Irongate Global Strategy Fund Ltd. | 4,893 | 0.03 |
| NCA Fairfield Ltd. | 18 | 0.00 |
| Total deferred fees investments in funds | 18,193 | 0.24 |
| Total financial assets at fair value through profit or loss | 7,175,195 | 100.37 |

The Company's net gains on financial assets and liabilities at fair value through profit or loss are comprised of the following:

| | June 30, 2008 | June 30, 2007 |
|---|---|---|
| Realized | 253,650 | 207,838 |
| Unrealized | (4,636) | 15,177 |
| Total gains | 249,014 | 223,015 |

### 3.5.6    Risks associated with financial instruments

The Company can maintain positions in a variety of derivative and non-derivative financial instruments as dictated by its investment management strategy. The Company's investment portfolio comprises quoted and non-quoted investments, options investments and in other investment funds that it intends to hold for an indefinite period of time.

The Company seeks to obtain capital appreciation of its assets principally through the utilization of a non-traditional options trading strategy described as "split strike conversion," to which the Company allocates the predominant portion of its assets. Set forth below is a description of the SSC Strategy ("SSC Investments"). The establishment of a typical position entails (i) the purchase of a group or basket of equity securities that are intended to highly correlate to the S&P 100 Index, (ii) the purchase of out-of-the-money S&P 100 Index put options with a notional value that approximately equals the market value of the basket of equity securities, and (iii) the sale of out-of-the-money S&P 100 Index call options with a notional value that approximately equals the market value of the basket of equity securities. An index call option is out-of-the-money when its strike price is greater than the current price of the index; an index put option is out-of-the-money when the strike price is lower than the current price of the index.

*Fairfield Sentry Limited,*
*Road Town, Tortola, British Virgin Islands*                                        18

### 3.5    Selected notes to condensed financial information for the six months ended June 30, 2008

*(All figures in USD thousands, except per share amounts and unless otherwise stated)*

The Company's investing activities expose it to various types of risk that are associated with the financial instruments and markets in which it invests. The most important types of financial risk to which the Company is exposed are market risk, credit risk and liquidity risk.

Asset allocation is determined by the Company's Investment Manager who manages the distribution of assets to achieve its investment objectives. Divergence from target asset allocations and the composition of the portfolio is closely monitored by the Investment Manager to manage risk exposure.

The nature and extent of the financial instruments outstanding at the condensed balance sheet date and the risk management policies employed by the Company are discussed below.

*Market risk*

Market risk embodies the potential for both loss and gains and includes currency risk, interest rate risk and price risk.

The Company's strategy on the management of investment risk is driven by the Company's investment objective as disclosed in note 3.5.1. The Company's market risk is managed on a daily basis by the Investment Manager in accordance with policies and procedures in place. The Company has defined risk/reward parameters which can be ascertained at the time a position is constructed. The split-strike conversion strategy is executed under a set of strict operating guidelines which serves to limit market risk.

Market risk is measured and monitored both qualitatively and quantitatively using a number of in-house and third party risk tools. The Investment Manager monitors the portfolio and performs checks to monitor the investment compliance to operating guidelines.

Details of the nature of the Company's investment portfolio at the condensed balance sheet date are disclosed in note 3.5.5.

*Currency risk*

The Company may invest in financial instruments and enter into transactions denominated in currencies other than its functional currency. Consequently, the Company is exposed to risks that the exchange rate of the USD relative to other currencies may change in a manner that has an adverse effect on the value of that portion of the Company's assets or liabilities denominated in currencies other than the USD.

At June 30, 2008, the Company did not have any exposure in currencies other than its functional currency.

*Interest rate risk*

The Company's interest rate risk is managed on a daily basis by the Investment Manager in accordance with policies and procedures in place.

As the majority of the Company's investment at June 30, 2008 are US treasury bills with short durations (i.e. less than one year), sensitivity to interest changes and consequent impact on net assets and profit is considered to be not material. Interest rate risk on cash balances is also considered not material.

*Other price risk*

Other price risk comprises the risk that the value of investments will fluctuate as a result of changes in market prices (other than those arising from interest rate risk or currency risk), whether caused

*Fairfield Sentry Limited,*
*Road Town, Tortola, British Virgin Islands*                                            19

### 3.5 Selected notes to condensed financial information for the six months ended June 30, 2008

*(All figures in USD thousands, except per share amounts and unless otherwise stated)*

by factors specific to an individual investment, its issuer or all factors affecting all financial instruments traded in the market. As the majority of the Company's financial instruments are carried at fair value with fair value changes recognized directly in the condensed income statement, all changes in market conditions will directly affect the Company's net investment income.

Price risk is mitigated by the Company's Investment Manager by constructing a diversified portfolio of instruments traded on various markets.
A typical position in its entirety could be characterized as a bull spread which, presuming the stock basket highly correlates to the S&P 100 Index, is intended to work as follows: (i) it sets a floor value below which further declines in the value of the stock basket is offset by gains in the put options, (ii) it sets a ceiling value beyond which further gains in the stock basket are offset by increasing liability of the short calls, and (iii) it defines a range of potential market gain or loss, depending on how tightly the options collar is struck.

*Credit risk*

Credit risk is the risk that counterparty to a financial instrument will fail to discharge an obligation or commitment that it has entered into with the Company.

The carrying amounts of financial assets best represent the maximum credit risk exposure at the condensed balance sheet date. This relates also to financial assets carried at amortized cost, as they have a short-term to maturity.

As at June 30, 2008, the following financials assets were exposed to credit risk:

|  | June 30, 2008 | December 31, 2007 |
|---|---|---|
| Cash and cash equivalents | 164,177 | 103,866 |
| Financial assets at fair value through profit or loss | 7,359,359 | 7,173,165 |
| Interest, dividends and other receivables | 13 | 255 |
|  | 7,523,549 | 7,277,286 |

Amounts in the above table are based on the carrying value of all accounts.

As a result of the Investment Manager's selection of Bernard L. Madoff Investment Securities, LLC ("BLM") as execution agent of the split strike conversion strategy, substantially all of the Company's assets will be held in segregated accounts at BLM, a U.S. registered broker-dealer and qualified custodian. Accordingly, BLM will be a sub-custodian of the Company. The services of BLM and its personnel are essential to the continued operation of the Company, and its profitability, if any.

The underlying assets of the Non-SSC Investments are held pursuant to custodial arrangements with other qualified entities.

Substantially all of the cash held by the Company is held by Citco Bank Nederland NV. Bankruptcy or insolvency by the bank may cause the Company's rights with respect to the cash held by the bank to be delayed or limited. The Company monitors its risk by monitoring the credit quality and financial position of the bank.

3.5    Selected notes to condensed financial information for the six
months ended June 30, 2008
*(All figures in USD thousands, except per share amounts and unless otherwise
stated)*

*Liquidity risk*

The Company's constitution provides for the monthly creation and cancellation of redeemable
participating shares and it is therefore exposed to the liquidity risk of meeting shareholder
redemptions of redeemable participating shares at any time.

The Company's listed securities are considered to be readily realizable as they are all listed on
major stock exchanges.
The Company's liquidity risk is managed on a periodic basis by the Investment Manager. The
Company's redemption policy only allows for redemptions on the last day of each month and
shareholders must provide 15 calendar days notice.

As of June 30, 2008, the Company's financial liabilities are all due within one month.

