# Exhibit 7a

**Statuts**



TIMBRE CANTONAL
**Fr. 4.50**

RC GE     SA 12455/1999
CHE-106.844.161
3722 22.03.2005 002
756 660 000000489412 00000-9

## I - DENOMINATION - SIEGE - BUT - DUREE

### Article 1
### Raison sociale

Il existe sous la raison sociale Crédit Agricole (Suisse) SA, une société anonyme qui est régie par les présents statuts, et subsidiairement par le titre XXVI du Code des Obligations et la Loi fédérale sur les Banques et les Caisses d'Epargne ainsi que par la Loi fédérale sur les bourses et le commerce des valeurs mobilières.

### Article 2
### Siège

Le siège de la société est à Genève.

### Article 3
### But

La société a pour but l'exploitation d'une banque. Son activité comprend notamment :

a)   l'acceptation de fonds sous toutes les formes bancaires usuelles;

b)   l'activité de négociant en valeurs mobilières, ainsi que tous conseils en matière d'investissements boursiers, la gestion de fortune et la passation d'ordres de bourse en Suisse et à l'étranger;

c)   le maintien de comptes courants et de dépôts pour les clients dans le cadre de la gestion de leurs portefeuilles;

d)   l'achat et la vente de devises au comptant et à terme;

e)   l'achat et la vente pour elle-même et pour les clients, au comptant et à terme de valeurs mobilières (titres, tous instruments financiers, etc.) ainsi que de métaux précieux;

f)   l'achat et la vente de dérivés, pour elle-même et pour les clients;

g)   l'émission, l'escompte et l'encaissement d'effets suisses ou étrangers;

h)   la participation à toutes opérations de financement d'émission et de syndicat, notamment la souscription à des emprunts et actions ainsi que la participation à tous syndicats de placement (obligations, actions et autres papiers-valeurs);

i)   le placement de fonds à vue et à terme auprès des banques et instituts financiers;

j)   l'octroi de crédits lombards, de crédits hypothécaires, de prêts et d'avances en tout genre et sous toutes les formes, comportant des garanties ou non;

k)   l'établissement de lettres de crédits, l'ouverture d'accréditifs et la participation à de tels engagements;

l)   l'émission de garanties, cautionnement, etc.;

m)   toutes fonctions fiduciaires et exécutions testamentaires;

n)   la location de coffres;

o)   la constitution, la gestion et l'administration de sociétés pour le compte de tiers;

p)   la sous-traitance informatique et le back office pour compte d'établissements bancaires tiers;

q)   et plus généralement toute opération ordinaire d'une banque.



La société peut créer, en Suisse et à l'étranger, des filiales, succursales, agences et représentations et acquérir des participations dans d'autres banques et sociétés. Elle peut également détenir des immeubles pour compte propre.

La société peut accomplir tous les actes en relation directe ou indirecte avec son but social.

La société déploie son activité en Suisse et à l'étranger.

Article 4
Durée

La durée de la société est indéterminée.

## II - CAPITAL-ACTIONS ET ACTIONS

Article 5
Constitution et libération du capital

Le capital-actions s'élève à cinq cent septante-neuf millions trois cent septante et un mille francs (Frs 579'371'000.-) entièrement libéré.

Il est divisé en cinq cent septante-neuf mille trois cent septante et une (579'371) actions d'une valeur nominale de mille francs (Frs 1'000.-) chacune.

Article 5 bis

Le 20 novembre 1999, la société "Crédit Agricole Indosuez", société anonyme ayant son siège à Paris, a fait apport, avec effet rétroactif au 1er juillet 1999, à la société, de l'ensemble des actifs et passifs, ainsi que des opérations hors bilan, de ses succursales suisses de Genève, Lausanne, Lugano et Zurich, d'une valeur nette comptable de **quatre-vingt-neuf millions trente mille huit cent soixante-deux francs et quarante-neuf centimes (Frs. 89'030'862,49)** dont soixante millions de francs (Frs. 60'000'000.--), sont imputés sur le capital-actions.

En contrepartie de cet apport, il a été remis au Crédit Agricole Indosuez Paris, soixante mille (60'000) actions de mille francs (Frs. 1'000.--) chacune, nominatives, entièrement libérées, de la société.

Article 5 ter

La société a absorbé le 20 novembre 1999, par voie de fusion, avec effet rétroactif au 1er juillet 1999, la "Banque du Crédit Agricole (Suisse) SA", à Genève, selon contrat de fusion du 20 novembre 1999 et bilan arrêté au 30 juin 1999 présentant :

| | | |
|---|---|---|
| - un actif de | Frs. | 943'094'109.-- |
| - un passif envers les tiers de | Frs. | 857'810'154.-- |
| - soit un actif net de | Frs. | 85'283'955.-- |

Apport fait et accepté pour le prix de quatre-vingt-cinq millions deux cent quatre-vingt-trois mille neuf cent cinquante-cinq francs (Frs. 85'283'955.--) et imputé sur le capital à concurrence de cinquante millions de francs (Frs. 50'000'000.-)

En contrepartie, il a été remis aux actionnaires de la société absorbée cinquante mille (50'000) actions de mille francs (Frs. 1'000.--) chacune, nominatives, entièrement libérées de la société.

Fr. 4.50

### Article 5 quater

Aux termes d'actes reçus le 12 mai 2001, par Me Pierre-Frédéric Buhler, notaire à Genève, la société a absorbé par voie de fusion, avec effet rétroactif au premier janvier deux mille un, la BANQUE CAI (SUISSE) SA, à Genève, selon bilan arrêté au 31 décembre 2000, présentant :

◆ un actif de      Frs      2'571'869'369.--

◆ un passif envers les tiers de      Frs      2'498'483'478.--

◆ soit un actif net de      Frs      73'385'891.--

◆ (opérations hors-bilan      Frs      2'136'692.--)

Cet apport est fait et accepté pour une valeur septante-trois millions trois cent quatre-vingt-cinq mille huit cent nonante-et-un francs (Frs. 73'385'891.--), montant imputé sur le capital à concurrence de quarante millions de francs (Frs. 40'000'000.--).

En contrepartie, il a été remis aux actionnaires de la société absorbée quarante mille (40'000) actions de mille francs (Frs 1'000.--) chacune, nominatives, entièrement libérées."

### Article 5 quinquies

Aux termes d'actes reçus le 6 septembre 2003, par Me Pierre-Frédéric Buhler, notaire à Genève, la société a absorbé par voie de fusion, avec effet rétroactif au premier juillet deux mille trois, IntesaBci Bank (Suisse), à Zurich, selon bilan arrêté au 30 juin 2003, présentant :

◆ un actif de      Frs      608'574'676,75

◆ un passif envers les tiers de      Frs      499'877'120,37

◆ soit un actif net de      Frs      108'697'556,38

◆ (opérations hors-bilan      Frs      4'009'606'524,96)

Cet apport est fait et accepté pour une valeur de cent huit millions six cent nonante-sept mille cinq cent cinquante-six francs et trente-huit centimes (Frs. 108'697'556,38), montant imputé sur le capital à concurrence de cinquante-trois millions neuf cent treize mille francs (Frs. 53'913'000.--).

En contrepartie, il a été remis aux actionnaires de la société absorbée cinquante-trois mille neuf cent treize (53'913) actions de mille francs (Frs 1'000.--) chacune, nominatives, entièrement libérées.

