# EXHIBIT 7

**UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>FAIRFIELD SENTRY LIMITED, *et al.*,<br><br>Debtors in Foreign Proceedings. | Ch. 15 Case<br><br>Case No. 10-13164 (SMB)<br><br>Jointly Administered |
| FAIRFIELD SENTRY LIMITED, *et al.* (In Liquidation), acting by and through the Foreign Representatives thereof,<br><br>Plaintiffs,<br><br>-against-<br><br>THEODOOR GGC AMSTERDAM, *et al.*,<br><br>Defendants. | Adv. Pro. No. 10-03496 (SMB)<br><br>Administratively Consolidated |
| FAIRFIELD SENTRY LIMITED, *et al.* (In Liquidation), acting by and through the Foreign Representatives thereof,<br><br>Plaintiffs,<br><br>-against-<br><br>ABN AMRO SCHWEIZ AG a/k/a ABN AMRO (SWITZERLAND) AG, *et al.*,<br><br>Defendants. | Adversary  Pro. No. 10-03635 (SMB) |
| FAIRFIELD SENTRY LIMITED, *et al.* (In Liquidation), acting by and through the Foreign Representatives thereof,<br><br>Plaintiffs,<br><br>-against-<br><br>ABN AMRO SCHWEIZ AG a/k/a ABN AMRO (SWITZERLAND) AG, *et al.*,<br><br>Defendants. | Adversary  Pro. No. 10-03636 (SMB) |

## DECLARATION OF YANN LAJOUX

I, Yann LAJOUX, being duly sworn under penalty of perjury, pursuant to 28 U.S.C. § 1746 and the laws of the United States of America, declares that the following is true and correct :

## Qualifications

1.      I am a citizen of Monaco and an Attorney licensed to practice law in the Principality of Monaco. My offices are located at 18 boulevard des Moulins, MC 98000, Monaco.

2.      I have been a Barrister with the Bar of Monaco since 1998 and was appointed as a Defense Counsel of the Bar of Monaco in 2006. I served as the President of the Monaco Bar Association for the period 2018-2019. I am a Knight of the Order of Saint-Charles of the Principality of Monaco. A full copy of my curriculum vitae is attached hereto. **(Exhibit 1)**

3.      I have been retained by counsel for EFG Bank (Monaco) S.A.M. f/k/a EFG Eurofinancière d'Invest MCL ("EFG") named as a defendant in the above-captioned proceeding to give my opinion on three questions relating to the postal service of summons, complaint and amended complaints.

4.      I understand that another attorney licensed to practice in Monaco, Geraldine Gazo, issued a declaration in January 2017 on behalf of EFG in connection with the above-referenced proceedings and responding to the same three questions as those below. *See* Declaration of Geraldine Gazo, *Fairfield Sentry Ltd., et al., v. ABN AMRO Schweitz AG, et al.*, Adv. Pro. No. 10-03635 [Dkt. No. 216]. I have reviewed her declaration and the exhibits attached thereto and have reached the same conclusions as those set forth in her declaration. In particular, I reviewed and analyzed the legal authorities that she cited in her declaration and independently assessed the relevant case law. I make this declaration upon my own personal knowledge and affirm that I am familiar with the international treaties, law and case law cited herein.


## Question No. 1:

Counsel for the Fairfield liquidators have filed certificates with the New York State Court and the US Bankruptcy Court noting service of the complaints, amended complaints and summons by postal service. Is postal service of a summons and complaint issued in a foreign proceeding valid under the laws of Monaco?

## Response to Question No. 1:

5.      The Hague Convention of 15 November 1965 (hereinafter, the "Convention") concerned the service abroad of judicial and extrajudicial documents in civil or commercial matters. **(Exhibit 2)**

6.      The United States of America acceded to the aforementioned Convention, and ratified it on 24 August 1967; it entered into force on 10 February 1969. **(Exhibit 3)**

7.      The Principality of Monaco acceded to the Convention on 1 March 2007, and following Ordinance No. 1,059 of 13 April 2007, published in the *Journal de Monaco* ("Monaco Journal") of 11 May 2007; the Convention entered into force in Monaco on 1

November 2007. However, in Monaco's legal system, an international convention's entry into force has a dual nature; that is, in addition to the signing and the ratification of the international convention, a Sovereign Ordinance is required to acknowledge and incorporate the convention under domestic law. **(Exhibit 4)**

8.      The Principality of Monaco issued four declarations relating to Articles 8, 10, 15 and 16 of the Convention. The Convention and the declarations establish the requirements for valid and enforceable service of a judicial complaint from a foreign proceeding on defendants located within the Principality of Monaco.

9.      Article 3 of the Convention provides that:

*"The authority or judicial officer competent under the law of the State in which the documents originate shall forward to the Central Authority of the State addressed a request conforming to the model annexed to the present Convention, without any requirement of legalization or other equivalent formality .*

*The document to be served or a copy thereof shall be annexed to the request. The request and the document shall both be furnished in duplicate. "*

And Article 5 of the Convention specifies that:

*"The Central Authority of the State addressed shall itself serve the document or shall arrange to have it served by an appropriate agency, either –*

> *a)      by a method prescribed by its internal law for the service of documents in domestic actions upon persons who are within its territory, or*

> *b)      by a particular method requested by the applicant, unless such a method is incompatible with the law of the State addressed.*

10.      The Monegasque legal framework for valid and enforceable service of process arising from a US foreign proceeding on Monegasque defendants requires that US Authorities send a request to the Monaco Authorities to serve the judicial documents. Then, the Monaco Authorities asks a Monaco Bailiff to serve the summons, and/or the complaint, and/or the amended complaint with a sworn translation in French (*i.e.*, the official language of Monaco) to the Monegasque defendant.

11.      According to the *"Affidavits of Service"* the Liquidators filed, the "summons," "complaints," and " amended complaints" were allegedly served in the following way: *"postage pre-paid envelope to be delivered via International Registered Mail and depositing same in official depository under the exclusive care and custody of the United States Postal Service within the State of New York, upon the following: SEE ATTACHED SERVICE LIST."* EFG appears as the recipient of the above notifications via the postal service in the *"Service List"* annexed to the *"Affidavits of Service"* above. I understand from the terms used by the signatory of these *"Affidavits"* that no other method has been used to effect service of the abovementioned documents.

12.    Monaco's second declaration specifically concerns Article 10 of the Convention regarding postal service of a judicial complaint from a foreign proceeding on defendants located within the Principality of Monaco, stating:

*"The Principality of Monaco declares that it is opposed to the exercise of the freedom provided for in Article 10, paragraph 1 a)."* **(Exhibit 5)**

Therefore, the Principality of Monaco, when acting as the State of destination, is opposed and has not consented to under the Convention the direct service of judicial documents, using the postal service, to defendants located within the Principality of Monaco. For service of a judicial complaint from a foreign proceeding on defendants located within the Principality of Monaco to be valid and enforceable, the parties must comply with the provisions of Article 3 and Article 5 of the Convention.

13.    It follows from the combined provisions in Articles 3 and 5 above, and the Principality of Monaco's opposition to the application of freedom described by Article 10, paragraph 1a) of the Convention, that the service of judicial and/or extrajudicial documents via the postal service is not in accordance with Monaco's legal system.

14.    In conclusion, I am of the opinion that the service of the abovementioned documents to EFG solely via the postal service does not comply with Monegasque law. Service of the above-mentioned documents by postal service as reflected in the Affidavits of Service will be declared void and unenforceable by a Monegasque Judge consistent with the provisions of the Convention, Sovereign Ordinance, declarations and Monegasque law described above.

## Question No. 2:

In the complaints, amended complaints and the proposed amended complaints, the Fairfield liquidators refer to provisions of subscription agreements which purport to authorize postal service on a signatory. Are those provisions of the subscription agreements purportedly authorizing postal service of a summons and complaint enforceable under the laws of Monaco?

## Response to Question No. 2:

15.    The subscription agreements clause in question is covered in page 8 of the "Complaint" of 21 September 2010; notably, it is reproduced in full on page 10 of the "First Amended Complaint" of 10 January 2011 as well as on page 10 of the "Second Amended Complaint" of 3 May 2011, on pages 9 and 10 of the "Third Amended Complaint" of July 2012, and on pages 10 and 11 of the "Fourth Amended Complaint" of 9 February 2020. The clause concerns the application of New York law, assigning exclusive jurisdiction to the Courts of New York. It also provides that the subscriber consents to any notifications outside of a New York court that are made via the postal service.

16.    It is common to come across an article in a contract relating to the applicable law and the jurisdiction of the courts. There is no disputing that the parties may choose the law applicable to their contractual relationship and agree to submit to the jurisdiction of their

choosing, which would of course be subject to the applicable rules of jurisdiction *ratione materiae* and *ratione loci*. However, the contractual provision in question relating to a notification or service via postal service is a different matter.

17.    In Monaco, international conventions take precedence over domestic laws of the contracting countries, even those established subsequently, as the Court of Revision—the highest civil court in Monaco—has ruled. **(Exhibit 6)**

18.    This principle has since been reaffirmed on several occasions by the Court of Appeal in Monaco. Thus, in a judgment dated 21 June 1994, the Court of Appeal ruled that:

*"Considering that an international Convention is essentially a contract under international law between legal persons, whose only inherent aim is to bind the signatory states together in their relationships;*

*That only when if arises from the Convention, the objective of this text shall be to establish direct rights to the benefit of nationals of the signatory states, or place obligations upon them;*

*That a provision of an international agreement must be considered by the judge as being **directly applicable,** when taking into account the wording, objective and nature of the agreement, it contains a clear, precise obligation, whose fulfilment and effect does not require any supplementary measures."* **(Exhibit 7)**

19.    In a judgment dated 30 August 2001 delivered in a case in point concerning the International Covenant on Civil and Political Rights of 16 December 1966, the Court of Appeal ruled:

*"In this regard, it should be noted, in effect, that in a judgment delivered on 21 April 1980, the Court of Revision held that international conventions take precedence over domestic laws of the contracting countries, even those established subsequently. The abovementioned International Covenant on Civil and Political Rights stipulates (...) however, that the Gouvernement princier* [the "Prince's Government," i.e. Monaco's government] *indicated that this text should be interpreted as stating a general principal to which limited exceptions could be made under law, set out in the declaration annexed to that Covenant. It follows that this principal of direct application under Monegasque law may only be limited by means of a legal provision. "* **(Exhibit 8)**

20.    Under this case law, it is my opinion that the signatory parties of the "Subscription Agreements" cannot, by means of a simple contractual provision, prevent application of an international convention that was lawfully introduced into Monegasque national law, with supra-legislative value, and which should be applied directly by the Monegasque Judge. As a result, the requirements for valid and enforceable service of judicial documents under the Convention, Sovereign Ordinance and declarations cannot be altered by contract or agreement between parties.

21.    Consequently, I am of the opinion that the subscription agreements clause, which would authorize, as is claimed, the service of a summons via the postal service and/or a

complaint to the Monegasque company EFG, is contrary to the Convention, as well as the declaration of the Principality of Monaco opposing the exercise of freedom provided for by Article 10, paragraph 1 a) of the aforementioned Convention. Therefore, this subscription agreements clause would not be valid and enforceable within the Principality of Monaco as it conflicts with the Convention that is directly applicable in this circumstance.

**Question No. 3:**

In the complaints, amended complaints and the proposed amended complaints, the Fairfield liquidators note that CGC NA and various other Citco-related entities (the "Citco Subscriber"), entities related to the fund administrator for the Fairfield funds, "upon information and belief," signed subscription agreements with Fairfield Sentry and Fairfield Sigma which contain provisions allegedly binding beneficial shareholders to the provisions of those subscription agreements which purport to authorize postal service on a signatory. If so, then are those provisions purportedly authorizing postal service of a summons and complaint allegedly signed by the Citco Subscriber in its representative capacity and allegedly binding on beneficial shareholders enforceable under the laws of Monaco?

**Response to Question No.3:**

22.    As indicated in my response to Question No. 2, the parties cannot, through a contractual provision, provide any opposition to the application of an international convention that has been lawfully introduced into domestic law in the Principality of Monaco and which has supra-legislative value.

23.    Consequently, I am of the opinion that the abovementioned provisions, authorizing the purported postal service of a summons and a complaint apparently signed by CGC NA in its representative capacity and which would apparently bind the beneficial shareholders, would not be valid and enforceable within the Principality of Monaco for the reasons indicated in my response to Question No. 2.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Dated: March 12, 2020
Principality of Monaco

**Yann LAJOUX**

**YANN LAJOUX**
AVOCAT - DEFENSEUR
18, Boulevard des Moulins
MC - 98000 MONTE-CARLO
Tél. : (00-377) 97 77 56 56 - Fax : (00-377) 97 77 56 57

List of Exhibits:

1 - Curriculum Vitae of Maître Yann Lajoux

2 - Hague Convention of 15 November 1965

3 - Status Table

4- Sovereign Ordinance n° 1,059 of 13 April 2007

5 - Monaco's Declarations Articles 8, 10, 15, 16

6 - Case Law, Court of Révision, 21 April 1980

7 - Case Law, Court of Appeal, 21 June 1994

8 - Case Law, Court of Appeal, 30 August 2001

# EXHIBIT 1

CURRICULUM VITAE

**Yann LAJOUX, 18 boulevard des Moulins, Principality of Monaco**



### WORK HISTORY

- Barrister with the Bar of Monaco since 1998, specialized in :

  - International law,
  - Banking law,
  - Criminal business law
  - All types of civil and business procedures before the Monegasque Courts

- Defense Counsel with the Bar of Monaco since 2006, appointed by Sovereign Order of His Serene Highness Prince Rainier III

- Member of the Bar Association of the Principality of Monaco

- President of the Monaco Bar Association in 2018-2019

### EDUCATION

- Master's in law, Université de droit et de sciences économiques, Nice Sophia-Antipolis, France

- References:

    Knight of the Order of Saint-Charles of the Principality of Monaco

### LANGUAGES

French, English, Italian

# EXHIBIT 2

### 14. CONVENTION RELATIVE À LA SIGNIFICATION ET LA NOTIFICATION À L'ÉTRANGER DES ACTES JUDICIAIRES ET EXTRAJUDICIAIRES EN MATIÈRE CIVILE OU COMMERCIALE

*(Conclue le 15 novembre 1965)*



Les Etats signataires de la présente Convention,

Désirant créer les moyens appropriés pour que les actes judiciaires et extrajudiciaires qui doivent être signifiés ou notifiés à l'étranger soient connus de leurs destinataires en temps utile,

Soucieux d'améliorer à cette fin l'entraide judiciaire mutuelle en simplifiant et en accélérant la procédure,

Ont résolu de conclure une Convention à ces effets et sont convenus des dispositions suivantes :

#### Article premier

La présente Convention est applicable, en matière civile ou commerciale, dans tous les cas où un acte judiciaire ou extrajudiciaire doit être transmis à l'étranger pour y être signifié ou notifié.

