IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 15 Case |
| FAIRFIELD SENTRY LIMITED, et al., | Case No. 10-13164 (SMB) |
| Debtor in Foreign Proceedings. | Jointly Administered |
| FAIRFIELD SENTRY LTD. (IN LIQUIDATION), et al., | Adv. Pro. No. 10-03496 (SMB) |
| Plaintiffs, | |
| v. | Administratively Consolidated |
| THEODOOR GGC AMSTERDAM, et al., | |
| Defendants. | |

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' RENEWED MOTION TO DISMISS

Date:  May 29, 2020

SELENDY & GAY PLLC

David Elsberg
Andrew R. Dunlap
Lena Konanova
Jordan Garman
Ronald Krock
Evan Bianchi
1290 Avenue of the Americas
New York, NY 10104
Telephone: 212-390-9000

-and-

BROWN RUDNICK LLP

David J. Molton
Marek P. Krzyzowski
Seven Times Square
New York, NY 10036
Telephone: 212-209-4800

*Attorneys for Plaintiffs Foreign
Representatives*

# TABLE OF CONTENTS

**Pages**

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ........................................................................................................3

    A.    The Funds................................................................................................4

    B.    Allegations Of Citco's Fraudulent Conduct ..........................................4

    C.    This Court's Decisions............................................................................6

    D.    The Instant Motion.................................................................................7

ARGUMENT ..............................................................................................................8

I.    THE LIQUIDATORS' CLAIMS ARE EXEMPT FROM SECTION 546(e) OF
THE BANKRUPTCY CODE.............................................................................8

    A.    Section 546(e) Does Not Apply To The Liquidators' Claims To Avoid
Intentionally Fraudulent Transfers.........................................................9

    B.    Section 546(e) Does Not Apply To The Liquidators' Constructive Trust
Claims ..................................................................................................13

        1.    Section 546(e) Does Not Apply To Foreign Common Law Claims
Like The Liquidators' Constructive Trust Claims .....................14

        2.    Even If Section 546(e) Could Apply To Foreign Common Law
Claims, It Would Not Preempt The Constructive Trust Claims
Because They Concern Intentionally Fraudulent Transfers.......17

    C.    Section 546(e) Does Not Apply To The Funds ....................................19

        1.    The Funds Are Not Financial Institutions..................................19

        2.    The Funds Are Not Financial Participants..................................21

II.    THE COURT SHOULD APPROVE ALTERNATIVE SERVICE ON U.S.
COUNSEL OR ORDER NEW SERVICE FOR THE SWISS DEFENDANTS...............23

    A.    This Court Should Retroactively Approve Alternative Service On Swiss
Defendants' U.S. Counsel.....................................................................24

        1.    The Hague Convention Does Not Preclude Alternative Service On
U.S. Counsel ..............................................................................25

2.      Service On U.S. Counsel Was Consistent With Due Process....................28

3.      This Case Is An Ideal Candidate For Alternative Service ........................30

B.      In Any Event, The Liquidators Exercised The Due Diligence Necessary
For The Opportunity To Re-effect Service If The Court So Orders......................34

CONCLUSION.....................................................................................................................36

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adelphia Recovery Tr.*,
  634 F.3d 678 (2d Cir. 2011).................................................................................................10

*Adelphia Recovery Tr. v. Bank of Am., N.A.*,
  624 F. Supp. 2d 292 (S.D.N.Y. 2009).................................................................................11

*Advanced Aerofoil Techs., AG v. Todaro*,
  2012 WL 299959 (S.D.N.Y. Jan. 31, 2012) .......................................................................27

*Al-Kurdi v. United States*,
  25 Cl. Ct. 599 (1992) .........................................................................................................15

*AMTO LLC v. Bedford Asset Mgmt., LLC*,
  2015 WL 3457452 (S.D.N.Y. June 1, 2015) .......................................................................28

*AP Servs. LLP v. Silva*,
  483 B.R. 63 (S.D.N.Y. 2012)........................................................................................15, 18

*Aqua Shield, Inc. v. Inter Pool Cover Team*,
  2007 WL 4326793 (E.D.N.Y. Dec. 7, 2007) ......................................................................34

*In re Bean*,
  252 F.3d 113 (2d Cir. 2001)................................................................................................13

*Blockbuster, LLC v. Grupo Mizbe, S.A.*,
  2015 WL 12712061 (S.D. Fla. July 22, 2015).....................................................................36

*In re Bozel S.A.*,
  2017 WL 3175606 (S.D.N.Y. July 25, 2017) ......................................................................35

*Brockmeyer v. May*,
  383 F.3d 798 (9th Cir. 2004) ..............................................................................................32

*Brown v. China Integrated Energy, Inc.*,
  285 F.R.D. 560 (C.D. Cal. 2012)........................................................................................33

*Burda Media, Inc. v. Blumenberg*,
  2004 WL 1110419 (S.D.N.Y. May 18, 2004) ......................................................................34

*Cassano v. Altshuler*,
  186 F. Supp. 3d 318 (S.D.N.Y. 2016)..................................................................................35

*Contemporary Indus. Corp. v. Frost*,
    564 F.3d 981 (8th Cir. 2009) ...................................................................15, 18

*Credit Suisse First Bos. LLC v. Coeur d'Alene Mines Corp.*,
    2004 WL 2903772 (S.D.N.Y. Dec. 15, 2004) ..............................................31

*Dickerson v. Napolitano*,
    604 F.3d 732 (2d Cir. 2010)........................................................................35

*English v. Gen. Elec. Co.*,
    496 U.S. 72 (1990)......................................................................................14

*Exp.-Imp. Bank of U.S. v. Asia Pulp & Paper Co.*,
    2005 WL 1123755 (S.D.N.Y. May 11, 2005) ..........................................24, 26

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*,
    542 U.S. 155 (2004)....................................................................................16

*In re Fairfield Sentry Ltd.*,
    2018 WL 3756343 (Bankr. S.D.N.Y. Aug. 6, 2018) ...........................3, 6, 32

*In re Fairfield Sentry Ltd.*,
    458 B.R. 665 (S.D.N.Y. 2011)......................................................................16

*In re Fairfield Sentry Ltd.*,
    596 B.R. 275 (Bankr. S.D.N.Y. 2018)....................2, 3, 4, 6, 7, 9, 10, 13, 15, 16, 20

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000)....................................................................................22

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
    505 U.S. 88 (1992)......................................................................................14

*In re GLG Life Tech Corp. Sec. Litig.*,
    287 F.R.D. 262 (S.D.N.Y. 2012) .......................................................25, 26, 30, 33

*Gomez v. Toledo*,
    446 U.S. 635 (1980)......................................................................................9

*In re Graña y Montero S.A.A. Sec. Litig.*,
    2019 WL 259778 (E.D.N.Y. Jan. 9, 2019) ..................................................29

*Haffner Int'l Mktg. Grp., Inc. v. Sahin*,
    2013 WL 5954379 (D. Nev. Nov. 5, 2013) ..................................................33

*Harris v. City of New York*,
    186 F.3d 243 (2d Cir. 1999)..........................................................................9

*In re Hechinger Inv. Co. of Del.*,
    274 B.R. 71 (D. Del. 2002) ........................................................................15, 18

*In re Hellas Telecomms. (Luxembourg) II SCA*,
    526 B.R. 499 (Bankr. S.D.N.Y. 2015) ............................................11, 17, 18, 19

*In re Hellas Telecomms. (Luxembourg) II SCA*,
    535 B.R. 543 (Bankr. S.D.N.Y. 2015) .................................................................19

*Icon DE Holdings LLC v. Eastside Distribs.*,
    2015 WL 4557278 (S.D.N.Y. July 28, 2015) .....................................................26

*Integr8 Fuels, Inc. v. OW Bunker Panama SA*,
    2017 WL 11455309 (S.D.N.Y. Feb. 2, 2017) .....................................................25

*Jaen v. Sessions*,
    899 F.3d 182 (2d Cir. 2018) ................................................................................10

*Jian Zhang v. Baidu.com Inc.*,
    293 F.R.D. 508 (S.D.N.Y. 2013) ..............................................................26, 27, 28

*Johnson v. City of Shelby, Miss.*,
    574 U.S. 10 (2014) (per curiam) ........................................................................11

*Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*,
    2018 WL 4681616 (S.D.N.Y. Sept. 11, 2018) ...................................................34

*Matter of Kennise Diversified Corp.*,
    34 B.R. 237 (Bankr. S.D.N.Y. 1983) ..................................................................20

*Knit With v. Knitting Fever, Inc.*,
    2010 WL 4977944 (E.D. Pa. Dec. 7, 2010) .......................................................33

*KPN B.V. v. Corcyra D.O.O.*,
    2009 WL 690119 (S.D.N.Y. Mar. 16, 2009) ......................................................30

*LaSala v. Bordier et Cie*,
    519 F.3d 121 (3d Cir. 2008) ................................................................................15

*In re Lehman Bros. Holdings Inc.*,
    469 B.R. 415 (Bankr. S.D.N.Y. 2012) ...........................................................17, 18

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    797 F.3d 160 (2d Cir. 2015) ................................................................................11

*Lumbermens Mut. Cas. Co. v. Franey Muha Alliant Ins. Servs.*,
    388 F. Supp. 2d 292 (S.D.N.Y. 2005) .................................................................20

*Lyell Theater Corp. v. Loews Corp.*,
    682 F.2d 37 (2d Cir. 1982) ................................................................................... 35

*In re Lyondell Chem. Co.*,
    554 B.R. 635 (S.D.N.Y. 2016) .............................................................................. 11

*In re Maxwell Commc'n Corp.*,
    93 F.3d 1036 (2d Cir. 1996) ................................................................................. 16

*Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*,
    138 S. Ct. 883 (2018) ...................................................................................... 7, 14

*Montalbano v. Easco Hand Tools, Inc.*,
    766 F.2d 737 (2d Cir. 1985) ............................................................................ 34, 36

*Morgan Art Found. Ltd. v. Brannan*,
    2020 WL 469982 (S.D.N.Y. Jan. 28, 2020) .......................................................... 10

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
    339 U.S. 306 (1950) ............................................................................................. 28

*Nat'l Union Fire Ins. Co. of Pittsburgh*,
    1994 WL 463009 (S.D.N.Y. Aug. 25, 1994) ......................................................... 36

*Nielsen v. Rabin*,
    746 F.3d 58 (2d Cir. 2014) ................................................................................... 21

*Ninety-Five Madison Co., L.P. v. Vitra Int'l AG*,
    2020 WL 1503640 (S.D.N.Y. Mar. 30, 2020) ................................................. 31, 35

*NYKCool A.B. Pac. Int'l Servs., Inc.*,
    2015 WL 998455 (S.D.N.Y. Mar. 5, 2015) ..................................................... 26, 29*

*Payne v. McGettigan's Mgmt. Servs. LLC*,
    2019 WL 6647804 (S.D.N.Y. Nov. 19, 2019) ................................................. 31, 33

*In re Peters*,
    642 F.3d 381 (2d Cir. 2011) ................................................................................. 10

*In re Petrobras Sec. Litig.*,
    169 F. Supp. 3d 547 (S.D.N.Y. 2016) ............................................................. 15, 16

*Picard v. Cohmad Secs. Corp. (In re Bernie L. Madoff Inv. Sec. LLC)*,
    418 B.R. 75 (Bankr. S.D.N.Y. 2009) .................................................................... 32

*Picard v. Ida Fishman Revocable Tr.*,
    773 F.3d 411 (2d Cir. 2014) ................................................................................. 23

*In re Picard*,
    917 F.3d 85 (2d Cir. 2019).................................................................................16

