# Appendix C
# Compendium of Foreign Authorities

# Table of Authorities

**International Cases**

*DD Growth Premium 2X Fund v. RMF Mkt. Neutral Strategies (Master) Ltd.*
    [2017] UKPC 36

*El Ajou v Dollar Land Holdings*
    [1994] 2 All E.R. 685

*Fairfield Sentry Ltd. (In Liquidation ) v. Migani*
    [2014] UKPC 9

*Alderson v. Temple*
    [1768] 4 Burrow 2235 (Ct. of King's Bench)

**Treatises**

Dobbs' Law of Remedies

# DD Growth Premium 2X Fund v. RMF Mkt. Neutral Strategies (Master) Ltd.

# [2017] UKPC 36



**Michaelmas Term**
[2017] UKPC 36
**Privy Council Appeal No 0050 of 2016**

# JUDGMENT

# DD Growth Premium 2X Fund (In Official Liquidation) (Appellant) *v* RMF Market Neutral Strategies (Master) Limited (Respondent) (Cayman Islands)

## From the Court of Appeal of the Cayman Islands

### before

**Lord Mance**
**Lord Sumption**
**Lord Carnwath**
**Lord Hodge**
**Lord Briggs**

## JUDGMENT GIVEN ON

## 23 November 2017

**Heard on 4 and 5 October 2017**

| *Appellant* | *Respondent* |
|---|---|
| Tom Smith QC | David Chivers QC |
| Adam Al-Attar | Paul Smith |
| Jeremy Snead | Ben Hobden |
| (Instructed by Peter | (Instructed by Herbert |
| McMaster QC of Appleby | Smith Freehills LLP and |
| (Cayman) Ltd and by Alan | by Conyers Dill & |
| Taylor and Co) | Pearman) |

**LORD SUMPTION AND LORD BRIGGS: (with whom Lord Carnwath agrees)**

*Introduction - the issues*

1.      In late 2008, just after the Lehman Brothers crash, a group of investors in a
Cayman Islands open-ended investment company called DD Growth Premium 2X Fund
("the Company") decided to cash in their investments by exercising their right to have
their shares in the Company redeemed. The management of the Company responded,
in January 2009, by paying some of the investors in full, and some of them nothing. The
largest payments were made to one investor, RMF Market Neutral Strategies (Master)
Limited ("RMF"), in the aggregate sum of US$23m odd, but this was less than 40% of
the amount owed to RMF by way of redemption. The Company then ran out of money
and, shortly thereafter, went into insolvent liquidation. The liquidator then caused the
Company to claim the US$23m back from RMF but the claim failed, both in the Grand
Court and in the Cayman Islands Court of Appeal.

2.      The Company's appeal from the Court of Appeal raises issues about Cayman
company law, as it was between 1989 and 2011, in relation to payments by the Company
of premium due on the redemption of its shares, on largely undisputed facts which were
either agreed at the outset of the litigation, or found by the Chief Justice of the Cayman
Islands, at the trial of preliminary issues in 2014.

3.      The first and second issues are about the interpretation of section 37 of the
Cayman Companies Law (2007 Revision) in its statutory and historical context. Section
37 permits a company to issue redeemable shares and regulates the circumstances in
which, and the manner in which, they may be redeemed. The 2007 Revision will be
referred to as the Companies Law. The third issue is about the common law, which in
this respect is not suggested to be different as between the Cayman Islands and England,
and concerns the nature of the remedies available to the company or to its liquidator for
the recovery of a redemption payment rendered unlawful by section 37.

4.      Cayman law (like the law of the UK) has always contained restrictions upon the
ability of a company to reduce its capital, primarily for the protection of its creditors.
Although originally to be found in judge-made law, they are now almost completely
statutory. The particular restriction in issue on this appeal consists of a form of solvency
test which must be satisfied by a company if it is lawfully to pay for the redemption of
shares out of capital. It is to be found in section 37(6) of the Companies Law in the
following form:

"(6)(a) A payment out of capital by a company for the redemption or purchase of its own shares is not lawful unless immediately following the date on which the payment out of capital is proposed to be made the company shall be able to pay its debts as they fall due in the ordinary course of business.

(b)    The company and any director or manager thereof who knowingly and wilfully authorises or permits any payment out of capital to effect any redemption or purchase of any share in contravention of paragraph (a) is guilty of an offence and liable on summary conviction to a fine to fifteen thousand dollars and to imprisonment for five years."

5.    The first issue is mainly a question of interpretation or application of the phrase "its debts as they fall due in the ordinary course of business" in section 37(6)(a). The question is whether generally that phrase is apt to include the debts constituted by the redemption price payable to shareholders who have exercised their right to redeem ("a redemption debt"). A subsidiary question is whether in any event redemption debts were incurred by this Company in the ordinary course of its business, as the judge held. It is common ground that, if redemption debts are generally, or are in the context of this Company's business, within section 37(6)(a), then the Company was insolvent at the material time. There is a factual dispute whether, if not, the Company had other debts which rendered it insolvent within the meaning of section 37(6)(a). The judge found it unnecessary to resolve that question and, for reasons which will appear, so does the Board. This issue will be referred to as "the Solvency Issue".

6.    The second, and main, issue in the appeal is whether a payment out of a company's share premium account towards the premium payable on redemption of shares (rather than towards the nominal amount of those shares) is a capital payment with the meaning of section 37(6)(a). If it is, then a company may not use sums standing to the credit of its share premium account for payment of the premium due on redemption of shares unless it satisfies the solvency test in section 37(6)(a).

7.    The appellant liquidators also challenged the lawfulness of the redemption payments made by the Company in this case by two alternative submissions which do not involve reliance upon section 37(6)(a). For reasons which will become apparent the Board has not found it necessary to address those in detail. Since all three routes of challenge question the legality of the redemption payments made, these issues will be referred to collectively as "the Illegality Issue".

8.    The third issue, which will be called "the Remedies Issue", may be summarised in this way. The Companies Law creates no express statutory cause of action or other

civil remedy against the recipient of an unlawful redemption payment. There is only a
criminal sanction against the company, its directors and managers. It is not in dispute
that the directors of a company who procure the making of an unlawful redemption
payment would be liable to the company for breach of trust, and that a recipient with
knowledge of the facts as to the unlawfulness of the payment would be liable as a
constructive trustee. The question is whether a claim for the recovery of an unlawful
redemption payment may be pursued by the company or its liquidator against a recipient
which received the payment without knowledge of the facts giving rise to the illegality,
and in settlement (or part-settlement) of the debt constituted by the Company's
obligation to pay the redemption price after a valid exercise of the shareholder's right
to redeem, by means of a claim in unjust enrichment, subject only to established
defences, such as change of position.

*The Facts*

9.      The Company is a Cayman Islands company limited by shares which, until
placed in official liquidation in March 2009, carried on business as a feeder fund for the
facilitation of investment in the DD Growth Premium Master Fund ("the Master Fund").
That was a hedge fund which, until the collapse of Lehman Brothers in late 2008,
pursued what the judge described as a well-known trading strategy of investment in
correlated stocks. The mechanism whereby the Company made this facility available to
investors was by the issue of redeemable ordinary shares at a premium, and by using
the proceeds of the issued shares as investments in the Master Fund. Investors could
realise their investments through the Company in the Master Fund by making written
requests to redeem their shares on one of a regular monthly series of redemption days.
Both the issue price payable by the investor and the redemption price payable by the
Company was to be calculated by reference to Net Asset Value ("NAV") calculations
based upon the market value, from time to time, of the Company's investment in the
Master Fund on the relevant issue or redemption date.

10.     The use of redeemable shares as the vehicle for investment in this way was a
common business practice in the Cayman Islands, and involved both the issue and the
redemption of the ordinary shares at a very substantial premium. By way of example,
the NAV per US$ share of the Company's ordinary shares ranged during the period
from January to June 2008 between US$106,575 and US$112.288, whereas the nominal
value per share was US$0.001. Thus, an incoming investor during that period would
pay for the issue of shares an amount consisting almost entirely of premium, and the
payment to an outgoing investor on a redemption day during that period would be
similarly constituted.

11.     As a feeder fund, the Company's ordinary business consisted of the issue of
shares, the transmission to the Master Fund of the proceeds of the issue, the receipt from
the Master Fund of payments necessary to fund redemptions, and the payment out of

redemption moneys to redeeming shareholders. The company had no separate trading activities of its own.

12.    The timetable for redemption laid down by the Company's articles may be summarised as follows:

      i)    A shareholder is required to give 30 days' written notice of its wish to redeem, prior to a redemption day.

      ii)    Redemption days were scheduled for the first business day of each month.

      iii)    The NAV per share was to be assessed by the Administrator at the close of business on the day prior to the first business day of each month.

      iv)    On the redemption day redeeming shareholders redeemed their shares at a price per share based on the NAV per share of the relevant class of share. They ceased to be shareholders and became creditors of the Company for that price on that day.

      v)    Payment of the redemption price was to be made by the Company within 14 business days of the redemption day.

13.    The conversion of the status of a redeeming investor from a shareholder to a creditor on the redemption day, in advance of payment, was expressly laid down by the articles, and the validity of that first stage in the redemption process was affirmed by the Board in *Pearson v Primeo Fund* [2017] UKPC 19.

14.    By August 2008 the Respondent RMF Market Neutral Strategies (Master) Limited ("RMF") was a substantial investor in the Company's US$ denominated shares. The Company operated a substantially similar Euro denominated share structure, which can be ignored for the present purposes. One effect of the Company's trading was that it had a substantial surplus of share premium available for redemption of shares, although it did not maintain a formal share premium account in its books.

15.    The seismic shock to the derivatives markets which was triggered by the collapse of Lehman Brothers in late September 2008 had a catastrophic effect upon the investment strategy, and therefore the asset value, of the Master Fund. This meant that, in reality (and as later calculated by the Master Fund's liquidators), the Master Fund had a net asset value of minus US$69m odd by the end of November 2008, having lost US$76m odd in October and US$173m odd in November.

16.    The manager of the Master Fund, and of the Company, was Dynamic Decisions
Capital Management Limited which was itself run by a Mr Alberto Micalizzi, who was
also a director of the Master Fund and of the Company. It appears that, under his
supervision, the Master Fund concealed its catastrophic losses by investments in
worthless bonds (the Asseterra bonds) which were attributed a value in the Master
Fund's books sufficient both to conceal its insolvency and to portray to the world, and
in particular to those responsible for the calculation of the NAV, a continuing state of
profitability.

17.    Meanwhile, RMF and six other investors decided to redeem shares in the
Company, giving redemption notices effective on the 1 December 2008. Of its
693,630.656 ordinary US$ shares, RMF gave notice to redeem 87,466.106 on 29
October and 437,330.534 on 31 October 2008, both effective on the 1 December
redemption day. This left RMF holding 168,834.016 shares thereafter, which it
unsuccessfully sought to redeem in January 2009.

18.    Based upon the false information provided by or on behalf of the Master Fund,
the NAV per US$ share for the December redemption date was calculated at
US$118.880. Accordingly RMF became a creditor of the Company on 1 December
2008 in respect of its two redemption notices in the aggregate sum of US$62,387,824.

19.    The Company had no cash of its own at that time. Nonetheless those managing
the Master Fund managed to scrape together sufficient cash, made available first on 8
January 2009, to enable the Company to make part payment to the investors who
redeemed in December. In summary, RMF was paid (between 12 January and 6
February 2009) US$23m odd, amounting to some 36.89% of what it was owed. Of the
other six investors, the aggregate of whose redeemed shares was much less than that of
RMF, three were paid in full, but three were paid nothing.

20.    The Company suspended its redemptions shortly thereafter and in March 2009
was placed in official liquidation. By these proceedings the liquidators seek, through
the Company, to recover the whole of the US$23m odd paid in January 2009 to RMF,
on the basis that those redemption payments were rendered unlawful by section 37, or
alternatively section 34, of the Companies Law.

21.    Since the Company had no assets other than its investment in the Master Fund,
it followed that it had in truth a negative asset value by 1 December 2008, and at all
times thereafter. It was also common ground that, if the debts to redeeming shareholders
are to be taken into account, the Company failed the solvency test imposed by section
37(6)(a) both on 1 December 2008, and when the part payments of the Company's
redemption debts to RMF were made. The Company submits (and asserted before the
judge) that it also owed debts to creditors other than redeeming shareholders which it

was from December 2008 onwards unable to pay in the ordinary course of business. The judge found it unnecessary to reach any conclusions about that.

*The Proceedings*

22.    RMF initiated this litigation with a claim for a negative declaration (ie that it was not liable to repay the US$23m) in February 2011. The Company cross-claimed for recovery of that sum, on the alternative bases that (1) it was the aggregate of unlawful redemption payments, recoverable by way of unjust enrichment or constructive trust and (2) that the payments constituted fraudulent preferences.

23.    In his judgment handed down on 17 November 2014 (after a trial of preliminary issues in September) the Chief Justice held that:

> i)    The payments were not unlawful, being a legitimate use of the share premium account pursuant to sections 34 and 37 of the Companies Law.

> ii)    That the Company was insolvent, both within the meaning of section 37(6)(a) and generally, at the material time.

> iii)    That the fraudulent preference claim failed on the facts.

24.    In the circumstances, the judge found it unnecessary to decide any part of the remedies issue. Indeed, the facts relevant to any claim based in constructive trust were neither agreed nor determined as part of the preliminary issues.

25.    The Company's liquidators have not sought to appeal the judge's rejection of the claim based on fraudulent preference. Apart from that, the Company sought to pursue its unsuccessful claims in full by way of appeal.

26.    By its judgment handed down on 20 November 2015 the Court of Appeal (Mr John Martin, Sir Richard Field and Sir Alan Moses JJA) dismissed the Company's appeal, in substance agreeing with the judge's interpretation of sections 34 and 37, albeit partly for different reasons. Like the judge, the Court of Appeal found it unnecessary to address any issues about remedy. Nor does it appear that the Court of Appeal addressed RMF's challenge, raised by Respondent's notice, to the judge's finding of insolvency within the meaning of section 37(6)(a).

*The Solvency Issue*

27.    It is convenient to take this issue first since, if the Judge's finding that the Company failed the section 37(6)(a) solvency test was unsound, this undermines the claim for recovery based upon the alleged unlawfulness of the redemption payments.

28.    It is common ground between the parties that, if redemption debts owed to the shareholders redeeming on the 1 December 2008 redemption day are to be taken into account, then the Company was then unable to pay its debts as they fell due. This is because the payments challenged satisfied only part of the December redemption debts, and the Company was thereafter unable to pay the rest. It is also necessary to bear in mind at the outset that it is common ground that the December redemptions were themselves valid in the sense that, with effect from 1 December 2008, both RMF and the six other redeeming shareholders were converted from shareholders to creditors in respect of the shares being redeemed, and the shares cancelled. It is also part of that common ground that, although the NAV of US$118.880 per share had been calculated upon false information, it was nonetheless a valid NAV for the purpose of crystallising the amount of the redeeming shareholders' debt: see *Fairfield Sentry Ltd (in liquidation) v Migani* [2014] 1CLC 611.

29.    The insolvency test laid down by section 37(6)(a) is quoted in full at the beginning of this judgment. The main submission made for RMF was that "debts" should be held, on a purposive construction, to exclude debts due to former shareholders. This, it was said, is because section 37(6) is part of a statutory buttress for the maintenance of capital, and maintenance of capital is something designed for the protection, not of contributories, but of ordinary creditors, so that it would be perverse to read section 37(6) as designed to ensure that former shareholders could not be paid on redemption, merely because of a shortfall available to pay all redeeming shareholders in full. Accordingly, the test should address only the question whether, after the proposed payment, the company would be able to pay its ordinary creditors (principally trade and expense creditors), and since this Company was not proved to have had any such creditors at the material time, it could not be said to have failed this solvency test.

30.    In the Board's judgment this submission should be rejected, for the following reasons. First, although there is force in the proposition that the underlying purpose of any statutory or common law provisions or principles for the maintenance of capital is to protect ordinary creditors rather than shareholders or former shareholders, the protection afforded by section 37(6) would not be effective if debts still owing to former shareholders who had redeemed could not be paid after the proposed payment. This is because those creditors would, pending any liquidation, be competing for payment with the company's "ordinary" creditors, and the existence of those competing debts would hamper the ability of the company to pay its ordinary creditors in full as and when their debts became due. It is in that context nothing to the point that section 49 of the

Companies Law postpones claims of members of a company to the claims of ordinary unsecured creditors, precisely because it only operates in the context of a liquidation. Until then, former shareholders with redemption debts are as much entitled to exercise creditors' remedies as any other creditors.

31.    Secondly, there is no textual basis within section 37(6) on which this purposive restriction can be founded. The words "in the ordinary course of business" in section 37(6)(a) do not operate so as to disqualify some debts rather than others. They are words which amplify the meaning of the phrase "as they fall due". The question whether a company is able "to pay its debts as they fall due" is now a well-known test for commercial rather than balance sheet solvency, and requires that regard be had to the company's forthcoming liabilities, and to its likely forthcoming resources with which to discharge them. It would be an entirely artificial exercise in the context of a company with substantial redemption liabilities to former shareholders who have, in respect of their redeemed shares, become creditors, to leave the debts owed to them out of any test for commercial solvency.

32.    Thirdly, as the judge found, the payment of debts owed to redeeming creditors lay right at the heart of the ordinary business of this Company. It is an open-ended investment company. Thus, even if the phrase "in the ordinary course of business" qualified the type of debt to be taken into account, payment of redeeming shareholders fell squarely within this Company's ordinary course of business.

33.    The Board therefore approaches the larger and more difficult illegality issue on the basis that the judge was right to find that the Company could not satisfy the section 37(6) solvency test when it made the payments now claimed to have been unlawful.

*The Illegality Issue*

34.    It is convenient at this point to set out in full the provisions of the Companies Law which bear in any way upon this issue. As consolidated in 2007 they represent provisions introduced in 1963, 1987 and 1989. It cannot be doubted that their clarity suffers to a substantial extent from the piecemeal way in which they have come together over time.

> "34.(1) Where a company issues shares at a premium, whether for cash or otherwise, a sum equal to the aggregate amount of the value of the premiums on those shares shall be transferred to an account called 'the share premium account'. Where a company issues shares without nominal or par value, the consideration received shall be paid up share capital of the company.

(2)    The share premium account may be applied by the company subject to the provisions, if any, of its memorandum or articles of association in such manner as the company may, from time to time, determine including, but without limitation -

(a)    paying distributions or dividends to members;

(b)    paying up unissued shares of the company to be issued to members as fully paid bonus shares;

(c)    in the manner provided in section 37;

(d)    writing off the preliminary expenses of the company;

(e)    writing off the expenses of, or the commission paid or discount allowed on, any issue of shares or debentures of the company;

and

(f)    providing for the premium payable on redemption or purchase of any shares or debentures of the company:

Provided that no distribution or dividend may be paid to members out of the share premium account unless, immediately following the date on which the distribution or dividend is proposed to be paid, the company shall be able to pay its debts as they fall due in the ordinary course of business; and the company and any director or manager thereof who knowingly and wilfully authorises or permits any distribution or dividend to be paid in contravention of the foregoing provision is guilty of an offence and liable on summary conviction to a fine of fifteen thousand dollars and to imprisonment for five years. …

37.(1) Subject to this section, a company limited by shares or limited by guarantee and having a share capital may, if authorised to do so by its articles of association, issue shares which are to be redeemed or are liable to be redeemed at the option of the company or the shareholder.

(2)    Subject to this section, a company limited by shares or limited by guarantee and having a share capital may, if authorised to do so by its articles of association, purchase its own shares, including any redeemable shares.

(3)    (a)    No share may be redeemed or purchased unless it is fully paid.

(b)    A company may not redeem or purchase any of its shares if, as a result of the redemption or purchase, there would no longer be any other member of the company holding shares.

(c)    Redemption of shares may be effected in such manner as may be authorised by or pursuant to the company's articles of association.

(d)    If the articles of association do not authorise the manner of purchase, a company shall not purchase any of its own shares unless the manner of purchase has first been authorised by a resolution of the company.

(e)    The premium, if any, payable on redemption or purchase must have been provided for out of the profits of the company or out of the company's share premium account before or at the time the shares are redeemed or purchased or in the manner provided for in subsection (5).

(f)    Shares may only be redeemed or purchased out of profits of the company or out of the proceeds of a fresh issue of shares made for the purposes of the redemption or purchase or in the manner provided for in subsection (5).

(g)    Shares redeemed or purchased under this section shall be treated as cancelled on redemption or purchase, and the amount of the company's issued share capital shall be diminished by the nominal value of those shares accordingly; but the redemption or purchase of shares by a company is not to be taken as reducing the amount of the company's authorised share capital.

(h)    Without prejudice to paragraph (g), where a company is about to redeem or purchase shares, it has power to issue shares up to the nominal value of the shares to be redeemed or purchased as if those shares had never been issued:

Provided that where new shares are issued before the redemption or purchase of the old shares the new shares shall not, so far as relates to fees payable on or accompanying the filing of any return or list, be deemed to have been issued in pursuance of this subsection if the old shares are redeemed or purchased within one month after the issue of the new shares.

(4)    (a)    Where, under this section, shares of a company are redeemed or purchased wholly out of the company's profits, the amount by which the company's issued share capital is diminished in accordance with paragraph (g) of subsection (3) on cancellation of the shares redeemed or purchased shall be transferred to a reserve called 'the capital redemption reserve'.

(b)    If the shares are redeemed or purchased wholly or partly out of the proceeds of a fresh issue and the aggregate amount of those proceeds is less than the aggregate nominal value of the shares redeemed or purchased, the amount of the difference shall be transferred to the capital redemption reserve.

(c)    Paragraph (b) does not apply if the proceeds of the fresh issue are applied by the company in making a redemption or purchase of its own shares in addition to a payment out of capital under subsection (5).

(d)    The provisions of this Law relating to the reduction of a company's share capital apply as if the capital redemption reserve were paid-up share capital of the company, except that the reserve may be applied by the company in paying up its unissued shares to be allotted to members of the company as fully paid bonus shares.

(5)    (a)    Subject to this section, a company limited by shares or limited by guarantee and having a share capital may, if

so authorised by its articles of association, make a payment
in respect of the redemption or purchase of its own shares
otherwise than out of its profits or the proceeds of a fresh
issue of shares.

(b)    References in subsections (6) to (9) to payment out
of capital are, subject to paragraph (f), references to any
payment so made, whether or not it would be regarded apart
from this subsection as a payment out of capital.

(c)    The amount of any payment which may be made by
a company out of capital in respect of the redemption or
purchase of its own shares is such an amount as, taken
together with -

(i)    any available profits of the company are
being applied for purposes of the redemption or
purchase; and

(ii)    the proceeds of any fresh issue of shares made
for the purpose of the redemption or purchase, is
equal to the price of redemption or purchase,

is equal to the price of redemption or purchase, and the
payment out of capital permitted under this paragraph is
referred to in subsections (6) to (9) as the capital payment
for the shares. Nothing in this paragraph shall be taken to
imply that a company shall be obliged to exhaust any
available profits before making any capital payment.

(d)    Subject to paragraph (f), if the capital payment for
shares redeemed or purchased and cancelled is less than
their nominal amount, the amount of the difference shall be
transferred to the company's capital redemption reserve.

(e)    Subject to paragraph (f), if the capital payment is
greater than the nominal amount of the shares redeemed or
purchased and cancelled, the amount of any capital
redemption reserve, share premium account or fully paid
share capital of the company may be reduced by a sum not
exceeding, or by sums not in the aggregate exceeding, the

amount by which the capital payment exceeds the nominal amount of the shares.

(f)　　Where the proceeds of a fresh issue are applied by a company in making any redemption or purchase of its own shares in addition to a payment out of capital under this subsection, the references in paragraphs (d) and (e) to the capital payment are to be read as referring to the aggregate of that payment and those proceeds.

(6)　(a)　　A payment out of capital by a company for the redemption or purchase of its own shares is not lawful unless immediately following the date on which the payment out of capital is proposed to be made the company shall be able to pay its debts as they fall due in the ordinary course of business.

(b)　　The company and any director or manager thereof who knowingly and wilfully authorises or permits any payment out of capital to effect any redemption or purchase of any share in contravention of paragraph (a) is guilty of an offence and liable on summary conviction to a fine of fifteen thousand dollars and to imprisonment for five years.

(7)　　…"

35.　　Beginning again with section 37(6), and leaving aside the issue about the meaning of "debts as they fall due in the ordinary course of business", there is nothing difficult or uncertain about its purpose and effect, which is to subject any payment out of capital for the redemption or purchase by a company of its own shares to the solvency test as a condition for its lawfulness. But it immediately begs the question what is "a payment out of capital". That question is answered in terms by section 37(5)(b), which is expressed to apply in the context of subsections (6) to (9). It is "any payment so made, whether or not it would be regarded apart from this subsection as a payment out of capital". It is common ground, and clearly correct, that the phrase "any payment so made" means any payment referred to in section 37(5)(a); ie "a payment in respect of the redemption or purchase of its own shares otherwise than out of its profits or the proceeds of a fresh issue of shares". Since a payment out of share premium account is plainly not a payment out of profits or out of the proceeds of a fresh issue of shares, it is deemed to be a payment out of capital, provided only that it is made "in respect of" the redemption or purchase of the company's own shares. It was common ground, and

plainly correct, that the phrase "in respect of" is wide enough to include a payment of the premium due on the redemption of shares.

36.    In the Board's judgment that is the end of the matter. Section 37(6) is, on its face, a free-standing condition for the lawfulness of a particular type of payment for the redemption or purchase of shares, namely payment out of capital. Section 37(5)(a) and (b) operate, expressly, as a form of definition of the meaning of "payment out of capital" and do so for the purpose of deeming that to be capital whether it would or would not otherwise be so regarded. The conclusion that, therefore, a payment in respect of the redemption of shares out of share premium account is a deemed payment out of capital subject to the section 37(6) solvency test is a straightforward application of clear statutory language, the displacement of which would require very strong pointers to the contrary.

37.    The main arguments that there are sufficient pointers to the contrary, advanced for RMF, have thus far persuaded both the courts below. They may conveniently be divided into three classes, namely:

    i)      Arguments based on section 37(3)(e);

    ii)     Arguments based on section 34; and,

    iii)    Arguments based on the legislative history behind these provisions, both in the UK and in the Cayman Islands.

