# Exhibit 1

No. _____

## This document applies to appeals from proceedings listed on Appendix A

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

FAIRFIELD SENTRY LIMITED (IN LIQUIDATION), ET AL.,

*Plaintiffs-Appellees,*

– v. –

CITIBANK NA LONDON, ET AL.,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK (BERNSTEIN, J.)

IN RE FAIRFIELD SENTRY LIMITED, ET AL., CASE NO. 10-13164
(ADMINISTRATIVELY CONSOLIDATED)

## BRIEF FOR DEFENDANTS-APPELLANTS

| | |
|---|---|
| CLEARY GOTTLIEB STEEN & HAMILTON LLP | CLEARY GOTTLIEB STEEN & HAMILTON LLP |
| | |
| Nowell D. Bamberger | Joseph M. Kay |
| 2112 Pennsylvania Avenue, NW | Christine M. Jordan |
| Washington, D.C. 20037 | One Liberty Plaza |
| Tel. (202) 974-1500 | New York, New York 10006 |
| Fax (202) 974-1999 | Tel. (212) 225-2000 |
| nbamberger@cgsh.com | Fax (212) 225-3999 |
| (admitted *pro hac vice*) | jkay@cgsh.com |
| | cjordan@cgsh.com |

*Attorneys for HSBC Bank USA, N.A., HSBC Private Bank (Suisse) S.A., and HSBC Securities Services (Luxembourg) SA*

*(Additional counsel listed on Appendix B)*

# TABLE OF CONTENTS

Page

STATEMENT OF THE ISSUE PRESENTED ........................................................1

PRELIMINARY STATEMENT ..............................................................................2

BACKGROUND .....................................................................................................4

      A.    The Liquidators' Claims .............................................................5

      B.    The Safe Harbor Decisions Below..............................................6

STANDARD OF REVIEW ...................................................................................10

ARGUMENT .........................................................................................................11

I.    Section 546(e) Preempts The Liquidators' BVI Constructive Trust
    Claim. .........................................................................................................11

      A.    Under Controlling Precedent, Non-Bankruptcy Claims Such As
           The Liquidators' Constructive Trust Claim Are Preempted By
           Section 546(e). .........................................................................14

      B.    The Bankruptcy Court Erred In Holding That Federal Law
           Does Not Preempt Or Displace Conflicting Foreign Law........19

      C.    If It Is Not Preempted, The Liquidators' Constructive Trust
           Claim Is Precluded Because It Is Literally A Re-Cast
           Avoidance Claim.......................................................................29

CONCLUSION ......................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

## Rules and Statutes

11 U.S.C. § 546(e) ............................................................................... *passim*

11 U.S.C. § 548(a)(1)(A) .................................................................    11

11 U.S.C. § 548(a)(1)(B) .................................................................    30

11 U.S.C. § 548(c) ............................................................................    34

11 U.S.C. § 561(d) ...........................................................................*passim*

11 U.S.C. § 1506 ..............................................................................    24

11 U.S.C. § 1521(a)(7)......................................................................    29

15 U.S.C. § 78bb(f)(1) ......................................................................    26

15 U.S.C. § 78c(a)(16)......................................................................    26

N.Y.D.C.L. § 273(a)(2) ...................................................................    30

N.Y.D.C.L. § 277(a) ........................................................................    34

## Cases

*Al-Kurdi v. United States*,
25 Cl. Ct. 599 (Cl. Ct. 1992)...........................................................    24-25

*AP Servs., LLP v. Silva*,
483 B.R. 63 (S.D.N.Y. 2012)...........................................................    15, 16

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015).........................................................................    21

*Att'y. Gen. of Can. v. R.J. Reynolds Tobacco Holdings, Inc.*,
268 F.3d 103 (2d Cir. 2001)............................................................................. 33

*Bank of Augusta v. Earle*,
38 U.S. 519 (1839).......................................................................................... 22-23

*Blazevska v. Raytheon Aircraft Co.*,
522 F.3d 948 (9th Cir. 2008) .......................................................................... 28

*California v. ARC Am. Corp.*,
490 U.S. 93 (1989)........................................................................................... 23

*Comrie v. IPSCO Inc.*,
2008 WL 5220301 (N.D. Ill. Dec. 10, 2008)................................................. 27, 28

*Contemp. Indus. Corp. v. Frost*,
564 F.3d 981 (8th Cir. 2009) .......................................................................... 16, 17

*Donohue v. Cuomo*,
980 F.3d 53 (2d Cir. 2020).............................................................................. 25

*Hilton v. Guyot*,
159 U.S. 113 (1895)......................................................................................... 23

*Howlett By & Through Howlett v. Rose*,
496 U.S. 356 (1990)......................................................................................... 22

*In re Bernard L. Madoff Inv. Secs. LLC*,
654 F.3d 229 (2d Cir. 2011)............................................................................ 10

*In re Condor Ins. Ltd.*,
601 F.3d 319 (5th Cir. 2010) .......................................................................... 29

*In re Enron Creditors Recovery Corp.*,
651 F.3d 329 (2d Cir. 2011)............................................................................ 16

*In re Fairfield Sentry Ltd.*,
596 B.R. 275 (Bankr. S.D.N.Y. 2018) ("*Fairfield II*")................................... *passim*

iv

*In re Fairfield Sentry Ltd.*,
2020 WL 7345988 (Bankr. S.D.N.Y. Dec. 14, 2020) ("*Fairfield III*") ......... *passim*

*In re Fairfield Sentry Ltd.*,
2021 WL 771677 (Bankr. S.D.N.Y. Feb. 23, 2021) ("*Fairfield IV*") ............ *passim*

*In re Kingate Mgmt. Litig.*,
784 F.3d 128 (2d Cir. 2015) ............................................................. 26, 33

*In re Nine West LBO Sec. Litig.*,
482 F. Supp. 3d 187 (S.D.N.Y. 2020) ............................................ 16, 17

*In re Picard*,
917 F.3d 85 (2d Cir. 2019) ....................................................................... 30

*In re Tribune Co. Fraudulent Conv. Litig.*,
946 F.3d 66 (2d Cir. 2019) ........................................... 13, 15, 17, 34

*LaSala v. Bordier et Cie*,
519 F.3d 121 (3d Cir. 2008) ............................................................ 26, 27

*Martin v. Hunter's Lessee*,
14 U.S. 304 (1816) ....................................................................................... 22

*Medtronic, Inc. v. Lohr*,
518 U.S. 470 (1996) ..................................................................................... 23

*Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*,
138 S. Ct. 883 (2018) .................................................................................. 12

*Official Comm. of Unsecured Creditors of Hechinger Inv. Co. of Del. v. Fleet
Retail Fin. Grp. (In re Hechinger Inc.)*,
274 B.R. 71 (D. Del. 2002) ...................................................... 15, 16-17

*Pravin Banker Assocs., Ltd. v. Banco Popular del Peru*,
109 F.3d 850 (2d Cir. 1997) ................................................................... 24

*The Schooner Exch. v. McFaddon*,
11 U.S. 116 (1812) ...................................................................................... 22

*SIPC. v. BLMIS*,
516 B.R. 18 (S.D.N.Y. 2014)........................................................... 34

*U.S. Bank Nat'l Ass'n v. Verizon Commc'ns Inc.*,
892 F. Supp. 2d 805 (N.D. Tex. 2012) ........................................... 16

**Other Authorities**

*Alderson v. Temple* [1768] 98 E.R. 165 (Ct. of King's Bench)..................... 30

John Ash, New and Complete Dictionary of the English Language, 2d Ed.
(1795) ................................................................................................... 21

Black's Law Dictionary (11th Ed. 2019)........................................... 21

*Fairfield Sentry Ltd. (in Liquidation) v. Migani* [2014] UKPC 9 ................ 5

H.R. Rep. No. 106-711, pt. 2 (2000) ............................................... 18-19

RESTATEMENT (SECOND) CONFLICT OF LAWS § 90......................................... 24

Samuel Johnson, A Dictionary of the English Language (1755) .................. 21

Uniform Fraudulent Transfer Act, Sec. 8 ........................................ 34

U.S. Const. art. VI, cl. 2................................................................ 20-21

## **STATEMENT OF THE ISSUE PRESENTED**

1.  Do 11 U.S.C. §§ 546(e) and 561(d) bar foreign law claims asserted by a foreign representative in a Chapter 15 proceeding that seek avoidance of transfers or are duplicative of barred avoidance claims?

This consolidated brief for Defendants-Appellants[1] is submitted on behalf of the approximately 100 Defendants-Appellants set forth in Appendix A ("Defendants"), by the undersigned and additional counsel in Appendix B to separately-represented Defendants, who were shareholders (or their transferees) in three investment funds organized in the British Virgin Islands ("BVI"). On a motion to dismiss by Defendants, the Bankruptcy Court (Bernstein, J.) dismissed nearly all of the Liquidators' BVI law claims as barred by the U.S. Bankruptcy Code securities safe harbor codified in 11 U.S.C. § 546(e) and made applicable in Chapter 15 proceedings such as these through 11 U.S.C. § 561(d). This appeal concerns the sole remaining BVI law equitable claim that the Bankruptcy Court declined to dismiss as barred by the safe harbor, despite recognizing that the safe harbor required dismissal of foreign avoidance claims and of domestic state law non-bankruptcy claims equivalent to the BVI law equitable claim. For the reasons set forth herein, the Bankruptcy Court's ruling was erroneous and should be reversed.

## PRELIMINARY STATEMENT

This appeal addresses a single threshold question that is dispositive of the only remaining claim in these adversary proceedings: Can the foreign representatives in

---

[1]    The Bankruptcy Court reserved decision as to personal jurisdiction. Jurisdiction is not conceded by Defendants in this case and is the subject of ongoing motion to dismiss briefing before the Bankruptcy Court.

this Chapter 15 proceeding circumvent the U.S. Bankruptcy Code securities safe
harbor that bars their foreign law insolvency claims by re-casting those same
allegations as a foreign law equitable constructive trust claim?

In the proceedings below, the Bankruptcy Court correctly held that the
liquidators (the "Liquidators") of Fairfield Sentry Limited, Fairfield Sigma Limited,
and Fairfield Lambda Limited (collectively, the "Funds") were precluded by
Sections 546(e) and 561(d) of the Bankruptcy Code from asserting avoidance claims
under the BVI Insolvency Act.  The Bankruptcy Court likewise recognized that,
under controlling precedent, the Liquidators would have been precluded from re-
casting their avoidance claims under domestic common law theories, such as unjust
enrichment or constructive trust, because doing so would "frustrate the purpose of
Section 546(e)."  *In re Fairfield Sentry Ltd.*, 2021 WL 771677, at *3 (Bankr.
S.D.N.Y. Feb. 23, 2021) ("*Fairfield IV*").  Yet, having held that Section 546(e)
would preempt such claims if asserted under domestic law, the Bankruptcy Court
denied Defendants' motion to dismiss the Constructive Trust Claim, and did so
solely because the claim at issue was asserted under foreign, not domestic, law.

This was error.  Section 546(e) does not differentiate between foreign and
domestic law; as a matter of public policy, it precludes a trustee in bankruptcy from
bringing claims to avoid and recover transfers that are settlement payments or made
in connection with securities contracts.  In enacting Section 546(e), Congress barred

3

these types of transactions from being unwound after balancing the interests of creditors of insolvent companies against the risks to the stability of the U.S. financial system posed by undermining the finality of securities transactions. For purposes of this appeal, there is no dispute that the transactions at issue fall within the scope of the safe harbor. Section 561(d) of the Bankruptcy Code, in turn, extends the limitations on avoidance imposed on a domestic bankruptcy, including the Section 546(e) safe harbor, to proceedings such as these brought by a foreign representative in Chapter 15. The Second Circuit has held that a plaintiff cannot circumvent Section 546(e) by re-casting the same claims under non-bankruptcy law, and that conclusion applies with equal force to claims asserted in U.S. courts whether the claims in question are asserted under domestic or foreign law.

## BACKGROUND

This appeal arises from 18 of more than 200 actions that Plaintiffs-Appellees – the Liquidators of the Funds – have brought in the Bankruptcy Court. The Liquidators' claims relate to the liquidation in the BVI of the Funds. Each Fund entered into liquidation following the revelation in 2008 that Bernard L. Madoff Investment Securities LLC, in which each Fund was directly or indirectly invested, was a Ponzi scheme. For the last decade, the Liquidators have pursued claims both in the BVI and here in New York, seeking to claw back redemption payments to

shareholders of the Funds in the years leading up to the commencement of the Funds'

liquidation proceedings.

### A.    The Liquidators' Claims

Defendants allegedly either (a) redeemed shares in one or more of the Funds

in exchange for redemption payments calculated based on each Fund's net asset

value ("NAV") at the time of redemption or (b) are transferees of such investors.

The Liquidators have argued in proceedings in the BVI and the United States that

they are entitled to unwind billions of dollars in redemption payments and recover

from Defendants under various legal theories.  In proceedings arising from the BVI

liquidation, the U.K. Privy Council, sitting as the court of last resort, held in 2014

that the NAV was binding on the Funds and accordingly concluded that the

redemption payments made to Defendants were legally compelled. *Fairfield Sentry*

*Ltd. (in Liquidation) v. Migani* [2014] UKPC 9, ¶¶ 24-32.[2]

The Liquidators' efforts to recover in these U.S. proceedings the payments

made to Defendants when they redeemed their shares in the Funds have largely been

unsuccessful as well.  In response to motions to dismiss on various grounds in over

200 actions involving over 350 Defendants, the Bankruptcy Court directed the

parties to first brief a series of common and potentially dispositive issues.  As a result

---

[2]      A foreign law compendium is attached as Appendix C.

of four decisions on those motions, all of the Liquidators' claims have been
dismissed, save for a single BVI equitable constructive trust claim asserted in
18 remaining actions. That remaining claim – the Constructive Trust Claim – is the
only claim directly at issue in this appeal.

### B.   The Safe Harbor Decisions Below

In three decisions below, the Bankruptcy Court applied Sections 546(e)
and 561(d) of the Bankruptcy Code to the claims brought by the Liquidators. The
first decision addressing the safe harbor was *Fairfield II*, decided in
December 2018.[3]   In that decision, among other issues addressed, the Bankruptcy
Court held that Section 561(d) made Section 546(e) applicable to "proceedings
brought by foreign representatives in a Chapter 15 case seeking to avoid purely
foreign transfers under foreign insolvency laws," explaining that Congress expanded
Section 546(e) to Chapter 15 to "provide broad protection to avoid the spread of
financial contagion."[4]   Applying the Section 546(e) safe harbor, the Bankruptcy
Court concluded that the redemptions at issue were entitled to protection as
"Covered Transactions because they were settlement payments made in connection

---

[3]   *In re Fairfield Sentry Ltd.*, 596 B.R. 275 (Bankr. S.D.N.Y. 2018)
("*Fairfield II*").

[4]   *Id.* at 310, 314.

with securities contracts."[5]  The Bankruptcy Court further held that Sections 546(e)

and 561(d) would bar the statutory avoidance claims under the BVI Insolvency Act,

and potentially all of the Liquidators' claims, if Defendants could demonstrate on a

renewed motion to dismiss that the redemption payments were made by, to, or for

the benefit of a financial institution, financial participant, or other statutorily

protected entity (each, a "Covered Entity") within the meaning of the Bankruptcy

Code.[6]

In May 2019, the Liquidators appealed *Fairfield II*'s dismissal of their

contract and common law claims, which resulted in final judgments in certain cases

and Rule 54(b) partial judgments in other cases.[7]  Among the issues raised by those

appeals were the Bankruptcy Court's interlocutory rulings applying Sections 561(d)

and 546(e).  Because the Bankruptcy Court was continuing to hear issues related to

the application of the safe harbor, however, this Court stayed appellate proceedings

on those interlocutory issues – including, specifically, whether Section 561(d)

incorporates and makes applicable Section 546(e) to Chapter 15 proceedings and

---

[5]     *Id.* at 314.

[6]     *Id.* at 314-15.

[7]     *See, e.g.*, Notice of Appeal, pt. 2, *Fairfield Sentry Ltd. v. Citibank NA London*,
Adv. Pro. No. 10-3622 (Bankr. S.D.N.Y. May 1, 2019) (Dkt. 74) (partial final
judgment);. Notice of Appeal, pt. 2, *Fairfield Sentry Ltd. v. Banco Nominees (IOM)
Limited*, Adv. Pro. No. 10-4097 (Bankr. S.D.N.Y. May 16, 2019) (Dkt. 54) (final
judgment).

whether Sections 546(e) and 561(d) apply to foreign transfers and foreign avoidance claims.[8]

In December 2020, the Bankruptcy Court decided *Fairfield III*,[9] which picked up the application of the safe harbor where *Fairfield II* had left off.  In relevant part, *Fairfield III* dismissed all of the Liquidators' BVI Insolvency Act claims on the basis that those claims sought to avoid Covered Transactions made "by" the Funds, which were Covered Entities, and therefore every redemption payment was safe-harbored and protected from being unwound in Chapter 15 by the operation of Sections 546(e) and 561(d).[10]

The Bankruptcy Court declined, however, to dismiss the Constructive Trust Claim, which sought to recover the same redemption payments.[11]  While the Bankruptcy Court acknowledged that the safe harbor would require dismissal of state law claims that duplicate statutory avoidance claims because state law claims are "preempted" under the Supremacy Clause of the U.S. Constitution, it held that

---

[8]    Order ¶ A, *Fairfield Sentry Ltd. v. Citibank NA London*, No. 19-cv-3911 (VSB) (Lead Case) (S.D.N.Y Sept. 11, 2019) (Dkt. 8).

[9]    *In re Fairfield Sentry Ltd.*, 2020 WL 7345988, at *5-10 (Bankr. S.D.N.Y. Dec. 14, 2020) ("*Fairfield III*").

[10]    *Id.* at *6-7.

[11]    *Id.* at *9-10.

8

doctrines of implied "preemption" are not applicable to claims brought in U.S. courts under foreign law.[12]

On February 17, 2021, Defendants moved for reconsideration of *Fairfield III*'s denial of Defendants' motion to dismiss the Constructive Trust Claim as barred by Sections 546(e) and 561(d).[13]  Defendants argued that the Bankruptcy Court overlooked Defendants' argument that the Constructive Trust Claim is literally an avoidance claim under foreign law because, as pled, it duplicates the elements of avoidance.[14]  Defendants also argued that the Bankruptcy Court erred in its preemption analysis:  contrary to what the Bankruptcy Court held, in the face of contrary federal law, foreign law is entitled to less protection than the protection state law receives because state sovereignty and constitutional limits act as a counterweight to the ability of the federal government to override state law.[15]  Thus, Defendants argued that foreign law that contradicts U.S. public policy cannot move forward in U.S. courts.

---

[12]    *See id.* at *9-10.

[13]    Defs.' Letter-Mot. for Reconsideration, *Fairfield Sentry Ltd. v Theodoor GGC Amsterdam*, Adv. Pro. No. 10-3496 (Bankr. S.D.N.Y. Feb. 17, 2021) (Dkt. 3072).

[14]    *See id.* at 2-5.

[15]    *See id.* at 5-6.

On February 23, 2021, the Bankruptcy Court issued *Fairfield IV*, denying reconsideration on the basis that the Constructive Trust Claim is not an avoidance claim and reiterated its prior holding that federal law cannot impliedly preempt foreign law.[16]

This Appeal was timely noticed from *Fairfield III*, *Fairfield IV*, and their implementing orders to the extent they concern the application of Sections 546(e) and 561(d) to the Constructive Trust Claim.[17]

## STANDARD OF REVIEW

This Court reviews *de novo* the Bankruptcy Court's decision denying a motion to dismiss, including the Bankruptcy Court's interpretation of Bankruptcy Code Sections 546(e) and 561(d) and of the Supremacy Clause. *See In re Bernard L. Madoff Inv. Secs. LLC*, 654 F.3d 229, 234 (2d Cir. 2011).

---

[16]    *Fairfield IV*, 2021 WL 771677, at *2-4.

[17]    The Bankruptcy Court entered final orders on (i) *Fairfield III* between February 25 and 27, 2021, *see, e.g.*, Stipulated Order, *Fairfield Sentry Ltd. v. Citibank NA London*, Adv. Pro. No. 10-3622 (Bankr. S.D.N.Y. Feb. 25, 2021) (Dkt. 102) ("Citi London Stipulated Order"), and (ii) *Fairfield IV* on February 23, 2021, *see Fairfield IV,* 2021 WL 771677, at *4. The instant notices of appeal were timely filed on March 30, 2021, pursuant to Bankruptcy Court orders extending the time for appeal. *See* Stipulated Order, *Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam*, Adv. Pro. No. 10-3496 (Bankr. S.D.N.Y. Mar. 8, 2021) (Dkt. 3079); *see, e.g.*, Citi London Stipulated Order ¶ II.2.

## ARGUMENT

**I.  Section 546(e) Preempts The Liquidators' BVI Constructive Trust Claim.**

The Bankruptcy Court erred by holding that a BVI constructive trust claim brought in a Chapter 15 proceeding, which would have been barred by Section 546(e) had it been asserted under U.S. law, was not barred "because U.S. preemption law . . . does not apply to foreign law claims." *Fairfield IV*, 2021 WL 771677, at *3.

Section 546(e) of the Bankruptcy Code provides that, notwithstanding the preference and avoidance provisions of the Bankruptcy Code, a trustee "may not avoid a transfer" that is a settlement payment or a payment made in connection with a securities contract by, to, or for the benefit of a financial institution or other statutorily covered entity.  11 U.S.C. § 546(e).  The only relevant exception is for claims brought under Section 548(a)(1)(A), which permits avoidance of intentional fraudulent transfers made on or within two years prior to the petition date.  *Id.*; 11 U.S.C. § 548(a)(1)(A).

While Section 546(e) itself refers to the powers of a U.S. "trustee," the very same limitations are extended to a foreign representative who uses Chapter 15 to commence proceedings in the United States.  In relevant part, Section 561(d) provides that "[a]ny provisions of this title relating to securities contracts . . . shall apply in a case under chapter 15 . . . to limit avoidance powers to the same extent as

11

in a proceeding under chapter 7 or 11 of this title." 11 U.S.C. § 561(d). The safe

harbor under Section 546(e) is among these "limit[s]" on avoidance powers; it limits

a trustee's power to avoid settlement payments or payments in connection with a

securities contract. *See Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*,

138 S. Ct. 883, 893 (2018) ("§ 546(e) operates as an exception to the avoiding

powers afforded to the trustee under the substantive avoidance provisions.").

Section 546(e) therefore limits the powers of a Chapter 15 foreign representative in

precisely the same manner as it limits the powers of a U.S. trustee in a Chapter 7

or 11 case. *See Fairfield II*, 596 B.R. at 308, 310 (recognizing the Liquidators'

argument that "section 561(d) does no more than make section 546(e) equally

applicable (or inapplicable) in a chapter 15" and ultimately concluding that

Section 546(e) applies to Chapter 15 through Section 561(d)).

