# EXHIBIT C

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X
                                       :

In re:                              :        Chapter 15 Case

                                         :

FAIRFIELD SENTRY LIMITED, *et al.*,   :        Case No. 10-13164 (SMB)

                                         :

        Debtors in Foreign Proceedings.    :        Jointly Administered

-------------------------------------------------------X
FAIRFIELD SENTRY LIMITED         :
(IN LIQUIDATION), acting by and through the :   Adv. Proc. No. 10-03496 (SMB)
Foreign Representatives thereof,        :

                                       :        Administratively Consolidated

                 Plaintiffs,        :

                                       :

            -against-           :

                                       :

THEODOOR GGC AMSTERDAM, *et al.*,  :

                                       :

            Defendants.       :
-------------------------------------------------------X

**MEMORANDUM DECISION GRANTING IN PART AND
DENYING IN PART DEFENDANTS' RENEWED MOTION TO DISMISS**

**A P P E A R A N C E S :**

SELENDY & GAY PLLC
1290 Avenue of the Americas
New York, NY 10404

     David Elsberg, Esq.
     Andrew R. Dunlap, Esq.
     Lena Konanova, Esq.
     Jordan Garman, Esq.
     Ronald Krock, Esq.
     Evan Bianchi, Esq.
          Of Counsel

BROWN RUDNICK LLP
Seven Times Square
New York, NY 10036

     David J. Molton, Esq.
     Marek P. Krzyzowski, Esq.
          Of Counsel

*Attorneys for Plaintiffs*

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, NY 10006

> Thomas J. Moloney, Esq.
> Joseph M. Kay, Esq.
> Christine M. Jordan Esq.
>> Of Counsel

*Attorneys for Defendants[1]*

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge**

This litigation arises from the Ponzi scheme perpetrated by Bernard L. Madoff through the investment advisory division of Bernard L. Madoff Investment Securities LLC ("BLMIS"). The Plaintiffs, Kenneth M. Krys and Greig Mitchell (together, the "Liquidators"),[2] sue in their capacities as liquidators and foreign representatives of Fairfield Sentry Limited ("Sentry"), Fairfield Sigma Limited ("Sigma"), and Fairfield Lambda Limited ("Lambda," and collectively with Sentry and Sigma, the "Funds"), foreign feeder funds that invested with BLMIS. In *Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam* (*In re Fairfield Sentry Ltd.*), 596 B.R. 275 (Bankr. S.D.N.Y. 2018) ("*Fairfield II*"), *appeal docketed*, No. 1:19-cv-03911-VSB (S.D.N.Y. May 1, 2019), the

---

[1] This motion is made by 365 Defendants listed on Appendix A to the *Consolidated Memorandum of Law in Support of Defendants' Renewed Motion to Dismiss Pursuant to 11 U.S.C. §§ 561(d), 546(e), and 546(g) and for Insufficient Service of Process Under the Hague Service Convention*, dated Mar. 16, 2020 ("*Defendants Brief*") (ECF Doc. # 2903). Cleary Gottlieb represents a subset of the Defendants but has served as coordinating counsel to all Defendants. A list of the other defense counsel can be found in Appendix H to the *Defendants Brief*.

The Liquidators' actions to recover redemptions paid by the Funds were administratively consolidated for pretrial purposes. (*Amended Order Authorizing the Consolidation of Redeemer Actions Pursuant to Federal Rule of Bankruptcy Procedure 7042*, dated Nov. 17, 2010 (ECF Doc. # 25).) Unless otherwise specified, references to docket entries refer to the electronic docket of the consolidated proceeding, *Fairfield Sentry Limited (In Liquidation) v. Theodoor GGC Amsterdam*, Adv. Proc. No. 10-03496 (SMB).

[2] Different individuals have served as Liquidators of the Funds. When used in this memorandum decision, the term refers to the individuals serving in that position during the referenced time period.

2

Court dismissed all of the Liquidators' claims except for avoidance claims under British

Virgin Islands ("BVI") law to recover "unfair preferences" and "undervalue transactions"

(together, the "BVI Avoidance Claims") and constructive trust claims against the so-

called Knowledge Defendants (the "Constructive Trust Claims"). According to the

Liquidators, the Knowledge Defendants knew when they redeemed their interests in the

Funds that the redemption prices were inflated because they were based on Sentry's

fictitious BLMIS account statements listing securities that did not exist.

The Defendants have now renewed their motion to dismiss (the "Motion")

arguing that the remaining claims are barred by 11 U.S.C. § 546(e) (the "Safe Harbor")

and service of process was insufficient.[3] The Liquidators oppose the Motion.[4] For the

reasons stated, the BVI Avoidance Claims are dismissed, the Constructive Trust Claims

are not dismissed and the motion to dismiss for insufficient service of process is denied.

## BACKGROUND

Unless otherwise indicated, the background information is taken from the well-

pleaded factual allegations of the *Third Amended Complaint*, dated Jan. 9, 2020

("*Citibank Complaint*") (ECF Adv. Proc. No. 10-03622 Doc. # 79) in *Fairfield Sentry

Limited v. Citibank NA London*, Adv. Proc. No. 10-03622 (SMB) ("Citibank Action")[5]

---

[3]   *See Defendants Brief; see also Consolidated Reply Memorandum of Law in Further Support of Defendants' Renewed Motion to Dismiss*, dated June 19, 2020 ("*Defendants Reply*") (ECF Doc. # 3036).

[4]   *See Memorandum of Law in Opposition to Defendants' Renewed Motion to Dismiss*, dated May 29, 2020 ("*Liquidators Brief*") (ECF Doc. # 3033).

[5]   The Liquidators have served approximately 300 complaints. To facilitate consideration of the Safe Harbor defense on an omnibus basis, and following consultation with the parties, the Court designated the *Citibank Complaint* as the representative complaint on certain issues pertaining to the Safe Harbor. (*See Scheduling Order*, dated Apr. 14, 2020 ("*Scheduling Order*") at ¶ 1(a) (ECF Doc. #

3

and other information the Court may consider on a motion to dismiss for failure to state
a claim.  The Court will also describe the procedural history that is relevant to the
instant Motion.

## A.    The Funds' Investments With BLMIS

The Funds were organized under BVI law.  (¶¶ 18, 26.)  Sentry sold shares to
foreign investors and invested 95% of the proceeds with BLMIS.  (¶¶ 2, 33, 35.)  Sigma
and Lambda were "funds of funds" – they sold shares to investors and invested those
proceeds with Sentry, which, in turn, invested those funds with BLMIS.  (¶¶ 2, 33.)
Hence, the Funds invested virtually all of their assets directly or indirectly with BLMIS.
(¶¶ 4, 34.)

In December 2008, Madoff admitted to operating the investment advisory
business of BLMIS as a Ponzi scheme, and BLMIS was placed into liquidation pursuant
to section 78eee of the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa, *et seq*,
("SIPA").  (¶¶ 17, 84-88.)  The Funds ceased making redemption payments after
Madoff's arrest.  (¶ 89.)  Shortly after the collapse of BLMIS, certain of the Funds'
creditors and shareholders commenced insolvency proceedings against the Funds in the
Commercial Division of the Eastern Caribbean High Court of Justice, British Virgin
Islands ("BVI Court").  (¶¶ 90-93.)  The BVI Court appointed the Liquidators, and they
commenced ancillary proceedings in this Court under chapter 15 of the Bankruptcy
Code to obtain recognition of the BVI liquidation proceedings as "foreign main

---

3028).)  "(¶ _ )" refers to paragraphs in the *Citibank Complaint*.  The extensive history of the Liquidators'
actions against former investors of the Funds is discussed at length in *Fairfield II*.

proceedings." (¶¶ 27, 28, 94.)  The Court granted the Liquidators' recognition applications on July 22, 2010.  (¶ 28.)

