## **EXHIBIT D**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
                                       :

In re:                                     :        Chapter 15 Case

FAIRFIELD SENTRY LIMITED, *et al.*,    :        Case No. 10-13164 (SMB)

       Debtors in Foreign Proceedings.   :        Jointly Administered
-------------------------------------------------------X

FAIRFIELD SENTRY LIMITED       :
(IN LIQUIDATION), acting by and through the :        Adv. Proc. No. 10-03496 (SMB)
Foreign Representatives thereof,      :
                                     :        Administratively Consolidated
             Plaintiffs,             :
                                     :
            -against-              :
                                     :

THEODOOR GGC AMSTERDAM, *et al.*,   :
                                     :
            Defendants.           :
-------------------------------------------------------X

## MEMORANDUM DECISION GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS AND PLAINTIFFS' MOTIONS FOR LEAVE TO AMEND

**A P P E A R A N C E S :**

BROWN RUDNICK LLP
Seven Times Square
New York, NY 10036

       David J. Molton, Esq.
       Marek P. Krzyzowski, Esq.
          Of Counsel

KELLOGG, HANSEN, TODD, FIGEL
& FREDERICK, P.L.L.C.
1615 M. Street, N.W., Suite 400
Washington, D.C. 20036

       Michael K. Kellogg, Esq. (admitted *pro hac vice*)
       Aaron M. Panner, Esq. (admitted *pro hac vice*)
          Of Counsel

*Attorneys for Plaintiffs*

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, NY 10006

 Thomas J. Moloney, Esq.
  Of Counsel

HOGAN LOVELLS US LLP
875 Third Avenue
New York, NY 10022

 Marc J. Gottridge, Esq.
  Of Counsel

MOSES & SINGER LLP
405 Lexington Avenue
New York, NY 10174

 Alan Kolod, Esq.
  Of Counsel

CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, NY 10019

 Jeff Butler, Esq.
  Of Counsel

*Attorneys for Defendants[1]*

## STUART M. BERNSTEIN
## United States Bankruptcy Judge

 Plaintiffs Kenneth M. Krys and Charlotte Caulfield (together, the "Liquidators"),[2]

in their capacities as foreign representatives of Fairfield Sentry Limited ("Sentry"),

Fairfield Sigma Limited ("Sigma"), and Fairfield Lambda Limited ("Lambda," and

collectively, the "Funds") seek leave to amend their complaints, (*see Memorandum Of*

*Law in Support of Motion for Leave to Amend*, dated Oct. 21, 2016 ("*Liquidators*

---

[1] The listed attorneys for the Defendants participated at the oral argument; additional defense counsel are set forth in Appendix E to the *Consolidated Memorandum of Law in Opposition to Plaintiffs' Motion for Leave to Amend and in Support of Defendants' Motion to Dismiss*, dated Jan. 13, 2017 ("*Defendants Motion*") (ECF Doc. # 960).

[2] Different individuals have served as Liquidators of the Funds. When used in this memorandum decision, the term refers to the individuals serving in that position during the referenced time-period.

*Motion*") (ECF Doc. # 923)), in 305 adversary proceedings pending in this Court in which the Liquidators seek to recover redemptions paid by the Funds to the defendants (collectively, the "U.S. Redeemer Actions").[3] The defendants in the U.S. Redeemer Actions (collectively, the "Defendants") oppose the amendments and seek dismissal of the U.S. Redeemer Actions on various grounds discussed below.

In a prior decision, the Court concluded that it had subject matter jurisdiction over the U.S. Redeemer Actions, and that the execution of certain Subscription Agreements, without more, did not subject the Defendants to the personal jurisdiction of the Court. *Fairfield Sentry Ltd.* (*In Liquidation*) *v. Theodoor GGC Amsterdam* (*In re Fairfield Sentry Ltd.*), Adv. Proc. No. 10-03496 (SMB), 2018 WL 3756343 (Bankr. S.D.N.Y. Aug. 6, 2018) ("*Prior Decision*"). The Court refrained from addressing the parties' merit-based contentions because the *Prior Decision* did not completely resolve the motions to dismiss for lack of personal jurisdiction. *Id.* at *12. The parties subsequently stipulated to be bound by the merit-based determinations of the motions without prejudice to their jurisdictional objections or the right to seek reconsideration or to appeal. (*Order and Stipulation Between the Liquidators and the Defendants Listed on Appendix A*, "so-ordered" on Sept. 20, 2018 (ECF Doc. # 1735).)

---

[3]     A list of all U.S. Redeemer Actions is attached as Appendix D to the *Foreign Representatives' Memorandum of Law in Opposition to Defendants' Consolidated Memorandum of Law and in Further Support of Foreign Representatives' Motion for Leave to Amend Complaints*, dated Mar. 31, 2017 ("*Liquidators Reply*") (ECF Doc. # 1336). The U.S. Redeemer Actions were administratively consolidated for pretrial purposes. (*See Amended Order Authorizing the Consolidation of Redeemer Actions Pursuant to Federal Rule of Bankruptcy Procedure 7042*, signed Nov. 17, 2010 (ECF Doc. # 25).) Unless otherwise specified, references to docket entries are to documents filed on the electronic docket of the consolidated proceeding, *Fairfield Sentry Limited* (*In Liquidation*) *v. Theodoor GGC Amsterdam*, Adv. Proc. No. 10-03496 (SMB).

For the reasons set forth below, the Liquidators' motions to amend are denied and the Defendants' motions to dismiss are granted with respect to the Contract and Common Law Claims described below except to the extent the pleading or proposed amendment adequately alleges that a particular Defendant knew that the net asset value ("NAV") as calculated at the time of the redemption payment was mistaken because the Funds' investments with Bernard L. Madoff Investment Securities LLC ("BLMIS") were worthless or nearly worthless. In that situation, the Liquidators may assert a claim to impose a constructive trust on the Defendant. Separately, the motions to dismiss the BVI Avoidance Claims, also described below, are denied without prejudice to renewal on the basis that the BVI Avoidance Claims (and, possibly, all claims) are barred under 11 U.S.C. §§ 546(e) and 561(d).

## BACKGROUND

The background is set forth in the *Prior Decision* and will be repeated or amplified only to the extent necessary to explain this decision.

The Funds were organized under the laws of the British Virgin Islands ("BVI"). Sentry sold shares to foreign investors and invested 95% of the proceeds with BLMIS. Sigma and Lambda were "funds of funds." They also sold shares to investors, but invested the proceeds with Sentry which, in turn, invested those funds with BLMIS. Thus, each of the Funds invested virtually all of their assets with BLMIS directly or indirectly, and the value of their assets derived from the value of their BLMIS investments.

The Funds were governed by their respective Articles of Association ("Articles," and each provision within the Articles, an "Article").[4] The Directors of each Fund (referred to in the Articles as the "Company") were vested with the authority to manage the Fund. (Article 52.) Article 9 described the process for the subscription of shares and Article 10 addressed the redemption of shares. With certain exceptions and conditions that are not relevant, Article 10(1) provided that upon written request specifying the number and class of Shares to be redeemed, "the Company . . . shall redeem or purchase all or any portion of the Shares registered in the Applicant's name." The redemption payment was due on the Dealing Day which was generally thirty days after the receipt of the redemption request. (Article 10(1)(c).)

The redemption price was determined in accordance with Article 11 as of the Dealing Day. (Article 10(2).) The subscription price for investors buying into the Fund was also determined under Article 11. (Article 9(2).) Under Article 11, the Directors determined the NAV per share by dividing the value of the Fund's net assets by the number of outstanding shares. (Article 11(1)(a), (b).)[5] "Any certificate as to the Net Asset Value per Share or as to the Subscription Price or the Redemption Price therefor *given in good faith by or on behalf of the Directors shall be binding* on the parties." (Article 11(1)(c) (emphasis added).) The Funds delegated the duty to compute the NAV

---

[4] A copy of Sentry's Articles is attached as Exhibit F to the *Declaration of William Hare in Support of Motion for Leave to Amend*, signed Oct. 21, 2016 ("*Hare Declaration*") (ECF Doc. # 925). The Articles for Sigma and Lambda are identical in all material respects to Sentry's and are attached as Exhibits D and E, respectively, to the *Attorney Declaration of Thomas J. Moloney in Opposition to Plaintiffs' Motion for Leave to Amend and in Support of Defendants' Motion to Dismiss*, signed Jan. 13, 2017 ("*Moloney Declaration*") (ECF Doc. # 961).

[5] The three subparagraphs that comprise Article 11(1) are not numbered or lettered. For ease of reference, I have assigned letters to each subparagraph. Article 11(1)(a) refers to the first subparagraph, Article 11(1)(b) to the second and Article 11(1)(c) to the third.

to Citco Fund Services (Europe) BV ("Citco") pursuant to a separate agreement. *See Fairfield Sentry Ltd.* (*In Liquidation*) *v. Migani*, [2014] UKPC 9 ("*Migani*"), ¶ 14.[6]

Prior to December 2008, the Directors certified the NAV for each subscription and redemption in the belief that Sentry's investment with BLMIS had substantial value. In December 2008, however, Madoff admitted to operating the investment advisory business of BLMIS as a Ponzi scheme, and BLMIS was placed into a liquidation proceeding pursuant to section 78eee of the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa, *et seq.* In hindsight, the Funds had overpaid the earlier redemptions based on an erroneous view of the value of Sentry's BLMIS investments. Shortly after Madoff's arrest and the collapse of BLMIS, the Funds became the subjects of liquidation proceedings in the BVI. The British Virgin Island Court ("BVI Court") appointed the Liquidators, the Liquidators commenced ancillary proceedings in this Court under Chapter 15 of the Bankruptcy Code to obtain recognition of the BVI liquidation proceedings as "foreign main proceedings," and the Court granted the Liquidators' applications on July 22, 2010.

### A.     BVI Redeemer Actions

In or about March 2010, the Liquidators commenced proceedings in the BVI (the "BVI Redeemer Actions") in the name of Sentry to recover redemption payments made in 2004. (*See Statement of Claim* in *Fairfield Sentry Ltd.* (*In Liquidation*) *v. Bank*

---

[6]     A copy of the *Migani* decision is attached as Exhibit Q to the *Hare Declaration*. An electronic version of the opinion without paragraph numbers can be found on the Westlaw database at 2014 WL 1219748.

*Julius Baer & Co. Ltd.,* dated Mar. 12, 2010 ("*Statement of Claim*").)[7] Sentry's theory

was straightforward. It invested 95% of its assets with BLMIS, (*Statement of Claim* ¶ 4),

the BVI defendants (the "Redeemers") requested redemptions in March 2004, (*id.* ¶ 6),

and Sentry computed the NAV in accordance with the Articles in the aggregate amount

of $135,405,694.70. (*Id.* ¶¶ 7, 8.) Because BLMIS operated as a Ponzi scheme and

Sentry's investments were worthless, the actual NAV was nil or nominal at the time of

the redemptions. (*Id.* ¶¶ 9, 10.) Accordingly, the NAV was calculated under a mistake of

fact by Sentry (unilateral mistake), and the Redeemers were unjustly enriched and liable

to make restitution in the full amount or the difference between the redemption price

and the actual, nominal amount of the redeemed shares. (*Id.* ¶¶ 9, 11.) Alternatively,

Sentry was entitled to set aside the redemptions on the ground of mutual mistake. (*Id.* ¶

12.)

### 1. The Preliminary Issues Proceeding

In early 2011, certain Redeemers filed applications requesting that the BVI Court

hold a trial to determine "preliminary issues." (*See Hare Declaration,* Ex. C.) A

preliminary issues trial is a mechanism for deciding specific issues that are likely to

resolve the case. (*Hare Declaration* ¶ 23; *Declaration of Phillip Kite in Opposition to*

*Plaintiffs' Motion for Leave to Amend and in Support of Defendants' Motion to*

*Dismiss*, signed Jan. 12, 2017 ("*Kite Declaration*"), at ¶ 9 (ECF Doc. # 963).) The

Redeemers identified two preliminary issues; the first concerned the calculation of the

NAV (the "Certification Issue"). They argued that if the NAV was calculated in

---

[7]     A copy of the *Statement of Claim* is attached as Exhibit A to the *Hare Declaration.*

accordance with Article 11(1) and "certified," Sentry could not recalculate the NAV after

redemption. (*Hare Declaration,* Ex. G, ¶¶ 17-19.) Referring to Article 11(1)(c), (*id.* ¶ 16),

the Redeemers further argued that Sentry's good faith was irrelevant on the Certification

Issue. Even if the certificates were issue in bad faith, Sentry could not rely on its own

bad faith to defeat the binding nature of the certificates. (*Id.* ¶¶ 21(1), 22.)

The second, proposed preliminary issue addressed the consideration given by the

Redeemers for the redemption payments (the "Good Consideration Issue"). They

maintained that regardless of the NAV per share, they gave good consideration by

surrendering their shares, and this provided a complete defense to Sentry's clawback

claims. (*Id.* ¶ 29.)

Sentry opposed the preliminary issues application. It argued that discovery was

necessary on the Certification Issue, (*id.*, Ex. H, ¶¶ 8-12), but conceded that the Good

Consideration Issue was purely legal though difficult. (*Id.* ¶¶ 13, 14, 17.) Sentry did not

contend that a factual issue existed as to whether the NAVs were calculated in bad faith,

but did maintain that it could not say if a factual dispute existed on the "Binding NAV

Issues" without disclosure as it did not yet have Citco's documents. (*Id.* ¶ 16.)

On April 20, 2011, Judge Bannister of the BVI Court issued a decision and

separate order granting the Redeemers' motion, and ordered a trial on the two

categories of preliminary issues (hereinafter, the "Preliminary Issues"). (*Id.*, Ex. N.) He

subdivided the Certification Issue into three separate questions which were thereafter

referred to as Preliminary Issues Nos. 1 through 3:

> (1)     Whether [a specific document] is a certificate within the meaning of
> Article 11(1) of the Articles of Association of the Claimant. . . ;

      (2)     if the answer to (1) is yes, whether any. . . of the documents is

          (a)     a certificate as to the Net Asset Value per share ("NAV") or

          (b)     a certificate as to Redemption Price within the meaning of the Articles;

      (3)     if the answer to (2)(a) or (b) is yes, whether the publication or delivery by the Claimant

          (a) as a matter of information only, or

          (b) in connection with a redemption request

of a document containing substantially the same items of information as a document identified as falling within (2)(a) or (b) above to a redeeming or redeemed Member of the Claimant precludes the Claimant from asserting that money paid to that redeeming or redeemed Member on redemption exceeded the true Redemption Price and as such is recoverable as to the excess from such redeeming Member.

