# Exhibit 21

**SELENDY & GAY PLLC**
1290 Avenue of the Americas
New York, NY 10104
David Elsberg
Andrew Dunlap
Lena Konanova
Jordan Garman
Ester Murdukhayeva
Ron Krock
212-390-9000

-and-

**BROWN RUDNICK LLP**
Seven Times Square
New York, New York 10036
David J. Molton
Marek P. Krzyzowski
212-209-4800

*Attorneys for the Foreign Representatives*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>FAIRFIELD SENTRY LIMITED, et al.,<br><br>      Debtors in Foreign Proceedings. | Chapter 15 Case<br><br>Case No. 10-13164 (CGM)<br><br>Jointly Administered |
| FAIRFIELD SENTRY LIMITED (IN LIQUIDATION), et al.,<br><br>      Plaintiffs,<br><br>      -against-<br><br>THEODOOR GGC AMSTERDAM, et al.,<br><br>      Defendants. | Adv. Pro. No. 10-03496 (CGM)<br>Administratively Consolidated |

i

| | |
|---|---|
| FAIRFIELD SENTRY LIMITED (IN LIQUIDATION) and FAIRFIELD SIGMA LIMITED (IN LIQUIDATION), acting by and through the Foreign Representatives thereof, and KENNETH KRYS and GREIG MITCHELL, solely in their capacities as Foreign Representatives and Liquidators thereof, | Adv. Pro. No. 10-03630 (CGM) |
| Plaintiffs, | |
| -against- | |
| HSBC SECURITIES SERVICES (LUXEMBOURG) SA, BANCO ATLANTICO PANAMA SA, MOMENTUM CLIENT ACCOUNT, ORBIT CLIENT ACCOUNT, ORBIT PERF. STRATEGIES LTD., ORBIT US STRATEGY FUND, PRIVATE SPACE LTD., and BENEFICIAL OWNERS OF ACCOUNTS HELD IN THE NAME OF HSBC SECURITIES SERVICES (LUXEMBOURG) SA 1-1000, including without limitation BENEFICIAL OWNERS OF ACCOUNTS ASSOCIATED WITH REFERENCE IDENTIFIERS PS and BASF, | |
| Defendants. | |

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................ 1

JURISDICTION AND VENUE ........................................................................... 6

PARTIES ............................................................................................................. 9

    A.    Plaintiffs ................................................................................................ 9

    B.    Defendants .......................................................................................... 13

NOTICE PURSUANT TO FED. R. CIV. P. 44.1 .............................................. 14

FACTUAL ALLEGATIONS ............................................................................ 15

    A.    Role Of Feeder Funds In Madoff Fraud ............................................ 15

    B.    Calculation Of Net Asset Value And Shareholder Redemption Payments ........... 15

    C.    Redemption Payments Made Or Transferred To Defendants ............... 18

    D.    HSBC SSL (Lux) Knew Of, Was Willfully Blind To, Or Recklessly Disregarded, The Inflation Of The NAV ............................................ 19

            1.    HSBC SSL (Lux)'s Knowledge Of BLMIS-Associated Risk As A Result Of Fund Services Work ............................................ 19

            2.    HSBC Entities, Including HSBC SSL (Lux), Closely Collaborated And Shared Information Among Themselves, Including About The Risk Of BLMIS-Associated Fraud ............................................... 28

            3.    Internal HSBC Diligence Reports Indicated Risk Of BLMIS-Associated Fraud—But Were Ignored ............................................ 31

            4.    KPMG Assesses Fraud And Operational Risk At BLMIS Only To Have HSBC SSL (Lux) Turn A Blind Eye To Its Findings ......... 37

            5.    Two Years Later, KPMG Identifies The Same—And More—Risk Concerns Associated With BLMIS, Showing That HSBC SSL (Lux) Failed To Heed Earlier Warnings ............................................ 39

            6.    HSBC SSL (Lux)'s Knowledge Of BLMIS-Associated Fraud Gained As A Result Of HSBC Suisse's Marketing Investments .. 40

    E.    The Beneficial Shareholders Knew Or Should Have Known Of The BLMIS Fraud ............................................................................... 41

    F.    Citco Did Not Issue Any Certifications Of Net Asset Value In "Good Faith" ...... 42

1.      Citco Expressed Doubt As To Whether The Funds' Assets At BLMIS Even
        Existed......................................................................................................... 43

2.      Citco Failed To Obtain Evidence Of The Existence Of The Funds' Assets
        ..................................................................................................................... 46

3.      Citco Negotiated For Higher Fees As Reimbursement For The "Risks" Of
        Doing Business With Madoff ..................................................................... 48

G.      Exposure Of Madoff's Fraud ..............................................................................52

H.      The Funds' Estates In Liquidation ......................................................................53

FIRST CLAIM.........................................................................................................................54

PRAYER FOR RELIEF ..........................................................................................................57

Fairfield Sentry Limited ("Sentry") and Fairfield Sigma Limited ("Sigma"), by and through

Kenneth Krys and Greig Mitchell (together with their predecessors, the "Foreign Representatives"

or "Liquidators"), and Kenneth Krys and Greig Mitchell (together with Sentry and Sigma, the

"Plaintiffs"), solely in their capacities as the Liquidators of Sentry and Sigma and the Foreign

Representatives of the liquidation proceedings involving Sentry, Sigma, and Fairfield Lambda

Limited ("Lambda," together with Sentry and Sigma, the "Funds" or the "Debtors") pending

before the Commercial Division of the Eastern Caribbean High Court of Justice, British Virgin

Islands (the "BVI Court"), for their complaint against Defendants, as defined herein, allege the

following based on personal knowledge or information derived from the Funds' books and records

or from other sources, including, *inter alia*, court filings and statements of governmental agencies

and other parties.

## PRELIMINARY STATEMENT

1.      This adversary proceeding, which arises out of a now decade-long effort to recoup

assets for the victims of the largest Ponzi scheme in history, seeks recovery of more than $84

million improperly received by Defendant HSBC Securities Services (Luxembourg) SA ("HSBC

SSL (Lux)").

2.      HSBC SSL (Lux) is one of a number of banks that invested, for itself and others,

in so-called "feeder funds," which channeled private investments into managed accounts with

Bernard L. Madoff and his now-infamous brokerage business, Bernard L. Madoff Securities LLC

("BLMIS").

3.      The Madoff scheme worked seamlessly for decades, apparently netting

shareholders handsome returns that far exceeded the market.

4.      Once BLMIS imploded, however, the world learned what some in the investing community, including senior management at HSBC SSL (Lux), had long turned a blind eye to: that the payments investors received from the feeder funds in exchange for the redemption of shares were massively overvalued.  In fact, they were non-existent.

5.      The feeder funds, like the Funds in this case, were essential to the perpetration of Madoff's scheme.  From their inception until the revelation of Madoff's fraud in December 2008, during most relevant times, the Funds sought out new investment through the sale of shares to investors and transferred (either directly in the case of Sentry or indirectly, through Sentry, in the cases of Sigma and Lambda) substantially all the proceeds of those sales, net of fees and expenses, to BLMIS for investment in accounts managed by Madoff.

6.      BLMIS and the feeder funds relied heavily on the international recognition and power of a single institution:  HSBC.  HSBC provided the oxygen needed to keep BLMIS's fire burning through major feeder funds, including Lagoon Investment Ltd., Hermes International Fund, Alpha Prime, Thema Wise, Thema Fund Ltd., Thema Coral Fund, Primeo Fund, Herald Fund, Herald (Lux), Senator, Square One Fund Ltd., Ascot Fund, Ltd., Kingate Global Fund, Ltd. and Kingate Euro Fund, Ltd.  HSBC served as the feeder funds' marketer, custodian, and/or administrator, using the reputation of its brand to convince foreign and American investors to invest billions of dollars into BLMIS.  By BLMIS's own account, HSBC clients represented *one-third* of its entire business.  HSBC received significant fees in return for legitimizing BLMIS to the investors whose capital BLMIS so desperately needed.

7.      However, instead of using investor proceeds collected by the Funds to purchase securities and other investments, BLMIS used those contributions to service the redemption requests of other investors, enriching Madoff and his associates in the process.

2

8.    The investors lucky enough to redeem their shares in the Funds before the collapse of the Ponzi scheme received payments ("Redemption Payments") at a grossly inflated "Net Asset Value" (or "NAV")—the price determined by dividing the value of the respective assets of Sentry, Sigma, and Lambda by the number of shares outstanding in each Fund.  HSBC SSL (Lux) is one such investor.

9.    Between April 8, 2004 and September 16, 2008, HSBC SSL (Lux) received USD $84,497,835.97 in Redemption Payments from Sentry and Sigma.  At the time it received these payments, HSBC SSL (Lux) had already uncovered multiple indicia that Madoff was engaged in some form of fraud.  But rather than confront the facts before it, HSBC SSL (Lux) turned a blind eye, accepting millions of dollars while willfully ignoring or, at the very least, recklessly disregarding the truth in clear violation of the laws of the British Virgin Islands (or "BVI").

10.    Beginning as early as 2001, employees of Bank of Bermuda's Luxembourg branch—who would become HSBC SSL (Lux) employees after HSBC acquired Bank of Bermuda in 2004—raised concerns about BLMIS's operations and acknowledged multiple indicia of significant fraud, including the lack of transparency as to BLMIS's internal controls, the lack of an independent auditor, and suspected comingling of assets.  Yet, time and time again, those employees affirmatively chose to ignore the obvious risks.  Even after the takeover, those employees continued to turn a blind eye to BLMIS's fraud despite the fact that HSBC SSL (Lux) was also receiving knowledge of BLMIS-related risks and concerns—such as the lack of an independent control review—from other HSBC entities, including those in London, and, upon information and belief, New York, and Switzerland.  It was no secret that, as one top-ranking HSBC risk officer put it, BLMIS was "a *perfect structure for fraud*."

11.     Additionally, in 2005, HSBC SSL (Lux) affiliates engaged KPMG to review BLMIS for fraud and related operational risk.  The resulting report from KPMG identified a lengthy list of substantial fraud and related operational risks related to BLMIS's operations. HSBC SSL (Lux) deliberately avoided taking steps to implement KPMG's recommendations and instead continued to delegate its custodial duties for multiple feeder funds to BLMIS. HSBC SSL (Lux) affiliates engaged KPMG in 2008 to review BLMIS a second time for similar risks.  Again, KPMG presented a laundry list of warning signs—even longer than the first. And again, HSBC SSL (Lux) ignored KPMG's findings and recommendations.

12.     Although HSBC SSL (Lux) was convinced that it was necessary to obtain an independent auditor's confirmation that the BLMIS-held assets were real and not commingled, it repeatedly chose not to verify whether Madoff was in fact engaged in fraud because, in the words of another high-level HSBC risk officer, HSBC was "***too afraid to lose the revenue***" associated with maintaining and furthering BLMIS's business.  The consequences of further review into Madoff—the type of review that would confirm whether BLMIS was a sham— would have been, according to a top HSBC SSL (Lux) employee, "both painful and, it would appear, ***fatal***."

13.     At all relevant times, HSBC SSL (Lux) knew that the Redemption Payments did not, as Sentry and Sigma intended, represent the proceeds arising from the profitability of or continued investment in BLMIS.  Instead, any amounts obtained directly or indirectly by Sentry and Sigma from BLMIS to make Redemption Payments to HSBC SSL (Lux) generally were proceeds of Madoff's Ponzi scheme, obtained from other BLMIS investors or other Sentry and Sigma investors invested in BLMIS.

14.     Accordingly, the Funds' actual assets are, and at relevant times were, far less than the amount needed to satisfy their liabilities and the claims that have been or may be asserted against them.  At all relevant times, the Funds were unable to pay their debts as they fell or would fall due.  Specifically, at the time the Redemptions Payments were made, the Funds had insufficient assets from which to pay debts as they fell or would fall due.  The Funds have been unable to satisfy their debts to BLMIS customers, the BLMIS Trustee (as defined below), and other creditors of the Funds, and have further increased the amount of those liabilities.

15.     As a result, the Funds were placed into liquidation by the BVI courts and the Foreign Representatives were appointed, and thereafter commenced ancillary proceedings in this Court pursuant to Chapter 15 of the Bankruptcy Code to recover improper Redemption Payments received by the Funds' investors.

16.     Upon information and belief, HSBC SSL (Lux) has either retained the Redemption Payments made to it by Sentry and Sigma for its own account and benefit or, alternatively, paid all or some portion of such payments to or for the account of persons or entities, including but not limited to Banco Atlantico Panama SA, Momentum Client Account, Orbit Client Account, Orbit Perf. Strategies Ltd., Orbit US Strategy Fund, and Private Space, for whom HSBC SSL (Lux) may have subscribed for shares of the Funds in the capacity of trustee, agent, representative, nominee, or custodian (individually, a "Beneficial Shareholder" and collectively, "Beneficial Shareholders," together with HSBC SSL (Lux), the "Defendants").  Based on Sentry's and Sigma's records, some or all of the Redemption Payments may have been paid to an account holder or holders associated with reference identifiers PS and BASF.

