# Exhibit 23

**SELENDY & GAY PLLC**
1290 Avenue of the Americas
New York, NY 10104
David Elsberg
Andrew Dunlap
Lena Konanova
Jordan Garman
Ester Murdukhayeva
Ron Krock
212-390-9000

-and-

**BROWN RUDNICK LLP**
Seven Times Square
New York, New York 10036
David J. Molton
Marek P. Krzyzowski
212-209-4800

*Attorneys for the Foreign Representatives*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>FAIRFIELD SENTRY LIMITED, et al.,<br><br>　　　　Debtors in Foreign Proceedings. | Chapter 15 Case<br><br>Case No. 10-13164 (CGM)<br><br>Jointly Administered |
| FAIRFIELD SENTRY LIMITED (IN LIQUIDATION), et al.,<br><br>　　　　　　Plaintiffs,<br><br>　　　　-against-<br><br>THEODOOR GGC AMSTERDAM, et al.,<br><br>　　　　　　Defendants. | Adv. Pro. No. 10-03496 (CGM)<br>Administratively Consolidated |

FAIRFIELD SENTRY LIMITED (IN LIQUIDATION), and
FAIRFIELD SIGMA LIMITED (IN LIQUIDATION), acting
by and through the Foreign Representatives thereof, and
KENNETH KRYS and GREIG MITCHELL, solely in their
capacities as Foreign Representatives and Liquidators thereof,

Plaintiffs,

-against-

MERRILL LYNCH INTERNATIONAL and BENEFICIAL
OWNERS OF ACCOUNTS HELD IN THE NAME OF
MERRILL LYNCH INTERNATIONAL 1-1000,

Defendants.

Adv. Pro. No. 11-01463
(CGM)

**<u>TABLE OF CONTENTS</u>**

**<u>Pages</u>**

PRELIMINARY STATEMENT ......................................................................1

JURISDICTION AND VENUE ....................................................................4

PARTIES ......................................................................................................8

    A.    Plaintiffs .......................................................................... 8

    B.    Defendants ...................................................................... 11

NOTICE PURSUANT TO FED. R. CIV. P. 44.1 .....................................12

FACTUAL ALLEGATIONS .....................................................................12

    A.    Role Of Feeder Funds In Madoff Fraud .................................. 12

    B.    Calculation Of Net Asset Value And Shareholder Redemption Payments .......... 13

    C.    Redemption Payments Made Or Transferred To Defendants .............................. 16

    D.    Merrill International Knew Or Should Have Known Of The BLMIS Fraud ....... 16

        1.    MLCI Instituted A Practice Against Madoff-Related Investments Based On Its Concerns With Madoff And, Upon Information And Belief, Shared Those Concerns With Relevant Subsidiaries Such As Merrill International ............................................................. 16

        2.    Merrill International Also Repeatedly Refused Trades Involving Madoff Exposure ...................................................... 18

    E.    The Beneficial Shareholder Had The Same Knowledge As Merrill International ............................................................................ 21

    F.    Citco Did Not Issue Any Certifications Of Net Asset Value In "Good Faith".......................................................................... 22

        1.    Citco Expressed Doubt As To Whether the Funds' Assets At BLMIS Even Existed .............................................. 23

        2.    Citco Failed To Obtain Evidence Of The Existence Of The Funds' Assets ................................................................. 26

        3.    Citco Negotiated For Higher Fees As Reimbursement For The "Risks" Of Doing Business With Madoff.................................... 28

i

G.      Exposure Of Madoff's Fraud ................................................................................. 32

H.      The Funds' Estates In Liquidation ........................................................................ 33

FIRST CLAIM ............................................................................................................................34

PRAYER FOR RELIEF ..............................................................................................................37

Fairfield Sentry Limited ("Sentry") and Fairfield Sigma Limited ("Sigma"), by and through Kenneth Krys and Greig Mitchell (together with their predecessors, the "Foreign Representatives" or "Liquidators"), and Kenneth Krys and Greig Mitchell (together with Sentry and Sigma, the "Plaintiffs"), solely in their capacities as the Liquidators of Sentry and Sigma and the Foreign Representatives of the liquidation proceedings involving Sentry, Sigma, and Fairfield Lambda Limited ("Lambda," together with Sentry and Sigma, the "Funds" or the "Debtors") pending before the Commercial Division of the Eastern Caribbean High Court of Justice, British Virgin Islands (the "BVI Court"), for their complaint against Defendants (as defined herein), allege the following based on personal knowledge or information derived from the Funds' books and records or from other sources, including, *inter alia*, court filings and statements of governmental agencies and other parties.

## PRELIMINARY STATEMENT

1.    This adversary proceeding, which arises out of a now decade-long effort to recoup assets for the victims of the largest Ponzi scheme in history, seeks recovery of $16,077,850 improperly received by Defendant Merrill Lynch International ("Merrill International").

2.    Merrill International is one of a number of banks that invested, for itself or others, in so-called "feeder funds," which channeled private investments into managed accounts with Bernard L. Madoff and his now-infamous brokerage business, Bernard L. Madoff Securities LLC ("BLMIS").

3.    The Madoff scheme worked seamlessly for decades, apparently netting shareholders handsome returns that far exceeded the market.

4.    Once BLMIS imploded, however, the world learned what some in the investing community, including senior management at Merrill International, had long turned a blind eye to:

that the payments investors received from the feeder funds in exchange for the redemption of shares were massively overvalued.  In fact, they were non-existent.

5.    The feeder funds, like the Funds in this case, were essential to the perpetration of Madoff's scheme.  From their inception until the revelation of Madoff's fraud in December 2008, during most relevant times, the Funds sought out new investment through the sale of shares to investors and transferred (either directly in the case of Sentry or indirectly, through Sentry, in the cases of Sigma and Lambda) substantially all the proceeds of those sales, net of fees and expenses, to BLMIS for investment in accounts managed by Madoff.

6.    However, instead of using investor proceeds collected by the Funds to purchase securities and other investments, BLMIS used those contributions to service the redemption requests of other investors, enriching Madoff and his associates in the process.

7.    The investors lucky enough to redeem their shares in the Funds before the collapse of the Ponzi scheme received payments ("Redemption Payments") at a grossly inflated "Net Asset Value" (or "NAV")—the price determined by dividing the value of the respective assets of Sentry, Sigma, and Lambda by the number of shares outstanding in each Fund.  Merrill International is one such investor.

8.    Between August 14, 2006 and November 21, 2008, Merrill International received USD $16,077,850 in Redemption Payments from Sentry and Sigma collectively.  At the time it received these payments, Merrill International had already uncovered multiple indicia that Madoff was engaged in some form of fraud.  But rather than confront the facts before it, Merrill International turned a blind eye, accepting millions of dollars while willfully ignoring or, at the very least, recklessly disregarding the truth in clear violation of the laws of the British Virgin Islands (or "BVI").

9.      At some point before 2006, Merrill International's parent, Merrill Lynch & Co., Inc. ("MLCI" and, collectively with Merrill International and all other MLCI subsidiaries or affiliates, the "Merrill Companies"), instituted a practice across the Merrill Companies to refuse all Madoff-related investments.

10.     Merrill International personnel, including derivatives experts and trading desk employees, consistently refused BLMIS-related trades citing, among other issues, the secrecy surrounding the source of Madoff's returns and the questionable nature of the BLMIS's "split strike conversion" (or "SSC") strategy.  Notwithstanding Merrill International's ban on Madoff-related investments, Merrill International still chose to purchase shares in Sentry and Sigma.

11.     By virtue of its skepticism regarding the source of Madoff's returns, Merrill International at a minimum recklessly disregarded that the Net Asset Value was massively overvalued and, therefore, that the Redemption Payments it received were improperly calculated.

12.     At all relevant times, Merrill International knew that the Redemption Payments did not, as Sentry and Sigma intended, represent the proceeds arising from the profitability of or continued investment in BLMIS.  Instead, any amounts obtained directly or indirectly by Sentry and Sigma from BLMIS to make Redemption Payments to Merrill International generally were proceeds of Madoff's Ponzi scheme, obtained from other BLMIS investors or other Sentry and Sigma investors invested in BLMIS.

13.     Accordingly, the Funds' actual assets are, and at all relevant times were, far less than the amount needed to satisfy their liabilities and the claims that have been or may be asserted against them.  At all relevant times, the Funds were unable to pay their debts as they fell or would fall due.  Specifically, at the time the Redemptions Payments were made, the Funds had insufficient assets from which to pay debts as they fell or would fall due.  The Funds have been unable to

satisfy their debts to BLMIS customers, the BLMIS Trustee (as defined below), and other creditors

of the Funds, and have further increased the amount of those liabilities.

