# Exhibit 24

**SELENDY & GAY PLLC**
1290 Avenue of the Americas
New York, NY 10104
David Elsberg
Andrew Dunlap
Lena Konanova
Jordan Garman
Ester Murdukhayeva
Ron Krock
212-390-9000

-and-

**BROWN RUDNICK LLP**
Seven Times Square
New York, New York 10036
David J. Molton
Marek P. Krzyzowski
212-209-4800

*Attorneys for the Foreign Representatives*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>FAIRFIELD SENTRY LIMITED, et al.,<br><br>    Debtors in Foreign Proceedings. | Chapter 15 Case<br><br>Case No. 10-13164 (CGM)<br><br>Jointly Administered |
| FAIRFIELD SENTRY LIMITED (IN LIQUIDATION), et al.,<br><br>    Plaintiffs,<br><br>-against-<br><br>THEODOOR GGC AMSTERDAM, et al.,<br><br>    Defendants. | Adv. Pro. No. 10-03496 (CGM)<br>Administratively Consolidated |

FAIRFIELD SENTRY LIMITED (IN LIQUIDATION), acting by and through the Foreign Representatives thereof, and KENNETH KRYS and GREIG MITCHELL, solely in their capacities as Foreign Representatives and Liquidators thereof,

Plaintiffs,

-against-

UBS AG NEW YORK, SORIANO S.A. and BENEFICIAL OWNERS OF ACCOUNTS HELD IN THE NAME OF UBS AG NEW YORK 1-1000, including without limitation BENEFICIAL OWNERS OF ACCOUNTS ASSOCIATED WITH REFERENCE NUMBER 050083,

Defendants.

Adv. Pro. No. 10-03780 (CGM)

## Table of Contents

PRELIMINARY STATEMENT ...................................................................................1

JURISDICTION AND VENUE .................................................................................5

PARTIES .....................................................................................................................8

    A.    Plaintiffs.............................................................................................8

    B.    Defendants ........................................................................................11

NOTICE PURSUANT TO FED. R. CIV. P. 44.1 .....................................................12

FACTUAL ALLEGATIONS .....................................................................................12

    A.    Role Of Feeder Funds In Madoff Fraud ........................................12

    B.    Calculation Of Net Asset Value And Shareholder Redemption Payments ..........13

    C.    Redemption Payments Made Or Transferred To Defendants................................16

    D.    UBS AG Knew Of, Was Willfully Blind To, Or Recklessly Disregarded The Inflation Of The NAV ...................................................17

        1.    The UBS Entities' Corporate Structure Ensured That Information Was Shared Among UBS Entities ...........................................18

        2.    After Conducting Due Diligence On BLMIS, UBS AG Turns Down Multiple BLMIS-Related Products And Refuses To Recommend Feeder Funds To Its Clients ...................................................19

        3.    UBS AG Acquired Additional Knowledge Of The Madoff Fraud Through Its And UBS Lux's Relationships With BLMIS Feeder Fund Luxalpha ...........................................22

        4.    UBS AG Acquired Additional Knowledge Of The Madoff Fraud Through Its And UBS Lux's Relationships With BLMIS Feeder Fund LIF-USEP .....................................32

    E.    The Beneficial Shareholders Had The Same Knowledge As UBS AG ................35

    F.    Citco Did Not Issue Any Certifications Of Net Asset Value In "Good Faith"...................................................36

        1.    Citco Expressed Doubt As To Whether The Funds' Assets At BLMIS Even Existed .............................................37

2.    Citco Failed To Obtain Evidence Of The Existence Of The Funds'
Assets ........................................................................................................40

3.    Citco Negotiated For Higher Fees As Reimbursement For The
"Risks" Of Doing Business With Madoff...................................................42

G.    Exposure Of Madoff's Fraud ................................................................................46

H.    The Funds' Estates In Liquidation ........................................................................47

FIRST CLAIM.....................................................................................................................48

PRAYER FOR RELIEF .....................................................................................................51

Fairfield Sentry Limited ("Sentry"), by and through Kenneth Krys and Greig Mitchell (together with their predecessors, the "Foreign Representatives" or "Liquidators"), and Kenneth Krys and Greig Mitchell (together with Sentry, the "Plaintiffs"), solely in their capacities as the Liquidators of Sentry and the Foreign Representatives of the liquidation proceedings involving Sentry, Fairfield Sigma Limited ("Sigma"), and Fairfield Lambda Limited ("Lambda," together with Sentry and Sigma, the "Funds" or the "Debtors") pending before the Commercial Division of the Eastern Caribbean High Court of Justice, British Virgin Islands (the "BVI Court"), for their complaint against Defendants (as defined herein) allege the following based on personal knowledge or information derived from the Funds' books and records or from other sources, including, *inter alia*, court filings and statements of governmental agencies and other parties.

## PRELIMINARY STATEMENT

1.      This adversary proceeding, which arises out of a now decade-long effort to recoup assets for the victims of the largest Ponzi scheme in history, seeks recovery of approximately $7.6 million improperly received by Defendant UBS AG.

2.      UBS AG is one of a number of banks that invested, for itself or others, in so-called "feeder funds," which channeled private investments into managed accounts with Bernard L. Madoff and his now-infamous brokerage business, Bernard L. Madoff Securities LLC ("BLMIS").

3.      The Madoff scheme worked seamlessly for decades, apparently netting shareholders handsome returns that far exceeded the market.

4.      Once BLMIS imploded, however, the world learned what some in the investing community, including senior management at UBS AG, had long turned a blind eye to:  that the payments investors received from the feeder funds in exchange for the redemption of shares were massively overvalued.  In fact, they were non-existent.

5.      The feeder funds, like the Funds in this case, were essential to the perpetration of Madoff's scheme.  From their inception until the revelation of Madoff's fraud in December 2008, during most relevant times, the Funds sought out new investment through the sale of shares to investors and transferred (either directly in the case of Sentry or indirectly, through Sentry, in the cases of Sigma and Lambda) substantially all the proceeds of those sales, net of fees and expenses, to BLMIS for investment in accounts managed by Madoff.

6.      However, instead of using investor proceeds collected by the Funds to purchase securities and other investments, BLMIS used those contributions to service the redemption requests of other investors, enriching Madoff and his associates in the process.

7.      The investors lucky enough to redeem their shares in the Funds before the collapse of the Ponzi scheme received payments ("Redemption Payments") at a grossly inflated "Net Asset Value" (or "NAV")—the price determined by dividing the value of the respective assets of Sentry, Sigma, and Lambda by the number of shares outstanding in each Fund.  UBS AG is one such investor.

8.      Between September 15, 2004 and November 19, 2008, UBS AG received USD $7,602,622.59 in Redemption Payments from Sentry.  At the time it received these payments, UBS AG had already uncovered multiple indicia that Madoff was engaged in some form of fraud.  But rather than confront the facts before it, UBS AG turned a blind eye, accepting millions of dollars while willfully ignoring or, at the very least, recklessly disregarding the truth in clear violation of the laws of the British Virgin Islands (or "BVI").

9.      Between November 2000 and September 2008, UBS AG conducted multiple rounds of extensive due diligence on BLMIS.  During these processes, UBS AG employees identified several red flags, including Madoff's dual roles as broker and depository, the

impossibility of BLMIS's reported returns, and Madoff's repeated refusal to meet with UBS AG's analysts.  UBS AG ultimately concluded that the risks posed by BLMIS were simply too great.  UBS AG therefore sought to limit its exposure to BLMIS by rejecting multiple opportunities to directly invest in feeder funds and prohibiting the recommendation of these funds to UBS AG's private wealth clients.

10.    As early as 2003, UBS AG shared its specific concerns about BLMIS with its subsidiary, non-party UBS (Luxembourg) SA ("UBS Lux").  Around that time, UBS Lux was approached with an opportunity to participate in a new feeder fund later known as Luxalpha SICAV ("Luxalpha").  This opportunity prompted UBS Lux to conduct its own due diligence on BLMIS, which included consulting UBS AG.  The message conveyed by UBS AG and echoed by subsidiary and non-party UBS O'Connor was unambiguously negative and specifically highlighted Madoff's dual role as broker and depository, the impossibility of BLMIS's reported returns, and Madoff's notorious lack of transparency.  UBS Lux acknowledged these risks, but ultimately concluded that the sheer magnitude of potential fees warranted disregarding UBS AG's concerns.  In the words of UBS Lux managing director Bernard Stiehl, "Business is business.  We cannot permit ourselves to lose [a] 300 million [client]."

11.    UBS AG subsequently served as the sponsor for Luxalpha and a second feeder fund, Luxembourg Investment Fund US Equity Plus SICAV ("LIF-USEP"), while UBS Lux served as co-sponsor, administrator, custodian, and portfolio manager for both funds.  Through this experience, UBS AG and UBS Lux gained first-hand exposure to the very indicia of Madoff's fraud that UBS AG had flagged for UBS Lux.  UBS Lux not only delegated to BLMIS its custodian and portfolio management duties for both feeder funds, but also failed to disclose these delegations to the feeder funds' investors and Luxembourg regulators.  In fact, UBS Lux additionally pressured

the feeder funds' auditor, Ernst & Young, into removing references to BLMIS from the feeder funds' audit reports. Multiple UBS AG employees recognized that the misrepresentation of these delegations could create legal exposure for both UBS AG and UBS Lux.

12.     At all relevant times, UBS AG knew that the Redemption Payments did not, as Sentry intended, represent the proceeds arising from the profitability of or continued investment in BLMIS. Instead, any amounts obtained directly or indirectly by Sentry from BLMIS to make Redemption Payments to UBS AG generally were proceeds of Madoff's Ponzi scheme, obtained from other BLMIS investors or other Sentry investors invested in BLMIS.

13.     Accordingly, the Funds' actual assets are, and at all relevant times were, far less than the amount needed to satisfy their liabilities and the claims that have been or may be asserted against them. At all relevant times, the Funds were unable to pay their debts as they fell or would fall due. Specifically, at the time the Redemptions Payments were made, the Funds had insufficient assets from which to pay debts as they fell or would fall due. The Funds have been unable to satisfy their debts to BLMIS customers, the BLMIS Trustee (as defined below), and other creditors of the Funds, and have further increased the amount of those liabilities.

14.     As a result, the Funds were placed into liquidation by the BVI courts, and the Foreign Representatives were appointed and thereafter commenced ancillary proceedings in this Court pursuant to Chapter 15 of the Bankruptcy Code to recover improper Redemption Payments received by the Funds' investors.

15.     Upon information and belief, UBS AG has either retained the Redemption Payments made to it by Sentry for its own account and benefit or paid all or some portion of such payments to or for the account of persons or entities, including, but not limited to, Soriano S.A., for whom UBS AG may have subscribed for shares of the Funds in the capacity of trustee, agent,

representative, nominee, or custodian (individually, a "Beneficial Shareholder" and collectively, "Beneficial Shareholders," together with UBS AG, the "Defendants").

16.     By this proceeding, Plaintiffs seek to recoup for the benefit of the Funds' estates, Redemption Payments transferred to UBS AG.  Without this recovery, Defendants will have been unjustly enriched, and allowed to retain a windfall at the expense of other shareholders and creditors of the Funds.  Any recoveries will aid the Funds in satisfying their liabilities and redound to the benefit of the Funds' investors who found themselves victims of Madoff's Ponzi scheme.

## JURISDICTION AND VENUE

17.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 157(b) and 1334(b), as this adversary proceeding and the claim asserted by the Foreign Representatives herein arise under, arise in and/or relate to the Chapter 15 proceedings of the above-captioned Debtors, *In re Fairfield Sentry Limited, et al.*, No. 10-13164 (CGM), pending in this Court.  Additionally, pursuant to section 78eee(b)(2)(A)(iii) of the Securities Investor Protection Act ("SIPA"), which incorporates 28 U.S.C. § 1334(b) and applicable provisions of Title 11 of the United States Code, jurisdiction is also proper in this Court because this action also relates to the consolidated liquidation proceedings of BLMIS and Bernard L. Madoff, pending in this Court under the caption *Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC*, SIPA Liquidation No. 08-1789 (CGM).  Pursuant to the Amended Standing Order of Reference of the United States District Court for the Southern District of New York, dated January 31, 2012, all proceedings arising in, arising under and/or related to cases under Title 11 of the United States Code (as amended, the "Bankruptcy Code") are referred to this Court for adjudication.

