# Exhibit 26

**SELENDY & GAY PLLC**
1290 Avenue of the Americas
New York, NY 10104
David Elsberg
Andrew Dunlap
Lena Konanova
Jordan Garman
Ester Murdukhayeva
Ron Krock
212-390-9000

-and-

**BROWN RUDNICK LLP**
Seven Times Square
New York, New York 10036
David J. Molton
Marek P. Krzyzowski
212-209-4800

*Attorneys for the Foreign Representatives*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>FAIRFIELD SENTRY LIMITED, et al.,<br><br>  Debtors in Foreign Proceedings. | Chapter 15 Case<br><br>Case No. 10-13164 (CGM)<br><br>Jointly Administered |
| FAIRFIELD SENTRY LIMITED (IN LIQUIDATION), et al.,<br><br>  Plaintiffs,<br><br>  -against-<br><br>THEODOOR GGC AMSTERDAM, et al.,<br><br>  Defendants. | Adv. Pro. No. 10-03496 (CGM)<br>Administratively Consolidated |

FAIRFIELD SENTRY LIMITED (IN LIQUIDATION), and
FAIRFIELD SIGMA LIMITED (IN LIQUIDATION), acting
by and through the Foreign Representatives thereof, and
KENNETH KRYS and GREIG MITCHELL, solely in their
capacities as Foreign Representatives and Liquidators thereof,

Plaintiffs,

-against-

ZURICH CAPITAL MARKETS COMPANY, ANTONIO
BACELAR CARREHAS, BANCO ITAU EUROPA
LUXEMBOURG, BANK MORGAN STANLEY AG, BANK
MORGAN STANLEY SA, BANQUE SUDAMERIS,
CAPRICE INTERNATIONAL GROUP, CITIBANK
(SWITZERLAND) ZURICH, CITIVIC NOMINEES
LIMITED, COMPAGNIE BANCAIRE ESPIRITU SANTO
SA N/K/A BANQUE PRIVEE ESPIRITO SANTO SA,
DESERT ROSE LIMITED, DENISE BAR, EDSON TERRA
CUNHA, EFG PRIVATE BANK SA, FABIO RODRIGUES
MENDES, HSBC BANK USA, MERRILL LYNCH BANK,
MORGAN STANLEY & CO. INTERNATIONAL PLC,
PINE CLIFFS INVESTMENTS LIMITED, SAFRA
NATIONAL BANK OF NEW YORK, ASBT CAYMAN
SUB NO. 82, ZCM MATCHED FUNDING CORP., ZCM
ASSET HOLDING CO. BERMUDA, and BENEFICIAL
OWNERS OF THE ACCOUNTS HELD IN THE NAME OF
ZURICH CAPITAL MARKETS COMPANY 1-1000 et al.,

Defendants.

Adv. Pro. No. 10-03634
(CGM)

2

## <u>TABLE OF CONTENTS</u>

<u>Pages</u>

PRELIMINARY STATEMENT ........................................................................1

JURISDICTION AND VENUE .......................................................................4

PARTIES ........................................................................................................8

NOTICE PURSUANT TO FED. R. CIV. P. 44.1 .........................................16

FACTUAL ALLEGATIONS ..........................................................................16

    A.    Role Of Feeder Funds In Madoff Fraud ...................................... 16

    B.    Calculation Of Net Asset Value And Shareholder Redemption Payments .......... 17

    C.    Redemption Payments Made Or Transferred To Defendants............................. 20

    D.    Zurich Capital Knew Of, Was Willfully Blind To, Or Recklessly Disregarded The BLMIS Fraud ........................................ 21

    E.    The Beneficial Owners Had The Same Knowledge As Zurich Capital............... 22

        1.    Beneficial Owner Citibank (Switzerland) Zurich Also Knew Or Should Have Known Of The BLMIS Fraud ............................... 23

        2.    Beneficial Owner HSBC Bank USA Also Knew Or Should Have Known Of The BLMIS Fraud.................................... 46

        3.    Beneficial Owner Merrill Lynch Bank Also Knew Or Should Have Known Of The BLMIS Fraud.................................... 52

    F.    Citco Did Not Issue Any Certifications Of Net Asset Value In "Good Faith"........................................................................... 56

        1.    Citco Expressed Doubt As To Whether the Funds' Assets At BLMIS Even Existed ............................... 58

        2.    Citco Failed To Obtain Evidence Of the Existence Of The Funds' Assets ...................................................... 61

        3.    Citco Negotiated For Higher Fees As Reimbursement For The "Risks" Of Doing Business With Madoff.................................. 63

    G.    Exposure Of Madoff's Fraud ................................................. 66

    H.    The Funds' Estates In Liquidation....................................... 67

i

FIRST CLAIM .................................................................................................................69

PRAYER FOR RELIEF ...................................................................................................71

1.      Fairfield Sentry Limited ("Sentry"), by and through Kenneth Krys and Greig Mitchell (together with their predecessors, the "Foreign Representatives" or the "Liquidators"), and Kenneth Krys and Greig Mitchell (together with Sentry, the "Plaintiffs"), solely in their capacities as the Liquidators of Sentry and the Foreign Representatives of the liquidation proceedings involving Sentry, Fairfield Sigma Limited ("Sigma"), and Fairfield Lambda Limited ("Lambda," together with Sentry and Sigma, the "Funds" or the "Debtors") pending before the Commercial Division of the Eastern Caribbean High Court of Justice, British Virgin Islands (the "BVI Court"), for their complaint against Defendants (as defined herein), allege the following based on personal knowledge or information derived from the Funds' books and records or from other sources, including, *inter alia*, court filings and statements of governmental agencies and other parties.

## PRELIMINARY STATEMENT

2.      This adversary proceeding, which arises out of a now decade-long effort to recoup assets for the victims of the largest Ponzi scheme in history, seeks recovery of $15,142,755.05 improperly received by Defendant Zurich Capital Markets Co. ("Zurich Capital").

3.      Zurich Capital is one of a number of banks that invested, for itself or others, in so-called "feeder funds," which channeled private investments into managed accounts with Bernard L. Madoff and his now-infamous brokerage business, Bernard L. Madoff Securities LLC ("BLMIS").

4.      The Madoff scheme worked seamlessly for decades, apparently netting shareholders handsome returns that far exceeded the market.

5.      Once BLMIS imploded, however, the world learned what some in the investing community, including senior management at Zurich Capital, had long turned a blind eye to:  that

the payments investors received from the feeder funds in exchange for the redemption of shares were massively overvalued. In fact, they were non-existent.

6. The feeder funds, like the Funds in this case, were essential to the perpetration of Madoff's scheme. From their inception until the revelation of Madoff's fraud in December 2008, during most relevant times, the Funds sought out new investment through the sale of shares to investors and transferred (either directly in the case of Sentry or indirectly, through Sentry, in the cases of Sigma and Lambda) substantially all the proceeds of those sales, net of fees and expenses, to BLMIS for investment in accounts managed by Madoff.

7. However, instead of using investor proceeds collected by the Funds to purchase securities and other investments, BLMIS used those contributions to service the redemption requests of other investors, enriching Madoff and his associates in the process.

8. The investors lucky enough to redeem their shares in the Funds before the collapse of the Ponzi scheme received payments ("Redemption Payments") at a grossly inflated "Net Asset Value" (or "NAV")—the price determined by dividing the value of the respective assets of Sentry, Sigma, and Lambda by the number of shares outstanding in each Fund. Zurich Capital is one such investor.

9. Between April 21, 2004 and August 14, 2006, Zurich Capital received USD $15,142,755.05 in Redemption Payments from Sentry. At the time it received these payments, Zurich Capital had already uncovered multiple indicia that Madoff was engaged in some form of fraud. But rather than confront the facts before it, Zurich Capital turned a blind eye, accepting millions of dollars while willfully ignoring or, at the very least, recklessly disregarding the truth in clear violation of the laws of the British Virgin Islands ("BVI").

10.     At some time prior to July 2003, Zurich Capital marketed certain assets to the French banking giant, Société Générale ("SocGen"), consisting of, among other things, a credit facility to Santa Barbara Holdings Ltd.—a company that was wholly invested in a single-manager BLMIS feeder fund, Harley International Ltd.

11.     SocGen ultimately rejected the proposed deal after conducting due diligence on those assets and uncovering certain suspicious red flags about BLMIS. Upon information and belief, SocGen conveyed those concerns to Zurich Capital when it declined to go forward with its purchase.

12.     By virtue of knowledge it acquired from SocGen, Zurich Capital at a minimum recklessly disregarded that the Net Asset Value was massively overvalued and, therefore, that the Redemption Payments it received were improperly calculated.

13.     At all relevant times, Zurich Capital knew that the Redemption Payments did not, as Sentry intended, represent the proceeds arising from the profitability of or continued investment in BLMIS. Instead, any amounts obtained directly or indirectly by Sentry from BLMIS to make Redemption Payments to Zurich Capital generally were proceeds of Madoff's Ponzi scheme, obtained from other BLMIS investors or other Sentry investors invested in BLMIS.

14.     Accordingly, the Funds' actual assets are, and at all relevant times were, far less than the amount needed to satisfy their liabilities and the claims that have been or may be asserted against them. At all relevant times, the Funds were unable to pay their debts as they fell or would fall due. Specifically, at the time the Redemptions Payments were made, the Funds had insufficient assets from which to pay debts as they fell or would fall due. The Funds have been unable to satisfy their debts to BLMIS customers, the BLMIS Trustee (as defined below), and other creditors of the Funds, and have further increased the amount of those liabilities.

3

15.     As a result, the Funds were placed into liquidation by the BVI courts and the Foreign Representatives were appointed, and thereafter commenced ancillary proceedings in this Court pursuant to Chapter 15 of the Bankruptcy Code to recover improper Redemption Payments received by the Funds' investors.

16.     Upon information and belief, Zurich Capital has either retained the Redemption Payments made to it by Sentry for its own account and benefit or, alternatively, paid all or some portion of such payments to or for the account of persons or entities for whom Zurich Capital may have subscribed for shares of the Funds in the capacity of trustee, agent, representative, nominee, or custodian (individually, a "Beneficial Shareholder" and collectively, "Beneficial Shareholders," together with Zurich Capital, the "Defendants"), only some of whom the Liquidators have been able to individually name as Defendants in this action and the remainder of which are identified by the catch-all reference to "Beneficial Owners of the Accounts Held in the Name of Zurich Capital Markets Company."    At least some of these Beneficial Shareholders—Citibank (Switzerland) Zurich, HSBC Bank USA, and Merrill Lynch Bank—separately knew or should have know about the Madoff fraud.

17.     By this proceeding, Plaintiffs seek to recoup for the benefit of the Funds' estates, Redemption Payments transferred to Zurich Capital.  Without this recovery, Defendants will have been unjustly enriched, and allowed to retain a windfall at the expense of other shareholders and creditors of the Funds.  Any recoveries will aid the Funds in satisfying their liabilities and redound to the benefit of the Funds' investors who found themselves victims of Madoff's Ponzi scheme.

## JURISDICTION AND VENUE

18.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 157(b) and 1334(b), as this adversary proceeding and the claim asserted by the Foreign Representatives herein arise under,

4

arise in and/or relate to the Chapter 15 proceedings of the above-captioned Debtors, *In re Fairfield Sentry Limited, et al.*, No. 10-13164 (CGM), pending in this Court. Additionally, pursuant to section 78eee(b)(2)(A)(iii) of the Securities Investor Protection Act ("SIPA"), which incorporates 28 U.S.C. § 1334(b) and applicable provisions of Title 11 of the United States Code, jurisdiction is also proper in this Court because this action also relates to the consolidated liquidation proceedings of BLMIS and Bernard L. Madoff, pending in this Court under the caption *Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC*, SIPA Liquidation No. 08-1789 (CGM). Pursuant to the Amended Standing Order of Reference of the United States District Court for the Southern District of New York, dated January 31, 2012, all proceedings arising in, arising under and/or related to cases under Title 11 of the United States Code (as amended, the "Bankruptcy Code") are referred to this Court for adjudication.

19.     This is a core proceeding under 28 U.S.C. § 157(b)(2). Should the Court determine that this is a non-core proceeding, Plaintiffs consent to entry of final judgment and order by this Court.

20.     This Court has jurisdiction over Zurich Capital and any Beneficial Shareholders pursuant to Rules 7004(d) and (f) of the Federal Rules of Bankruptcy Procedure and New York Civil Practice Law & Rules § 302 (McKinney 2008) because Zurich Capital and the Beneficial Shareholders purposely availed themselves of the laws of the United States and the State of New York by, among other things, investing money with the Funds, knowing and intending that the Funds would invest substantially all of that money in New York-based BLMIS, and maintaining bank accounts in the United States at Citibank NA, and in fact receiving Redemption Payments in those United States-based and/or New York-based accounts. Zurich Capital and the Beneficial Shareholders selected U.S. dollars as the currency in which to invest and execute their transactions

5

in Sentry, designated United States-based and/or New York-based bank accounts to receive their Redemption Payments from the Funds, and actively directed Redemption Payments at issue in this action into those bank accounts. Zurich Capital and the Beneficial Shareholders thus knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York, derived significant revenue from New York, and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claim alleged herein. Zurich Capital and the Beneficial Shareholders should therefore reasonably expect to be subject to United States jurisdiction.

21.     Moreover, this Court has jurisdiction over Zurich Capital and any Beneficial Shareholders by virtue of the legally binding and valid agreements and representations set forth in one or more agreements for the subscription of Shares that Zurich Capital entered into with Sentry.

22.     Zurich Capital, upon information and belief, entered into a Subscription Agreement with Sentry on or about January 31, 2003 (the "Initial Subscription Agreement") pursuant to which Zurich Capital subscribed for Shares. Subsequent to entering into the Initial Subscription Agreement, Zurich Capital, upon information and belief, entered into additional agreements (the "Subsequent Subscription Agreements") with Sentry on or about March 31, 2003, July 1, 2003, July 30, 2003, July 31, 2003, August 29, 2003, September 30, 2003, October 31, 2003, November 4, 2003, November 28, 2003, September 30, 2004, November 30, 2004, and April 29, 2005, pursuant to which it subscribed for additional Shares on the same terms and conditions as those shares subscribed for pursuant to the Initial Subscription Agreement. The Initial Subscription Agreement and Subsequent Subscription Agreements are collectively referred to herein as the "Subscription Agreements."

23.    The Subscription Agreements provide for, *inter alia*, the irrevocable submission by Zurich Capital to the jurisdiction of the New York courts with respect to any proceeding with respect to said agreement and Sentry and Zurich Capital's consent to service of process by the mailing of such process, as provided therein.  In particular, the Subscription Agreements provide as follows:

> New York Courts.    Subscriber agrees that any suit, action or proceeding ("Proceeding") with respect to this Agreement and the Fund may be brought in New York.  Subscriber irrevocably submits to the jurisdiction of the New York courts with respect to any Proceeding and consents that service of process as provided by New York law may be made upon Subscriber in such Proceeding, and may not claim that a Proceeding has been brought in an inconvenient forum.  Subscriber consents to the service of process out of any New York court in any such Proceeding by the mailing of copies thereof, by certified or registered mail, return receipt requested, addressed to Subscriber at the address of Subscriber then appearing on the Fund's records.  Nothing herein shall affect the Fund's right to commence any Proceeding or otherwise to proceed against Subscriber in any other jurisdiction or to serve process upon Subscriber in any manner permitted by any applicable law in any relevant jurisdiction.