*Off-balance sheet risk*

An off-balance sheet risk exists when the maximum potential loss on a particular investment is
greater than the value of such investment as reflected in the Company's condensed balance sheet.

Off-balance sheet credit risk exists, among other situations, when the collateral received by the
Company is insufficient to cover losses which might result from a counterparty's failure to fulfill
its obligation under contracts with the Company.

As at June 30, 2008 and December 31, 2007, the Company had no significant off-balance sheet
risks.

*3.5.7    Fees payable and accrued expenses*

|  | June 30, 2008 | December 31, 2007 |
|---|---|---|
| Management fees | 19,515 | 19,564 |
| Performance fees | 33,863 | 22,422 |
| Administration fees | 746 | 365 |
| Legal and professional fees | 72 | 141 |
| Custody fees | 61 | 60 |
| Deferred fees | 31,045 | 26,254 |
| Other accounts payable and accrued expenses | 32 | 18 |
|  | 85,334 | 79,284 |

*3.5.8    Redeemable participating shares*

The authorized redeemable participating shares of the Company are USD 100,000 divided into
10,000,000 ordinary shares of USD 0.01 each. As at June 30, 2008 there were 5,502,814.49
(December 31, 2007: 5,537,433.46) redeemable participating shares issued and fully paid.

Each redeemable participating share entitles the holder to one vote and to receive such dividends as
declared by the directors and to participate upon liquidation on a proportional basis. The dividend

*Fairfield Sentry Limited,*
*Road Town, Tortola, British Virgin Islands*                                      31

### 3.5    Selected notes to condensed financial information for the six months ended June 30, 2008

*(All figures in USD thousands, except per share amounts and unless otherwise stated)*

policy is determined by the directors and the current policy is directed towards capital appreciation.

The Company will not accept a subscription tendered for shares at a time when the number of its outstanding shares is 10,000,000.

### 3.5.9    Related parties

Parties are considered to be related if one party has the ability to control the other party or exercise significant influence over the other party in making financial or operational decisions.

### Management fees

The Investment Manager receives a monthly management fee in an amount equal to one-twelfth of one percent 0.0833% (2007: 0.0833%) of the net asset value before performance fees, as calculated as the opening of the first day of each calendar month, which will include capital activity as of the first day of the month. This fee is payable monthly in arrears. A portion of this fee may be paid to an affiliate of Fairfield Greenwich Limited ("FGL") and the Investment Manager in consideration of the affiliate providing certain administrative services and back office support to the Company.

### Performance fees

The Investment Manager receives a performance fee of 20% of the new appreciation in share value each quarter. The performance fees are calculated and payable quarterly in arrears. Shares which are either purchased or redeemed during a calendar quarter shall be subject to the payment of a performance fee only for the portion of the calendar quarter during which such shares were outstanding. The performance fee will only be paid on new appreciation in the Company's Net Asset Value allocable to the shares.

### Deferred Fee

The Investment Manager and FGL have the option to defer the payment of all or a portion of the performance fees and/or management fees. For 2008, the Investment Manager has deferred, for periods ranging from two to ten years, payment of the performance fees/management fees for an amount of USD 21,044,578 (December 31, 2007: USD 26,283,671). Deferred fees earn market appreciation through investments in the Company, or in other permissible investments, as defined in the deferred fee agreement dated July 1, 2003. The remaining part of the performance fees/management fees as stated in the condensed income statement are paid to the Investment Manager.

### Directors' fees

The directors not affiliated with the Investment Manager, of which there are at the present time two, will each be paid a fee of USD 25,000 (2007: USD 25,000) per annum by the Company together with out-of-pocket expenses made in attending meetings of the board of directors or of shareholders.

Mr. Noel, a director of the Company, is also principal officer and director of the parent company of the Company's Investment manager. Mr Noel has waived his fees in the Company as at June 30, 2008 and 2007.

*Fairfield Sentry Limited,
Road Town, Tortola, British Virgin Islands*                                                                22

### 3.5   Selected notes to condensed financial information for the six months ended June 30, 2008

*(All figures in USD thousands, except per share amounts and unless otherwise stated)*

The directors held no shares in the Company as at June 30, 2008 and December 31, 2007.

*Administration fees*

The Company pays to the administrator a monthly fee based on the net asset value of the Company as of the last business day of the month. The administrator will also be reimbursed for all disbursements and reasonable expenses incurred in the performance of its duties as detailed in the administrative services agreement.

*Custody fees*

The Company pays custody fees monthly in arrears in accordance with the custody agreement. The custody fee will be accrued on a monthly basis. The custodian will charge the Company a transaction fee per transfer, subscription, purchase, sale or redemption of hedge fund assets.

Investments made during the year in trading securities in related party investment funds are as follows:

|  | Six months ended June 30 | |
|  | 2008 | 2007 |
|---|---|---|
| Trading securities bought | 17,141 | 52,788 |
| Trading securities sold | 9,501 | 24,439 |

As at June 30, 2008 investment funds managed by related parties held 981,944.93 (December 31, 2007: 958,832.17) shares in the Company.

### 3.5.10   Reconciliation IFRS-US GAAP

As the Company is managed by an SEC registered investment advisor, it is required that the Company issues its financial statements in accordance with United States generally accepted accounting principles (US GAAP) or otherwise presents a reconciliation to US GAAP in the financial statements.

3.5 Selected notes to condensed financial information for the six
months ended June 30, 2008
*(All figures in USD thousands, except per share amounts and unless otherwise
stated)*

The Company has elected to prepare the financial statements in accordance with IFRS.
Accordingly, a reconciliation of the net assets attributable to holders of redeemable participating
shares under US GAAP follows:

| | As at June 30 | | | | | |
|---|---|---|---|---|---|---|
| | 2008 | | NAV | | 2007 | | NAV |
| | Totals | USD Number of | per | Totals | USD Number of | per |
| | (000's) | shares | share | (000's) | shares | share |
| Net assets attributable to holders of redeemable participating shares based on IFRS | 7,290,843 | 5,502,814.49 | 1,324.93 | 6,824,034 | 5,453,062.48 | 1,251.41 |
| Adjustment for: Valuation of investments against last price | — | — | — | — | — | — |
| Net assets attributable to holders of redeemable participating shares based on US GAAP | 7,290,843 | 5,502,814.49 | 1,324.93 | 6,824,034 | 5,453,062.48 | 1,251.41 |

*Valuation of investments against closing price*

IFRS requires that financial assets are priced at current bid prices, while financial liabilities are
priced at current asking prices. US GAAP requires both financial assets as well as financial
liabilities to be priced at the last quoted sales prices. As at June 30, 2008 and 2007 there is no
difference between net assets attributable to holders of redeemable participating shares based on
IFRS and US GAAP.

*3.5.11 Financial Highlights*

Pursuant to the AICPA Audit and Accounting Guide, Audits of Investment Companies, non-public
investment companies are required to disclose certain financial highlights related to investment
performance and operations. These financial highlights include the total return and net investment
income and expense ratios and per share operating performance for the periods ended June 30,
2008 and 2007 for the Company based on US GAAP.