### Article 5 sexies

Aux termes d'actes reçus le 19 mars 2005 par Me Pierre-Frédéric BUHLER, notaire à Genève, la société a repris, au sens de l'article 3 alinéa premier lettre a LFus (fusion par absorption), avec effet rétroactif au 1er janvier 2005, la société Crédit Lyonnais (Suisse) SA (Crédit Lyonnais (Schweiz) AG) (Crédit Lyonnais (Svizzera) SA), à Genève, selon contrat de fusion du 4 février 2005 et bilan au 31 décembre 2004, présentant:

| • | un actif de | Frs | 4'432'376'000.- |
|---|---|---|---|
| • | un passif envers les tiers de | Frs | 3'934'493'000.- |
| • | soit un actif net de | Frs | 497'883'000.- |

pour une valeur de Frs 497'883'000.-, montant imputé sur le capital à concurrence de Frs 225'458'000.-.

En contrepartie, les actionnaires de Crédit Lyonnais (Suisse) SA recevront 225'458 actions de Frs 1'000.- chacune, nominatives, ordinaires, non-liées, entièrement libérées, de Crédit Agricole (Suisse) SA.

## Article 6
### Espèces d'actions

Les actions sont nominatives.

Elles sont numérotées et portent la signature d'un administrateur. La société peut émettre en lieu et place de titres unitaires, des certificats globaux représentatifs de plusieurs actions.

La société a la faculté de renoncer à l'impression et à l'émission des titres relatifs aux actions. Tout actionnaire a le droit de demander en tout temps l'impression et la remise gratuite des titres relatifs à ses actions.

Par une modification des statuts, l'assemblée générale peut en tout temps convertir des actions au porteur en actions nominatives ou des actions nominatives en actions au porteur et a en outre le droit de diviser les actions en titres de valeur nominale réduite, ou de les réunir en titres de valeur nominale plus élevée du consentement de chaque actionnaire.

## Article 7
### Transfert des actions

Le transfert de la propriété des actions nominatives requiert la remise du titre endossé.

Les actions nominatives non imprimées ainsi que les droits qui en découlent sont transmissibles par cession écrite.

Le transfert des actions nominatives prend date et déploie ses effets vis-à-vis de la société, dès le jour de l'inscription du nouvel actionnaire sur le registre des actions de la société.

## Article 8
### Registre des actions nominatives

La société tient un registre des actions qui mentionne le nom et l'adresse de leurs propriétaires et usufruitiers.

L'inscription au registre des actions n'a lieu qu'au vu d'une pièce établissant l'acquisition de l'action ou la constitution d'un usufruit.

Est considéré comme actionnaire ou usufruitier à l'égard de la société celui qui est inscrit au registre des actions.

## Article 9
### Droits et obligations des actionnaires

Chaque action est indivisible à l'égard de la société qui ne reconnaît qu'un propriétaire par action.

Chaque actionnaire a droit à une part de bénéfice résultant du bilan et du produit de liquidation en proportion des versements opérés au capital-actions conformément aux articles 660 et 661 du Code des Obligations.

Les actionnaires ne sont tenus que des prestations statutaires et ne répondent pas personnellement des dettes sociales.

# III - ORGANISATION DE LA SOCIETE



### Article 10
### Organes de la société

Les organes de la société sont :

A.    L'assemblée générale des actionnaires

B.    Le Conseil d'Administration

C.    La Direction Générale

D.    L'organe de révision

## A.    L'assemblée générale des actionnaires

### Article 11
### Portée des décisions de l'assemblée générale

L'assemblée générale des actionnaires est le pouvoir suprême de la société. Ses décisions sont obligatoires pour tous les actionnaires même non présents ou non représentés.

Le Conseil d'Administration et chaque actionnaire peuvent attaquer en justice les décisions de l'assemblée générale qui violent la loi ou les statuts dans les conditions prévues aux articles 706 et suivants du Code des Obligations.

### Article 12
### Droit inaliénable

L'assemblée générale a le droit inaliénable :

1.    D'adopter et de modifier les statuts.

2.    De nommer les membres du Conseil d'Administration et l'organe de révision.

3.    D'approuver le rapport annuel et, lorsque la loi le prescrit, les comptes de groupe.

4.    D'approuver les comptes annuels et de déterminer l'emploi du bénéfice résultant du bilan, en particulier de fixer le dividende et les tantièmes.

5.    De donner décharge aux membres du Conseil d'Administration.

6.    De prendre toutes les décisions qui lui sont réservées par la loi ou les statuts.

### Article 13
### Assemblées générales ordinaires et extraordinaires

L'assemblée générale ordinaire se réunit chaque année dans les quatre mois qui suivent la clôture de l'exercice annuel.

L'assemblée générale des actionnaires peut être réunie extraordinairement aussi souvent qu'il est nécessaire.

Les dispositions qui suivent s'appliquent aux assemblées générales ordinaires et extraordinaires.

### Article 14
### Convocation de l'assemblée générale

L'assemblée générale est convoquée par le Conseil d'Administration ou, au besoin, par les réviseurs, les liquidateurs ou les représentants des obligataires.

Elle peut être tenue ailleurs qu'au siège social, mais en Suisse seulement.

Un ou plusieurs actionnaires, représentant ensemble le dix pour cent au moins du capital-actions, peuvent aussi requérir la convocation de l'assemblée générale ou l'inscription d'un objet à l'ordre du jour.

En outre, des actionnaires dont les actions totalisent une valeur nominale d'au moins un million de francs (CHF 1'000'000.-), peuvent requérir l'inscription d'un objet à l'ordre du jour.

La convocation et l'inscription d'un objet à l'ordre du jour doivent être requises par écrit en indiquant les objets de discussion et les propositions.

## Article 15
## Mode de convocation

L'assemblée générale est convoquée vingt jours au moins avant la date de sa réunion par publication dans la Feuille Officielle Suisse du Commerce et par courrier recommandé à chacun des actionnaires ou usufruitiers à l'adresse figurant au registre des actions.

Sont mentionnés dans la convocation le lieu, la date, les objets portés à l'ordre du jour, les propositions du Conseil d'Administration ou des actionnaires qui ont demandé la convocation de l'assemblée et/ou l'inscription d'un objet à l'ordre du jour, ainsi que la possibilité pour les actionnaires d'exiger qu'un exemplaire du rapport de gestion et du rapport de révision leur soit délivré dans les meilleurs délais.

Le rapport de gestion et le rapport de révision sont mis à la disposition des actionnaires au siège de la société vingt jours au plus tard avant l'assemblée générale.

Aucune décision ne peut être prise sur des objets qui n'ont pas été dûment portés à l'ordre du jour, à l'exception des propositions de convoquer une assemblée générale extraordinaire ou d'instituer un contrôle spécial.

Il n'est pas nécessaire d'annoncer à l'avance les propositions entrant dans le cadre des objets portés à l'ordre du jour ni les délibérations qui ne doivent pas être suivies d'un vote.

Tout actionnaire peut encore dans l'année qui suit l'assemblée générale se faire délivrer par la société une copie du rapport de gestion approuvé par l'assemblée ainsi que du rapport de révision.