La Convention ne s'applique pas lorsque l'adresse du destinataire de l'acte n'est pas connue.

CHAPITRE 1- ACTES JUDICIAIRES

#### Article 2

Chaque Etat contractant désigne une Autorité centrale qui assume, conformément aux articles 3 à 6, la charge de recevoir les demandes de signification ou de notification en provenance d'un autre Etat contractant et d'y donner suite.

L'Autorité centrale est organisée selon les modalités prévues par l'Etat requis.

#### Article 3

L'autorité ou l'officier ministériel compétents selon les lois de l'Etat d'origine adresse à l'Autorité centrale de l'Etat requis une demande conforme à la formule modèle annexée à la présente Convention, sans qu'il soit besoin de la légalisation des pièces ni d'une autre formalité équivalente.

La demande doit être accompagnée de l'acte judiciaire ou de sa copie, le tout en double exemplaire.

#### Article 4

Si l'Autorité centrale estime que les dispositions de la Convention n'ont pas été respectées, elle en informe immédiatement le requérant en précisant les griefs articulés à l'encontre de la demande.

---

[1] Cette Convention, y compris la documentation y afférente, est disponible sur le site Internet de la Conférence de La Haye de droit international privé (www.hcch.net), sous la rubrique« Conventions » ou sous l'« Espace Notification ». Concernant l'historique complet de la Convention, voir Conférence de La Haye de droit international privé, *Actes et documents de la Dixième session (1964),* tome III, *Notification* (391 p.).

### Article 5

L'Autorité centrale de l'Etat requis procède ou fait procéder à la signification ou à la notification de l'acte :
*a)* soit selon les formes prescrites par la législation de l'Etat requis pour la signification ou la notification des actes dressés dans ce pays et qui sont destinés aux personnes se trouvant sur son territoire,
*b)* soit selon la forme particulière demandée par le requérant, pourvu que celle-ci ne soit pas incompatible avec la loi de l'Etat requis.

Sauf le cas prévu à l'alinéa premier, lettre *b)*, l'acte peut toujours être remis au destinataire qui l'accepte volontairement.
Si l'acte doit être signifié ou notifié conformément à l'alinéa premier, l'Autorité centrale peut demander que l'acte soit rédigé ou traduit dans la langue ou une des langues officielles de son pays.
La partie de la demande conforme à la formule modèle annexée à la présente Convention, qui contient les éléments essentiels de l'acte, est remise au destinataire.

### Article 6

L'Autorité centrale de l'Etat requis ou toute autorité qu'il aura désignée à cette fin établit une attestation conforme à la formule modèle annexée à la présente Convention.
L'attestation relate l'exécution de la demande ; elle indique la forme, le lieu et la date de l'exécution ainsi que la personne à laquelle l'acte a été remis. Le cas échéant, elle précise le fait qui aurait empêché l'exécution.
Le requérant peut demander que l'attestation qui n'est pas établie par l'Autorité centrale ou par une autorité judiciaire soit visée par l'une de ces autorités.
L'attestation est directement adressée au requérant.

### Article 7

Les mentions imprimées dans la formule modèle annexée à la présente Convention sont obligatoirement rédigées soit en langue française, soit en langue anglaise. Elles peuvent, en outre, être rédigées dans la langue ou une des langues officielles de l'Etat d'origine.
Les blancs correspondant à ces mentions sont remplis soit dans la langue de l'Etat requis, soit en langue française, soit en langue anglaise.

### Article 8

Chaque Etat contractant a la faculté de faire procéder directement, sans contrainte, par les soins de ses agents diplomatiques ou consulaires, aux significations ou notifications d'actes judiciaires aux personnes se trouvant à l'étranger.
Tout Etat peut déclarer s'opposer à l'usage de cette faculté sur son territoire, sauf si l'acte doit être signifié ou notifié à un ressortissant de l'Etat d'origine.

### Article 9

Chaque Etat contractant a, de plus, la faculté d'utiliser la voie consulaire pour transmettre, aux fins de signification ou de notification, des actes judiciaires aux autorités d'un autre Etat contractant que celui-ci a désignées.
Si des circonstances exceptionnelles l'exigent, chaque Etat contractant a la faculté d'utiliser, aux mêmes fins, la voie diplomatique.

### Article 10

La présente Convention ne fait pas obstacle, sauf si l'Etat de destination déclare s'y opposer:
*a)* à la faculté d'adresser directement, par la voie de la poste, des actes judiciaires aux personnes se trouvant à l'étranger,

*b* ) à la faculté, pour les officiers ministériels, fonctionnaires ou autres personnes compétents de l'Etat d'origine, de faire procéder à des significations ou notifications d'actes judiciaires directement par les soins des officiers ministériels, fonctionnaires ou autres personnes compétents de l'Etat de destination,
*c)* à la faculté, pour toute personne intéressée à une instance judiciaire, de faire procéder à des significations ou notifications d'actes judiciaires directement par les soins des officiers ministériels, fonctionnaires ou autres personnes compétents de l'Etat de destination.

### Article 11

La présente Convention ne s'oppose pas à ce que des Etats contractants s'entendent pour admettre, aux fins de signification ou de notification des actes judiciaires, d'autres voies de transmission que celles prévues par les articles qui précèdent et notamment la communication directe entre leurs autorités respectives.

### Article 12

Les significations ou notifications d'actes judiciaires en provenance d'un Etat contractant ne peuvent donner lieu au paiement ou au remboursement de taxes ou de frais pour les services de l'Etat requis.
Le requérant est tenu de payer ou de rembourser les frais occasionnés par :
*a)* l'intervention d'un officier ministériel ou d'une personne compétente selon la loi de l'Etat de destination,
*b)* l'emploi d'une forme particulière.

### Article 13

L'exécution d'une demande de signification ou de notification conforme aux dispositions de la présente Convention ne peut être refusée que si l'Etat requis juge que cette exécution est de nature à porter atteinte à sa souveraineté ou à sa sécurité.
L'exécution ne peut être refusée pour le seul motif que la loi de l'Etat requis revendique la compétence judiciaire exclusive dans l'affaire en cause ou ne connaît pas de voie de droit répondant à l'objet de la demande.
En cas de refus, l'Autorité centrale en informe immédiatement le requérant et indique les motifs.

### Article 14

Les difficultés qui s'élèveraient à l'occasion de la transmission, aux fins de signification ou de notification, d'actes judiciaires seront réglées par la voie diplomatique.

### Article 15

Lorsqu'un acte introductif d'instance ou un acte équivalent a dû être transmis à l'étranger aux fins de signification ou de notification, selon les dispositions de la présente Convention, et que le défendeur ne comparaît pas, le juge est tenu de surseoir à statuer aussi longtemps qu'il n'est pasétabli :
*a)* ou bien que l'acte a été signifié ou notifié selon les formes prescrites par la législation de l'Etat requis pour la signification ou la notification des actes dressés dans ce pays et qui sont destinés aux personnes se trouvant sur son territoire,
*b)* ou bien que l'acte a été effectivement remis au défendeur ou à sa demeure selon un autre procédé prévu par la présente Convention,
et que, dans chacune de ces éventualités, soit la signification ou la notification, soit la remise a eu lieu en temps utile pour que le défendeur ait pu se défendre.

Chaque Etat contractant a la faculté de déclarer que ses juges, nonobstant les dispositions de l'alinéa premier, peuvent statuer si les conditions suivantes sont réunies, bien qu'aucune attestation constatant soit la signification ou la notification, soit la remise, n'ait été reçue :
*a)* l'acte a été transmis selon un des modes prévus par la présente Convention,
*b)* un délai que le juge appréciera dans chaque cas particulier et qui sera d'au moins six mois, s'est écoulé depuis la date d'envoi de l'acte,

*c)* nonobstant toutes diligences utiles auprès des autorités compétentes de l'Etat requis, aucune attestation n'a pu être obtenue.

Le présent article ne fait pas obstacle à ce qu'en cas d'urgence, le juge ordonne toutes mesures provisoires ou conservatoires.

## Article 16

Lorsqu'un acte introductif d'instance ou un acte équivalent a dû être transmis à l'étranger aux fins de signification ou de notification, selon les dispositions de la présente Convention, et qu'une décision a été rendue contre un défendeur qui n'a pas comparu, le juge a la faculté de relever ce défendeur de la forclusion résultant de l'expiration des délais de recours, si les conditions suivantes sont réunies :
*a)* le défendeur, sans qu'il y ait eu faute de sa part, n'a pas eu connaissance en temps utile dudit acte pour se défendre et de la décision pour exercer un recours,
*b)* les moyens du défendeur n'apparaissent pas dénués de tout fondement.

La demande tendant au relevé de la forclusion est irrecevable si elle n'est pas formée dans un délai raisonnable à partir du moment où le défendeur a eu connaissance de la décision.
Chaque Etat contractant a la faculté de déclarer que cette demande est irrecevable si elle est formée après l'expiration d'un délai qu'il précisera dans sa déclaration, pourvu que ce délai ne soit pas inférieur à un an à compter du prononcé de la décision.
Le présent article ne s'applique pas aux décisions concernant l'état des personnes.

### CHAPITRE Ii -ACTES EXTRAJUDICIAIRES

## Article 17

Les actes extrajudiciaires émanant des autorités et officiers ministériels d'un Etat contractant peuvent être transmis aux fins de signification ou de notification dans un autre Etat contractant selon les modes et aux conditions prévus par la présente Convention.

### CHAPITRE III - DISPOSITIONS GENERALES

## Article 18

Tout Etat contractant peut désigner, outre l'Autorité centrale, d'autres autorités dont il détermine les compétences.
Toutefois, le requérant a toujours le droit de s'adresser directement à l'Autorité centrale.
Les Etats fédéraux ont la faculté de désigner plusieurs Autorités centrales.

## Article 19

La présente Convention ne s'oppose pas à ce que la loi interne d'un Etat contractant permette d'autres formes de transmission non prévues dans les articles précédents, aux fins de signification ou de notification, sur son territoire, des actes venant de l'étranger.

## Article 20

La présente Convention ne s'oppose pas à ce que des Etats contractants s'entendent pour déroger :
*a)* à l'article 3, alinéa 2, en ce qui concerne l'exigence du double exemplaire des pièces transmises,
*b)* à l'article 5, alinéa 3, et à l'article 7, en ce qui concerne l'emploi des langues,
*c)* à l'article 5, alinéa 4,
*d)* à l'article 12, alinéa 2.

### Article 21

Chaque Etat contractant notifiera au Ministère des Affaires Etrangères des Pays-Bas soit au moment du dépôt de son instrument de ratification ou d'adhésion, soit ultérieurement :
*a)* la désignation des autorités prévues aux articles 2 et 18,
*b)* la désignation de l'autorité compétente pour établir l'attestation prévue à l'article 6,
*c)* la désignation de l'autorité compétente pour recevoir les actes transmis par la voie consulaire selon l'article 9.

Il notifiera, le cas échéant, dans les mêmes conditions :
*a)* son opposition à l'usage des voies de transmission prévues aux articles 8 et 10,
*b)* les déclarations prévues aux articles 15, alinéa 2, et 16, alinéa 3,
*c)* toute modification des désignations, opposition et déclarations mentionnées ci-dessus.

### Article 22

La présente Convention remplacera dans tes rapports entre les Etats qui l'auront ratifiée, les articles 1 à 7 des Conventions relatives à la procédure civile, respectivement signées à La Haye, le 17 juillet 1905 et le premier mars 1954, dans la mesure où lesdits Etats sont parties à l'une ou à l'autre de ces Conventions.

### Article 23

La présente Convention ne porte pas atteinte à l'application de l'article 23 de la Convention relative à la procédure civile, signée à La Haye, le 17 juillet 1905, ni de l'article 24 de celle signée à La Haye, le premier mars 1954.
Ces articles ne sont toutefois applicables que s'il est fait usage de modes de communication identiques à ceux prévus par lesdites Conventions.

### Article 24

Les accords additionnels auxdites Conventions de 1905 et de 1954, conclus par les Etats contractants, sont considérés comme également applicables à la présente Convention à moins que les Etats intéressés n'en conviennent autrement.

### Article 25

Sans préjudice de l'application des articles 22 et 24, la présente Convention ne déroge pas aux Conventions auxquelles les Etats contractants sont ou seront Parties et qui contiennent des dispositions sur les matières réglées par la présente Convention.

### Article 26

La présente Convention est ouverte à la signature des Etats représentés à la Dixième session de la Conférence de La Haye de droit international privé.
Elle sera ratifiée et les instruments de ratification seront déposés auprès du Ministère des Affaires Etrangères des Pays-Bas.

Article 27

La présente Convention entrera en vigueur le soixantième jour après le dépôt du troisième instrument de ratification prévu par l'article 26, alinéa 2.

La Convention entrera en vigueur, pour chaque Etat signataire ratifiant postérieurement, le soixantième jour après le dépôt de son instrument de ratification.

Article 28

Tout Etat non représenté à la Dixième session de la Conférence de La Haye de droit international privé pourra adhérer à la présente Convention après son entrée en vigueur en vertu de l'article 27, alinéa premier. L'instrument d'adhésion sera déposé auprès du Ministère des Affaires Etrangères des Pays-Bas.

La Convention n'entrera en vigueur pour un tel Etat qu'à défaut d'opposition de la part d'un Etat ayant ratifié la Convention avant ce dépôt, notifiée au Ministère des Affaires Etrangères des Pays-Bas dans un délai de six mois à partir de la date à laquelle ce Ministère lui aura notifié cette adhésion.