*Quality Inv. Fund, Malta 1, Ltd. v. Schuermann*,
    2018 WL 6252426 (C.D. Cal. July 20, 2018).........................................................24

*Emps.' Ret. Sys. of Gov't Virgin Is. v. Blanford*,
    794 F.3d 297 (2d Cir. 2015)...........................................................................11, 12

*RSM Prod. Corp. v. Fridman*,
    2007 WL 2295907 (S.D.N.Y. Aug. 10, 2007)........................................................25

*SEC v. Jammin Java Corp.*,
    2016 WL 6650849 (C.D. Cal. Apr. 21, 2016)....................................................26, 29

*Silverman v. Miranda*,
    116 F. Supp. 3d 289 (S.D.N.Y. 2015)....................................................................11

*Spinelli v. Nat'l Football League*,
    903 F.3d 185 (2d Cir. 2018)..................................................................................9

*Stream SICAV v. Wang*,
    989 F. Supp. 2d 264 (S.D.N.Y. 2013)....................................................................33

*In re Tankson*,
    1991 WL 174653 (Bankr. N.D. Ill. Aug. 28, 1991)...............................................20

*In re Taylor, Bean & Whitaker Mortg. Corp.*,
    2017 WL 4736682 (Bankr. M.D. Fla. Mar. 14, 2017)............................................23

*In re Teleservs. Grp., Inc.*,
    444 B.R. 767 (Bankr. W.D. Mich. 2011)................................................................12

*In re Tribune Co. Fraudulent Conveyance Litig.*,
    2019 WL 1771786 (S.D.N.Y. Apr. 23, 2019)....................................................21, 22

*In re Tribune Co. Fraudulent Conveyance Litig.*,
    946 F.3d 66 (2d Cir. 2019)............................................................................15, 18

*U.S. Bank N.A. v. Verizon Commc'ns Inc.*,
    892 F. Supp. 2d 805 (N.D. Tex. 2012) ............................................................15, 18

*Volkswagenwerk Aktiengesellschaft v. Schlunk*,
    486 U.S. 694 (1988)..........................................................................................25

*Warsco v. Preferred Tech. Grp.*,
    258 F.3d 557 (7th Cir. 2001) .............................................................................23

*Wash. State Inv. Bd. v. Odebrecht S.A.*,
   2018 WL 6253877 (S.D.N.Y. Sept. 21, 2018)..........................................24, 25, 26, 27, 28, 30

*Water Splash Inc. v. Menon*,
   137 S. Ct. 1504 (2017) ..................................................................................................27

*Zherka v. Ryan*,
   52 F. Supp. 3d 571 (S.D.N.Y. 2014) ..............................................................................35

**Rules and Statutes**

11 U.S.C. § 101.............................................................................................................20, 21, 22

11 U.S.C. § 546(e) .................................................................................................................8

11 U.S.C. § 546(e) ...........................................................................................................10, 13

11 U.S.C. § 546(g) .................................................................................................................9

11 U.S.C. § 548(a)(1)(A) ......................................................................................................10

11 U.S.C. § 561(d) ...........................................................................................................14, 15

11 U.S.C. § 926(a) ................................................................................................................10

11 U.S.C. § 1521(a)(7)...........................................................................................................19

Fed. R. Civ. P. 4(f)(3) ...........................................................................................................24

**Treatises**

Wright & Miller, 5 Fed. Prac. & Proc. Civ. § 1276 (3d ed. 2002) ..................................9

**Other Authorities**

H.R. Rep. 95-595 (1977)........................................................................................................20

H.R. Rep. 109-31(I) (2005)....................................................................................................22

S. Rep. 989 (1978) .................................................................................................................20

Kenneth M. Krys and Greig Mitchell (the "Liquidators" or "Foreign Representatives"), in their capacities as the duly appointed Liquidators and Foreign Representatives of Fairfield Sentry Limited (In Liquidation) ("Sentry"), Fairfield Sigma Limited (In Liquidation) ("Sigma"), and Fairfield Lambda Limited (In Liquidation) ("Lambda" and, collectively with Sentry and Sigma, the "Funds") in these consolidated adversary proceedings (the "Actions"), respectfully submit this memorandum of law in opposition to Defendants' Renewed Motion to Dismiss Pursuant to 11 U.S.C. §§ 546(e), 546(g), and 561(d), and for Insufficient Service of Process Under the Hague Service Convention (the "Renewed Motion to Dismiss" or "Mot.").

## PRELIMINARY STATEMENT

The Bankruptcy Code does not protect Defendants' ill-gotten monies from clawback, and Defendants served in Switzerland have long been properly on notice of the Liquidators' claims here. For ten years, the Liquidators have fought tirelessly for the Funds' estates to recover $6 billion of fraudulently inflated redemption payments from Defendants who benefited from the largest Ponzi scheme in history. The Liquidators seek to right the imbalance between Defendants (windfall "winners" of the fraud), and non-redeeming shareholders (who lost their investments when the scheme collapsed). Yet for a decade, Defendants have attempted to avoid the merits of the dispute in this Court. In this latest round, Defendants argue that 11 U.S.C. § 546(e), the Bankruptcy Code's securities safe harbor, bars the Liquidators' foreign avoidance and common law claims, and that the Liquidators' claims against the Switzerland-based Defendants ("Swiss Defendants") should be dismissed because of failure to effect proper service. Defendants' arguments fail.

First, the Liquidators' foreign avoidance claims are exempt from Section 546(e), because the transfers at issue were made with actual fraudulent intent. The Liquidators have consistently alleged facts sufficient to plead that the Citco Administrator (defined below) committed fraud: Its motive was exorbitant fees, its opportunity came as the Funds' authorized agent to calculate the

NAVs, and it consciously or (at a minimum) recklessly disregarded that the NAVs it calculated were worthless. In its December 2018 Memorandum Decision, *In re Fairfield Sentry Ltd.*, 596 B.R. 275 (Bankr. S.D.N.Y. 2018) ("*Fairfield II*"), this Court accepted Defendants' argument that the Citco Administrator's knowledge and conduct are imputed to the Funds. Under this holding, the redemption payments made to the Defendants are intentionally fraudulent transfers, exempt from the safe harbor.

Nor does Section 546(e) bar the Liquidators' constructive trust claims, brought under BVI common law. While Defendants cite cases impliedly preempting state common law claims under the Constitution's Supremacy Clause, implied preemption does not apply to foreign law claims—Congress displaces foreign law expressly, or not at all. Section 546(e) does not bar foreign common law claims expressly. While this Court held that Section 561(d) extends Section 546(e) to bar certain foreign statutory avoidance claims, no court has held that it extended Section 546(e) to bar foreign common claims as well, and nothing in the statute or legislative history supports doing so. In any event, like their avoidance claims, the Liquidators' constructive trust claims concern transfers made with actual fraudulent intent, and so could not be barred by Section 546(e).

The Section 546(e) safe harbor—an affirmative defense for which Defendants bear the burden of proof—also requires an underlying transaction made "by or to (or for the benefit of)" a "financial institution" or a "financial participant." The Funds are neither. They are indisputably not financial institutions themselves. Per the plain terms of the Bankruptcy Code, a financial institution's customer may qualify as a financial institution if the financial institution is an agent or custodian for the customer in connection with a securities contract. Defendants point to Citco Bank (defined below)—a different entity than the Citco Administrator—but identify nothing in the pleadings showing that Citco Bank was the Funds' agent or custodian. And, as the text,

structure, and legislative history of the Bankruptcy Code make clear, debtors like the Funds cannot be financial participants.

Second, the Swiss Defendants are out on a limb in contesting adequacy of service. At the start of this litigation, the Liquidators undisputedly served the representative Defendant HSBC Suisse (and all Defendants) by international registered mail, as explicitly permitted by the Funds' subscription agreements. In those agreements, HSBC Suisse (and other Defendants) consented to such service. The Liquidators also served HSBC Suisse's U.S. counsel by first-class mail. After its August 2018 decision that the Liquidators' claims were not "with respect to" the subscription agreements for personal jurisdiction purposes, this Court entered stipulated orders in April 2019 setting the service issue for this second round of motions to dismiss. Given the unique circumstances of this case, including the significant cost (estimated at over $270,000 for the Swiss Defendants alone, excluding attorney and staff costs) and the delay of re-effecting service, the Liquidators respectfully request the Court approve alternative service on HSBC Suisse's U.S. counsel. Such service would be consistent with the Hague Convention and would provide HSBC Suisse due process. Approving such service would be particularly appropriate, as HSBC Suisse indisputably had actual notice of this litigation for a decade, it has effectively litigated at each phase, and the Liquidators diligently made good faith efforts to apprise it of this litigation from the start. Alternatively, the Liquidators respectfully request the Court authorize them to re-effect service.

## **BACKGROUND**

For nearly a decade, the Liquidators have tried to recoup over $6 billion in assets for the victims of the largest Ponzi scheme in history, Bernard L. Madoff Investment Securities ("BLMIS"), as discussed in this Court's August 2018 decision, *In re Fairfield Sentry Ltd.*, 2018 WL 3756343 (Bankr. S.D.N.Y. Aug. 6, 2018) ("*Fairfield I*"), and *Fairfield II*, 596 B.R. 275. The Liquidators highlight here relevant points and subsequent developments.

3

## A.    The Funds

Sentry was a BLMIS feeder fund, investing over 95% of its assets in BLMIS. *Citibank* Compl. ¶ 35.[1]  Sigma and Lambda, established for foreign currency investments, were "funds of funds" that invested all assets in Sentry. *Id.* ¶ 33.  Organized under the laws of the BVI, *Fairfield II*, 596 B.R. at 282, the Funds were governed by their respective Articles of Association (the "Articles"), which were substantially identical in all material respects, *id.* at 283 n.4.  The Articles authorized the Funds to redeem shares at a redemption price based on the Funds' net asset value ("NAV").  *Citibank* Compl. ¶¶ 4, 35.  The Funds delegated this duty to Citco Fund Services (Europe) B.V. (with its delegate Citco (Canada) Inc., the "Citco Administrator").  *Id.* ¶ 45.  The Funds engaged Citco Bank Nederland NV Dublin Branch ("Citco Bank") and Citco Global Custody as custodians; but they were custodians "only … on paper"; Madoff served as his own custodian. *Id.* ¶ 49.  Only the Citco Administrator—not Citco Bank or Citco Global Custody—issued NAV certificates.  *Id.* ¶¶ 72–73.

## B.    Allegations Of Citco's Fraudulent Conduct

In mid-2014, the Liquidators obtained evidence that the Citco Administrator had not calculated or certified the NAVs in good faith—which, under the Articles, meant those NAVs and corresponding redemption payments were not binding.  *See* Oct. 21, 2016 Mot. to Amend (Dkt. 933 at 7).[2]  The Liquidators sought leave to amend their complaints to allege Citco's bad

---

[1] The amended complaints in the Actions are materially identical for the purposes of the Motion. Per this Court's direction, *infra* Background Section D, the Liquidators cite the Third Amended Complaint in *Fairfield Sentry Ltd. v. Citibank NA London*, 10-ap-03622 (SMB) (Bankr. S.D.N.Y. Jan. 9, 2020) (Dkt. 79) ("*Citibank* Compl.") here as a representative complaint.

[2] Unless otherwise noted, docket citations refer to the consolidated adversary proceeding docket, *Fairfield Sentry Ltd. (In Liquidation), et al. v. Theodoor GGC Amsterdam, et al.*, No. 10-ap-03496 (SMB) (Bankr. S.D.N.Y.), and page citations refer to ECF paginations.

faith.  *Id.* at 20–21.  Defendants opposed and moved to dismiss, arguing in relevant part that Section 546(e) barred all the Liquidators' claims and service was improper for many Defendants. Jan. 13, 2017 Mot. to Dismiss (Dkt. 960).