38.    Section 37(3)(e) provides for three permitted ways or "gateways" whereby the premium payable on redemption for purchase of shares may be provided for, namely: (1) out of profits (2) out of share premium account or (3) "in the manner provided for in subsection (5)". RMF submitted that section 37(3)(e) permits the use of share premium account to pay premium on redemption, regardless of the restriction in section 37(6), which only applies if the third gateway, namely the manner provided for in subsection (5), has to be employed for the purpose. The submission therefore treats section 37(6) as if it is purely parasitic upon section 37(5).

39.    While attractively argued by Mr David Chivers QC for RMF, the Board has not been persuaded that this analysis is correct. Neither on its own nor when aggregated with the other arguments to which reference will be made below is it sufficient to displace the clear meaning and effect of subsection (6), read with and interpreted by reference to subsection (5)(a) and (b). The reasons follow.

40.     First, section 37(3)(e) is silent as to whether the use of share premium account for the payment of premium on redemption is, or is not, subject to the solvency test. The answer to that question lies elsewhere. Secondly, subsections (5) and (6) are both expressly concerned with conditions for payment of redemption amounts whereas subsection (3)(e) is, by its terms, concerned with the making of provision in advance of, or at the time of, redemption.

41.     Thirdly, the third gateway in subsection (5)(e), namely "the manner provided for in subsection (5)" could, had this been intended, easily have referred also to subsection (6), or subsection (6) could itself have been framed so as to be expressly confined to payments sought to be achieved by using the subsection (5) gateway. In short, subsection (6) could have been, but is not, expressed to be parasitic upon subsection (5). It is only if that parasitic relationship between the two subsections is assumed, rather than treated as the issue to be determined, that the alternative construction, advanced by RMF and favoured by Lord Hodge, gains strength.

42.     Fourthly, this argument pays insufficient attention to what appears to be the main purpose of subsection (3)(e), read in the context of its sister, subsection (3)(f). Subsection (3)(f) is designed to identify the legitimate resources for payment of the nominal amount due on redeemed shares, whereas subsection (3)(e) is about resources for the payment of premium. Reading the two together, they both permit the use of profits and the manner provided for in subsection (5), but they prohibit the use of share premium account for the payment of the nominal amount due, and they prohibit the use of a fresh issue of shares for payment of the premium amount. That purpose is unrelated to the question whether any of the permitted methods, and in particular the use of share premium account, amounts to a deemed capital payment, thereby triggering the solvency test in subsection (6).

43.     Finally, if the legislature had intended to exclude share premium account from the reach of the deeming effect of subsections (5)(a) and (b), this could so easily have been expressly stated in subsection (5)(a), by adding a reference to share premium account in the words following "otherwise than". This is incidentally just what the legislature did do in 2011, although that is irrelevant for the purposes of construction.

44.     Turning to section 34, the argument is that, when subsection (2) is read as a whole, it appears to contemplate and indeed authorise the use of share premium account for providing for the premium payable on redemption or purchase of shares without any solvency requirement. This is because the provision on redemption is given in subsection (2)(f), whereas the proviso, which contains an identical solvency test to that in section 37(6)(a), is expressed to apply only to distributions or dividends which are authorised by subsection (2)(a). Again, this is an attractive argument, and one which strongly influenced the judge and the Court of Appeal.

45.    The Board has not been persuaded by this argument, for two main reasons. The first is that the provision for a solvency test in relation to distributions or dividends in section 34 does not mean or imply that there is not some other solvency test applicable to one or more of the other permitted uses of share premium account, such as that in section 37(6). Section 34 is the only place in the Companies Law in which the use of share premium account for distribution or dividends is dealt with. By contrast the use of share premium account for redemption for purchase is just mentioned in the non-exclusive list in section 34(2), but dealt with in detail in section 37.

46.    The second reason derives from the history of the piecemeal introduction of these provisions, and reinforces the first. The provisions for the use of share premium account on redemption of shares, including earlier versions of what are now sections 37(3)(e) and (f), and section 37(5) and (6), were introduced in 1987, as parts of what were then section 34. At that stage section 32 (which was the earlier version of what is now section 34) made no mention of the use of share premium account for distribution or dividends, made no reference to any solvency test and merely noted that it could be used in providing for the premium payable on redemption of any shares or any debentures of the company. The permission to use share premium account for distribution or dividends was introduced, side by side with the solvency proviso now in section 34(2), in 1989. If the provisions newly introduced in 1987 subjected the use of share premium account to the solvency test, it could not sensibly be suggested that the 1989 addition of distribution and dividends, side by side with its own solvency test, was intended by a side-wind to release the use of share premium account for redemption from a solvency requirement.

47.    Turning to the wider legislative history, counsel for both parties travelled at length through the history of the common law and statutory provision for the maintenance of capital, beginning with *Trevor v Whitworth* (1887) 12 App Cas 409 and continuing through the UK Companies Acts from 1929 onwards into the Cayman Islands legislation which, in its original form in 1963, mirrored that to be found in the UK Companies Act 1948. Thereafter the two legislative schemes diverged.

48.    The argument for RMF was that, in the context of a progressive liberalisation of the regime for the maintenance of capital, share premium account had, from 1948 in the UK and from 1963 in the Cayman Islands, been available for the payment of a premium on redemption of shares without any requirement for commercial solvency. For completeness, it was pointed out that this has clearly been the position from 2011, when share premium account was, by further amendment of section 37(5)(a), clearly excluded from the definition of capital payments. Why, it was asked rhetorically, should there have been a blip in that process of liberalisation which applied a solvency test to the use of share premium account for this purpose, which had previously been absent?

49.    The answer in the Board's judgment is that, prior to 1987, Cayman law permitted only the issue and redemption of preference shares, rather than equity shares, following in that respect the precedent set by the Companies Act 1948. In sharp contrast with shares of the type in issue in these proceedings, where the premium may exceed the nominal amount by several orders of magnitude, the premium likely to be payable upon the redemption of preference shares would typically be modest, limited to some capitalisation of coupon, unpaid on early redemption. The propensity for permitting the premium payable on redemption of equity shares to undermine capital maintenance, by comparison with preference shares, was perceptively analysed by Professor Gower in 1980 in his consultative report "The Purchase by a Company of its Own Shares" (Cmnd 7944). At para 22, after pointing out that section 58 of the Companies Act 1948 permitted a premium payable on redemption to be provided for out of share premium account, he continued:

> "This anomaly may not matter much in the case of preference shares in the strict sense, where the premiums are likely to be small. But in relation to redeemable equity shares the premiums might well be many times the nominal value, resulting in a substantial reduction of capital on redemption. It is therefore suggested that sections 56 and 58 should be amended so as to prevent redeemable shares from being redeemed otherwise than out of profits or an issue of new capital without any use of share premium account which would be left intact."

50.    In due course, the UK Parliament followed that advice and prohibited the use of share premium account for the payment of premium on redemption of shares, when extending the ability of a company to issue and redeem shares from preference shares to equity shares. This was done in the Companies Act 1981. By contrast, in 1987 the Cayman Islands adopted a more nuanced approach. The ability to issue and redeem shares was extended from preference shares to equity shares, and share premium account was permitted to be used for funding the premium payable on redemption. It is not surprising in that context that the Cayman Islands legislature took the more modest step of imposing a solvency test from the use of share premium account for that purpose rather than, as in the UK, prohibiting it altogether. It may well be that this was done specifically to permit or encourage the use of shares and share premium as an investment vehicle in the way commonly used by open-ended investment companies as illustrated by the facts of this appeal. There was no time before 2011 at which, in the Cayman Islands, redeemable equity shares could be issued, or redeemed, when there was also an uncontrolled right to fund premium payable on redemption out of share premium account. If the solvency test was imposed in 1987, as the Board considers that it was, it cannot in the light of the legislative history sensibly be described as some unaccountable blip in an otherwise seamless liberalisation of the capital maintenance regime.

51.    Lord Hodge criticises this analysis, in particular the reference to Professor Gower's report, as a misuse of UK legislative history and policy for the interpretation of the undoubtedly different provisions of the Cayman Company Law. But when Professor Gower reported in 1980 the statutory provisions regulating the issue and redemption of shares were substantially the same in both jurisdictions, and the risks arising from the extension of the redemption of shares from preference to equity shares were therefore also the same. Professor Gower was doing no more than point out the logical consequences of providing for the redemption of equity shares upon the maintenance of capital.

52.    Lord Hodge draws support from a detailed textual analysis of the progressive development of the Cayman regime regulating the issue and redemption of shares from 1963, through 1987 and 1989 to 2007, for a conclusion that the solvency test now in section 37(6) was never intended to apply to the use of share premium account for the payment of premium on redemption. In the Board's view the question turns primarily upon the construction of the 2007 Revision. If the 1987 Revision had clearly not applied the solvency test, then this might have been a sufficient contra-indication to displace the apparently clear meaning of section 37(6) read with the definition of payment out of capital in subsection (5), in the 2007 Revision. But the Board's view is that the broadly equivalent provisions of the 1987 Revision do not lead to any different conclusion, construed on their own, and the modest textual changes to what is now section 37 introduced in 1989 make no significant difference.

53.    The judge was clearly influenced in his approach to the construction of sections 34 and 37 by a perception that to subject the lawfulness of a payment of redemption premium out of share premium account to a solvency test would expose investors in companies of this kind to unacceptable risks of uncertainty because of the risk of claw-back claims, sometimes long after redemption, arising from facts internal to the issuing company, unknown to the investor but affecting the commercial solvency of the company. If those claw-back claims could indeed be made against innocent investors (ie without knowledge of the facts about the company's solvency giving rise to the illegality) then the judge's concerns would be understandable. Nonetheless, as will shortly appear, the Board considers that the answer to those concerns lies in the limited nature of the remedy, rather than in adopting a strained construction of sections 34 and 37.

54.    The conclusion that the solvency test in section 37(6) applies to the use of share premium account for payment of premium on redemption means that it is unnecessary to address in detail either of the other grounds upon which the Company argued that the payments in issue were unlawful. For completeness there follows a brief explanation why the Board found neither of them persuasive.

55.    The first was that, separately from section 37(6), and although only applicable to payment of the nominal amount due on the redemption of shares, section 37(3)(f) was nonetheless itself a cumulative condition which would render the use of share premium account for payment of the premium under section 37(3)(e) unlawful, if the nominal amount was not to be funded out of proceeds of a fresh issue or in the manner provided for in subsection (5). Although generally the conditions for redemption are cumulative in section 37, subsections 3(e) and (f) deal with quite different aspects of the manner in which redemption is to be funded. Once a valid redemption has occurred (as is common ground in these proceedings) then the company owes a debt to the redeeming shareholder equivalent to what will always be the aggregate of the nominal amount and any relevant premium. It does not follow, merely because the nominal amount is not provided for or paid in a manner which renders the payment lawful, that this necessarily affects the lawfulness of the payment of the premium amount.

56.    The second alternative submission was that, in the context of the payment of premium on redemption, where there was no lawful payment of the nominal amount, the payment of the premium would be a distribution or divided, separately subjected to a solvency test by section 34(2). Again, the concession that there was a valid redemption, sufficient to convert the redeeming shareholders into creditors and to bring to an end their rights as shareholders, necessarily means that a payment then or thereafter made to them is neither a dividend nor a distribution. Accordingly, it is not subject to the solvency test in section 34(2).

57.    For the reasons already given, the Board has concluded that the payments in issue in these proceedings were unlawful payments, because they were capital payments which triggered the solvency test in section 37(6), with which the Company was at the time unable to comply.

*The Remedy Issue*

58.    If, as the Board concludes, payment of the redemption proceeds was unlawful by virtue of section 37(6)(a) of the Companies Law, the next question is whether they are recoverable by the Company. The liquidators' primary case is that they are recoverable at common law on the ground of unjust enrichment. Alternatively they submit that they are recoverable in equity on the ground that the redeeming shareholder is accountable as a constructive trustee on the footing of knowing receipt. Conceptually these two proposed bases of recovery are very different. A common law liability in restitution depends on the defendant having been unjustly enriched by the receipt. The liability of a constructive trustee is essentially a custodial liability comparable to that of an express trustee, which is imposed on him because he has sufficient knowledge to affect his conscience. The difference is of some practical importance in the present case. If the payments are recoverable only on the footing of knowing receipt, the company must establish that the redeeming shareholder had sufficient knowledge of the facts which

made the payment unlawful. But knowledge of the facts giving rise to a right of restitution is generally irrelevant.

59.    A number of uncontroversial points should be made by way of introduction. First, section 37(6)(a) of the Companies Law prohibits a payment out of capital of the redemption proceeds, but does not prohibit the redemption itself. It is, as the Board has observed, common ground that the redemption itself was lawful and effective. It follows that on the relevant Redemption Days the transaction was executed. The redeemed shares were thereupon cancelled and the Company's issued share capital was reduced by their nominal value: see the Companies Law, section 37(3)(g). Secondly, there is nothing in the Companies Law to prevent the redemption proceeds from being payable at some time after the Redemption Day. Under the terms of the Offering Memorandum for the shares in question, the redemption proceeds were payable within 14 days. It follows, as the parties agree, that on the Redemption Day, the Company came under a liability to pay the redemption proceeds by the due date. The debt was incurred by the Company in consideration of the cancellation of the shares, and the payment was in consideration of the discharge of that debt. Thirdly, the prohibition in section 37(6)(a) is directed at the Company, ie at the directors by whom it acts. Fulfilment of the conditions imposed by section 37(6)(a) is a matter of internal administration. It is a breach of trust on the part of the directors to authorise the payment of the redemption proceeds if the conditions in section 37(6)(a) are not satisfied.

60.    In principle, money paid under an ineffective (eg a void) transaction is recoverable: *Westdeutsche Landesbank Girozentrale v Islington London Borough Council* [1994] 4 All ER 890 (Hobhouse J), approved (obiter) on appeal to the House of Lords [1996] AC 669, 681-682 (Lord Goff), 714 (per Lord Browne-Wilkinson), 723 (per Lord Woolf); *Guinness Mahon & Co Ltd v Kensington and Chelsea Royal London Borough Council* [1999] QB 215. As the editors of Goff & Jones, *The Law of Unjust Enrichment*, 9th ed (2016), Chapter 13, explain, the ground of recovery in these cases is failure of basis. The transfer was not intended to be gratuitous, but the ineffectiveness of the transaction means that there never was any consideration for it. The same is in principle true if the reason why the transaction is ineffective is that it is illegal, although in this case the position is complicated by the public policy against the recovery of money paid for an illegal purpose: *Smith v Bromley* (1760) 2 Doug KB 696n; *Patel v Mirza* [2016] 3 WLR 399, paras 146-148 (Lord Neuberger), 194-197 (Lord Mance), 251-252 (Lord Sumption).

61.    The present case is, however, rather different. The basis for the payment of the redemption proceeds is that the shares have been redeemed and cancelled and a valid debt is owed by the Company. That basis has not failed. On the contrary, the redemption was lawful. The shares have been duly cancelled and the nominal share capital of the company adjusted accordingly. The Company's payment of part of the proceeds discharged *pro tanto* the lawful debt that arose in consequence. It is accepted by the liquidators that if it had not been paid, it could have been proved as a debt in the

liquidation of the company. It follows that although the Company acted illegally in
making the payment, upon receipt it discharged a valid legal entitlement of the
redeeming shareholder.

62.     It is fundamental that a payment cannot amount to enrichment if it was made for
full consideration; and that it cannot be unjust to receive or retain it if it was made in
satisfaction of a legal right. As Professor Burrows has put it in his *Restatement of the
English Law of Unjust Enrichment* (2012), para 3(6), "in general, an enrichment is not
unjust if the benefit was owed to the defendant by the claimant under a valid contractual,
statutory or other legal obligation". The proposition is supported by more than a century
and a half of authority: see, in particular, *Aiken v Short* (1856) 1 H & N 210, 215,
*Barclays Bank Ltd v W J Simms, Son and Cooke (Southern) Ltd* [1980] QB 677, *Lipkin
Gorman (a firm) v Karpnale Ltd* [1991] 2 AC 548, 574-577, 580-581, *Kleinwort Benson
Ltd v Lincoln City Council* [1999] 2 AC 349, 408 (Lord Hope), *Fairfield Sentry Ltd (in
liquidation) v Migani* [2014] 1 CLC 611 (JCPC), para 18.

63.     The liquidators submitted that, subject to any change of position defence, there
was a right to restitution because the purpose of section 37(6)(a) was the protection of
the company's assets for the benefit of its creditors. In support of this submission, he
cited *Smith v Bromley* (1760) 2 Doug KB 696n, *Browning v Morris* (1778) 2 Cowp 790,
and *Kiriri Cotton Co Ltd v Dewani* [1960] AC 192. These are all decisions about the
rule of public policy against the recovery of money paid for an illegal purpose. They
are authority for the proposition that although in principle money paid for an illegal
purpose is not recoverable, there is an exception for cases where the parties to the illegal
transaction were not *in pari delicto*. One circumstance in which they will not be *in pari
delicto* is that the illegality consisted in the breach of an obligation laid upon the
defendant for the protection of the very class of persons to which the claimant belonged.
Thus in *Kiriri Cotton Co Ltd* a tenant was entitled to restitution of an illegal premium
which he had paid by agreement to the landlord, because the duty not to charge it was
laid by statute on landlords for the protection of tenants. This line of cases needs to be
revisited in the light of the decision of the Supreme Court in *Patel v Mirza* [2016] 3
WLR 399, in which every member of the court (albeit for different reasons) recognised
a more general right to restitution of money paid under an illegal transaction. But this
does not matter, for these cases have no bearing on facts like those presently before the
Board. They assume a prima facie right to restitution and address the circumstances in
which the illegality of the underlying transaction may afford a defence, whereas in the
present case there is no prima facie right to restitution to call for such a defence. They
go on to assume (as was in fact the case in all of them) that the party seeking restitution
was party to the illegality, whereas in the present case the redeeming shareholder simply
received payments which were due to him under lawful transactions. The purpose of
the rule which made the transaction illegal may be relevant to defeat reliance on the
principle of public policy *ex turpi causa non oritur actio*. But it cannot create a right of
restitution which would not otherwise exist.

64.    The Board concludes that the Company is not entitled to recover the payments at common law on the ground of unjust enrichment. The reality of the present case is that a payment has been received from a company for lawful consideration but it has been authorised by its directors in breach of their duties to the Company. This is the proper domain of the law of constructive trusts. Not even in return for good consideration can a person retain assets which he knows to have been paid to him in breach of the statutory duties of the directors. But knowledge, especially in relation to apparently routine transactions where lawfulness depends on the internal affairs of the Company, may be hard to prove.

65.    The Board will humbly advise Her Majesty that this appeal must be allowed, and a declaration made that the payments of redemption proceeds pursuant to the respondents' redemption requests dated 29 and 31 October 2008 were unlawful by virtue of section 37(6)(a) of the Companies Law. The courts below did not deal with the right of recovery because they considered that the payments were lawful. Accordingly, there are no findings of fact to found the claim to make the redeeming shareholder accountable on the footing of knowing receipt. The matter must therefore be remitted to the Grand Court to determine whether the respondent is accountable for those payments as a constructive trustee.

**LORD HODGE: (dissenting) (with whom Lord Mance agrees)**

66.    I agree with the judgment of Lord Sumption and Lord Briggs on the solvency issue and also on the remedy issue if the repayment of the premium on the redeemed shares were illegal. I am not however persuaded that the Chief Justice and the Court of Appeal of the Cayman Islands erred in their conclusions on the illegality issue.

67.    The relevant provisions of the 2007 Companies Law are the consolidation of provisions introduced in 1963, 1987 and 1989. The legislative history of the current provisions, which have been set out in para 33 above, differs markedly from the way in which companies legislation in the United Kingdom has regulated the share premium account. The policies behind the legislation in the United Kingdom do not, in my view, provide a reliable guide as to the meaning of the 2007 Companies Law.

68.    The 1963 Companies Law, in section 32, treated the share premium account as a species of capital by applying the provisions of the 1963 Law relating to the reduction of share capital to the share premium account "as if the share premium account were paid-up share capital". But that deeming provision was qualified in subsection (1) by the words "except as provided in this section". It was therefore subject to exceptions in subsection (2), of which the relevant one was that the share premium account could be applied "in providing for the premium payable on redemption of any redeemable preference shares or of any debenture of the company". Section 34 of the 1963 Law,

which empowered a company, if authorised by its articles, to issue redeemable
preference shares, drew a distinction between the redemption of shares and the
repayment of the premium on those shares. It provided (i) that the shares were to be
redeemed out of profits otherwise available for dividend or out of the proceeds of a
fresh issue of shares made for the purposes of the redemption (section 34(1)(a)) and (ii)
that any premium payable on redemption must have been provided for out of profits or
the share premium account before the shares are redeemed (section 34(1)(c)). The 1963
Law reflected the relevant provisions (sections 56 and 58) of the United Kingdom's
Companies Act 1948. No other provision was needed to authorise the use of funds in
the share premium account in paying the premium on redemption of the preference
shares.

69.    At that time, the only redeemable shares which a company was authorised to
issue were preference shares, which would normally have only a modest premium
payable on redemption. But in 1987 company law in the Cayman Islands was altered
radically when companies were empowered to issue redeemable equity shares. The
1987 Law substituted a new section 32 which did not alter the basic rule which treated
the share premium account as if it were capital but, by extending the exception of the
provisions of that section from that deeming provision, allowed the use of that account
to provide for the premium payable on the redemption of any shares or of any debenture
of the company. The substituted section 34, providing for the redemption and purchase
of shares, preserved the substance of section 34(1)(c) of the 1963 Law by providing (in
subsection (2)(e)):

> "The premium (if any) payable on redemption or purchase must
> have been provided for out of the profits of the company or out of
> the company's shares [sic] premium account before or at the time
> the shares are redeemed or purchased."

The section retained the distinction between the use of the share premium account to
pay the premium on redemption or purchase and the repayment of the nominal value of
the shares on redemption or purchase by providing (in subsection 34(3)(f)):

> "Subject to the provisions of subsection (5), shares may only be
> redeemed or purchased out of profits of the company or out of the
> proceeds of a fresh issue of shares made for the purposes of the
> redemption or purchase." (emphasis added)

But, as the emphasised words show, the repayment of the nominal value of the shares
was subjected to a new regime, which is in substance that which is now contained in
section 37(5) and (6) of the 2007 Act. That regime allows the company to make a
payment in respect of the redemption or purchase of its own shares otherwise than out

of its profits or the proceeds of a fresh issue of shares but deems such payments to be a
payment out of capital and subjects those payments to the solvency test in subsection
(6).

70.    The 1989 Law by repealing subsections (1) and (2) of section 32 removed the
provision that the share premium account was to be subjected to the rules relating to the
reduction of capital as if it were paid up share capital, except as provided in that section.
It replaced those subsections with the provisions which are now found in section 34 of
the 2007 Law and are set out in para 33 above. Those amendments preserved the share
premium account but no longer deemed the share premium account to be capital for any
purpose. The new subsection (2) provided that the share premium account may be
applied in such manner as the company may determine. The enumerated uses of the
account were stated not to limit that discretion. Those uses included the paying of
distributions or dividend to members, which use alone was subjected to the solvency
test in what is now the proviso to section 34(2) of the 2007 Act. The uses which were
not so subjected included and include the application of the share premium account "(f)
providing for the premium payable on redemption or purchase of any shares or
debentures of the company".

71.    Another use which was not subjected to the solvency test in section 34(2) of the
1963 Law as amended in 1989 is the application of the share premium account "(c) in
the manner provided in section 34" (now section 37 of the 2007 Law). This would allow
the funds in the share premium account to be used to redeem the nominal value of
shares, but such application would fall under what under the 2007 Law is the section
37(5) regime and thus the section 37(6) solvency test.

72.    The 1989 Law amended section 34(3)(e) of the 1963 Law to read:

> "The premium (if any) payable on redemption or purchase must
> have been provided for out of the profits of the company or out of
> the company's share premium account before or at the time the
> shares are redeemed or purchased or in the manner provided for in
> subsection (5)." (emphasis added)

This provision as amended thus provided an additional source of the funds, deemed
capital under subsection (5), which a company could use to pay the premium payable
on redemption or purchase. The 1989 Law also amended section 34(3)(f) by deleting
the opening words emphasised in para 69 above and by adding the words emphasised
below so as to read:

> "Shares may only be redeemed or purchased out of profits of the
> company or out of the proceeds of a fresh issue of shares made for

the purposes of the redemption or purchase <u>or in the manner provided for in subsection (5)</u>." (emphasis added)

Thus the nominal value of redeemed or purchased shares could be paid for out of profit, out of the proceeds of a fresh issue of shares made for that purpose or out of deemed capital as provided in subsection (5). Changes were also made by the 1989 Law to section 34(5) (now section 37(5) of the 2007 Law) but they are not relevant.

73.    From this legislative history the following conclusions can be drawn. First, the legislation has throughout authorised the application of the share premium account to pay the premium on the redemption of redeemable shares. Secondly, when redeemable equity shares were introduced, the 1987 Law preserved a distinction between the repayment of the premium on redeemable shares (now including redeemable equity shares) and the repayment of the nominal value of those shares by subjecting only the latter to the provisions of subsections (5) and (6) in the opening words of section 34(3)(f) (para 69 above). Thirdly, this distinction is preserved by the amendments introduced by the 1989 Law which expressly provide for an additional optional source of payment in both section 37(3)(e) and section 37(3)(f) of the 2007 Law. Thus the premium on redemption of shares may be paid out of (a) profits or (b) the share premium account or (c) as provided for in subsection (5) (ie a deemed capital payment subject to a solvency test). The nominal value of the shares on the other hand may be paid (a) out of profits or (b) out of the proceeds of a fresh issue of shares or (c) as provided for in subsection (5) (ie a deemed capital payment subject to the solvency test). The use of the disjunctive "or" in section 37(3)(e) means that the payment of the premium on redemption or purchase out of the share premium account is not subjected to the regime under subsections (5) and (6). This is consistent with section 34 of the 2007 Law, which does not impose a solvency test on the use of the share premium account when it is used to provide the premium payable on the redemption or purchase of shares.