Considering that the Liquidators' Constructive Trust Claim would have been

barred by Section 546(e) if asserted by a U.S. trustee in a Chapter 7 or 11 case, so

too the Liquidators should be precluded from asserting this claim in a Chapter 15

case. Yet, even though the Bankruptcy Court "assume[d] . . . that similar,

constructive trust claims asserted by a U.S. case trustee under state law would be

barred by the safe harbor because they would 'frustrate the purpose of

Section 546(e),'" the Court nonetheless declined to dismiss the Constructive Trust

Claim. *Fairfield IV*, 2021 WL 771677, at *3-4. It did so exclusively on the basis

that the claim asserted – although brought in U.S. bankruptcy court – was alleged to be governed by foreign substantive law. As the Bankruptcy Court posited, "U.S. preemption law, the basis for the decisions by the Defendants' authorities, does not apply to foreign law claims, and sections 546(e) and 561(d) do not expressly preempt or displace foreign common law claims." *Id.* at *3.

This was error. In enacting Section 561(d), Congress plainly intended to impose the same limits on the power of a foreign representative that are imposed on a domestic trustee. 11 U.S.C. § 561(d) (limiting foreign representative's avoidance powers "to the same extent as" domestic trustee's powers). Those limitations include the securities safe harbor in Section 546(e), a policy-based limitation that is designed to protect the U.S. financial system by "minimiz[ing] the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries." *In re Tribune Co. Fraudulent Conv. Litig.*, 946 F.3d 66, 92 (2d Cir. 2019) (quoting *In re Quebecor World (USA) Inc.*, 719 F.3d 94, 100 (2d Cir. 2013), *abrogated on other grounds by Merit Mgmt.*, 138 S. Ct. 883); *accord Fairfield II*, 596 B.R. 275, 311-14 (recounting legislative history of Section 561(d) and recognizing the same risk was posed by foreign financial market participants). The limitations on a foreign representative's powers in a proceeding under Chapter 15 are thus set out in federal statutes, which supersede other sources of law, including foreign law, to the extent they conflict. Accordingly, contrary to the

13

Bankruptcy Court's holding, a U.S. court is under no obligation to give effect to a foreign legal obligation that would "frustrate the purpose of Section 546(e)" any more than it is required to give like effect to a conflicting state law. *See Fairfield IV*, 2021 WL 771677, at *3.

A.   **Under Controlling Precedent, Non-Bankruptcy Claims Such As The Liquidators' Constructive Trust Claim Are Preempted By Section 546(e).**

The Liquidators' Constructive Trust Claim is incompatible with Section 546(e)'s safe harbor provisions. Indeed, the history of these cases reveals that the Constructive Trust Claim is simply a re-casting of dismissed avoidance claims, which the Bankruptcy Court held were barred by Section 546(e). *See supra* at 11-13.

According to the Liquidators, their claim seeks "to recoup [the redemption payments] for the benefit of the Funds' estates" and to avoid Defendants retaining payments "at the expense of other shareholders and creditors." Proposed Fourth Am. Compl. ¶ 18, *Fairfield Sentry Ltd. v. Citibank N.A.*, Adv. Pro. No. 10-3622 (Dkt. 2873-20) (Jan. 15, 2020) ("Proposed Fourth Am. Compl."); *see* Third Am. Compl. ¶ 16, *Fairfield Sentry Ltd. v. Citibank N.A.*, Adv. Pro. No. 10-3622 (Dkt. 79) (Jan. 9, 2020) ("Third Am. Compl."). "Any recoveries will aid the Funds in satisfying their liabilities and redound to the benefit of the Funds' investors." Proposed Fourth Am. Compl. ¶ 18; *see* Third Am. Compl. ¶ 16. This is the very

14

same relief that the Liquidators sought in their now-dismissed BVI Insolvency Act claims. *See* Third Am. Compl. ¶¶ 104-35.

Parties are not permitted to "simply re-label[] avoidance claims" to avoid preemption under Section 546(e), *Official Comm. of Unsecured Creditors of Hechinger Inv. Co. of Del. v. Fleet Retail Fin. Grp. (In re Hechinger Inc.)*, 274 B.R. 71, 96 (D. Del. 2002), because doing so and "[a]llowing recovery [on such claims] . . . would implicate the same concerns regarding the unraveling of settled securities transactions . . . which is precisely the result that section 546(e) precludes." *AP Servs., LLP v. Silva*, 483 B.R. 63, 71 (S.D.N.Y. 2012) (quoting *In re Hechinger Inc.*, 274 B.R. at 96).

Controlling law in this Circuit holds that a litigant in a bankruptcy proceeding cannot re-cast a fraudulent transfer claim under non-bankruptcy state law to avoid Section 546(e)'s safe harbor.    In *Tribune*, the Second Circuit held that non-bankruptcy state law claims brought by the creditors of the debtor, although not literally within the scope of Section 546(e) because they were not asserted by a "trustee," were nonetheless preempted by Section 546(e) because they sought to accomplish the same objective as an avoidance claim.  946 F.3d at 90-91.  In doing so, the Second Circuit reasoned that Section 546(e) bars non-bankruptcy fraudulent transfer claims because "[u]nwinding settled securities transactions by claims such as appellants' would seriously undermine" the securities markets that the safe harbor

was designed to protect. *Id.* at 90. Congress enacted a "broad" safe harbor expressly to "prevent the insolvency of one commodity or security firm from spreading to other firms and possibl[y] threatening the collapse of the affected market." *Id.* at 91 (quoting H.R. Rep. No. 97-420, at 1 (1982)). Requiring a financial institution to "repay amounts received in settled securities transactions" could "plac[e] other market participants and the securities markets themselves at risk." *In re Enron Creditors Recovery Corp.*, 651 F.3d 329, 334 (2d Cir. 2011).

Both before and after *Tribune*, courts have recognized that non-bankruptcy claims that would "frustrat[e] the purpose of Section 546(e)" are preempted by it. *See AP Servs*, 483 B.R. at 71 (barring unjust enrichment claim that could not proceed "without frustrating the purpose of Section 546(e)"); *In re Nine West LBO Sec. Litig.*, 482 F. Supp. 3d 187, 207 (S.D.N.Y. 2020) (barring unjust enrichment claims that sought "to recover the same payments held unavoidable under § 546(e)") (internal citation omitted); *Contemp. Indus. Corp. v. Frost*, 564 F.3d 981, 988 (8th Cir. 2009) (barring unjust enrichment and other state law claims because they sought "to recover the same payments . . . [that] are unavoidable under § 546(e)"), *abrogated on other grounds by Merit Mgmt.*, 138 S. Ct. 883; *U.S. Bank Nat'l Ass'n v. Verizon Commc'ns Inc.*, 892 F. Supp. 2d 805, 824-25 (N.D. Tex. 2012) (barring a state unlawful dividend cash claim that was "in many ways similar to" the barred constructive fraudulent transfer claims); *In re Hechinger*, 274 B.R. at 94, 96 (barring

unjust enrichment claim because it "effectively acts as an avoidance claim against the shareholders in a transaction that the court has already found is an unavoidable settlement payment").

As Judge Rakoff explained in *Nine West*, the question in the preemption context is not whether the non-bankruptcy claims are "substantially identical" to the barred avoidance claims. 482 F. Supp. 3d at 207. Instead, "it is the remedy sought, rather than the allegations pled, that determines whether § 546(e) preempts a state law claim." *Id.*; *see also Contemp. Indus.*, 564 F.3d at 988 ("Allowing recovery on these claims would render the § 546(e) exemption meaningless, and would wholly frustrate the purpose behind that section."). This is so because Section 546(e) is concerned with the potential effect that unwinding securities transactions might have on the financial system, as distinguished from the particulars of the parties or allegations giving rise to those claims. *Tribune*, 946 F.3d at 92 ("Section 546(e)'s protection of the transactions consummated through these entities was not intended as protection of politically favored special interests.").[18]

_____

[18]    Rather, as the Circuit recognized in *Tribune*, the primary impetus for enacting Section 546(e) in the first place was "to protect investors from the disruptive effect of after-the-fact unwinding of securities transactions," to minimize "substantial deterrents . . . to investing in the securities market," and to "protect a national, heavily regulated market by limiting creditors' rights." 946 F.3d at 93-94.

Allowing the Liquidators to pursue the Constructive Trust Claim pled here
would frustrate the objective of Section 546(e). By this claim, the Liquidators seek
to unwind hundreds of millions of dollars of transfers by major foreign investment
funds to and through a litany of domestic and international banks, funds, and
investors. *See Fairfield II*, 596 B.R. at 281-84; Third Am. Compl., Ex. A.[19]

Indeed, history confirms that this is exactly what Congress intended to prevent
when it extended Section 546(e) to Chapter 15 proceedings in 2005. Specifically,
Section 561(d) was enacted as part of the 2005 bankruptcy reform bill in response
to the near-collapse of Long-Term Capital Management, L.P. ("LTCM"), a Cayman
Islands hedge fund that ultimately had to be bailed out at the request of the Federal
Reserve by a consortium of banks on the order of billions of dollars. *See* H.R. Rep.
No. 106-711, pt. 2, at 55 (2000) ("The near failure of Long-Term Capital
Management . . . highlights the need for the U.S. to further refine its bankruptcy and

---

[19]    In opposition to Defendants' renewed motion to dismiss and reconsideration
of the same, the Liquidators asserted that "the Constructive Trust Claims seek the
overpaid portions of the transfers" only, whereas their "avoidance claims seek to
avoid transfers in their entirety." Pls.' Letter Opp'n to Defs.' Mot. for
Reconsideration at 7, *Fairfield Sentry Ltd. v. Citibank NA London*, No. 19-cv-3911
(Bankr. S.D.N.Y. Feb. 17, 2021) (Dkt. 3073). It is unclear what portions of the
transfers the Liquidators consider to be overpaid. In any event, there is no doubt that
the Liquidators continue to seek the unwinding of settled transactions. *See* Proposed
Fourth Am. Compl. ¶ 192 (alleging that Defendants were "not entitled to receive the
Redemption Payments" and seeking that "a constructive trust . . . be imposed on the
Redemption Payments that were received by Defendants," without qualification);
*accord* Third Am. Compl. ¶¶ 101, 103.

18

insolvency laws in order to avoid systemic risk to the nation's financial system in the event of a failure of a large bank, hedge fund, or securities firm . . .").  The President's Working Group pointed out that, had LTCM failed and been forced into liquidation abroad, the liquidation could have had devastating effects on the financial markets – a concern that led to the enactment of what would eventually become Section 561(d), *Fairfield II*, 596 B.R. at 311-14 (recounting legislative history of Section 561(d) and citing, *inter alia*, the President's Working Group on Financial Markets, *Hedge Funds, Leverage, and the Lessons of Long-Term Capital Management* (Apr. 1999)).  The protections that Congress enacted in Section 561(d) would be illusory if foreign representatives could avoid the safe harbor by simply pleading their avoidance claims under foreign law equitable or common law doctrines.

Because the Liquidators' Constructive Trust Claim is incompatible with Section 546(e), it should have been dismissed.

### B.    The Bankruptcy Court Erred In Holding That Federal Law Does Not Preempt Or Displace Conflicting Foreign Law.

The Bankruptcy Court did not disagree that the Constructive Trust Claim would be preempted if it had been pled under the laws of New York or another state. Yet, following only a cursory analysis, the Bankruptcy Court erroneously declined to dismiss the Constructive Trust Claim simply because it was pled under BVI law.

19

The root of the Court's error is that it misread the Supremacy Clause of the

Constitution.  In *Fairfield III*, the Bankruptcy Court began with the premise that:

> Under the Supremacy Clause of the United States
> Constitution, federal law 'shall be the supreme Law of the
> Land . . . any Thing in the Constitution or Laws of any
> State to the Contrary notwithstanding.'  U.S. Const. art.
> VI, cl. 2.

2020 WL 7345988, at *9 (modifications in original).  From that premise, the Court

presumed that "[c]ourts do not assume that otherwise applicable foreign law is

preempted absent express statutory language to that effect."  *Id.* at *10; *accord*

*Fairfield IV*, 2021 WL 771677, at *3 (holding that "U.S. preemption law . . . does

not apply to foreign law claims").  That conclusion, in turn, led the Court to favor

foreign law claims over domestic state law claims by holding that while identical

claims asserted under the law of a U.S. state would be preempted, claims asserted

under foreign law were not.  *Fairfield III*, 2020 WL 7345988, at *9-10.

But the Bankruptcy Court's recitation of the Supremacy Clause omitted text

in a way that fundamentally changed its meaning.  There is no foreign law carve-out

to the Supremacy Clause.  Rather, in full, it reads as follows:

> **This Constitution, and the Laws of the United States**
> **which shall be made in Pursuance thereof; and all**
> **Treaties made, or which shall be made, under the**
> **Authority of the United States, shall be the supreme**
> **Law of the Land;** *and the Judges in every State shall be*
> *bound thereby, any Thing in the Constitution or Laws of*
> *any State to the Contrary notwithstanding.*

20

U.S. CONST. art. VI, cl. 2 (emphasis added).

The Clause accordingly sets forth two independent, albeit related, principles:

*First* – as offset in the **boldface text** – the Clause establishes that the Constitution, laws, and treaties of the United States are supreme, meaning that in the case of conflict between federal law and other sources of law, federal law is to be applied. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015) ("It is apparent that this Clause creates a rule of decision: Courts 'shall' regard the 'Constitution,' and all laws 'made in Pursuance thereof,' as 'the supreme Law of the Land.'").[20]

*Second* – as offset in the *italicized text* – the Clause establishes that the judges of the states (sitting in courts established under state law) are bound by federal law notwithstanding anything to the contrary in state constitutions or laws. Importantly, the language referring to state laws or constitutions "notwithstanding" modifies this second sub-clause, referring to the obligations of "Judges in every State." This Clause establishes that state court judges are obligated to apply federal law when it

---

[20]    The language would have been understood as such at the time it was drafted. *See, e.g.*, Samuel Johnson, A Dictionary of the English Language (1755) ("Supremacy . . . Higheft place; higheft authority. . . . No appeal may be made unto any one of higher power[.]"); John Ash, New and Complete Dictionary of the English Language, 2d Ed. (1795) ("Supreme . . . Higheft in dignity, higheft in authority."); *see also* Black's Law Dictionary (11th Ed. 2019) ("supremacy . . . having the superior or greatest power or authority").

conflicts with the law of their respective states. *See Howlett By & Through Howlett v. Rose*, 496 U.S. 356, 369 n.16 (1990) ("The language of the Supremacy Clause – which directs that 'the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any state to the Contrary notwithstanding' – and our cases confirm that state courts have the coordinate authority and consequent responsibility to enforce the supreme law of the land.").[21]

Nothing in this second sub-clause modifies or limits the declaration of the supremacy of federal law contained in the first. While the Supremacy Clause does not specifically refer to foreign law, that does not mean that courts should (or even may) apply foreign law when it conflicts with federal law. Rather, historically, courts were understood to apply foreign law *only* when it does not conflict with domestic law. *See The Schooner Exch. v. McFaddon*, 11 U.S. 116, 136 (1812) ("The jurisdiction of the nation within its own territory is necessarily exclusive and absolute . . . . All exceptions, therefore, to the full and complete power of a nation within its own territories, must be traced up to the consent of the nation itself. They can flow from no other legitimate source."); *Bank of Augusta v. Earle*, 38 U.S. 519,

---

[21]    *See also Martin v. Hunter's Lessee*, 14 U.S. 304, 342 (1816) ("It must, therefore, be conceded that the constitution not only contemplated, but meant to provide for cases within the scope of the judicial power of the United States, which might yet depend before state tribunals. It was foreseen that in the exercise of their ordinary jurisdiction, state courts would incidentally take cognizance of cases arising under the constitution, the laws, and treaties of the United States.")

520 (1839) ("The comity thus extended to other nations is no impeachment of sovereignty. It is the voluntary act of the nation by which it is offered; and is inadmissible when contrary to its policy, or prejudicial to its interests.").

Modern law follows the same principle. As the Supreme Court has held, the Supremacy Clause displaces conflicting law that "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *California v. ARC Am. Corp.*, 490 U.S. 93, 100-01 (1989) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). While so-called conflict preemption cases typically speak in terms of the conflict between federal and state law, that is only because, in a federal system of concurrent legislative authority, conflicts most often occur between state and federal law. In that context, "because the States are independent sovereigns in our federal system," courts "have long presumed that Congress does not cavalierly pre-empt state-law causes of action." *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996).

Courts should not be *more* willing to find state law, as opposed to foreign law, preempted by federal law. Rather, if anything, the opposite is true. While federal courts can and do construe and apply foreign law, they do so only as a matter of comity and only insofar as doing so does not conflict with federal law. *See, e.g., Hilton v. Guyot*, 159 U.S. 113, 164 (1895) ("[N]o nation will suffer the laws of another to interfere with her own to the injury of her citizens."). Even without an

23

express conflict with federal law like there is here, the Bankruptcy Act prohibits
foreign representatives from pursuing claims that are "manifestly contrary to the
*public policy* of the United States."  11 U.S.C. § 1506 (emphasis added); *see Pravin
Banker Assocs., Ltd. v. Banco Popular del Peru*, 109 F.3d 850, 854 (2d Cir. 1997)
(declining to recognize foreign proceedings when "contrary to the policies or
prejudicial to the interests of the United States"); *id.* ("[T]he obligation of comity
expires when the strong public policies of the forum are vitiated by the foreign act.")
(quoting *Laker Airways Ltd. v. Sabena Belgian World Airlines*, 731 F.2d 909, 937
(D.C. Cir. 1984)); RESTATEMENT (SECOND) CONFLICT OF LAWS § 90 ("No action will
be entertained on a foreign cause of action the enforcement of which is contrary to
the strong public policy of the forum.").

Against that context, the Bankruptcy Court's holding is peculiar in that it
subordinates the dignity of state law relative to that of *foreign* law.  The Bankruptcy
Court appears to have believed that while state laws that frustrate a federal statutory
objective may be validly preempted by implication, federal courts sitting in the
United States are obligated to recognize and give effect to conflicting *foreign* laws
– equally frustrating Congressional purpose – "absent express statutory language."
*Fairfield III*, 2020 WL 7345988, at *10.

The Bankruptcy Court cited no cases that actually support this proposition.
The sole case that the Bankruptcy Court cited for its assertion that the "Supremacy

Clause applies to states and is inapplicable to considerations of federal law versus foreign law," is *Al-Kurdi v. United States*, 25 Cl. Ct. 599 (Cl. Ct. 1992). *Fairfield III*, 2020 WL 7345988, at \*10 (quoting *Al-Kurdi*, 25 Cl. Ct. at 601 n.3). *Al-Kurdi*, however, did not involve foreign claims that would have frustrated a federal statute like Section 546(e). Rather, it was a conflict-of-laws case, in which the question was whether U.S. or Jordanian law should control "a contract with a foreign citizen, allegedly made and performed in a foreign country." *Al-Kurdi*, 25 Cl. Ct. at 601. The *Al-Kurdi* court considered the Supremacy Clause only in a footnote, and only to note that federal law did not necessarily displace foreign law as providing the rule of decision. *Id.* at 601 n.3. Critically, nothing in U.S. federal law prohibited the application of foreign law, nor – given that contract law is typically the province of state law in this country, *Donohue v. Cuomo*, 980 F.3d 53, 65 (2d Cir. 2020) – was there necessarily any conflict between applying foreign law to the contractual dispute and any federal law or policy. In other words, properly contextualized, *Al-Kurdi* stands for nothing more than the principle that the Supremacy Clause does not control substantive choice-of-law analysis; it says nothing about conflict preemption in circumstances where, as here, federal law limits a foreign representative's powers regardless of the source of substantive law.

The Bankruptcy Court also relied on a series of cases interpreting the Securities Litigation Uniform Standards Act ("SLUSA"), 15 U.S.C. § 78bb,

reasoning that because SLUSA has been held not to preempt foreign securities laws, in effect, that no federal statute could do so – at least in the absence of express statutory language. *Fairfield III*, 2020 WL 7345988, at *10. Yet, the reason SLUSA only preempts state law and not foreign law has nothing to do with the limits of the Supremacy Clause. State law is preempted pursuant to the express language of the statute, which prohibits plaintiffs from bringing certain types of securities fraud cases under the "law of any State." 15 U.S.C. § 78bb(f)(1).

By its terms, SLUSA says nothing about foreign law, and with good reason. Congress passed SLUSA to end circumvention of the Private Securities Litigation Reform Act ("PSLRA") through collective actions brought under state law. *In re Kingate Mgmt. Litig.*, 784 F.3d 128, 138 (2d Cir. 2015); *LaSala v. Bordier et Cie*, 519 F.3d 121, 128 (3d Cir. 2008). In enacting SLUSA, Congress was concerned about the assertion of securities claims under concurrently applicable state law to the same facts as federal securities claims. *Kingate*, 784 F.3d at 138; *LaSala*, 519 F.3d at 128. Congress was not concerned with the possibility of plaintiffs seeking to circumvent the PSLRA by asserting their securities claims under foreign law. *LaSala*, 519 F.3d at 138-39. Congress therefore addressed SLUSA to claims "based upon the statutory or common law of any *State*." *Id.* at 138 (quoting 15 U.S.C. § 78bb(f)(1)) (emphasis added); *see also* 15 U.S.C. § 78c(a)(16) ("'State' means any State of the United States . . . or any other possession of the United States."). Indeed,

26

the fact that Congress expressly referred to the laws of a State (rather than, for example, "any other law"), demonstrates that Congress *intended* SLUSA preemption to be confined to state law. There is no basis for applying that statutory analysis here. In contrast to SLUSA, Section 561(d) – which limits a Chapter 15 foreign representative's "avoidance powers to the same extent as in a proceeding under Chapter 7 or 11" – is much more general. More fundamentally, cases construing SLUSA's specific language do not bear on whether foreign law claims can be preempted in the event of a conflict with federal law.

Finally, in deciding that preemption of foreign law requires express statutory language, the Bankruptcy Court relied on *Comrie v. IPSCO Inc.*, 2008 WL 5220301, at *4-5 (N.D. Ill. Dec. 10, 2008). *Fairfield III*, 2020 WL 7345988, at *10. The Bankruptcy Court's reliance on *Comrie* was misplaced. *Comrie* concerned whether the exclusive civil enforcement provisions of the U.S. Employee Retirement Income Security Act ("ERISA") preempted Canadian law contract claims based on an employment contract entered into in Canada. 2008 WL 5220301, at *4-5. Like the court in *LaSala*, the court in *Comrie* considered only the meaning of the statutory language, which it found expressly referred only to the preemption of state law and thus excluded the preemption of other laws. *Id.* at *5 ("[T]he provisions of this title . . . shall supersede any and all State laws . . . .") (quoting 29 U.S.C. § 1144(a)). Moreover, there was no actual conflict between the federal law ERISA (which

27

governs employee benefit plans in the United States) and the Canadian employment law contract, and so, unlike here, the *Comrie* court never had to decide whether to apply foreign law that conflicts with a federal statute.