While the Funds were operational, the shares in the Funds were redeemable at a price equal to the respective Fund's net asset value ("NAV") per share calculated by dividing the value of the Fund's assets by the number of outstanding shares, net of certain expenses.  (¶¶ 4, 35.)  Each Fund's Articles of Association ("Articles") specified that the Fund would issue certificates with respect to the NAV, and "[a]ny certificate as to the Net Asset Value per Share or as to the Subscription Price or the Redemption Price therefor *given in good faith by or behalf of the Directors shall be binding* on the parties." *Fairfield II*, 596 B.R. at 283.  The Funds' Directors retained Citco Group Limited ("Citco Group") and its affiliates (collectively, "Citco") to perform administrative and custodial functions for the Funds.  (¶ 45.)  Citco Fund Services (Europe) B.V. ("Citco Administrator") and its delegate Citco (Canada) Inc. served as the Funds' administrators (together, the "Administrators") with responsibility for calculating the NAV and issuing corresponding certificates to investors.  (¶¶ 45, 72, 73.) In calculating the NAV of the Funds, the Administrators typically relied on the pricing information supplied by BLMIS.  (¶ 69.)  Citco Bank Nederland N.V. Dublin Branch ("Citco Bank") and Citco Global Custody served as the Funds' custodians (together, the "Custodians").[6]  However, the Custodians did not actually hold the assets; BLMIS served

---

[6]      The Liquidators allege that the Administrators and the Custodians worked with multiple other Citco affiliates to provide services to the Funds.  All Citco entities worked under the direction and control of Citco Group.  (¶¶ 72-73.)

as its own custodian, and the custody statements issued by the Custodians merely copied information from Sentry's BLMIS account statements. (¶¶ 49, 69.)

## B.    Allegations of Knowledge and Bad Faith

The preparation of the certificates setting forth the NAV per share was delegated to Citco.  The *Citibank Complaint* alleges that Citco did not issue the certificates in good faith because it knew or willfully blinded itself to the fact that the Funds' BLMIS investments were worthless or virtually worthless.  As a result of Citco's bad faith, the Funds were not bound by Citco's certifications regarding the NAV.  (¶¶ 45-74.)  The Defendants do not challenge the sufficiency of the allegations of Citco's bad faith at this time and I assume the sufficiency of the allegations of bad faith for now.[7]

The *Citibank Complaint* also alleges that Citibank NA London ("Citibank") knew or should have known that the redemption payments were inflated due to Madoff's fraud.  (¶¶ 75-83.)  Again, the Defendants do not challenge the legal sufficiency of these allegations at this time.  I assume, therefore, for the purpose of the Motion that the Liquidators have adequately alleged Citco's bad faith and the Knowledge Defendants'

---

[7]     The *Citibank Complaint* alleges that the Funds were innocent dupes unaware that BLMIS was a Ponzi scheme and the NAVs were inflated.  (¶ 38 ("The Funds believed that the amounts provided in connection with such withdrawals represented the proceeds arising from the profitability of or to continue investment in BLMIS."); *see* ¶ 39 ("[T]he money paid by the Funds (directly in the case of Sentry and indirectly in the cases of Sigma and Lambda) to BLMIS on account of Sentry was, at all relevant times and unknown to the Funds, misused and misappropriated by Madoff as part of his Ponzi scheme.").)  In *Fairfield II*, the Court noted that if the Director were not aware of Citco's bad faith certifications, they, and hence the Funds, mistakenly relied on Citco, a variation of the mistake claims rejected by the Privy Council in *Fairfield Sentry Ltd.* (*In Liquidation*) *v. Migani*, [2014] UKPC 9 ("*Migani*").  *Fairfield II*, 596 B.R. at 300.  In any event, the pertinent inquiry is what the Knowledge Defendants knew at the time of the redemptions, not what Citco knew.  Even if Citco acted in good faith, the Knowledge Defendants cannot escape the consequences resulting from their knowledge that the redemption prices were based on fictitious assets.

actual or constructive knowledge that the NAVs per share and, hence, the redemption prices were inflated.

## C.    The Transfers

In the Citibank Action, the Liquidators seek to recover redemption payments Sentry made to Citibank totaling $58,484,257.49 between May 17, 2004 and November 19, 2008. (¶¶ 40-42; *see Citibank Complaint*, Ex. A.)  The Liquidators allege that Sentry had insufficient assets and was unable to pay its debts as they fell due at the time the redemption payments were made, Sentry received no consideration or significantly less consideration from Citibank in exchange for the payments, and the payments were in excess of the amounts previously paid by Citibank to purchase the shares.  (¶¶ 43-44.) The Constructive Trust Claim seeks to recover all redemption payments from Citibank and certain unnamed beneficial shareholders on whose behalf Citibank may have invested in Sentry, (¶¶ 14, 96-103), and the BVI Avoidance Claims seek recovery of the payments made within two years of the appointment of the Liquidators in Sentry's BVI liquidation proceeding.  (¶¶ 104-35.)

## D.    The Safe Harbor and the Renewed Motion to Dismiss

In their prior dismissal motion, the Defendants contended that the Liquidators' claims were barred by application of the Safe Harbor, 11 U.S.C. § 546(e).  The Court agreed that Bankruptcy Code § 561(d) extends the Safe Harbor to the BVI Avoidance Claims, *Fairfield II*, 596 B.R. at 306-14, but declined to rule on the merits because the Supreme Court had issued *Merit Mgmt. Grp. LP v. FTI Consulting, Inc.*, 138 S. Ct. 883 (2018) shortly after the parties' submissions.  In *Merit*, the Supreme Court concluded that "the relevant transfer for purposes of the § 546(e) safe-harbor inquiry is the

7

overarching transfer that the trustee seeks to avoid under one of the substantive avoidance provisions." *Id.* at 893; *accord In re Tribune Co. Fraudulent Conveyance Litig.*, 946 F.3d 66, 75, 77 (2d Cir. 2019), *petition for cert. filed*, No. 20-8, 2020 WL 3891501 (U.S. July 6, 2020); *In re Nine West Sec. Litig.*, 20 MD. 2941 (JSR), 2020 WL 5049621, at *14 (S.D.N.Y. Aug. 27, 2020), *appeal docketed*, No. 20-3941 (2d Cir. Nov. 23, 2020). A court must focus on the transferor and transferee of the overarching transfer, and where a qualifying participant such as a financial institution serves as a mere conduit or intermediary in connection with the overarching transaction between non-qualifying participants, the Safe Harbor does not apply. *See Merit*, 138 S. Ct. at 892, 897; *Tribune*, 946 F.3d at 75.

*Merit* abrogated the then-existing Second Circuit precedent applying the Safe Harbor even when a qualifying entity acted as a mere conduit or intermediary. *See Official Comm. of Unsecured Creditors of Quebecor World (USA) Inc. v. Am. United Life Ins. Co.* (*In re Quebecor World (USA) Inc.*), 719 F.3d 94, 99 (2d Cir. 2013). The change in the law prompted a flurry of letters from the Liquidators and the Defendants making substantive arguments. Rather than consider the arguments made through the numerous letters, the Court denied the Defendants' motion without prejudice to renewal.

The Defendants now make their renewed Motion seeking dismissal on two grounds with broad applicability across over 300 adversary proceedings commenced by the Liquidators to recover redemptions (the "U.S. Redeemer Actions"). As before, the Defendants contend that the BVI Avoidance Claims are barred by the Safe Harbor. According to the Defendants, the redemptions were made by a "financial institution"

8

within the meaning of 11 U.S.C. § 101(22) because the Funds were customers of Citco
Bank which acted as the Funds' agent with respect to the redemptions. (*Defendants
Brief* at 12-15.) Redemptions paid by Sentry and Sigma are also safe harbored because
those entities were "financial participants" within the meaning of 11 U.S.C. § 101(22A)
when the redemptions were made. (*Id.* at 15-23.) Finally, redemptions from Sigma and
Lambda are safe harbored for the additional reason that they were made for the benefit
of Sentry – a "financial institution" and "financial participant." (*Id.* at 23-24.)[8]
Furthermore, the Defendants contend that the Safe Harbor extends to bar the
Constructive Trust Claims because they seek the same relief as the BVI Avoidance
Claims. (*Id.* at 29-31.)