(*Id.*, Ex. N, at ECF pp. 9 of 18.)[8]

Judge Bannister framed the Good Consideration Issue, now Preliminary

Issue No. 4 (containing two subparts), as follows:

Whether a redeeming Member of the Claimant in surrendering its shares gave good consideration for the payment by the Claimant of the Redemption Price and, if so, whether that precludes the Claimant from asserting that the money paid to that Member on redemption exceeded the true Redemption Price and as such is recoverable as to the excess from such redeeming Member.

(*Id.*)

Acknowledging Sentry's concerns regarding the need for discovery, Judge

Bannister included the following proviso that applied to the Certification Issue but not

to the Good Consideration Issue:

Determination against the Claimant of any of the questions falling to be determined in issue (1) above [Preliminary Issues Nos. 1, 2 and 3] shall not debar the Claimant from subsequently asserting on the basis of a fact or facts not actually known to the Liquidators of the Claimant at the time of the hearing of issue (1) that notwithstanding the determination of that

---

[8]     "ECF pp." refers to the pagination printed by the Court's CM/ECF system at the top of each page of a filed document.

question a particular defendant is liable to repay to the Claimant all or some part of any redemption monies paid to that defendant.

(*Id.*, Ex. N, at ECF pp. 9-10 of 18.)

The Preliminary Issues proceeded to trial. Prior to trial, the Redeemers submitted their *Skeleton Argument of the Defendants on the Preliminary Issues*, (*Kite Declaration*, Ex. A), in which they repeated their argument that whether the certificates were issued in good faith was irrelevant for two reasons. First, Sentry could not rely on its own bad faith to defeat the binding nature of a certificate. Second, the requirement of good faith was intended to protect the subscribers and redeemers, but was not intended to protect Sentry "by enabling Sentry to escape from the consequences of understating the values in relation to subscriptions, or of overstating the values in relation to redemptions, in circumstances where its Directors have acted in bad faith." (*Id.*, Ex. A, at ECF pp. 21 of 31.)

Judge Bannister rendered his decision on the Preliminary Issues on September 16, 2011. *See Fairfield Sentry Ltd.* (*In Liquidation*) *v. Bank Julius Baer & Co. Ltd.*, Nos. BVIHC (COM) 30-2010, *et al.* ("*BVI Court PI Decision*").[9] He concluded that the various communications sent to investors by or on behalf of the Directors were not certificates within the meaning of Articles. *Id.* ¶¶ 30-33. Accordingly, he answered Preliminary Issues Nos. 1 and 2 in the negative, and

---

[9]        A copy of the *BVI Court PI Decision* is attached as Exhibit B to the *Kite Declaration*.

those answers rendered Preliminary Issue No. 3 moot.  (*Kite Declaration*, Ex. C,

at ECF pp. 16-17 of 212.)

However, he further concluded that the Redeemers gave good

consideration for the redemptions by surrendering their shares.  He reasoned:

> Left to myself I would have held that the redemption of shares in this case
> amounted to a bargain and sale for which the consideration received by
> Sentry was the surrender of the rights of the redeeming shareholder. . . .  I
> further fail to understand how Sentry can recover the redemption price in
> circumstances in which *restitutio in integrum* is no longer possible.[10]

*BVI Court PI Decision* ¶ 34.

Judge Bannister concluded:

> In my judgment, therefore, it is not open to Sentry now to seek to recover
> the price which it paid for the purchase of the shares of redeeming
> investors simply because it calculated the NAV upon information which
> has subsequently proved unreliable for reasons unconnected with any of
> the redeemers.

*Id.* at ¶ 36.  Accordingly, he answered Preliminary Issue No. 4 in the affirmative.

(*Kite Declaration*, Ex. C, at 17 of 212.)  Judge Bannister directed one of the

Redeemers to promptly move for summary judgment.  (*Id.*)

Per the direction, one of the Redeemers filed a motion for summary

judgment, (*Hare Declaration*, Ex. E), and Judge Bannister granted the motion on

October 10, 2011.  (*Id.*, Ex. P.)  Initially, the Good Consideration Issue was

directed at the cause of action based on Sentry's unilateral mistake alleged in

paragraphs 9 and 10 of the *Statement of Claim*, (*id.*, Ex. P, at ¶ 4), and the

Preliminary Issues trial did not decide the claim based on mutual mistake.  (*Id.*,

---

[10] *Restitutio in integrum* means "[r]estoration to the previous condition or status quo."  BRYAN A. GARNER, BLACK'S LAW DICTIONARY 1507 (10th ed. 2014).

Ex. P, at ¶¶ 5, 10.)  Nevertheless, the Redeemers were entitled to summary

judgment on the mutual mistake claim.  First, equity would not permit a party to

rescind a contract binding in law on grounds of common mistake.  (*Id.*, Ex. P, at ¶

18.)  Second, rescission was not available where, as in the case before him,

*restitutio in integrum* was impossible.  (*Id.*)

In reaching his decision, Judge Bannister rejected Sentry's request for an

adjournment based on pleadings recently provided by the trustee of BLMIS and

the need for more time to obtain evidence showing that the Redeemers received

the redemptions with knowledge that BLMIS was a fraud.  While acknowledging

the general rule that it may be unconscionable for a party to retain the benefit of a

transaction when it knows that the counterparty is acting under a mistake, Judge

Bannister did not see how that principle could be applied where the parties could

not be restored to their previous positions.  (*Id.*, Ex. P, at ¶ 20.)  Furthermore,

Sentry offered nothing specific to indicate the Redeemers' bad faith, and the

possibility that "something may turn up" did not provide a reason to deny a

summary judgment motion.  (*Id.*, Ex. P, at ¶ 22.)

### 2.    The ECCA Appeal

Both sides appealed to the Eastern Caribbean Court of Appeal ("ECCA"),

the Redeemers on the Certification Issue and Sentry on the Good Consideration

Issue and the subsequent dismissal of its claims pursuant to summary judgment.

On June 13, 2012, the ECCA affirmed on both Preliminary Issues and the grant of

summary judgment, and dismissed the appeals.  *See Quilvest Fin. Ltd. v.*

*Fairfield Sentry Ltd.* (*In Liquidation*), Nos. HCVAP 2011/041, *et al.* ("*ECCA*

*Decision*").[11]  Writing for the ECCA on the Good Consideration Issue, Justice

Pereira began with the principle that in a two-party situation where one party

pays money to another party to discharge a contractual obligation, the payor

cannot argue that the payee was unjustly enriched, *id.* ¶ 66 (quoting GOFF &

JONES, THE LAW OF UNJUST ENRICHMENT ¶ 29-19 (8th ed., Sweet & Maxwell

2011)), although the defense may fail where the payee was aware of the payor's

mistake and did not receive the money in good faith.  *Id.* ¶ 69.  However, Sentry

did not allege that the Redeemers had received the redemption payments in bad

faith.  *Id.*

The ECCA further stated that upon receipt of a redemption request, Sentry

was obligated to redeem the shares based on the redemption price computed by

Sentry (not by the shareholder), and notwithstanding any mistake on Sentry's

part.  *Id.* ¶¶ 78-79, 81.  The shareholders paid the initial consideration based on

Sentry's determination of the NAV, Sentry issued the shares in exchange for that

consideration, and when it paid the redemption price it got precisely what it

bargained for.  *Id.* ¶ 81.  Furthermore, predictability is critical in commercial

transactions, a contract reflects the parties' allocation of risks, and restitutionary

remedies such as unjust enrichment necessarily yield to contractual obligations.[12]

*Id.* ¶¶ 83, 85-86.  In her conclusion, Justice Pereira ruled:

---

[11]  A copy of the *ECCA Decision* is attached as Ex. G to the *Kite Declaration*.

[12]  Justice Pereira noted that the Private Placement Memorandum disclosed the risk that Sentry
would invest the subscriber's money and not retain custody of the investment, and "there is always the
risk that the personnel of any entity with which the Fund invests could misappropriate the securities or
funds (or both) of the Fund."  *ECCA Decision* ¶ 76.

> I agree with the ultimate conclusion arrived at by the learned trial judge that the P I Respondents gave good consideration for the surrender of their shares and Sentry's restitutionary claim would be defeated. It is simply not open to Sentry to recover the redemption prices which it paid for the purchase of the redeemed shares because it has now been discovered that it determined its NAV on unreliable or erroneous information from BLMIS which had nothing to do whatsoever with any of Sentry's shareholders. The shareholders fully performed all their obligations under the contract. Sentry, in paying the redemption price, did so in the discharge of its debt obligations to the redeeming shareholders pursuant to Sentry's Articles which remained perfectly valid and in force. Accordingly, I would dismiss Sentry's appeal on this issue.

*Id.* ¶ 87.

### 3. *Migani*

The parties appealed to the Privy Council, which rendered the *Migani* decision on April 16, 2014. Writing for the Privy Council, Lord Sumption opined that, whereas the lower courts had reviewed the Certification Issue and the Good Consideration Issue separately, the issues "are closely related and have to be considered together." *Migani* at ¶ 6. In rejecting Sentry's arguments relating to the Certification Issue, the Privy Council considered the provisions of Articles 9, 10 and 11, and concluded that the NAV had to be definitively determined *at the time of* the subscription or redemption; otherwise, the scheme was "unworkable." *Id.* ¶ 21; *accord* ¶ 24 ("If, as the articles clearly envisage, the Subscription Price and the Redemption Price are to be definitively ascertained at the time of the subscription or redemption, then the NAV per share on which those prices are based must be the one determined by the Directors at the time, whether or not the determination was correctly carried out in accordance with Articles 11(2) and (3)."). Interpreting the Articles to permit Sentry to recalculate the NAV at a future date based on new information

- 14 -

> would not only expose Members who had redeemed their shares to an
> open-ended liability to repay part of the price received if it subsequently
> appeared that the assets were worth less than was thought at the time. It
> would confer on them an open-ended right to recover more (at the expense
> of other Members) if it later appeared that they were worth more.
> Corresponding problems would arise out of the retrospective variation of
> the Subscription Price long after the shares had been allotted. Indeed, it is
> difficult to see how the Directors could perform their duty under Article
> 9(1)(b) not to allot or issue a share at less than the Subscription Price if the
> latter might depend on information coming to light after the allotment had
> been made.

*Id.* ¶ 23.

Having concluded that the documents at issue were "certificates" establishing the

NAV per share at the time of the subject redemptions, it followed that the redemption

payments were not subject to restitution. The payee is not unjustly enriched if he is

entitled to receive the sums he was paid, even if the amount paid was mistaken. *Id.* ¶ 18.

Sentry was obligated to pay the sum computed as the NAV per share at the time of the

redemption rather than in light of subsequent information. The payment of that sum

discharged Sentry's obligation under the Articles and "the shares having been

surrendered in exchange for the amount properly due under the Articles, the

redemption payments are irrecoverable." *Id.* ¶ 19.

Accordingly, the Privy Council reversed the lower courts' on the Certification

Issue, and dismissed the appeal of the Good Consideration Issue. The dismissal of the

appeal from the Good Consideration Issue "must be taken to have confirmed the

conclusion of the courts below that a redeeming member by surrendering its shares gave

good consideration for the payment by Sentry of the redemption price." *See ABN*

*AMRO Fund Servs.* (*Isle of Man*) *24 Nominees Ltd. v. Krys,* Nos. BVIHCMAP: 11-16,

23-28 of 2016, at ¶ 5 (ECCA Nov. 20, 2017) (Pereira, J.) ("*ECCA 273 Decision*")[13];

*Skandinaviska Enskilda Banken AB (PUBL) v. Conway* (*In re Weavering Macro Fixed Income Fund Ltd.*), [2016] CICA No. 2 of 2016 ("*Weavering*"), at ¶ 26 (stating that the Privy Council determined the Good Consideration Issue in the Redeemers' favor).[14] However, it is "arguable" that the Good Consideration Issue, affirmed by *Migani*, did not address the possible effect of Citco's alleged bad faith, a question that was not raised or presented. *ECCA 273 Decision* ¶ 61(iii).

## B.  U.S. Redeemer Actions

Citco's alleged bad faith is the principal issue on the motions before the Court in the 305 U.S. Redeemer Actions. The Liquidators have filed substantially similar adversary proceedings against the Defendants, and have also amended certain of the complaints in the U.S. Redeemer Actions to assert avoidance claims under sections 245 and 246 of the BVI INSOLVENCY ACT of 2003 ("INSOLVENCY ACT") to claw back redemptions paid with inflated prices as "unfair preferences" and/or "undervalue transactions."

The proposed amended complaint in *Fairfield Sentry Ltd. v. Citigroup Global Mkts. Ltd.*, Adv. Proc. No. 11-02770 (SMB) ("*Proposed Citigroup Complaint*") is typical.[15] The Liquidators' theory remains unchanged from the BVI Redeemer Actions:

---

[13]   A copy of the *ECCA 273 Decision* is attached to the *Letter of David J. Molton, Esq.* dated Nov. 22, 2017 (ECF Doc. # 1603).

[14]   A copy of the *Weavering* decision is attached as Exhibit 79 to the *Declaration of Gabriel Moss QC in Further Support of Motion for Leave to Amend and in Opposition to Defendants' Motion to Dismiss*, signed Mar. 30, 2017 ("*Moss II Declaration*") (ECF Doc. # 1338).

[15]   A redacted version of the *Proposed Citigroup Complaint* is attached as Exhibit C to the *Declaration of David J. Molton in Support of Motion for Leave to Amend*, signed Oct. 21, 2016 (ECF Doc. # 924), and the redactions were authorized pursuant to Court order. (*See Order Authorizing the Foreign*

the redemption payments were based on inflated NAVs per share resulting from an erroneous belief as to the value of the Funds' investments with BLMIS. (*Id.* at ¶¶ 7, 10, 33-35, 93.) The key difference is that the Liquidators now contend that Citco certified the NAV in bad faith at the time of redemption, and accordingly, the certificates fixing the NAV per share issued pursuant to Article 11(1) were not binding under Article 11(1)(c). (*Id.* at ¶¶ 41, 70.) The Liquidators seek the return of the redemption overpayments from the Defendants as the registered owners of the shares and/or the Defendants' unknown clients as beneficial owners, based on (i) unjust enrichment (*id.*, First and Second Claims), money had and received (*id.*, Third and Fourth Claims), mistaken payment (*id.*, Fifth and Sixth Claims) and constructive trust (*id.*, Seventh Claim) (collectively, the "Common Law Claims"), (ii) unfair preferences under the INSOLVENCY ACT § 245 (*id.*, Eighth and Ninth Claims), and undervalue transactions under the INSOLVENCY ACT § 246 (*id.*, Tenth and Eleventh Claims) (collectively, the "BVI Avoidance Claims") and (iii) breach of contract (*id.*, Twelfth Claim) and breach of the implied covenant of good faith and fair dealing (*id.*, Thirteenth Claim) (collectively, the "Contract Claims").[16] The Defendants seek the dismissal of the Common Law Claims

---

*Representatives to File Proposed Amended Complaints in Partially Redacted Form and Unredacted Proposed Amended Complaints Under Seal*, dated Sept. 6, 2016 (ECF Doc. # 909).) The redactions relate to the allegations of Citco's bad faith. The Court has not ruled on whether the information is confidential, but the specific allegations do not need to be unsealed for purposes of this omnibus proceeding.