17.     By this proceeding, Plaintiffs seek to recoup for the benefit of the Funds' estates Redemption Payments transferred to HSBC SSL (Lux).  Without this recovery, Defendants will

5

have been unjustly enriched, and allowed to retain a windfall at the expense of other shareholders and creditors of the Funds. Any recoveries will aid the Funds in satisfying their liabilities and redound to the benefit of the Funds' investors who found themselves victims of Madoff's Ponzi scheme.

## JURISDICTION AND VENUE

18.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 157(b) and 1334(b), as this adversary proceeding and the claim asserted by the Foreign Representatives herein arise under, arise in and/or relate to the Chapter 15 proceedings of the above-captioned Debtors, *In re Fairfield Sentry Limited, et al.*, No. 10-13164 (CGM), pending in this Court. Additionally, pursuant to section 78eee(b)(2)(A)(iii) of the Securities Investor Protection Act ("SIPA"), which incorporates 28 U.S.C. § 1334(b) and applicable provisions of Title 11 of the United States Code, jurisdiction is also proper in this Court because this action also relates to the consolidated liquidation proceedings of BLMIS and Bernard L. Madoff, pending in this Court under the caption *Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC*, SIPA Liquidation No. 08-1789 (CGM). Pursuant to the Amended Standing Order of Reference of the United States District Court for the Southern District of New York, dated January 31, 2012, all proceedings arising in, arising under and/or related to cases under Title 11 of the United States Code (as amended, the "Bankruptcy Code") are referred to this Court for adjudication.

19.    This is a core proceeding under 28 U.S.C. § 157(b)(2). Should the Court determine that this is a non-core proceeding, Plaintiffs consent to entry of final judgment and order by this Court.

20.    This Court has jurisdiction over HSBC SSL (Lux) and any Beneficial Shareholders pursuant to Rules 7004(d) and (f) of the Federal Rules of Bankruptcy Procedure and New York Civil Practice Law & Rules § 302 (McKinney 2008) because HSBC SSL (Lux) and the Beneficial

Shareholders purposely availed themselves of the laws of the United States and the State of New York by, among other things, investing money with the Funds, knowing and intending that the Funds would invest substantially all of that money in New York-based BLMIS, and, upon information and belief, maintaining bank accounts in the United States, and in fact receiving Redemption Payments in those United States-based accounts. HSBC SSL (Lux) and the Beneficial Shareholders selected U.S. dollars as the currency in which to invest and execute their transactions in Sentry, upon information and belief, designated United States-based bank accounts to receive their Redemption Payments from the Funds, and actively directed Redemption Payments at issue in this action into those bank accounts. HSBC SSL (Lux) and the Beneficial Shareholders thus knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York, derived significant revenue from New York, and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claim alleged herein. HSBC SSL (Lux) and the Beneficial Shareholders should therefore reasonably expect to be subject to United States jurisdiction.

21.    Moreover, this Court has jurisdiction over HSBC SSL (Lux) and any Beneficial Shareholders by virtue of the legally binding and valid agreements and representations set forth in one or more agreements for the subscription of shares that HSBC SSL (Lux) entered into with Sentry and Sigma.

22.    HSBC SSL (Lux), upon information and belief, entered into a Subscription Agreement with Sentry on or about February 24, 2005 (the "Initial Subscription Agreement") pursuant to which HSBC SSL (Lux) subscribed for shares. Subsequent to entering into the Initial Subscription Agreement, HSBC SSL (Lux), upon information and belief, entered into additional agreements (the "Subsequent Subscription Agreements") with Sentry and Sigma on or about

February 28, 2005, March 29, 2005, June 24, 2005, June 28, 2005, September 30, 2005,

December 31, 2005, March 27, 2006, May 26, 2006, May 31, 2006, June 30, 2006, September 27,

2006, September 28, 2006, September 30, 2006, December 21, 2006, December 27, 2006,

March 31, 2007, June 30, 2007, August 29, 2007, December 21, 2007, and January 28, 2008,

pursuant to which it subscribed for additional shares on the same terms and conditions as those

shares subscribed for pursuant to the Initial Subscription Agreement.  The Initial Subscription

Agreement and Subsequent Subscription Agreements are collectively referred to herein as the

"Subscription Agreements."

23.    The Subscription Agreements provide for, *inter alia*, the irrevocable submission by

HSBC SSL (Lux) to the jurisdiction of the New York courts with respect to any proceeding with

respect to said agreements and Sentry and Sigma and HSBC SSL (Lux)'s consent to service of

process by the mailing of such process, as provided therein.  In particular, the Subscription

Agreements provide as follows:

> New York Courts.  Subscriber agrees that any suit, action or proceeding
> ("Proceeding") with respect to this Agreement and the Fund may be brought in New
> York.  Subscriber irrevocably submits to the jurisdiction of the New York courts
> with respect to any Proceeding and consents that service of process as provided by
> New York law may be made upon Subscriber in such Proceeding, and may not
> claim that a Proceeding has been brought in an inconvenient forum.  Subscriber
> consents to the service of process out of any New York court in any such
> Proceeding by the mailing of copies thereof, by certified or registered mail, return
> receipt requested, addressed to Subscriber at the address of Subscriber then
> appearing on the Fund's records.  Nothing herein shall affect the Fund's right to
> commence any Proceeding or otherwise to proceed against Subscriber in any other
> jurisdiction or to serve process upon Subscriber in any manner permitted by any
> applicable law in any relevant jurisdiction.

24.    Furthermore, by executing the Subscription Agreements, HSBC SSL (Lux) agreed

to all terms and conditions contained therein, including the express provision that any agreement

made by HSBC SSL (Lux) in the Subscription Agreements would also apply to any other person

for whom HSBC SSL (Lux) was subscribing as trustee, agent, representative, or nominee—*i.e.*,

8

all Beneficial Shareholders.  Moreover, by executing the Subscription Agreements, HSBC SSL

(Lux) represented that it had all requisite authority from Beneficial Shareholders to execute and

perform any and all obligations on their behalf, and also agreed to indemnify Sentry and Sigma

for any damages resulting from an assertion by a Beneficial Shareholder that HSBC SSL (Lux)

lacked proper authorization to enter into the Subscription Agreements or perform the obligations

thereof.  Specifically, the Subscription Agreements provide as follows:

> If Subscriber is acting as a Representative.  If Subscriber is subscribing as trustee,
> agent, representative, or nominee for another person (the "Beneficial
> Shareholder"), Subscriber agrees that the representations and agreements herein are
> made by Subscriber with respect to itself and the Beneficial Shareholder.
> Subscriber has all requisite authority from the Beneficial Shareholder to execute
> and perform the obligations hereunder.  Subscriber also agrees to indemnify the
> Fund … for any and all costs, fees and expenses (including legal fees and
> disbursements, fines and amounts paid in settlement) in connection with any
> damages resulting from Subscriber's misrepresentation or misstatement contained
> here, or the assertion of Subscriber's lack of proper authorization from the
> Beneficial Shareholder to enter into this Agreement or perform the obligations
> hereof.

25.    Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

## PARTIES

### A.    Plaintiffs

26.    Sentry, a British Virgin Islands company, was organized in 1990 under the

International Business Company Act of the British Virgin Islands and was subsequently re-

registered as a business company under the BVI Business Companies Act 2004. Sentry's registered

agent is Codan Trust Company (B.V.I.) located at Romasco Place, Wickhams Cay 1, Road Town,

Tortola, BVI.  Sentry is currently in liquidation in proceedings commenced on April 21, 2009 in

the BVI Court.

27.    Sigma, a British Virgin Islands company, was organized in 1990 under the

International Business Company Act of the British Virgin Islands and was subsequently re-

registered as a business company under the BVI Business Companies Act 2004. Sigma's registered agent is Codan Trust Company (B.V.I.) located at Romasco Place, Wickhams Cay 1, Road Town, Tortola, BVI. Sigma is currently in liquidation in proceedings commenced on April 23, 2009, in the BVI Court.

28.     The Foreign Representatives were appointed by the BVI Court as Liquidators of the Funds to supervise the liquidation of the Funds' estates and, where necessary, commence proceedings in the name of and on behalf of the Funds or in their own official names. On April 23, 2009, the BVI Court issued an order appointing Christopher Stride as liquidator of Lambda (the "Lambda Appointment Order"). On July 21, 2009, the BVI Court issued an order appointing Kenneth Krys and Mr. Stride as joint liquidators of Sentry and Sigma (the "Sentry & Sigma Appointment Order"). On September 6, 2010, the BVI Court issued notices acknowledging Mr. Stride's resignation and the appointment of Joanna Lau as joint liquidator with Mr. Krys of all three Funds (the "Supplemental Appointment Order"). On November 23, 2011, Ms. Lau resigned as joint liquidator of the Funds. On June 24, 2014, the BVI Court issued an order appointing Charlotte Caulfield as joint liquidator, with Mr. Krys, of all three Funds (the "Second Supplemental Appointment Order"). On June 21, 2019, Ms. Caulfield resigned as joint liquidator of the Funds. On July 8, 2019, the BVI Court issued an order appointing Greig Mitchell as joint liquidator, with Mr. Krys, of all three Funds (the "Third Supplemental Appointment Order" and, together with the Lambda Appointment Order, the Sentry & Sigma Appointment Order, the Supplemental Appointment Order, and the Second Supplemental Appointment Order, the "BVI Appointment Orders"). The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of the Funds, have been authorized by the foreign court having jurisdiction over the matter to bring this action and the claim herein.

29.    Pursuant to the BVI Appointment Orders, the Foreign Representatives are responsible for all aspects of the Funds' businesses, including, among other things, custody and control of the Funds' assets, the power to do all acts and execute, in the name and on behalf of the Funds, any deeds, receipts or other documents, and the power to compromise claims, commence litigation and to dispose of property.    After obtaining BVI Court approval, the Foreign Representatives filed petitions in this Court in June of 2010, under Chapter 15 of Title 11 of the United States Code, seeking recognition of the BVI Liquidation Proceedings as "foreign main proceedings" under Chapter 15.  On July 22, 2010, this Court issued an order (the "Recognition Order") granting that recognition.

30.    Pursuant to the Recognition Order, the Foreign Representatives were automatically afforded relief available under 11 U.S.C. § 1520, including application of the Bankruptcy Code's automatic stay to the Funds and their property located in the United States, as well as the ability to operate the Funds' business and exercise the rights and powers of a trustee under Sections 363 and 552 of the Bankruptcy Code.  Moreover, the Bankruptcy Court specifically granted additional relief in the Recognition Order to the Foreign Representatives pursuant to 11 U.S.C. § 1521(a). Such relief includes, but is not limited to: (i) staying any actions, proceedings or execution against the Funds' assets to the extent not stayed under Section 1520; (ii) authorizing the Foreign Representatives to seek leave to conduct discovery concerning the Funds' assets, affairs, rights, obligations or liabilities; (iii) entrusting the Foreign Representatives with the administration and realization of the Funds' assets that are located within the United States, including all claims and causes of action belonging to the Funds; and (iv) otherwise giving full force and effect to the proceedings before the BVI Court.

31.     Claims had been previously asserted against the Funds in actions commenced by Irving H. Picard, the Trustee appointed by the United States District Court for the Southern District of New York for the liquidation of BLMIS (the "BLMIS Trustee"), in an adversary proceeding pending before the United States Bankruptcy Court of the Southern District of New York, *Picard v. Fairfield Sentry Limited, et al.*, No. 08-01789 (CGM) (the "BLMIS Adversary Proceeding"). As set forth in the complaint filed in the BLMIS Adversary Proceedings, the BLMIS Trustee sought to recover from the Funds, on preference and fraudulent transfer grounds, approximately $3.2 billion.  This amount was alleged to have been transferred to the Funds from BLMIS, directly (in the case of Sentry), or indirectly (in the cases of Sigma and Lambda), during the six years preceding the December 2008 disclosure of the Madoff fraud.  The BLMIS Trustee alleged that the monies transferred from BLMIS to the Funds were the misappropriated assets of other BLMIS investors.  At all relevant times, monies that the Funds received from BLMIS, net of fees and expenses, were transferred to shareholders as Redemption Payments.

32.     On July 13, 2011, pursuant to an agreement between the Foreign Representatives and the BLMIS Trustee dated May 9, 2011, the United States Bankruptcy Court for the Southern District of New York entered judgments against each of the Funds on the claims against the Funds asserted in the BLMIS Adversary Proceeding (the "Judgments") in the amount of $3,054,000,000 with respect to Sentry, $752,300,000 with respect to Sigma, and $52,900,000 with respect to Lambda.  The Redemption Payments rendered the Funds unable to satisfy their liabilities to the BLMIS customers, the BLMIS Trustee, including on account of the Judgments, and other creditors of the Funds, and have further increased the amount of those liabilities.  In this way, the Redemption Payments caused the Funds to become insolvent and/or deepened their existing

insolvency, in that, among other things, at all relevant times the Funds were unable to pay their debts as they fell or would fall due.