14.    As a result, the Funds were placed into liquidation by the BVI courts and the

Foreign Representatives were appointed, and thereafter commenced ancillary proceedings in this

Court pursuant to Chapter 15 of the Bankruptcy Code to recover improper Redemption Payments

received by the Funds' investors.

15.    Upon information and belief, Merrill International has either retained the

Redemption Payments made to it by Sentry and Sigma for its own account and benefit or,

alternatively, paid all or some portion of such payments to or for the account of persons or entities

for whom Merrill International may have subscribed for shares of the Funds in the capacity of

trustee, agent, representative, nominee or custodian (individually, a "Beneficial Shareholder" and

collectively, "Beneficial Shareholders," together with Merrill International, the "Defendants").

16.    By this proceeding, Plaintiffs seek to recoup for the benefit of the Funds' estates,

Redemption Payments transferred to Merrill International.  Without this recovery, Defendants will

have been unjustly enriched, and allowed to retain a windfall at the expense of other shareholders

and creditors of the Funds. Any recoveries will aid the Funds in satisfying their liabilities and

redound to the benefit of the Funds' investors who found themselves victims of Madoff's Ponzi

scheme.

## JURISDICTION AND VENUE

17.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 157(b) and 1334(b), as

this adversary proceeding and the claim asserted by the Foreign Representatives herein arise under,

arise in and/or relate to the Chapter 15 proceedings of the above-captioned Debtors, *In re Fairfield*

*Sentry Limited, et al.*, No. 10-13164 (CGM), pending in this Court.  Additionally, pursuant to

section 78eee(b)(2)(A)(iii) of the Securities Investor Protection Act ("SIPA"), which incorporates

4

28 U.S.C. § 1334(b) and applicable provisions of Title 11 of the United States Code, jurisdiction is also proper in this Court because this action also relates to the consolidated liquidation proceedings of BLMIS and Bernard L. Madoff, pending in this Court under the caption *Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC*, SIPA Liquidation No. 08-1789 (CGM).  Pursuant to the Amended Standing Order of Reference of the United States District Court for the Southern District of New York, dated January 31, 2012, all proceedings arising in, arising under and/or related to cases under Title 11 of the United States Code (as amended, the "Bankruptcy Code") are referred to this Court for adjudication.

18.    This is a core proceeding under 28 U.S.C. § 157(b)(2).  Should the Court determine that this is a non-core proceeding, Plaintiffs consent to entry of final judgment and order by this Court.

19.    This Court has jurisdiction over Merrill International and any Beneficial Shareholders pursuant to Rules 7004(d) and (f) of the Federal Rules of Bankruptcy Procedure and New York Civil Practice Law & Rules § 302 (McKinney 2008) because Merrill International and the Beneficial Shareholders purposely availed themselves of the laws of the United States and the State of New York by, among other things, investing money with the Funds, knowing and intending that the Funds would invest substantially all of that money in New York-based BLMIS, and maintaining bank accounts in the United States at JP Morgan Chase, and in fact receiving Redemption Payments in those United States-based and/or New York-based accounts.  Merrill International and the Beneficial Shareholders selected U.S. dollars as the currency in which to invest and execute their transactions in Sentry, designated United-States based and/or New York-based bank accounts to receive their Redemption Payments from the Funds, and actively directed Redemption Payments at issue in this action into those bank accounts.  Merrill International and

the Beneficial Shareholders thus knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York, derived significant revenue from New York, and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claim alleged herein.  Merrill International and the Beneficial Shareholders should therefore reasonably expect to be subject to United States jurisdiction.

20.     Moreover, this Court has jurisdiction over Merrill International and any Beneficial Shareholders by virtue of the legally binding and valid agreements and representations set forth in one or more agreements for the subscription of shares that Merrill International entered into with Sentry and Sigma.

21.     Merrill International, upon information and belief, entered into a Subscription Agreement with Sentry on or about July 30, 2005 (the "Initial Subscription Agreement") pursuant to which the Merrill International subscribed for a total of 5,490.55 shares.  Subsequent to entering into the Initial Subscription Agreement, Merrill International, upon information and belief, entered into additional agreements (the "Subsequent Subscription Agreements") with Sentry and Sigma on or about July 27, 2005, October 26, 2005, February 27, 2006, May 30, 2006, January 26, 2007, April 24, 2007, May 29, 2007, July 13, 2007, August 28, 2007, and December 5, 2007 pursuant to which it subscribed for 28,875.4022 additional shares on the same terms and conditions as those shares subscribed for pursuant to the Initial Subscription Agreement.  The Initial Subscription Agreement and Subsequent Subscription Agreements are collectively referred to herein as the "Subscription Agreements."

22.     The Subscription Agreements provide for, *inter alia*, the irrevocable submission by Merrill International to the jurisdiction of the New York courts with respect to any proceeding

with respect to said agreements and Sentry and Sigma and Merrill International's consent to service of process by the mailing of such process, as provided therein. In particular, the Subscription Agreements provide as follows:

> New York Courts. Subscriber agrees that any suit, action or proceeding ("Proceeding") with respect to this Agreement and the Fund may be brought in New York. Subscriber irrevocably submits to the jurisdiction of the New York courts with respect to any Proceeding and consents that service of process as provided by New York law may be made upon Subscriber in such Proceeding, and may not claim that a Proceeding has been brought in an inconvenient forum. Subscriber consents to the service of process out of any New York court in any such Proceeding by the mailing of copies thereof, by certified or registered mail, return receipt requested, addressed to Subscriber at the address of Subscriber then appearing on the Fund's records. Nothing herein shall affect the Fund's right to commence any Proceeding or otherwise to proceed against Subscriber in any other jurisdiction or to serve process upon Subscriber in any manner permitted by any applicable law in any relevant jurisdiction.

23.     Furthermore, by executing the Subscription Agreements, Merrill International agreed to all terms and conditions contained therein, including the express provision that any agreement made by Merrill International in the Subscription Agreements would also apply to any other person for whom Merrill International was subscribing as trustee, agent, representative, or nominee—*i.e.*, all Beneficial Shareholders. Moreover, by executing the Subscription Agreements, Merrill International represented that it had all requisite authority from Beneficial Shareholders to execute and perform any and all obligations on their behalf, and also agreed to indemnify Sentry and Sigma for any damages resulting from an assertion by a Beneficial Shareholder that Merrill International lacked proper authorization to enter into the Subscription Agreements or perform the obligations thereof. Specifically, the Subscription Agreements provide as follows:

> If Subscriber is acting as a Representative. If Subscriber is subscribing as trustee, agent, representative, or nominee for another person (the "Beneficial Shareholder"), Subscriber agrees that the representations and agreements herein are made by Subscriber with respect to itself and the Beneficial Shareholder. Subscriber has all

requisite authority from the Beneficial Shareholder to execute and perform the obligations hereunder. Subscriber also agrees to indemnify the Fund … for any and all costs, fees and expenses (including legal fees and disbursements, fines and amounts paid in settlement) in connection with any damages resulting from Subscriber's misrepresentation or misstatement contained here, or the assertion of Subscriber's lack of proper authorization from the Beneficial Shareholder to enter into this Agreement or perform the obligations hereof.

24.    Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

## PARTIES

### A.    Plaintiffs

25.    Sentry, a British Virgin Islands company, was organized in 1990 under the International Business Company Act of the British Virgin Islands and was subsequently re-registered as a business company under the BVI Business Companies Act 2004. Sentry's registered agent is Codan Trust Company (B.V.I.) located at Romasco Place, Wickhams Cay 1, Road Town, Tortola, BVI. Sentry is currently in liquidation in proceedings commenced on April 21, 2009 in the BVI Court.

26.    Sigma, a British Virgin Islands company, was organized in 1990 under the International Business Company Act of the British Virgin Islands and was subsequently re-registered as a business company under the BVI Business Companies Act 2004. Sigma's registered agent is Codan Trust Company (B.V.I.) located at Romasco Place, Wickhams Cay 1, Road Town, Tortola, BVI. Sigma is currently in liquidation in proceedings commenced on April 23, 2009, in the BVI Court.