18.     This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) on the basis that this case involves an amount in dispute exceeding $75,000 and, upon information

and belief, is between, on the one hand, Sentry, a BVI entity, and the Foreign Representatives thereof, and on the other hand, UBS AG, a citizen of the United States.

19.     This is a core proceeding under 28 U.S.C. § 157(b)(2).  Should the Court determine that this is a non-core proceeding, Plaintiffs consent to entry of final judgment and order by this Court.

20.     This Court has jurisdiction over UBS AG and any Beneficial Shareholders pursuant to Rules 7004(d) and (f) of the Federal Rules of Bankruptcy Procedure and New York Civil Practice Law & Rules § 302 (McKinney 2008) because UBS AG and the Beneficial Shareholders purposely availed themselves of the laws of the United States and the State of New York by, among other things, investing money with the Funds, knowing and intending that the Funds would invest substantially all of that money in New York-based BLMIS, and maintaining bank accounts in the United States at UBS AG, and in fact receiving Redemption Payments in those United States-based and/or New York-based accounts.  UBS AG and the Beneficial Shareholders selected U.S. dollars as the currency in which to invest and execute their transactions in Sentry, designated United States-based and/or New York-based bank accounts to receive their Redemption Payments from the Funds, and actively directed Redemption Payments at issue in this action into those bank accounts.  UBS AG and the Beneficial Shareholders thus knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York, derived significant revenue from New York, and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claim alleged herein. UBS AG and the Beneficial Shareholders should therefore reasonably expect to be subject to United States jurisdiction.

21.     Moreover, this Court has jurisdiction over UBS AG and any Beneficial Shareholders by virtue of the legally binding and valid agreements and representations set forth in one or more agreements for the subscription of Shares that UBS AG entered into with Sentry.

22.     UBS AG, upon information and belief, entered into a Subscription Agreement with Sentry, on or about April 26, 2004 (the "Initial Subscription Agreement") pursuant to which UBS AG subscribed for Shares.  Subsequent to entering into the Initial Subscription Agreement, UBS AG, upon information and belief, entered into additional agreements (the "Subsequent Subscription Agreements") with Sentry on or about December 27, 2005 and August 31, 2007, pursuant to which it subscribed for additional Shares on the same terms and conditions as those shares subscribed for pursuant to the Initial Subscription Agreement.  The Initial Subscription Agreement and Subsequent Subscription Agreements are collectively referred to herein as the "Subscription Agreements."

23.     The Subscription Agreements provide for, *inter alia*, the irrevocable submission by UBS AG to the jurisdiction of the New York courts with respect to any proceeding with respect to said agreements and Sentry and UBS AG's consent to service of process by the mailing of such process, as provided therein.  In particular, the Subscription Agreements provide as follows:

New York Courts.    Subscriber agrees that any suit, action or proceeding ("Proceeding") with respect to this Agreement and the Fund may be brought in New York.  Subscriber irrevocably submits to the jurisdiction of the New York courts with respect to any Proceeding and consents that service of process as provided by New York law may be made upon Subscriber in such Proceeding, and may not claim that a Proceeding has been brought in an inconvenient forum.  Subscriber consents to the service of process out of any New York court in any such Proceeding by the mailing of copies thereof, by certified or registered mail, return receipt requested, addressed to Subscriber at the address of Subscriber then appearing on the Fund's records.  Nothing herein shall affect the Fund's right to commence any Proceeding or otherwise to proceed against Subscriber in any other jurisdiction or to serve process upon Subscriber in any manner permitted by any applicable law in any relevant jurisdiction.

24.    Furthermore, by executing the Subscription Agreements, UBS AG agreed to all terms and conditions contained therein, including the express provision that any agreement made by UBS AG in the Subscription Agreements would also apply to any other person for whom UBS AG was subscribing as trustee, agent, representative, or nominee—*i.e.*, all Beneficial Shareholders. Moreover, by executing the Subscription Agreements, UBS AG represented that it had all requisite authority from Beneficial Shareholders to execute and perform any and all obligations on their behalf, and also agreed to indemnify Sentry for any damages resulting from an assertion by a Beneficial Shareholder that UBS AG lacked proper authorization to enter into the Subscription Agreements or perform the obligations thereof. Specifically, the Subscription Agreements provide as follows:

> <u>If Subscriber is acting as a Representative</u>. If Subscriber is subscribing as trustee, agent, representative, or nominee for another person (the "Beneficial Shareholder"), Subscriber agrees that the representations and agreements herein are made by Subscriber with respect to itself and the Beneficial Shareholder. Subscriber has all requisite authority from the Beneficial Shareholder to execute and perform the obligations hereunder. Subscriber also agrees to indemnify the Fund … for any and all costs, fees and expenses (including legal fees and disbursements, fines and amounts paid in settlement) in connection with any damages resulting from Subscriber's misrepresentation or misstatement contained here, or the assertion of Subscriber's lack of proper authorization from the Beneficial Shareholder to enter into this Agreement or perform the obligations hereof.

25.    Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

## PARTIES

### A.    <u>Plaintiffs</u>

26.    Sentry, a British Virgin Islands company, was organized in 1990 under the International Business Company Act of the British Virgin Islands and was subsequently re-registered as a business company under the BVI Business Companies Act 2004. Sentry's registered agent is Codan Trust Company (B.V.I.) located at Romasco Place, Wickhams Cay 1, Road Town,

Tortola, BVI.  Sentry is currently in liquidation in proceedings commenced on April 21, 2009 in the BVI Court.

27.     The Foreign Representatives were appointed by the BVI Court as Liquidators of the Funds to supervise the liquidation of the Funds' estates and, where necessary, commence proceedings in the name of and on behalf of the Funds or in their own official names.  On April 23, 2009, the BVI Court issued an order appointing Christopher Stride as liquidator of Lambda (the "Lambda Appointment Order").  On July 21, 2009, the BVI Court issued an order appointing Kenneth Krys and Mr. Stride as joint liquidators of Sentry and Sigma (the "Sentry & Sigma Appointment Order").  On September 6, 2010, the BVI Court issued notices acknowledging Mr. Stride's resignation and the appointment of Joanna Lau as joint liquidator with Mr. Krys of all three Funds (the "Supplemental Appointment Order").  On November 23, 2011, Ms. Lau resigned as joint liquidator of the Funds.  On June 24, 2014, the BVI Court issued an order appointing Charlotte Caulfield as joint liquidator, with Mr. Krys, of all three Funds (the "Second Supplemental Appointment Order").  On June 21, 2019, Ms. Caulfield resigned as joint liquidator of the Funds.  On July 8, 2019, the BVI Court issued an order appointing Greig Mitchell as joint liquidator, with Mr. Krys, of all three Funds (the "Third Supplemental Appointment Order" and, together with the Lambda Appointment Order, the Sentry & Sigma Appointment Order, the Supplemental Appointment Order, and the Second Supplemental Appointment Order, the "BVI Appointment Orders").  The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of the Funds, have been authorized by the foreign court having jurisdiction over the matter to bring this action and the claim herein.

28.     Pursuant to the BVI Appointment Orders, the Foreign Representatives are responsible for all aspects of the Funds' businesses, including, among other things, custody and

control of the Funds' assets, the power to do all acts and execute, in the name and on behalf of the Funds, any deeds, receipts or other documents, and the power to compromise claims, commence litigation and to dispose of property. After obtaining BVI Court approval, the Foreign Representatives filed petitions in this Court in June of 2010, under Chapter 15 of Title 11 of the United States Code, seeking recognition of the BVI Liquidation Proceedings as "foreign main proceedings" under Chapter 15. On July 22, 2010, this Court issued an order (the "Recognition Order") granting that recognition.

29.     Pursuant to the Recognition Order, the Foreign Representatives were automatically afforded relief available under 11 U.S.C. § 1520, including application of the Bankruptcy Code's automatic stay to the Funds and their property located in the United States, as well as the ability to operate the Funds' business and exercise the rights and powers of a trustee under Sections 363 and 552 of the Bankruptcy Code. Moreover, the Bankruptcy Court specifically granted additional relief in the Recognition Order to the Foreign Representatives pursuant to 11 U.S.C. § 1521(a). Such relief includes, but is not limited to: (i) staying any actions, proceedings or execution against the Funds' assets to the extent not stayed under Section 1520; (ii) authorizing the Foreign Representatives to seek leave to conduct discovery concerning the Funds' assets, affairs, rights, obligations or liabilities; (iii) entrusting the Foreign Representatives with the administration and realization of the Funds' assets that are located within the United States, including all claims and causes of action belonging to the Funds; and (iv) otherwise giving full force and effect to the proceedings before the BVI Court.

30.     Claims had been previously asserted against the Funds in actions commenced by Irving H. Picard, the Trustee appointed by the United States District Court for the Southern District of New York for the liquidation of BLMIS (the "BLMIS Trustee"), in an adversary proceeding

pending before the United States Bankruptcy Court of the Southern District of New York, *Picard v. Fairfield Sentry Limited, et al.*, No. 08-01789 (CGM) (the "BLMIS Adversary Proceeding"). As set forth in the complaint filed in the BLMIS Adversary Proceedings, the BLMIS Trustee sought to recover from the Funds, on preference and fraudulent transfer grounds, approximately $3.2 billion. This amount was alleged to have been transferred to the Funds from BLMIS, directly (in the case of Sentry), or indirectly (in the cases of Sigma and Lambda), during the six years preceding the December 2008 disclosure of the Madoff fraud. The BLMIS Trustee alleged that the monies transferred from BLMIS to the Funds were the misappropriated assets of other BLMIS investors. At all relevant times, monies that the Funds received from BLMIS, net of fees and expenses, were transferred to shareholders as Redemption Payments.

31.    On July 13, 2011, pursuant to an agreement between the Foreign Representatives and the BLMIS Trustee dated May 9, 2011, the United States Bankruptcy Court for the Southern District of New York entered judgments against each of the Funds on the claims against the Funds asserted in the BLMIS Adversary Proceeding (the "Judgments") in the amount of $3,054,000,000 with respect to Sentry, $752,300,000 with respect to Sigma, and $52,900,000 with respect to Lambda. The Redemption Payments rendered the Funds unable to satisfy their liabilities to the BLMIS customers, the BLMIS Trustee, including on account of the Judgments, and other creditors of the Funds, and have further increased the amount of those liabilities. In this way, the Redemption Payments caused the Funds to become insolvent and/or deepened their existing insolvency, in that, among other things, at all relevant times the Funds were unable to pay their debts as they fell or would fall due.

**B.    Defendants**

32.    UBS AG was, at all relevant times, a member of Sentry and a registered holder of Shares. Upon information and belief, UBS AG is a corporate entity organized under the laws of

New York and having its registered address at 101 Park Avenue, New York, New York 10178. UBS AG subscribed for the purchase of Shares by entering into one or more Subscription Agreements with Sentry. All purchases of Shares by UBS AG were subject to the terms of the Subscription Agreements.

33.    Defendants "Beneficial Owners of the Accounts Held in the Name of UBS AG New York 1-1000"—*i.e.*, the Beneficial Shareholders, are, as noted, any persons or entities having a beneficial ownership or interests in Shares of Sentry issued to UBS AG and on whose behalf UBS AG was acting as trustee, agent, representative, or nominee. Based on Sentry records, some or all of the Redemption Payments made to UBS AG may have been paid to an account holder or holders associated with reference number 050083.