24.    Furthermore, by executing the Subscription Agreements, Zurich Capital agreed to all terms and conditions contained therein, including the express provision that any agreement made by Zurich Capital in the Subscription Agreements would also apply to any other person for whom Zurich Capital was subscribing as trustee, agent, representative, or nominee—*i.e.*, all Beneficial Shareholders.  Moreover, by executing the Subscription Agreements, Zurich Capital represented that it had all requisite authority from Beneficial Shareholders to execute and perform any and all obligations on their behalf, and also agreed to indemnify Sentry for any damages resulting from an assertion by a Beneficial Shareholder that Zurich Capital lacked proper authorization to enter into the Subscription Agreements or perform the obligations thereof.  Specifically, the Subscription Agreements provide as follows:

> If Subscriber is acting as a Representative.  If Subscriber is subscribing as trustee, agent, representative, or nominee for another person (the "Beneficial Shareholder"), Subscriber agrees that the representations and agreements herein are

made by Subscriber with respect to itself and the Beneficial Shareholder. Subscriber has all requisite authority from the Beneficial Shareholder to execute and perform the obligations hereunder. Subscriber also agrees to indemnify the Fund … for any and all costs, fees and expenses (including legal fees and disbursements, fines and amounts paid in settlement) in connection with any damages resulting from Subscriber's misrepresentation or misstatement contained here, or the assertion of Subscriber's lack of proper authorization from the Beneficial Shareholder to enter into this Agreement or perform the obligations hereof.

25.    Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

## PARTIES

### A.    Plaintiffs

26.    Sentry, a British Virgin Islands company, was organized in 1990 under the International Business Company Act of the British Virgin Islands and was subsequently re-registered as a business company under the BVI Business Companies Act 2004. Sentry's registered agent is Codan Trust Company (B.V.I.) located at Romasco Place, Wickhams Cay 1, Road Town, Tortola, BVI.  Sentry is currently in liquidation in proceedings commenced on April 21, 2009 in the BVI Court.

27.    The Foreign Representatives were appointed by the BVI Court as Liquidators of the Funds to supervise the liquidation of the Funds' estates and, where necessary, commence proceedings in the name of and on behalf of the Funds or in their own official names.  On April 23, 2009, the BVI Court issued an order appointing Christopher Stride as liquidator of Lambda (the "Lambda Appointment Order").  On July 21, 2009, the BVI Court issued an order appointing Kenneth Krys and Mr. Stride as joint liquidators of Sentry and Sigma (the "Sentry & Sigma Appointment Order").  On September 6, 2010, the BVI Court issued notices acknowledging Mr. Stride's resignation and the appointment of Joanna Lau as joint liquidator with Mr. Krys of all three Funds (the "Supplemental Appointment Order").  On November 23, 2011, Ms. Lau resigned as joint liquidator of the Funds.  On June 24, 2014, the BVI Court issued an order appointing

Charlotte Caulfield as joint liquidator, with Mr. Krys, of all three Funds (the "Second Supplemental Appointment Order"). On June 21, 2019, Ms. Caulfield resigned as joint liquidator of the Funds. On July 8, 2019, the BVI Court issued an order appointing Greig Mitchell as joint liquidator, with Mr. Krys, of all three Funds (the "Third Supplemental Appointment Order" and, together with the Lambda Appointment Order, the Sentry & Sigma Appointment Order, the Supplemental Appointment Order, and the Second Supplemental Appointment Order, the "BVI Appointment Orders"). The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of the Funds, have been authorized by the foreign court having jurisdiction over the matter to bring this action and the claim herein.

28.    Pursuant to the BVI Appointment Orders, the Foreign Representatives are responsible for all aspects of the Funds' businesses, including, among other things, custody and control of the Funds' assets, the power to do all acts and execute, in the name and on behalf of the Funds, any deeds, receipts or other documents, and the power to compromise claims, commence litigation and to dispose of property. After obtaining BVI Court approval, the Foreign Representatives filed petitions in this Court in June of 2010, under Chapter 15 of Title 11 of the United States Code, seeking recognition of the BVI Liquidation Proceedings as "foreign main proceedings" under Chapter 15. On July 22, 2010, this Court issued an order (the "Recognition Order") granting that recognition.

29.    Pursuant to the Recognition Order, the Foreign Representatives were automatically afforded relief available under 11 U.S.C. § 1520, including application of the Bankruptcy Code's automatic stay to the Funds and their property located in the United States, as well as the ability to operate the Funds' business and exercise the rights and powers of a trustee under Sections 363 and 552 of the Bankruptcy Code. Moreover, the Bankruptcy Court specifically granted additional

relief in the Recognition Order to the Foreign Representatives pursuant to 11 U.S.C. § 1521(a).

Such relief includes, but is not limited to: (i) staying any actions, proceedings or execution against

the Funds' assets to the extent not stayed under Section 1520; (ii) authorizing the Foreign

Representatives to seek leave to conduct discovery concerning the Funds' assets, affairs, rights,

obligations or liabilities; (iii) entrusting the Foreign Representatives with the administration and

realization of the Funds' assets that are located within the United States, including all claims and

causes of action belonging to the Funds; and (iv) otherwise giving full force and effect to the

proceedings before the BVI Court.

30.     Claims had been previously asserted against the Funds in actions commenced by

Irving H. Picard, the Trustee appointed by the United States District Court for the Southern District

of New York for the liquidation of BLMIS (the "BLMIS Trustee"), in an adversary proceeding

pending before the United States Bankruptcy Court of the Southern District of New York, *Picard*

*v. Fairfield Sentry Limited, et al.*, No. 08-01789 (CGM) (the "BLMIS Adversary Proceeding").

As set forth in the complaint filed in the BLMIS Adversary Proceedings, the BLMIS Trustee

sought to recover from the Funds, on preference and fraudulent transfer grounds, approximately

$3.2 billion.  This amount was alleged to have been transferred to the Funds from BLMIS, directly

(in the case of Sentry), or indirectly (in the cases of Sigma and Lambda), during the six years

preceding the December 2008 disclosure of the Madoff fraud.  The BLMIS Trustee alleged that

the monies transferred from BLMIS to the Funds were the misappropriated assets of other BLMIS

investors.  At all relevant times, monies that the Funds received from BLMIS, net of fees and

expenses, were transferred to shareholders as Redemption Payments.

31.     On July 13, 2011, pursuant to an agreement between the Foreign Representatives

and the BLMIS Trustee dated May 9, 2011, the United States Bankruptcy Court for the Southern

District of New York entered judgments against each of the Funds on the claims against the Funds asserted in the BLMIS Adversary Proceeding (the "Judgments") in the amount of $3,054,000,000 with respect to Sentry, $752,300,000 with respect to Sigma, and $52,900,000 with respect to Lambda. The Redemption Payments rendered the Funds unable to satisfy their liabilities to the BLMIS customers, the BLMIS Trustee, including on account of the Judgments, and other creditors of the Funds, and have further increased the amount of those liabilities. In this way, the Redemption Payments caused the Funds to become insolvent and/or deepened their existing insolvency, in that, among other things, at all relevant times the Funds were unable to pay their debts as they fell or would fall due.

**B.    Defendants**

32.    Zurich Capital was, at all relevant times, a member of Sentry and a registered holder of Shares. Upon information and belief, Zurich Capital is a corporate entity organized under the laws of Ireland and having its registered address at La Touche House, 3rd Floor, IFSC, Dublin 1, Ireland. Zurich Capital subscribed for the purchase of Shares by entering into one or more Subscription Agreements with Sentry. All purchases of Shares by Zurich Capital were subject to the terms of the Subscription Agreements.

33.    Defendants "Beneficial Owners of the Accounts Held in the Name of Zurich Capital Markets Company"—*i.e.*, the Beneficial Shareholders, are, as noted, any persons or entities having a beneficial ownership or interests in Shares of Sentry issued to Zurich Capital and on whose behalf Zurich Capital was acting as trustee, agent, representative, or nominee.

34.    Based on Sentry records, some or all of the Redemption Payments made to Zurich Capital may have been paid to an account holder or holders associated with the Beneficial Shareholder, Antonio Bacelar Carrehas.

11

35.     Based on Sentry records, some or all of the Redemption Payments made to Zurich Capital may have been paid to an account holder or holders associated with the Beneficial Shareholder, Banco Itau Europa Luxembourg.  Upon information and belief, Banco Itau Europa Luxembourg is a corporate entity organized under the laws of Luxembourg and has its registered address at 29 Avenue Porte-Neuve, P.O. Box 572, L-2227, Luxembourg.

36.     Based on Sentry records, some or all of the Redemption Payments made to Zurich Capital may have been paid to an account holder or holders associated with the Beneficial Shareholder, Bank Morgan Stanley AG.  Upon information and belief, Bank Morgan Stanley Ag is a corporate entity organized under the laws of Switzerland and has its registered address at Bleicherweg 5, Postach CH-8022, Zurich, Switzerland.

37.     Based on Sentry records, some or all of the Redemption Payments made to Zurich Capital may have been paid to an account holder or holders associated with the Beneficial Shareholder, Bank Morgan Stanley SA.  Upon information and belief, Bank Morgan Stanley SA is a corporate entity organized under the laws of Switzerland and has its registered address at 12 Place de la Fusterie, CH-1211 Geneva, Switzerland.

38.     Based on Sentry records, some or all of the Redemption Payments made to Zurich Capital may have been paid to an account holder or holders associated with the Beneficial Shareholder, Banque Sudameris.  Upon information and belief, Banque Sudameris is a corporate entity organized under the laws of Florida and has its registered address at c/o Corporate Creations Network, Inc., 11380 Prosperity Farms Road, #221E, Palm Beach Gardens, FL 33410.

39.     Based on Sentry records, some or all of the Redemption Payments made to Zurich Capital may have been paid to an account holder or holders associated with the Beneficial Shareholder, Caprice International Group.

12

40.     Based on Sentry records, some or all of the Redemption Payments made to Zurich Capital may have been paid to an account holder or holders associated with the Beneficial Shareholder, Citibank (Switzerland) Zurich.  Upon information and belief, Citibank (Switzerland) Zurich is a corporate entity organized under the laws of Switzerland and has its registered address at Seestrasse 25, P.O. Box 3760, CH-8021 Zurich, Switzerland.

41.     Based on Sentry records, some or all of the Redemption Payments made to Zurich Capital may have been paid to an account holder or holders associated with the Beneficial Shareholder, Citivic Nominees Limited.  Upon information and belief, Citivic Nominees Limited is a corporate entity organized under the laws of the United Kingdom and has its registered address at Citigroup Centre, Canada Square, Canary Wharf, London, E14 5LB, United Kingdom.

42.     Based on Sentry records, some or all of the Redemption Payments made to Zurich Capital may have been paid to an account holder or holders associated with the Beneficial Shareholder, Compagnie Bancaire Espiritu Santo SA n/k/a Banque Privee Espirito Santo SA. Upon information and belief, Compagnie Bancaire Espiritu Santo SA n/k/a Banque Privee Espirito Santo SA is a corporate entity organized under the laws of Switzerland and has its registered address at 15 Avenue de Montchoisi, Case Postale 390, 1001 Lousanne, Suisse, Switzerland.

43.     Based on Sentry records, some or all of the Redemption Payments made to Zurich Capital may have been paid to an account holder or holders associated with the Beneficial Shareholder, Desert Rose Limited.  Upon information and belief, Desert Rose Limited is a corporate entity organized under the laws of New York and has its registered address at 250 W. 39th Street, 8th Avenue, New York, NY 10018.

44.     Based on Sentry records, some or all of the Redemption Payments made to Zurich Capital may have been paid to an account holder or holders associated with the Beneficial Shareholder, Denise Bar.

45.     Based on Sentry records, some or all of the Redemption Payments made to Zurich Capital may have been paid to an account holder or holders associated with the Beneficial Shareholder, Edson Terra Cunha.

46.     Based on Sentry records, some or all of the Redemption Payments made to Zurich Capital may have been paid to an account holder or holders associated with the Beneficial Shareholder, EFG Private Bank SA.  Upon information and belief, EFG Private Bank SA is a corporate entity organized under the laws of Switzerland and has its registered address at Quai du Seujet 24, P.O. Box 2391, 1211 Geneva 2, Switzerland.

47.     Based on Sentry records, some or all of the Redemption Payments made to Zurich Capital may have been paid to an account holder or holders associated with the Beneficial Shareholder, Fabio Rodrigues Mendes.  Upon information and belief, Fabio Rodrigues Mendes is an individual maintaining an address at 89 Autumnwood Drive, Rockton, IL 61072.

48.     Based on Sentry records, some or all of the Redemption Payments made to Zurich Capital may have been paid to an account holder or holders associated with the Beneficial Shareholder, HSBC Bank USA ("HSBC USA").  Upon information and belief, HSBC USA is a corporate entity organized under the laws of New York and has its registered address at 452 Fifth Avenue, New York, NY 10018.

49.     Based on Sentry records, some or all of the Redemption Payments made to Zurich Capital may have been paid to an account holder or holders associated with the Beneficial Shareholder, Merrill Lynch Bank ("Merrill Lynch").  Upon information and belief, Merrill Lynch

14

is a corporate entity organized under the laws of Switzerland and has its registered address at 13 Route de Florissant, Geneva, CH-1211, Switzerland.

50.　　Based on Sentry records, some or all of the Redemption Payments made to Zurich Capital may have been paid to an account holder or holders associated with the Beneficial Shareholder, Morgan Stanley & Co. International PLC.　Upon information and belief, Morgan Stanley & Co. International PLC is a corporate entity organized under the laws of Switzerland and has its registered address at 13 Route de Florissant, Geneva, CH-1211, Switzerland.

51.　　Based on Sentry records, some or all of the Redemption Payments made to Zurich Capital may have been paid to an account holder or holders associated with the Beneficial Shareholder, Pine Cliffs Investments Limited.

52.　　Based on Sentry records, some or all of the Redemption Payments made to Zurich Capital may have been paid to an account holder or holders associated with the Beneficial Shareholder, Safra National Bank of New York.　Upon information and belief, Safra National Bank of New York is a corporate entity organized under the laws of New York and has its registered address at 546 Fifth Avenue, New York, NY 10036.

53.　　Based on Sentry records, some or all of the Redemption Payments made to Zurich Capital may have been paid to an account holder or holders associated with the Beneficial Shareholder, ASBT Cayman Sub No. 82.　Upon information and belief, ASBT Cayman Sub No. 82 is a corporate entity organized under the laws of the Cayman Islands and has its registered address at c/o John Cullinane and Derrie Boggess, c/o Walkers SPV Limited, P.O. Box 908, George Town, Grand Cayman, Cayman or Intertrust Corporate Services (C.I) Limited, 190 Elgin Avenue, George Town, Grand Cayman, KY1-9005, Cayman Islands.

54.     Based on Sentry records, some or all of the Redemption Payments made to Zurich Capital may have been paid to an account holder or holders associated with the Beneficial Shareholder, ZCM Matched Funding Corp.  Upon information and belief, ZCM Matched Funding Corp.  is a corporate entity organized under the laws of United States and has its registered address at c/o The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

55.     Based on Sentry records, some or all of the Redemption Payments made to Zurich Capital may have been paid to an account holder or holders associated with the Beneficial Shareholder, ZCM Asset Holding Co. Bermuda.  Upon information and belief, ZCM Asset Holding Co. Bermuda is a corporate entity organized under the laws of Bermuda and has its registered address at c/o BNP Paribas Security Corp., 787 Seventh Avenue, 3rd Floor, New York, NY 10019 or Wellesley House, 3rd Floor, 90 Pitts Bay Road, Pembroke HM 08.

## NOTICE PURSUANT TO FED. R. CIV. P. 44.1

56.     Certain of the substantive issues to be resolved in this case will be governed by the laws of the British Virgin Islands.  Plaintiffs intend to rely upon the applicable laws of that territory.