3.5    Selected notes to condensed financial information for the six
months ended June 30, 2008
*(All figures in USD thousands, except per share amounts and unless otherwise
stated)*

| Based on US GAAP | Six months ended June 30 | |
| --- | --- | --- |
| | 2008 | 2007 |
| Ratio of net investment fees to average net assets | (0.88%) | (1.05%) |
| Ratio of operating expenses and performance fees to average net assets | | |
| Operating expenses | 0.58% | 0.58% |
| Performance fees | 0.60% | 0.94% |
| Total operating expenses and performance fees | 1.18% | 1.52% |

The computation of the above-mentioned ratios based on the amount of operating expenses and
performance fees assessed to an individual investor's equity may vary from these ratios based on
the timing of capital transactions.

| Based on US GAAP | Six months ended June 30 | |
| --- | --- | --- |
| | 2008 | 2007 |
| Total return | | |
| Total return before performance fees | 3.19% | 5.89% |
| Performance fees | (0.61%) | (1.00%) |
| Total return after performance fees | 2.58% | 4.89% |

Total returns stated above are the total returns for the Company as a whole before and after
performance fees based on the total capital subscriptions and redemptions and the change in net
asset value during the years for the Company.

| Based on US GAAP | Six months ended June 30 | |
| --- | --- | --- |
| | 2008 | 2007 |
| Per share operating performance | | |
| Net asset value, beginning of period | 1,291.61 | 1,203.28 |
| Net investment gain or (loss) | (11.70) | (12.85) |
| Net realised and unrealised gains/(losses) on transactions | 45.02 | 61.00 |
| Total from investment operations | 33.32 | 48.15 |
| Net asset value, end of period | 1,324.93 | 1,251.43 |

The schedule above provides a breakdown of the increase in net asset value per share into the net
investment result and net realised and unrealised gain/losses on transactions.

*Fairfield Sentry Limited,*
*Road Town, Tortola, British Virgin Islands*                                          25

3.5    Selected notes to condensed financial information for the six
months ended June 30, 2008
*(All figures in USD thousands, except per share amounts and unless otherwise
stated)*

3.5.13    *Post balance sheet events*

There were no material post-balance sheet events which have a bearing on the understanding of the
condensed financial information.

# Exhibit I

ANWAR, *et al.*,

                     Plaintiffs,

      -against-

FAIRFIELD GREENWICH LIMITED, *et al.*,

                    Defendants.

This Document Relates To:  All Actions

Master File No. 09-cv-118 (VM)

## CONSOLIDATED AMENDED COMPLAINT

# Exhibit 23

**Fairfield Sigma Limited**

**Financial statements**
for the years ended December 31, 2007 and 2006
Road Town, Tortola
British Virgin Islands

## Contents

| 1 | Directors and other information | 1 |
|---|---|---|
| 1.1 | Directors and other information | 2 |
| **2** | **Financial statements** | **3** |
| 2.1 | Auditors' report | 4 |
| 2.2 | Balance sheets as at December 31, 2007 and 2006 | 5 |
| 2.3 | Income statements for the years ended December 31, 2007 and 2006 | 6 |
| 2.4 | Statements of changes in net assets attributable to holders of redeemable participating shares for the years ended December 31, 2007 and 2006 | 7 |
| 2.5 | Cash flow statements for the years ended December 31, 2007 and 2006 | 8 |
| 2.6 | Notes to the financial statements as at December 31, 2007 and 2006 | 9 |

*Fairfield Sigma Limited,*
*Road Town, Tortola, British Virgin Islands*

Case 1:09-cv-00118-VM   Document 116-24   Filed 04/24/09   Page 4 of 26

1    **Directors and other information**

## 1.1   Directors and other information

**Board of directors**
Mr Walter M. Noel, Jr. (non-executive director)
Mr Jan R. Naess (non-executive director)
Mr Peter P. Schmid (non-executive director)

**Registered office**
Fairfield Sigma Limited
c/o Codan Trust Company (B.V.I.) Ltd.
P.O. Box 3140
Romasco Place, Wickhams Cay
Road Town, Tortola
British Virgin Islands

**Administrator, registrar and transfer agent**
Citco Fund Services (Europe) B.V.
Telestone 8 - Teleport
Naritaweg 165
1043 BW Amsterdam
The Netherlands

**Bank**
Citco Bank Nederland N.V., Dublin Branch
Customs House Plaza Block 6
International Financial Services Centre
P.O. Box 6639 Dublin - 1
Ireland

**B.V.I. Counsel**
Conyers Dill & Pearman
Romasco Place, Wickhams Cay 1
P.O. Box 3140
Road Town, Tortola
British Virgin Islands

**Investment manager**
Fairfield Greenwich (Bermuda) Ltd.
12 Church Street
Suite 606
Hamilton, Bermuda HM 11

**Auditors**
PricewaterhouseCoopers LLP
77 King Street, Royal Trust Tower
Toronto, Ontario
M5K 1G8
Canada

**Legal advisor**
DLA Piper LLP
1251 Avenue of the Americas
New York, New York 10620-1104
United States of America

**Custodian**
Citco Global Custody N.V.
6 Customs House Plaza Harbourmaster Plaza
Dublin 1
Ireland

Case 1:09-cv-00118-VM   Document 116-24   Filed 04/24/09   Page 6 of 26

## 2    Financial statements

## 2.1 Auditors report



PricewaterhouseCoopers LLP
Chartered Accountants
PO Box 82
Royal Trust Tower, Suite 3000
Toronto Dominion Centre
Toronto, Ontario
Canada M5K 1G8
Telephone +1 416 863 1133
Facsimile +1 416 365 8215

April 7, 2008

### Report of Independent Auditors

To the Directors and Shareholders of
Fairfield Sigma Limited

In our opinion, the accompanying balance sheet and the related income statement, the statement of
changes in net assets attributable to holders of redeemable participating shares and the cash flow
statement present fairly, in all material respects, the financial position of **Fairfield Sigma Limited** (the
"Company") as of December 31, 2007 and the results of its operations, the changes in its net assets
attributable to holders of redeemable participating shares and its cash flows for the year then ended in
conformity with International Financial Reporting Standards. These financial statements are the
responsibility of the Company's management; our responsibility is to express an opinion on these
financial statements based on our audit. We conducted our audit of these financial statements in
accordance with auditing standards generally accepted in the United States of America. Those
standards require that we plan and perform the audit to obtain reasonable assurance about whether the
financial statements are free of material misstatement. An audit includes examining, on a test basis,
evidence supporting the amounts and disclosures in the financial statements, assessing the accounting
principles used and significant estimates made by the Company's management, and evaluating the
overall financial statement presentation. We believe that our audit provides a reasonable basis for our
opinion.

*Pricewaterhouse Coopers LLP*

**Chartered Accountants, Licensed Public Accountants**

PricewaterhouseCoopers refers to the Canadian firm of PricewaterhouseCoopers LLP and the other member firms of PricewaterhouseCoopers
International Limited, each of which is a separate and independent legal entity.