## Article 16
## Réunion de tous les actionnaires (assemblée universelle)

Les propriétaires ou les représentants de la totalité des actions peuvent, s'il n'y a pas d'opposition, tenir une assemblée générale, sans observer les formes prévues pour sa convocation.

Aussi longtemps qu'ils sont présents, cette assemblée générale a le droit de délibérer et de statuer valablement sur tous les objets qui sont du ressort de l'assemblée générale.

## Article 17
## Droit de vote à l'assemblée générale

Les actionnaires exercent leur droit de vote à l'assemblée générale proportionnellement à la valeur nominale de toutes les actions qui leur appartiennent. Chaque actionnaire a droit à une voix au moins, même s'il ne possède qu'une action.

Vis-à-vis de la société, la personne inscrite dans le registre des actions est autorisée à exercer le droit de vote.

L'action grevée d'un droit d'usufruitier est représentée par l'usufruitier.

Un actionnaire peut faire représenter ses actions par une personne munie d'un pouvoir écrit.

## Article 18
## Constitution et présidence

L'assemblée générale est valablement constituée si au moins cinquante pour cent (50%) des actions sont représentées. Si cette proportion n'est pas atteinte, une nouvelle assemblée générale est convoquée conformément aux dispositions statutaires. Celle-ci est valablement constituée quel que soit le nombre d'actions représentées.

L'assemblée générale est présidée par le président du Conseil d'Administration ou, en cas d'empêchement, par le vice-président ou, à défaut, par un autre administrateur désigné par le Conseil d'Administration. A défaut, l'assemblée générale désigne un président parmi les actionnaires présents.

Le président désigne un scrutateur, choisi parmi les actionnaires et le secrétaire qui n'a pas besoin d'être actionnaire.

Le Conseil d'Administration doit présenter à l'assemblée générale le rapport de gestion annuel et ses propositions relatives à l'affectation du résultat et notamment à la répartition du bénéfice s'il y en a un.

### Article 19
### Décisions et élections

Les décisions et les nominations ont lieu à main levée à moins que le scrutin secret ne soit demandé par un ou plusieurs actionnaires, réunissant au moins 10% des voix présentes ou représentées ou ne soit décidé par le président de l'assemblée.

L'assemblée générale prend ses décisions et procède aux nominations à la majorité absolue des voix attribuées aux actions représentées, si la loi n'en dispose pas autrement. Si un second tour de scrutin est nécessaire, la majorité relative est suffisante. En cas d'égalité de voix, celle du président de l'assemblée est prépondérante.

Une décision de l'assemblée générale recueillant au moins les deux tiers des voix attribuées aux actions représentées et la majorité absolue des valeurs nominales représentées est nécessaire pour :

1.  la modification du but social;
2.  l'introduction d'actions à droit de vote privilégié;
3.  la restriction de la transmissibilité des actions nominatives;
4.  l'augmentation autorisée ou conditionnelle du capital-actions;
5.  l'augmentation du capital-actions au moyen des fonds propres, contre apport en nature ou en vue d'une reprise de biens et l'octroi d'avantages particuliers;
6.  la limitation ou la suppression du droit de souscription préférentiel;
7.  le transfert du siège de la société;
8.  la dissolution de la société sans liquidation;
9.  le changement de la forme juridique de la société.

Les dispositions statutaires, qui prévoient pour la prise de certaines décisions une plus forte majorité que celle prévue par la loi, ne peuvent être adoptées qu'à la majorité prévue.

### Article 20
### Procès-verbal

Le Conseil d'Administration veille à la rédaction du procès-verbal des séances de l'assemblée générale, lequel mentionne:

-   le nombre, l'espèce, la valeur nominale et la catégorie des actions représentées par les actionnaires, les organes ainsi que les représentants indépendants et les représentants dépositaires;
-   les décisions et le résultat des élections;
-   les demandes de renseignements et les réponses données;
-   les déclarations dont les actionnaires demandent l'inscription.

Le procès-verbal est signé par le président et le secrétaire de l'assemblée générale.

Les actionnaires ont le droit de consulter le procès-verbal. Les extraits qui en sont délivrés sont certifiés conformes par un membre du Conseil d'Administration.

## B.    Le Conseil d'Administration

### Article 21
### Composition

La société est administrée par un Conseil d'Administration composé de cinq membres au moins pris parmi les actionnaires et nommés par l'assemblée générale. Les exigences de nationalité et de domicile des administrateurs sont celles fixées par la loi.

Aucun membre du Conseil d'Administration ne peut appartenir à la Direction Générale de la société.

### Article 22
#### Organisation

Le Conseil désigne son président, ses deux vice-présidents et son secrétaire, lequel peut être pris hors du Conseil d'Administration.

### Article 23
#### Elections et durée des fonctions

La durée des fonctions des administrateurs est d'une année; elle prend fin lors de l'assemblée générale ordinaire suivante. En cas de décès ou de démission d'un administrateur, il est pourvu à son remplacement dans la plus prochaine assemblée générale ordinaire ou dans une assemblée générale extraordinaire.

L'administrateur nommé en remplacement d'un autre ne demeurera en fonction que pour le temps qu'aurait duré le mandat de son prédécesseur. Les administrateurs sont indéfiniment rééligibles.

### Article 24
#### Réunions et Décisions

Le Conseil d'Administration se réunit en principe en Suisse aussi souvent que les affaires l'exigent, ou à la demande écrite d'un membre adressée au président, mais au moins une fois par trimestre.

Pour être valablement tenues, les séances du Conseil d'Administration doivent réunir au moins les deux tiers de l'ensemble des membres du Conseil. Le Conseil d'Administration peut exceptionnellement tenir ses séances par conférence téléphonique.

Les décisions du Conseil d'Administration sont prises à la majorité des voix émises. En cas d'égalité, le président du Conseil a une voix prépondérante. Aucun quorum n'est nécessaire pour procéder aux formalités relatives aux augmentations de capital-actions.

Si les circonstances l'exigent, les décisions du Conseil d'Administration peuvent également être prises dans la forme d'une approbation donnée par écrit à une proposition, à condition que les propositions y relatives aient été envoyées à tous les membres du Conseil d'Administration, par courrier, par télécopieur ou par tout autre mode de communication électronique approprié, notamment par courrier électronique, et qu'aucun membre n'exige une discussion dans un délai de sept jours à compter de la date d'envoi. Pour autant qu'aucun membre du Conseil d'Administration n'exige de discussion dans le délai requis, la décision est réputée acceptée lorsque la majorité des membres du Conseil d'Administration ont approuvé par écrit la décision et que, dans cette majorité, se trouve le président du Conseil d'Administration. Dans l'hypothèse où un membre du Conseil d'Administration exige une discussion dans le délai requis, la décision est réputée ne pas être acceptée et le président du Conseil d'Administration doit convoquer une réunion du Conseil d'Administration ayant à l'ordre du jour les propositions soumises par voie de circulation. Les décisions prises par voie de circulation doivent être mentionnées pour mémoire dans le procès-verbal de la plus prochaine séance du Conseil d'Administration.

### Article 25
#### Procès-verbal

Il est tenu un procès-verbal des délibérations et décisions du Conseil d'Administration.

Celui-ci est signé par le président de la séance et le secrétaire. Il doit mentionner les membres présents.