A défaut d'opposition, la Convention entrera en vigueur pour l'Etat adhérant le premier jour du mois qui suit l'expiration du dernier des délais mentionnés à l'alinéa précédent.

Article 29

Tout Etat, au moment de la signature, de la ratification ou de l'adhésion, pourra déclarer que la présente Convention s'étendra à l'ensemble des territoires qu'il représente sur le plan international, ou à l'un ou plusieurs d'entre eux. Cette déclaration aura effet au moment de l'entrée en vigueur de la Convention pour ledit Etat.

Par la suite, toute extension de cette nature sera notifiée au Ministère des Affaires Etrangères des Pays-Bas.

La Convention entrera en vigueur, pour les territoires visés par l'extension, le soixantième jour après la notification mentionnée à l'alinéa précédent.

Article 30

La présente Convention aura une durée de cinq ans à partir de la date de son entrée en vigueur conformément à l'article 27, alinéa premier, même pour les Etats qui l'auront ratifiée ou y auront adhéré postérieurement.

La Convention sera renouvelée tacitement de cinq en cinq ans, sauf dénonciation.

La dénonciation sera, au moins six mois avant l'expiration du délai de cinq ans, notifiée au Ministère des Affaires Etrangères des Pays-Bas.

Elle pourra se limiter à certains des territoires auxquels s'applique la Convention.

La dénonciation n'aura d'effet qu'à l'égard de l'Etat qui l'aura notifiée. La Convention restera en vigueur pour les autres Etats contractants.

Article 31

Le Ministère des Affaires Etrangères des Pays-Bas notifiera aux Etats visés à l'article 26, ainsi qu'aux Etats qui auront adhéré conformément aux dispositions de l'article 28 :

a) les signatures et ratifications visées à l'article 26 ;

b) la date à laquelle la présente Convention entrera en vigueur conformément aux dispositions de l'article 27, alinéa premier;

c) les adhésions visées à l'article 28 et la date à laquelle elles auront effet ;

d) les extensions visées à l'article 29 et la date à laquelle elles auront effet ;

e) les désignations, opposition et déclarations mentionnées à l'article 21 ;

f) les dénonciations visées à l'article 30, alinéa 3.

En foi de quoi, les soussignés, dûment autorisés, ont signé la présente Convention.

Fait à La Haye, le 15 novembre 1965, en français et en anglais, les deux textes faisant également foi, en un seul exemplaire, qui sera déposé dans les archives du Gouvernement des Pays-Bas et dont une copie certifiée conforme sera remise, par la voie diplomatique, à chacun des Etats représentés à la Dixième session de la Conférence de La Haye de droit international privé.

# EXHIBIT 3

ÉTAT PRÉSENT

## 14: Convention du 15 novembre 1965 relative à la signification et la notification à l'étranger des actes judiciaires et extrajudiciaires en matière civile ou commerciale

Entrée en vigueur: 10-11-1969

Dernière mise à jour: 20-VII-2016

,Q, Consulter et/ou imprimer l'état complet

Nombre d'États contractants à cette Convention : 71

Membres de la HCCH        Etats non membres

## Membres de l'Organisation

| États | S | R/A/S2 | Type³ | VIG⁴ | EXT⁵ | Aut ⁶ | Rés/D/N ⁷ |
|-------|---|--------|-------|------|------|-------|-----------|
| Albanie | | 1-XI-2006 | A | 1-VII-2007 | | 3 | |
| Allemagne | 15-XI-1965 | 27-IV-1979 | R | 26-VI-1979 | | 3 | D |
| Argentine | | 2-11-2001 | A | 1-XII-2001 | | 2 | D,Res |
| Arménie | | 27-VI-2012 | A | 1-11-2013 | | | |
| Australie | | 15-111-2010 | A | 1-XI-2010 | 7 | 5 | D |
| Bélarus | | 6-VI-1997 | A | 1-11-1998 | | | |
| Belgique | 21-1-1966 | 19-XI-1970 | R | 18-1-1971 | | 2 | D |
| Bosnie-Herzégovine | | 16-VI-2008 | A | 1-11-2009 | | | |
| Bulgarie | | 23-XI-1999 | A | 1-VIII-2000 | | 3 | D |
| Canada | | 26-IX-1988 | A | 1-V-1989 | | 4 | D |
| Chine, République populaire de | | 6-V-1991 | A | 1-1-1992 | | 8 | D,N |
| Chypre | | 26-X-1982 | A | 1-VI-1983 | | 4 | D |

| | | | | | | |
|---|---|---|---|---|---|---|
| Corée, République de | | 13-1-2000 | A | 1-VIII-2000 | 2 | D,Res |
| Costa Rica | | 16-111-2016 | A | 1-X-2016 | | |
| Croatie | | 28-11-2006 | A | 1-XI-2006 | 3 | D,Res |
| Danemark | 7-1-1969 | 2-VIII-1969 | R | 1-X-1969 | 3 | D |
| Egypte | 1-111-1966 | 12-XII-1968 | R | 10-11-1969 | | Res |
| Espagne | 21-X-1976 | 4-VI-1987 | R | 3-VIII-1987 | 3 | D |
| Estonie | | 2-11-1996 | | 1-X-1996 | | D |
| Etats-Unis d'Amérique | 15-XI-1965 | 24-VI11-1967 | R | 10-11-1969 | | D |
| Ex-République yougoslave de Macédoine | | 23-XII-2008 | A | 1-IX-2009 | | D,Res |
| Finlande | 15-XI-1965 | 11-IX-1969 | R | 1 0-XI-1969 | 2 | D |
| France | 12-1-1967 | 3-VII-1972 | R | 1-IX-1972 | 3 | D |
| Grèce | 20-VI1-1983 | 20-VII-1983 | R | 18-IX-1983 | | D |
| Hongrie | | 13-VII-2004 | A | 1-IV-2005 | 3 | D |
| Inde | | 23-XI-2006 | A | 1-VIII-2007 | | D,Res |
| Irlande | 20-X-1989 | 5-IV-1994 | R | 4-VI-1994 | 3 | D,Res |
| Islande | | 10-XI-2008 | A | 1-VII-2009 | | D,Res |
| Israël | 25-XI-1965 | 14-VIII-1972 | R | 13-X-1972 | 2 | D,Res |
| Italie | 25-1-1979 | 25-XI-1981 | R | 24-1-1982 | 3 | D |
| Japon | 12-111-1970 | 28-V-1970 | R | 27-VII-1970 | 3 | D |
| Lettonie | | 28-111-1995 | A | 1-XI-1995 | 4 | D |
| Lituanie | | 2-VIII-2000 | A | 1-VI-2001 | 3 | D,Res |
| Luxembourg | 27-X-1971 | 9-VII-1975 | R | 7-IX-1975 | | D,Res |
| Malte | | 24-11-2011 | A | 1-X-2011 | | D |
| Maroc | | 24-111-2011 | A | 1-XI-2011 | | |
| Mexique | | 2-XI-1999 | A | 1-VI-2000 | 2 | D |
| Monaco | | 1-111-2007 | A | 1-XI-2007 | 2 | D |
| Monténégro | | 16-1-2012 | A | 1-IX-2012 | 2 | D |

| États | S | R/A/S2 | Type3 | VIG4 | EXT5 | Aut6 | Rés/D/N7 |
|---|---|---|---|---|---|---|---|
| Norvège | 15·X-1 968 | 2-VIII-1969 | R | 1-X-1969 | | 3 | D,Res |
| Pays-Bas | 15-XI-1965 | 3-XI-1975 | R | 2-1-1976 | | 5 | D |
| Pologne | | 13-11-1996 | A | 1-IX-1996 | | 4 | Res |
| Portugal | 5-VII-1971 | 27-XII-1973 | R | 25-11-1974 | | 2 | D |
| République de Moldova | | 4·VII-2012 | A | 1-11-2013 | | 2 | D,Res |
| République tchèque | | 28-1-1993 | Su | 1·1-1993 | | 4 | D,Res |
| Roumanie | | 21-VI11-2003 | A | 1·IV-2004 | | 2 | D |
| Royaume-Uni de Grande-Bretagne et d'Irlande du Nord | 10-XII-1965 | 17-XI-1967 | R | 10·11·1969 | 14 | 4 | D |
| Russie, Fédération de | | 1-V-2001 | A | 1-XII-2001 | | 4 | D,Res |
| Serbie | | 2-VII-2010 | A | 1-11-2011 | | 2 | D |
| Slovaquie | | 15-111-1993 | Su | 1·1-1993 | | 4 | D |
| Slovénie | | 18-IX-2000 | A | 1-VI-2001 | | | D,Res |
| Sri Lanka | | 31-VI11-2000 | A | 1-VI-2001 | | 3 | D |
| Suède | 4-11-1969 | 2-VIII-1969 | R | 1·X-1969 | | 2 | D |
| Suisse | 21-V-1985 | 2-XI-1994 | R | 1+1995 | | 3 | D,Res |
| Turquie | 11-VI-1968 | 28-11-1972 | R | 28-IV-1972 | | 3 | Res,D |
| Ukraine | | 1-11-2001 | A | 1-XII-2001 | | 3 | D,Res |
| Venezuela | | 29-X-1993 | A | 1-VII-1994 | | I | D,Res |
| Viet Nam | | 16·111-2016 | A | 1·X-2016 | | | D,N |

# Etats non membres de l'Organisation

| États | 51 | R/A/S2 | Type3 | VIG4 | EXT5 | Aut6 | Rés/D/N7 |
|---|---|---|---|---|---|---|---|
| Antigua et Barbuda | | 1-V-1985 | Su | 1-XI-1981 | | | |
| Bahamas | | 17-VI-1997 | A | 1-11-1998 | | | |
| Barbade | | 10-11-1969 | A | 1·X -1969 | | | |

| | | | | | |
|---|---|---|---|---|---|
| Belize | 8-IX-2009 | A | 1-V-2010 | | |
| Botswana | 10-11-1969 | A | 1-IX-1969 | 3 | D |
| Colombie | 10-IV-2013 | A | 1-XI-2013 | | D |
| Kazakhstan | 15-X-2015 | A | 1-VI-2016 | | D |
| Koweït | 8-V-2002 | A | 1-XII-2002 | 3 | D.Res |
| Malawi | 24-IV-1972 | A | 1-XII-1972 | l | |
| Pakistan | 7-XII-1988 | A | 1-VIII-1989 | 3 | D |
| Saint-Marin | 15-IV-2002 | A | 1-XI-2002 | 3 | D |
| Saint-Vincent-et-les-Grenadines | 6-1-2005 | Su | 27-X-1979 | 3 | D |
| Seychelles | 18-XI-1980 | A | 1-VII-1981 | | D |

1) S = Signature
2) R/A/Su = Ratification, Adhésion ou Succession
3) Type = R: Ratification;

    A: Adhésion;
    A*: Adhésion donnant lieu à une procédure d'acceptation; veuillez cliquer sur A* pour plus d'informations sur les acceptations de cette adhésion ;
    C: Continuation;
    Su: Succession;
    Den: dénonciation;
4) VIG = Entrée en vigueur
5) EXT = Extensions de l'application
6) Aut = Désignation d'Autorités
7) Rés/D/N = Réserves, déclarations ou notifications

# EXHIBIT 4

PIÈCE
COMMUNIQUÉE
N° 4

*JCN Codes & Lois Monaco - Version 212016*

**Textes non codifiés / 2006 et suivantes / 2007 / avril / 13 avril 2007 / Ordonnance n° 1.058 portant fixation du taux de l'intérêt légal**

## 13  avril 2007

**Textes non codifiés / 2006 et suivantes / 2007 / avril / 13 avril 2007 / Ordonnance n° 1.059 rendant exécutoire la Convention de La Haye du 15 novembre 1965 relative à la signification et à la notification des actes judiciaires et extrajudiciaires en matière civile et commerciale**
Ordonnance n° 1.059 rendant exécutoire la Convention de La Haye du 15 novembre 1965 relative à la signification et à la notification des actes judiciaires et extrajudiciaires en matière civile et commerciale *(Journal de Monaco du 11 mai 2007).*

Vu la Constitution; Nos instruments d'adhésion à la Convention de La Haye du 15 novembre 1965, relative à la signification et à la notification des actes judiciaires et extrajudiciaires en matière civile et commeirciale, ayant été déposés le 1er mars 2007 auprès du Ministère des Affaires Etrangères des Pays-Bas, ladite Convention entrera en vigueur pour Monaco le 1er novembre  2007.

———————

15  novembre 1965

**Textes non codifiés / 2006 et suivantes / 2007 / avril / 13 avril 2007 / Ordonnance n° 1.059 rendant exécutoire la Convention de La Haye du 15 novembre 1965 relative à la signification et à la notification des actes judiciaires et extrajudiciaires en matière civile et commerciale/ Convention**

### Convention

**Convention de la Haye relative à la signification et à la notification des actes judiciaires et extrajudiciaires en matière civile et commerciale.**

Les États signataires de la présente Convention,

Désirant créer les moyens appropriés pour que les actes judiciaires et extrajudiciaires qui doivent être signifiés ou notifiés à l'étranger soient connus de leurs destinataires en temps utile,

Soucieux d'améliorer à cette fin l'entraide judiciaire mutuelle en  simplifiant  et  en accélérant la procédure,

Ont résolu de conclure une Convention à ces effets et sont convenus des dispositions suivantes :

**Art. 1er.** - La présente Convention est applicable, en matière civile ou commerciale, dans tous les cas où un acte judiciaire ou extrajudiciaire doit être transmis à l'étranger pour y être signifié ou notifié.

La Convention ne s'applique pas lorsque l'adresse du destinataire de l'acte n'est pas connue.

**Textes non codifiés / 2006 et suivantes / 2007 / avril / 13 avril 2007 / Ordonnance n° 1.059 rendant exécutoire la Convention de La Haye du 15 novembre 1965 relative à la signification et à la notification des actes judiciaires et extrajudiciaires en matière civile et commerciale / Convention / CHAPITRE 1. -Actes judiciaires**

### CHAPITRE I. - Actes "udiciaires

**Art. 2.** - Chaque État contractant désigne une Autorité centrale qui assume, conformément aux articles 3 à 6, la char e de recevoir les demandes de signification ou de notification en provenance d'un autre Etat contractant et d'y donner suite.