Based on the newly obtained evidence, the Liquidators alleged that, as early as 2000, executives of "Citco" (defined as all Citco entities, *Citibank* Compl. ¶ 45) like Ger Jan Meijer— the Citco Administrator's head of internal audit—expressed serious doubt that the Funds' assets at BLMIS existed.  *Id.* ¶¶ 50–53.  Though Meijer raised these concerns to other top-level Citco employees, including the Citco parent entity's CEO Christopher Smeets, he was silenced and told to stop.  *Id.* ¶¶ 51–52, 54–55.  Each year from 2000 to 2006, Citco acknowledged it should independently confirm the existence of the Funds' assets at BLMIS or resign.  *Id.* ¶ 57.  But after three unsuccessful verification attempts, *id.* ¶¶ 58–61, it stopped trying and, instead of quitting, ended its credit relationships with the Funds, decreasing its exposure to BLMIS, *id.* ¶ 65.

The Liquidators also alleged that Citco knew that it did not consistently price the Funds' portfolios independently, typically relying only on Madoff's share pricing information; it did not have custody of the Funds' portfolios; BLMIS's statements contained incorrect information; BLMIS's transactions were likely impossible; Madoff was the only broker-dealer it worked with that provided only settlement date transaction confirmations, not trade date confirmations; Madoff insisted that Citco book all trades for the Funds manually, contradicting Citco's own internal pol- icy; and there were inconsistencies between Citco's and Madoff's custody statements that Citco did not analyze.  *Id.* ¶¶ 69–71.  And Citco knew the risk it was taking.  *See id.* ¶ 66 ("We are taking a risk and we only get US$60K per year!").

The Liquidators further alleged that Citco, putting "its financial interests ahead of its duties to the Funds," *id.* ¶ 63, kept calculating NAVs based on BLMIS's stated returns, but negotiated a

new fee based on a percentage of the Funds' total NAV—tying Citco's compensation directly to the very NAVs it calculated and certified—resulting in an 800% increase, *id.* ¶¶ 67–68.

### C.    This Court's Decisions

On August 6, 2018, as relevant here, this Court decided that the New York forum selection clauses in the Funds' subscription agreements did not provide it with personal jurisdiction over Defendants, because the Actions were not "with respect to" those agreements, *Fairfield I*, 2018 WL 3756343, *12.[3]  Defendants reserved their rights to contest personal jurisdiction, and the parties stipulated to be bound by the Court's decision on the merits.  *See* Sept. 13, 2018 Stipulation (Dkt. 1735 at 4).

On December 6, 2018, this Court held, in relevant part, that if the Liquidators' allegations regarding Citco were true, the NAVs would still be binding under BVI common and contract law. *Fairfield II*, 596 B.R. at 295–302, 316.  It denied the Liquidators leave to amend their common law and contract claims, and dismissed them, except it allowed constructive trust claims against those "Defendant[s] [who] knew the NAV was inflated at the time of redemption." *Id.* at 295.[4]

In the same decision, the Court held that Section 561(d) "makes [Section 546(e)] applicable to proceedings brought by foreign representatives in a [C]hapter 15 case seeking to avoid purely foreign transfers under foreign insolvency laws." *Id.* at 310–14.  The Court denied Defendants' motion to dismiss the foreign avoidance claims based on Section 546(e) without prejudice,

---

[3] The Liquidators have appealed this ruling, *see, e.g.*, May 1, 2019 Notice of Appeal (No. 19-cv-03911 (VSB) (S.D.N.Y.) Dkt. 1 at 3, and the appeal is stayed pending proceedings in this Court, *see* Sept. 11, 2019 Order, *id.*, Dkt. 8 at 5.

[4] The Liquidators have appealed that portion of *Fairfield II* denying the motion for leave to amend and dismissing the remaining common law and contract claims. *Fairfield Sentry Ltd. (In Liquidation) et al. v. Citibank NA London*, No. 19-cv-03911 (VSB) (S.D.N.Y.) (Admin. Consol.).

allowing Defendants to bring subsequent motions. *Id.* at 315.[5]  The Court did not rule on Defendants' additional argument that Section 561(d) also extended Section 546(e) to bar foreign common law claims that sought similar relief. *Id.* at 311 n.52.

Also in that decision, ruling for the Defendants and against the Liquidators, the Court "concluded that [the Citco Administrator]'s bad faith is imputed to the Funds …." *Id.* at 306 (imputation precludes finding that redemption of shares at inflated NAVs were made in good faith).  The Court did not determine—and no party asked it to determine—whether, considering this imputation, the redemption payments were intentionally fraudulent transfers.

In April 2019, the Court entered orders setting the issues for the next round of motion to dismiss briefing, including Section 546(e) and service. *See, e.g.*, Apr. 15, 2019 Stipulated Order, *Fairfield Sentry Ltd. (In Liquidation) v. ABN AMRO Schweiz AG*, No. 10-ap-03635 (SMB) (Bankr. S.D.N.Y.) (Dkt. 431 at 11 (¶¶ II.A.)).  The Liquidators filed operative complaints against all surviving Defendants and moved for leave to amend to assert knowledge allegations against 29 of those Defendants.  Jan. 15, 2020 Mot. for Leave (Dkt. 2873-2).

### D.    The Instant Motion

Defendants submitted their consolidated Renewed Motion to Dismiss on March 16, 2020 (Dkt. 2903).  The Court narrowed the issues for this round of briefing to: (1) whether Sections 546(e), 546(g), or 561(d) bar any of the Liquidators' claims, based on the *Citibank*

---

[5] Defendants misleadingly assert that the Liquidators did not previously contest that the Funds or individual Defendants are financial institutions or financial participants.  Mot. 9.  In fact, in prior briefing, Defendants argued only that their intermediary banks were financial institutions and that Sentry was a financial participant, citing then-applicable Second Circuit law that looked at intermediary transactions.  *See* Mot. to Dismiss (Dkt. 960 at 57–58).  The Supreme Court then decided *Merit Management Group, LP v. FTI Consulting, Inc.*, 138 S. Ct. 883 (2018), holding courts should not look at intermediaries, only the ultimate transferor and transferee.  The Liquidators promptly contested Defendants' arguments, Mar. 8, 2018 Letter (Dkt. 1671 at 2–3), and the Court sua sponte granted new briefing in light of *Merit*.  *Fairfield II*, 596 B.R. at 315.

Complaint—but excluding whether individual Defendants are financial institutions or financial participants, Mar. 19, 2020 Order (Dkt. 2926 at 4–5); Apr. 14, 2020 Order (Dkt. 3028 at 2 (¶ 1(a)(i))); and (2) whether, "as a matter of law, service was properly effected on the Defendants who reside in [Switzerland]," a signatory to the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (the "Hague Convention"), based on the operative complaint against HSBC Private Bank (Suisse) SA ("HSBC Suisse") (No. 10-ap-03633), Dkt. 2926 at 4–5, 6 (¶ 2(a)); Dkt. 3028 at 2 (¶ 1(a)(ii)).  The Court reserved all individualized issues pending determination of these omnibus issues.  *See* Dkt. 2926 at 8 (¶ 7).

## ARGUMENT

## I.    THE LIQUIDATORS' CLAIMS ARE EXEMPT FROM SECTION 546(e) OF THE BANKRUPTCY CODE

Section 546(e) of the Bankruptcy Code is a safe harbor exception to a bankruptcy trustee's powers to avoid transfers.  As relevant here, it prevents a trustee from avoiding (1) a "transfer"; (2) that is a "settlement payment" or was made "in connection with a securities contract"; (3) "by or to (or for the benefit of) a … financial institution [or] financial participant"; (4) unless the transfer was intentionally fraudulent under Section 548(a)(1)(A) of the Code.  11 U.S.C. § 546(e).[6]

---

[6] Section 546(e) provides, in full:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 101, 741, or 761 of this title, or settlement payment, as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract, as defined in section 741(7), commodity contract, as defined in section 761(4), or forward contract, that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

Section 546(e) is "an affirmative defense as to which the Defendants bear the burden of proof." *Fairfield II*, 596 B.R. at 307 (collecting authorities). The Liquidators thus did not have to plead around it. *See, e.g.*, *Gomez v. Toledo*, 446 U.S. 635, 640 (1980) (plaintiff need not plead around affirmative defense of qualified immunity); *Harris v. City of New York*, 186 F.3d 243, 251 (2d Cir. 1999) (same regarding affirmative defense of statute of limitations); 5 Wright & Miller, Fed. Prac. & Proc. Civ. § 1276 (3d ed. 2002) (allegations rebutting potential affirmative defense "lie outside [plaintiff's] burden of pleading").

Accordingly, the Court cannot dismiss based on Section 546(e) unless Defendants show that "the facts necessary to establish the defense are evident on the face of the complaint." *Spinelli v. Nat'l Football League*, 903 F.3d 185, 199 (2d Cir. 2018); *see also Fairfield II*, 596 B.R. at 306. Defendants have not done so. Nor could they. Section 546(e) does not apply to claims concerning intentionally fraudulent transfers and—given this Court's ruling imputing the Citco Administrator's knowledge and conduct to the Funds—the Liquidators' foreign avoidance claims concern such transfers. In any event, Section 546(e) does not displace or preempt foreign common law claims, and the Liquidators' constructive trust claims are brought under BVI common law. Even if Section 546(e) could preempt foreign law claims, they would not preempt the constructive trust claims here, as they, like the avoidance claims, deal with intentionally fraudulent transfers. Finally, even if Section 546(e) otherwise applied to the Liquidators' claims, Defendants cannot show the Funds were financial institutions or financial participants.

A.    **Section 546(e) Does Not Apply To The Liquidators' Claims To Avoid Intentionally Fraudulent Transfers**

Since the parties briefed a prior motion to dismiss in 2018, the Liquidators' allegations

---

11 U.S.C. § 546(e). As this Court has acknowledged, 11 U.S.C. § 546(g) "provides a similar safe harbor regarding swap agreements" that requires application of the "same principles" that apply to Section 546(e). *Fairfield II*, 596 B.R. at 308 n.46.

regarding Citco have not changed—but the law has.  In its December 2018 decision, this Court "concluded that [the Citco Administrator]'s bad faith is imputed to the Funds." *Fairfield II*, 596 B.R. at 306.  That holding is now law of this case, *see, e.g.*, *In re Peters*, 642 F.3d 381, 386 (2d Cir. 2011), and—having previously argued successfully for imputation, Dkt. 960 at 66, and won— Defendants are judicially estopped from arguing the contrary now, *see In re Adelphia Recovery Tr.*, 634 F.3d 678, 697–99 (2d Cir. 2011); *Morgan Art Found. Ltd. v. Brannan*, 2020 WL 469982, *8 (S.D.N.Y. Jan. 28, 2020) (judicial estoppel "prevents a party from improperly taking inconsistent legal positions with respect to the same set of facts").  The Court must examine the Liquidators' allegations in light of its imputation holding, which renders each of the redemption payments an intentionally fraudulent transfer exempt from Section 546(e).