74.    Lord Sumption and Lord Briggs start their analysis with section 37(6) of the 2007 Law, and thereby bypass the restrictions on the scope of section 37(5) on which subsection (6) is parasitic. Subsection (6) is parasitic on subsection (5) because the solvency test imposed by that subsection is applied only to the payments out of capital or out of that which subsection (5) deems to be capital when used to make a payment in respect of the redemption or purchase of the company's own shares. But, as I have shown, under the 1963 Law and the 1987 Law the share premium account was not treated "as if [it] were paid up capital" when it was used to pay the premium on the redemption of shares because such use was exempted from the deeming provision. In the 1989 Law the share premium account ceased to be subject to the provisions of the Law relating to the reduction of share capital. Thus, under the 2007 Law the share premium account is not capital and therefore is not caught by section 37(6) unless subsection (5) applies to make it so. But section 37(5)(a), which introduces the regime for payment in respect of the redemption or purchase of shares out of deemed capital, is stated to be "[s]ubject to this section", which requires reference to the other provisions

of section 37, including subsection (3)(e), in order to determine the scope of subsection (5).

75.     Lord Sumption and Lord Briggs in paras 40 and 42 above interpret section 37(3)(e) and (f) of the 2007 Law as being concerned only with "the making of provision" or being "to identify the legitimate resources" for the payment of the premium and the nominal amount of the redeemed shares, while they construe section 37(5) as providing the authorisation for payment subject to the subsection (6) solvency test (paras 35 and 36 above). On their approach, section 37(3), when read with section 34(2), does not authorise the use of those funds. I respectfully disagree. Section 37(3)(e) of the 2007 Law performs a purpose which can be traced back to section 34(1)(c) of the 1963 Law (para 68 above). It identifies the sources of the payment of the premium on redemption and one source is the share premium account, which under section 34(2) of the 2007 Law (and formerly section 32(2) of the 1963 Law both as originally enacted and as amended in 1987 and 1989) can be applied in providing for the premium payable on redemption. Under the 1963 Law, and the 1948 UK Act on which it was modelled, no other authorisation for the payment was required. The amendments to section 34(3)(f) of the 1963 Law in 1987 (para 69 above) and to both section 34(3)(e) and (f) of that Law in 1989 (para 71 above) preserved this position. Against this legislative background, I am not persuaded that the introduction of what is now section 37(5) of the 2007 Law overrode the authorisation given by the combination of section 34(2) and section 37(3)(e) of that Law.

76.     This view of the scope of the deeming provisions in section 37(5)(a) and (b) of the 2007 Law does not empty those provisions of content. The deeming provisions would cover liquid assets of the company, such as cash obtained by borrowing, if they were to be used in respect of the redemption or purchase of the company's shares. Further, the conclusion that the share premium account is available for the payment of premium on the redemption of redeemable shares is consistent with the altered status of that account which ceased to be deemed in any circumstances to be capital for the purpose of the provisions of the Law relating to reduction of capital in 1989. But for the imposition of the solvency test in relation to the use of the share premium account in paying distributions and dividends to members (now by section 34(2) of the 2007 Law) the share premium account would have reverted to its pre-1963 status in Jamaican (and Cayman) law in the Jamaican Companies Act 1864 (as amended) as profits available for distribution: *In re Hoare & Co Ltd* [1904] 2 Ch 208; *Drown v Gaumont-British Picture Corporation Ltd* [1937] Ch 402. In this regard the amendments made to the Law in 1989 confirm my view that the legislature in 1987 by making only section 34(3)(f) subject to section 34(5) did not include the use of the share premium account to pay the premium on the redemption or purchase of shares within the section 34(6) solvency test.

77.     It is undoubtedly correct that the legislation could have been more clearly drafted as Lord Sumption and Lord Briggs have stated. But the legislative history which I have set out does not suggest that the legislature altered the substance of the 2007 Law when

in 2011 it amended section 37(5) expressly to exclude payments out of the share premium account from the extended definition of capital and thus from the solvency test. In short, the legislature of the Cayman Islands in 1987 adopted a radically different approach to the use of the share premium account from that which Professor Gower recommended to the UK government and which the UK Parliament adopted in the Companies Act 1981. The 1987 Law extended the authorised use of the share premium account in payment of the premium on the redemption of shares, which previously had been limited to redeemable preference shares, to provide for the payment of the premium on the redemption of equity shares, notwithstanding that the premium commanded by such shares would often be much larger. In so doing, it did not impose on such use of the share premium account the solvency test now contained in section 37(6).

78.    I agree with the conclusion of Lord Sumption and Lord Briggs that the Company's other submissions, namely (i) that there were cumulative conditions in section 37(3)(f) and (e) of the 2007 Law and (ii) that the payment of the premium to a former shareholder would be a distribution subject to the solvency test in the proviso to section 34(2) of the 2007 Law, fall to be rejected for the reasons which they have stated in paras 51 and 52 of the judgment.

*Conclusion*

79.    I would therefore have dismissed the appeal.

# El Ajou v Dollar Land Holdings
## [1994] 2 All E.R. 685

El-Ajou v Dollar Land Holdings Plc (No.1), [1994] B.C.C. 143 (1993)

# *143 EI Ajou v Dollar Land Holdings plc & Anor

 Positive/Neutral Judicial Consideration

**Court**
Court of Appeal (Civil Division)

**Judgment Date**
2 December 1993

**Report Citation**
[1994] B.C.C. 143

Court of Appeal (Civil Division)

Nourse , Rose and Hoffmann L JJ.

Judgment delivered 2 December 1993

*Knowing receipt of trust funds—Knowledge of company—Plaintiff victim of fraud sought to trace proceeds to company—Whether plaintiff could trace proceeds—Whether knowledge of director was attributable to company.*

This was an appeal by the plaintiff from a judgment of Millett J *[1993] BCC 698* , raising the question whether, for the purposes of establishing a company's liability under the 'knowing receipt' head of constructive trust, the knowledge of one of its directors could be treated as the knowledge of the company.

The plaintiff was one of many victims of a massive share fraud carried out in Amsterdam by three Canadians between 1984 and 1985. He claimed to be able to trace some of the proceeds of the fraud from Amsterdam through intermediate resting places in Geneva, Gibraltar, Panama and Geneva (again) to London, where they were invested in a joint venture to carry out a property development project in Battersea in conjunction with the first defendant, Dollar Land Holdings plc ('DLH'). The plaintiff sought to recover from DLH, alleging that DLH's chairman, 'F', possessed the necessary knowledge attributable to DLH that the funds represented the proceeds of fraud.

On the question of F's knowledge the judge held that F's position as chairman and non-executive director of DLH was insufficient by itself to constitute his knowledge ipso facto the knowledge of DLH. He further held that F did not act as the agent of DLH in obtaining the money from the Canadians: F discovered that the Canadians were fraudsters and that their money had been obtained by fraud at a time when he was acting in his own interest and as a director of another company, and not as a director of DLH. In seeking finance on ordinary commercial terms, and in the absence of anything to put it on inquiry, DLH was not bound to inquire as to the source of the money it was offered; and, that being so, F was under no obligation to tell DLH what he knew. The judge also held that at the time of the relevant transaction (in March 1988) F had ceased to be a director of DLH for nine months, and he had nothing at all to do with the transaction: even if F's knowledge could have been attributed to DLH in 1986, it was wrong to treat DLH as still possessing that knowledge in 1988.

By a respondent's notice, DLH challenged the judge's finding that the plaintiff had established that the money in an

© 2021 Thomson Reuters.

account in Geneva, used to secure an advance to finance the project, represented the proceeds of the fraud, which had been remitted from Gibraltar to Panama. The issues on the appeal were: the source of the money in the Geneva account; the identity of the assets received by DLH and the dates when it received them; and whether the admitted knowledge of the frauds on the part of F could be imputed to the company.

*Held* , allowing the appeal:

1.   The judge's conclusions on the assets received by DLH were correct, as was his finding that the money could be traced to the proceeds of fraud by the Canadians.

2.   The transactions to be considered were those by which DLH received assets representing the moneys fraudulently misapplied. The responsibility for the management and control of those transactions was not to be determined by identifying those who were responsible for deciding that DLH would participate in the project and the nature and extent of that participation, far less by identifying those who were responsible for business decisions generally. Millet J's unchallenged conclusion that the 'moving force' behind the company's *144 activities was 'S', although neither a director nor an employee, did not preclude a finding that F was the company's directing mind and will in relation to some activities.

3.   In relation to the relevant transactions, F as an individual exercised powers on behalf of the company which identified him as the company's directing mind and will. So far as the constitution of DLH was concerned, he committed the company to the transaction as an autonomous act which the company adopted by performing the agreement.

4.   It did not matter that by the time of the relevant transaction F had ceased to be a director. Once his knowledge was treated as being the knowledge of the company in relation to a given transaction, the company continued to be affected with that knowledge for any subsequent stages of the same transaction.

5.   F acquired his knowledge of the fraudulent misapplication as a director of another company. As agent, he was under no obligation to disclose his knowledge to DLH, there being no duty on DLH to enquire as to the source of the offered money. ( *Re David Payne & Co Ltd [1904] 2 Ch 608 applied* .)

The following cases were referred to in the judgments:

Baldwin v Casella (1872) LR 7 Ex 325 .
Blackburn, Low & Co v Thomas Vigors (1887) 12 App Cas 531 .
Blackley v National Mutual Life Association of Australasia Ltd [1972] NZLR 1038 .
Carew's Estate Act, Re (No. 2) (1862) 31 Beav 39; 54 ER 1051 .
Dresser v Norwood & Anor (1864) 17 CB (NS) 466; 144 ER 188 .
Fenwick, Stobart & Co Ltd, Re [1902] 1 Ch 507 .
Gladstone & Anor v King (1813) 1 M & S 35; 105 ER 13 .
Hampshire Land Co, Re [1896] 2 Ch 743 .
Kelly v Cooper & Anor [1993] AC 205 .
Lennard's Carrying Co Ltd v Asiatic Petroleum Co Ltd [1915] AC 705 .

El-Ajou v Dollar Land Holdings Plc (No.1), [1994] B.C.C. 143 (1993)

---

*Payne (David) & Co Ltd, Re [1904] 2 Ch 608* .
*Powles v Page (1846) 3 CB 16; 136 ER 7* .
*R v Andrews-Weatherfoil Ltd [1972] 1 WLR 118* .
*Regina Fur Co Ltd v Bossom [1957] 2 L1 Rep 466* .
*Tanham v Nicholson (1872) LR 5 HL 561* .
*Tesco Supermarkets Ltd v Nattrass [1972] AC 153* .
*Turton v London and North-Western Railway Co (1850) 15 LT(OS) 92* .

Representation

Michael Beloff QC , Roger Ellis and Sarah Moore (instructed by Bower Cotton & Bower ) for the appellant.
Romie Tager (instructed by Kaufman Kramer Shebson ) for the respondents.

JUDGMENT

Nourse LJ:

Introduction

Of the questions that remain in dispute in this case, the most important is whether, for the purposes of establishing a company's liability under the 'knowing receipt' head of constructive trust, the knowledge of one of its directors can be treated as having been the knowledge of the company. That is essentially a question of company law. There are or have been other questions on tracing and constructive trust.

The company is the first defendant, Dollar Land Holdings plc ('DLH'). The director is Mr Sylvain Ferdman, who was the chairman and one of the three directors of DLH between June 1985 and June 1987. The party who seeks to recover against DLH in constructive trust is the plaintiff, Abdul Ghani El Ajou. He has put his claim at £1.3m. On 12 June 1992, after a trial extending over some 11 days, Millett J delivered a reserved judgment dismissing the plaintiff's action *[1993] BCC 698* . He held that the plaintiff had an equitable right to trace the money into the hands of DLH, but that Mr Ferdman's *145* knowledge of their fraudulent misapplication could not be treated as having been the knowledge of DLH, either on the ground of his having been its directing mind and will or on the ground of his having been its agent in the transaction. The judge found that another person closely concerned with the affairs of DLH, Mr William Stern, did not have the requisite knowledge of the misapplication. The plaintiff now appeals to this court. He does not seek to upset the judge's finding in regard to Mr Stern. DLH has put in a respondent's notice whose primary purpose is to impugn the judge's finding as to one part of the tracing exercise.

Millett J's judgment is reported at *[1993] BCC 698* . Because the report sets out in full the judge's clear and necessarily lengthy statement of the facts and because the issues have narrowed in this court, the facts can now be stated relatively briefly. I will state them mainly in the judge's own words.

The facts

The plaintiff is a wealthy Arab businessman resident in Riyadh. He was the largest single victim, though only one of many victims, of a massive share fraud carried out in Amsterdam between 1984 and 1985 by three Canadians, Allan Lindzon (or Levinson), Lloyd Gaplan and Harry Roth ('the Canadians'). Some of the proceeds of the fraud were passed from Amsterdam through intermediate resting places in Geneva, Gibraltar, Panama and Geneva (again) to London, where in 1986 they were invested in a joint venture to carry out a property development project at Nine Elms in Battersea in conjunction with DLH. The interest of the Canadians in the joint venture was bought out by DLH in 1988, which is a

© 2021 Thomson Reuters.

public limited company incorporated in England but resident for tax purposes in Switzerland. It is a holding company. Its principal activities, carried on through its subsidiaries, are property dealing and investment. At the material time it was in a substantial way of business. It denies that in 1986 it had any knowledge that the money which the Canadians invested in the project represented the proceeds of fraud. Moreover, in buying out their interest in 1988 it claims to have been a bona fide purchaser for value without notice of the fraud.

Mr Ferdman is a Swiss national, resident in Geneva. He worked for many years for the Bank of International Credit in Geneva. In 1972 he left the bank and set up his own company, Société d'Administration et de Financement SA ('SAFI'), through which he acted as a fiduciary agent. SAFI was originally owned jointly by Mr Ferdman and an old-established Swiss cantonal bank of good reputation, but in 1982 Mr Ferdman became its sole proprietor. SAFI acted as a fiduciary agent for clients who did not wish their identities to be disclosed. Two of its clients were Mr Singer and Mr Goldhar, who were associates of the Canadians. Mr Ferdman was accustomed to accept funds from clients without questioning their origin, and to act for clients who were anxious to conceal their identity. He regarded the need to preserve his clients' anonymity as paramount-without it he would have had no business – and to this end he was willing on occasion to present himself or SAFI as a beneficial owner and to make false statements to that effect. The judge found that it must have been plain to Mr Ferdman by the end of October 1985 that Singer and Goldhar were implicated in a fraud. Moreover, Mr Ferdman admitted to the judge at the trial that he knew perfectly well that the Canadians were involved with Singer and Goldhar in the fraud and were not just behind them. The Canadians also had a fiduciary agent resident in Geneva who acted for them. He was Mr David D'Albis, an American citizen.

DLH is an English company which was formerly listed on the London Stock Exchange. In June 1985 its entire issued share capital was acquired by Keristal Investments and Trading SA ('Keristal'), a Panamanian company beneficially owned by a Liechtenstein foundation. In the annual reports of DLH Mr Ferdman described himself as the beneficial owner of Keristal, but that was not the case. He was simply preserving *146* the anonymity of his principals, the founders and beneficiaries of the Liechtenstein foundation, who were two US citizens resident in New York ('the Americans'). The judge recorded that the plaintiff was satisfied that the Americans had no connection of any kind with the Canadians or their associates or any of the other persons involved in the fraud.

DLH was acquired as a vehicle for the Americans' property dealings in the United Kingdom. Its business activities were under the direction of Mr William Stern, described by the judge as a property dealer who suffered a spectacular and well – publicised bankruptcy as a result of the 1974 property crash. He was engaged in the business of identifying opportunities for property investment and introducing them to investors willing to pay him a fee or a share in the eventual profits. Mr Stern had lived in Geneva as a boy and was acquainted with Mr Ferdman. They became friends, though they lost contact with each other for some years. Mr Stern knew that he was a fiduciary agent and had established SAFI, which he believed still to be jointly owned by Mr Ferdman and a reputable cantonal bank. From time to time he suggested deals to Mr Ferdman and enquired of him whether he had any suitable investors among his clients.

Mr Ferdman introduced the Americans to Mr Stern, who was able to recommend a successful investment in a UK property. The Americans were willing to make further investments in the UK, and Mr Stern suggested that he should look for a suitable English vehicle, if possible a quoted company, which they could acquire and use as a medium for further investment. Mr Stern found DLH and Keristal acquired it as a pure cash shell in June 1985. Mr Ferdman and Mr Favre and Mr Jaton, two fellow directors of SAFI, were appointed to be the directors of DLH and Mr Ferdman its chairman. The judge described the three of them as nominee directors representing the interests of the beneficial owners. They played no part in the conduct of DLH's business which was carried on by Mr Stern in consultation with the Americans. Mr Stern was not a director of DLH, but he was appointed managing director of Dollar Land Management Ltd, one of its subsidiaries. DLH was in a substantial way of business and was able to raise very large sums on the security of its assets. At the end of 1986 it had secured bank loans and other mortgage creditors of more than £10m. By the end of 1987 that figure had risen to more than £30m.

El-Ajou v Dollar Land Holdings Plc (No.1), [1994] B.C.C. 143 (1993)

Mr Stern asked Mr Ferdman if he could find an investor willing to put up equity finance for the Nine Elms project. Mr Ferdman, who was to receive from DLH an introductory commission of five per cent of the funds obtained, brought one of the Canadians, Roth, to London in March 1986 and introduced him to Mr Stern, who provided him with a detailed investment proposal which included a profit forecast. All negotiations were conducted between Roth and Mr Stern. Mr Ferdman played no part. By a letter dated 20 March 1986 and addressed to Roth, care of SAFI in Geneva, the terms which had been agreed between him and Mr Stern were set out. Although that letter was signed by Mr Ferdman, it was composed entirely by Mr Stern. I will return to it later in this judgment.

On 25 March Mr Ferdman copied the letter of 20 March (with two variations which the judge inferred were made at the request of the Canadians) by telex to Mr D'Albis, who gave instructions on the same day for £270,000 to be transferred from Geneva to the Royal Bank of Scotland in London for the account of DLH's solicitors, Grangewoods. The judge found that that sum represented proceeds of the fraud and that finding has not been questioned in this court. Subsequently, Mr Ferdman despatched a duplicate of the telex in the form of a letter on DLH's headed paper, and over his own signature, to Yulara Realty Ltd ('Yulara') in Panama. That letter was dated 7 April. Again, I will return to it later. Yulara was a Panamanian company owned by the Canadians, which Mr Ferdman knew was a vehicle for their investment in the Nine Elms *147* project. Mr Ferdman retained on his own files a copy of the letter countersigned by a Panamanian lawyer on behalf of Yulara by way of acceptance.

Contracts for the purchase of the Nine Elms site were exchanged on 26 March. The purchaser was a subsidiary of DLH, Dollar Land (London) Ltd ('DLH London'). The £270,000 which Grangewoods had received on the previous day was used to pay the deposit. On 11 June 1986 DLH London assigned the benefit of the contract to DLH for £100,000 and on the same day DLH entered into a contract for the sale of the site to Regalian Properties (Northern) Ltd ('Regalian'). Completion took place on the same day at a price of £2.7m, £1m of which was recorded as being paid by DLH.

The further funding of the project was complex. Reduced to its essentials, the method adopted was as follows. On 6 May 1986 Keristal (expressed to be represented by Mr Ferdman) and Yulara (expressed to be represented by the Panamanian lawyer) entered into a written loan agreement which was signed by them on behalf of Keristal and Yulara respectively. The agreement recited that Keristal was the holding company of DLH and that Yulara and DLH had entered into an agreement as per the letter dated 7 April. Article 1 was in substance a further recital to the effect that Yulara was making available or had given to Keristal (it is not clear which) the amount of up to $2.5m for as long as the agreement as per the letter of 7 April would be in force. By art. 2 Keristal accepted that amount on terms that it undertook to use the funds (a) 'in order to make a joint venture in a certain real estate investment in London' in accordance with the terms contained in the letter dated 7 April and (b) 'in order to [obtain] a bank guarantee of £1,300,000 to be issued in favour of [DLH London] or another company owned by [DLH]'.

On 12 and 16 May respectively two sums of $1,541,432 and $1,143,000, making a total of $2,684,432, were credited to an account of Keristal ('the Keristal No. 2 account') at Banque Scandinave in Geneva. The account was operated by SAFI and was used exclusively for the purpose of funding the Nine Elms project. The bank statement for the account shows that the first sum came from the Bank of America; the source of the second is not shown. The judge found that both sums were traceable to Panama as proceeds of the fraud. That is the finding which the respondent's notice seeks to impugn. I will return to it shortly.

Pursuant to arrangements made by Mr Ferdman, Scandinavian Bank Group plc in London then agreed to advance £1.3m to Factotum NV ('Factotum'), a shelf company previously incorporated by Mr Ferdman in the Netherland Antilles, which he

El-Ajou v Dollar Land Holdings Plc (No.1), [1994] B.C.C. 143 (1993)

decided to make use of as a convenient vehicle for channelling the money to DLH. (Factotum is the second defendant in the action, but it has no assets and has never been served.) The advance was supported by a guarantee given by Banque Scandinave secured on the moneys in the Keristal No. 2 account. The whole of the loan from Scandinavian Bank in London to Factotum was drawn down and £1,030,000 was paid into Grangewoods' client account on 29 May. Of those moneys £745,598.60 were used to discharge the amount due from DLH on completion of the purchase of the site on 11 June. The balance was used to discharge obligations of DLH and to make various other payments at the direction of DLH, including payment to Mr Ferdman of his introductory commission of £65,000.

It is clear from the foregoing that the £1,030,000 paid to Grangewoods represented moneys that had been credited to the Keristal No. 2 account. It is also clear that the moneys so credited belonged to the Canadians. What is in dispute is the judge's finding that they represented moneys which Mr D'Albis had sent to Panama from Gibraltar on 30 March and 1 April 1986, a fact that had to be established in order that they could be treated as proceeds of the fraud. It is convenient to deal with that question now.

*148*

Tracing through Panama

The question was dealt with by the judge between pp. 713 and 715. He said that the plaintiff was unable, by direct evidence, to identify the moneys in the Keristal No. 2 account with the money which Mr D'Albis had sent to Panama only a few weeks before. However, he thought that there was sufficient, though only just, to enable him to draw the necessary inference. At p. 713G, he continued:

'One of the two sums received in the Keristal No. 2 account was $1,541,432 received on 12 May 1986 from Bank of America. That corresponds closely with the sum of $1,600,000 transferred to Bank of America, Panama on 1 April 1986. In relation to the later transaction, Bank of America may, of course, merely have been acting as a correspondent bank in New York and not as the paying bank; and the closeness of the figures could be a coincidence. It is not much, but it is something; and there is nothing in the opposite scale. The source of the other money received in the Keristal No. 2 account is not known, but from the way in which the Canadians appear to have dealt with their affairs, if one sum came from Panama, then the other probably did so too.'

At p. 714C, after considering other points on each side, the judge said that the fact remained that there was no evidence that the Canadians had any substantial funds available to them which did not represent proceeds of the fraud. At p. 715A, he concluded:

'In my judgment, there is some evidence to support an inference that the money which reached the Keristal No. 2 account represented part of the moneys which had been transmitted to Panama by the second tier Panamanian companies some six weeks previously, and the suggestion that it was derived from any other source is pure speculation.'

Mr Tager, for DLH, submitted that neither of the routes followed by the judge led to the conclusion that he reached. He took us carefully through the bank statement for the Keristal No. 2 account. He relied on the fact that there were two separate credits to it of very precise amounts, the second having been made four working days after the first. It had been impossible to identify the source of the second credit. All this suggested that the two credits had come from different

sources. There was no necessary connection between the first and the sum of $1.6m that had been sent from Gibraltar to the Bank of America in Panama on 1 April. Mr Tager argued that there were other very substantial funds available to the Canadians. He disputed the judge's view that there was no evidence that they had any substantial funds available to them that did not represent proceeds of the fraud. He submitted that the plaintiff had not discharged the evidential burden of establishing the necessary link. Having carefully considered these and other arguments of Mr Tager, I remain unconvinced that the judge drew the wrong inference. I well appreciate both that the question is of critical importance to the plaintiff's case and that, since it depends almost entirely, if not exclusively, on documentary evidence and undisputed events, we in this court are, in theory at any rate, in as good a position to draw an inference as the judge himself. In practice, however, the judge, after an 11 day trial, was in a much better position than we are. From all that I have seen and heard of the case, I would feel no confidence at all in saying that the judge had drawn the wrong inference.

The assets received by DLH

On the footing that the moneys credited to the Keristal No. 2 account were proceeds of the fraud, it becomes necessary to identify the assets received by DLH and the dates when it received them. The plaintiff's position is a simple one. He says that DLH received £270,000 on 25 March 1986 and a further £1,030,000 in June 1986 (though logically he *149 ought to say on 29 May 1986, when the latter sum was paid into Grangewoods' client account; see further below). The judge considered these questions at pp. 716–717. He thought that the position was somewhat more complicated than the plaintiff would have had it.

As to the £270,000, the judge said, at p. 716G:

'The sum of £270,000 was never received by DLH. It was paid into Grangewoods' client account, and their client at the time must be taken to have been DLH London. DLH London was not a nominee or agent for DLH. As had previously been agreed between Roth and Mr Stern, it was the intended contractual purchaser of the site, and the money was to be used exclusively for the payment of the deposit on exchange of contracts. In my judgment, DLH did not receive the money at all, and DLH London did not receive it beneficially but upon trust to apply it for a specific purpose. DLH London used the money, as it was bound to do, to pay the deposit on the site, and thereby acquired for its own benefit a corresponding interest in the site which it subsequently sold and transferred to DLH. The plaintiff can follow his money through these various transactions, but the relevant asset capable of being identified as having been received by DLH is an interest in the site corresponding to the payment of the deposit.'