Importantly, the Bankruptcy Court was not confronted in this case with a statute that either limited its scope to displacing state law, or an application of a statute that would have regulated conduct abroad. Here, the Liquidators have asserted claims in U.S. courts. Chapter 15 of the Bankruptcy Code permits them to do so, but also places limits on their powers for the protection of the U.S. financial system. Section 561(d) makes clear that the Liquidators cannot bring claims that Congress has prohibited a U.S. trustee from bringing insofar as they "relat[e] to securities contracts." 11 U.S.C. § 561(d). Nothing in Section 561(d), or Section 546(e) for that matter, differentiates between claims asserted under domestic or foreign law; rather, the limitation is on the power of the foreign representative. *Cf. Blazevska v. Raytheon Aircraft Co.*, 522 F.3d 948, 953-54 (9th Cir. 2008) (holding that while statute at issue contained no language displacing otherwise applicable foreign law, it still barred foreign cause of action because statute provided a limit on relief available in the U.S. that was applicable to both foreign and domestic claims).

Once the Bankruptcy Court recognized that the Constructive Trust Claim asserted by the Liquidators was the type of claim that "frustrate[s] the purpose of Section 546(e)," *Fairfield IV*, 2021 WL 771677, at *3, it was incumbent on the

Bankruptcy Court to dismiss this claim as precluded by federal law, just as it
dismissed the BVI Insolvency Act claims.

### C. If It Is Not Preempted, The Liquidators' Constructive Trust Claim Is Precluded Because It Is Literally A Re-Cast Avoidance Claim.

While any attempt to circumvent Section 546(e) by pleading common law or
equitable claims should have failed, in this case the Liquidators' Constructive Trust
Claim falls even *more* clearly within the scope of the safe harbor because – as
actually pled here – it *literally* duplicates a statutory avoidance claim.

As the Bankruptcy Court correctly held, Section 546(e), as extended to
Chapter 15 proceedings by Section 561(d), precludes the Liquidators from asserting
avoidance claims under foreign law:

> A chapter 15 foreign representative cannot exercise the
> avoidance powers available to a trustee in chapter 7 or
> chapter 11. *See* 11 U.S.C. § 1521(a)(7). ***Consequently,
> section 561(d) is necessarily referring to avoidance
> powers available under non-U.S. law.***

*Fairfield II*, 596 B.R. at 310 (emphasis added); *accord* 11 U.S.C. § 1521(a)(7); *In re
Condor Ins. Ltd.*, 601 F.3d 319, 327 (5th Cir. 2010) (holding that Chapter 15 does
not allow foreign representative "to gain access to avoidance powers not provided
by the law of the foreign proceeding"). Because Congress could not possibly have
listed all of the foreign law avoidance claims that exist in the world, this necessarily
requires that the Court examine the substance of the actual claims pled to identify

those that are "analogous to preference claims, state law fraudulent transfer claims or constructive fraudulent transfer claims under Bankruptcy Code § 548(a)(1)(B)." *See Fairfield III*, 2020 WL 7345988, at *5; *see also Fairfield II*, 596 B.R. at 310-14.

An "avoidance" claim is typically understood to be a claim brought by an insolvent entity or its creditors seeking to set aside transfers of assets by the debtor in order to satisfy claims of other creditors. *See In re Picard*, 917 F.3d 85, 97 (2d Cir. 2019) ("A general purpose of the Bankruptcy Code's avoidance provisions . . . is protecting a debtor's estate from depletion to the prejudice of the unsecured creditor." (internal quotation and alterations omitted)).[22]

Here, the Liquidators' Constructive Trust Claim – in substance – seeks to do precisely the same. The crux of the Liquidators' Constructive Trust Claim is that it would be unfair and unconscionable to other investors to permit "investors lucky enough to redeem their shares in the Funds before the collapse of the Ponzi scheme," Proposed Fourth Am. Compl. ¶ 7, to retain payments while others "found themselves victims of Madoff's Ponzi scheme," *id.* ¶ 18. The claim thus seeks traditional avoidance under U.S. law and, specifically, replicates constructively fraudulent transfers. *See, e.g.*, 11 U.S.C. § 548(a)(1)(B); N.Y.D.C.L. § 273(a)(2).

---

[22] While the U.S. and many other countries have codified such claims in their statutes, historically the ability to avoid fraudulent conveyances was a common law right. *See Alderson v. Temple* [1768] 98 E.R. 165 (Ct. of King's Bench) (per curiam) (allowing plaintiff's action in trover to recover void fraudulent conveyance of notes).

The tell-tale sign that the Liquidators' claim is really one to "avoid" transfers is that their sole basis for contending that the transfers were unfair and "unconscionable" is that they frustrate pro rata distribution to other Fund investors. *See* Third Am. Compl. ¶ 16. The Liquidators allege this in detail:

(1)    Redemption payments were made to each Defendant, *id.* ¶¶ 9, 40;

(2)    In fact, "those Redemption Payments [were] in excess of the Net Asset Value of redeemed Shares that would have been calculated based upon the true facts existing at that time," *id.* ¶ 97;

(3)    Defendants "had knowledge of the possibility of Madoff's Ponzi scheme," *id.* ¶ 79, and "consciously disregarded" evidence the NAV was inflated, *id.* ¶ 73;

(4)    Defendants were therefore "unjustly enriched to the detriment of [the Funds] and other shareholders and creditors of [the Funds]," *id.* ¶ 100; and

(5)    That because "[i]t would offend principles of equity and good conscience to permit Defendants to retain the Redemption Payments," *id.* ¶ 102, "a constructive trust should be imposed . . . for the benefit of the Foreign Representatives and [the Funds] and other shareholders and creditors of [the Funds]," *id.* ¶ 103.

Notably, the Liquidators make clear in proposed amended complaints (which they seek to file in Bankruptcy Court) that the purpose of their claim is "to recoup [the redemption payments] for the benefit of the Funds' estates" and to avoid Defendants retaining payments "at the expense of other shareholders and creditors." Proposed Fourth Am. Compl. ¶ 18; *see* Third Am. Compl. ¶ 16. "Any recoveries," they allege, "will aid the Funds in satisfying their liabilities and redound to the

benefit of the Funds' investors." Prop. Fourth Am. Compl. ¶ 18; *see* Third Am. Compl. ¶ 16. These allegations are the language of an avoidance action: the Liquidators seek payments, made by an insolvent company,[23] on the basis that retention of the payments is unfair to other investors, and they propose to use the proceeds of those actions to fund distributions through a liquidation to other shareholders and creditors. *Cf. Fairfield II*, 596 B.R. at 302 (recognizing BVI Insolvency Act Section 245 permits return of payments made by an insolvent debtor that "put the creditor in a better position than if the transfer had not been made and the company was liquidated").

As discussed above, it is notable that the Liquidators' Constructive Trust Claim not only duplicates the elements of and remedies sought by their BVI statutory avoidance claims, but in fact was pled in this form belatedly in this case, after it became clear that their statutory avoidance claims were unlikely to survive. *See Fairfield II*, 596 B.R. at 298, 301. While the Bankruptcy Court granted the Liquidators leave to assert a Constructive Trust Claim, when it came time to actually

---

[23]    While insolvency is not an element of all constructive trust claims, it is pled here and is not just incidental to the claim. The Liquidators assert that these redemption payments were inequitable for the same reason that the payments pushed the Funds into insolvency. Like a trustee in bankruptcy, the Liquidators purport to pursue the Constructive Trust Claim "for the benefit of . . . [the Funds'] creditors." Third Am. Compl. ¶ 103; *see also id.* ¶ 100 (alleging Defendants were enriched at the "detriment of . . . creditors").

plead their claim, the Liquidators simply repackaged and repeated the very same allegations that supported their statutory avoidance claims.

Courts do not ordinarily permit plaintiffs to simply repackage barred claims through artful pleading. "What matters is not the form of the action, but the substance of the claim." *See Att'y. Gen. of Can. v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 130 (2d Cir. 2001) (holding RICO claim precluded by the common law Revenue Rule where claim substantively sought to enforce Canadian tax law); *see also Kingate*, 784 F.3d at 140 (explaining that in the SLUSA context courts "review the substance of a complaint's allegations, and claimants cannot avoid its application through artful pleading that removes the covered words . . . but leaves in the covered concepts") (internal quotation omitted)).

While the Liquidators have argued, and the Bankruptcy Court appears to have focused on, that a BVI constructive trust claim requires pleading the defendant's "knowing receipt" of the challenged transfer, *Fairfield II*, 596 B.R. at 297 (citing *DD Growth Premium 2X Fund v. RMF Mkt. Neutral Strategies (Master) Ltd.* [2017] UKPC 36), that allegation does not fundamentally change the nature of the Liquidators' claims or the applicability of Section 546(e). Section 546(e)'s prohibition on claims to avoid fraudulent conveyances applies equally to claims requiring a showing of the transferee's bad faith, as well as those premised on constructive fraud or other theories, such as a state law claim requiring knowledge.

The transferee's knowledge is relevant to claims for avoidance under both federal and state fraudulent conveyance law. *See, e.g.*, Uniform Fraudulent Transfer Act, Sec. 8 (currently enacted by 31 states and D.C.); N.Y.D.C.L. § 277(a) (providing a transfer is "not voidable . . . against a person that took in good faith and for a reasonably equivalent value"); 11 U.S.C. § 548(c) ("[A] transferee . . . that takes for value and in good faith has a lien on or may retain any interest transferred.").[24]

Allowing the Liquidators to circumvent the safe harbor by repleading the same substantive avoidance allegations that were dismissed would conflict with and frustrate the express federal policy underlying the safe harbor. It would undermine the finality of a substantial number of securities transactions and risk the stability of the international securities market with cascading claw back actions. *Tribune*, 946 F.3d at 90-94. Accordingly, the Bankruptcy Court's decision denying Defendants' motion to dismiss the Constructive Trust Claim should be reversed.

---

[24]    Nor does it matter that for certain federal statutory avoidance claims a defendant's good faith is a defense rather than an element. Whether the burden is assigned to plaintiff or defendant, a claim seeking to set aside a transfer by an insolvent for the benefit of creditors is an "avoidance" claim. *See SIPC. v. BLMIS*, 516 B.R. 18, 24 (S.D.N.Y. 2014) (requiring that trustee plead "defendant did not act in good faith"). Indeed, the Liquidators must plead Defendants' knowledge as an element of their barred BVI Insolvency Act Section 246 claims under the Bankruptcy Court's prior decisions. *Fairfield II*, 596 B.R. at 303, 305 (requiring "plaintiff to plead and ultimately prove . . . the transferor" received inadequate consideration by pleading knowledge).

## CONCLUSION

For the reasons provided, Defendants respectfully submit that this Court should reverse the Bankruptcy Court's decision denying Defendants' motion to dismiss the Constructive Trust Claim.

Dated: March 30, 2021                Respectfully submitted,
     Washington, D.C.

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By:  */s/ Nowell D. Bamberger*
     Nowell D. Bamberger
     (admitted *pro hac vice*)

     2112 Pennsylvania Avenue, NW
     Washington, D.C. 20037
     Tel. (202) 974-1500
     Fax (202) 974-1999
     nbamberger@cgsh.com

     Joseph M. Kay
     Christine M. Jordan
     One Liberty Plaza
     New York, New York 10006
     Tel. (212) 225-2000
     Fax (212) 225-3999
     jkay@cgsh.com
     cjordan@cgsh.com

     *Attorneys for HSBC Bank USA, N.A.; HSBC Private Bank (Suisse) S.A.; HSBC Securities Services (Luxembourg) SA*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Federal Rule of Bankruptcy Procedure 8015(a)(7)(B)(i), because it contains 8,235 words, excluding the parts of the brief exempted by Federal Rule of Bankruptcy Procedure 8015(g).

2.      This brief complies with the typeface requirements of Federal Rule of Bankruptcy Procedure 8015(a)(5) and the type style requirements of Federal Rule of Bankruptcy Procedure 8015(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated:  March 30, 2021
        Washington, D.C.


            By:  */s/ Nowell D. Bamberger*
                 Nowell D. Bamberger

# Appendix A
# Defendants-Appellants[1]

| | Case No. (S.D.N.Y. Bankr.) | Case Name | Defendant Name | Prior Pending S.D.N.Y. Appeal No.[2] |
|---|---|---|---|---|
| 1. | Adv. Pro. 10-3622 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Citibank NA London, et al.* | Citibank NA London | 19-cv-3911 |
| 2. | Adv. Pro. 10-3626 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. BNP Paribas Luxembourg SA a/k/a BGL BNP Paribas* | BNP Paribas Luxembourg SA a/k/a BGL BNP Paribas | N/A[3] |
| 3. | Adv. Pro. 10-3627 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. BNP Paribas Securities Services Luxembourg, et al.* | Altigefi-Altipro Master a/k/a Olympia Capital Management | N/A |
| 4. | Adv. Pro. 10-3627 | *Fairfield Sentry Ltd. (In Liquidation), et al.v. BNP Paribas Securities Services Luxembourg, et al.* | BNP Paribas Securities Services Luxembourg | N/A |
| 5. | Adv. Pro. 10-3627 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. BNP Paribas Security Services Luxembourg, et al.* | Rothschild & Cie Banque-EGA | N/A |
| 6. | Adv. Pro. 10-3627 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. BNP Paribas Securities Services Luxembourg, et al.* | Milan Clessidra a/k/a Clessidra SGR SpA | N/A |

---

[1]    The names of Defendants included in this Appendix reflect parties named as Defendants by the Liquidators in the relevant complaints (or to the extent there has been an update to the docket in a particular Action changing the name of a defendant, the updated defendant name) (the "As-Named Defendants"). The inclusion of the As-Named Defendants in this Appendix is not and shall not be construed as an acknowledgement that any such As-Named Defendants are cognizable legal entities or as a waiver of any substantive or procedural rights and remedies by any such As-Named Defendants, all of which are hereby expressly reserved.

[2]    As of the time of filing the Notice of Appeal for the instant interlocutory appeals in each Bankruptcy Court adversary proceeding listed here, S.D.N.Y. docket numbers have not yet been assigned to each newly-opened interlocutory appeal. Listed instead in this column for the Court's convenience are the S.D.N.Y. docket numbers assigned to the Liquidators' currently-pending appeals of right taken in 2019 arising out of *Fairfield II.*

[3]    Two cases involving five Defendants have their prior pending S.D.N.Y. appeal numbers listed as "N/A" because those parties stipulated to orders binding them to this Court's ruling on the 2019 appeals. *See, e.g.*, Stipulated Order ¶¶ IV.C-D, *Fairfield Sentry Ltd. v. BNP Paribas Secs. Servs. Lux.*, Adv. Pro. No. 10-3627 (Bankr. S.D.N.Y. Aug. 8, 2019) (Dkt. 91). For one case involving seven Defendants, the Liquidators filed their adversarial complaint only after the prior pending S.D.N.Y. appeal was filed. These Defendants therefore do not have their own prior pending S.D.N.Y. appeal numbers.

| | Case No. (S.D.N.Y. Bankr.) | Case Name | Defendant Name | Prior Pending S.D.N.Y. Appeal No.[2] |
|---|---|---|---|---|
| 7. | Adv. Pro. 10-3630 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. HSBC Securities Services (Luxembourg) SA, et al.* | HSBC Securities Services (Luxembourg) SA | 19-cv-4860 |
| 8. | Adv. Pro. 10-3630 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. HSBC Securities Services (Luxembourg) SA, et al.* | Private-Space Ltd. | 19-cv-4860 |
| 9. | Adv. Pro. 10-3633 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. HSBC Private Bank Suisse SA, et al.* | HSBC Private Bank Suisse SA | 19-cv-4861 |
| 10. | Adv. Pro. 10-3634 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Zurich Capital Markets Company, et al.* | Zurich Capital Markets Company | 19-cv-5135 |
| 11. | Adv. Pro. 10-3634 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Zurich Capital Markets Company, et al.* | ZCM Asset Holding Co. Bermuda | 19-cv-5135 |
| 12. | Adv. Pro. 10-3634 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Zurich Capital Markets Company, et al.* | ZCM Matched Funding Corp. | 19-cv-5135 |
| 13. | Adv. Pro. 10-3634 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Zurich Capital Markets Company, et al.* | Merrill Lynch Bank[4] | 19-cv-5135 |
| 14. | Adv. Pro. 10-3634 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Zurich Capital Markets Company, et al.* | HSBC Bank USA | 19-cv-5135 |
| 15. | Adv. Pro. 10-3634 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Zurich Capital Markets Company, et al.* | Citibank (Switzerland) Zurich | 19-cv-5135 |
| 16. | Adv. Pro. 10-3634 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Zurich Capital Markets Company, et al.* | Citivic Nominees Limited | 19-cv-5135 |

---

[4]     The party sued here as "Merrill Lynch Bank" is a nonexistent entity, and there is no concession to the contrary by submitting this filing.

| | Case No. (S.D.N.Y. Bankr.) | Case Name | Defendant Name | Prior Pending S.D.N.Y. Appeal No.[2] |
|---|---|---|---|---|
| 17. | Adv. Pro. 10-3634 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Zurich Capital Markets Company, et al.* | Banco Itau Europa Luxembourg | 19-cv-5135 |
| 18. | Adv. Pro. 10-3634 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Zurich Capital Markets Company, et al.* | EFG Private Bank SA | 19-cv-5135 |
| 19. | Adv. Pro. 10-3634 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Zurich Capital Markets Company, et al.* | Bank Morgan Stanley AG; Morgan Stanley & Co. International, PLC | 19-cv-5135 |
| 20. | Adv. Pro. 10-3634 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Zurich Capital Markets Company, et al.* | Safra National Bank of New York | 19-cv-5135 |
| 21. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Verwaltungs-und Privat-Bank Aktiengesellschaft | 19-cv-4964 |
| 22. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Centrum Bank Aktiengesellschaft | 19-cv-4964 |
| 23. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | UBS AG Zurich | 19-cv-4964 |
| 24. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | UBS AG New York | 19-cv-4964 |
| 25. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | UBS Jersey Nominees | 19-cv-4964 |
| 26. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Caceis Bank Luxembourg | 19-cv-4964 |
| 27. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Clariden Leu Ltd. | 19-cv-4964 |
| 28. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Credit Suisse AG Zurich | 19-cv-4964 |

| | Case No. (S.D.N.Y. Bankr.) | Case Name | Defendant Name | Prior Pending S.D.N.Y. Appeal No.[2] |
|---|---|---|---|---|
| 29. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Union Bancaire Privée, UBP SA (sued as ABN AMRO Schweiz AG a/k/a ABN AMRO (Switzerland) AG) | 19-cv-4964 |
| 30. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Liechtensteinische Landesbank AG (sued as Liechtensteinische LB Reinvest AMS) | 19-cv-4964 |
| 31. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Dresdner Bank Schweiz (n/k/a LGT Bank (Switzerland) Ltd.) | 19-cv-4964 |
| 32. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | LGT Bank in Liechtenstein AG (n/k/a LGT Bank AG) | 19-cv-4964 |
| 33. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Banca Arner S.A. | 19-cv-4964 |
| 34. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Harmony Capital Fund Ltd. | 19-cv-4964 |
| 35. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Lloyds TSB Bank Geneva (now known as Lloyds TSB Bank, plc) | 19-cv-4964 |
| 36. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | RBC Investor Services Bank S.A. | 19-cv-4964 |
| 37. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | RBS Coutts Bank Ltd., now known as Coutts & Co. Ltd | 19-cv-4964 |
| 38. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | BBVA (Suisse) SA | 19-cv-4964 |
| 39. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | BNP Paribas (Suisse) SA Ex Fortis (n/k/a BNP Paribas (Suisse) SA) | 19-cv-4964 |

| | Case No. (S.D.N.Y. Bankr.) | Case Name | Defendant Name | Prior Pending S.D.N.Y. Appeal No.[2] |
|---|---|---|---|---|
| 40. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | BNP Paribas (Suisse) SA | 19-cv-4964 |
| 41. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | BNP Paribas (Suisse) SA Private (n/k/a BNP Paribas (Suisse) SA) | 19-cv-4964 |
| 42. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Bank Julius Baer & Co. Ltd. | 19-cv-4964 |
| 43. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Banque Cantonale Vaudoise | 19-cv-4964 |
| 44. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | BCV AMC Defensive AL Fund | 19-cv-4964 |
| 45. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Compagnie Bancaire Helvetique | 19-cv-4964 |
| 46. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Edmond de Rothschild (Suisse) SA (sued as Sella Bank AG) | 19-cv-4964 |
| 47. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Lombard Odier Darier Hentsch & Cie | 19-cv-4964 |
| 48. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Rothschild Bank AG Zurich (Dublin) a/k/a Rothschild Bank AG | 19-cv-4964 |
| 49. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Rothchild Bank Geneva (Dublin) | 19-cv-4964 |
| 50. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Rothschild Lugano Dublin a/k/a Banca Privata Edmond de Rothschild Lugano SA | 19-cv-4964 |
| 51. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Societe Generale Bank & Trust | 19-cv-4964 |
| 52. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Pictet & Cie | 19-cv-4964 |

| | Case No. (S.D.N.Y. Bankr.) | Case Name | Defendant Name | Prior Pending S.D.N.Y. Appeal No.[2] |
|---|---|---|---|---|
| 53. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | "HSBC"[5] | 19-cv-4964 |
| 54. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Fairfield Investment Fund Ltd. | 19-cv-4964 |
| 55. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Fairfield Investment GCI | 19-cv-4964 |
| 56. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | FIF Advanced Ltd. | 19-cv-4964 |
| 57. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Vorarlberger Landes- und Hypothekenbank Aktiengesellschaft | 19-cv-4964 |
| 58. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Quasar Funds SPC a/k/a Quasar Fund SPC Class A and Class B CGCNV | 19-cv-4964 |
| 59. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Bank Hapoalim Switzerland Ltd. | 19-cv-4964 |
| 60. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Corner Banca SA | 19-cv-4964 |
| 61. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Finter Bank Zurich | 19-cv-4964 |
| 62. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | IHAG Handelsbank AG | 19-cv-4964 |
| 63. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | PKB Privatbank AG | 19-cv-4964 |
| 64. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Banque Internationale à Luxembourg SA f/k/a Dexia Banque Internationale à Luxembourg SA | 19-cv-4964 |

[5] The party sued here as "HSBC" is a nonexistent entity, and there is no concession to the contrary by submitting this filing.