The Liquidators oppose the application of the Safe Harbor on several grounds.
First, they contend that the Safe Harbor does not apply to the BVI Avoidance Claims
because they seek to avoid intentionally fraudulent transfers which are carved out of the
Safe Harbor. The Liquidators reach this conclusion by imputing the bad faith of Citco
Administrator to the Funds – a result which they claim was uncertain until the Court's
ruling in *Fairfield II.* (*Liquidators Brief* at 9-13.) Second, the Safe Harbor does not
apply to the Constructive Trust Claims because (i) the Safe Harbor's plain language does
not bar the claims, (ii) the precedent extending the Safe Harbor to state common law
claims relied on the Supremacy Clause which does not apply to foreign law claims, (iii)
prescriptive comity considerations limit the reach of section 546(e), and (iv) the Safe

---

[8] The resolution of these matters is immaterial to the Citibank Action because the parties have
stipulated that Citibank, as transferee, is a "financial institution" as defined in 11 U.S.C. § 101(22).
(*Scheduling Order* at 2.) Nevertheless, the determination of whether the Funds were covered entities
under section 546(e) applies generally to all of the U.S. Redeemer Actions.

9

Harbor does not extend to common law claims concerning intentionally fraudulent transfers. (*Id.* at 13-19.) Third, the Liquidators contest the assertion that the redemptions were made by a financial institution because the pleadings do not establish that Citco Bank was an agent of the Funds. (*Id.* at 19-21.) Fourth, the redemptions were not made by a financial participant because 11 U.S.C. § 101(22A) precludes a debtor from being a financial participant. (*Id.* at 21-23.)

The Defendants also seek dismissal of the U.S. Redeemer Actions for insufficient service of process pursuant to Rule 12(b)(5) of the Federal Rules of Civil Procedure, made applicable to these adversary proceedings by Rule 7012(b) of the Federal Rules of Bankruptcy Procedure. They assert that the Liquidators were required to serve the Defendants in accordance with the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents ("Hague Service Convention"), and the Liquidators' service of the initial complaints via international mail failed to satisfy its requirements. (*Defendants Brief* at 32-39.) The Liquidators do not deny that mail service failed to meet the strictures of the Hague Service Convention specifically in an adversary proceeding against HSBC Private Bank (Suisse) SA ("HSBC Suisse"), discussed below. Rather, they ask the Court to retroactively approve mail service to HSBC Suisse's U.S. counsel – Cleary Gottlieb – as an alternative means of service to a foreign party pursuant to Federal Civil Rule 4(f)(3). (*Liquidators Brief* at 23-34.) In the event the

Court denies their request, the Liquidators ask that the Court exercise its discretion to allow them to re-effect service.  (*Id.* at 34-36.)[9]

## DISCUSSION

### A.    Motion to Dismiss For Failure to State a Claim

####    1.    Standards Governing the Motion

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *accord Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *accord Twombly*, 550 U.S. at 556. Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.  Where the burden of pleading rests on the defendant, the Court may stilly dismiss a claim pursuant to Federal Civil Rule 12(b)(6) if the defense is apparent on the face of the complaint.  *Official Comm. of Unsecured Creditors of Color*

---

[9]    After the parties' submissions, the Liquidators wrote the Court seeking leave to submit a five-page sur-reply in response to three purportedly new arguments raised in the *Defendants Reply*.  (*See Letter of David Elsberg*, dated July 3, 2020 ("*Liquidators Letter*") (ECF Doc. # 3038).)  Courts generally do not consider arguments raised for the first time in a reply brief, *In re Avaya Inc.*, 573 B.R. 93, 103 (Bankr. S.D.N.Y. 2017) (citing authorities), but can allow the filing of a sur-reply if it chooses to consider the new arguments.  Here, the *Liquidators Letter* did not identify arguments made for the first time in the *Defendants Reply*.  Rather, it addressed Defendants' arguments previously raised in the *Defendants Brief* (*e.g.*, all of the Liquidators' claims are subject to the Safe Harbor) or Defendants' replies to arguments in the *Liquidators Brief* (*e.g.*, responding to argument that Citco's intent is imputable to the Funds).  Therefore, the request to file a sur-reply is denied.

11

*Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 158 (2d Cir. 2003); *accord Spinelli v. Nat'l Football League*, 903 F.3d 185, 199 (2d Cir. 2018).

In deciding the motion, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007). In addition, the Court may consider judicial admissions, including those made in briefs. *Scott v. City of White Plains*, No. 10 Civ. 1887 (KBF), 2012 WL 1267873, at *8 n. 7 (S.D.N.Y. Apr. 10, 2012); *Staff Mgmt. Sols., LLC v. Feltman* (*In re Corp. Res. Servs., Inc.*), Adv. Proc. No. 19-01371 (MG), 2020 WL 2278416, at *10 (Bankr. S.D.N.Y. May 6, 2020); *see Purgess v. Sharrock*, 33 F.3d, 134, 144 (2d Cir. 1994) ("A court can appropriately treat statements in briefs as binding judicial admissions of fact.").

### 2.    Safe Harbor

The Safe Harbor, 11 U.S.C. § 546(e), is an affirmative defense for which the Defendants bear the burden of proof. *Fairfield II*, 596 B.R. at 307 (citing precedent). Nevertheless, "[t]he application of Section 546(e) presents a straightforward question of statutory interpretation of the type that is appropriately resolved on the pleadings." *In re Tribune Co. Fraudulent Conveyance Litig.*, No. 11MD2296 (DLC), 2019 WL 1771786, at *7 (S.D.N.Y. Apr. 23, 2019). Section 546(e) of the Bankruptcy Code provides in pertinent part:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a . . . settlement payment, as defined in section 101 or 741 of this title, made by or to (or for the

12

> benefit of) a . . . financial institution [or] financial participant . . ., or that is
> a transfer made by or to (or for the benefit of) a . . . financial institution
> [or] financial participant . . . in connection with a securities contract, as
> defined in section 741(7) . . ., that is made before the commencement of
> the case, except under section 548(a)(1)(A) of this title.

11 U.S.C. § 546(e). "Put simply, the safe harbor applies where two requirements are

met: (1) there is a *qualifying transaction* (i.e., there is a 'settlement payment' or a

'transfer payment . . . made in connection with a securities contract) and (2) there is a

*qualifying participant* (i.e., the transfer was 'made by or to (or for the benefit of) a . . .

financial institution')." *Nine West,* 2020 WL 5049621, at *6 (emphasis in original).

Section 561(d), in turn, makes the Safe Harbor applicable in a chapter 15 case to

"limit avoidance powers to the same extent as in a proceeding under chapter 7 or 11" of

the Bankruptcy Code. As explained in *Fairfield II*, "section 561(d) is necessarily

referring to avoidance powers available under non-U.S. law" because a chapter 15

foreign representative cannot exercise the avoidance powers available to a trustee in a

chapter 7 or chapter 11 case. 596 B.R. at 310; *see* 11 U.S.C. § 1521(a)(7). Thus, the Safe

Harbor bars the Liquidators' BVI Avoidance Claims to the extent they are analogous to

preference claims, state law fraudulent transfer claims or constructive fraudulent

transfer claims under Bankruptcy Code § 548(a)(1)(B). In *Fairfield II*, the Court

reviewed the elements of the Liquidators' BVI Avoidance Claims. It concluded that

unfair preference claims under BVI Insolvency Act § 245 resemble preference claims

under 11 U.S.C. § 547(b) and the undervalue transaction claims under BVI Insolvency

Act § 246 are similar to constructive fraudulent transfer claims under state and federal

law. *Fairfield II*, 596 B.R. at 302, 314. The Liquidators do not argue otherwise, and

13

accordingly, the BVI Avoidance Claims will be barred by the Safe Harbor if they meet its strictures.

### a. The Transfers Were Settlement Payments Made "in Connection with" a "Securities Contract"

As the Court previously noted, *see id.* at 314-15, the parties do not dispute that the redemptions at issue were settlement payments made in connection with securities contracts. (*See* ¶ 35 ("In accordance with the Funds' Subscription Agreements, Articles of Association, offering materials and/or other relevant documents . . . the Funds paid to shareholders, for each Share tendered for redemption, an amount that was based on each of the respective Funds' purported Net Asset Value, as it was then calculated.")); *cf. Picard v. Ida Fishman Revocable Tr.* (*In re BLMIS*), 773 F.3d 411, 422-23 (2d Cir. 2014) (payments to BLMIS investors were settlement payments on account of securities contracts), *cert. denied*, 576 U.S. 1044 (2015). Therefore, except for the Liquidators' argument that the BVI Avoidance Claims are subject to the carveout for intentional fraudulent transfer claims, addressed separately below, the remaining issue on the applicability of the Safe Harbor to the BVI Avoidance Claims is whether the redemptions were made by, to, or for the benefit of a qualifying entity such as a "financial institution" of a type identified in the statute.