[16]     The *Proposed Citigroup Complaint* also includes a Fourteenth Claim for a declaratory judgment under 28 U.S.C. § 2201. Since all of the issues raised by the Fourteenth Claim are subsumed by the other claims that seek monetary relief, the separate consideration of the declaratory judgment claim would serve no useful purpose. Accordingly, I decline in the exercise of discretion to consider it and dismiss the Fourteenth Claim. *See Broadview Chem. Corp. v. Loctite Corp.*, 417 F.2d 998, 1000-01 (2d Cir. 1969), *cert. denied*, 397 U.S. 1064 (1970).

and the Contract Claims primarily arguing that the Claims are barred by the Privy Council's decision in *Migani*.

## DISCUSSION

On these motions to dismiss for failure to state a claim and motions for leave to amend, the threshold issue is whether *Migani* renders Citco's bad faith irrelevant with respect to the Common Law Claims and the Contract Claims. These claims are governed by BVI law, and the support for the parties' respective positions is based on the lengthy declarations by their experts in BVI law. The declarations of Gabriel Moss QC and William Hare,[17] on behalf of the Liquidators, and Simon Mortimore QC and Phillip Kite,[18] on behalf of the Defendants, span a combined 411 pages (with an additional 7,591 pages of exhibits) and each expert disagrees with the other on numerous areas of BVI and English law.[19]

These declarations are informative and helpful, but the "[d]etermination of a foreign country's law is an issue of law." *Itar–Tass Russian News Agency v. Russian Kurier, Inc.,* 153 F.3d 82, 92 (2d Cir. 1998). While the Court "may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence," FED. R. CIV. P. 44.1, it is free to

---

[17]     *See Declaration of Gabriel Moss QC in Support of Motion for Leave to Amend*, signed Oct. 20, 2016 ("*Moss I Declaration*") (ECF Doc. # 926); *Moss II Declaration*; *Hare Declaration*.

[18]      *See Declaration of Simon Mortimore, QC in Opposition to Plaintiffs' Motion for Leave to Amend and in Support of the Defendants' Motion to Dismiss*, signed Jan. 13, 2017 ("*Mortimore I Declaration*") (ECF Doc. # 962); *Second Declaration of Simon Mortimore, QC in Further Support of the Defendants' Motion to Dismiss*, signed May 26, 2017 ("*Mortimore II Declaration*") (ECF Doc. # 1456); *Kite Declaration*.

[19]     The BVI is an autonomous British territory. Although the BVI has its own legislation, its legal system is based on English law. (*Mortimore I Declaration* ¶ 12.)

- 18 -

conduct "[its] own research and interpretation," *Ackermann v. Levine,* 788 F.2d 830, 838 n. 7 (2d Cir. 1986), and "[u]ltimately, the responsibility for correctly identifying and applying foreign law rests with the court." *Rationis Enters. Inc. of Pan. v. Hyundai Mipo Dockyard Co., Ltd.,* 426 F.3d 580, 586 (2d Cir. 2005), *cert. denied*, 549 U.S. 946 (2006).

## A.  Preclusion Doctrines

The Defendants raise several preclusion doctrines which, they assert, foreclose any further Common Law and Contract Claims.  In substance, they contend that *Migani* precludes reliance on Citco's alleged bad faith or challenge to the conclusion that the Defendants gave good consideration when they redeemed their shares.  (*Defendants Motion* at 44-51.)

### 1.  Choice of Law

Initially, the parties disagree about whether U.S. or BVI law determines the preclusive effect of *Migani*.  The authorities are split.  *Compare Simmtech Co., Ltd. v. Citibank, N.A.*, No. 13-cv-6768 (KBF), 2016 WL 4184296, at *8 (S.D.N.Y. Aug. 3, 2016) ("[T]he prevailing practice appears to be 'follow[ing] domestic rules of preclusion, whether they apply those of the applicable federal or state court.'") (quoting *Hurst v. Socialist People's Libyan Arab Jamahiriya*, 474 F. Supp. 2d 19, 32 (D.D.C. 2007)), *aff'd* 697 F. App'x 35 (2d Cir. 2017) (summary order), *cert. denied*, 138 S. Ct. 748 (2018); *Alfadda v. Fenn*, 966 F. Supp. 1317, 1329 (S.D.N.Y. 1997) ("[A] federal court should normally apply either federal or state law, depending on the nature of the claim to determine the preclusive effect of a foreign country judgment.") (footnote omitted), *aff'd on other grounds*, 159 F.3d 41 (2d Cir. 1998); *with Kim v. Co-Operative Centrale*

*Raiffeisen-Boerenleenbank B.A.*, 364 F. Supp. 2d 346, 349 (S.D.N.Y. 2005) (a New York
court would look to the law of Singapore to determine the preclusive effect of a
Singaporean judgment); *Weiss v. La Suisse, Société d' Assurances Sue La Vie*, 293 F.
Supp. 2d 397, 404-05 (S.D.N.Y. 2003) ("Generally, New York courts will give a foreign
court decision no more preclusive effect than it would be accorded by courts of the
jurisdiction that rendered it.") (citations omitted). The Defendants argue that the Court
must apply U.S. preclusion law; the Liquidators assert that BVI preclusion law
governs.[20] The Court need not decide which jurisdiction's preclusion law applies
because both lead to the same conclusion.

### 2.   *Res Judicata*/Claim Preclusion

Under the U.S. doctrine of *res judicata*, "a final judgment on the merits of an
action precludes the parties or their privies from relitigating issues that were or could
have been raised in that action." *Allen v. McCurry*, 449 U.S. 90, 94 (1980) (citation
omitted); *Burgos v. Hopkins*, 14 F.3d 787, 789 (2d Cir. 1994). "Whether or not the first
judgment will have preclusive effect depends in part on whether the same transaction or
series of transactions is at issue, whether the same evidence is needed to support both
claims, and whether the facts essential to the second were present in the first." *NLRB v.
United Techs. Corp.*, 706 F.2d 1254, 1260 (2d Cir. 1983) (citations omitted). The party
asserting *res judicata* must show that "(1) the previous action involved an adjudication
on the merits; (2) the previous action involved the plaintiffs or those in privity with
them; (3) the claims asserted in the subsequent action were, or could have been, raised

---

[20]    The Defendants alluded to both federal and New York preclusion law in their moving brief, (*see
Defendants Motion* at 44), but clarified in their *Consolidated Reply Memorandum of Law in Further
Support of Defendants' Motion to Dismiss*, dated May 26, 2017 ("*Defendants Reply*") (ECF Doc. # 1457)
that they are relying on federal preclusion law. (*Defendants Reply* at 22.)

in the prior action." *Monahan v. N.Y. City Dep't of Corr.*, 214 F.3d 275, 285 (2d. Cir.), *cert. denied*, 531 U.S. 1035 (2000).

The English form of claim preclusion is similar. It provides that "once a cause of action has been held to exist or not to exist, that outcome may not be challenged by either party in subsequent proceedings." *Virgin Atl. Airways Ltd. v. Zodiac Seats UK Ltd.,* [2013] UKSC 46, ¶ 17.[21] It also bars "the raising in subsequent proceedings of points essential to the existence or non-existence of a cause of action which were not decided because they were not raised in the earlier proceedings, if they could with reasonable diligence and should in all the circumstances have been raised." *Id.* ¶ 22.

Both the U.S. and English iterations of the doctrine preclude the relitigation of the same claim.

The parties concede that the claims asserted in the U.S. Redeemer Actions are not the same claims that were asserted in *Migani*. (*See Defendants Motion* at 8 (The Liquidators claims in the U.S. Redeemer Actions "concerned different time periods than those in the [BVI Redeemer Actions]"); *Liquidators Reply* at 43 (same).) The BVI Redeemer Actions involved March 2004 redemptions. The U.S. Redeemer Actions involve later redemptions. (*E.g., Proposed Citigroup Complaint* ¶ 9 ("During the period from and after October 14, 2005 through November 19, 2008, following the receipt by Sentry of notices of redemption, Sentry made Redemption Payments to accounts held in

---

[21]     A copy of *Virgin Atl. Airways v. Zodiac Seats UK Ltd.* is annexed to the *Moss II Declaration* as Exhibit 92.

the name of Defendant Citigroup Global Markets Limited ("CGML") aggregating USD $130,000,000.").)

Furthermore, the different transfers may involve different evidence relating to Citco's bad faith because Citco's knowledge and conduct must be viewed as of the time that it certified the NAV per share. Citco may have been acting in good faith in 2004, because it learned only after March 2004 that BLMIS was not actually trading securities. Conversely, it may have strongly suspected in March 2004 that the BLMIS investments were worthless, conducted due diligence as a result and determined in good faith that the BLMIS investments were worth what BLMIS said they were worth. Accordingly, neither the U.S. nor the BVI doctrines of claim preclusion prevent the Liquidators from arguing that Citco's bad faith allows them to recover the inflated redemption payments.

### 3. Collateral Estoppel/Issue Preclusion

"Under federal law, collateral estoppel applies when '(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits.'" *Purdy v. Zeldes*, 337 F.3d 253, 258 (2d Cir. 2003) (footnotes omitted) (quoting *Interoceanica Corp. v. Sound Pilots, Inc.,* 107 F.3d 86, 91 (2d Cir.1997)). Mutuality of the parties is not necessary where collateral estoppel is asserted defensively. *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 329 (1979); *Wilder v. Thomas,* 854 F.2d 605, 621 (2d Cir. 1988), *cert. denied*, 489 U.S. 1053 (1989).

Under BVI law, issue estoppel is more restrictive because it requires mutuality – either the same parties or their privies:

> In order for there to be an issue estoppel there must be (i) a final and conclusive judgment on the merits by a court of competent jurisdiction; (ii) between the same parties or their privies; and (iii) the issue decided in the former case on which the estoppel is sought to be founded must be the same as the issue in the later case and must have been necessary for the earlier decision.

*OJSC Oil Co. Yugraneft v. Abramovich,* [2008] EWHC 2613 (Comm), ¶ 396.[22] Despite this difference, both U.S. and BVI law require that the issue was litigated and decided.

The Liquidators argue that *Migani* did not consider the question of Citco's bad faith, and hence, the decision does not preclude the Liquidators from arguing in these adversary proceedings that Citco's bad faith certifications allow them to recover the redemptions. It is true that bad faith was on everyone's mind during the BVI Redeemer Actions. The Liquidators had already alleged in another adversary proceeding that the Funds' managers and controlling partners were grossly negligent and reckless in failing to supervise Citco and independently verify the NAVs. (*See Verified Complaint* in *Fairfield Sentry Ltd. v. Fairfield Greenwich Grp.*, dated May 29, 2009, at ¶¶ 79-99 (ECF Adv. Proc. No. 10-03800 Doc. # 1-5).)[23] Under BVI law, lack of good faith, *i.e.* bad

---

[22]    A copy of *OJSC Oil Co. Yugraneft v. Abramovich* is annexed as Exhibit 40 to the *Mortimore I Declaration*.

[23]    The Defendants also point to the *Anwar* class action – a case to which the Liquidators were not parties – in which shareholders of the Funds sued former Fund managers, executives and service providers, including Citco, asserting various securities law, tort, and breach of contract claims. *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 387 (S.D.N.Y. 2010). The shareholders alleged that Citco failed to perform adequate due diligence with respect to the Funds' BLMIS investment, knew that the Funds' risk controls were deficient, and did not inform investors of the deficiencies. *Id.* at 394. The Defendants argue that the Liquidators were monitoring the *Anwar* action, and were aware of the allegations regarding Citco's bad faith. (*Defendants Motion* at 50-51.)

faith, includes wrongdoing by one who acts recklessly as well as one who acts with actual
knowledge that he is acting wrongfully or willfully blinds himself to that fact. (*Moss I
Declaration* ¶¶ 40-41.) In addition, the BVI Redeemers had argued in connection with
the Preliminary Issues litigation that the Funds' good faith was irrelevant. Nevertheless,
neither the BVI Court, the ECCA nor the Privy Council mentioned the good faith issue,
and the issue was not actually decided.[24] Accordingly, the doctrine of issue preclusion
under both U.S. and BVI law does not prevent the Liquidators from arguing that a bad
faith certificate permits them to recover the corresponding redemption.

### 4.  *Henderson v. Henderson*

The English doctrine of *Henderson v. Henderson*[25] precludes a party from
"raising in subsequent proceedings matters which were not, but could and should have
been raised in the earlier ones." *Virgin Atl.* ¶ 17. Unlike the claim and issue preclusion,
the *Henderson* doctrine may apply where "the parties to the two actions were different,
and neither issue estoppel nor cause of action estoppel could therefore run." *Id.* ¶ 25.
Although the *Henderson* doctrine and claim estoppel share common characteristics, the
parties agree that the *Henderson* doctrine is procedural rather than substantive,
(*Mortimore II Declaration* ¶ 54; *Moss II Declaration* ¶ 38), and is concerned with abuse

---

[24]     The Liquidators imply that the BVI Court's proviso to Preliminary Issues Nos. 1, 2 and 3 allows
them in these adversary proceedings to rely on newly discovered evidence to show that the certified NAV
was incorrect and issued in bad faith. Notably, the BVI Court subsequently denied Sentry's request for an
adjournment and granted summary judgment to the BVI Redeemers, meaning Sentry had not identified
any factual issues in connection with its claims of mistake to warrant revisiting the Certification Issue.
Furthermore, *Migani* reversed on Preliminary Issues Nos. 1, 2 and 3 in 2014 without mentioning the
separate proviso. In any event, if the Liquidators conclude that newly discovered evidence allows them to
reopen the Certification Issue under the BVI Court's order, they must return to the BVI Court.