**B.    Defendants**

33.    HSBC SSL (Lux) was, at all relevant times, a member of Sentry and Sigma and a registered holder of shares.  Upon information and belief, HSBC SSL (Lux) is a corporate entity organized under the laws of Luxembourg and having its registered address at 40 Avenue Monteray, L 2163 Luxembourg.  HSBC SSL (Lux) subscribed for the purchase of shares by entering into one or more Subscription Agreements with Sentry and Sigma.  All purchases of shares by HSBC SSL (Lux) were subject to the terms of the Subscription Agreements.

34.    Defendants "Beneficial Owners of the Accounts Held in the Name of HSBC Securities Services (Luxembourg) SA 1-1000"—*i.e.*, the Beneficial Shareholders, are, as noted, any persons or entities having a beneficial ownership or interests in shares of Sentry and/or Sigma issued to HSBC SSL (Lux) and on whose behalf HSBC SSL (Lux) was acting as trustee, agent, representative, nominee, or custodian.  Based on Sentry and Sigma records, some or all of the Redemption Payments made to HSBC SSL (Lux) may have been paid to an account holder or holders associated with PS and BASF.

35.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to HSBC SSL (Lux) may have been paid to an account holder or holders associated with the Beneficial Shareholder, Banco Atlantico Panama SA.  Upon information and belief, Banco Atlantico Panama SA is a corporate entity organized under the laws of Panama and has its registered address at Calle 50 Y Calle 53, Edif. Banco De Atlantico-Apdo., Postal 6553, Zona 5, Panama.

36.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to HSBC SSL (Lux) may have been paid to an account holder or holders associated with the Beneficial Shareholder, Momentum Client Account.

37.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to HSBC SSL (Lux) may have been paid to an account holder or holders associated with the Beneficial Shareholder, Orbit Client Account.

38.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to HSBC SSL (Lux) may have been paid to an account holder or holders associated with Orbit Perf. Strategies Ltd.

39.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to HSBC SSL (Lux) may have been paid to an account holder or holders associated with the Beneficial Shareholder, Orbit US Strategy Fund.

40.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Private Space Ltd.   Upon information and belief, Private Space Ltd. is a corporate entity organized under the laws of Monaco and has as its registered address 7 Rue du Gabian, MC 98000, Monaco.

## NOTICE PURSUANT TO FED. R. CIV. P. 44.1

41.     Certain of the substantive issues to be resolved in this case will be governed by the laws of the British Virgin Islands.  Plaintiffs intend to rely upon the applicable laws of that territory.

## FACTUAL ALLEGATIONS

### A.    Role Of Feeder Funds In Madoff Fraud

42.    Sentry was the largest of all the so-called "feeder funds" to maintain accounts with BLMIS.  Sigma and Lambda were indirect BLMIS feeder funds established for foreign currency (respectively, Euro and Swiss franc) investment through purchase of shares of Sentry.  The Funds had the following par values per share: $.01 per share (Sentry), €.01 per share (Sigma), and CHF.01 per share (Lambda).  Sentry's account statements with BLMIS as of the end of October 2008 showed in excess of $6 billion of invested assets supposedly held by BLMIS.  As stated in its offering materials, Sentry's investment objective was to achieve capital appreciation through investments in BLMIS.

43.    As discussed above, Sentry, Sigma, and Lambda were established for the purpose of making investments in BLMIS.  It is now known that these types of feeder funds were a crucial part of Madoff's Ponzi scheme.  Feeder funds, such as Sentry (which was a direct feeder fund into BLMIS), and Sigma and Lambda (which were indirect feeder funds, through Sentry, into BLMIS) brought new investors and new investments into the scheme, allowing Madoff to make payments to early investors who sought to liquidate their investments.  In this way, the feeder funds were used by Madoff to continue and perpetuate his fraud by maintaining the illusion that BLMIS was making active investments and engaging in a successful investment strategy.

### B.    Calculation Of Net Asset Value And Shareholder Redemption Payments

44.    From the Funds' inception until the disclosure of Madoff's fraud in December 2008, during most relevant times, substantially all of the money (up to 95%) raised by the Funds from the sale of their shares, net of fees and expenses, was turned over to and invested in BLMIS (by and/or through Sentry), and supposedly credited to accounts held in the name of Sentry with BLMIS, purportedly for use in the now infamous "split-strike conversion" investment

strategy. In accordance with the Funds' Subscription Agreements, Articles of Association, offering materials and/or other relevant documents, from time to time, the Funds paid to shareholders, for each Share tendered for redemption, an amount that was based on each of the respective Funds' purported "Net Asset Value"—the value of the respective assets of Sentry, Sigma, and Lambda divided by the number of shares outstanding in each Fund—as it was then calculated.

45.     In calculating each of the Funds' Net Asset Value, the Funds' administrators used and relied on account statements provided by BLMIS purportedly showing securities and investments, or interests or rights in securities and investments, held by BLMIS for the account of Sentry. Generally, all securities identified on BLMIS account statements were traded on public exchanges and had readily ascertainable market values, and those market values (in addition to, among other items, cash on hand that was identified in the Sentry account statement for the relevant time period) were used in accordance with the Funds' Subscription Agreements, Articles of Association, offering materials and/or other documents to calculate the Net Asset Value of the shares.

46.     In fact, at all relevant times, no securities were ever purchased or sold by BLMIS for Sentry and any stated cash on hand in the BLMIS accounts was based on misinformation and fictitious account statements. None of the transactions shown on the account statements provided by BLMIS to Sentry ever occurred. Indeed, no investments of any kind were ever made by BLMIS for Sentry. At all relevant times, all of the account statements that BLMIS provided to Sentry were entirely and utterly fictitious. Further, all amounts deposited by Sentry (or by Sigma and Lambda through Sentry) with BLMIS for investment and the purchase of securities to be held by BLMIS

for the account of Sentry were used by Madoff to pay other BLMIS investors or were misappropriated by Madoff for other unauthorized uses.

47.     From time to time, to make Redemption Payments, Sentry (and Sigma and Lambda through Sentry) made withdrawals from Sentry's BLMIS accounts (or utilized subscription monies of other investors on hand that were directed for investment in BLMIS).  At all relevant times, the Funds believed that the amounts provided in connection with such withdrawals represented the proceeds arising from the profitability of or continued investment in BLMIS.  In fact, however, payments made by BLMIS to Sentry purportedly representing the proceeds of sales of securities or other investment positions were nothing other than the deposits of other BLMIS investors or previous deposits made by Sentry, never invested but rather misused and misappropriated as part of Madoff's fraud.  At all relevant times, payments made from BLMIS to Sentry were made by Madoff to continue and perpetuate his Ponzi scheme and avoid detection of his fraud.  The payments from BLMIS to Sentry were not payments made in the ordinary course of or as part of any business, nor did they have a legitimate business purpose.  Similarly, the Redemption Payments were not made for any legitimate purposes or in the ordinary course of any business.  Those Redemption Payments did not conform to or follow the terms of the Funds' Subscription Agreements, Articles of Association and/or other offering documents, as they were based upon Net Asset Values that were not calculated based upon the true facts existing at any relevant time, and because, more generally, the Redemption Payments represented the proceeds arising from investment in BLMIS (or a substitute therefor, in the form of subscription monies from other investors in the Funds, used as a shortcut to investing subscription monies with BLMIS and simultaneously withdrawing monies from BLMIS), which the world now knows was operated by Madoff as a Ponzi scheme.

48.     Given the fraudulent nature of BLMIS and its operation as a massive Ponzi scheme, the money paid by the Funds (directly in the case of Sentry and indirectly in the cases of Sigma and Lambda) to BLMIS on account of Sentry was, at all relevant times and unknown to the Funds, misused and misappropriated by Madoff as part of his Ponzi scheme.  At all relevant times, the Funds were insolvent when the Redemption Payments were made or were rendered insolvent, and/or their insolvency was deepened, as a result of the Redemption Payments.  As a result, at all relevant times, the Net Asset Value of the shares redeemed was miscalculated, and Redemption Payments were mistakenly made for amounts far in excess of the Net Asset Value of shares redeemed that would have been calculated based upon the true facts existing at any relevant time.

**C.     Redemption Payments Made Or Transferred To Defendants**

49.     During the period from and after April 8, 2004 through September 16, 2008, HSBC SSL (Lux) received Redemption Payments totaling USD $84,497,835.97 from Sentry and Sigma in respect of shares tendered for redemption.

50.     At HSBC SSL (Lux)'s directions and instructions, some or all of the Redemption Payments were received at, upon information and belief, designated United States-based bank accounts.

51.     The dates and amounts of each Redemption Payment received by HSBC SSL (Lux) from Sentry, and the HSBC SSL (Lux) bank accounts to which each Redemption Payment was made, are set forth on Exhibit A.  The dates and amounts of each Redemption Payment received by HSBC SSL (Lux) from Sigma, and the HSBC SSL (Lux) bank accounts to which each Redemption Payment was made, are set forth on Exhibit B.

52.     At the time those Redemption Payments were made, the Funds had insufficient assets and were unable to pay their debts as they would fall due.  In exchange for each Redemption Payment, each of which constitutes or forms part of a transaction between HSBC SSL (Lux) and

18

Sentry and Sigma, Sentry and Sigma received no consideration or consideration of a value that, in money or money's worth, was significantly less than the value, in money or money's worth, of the consideration provided by Sentry and Sigma.

53.     Upon information and belief, HSBC SSL (Lux) and/or the Beneficial Shareholders received Redemption Payments in excess of amounts paid by such person(s) for purchase of their shares.

**D.     HSBC SSL (Lux) Knew Of, Was Willfully Blind To, Or Recklessly Disregarded, The Inflation Of The NAV**

54.     Upon information and belief, HSBC SSL (Lux)'s role as administrator, custodian, and sub-custodian of multiple feeder funds gave it firsthand exposure to BLMIS.  Specifically, upon information and belief, HSBC SSL (Lux) served as sub-custodian and sub-administrator to Lagoon Investment Ltd., Hermes International Fund, Thema Wise, Thema Fund Ltd., Thema Coral Fund, Alpha Prime; custodian and sub-administrator to Primeo; and custodian and administrator to Herald Fund, Herald (Lux), Senator, and Lagoon Investment Trust.

55.     In the course of performing these fund services functions, employees at HSBC SSL (Lux) both perceived and appreciated significant indicia of fraud at BLMIS.

**1.     HSBC SSL (Lux)'s Knowledge Of BLMIS-Associated Risk As A Result Of Fund Services Work**

56.     HSBC SSL (Lux)'s predecessor, Bank of Bermuda (Luxembourg) SA, was part of the Bank of Bermuda Group.  In February 2004, the Bank of Bermuda group was taken over by HSBC.  "Bank of Bermuda's private banking operations were fully integrated during the year," as asserted in HSBC Holdings' 2005 Annual Report and Accounts.

57.     As early as 2001, high-level employees of Bank of Bermuda (Luxembourg) SA's Global Fund Services division ("GFS") acknowledged and purposefully disregarded signs of significant risks at BLMIS in connection with Bank of Bermuda's relationship with certain feeder

funds, such as Primeo Fund.  As explained below, these employees explicitly recognized that Madoff's role as manager, broker, and custodian to his accounts was a "red flag," and that "independent confirmation" that Madoff-held securities were kept in segregated accounts was necessary.

58.    Following HSBC's takeover of the Bank of Bermuda Group, GFS became Alternative Funds Services ("AFS"), a division within HSBC SSL (Lux).

59.    Many of those key GFS players became leading employees of HSBC SSL (Lux) and AFS, bringing with them their knowledge of the significant risks associated with BLMIS.  And yet, these same individuals continued to turn a blind eye to those concerns, just as they had done while at GFS.

60.    Specifically, in December 2001, Brian Wilkinson (the Head of Sales and Head of GFS, Dublin who became the AFS Global Head of Sales), wrote an email to various recipients in regards to a BLMIS feeder-fund, Thema, stating: "As far as I can determine the sub-custodian and investment advisor are one of the same, ie there are no 'Chinese' walls between asset management and clearing/custody.  We are receiving trade details from Madoff the sub-custodian and nothing from Madoff the investment advisory, consequently *we were posting trades from the sub-custodian with no confirmation from the investment advisor that these are valid trades*."

61.    Between July 2002 and December 2003, Nigel Fielding (the Deputy Head of Client Services of GFS who became the Global Head of Business Services for Bank GFS in January 2004 and the Global Chief Administrative Officer of AFS in January 2005) was involved in various conversations with Bank of Bermuda and HSBC employees that demonstrated an increasing awareness that normal vetting procedures were not being followed as to BLMIS:

- On September 19, 2002, Tom Young (the Credit and Risk Manager for Bank of Bermuda Dublin) e-mailed Mr. Fielding asking "[w]ould it be possible to get

*independent verification that the assets of [Thema] are segregated from other assets held by Madoff*?"  Mr. Fielding responded to that e-mail that "a fund auditor worth his salt would be doing this as a matter of course."  Nonetheless, Mr. Fielding stated: "*The review is finished and signed off for this year* and I do not intend to do more unless the GFS Board supports it, risk versus cost versus relationship, etc."