27.    The Foreign Representatives were appointed by the BVI Court as Liquidators of the Funds to supervise the liquidation of the Funds' estates and, where necessary, commence proceedings in the name of and on behalf of the Funds or in their own official names. On April 23, 2009, the BVI Court issued an order appointing Christopher Stride as liquidator of Lambda (the

"Lambda Appointment Order").  On July 21, 2009, the BVI Court issued an order appointing

Kenneth Krys and Mr. Stride as joint liquidators of Sentry and Sigma (the "Sentry & Sigma

Appointment Order").  On September 6, 2010, the BVI Court issued notices acknowledging Mr.

Stride's resignation and the appointment of Joanna Lau as joint liquidator with Mr. Krys of all

three Funds (the "Supplemental Appointment Order").  On November 23, 2011, Ms. Lau resigned

as joint liquidator of the Funds.  On June 24, 2014, the BVI Court issued an order appointing

Charlotte Caulfield as joint liquidator, with Mr. Krys, of all three Funds (the "Second

Supplemental Appointment Order").  On June 21, 2019, Ms. Caulfield resigned as joint liquidator

of the Funds.  On July 8, 2019, the BVI Court issued an order appointing Greig Mitchell as joint

liquidator, with Mr. Krys, of all three Funds (the "Third Supplemental Appointment Order" and,

together with the Lambda Appointment Order, the Sentry & Sigma Appointment Order, the

Supplemental Appointment Order, and the Second Supplemental Appointment Order, the "BVI

Appointment Orders").  The Foreign Representatives, in their capacities as Foreign

Representatives and liquidators of the Funds, have been authorized by the foreign court having

jurisdiction over the matter to bring this action and the claim herein.

        28.    Pursuant to the BVI Appointment Orders, the Foreign Representatives are

responsible for all aspects of the Funds' businesses, including, among other things, custody and

control of the Funds' assets, the power to do all acts and execute, in the name and on behalf of the

Funds, any deeds, receipts or other documents, and the power to compromise claims, commence

litigation and to dispose of property.  After obtaining BVI Court approval, the Foreign

Representatives filed petitions in this Court in June of 2010, under Chapter 15 of Title 11 of the

United States Code, seeking recognition of the BVI Liquidation Proceedings as "foreign main

proceedings" under Chapter 15. On July 22, 2010, this Court issued an order (the "Recognition Order") granting that recognition.

29.    Pursuant to the Recognition Order, the Foreign Representatives were automatically afforded relief available under 11 U.S.C. § 1520, including application of the Bankruptcy Code's automatic stay to the Funds and their property located in the United States, as well as the ability to operate the Funds' business and exercise the rights and powers of a trustee under Sections 363 and 552 of the Bankruptcy Code. Moreover, the Bankruptcy Court specifically granted additional relief in the Recognition Order to the Foreign Representatives pursuant to 11 U.S.C. § 1521(a). Such relief includes, but is not limited to: (i) staying any actions, proceedings or execution against the Funds' assets to the extent not stayed under Section 1520; (ii) authorizing the Foreign Representatives to seek leave to conduct discovery concerning the Funds' assets, affairs, rights, obligations or liabilities; (iii) entrusting the Foreign Representatives with the administration and realization of the Funds' assets that are located within the United States, including all claims and causes of action belonging to the Funds; and (iv) otherwise giving full force and effect to the proceedings before the BVI Court.

30.    Claims had been previously asserted against the Funds in actions commenced by Irving H. Picard, the Trustee appointed by the United States District Court for the Southern District of New York for the liquidation of BLMIS (the "BLMIS Trustee"), in an adversary proceeding pending before the United States Bankruptcy Court of the Southern District of New York, *Picard v. Fairfield Sentry Limited, et al.*, No. 08-01789 (CGM) (the "BLMIS Adversary Proceeding"). As set forth in the complaint filed in the BLMIS Adversary Proceedings, the BLMIS Trustee sought to recover from the Funds, on preference and fraudulent transfer grounds, approximately $3.2 billion. This amount was alleged to have been transferred to the Funds from BLMIS, directly

(in the case of Sentry), or indirectly (in the cases of Sigma and Lambda), during the six years preceding the December 2008 disclosure of the Madoff fraud.  The BLMIS Trustee alleged that the monies transferred from BLMIS to the Funds were the misappropriated assets of other BLMIS investors.  At all relevant times, monies that the Funds received from BLMIS, net of fees and expenses, were transferred to shareholders as Redemption Payments.

31.     On July 13, 2011, pursuant to an agreement between the Foreign Representatives and the BLMIS Trustee dated May 9, 2011, the United States Bankruptcy Court for the Southern District of New York entered judgments against each of the Funds on the claims against the Funds asserted in the BLMIS Adversary Proceeding (the "Judgments") in the amount of $3,054,000,000 with respect to Sentry, $752,300,000 with respect to Sigma, and $52,900,000 with respect to Lambda.  The Redemption Payments rendered the Funds unable to satisfy their liabilities to the BLMIS customers, the BLMIS Trustee, including on account of the Judgments, and other creditors of the Funds, and have further increased the amount of those liabilities.  In this way, the Redemption Payments caused the Funds to become insolvent and/or deepened their existing insolvency, in that, among other things, at all relevant times the Funds were unable to pay their debts as they fell or would fall due.

**B.     Defendants**

32.     Merrill International was, at all relevant times, a member of Sentry and Sigma and a registered holder of shares.  Upon information and belief, Merrill International is a corporate entity organized under the laws of the United Kingdom and having its registered address at 2 King Edward Street, London ECIA 1HQ, United Kingdom.  Merrill International subscribed for the purchase of shares by entering into the Subscription Agreements with Sentry and Sigma.  All purchases of shares by Merrill International were subject to the terms of the Subscription Agreements.

33.     At all relevant times, non-party MLCI was the ultimate parent company of Merrill International.  MLCI is a Delaware corporation with a principal place of business at 4 World Financial Center, 250 Vesey Street, New York, New York 10080.  MLCI, through its numerous subsidiaries and affiliates, provides financial products and services on a global basis.  MLCI operates as a wholly owned subsidiary of Bank of America Corporation.

34.     Defendants "Beneficial Owners of the Accounts Held in the Name of Merrill Lynch International 1-1000"—*i.e.*, the Beneficial Shareholders—are, as noted, any persons or entities having a beneficial ownership or interests in shares of Sentry and/or Sigma issued to Merrill International and on whose behalf Merrill International was acting as trustee, agent, representative, or nominee.

## NOTICE PURSUANT TO FED. R. CIV. P. 44.1

35.     Certain of the substantive issues to be resolved in this case will be governed by the laws of the British Virgin Islands.  Plaintiffs intend to rely upon the applicable laws of that territory.

## FACTUAL ALLEGATIONS

### A.     Role Of Feeder Funds In Madoff Fraud

36.     Sentry was the largest of all the so-called "feeder funds" to maintain accounts with BLMIS.  Sigma and Lambda were indirect BLMIS feeder funds established for foreign currency (respectively, Euro and Swiss franc) investment through purchase of shares of Sentry.  Shares in the Funds had the following par values: $.01 per share (Sentry), €.01 per share (Sigma), and CHF.01 per share (Lambda).  Sentry's account statements with BLMIS as of the end of October 2008 showed in excess of $6 billion of invested assets supposedly held by BLMIS.  As stated in its offering materials, Sentry's investment objective was to achieve capital appreciation through investments in BLMIS.

37.    As discussed above, Sentry, Sigma, and Lambda were established for the purpose of making investments in BLMIS.  It is now known that these types of feeder funds were a crucial part of Madoff's Ponzi scheme.  Feeder funds, such as Sentry (which was a direct feeder fund into BLMIS), and Sigma and Lambda (which were indirect feeder funds, through Sentry, into BLMIS) brought new investors and new investments into the scheme, allowing Madoff to make payments to early investors who sought to liquidate their investments.  In this way, the feeder funds were used by Madoff to continue and perpetuate his fraud by maintaining the illusion that BLMIS was making active investments and engaging in a successful investment strategy.

**B.    Calculation Of Net Asset Value And Shareholder Redemption Payments**

38.    From the Funds' inception until the disclosure of Madoff's fraud in December 2008, during most relevant times, substantially all of the money (up to 95%) raised by the Funds from the sale of their shares, net of fees and expenses, was turned over to and invested in BLMIS (by and/or through Sentry), and supposedly credited to accounts held in the name of Sentry with BLMIS, purportedly for use in the now infamous "split-strike conversion" investment strategy.  In accordance with the Funds' Subscription Agreements, Articles of Association, offering materials and/or other relevant documents, from time to time, the Funds paid to shareholders, for each share tendered for redemption, an amount that was based on each of the respective Funds' purported "Net Asset Value"—the value of the respective assets of Sentry, Sigma, and Lambda divided by the number of shares outstanding in each Fund—as it was then calculated.