34.    Based on Sentry records, some or all of the Redemption Payments made to UBS AG may have been paid to an account holder or holders associated with the Beneficial Shareholder, Soriano S.A. Upon information and belief, Soriano S.A. is a corporate entity organized under the laws of Argentina and has its registered address at El Salvador 5161, C (1414) BPS, Capital Federal, Ciudad, Buenos Aires, Argentina.

## NOTICE PURSUANT TO FED. R. CIV. P. 44.1

35.    Certain of the substantive issues to be resolved in this case will be governed by the laws of the British Virgin Islands. Plaintiffs intend to rely upon the applicable laws of that territory.

## FACTUAL ALLEGATIONS

### A.    Role Of Feeder Funds In Madoff Fraud

36.    Sentry was the largest of all the so-called "feeder funds" to maintain accounts with BLMIS. Sigma and Lambda were indirect BLMIS feeder funds established for foreign currency (respectively, Euro and Swiss franc) investment through purchase of shares of Sentry. Shares in

the Funds had the following par values: $.01 per share (Sentry), €.01 per share (Sigma), and CHF.01 per share (Lambda). Sentry's account statements with BLMIS as of the end of October 2008 showed in excess of $6 billion of invested assets supposedly held by BLMIS. As stated in its offering materials, Sentry's investment objective was to achieve capital appreciation through investments in BLMIS.

37.    As discussed above, Sentry, Sigma, and Lambda were established for the purpose of making investments in BLMIS. It is now known that these types of feeder funds were a crucial part of Madoff's Ponzi scheme. Feeder funds, such as Sentry (which was a direct feeder fund into BLMIS), and Sigma and Lambda (which were indirect feeder funds, through Sentry, into BLMIS) brought new investors and new investments into the scheme, allowing Madoff to make payments to early investors who sought to liquidate their investments. In this way, the feeder funds were used by Madoff to continue and perpetuate his fraud by maintaining the illusion that BLMIS was making active investments and engaging in a successful investment strategy.

**B.    Calculation Of Net Asset Value And Shareholder Redemption Payments**

38.    From the Funds' inception until the disclosure of Madoff's fraud in December 2008, during most relevant times, substantially all of the money (up to 95%) raised by the Funds from the sale of their Shares, net of fees and expenses, was turned over to and invested in BLMIS (by and/or through Sentry), and supposedly credited to accounts held in the name of Sentry with BLMIS, purportedly for use in the now infamous "split-strike conversion" investment strategy. In accordance with the Funds' Subscription Agreements, Articles of Association, offering materials and/or other relevant documents, from time to time, the Funds paid to shareholders, for each Share tendered for redemption, an amount that was based on each of the respective Funds' purported Net Asset Value, as it was then calculated.

39.    In calculating each of the Funds' Net Asset Value, the Funds' administrators used and relied on account statements provided by BLMIS purportedly showing securities and investments, or interests or rights in securities and investments, held by BLMIS for the account of Sentry.  Generally, all securities identified on BLMIS account statements were traded on public exchanges and had readily ascertainable market values, and those market values (in addition to, among other items, cash on hand that was identified in the Sentry account statement for the relevant time period) were used in accordance with the Funds' Subscription Agreements, Articles of Association, offering materials and/or other documents to calculate the Net Asset Value of the Shares.

40.    In fact, at all relevant times, no securities were ever purchased or sold by BLMIS for Sentry and any stated cash on hand in the BLMIS accounts was based on misinformation and fictitious account statements.  None of the transactions shown on the account statements provided by BLMIS to Sentry ever occurred.  Indeed, no investments of any kind were ever made by BLMIS for Sentry.  At all relevant times, all of the account statements that BLMIS provided to Sentry were entirely and utterly fictitious.  Further, all amounts deposited by Sentry (or by Sigma and Lambda through Sentry) with BLMIS for investment and the purchase of securities to be held by BLMIS for the account of Sentry were used by Madoff to pay other BLMIS investors or were misappropriated by Madoff for other unauthorized uses.

41.    From time to time, to make Redemption Payments, Sentry (and Sigma and Lambda through Sentry) made withdrawals from Sentry's BLMIS accounts (or utilized subscription monies of other investors on hand that were directed for investment in BLMIS).  At all relevant times, the Funds believed that the amounts provided in connection with such withdrawals represented the proceeds arising from the profitability of or continued investment in BLMIS.  In fact, however,

14

payments made by BLMIS to Sentry purportedly representing the proceeds of sales of securities or other investment positions were nothing other than the deposits of other BLMIS investors or previous deposits made by Sentry, never invested but rather misused and misappropriated as part of Madoff's fraud.  At all relevant times, payments made from BLMIS to Sentry were made by Madoff to continue and perpetuate his Ponzi scheme and avoid detection of his fraud.  The payments from BLMIS to Sentry were not payments made in the ordinary course of or as part of any business, nor did they have a legitimate business purpose.  Similarly, the Redemption Payments were not made for any legitimate purposes or in the ordinary course of any business. Those Redemption Payments did not conform to or follow the terms of the Funds' Subscription Agreements, Articles of Association and/or other offering documents, as they were based upon Net Asset Values that were not calculated based upon the true facts existing at any relevant time, and because, more generally, the Redemption Payments represented the proceeds arising from investment in BLMIS (or a substitute therefor, in the form of subscription monies from other investors in the Funds, used as a shortcut to investing subscription monies with BLMIS and simultaneously withdrawing monies from BLMIS), which the world now knows was operated by Madoff as a Ponzi scheme.

42.    Given the fraudulent nature of BLMIS and its operation as a massive Ponzi scheme, the money paid by the Funds (directly in the case of Sentry and indirectly in the cases of Sigma and Lambda) to BLMIS on account of Sentry was, at all relevant times and unknown to the Funds, misused and misappropriated by Madoff as part of his Ponzi scheme.  At all relevant times, the Funds were insolvent when the Redemption Payments were made or were rendered insolvent, and/or their insolvency was deepened, as a result of the Redemption Payments.  As a result, at all relevant times, the Net Asset Value of the Shares redeemed was miscalculated, and Redemption

Payments were mistakenly made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at any relevant time.

### C. <u>Redemption Payments Made Or Transferred To Defendants</u>

43.     During the period from and after September 15, 2004, through November 19, 2008, UBS AG received Redemption Payments totaling USD $7,602,622.59 from Sentry in respect of Shares tendered for redemption.

44.     At UBS AG's directions and instructions, UBS AG received $6,053,807.08 in Redemption Payments at its bank account with UBS AG in New York and $1,365,058.03 in Redemption Payments at its bank account with UBS AG in Stamford, Connecticut.

45.     The dates and amounts of each Redemption Payment received by UBS AG from Sentry, and the UBS AG bank accounts to which each Redemption Payment was made, are set forth on <u>Exhibit A</u>.

46.     At the time those Redemption Payments were made, the Funds had insufficient assets and were unable to pay their debts as they would fall due.  In exchange for each Redemption Payment, each of which constitutes or forms part of a transaction between UBS AG and Sentry, Sentry received no consideration or consideration of a value that, in money or money's worth, was significantly less than the value, in money or money's worth, of the consideration provided by Sentry.

47.     Upon information and belief, UBS AG and/or the Beneficial Shareholders received Redemption Payments in excess of amounts paid by such person(s) for purchase of their Shares.

**D.**    **UBS AG Knew Of, Was Willfully Blind To, Or Recklessly Disregarded The Inflation Of The NAV**

48.    By as early as 2000, UBS AG acquired knowledge that the NAV was inflated at the time of the Redemption Payments from its own due diligence on BLMIS and from its subsidiaries UBS Lux and UBS O'Connor.

49.    Between 2000 and 2008, UBS AG conducted multiple rounds of due diligence on BLMIS in connection with opportunities involving various feeder funds. Units within UBS AG and UBS O'Connor identified multiple red flags, including Madoff's dual role as custodian and broker, the seeming impossibility of BLMIS's reported returns, and Madoff's notorious lack of transparency. Although UBS AG sought meetings with Madoff to discuss its concerns, Madoff repeatedly rebuffed these requests. UBS AG was never able to obtain satisfactory explanations for its concerns. Instead, UBS AG minimized its exposure to BLMIS by declining investment opportunities with feeder funds and prohibiting the recommendation of feeder funds to UBS AG's private wealth clients.

50.    In 2003, UBS Lux began its own due diligence on BLMIS after being asked to participate in the founding of feeder fund Luxalpha. UBS Lux solicited UBS AG and UBS O'Connor for their opinions on BLMIS; the feedback that UBS Lux received was resoundingly negative. Both UBS AG and UBS O'Connor flagged as problematic Madoff's dual role as broker and depository, the impossibility of BLMIS's reported returns, and Madoff's notorious lack of transparency. UBS Lux recognized that these concerns presented a significant risk to UBS Lux, with one UBS Lux managing director commenting that this feedback "d[id] not contribute to me having a better feeling" about BLMIS. But UBS Lux made no attempt to diligently pursue these concerns. Instead, UBS Lux was content to turn a blind eye to these concerns to reap the significant fees from serving in multiple roles for Luxalpha and later LIF-USEP. In fact, the UBS Lux

managing director who authorized UBS Lux's participation in Luxalpha justified this decision on the basis that "Business is business. We cannot permit ourselves to lose [a] 300 million [client]."

51.    UBS AG subsequently served as the sponsor for both Luxalpha and LIF-USEP, while UBS Lux served as the co-sponsor, administrator, custodian, and portfolio manager for both Luxalpha and LIF-USEP. This experience gave UBS AG firsthand exposure to the very concerns that it and UBS O'Connor had raised about BLMIS. UBS Lux intentionally relinquished its oversight role over BLMIS by delegating its custodian and portfolio manager duties to BLMIS itself in violation of Luxembourg law. UBS Lux additionally engaged in a concerted effort to conceal this abdication of its duties from both feeder funds' investors and Luxembourg regulators by omitting this fact from sales prospectuses, audit reports, and submissions to Luxembourg regulators. UBS Lux's conduct surprised employees of both UBS AG and UBS Lux alike. For example, one UBS AG employee pointed out that these delegations did not appear in Luxalpha's sales prospectuses and questioned, "Should we be at risk in any regulator investigation?" And a UBS Lux employee later questioned "how one can argue that we are officially the portfolio manager [of LIF-USEP] but do not have a cent posted to our books."

52.    Notwithstanding this knowledge, UBS AG continued to invest in and do business with the Fairfield Funds.

1.    **The UBS Entities' Corporate Structure Ensured That Information Was Shared Among UBS Entities**

53.    UBS AG and its subsidiaries, such as UBS Lux, presented themselves to the public as a unified global entity that operates as "a coherent and effective whole." UBS AG and its subsidiaries share a centralized structure for their core enterprise functions including finance, risk, legal, compliance and shared services including, among other things, human resources, information technology, communication and branding, and corporate development.

54.     This organizational structure is designed to ensure the centralized control over UBS-group companies by UBS AG of global business strategy.  UBS AG subsidiaries market themselves as part of an "extensive global network," which provides an "international network of experts and can propose truly global investment solutions" that benefit from "the experience, know-how and substantial resources provided by the UBS Group as a whole."

55.     By virtue of this centralized structure, UBS AG accumulated and shared knowledge of the Madoff fraud from and with its subsidiaries.

### 2.     After Conducting Due Diligence On BLMIS, UBS AG Turns Down Multiple BLMIS-Related Products And Refuses To Recommend Feeder Funds To Its Clients

56.     In November 2000, UBS AG acquired Fondvest AG ("Fondvest"), a Zurich-based company specializing in independent advisory and distribution services in the fund business. Fondvest served as the research unit for UBS AG and its subsidiaries, providing analysis on third-party funds for the UBS business units.