## FACTUAL ALLEGATIONS

### C.     Role Of Feeder Funds In Madoff Fraud

57.     Sentry was the largest of all the so-called "feeder funds" to maintain accounts with BLMIS.  Sigma and Lambda were indirect BLMIS feeder funds established for foreign currency (respectively, Euro and Swiss franc) investment through purchase of shares of Sentry.  Shares in the Funds had the following par values: $.01 per share (Sentry), €.01 per share (Sigma), and CHF.01 per share (Lambda).  Sentry's account statements with BLMIS as of the end of October 2008 showed in excess of $6 billion of invested assets supposedly held by BLMIS.  As stated in

16

its offering materials, Sentry's investment objective was to achieve capital appreciation through investments in BLMIS.

58.     As discussed above, Sentry, Sigma, and Lambda were established for the purpose of making investments in BLMIS.  It is now known that these types of feeder funds were a crucial part of Madoff's Ponzi scheme.  Feeder funds, such as Sentry (which was a direct feeder fund into BLMIS), and Sigma and Lambda (which were indirect feeder funds, through Sentry, into BLMIS) brought new investors and new investments into the scheme, allowing Madoff to make payments to early investors who sought to liquidate their investments.  In this way, the feeder funds were used by Madoff to continue and perpetuate his fraud by maintaining the illusion that BLMIS was making active investments and engaging in a successful investment strategy.

**D.     Calculation Of Net Asset Value And Shareholder Redemption Payments**

59.     From the Funds' inception until the disclosure of Madoff's fraud in December 2008, during most relevant times, substantially all of the money (up to 95%) raised by the Funds from the sale of their Shares, net of fees and expenses, was turned over to and invested in BLMIS (by and/or through Sentry), and supposedly credited to accounts held in the name of Sentry with BLMIS, purportedly for use in the now infamous "split-strike conversion" (or "SSC") investment strategy.   In accordance with the Funds' Subscription Agreements, Articles of Association, offering materials and/or other relevant documents, from time to time, the Funds paid to shareholders, for each Share tendered for redemption, an amount that was based on each of the respective Funds' purported "Net Asset Value"—the value of the respective assets of Sentry, Sigma, and Lambda divided by the number of shares outstanding in each Fund—as it was then calculated.

60.     In calculating each of the Funds' Net Asset Value, the Funds' administrators used and relied on account statements provided by BLMIS purportedly showing securities and

investments, or interests or rights in securities and investments, held by BLMIS for the account of Sentry. Generally, all securities identified on BLMIS account statements were traded on public exchanges and had readily ascertainable market values, and those market values (in addition to, among other items, cash on hand that was identified in the Sentry account statement for the relevant time period) were used in accordance with the Funds' Subscription Agreements, Articles of Association, offering materials and/or other documents to calculate the Net Asset Value of the Shares.

61.    In fact, at all relevant times, no securities were ever purchased or sold by BLMIS for Sentry and any stated cash on hand in the BLMIS accounts was based on misinformation and fictitious account statements. None of the transactions shown on the account statements provided by BLMIS to Sentry ever occurred. Indeed, no investments of any kind were ever made by BLMIS for Sentry. At all relevant times, all of the account statements that BLMIS provided to Sentry were entirely and utterly fictitious. Further, all amounts deposited by Sentry (or by Sigma and Lambda through Sentry) with BLMIS for investment and the purchase of securities to be held by BLMIS for the account of Sentry were used by Madoff to pay other BLMIS investors or were misappropriated by Madoff for other unauthorized uses.

62.    From time to time, to make Redemption Payments, Sentry (and Sigma and Lambda through Sentry) made withdrawals from Sentry's BLMIS accounts (or utilized subscription monies of other investors on hand that were directed for investment in BLMIS). At all relevant times, the Funds believed that the amounts provided in connection with such withdrawals represented the proceeds arising from the profitability of or continued investment in BLMIS. In fact, however, payments made by BLMIS to Sentry purportedly representing the proceeds of sales of securities or other investment positions were nothing other than the deposits of other BLMIS investors or

previous deposits made by Sentry, never invested but rather misused and misappropriated as part of Madoff's fraud. At all relevant times, payments made from BLMIS to Sentry were made by Madoff to continue and perpetuate his Ponzi scheme and avoid detection of his fraud. The payments from BLMIS to Sentry were not payments made in the ordinary course of or as part of any business, nor did they have a legitimate business purpose. Similarly, the Redemption Payments were not made for any legitimate purposes or in the ordinary course of any business. Those Redemption Payments did not conform to or follow the terms of the Funds' Subscription Agreements, Articles of Association and/or other offering documents, as they were based upon Net Asset Values that were not calculated based upon the true facts existing at any relevant time, and because, more generally, the Redemption Payments represented the proceeds arising from investment in BLMIS (or a substitute therefor, in the form of subscription monies from other investors in the Funds, used as a shortcut to investing subscription monies with BLMIS and simultaneously withdrawing monies from BLMIS), which the world now knows was operated by Madoff as a Ponzi scheme.

63.    Given the fraudulent nature of BLMIS and its operation as a massive Ponzi scheme, the money paid by the Funds (directly in the case of Sentry and indirectly in the cases of Sigma and Lambda) to BLMIS on account of Sentry was, at all relevant times and unknown to the Funds, misused and misappropriated by Madoff as part of his Ponzi scheme. At all relevant times, the Funds were insolvent when the Redemption Payments were made or were rendered insolvent, and/or their insolvency was deepened, as a result of the Redemption Payments.

64.    As a result, at all relevant times, the Net Asset Value of the Shares redeemed was miscalculated, and Redemption Payments were mistakenly made for amounts far in excess of the

19

Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at any relevant time.

**E.    Redemption Payments Made Or Transferred To Defendants**

65.    During the period from and after April 21, 2004, through August 14, 2006, Zurich Capital received Redemption Payments totaling USD $15,142,755.05 from Sentry in respect of Shares tendered for redemption.

66.    At Zurich Capital's directions and instructions, Redemption Payments totaling USD $15,142,755.05 were received at Zurich Capital's bank account with Citibank NA in New York.

67.    The dates and amounts of each Redemption Payment received by Zurich Capital from Sentry, and the bank accounts to which each Redemption Payment was made, are set forth on Exhibit A.

68.    At the time those Redemption Payments were made, the Funds had insufficient assets and were unable to pay their debts as they would fall due.  In exchange for each Redemption Payment, each of which constitutes or forms part of a transaction between Zurich Capital and Sentry, Sentry received no consideration or consideration of a value that, in money or money's worth, was significantly less than the value, in money or money's worth, of the consideration provided by Sentry.

69.    Upon information and belief, Zurich Capital and/or the Beneficial Shareholders received Redemption Payments in excess of amounts paid by such person(s) for purchase of their Shares.

F.  **Zurich Capital Knew Of, Was Willfully Blind To, Or Recklessly Disregarded The BLMIS Fraud**

70.    At some time prior to July 2003, Zurich Capital marketed certain assets to SocGen, including a credit facility to Santa Barbara Holdings Ltd.—a company that was wholly invested in a single-manager BLMIS feeder fund, Harley International Ltd.

71.    Zurich Capital acquired knowledge of Madoff's Ponzi scheme from SocGen, in connection with SocGen's due diligence on a potential purchase of assets from Zurich Capital, including a credit facility to Santa Barbara Holdings Ltd.—a company that was wholly invested in a single-manager BLMIS feeder fund, Harley International Ltd.

72.    In the course of conducting due diligence, SocGen uncovered a variety of red flags about BLMIS including:

- On the basis of a chart from the Sentry Fund, that showed investment returns in excess of 8% from 2000 to 2002, it was "readily apparent" such returns were "impossible";

- On the basis of BLMIS's trade confirmations, that BLMIS purported to consistently buy below a stock's average price and sell above a stock's average price by 50 to 100 basis points, thereby outperforming the market nearly 90% of the time; and

- On the basis of BLMIS's representation that it traded securities throughout a trading day, the average price that BLMIS reported on trade confirmations would have trended toward that stock's midpoint or volume weighted average price.

73.    Upon information and belief, SocGen was also suspicious that it had never seen BLMIS trading in the options market.  It was also apparently suspicious that BLMIS did not charge customary management or performance fees, forgoing roughly $300 million at the time.  To resolve its concerns, SocGen sent Madoff a list of questions in advance of an investment strategy meeting with BLMIS, but the meeting was abruptly canceled, and the investment never went forward.

21

74.    Upon information and belief, by virtue of knowledge it acquired from SocGen, Zurich Capital at a minimum recklessly disregarded that the Net Asset Value was massively overvalued and, therefore, that the Redemption Payments it received were improperly calculated.

**G.    The Beneficial Owners Had The Same Knowledge As Zurich Capital**

75.    Zurich Capital served as trustee, agent, representative, nominee or custodian for the Beneficial Owners in connection with their investments in the Funds, including, by:  subscribing to Shares of Sentry on behalf of the Beneficial Owners, maintaining custody of the Shares as record shareholders, paying redemption proceeds from the Shares of Sentry to the Beneficial Owners, and otherwise exercising control over the Shares of Sentry.

76.    Further, each of the Subscription Agreements, executed by Zurich Capital, manifested the Beneficial Owners' consent for Zurich Capital to act on behalf of and subject to the Beneficial Owners' control.  And, in executing the Subscription Agreements, Zurich Capital accepted and agreed to act on behalf of the Beneficial Owners.

77.    Accordingly, the Beneficial Owners had the same knowledge as Zurich Capital regarding all relevant matters relating to BLMIS and the Funds' Net Asset Values at all relevant times.

78.    But in the alternative, both the Funds' Articles of Association as well as each of the Subscription Agreements provide that it is the registered shareholders that are to be treated as the parties to the Funds' Articles.

79.    Article 8 of the Funds' Articles provides that "The Company shall be entitled to treat the registered holder of any share as the absolute owner thereof and accordingly shall not be bound to recognise an equitable or other claim to, or interest in, such share on the part of any other person."

80.    Paragraph 27 of the Subscription Agreements similarly provides that "If Subscriber is subscribing as trustee, agent, representative or nominee for another person (the 'Beneficial Shareholder'), Subscriber agrees that the representations and agreements herein are made by Subscriber with respect to itself and the Beneficial Shareholder.  Subscriber has all the requisite authority from the Beneficial Shareholder to execute and perform the obligations hereunder."

81.    Together, these contractual provisions bind the Beneficial Owners to Zurich Capital's bad faith on all relevant matters relating to BLMIS and the Funds' Net Asset Values at all relevant times.

**1.    Beneficial Owner Citibank (Switzerland) Zurich Also Knew Or Should Have Known Of The BLMIS Fraud**

**a.  Citigroup's Corporate Structure Ensured That Information Was Shared Among Citigroup Entities**

82.    At the time Citigroup's subsidiaries and affiliates, including Citibank (Switzerland) Zurich, were investing in BLMIS-related funds, Citigroup was among the largest investment banks in the world.

83.    Citigroup was known to have particular expertise in the equity derivatives market, including options-based derivatives transactions.   For example, in 2004, Citigroup affiliate Citigroup Global Markets, Inc. ("Citi Markets Inc.") published a leading industry guide on derivatives with the assistance of three of its key employees: Leon Gross ("Gross"), Joseph Elminger ("Elminger"), and Richard Burns ("Burns").[1]

---

[1] Gross was Citi Markets Inc.'s Global Head of Equity Derivatives Research and Strategy; Elminger was the Global Head of Equity Derivatives; and Burns was the Global Head of Equity Structured Products and Structured Fund Products.

84.    In 2005, Citigroup was amongst the top five derivative dealers in the United States, and was a recurrent player in the over-the-counter ("OTC") options market.

85.    Citigroup promoted itself as "one company," and utilized a complex corporate structure with numerous legal entities that operated across several of its business segments. Entities and personnel in these Citigroup segments shared information, worked together on risk assessment issues, collaborated on transactions, and generally operated as a cohesive unit.

86.    According to its 2005 Annual Statement, Citigroup's objective was to "provid[e] integrated solutions by leveraging teams from across the firm and around the world" and "to bridge [their] businesses so all of the company is working in unison."

87.    Citigroup continued to advertise that its "bankers are organized into industry, product, and regional groups and work closely with partners in capital markets, sales and trading, research and global relationship banking to offer customized financing strategies for our clients."

88.    Citi Markets Inc. similarly promoted its collaboration and coordination with other Citigroup subsidiaries and affiliates.  For example, Citi Markets Inc. disclosed in its Form 10-K for 2004 that its "risk management control framework is based upon the ongoing participation of senior management and business unit managers and the coordinated efforts of various support units throughout" Citi Markets Inc.

89.    Upon information and belief, by virtue of this close collaboration, information sharing, and general coordination among Citigroup business units, both Citigroup and Citi Markets Inc. shared knowledge that the NAV was inflated with and among other Citigroup subsidiaries and affiliates, including Citibank (Switzerland) Zurich.

24

**b. Citibank (Switzerland) Zurich Acquired Knowledge Through Harry Gross's Interactions With Harry Markopolos**

90.    Harry Gross began working in the derivatives research group at Citi Markets Inc. at some point after 1993.  In 2005, Gross was the Global Head of Equity Derivative Strategy.  In this role, Gross was responsible for making recommendations to investors on equity derivatives and other assets.  Gross regularly met directly with customers to provide data regarding options and to assist them in performing certain analyses.

91.    In 2005, sometime before November 7, Gross met with Harry Markopolos, a Citi Markets Inc. customer and fellow member of the financial industry.  At that meeting, Markopolos showed Gross a description of BLMIS's split-strike conversion strategy and information relating to investment returns that BLMIS purported to produce by employing that strategy.  Markopolos asked Gross to analyze the data and to determine whether it was possible to produce BLMIS's purported returns using the split-strike conversion strategy, and whether anyone else at Citi Markets Inc. was familiar with BLMIS trading index options.  Gross expressed that he was "skeptical that [the SSC strategy] as described could generate those returns," but tried to "reconcile" what he recognized as "a discrepancy between the strategy and the returns …."

92.    Gross investigated six or seven different possibilities to explain the discrepancy between the split-strike conversion strategy and the returns BLMIS claimed to be earning.  Gross considered, for example adjusting the parameters of the split-strike conversion strategy's purported options collar and considering possible alternative strategies, including whether BLMIS could have produced its purported returns through market timing or "buying individual options, and selling index options," or "buying stocks and shorting the index."

93.    Gross conducted a "mathematical analysis," which included "seeing what the average return of the S&P was, seeing what the standard deviation was, seeing if you, you know,

had different amounts of all cash or collars, how wide it would be, what the returns would look like, et cetera, seeing on average, you know, what the volatility difference was between the puts and the calls, and would you make or lose money doing that ….”

94.     After completing his analyses, Gross concluded that the split-strike conversion strategy was incapable of achieving the returns BLMIS claimed to be achieving.  Gross came to believe “that the returns weren’t generated by the strategy, they were either generated by something else—that something was amiss there.”

95.     In addition to his quantitative analysis, Gross also looked into whether anyone at Citi Markets Inc. was aware of Madoff trading index options.  On at least one occasion, Gross inquired at the index options desk about whether anyone had heard of Madoff trading index options.  He was told “no.”  Gross additionally specifically questioned his colleagues about whether anyone had heard of Bernie Madoff or Madoff trading as a counterparty for options on the Chicago Board Options Exchange (“OEX”) options or any other index product, either on an exchange or over the counter.  Gross was again told that nobody had heard of Madoff participating in options trades.

96.     Gross also inquired with the equity derivatives salespeople at Citi Markets Inc. Gross asked whether they had any experience with Madoff as a customer or whether they had even heard of him as someone who is active in the options market.  Like their colleagues at the index options desk, the salespeople had no familiarity with Madoff as someone who traded in the options markets.