## 2.2    Balance sheet as at December 31, 2007 and 2006
*(All amounts in EUR  unless otherwise stated)*

| | Notes | 2007 | 2006 |
|---|---|---|---|
| **Assets** | | | |
| Cash and cash equivalents | | 8,900,952 | 25,832,256 |
| Balances due from brokers | | - | 4,610,606 |
| Financial assets at fair value through profit or loss | 2.6.4 | 756,613,775 | 461,006,970 |
| Unrealized gains on forward foreign exchange contracts | 2.6.5 | 9,818,709 | 704,531 |
| Redemptions for redeemable participating shares paid in advance | | 21,357 | 1,245,620 |
| Interest receivable | | - | 19,546 |
| **Total assets** | | 775,354,793 | 493,419,529 |
| | | | |
| **Liabilities** | | | |
| Line of credit | 2.6.11 | 25,211,571 | - |
| Subscriptions for redeemable participating shares received in advance | | 6,886,203 | 17,421,234 |
| Redemptions from financial assets received in advance | | - | 492,462 |
| Fees payable and accrued expenses | 2.6.8 | 470,725 | 304,974 |
| Interest payable on line of credit | 2.6.11 | 56,397 | - |
| **Total liabilities (excluding net assets attributable to holders of redeemable participating shares)** | | 32,624,896 | 18,218,670 |
| **Net assets attributable to holders of redeemable participating shares** | 2.6.9 | 742,729,897 | 475,200,859 |
| **Total liabilities** | | 775,354,793 | 493,419,529 |
| | | | |
| Net asset value per share based on net asset value of 742,729,897 (2006: 475,200,859) and 4,006,319.36 (2006: 2,707,785.03) shares outstanding | 2.6.9 | 185.39 | 175.49 |

### 2.3    Income statement for the years ended December 31, 2007 and 2006
*(All amounts in EUR unless otherwise stated)*

|  | Notes | 2007 | 2006 |
|---|---|---|---|
| **Revenue** | | | |
| Interest income | | 704,831 | 460,708 |
| Net gains on financial assets and liabilities at fair value | | | |
| through profit or loss | 2.6.4 | 36,099,946 | 25,300,039 |
| Net gains/(losses) on currency exchange | 2.6.4 | 283,316 | (1,134,276) |
| **Total investment income** | | 37,088,093 | 24,626,471 |
| **Expenses** | | | |
| Expense reimbursement | 2.6.10 | 959,802 | 561,774 |
| Administration fees | 2.6.10 | 214,863 | 132,000 |
| Legal and professional fees | | 26,589 | 22,319 |
| Interest expense | | 162,298 | 106,312 |
| Bank charges and commissions | | 40,093 | 25,875 |
| Directors' fees | 2.6.10 | 7,953 | 7,597 |
| Other operating expenses | | 315,871 | 191,990 |
| **Total operating expenses** | | 1,727,469 | 1,047,867 |
| **Change in net assets attributable to holders of redeemable participating shares resulting from operations** | | 35,360,624 | 23,578,604 |

*The accompanying notes are an integral part of these financial statements.*

*Fairfield Sigma Limited,*
*Road Town, Tortola, British Virgin Islands*

6

### 2.4    Statement of changes in net assets attributable to holders of redeemable participating shares for the years ended December 31, 2007 and 2006
*(All amounts in EUR unless otherwise stated)*

|  | Number of shares | EUR |
|---|---|---|
| **Balances at December 31, 2005** | 1,988,915.27 | 327,656,529 |
| Issue of redeemable participating shares | 1,257,085.85 | 214,539,231 |
| Redemption of redeemable participating shares | (538,216.09) | (90,573,505) |
| Change in net assets attributable to holders of redeemable participating shares resulting from operations | - | 23,578,604 |
| **Balances at December 31, 2006** | 2,707,785.03 | 475,200,859 |
| Issue of redeemable participating shares | 1,953,889.12 | 350,784,254 |
| Redemption of redeemable participating shares | (655,354.79) | (118,615,840) |
| Change in net assets attributable to holders of redeemable participating shares resulting from operations | - | 35,360,624 |
| **Balances at December 31, 2007** | 4,006,319.36 | 742,729,897 |

*The accompanying notes are an integral part of these financial statements.*

*Fairfield Sigma Limited,*
*Road Town, Tortola, British Virgin Islands*

7

## 2.5   Cash flow statement for the years ended December 31, 2007 and 2006

*(All amounts in EUR unless otherwise stated)*

|  | 2007 | 2006 |
|---|---|---|
| **Cash flow from operating activities** | | |
| **Increase in net assets attributable to holders of redeemable participating shares from operations** | 35,360,624 | 23,578,604 |
| Adjustment for: | | |
| Interest income | (704,831) | (460,708) |
| Interest expense | 162,298 | 106,312 |
| **Operating profit before working capital changes** | 34,818,091 | 23,224,208 |
| Net decrease/(increase) in balances due from brokers | 4,610,606 | (1,329,594) |
| Net increase in financial assets at fair value through profit or loss | (295,606,805) | (136,828,335) |
| Net increase in unrealized losses on forward foreign exchange contracts | (9,114,178) | (955,096) |
| Net increase in fees payable and accrued expenses | 165,751 | 77,563 |
| **Cash used in operations** | (265,126,535) | (115,811,254) |
| Interest received | 724,377 | 452,201 |
| Interest paid | (105,901) | (106,312) |
| **Net cash used in operating activities** | (264,508,059) | (115,465,365) |
| **Cash flows from financing activities** | | |
| (Decrease)/increase in subscriptions for redeemable participating shares received in advance | (10,535,031) | 12,417,234 |
| Decrease/(increase) in redemptions for redeemable participating shares paid in advance | 1,224,263 | (1,245,620) |
| (Decrease)/increase in redemptions from financial assets received in advance | (492,462) | 492,462 |
| Issue of redeemable participating shares | 350,784,254 | 214,539,231 |
| Redemption of redeemable participating shares | (118,615,840) | (90,573,505) |
| Increase in line of credit | 25,211,571 | - |
| **Net cash from financing activities** | 247,576,755 | 135,629,802 |
| **Net (decrease)/increase in cash and cash equivalents** | (16,931,304) | 20,164,437 |
| Cash and cash equivalents at beginning of the year | 25,832,256 | 5,667,819 |
| **Cash and cash equivalents at end of the year** | 8,900,952 | 25,832,256 |

*The accompanying notes are an integral part of these financial statements.*

**Fairfield Sigma Limited,**
**Road Town, Tortola, British Virgin Islands**

8

## 2.6    Notes to the financial statements as at December 31, 2007 and 2006
*(All amounts in EUR unless otherwise stated)*

### 2.6.1    General

Fairfield Sigma Limited (the "Company") is an open ended investment fund domiciled and incorporated in the British Virgin Islands as an international business company on March 19, 1997. The address of its registered office is: c/o Codan Trust Company (B.V.I.) Ltd., Romasco Place, Wickhams Cay 1, P.O. Box 3140, Road Town, Tortola, British Virgin Islands.

The Company primarily invests in Fairfield Sentry Limited (or "FSL"). FSL is an open ended investment fund domiciled and incorporated under the provisions of The Mutual Funds Laws of the British Virgin Islands on October 30, 1990. The Company substantially invests its assets in voting shares of FSL. As at December 31, 2007 and 2006, the Company owns 15.45% (2006: 10.82%) of FSL.

Users of these financial statements should read them together with FSL's financial statements as at and for the years ended December 31, 2007 and 2006 in order to obtain full information on the financial position, results of operations and changes in financial position of the Company.

The investment manager of the Company is Fairfield Greenwich (Bermuda) Ltd. (the "Investment Manager"), a corporation organized under the laws of Bermuda. On March 27, 2006 the Investment Manager filed to become a registered investment advisor with the Securities and Exchange Commission. The registration became effective April 20, 2006.