### Article 26
#### Attributions intransmissibles et inaliénables

Le Conseil d'Administration peut prendre des décisions sur toutes les affaires qui ne sont pas attribuées à l'assemblée générale par la loi ou les statuts.

Le Conseil d'Administration est l'organe chargé de la haute direction, de la surveillance et du contrôle de la société. Il définit la politique générale de la société. Il exerce ses compétences dans le cadre fixé par le règlement interne.

Il a les attributions intransmissibles et inaliénables suivantes :

TIMBRE CANTONAL

Fr. 4.50

1. exercer la haute direction de la société et établir les instructions nécessaires;

2. fixer l'organisation, en particulier établir le règlement interne de la société;

3. fixer les principes de la comptabilité et du contrôle financier ainsi que du plan financier, pour autant que celui-ci soit nécessaire à la gestion de la société;

4. nommer et révoquer les personnes chargées de la gestion;

5. exercer la haute surveillance sur les personnes chargées de la gestion pour s'assurer notamment qu'elles observent la loi, les statuts, les règlements et les instructions données;

6. établir le rapport annuel, préparer l'assemblée générale et exécuter ses décisions;

7. informer le juge en cas de surendettement.

Il a en outre les attributions suivantes :

8. définir la politique générale et les orientations stratégiques de la société;

9. mandater l'institution de révision prévue par la loi fédérale sur les banques et les caisses d'épargne et examiner ses rapports ; le Conseil peut confier à cet organe des mandats spéciaux ou périodiques dépassant les contrôles prescrits par la loi;

10. décider de l'établissement de filiales, succursales, agences et représentations et de leur suppression;

11. décider de l'octroi de crédits, y compris ceux aux membres des organes de la société, conformément au règlement interne;

12. exercer le contrôle interne et la surveillance de l'évolution des gros risques au sens de l'article 21 alinéa 1 OB sur la base des relevés trimestriels établis par la Direction Générale;

13. prendre toute décision relative à l'achat et à la vente de tous biens immobiliers destinés à l'usage de la banque, ainsi qu'à la constitution de gages immobiliers sur ces biens immobiliers;

14. fixer la politique des risques, notamment en matière de risques de crédits et de risques de marchés, et procéder à un examen périodique de l'adéquation de la politique des risques et des limites y relatives.

## Article 27
### Représentation de la société

Le Conseil d'Administration représente la société à l'égard des tiers.

Il peut déléguer le pouvoir de représentation à un ou plusieurs de ses membres ou à des tiers et leur confère la signature sociale sous forme collective.

Il peut nommer des fondés de procuration et d'autres mandataires commerciaux.

## Article 28
### Comités

Le Conseil d'Administration peut constituer en son sein des comités du Conseil dont l'organisation et les compétences sont définies dans le règlement interne.

## Article 29
### Inspectorat

Le Conseil d'Administration désigne le(s) membre(s) de l'inspectorat interne dont les compétences et attributions sont définies dans le règlement interne.

## Article 30

Pour leurs fonctions, les administrateurs reçoivent, outre le remboursement de leurs frais, des honoraires dont le montant est fixé par l'assemblée générale.

## C.    La Direction Générale

### Article 31
### Composition et fonctions

La gestion et la conduite des affaires de la société est confiée à une Direction Générale.

La Direction Générale se compose d'un Président de la Direction Générale et de Directeurs Généraux.

Le Président de la Direction Générale et les Directeurs Généraux sont nommés par le Conseil d'Administration.

La Direction Générale est responsable de la gestion et du développement des affaires de la société, dans le cadre de la politique générale définie par le Conseil d'Administration, de l'observation et de l'application des lois et règlements, des instructions du Conseil d'Administration ainsi que de l'organisation et du bon fonctionnement des services de la société.

Ces compétences et devoirs sont fixés dans le règlement interne.

Elle répond envers le Conseil d'Administration de la bonne marche des affaires de la société.

Elle fait rapport sur son activité et les affaires de la société au Conseil d'Administration.

## D.    L'organe de révision

### Article 32
### Qualités requises

L'organe de révision est nommé par l'assemblée générale ordinaire et est composé de un ou plusieurs réviseurs. Une société fiduciaire ou un syndicat de révision agréé peut également être désigné comme organe de révision ou comme membre de cet organe.

Seuls les syndicats de révision et les sociétés fiduciaires reconnus comme institutions de révision pour les banques peuvent être chargés de la révision.

Les réviseurs doivent remplir les exigences de qualifications et d'indépendance prévues par les articles 727b et c du Code des Obligations, par les articles 20 alinéas 2, 3 et 4 de la Loi fédérale sur les banques et les caisses d'épargne, et l'art. 18 de la Loi fédérale sur les bourses et le commerce des valeurs mobilières.

Ils doivent se conformer aux dispositions des articles 728 et suivants du Code des Obligations, 19 et suivants de la Loi fédérale sur les banques et les caisses d'épargne, et 19 de la Loi fédérale sur les bourses et le commerce des valeurs mobilières.

### Article 33
### Durée des fonctions

La durée de fonction des réviseurs est d'une année ; elle prend fin lors de l'assemblée générale à laquelle le dernier rapport doit être soumis.

La réélection est possible.

### Article 34
### Attributions

L'organe de révision vérifie si la comptabilité, les comptes annuels et la proposition concernant l'emploi du bénéfice résultant du bilan sont conformes à la loi, aux statuts et aux directives en la matière.

L'organe de révision présente à l'assemblée générale un rapport écrit sur le résultat de sa vérification.

En cas de surendettement manifeste, il avise le juge si le Conseil d'Administration omet de le faire.

Les réviseurs s'assureront que les comptes annuels sont établis, tant à la forme qu'au fond, conformément aux prescriptions des lois, des statuts et des règlements ; ils mentionneront le résultat de leurs constatations dans le rapport de révision.

La société donnera aux réviseurs la possibilité de consulter en tout temps les livres et pièces comptables, et leur fournira tous les renseignements dont ils pourraient avoir besoin dans l'accomplissement de leur tâche.

La société leur remettra également les rapports établis par l'inspectorat interne.

Lorsque, au cours de leurs travaux, les réviseurs décèlent des infractions aux prescriptions légales ou d'autres irrégularités, ils doivent inviter la société à régulariser sa situation dans un délai approprié.

### Article 35
### Approbation de l'assemblée générale

L'assemblée générale ne peut approuver les comptes annuels ni décider de l'emploi du bénéfice résultant du bilan que si un rapport de révision lui est soumis et si un réviseur est présent.

L'assemblée générale peut renoncer à la présence d'un réviseur par une décision prise à l'unanimité.

## IV - COMPTES ANNUELS, RESERVES, DIVIDENDES

### Article 36
### Exercice social

L'exercice social se termine le trente et un décembre de chaque année.

### Article 37
### Rapport de gestion

Le Conseil d'Administration établit pour chaque exercice un rapport de gestion, lequel comprend les comptes annuels, le rapport annuel, ainsi que les bilans intermédiaires et, lorsque la loi le prescrit, des comptes de groupes. Ceux-ci seront établis conformément aux dispositions des articles 662 et suivants, 958 et suivants du Code des Obligations ainsi qu'à celles de la Loi fédérale sur les banques et les caisses d'épargne et à celles de la Loi fédérale sur les bourses et le commerce des valeurs mobilières.