L'Autorité centrale est organisée selon les modalités prévues par l'État requis.

**Art. 3.** - L'autorité ou l'officier ministériel compétents selon les lois de l'État d'origine adresse à l'Autorité centrale de l'État requis une demande conforme à la formule modèle annexée à la présente Convention, sans qu'il soit besoin de la légalisation des pièces ni d'une autre formalité équivalente.

La demande doit être accompagnée de l'acte judiciaire ou de sa copie, le tout en double exemplaire.

**Art. 4.** - Si l'Autorité centrale estime que les dispositions de la Convention n'ont pas été respectées, elle en informe immédiatement le requérant en précisant les griefs articulés à l'encontre de la demande.

**Art. S.** - L'Autorité centrale de l'État requis procède ou fait procéder à la signification ou à la notification de l'acte :

*a)* soit selon les formes prescrites par la législation de l'État requis pour la signification ou la notification des actes dressés dans ce pays et qui sont destinés aux personnes se trouvant sur son territoire,

*b)* soit selon la forme particulière demandée par le requérant, pourvu que celle-ci ne soit pas incompatible avec la loi de l'État requis.

Sauf le cas prévu à l'alinéa premier, lettre *b),* l'acte peut toujours être remis au destinataire qui l'accepte volontairement.

Si l'acte doit être signifié ou notifié conformément à l'alinéa premier, l'Autorité centrale peut demander que l'acte soit rédigé ou traduit dans la langue ou une des langues officielles de son pays.

La partie de la demande conforme à la formule modèle annexée à la présente Convention, qui contient les éléments essentiels de l'acte, est remise au destinataire.

**Art. 6.** - L'Autorité centrale de l'État requis ou toute autorité qu'il aura désignée à cette fin établit une attestation conforme à la formule modèle annexée à la présente Convention.

L'attestation relate l'exécution de la demande ; elle indique la forme, le lieu et la date de l'exécution ainsi que la personne à laquelle l'acte a été remis. Le cas échéant, elle précise, le fait qui aurait empêché l'exécution.

Le requérant peut demander que l'attestation qui n'est pas établie par l'Autorité centrale ou par une autorité judiciaire soit visée par l'une de ces autorités.

L'attestation est directement adressée au requérant.

**Art. 7.** - Les mentions imprimées dans la formule modèle annexée à la présente Convention sont obligatoirement rédigées soit en langue française, soit en langue anglaise. Elles peuvent, en outre, être rédigées dans la langue ou une des langues officielles de l'État d'origine.

Les blancs correspondant à ces mentions sont remplis soit dans la langue de l'État requis, soit en langue française, soit en langue anglaise.

**Art. 8.** - Chaque État contractant a la faculté de faire procéder directement, sans contrainte, par les soins de ses agents diplomatiques ou consulaires, aux significations ou notifications d'actes judiciaires aux personnes se trouvant à l'étranger.

Tout État peut déclarer s'opposer à l'usage de cette faculté sur son territoire, sauf si l'acte doit être signifié ou notifié à un ressortissant de l'État d'origine.

**Art. 9.** - Chaque État contractant a, de plus, la faculté d'utiliser la voie consulaire pour transmettre, aux fins de signification ou de notification, des actes judiciaires aux autorités d'un autre État contractant que celui-ci a désignées.

Si des circonstances exceptionnelles l'exigent, chaque État contractant a la faculté d'utiliser, aux mêmes fins, la voie diplomatique.

**Art. 10.** - La présente Convention ne fait pas obstacle, sauf si l'État de destination déclare s'y opposer :

*a)* à la faculté d'adresser directement, par la voie de la poste, des actes judiciaires aux personnes se trouvant à l'étranger,

*b)* à la faculté, pour les officiers ministériels, fonctionnaires ou autres personnes compétents de l'État d'origine, de faire procéder à des significations ou notifications d'actes judiciaires directement par les soins des officiers ministériels, fonctionnaires ou autres personnes compétents de l'État de destination,

*cJ* à la faculté, pour toute personne intéressée à une instance judiciaire, de faire procéder à des significations ou notifications d'actes judiciaires directement par les soins des officiers ministériels, fonctionnaires ou autres personnes compétents de l'État de destination.

**Art. 11.** - La présente Convention ne s'oppose pas à ce que des États contractants s'entendent pour admettre, aux fins de signification ou de notification des actes judiciaires, d'autres voies de transmission que celles prévues par les articles qui précèdent et notamment la communication directe entre leurs autorités respectives.

**Art. 12.** - Les significations ou notifications d'actes judiciaires en provenance d'un État contractant ne peuvent donner lieu au paiement ou au remboursement de taxes ou de frais pour les services de l'État requis.

Le requérant est tenu de payer ou de rembourser les frais occasionnés par :

*a)* l'intervention d'un officier ministériel ou d'une personne compétente selon la loi de l'État de destination,

*b)* l'emploi d'une forme particulière.

**Art. 13.** - L'exécution d'une demande de signification ou de notification conforme aux dispositions de la présente Convention ne peut être refusée que si l'État requis juge que cette exécution est de nature à porter atteinte à sa souveraineté ou à sa sécurité.

L'exécution ne peut être refusée pour le seul motif que la loi de l'État requis revendique la compétence judiciaire exclusive dans l'affaire en cause ou ne connaît pas de voie de droit répondant à l'objet de la demande.

En cas de refus, l'Autorité centrale en informe immédiatement le requérant et indique les motifs.

**Art. 14.** - Les difficultés qui s'élèveraient à l'occasion de la transmission, aux fins de signification ou de notification, d'actes judiciaires seront réglées par la voie diplomatique.

**Art. 15.** - Lorsqu'un acte introductif d'instance ou un acte équivalent a dû être transmis à l'étranger aux fins de signification ou de notification, selon les dispositions de la présente Convention, et que le défendeur ne comparaît pas, le juge est tenu de surseoir à statuer aussi longtemps qu'il n'est pas établi :

*a)* ou bien que l'acte a été signifié ou notifié selon les formes prescrites par la législation de l'État requis pour la signification ou la notification des actes dressés dans ce pays et qui sont destinés aux personnes se trouvant sur son territoire,

*b)* ou bien que l'acte a été effectivement remis au défendeur ou à sa demeure selon un autre procédé prévu par la présente Convention, et que, dans chacune de ces éventualités, soit la signification ou la notification, soit la remise a eu lieu en temps utile pour que le défendeur ait pu se défendre.

Chaque État contractant a la faculté de déclarer que ses juges, nonobstant les dispositions de l'alinéa premier, peuvent statuer si les conditions suivantes sont réunies, bien qu'aucune attestation constatant soit la signification ou la notification, soit la remise, n'ait été reçue :

*a)* l'acte a été transmis selon un des modes prévus par la présente Convention,

*b)* un délai que le juge appréciera dans chaque cas particulier et qui sera d'au moins six mois, s'est écoulé depuis la date d'envoi de l'acte,

*c)* nonobstant toutes diligences utiles auprès des autorités compétentes de l'État requis, aucune attestation n'a pu être obtenue.

Le présent article ne fait pas obstacle à ce qu'en cas d'urgence, le juge ordonne toutes mesures provisoires ou conservatoires.

**Art. 16.** - Lorsqu'un acte introductif d'instance ou un acte équivalent a dû être transmis à l'étranger aux fins de signification ou de notification, selon les dispositions de la présente Convention, et qu'une décision a été rendue contre un défendeur qui n'a pas comparu, le juge a la faculté de relever ce défendeur de la forclusion résultant de l'expiration des délais de recours, si les conditions suivantes sont réunies :

*a)* le défendeur, sans qu'il y ait eu faute de sa part, n'a pas eu connaissance en temps utile dudit acte pour se défendre et de la décision pour exercer un recours,

*b)* les moyens du défendeur n'apparaissent pas dénués de tout fondement.

La demande tendant au relevé de la forclusion est irrecevable si elle n'est pas formée dans un délai raisonnable à partir du moment où le défendeur a eu connaissance de la décision.

Chaque État contractant a la faculté de déclarer que cette demande est irrecevable si elle est formée après l'expiration d'un délai qu'il précisera dans sa déclaration, pourvu que ce délai ne soit pas inférieur à un an à compter du prononcé de la décision.

Le présent article ne s'applique pas aux décisions concernant l'état des personnes.

**Textes non codifiés/ 2006 et suivantes/ 2007 /avril/ 13 avril 2007 / Ordonnance n° 1.059 rendant exécutoire la Convention de La Haye du 15 novembre 1965 relative à la signification et à la notification des actes judiciaires et extrajudiciaires en matière civile et commerciale / Convention / CHAPITRE II. - Actes extrajudiciaires**

### CHAPITRE II. - Actes extra"udiciaires

**Art. 17.** - Les actes extrajudiciaires émanant des autorités et officiers ministériels d'un État contractant peuvent être transmis aux fins de signification ou de notification dans un autre État contractant selon les modes et aux conditions prévus par la présente Convention.

**Textes non codifiés / 2006 et suivantes / 2007 / avril / 13 avril 2007 / Ordonnance n° 1.059 rendant exécutoire la Convention de La Haye du 15 novembre 1965 relative à la signification et à la notification des actes judiciaires et extrajudiciaires en matière civile et commerciale/ Convention / CHAPITRE III. - Dispositions générales**

### CHAPITRE III. - Dispositions générales

**Art. 18.** - Tout État contractant peut désigner, outre l'Autorité centrale, d'autres autorités dont il détermine les compétences.

Toutefois, le requérant a toujours le droit de s'adresser directement à l'Autorité centrale.

Les États fédéraux ont la faculté de désigner plusieurs Autorités centrales.

**Art. 19.** - La présente Convention ne s'oppose pas à ce que la loi interne d'un État contractant permette d'autres formes de transmission non prévues dans les articles précédents, aux fins de signification ou de notification, sur son territoire, des actes venant de l'étranger.

**Art. 20.** - La présente Convention ne s'oppose pas à ce que des États contractants s'entendent pour déroger :

*a)* à l'article 3, alinéa 2, en ce qui concerne l'exigence du double exemplaire des pièces transmises,

*b)* à l'article 5, alinéa 3, et à l'article 7, en ce qui concerne l'emploi des langues,

*c)* à l'article 5, alinéa 4,

*d)* à l'article 12, alinéa 2.

**Art. 21.** - Chaque État contractant notifiera au Ministère des Affaires Etrangères des Pays-Bas soit au moment du dépôt de son instrument de ratification ou d'adhésion, soit

ultérieurement :

*a)* la désignation des autorités prévues aux articles 2 et 18,

*b)* la désignation de l'autorité compétente pour établir l'attestation prévue à l'article 6,

*c)* la désignation de l'autorité compétente pour recevoir les actes transmis par la voie consulaire selon l'article 9.

Il notifiera, le cas échéant, dans les mêmes conditions :

*a)* son opposition à l'usage des voies de transmission prévues aux articles 8 et 10,

*b)* les déclarations prévues aux articles 15, alinéa 2, et 16, alinéa 3,

*c)* toute modification des désignations, opposition et déclarations mentionnées ci-dessus.

**Art. 22.** - La présente Convention remplacera dans les rapports entre les États qui l'auront ratifiée, les articles 1 à 7 des Conventions relatives à la procédure civile, respectivement signées à La Haye, le 17 juillet 1905 et le premier mars 1954, dans la mesure où lesdits États sont Parties à l'une ou à l'autre de ces Conventions.

**Art. 23.** - La présente Convention ne porte pas atteinte à l'application de l'article 23 de la Convention relative à la procédure civile, signée à La Haye, le 17 juillet 1905, ni de l'article 24 de celle signée à La Haye, le premier mars 1954.

Ces articles ne sont toutefois applicables que s'il est fait usage de modes de communication identiques à ceux prévus par lesdites Conventions.

**Art. 24.** - Les accords additionnels auxdites Conventions de 1905 et de 1954, conclus par les États contractants, sont considérés comme également applicables à la présente Convention à moins que les États intéressés n'en conviennent autrement.

**Art. 25.** - Sans préjudice de l'application des articles 22 et 24, la présente Convention ne déroge pas aux Conventions auxquelles les États contractants sont ou seront Parties et qui contiennent des dispositions sur les matières réglées par la présente Convention.

**Art. 26.** - La présente Convention est ouverte à la signature des États représentés à la Dixième session de la Conférence de La Haye de droit international privé.

Elle sera ratifiée et les instruments de ratification seront déposés auprès du Ministère des Affaires Etrangères des Pays-Bas.

**Art. 27.** - La présente Convention entrera en vigueur le soixantième jour après le dépôt du troisième instrument de ratification prévu par l'article 26, alinéa 2.

La Convention entrera en vigueur, pour chaque État signataire ratifiant postérieurement, le soixantième jour après le dépôt de son instrument de ratification.

**Art. 28.** - Tout État non représenté à la Dixième session de la Conférence de La Haye de droit international privé pourra adhérer à la présente Convention après son entrée en vigueur en vertu de l'article 27, alinéa premier. L'instrument d'adhésion sera déposé auprès du Ministère des Affaires Etrangères des Pays-Bas.

La Convention n'entrera en vigueur pour un tel État qu'à défaut d'opposition de la part d'un État ayant ratifié la Convention avant ce dépôt, notifiée au Ministère des Affaires Etrangères des Pays-Bas dans un délai de six mois à partir de la date à laquelle ce Ministère lui aura notifié cette adhésion.

À défaut d'opposition, la Convention entrera en vigueur pour l'État adhérant le premier jour du mois qui suit l'expiration du dernier des délais mentionnés à l'alinéa précédent.

**Art. 29.** - Tout État, au moment de la signature, de la ratification ou de l'adhésion, pourra déclarer que la présente Convention s'étendra à l'ensemble des territoires qu'il représente sur le plan international, ou à l'un ou plusieurs d'entre eux. Cette déclaration aura effet au moment de l'entrée en vigueur de la Convention pour ledit État.

Par la suite, toute extension de cette nature sera notifiée au Ministère des Affaires Etrangères des Pays-Bas.

La Convention entrera en vigueur, pour les territoires visés par l'extension, le soixantième jour après la notification mentionnée à l'alinéa précédent.

**Art. 30.** - La présente Convention aura une durée de cinq ans à partir de la date de son entrée en vigueur conformément à l'article 27, alinéa premier, même pour les États qui l'auront ratifiée ou y auront adhérée postérieurement.