By its plain terms, Section 546(e) does not apply to claims to avoid intentionally fraudulent <u>transfers</u>.  Section 546(e) prohibits avoidance of some "transfer[s]," 11 U.S.C. § 546(e), unless within Section 548(a)(1)(A), which allows avoidance of "transfer[s]" made "with actual intent to … defraud any entity to which the debtor was ... indebted," 11 U.S.C. § 548(a)(1)(A).  The statutes intentionally do not require that such transfers be the subject of any specific cause of action.[7]

Thus, if the Liquidators allege the redemption payments were intentionally fraudulent transfers, their claims to avoid them are within Section 548(a)(1)(A)—and exempt from Section 546(e)—even if not labeled as claims to avoid intentionally fraudulent transfers under

---

[7] "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Jaen v. Sessions*, 899 F.3d 182, 189 (2d Cir. 2018).  In the Bankruptcy Code, Congress used "transfer" in Sections 546(e) and 548(a)(1)(A) but used "cause of action" elsewhere.  *E.g.*, 11 U.S.C. § 926(a) ("If the debtor refuses to pursue a cause of action under section 544, 545, 547, 548, 549(a), or 550 of this title, then on request of a creditor, the court may appoint a trustee to pursue such cause of action." (emphases added)).  Thus, Congress' use of "transfer," and omission of "cause of action," in Section 546(e) was intentional.

Section 548(a)(1)(A). *See, e.g., Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014) (per curiam) ("Federal pleading rules … do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted."); *Silverman v. Miranda*, 116 F. Supp. 3d 289, 304 (S.D.N.Y. 2015) ("[I]t is well established that the failure in a complaint to cite a statute, or cite the correct one, in no way affects the merits of a claim."); *cf. In re Hellas Telecomms. (Luxembourg) II SCA* ("*Hellas II*"), 526 B.R. 499, 510 (Bankr. S.D.N.Y. 2015) (applying Section 548(a)(1)(A) to a "common law claim [that] alleges facts substantially identical to an <u>actual</u> fraudulent conveyance claim under section 548(a)(1)(A)").

To plead intentional fraudulent transfers, the Liquidators' must allege either "motive and opportunity to commit the fraud" or "strong circumstantial evidence of conscious misbehavior <u>or recklessness</u>" in making the redemption payments. *Emps.' Ret. Sys. of Gov't Virgin Is. v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (emphasis added); *see also Adelphia Recovery Tr. v. Bank of Am., N.A.*, 624 F. Supp. 2d 292, 314 (S.D.N.Y. 2009). Such allegations "give rise to a strong inference of fraudulent intent" that is sufficient at the pleading stage. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 171 (2d Cir. 2015); *see also In re Lyondell Chem. Co.*, 554 B.R. 635, 652 (S.D.N.Y. 2016). The Liquidators' allegations satisfy both tests.

The Liquidators have squarely pleaded that the Citco Administrator had motive and opportunity to commit fraud in making the redemption payments. Its motive was exorbitant new fees for Citco, 800% higher, tied directly to the NAVs the Citco Administrator calculated and certified. *Citibank* Compl. ¶ 68. Its opportunity was its authority, delegated by the Funds' Directors, to determine those NAVs. *Id.* ¶ 45. The Citco Administrator had non-public information regarding BLMIS, *id.*, that it used to determine fraudulent NAVs and make fraudulent redemption payments. That easily meets the "motive and opportunity" test. *Blanford*, 794 F.3d

11

at 309–10 (vacating dismissal where allegations defendants disguised true level of company's inventory and profited through sales of company's stock pleaded fraudulent intent).

The Liquidators have also overwhelmingly pleaded that the Citco Administrator acted consciously or (at the very least) recklessly. As early as 2000, its employees doubted the Funds' assets at BLMIS existed, *Citibank* Compl. ¶¶ 48–51, but Citco's senior executives ignored and then silenced them, *id.* ¶¶ 52–55. After a few unsuccessful attempts, Citco gave up trying to confirm the existence of the Funds' assets, *id.* ¶¶ 57–61, but closed its credit relationships with the Funds—to decrease its own exposure—while the Citco Administrator continued to issue NAV certificates. *Id.* ¶¶ 62, 65. When it issued those certificates, the Citco Administrator knew that BLMIS did not consistently price the Funds' portfolios independently; BLMIS's transactions were likely impossible; BLMIS—unlike all other broker-dealers—provided only settlement date transaction confirmations, not trade date confirmations; BLMIS required Citco to book all trades for the Funds manually—contradicting Citco's internal policy; and there were inconsistencies between Citco's and Madoff's custody statements. *Id.* ¶¶ 70–71. This more than satisfies the "conscious misbehavior or recklessness" test. *Blanford*, 794 F.3d at 307–09 (allegations defendants knew of company's true level of inventory but hid facts from auditors and ignored or silenced employees pleaded fraudulent intent).

Under this Court's imputation holding, the Funds are charged with the Citco Administrator's knowledge that the redemption payments were nearly worthless, rendering them intentionally fraudulent transfers. Those transfers are exempt from Section 546(e), even if the claims to avoid them were labeled as claims to avoid unfair preferences, which do not require a showing of fraudulent intent. *See In re Teleservs. Grp., Inc.*, 444 B.R. 767, 808 (Bankr. W.D. Mich. 2011) ("[W]hat otherwise might be subject to avoidance as a preference (and, by analogy,

12

a constructively fraudulent transfer) could also be subject to avoidance as an actually fraudulent

transfer if the debtor had the requisite fraudulent intent." (citing *Dean v. Davis*, 242 U.S. 438, 444

(1917))).

Defendants do not address these issues, forfeiting any arguments about them.[8]   In a

footnote, they cite this Court's footnote in *Fairfield II*, addressing the prior briefing, that "the BVI

Avoidance Claims do not allege intentional fraudulent transfers." Mot. 19 n.54 (alteration omitted)

(quoting *Fairfield II*, 596 B.R. at 310 n.50).[9]   But the law has changed.   In the prior briefing, no

party asked the Court to consider whether the Liquidators' claims concerned intentionally

fraudulent transfers under Section 546(e) if the Citco Administrator's knowledge were imputed to

the Funds.   No party had cause to do so:   The Liquidators opposed imputation and the Defendants

opposed exemption from Section 546(e).    The Court's subsequent ruling that the Citco

Administrator's dishonest conduct was imputed to the Funds must be applied to the Liquidators'

allegations, which have not changed.   Under that holding, the transfers at issue in the foreign

avoidance claims are intentionally fraudulent transfers and thus exempt from Section 546(e).

### B.    Section 546(e) Does Not Apply To The Liquidators' Constructive Trust Claims

Section 546(e) also does not apply to the Liquidators' constructive trust claims, brought

under BVI common law.   By its plain terms, Section 546(e) prevents a bankruptcy trustee from

suing to avoid certain transfers.   11 U.S.C. § 546(e) ("[T]he trustee may not avoid a transfer ….");

---

[8] If Defendants advance new arguments on reply, they should be ignored as forfeited, or at a minimum, the Liquidators should be allowed a sur-reply.

[9] The Court's footnote was not a ruling on the merits of whether the Liquidators' claims involved intentionally fraudulent transfers under Section 546(e).  As the Court denied Defendants' motion to dismiss without resolving the merits of the Section 546(e) defense, any statement on the merits of that issue would have been non-binding dicta, "not necessary to decide the issue" before the Court. *In re Bean*, 252 F.3d 113, 118 (2d Cir. 2001).

*see Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 888 (2018) ("[T]he § 546(e) safe harbor operates as a limit to the general avoiding powers of a bankruptcy trustee ...."). Section 561(d) extends Section 546(e) to Chapter 15 proceedings "to limit avoidance powers to the same extent as in a proceeding under chapter 7 or 11 ...."  11 U.S.C. § 561(d).

Nothing in Sections 546(e) or 561(d) expressly limits a trustee's or liquidator's ability to bring common law claims in a Chapter 15 proceeding.  Defendants cite cases holding that Section 546(e) <u>impliedly</u> preempts some state common law claims under the Supremacy Clause, but there is no implied displacement of foreign common law claims—Congress displaces foreign law expressly, or not at all.  This Court held that Congress expressly extended Section 546(e) to displace foreign avoidance claims where Section 546(e)'s prerequisites are met, but no court has held it expressly intended to displace foreign common law claims as well.  In any event, the constructive trust claims would not be displaced because they concern intentionally fraudulent transfers and thus are exempt from Section 546(e).

### 1.    Section 546(e) Does Not Apply To Foreign Common Law Claims Like The Liquidators' Constructive Trust Claims

Section 546(e) does not expressly preempt the Liquidators' constructive trust claims.  Section 561(d) extends Section 546(e) to Chapter 15 proceedings "to limit <u>avoidance powers</u> to the same extent as in a proceeding under chapter 7 or 11 ...."  11 U.S.C. § 561(d) (emphasis added).  Neither Section 546(e) nor Section 561(d) say anything about prohibiting common law claims, as opposed to statutory avoidance claims, under state or foreign law.

If the Liquidators brought certain types of <u>state</u> common law claims, Section 546(e) might impliedly preempt them, *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992), via the Constitution's Supremacy Clause, *English v. Gen. Elec. Co.*, 496 U.S. 72, 78 (1990).  Defendants cite (Mot. 29–30) a string of cases in which Section 546(e) impliedly preempted such state

14

common law claims. *In re Tribune Co. Fraudulent Conveyance Litig.*, 946 F.3d 66, 81 (2d Cir. 2019); *Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, 988 (8th Cir. 2009), *abrogated by Merit Mgmt. Grp.*, *supra*; *AP Servs. LLP v. Silva*, 483 B.R. 63, 71 (S.D.N.Y. 2012); *U.S. Bank N.A. v. Verizon Commc'ns Inc.*, 892 F. Supp. 2d 805, 824–25 (N.D. Tex. 2012); *In re Hechinger Inv. Co. of Del.*, 274 B.R. 71, 96–97 (D. Del. 2002).

But the Liquidators bring <u>foreign</u> common law claims, which cannot be impliedly displaced. When Congress intends to displace otherwise applicable foreign law, it does so <u>explicitly</u>. *E.g.*, *LaSala v. Bordier et Cie*, 519 F.3d 121, 138–39 (3d Cir. 2008) (citing 15 U.S.C. § 78*o*(b)(4)(B)); *In re Petrobras Sec. Litig.*, 169 F. Supp. 3d 547, 551–52 (S.D.N.Y. 2016). The implied preemption doctrine created by the Supremacy Clause does not apply. *Al-Kurdi v. United States*, 25 Cl. Ct. 599, 601 n.3 (1992) ("The Supremacy clause applies to states and is inapplicable to considerations of federal law versus foreign law.").

Congress did not explicitly displace foreign common law claims here. Section 561(d) says nothing about limiting such claims, neither does the legislative history. Rather, Section 561(d) extends Section 546(e)'s limits on avoidance powers to Chapter 15 proceedings "to the same extent" that they apply in Chapter 7 or Chapter 11 proceedings. 11 U.S.C. § 561(d). In such proceedings, Section 546(e) does not expressly apply to non-Section 544(b) state common law claims. (If Section 546(e) did expressly bar such claims, courts would not need to find them impliedly preempted, as in Defendants' cited cases.) Section 546(e), extended to this Chapter 15 proceeding, thus does not reach common law constructive trust claims.

This conclusion is fully consistent with this Court's ruling that Congress displaced some foreign law avoidance claims when it extended Section 546(e) to Chapter 15 proceedings in Section 561(d). *Fairfield II*, 596 B.R. at 310–11. Defendants also argued that Section 546(e) "bars

15

the Liquidators from bringing common law and other non-bankruptcy law claims that effectively

seek the same relief" as their avoidance claims, *id.* at 311 n.52, but this Court ruled only as to the

avoidance claims, *id.* at 314.  No court has held that Congress intended Section 546(e) to displace

foreign common law claims and—without any supporting statutory language or legislative his-

tory—this Court should not do so now.  *See Petrobras*, 169 F. Supp. 3d at 551–52 (SLUSA did

not displace foreign law class action securities claims—even though SLUSA preempted state law

class action securities claims—because the statute did not do so expressly and the legislative his-

tory did not mention foreign law claims).