This question depends on the true construction and effect of the letter of 20 March 1986. Both Mr Beloff QC, for the plaintiff, and Mr Tager referred to its terms at some length in order to determine whether DLH London had acted as principal or as agent for DLH. Although he was not greatly concerned either way, Mr Beloff submitted that DLH London had acted as agent and that the £270,000 was accordingly received by DLH on 25 March. But in my view the judge was right, as a matter of construction, to conclude that DLH London, and not DLH itself, was the principal, so that it was that company that was Grangewoods' client when the money was received. I therefore agree with the judge that DLH did not receive anything on 25 March, but that on the assignment of the benefit of the contract to it on 11 June it received an interest in the site corresponding to the payment of the deposit.

As to the balance of £1,030,000, the judge said, at p. 717A:

'The sum of £1,030,000 was also paid into Grangewoods' client account, but by then their client had become DLH. The money was disbursed on the instructions and for the benefit of DLH. Only £745,598.60 was used to pay the

El-Ajou v Dollar Land Holdings Plc (No.1), [1994] B.C.C. 143 (1993)

money due to the vendor on completion, but this was the result of the arrangements which DLH had made with Regalian. So far as Yulara is concerned, the whole £1.3m must be taken to have been disbursed as agreed between them on the acquisition of a 40 per cent interest in the project. Moreover, in my judgment, on a proper analysis of the transaction between Yulara and DLH, Yulara's money should be treated as having been invested in its share of the project, and not in or towards the acquisition of DLH's share.

The investment proved highly successful. In itself it was not a breach of trust and caused the plaintiff no loss. Had he been able to intervene before the Canadians were bought out, he could have claimed the whole of Yulara's interest in the project; but whatever the extent of DLH's knowledge of the source of Yulara's funds, his claim would have been confined to Yulara's interest in exoneration of that of DLH. In the events which have happened, the plaintiff is in my judgment bound to treat his money as represented by Yulara's interest in the project, and must rely exclusively on the transaction on 16 March 1988 when Yulara's interest was bought out by DLH.'

For a reason which will become clear when I deal with the question whether Mr Ferdman was the directing mind and will of DLH, Mr Beloff expressed greater concern *150 at the judge's decision of this question. However, subject to one point, I feel unable to differ from his reasoning on it.

I am puzzled by the judge's suggestion that by the time the £1,030,000 was paid into Grangewoods' client account their client had become DLH. At p. 709F he had found that that payment was made on 29 May, before the assignment of the benefit of the contract by DLH London to DLH Amsterdam on 11 June. However, this point (which was not addressed in argument), though it may be of importance in relation to the date at which DLH must be treated as having had knowledge of the fraud (see below), does not affect the judge's view of the asset received by DLH in respect of the £1,030,000 and the date when it received it.

Knowledge

It having been established that DLH received assets representing proceeds of the fraud, I come to the question of knowledge. By the end of the hearing there could have been no doubt that Mr Ferdman himself had the requisite knowledge. At p. 718H, the judge said of him:

'He freely admitted that he knew that the persons who were providing the money for the Nine Elms project were the persons who had been behind the fraud in Amsterdam; and that by 7 April 1986, when he signed the letter to Yulara, he knew (or assumed) that the money which he would be receiving into the Keristal No. 2 account was part of the proceeds of the fraud.'

Thus arises the most important question remaining in dispute, which is whether Mr Ferdman's knowledge can be treated as having been the knowledge of DLH. The plaintiff contends that it can and ought to be, first, on the ground that Mr Ferdman was, in relation to DLH's receipt of the assets representing the moneys fraudulently misapplied, its directing mind and will; secondly and alternatively, on the ground that he was its agent in the transaction. Because a company's directing mind and will are often the mind and will of one or more of its directors and because a director is for many purposes an agent of the company, there is a danger of confusion between the two grounds on which the plaintiff relies. But they are, as the judge made clear, quite separate. The plaintiff can succeed on either. The convenient course is to deal with the law and the facts in regard to each of them in turn.

El-Ajou v Dollar Land Holdings Plc (No.1), [1994] B.C.C. 143 (1993)

Directing mind and will

This doctrine, sometimes known as the alter ego doctrine, has been developed, with no divergence of approach, in both criminal and civil jurisdictions, the authorities in each being cited indifferently in the other. A company having no mind or will of its own, the need for it arises because the criminal law often requires mens rea as a constituent of the crime, and the civil law intention or knowledge as an ingredient of the cause of action or defence. In the oft-quoted words of Viscount Haldane LC in *Lennard's Carrying Co Ltd v Asiatic Petroleum Co Ltd [1915] AC 705* at p. 713:

'My Lords, a corporation is an abstraction. It has no mind of its own any more than it has a body of its own; its active and directing will must consequently be sought in the person of somebody who for some purposes may be called an agent, but who is really the directing mind and will of the corporation, the very ego and centre of the personality of the corporation.'

The doctrine attributes to the company the mind and will of the natural person or persons who manage and control its actions. At that point, in the words of Millett J at p. 719B:

'Their minds are its mind; their intention its intention; their knowledge its knowledge.'

*\*151*

It is important to emphasise that management and control is not something to be considered generally or in the round. It is necessary to identify the natural person or persons having management and control in relation to the act or omission in point. This was well put by Eveleigh J in delivering the judgment of the Criminal Division of this court in *R v Andrews-Weatherfoil Ltd [1972] 1 WLR 118* at p. 124C:

'It is necessary to establish whether the natural person or persons in question have the status and authority which in law makes their acts in the matter under consideration the acts of the company so that the natural person is to be treated as the company itself.'

Decided cases show that, in regard to the requisite status and authority, the formal position, as regulated by the company's articles of association, service contracts and so forth, though highly relevant, may not be decisive. Here Millett J adopted a pragmatic approach. In my view he was right to do so, although it has led me, with diffidence, to a conclusion different from his own.

DLH contends that its directing mind and will in relation to its receipt of the assets representing the moneys fraudulently misapplied were either the mind and will of Mr Stern alone or of Mr Stern and the Americans together. They were not the mind and will of Mr Ferdman. The judge's acceptance of this contention is expressed at p. 719D:

'In 1986 [DLH's] directors were all officers of SAFI, but they were merely nominee directors representing the interests of the Americans. Mr Ferdman was a non-executive director. His only executive responsibilities were to act as a fiduciary agent, represent the interests of the Americans, and ensure that the necessary corporate documentation

© 2021 Thomson Reuters.                                                                                    9

was in order. The witnesses agreed that, in the early days of DLH, Mr Ferdman played a bigger role than he did [later]; but I do not think that that was due to any change in his role. He was always responsible for the formal paper work, but not for the business. As the business expanded, so his relative importance diminished. Even in 1986, he played no part in business decisions. These were taken by Mr Stern in consultation with the Americans. In my judgment, Mr Ferdman's position as chairman and non-executive director of DLH was insufficient by itself to constitute his knowledge ipso facto the knowledge of DLH.

It has not been alleged, still less established, that the other two officers of SAFI, who with Mr Ferdman constituted the board of DLH in 1986, shared Mr Ferdman's knowledge of the source of the Canadians' money, but in my judgment it would make no difference if they did. Like Mr Ferdman, they were merely nominee directors with non-executive responsibility. They had no authority to take business decisions. In relation to its business affairs in 1986, neither Mr Ferdman alone nor the board as a whole can realistically be regarded as the directing mind and will of DLH.'

In disagreeing with the judge on this question, I start from the position that the transactions to be considered are those by which DLH received assets representing the moneys fraudulently misapplied. The responsibility for the management and control of those transactions is not to be determined by identifying those who were responsible for deciding that DLH would participate in the Nine Elms project and the nature and extent of that participation, far less by identifying those who were responsible for business decisions generally. Neither Mr Stern nor the Americans made any of the arrangements for the receipt or disbursement of the moneys by Grangewoods. Nor did they commit DLH to the obligations correlative to their receipt. None of them had the authority to do so. That was the responsibility of Mr Ferdman. The crucial considerations are that Mr Ferdman made all the arrangements for the receipt and disbursement of the £270,000 and the £1,030,000; that it was he who signed the letter of 20 March to Roth; that it was *152* he who, on 25 March, copied that letter to Mr D'Albis; that it was he who signed and despatched the letter of 7 April to Yulara; that it was he who, on 6 May, signed the agreement with Yulara; and that it was those steps that caused DLH to become involved in the project and enabled it later to acquire the assets representing the moneys fraudulently misapplied.

Each of the steps taken by Mr Ferdman was taken without the authority of a resolution of the board of DLH. That demonstrates that as between Mr Ferdman on the one hand and Mr Favre and Mr Jaton on the other it was Mr Ferdman who had the de facto management and control of the transactions. It may be that that state of affairs involved some breach of the directors' duties to DLH. But that would not enable DLH to say that Mr Favre and Mr Jaton were parties to its directing mind and will in any relevant respect. Mr Tager sought to show that they did perform duties as directors of DLH. No doubt they did. But there is no real evidence that they had any responsibility for the transactions in question. In my view the directing mind and will of DLH in relation to the relevant transactions between March and June 1986 were the mind and will of Mr Ferdman and none other. That means that DLH had the requisite knowledge at that time.

Next, I must consider whether the plaintiff's right to recover is affected by Mr Ferdman's having ceased to be a director of DLH in June 1987. This question is of significance only in relation to the £1,030,000. It has no bearing on the £270,000. At p. 721B, Millett J, having repeated his view that, in regard to the £1,030,000, the relevant transaction was the acquisition by DLH of Yulara's interest in the joint venture on 16 March 1988, continued:

'By then Mr Ferdman had ceased to be a director of DLH for nine months, and he had nothing at all to do with the transaction. Even if, contrary to my judgment, Mr Ferdman's knowledge should be attributed to DLH in 1986, it would be quite wrong to treat DLH as still possessing that knowledge in 1988. As Megarry V-C pointed out in *Re Montagu's Settlement Trust [1987] Ch 264* at p. 284, a natural person should not be said to have knowledge of a fact that he once knew if at the time in question he has genuinely forgotten all about it. In my judgment, where the knowledge of a director is attributed to a company, but is not actually imparted to it, the company should not be treated as continuing to possess that knowledge after the director in question has died or left its service. In such

© 2021 Thomson Reuters.                                                                10

circumstances, the company can properly be said to have "lost its memory".'

While I might agree with the judge that the knowledge of a director, who had known of a misapplication of trust moneys at the time of their misapplication but had genuinely forgotten all about it by the time that they were received by the company, could not be attributed to the company, I am unable to see how that can assist DLH here. The steps that caused DLH to become involved in the project and enabled it later to acquire the asset representing the £1,030,000 were all taken between March and June 1986. Moreover, although the judge held that the plaintiff was bound to treat the £1,030,000 as represented by Yulara's interest in the project, he found, at p. 709F, that that sum had been paid into Grangewoods' client account on 29 May 1986 and had thereafter been wholly disbursed as directed by DLH, £745,000 approximately in satisfaction of the purchase price. In the circumstances, DLH having had the requisite knowledge at the time that it became involved in the project and when the £1,030,000 was disbursed as it directed, it would in my view be unrealistic to hold that it ceased to have that knowledge simply because the mind and will that had been the source of it played no part in the receipt of the asset itself. I am therefore of the opinion that DLH is on this ground liable to the plaintiff in constructive trust.

Agency

Although the views so far expressed are enough to dispose of the appeal in favour of the plaintiff, I turn briefly to the alternative question whether Mr Ferdman's knowledge *153 ought to be imputed to DLH, on the ground that he acted as DLH's agent in the transaction.

Millett J thought that it was not accurate to describe Mr Ferdman as having acted as the agent of DLH in obtaining money from the Canadians. I am not sure that I would agree with him on that question. The real question is whether Mr Ferdman acted as the agent of DLH in the transactions by which it received assets representing the moneys fraudulently misapplied. I find it unnecessary to answer either question. That is because I agree with the judge that, even if Mr Ferdman was DLH's agent, his knowledge could not, as a matter of law, be imputed to it.

It is established on the authorities that the knowledge of a person who acquires it as a director of one company will not be imputed to another company of which he is also a director, unless he owes, not only a duty to the second company to receive it, but also a duty to the first to communicate it: see *Re Hampshire Land Co [1896] 2 Ch 743* and *Re Fenwick, Stobart & Co Ltd [1902] 1 Ch 507* .

Mr Ferdman acquired his knowledge of the fraudulent misapplication as a director of SAFI. I do not doubt that he owed a duty to DLH to receive it. But I agree with the judge that he owed no duty to SAFI to communicate it. I also agree with him that the facts of this case are indistinguishable in any material respect from those in *Re David Payne & Co Ltd [1904] 2 Ch 608* .

Conclusion

I would allow the appeal. On that footing, it becomes necessary to consider the relief to which the plaintiff is entitled, a consideration so far made unnecessary by the judge's dismissal of the action. Although it would be possible for this court

© 2021 Thomson Reuters.

to deal with that question itself, I think it preferable to remit it for consideration by the judge.

Rose LJ:

I gratefully adopt the recital of facts in the judgment of Nourse LJ. For the reasons which he gives, I agree that the appellant's submissions with regard to the payment of the deposit and the balance of the money fail. The judge's conclusions, namely that the deposit was paid to Dollar Land Holdings London beneficially and that the balance was received by DLH on trust to invest on behalf of Yulara pursuant to a joint venture agreement, were, on the evidence before him, correct. Equally, the judge's finding, which DLH seek to challenge, that the money can be traced to the proceeds of fraud by the Canadians, is, in my view, unimpeachable.

The submissions with regard to the role of Ferdman and whether his knowledge of the fraudulent origin of the invested funds should be attributed to DLH raise considerations of more general importance. In English law the concept of a company's directing mind and will has its origins in the speech of Viscount Haldane LC in *Lennard's Carrying Co Ltd v Asiatic Petroleum Co Ltd [1915] AC 705* at p. 713. In *Tesco Supermarkets Ltd v Nattrass [1972] AC 153* , Lord Diplock at p. 200A identified those who are to be treated in law as being the company as:

'those natural persons who by the memorandum and articles of association or as a result of action taken by the directors, or by the company in general meeting pursuant to the articles, are entrusted with the exercise of the powers of the company.'

Lord Reid at p. 171F said:

'Normally the board of directors, the managing director and perhaps other superior officers of a company carry out the functions of management and speak and act as the company … But the board of directors may delegate some part of their functions of management giving to their delegate full discretion to act independently of instructions from them.'

*154* At p. 190G Lord Pearson said:

'There are some officers of a company who may for some purposes be identified with it, as being or having its directing mind and will, its centre and ego, and its brains … The reference in section 20 of the Trades Descriptions Act 1968 to "any director, manager, secretary or other similar officer of the body corporate" affords a useful indication of the grades of officers who may for some purposes be identifiable with the company …'

There are, it seems to me, two points implicit, if not explicit, in each of these passages. First, the directors of a company are, prima facie, likely to be regarded as its directing mind and will whereas particular circumstances may confer that status on non-directors. Secondly, a company's directing mind and will may be found in different persons for different activities of the company.

It follows that Millett J's unchallenged conclusion that Stern, although neither a director nor an employee, was the 'moving

force' behind the company's activities does not preclude a finding that Ferdman was the company's directing mind and will in relation to some activities.

In the present case, the company's activity to which Ferdman's knowledge was potentially pertinent was the receipt of over £1m for investment. Ferdman had been appointed by the Americans for two reasons in particular: first, as a Swiss resident operating the formal aspects of the company he was able to confer the tax advantages of non-resident status on DLH on the basis that its 'central management and control' was in Switzerland not England; and secondly because the Americans did not want Stern to be seen to have any official role in the company. Ferdman was a director and chairman of the board and his services were charged for at a higher rate than that for other directors. He instructed accountants and solicitors. He convened meetings. He claimed in the company's accounts to be its ultimate beneficiary. He was a necessary signatory of legal documents and signed the Yulara agreement without needing the authority of a board resolution to do so: by so doing he committed the company to that agreement.

Having regard to these matters, it seems to me to be plain that, for the limited purposes here relevant, i.e. the receipt of money and the execution of the Yulara agreement, he was the directing mind and will of the company. In consequence, his knowledge of the fraud was DLH's knowledge and, in this respect, I differ from Millett J. It is immaterial that by March 1988, when DLH acquired Yulara's interest, Ferdman had ceased to be a director. That cessation did not deprive DLH of its continuing knowledge in relation to the transaction, which embraced both the initial receipt of the money in May 1986 and the ultimate acquisition of Yulara's interest.

If the appellant does not succeed on this point, Mr Beloff's alternative submission based on agency is, in my view, doomed to fail. This court is, in my judgment, bound to hold, on the authority of *Re David Payne [1904] 2 Ch 608* that, qua agent, Ferdman was under no obligation to disclose his knowledge to DLH, there being no duty on DLH to enquire as to the source of the offered money. I agree with Hoffmann LJ's analysis of the three categories of agency cases to which he refers and with his conclusion that they have no application in the present circumstances. To the extent indicated I would allow this appeal.

Hoffmann LJ:

This is a claim to enforce a constructive trust on the basis of knowing receipt. For this purpose the plaintiff must show, first, a disposal of his assets in breach of fiduciary duty; secondly, the beneficial receipt by the defendant of assets which are traceable as representing the assets of the plaintiff; and thirdly, knowledge on the part of the defendant that the assets he received are traceable to a breach of fiduciary duty.

There is no dispute that the first requirement is satisfied. The Canadians bribed the plaintiff's fiduciary agent to give them over US $10m of his money in return for worthless *155* shares. The argument in this appeal has been over, first, which assets were received beneficially by DLH; secondly, whether they are traceable as representing the plaintiff's money; and thirdly, whether the admitted knowledge of the frauds on the part of Mr Ferdman, chairman of DLH, can be imputed to the company.

(1) Identifying the assets beneficially received

El-Ajou v Dollar Land Holdings Plc (No.1), [1994] B.C.C. 143 (1993)

The judge has found as a fact that certain assets received by DLH, namely the benefit of the deposit paid under the contract for the purchase of the Nine Elms site and Yulara's interest in the development, were traceable in equity as proceeds of fraud. Both sides have challenged certain aspects of this finding.

*(a) The deposit*

The plaintiff says that the asset received by DLH was not the benefit of the deposit but the money used to pay it. This had been sent on 25 March 1986 to DLH's subsidiary DLH London, which entered into the contract to buy the site and afterwards assigned that contract (with the benefit of the deposit) to DLH. The plaintiff says that DLH London received the money as agent for DLH. The only evidence for this claim is that it was paid pursuant to an agreement between Roth and DLH. But that in my judgment is no reason why DLH London should not have received the money beneficially and this would be consistent with its having been the contracting party and subsequently assigning that contract for a substantial consideration to DLH.

*(b) The main investment*

The plaintiff says that the other asset received by DLH was not Yulara's interest in the project, which it acquired on 16 March 1988, but the £1,030,000 invested by Yulara on 29 May 1986. In my judgment the judge was right in holding that money was not received by DLH beneficially but on trust to invest on behalf of Yulara. DLH and Yulara were joint venturers. Yulara was making an equity investment by which it acquired a proprietary interest in half the share of profits due to DLH under its arrangements with Regalian and the benefit of a guarantee by DLH that its capital would be repaid. DLH received no part of this investment beneficially until it bought out Yulara's interest.

(2) Tracing

DLH challenges the judge's finding that the money can be traced to the proceeds of fraud which the Canadians had remitted to Panama. In my view, this was a finding which the judge was entitled to make. Mr Tager says that it might have been the proceeds of frauds on other people or even the money realised by the Canadians when they sold the business. It might have been, but as against the plaintiff I do not think that the Canadians would have been entitled to say so. Nor is DLH. The mixed fund was impressed with an equitable charge in favour of the plaintiff which was enforceable against the Canadians and persons claiming under them.

(3) Knowledge

The judge correctly analysed the various capacities in which Mr Ferdman was involved in the transaction between DLH and the Canadians. First, he acted as a broker, introducing the Canadians to DLH in return for a five per cent commission. In this capacity he was not acting as agent for DLH but as an independent contractor performing a service for a fee. Secondly, he was authorised agent of DLH to sign the agreement with Yulara. Thirdly, he was at all material times a director and chairman of the board of DLH. There are two ways in which Mr Ferdman's knowledge can be attributed to DLH. The first is that as agent of DLH his knowledge can be imputed to *156* the company. The second is that for this purpose he *was* DLH and his knowledge was its knowledge. The judge rejected both.

*(a) The agency theory*

El-Ajou v Dollar Land Holdings Plc (No.1), [1994] B.C.C. 143 (1993)

The circumstances in which the knowledge of an agent is imputed to the principal can vary a great deal and care is needed in analysing the cases. They fall into a number of categories which are not always sufficiently clearly distinguished. I shall mention three such categories because they each include cases on which Mr Beloff placed undifferentiated reliance. In fact, however, they depend upon distinct principles which have no application in this case.

(i) Agent's knowledge affecting performance or terms of authorised contract

First, there are cases in which an agent is authorised to enter into a transaction in which his own knowledge is material. So for example, an insurance policy may be avoided on account of the broker's failure to disclose material facts within his knowledge, even though he did not obtain that knowledge in his capacity as agent for the insured. As Lord Macnaghten said in *Blackburn, Low & Co v Vigors (1887) 12 App Cas 531* at p. 542:

'But that is not because the knowledge of the agent is to be imputed to the principal but because the agent of the assured is bound as the principal is bound to communicate to the underwriters all material facts within his knowledge.'

In this category fall two of the cases upon which Mr Beloff QC relied, namely *Turton v London and North-Western Railway Co (1850) 15 LT(OS) 92* and *Dresser v Norwood (1864) 17 CB(NS) 466* . In the former case the agent was authorised to conclude a contract of carriage on behalf of the principal. The agent's knowledge of the carrier's standard terms of business was held sufficient to enable those terms to be treated as included in the contract. The agent, said Pollock CB, 'made the same contract in this case as if he had made it for himself'. In the latter case, the agent was authorised to enter into a contract for the purchase of wood. His knowledge that the vendor was a factor dealing for a principal was held sufficient to enable the contract to be treated as made with the principal and so preclude the purchaser from relying on a set-off against the factor. Neither are cases of imputation of knowledge. Rather, the agent's knowledge affects the terms or performance of the contract which he concludes on behalf of his principal.

These principles have no application in this case. We are not concerned with the contractual terms upon which DLH received the traceable assets but whether it had the knowledge which would impose a constructive trust. In other words, real imputation of knowledge is required.

(ii) Principal's duty to investigate or make disclosure

Secondly, there are cases in which the principal has a duty to investigate or to make disclosure. The duty to investigate may arise in many circumstances, ranging from an owner's duty to inquire about the vicious tendencies of his dog ( *Baldwin v Casella (1872) LR 7 Ex 325* ) to the duty of a purchaser of land to investigate the title. Or there may be something about a transaction by which the principal is 'put on inquiry'. If the principal employs an agent to discharge such a duty, the knowledge of the agent will be imputed to him. (There is an exception, the scope of which it is unnecessary to discuss, in cases in which the agent commits a fraud against the principal.) Likewise in cases in which the principal is under a duty to make disclosure (for example, to an insurer) he may have to disclose not only facts of which he knows but also material facts of which he could expect to have been told by his agents. So in *Gladstone v King (1813) 1 M & S 35; 105 ER 13* a marine insurance policy was avoided because the master of the ship knew that it had suffered damage, even though he had not in fact communicated this information to the owner. The case of *Regina Fur Co Ltd v Bossom [1957] 2 L1 Rep 466* upon which *157 Mr Beloff strongly relied, also concerned the duty to make disclosure under an insurance policy and therefore falls within the same category.

None of these cases are relevant because in receiving the traceable assets, DLH had no duty to investigate or make disclosure. There was nothing to put it on inquiry.

El-Ajou v Dollar Land Holdings Plc (No.1), [1994] B.C.C. 143 (1993)

(iii) Agent authorised to receive communications

Thirdly, there are cases in which the agent has actual or ostensible authority to receive communications, whether informative (such as the state of health of an insured: *Blackley v National Mutual Life Association [1972] NZLR 1038* ) or performative (such as a notice to quit: *Tanham v Nicholson (1872) LR 5 HL 561* ) on behalf of the principal. In such cases, communication to the agent is communication to the principal. These cases also have no application here. Mr Ferdman did not receive information about the frauds in his capacity as agent for DLH. He found it out while acting for the Canadians.

(iv) Agent's duty to principal irrelevant

What it therefore comes to is that Mr Ferdman, an agent of DLH, had private knowledge of facts into which DLH had no duty to inquire. Mr Beloff said that Mr Ferdman nevertheless owed DLH a duty to disclose those facts. He then submits that because he had such a duty, DLH must be treated as if he had discharged it.

I am inclined to agree that Mr Ferdman did owe a duty, both as broker employed by DLH to find an investor and as chairman of the board, to inform DLH that the Yulara money was the proceeds of fraud. I reject Mr Tager's submission, based on *Kelly v Cooper [1993] AC 205* , that no term can be implied in a contract with a Swiss fiduciary agent which requires him to disclose that the money for which he is being paid a five per cent procurement commission has been stolen. There is no evidence that Switzerland will enforce a confidence in iniquity any more than this country.

But Mr Beloff's submission that DLH must be treated as if the duty had been discharged raises an important point of principle. In my judgment the submission is wrong. The fact that an agent owed a duty to his principal to communicate information may permit a court to infer as a fact that he actually did so. But this is a rebuttable inference of fact and in the present case the judge found that Mr Ferdman did not disclose what he knew to anyone else acting on behalf of DLH. In some of the cases in the third of the categories I have mentioned, the fact that an agent with authority to receive a communication had a duty to pass the communication on to his principal is mentioned as a reason why the principal should be treated as having received it. I think, however, that the true basis of these cases is that communication to the agent is treated, by reason of his authority to receive it, as communication to the principal. I know of no authority for the proposition that in the absence of any duty on the part of the principal to investigate, information which was received by an agent otherwise than as agent can be imputed to the principal simply on the ground that the agent owed to his principal a duty to disclose it.

On the contrary, I agree with the judge that *David Payne & Co Ltd [1904] 2 Ch 608* at p. 611 is authority against such a proposition. In that case the Exploring Land and Minerals Co Ltd lent £6,000 to David Payne & Co Ltd for 30 days on the security of a debenture. One Kolckmann, a stockbroker who was concerned in an ambitious and somewhat dubious scheme of flotation involving David Payne & Co Ltd, was also a director of the Exploring Land Co. In his capacity as stockbroker he knew that the money would not be applied to any authorised purpose of the company but diverted to the use of its controlling shareholder. He actually signed the cheque by which the money was advanced. David Payne & Co Ltd went into liquidation and the liquidator challenged the validity of the debenture on the ground that Kolckmann's knowledge of the ultra *158* vires purposes for which the money would be used should be imputed to the Exploring Land Co.