| | Case No. (S.D.N.Y. Bankr.) | Case Name | Defendant Name | Prior Pending S.D.N.Y. Appeal No.[2] |
|---|---|---|---|---|
| 65. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Banca Unione di Credito | 19-cv-4964 |
| 66. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | BSI AG | 19-cv-4964 |
| 67. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | BSI Ex Banca Del Gottardo | 19-cv-4964 |
| 68. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | EFG Bank SA Switzerland | 19-cv-4964 |
| 69. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | EFG Eurofinancier D'Invest MCL | 19-cv-4964 |
| 70. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Allianzbank SPA/Unifortune Conservative Side Pocket | 19-cv-4964 |
| 71. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Incore Bank AG | 19-cv-4964 |
| 72. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Falcon Private Bank | 19-cv-4964 |
| 73. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Sis Seeganintersettle | 19-cv-4964 |
| 74. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | SIX SIS Ltd. | 19-cv-4964 |
| 75. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | National Bank of Kuwait SAK | 19-cv-4964 |
| 76. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | NBK Banque Privée (Suisse) SA | 19-cv-4964 |
| 77. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Bank Sarasin & Cie | 19-cv-4964 |
| 78. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Verwaltungs-und Privat-Bank Aktiengesellschaft | 19-cv-4888 |

| | Case No. (S.D.N.Y. Bankr.) | Case Name | Defendant Name | Prior Pending S.D.N.Y. Appeal No.[2] |
|---|---|---|---|---|
| 79. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Centrum Bank Aktiengesellschaft | 19-cv-4888 |
| 80. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | UBS AG Zurich | 19-cv-4888 |
| 81. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | UBS AG New York | 19-cv-4888 |
| 82. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | UBS Jersey Nominees | 19-cv-4888 |
| 83. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Caceis Bank Luxembourg | 19-cv-4888 |
| 84. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Clariden Leu Ltd. | 19-cv-4888 |
| 85. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Credit Suisse AG Zurich | 19-cv-4888 |
| 86. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Arden International Capital Limited | 19-cv-4888 |
| 87. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | ABN AMRO Schweiz AG A/K/A ABN AMRO (Switzerland) AG | 19-cv-4888 |
| 88. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Liechtensteinische Landesbank AG (sued as Liechtensteinische LB Reinvest AMS) | 19-cv-4888 |
| 89. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Dresdner Bank Schweiz (n/k/a LGT Bank (Switzerland) Ltd.) | 19-cv-4888 |
| 90. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | LGT Bank in Liechtenstein AG (n/k/a LGT Bank AG) | 19-cv-4888 |

| | Case No. (S.D.N.Y. Bankr.) | Case Name | Defendant Name | Prior Pending S.D.N.Y. Appeal No.[2] |
|---|---|---|---|---|
| 91. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Banca Arner S.A. | 19-cv-4888 |
| 92. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Harmony Capital Fund Ltd. | 19-cv-4888 |
| 93. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Lloyds TSB Bank Geneva (now known as Lloyds TSB Bank, plc) | 19-cv-4888 |
| 94. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | RBC Investor Services Bank S.A. | 19-cv-4888 |
| 95. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | RBS Coutts Bank Ltd., now known as Coutts & Co. Ltd | 19-cv-4888 |
| 96. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | BBVA (Suisse) SA | 19-cv-4888 |
| 97. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | BNP Paribas (Suisse) SA | 19-cv-4888 |
| 98. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | BNP Paribas (Suisse) SA Ex Fortis (n/k/a BNP Paribas (Suisse) SA) | 19-cv-4888 |
| 99. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | BNP Paribas (Suisse) SA Private (n/k/a BNP Paribas (Suisse) SA) | 19-cv-4888 |
| 100. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Bank Julius Baer & Co. Ltd. | 19-cv-4888 |
| 101. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Banque Cantonale Vaudoise | 19-cv-4888 |
| 102. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | BCV AMC Defensive AL Fund | 19-cv-4888 |
| 103. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Compagnie Bancaire Helvetique | 19-cv-4888 |

| | Case No. (S.D.N.Y. Bankr.) | Case Name | Defendant Name | Prior Pending S.D.N.Y. Appeal No.[2] |
|---|---|---|---|---|
| 104. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Edmond de Rothschild (Suisse) SA (sued as Sella Bank AG) | 19-cv-4888 |
| 105. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Lombard Odier Darier Hentsch & Cie | 19-cv-4888 |
| 106. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Rothschild Bank AG Zurich (Dublin) a/k/a Rothschild Bank AG | 19-cv-4888 |
| 107. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Rothchild Bank Geneva (Dublin) | 19-cv-4888 |
| 108. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Rothschild Lugano Dublin a/k/a Banca Privata Edmond de Rothschild Lugano SA | 19-cv-4888 |
| 109. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Societe Generale Bank & Trust | 19-cv-4888 |
| 110. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Pictet & Cie | 19-cv-4888 |
| 111. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | "HSBC"[6] | 19-cv-4888 |
| 112. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Fairfield Investment Fund Ltd. | 19-cv-4888 |
| 113. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Fairfield Investment GCI | 19-cv-4888 |
| 114. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | FIF Advanced Ltd. | 19-cv-4888 |
| 115. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Vorarlberger Landes- und Hypothekenbank Aktiengesellschaft | 19-cv-4888 |

---

[6] The party sued here as "HSBC" is a nonexistent entity, and there is no concession to the contrary by submitting this filing.

| | Case No. (S.D.N.Y. Bankr.) | Case Name | Defendant Name | Prior Pending S.D.N.Y. Appeal No.[2] |
|---|---|---|---|---|
| 116. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Quasar Funds SPC a/k/a Quasar Fund SPC Class A and Class B CGCNV | 19-cv-4888 |
| 117. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Bank Hapoalim Switzerland Ltd. | 19-cv-4888 |
| 118. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Corner Banca SA | 19-cv-4888 |
| 119. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Finter Bank Zurich | 19-cv-4888 |
| 120. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | IHAG Handelsbank AG | 19-cv-4888 |
| 121. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | PKB Privatbank AG | 19-cv-4888 |
| 122. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Banque Internationale à Luxembourg SA f/k/a Dexia Banque Internationale à Luxembourg SA | 19-cv-4888 |
| 123. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Bank Leumi le-Israel B.M. | 19-cv-4888 |
| 124. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Banca Unione di Credito | 19-cv-4888 |
| 125. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | BSI AG | 19-cv-4888 |
| 126. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | BSI Ex Banca Del Gottardo | 19-cv-4888 |
| 127. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | EFG Bank SA Switzerland | 19-cv-4888 |
| 128. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | EFG Eurofinancier D'Invest MCL | 19-cv-4888 |

| | Case No. (S.D.N.Y. Bankr.) | Case Name | Defendant Name | Prior Pending S.D.N.Y. Appeal No.[2] |
|---|---|---|---|---|
| 129. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Allianzbank SPA/Unifortune Conservative Side Pocket | 19-cv-4888 |
| 130. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Incore Bank AG | 19-cv-4888 |
| 131. | Adv. Pro. 10-3635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Falcon Private Bank | 19-cv-4888 |
| 132. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Sis Seeganintersettle | 19-cv-4888 |
| 133. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | SIX SIS Ltd. | 19-cv-4888 |
| 134. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | National Bank of Kuwait SAK | 19-cv-4888 |
| 135. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | NBK Banque Privée (Suisse) SA | 19-cv-4888 |
| 136. | Adv. Pro. 10-3636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* | Bank Sarasin & Cie | 19-cv-4888 |
| 137. | Adv. Pro. 10-3780 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. UBS AG New York, et al.* | UBS AG New York | 19-cv-4869 |
| 138. | Adv. Pro. 10-4098 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. BNP Paribas Arbitrage SNC, et al.* | BNP Paribas Arbitrage SNC | 19-cv-4385 |
| 139. | Adv. Pro. 10-4099 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. BNP Paribas Private Bank and Trust Cayman Ltd., et al.* | BNP Paribas Private Bank and Trust Cayman Ltd | 19-cv-5006 |
| 140. | Adv. Pro. 11-1250 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. UBS Europe SE, Luxembourg Branch, et al.* | UBS Europe SE, Luxembourg Branch | 19-cv-4386 |

| | Case No. (S.D.N.Y. Bankr.) | Case Name | Defendant Name | Prior Pending S.D.N.Y. Appeal No.[2] |
|---|---|---|---|---|
| 141. | Adv. Pro. 11-1463 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Merrill Lynch International, et al.* | Merrill Lynch International | 19-cv-4388 |
| 142. | Adv. Pro. 11-1579 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. BNP Paribas Securities Nominees Ltd., et al* | BNP Paribas Securities Nominees Ltd. | 19-cv-4973 |
| 143. | Adv. Pro. 11-1617 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Fortis Bank SA/NV, et al.* | BNP Paribas Fortis | 19-cv-4395 |
| 144. | Adv. Pro. 11-2770 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Citigroup Global Markets Limited, et al.* | Citigroup Global Markets Limited | 19-cv-4396 |
| 145. | Adv. Pro. 12-1551 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. BNP Paribas Espana f/k/a Fortis Bank (Espana), et al.* | BNP Paribas España | 19-cv-4415 |
| 146. | Adv. Pro. 19-1122 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Citco Global Custody NV, et al. (In re Fairfield Sentry Ltd.)* | Citco Global Custody NV | N/A |
| 147. | Adv. Pro. 19-1122 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Citco Global Custody NV, et al. (In re Fairfield Sentry Ltd.)* | Citco Global Custody (NA) NV | N/A |
| 148. | Adv. Pro. 19-1122 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Citco Global Custody NV, et al. (In re Fairfield Sentry Ltd.)* | CGC NA | N/A |
| 149. | Adv. Pro. 19-1122 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Citco Global Custody NV, et al. (In re Fairfield Sentry Ltd.)* | Citco Bank Nederland N.V. | N/A |
| 150. | Adv. Pro. 19-1122 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Citco Global Custody NV, et al. (In re Fairfield Sentry Ltd.)* | Citco Bank Nederland N.V. Dublin Branch | N/A |
| 151. | Adv. Pro. 19-1122 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Citco Global Custody NV, et al. (In re Fairfield Sentry Ltd.)* | Citco Banking Corporation N.V. | N/A |

| | Case No. (S.D.N.Y. Bankr.) | Case Name | Defendant Name | Prior Pending S.D.N.Y. Appeal No.[2] |
|---|---|---|---|---|
| 152. | Adv. Pro. 19-1122 | *Fairfield Sentry Ltd. (In Liquidation), et al.* v. *Citco Global Custody NV, et al. (In re Fairfield Sentry Ltd.)* | Citco Group Limited | N/A |

# Appendix B
## Additional Counsel

### ALLEGAERT BERGER & VOGEL LLP

John F. Zulack
jzulack@abv.com

111 Broadway, 20th Floor
New York, NY 10006
 T: (212) 571-0550

### BOIES SCHILLER FLEXNER LLP

Alan B. Vickery
avickery@bsfllp.com
Steven I. Froot
sfroot@bsfllp.com

55 Hudson Yards
New York, NY 10001
T: (212) 446-2300

### CHAFFETZ LINDSEY LLP

Andreas A. Frischknecht
a.frischknecht@chaffetzlindsey.com
Erin E. Valentine
e.valentine@chaffetzlindsey.com

1700 Broadway, 33rd Floor
New York, NY 10019
T: (212) 257-6960

### CLEARY GOTTLIEB STEEN & HAMILTON LLP

Carmine D. Boccuzzi, Jr.
cboccuzzi@cgsh.com
Breon S. Peace
bpeace@cgsh.com
Elizabeth Vicens
evicens@cgsh.com
Ari D. MacKinnon
amackinnon@cgsh.com
Thomas S. Kessler

tkessler@cgsh.com
E. Pascale Bibi
pbibi@cgsh.com

One Liberty Plaza
New York, NY 10006
T: (212) 225-2000
F: (212) 225-3999

**CLIFFORD CHANCE US LLP**

Jeff. E. Butler
jeff.butler@cliffordchance.com
La'Tise M. Tangherlini
latise.tangherlini@cliffordchance.com

31 West 52nd Street
New York, NY 10019
T: (212) 878-8000
F: (212) 878-8375

**DAVIS POLK & WARDWELL LLP**

Elliot Moskowitz
elliot.moskowitz@davispolk.com
Andrew Ditchfield
andrew.ditchfield@davispolk.com

450 Lexington Avenue
New York, NY 10017
T: (212) 450-4000

**DLA PIPER LLP (US)**

Rachel Ehrlich Albanese
Rachel.Albanese@us.dlapiper.com
Cherelle Glimp
Cherelle.Glimp@us.dlapiper.com

1251 Avenue of the Americas
New York, NY 10020
T: (212) 335-4500
F: (212) 335-4501

**FRIED, FRANK, HARRIS, SHRIVER &
JACOBSON LLP**

David M. Morris
david.morris@friedfrank.com

One New York Plaza
New York, NY 10004
T: (212) 859-8000

**GIBSON, DUNN & CRUTCHER LLP**

Marshall R. King
mking@gibsondunn.com
Gabriel Herrmann
gherrmann@gibsondunn.com

200 Park Avenue
New York, NY 10166
T: (212) 351-4000

**GILMARTIN, POSTER & SHAFTO LLP**

Michael C. Lambert
mclambert@lawpost-nyc.com

845 Third Avenue, 17th Floor
New York, NY 10022
T: (212) 425-3220

**HARNIK LAW FIRM**

Stephen M. Harnik
stephen@harnik.com

666 Third Avenue, 10th Floor
New York, NY 10017
T: (212) 599-7575

**HERBERT SMITH FREEHILLS NEW YORK
LLP**

Scott Balber
Scott.Balber@hsf.com
Jonathan Cross
Jonathan.cross@hsf.com

450 Lexington Avenue
New York, NY  10017
T: (917) 542-7600

**JENNER & BLOCK LLP**

Richard Levin
rlevin@jenner.com
Carl Wedoff
cwedoff@jenner.com

919 Third Avenue
New York NY 10022
T: (212) 891-1600
F: (212) 891-1699

**KATTEN MUCHIN ROSENMAN LLP**

Anthony L. Paccione
anthony.paccione@katten.com
Mark T. Ciani
mark.ciani@katten.com

575 Madison Avenue
New York, NY 10022
T: (212) 940-8800

**KING & SPALDING LLP**

Richard A. Cirillo
rcirillo@kslaw.com

1185 Avenue of the  America
New York, NY  10036
T: (212) 556-2100
F:  (212) 556-2222

**KLEINBERG KAPLAN WOLFF & COHEN,
P.C.**

Norris D. Wolff
nwolff@kkwc.com

500 Fifth Avenue, 38th Floor
New York, NY 10110
T: (212) 986-6000

**KOBRE & KIM LLP**

D. Farrington Yates
farrington.yates@kobrekim.com
Adam M. Lavine
adam.lavine@kobrekim.com
Donna (Dong Ni) Xu
donna.xu@kobrekim.com
Jonathan D. Cogan
jonathan.cogan@kobrekim.com

800 Third Avenue
New York, NY 10022
Telephone (212) 488-1200

**LATHAM & WATKINS LLP**

Christopher Harris
christopher.harris@lw.com
Thomas J. Giblin
thomas.giblin@lw.com

885 Third Avenue
New York, NY 10022
T: (212) 906-1200
F: (212) 751-4864

**MAYER BROWN LLP**

Marc. R. Cohen
mcohen@mayerbrown.com

1999 K Street, N.W.
Washington, D.C. 20006
T: (202) 263-5282

Mark G. Hanchet
mhanchet@mayerbrown.com
Kevin C. Kelly
kkelly@mayerbrown.com

1221 Avenue of the Americas
New York, NY 10020
T: (212) 506-2500

**MCKOOL SMITH, P.C.**

Eric B. Halper
ehalper@mckoolsmith.com

One Manhattan West
395 9th Avenue, 50th Floor
New York, NY 10001
T: (212) 402-9400
F: (212) 402-9444

**O'MELVENY & MYERS LLP**

William J. Sushon
wsushon@omm.com
Daniel S. Shamah
dshamah@omm.com
Pamela A. Miller
pmiller@omm.com
Nathaniel Asher
nasher@omm.com

Times Square Tower
7 Times Square
New York, NY 10036
T: (212) 326-2000
F: (212) 326-2061

**PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP**

Andrew G. Gordon
agordon@paulweiss.com
Gregory F. Laufer
glaufer@paulweiss.com

1285 Avenue of the Americas
New York, NY 10019
T: (212) 373-3000

**PILLSBURY WINTHROP SHAW PITTMAN
LLP**

Eric Fishman
eric.fishman@pillsburylaw.com
Andrew Troop

andrew.troop@pillsburylaw.com
Rahman Connelly
rahman.connelly@pillsburylaw.com

31 West 52nd Street
New York, NY 10019
T: (212) 858-1000
F : (212) 858-1500

**SEWARD & KISSEL LLP**

M. William Munno
munno@sewkis.com

One Battery Park Plaza
New York, NY 10004
T: (212) 574-1200
F: (212) 480-8421

**SHEARMAN & STERLING LLP**

Jeffrey Resetarits
jeffrey.resetarits@shearman.com
Randall Martin
randall.martin@shearman.com

599 Lexington Avenue
New York, NY 10022
T: (212) 848-4000

**SULLIVAN & CROMWELL LLP**

Jeffrey T. Scott
scottj@sullcrom.com
Andrew J. Finn
finna@sullcrom.com

125 Broad Street
New York, NY 10004
T: (212) 558-4000

**WACHTELL, LIPTON, ROSEN & KATZ**

Emil A. Kleinhaus
eakleinhaus@wlrk.com
Angela K. Herring

akherring@wlrk.com

51 West 52nd Street
New York, NY 10019
T: (212) 403-1332
F: (212) 403-2332

**WESTERMAN BALL EDERER MILLER ZUCKER & SHARFSTEIN, LLP**

Michael B. Weitman
mweitman@westermanllp.com

1201 RXR Plaza
New York, NY 10104
T: (516) 622-9200

**WIGGIN AND DANA LLP**

James H. Bicks
jbicks@wiggin.com

437 Madison Ave, 35th Floor
New York, NY 10022
T: (212) 490-1700
F: (212)551-2888

**WILMER CUTLER PICKERING HALE AND DORR LLP**

George W. Shuster, Jr.
george.shuster@wilmerhale.com
Benjamin W. Loveland
benjamin.loveland@wilmerhale.com

7 World Trade Center
250 Greenwich Street
New York, NY 10007
T: (212) 937-7518

**WINSTON & STRAWN LLP**

Keith Palfin
kpalfin@winston.com
Heather Lamberg
hlamberg@winston.com

1901 L Street, N.W.
Washington, D.C. 20036
T: (202) 282-5000

**WOLLMUTH MAHER & DEUTSCH LLP**

William A. Maher
wmaher@wmd-law.com
Fletcher W. Strong
fstrong@wmd-law.com
Maxwell G. Dillan
mdillan@wmd-law.com

500 Fifth Avenue
New York, NY 10110
T: (212) 382-3300

**WUERSCH & GERING LLP**

Gregory F. Hauser
gregory.hauser@wg-law.com
Jascha D. Preuss
jascha.preuss@wg-law.com

100 Wall Street, 10th Floor
New York, NY 10005
T: (212) 509-5050

# APPENDIX C
# COMPENDIUM OF FOREIGN AUTHORITIES

# FOREIGN AUTHORITIES

**Page**

**Foreign Cases**

*Alderson v. Temple*
   [1789] 98 E.R. 165 (Ct. of  King's Bench)...................................................    1

*DD Growth Premium 2X Fund v. RMF Mkt. Neutral Strategies (Master) Ltd.*
  [2017] UKPC 36 ............................................................................................
                                                                                                                       8

*Fairfield Sentry Ltd. (In Liquidation) v. Migani*
   [2014] UKPC 9 ............................................................................................    38

# Alderson v. Temple
## [1768] 98 E.R. 165 (Ct. of King's Bench)

# *165 Alderson and Others, Assignees v Temple

 Positive/Neutral Judicial Consideration

**Court**
Court of King's Bench

**Judgment Date**
10 June 1768

**Report Citation**
(1768) 4 Burrow 2235
98 E.R. 165

1768

[2235]Trinity Term, 8 Geo. 3, B. R. 1768.

(S. C. 1 Bl. 660.) Friday, 10th June 1768. An insolvent cannot prefer a particular creditor.

[Referred to, *Marks* v. *Feldman* , 1870, L. R. 5 Q. B. 283; *Ex parte Craven* , 1870, L. R. 10 Eq. 655; L. R. 6 Ch. 70.]

This was an action of trover brought by the plaintiffs as assignees of Charles La Roche and Robert Willing, bankrupts, against the defendant.

The first count of the declaration sets forth, that the plaintiffs, as assignees, on 7th Nov. 1766, were possessed of a promissory note drawn by Bryer and Everard for £600 payable to La Roche and Willing or order, before they became bankrupts: which note was accidentally lost, and came to the hands of the defendant; and he converted it to his own use. The second count was for another note, made by one Rachael Phipps, to one Richard Blackburn for £439, and indorsed to the said bankrupts in like manner.

To which declaration, the defendant pleaded "not guilty:" and thereupon issue was joined.

The cause came on to be tried at Guildhall, at the sitting after last Hilary term, before Lord Mansfield; when the jury found for the plaintiffs upon the first count, subject to the opinion of the Court upon the following case; and for the defendant, upon the second count.

Case. The bankrupts La Roche and Willing, on Friday 7th Nov. 1776, indorsed the note in question to the defendant Temple, to whom they were indebted to a large amount; and sent it in a letter directed to him at Trowbridge; which letter was carried to the post-house that morning; the bankrupts thinking that the post-day for Trowbridge. The letter by the course of the post [2236] (which went out on the Saturday night) was received by the defendant some time on Monday the 10th; and could not be so before.

The note in question was—"London, 10th Octob. 1766. Two months after date, we promise to pay Messieurs La Roche and Willing, or order six hundred pounds, for value received. Bryer and Everard ."

The bankrupts had given Bryer and Everard two notes for £300 each; which had *166* not been discharged. La Roche and Willing committed acts of bankruptcy on Saturday the 8th. And the said note was so indorsed, and sent to the defendant in contemplation of their insolvency and subsequent failure.

The question for the opinion of the Court was—"whether the plaintiffs ought to recover." If not, they were to be nonsuited.

This case was argued by Mr. Chambers, for the plaintiffs; and Mr. Solicitor-General, for the defendant.

Two questions were raised upon it, first—"whether the bankrupt's property in the note was devested before the act of bankruptcy was committed by him:" second—"whether a trader can, in any case, give such a preference as this."