### b. The Transfers Were Made by a Financial Institution as Agent for Its Customer

#### i. Citco Bank Is a Financial Institution

The Bankruptcy Code defines the term "financial institution" to include:

> a Federal reserve bank, or an entity that is a commercial or savings bank, industrial savings bank, savings and loan association, trust company, federally-insured credit union, or receiver, liquidating agent, or conservator for such entity *and, when any such* Federal reserve bank,

14

receiver, liquidating agent, conservator or *entity is acting as agent* or custodian *for a customer* (whether or not a "customer", as defined in section 741) *in connection with a securities contract* (as defined in section 741) *such customer . . . .*

11 U.S.C. § 101(22)(A) (emphasis added).

All of the redemption payments were made by the Dublin Branch of Citco Bank where the Funds maintained accounts. (*Foreign Representatives' Memorandum of Law in Opposition to Defendants' Consolidated Memorandum of Law and in Further Support of Foreign Representatives' Motion for Leave to Amend Complaints*, dated Mar. 31, 2017 ("*Liquidators 2017 Brief*") at 67 & n. 89 (ECF Doc. # 1336);[10] *accord* Transcript of 3/27/20 Hr'g at 15:13-15 ("MR. ELSBERG: . . . Your question earlier about the flow of payments through Citco -- we agreed that it did go through Citco and so I think all that remains is to identify a complaint.") (ECF Doc. # 3061).) Citco Bank qualifies as a "financial institution" because it has been a bank regulated by the De Nederlandsche Bank ("DNB") (the central bank of the Netherlands) since December 31, 1985.[11] The Court may take judicial notice of bank registration information provided by DNB's website as its accuracy cannot reasonably be questioned. FED. R. EVID. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because

---

[10] The Liquidators did not dispute or object to the Court's consideration of this admission after the Defendants identified the admission in their moving brief. (*See Defendants Brief* at 13.)

[11] *See* De Nederlandsche Bank, *Information Detail: Citco Bank Nederland N.V.*, https://www.dnb.nl/en/supervision/public-register/WFTKF/detail.jsp?id=26bbcae35848e311b55a005056b672cf# (last visited Nov. 28, 2020). In addition, Citco Bank's Dublin branch, the paying bank, is registered with the Central Bank of Ireland as a "credit institution" defined as "(a) an undertaking whose business is to receive deposits or other repayable funds from the public and to grant credits for its own account, or (b) an electronic money institution." *See* Central Bank of Ireland, *Financial Service Provider Profile: Citco Bank Nederland NV Dublin Branch*, http://registers.centralbank.ie/FirmDataPage.aspx?firmReferenceNumber=C27278 (last visited Nov. 28, 2020).

15

it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); *see Enron Corp. v. Bear, Stearns Int'l Ltd.* (*In re Enron Corp.*), 323 B.R. 857, 869 (Bankr. S.D.N.Y. 2005) (taking judicial notice of various public and quasi-public bodies including the United Kingdom Financial Services Authority in determining that an entity was covered by the Safe Harbor); *cf. Tribune*, 946 F.3d at 78 (Computershare was a "financial institution" for the purposes of Section 546(e) because it is a trust company and a bank based on Office of the Comptroller of the Currency records); *Holliday v. K Rd. Power Mgmt., LLC* (*In re Boston Generating LLC*), 617 B.R. 442, 489 (Bankr. S.D.N.Y. 2020) (finding that the Bank of New York is a "financial institution" for the purposes of Section 546(e) because it is a bank pursuant to the Office of the Comptroller website).

### ii. The Funds, as Customers of Citco Bank, Were Also Financial Institutions

Under the definition of "financial institution," quoted *supra*, a *customer* of a financial institution such as a bank is also deemed to be a financial institution if the bank acts as the customer's agent in connection with a securities contract. Bankruptcy Code § 741(2) defines the term "customer" for use in stockbroker liquidations under subchapter III of chapter 7, but Bankruptcy Code § 101(22)(A) specifies that the term "customer" is not limited to section 741(2)'s definition when determining whether an entity is a financial institution. The ordinary meaning of customer is "someone who buys goods or services." *Tribune*, 946 F.3d at 79 (quoting *UBS Fin. Servs., Inc. v. W. Virginia Univ. Hosps., Inc.*, 660 F.3d 643, 650 (2d Cir. 2011)); *accord Customer*, BLACK'S LAW DICTIONARY (11th ed. 2019) (a "customer" includes "[a] buyer or purchaser of goods or services").

16

The *Citibank Complaint* does not spell out the relationship between Sentry or the other Funds on the one hand and Citco Bank on the other, or Citco Bank's role in connection with the securities contracts pursuant to which the Funds paid the redemptions. However, as noted, the Liquidators admitted in the *Liquidators 2017 Brief* filed in connection with the previous motion to dismiss, and reiterated earlier this year during a conference, that the redemption payments were made from the Funds' Citco Bank account in Ireland.

Thus, the Funds held accounts with Citco Bank from which the redemptions were paid. An account holder is a "customer" of the bank under U.S. law. *See* N.Y. U.C.C. § 4-104(1)(e) (defining "customer" as "any person having an account with a bank or for whom a bank has agreed to collect items and includes a bank carrying an account with another bank."). While U.S. law is not controlling, it is nevertheless persuasive on this point. Further, the Liquidators have not challenged the Defendants' contention that the Funds were customers of Citco Bank, (*see Defendants Brief* at 11-14), but to the extent they do, that argument is deemed abandoned. *Purdie v. Brown*, No. 14 Civ. 8490(NSR), 2015 WL 6741875, at *8 (S.D.N.Y. Nov. 3, 2015) (plaintiff's failure to respond to contentions raised in a motion to dismiss constitutes an abandonment of those claims) (citing authorities).

Next, Citco Bank acted as the Funds' agent in connection with the securities contract underlying the redemptions. In *Tribune Co. Fraudulent Conveyance Litig.*, the Second Circuit applied the common-law standard for establishing an agency relationship which requires: (1) the principal's manifestation of intent to grant authority to the agent, (2) agreement by the agent, and (3) the principal's maintenance of control

17

over key aspects of the undertaking.  946 F.3d at 79 (citing *Commercial Union Ins. Co.*

*v. Alitalia Airlines, S.p.A.*, 347 F.3d 448, 462 (2d Cir. 2003)); *accord Nine West*, 2020

WL 5049621, at *8.

Once again, the Liquidators' admission that redemptions were paid by Citco Bank

establishes the necessary agency.  It is implausible to infer that Citco Bank made the

redemption payments to specific redeemers in specific amounts absent the Funds'

directions to do so.  Moreover, Citco Bank accepted those directions by executing the

redemption payments.

Based on the foregoing, the Funds were customers of Citco Bank who acted as

their agents in connection with the securities contracts pursuant to which the

redemption payments were made, and the Funds were, therefore "financial institutions"

within the meaning of 11 U.S.C. § 546(e).[12]  Accordingly, the BVI Avoidance Claims

alleged in the *Citibank Complaint* are barred by 11 U.S.C. § 561(d).

### c.    Applicability of the Exception Under Section 548(a)(1)(A)

The Safe Harbor does not shield claims to avoid intentional fraudulent transfers

under 11 U.S.C. § 548(a)(1)(A).[13]  *See* 11 U.S.C. § 546(e) (protecting certain transfers

from avoidance "except under section 548(a)(1)(A) of this title") (hereinafter, the

"Intentional Fraud Exception").  The Liquidators have not asserted claims under section

---

[12]    Because the Court finds that the Funds were "financial institutions," it does not address the
Defendants' alternative arguments that Sentry and Sigma were "financial participants" or that
redemptions paid by Sigma and Lambda were for the benefit of Sentry.