[25]     The *Henderson* doctrine was first set forth in *Henderson v. Henderson*, (1843) 3 Hare 100, 115.

of process. *Virgin Atl.* ¶ 24; *Johnson v. Gore Wood & Co.*, [2001] B.C.C. 820, 834.[26]  In

*Michael Wilson & Partners Ltd. v. Sinclair*, [2017] EWCA (Civ) 3, the Court surveyed

the law and summarized the principles of the *Henderson* doctrine:

> (1) In cases where there is no *res judicata* or issue estoppel, the power to strike out a claim for abuse of process is founded on two interests: the private interest of a party not to be vexed twice for the same reason and the public interest of the state in not having issues repeatedly litigated. . . . These interests reflect unfairness to a party on the one hand, and the risk of the administration of public justice being brought into disrepute on the other. . . .  Both or either interest may be engaged.

> (2) An abuse may occur where it is sought to bring new proceedings in relation to issues that have been decided in prior proceedings.  However, there is no prima facie assumption that such proceedings amount to an abuse, . . . and the court's power is only used where justice and public policy demand it. . . .

> (3) To determine whether proceedings are abusive the Court must engage in a close 'merits based' analysis of the facts.  This will take into account the private and public interests involved, and will focus on the crucial question: whether in all the circumstances a party is abusing or misusing the court's process. . . .

> (4) In carrying out this analysis, it will be necessary to have in mind that: (a) the fact that the parties may not have been the same in the two proceedings is not dispositive, since the circumstances may be such as to bring the case within 'the spirit of the rules' . . . ; thus (b) it may be an abuse of process, where the parties in the later civil proceedings were neither parties nor their privies in the earlier proceedings, if it would be manifestly unfair to a party in the later proceedings that the same issues should be relitigated, . . .  or, . . . if there is an element of vexation in the use of litigation for an improper purpose.

> (5) It will be a rare case where the litigation of an issue which has not previously been decided between the same parties or their privies will amount to an abuse of process. . . .

*Id.* ¶ 48 (citations omitted).[27]

---

[26]    A copy of *Johnson v. Gore Wood & Co.* is annexed to the *Moss II Declaration* as Exhibit 42.

[27]    A copy of *Michael Wilson & Partners Ltd. v. Sinclair* is annexed to the *Moss II Declaration* as Exhibit 50.

I conclude that the *Henderson* doctrine does not preclude the Liquidators' claims. First, the doctrine is conceded by all to be procedural rather than substantive. "In actions where the rights of the parties are grounded upon the law of jurisdictions other than the forum, it is a well-settled conflict-of-laws rule that the forum will apply the foreign substantive law, but will follow its own rules of procedure." *Bournias v. Atl. Mar. Co., Ltd.*, 220 F.2d 152, 154 (2d Cir. 1955); *accord Bakalar v. Vavra*, 550 F. Supp. 2d 548, 551 (S.D.N.Y. 2008); *Hosking v. TPG Capital Mgmt., L.P.* (*In re Hellas Telecomms. (Lux.) II SCA*), 535 B.R. 543, 566 (Bankr. S.D.N.Y. 2015); *see* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 122 (1971) ("A court usually applies its own local law rules prescribing how litigation shall be conducted even when it applies the local law rules of another state to resolve other issues in the case."). If the Liquidators have abused the process of *this* Court, this Court can deal with those abuses under its own rules (FED. R. BANKR. P. 9011), federal law (28 U.S.C. § 1927) or its inherent authority. *See Chambers v. Nasco, Inc.*, 501 U.S. 32, 43 (1991)

Second, the issue of Citco's bad faith was never litigated or decided in connection with the BVI Redeemer Actions, and this is not one of those "rare cases" where "the litigation of an issue which has not previously been decided between the same parties or their privies will amount to an abuse of process." *Michael Wilson & Partners Ltd. v. Sinclair* ¶ 48. The Defendants contend that even if the Liquidators did not know the facts necessary to allege Citco's bad faith, they had already alleged the same recklessness against the Fairfield defendants that they now level against Citco. Hence, the Liquidators could have argued that the certificates at issue in the BVI Redeemer Actions were not binding because of Fairfield's bad faith but chose not to raise the issue. "It is,

however, wrong to hold that because a matter could have been raised in earlier
proceedings it should have been, so as to render the raising of it in later proceedings
necessarily abusive." *Johnson v. Gore Wood & Co.*, [2001] B.C.C. at 834. The
allegations against the Fairfield defendants were not directed at any specific
redemptions, and whether a particular certificate was issued in bad faith is a factual
issue that must be determined on a case by case basis.

**B.     The Common Law Claims**

Although the Liquidators are not precluded from raising Citco's bad faith, the
persuasive authority of *Migani*, its progeny and the common law principles that
informed those decisions requires the Court to reject the Liquidators' argument that
Citco's bad faith, which I assume for the purposes of analysis, allows them to recover the
redemption payments. The only exception is where a Defendant knew the NAV was
inflated at the time of redemption (hereinafter, a "Knowledge Defendant").

*Migani*'s emphasis on finality, certainty and workability has been successfully
raised to prevent liquidators from recovering excess redemption payments even where
the NAV was the product of fraud or the redemption payment was illegal. Once the
redemption price has been paid based on the certified NAV, "the tree must lie as it falls."
*Pearson v. Primeo Fund*, [2017] UKPC 19, [2017] B.C.C. 552, ¶ 20. Neither fraud nor
illegality nor breach of trust allows either side to revisit the redemption payment in the
absence of bad faith by the redeeming shareholder. For example, in *Weavering*, the
defendant ("SEB") redeemed its investment in a fund at a price believed at the time to
reflect the NAV per share. *Weavering* ¶¶ 8-11. The value of the fund's investments
depended on the value of certain swaps to which it was a party. *Id.* ¶¶ 5-7. The fund's

Article 34 provided that "[a]ny valuations made pursuant to these Articles shall be binding on all persons." *Id.* ¶ 21.

The swaps that formed the basis of the NAV were the product of the fraud of the controlling director and were worthless. As a result, the NAV per share used to calculate the redemption payments was inflated. Once the directors discovered the fraud, they suspended further redemption payments, put the company into liquidation, and the liquidator commenced a preference action against SEB. *Id.* ¶¶ 1-4, 15. Among other things, the liquidators had to prove that the fund was unable to pay its debts.

SEB came up with a novel argument. It submitted that the NAVs were the product of fraud, the fund did not have to pay any redemptions based on the mistaken NAVs, and accordingly, there were no debts that the fund was unable to pay. *Id.* ¶¶ 18-19. SEB volunteered that the liquidator *might* have been able to recover the redemption payments based on a mistaken NAV, presumably under the common law, but that claim was time-barred. *Id.* ¶ 20. The Liquidators have referred to this unlitigated concession as authority for the proposition that they can recover redemption payments based on mistaken NAVs. (*Moss II Declaration* ¶ 67(b).)

The *Weavering* court rejected SEB's argument and hence the principle it purported to concede. Relying on *Migani*, it concluded that given the related interests of finality, certainty and workability, the subsequently discovered fraud did not vitiate the legitimacy of an obligation to pay the NAV computed at the time of the redemption:

> [T]he practical reasons that underlie the decision in *Fairfield Sentry* apply equally to a situation in which the NAV is affected by fraud. *It is essential to the operation of an investment vehicle such as the Company that permits investment through the acquisition and redemption of shares*

- 28 -

> *that there should be certainty on a day-to day basis as to the price at
> which shares are to be purchased or redeemed.* It may be that, as in the
> present case, the subscription price and the redemption price are largely
> or entirely artificial, but it is nevertheless important that they are
> calculated on a consistent basis. That is the purpose of article 34, which is
> to be construed as referring to a valuation purportedly made in compliance
> with the articles. Otherwise, the problems identified in paragraph (23) of
> the judgment in *Fairfield Sentry* [the open-ended right to recover
> excessive redemption payments] will arise.

*Weavering* ¶ 29 (emphasis added); *accord Pearson v. Primeo Fund* ¶¶ 20-21

(shareholder in Madoff feeder fund (Herald) that had redeemed before Madoff's fraud

was discovered but had not yet received the redemption payment when Herald began

winding-up proceedings was entitled to prove its debt against Herald based on the

fraudulently inflated price at which it had redeemed).

*DD Growth Premium 2X Fund v. RMF Mkt. Neutral Strategies (Master) Ltd.*,

[2017] UKPC 36 ("*DD Growth*"),[28] a decision by the Privy Council, is also instructive.

DD Growth was a feeder fund that had invested in a Master Fund that, in turn, had

invested in correlated stocks. *Id.* ¶ 9. Pursuant to the relevant governing document, the

subscription and redemption prices for DD Growth's shares were computed, in the usual

manner, by determining the NAV per share. *Id.* RMF was a substantial investor in DD

Growth. *Id.* ¶ 14.

The collapse of Lehman Brothers in 2008 resulted in severe losses to the Master

Fund, and hence, to the value of DD Growth's assets. *Id.* ¶ 15. However, the investment

manager for both DD Growth and the Master Fund concealed the losses by purchasing

worthless bonds and attributing fictitious values to the bonds sufficient to cover the

---

[28]     A copy of *DD Growth* is attached to the *Letter of Thomas J. Moloney*, dated Dec. 22, 2017 (ECF
Doc. # 1608).

actual losses. *Id.* ¶ 16. Meanwhile, RMF and other shareholders gave notices of redemption, and based on the false information provided by the Master Fund, the NAV per share was calculated at an erroneous, inflated number. *Id.* ¶¶ 17-18. DD Growth paid RMF approximately $23 million, representing less than 40% of the amount due, before suspending redemptions. *Id.* ¶¶ 18-19. After DD Growth was placed in liquidation, the liquidators sued to recover the payments based on unjust enrichment and/or constructive trust. *Id.* ¶¶ 20, 22.

Initially, the Privy Council, per Lord Sumption (the author of *Migani*) and Lord Briggs, concluded that the redemptions were valid, the redeeming shareholders became creditors, and although the NAV had been calculated based on false information, it was valid for fixing the amount of the redeeming shareholders' debt. *Id.* ¶ 28 (citing *Migani*). The Privy Council then concluded that the redemption payments were unlawful because they were capital payments made by an insolvent company. *Id.* ¶ 57. In addition, it was a breach of trust by the directors to authorize the redemption payments if the company was insolvent. *Id.* ¶ 59.

It did not follow, however, that the inflated, illegal redemption payments could be recovered. The redemption itself was lawful and effective, and the resulting debt was incurred in consideration of the surrender of the shares and the cancellation of the debt. *Id.* The redemption payment, although itself unlawful, discharged a lawful debt owed to the redeeming shareholders that arose at the time of the redemption. *Id.* ¶ 61. Consequently, for the reasons stated in *Migani* and other cases, the payees were not unjustly enriched. *Id.* ¶ 62. Carving out an exception where the payee was aware of the

- 30 -

directors' breach of trust, the Privy Council summarized its holding in the following

manner:

> The Board concludes that the company is not entitled to recover the
> payments at common law on the ground of unjust enrichment. The reality
> of the present case is that a payment has been received from a company for
> lawful consideration but it has been authorised by its directors in breach of
> their duties to the company. This is the proper domain of the law of
> constructive trusts. Not even in return for good consideration can a
> person retain assets which he knows to have been paid to him in breach of
> the statutory duties of the directors.

*Id.* ¶ 64.

The same principles require the dismissal of the Liquidators' Common

Law Claims with the one exception noted by *DD Growth*. A contract arose at the

time that the Defendants served their notices of redemption. At that moment,

they were entitled to be paid the NAV per share computed in accordance with

Article 11(1) in exchange for their shares. If the certificates were issued in bad

faith, the redeemers were free to contest the redemption price and insist on more.

But once the Funds discharged their debts by making the redemption payments

and the Defendants discharged their obligations by surrendering their shares,

neither side could revisit the NAV based on hindsight. To allow otherwise would

create the unworkable situation identified by *Migani*, *Weavering* and *DD

Growth.* The only exception allows the Liquidators to impose a constructive trust

as to any Defendant who received a redemption payment and knew that the

Fund's BLMIS investments were worthless or nearly worthless.

Separately, the Defendants contend that the doctrine *ex turpi causa non oritur

actio* ("*ex turpi*") bars the Liquidators' claims. Over 200 years ago, Lord Mansfield

wrote that "[n]o court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act." *Holman v. Johnson*, (1775) 1 Cowp 341, 343.[29]  *Ex turpi* expresses Lord Mansfield's maxim that, in modern terms, "precludes a party to a contract tainted by illegality from recovering money paid under the contract from the other party under the law of unjust enrichment." *Patel v. Mirza*, [2016] UKSC 42, ¶ 9.[30] According to the Defendants, the success of the Liquidators' claims depends on Citco's dishonest and, possibly, criminal conduct which is attributed to the Funds. (*Mortimore I Declaration* ¶¶ 95, 97.)  The Liquidators respond that there is nothing illegal or immoral in paying a redemption request or seeking to recover it based on the facts alleged regarding Citco's bad faith. (*Moss II Declaration* ¶¶ 95, 96, 99(a).) Furthermore, even if the doctrine *ex turpi* applied, Citco's bad faith would not be attributable to the Funds. (*Id.* ¶ 97(a).)  The primary victims of Citco's bad faith were the Funds and the remaining shareholders; the Defendants actually benefitted from Citco's bad faith. (*Id.* ¶ 99(b).)

Ex turpi* is a flexible doctrine.  The party seeking relief must initially show that it is entitled to restitution because the defendant has been unjustly enriched. *Patel* ¶ 116. *Ex turpi* does not itself create a right to restitution. *DD Growth* ¶ 63.  If the plaintiff establishes its *prima facie* case, the Defendant may then assert the doctrine *ex turpi* to bar recovery, and the Court must consider several factors in determining whether public interest would be harmed by allowing the claim to proceed:

---

[29]     A copy of *Holman v. Johnson* is annexed as Exhibit 36 to the *Moss II Declaration*.

[30]     A copy of *Patel v. Mirza* is annexed as Exhibit 41 of the *Mortimore I Declaration* and as Exhibit 57 to the *Moss II Declaration.*

> In assessing whether the public interest would be harmed in that way, it is necessary a) to consider the underlying purpose of the prohibition which has been transgressed and whether that purpose will be enhanced by denial of the claim, b) to consider any other relevant public policy on which the denial of the claim may have an impact and c) to consider whether denial of the claim would be a proportionate response to the illegality, bearing in mind that punishment is a matter for the criminal courts.

*Patel* ¶ 120; *accord id.* ¶ 107 ("I would not attempt to lay down a prescriptive or definitive list because of the infinite possible variety of cases. Potentially relevant factors include the seriousness of the conduct, its centrality to the contract, whether it was intentional and whether there was marked disparity in the parties' respective culpability.").