- On September 11, 2002, Mr. Young e-mailed Mr. Fielding reiterating concerns about the level and quality of the due diligence process: "When you get back, maybe you could look at this again.  *What is required is independent auditor's confirmation that the assets are not commingled.*  Madoff's representation is not enough annual audited accounts of Madoff."

- On October 1, 2002, Paul Smith (the Global Head of GFS who became Global Head of HSBC's Alternative Investment Fund), e-mailed Mr. Fielding that "[w]e have a problem with him [Madoff].  He is a manager, broker and custodian to his accounts.  *In today's world this is a red flag.*"

- On September 30, 2002, Mr. Wilkinson e-mailed the GFS Board regarding BLMIS, stating "*I feel there is still one vital piece of the 'jigsaw' missing, and that is independent confirmation that all securities held with Madoff are held in segregated accounts.* … ([I]n the case of [Thema] I suspect that the auditors have gone no deeper than the named custodian or sub-custodian, both of which are [Bank of Bermuda]). As you will see, Nigel [Fielding] does not intend to go further with the review of Madoff unless the GFS Board supports it."

- In response to a question from David Smith (a Bank of Bermuda Group executive based in Dublin) regarding whether Mr. Wilkinson was suggesting that Madoff's external auditor provide independent confirmation, Mr. Wilkinson said yes, but noted "however I also have a concern here in that Gerry [Brady (a Director of Thema)] had heard that the audit firm for Madoff is headed up by Madoff's brother in law."

- Paul Smith responded: "*I am very worried about Madoff and I think we should seek independent confirmation.  I would be prepared for GFS to pay.  It's too big for us to ignore the warning signs.*"  Mr. Wilkinson forwarded the e-mail to Mr. Fielding, noting: "I think Paul is absolutely correct."

- On October 1, 2002, Mr. Fielding e-mailed the GFS Board stating he had spoken to Mr. Wilkinson and that he "underst[ood] the board decision [was] to ask for the bank's external auditor to undertake independent audit confirmation of the assets held by Madoff for our clients in Bermuda, Dublin and Luxembourg even though this is not something we would ordinarily do with an agent."

- On information and belief, the GFS Board never sent in the bank's external auditor to obtain independent audit confirmation of the assets.

- On September 30, 2002, in a phone call with Mr. Wilkinson, Mr. Fielding recognized that "*everybody has some concern about Madoff, or 'made off' as he like to call himself, which I think makes it even worse, 'made off with the money.'*" Mr. Wilkinson responded that he "could be wrong … and maybe I'll investigate that, but I'm just covering all of our backsides to make sure we've done everything possible if this thing ever went up, you know." Mr. Fielding replied: "I'm not saying we shouldn't do it, I guess I wanted the board to say we wanted to do it, having heard David rant and rave about upsetting the guy before." Mr. Wilkinson stated that Madoff's "financial statements are not very detailed" and recognized that "we're really relying on the financial strength of Madoff, as well as much as anything."

- On October 10, 2002, David Smith e-mailed Mr. Fielding, stating: "*Madoff is really cheesed off with us ([Bank of Bermuda]) and he may cut the umbilical if we go once more to the well.* We may think our [REDACTED] has power in the market but he can replace that within a month. He may put us on the black list so we have to agree [on] a plan of action. Perhaps we should discuss?"

- On December 24, 2002, Mr. Fielding expressed to David Smith that "Paul [Smith] seems hellbent on irritating Madoff with FIG." Upon information and belief, "FIG" refers to the "Financial Institutions Group" within HSBC.

- In May 2003, Mr. Fielding made a presentation, along with Germain Birgen (then-Head of GFS Luxembourg who became Managing Director and Global Head of Fund Solutions at HSBC SSL (Lux)), to Bank Austria (Primeo Fund's promoter, marketer, and manager), in which they gave a positive impression of the BLMIS relationship despite that they apparently knew the GFS Board required audit confirmation from KPMG.

- In response to Bank Austria's request for copies of quarterly due diligence conducted by Bank of Bermuda, Mr. Wilkinson commented: "Quarterly due diligence, you have got to be joking!! *The only due diligence we have on Madoff is what Nigel [Fielding] did some months ago.*"

62.    At a Board of Directors of Primeo Fund meeting on June 23, 2003, Bank Austria identified that "they had to *totally rely on Madoff for information regarding the Fund* due to his position as both Manager and Broker of the account." Additionally, "*[c]onfirmation of transactions was also an issue without an independent broker counter party.*" Mr. Fielding—

22

who sat on the board—"reminded the board that Madoff supplies detailed statements of all activity, that the firm is registered with the SEC and has clean audit options."

63.     On information and belief, in Fall 2004, concerns regarding Madoff were raised during an HSBC SSL (Lux) board meeting in Dublin, Ireland, following which further diligence of BLMIS was proposed.  In an e-mail to Paul Smith, copied to the AFS Global Management Committee, Mr. Wilkinson responded to the proposed diligence with a stark warning: "***The consequences of the trustee review of the sub-custodian, Madoff, will be both painful and, it would appear, fatal.***  Clearly I am not suggesting that GIS (HSBC) should ignore their fiduciary responsibilities, however, *we should all be aware of the potential fall-out*."

64.     On March 3, 2004, Mr. Fielding (now the GFS Global Head of Business Services) and Christopher Wilcockson (the GFS Global Head) held a due diligence meeting at BLMIS's office in New York.  In a follow-up email on March 3, 2004, Mr. Fielding stated that the result of the meeting was "perfectly satisfactory," and that a "[s]eparate [Depository Trust Co.] account [was] used for client assets in addition to segregated records at Madoff."

65.     In December 2004, HSBC SSL (Lux) was approached about acting as custodian and administrator for a new Madoff-related fund.  Mr. Wilkinson e-mailed an individual, Peter Heaps (a Director at HSBC Security Services (Ireland) DAC, and Head of Client Relationship Management of Europe for AFS): "Please speak to Nigel Fielding on this.  *The whole Madoff issue is coming under focus now that we are part of HSBC.*  My gut reaction is that this will not fly."

66.     In February 2005, Ernst & Young ("E&Y") (auditors for several BLMIS feeder funds, including Primeo) raised concerns about Madoff at a meeting with Saverio Fiorino (the Head of GFS and subsequently AFS for HSBC SSL (Lux) from 2003 to 3008), and Mr. Birgen.

23

Following the meeting, Mr. Fiorino e-mailed Mr. Fielding that: "Germain and I have just had a meeting with E&Y …. Can I speak to you when you have five minutes. ***They have a transparency issue with Madoff.***"

67.    On February 24, 2005, Mr. Fiorino again wrote to Mr. Fielding, stating: "Nespolo [of Genevalor Benbassat, which managed Madoff-related Hermes and Thema Funds] understands the auditors concern and asked if their worries were based on the rumors (1) what is his real strategy, how on earth can he always produce 12%pa (2) where are the assets and are there really assets or is it all fictitious."

68.    On March 17, 2005, Mr. Fiorino e-mailed Mr. Fielding regarding concerns with BLMIS's auditors, Friehling and Horowitz CPA, stating that: "[O]ver the last weeks, [E&Y] raised some concerns about Madoff, as follows": (i) "Madoff strategy and queries on ***regular profits even when markets are bad***"; (ii) "***segregation of assets and real existence of these assets with Madoff***"; and (iii) "***reliability and independence of Friehling and Horowitz CPA*** (auditors of BMadof)f [sic].  Apparently F&H are related to BMadoff.  Resonses [sic] to questions raised by E&Y to BM auditors were not clear."

69.    On March 14, 2005, E&Y requested a "custody confirmation from HSBC for the positions held within the Madoff account as [of] 31 December 2004."  The following day, Mr. Fielding confirmed that HSBC SSL (Lux) would issue the requested custody confirmation.  On April 5, 2005, HSBC SSL (Lux) issued a custody confirmation letter and attachment in relation to the Primeo assets on the BLMIS managed account.  The attachment was a report relating to the securities held by BLMIS, which were not based on any independent confirmations, but solely on information contained in the trade confirmations received from BLMIS.  HSBC SSL (Lux) issued similar custody confirmations to E&Y for the audit years 2005 and 2006.

70.     On June 6, 2005, Christine Coe—the Chief Risk Officer of HSBC Security Services, in London ("HSBC SS (London)")—spoke to Mr. Fielding on the phone, voicing concerns with the diligence process: "The biggest single concern is the whole process, once it gets into Madoff's hands, is fairly incestuous within Madoff and their internal control system, which is done by … his mate, the accountant, ***it's not really in-dependent enough to give us a level of independent comfort that we would ordinarily look to***."

71.     On May 23, 2005, Ms. Coe prepared a discussion paper for review by the HSBC SS (London) Management Committee regarding Madoff risks encountered during the due diligence process, including:

- "BLMIS enters into a series of options.  These options are processed through the sister company.  ***Thus the whole process and evidence of all trades and holdings are entirely within the control of the Madoff family.***"

- "Whilst we have carried out a due diligence … ***we have not been able to undertake (nor do we have the legal right to do so) an audit of the end to end process flow to confirm the integrity of the whole activity.***  It is questionable how much we can rely on the auditor produced control statement.  Not only is it concise, the auditors are not one of the major independent accountancy groups."

- "The real issue is are we satisfied with the integrity of the Madoff operations such that we are comfortable with a lack of real independent evidence of the trading of client assets."

- "The financial cost of appointing a sub-custodian that we cannot exercise a level of due care over, could be significant; equally so would be the reputational risk."

- "The key to this in my view, is the ***need for an independent control review***. If we had the equivalent of a SAS70 carried out by a major firm, I think we could get comfortable. How feasible this is, will of-course be the question." (emphasis added throughout).

72.     In particular, Ms. Coe noted that though "[t]here are substantial relationships here, which have operated with Bank of Bermuda for some time, … there is substantial risk, in the event there is any question over the integrity of the process."

73.     Ms. Coe testified that, in 2005, the year in which she wrote the discussion paper, she explicitly considered "that ***one of the possible options was that [BLMIS] was all a sham.***"

74.     On May 30, 2005, following Ms. Coe's discussion paper, John Gubert (the Global Head of HSBC SS (London)), sent an e-mail concerning BLMIS to Mr. Fielding, Ms. Coe, Paul Smith, and Brian Pettitt (the Head of Network Management for HSBC SS (London)).  The email included the following statements:

- "Thank you for the papers on the above.  It strikes me that the firm has reasonable capital …, has a solid reputation but that we have a flawed process."

- "Although there is no reason to doubt the integrity or professionalism of the Group, the reality is that: we do not have full control of assets or real time sight of transaction flows[;] the transactions are all internal to the family firms and there is no proof of best execution or even actual execution[;] the audit is undertaken by a firm that is not on our recognised list of auditors[.]"

- "***I cannot countenance this process – and I appreciate it is a major money earner – unless we can adopt the process common in banking in the USA where liens (rather than absolute title and possession) are adopted.***  Under that process we – or our delegate – could arrive unannounced at the client office to assess that all security was in place as advised."

- "I appreciate ***Madoff does not like external 'intrusion'*** and am willing for this to be undertaken by our auditors (at our cost).  ***If this cannot be done, then we should exit the relationship.***"

75.     But HSBC did not "exit the relationship."  Three years later, Ms. Coe requested an urgent meeting between KPMG and HSBC personnel to discuss KPMG's findings as to potential fraud and operational risk associated with BLMIS.  Accordingly, a conference call was held on July 17, 2008 (the "2008 HSBC Conference Call"), involving Ms. Coe, Mr. Pettitt, other HSBC

employees from London, KPMG, and, upon information and belief, HSBC employees from Luxembourg, New York, and Hong Kong.

76.    During the 2008 HSBC Conference Call, Ms. Coe stated that BLMIS "is *a perfect structure for fraud.*"

77.    During the 2008 HSBC Conference Call, an employee of KPMG stated: "The key thing is *we need to test the existence of the actual trade* because [that is] the only way you're going to be able to verify that this is not just an elaborate fraud."

78.    In response to a KPMG comment made regarding verifying the existence of BLMIS's trades, Ms. Coe stated her concern about HSBC's across-the-board increased exposure due to the integration of Bank of Bermuda's entire custody portfolio: "[t]hat's the real concern that we have *and it has grown exponentially*. … I mean we, our outage has probably gone up three, three times. … I mean *that's a lot of billions of dollars*."

79.    During the 2008 HSBC Conference Call, an HSBC employee stated: "*What we are concerned about … is the fact that there could be a fraud* … [that] there is no real trading … and it is just a Ponzi scheme."

80.    Upon information and belief, in August 2008, Gordon Thomson (the Head of Institutional Fund Services for HSBC SSL (Lux)) sent an e-mail to Ms. Coe, Mr. Pettitt, Andrew Bastow (upon information and belief, the Chief Technology and Services Officer for HSBC Security Services (Ireland) DAC), and Michael May (the Managing Director in charge of operations, risk, and compliance).  Thomson's email stated that Madoff investments were "*[t]oo good to be true*" and characterized Madoff investments as involving "unusual activity."