39.    In calculating each of the Funds' Net Asset Value, the Funds' administrators used and relied on account statements provided by BLMIS purportedly showing securities and investments, or interests or rights in securities and investments, held by BLMIS for the account of Sentry.  Generally, all securities identified on BLMIS account statements were traded on public exchanges and had readily ascertainable market values, and those market values (in addition to,

among other items, cash on hand that was identified in the Sentry account statement for the relevant time period) were used in accordance with the Funds' Subscription Agreements, Articles of Association, offering materials and/or other documents to calculate the Net Asset Value of the shares.

40.     In fact, at all relevant times, no securities were ever purchased or sold by BLMIS for Sentry and any stated cash on hand in the BLMIS accounts was based on misinformation and fictitious account statements.  None of the transactions shown on the account statements provided by BLMIS to Sentry ever occurred.  Indeed, no investments of any kind were ever made by BLMIS for Sentry.  At all relevant times, all of the account statements that BLMIS provided to Sentry were entirely and utterly fictitious.  Further, all amounts deposited by Sentry (or by Sigma and Lambda through Sentry) with BLMIS for investment and the purchase of securities to be held by BLMIS for the account of Sentry were used by Madoff to pay other BLMIS investors or were misappropriated by Madoff for other unauthorized uses.

41.     From time to time, to make Redemption Payments, Sentry (and Sigma and Lambda through Sentry) made withdrawals from Sentry's BLMIS accounts (or utilized subscription monies of other investors on hand that were directed for investment in BLMIS).  At all relevant times, the Funds believed that the amounts provided in connection with such withdrawals represented the proceeds arising from the profitability of or continued investment in BLMIS.  In fact, however, payments made by BLMIS to Sentry purportedly representing the proceeds of sales of securities or other investment positions were nothing other than the deposits of other BLMIS investors or previous deposits made by Sentry, never invested but rather misused and misappropriated as part of Madoff's fraud.  At all relevant times, payments made from BLMIS to Sentry were made by Madoff to continue and perpetuate his Ponzi scheme and avoid detection of his fraud.  The

payments from BLMIS to Sentry were not payments made in the ordinary course of or as part of any business, nor did they have a legitimate business purpose. Similarly, the Redemption Payments were not made for any legitimate purposes or in the ordinary course of any business. Those Redemption Payments did not conform to or follow the terms of the Funds' Subscription Agreements, Articles of Association and/or other offering documents, as they were based upon Net Asset Values that were not calculated based upon the true facts existing at any relevant time, and because, more generally, the Redemption Payments represented the proceeds arising from investment in BLMIS (or a substitute therefor, in the form of subscription monies from other investors in the Funds, used as a shortcut to investing subscription monies with BLMIS and simultaneously withdrawing monies from BLMIS), which the world now knows was operated by Madoff as a Ponzi scheme.

42.    Given the fraudulent nature of BLMIS and its operation as a massive Ponzi scheme, the money paid by the Funds (directly in the case of Sentry and indirectly in the cases of Sigma and Lambda) to BLMIS on account of Sentry was, at all relevant times and unknown to the Funds, misused and misappropriated by Madoff as part of his Ponzi scheme. At all relevant times, the Funds were insolvent when the Redemption Payments were made or were rendered insolvent, and/or their insolvency was deepened, as a result of the Redemption Payments.

43.    As a result, at all relevant times, the Net Asset Value of the shares redeemed was miscalculated, and Redemption Payments were mistakenly made for amounts far in excess of the Net Asset Value of shares redeemed that would have been calculated based upon the true facts existing at any relevant time.

C.    <u>**Redemption Payments Made Or Transferred To Defendants**</u>

44.    During the period from and after August 14, 2006 through November 21, 2008, Merrill International received Redemption Payments totaling USD $16,077,850.00 from Sentry and Sigma with respect to shares tendered for redemption.

45.    At Merrill International's directions and instructions, Merrill International received $14,200,000 in Redemption Payments at its bank account with JP Morgan Chase in New York and $1,877,850 at its bank account with Citibank London.

46.    The dates and amounts of each Redemption Payment received by Merrill International from Sentry, and the Merrill International bank accounts to which each Redemption Payment was made, are set forth on <u>Exhibit A</u>.  The dates and amounts of each Redemption Payment received by Merrill International from Sigma, and the Merrill International bank accounts to which each Redemption Payment was made, are set forth on <u>Exhibit B</u>.

47.    At the time those Redemption Payments were made, the Funds had insufficient assets from which to pay their debts as they fell or would fall due.  In exchange for each Redemption Payment, each of which constitutes or forms part of a transaction between Merrill International and Sentry and Sigma, Sentry and Sigma received no consideration or consideration of a value that, in money or money's worth, was significantly less than the value, in money or money's worth, of the consideration provided by Sentry and Sigma.

48.    Upon information and belief, Merrill International and/or the Beneficial Shareholders received Redemption Payments in excess of amounts paid by such person(s) for purchase of their shares.

D.    <u>**Merrill International Knew Or Should Have Known Of The BLMIS Fraud**</u>

   1.    **MLCI Instituted A Practice Against Madoff-Related Investments Based On Its Concerns With Madoff And, Upon Information And Belief, Shared Those Concerns With Relevant Subsidiaries Such As Merrill International**

49.    In the years before BLMIS's demise, Merrill International and its parent company, MLCI, were each presented with multiple opportunities to invest with Madoff through Madoff Feeder Funds and thus learn about BLMIS.

50.    MLCI, as a global organization, performed due diligence on Madoff and his split-strike conversion strategy.  Upon information and belief, as a result of its inquiry, MLCI concluded that Madoff's structure—in which BLMIS simultaneously served as the investment adviser, the prime broker, and the custodian of assets—lent itself to fraud and manipulation without adequate independent checks, that Madoff's returns were not generated by the claimed trading strategy, and that Madoff's investment advisory business might very well be fraudulent.

51.    In addition to MLCI's Madoff-related due diligence, Fabio Savoldelli, a former senior executive at Merrill Lynch Investment Management ("MLIM"), a subsidiary of MLCI, sounded the internal warning bell about Madoff across the Merrill Companies many years before BLMIS's collapse.

52.    Savoldelli, and others within the global organization of Merrill Companies, spotted numerous red flags indicative of irregular or fictitious lending activities in Madoff's operations, including: (i) impossibly consistent returns with no down years ever; (ii) Madoff's total equity portfolio liquidation at every quarter and year end; (iii) audits of BLMIS by a small, strip mall accountant and tax preparer; (iv) Madoff's purported trading with unidentified options counterparties; and (v) the lack of, and defects in, independent checks and balances—*i.e.*, lack of internal controls as to the existence of actual assets where Madoff simultaneously served as the adviser, broker, and custodian of the assets.  In addition, Madoff's "commission" structure, whereby he left hundreds of millions, if not billions, of dollars in performance and management fees on the table for others, such as the feeder funds, reminded Savoldelli of other Ponzi schemes.

53.     Upon information and belief, as Merrill International's parent company, MLCI alerted others within the Merrill Companies, including Merrill International, to the results of its due diligence into and internal identification of red flags regarding the Madoff funds.  Moreover, as an affiliate of MLCI, Merrill International is a member the global MLCI organization, and thus received Savoldelli's internal warning bell regarding Madoff.

54.     Sometime before the late 1990s, the highest authorities within MLCI instituted an enterprise-wide practice against the investment of its own money or its clients' money in BLMIS, either directly or indirectly.  MLCI consistently refused to provide leverage to institutional investors seeking to make levered investments in Madoff-related funds through structured products like notes or swaps.  MLCI also regularly refused to direct investments to Madoff through, for example, funds of funds or single hedge fund wrap vehicles.

55.     Upon information and belief, as Merrill International's parent company, MLCI's highest authorities informed Merrill International of this enterprise-wide practice against Madoff-related investments and the reasons for that practice, as evidenced by the fact that—as individuals like Savoldelli have testified—the Merrill Companies did not lose any money on Madoff.

**2.     Merrill International Also Repeatedly Refused Trades Involving Madoff Exposure**

56.     Consistent with the anti-Madoff investment policy of its parent company, MLCI, Merrill International repeatedly refused trades involving Madoff.