57.     In 2003, UBS AG merged Fondvest with the Investment Solutions unit within UBS Wealth Management, a business division of UBS AG.  The Investment Solution unit became responsible for providing analysis of third-party funds to UBS AG.  According to a May 2009 article in the *Financial Times*, the Investment Solutions unit:

> had earlier looked at the Madoff funds platform from a general process and firm perspective, but did not receive the required levels of comfort and gave the funds a "non approved" status for internal records. This was seen as a clear signal that Madoff funds should not be actively held for portfolio construction uses at UBS.

58.     In addition, as early as 2002, UBS AG rejected an overture to invest in BLMIS feeder fund Broad Market Fund despite its attractive returns.  In a memo assessing this investment opportunity, an unnamed employee from UBS AG subsidiary UBS O'Connor noted that "[t]he fund seems to do very well, but there are voices in the industry warning because generating such

consistent returns with such a strategy is more or less impossible." This UBS O'Connor employee additionally explained that "[w]e consider ourselves pretty smart and no one in their firm has properly explained their strategy to match the return profile to us, so we avoid stuff like that."

59.    Although Broad Market Fund's promoters claimed that "they know more than anyone else about Madoff because they have got a great relationship with Madoff," they were, upon information and belief, never able to sufficiently answer UBS AG's questions about the strategy. As a result, UBS AG decided against investing in Broad Market Fund.

60.    Between September 2007 and December 2008, UBS AG was approached about investing in several BLMIS-related products. Internal emails between UBS entities show that these requests prompted UBS AG to perform extensive due diligence on BLMIS. During this process, several red flags were raised regarding BLMIS and Madoff, including Madoff's lack of transparency and his refusal to meet with UBS AG's analysts.

61.    For example, representatives of an investment firm called Pioneer Alternative Investment Management, Ltd., Dublin or Pioneer Global Asset Management S.p.A. in Milan ("Pioneer") approached UBS AG about offering and promoting a BLMIS Feeder Fund called Primeo Select. UBS AG ultimately refused to allow Primeo Select to be offered through UBS AG. This decision appears to have been based on due diligence done by UBS AG in London, as well as a decision from UBS AG's asset management group in Switzerland. UBS AG believed that it did not have enough information on Madoff, who was the underlying fund manager for Primeo Select, could not get comfortable with Madoff's strategy, and refused to offer any Madoff product because Madoff would not meet with UBS AG's analysts.

62.    While UBS AG was deciding whether to approve these investments in BLMIS-related products, UBS AG instructed its analysts to obtain more information on the underlying

fund manager, Madoff.  UBS AG delegated this task to Mary Kleckner, a UBS AG analyst in

London.

63.     Kleckner solicited other UBS employees for their opinions on Madoff.  On October

31, 2007, in response to her question, "What are your feelings on Madoff," Kleckner received the

following response:

> I think [M]adoff is one of the most controversial funds out there. The historic
> returns and low vol[ume] make the [M]adoff feeders look very attractive for
> leveraged structured products and FAs love it. In addition, [M]adoff is very
> involved with the [NASD] and on a number of committees there. We get asked
> about sp's on these funds all the time, but there are a lot of folks who are concerned
> about the fund. Everything is probably fine, but there are a number of things that
> are odd or different than the norm. Like no prime broker, all trades done through
> [M]adoff securities through an ordinary brokerage account. It's also unclear which
> dealers are executing the [OTC] collars for him? They are pretty big, but no one
> seems to know who is trading them. The compensation for him is just through
> commission, no mgmt or incentive fee. There are a couple of other flags as well but
> [redacted] and [redacted] have both written a lot of structured products on [M]adoff
> … I've never met him, but we did have a call with one of his risk folks some time
> ago. Could be ok, but there is more risk due to the lack of transparency on this one
> than in many other funds. Some folks think [M]adoff could be one of the most
> successful schemes ever, I think it would be hard to do anything on them without
> more transparency than they have historically been willing to provide.

Kleckner then replied:

> I totally agree with everything you said!  I do not think there is anything sinister
> going on but as is with [Redacted].  You make a choice whether to just invest and
> hope for the best or to pass on it.  I really would like to facilitate trades but I can't
> support my existence at ubs by giving a positive opinion on something I can't get
> transparency on.

64.     During this later due diligence, one of UBS AG's requirements was "a face to face

meeting with the manager and a site visit to the HQ of the firm where money is managed."  In

September 2008, as part of preparation for such a meeting, Kleckner asked her team for a list of

specific questions or topics they would like answered.  The team responded with concerns about

the total assets BLMIS was managing and whether there was a point at which these assets would

be large enough to deteriorate the strategy's performance.  Additionally, UBS AG raised questions about the potential misuse of information between BLMIS's market-making and IA Business arms.

65.    UBS AG never received answers to these questions, as Madoff repeatedly refused Kleckner's requests to meet.  In a September 17, 2008 email, Kleckner was informed:

> Madoff has turned down our request for a meeting. His simple explanation was that if he meets with one client he would be obligated, perhaps even from a regulatory standpoint now that he is an RIA, to meet with all of them, and he would literally be forced to build an infrastructure to support meetings and devote a huge amount of time to it.

66.    Ultimately, UBS AG decided that it did not have enough information on Madoff to invest with him.  UBS AG was unable to assuage its concerns, since Madoff refused to meet with any of UBS's analysts.  UBS AG concluded that "Madoff is not a manager that we are willing to structure products on …."

67.    Because of the aforementioned due diligence activities, UBS Wealth Management put BLMIS on a "non approved" list, prohibiting the recommendation of BLMIS and its related feeder funds for investment to UBS AG's private wealth clients out of a concern that BLMIS presented an unacceptable risk.  Thus, following the revelation of Madoff's fraud, UBS AG publicly stated that it had no material exposure to BLMIS.

### 3.    UBS AG Acquired Additional Knowledge Of The Madoff Fraud Through Its And UBS Lux's Relationships With BLMIS Feeder Fund Luxalpha

68.    At some point in 2003, Access International Advisors and certain of its affiliates (collectively, "Access") contacted UBS Lux about forming a Madoff feeder fund, later known as Luxalpha.  Access had previously worked with BNP Paribas to establish the Madoff feeder fund Oreades SICAV ("Oreades"), but BNP Paribas shut down Oreades in March 2004 due to its misgivings about BLMIS.  Access sought out UBS Lux to replace BNP Paribas as the prime bank through which to direct investments to BLMIS.

69.    UBS Lux contacted UBS AG about this opportunity.  On March 31, 2003, UBS AG employee Florentin Soliva responded by noting that one of UBS AG's biggest concerns with BLMIS was that Madoff was simultaneously acting as both a broker and a depository.  Soliva explained that:

> [W]e normally have to give "NO" as the answer in cases like Madoff. In doing so, we make reference to the following principles: no broker as depository, and the broker may under no circumstances also be a depository at the same time! Such a NO is easy to comprehend for both business policy reasons and risk reasons.

However, Soliva indicated that UBS AG was willing to make an exception provided that certain conditions were met, including:  (1) the potential fund "ha[ve] a segregated depository relationship with UBS Luxembourg explicitly for these positions via Madoff"; (2) "UBS Lux keeps a segregated depository with Madoff which explicitly contains only the Securities of this one [fund]"; (3) "Madoff reports to UBS Lux for the purpose of daily reconciliation similar to reconciliation usage at UBS Luxembourg"; (4) "UBS Luxembourg is in a position to guarantee the daily reconciliation and has a valid trading authority contract with Madoff"; and (5) "Madoff keeps a separate account for UBS Luxembourg in which only these positions of this one client are kept."

70.    On December 17, 2003, Vivian DeAngelis, a UBS Lux managing director, forwarded Soliva's email to other UBS Lux employees.  DeAngelis acknowledged that UBS Lux "would effectively enter into several risks upon taking over the Oreades Fund (USD 300 million)."  These risks included UBS Lux assuming the functions of portfolio manager, promoter, and depository bank.  DeAngelis concluded that these risks "should not be underestimated" but that this deal would "be advantageous on the income side."

71.    On January 6, 2004, Bernard Stiehl, another UBS Lux managing director, instructed DeAngelis to accept the proposal to participate in Luxalpha.  He explained that "Business is

business.  We cannot permit ourselves to lose 300 million."  Upon information and belief, UBS

Lux did not condition its participation on Luxalpha implementing the aforementioned conditions

that UBS AG required.

72.    UBS Lux also conducted its own due diligence on BLMIS and received significant

negative feedback from other UBS entities.  For example, in a March 5, 2004 email, Mike Welch

of UBS O'Connor cautioned against becoming involved with Madoff:  "[W]e never got enough

transparency to truly see how they were generating returns, but our issue is that it could not have

been how it was marketed."  In a portion of his email titled "Investment Approach," Welch raised

concern with the consistency of Madoff's returns:  "Madoff has run [his] strategy since 1990 with

only a handful of negative months, generating 11% to 15% per annum EVERY year.  Demand for

the return stream has driven his asset base well over $ 10B and people often speculate how Madoff

actually makes money so consistently."  In another portion of this email titled "Thoughts and

Rationale for NOT Investing," Welch raised additional red flags.  First, he stated that "[i]f Madoff

were to run the strategy totally independently from his [broker/dealer business], it would be

IMPOSSIBLE to generate the returns that he has produced since 1990."  Second, Welch noted that

Madoff did not charge fees for his hedge fund, which "[m]akes one ask the question of why Madoff

would bother to have such a product when the only revenue coming from running outside money

is commission dollars."  Welch concluded that "[t]he simple fact that an investor has to start

considering how the fund and the [broker/dealer] benefit one another is a non-starter in our mind."

73.    Tim Bell, a UBS AG employee who regularly advised on hedge fund investments,

raised similar concerns about BLMIS.  In an email dated March 5, 2004, Bell characterized the

question of whether UBS entities "should [] go there" as depending on the answers to the questions,

"can we really get transparency and can we really get comfortable?"  In response to UBS Lux's inquiries about BLMIS, Bell stated:

> [w]e should have a proper UBS view on what we think of all this rather than a purely personal view on my part, but I think you will find that the general UBS view would steer on the negative side given the great need for transparency … My natural leaning would be negative as well, not because of any-thing against the strategy or Madoff himself, but because of the size, the lack of transparency, [and] the lack of capcity [sic] ….

74.    Upon receiving Bell's email, DeAngelis wrote that Bell's assessment "does not contribute to me having a better feeling" and that she had "inquired about additional insurance" for UBS Lux.

75.    Luxalpha was incorporated in February 2004, and UBS Lux opened an account on Luxalpha's behalf with BLMIS in March 2004.  Both UBS AG and UBS Lux served as the sponsor of Luxalpha, while UBS Lux additionally served as the custodian and portfolio manager.

76.    UBS Lux, however, delegated both its custodian and portfolio manager duties to BLMIS.  First, on February 5, 2004, UBS Lux entered into a sub-custodian agreement with BLMIS that delegated UBS Lux's custodial duties to BLMIS "with the function of safekeeping holder and settlement and corporate agent of United States securities, cash, derivatives instruments and other assets" and noted that the "US assets of the Fund" would be invested with BLMIS.  Second, on March 18, 2004, in its capacity as Luxalpha's manager, UBS Lux executed an agreement with BLMIS that delegated management of Luxalpha's assets to BLMIS, designating BLMIS as their "agent and attorney in fact to buy, sell and trade in stocks, bonds, options and any other securities." Both of these delegations violated Luxembourg financial regulations governing open-ended collective investment schemes ("UCITS"), which prohibit UCITS funds, like Luxalpha, from (1) appointing one entity as both custodian and investment manager, and (2) with the exception of circumstances not applicable here, subdelegating custodial duties.

77.     UBS Lux concealed both of these delegations from its investors and Luxembourg financial regulator the Commission de Surveilance du Secteur Financier ("CSSF") by omitting them from all Luxalpha sales prospectuses.  In fact, the February 2004, August 2004, August 2006, March 2007, and November 2008 Luxalpha sales prospectuses each misleadingly state that UBS Lux had assumed Luxalpha's custodial rights and duties, failing to disclose the delegation of custodial responsibilities to BLMIS.