97.     Following Markopolos’ meeting with Gross, on November 7, 2005, Markopolos made a submission to the SEC entitled “The World’s Largest Hedge Fund is a Fraud.” Markopolos’ letter set forth evidence that he had accumulated evidencing fraud at BLMIS.  Markopolos’ letter

identified several derivatives experts that he claimed would corroborate his assertion that BLMIS

was a fraud. Based on his conversations with Gross, Markopolos suggested that the commission

should interview Gross as a derivatives expert. Markopolos previewed Gross's findings, writing:

"Leon [Gross] can't believe that the SEC hasn't shut down Bernie Madoff yet. He's also amazed

that FOF's [Funds of Funds] actually believe this stupid options strategy is capable of earning a

positive return much less a 12% net average annual return. He thinks the strategy would have

trouble earning 1% net much less 12% net."[2]

98.    Gross and Markopolos remained in contact after Markopolos began his career as a

Certified Fraud Investigator. The two remained in touch via e-mail and met at Citi Markets Inc.'s

offices on at least two subsequent occasions before Madoff's fraud was publicly revealed. In June

2007, Markopolos sent Gross an email asking for his "insight" into whether a new swap product

indicated that Madoff was "running short of new cash" to "feed the Ponzi beast." Markopolos

wrote:

> Leon, Long time no hear but I know you'll love this. Wickford [a BLMIS feeder
> fund] is offering a HSBC swap on Bernie Madoff that provides 3.0 - 3.25 X's
> exposure to Bernie Madoff. How they're planning on hedging this should be telling.
> If they aren't getting full visibility to Madoff's positions, then I'm very suspicious.
> If HSBC is running a blind factor model to predict Madoff's return stream and then
> replicating it, I'm even more suspicious. If Madoff is allowing a 3rd party marketer
> to pitch this sort of product, my guess is that he's running low on new investors
> cash in-flows and needs to feed the Ponzi beast or face ruin. Any insight on your
> part on what you might be hearing? Is Madoff running short of new cash? We all
> know how Ponzi Schemes turn out[.]"

---

[2] In 2010, Gross was asked about this portion of Markopolos's submission to the SEC. Gross
stated that he could not recall whether "that is [Markopolos] paraphrasing me or my own words,
but I do remember saying something is wrong here."

99.    Accordingly, at least one high ranking Citi Markets Inc. employee was not only told that BLMIS was a Ponzi scheme, but also corroborated this allegation with his own independent research.

### c. Citibank (Switzerland) Zurich Acquired Knowledge When Brian Leach Became The Chief Risk Officer For Citigroup

100.    Brian Leach became the Chief Risk Officer for Citigroup and its affiliates in or around March 2008.  Prior to joining Citigroup and its affiliates, Leach had been the Chief Risk Officer and Co-Chief Operating Officer of Old Lane L.P., a multi-strategy hedge fund which was acquired by Citigroup in 2007.

101.    Before joining Old Lane L.P., Leach had been the Risk Manager for Institutional Services Business at Morgan Stanley.  Upon information and belief, at the time Leach was employed at Morgan Stanley, the firm had implemented an internal policy of avoiding BLMIS investments due to concerns of fraud and other wrongdoing.  Leach was aware of both Morgan Stanley's internal policy and the reasons leading to its implementation.

102.    Shortly after Leach became Citigroup's Chief Risk Officer, Citigroup began to immediately unwind its BLMIS trades and rid itself of any and all remaining Madoff exposure. Upon information and belief, Leach shared his knowledge of Morgan Stanley's internal policy and the underlying concerns with Citigroup, which contributed to Citigroup's decision to withdraw from Madoff-related investments.

### d. Citibank (Switzerland) Zurich Acquired Knowledge Through Four Suspicious Transactions

#### i.    The Fairfield Sentry Leverage Deal

103.    In March 2005, two of Citibank (Switzerland) Zurich's affiliates, Citigroup Global Markets Limited ("CGML") and Citibank, N.A., began negotiating an offshore swap transaction with Auriga International Limited ("Auriga") in which CGML agreed to pay Auriga two-times the

return on a hypothetical investment in Sentry in exchange for fees (the "Fairfield Sentry Leverage Deal").

104.    Due diligence on the Fairfield Sentry Leverage Deal was led by Samir Mathur (a managing director at Citi Markets Inc.) and Rajiv Sennar (an employee who worked with the Fund and Multi-Asset Derivatives group at Citi Markets Inc.).  In the course of this due diligence, Mathur and Sennar identified evidence of fraud at BLMIS—principally, the absence of proof of BLMIS's purported billions of dollars in options transactions, and the lack of an independent custodian to safeguard customer assets.

105.    In a March 10, 2005 memorandum (the "First Memo") from the Global Hybrid Trading Desk, Citi Markets Inc. described the proposed terms of the Fairfield Sentry Deal, including preliminary information regarding due diligence performed by Citi Markets Inc.  The First Memo noted that one of the integral elements of the split-strike conversion strategy was the purchase and sale of S&P 100 Index options to create a collar to hedge the basket of equities.

106.    Upon information and belief, as seasoned investment professionals and active participants in the options market, Citi Markets Inc. employees knew that to sustain the split-strike conversion strategy, BLMIS would have had to purchase at least $4.8 billion in S&P 100 Index put options and sell at least $4.8 billion in S&P 100 Index call options each time it entered the market, which occurred six to seven times per year.  But neither Elminger, nor Burns, nor Gross, nor Ramesh Gupta ("Gupta")[3] could identify any counterparties or other trace of BLMIS's trades.

---

[3] Gupta was the Global Head of Equity Market Risk at Citi Markets Inc. Gupta was allegedly known by colleagues as being "wary" of the Fairfield Sentry Leverage Deal. In May 2005, he inquired internally at Citi Markets Inc., and externally, with a contact at Credit Suisse First Boston, to see if anyone was familiar with Madoff trading index options.  They were not.

107.    At the same time, individuals at Citi Markets Inc. became increasingly concerned that there was no independent custodian or oversight mechanism in place to ensure that BLMIS was not misappropriating Sentry's assets.  On March 11, 2005, Marc Fisher (a CGML employee) raised this concern with Kim Perry (a FGG employee), explaining that Citibank, N.A. was worried that the assets in Sentry's customer account could disappear.  In an internal e-mail, Perry conveyed Fisher's concerns to FGG personnel, stating: "The concerns that Citibank has are primarily credit concerns as opposed to performance risk concerns. i.e. ***could the money disappear from the account in any one day***, leaving Citibank exposed with a $150 million loan and no collateral. They are not necessarily concerned about transparency to the portfolio, ***they just would feel more comfortable if there were some sort of control on money leaving the account.***"  (Emphasis added).  Perry additionally explained that while "Citibank has relationships on several levels with the Madoff organization and the feeling seems to be that everything checks out OK but that he is obviously secretive," Citibank, N.A. feared directly confronting Madoff with their remaining concerns and were instead "trying to see if there is someone in the organization who could call Bernie on this trade without ruffling his feathers."

108.    On or around March 22, 2005, Mathur, Gupta and several other Citi employees visited FGG's offices in New York City as part of their ongoing due diligence on Sentry and BLMIS.  This visit did nothing to alleviate their concerns, as evidenced by a FGG internal email dated two days later noting Fisher's continued concerns about the "theoretical fraud risk given that Madoff is the custodian of the assets," and that "the head of trading at Citicorp ha[d] agreed to assume this [fraud] risk."

109.    Sometime between March 24 and March 30, 2005, Citi Markets Inc. requested a meeting with Madoff or someone else at BLMIS in yet another attempt to resolve their concerns.

FGG informed Mathur that would not be possible, to which Mathur expressed "disappoint[ment]" because "the more we could find out more directly it's better …."

110.    Mathur followed up with FGG for public information about BLMIS that he could share with members of the Citi Markets Inc. credit committee.  An internal FGG email explained that the purpose of this request was, in Mathur's words, "to help [the Citi Markets Inc. credit committee] get 'comfortable' with BLM[IS]."  FGG responded by providing public journals, newspapers, and a link to BLMIS's website—none of which addressed Fisher's primary concern that "the money [could] disappear from the account in any one day."

111.    According to Mathur, although Citi Markets Inc. was additionally provided information such as BLMIS's audited financials, no one from Citi Markets Inc. actually did any diligence on BLMIS's auditor, Friehling & Horowitz, and, to his knowledge, no one from Citi Markets Inc. actually looked at the information BLMIS submitted to the SEC in its annual filing.

112.    On March 30, 2005, in advance of a Citi Markets Inc. management meeting regarding the Fairfield Sentry Leverage Deal, Mathur requested a telephone call with Amit Vijayvergiya, FGG's Head of Risk Management.  According to Vijayvergiya, Mathur wanted to revisit several topics covered during their March 22 meeting including:  "1) in whose name are the stocks and options positions held at DTCC [the Depository Trust & Clearing Corporation]"; "2) what happens to assets in the event of BLM[IS] bankruptcy"; "3) [what is the] name of BLM[IS]'s accountant"; "4) # [number] of options counterparties."  Upon information and belief, Vijayvergiya was unable to provide satisfactory responses for any of these topics.

113.    In a March 30, 2005 memorandum (the "Second Memo") from the Global Hybrid Trading Desk at Citi Markets Inc. to the Fast Track Capital Markets Approval Committee (the "Capital Markets Approval Committee"), the committee responsible for reviewing new and/or

complex products and evaluating them for their riskiness, Citi Markets Inc. documented its

concerns about BLMIS, writing that "Madoff is both the Prime Broker and Custodian of the SSC

assets of Sentry" and concluded "[t]here is a fraud risk."  The Second Memo omitted any reference

to the fact that Citi Markets Inc. had been unable to identify a single options counterparty, despite

repeated requests to FGG for this information.  Indeed, Mathur could not recall ever disclosing

this issue to the Capital Markets Approval Committee.  Instead, Citi Markets Inc. hid this known

risk from the Capital Markets Approval Committee by writing that "[t]here should be no

counterparty risk associated with this transaction."

114.    As part of the First and Second Memos, Citi Markets Inc. included a quantitative

analysis (the "Quantitative Analysis") that described, in detail, BLMIS's purported split-strike

conversion strategy and examined BLMIS's purported returns over a 170-month period from

December 1990 through January 2005 by employing that strategy.  Among other things, it showed

that BLMIS purported to generate positive returns in 164 out of 170 months—or 96.5% of the

time.  BLMIS purported to earn positive returns in 57 of the 63 months in which the S&P 100

Index suffered losses—despite the fact that the split-strike conversion strategy intended to highly

correlate to the S&P 100 Index.

115.    As a sophisticated participant in the options market, Citi Markets Inc. knew that the

split-strike conversion strategy was designed to limit potential losses through the purchase of S&P

100 Index put options.  Citi Markets Inc. must also have known that the exercise of the put options

could not turn losses into gains; thus, it was highly improbable that the split-strike conversion

strategy could consistently produce positive returns, even during months when the S&P 100 Index

was down.  But the Quantitative Analysis revealed just that: Sentry was earning positive returns

in more than 90% of the months the S&P 100 Index was down.

116.    The Quantitative Analysis revealed additional points of disconnect between the split-strike conversion strategy and BLMIS's reported returns.  For example, the Quantitative Analysis assessed Sentry's drawdown figures.  A drawdown occurs when a fund experiences a loss in a month that brings its NAV below its previous high.  Sentry experienced a total of seven drawdowns during the 170 month sample period.  The Quantitative Analysis analyzed the five largest of these drawdowns, which ranged between -0.5% and -0.2% and found that in all but one case, Sentry had recovered all of the losses within one or two months.  In contrast, the worst drawdown the S&P 100 Index suffered during the same period was -49.37%—nearly 100 times worse than Sentry.  This occurred in September 2002, and the S&P 100 Index had not yet recovered from this drawdown 28 months later in January 2005.  At the same time, BLMIS inexplicably reported a gain of .01% using the split-strike conversion strategy when the S&P l00 Index was down almost 50%.

117.    The Quantitative Analysis also found similar anomalies in its analysis of Sentry's drawups.  A drawup occurs when a fund experiences a gain in the current month that brings the NAV for the fund above its previous high value.  The Quantitative Analysis highlighted that Sentry's largest drawup was an astounding 134% rise.  Even more remarkably, it lasted for 83 consecutive months.  In other words, BLMIS purported to earn positive returns for nearly seven years, without suffering a single negative month.  Sentry's purported 83-month drawup began in September 1995 and continued until August 2002.  This drawup period revealed that despite purportedly employing a strategy designed to correlate to movements of the S&P 100 Index, BLMIS claimed to generate returns impervious to the most drastic and unpredictable market declines.  These included the September 11, 2001 terrorist attacks—an event no investor could have predicted—and the dotcom bubble bust in April 2000 through March 2001.

118.    The Quantitative Analysis next identified inconsistencies in the volatility of BLMIS's purported returns.  This portion of the analysis highlighted the Sharpe ratio, which is a metric commonly used in the hedge fund industry to show how well a trading strategy compensates an investor for risk.  A higher Sharpe ratio indicates the investment is generating more return relative to the amount of risk.  As a sophisticated and experienced global financial institution, Citi Markets Inc. knew that had BLMIS been implementing the SSC strategy as it purported to do, the volatility of its returns would have been similar to the volatility of the S&P 100 Index, and their Sharpe ratios would also be similar.  BLMIS's purported returns and Sharpe ratio, however, bore no correlation to the returns or volatility of the S&P 100 Index.  Based on its own calculations in the Quantitative Analysis, Citi Markets Inc. knew that the Sharpe ratio for BLMIS's purported returns during the 170 month sample period was a remarkable 2.9.  This stood in stark contrast to the Sharpe ratio for the S&P 100 Index during the same period, which was approximately 0.53.  Based on its considerable expertise and experience in evaluating investment strategies, Citi Markets Inc. knew that the SSC strategy could not produce a Sharpe ratio nearly five and a half times higher than the S&P 100 Index to which it was supposedly correlated.

119.    The Quantitative Analysis thus empirically demonstrated to Citi Markets Inc. that BLMIS could not have been achieving the investment returns it purported to earn using the split-strike conversion strategy.  It was therefore unsurprising that the last line of the Second Memo, to which the Quantitative Analysis was appended, concluded: "There is a fraud risk."

120.    In sum, by April 2005, CGML, Citibank, N.A., and Citi Markets Inc. were fully aware that Sentry's relationship to BLMIS presented significant fraud risk; their due diligence efforts had only exacerbated their outstanding concerns, but they were ultimately unwilling to press FGG or Madoff directly for answers.  According to Mathur, one possible explanation

considered by Citi Markets Inc. for Madoff's extraordinary consistently positive returns was that because BLMIS had a market-making business, Madoff could illegally take advantage of seeing large order flow.  Notwithstanding Citi Market Inc's understanding that Madoff might be engaging in illegal front-running to generate the incredible BLMIS returns, Citi Markets Inc. never conducted any further inquiry on how Madoff's returns were so consistently positive over such a long period of time. Instead, CGML turned a blind eye to its fears of fraud and executed the Fairfield Sentry Leverage Deal on or around April 2005.

### ii.      The Prime Fund Credit Deal

121.    On or about June 10, 2005, Citibank, N.A. extended a $300 million revolving credit facility to American Masters Broad Market Prime Fund, L.P. ("Prime Fund") to enable it to invest in BLMIS's investment advisory business (the "Prime Fund Credit Deal").  In connection with the Prime Fund Credit Deal, Citibank, N.A. executed a revolving credit agreement (the "Revolving Credit Agreement") with Prime Fund and others—Citicorp North America, Inc. (as Citibank, N.A.'s agent in the Prime Fund Credit Deal); Tremont Partners, Inc. ("Tremont") (Prime Fund's general partner); and CAFCO, LLC (a conduit commercial lender for Citigroup).