The Investment Manager is also the investment manager of FSL, which is the Company's primary investment. FSL utilizes an options trading strategy, known as a "split strike conversion". In addition, the Investment Manager has allocated relatively small portions of FSL's assets to other strategies typically sub-advised by experienced personnel starting new businesses (the "Seedlings"). Allocations to Seedlings may never exceed, in the aggregate, 5% of FSL's net asset value at the time of the investment. It is anticipated that other allocations will be made to new investment vehicles, with no single allocation exceeding USD 50,000,000 at the time of the investment. Non-split strike conversion investments may also include strategic allocations to experienced managers in established funds.

The administrator of the Company is Citco Fund Services (Europe) B.V.

The Company has no employees.

The Company's financial statements were authorized for issue on April 7, 2008 by the Board of Directors.

### 2.6.2    Accounting policies

The principal accounting policies applied in the preparation of these financial statements are set out below. These policies have been consistently applied to all the years presented, unless otherwise stated.

#### Basis of preparation

The Company's financial statements have been prepared in accordance with International Financial Reporting Standards (IFRS).

## 2.6    Notes to the financial statements as at December 31, 2007 and 2006 (All amounts in EUR unless otherwise stated)

The financial statements are prepared under the historical cost convention as modified by the revaluation of financial assets and financial liabilities (including derivative financial instruments) at fair value through profit or loss.

The preparation of financial statements in conformity with IFRS requires the use of accounting estimates. It also requires management to exercise its judgment in the process of applying the Company's accounting policies. Because of the inherent uncertainty of valuation for all fair value investments and interests, the estimate of fair value may differ from the values that would have been used had a ready market existed, and the differences could be material.

All references to net assets throughout this document refer to net assets attributable to holders of redeemable participating shares unless otherwise stated.

The balance sheet presents assets and liabilities in decreasing order of liquidity and does not distinguish between current and non-current items. All the Company's assets and liabilities are held for the purpose of being traded or are expected to be realized within one year.

IFRS 7, Financial Instruments: Disclosures, and the complementary Amendment to IAS 1, Presentation of Financial Statements - Capital Disclosures, came into effect in 2007. IFRS 7 introduces new disclosures relating to financial instruments. This standard does not have any impact on the classification and valuation of the Company's financial instruments. In accordance with the requirements of Amendment to IAS 1, additional disclosures have been provided on the Company's objectives and policies for its capital, which is represented by the net assets attributable to the holders of redeemable shares. There is no impact on the classification of the Company's capital.

### Foreign currency translation

#### (a) Functional and presentation currency

The financial statements are prepared in euros (EUR), this being the Company's functional currency. Management has chosen EUR as the functional and presentation currency for the Company to reflect the fact that the issued ordinary shares of the Company are denominated in EUR.

#### (b) Transactions and balances

Foreign currency transactions are translated into the functional currency using the exchange rates prevailing at the dates of the transactions. Foreign exchange gains and losses resulting from the settlement of such transactions and from the translation at year-end exchange rates of monetary assets and liabilities denominated in foreign currencies are recognized in the income statement. Translation differences on non-monetary financial assets and liabilities such as equities at fair value through profit or loss are recognized in the income statement within the fair value net gain or loss.

### Cash and cash equivalents

For the purpose of the cash flow statement, cash and cash equivalents include cash on hand, deposits held with banks, other short-term highly liquid investments with original maturities of three months or less, and bank overdrafts.

### Due from brokers

Amounts due from brokers represent deposit amounts held with brokers as collateral for engaging into forward foreign currency contract transactions.

## 2.6    Notes to the financial statements as at December 31, 2007 and 2006 (All amounts in EUR unless otherwise stated)

*Financial assets at fair value through profit or loss*

Management designates the Company's investment in FSL as financial assets at fair value through profit or loss at inception.

A financial asset or financial liability at fair value through profit or loss is a financial asset or financial liability that meets either of the following conditions:

(a)    It is classified as held for trading. A financial asset or liability is classified as held for trading if it is:
    (i)    acquired or incurred principally for the purpose of selling or repurchasing it in the near term;
    (ii)    part of a portfolio of identified financial instruments that are managed together and for which there is evidence of a recent actual pattern of short-term profit taking or
    (iii) a derivative

(b)    Upon recognition it is designated by the entity as at fair value through profit or loss.

All other financial assets are classified as loans and receivables and valued at amortized cost. Other financial liabilities that are not at fair value through profit or loss or redeemable participating shares are classified as other liabilities and are valued at amortized cost using the effective interest rate method.    The effective interest rate method is a method of calculating the amortized cost of a financial asset or financial liability and of allocating the interest income or interest expense over the relevant period. The effective interest rate is the rate that exactly discounts estimated future cash payments or receipts throughout the expected life of the financial instrument, or a shorter period where appropriate, to the net carrying amount of the financial asset or financial liability. When calculating the effective interest rate, the Company estimates cash flows considering all contractual terms of the financial instrument (for example, prepayment options) but does not consider future credit losses. The calculation includes all fees and points paid or received between parties to the contract that are an integral part of the effective interest rate, transaction costs and all other premiums or discounts. Once a financial asset or a group of similar financial assets has been written down as a result of an impairment loss, interest income is recognized using the rate of interest used to discount the future cash flows for the purpose of measuring the impairment loss.    Interest income is presented under net gains and losses on financial assets and liabilities at fair value through profit and loss.

Derivatives are currently employed to hedge USD exposure to the Company.

Regular-way purchases and sales of investments are recognized on trade date, which is the date the Company commits to purchase or sell the investment. Investments are initially recognized at cost. Transaction costs are expensed as incurred.    Investments are derecognized when the rights to receive cash flows from the investments have expired or the Company has transferred substantially all risks and rewards of ownership.

Listed securities are valued at the last reported bid price if owned and asked price if sold short on the last business day of the valuation period.

Unlisted securities are valued at their fair values as determined by management in consultation with the Investment Manager in accordance with recognized accounting and financial principles. In this respect, investments in other investment companies are valued at the net asset value per share on the day of valuation as calculated by the related administrators, unless the directors are aware of good reasons why such valuation would not be the most appropriate indicator of fair value.

*Fairfield Sigma Limited,*
*Road Town, Tortola, British Virgin Islands*

11

## 2.6    Notes to the financial statements as at December 31, 2007 and 2006 (All amounts in EUR unless otherwise stated)

*Determination of gains or losses on financial assets and liabilities at fair value through profit or loss*

Both realized and unrealized gains and losses on financial assets and liabilities at fair value through profit or loss are taken as income and expenses as incurred. Realized gains and losses on sales of financial assets and liabilities at fair value through profit or loss are calculated on a first-in-first-out basis. The difference between the cost and the fair value of financial assets and liabilities at fair value through profit or loss is reflected in the income statement as the change in unrealized gains or losses on investments.

*Derivative financial instruments*

Derivative financial instruments including forward currency contracts are initially recognized on the balance sheet at fair value on the date on which a derivative contract is entered into and are subsequently re-measured at their fair value.

Fair values are primarily obtained from quoted market prices.  All derivatives are recorded as assets when amounts are receivable by the Company and as liabilities when amounts are payable by the Company. Changes in the fair values of derivatives are included in the income statement.

Initial margin deposits are made upon entering into forward contracts and are generally made in cash. During the period the contract is open, changes in the value of the contracts are recognized as unrealized gains or losses by 'marking-to-market' on a daily basis to reflect the market value of the contract at the end of each day's trading.