### Article 38
### Affectation du bénéfice

Un vingtième au moins du bénéfice annuel net est versé à un fonds de réserve destiné à couvrir des pertes et à faire face à des amortissements. Les versements doivent être effectués jusqu'à ce que le fonds ait atteint un cinquième du capital social.

Le solde du bénéfice de l'exercice est réparti conformément aux décisions de l'assemblée générale, sur la proposition du Conseil d'Administration.

Les dispositions impératives de la loi sur les réserves doivent être respectées.

L'assemblée générale peut en tout temps décider de la création, à côté de la réserve générale prévue par la loi, d'autres fonds de réserve dont elle détermine le but et l'emploi.

### Article 39
### Dividende

Le paiement du dividende a lieu à l'époque fixée par le Conseil d'Administration.

Tout dividende qui n'a pas été réclamé dans les cinq ans dès son exigibilité est prescrit de plein droit au profit de la société.

# V -DISSOLUTION ET LIQUIDATION

### Article 40
### Dissolution

En cas de dissolution et de liquidation de la société, les dispositions de l'article 739 du Code des Obligations ainsi que les dispositions pertinentes de la Loi sur les banques sont applicables.

Lorsque la dissolution est décidée, la liquidation a lieu par les soins du Conseil d'Administration, sauf décision contraire de l'assemblée générale.

L'un au moins des liquidateurs doit être domicilié en Suisse et avoir qualité pour représenter la société.

### Article 41
### Liquidation

Pendant la liquidation, les pouvoirs des organes sociaux sont restreints aux actes qui sont nécessaires à cette opération et qui, de par leur nature, ne sont point du ressort des liquidateurs.

L'assemblée générale des actionnaires conserve le droit d'approuver les comptes de la liquidation et de donner décharge aux liquidateurs.

Les liquidateurs ne peuvent transférer à des tiers, contre paiement ou autre contre-valeur, l'ensemble des actifs et passifs de la société dissoute qu'en vertu d'une délibération de l'assemblée générale.

Après paiement des dettes, l'actif de la société dissoute est réparti entre les actionnaires au pro rata de leur participation au capital.

Cette répartition ne peut se faire qu'après l'expiration d'une année dès le jour où l'appel aux créanciers a été publié pour la troisième fois.

Une répartition peut avoir lieu après un délai de trois mois si un réviseur particulièrement qualifié atteste que les dettes sont éteintes et qu'on peut inférer des circonstances qu'aucun intérêt de tiers n'est mis en péril.

# VI - PUBLICATION ET FOR

### Article 42
### Publication

Les publications de la société sont valablement faites dans la Feuille Officielle Suisse du Commerce. Le Conseil d'Administration peut désigner également d'autres journaux.

### Article 43
### For

*Toutes contestations qui pourront s'élever pendant la durée de la société ou sa liquidation, soit entre les actionnaires et la société, ses administrateurs ou ses réviseurs, soit entre les actionnaires eux-mêmes en raison des affaires de la société, seront soumises aux tribunaux du siège de la société, sous réserve de recours au Tribunal Fédéral.*

*Le Notaire soussigné certifie que les présents statuts sont ceux actuellement en vigueur de "Crédit Agricole (Suisse) SA", société anonyme ayant son siège à Genève.*

*Genève, le 19 mars 2005*

# Exhibit 7b



12455 99

**Articles of Association**

## I - NAME - REGISTERED OFFICE - PURPOSE – TERM

Article 1

Name

A société anonyme (Swiss joint stock company) is formed under the name of Crédit Agricole (Suisse) SA, governed by these Articles of Association and title XXVI of the Swiss Code of Obligations and the Swiss Federal Law on Banks and Savings Institutions and the Federal Act on Stock Exchanges and Securities Trading.

Article 2

Registered office

The company's registered office is in Geneva.

Article 3

Purpose

The purpose of the company is the operation of a bank. Its activity includes, but is not limited to:

a)      the acceptance of funds in all usual banking forms;

b)      trading in securities, as well as consulting on stock market investments, asset management and stock market orders in Switzerland and abroad;

c)      maintaining current and deposit accounts for clients in the context of managing their portfolios;

d)      the purchase and sale of foreign currency in spot trades and futures;

e)      the purchase and sale of securities (securities, any and all financial instruments, etc.) for itself and for clients, in cash and futures, as well as precious metals;

f)      the purchase and sale of derivatives, for itself and for clients;

g)      the issuance, discounting and receipt of Swiss or foreign instruments;

h)      participation in any and all issuance and syndication financing transactions, including but not limited to subscription to loans and shares, as well as participation in any and all investment syndicates (bonds, equities and other securities);

i)      the placement of demand and term deposits with banks and financial institutions;

j)      the granting of Lombard loans, mortgages, loans and advances of all kinds and in all forms, with or without guarantees;

k)      establishing letters of credit, opening of credit, and participation in such commitments;

l)      the issuance of guarantees, surety bonds, etc.;

m)      all fiduciary duties and executions;

n)      safe deposit box rental;

o)      the formation, management and administration of companies on behalf of others;

p)      IT outsourcing and back office for third-party banks;

q)      and, in general, all normal banking operations.

[blank page in original]

The company may establish, in Switzerland and abroad, subsidiaries, branches, agencies and representations and acquire stakes in other banks and companies. It may also hold real estate on its own behalf.

The company may perform any and all activities directly or indirectly related to its corporate purpose.

The company operates in Switzerland and abroad.

Article 4
Term

The term of the company is indefinite.

**II - SHARE CAPITAL AND SHARES**

Article 5
Constitution and release of capital

The share capital amounts to five hundred and seventy-nine million three hundred and seventy-one thousand francs (579,371,000.-- CHF), fully paid up.

It is divided into five hundred and seventy-nine thousand three hundred and seventy-one (579,371) shares with a par value of one thousand francs (1,000.-- CHF) each.

Article 5b

On November 20, 1999, effective retroactively from July 1, 1999, the company "Crédit Agricole Indosuez," a société anonyme with its registered office in Paris, contributed to the company all of the assets and liabilities, as well as the off-balance sheet transactions, of its Swiss branches in Geneva, Lausanne, Lugano and Zurich, with a net book value of **eighty-nine million thirty thousand eight hundred and sixty-two francs and forty-nine centimes (89,030,862.49 CHF),** of which sixty million francs (60,000,000.-- CHF) were charged to the share capital.

In return for this contribution, Crédit Agricole Indosuez Paris was provided with sixty thousand (60,000) fully paid-up registered shares of the company, valued at one thousand francs (1,000.-- CHF) each.

Article 5c

On November 20, 1999 in Geneva, effective retroactively from July 1, 1999, the company absorbed "Banque du Crédit Agricole (Suisse) SA" by merger in accordance with the merger agreement dated November 20, 1999 and the balance sheet as at June 30, 1999 showing:

- assets totaling                                 943,094,109.-- CHF
- liabilities to third parties totaling           857,810,154.-- CHF
- or net assets totaling                     85,283,955.-- CHF

Contribution made and accepted for the price of eighty-five million two hundred and eighty-three thousand nine hundred and fifty-five francs (85,283,955.-- CHF), with fifty million francs (50,000,000.-- CHF) charged to the capital. In return, the absorbed company's shareholders received fifty thousand (50,000) fully paid-up registered shares of the company, with a value of one thousand francs (1,000.-- CHF) each.