La Convention sera renouvelée tacitement de cinq en cinq ans, sauf dénonciation.

La dénonciation sera, au moins six mois avant l'expiration du délai de cinq ans, notifiée au Ministère des Affaires Etrangères des Pays-Bas.

Elle pourra se limiter à certains des territoires auxquels s'applique la Convention.

La dénonciation n'aura d'effet qu'à l'égard de l'État qui l'aura notifiée. La Convention restera en vigueur pour les autres États contractants.

**Art. 31.** - Le Ministère des Affaires Etrangères des Pays-Bas notifiera aux États visés à l'article 26, ainsi qu'aux États qui auront adhéré conformément aux dispositions de l'article 28 :

*a)* les signatures et ratifications visées à l'article 26;

*b)* la date à laquelle la présente Convention entrera en vigueur conformément aux dispositions de l'article 27, alinéa premier;

*c)* les adhésions visées à l'article 28 et la date à laquelle elles auront *effet;*

*d)* les extensions visées à l'article 29 et la date à laquelle elles auront *effet;*

*e)* les désignations, opposition et déclarations mentionnées à l'article 21;

*f)* les dénonciations visées à l'article 30, alinéa 3.

En foi de quoi, les soussignés, dûment autorisés, ont signé la présente Convention.

Fait à La Haye, le 15 novembre 1965, en français et en anglais, les deux textes faisant également foi, en un seul exemplaire, qui sera déposé dans les archives du Gouvernement des Pays-Bas et dont une copie certifiée conforme sera remise, par la voie diplomatique, à chacun des États représentés à la Dixième session de la Conférence de La Haye de droit international privé.

**Textes non codifiés / 2006 et suivantes / 2007 / avril / 13 avril 2007 / Ordonnance n° 1.059 rendant exécutoire la Convention de La Haye du 15 novembre 1965 relative à la signification et à la notification des actes judiciaires et extrajudiciaires en matière civile et commerciale/ Convention /**

## Annexe à la convention

### Annexe à la convention

**Formulaires actifs (demande, Attestation, Éléments essentiels de l'acte)**
*(Voir le Journal de Monaco du 11 mai 2007).*

---

# EXHIBIT 5

# DÉCLARATION/RÉSERVE/NOTIFICATION



Déclarations

Articles: 8,10,15,16

1. La Principauté de Monaco déclare s'opposer, ainsi qu'il est prévu à l'article 8, à la notification directe, par les soins des agents diplomatiques et consulaires des Etats contractants, des actes destinés à des personnes qui ne sont pas ressortissantes de ces Etats.

2. La Principauté de Monaco déclare s'opposer à l'exercice de la faculté prévue par l'article 10, alinéa 1 a).

3. La Principauté de Monaco déclare que les dispositions du deuxième alinéa de l'article 15 reçoivent son agrément.

4. La Principauté de Monaco déclare - en regard de l'article 16, alinéa 3 - que la demande tendant au relevé de la forclusion résultant de l'expiration des délais de recours ne sera plus recevable si elle est présentée plus de douze mois après la prononcée de la décision.

# EXHIBIT 6





Accueil > Jurisprudence > Cour de révision

## Cour de révision

Monaco
MM. Combaldieu, prem. prés., Marion, rapp., Zambeaux, proc. gén., MMe Clérissi et Lorenzi, av. déf.

21 avril 1980
Dame M. Veuve N. S.
c/ Dame Q. Veuve P.



Contentieux Judiciaire

**Abstract**

EXEQUATUR. SIGNIFICATION DE L'ACTE DONT L'EXEQUATUR EST POURSUIVI.
Signification à Monaco d'une décision rendue en France.
Application de l'*article 684 du Code de procédure civile* français, qui prescrit la
signification à parquet d'un acte destiné à une personne à l'étranger (non).
Signification par un huissier monégasque.
Régularité au regard de la convention franco-monégasque d'aide
mutuelle judiciaire du 21 septembre 1945 (oui).

**Résumé**

Pour déclarer régulière la signification par un huissier monégasque de l'arrêt dont l'exequatur était poursuivi, la Cour d'appel considère à bon droit que les conventions internationales priment les lois internes même postérieures des pays contractants, et, en conséquence, a fait une exacte application de la convention franco-monégasque, antérieure à l'article 684 invoqué, dont l'article 10, relatif au mode de signification des actes judiciaires destinés aux personnes domiciliées dans l'autre pays, ne s'oppose pas en matière civile et commerciale à la faculté de faire effectuer dans l'un des deux pays par les soins des officiers ministériels des significations d'actes aux personnes y demeurant.

La Cour de révision

Vu :

L'arrêt contradictoirement rendu par la Cour d'appel de la Principauté de Monaco, le 27 février 1979 ;

Le pourvoi en révision formé le 9 mai 1979, par Maître Clérissi, avocat-défenseur, au nom de la dame G. M. veuve N.-S., à l'encontre de l'arrêt susvisé ;

Sur les trois moyens réunis :

Attendu qu'il est fait grief à l'arrêt attaqué d'avoir déclaré exécutoire en Principauté un *arrêt de la Cour d'appel de Rennes du 23 mai 1977* condamnant dame Veuve N.-S. à payer à dame Veuve P. la somme principale de 80 000 francs, alors que cette décision n'aurait pu acquérir l'autorité de la chose jugée en raison de ce que, contrairement aux dispositions de l'article 684 du nouveau Code de procédure civile français qui prescrit la signification à Parquet d'un acte destiné à une personne à l'étranger, la signification dont il s'agit a été faite par un huissier de Monaco ; qu'en effet, la Convention Franco-Monégasque d'aide mutuelle judiciaire du 21 septembre 1945, appliquée par la Cour d'appel, ne pouvait prévaloir sur le texte de l'article 684 précité, promulgué postérieurement à cette convention et qu'en tout cas en vertu même de cette convention une décision intervenue en France devait être signifiée par un huissier français ;

Que, le pourvoi soutient encore qu'il n'aurait pas été répondu à tous les chefs de demande relatifs au paiement de la somme principale et qu'enfin l'allocation de dommages-intérêts pour procédure abusive ne serait pas motivée ;

Mais attendu, d'une part, que pour déclarer régulière la signification par un huissier monégasque de l'arrêt dont l'exequatur était poursuivi, la Cour d'appel considère à bon droit que les conventions internationales priment les lois internes même postérieures des pays contractants et, en conséquence, a fait une exacte application de la convention franco-monégasque, antérieure à l'article 684 invoqué, dont l'article 10, relatif au mode de signification des actes judiciaires destinés aux personnes domiciliées dans l'autre pays, ne s'oppose pas en matière civile et commerciale à la faculté de faire effectuer dans l'un des deux pays par les soins des officiers ministériels des significations d'actes aux personnes y demeurant ;

Attendu, d'autre part, qu'en statuant sur les conclusions de dame N. S. relatives au versement qu'elle invoquait, et, en retenant le caractère purement dilatoire de la procédure, l'arrêt a, sans se contredire, répondu à tous les chefs de demande et a légalement justifié sa décision ;

**PAR CES MOTIFS,**

Rejette le pourvoi ;

Condamne la dame M. Veuve N.-S. à l'amende et aux dépens ;

Contentieux Judiciaire

www.legimonaco.mc - Mentions Légales - Nous contacter - Tous droits reservés Monaco 2015
Contenu du site à jour au Journal de Monaco en date du 21 février 2020

# EXHIBIT 7







Accueil > Jurisprudence > Cour d'appel

## Cour d'appel
**Monaco**
MM. Sacotte, prem. prés. ; Carrasco, proc. gén. ; Mes Sanita, Clerissi av. déf. ; Derouin av. CA Paris.
21 juin 1994
État de Monaco
c/ The Chase Manhattan Bank NA

Contentieux Judiciaire

**Abstract**

CONVENTION INTERNATIONALE
Liens contractuels institués entre les personnes morales de droit international (principe). Droits directs prévus au profit des ressortissants des États signataires. Application par le juge

Convention fiscale franco-monégasque contenant certaines règles directement applicables aux particuliers

TAXES SUR LA VALEUR AJOUTÉE
Succursale à Monaco. Assujettissement à la TVA à Monaco. Règles de territorialité applicables : en application de la convention fiscale franco-monégasque (art. 7 à 14). Application du Code monégasque des taxes sur le chiffre d'affaires.

**Résumé**

Une convention internationale est par essence un contrat entre des personnes morales de droit international et n'a pour objectif naturel que de lier les États signataires dans leurs rapports ; ce n'est que s'il résulte de la convention que tel est son but, que ce texte crée des droits directs au profit des ressortissants des États signataires, ou crée des obligations à leur charge.

Une disposition d'un accord international doit être considérée par le juge comme étant d'application directe lorsque, eu égard à ses termes ainsi qu'à l'objet et à la nature de l'accord, elle comporte une obligation claire et précise qui n'est subordonnée dans son exécution ou dans ses effets, à l'intervention d'aucun acte ultérieur.

Si la plupart des dispositions des articles 7 à 14 de la Convention fiscale franco-monégasque du 18 mai 1963, établissent, ainsi qu'il résulte de leur objet et de leur texte même, des règles directement applicables aux particuliers, il ne saurait en être de même des articles 15, 17 et 25 invoqués par l'État de Monaco, tel est à l'évidence le cas de l'article 25 qui institue un organe mixte, à caractère consultatif, destiné à proposer des solutions aux difficultés pouvant surgir entre les deux États signataires ; il en est de même de l'article 17 qui prévoit le partage entre les deux États des ressources provenant de certaines taxes ; de la même manière l'article 15 n'a pour but que d'obliger la Principauté de Monaco à instituer des taxes sur le chiffre d'affaires ou des taxes de remplacement et à les appliquer sur son territoire sur les mêmes bases et les mêmes tarifs qu'en France.

Une entreprise privée siégeant à Monaco où elle est assujettie à la TVA, est fondée dans sa prétention à bénéficier de la déduction de cette taxe, dans le cadre des règles de territorialité, c'est-à-dire en ne prenant en compte que les prestations de services rendues à partir de l'établissement de Monaco sans référence aux opérations de la succursale française que l'administration monégasque n'a vocation ni à contrôler ni à taxer, de sorte qu'il ne saurait être fait application de la convention fiscale franco-monégasque du 18 mai 1963 mais des dispositions du Code monégasque des taxes sur le chiffre d'affaires et de son annexe, telles qu'elles résultent des ordonnances souveraines intervenues en la matière, prises pour la mise en œuvre de l'article 15 susvisé, conformément à la constitution. Dans ces conditions, il n'y a pas lieu à interprétation de la convention franco monégasque du 18 mai 1963 ; L'entreprise privée dont s'agit est fondée à voir sa succursale monégasque imposée sur les seules bases de la législation fiscale monégasque et en particulier, en l'espèce, à voir appliquer les *articles 33 du Code des taxes sur le chiffre d'affaires* et A 80 et A 89 de son annexe, aucune disposition de ces textes ne prévoyant qu'il soit tenu compte pour le calcul de la TVA de recettes perçues hors du territoire monégasque par un établissement distinct de celui considéré.

La Cour,

La Cour statue sur l'appel du jugement rendu le 31 octobre 1991 par le Tribunal de première instance de Monaco dans le litige opposant la société américaine The Chase Manhattan Bank NA à l'État de Monaco.

Les faits, la procédure, les moyens et les prétentions des parties peuvent être relatés comme suit, étant fait référence pour le surplus à la décision attaquée et aux écritures échangées en appel ;

Le 1er juin 1984, la société américaine The Chase Manhattan Bank NA, régulièrement autorisée, a ouvert à Monaco une succursale qu'elle a exploitée jusqu'au 20 décembre 1990. L'activité de cet établissement bancaire consistait principalement, mais non exclusivement, dans la gestion de fortunes.

Fiscalement, l'établissement monégasque de la Chase Manhattan était, ainsi qu'il est constant, assujetti à la TVA.

Il n'est pas contesté que la Banque était fondée à bénéficier du droit à déduction de la TVA conformément aux dispositions de l'*article 33 du Code des taxes sur le chiffre d'affaires*. Toutefois, certaines opérations étant soumises à la TVA alors que d'autres échappaient au champ d'application de cette taxe, la déduction ne devait être que partielle, les opérations exonérées de TVA ne pouvant donner lieu à déduction.

Pour le calcul de cette déduction, et à défaut de pouvoir individualiser avec précision des opérations simples ouvrant droit à déduction et des opérations simples n'ouvrant pas droit à déduction, les assujettis sont autorisés, en application des dispositions des articles A 80 et A 89 de l'annexe au Code des taxes sur le chiffre d'affaires, à déduire une fraction de la TVA qui a grevé les biens constituant des immobilisations égale au montant de cette taxe multiplié par le rapport existant entre le montant annuel des recettes afférentes à des opérations ouvrant droit à déduction et le montant annuel des recettes afférentes à l'ensemble des opérations réalisées.

Le pourcentage de déduction ainsi déterminé s'applique à la TVA qui a grevé l'ensemble des frais et charges de l'entreprise. Cette méthode, dite du prorata, exposée dans leurs écritures par les deux

parties ne fait l'objet d'aucune contestation ni dans son principe, ni dans sa technique.

En sa qualité d'assujettie partielle à la TVA, la Chase Manhattan a déclaré aux services fiscaux monégasques son chiffre d'affaires réalisé en Principauté et a calculé la déduction de la TVA qui lui était facturée par ses fournisseurs en appliquant le prorata déterminé comme exposé ci-dessus et sur la seule base des prestations effectuées à partir de l'établissement monégasque. Le prorata ainsi calculé par la Banque s'élevait à 66 % en 1984, 50 % en 1985, 88 % en 1986 et 91 % en 1987.

Bénéficiaire d'un crédit de TVA déductible mais non imputable à la fin de chaque période, l'établissement monégasque de la Chase Manhattan a présenté à l'Administration, le 24 avril 1985, une demande de remboursement du crédit de TVA portant sur le montant de la taxe déductible non imputable à la fin du mois de mars 1985 et s'élevant à la somme totale de 1 881 638,31 F. Cette demande ayant été rejetée par l'Administration en raison d'une contestation sur la méthode de calcul du prorata de déduction, la Banque renouvela sa demande en janvier 1988 et obtint, par décision du directeur des services fiscaux du 29 janvier 1988, le remboursement d'une partie du crédit de TVA qui n'était pas contestée.