Even if it were ambiguous whether Section 561(d) extends Section 546(e) to bar foreign

common law claims, prescriptive comity would require holding that it does not.  Prescriptive com-

ity is a "rule of construction," under which courts "ordinarily construe[] ambiguous statutes to

avoid unreasonable interference with the sovereign authority of other nations." *F. Hoffmann-La*

*Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 164 (2004).  It applies if a "true conflict" exists be-

tween U.S. and foreign law, unless Congress "indicated otherwise." *In re Picard*, 917 F.3d 85,

102–03 (2d Cir. 2019).  This rule is "especially important" in the bankruptcy context, as deference

to foreign insolvency proceedings furthers the equitable and systematic distribution of the debtor's

assets. *In re Maxwell Commc'n Corp.*, 93 F.3d 1036, 1048 (2d Cir. 1996).  Here, extending Sec-

tion 546(e) to preclude the Liquidators' constructive trust claims would conflict with BVI law,

which would not bar those claims, and Congress has not indicated that prescriptive comity should

not apply.  It would also run counter to Chapter 15's purpose of assisting the foreign main juris-

diction. *See In re Fairfield Sentry Ltd.*, 458 B.R. 665, 676, 678–79 (S.D.N.Y. 2011) (Preska, C.J.)

(Chapter 15 court acts as "arm of [the] foreign bankruptcy court" to "maximize assistance to the

foreign court conducting the main proceeding").

16

### 2. Even If Section 546(e) Could Apply To Foreign Common Law Claims, It Would Not Preempt The Constructive Trust Claims Because They Concern Intentionally Fraudulent Transfers

Even if, theoretically, Section 546(e) could preempt foreign law claims, Defendants could not meet their burden to show that it preempts the constructive trust claims here. By its plain terms, Section 546(e) provides only "limited immunity." *In re Lehman Bros. Holdings Inc.*, 469 B.R. 415, 450 (Bankr. S.D.N.Y. 2012). It "does not bar … all common law claims, intentional fraud claims and any other claims not expressly embraced by section 546(e)." *Id.* (Section 546(e) is "not all encompassing and do[es] not offer 'fail safe' protection against every cognizable claim made in relation to transaction that may fit within the statutory framework"; it "do[es] not extend to the open waters of litigation and [is] not an impenetrable barrier to other claims against a market participant that has behaved in a manner that may expose the actor to potential liability").

Section 546(e) specifically does not bar common law claims that "have more in common with claims grounded in <u>actual</u> fraudulent intent" than with "claims for <u>constructively</u> fraudulent transfers." *Id.* at 451 (emphases added); *see also Hellas II*, 526 B.R. at 510 (Section 546(e) does not bar common law claims based on allegations "substantially identical" to intentional fraudulent transfer claims exempt from Section 546(e) under Section 548(a)(1)(A)). In *Lehman Brothers*, Section 546(e) did not bar common law claims—including a constructive trust claim—where the plaintiffs alleged "badges of fraud" that created a "strong inference of fraudulent intent." 469 B.R. at 447–48 (debtor was wholly reliant on defendant creditor; transfers occurred when debtor was insolvent or undercapitalized and were unusually rushed before debtor's bankruptcy; debtor received no consideration for incurring substantial potential obligations; and significant portion of debtor's liquidity was drained and unjustifiably transferred to creditor). Similarly, in *Hellas II*, Section 546(e) did not bar an unjust enrichment claim where the plaintiffs alleged that "the transfers underlying [their claims] were made with actual fraudulent intent. 526 B.R. at 510, 512–13

17

(defendant creditors knew debtor was insolvent or would soon be; creditors could dominate or control debtor; and creditors caused debtor to transfer a redemption payment and consulting fees in knowing disregard of devastating consequences for other creditors).

Like the common law claims in *Lehman Brothers* and *Hellas II*, the Liquidators' constructive trust claims target transfers made with actual fraudulent intent. The Funds—with knowledge imputed from the Citco Administrator—intentionally made redemption payments to redeeming shareholders at the expense of non-redeemers. Claims based on such allegations cannot be dismissed under Section 546(e). *See Hellas II*, 526 B.R. at 513 (denying motion to dismiss unjust enrichment claim under Section 546(e), as plaintiffs alleged transfers made with actual fraudulent intent, "rais[ing] factual issues that cannot be appropriately resolved on a motion to dismiss").

Defendants' cited cases are not to the contrary. Mot. 29–30. All but one concern constructively fraudulent transfers, *In re Tribune*, 946 F.3d at 71; *Contemporary Indus.*, 564 F.3d at 984, 988; *AP Servs.*, 483 B.R. at 71 & n.65; *Hechinger*, 274 B.R. at 96, while the constructive trust claims here—under the Court's imputation ruling—concern intentionally fraudulent transfers. *See Hellas II*, 526 B.R. at 509–10 (denying motion to dismiss common law claims similar to claims to avoid intentionally fraudulent transfers) (distinguishing *Contemporary Industries*, *Hechinger*, and *AP Services* as concerning allegations substantially identical to constructively fraudulent transfers); *Lehman Bros.*, 469 B.R. at 451 (distinguishing *Contemporary Industries* and *Hechinger* on the same basis).[10] Their other case used a technical reading of Section 546(e) to apply it to state law intentionally fraudulent transfer claims brought under Section 544. *See Verizon*, 892 F. Supp.

---

[10] Citing *Hechinger*, Defendants argue that a claim based on wrongful receipt of proceeds is treated as "effectively … a section 544 fraudulent conveyance claim" barred by Section 546(e). Mot. 30. But *Hechinger* concerned a constructively fraudulent transfer otherwise barred by Section 546(e), 274 B.R. at 96; it is inapposite to intentionally fraudulent transfers otherwise exempt from Section 546(e), like the ones at issue.

18

2d at 816–17.  Even if correct, that case would not apply to the Liquidators' claims, which are not

and could not be brought under Section 544.  *See* 11 U.S.C. § 1521(a)(7) (prohibiting foreign

liquidator from bringing Chapter 5 avoidance claims).  Defendants do not argue otherwise.[11]

### C.    Section 546(e) Does Not Apply To The Funds

Even if Section 546(e) applied to the types of claims brought by the Liquidators, it would

apply only if the underlying transactions were made "by or to" a "financial institution" or "finan-

cial participant."[12]  Defendants do not meet their burden of showing that the Funds are either one.[13]

### 1.    The Funds Are Not Financial Institutions

The Bankruptcy Code defines a "financial institution" as:

> [A] Federal reserve bank, or an entity that is a commercial or savings
> bank, industrial savings bank, savings and loan association, trust
> company, federally-insured credit union, or receiver, liquidating
> agent, or conservator for such entity and, when any such Federal
> reserve bank, receiver, liquidating agent, conservator or entity is

---

[11] Defendants' contention that the avoidance and constructive trust claims seek the "same relief," Mot. 31, goes nowhere.  The avoidance claims seek to avoid the transfers; the constructive trust claims seek a common law remedy for the overpaid portions of the transfers.  *Compare Citibank* Compl. ¶¶ 120, 124, 131, 135 & Prayer for Relief (B)–(C), *with id.* ¶¶ 101, 103 & Prayer for Relief (A); *see also In re Hellas Telecomms. (Luxembourg) II SCA*, 535 B.R. 543, 587 (Bankr. S.D.N.Y. 2015) (Section 1521(a)(7) did not preempt unjust enrichment claim that sought "similar … but not identical relief" as statutory avoidance claim).  In any event, the nature of the relief sought does not matter, as *Hellas II* shows.  There, Section 546(e) did not apply to transfers because they were intentionally fraudulent.  *Hellas II*, 526 B.R. at 509–10.  The court ignored the defendants' argument that Section 546(e) should apply anyway because the claims involving those transfers sought the same relief as other claims barred by Section 546(e).  *Id.* at 505.

[12] Per this Court's April 14, 2020 Scheduling Order, Dkt. 3028, the Liquidators respond here to Section I.D. of Defendants' Consolidated Brief only as to the *Citibank* Complaint.  While the parties have stipulated that Citibank NA London is a "financial institution" for purposes of the Motion, the Liquidators expressly reserved their rights to challenge the status of other Defendants as financial institutions or financial participants.

[13] Defendants also argue that if Sigma or Lambda are not financial institutions or financial participants, the redemption payments those Funds made were "for the benefit of" Sentry.  Mot. 23.  But Defendants cannot show Sentry was a financial institution or financial participant.  And Defendants provide no authority showing how redemption payments made by Sigma and Lambda to redeeming shareholders could be for Sentry's benefit.

<u>acting as agent or custodian</u> for a customer … in connection with a securities contract … such customer.

11 U.S.C. § 101(22)(A) (emphasis added).

Defendants assert the Funds are financial institutions because they were customers of Citco Bank, which they assert was the Funds' "custodian" or "agent" in connection with the redemption payments. Mot. 12–15. They are wrong.

Defendants cannot show on the pleadings that Citco Bank was the Funds' custodian. The Bankruptcy Code defines a "custodian" as a receiver or trustee of the debtor's property; an assignee for benefit of the debtor's creditors; or a trustee, receiver, or agent appointed to take charge of the debtor's property. 11 U.S.C. § 101(11); *see also* H.R. Rep. 95-595, 310 (1977), U.S.C.C.A.N. 1978, 6267 ("['Custodian'] is defined to facilitate drafting, <u>and means [a] prepetition liquidator of the debtor's property</u> …." (emphasis added)); S. Rep. 989, 23 (1978), U.S.C.C.A.N. 1978, 5809 (same). Defendants do not argue that Citco Bank meets this definition. The Complaint alleges that Citco Bank was supposed to generate custody statements, *Citibank* Compl. ¶ 49, which is nowhere near enough, *see Matter of Kennise Diversified Corp.*, 34 B.R. 237, 244–45 (Bankr. S.D.N.Y. 1983) (court-appointed building administrator not a custodian, as his actions not aimed at pre-petition liquidation); *In re Tankson*, 1991 WL 174653, at *8 (Bankr. N.D. Ill. Aug. 28, 1991) (creditor not a custodian as its relationship with debtor did not concern pre-petition liquidation).

Defendants also cannot show on the pleadings that Citco Bank was the Funds' agent in connection with the redemption payments.[14] The existence of an agency relationship is a "mixed question of law and fact" that "should be submitted to the jury," *Lumbermens Mut. Cas. Co. v. Franey Muha Alliant Ins. Servs.*, 388 F. Supp. 2d 292, 301 (S.D.N.Y. 2005), and generally cannot

---

[14] When the Court imputed the Citco Administrator's conduct and knowledge to the Funds under an agency theory, *Fairfield II*, 596 B.R. at 283, 306, it did not do so for Citco Bank.

be resolved on a motion to dismiss. Defendants try to stitch four scattered allegations into a state-ment that Citco Bank was the Funds' custodian and thus their agent. Mot. 14 (citing *Fairfield Sentry Ltd. v. HSBC Private Bank Suisse SA*, 10-ap-03633 (SMB) (Bankr. S.D.N.Y. Jan. 9, 2020) (Dkt. 86) ("*HSBC Suisse* Compl.") ¶¶ 51, 65, 74–75). But only one allegation specifically refers to Citco Bank—to allege it was a custodian in name only, *HSBC Suisse* Compl. ¶ 51—and none say Citco Bank agreed to be or acted like an agent. On their face—and certainly when drawing all reasonable inferences in the Liquidators' favor, *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014)—these are not allegations that Citco Bank was the Funds' agent.