Buckley J appears to have assumed that, as a director of the Exploring Land Co, Kolckmann owed a duty to disclose what he knew about the real purposes for which the money would be used. But he regarded this as insufficient to enable that knowledge to be imputed to the company. He said at p. 611 (emphasis added):

'I understand the law to be this: that if a communication be made to his agent *which it would be his duty to hand on to his principals* … and if the agent has an interest which would lead him not to disclose to his principals the information that he has thus obtained, and in point of fact he does not communicate it, you are not to impute to his principals knowledge by reason of the fact that their agent knew something which it was not in his interest to disclose

and which he did not disclose.'

It is true that in the Court of Appeal, both Vaughan-Williams LJ and Romer LJ said that Kolckmann owed no duty to impart his knowledge to the Exploring Land Co. Thus Romer LJ said at p. 619:

'I take it that in such a transaction the lending company was not bound to inquire as to the application of the money at all by the borrowing company. That being so, it appears to me that knowledge independently acquired by a director in his personal capacity in respect to a matter which was irrelevant so far as concerned the lending company is knowledge which cannot be imputed to the company, for it was knowledge of something which did not really concern the lending company as a matter of law. Therefore, you cannot imply a duty on the part of the director to have told these facts to the lending company, or a duty on the part of the lending company to have inquired into that question …'

It is however clear from the process of reasoning that what Romer LJ means is that in the absence of a duty to inquire, there was no duty of disclosure on the part of the director on which an outsider could rely for the purpose of imputing his knowledge to the company. I do not think that it would have affected his conclusion if the director had for some other reason (e.g. some internal company rule) owed a duty of disclosure with which he did not in fact comply. I agree with Buckley J that this would have been irrelevant. It follows that in my judgment Millett J was right to hold that Mr Ferdman's position as agent or broker does not enable his knowledge to be imputed to DLH.

*(b) The 'directing mind and will' theory*

The phrase 'directing mind and will' comes from a well-known passage in the judgment of Viscount Haldane LC in *Lennard's Carrying Co Ltd v Asiatic Petroleum Co Ltd [1915] AC 705* which distinguishes between someone who is 'merely a servant or agent' and someone whose action (or knowledge) is that of the company itself. Despite their familiarity, it is worth quoting the terms in which Viscount Haldane said that the directing mind could be identified (at p. 713):

'That person may be under the direction of the shareholders in general meeting; that person may be the board of directors itself, or it may be, and in some companies it is so, that that person has an authority co-ordinate with the board of directors given to him under the articles of association, and is appointed by the general meeting of the company, and can only be removed by the general meeting of the company. My Lords, whatever is not known about Mr Lennard's position, this is known for certain, Mr Lennard took the active part in the management of this ship on behalf of the owners, and Mr Lennard, as I have said, was registered as the person designated for this purpose in the ship's register.'

*161*

Viscount Haldane therefore regarded the identification of the directing mind as primarily a constitutional question, depending in the first instance upon the powers entrusted to a person by the articles of association. The last sentence about Mr Lennard's position shows that the position as reflected in the articles may have to be supplemented by looking at the actual exercise of the company's powers. A person held out by the company as having plenary authority or in whose exercise of such authority the company acquiesces, may be treated as its directing mind.

It is well known that Viscount Haldane derived the concept of the 'directing mind' from German law (see Gower's Principles of Modern Company Law (5th edn, 1992) p. 194, note 36) which distinguishes between the agents and organs of

El-Ajou v Dollar Land Holdings Plc (No.1), [1994] B.C.C. 143 (1993)

the company. A German company with limited liability (GmbH) is required by law to appoint one or more directors ( *Geschäftsführer* ). They are the company's organs and for legal purposes represent the company. The knowledge of any one director, however obtained, is the knowledge of the company (Scholz, Commentary on the GmbH Law (7th edn, 1986), section 35 ). English law has never taken the view that the knowledge of a director ipso facto imputed to the company: *Powles v Page (1846) 3 CB 16; 136 ER 7* ; *Re Carew's Estate Act (No. 2) (1862) 31 Beav 39; 54 ER 1051* . Unlike the German *Geschäftsführer* , an English director may as an individual have no powers whatever. But English law shares the view of German law that whether a person is an organ or not depends upon the extent of the powers which in law he has express or implied authority to exercise on behalf of the company.

Millett J did not accept that Mr Ferdman was the directing mind and will of DLH because he exercised no independent judgment. As a fiduciary he acted entirely upon the directions of the American beneficial owners and their consultant Mr Stern. All that he did was to sign the necessary documents and ensure that the company's paper work was in order. This involved seeing that decisions which had really been taken by the Americans and Mr Stern were duly minuted as decisions of the board made in Switzerland.

But neither the Americans nor Mr Stern held any position under the constitution of the company. Nor were they held out as doing so. They signed no documents on behalf of the company and carried on no business in its name. As a holding company, DLH had no independent business of its own. It entered into various transactions and on those occasions the persons who acted on its behalf were the board or one or more of the directors.

It seems to me that if the criterion is whether the candidate for being the 'directing mind and will' was exercising independent judgment, as opposed to acting upon off-stage instructions, not even the board of directors acting collectively would in this case have qualified. It also did what it was told. But Mr Tager was inclined to concede that the board, acting as a board, could properly be regarded as the directing mind and will. It was certainly held out in certain quarters as such. DLH claimed non-resident status from the Inland Revenue on the ground that its 'central management and control' was situated in Switzerland.

The authorities show clearly that different persons may for different purposes satisfy the requirements of being the company's directing mind and will. Therefore the question in my judgment is whether in relation to the Yulara transaction, Mr Ferdman as an individual exercised powers on behalf of the company which so identified him. It seems to me that Mr Ferdman was clearly regarded as being in a different position from the other directors. They were associates of his who came and went. SAFI charged for their services at a substantially lower rate. It was Mr Ferdman who claimed in the published accounts of DLH to be its ultimate beneficial owner. In my view, however, the most significant fact is that Mr Ferdman signed the agreement with Yulara on behalf of DLH.

*160

There was no board resolution authorising him to do so. Of course we know that in fact he signed at the request of Mr Stern, whom he knew to be clothed with authority from the Americans. But so far as the constitution of DLH was concerned, he committed the company to the transaction as an autonomous act which the company adopted by performing the agreement. I would therefore hold, respectfully differing from the judge, that this was sufficient to justify Mr Ferdman being treated, in relation to the Yulara transaction, as the company's directing mind and will. Nor do I think it matters that by the time DLH acquired Yulara's interest in the Nine Elms project on 16 March 1988, Mr Ferdman had ceased to be a director. Once his knowledge is treated as being the knowledge of the company in relation to a given transaction, I think that the company continues to be affected with that knowledge for any subsequent stages of the same transaction. So, for example, if (contrary to the judge's finding) the £1,030,000 sent by Yulara on 29 May 1986 had been received beneficially by DLH as a loan, but Mr Ferdman had resigned or died a week earlier, I do not think that the DLH could have said that it received the money without imputed knowledge of the fraud. And in my judgment the subsequent acquisition of Yulara's interest was sufficiently connected with the original investment to be affected by the same knowledge.

I would therefore allow the appeal. I do not regard this as an unsatisfactory outcome. If the persons beneficially interested

© 2021 Thomson Reuters.

**El-Ajou v Dollar Land Holdings Plc (No.1), [1994] B.C.C. 143 (1993)**

in a company prefer for tax or other reasons to allow that company to be for all legal purposes run by off-shore fiduciaries, they must accept that it may incur liabilities by reason of the acts or knowledge of those fiduciaries.

*(Order accordingly)* ***\*161***

# Fairfield Sentry Ltd. (In Liquidation ) v. Migani
# [2014] UKPC 9



[2014] UKPC 9
**Privy Council Appeal No 0061 of 2012
and Nos 0058, 0059, 0060 and 0061 of 2013**

# JUDGMENT

## Fairfield Sentry Limited (in Liquidation) (Appellant) v Migani and others (Respondents)

## Lombard, Odier & Cie and others (Appellants) *v* Fairfield Sentry Limited (in Liquidation) (Respondent)

## Credit Suisse London Nominees Limited and another (Appellants) v Fairfield Sentry Limited (in Liquidation) (Respondent)

## Quilvest Finance Limited and others (Appellants) v Fairfield Sentry Limited (in Liquidation) (Respondent)

## UBS AG New York and others (Appellants) v Fairfield Sentry Limited (in Liquidation) (Respondent)

### From the Court of Appeal of the British Virgin Islands

**before**

**Lord Neuberger**
**Lord Mance**
**Lord Clarke**
**Lord Sumption**
**Lord Toulson**


## JUDGMENT DELIVERED BY

## Lord Sumption

## ON

## 16 April 2014

**Heard on 18 and 19 March 2014**

*Lombard, Odier & Cie
and others*
David Lord QC
Robert Christie

(Instructed by Blake
Lapthorn)


*Credit Suisse London
Nominees Ltd and another*
Laurence Rabinowitz QC
Arabella di Iorio
Maximilian Schlote
(Instructed by Herbert
Smith Freehills LLP)


*UBS AG New York and
others*
Lord Falconer QC
Paul Webster QC
(Instructed by Gibson
Dunn & Crutcher LLP)


*Quilvest Finance Ltd and
others*
Mark Hapgood QC
Phillip Kite
Alan Roxburgh
(Instructed by Latham &
Watkins)

*Fairfield Sentry Ltd (in
Liquidation)*
Jonathan Crow QC
Andrew Westwood
Stephen Midwinter
(Instructed by Macfarlanes
LLP)

**LORD SUMPTION:**

*Introduction*

1.     Bernard L. Madoff and his company Bernard L. Madoff Investment Securities LLC ('BLMIS') ostensibly operated as fund managers, principally from New York. Over a period of at least seventeen years he operated what seems likely to be the largest Ponzi scheme in history, accepting sums variously estimated between US$17 billion and US$50 billion for investment. It appears that from at least the early 1990s there had been no trades and no investments. Returns to investors were fictitious and the corresponding documentation fabricated. As with any Ponzi scheme, net withdrawals from funds under management were paid from new money placed with BLMIS for investment. In December 2008 Madoff was arrested, and in March 2009 he pleaded guilty in a New York court to a number of counts of fraud. He was later sentenced to 150 years imprisonment.

2.     Fairfield Sentry Ltd is a company incorporated in the British Virgin Islands as a mutual fund. I shall, like most of the formal documentation, call it "the Fund". From 1997 to 2008, it was the largest of a number of feeder funds which placed money with BLMIS for investment. Over that period, about 95% of its assets, amounting to some US$7.2 billion was placed with BLMIS. Investors participated indirectly in these placements by subscribing for shares in the Fund at a price dependent on the Fund's net asset value per share ('NAV'), and were entitled to withdraw funds by redeeming their shares under the provisions of the Fund's Articles of Association. The net addition to or reduction of its funds arising from subscriptions or withdrawals over any month was reflected in corresponding additions or reductions of funds placed with BLMIS. The shares were also transferrable, subject to certain restrictions in the Articles, but we were told that there was no secondary market in them. On 18 December 2008, shortly after Madoff's frauds came to light, the Directors of the Fund suspended the determination of the Fund's NAV per share, thus effectively terminating the redemption of shares. On 21 July 2009, the High Court of the British Virgin Islands ordered the Fund to be wound up.

3.     It is inherent in a Ponzi scheme that those who withdraw their funds before the scheme collapses escape without loss, and quite possibly with substantial fictitious profits. The loss falls entirely on those investors whose funds are still invested when the money runs out and the scheme fails. Members of the Fund who redeemed their shares before 18 December 2008 recovered the NAV which the Directors determined to be attributable to their shares on the basis of fictitious reports from BLMIS. The loss will in principle be borne entirely by those who were still Members of the Fund at that date.

4.    These proceedings are brought by the Fund at the instance of its liquidators against a number of financial institutions who were Members of the Fund but redeemed some or all of their shares before December 2008. Their purpose is to recover from the Defendants the amounts paid out to them on redemption, on the footing that they were paid out in the mistaken belief that the assets were as stated by BLMIS, when there were in fact no such assets. Any recoveries made on this basis can then be distributed rateably between all Members, irrespective of when or whether they redeemed.

5.    Similar proceedings have been brought by the Fund in other jurisdictions against other Members and former Members to recover redemption payments. They include more than 300 actions in the United States, in which the Fund is claiming more than US$6 billion. The United States actions have been stayed pending the outcome of these proceedings.

6.    On 20 April 2011, Bannister J in the Commercial Division of the High Court of the British Virgin Islands ordered four preliminary issues to be tried. The first three issues have together been called the "Article 11" question.  These issues were all concerned with the question whether certain transaction documents issued to Members of the Fund recording the NAV per share or the redemption price upon redemption were binding on the Fund under Article 11 of its Articles, which deals with the effect of certain "certificates". It is now accepted, and rightly accepted, by the Fund that if they were binding the present claims must fail. The fourth issue was whether the Defendants have a defence on the ground that by their surrendering their shares they gave good consideration for the money that they received on redemption. This has been called the "Good Consideration" question. The two questions were argued separately below and before us. But for reasons which will be explained, they are closely related and have to be considered together.

7.    Bannister J decided the Article 11 question in favour of the Fund. He held that the documents relied upon by the Defendants as binding were not "certificates" for the purpose of Article 11. But he held in favour of the Defendants on the Good Consideration question, and on that basis summarily dismissed the action. He was affirmed on both points by the Eastern Caribbean Court of Appeal.

*The contractual documentation*

8.    Subscribers for shares in the Fund complete a Subscription Agreement, by which they subscribe for shares to be offered by the Fund at the NAV per share as the opening of business on the effective date of purchase "pursuant to the terms herein, the Memorandum, and the Fund's Memorandum of Association and Articles of Association (collectively 'the Fund Documents')": see clause 1.

9.      Of these three documents, the "Memorandum" means the Private Placement Memorandum by which the Fund offers a stated number of shares. Its main function is to convey information about how the Fund is managed and how its assets are invested, and to define certain expressions used in the Subscription Agreement. It describes the investment strategy of the Fund, and explains that it is implemented by BLMIS. A section headed "Transfers, Redemptions and Termination" describes the procedure for redemption.

10.     The Subscription Agreement binds the subscriber to his subscription and to the terms of the Fund Documents, but is otherwise concerned entirely with acknowledgements, representations and warranties as to his understanding of the investment and of associated procedures and risks, mostly for regulatory purposes. For present purposes, what matters is not the subscriber's acknowledgements, representations and warranties, nor the factual statements of the Fund, but the terms of the subscriber's membership of the Fund, which govern the redemption of its shares. These terms are to be found in the Articles of Association of the Fund. The relevant provisions are Articles 9, 10 and 11 and the associated definitions in Article 1. These operate by reference to the "Valuation Day" and the "Dealing Day". A Valuation Day is the last business day of any month (or such other date as the Directors may determine); and with respect to redemptions a Dealing Day is a Valuation Day.

11.     Article 9 deals with the issue and allotment of shares. Article 9(1) provides for shares to be issued to those applying for them on the Dealing Day following the application. Article 9(1)(b) provides:

> "The issue of Shares pursuant to this Article shall be effected at not less than the Subscription Price determined in accordance with paragraph (2) of this Article but in no event shall a Share be allotted or issued at a price less than its par value."

Article 9(2) provides that the Subscription Price per share is to be the

> "Net Asset Value of each Share (as determined in accordance with Article 11) as at the close of business in Amsterdam, The Netherlands, on the Valuation Day immediately preceding the Dealing Day on which such issue is made."

12.     Article 10 deals with redemptions. It is in some respects the mirror image of Article 9. Article 10(1) provides that

"Subject to the provisions of the Memorandum, these Articles and
the Act and subject as hereinafter provided, the Company shall on
receipt by it or its authorised agent of a request in writing (or in
such other form as the Directors may determine) by a Member
('the Applicant') specifying the number and class of Shares to be
redeemed redeem or purchase all or any portion of the Shares
registered in the Applicant's name, PROVIDED THAT:

(a) subject as hereinafter provided, the redemption or purchase of
Shares pursuant to this Article shall be made on the Dealing Day
on which, or immediately following the day on which, the written
request is received provided that the said request is received on or
before the Dealing Time."

Article 10(1)(b) provides (so far as relevant) that

"the redemption or purchase of Shares pursuant to this article shall
be effected at the Redemption Price determined in accordance with
paragraph (2) of this article."

Article 10(1)(c) provides for the Redemption Price to be paid "as soon as practicable
after the Dealing Day", being normally 30 days after the Dealing Day, subject to
extension in certain special cases. Article 10(2) deals with the Redemption Price. It
provides:

"(2)    The Redemption Price for each Share shall be the Net Asset
Value per Share (as determined in accordance with Article 11) as
at the close of business in Amsterdam, The Netherlands on the
Dealing Day on which such redemption is effected less such sum
(if any) as the Directors may consider represents the appropriate
provision for fiscal and sale charges which would be incurred on
the sale of assets of the Company, in each case rounded to the
nearest minimum integral unit of the Base Currency."

13.    Article 11 deals with the determination of the NAV per share for the purpose of
both subscriptions and redemptions. Article 11(1) provides:

"[a] The Net Asset Value per Share of each class shall be
determined by the Directors as at the close of business on each
Valuation Day (except when determination of the Net Asset Value
per Share has been suspended under the provisions of paragraph

(4) of this Article), on such other occasions as may be required by these Articles and on such other occasions as the Directors may from time to time determine.

[b] The Net Asset Value per Share shall be calculated at the time of each determination by dividing the value of the net assets of the Fund by the number of Shares then in issue or deemed to be in issue and by adjusting for each class of Shares such resultant number to take into account any dividends, distributions, assets or liabilities attributable to such class of Shares pursuant to paragraph (2) of Article 4, all determined and calculated as hereinafter provided.

[c] Any certificate as to the Net Asset Value per Share or as to the Subscription Price or Redemption Price therefor given in good faith by or on behalf of the Directors shall be binding on all parties."

The sub-paragraph numbers [a], [b] and [c] have been added for ease of reference. Article 11(2) identifies the assets and liabilities to be included in the calculation of the NAV. In effect they are all the assets and liabilities of the Fund. Article 11(3) contains detailed supplementary provisions governing certain aspects of the valuation.

*Redemption procedure*

14.    Since 1999, the Fund's administrator has been Citco Fund Services (Europe) BV, a leading professional administrator of mutual funds based in the Netherlands. The Private Placement Memorandum records that under an administration agreement dated 20 February 2003, the Fund has appointed Citco as the administrator of the Fund under the overall direction of the Directors. Citco is described as having responsibility for day-to-day administrative services including "calculation of Net Asset Value" and "communications with shareholders".

15.    This summary description is borne out by the terms of the agreement of 20 February 2003. Clause 2.1 of the agreement provides for the Administrator (Citco) to provide "the Services", which are defined in Schedule 2 as including the "calculation of the Net Asset Value and the Net Asset Value per Share on a monthly basis in accordance with the Fund Documents", and "publishing the Net Asset Value per Share (of each class if appropriate) as requested by the Fund." Clause 3.4 provides that "the Administrator shall on behalf of the Fund redeem Shares in accordance with the provisions and procedures set out in the applicable Fund Documents", on receipt of the

Member's written request to redeem and the provision of sufficient moneys to satisfy the Redemption Price.

16.    The management of a mutual fund is bound to involve the communication to Members of a substantial volume of routine documentation, including transactional documentation generated upon redemption. It is common ground that in the Fund's case, this included the following documents:

i)    Citco calculated an estimated NAV weekly and a final NAV on each Valuation Day, i.e. on the last business day of each month. All of these figures were posted by Citco on a password-protected website which it maintained and which was accessible to Members.

ii)    The final NAV per share for the last business day of each month was communicated in about the middle of the following month by the Fairfield Group client desk at Citco by e-mail to all Members. The operative part of the representative e-mail before us reads:

"Please be advised that the final net asset value per share of Fairfield Sentry Limited, Class A, is USD 957.8430 as at December 2003.

Should you have any questions or require further information, please do not hesitate to contact us."

iii)    Upon each redemption, the redeeming Member received from Citco in about the middle of the month following the relevant Valuation Day a contract note recording the transaction. The operative part began:

"In accordance with your instructions, we confirm having REDEEMED the following voting shares from FAIRFIELD SENTRY LIMITED."

There followed the relevant Valuation Day, the number of shares redeemed, the Redemption price per share and the total net redemption proceeds.

iv)    Each Member received from Citco in about the middle of each month a monthly statement of his account. This recorded, among other things, the

opening and closing NAV per share for the previous calendar month, and a summary of activity (if any) over the previous calendar month recording subscriptions and redemptions in the month and the NAV per share corresponding to each one.

Each of these documents is said by the Defendants to be a "certificate" for the purpose of Article 11(1) [c] of the Fund's Articles.

*Restitution*

17.    The availability of a claim for restitution arising out of a transaction governed by the Articles of the Fund is governed by the same law which governs the Articles themselves, namely the law of the British Virgin Islands. In every relevant respect, the principles of the law of the British Virgin Islands governing the construction of the Articles and any associated common law right to restitution are the same as those of English law.

18.    The basic principle is not in dispute. The payee of money "cannot be said to have been unjustly enriched if he was entitled to receive the sum paid to him": *Kleinwort Benson Ltd v Lincoln City Council* [1999] 2 AC 349 at 408B (Lord Hope). Or, as Professor Burrows has put it in his *Restatement of the English Law of Unjust Enrichment* (2012) at §3(6), "in general, an enrichment is not unjust if the benefit was owed to the defendant by the claimant under a valid contractual, statutory or other legal obligation." Therefore, to the extent that a payment made under a mistake discharges a contractual debt of the payee, it cannot be recovered, unless (which is not suggested) the mistake is such as to avoid the contract: *Barclays Bank Ltd v W.J. Simms Son & Cooke (Southern) Ltd* [1980] QB 677, 695. So far as the payment exceeds the debt properly due, then the payer is in principle entitled to recover the excess.

19.    It follows that the Fund's claim to recover the redemption payments depends on whether it was bound by the redemption terms to make the payments which it did make. That in turn depends on whether the effect of those terms is that the Fund was obliged upon a redemption to pay (i) the true NAV per share, ascertained in the light of information which subsequently became available about Madoff's frauds, or (ii) the NAV per share which was determined by the Directors at the time of redemption. If (ii) is correct then, the shares having been surrendered in exchange for the amount properly due under the Articles, the redemption payments are irrecoverable.

*What was the Fund obliged to pay upon redemption*

20.    Mr Crow QC, who appeared for the Fund, invited us to stop at the general principle, and not to answer this question. He submitted that the effect of the contractual

provisions governing redemption was not covered by the preliminary issues and ought
to be referred back to the High Court. He also suggested that at a further hearing in the
High Court, New York law, which is the proper law of the Subscription Agreement,
might be relevant. The Board unhesitatingly rejects these submissions. Neither the
Article 11 question nor the Good Consideration question, as formulated in the
preliminary issues, can be resolved without deciding what is the effect of the Articles.
Both courts below proceeded on that basis. The effect of the Articles is therefore
properly before the Board. The Board notes that neither the Fund nor the Defendants
have pleaded New York law. Nor can the Board discern any basis on which New York
law could be relevant, since none of the questions raised by the preliminary issues
depends on the terms of the Subscription Agreement. They depend wholly on the
construction of the Articles, which is governed by the law of the British Virgin Islands.


21.    The starting point is the scheme of the Articles. Articles 9 and 10 determine the
status of investors as Members of the Fund, a question which ought in principle to be
capable of definitive resolution at any moment in the Fund's history. Both the
Subscription Price under Article 9 and the Redemption Price under Article 10 depend
on the NAV per share determined under Article 11. Article 9(1)(a) provides that the
issue of shares "shall be made on the Dealing Day". Article 9(1)(b) provides for the
Subscription Price to be determined in accordance with Article 9(2), which means that
it is to be the NAV per share "determined in accordance with Article 11". Article 9(1)(c)
provides for the Subscription Price to be payable at a time fixed by the Directors, failing
which any allotment for which payment is due may be cancelled. There are
corresponding provisions of Article 10 concerning redemptions. Article 10(1)(a)
provides that the redemption of shares "shall be made on the Dealing Day". Article
10(1)(b) provides that the redemption is to be effected at the Redemption Price
determined in accordance with Article 10(2), which means the "Redemption Price for
each Share shall be the Net Asset Value per Share (as determined in accordance with
Article 11)" on the Dealing Day. Under Article 10(1)(c), that price must be paid as soon
as practicable after the Dealing Day, being normally thirty days thereafter subject to
specified and limited extensions. These provisions determine the amount due and the
time of payment. Moreover, once the NAV per share for a given monthly Valuation
Day is ascertained, subscriptions and redemptions effected at the corresponding
Subscription and Redemption Price will affect the determination of NAV per share on
the following monthly Valuation Day. This is because the receipt of subscription
moneys and the payment out of redemption moneys will affect the amount of the Fund's
assets for the purpose of Article 11(2). It will be apparent from this summary that the
whole of this scheme depends upon the price being definitively ascertained by the
Dealing Day and known to the parties shortly thereafter. It is unworkable on any other
basis.


22.    The Fund's case is that when Article 10(2) defines the Redemption Price as the
NAV per share "determined in accordance with Article 11", it means the NAV correctly
determined by dividing the NAV of the Fund by the number of shares in issue in
accordance with Articles 11(1)[b], 11(2) and 11(3). If this is right, the same must be

true of Article 9(1)(c), which fixes the Subscription Price by reference to the same provisions of Article 11. The Directors' determination of the NAV per share as at the Valuation Day, under Article 11, was not definitive according to this analysis unless a certificate was issued pursuant to Article 11(1)[c], and that would happen only if the Directors chose to issue one.