Mr. Chambers insisted that the property of the bankrupts in this note was not devested. He urged, that mutual consent is necessary to all contracts: whereas here was none on the part of the defendant. If this note had been lost, it would have been the risque of the owner: the defendant would not have borne the loss. He had not agreed to accept it: possibly, he might have declined doing so. And the bankrupts might have countermanded it. Their bankruptcy is a countermand and revocation. Vide Jenkins's 3d Century, case 9, p. 109. Digest. lib. 41, title 2, law 38 (master writing a letter to a slave; the property in him is not devested, till the letter is received).*Lane* v. *Cotton et Al'* , Carthew, 487. 2 Atkyns, 562. 1 Atkyns, 15. 1 Atkyns, 245, *Snee and Baxter, Assignees of Tollet* , against *Prescot and Others* ; and the case of *Hague and Others, Assignees of Ann and Isaac Scott* , against *Rolleston* , [1] H. 8 G. 3, in this Court.

He insisted, secondly, that it is not in the power of a bankrupt to make such a preference as this. Reason and equity require that all the creditors of a bankrupt should be put upon an equal foot: and this is the view, end, and [2237] intention of the bankrupt-laws; which are to be construed liberally for creditors.

Mr. Solicitor-General (Dunning) on the other side argued that the property was devested. That a disagreement shall not be presumed; but, on the contrary, an acceptance shall be intended, unless the contrary appears: the contract does not stand open till agreement; but is complete, unless there be an actual disagreement. This letter could not have been recalled, after it was once put into the post-office. A delivery to one, to the use of another, upon a precedent consideration, is not countermandable; but vests the absolute property in that other person, before his agreement to it. In proof of all which, he cited the case of *Atkin* v. *Barwick* , in Sir John Strange's 1st volume, page 165, and he also mentioned the case of *Peter Barris* v. *Peter de Bervoir* , in Cro. Jac. 687.

As to the preference of the defendant to the other creditors, he said it was very just and reasonable to give it in the present case: and there is no authority to prove that such a power may not be exercised by a bankrupt, where it is just and reasonable. [2]

He rehearsed the case of *Small and Oudley* ; and cited *Wilson* v. *Day* , as a proof that an assignment of part of the effects is good, if possession is delivered.

But the Court were of opinion for the plaintiffs, the assignees of the bankrupts. They held this indorsing and sending the note, under the circumstances stated, to be fraudulent upon all the other creditors, and particularly Messieurs Bryer and Everard.

Rule—that the postea be delivered to the plaintiffs.

I was not present when the Court pronounced this rule; being, at that time, confined with the gout. Therefore this is all that I can report, as from myself. But as I am informed that Lord Mansfield was very copious in delivering his opinion, and laid down several positions which well deserve to be kept in memory, I have, by the favour of a very eminent barrister and most excellent note-taker, procured the following account of what his Lordship said: which, being more accurately taken down than I should have been myself capable of taking it, had I been present, must therefore be more satisfactory to the reader, than any report of my own could have been.

[2238] Lord Mansfield.—This is an action of trover, brought by the assignees of *\*167* Laroche and Winning, for a note of 600*l.*; and there is a verdict for the plaintiff, upon the following case—

The bankrupts, upon the 7th of November 1766, indorsed the note in question; which is in the words following; "London, 10th Octob. 1766, 600*l.* Two months after date we promise to pay to Messieurs Laroche and Winning or order, 600l. value received;" and is signed by Bryer and Everard. The note is indorsed by the bankrupts to the defendant, to whom they were indebted, to a larger amount; and was sent to him in a letter directed to Trowbridge, which was carried to the post that morning, and was received on the 10th, and could not be received before.

The bankrupts had given Bryer and Everard two notes for 300*l.* each; which had not been discharged.

Laroche and Winning committed several acts of bankruptcy on the 8th.

The note was so indorsed and sent to the defendant by the bankrupts, in contemplation of their insolvency and bankruptcy.

Upon this case, the question is, "if the plaintiff ought to recover."

And it is material to observe a great deal that is not stated in it. First—there never was any course of dealing between the bankrupts and the defendant, by way of indorsing or sending notes to each other. The next thing is, that the letter in which the note was sent, is suppressed by the defendant. It is not found "that the note was indorsed in payment of any debt:" it is only said "he was a creditor to a larger amount." It is not said whether it was to be received at the risque of Temple; or only as agent of the bankrupts: but the letter, which was in the power of the defendant, was not produced; and so the case stands without any appropriation of the note. The case is silent in these particulars; and very materially so.

It is found "that Bryer and Everard were creditors of the bankrupts to just the same amount, for two other notes they had taken in exchange:" and "that those two notes were not discharged."

[2239] The only question I make is—"whether, under the circumstances of this case, the indorsing and sending this note to the defendant is fraudulent; and void, as such."

And I choose to put the case upon that ground; because the most desirable object in all judicial determinations, especially in mercantile ones, (which ought to be determined upon natural justice, and not upon the niceties of law,) is, to do substantial justice. And therefore I will avoid laying the stress that might properly be laid upon the assent being necessary to complete the contract, or the want of a delivery; the solid ground of which is, that a contract shall be presumed complete upon any distinction where the justice of the case requires it, though there is no actual delivery. And it is settled "that if a man sends bills of exchange, or consign a cargo; and the person to whom he sends them has paid the value before; though he did not know of the sending them at that time, the sending of them to the carrier will be sufficient to prevent the assignees from taking these goods back, in case of an intervening act of bankruptcy:" but if goods or bills of exchange are sent, and the consideration has not been received, the Court of Chancery always interposes; and there are numbers of adjudged cases of that kind, in Chancery. In the case in [3] Strange, there is no doubt but the honesty of the case inclined the Court to the judgment they gave: the reason given turns upon a subtilty. The Court of Chancery, in that case, would have interposed, and said "the assignees should not have the goods without paying the price." I think the determination was right; and there was an actual delivery to a person who became a trustee: but a post-boy is not a trustee. I think the case was well supported upon other grounds than those mentioned in the book.

I ground my opinion upon this, "whether the indorsement be fraudulent." And as to that, it is certain that the Statutes of Bankruptcy leave a trader, to the moment of an act of bankruptcy committed, every power an owner can have over his estate. The statute says [4] —"Fraudulent conveyances shall be an act of bankruptcy." Other acts that are fraudulent are not made acts of bankruptcy: but they are attended with the consequences of fraud, at law; which is, "that fraud renders every act void." *168*

All acts to defraud creditors or the public laws of the land are void; and if the nature of the act be a conveyance or grant, 'tis not only void, but an act of bankruptcy. It has been determined "that a conveyance by a trader, of all his effects, for the payment of one or more bonâ [2240] fide creditors of the most meritorious kind, though his effects do not amount to half what is due, is void; because it is not an act in the ordinary course of business; it is not such an act as a man could do, but it must be followed by an immediate act of bankruptcy, and it is defeating the equality that is introduced by the Statutes of Bankruptcy, and the criminal (for the bankrupt is considered as a criminal) is taking upon himself to prefer whom he pleases." But suppose he leaves out a considerable part of his effects: if it appears to be only colourable, that don't vary the case; it is fraudulent. Suppose a trader makes a conveyance of all his estate, for the payment of all his creditors except one,

(which was the case of [5]*Gayner* cited in *Dematto's case* ,) it is void. Suppose it was, "to pay all his creditors rateably:" if there were no assent of his creditors, or composition, it would be void: for, it would be rescinding the whole system of the bankrupt laws, and instead of applying to the Great Seal, he would choose his own trustees. If this is a fraudulent act, it is void.

A general question has been started, "whether in any case, upon the eve of a bankruptcy, a man may do that which in consequence prefers a particular creditor:" and that has been argued as a general question.

But that will depend upon the act. As, if a bankrupt, in course of payment pays a creditor; this is a fair advantage, in the course of trade: or, if a creditor threatens legal diligence, and there is no collusion; or begins to sue a debtor: and he makes an assignment of part of his goods; it is a fair transaction, and what a man might do without having any bankruptcy in view. Suppose such a case as [6]*Small and Oudley* : there it was for the advantage of the creditors, and no fraud to them; and if part of the transaction were set aside as fraudulent, the whole must. But it never entered into the mind of any Judge, to say "that a man, in contemplation of an act of bankruptcy, could sit down and dispose of all his effects to the use of different creditors:" for, that would be a fraud upon the acts of bankruptcy. But if done in a course of trade, and not fraudulent, it may be supported.

This was not done in a course of trade: for, there never was any dealing between the parties in sending indorsed notes. There was no application made by the defendant. And it was done with a view to positive iniquity: for, the bankrupts had received this note from Bryer and Everard, for notes of the same value; and knowing that they should become bankrupts the next day, to defeat Bryer and Everard of setting off their notes against it, indorse this note to another person. And [2241] there was no way of doing justice to Bryer and Everard, but supporting the claim now made by the assignees. So that there was express particular fraud, at the time the fact was done. Next, 'tis an act that is, most certainly, not complete, as between the parties. The argument of the case of [7]*Scott* is very applicable to the present. For, there was a preference given to a bonâ fide creditor: but he knew nothing of it. Suppose, in the course of trade, a bill is sent to Constantinople, and a bankruptcy happens in England before it arrives; yet it may be good. But here, it is done, because they were resolved to commit an act of bankruptcy.

The three other Judges agreed that an assent is necessary to complete every contract; that in the present case, the defendant has his election till the tenth of November; that the act of bankruptcy being committed on the eighth, the contract was incomplete; and that, upon the whole circumstances taken together, the transaction was fraudulent and void.

Per Cur' unanimously.—

Let the postea be delivered to the plaintiffs.

Burrow

### Footnotes

[1]                    Vide ante, p. 2174.

2        Vide post, 14th June 1774,
*Harman and Others* v. *Fisher* ;
upon the preference given to
Mr. Fisher by Fordyce.

3        *Atkyns* v. *Barwick* , v. 1, Sir J.
Str. 165.

4        V. 1 Jac. 1, c. 15, § 2.

5        Vide ante, p. 477.

6        Vide ante, p. 480.

7        Vide ante, p. 2174.

# DD Growth Premium 2X Fund v. RMF Mkt. Neutral Strategies (Master) Ltd.

# [2017] UKPC 36



**Michaelmas Term**
[2017] UKPC 36
**Privy Council Appeal No 0050 of 2016**

# JUDGMENT

# DD Growth Premium 2X Fund (In Official Liquidation) (Appellant) *v* RMF Market Neutral Strategies (Master) Limited (Respondent) (Cayman Islands)

### From the Court of Appeal of the Cayman Islands

**before**

**Lord Mance**
**Lord Sumption**
**Lord Carnwath**
**Lord Hodge**
**Lord Briggs**

## JUDGMENT GIVEN ON

## 23 November 2017

### Heard on 4 and 5 October 2017

|                           |                            |
|:-------------------------:|:--------------------------:|
| *Appellant*               | *Respondent*               |
| Tom Smith QC              | David Chivers QC           |
| Adam Al-Attar             | Paul Smith                 |
| Jeremy Snead              | Ben Hobden                 |
| (Instructed by Peter      | (Instructed by Herbert     |
| McMaster QC of Appleby    | Smith Freehills LLP and    |
| (Cayman) Ltd and by Alan  | by Conyers Dill &          |
| Taylor and Co)            | Pearman)                   |

**LORD SUMPTION AND LORD BRIGGS: (with whom Lord Carnwath agrees)**

*Introduction - the issues*

1.      In late 2008, just after the Lehman Brothers crash, a group of investors in a Cayman Islands open-ended investment company called DD Growth Premium 2X Fund ("the Company") decided to cash in their investments by exercising their right to have their shares in the Company redeemed. The management of the Company responded, in January 2009, by paying some of the investors in full, and some of them nothing. The largest payments were made to one investor, RMF Market Neutral Strategies (Master) Limited ("RMF"), in the aggregate sum of US$23m odd, but this was less than 40% of the amount owed to RMF by way of redemption. The Company then ran out of money and, shortly thereafter, went into insolvent liquidation. The liquidator then caused the Company to claim the US$23m back from RMF but the claim failed, both in the Grand Court and in the Cayman Islands Court of Appeal.

2.      The Company's appeal from the Court of Appeal raises issues about Cayman company law, as it was between 1989 and 2011, in relation to payments by the Company of premium due on the redemption of its shares, on largely undisputed facts which were either agreed at the outset of the litigation, or found by the Chief Justice of the Cayman Islands, at the trial of preliminary issues in 2014.

3.      The first and second issues are about the interpretation of section 37 of the Cayman Companies Law (2007 Revision) in its statutory and historical context. Section 37 permits a company to issue redeemable shares and regulates the circumstances in which, and the manner in which, they may be redeemed. The 2007 Revision will be referred to as the Companies Law. The third issue is about the common law, which in this respect is not suggested to be different as between the Cayman Islands and England, and concerns the nature of the remedies available to the company or to its liquidator for the recovery of a redemption payment rendered unlawful by section 37.

4.      Cayman law (like the law of the UK) has always contained restrictions upon the ability of a company to reduce its capital, primarily for the protection of its creditors. Although originally to be found in judge-made law, they are now almost completely statutory. The particular restriction in issue on this appeal consists of a form of solvency test which must be satisfied by a company if it is lawfully to pay for the redemption of shares out of capital. It is to be found in section 37(6) of the Companies Law in the following form:

"(6)(a) A payment out of capital by a company for the redemption
or purchase of its own shares is not lawful unless immediately
following the date on which the payment out of capital is proposed
to be made the company shall be able to pay its debts as they fall
due in the ordinary course of business.

(b)    The company and any director or manager thereof who
knowingly and wilfully authorises or permits any payment out of
capital to effect any redemption or purchase of any share in
contravention of paragraph (a) is guilty of an offence and liable on
summary conviction to a fine to fifteen thousand dollars and to
imprisonment for five years."

5.    The first issue is mainly a question of interpretation or application of the phrase
"its debts as they fall due in the ordinary course of business" in section 37(6)(a). The
question is whether generally that phrase is apt to include the debts constituted by the
redemption price payable to shareholders who have exercised their right to redeem ("a
redemption debt"). A subsidiary question is whether in any event redemption debts were
incurred by this Company in the ordinary course of its business, as the judge held. It is
common ground that, if redemption debts are generally, or are in the context of this
Company's business, within section 37(6)(a), then the Company was insolvent at the
material time. There is a factual dispute whether, if not, the Company had other debts
which rendered it insolvent within the meaning of section 37(6)(a). The judge found it
unnecessary to resolve that question and, for reasons which will appear, so does the
Board. This issue will be referred to as "the Solvency Issue".

6.    The second, and main, issue in the appeal is whether a payment out of a
company's share premium account towards the premium payable on redemption of
shares (rather than towards the nominal amount of those shares) is a capital payment
with the meaning of section 37(6)(a). If it is, then a company may not use sums standing
to the credit of its share premium account for payment of the premium due on
redemption of shares unless it satisfies the solvency test in section 37(6)(a).

7.    The appellant liquidators also challenged the lawfulness of the redemption
payments made by the Company in this case by two alternative submissions which do
not involve reliance upon section 37(6)(a). For reasons which will become apparent the
Board has not found it necessary to address those in detail. Since all three routes of
challenge question the legality of the redemption payments made, these issues will be
referred to collectively as "the Illegality Issue".

8.    The third issue, which will be called "the Remedies Issue", may be summarised
in this way. The Companies Law creates no express statutory cause of action or other

civil remedy against the recipient of an unlawful redemption payment. There is only a criminal sanction against the company, its directors and managers. It is not in dispute that the directors of a company who procure the making of an unlawful redemption payment would be liable to the company for breach of trust, and that a recipient with knowledge of the facts as to the unlawfulness of the payment would be liable as a constructive trustee. The question is whether a claim for the recovery of an unlawful redemption payment may be pursued by the company or its liquidator against a recipient which received the payment without knowledge of the facts giving rise to the illegality, and in settlement (or part-settlement) of the debt constituted by the Company's obligation to pay the redemption price after a valid exercise of the shareholder's right to redeem, by means of a claim in unjust enrichment, subject only to established defences, such as change of position.

*The Facts*

9.    The Company is a Cayman Islands company limited by shares which, until placed in official liquidation in March 2009, carried on business as a feeder fund for the facilitation of investment in the DD Growth Premium Master Fund ("the Master Fund"). That was a hedge fund which, until the collapse of Lehman Brothers in late 2008, pursued what the judge described as a well-known trading strategy of investment in correlated stocks. The mechanism whereby the Company made this facility available to investors was by the issue of redeemable ordinary shares at a premium, and by using the proceeds of the issued shares as investments in the Master Fund. Investors could realise their investments through the Company in the Master Fund by making written requests to redeem their shares on one of a regular monthly series of redemption days. Both the issue price payable by the investor and the redemption price payable by the Company was to be calculated by reference to Net Asset Value ("NAV") calculations based upon the market value, from time to time, of the Company's investment in the Master Fund on the relevant issue or redemption date.

10.    The use of redeemable shares as the vehicle for investment in this way was a common business practice in the Cayman Islands, and involved both the issue and the redemption of the ordinary shares at a very substantial premium. By way of example, the NAV per US$ share of the Company's ordinary shares ranged during the period from January to June 2008 between US$106,575 and US$112.288, whereas the nominal value per share was US$0.001. Thus, an incoming investor during that period would pay for the issue of shares an amount consisting almost entirely of premium, and the payment to an outgoing investor on a redemption day during that period would be similarly constituted.

11.    As a feeder fund, the Company's ordinary business consisted of the issue of shares, the transmission to the Master Fund of the proceeds of the issue, the receipt from the Master Fund of payments necessary to fund redemptions, and the payment out of

redemption moneys to redeeming shareholders. The company had no separate trading activities of its own.

12.    The timetable for redemption laid down by the Company's articles may be summarised as follows:

    i)    A shareholder is required to give 30 days' written notice of its wish to redeem, prior to a redemption day.

    ii)    Redemption days were scheduled for the first business day of each month.

    iii)    The NAV per share was to be assessed by the Administrator at the close of business on the day prior to the first business day of each month.

    iv)    On the redemption day redeeming shareholders redeemed their shares at a price per share based on the NAV per share of the relevant class of share. They ceased to be shareholders and became creditors of the Company for that price on that day.

    v)    Payment of the redemption price was to be made by the Company within 14 business days of the redemption day.

13.    The conversion of the status of a redeeming investor from a shareholder to a creditor on the redemption day, in advance of payment, was expressly laid down by the articles, and the validity of that first stage in the redemption process was affirmed by the Board in *Pearson v Primeo Fund* [2017] UKPC 19.

14.    By August 2008 the Respondent RMF Market Neutral Strategies (Master) Limited ("RMF") was a substantial investor in the Company's US$ denominated shares. The Company operated a substantially similar Euro denominated share structure, which can be ignored for the present purposes. One effect of the Company's trading was that it had a substantial surplus of share premium available for redemption of shares, although it did not maintain a formal share premium account in its books.

15.    The seismic shock to the derivatives markets which was triggered by the collapse of Lehman Brothers in late September 2008 had a catastrophic effect upon the investment strategy, and therefore the asset value, of the Master Fund. This meant that, in reality (and as later calculated by the Master Fund's liquidators), the Master Fund had a net asset value of minus US$69m odd by the end of November 2008, having lost US$76m odd in October and US$173m odd in November.

16.    The manager of the Master Fund, and of the Company, was Dynamic Decisions
Capital Management Limited which was itself run by a Mr Alberto Micalizzi, who was
also a director of the Master Fund and of the Company. It appears that, under his
supervision, the Master Fund concealed its catastrophic losses by investments in
worthless bonds (the Asseterra bonds) which were attributed a value in the Master
Fund's books sufficient both to conceal its insolvency and to portray to the world, and
in particular to those responsible for the calculation of the NAV, a continuing state of
profitability.

17.    Meanwhile, RMF and six other investors decided to redeem shares in the
Company, giving redemption notices effective on the 1 December 2008. Of its
693,630.656 ordinary US$ shares, RMF gave notice to redeem 87,466.106 on 29
October and 437,330.534 on 31 October 2008, both effective on the 1 December
redemption day. This left RMF holding 168,834.016 shares thereafter, which it
unsuccessfully sought to redeem in January 2009.

18.    Based upon the false information provided by or on behalf of the Master Fund,
the NAV per US$ share for the December redemption date was calculated at
US$118.880. Accordingly RMF became a creditor of the Company on 1 December
2008 in respect of its two redemption notices in the aggregate sum of US$62,387,824.

19.    The Company had no cash of its own at that time. Nonetheless those managing
the Master Fund managed to scrape together sufficient cash, made available first on 8
January 2009, to enable the Company to make part payment to the investors who
redeemed in December. In summary, RMF was paid (between 12 January and 6
February 2009) US$23m odd, amounting to some 36.89% of what it was owed. Of the
other six investors, the aggregate of whose redeemed shares was much less than that of
RMF, three were paid in full, but three were paid nothing.

20.    The Company suspended its redemptions shortly thereafter and in March 2009
was placed in official liquidation. By these proceedings the liquidators seek, through
the Company, to recover the whole of the US$23m odd paid in January 2009 to RMF,
on the basis that those redemption payments were rendered unlawful by section 37, or
alternatively section 34, of the Companies Law.

21.    Since the Company had no assets other than its investment in the Master Fund,
it followed that it had in truth a negative asset value by 1 December 2008, and at all
times thereafter. It was also common ground that, if the debts to redeeming shareholders
are to be taken into account, the Company failed the solvency test imposed by section
37(6)(a) both on 1 December 2008, and when the part payments of the Company's
redemption debts to RMF were made. The Company submits (and asserted before the
judge) that it also owed debts to creditors other than redeeming shareholders which it

15

was from December 2008 onwards unable to pay in the ordinary course of business. The judge found it unnecessary to reach any conclusions about that.

*The Proceedings*

22.    RMF initiated this litigation with a claim for a negative declaration (ie that it was not liable to repay the US$23m) in February 2011. The Company cross-claimed for recovery of that sum, on the alternative bases that (1) it was the aggregate of unlawful redemption payments, recoverable by way of unjust enrichment or constructive trust and (2) that the payments constituted fraudulent preferences.

23.    In his judgment handed down on 17 November 2014 (after a trial of preliminary issues in September) the Chief Justice held that:

      i)    The payments were not unlawful, being a legitimate use of the share premium account pursuant to sections 34 and 37 of the Companies Law.

      ii)    That the Company was insolvent, both within the meaning of section 37(6)(a) and generally, at the material time.

      iii)    That the fraudulent preference claim failed on the facts.

24.    In the circumstances, the judge found it unnecessary to decide any part of the remedies issue. Indeed, the facts relevant to any claim based in constructive trust were neither agreed nor determined as part of the preliminary issues.

25.    The Company's liquidators have not sought to appeal the judge's rejection of the claim based on fraudulent preference. Apart from that, the Company sought to pursue its unsuccessful claims in full by way of appeal.