[13]    Section 548(a)(1)(A) allows the trustee to avoid a transfer made within two years of the
bankruptcy filing if the debtor "made such transfer . . . with actual intent to hinder, delay, or defraud"
creditors.

548(a)(1)(A) nor could they absent the commencement of a case under chapter 7 or 11.
*See* 11 U.S.C. § 1521(a)(7) (permitting a court to grant certain relief to a chapter 15
foreign representative "except for relief available under sections . . . 544 [and] 548 . . .
."). The two BVI Avoidance Claims (*see* ¶¶ 104-20, 125-31) resemble preference claims
under section 547(b) of the Bankruptcy Code and constructive fraudulent transfer
claims under federal and state law, s*ee Fairfield II*, 596 B.R. at 302, which would be
barred by the Safe Harbor.

Nevertheless, the Liquidators assert that the Intentional Fraud Exception is not
limited to claims brought under section 548(a)(1)(A), and applies to claims under BVI
law to avoid transfers made with the intent to defraud creditors irrespective of the label
attached to a claim. (*Liquidators Brief* at 10-11.) They further argue that the BVI
Avoidance Claims fall within the Intentional Fraud Exception because Citco
Administrator's knowledge is imputable to the Funds, and the *Citibank Complaint*
alleges conscious misbehavior or recklessness by Citco Administrator as well as a motive
and opportunity to commit fraud in connection with the redemptions. (*Liquidators
Brief* at 10-12.)

The Liquidators' argument lacks merit. First, the Intentional Fraud Exception
only applies to intentional fraudulent transfer claims under Bankruptcy Code §
548(a)(1)(A); the Safe Harbor still bars state law intentional fraudulent transfer claims
that a U.S. bankruptcy trustee could assert through 11 U.S.C. § 544(b)(1). The
Liquidators, as foreign representatives under chapter 15, cannot assert a claim under
Bankruptcy Code § 548(a)(1)(A). Instead, they assume that their BVI intentional
fraudulent transfer claim is sufficiently analogous to a bankruptcy fraudulent transfer

19

claim for purposes of 11 U.S.C. § 561(d) and therefore comes within the Intentional Fraud Exception.  If true, it is also sufficiently analogous to a state law fraudulent transfer claim that is barred.  The Liquidators fail to articulate any rationale for equating their BVI intentional fraudulent transfer claim to a U.S. bankruptcy law claim rather than a state law fraudulent transfer claim.

Second, they fail to identify the source of such an intentional fraudulent transfer claim under BVI law.[14]  Since the Safe Harbor only prohibits avoidance claims and does not apply to non-avoidance claims absent preemption, discussed below, I limit my consideration to the avoidance provisions under the BVI Insolvency Act.  The BVI Insolvency Act recognizes four types of voidable transactions.  BVI INSOLVENCY ACT § 244(1) ("'voidable transaction' means (a) an unfair preference; (b) an undervalue transaction; (c) a floating charge that is voidable under section 247; and (d) an extortionate credit transaction.").  The Court has already concluded that the unfair preference and undervalue transaction claims under sections 245 and 246 of the BVI Insolvency Act, respectively, are barred by the Safe Harbor through the operation of 11 U.S.C. § 561(d).  The two other avoidance claims concern voidable floating charges

---

[14]     The Liquidators have not submitted an affidavit by an expert on BVI law to support the existence or elements of such a claim.

under BVI Insolvency Act § 247[15] and extortionate credit transactions under BVI

Insolvency Act § 248.[16]

As to the former, the BVI Insolvency Act defines a "floating charge" as a "charge

created by a company or a foreign company which is, or as created was, a floating charge

whether crystallised or not."  BVI Insolvency Act § 2(1).  The definition is not helpful,

but a floating charge sounds like a security interest.  *See id.* § 92(1) ("The Court may, on

---

[15]     BVI Insolvency Act § 247 states in pertinent part:

(1) Subject to subsection (2), a floating charge created by a company is voidable if

            (a) it is created within the vulnerability period; and

            (b) it is an insolvency transaction.

(2) A floating charge is not voidable to the extent that it secures

            (a) money advanced or paid to the company, or at its direction, at the same time as, or after, the creation of the charge;

            (b) the amount of any liability of the company discharged or reduced at the same time as, or after, the creation of the charge;

            (c) the value of assets sold or supplied, or services supplied, to the company at the same time as, or after, the creation of the charge; and

            (d) the interest, if any, payable on the amount referred to in paragraphs (a) to (c) pursuant to any agreement under which the money was advanced or paid, the liability was discharged or reduced, the assets were sold or supplied or the services were supplied.

. . . .

(4) For the purposes of subsection (2)(c), the value of assets or services sold or supplied is the amount in money which, at the time they were sold or supplied, could reasonably have been expected to be obtained for the sale or supply of the goods or services in the ordinary course of business and on the same terms, apart from the consideration, as those on which the assets or services were sold or supplied to the company.

[16]     BVI Insolvency Act § 248 states:

A transaction entered into by the company within the vulnerability period for, or involving the provision of, credit to the company is an extortionate credit transaction if, having regard to the risk accepted by the person providing the credit

            (a) the terms of the transaction are or were such as to require grossly exorbitant payments to be made (whether unconditionally or in certain contingencies) in respect of the provision of credit; or

            (b) the transaction otherwise grossly contravenes ordinary principles of fair trading.

21

the application of the administrator, make an order authorizing the administrator to dispose of (a) assets of the company that are subject to a security interest that is not a floating charge."). The *Citibank Complaint* does not allege that the transfers to Citibank involved "floating charges." As to the latter, the extortionate credit transaction applies by its terms to "credit transactions," and appears to focus on unconscionable and usurious credit transactions. The transfers to *Citibank* did not concern credit transactions. Finally, neither avoidance claim requires proof of an intent to "hinder, delay or defraud," the critical element of an intentional fraud claim. *See* 11 U.S.C. § 548(a)(1)(A).

Third, as noted, the *Citibank Complaint* alleges that the Funds were duped, believing that their BLMIS investments were worth what the BLMIS monthly statements showed. The Funds were the transferors and if they were duped, they could not have intended to "hinder, delay or defraud" the Funds' other creditors by redeeming investments at prices they believed to be accurate.[17]

### 3.    The Constructive Trust Claims

Under the Supremacy Clause of the United States Constitution, federal law "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. "In the absence of express congressional command, state law is pre-empted if that law actually conflicts with

---

[17]    The Liquidators contend that Citco's bad faith is imputed to the Funds. This is inconsistent with the notion that the Funds were duped. Furthermore, the Court stated in *Fairfield II* that if the Funds knew the NAVs were inflated, either directly or through imputation of Citco's knowledge, "but nonetheless breached their fiduciary duties to the other shareholders by authorizing the payment of inflated redemption prices, the Funds cannot rely on their own misconduct to recover the inflated redemption payments." 596 B.R. at 299.

federal law . . . or if federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it." *AP Servs. LLP v. Silva*, 483 B.R. 63, 71 (S.D.N.Y. 2012) (quoting *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992)). Several courts have ruled that state law claims that seek to recover transfers shielded by the Safe Harbor are impliedly preempted by 11 U.S.C. § 546(e). *See, e.g.*, *Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, 988 (8th Cir. 2009) (dismissing unjust enrichment and illegal and/or excessive shareholder distribution claims), *abrogated on other grounds by Merit Mgmt. Grp., LP v. FTI Consulting*, 138 S. Ct. 883 (2018); *Nine West*, 2020 WL 5049621, at *15 (dismissing unjust enrichment claims); *AP Servs.*, 483 B.R. at 71 (same); *cf. Hosking v. TPG Capital, L.P.* (*In re Hellas Telecomms. (Lux.) II SCA*), 526 B.R. 499, 510 (Bankr. S.D.N.Y. 2015) (denying dismissal of unjust enrichment claim which alleged facts "substantially identical to an *actual* fraudulent conveyance claim under section 548(a)(1)(A)") (emphasis in original); *Lehman Bros. Holdings Inc. v. JPMorgan Chase Bank, N.A.* (*In re Lehman Bros. Holdings Inc.*), 469 B.R. 415, 451 (Bankr. S.D.N.Y. 2012) (same). Allowing a plaintiff to recover a safe harbored transfer by attaching a different label to the claim would frustrate the purpose of section 546(e). *AP Servs.*, 483 B.R. at 71; *accord Contemporary Indus.*, 564 F.3d at 988; *Official Comm. of Unsecured Creditors of Hechinger Inv. Co. of Del. v. Fleet Retail Fin. Grp.* (*In re Hechinger Inv. Co. of Del.*). 274 B.R. 71, 96 (D. Del. 2002). Relying on these and similar authorities, Defendants contend that the Constructive Trust Claims should be dismissed because they seek to unwind safe harbored redemption payments. (*Defendants Brief* at 29-31.)