Ex turpi does not bar the Liquidators' claims. The Defendants were not unjustly enriched for the reasons already stated, but even if they had been, the Liquidators do not plead illegal or immoral conduct sufficient to trigger the doctrine. Clearly, the contract to redeem under the Articles was not illegal. Furthermore, although the Directors were prohibited from paying redemptions out of capital or in breach of trust, the redemption payments themselves were lawful and discharged the Funds' valid obligations.[31] *DD Growth* ¶¶ 58, 61. That the redemption prices were based on bad faith certificates did not render the payments unlawful any more than did the fraud and illegality described in *DD Growth*.

Furthermore, the Liquidators' assertion of Citco's bad faith as a reason to recover the inflated redemption payments is self-defeating. The Articles state that for purposes

---

[31] In a footnote, the Defendants assert that the allegations of Citco's bad faith describe illegal conduct under two BVI criminal statutes and one UK criminal statute. (*See Mortimore I Declaration* ¶ 95 n. 100). They have failed to explain how Citco's alleged bad faith satisfied the elements of these statutes.

of fixing the subscription and redemption prices, the NAV "*shall be determined by the Directors . . . .*" (Article 11(1)(a) (emphasis added).) The Funds delegated this task to Citco, who served as the Funds' administrator "under the overall direction of the Directors," (*Migani* ¶ 14 (quoting Sentry's Private Placement Memorandum)), but the Directors, not Citco, bore the responsibility for calculating the NAV per share. Accordingly, in considering whether the certificates were issued in good faith "by or on behalf of the Directors," and therefore binding, (Article 11(1)(c)), it is the Directors' good faith, not Citco's, that is relevant. Moreover, Citco's knowledge and conduct will be imputed to its principal, *i.e.*, the Funds, and the Funds are bound by its acts even if Citco acted fraudulently or in its own interests. *Bilta (UK) Ltd. v. Nazir*, [2016] AC 1, ¶ 181 ("In most circumstances the acts and state of mind of its directors and agents can be attributed to a company by applying the rules of the law of agency.") (Lords Toulson and Hodge, concurring)[32]; (*Mortimore I Declaration* ¶¶ 76-77 & n. 81 ("An act of an agent within the scope of his apparent authority does not cease to bind his principal merely because the agent was acting fraudulently and in furtherance of his own interests.") (quoting BOWSTEAD AND REYNOLDS ON AGENCY § 8-062 (20th ed. 2016)); *Moss I Declaration* ¶ 43 ("Knowledge gained by an employee or other agent while acting in the course of his employment for his principal will ordinarily be attributed to his principal.") (citing BOWSTEAD AND REYNOLDS ON AGENCY ¶ 8-207 (20th ed.)).)

If the Directors knew the NAVs were inflated based on BLMIS' fraud, either directly or through the imputation of Citco's knowledge, but nonetheless breached their

---

[32] A copy of *Bilta v. Nazir* is annexed to the *Mortimore I Declaration* as Exhibit 8 and the *Moss II Declaration* as Exhibit 16.

fiduciary duties to the other shareholders by authorizing the payment of inflated

redemption prices, the Funds cannot rely on their own misconduct to recover the

inflated redemption payments.[33]  *Weavering* ¶ 29; *Kingate Global Fund Ltd. v. Kingate*

*Mgmt. Ltd.,* [2015] SC (Bda) 65 Com ("*Kingate*") ¶ 157 (discussing the general principle

"that a party will not generally be entitled to take advantage of his own breach of

contract as against the other party.")[34]; *accord Moss II Declaration* ¶ 81 ("It is a

principle of English/BVI law that a contract will generally be construed in such a way as

to prevent a party from taking advantage of its own wrong.").[35]

      If, on the other hand, Citco's bad faith is not imputed to the Directors or the

Funds, the Liquidators are still not entitled to recover the redemption payments.  In that

event, the Directors would have been duped by Citco and BLMIS when they authorized

the excessive redemption payments.  This scenario is merely a variation of the "mistake"

---

[33]    The Liquidators allege that the Funds were unaware of the Madoff fraud and inflated NAV at the time of the redemptions.  (*Proposed Citigroup Complaint* ¶¶ 35, 128, 137.)  If the Funds gave the certificates in good faith, the Liquidators cannot argue that they were given in bad faith.

[34]    A copy of *Kingate* is annexed to the *Mortimore I Declaration* as Exhibit 31 and the *Moss II Declaration* as Exhibit 44.

[35]    *Lipkin Gorman v Karpnale*, [1991] 2 AC 548, (a copy of which is annexed to the *Moss II Declaration* as Exhibit 47) which the Liquidators cite for the proposition that the dishonest agent's knowledge is not imputed to defeat a restitution claim, (*see Moss II Declaration* ¶ 89(b)), is wholly inapposite.  There, a partner in a law firm stole the firm's client funds and lost most of what he stole gambling at a London club.  The firm sued the club to recover the stolen funds.  In ruling for the firm, the House of Lords concluded that the partner was a thief, the gambling contract by which the club acquired the money was void under English law and the club gave no consideration for the stolen funds.  It stood in the shoes of an innocent donee that received a contribution consisting of stolen property and had to return the stolen funds less the winnings paid to the partner.  The imputation or attribution of the partner's dishonesty to the law firm was not an issue in the case, and no one suggested that the theft of client funds was an act within the scope of the partner's agency.

    In contrast, the contract that required the Funds to redeem the shares at the NAV was a lawful contract.  Furthermore, the computation of the NAV, though erroneous in hindsight, was an authorized act, and the Liquidators cannot dispute the validity and genuineness of the certificate.  *See* BVI BUSINESS COMPANIES ACT, 2004 § 31.  Moreover, the payment of the redemption as computed by the erroneous NAV was an authorized and contractually required act, and the Defendants gave good consideration for their redemptions.  Finally, the Liquidators cannot restore the Defendants to the status quo.

claims rejected by the *Migani* courts. *See Kingate* ¶¶ 153-54 (If the Administrator of BLMIS feeder funds rather than the funds mistakenly calculated the NAV, "the Funds mistake was to believe the information supplied by BLMIS was correct.").

*Kingate*, on which the Liquidators rely, (*see Moss II Declaration* ¶ 69), does not support the proposition that Citco's bad faith allows them to recover the redemption payments through the Common Law Claims. In *Kingate*, the liquidators of two BLMIS feeder funds (the "Kingate Funds") sued their manager (KML) and others to recover excessive management fees. The management fees were determined by the Kingate Funds' Administrator, a different entity, based on the NAV computed at the time. As with the Fairfield Funds, the NAV did not reflect the "true" value which only became apparent after the revelation of BLMIS' fraud.

The relevant agreements provided that the valuations made pursuant to the articles were binding on all persons in the absence of "bad faith or manifest error." *See Kingate* ¶ 42. The case proceeded on the trial of seven inter-related preliminary issues. In each instance, the defendants *conceded* that the Liquidators were entitled to recover the excess payments if the NAVs were tainted by bad faith or manifest error. *Id.* ¶ 75 ("The Defendants submit that . . . absent bad faith or manifest error KML was entitled to be paid 1.5% of the NAV as determined at the time by the Administrator."); *id.* ¶ 108 (Mr. Boyle, one of the counsel for other defendants, submitted that bad faith or manifest error were the only circumstances in which valuations would not be binding); *id.* ¶ 120 (accepting the submission of Mr. Lowe, counsel for other defendants, "that absent bad faith or manifest error the Court should not look behind the ostensible NAV determination to enquire whether that determination was actual or merely purported.").

- 36 -

The issue was not litigated and the *Kingate* Court declared, adopting the parties'
positions, that "the Administrator's determinations of the NAV were binding on the
Funds for the purpose of calculating the fees due to KML pursuant to the Manager
Agreements in force between the Funds and KML, in the absence of bad faith or
manifest error." *Id.* ¶ 116.

The *Kingate* Court did not rule that bad faith or manifestly erroneous valuations
allowed the liquidators to recover the management fees; instead, the defendants
conceded the point, at least for the purposes of the preliminary issues. Furthermore, the
*Kingate* Court did not consider whether the Administrator's manifest error (the
liquidators did not plead bad faith) would be imputed, and if so, what that meant.

Each of the Common Law Claims alleging unjust enrichment, money had and
received and mistaken payment (First through Sixth Claims) asserts that because the
Funds overpaid the redemption prices considering the "true facts," the Defendants did
not give "valuable consideration." (*Proposed Citigroup Complaint* ¶¶ 96, 103, 109, 118,
129, 138).) This assumption is wrong. The Defendants gave the consideration required
by their contracts with the Funds when they surrendered their shares in exchange for
the Funds' discharge of their contractual redemption obligations.[36] Moreover, finality
and certainty are necessary to make the redemption scheme "workable," and
accordingly, if a valuation is "purportedly made" in compliance with the redemption
scheme and the transaction is consummated, the valuation cannot be attacked at a
future date based on the subsequent discovery of additional facts. *See Weavering* ¶ 29

---

[36] In addition, the Defendants gave "valuable consideration" when they purchased their shares at
inflated subscription prices because of the same BLMIS Ponzi scheme.

("That is the purpose of article 34, which is to be construed as referring to a valuation purportedly made in compliance with the articles. Otherwise, the problems identified in paragraph (23) of the judgment in *Fairfield Sentry* will arise."). The suggestion that the subsequent disclosure of facts indicating that the valuation was made in bad faith vitiates the contract and requires restitution lacks support. The only exception concerns the Knowledge Defendants that received redemption payments with the knowledge that the NAV was wrong. In those circumstances, the Liquidators may seek to impose a constructive trust. *DD Growth* ¶ 64.

## C.    The Contract Claims

The Articles do not state that the Funds can recover inflated redemption payments. Instead, the Liquidators argue that the term must be implied. The Twelfth Claim alleges that at any time prior to the issuance of a good faith certificate, the redemption price is subject to adjustment, and the Articles contained an implied term permitting the Fund to recover any overpayments based, *inter alia*, on obviousness, business efficiency and the reasonable expectation of the parties. (*Proposed Citigroup Complaint* ¶ 193.) The Thirteenth Claim, based on breach of the implied covenant of good faith and fair dealing, alleges that the Defendant denied the Fund the benefit of its bargain by retaining the inflated redemption payment. (*Id.* ¶ 203.)

In *Attorney General of Belize v. Belize Telecom Ltd.*, [2009] 1 WLR 1988, Lord Hoffman summarized the principles that govern the implication of terms in a contract:

> The question of implication arises when the instrument does not expressly provide for what is to happen when some event occurs. The most usual inference in such a case is that nothing is to happen. If the parties had intended something to happen, the instrument would have said so. Otherwise, the express provisions of the instrument are to continue to

operate undisturbed.  If the event has caused loss to one or other of the parties, the loss lies where it falls.

In some cases, however, the reasonable addressee would understand the instrument to mean something else.  He would consider that the only meaning consistent with the other provisions of the instrument, read against the relevant background, is that something is to happen.  The event in question is to affect the rights of the parties.  The instrument may not have expressly said so, but this is what it must mean.  In such a case, it is said that the court implies a term as to what will happen if the event in question occurs.  But the implication of the term is not an addition to the instrument.  It only spells out what the instrument means.

. . . . .

It follows that in every case in which it is said that some provision ought to be implied in an instrument, the question for the court is whether such a provision would spell out in express words what the instrument, read against the relevant background, would reasonably be understood to mean. . . .

*Id.* ¶ 17, 18, 21.

Given the interests identified in *Migani*, it is neither obvious nor efficient nor consistent with the parties' expectations to imply that subscribers, redeemers or the Funds agreed to open-ended liability based on hindsight for incorrectly stated NAVs. The Funds computed the NAV and paid the redemption price, and the Defendants surrendered their shares.  Each party discharged its contractual obligations under the Articles, the transaction was consummated and there is no return to the status quo.  The Liquidators seek to imply a term that would, in *Migani*'s words, render the scheme unworkable.  *See Weavering* ¶ 23 ("The argument advanced by SEB was equivalent to an argument rejected in *Fairfield Sentry* as 'impossible.'  Properly construed, the articles required the published NAV to be binding in respect of both acquisition and redemption of shares: they could not be construed as conferring on the Company an ability to adjust the NAV from time to time in the light of new information.  Such an approach to the articles would render the rights of shareholders entirely uncertain.").

- 39 -

Similarly, there is no basis to imply a term that requires a Defendant to return an overpayment where the very principles of unjust enrichment invoked by the Liquidators allow it to keep that payment. Accordingly, the Contract Claims are dismissed.

## D. The BVI Avoidance Claims

The Liquidators assert claims under sections 245 and 246 of the INSOLVENCY ACT.[37] Section 245 resembles Bankruptcy Code § 547(b) and allows a liquidator to set aside an unfair preference. *See* INSOLVENCY ACT § 245 (authorizing avoidance of a transfer made (i) when the debtor was insolvent or rendered insolvent, (ii) during the "vulnerability period,"[38] (iii) that put the creditor in a better position than if the transfer had not been made and the company was liquidated). Section 246 allows a liquidator to avoid an undervalue transaction, which is similar to a constructive fraudulent transfer under state and federal law. *See* INSOLVENCY ACT § 246 (authorizing avoidance of a transfer made (i) when the debtor was insolvent or rendered insolvent, (ii) during the "vulnerability period," (iii) for which the debtor received no consideration or consideration worth significantly less in value than it provided). If the transaction is voidable, the Court "may make an order setting aside the transaction in whole or in part," INSOLVENCY ACT § 249(1)(a), and "require any person to pay, in respect of benefits received by him from the company, such sums to the liquidator as the Court may direct." INSOLVENCY ACT § 249(2)(d).

---

[37] The pertinent provisions of the INSOLVENCY ACT are attached as Exhibit 97 to the *Moss II Declaration*.

[38] The "vulnerability period" or length of the reach back period depends on whether the transferee is a "connected person," *i.e.*, an insider. Unless the transferee is a "connected person," the "vulnerability period" is six months "prior to the onset of insolvency and ending on the appointment of the administrator or, if the company is in liquidation, the liquidator." INSOLVENCY ACT § 244(1).

The Defendants raise several objections to the BVI Avoidance Claims, but only the objection under the Bankruptcy Code requires an extended discussion.

### 1. The Court Lacks the Power to Grant Relief

The Defendants contend that this Court cannot grant the statutory remedies available under the Insolvency Act. (*Defendants Motion* at 69-70.) This argument was expressly rejected by the ECCA. *ECCA 273 Decision* ¶¶ 80-81.