81.    HSBC SSL (Lux)'s BLMIS-related knowledge was not derived only from its fund services work.  As described below, entities within HSBC Group shared common business

objectives, coordinated strategies, and exchanged information freely among one another. As a result, upon information and belief, HSBC SSL (Lux) possessed the same knowledge as other HSBC entities, including knowledge regarding BLMIS-associated risks and concerns.

**2.    HSBC Entities, Including HSBC SSL (Lux), Closely Collaborated And Shared Information Among Themselves, Including About The Risk Of BLMIS-Associated Fraud**

82.    HSBC was instrumental to the furtherance and expansion of BLMIS. Using its international status and reputation, HSBC opened channels between BLMIS and foreign and domestic investors in its capacity as the feeder funds' marketer, custodian, and administrator. It was so successful in convincing investors to invest in BLMIS that, by BLMIS's own account, HSBC clients represented ***one-third*** of its entire business. By virtue of its significant involvement in Madoff, HSBC acquired knowledge all but confirming that BLMIS was a fraud. Yet instead of taking steps to find out the truth, HSBC turned a blind eye, portraying BLMIS as a legitimate source of above-average returns to the investors whose capital BLMIS so desperately needed and receiving significant fees in return.

83.    In pursuit of their common objective, upon information and belief, all HSBC entities, including HSBC SSL (Lux), HSBC SS (London), HSBC Private Bank (Suisse) SA ("HSBC Suisse"), HSBC Bank USA ("HSBC USA"), and HSBC Bank Bermuda Limited ("HSBC Bank Bermuda") worked collaboratively and freely shared information in connection with BLMIS-related matters.

84.    Various reports and disclosures published by major HSBC parent companies— including HSBC Holdings plc (HSBC Group's ultimate parent company, "HSBC Holdings") and HSBC Bank plc ("HSBC Bank") demonstrate that the HSBC Group had an organizational and structured risk management monitoring and reporting framework that mandated close coordination across the HSBC Group entities:

- As stated in HSBC Bank's 2007 Annual Report and Accounts: "***Centralised funtional control*** is exercised over all computer system developments and operations. … ***Credit and market risks are measured and reported on in the bank and major subsidiaries and aggregated for review of risk concentrations on an HSBC Group-wide basis.***"  (bolding added for emphasis throughout). A nearly identical statement is made in HSBC Holdings' 2004 Annual Report and Accounts.

- As stated in HSBC Bank's 2007 Annual Report and Accounts: "***[C]o-operation between head office departments and businesses is required to ensure a strong adherence to the group's risk management system*** and its corporate social responsibility practices."  A nearly identical statement is made in HSBC Holdings' 2004 Annual Report and Accounts.

- As stated in HSBC Bank's 2008 Annual Report and Accounts: "***[P]olicies on all major aspects of business are set for the group and for individual subsidiary companies, businesses and functions.***  These policies, which form an integral part of the internal control systems, are communicated through manuals and statements of policy and are promulgated through internal communications.  The policies cover social, ethical and environmental issues and set out operational procedures in all areas of reputational risk, including money laundering deterrence, environmental impact, anti-corruption measures and employee relations."

- As stated in HSBC Holdings' June 2008 Risk Disclosure: "***Chief Risk Officers in each major operating subsidiary typically report directly to their local Chief Executive Officer or country manager but also have a reporting line to the Group Chief Risk Officer ['GCRO'].***"  HSBC Holdings' December 2008 Risk Disclosure states that "***Group Risk works closely with its functional colleagues*** across the Group," and that "***[r]isk measurement, monitoring and reporting structures are mirrored in Group subsidiaries and global businesses.***"

- As stated in HSBC Holdings' June 2008 Risk Disclosure: "Within the Group Risk function, HSBC has constructed a ***centralised database covering substantially all the Group's direct lending exposures*** to support regulatory reporting and deliver comprehensive management information at an increasingly granular level."

- As stated in HSBC Holdings' 2009 Risk Disclosure: "The ***measurement and monitoring of the major risks encountered by the Group***, including credit, market and operational risks, ***are increasingly delivered by central systems*** …."

- Similarly, HSBC Holding 2009 Risk Disclosure states that "***Global risk … establishes Group policy***, exercises Group-wide oversight and provides reporting and analysis of portfolio composition and trends on a global and regional basis to senior management. ***Accountability and consistent control across the Global Risk function*** is provided through the Global Risk Management Board, chaired by the GCRO, the members of which include the Chief Risk Officers of HSBC's regions and the heads of risk disciplines within Group Management Office ('GMO'). Regional Chief Risk Officers report both within the business line to their local CEOs and also functionally to the GCRO, who has joint responsibility with CEOs for the appointment of the most senior risk officers and the setting of their performance objectives."

- As stated in multiple HSBC Holdings Annual Reports and Accounts: "***The Directors have free and open contact with management at all levels.*** Group Managing Directors and Group General Managers meet informally with Directors after Board meetings. Board offsite visits are made each year to enable Directors to see at first hand subsidiary company operations at their operating environments and to meet local management, employees and customers." For example, in 2005, the Board visited Bermuda, among other sites; in 2007, the Board visited New York.

85. Upon information and belief, information concerning BLMIS-associated fraud risks was reported and shared across HSBC subsidiaries, in accordance with HSBC's risk management policies and procedures. For one example, as detailed above, on July 17, 2008, HSBC employees from, upon information and belief, Luxembourg, London, New York, and Hong Kong, joined a conference call in which BLMIS-associated concerns were discussed extensively.

86. As another example, when HSBC Bank engaged KPMG, as detailed below, to review BLMIS for fraud and related operational risk, KPMG did not focus on the exposure of isolated HSBC subsidiaries. Rather, its analysis was concerned about HSBC Group-wide exposure. To that end, KPMG's review involved consulting with employees across HSBC entities, including members of HSBC SSL (Lux), HSBC SS (London), and HSBC Institutional Trust Services (Ireland) Ltd, in Dublin.

87.    The following sections detail the vast knowledge concerning BLMIS-associated fraud possessed by various HSBC affiliates, which was shared, upon information and belief, with HSBC SSL (Lux).

### 3.    Internal HSBC Diligence Reports Indicated Risk Of BLMIS-Associated Fraud—But Were Ignored

88.    In 2001, David Mullane, an employee of HSBC Republic (which became HSBC Private Bank, a division of HSBC USA) was a member of the research committee ("Research Committee") that created two due diligence reports on Sentry:  one on August 10, 2001 (the "2001 Due Diligence Report") and another on January 8, 2003 (the "2003 Due Diligence Report").  Upon information and belief, Mr. Mullane left HSBC USA in 2003 to work at HSBC Suisse in Geneva, spreading across the HSBC Group the knowledge attained during the multiple due diligence efforts into Sentry.

89.    The 2001 Due Diligence Report emphasized concerns over Madoff's improbable return stream:

> Bernie Madoff's ***12 year track record*** trading a ***split strike conversion strategy*** on the ***S&P 100***, is quite simply ***astounding***.  His ***annualized return*** of 15%, (net of a 20% performance fee), at a ***risk*** of 3%, yields a ***sharpe ratio*** of 3.3. Over this period the fund has endured only ***4 down months*** (the maximum of which was down 0.5%), and has now gone almost 6 years without a ***drawdown***.

> With this track record, seemingly derived from such a ***simple investment strategy***, certain members of the investment community are ***baffled***, as to how such a return stream has been earned. (underlining emphasis in original throughout).

90.    The 2001 Due Diligence Report also identified multiple indicia of fraud, including that "Madoff takes absolutely ***no fees*** at fund level," "is effectively the ***custodian*** of the securities," "***liquidates the portfolio at year-end*** and so no securities appear on the audited fund financials," and "***no longer meets with investors*** in the fund."

91.     The 2001 Due Diligence Report additionally noted the concern that Madoff was "*trad[ing] outside of the stated universe*," and acknowledged that the issue had not been resolved.

92.     The 2001 Due Diligence Report expressed further skepticism about BLMIS's strategy, stating: "It is very difficult for us to understand *how they can profit* from this strategy *in down markets*. Consequently, *it is very difficult for us to understand how the fund has so consistently made money over the last 12 and a half years*." The report found it "difficult to understand why other participants are not successfully employing the strategy."

93.     In analyzing potential sources of BLMIS's returns, the 2001 Due Diligence Report noted, in part:

- "The 'pure strategy' – given the fact that the strategy loses money in down markets we believe that it is *unlikely* that the *returns* can be *attributed solely* to this strategy."

- "Market Bias/Timing – given the consistent returns of the strategy, plus the fact that it takes them three days to enter/exit a position it seems unlikely to us that they are making a great deal of money, so consistently, from market timing."

- "Portfolio outperforms Index – given the consistent returns of the strategy, plus the fact that they state that the portfolio is strongly correlated to the index, it seems that it is *unlikely* that this is a *significant source of returns*."

- "Investing outside of Index – we found *no evidence* that the baskets contained stocks outside the S&P 100."

94.     "Madoff is reluctant to explain the strategy in detail," stated the 2001 Due Diligence Report. It additionally noted that the Research Committee was "unable to meet with *Bernie Madoff*" and that "[w]ithout meeting with Madoff we are *unable to cover their particular risk controls*."

95.     The 2001 Due Diligence Report rated Sentry "Info. Inaccessible," which it defined as "Established managers with whom transparency issues prevent us from conducting a proper due diligence."

96.     More than a year later, the Research Committee again rated Sentry as "Info. Inaccessible," in its 2003 Due Diligence Report, "due to the lack of transparency …."  The 2003 Due Diligence Report was created by Mr. Mullane and Cedric Vuignier, another employee of HSBC USA's Republic division.  Upon information and belief, Mr. Vuignier left HSBC USA in 2002 to work at HSBC Suisse in Geneva, similarly bringing with him the knowledge attained during the due diligence effort into Sentry.

97.     Once again, the 2003 Due Diligence Report stated that the Research Committee was "still unable to meet with Bernie Madoff."  Additionally, the report noted that, "with little transparency and a number of other issues some investors (and the media) have questioned whether the split-strike conversion strategy that is reported to be employed has produced [BLMIS's] returns."

98.     The 2003 Due Diligence Report concluded that "[the Research Committee's] opinion has not changed in one year and *investors have to be aware of the risk accompanying an investment in this fund*."

99.     The 2003 Due Diligence Report identified the exact same indicia of fraud in connection with BLMIS that it had identified in the 2001 Due Diligence Report.

100.    In the Research Committee's minutes from January 10, 2003, Mr. Mullane stated: "*I would not invest in [Sentry], nor would I want investors to invest.*"

101.    In addition to the 2001 Due Diligence Report and 2003 Due Diligence Report, HSBC USA's Research Committee issued another diligence report on Sentry on January 9, 2004 (the "January 2004 Due Diligence Report").  The report noted that, while the Research Committee had been "given more transparency," it was "still not satisfied that [it could not] review the portfolio."  As a result, the Research Committee "*[could not] independently guarantee how the*

***fund actually provides for its returns.***" The January 2004 Due Diligence Report gave Sentry a 2/5 and "info inaccessible" rating.

102. The January 2004 Due Diligence Report identified a multitude of BLMIS-associated concerns, including that the Research Committee could not meet with Madoff, that Madoff takes no fees at the fund level, and that Madoff is the effective custodian of the securities. "Normally we feel comfort if there is an independent prime broker," the report stated, "but here the fund also plays that role."

103. The Research Committee produced another due diligence report on Sentry in September 2004 (the "September 2004 Due Diligence Report"). The Research Committee again gave Sentry a 2/5 and stated: "[the Research Committee's] concerns regarding the strategy remain unaltered as does the rating of 'info inaccessible.'"

104. The September 2004 Due Diligence Report identified the following primary BLMIS-associated concerns:

- "Unable to meet with Bernie Madoff who directs the investment strategy";

- "***'Too good to be true' track record***";

- "HSBC has significant exposure to this strategy";

- "Quarterly incentives fees are charged";

- "Madoff also runs a ***brokerage business***, Bernard L. Madoff Investment Securities (BLM), that accounts for 15% of the daily volume in US stocks. BLM is a market maker in the stocks in which the fund invests, and hence trades with the fund as principal.";

- "Madoff takes absolutely ***no fees*** at fund level …";

- "Madoff is effectively the ***custodian*** of the securities";

- "Madoff ***liquidates the portfolio at year-end*** and so no securities appear on the audited fund financials"; and

34

- "***Madoff no longer meets with investors*** in the fund."

105.    The Research Committee produced another due diligence report on Sentry in September 2005 (the "2005 Due Diligence Report").  The 2005 Due Diligence Report noted that "[the Research Committee's] concerns regarding the strategy remain significant."  It identified a similar list of indicia of fraud associated with BLMIS, noting the lack of an independent prime broker and that "***manipulation of bid/ask spread has been suggested by some in industry***" to explain Madoff's track record.

106.    The Research Committee produced another due diligence report on Sentry in August 2006 (the "2006 Due Diligence Report").  The 2006 Due Diligence Report identified a similar set of BLMIS-associated concerns as identified by the 2005 Due Diligence Report.