57.     In December 2006, Merrill International's London-based fund-linked derivatives solutions group was asked to consider a leveraged transaction involving a Madoff Feeder Fund.  A Merrill International London desk employee responded as follows:

> [T]he fund is managed by Bernie Madoff, and the brokerage firm behind the fund is Madoff securities.  Madoff is known for keeping the source of his returns a secret.  This caused a lot of speculation on Wall Street about the true sources of the admittedly impressive

> returns. Merrill Lynch has repeatedly looked into Fairfield Sentry
> and other Madoff funds, which all use the same strategy called 'spit
> [*sic*] strike conversion.' The decision was taken some time ago that
> Merrill Lynch does not offer any products on these funds.

58.     Following the December 2006 inquiry, another Merrill International employee sent

a follow-up email confirming Merrill International's anti-Madoff investment policy and providing

a May 7, 2001 article from *Barron's* by Erin E. Arvedlund entitled, "Don't Ask, Don't Tell: Bernie

Madoff is so secretive, he even asks investors to keep mum," which noted the heavy skepticism

on Wall Street surrounding Madoff, as well as the lack of transparency around the BLMIS

investment advisory business because of Madoff's unwillingness to answer basic due diligence

questions about his SSC strategy.

59.     In July 2007, a Vice President for Latin America Structured Products from a

"Merrill Lynch" entity contacted the Merrill International London desk asking whether Merrill

International would be willing to structure a leveraged trade on Sentry and possibly another fund.

A Merrill International London desk employee answered promptly: "Both [funds] are related to

Madoff. We can't provide leverage on these funds."

60.     In September 2007, a Paris-based Merrill International employee contacted his

colleagues on the Merrill International London desk and informed them that a French client was

interested in getting a quote on a three times (3x) leverage structured note on Sentry. Within 24

hours, a Merrill International London desk employee informed his French counterpart that Merrill

International had no appetite for any portion of Sentry risk and would not quote a price on any

structured product with leverage on Sentry.

61.     In February 2008, Merrill International was again asked for a quote for a two times

(2x) levered note on Sentry. A Merrill International London desk employee responded as follows:

"We receive a lot of requests for leverage on the Madoff Feeder Funds (Fairfield Sentry, Kingate,

etc.) but we aren't prepared to quote on that: [i] We don't have a mandate for single manager HF leverage [ii] [and] There is a lack of transparency into the real strategy employed, and lots of rumors around the funds.  We're pretty much in line with our competitors on that (no-one is really willing to quote)."

62.    Sometime in the second half of 2008, a hedge fund consultant at Financial Risk Management ("FRM"), an independent hedge fund investment specialist in London, who had previously worked at Citigroup Global Markets Limited ("CGML") in London, contacted Merrill International's London desk to inquire whether Merrill International was interested in replacing CGML on a total return swap linked to Sentry for a CGML client because CGML wanted out of the trade.  The FRM employee closed his e-mail with "Madoff risk isn't for everyone – happy to discuss other trades that might be though."  The Merrill International trader replied, "I think we are reluctant to take Madoff risk irrespective of the credit environment e.g[.] even if we find committed [total return swap] financing."

63.    After Madoff's fraud was exposed to the rest of the world in December 2008, as discussed in Section F, *infra*, a Merrill International employee summed up Merrill International's awareness of Madoff's illegal conduct to another of his London-based colleagues in a December 12, 2008 email:  "Not a big surprise … but definitely a bad signal for us all."

64.    Later that same day, a different Merrill International London employee echoed that sentiment in an email to two of his London-based colleagues:  "We all knew there was something wrong at Madoff – I guess now our suspicions have been confirmed."

65.    Given Merrill International's awareness of the results of MCLI's due diligence into Madoff, Savoldelli's internal warning bell, and both MCLI and Merrill International's own practices against Madoff investments due to suspicions regarding Madoff's claimed revenues,

Merrill International turned a blind eye or was, at the very least, reckless with respect to the fact that the Net Asset Value calculations were inaccurate.

**E.      The Beneficial Shareholder Had The Same Knowledge As Merrill International**

66.      Merrill International served as trustee, agent, representative, nominee or custodian for the Beneficial Shareholders in connection with their investments in the Funds, including, by: subscribing to shares of Sentry and Sigma on behalf of the Beneficial Shareholders, maintaining custody of the shares as record shareholders, paying redemption proceeds from the shares of Sentry and Sigma to the Beneficial Shareholders, and otherwise exercising control over the shares of Sentry and Sigma.

67.      Further, each of the Subscription Agreements, executed by Merrill International, manifested the Beneficial Shareholders' consent for Merrill International to act on behalf of and subject to the Beneficial Shareholders' control.  And in executing the Subscription Agreements, Merrill International accepted and agreed to act on behalf of the Beneficial Shareholders.

68.      Accordingly, the Beneficial Shareholders had the same knowledge as Merrill International regarding all relevant matters relating to BLMIS and the Funds' Net Asset Values at all relevant times.

69.      But in the alternative, both the Funds' Articles of Association as well as each of the Subscription Agreements provide that it is the registered shareholders that are to be treated as the parties to the Funds' Articles.

70.      Article 8 of the Funds' Articles provides that "The Company shall be entitled to treat the registered holder of any share as the absolute owner thereof and accordingly shall not be bound to recognise an equitable or other claim to, or interest in, such share on the part of any other person."

71.    Paragraph 27 of the Subscription Agreements similarly provides that "If Subscriber is subscribing as trustee, agent, representative or nominee for another person (the 'Beneficial Shareholder'), Subscriber agrees that the representations and agreements herein are made by Subscriber with respect to itself and the Beneficial Shareholder.  Subscriber has all the requisite authority from the Beneficial Shareholder to execute and perform the obligations hereunder."

72.    Together, these contractual provisions bind the Beneficial Shareholders to Merrill International's bad faith on all relevant matters relating to BLMIS and the Funds' Net Asset Values at all relevant times.

**F.    Citco Did Not Issue Any Certifications Of Net Asset Value In "Good Faith"**

73.    Article 11 of the Funds' Articles provides that "[a]ny certificate as to the Net Asset Value per Share … given in good faith by or on behalf of the Directors shall be binding on all parties."  During the relevant period, statements of the Net Asset Value were issued by the Funds' administrators, Citco Fund Services (Europe) B.V. and its delegatee Citco (Canada) Inc. (the "Administrators").  On April 16, 2014, the Judicial Committee of the Privy Council (the "Privy Council") issued a decision in which it held that certain statements of Net Asset Value, in particular, certain monthly emails, contract notes, and monthly account statements issued by the Administrators, constituted "certificates" for the purposes of Article 11 (the "Certificates").   The Privy Council did not, however, address whether such Certificates were given "in good faith."  In carrying out this responsibility, the Administrators and affiliated Citco companies within Citco Group Limited (collectively, "Citco") acted with a lack of good faith in giving the Certificates.

74.    Over the course of fifteen years, in its capacity as service providers to the Funds, Citco reviewed information concerning BLMIS not available to the general public, and expressed internal alarm about what that information showed with respect to the likelihood of fraud at

BLMIS, but turned a blind eye to the reality reflected in the information and instead proceeded with issuing the Certificates as if there were no problem.

75.     So grave were the Administrators' internal concerns that they expressed doubts—many years before the fraud was made public—that the Funds' assets with BLMIS even existed, with one employee stating "I will not change my [opinion] as long as I [do] not see evidence that the portfolio exists."  The Administrators also expressed repeated concern over the fact there was no segregation of duties at BLMIS—*i.e.*, BLMIS (i) had discretion over which investments to make and when to make them, such that BLMIS was de facto investment manager, (ii) had actual custody of the Funds' assets, such that BLMIS was de facto custodian, and (iii) was also the broker. Based upon the proprietary information they reviewed, Citco expressed concern—internally—that BLMIS would be a repeat of the notorious Manhattan Investment Fund fraud of the 1990s "multiplied by a factor of five."  Ultimately, unable to resolve their grave concerns, Citco, rather than withdrawing, ceasing to issue Certificates, or sounding a public alarm, made a corporate decision to continue on as service providers—in exchange for an 800% increase in fees.

**1.     Citco Expressed Doubt As To Whether the Funds' Assets At BLMIS Even Existed**

76.     Beginning in 2000, the Administrators ran into trouble with the basic task of verifying the existence of the Funds' assets with Madoff.  Initially, Citco expressed serious concerns regarding whether the Funds' Treasury bond transactions actually matched those transactions reported by Madoff because of an apparent "rhythm of trading" each month.  The rhythm of trading within Sentry's portfolio appeared too consistent to be true, as the assets included only a limited number of Treasury bonds by each month's end.  At the beginning of each month, Madoff would purchase shares and put options and would sell call options, but, like clockwork,

would then liquidate all of Sentry's holdings by the 20th of each month. Thus, the Administrators wanted to check whether the Treasury bonds even existed at all.