78.     Documents submitted to the CSSF on UBS Lux's behalf also misrepresented UBS Lux's custodial function.  In a report dated January 15, 2008 entitled "Controls' Report of the Independent Auditor on the Custodian Bank Function in the Context of the CSSF Circular 02/81," to meet CSSF requirements, UBS Lux purported to set forth complete lists of the funds for which it served as custodian and the sub-custodians that it used worldwide.  Although Luxalpha was included in the list of funds in the report, neither Madoff nor BLMIS was identified as a sub-custodian and are nowhere to be found in the report.  The report misleadingly identifies Brown Brothers Harriman as the only sub-custodian that UBS Lux used in the United States.  Upon information and belief, UBS Lux submitted such reports regarding its custodial function and its global custodial network to CSSF annually from 2004 through 2008, but failed to identify Madoff or BLMIS as a sub-custodian in any of those reports.

79.     In an August 14, 2009 interview given to *Les Echos*, a French financial publication, Jean Guill, the General Director of the CSSF, confirmed that Luxalpha and UBS Lux never disclosed—either to the CSSF or in sales prospectuses—that they had ultimately delegated custody of the fund's assets to BLMIS, and that the non-disclosure violated UCITS law.

80.    The 2009 Annual Report of the CSSF further confirms that the documents that were submitted to it on behalf of Luxalpha, upon which the CSSF based its decision to approve Luxalpha as a UCITS fund,

> did not contain any reference either to the identity of B[L]MIS or to the multiple responsibilities carried on de facto by one entity. Between the launch of [Luxalpha] and the breakout of the Madoff affair in December 2008, the CSSF was never informed in a transparent manner, by the professionals involved, of the structure actually set in place nor of the role played in practice by B[L]MIS at different levels of this structure.

81.    Even employees of UBS AG recognized that this delegation of both custodial and management authority to BLMIS could create legal exposure for both UBS AG and UBS Lux.  In an email chain dated May 7, 2004, UBS AG employee Philippe d'Anterroches observed that Luxalpha,

> was an alternative [fund] managed by 5 or 6 US hedge fund managers.  This does not appear at all on the prospectus either in guidelines and for any delegation to external managers.  Should we be at risk in any regulator investigation?

82.    Another UBS AG employee, Andreas Jacobs, forwarded d'Anterroches's email to UBS Lux employees with the observation that "the bottom line seems to be that what the fund does is not in line with what the prospectus says (???)."  Although UBS Lux director Serge Karp later weighed in to defend the prospectus, Karp notably did not address the prospectus's failure to disclose the delegation of management authority.

83.    Upon information and belief, the concealment of these delegations was, in part, driven by Madoff's insistence that his name not appear in any official offering document relating to Luxalpha.  In addition to omitting Madoff's name from Luxalpha's offering documents and the control reports submitted annually to the CSSF, UBS Lux took steps to remove all references to Madoff from Luxalpha audit reports prepared by Ernst & Young.  Ernst & Young agreed to remove

Madoff's name from its reports after Karp had "very long discussions with E&Y concerning this subject."

84.    In addition to contractually delegating its custodial and managerial duties, UBS Lux also entered into a series of indemnity agreements with Access to insulate itself from the risks associated with Luxalpha's creation and management.  On or about February 5, 2004, Access entity AIA (Lux), which purported to advise UBS Lux in connection with UBS Lux's nominal role as Luxalpha's portfolio manager from February 4, 2004 to August 1, 2004, entered into a series of indemnity agreements with the Luxalpha directors who were also UBS Lux employees.  The agreements purported to indemnify and hold harmless these directors and UBS Lux for any liabilities resulting from their involvement with Luxalpha.  The agreement further acknowledged and agreed that AIA (Lux) "requested [UBS Lux] to act as a figure head to third parties in the sponsorship and in the managementship [sic] of the Fund."  AIA (Lux) also agreed that it would assume UBS Lux's liability for "damages resulting from proved irregularities, inadequacies, or omissions in the administration or management" of Luxalpha.  From UBS Lux's perspective, such agreements were necessary to avoid the "worst case scenario":  BLMIS's failure and UBS Lux's resulting liability to Luxalpha investors.  UBS Lux also demanded that Access provide a "hold harmless" letter from Luxalpha's investors for loss resulting from BLMIS's failure and required Access to obtain and pay for an insurance policy covering Luxalpha's risks.  Upon information and belief, when a different Access entity, AML, was appointed to assist UBS Lux in its role as portfolio manager, AML entered into substantially similar indemnity agreements with UBS Lux and the Luxalpha directors who were also UBS Lux employees.

85.    By 2006 at the latest, UBS AG and UBS Lux became aware of the problems regarding BLMIS's purported options counterparties through its performance of duties for

Luxalpha. As set forth in the Securities and Exchange Commission ("SEC")'s Office of the Inspector General's report dated August 30, 2009 (the "OIG Report"), the SEC's Enforcement Staff sent a draft document request to UBS Financial Services Inc. in the United States on June 16, 2006 in an attempt to verify whether any of UBS's European affiliates served as one of Madoff's purported OTC option counterparties as Madoff had claimed. The OIG Report details that, instead of providing the SEC with a direct answer, UBS Financial Services claimed to be unable to access the relevant data from its European affiliates, and informed the SEC's Enforcement Staff that it would have to seek the relevant information directly from the European affiliates. However, both UBS AG and UBS Lux must have known in 2006 that they had never been a counterparty to one of Madoff's trades.

86.     Another example of UBS AG's and UBS Lux's misrepresentations concerning BLMIS's options counterparties can be seen in Risk Approach Memos that were prepared for Luxalpha's auditors. Those memos, which were prepared by UBS Lux and sent to the fund's auditors in 2004 and 2006, falsely state that the option counterparties are approved by UBS AG in its capacity as the sponsor of Luxalpha. In reality, no such counterparties were ever identified to, or approved by, UBS AG.

87.     UBS Lux was also aware that because of BLMIS's delays in providing trade information, Access provided UBS Lux with "backdated monthly investment recommendation[s]" for Luxalpha, a practice that UBS Lux endorsed in the October 16, 2008 Luxalpha Operating Memorandum. This backdating procedure was made necessary and put in place to accommodate BLMIS's delayed, hard copy reporting of its purported trades.

88.     On multiple occasions, UBS Lux asked Madoff for electronic trade and transfer information but was repeatedly rebuffed. In a January 13, 2006 email, Karp stated: "Unfortunately

although we submitted this request [for electronic data] on several times the answer remains still no."

89.    In the course of working with UBS Lux to service Luxalpha, Access came to recognize the serious concerns that both UBS Lux and UBS AG possessed about BLMIS.  On July 26, 2006, the founding partner, chairman, and CEO of Access entity AIA LLC Patrick Littaye entered the following note into Access's internal database regarding conversations among himself, UBS Lux managing director DeAngelis, and an individual named Lila Seirafi:

> LS HAD CALLED ME TO ASK IF THEY COULD STRUCTURE A NOTE WITH LEVERAGE ON LUX. FOR ONE OF THEIR CLIENTS. THINKING THEY CAME TO US THROUGH UBS LUXEMBOURG, I SENT QUITE A DOC TO HER, THOUGH NON MENTIONNING [sic] BMI.
>
> ***V DE ANGELIS STOPPED ME, EXPLAINING THAT THIS COULD CAUSE THE END OF OUR FUND, BECAUSE, IF THE ANALYSTS OF ZURICH FIND OUT BMI IS BEHIND THE STORY, WE WOULD BE KILLED.***
>
> SO I CALLED L. SEIRAFI, TELLING HER WE COULD NOT GO ANY FURTHER BECAUSE THIS IS REALLY A FAMILY FUND AND WE CANNOT LET THE PRODUCT SPREAD OUT. I TOLD HER THAT, WHEN WE HAVE THE IXIS PROPOSAL, I WOULD CALL HER AGAIN. ***THEN I TALKED TO VDA AGAIN. SHE TOLD ME TO DROP ANY RELATIONSHIP.***

(Emphasis added.)

90.    Upon information and belief, in September of 2006, Littaye entered another note into the internal Access database which reads in part:

> M. Neiman had a bid last July from Ixis concerning a leveraged position in Luxalpha (Leverage 3). One way of the other [*sic*], he contacted UBS structured product department – Geneva to get a second bid. This department was very excited.
>
> ***Now V. d Angelis had told her hierarchy that Luxalpha was a sicav dedicated to a family. She entered in a fundamental risk on her own position, because of this movement, which shows that the sicav is evidently not a dedicated sicav (huge internal compliance risk).***

(Emphasis added.)

91.     On June 19, 2007, Littaye entered an additional note into Access's internal database:

> V     DE     ANGELIS     IS     RESPONSIBLE     OF     [*sic*]     THE     UBS
> DEPARTMENT[]ADMINISTRATING THE FUNDS DEDICATED TO A
> FAMILY OR SOME GROUP. ***UBS INTERNAL AUDIT ON THESE FUNDS
> WAS COMPLETED 6 WEEKS AGO. WE FEARED FOR LUXALPHA
> SURVIVAL DUE TO THE MULTIPLICITY OF SUBSCRIBERS. []IT SEEMS
> TODAY THAT NO HARM WILL BE DONE.*** AN A[U]DIT ON THE DEPT
> ITSELF STARTS IN ONE WEEK. VDA IS HIGHLY CONFIDENT. IT SEEMS
> WE SHOULD BE TOTALLY COMFORTED AT THE END OF JULY.

(Emphasis added.)

92.     These internal notes demonstrate that Access understood that (1) UBS AG possessed serious concerns about the fraud risk presented by BLMIS and (2) UBS Lux was aware of UBS AG's concerns.

93.     In sum, by March 2004, UBS Lux was acutely aware that BLMIS presented a significant fraud risk.  UBS AG and UBS O'Connor alerted UBS Lux to specific red flags, including Madoff's dual roles as broker and custodian, the discrepancy between BLMIS's investment strategy and its reported returns, and Madoff's notorious lack of transparency.  Two UBS Lux managing directors, DeAngelis and Stiehl, expressly acknowledged that doing business with a feeder fund would expose UBS Lux to these risks.  But rather than diligently pursue these concerns directly with BLMIS or implement UBS AG's recommended safeguards for structuring the relationship with Luxalpha, UBS Lux turned a blind eye both to the expressed concerns and recommended safeguards in order lock down the lucrative fees as service providers for Luxalpha. In addition, UBS AG's and UBS Lux's experience with Luxalpha provided firsthand confirmation of the very concerns that UBS AG and UBS O'Connor had raised.  UBS Lux intentionally relinquished its oversight role over BLMIS by delegating its custodian and portfolio manager duties to BLMIS itself and engaged in strenuous efforts to conceal this abdication of its duties

31

from Luxalpha's investors and Luxembourg regulators.    UBS AG recognized that the misrepresentation of these delegations could create legal exposure for both itself and UBS Lux, but was similarly financially incentivized to pursue these concerns no further.

### 4.    UBS AG Acquired Additional Knowledge Of The Madoff Fraud Through Its And UBS Lux's Relationships With BLMIS Feeder Fund LIF-USEP

94.    In or around 2005, Spanish investment services firm M&B Capital Advisers Sociedad de Valores S.A. ("M&B") established a new Madoff feeder fund, LIF-USEP.  M&B worked with Serge Karp, the UBS Lux director who was also involved with Luxalpha, to obtain UBS Lux's agreement to serve as LIF-USEP's sponsor, custodian, and administrator.  LIF-USEP was designed to replicate Luxalpha by exclusively investing with BLMIS.

95.    UBS Lux recognized it could enrich itself through LIF-USEP by installing subsidiaries as service providers with Madoff feeder funds and collecting fees, just as it had done with Luxalpha.  UBS Lux served as co-sponsors with UBS AG, co-managers with another UBS AG subsidiary UBS Third Party Management Company ("UBSTPM"), and as the sole custodian. LIF-USEP's board of directors was stocked with UBS Lux employees:  at all times, all members of LIF-USEP's board of directors were also UBS Lux employees.