122.    Citi Markets Inc.—principally led by two employees, Marc Adelman (a director in the Global Securitized Markets group) and Matthew Nicholls (a managing director in the Corporate & Investment Banking group)—conducted due diligence on Prime Fund and BLMIS, negotiated the terms of the loan as well as the terms of each renewal, and executed the agreements governing the deal.

123.    Upon information and belief, during this process, Citi Markets Inc. learned, among other things, that Tremont received only paper copy trade confirmations approximately five days after BLMIS conducted the alleged trading—a practice rife with the possibility for fraud due to

the ability of the brokerage firm to backdate or manufacture trading activity with no ability on the customer's part to check that the trades actually took place.  Citi Markets Inc. further learned from Tremont that all of the information about Prime Fund's account and trading activities through BLMIS would be supplied solely by Tremont.  As a result, Citi Markets Inc. was advised that Tremont, and not Madoff, would be the party reporting necessary information for Citi Markets Inc.'s ongoing monitoring of Prime Fund's compliance with the credit agreement.  This meant that Citi Markets Inc. would have to rely almost exclusively upon secondhand information concerning Madoff s alleged trading activity provided by Tremont.  Citi Markets Inc. concluded that these practices contributed to the risk of fraud presented by BLMIS.

124.    Because Prime Fund was almost entirely invested in BLMIS, and because Citi Markets Inc. had substantial concerns of fraud at BLMIS, Citi Markets Inc. demanded a unique indemnification provision, designed to protect Citibank, N.A. from financial loss in the event that BLMIS turned out to be a fraud.  Pursuant to the indemnity, Tremont and Prime Fund would cover "all losses, liabilities and damages arising out of or in connection with the Facility."  This necessarily includes all losses, damages, and liabilities arising out of certain contractually defined events of default, which included: (i) any SEC action taken to revoke BLMIS's broker/dealer registration; (ii) any major indictment or enforcement action taken against BLMIS; (iii) an action to appoint a receiver for BLMIS; (iv) BLMIS's inability to pay debts as they came due; and (v) any action to adjudicate BLMIS insolvent or bankrupt.  This indemnity was supplemented by an additional provision known as the "Parent Guarantee," which provided that Tremont's parent company Tremont Capital Management, Inc. ("TCM") "will guarantee … the full and timely payment of all payment obligations of [Tremont and Prime Fund], with the exception of the obligation to support [Prime] Fund's failure to repay Advances that resulted from a decline in the

fair market value of the assets purchased in adherence to the Investment Strategy." The exception within the Parent Guarantee for losses stemming from "a decline in the fair market value of the assets" demonstrates how Citi Markets Inc. was more concerned about fraud at BLMIS than with BLMIS making bad investments.

125.    In a May 31, 2005 memorandum (the "Third Memo"), Citi Markets Inc. noted that "[Capital Markets Approval Committee] approval [was] requested to pursue the Facility due to the unique circumstances of how the assets of the Fund [would] be held, and the corresponding reliance on indemnities provided by Tremont Partners, Inc. (the 'General Partner' of the Fund) for the payment of the obligations of the Fund." The Third Memo explained that "[b]ecause [Madoff] has full discretion over [Prime Fund's account at BLMIS], the potential risk, while remote, of fraud by the Investment Advisor is introduced." The Third Memo also devoted an entire paragraph to the subject of "Fraud by the Investment Advisor due to physical control of the Brokerage Account and full discretion over account activity." The Third Memo acknowledged that the combination of the indemnity and the Parent Guarantee was the "primary mitigant of fraud by [BLMIS]."

126.    In sum, Citi Markets Inc.'s due diligence and negotiation of the Prime Fund Credit deal unearthed additional concerns about the practices of BLMIS and its related-feeder funds. These concerns, combined with those first discovered during the due diligence of the Fairfield Sentry Leverage Deal, once again led Citi Markets Inc. to conclude that BLMIS presented a risk of fraud. But rather than diligently pursue these concerns, Citi Markets Inc. was again content to abandon its efforts so that an affiliate (here, Citibank, N.A.) could reap the financial benefits of a transaction involving a Madoff feeder fund—this time contractually shielded from the very risk that Citi Markets Inc. feared.

### iii.    The Proposed Tremont Deal

127.    On December 16, 2005, Citi Markets Inc. began exploring the possibility of a lending arrangement with Tremont, under which Citibank, N.A. and its affiliates would own shares in one of Tremont's BLMIS feeder funds (the "Proposed Tremont Deal"). Unlike the Prime Fund Credit Deal, the terms of the Proposed Tremont Deal did not include an indemnity from Tremont coupled with a guarantee from TCM in the event of fraud at BLMIS. Citi Markets Inc. was therefore forced to resume due diligence into the many concerns about BLMIS that it had previously discovered while negotiating the Fairfield Sentry Leverage Deal and the Prime Fund Credit Deal. Citi Markets Inc. once again concluded that BLMIS presented a risk of fraud and rejected the Proposed Tremont Deal on this basis. Without the protection of an indemnification, Citi Markets Inc. was simply unwilling to bear the full financial brunt of the fraud risk. But rather than apply the implication of this fraud risk to its other transactions involving BLMIS and its related feeder funds, Citi Markets Inc. turned a blind eye to this fraud risk by instead continuing to seek out indemnity provisions.

128.    As part of the due diligence conducted for the Proposed Tremont Deal, Citi Markets Inc. requested a meeting with Madoff and other BLMIS personnel to address outstanding concerns regarding direct fraud exposure. Citi Markets Inc.'s requests for a meeting with Madoff prompted Patrick Kelly (Tremont's Senior Vice President of Product Management), to e-mail Robert Schulman, Tremont's CEO, asking: "What type of access can we provide to Madoff to allow a credit provider (Citi) to perform due diligence? They are asking for an initial DDQ [due diligence questionnaire] meeting and subsequent updates on a semi-annual or annual basis." Schulman responded, "Can't do it."

129.    On January 30, 2006, Sennar sent an email to Tremont employee Darren Johnston to remind him that Citi Markets Inc. could not proceed with the Proposed Tremont Deal unless it first resolved its concerns of fraud at BLMIS:  "[A]s we indicated in previous conversations, in order to get the deal approved we need to figure out how to address the due diligence questions our internal control functions have."

130.    Notwithstanding several conference calls and at least two diligence sessions to discuss concerns of fraud surrounding the Proposed Tremont Deal, by February 2006 Tremont had still not provided adequate assurance that customer accounts at BLMIS actually contained any assets.

131.    On February 16, 2006, Johnston provided a copy of the Prime Fund Pledge Agreement to Sennar, which apparently indicated that Prime Fund's BLMIS account "was held as a 'segregated customer account.'"  Although the Prime Fund Pledge Agreement required BLMIS to maintain segregated customer accounts, Johnston did not provide bank records or other independent means of verifying that BLMIS in fact maintained separate customer accounts.

132.    Still unsatisfied, on February 23, 2006, Sennar requested a call with Tremont to follow up on his concerns.  Sennar subsequently spoke with Johnston and Schulman.  Following the call, Johnston e-mailed Sennar and Mathur copies of an independent auditor's report and a statement of financial condition prepared by BLMIS's auditor, Friehling & Horowitz.  This information was not responsive to Sennar's fraud concerns, as neither report addressed whether BLMIS maintained segregated customer accounts.

133.    Mathur continued to investigate the existence of BLMIS's options trades in an attempt to "make a case" for the Proposed Tremont Deal.  However, Mathur's efforts to identify even one counterparty to BLMIS trades continued to come up short.

134.    Ultimately, Burns, Elminger, and Mathur decided to set up a meeting directly with Madoff to address their fraud concerns.  Given the $300 million at stake as part of the Proposed Tremont Deal, they believed that Madoff would agree to meet with them.

135.    While others at Citi Markets Inc. were looking for evidence of BLMIS counterparties, Vishal Mishra, another Citi Markets Inc. employee, was identifying apparent discrepancies between the prices BLMIS reported to Sentry for its purported options transactions and the prices reported by Bloomberg.  This information was provided to CGML pursuant to an information agreement ("Information Agreement") between CGML and Sentry as part of the Fairfield Sentry Leverage Deal Agreement.  Upon information and belief, the Information Agreement explicitly required Sentry to provide CGML with "full and transparent disclosure of details of all the Fund's past and present investments and investment activities, including, without limitation, contracts, trade tickets and details of all outstanding transactions comprising the Fund's portfolio of investments; and … such personnel of the Fund or the Fund Manager as may be necessary to respond adequately to … enquiries in relation to the Fund's strategy and the composition of the Fund's portfolio of investments."

136.    Mishra confronted FGG's Vijayvergiya about the discrepancies on March 23, 2006. Following a telephone conversation between Mishra and Vijayvergiya, Citi Markets Inc. requested additional evidence from FGG and Tremont to confirm the existence of BLMIS's options transactions.  The following day, Mishra asked Vijayvergiya to provide the name of just one or two counterparties to BLMIS's options trades.  Tremont could not answer this basic question, which prompted Patrick Kelly (at Tremont) to send an internal email to Schulman, stating: "[d]o you know who the counterparties to [M]adoff's options are? City (sic) has asked around and can't

find anyone who admits to being a counterparty." Schulman responded, "[Madoff] has not disclosed that to us."

137.    On March 27, 2006, Johnston sent an e-mail to Schulman regarding Citi Markets Inc.'s request for a meeting with Madoff, since the options counterparties had become a "critical issue" for Citi Markets Inc. as they continued to search for "proof such as a sample confirm or even talking to the counterparty if they are unable to find out directl[y]." A meeting was scheduled for April 26, 2006.

138.    Upon information and belief, Citi Markets Inc. received a KPMG report dated April 17, 2006 (the "KPMG Report") that induced even more concern. The KPMG Report reflected discrepancies between BLMIS's reported figures on OTC S&P 100 option transactions on October 31, 2005 against prices reported by two different sources—Bloomberg and Interactive Data Corporation.

139.    The day after the KPMG Report was released, Mishra sent an e-mail to Vijayvergiya, copying Mathur and Gupta, regarding the agenda for an upcoming April 20, 2006 meeting about the Proposed Tremont Deal. The main agenda items included substantiating the existence of BLMIS's purported trades. The meeting took place at FGG's offices, and the attendees included Mathur, Gupta, and Mishra from Citi Markets Inc., and Vijayvergiya from FGG. During the meeting, the Citi Markets Inc. attendees requested to see any confirmations that Sentry would have received from BLMIS evidencing options trades. They were shown a binder of trade confirmations and were not allowed to take the binder with them.

140.    However, according to Mathur, nothing presented at the meeting confirmed the existence of BLMIS counterparties. The trade confirmations within the binder did not identify any counterparties.    Citi    Markets    Inc.    also    requested    to    see    a    report    generated    by

PricewaterhouseCoopers LLP ("PWC"), Sentry's auditor.  Mathur believed that the report could

be used to independently verify (1) the counterparties on the BLMIS trades, and (2) that BLMIS's

customer accounts contained the purported securities and options.  However, FGG did not provide

the report to Citi Markets Inc. and declined to comment on the processes that PWC used to generate

the report.  While the April 20, 2006 meeting with FGG "did not raise any new flags," Mathur

concluded, "it did not give us the answer we were looking for."

141.    According to Mathur, Citi Markets Inc. was never satisfied in terms of its questions

concerning BLMIS's options trading but, crucially, did nothing more to attempt to independently

identify options counterparties for BLMIS or the feeder funds.  Additionally, FGG never provided

Citi Markets Inc. with copies of options confirmations received from BLMIS.  Mathur and his

colleagues relied almost exclusively on information received from FGG and Sentry and conducted

no independent due diligence on Sentry or BLMIS.

142.    Following the April 20, 2006 meeting with FGG, Nicholls informed Tremont that

the Proposed Tremont Deal was off.  According to an internal Tremont email, Nicholls indicated

that two "fundamental roadblocks" were "1) custody of the trading account is with [] Madoff and

not with a 3rd party and 2) lack of transparency regarding how Madoff executes his volume of

options[.]"

143.    Although the Proposed Tremont Deal never came to fruition, Citi Markets Inc.

remained enthusiastic about the Prime Fund Credit Deal—a deal where Citibank, N.A. was

indemnified against any losses stemming from BLMIS's fraud.  As Johnston noted in an email to

his Tremont colleagues, "Matthew [Nicholls] hopes this doesn't affect our current relationship

where he is extremely happy working and growing Prime [Fund]'s conduit lending facility (where

they [Defendants] have much greater asset coverage)."  In other words, Citi Markets Inc. was

content to engage in BLMIS-related transactions notwithstanding the lack of evidence that BLMIS had actually executed any trades it purported to have made, and notwithstanding the fact that there was no independent custodian or other protection against the disappearance of assets in BLMIS's customer accounts, so long as there was an indemnity backed by the Parent Guarantee in place. Citi Markets Inc. was thus financially incentivized to abandon the April 26, 2006 meeting with Madoff; if Citi Markets Inc. had continued to pursue its suspicion of fraud at BLMIS, it would have jeopardized renewal of the Prime Fund Credit Deal.

### iv.    The Proposed Prime Fund Credit Deal Renewal

144.    On April 12, 2006, Tremont informed Citi Markets Inc. that it wished to increase the size of the Prime Fund Credit Deal from $300 million to $450 million (the "Proposed Prime Fund Credit Deal Renewal").

145.    On April 17, 2006, Adelman told Tremont that Citi Markets Inc. would consider the requested increase and a one-year renewal of the facility.  In contrast to the negotiations and due diligence leading up to the Proposed Tremont Deal, which had lasted many months, Adelman explained that Citi Markets Inc. would be able to complete due diligence and confirm the increase and renewal in a matter of weeks.

146.    But by May 2006, the deal was in jeopardy.  Although Citi Markets Inc. was ready to finalize the Proposed Prime Fund Credit Deal Renewal, it had yet to receive Tremont's 2004 and 2005 audited financial reports, which it needed in order to assess Tremont's ability to indemnify Citibank, N.A. and Citi Markets Inc. in the event that BLMIS turned out to be a fraud.

147.    For example, on May 9, 2006, after informing Citi Markets Inc. that it did not yet have audited financial statements for 2004 or 2005, Tremont acknowledged internally that this could potentially derail the facility renewal and increase:  "Citi is concerned about the delay in the

2004 audited financials" and "'Citi will not consider the waiver or the increase until this issue has been resolved.'"  Tremont sent the unaudited financial statements to Nicholls and Adelman that same day.  However, Tremont noted internally that Citi Markets Inc. was "becoming increasingly uncomfortable" and was "very unsettled that the 2004 audit is not yet completed."

148.    On June 7, 2006, following a call with Adelman regarding the renewal and increase of the Prime Fund Credit Deal, Johnston sent an internal e-mail explaining that "[Citi Markets Inc.] clearly do require the 2004 and 2005 audited [financial statements] for [Tremont Partners] by July 31st and are also now seeking a Madoff meeting[,]" but explained that he "sensed some wiggle room" on the Madoff meeting.  Johnston and Adelman agreed that Tremont and Citi Markets Inc. needed to discuss "what specifically [Citi Markets Inc.] [is] hoping to accomplish with a meeting[,]" and Adelman had Schulman speak with Nichols "to flush out this request."

149.    In September 2006, Citi Markets Inc. again reached out to Tremont regarding a meeting with Madoff.  Tremont asked Citi Markets Inc. to prepare a list of proposed agenda items and refused to provide a clear answer about whether they were willing to arrange a meeting with Madoff.