Variation margin payments are made or received, depending upon whether unrealized losses or gains are incurred. Unrealized gains are reported as an asset and unrealized losses are reported as a liability in the balance sheet. When the contract is closed, the Company records a realized gain or loss equal to the difference between the proceeds from (or cost of) the closing transaction and the Company's basis in the contract.

*Offsetting financial instruments*

Financial assets and liabilities are offset and the net amount is reported on the balance sheet when there is a legally enforceable right to set off the recognized amounts and there is an intention to settle on a net basis, or realize the asset and settle the liability simultaneously.

*Redeemable participating shares*

A continuous offering of redeemable participating shares is taking place and participating shares will be issued on the first business day of each month at a price equal to the net asset value per participating share computed on the immediately preceding valuation date (being the last business day of each calendar month and such other days as the directors may determine). The minimum initial investment per subscriber is EUR 200,000. Following this initial investment, a shareholder may make additional investments in amounts of not less than EUR 75,000.

Redemptions of redeemable participating shares can be made on the last business day of each month (the "Valuation Date") at a price equal to the net asset value of that month upon at least 15 calendar days notice prior to the Valuation Date.

The net asset value of shares for any valuation date is determined by dividing the value of the assets of the Company less its liabilities at the close of business on such Valuation Date, by the number of shares outstanding at that date.

## 2.6    Notes to the financial statements as at December 31, 2007 and 2006 (All amounts in EUR unless otherwise stated)

The Company issues redeemable shares, which are redeemable at the holder's option and are classified as financial liabilities. Redeemable shares can be put back to the Company at any time for cash equal to a proportionate share of the Company's net asset value. The redeemable share is carried at the redemption amount that is payable at the balance sheet date if the holder exercises the right to put the share back to the Company.

In accordance with the provisions of the Company's regulations, investment positions are valued based on the last traded market price for determining the net asset value per share for subscriptions and redemptions. (Refer to Note 2.6.12 Reconciliation of IFRS-US GAAP.)

Subscriptions for redeemable participating shares received in advance represent monies received by the Company before the Company's dealing date for redeemable participating shares to be issued.

Redemptions for redeemable participating shares paid in advance represent monies paid by the Company before the Company's dealing date for redeemable participating shares. (Refer to Note 2.6.3 Redemptions payable.)

### Interest income and expense

Interest income and expense are recognized in the income statement on an accrual basis.

### Expenses

Expenses are accounted for on an accrual basis.

### Taxation

Under current laws of the British Virgin Islands, there are no income, estate, transfer, sales or other British Virgin Island taxes payable by the Company. Generally, the Company intends to conduct its affairs so as not to be liable to taxation in any other jurisdiction; however, the Company may invest in securities whose income is subject to non-refundable foreign withholding taxes.

### 2.6.3    Redemptions payable

The Company has received redemption notices as of December 31, 2007. These amounts are included in net assets attributable to holders of redeemable participating shares and are not reflected as redemptions for redeemable participating shares payable. The amount of net assets attributable to holders of redeemable participating shares at December 31, 2007 subject to redemption notices which have been received is 8,825,370 (2006: 6,965,861).

### 2.6.4    Financial assets at fair value through profit or loss

As at December 31, 2007 and 2006, the Company's financial assets at fair value through profit or loss comprised the following:

| Funds | 2007 | | | 2006 | | |
|---|---|---|---|---|---|---|
| | Shares | Value | % of total net assets | Shares | Value | % of total net assets |
| Fairfield Sentry Ltd. | 854,696.83 | 756,613,775 | 101.87 | 505,696.86 | 461,006,970 | 97.01 |

*Fairfield Sigma Limited,*
*Road Town, Tortola, British Virgin Islands*

13

## 2.6    Notes to the financial statements as at December 31, 2007 and 2006 (All amounts in EUR unless otherwise stated)

The Company's net gains on financial assets and liabilities at fair value through profit or loss are comprised of the following:

|  | 2007 | 2006 |
|---|---|---|
| Realized | 49,863,318 | 32,213,056 |
| Unrealized | (13,763,372) | (6,913,017) |
| Total gains / (losses) | 36,099,946 | 25,300,039 |

The Company's net gains on currency exchange are comprised of the following:

|  | 2007 | 2006 |
|---|---|---|
| Realized | (501,653) | (1,217,504) |
| Unrealized | 784,969 | 83,228 |
| Total gains / (losses) | 283,316 | (1,134,276) |

### 2.6.5   Derivative financial instruments

As at December 31, 2007 the Company had the following outstanding forward foreign currency contracts:

|  | Bought amount |  | Sold amount | Maturity date | Unrealized gain/(loss) |
|---|---|---|---|---|---|
| EUR | 742,291,723 | USD | 1,069,310,569 | 01/29/2008 | 9,818,709 |
|  |  |  |  |  | 9,818,709 |

As at December 31, 2006 the Company had the following outstanding forward foreign currency contracts:

|  | Bought amount |  | Sold amount | Maturity date | Unrealized gain/(loss) |
|---|---|---|---|---|---|
| USD | 15,044,590 | EUR | 11,400,000 | 01/02/2007 | (4,237) |
| EUR | 483,198,604 | USD | 637,641,830 | 01/25/2007 | 708,768 |
|  |  |  |  |  | 704,531 |

### 2.6.6   Risks associated with financial instruments

The Company can maintain positions in a variety of derivative and non-derivative financial instruments as dictated by its investment management strategy. The Company's investment

**Fairfield Sigma Limited,**                                                                                        14
**Road Town, Tortola, British Virgin Islands**

## 2.6    Notes to the financial statements as at December 31, 2007 and 2006 (All amounts in EUR unless otherwise stated)

portfolio comprises quoted and non-quoted investments, options investments in other funds that it intends to hold for an indefinite period of time.

The Company's primary investment are shares of FSL, which seeks to obtain capital appreciation of its assets principally through the utilization of a non-traditional options trading strategy described as "split strike conversion," to which FSL allocates the predominant portion of its assets. Set forth below is a description of the SSC Strategy ("SSC Investments"). The establishment of a typical position entails (i) the purchase of a group or basket of equity securities that are intended to highly correlate to the S&P 100 Index, (ii) the purchase of out-of-the-money S&P 100 Index put options with a notional value that approximately equals the market value of the basket of equity securities, and (iii) the sale of out-of-the-money S&P 100 Index call options with a notional value that approximately equals the market value of the basket of equity securities. An index call option is out-of-the-money when its strike price is greater than the current price of the index; an index put option is out-of-the-money when the strike price is lower than the current price of the index.

The Company's investing activities expose it to various types of risk that are associated with the financial instruments and markets in which it invests. The most important types of financial risk to which the Company is exposed to are market risk, credit risk and liquidity risk.

Asset allocation is determined by the Company's Investment Manager who manages the distribution of assets to achieve its investment objectives. Divergence from target asset allocations and the composition of the portfolio is closely monitored by the Investment Manager to manage risk exposure.

The nature and extent of the financial instruments outstanding at the balance sheet date and the risk management policies employed by the Company are discussed below.

### Market risk

Market risk embodies the potential for both loss and gains and includes currency risks, interest rate risk and price risk.

The Company's strategy on the management of investment risk is driven by the Company's investment objective as disclosed in note 2.6.1. The Company's market risk is managed on a daily basis by the Investment Manager in accordance with policies and procedures in place. The Company has defined risk/reward parameters which can be ascertained at the time a position is constructed. The split-strike conversion strategy is executed under a set of strict operating guidelines which serves to limit market risk.