Fr. 4.50

### Article 5d

Pursuant to documents received on May 12, 2001, by Mtre Pierre-Frédéric Buhler, notary in Geneva, effective retroactively from January 1, 2001, the company absorbed BANQUE CAI (SUISSE) SA by merger, in Geneva, in accordance with the balance sheet as of December 31, 2000, showing:

- ◆ assets totaling    2,571,869,369.-- CHF
- ◆ liabilities to third parties totaling    2,498,483,478.-- CHF
- ◆ or net assets totaling    73,385,891.-- CHF
- ◆ (off-balance sheet transactions    2,136,692.-- CHF)

This contribution is made and accepted for a value of seventy-three million three hundred and eighty-five thousand eight hundred and ninety-one francs (73,385,891.-- CHF), with forty million francs (40,000,000.-- CHF) charged to the capital.

In return, the absorbed company's shareholders received forty thousand (40,000) fully paid-up registered shares with a value of one thousand francs (1,000.-- CHF) each.

### Article 5e

Pursuant to documents received on September 6, 2003 by Mtre Pierre-Frédéric Buhler, notary in Geneva, effective retroactively from July 1, 2003, the company absorbed IntesaBci Bank (Switzerland) by merger, in Zurich, in accordance with the balance sheet as of June 30, 2003 showing:

- ◆ assets totaling    608,574,676.75 CHF
- ◆ liabilities to third parties totaling    499,877,120.37 CHF
- ◆ or net assets totaling    108,697,556.38 CHF
- ◆ (off-balance sheet transactions    4,009,606,524.96 CHF)

This contribution is made and accepted for a value of one hundred and eight million six hundred and ninety-seven thousand five hundred and fifty-six francs and thirty-eight centimes (108,697,556.38 CHF), with fifty-three million nine hundred and thirteen thousand francs (53,913,000.-- CHF).

In return, the absorbed company's shareholders received fifty-three thousand nine hundred and thirteen (53,913) fully paid-up registered shares with a value of one thousand francs (1,000.--- CHF) each.

### Article 5f

Pursuant to documents received on March 19, 2005 by Mtre Pierre-Frédéric BUHLER, notary in Geneva, effective retroactively from January 1, 2005, the company has, within the meaning of Article 3, paragraph, point a of the Swiss Merger Act (absorption merger), acquired the company Crédit Lyonnais (Suisse) SA (Crédit Lyonnais (Schweiz) AG) (Crédit Lyonnais (Svizzera) SA), in Geneva, in accordance with the merger agreement dated February 4, 2005 and the balance sheet as of December 31, 2004 showing:

[blank page in original]

- ◆ assets totaling                                                        4,432,376,000.-- CHF
- ◆ liabilities to third parties totaling                          3,934,493,000.-- CHF
- ◆ or net assets totaling                                          497,883,000.-- CHF

for a value of 497,883,000.-- CHF, with 225,458,000.-- CHF charged to the capital.

In return, Crédit Lyonnais (Suisse) SA's shareholders will receive 225,458 registered, fully paid, non-linked ordinary shares of Crédit Agricole (Suisse) SA, with a value of 1,000.-- CHF each.

### Article 6
### Types of shares

The shares are registered.
They are numbered and signed by an administrator. In lieu of single securities, the company may issue global certificates representing several shares.
The company may forgo the printing and issuance of securities relating to the shares. Every shareholder has the right to request, at any time, the printing and free delivery of the securities related to his shares.
By amendment of the Articles of Association, the general meeting may at any time convert bearer shares into registered shares or registered shares into bearer shares, and it also has the right to divide the shares into smaller par value securities or merge them into higher par value securities with the consent of each shareholder.

### Article 7
### Transfer of shares

The transfer of ownership of registered shares requires presentation of the endorsed share certificate.
Unprinted registered shares and the rights deriving therefrom may be transferred by written assignment.
The transfer of registered shares is dated on and effective from the date of registration of the new shareholder in the company's share register.

### Article 8
### Register of registered shares

The company keeps a register of shares containing the names and addresses of their owners and usufructuaries.
Registration in the share register can only occur upon presentation of a document establishing the acquisition of the share or the constitution of a usufruct.
The person registered in the share register is considered the shareholder or usufructuary vis-à-vis the company.

### Article 9
### Shareholders' rights and obligations

Each share is indivisible vis-à-vis the company, which recognizes only one owner per share.
Each shareholder is entitled to a share of the profit resulting from the balance sheet and the liquidation proceeds in proportion to the payments made to the share capital in accordance with Articles 660 and 661 of the Swiss Code of Obligations.
The shareholders are only held liable for their statutory contributions and do not answer personally for the social debts.

[blank page in original]



## III - ORGANIZATION OF THE COMPANY

Article 10
Corporate bodies

The company's corporate bodies are:
A.    the general meeting
B.    the Board of Directors
C.    General Management
D.    the auditing body

A.    The General Meeting

Article 11
Scope of decisions by the general meeting

The general meeting is the highest authority of the company. Its decisions are binding on all shareholders even if they are not present or not represented.
The Board of Directors and each shareholder may take legal action against decisions of the general meeting that violate the law or the Articles of Association in accordance with Articles 706 et seq. of the Swiss Code of Obligations.

Article 12
Inalienable right

The general meeting has the inalienable right:

1.    To adopt and modify the Articles of Association.
2.    To appoint members of the Board of Directors and auditors.
3.    To approve the annual report and, where required by law, the group accounts.
4.    To approve the annual accounts and determine the use of the profit resulting from the balance sheet, including but not limited to determining the dividend and the share in profits.
5.    To grant discharge to the members of the Board of Directors.
6.    To make any and all decisions reserved to it by law or the Articles of Association.

Article 13
Ordinary and extraordinary general meetings

The ordinary general meeting occurs every year within the four months following the end of the fiscal year.
The general meeting may also be convened extraordinarily as often as necessary.
The following provisions apply to ordinary and extraordinary general meetings.

Article 14
Convening the general meeting

The general meeting is convened by the Board of Directors or, when necessary, by the auditors, liquidators, or representatives of the bondholders.
It may be held in a different location to the registered office, but only in Switzerland.

[blank page in original]

One or more shareholders, together representing at least ten per cent of the share capital, may also request the convening of the general meeting or the inclusion of an item on the agenda.

In addition, shareholders whose shares have a par value of at least one million francs (1,000,000 CHF) may request the inclusion of an item in the agenda.

The convocation and the inclusion of an object on the agenda must be requested in writing, including the discussion points and proposals.

Article 15

Convocation method

The general meeting is convened at least twenty days in advance by publication in the Swiss Official Gazette of Commerce and by registered mail to each of the shareholders or usufructuaries at the address appearing in the share register.

The convocation must include the location and date of the meeting, the items on the agenda, any proposals from the Board of Directors or the shareholders who requested that the meeting be convened and/or that an item be added to the agenda, as well as the option for shareholders to require that a copy of the management report and the audit report be issued to them as soon as possible.

The management report and the audit report are made available to the shareholders at the company's registered office no later than twenty days before the general meeting.

No decision can be made on items that have not been duly placed on the agenda, with the exception of proposals to convene an extraordinary general meeting or to institute special control.