Continuant d'être en situation créditrice de TVA, l'établissement monégasque de la Chase Manhattan demandait, le 25 avril 1988, le remboursement partiel du crédit de taxe déductible apparaissant à la fin du premier trimestre 1988, soit 400 000 F ainsi que l'allocation d'intérêts moratoires sur les sommes dont elle avait précédemment réclamé le remboursement.

N'ayant pas obtenu satisfaction, la société The Chase Manhattan Bank NA a fait assigner devant le Tribunal de première instance de Monaco l'État de Monaco, représenté par M. le Ministre d'État, et le directeur des services fiscaux, aux fins, pour l'essentiel, de les voir condamner, in solidum, à lui rembourser les sommes de 1 881 638,31 F et 400 000 F augmentées de leurs intérêts au taux légal à compter respectivement du 24 avril 1985 et 25 avril 1988, avec capitalisation desdits intérêts.

Par le jugement attaqué, le Tribunal de première instance a :

- Condamné l'État de Monaco à payer à la société anonyme de droit américain The Chase Manhattan Bank NA :

la somme de 940 819,31 F avec intérêts au taux légal à compter du 8 janvier 1988,

la somme de 400 000 F avec intérêts au taux légal à compter du 29 mars 1989,

- Dit que les intérêts au taux légal de la somme de 940 819,31 F échus du 8 janvier 1988 au 29 mars 1989 sont eux-mêmes devenus productifs d'intérêts au taux légal à compter de cette dernière date ;

- Débouté les parties du surplus de leurs demandes ;

- Laissé les dépens à la charge de l'État de Monaco ;

L'état de Monaco a relevé appel de cette décision ;

l'appui de son appel, l'État expose à titre préliminaire que la Chase Manhattan a non seulement une succursale à Monaco, mais également une succursale en France.

Il soutient qu'en application de l'article 15 de la Convention fiscale franco-monégasque du 18 mai 1963, le prorata de déduction ne doit pas être établi séparément en France et à Monaco sur la base des opérations réalisées respectivement dans chacun des deux États, mais doit faire l'objet d'un seul calcul sur la base de l'ensemble des opérations réalisées tant en France qu'à Monaco, selon la règle dite du « prorata unique ».

L'État de Monaco fait valoir en premier lieu que le Code des taxes sur le chiffre d'affaires qui régit à Monaco la question de la TVA, édicté par voie d'Ordonnances Souveraines ne procède pas de la Loi, mais directement de la Convention fiscale susvisée.

Il considère que le litige soumis aux premiers juges nécessitait l'interprétation de la Convention fiscale, et notamment de ses articles 15, 17 et 25.

Il prétend que les premiers juges ne pouvaient, comme ils l'ont fait, interpréter eux-mêmes la Convention, cette interprétation relevant de la seule compétence du Ministre d'État, dans la mesure où elle touche directement aux relations interétatiques et à l'ordre public international.

Il en déduit que le tribunal devait surseoir à statuer pour que soit soumise au Gouvernement la question préjudicielle de l'interprétation de la Convention.

Il relève toutefois au passage que l'interprétation du Gouvernement est déjà connue puisque c'est celle qu'il adopte dans la présente instance, sur la base d'un avis de la Commission mixte instituée par l'article 25 de ladite Convention ;

En deuxième lieu, l'État soutient que l'interprétation de la Convention donnée par les premiers juges, à la supposer possible, serait erronée et contradictoire.

Au soutien de cette affirmation, il rappelle qu'il résulte tant des articles 15 et 17 de la Convention fiscale franco-monégasque du 18 mai 1963, rendue exécutoire à Monaco par l' *Ordonnance Souveraine n° 3037 du 19 août 1963* , que de la Convention douanière du même jour, rendue exécutoire à Monaco par l' *Ordonnance Souveraine n° 3038* , que les deux États ont entendu assurer entre leurs territoires la libre circulation des biens et des services.

Il déclare que l'absence de frontière douanière entre les deux États implique, pour éviter toute fraude, que soient retenus de part et d'autre les mêmes mécanismes d'application de la TVA.

Il relève que chaque législation nationale prévoit des bases et des tarifs identiques en matière de TVA et que l'assiette, le taux, ainsi que les règles de territorialité sont les mêmes.

Il prétend que l'exigence de la continuité territoriale entre Monaco et la France emporterait, au regard de la TVA, d'une part, le principe de la neutralité de l'impôt et, d'autre part, la mise en œuvre d'un régime commun de déduction, sans la moindre considération de la localisation des entreprises, à Monaco ou en France.

Il en déduit que l'article 15 de la Convention fiscale, qui prévoit l'application de la TVA dans les deux états sur les mêmes bases et les mêmes tarifs, implique « de plano » l'existence d'un prorata unique.

Il ajoute que la nécessité d'un prorata unique résulterait également de la limitation de l'autonomie budgétaire de chacun des deux États, conséquence de l'existence entre eux d'un compte de partage établi en application de l'article 17 de la Convention fiscale.

Il fait observer sur ce point que le libre disposition des recettes de la TVA par chacun des États n'est pas définie en fonction de la localisation des encaissements, mais par référence à une quote-part déterminée par un accord entre les deux parties.

Il affirme enfin que la règle du prorata unique, dont il relève qu'elle a été adoptée par la Commission mixte établie par l'article 25 de la Convention fiscale, est seule susceptible d'éviter les fraudes et déclare, qu'en tout état de cause, l'Administration monégasque ne peut se soustraire à ses obligations internationales en adoptant, dans ses rapports avec les contribuables, une interprétation des textes qui serait contraire à celle retenue par la Commission mixte.

Il conclut sur ce point que le tribunal de première instance a méconnu les dispositions de l'article 15 de la Convention fiscale dont il a fait une interprétation erronée et contradictoire ; qu'il a méconnu l'existence et le rôle de la Commission mixte instituée par l'article 25 de ladite Convention et qu'il a méconnu l'interprétation commune de cette Convention donnée par les deux États au sein de la Commission mixte.

En troisième lieu, répondant à un moyen soulevé par la Chase Manhattan, l'État de Monaco, tout en admettant que certaines dispositions de la Convention fiscale, telles celles contenues dans les articles 17 et 25, n'ont pour objet que de réglementer les rapports entre les États signataires et, de ce fait ne peuvent être invoquées dans un litige concernant un particulier, estime que d'autres dispositions sont directement applicables et opposables, aux ressortissants desdits États.

Il soutient que tel est le cas de l'article 15 qui dispose : « les taxes sur le chiffre d'affaires et les taxes de remplacement sont appliquées dans la Principauté sur les mêmes bases et aux mêmes tarifs qu'en France ».

Il expose que l' *Ordonnance Souveraine n° 3037, du 19 août 1963* aurait rendu la Convention fiscale directement exécutoire en Principauté.

Il relève que l'article 15 est particulièrement précis et prétend que les premiers juges, après avoir justement admis qu'ils devaient examiner le litige au regard de la réglementation monégasque, qu'elle soit de source interne ou conventionnelle, ne s'étaient référés qu'au seul Code des taxes sur le chiffre d'affaires, négligeant de prendre en compte la Convention.

Subsidiairement sur ce point, l'État de Monaco prétend que seuls les États contractants seraient qualifiés pour déterminer si leur intention, en rédigeant l'article 15 de la Convention, était d'en faire une disposition directement applicable créant des droits et des obligations pour les contribuables, ou de le limiter aux rapports interétatiques. Il soutient que cette question préjudicielle devrait être soumise au Gouvernement.

En quatrième lieu, et à titre subsidiaire, l'État de Monaco soutient que la banque ne peut se prévaloir de la théorie dite « des secteurs distincts d'activités ».

Il rappelle que, pour qu'il puisse y avoir secteurs distincts d'activités, il est indispensable qu'il y ait pluralité d'activités et que ces activités soient soumises à des dispositions distinctes au regard de la TVA.

Il relève que la Chase Manhattan exerce la même activité bancaire en France et à Monaco et que les réglementations française et monégasque sur la TVA sont exactement identiques, même si elles résultent de textes distincts.

En cinquième lieu, l'État de Monaco prétend que'au cas où l'autonomie de la succursale monégasque de la Chase Manhattan serait reconnue, cette banque, au lieu de pouvoir prétendre à un remboursement, se trouverait débitrice, dans la mesure où les intérêts crédités par la succursale française au profit de la succursale monégasque devraient être considérés comme du chiffre d'affaires exonéré de TVA, ce qui modifierait le prorata au détriment de la succursale monégasque.

En sixième lieu, et toujours subsidiairement, l'État de Monaco soutient qu'il ne peut être condamné au paiement d'intérêts moratoires, ceux-ci n'étant pas prévus en matière fiscale par le Code des taxes sur le chiffre d'affaires, ni par l' *Ordonnance du 28 avril 1828* à laquelle il renvoie.

Il prétend qu'à défaut de texte sur ce point, il ne peut être fait application ni de la réglementation française, ni, surtout, de l' *article 1008 du Code civil* qui ne serait pas applicable en matière fiscale.

L'État de Monaco demande en conséquence à la Cour :

- avant dire droit, de renvoyer au Gouvernement Princier la question préjudicielle relative à l'interprétation des articles 15, 17 et 25 et du protocole additionnel à la *Convention fiscale du 18 mai*

*1963 ; ainsi que des conséquences qui en découlent, soit :*

- d'infirmer le jugement entrepris ;

- de débouter la Chase Manhattan Bank NA de toutes ses demandes, fins et conclusions ;

- de la condamner aux dépens de première instance et d'appel ;

- La Chase Manhattan Bank NA pour sa part, prétend essentiellement que sa succursale monégasque était assujettie à la TVA à Monaco et qu'à ce titre elle doit bénéficier de la déduction de la TVA qui a grevé ses opérations, dans le cadre des règles de territorialité, c'est-à-dire en ne prenant en compte que les prestations de services rendues à partir de l'établissement de Monaco, sans aucune référence aux opérations de la succursale française, que l'Administration monégasque n'a vocation ni à contrôler, ni à taxer.

Elle estime, de ce fait, n'être soumise qu'à la loi monégasque, laquelle ne prévoit en aucune façon l'application d'un prorata unique.

Au soutien de sa position, la Chase Manhattan fait valoir en premier lieu que les stipulations d'une Convention internationale ne peuvent être invoquées dans un litige concernant un particulier dès lors qu'elles ne créent que des obligations entre les États signataires et qu'elles n'ont pas pour objet de créer des droits ou des obligations dont les justiciables pourraient se prévaloir.

Citant une jurisprudence étrangère, elle affirme que ce n'est que s'il résulte de la Convention que tel est son but, que ce texte crée des droits directs au profit des citoyens des États signataires.

Elle expose que la Convention fiscale franco-monégasque comporte à la fois des dispositions directement applicables, telles que celles contenues dans les articles 7 à 14, et des dispositions qui ne sont pas d'application directe et dont la mise en œuvre a nécessité, de la part de l'État, l'intervention d'actes ultérieurs.

Elle soutient que les articles 15 et 17, invoqués par l'État de Monaco, relatifs à l'instauration de taxes sur le chiffre d'affaires et à la répartition entre la France et Monaco du produit de ces taxes, ne concernent que les rapports entre les États contractants et ne peuvent être invoqués devant les tribunaux ni par les contribuables, ni par l'administration fiscale.

Elle fait remarquer que la mise en œuvre de l'article 15 a nécessité, conformément aux articles 68 et 70 de la Constitution, l'intervention d'Ordonnances Souveraines qui ont établi le Code des taxes sur le chiffre d'affaires et son annexe.

Elle en conclut que seule cette législation monégasque est applicable en l'espèce et que toutes les questions soulevées par l'État de Monaco et portant sur l'interprétation de la Convention fiscale sont dénuées de pertinence.

En deuxième lieu, tout en rappelant que l'invocation de la Convention serait, selon elle, inopérante, elle déclare que l'article 15, qui prévoit une identité de bases et de tarifs pour l'application de la TVA n'implique nullement une unicité de prorata.

Elle explique qu'un prorata unique ne pourrait se concevoir que s'il existait entre la France et Monaco un système fiscal et un territoire fiscal uniques, soulignant au passage que la Convention fiscale ne comporte aucune disposition équivalant à celle de la Convention douanière qui institue un territoire douanier unique.

Elle estime également que le fait que la France et Monaco ne soient pas territoires d'exportation l'un vis-à-vis de l'autre, n'implique pas l'unité de leurs territoires.

Elle considère enfin sur ce point que la règle de territorialité qui régit sans conteste la détermination des montants de la TVA « d'amont » implique toute naturellement qu'elle régisse la détermination du prorata de déduction.

En troisième lieu, la Chase Manhattan, après avoir à nouveau rappelé qu'à son sens il n'y a pas lieu de faire application de la Convention, soutient qu'en toute hypothèse aucune question d'interprétation ne se pose et qu'aucune question préjudicielle ne doit être envisagée.

Invoquant une abondante jurisprudence étrangère, elle relève que la pratique du renvoi de l'interprétation des conventions internationales aux gouvernements a été abandonnée par la jurisprudence civile et administrative en France comme dans d'autres pays.

Elle expose que la Commission mixte, instituée par la Convention fiscale et dont l'État de Monaco invoque l'avis, n'est qu'un organe consultatif intervenant en cas de difficulté entre les États signataires, mais en aucune façon dans les litiges entre un État et l'un de ses contribuables.

Elle souligne que le renvoi à l'interprétation de l'État de Monaco alors que celui-ci est partie au procès serait contraire au principe fondamental de l'égalité des plaideurs et reviendrait à donner d'avance et dans tous les cas gain de cause à l'État.

Elle en déduit qu'il appartient au juge d'interpréter lui-même, le cas échéant, les Conventions internationales comme toutes les autres règles de droit.

En quatrième lieu, et à titre subsidiaire pour le cas où la thèse des prorata distincts ne serait pas retenue, elle prétend pouvoir bénéficier de la règle dite des « secteurs distincts ».

Elle fait valoir sur ce point que les succursales française et monégasque utilisaient des moyens différents, tenaient une comptabilité différente et étaient soumises à des lois fiscales différentes.