### 2.    The Funds Are Not Financial Participants

Defendants do not dispute that Lambda was not a financial participant. Nor do they dispute that Sigma was not a financial participant before 2006. Mot. 17. But they argue that Sentry—and Sigma, as of 2006—were financial participants. Mot. 15–23.

Sentry and Sigma cannot be financial participants because they are debtors. The Bank-ruptcy Code defines a financial participant, in relevant part, as an "[a]n entity that … has one or more agreements or transactions ... <u>with the debtor or any other entity</u> (other than an affiliate) …." 11 U.S.C. § 101(22A)(A) (emphasis added).

The statute's plain language "forecloses the … argument" that a debtor can be a financial participant. *In re Tribune Co. Fraudulent Conveyance Litig.*, 2019 WL 1771786, at *9 (S.D.N.Y. Apr. 23, 2019). If the term "an entity" that transacts "with the debtor or any other entity" included the debtor, then "the debtor" would be redundant, violating the interpretative cannon that each of a statute's terms have meaning. *Id.* (citing *Hedges v. Obama*, 724 F.3d 170, 189 (2d Cir. 2013)). If Congress intended "financial participant" to include the debtor, it would have defined that term as "an entity that … has one or more agreements or transactions … with any other entity …," but it did not. Moreover, reading "financial participant" to include a debtor would mean that a debtor

could have covered transactions with itself, which "would be unusual if not impossible." *Id.* at *9.

Reading "financial participant" to exclude the debtor accords with the rest of the Bank-ruptcy Code. A statute's words "must be read in their context and with a view to their place in the overall statutory scheme." *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). Sections 546(f) and 546(g) prevent a trustee from avoiding certain non-fraudu-lent transfers made to "financial participant[s]," "repo participant[s]" and "swap participant[s]." The Code defines "repo participant" as "<u>an entity</u> that, at any time before the filing of the petition, has an outstanding repurchase agreement <u>with the debtor</u>." 11 U.S.C. § 101(46) (emphases added). It similarly defines "swap participant" as "<u>an entity</u> that, at any time before the filing of the petition, has an outstanding swap agreement <u>with the debtor</u>." *Id.* § 101(53C) (emphases added). Reading these provisions together shows that Congress intended to address the avoidance of claims between debtors and other entities.

This reading is confirmed by the legislative history. When Congress enacted the Bank-ruptcy Abuse Prevention and Consumer Protection Act of 2005, it added "financial participant" to the Bankruptcy Code "to limit the potential impact of insolvencies upon <u>other major market par-ticipants</u>. This definition will allow such market participants to close-out and net agreements with insolvent entities … even if the creditor could not qualify as, for example, a commodity broker." H.R. Rep. 109-31(I), 130, 2005 U.S.C.C.A.N. 88, 191 (emphasis added). That is, Congress in-tended "financial participant" to protect non-debtors from the impact of a debtor's insolvency.[15] It did not intend to extend that protection to the debtor itself.

---

[15] This legislative history is relevant to interpreting the term "financial participant." The legislative history that Defendants cite—which broadly refers to updating the Bankruptcy Code to avoid systemic risk—is not. Mot. 15–16. Defendants cite nothing in the legislative history concerning "financial participant" that suggests that <u>debtor</u> hedge funds can be financial participants.

Defendants' arguments to the contrary are meritless. They assert that Section 101(22A)(A) does not expressly exclude a debtor from being an "entity" that is a financial participant, Mot. 22, but it does—by defining a debtor as one of that entity's counterparties. Just as there would be no need to define a baseball pitcher as a player who is not the catcher, there was no need for Congress to define an entity that transacts with a debtor as an entity that is not the debtor. The case Defendants cite (Mot. 22), *In re Taylor, Bean & Whitaker Mortgage Corporation*, which held the contrary—with no analysis or reasoning—was wrongly decided. 2017 WL 4736682, at *6 (Bankr. M.D. Fla. Mar. 14, 2017).

Defendants assert that reading Section 101(22A)(A) to exclude debtors "would make it impossible to have transfers 'by' a financial participant …." Mot. 22. Not so. A trustee can bring avoidance claims against third parties—for example, transfers made by a custodian of securities for the benefit of the debtor. *See Warsco v. Preferred Tech. Grp.*, 258 F.3d 557, 564 (7th Cir. 2001) ("As the explicit language of the Bankruptcy Code makes clear … , the transfer need not be made directly by the debtor; indirect transfers made by third parties to a creditor on behalf of the debtor may also be avoidable under the Code.") (citing *Dean*, 242 U.S. at 443 ("Mere circuity of arrangement will not save a transfer which effects a preference from being invalid as such.")). And while Defendants assert that cases "routinely appl[y]" Section 546(e) to transfers by debtors, Mot. 22, they cite no cases doing so because a debtor was a "financial participant"; the only case they cite addressed whether a debtor could be a "stockbroker," not a "financial participant," and so is inapposite here. *Picard v. Ida Fishman Revocable Trust*, 773 F.3d 411, 417 (2d Cir. 2014).

## II.    THE COURT SHOULD APPROVE ALTERNATIVE SERVICE ON U.S. COUNSEL OR ORDER NEW SERVICE FOR THE SWISS DEFENDANTS

The Swiss Defendants ask this Court to ignore the reality of what has transpired over the long course of this litigation by dismissing the Liquidators' claims for failure to accomplish service

23

in Switzerland in accordance with Swiss law.  That argument should be rejected for two reasons.

<u>First</u>, the Court may retroactively approve the Liquidators' alternative service of the amended complaints on Swiss Defendants' U.S. counsel.  Courts routinely authorize such alternative service for foreign defendants, particularly where, as here, requiring service abroad would accomplish little but delay and expense.  Swiss Defendants' U.S. counsel's active involvement at every stage of this litigation shows beyond doubt the Swiss Defendants have long had actual notice of the claims against them.  <u>Second</u>, if alternative service were unavailable, the Liquidators respectfully request to re-effect service on the Swiss Defendants as this Court deems fit.  Courts routinely grant such requests where, as here, plaintiffs were diligent in their initial attempts to effect service.

### A. This Court Should Retroactively Approve Alternative Service On Swiss Defendants' U.S. Counsel

Rule 4(f)(3) allows this Court to authorize alternative service:  "[A]n individual … may be served at a place not within any judicial district of the United States … by other means not pro-hibited by international agreement, as the court orders."  To ensure that "the foreign individual is served and thereby provided notice outside a United States judicial district, in accordance with Rule 4's plain language," this flexible standard encompasses service upon U.S. counsel who act as a "domestic conduit" to the foreign individual.  *Wash. State Inv. Bd. v. Odebrecht S.A.*, 2018 WL 6253877, at *4 (S.D.N.Y. Sept. 21, 2018).

Moreover, courts have retroactively approved alternative service under Rule 4(f)(3) *nunc pro tunc.  See, e.g.*, *Exp.-Imp. Bank of U.S. v. Asia Pulp & Paper Co.*, 2005 WL 1123755, at *5 (S.D.N.Y. May 11, 2005) (retroactively authorizing alternative service on Indonesian defendants, notwithstanding that Indonesian law may prohibit such service, where defendants "agreed to ser-vice of process by international registered mail" that "has already proven effective"); *see also Quality Inv. Fund, Malta 1, Ltd. v. Schuermann*, 2018 WL 6252426, at *1 (C.D. Cal. July 20,

2018) ("[N]o appellate court has rejected the retroactive approval of an alternative method of ser-vice."); *cf. Integr8 Fuels, Inc. v. OW Bunker Panama SA*, 2017 WL 11455309, at *3 (S.D.N.Y. Feb. 2, 2017) (declining to follow *Asia Pulp* where, unlike here, "there is no indication that [Pan-amanian defendant] received actual notice of the lawsuit").

To authorize retroactive service on U.S. counsel, the Court need find only that such service "(1) is not prohibited by international agreement; and (2) comports with constitutional notions of due process." *Odebrecht*, 2018 WL 6253877, at *4. The Court may then authorize service in its discretion. This case easily satisfies those criteria and is ideal for alternative service.

### 1.    The Hague Convention Does Not Preclude Alternative Service On U.S. Counsel

The Hague Convention does not preclude service on U.S. counsel because it does not apply to such service. The Hague Convention "only" applies to "transmittal abroad that is required as a necessary part of service." *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 707 (1988). It has "no further implications" "[w]here service on a domestic agent is valid and complete under both state law and the Due Process Clause." *Id.*

As numerous courts have held, "service on [U.S.] counsel … would not run afoul of the Hague Convention since … no documents would be transmitted abroad." *In re GLG Life Tech Corp. Sec. Litig.*, 287 F.R.D. 262, 267 (S.D.N.Y. 2012); *see also RSM Prod. Corp. v. Fridman*, 2007 WL 2295907, at *3 (S.D.N.Y. Aug. 10, 2007) (alternative service on U.S. counsel did not implicate Hague Convention because no transmittal of documents abroad was required).

Accordingly, courts routinely authorize alternative service under Rule 4(f)(3) on U.S. counsel for foreign defendants residing in countries subject to the Hague Convention (or other service treaties). *See, e.g.*, *Odebrecht*, 2018 WL 6253877, at *5, *8 (authorizing alternative service on U.S. counsel for Brazilian defendant, notwithstanding Brazil's status as then-signatory to Inter-

American Convention on Letters Rogatory); *NYKCool A.B. Pac. Int'l Servs., Inc.*, 2015 WL 998455, at *4–5 (S.D.N.Y. Mar. 5, 2015) (authorizing alternative service on U.S. counsel for Ecuadorian defendant, notwithstanding Ecuador's status as signatory to Inter-American Convention on Letters Rogatory); *Jian Zhang v. Baidu.com Inc.*, 293 F.R.D. 508, 515 (S.D.N.Y. 2013) (authorizing alternative service on U.S. counsel for Chinese defendant, notwithstanding China's objection to service under Hague Convention); *GLG*, 287 F.R.D. at 266 (authorizing alternative service on U.S. counsel for Chinese defendant, as plaintiffs previously attempted service consistent with Hague Convention and further attempts "may unnecessarily delay this case").[16]

In one such case, the court authorized alternative service on U.S. counsel for a defendant residing in Switzerland, notwithstanding that plaintiff failed to furnish a translated version of the complaint in defendant's native German as required for service under the Hague Convention, because plaintiff "provided sufficient evidence that [defendant] is in contact with his U.S.-based counsel and is aware of the instant case." *SEC v. Jammin Java Corp.*, 2016 WL 6650849, at *2 (C.D. Cal. Apr. 21, 2016). That case is materially indistinguishable from the facts here.[17]

"Nothing in the Hague Convention prohibits such service," *Baidu.com*, 293 F.R.D. at 515, as Defendants apparently concede, *see* Mot. 38 n.76 (acknowledging option of "alternative service

---

[16] In routinely authorizing alternative service on U.S. counsel for foreign individuals, courts in this district have rejected purported comity concerns. *See, e.g.*, *Odebrecht*, 2018 WL 6253877, at *9 (any potential "offense to Brazilian law" from service on U.S. counsel is "outweighed by … the delay and difficulties associated with obtaining [international] service"); *see also GLG*, 287 F.R.D. at 266 (similar); *Asia Pulp*, 2005 WL 1123755, at *4 (similar).