23.    In the Board's opinion, this is an impossible construction. If it were correct, an essential term of both the subscription for shares and their redemption, namely the price, would not be definitively ascertained at the time when the transaction took effect, nor at the time when the price fell to be paid. Indeed, it would not be definitively ascertained for an indefinite period after the transaction had ostensibly been completed, because unless a certificate was issued it would always be possible to vary the determination of the NAV per share made by the Directors at the time and substitute a different one based on information acquired long afterwards about the existence or value of the assets. This would not only expose Members who had redeemed their shares to an open-ended liability to repay part of the price received if it subsequently appeared that the assets were worth less than was thought at the time. It would confer on them an open-ended right to recover more (at the expense of other Members) if it later appeared that they were worth more. Corresponding problems would arise out of the retrospective variation of the Subscription Price long after the shares had been allotted.  Indeed, it is difficult to see how the Directors could perform their duty under Article 9(1)(b) not to allot or issue a share at less than the Subscription Price if the latter might depend on information coming to light after the allotment had been made.

24.    If, as the Articles clearly envisage, the Subscription Price and the Redemption Price are to be definitively ascertained at the time of the subscription or redemption, then the NAV per share on which those prices are based must be the one determined by the Directors at the time, whether or not the determination was correctly carried out in accordance with Articles 11(2) and (3). That means either (i) that the Directors' determination at the time must be treated as conclusive whether or not there is a certificate under Article 11(1)[c]; or else (ii) that  Article 11(1)[c] must be read as referring to the ordinary transaction documents recording the NAV per share or the Subscription or Redemption Price which will necessarily be generated and communicated to the Member at the time, and not to some special document issued at the discretion of the Directors. The Board considers, for the reasons given below, that in a case where a provision for certification such as Article 11(1)[c] has been included as part of the mechanics of subscription and redemption, the correct approach is the second one.

*Certification*

25.    The Board has been referred to a number of authorities dealing with certification clauses, none of them analogous to Article 11(1)[c]. Their effect, broadly summarised, is that the word "certificate" has no standard meaning and that the question what

constitutes a certificate is dependent on the commercial or legal context in which the
certification clause appears.

26.    The Board was invited by the Fund to read the opening words ("Any certificate")
as if they said "A certificate, if any". This, it was argued, showed that there would not
necessarily be one in every case. For that reason, and because there is nothing in the
language of the Articles which obliged the Fund to issue a certificate, it was submitted
that the issue of a certificate was wholly in the discretion of the Directors or their
delegates and that it could be withheld for any rational and honest reason. A variant of
this argument appears to have been accepted by the Court of Appeal. The Board,
however, is unable to accept it. In the first place, it places more weight on the word
"Any" than it will bear. It seems more likely that the word was used because the rest of
the clause refers to a number of different things that may be certified, namely the NAV
per share, the Subscription Price and the Redemption Price. Secondly, the problem
about the suggestion that certification is a discretionary matter for the Directors, is that
it is impossible to discern what purpose such a discretion could rationally be thought to
serve. The sole object of certification is to produce finality, and the scheme of the
Articles, as the Board has summarised it above, shows that finality is equally important
for all determinations of the NAV per share and all Subscription and Redemption Prices.
There is no rational ground for regarding finality as desirable in some cases but not in
others, according to the discretionary decision of the Directors or their delegates. Such
a discretion, if it existed, could only operate capriciously, and is therefore most unlikely
to have been intended by the draftsman.

27.    As a matter of language, a "certificate" ordinarily means (i) a statement in
writing, (ii) issued by an authoritative source, which (iii) is communicated by whatever
method to a recipient or class of recipients intended to rely on it, and (iv) conveys
information, (v) in a form or context which shows that it is intended to be definitive.
There is no reason to think that a document must satisfy any further formal
requirements, unless its purpose or legal context plainly requires them. There is nothing
in the context of these Articles which does.

28.    The relevant categories of document generated in the ordinary course of the
Fund's relations with Members are listed at paragraph 16. In the Board's opinion the
monthly e-mail, the contract notes and the monthly statement of account are all
"certificates". They communicate information in documentary form to Members. It
follows that the critical questions in the present case are whether transaction documents
in the three categories are (i) issued by an authoritative source and (ii) in a form or
context which shows that they are intended to be definitive.

29.    The authoritative character of their source can be shortly dealt with. Documents
in all three categories were issued by Citco under the authority of the Directors,
conferred by the Administration Agreement. The calculation of the monthly NAV per

share was among the functions of Citco included in Schedule 2, Part 1 of the Agreement. Its publication was a function of Citco under Schedule 2, Part 2(e). The communication to Members seeking to redeem their shares of the monthly NAV per share and the Redemption Price is necessarily implicit in clause 3.4 of the Agreement, which delegates to Citco the duty of redeeming shares in accordance with the "provisions and procedures" set out in the Fund Documents. These authorities are general, and not specific to any particular transaction or category of transactions. If the issue of a "certificate" were an exceptional or discretionary step, something more specific by way of authority might have been required. But for the reasons which the Board has already given, the certification procedure under Article 11(1)[c] is neither exceptional nor discretionary.

30.    Turning to the question whether they were intended to be definitive, the context in which they are issued plainly demonstrates that they were. As the Board has already observed, the nature of a redemption transaction and the procedures set out in Article 10 make it essential that the Redemption Price should be definitively ascertained at the time of the transaction and as at the Valuation Day. In that context, any unqualified documentary statement of the Redemption Price or the NAV per share on which it is based must be intended to be definitive. The Articles could not otherwise operate as they are intended to.

31.    This conclusion is borne out by the language of the documents. The emails formally "advising" the monthly NAV per share to Members describe it in terms as the "final" figure. The contract notes formally "confirm" the redemption and record its terms. The monthly Members' statement constitutes a formal record of each transaction during the month and the NAV per share at which it went through. All of this information was plainly intended to be relied upon by Members as a definitive record of the transaction and the values on which it was based.

32.    The Board prefers to express no opinion on the question whether the statements posted on the Citco website are also "certificates". A statement on a website may well have all the characteristics of a "certificate", but that may depend on a variety of considerations on which the Board has little or no evidence, including the permanence of any statement posted on it and what Members are told about the kind of information which they will find there.

*Conclusion*

The Board will humbly advise Her Majesty that the appeals against the decision of Bannister J and the Court of Appeal on Preliminary Issues 1, 2 and 3 should be allowed, save as to information posted on the Citco website, and that the appeal against their decision on Issue 4 should be dismissed. The parties are invited to agree an appropriate form of declaration on all four issues.

# Alderson v. Temple
## [1768] 4 Burrow 2235 (Ct. of King's Bench)

Alderson v Temple, 98 E.R. 165 (1768)

# *165 Alderson and Others, Assignees v Temple

 **Positive/Neutral Judicial Consideration**

**Court**
Court of King's Bench

**Judgment Date**
10 June 1768

**Report Citation**
(1768) 4 Burrow 2235
98 E.R. 165

1768

[2235]Trinity Term, 8 Geo. 3, B. R. 1768.

(S. C. 1 Bl. 660.) Friday, 10th June 1768. An insolvent cannot prefer a particular creditor.

[Referred to, *Marks* v. *Feldman* , 1870, L. R. 5 Q. B. 283; *Ex parte Craven* , 1870, L. R. 10 Eq. 655; L. R. 6 Ch. 70.]

This was an action of trover brought by the plaintiffs as assignees of Charles La Roche and Robert Willing, bankrupts, against the defendant.

The first count of the declaration sets forth, that the plaintiffs, as assignees, on 7th Nov. 1766, were possessed of a promissory note drawn by Bryer and Everard for £600 payable to La Roche and Willing or order, before they became bankrupts: which note was accidentally lost, and came to the hands of the defendant; and he converted it to his own use. The second count was for another note, made by one Rachael Phipps, to one Richard Blackburn for £439, and indorsed to the said bankrupts in like manner.

To which declaration, the defendant pleaded "not guilty:" and thereupon issue was joined.

The cause came on to be tried at Guildhall, at the sitting after last Hilary term, before Lord Mansfield; when the jury found for the plaintiffs upon the first count, subject to the opinion of the Court upon the following case; and for the defendant, upon the second count.

Alderson v Temple, 98 E.R. 165 (1768)

Case. The bankrupts La Roche and Willing, on Friday 7th Nov. 1776, indorsed the note in question to the defendant Temple, to whom they were indebted to a large amount; and sent it in a letter directed to him at Trowbridge; which letter was carried to the post-house that morning; the bankrupts thinking that the post-day for Trowbridge. The letter by the course of the post [2236] (which went out on the Saturday night) was received by the defendant some time on Monday the 10th; and could not be so before.

The note in question was—"London, 10th Octob. 1766. Two months after date, we promise to pay Messieurs La Roche and Willing, or order six hundred pounds, for value received. Bryer and Everard ."

The bankrupts had given Bryer and Everard two notes for £300 each; which had *166 not been discharged. La Roche and Willing committed acts of bankruptcy on Saturday the 8th. And the said note was so indorsed, and sent to the defendant in contemplation of their insolvency and subsequent failure.

The question for the opinion of the Court was—"whether the plaintiffs ought to recover." If not, they were to be nonsuited.

This case was argued by Mr. Chambers, for the plaintiffs; and Mr. Solicitor-General, for the defendant.

Two questions were raised upon it, first—"whether the bankrupt's property in the note was devested before the act of bankruptcy was committed by him:" second—"whether a trader can, in any case, give such a preference as this."

Mr. Chambers insisted that the property of the bankrupts in this note was not devested. He urged, that mutual consent is necessary to all contracts: whereas here was none on the part of the defendant. If this note had been lost, it would have been the risque of the owner: the defendant would not have borne the loss. He had not agreed to accept it: possibly, he might have declined doing so. And the bankrupts might have countermanded it. Their bankruptcy is a countermand and revocation. Vide Jenkins's 3d Century, case 9, p. 109. Digest. lib. 41, title 2, law 38 (master writing a letter to a slave; the property in him is not devested, till the letter is received).*Lane* v. *Cotton et Al'* , Carthew, 487. 2 Atkyns, 562. 1 Atkyns, 15. 1 Atkyns, 245, *Snee and Baxter, Assignees of Tollet* , against *Prescot and Others* ; and the case of *Hague and Others, Assignees of Ann and Isaac Scott* , against *Rolleston* , [1] H. 8 G. 3, in this Court.

He insisted, secondly, that it is not in the power of a bankrupt to make such a preference as this. Reason and equity require that all the creditors of a bankrupt should be put upon an equal foot: and this is the view, end, and [2237] intention of the bankrupt-laws; which are to be construed liberally for creditors.

Mr. Solicitor-General (Dunning) on the other side argued that the property was devested. That a disagreement shall not be presumed; but, on the contrary, an acceptance shall be intended, unless the contrary appears: the contract does not stand open till agreement; but is complete, unless there be an actual disagreement. This letter could not have been recalled, after it was once put into the post-office. A delivery to one, to the use of another, upon a precedent consideration, is not countermandable; but vests the absolute property in that other person, before his agreement to it. In proof of all which, he cited the case of *Atkin* v. *Barwick* , in Sir John Strange's 1st volume, page 165, and he also mentioned the case of *Peter Barris* v. *Peter de Bervoir* , in Cro. Jac. 687.

© 2021 Thomson Reuters.

Alderson v Temple, 98 E.R. 165 (1768)

As to the preference of the defendant to the other creditors, he said it was very just and reasonable to give it in the present case: and there is no authority to prove that such a power may not be exercised by a bankrupt, where it is just and reasonable. [2]

He rehearsed the case of *Small and Oudley* ; and cited *Wilson* v. *Day* , as a proof that an assignment of part of the effects is good, if possession is delivered.

But the Court were of opinion for the plaintiffs, the assignees of the bankrupts. They held this indorsing and sending the note, under the circumstances stated, to be fraudulent upon all the other creditors, and particularly Messieurs Bryer and Everard.

Rule—that the postea be delivered to the plaintiffs.

I was not present when the Court pronounced this rule; being, at that time, confined with the gout. Therefore this is all that I can report, as from myself. But as I am informed that Lord Mansfield was very copious in delivering his opinion, and laid down several positions which well deserve to be kept in memory, I have, by the favour of a very eminent barrister and most excellent note-taker, procured the following account of what his Lordship said: which, being more accurately taken down than I should have been myself capable of taking it, had I been present, must therefore be more satisfactory to the reader, than any report of my own could have been.

[2238] Lord Mansfield.—This is an action of trover, brought by the assignees of *167* Laroche and Winning, for a note of 600*l*.; and there is a verdict for the plaintiff, upon the following case—

The bankrupts, upon the 7th of November 1766, indorsed the note in question; which is in the words following; "London, 10th Octob. 1766, 600*l*. Two months after date we promise to pay to Messieurs Laroche and Winning or order, 600l. value received;" and is signed by Bryer and Everard. The note is indorsed by the bankrupts to the defendant, to whom they were indebted, to a larger amount; and was sent to him in a letter directed to Trowbridge, which was carried to the post that morning, and was received on the 10th, and could not be received before.

The bankrupts had given Bryer and Everard two notes for 300*l*. each; which had not been discharged.

Laroche and Winning committed several acts of bankruptcy on the 8th.

The note was so indorsed and sent to the defendant by the bankrupts, in contemplation of their insolvency and bankruptcy.

© 2021 Thomson Reuters.

Alderson v Temple, 98 E.R. 165 (1768)

Upon this case, the question is, "if the plaintiff ought to recover."

And it is material to observe a great deal that is not stated in it. First—there never was any course of dealing between the bankrupts and the defendant, by way of indorsing or sending notes to each other. The next thing is, that the letter in which the note was sent, is suppressed by the defendant. It is not found "that the note was indorsed in payment of any debt:" it is only said "he was a creditor to a larger amount." It is not said whether it was to be received at the risque of Temple; or only as agent of the bankrupts: but the letter, which was in the power of the defendant, was not produced; and so the case stands without any appropriation of the note. The case is silent in these particulars; and very materially so.

It is found "that Bryer and Everard were creditors of the bankrupts to just the same amount, for two other notes they had taken in exchange:" and "that those two notes were not discharged."

[2239] The only question I make is—"whether, under the circumstances of this case, the indorsing and sending this note to the defendant is fraudulent; and void, as such."

And I choose to put the case upon that ground; because the most desirable object in all judicial determinations, especially in mercantile ones, (which ought to be determined upon natural justice, and not upon the niceties of law,) is, to do substantial justice. And therefore I will avoid laying the stress that might properly be laid upon the assent being necessary to complete the contract, or the want of a delivery; the solid ground of which is, that a contract shall be presumed complete upon any distinction where the justice of the case requires it, though there is no actual delivery. And it is settled "that if a man sends bills of exchange, or consign a cargo; and the person to whom he sends them has paid the value before; though he did not know of the sending them at that time, the sending of them to the carrier will be sufficient to prevent the assignees from taking these goods back, in case of an intervening act of bankruptcy:" but if goods or bills of exchange are sent, and the consideration has not been received, the Court of Chancery always interposes; and there are numbers of adjudged cases of that kind, in Chancery. In the case in [3] Strange, there is no doubt but the honesty of the case inclined the Court to the judgment they gave: the reason given turns upon a subtilty. The Court of Chancery, in that case, would have interposed, and said "the assignees should not have the goods without paying the price." I think the determination was right; and there was an actual delivery to a person who became a trustee: but a post-boy is not a trustee. I think the case was well supported upon other grounds than those mentioned in the book.

I ground my opinion upon this, "whether the indorsement be fraudulent." And as to that, it is certain that the Statutes of Bankruptcy leave a trader, to the moment of an act of bankruptcy committed, every power an owner can have over his estate. The statute says [4] —"Fraudulent conveyances shall be an act of bankruptcy." Other acts that are fraudulent are not made acts of bankruptcy: but they are attended with the consequences of fraud, at law; which is, "that fraud renders every act void." *168*

All acts to defraud creditors or the public laws of the land are void; and if the nature of the act be a conveyance or grant, 'tis not only void, but an act of bankruptcy. It has been determined "that a conveyance by a trader, of all his effects, for the payment of one or more bonâ [2240] fide creditors of the most meritorious kind, though his effects do not amount to half what is due, is void; because it is not an act in the ordinary course of business; it is not such an act as a man could do, but it must be followed by an immediate act of bankruptcy, and it is defeating the equality that is introduced by the Statutes of Bankruptcy, and the criminal (for the bankrupt is considered as a criminal) is taking upon himself to prefer whom he pleases." But suppose he leaves out a considerable part of his effects: if it appears to be only colourable, that don't vary the case; it is fraudulent. Suppose a trader makes a conveyance of all his estate, for the payment of all his creditors except one,

Alderson v Temple, 98 E.R. 165 (1768)

(which was the case of [5]*Gayner* cited in *Dematto's case* ,) it is void. Suppose it was, "to pay all his creditors rateably:" if there were no assent of his creditors, or composition, it would be void: for, it would be rescinding the whole system of the bankrupt laws, and instead of applying to the Great Seal, he would choose his own trustees. If this is a fraudulent act, it is void.

A general question has been started, "whether in any case, upon the eve of a bankruptcy, a man may do that which in consequence prefers a particular creditor:" and that has been argued as a general question.

But that will depend upon the act. As, if a bankrupt, in course of payment pays a creditor; this is a fair advantage, in the course of trade: or, if a creditor threatens legal diligence, and there is no collusion; or begins to sue a debtor: and he makes an assignment of part of his goods; it is a fair transaction, and what a man might do without having any bankruptcy in view. Suppose such a case as [6]*Small and Oudley* : there it was for the advantage of the creditors, and no fraud to them; and if part of the transaction were set aside as fraudulent, the whole must. But it never entered into the mind of any Judge, to say "that a man, in contemplation of an act of bankruptcy, could sit down and dispose of all his effects to the use of different creditors:" for, that would be a fraud upon the acts of bankruptcy. But if done in a course of trade, and not fraudulent, it may be supported.

This was not done in a course of trade: for, there never was any dealing between the parties in sending indorsed notes. There was no application made by the defendant. And it was done with a view to positive iniquity: for, the bankrupts had received this note from Bryer and Everard, for notes of the same value; and knowing that they should become bankrupts the next day, to defeat Bryer and Everard of setting off their notes against it, indorse this note to another person. And [2241] there was no way of doing justice to Bryer and Everard, but supporting the claim now made by the assignees. So that there was express particular fraud, at the time the fact was done. Next, 'tis an act that is, most certainly, not complete, as between the parties. The argument of the case of [7]*Scott* is very applicable to the present. For, there was a preference given to a bonâ fide creditor: but he knew nothing of it. Suppose, in the course of trade, a bill is sent to Constantinople, and a bankruptcy happens in England before it arrives; yet it may be good. But here, it is done, because they were resolved to commit an act of bankruptcy.

The three other Judges agreed that an assent is necessary to complete every contract; that in the present case, the defendant has his election till the tenth of November; that the act of bankruptcy being committed on the eighth, the contract was incomplete; and that, upon the whole circumstances taken together, the transaction was fraudulent and void.

Per Cur' unanimously.—

Let the postea be delivered to the plaintiffs.

Burrow

### Footnotes

[1]                        Vide ante, p. 2174.

© 2021 Thomson Reuters.

**Alderson v Temple, 98 E.R. 165 (1768)**

2          Vide post, 14th June 1774,
           *Harman and Others* v. *Fisher* ;
           upon the preference given to
           Mr. Fisher by Fordyce.

3          *Atkyns* v. *Barwick* , v. 1, Sir J.
           Str. 165.

4          V. 1 Jac. 1, c. 15, § 2.

5          Vide ante, p. 477.

6          Vide ante, p. 480.

7          Vide ante, p. 2174.

# DOBBS' LAW OF REMEDIES

# LAW OF REMEDIES

## DAMAGES–EQUITY–RESTITUTION

## Second Edition

By
### **Dan B. Dobbs**

*Professor of Law*
*University of Arizona*

*This book is an abridgement of Dobbs' "Law of Remedies,*
*Second Edition, Volumes 1–3," Practitioner Treatise Series.*

### **HORNBOOK SERIES®**



### **WEST PUBLISHING CO.**
ST. PAUL, MINN., 1993

This is an abridgement of Dobbs' "Law of Remedies, Second Edition, Volumes 1–3", Practitioner Treatise Series, West Publishing Co., 1993.

*Hornbook Series, Westlaw,* the West Publishing Co. Logo and the key symbol appearing on the front cover are registered trademarks of West Publishing Co. Registered in U.S. Patent and Trademark Office.

COPYRIGHT © 1973 WEST PUBLISHING CO.
COPYRIGHT © 1993 By WEST PUBLISHING CO.
                    610 Opperman Drive
                    P.O. Box 64526
                    St. Paul, MN 55164–0526
                    1–800–328–9352
All rights reserved
Printed in the United States of America

**Library of Congress Cataloging-in-Publication Data**
Dobbs, Dan B.
    Law of remedies : damages, equity, restitution / by Dan B. Dobbs. —
2nd ed.
        p.    cm. — (Hornbook series)
    Rev. ed. of : Handbook on the law of remedies. 1973. Includes index.
    ISBN 0–314–01123–4

    1. Remedies (Law)—United States.  I. Dobbs, Dan B.    Handbook on
the law of remedies.  II. Title.  III. Series.
KF9010.D6  1993b
347.73'77—dc20
[347.30777]                                    93–10776
                                                CIP

ISBN 0–314–01123–4

Dobbs, Remedies, 2nd Ed. HB



PRINTED ON 10% POST
CONSUMER RECYCLED PAPER



security, and conceivably this is a constitutional requirement in some cases. Some of these constraints are discussed in connection with discussions of preliminary injunctions and TROs generally,[10] in connection with replevin and related remedies,[11] and in connection with the use of preliminary injunctions to freeze bank accounts or other funds.[12]

## § 1.4  Remedies and Enforcement Devices

The law of remedies is only indirectly concerned with devices for enforcement of judgments and decrees against defendants who do not voluntarily comply with the court's decisions. That indirect concern is sometimes important, however, because the plaintiff's choice of a remedy may govern the procedures for enforcement of the final judgment. So remedial strategy must always take enforcement into account and for this reason the major enforcement devices are outlined in this section.

### *Execution of Money Judgments "at Law"*

*Adjudication of liability, not a command to pay.* Ordinary money judgments reflect an adjudication of liability but they do not enter any command to the defendant. Money judgments rendered by the old separate law courts and most money judgments today are in a form which says that the plaintiff shall have and recover of the defendant the sum of $10. Since this was not a personal order, the defendant who does not pay is not jailed for contempt. Instead, enforcement is achieved indirectly by seizing the defendant's property. Enforcement is *in rem,* that is against things or property, not against persons. The process is referred to as execution.

*Traditional execution writs.* Execution was, in England, carried out by the use of several distinct execution writs with peculiar names like *fieri facias* and even more peculiar abbreviations like *fi. fa.* Such names can be found often in older American usage as well and are still used in some states. All the execution writs entailed seizure of property, either actually or symbolically. The writs commanded the sheriff to sell goods, or (at a later period of history) to sell land of the judgment debtor in order to provide money for the payment of the judgment.[1]

*Statutory base in modern law.* Execution to enforce judgments at law today is carried out largely under statutory provisions, but the main outlines remain the same. After the judgment is rendered for a certain sum of money,[2] an execution or execution writ is issued out of the clerk's office and

---

10. See §§ 2.11(2) & 2.11(3).

11. See § 5.17(2) below.

12. See § 6.5(1).

**§ 1.4**

1. The principle writs, each providing for execution on a different sort of interest of the debtor, were (1) fieri facias, calling upon the sheriff to sell the goods and chattels of the debtor; (2) levari facias, calling upon the sheriff to seize lands and goods for the purpose of getting rents and profits; (3) elegit, permitting seizure of goods for delivery to the creditor at appraised value, and then, if necessary, permitting installation of the creditor on one-half

of the debtor's land. See R. Millar, Civil Procedure of the Trial Court in Historical Perspective 422 ff. (1952). Provisions for personal arrest of the defendant in certain cases are largely obsolete.

2. The money judgment issued by the old separate law courts was for a sum certain, not installments. Execution issues only to enforce a judgment for a sum certain. See Roach v. Roach, 164 Ohio St. 587, 132 N.E.2d 742, 59 A.L.R.2d 685 (1956) (child support installments due but not reduced to lump sum judgment are not subject to execution). Courts today can draw on the powers of the old separate courts of equity to enforce install-

given to the sheriff, who is commanded by the writ to levy on the property of the debtor.[3] The sheriff usually does this by actually taking possession of the property or, at times, symbolically doing so.[4] He then publishes notice of the intended sale[5] of the property and a sale is held. This is usually regulated in some detail by statute. The money obtained from the sale is used to pay the court costs, sheriff's fees, and, so far as possible, the plaintiff's judgment.[6] If any of the proceeds remain, those proceeds may be applied to claims of other judgment creditors. If all such creditors are paid and money still remains, the excess is paid to the defendant.

*In rem* enforcement of money judgments is usually cumbersome and slow. Fairness requires notice to the debtor. Both fairness and efficiency require notice to potential buyers and the conduct of the sale at a time that is most likely to obtain a good price for the goods or land. Buyers, especially buyers of real property, will not pay full prices unless they are assured that the execution and sale were procedurally sound so that they can get good title. When there are several judgment creditors, issues of priority complicate the distribution of proceeds. These and other issues raised by *in rem* enforcement are left for more specialized treatment elsewhere.

### Contempt Sentences to Enforce Coercive Remedies

*Decree issuing a command in personam.* In the old separate court system, law courts adjudicated rights and liabilities but they issued no commands. Instead they preferred to enforce judgments *in rem.* The old separate equity courts worked the other way around. Their decrees ended in a personal command telling the defendant to do something or to cease doing something. You could not disobey the judgment of a law court because it ordered nothing. But you could disobey the decree in equity because it commanded you to act in a specified way. This difference wrought a difference in enforcement. The old separate equity court often enforced its decree by using contempt powers, fining or imprisoning the defendant until he complied with the degree. This is sometimes called *in personam* enforcement, in contrast to the *in rem* enforcement at law.

*Law and equity and coercive orders.* Most judicial systems have long since combined law and equity courts in a single court having the powers of both the old law and the old equity courts. So it is technically no longer right in most states to say that equity enforces decrees *in personam* while law enforces them *in rem.* However, the kind of decree equity once issued, a coercive, *in personam* order directing the defendant to act in a specified way, is enforceable by contempt just as it was when there were separate equity courts. It is still common, by way of shorthand, to associate contempt powers with "equity," although it is more accurate to associate them with a valid coercive order.