26.    By its judgment handed down on 20 November 2015 the Court of Appeal (Mr John Martin, Sir Richard Field and Sir Alan Moses JJA) dismissed the Company's appeal, in substance agreeing with the judge's interpretation of sections 34 and 37, albeit partly for different reasons. Like the judge, the Court of Appeal found it unnecessary to address any issues about remedy. Nor does it appear that the Court of Appeal addressed RMF's challenge, raised by Respondent's notice, to the judge's finding of insolvency within the meaning of section 37(6)(a).

*The Solvency Issue*

27.    It is convenient to take this issue first since, if the Judge's finding that the
Company failed the section 37(6)(a) solvency test was unsound, this undermines the
claim for recovery based upon the alleged unlawfulness of the redemption payments.

28.    It is common ground between the parties that, if redemption debts owed to the
shareholders redeeming on the 1 December 2008 redemption day are to be taken into
account, then the Company was then unable to pay its debts as they fell due. This is
because the payments challenged satisfied only part of the December redemption debts,
and the Company was thereafter unable to pay the rest. It is also necessary to bear in
mind at the outset that it is common ground that the December redemptions were
themselves valid in the sense that, with effect from 1 December 2008, both RMF and
the six other redeeming shareholders were converted from shareholders to creditors in
respect of the shares being redeemed, and the shares cancelled. It is also part of that
common ground that, although the NAV of US$118.880 per share had been calculated
upon false information, it was nonetheless a valid NAV for the purpose of crystallising
the amount of the redeeming shareholders' debt: see *Fairfield Sentry Ltd (in liquidation)
v Migani* [2014] 1CLC 611.

29.    The insolvency test laid down by section 37(6)(a) is quoted in full at the
beginning of this judgment. The main submission made for RMF was that "debts"
should be held, on a purposive construction, to exclude debts due to former
shareholders. This, it was said, is because section 37(6) is part of a statutory buttress for
the maintenance of capital, and maintenance of capital is something designed for the
protection, not of contributories, but of ordinary creditors, so that it would be perverse
to read section 37(6) as designed to ensure that former shareholders could not be paid
on redemption, merely because of a shortfall available to pay all redeeming shareholders
in full. Accordingly, the test should address only the question whether, after the
proposed payment, the company would be able to pay its ordinary creditors (principally
trade and expense creditors), and since this Company was not proved to have had any
such creditors at the material time, it could not be said to have failed this solvency test.

30.    In the Board's judgment this submission should be rejected, for the following
reasons. First, although there is force in the proposition that the underlying purpose of
any statutory or common law provisions or principles for the maintenance of capital is
to protect ordinary creditors rather than shareholders or former shareholders, the
protection afforded by section 37(6) would not be effective if debts still owing to former
shareholders who had redeemed could not be paid after the proposed payment. This is
because those creditors would, pending any liquidation, be competing for payment with
the company's "ordinary" creditors, and the existence of those competing debts would
hamper the ability of the company to pay its ordinary creditors in full as and when their
debts became due. It is in that context nothing to the point that section 49 of the

Companies Law postpones claims of members of a company to the claims of ordinary unsecured creditors, precisely because it only operates in the context of a liquidation. Until then, former shareholders with redemption debts are as much entitled to exercise creditors' remedies as any other creditors.

31.    Secondly, there is no textual basis within section 37(6) on which this purposive restriction can be founded. The words "in the ordinary course of business" in section 37(6)(a) do not operate so as to disqualify some debts rather than others. They are words which amplify the meaning of the phrase "as they fall due". The question whether a company is able "to pay its debts as they fall due" is now a well-known test for commercial rather than balance sheet solvency, and requires that regard be had to the company's forthcoming liabilities, and to its likely forthcoming resources with which to discharge them. It would be an entirely artificial exercise in the context of a company with substantial redemption liabilities to former shareholders who have, in respect of their redeemed shares, become creditors, to leave the debts owed to them out of any test for commercial solvency.

32.    Thirdly, as the judge found, the payment of debts owed to redeeming creditors lay right at the heart of the ordinary business of this Company. It is an open-ended investment company. Thus, even if the phrase "in the ordinary course of business" qualified the type of debt to be taken into account, payment of redeeming shareholders fell squarely within this Company's ordinary course of business.

33.    The Board therefore approaches the larger and more difficult illegality issue on the basis that the judge was right to find that the Company could not satisfy the section 37(6) solvency test when it made the payments now claimed to have been unlawful.

*The Illegality Issue*

34.    It is convenient at this point to set out in full the provisions of the Companies Law which bear in any way upon this issue. As consolidated in 2007 they represent provisions introduced in 1963, 1987 and 1989. It cannot be doubted that their clarity suffers to a substantial extent from the piecemeal way in which they have come together over time.

> "34.(1) Where a company issues shares at a premium, whether for cash or otherwise, a sum equal to the aggregate amount of the value of the premiums on those shares shall be transferred to an account called 'the share premium account'. Where a company issues shares without nominal or par value, the consideration received shall be paid up share capital of the company.

(2)    The share premium account may be applied by the company subject to the provisions, if any, of its memorandum or articles of association in such manner as the company may, from time to time, determine including, but without limitation -

(a)    paying distributions or dividends to members;

(b)    paying up unissued shares of the company to be issued to members as fully paid bonus shares;

(c)    in the manner provided in section 37;

(d)    writing off the preliminary expenses of the company;

(e)    writing off the expenses of, or the commission paid or discount allowed on, any issue of shares or debentures of the company;

and

(f)    providing for the premium payable on redemption or purchase of any shares or debentures of the company:

Provided that no distribution or dividend may be paid to members out of the share premium account unless, immediately following the date on which the distribution or dividend is proposed to be paid, the company shall be able to pay its debts as they fall due in the ordinary course of business; and the company and any director or manager thereof who knowingly and wilfully authorises or permits any distribution or dividend to be paid in contravention of the foregoing provision is guilty of an offence and liable on summary conviction to a fine of fifteen thousand dollars and to imprisonment for five years. …

37.(1) Subject to this section, a company limited by shares or limited by guarantee and having a share capital may, if authorised to do so by its articles of association, issue shares which are to be redeemed or are liable to be redeemed at the option of the company or the shareholder.

(2)     Subject to this section, a company limited by shares or limited by guarantee and having a share capital may, if authorised to do so by its articles of association, purchase its own shares, including any redeemable shares.

(3)     (a)     No share may be redeemed or purchased unless it is fully paid.

(b)     A company may not redeem or purchase any of its shares if, as a result of the redemption or purchase, there would no longer be any other member of the company holding shares.

(c)     Redemption of shares may be effected in such manner as may be authorised by or pursuant to the company's articles of association.

(d)     If the articles of association do not authorise the manner of purchase, a company shall not purchase any of its own shares unless the manner of purchase has first been authorised by a resolution of the company.

(e)     The premium, if any, payable on redemption or purchase must have been provided for out of the profits of the company or out of the company's share premium account before or at the time the shares are redeemed or purchased or in the manner provided for in subsection (5).

(f)     Shares may only be redeemed or purchased out of profits of the company or out of the proceeds of a fresh issue of shares made for the purposes of the redemption or purchase or in the manner provided for in subsection (5).

(g)     Shares redeemed or purchased under this section shall be treated as cancelled on redemption or purchase, and the amount of the company's issued share capital shall be diminished by the nominal value of those shares accordingly; but the redemption or purchase of shares by a company is not to be taken as reducing the amount of the company's authorised share capital.

(h)    Without prejudice to paragraph (g), where a company is about to redeem or purchase shares, it has power to issue shares up to the nominal value of the shares to be redeemed or purchased as if those shares had never been issued:

Provided that where new shares are issued before the redemption or purchase of the old shares the new shares shall not, so far as relates to fees payable on or accompanying the filing of any return or list, be deemed to have been issued in pursuance of this subsection if the old shares are redeemed or purchased within one month after the issue of the new shares.

(4)    (a)    Where, under this section, shares of a company are redeemed or purchased wholly out of the company's profits, the amount by which the company's issued share capital is diminished in accordance with paragraph (g) of subsection (3) on cancellation of the shares redeemed or purchased shall be transferred to a reserve called 'the capital redemption reserve'.

(b)    If the shares are redeemed or purchased wholly or partly out of the proceeds of a fresh issue and the aggregate amount of those proceeds is less than the aggregate nominal value of the shares redeemed or purchased, the amount of the difference shall be transferred to the capital redemption reserve.

(c)    Paragraph (b) does not apply if the proceeds of the fresh issue are applied by the company in making a redemption or purchase of its own shares in addition to a payment out of capital under subsection (5).

(d)    The provisions of this Law relating to the reduction of a company's share capital apply as if the capital redemption reserve were paid-up share capital of the company, except that the reserve may be applied by the company in paying up its unissued shares to be allotted to members of the company as fully paid bonus shares.

(5)    (a)    Subject to this section, a company limited by shares or limited by guarantee and having a share capital may, if

so authorised by its articles of association, make a payment in respect of the redemption or purchase of its own shares otherwise than out of its profits or the proceeds of a fresh issue of shares.

(b)     References in subsections (6) to (9) to payment out of capital are, subject to paragraph (f), references to any payment so made, whether or not it would be regarded apart from this subsection as a payment out of capital.

(c)     The amount of any payment which may be made by a company out of capital in respect of the redemption or purchase of its own shares is such an amount as, taken together with -

(i)     any available profits of the company are being applied for purposes of the redemption or purchase; and

(ii)     the proceeds of any fresh issue of shares made for the purpose of the redemption or purchase, is equal to the price of redemption or purchase,

is equal to the price of redemption or purchase, and the payment out of capital permitted under this paragraph is referred to in subsections (6) to (9) as the capital payment for the shares. Nothing in this paragraph shall be taken to imply that a company shall be obliged to exhaust any available profits before making any capital payment.

(d)     Subject to paragraph (f), if the capital payment for shares redeemed or purchased and cancelled is less than their nominal amount, the amount of the difference shall be transferred to the company's capital redemption reserve.

(e)     Subject to paragraph (f), if the capital payment is greater than the nominal amount of the shares redeemed or purchased and cancelled, the amount of any capital redemption reserve, share premium account or fully paid share capital of the company may be reduced by a sum not exceeding, or by sums not in the aggregate exceeding, the

amount by which the capital payment exceeds the nominal amount of the shares.

(f)    Where the proceeds of a fresh issue are applied by a company in making any redemption or purchase of its own shares in addition to a payment out of capital under this subsection, the references in paragraphs (d) and (e) to the capital payment are to be read as referring to the aggregate of that payment and those proceeds.

(6)    (a)    A payment out of capital by a company for the redemption or purchase of its own shares is not lawful unless immediately following the date on which the payment out of capital is proposed to be made the company shall be able to pay its debts as they fall due in the ordinary course of business.

(b)    The company and any director or manager thereof who knowingly and wilfully authorises or permits any payment out of capital to effect any redemption or purchase of any share in contravention of paragraph (a) is guilty of an offence and liable on summary conviction to a fine of fifteen thousand dollars and to imprisonment for five years.

(7)    …"

35.    Beginning again with section 37(6), and leaving aside the issue about the meaning of "debts as they fall due in the ordinary course of business", there is nothing difficult or uncertain about its purpose and effect, which is to subject any payment out of capital for the redemption or purchase by a company of its own shares to the solvency test as a condition for its lawfulness. But it immediately begs the question what is "a payment out of capital". That question is answered in terms by section 37(5)(b), which is expressed to apply in the context of subsections (6) to (9). It is "any payment so made, whether or not it would be regarded apart from this subsection as a payment out of capital". It is common ground, and clearly correct, that the phrase "any payment so made" means any payment referred to in section 37(5)(a); ie "a payment in respect of the redemption or purchase of its own shares otherwise than out of its profits or the proceeds of a fresh issue of shares". Since a payment out of share premium account is plainly not a payment out of profits or out of the proceeds of a fresh issue of shares, it is deemed to be a payment out of capital, provided only that it is made "in respect of" the redemption or purchase of the company's own shares. It was common ground, and

plainly correct, that the phrase "in respect of" is wide enough to include a payment of the premium due on the redemption of shares.

36.    In the Board's judgment that is the end of the matter. Section 37(6) is, on its face, a free-standing condition for the lawfulness of a particular type of payment for the redemption or purchase of shares, namely payment out of capital. Section 37(5)(a) and (b) operate, expressly, as a form of definition of the meaning of "payment out of capital" and do so for the purpose of deeming that to be capital whether it would or would not otherwise be so regarded. The conclusion that, therefore, a payment in respect of the redemption of shares out of share premium account is a deemed payment out of capital subject to the section 37(6) solvency test is a straightforward application of clear statutory language, the displacement of which would require very strong pointers to the contrary.

37.    The main arguments that there are sufficient pointers to the contrary, advanced for RMF, have thus far persuaded both the courts below. They may conveniently be divided into three classes, namely:

 i)      Arguments based on section 37(3)(e);

 ii)     Arguments based on section 34; and,

 iii)    Arguments based on the legislative history behind these provisions, both in the UK and in the Cayman Islands.

38.    Section 37(3)(e) provides for three permitted ways or "gateways" whereby the premium payable on redemption for purchase of shares may be provided for, namely: (1) out of profits (2) out of share premium account or (3) "in the manner provided for in subsection (5)". RMF submitted that section 37(3)(e) permits the use of share premium account to pay premium on redemption, regardless of the restriction in section 37(6), which only applies if the third gateway, namely the manner provided for in subsection (5), has to be employed for the purpose. The submission therefore treats section 37(6) as if it is purely parasitic upon section 37(5).

39.    While attractively argued by Mr David Chivers QC for RMF, the Board has not been persuaded that this analysis is correct. Neither on its own nor when aggregated with the other arguments to which reference will be made below is it sufficient to displace the clear meaning and effect of subsection (6), read with and interpreted by reference to subsection (5)(a) and (b). The reasons follow.

40.    First, section 37(3)(e) is silent as to whether the use of share premium account for the payment of premium on redemption is, or is not, subject to the solvency test. The answer to that question lies elsewhere. Secondly, subsections (5) and (6) are both expressly concerned with conditions for payment of redemption amounts whereas subsection (3)(e) is, by its terms, concerned with the making of provision in advance of, or at the time of, redemption.

41.    Thirdly, the third gateway in subsection (5)(e), namely "the manner provided for in subsection (5)" could, had this been intended, easily have referred also to subsection (6), or subsection (6) could itself have been framed so as to be expressly confined to payments sought to be achieved by using the subsection (5) gateway. In short, subsection (6) could have been, but is not, expressed to be parasitic upon subsection (5). It is only if that parasitic relationship between the two subsections is assumed, rather than treated as the issue to be determined, that the alternative construction, advanced by RMF and favoured by Lord Hodge, gains strength.

42.    Fourthly, this argument pays insufficient attention to what appears to be the main purpose of subsection (3)(e), read in the context of its sister, subsection (3)(f). Subsection (3)(f) is designed to identify the legitimate resources for payment of the nominal amount due on redeemed shares, whereas subsection (3)(e) is about resources for the payment of premium. Reading the two together, they both permit the use of profits and the manner provided for in subsection (5), but they prohibit the use of share premium account for the payment of the nominal amount due, and they prohibit the use of a fresh issue of shares for payment of the premium amount. That purpose is unrelated to the question whether any of the permitted methods, and in particular the use of share premium account, amounts to a deemed capital payment, thereby triggering the solvency test in subsection (6).

43.    Finally, if the legislature had intended to exclude share premium account from the reach of the deeming effect of subsections (5)(a) and (b), this could so easily have been expressly stated in subsection (5)(a), by adding a reference to share premium account in the words following "otherwise than". This is incidentally just what the legislature did do in 2011, although that is irrelevant for the purposes of construction.

44.    Turning to section 34, the argument is that, when subsection (2) is read as a whole, it appears to contemplate and indeed authorise the use of share premium account for providing for the premium payable on redemption or purchase of shares without any solvency requirement. This is because the provision on redemption is given in subsection (2)(f), whereas the proviso, which contains an identical solvency test to that in section 37(6)(a), is expressed to apply only to distributions or dividends which are authorised by subsection (2)(a). Again, this is an attractive argument, and one which strongly influenced the judge and the Court of Appeal.

45.    The Board has not been persuaded by this argument, for two main reasons. The first is that the provision for a solvency test in relation to distributions or dividends in section 34 does not mean or imply that there is not some other solvency test applicable to one or more of the other permitted uses of share premium account, such as that in section 37(6). Section 34 is the only place in the Companies Law in which the use of share premium account for distribution or dividends is dealt with. By contrast the use of share premium account for redemption for purchase is just mentioned in the non-exclusive list in section 34(2), but dealt with in detail in section 37.

46.    The second reason derives from the history of the piecemeal introduction of these provisions, and reinforces the first. The provisions for the use of share premium account on redemption of shares, including earlier versions of what are now sections 37(3)(e) and (f), and section 37(5) and (6), were introduced in 1987, as parts of what were then section 34. At that stage section 32 (which was the earlier version of what is now section 34) made no mention of the use of share premium account for distribution or dividends, made no reference to any solvency test and merely noted that it could be used in providing for the premium payable on redemption of any shares or any debentures of the company. The permission to use share premium account for distribution or dividends was introduced, side by side with the solvency proviso now in section 34(2), in 1989. If the provisions newly introduced in 1987 subjected the use of share premium account to the solvency test, it could not sensibly be suggested that the 1989 addition of distribution and dividends, side by side with its own solvency test, was intended by a side-wind to release the use of share premium account for redemption from a solvency requirement.

47.    Turning to the wider legislative history, counsel for both parties travelled at length through the history of the common law and statutory provision for the maintenance of capital, beginning with *Trevor v Whitworth* (1887) 12 App Cas 409 and continuing through the UK Companies Acts from 1929 onwards into the Cayman Islands legislation which, in its original form in 1963, mirrored that to be found in the UK Companies Act 1948. Thereafter the two legislative schemes diverged.

48.    The argument for RMF was that, in the context of a progressive liberalisation of the regime for the maintenance of capital, share premium account had, from 1948 in the UK and from 1963 in the Cayman Islands, been available for the payment of a premium on redemption of shares without any requirement for commercial solvency. For completeness, it was pointed out that this has clearly been the position from 2011, when share premium account was, by further amendment of section 37(5)(a), clearly excluded from the definition of capital payments. Why, it was asked rhetorically, should there have been a blip in that process of liberalisation which applied a solvency test to the use of share premium account for this purpose, which had previously been absent?

49.    The answer in the Board's judgment is that, prior to 1987, Cayman law permitted only the issue and redemption of preference shares, rather than equity shares, following in that respect the precedent set by the Companies Act 1948. In sharp contrast with shares of the type in issue in these proceedings, where the premium may exceed the nominal amount by several orders of magnitude, the premium likely to be payable upon the redemption of preference shares would typically be modest, limited to some capitalisation of coupon, unpaid on early redemption. The propensity for permitting the premium payable on redemption of equity shares to undermine capital maintenance, by comparison with preference shares, was perceptively analysed by Professor Gower in 1980 in his consultative report "The Purchase by a Company of its Own Shares" (Cmnd 7944). At para 22, after pointing out that section 58 of the Companies Act 1948 permitted a premium payable on redemption to be provided for out of share premium account, he continued:

> "This anomaly may not matter much in the case of preference shares in the strict sense, where the premiums are likely to be small. But in relation to redeemable equity shares the premiums might well be many times the nominal value, resulting in a substantial reduction of capital on redemption. It is therefore suggested that sections 56 and 58 should be amended so as to prevent redeemable shares from being redeemed otherwise than out of profits or an issue of new capital without any use of share premium account which would be left intact."

50.    In due course, the UK Parliament followed that advice and prohibited the use of share premium account for the payment of premium on redemption of shares, when extending the ability of a company to issue and redeem shares from preference shares to equity shares. This was done in the Companies Act 1981. By contrast, in 1987 the Cayman Islands adopted a more nuanced approach. The ability to issue and redeem shares was extended from preference shares to equity shares, and share premium account was permitted to be used for funding the premium payable on redemption. It is not surprising in that context that the Cayman Islands legislature took the more modest step of imposing a solvency test from the use of share premium account for that purpose rather than, as in the UK, prohibiting it altogether. It may well be that this was done specifically to permit or encourage the use of shares and share premium as an investment vehicle in the way commonly used by open-ended investment companies as illustrated by the facts of this appeal. There was no time before 2011 at which, in the Cayman Islands, redeemable equity shares could be issued, or redeemed, when there was also an uncontrolled right to fund premium payable on redemption out of share premium account. If the solvency test was imposed in 1987, as the Board considers that it was, it cannot in the light of the legislative history sensibly be described as some unaccountable blip in an otherwise seamless liberalisation of the capital maintenance regime.

51.    Lord Hodge criticises this analysis, in particular the reference to Professor
Gower's report, as a misuse of UK legislative history and policy for the interpretation
of the undoubtedly different provisions of the Cayman Company Law. But when
Professor Gower reported in 1980 the statutory provisions regulating the issue and
redemption of shares were substantially the same in both jurisdictions, and the risks
arising from the extension of the redemption of shares from preference to equity shares
were therefore also the same. Professor Gower was doing no more than point out the
logical consequences of providing for the redemption of equity shares upon the
maintenance of capital.

52.    Lord Hodge draws support from a detailed textual analysis of the progressive
development of the Cayman regime regulating the issue and redemption of shares from
1963, through 1987 and 1989 to 2007, for a conclusion that the solvency test now in
section 37(6) was never intended to apply to the use of share premium account for the
payment of premium on redemption. In the Board's view the question turns primarily
upon the construction of the 2007 Revision. If the 1987 Revision had clearly not applied
the solvency test, then this might have been a sufficient contra-indication to displace
the apparently clear meaning of section 37(6) read with the definition of payment out
of capital in subsection (5), in the 2007 Revision. But the Board's view is that the
broadly equivalent provisions of the 1987 Revision do not lead to any different
conclusion, construed on their own, and the modest textual changes to what is now
section 37 introduced in 1989 make no significant difference.

53.    The judge was clearly influenced in his approach to the construction of sections
34 and 37 by a perception that to subject the lawfulness of a payment of redemption
premium out of share premium account to a solvency test would expose investors in
companies of this kind to unacceptable risks of uncertainty because of the risk of claw-
back claims, sometimes long after redemption, arising from facts internal to the issuing
company, unknown to the investor but affecting the commercial solvency of the
company. If those claw-back claims could indeed be made against innocent investors
(ie without knowledge of the facts about the company's solvency giving rise to the
illegality) then the judge's concerns would be understandable. Nonetheless, as will
shortly appear, the Board considers that the answer to those concerns lies in the limited
nature of the remedy, rather than in adopting a strained construction of sections 34 and
37.

54.    The conclusion that the solvency test in section 37(6) applies to the use of share
premium account for payment of premium on redemption means that it is unnecessary
to address in detail either of the other grounds upon which the Company argued that the
payments in issue were unlawful. For completeness there follows a brief explanation
why the Board found neither of them persuasive.