I disagree.  The Liquidators correctly point out, (*see Liquidators Brief* at 14-16), that the "Supremacy Clause applies to states and is inapplicable to considerations of federal law versus foreign law."  *Al-Kurdi v. United States*, 25 Cl. Ct. 599, 601 n. 3 (Cl. Ct. 1992).  Courts do not assume that otherwise applicable foreign law is preempted absent express statutory language to that effect.  *See LaSala v. Bordier et Cie*, 519 F.3d 121, 138-39 (3d Cir.) (rejecting argument that Congress impliedly preempted Swiss law claims through the enactment of Securities Litigation Uniform Standards Act (SLUSA)), *cert. dismissed*, 555 U.S. 1028 (2008); *In re Petrobras Sec. Litig.*, 169 F. Supp. 3d 547, 551-52 (S.D.N.Y. 2016) (plain language of SLUSA does not bar Brazilian law claims "[d]espite how well a ban on foreign law claims might fit within the larger statutory scheme"); *Comrie v. IPSCO Inc.*, No. 08-cv-03060, 2008 WL 5220301, at *4-5 (N.D. Ill. Dec. 10, 2008) (rejecting argument that Canadian law claims were preempted by the Employee Retirement Income Security Act (ERISA): "The statutory text of ERISA does not clearly preempt foreign law, only state law. . . . Thus, it must be presumed that Congress did not intend ERISA to preempt foreign law.").

Here, the Constructive Trust Claims are based on BVI law and the Defendants have not identified any statutory language that purports to *expressly* preempt the Constructive Trust Claims.  Consequently, the Motion to dismiss the Constructive Trust Claims on the ground that they seek to recover safe harbored transfers is denied.

## B.    Motion to Dismiss for Insufficient Service of Process

When the Liquidators commenced the U.S. Redeemer Actions, the Liquidators served the Defendants, including the foreign Defendants, by mail.  For example, the Liquidators served the summons and initial complaint in *Fairfield Sentry Ltd. v. HSBC*

24

*Private Bank Suisse SA*, Adv. Proc. No. 10-03633 (SMB) (the "HSBC Action")[18] on

HSBC Suisse by international registered mail to HSBC Suisse's address in Switzerland

listed on the Funds' records. (*See Declaration of David J. Molton in Support of*

*Liquidators' Memorandum of Law in Opposition to Defendants' Renewed Motion to*

*Dismiss*, dated May 29, 2020 ("*Molton Declaration*") at ¶ 2 (ECF Doc. # 3034).) The

Liquidators also served the complaint by mail on HSBC Suisse's U.S. counsel, Cleary

Gottlieb Steen & Hamilton LLP ("Cleary Gottlieb"), at its New York office. (*Id.*)

The Defendants seek dismissal of the U.S. Redeemer Actions for insufficient

service of process under Federal Civil Rule 12(b)(5). Using the summons and complaint

in the HSBC Action as the test case, they argue that the Liquidators were required to

effectuate service pursuant to the Hague Service Convention, mail service is not

permitted where the member country has objected to that method of service,

Switzerland has expressly objected to mail service, and therefore, the Liquidators' 2010

service on HSBC Suisse via international mail was ineffective. (*Defendants Brief* at 32-

37.)

The Liquidators do not dispute that mail service on HSBC Suisse failed to satisfy

the requirements of the Hague Service Convention. Instead, they seek retroactive

approval of their 2010 mail service on HSBC Suisse's U.S. counsel, Cleary Gottlieb, as a

form of alternative service pursuant to Federal Civil Rule 4(f)(3).

---

[18]     Again, following consultation with the parties, the Court designated the HSBC Action as the representative action with respect to the Defendants' arguments seeking dismissal for insufficient service of process. (*See Scheduling Order* at ¶ 1(a).)

1.      **Rule 4(f)(3)**

A foreign corporation may be served abroad "in any manner prescribed by Rule

4(f) for serving an individual, except personal delivery under (f)(2)(C)(i)." FED. R. CIV.

P. 4(h)(2).  Rule 4(f), in turn, states in pertinent part:

> **Serving an Individual in a Foreign Country.**  Unless federal law
> provides otherwise, an individual . . .  may be served at a place not within
> any judicial district of the United States:
>
> > (1) by any internationally agreed means of service that is reasonably
> > calculated to give notice, such as those authorized by the [Hague
> > Service Convention];
> >
> > . . . or
> >
> > (3) by any means not prohibited by international agreement, as the
> > court orders.

FED. R. CIV. P. 4(f).

"Courts have repeatedly recognized that there is no hierarchy among the

subsections in Rule 4(f)." *Wash. State Inv. Bd. v. Odebrecht S.A.*, 17 Civ. 8118 (PGG),

2018 WL 6253877, at *3 (S.D.N.Y. Sept. 21, 2018); *accord In re GLG Life Tech Corp.*

*Sec. Litig.*, 287 F.R.D. 262, 265 (S.D.N.Y. 2012); *Advanced Aerofoil Techs., AG v.*

*Todaro*, No. 11 Civ. 9505(ALC), 2012 WL 299959, at *1 (S.D.N.Y. Jan. 31, 2012).  Hence,

"court-directed service under Rule 4(f)(3) is as favored as service under Rule 4(f)(1),"

*GLG Life Tech*, 287 F.R.D. at 265 (quoting *Rio Props., Inc. v. Rio Int'l Interlink*, 284

F.3d 1007, 1015 (9th Cir. 2002)), and "[a] plaintiff is *not* required to attempt service

through the other provisions of Rule 4(f) before the Court may order service pursuant to

Rule 4(f)(3)." *S.E.C. v. Anticevic*, No. 05 CV 6991(KMW), 2009 WL 361739, at *3

(S.D.N.Y. Feb. 13, 2009) (emphasis in original); *see also Madu, Edozie & Madu, P.C. v.*

26

*Socketworks Ltd. Nigeria*, 265 F.R.D. 106, 115 (S.D.N.Y. 2010) ("Service of process under Rule 4(f)(3) is neither a last resort nor extraordinary relief.") (citation omitted).

An alternative method of service under Rule 4(f)(3) is proper so long as it (1) is not prohibited by international agreement, and (2) comports with constitutional notions of due process. *Odebrecht*, 2018 WL 6253877, at *4; *accord Stream SICAV v. Wang*, 989 F. Supp. 2d 264, 278 (S.D.N.Y. 2013). The decision to approve an alternative method of service is committed to the court's sound discretion. *S.E.C. v. China Ne. Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379, 397 (S.D.N.Y. 2014); *In re S. African Apartheid Litig.*, 643 F. Supp. 2d 423, 433 (S.D.N.Y. 2009). In exercising this discretion, courts in this District routinely require "(1) a showing that the plaintiff has reasonably attempted to effectuate service on the defendant, and (2) a showing that the circumstances are such that the court's intervention is necessary." *Odebrecht*, 2018 WL 6253877, at *6; *accord Peifa Xu v. Gridsum Holding Inc.*, 18 Civ. 3655 (ER), 2020 WL 1508748, at *14 (S.D.N.Y. Mar. 30, 2020). "But nothing in Rule 4(f) itself or controlling case law suggests that a court must always require a litigant to first exhaust the potential for service under the Hague Convention before granting an order permitting alternative service under Rule 4(f)(3)." *GLG Life Tech*, 287 F.R.D. at 266.