### 2. The Defendants Were Not Creditors

The Defendants argue that the Funds could not have preferred them as creditors under section 245 because they were members rather than creditors when the Funds became obligated to pay them. In addition, the BVI liquidation rules subordinated the members to the creditors. (*Defendants Motion* at 62-63 & n. 43.) As discussed earlier, the Defendants became creditors when they requested redemptions. In addition, the Funds were not in liquidation when they paid the redemptions, and the liquidation priorities are irrelevant.

### 3. The Defendants Gave Sufficient Consideration

An undervalue transaction requires the plaintiff to plead and ultimately prove, *inter alia*, that the transferor received nothing or "significantly less" in exchange for the value it transferred. INSOLVENCY ACT § 246(1)(b). Relying on a market value approach, the Defendants contend that the redemption prices they received reflected the value of the shares they surrendered. (*Defendants Motion* at 64.) The NAV per share, as calculated at the time, reflected the price that a well-informed purchaser of shares or redeemer of shares would accept to purchase or redeem. Thus, the NAV per share as

- 41 -

calculated at the time represented the open market value of the shares. The Liquidators respond, *inter alia*, that the true value of the Funds' assets and the shares were nil, and the Court can look to subsequent information to determine the true value of the consideration the Funds received in exchange for the redemption payments. (*Liquidators Reply* at 27-30.) The parties' dispute turns on whether value can be determined based on hindsight in connection with the determination of an avoidance claim.

*Phillips v. Brewin Dolphin Bell Lawrie*, [2001] BCC 864 provides a qualified, affirmative answer.[39] There, the debtor sold its business to the defendant. For tax reasons, the price was structured in two parts. First, the defendant assumed certain obligations of the debtor. Second, the defendant's parent agreed to rent the debtor's leased computers and pay four annual installments of rent. The rental payments formed most of the purchase price.

At the time of the transaction, the value of the stream of rental payments was uncertain because the master computer leases absolutely prohibited the debtor from subleasing the computer equipment. *Id.* ¶ 22. After the transaction closed, the master lessors terminated the computer leases based on the unauthorized transfers, and the defendant's parent refused to make the rental payments.

The debtor went into liquidation, and the liquidator sued the defendant, challenging the transfer of the debtor's business as an undervalue transaction pursuant

---

[39]     A copy of *Phillips v. Brewin Dolphin Bell Lawrie Limited* is annexed as Exhibit 43 to the *Mortimore I Declaration* and Exhibit 59 to the *Moss II Declaration*.

to section 238 of the U.K. Insolvency Act.  The House of Lords, per Lord Scott, initially

concluded that the purchase price for the debtor's assets included the obligations

assumed by the defendant and the lease payments the defendant's parent agreed to

make.  *Id.* ¶ 20.  One of the questions was what value to place on the parent's covenant

to make the lease payments which became worthless when the master lessors

repossessed the computers after the sale transaction had closed.

Lord Scott ruled that under the circumstances of the case, he could consider

events that occurred after the closing which shed light on the value of the consideration

given at the time of the closing.  The survival of the sublease covenant was uncertain at

the time it was given because the sublease violated the master lease.  Where the

contingency that rendered value uncertain actually occurs, it is "unsatisfactory and

unnecessary for the court to wear blinkers and pretend that it does not know what has

happened."  *Id.* ¶ 26.  Thus, when considering "the valuation of the consideration for

which a company has entered into a transaction, reality should, in my opinion, be given

precedence over speculation.  I would hold, taking into account of the events that took

place [after the closing] that the value of [the] . . . covenant in the sublease . . . was nil."

*Id.*; *cf. Adelphia Recovery Tr. v. FPL Grp., Inc.* (*In re Adelphia Commc'ns Corp.*), 512

B.R. 447, 495 (Bankr. S.D.N.Y. 2014) ("Though courts must determine solvency free of

impermissible hindsight, courts may consider information originating subsequent to the

transfer date if it tends to shed light on a fair and accurate assessment of the asset or

liability as of the pertinent date, which assures that the valuation is based in reality.

Subsequent discovery of fraud is appropriately considered when determining the real

financial condition of the company at the time of the transfer.") (footnotes, internal

quotation marks and citations omitted), *aff'd*, Civil Case No. 14–CV–5532 (VEC), 2015 WL 1208588 (S.D.N.Y. Mar. 17, 2015), *aff'd*, 652 F. App'x 19 (2d Cir. 2016); *Mishkin v. Ensminger* (*In re Adler Coleman Clearing Corp.*), 247 B.R. 51, 111 (Bankr. S.D.N.Y. 1999) ("We may consider evidence uncovered after the advent of bankruptcy to determine the value of the debtor's assets at the time the alleged insolvency occurred."), *aff'd*, 263 B.R. 406 (S.D.N.Y. 2001).

The *Phillips* case is not directly on point.  It dealt with a situation where the value of the covenant to lease computer equipment was uncertain at the time it was given, and a post transaction event resolved the uncertainty and rendered the covenant worthless. It did not establish a general rule that a court may value an asset with the benefit of hindsight.  *See Joiner v. George*, [2003] BCC 298, ¶ 71.[40]  The Liquidators' case does not deal with a post-transaction event that fixed the actual value of consideration that was uncertain at the time it was given.  According to the Liquidators, the Defendants' shares were always worthless.  Instead, it concerns a pre-existing state of facts that was not discovered until after the redemption transaction was completed.

Nevertheless, *Phillips* implies that when the value of consideration is uncertain at the time it is given, and a subsequent event eliminates the uncertainty and fixes the actual value, the Court may consider the value of the consideration with the benefit of that hindsight in deciding an undervalue avoidance claim.  In addition, the uncertainty must be within the knowledge of the party giving the consideration, although *Phillips* does not make clear whether the knowledge must be objective or subjective.  At one

---

[40]     *Joiner v. George* is annexed as Exhibit 29 to the *Mortimore I Declaration* and Exhibit 43 to the *Moss II Declaration*.

point, the Court implied that the obligors were aware of the uncertain value of the future

lease payments, *id.* ¶ 22, but at other points, the Court seemed to suggest that objective

uncertainty was sufficient. *See id.* ¶¶ 25, 26. Accordingly, to take advantage of the rule

laid down in *Phillips*, the Liquidators must plead, at a minimum, that at the time of a

redemption, a Defendant had reason to believe that the NAVs were inflated and the

Defendant's shares were worthless. The Liquidators contend that the Knowledge

Defendants knew or should have known that the NAVs were inflated because of

Madoff's fraud, (*see Proposed Citigroup Complaint* ¶¶ 71-81), and if this turns out to be

the case,[41] the Court should not wear "blinkers" and attribute a value that these

Defendants thought was precarious.[42]

### 4. The Redemptions Did Not Injure the Funds

The Defendants also contend that the redemptions did not injure the Funds.

They argue that the value of their BLMIS portfolio and the subscription and redemption

prices were inflated to the same degree as a result of Madoff's fraud. Thus, as long as

the BLMIS fraud was ongoing, the Funds could raise more money through equally

inflated subscription payments. (*Defendants Motion* at 58-61.) Arguably, Sentry could

also redeem all or part of its investment in its BLMIS account and use those withdrawals

---

[41]    The Court is not passing on the legal sufficiency of these allegations.

[42]    It is important to distinguish between the value of consideration when dealing with the Contract
and Common Law Claims on the one hand, and the BVI Avoidance Claims on the other. The Defendants
gave sufficient consideration for contract purposes when they surrendered their shares and gave up their
rights as shareholders in the Funds at the time of the redemptions. The consideration they surrendered
may still be "significantly less" and support an undervalue avoidance claim under INSOLVENCY ACT § 246.
*Cf. In re Asia Global Crossing, Ltd.*, 344 B.R. 247, 253 (Bankr. S.D.N.Y. 2006) (comparing consideration
that will support a contract and "fair consideration" under New York's fraudulent conveyance law and
concluding that the constructively fraudulent nature of an obligation does not render it unenforceable
under non-bankruptcy law).

to satisfy its own investors' redemption requests, including redemptions by Lambda and Sigma.

The argument is unpersuasive. Although the Funds themselves were not operated as Ponzi schemes, the withdrawal of money based on inflated NAVs had the same effect. Each redemption at an inflated price drove the Funds deeper into insolvency and caused harm to the Funds and the remaining investors that did not redeem their investments.

### 5.    The Funds Were Not Insolvent

Both BVI Avoidance Claims require the Liquidators to prove that each redemption was made when the Fund was insolvent or was rendered insolvent. Section 244(3) of the INSOLVENCY ACT incorporates the definition of "insolvent" contained in INSOLVENCY ACT § 8(1), excluding paragraph (c)(i) of that section. For present purposes, "insolvent" means "the company is unable to pay its debts as they fall due." INSOLVENCY ACT § 8(1)(c)(ii). "Liabilities" include future, certain, contingent, fixed or liquidated liabilities, but do not include illegal or unenforceable liabilities. INSOLVENCY ACT § 10(2), (3). The excluded subparagraph refers to balance sheet insolvency ("the value company's liabilities exceeds its assets"). The Defendants argue that the Funds have alleged that they were able to pay their liabilities as they came due, (*Proposed Citigroup Complaint* ¶ 164), and hence, have pled themselves out of their claims. (*Defendants Motion* at 65-66.)

The Defendants mischaracterize the Liquidators' pleadings. In fact, the Liquidators allege that the Funds were unable to pay their debts as they fell or would fall

- 46 -

due.  (*Proposed Citigroup Complaint* ¶¶ 11, 39.)  The Defendants ignore these
allegations, and quote the portion of the Liquidators' pleading alleging that the Funds
"were only able to pay debts falling due" because they could redeem their investments in
the BLMIS Ponzi scheme or use incoming subscriptions.  (*Id.* ¶ 164.)  Liabilities include
future and contingent debts, including redemption debts (no one invests forever), and
once the BLMIS Ponzi scheme collapsed, as it did, the Funds had few if any assets to pay
any liabilities.  In the end, insolvency is a question of fact.

### 6.  The Liquidators' Plead Complete Defenses

### a.  Ordinary Course of Business

"[A] complaint can be dismissed for failure to state a claim pursuant to a Rule
12(b)(6) motion raising an affirmative defense if the defense appears on the face of the
complaint."  *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers &*
*Lybrand, LLP*, 322 F.3d 147, 158 (2d Cir. 2003) (internal quotation marks and citation
omitted).  A transaction is not an unfair preference if it took place in the ordinary course
of business.  INSOLVENCY ACT § 245(2).  The Defendants contend that the redemption of
shares and the payment of the redemption price is an ordinary business transaction.
(*Defendants Motion* at 66-67.)

While the Funds may have redeemed shares in the ordinary course of the Funds'
business, it does not follow that they made the redemptions at issue in the ordinary
course of business.  In fact, the Liquidators allege that the Funds made the redemptions
based on bad faith and erroneous valuations.  At bottom, whether each redemption
payment was made in the ordinary course of business is a factual question that cannot
be resolved in the context of motions to dismiss.

### b. Good Faith

A company does not enter into an undervalue transaction if enters into the transaction in good faith, and at the time, there were reasonable grounds to believe that the transaction would benefit the company. INSOLVENCY ACT § 246(2). The Defendants maintain that the Liquidators' pleadings establish this defense. The Liquidators plead that the Funds were victims of the BLMIS fraud, and redeeming shares was part of the Funds' essential business and basic contractual obligations. (*Defendants Motion* at 66-69.) Having concluded that Citco's bad faith is imputed to the Funds, the Court cannot conclude that the redemption of shares at inflated NAVs was made in good faith or that it was reasonable to believe at the time of the redemption payments that they would benefit the Funds. At best, this argument is premature.

## D. Sections 546(e) and 561(d) of the Bankruptcy Code

### 1. Introduction

The Defendants contend that the safe harbor provision under 11 U.S.C. § 546(e)[43] is a complete defense to the claims asserted against them in the U.S. Redeemer Actions. Section 546(e) of the Bankruptcy Code operates as an exception to the bankruptcy trustee's avoidance powers. *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 893-94 (2018) ("*Merit*"). The safe harbor prevents a trustee from avoiding, *inter*

---

[43] Section 546(e) of the Bankruptcy Code provides in pertinent part:

Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a . . . settlement payment, as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a . . . financial institution [or] financial participant . . . , or that is a transfer made by or to (or for the benefit of) a . . . financial institution [or] financial participant . . . in connection with a securities contract, as defined in section 741(7) . . . . , that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

- 48 -

*alia*, a pre-petition transfer (i) that is a "settlement payment" made by, to or for the

benefit of a financial institution[44] or financial participant,[45] or (ii) made by, to or for the

benefit of a financial institution or financial participant in connection with a "securities

contract," unless the transfer was intentionally fraudulent within the meaning of section

548(a)(1)(A). *See* 11 U.S.C. § 546(e). I refer to the type of transfer protected by section

546(e) as a Covered Transaction.

The section 546(e) safe harbor is an affirmative defense as to which the

Defendants bear the burden of proof. *Tronox Inc. v. Kerr McGee Corp.* (*In re Tronox

Inc.*), 503 B.R. 239, 339 (Bankr. S.D.N.Y. 2013) ("§ 546(e) is a classic affirmative

defense"; "[c]ases construing § 546(e) have uniformly treated it as an affirmative

---

[44]     A "financial institution" means

       (A) a Federal reserve bank, or an entity that is a commercial or savings bank,
industrial savings bank, savings and loan association, trust company, federally-insured
credit union, or receiver, liquidating agent, or conservator for such entity and, when any
such Federal reserve bank, receiver, liquidating agent, conservator or entity is acting as
agent or custodian for a customer (whether or not a "customer", as defined in section 741)
in connection with a securities contract (as defined in section 741) such customer; or

       (B) in connection with a securities contract (as defined in section 741) an
investment company registered under the Investment Company Act of 1940.

11 U.S.C. § 101(22).

[45]     A "financial participant" means

       (A) an entity that, at the time it enters into a securities contract, commodity
contract, swap agreement, repurchase agreement, or forward contract, or at the time of
the date of the filing of the petition, has one or more agreements or transactions
described in paragraphs (1), (2), (3), (4), (5), or (6) of section 561(a) with the debtor or
any other entity (other than an affiliate) of a total gross dollar value of not less than
$1,000,000,000 in notional or actual principal amount outstanding (aggregated across
counterparties) at such time or on any day during the 15-month period preceding the date
of filing of the petition, or has gross mark-to-market positions of not less than
$100,000,000 (aggregated across counterparties) in one or more such agreements or
transactions with the debtor or any other entity (other than an affiliate) at such time or on
any day during the 15-month period preceding the date of the filing of the petition; or

       (b) a clearing organization (as defined in section 402 of the Federal Deposit
Insurance Corporation Improvement Act of 1991).