107.    HSBC USA's Research Committee's May 2007 minutes note that Sentry did not "really know how [BLMIS's trading] model work[ed]" and that "[w]e have better transparency with some of the more secretive managers …."  The minutes further state that "[t]ransparency remains unclear," and that "***[t]hings do not add up in terms of Bernie's compensation structure.***"

108.    The Research Committee produced another due diligence report on Sentry in June 2007 (the "2007 Due Diligence Report").  In addition to other risk concerns, the 2007 Due Diligence Report noted that "[t]he lack of transparency involving fees paid to Madoff was disturbing," and that the only fees BLMIS was supposed to charge were "not disclosed anywhere, not even the audited financial statements."  Not long after, in December 2007, when non-party BNP Securities Corp. was negotiating an option agreement referencing a feeder fund, it was instructed by HSBC USA to delete any references to Madoff or BLMIS—and complied with the request.  Such a reference could, to a savvy investor, suggest potential impropriety that would make it difficult to finalize the agreement.

109.    The Research Committee produced another due diligence report on Sentry in August 2008 (the "2008 Due Diligence Report").  The 2008 Due Diligence Report noted that Madoff's strategy "attracts a certain amount of conjecture, not least because of its stunning risk-adjusted performance over close to two decades.  Similar strategies executed by other firms … have delivered nothing like the same return profile.  ***This remains largely unexplained*** as there is little transparency into Madoff Securities and the models they use to execute the strategy."

110.    The 2008 Due Diligence Report identified numerous red flags associated with BLMIS, including:

- "No access to the strategy's manager (Madoff Securities)";

- "No independent custody and verification of trading activity away from the investment manager (unlike a standard hedge fund that has a prime broker)";

- "Madoff's lack of realistically independent auditor – Friehling & Horowitz is a very small firm with Madoff as its only major client";

- "Counterparty risk in the options trading";

- "Unusual Madoff compensation structure (commission based, no fees)"; and

- "High degree of family involvement at Madoff Securities combined with secrecy surrounding the firm."

111.    Attached as an appendix to the 2008 Due Diligence Report was a *Hedge* article entitled "*Madoff tops charts; skeptics ask how.*"

112.    HSBC's due diligence into BLMIS and its feeder funds was not limited to internal review.  As described in the following sections, HSBC hired a reputable auditor to review BLMIS for fraud risks—twice—yet willfully disregarded the numerous red flags the auditor repeatedly identified.

4.    **KPMG Assesses Fraud And Operational Risk At BLMIS Only To Have HSBC SSL (Lux) Turn A Blind Eye To Its Findings**

113.    In September 2005, HSBC Bank (HSBC SSL (Lux)'s parent company) engaged KPMG to review BLMIS for fraud and related operational risk.  KPMG's review focused on fraud risks in BLMIS's methods of recording and reporting client funds held by BLMIS, and HSBC's ability to detect suspected fraud or misconduct in client funds for which HSBC SSL (Lux) and its affiliates served as primary custodian.  KPMG's review was to include speaking to HSBC staff in Luxembourg, London, and Dublin and conducting a selective review at Madoff's office.

114.    KPMG's findings were encapsulated in a February 16, 2006 report, titled "Review of fraud risk and related operational risks at Bernard L. Madoff Investment Securities LLC" (the "2006 Report").  In the 2006 Report, KPMG identified a laundry list of possible fraud and related operational concerns—which it characterized as "[r]isk[s] or potential issue[s]"—related to BLMIS's operations including:

- falsification of client mandates;

- embezzlement of client funds;

- falsification of client instructions to disguise poor proprietary positions;

- failure to segregate client funds from BLMIS funds;

- diversion of client funds for personal gain;

- inaccurate allocation of reinvested funds from Fidelity across individual accounts;

- manipulation of option prices to maximize commissions;

- use of BLMIS claim funds to settle options exercised against HSBC;

- exercising options but telling HSBC that the option was left to expire;

- use of client funds to misappropriate position (e.g., invest in premium bonds and notes but report as low-value investments);

- diversion of cash resulting from the sale of equities and Treasury bills;

- over-valuing of positions and the failure to report positions to HSBC in order to control relationship;

- failure to hold stocks in client names;

- inflation of call values to disguise misappropriation or poor positions;

- unauthorized trading in client accounts;

- execution of trades made by unauthorized BLMIS staff members;

- execution of sham trades to divert client cash;

- front-running client trades to BLMIS's advantage;

- false reporting of trades without execution to collect commissions; and

- falsification of trade confirmations.

115.    KPMG was particularly concerned that it could not identify the owners of individual HSBC client assets, and that controls in place at BLMIS might not prevent fraud or errors in client accounts.

116.    As part of its review, KPMG spoke with Mr. Fiorino, the AFS Head.  As a result, HSBC SSL (Lux) was aware of HSBC Bank's engagement of KPMG.   Upon information and belief, HSBC SSL (Lux) received the 2006 Report after its completion.

117.    Despite the litany of fraud and operational risks identified by KPMG, HSBC SSL (Lux) continued its relationship with Madoff and deliberately avoided taking any steps to implement KPMG's recommendations.

5.      **Two Years Later, KPMG Identifies The Same—And More—Risk Concerns Associated With BLMIS, Showing That HSBC SSL (Lux) Failed To Heed Earlier Warnings**

118.    After ignoring KPMG's dire warnings in 2006, HSBC Bank asked KPMG to conduct another review of BLMIS in March 2008.  The scope of the review was identical to the 2006 review, except that KPMG was also asked to assess the risk of placing HSBC investments with BLMIS.

119.    KPMG's conclusions were contained in a September 8, 2008, report entitled "Review of fraud risk and related operational risks at Bernard L. Madoff Investment Securities LLC" (the "2008 Report").   KPMG wrote that, according to Madoff, HSBC's client investments represented an astonishing 33% of BLMIS's assets under management.

120.    In the 2008 Report, KPMG identified the same fraud and operational "[r]isk[s] or potential issue[s]" associated with BLMIS, plus more that were not previously identified in the 2006 Report, including:

- diversion of client cash by falsifying signatures on client instruction in an attempt to legitimize an unauthorized transaction (*i.e.*, redemption); and

- intentional failure to allocate stocks a fair price from the bulk trade.

121.    Upon information and belief, HSBC SSL (Lux) received the 2008 Report after its completion.

122.    Despite the litany of fraud and operational risks identified by KPMG, HSBC SSL (Lux) continued its relationship with Madoff and took no steps to implement KPMG's recommendations.

123.    In addition to fund services work, HSBC entities gained further exposure and insight into Madoff while serving as marketer of multiple BLMIS feeder funds.

6. **HSBC SSL (Lux)'s Knowledge Of BLMIS-Associated Fraud Gained As A Result Of HSBC Suisse's Marketing Investments**

124.     Upon information and belief, through its contact with BLMIS as a marketer of and investor in feeder funds, HSBC Suisse was well aware of BLMIS-related fraud risks, including Madoff's non-standard fee structure, lack of an independent auditor, and improbable returns. Yet, upon information and belief, HSBC Suisse took no steps to quell these concerns.

125.     Upon information and belief, beginning in the late 1990s, HSBC Suisse solicited clients to invest in BLMIS feeder funds, including Sentry, Sigma, Primeo, Thema International, Ascot Fund, Ltd., and the Kingate Funds.

126.     Upon information and belief, in 2004, HSBC Suisse represented to an investor that Kingate Global (which, together with Kingate Euro, invested a staggering $1.7 billion with BLMIS) was part of HSBC's diversified funds and that HSBC itself was invested in Kingate Global. Upon information and belief, HSBC Suisse sent that investor marketing materials two years later recommending Kingate Global and Sentry for investment. Upon information and belief, in 2008, when that investor inquired further about Kingate Global, HSBC Suisse informed the investor that HSBC had completely divested from Kingate Global due to "problems" with the fund.

127.     Upon information and belief, in 2004, HSBC Suisse recommended Kingate Global to another investor, touting its 10% to 12% returns. Upon information and belief, HSBC Suisse told that investor that HSBC's own inspectors had confirmed that those feeder funds were operating properly and that HSBC tracked the performance of all hedge funds its clients were invested in.

128.     Upon information and belief, HSBC Suisse informed yet another investor in 2004 that it did not sell every available fund, but only those that passed its due diligence requirements.

Upon information and belief, HSBC Suisse confirmed that HSBC performed due diligence on all recommended funds.

129.    Upon information and belief, in 2005, one investor placed $300,000 in Sentry based on HSBC Suisse's recommendation.  Upon information and belief, HSBC Suisse did not inform that investor of the significant concerns it held regarding Sentry or BLMIS.  Upon information and belief, the investor's HSBC Suisse advisor told the investor to "*get out*" because HSBC conceded that it did not understand the investment strategy.

**E.**    **The Beneficial Shareholders Knew Or Should Have Known Of The BLMIS Fraud**

130.    HSBC SSL (Lux) served as trustee, agent, representative, nominee, or custodian for the Beneficial Shareholders in connection with their investments in the Funds, including, by: subscribing to shares of Sentry and Sigma on behalf of the Beneficial Shareholders, maintaining custody of the shares as record shareholders, paying redemption proceeds from the shares of Sentry and Sigma to the Beneficial Shareholders, and otherwise exercising control over the shares of Sentry and Sigma.

131.    Further, each of the Subscription Agreements, executed by HSBC SSL (Lux), manifested the Beneficial Shareholders' consent for HSBC SSL (Lux) to act on behalf of and subject to the Beneficial Shareholders' control.  And in executing the Subscription Agreements, HSBC SSL (Lux) accepted and agreed to act on behalf of the Beneficial Shareholders.

132.    Accordingly, the Beneficial Shareholders had the same knowledge as HSBC SSL (Lux) regarding all relevant matters relating to BLMIS and the Funds' Net Asset Values at all relevant times.

133.    But in the alternative, both the Funds' Articles of Association as well as each of the Subscription Agreements provide that it is the registered shareholders that are to be treated as the parties to the Funds' Articles.

134.    Article 8 of the Funds' Articles provides that "The Company shall be entitled to treat the registered holder of any share as the absolute owner thereof and accordingly shall not be bound to recognise an equitable or other claim to, or interest in, such share on the part of any other person."

135.    Paragraph 27 of the Subscription Agreements similarly provides that "If Subscriber is subscribing as trustee, agent, representative or nominee for another person (the 'Beneficial Shareholder'), Subscriber agrees that the representations and agreements herein are made by Subscriber with respect to itself and the Beneficial Shareholder. Subscriber has all the requisite authority from the Beneficial Shareholder to execute and perform the obligations hereunder."

136.    Together, these contractual provisions bind the Beneficial Shareholders to HSBC SSL (Lux)'s bad faith on all relevant matters relating to BLMIS and the Funds' Net Asset Values at all relevant times.

F.    **Citco Did Not Issue Any Certifications Of Net Asset Value In "Good Faith"**

137.    Article 11 of the Funds' Articles provides that "[a]ny certificate as to the Net Asset Value per Share … given in good faith by or on behalf of the Directors shall be binding on all parties."  During the relevant period, statements of the Net Asset Value were issued by the Funds' administrators, Citco Fund Services (Europe) B.V. and its delegatee Citco (Canada) Inc. (the "Administrators").  On April 16, 2014, the Judicial Committee of the Privy Council (the "Privy Council") issued a decision in which it held that certain statements of Net Asset Value, in particular, certain monthly emails, contract notes, and monthly account statements issued by the Administrators, constituted "certificates" for the purposes of Article 11 (the "Certificates").  The Privy Council did not, however, address whether such Certificates were given "in good faith."  In carrying out this responsibility, the Administrators and affiliated Citco companies within Citco Group Limited (collectively, "Citco") acted with a lack of good faith in giving the Certificates.

138.    Over the course of fifteen years, in its capacity as service providers to the Funds, Citco reviewed information concerning BLMIS that was not available to the general public and expressed internal alarm about what that information showed with respect to the likelihood of fraud at BLMIS, but turned a blind eye to the reality reflected in the information and instead proceeded with issuing the Certificates as if there were no problem.

139.    So grave were the Administrators' internal concerns that they expressed doubts—many years before the fraud was made public—that the Funds' assets with BLMIS even existed, with one employee stating "I will not change my [opinion] as long as I [do] not see evidence that the portfolio exists."  The Administrators also expressed repeated concern over the fact there was no segregation of duties at BLMIS—*i.e.*, BLMIS (i) had discretion over which investments to make and when to make them, such that BLMIS was de facto investment manager, (ii) had actual custody of the Funds' assets, such that BLMIS was de facto custodian, and (iii) was also the broker. Based upon the proprietary information they reviewed, Citco expressed concern—internally—that BLMIS would be a repeat of the notorious Manhattan Investment Fund fraud of the 1990s "multiplied by a factor of five."  Ultimately, unable to resolve their grave concerns, Citco, rather than withdrawing, ceasing to issue Certificates, or sounding a public alarm, made a corporate decision to continue on as service providers—in exchange for an 800% increase in fees.