77.     The Administrators could not verify the existence of the assets because the Funds' custodians, Citco Bank Nederland N.V. Dublin Branch and Citco Global Custody (the "Custodians"), did not actually hold them. Instead, Madoff served as his own custodian. Therefore, the custody statements that the Custodians were supposed to generate based on assets in their possession, were instead merely copied, or "shadow book[ed]," from BLMIS account statements. The Custodians were "only the custodian[s] on paper, not in reality" and did not place any trades for the Funds.

78.     Management within Citco, including Ruud Bodewes ("Bodewes"), the head of internal audit for all of Citco Group, and Ger Jan Meijer ("Meijer"), the head of internal audit for the Administrators, expressed concern about the operations at BLMIS. In May 2000, Bodewes expressed his concern to the general counsel and manager of Citco Bank Nederland, as well as Meijer, that "[w]ith [the] Manhattan [Investment Fund fraud] in the back of our minds, we, as Citco, may very well be in a potential dangerous situation, since we do not seem to have an independent source to verify the information from BLMIS." Indeed, Meijer had raised these concerns to Bodewes weeks earlier, warning that Madoff could be "a Manhattan multiplied by a factor of five."

79.     In addition to warning Bodewes, Meijer also warned Citco Group's Chief Executive Officer, Christopher Smeets ("Smeets") in May 2000 that "[t]o not react or to react too late does indeed mean that investors once again faithfully deposit tens of millions of USD in the Madoff well (for which we do not know if there is a bottom to it) at month's end," with the understanding that Citco could "already be held personally responsible insofar as we have allowed

the subscriptions to take place as of May without a fight." Smeets acknowledged receipt of Meijer's emails and concerns. At that time, Meijer emphasized that "with the current knowledge and Citco as asset protector, Citco has a legal obligation to obtain more assurance" of the Funds' assets.

80.    However, in what became a familiar pattern, Citco turned a blind eye to the documents and information in their possession. Citco Group did not address the Administrators' concerns raised in May 2000, and a few months later, Meijer stated: "[i]t seemed that this affair [was] being put on the back burner and hushed."

81.    A year later, Meijer again reiterated his concerns about BLMIS's operations, which "remain[ed] unsolved." Meijer warned that "Citco has a risk exposure of more than USD3 billion" and that "[p]robably there are no options to restore this situation from a worst case scenario." He stated: "I will not change my [opinion] as long as I [do] not see evidence that the portfolio exists." Five months later, in January 2002, the Administrators again emphasized that the issues concerning BLMIS posed severe risks to Citco and the Funds' investors. Meijer told Bodewes: "I have been worried about this situation for 2 years (including the risk to the continued existence of Citco), however the same was not taken seriously by certain gentlemen…. My intuition (combined with the business that I have seen) tells me that things are not right."

82.    In January 2002, Meijer insisted to Bodewes that: "Citco must now seriously take the possibility that everything is really wrong with [the Funds'] account, as well as the possibility that everything will come into view within 2 years…. Personally I think the chance [that something is wrong] is at least 50%." Meijer persisted that there was "still the opportunity to more or less direct the whole process, and search out the best way out with the help of good lawyers (legal contingency plan). Otherwise you run the risk that the scene will later be determined by others."

However, in response Citco Group's management, and Bodewes in particular, failed to undertake a meaningful investigation into Meijer's doubts regarding the existence of the Funds' assets, and instead continued acting as a service provider for the Funds for over six more years.

83.    In fact, multiple members of the Administrator's management tried to prevent Meijer from asking questions.  John Verhooren ("Verhooren"), a member of Citco's administration services management team, actually knew that Meijer had raised concerns about the existence of the Funds' assets for years, but deliberately ignored those concerns.  For example, in May 2000, Verhooren acknowledged that the lack of segregation of duties and trading patterns at Madoff were not new discoveries, and many people at Citco had already recognized these phenomena.  Later, in response to concerns raised in 2001, Verhooren again rebuffed Meijer's insistence that Citco was facing "an enormous risk exposure."  Instead, Verhooren told Meijer to stop raising the issue and claimed that Citco would try to meet with Madoff to investigate.  However, neither Verhooren nor any member of the Administrator's staff ever gained sufficient evidence that the Funds' assets existed from Madoff.

## 2.    Citco Failed To Obtain Evidence Of The Existence Of The Funds' Assets

84.    Citco not only expressed internal concern regarding whether the Funds' assets with BLMIS even existed—it knew that BLMIS would not confirm their existence for Citco as the Funds' service providers.

85.    The Administrators' audit reports designated Sentry as a non-compliant fund on their "watch list" as a result of the lack of segregation of duties at BLMIS.  Each year from 2000 through 2006, the Administrators recommended that Citco either confirm the existence of the Funds' assets held by BLMIS or resign as service providers.  On three occasions between May 2000 and December 2002, Citco attempted to verify the existence of the Funds' assets at BLMIS. All attempts failed.

86.    In May 2000, Citco set up a meeting with Madoff to gain "independent confirmation of the[] existence" of the Funds' assets, particularly the Treasury bonds, and to determine how Madoff derived share prices from the markets. However, this effort failed. BLMIS did not verify the existence of the assets, and Citco concluded internally that the meeting had not provided "a full disclosure of [the] assignment."

87.    In July 2001, Bodewes had attempted to assess the concerns raised by Meijer in an internal due diligence memorandum. However, Bodewes's due diligence was limited to a review of Citco's proprietary documents because Citco was concerned that permitting "an on-site audit at [BLMIS] premises may hurt the relationship with [the Fund], resulting in a possible loss of [a] USD 1.5 million dollar fee income." Even so, based on the documents and information in Citco's possession, Bodewes shared Meijer's concerns about BLMIS's operations, and concluded that losses at BLMIS could be hidden, leaving Citco ultimately liable to the Funds' shareholders. Bodewes also noted that the two-man audit firm used by BLMIS did not "match up" with the size of BLMIS's business. Indeed, multiple Administrator employees acknowledged that the small size of Madoff's accounting firm posed a risk, given that the size of the firm was not large enough to audit the amount of assets purportedly managed by BLMIS.

88.    Smeets, Citco Group's CEO, received Bodewes' memo regarding the issues at BLMIS, including the issues posed by the size of Madoff's audit firm. Citco Group's management responded that they would like to "work this out" with Madoff, but never met with him in 2001.

89.    By an email dated February 6, 2002, Ermanno Unternaehrer ("Unternaehrer") of Citco Group stated that Citco wanted evidence the Treasury bonds existed. In December 2002, Citco once again "attempt[ed] to get conclusive proof" from Madoff that Sentry's portfolio was in BLMIS custody and to have "Madoff ... provide evidence of the existence/custody of the

27

positions."  Before the meeting, Meijer directed a member of the internal audit group at Citco to "[p]roperly record what you have done and what you have not been able to determine…. It is a troublesome task insofar as Madoff is not known for his openness."  However, the meeting did not include any meaningful discussion with Madoff regarding the holdings purported to be in his custody.  The employee, Albert van Nijen, reported back that the Administrators' "mission" to increase "Citco's comfort level with respect to the existence of the assets in relation to [Citco's] responsibilities as Custodian[s]" had again failed.  On December 27, 2002 Bodewes reported to the executive committee of Citco Group that as long as the position of Sentry with BLMIS was not independently verified "there will be doubts."

90.    After Citco's third failed attempt, Citco never again tried to gain evidence from Madoff that the Funds' assets existed until his fraud was ultimately exposed in December 2008. In addition, Meijer noted that "Madoff [was] no[t] known" to Citco's external traders, even though his investment strategy required selling major quantities of call options each month.  In an email to Bodewes, Meijer stated, "I visited the Madoff website…. According to the investment policy, the fund needs to sell major quantities of call options on the market each month.  I absolutely do not trust it!!!!"

91.    Meanwhile, through the entire period, Citco continued to issue the Certificates.

**3.    Citco Negotiated For Higher Fees As Reimbursement For The "Risks" Of Doing Business With Madoff**

92.    Facing grave concerns regarding the Funds' assets placed with BLMIS, Citco put its financial interests ahead of its duties to the Funds and the Funds' investors.