96.    Under the management agreements with LIF-USEP, UBS Lux and UBSTPM were responsible for managing the fund's assets, including "continuous monitoring and adjustments of investments in line with the specific investment policy.  Thus, UBS Lux and UBSTPM, who received and analyzed BLMIS reported trade data and customer statements, were well aware of trades executed outside the daily price range and understood such trades were impossible.

97.    UBS Lux's performance of its duties for LIF-USEP mirrored many of the problematic aspects of its performance of duties for Luxalpha.  In August 2005, UBS Lux entered into a Sub-Custodian Agreement with BLMIS, delegating its custodial functions to BLMIS.  The

Sub-Custodian agreement stated that the "US assets of the Fund" would be invested with BLMIS. The Sub-Custodian Agreement was not disclosed in any prospectus filed with the CSSF. Upon information and belief, UBS Lux continued to receive substantial fees as LIF-USEP's custodian even though it had delegated substantially all of its functions to BLMIS.

98.     UBS Lux also entered into a "Trading Authorization Limited to Purchases and Sales of Securities and Options" with BLMIS, and delivered this document to BLMIS. The Trading Authorization provided BLMIS with complete authority to trade the assets of LIF-USEP. UBS Lux failed to disclose either delegation in submissions to the CSSF or LIF-USEP prospectuses.[1] Nonetheless, upon information and belief, UBS Lux continued to receive fees for acting as the fund's custodian, and remained statutorily and contractually responsible as the fund's custodian.

99.     UBS Lux ultimately omitted all mention of Madoff from all of LIF-USEP's offering documents, such as prospectuses and marketing materials.

100.     UBS Lux's abdication of its asset management responsibilities surprised even its Head of Portfolio Management, Christian Schoen. In a March 22, 2004 e-mail, Schoen wrote:

> I am wondering how this is supposed to work and how one can argue that we are officially the portfolio manager but do not have a cent posted to our books. To date I had assumed that Madoff certainly makes the trades and executes them, but that the assets lie with us and that in the end we settle the trades with Madoff. This way I would have been in a position to exercise a certain oversight function.

---

[1] On May 2, 2006, UBS Lux's official managerial responsibility was assigned to UBSTPM. UBSTPM then represented to the CSSF and to LIF-USEP investors that it had assumed responsibility for the management, administration, and monitoring of LIF-USEP's investment policies and restrictions. But UBSTPM never managed LIF-USEP, because that function had already been delegated to BLMIS under the trading authorization agreement between UBS Lux and BLMIS.

101.    UBS Lux strove to remove all references to Madoff from their audit reports. For example, on November 13 and 14, 2006, Karp of UBS Lux asked Laurence Blanchard of Ernst & Young to remove Madoff's name from the March 2006 long form report that Ernst & Young was preparing. Karp noted that Ernst & Young had already agreed to remove Madoff's name from the equivalent report for Luxalpha, and that UBS Lux and Ernst & Young had already "had very long discussions with E&Y concerning this subject." In a November 29, 2006 email, Blanchard assented to Karp's request, stating that "E&Y has agreed to take out the name of Madoff in all of the report." Karp also forwarded to DeAngelis of UBS Lux his request to remove Madoff's name, with a cover email that stated "[o]ne has to be careful about everything." DeAngelis responded, "You are right."

102.    UBS Lux also knew that it regularly received delayed trading information from BLMIS. An Operating Memorandum for LIF-USEP dated December 20, 2005, prepared by UBS Lux, specifies that LIF-USEP's investment advisor, Reliance Gibraltar, would provide UBS Lux "with a backdated monthly investment recommendation." This backdating procedure was made necessary and put in place to accommodate BLMIS's delayed, hard copy reporting of its purported trades.

103.    M&B correctly predicted that LIF-USEP would inspire significant demand for investment. LIF-USEP's rapid growth left UBS AG and UBS Lux uncomfortable with their overall exposure to Madoff. This concern led UBS Lux to close LIF-USEP to new subscriptions in March 2007. But less than a year later, UBS Lux reconsidered and in early 2008 re-opened the fund to new subscriptions.

104.    By accepting various roles with LIF-USEP and delegating critical duties to BLMIS, UBS AG and UBS Lux ignored their own concerns about specific indicia of fraud in order to reap the financial benefits of providing services to an additional feeder fund.

### E.    The Beneficial Shareholders Had The Same Knowledge As UBS AG

105.    UBS AG served as trustee, agent, representative, nominee or custodian for the Beneficial Shareholders in connection with their investments in the Funds, including, by: subscribing to Shares of Sentry on behalf of the Beneficial Shareholders, maintaining custody of the Shares as record shareholders, paying redemption proceeds from the Shares of Sentry to the Beneficial Shareholders, and otherwise exercising control over the Shares of Sentry.

106.    Each of the Subscription Agreements, executed by UBS AG, manifested the Beneficial Shareholders' consent for UBS AG to act on behalf of and subject to the Beneficial Shareholders' control.  And in executing the Subscription Agreements, UBS AG accepted and agreed to act on behalf of the Beneficial Shareholders.

107.    Accordingly, the Beneficial Shareholders had the same knowledge as UBS AG regarding all relevant matters relating to BLMIS and the Funds' Net Asset Values at all relevant times.

108.    But in the alternative, both the Funds' Articles of Association as well as each of the Subscription Agreements provide that it is the registered shareholders that are to be treated as the parties to the Funds' Articles.

109.    Article 8 of the Funds' Articles provides that "The Company shall be entitled to treat the registered holder of any share as the absolute owner thereof and accordingly shall not be bound to recognise an equitable or other claim to, or interest in, such share on the part of any other person."

110.    Paragraph 27 of the Subscription Agreements similarly provides that "If Subscriber is subscribing as trustee, agent, representative or nominee for another person (the 'Beneficial Shareholder'), Subscriber agrees that the representations and agreements herein are made by Subscriber with respect to itself and the Beneficial Shareholder. Subscriber has all the requisite authority from the Beneficial Shareholder to execute and perform the obligations hereunder."

111.    Together, these contractual provisions bind the Beneficial Shareholders to UBS AG's bad faith on all relevant matters relating to BLMIS and the Funds' Net Asset Values at all relevant times.

### F.    Citco Did Not Issue Any Certifications Of Net Asset Value In "Good Faith"

112.    Article 11 of the Funds' Articles provides that "[a]ny certificate as to the Net Asset Value per Share … given in good faith by or on behalf of the Directors shall be binding on all parties."  During the relevant period, statements of the Net Asset Value were issued by the Funds' administrators, Citco Fund Services (Europe) B.V. and its delegatee Citco (Canada) Inc. (the "Administrators").  On April 16, 2014, the Judicial Committee of the Privy Council (the "Privy Council") issued a decision in which it held that certain statements of Net Asset Value, in particular, certain monthly emails, contract notes, and monthly account statements issued by the Administrators, constituted "certificates" for the purposes of Article 11 (the "Certificates").  The Privy Council did not, however, address whether such Certificates were given "in good faith."  In carrying out this responsibility, the Administrators and affiliated Citco companies within Citco Group Limited (collectively, "Citco") acted with a lack of good faith in giving the Certificates.

113.    Over the course of fifteen years, in its capacity as service providers to the Funds, Citco reviewed information concerning BLMIS that was not available to the general public and expressed internal alarm about what that information showed with respect to the likelihood of fraud

at BLMIS, but turned a blind eye to the reality reflected in the information and instead proceeded with issuing the Certificates as if there were no problem.

114.    So grave were the Administrators' internal concerns that they expressed doubts—many years before the fraud was made public—that the Funds' assets with BLMIS even existed, with one employee stating "I will not change my [opinion] as long as I [do] not see evidence that the portfolio exists." The Administrators also expressed repeated concern over the fact there was no segregation of duties at BLMIS—i.e., BLMIS (i) had discretion over which investments to make and when to make them, such that BLMIS was de facto investment manager, (ii) had actual custody of the Funds' assets, such that BLMIS was de facto custodian, and (iii) was also the broker. Based upon the proprietary information they reviewed, Citco expressed concern—internally—that BLMIS would be a repeat of the notorious Manhattan Investment Fund fraud of the 1990s "multiplied by a factor of five." Ultimately, unable to resolve their grave concerns, Citco, rather than withdrawing, ceasing to issue Certificates, or sounding a public alarm, made a corporate decision to continue on as service providers—in exchange for an 800% increase in fees.

**1.    Citco Expressed Doubt As To Whether The Funds' Assets At BLMIS Even Existed**

115.    Beginning in 2000, the Administrators ran into trouble with the basic task of verifying the existence of the Funds' assets with Madoff. Initially, Citco expressed serious concerns regarding whether the Funds' Treasury bond transactions actually matched those transactions reported by Madoff because of an apparent "rhythm of trading" each month. The rhythm of trading within Sentry's portfolio appeared too consistent to be true, as the assets included only a limited number of Treasury bonds by each month's end. At the beginning of each month, Madoff would purchase shares and put options and would sell call options, but, like clockwork,

would then liquidate all of Sentry's holdings by the 20th of each month. Thus, the Administrators wanted to check whether the Treasury bonds even existed at all.

116.    The Administrators could not verify the existence of the assets because the Funds' custodians, Citco Bank Nederland N.V. Dublin Branch and Citco Global Custody (the "Custodians"), did not actually hold them. Instead, Madoff served as his own custodian. Therefore, the custody statements that the Custodians were supposed to generate based on assets in their possession, were instead merely copied, or "shadow book[ed]," from BLMIS account statements. The Custodians were "only the custodian[s] on paper, not in reality" and did not place any trades for the Funds.

117.    Management within Citco, including Ruud Bodewes ("Bodewes"), the head of internal audit for all of Citco Group, and Ger Jan Meijer ("Meijer"), the head of internal audit for the Administrators, expressed concern about the operations at BLMIS. In May 2000, Bodewes expressed his concern to the general counsel and manager of Citco Bank Nederland, as well as Meijer, that "[w]ith [the] Manhattan [Investment Fund fraud] in the back of our minds, we, as Citco, may very well be in a potential dangerous situation, since we do not seem to have an independent source to verify the information from BLMIS." Indeed, Meijer had raised these concerns to Bodewes weeks earlier, warning that Madoff could be "a Manhattan multiplied by a factor of five."

118.    In addition to warning Bodewes, Meijer also warned Citco Group's Chief Executive Officer, Christopher Smeets ("Smeets") in May 2000 that "[t]o not react or to react too late does indeed mean that investors once again faithfully deposit tens of millions of USD in the Madoff well (for which we do not know if there is a bottom to it) at month's end," with the understanding that Citco could "already be held personally responsible insofar as we have allowed

the subscriptions to take place as of May without a fight." Smeets acknowledged receipt of Meijer's emails and concerns. At that time, Meijer emphasized that "with the current knowledge and Citco as asset protector, Citco has a legal obligation to obtain more assurance" of the Funds' assets.

119.   However, in what became a familiar pattern, Citco turned a blind eye to the documents and information in their possession. Citco Group did not address the Administrators' concerns raised in May 2000, and a few months later, Meijer stated: "[i]t seemed that this affair [was] being put on the back burner and hushed."

120.   A year later, Meijer again reiterated his concerns about BLMIS's operations, which "remain[ed] unsolved." Meijer warned that "Citco has a risk exposure of more than USD3 billion" and that "[p]robably there are no options to restore this situation from a worst case scenario." He stated: "I will not change my [opinion] as long as I [do] not see evidence that the portfolio exists." Five months later, in January 2002, the Administrators again emphasized that the issues concerning BLMIS posed severe risks to Citco and the Funds' investors. Meijer told Bodewes: "I have been worried about this situation for 2 years (including the risk to the continued existence of Citco), however the same was not taken seriously by certain gentlemen…. My intuition (combined with the business that I have seen) tells me that things are not right."