150.    On October 11, 2006, Nicholls sent Tremont a proposed "due diligence agenda" for the requested Madoff meeting.  Conspicuously absent from this agenda were questions regarding Citi Markets Inc.'s two primary fraud concerns—proof of options trades and verification that the purported assets actually existed.  Instead, the agenda focused on "the competitive environment," "key financial and business risks facing the Company and steps taken by the Company to address those risks," the "[s]tructure of information technology function," and a "[s]ummary of corporate governance issues and the application of other federal and state laws."  As Nicholls characterized

the agenda, "[t]here are a number of questions, but this essentially boils down to a corporate overview."

151.    On November 24, three days before the Madoff meeting, Citi Markets Inc. instructed its attorneys to draft the necessary documents for completion of the facility renewal and increase.

152.    On November 27, 2006, Citi Markets Inc. met with Madoff, along with Schulman and Rupert Allan.  Upon information and belief, each of the three individuals who attended the meeting on behalf of Citi Markets Inc.—Thomas Fontana, Bruce Clark, and Nicholls —had a direct economic interest in renewing and increasing the Prime Fund Credit Deal.  Thus, unlike previous but failed attempts to meet with Madoff to address outstanding fraud concerns, this meeting amounted to a perfunctory "corporate overview" of BLMIS.

153.    Ultimately, Citi Markets Inc. agreed to the Proposed Prime Fund Credit Deal Renewal, extending the term of the loan from November 30, 2006 to December 13, 2007, and increasing the size of the facility from $300 million to $400 million.

154.    In October 2007, just two months before the Proposed Prime Fund Credit Deal Renewal was to expire, Tremont proposed new terms, which included an "eradicat[ion]" of the indemnification provision.  Since Citi Markets Inc. still believed there was a substantial likelihood of fraud at BLMIS, the indemnity was a critical component of the deal.

155.    Even Tremont recognized that its proposal put the Proposed Prime Fund Credit Deal Renewal in jeopardy.  On November 7, 2007, Johnston inquired internally about the status of negotiations, asking whether "Citi [is] going to walk or is it the same TPI [Tremont Partners] GP [General Partner] issue?"  Kelly responded that elimination of the indemnification provision

was a "limited recourse issue. We may have to walk." The parties agreed to a short-term, three-month renewal on December 13, 2007 so that they could continue negotiations.

156.    But as negotiations continued, Citi Markets Inc. remained steadfast that an indemnity provision was a required term of the deal. On March 10, 2008, Tremont sent an internal e-mail explaining that Citi Markets Inc. required indemnification against fraud risk at BLMIS: "Citi needs indemnification from manager fraud."

157.    Because Tremont and Citi Markets Inc. were unable to reach an agreement with respect to the indemnification provision, the deal was called off. The parties executed a termination agreement on March 26, 2008.

158.    Citi Markets Inc.'s negotiation and rejection of the Proposed Tremont Deal followed the familiar pattern of conduct from the previous three deals. Initially, Citi Markets Inc. conducted due diligence that uncovered concerns about BLMIS's practices and identified a specific and significant risk of fraud. But then, Citi Markets Inc. abandoned efforts to obtain definitive answers about this risk, instead engaging in a check-the-box exercise designed to avoid knowledge, and instead seeking the protection of an indemnification provision that would have allowed Citibank, N.A. to enrich itself from the transaction in spite of the risk. Citi Markets Inc.'s ultimate termination of the Proposed Tremont Deal Renewal demonstrates that Citi Markets Inc. specifically appreciated that BLMIS and its related feeder funds presented an intolerable risk of fraud.

## 2.    Beneficial Owner HSBC USA Also Knew Or Should Have Known Of The BLMIS Fraud

159.    Beginning as early as 2001, HSBC USA began completing due diligence reports on Sentry. Each report, as described below, noted multiple indicia of fraud associated with BLMIS.

160.    In 2001, a research committee ("Research Committee") of HSBC Republic (which became HSBC Private Bank, a division of HSBC USA) created a due diligence report on Sentry (the "2001 Due Diligence Report").  The report emphasized concerns over Madoff's improbable return stream:

> Bernie Madoff's 12 year track record trading a split strike conversion strategy on the S&P 100, is quite simply astounding.  His annualized return of 15%, (net of a 20% performance fee), at a risk of 3%, yields a sharpe ratio of 3.3.  Over this period the fund has endured only 4 down months (the maximum of which was down 0.5%), and has now gone almost 6 years without a drawdown.
>
> With this track record, seemingly derived from such a simple investment strategy, certain members of the investment community are baffled, as to how such a return stream has been earned. (underlining emphasis in original throughout).

161.    The 2001 Due Diligence Report also identified multiple indicia of fraud, including that "Madoff takes absolutely *no fees* at fund level," "is effectively the *custodian* of the securities," "*liquidates the portfolio at year-end* and so no securities appear on the audited fund financials," and "*no longer meets with investors* in the fund."

162.    The 2001 Due Diligence Report additionally noted the possibility that Madoff was "*trad[ing] outside of the stated universe*," and acknowledged that the concern had not been substantiated.

163.    The 2001 Due Diligence Report expressed further skepticism about BLMIS's strategy, stating:  "It is very difficult for us to understand *how they can profit* from this strategy *in down markets*.  Consequently, *it is very difficult for us to understand how the fund has so consistently made money over the last 12 and a half years*."  The report found it "difficult to understand why other participants are not successfully employing the strategy."

164.    In analyzing potential sources of BLMIS's returns, the 2001 Due Diligence Report noted, in part:

47

- "The 'pure strategy' – given the fact that the strategy loses money in down markets we believe that it is *unlikely* that the *returns* can be *attributed solely* to this strategy."

- "Market Bias/Timing – given the consistent returns of the strategy, plus the fact that it takes them three days to enter/exit a position it seems unlikely to us that they are making a great deal of money, so consistently, from market timing."

- "Portfolio outperforms Index – given the consistent returns of the strategy, plus the fact that they state that the portfolio is strongly correlated to the index, it seems that it is *unlikely* that this is a *significant source of returns*."

- "Investing outside of Index – we found *no evidence* that the baskets contained stocks outside the S&P 100."

165.   "Madoff is *reluctant* to explain the strategy in detail," stated the 2001 Due Diligence Report.  It additionally noted that the Research Committee was "unable to meet with *Bernie Madoff*" and that "[w]ithout meeting with Madoff we are *unable to cover their particular risk controls*."

166.   The 2001 Due Diligence Report rated Sentry "Info. Inaccessible," which it defined as "Established managers with whom transparency issues prevent us from conducting a proper due diligence."

167.   In 2003, the Research Committee completed another due diligence report on Sentry (the "2003 Due Diligence Report"), again rating Sentry as "Info. Inaccessible … due to the lack of transparency … ."  The 2003 Due Diligence Report stated that the Research Committee was "still unable to meet with Bernie Madoff."  Additionally, the report noted that, "with little transparency and a number of other issues some investors (and the media) have questioned whether the split-strike conversion strategy that is reported to be employed has produced [BLMIS's] returns."

168.    The 2003 Due Diligence Report concluded that "[the Research Committee's] opinion has not changed in one year and ***investors have to be aware of the risk accompanying an investment in this fund***."

169.    The 2003 Due Diligence Report identified the exact same indicia of fraud in connection with BLMIS that it had identified in the 2001 Due Diligence Report.

170.    In the Research Committee's minutes from January 10, 2003, one member stated: "***I would not invest in [Sentry], nor would I want investors to invest.***"

171.    The Research Committee issued another diligence report on Sentry on January 9, 2004 (the "January 2004 Due Diligence Report").  The report noted that, while the Research Committee had been "given more transparency," it was "still not satisfied that [it could not] review the portfolio."  As a result, the Research Committee "***[could not] independently guarantee how the fund actually provides for its returns.***"  The January 2004 Due Diligence Report gave Sentry a 2/5 and "info inaccessible" rating.

172.    The January 2004 Due Diligence Report identified a multitude of BLMIS-associated concerns, including that the Research Committee could not meet with Madoff, that Madoff takes no fees at the fund level, and that Madoff is the effective custodian of the securities. "Normally we feel comfort if there is an independent prime broker," the report stated, "but here the fund also plays that role."

173.    The Research Committee produced another due diligence report on Sentry in September 2004 (the "September 2004 Due Diligence Report").  The Research Committee again gave Sentry a 2/5 and stated:  "[the Research Committee's] concerns regarding the strategy remain unaltered as does the rating of 'info inaccessible.'"

174.    The September 2004 Due Diligence Report identified the following primary BLMIS-associated concerns:

- "Unable to meet with Bernie Madoff who directs the investment strategy"'

- "*'Too good to be true' track record*";

- "HSBC has significant exposure to this strategy";

- "Quarterly incentives fees are charged";

- "Madoff also runs a ***brokerage business***, Bernard L. Madoff Investment Securities (BLM), that accounts for 15% of the daily volume in US stocks. BLM is a market maker in the stocks in which the fund invests, and hence trades with the fund as principal.";

- "Madoff takes absolutely ***no fees*** at fund level …";

- "Madoff is effectively the ***custodian*** of the securities";

- "Madoff ***liquidates the portfolio at year-end*** and so no securities appear on the audited fund financials"; and

- "***Madoff no longer meets with investors*** in the fund."

175.    The Research Committee produced another due diligence report on Sentry in September 2005 (the "2005 Due Diligence Report").  The 2005 Due Diligence Report noted that "[the Research Committee's] concerns regarding the strategy remain significant."  It identified a similar list of indicia of fraud associated with BLMIS, noting the lack of an independent prime broker and that "***manipulation of bid/ask spread has been suggested by some in industry***" to explain Madoff's track record.

176.    The Research Committee produced another due diligence report on Sentry in August 2006 (the "2006 Due Diligence Report").  The 2006 Due Diligence Report identified a similar set of BLMIS-associated concerns as identified by the 2005 Due Diligence Report.

177.    The Research Committee's May 2007 minutes note a member's comment that Sentry did not "really know how [BLMIS's trading] model work[ed]" and that "[w]e have better transparency with some of the more secretive managers … ."   The minutes further include comments that "[t]ransparency remains unclear," and that "***[t]hings do not add up in terms of Bernie's compensation structure.***"

178.    The Research Committee produced another due diligence report on Sentry in June 2007 (the "<u>2007 Due Diligence Report</u>").   In addition to other risk concerns, 2007 Due Diligence Report noted that "[t]he lack of transparency involving fees paid to Madoff was distributing," and that the only fees BLMIS was supposed to charge were "not disclosed anywhere, not even the audited financial statements."   Not long after, in December 2007, when non-party BNP Securities Corp. was negotiating an option agreement referencing a feeder fund, it was instructed by HSBC USA to delete any references to Madoff or BLMIS—and complied with the request.   Such a reference could, to a savvy investor, suggest potential impropriety that would make it difficult to finalize the agreement.

179.    The Research Committee produced another due diligence report on Sentry in August 2008 (the "<u>2008 Due Diligence Report</u>").   The 2008 Due Diligence Report noted that Madoff's strategy "attracts a certain amount of conjecture, not least because of its stunning risk-adjusted performance over close to two decades.   Similar strategies executed by other firms … have delivered nothing like the same return profile.   ***This remains largely unexplained*** as there is little transparency into Madoff Securities and the models they use to execute the strategy."

180.    The 2008 Due Diligence Report identified numerous red flags associated with BLMIS, including:

- "No access to the strategy's manager (Madoff Securities)";

- "No independent custody and verification of trading activity away from the investment manager (unlike a standard hedge fund that has a prime broker)";

- "Madoff's lack of realistically independent auditor – Friehling & Horowitz is a very small firm with Madoff as its only major client";

- "Counterparty risk in the options trading";

- "Unusual Madoff compensation structure (commission based, no fees)"; and

- "High degree of family involvement at Madoff Securities combined with secrecy surrounding the firm."

181.    Attached as an appendix to the 2008 Due Diligence Report was a *Hedge* article entitled "*Madoff tops charts; skeptics ask how*."

182.    Despite the litany of BLMIS-associated risks it identified, HSBC USA took no steps to confirm its suspicion that Madoff was engaged in fraud.

### 3.    Beneficial Owner Merrill Lynch Bank Also Knew Or Should Have Known Of The BLMIS Fraud

#### a.    MLCI Instituted A Practice Against Madoff-Related Investments Based On Its Concerns With Madoff And, Upon Information And Belief, Shared Those Concerns With Relevant Subsidiaries Such As Merrill Lynch Bank

183.    In the years before BLMIS's demise, Merrill Lynch Bank and its parent company, MLCI, were each presented with multiple opportunities to invest with Madoff through Madoff Feeder Funds and thus learn about BLMIS.

184.    MLCI, as a global organization, performed due diligence on Madoff and his SSC strategy.  Upon information and belief, as a result of its inquiry, MLCI concluded that Madoff's structure—in which BLMIS simultaneously served as the investment adviser, the prime broker, and the custodian of assets—lent itself to fraud and manipulation without adequate independent

checks, that Madoff's returns were not generated by the claimed trading strategy, and that Madoff's investment advisory business might very well be fraudulent.

185.    In addition to MLCI's Madoff-related due diligence, Fabio Savoldelli, a former senior executive at Merrill Lynch Investment Management ("MLIM"), a subsidiary of MLCI, sounded the internal warning bell about Madoff across the Merrill Companies many years before BLMIS's collapse.

186.    Savoldelli, and others within the global organization of Merrill Companies, spotted numerous red flags indicative of irregular or fictitious lending activities in Madoff's operations, including: (i) impossibly consistent returns with no down years ever; (ii) Madoff's total equity portfolio liquidation at every quarter and year end; (iii) audits of BLMIS by a small, strip mall accountant and tax preparer; (iv) Madoff's purported trading with unidentified options counterparties; and (v) the lack of, and defects in, independent checks and balances—*i.e.*, lack of internal controls as to the existence of actual assets where Madoff simultaneously served as the adviser, broker, and custodian of the assets.    In addition, Madoff's "commission" structure, whereby he left hundreds of millions, if not billions, of dollars in performance and management fees on the table for others, such as the feeder funds, reminded Savoldelli of other Ponzi schemes.

187.    Upon information and belief, as Merrill Lynch Bank's parent company, MLCI alerted others within the Merrill Companies, including Merrill Lynch Bank, to the results of its due diligence into and internal identification of red flags regarding the Madoff funds.    Moreover, as an affiliate of MLCI, Merrill Lynch Bank is a member the global MLCI organization, and thus received Savoldelli's internal warning bell regarding Madoff.

188.    Sometime before the late 1990s, the highest authorities within MLCI instituted an enterprise-wide practice against the investment of its own money or its clients' money in BLMIS,

either directly or indirectly. MLCI consistently refused to provide leverage to institutional investors seeking to make levered investments in Madoff-related funds through structured products like notes or swaps. MLCI also regularly refused to direct investments to Madoff through, for example, funds of funds or single hedge fund wrap vehicles.

189. Upon information and belief, as Merrill Lynch Bank's parent company, MLCI's highest authorities informed Merrill Lynch Bank of this enterprise-wide practice against Madoff-related investments and the reasons for that practice, as evidenced by the fact that—as individuals like Savoldelli have testified—the Merrill Companies did not lose any money on Madoff.

### b. Merrill Lynch Bank's Affiliate, Merrill International, Also Repeatedly Refused Trades Involving Madoff Exposure

190. Consistent with the anti-Madoff investment policy of the parent company, MLCI, at least one of Merrill Lynch Bank's affiliates, Merrill International, repeatedly refused trades involving Madoff.

191. In December 2006, Merrill International's London-based fund-linked derivatives solutions group was asked to consider a leveraged transaction involving a Madoff Feeder Fund. A Merrill International London desk employee responded as follows:

> [T]he fund is managed by Bernie Madoff, and the brokerage firm behind the fund is Madoff securities. Madoff is known for keeping the source of his returns a secret. This caused a lot of speculation on Wall Street about the true sources of the admittedly impressive returns. Merrill Lynch has repeatedly looked into Fairfield Sentry and other Madoff funds, which all use the same strategy called 'spit [*sic*] strike conversion.' The decision was taken some time ago that Merrill Lynch does not offer any products on these funds.