Market risk is measured and monitored both qualitatively and quantitatively using a number of in-house and third party risk tools. The Investment Manager monitors the portfolio and performs checks to monitor the investment compliance to operating guidelines.

Details of the nature of the Company's investment portfolio at the balance sheet date are disclosed in note 2.6.4.

### Currency risk

The Company may invest in assets denominated in currencies other than its reporting currency, the Euro. Consequently, the Company is exposed to risks that the exchange rate of the Euro relative to other currencies may change in a manner that has an adverse effect on the reported value of that portion of the Company's assets denominated in currencies other than the Euro.

*Fairfield Sigma Limited,*
*Road Town, Tortola, British Virgin Islands*                                                              15

## 2.6    Notes to the financial statements as at December 31, 2007 and 2006 (All amounts in EUR unless otherwise stated)

The Company hedges its net assets denominated in other currencies than its reporting currency by entering into forward foreign currency contracts.

The table below summarizes the Company's exposure to currency risks.

**As at December 31, 2007 (All amounts in EUR)**

|  | EUR | USD | Total |
|---|---|---|---|
| **Assets** | | | |
| Cash due from banks and brokers | 7,037,576 | 1,863,376 | 8,900,952 |
| Financial assets at fair value through profit or loss | - | 756,613,775 | 756,613,775 |
| Other assets | 21,357 | 9,818,709 | 9,840,066 |
| **Total assets** | 7,058,933 | 768,295,860 | 775,354,793 |
| **Liabilities** | | | |
| Line of credit | | (25,211,571) | (25,211,571) |
| Other liabilities | (7,160,542) | (252,783) | (7,413,325) |
| **Total liabilities (excluding net assets attributable to holders of participating redeemable shares)** | (7,160,542) | (25,464,354) | (32,624,896) |

**As at December 31, 2006 (All amounts in EUR)**

|  | EUR | USD | Total |
|---|---|---|---|
| **Assets** | | | |
| Cash due from banks and brokers | 17,621,983 | 12,820,879 | 30,442,862 |
| Financial assets at fair value through profit or loss | - | 461,006,970 | 461,006,970 |
| Other assets | 1,245,620 | 724,077 | 1,969,697 |
| **Total assets** | 18,867,603 | 474,551,926 | 493,419,529 |
| **Liabilities** | | | |
| Financial assets at fair value through profit or loss | - | - | - |
| Other liabilities | (18,091,590) | (127,080) | (18,218,670) |
| **Total liabilities (excluding net assets attributable to holders of participating redeemable shares)** | (18,091,590) | (127,080) | (18,218,670) |

At December 31, 2007, had the exchange rate between the US dollar and the euro increased or decreased by 5% with all other variables held constant, the increase or decrease respectively in net assets attributable to holders of redeemable shares would amount to approximately EUR 31,965 (2006: EUR 248,195). In accordance with the Company's policy, the Investment Manager monitors the Company's currency position on a daily basis.

## 2.6   Notes to the financial statements as at December 31, 2007 and 2006 (All amounts in EUR unless otherwise stated)

*Interest rate risk*

The Company's interest rate risk is managed on a daily basis by the Investment Manager in accordance with policies and procedures in place.

The investments of FSL at December 31, 2007 are primarily US treasury bills with short durations (i.e. less than one year), sensitivity to interest changes and consequent impact on net assets and profit is considered to be not material. Interest rate risk on cash balances is also considered not material.

*Other price risk*

Other price risk comprises the risk that the value of investments will fluctuate as a result of changes in market prices (other than those arising from interest rate risk or currency risk), whether caused by factors specific to an individual investment, its issuer or all factors affecting all financial instruments traded in the market. As the majority of the Company's financial instruments are carried at fair value with fair value changes recognized directly in the income statement, all changes in market conditions will directly affect the Company's net investment income.

Price risk is mitigated by the Company's Investment Manager by constructing a diversified portfolio of instruments traded on various markets.

A typical position in its entirety could be characterized as a bull spread which, presuming the stock basket highly correlates to the S&P 100 Index, is intended to work as follows: (i) it sets a floor value below which further declines in the value of the stock basket is offset by gains in the put options, (ii) it sets a ceiling value beyond which further gains in the stock basket are offset by increasing liability of the short calls, and (iii) defines a range of potential market gain or loss, depending on how tightly the options collar is struck.

*Credit risk*

Credit risk is the risk that counterparty to a financial instrument will fail to discharge an obligation or commitment that it has entered into with the Company.

The carrying amounts of financial assets best represent the maximum credit risk exposure at the balance sheet date. This relates also to financial assets carried at amortized cost, as they have a short-term to maturity.

As at December 31, 2007, the following financials assets were exposed to credit risk:

|  | 2007 | 2006 |
|---|---|---|
| Cash and cash equivalents | 8,900,952 | 25,832,256 |
| Financial assets at fair value through profit or loss | 756,613,775 | 461,006,970 |
| Interest, dividends and other receivables | - | 19,546 |
|  | 765,514,727 | 486,858,772 |

Amounts in the above table are based on the carrying value of all accounts.

Substantially all of the cash held by the Company is held by Citco Bank Nederland NV. Bankruptcy or insolvency by the bank may cause the Company's rights with respect to the cash

*Fairfield Sigma Limited,*
*Road Town, Tortola, British Virgin Islands*

17

## 2.6    Notes to the financial statements as at December 31, 2007 and 2006 (All amounts in EUR unless otherwise stated)

held by the bank to be delayed or limited.  The Company monitors its risk by monitoring the credit quality and financial positions of the bank.

*Liquidity risk*

The Company's constitution provides for the monthly creation and cancellation of redeemable participating shares and it is therefore exposed to the liquidity risk of meeting shareholder redemptions of redeemable participating shares at any time.

The Company's liquidity risk is managed on a periodic basis by the Investment Manager. The Company's redemption policy only allows for redemptions on the last day of each month and shareholders must provide 15 calendar days notice.

At December 31, 2007 and 2006, the Company's financial liabilities had maturities of less than one month.

*Off-balance sheet risk*

An off-balance sheet risk exists when the maximum potential loss on a particular investment is greater than the value of such investment as reflected in the Company's balance sheet.

Off-balance sheet credit risk exists, among other situations, when the collateral received by the Company is insufficient to cover losses which might result from a counterparty's failure to fulfil its obligation under contracts with the Company.

As at December 31, 2007 and 2006, the Company had no significant off-balance sheet risks.

### 2.6.7    Specific instruments

*Forwards*

Forward contracts are commitments either to purchase or sell a designated financial instrument, currency, commodity or an index at a specified future date for a specified price and may be settled in cash or another financial asset. Forward contracts result in credit exposure to the counterparty. Forward contracts result in exposure to market risk based on changes in market prices relative to contracted amounts. Market risks arise due to the possible movement in foreign currency exchange rates, indices, and securities' values underlying these instruments.

In addition, because of the low margin deposits normally required in relation to notional contract sizes, a high degree of leverage may be typical of a forward trading account. As a result, a relatively small price movement in an underlying of forward contract may result in substantial losses to the Company. Forward contracts are generally subject to liquidity risk.

Notional amounts are the underlying reference amounts to foreign currencies upon which the fair value of forward contracts traded by the Company are based.

While notional amounts do not represent the current fair value and are not necessarily indicative of the future cash flows of the Company's forward contracts, the underlying price changes in relation to the variables specified by the notional amounts affect the fair value of these derivative financial instruments.