It is not necessary to announce in advance any proposals falling within the scope of the items on the agenda nor deliberations that do not need to be followed by a vote.

In the year following the general meeting, any shareholder may have the company send them a copy of the management report approved by the general meeting, as well as a copy of the audit report.

Article 16

Meeting of all Shareholders (Universal Shareholders' Meeting)

The owners or representatives of all shares may, if there is no opposition, hold a general meeting without observing the formalities stipulated for its convocation.

As long as they are present, this general meeting has the right to deliberate and validly decide on all subjects that fall under the responsibility of the general meeting.

Article 17

Right to vote at the general meeting

Shareholders exercise their voting rights at the general meeting in proportion to the par value of all shares belonging to them. Each shareholder is entitled to at least one vote, even if he has only one share.

The person registered in the register of shares is authorized to exercise the right to vote vis-à-vis the company.

Any share with a usufructuary right is represented by the usufructuary.

A shareholder may have his shares represented by a person with written authorization.

Article 18

Constitution and chairmanship

The general meeting is validly constituted if at least fifty percent (50%) of the shares are represented. If this proportion is not reached, a new general meeting is convened in accordance with the statutory provisions. It is validly constituted regardless of the number of shares represented.

The general meeting is chaired by the chairman of the Board of Directors or, in his absence, by the vice-chairman or, failing that, by another director appointed by the Board of Directors. Failing that, the general meeting appoints a chairman from among the shareholders present.

The chairman appoints a scrutineer, chosen from among the shareholders, and the secretary, who does not need to be a shareholder.

For every financial year, the Board of Directors shall present, to the general meeting, an annual management report and its proposals regarding the allocation of the result, including but not limited to distribution of profit if there is any.

Fr. 4.50

### Article 19
### Decisions and elections

Decisions and appointments shall be by show of hands unless a secret ballot is requested by one or more shareholders representing at least 10% of the votes present or represented, or decided by the chairman of the meeting. The general meeting makes its decisions and appointments by absolute majority of the votes attributed to the represented shares, if the law does not stipulate otherwise. If a second ballot is necessary, a relative majority is sufficient. In the event of a tie, the chairman of the meeting has the deciding vote.

A decision of the general meeting receiving at least two thirds of the votes attributed to the represented shares, and the absolute majority of the nominal values represented, is necessary for:

1.      modification of the corporate purpose;
2.      the introduction of shares with privileged voting rights;
3.      restricting the transferability of registered shares;
4.      an authorized or conditional increase in share capital;
5.      a capital increase using existing equity, against contribution in kind or for the purposes of taking over assets, and the provision of special preferences;
6.      restriction or abolition of preferential subscription rights;
7.      the transfer of the company's registered office;
8.      the dissolution of the company without liquidation;
9.      changing the legal form of the company.

Provisions of the Articles of Association which prescribe a larger majority than that stipulated by law for the passing of certain resolutions can only be adopted if the prescribed majority is obtained.

### Article 20
### Minutes

The Board of Directors is responsible for drafting the minutes of the general meetings, which shall include:

−      the number, type, par value and class of the shares represented by the shareholders, the corporate bodies, the independent representatives, and the depositary representatives;
−      the decisions and results of elections;
−      inquiries and answers given;
−      any statements that the shareholders have requested be placed on the record.

The minutes are signed by the chairman and secretary of the general meeting.

Shareholders have the right to consult the minutes. The extracts delivered to them shall be certified as true copies by a member of the Board of Directors.

## B.      The Board of Directors

### Article 21
### Composition

The company is managed by a Board of Directors composed of at least five members from among the shareholders and appointed by the general meeting. The nationality and domicile requirements of the directors are those set by law.

No member of the Board of Directors may belong to the General Management of the company.

[blank page in original]

## Article 22
## Organization

The Board shall appoint a chairman, two vice chairmen and a secretary, who may come from outside the Board of Directors.

## Article 23
## Elections and terms of office

The term of office for each Director is one year; it ends at the time of the next ordinary general meeting. In the event of the death or resignation of a Director, he shall be replaced at the next ordinary general meeting or in an extraordinary general meeting.

A Director appointed to replace another Director shall serve as Director only for the remainder of his predecessor's term of office. Administrators can be reelected indefinitely.

## Article 24
## Meetings and Decisions

The Board of Directors generally meets in Switzerland as often as business requires, or by written request of a member addressed to the chairman, but at least once per quarter.

To be validly held, meetings of the Board of Directors must be attended by at least two-thirds of all Board members. The Board of Directors may hold its sessions by conference call in exceptional circumstances.

The resolutions of the Board of Directors are made by a majority of the votes cast. In the event of a tie, the chairman of the Board has the deciding vote. No quorum is required to proceed with the formalities relating to share capital increases.

If circumstances so require, decisions of the Board of Directors may also be made in the form of written approval of a proposal, provided that the relevant proposals have been sent to all members of the Board of Directors by mail, fax, or any other appropriate electronic means of communication, including but not limited to e-mail, and that no member requests a discussion within seven days from the date of dispatch. If no member of the Board of Directors requires discussion within the prescribed period, the decision shall be deemed to be accepted when the majority of the members of the Board of Directors have approved the decision in writing, provided that the chairman of the Board of Directors is part of said majority. If a member of the Board of Directors does request a discussion within the prescribed period, the decision is deemed not to be accepted and the Chairman of the Board of Directors must convene a meeting of the Board of Directors whose agenda includes the proposals submitted by correspondence. Decisions made by correspondence must be documented for the record in the minutes of the next meeting of the Board of Directors.

## Article 25
## Minutes

Minutes of the deliberations and decisions of the Board of Directors are kept.

They are signed by the chairman of the meeting and by the secretary. They must include a list of the members present.

## Article 26
## Non-transferable and inalienable duties

The Board of Directors may make decisions on all matters that do not fall under the responsibility of the general meeting under the law or the bylaws.

The Board of Directors is the body responsible for senior management, oversight and control of the company. It determines the company's general policy. It exercises its powers within the framework set by the internal regulations.

It has the following non-transferable and inalienable duties:

[blank page in original]

Fr. 4.50

1. management of the company at the highest level and issuing the necessary instructions;
2. establishing the organization of the company, including but not limited to the company's internal regulations;
3. establishing the accounting and financial control principles as well as the financial plan, provided that it is necessary for the management of the company;
4. appointing and dismissing the persons responsible for management;
5. high-level supervision of the persons responsible for management of the company, including but not limited to their compliance with laws, the Articles of Association, regulations and instructions;
6. drafting the annual report, preparing for the general meeting and executing its decisions;
7. informing the judge in the event of over-indebtedness.

It also has the following duties:

8. defining the company's general policy and strategic guidelines;
9. appointing the auditing body stipulated by the Swiss Federal Law on Banks and Savings Institutions and examining its reports; the Board may entrust to said body special or periodic mandates exceeding the audits required by law;
10. deciding on the creation and abolition of subsidiaries, branches, agencies and representations;
11. deciding on the granting of credit, including to members of the company's corporate bodies, in accordance with the internal regulations;
12. exercising internal control and monitoring the development of major risks within the meaning of Article 21 paragraph 1 OB on the basis of quarterly statements prepared by the General Management;
13. making any and all decisions relating to the purchase and sale of any and all real property holdings intended for use by the bank, as well as establishing antichreses on these real property holdings;
14. setting the company's risk policy, particularly with regard to credit risks and market risks, and carrying out a periodic review of the adequacy of the risk policy and the limits related to it.