En cinquième lieu, et à titre très subsidiaire, au cas où serait retenu un prorata unique, et dans le cadre de la notion de secteurs distincts, la Chase Manhattan fait observer que les opérations internes entre les succursales d'une même entité ne pourraient être prises en compte pour la détermination du chiffre d'affaires ni, de ce fait, pour le calcul du montant des impositions.

En sixième lieu, et enfin, la Chase Manhattan rappelle que l'allocation d'intérêts moratoires découle d'un principe général posé par le droit civil. Elle affirme qu'en l'absence de tout texte dérogatoire particulier en matière fiscale, il y a lieu de faire droit à sa demande.

La Chase Manhattan Bank NA demande en conséquence à la Cour :

- de confirmer le jugement entrepris,

- de débouter l'État de Monaco de toutes ses demandes, fins et conclusions,

- de le condamner aux entiers dépens,

Ceci étant exposé, la Cour :

Considérant qu'une Convention internationale est par essence un contrat entre des personnes morales de droit International et n'a pour objectif naturel que de lier les États signataires dans leurs rapports ;

Que ce n'est que s'il résulte de la Convention que tel est son but, que ce texte crée des droits directs au profit des ressortissants des États signataires, ou crée des obligations à leur charge ;

Qu'une disposition d'un accord international doit être considérée par le juge comme étant d'application directe lorsque, eu égard à ses termes ainsi qu'à l'objet et à la nature de l'accord, elle comporte une obligation, claire et précise qui n'est subordonnée dans son exécution ou dans ses effets, à l'intervention d'aucun acte ultérieur ;

Considérant que si la plupart des dispositions des articles 7 à 14 de la Convention fiscale établissent, ainsi qu'il résulte de leur objet et de leur texte même, des règles directement applicables aux particuliers, il ne saurait en être de même des articles 15, 17 et 25 invoqués par l'État de Monaco ;

Que tel est à l'évidence le cas de l'article 25 qui institue un organe mixte, à caractère consultatif, destiné à proposer des solutions aux difficultés pouvant surgir entre les deux États signataires ;

Qu'il en est de même de l'article 17 qui prévoit le partage entre les deux États des ressources provenant de certaines taxes ;

Que, de la même manière, l'article 15 n'a pour but que d'obliger la Principauté de Monaco à instituer des taxes sur le chiffre d'affaires ou des taxes de remplacement et à les appliquer sur son territoire sur les mêmes bases et les mêmes tarifs qu'en France ;

Que la mise en œuvre de cet article a nécessité, conformément à la Constitution, l'intervention ultérieure des Ordonnances Souveraines instituant le Code des taxes sur le chiffre d'affaires et son annexe ;

Que la longueur et la complexité de ces textes démontrent à l'évidence que l'article 15 de la Convention fiscale ne pouvait recevoir directement aucune application ;

Considérant qu'ainsi les articles 15, 17 et 25 de la Convention fiscale ne peuvent être invoqués dans le présent litige ;

Qu'en l'espèce, seules sont applicables les dispositions du Code des taxes sur le chiffre d'affaires et de son annexe, telles qu'elles résultent des Ordonnances Souveraines intervenues en la matière ;

Considérant que, dans ces conditions, il n'y a pas lieu à interprétation de la Convention fiscale franco-monégasque du 18 mai 1963 ;

Qu'il s'ensuit que doit être rejetée la demande de l'État de Monaco tendant à ce qu'il soit sursis à statuer jusqu'à interprétation de la Convention par le Gouvernement Princier ;

Que doivent également être écartés, comme non pertinents, les moyens des parties proposant diverses interprétations de ladite Convention ;

Considérant que la Chase Manhattan Bank NA est fondée à voir sa succursale monégasque imposée sur les seules bases de la législation fiscale monégasque, et en particulier, en l'espèce, à voir appliquer les *articles 33 du Code des taxes sur le chiffre d'affaires* et A 80 et A 89 de son annexe ;

Considérant qu'aucune disposition de ces textes ne prévoit qu'il soit tenu compte pour le calcul de la TVA de recettes perçues hors du territoire monégasque par un établissement distinct de celui considéré ;

Considérant que le montant des créances de la Chase Manhattan Bank NA, tel que déterminé par les premiers juges, ne fait l'objet d'aucune contestation sérieuse ;

Que si l'État de Monaco affirme que l'adoption d'un système de prorata distinct pourrait conduire à une réduction du prorata admissible du fait que les intérêts crédités en compte au profit de la succursale monégasque par la succursale française devraient être considérés comme du chiffre d'affaires exonéré de la TVA et donc augmenter le dénominateur de la fraction représentative du prorata, il ne formule de ce chef aucune demande ;

Qu'il y a lieu en conséquence de confirmer sur ce point la décision des premiers juges ;

Considérant qu'en l'absence de toute disposition particulière relative aux intérêts moratoires en matière fiscale, il y a lieu d'appliquer, comme l'a justement fait le tribunal, les règles de portée générale posées par les *articles 1008 et 1009 du Code civil* , étant observé que l'intimée, qui sollicite la confirmation du jugement, ne formule devant la Cour aucune demande complémentaire d'anatocisme ;

Considérant que les prétentions des parties relatives aux secteurs d'activité distincts, et les moyens qu'elles invoquent à leur soutien, ne sont présentées qu'à titre subsidiaire, au cas où la Cour aurait retenu le principe d'un prorata unique ;

Que tel n'étant pas le cas, ces demandes deviennent sans objet et n'ont pas à être examinées ;

**PAR CES MOTIFS, partiellement substitués à ceux des premiers juges,**

La Cour d'appel de la Principauté de Monaco,

Statuant contradictoirement,

Vu l'arrêt du 29 juin 1993,

Dit n'y avoir lieu à interprétation de la Convention fiscale franco-monégasque du 18 mai 1963,

Dit n'y avoir lieu à surseoir à statuer

Condamne l'État de Monaco à payer à la société The Chase Manhattan Bank NA

 la somme de 940 819.31 F avec intérêts au taux légal à compter du 8 janvier 1988,

 la somme de 400 000 F avec intérêts au taux légal à compter du 29 mars 1989,

Dit que les intérêts de la somme de 940 819.31 F échus du 8 janvier 1988 au 29 mars 1989 ont eux-mêmes produit intérêts au taux légal à compter de cette dernière date.

Déboute les parties de toutes leurs autres demandes, fins et conclusions.

Contentieux Judiciaire

# EXHIBIT 8

# LÉGIMONACO
CODES ET LOIS MONÉGASQUES


Gouvernement Princier
PRINCIPAUTÉ DE MONACO

Accueil > Jurisprudence > Cour d'appel

## Cour d'appel
**Monaco**
M. Landwerlin, prem. ; prés. ; Serdet, proc. gén. : Mes Blot, av. déf., Gorra, av. bar de Nice, Ottaway et Lancre, av. bar de Paris

**30 août 2001**
S.
c/ Ministère public

Contentieux Judiciaire

**Abstract**

PROCÉDURE PÉNALE
    Droits de l'homme
      - Convention Internationale : pacte de New-York du 16 décembre 1966, art. 14, § 5.
        - Principe d'application directe sous réserve d'une restriction de droit interne
          - Recevabilité de l'appel contre un jugement insusceptible d'opposition
        indépendamment de l'existence d'un mandat d'arrêt
CONVENTION INTERNATIONALE
    Procédure pénale
      Droits de l'homme
        Pacte de New-York du 16 décembre 1966
          Recevabilité de l'appel contre un jugement insusceptible d'opposition
APPEL PÉNAL
    Jugement d'itératif défaut
      Déchéance de l'opposition
        Recevabilité de l'appel

**Résumé**

Le pacte international relatif aux droits civils et politiques, fait à New-York le 16 décembre 1966, applicable à Monaco, en vertu de l'ordonnance souveraine n° 13330 du 12 février 1998, qui a institué un contrôle international des normes conventionnelles relatives aux droits de l'homme, comporte en lui-même des normes directement applicables, en tant qu'elles apparaissent suffisamment précises, à la fois en leur objet et en leur forme, pour être mises en œuvre dans l'ordre juridique interne des Etats, sans mesures complémentaires d'exécution. Les justiciables doivent être ainsi admis à invoquer utilement ces normes devant la jurisprudence de chaque Etat, à l'encontre des dispositions de leur droit interne. Ces juridictions doivent alors se prononcer sur l'application de ces normes nécessairement tenues pour supérieures aux dispositions internes qui leur seraient contraires.

Il doit être à cet égard rappelé, en effet, ainsi que l'a retenu la Cour de révision aux termes d'un arrêt rendu le 21 avril 1980, que les conventions internationales priment les lois internes même postérieures des pays contractants.

Le pacte international de New-York susvisé, stipule en son article 14 § 5, que « toute personne déclarée coupable d'une infraction a le droit de faire examiner par une juridiction supérieure la déclaration de culpabilité et la condamnation, conformément à la loi », tandis que par déclaration annexée audit pacte le Gouvernement princier a indiqué qu'il convenait d'interpréter ce texte comme posant un principe général auquel la loi peut apporter des exceptions limitées.

Il s'en suit que ce principe d'application directe en droit monégasque ne peut être restreint que par une disposition légale.

Aux termes de l'article 411 du Code de procédure pénale « l'appel est formé, à peine de nullité, par une déclaration au greffe général sur le registre à ce destiné ». Aucune autre condition n'est imposée par la loi pour la recevabilité de l'appel.

Il ne saurait donc être désormais fait référence, comme par le passé aux principes généraux du Code de procédure pénale afin de faire obstacle à ce qu'un prévenu, contre qui a été décerné un mandat d'arrêt, charge son conseil d'interjeter appel en ses lieu et place.

Outre le Ministère public, il convient de recevoir H. S. en son appel susvisé, sans égard à la circonstance que ce prévenu ait été, lors de cet appel, l'objet d'un mandat d'arrêt.

En définitive, la cour devra donc examiner la poursuite exercée contre S., objet du jugement précité du 9 mai 2000 en tant que ce jugement a été nécessairement visé par les appels ainsi formés, le prévenu ayant été déchu de son opposition contre ce jugement, par celui d'itératif défaut du 23 janvier 2001, celui-ci s'identifiant en effet avec le jugement de défaut qu'il a fait survivre, à compter de cette date.

Il s'en suit que le premier jugement n'étant plus susceptible d'opposition, l'appel qui a été relevé par le prévenu dans le délai de 10 jours du jugement du 23 janvier 2001 à l'égard duquel n'est formulé aucun grief - doit être déclaré recevable par l'application, a contrario, de l'article 414 du Code de procédure pénale, et concerne donc que le premier chef du jugement de défaut.

La Cour,

Jugeant correctionnellement,

Considérant les faits suivants :

la suite d'une plainte avec constitution de partie civile formulée le 21 octobre 1996 par E. O.-B. au nom de la société Générale de Parfumerie et par R. M., au nom de la société Bluebell International Monaco, H. S. a été, sur commission rogatoire internationale, inculpé le 30 septembre 1997 d'escroquerie, faux en écritures de commerce, infraction aux règles régissant l'établissement des bilans, recel et banqueroute simple et frauduleuse.

Aux termes de l'information judiciaire ultérieurement suivie à son encontre de ces chefs, H. S. a été renvoyé devant le tribunal correctionnel selon ordonnance du magistrat instructeur du 14 février 2000, comme prévenu :

d'avoir à Monaco, courant 1995, 1996, en tout cas depuis temps non prescrit, détourné ou dissipé, au préjudice de la Société Générale de Parfumerie, propriétaire, des fonds, en l'espèce 500 000 francs et 5 000 000 de francs, qui ne lui avaient été remis qu'à titre de mandats, à charge de les rendre ou d'en faire usage ou un emploi déterminé.

d'avoir dans les mêmes circonstances de temps et de lieu, détourné ou dissipé, au préjudice de la Société Générale de Parfumerie, propriétaire, des marchandises pour un montant de 177 339 dollars américains, qui ne lui avaient été remises qu'à titre de mandat, à charge de les rendre ou d'en faire un usage ou un emploi déterminé.

d'avoir à Monaco, commis les faux en écritures de commerce suivants :

- le 24 avril 1996, une facture de 235 400 francs, à l'encontre de Bluebell Japan,

- le 24 avril 1996, une facture de 336 375 francs sur Bluebell Malaisie,

- le 24 avril 1996, une facture de 304 835 francs sur Bluebell Japan,

- le 28 mai 1996, une facture de 1 812 652,76 francs sur Waked International,

- le 1er mai 1996, une facture de 1 482 240 francs sur Général Perfume,

au préjudice de la Société Générale de Parfumerie,

et d'avoir à Monaco, courant 1996, fait usage de ces fausses factures au préjudice de la Société Générale de Parfumerie, en les présentant à l'escompte.

Faits prévus et réprimés par les articles 94, 95, 330 et 337 du Code pénal.

l'audience du tribunal correctionnel du 9 mai 2000 à laquelle il a été cité sous ces préventions, H. S. a fait défaut, tandis que la Société Générale de Parfumerie et la Société Bluebell International Monaco sollicitaient, en revanche, qu'il soit condamné à les indemniser du préjudice étant résulté pour elles des faits poursuivis.

Par jugement du 9 mai 2000, le Tribunal correctionnel statuant par défaut a déclaré H. S. coupable des délits visés par la poursuite et l'a condamné de ces chefs à la peine de deux ans d'emprisonnement, en décernant mandat d'arrêt à son encontre.

Par cette même décision, et sur l'action civile, le Tribunal correctionnel a déclaré l'action civile partiellement fondée et, condamné H. S. à payer aux sociétés précitées les sommes de 8 000 000 de francs et de 200 000 francs.

Selon courrier daté du 11 octobre 2000, Maître Frank Michel a déclaré former opposition pour le compte de son client H. S.

Cité pour l'audience du 23 janvier 2001, ce dernier a, le 17 janvier 2001, adressé au Président du tribunal correctionnel une lettre par laquelle il a sollicité l'autorisation de se faire représenter à l'audience par son conseil.