[17] As cases authorizing alternative service on U.S. counsel, like *Jammin Java* show, the failure to provide translations in such cases cannot be an "independent reason" for dismissal, contrary to Defendants' contention. Mot. 36 n.71. Defendants' sole authority—*Icon DE Holdings LLC v. Eastside Distributors*, 2015 WL 4557278, at *1 (S.D.N.Y. July 28, 2015)—is inapposite, because it did not concern alternative service on a foreign individual's U.S. counsel in the United States, but instead Hague Convention service on a foreign individual abroad.

26

not prohibited by international agreement"). The Hague Convention was never intended to be the exclusive means of effectuating service on parties located abroad—only one "appropriate means." *Baidu.com*, 293 F.R.D. at 513 (quoting *Burda Media, Inc. v. Viertel*, 417 F.3d 292, 300 (2d Cir. 2005) (in turn quoting Hague Convention preamble)). Consequently, contrary to Defendants' arguments (Mot. 36–37), alternative service on Swiss Defendants' U.S. counsel would not violate the Hague Convention or Swiss law.

Defendants' citation (Mot. 35) to *Advanced Aerofoil Techs., AG v. Todaro*, 2012 WL 299959 (S.D.N.Y. Jan. 31, 2012), does not alter that conclusion. In *Aerofoil*, plaintiffs failed to show that U.S. counsel had been retained by the foreign defendants in the matter or even that counsel had a constitutionally sufficient level of communication with the defendants to guarantee they would be apprised of the claims. *See id.* at *2 (citing, among other things, plaintiffs' failure to "offer[] adequate information that the foreign defendants' counsel is authorized to accept service, the location of counsel, or whether counsel has been retained to represent the foreign defendants in this matter").

Defendants' extensive discussion (Mot. 32–37) of *Water Splash Inc. v. Menon*, 137 S. Ct. 1504 (2017), is also misplaced. *Water Splash* reaffirms *Schlunk*'s principle that the Hague Convention merely "'pre-empts inconsistent methods of service' <u>wherever it applies</u>." *Id.* at 1507 (quoting *Schlunk*, 486 U.S. at 699) (emphasis added). As later cases confirm, the Hague Convention has not displaced alternative service on U.S. counsel as a valid method of service, as it would not involve transmitting documents abroad. *Odebrecht*, 2018 WL 6253877, at *10 (authorizing alternative service on U.S. counsel for Brazilian defendant more than a year after *Water Splash*).[18]

_____

[18] Because service on foreign defendants' U.S. counsel in the United States is a valid alternative to service abroad under foreign law, the Court need not consider Professor Jeandin's assertion that "whoever carries out activities on behalf of a foreign state <u>on Swiss territory</u> without lawful

## 2.    Service On U.S. Counsel Was Consistent With Due Process

The Liquidators' alternative service on Swiss Defendants' U.S. counsel easily satisfied due process requirements.  The basic constitutional inquiry is whether the service provided notice "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950).  In deciding whether constitutional due process was satisfied, a court may consider "the practicalities in a given case."  *Odebrecht*, 2018 WL 6253877, at *4.

Alternative service on U.S. counsel satisfies constitutional due process where there was "adequate communication between the foreign defendant and the lawyer" to conclude the lawyer was "reasonably likely to apprise" her client.  *Id.* at *5.  This standard is met where U.S. counsel represents a well-established foreign entity, which it has represented before, over the course of a litigation.  *See Baidu.com*, 293 F.R.D. at 515 (authorizing service on New York counsel for large Chinese company, that had represented that company before, and had represented that company in litigation for 9 months).  Here, Defendants do not deny that they are well-established entities, with prior relationships with their counsel, who have represented them in this case for nearly a decade. *Cf. AMTO LLC v. Bedford Asset Mgmt., LLC*, 2015 WL 3457452, at *6, *10 (S.D.N.Y. June 1, 2015) (declining to authorize service on UK counsel for Russian defendant where, unlike here, there was "no indication that these attorneys would apprise [Russian defendant] of the instant [a]ction") (ultimately authorizing e-mail service directly on defendants, notwithstanding Russia's objection to service under Article 10 of the Hague Convention).

In addition, "[c]ourts have permitted service on domestic counsel, even where the address

---

authority … such as the service of judicial documents <u>directly on a Swiss defendant</u>, may be subject to criminal charges."  Mar. 16, 2020, Decl. of Prof. Nicolas Jeandin ("<u>Jeandin Decl.</u>") (Dkt. 2905 at 6 (¶ 8)) (emphases added); *see also* Mot. 36.

of a defendant was known and/or the defendant was not trying to evade service." *In re Graña y Montero S.A.A. Sec. Litig.*, 2019 WL 259778, at *5 (E.D.N.Y. Jan. 9, 2019) (R. & R.) (collecting cases), *adopted by* 2019 WL 1046627 (E.D.N.Y. Mar. 5, 2019).  "In those cases, courts typically focus on whether the defendant had actual notice of the law suit and concluded that such notice would satisfy any due process concerns." *Id.*  Importantly, courts have rejected the idea that such service is ineffective simply because a defendant's attorneys have "ma[de] a 'special' or 'limited' appearance" for purposes of challenging jurisdiction. *NYKCool*, 2015 WL 998455, at *5; *see also Jammin Java*, 2016 WL 6650849, at *2 ("[T]hat domestic counsel has not been authorized to accept service by a foreign defendant does not mean service upon them violates due process.").[19]

The Liquidators served U.S. counsel for the representative Defendant HSBC Suisse with the complaint by first-class mail back in 2010.  *See* May 29, 2020, Decl. of David Molton ("Molton Decl.") ¶ 2 and Ex. 1.  Since then, HSBC Suisse (like all Swiss Defendants) has been actively represented by and in regular contact with their sophisticated U.S. counsel throughout this litigation, as shown by their repeated filings over many years.  *See id.*, Ex. 2 (showing dates on which U.S. counsel for HSBC Suisse and others:  (i) first appeared; (ii) first received service of a complaint; and (iii) were served with current, operative complaints).  Unlike in *AMTO*, there is simply no question that the Liquidators' service efforts have apprised HSBC Suisse (and all Swiss Defendants) of the claims against it (and them).  As such, service on U.S. counsel here was entirely consistent with due process.

---

[19] To justify alternative service, the Liquidators need not establish an agency relationship between Swiss Defendants and their U.S. counsel, because "the only relevant due process requirement is that the method chosen be reasonably calculated to give the necessary notice to the client." *NYKCool*, 2015 WL 998455, at *5.

### 3.    This Case Is An Ideal Candidate For Alternative Service

The decision to authorize alternative methods of service is committed to this Court's sound discretion. *Odebrecht*, 2018 WL 6253877, at *3. Courts in the Second Circuit have used their discretion to permit alternative service when: (1) "the plaintiff has reasonably attempted to effectuate service on the defendant," meaning it "has made some attempts at service, and has offered evidence demonstrating the difficulties associated with" traditional service under Rules 4(f)(1) or 4(f)(2); and (2) "the circumstances are such that the court's intervention is necessary," meaning the "[p]laintiff has done more than make an unsupported generalized complaint that service through the letters rogatory process would be 'very costly and time consuming.'" *Id.* at *6, *8.

Importantly, a plaintiff need not exhaust options for service under Rules 4(f)(1) and 4(f)(2) before a court may authorize alternative service under Rule 4(f)(3). *See, e.g.*, *GLG*, 287 F.R.D. at 266 (citing Wright & Miller, 4B Fed. Prac. & Proc. Civ. § 1134 (3d ed. 2002)). The Supreme Court's decision in *Schlunk* "does not hold or even suggest that the Hague Convention must always be complied with before alternative service is ordered." *Id.* at 266 n.7. That makes sense, as "[s]ervice of process under Rule 4(f)(3) is neither a last resort nor extraordinary relief" but instead "one means among several which enables service of process on an international defendant." *KPN B.V. v. Corcyra D.O.O.*, 2009 WL 690119, at *1 (S.D.N.Y. Mar. 16, 2009).

This case is an ideal candidate for Rule 4(f)(3) treatment.

First, the Liquidators made significant good faith efforts at the start of this case in 2010 to serve and apprise HSBC Suisse (and all Swiss Defendants) of the claims, consistent with the parties' subscription agreements. Those agreements each provided the "Subscriber consents to the service of process out of any New York court in any such Proceeding by the mailing of copies thereof, by certified or registered mail, return receipt requested, addressed to Subscriber at the address of Subscriber then appearing on the Fund's records." Oct. 30, 2006, Subscription Agmt.

(Dkt. 1337, Ex. A ¶ 19).  The Liquidators followed those agreements to the letter, serving HSBC

Suisse (and all Swiss Defendants) the relevant complaint and summons by international registered

mail at the addresses listed in the Funds' records.  *See* Molton Decl., Ex. 2.  Also in 2010, the

Liquidators served HSBC Suisse and its U.S. counsel (and certain other Swiss Defendants and

their U.S. counsel) the relevant complaint and summons by international registered mail and first-

class mail, respectively.  *See id.*, Ex. 1.[20]

     For eight years, the Liquidators had no reason to believe their service was ineffective.  As

Defendants concede, under U.S. law, "consent" obviates the need for "authorization for service of

summons on the defendant."  Mot. 32 (quoting *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484

U.S. 97, 104 (1987)).  Defendants do not dispute that they consented to service by international

registered mail in the subscription agreements or that the Liquidators provided such service of the

complaint.  The Liquidators had no reason to doubt this service was sufficient, as it appeared fully

consistent with the Hague Convention.  *See, e.g.*, *Ninety-Five Madison Co., L.P. v. Vitra Int'l AG*,

2020 WL 1503640, at *4 (S.D.N.Y. Mar. 30, 2020) (holding "service [on Swiss defendant] via

registered mail was proper because [d]efendant consented to such service and waived its right to

service otherwise"); *see also Payne v. McGettigan's Mgmt. Servs. LLC*, 2019 WL 6647804, at *1

(S.D.N.Y. Nov. 19, 2019) ("[S]ervice of process may be ordered under Rule 4(f)(3) even if the

---

[20] The Liquidators have repeatedly notified HSBC Suisse (and Swiss Defendants) of these
proceedings.  Consistent with this Court's May 2012 Case Management Order ("CMO")
(Dkt. 467), the Liquidators served hard copies of complaints on newly-added Defendants and
served amended complaints on U.S. counsel for HSBC Suisse (and all Defendants then in the case)
via ECF.  *Id.* ¶¶ 1, 10–11; *see also* Molton Decl., Exs. 1–2.  Most recently, following the Court's
entry of the parties' stipulated orders in 2019, the Liquidators served a further amended
complaint—*i.e.*, the operative complaint—upon HSBC Suisse's U.S. counsel (and on U.S. counsel
for all surviving Defendants).  To the extent any retroactive service authorized here would be
inconsistent with the Court's orders, the Court "necessarily retains discretion to grant relief …."
from such orders.  *Credit Suisse First Bos. LLC v. Coeur d'Alene Mines Corp.*, 2004 WL 2903772,
at *4 (S.D.N.Y. Dec. 15, 2004).

method of service is in contravention of the laws of the foreign country.").[21]  Defendants are thus

simply wrong to assert that the Liquidators "never even attempted proper service on the Hague

Defendants in the decade since commencing these Actions" (Mot. 33; *see also id.* 4, 36 n.72, 38–

39)—or that the Liquidators have "long been on notice" (*id.* 33, 39) of purported deficiency of

their initial service.[22]

Only in August 2018 did this Court issue its personal jurisdiction decision (*Fairfield I*),

holding Defendants had not consented to jurisdiction in the subscription agreements, because the

Liquidators' claims were not "with respect to th[e] [Subscription] Agreement and the Fund."  2018

WL 3756343, at *9.  After that ruling, and the Court's December 2018 decision on the motion to

dismiss (*Fairfield II*), the parties extensively negotiated stipulated orders, entered in April 2019,

that schedule the second motion to dismiss, including on service.  Defendants now argue *Fairfield I*

"is fatal to any renewed attempt to rely on the identical provision to support a 'consent to service'

argument."  Mot. 32 n.64; *see id.* 39 n.78.  But that decision does not change the good faith nature

of the Liquidators' initial service pursuant to the express language of the subscription agreements.