*Examples of contempt powers.* A coercive order might command the defendant to disclose the presence of her daughter so that her former husband can exercise his visitation rights. If the defendant refuses to make disclosure as ordered, the contempt power allows the judge to impose either

---

ments in a different way, by contempt power if necessary. There are a few changes in attitudes about installment judgments. See the discussion of periodic payment statutes

and structured settlements in personal injury litigation, § 8.5(5) below. See also § 8.10 on injunctive enforcement of payment in personal injury cases.

criminal or civil sanctions. A criminal sanction might be, for example, a $1,000 fine or 10 days in jail. A civil sanction is one designed to coerce the defendant to comply with the order, so it would not be a fixed fine or jail sentence. Instead, a civil contempt sanction would be a daily fine, say $100 per day until the defendant complies with the decree, or an indefinite jail sentence until the defendant complies.

The contempt power is dangerous but often effective and efficient. The implicit threat of that power lies behind most injunctive orders, and that threat may play a part in the plaintiff's strategic choice of the injunctive remedy in some cases. The contempt power also raises complex technical and policy issues that require a more complete discussion in connection with equitable remedies generally.[7]

*Non-contempt enforcement of in personam orders.* Although contempt is the enforcement device most commonly associated with coercive remedies, courts are not necessarily required to resort to that power. If, for example, a court were to order the defendant to make periodic payments of money, the decree would be coercive and would not qualify for ordinary *in rem* enforcement because of the rule that execution issues only on a judgment for a specified sum of money.[8] But a court could avoid invoking the drastic power of contempt by reducing the past due payments to a separate judgment and authorizing execution on that judgment. Or if a court ordered specific performance of a contract to sell Blackacre, it could jail the defendant for refusing to comply, but it could avoid such extremes by making the conveyance itself.[9]

### Garnishment

Execution clearly doesn't work where the debtor has no tangible assets. However, the debtor may have intangible rights that can be reached by the judgment creditor. Garnishment has been mentioned as a provisional remedy;[10] it is also an enforcement device. Suppose T owes money to the judgment debtor. The judgment creditor may be permitted to bring T into court and require T to pay what he owes the debtor. If T admits the debt and pays it into court, the money is used toward the satisfaction of the creditor's judgment. If T does not answer the process served upon him, a default judgment may be taken against him. The details of this process are controlled by statute and vary with local practice.[11] Particular states may call this kind of garnishment by other names. Such a garnishment to enforce a final judgment should be distinguished from the provisional remedy of garnishment before trial, which is aimed at preserving assets of the debtor until a final decision can be had on the merits.

### Supplementary Proceedings or Creditors Bills in Equity

Sometimes neither execution nor garnishment is effective to reach intangible or equitable assets of the debtor, even when those assets are not subject to exemption. In cases of this sort, the judgment creditor may be compelled to resort to a device that used to be called a creditor's bill or supplementary proceeding in equity. With the merger of law and equity, a separate suit is no longer required, but such proceedings remain equitable in

---

7. See § 2.8 below.

the sense that enforcement is achieved, not through seizure of the property, but through the coercive power of the old separate equity court.

For example, if the plaintiff recovers a money judgment at law against the defendant, and finds no assets except the defendant's share in a patent right, the plaintiff may ask the court to order the defendant to sell his share of the patent, or to execute an assignment of it toward satisfaction of the money judgment. The court may do this, and enforce its order by contempt if necessary, or it may appoint a trustee or other officer of the court to execute the assignment of the patent in the name of the debtor.[12] Other intangible interests can be reached in the same way.

### Equitable Liens and Constructive Trusts

The old separate equity courts gave remedies that were not obviously coercive and that were not called injunctions. The plaintiff could seek certain restitutionary remedies in the old equity courts, notably equitable liens, constructive trusts, and an accounting for profits. Those remedies must be discussed in detail later.[13] An illustration is enough to suggest their distinctive quality. Suppose the defendant embezzles the plaintiff's money and uses it to purchase Blackacre. When the plaintiff discovers these facts, she might sue for damages or money restitution equal to the amount taken. But if Blackacre has risen in value, the plaintiff might instead seek a constructive trust. The constructive trust remedy says that the defendant, holding legal title to Blackacre, will be treated as if he were holding it in trust for the plaintiff. The court will then order the defendant to execute his trust by conveying to the plaintiff. One effect is to give the plaintiff the increase in value of Blackacre itself. Another is to give her priority over other creditors who might otherwise seek to levy upon Blackacre for payment of their judgments.

The equitable lien is similar, but as its name suggests, it gives the plaintiff a lien or security interest in Blackacre rather than ultimate ownership. The equitable lien might be more appropriate if the defendant purchased Blackacre with both his own and the plaintiff's money. The equitable lien would hold Blackacre hostage for repayment of the plaintiff's money but would not give her title. The lien could be foreclosed much as a mortgage is foreclosed if necessary.[14]

The constructive trust and the equitable lien are perhaps most conventionally thought of as remedies rather than as enforcement devices. However, lurking behind the constructive trust is the *in personam* power of the old equity courts. Implicitly, if not actually, the defendant who is subjected to a constructive trust will be subjected to a coercive order to make the required transfer of property or funds. The equitable lien would normally be enforced by foreclosure, which bears some resemblance to an execution sale, although foreclosure is traditionally considered to be "equitable."

### Judgments for Possession of Property at Law

Where the plaintiff sued, not for money, but to regain possession of property to which he claimed a right, law courts again approached enforce-

---

13. See § 4.3 below.                    14. See § 4.3(3) below.

ment by an *in rem* procedure using the sheriff. In ejectment cases, the sheriff was told to put the plaintiff in possession of real property (by ousting the defendant if necessary).[15] In replevin cases, the sheriff was told to bring personal property either to the plaintiff or to the court when the plaintiff put up a bond.[16] In both cases, the method was cumbersome, and there were things the sheriff might not wish to do, such as put the plaintiff in possession of Blackacre by removing an encroaching 10–story building. In replevin cases the sheriff might not be able to find the personal property claimed in the writ. Thus ultimate enforcement of legal rights of possession might require the attention of the equity court, which could make a coercive order to compel the defendant to remove the encroachment[17] or give up the personal property.[18]

### Receivers and Masters

*Receivers.* Two other enforcement devices can be especially important in some cases. Courts may appoint receivers to manage property.[19] A receiver might be appointed before trial to preserve the property or manage it pending decisions on the merits. Receivers may be especially useful to manage an ongoing operation such as a business. Receivers may also be appointed to execute a judgment, for example by selling off property gradually to obtain the best prices over a period of time, or simply to locate and return property.[20]

*Masters.*[21] Sometimes courts appoint masters, who act as officers of the court, usually to assist in managing complex trials by taking testimony and making a report or recommendation, or by managing a large, complex discovery process.[22] A master used in this way is a procedural, not an enforcement device. On the other hand, a master might be appointed to monitor the execution of and compliance with a complex decree and report to the court if the defendant fails to comply.[23] In that role, the master is a means of assisting enforcement.

*Receiver-masters under civil rights or restructuring injunctions.* Courts have made dramatic use of receivers and masters or some combination in some major civil rights injunctions. When courts undertake to restructure a social institution such as a school system or a prison, to make it conform to constitutional standards,[24] legal rules may be pitted against strongly ingrained cultures that are not amenable to change merely because the court orders it. So in some cases courts have displaced elected or other local authority by appointing a receiver to manage a school system to bring it into compliance with court orders.[25] Such remedies are obviously extreme and reserved for extreme cases or last resorts.

---

**15.** See §§ 4.2(2) & 5.10(1) below.

**16.** See § 5.17 below.

**17.** See § 5.10(4) below.

**18.** See § 5.17(3) below.

**19.** See Fed.R.Civ.Proc. Rule 66.

**22.** Fed.R.Civ.Proc.R. 53 authorizes appointment of masters. Federal magistrates may now perform masters' functions, but traditionally a master was a lawyer appointed for the specific task assigned.

**23.** See Ruiz v. Estelle, 679 F.2d 1115, 1159–1163 (5th Cir.1982), cert. denied, 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983).

**24.** See § 7.4(4) below.

**25.** Morgan v. McDonough, 540 F.2d 527 (1st Cir.1976), cert. denied, 429 U.S. 1042, 97 S.Ct. 743, 50 L.Ed.2d 755 (1977).

ments, to make them read as they should.[4] Any of these remedies might be granted without using the traditional terminology or stating its theory.[5]

### Four Potential Effects of Tracing Remedies

Four major practical effects can result when a constructive trust is invoked, and to some extent the same can be said of its sister remedies, lien, subrogation and accounting. (1) Because these remedies are largely "equitable," a non-jury trial may be invoked.[11] (2) All the remedies named allow the plaintiff to trace funds or property taken from him into any new property or entitlement that is substituted for the plaintiff's property; the effect can be to give the plaintiff the gain a defendant makes from sale of the plaintiff's property and any reinvestment of the funds.[12] (3) Constructive trust may allow recovery of the specific property taken from the plaintiff, or any property substituted for it.[13] (4) The constructive trust, the equitable lien and the right of subrogation operate to give the plaintiff a priority over other creditors to the extent that the plaintiff can identify property or its substitutes as that which in equity and good conscience belongs to him.[14]

These mechanisms, their basis and effect, are explained in more detail in the subsections below, along with a closely related line of equity reasoning associated with the term "equitable conversion." [15]

### § 4.3(2)  The Constructive Trust

#### In Summary

When equity imposes a constructive trust upon an asset of the defendant, the plaintiff ultimately gets formal legal title.[1] The effect is to allow the plaintiff to recover the asset in specie. For instance, the plaintiff may recover legal rights to Blackacre itself, or a particular bank account, or rights in an intangible such as a trademark, not merely a money judgment equal to the value of such assets. If the asset has increased in value, the plaintiff gets the increase. If the defendant has other creditors who might exhaust his assets in satisfying their claims, the plaintiff gains priority over them as to assets covered by the constructive trust. The constructive trust might be imposed upon any identifiable kind of property or entitlement in the defendant's hands if, in equity and conscience, it belongs to the plaintiff. This rule may be extended in some cases to cover not only property gained from the plaintiff directly, but also new property the defendant had substituted for it by sale or exchange. The constructive trust may also be imposed upon the property even after it has been transferred to third persons, so long as they are not bona fide purchasers. This subsection attempts to explain these rules.

#### The Mechanism of the Constructive Trust

*The constructive trust and quasi-contract.* Equity courts developed an equitable parallel to the law courts' quasi-contract.[2] Equity called this a

---

§ 4.3(2)

1. See, e.g., In re Marriage of Allen, 724 P.2d 651 (Colo.1986). The Restatement of Restitution, in a fling with esoteric metaphysics, delivered itself of the notion that there could be constructive trusts that had no effects whatever. Palmer carefully criticizes this notion. See I G. Palmer, Law of Restitution

§ 1.4 (1978 & Supps.). Even if there are such incorporeal and inoperative constructive trusts, they are of no account in procuring restitution. The text statement that title is ultimately passed when a constructive trust is declared is accurate both factually and theoretically.

constructive trust. The quasi-contract is imposed by courts to prevent unjust enrichment, not generated by contract. The constructive trust is likewise imposed by court to prevent unjust enrichment, and not generated by any trust.[3] The contract and trust language is the language of analogy or metaphor. Both quasi-contract and constructive trust aim at restitution of something that in good conscience belongs to the plaintiff.

One important difference between the quasi-contract and the constructive trust claim is that the quasi-contract claim is one for money and does not require the plaintiff to identify any particular asset as rightly "belonging" to him. The constructive trust, in contrast, restores to the plaintiff a particular asset, which is either the asset that rightly belongs to the plaintiff or one substituted for it. Although there are restitution claims "at law" which also restore the plaintiff to a particular asset, the constructive trust differs from these claims, too. Specific restitution at law is usually accomplished in ejectment and replevin actions. They restore to the plaintiff property which is legally his, not property which is only equitably his. If he has no legal title, he cannot recover the property.[4] The constructive trust allows the plaintiff to recover an asset even if he has no legal title to it, so long as that asset is regarded as "belonging" to him in an equitable sense.

*Mechanisms and procedures of the constructive trust.* Where the quasi-contract plaintiff wins a simple money judgment, enforceable by execution,[5] the constructive trust plaintiff who proves his claim by clear and convincing evidence[6] wins an *in personam* order that requires the defendant to transfer legal rights and title of specific property or intangibles to the plaintiff. When the court decides that the defendant is obliged to make restitution, it first declares him to be constructive trustee, then orders him as trustee to make a transfer of the property to the beneficiary of the constructive trust, the plaintiff.[7] For example, if the defendant, by fraud, induces the plaintiff to convey Blackacre to him, the court will declare that the defendant holds Blackacre on constructive trust for the plaintiff, and then order a conveyance to the plaintiff, on whatever conditions may be required to do justice.[8] The power to issue coercive or injunctive orders thus lies at the basis of the constructive trust.

*Requirement of res or property.* The constructive trust is only used when the defendant has a legally recognized right in a particular asset.[9] The asset may be an intangible entitlement such as a trademark. It may even be a fund of money like a bank account. But whatever it is, it must be an asset

3. See generally I G. Palmer, Law of Restitution §§ 1.3 & 1.4 (1978 & Supps.).

4. In the case of replevin of chattels by a seller of goods who was defrauded, there is something of an exception that seems to have come about because courts first thought that the buyer got no title when he acquired goods by fraud. Under that view, replevin of course would lie to permit recovery of the goods. Later, courts came to the view that the fraudulent buyer did get title that was voidable, but they kept the replevin procedure. See I G.

Palmer, Law of Restitution § 3.16 (1978 & Supps.).

5. See § 1.4 as to enforcement of money judgments.

7. See G. Bogert, Trusts and Trustees, § 471 et seq. (2d ed. 1960); 5 A. Scott, Trusts & 461 et seq. (3d ed. 1967); Restatement of Restitution § 160 Comment e (1937).

8. Restatement of Restitution § 160 Comments e & f (1937).

9. Restatement of Restitution § 160, Comments i & j (1937).

that can be identified as belonging in good conscience to the plaintiff in spite of the defendant's legal right to it.[10] If defendant obtains Blackacre from the plaintiff by fraud, he holds it on constructive trust and must ultimately reconvey to the plaintiff. But if the defendant sells the land and dissipates the money, the defendant is not a constructive trustee because he has nothing of the plaintiff's to hold in trust. The defendant may have other property of his own, but as to his own property he is not a constructive trustee.

*Other liabilities not excluded.* Although the defendant cannot be a constructive trustee when he no longer has an asset belonging in equity to the plaintiff, he may still be liable personally. If he gained Blackacre by fraud but no longer has Blackacre or any substituted property, he is still liable to the plaintiff for damages for the fraud. If he gave Blackacre to his children and they no longer own it, even the children as donees might owe restitution in money.[11] But neither the children nor the fraudfeasor himself are constructive trustees if they no longer own Blackacre or some substituted asset. In that case they are only debtors and the plaintiff is only an unsecured creditor.[12] Suing only as a creditor and without the constructive trust, the plaintiff will be unable to recover the specific property, unable to recover any gains that might once have been associated with that property, and will be unable to get the benefit of any automatic priority over other creditors.

### Operation and Effects of the Constructive Trust

*(1) Capturing the defendant's gains.* The constructive trust has three or four especially important characteristics. One is that under the rules for following property or money into its product, the plaintiff may obtain, not merely what he lost, but gains received by the defendant from the property's increase in value,[13] from its transfer,[14] from its use in a business operation.[15] The defendant will also be liable for prejudgment interest on the plaintiff's

---

10. Identification is made by "tracing" the asset into its products or substitutes. See § 6.1 below.

11. See Otis v. Otis, 167 Mass. 245, 45 N.E. 737 (1897) (the plaintiff would have been entitled to a constructive trust against a fund that had been on deposit, but the defendant had withdrawn the money and given it to his daughters; the plaintiff was allowed a claim for "compensation" from all defendants to the extent of their respective misappropriations); I G. Palmer, Law of Restitution § 2.14 (1978 & Supps.); cf. United States v. Robilotto, 828 F.2d 940 (2d Cir.1987), cert. denied, 484 U.S. 1011, 108 S.Ct. 711, 98 L.Ed.2d 662 (1988) (RICO forfeiture not merely *in rem* against the property but also a personal liability of the wrongdoer for all his gains whether traceable to a particular *res* or not).

12. E.g., United States Fidelity and Guar. Co. v. Hiles, 670 S.W.2d 134 (Mo.App.1984); Aebig v. Commercial Bank of Seattle, 36 Wash.App. 477, 674 P.2d 696 (1984) (deposits with travel agency as prepayment on trips to be taken created no identifiable fund, no constructive trust, only debt).

13. In re Rothko's Estate, 43 N.Y.2d 305, 401 N.Y.S.2d 449, 372 N.E.2d 291 (1977) ("damages" based on increased value of property still held by the defendant).

14. E.g., Janigan v. Taylor, 344 F.2d 781 (1st Cir.1965), cert. denied, 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965) (after wrongfully acquiring shares of stock for a certain amount of money, defendant sold the shares for a higher sum, recovery of the gain allowed as a remedy under federal securities laws); cf. G & M Motor Co. v. Thompson, 567 P.2d 80 (Okl.1977) (embezzled funds invested in life insurance, embezzler died, victim could have had entire insurance fund, in excess of its loss, if it had so claimed).

15. E.g., Zeller v. Bogue Elec. Mfg. Corp., 476 F.2d 795 (2d Cir.1973), cert. denied, 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973); Brooks v. Conston, 364 Pa. 256, 72 A.2d 75 (1950).

THE CONSTRUCTIVE TRUST

funds if use value is not otherwise accounted for.[16]  These rules may give the plaintiff a considerable added sum.[17]

—*Example.*  For instance, if the defendant secured Blackacre by fraud at a time when it was worth $10,000, and then traded it for Whiteacre which was worth $15,000, a constructive trust in the plaintiff's favor on Whiteacre would net him property worth considerably more than the property he lost. In this respect the constructive trust resembles the simple conversion case in which the plaintiff "waives the tort and sues in assumpsit", to get the price received by the converter,[18] but as shown in discussing the measures of restitution,[19] the constructive trust may be more potent in some cases.

—*Tracing.*  The favorable rule that allows the plaintiff the gain produced by his property is often difficult to invoke.  The plaintiff must trace his money or property to some particular funds or assets.  Especially when the defendant has taken money, tracing is difficult.  In such cases the plaintiff can often prove that the money was taken, but has difficulty in identifying that money with funds in the defendant's accounts.  This leads to a series of special rules for tracing money.[20]  If the tracing is incomplete, the rule that requires a *res* is invoked and the constructive trust is denied, with the result that the defendant is only a simple debtor.

*(2) Preferences and priorities.*  The second especially important characteristic of the constructive trust is that it may function to give the plaintiff a priority over other creditors of the defendant.[21]  A closely related advantage is that on the right facts it may also defeat a debtor's homestead or other exemption, allowing the plaintiff a satisfaction from assets of the defendant which are otherwise protected from creditors.[22]

—*Example.*  For instance, suppose that X obtains Blackacre from the plaintiff by fraud.  As is usually the case, X has many creditors with many valid claims against him.  These creditors begin to file actions against X, asserting that he owes them debts, or has committed torts against them.  In the ordinary course of events, such creditors, on getting a money judgment, would be entitled to enforce the judgment by forcing a sale of most or all of X's property, using the money to pay the judgments.  Since X has legal title to Blackacre in his name, though he obtained it fraudulently, Blackacre might be sold in this way to satisfy the claims of X's creditors.  If the

16. In re Estate of Wernick, 127 Ill.2d 61, 129 Ill.Dec. 111, 535 N.E.2d 876 (1989); Sack v. Feinman, 489 Pa. 152, 413 A.2d 1059 (1980). Interest would be inappropriate if use value were accounted for by an award of rent or earnings from the property.

17. See Ames, Following Misappropriated Property into Its Product, 19 Harv.L.Rev. 511 (1906).

18. See § 4.2 above.

19. See § 4.5 below.

20. See § 6.1 below.

21. E.g., Atlas, Inc. v. United States, 459 F.Supp. 1000 (D.N.D.1978); Estate of Liebman, 189 Misc. 282, 60 N.Y.S.2d 482 (1945); see Middlebrooks v. Lonas, 246 Ga. 720, 272 S.E.2d 687 (1980).

22. If the defendant purchases a home with money which belongs to the plaintiff in equity and good conscience, the constructive trust and its sister remedies are appropriate devices to avoid the exemption that would otherwise reserve the home to the defendant. American Ry. Express Co. v. Houle, 169 Minn. 209, 210 N.W. 889, 48 A.L.R. 1266 (1926); Annotations, 48 A.L.R. 1269 (1927); 47 A.L.R. 371 (1927); see also 43 A.L.R. 1415 (1926). Similarly, the constructive trust and sister remedies may allow the plaintiff to recover property that would otherwise be protected by the defendant's discharge in bankruptcy. See Leyden v. Citicorp Indus. Bank, 782 P.2d 6 (Colo.1989).

plaintiff is able to impose a constructive trust on Blackacre, however, the court will force the defendant to convey the land to the plaintiff. The land will not be used to satisfy other creditors' claims and the plaintiff will obtain what is his. This procedure treats the plaintiff better than other creditors, whose claims may have just as strong a moral basis. In theory such a result is justified because Blackacre, in the eyes of equity, has always been the plaintiff's property in all good conscience, though formal legal title was in X.

—*Combining profits and priorities.* When the constructive trust gives the plaintiff both priority over creditors *and* gains or profits, other creditors of X may suffer in order to give the plaintiff a windfall. Suppose X secures Blackacre by fraud, paying $10,000 for it when it was worth in fact $15,000, and then trades Blackacre for Whiteacre. Whiteacre proves to be worth $30,000, though X used no fraud to gain this extraordinary profit. X now has in his hands values of $30,000 for which he paid $10,000. The plaintiff's economic loss is only $5,000. He may have preferred to have Blackacre back, but if it was traded to a bona fide purchaser for value, he cannot have that in any event. The alternatives are to recompense the plaintiff by paying him $5,000, or to give him a constructive trust on Whiteacre. The latter course would give him a net gain of $15,000. On the other hand, if his claim is limited to a simple money recovery measured by his loss, the gains made by X's trade for Whiteacre will be available and may inure to the benefit of X's creditors.

While it would be improper to permit X himself to keep such gains, since they were the product of his own wrong, there is no similar reason against permitting the creditors of X to have the benefit of this property, once the plaintiff is restored. This is the kind of case, in other words, in which the preference worked by the constructive trust should not be permitted. Sometimes it is very difficult to see this, because in trying to right the wrong done to the plaintiff, one may forget that others, equally innocent, have a stake in the defendant's assets.

—*Priorities and tracing.* The problem of preference is especially acute when tracing is questionable. Indeed, a major reason for the rules requiring tracing is to avoid the unfairness that results to creditors of the defendant and other innocent persons when a preference is invoked without justification. Suppose X embezzles money from the plaintiff, then deposits it in his bank account. If the defendant opens an account with the plaintiff's money and neither added to it nor subtracted from it, it is fair to treat the account as a *res* held upon constructive trust. Any money that can be withdrawn from the deposit is precisely equivalent to the money originally deposited and belonging to the plaintiff. Imposing a constructive trust in such a case defeats claims the defendant's other creditors might have been able to collect from such funds, but that is fair enough because we can see by tracing that the funds have always belonged to the plaintiff.

However, if X withdraws all the funds and then at some other time opens another bank account, we cannot be sure that the second account contains money identifiable as the plaintiff's.[23] To impose a constructive trust upon the second account is to prefer the plaintiff's claim to those of

---

**23.** See § 6.1 below.

other creditors, and for no good reason. The plaintiff in such a case has a claim against the defendant, but he stands as an ordinary creditor and must take his chances with the rest by recovering a money judgment and enforcing it through execution, or sharing the limited funds with other creditors in an insolvency proceeding. Sympathy for the plaintiff's loss can distort these rules, but a court which imposes a trust without tracing the plaintiff's loss to the defendant's gain may simply be shifting the plaintiff's loss to a creditor of the defendant or to another innocent person.[24]

*(3) Recovery of specific property.* The third effect of a constructive trust in some cases is to permit recovery of specific property rather than a money substitute. The constructive trust is not the only remedy which permits specie recovery. Ejectment and replevin also permit such a recovery, but those remedies apply only, or at least most clearly, to cases in which legal title has remained in the plaintiff.[25] The constructive trust on the other hand permits the plaintiff to recover what equity regards as his. The very basis of the suit is that the defendant has legal title and must therefore be treated as a "trustee" who holds that title for the plaintiff. Although recovery of specific assets can be explained on other grounds besides constructive trust, the effect of a constructive trust is always to reach some specific asset.

*(4) Equity trials—Nonjury trial.* When the plaintiff asserts a constructive trust claim he asserts what is traditionally viewed as an equitable claim. The case is therefore tried as an equity case, without a jury.[26]

*—Adequate remedy at law.* Certain claims in equity were traditionally dismissed if the chancellor thought the plaintiff would have an adequate remedy at law.[27] Claims subject to the adequacy rule were claims based on rights the law courts recognized or created in the first place. The plaintiff in such cases resorted to equity only in hopes of a more effective remedy for a legal right. The constructive trust claim is different. It is not a claim based on a legal right. On the contrary, constructive trusts are needed because legal title is in the defendant. The plaintiff seeking a constructive trust does not assert a legal right but an equitable interest. In this setting, the adequacy of legal remedy seems irrelevant. Professor Palmer concludes that the adequacy rule has no effect when the claim is against a fiduciary, so that the case may proceed in equity even if there is an adequate remedy at law; but when the defendant is not a fiduciary, he believes the results are unpredictable.[28]

**24.** Cf. Rogers v. Rogers, 63 N.Y.2d 582, 483 N.Y.S.2d 976, 473 N.E.2d 226 (1984); Simonds v. Simonds, 45 N.Y.2d 233, 408 N.Y.S.2d 359, 380 N.E.2d 189 (1978). In *Simonds* a divorcing spouse promised to insure his life for the benefit of his first spouse; after he remarried he terminated the policy and procured a new policy in favor of the second spouse. A constructive trust was imposed in favor of the first spouse against the second, although it seems impossible to trace the second spouse's gain to the first spouse's loss. See § 6.1 below. New York has also been quick to equate loss on one side with gain on the other in statute of frauds cases. See Farash v. Sykes Datatronics, Inc., 59 N.Y.2d 500, 465 N.Y.S.2d 917, 452 N.E.2d 1245 (1983); § 13.2(2) below.