55.    The first was that, separately from section 37(6), and although only applicable to payment of the nominal amount due on the redemption of shares, section 37(3)(f) was nonetheless itself a cumulative condition which would render the use of share premium account for payment of the premium under section 37(3)(e) unlawful, if the nominal amount was not to be funded out of proceeds of a fresh issue or in the manner provided for in subsection (5). Although generally the conditions for redemption are cumulative in section 37, subsections 3(e) and (f) deal with quite different aspects of the manner in which redemption is to be funded. Once a valid redemption has occurred (as is common ground in these proceedings) then the company owes a debt to the redeeming shareholder equivalent to what will always be the aggregate of the nominal amount and any relevant premium. It does not follow, merely because the nominal amount is not provided for or paid in a manner which renders the payment lawful, that this necessarily affects the lawfulness of the payment of the premium amount.

56.    The second alternative submission was that, in the context of the payment of premium on redemption, where there was no lawful payment of the nominal amount, the payment of the premium would be a distribution or divided, separately subjected to a solvency test by section 34(2). Again, the concession that there was a valid redemption, sufficient to convert the redeeming shareholders into creditors and to bring to an end their rights as shareholders, necessarily means that a payment then or thereafter made to them is neither a dividend nor a distribution. Accordingly, it is not subject to the solvency test in section 34(2).

57.    For the reasons already given, the Board has concluded that the payments in issue in these proceedings were unlawful payments, because they were capital payments which triggered the solvency test in section 37(6), with which the Company was at the time unable to comply.

*The Remedy Issue*

58.    If, as the Board concludes, payment of the redemption proceeds was unlawful by virtue of section 37(6)(a) of the Companies Law, the next question is whether they are recoverable by the Company. The liquidators' primary case is that they are recoverable at common law on the ground of unjust enrichment. Alternatively they submit that they are recoverable in equity on the ground that the redeeming shareholder is accountable as a constructive trustee on the footing of knowing receipt. Conceptually these two proposed bases of recovery are very different. A common law liability in restitution depends on the defendant having been unjustly enriched by the receipt. The liability of a constructive trustee is essentially a custodial liability comparable to that of an express trustee, which is imposed on him because he has sufficient knowledge to affect his conscience. The difference is of some practical importance in the present case. If the payments are recoverable only on the footing of knowing receipt, the company must establish that the redeeming shareholder had sufficient knowledge of the facts which

made the payment unlawful. But knowledge of the facts giving rise to a right of restitution is generally irrelevant.

59.     A number of uncontroversial points should be made by way of introduction. First, section 37(6)(a) of the Companies Law prohibits a payment out of capital of the redemption proceeds, but does not prohibit the redemption itself. It is, as the Board has observed, common ground that the redemption itself was lawful and effective. It follows that on the relevant Redemption Days the transaction was executed. The redeemed shares were thereupon cancelled and the Company's issued share capital was reduced by their nominal value: see the Companies Law, section 37(3)(g). Secondly, there is nothing in the Companies Law to prevent the redemption proceeds from being payable at some time after the Redemption Day. Under the terms of the Offering Memorandum for the shares in question, the redemption proceeds were payable within 14 days. It follows, as the parties agree, that on the Redemption Day, the Company came under a liability to pay the redemption proceeds by the due date. The debt was incurred by the Company in consideration of the cancellation of the shares, and the payment was in consideration of the discharge of that debt. Thirdly, the prohibition in section 37(6)(a) is directed at the Company, ie at the directors by whom it acts. Fulfilment of the conditions imposed by section 37(6)(a) is a matter of internal administration. It is a breach of trust on the part of the directors to authorise the payment of the redemption proceeds if the conditions in section 37(6)(a) are not satisfied.

60.     In principle, money paid under an ineffective (eg a void) transaction is recoverable: *Westdeutsche Landesbank Girozentrale v Islington London Borough Council* [1994] 4 All ER 890 (Hobhouse J), approved (obiter) on appeal to the House of Lords [1996] AC 669, 681-682 (Lord Goff), 714 (per Lord Browne-Wilkinson), 723 (per Lord Woolf); *Guinness Mahon & Co Ltd v Kensington and Chelsea Royal London Borough Council* [1999] QB 215. As the editors of Goff & Jones, *The Law of Unjust Enrichment*, 9th ed (2016), Chapter 13, explain, the ground of recovery in these cases is failure of basis. The transfer was not intended to be gratuitous, but the ineffectiveness of the transaction means that there never was any consideration for it. The same is in principle true if the reason why the transaction is ineffective is that it is illegal, although in this case the position is complicated by the public policy against the recovery of money paid for an illegal purpose: *Smith v Bromley* (1760) 2 Doug KB 696n; *Patel v Mirza* [2016] 3 WLR 399, paras 146-148 (Lord Neuberger), 194-197 (Lord Mance), 251-252 (Lord Sumption).

61.     The present case is, however, rather different. The basis for the payment of the redemption proceeds is that the shares have been redeemed and cancelled and a valid debt is owed by the Company. That basis has not failed. On the contrary, the redemption was lawful. The shares have been duly cancelled and the nominal share capital of the company adjusted accordingly. The Company's payment of part of the proceeds discharged *pro tanto* the lawful debt that arose in consequence. It is accepted by the liquidators that if it had not been paid, it could have been proved as a debt in the

liquidation of the company. It follows that although the Company acted illegally in making the payment, upon receipt it discharged a valid legal entitlement of the redeeming shareholder.

62.    It is fundamental that a payment cannot amount to enrichment if it was made for full consideration; and that it cannot be unjust to receive or retain it if it was made in satisfaction of a legal right. As Professor Burrows has put it in his *Restatement of the English Law of Unjust Enrichment* (2012), para 3(6), "in general, an enrichment is not unjust if the benefit was owed to the defendant by the claimant under a valid contractual, statutory or other legal obligation". The proposition is supported by more than a century and a half of authority: see, in particular, *Aiken v Short* (1856) 1 H & N 210, 215, *Barclays Bank Ltd v W J Simms, Son and Cooke (Southern) Ltd* [1980] QB 677, *Lipkin Gorman (a firm) v Karpnale Ltd* [1991] 2 AC 548, 574-577, 580-581, *Kleinwort Benson Ltd v Lincoln City Council* [1999] 2 AC 349, 408 (Lord Hope), *Fairfield Sentry Ltd (in liquidation) v Migani* [2014] 1 CLC 611 (JCPC), para 18.

63.    The liquidators submitted that, subject to any change of position defence, there was a right to restitution because the purpose of section 37(6)(a) was the protection of the company's assets for the benefit of its creditors. In support of this submission, he cited *Smith v Bromley* (1760) 2 Doug KB 696n, *Browning v Morris* (1778) 2 Cowp 790, and *Kiriri Cotton Co Ltd v Dewani* [1960] AC 192. These are all decisions about the rule of public policy against the recovery of money paid for an illegal purpose. They are authority for the proposition that although in principle money paid for an illegal purpose is not recoverable, there is an exception for cases where the parties to the illegal transaction were not *in pari delicto*. One circumstance in which they will not be *in pari delicto* is that the illegality consisted in the breach of an obligation laid upon the defendant for the protection of the very class of persons to which the claimant belonged. Thus in *Kiriri Cotton Co Ltd* a tenant was entitled to restitution of an illegal premium which he had paid by agreement to the landlord, because the duty not to charge it was laid by statute on landlords for the protection of tenants. This line of cases needs to be revisited in the light of the decision of the Supreme Court in *Patel v Mirza* [2016] 3 WLR 399, in which every member of the court (albeit for different reasons) recognised a more general right to restitution of money paid under an illegal transaction. But this does not matter, for these cases have no bearing on facts like those presently before the Board. They assume a prima facie right to restitution and address the circumstances in which the illegality of the underlying transaction may afford a defence, whereas in the present case there is no prima facie right to restitution to call for such a defence. They go on to assume (as was in fact the case in all of them) that the party seeking restitution was party to the illegality, whereas in the present case the redeeming shareholder simply received payments which were due to him under lawful transactions. The purpose of the rule which made the transaction illegal may be relevant to defeat reliance on the principle of public policy *ex turpi causa non oritur actio*. But it cannot create a right of restitution which would not otherwise exist.

64.    The Board concludes that the Company is not entitled to recover the payments at common law on the ground of unjust enrichment. The reality of the present case is that a payment has been received from a company for lawful consideration but it has been authorised by its directors in breach of their duties to the Company. This is the proper domain of the law of constructive trusts. Not even in return for good consideration can a person retain assets which he knows to have been paid to him in breach of the statutory duties of the directors. But knowledge, especially in relation to apparently routine transactions where lawfulness depends on the internal affairs of the Company, may be hard to prove.

65.    The Board will humbly advise Her Majesty that this appeal must be allowed, and a declaration made that the payments of redemption proceeds pursuant to the respondents' redemption requests dated 29 and 31 October 2008 were unlawful by virtue of section 37(6)(a) of the Companies Law. The courts below did not deal with the right of recovery because they considered that the payments were lawful. Accordingly, there are no findings of fact to found the claim to make the redeeming shareholder accountable on the footing of knowing receipt. The matter must therefore be remitted to the Grand Court to determine whether the respondent is accountable for those payments as a constructive trustee.

## LORD HODGE: (dissenting) (with whom Lord Mance agrees)

66.    I agree with the judgment of Lord Sumption and Lord Briggs on the solvency issue and also on the remedy issue if the repayment of the premium on the redeemed shares were illegal. I am not however persuaded that the Chief Justice and the Court of Appeal of the Cayman Islands erred in their conclusions on the illegality issue.

67.    The relevant provisions of the 2007 Companies Law are the consolidation of provisions introduced in 1963, 1987 and 1989. The legislative history of the current provisions, which have been set out in para 33 above, differs markedly from the way in which companies legislation in the United Kingdom has regulated the share premium account. The policies behind the legislation in the United Kingdom do not, in my view, provide a reliable guide as to the meaning of the 2007 Companies Law.

68.    The 1963 Companies Law, in section 32, treated the share premium account as a species of capital by applying the provisions of the 1963 Law relating to the reduction of share capital to the share premium account "as if the share premium account were paid-up share capital". But that deeming provision was qualified in subsection (1) by the words "except as provided in this section". It was therefore subject to exceptions in subsection (2), of which the relevant one was that the share premium account could be applied "in providing for the premium payable on redemption of any redeemable preference shares or of any debenture of the company". Section 34 of the 1963 Law,

which empowered a company, if authorised by its articles, to issue redeemable
preference shares, drew a distinction between the redemption of shares and the
repayment of the premium on those shares. It provided (i) that the shares were to be
redeemed out of profits otherwise available for dividend or out of the proceeds of a
fresh issue of shares made for the purposes of the redemption (section 34(1)(a)) and (ii)
that any premium payable on redemption must have been provided for out of profits or
the share premium account before the shares are redeemed (section 34(1)(c)). The 1963
Law reflected the relevant provisions (sections 56 and 58) of the United Kingdom's
Companies Act 1948. No other provision was needed to authorise the use of funds in
the share premium account in paying the premium on redemption of the preference
shares.

69.    At that time, the only redeemable shares which a company was authorised to
issue were preference shares, which would normally have only a modest premium
payable on redemption. But in 1987 company law in the Cayman Islands was altered
radically when companies were empowered to issue redeemable equity shares. The
1987 Law substituted a new section 32 which did not alter the basic rule which treated
the share premium account as if it were capital but, by extending the exception of the
provisions of that section from that deeming provision, allowed the use of that account
to provide for the premium payable on the redemption of any shares or of any debenture
of the company. The substituted section 34, providing for the redemption and purchase
of shares, preserved the substance of section 34(1)(c) of the 1963 Law by providing (in
subsection (2)(e)):

> "The premium (if any) payable on redemption or purchase must
> have been provided for out of the profits of the company or out of
> the company's shares [sic] premium account before or at the time
> the shares are redeemed or purchased."

The section retained the distinction between the use of the share premium account to
pay the premium on redemption or purchase and the repayment of the nominal value of
the shares on redemption or purchase by providing (in subsection 34(3)(f)):

> "Subject to the provisions of subsection (5), shares may only be
> redeemed or purchased out of profits of the company or out of the
> proceeds of a fresh issue of shares made for the purposes of the
> redemption or purchase." (emphasis added)

But, as the emphasised words show, the repayment of the nominal value of the shares
was subjected to a new regime, which is in substance that which is now contained in
section 37(5) and (6) of the 2007 Act. That regime allows the company to make a
payment in respect of the redemption or purchase of its own shares otherwise than out

of its profits or the proceeds of a fresh issue of shares but deems such payments to be a payment out of capital and subjects those payments to the solvency test in subsection (6).

70.    The 1989 Law by repealing subsections (1) and (2) of section 32 removed the provision that the share premium account was to be subjected to the rules relating to the reduction of capital as if it were paid up share capital, except as provided in that section. It replaced those subsections with the provisions which are now found in section 34 of the 2007 Law and are set out in para 33 above. Those amendments preserved the share premium account but no longer deemed the share premium account to be capital for any purpose. The new subsection (2) provided that the share premium account may be applied in such manner as the company may determine. The enumerated uses of the account were stated not to limit that discretion. Those uses included the paying of distributions or dividend to members, which use alone was subjected to the solvency test in what is now the proviso to section 34(2) of the 2007 Act. The uses which were not so subjected included and include the application of the share premium account "(f) providing for the premium payable on redemption or purchase of any shares or debentures of the company".

71.    Another use which was not subjected to the solvency test in section 34(2) of the 1963 Law as amended in 1989 is the application of the share premium account "(c) in the manner provided in section 34" (now section 37 of the 2007 Law). This would allow the funds in the share premium account to be used to redeem the nominal value of shares, but such application would fall under what under the 2007 Law is the section 37(5) regime and thus the section 37(6) solvency test.

72.    The 1989 Law amended section 34(3)(e) of the 1963 Law to read:

> "The premium (if any) payable on redemption or purchase must have been provided for out of the profits of the company or out of the company's share premium account before or at the time the shares are redeemed or purchased or in the manner provided for in subsection (5)." (emphasis added)

This provision as amended thus provided an additional source of the funds, deemed capital under subsection (5), which a company could use to pay the premium payable on redemption or purchase. The 1989 Law also amended section 34(3)(f) by deleting the opening words emphasised in para 69 above and by adding the words emphasised below so as to read:

> "Shares may only be redeemed or purchased out of profits of the company or out of the proceeds of a fresh issue of shares made for

the purposes of the redemption or purchase <u>or in the manner provided for in subsection (5)</u>." (emphasis added)

Thus the nominal value of redeemed or purchased shares could be paid for out of profit, out of the proceeds of a fresh issue of shares made for that purpose or out of deemed capital as provided in subsection (5). Changes were also made by the 1989 Law to section 34(5) (now section 37(5) of the 2007 Law) but they are not relevant.

73.    From this legislative history the following conclusions can be drawn. First, the legislation has throughout authorised the application of the share premium account to pay the premium on the redemption of redeemable shares. Secondly, when redeemable equity shares were introduced, the 1987 Law preserved a distinction between the repayment of the premium on redeemable shares (now including redeemable equity shares) and the repayment of the nominal value of those shares by subjecting only the latter to the provisions of subsections (5) and (6) in the opening words of section 34(3)(f) (para 69 above). Thirdly, this distinction is preserved by the amendments introduced by the 1989 Law which expressly provide for an additional optional source of payment in both section 37(3)(e) and section 37(3)(f) of the 2007 Law. Thus the premium on redemption of shares may be paid out of (a) profits or (b) the share premium account or (c) as provided for in subsection (5) (ie a deemed capital payment subject to a solvency test). The nominal value of the shares on the other hand may be paid (a) out of profits or (b) out of the proceeds of a fresh issue of shares or (c) as provided for in subsection (5) (ie a deemed capital payment subject to the solvency test). The use of the disjunctive "or" in section 37(3)(e) means that the payment of the premium on redemption or purchase out of the share premium account is not subjected to the regime under subsections (5) and (6). This is consistent with section 34 of the 2007 Law, which does not impose a solvency test on the use of the share premium account when it is used to provide the premium payable on the redemption or purchase of shares.

74.    Lord Sumption and Lord Briggs start their analysis with section 37(6) of the 2007 Law, and thereby bypass the restrictions on the scope of section 37(5) on which subsection (6) is parasitic. Subsection (6) is parasitic on subsection (5) because the solvency test imposed by that subsection is applied only to the payments out of capital or out of that which subsection (5) deems to be capital when used to make a payment in respect of the redemption or purchase of the company's own shares. But, as I have shown, under the 1963 Law and the 1987 Law the share premium account was not treated "as if [it] were paid up capital" when it was used to pay the premium on the redemption of shares because such use was exempted from the deeming provision. In the 1989 Law the share premium account ceased to be subject to the provisions of the Law relating to the reduction of share capital. Thus, under the 2007 Law the share premium account is not capital and therefore is not caught by section 37(6) unless subsection (5) applies to make it so. But section 37(5)(a), which introduces the regime for payment in respect of the redemption or purchase of shares out of deemed capital, is stated to be "[s]ubject to this section", which requires reference to the other provisions

of section 37, including subsection (3)(e), in order to determine the scope of subsection (5).

75.    Lord Sumption and Lord Briggs in paras 40 and 42 above interpret section 37(3)(e) and (f) of the 2007 Law as being concerned only with "the making of provision" or being "to identify the legitimate resources" for the payment of the premium and the nominal amount of the redeemed shares, while they construe section 37(5) as providing the authorisation for payment subject to the subsection (6) solvency test (paras 35 and 36 above). On their approach, section 37(3), when read with section 34(2), does not authorise the use of those funds. I respectfully disagree. Section 37(3)(e) of the 2007 Law performs a purpose which can be traced back to section 34(1)(c) of the 1963 Law (para 68 above). It identifies the sources of the payment of the premium on redemption and one source is the share premium account, which under section 34(2) of the 2007 Law (and formerly section 32(2) of the 1963 Law both as originally enacted and as amended in 1987 and 1989) can be applied in providing for the premium payable on redemption. Under the 1963 Law, and the 1948 UK Act on which it was modelled, no other authorisation for the payment was required. The amendments to section 34(3)(f) of the 1963 Law in 1987 (para 69 above) and to both section 34(3)(e) and (f) of that Law in 1989 (para 71 above) preserved this position. Against this legislative background, I am not persuaded that the introduction of what is now section 37(5) of the 2007 Law overrode the authorisation given by the combination of section 34(2) and section 37(3)(e) of that Law.

76.    This view of the scope of the deeming provisions in section 37(5)(a) and (b) of the 2007 Law does not empty those provisions of content. The deeming provisions would cover liquid assets of the company, such as cash obtained by borrowing, if they were to be used in respect of the redemption or purchase of the company's shares. Further, the conclusion that the share premium account is available for the payment of premium on the redemption of redeemable shares is consistent with the altered status of that account which ceased to be deemed in any circumstances to be capital for the purpose of the provisions of the Law relating to reduction of capital in 1989. But for the imposition of the solvency test in relation to the use of the share premium account in paying distributions and dividends to members (now by section 34(2) of the 2007 Law) the share premium account would have reverted to its pre-1963 status in Jamaican (and Cayman) law in the Jamaican Companies Act 1864 (as amended) as profits available for distribution: *In re Hoare & Co Ltd* [1904] 2 Ch 208; *Drown v Gaumont-British Picture Corporation Ltd* [1937] Ch 402. In this regard the amendments made to the Law in 1989 confirm my view that the legislature in 1987 by making only section 34(3)(f) subject to section 34(5) did not include the use of the share premium account to pay the premium on the redemption or purchase of shares within the section 34(6) solvency test.

77.    It is undoubtedly correct that the legislation could have been more clearly drafted as Lord Sumption and Lord Briggs have stated. But the legislative history which I have set out does not suggest that the legislature altered the substance of the 2007 Law when

in 2011 it amended section 37(5) expressly to exclude payments out of the share premium account from the extended definition of capital and thus from the solvency test. In short, the legislature of the Cayman Islands in 1987 adopted a radically different approach to the use of the share premium account from that which Professor Gower recommended to the UK government and which the UK Parliament adopted in the Companies Act 1981. The 1987 Law extended the authorised use of the share premium account in payment of the premium on the redemption of shares, which previously had been limited to redeemable preference shares, to provide for the payment of the premium on the redemption of equity shares, notwithstanding that the premium commanded by such shares would often be much larger. In so doing, it did not impose on such use of the share premium account the solvency test now contained in section 37(6).

78.    I agree with the conclusion of Lord Sumption and Lord Briggs that the Company's other submissions, namely (i) that there were cumulative conditions in section 37(3)(f) and (e) of the 2007 Law and (ii) that the payment of the premium to a former shareholder would be a distribution subject to the solvency test in the proviso to section 34(2) of the 2007 Law, fall to be rejected for the reasons which they have stated in paras 51 and 52 of the judgment.

*Conclusion*

79.    I would therefore have dismissed the appeal.

# Fairfield Sentry Ltd. (In Liquidation ) v. Migani [2014] UKPC 9

[2014] UKPC 9
**Privy Council Appeal No 0061 of 2012
and Nos 0058, 0059, 0060 and 0061 of 2013**

# JUDGMENT

**Fairfield Sentry Limited (in Liquidation)
(Appellant) v Migani and others (Respondents)**

**Lombard, Odier & Cie and others (Appellants) *v*
Fairfield Sentry Limited (in Liquidation)
(Respondent)**

**Credit Suisse London Nominees Limited and
another (Appellants) v Fairfield Sentry Limited (in
Liquidation) (Respondent)**

**Quilvest Finance Limited and others (Appellants) v
Fairfield Sentry Limited (in Liquidation)
(Respondent)**

**UBS AG New York and others (Appellants) v
Fairfield Sentry Limited (in Liquidation)
(Respondent)**

**From the Court of Appeal of the British Virgin Islands**

**before**

**Lord Neuberger**
**Lord Mance**
**Lord Clarke**
**Lord Sumption**
**Lord Toulson**

## JUDGMENT DELIVERED BY

## Lord Sumption

## ON

## 16 April 2014

**Heard on 18 and 19 March 2014**

*Lombard, Odier & Cie
and others*
David Lord QC
Robert Christie

(Instructed by Blake
Lapthorn)


*Credit Suisse London
Nominees Ltd and another*
Laurence Rabinowitz QC
Arabella di Iorio
Maximilian Schlote
(Instructed by Herbert
Smith Freehills LLP)


*UBS AG New York and
others*
Lord Falconer QC
Paul Webster QC
(Instructed by Gibson
Dunn & Crutcher LLP)


*Quilvest Finance Ltd and
others*
Mark Hapgood QC
Phillip Kite
Alan Roxburgh
(Instructed by Latham &
Watkins)

*Fairfield Sentry Ltd (in
Liquidation)*
Jonathan Crow QC
Andrew Westwood
Stephen Midwinter
(Instructed by Macfarlanes
LLP)

**LORD SUMPTION:**

*Introduction*

1.      Bernard L. Madoff and his company Bernard L. Madoff Investment Securities
LLC ('BLMIS') ostensibly operated as fund managers, principally from New York.
Over a period of at least seventeen years he operated what seems likely to be the largest
Ponzi scheme in history, accepting sums variously estimated between US$17 billion
and US$50 billion for investment. It appears that from at least the early 1990s there had
been no trades and no investments. Returns to investors were fictitious and the
corresponding documentation fabricated. As with any Ponzi scheme, net withdrawals
from funds under management were paid from new money placed with BLMIS for
investment. In December 2008 Madoff was arrested, and in March 2009 he pleaded
guilty in a New York court to a number of counts of fraud. He was later sentenced to
150 years imprisonment.