## 2. Service on U.S.-Based Counsel

Initially, the Defendants contend that service on a foreign corporation's U.S. counsel cannot be a proper method of service under Rule 4(f)(3). (*Defendants Reply* at 17; *Letter of Marc J. Gottridge*, dated July 27, 2020 (ECF Doc. # 3044).) Specifically, Rule 4(f) sets forth the methods in which an individual "may be served at a place *not within any judicial district of the United States*." FED. R. CIV. P. (4)(f) (emphasis

added); *see also* FED. R. CIV. P. 4(h)(2) (a foreign corporation must be served "at a place not within any judicial district of the United States, in any manner prescribed by Rule 4(f) . . . .").

Courts are split on the issue of whether domestic service on a foreign defendant's U.S. counsel can constitute service "at a place not within" the U.S. under Rule 4(f)(3), but the majority view service on U.S.-based counsel a permissible method under Rule 4(f)(3). *See, e.g.*, *Zanghi v. Ritella*, 19 Civ. 5830 (NRB), 2020 WL 589409, at *7 (S.D.N.Y. Feb. 5, 2020); *Odebrecht*, 2018 WL 6253877, at *4; *NYKCool A.B. v. Pac. Int'l Servs., Inc.*, No. 12–cv–5754 (LAK), 2015 WL 998455, at *4-5 (S.D.N.Y. Mar. 5, 2015); *Atlantica Holdings, Inc. v. BTA Bank JSC*, 13 Civ. 5790 (JMF), 2014 WL 12778844, at *3 (S.D.N.Y. Mar. 31, 2014); *Jian Zhang v. Baidu.com Inc.*, 293 F.R.D. 508, 515 (S.D.N.Y. 2013); *GLG Life Tech*, 287 F.R.D. at 267; *Arista Records LLC v. Media Servs. LLC*, No. 06 Civ. 15319(NRB), 2008 WL 563470, at *2 (S.D.N.Y. Feb. 25, 2008); *RSM Prod. Corp. v. Fridman*, No. 06 Civ. 11512(DLC), 2007 WL 2295907, at *6 (S.D.N.Y. Aug. 10, 2007); *Enrenfeld v. Salim a Bin Mahfouz*, No. 04 Civ. 9641(RCC), 2005 WL 696769, at *3 (S.D.N.Y. Mar. 23, 2005); *contra Convergen Energy LLC v. Brooks*, 20-cv-3746 (LJL), 2020 WL 4038353, at *7 (S.D.N.Y. July 17, 2020) (service on domestic counsel is not permissible under Rule 4(f) because the "place" of service is within the U.S.). In *Odebrecht*, District Judge Gardephe observed that alternative service to a U.S. attorney is permissible "because such service requires transmission of service papers to a foreign defendant via a domestic conduit like a law firm or agent – ultimately, the foreign individual is served and thereby provided notice outside a United States judicial district, in accordance with Rule 4's plain language." 2018 WL 6253877, at *4 (quoting

*In re Cathode Ray Tube (CRT) Antitrust Litig.*, 27 F. Supp. 3d 1002, 1010 (N.D. Cal. 2014)) (alteration omitted); *accord RMS Prod. Corp.*, 2007 WL 2295907, at *6 ("Court-ordered service on counsel made under Rule 4(f)(3) serves as effective authorization 'by law' for counsel to receive service."); *see Freedom Watch, Inc. v. Org. of the Petroleum Exporting Countries (OPEC)*, 766 F.3d 74, 84 (D.C. Cir. 2014) ("[W]hile Rule 4(f)(3) addresses service only 'at a place not within any judicial district of the United States,' Fed.R.Civ.P. 4(f), arguably, when a court orders service on a foreign entity through its counsel in the United States, the attorney functions as a mechanism to transmit the service to its intended recipient abroad."). Hence, the "relevant circumstance is where the defendant is, and not the location of the intermediary." *Odebrecht*, 2018 WL 6253877, at *4; *accord Bazarian Int'l Fin. Assocs., L.L.C. v. Desarrollos Aerohotelco, C.A.*, 168 F. Supp. 3d 1, 14 (D. D.C. 2016) (criticizing a narrow interpretation of Rule 4(f) because it "assumes, without explanation, that 'service' is complete when the foreign defendant's United States counsel physically receives the summons"). The Court agrees with *Odebrecht* and the other cases ruling that service to a foreign defendant via a domestic conduit is permissible under Rule 4(f)(3).

When seeking approval of alternative service through counsel, the movant must show adequate communication between the counsel and the party to be served. *GLG Life Tech*, 287 F.R.D. at 267. Here, HSBC Suisse has undoubtedly been in regular contact with Cleary Gottlieb and has actively participated in the HSBC Action since at least September 2010 (*see Motion of Moving Defendants to Withdraw the Reference of the Above-Captioned Adversary Proceedings to the Bankruptcy Court*, dated Sept. 20, 2010 (filed by Cleary Gottlieb attorney Evan A. Davis, Esq. on behalf of HSBC Suisse *et*

*al.*) (ECF Adv. Proc. No. 10-03633 Doc. # 2)) and thereafter. *See Baidu.com Inc.*, 293

F.R.D. at 515 ("service on Baidu's counsel would satisfy the requirements of due process,

as Baidu has actual notice of this lawsuit and there is evidence of adequate

communication between Baidu and counsel") (citation and internal quotation marks

omitted).

### 3.     Not Prohibited by International Agreement

Under Rule 4(f)(3), the proposed method of service must not be prohibited by

international agreement, and the Defendants contend that mail service to Cleary

Gottlieb runs afoul of the Hague Service Convention. (*Defendants Reply* at 17-18.) This

argument lacks merit. When service is made on domestic counsel, the Hague Service

Convention is not implicated because no documents are transmitted abroad. *Baidu.com*

*Inc.*, 293 F.R.D. 515; *GLG Life Tech*, 287 F.R.D. at 267; *cf. Volkswagenwerk*

*Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 707 (1988) ("Where service on a domestic

agent is valid and complete under both state law and the Due Process Clause, our

inquiry ends and the [Hague Service Convention] has no further implications."). Here,

Cleary Gottlieb was served domestically, and the Hague Service Convention is therefore

inapplicable.

### 4.     Prior Attempt at Service and Other Considerations

As stated, the Court in the exercise of its discretion may consider whether the

plaintiff has reasonably attempted service on the defendant as well as other surrounding

circumstances. In addition to serving Cleary Gottlieb by mail, the Liquidators served

the summons and initial complaint on HSBC Suisse in Switzerland by international mail

in 2010. (*Molton Declaration* at ¶ 2.) In serving HSBC Suisse by mail, the Liquidators

relied on a provision in subscription agreements with Sentry under which HSBC Suisse consented to the jurisdiction of New York courts and service by mail for "any suit, action or proceeding with respect to [the subscription agreement] and the Fund." (*See Declaration of David J. Molton in Further Support of Motion for Leave to Amend and in Opposition to Defendants' Motion to Dismiss*, dated Mar. 31, 2017, Ex. A at ¶ 19 (emphasis added) (ECF Doc. # 1337).)

The Court concluded in connection with the prior motion to dismiss that the U.S. Redeemer Actions were not proceedings with respect to the subscription agreements. *Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam* (*In re Fairfield Sentry Ltd.*), No. 10-13164 (SMB), 2018 WL 3756343, at *10-12 (Bankr. S.D.N.Y. Aug. 6, 2018) ("*Fairfield I*"). Until the Court issued *Fairfield I* in August 2018, the Liquidators had a reasonable basis to believe that they had properly served HSBC Suisse by mail in accordance with the subscription agreements. After the Court issued *Fairfield I* and *Fairfield II*, the parties entered into detailed stipulations in 2019 resolving the prior motion to dismiss and identifying the issues to be raised in the instant Motion to dismiss including "whether service was properly effected." (*See Stipulated Order Granting in Part and Denying in Part Moving Defendants' Motions to Dismiss and Plaintiffs' Motion for Leave to Amend*, so-ordered on Apr. 15, 2019 at § II.A (ECF Adv. Proc. No. 10-3633 Doc. # 81).)[19]

---

[19]    Because the parties specifically contemplated that the issue of proper service would be litigated through the current Motion, the Defendants' argument that the Liquidators have ignored the Court's ruling in *Fairfield I* (*see Defendants Reply* at 18-19) is without merit.