11 U.S.C. § 101(22A).

defense") (citations omitted); *accord Picard v. Merkin* (*In re BLMIS*), No. 11 MC 0012
(KMW), 2011 WL 3897970, at *12 (S.D.N.Y. Aug. 31, 2011); *Grayson Consulting, Inc. v.
Wachovia Sec., LLC* (*In re Derivium Capital, LLC*), 437 B.R. 798, 812 (Bankr. D.S.C.
2010), *aff'd*, 716 F.3d 355 (4th Cir. 2013); *Official Comm. of Unsecured Creditors v.
Boveri* (*In re Grand Eagle Cos., Inc.*), 288 B.R. 484, 494-95 (Bankr. N.D. Ohio 2003);
*contra SIPC v. BLMIS* (*In re BLMIS*), No. 12 MC 115 (JSR), 2013 WL 1609154, at *4
(S.D.N.Y. Apr. 15, 2013) (placing the burden of proof on the plaintiff to prove the non-
application of section 546(e) in actions to avoid and recover pre-petition transfers made
to customers of a brokerage in liquidation under the Securities Investor Protection Act,
15 U.S.C. §§ 78aaa *et seq.*).

Section 546(e) was designed to protect against the ripple effect of requiring a
transferee to "repay amounts received in settled securities transactions," which could
leave the transferee with "insufficient capital or liquidity to meet its current securities
trading obligations, placing other market participants and the securities markets
themselves at risk."  *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.* (*In re
Enron Creditors Recovery Corp.*), 651 F.3d 329, 334 (2d Cir. 2011); *see also In re
Tribune Co. Fraudulent Conveyance Litig.*, 818 F.3d 98, 120-21 (2d Cir. 2016) (Section
546(e)'s "larger purpose was to promote finality and certainty for investors, by limiting
the circumstances, e.g., to cases of intentional fraud, under which securities transactions
could be unwound") (alterations and quotations omitted),[46] *petition for cert. filed*, No.

---

[46]     Bankruptcy Code § 546(g) provides a similar safe harbor regarding swap agreements.  *See Whyte
v. Barclays Bank PLC*, 644 F. App'x 60 (2d Cir. 2016) (summary order); *cert. denied*, 137 S. Ct. 2114
(2017).  To the extent that the Liquidators are seeking to avoid and recover redemption payments made in
connection with swap agreements, the same principles apply.

16-317 (U.S. Sept. 12, 2016), *cert. deferred*, 138 S. Ct. 1162 (2018), *mandate recalled*,

No. 13-3992(L) (2d Cir. May 15, 2018).

Section 561(d) of the Bankruptcy Code extends the 546(e) safe harbor to

proceedings brought by a foreign representative in a chapter 15 case "to the same extent

as in a proceeding under chapter 7 or 11 of this title."  It provides:

> Any provisions of this title relating to securities contracts, commodity
> contracts, forward contracts, repurchase agreements, swap agreements, or
> master netting agreements shall apply in a case under chapter 15, so that
> enforcement of contractual provisions of such contracts and agreements in
> accordance with their terms will not be stayed or otherwise limited by
> operation of any provision of this title or by order of a court in any case
> under this title, *and to limit avoidance powers to the same extent as in a
> proceeding under chapter 7 or 11 of this title (such enforcement not to be
> limited based on the presence or absence of assets of the debtor in the
> United States).*

11 U.S.C. § 561(d) (emphasis added) (the concluding, italicized parenthetical is referred

to as the "Enforcement Parenthetical").  Relying on the "plain text" of section 561(d), the

Defendants argue that it makes section 546(e) apply extraterritorially to bar the

Liquidators' avoidance claims as well as their common law claims.  (*Defendants Motion*

at 36-37.)

Not surprisingly, the Liquidators disagree.  They acknowledge that the safe

harbor in section 546(e) bars certain avoidance claims brought by a chapter 7 or chapter

11 trustee, but argue that section 546(e) does not apply extraterritorially, and section

561(d) does no more than make section 546(e) equally applicable (or inapplicable) in a

chapter 15.  They reason that since section 546(e) does not apply extraterritorially to an

action by a chapter 7 or a chapter 11 trustee to avoid a foreign transfer, it does not apply

to an action brought by foreign representatives like those brought by the Liquidators in

the U.S. Redeemer Actions. (*Liquidators Reply* at 61-62.) Furthermore, even if the Enforcement Parenthetical extended the enforcement of contractual Close-Out Rights[47] to collateral located abroad, the Defendants are not seeking to exercise Close-Out Rights; the Liquidators are seeking to avoid transfers. The Enforcement Parenthetical simply clarifies that provisions affecting enforcement of Close-Out Rights apply irrespective of whether the assets of the foreign debtor are present in the United States, but property transferred to a third party prior to a bankruptcy case is neither property of the estate[48] nor property of the debtor when the case is commenced. Therefore, in the Liquidators' claim to avoid a transfer made by the debtor, the property transferred is not an "asset of the debtor" within the Enforcement Parenthetical. (*Id.* at 62-63.) Finally, interpreting section 561(d) to extend the safe harbor to foreign transfers would undermine chapter 15's goal of granting relief to a foreign main proceeding by allowing a Defendant who has received a foreign transfer to assert U.S. bankruptcy law to defeat a BVI avoidance action. (*Id.* at 63-64.)

### 2.  Extraterritoriality

The "presumption against extraterritoriality" is a "longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991) ("*Aramco*") (internal quotation marks and

---

[47] "Close-Out Rights" as used in this decision refers to the non-debtor's contractual right to cause the termination, liquidation, or acceleration of or to offset or net termination values, payment amounts, or other transfer obligations as set forth in 11 U.S.C. § 561.

[48] The filing of a petition for recognition under chapter 15 does not create an "estate" or "property of the estate." *See* 11 U.S.C. § 541(a) ("The commencement of a case under sections 301, 302, or 303 of this title creates an estate.").

citation omitted); *accord RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2100

(2016) ("*Nabisco*"); *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010)

("*Morrison*"). The presumption "serves to protect against unintended clashes between

our laws and those of other nations which could result in international discord."

*Aramco*, 499 U.S. at 248.

The presumption against extraterritoriality involves an exercise in statutory

interpretation and calls for a two-step analysis which can be examined in either order.

"At the first step, we ask whether the presumption against extraterritoriality has been

rebutted—that is, whether the statute gives a clear, affirmative indication that it applies

extraterritorially." *Nabisco*, 136 S. Ct. at 2101; *accord Morrison*, 561 U.S. at 255 ("When

a statute gives no clear indication of an extraterritorial application, it has none."). The

first step does not impose a "clear statement rule," because even absent a "clear

statement," the context of the statute can be consulted to give the most faithful reading.

*Morrison*, 561 U.S. at 265. If the first step yields the conclusion that the statute applies

extraterritorially, the inquiry ends.

If it does not, the court must turn to the second step in which the Court must

determine whether the case involves a domestic application of the statute, and we do

this by looking to the statute's "focus." If the conduct relevant to the statute's focus

occurred in the United States, then the case involves a permissible domestic application

even if other conduct occurred abroad; but if the conduct relevant to the focus occurred

in a foreign country, then the case involves an impermissible extraterritorial application

regardless of any other conduct that occurred in U.S. territory. *Nabisco*, 136 S. Ct. at

2101; *accord Morrison*, 561 U.S. at 266-67 (court must look to the "'focus' of

congressional concern," *i.e.*, the "objects of the statute's solicitude").

### 3. The Relationship Between sections 546(e) and 561(d)

Asking whether section 546(e) applies extraterritorially is the wrong question.[49]

The correct question is whether section 561(d) makes the safe harbor applicable to

proceedings brought by foreign representatives in a chapter 15 case seeking to avoid

purely foreign transfers under foreign insolvency laws. The plain text indicates that it

does. Section 561(d) serves two purposes. First, it prevents a foreign representative or a

U.S. bankruptcy court from interfering with the enforcement by a non-debtor

counterparty of its Close-Out Rights, and "such enforcement [is] not to be limited based

on the presence or absence of assets of the debtor in the United States." In other words,

the chapter 15 bankruptcy court cannot enjoin a party over which it has personal

jurisdiction from exercising its Close-Out Rights to foreclose on collateral regardless of

whether the collateral is located within or without the United States. The Liquidators

concede as much. (*Foreign Representatives' Supplemental Memorandum of Law*

*Addressing Bankruptcy Code Section 561(d) pursuant to February 1, 2018 Order of the*

---

[49] Presumably, section 546(e) will apply extraterritorially to the same extent that the chapter 5 avoidance provisions apply extraterritorially, an issue that has drawn divergent views. *Compare SIPC v. BLMIS* (*In re BLMIS*), 513 B.R. 222, 231 (S.D.N.Y. 2014) (Bankruptcy Code § 550(a) did not apply extraterritorially to permit recovery of foreign transfers), *supplemented by* No. 12-mc-115 (JSR), 2014 WL 3778155 (S.D.N.Y. July 28, 2014); *LaMonica v. CEVA Grp. PLC* (*In re CIL Ltd.*), 582 B.R. 46, 92-93 (Bankr. S.D.N.Y. 2018) ("Congress has not 'clearly expressed' that sections 548 and 550 apply extraterritorially"), *reconsideration granted on other grounds*, Adv. Proc. No. 14-02442 (JLG), 2018 WL 3031094 (Bankr S.D.N.Y. June 15, 2018); *Spizz v. Goldfarb Seligman & Co.* (*In re Ampal-Am. Isr. Corp.*), 562 B.R. 601, 612 (Bankr. S.D.N.Y. 2017) ("the avoidance provisions of the Bankruptcy Code . . . do not apply extraterritorially") *with French v. Liebmann* (*In re French*), 440 F.3d 145, 152 (4th Cir.) ("Congress made manifest its intent that § 548 apply to all property that, absent a prepetition transfer, would have been property of the estate, wherever that property is located."), *cert. denied*, 549 U.S. 815 (2006); *Weisfelner v. Blavatnik* (*In re Lyondell Chem. Co.*), 543 B.R. 127, 155 (Bankr. S.D.N.Y. 2016) (same).

*Court*, dated February 15, 2018 ("*Liquidators Supplemental Memo*") at 9 ("[T]he purpose of the parenthetical is apparent: to make as plain as possible that the provisions protecting netting agreements are fully applicable in ancillary proceedings, *even if* the debtor's assets comprising the collateral subject to netting or off-set are sited abroad.") (emphasis in original) (ECF Doc. # 1656).)

Second, section 561(d) limits the foreign representative's ability to recover property transferred in connection with the earlier exercise of Close-Out Rights.[50]  It provides that the safe harbors under the Bankruptcy Code "shall apply in a case under chapter 15 . . . to limit avoidance powers to the same extent as in a proceeding under chapter 7 or 11 of this title."  A chapter 15 foreign representative cannot exercise the avoidance powers available to a trustee in chapter 7 or chapter 11.  *See* 11 U.S.C. § 1521(a)(7).  Consequently, section 561(d) is necessarily referring to avoidance powers available under non-U.S. law.[51]  The Defendants argue that section 561(d) precludes foreign law avoidance claims brought in the United States even when the property transferred in connection with the enforcement of the Close-Out Rights, *i.e.*, the collateral that was foreclosed, was located outside the United States.[52]  (*Defendants Motion* at 36; *Defendants Reply* at 17.)

---

[50]    Although section 546(e) does not protect against an intentional fraudulent transfer claim under 11 U.S.C. § 548(a)(1)(A), the BVI Avoidance Claims do not allege intentional fraudulent transfers.

[51]    A foreign representative under section 304 (the predecessor to Chapter 15) also lacked the authority to exercise a trustee's avoidance powers.  *See Koreag, Controle et Revision S.A. v. Refco F/X Assocs., Inc.* (*In re Koreag, Controle et Revision S.A.*), 961 F.2d 341, 357 (2d Cir.), *cert. denied*, 506 U.S. 865 (1992).

[52]    The Defendants also contend that the safe harbor bars the Liquidators from bringing common law and other non-bankruptcy law claims that effectively seek the same relief based on the same act.  *See, e.g.*, *Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, 988 (8th Cir. 2009) (common law unjust enrichment and "excessive shareholder distributions" claims barred because they sought "to recover the same

The Court concludes that the Liquidators' interpretation is unreasonable because it severs the provision that protects Close-Out Rights from the clause that limits foreign avoidance claims. These provisions complement each other and cannot be viewed separately because the same concern — the domino effect of a financial meltdown — animates both clauses. The foreign representative cannot prevent the enforcement of the Close-Out Rights and cannot avoid the transfers that result from the enforcement of Close-Out Rights. Yet under the Liquidators' interpretation, they could not prevent the enforcement of the Close-Out Rights but could nonetheless avoid and recover the corresponding transfers. Their interpretation leads to the absurd result of protecting the transfer at the front end while avoiding it at the back end.

### 4. The Origins of Section 561(d)

To the extent there is any ambiguity, the history leading to the adoption of section 561(d) confirms the Court's interpretation. Section 561(d) originated with legislation proposed in 1996 by the International Swaps and Derivatives Association, Inc. ("ISDA") and the Public Securities Association ("PSA") (together, "ISDA/PSA"). At that time, ISDA/PSA focused on the concern that "a failure of one large participant in financial markets or a disruption in one market *could lead to widespread difficulties at other institutions or systemic disruptions in other markets or in the financial system as*

---

payments . . . [that] are unavoidable under Section 546(e)"), *abrogated on other grounds by Merit Mgmt. Grp., LP v. FTI Consulting*, 138 S. Ct. 883 (2018); *AP Servs. LLP v. Silva*, 483 B.R. 63, 71 (S.D.N.Y. 2012) (unjust enrichment claim could not be permitted without "frustrating the purpose of Section 546(e)"); *Official Comm. of Unsecured Creditors of Hechinger Inv. Co. v. Fleet Retail Fin. Grp.* (*In re Hechinger Inv. Co.*), 274 B.R. 71, 96 (D. Del. 2002) (unjust enrichment claim barred where it "effectively acts as an avoidance claim against the shareholders in a transaction that the court has already found is an unavoidable settlement payment").

*a whole.*" International Swaps and Derivatives Association, Inc. & Public Securities

Association, *Financial Transactions in Insolvency: Reducing Legal Risk Through*

*Legislative Reform*, at 1 (Apr. 2, 1996) ("*Reducing Legal Risk*") (emphasis added).[53]

Relevant to these adversary proceedings, the ISDA/PSA worried that the

bankruptcy of a counterparty to a qualifying transaction could interfere with the non-

debtor counterparties' ability to enforce its Close-Out Rights. *Id.* at 1-2. According to

the ISDA/PSA, the inability of the non-debtor counterparty to enforce Close-Out Rights

could lead to uncertainty, gridlock, lack of liquidity, spread to other institutions and

markets and prevent determination of credit exposures critical to the implementation of

prudent risk management procedures. *Id.* at 2.