### 1.    Citco Expressed Doubt As To Whether The Funds' Assets At BLMIS Even Existed

140.    Beginning in 2000, the Administrators ran into trouble with the basic task of verifying the existence of the Funds' assets with Madoff.  Initially, Citco expressed serious concerns regarding whether the Funds' Treasury bond transactions actually matched those transactions reported by Madoff because of an apparent "rhythm of trading" each month.  The rhythm of trading within Sentry's portfolio appeared too consistent to be true, as the assets included

only a limited number of Treasury bonds by each month's end. At the beginning of each month, Madoff would purchase shares and put options and would sell call options, but, like clockwork, would then liquidate all of Sentry's holdings by the 20th of each month. Thus, the Administrators wanted to check whether the Treasury bonds even existed at all.

141.    The Administrators could not verify the existence of the assets because the Funds' custodians, Citco Bank Nederland N.V. Dublin Branch and Citco Global Custody (the "Custodians"), did not actually hold them. Instead, Madoff served as his own custodian. Therefore, the custody statements that the Custodians were supposed to generate based on assets in their possession, were instead merely copied, or "shadow book[ed]," from BLMIS account statements. The Custodians were "only the custodian[s] on paper, not in reality" and did not place any trades for the Funds.

142.    Management within Citco, including Ruud Bodewes ("Bodewes"), the head of internal audit for all of Citco Group, and Ger Jan Meijer ("Meijer"), the head of internal audit for the Administrators, expressed concern about the operations at BLMIS. In May 2000, Bodewes expressed his concern to the general counsel and manager of Citco Bank Nederland, as well as Meijer, that "[w]ith [the] Manhattan [Investment Fund fraud] in the back of our minds, we, as Citco, may very well be in a potential dangerous situation, since we do not seem to have an independent source to verify the information from BLMIS." Indeed, Meijer had raised these concerns to Bodewes weeks earlier, warning that Madoff could be "a Manhattan multiplied by a factor of five."

143.    In addition to warning Bodewes, Meijer also warned Citco Group's Chief Executive Officer, Christopher Smeets ("Smeets") in May 2000 that "[t]o not react or to react too late does indeed mean that investors once again faithfully deposit tens of millions of USD in the

Madoff well (for which we do not know if there is a bottom to it) at month's end," with the understanding that Citco could "already be held personally responsible insofar as we have allowed the subscriptions to take place as of May without a fight." Smeets acknowledged receipt of Meijer's emails and concerns. At that time, Meijer emphasized that "with the current knowledge and Citco as asset protector, Citco has a legal obligation to obtain more assurance" of the Funds' assets.

144.    However, in what became a familiar pattern, Citco turned a blind eye to the documents and information in their possession. Citco Group did not address the Administrators' concerns raised in May 2000, and a few months later, Meijer stated: "[i]t seemed that this affair [was] being put on the back burner and hushed."

145.    A year later, Meijer again reiterated his concerns about BLMIS's operations, which "remain[ed] unsolved." Meijer warned that "Citco has a risk exposure of more than USD3 billion" and that "[p]robably there are no options to restore this situation from a worst case scenario." He stated: "I will not change my [opinion] as long as I [do] not see evidence that the portfolio exists." Five months later, in January 2002, the Administrators again emphasized that the issues concerning BLMIS posed severe risks to Citco and the Funds' investors. Meijer told Bodewes: "I have been worried about this situation for 2 years (including the risk to the continued existence of Citco), however the same was not taken seriously by certain gentlemen. … My intuition (combined with the business that I have seen) tells me that things are not right."

146.    In January 2002, Meijer insisted to Bodewes that: "Citco must now seriously take the possibility that everything is really wrong with [the Funds'] account, as well as the possibility that everything will come into view within 2 years. … Personally I think the chance [that something is wrong] is at least 50%." Meijer persisted that there was "still the opportunity to more

or less direct the whole process, and search out the best way out with the help of good lawyers (legal contingency plan).  Otherwise you run the risk that the scene will later be determined by others."  However, in response Citco Group's management, and Bodewes in particular, failed to undertake a meaningful investigation into Meijer's doubts regarding the existence of the Funds' assets, and instead continued acting as a service provider for the Funds for over six more years.

147.    In fact, multiple members of the Administrator's management tried to prevent Meijer from asking questions.  John Verhooren ("Verhooren"), a member of Citco's administration services management team, actually knew that Meijer had raised concerns about the existence of the Funds' assets for years, but deliberately ignored those concerns.  For example, in May 2000, Verhooren acknowledged that the lack of segregation of duties and trading patterns at Madoff were not new discoveries, and many people at Citco had already recognized these phenomena.  Later, in response to concerns raised in 2001, Verhooren again rebuffed Meijer's insistence that Citco was facing "an enormous risk exposure."  Instead, Verhooren told Meijer to stop raising the issue and claimed that Citco would try to meet with Madoff to investigate.  However, neither Verhooren nor any member of the Administrator's staff ever gained sufficient evidence that the Funds' assets existed from Madoff.

### 2.    Citco Failed To Obtain Evidence Of The Existence Of The Funds' Assets

148.    Citco not only expressed internal concern regarding whether the Funds' assets with BLMIS even existed—it knew that BLMIS would not confirm their existence for Citco as the Funds' service providers.

149.    The Administrators' audit reports designated Sentry as a non-compliant fund on their "watch list" as a result of the lack of segregation of duties at BLMIS.  Each year from 2000 through 2006, the Administrators recommended that Citco either confirm the existence of the Funds' assets held by BLMIS or resign as service providers.  On three occasions between

May 2000 and December 2002, Citco attempted to verify the existence of the Funds' assets at BLMIS. All attempts failed.

150.    In May 2000, Citco set up a meeting with Madoff to gain "independent confirmation of the[] existence" of the Funds' assets, particularly the Treasury bills, and to determine how Madoff derived share prices from the markets. However, this effort failed. BLMIS did not verify the existence of the assets, and Citco concluded internally that the meeting had not provided "a full disclosure of [the] assignment."

151.    In July 2001, Bodewes had attempted to assess the concerns raised by Meijer in an internal due diligence memorandum. However, Bodewes's due diligence was limited to a review of Citco's proprietary documents because Citco was concerned that permitting "an on-site audit at [BLMIS] premises may hurt the relationship with [the Fund], resulting in a possible loss of [a] USD 1.5 million dollar fee income." Even so, based on the documents and information in Citco's possession, Bodewes shared Meijer's concerns about BLMIS's operations, and concluded that losses at BLMIS could be hidden, leaving Citco ultimately liable to the Funds' shareholders. Bodewes also noted that the two-man audit firm used by BLMIS did not "match up" with the size of BLMIS's business. Indeed, multiple Administrator employees acknowledged that the small size of Madoff's accounting firm posed a risk, given that the size of the firm was not large enough to audit the amount of assets purportedly managed by BLMIS.

152.    Smeets, Citco Group's CEO, received Bodewes' memo regarding the issues at BLMIS, including the issues posed by the size of Madoff's audit firm. Citco Group's management responded that they would like to "work this out" with Madoff, but never met with him in 2001.

153.    By an email dated February 6, 2002, Ermanno Unternaehrer ("Unternaehrer") of Citco Group stated that Citco wanted evidence the T Bills existed. In December 2002, Citco once

again "attempt[ed] to get conclusive proof" from Madoff that Sentry's portfolio was in BLMIS

custody and to have "Madoff … provide evidence of the existence/custody of the positions."

Before the meeting, Meijer directed a member of the internal audit group at Citco to "[p]roperly

record what you have done and what you have not been able to determine. … It is a troublesome

task insofar as Madoff is not known for his openness."  However, the meeting did not include any

meaningful discussion with Madoff regarding the holdings purported to be in his custody.   The

employee, Albert van Nijen, reported back that the Administrators' "mission" to increase "Citco's

comfort level with respect to the existence of the assets in relation to [Citco's] responsibilities as

Custodian[s]" had again failed.   On December 27, 2002 Bodewes reported to the executive

committee of Citco Group that as long as the position of Sentry with BLMIS was not independently

verified "there will be doubts".

154.    After Citco's third failed attempt, Citco never again tried to gain evidence from

Madoff that the Funds' assets existed until his fraud was ultimately exposed in December 2008.

In addition, Meijer noted that "Madoff [was] no[t] known" to Citco's external traders, even though

his investment strategy required selling major quantities of call options each month.  In an email

to Bodewes, Meijer stated, "I visited the Madoff website. … According to the investment policy,

the fund needs to sell major quantities of call options on the market each month.  I absolutely do

not trust it!!!!"

155.    Meanwhile, through the entire period, Citco continued to issue the Certificates.

**3.     Citco Negotiated For Higher Fees As Reimbursement For The "Risks" Of
         Doing Business With Madoff**

156.    Facing grave concerns regarding the Funds' assets placed with BLMIS, Citco put

its financial interests ahead of its duties to the Funds and the Funds' investors.

157.    By 2002, Citco knew that the Funds' holdings could not be verified, knew that BLMIS cleared its own trades, and knew that Citco's efforts to reconcile Madoff's operations had failed.  That year, Citco's executive committee put credit line requests from the Funds "on hold until … the 'investigation' on Fairfield" was complete, because Citco was concerned about its exposure to liabilities well beyond the loans in the case of fraud.  Smeets and Citco's management were aware that the credit line requests were on hold while Citco tried to "get as much comfort as possible" that BLMIS was not a fraud.

158.    Two years later, in February and March 2004, the Custodian decided to cancel one of its credit facilities with Sentry following its discovery that AIG had pulled its investments from BLMIS altogether.  Specifically, the Administrator's management, including Meijer, Verhooren, and William Keunen—who was responsible for the entire division of administration services at Citco—found out that "the risk team of AIG took the decision to get out from all Madoff exposure … [t]hey are scared with the structure …."  It appears that at least some Citco Group management wanted the Custodian to resign: by an email on February 6, 2004, Keunen informed the Administrator that Unternaehrer of Citco Group had decided the Custodian should step down as custodian.  At this time, Smeets was kept informed and aware of Citco's concerns regarding AIG's withdrawal from Madoff.  A few months later, in or about September 2004, Citco's board of directors made the decision to place the Custodians' and Administrators' business with the Funds "under scrutiny" and "to close down all credit relationships … to decrease [Citco's] exposure."  Citco knew that its credit relationship with the Funds would expose it to liability because of BLMIS's role as custodian, among other reasons.

159. By 2006, Citco considered resigning as service providers. The Custodians told Citco Group's management, including Smeets: "We are taking a risk and we only get US$60K per year!"

160. Instead, Citco negotiated a new fee arrangement. The new arrangement calculated the Custodians' rate as one basis point (one hundredth of one percent) of the Funds' total Net Asset Value. In other words, Citco's fees for the Custodians' services were now directly tied to the Net Asset Value as determined by the Administrators. Citco decided "[o]n that basis" to stay on as Custodians because Sentry's Net Asset Value at that time, based principally on the assets purportedly at BLMIS, was approximately "$5bn, i.e., fees of $500k."

161. Simply put, Citco accepted dramatically higher fees—tied directly to the Net Asset Value certified by Citco—in exchange for the risks to Citco of doing business with BLMIS, as well as its continued silence regarding BLMIS's role as custodian of the Funds' assets. Ultimately, Citco's fees increased by 800%.

162. Internally, Citco knew that: (i) the Administrators did not consistently price the Funds' portfolios independently and typically relied exclusively on the share pricing information supplied by Madoff; and (ii) the Custodians did not have custody of the Funds' portfolios.

163. Citco failed to verify the pricing information for the Funds' portfolio from independent sources and instead relied on BLMIS statements, even though it knew that such account statements contained incorrect information. Accountants working for the Administrators discovered on numerous occasions that the trades reported by BLMIS contradicted the public daily price ranges for corresponding trades. When the Administrators' personnel discovered that the reported share or option prices reported by Bloomberg and Madoff differed, they used the public

price in calculating the Net Asset Value reflected in the Certificates. Citco thus turned a blind eye to its knowledge that BLMIS issued account statements with incorrect pricing information.

164.    Citco acted with a lack of good faith by issuing Certificates in spite of its knowledge that: (1) BLMIS's transactions were likely impossible, given its awareness that "Madoff always [knew] precisely when to buy and sell;" (2) Madoff was the only broker-dealer Citco worked with that provided settlement date transaction confirmations only, rather than trade date confirmations; and (3) Madoff insisted that Citco book all trades for the Funds manually, rather than through automated or electronic means, which directly contradicted Citco's own "policy to set up [electronic] reconciliation programs for each fund and to avoid manual entries as much as possible;" and, within its own records, "there [were] differences between the custody statements of Citco Bank and Madoff that [were] not being analyzed" by Citco.

165.    This lack of good faith permeated the entire Citco organization. Until 2008, the Administrators and the Custodians worked hand-in-hand with multiple other "Citco" entities to generate the Certificates for the Funds and served as the intermediaries for all subscription funds invested by Defendants under the Subscription Agreements. Under Citco Group's direction and control, the Administrators issued Certificates without good faith and with willful blindness to the fact that they could not confirm whether the Funds' assets actually existed.