93.    By 2002, Citco knew that the Funds' holdings could not be verified, knew that BLMIS cleared its own trades, and knew that Citco's efforts to reconcile Madoff's operations had failed.  That year, Citco's executive committee put credit line requests from the Funds "on hold

until … the 'investigation' on Fairfield" was complete, because Citco was concerned about its exposure to liabilities well beyond the loans in the case of fraud. Smeets and Citco's management were aware that the credit line requests were on hold while Citco tried to "get as much comfort as possible" that BLMIS was not a fraud.

94.     Two years later, in February and March 2004, the Custodian decided to cancel one of its credit facilities with Sentry following its discovery that AIG had pulled its investments from BLMIS altogether. Specifically, the Administrator's management, including Meijer, Verhooren, and William Keunen—who was responsible for the entire division of administration services at Citco—found out that "the risk team of AIG took the decision to get out from all Madoff exposure … [t]hey are scared with the structure …." It appears that at least some Citco Group management wanted the Custodian to resign: by an email of February 6, 2004, Keunen informed the Administrator that Unternaehrer of Citco Group had decided the Custodian should step down as custodian. At this time, Smeets was kept informed and aware of Citco's concerns regarding AIG's withdrawal from Madoff. A few months later, in or about September 2004, Citco's board of directors made the decision to place the Custodians' and Administrators' business with the Funds "under scrutiny" and "to close down all credit relationships … to decrease [Citco's] exposure." Citco knew that its credit relationship with the Funds would expose it to liability because of BLMIS's role as custodian, among other reasons.

95.     By 2006, Citco considered resigning as service providers. The Custodians told Citco Group's management, including Smeets: "We are taking a risk and we only get US$60K per year!"

96.     Instead, Citco negotiated a new fee arrangement. The new arrangement calculated the Custodians' rate as one basis point (one hundredth of one percent) of the Funds' total Net Asset

Value. In other words, Citco's fees for the Custodians' services were now directly tied to the Net Asset Value as determined by the Administrators. Citco decided "[o]n that basis" to stay on as Custodians because Sentry's Net Asset Value at that time, based principally on the assets purportedly at BLMIS, was approximately "$5bn, i.e., fees of $500k."

97.     Simply put, Citco accepted dramatically higher fees—tied directly to the Net Asset Value certified by Citco—in exchange for the risks to Citco of doing business with BLMIS, as well as its continued silence regarding BLMIS's role as custodian of the Funds' assets. Ultimately, Citco's fees increased by 800%.

98.     Internally, Citco knew that: (i) the Administrators did not consistently price the Funds' portfolios independently and typically relied exclusively on the share pricing information supplied by Madoff; and (ii) the Custodians did not have custody of the Funds' portfolios.

99.     Citco failed to verify the pricing information for the Funds' portfolio from independent sources and instead relied on BLMIS statements, even though it knew that such account statements contained incorrect information. Accountants working for the Administrators discovered on numerous occasions that the trades reported by BLMIS contradicted the public daily price ranges for corresponding trades. When the Administrators' personnel discovered that the reported share or option prices reported by Bloomberg and Madoff differed, they used the public price in calculating the Net Asset Value reflected in the Certificates. Citco thus turned a blind eye to its knowledge that BLMIS issued account statements with incorrect pricing information.

100.    Citco acted with a lack of good faith by issuing Certificates in spite of its knowledge that: (1) BLMIS's transactions were likely impossible, given its awareness that "Madoff always [knew] precisely when to buy and sell;" (2) Madoff was the only broker-dealer Citco worked with that provided settlement date transaction confirmations only, rather than trade date confirmations;

30

and (3) Madoff insisted that Citco book all trades for the Funds manually, rather than through automated or electronic means, which directly contradicted Citco's own "policy to set up [electronic] reconciliation programs for each fund and to avoid manual entries as much as possible;" and, within its own records, "there [were] differences between the custody statements of Citco Bank and Madoff that [were] not being analyzed" by Citco.

101.    This lack of good faith permeated the entire Citco organization.  Until 2008, the Administrators and the Custodians worked hand-in-hand with multiple other "Citco" entities to generate the Certificates for the Funds and served as the intermediaries for all subscription funds invested by Defendants under the Subscription Agreements.  Under Citco Group's direction and control, the Administrators issued Certificates without good faith and with willful blindness to the fact that they could not confirm whether the Funds' assets actually existed.

102.    From the top down, Citco saw and appreciated, but consciously disregarded, the risks to the Funds' investors posed by Madoff's operations.  The Administrators and all other "Citco" subsidiaries served at the whim of Citco Group, which controlled the day-to-day operations of the Administrators and the issuance of Certificates showing an inaccurate and inflated Net Asset Value under the Administration Agreements (as amended from time to time) with the Funds.  Irrespective of which "Citco" entity the Funds engaged, at all relevant times the Funds were provided services from and on behalf of "Citco" as a whole from at least eight separate entities, including: Citco Group; Citco Global Custody NV; Citco Global Custody (NA) NV; CGC (NA); Citco Fund Services (BVI); Citco Fund Services (Europe) B.V.; Citco (Canada) Inc.; and Citco Global Security Services.

103.   By virtue of the foregoing conduct, Citco issued the Certificates without good faith. The Funds were the primary victims of Citco's conduct and its lack of good faith in issuing the Certificates.

## G.   Exposure Of Madoff's Fraud

104.   On December 11, 2008, federal agents arrested Madoff for violation of federal securities laws.  On that same day, the United States Attorney brought criminal charges against Madoff, alleging that Madoff ran a multibillion-dollar Ponzi scheme.  *See United States v. Madoff*, No. 08-mj-2735 (S.D.N.Y., filed Dec. 11, 2008).  Upon arrest, Madoff was reported to have told the agents that "there is no innocent explanation" for the fraudulent scheme he had orchestrated and confessed that he "paid investors with money that wasn't there."

105.   On December 11, 2008, the United States Securities and Exchange Commission ("SEC") filed an emergency action in the Southern District of New York to halt ongoing fraudulent offerings of securities and investment advisory fraud by Madoff and BLMIS.  *See SEC v. Madoff*, No. 08-cv-10791 (S.D.N.Y. filed Dec. 11, 2008). On February 9, 2009, the SEC submitted to the Court a proposed partial judgment, to which Madoff consented, imposing a permanent injunction and continuing relief against him, including a permanent freezing of his assets.

106.   In March 2009, Madoff pleaded guilty to the criminal charges brought against him. In his plea allocution, Madoff confessed: "for many years up until my arrest on December 11, 2008, I operated a Ponzi scheme through the investment advisory side of my business, Bernard L. Madoff Securities LLC."  As Madoff himself described how the scheme worked:

> The essence of my scheme was that I represented to clients and prospective clients who wished to open investment advisory and individual trading accounts with me that I would invest their money in shares of common stock, options and other securities of large well-known corporations, and upon request, would return to them their profits and principal.  Those representations were false because for many years up and until I was arrested on December 11, 2008, I

> never invested those funds in the securities, as I had promised. Instead, those funds were deposited in a bank account at Chase Manhattan Bank. When clients wished to receive the profits they believed they had earned with me or to redeem their principal, I used the money in the Chase Manhattan bank account that belonged to them or other clients to pay the requested funds.

107.    Madoff further confessed to covering up his fraud by fabricating false trade confirmation and account statements:

> To further cover-up the fact that I had not executed trades on behalf of my investment advisory clients, I knowingly caused false trading confirmations and client account statements that reflected the bogus transactions and positions to be created and sent to clients purportedly involved in the split strike conversion strategy, as well as other individual clients I defrauded who believed they had invested in securities through me. The clients receiving trade confirmations and account statements had no way of knowing by reviewing these documents that I had never engaged in the transactions represented on the statements and confirmations.

108.    Madoff was sentenced to 150 years in federal prison. He died in prison on April 14, 2021.

## H.    The Funds' Estates In Liquidation

109.    Following the revelation of Madoff's fraud, the Funds' boards of directors suspended any further redemptions of shares and the calculation of the Funds' Net Asset Values. As of December 2008, and presently, Sentry, Sigma, and Lambda had, respectively, approximately 4.7 million, 3.9 million, and 0.2 million shares outstanding.

110.    In 2009, the Funds were put into liquidation proceedings in the BVI.

111.    On February 27, 2009, a secured creditor of Lambda commenced proceedings in the BVI Court pursuant to the BVI Insolvency Act of 2003 seeking the appointment of a liquidator over Lambda (the "Lambda Proceeding"). The Lambda Proceeding is pending in the BVI Court as claim number BVIHC(COM)2009/74.