121.   In January 2002, Meijer insisted to Bodewes that: "Citco must now seriously take the possibility that everything is really wrong with [the Funds'] account, as well as the possibility that everything will come into view within 2 years…. Personally I think the chance [that something is wrong] is at least 50%." Meijer persisted that there was "still the opportunity to more or less direct the whole process, and search out the best way out with the help of good lawyers (legal contingency plan). Otherwise you run the risk that the scene will later be determined by others."

However, in response Citco Group's management, and Bodewes in particular, failed to undertake a meaningful investigation into Meijer's doubts regarding the existence of the Funds' assets, and instead continued acting as a service provider for the Funds for over six more years.

122.    In fact, multiple members of the Administrator's management tried to prevent Meijer from asking questions. John Verhooren ("Verhooren"), a member of Citco's administration services management team, actually knew that Meijer had raised concerns about the existence of the Funds' assets for years, but deliberately ignored those concerns. For example, in May 2000, Verhooren acknowledged that the lack of segregation of duties and trading patterns at Madoff were not new discoveries, and many people at Citco had already recognized these phenomena. Later, in response to concerns raised in 2001, Verhooren again rebuffed Meijer's insistence that Citco was facing "an enormous risk exposure." Instead, Verhooren told Meijer to stop raising the issue and claimed that Citco would try to meet with Madoff to investigate. However, neither Verhooren nor any member of the Administrator's staff ever gained sufficient evidence that the Funds' assets existed from Madoff.

### 2.    Citco Failed To Obtain Evidence Of The Existence Of The Funds' Assets

123.    Citco not only expressed internal concern regarding whether the Funds' assets with BLMIS even existed—it knew that BLMIS would not confirm their existence for Citco as the Funds' service providers.

124.    The Administrators' audit reports designated Sentry as a non-compliant fund on their "watch list" as a result of the lack of segregation of duties at BLMIS. Each year from 2000 through 2006, the Administrators recommended that Citco either confirm the existence of the Funds' assets held by BLMIS or resign as service providers. On three occasions between May 2000 and December 2002, Citco attempted to verify the existence of the Funds' assets at BLMIS. All attempts failed.

125.    In May 2000, Citco set up a meeting with Madoff to gain "independent confirmation of the[] existence" of the Funds' assets, particularly the Treasury bills, and to determine how Madoff derived share prices from the markets.  However, this effort failed.  BLMIS did not verify the existence of the assets, and Citco concluded internally that the meeting had not provided "a full disclosure of [the] assignment."

126.    In July 2001, Bodewes had attempted to assess the concerns raised by Meijer in an internal due diligence memorandum.  However, Bodewes's due diligence was limited to a review of Citco's proprietary documents because Citco was concerned that permitting "an on-site audit at [BLMIS] premises may hurt the relationship with [the Fund], resulting in a possible loss of [a] USD 1.5 million dollar fee income."  Even so, based on the documents and information in Citco's possession, Bodewes shared Meijer's concerns about BLMIS's operations, and concluded that losses at BLMIS could be hidden, leaving Citco ultimately liable to the Funds' shareholders.  Bodewes also noted that the two-man audit firm used by BLMIS did not "match up" with the size of BLMIS's business.  Indeed, multiple Administrator employees acknowledged that the small size of Madoff's accounting firm posed a risk, given that the size of the firm was not large enough to audit the amount of assets purportedly managed by BLMIS.

127.    Smeets, Citco Group's CEO, received Bodewes' memo regarding the issues at BLMIS, including the issues posed by the size of Madoff's audit firm.  Citco Group's management responded that they would like to "work this out" with Madoff, but never met with him in 2001.

128.    By an email dated February 6, 2002, Ermanno Unternaehrer ("Unternaehrer") of Citco Group stated that Citco wanted evidence the T Bills existed.  In December 2002, Citco once again "attempt[ed] to get conclusive proof" from Madoff that Sentry's portfolio was in BLMIS custody and to have "Madoff … provide evidence of the existence/custody of the positions."

Before the meeting, Meijer directed a member of the internal audit group at Citco to "[p]roperly record what you have done and what you have not been able to determine…. It is a troublesome task insofar as Madoff is not known for his openness." However, the meeting did not include any meaningful discussion with Madoff regarding the holdings purported to be in his custody. The employee, Albert van Nijen, reported back that the Administrators' "mission" to increase "Citco's comfort level with respect to the existence of the assets in relation to [Citco's] responsibilities as Custodian[s]" had again failed. On 27 December 2002 Bodewes reported to the executive committee of Citco Group that as long as the position of Sentry with BLMIS was not independently verified "there will be doubts."

129.     After Citco's third failed attempt, Citco never again tried to gain evidence from Madoff that the Funds' assets existed until his fraud was ultimately exposed in December 2008. In addition, Meijer noted that "Madoff [was] no[t] known" to Citco's external traders, even though his investment strategy required selling major quantities of call options each month. In an email to Bodewes, Meijer stated, "I visited the Madoff website…. According to the investment policy, the fund needs to sell major quantities of call options on the market each month. I absolutely do not trust it!!!!"

130.     Meanwhile, through the entire period, Citco continued to issue the Certificates.

**3.     Citco Negotiated For Higher Fees As Reimbursement For The "Risks" Of Doing Business With Madoff**

131.     Facing grave concerns regarding the Funds' assets placed with BLMIS, Citco put its financial interests ahead of its duties to the Funds and the Funds' investors.

132.     By 2002, Citco knew that the Funds' holdings could not be verified, knew that BLMIS cleared its own trades, and knew that Citco's efforts to reconcile Madoff's operations had failed. That year, Citco's executive committee put credit line requests from the Funds "on hold

until … the 'investigation' on Fairfield" was complete, because Citco was concerned about its exposure to liabilities well beyond the loans in the case of fraud.  Smeets and Citco's management were aware that the credit line requests were on hold while Citco tried to "get as much comfort as possible" that BLMIS was not a fraud.

133.    Two years later, in February and March 2004, the Custodian decided to cancel one of its credit facilities with Sentry following its discovery that AIG had pulled its investments from BLMIS altogether.  Specifically, the Administrator's management, including Meijer, Verhooren, and William Keunen—who was responsible for the entire division of administration services at Citco—found out that "the risk team of AIG took the decision to get out from all Madoff exposure … [t]hey are scared with the structure …."  It appears that at least some Citco Group management wanted the Custodian to resign:  by an email of February 6, 2004, Keunen informed the Administrator that Unternaehrer of Citco Group had decided the Custodian should step down as custodian.  At this time, Smeets was kept informed and aware of Citco's concerns regarding AIG's withdrawal from Madoff.  A few months later, in or about September 2004, Citco's board of directors made the decision to place the Custodians' and Administrators' business with the Funds "under scrutiny" and "to close down all credit relationships … to decrease [Citco's] exposure." Citco knew that its credit relationship with the Funds would expose it to liability because of BLMIS's role as custodian, among other reasons.

134.    By 2006, Citco considered resigning as service providers.  The Custodians told Citco Group's management, including Smeets:  "We are taking a risk and we only get US$60K per year!"

135.    Instead, Citco negotiated a new fee arrangement. The new arrangement calculated the Custodians' rate as one basis point (one hundredth of one percent) of the Funds' total Net Asset

Value.  In other words, Citco's fees for the Custodians' services were now directly tied to the Net Asset Value as determined by the Administrators.  Citco decided "[o]n that basis" to stay on as Custodians because Sentry's Net Asset Value at that time, based principally on the assets purportedly at BLMIS, was approximately "$5bn, i.e., fees of $500k."

136.    Simply put, Citco accepted dramatically higher fees—tied directly to the Net Asset Value certified by Citco—in exchange for the risks to Citco of doing business with BLMIS, as well as its continued silence regarding BLMIS's role as custodian of the Funds' assets.  Ultimately, Citco's fees increased by 800%.

137.    Internally, Citco knew that:  (i) the Administrators did not consistently price the Funds' portfolios independently and typically relied exclusively on the share pricing information supplied by Madoff; and (ii) the Custodians did not have custody of the Funds' portfolios.

138.    Citco failed to verify the pricing information for the Funds' portfolio from independent sources and instead relied on BLMIS statements, even though it knew that such account statements contained incorrect information.  Accountants working for the Administrators discovered on numerous occasions that the trades reported by BLMIS contradicted the public daily price ranges for corresponding trades.  When the Administrators' personnel discovered that the reported share or option prices reported by Bloomberg and Madoff differed, they used the public price in calculating the Net Asset Value reflected in the Certificates.  Citco thus turned a blind eye to its knowledge that BLMIS issued account statements with incorrect pricing information.

139.    Citco acted with a lack of good faith by issuing Certificates in spite of its knowledge that:  (1) BLMIS's transactions were likely impossible, given its awareness that "Madoff always [knew] precisely when to buy and sell;" (2) Madoff was the only broker-dealer Citco worked with that provided settlement date transaction confirmations only, rather than trade date confirmations;

and (3) Madoff insisted that Citco book all trades for the Funds manually, rather than through automated or electronic means, which directly contradicted Citco's own "policy to set up [electronic] reconciliation programs for each fund and to avoid manual entries as much as possible;" and, within its own records, "there [were] differences between the custody statements of Citco Bank and Madoff that [were] not being analyzed" by Citco.

140.    This lack of good faith permeated the entire Citco organization. Until 2008, the Administrators and the Custodians worked hand-in-hand with multiple other "Citco" entities to generate the Certificates for the Funds and served as the intermediaries for all subscription funds invested by Defendants under the Subscription Agreements. Under Citco Group's direction and control, the Administrators issued Certificates without good faith and with willful blindness to the fact that they could not confirm whether the Funds' assets actually existed.

141.    From the top down, Citco saw and appreciated, but consciously disregarded, the risks to the Funds investors posed by Madoff's operations. The Administrators and all other "Citco" subsidiaries served at the whim of Citco Group, which controlled the day-to-day operations of the Administrators and the issuance of Certificates showing an inaccurate and inflated Net Asset Value under the Administration Agreements (as amended from time to time) with the Funds. Irrespective of which "Citco" entity the Funds engaged, at all relevant times the Funds were provided services from and on behalf of "Citco" as a whole from at least eight separate entities, including: Citco Group; Citco Global Custody NV; Citco Global Custody (NA) NV; CGC (NA); Citco Fund Services (BVI); Citco Fund Services (Europe) B.V.; Citco (Canada) Inc.; and Citco Global Security Services.

142.    By virtue of the foregoing conduct, Citco issued the Certificates without good faith. The Funds were the primary victims of Citco's conduct and its lack of good faith in issuing the Certificates.

### G.    Exposure Of Madoff's Fraud

143.    On December 11, 2008, federal agents arrested Madoff for violation of federal securities laws.  On that same day, the United States Attorney brought criminal charges against Madoff, alleging that Madoff ran a multibillion-dollar Ponzi scheme.  *See United States v. Madoff*, No. 08-mj-2735 (S.D.N.Y., filed Dec. 11, 2008).  Upon arrest, Madoff was reported to have told the agents that "there is no innocent explanation" for the fraudulent scheme he had orchestrated and confessed that he "paid investors with money that wasn't there."

144.    On December 11, 2008, the SEC filed an emergency action in the Southern District of New York to halt ongoing fraudulent offerings of securities and investment advisory fraud by Madoff and BLMIS.  *See SEC v. Madoff*, No. 08-cv-10791 (S.D.N.Y. filed Dec. 11, 2008). On February 9, 2009, the SEC submitted to the Court a proposed partial judgment, to which Madoff consented, imposing a permanent injunction and continuing relief against him, including a permanent freezing of his assets.