192. Following the December 2006 inquiry, another Merrill International employee sent a follow-up email confirming Merrill International's anti-Madoff investment policy and providing a May 7, 2001 article from *Barron's* by Erin E. Arvedlund entitled, "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks investors to keep mum," which noted the heavy skepticism

on Wall Street surrounding Madoff, as well as the lack of transparency around the BLMIS investment advisory business because of Madoff's unwillingness to answer basic due diligence questions about his SSC strategy.

193.    In July 2007, a Vice President for Latin America Structured Products from a "Merrill Lynch" entity contacted the Merrill International London desk asking whether Merrill International would be willing to structure a leveraged trade on Sentry and possibly another fund. A Merrill International London desk employee answered promptly: "Both [funds] are related to Madoff. We can't provide leverage on these funds."

194.    In September 2007, a Paris-based Merrill International employee contacted his colleagues on the Merrill International London desk and informed them that a French client was interested in getting a quote on a three times (3x) leverage structured note on Sentry. Within 24 hours, a Merrill International London desk employee informed his French counterpart that Merrill International had no appetite for any portion of Sentry risk and would not quote a price on any structured product with leverage on Sentry.

195.    In February 2008, Merrill International was again asked for a quote for a two times (2x) levered note on Sentry. A Merrill International London desk employee responded as follows: "We receive a lot of requests for leverage on the Madoff Feeder Funds (Fairfield Sentry, Kingate, etc.) but we aren't prepared to quote on that: [i] We don't have a mandate for single manager HF leverage [ii] [and] There is a lack of transparency into the real strategy employed, and lots of rumors around the funds. We're pretty much in line with our competitors on that (no-one is really willing to quote)."

196.    Sometime in the second half of 2008, a hedge fund consultant at Financial Risk Management ("FRM"), an independent hedge fund investment specialist in London, who had

previously worked at Citigroup Global Markets Limited ("CGML") in London, contacted Merrill International's London desk to inquire whether Merrill International was interested in replacing CGML on a total return swap linked to Sentry for a CGML client because CGML wanted out of the trade.  The FRM employee closed his e-mail with "Madoff risk isn't for everyone – happy to discuss other trades that might be though."  The Merrill International trader replied, "I think we are reluctant to take Madoff risk irrespective of the credit environment e.g[.] even if we find committed [total return swap] financing."

197.    After Madoff's fraud was exposed to the rest of the world in December 2008, as discussed in Section F, *infra*, a Merrill International employee summed up Merrill International's awareness of Madoff's illegal conduct to another of his London-based colleagues in a December 12, 2008 email:  "Not a big surprise … but definitely a bad signal for us all."

198.    Later that same day, a different Merrill International London employee echoed that sentiment in an email to two of his London-based colleagues:  "We all knew there was something wrong at Madoff – I guess now our suspicions have been confirmed."

199.    Given Merrill International's awareness of the results of MCLI's due diligence into Madoff, Savoldelli's internal warning bell, and both MCLI and Merrill International's own practices against Madoff investments due to suspicions regarding Madoff's claimed revenues, Merrill International turned a blind eye or was, at the very least, reckless with respect to the fact that the Net Asset Value calculations were inaccurate.

## H.    Citco Did Not Issue Any Certifications Of Net Asset Value In "Good Faith"

200.    Article 11 of the Funds' Articles provides that "[a]ny certificate as to the Net Asset Value per Share … given in good faith by or on behalf of the Directors shall be binding on all parties."  During the relevant period, statements of the Net Asset Value were issued by the Funds' administrators, Citco Fund Services (Europe) B.V. and its delegatee Citco (Canada) Inc. (the

"<u>Administrators</u>"). On April 16, 2014, the Judicial Committee of the Privy Council (the "<u>Privy Council</u>") issued a decision in which it held that certain statements of Net Asset Value, in particular, certain monthly emails, contract notes, and monthly account statements issued by the Administrators, constituted "certificates" for the purposes of Article 11 (the "<u>Certificates</u>"). The Privy Council did not, however, address whether such Certificates were given "in good faith." In carrying out this responsibility, the Administrators and affiliated Citco companies within Citco Group Limited (collectively, "<u>Citco</u>") acted with a lack of good faith in giving the Certificates.

201.    Over the course of fifteen years, in its capacity as service providers to the Funds, Citco reviewed information concerning BLMIS that was not available to the general public, and expressed internal alarm about what that information showed with respect to the likelihood of fraud at BLMIS, but turned a blind eye to the reality reflected in the information and instead proceeded with issuing the Certificates as if there were no problem.

202.    So grave were the Administrators' internal concerns that they expressed doubts—many years before the fraud was made public—that the Funds' assets with BLMIS even existed, with one employee stating "I will not change my [opinion] as long as I [do] not see evidence that the portfolio exists." The Administrators also expressed repeated concern over the fact there was no segregation of duties at BLMIS—*i.e.*, BLMIS (i) had discretion over which investments to make and when to make them, such that BLMIS was de facto investment manager, (ii) had actual custody of the Funds' assets, such that BLMIS was de facto custodian, and (iii) was also the broker. Based upon the proprietary information they reviewed, Citco expressed concern—internally—that BLMIS would be a repeat of the notorious Manhattan Investment Fund fraud of the 1990s "multiplied by a factor of five." Ultimately, unable to resolve their grave concerns, Citco, rather

than withdrawing, ceasing to issue Certificates, or sounding a public alarm, made a corporate decision to continue on as service providers—in exchange for an 800% increase in fees.

### 1.    Citco Expressed Doubt As To Whether the Funds' Assets At BLMIS Even Existed

203.    Beginning in 2000, the Administrators ran into trouble with the basic task of verifying the existence of the Funds' assets with Madoff.  Initially, Citco expressed serious concerns regarding whether the Funds' Treasury bond transactions actually matched those transactions reported by Madoff because of an apparent "rhythm of trading" each month.  The rhythm of trading within Sentry's portfolio appeared too consistent to be true, as the assets included only a limited number of Treasury bonds by each month's end.  At the beginning of each month, Madoff would purchase shares and put options and would sell call options, but, like clockwork, would then liquidate all of Sentry's holdings by the 20th of each month.  Thus the Administrators wanted to check whether the Treasury bonds even existed at all.

204.    The Administrators could not verify the existence of the assets because the Funds' custodians, Citco Bank Nederland N.V. Dublin Branch and Citco Global Custody (the "Custodians"), did not actually hold them.  Instead, Madoff served as his own custodian.  Therefore, the custody statements that the Custodians were supposed to generate based on assets in their possession, were instead merely copied, or "shadow book[ed]," from BLMIS account statements.  The Custodians were "only the custodian[s] on paper, not in reality" and did not place any trades for the Funds.

205.    Management within Citco, including Ruud Bodewes ("Bodewes"), the head of internal audit for all of Citco Group, and Ger Jan Meijer ("Meijer"), the head of internal audit for the Administrators, expressed concern about the operations at BLMIS.  In May 2000, Bodewes expressed his concern to the general counsel and manager of Citco Bank Nederland, as well as

Meijer, that "[w]ith [the] Manhattan [Investment Fund fraud] in the back of our minds, we, as Citco, may very well be in a potential dangerous situation, since we do not seem to have an independent source to verify the information from BLMIS." Indeed, Meijer had raised these concerns to Bodewes weeks earlier, warning that Madoff could be "a Manhattan multiplied by a factor of five."

206.    In addition to warning Bodewes, Meijer also warned Citco Group's Chief Executive Officer, Christopher Smeets ("Smeets") in May 2000 that "[t]o not react or to react too late does indeed mean that investors once again faithfully deposit tens of millions of USD in the Madoff well (for which we do not know if there is a bottom to it) at month's end," with the understanding that Citco could "already be held personally responsible insofar as we have allowed the subscriptions to take place as of May without a fight." Smeets acknowledged receipt of Meijer's emails and concerns. At that time, Meijer emphasized that "with the current knowledge and Citco as asset protector, Citco has a legal obligation to obtain more assurance" of the Funds' assets.

207.    However, in what became a familiar pattern, Citco turned a blind eye to the documents and information in their possession. Citco Group did not address the Administrators' concerns raised in May 2000, and a few months later, Meijer stated: "[i]t seemed that this affair [was] being put on the back burner and hushed."

208.    A year later, Meijer again reiterated his concerns about BLMIS's operations, which "remain[ed] unsolved." Meijer warned that "Citco has a risk exposure of more than USD3 billion" and that "[p]robably there are no options to restore this situation from a worst case scenario." He stated: "I will not change my [opinion] as long as I [do] not see evidence that the portfolio exists." Five months later, in January 2002, the Administrators again emphasized that the issues concerning

59

BLMIS posed severe risks to Citco and the Funds' investors. Meijer told Bodewes: "I have been worried about this situation for 2 years (including the risk to the continued existence of Citco), however the same was not taken seriously by certain gentlemen…. My intuition (combined with the business that I have seen) tells me that things are not right."

209.    In January 2002, Meijer insisted to Bodewes that: "Citco must now seriously take the possibility that everything is really wrong with [the Funds'] account, as well as the possibility that everything will come into view within 2 years…. Personally I think the chance [that something is wrong] is at least 50%." Meijer persisted that there was "still the opportunity to more or less direct the whole process, and search out the best way out with the help of good lawyers (legal contingency plan). Otherwise you run the risk that the scene will later be determined by others." However, in response Citco Group's management, and Bodewes in particular, failed to undertake a meaningful investigation into Meijer's doubts regarding the existence of the Funds' assets, and instead continued acting as a service provider for the Funds for over six more years.

210.    In fact, multiple members of the Administrator's management tried to prevent Meijer from asking questions. John Verhooren ("Verhooren"), a member of Citco's administration services management team, actually knew that Meijer had raised concerns about the existence of the Funds' assets for years, but deliberately ignored those concerns. For example, in May 2000, Verhooren acknowledged that the lack of segregation of duties and trading patterns at Madoff were not new discoveries, and many people at Citco had already recognized these phenomena. Later, in response to concerns raised in 2001, Verhooren again rebuffed Meijer's insistence that Citco was facing "an enormous risk exposure." Instead, Verhooren told Meijer to stop raising the issue and claimed that Citco would try to meet with Madoff to investigate. However, neither Verhooren

nor any member of the Administrator's staff ever gained sufficient evidence that the Funds' assets existed from Madoff.

### 2.    Citco Failed To Obtain Evidence Of the Existence Of The Funds' Assets

211.    Citco not only expressed internal concern regarding whether the Funds' assets with BLMIS even existed—it knew that BLMIS would not confirm their existence for Citco as the Funds' service providers.

212.    The Administrators' audit reports designated Sentry as a non-compliant fund on their "watch list" as a result of the lack of segregation of duties at BLMIS. Each year from 2000 through 2006, the Administrators recommended that Citco either confirm the existence of the Funds' assets held by BLMIS or resign as service providers. On three occasions between May 2000 and December 2002, Citco attempted to verify the existence of the Funds' assets at BLMIS. All attempts failed.

213.    In May 2000, Citco set up a meeting with Madoff to gain "independent confirmation of the[] existence" of the Funds' assets, particularly the Treasury bills, and to determine how Madoff derived share prices from the markets. However, this effort failed. BLMIS did not verify the existence of the assets, and Citco concluded internally that the meeting had not provided "a full disclosure of [the] assignment."

214.    In July 2001, Bodewes had attempted to assess the concerns raised by Meijer in an internal due diligence memorandum. However, Bodewes's due diligence was limited to a review of Citco's proprietary documents because Citco was concerned that permitting "an on-site audit at [BLMIS] premises may hurt the relationship with [the Fund], resulting in a possible loss of [a] USD 1.5 million dollar fee income." Even so, based on the documents and information in Citco's possession, Bodewes shared Meijer's concerns about BLMIS's operations, and concluded that losses at BLMIS could be hidden, leaving Citco ultimately liable to the Funds' shareholders.

61

Bodewes also noted that the two-man audit firm used by BLMIS did not "match up" with the size of BLMIS's business. Indeed, multiple Administrator employees acknowledged that the small size of Madoff's accounting firm posed a risk, given that the size of the firm was not large enough to audit the amount of assets purportedly managed by BLMIS.

215.    Smeets, Citco Group's CEO, received Bodewes' memo regarding the issues at BLMIS, including the issues posed by the size of Madoff's audit firm. Citco Group's management responded that they would like to "work this out" with Madoff, but never met with him in 2001.

216.    By an email dated February 6, 2002, Ermanno Unternaehrer ("Unternaehrer") of Citco Group stated that Citco wanted evidence the T Bills existed. In December 2002, Citco once again "attempt[ed] to get conclusive proof" from Madoff that Sentry's portfolio was in BLMIS custody and to have "Madoff … provide evidence of the existence/custody of the positions." Before the meeting, Meijer directed a member of the internal audit group at Citco to "[p]roperly record what you have done and what you have not been able to determine…. It is a troublesome task insofar as Madoff is not known for his openness." However, the meeting did not include any meaningful discussion with Madoff regarding the holdings purported to be in his custody. The employee, Albert van Nijen, reported back that the Administrators' "mission" to increase "Citco's comfort level with respect to the existence of the assets in relation to [Citco's] responsibilities as Custodian[s]" had again failed. On December 27, 2002 Bodewes reported to the executive committee of Citco Group that as long as the position of Sentry with BLMIS was not independently verified "there will be doubts."

217.    After Citco's third failed attempt, Citco never again tried to gain evidence from Madoff that the Funds' assets existed until his fraud was ultimately exposed in December 2008. In addition, Meijer noted that "Madoff [was] no[t] known" to Citco's external traders, even though

his investment strategy required selling major quantities of call options each month.  In an email to Bodewes, Meijer stated, "I visited the Madoff website…. According to the investment policy, the fund needs to sell major quantities of call options on the market each month.  I absolutely do not trust it!!!!"

218.    Meanwhile, through the entire period, Citco continued to issue the Certificates.

**3.    Citco Negotiated For Higher Fees As Reimbursement For The "Risks" Of Doing Business With Madoff**

219.    Facing grave concerns regarding the Funds' assets placed with BLMIS, Citco put its financial interests ahead of its duties to the Funds and the Funds' investors.

220.    By 2002, Citco knew that the Funds' holdings could not be verified, knew that BLMIS cleared its own trades, and knew that Citco's efforts to reconcile Madoff's operations had failed.  That year, Citco's executive committee put credit line requests from the Funds "on hold until … the 'investigation' on Fairfield" was complete, because Citco was concerned about its exposure to liabilities well beyond the loans in the case of fraud.  Smeets and Citco's management were aware that the credit line requests were on hold while Citco tried to "get as much comfort as possible" that BLMIS was not a fraud.

221.    Two years later, in February and March 2004, the Custodian decided to cancel one of its credit facilities with Sentry following its discovery that AIG had pulled its investments from BLMIS altogether.  Specifically, the Administrator's management, including Meijer, Verhooren, and William Keunen—who was responsible for the entire division of administration services at Citco—found out that "the risk team of AIG took the decision to get out from all Madoff exposure … [t]hey are scared with the structure …."  It appears that at least some Citco Group management wanted the Custodian to resign:  by an email of February 6, 2004, Keunen informed the Administrator that Unternaehrer of Citco Group had decided the Custodian should step down

as custodian.  At this time, Smeets was kept informed and aware of Citco's concerns regarding AIG's withdrawal from Madoff.  A few months later, in or about September 2004, Citco's board of directors made the decision to place the Custodians' and Administrators' business with the Funds "under scrutiny" and "to close down all credit relationships … to decrease [Citco's] exposure."  Citco knew that its credit relationship with the Funds would expose it to liability because of BLMIS's role as custodian, among other reasons.