## 2.6    Notes to the financial statements as at December 31, 2007 and 2006 (All amounts in EUR unless otherwise stated)

### 2.6.8    Fees payable and accrued expenses

|                                             |   2007  |   2006  |
|---------------------------------------------|---------|---------|
| Expense reimbursement                       | 274,189 | 171,195 |
| Legal and professional fees                 | 42,589  | 33,228  |
| Custody fees                                | 90,716  | 54,672  |
| Other accounts payable and accrued expense  | 63,231  | 45,879  |
|                                             | 470,725 | 304,974 |

### 2.6.9    Redeemable participating shares

The authorized redeemable participating shares of the Company is EUR 50,000 divided into 5,000,000 ordinary shares. As at December 31, 2007 there were 4,006,319.36 (December 31, 2006: 2,707,785.03) redeemable participating shares issued and fully paid.

Each redeemable participating share entitles the holder to one vote and to receive such dividends as declared by the directors and to participate upon liquidation on a proportional basis. The dividend policy is determined by the directors and the current policy is directed towards capital appreciation.

The Company will not accept a subscription tendered at a time when the number of its outstanding shares is 5,000,000.

### 2.6.10    Related parties

Parties are considered to be related if one party has the ability to control the other party or exercise significant influence over the other party in making financial or operational decisions.

#### Management fees

The Investment Manager of the Company receives no management fee or performance fee. Any fees incidental to the investments in FSL shall be paid to the manager by FSL.

The Company pays Fairfield Greenwich Advisors LLC ("FGA"), an affiliate of the Investment Manager, an annual expense reimbursement charge of fifteen basis points, payable quarterly in an amount equal to one-thirty seventh and one half of one percent (0.0375%) of the Company's Net Asset Value as of the last day of each calendar quarter, for providing certain administrative services and back-office support to the Company. FGA receives a similar reimbursement from FSL for providing administrative services and back-office support to FSL.

#### Directors' fees

The directors not affiliated with the Investment Manager, of which there are at the present time two, will each be paid a fee of USD 5,000 (2006: USD 5,000) per annum by the Company together with out-of-pocket expenses made in attending meetings of the Board of Directors or of shareholders.  The directors received a remuneration of EUR 7,953 for the year 2007 (2006: EUR 7,597).

*Fairfield Sigma Limited,*
*Road Town, Tortola, British Virgin Islands*

19

## 2.6    Notes to the financial statements as at December 31, 2007 and 2006 (All amounts in EUR unless otherwise stated)

Mr. Walter M. Noel, Jr., a director of the Company is also a principal officer and director of Fairfield Greenwich Limited. The Investment Manager is a wholly owned subsidiary of Fairfield Greenwich Limited.

*Administration fees*

The Company pays to the administrator a monthly fee based on the net asset value of the Company as of the last business day of the month.  The administrator will also be reimbursed for all disbursements and reasonable expenses incurred in the performance of its duties as detailed in the administrative services agreement.

*Custody fee*

The Company pays custody fees quarterly in arrears in accordance with the custody agreement. The custody fee will be accrued on a monthly basis. The custodian will charge the Company a transaction fee per transfer, subscription, purchase, sale or redemption of FSL.  Custody fees are included in other operating expenses on the income statement.

Investments made during the year in FSL are as follows:

|  | 2007 USD | 2006 USD |
|---|---|---|
| Trading securities bought | 454,792,803 | 222,871,437 |
| Trading securities sold | 21,005,802 | 39,381,659 |

### 2.6.11  Line of Credit

The Company obtained a credit facility from an investment bank on January 25, 2005. The credit facility may not exceed the lesser of USD 50,000,000 or 15% of the Net Asset Value.

The outstanding principal bears an interest percentage of 2.0% per annum above the Federal Funds Effective Rate. Interest will be charged quarterly and will be calculated on the basis of a 360-day year and actual days elapsed.

The facility is generally used only when there is a realized treasury loss on the forward currency (hedging) contract.  The facility is generally paid off within 30 days.  As at December 31, 2007 the Company had a total of EUR 25,267,968, including EUR 56,397 in interest payable, (2006: nil) due under the credit facility.

### 2.6.12  Reconciliation IFRS – US GAAP

As the Company is managed by an SEC registered investment advisor, it is required that the Company issues its financial statements in accordance with United States generally accepted accounting principles (US GAAP) or otherwise presents a reconciliation to US GAAP in the financial statements.

The Company has elected to prepare the financial statements in accordance with IFRS. Accordingly, a reconciliation of the net assets attributable to holders of redeemable participating

*Fairfield Sigma Limited,*
*Road Town, Tortola, British Virgin Islands*

20

## 2.6    Notes to the financial statements as at December 31, 2007 and 2006 (All amounts in EUR unless otherwise stated)

shares under US GAAP was completed and there were no differences noted as at December 31, 2007 and 2006.

*Valuation of investments against closing price*

IFRS requires that financial assets are priced at current bid prices, while financial liabilities are priced at current asking prices. US GAAP requires both financial assets as well as financial liabilities to be priced at the last quoted sales prices. As at December 31, 2007 and 2006 there is no material difference between net assets attributable to holders of redeemable participating shares based on IFRS and US GAAP.

### 2.6.13  Financial highlights

Pursuant to the AICPA Audit and Accounting Guide, *Audits of Investment Companies*, non-public investment companies are required to disclose certain financial highlights related to investment performance and operations. These financial highlights include the total return and net investment income and expense ratios and per share operating performance for the period ended December 31, 2007 and 2006 for the Company based on US GAAP.

| Based on US GAAP | 2007 | 2006 |
|---|---|---|
| Ratio of net investment loss to average net assets | (0.16%) | (0.16%) |
| Ratio of operating expenses and performance fee to average net assets: | | |
| • Operating expense | 0.27% | 0.25% |
| Total operating expenses and performance fees | 0.27% | 0.25% |

The computation of the above-mentioned ratios based on the amount of operating expenses and performance fee assessed to an individual investor's equity may vary from these ratios based on the timing of capital transactions. The above ratios do not reflect the Company's proportionate share of income and expenses of FSL.

| Based on US GAAP | 2007 | 2006 |
|---|---|---|
| Total return: | | |
| • Total return before performance fee | 5.64% | 6.53% |
| Total return after performance fees | 5.64% | 6.53% |

Total returns stated above are the total returns for the Company as a whole before and after performance fees based on the total capital subscriptions and redemptions and the change in net asset value during the years for the Company.

*Fairfield Sigma Limited,*
*Road Town, Tortola, British Virgin Islands*

21

## 2.6    Notes to the financial statements as at December 31, 2007 and 2006 (All amounts in EUR unless otherwise stated)

*Based on US GAAP*

|  | 2007 | 2006 |
|---|---|---|
| Per share operating performance |  |  |
| Net asset value, beginning of year | 175.49 | 164.74 |
| Net investment loss | (0.27) | (0.27) |
| Net realized and unrealized gains on transactions | 10.17 | 11.02 |
| Total from investment operations | 9.90 | 10.75 |
| Net asset value, end of year | 185.39 | 175.49 |

The schedule above provides a breakdown of the increase in net asset value per share into the net investment loss and net realized and unrealized gains on transactions.

### 2.6.14  Post-balance sheet events

There were no material post-balance sheet events which have a bearing on the understanding of the financial statements.