Article 27
Representation of the company

The Board of Directors represents the company vis-à-vis third parties.

It may delegate the power of representation to one or more of its members or to third parties and confer the corporate signature on them, collectively.

It may appoint proxies and other commercial agents.

Article 28
Committees

The Board of Directors may form internal Board Committees whose organization and powers are defined in the internal regulations.

Article 29
Inspectorate

The Board of Directors appoints the member(s) of the internal inspectorate, whose powers and responsibilities are defined in the internal regulations.

Article 30

For their duties, the directors receive, in addition to the reimbursement of their expenses, a fee, the amount of which is set by the general meeting.

### C.    General Management

Article 31
Composition and duties

The management and conduct of the affairs of the company is entrusted to the General Management.

The General Management is composed of the President of General Management and the Managing Directors.

The President of General Management and the Managing Directors are appointed by the Board of Directors.

The General Management is responsible for the management and development of the company's business, within the framework of the general policy defined by the Board of Directors; the observation and application of laws, regulations, and instructions from the Board of Directors, as well as the organization and proper functioning of the company's departments.

These powers and duties are set out in the internal regulations.

It is responsible to the Board of Directors for the smooth operation of the company's business.

It reports on its activity and the affairs of the company to the Board of Directors.

### D.    The Auditing Body

Article 32
Qualifications

The auditing body is appointed by the ordinary general meeting and is composed of one or more auditors. A trust company or an approved auditors' union may also be appointed as an auditing body or a member of that body.

Only auditors' unions and trust companies recognized as audit institutions for banks may be responsible for the audit.

Auditors must meet the qualifications and independence requirements of Articles 727b and c of the Swiss Code of Obligations; Article 20, paragraphs 2, 3 and 4 of the Swiss Federal Law on Banks and Savings Institutions, and Article 18 of the Swiss Federal Law on Stock Exchanges and Securities Trading.

They must comply with the provisions of Article 728 et seq. of the Swiss Code of Obligations, Article 19 et seq. of the Swiss Federal Law on Banks and Savings Institutions, and Article 19 of the Swiss Federal Law on Stock Exchanges and Securities Trading.

Article 33
Terms of office

The term of office for each auditor is one year; it ends at the time of the general meeting to which the last report must be submitted.

Reelection is possible.

Article 34
Duties

The auditing body shall check whether the accounts, the annual accounts and the proposal concerning the use of the profit resulting from the balance sheet comply with the relevant laws, statutes and directives.

The auditing body shall deliver a written report to the general meeting on the outcome of their audit.

In the event of manifest over-indebtedness, it shall notify the judge if the Board of Directors fails to do so.

The auditors shall make sure that the annual accounts are prepared, in both form and substance, in accordance with the provisions of the laws, statutes and regulations; they shall include the results of their findings in the audit report.

The company will give the auditors the opportunity to consult the books and accounting documents at any time and provide them with any information they may need in the performance of their duties.

The company shall also provide them with the reports prepared by the internal inspectorate.

If, during the course of their work, the auditors detect any violations of legal requirements or other irregularities, they must ask the company to resolve its situation within an appropriate period of time.

Article 35

Approval by the general meeting

The general meeting may only approve the annual accounts or decide on the use of the profit resulting from the balance sheet if an audit report is submitted to it and an auditor is present.

The general meeting may waive the presence of an auditor by unanimous decision.

## IV - ANNUAL ACCOUNTS, RESERVES, DIVIDENDS

Article 36

Fiscal year

The company's fiscal year ends on the thirty-first of December each year.

Article 37

Management report

For each fiscal year, the Board of Directors prepares a management report which includes the annual accounts, the annual report, the interim reports and, where required by law, the group accounts. They must be established in accordance with the provisions of Article 662 et seq. and Article 958 et seq. of the Swiss Code of Obligations, as well as those of the Swiss Federal Law on Banks and Savings Institutions and the Swiss Federal Law on Stock Exchanges and Securities Trading.

Article 38

Appropriation of profit

At least one twentieth of the annual net profit is paid into a reserve fund to cover losses and depreciation. These payments must be made until the fund has reached one fifth of the share capital.

The remainder of the profit for the year is distributed in accordance with the decisions of the general meeting, on the proposal of the Board of Directors.

The mandatory provisions of Swiss laws on reserves must be respected.

The general meeting may at any time decide on the creation, aside from the general reserve required by law, of other reserve funds whose purpose and use are determined by the general meeting.

Article 39

Dividend

Payment of the dividend shall take place at the time set by the Board of Directors.

Any dividend not claimed within five years from its payability date is automatically forfeited to the company.

## V - DISSOLUTION AND LIQUIDATION

### Article 40
### Dissolution

In the event of dissolution and liquidation of the company, the provisions of Article 739 of the Swiss Code of Obligations and the relevant provisions of the Swiss Law on Banks shall apply.

If dissolution is ordered, liquidation shall be effected by the Board of Directors, unless otherwise decided by the general meeting.

At least one of the liquidators must be domiciled in Switzerland and have the authority to represent the company.

### Article 41
### Liquidation

During the liquidation, the powers of the corporate bodies are limited to actions that are necessary for this operation and which, by their nature, are not the responsibility of the liquidators.

The general shareholders' meeting retains the right to approve the liquidation accounts and grant discharge to the liquidators.

The liquidators may not transfer to third parties, for payment or other equivalent, any assets and liabilities of the dissolved company, except pursuant to a deliberation of the general meeting.

After payment of any debts, the assets of the dissolved company shall be distributed among the shareholders in proportion to their shareholding.

This distribution can be carried out only after the expiration of one year from the day the appeal to creditors was published for the third time.

A distribution may take place after a period of three months if a specially qualified auditor certifies that the debts are extinguished, and circumstances do not suggest that any third party interest is jeopardized.

## VI - PUBLICATION AND PLACE OF JURISDICTION

### Article 42
### Publication

The company's publications are validly made in the Swiss Official Gazette of Commerce. The Board of Directors may also designate other newspapers.

### Article 43
### Place of jurisdiction

*Any disputes that may arise during the life of the company or its liquidation, either between the shareholders and the company, its directors or its auditors, or between the shareholders themselves due to the affairs of the company, shall be submitted to the court having jurisdiction over the location of the registered office, subject to appeal to the Federal Court.*

*The undersigned Notary hereby certifies that these Articles of Association are those currently in force for "Crédit Agricole (Suisse) SA," a société anonyme with its registered office in Geneva.*

*Geneva,  March 19, 2005*

[SIGNATURE]
[ILLEGIBLE STAMP]

Inscription No. 3722        2005      Document No. 7

# TRANSLATION CERTIFICATION

Date: January 21, 2020

To whom it may concern:

This is to certify that the attached translation is an accurate representation of the documents received by this office. The translation was completed from:

- French (France)

To:

- English (USA)

The documents are designated as:
- Credit Agricole (Suisse) SA, Articles of Association_English

Jay Bragg, Project Manager in this company, attests to the following:

"To the best of my knowledge, the aforementioned documents are a true, full and accurate translation of the specified documents."

Signature of Jay Bragg