Sans faire droit à cette demande, et par jugement immédiatement rendu le 23 janvier 2001, le Tribunal correctionnel, constatant qu'H. S., défaillant, ne s'était pas constitué prisonnier avant l'audience, comme le prescrit l'article 385 du Code de procédure pénale, en l'état du mandat d'arrêt antérieurement décerné a, par jugement d'itératif défaut, déclaré le prévenu déchu de son opposition au jugement de défaut du 9 mai 2000.

Par acte du 1er février 2001, Maître Frank Michel, avocat-défenseur, a déclaré former appel en toutes ses dispositions du jugement ainsi rendu.

Pour sa part le Ministère public, par acte du même jour, a déclaré interjeter appel incident de ce jugement en toutes ses dispositions.

Quant au fond, la procédure d'instruction ayant fait l'objet des jugements précités révèle que, sur requête de la « Société Générale de Parfumerie » (SGP), représentée par son Président délégué E. O.-B. et par l'administrateur délégué R. M., un mandataire de justice a été désigné, le 9 août 1996, en la personne d'A. G., expert-comptable, afin de faire rapport sur la situation financière et commerciale de ladite société.

Il est résulté du rapport déposé le 24 septembre 1996 par ce mandataire de justice, que, sous la direction d'H. S., qui était devenu en 1994, actionnaire délégué de ladite société - avant d'être révoqué en juillet 1996 - celle-ci avait obtenu du groupe Bluebell, dont elle faisait partie, des avances de fonds totalisant au 31 décembre 1995 plus de 11 millions de francs, somme à laquelle le groupe Bluebell devait ajouter celle de 5 000 000 de francs, versée au cours du premier semestre 1996 à la société SGP.

En l'état de ces avances de fonds une situation a été établie au 31 août 1996 qui a révélé une insuffisance d'actif de 20 millions de francs.

Toutefois l'assemblée générale de la société SGP, saisie extraordinairement le 16 septembre 1996, tout en confirmant la révocation du mandat d'administrateur de S., a décidé, nonobstant l'importance des pertes et l'insuffisance d'actif, de poursuivre l'activité sociale, le groupe Bluebell acceptant d'apporter à cet effet les concours financiers nécessaires.

Cette décision a évité à la société SGP d'être judiciairement déclarée en état de cessation des paiements.

La plainte avec constitution de partie civile susvisée a été alors déposée tant par cette société SGP, que par la société Bluebell International Monaco (BIM) faisant partie du même groupe et dont S. avait été également dirigeant.

Cette plainte, formulée contre S., rapporte divers faits d'abus de confiance, dont ce dernier a été déclaré coupable par le jugement précité du Tribunal correctionnel, du 9 mai 2000 :

- qu'il avait asséché la Trésorerie de la société SGP par une gestion désastreuse et irrégulière (p. 7),

- qu'il avait infligé une perte sèche de 177 339 dollars à la société SGP pour avoir vendu à une autre société (Général Perfume) des coffrets de parfums à des prix sensiblement minimisés (p. 19),

- et, qu'après s'être engagé à reprendre à une société Cosmetic Laboratories pour 5 079 472 francs de marchandises, et à établir des avoirs de pareil montant, il avait convenu avec cette société qu'elle garderait le stock initial et que la société SGP ne ferait aucun avoir, de sorte qu'en restituant ultérieurement et sans contrepartie à la société Cosmetic Laboratories cinq traites de 5 000 000 de francs au total, il avait dépossédé la société SGP d'une partie importante de ses actifs (p. 22).

En outre, la plainte rapporte également que S. s'était livré à des faux en écritures dans diverses facturations établies par la société SGP (p. 11 à 16).

Sur ces divers points le Tribunal correctionnel, en son jugement du 9 mai 2000, a considéré comme établi :

- que S. avait indûment prélevé de prétendus émoluments et gratifications sur le compte courant de la société SGP,

- qu'il avait abandonné sans raison apparente cinq traites d'un montant total de 5 000 000 de francs,

- qu'il avait vendu apparemment à perte et en tous cas sans justifications valables pour 177 339 dollars de marchandises,

- et enfin, qu'il avait émis et fait usage de cinq fausses factures.

Le Tribunal correctionnel, sur la base de ces constatations, a estimé qu'étaient, en conséquence, établis les délits visés par la poursuite à l'encontre de S. ;

Sur l'action civile, le Tribunal a, par ailleurs, évalué globalement à la somme de 8 000 000 de francs le préjudice financier subi par l' « entité Société Générale de Parfumerie Bluebell International Monaco » et à 200 000 francs le préjudice moral de cette entité.

l'audience du 7 mai 2001 fixée pour l'examen des appels susvisés, le Ministère public a requis la confirmation dudit jugement tant comme le conseil des parties civiles, la société Générale de Parfumerie, et Bluebell International (Monaco), pour ce qui est des délits retenus par le tribunal.

Sans toutefois former appel incident quant aux dispositions civiles du jugement entrepris, ledit conseil a conclu, par ailleurs à l'infirmation de cette décision, à cet égard, demandant à la Cour d'allouer aux parties civiles la somme de 1 000 000 de francs en réparation du préjudice moral, outre celle du 8 000 000 de francs, déjà allouée en première instance, à titre de préjudice financier, et 100 000 francs à titre de dommages-intérêts.

Présent à cette même audience du 7 mai 2001, Maître Frank Michel, avocat-défenseur, a, pour sa part, indiqué à la cour qu'il ne disposait pas, en dernier lieu, d'un pouvoir de représentation pour assurer la défense du prévenu, en l'état de l'absence constatée de celui-ci à l'audience.

Sur quoi :

En la forme :

Considérant qu'aux termes de l'ordonnance souveraine n° 13330 du 12 février 1998, le pacte international relatif aux droits civils et politiques, fait à New-York le 16 décembre 1966, est en vigueur à Monaco ;

Que ce pacte, qui institue, un contrôle international des normes conventionnelles relatives aux droits de l'Homme, comporte en lui-même des normes directement applicables, en tant qu'elles apparaissent suffisamment précises, à la fois en leur objet et en leur forme, pour être mises en œuvre dans l'ordre juridique interne des États, sans mesures complémentaires d'exécution ;

Que les justiciables doivent être ainsi admis à invoquer utilement ces normes devant les juridictions de chaque État, à l'encontre des dispositions de leur droit interne ; que ces juridictions doivent alors se prononcer sur l'application de ces normes nécessairement tenues pour supérieures aux dispositions internes qui leur seraient contraires ;

Qu'il doit être à cet égard rappelé, en effet, qu'ainsi que l'a retenu la Cour de révision aux termes d'un arrêt rendu le 21 avril 1980, les conventions internationales priment les lois internes même postérieures des pays contractants ;

Considérant que le pacte international de New-York du 16 décembre 1966, stipule, en son article 14 § 5, que « toute personne déclarée coupable d'une infraction a le droit de faire examiner par une juridiction supérieure la déclaration de culpabilité et la condamnation, conformément à la loi », tandis que par déclaration annexée audit pacte le gouvernement princier a indiqué qu'il convenait d'interpréter ce texte comme posant un principe général auquel la loi peut apporter des exceptions limitées ;

Qu'il s'ensuit que ce principe d'application directe en droit monégasque ne peut être restreint que par une disposition légale ;

Considérant qu'aux termes de l'article 417 du Code de procédure pénale « l'appel est formé, à peine de nullité, par une déclaration reçue au greffe général sur le registre à ce destiné » ;

Qu'aucune autre condition n'est imposée par la loi pour la recevabilité de l'appel ;

Qu'il ne saurait donc être désormais fait référence, comme par le passé, aux principes généraux du Code de procédure pénale afin de faire obstacle à ce qu'un prévenu, contre qui a été décerné un mandat d'arrêt, charge son conseil d'interjeter appel en ses lieu et place ;

Qu'outre le Ministère public, il convient donc de recevoir H. S. en son appel susvisé, sans égard à la circonstance que ce prévenu ait été, lors de cet appel, l'objet d'un mandat d'arrêt ;

Qu'en définitive la Cour devra donc examiner la poursuite exercée contre S., objet du jugement précité du 9 mai 2000 - en tant que ce jugement a été nécessairement visé par les appels ainsi formés le prévenu ayant été déchu de son opposition contre ce jugement, par celui d'itératif défaut du 23 janvier 2001 ;

Que le jugement d'itératif défaut précité s'identifie, en effet, avec le jugement de défaut qu'il a fait survivre à compter du 23 janvier 2001 ;

Qu'il s'ensuit, que, ce premier jugement n'étant plus susceptible d'opposition, l'appel qui a été relevé par le prévenu dans le délai de 10 jours du jugement du 23 janvier 2001 - à l'égard duquel n'est formulé aucun grief - doit être déclaré recevable par l'application, a contrario, de l'article 414 du Code de procédure pénale, et concerne donc au premier chef le jugement de défaut ;

Qu'en revanche, faute d'appel régulièrement formé sur ce point par les parties civiles, les demandes d'infirmation de ce même jugement du 9 mai 2000, quant aux indemnités allouées, doivent être déclarées irrecevables ;

Au fond :

Considérant, sur ce, que les délits de faux et d'usage de faux retenus par la poursuite à l'encontre de S. sont établis par l'instruction préparatoire ; que c'est donc à juste titre que le tribunal a déclaré coupable le prévenu de ces délits ;

Qu'il en va de même relativement au prélèvement de 500 000 francs indûment effectué par S. à partir du compte courant de la Société Générale de Parfumerie qu'il avait mandat de gérer, prélèvement qui a constitué une rémunération à laquelle il estimait néanmoins pouvoir prétendre mais qui se trouve contestée, ce qui caractérise le détournement relatif à l'abus de confiance retenu à ce titre ;

Considérant qu'en revanche n'apparaît pas caractérisé le détournement prétendu de la somme de 177 339 dollars, correspondant à une perte consécutive à la minoration alléguée des montants de factures établies à l'adresse de la Société Générale de Parfumerie comme correspondant à une vente de coffrets de parfums acquis par celle-ci, dès lors que le prix de ces coffrets n'apparaît pas avoir été versé, et qu'aucune appropriation de la différence du prix n'est avérée de la part du prévenu ;

Qu'en outre, si des traites ont été manifestement tirées sur la société Cosmetic Laboratories au bénéfice de la Société Générale de Parfumerie pour un montant de 5 000 000 francs, lesquelles ont été ensuite restituées par S. à la société tirée, dès lors que ces effets n'auraient circulé ainsi que dans le cadre d'une opération commerciale de vente « non bouclée » (D196, p. 3) intéressant ces deux sociétés, et relevant normalement de l'activité de dirigeant social de S., l'abus de confiance retenu sur ce point contre ce dernier n'apparaît pas davantage établi, étant relevé que la restitution incriminée des traites a été incontestablement provoquée par des défectuosités d'un stock cédé par la Société Générale de Parfumerie, et que leur montant n'apparaît pas non plus avoir, en tant que tel, fait l'objet d'une appropriation par le prévenu ;

Que, de ces deux derniers chefs il y a donc lieu de prononcer la relaxe d'H. S. ;

Que la sanction infligée à ce prévenu devra être en conséquence réduite, sans qu'il y ait lieu pour autant de donner mainlevée du mandat d'arrêt décerné contre lui, qui s'avère justifié ainsi que le tribunal l'a retenu ;

Considérant quant à l'action civile, qu'il convient, par ailleurs, de réduire également, compte tenu des relaxes prononcées, l'indemnisation revenant aux parties civiles ;

Que le montant des dommages-intérêts retenu à ce titre par le Tribunal correctionnel apparaît devoir ainsi être ramené à celui de 2 000 000 francs, toutes causes de préjudice réunies, eu égard aux éléments d'appréciation suffisants dont dispose la cour pour apprécier les dommages subis en l'occurrence ;

**PAR CES MOTIFS :**

La Cour d'appel de la Principauté de Monaco,

Statuant par défaut à l'égard d'H. S., et contradictoirement à l'égard des parties civiles,

Reçoit H. S. et le Ministère public en leurs appels, mais dit irrecevables les conclusions des parties civiles tendant à la majoration des dommages-intérêts alloués par le Tribunal correctionnel,

Confirme, sur l'action publique, le jugement du Tribunal correctionnel du 9 mai 2000, en ce qui concerne sa culpabilité, sauf quant à l'abus de confiance retenu contre S. du chef de sommes de 177 339 dollars américains et de 5 000 000 francs,

Statuant à nouveau à cet égard, relaxe H. S. de ces deux chefs,

Infirmant par ailleurs le jugement susvisé quant à la peine prononcée, condamne H. S. à la peine d'un an d'emprisonnement,

Dit n'y avoir lieu, toutefois, de donner mainlevée du mandat d'arrêt décerné contre celui-ci ;

Et réformant, sur l'action civile, le jugement précité, ramène à 2 000 000 francs le montant total de l'indemnité revenant aux parties civiles,

Contentieux Judiciaire

NOTE : Cet arrêt confirme sur l'action publique le jugement correctionnel du 9 mai 2000 et, l'infirme quant au prononcé de la peine et la réforme sur l'action civile.Aux termes d'une information judiciaire M. S. a été renvoyé devant le Tribunal correctionnel pour abus de confiance, faux en écriture de commerce et usage. Il a été, par jugement du 9 mai 2000, condamné par défaut à une peine de 2 ans d'emprisonnement, accompagnée d'un mandat d'arrêt décerné à son encontre et de dommages intérêts envers les parties civiles. Son avocat a déclaré avoir formé opposition pour son compte. Cité pour l'audience du 23 janvier 2001, S. a par lettre sollicité l'autorisation du président de se faire représenter à l'audience. Sans faire droit à cette demande le tribunal, constatant que S. défaillant ne s'était pas constitué prisonnier avant l'audience, comme le prescrivait l'article 385 du Code de procédure pénale, en l'état du mandat d'arrêt antérieurement décerné, a par jugement itératif défaut du 23 janvier 2001 déclaré le prévenu déchu de son opposition au jugement de défaut du 9 mai 2000. Par acte du 1er février 2001, Me Franck Michel avocat-défenseur a déclaré former appel. Cet avocat qui était présent à l'audience n'avait pas assuré la défense, faute de disposer d'un pouvoir de représentation.

www.legimonaco.mc - **Mentions Légales** - **Nous contacter** - Tous droits reservés Monaco 2015
Contenu du site à jour au Journal de Monaco en date du 21 février 2020