Second, this litigation is nearly a decade old, and attempts to re-serve HSBC Suisse (and

other Swiss Defendants) would require four months or more and over $270,000, excluding attor-

ney and staff costs.  Molton Decl. ¶¶ 4–14; *id.*, Ex. 3 (price quotation from international service

---

[21] Professor Jeandin's assertion that Swiss law prevents private parties from consenting to a form of service not already permitted under Swiss law (Jeandin Decl. ¶ 9) does not change that conclusion.  As cases like *Vitra International* have shown, whether a Swiss court would enforce a contract between private parties expressly governed by New York law has no bearing on whether a U.S. court would enforce that same contract.

[22] Defendants cite *Picard v. Cohmad Secs. Corp. (In re Bernie L. Madoff Inv. Sec. LLC)*, 418 B.R. 75, 84 (Bankr. S.D.N.Y. 2009) (Lifland, J.) and *Brockmeyer v. May*, 383 F.3d 798 (9th Cir. 2004) to argue that Liquidators failed to comply with formal service requirements.  Mot. 36 n.72, 37, 39 n.77.  Those cases are irrelevant to whether the Liquidators believed in good faith that the Swiss Defendants had consented to service by international registered mail.

shop). To serve the 242 other Defendants would raise costs even further.[23]  Courts have authorized

alternative service where regular service would cause similar delays and cost less. *See, e.g.*, *Payne*,

2019 WL 6647804, at *2 (9–12 months delay; $3,500 additional expense); *Haffner Int'l Mktg.*

*Grp., Inc. v. Sahin*, 2013 WL 5954379, at *2 (D. Nev. Nov. 5, 2013) (1–2 month delay); *Stream*

*SICAV v. Wang*, 989 F. Supp. 2d 264, 280 (S.D.N.Y. 2013) (4–6 month delay); *GLG*, 287 F.R.D.

at 264, 266–67 (6–8 months delay; $5,000 additional cost); *Brown v. China Integrated Energy,*

*Inc.*, 285 F.R.D. 560, 562–66 (C.D. Cal. 2012) (4–6 months delay; $15,000 additional cost); *Knit*

*With v. Knitting Fever, Inc.*, 2010 WL 4977944, at *4–5 (E.D. Pa. Dec. 7, 2010) (3 month delay).

Defendants cannot credibly fault the Liquidators for not effecting new service under

Rule 4(f) (under the Hague Convention or otherwise) since the Court issued *Fairfield I*.  Mot. 37–

39 & 39 n.78.  This Court never ruled the prior service inadequate; to the contrary, after this Court's

2018 decisions, the issue of adequate service was expressly carved out—in orders HSBC Suisse

and other Swiss Defendants consented to—for the briefing now underway.  Now is precisely the

time for the Liquidators to seek authorization for the alternative service necessitated by *Fairfield I*.

Moreover, the Liquidators are responsible to the Funds' stakeholders to grow—not deplete—the

estate through judicious exercise of their statutory powers.  Absent a ruling by this Court, the

Liquidators should not expend estate resources or further delay their efforts to recover for estate

---

[23] The costs balloon even higher when considering the Defendants beyond the Swiss Defendants.
For all Defendants, including the 169 who say they are in Hague Convention signatory countries
that do not object to mail service, the Liquidators would incur vendor and attorney time to
accomplish that service.  For the additional 13 Defendants who say they are located in Hague
Convention signatory countries that—like Switzerland—object to mail service, there would be
additional costs.  And for the 60 more Defendants who may be in countries that did not sign the
Hague Convention, service requirements are supplied by the Inter-American Service Convention,
the letters rogatory process, or other local laws, requiring other additional costs. And if one
includes the actions on appeal to the District Court, the Liquidators could have to re-serve over
700 Defendants.

beneficiaries. That is particularly so because no Swiss Defendant has suggested that it was una-ware of the claims against it, much less that it was prejudiced by the service effected so far.

To require Plaintiffs to re-effect service now would accomplish nothing but increased cost and delay. This Court should retroactively approve prior alternative service on U.S. counsel.

### B.    In Any Event, The Liquidators Exercised The Due Diligence Necessary For The Opportunity To Re-effect Service If The Court So Orders

There is no specific deadline for effecting foreign service under Rule 4(f). *See Burda Media, Inc. v. Blumenberg*, 2004 WL 1110419, at *5 (S.D.N.Y. May 18, 2004), *aff'd sub nom. Burda Media, Inc. v. Viertel*, 417 F.3d 292 (2d Cir. 2005). Instead, "courts have 'use[d] a flexible due diligence standard to determine whether service of process was timely.'" *Id.* (quoting *Yellowave Corp. v. Mana*, 2000 WL 1508249, at *2 (S.D.N.Y. Oct. 11, 2000)). Courts have found the requisite "due diligence" where plaintiffs have "attempted foreign service" within the timeline established by Rule 4(m). *Id.* at *6 (plaintiff was diligent, despite 10-month delay in completing service under the Hague Convention, where it was "uncertain" at outset of the case "whether service would take place domestically or internationally"); *see also Aqua Shield, Inc. v. Inter Pool Cover Team*, 2007 WL 4326793, at *2 (E.D.N.Y. Dec. 7, 2007) (plaintiff was diligent where it was unclear if plaintiff was "required to separately file service of the complaint upon [defendant] in accordance with the Hague Convention"); *cf. Montalbano v. Easco Hand Tools, Inc.*, 766 F.2d 737, 740 (2d Cir. 1985) (unlike here, plaintiff was not diligent where it "never attempted to serve process in a foreign country" and "has not exactly bent over backward to effect service"). Courts have found the requisite due diligence even despite "periods of inactivity" by the plaintiff. *Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*, 2018 WL 4681616, at *11 (S.D.N.Y. Sept. 11, 2018) (R. & R.) (plaintiff was diligent where papers were still "under review" by German authorities), *adopted by* 2018 WL 4666069 (S.D.N.Y. Sept. 28, 2018).

34

In assessing due diligence, courts look to the "[1] the reasonableness of the plaintiff's efforts and [2] the prejudice to the defendant from any delay." *In re Bozel S.A.*, 2017 WL 3175606, at *2–3 (S.D.N.Y. July 25, 2017); *see also Lyell Theater Corp. v. Loews Corp.*, 682 F.2d 37, 42–43 (2d Cir. 1982). The Liquidators easily satisfy both prongs here.

As discussed in Part II.A, *supra*, the Liquidators reasonably provided HSBC Suisse (and all Swiss Defendants) with the initial complaint and summons in a timely manner consistent with the subscription agreements. They then reasonably provided HSBC Suisse (and all Swiss Defendants) with an amended complaint in a manner consistent with this Court's CMO. Until *Fairfield I*, the Liquidators reasonably believed that they had effectively served HSBC Suisse (and all Swiss Defendants) under existing law that defendants may consent to personal jurisdiction by private contract. *See, e.g.*, *Vitra Int'l*, 2020 WL 1503640, at *4. Now, following *Fairfield I* and *II* and this Court's orders for briefing on service issues, the Liquidators are reasonably awaiting this Court's ruling on alternative service before spending estate assets on expensive new service that might not be necessary.

Likewise, neither HSBC Suisse nor any other Swiss Defendant has suggested any prejudice from a purported failure to receive service under the Hague Convention. Nor could they. By the time *Fairfield I* was decided, this litigation had been pending for nearly nine years, and HSBC Suisse (and all Swiss Defendants) actively participated in it through their U.S. counsel.

Defendants' cases (Mot. 38–39) are unavailing. Each involves inapposite facts[24] that were

---

[24] *See Dickerson v. Napolitano*, 604 F.3d 732, 752–53 (2d Cir. 2010) (affirming district court's denial of additional time to effect service where "plaintiffs made neither a reasonable effort to effect service nor filed a motion for an extension of time to do so"); *Cassano v. Altshuler*, 186 F. Supp. 3d 318, 322 (S.D.N.Y. 2016) (no "good cause" for failure to effect timely service where "[p]laintiffs offer no explanation for their failure to effect proper service" and were "provided ample indicators [including an order of service from the court] that it was incumbent upon them to properly serve [d]efendants"); *Zherka v. Ryan*, 52 F. Supp. 3d 571, 577–78 (S.D.N.Y. 2014) (no

subject to Rule 4(m)'s presumptive deadline of 90 days for <u>domestic</u> service—a requirement not applicable to <u>foreign</u> service.[25]

Finally, Defendants assert the Liquidators cannot rely on Rule 4(f)(3), because they have not "moved this court" for an order allowing service under that provision. Mot. 38 n.76. But this Court can enter such an order sua sponte. *See, e.g.*, *Blockbuster, LLC v. Grupo Mizbe, S.A.*, 2015 WL 12712061, at *1 (S.D. Fla. July 22, 2015). Or, should the Court so direct, the Liquidators will promptly file such a motion. But, in any event, the Liquidators cannot be faulted for not expending the estate's limited resources on such a motion in the first instance. And outright dismissal of the Liquidators' complaints would be an extraordinarily punitive result—disfavored by courts in the Second Circuit—where there remains a reasonable prospect of sufficient re-service. *Montalbano*, 766 F.2d at 740 (noting that an "action [will be] preserved where 'there is a reasonable prospect that plaintiff ultimately will be able to serve defendant properly'" (quoting 5 Wright & Miller, Fed. Prac. & Proc. Civ. § 1354 (1969)).

Thus, if the Court does not authorize alternative service retroactively, the Liquidators respectfully ask to serve HSBC Suisse (and all Swiss Defendants) in a manner the Court deems fit.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Liquidators respectfully request that the Court deny Defendants' Renewed Motion to Dismiss.

---

good cause where plaintiff's only attempt to serve defendant consisted of an "email exchange" with an attorney who expressly stated that she "had not yet been authorized to represent [defendant], and could not accept service on her behalf"); *Nat'l Union Fire Ins. Co. of Pittsburgh*, 1994 WL 463009, at *4 (S.D.N.Y. Aug. 25, 1994) (no good cause where plaintiff "fails even to offer an explanation for its failure to timely serve" defendant).

[25] Rule 4(m)'s deadline was shortened from 120 days by the 2015 Federal Rules amendments.

Dated:    New York, NY                          Respectfully submitted,
          May 29, 2020


                                    By:      /s/  *David Elsberg*
                                          SELENDY & GAY PLLC

                                          David Elsberg
                                          Andrew R. Dunlap
                                          Lena Konanova
                                          Jordan Garman
                                          Ronald Krock
                                          Evan Bianchi
                                          1290 Avenue of the Americas
                                          New York, NY 10104
                                          Telephone: 212-390-9000
                                          delsberg@selendygay.com
                                          adunlap@selendygay.com
                                          lkonanova@selendygay.com
                                          jgarman@selendygay.com
                                          rkrock@selendygay.com
                                          ebianchi@selendygay.com

                                          -and-

                                          BROWN RUDNICK LLP

                                          David J. Molton
                                          Marek P. Krzyzowski
                                          Seven Times Square
                                          New York, NY 10036
                                          Telephone: 212-209-4800
                                          dmolton@brownrudnick.com
                                          mkrzyzowski@brownrudnick.com

                                          *Attorneys for Plaintiffs Foreign Representatives*