**25.** See § 4.2 above. As to replevin when title has passed, see note 4, supra.

**26.** See § 2.6 above.

**27.** See § 2.5(1) above.

**28.** I G. Palmer, Law of Restitution § 1.6 (1978 & Supps.).

At least some authorities support the view that a claim for a constructive trust may be pursued even if the legal remedy is adequate [29] and even if the trust would yield only money that could be recovered at law.[30] With the decline of the adequacy test generally,[31] an unhindered access to equity for restitution seems to be the most appropriate solution unless there are especially important needs for a jury trial. On the other hand, a claim for a constructive trust that does not attempt to identify particular property or fund subject to the alleged trust can sensibly be read as nothing but a claim at law for money had and received and hence as a jury trial case.[32]

*Constructive trust effects without constructive trust terminology.* The term constructive trust was once important because it denoted a theory that explained why equity courts would deny the defendant the benefits of his legal title in the assets. That no longer seems to lawyers to be a very significant issue and today the term constructive trust is remedially important only as a way of signifying the effects listed above. It is not important for courts to use the term constructive trust to achieve any given effect, such as restoration of specific property [33] or recovery of the defendant's gains.[34] Any of the effects for which constructive trust stands can be addressed without the slightest reference to constructive trust. A decision to award the plaintiff a recovery based on the defendant's profits, for example, is not a result of a constructive trust. Such an award is a result of a decision about the best way to remedy unjust enrichment in the particular case. Constructive trust is the name we give to that decision, not the reason for it. It is convenient to use the constructive trust terminology to stand for one or more of the potential effects, but the term has no mystical significance.

### Grounds for the Constructive Trust

*Basis in unjust enrichment.* The constructive trust, like its counterpart

**29.** See Heckmann v. Ahmanson, 168 Cal. App.3d 119, 134, 214 Cal.Rptr. 177, 187 (1985) ("[A]n action in equity to establish a constructive trust does not depend on the absence of an adequate legal remedy"); Note 25 St. John's L.Rev. 253 (1951).

**30.** See Hochman v. Zigler's, Inc., 139 N.J.Eq. 139, 50 A.2d 97 (1946) (constructive trust to compel return of money exacted under duress, even though the court recognized that money could be recovered by an action at law).

**31.** See Laycock, The Death of the Irreparable Injury Rule, 103 Harv.L.Rev. 687 (1990); § 2.5 above.

**32.** Blue Cross Health Servs., Inc. v. Sauer, 800 S.W.2d 72 (Mo.App.1990).

**33.** See II G. Palmer, Law of Restitution § 11.5(c), p. 519 (1978 & Supps.). Restoration of specific property may be accomplished "at law" through ejectment and replevin, although usually only when legal title remains in the plaintiff. In equity, restoration might be accomplished even when title is not in the plaintiff through devices such as reformation and specific performance. A simple *in personam* order without the constructive trust terminology is also appropriate.

**34.** Defendant's gains, at least in certain forms, can be recovered at law under quasi-contract doctrines. Ablah v. Eyman, 188 Kan. 665, 365 P.2d 181, 90 A.L.R.2d 766 (1961) (business savings resulting to defendant from use of plaintiff's property); Edwards v. Lee's Adm'r, 265 Ky. 418, 96 S.W.2d 1028 (1936); cf. Olwell v. Nye & Nissen Co., 26 Wash.2d 282, 173 P.2d 652, 169 A.L.R. 139 (1946) (value of use of a machine). In this respect, note that net savings in a business operation are equivalent to increased profits (or, in a losing business, to diminished losses).

In Popp v. Gountanis, 221 Mont. 267, 718 P.2d 340 (1986) the defendant's gains were recovered by the plaintiff without reference to any restitutionary terms whatever. The plaintiff was a farm tenant. The defendants were landlords who had received federal payments for not raising crops on the land. The tenant was entitled to keep two-thirds of crops he raised. The court held he was entitled to two-thirds of the federal payments. The result must have seemed obvious because its only explanation was: "Popp had an estate in land for the duration of his tenancy, and the [federal payment] to Frank and Fountanis was in derogation of Popp's interest." Id. at 342.

remedies "at law," is a remedy for unjust enrichment.[35] It is not appropriate to every case because it can overdo the job or produce bad side effects such as unfair preferences. Where the constructive trust will produce the right measure and conditions of restitution, however, it is appropriate in any kind of unjust enrichment case and is in no way limited to cases of wrongdoing.[36]

*Earlier limitations.* At one time the constructive trust was closely associated with the violation of express trusts or with the violation of other fiduciary duties [37] and courts placed artificial limits on its use. One decision said that a thief could not be a trustee.[38] Sometimes it is still said that the constructive trust applies only to misdealings by fiduciaries or in cases of fraud.[39] But this is a misconception. The constructive trust is based on property, not wrongs. It proceeds on the notion that the defendant has legal title but that the plaintiff has the superior moral or equitable claim. The misconception probably arises in part from the trust language itself. The constructive trust terminology, like quasi-contract terminology at law, is an analogy only, but if taken literally can suggest a trust and hence a fiduciary.[40] It also probably arises in part from the fact that in a few special cases,[41] wrongdoing is indeed relevant to the constructive trust. At any rate, the constructive trust is no longer limited to misconduct cases; it redresses unjust enrichment, not wrongdoing.

*Application of constructive trusts today.* Restitution by way of constructive trust and similar remedies may be appropriate for embezzlement of money or for conversion of goods,[42] for benefits transferred because of fraud,[43] or duress,[44] or undue influence,[45] and for gains received by reason of misuse of position or information.[46] Analogous relief has been given for such torts as infringement of copyright and the like.[47] Even the murderer for gain may be a constructive trustee.[48] But wrongdoing is not required. Property transferred by mistake, for example, may be recovered in specie by

---

**35.** See I G. Palmer, Law of Restitution §§ 1.3 & 1.4 (1978 & Supps.).

**36.** Martin v. Kehl, 145 Cal.App.3d 228, 237, 193 Cal.Rptr. 312, 317 (1983) ("Section 2224 provides that '[o]ne who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it'"); Carr v. Carr, 120 N.J. 336, 352, 576 A.2d 872, 880 (1990) ("A constructive trust should 'be impressed in any case where to fail to do so will result in an unjust enrichment'"); see Petrie v. LeVan, 799 S.W.2d 632 (Mo.App.1990).

**37.** See J. Dawson, Unjust Enrichment 26–28 (1951); R. Goff and G. Jones, The Law of Restitution 60 (2d ed. 1978) (English law). Many kinds of fiduciary cases are categorized in Douthwaite, Profits and Their Recovery, 15 Vill.L.Rev. 346 (1970).

**38.** Campbell v. Drake, 39 N.C. (4 Ired.Eq.) 94 (1844).

**39.** Perry v. Wyeth, 25 Ill.2d 250, 184 N.E.2d 861 (1962).

**40.** See I G. Palmer, Law of Restitution § 1.3 (1978 & Supps.). Palmer and others have called the constructive trust a fiction. Analogy, metaphor, or conception might be more apt terms because nothing turns on the decision to use trust terminology; the term merely has the explanatory power of an analogy, and once accepted for that reason becomes a shorthand designation for a series of legal effects.

**41.** See paragraph *"When constructive trust is limited to cases of wrongdoing,"* below.

**42.** See § 6.1 below.

**43.** See § 9.3(4) below.

**44.** See § 10.2 below.

**45.** See § 10.3 below.

**46.** See §§ 10.4–10.6 below.

**47.** For example, recovery of the copyright infringer's profits is permitted, although the constructive trust terminology is not necessary to that recovery. See § 6.3(4) below.

**48.** See § 6.7 below.

way of constructive trust in appropriate cases.[49] The constructive trust or its tracing features has been used to provide for an equitable division of marital property when the facts called for relief but statutes did not cover the case,[50] and also to provide for such a division as between unmarried cohabitants, so that their respective economic contributions can be recognized.[51] Even nonpayment of a debt for specific property might suffice to warrant imposition of a constructive trust on the property under some circumstances.[52] The point is not that the defendant violated a fiducial duty, but that the plaintiff's money, services, or property can be traced to and identified as the asset the defendant now holds.

*When constructive trust is limited to cases of wrongdoing.* In a few cases the court cannot find unjust enrichment at all unless there is wrongdoing, and hence would have no basis for granting a constructive trust or any other restitutionary remedy. The statute of frauds cases are like this.[53] The plaintiff cannot indirectly enforce an oral contract and cannot enforce an oral trust, either. This rule would be defeated if the plaintiff could enforce the oral trust by simply resorting to constructive trust language. So when the plaintiff claims that the defendant orally promised to convey Blackacre, he has no claim for a constructive trust unless he can add some ingredient that makes the claim more than one to enforce an oral trust or contract. That ingredient is fiduciary breach or fraud. When the oral trust is accompanied by fraud or fiduciary breach, the constructive trust is imposed, otherwise usually not.[54] These rules are necessary to support the statute of frauds, but they have no application to cases generally.

*Donees and purchasers.* Since the constructive trust is not limited to cases in which the defendant is a wrongdoer, it may be applied to require restitution from transferees who are not bona fide purchasers of the assets.[55]

**49.** See Proctor v. Sagamore Big Game Club, 265 F.2d 196, 198 (3d Cir.1959), cert. denied, 361 U.S. 831, 80 S.Ct. 81, 4 L.Ed.2d 73 (1959) ("when Childs acquired the tax deed for Elk Tanning Company, the latter acquired title to a larger estate than was intended because of a mutual mistake of law as to the effect of the transaction"); Petrie v. LeVan, 799 S.W.2d 632, 634–635 (Mo.App.1990); II G. Palmer, Law of Restitution § 11.5(c); §§ 11.-6(3) & 11.7 below.

**50.** Carr v. Carr, 120 N.J. 336, 576 A.2d 872 (1990) (wife separated from husband who died before divorce was complete; she could not take an equitable distribution of the marital estate because that was available only upon divorce; she could not elect to take a surviving spouse's share of the decedent's estate because that was permitted only to a spouse living with the deceased at the time of death; constructive trust was held legally available to prevent unjust enrichment of the decedent's children). A constructive trust is of course appropriate as a means of capturing marital assets misappropriated by one of the partners. See Cottman v. Cottman, 56 Md. App. 413, 468 A.2d 131 (1983).

**51.** Goode v. Goode, 183 W.Va. 468, 396 S.E.2d 430 (1990); cf. Simonds v. Simonds, 45 N.Y.2d 233, 408 N.Y.S.2d 359, 380 N.E.2d 189 (1978); see also § 13.6 below.

**52.** See Middlebrooks v. Lonas, 246 Ga. 720, 272 S.E.2d 687 (1980) (promise to repay loan allegedly made without intention to perform; if so proved, constructive trust would be appropriate on funds, or equitable lien on property improved by them). In Leyden v. Citicorp Indus. Bank, 782 P.2d 6 (Colo.1989) the plaintiff transferred property to Howe in exchange for a promissory note. Howe never paid the note and Howe was eventually discharged in bankruptcy. In the meantime Howe had mortgaged the property to a bank in exchange for a loan and the bank took over the property. As against Howe, the court held that the plaintiff was entitled to an equitable lien on the property as a special form of constructive trust, and as against the bank and its transferees, she was entitled to the lien if they had notice of her claim.

**53.** See generally § 13.2(3) below.

**54.** See, e.g., King v. Uhlmann, 103 Ariz. 136, 437 P.2d 928 (1968).

**55.** See In re Marriage of Allen, 724 P.2d 651 (Colo.1986); § 4.7 below.

Suppose that, by fraudulent misrepresentations, the defendant secures title to Blackacre from the plaintiff, then gives Blackacre to his uncle, who needs a place to live. The uncle is a donee, not a purchaser. He is subject to the constructive trust, which is to say he must transfer Blackacre to the plaintiff as the person to whom it belongs in the eyes of equity and good conscience. The same would be true if the uncle had purchased Blackacre for valuable consideration, if he acted with notice of the plaintiff's interest.[56]

### Constructive Trust in Relation to Other Trusts

The constructive trust is not in fact a trust, but a remedy which is explained by analogy to trusts. The differences and the similarities can be seen by considering an express trust and the so-called resulting trust.

[*For a brief comparison to express and resulting trusts, see this section in the Practitioner Treatise edition.*]

## § 4.3(3)   The Equitable Lien

### Liens Generally

A lien is a charge against property that makes the property stand as security for a debt owed. A creditor who has a lien upon property of the debtor is entitled at a proper time to have the property sold and the proceeds used for payment of the debt. The lien creditor thus stands in a better position than a general, unsecured creditor of the same debtor, because he has a priority: the property subject to his lien is in effect set aside for the satisfaction of his claim first. Only after his claim is satisfied will the property or its proceeds become available for the payment of other creditors.[1] A lien is thus not merely a matter between the lien creditor and his debtor; it is a matter affecting other creditors as well, because it withdraws some of the debtor's resources that ordinarily would be available for satisfaction of the claims of those other creditors.

### Agreements and Other Lien Sources

Most but not all liens are created by express agreement of the parties. Because other creditors or potential creditors of the debtor may be affected, most of these are recorded in some fashion. A creditor deciding whether to make a loan or whether to insist on immediate payment of a past debt can examine the official records of liens and other security devices and form some estimate of the debtor's assets for payment of his debts. A few liens, no longer of great commercial significance, are possessory—that is, the lien creditor has possession of some particular piece of property and the possession itself serves as notice to other creditors of the possessor's lien claim. A few others, some of the mechanics' and materialmen's liens, are based on complex statutory provisions.[2]

### Equitable Liens by Agreement

The term "equitable lien" is used in at least two fairly disparate senses. In one sense it may refer to a lien created by express or at least implied-in-

---

**56.** See, e.g., Leyden v. Citicorp Indus. Bank, 782 P.2d 6 (Colo.1989) (equitable lien, a form of constructive trust, enforceable against transferees who were not unjustly enriched, since they had notice).

**§ 4.3(3)**
**2.** See § 12.20(3) below.

ing, at least in most creditor-debtor cases, are likely to be small compared to the added cost of holding hearings in all cases.[14]

Other statutes respond to the constitutional problem by requiring an adversary hearing on the question whether to transfer possession of the disputed chattel, followed by an order of the judge. Some go on to allow the plaintiff to recover possession without notice to the defendant or a hearing at which he is present, but unlike the traditional procedure, require an *ex parte* hearing before the judge, who must hear evidence and make explicit findings.[15] This procedure also differs from the traditional procedure in that the transfer of possession is the result of a judicial order, not merely the seizure by an officer of the court. Statutory changes of this kind come close to converting the common law in rem actions into equity claims for the transfer of possession by injunction.

## § 5.17(3)  Injunction:  Equitable Recovery of Chattels

### *Inadequate Legal Remedy*

"Equitable replevin" is merely a form of injunction compelling the defendant to hand over a chattel. As in most other injunction cases, such relief was not available unless it could be said that legal relief was inadequate, as where the chattel is unique. In such a case replevin would prove inadequate if the defendant secreted the chattel, or removed it from the jurisdiction, so that the sheriff could not seize it. The defendant's ability to retain possession by posting a redelivery bond would defeat even the most urgent need in a replevin action. With these inadequacies of replevin in mind, the late Professor Van Hecke supported wide use of equitable replevin.[1] There are in fact occasional cases in which injunctions have been used to give the plaintiff possession of an unique or unusual chattel where the legal remedy is inadequate.[2] Where the legal remedy is perceived to be

---

**14.** See Del's Big Saver Foods, Inc. v. Carpenter Cook, Inc., 795 F.2d 1344, 1349 (7th Cir.1986); Robert E. Scott, Constitutional Regulation of Provisional Creditor Remedies: The Cost of Procedural Due Process, 61 Va.L.Rev. 807 (1975).

In *Del's Big Saver Foods,* supra, Judge Posner said in part:

A predeprivation hearing would confer benefits as well as impose costs; it would reduce the likelihood of an erroneous repossession order that might work a hardship to the debtor. But this danger is small where the creditor is required to put up a substantial bond * * *. Considering the importance of summary repossession as a creditor's remedy (and hence its value to nondefaulting debtors, who pay lower interest rates than they would have to do if creditors lacked good remedies in the event of default), [and other elements] we would be inclined * * * to hold that a procedure which provides for a bond and entitles the debtor to a prompt postdeprivation hearing is constitutionally adequate.

The excerpt is highly compressed.

**15.** § 34–1–9.1–4; N.Y.C.P.L.R. 7102(d).

## § 5.17(3)

**1.** Van Hecke, Equitable Replevin, 33 N.C.L.Rev. 57 (1954).

**2.** Yeargin Const. Co., Inc. v. Parsons & Whittemore Alabama Mach. & Serv. Corp., 609 F.2d 829 (5th Cir.1980); Burton v. Rex Oil & Gas Co., 324 Mich. 426, 36 N.W.2d 731 (1949) (goods not available in market, defendant refused to disclose whereabouts so that sheriff could not take them on a replevin writ); Steggles v. National Discount Corp., 326 Mich. 44, 39 N.W.2d 237, 15 A.L.R.2d 208 (1949) (return of car from finance company, court purported to see a risk of multiplicity of suits justifying equitable intervention); McGowin v. Remington, 12 Pa. 56 (1849); Pressed Steel Car Co. v. Standard Steel Car Co., 210 Pa. 464, 60 A. 4 (1904).

Cf. Ferry–Morse Seed Co. v. Food Corn, Inc., 729 F.2d 589 (8th Cir.1984) (preliminary mandatory injunction requiring defendant to turn over 6000 bags of unique seed corn pursuant to a contract).

The classic case is McGowin v. Remington, 12 Pa. 56 (1849). The chattels involved were maps and plans. Damages could not be mea-

adequate, on the other hand, the injunction is denied and plaintiff left to damages or replevin under the statutes.[3]  The adoption of the revised replevin statutes with provisions for pre-seizure hearings, however, may eliminate the need for any separate equitable kind of claim.  Indeed, there may be a general blending of equitable and legal approaches.[4]

### *Provisional Equitable Relief and Constitutional Requirements*

If the plaintiff needs injunctive relief in recovering a chattel he usually needs immediate relief as well, so the claim is usually one for a temporary restraining order or a preliminary injunction.  The preliminary injunction motion requires notice to the defendant and an opportunity to be heard, and hence clearly meets the constitutional requirement of notice and hearing.[5]

The temporary restraining order, however, is issued without notice to the defendant and without a hearing at which he takes part.  As to such orders there may be at least a degree of constitutional doubt.  But the restraining order under most procedures [6] is issued by a judge after taking at least informal evidence, and is followed by an almost immediate right to a hearing.  These factors are probably sufficient to justify the temporary restraining order as a means of affecting possession.[7]  Conversely, if notice could be given but is not,[8] or if a bond could have been posted but is not,[9] or if the defendant could have been provided with a prompt opportunity to seek dissolution of the order but was not,[10] the restraining order will be improper.

sured adequately for any dispossession period; the plans could not be replaced and damages would therefore not be adequate even if measurable; and the defendant was in the role of a trustee against whom equity was especially willing to act.

**3.** Charles Simkin & Sons, Inc. v. Massiah, 289 F.2d 26 (3d Cir.1961) (tools); Alger v. Davis, 345 Mich. 635, 76 N.W.2d 847 (1956) (merchandise); Haavik v. Farnell, 264 Ala. 326, 87 So.2d 629 (1956) (personal items).

**4.** Thus statutes may authorize not only a hearing in a replevin suit at law but also the use of in personam restraining orders.  See West's Ann.Ind.Code 34–1–9.1–4(b).  Under a revised-type replevin statute the court may invoke discretion to refuse a seizure order just as an equity court might.  See Consolidated Edison Co. of New York, Inc. v. Haymer, 139 Misc.2d 95, 527 N.Y.S.2d 941 (1988).  And conversely a restraining order may be used to initiate a seizure of property by the sheriff, so that what was traditionally an in rem action throughout can now begin in personam and end in rem.  See Gozelski v. Wyoming County, 115 A.D.2d 1000, 497 N.Y.S.2d 562 (1985).

**5.** City of Signal Hill v. Owens, 154 Cal. App.3d 118, 200 Cal.Rptr. 925 (1984); cf. Attorney General v. Thomas Solvent Co., 146 Mich.App. 55, 380 N.W.2d 53 (1985) (defendant who received notice and had several hearings on preliminary injunction motion suffered no denial of due process merely because it could not take discovery).

**6.** See § 2.11 above.

**7.** State v. B Bar Enterprises, Inc., 133 Ariz. 99, 649 P.2d 978, 981 (1982) (abatement of bawdy house nuisance, specific facts must be shown, "only a court can issue the temporary restraining order, the order is of limited duration, and the restrained party can obtain an expeditious hearing").  The same idea has been used in support of the ex parte temporary restraining order where the defendant is prohibited from exercising a personal, as distinct from a property right.  Marquette v. Marquette, 686 P.2d 990 (Okl.App.1984) (former husband enjoined from communicating with former wife, depriving him of visitation rights with children, but fact of hearing, fact that judge issues order, and fact that it is of limited duration together defeat due process argument).

**8.** Thompson v. Ramirez, 597 F.Supp. 726 (D.Puerto Rico 1984) (plaintiff must show, prior to the restraining order, that notice could not or should not have been given to the defendant, and if plaintiff fails to make this showing, issuance of the restraining order would violate due process).

**9.** Simpson v. Simpson, 524 So.2d 1124 (Fla.App.1988) (injunction reversible when no bond posted).

**10.** United States v. Spilotro, 680 F.2d 612 (9th Cir.1982); United States v. Perholtz, 622 F.Supp. 1253 (D.D.C.1985).  See Gozelski v. Wyoming County, 115 A.D.2d 1000, 497 N.Y.S.2d 562, 563 (1985) ("The fact that the order was issued ex parte does not, by itself, deny plaintiff his property without due pro-

## § 5.18  Restitution in Money

### § 5.18(1)  Waiver of Tort and Suit in Assumpsit for Conversion

If the defendant converts chattels of the plaintiff and sells them, he is enriched by the sum he receives from the sale.  If the defendant converts a gold watch worth $100 but sells it for $200, the plaintiff is allowed to recover not merely the $100 value of his watch, but the $200 gained by the tortfeasor.  The recovery is allowed, not as compensation for loss but as restitution to prevent unjust enrichment.[1]  It has been applied even against joint tortfeasors.[2]  The right to recover for unjust enrichment is a substitute for the right to sue for tort damages, and presumably the right invested in the very person who could have maintained the claim for tort damages—that is, the person at whose expense the defendant was unjustly enriched.[3]  The principle under which the tort victim may substitute an unjust enrichment recovery has been extended to the "conversion" of intangibles in some cases [4], and similarly, to the case of one who merely uses a chattel without converting it.  In the latter case, the value of the use rather than market value is the measure of unjust enrichment.[5]

The option is with the plaintiff: he may sue for ordinary tort damages if that suits him, but he may obtain restitution of the proceeds if he prefers, as he presumably would when the tortfeasor's gain exceeds the plaintiff's loss.

cess of law" because plaintiff could have moved to vacate the restraining order).

### § 5.18(1)

**1.**  "The touchstone of the rule is the moral obligation arising out of unjust enrichment to the tortfeasor."  Western Nat. Bank of Casper v. Harrison, 577 P.2d 635, 642 (Wyo.1978).  See generally, I G. Palmer, Law of Restitution § 2.2 (1978 & Supps.).  Traditional expressions asserted that there is an implied in law promise to make payment, or by that the plaintiff is entitled to sue in assumpsit.  These expressions are still used as ancient references to restitution.  As to restitution for unjust enrichment generally, see §§ 4.1 et seq.

**2.**  See Western Nat. Bank of Casper v. Harrison, 577 P.2d 635 (Wyo.1978).  In that case a secured creditor and one who helped him avoid debtor's right to notice were joint converters of the chattel, a mobile home.  The court held that the plaintiff-debtor's claim could proceed on a theory of waiver of tort and suit in assumpsit, with recovery measured by benefits to tortfeasors.  It looks as if the court had in mind separate measurement of liabilities, however, based on separate net benefits.

**3.**  The owner of the converted chattel would have the right to sue for tort damages and thus the right to sue for unjust enrichment instead.

The principle may have been overlooked in John A. Artukovich & Sons, Inc. v. Reliance Truck Co., 126 Ariz. 246, 614 P.2d 327 (1980), where temporary use of a chattel was in issue.  The owner of a crane who had leased it to another, was allowed to recover on an unjust enrichment from one who had used the crane without permission of either the owner-lessor or of the lessee.  Since the owner-lessor had no right to use the crane while it was under lease, he was denied a tort recovery.  But, without explanation, he was allowed a recovery for unjust enrichment, even though it would appear that defendant enriched himself at the expense of the lessee rather than the expense of the lessor.  The court did not explain why the lessor was the proper plaintiff.  However, the lessee had told the defendant-user that he would have to get permission from the plaintiff to use the crane, so perhaps the claim for unjust enrichment from use of the crane had passed back to the lessor.

**4.**  Cablevision of Breckenridge, Inc. v. Tannhauser Condominium Ass'n, 649 P.2d 1093 (Colo.1982) ("conversion" of cable television feeds).  But cf. Moore v. Regents of the University of California, 51 Cal.3d 120, 271 Cal.Rptr. 146, 793 P.2d 479 (1990), cert. denied, ___ U.S. ___, 111 S.Ct. 1388, 113 L.Ed.2d 444 (1991) (no conversion of body cells could be found where patient knew body tissue was removed, even though he did not suspect it was removed for research and commercial development and subsequent cell-products; subsequently developed products from cells treated as not owned by patient).

**5.**  See John A. Artukovich & Sons, Inc. v. Reliance Truck Co., 126 Ariz. 246, 614 P.2d 327 (1980); § 5.18(2).