2.      Fairfield Sentry Ltd is a company incorporated in the British Virgin Islands as a
mutual fund. I shall, like most of the formal documentation, call it "the Fund". From
1997 to 2008, it was the largest of a number of feeder funds which placed money with
BLMIS for investment. Over that period, about 95% of its assets, amounting to some
US$7.2 billion was placed with BLMIS. Investors participated indirectly in these
placements by subscribing for shares in the Fund at a price dependent on the Fund's net
asset value per share ('NAV'), and were entitled to withdraw funds by redeeming their
shares under the provisions of the Fund's Articles of Association. The net addition to
or reduction of its funds arising from subscriptions or withdrawals over any month was
reflected in corresponding additions or reductions of funds placed with BLMIS. The
shares were also transferrable, subject to certain restrictions in the Articles, but we were
told that there was no secondary market in them. On 18 December 2008, shortly after
Madoff's frauds came to light, the Directors of the Fund suspended the determination
of the Fund's NAV per share, thus effectively terminating the redemption of shares. On
21 July 2009, the High Court of the British Virgin Islands ordered the Fund to be wound
up.

3.      It is inherent in a Ponzi scheme that those who withdraw their funds before the
scheme collapses escape without loss, and quite possibly with substantial fictitious
profits. The loss falls entirely on those investors whose funds are still invested when the
money runs out and the scheme fails. Members of the Fund who redeemed their shares
before 18 December 2008 recovered the NAV which the Directors determined to be
attributable to their shares on the basis of fictitious reports from BLMIS. The loss will
in principle be borne entirely by those who were still Members of the Fund at that date.

4.      These proceedings are brought by the Fund at the instance of its liquidators
against a number of financial institutions who were Members of the Fund but redeemed
some or all of their shares before December 2008. Their purpose is to recover from the
Defendants the amounts paid out to them on redemption, on the footing that they were
paid out in the mistaken belief that the assets were as stated by BLMIS, when there were
in fact no such assets. Any recoveries made on this basis can then be distributed rateably
between all Members, irrespective of when or whether they redeemed.

5.      Similar proceedings have been brought by the Fund in other jurisdictions against
other Members and former Members to recover redemption payments. They include
more than 300 actions in the United States, in which the Fund is claiming more than
US$6 billion. The United States actions have been stayed pending the outcome of these
proceedings.

6.      On 20 April 2011, Bannister J in the Commercial Division of the High Court of
the British Virgin Islands ordered four preliminary issues to be tried. The first three
issues have together been called the "Article 11" question.  These issues were all
concerned with the question whether certain transaction documents issued to Members
of the Fund recording the NAV per share or the redemption price upon redemption were
binding on the Fund under Article 11 of its Articles, which deals with the effect of
certain "certificates". It is now accepted, and rightly accepted, by the Fund that if they
were binding the present claims must fail. The fourth issue was whether the Defendants
have a defence on the ground that by their surrendering their shares they gave good
consideration for the money that they received on redemption. This has been called the
"Good Consideration" question. The two questions were argued separately below and
before us. But for reasons which will be explained, they are closely related and have to
be considered together.

7.      Bannister J decided the Article 11 question in favour of the Fund. He held that
the documents relied upon by the Defendants as binding were not "certificates" for the
purpose of Article 11. But he held in favour of the Defendants on the Good
Consideration question, and on that basis summarily dismissed the action. He was
affirmed on both points by the Eastern Caribbean Court of Appeal.

*The contractual documentation*

8.      Subscribers for shares in the Fund complete a Subscription Agreement, by which
they subscribe for shares to be offered by the Fund at the NAV per share as the opening
of business on the effective date of purchase "pursuant to the terms herein, the
Memorandum, and the Fund's Memorandum of Association and Articles of Association
(collectively 'the Fund Documents')": see clause 1.

9.      Of these three documents, the "Memorandum" means the Private Placement Memorandum by which the Fund offers a stated number of shares. Its main function is to convey information about how the Fund is managed and how its assets are invested, and to define certain expressions used in the Subscription Agreement. It describes the investment strategy of the Fund, and explains that it is implemented by BLMIS. A section headed "Transfers, Redemptions and Termination" describes the procedure for redemption.

10.      The Subscription Agreement binds the subscriber to his subscription and to the terms of the Fund Documents, but is otherwise concerned entirely with acknowledgements, representations and warranties as to his understanding of the investment and of associated procedures and risks, mostly for regulatory purposes. For present purposes, what matters is not the subscriber's acknowledgements, representations and warranties, nor the factual statements of the Fund, but the terms of the subscriber's membership of the Fund, which govern the redemption of its shares. These terms are to be found in the Articles of Association of the Fund. The relevant provisions are Articles 9, 10 and 11 and the associated definitions in Article 1. These operate by reference to the "Valuation Day" and the "Dealing Day". A Valuation Day is the last business day of any month (or such other date as the Directors may determine); and with respect to redemptions a Dealing Day is a Valuation Day.

11.      Article 9 deals with the issue and allotment of shares. Article 9(1) provides for shares to be issued to those applying for them on the Dealing Day following the application. Article 9(1)(b) provides:

> "The issue of Shares pursuant to this Article shall be effected at not less than the Subscription Price determined in accordance with paragraph (2) of this Article but in no event shall a Share be allotted or issued at a price less than its par value."

Article 9(2) provides that the Subscription Price per share is to be the

> "Net Asset Value of each Share (as determined in accordance with Article 11) as at the close of business in Amsterdam, The Netherlands, on the Valuation Day immediately preceding the Dealing Day on which such issue is made."

12.      Article 10 deals with redemptions. It is in some respects the mirror image of Article 9. Article 10(1) provides that

"Subject to the provisions of the Memorandum, these Articles and the Act and subject as hereinafter provided, the Company shall on receipt by it or its authorised agent of a request in writing (or in such other form as the Directors may determine) by a Member ('the Applicant') specifying the number and class of Shares to be redeemed redeem or purchase all or any portion of the Shares registered in the Applicant's name, PROVIDED THAT:

(a) subject as hereinafter provided, the redemption or purchase of Shares pursuant to this Article shall be made on the Dealing Day on which, or immediately following the day on which, the written request is received provided that the said request is received on or before the Dealing Time."

Article 10(1)(b) provides (so far as relevant) that

"the redemption or purchase of Shares pursuant to this article shall be effected at the Redemption Price determined in accordance with paragraph (2) of this article."

Article 10(1)(c) provides for the Redemption Price to be paid "as soon as practicable after the Dealing Day", being normally 30 days after the Dealing Day, subject to extension in certain special cases. Article 10(2) deals with the Redemption Price. It provides:

"(2)    The Redemption Price for each Share shall be the Net Asset Value per Share (as determined in accordance with Article 11) as at the close of business in Amsterdam, The Netherlands on the Dealing Day on which such redemption is effected less such sum (if any) as the Directors may consider represents the appropriate provision for fiscal and sale charges which would be incurred on the sale of assets of the Company, in each case rounded to the nearest minimum integral unit of the Base Currency."

13.    Article 11 deals with the determination of the NAV per share for the purpose of both subscriptions and redemptions. Article 11(1) provides:

"[a] The Net Asset Value per Share of each class shall be determined by the Directors as at the close of business on each Valuation Day (except when determination of the Net Asset Value per Share has been suspended under the provisions of paragraph

(4) of this Article), on such other occasions as may be required by these Articles and on such other occasions as the Directors may from time to time determine.

[b] The Net Asset Value per Share shall be calculated at the time of each determination by dividing the value of the net assets of the Fund by the number of Shares then in issue or deemed to be in issue and by adjusting for each class of Shares such resultant number to take into account any dividends, distributions, assets or liabilities attributable to such class of Shares pursuant to paragraph (2) of Article 4, all determined and calculated as hereinafter provided.

[c] Any certificate as to the Net Asset Value per Share or as to the Subscription Price or Redemption Price therefor given in good faith by or on behalf of the Directors shall be binding on all parties."

The sub-paragraph numbers [a], [b] and [c] have been added for ease of reference. Article 11(2) identifies the assets and liabilities to be included in the calculation of the NAV. In effect they are all the assets and liabilities of the Fund. Article 11(3) contains detailed supplementary provisions governing certain aspects of the valuation.

*Redemption procedure*

14.    Since 1999, the Fund's administrator has been Citco Fund Services (Europe) BV, a leading professional administrator of mutual funds based in the Netherlands. The Private Placement Memorandum records that under an administration agreement dated 20 February 2003, the Fund has appointed Citco as the administrator of the Fund under the overall direction of the Directors. Citco is described as having responsibility for day-to-day administrative services including "calculation of Net Asset Value" and "communications with shareholders".

15.    This summary description is borne out by the terms of the agreement of 20 February 2003. Clause 2.1 of the agreement provides for the Administrator (Citco) to provide "the Services", which are defined in Schedule 2 as including the "calculation of the Net Asset Value and the Net Asset Value per Share on a monthly basis in accordance with the Fund Documents", and "publishing the Net Asset Value per Share (of each class if appropriate) as requested by the Fund." Clause 3.4 provides that "the Administrator shall on behalf of the Fund redeem Shares in accordance with the provisions and procedures set out in the applicable Fund Documents", on receipt of the

Member's written request to redeem and the provision of sufficient moneys to satisfy the Redemption Price.

16.    The management of a mutual fund is bound to involve the communication to Members of a substantial volume of routine documentation, including transactional documentation generated upon redemption. It is common ground that in the Fund's case, this included the following documents:

i)    Citco calculated an estimated NAV weekly and a final NAV on each Valuation Day, i.e. on the last business day of each month. All of these figures were posted by Citco on a password-protected website which it maintained and which was accessible to Members.

ii)    The final NAV per share for the last business day of each month was communicated in about the middle of the following month by the Fairfield Group client desk at Citco by e-mail to all Members. The operative part of the representative e-mail before us reads:

"Please be advised that the final net asset value per share of Fairfield Sentry Limited, Class A, is USD 957.8430 as at December 2003.

Should you have any questions or require further information, please do not hesitate to contact us."

iii)    Upon each redemption, the redeeming Member received from Citco in about the middle of the month following the relevant Valuation Day a contract note recording the transaction. The operative part began:

"In accordance with your instructions, we confirm having REDEEMED the following voting shares from FAIRFIELD SENTRY LIMITED."

There followed the relevant Valuation Day, the number of shares redeemed, the Redemption price per share and the total net redemption proceeds.

iv)    Each Member received from Citco in about the middle of each month a monthly statement of his account. This recorded, among other things, the

opening and closing NAV per share for the previous calendar month, and a
summary of activity (if any) over the previous calendar month recording
subscriptions and redemptions in the month and the NAV per share
corresponding to each one.

Each of these documents is said by the Defendants to be a "certificate" for the purpose
of Article 11(1) [c] of the Fund's Articles.

*Restitution*

17.   The availability of a claim for restitution arising out of a transaction governed
by the Articles of the Fund is governed by the same law which governs the Articles
themselves, namely the law of the British Virgin Islands. In every relevant respect, the
principles of the law of the British Virgin Islands governing the construction of the
Articles and any associated common law right to restitution are the same as those of
English law.

18.   The basic principle is not in dispute. The payee of money "cannot be said to have
been unjustly enriched if he was entitled to receive the sum paid to him": *Kleinwort
Benson Ltd v Lincoln City Council* [1999] 2 AC 349 at 408B (Lord Hope). Or, as
Professor Burrows has put it in his *Restatement of the English Law of Unjust
Enrichment* (2012) at §3(6), "in general, an enrichment is not unjust if the benefit was
owed to the defendant by the claimant under a valid contractual, statutory or other legal
obligation." Therefore, to the extent that a payment made under a mistake discharges a
contractual debt of the payee, it cannot be recovered, unless (which is not suggested)
the mistake is such as to avoid the contract: *Barclays Bank Ltd v W.J. Simms Son &
Cooke (Southern) Ltd* [1980] QB 677, 695. So far as the payment exceeds the debt
properly due, then the payer is in principle entitled to recover the excess.

19.   It follows that the Fund's claim to recover the redemption payments depends on
whether it was bound by the redemption terms to make the payments which it did make.
That in turn depends on whether the effect of those terms is that the Fund was obliged
upon a redemption to pay (i) the true NAV per share, ascertained in the light of
information which subsequently became available about Madoff's frauds, or (ii) the
NAV per share which was determined by the Directors at the time of redemption. If (ii)
is correct then, the shares having been surrendered in exchange for the amount properly
due under the Articles, the redemption payments are irrecoverable.

*What was the Fund obliged to pay upon redemption*

20.   Mr Crow QC, who appeared for the Fund, invited us to stop at the general
principle, and not to answer this question. He submitted that the effect of the contractual

provisions governing redemption was not covered by the preliminary issues and ought to be referred back to the High Court. He also suggested that at a further hearing in the High Court, New York law, which is the proper law of the Subscription Agreement, might be relevant. The Board unhesitatingly rejects these submissions. Neither the Article 11 question nor the Good Consideration question, as formulated in the preliminary issues, can be resolved without deciding what is the effect of the Articles. Both courts below proceeded on that basis. The effect of the Articles is therefore properly before the Board. The Board notes that neither the Fund nor the Defendants have pleaded New York law. Nor can the Board discern any basis on which New York law could be relevant, since none of the questions raised by the preliminary issues depends on the terms of the Subscription Agreement. They depend wholly on the construction of the Articles, which is governed by the law of the British Virgin Islands.

21.    The starting point is the scheme of the Articles. Articles 9 and 10 determine the status of investors as Members of the Fund, a question which ought in principle to be capable of definitive resolution at any moment in the Fund's history. Both the Subscription Price under Article 9 and the Redemption Price under Article 10 depend on the NAV per share determined under Article 11. Article 9(1)(a) provides that the issue of shares "shall be made on the Dealing Day". Article 9(1)(b) provides for the Subscription Price to be determined in accordance with Article 9(2), which means that it is to be the NAV per share "determined in accordance with Article 11". Article 9(1)(c) provides for the Subscription Price to be payable at a time fixed by the Directors, failing which any allotment for which payment is due may be cancelled. There are corresponding provisions of Article 10 concerning redemptions. Article 10(1)(a) provides that the redemption of shares "shall be made on the Dealing Day". Article 10(1)(b) provides that the redemption is to be effected at the Redemption Price determined in accordance with Article 10(2), which means the "Redemption Price for each Share shall be the Net Asset Value per Share (as determined in accordance with Article 11)" on the Dealing Day. Under Article 10(1)(c), that price must be paid as soon as practicable after the Dealing Day, being normally thirty days thereafter subject to specified and limited extensions. These provisions determine the amount due and the time of payment. Moreover, once the NAV per share for a given monthly Valuation Day is ascertained, subscriptions and redemptions effected at the corresponding Subscription and Redemption Price will affect the determination of NAV per share on the following monthly Valuation Day. This is because the receipt of subscription moneys and the payment out of redemption moneys will affect the amount of the Fund's assets for the purpose of Article 11(2). It will be apparent from this summary that the whole of this scheme depends upon the price being definitively ascertained by the Dealing Day and known to the parties shortly thereafter. It is unworkable on any other basis.

22.    The Fund's case is that when Article 10(2) defines the Redemption Price as the NAV per share "determined in accordance with Article 11", it means the NAV correctly determined by dividing the NAV of the Fund by the number of shares in issue in accordance with Articles 11(1)[b], 11(2) and 11(3). If this is right, the same must be

true of Article 9(1)(c), which fixes the Subscription Price by reference to the same
provisions of Article 11. The Directors' determination of the NAV per share as at the
Valuation Day, under Article 11, was not definitive according to this analysis unless a
certificate was issued pursuant to Article 11(1)[c], and that would happen only if the
Directors chose to issue one.

23.    In the Board's opinion, this is an impossible construction. If it were correct, an
essential term of both the subscription for shares and their redemption, namely the price,
would not be definitively ascertained at the time when the transaction took effect, nor
at the time when the price fell to be paid. Indeed, it would not be definitively ascertained
for an indefinite period after the transaction had ostensibly been completed, because
unless a certificate was issued it would always be possible to vary the determination of
the NAV per share made by the Directors at the time and substitute a different one based
on information acquired long afterwards about the existence or value of the assets. This
would not only expose Members who had redeemed their shares to an open-ended
liability to repay part of the price received if it subsequently appeared that the assets
were worth less than was thought at the time. It would confer on them an open-ended
right to recover more (at the expense of other Members) if it later appeared that they
were worth more. Corresponding problems would arise out of the retrospective
variation of the Subscription Price long after the shares had been allotted.  Indeed, it is
difficult to see how the Directors could perform their duty under Article 9(1)(b) not to
allot or issue a share at less than the Subscription Price if the latter might depend on
information coming to light after the allotment had been made.

24.    If, as the Articles clearly envisage, the Subscription Price and the Redemption
Price are to be definitively ascertained at the time of the subscription or redemption,
then the NAV per share on which those prices are based must be the one determined by
the Directors at the time, whether or not the determination was correctly carried out in
accordance with Articles 11(2) and (3). That means either (i) that the Directors'
determination at the time must be treated as conclusive whether or not there is a
certificate under Article 11(1)[c]; or else (ii) that  Article 11(1)[c] must be read as
referring to the ordinary transaction documents recording the NAV per share or the
Subscription or Redemption Price which will necessarily be generated and
communicated to the Member at the time, and not to some special document issued at
the discretion of the Directors. The Board considers, for the reasons given below, that
in a case where a provision for certification such as Article 11(1)[c] has been included
as part of the mechanics of subscription and redemption, the correct approach is the
second one.

*Certification*

25.    The Board has been referred to a number of authorities dealing with certification
clauses, none of them analogous to Article 11(1)[c]. Their effect, broadly summarised,
is that the word "certificate" has no standard meaning and that the question what

constitutes a certificate is dependent on the commercial or legal context in which the certification clause appears.

26.    The Board was invited by the Fund to read the opening words ("Any certificate") as if they said "A certificate, if any". This, it was argued, showed that there would not necessarily be one in every case. For that reason, and because there is nothing in the language of the Articles which obliged the Fund to issue a certificate, it was submitted that the issue of a certificate was wholly in the discretion of the Directors or their delegates and that it could be withheld for any rational and honest reason. A variant of this argument appears to have been accepted by the Court of Appeal. The Board, however, is unable to accept it. In the first place, it places more weight on the word "Any" than it will bear. It seems more likely that the word was used because the rest of the clause refers to a number of different things that may be certified, namely the NAV per share, the Subscription Price and the Redemption Price. Secondly, the problem about the suggestion that certification is a discretionary matter for the Directors, is that it is impossible to discern what purpose such a discretion could rationally be thought to serve. The sole object of certification is to produce finality, and the scheme of the Articles, as the Board has summarised it above, shows that finality is equally important for all determinations of the NAV per share and all Subscription and Redemption Prices. There is no rational ground for regarding finality as desirable in some cases but not in others, according to the discretionary decision of the Directors or their delegates. Such a discretion, if it existed, could only operate capriciously, and is therefore most unlikely to have been intended by the draftsman.

27.    As a matter of language, a "certificate" ordinarily means (i) a statement in writing, (ii) issued by an authoritative source, which (iii) is communicated by whatever method to a recipient or class of recipients intended to rely on it, and (iv) conveys information, (v) in a form or context which shows that it is intended to be definitive. There is no reason to think that a document must satisfy any further formal requirements, unless its purpose or legal context plainly requires them. There is nothing in the context of these Articles which does.

28.    The relevant categories of document generated in the ordinary course of the Fund's relations with Members are listed at paragraph 16. In the Board's opinion the monthly e-mail, the contract notes and the monthly statement of account are all "certificates". They communicate information in documentary form to Members. It follows that the critical questions in the present case are whether transaction documents in the three categories are (i) issued by an authoritative source and (ii) in a form or context which shows that they are intended to be definitive.

29.    The authoritative character of their source can be shortly dealt with. Documents in all three categories were issued by Citco under the authority of the Directors, conferred by the Administration Agreement. The calculation of the monthly NAV per

share was among the functions of Citco included in Schedule 2, Part 1 of the Agreement. Its publication was a function of Citco under Schedule 2, Part 2(e). The communication to Members seeking to redeem their shares of the monthly NAV per share and the Redemption Price is necessarily implicit in clause 3.4 of the Agreement, which delegates to Citco the duty of redeeming shares in accordance with the "provisions and procedures" set out in the Fund Documents. These authorities are general, and not specific to any particular transaction or category of transactions. If the issue of a "certificate" were an exceptional or discretionary step, something more specific by way of authority might have been required. But for the reasons which the Board has already given, the certification procedure under Article 11(1)[c] is neither exceptional nor discretionary.

30.    Turning to the question whether they were intended to be definitive, the context in which they are issued plainly demonstrates that they were. As the Board has already observed, the nature of a redemption transaction and the procedures set out in Article 10 make it essential that the Redemption Price should be definitively ascertained at the time of the transaction and as at the Valuation Day. In that context, any unqualified documentary statement of the Redemption Price or the NAV per share on which it is based must be intended to be definitive. The Articles could not otherwise operate as they are intended to.

31.    This conclusion is borne out by the language of the documents. The emails formally "advising" the monthly NAV per share to Members describe it in terms as the "final" figure. The contract notes formally "confirm" the redemption and record its terms. The monthly Members' statement constitutes a formal record of each transaction during the month and the NAV per share at which it went through. All of this information was plainly intended to be relied upon by Members as a definitive record of the transaction and the values on which it was based.

32.    The Board prefers to express no opinion on the question whether the statements posted on the Citco website are also "certificates". A statement on a website may well have all the characteristics of a "certificate", but that may depend on a variety of considerations on which the Board has little or no evidence, including the permanence of any statement posted on it and what Members are told about the kind of information which they will find there.

*Conclusion*

The Board will humbly advise Her Majesty that the appeals against the decision of Bannister J and the Court of Appeal on Preliminary Issues 1, 2 and 3 should be allowed, save as to information posted on the Citco website, and that the appeal against their decision on Issue 4 should be dismissed. The parties are invited to agree an appropriate form of declaration on all four issues.