Other factors also militate in favor of allowing mail service on Cleary Gottlieb, specifically cost and delay. According to an estimate the Liquidators provided, the cost associated with re-serving HSBC Suisse and the other Swiss Defendants would total $272,441 (*Motion Declaration* at ¶¶ 4-12; Ex. 3), and the process would take four months or more. (*Liquidators Brief* at 32-33.) Courts often consider the cost and delay associated with service under the Hague Service Convention or other treaties when approving alternative service under Rule 4(f)(3). *Odebrecht*, 2018 WL 6253877, at *8-9; *GLG Life Tech*, 287 F.R.D. at 266-67.

The issue of cost is particularly compelling in this case. The *Citibank Complaint* alleges that the Funds were insolvent or rendered insolvent by the transfers, (¶¶ 7, 13, 39), and their financial situation is not much better today. After the chapter 15 cases were filed, the Liquidators and the BLMIS SIPA trustee entered into a settlement pursuant to which the latter entered judgments in this Court in the amount of $3,054,000,000 against Sentry, $752,300,000 against Sigma and $52,900,000 against Lambda. (¶ 13.) Among other things, Sentry, the BLMIS customer, received an allowed $230 million claim in the BLMIS SIPA proceeding. *In re Fairfield Sentry Ltd.,* 539 B.R. 658, 662 (Bankr. S.D.N.Y. 2015), *aff'd,* 690 F. App'x 761 (2d Cir.) (summary order), *cert. denied*, 138 S. Ct. 285 (2017). Suffice it to say that the judgments dwarf the BLMIS claim and the Funds appear to still be insolvent. Forcing the Liquidators to expend significant sums to effect service under the Hague Service Convention when cheaper and equally effective alternatives exist will adversely affect the amount available for ratable distribution to the Funds' creditors and shareholders. Moreover, HSBC Suisse has had actual notice of the HSBC Action, has actively litigated for a decade through capable

32

counsel, "and, thus, as a practical matter, the purpose of the service requirement has already been accomplished." *Arista Records*, 2008 WL 563470, at *2; *accord Atlantica Holdings*, 2014 WL 12778844, at *3.

### 5. Retroactive Approval

The stumbling block, however, is retroactive approval. As the Defendants argue, retroactive approval of a method of service pursuant to Rule 4(f)(3) is impermissible. (*Defendants Reply* at 16.) Rule 4(f)(3) permits service "by other means not prohibited by international agreement, *as the court orders*." (Emphasis added). The emphasized portion denotes that the party must receive court approval prior to service. *Fed. Trade Comm'n v. Pecon Software Ltd.*, No. 12 Civ. 7186(PAE), 2013 WL 4016272, at *9 (S.D.N.Y. Aug. 7, 2013); *United States v. Machat*, No. 08 Civ. 7936(JGK), 2009 WL 3029303, at *4 (S.D.N.Y. Sept. 21, 2009); 1 MOORE'S FEDERAL PRACTICE § 4.52 (3d ed. 2020) ("The language of Rule 4(f)(3) permitting service 'as the court orders' requires *prior* approval of the service method by court order before it is used.") (emphasis in original).[20]

Nonetheless, the Liquidators request alternative relief in the form of additional time to re-effect service on HSBC Suisse (*Liquidators Brief* at 34-35) — an issue to which I now turn.

---

[20]    The District Court in *Exp.-Imp. Bank of the United States v. Asia Pulp & Paper Co., Ltd.*, No. 03Civ.8554(LTS)(JCF), 2005 WL 1123755 (S.D.N.Y. 2005) retroactively approved a method of service under Rule 4(f)(3) where such service had proved effective in providing notice to the defendant. *Id.* at *5. However, "defective service cannot be ignored on the mere assertion that defendant had 'actual notice.'" *Pecon Software*, 2013 WL 4016272, at *9 (quoting *Weston Funding, LLC v. Consorcio G Grupo Dina, S.A. de C.V.*, 451 F. Supp. 2d 585, 589 (S.D.N.Y. 2006)).

### 6.  Additional Time to Effect Service

The Defendants seek dismissal for failure to make timely service.  (*Defendants Brief* at 38-39; *Defendants Reply* at 20.)  The general rule under Federal Civil Rule 4(m) that service must be made on a defendant within 120 days of the time the case was commenced (the limit has since been reduced to 90 days) "does not apply to service in a foreign country under Rule 4(f) [or] 4(h)(2)," FED. R. CIV. P. 4(m), so long as the plaintiff attempts to begin service on a foreign defendant within that timeframe.  *USHA (India) Ltd. v. Honeywell Int'l, Inc.*, 421 F.3d 129, 133-34 (2d Cir. 2005); *Trilliant Funding, Inc. v. Marengere* (*In re Bozel S.A.*), 1:16-cv-3739 (ALC), 2017 WL 3175606, at *2 (S.D.N.Y. July 25, 2017).  Under the foreign country exception, the court applies a "flexible due diligence standard to determine whether service of process was timely," *Burda Media, Inc. v. Blumenberg*, No. 97 Civ.7167(RWS), 2004 WL 1110419, at *5 (S.D.N.Y. May 18, 2004) (citation omitted), and "assesses the reasonableness of the plaintiff's efforts and the prejudice to the defendant from the delay."  *Bozel*, 2017 WL 3175606, at *2. [21]

Here, as stated above, the Liquidators exercised due diligence.  They attempted service on HSBC Suisse in a timely manner consistent with the subscription agreements.  The Liquidators had a reasonable basis to believe that they had properly served HSBC

---

[21]     Neither party addressed the issue of whether the foreign service exception to Rule 4(m) applies when the plaintiff is seeking to serve a domestic conduit under Rule 4(f)(3).  Rather, both sides relied on precedent applying the flexible due diligence standard for determining timeliness of service on a foreign defendant.  (S*ee Liquidators Brief* at 35; *Defendants Reply* at 20 (arguing that the Liquidators have failed to show diligence).)  The Court will, therefore, apply this standard.  In any event, even if the exception did not apply, the service deadline must be extended pursuant to Rule 4(m) upon a showing of "good cause" which balances the "plaintiff's reasonable efforts to effect service" against the "prejudice to the defendant from delay," *Savage & Assocs., P.C. v. Williams Commc'ns*, (*In re Teligent Servs., Inc.*), 324 B.R. 467, 472 (Bankr. S.D.N.Y. 2005) (citation omitted), *aff'd*, 372 B.R. 594 (S.D.N.Y. 2007) – a comparable analysis to that required under the flexible due diligence standard.

Suisse, and not attempt further service, until the issuance of *Fairfield I* in 2018.  The service issue nonetheless remained a live dispute, and the parties stipulated to litigating the issue of service of process in connection with the current Motion.  The decision to litigate the propriety of past service or seek a different and less costly method of new service, rather than proceed with the costly and time-consuming process of serving the Defendants under the Hague Service Convention, does not signify a lack of due diligence.

Nor have the Defendants identified any prejudice they have suffered as a result of the passage of time.  Despite the service issue, they have been actively litigating numerous issues in this Court since 2010, including the dismissal of all of the Liquidators' claims which culminated in this decision, and these threshold issues had to be decided before the litigations could advance.

Accordingly, the Liquidators request to effect service on HSBC Suisse's U.S. counsel, Cleary Gottlieb, is granted.  The parties should, in the first instance, meet and confer in an attempt to forego another round of service failing which the Liquidators must serve Clearly Gottlieb by first class mail within sixty days of the date of this memorandum decision.  The parties must submit a joint letter to the Court within thirty days of this memorandum decision on the status of their meet and confer.

The Court has considered the parties' other arguments and to the extent not addressed herein, concludes that they lack merit or are mooted by the Court's rulings.

35

 Settle orders in each affected adversary proceeding on notice or submit consensual

orders.


Dated:   New York, New York
         December 14, 2020


                                    /s/ *Stuart M. Bernstein*
                              STUART M. BERNSTEIN
                           United States Bankruptcy Court