The ISDA/PSA offered a series of legislative proposals one of which addressed

ancillary proceedings under the Bankruptcy Code. Proposed § 106(m) would add §

304(d) to the Bankruptcy Code:

> Any provisions of this title relating to securities contracts, commodity
> contracts, forward contracts, repurchase agreements, swap agreements
> or master netting agreements shall apply in a case ancillary to a foreign
> proceeding under this section, so that enforcement of contractual
> provisions of such contracts and agreements in accordance with their
> terms will not be stayed or otherwise limited by operation of any
> provision of this title or by order of a court in any proceeding under
> this title, and to limit avoidance powers to the same extent as a
> proceeding under Chapters 7 or 11 of this title (such enforcement not to be
> limited based on the presence or absence of assets of the debtor in the
> United States).

---

[53]     A copy of *Reducing Legal Risk* is annexed as Exhibit A to the *Attorney Declaration of William M. Lemon in Support of Defendants' Supplemental Memorandum of Law Concerning the Legislative History of 11 U.S.C. § 561(d)*, dated Feb. 15, 2018 ("*Lemon Declaration*") (ECF Doc. # 1658).

*Id.* at A-19.  The ISDA/PSA explained the purpose of the proposed provision in the following manner:

> Section 106(m) clarifies that the provisions of the Bankruptcy Code related to securities contracts, commodity contracts, forward contracts, repurchase agreements, swap agreements and master netting agreements will apply in a Section 304 proceeding ancillary to a foreign insolvency proceeding.  This provision is designed so that a bankruptcy court or trustee does not exercise its discretion in a Section 304 proceeding to reach a result that would be at odds with the result that would be required in a non-Section 304 proceeding for a debtor under the Bankruptcy Code.

*Id.* at 18.

The proposal was prompted by the anxiety over the bankruptcy court's injunctive powers.  While the automatic stay did not apply in section 304 ancillary proceedings, bankruptcy courts had broad authority to grant injunctions in favor of foreign representatives and could potentially bar the exercise of the Close-Out Rights, especially the right to foreclose on collateral, leading to a meltdown of the financial system.  Fear over injunctive relief came into greater focus with the insolvency of Long-Term Capital Management ("LTCM") in 1998.

LTCM, a Delaware limited partnership, operated a fund (the "LTCM Fund") organized as a Cayman Island partnership.  Beginning in late July 1998, the LTCM Fund started to sustain substantial losses.  The President's Working Group on Financial Markets ("Working Group"), which consisted of the Secretary of the Treasury, the Chairman of the Board of Governors of the Federal Reserve, the Chairman of the SEC and the Chairperson of the Commodities Futures Trading Commission, issued a study relating to LTCM's downfall and made certain recommendations to prevent disruptions

in the markets.  President's Working Group, *Hedge Funds, Leverage, and the Lessons of Long-Term Capital Management* (Apr. 1999) ("*Working Group Report*").[54]

Although the LTCM Fund was ultimately bailed out, the Working Group, among other things, hypothesized the effect of a default on the LTCM Fund's counterparties.  It noted that if the LTCM Fund was the subject of a Cayman Islands insolvency proceeding, "its Cayman receiver could have sought a Section 304 Injunction prohibiting at least temporarily the liquidation of U.S. collateral pledged by LTCM to its counterparties." *Id.* at 28.  This might force U.S. secured creditors to seek the permission of the foreign bankruptcy court to liquidate their collateral, or at least delay them from liquidating any U.S. Treasury securities pledged by the Fund under a master netting agreement. *Id.* at E-8 to E-9.

The Working Group thought an earlier proposal it had submitted to Congress solved the situation and clarified that a U.S. creditor could immediately liquidate its U.S. collateral. *Id.* at E-10.  The proposed legislative fix was included in two bills, S. 1914, § 210 (105th Cong., 2nd Sess. April 2, 1998) ("Grassley Bill"); H.R. 4393 (105th Cong., 2nd Sess. Oct. 4, 1998) ("Leach Bill"). *Id.* at E-8 n. 15.  Section 210 of the Grassley Bill essentially tracked the language of the ISDA/PSA proposal verbatim.[55]  Similarly,

---

[54]  A copy of *Working Group Report* is annexed as Exhibit D to the *Lemon Declaration*.

[55]  Section 210 would have added the following provision to the Bankruptcy Code as section 304(d):

Any provision of this title relating to securities contracts, commodity contracts, forward contracts, repurchase agreements, swap agreements, or master netting agreements shall apply in a case ancillary to a foreign proceeding under this section so that enforcement of contractual provisions of such contracts and agreements in accordance with their terms will not be stayed or otherwise limited by operation of any provision of this title or by order of a court in any proceeding under this title, and to limit avoidance powers to the same extent as a proceeding under chapter 7 or 11 of this title (such enforcement not to be limited based on the presence or absence of assets of the debtor in the United States).

section 8(m) of the Leach Bill tracked the ISDA/PSA proposal with slight immaterial

modifications,[56] and was intended to clarify "that the provisions of the Bankruptcy Code

related to securities contracts, commodity contracts, forward contracts, repurchase

agreements, swap agreements and master netting agreements apply in a section 304

proceeding ancillary to a foreign insolvency proceeding." H.R. REP. NO. 105-688, pt. 1,

at 18 (1998).

These bills were not enacted. Similar proposals relating to ancillary proceedings

were included in bills submitted in the 106th, 107th and 108th Congresses, but these

bills were also not enacted. (*See Liquidators Supplemental Memo* at 5 n. 2 (collecting

bills).)

Section 561(d) was ultimately enacted as part of the Bankruptcy Abuse and

Consumer Protection Act of 2005 ("BAPCPA") along with other provisions that clarified

and expanded the protections afforded to the exercise of Close-Out Rights. *See* Pub. L.

109-8, 119 Stat. 23 § 907 (2005). The House Report explained:

---

Business Bankruptcy Reform Act, S. 1914, 105th Cong. § 210 (1998).

[56] Section 8(m) proposed to add the following provision to the Bankruptcy Code as section 304(d):

Any provisions of this title relating to securities contracts, commodity contracts, forward contracts, repurchase agreements, swap agreements, or master netting agreements shall apply in a case ancillary to a foreign proceeding under this section or any other section of this title so that enforcement of contractual provisions of such contracts and agreements in accordance with their terms will not be stayed or otherwise limited by operation of any provision of this title or by order of a court in any proceeding under this title, and to limit avoidance powers to the same extent as in a proceeding under chapter 7 or 11 of this title (such enforcement not to be limited based on the presence or absence of assets of the debtor in the United States).

Financial Contract Netting Improvement Act of 1998, H.R. 4393, 105th Cong. § 8(m) (1998).

> New section 561 of the Bankruptcy Code clarifies that the provisions of the Bankruptcy Code related to securities contracts, commodity contracts, forward contracts, repurchase agreements, swap agreements and master netting agreements apply in a proceeding ancillary to a foreign insolvency proceeding *under new section 304 of the Bankruptcy Code.*

H.R. REP. NO. 109-31, pt. 1, at 133 (2005) (emphasis added).  Of course, there was no "new" section 304 enacted as part of BAPCPA; BAPCPA abrogated section 304, and substituted the more comprehensive chapter 15 in its place.  The legislative history pertaining to section 561(d) was apparently lifted from prior conference reports.

Thus, Section 561(d) traces its lineage to the ISDA/PSA proposal, and its adoption along with the expansion of the safe harbor protections reflect Congressional intent to provide broad protection to avoid the spread of financial contagion.  While Congress and the Working Group were primarily and understandably concerned with U.S. creditors and U.S. markets, the ISDA/PSA recognized that the financial contagion they feared did not stop at the border, and neither the statute nor the legislative history suggests that the safe harbors are limited to U.S. creditors or U.S. markets.

The Liquidators' argument that section 561(d) was simply intended to put ancillary proceedings on the same footing as plenary bankruptcies is correct but misses the point.  A chapter 7 or a chapter 11 trustee cannot avoid and recover a transfer that occurred in connection with the enforcement of a Close-Out Right if the exercise of the Close-Out Right could not be prevented under the Bankruptcy Code.  The exercise of Close-Out Rights is exempt from the automatic stay under 11 U.S.C. § 362(b), and except for certain intentional fraudulent transfers, the safe harbor bars the trustee from avoiding transfers that occurred in connection with the pre-petition exercise of Close-Out Rights.  Similarly, a chapter 15 foreign representative (and the bankruptcy court)

cannot prevent the enforcement of Close-Out Rights, even if the exercise of those rights

involves the transfer of collateral located abroad and cannot invoke non-U.S. law to

avoid and recover those transfers if they have already occurred.  Furthermore, the

Liquidators' policy argument that the Defendants' interpretation of section 561(d) will

undermine chapter 15 by placing limitations on the ability of foreign representative to

avoid Covered Transactions involving foreign assets may be true but ignores the policy

rationale underlying the adoption and subsequent expansion of the Bankruptcy Code's

safe harbor provisions to prevent a financial meltdown.

###  5.    The Liquidators' Foreign Avoidance Claims

Through the extant complaints and/or proposed amendments, the Liquidators

seek to avoid and recover "unfair preferences" and "undervalue transactions" pursuant

to the INSOLVENCY ACT §§ 245 and 246, respectively.  As noted earlier, these claims

correspond to claims to avoid preferences under 11 U.S.C. § 547 and constructive

fraudulent transfers under 11 U.S.C. §§ 544(b)(1) (incorporating state avoidance law)

and 548(a)(1)(B).  If the subject redemptions were Covered Transactions, the avoidance

of those transactions would be barred under 11 U.S.C. §§ 546(e) and 561(d).

There does not appear to be any dispute that the redemptions at issue were

Covered Transactions because they were settlement payments made in connection with

securities contracts.  *Cf. Picard v. Ida Fishman Revocable Tr.* (*In re BLMIS*), 773 F.3d

411, 422-23 (2d Cir. 2014) (payments to BLMIS investors were settlement payments on

account of securities contracts), *cert. denied*, 135 S. Ct. 2858 (2015).  The more difficult

question is whether the transferor or the transferee was a covered entity – either a

financial institution or a financial participant.  Within weeks of the parties' submissions,

the Supreme Court issued *Merit*. It concluded that the transferor or transferee had to be

a qualifying entity under section 546(e), *id*. at 892-95, 897, and abrogated the Second

Circuit's rule in *Official Comm. of Unsecured Creditors of Quebecor World (USA) Inc.*

*v. Am. United Life Ins. Co.* (*In re Quebecor World (USA) Inc.*), 719 F.3d 94 (2d Cir.

2013) under which the safe harbor applied if a qualifying financial entity acted merely as

a conduit or intermediary. *Id.* at 99. Because *Quebecor* was the controlling law in the

Second Circuit at the time, neither party had focused on whether the transfer was made

by, to or for the benefit of an enumerated financial entity. The *Defendants Motion*

argued that the redemptions were sent to "financial institutions" because the

redemptions were received in "bank accounts," (*Defendants Motion* at 43-44), but after

*Merit*, that may not be enough to protect the transfer under section 546(e).

Alternatively, the Defendants argued that Sentry was a "financial participant" and

the redemptions it paid are protected from avoidance by the safe harbor. (*Defendants

Motion* at 43.)[57] For support, they pointed to the Liquidators' allegations that Sentry

held in excess of $6 billion of assets with BLMIS as of October 2008. (*Id*.) According to

the Defendants, this admission placed Sentry within the statutory definition of

"financial participant" because it held securities contracts with an aggregate value over

$1 billion within the fifteen-month time period set forth in the statute. *See* 11 U.S.C. §

101(22A). However, the statute refers to the "15-month period preceding the date of the

filing of the petition." *Id.* Sentry's "petition" was filed on June 14, 2010.[58] Since

---

[57]    The Defendants did not address this argument to the redemption payments made by Sigma and
Lambda.

[58]    A chapter 15 debtor's "petition" refers to the petition for recognition of a foreign proceeding under
11 U.S.C. § 1504. *See* 11 U.S.C. § 101(42).

October 2008 was 19 months prior to Sentry's petition, the value of outstanding securities contracts at that time is not dispositive of Sentry's status as a "financial participant."

The change in the law resulting from the Supreme Court's *Merit* decision prompted a flurry of letters from the parties over a two-month span containing new arguments regarding the effect of *Merit* on the Defendants' motions, including whether the redemptions were made by, to or for the benefit of an entity covered by section 546(e). (*See Letter of David J. Molton*, dated Mar. 8, 2018 (ECF Doc. # 1671); *Letter of Thomas J. Moloney*, dated Mar. 23, 2018 (ECF Doc. # 1687); *Letter of David J. Molton*, dated Apr. 5, 2018 (ECF Doc. # 1690); *Letter of David J. Molton*, dated Apr. 27, 2018 (ECF Doc. # 1692); *Letter of Thomas J. Moloney*, dated Apr. 27, 2018 (ECF Doc. # 1693); *Letter of David J. Molton*, dated May 9, 2017 (ECF Doc. # 1694); *Letter of Thomas J. Moloney*, dated May 10, 2018 (ECF Doc. # 1695).) Rather than consider the arguments made through the multiple letters, the Court denies the branch of the Defendants' motions seeking dismissal based on sections 546(e) and 561(d) without prejudice to their right to make subsequent motions that the Funds and/or the Defendants were financial participants or financial institutions and without prejudice to the Liquidators' right to oppose those motions.

## CONCLUSION

For the reasons stated, the Defendants' motions to dismiss are granted to the extent of dismissing all of the Common Law Claims and the Contract Claims except to the extent that a complaint alleges a constructive trust claim against a Knowledge Defendant. The motions to dismiss the BVI Avoidance Claims are denied without prejudice to a renewed motion based on the applicability of 11 U.S.C. §§ 546(e) and 561(d). Correspondingly, the Liquidators are granted leave to amend to assert constructive trust claims against Knowledge Defendants and BVI Avoidance Claims against all Defendants. The Court has considered the remaining arguments made by the parties, and to the extent not specifically addressed, concludes that they lack merit or are rendered moot by the disposition of the motions. The Liquidators are directed to settle or submit a consensual order consistent with this decision in each adversary proceeding.

Dated:   New York, New York
December 6, 2018

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
United States Bankruptcy Judge