166.    From the top down, Citco saw and appreciated, but consciously disregarded, the risks to the Fund's investors posed by Madoff's operations. The Administrators and all other "Citco" subsidiaries served at the whim of Citco Group, which controlled the day-to-day operations of the Administrators and the issuance of Certificates showing an inaccurate and inflated Net Asset Value under the Administration Agreements (as amended from time to time) with the Funds. Irrespective of which "Citco" entity the Funds' engaged, at all relevant times the

Funds were provided services from and on behalf of "Citco" as a whole from at least eight separate entities, including: Citco Group; Citco Global Custody NV; Citco Global Custody (NA) NV; CGC (NA); Citco Fund Services (BVI); Citco Fund Services (Europe) B.V.; Citco (Canada) Inc.; and Citco Global Security Services.

167.    By virtue of the foregoing conduct, Citco issued the Certificates without good faith. The Funds were the primary victims of Citco's conduct and its lack of good faith in issuing the Certificates.

## G.    **Exposure Of Madoff's Fraud**

168.    On December 11, 2008, federal agents arrested Madoff for violation of federal securities laws.  On that same day, the United States Attorney brought criminal charges against Madoff, alleging that Madoff ran a multibillion-dollar Ponzi scheme.  *See United States v. Madoff*, No. 08-mj-2735 (S.D.N.Y., filed Dec. 11, 2008).  Upon arrest, Madoff was reported to have told the agents that "there is no innocent explanation" for the fraudulent scheme he had orchestrated and confessed that he "paid investors with money that wasn't there."

169.    On December 11, 2008, the United States Securities and Exchange Commission ("SEC") filed an emergency action in the Southern District of New York to halt ongoing fraudulent offerings of securities and investment advisory fraud by Madoff and BLMIS.  *See SEC v. Madoff*, No. 08-cv-10791 (S.D.N.Y. filed Dec. 11, 2008). On February 9, 2009, the SEC submitted to the Court a proposed partial judgment, to which Madoff consented, imposing a permanent injunction and continuing relief against him, including a permanent freezing of his assets.

170.    In March 2009, Madoff pleaded guilty to the criminal charges brought against him. In his plea allocution, Madoff confessed: "for many years up until my arrest on December 11, 2008, I operated a Ponzi scheme through the investment advisory side of my business, Bernard L. Madoff Securities LLC."  As Madoff himself described how the scheme worked:

The essence of my scheme was that I represented to clients and prospective clients
who wished to open investment advisory and individual trading accounts with me
that I would invest their money in shares of common stock, options and other
securities of large well-known corporations, and upon request, would return to them
their profits and principal.  Those representations were false because for many years
up and until I was arrested on December 11, 2008, I never invested those funds in
the securities, as I had promised.  Instead, those funds were deposited in a bank
account at Chase Manhattan Bank.  When clients wished to receive the profits they
believed they had earned with me or to redeem their principal, I used the money in
the Chase Manhattan bank account that belonged to them or other clients to pay the
requested funds.

171.    Madoff further confessed to covering up his fraud by fabricating false trade

confirmation and account statements:

To further cover-up the fact that I had not executed trades on behalf of my
investment advisory clients, I knowingly caused false trading confirmations and
client account statements that reflected the bogus transactions and positions to be
created and sent to clients purportedly involved in the split strike conversion
strategy, as well as other individual clients I defrauded who believed they had
invested in securities through me. The clients receiving trade confirmations and
account statements had no way of knowing by reviewing these documents that I
had never engaged in the transactions represented on the statements and
confirmations.

172.    Madoff was sentenced to 150 years in federal prison.  He died in prison on April 14,

2021.

**H.    The Funds' Estates In Liquidation**

173.    Following the revelation of Madoff's fraud, the Funds' boards of directors

suspended any further redemptions of shares and the calculation of the Funds' Net Asset Values.

As of December 2008, and presently, Sentry, Sigma, and Lambda had, respectively, approximately

4.7 million, 3.9 million, and 0.2 million shares outstanding.

174.    In 2009, the Funds were put into liquidation proceedings in the BVI.

175.    On February 27, 2009, a secured creditor of Lambda commenced proceedings in

the BVI Court pursuant to the BVI Insolvency Act of 2003 seeking the appointment of a liquidator

over Lambda (the "Lambda Proceeding").  The Lambda Proceeding is pending in the BVI Court as claim number BVIHC(COM)2009/74.

176.    On April 21, 2009, ten shareholders applied to the BVI Court for the appointment of a liquidator over Sentry (the "Sentry Proceeding").  The Sentry Proceeding is pending in the BVI Court under claim number BVIHC(COM)2009/136.

177.    On April 23, 2009, a shareholder applied to the BVI Court for the appointment of a liquidator over Sigma (the "Sigma Proceeding" and collectively with the Lambda Proceeding and the Sentry Proceeding, the "BVI Liquidation Proceedings").  The Sigma Proceeding is pending in the BVI Court under claim number BVIHC(COM)2009/139.

178.    As alleged above, the BVI Court issued orders—the BVI Appointment Orders— appointing the Foreign Representatives as liquidators of the Funds.  Pursuant to the BVI Appointment Orders, the Foreign Representatives are responsible for all aspects of the Funds' business, including protecting, realizing, and distributing assets for the Funds' estates.

179.    The Redemption Payments that were made to Defendants were mistaken payments and constituted or formed part of avoidable transactions, and generally represent assets of Sentry and Sigma's estates that Defendants are not entitled to keep.

## FIRST CLAIM

### *(Constructive Trust - Against all Defendants)*

180.    Sentry and Sigma (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma) repeat and allege again the allegations contained in paragraphs 1 through 179 above as if set forth herein.

181.    In this Court's December 6, 2018 Memorandum Decision, the Foreign Representatives were "granted leave to amend to assert constructive trust claims against Knowledge Defendants."  *In re Fairfield Sentry Ltd.*, No. 10-ap-03496 (CGM), 596 B.R. 275, 316

(Bankr. S.D.N.Y. 2018) (Dkt. 1743 at 65). The Court clarified that the Foreign Representatives could establish a constructive trust with respect to "the Knowledge Defendants that received redemption payments with the knowledge that the NAV was wrong." *Id*. at 301 (Dkt. 1743 at 38). The Court further recognized that "[u]nder BVI law, lack of good faith, *i.e.* bad faith, includes wrongdoing by one who acts recklessly as well as one who acts with actual knowledge that he is acting wrongfully or willfully blinds himself to that fact." *Id*. at 293 (Dkt. 1743 at 23–24).

182.    As detailed above, upon receipt of a redemption request, Sentry and Sigma made each of the Redemption Payments to HSBC SSL (Lux). The Redemption Payments generally represented the proceeds arising from what the world now knows was Madoff's Ponzi scheme. Accordingly, these Redemption Payments did not, as Sentry and Sigma mistakenly believed, represent the proceeds arising from the profitability of or continued investment in BLMIS.

183.    Instead, the Redemption Payments were based on a miscalculated and inflated Net Asset Value, which caused those Redemption Payments to be in excess of the Net Asset Value of redeemed shares that would have been calculated based upon the true facts existing at that time or any relevant time.

184.    At the time of the Redemption Payments, HSBC SSL (Lux) had knowledge of the Madoff fraud, and therefore knowledge that the Net Asset Value was inflated.

185.    Between 2001 and 2008, employees of HSBC SSL (Lux), such as Mr. Fielding and Mr. Wilkinson, ascertained multiple indicia of significant fraud associated with BLMIS. Both recognized the lack of independent confirmation that Madoff-held assets were kept in segregated accounts. Both were privy to emails from other high-level employees expressing concerns regarding the lack of independent confirmation. The head of HSBC SSL (Lux)'s AFS—Mr. Fiorino—even had a discussion with Mr. Fielding regarding E&Y's concerns regarding the

segregation of assets held by BLMIS, the existence of those assets, and the reliability and independence of BLMIS's auditors. Mr. Fielding was also aware that top HSBC SS (London) employees identified BLMIS-associated risks. Moreover, upon information and belief, HSBC SSL (Lux) received reports completed by KPMG in 2006 and 2008 identifying numerous fraud and operational risks related to BLMIS's operations. Finally, upon information and belief, HSBC SSL (Lux) was aware of information received from other HSBC entities, such as HSBC SS (London), HSBC USA, HSBC Suisse, and HSBC Bank Bermuda, regarding concerns of fraud at BLMIS. Yet, though HSBC SSL (Lux) repeatedly acknowledged those red flags, it continuously and deliberately failed to take steps to assuage the concerns associated with BLMIS.

186.    Accordingly, at all relevant times, HSBC SSL (Lux) had actual knowledge of, was willfully blind to, or recklessly disregarded the fact that the NAV was inflated when it received the Redemption Payments.

187.    Upon information and belief, HSBC SSL (Lux) may have paid some or all of the Redemption Payments it received to the Beneficial Shareholders.

188.    By reason of their receipt of some or all of the Redemption Payments, Defendants have been unjustly enriched to the detriment of Sentry and Sigma and other shareholders and creditors of Sentry and Sigma.

189.    Furthermore, Defendants were not entitled to receive the Redemption Payments because the amounts transferred with respect to each of the Redemption Payments were based on a miscalculated and inflated Net Asset Value, which caused the payments received by HSBC SSL (Lux) for its redemption of shares to be in excess of the Net Asset Value of such shares that would have been calculated based upon the true facts existing at that time or any relevant time.

190.    It would offend principles of equity and good conscience to permit Defendants to retain the Redemption Payments.

191.    By reason of the foregoing, a constructive trust should be imposed on the Redemption Payments that were received by Defendants from Sentry and Sigma for the benefit of the Foreign Representatives and Sentry and Sigma and other shareholders and creditors of Sentry and Sigma.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs respectfully request the following relief:

A.      On the First Claim, imposition of a constructive trust on Redemption Payments;

B.      Awarding Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees and accountants' and experts' fees, costs and expenses; and

C.      Granting Plaintiffs such other and further relief as the Court deems just and proper.

Dated:  New York, New York
        May 12, 2021

**SELENDY & GAY PLLC**

By: */s/ David Elsberg*

David Elsberg
Andrew Dunlap
Lena Konanova
Jordan Garman
Ester Murdukhayeva
Ron Krock
1290 Avenue of the Americas
New York, NY 10104
Telephone: 212-390-9000
E-mail: delsberg@selendygay.com
E-mail: adunlap@selendygay.com
E-mail: lkonanova@selendygay.com
Email: jgarman@selendygay.com
Email: emurdukhayeva@selendygay.com
E-mail: rkrock@selendygay.com

-and-

**BROWN RUDNICK LLP**
David J. Molton
Marek P. Krzyzowski
Seven Times Square
New York, New York 10036
Telephone: 212-209-4800
Facsimile: 212-209-4801
E-mail: dmolton@brownrudnick.com
E-mail: mkrzyzowski@brownrudnick.com

*Attorneys for the Foreign Representatives*

# EXHIBIT A

*Redemption Payments Received by Defendants from Sentry*
*From April 8, 2004 Through September 16, 2008*

| **Payment Date** | **Redemption Payment** | **Number of Shares** | **Bank Account To Which Redemption Payment Was Made, Per Shareholder Direction[+]** |
|---|---|---|---|
| April 8, 2004 | $3,685,986.86 | 3,793.19 | Bank of Bermuda (Luxembourg) Ltd., Bermuda |
| September 27, 2005 | $100,000.00 | 621.47 | HSBC Bank PLC, London |
| April 20, 2006 | $4,500,000.00 | 4,001.97 | HSBC Bank PLC, London |
| April 20, 2006 | $15,454,411.06 | 13,744.02 | HSBC Bank PLC, London |
| April 20, 2006 | $29,492,368.49 | 26,288.35 | HSBC Bank PLC, London |
| June 16, 2006 | $824,179.33 | 721.05 | HSBC Bank PLC, London |
| June 16, 2006 | $5,493,271.54 | 4,805.90 | HSBC Bank PLC, London |
| May 16, 2007 | $13,237,978.21* | 10,700.77 | HSBC Bank PLC, London |
| August 17, 2007 | $1,806,272.46* | 1,440.98 | HSBC Bank PLC, London |
| February 15, 2008 | $4,467,940.88* | 3,437.56 | HSBC Bank PLC, London |
| September 16, 2008 | $1,606,907.40* | 1,195.69 | HSBC Bank PLC, London |

\* Denotes Redemptions in the Sentry Vulnerability Period

[+] Whether or not Redemption Payments were ultimately directed to bank accounts in the United States, all Redemption Payments from Sentry went through a correspondent bank account that Sentry's administrator maintained in the United States, and to the extent that any such Redemption Payments were directed outside the United States, they went through a correspondent bank account in the United States identified by shareholders for such payments.

# EXHIBIT B

*Redemption Payments Received by Defendants from Sigma*
*On or About April 17, 2007*

| Payment Date | Redemption Payment | Number of Shares | Bank Account To Which Redemption Payment Was Made, Per Shareholder Direction |
|---|---|---|---|
| April 17, 2007 | $3,828,519.74 | 15,882.87 | HSBC Bank PLC, London |

All $USD amounts are based on the exchange rate as of the date of the Redemption Payment. However, upon application of a different exchange rate, as may be required by applicable law, the amount of damages may be different.