112.    On April 21, 2009, ten shareholders applied to the BVI Court for the appointment of a liquidator over Sentry (the "Sentry Proceeding").  The Sentry Proceeding is pending in the BVI Court under claim number BVIHC(COM)2009/136.

113.    On April 23, 2009, a shareholder applied to the BVI Court for the appointment of a liquidator over Sigma (the "Sigma Proceeding" and collectively with the Lambda Proceeding and the Sentry Proceeding, the "BVI Liquidation Proceedings").  The Sigma Proceeding is pending in the BVI Court under claim number BVIHC(COM)2009/139.

114.    As alleged above, the BVI Court issued orders – the BVI Appointment Orders – appointing the Foreign Representatives as liquidators of the Funds.  Pursuant to the BVI Appointment Orders, the Foreign Representatives are responsible for all aspects of the Funds' business, including protecting, realizing, and distributing assets for the Funds' estates.

115.    The Redemption Payments that were made to Defendants were mistaken payments and constituted or formed part of avoidable transactions, and generally represent assets of Sentry and Sigma's estates that Defendants are not entitled to keep.

## FIRST CLAIM
### *(Constructive Trust - Against all Defendants)*

116.    Sentry and Sigma (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma) repeat and allege again the allegations contained in paragraphs 1 through 115 above as if set forth herein.

117.    In this Court's December 6, 2018 Memorandum Decision, the Foreign Representatives were "granted leave to amend to assert constructive trust claims against Knowledge Defendants." *In re Fairfield Sentry Ltd.*, No. 10-ap-03496 (CGM), 596 B.R. 275, 316 (Bankr. S.D.N.Y. 2018) (Dkt. 1743 at 65).  The Court clarified that the Foreign Representatives could establish a constructive trust with respect to "the Knowledge Defendants that received

redemption payments with the knowledge that the NAV was wrong." *Id*. at 301 (Dkt. 1743 at 38). The Court further recognized that "[u]nder BVI law, lack of good faith, *i.e.* bad faith, includes wrongdoing by one who acts recklessly as well as one who acts with actual knowledge that he is acting wrongfully or willfully blinds himself to that fact." *Id*. at 293 (Dkt. 1743 at 23–24).

118.    As detailed above, upon receipt of a redemption request, Sentry and Sigma made each of the Redemption Payments to Merrill International.  The Redemption Payments generally represented the proceeds arising from what the world now knows was Madoff's Ponzi scheme. Accordingly, these Redemption Payments did not, as Sentry and Sigma mistakenly believed, represent the proceeds arising from the profitability of or continued investment in BLMIS.

119.    Instead, the Redemption Payments were based on a miscalculated and inflated Net Asset Value, which caused those Redemption Payments to be in excess of the Net Asset Value of redeemed shares that would have been calculated based upon the true facts existing at that time or any relevant time.

120.    Upon information and belief, at the time of the Redemption Payments, Merrill International had knowledge of the Madoff fraud, and therefore knowledge that the Net Asset Value was inflated.  Specifically, for at least several years before 2006, specific individuals at Merrill International ascertained multiple indicia of fraud, both from others within the Merrill Companies and independently, leading it to believe that BLMIS was a fraud and, therefore, that the Net Asset Values could not be accurate.

121.    *First*, Merrill International's parent, MLCI, instituted an enterprise-wide practice across the Merrill Companies against Madoff-related investments following due diligence on BLMIS's structure that raised various red flags and other concerns raised by senior executives like Fabio Savoldelli, an executive at MLCI subsidiary, MLIM, who "sounded the internal warning

bell" about Madoff many years before BLMIS's collapse. Thereafter, MLCI consistently refused to provide leverage to institutional investors seeking to make levered investments in Madoff-related funds through structured products like notes or swaps. MLCI also regularly refused to direct investments to Madoff through, for example, funds of funds or single hedge fund wrap vehicles. Upon information and belief, MLCI's concerns and knowledge of the practice against BLMIS-related investments were widely shared within and among the Merrill Companies, including Merrill International, because—as individuals like Savoldelli have testified—the Merrill Companies did not lose any money on Madoff.

122.    *Second*, Merrill International personnel, including derivatives experts and trading desk employees, consistently refused BLMIS-related trades citing, among other issues, the secrecy surrounding the source of Madoff's returns and the questionable nature of the BLMIS's SSC strategy.

123.    Accordingly, at all relevant times, Merrill International had actual knowledge of, was willfully blind to, or recklessly disregarded the fact that the NAV was inflated when it received the Redemption Payments.

124.    Upon information and belief, Merrill International may have paid some or all of the Redemption Payments it received to Beneficial Shareholders.

125.    By reason of their receipt of some or all of the Redemption Payments, Defendants have been unjustly enriched to the detriment of Sentry and Sigma and other shareholders and creditors of Sentry and Sigma.

126.    Furthermore, Defendants were not entitled to receive the Redemption Payments because the amounts transferred with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payments received by Merrill

International for its redemptions of shares to be in excess of the Net Asset Value of such shares that would have been calculated based upon the true facts existing at that time or any relevant time.

127.    It would offend principles of equity and good conscience to permit Defendants to retain the Redemption Payments.

128.    By reason of the foregoing, a constructive trust should be imposed on the Redemption Payments that were received by Defendants from Sentry and Sigma for the benefit of the Foreign Representatives and Sentry and Sigma and other shareholders and creditors of Sentry and Sigma.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs respectfully request the following relief:

A.    On the First Claim, imposition of a constructive trust on Redemption Payments;

B.    Awarding Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees and accountants' and experts' fees, costs and expenses; and

C.    Granting Plaintiffs such other and further relief as the Court deems just and proper.

Dated: New York, New York
        May 14, 2021

**SELENDY & GAY PLLC**

By: */s/ David Elsberg*

David Elsberg
Andrew Dunlap
Lena Konanova
Jordan Garman
Ester Murdukhayeva
Ron Krock
1290 Avenue of the Americas
New York, NY 10104
Telephone: 212-390-9000
E-mail: delsberg@selendygay.com
E-mail: adunlap@selendygay.com

E-mail: lkonanova@selendygay.com
E-mail: jgarman@selendygay.com
E-mail: emurdukhayeva@selendygay.com
E-mail: rkrock@selendygay.com

-and-

**BROWN RUDNICK LLP**
David J. Molton
Marek P. Krzyzowski
Seven Times Square
New York, New York 10036
Telephone: 212-209-4800
Facsimile: 212-209-4801
E-mail: dmolton@brownrudnick.com
E-mail: mkrzyzowski@brownrudnick.com

*Attorneys for the Foreign Representatives*

# EXHIBIT A

**Redemption Payments Received by Defendants from Sentry**
**From August 14, 2006 Through November 19, 2008**

| Payment Date | Redemption Payment | Number of Shares | Bank Account To Which Redemption Payment Was Made, Per Shareholder Direction[+] |
|---|---|---|---|
| August 14, 2006 | $1,200,000.00 | 1,033.53 | JP Morgan Chase, New York |
| February 15, 2008 | $2,000,000.00* | 1,538.77 | JP Morgan Chase, New York |
| June 17, 2008 | $3,000,000.00* | 2,262.92 | JP Morgan Chase, New York |
| November 19, 2008 | $3,000,000.00* | 2,222.59 | JP Morgan Chase, New York |
| November 19, 2008 | $5,000,000.00* | 3,704.31 | JP Morgan Chase, New York |

\* Denotes Redemptions in the Sentry Vulnerability Period.

[+] Whether or not Redemption Payments were ultimately directed to bank accounts in the United States, all Redemption Payments from Sentry went through a correspondent bank account that Sentry's administrator maintained in the United States, and to the extent that any such Redemption Payments were directed outside the United States, they went through a correspondent bank account in the United States identified by shareholders for such payments.

**EXHIBIT B**

*Redemption Payments Received by Defendants from Sigma*
*On or About November 21, 2008*

| **Payment Date** | **Redemption Payment** | **Number of Shares** | **Bank Account To Which Redemption Payment Was Made, Per Shareholder Direction** |
|---|---|---|---|
| November 21, 2008 | $1,877,850.00* | 7,702.68 | Citibank London, London |

\* Denotes Redemptions in the Sigma Vulnerability Period.  All $USD amounts are based on the exchange rate as of the date of the Redemption Payment.  However, upon application of a different exchange rate, as may be required by applicable law, the amount of damages may be different.