145.    In March 2009, Madoff pleaded guilty to the criminal charges brought against him. In his plea allocution, Madoff confessed:  "for many years up until my arrest on December 11, 2008, I operated a Ponzi scheme through the investment advisory side of my business, Bernard L. Madoff Securities LLC."  As Madoff himself described how the scheme worked:

> The essence of my scheme was that I represented to clients and prospective clients who wished to open investment advisory and individual trading accounts with me that I would invest their money in shares of common stock, options and other securities of large well-known corporations, and upon request, would return to them their profits and principal.  Those representations were false because for many years up and until I was arrested on December 11, 2008, I never invested those funds in the securities, as I had promised.  Instead, those funds were deposited in a bank

account at Chase Manhattan Bank.  When clients wished to receive the profits they
believed they had earned with me or to redeem their principal, I used the money in
the Chase Manhattan bank account that belonged to them or other clients to pay the
requested funds.

146.     Madoff further confessed to covering up his fraud by fabricating false trade

confirmation and account statements:

To further cover-up the fact that I had not executed trades on behalf of my
investment advisory clients, I knowingly caused false trading confirmations and
client account statements that reflected the bogus transactions and positions to be
created and sent to clients purportedly involved in the split strike conversion
strategy, as well as other individual clients I defrauded who believed they had
invested in securities through me. The clients receiving trade confirmations and
account statements had no way of knowing by reviewing these documents that I
had never engaged in the transactions represented on the statements and
confirmations.

147.     Madoff was sentenced to 150 years in federal prison.  He died in prison on April 14,

2021.

**H.     The Funds' Estates In Liquidation**

148.     Following the revelation of Madoff's fraud, the Funds' boards of directors

suspended any further redemptions of Shares and the calculation of the Funds' Net Asset Values.

As of December 2008, and presently, Sentry, Sigma, and Lambda had, respectively, approximately

4.7 million, 3.9 million, and 0.2 million shares outstanding.

149.     In 2009, the Funds were put into liquidation proceedings in the BVI.

150.     On February 27, 2009, a secured creditor of Lambda commenced proceedings in

the BVI Court pursuant to the BVI Insolvency Act of 2003 seeking the appointment of a liquidator

over Lambda (the "Lambda Proceeding").  The Lambda Proceeding is pending in the BVI Court

as claim number BVIHC(COM)2009/74.

151.    On April 21, 2009, ten shareholders applied to the BVI Court for the appointment of a liquidator over Sentry (the "Sentry Proceeding").  The Sentry Proceeding is pending in the BVI Court under claim number BVIHC(COM)2009/136.

152.    On April 23, 2009, a shareholder applied to the BVI Court for the appointment of a liquidator over Sigma (the "Sigma Proceeding" and collectively with the Lambda Proceeding and the Sentry Proceeding, the "BVI Liquidation Proceedings").  The Sigma Proceeding is pending in the BVI Court under claim number BVIHC(COM)2009/139.

153.    As alleged above, the BVI Court issued orders—the BVI Appointment Orders—appointing the Foreign Representatives as liquidators of the Funds.  Pursuant to the BVI Appointment Orders, the Foreign Representatives are responsible for all aspects of the Funds' business, including protecting, realizing, and distributing assets for the Funds' estates.

154.    The Redemption Payments that were made to Defendants were mistaken payments and constituted or formed part of avoidable transactions, and generally represent assets of Sentry's estate that Defendants are not entitled to keep.

## FIRST CLAIM
### *(Constructive Trust - Against all Defendants)*

155.    Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 154 above as if set forth herein.

156.    In this Court's December 6, 2018 Memorandum Decision, the Foreign Representatives were "granted leave to amend to assert constructive trust claims against Knowledge Defendants." *In re Fairfield Sentry Ltd.*, No. 10-ap-03496 (CGM), 596 B.R. 275, 316 (Bankr. S.D.N.Y. 2018) (Dkt. 1743 at 65).  The Court clarified that the Foreign Representatives could establish a constructive trust with respect to "the Knowledge Defendants that received

redemption payments with the knowledge that the NAV was wrong." *Id*. at 301 (Dkt. 1743 at 38). The Court further recognized that "[u]nder BVI law, lack of good faith, *i.e.* bad faith, includes wrongdoing by one who acts recklessly as well as one who acts with actual knowledge that he is acting wrongfully or willfully blinds himself to that fact." *Id*. at 293 (Dkt. 1743 at 23–24).

157.    As detailed above, upon receipt of a redemption request, Sentry made each of the Redemption Payments to UBS AG.

158.    The Redemption Payments generally represented the proceeds arising from or continued investment in what the world now knows was Madoff's Ponzi scheme.  Accordingly, these Redemption Payments did not, as Sentry mistakenly believed, represent the proceeds arising from the profitability of or continued investment in BLMIS.

159.    Instead, the Redemption Payments were based on a miscalculated and inflated Net Asset Value, which caused those Redemption Payments to be in excess of the Net Asset Value of the redeemed Shares that would have been calculated based upon the true fact existing at the time or any relevant time.

160.    At the time of the Redemption Payments, UBS AG had knowledge of the Madoff fraud, and therefore knowledge that the Net Asset Value was inflated.  Specifically, between 2000 and 2008, UBS AG ascertained multiple indicia of fraud through due diligence on BLMIS, leading it to believe that BLMIS was a fraud, and, therefore, that the Net Asset Value could not be accurate. *First*, UBS AG, discovered multiple red flags concerning BLMIS through extensive due diligence. UBS AG was particularly troubled by Madoff's dual roles as both broker and depository, the impossibility of BLMIS's reported returns, and Madoff's notorious lack of transparency.  These red flags prompted UBS AG to decline multiple opportunities to invest in feeder funds and prohibit feeder funds from being recommended to UBS AG's private wealth clients. *Second*, UBS AG, as

well as UBS O'Connor, conveyed these specific concerns to UBS Lux as early as 2003. UBS Lux recognized that these concerns presented a significant risk, but willfully turned a blind eye to this risk to reap the lucrative fees of serving in multiple roles in Luxalpha and LIF-USEP. *Third*, UBS AG and UBS Lux subsequently gained first-hand experience with the concerns raised by UBS AG and UBS O'Connor while performing duties for Luxalpha and LIF-USEP. UBS Lux delegated its custodian and portfolio manager duties for both feeder funds to BLMIS and went to great lengths to conceal these delegations from both investors and Luxembourg regulators. UBS AG recognized that this conduct could create legal exposure for UBS AG and UBS Lux, but took no action so both UBS AG and UBS Lux could enjoy the lucrative fees of serving in multiple roles in Luxalpha and LIF-USEP.

161.    Accordingly, at all relevant times, UBS AG had actual knowledge of, was willfully blind to, or recklessly disregarded the fact that Madoff was operating a fraud.

162.    Upon information and belief, UBS AG may have paid some or all of the Redemption Payments it received to the Beneficial Shareholders.

163.    By reason of their receipt of some or all of the Redemption Payments, Defendants have been unjustly enriched to the detriment of Sentry and other shareholders and creditors of Sentry.

164.    Furthermore, Defendants were not entitled to receive the Redemption Payments because the amounts transferred with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payment received by UBS AG for its redemption of Shares to be in excess of the Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

165.    It would offend principles of equity and good conscience to permit Defendants to retain the Redemption Payments.

166.    By reason of the foregoing, a constructive trust should be imposed on the Redemption Payments that were received by Defendants from Sentry for the benefit of the Foreign Representatives and Sentry and other shareholders and creditors of Sentry.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs respectfully request the following relief:

A.    On the First Claim, imposition of a constructive trust on Redemption Payments.

B.    Awarding Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees and accountants' and experts' fees, costs and expenses; and

C.    Granting Plaintiffs such other and further relief as the Court deems just and proper.

Dated:  New York, New York
        May 14, 2021

**SELENDY & GAY PLLC**

By: */s/ David L. Elsberg*

David Elsberg
Andrew Dunlap
Lena Konanova
Jordan Garman
Ester Murdukhayeva
Ron Krock
1290 Avenue of the Americas
New York, NY 10104
Telephone: 212-390-9000
E-mail: delsberg@selendygay.com
E-mail: adunlap@selendygay.com
E-mail: lkonanova@selendygay.com

E-mail: jgarman@selendygay.com
E-mail: emurdukhayeva@selendygay.com
E-mail: rkrock@selendygay.com

-and-

**BROWN RUDNICK LLP**
David J. Molton
Marek P. Krzyzowski
Seven Times Square
New York, New York 10036
Telephone: 212-209-4800
Facsimile: 212-209-4801
E-mail: dmolton@brownrudnick.com
E-mail: mkrzyzowski@brownrudnick.com

*Attorneys for the Foreign Representatives*

**EXHIBIT A**

*Redemption Payments Received by Defendants from Sentry*
*From September 15, 2004 Through November 19, 2008*

| Payment Date | Redemption Payment | No. of Shares | Bank Account To Which Redemption Payment Was Made, Per Shareholder Direction+ |
|---|---|---|---|
| September 15, 2004 | $350,000.00 | 346.6900 | UBS AG, New York |
| November 16, 2004 | $135,220.31 | 133.2000 | UBS AG, New York |
| January 14, 2005 | $70,768.43 | 69.0000 | UBS AG, New York |
| September 15, 2005 | $120,988.56 | 114.2000 | UBS AG, New York |
| September 15, 2005 | $202,809.46 | 191.4300 | UBS AG, New York |
| November 17, 2005 | $349,039.99 | 321.3900 | UBS AG, Stamford, Connecticut |
| February 15, 2006 | $107,065.29 | 96.6500 | UBS AG, Stamford, Connecticut |
| March 17, 2006 | $70,000.00 | 63.0700 | UBS AG, Stamford, Connecticut |
| April 20, 2006 | $109,633.50 | 97.5000 | UBS AG, Stamford, Connecticut |
| August 14, 2006 | $232,759.64 | 200.4700 | UBS AG Stamford, Connecticut |
| August 14, 2006 | $279,817.80 | 241.0000 | UBS AG, Stamford, Connecticut |
| September 14, 2006 | $180,000.00 | 153.8500 | UBS AG, New York |
| October 12, 2006 | $216,741.81 | 184.0000 | UBS AG, Stamford, Connecticut |
| February 15, 2007 | $1,055,052.26 | 874.3200 | UBS AG, New York |
| March 16, 2007 | $453,706.62 | 376.4100 | UBS AG, New York |
| April 17, 2007 | $203,056.82 | 165.7397 | UBS AG, New York |
| April 17, 2007 | $230,329.14 | 188.0000 | UBS AG, New York |
| April 17, 2007 | $22,000.00 | 17.9569 | UBS AG, New York |
| May 16, 2007 | $202,427.52* | 163.6300 | UBS AG, New York |
| July 19, 2007 | $500,000.00* | 399.5484 | UBS AG, New York |
| November 19, 2007 | $701,464.12* | 550.0000 | UBS AG, New York |
| February 15, 2008 | $17,729.00* | 13.6404 | UBS AG, New York |
| March 18, 2008 | $50,000.00* | 38.4444 | UBS AG, New York |
| March 18, 2008 | $924,101.89* | 710.5300 | UBS AG, New York |
| April 14, 2008 | $272,088.45* | 208.8204 | UBS AG, New York |
| August 18, 2008 | $30,000.00* | 22.4820 | UBS AG, New York |
| September 16, 2008 | $153,757.48* | 114.4100 | UBS AG, New York |

*Redemption Payments Received by Defendants from Sentry*
*From September 15, 2004 Through November 19, 2008*

| Payment Date | Redemption Payment | No. of Shares | Bank Account To Which Redemption Payment Was Made, Per Shareholder Direction+ |
|---|---|---|---|
| November 19, 2008 | $362,064.50* | 268.2400 | UBS AG, New York |

\* Denotes Redemptions in the Sentry Vulnerability Period.

+ Whether or not Redemption Payments were ultimately directed to bank accounts in the United States, all Redemption Payments from Sentry went through a correspondent bank account that Sentry's administrator maintained in the United States, and to the extent that any such Redemption Payments were directed outside the United States, they went through a correspondent bank account in the United States identified by shareholders for such payments.