222.    By 2006, Citco considered resigning as service providers.  The Custodians told Citco Group's management, including Smeets:  "We are taking a risk and we only get US$60K per year!"

223.    Instead, Citco negotiated a new fee arrangement. The new arrangement calculated the Custodians' rate as one basis point (one hundredth of one percent) of the Funds' total Net Asset Value.  In other words, Citco's fees for the Custodians' services were now directly tied to the Net Asset Value as determined by the Administrators.  Citco decided "[o]n that basis" to stay on as Custodians because Sentry's Net Asset Value at that time, based principally on the assets purportedly at BLMIS, was approximately "$5bn, i.e., fees of $500k."

224.    Simply put, Citco accepted dramatically higher fees—tied directly to the Net Asset Value certified by Citco—in exchange for the risks to Citco of doing business with BLMIS, as well as its continued silence regarding BLMIS's role as custodian of the Funds' assets.  Ultimately, Citco's fees increased by 800%.

225.    Internally, Citco knew that:  (i) the Administrators did not consistently price the Funds' portfolios independently and typically relied exclusively on the share pricing information supplied by Madoff; and (ii) the Custodians did not have custody of the Funds' portfolios.

226.    Citco failed to verify the pricing information for the Funds' portfolio from independent sources and instead relied on BLMIS statements, even though it knew that such account statements contained incorrect information.  Accountants working for the Administrators discovered on numerous occasions that the trades reported by BLMIS contradicted the public daily price ranges for corresponding trades.  When the Administrators' personnel discovered that the reported share or option prices reported by Bloomberg and Madoff differed, they used the public price in calculating the Net Asset Value reflected in the Certificates.  Citco thus turned a blind eye to its knowledge that BLMIS issued account statements with incorrect pricing information.

227.    Citco acted with a lack of good faith by issuing Certificates in spite of its knowledge that:  (1) BLMIS's transactions were likely impossible, given its awareness that "Madoff always [knew] precisely when to buy and sell"; (2) Madoff was the only broker-dealer Citco worked with that provided settlement date transaction confirmations only, rather than trade date confirmations; and (3) Madoff insisted that Citco book all trades for the Funds manually, rather than through automated or electronic means, which directly contradicted Citco's own "policy to set up [electronic] reconciliation programs for each fund and to avoid manual entries as much as possible," and, within its own records, "there [were] differences between the custody statements of Citco Bank and Madoff that [were] not being analyzed" by Citco.

228.    This lack of good faith permeated the entire Citco organization.  Until 2008, the Administrators and the Custodians worked hand-in-hand with multiple other "Citco" entities to generate the Certificates for the Funds and served as the intermediaries for all subscription funds invested by Defendants under the Subscription Agreements.  Under Citco Group's direction and control, the Administrators issued Certificates without good faith and with willful blindness to the fact that they could not confirm whether the Funds' assets actually existed.

229.    From the top down, Citco saw and appreciated, but consciously disregarded, the risks to the Funds' investors posed by Madoff's operations.  The Administrators and all other "Citco" subsidiaries served at the whim of Citco Group, which controlled the day-to-day operations of the Administrators and the issuance of Certificates showing an inaccurate and inflated Net Asset Value under the Administration Agreements (as amended from time to time) with the Funds.  Irrespective of which "Citco" entity the Funds' engaged, at all relevant times the Funds' were provided services from and on behalf of "Citco" as a whole from at least eight separate entities, including: Citco Group; Citco Global Custody NV; Citco Global Custody (NA) NV; CGC (NA); Citco Fund Services (BVI); Citco Fund Services (Europe) B.V.; Citco (Canada) Inc.; and Citco Global Security Services.

230.    By virtue of the foregoing conduct, Citco issued the Certificates without good faith. The Funds were the primary victims of Citco's conduct and its lack of good faith in issuing the Certificates.

## I.    Exposure Of Madoff's Fraud

231.    On December 11, 2008, federal agents arrested Madoff for violation of federal securities laws.  On that same day, the United States Attorney brought criminal charges against Madoff, alleging that Madoff ran a multibillion-dollar Ponzi scheme.  *See United States v. Madoff*, No. 08-mj-2735 (S.D.N.Y., filed Dec. 11, 2008).  Upon arrest, Madoff was reported to have told the agents that "there is no innocent explanation" for the fraudulent scheme he had orchestrated and confessed that he "paid investors with money that wasn't there."

232.    On December 11, 2008, the United States Securities and Exchange Commission ("SEC") filed an emergency action in the Southern District of New York to halt ongoing fraudulent offerings of securities and investment advisory fraud by Madoff and BLMIS.  *See SEC v. Madoff*, No. 08-cv-10791 (S.D.N.Y. filed Dec. 11, 2008). On February 9, 2009, the SEC submitted to the

Court a proposed partial judgment, to which Madoff consented, imposing a permanent injunction

and continuing relief against him, including a permanent freezing of his assets.

233.    In March 2009, Madoff pleaded guilty to the criminal charges brought against him.

In his plea allocution, Madoff confessed: "for many years up until my arrest on December 11,

2008, I operated a Ponzi scheme through the investment advisory side of my business, Bernard L.

Madoff Securities LLC."  As Madoff himself described how the scheme worked:

> The essence of my scheme was that I represented to clients and prospective clients
> who wished to open investment advisory and individual trading accounts with me
> that I would invest their money in shares of common stock, options and other
> securities of large well-known corporations, and upon request, would return to them
> their profits and principal.  Those representations were false because for many years
> up and until I was arrested on December 11, 2008, I never invested those funds in
> the securities, as I had promised.  Instead, those funds were deposited in a bank
> account at Chase Manhattan Bank.  When clients wished to receive the profits they
> believed they had earned with me or to redeem their principal, I used the money in
> the Chase Manhattan bank account that belonged to them or other clients to pay the
> requested funds.

234.    Madoff further confessed to covering up his fraud by fabricating false trade

confirmation and account statements:

> To further cover-up the fact that I had not executed trades on behalf of my
> investment advisory clients, I knowingly caused false trading confirmations and
> client account statements that reflected the bogus transactions and positions to be
> created and sent to clients purportedly involved in the split strike conversion
> strategy, as well as other individual clients I defrauded who believed they had
> invested in securities through me. The clients receiving trade confirmations and
> account statements had no way of knowing by reviewing these documents that I
> had never engaged in the transactions represented on the statements and
> confirmations.

235.    Madoff was sentenced to 150 years in federal prison.  He died in prison on April 14,

2021.

## J.    The Funds' Estates In Liquidation

236.    Following the revelation of Madoff's fraud, the Funds' boards of directors

suspended any further redemptions of Shares and the calculation of the Funds' Net Asset Values.

As of December 2008, and presently, Sentry, Sigma, and Lambda had, respectively, approximately 4.7 million, 3.9 million, and 0.2 million shares outstanding.

237.    In 2009, the Funds were put into liquidation proceedings in the BVI.

238.    On February 27, 2009, a secured creditor of Lambda commenced proceedings in the BVI Court pursuant to the BVI Insolvency Act seeking the appointment of a liquidator over Lambda (the "Lambda Proceeding").  The Lambda Proceeding is pending in the BVI Court as claim number BVIHC(COM)2009/74.

239.    On April 21, 2009, ten shareholders applied to the BVI Court for the appointment of a liquidator over Sentry (the "Sentry Proceeding").  The Sentry Proceeding is pending in the BVI Court under claim number BVIHC(COM)2009/136.

240.    On April 23, 2009, a shareholder applied to the BVI Court for the appointment of a liquidator over Sigma (the "Sigma Proceeding" and collectively with the Lambda Proceeding and the Sentry Proceeding, the "BVI Liquidation Proceedings").  The Sigma Proceeding is pending in the BVI Court under claim number BVIHC(COM)2009/139.

241.    As alleged above, the BVI Court issued orders—the BVI Appointment Orders— appointing the Foreign Representatives as liquidators of the Funds.  Pursuant to the BVI Appointment Orders, the Foreign Representatives are responsible for all aspects of the Funds' business, including protecting, realizing, and distributing assets for the Funds' estates.

242.    The Redemption Payments that were made to Defendants were mistaken payments and constituted or formed part of avoidable transactions, and generally represent assets of Sentry's estate that Defendants are not entitled to keep.

**FIRST CLAIM**
*(Constructive Trust - Against all Defendants)*

243.    Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 242 above as if set forth herein.

244.    In this Court's December 6, 2018 Memorandum Decision, the Foreign Representatives were "granted leave to amend to assert constructive trust claims against Knowledge Defendants." *In re Fairfield Sentry Ltd.*, No. 10-ap-03496 (CGM), 596 B.R. 275, 316 (Bankr. S.D.N.Y. 2018) (Dkt. 1743 at 65).  The Court clarified that the Foreign Representatives could establish a constructive trust with respect to "the Knowledge Defendants that received redemption payments with the knowledge that the NAV was wrong."  *Id*. at 301 (Dkt. 1743 at 38). The Court further recognized that "[u]nder BVI law, lack of good faith, *i.e.* bad faith, includes wrongdoing by one who acts recklessly as well as one who acts with actual knowledge that he is acting wrongfully or willfully blinds himself to that fact."  *Id*. at 293 (Dkt. 1743 at 23–24).

245.    As detailed above, upon receipt of a redemption request, Sentry made each of the Redemption Payments to Zurich Capital.  The Redemption Payments generally represented the proceeds arising from what the world now knows was Madoff's Ponzi scheme.  Accordingly, these Redemption Payments did not, as Sentry mistakenly believed, represent the proceeds arising from the profitability of or continued investment in BLMIS.

246.    Instead, the Redemption Payments were based on a miscalculated and inflated Net Asset Value, which caused those Redemption Payments to be in excess of the Net Asset Value of redeemed Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

247.    At the time of the Redemption Payments, Zurich Capital had knowledge of the Madoff fraud, and therefore knowledge that the Net Asset Value was inflated.  Upon information and belief, from at least July 2003, Zurich Capital was aware of multiple indicia of fraud conveyed to it by SocGen in the course of negotiations over the latter's decision not to purchase certain assets of Zurich Capital, including a credit facility to a fund wholly invested in BLMIS.

248.    Upon information and belief, in the course of conducting due diligence for those assets, SocGen became aware of various red flags that led it to believe that BLMIS was a fraud, and, therefore, that the Net Asset Value could not be accurate.

249.    Upon information and belief, SocGen shared those concerns with Zurich Capital when it declined to move forward with the purchase.

250.    Accordingly, at all relevant times, Zurich Capital had actual knowledge of, was willfully blind to, or recklessly disregarded the fact that the NAV was inflated when it received the Redemption Payments.

251.    Upon information and belief, Zurich Capital may have paid some or all of the Redemption Payments it received to the Beneficial Shareholders.  At all relevant times, the Beneficial Shareholders, including specifically but not limited to Citibank (Switzerland) Zurich, HSBC Bank USA, and Merrill Lynch Bank, had actual knowledge of, was willfully blind to, or recklessly disregarded the fact that the NAV was inflated when they received the Redemption Payments.

252.    By reason of their receipt of some or all of the Redemption Payments, Defendants have been unjustly enriched to the detriment of Sentry and other shareholders and creditors of Sentry.

253.    Furthermore, Defendants were not entitled to receive the Redemption Payments because the amounts transferred with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payments received by Zurich Capital for its redemption of Shares to be in excess of the Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

254.    It would offend principles of equity and good conscience to permit Defendants to retain the Redemption Payments.

255.    By reason of the foregoing, a constructive trust should be imposed on the Redemption Payments that were received by Defendants from Sentry for the benefit of the Foreign Representatives and Sentry and other shareholders and creditors of Sentry.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request the following relief:

A.    On the First Claim, imposition of a constructive trust on Redemption Payments;

B.    Awarding Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees and accountants' and experts' fees, costs and expenses; and

C.    Granting Plaintiffs such other and further relief as the Court deems just and proper.

Dated: New York, New York
       May 14, 2021

SELENDY & GAY PLLC

By:  */s/ David Elsberg*

David Elsberg
Andrew Dunlap
Lena Konanova
Jordan Garman
Ester Murdukhayeva
Ron Krock
1290 Avenue of the Americas

71

New York, NY 10104
Telephone: 212-390-9000
E-mail: delsberg@selendygay.com

E-mail:  adunlap@selendygay.com
E-mail: lkonanova@selendygay.com
E-mail: jgarman@selendygay.com
E-mail: emurdukhayeva@selendygay.com
E-mail: rkrock@selendygay.com

-and-

**BROWN RUDNICK LLP**
David J. Molton
Marek P. Krzyzowski
Seven Times Square
New York, New York 10036
Telephone: 212-209-4800
Facsimile: 212-209-4801
E-mail: dmolton@brownrudnick.com
E-mail: mkrzyzowski@brownrudnick.com

*Attorneys for the Foreign Representatives*

# EXHIBIT A

*Redemption Payments Received by Defendants from Sentry*
*From April 24, 2004 Through August 14, 2006*

| **Payment Date** | **Redemption Payment** | **Number of Shares** | **Bank Account To Which Redemption Payment Was Made, Per Shareholder Direction[+]** |
|---|---|---|---|
| April 21, 2004 | $50,000.00 | 51.43 | Citibank NA, New York |
| June 17, 2004 | $110,000.00 | 111.91 | Citibank NA, New York |
| July 16, 2004 | $200,000.00 | 200.90 | Citibank NA, New York |
| August 13, 2004 | $120,000.00 | 120.44 | Citibank NA, New York |
| December 13, 2004 | $90,000.00 | 87.96 | Citibank NA, New York |
| January 14, 2005 | $50,000.00 | 48.75 | Citibank NA, New York |
| February 16, 2005 | $110,000.00 | 106.71 | Citibank NA, New York |
| March 15, 2005 | $70,000.00 | 67.66 | Citibank NA, New York |
| April 14, 2005 | $780,000.00 | 747.52 | Citibank NA, New York |
| May 13, 2005 | $50,000.00 | 47.85 | Citibank NA, New York |
| June 15, 2005 | $700,000.00 | 665.73 | Citibank NA, New York |
| July 15, 2005 | $660,000.00 | 624.79 | Citibank NA, New York |
| August 15, 2005 | $250,000.00 | 236.35 | Citibank NA, New York |
| September 15, 2005 | $250,000.00 | 235.97 | Citibank NA, New York |
| October 14, 2005 | $750,000.00 | 701.68 | Citibank NA, New York |
| November 17, 2005 | $800,000.00 | 736.63 | Citibank NA, New York |
| December 19, 2005 | $475,000.00 | 434.11 | Citibank NA, New York |
| January 19, 2006 | $325,000.00 | 295.43 | Citibank NA, New York |
| April 20, 2006 | $2,073,208.93 | 1,843.76 | Citibank NA, New York |
| June 16, 2006 | $2,110,587.19 | 1,846.49 | Citibank NA, New York |

*Redemption Payments Received by Defendants from Sentry*
*From April 24, 2004 Through August 14, 2006*

| Payment Date | Redemption Payment | Number of Shares | Bank Account To Which Redemption Payment Was Made, Per Shareholder Direction[+] |
|---|---|---|---|
| August 14, 2006 | $1,674,587.61 | 1,442.28 | Citibank NA, New York |
| August 14, 2006 | $3,444,371.32 | 2,966.55 | Citibank NA, New York |

[+] Whether or not Redemption Payments were ultimately directed to bank accounts in the United States, all Redemption Payments from Sentry went through a correspondent bank account that Sentry's administrator maintained in the United States, and to the extent that any such Redemption Payments were directed outside the United States, they went through a correspondent bank account in the United States identified by shareholders for such payments.