**SELENDY & GAY PLLC**

1290 Avenue of the Americas
New York, NY 10104
David Elsberg
Andrew Dunlap
Lena Konanova
Jordan Garman
Ester Murdukhayeva
Ron Krock
212-390-9000

-and-

**BROWN RUDNICK LLP**

Seven Times Square
New York, New York 10036
David J. Molton
Marek P. Krzyzowski
212-209-4800

*Attorneys for the Foreign Representatives*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 Case |
| FAIRFIELD SENTRY LIMITED, et al., | Case No. 10-13164 (CGM) |
| Debtors in Foreign Proceedings. | Jointly Administered |
| FAIRFIELD SENTRY LIMITED (IN LIQUIDATION), et al., | |
| Plaintiffs, | Adv. Pro. No. 10-03496 (CGM) |
| -against- | Administratively Consolidated |
| THEODOOR GGC AMSTERDAM, et al., | |
| Defendants. | |
| FAIRFIELD SENTRY LIMITED (IN LIQUIDATION) and FAIRFIELD SIGMA LIMITED (IN LIQUIDATION), acting by and through the Foreign Representatives thereof, and | |

KENNETH KRYS and GREIG MITCHELL, solely in their
capacities as Foreign Representatives and Liquidators thereof,

Plaintiffs,

-against-

ABN AMRO SCHWEIZ AG a/k/a ABN AMRO
(SWITZERLAND) AG, ADLER AND CO PRIVATBANK
AG, ALLIANZBANK SPA/UNIFORTUNE
CONSERVATIVE SIDE POCKET, ALTERNATIVE
INVESTMENT STRATEGIES, BANCA ARNER SA,
BANCA UNIONE DI CREDITO, BANK HAPOALIM
SWITZERLAND LTD., BANK JULIUS BAER & CO.
LTD., BANK SARASIN & CIE, BANQUE CANTONALE
VAUDOISE, BANQUE CRAMER & CIE SA, BBVA
(SUISSE) SA, BCV AMC DEFENSIVE AL FUND, BNP
PARIBAS (SUISSE) SA, BNP PARIBAS (SUISSE) SA EX
FORTIS, BNP PARIBAS (SUISSE) SA PRIVATE, BSI AG,
BSI EX BANCA DEL GOTTARDO, CACEIS BANK
LUXEMBOURG, CBB (BVI)/ THE ALKIMA FUND, CBT
GEMS LOW VOL REG, COMPAGNIE BANCAIRE
HELVETIQUE, CENTRUM BANK AG (AMS),
CLARIDEN LEU LTD., CORNER BANCA SA, CREDIT
SUISSE AG ZURICH, DEXIA BANQUE
INTERNATIONAL A LUXEMBOURG, DRESDNER
BANK SCHWEIZ, EFG BANK SA SWITZERLAND, EFG
EUROFINANCIER D'INVEST MCL, ENDURANCE
ABSOLUTE LTD. MASTER, FAIRFIELD INVESTMENT
GCI, FAIRFIELD INVESTMENT FUND LTD., FALCON
PRIVATE BANK, FIF ADVANCED LTD., FINTER BANK
ZURICH, HARMONY CAPITAL FUND LTD., HSBC,
IHAG HANDELSBANK AG, INCORE BANK AG,
KARASEL ENHANCED PORTFOLIO, KARLA
MULTISTRATEGIES LTD., LGT BANK IN
LIECHTENSTEIN AG, LIECHTENSTEINISCHE LB
REINVEST AMS, LLOYDS TSB BANK GENEVA,
LOMBARD ODIER DARIER HENTSCH & CIE,
LONGBOAT LTD., MASTER CAPITAL AND HEDGE
FUND, NATIONAL BANK OF KUWAIT, NBK BANQUE
PRIVEE SUISSE SA, PICTET & CIE, PKB PRIVATBANK
AG, QUASAR FUNDS SPC a/k/a QUASAR FUND SPC
CLASS A AND CLASS B CGCNV, RBC DEXIA
INVESTOR SERVICE JULIUS BAER SICAV, RBS
COUTTS BANK LTD., RICHOURT AAA
MULTISTRATEGIES, ROTHSCHILD BANK AG ZURICH
(DUBLIN) a/k/a ROTHSCHILD BANK AG, ROTHSCHILD

Adv. Pro. No. 10-03635
(CGM)

**FIFTH AMENDED
COMPLAINT**

BANK GENEVA (DUBLIN), ROTHSCHILD LUGANO
DUBLIN a/k/a BANCA PRIVATA EDMOND DE
ROTHSCHILD LUGANO S.A.,  EDMOND DE
ROTHSCHILD (SUISSE) S.A., SIS
SEEGANINTERSETTLE, SIX SIS LTD., SOCIETE
GENERALE BANK & TRUST, SOUNDVIEW FUND,
SWISSCANTO FD CENTRE CLIENTS A/C, T1 GLOBAL
FUND LTD., UBS AG NEW YORK, UBS AG ZURICH,
UBS JERSEY NOMINEES, VERWALTUNGS UND
PRIVAT-BANK AG AKTIENGESELLSCHAFT (AMS),
VORARLBERGER LANDES UND HYPOTHEKENBANK
AKTIENGESELLSCHAFT and BENEFICIAL OWNERS
OF ACCOUNTS HELD IN THE NAME OF CGC NA 1-
1000,

                    Defendants.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

JURISDICTION AND VENUE ..............................................................................................7

PARTIES ...............................................................................................................................10

    A.    Plaintiffs ..............................................................................................................10

    B.    Defendants ..........................................................................................................13

The Relationship Between The Defendants And The Citco Subscribers .....................30

The Relationship Between The Citco Record Subscriber And The Citco Banks.........33

NOTICE PURSUANT TO FED. R. CIV. P. 44.1 ...............................................................35

FACTUAL ALLEGATIONS ................................................................................................35

    A.    Role Of Feeder Funds In Madoff Fraud ..........................................................35

    B.    Calculation Of Net Asset Value And Shareholder Redemption Payments ..........36

    C.    Redemption Payments Made Or Transferred To Defendants................................39

    D.    Citco Did Not Issue Any Certifications Of Net Asset Value In "Good Faith"...................................................................................................................40

        1.    Citco Expressed Doubt As To Whether the Funds' Assets At BLMIS Even Existed ...............................................................................41

        2.    Citco Failed To Obtain Evidence Of The Existence Of The Funds' Assets ...................................................................................................44

        3.    Citco Negotiated For Higher Fees As Reimbursement For The "Risks" Of Doing Business With Madoff..................................................47

    E.    The Citco Record Subscriber And The Citco Banks Knew Of, Were Willfully Blind To Or Recklessly Disregarded The BLMIS Fraud......................50

    F.    Exposure Of Madoff's Fraud .............................................................................57

    G.    The Funds' Estates In Liquidation .....................................................................59

FIRST CLAIM.....................................................................................................................60

PRAYER FOR RELIEF ......................................................................................................62

Fairfield Sentry Limited ("Sentry") and Fairfield Sigma Limited ("Sigma"), by and through

Kenneth Krys and Greig Mitchell (together with their predecessors, the "Foreign Representatives"

or "Liquidators"), and Kenneth Krys and Greig Mitchell (together with Sentry and Sigma, the

"Plaintiffs"), solely in their capacities as the Liquidators of Sentry and Sigma and the Foreign

Representatives of the liquidation proceedings involving Sentry, Sigma, and Fairfield Lambda

Limited ("Lambda," together with Sentry and Sigma, the "Funds" or the "Debtors") pending

before the Commercial Division of the Eastern Caribbean High Court of Justice, British Virgin

Islands (the "BVI Court"), for their complaint against Defendants, as defined herein, allege the

following based on personal knowledge or information derived from the Funds' books and records

or from other sources, including, *inter alia*, court filings and statements of governmental agencies

and other parties.

## PRELIMINARY STATEMENT

1.      This adversary proceeding, which arises out of a now decade-long effort to recoup

assets for the victims of the largest Ponzi scheme in history, seeks recovery of more than $51

million improperly received by the above-captioned Defendants, as defined below.

2.      Defendants invested, through various entities—namely, the "Citco Subscribers," as

defined herein, which were associated with Citco Group Limited and affiliates (collectively,

"Citco")—in so-called "feeder funds," which channeled private investments into managed

accounts with Bernard L. Madoff and his now-infamous brokerage business, Bernard L. Madoff

Securities LLC ("BLMIS").

3.      The Madoff scheme worked seamlessly for decades, apparently netting

shareholders handsome returns that far exceeded the market.

4.      Once BLMIS imploded, however, the world learned what some in the investing

community, including senior management at Citco, had long turned a blind eye to:  that the

payments investors received from the feeder funds in exchange for the redemption of shares were massively overvalued. In fact, they were non-existent.

5.      The feeder funds, like the Funds in this case, were essential to the perpetration of Madoff's scheme. From their inception until the revelation of Madoff's fraud in December 2008, during most relevant times, the Funds sought out new investment through the sale of shares to investors and transferred (either directly in the case of Sentry or indirectly, through Sentry, in the cases of Sigma and Lambda) substantially all the proceeds of those sales, net of fees and expenses, to BLMIS for investment in accounts managed by Madoff.

6.      However, instead of using investor proceeds collected by the Funds to purchase securities and other investments, BLMIS used those contributions to service the redemption requests of other investors, enriching Madoff and his associates in the process.

7.      The investors lucky enough to redeem their shares in the Funds before the collapse of the Ponzi scheme received payments ("Redemption Payments") at a grossly inflated "Net Asset Value" (or "NAV")—the price determined by dividing the value of the respective assets of Sentry, Sigma, and Lambda by the number of shares outstanding in each Fund. Defendants are such investors.

8.      Between April 20, 2004 and November 19, 2008, following the receipt by Sentry and Sigma of notices of redemption, Sentry and Sigma made Redemption Payments to accounts held in the name of CGC NA (the "Citco Record Subscriber") aggregating USD $51,929,665.41. As set forth herein, in connection with, *inter alia*, Defendants' desire to invest in the Funds through Citco as described herein, (1) the Defendants hereto, (2) the Citco Record Subscriber and (3) the Citco Bank Nederland N.V., Citco Bank Nederland N.V. Dublin Branch (a wholly owned subsidiary of Citco Bank Nederland N.V.) or the Citco Banking Corporation N.V. (all of which

banks were affiliates of each other, the Citco Record Subscriber and all other Citco entities referred to herein; collectively, the "Citco Banks") entered Brokerage and Custody Agreements (the "B&C Agreements").  With respect to the B&C Agreements, at all relevant times (1) the Citco Record Subscriber acted as, *inter alia*, an agent of and nominee for the Citco Banks with respect to subscriptions and investments in the Funds for the benefit of Defendants, (2) both the Citco Record Subscriber and the Citco Banks (collectively, the "Citco Subscribers") were agents of the Defendants with respect to the B&C Agreements and investments in the Funds for the benefit of Defendants.  At the time CGC NA received these payments, Citco had already uncovered multiple indicia that Madoff was engaged in some form of fraud.  But rather than confront the facts before it, Citco turned a blind eye, accepting millions of dollars while willfully ignoring or, at the very least, recklessly disregarding the truth in clear violation of the law of the British Virgin Islands (or "BVI").

9.      Citco's and the Citco Subscribers' knowledge of BLMIS-related risks and concerns stemmed from their dual role as fund service providers, and included an acknowledgement of a lack of independent confirmation that BLMIS-held assets even existed, and Citco employees' expressed suspicions of BLMIS practices, like its apparent lack of segregation of duties and employment of an implausibly small auditing firm.  The head of internal audit for Citco reported to Citco's executive committee that as long as the position of Sentry with BLMIS was not independently verified, "***there will be doubts***."

10.     Yet time and time again, Citco turned a blind eye to the widespread red flags, with one Citco entity executive explaining that BLMIS was "***an important client, so we had to accommodate them***," and another telling the head of two Citco entities' internal audit, when raising concerns, "***it's not your business***."  After three failed attempts to verify that the BLMIS-

held assets existed, Citco considered resigning from its role as fund custodian, but instead quietly

reduced its own exposure to BLMIS and negotiated a drastic fee increase in relation to its custodian

role to offset its risk.

11.     At all times, there was a free flow of information between all Citco entities,

including the Citco Banks, the Citco Record Subscriber, and the Citco Group, with the Citco Banks

and Citco Record Subscriber as wholly-owned subsidiaries of the Citco Group and all Citco

entities working under the direction of Citco's Chief Executive Officer and executive committee.

12.     At all relevant times, Citco and the Citco Subscribers knew that the Redemption

Payments did not, as Sentry and Sigma intended, represent the proceeds arising from the

profitability of or continued investment in BLMIS.  Instead, any amounts obtained directly or

indirectly by Sentry and Sigma from BLMIS to make Redemption Payments to the Citco

Subscribers generally were proceeds of Madoff's Ponzi scheme, obtained from other BLMIS

investors or other Sentry investors invested in BLMIS.

13.     Accordingly, the Funds' actual assets are, and at relevant times were, far less than

the amount needed to satisfy their liabilities and the claims that have been or may be asserted

against them.  At all relevant times, the Funds were unable to pay their debts as they fell or would

fall due.  Specifically, at the time the Redemptions Payments were made, the Funds had insufficient

assets from which to pay debts as they fell or would fall due.  The Funds have been unable to

satisfy their debts to BLMIS customers, the BLMIS Trustee (as defined below), and other creditors

of the Funds, and have further increased the amount of those liabilities.

14.     As a result, the Funds were placed into liquidation by the BVI courts and the

Foreign Representatives were appointed, and thereafter commenced ancillary proceedings in this

Court pursuant to Chapter 15 of the Bankruptcy Code to recover improper Redemption Payments received by the Funds' investors.

15.    Upon information and belief, the Citco Subscribers have either retained the Redemption Payments made to them by Sentry and Sigma for their own accounts and benefit or, alternatively, paid all or some portion of such Redemption Payments to or for the account of persons or entities, including, but not limited to, ABN AMRO Schweiz AG a/k/a ABN AMRO Switzerland AG, Adler and Co Privatbank AG, Allianzbank SPA/Unifortune Conservative Side Pocket, Alternative Investment Strategies, Banca Arner SA, Banca Unione Di Credito, Bank Hapoalim Switzerland Ltd., Bank Julius Baer & Co. Ltd., Bank Sarasin & CIE, Banque Cantonale Vaudoise, Banque Cramer & CIE SA, BBVA (Suisse) SA, BCV AMC Defensive AL Fund, BNP Paribas (Suisse) SA, BNP Paribas (Suisse) SA Ex Fortis, BNP Paribas (Suisse) SA Private, BSI AG, BSI Ex Banca Del Gottardo, Caceis Bank Luxembourg, CBB (BVI)/ The Alkima Fund, CBT Gems Low Vol Reg, Compagnie Bancaire Helvetique, Centrum Bank AG (AMS), Clariden Leu Ltd., Corner Banca SA, Credit Suisse AG Zurich, Dexia Banque International A Luxembourg, Dresdner Bank Schweiz, EFG Bank SA Switzerland, EFG Eurofinancier D'Invest MCL, Endurance Absolute Ltd. Master, Fairfield Investment GCI, Fairfield Investment Fund Ltd., Falcon Private Bank, FIF Advanced Ltd., Finter Bank Zurich, Harmony Capital Fund Ltd., HSBC, IHAG Handelsbank AG, Incore Bank AG, Karasel Enhanced Portfolio, Karla Multistrategies Ltd., LGT Bank In Liechtenstein AG, Liechtensteinische LB Reinvest AMS, Lloyds TSB Bank Geneva, Lombard Odier Darier Hentsch & CIE, Longboat Ltd., Master Capital and Hedge Fund, National Bank of Kuwait, NBK Banque Privee Suisse SA, Pictet & CIE, PKB Privatbank AG, Quasar Funds SPC a/k/a Quasar Fund SPC Class A and Class B CGCNV, RBC Dexia Investor Service Julius Baer SICAV, RBS Coutts Bank Ltd., Richcourt AAA Multistrategies, Rothschild Bank AG Zurich

(Dublin) a/k/a Rothschild Bank AG, Rothschild Bank Geneva (Dublin), Rothschild Lugano Dublin a/k/a Banca Privata Edmond de Rothschild Lugano S.A., Edmond de Rothschild (Suisse) S.A., SIS Seeganintersettle, Six SIS Ltd., Societe Generale Bank & Trust, Soundview Fund, Swisscanto FD Centre Clients A/C, T1 Global Fund Ltd., UBS AG New York, UBS AG Zurich, UBS Jersey Nominees, Verwaltungs UND Privat-Bank AG Aktiengesellschaft (AMS), Vorarlberger Landes UND Hypothekenbank Aktiengesellschaft, and Beneficial Owners of the Accounts Held in the Name of CGC NA 1-1000, for whom the Citco Subscribers may have subscribed for shares of the Funds in the capacity of trustee, agent, representative, nominee or custodian (individually, a "Beneficial Shareholder" and collectively, the "Beneficial Shareholders" or the "Defendants").

16.    The Beneficial Shareholders who owned or had interests in shares of Funds issued to the Citco Subscribers had the same knowledge as the Citco Subscribers regarding all relevant matters relating to BLMIS and the Funds' Net Asset Values at all relevant times for two reasons. *First*, the Citco Subscribers agreed to act on behalf of the Beneficial Shareholders as trustee, agent, representative, nominee or custodian in connection with the Beneficial Shareholders' investments in the Funds. *Second*, the Funds' Articles of Associations and the Subscription Agreements between the Funds and the Citco Subscribers provide that the registered shareholders (*i.e.*, the Citco Subscribers) are to be treated as the parties to the Articles. These contractual provisions bind the Beneficial Shareholders to the bad faith of the Citco Subscribers.

17.    By this proceeding, Plaintiffs seek to recoup for the benefit of the Funds' estates Redemption Payments transferred to the Citco Subscribers. Without this recovery, Defendants will have been unjustly enriched, and allowed to retain a windfall at the expense of other shareholders and creditors of the Funds. Any recoveries will aid the Funds in satisfying their

liabilities and redound to the benefit of the Funds' investors who found themselves victims of Madoff's Ponzi scheme.

## JURISDICTION AND VENUE

18.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 157(b) and 1334(b), as this adversary proceeding and the claim asserted by the Foreign Representatives herein arise under, arise in, and/or relate to the Chapter 15 proceedings of the above-captioned Debtors, *In re Fairfield Sentry Limited, et al.*, No. 10-13164 (CGM), pending in this Court.  Additionally, pursuant to section 78eee(b)(2)(A)(iii) of the Securities Investor Protection Act ("SIPA"), which incorporates 28 U.S.C. § 1334(b) and applicable provisions of Title 11 of the United States Code, jurisdiction is also proper in this Court because this action also relates to the consolidated liquidation proceedings of BLMIS and Bernard L. Madoff, pending in this Court under the caption *Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC*, SIPA Liquidation No. 08-1789 (CGM).  Pursuant to the Amended Standing Order of Reference of the United States District Court for the Southern District of New York, dated January 31, 2012, all proceedings arising in, arising under, and/or related to cases under Title 11 of the United States Code (as amended, the "Bankruptcy Code") are referred to this Court for adjudication.

19.     This is a core proceeding under 28 U.S.C. § 157(b)(2).  Should the Court determine that this is a non-core proceeding, Plaintiffs consent to entry of final judgment and order by this Court.

20.     This Court has jurisdiction over the Beneficial Shareholders pursuant to Rules 7004(d) and (f) of the Federal Rules of Bankruptcy Procedure and New York Civil Practice Law & Rules § 302 (McKinney 2008) because the Beneficial Shareholders purposely availed themselves of the laws of the United States and the State of New York by, among other things, investing money with the Funds, and knowing and intending that the Funds would invest

substantially all of that money in New York-based BLMIS.  The Beneficial Shareholders thus knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York, derived significant revenue from New York, and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claim alleged herein.  The Beneficial Shareholders should therefore reasonably expect to be subject to United States jurisdiction.

21.    Moreover, this Court has jurisdiction over the Beneficial Shareholders by virtue of the legally binding and valid agreements and representations set forth in one or more agreements for the subscription of shares that the Citco Subscribers entered into with Sentry and Sigma.

22.    The Citco Subscribers, upon information and belief, entered into a Subscription Agreement with Sentry on or about September 27, 2004 (the "Initial Subscription Agreement") pursuant to which the Citco Subscribers subscribed for shares.  Subsequent to entering into the Initial Subscription Agreement, the Citco Subscribers, upon information and belief, entered into additional agreements (the "Subsequent Subscription Agreements") with Sentry and Sigma between February 4, 2005 and August 27, 2008, pursuant to which it subscribed for additional shares on the same terms and conditions as those shares subscribed for pursuant to the Initial Subscription Agreement.  The Initial Subscription Agreement and Subsequent Subscription Agreements are collectively referred to herein as the "Subscription Agreements."

23.    The Subscription Agreements provide for, *inter alia*, the irrevocable submission by the Citco Subscribers to the jurisdiction of the New York courts with respect to any proceeding with respect to said agreement and Sentry and Sigma and the Citco Subscribers' consent to service of process by the mailing of such process, as provided therein.  In particular, the Subscription Agreements provide as follows:

New York Courts.    Subscriber agrees that any suit, action or proceeding
("Proceeding") with respect to this Agreement and the Fund may be brought in New
York.  Subscriber irrevocably submits to the jurisdiction of the New York courts
with respect to any Proceeding and consents that service of process as provided by
New York law may be made upon Subscriber in such Proceeding, and may not
claim that a Proceeding has been brought in an inconvenient forum.  Subscriber
consents to the service of process out of any New York court in any such
Proceeding by the mailing of copies thereof, by certified or registered mail, return
receipt requested, addressed to Subscriber at the address of Subscriber then
appearing on the Fund's records.  Nothing herein shall affect the Fund's right to
commence any Proceeding or otherwise to proceed against Subscriber in any other
jurisdiction or to serve process upon Subscriber in any manner permitted by any
applicable law in any relevant jurisdiction.

24.    Furthermore, by executing the Subscription Agreements, the Citco Subscribers

agreed to all terms and conditions contained therein, including the express provision that any

agreement made by the Citco Subscribers in the Subscription Agreement would also apply to any

other person for whom the Citco Subscribers were subscribing as trustee, agent, representative, or

nominee—*i.e.*, all Beneficial Shareholders.  Moreover, by executing the Subscription Agreements,

the Citco Subscribers represented that they had all requisite authority from Beneficial Shareholders

to execute and perform any and all obligations on their behalf, and also agreed to indemnify Sentry

and Sigma for any damages resulting from an assertion by a Beneficial Shareholder that the Citco

Subscribers lacked proper authorization to enter into the Subscription Agreement or perform the

obligations thereof.  Specifically, the Subscription Agreements provide as follows:

If Subscriber is acting as a Representative.  If Subscriber is subscribing as trustee,
agent, representative, or nominee for another person (the "Beneficial
Shareholder"), Subscriber agrees that the representations and agreements herein are
made by Subscriber with respect to itself and the Beneficial Shareholder.
Subscriber has all requisite authority from the Beneficial Shareholder to execute
and perform the obligations hereunder.  Subscriber also agrees to indemnify the
Fund … for any and all costs, fees and expenses (including legal fees and
disbursements, fines and amounts paid in settlement) in connection with any
damages resulting from Subscriber's misrepresentation or misstatement contained
here, or the assertion of Subscriber's lack of proper authorization from the
Beneficial Shareholder to enter into this Agreement or perform the obligations
hereof.

25.    Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

## PARTIES

**A.    Plaintiffs**

26.    Sentry, a British Virgin Islands company, was organized in 1990 under the International Business Company Act of the British Virgin Islands and was subsequently re-registered as a business company under the BVI Business Companies Act 2004. Sentry's registered agent is Codan Trust Company (B.V.I.) located at Romasco Place, Wickhams Cay 1, Road Town, Tortola, BVI.  Sentry is currently in liquidation in proceedings commenced on April 21, 2009 in the BVI Court.

27.    Sigma, a British Virgin Islands company, was organized in 1990 under the International Business Company Act of the British Virgin Islands and was subsequently re-registered as a business company under the BVI Business Companies Act 2004. Sigma's registered agent is Codan Trust Company (B.V.I.) located at Romasco Place, Wickhams Cay 1, Road Town, Tortola, BVI.  Sigma is currently in liquidation in proceedings commenced on April 23, 2009, in the BVI Court.

28.    The Foreign Representatives were appointed by the BVI Court as Liquidators of the Funds to supervise the liquidation of the Funds' estates and, where necessary, commence proceedings in the name of and on behalf of the Funds or in their own official names.  On April 23, 2009, the BVI Court issued an order appointing Christopher Stride as liquidator of Lambda (the "Lambda Appointment Order").  On July 21, 2009, the BVI Court issued an order appointing Kenneth Krys and Mr. Stride as joint liquidators of Sentry and Sigma (the "Sentry & Sigma Appointment Order").  On September 6, 2010, the BVI Court issued notices acknowledging Mr. Stride's resignation and the appointment of Joanna Lau as joint liquidator with Mr. Krys of all three Funds (the "Supplemental Appointment Order").  On November 23, 2011, Ms. Lau

resigned as joint liquidator of the Funds. On June 24, 2014, the BVI Court issued an order appointing Charlotte Caulfield as joint liquidator, with Mr. Krys, of all three Funds (the "Second Supplemental Appointment Order"). On June 21, 2019, Ms. Caulfield resigned as joint liquidator of the Funds. On July 8, 2019, the BVI Court issued an order appointing Greig Mitchell as joint liquidator, with Mr. Krys, of all three Funds (the "Third Supplemental Appointment Order" and, together with the Lambda Appointment Order, the Sentry & Sigma Appointment Order, the Supplemental Appointment Order, and the Second Supplemental Appointment Order, the "BVI Appointment Orders"). The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of the Funds, have been authorized by the foreign court having jurisdiction over the matter to bring this action and the claim herein.

29.    Pursuant to the BVI Appointment Orders, the Foreign Representatives are responsible for all aspects of the Funds' businesses, including, among other things, custody and control of the Funds' assets, the power to do all acts and execute, in the name and on behalf of the Funds, any deeds, receipts or other documents, and the power to compromise claims, commence litigation and to dispose of property. After obtaining BVI Court approval, the Foreign Representatives filed petitions in this Court in June of 2010, under Chapter 15 of Title 11 of the United States Code, seeking recognition of the BVI Liquidation Proceedings as "foreign main proceedings" under Chapter 15. On July 22, 2010, this Court issued an order (the "Recognition Order") granting that recognition.

30.    Pursuant to the Recognition Order, the Foreign Representatives were automatically afforded relief available under 11 U.S.C. § 1520, including application of the Bankruptcy Code's automatic stay to the Funds and their property located in the United States, as well as the ability to operate the Funds' business and exercise the rights and powers of a trustee under Sections 363 and

11

552 of the Bankruptcy Code.  Moreover, the Bankruptcy Court specifically granted additional relief in the Recognition Order to the Foreign Representatives pursuant to 11 U.S.C. § 1521(a). Such relief includes, but is not limited to:  (i) staying any actions, proceedings or execution against the Funds' assets to the extent not stayed under Section 1520; (ii) authorizing the Foreign Representatives to seek leave to conduct discovery concerning the Funds' assets, affairs, rights, obligations or liabilities; (iii) entrusting the Foreign Representatives with the administration and realization of the Funds' assets that are located within the United States, including all claims and causes of action belonging to the Funds; and (iv) otherwise giving full force and effect to the Proceedings before the BVI Court.

31.    Claims had been previously asserted against the Funds in actions commenced by Irving H. Picard, the Trustee appointed by the United States District Court for the Southern District of New York for the liquidation of BLMIS (the "BLMIS Trustee"), in an adversary proceeding pending before the United States Bankruptcy Court of the Southern District of New York, *Picard v. Fairfield Sentry Limited, et al.*, No. 08-01789 (CGM) (the "BLMIS Adversary Proceeding"). As set forth in the complaint filed in the BLMIS Adversary Proceedings, the BLMIS Trustee sought to recover from the Funds, on preference and fraudulent transfer grounds, approximately $3.2 billion.  This amount was alleged to have been transferred to the Funds from BLMIS, directly (in the case of Sentry), or indirectly (in the cases of Sigma and Lambda), during the six years preceding the December 2008 disclosure of the Madoff fraud.  The BLMIS Trustee alleged that the monies transferred from BLMIS to the Funds were the misappropriated assets of other BLMIS investors.  At all relevant times, monies that the Funds received from BLMIS, net of fees and expenses, were transferred to shareholders as Redemption Payments.

32.     On July 13, 2011, pursuant to an agreement between the Foreign Representatives and the BLMIS Trustee dated May 9, 2011, the United States Bankruptcy Court for the Southern District of New York entered judgments against each of the Funds on the claims against the Funds asserted in the BLMIS Adversary Proceeding (the "Judgments") in the amount of $3,054,000,000 with respect to Sentry, $752,300,000 with respect to Sigma, and $52,900,000 with respect to Lambda.  The Redemption Payments rendered the Funds unable to satisfy their liabilities to the BLMIS customers, the BLMIS Trustee, including on account of the Judgments, and other creditors of the Funds, and have further increased the amount of those liabilities.  In this way, the Redemption Payments caused the Funds to become insolvent and/or deepened their existing insolvency, in that, among other things, at all relevant times the Funds were unable to pay their debts as they fell or would fall due.

**B.     Defendants**

33.     Defendants "Beneficial Owners of the Accounts Held in the Name of CGC NA 1-1000" are, as noted, any persons or entities having a beneficial ownership or interests in shares of Sentry and Sigma issued to the Citco Subscribers and on whose behalf the Citco Subscribers were acting as trustee, agent, representative, or nominee.

34.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, ABN AMRO Schweiz AG a/k/a ABN AMRO (Switzerland) AG.  Upon information and belief, ABN AMRO Schweiz AG a/k/a ABN AMRO (Switzerland) AG is a corporate entity organized under the laws of Switzerland and has its registered address at Beethovenstrasse 33, CH-8002 Zurich, Switzerland.

35.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the

Beneficial Shareholder, Adler and Co Privatbank AG.  Upon Information and belief, Adler and Co Privatbank AG is a corporate entity organized under the laws of Switzerland and has its registered address at Claridenstreasse 22, CH-8022 Zurich, Switzerland.

36.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Allianzbank SPA/Unifortune Conservative Side Pocket.   Upon information and belief, Allianzbank SPA/Unifortune Conservative Side Pocket is a corporate entity organized under the laws of Italy and has its registered address at Via Donizetti 53, Milan 20128, Italy.

37.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Alternative Investment Strategies.   Upon information and belief, Alternative Investment Strategies is a corporate entity organized under the laws of Bermuda and has its registered address c/o Absolute Performance Ltd., Bamboo Gate, 11 Harbour Road, Paget PG 03, Bermuda.

38.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Banca Arner SA.  Upon information and belief, Banca Arner SA is a corporate entity organized under the laws of Switzerland and has its registered address at Piazza Manzoni 8, CH-6901 Lugano, Switzerland.

39.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Banca Unione di Credito.  Upon information and belief, Banca Unione di

Credito is a corporate entity organized under the laws of Switzerland and has its registered address at Piazza Dante 7, CH-6901 Lugano, Switzerland.

40.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Bank Hapoalim Switzerland Ltd.  Upon information and belief, Bank Hapoalim Switzerland Ltd. is a corporate entity organized under the laws of Luxembourg and has its registered address at 18 Boulevard Royal, 2449 Luxembourg or 7 Rue de la Chapelle, 1325 Luxembourg.

41.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Bank Julius Baer & Co. Ltd.  Upon information and belief, Bank Julius Baer & Co. Ltd. is a corporate entity organized under the laws of Switzerland and has its registered address at Hohlstrasse 602, CH-8010 Zurich, Switzerland.

42.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Bank Sarasin & Cie.  Upon information and belief, Bank Sarasin & Cie is a corporate entity organized under the laws of Switzerland and has its registered address at Elizabethenstrasse 62, CH-4002 Basel, Switzerland.

43.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Banque Cantonale Vaudoise.  Upon information and belief, Banque Cantonale Vaudoise is a corporate entity organized under the laws of Switzerland and has its registered address at Place St. Francois 14, CH-1001 Lausanne, Switzerland.

44.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Banque Cramer & Cie SA.  Upon information and belief, Banque Cramer & Cie is a corporate entity organized under the laws of Switzerland and has its registered address at 20-22 Avenue de Miremont, P.O. Box 403, CH-1211 Geneva 12, Switzerland.

45.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, BBVA (SUISSE) SA.  Upon information and belief, BBVA (Suisse) SA is a corporate entity organized under the laws of Switzerland and has its registered address at P.O. Box 3930, Zeltweg 63, 8021 Zurich, Switzerland.

46.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, BCV AMC Defensive AL Fund.  Upon information and belief, BCV AMC Defensive AL Fund is a corporate entity organized under the laws of Switzerland and has its registered address at Place St. Francois, CH-1001 Lausanne, Switzerland.

47.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, BNP Paribas (Suisse) SA.  Upon information and belief, BNP Paribas (Suisse) SA is a corporate entity organized under the laws of Switzerland and has its registered address at 2 Place de Hollande, Case Postale, CH-1211 Geneva, Switzerland.

48.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, BNP Paribas (Suisse) SA Ex Fortis.  Upon information and belief, BNP

16

Paribas (Suisse) SA Ex Fortis is a corporate entity organized under the laws of Switzerland and has its registered address at 2 Place de Hollande, Case Postale, CH-1211 Geneva, Switzerland.

49.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, BNP Paribas (Suisse) SA Private.  Upon information and belief, BNP Paribas (Suisse) SA Private is a corporate entity organized under the laws of Switzerland and has its registered address at 2 Place de Hollande, Case Postale, CH-1211 Geneva, Switzerland.

50.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, BSI AG.  Upon information and belief, BSI AG is a corporate entity organized under the laws of Switzerland and has its registered address at Via Peri 23, CH-6901 Lugano, Switzerland.

51.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, BSI Ex Banca Del Gottardo.  Upon information and belief, BSI Ex Banca Del Gottardo is a corporate entity organized under the laws of Switzerland and has its registered address at Viale S Franscini 8, CH-6900 Lugano, Switzerland.

52.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Caceis Bank Luxembourg.  Upon information and belief, Caceis Bank Luxembourg is a corporate entity organized under the laws of Luxembourg and has its registered address at 5 Allee Scheffer, Luxembourg L-2520, Luxembourg.

53.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, CBB (BVI)/ The Alkima Fund.

54.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, CBT Gems Low Vol Reg.  Upon information and belief, CBT Gems Low Vol Reg is a corporate entity organized under the laws of the Bahamas and has its registered address at One Montague Place 1st Floor, East Bay Street, P.O. Box N-4906, Nassau, Bahamas.

55.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Compagnie Bancaire Helvetique.   Upon information and belief, Compagnie Bancaire Helvetique is a corporate entity organized under the laws of Switzerland and has its registered address at Route de Chancy 6B, Case Postale 64, CH-1211 Geneva 8, Switzerland.

56.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Centrum Bank AG (AMS).  Upon information and belief, Centrum Bank AG (AMS) is a corporate entity organized under the laws of Liechtenstein and has its registered address at Kirchstrasse 3, Postfach 1168, Vaduz FL 9490, Liechtenstein or VP Bank AG Aeulestrasse 6, 9490, Vaduz, Liechtenstein.

57.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Clariden Leu Ltd.  Upon information and belief, Clariden Leu Ltd. is a

corporate entity organized under the laws of Switzerland and has its registered address at Bahnhofstrasse 32, CH-8001, Zurich, Switzerland.

58.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Corner Banca SA.  Upon information and belief, Corner Banca SA is a corporate entity organized under the laws of Switzerland and has its registered address at Via Canova 16, CH-6901 Lugano, Switzerland.

59.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Credit Suisse AG Zurich.  Upon information and belief, Credit Suisse AG Zurich is a corporate entity organized under the laws of Switzerland and has its registered address at P.O. Box 300, Uetlibergstrasse 231, CH-8070 Zurich, Switzerland.

60.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Dexia Banque International A Luxembourg.  Upon information and belief, Dexia Banque International A Luxembourg is a corporate entity organized under the laws of Luxembourg and has its registered address at 69 Route D'Esch, Luxembourg L-2953, Luxembourg.

61.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Dresdner Bank Schweiz.  Upon information and belief, Dresdner Bank Schweiz is a corporate entity organized under the laws of Liechtenstein and has its registered

19

address at LGT Bank In Liechtenstein AG ex DBS, Herrengasse 12, Vaduz FL-9490, Liechtenstein.

62.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, EFG Bank SA Switzerland.  Upon information and belief, EFG Bank SA Switzerland is a corporate entity organized under the laws of Switzerland and has its registered address at 24 Quai du Seujet, CH-1211 Geneva 2, Switzerland.

63.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, EFG Eurofinancier D'Invest MCL.  Upon information and belief, EFG Eurofinancier D'Invest MCL is a corporate entity organized under the laws of Monaco and has its registered address at Villa les Aigles, 15 Avenue D'Ostenede, Monaco MC 9800.

64.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Endurance Absolute Ltd. Master.  Upon information and belief, Endurance Absolute Ltd. Master is a corporate entity organized under the laws of the United Kingdom and has its registered address c/o Argyle Investment Advisors, Iveagh Ltd., 21 Queen Anne's Gate, London SW1H 9BU, United Kingdom.

65.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Fairfield Investment GCI.  Upon information and belief, Fairfield Investment GCI is a corporate entity organized under the laws of New York and has as its

registered address the Fairfield Greenwich Group, Finance Group, 919 Third Avenue, New York 10022.

66.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Fairfield Investment Fund Ltd.  Upon information and belief, Fairfield Investment Fund Ltd. is a corporate entity organized under the laws of New York and has as its registered address the Fairfield Greenwich Group, Finance Group, 919 Third Avenue, New York 10022.

67.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Falcon Private Bank.  Upon information and belief, Falcon Private Bank is a corporate entity organized under the laws of Switzerland and has its registered address at Pelikanstrasse 37, P.O. Box 1376, CH-8021, Zurich, Switzerland.

68.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, FIF Advanced Ltd.  Upon information and belief, FIF Advanced Ltd. is a corporate entity organized under the laws of New York and has as its registered address the Fairfield Greenwich Group, Finance Group, 919 Third Avenue, New York 10022.

69.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Finter Bank Zurich.  Upon information and belief, Finter Bank Zurich is a corporate entity organized under the laws of Switzerland and has as its registered address Corso S Gottardo 35, CH-6830 Chiasso, Switzerland.

70.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Harmony Capital Fund Ltd.  Upon information and belief, Harmony Capital Fund Ltd. is a corporate entity organized under the laws of the United Kingdom and has its registered address c/o Jason Capital Partners LLP, 28 Grosvenor Street, London W1K 4QR, United Kingdom.

71.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, HSBC.  Upon information and belief, HSBC is a corporate entity organized under the laws of the United Kingdom and has its registered address 8 Canada Square, Canary Wharf, London, United Kingdom.

72.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, IHAG Handelsbank AG.  Upon information and belief, IHAG Handelsbank AG is a corporate entity organized under the laws of Switzerland and has as its registered address Bleicherweg 18, 8022- Zurich, Switzerland.

73.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Incore Bank AG.  Upon information and belief, Incore Bank AG is a corporate entity organized under the laws of Switzerland and has as its registered address Dreikoenigstr 8, CH-8022 Zurich, Switzerland.

74.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Karasel Enhanced Portfolio.

75.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Karla Multistrategies Ltd.  Upon information and belief, Karla Multistrategies Ltd. is a corporate entity organized under the laws of The Netherlands and has as its registered address Naritaweg 165, 1043 BW Amsterdam, The Netherlands.

76.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, LGT Bank In Liechtenstein AG.  Upon information and belief, LGT Bank In Liechtenstein AG is a corporate entity organized under the laws of Liechtenstein and has as its registered address Herrengasse 12, Vaduz FL 9490, Liechtenstein.

77.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Liechtensteinische LB Reinvest AMS.  Upon information and belief, Liechtensteinische LB Reinvest AMS is a corporate entity organized under the laws of Liechtenstein and has as its registered address Liechtensteinische Landesbank AG, Staedtle 44, Vaduz FL-9490, Liechtenstein.

78.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Lloyds TSB Bank Geneva. Upon information and belief, Lloyd's TSB

Bank Geneva is a corporate entity organized under the laws of Switzerland and has as its registered address Place Bel-Air 1, CH-1211 Geneva 2, Switzerland.

79.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Lombard Odier Darier Hentsch & Cie.  Upon information and belief, Lombard Odier Darier Hentsch & Cie is a corporate entity organized under the laws of Switzerland and has as its registered address Rue de la Corraterie 11, 1204 Geneva, Switzerland.

80.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Longboat Ltd., which has its registered address at 1st Floor, 3 Elstree Gate, Elstree Way, Borehamwood, England, WD6 1JD.

81.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Master Capital and Hedge Fund.  Upon information and belief, Master Capital and Hedge Fund is a corporate entity organized under the laws of The Netherlands and has its registered address c/o Citco Fund Services Europe BV, Naritaweg 165, 1043 BW Amsterdam, The Netherlands.

82.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, National Bank of Kuwait.  Upon information and belief, National Bank of Kuwait is a corporate entity organized under the laws of Kuwait and has its registered address P.O. Box 95 Safat, 13001 Kuwait, Abdullah Al Ahmad Street, Sharq, State of Kuwait.

83.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, NBK Banque Privee Suisse SA.  Upon information and belief, NBK Banque Privee Suisse SA is a corporate entity organized under the laws of Switzerland and has as its registered address Quai du Mont Blanc 21, P.O. Box 1923, Geneva 1, Switzerland.

84.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with Pictet & Cie.  Upon information and belief, Pictet & Cie is a corporate entity organized under the laws of Switzerland and has as its registered address Route Des Acacias 60, 1211 Geneva 73, Switzerland.

85.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, PKB Privatbank AG.  Upon information and belief, PKB Privatbank AG is a corporate entity organized under the laws of Switzerland and has as its registered address Via Balestra 1, CH-6901 Lugano, Switzerland.

86.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Quasar Funds SPC a/k/a Quasar Fund SPC Class A and Class B CGCNV. Upon information and belief, Quasar Funds SPC a/k/a Quasar Fund SPC Class A and Class B CGCNV is a corporate entity organized under the laws of The Netherlands and has its registered address c/o Citco Fund Services Europe BV, Naritaweg 165, 1043 BW Amsterdam, The Netherlands.

87.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, RBC Dexia Investor Service Julius Baer SICAV.  Upon information and belief, RBC Dexia Investor Service Julius Baer SICAV is a corporate entity organized under the laws of Luxembourg and has as its registered address Dexia Fund Services, 69 Route D'Esch, Luxembourg L-2953, Luxembourg.

88.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, RBS Coutts Bank Ltd.  Upon information and belief, RBS Coutts Bank Ltd. is a corporate entity organized under the laws of Switzerland and has as its registered address P.O. Box 2200, Stauffacherstrasse 1, CH-8022 Zurich, Switzerland.

89.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Richcourt AAA Multistrategies.  Upon information and belief, Richcourt AAA Multistrategies is a corporate entity organized under the laws of The Netherlands and has as its registered address Telstone 8 Teleport, 1043 BW Amsterdam, The Netherlands or Naritaweg 165, 1043 BW Amsterdam, The Netherlands.

90.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Rothschild Bank AG Zurich (Dublin) a/k/a Rothschild Bank AG.  Upon information and belief, Rothschild Bank AG Zurich (Dublin) a/k/a Rothschild Bank AG is a corporate entity organized under the laws of Switzerland and has as its registered address Zollikerstrasse 181, CH-8034 Zurich, Switzerland.

91.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Rothschild Bank Geneva (Dublin).    Upon information and belief, Rothschild Bank Geneva (Dublin) is a corporate entity organized under the laws of Switzerland and has as its registered address Banca Privee Edmond de Rothschild, 18 rue de Hesse, CH-1204 Geneva, Switzerland.

92.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Rothschild Lugano Dublin a/k/a Banca Privata Edmond de Rothschild Lugano S.A.    Upon information and belief, Rothschild Lugano Dublin a/k/a Banca Privata Edmond de Rothschild Lugano S.A. is a corporate entity organized under the laws of Switzerland and has as its registered address Via Ginevra 2, CH-6900 Lugano, Switzerland.

93.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Edmond de Rothschild (Suisse) S.A.    Upon information and belief, Edmond de Rothschild (Suisse) S.A. is a corporate entity organized under the laws of Switzerland and has as its registered address Corso Elvezia 9, CH-6900 Lugano, Switzerland.

94.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, SIS Seeganintersettle.    Upon information and belief, SIS Seeganintersettle is a corporate entity organized under the laws of Switzerland and has as its registered address Baslerstrasse 100, CH-4601 Olten, Switzerland.

95.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Six SIS Ltd.  Upon information and belief, Six SIS Ltd. is a corporate entity organized under the laws of Switzerland and has as its registered address Baslerstrasse 100, CH-4601 Olten, Switzerland.

96.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Societe Generale Bank & Trust.  Upon information and belief, Societe Generale Bank & Trust is a corporate entity organized under the laws of Luxembourg and has as its registered address 11-13 Avenue Emile Reuter, Luxembourg L-2420, Luxembourg.

97.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Soundview Fund.  Upon information and belief, Soundview Fund is a corporate entity organized under the laws of The Netherlands and has as its registered address Naritaweg 165, 1043 BW Amsterdam, The Netherlands.

98.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Swisscanto FD Centre Clients A/C.  Upon information and belief, Swisscanto FD Centre Clients A/C is a corporate entity organized under the laws of the United Kingdom and has as its registered address 4th Floor, 51 Moorgate, London EC2R 6BH, United Kingdom or 5th Floor, 110 Cannon Street, London, EC4N 6EU.

99.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the

Beneficial Shareholder, T1 Global Fund Ltd.  Upon information and belief, T1 Global Fund Ltd. is a corporate entity organized under the laws of Switzerland and has its registered address c/o Trust and Gain Asset Management, Corso San Gottardo 46, 6830 Chiasso, Switzerland.

100.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, UBS AG New York.  Upon information and belief, UBS AG New York is a corporate entity organized under the laws of New York and has as its registered address 101 Park Avenue, New York 10178.

101.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, UBS AG Zurich.  Upon information and belief, UBS AG Zurich is a corporate entity organized under the laws of Switzerland and has as its registered address UBS Wealth Management, Badenerstrasse 574/C, CH-8098 Zurich, Switzerland.

102.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, UBS Jersey Nominees.  Upon information and belief, UBS Jersey Nominees is a corporate entity organized under the laws of the United Kingdom and has as its registered address P.O. Box 350, 24 Union Street, St Helier JE4 8UJ, Jersey, United Kingdom.

103.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Verwaltungs UND Privat-Bank AG Aktiengesellschaft (AMS).  Upon information and belief, Verwaltungs UND Privat-Bank AG Aktiengesellschaft (AMS) is a corporate entity organized under the laws of Liechtenstein and has as its registered address Im

Zentrum, Vaduz FL-9490, Liechtenstein or VP Bank AG Aeulestrasse 6, 9490, Vaduz, Liechtenstein.

104.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Vorarlberger Landes Und Hypothekenbank Aktiengesellschaft.    Upon information and belief, Vorarlberger Landes Und Hypothekenbank Aktiengesellschaft is a corporate entity organized under the laws of Austria and has as its registered address Hypo-Passage 1, Bregenz 6900, Austria.

**C.**    **The Relationship Between The Defendants And The Citco Subscribers**

105.    Published materials by Citco companies within Citco Group make clear that the Citco Banks—utilizing the Citco Record Subscriber to be the record holder of shares in the Funds Register of Shares—performed and took the lead role in carrying out record holder duties on behalf of Defendants.    For example, a Citco Fund Services document describing "Fund Administration Operations"[1] explains:

> For institutional clients (primarily banks), the Citco Banks offer a unique custody service to alleviate these institutions from the administrative burden of locating, subscribing in, and keeping track of investments in international funds for their private banking customers.    These services include: locating the fund, placing the subscription/redemption, completing the paperwork, registering the funds in the name of Citco as custodian, addressing corporate actions, providing monthly statements of holdings and most recent NAVs and sending out documentation and information as required.

106.    Consistent with such explanations by Citco, upon information and belief, each of the Defendants entered into the B&C Agreements with a Citco Bank and the Citco Record

---

[1] Citco Fund Services, Fund Administration Operations Using the Ephesus Platform and Related Offshore Investor Relations Services, US Statement on Auditing Standards No. 70 Report on Controls Placed in Operation and Tests of Operating Effectiveness January 1, 2005 to September 30, 2005.

Subscriber.  The B&C Agreements made the Citco Subscribers and other Citco entities agents of the Defendants in connection therewith.  It was under the B&C Agreements that the Citco Subscribers purchased shares in and made redemptions from the Funds for the benefit of the Defendants, which are the subject of this action.  Under the B&C Agreements, the Defendants were required to maintain bank accounts at the Citco Banks from which and into which "all moneys received from or for the account of" the Defendants were deposited (the "B&C Accounts").  Although, there are some differences in the various B&C Agreements, the provisions summarized herein are, upon information and belief, substantially the same in all the agreements.

107.    Pursuant to the B&C Agreements, the Citco Subscribers had various duties.  For example, the B&C Agreements afforded the Citco Subscribers the power to:

- "register the Securities, other than physically held bearer shares, in the name of the [Citco Record Subscriber] or any sub-custodian";

- "deposit in the [B&C] Account all moneys received from or for the account of the [Defendants]"; and

- ensure that the "[s]ecurities held at any one time by the Custodian or any sub-custodian shall be recorded in and ascertainable from the books and/or ledgers of the [Citco] Banks and the [Citco Record Subscriber]."

108.    Moreover, the Citco Banks were solely responsible for providing brokerage services to the Defendants.  According to the B&C Agreements, these services included:

- "effecting [] transactions of and/or relating to the purchase and sale of and dealing in Securities in the name and for the account of the" Defendants; and

- "effecting [] transactions of and/or relating to the purchase and sale of and dealing in Securities in the name of the Bank, or of the [Defendants], or any nominee for the account of the [Defendants]."

109.    Pursuant to the B&C Agreements, the Defendants provided the Citco Banks "with Instructions in respect to all transactions in Securities to be performed by the Bank on the

[Defendants'] behalf," and it provided that the relevant Citco Bank, "may in its absolute discretion refuse to execute any Instructions given by or on behalf of the [Defendants]."

110.    With respect to the subscription or redemption of shares in the Funds, the Defendants submitted instructions to the Citco Banks and, upon information and belief, the Citco Banks directed the Citco Record Subscriber to subscribe for or redeem the relevant shares.

111.    According to the B&C Agreements, in "consideration of the services of the" Citco Banks and the Citco Record Subscriber, the Defendants were required to "pay to the Bank the fees and expenses" in "U.S. dollars."    Additionally, while the purchased securities were to be transferred to and registered in the name of the Citco Record Subscriber as the Custodian thereof, if the Defendants were more than five days delinquent in paying in full "all moneys due in connection with such purchase … such Securities will not be transferred to nor held by the Custodian [the Citco Record Subscriber] on behalf of the [Defendants], but will be freely available to the Bank."

112.    The B&C Agreements provide:  "In the performance of their [custodian service] duties, the Bank and/or the Custodian [the Citco Record Subscriber] may act through agents, subcustodians or any other third party which the Bank and/or Custodian [the Citco Record Subscriber] may, in their absolute discretion deem necessary.  The Bank and/or Custodian [the Citco Record Subscriber] are hereby authorized by the [Defendants] to enter into further agreements for the appointment of the aforementioned agents, sub-custodians and/or third parties."

113.    The B&C Agreements further provide:  "The [Defendants] recognize[ ] that in certain circumstances in order to preserve or safeguard the Securities or other assets of the [Defendants], the Bank and/or Custodian [the Citco Record Subscriber] may be required to act without first obtaining instructions from the Customer.  In such cases, the Bank and/or Custodian

[the Citco Record Subscriber] may act at their own absolute and unfettered discretion and shall not be liable, in the absence of negligence, willful misfeasance, reckless disregard or fraud, for any loss to the [Defendants] whatsoever."

114.    The B&C Agreements also provide:  "The Bank and Custodian [the Citco Record Subscriber] hereby agree to use their best efforts and judgement and due care [some B&C Agreements modify this language here as follows:  "best efforts and judgment and care of a prudent professional custodian"] in performing their obligations and duties pursuant to this Agreement; provided however that the Bank, Custodian [the Citco Record Subscriber], their directors, officers, employees and/or agents shall not be liable for any action taken or failure to act in the course of performing the services hereunder for any loss suffered by the [Defendants] in connection with the subject matter of this Agreement, unless such loss arises from willful misfeasance, fraud, bad faith or negligence in the performance of the Bank's/or Custodian's [the Citco Record Subscriber's] obligations and duties by reason of the Bank's and/or Custodian's [the Citco Record Subscriber's] reckless disregard of their obligations and duties hereunder."

115.    Upon information and belief, the B&C Agreements with the Defendants applied to all subscriptions and redemptions of shares in the Funds by the Citco Subscribers on behalf of the Defendants, and all Redemption Payments were, upon information and belief, sent by the Citco Banks (upon their receipt from the Funds) to the Defendants' B&C Accounts.

116.    The Citco Banks and the Citco Record Subscriber, per the B&C Agreements and in accordance with the Defendants' use of Citco in connection with investments in the Funds, were agents of Defendants.

**D.    <u>The Relationship Between The Citco Record Subscriber And The Citco Banks</u>**

117.    Consistent with the Citco Fund Services document described in paragraph 102 herein, and as described above in connection with the provisions of the B&C Agreements, the

Citco Banks played a lead role in performing and directing record holding duties on behalf of the Defendants.

118.    Pursuant to the B&C Agreements, the Citco Banks and the Citco Record Subscriber had various duties.  For example, the B&C Agreements afforded the Citco Banks and the Citco Record Subscriber the power to:

- "register the Securities, other than physically held bearer shares, in the name of the Custodian [the Citco Record Subscriber] or any sub-custodian";

- "deposit in the [B&C] Account [at the Citco Banks] all moneys received from or for the account of the [Defendants]"; and

- ensure that the "[s]ecurities held at any one time by the Custodian [the Citco Record Subscriber] or any sub-custodian shall be recorded in and ascertainable from the books and/or ledgers of the Banks and the Custodian [the Citco Record Subscriber]."

119.    Moreover, the Citco Banks were solely responsible for providing brokerage services to the Defendants.  According to the B&C Agreements, these services included:

- "effecting [] transactions of and/or relating to the purchase and sale of and dealing in Securities in the name and for the account of the" Defendants; and

- "effecting [] transactions of and/or relating to the purchase and sale of and dealing in Securities in the name of the Bank, or of the [Defendants], or any nominee for the account of the [Defendants]."

120.    Pursuant to the B&C Agreements, the Defendants provided the Citco Banks "with Instructions in respect to all transactions in Securities to be performed by the Bank on the [Defendants'] behalf," and it provided that the Citco Banks "may in [their] absolute discretion refuse to execute any Instructions given by or on behalf of the [Defendants]."

121.    With respect to the subscription or redemption of shares in the Funds, the Defendants submitted instructions to the Citco Banks, and, upon information and belief, the Citco Banks directed the Citco Record Subscriber to subscribe for or redeem the relevant shares.

122.    According to the B&C Agreements, in "consideration of the services of the" Citco Banks and the Citco Record Subscriber, the Defendants were required to "pay to the Bank the fees and expenses" in "U.S. dollars."   Additionally, while the purchased securities were to be transferred to and registered in the name of the Citco Record Subscriber, if the Defendants were more than five days delinquent in paying in full "all moneys due in connection with such purchase … such Securities will not be transferred to nor held by the Custodian [the Citco Record Subscriber] on behalf of the [Defendants], but will be freely available to the Bank."

123.    Upon information and belief, (i) the Citco Record Subscriber was a wholly owned subsidiary or, at a minimum affiliate, of the Citco Banks and all were affiliates of the Citco Group; (ii) the Citco Record Subscriber operated principally if not solely as a vehicle for the custody of shares purchased for Defendants by the Citco Banks; (iii) the Citco Record Subscriber was and at all times acted as the nominee of and agent for the Citco Banks with respect to such share purchases and custody thereof; (iv) the Citco Record Subscriber accordingly entered into the relevant Subscription Agreements with the Funds for and on behalf of the Citco Banks; and (v) the Citco Banks are, accordingly, real parties in interest to, bound by and parties to the Subscription Agreements.

### NOTICE PURSUANT TO FED. R. CIV. P. 44.1

124.    Certain of the substantive issues to be resolved in this case will be governed by the laws of the British Virgin Islands.   Plaintiffs intend to rely upon the applicable laws of that territory.

### FACTUAL ALLEGATIONS

**A.    Role Of Feeder Funds In Madoff Fraud**

125.    Sentry was the largest of all the so-called "feeder funds" to maintain accounts with BLMIS.   Sigma and Lambda were indirect BLMIS feeder funds established for foreign currency

(respectively, Euro and Swiss franc) investment through purchase of shares of Sentry. The Funds had the following par values per share: $.01 per share (Sentry), €.01 per share (Sigma), and CHF.01 per share (Lambda). Sentry's account statements with BLMIS as of the end of October 2008 showed in excess of $6 billion of invested assets supposedly held by BLMIS. As stated in its offering materials, Sentry's investment objective was to achieve capital appreciation through investments in BLMIS.

126.    As discussed above, Sentry, Sigma, and Lambda were established for the purpose of making investments in BLMIS. It is now known that these types of feeder funds were a crucial part of Madoff's Ponzi scheme. Feeder funds, such as Sentry (which was a direct feeder fund into BLMIS), and Sigma and Lambda (which were indirect feeder funds, through Sentry, into BLMIS) brought new investors and new investments into the scheme, allowing Madoff to make payments to early investors who sought to liquidate their investments. In this way, the feeder funds were used by Madoff to continue and perpetuate his fraud by maintaining the illusion that BLMIS was making active investments and engaging in a successful investment strategy.

## B.    Calculation Of Net Asset Value And Shareholder Redemption Payments

127.    From the Funds' inception until the disclosure of Madoff's fraud in December 2008, during most relevant times, substantially all of the money (up to 95%) raised by the Funds from the sale of their shares, net of fees and expenses, was turned over to and invested in BLMIS (by and/or through Sentry), and supposedly credited to accounts held in the name of Sentry with BLMIS, purportedly for use in the now infamous "split-strike conversion" investment strategy. In accordance with the Funds' Subscription Agreements, Articles of Association, offering materials, and/or other relevant documents, from time to time, the Funds paid to shareholders, for each Share tendered for redemption, an amount that was based on each of the

respective Funds' purported Net Asset Value—the value of the respective assets of Sentry, Sigma, and Lambda divided by the number of shares outstanding in each Fund—as it was then calculated.

128.    In calculating each of the Funds' Net Asset Value, the Funds' administrators used and relied on account statements provided by BLMIS purportedly showing securities and investments, or interests or rights in securities and investments, held by BLMIS for the account of Sentry.  Generally, all securities identified on BLMIS account statements were traded on public exchanges and had readily ascertainable market values, and those market values (in addition to, among other items, cash on hand that was identified in the Sentry account statement for the relevant time period) were used in accordance with the Funds' Subscription Agreements, Articles of Association, offering materials, and/or other documents to calculate the Net Asset Value of the shares.

129.    In fact, at all relevant times, no securities were ever purchased or sold by BLMIS for Sentry and any stated cash on hand in the BLMIS accounts was based on misinformation and fictitious account statements.  None of the transactions shown on the account statements provided by BLMIS to Sentry ever occurred.  Indeed, no investments of any kind were ever made by BLMIS for Sentry.  At all relevant times, all of the account statements that BLMIS provided to Sentry were entirely and utterly fictitious.  Further, all amounts deposited by Sentry (or by Sigma and Lambda through Sentry) with BLMIS for investment and the purchase of securities to be held by BLMIS for the account of Sentry were used by Madoff to pay other BLMIS investors or were misappropriated by Madoff for other unauthorized uses.

130.    From time to time, to make Redemption Payments, Sentry (and Sigma and Lambda through Sentry) made withdrawals from Sentry's BLMIS accounts (or utilized subscription monies of other investors on hand that were directed for investment in BLMIS).  At all relevant times, the

Funds believed that the amounts provided in connection with such withdrawals represented the proceeds arising from the profitability of or continued investment in BLMIS.  In fact, however, payments made by BLMIS to Sentry purportedly representing the proceeds of sales of securities or other investment positions were nothing other than the deposits of other BLMIS investors or previous deposits made by Sentry, never invested but rather misused and misappropriated as part of Madoff's fraud.  At all relevant times, payments made from BLMIS to Sentry were made by Madoff to continue and perpetuate his Ponzi scheme and avoid detection of his fraud.  The payments from BLMIS to Sentry were not payments made in the ordinary course of or as part of any business, nor did they have a legitimate business purpose.  Similarly, the Redemption Payments were not made for any legitimate purposes or in the ordinary course of any business. Those Redemption Payments did not conform to or follow the terms of the Funds' Subscription Agreements, Articles of Association, and/or other offering documents, as they were based upon Net Asset Values that were not calculated based upon the true facts existing at any relevant time, and because, more generally, the Redemption Payments represented the proceeds arising from investment in BLMIS (or a substitute therefor, in the form of subscription monies from other investors in the Funds, used as a shortcut to investing subscription monies with BLMIS and simultaneously withdrawing monies from BLMIS), which the world now knows was operated by Madoff as a Ponzi scheme.

131.    Given the fraudulent nature of BLMIS and its operation as a massive Ponzi scheme, the money paid by the Funds (directly in the case of Sentry and indirectly in the cases of Sigma and Lambda) to BLMIS on account of Sentry was, at all relevant times and unknown to the Funds, misused and misappropriated by Madoff as part of his Ponzi scheme.  At all relevant times, the Funds were insolvent when the Redemption Payments were made or were rendered insolvent,

and/or their insolvency was deepened, as a result of the Redemption Payments.  As a result, at all relevant times, the Net Asset Value of the shares redeemed was miscalculated, and Redemption Payments were mistakenly made for amounts far in excess of the Net Asset Value of shares redeemed that would have been calculated based upon the true facts existing at any relevant time.

**C.    Redemption Payments Made Or Transferred To Defendants**

132.    During the period from and after April 20, 2004, through November 19, 2008, the Beneficial Shareholders received Redemption Payments totaling USD $51,929,665.41 from Sentry and Sigma in respect of shares tendered for redemption.

133.    At Defendants' directions and instructions, some or all of the Redemption Payments were received at, upon information and belief, designated United States-based bank accounts.

134.    The dates and amounts of each Redemption Payment received by the Beneficial Shareholders from Sentry, and the bank accounts to which each Redemption Payment was made, are set forth on Exhibit A.  The dates and amounts of each Redemption Payment received by the Beneficial Shareholders from Sigma, and the bank accounts to which each Redemption Payment was made, are set forth on Exhibit B.

135.    At the time those Redemption Payments were made, the Funds had insufficient assets and were unable to pay their debts as they would fall due.  In exchange for each Redemption Payment, each of which constitutes or forms part of a transaction between the Beneficial Shareholders and Sentry and Sigma, Sentry and Sigma received no consideration or consideration of a value that, in money or money's worth, was significantly less than the value, in money or money's worth, of the consideration provided by Sentry and Sigma.

136.    Upon information and belief, the Beneficial Shareholders received Redemption Payments in excess of amounts paid by such person(s) for purchase of their shares.

**D.**     **Citco Did Not Issue Any Certifications Of Net Asset Value In "Good Faith"**

137.    Article 11 of the Funds' Articles provides that "[a]ny certificate as to the Net Asset

Value per Share … given in good faith by or on behalf of the Directors shall be binding on all

parties."  During the relevant period, statements of the Net Asset Value were issued by the Funds'

administrators, Citco Fund Services (Europe) B.V. and its delegatee Citco (Canada) Inc. (the

"Administrators").   On April 16, 2014, the Judicial Committee of the Privy Council (the "Privy

Council") issued a decision in which it held that certain statements of Net Asset Value, in

particular, certain monthly emails, contract notes, and monthly account statements issued by the

Administrators, constituted "certificates" for the purposes of Article 11 (the "Certificates").   The

Privy Council did not, however, address whether such Certificates were given "in good faith."  In

carrying out this responsibility, the Administrators and affiliated Citco entities acted with a lack

of good faith in giving the Certificates.

138.    Over the course of fifteen years, in its capacity as service providers to the Funds,

Citco reviewed information concerning BLMIS that was not available to the general public, and

expressed internal alarm about what that information showed with respect to the likelihood of fraud

at BLMIS, but turned a blind eye to the reality reflected in the information and instead proceeded

with issuing the Certificates as if there were no problem.

139.    So grave were the Administrators' internal concerns that they expressed doubts—

many years before the fraud was made public—that the Funds' assets with BLMIS even existed,

with one employee stating, "I will not change my [opinion] as long as I [do] not see evidence that

the portfolio exists."  The Administrators also expressed repeated concern over the fact there was

no segregation of duties at BLMIS—*i.e.*, BLMIS (i) had discretion over which investments to

make and when to make them, such that BLMIS was de facto investment manager, (ii) had actual

custody of the Funds' assets, such that BLMIS was de facto custodian, and (iii) was also the broker.

Based upon the proprietary information they reviewed, Citco expressed concern—internally—that BLMIS would be a repeat of the notorious Manhattan Investment Fund fraud of the 1990s "multiplied by a factor of five." Ultimately, unable to resolve their grave concerns, Citco, rather than withdrawing, ceasing to issue Certificates, or sounding a public alarm, made a corporate decision to continue on as service providers—in exchange for an 800% increase in fees.

### 1.   Citco Expressed Doubt As To Whether the Funds' Assets At BLMIS Even Existed

140.   Beginning in 2000, the Administrators ran into trouble with the basic task of verifying the existence of the Funds' assets with Madoff. Initially, Citco expressed serious concerns regarding whether the Funds' Treasury bond transactions actually matched those transactions reported by Madoff because of an apparent "rhythm of trading" each month. The rhythm of trading within Sentry's portfolio appeared too consistent to be true, as the assets included only a limited number of Treasury bonds by each month's end. At the beginning of each month, Madoff would purchase shares and put options and would sell call options, but, like clockwork, would then liquidate all of Sentry's holdings by the 20th of each month. According to Ger Jan Meijer ("Meijer"), the head of internal audit for the Administrators, the broker statements could not be reconciled with the strategy outlined in the offering document. Thus, the Administrators wanted to check whether the Treasury bonds even existed at all.

141.   The Administrators could not verify the existence of the assets because the Funds' custodians and depository, Citco Bank Nederland N.V. Dublin Branch and Citco Global Custody N.V. (individually, the "Custodian", and collectively, the "Custodians"), did not actually hold them. Instead, Madoff served as his own custodian. Therefore, the custody statements that the Custodians were supposed to generate based on assets in their possession, were instead merely

copied, or "shadow book[ed]," from BLMIS account statements.  The Custodians were "only the custodian[s] on paper, not in reality" and did not place any trades for the Funds.

142.    Management within Citco, including Ruud Bodewes ("Bodewes"), the head of internal audit for all of Citco Group, and Meijer, the head of internal audit for the Administrators, raised alarms about the operations at BLMIS.  In May 2000, Bodewes expressed his concern to the general counsel and manager of Citco Bank Nederland, as well as Meijer, that "[w]ith [the] Manhattan [Investment Fund fraud] in the back of our minds, we, as Citco, may very well be in a potential dangerous situation, since we do not seem to have an independent source to verify the information from BLMIS."  Indeed, Meijer had raised these concerns to Bodewes weeks earlier, warning that Madoff could be "a Manhattan multiplied by a factor of five."

143.    In addition to warning Bodewes, Meijer also warned Citco Group's Chief Executive Officer, Christopher Smeets ("Smeets") in May 2000 that "[t]o not react or to react too late does indeed mean that investors once again faithfully deposit tens of millions of USD in the Madoff well (for which we do not know if there is a bottom to it) at month's end," with the understanding that Citco could "already be held personally responsible insofar as we have allowed the subscriptions to take place as of May without a fight."  Smeets acknowledged receipt of Meijer's emails and concerns, but he dismissed them out of hand.  At that time, Meijer emphasized that "with the current knowledge and Citco as asset protector, Citco has a legal obligation to obtain more assurance" of the Funds' assets.

144.    However, in what became a familiar pattern, Citco turned a blind eye to the documents and information in their possession.  Citco Group did not address the Administrators' concerns raised in May 2000, and a few months later, Meijer stated:  "[i]t seemed that this affair [was] being put on the back burner and hushed."  Around this time, Meijer had a meeting with his

direct supervisor, Tony Stocks ("Stocks"), in which Meijer explained his concerns, expressed his desire to take immediate action, and suggested that Citco stop the subscriptions until it had assurance of the Funds' assets.  Stocks told Meijer that he, not Meijer, was managing the company, and "it's not your business."

145.   A year later, Meijer again reiterated his concerns about BLMIS's operations, which "remain[ed] unsolved."  Meijer warned that "Citco has a risk exposure of more than USD3 billion" and that "[p]robably there are no options to restore this situation from a worst case scenario."  He stated:  "I will not change my [opinion] as long as I [do] not see evidence that the portfolio exists." Five months later, in January 2002, the Administrators again emphasized that the issues concerning BLMIS posed severe risks to Citco and the Funds' investors.  Meijer told Bodewes: "I have been worried about this situation for 2 years (including the risk to the continued existence of Citco), however the same was not taken seriously by certain gentlemen…. My intuition (combined with the business that I have seen) tells me that things are not right." The purpose of Meijer's email was not merely to doubt that the BLMIS statements were inaccurate in some respect, but to fundamentally challenge whether the assets even existed.

146.   In January 2002, Meijer insisted to Bodewes that:  "Citco must now seriously take the possibility that everything is really wrong with [the Funds'] account, as well as the possibility that everything will come into view within 2 years…. Personally I think the chance [that something is wrong] is at least 50%."  Meijer persisted that there was "still the opportunity to more or less direct the whole process, and search out the best way out with the help of good lawyers (legal contingency plan).  Otherwise you run the risk that the scene will later be determined by others." Meijer also warned Albert van Nijen ("van Nijen"), a member of the internal audit group at Citco, in December 2002 that "[e]ven [BLMIS's purported compliance with] the SEC regulation

[governing annual account statements] is not a guarantee that everything is OK." However, Citco Group's management, and Bodewes in particular, failed to undertake a meaningful investigation into Meijer's doubts regarding the existence of the Funds' assets, and instead continued acting as a service provider for the Funds for over six more years.

147.    In fact, multiple members of the Administrator's management tried to prevent Meijer from asking questions. John Verhooren ("Verhooren"), a member of Citco's administration services management team, actually knew that Meijer had raised concerns about the existence of the Funds' assets for years, but deliberately ignored those concerns. For example, in May 2000, Verhooren acknowledged that the lack of segregation of duties and trading patterns at Madoff were not new discoveries, and many people at Citco had already recognized these phenomena. Later, in response to concerns raised in 2001, Verhooren again rebuffed Meijer's insistence that Citco was facing "an enormous risk exposure." Instead, Verhooren instructed Meijer to stop raising the issue and claimed that Citco would try to meet with Madoff to investigate.

148.    According to Willem Holst ("Holst"), a managing director of Citco Bank Nederland N.V., Citco "w[as] totally dependent on Madoff for verification of the existence of the assets" and that BLMIS "was a structure [that was] out of the ordinary for the bank," but BLMIS was nevertheless "an important client, so we had to accommodate them."

149.    Neither Verhooren nor Holst nor any member of the Administrator's staff ever gained sufficient evidence that the Funds' assets existed from Madoff.

### 2.    Citco Failed To Obtain Evidence Of The Existence Of The Funds' Assets

150.    Citco not only expressed internal concern regarding whether the Funds' assets with BLMIS even existed—it knew that BLMIS would not confirm their existence for Citco as the Funds' service providers.

151.    The Administrators' audit reports repeatedly designated Sentry as a non-compliant fund on their "watch list" as a result of the lack of segregation of duties at BLMIS.  Each year from 2000 through 2006, the Administrators recommended that Citco either confirm the existence of the Funds' assets held by BLMIS or resign as service providers.  On three occasions between May 2000 and December 2002, Citco attempted to verify the existence of the Funds' assets at BLMIS.  All attempts failed.

152.    In May 2000, Citco set up a meeting with Madoff to gain "independent confirmation of the[] existence" of the Funds' assets, particularly the Treasury bills, and to determine how Madoff derived share prices from the markets.  However, this effort failed.  BLMIS did not verify the existence of the assets, and Citco internally acknowledged that the meeting had not provided "a full disclosure of [the] assignment."

153.    In July 2001, Bodewes had attempted to assess the concerns raised by Meijer in an internal due diligence memorandum.  However, Bodewes's due diligence was limited to a review of Citco's proprietary documents because Citco was concerned that permitting "an on-site audit at [BLMIS] premises may hurt the relationship with [the Fund], resulting in a possible loss of [a] USD 1.5 million dollar fee income."  Even so, based on the documents and information in Citco's possession, Bodewes shared Meijer's concerns about BLMIS's operations, and concluded that losses at BLMIS could be hidden, leaving Citco ultimately liable to the Funds' shareholders.  Bodewes also noted that the two man audit firm used by BLMIS did not "match up" with the size of BLMIS's business.  Indeed, multiple Administrator employees acknowledged that the small size of Madoff's accounting firm posed a risk, given that the size of the firm was not large enough to audit the amount of assets purportedly managed by BLMIS.

154.    Smeets, Citco Group's CEO, received Bodewes' memo regarding the issues at BLMIS, including the issues posed by the size of Madoff's audit firm. Citco Group's management responded that they would like to "work this out" with Madoff, but never met with him in 2001.

155.    By an email dated February 6, 2002, Ermanno Unternaehrer ("Unternaehrer"), an executive director at Citco Group, stated that Citco wanted evidence of the existence of the treasury bills that BLMIS held on the Funds' behalf. In December 2002, Citco once again "attempt[ed] to get conclusive proof" from Madoff that Sentry's portfolio was in BLMIS custody and to have "Madoff … provide evidence of the existence/custody of the positions." Before the meeting, Meijer directed a member of the internal audit group at Citco to "[p]roperly record what you have done and what you have not been able to determine…. It is a troublesome task insofar as Madoff is not known for his openness." However, the meeting did not include any meaningful discussion with Madoff regarding the holdings purported to be in his custody. The employee, van Nijen, reported back that the Administrators' "mission" to increase "Citco's comfort level with respect to the existence of the assets in relation to [Citco's] responsibilities as [Fund] Custodian[s]" had again failed. On December 27, 2002 Bodewes reported to Smeets and the rest of the executive committee of Citco Group that, as long as the position of Sentry with BLMIS was not independently verified, "there will be doubts."

156.    After Citco's third failed attempt, Citco never again tried to gain evidence from Madoff that the Funds' assets existed until his fraud was ultimately exposed in December 2008. In addition, Meijer noted that "Madoff [was] no[t] known" to Citco's external traders, even though his investment strategy required selling major quantities of call options each month. In an email to Bodewes, Meijer stated, "I visited the Madoff website…. According to the investment policy,

the fund needs to sell major quantities of call options on the market each month. I absolutely do not trust it!!!!"

157.    Meanwhile, through the entire period, Citco continued to issue the Certificates.

### 3.    Citco Negotiated For Higher Fees As Reimbursement For The "Risks" Of Doing Business With Madoff

158.    Facing grave concerns regarding the Funds' assets placed with BLMIS, Citco put its financial interests ahead of its duties to the Funds and the Funds' investors.

159.    By 2002, Citco knew that the Funds' holdings could not be verified, knew that BLMIS cleared its own trades, and knew that Citco's efforts to reconcile Madoff's operations had failed. That year, Citco's executive committee put credit line requests from the Funds "on hold until … the 'investigation' on Fairfield" was complete, because Citco was concerned about its exposure to liabilities well beyond the loans in the case of fraud. Smeets and Citco's management were aware that the credit line requests were on hold while Citco tried to "get as much comfort as possible" that BLMIS was not a fraud.

160.    Two years later, in February and March 2004, the Custodian decided to cancel one of its credit facilities with Sentry following its discovery that AIG had pulled its investments from BLMIS altogether. Specifically, the Administrator's management, including Meijer, Verhooren, and William Keunen ("Keunen")—who was responsible for the entire division of administration services for Citco—found out that "the risk team of AIG took the decision to get out from all Madoff exposure … [t]hey are scared with the structure …." It appears that because of this revelation, at least some of Citco Group's management wanted the Custodian to resign: by an email of February 6, 2004, Keunen informed the Administrator that Unternaehrer of Citco Group had decided that the Custodian should step down as custodian. At this time, Smeets was kept informed and aware of Citco's concerns regarding AIG's withdrawal from BLMIS. A few months

later, in or about September 2004, Citco's board of directors made the decision to place the Custodians' and Administrators' business with the Funds "under scrutiny" and "to close down all credit relationships … to decrease [Citco's] exposure." Citco knew that its credit relationship with the Funds would expose it to liability because of BLMIS's role as custodian, among other reasons.

161.    By 2006, Citco considered resigning as service providers. The Custodians told Citco Group's management, including Smeets: "We are taking a risk and we only get US$60K per year!"

162.    Instead, Citco negotiated a new fee arrangement. The new arrangement calculated the Custodians' rate as one basis point (one hundredth of one percent) of the Funds' total Net Asset Value. In other words, Citco's fees for the Custodians' services were now directly tied to the Net Asset Value as determined by the Administrators. Citco decided "[o]n that basis" to stay on as Custodians because Sentry's Net Asset Value at that time, based principally on the assets purportedly at BLMIS, was approximately "$5bn, i.e., fees of $500k."

163.    Simply put, Citco accepted dramatically higher fees—tied directly to the Net Asset Value certified by Citco—in exchange for the risks to Citco of doing business with BLMIS, as well as its continued silence regarding BLMIS's role as custodian of the Funds' assets. Ultimately, Citco's fees increased by 800%.

164.    Internally, Citco knew that: (i) the Administrators did not consistently price the Funds' portfolios independently and typically relied exclusively on the share pricing information supplied by Madoff; and (ii) the Custodians did not have custody of the Funds' portfolios.

165.    Citco failed to verify the pricing information for the Funds' portfolio from independent sources and instead relied on BLMIS statements, even though it knew that such account statements contained incorrect information. Accountants working for the Administrators

discovered on numerous occasions that the trades reported by BLMIS contradicted the public daily price ranges for corresponding trades. When the Administrators' personnel discovered that the reported share or option prices reported by Bloomberg and Madoff differed, they used the public price in calculating the Net Asset Value reflected in the Certificates. The Administrators' personnel did not proceed to ask BLMIS for an explanation of these discrepancies. Citco thus turned a blind eye to its knowledge that BLMIS issued account statements with incorrect pricing information.

166. Citco acted with a lack of good faith by issuing Certificates in spite of its knowledge that: (1) BLMIS's transactions were likely impossible because, as Citco was aware, it appeared that "Madoff always [knew] precisely when to buy and sell"; (2) Madoff was the only broker-dealer Citco worked with that provided settlement date transaction confirmations only, rather than trade date confirmations; and (3) Madoff insisted that Citco book all trades for the Funds manually, rather than through automated or electronic means, which directly contradicted Citco's own "policy to set up [electronic] reconciliation programs for each fund and to avoid manual entries as much as possible;" and (4) within its own records, "there [were] differences between the custody statements of Citco Bank and Madoff that [were] not being analyzed" by Citco.

167. This lack of good faith permeated the entire Citco organization. Until 2008, the Administrators and the Custodians worked hand-in-hand with multiple other Citco entities to generate the Certificates for the Funds and served as the intermediaries for all subscription funds invested by Defendants under the Subscription Agreements. Under Citco Group's direction and control, the Administrators issued Certificates without good faith and with willful blindness to the fact that they could not confirm whether the Funds' assets actually existed.

168.     From the top down, Citco saw and appreciated, but consciously disregarded, the risk to the Funds' investors that the Funds' assets with BLMIS did not exist.  The Administrators and all other "Citco" subsidiaries served at the whim of Citco Group, which, through, inter alia, the executive committee, controlled and directed the operations of the Administrators and the issuance of Certificates showing an inaccurate and inflated Net Asset Value under the Administration Agreements (as amended from time to time) with the Funds.  Irrespective of which "Citco" entity the Funds engaged, at all relevant times the Funds were provided services from and on behalf of "Citco" as a whole from at least eleven separate entities, including:  Citco Group; Citco Global Custody NV; Citco Global Custody (NA) NV; CGC (NA); Citco Fund Services (BVI); Citco Fund Services (Europe) B.V.; Citco (Canada) Inc.; Citco Global Security Services; Citco Bank Nederland N.V.; Citco Bank Nederland N.V. Dublin Branch; and Citco Banking Corporation N.V.  Indeed, upon information and belief, Citco employees themselves often referred to the foregoing collectively as "Citco."

169.     By virtue of the foregoing conduct, Citco issued the Certificates without good faith. The Funds were the primary victims of Citco's conduct and its lack of good faith in issuing the Certificates.

### E.     The Citco Record Subscriber And The Citco Banks Knew Of, Were Willfully Blind To Or Recklessly Disregarded The BLMIS Fraud

170.     Upon information and belief, all of the foregoing information related to BLMIS was conveyed to Citco Bank Nederland N.V.[2]  At all relevant times, Citco Bank Nederland N.V. Dublin Branch was a wholly owned subsidiary of Citco Banking Corporation N.V., and, upon information and belief, Citco Bank Nederland N.V. worked with Citco Bank Nederland N.V.

---

[2] For clarity, the allegations of bad faith in connection with receipt of redemptions, charged on the basis of Citco Subscriber knowledge, do not extend to Sigma and Lambda.

Dublin Branch and Citco Banking Corporation N.V. with respect to their work for the Funds.  The

Citco Banks knew of or consciously disregarded the BLMIS fraud and the bases thereof.  In

addition to the foregoing:

- In May 2000, Bodewes and Meijer emailed Renger Boonstra, the general counsel of Citco Bank Nederland N.V., recognizing that the lack of segregation of duties in BLMIS posed a unique risk because they could not "be sure" that the Funds actually owned the reported holdings.  Boonstra warned that "[w]ith [the] Manhattan [Investment Fund Fraud] in the back of our minds, we as Citco, may very well be in a potential dangerous situation, since we do not seem to have an independent source to verify the information from BLMIS."  His proposed solution involved resignation or obtaining segregation of duties.

- Meijer responded to Bodewes and Boonstra by observing that BLMIS should have a FED book entry account for treasury bonds and proposed that someone should check whether the transactions for the Funds matched the transactions as they appeared on FED statements or FED confirmations received by BLMIS.  He expressed the view that Citco was selling asset protection that was not covered by sufficient evidence.  No evidence suggests that any one checked the FED statements.

- On August 28, 2000, Meijer emailed Bodewes expressing his concern that the issues with BLMIS were "being put on the back burner and being hushed."  On September 13, 2000, Bodewes forwarded the email from Meijer to representatives from Citco Bank Nederland N.V. and the Administrator.  In a separate email to Laurens Luckmann ("Luckmann"), a supervisory director of Citco Banking Corporation, Bodewes stated that Meijer was "a bit concerned for a second Manhattan case" [a fraud case] and also noted that Holst, a managing director of Citco Bank Nederland N.V., was not comfortable with the situation.

- On September 18, 2000, Holst replied to Bodewes' September 13 email stating support for Meijer's proposal that PricewaterhouseCoopers, the Funds' auditor, confirm the existence of assets in BLMIS's custody, but indicated that it should be done not once a year but every six months.

- In an internal memorandum circulated on July 13, 2001, Bodewes concluded that the two-man audit firm being used by BLMIS did not "match up" to the size of the company.  He added that there was a "concrete" risk that losses were being hidden and the custody statements overstated.  On July 27, 2001, Luckmann forwarded this memo to all Citco executive directors, including, upon information and belief, Smeets, requesting that it be discussed at their next meeting.  After this meeting, however, new administration and custodian agreements were executed between Citco and the Funds.

- On or about February 5, 2004, Unternaehrer was advised that AIG had decided to exit their investments with BLMIS citing concerns over the structure.  This discovery led

Luckmann (by email dated February 6, 2004, and following consultation with Smeets) to give instructions for Citco companies to redeem their own shares in Sentry.

- In emails dated February 6, 2004, Keunen advised the Administrator and Citco Group management that Unternaehrer had decided that Citco Bank Nederland N.V. would step down as the Custodian.

- On August 25, 2004, Holst emailed Luckmann acknowledging that there had been a problem with the position of BLMIS from the beginning because the Administrator and the Custodian totally depend on BLMIS. That email led Luckmann to email Scott Case (another managing director of Citco Bank Nederland N.V.), who responded the same day observing that he had no idea why Citco Bank Nederland N.V. continued to fulfill a "shadow" custody function.

- In an email dated September 9, 2004, Ronald Irausquin of Citco Bank Nederland N.V. confirmed that all business with Sentry, both on the part of the Administrator and the Custodian, was meant to have been placed under scrutiny by "the Board" and that a decision had been made to close down all credit relationships with Sentry.

- In an email dated September 16, 2004 to the executive committee members, including, upon information and belief, Smeets, and to Keunen and Luckmann, Unternaehrer stated that he had met with Cornelis Boele of Fairfield Greenwich Limited and that there had also been a conference call with legal counsel and Case of Citco Bank Nederland N.V., at which agreement had been reached to make changes to the custody agreement, the Private Placement Memorandum and sub-custody agreement in order to make "everybody comfortable with the structure." When Luckmann queried whether the custody fee could be changed from a fixed fee to a basis points structure, Unternaehrer replied "the main purpose here is to take away possible liabilities while maintaining CFS business."

- In an email dated October 14, 2004 to Keunen and Luckmann, William DeRosa, general manager at Citco Bank Nederland N.V., stated "Regarding Fairfield, a discussion took place wherein the question was posed as to what was going on with it because we thought we were resigning as custodians. [Unternaehrer] met with them and it now appears we are restructuring the relationship. The concern was that even if we restructured the legal agreement to meet the reality of how this account is processed, we still had some risk."

- On or about November 2, 2004, Boonstra noticed that BLMIS's role as custodian and investment manager contravened clause 2.38 of the Irish Stock Exchange's Listing Requirements and Procedures.

- On an October 6, 2005 email between Holst, DeRosa, Boonstra, and others, Boonstra stated that "we are not really the custodian for Fairfield Sentry, just a sub-custodian."

- A review by Citco Bank Nederland N.V.'s audit division in December 2007 concluded that it was not able to validate that client instructions were correctly processed by BLMIS.

- As late as 2008, Citco Bank Nederland N.V. employees, including Boonstra and DeRosa, claimed that the structure between the Funds and BLMIS was a "curious anomaly" and that Citco felt uncomfortable.

- In December 2009, Boonstra, DeRosa, Case, and others were part of an email exchange, which recapped a discussion with Mark McKeefry regarding the bank's preference to step down as Custodian after a finding that the Fund said it complied with the requirements of the Irish Stock Exchange after misrepresenting that the custodian and investment manager were separate.

171.    As alleged at length herein, all Citco entities worked collaboratively with respect to their work for the Funds.  The free flow of information and coordination of action between the various Citco entities, including the Citco Banks, the Citco Record Subscriber, and the Citco Group, demonstrate that all Citco entities worked in collaboration with each other.  Additionally, at all relevant times, the Citco Record Subscriber and the Citco Banks were wholly-owned subsidiaries of the Citco Group, and all the Citco entities worked under the ultimate direction of Smeets, Citco Group's Chief Executive Officer, and the Citco Group's executive committee.  At all relevant times, the Citco Group was aware of or consciously disregarded the potential fraudulent activity, and still directed or consented to the Administrator's and the Custodians' involvement with BLMIS:

- Following the emails and reports from the Administrator regarding the visit to BLMIS, Smeets (Chief Executive Officer of Citco Group) arranged an executive committee meeting on January 31, 2002 to discuss BLMIS.

- The revised administration agreement between the Funds and the Administrator dated April 10, 2002, was executed with either the agreement or at the direction of the Citco Group because an executive director at the Citco Group, Unternaehrer, sent an email dated February 6, 2002 to the Administrator stating that the Funds and BLMIS were under investigation.

- A report was forwarded to the Citco Group's executive committee on December 27, 2002 regarding the Administrator's visit to BLMIS that expressed the

Administrator's concerns with BLMIS, but a revised administration agreement was still executed between the Administrator and the Funds on February 20, 2003.

- In early 2002, Citco Group's executive committee closed some of the Funds' credit facilities to limit its exposure, and then put the credit line requests from the Funds "on hold until … the 'investigation' on Fairfield [the Funds]" was complete because the executive committee was concerned that the Custodian and Administrator were exposed to liabilities well beyond the loans in the case of fraud. This issue arose again in 2004 when the Custodian decided to cancel one of its credit facilities with the Funds following the discovery by the Citco Group's executive committee that another investor had pulled its investments from BLMIS. At all times, the executive committee was in charge of the investigation and either permitted or ordered the Citco entities to proceed.

- In relation to the dispute as to whether BLMIS's role as custodian and investment manager contravened the Irish Stock Exchange's Listing Requirements and Procedures, counsel for Citco Group told the Administrator that it was prepared to tolerate potentially misleading or inaccurate information being provided to the Irish Stock Exchange to continue its relationship with the Funds.

172.    In particular, Smeets, the CEO of Citco Group, was aware of and consciously disregarded the strong suspicions expressed by employees of the various Citco entities that BLMIS's practices called the existence of the Funds' assets into question. Rather than direct the Citco entities to thoroughly investigate BLMIS and confirm the Funds' assets, Smeets instead participated in the Citco entities' decisions to quietly reduce their exposure to the Funds and BLMIS.

- In May 2000, Meijer warned Smeets that "[t]o not react or to react too late does indeed mean that investors once again faithfully deposit tens of millions of USD in the Madoff well (for which we do not know if there is a bottom to it) at month's end," with the understanding that Citco could "already be held personally responsible insofar as we have allowed the subscriptions to take place as of May without a fight." Smeets acknowledged receipt of Meijer's emails and concerns, but he dismissed them out of hand.

- Smeets received Bodewes' July 2001 memo regarding the issues at BLMIS, including the issues posed by the size of Madoff's audit firm.

- On December 27, 2002, after Citco's third failed attempt to verify the Funds' assets, Bodewes reported to Smeets and the rest of the Citco Group executive committee that as long as the position of Sentry with BLMIS was not independently verified "there will be doubts."

- In 2002, Smeets was aware that the Funds' credit line requests were on hold while Citco tried to "get as much comfort as possible" that BLMIS was not a fraud.

- In February and March 2004, Smeets was kept informed and aware of Citco's concerns regarding AIG's withdrawal from BLMIS. Luckmann consulted Smeets before giving instructions for Citco companies to redeem their own shares in Sentry.

- In 2006, Smeets was aware that Citco considered resigning as the Funds' service providers. Along with Citco Group's management, he received an email stating: "We are taking a risk and we only get US$60K per year!"

173. Through the above-alleged conduct, the Citco Subscribers knew, as early as 2000, that there was no segregation of duties at BLMIS, and that the Citco Subscribers did not have an independent source to verify information received from BLMIS. The Citco Subscribers identified this risk internally for at least seven consecutive years and flagged it as a known and recognized problem in internal reports.

174. Because of the above-alleged knowledge, employees of the Citco Subscribers developed and expressed concerns about whether the Funds' assets with BLMIS even existed. Further, the Citco Subscribers recognized a suspiciously consistent and unique pattern of trading with BLMIS, whereby BLMIS purchased shares and put options and sold call options at the beginning of each month but liquidated all positions towards the end of the month. The Citco Subscribers learned that BLMIS did not welcome inquiries regarding its practices and also acknowledged internally that this lack of transparency posed a significant risk to investors. However, upon information and belief, the Citco Subscribers did not make any efforts after 2002 to verify the existence of the assets, to establish a line of communication with BLMIS or to investigate BLMIS' trading practices. Further, the Citco Subscribers expressed concerns regarding potential similarities between BLMIS and the Manhattan Investment Fund fraud exposed in 2000.

175.    In an effort to limit their own exposure and risk, the Citco Subscribers, including the Citco Banks, considered resigning as the Funds' service providers.  However, they ultimately decided to stay on, in exchange for dramatically increased fees.

176.    As set forth above, and in accordance with the B&C Agreements between the Defendants and the Citco Subscribers, the Citco Subscribers served as trustee, agent, representative, nominee, or custodian for the Defendants in connection with investments in the Funds, and otherwise exercised control, and as per the B&C Agreements, specific discretion over the shares of Sentry and Sigma on behalf of the Defendants.

177.    Further, each of the Subscription Agreements, executed by the Citco Subscribers, manifested the Defendants' consent for the Citco Subscribers to act on behalf of and subject to the Defendants' control in accordance with the B&C Agreements.

178.    In executing the Subscription Agreements, the Citco Subscribers accepted and agreed to act on behalf of the Defendants.

179.    As described above, the Citco Record Subscriber and the Citco Banks were aware of the irregularities at BLMIS at all relevant times during which they acted on behalf of the Defendants pursuant to the Subscription Agreements and the B&C Agreements in connection with Defendants' investments in the Funds that ultimately were invested in BLMIS.  The Citco Subscribers performed these services for the Defendants while possessing the knowledge of the irregularities at BLMIS.  As set forth above, and in accordance with the B&C Agreements, at all times this knowledge was relevant if not material to Defendants' investing in the Funds to participate in the Funds' investments in BLMIS.

180.    Accordingly, the Defendants/Beneficial Shareholders had the same knowledge as Citco, the Citco Record Subscriber and the Citco Banks regarding all relevant matters relating to BLMIS and the Funds' Net Asset Values at all relevant times.

181.    But in the alternative, both the Funds' Articles as well as each of the Subscription Agreements provide that it is the registered shareholders that are to be treated as the parties to the Funds' Articles of Association.

182.    Article 8 of the Funds' Articles provides that "The Company shall be entitled to treat the registered holder of any share as the absolute owner thereof and accordingly shall not be bound to recognise an equitable or other claim to, or interest in, such share on the part of any other person."

183.    Paragraph 27 of the Subscription Agreements similarly provides that "If Subscriber is subscribing as trustee, agent, representative or nominee for another person (the 'Beneficial Shareholder'), Subscriber agrees that the representations and agreements herein are made by Subscriber with respect to itself and the Beneficial Shareholder. Subscriber has all the requisite authority from the Beneficial Shareholder to execute and perform the obligations hereunder."

184.    Together, these contractual provisions bind the Defendants/Beneficial Shareholders to Citco's, the Citco Record Subscriber's, and the Citco Banks' bad faith on all relevant matters relating to BLMIS and the Funds' Net Asset Values at all relevant times.

**F.    Exposure Of Madoff's Fraud**

185.    On December 11, 2008, federal agents arrested Madoff for violation of federal securities laws.  On that same day, the United States Attorney brought criminal charges against Madoff, alleging that Madoff ran a multibillion-dollar Ponzi scheme.  *See United States v. Madoff*, No. 08-mj-2735 (S.D.N.Y., filed Dec. 11, 2008).  Upon arrest, Madoff was reported to have told

the agents that "there is no innocent explanation" for the fraudulent scheme he had orchestrated and confessed that he "paid investors with money that wasn't there."

186.    On December 11, 2008, the United States Securities and Exchange Commission ("SEC") filed an emergency action in the Southern District of New York to halt ongoing fraudulent offerings of securities and investment advisory fraud by Madoff and BLMIS. *See SEC v. Madoff*, No. 08-cv-10791 (S.D.N.Y. filed Dec. 11, 2008). On February 9, 2009, the SEC submitted to the Court a proposed partial judgment, to which Madoff consented, imposing a permanent injunction and continuing relief against him, including a permanent freezing of his assets.

187.    In March 2009, Madoff pleaded guilty to the criminal charges brought against him. In his plea allocution, Madoff confessed: "for many years up until my arrest on December 11, 2008, I operated a Ponzi scheme through the investment advisory side of my business, Bernard L. Madoff Securities LLC."  As Madoff himself described how the scheme worked:

> The essence of my scheme was that I represented to clients and prospective clients who wished to open investment advisory and individual trading accounts with me that I would invest their money in shares of common stock, options and other securities of large well-known corporations, and upon request, would return to them their profits and principal.  Those representations were false because for many years up and until I was arrested on December 11, 2008, I never invested those funds in the securities, as I had promised.  Instead, those funds were deposited in a bank account at Chase Manhattan Bank.  When clients wished to receive the profits they believed they had earned with me or to redeem their principal, I used the money in the Chase Manhattan bank account that belonged to them or other clients to pay the requested funds.

188.    Madoff further confessed to covering up his fraud by fabricating false trade confirmation and account statements:

> To further cover-up the fact that I had not executed trades on behalf of my investment advisory clients, I knowingly caused false trading confirmations and client account statements that reflected the bogus transactions and positions to be created and sent to clients purportedly involved in the split strike conversion strategy, as well as other individual clients I defrauded who believed they had

invested in securities through me.  The clients receiving trade confirmations and account statements had no way of knowing by reviewing these documents that I had never engaged in the transactions represented on the statements and confirmations.

189.    Madoff was sentenced to 150 years in federal prison.  He died in prison on April 14, 2021.

## G.    The Funds' Estates In Liquidation

190.    Following the revelation of Madoff's fraud, the Funds' boards of directors suspended any further redemptions of shares and the calculation of the Funds' Net Asset Values. As of December 2008, and presently, Sentry, Sigma, and Lambda had, respectively, approximately 4.7 million, 3.9 million, and 0.2 million shares outstanding.

191.    In 2009, the Funds were put into liquidation proceedings in the BVI.

192.    On February 27, 2009, a secured creditor of Lambda commenced proceedings in the BVI Court pursuant to the BVI Insolvency Act of 2003 seeking the appointment of a liquidator over Lambda (the "Lambda Proceeding").  The Lambda Proceeding is pending in the BVI Court as claim number BVIHC(COM)2009/74.

193.    On April 21, 2009, ten shareholders applied to the BVI Court for the appointment of a liquidator over Sentry (the "Sentry Proceeding").  The Sentry Proceeding is pending in the BVI Court under claim number BVIHC(COM)2009/136.

194.    On April 23, 2009, a shareholder applied to the BVI Court for the appointment of a liquidator over Sigma (the "Sigma Proceeding" and collectively with the Lambda Proceeding and the Sentry Proceeding, the "BVI Liquidation Proceedings").  The Sigma Proceeding is pending in the BVI Court under claim number BVIHC(COM)2009/139.

195.    As alleged above, the BVI Court issued orders—the BVI Appointment Orders— appointing the Foreign Representatives as liquidators of the Funds.  Pursuant to the BVI

Appointment Orders, the Foreign Representatives are responsible for all aspects of the Funds' business, including protecting, realizing, and distributing assets for the Funds' estates.

196.    The Redemption Payments that were made to Defendants were mistaken payments and constituted or formed part of avoidable transactions, and generally represent assets of Sentry and Sigma's estates that Defendants are not entitled to keep.

## FIRST CLAIM
### *(Constructive Trust - Against All Defendants)*

197.    Sentry and Sigma (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma) repeat and allege again the allegations contained in paragraphs 1 through 196 above as if set forth herein.

198.    In this Court's December 6, 2018 Memorandum Decision, the Foreign Representatives were "granted leave to amend to assert constructive trust claims against Knowledge Defendants." *In re Fairfield Sentry Ltd.*, No. 10-ap-03496 (CGM), 596 B.R. 275, 316 (Bankr. S.D.N.Y. 2018) (Dkt. 1743 at 65).  The Court clarified that the Foreign Representatives could establish a constructive trust with respect to "the Knowledge Defendants that received redemption payments with the knowledge that the NAV was wrong." *Id*. at 301 (Dkt. 1743 at 38). The Court further recognized that "[u]nder BVI law, lack of good faith, *i.e.* bad faith, includes wrongdoing by one who acts recklessly as well as one who acts with actual knowledge that he is acting wrongfully or willfully blinds himself to that fact." *Id*. at 293 (Dkt. 1743 at 23–24).

199.    As detailed above, upon receipt of a redemption request, Sentry and Sigma made each of the Redemption Payments to the Citco Subscribers.  The Redemption Payments generally represented the proceeds arising from what the world now knows was Madoff's Ponzi scheme. Accordingly, these Redemption Payments did not, as Sentry and Sigma mistakenly believed, represent the proceeds arising from the profitability of or continued investment in BLMIS.

200.    Instead, the Redemption Payments were based on a miscalculated and inflated Net Asset Value, which caused those Redemption Payments to be in excess of the Net Asset Value of redeemed shares that would have been calculated based upon the true facts existing at that time or any relevant time.

201.    At the time of the Redemption Payments, the Citco Subscribers had knowledge of the Madoff fraud, and therefore knowledge that the Net Asset Value was inflated.  They knew that they could not independently confirm that BLMIS-held assets existed, and that BLMIS practices, such as not segregating duties and employing an implausibly small auditing firm, were suspect. But instead of resigning or sounding the alarm publicly, Citco turned a blind eye to the wide-spread red flags by ceasing attempts to verify that BLMIS was not a fraud after three attempts, quietly reduced its own exposure to BLMIS through the Funds, and significantly increasing its Custodian fees to offset the risk.

202.    At all times, there was a free flow of information between and among all Citco entities, including the Citco Subscribers.

203.    Accordingly, at all relevant times, the Citco Subscribers had actual knowledge of, was willfully blind to, or recklessly disregarded the fact that the NAV was inflated when it received the Redemption Payments.

204.    Upon information and belief, the Citco Subscribers may have paid some or all of the Redemption Payments they received to the Beneficial Shareholders.

205.    The Beneficial Shareholders who owned or had interests in shares of Funds issued to the Citco subscribers had the same knowledge as the Citco Subscribers regarding all relevant matters relating to BLMIS and the Funds' Net Asset Values at all relevant times for two reasons. *First*, the Citco Subscribers agreed to act on behalf of the Beneficial Shareholders as trustee, agent,

representative, nominee or custodian in connection with the Beneficial Shareholders' investments in the Funds. *Second*, the Funds' Articles of Association and the Subscription Agreements between the Funds and the Citco Subscribers provide that the registered shareholders (*i.e.*, the Citco Subscribers) are to be treated as the parties to the Articles. These contractual provisions bind the Beneficial Shareholders to the bad faith of the Citco Subscribers.

206.    By reason of their receipt of some or all of the Redemption Payments, the Beneficial Shareholders have been unjustly enriched to the detriment of Sentry and Sigma and other shareholders and creditors of Sentry and Sigma.

207.    Furthermore, the Beneficial Shareholders were not entitled to receive the Redemption Payments because the amounts transferred with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payment received by the Citco Subscribers for their redemption of shares to be in excess of the Net Asset Value of such shares that would have been calculated based upon the true facts existing at that time or any relevant time.

208.    It would offend principles of equity and good conscience to permit the Beneficial Shareholders to retain the Redemption Payments.

209.    By reason of the foregoing, a constructive trust should be imposed on the Redemption Payments that were received by the Beneficial Shareholders from Sentry and Sigma for the benefit of the Foreign Representatives and Sentry and Sigma and other shareholders and creditors of Sentry and Sigma.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs respectfully request the following relief:

A.    On the First Claim, imposition of a constructive trust on Redemption Payments;

B.      Awarding Plaintiffs the costs and disbursements of the action, including reasonable

attorneys' fees and accountants' and experts' fees, costs and expenses; and

C.      Granting Plaintiffs such other and further relief as the Court deems just and proper.

Dated: New York, New York
       August 11, 2021

                                   **SELENDY & GAY PLLC**

                                   By: */s/ David Elsberg*

                                   David Elsberg
                                   Andrew Dunlap
                                   Lena Konanova
                                   Jordan Garman
                                   Ester Murdukhayeva
                                   Ron Krock
                                   1290 Avenue of the Americas
                                   New York, NY 10104
                                   Telephone: 212-390-9000
                                   E-mail: delsberg@selendygay.com
                                   E-mail: adunlap@selendygay.com
                                   E-mail: lkonanova@selendygay.com
                                   E-mail: jgarman@selendygay.com
                                   E-mail: emurdukhayeva@selendygay.com
                                   E-mail: rkrock@selendygay.com

                                   -and-

                                   **BROWN RUDNICK LLP**
                                   David J. Molton
                                   Marek P. Krzyzowski
                                   Seven Times Square
                                   New York, New York 10036
                                   Telephone: 212-209-4800
                                   Facsimile: 212-209-4801
                                   E-mail: dmolton@brownrudnick.com
                                   E-mail: mkrzyzowski@brownrudnick.com

                                   *Attorneys for the Foreign Representatives*

**EXHIBIT A**

*Redemption Payments Received by Defendants from Sentry*
*From April 21, 2004 Through November 19, 2008*

| Payment Date | Redemption Payment | No. of Shares | Bank Account to which Redemption Payment Was Made |
|---|---|---|---|
| April 21, 2004 | $325,094.34 | 334.37 | Citco Global Custody (NA) NV, Netherlands |
| April 21, 2004 | $10,937,878.23 | 11249.96 | Citco Global Custody (NA) NV, Netherlands |
| July 16, 2004 | $147,542.37 | 148.21 | Citco Global Custody (NA) NV, Netherlands |
| August 13, 2004 | $25,000.00 | 25.09 | Citco Global Custody (NA) NV, Netherlands |
| October 19, 2004 | $415,708.68 | 409.61 | Citco Global Custody (NA) NV, Netherlands |
| November 16, 2004 | $304,550.25 | 300 | Citco Global Custody (NA) NV, Netherlands |
| December 13, 2004 | $53,962.38 | 52.74 | Citco Global Custody (NA) NV, Netherlands |
| February 16, 2005 | $25,771.59 | 25 | Citco Global Custody (NA) NV, Netherlands |
| February 16, 2005 | $68,191.63 | 66.15 | Citco Global Custody (NA) NV, Netherlands |
| March 15, 2005 | $105,977.66 | 102.43 | Citco Global Custody (NA) NV, Netherlands |
| April 14, 2005 | $152,343.04 | 146 | Citco Global Custody (NA) NV, Netherlands |
| May 13, 2005 | $168,857.07 | 161.6 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2005 | $44,698.16 | 42.51 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2005 | $566,376.42 | 538.65 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2005 | $1,572,836.72 | 1495.84 | Citco Global Custody (NA) NV, Netherlands |
| July 15, 2005 | $1,354,042.63 | 1281.8 | Citco Global Custody (NA) NV, Netherlands |
| September 15, 2005 | $2,690.99 | 2.54 | Citco Global Custody (NA) NV, Netherlands |
| September 15, 2005 | $4,237.78 | 4 | Citco Global Custody (NA) NV, Netherlands |
| September 15, 2005 | $55,875.10 | 52.74 | Citco Global Custody (NA) NV, Netherlands |
| November 17, 2005 | $584,991.41 | 538.65 | Citco Global Custody (NA) NV, Netherlands |

*Redemption Payments Received by Defendants from Sentry*
*From April 21, 2004 Through November 19, 2008*

| | | | |
|---|---|---|---|
| December 19, 2005 | $319,381.83 | 291.89 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2005 | $792,989.13 | 724.73 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2005 | $113,554.58 | 103.78 | Citco Global Custody (NA) NV, Netherlands |
| January 19, 2006 | $1,495,058.15 | 1359.05 | Citco Global Custody (NA) NV, Netherlands |
| January 19, 2006 | $179,411.38 | 163.09 | Citco Global Custody (NA) NV, Netherlands |
| January 19, 2006 | $1,026,975.86 | 933.55 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2006 | $2,922,356.34 | 2638.07 | Citco Global Custody (NA) NV, Netherlands |
| March 17, 2006 | $4,786,139.73 | 4312.08 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2006 | $1,202,873.58 | 1059.75 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2006 | $505,712.00 | 445.54 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2006 | $258,054.55 | 227.35 | Citco Global Custody (NA) NV, Netherlands |
| June 16, 2006 | $2,191,799.23 | 1917.54 | Citco Global Custody (NA) NV, Netherlands |
| July 20, 2006 | $628,887.98 | 547.41 | Citco Global Custody (NA) NV, Netherlands |
| August 14, 2006 | $56,114.50 | 48.33 | Citco Global Custody (NA) NV, Netherlands |
| August 14, 2006 | $1,131,137.32 | 974.22 | Citco Global Custody (NA) NV, Netherlands |
| September 14, 2006 | $921,808.37 | 787.87 | Citco Global Custody (NA) NV, Netherlands |
| November 14, 2006 | $205,295.78 | 173.55 | Citco Global Custody (NA) NV, Netherlands |
| December 15, 2006 | $129,720.13 | 108.73 | Citco Global Custody (NA) NV, Netherlands |
| January 16, 2007 | $380,529.93 | 316.25 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2007 | $688,899.70 | 570.89 | Citco Global Custody (NA) NV, Netherlands |
| March 16, 2007 | $969,525.04 | 804.35 | Citco Global Custody (NA) NV, Netherlands |
| April 17, 2007 | $138,405.76 | 112.97 | Citco Global Custody (NA) NV, Netherlands |

*Redemption Payments Received by Defendants from Sentry*
*From April 21, 2004 Through November 19, 2008*

| | | | |
|---|---|---|---|
| April 17, 2007 | $231,284.76 | 188.78 | Citco Global Custody (NA) NV, Netherlands |
| April 17, 2007 | $306,288.75 | 250 | Citco Global Custody (NA) NV, Netherlands |
| April 17, 2007 | $329,958.74 | 269.32 | Citco Global Custody (NA) NV, Netherlands |
| May 16, 2007 | $2,721,854.12* | 2200.18 | Citco Global Custody (NA) NV, Netherlands |
| June 15, 2007 | $268,180.77* | 215.04 | Citco Global Custody (NA) NV, Netherlands |
| July 19, 2007 | $42,948.49* | 34.32 | Citco Global Custody (NA) NV, Netherlands |
| August 17, 2007 | $277,224.68* | 221.16 | Citco Global Custody (NA) NV, Netherlands |
| August 17, 2007 | $407,689.25* | 325.24 | Citco Global Custody (NA) NV, Netherlands |
| September 19, 2007 | $410,137.62* | 326.18 | Citco Global Custody (NA) NV, Netherlands |
| October 16, 2007 | $322,120.87* | 253.7312 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2007 | $407,022.51* | 319.1359 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2007 | $34,149.12* | 26.5 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2007 | $69,586.89* | 54 | Citco Global Custody (NA) NV, Netherlands |
| December 19, 2007 | $732,517.99* | 568.44 | Citco Global Custody (NA) NV, Netherlands |
| January 17, 2008 | $297,807.14* | 230.57 | Citco Global Custody (NA) NV, Netherlands |
| January 17, 2008 | $297,807.14* | 230.57 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2008 | $185,374.88* | 142.6245 | Citco Global Custody (NA) NV, Netherlands |
| February 15, 2008 | $190,048.10* | 146.22 | Citco Global Custody (NA) NV, Netherlands |
| March 18, 2008 | $220,396.47* | 169.46 | Citco Global Custody (NA) NV, Netherlands |
| April 14, 2008 | $342,904.8* | 263.17 | Citco Global Custody (NA) NV, Netherlands |
| May 15, 2008 | $700,000.00* | 532.2994 | Citco Global Custody (NA) NV, Netherlands |
| June 17, 2008 | $484,617.93* | 365.55 | Citco Global Custody (NA) NV, Netherlands |

*Redemption Payments Received by Defendants from Sentry*
*From April 21, 2004 Through November 19, 2008*

| | | | |
|---|---|---|---|
| June 17, 2008 | $3,318,920.26* | 2503.48 | Citco Global Custody (NA) NV, Netherlands |
| July 15, 2008 | $73,811.84* | 55.71 | Citco Global Custody (NA) NV, Netherlands |
| August 18, 2008 | $66,720.16* | 50 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $186,363.88* | 138.07 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $193,247.74* | 143.17 | Citco Global Custody (NA) NV, Netherlands |
| November 19, 2008 | $466,658.82* | 345.73 | Citco Global Custody (NA) NV, Netherlands |

\* Denotes Redemptions in the Sentry Vulnerability Period.

**EXHIBIT B**

**_Redemption Payment Received by Defendants from Sigma_**
**_On January 27, 2006_**

| **Payment Date** | **Redemption Payment** | **No. of Shares** | **Bank Account to which Redemption Payment Was Made** |
|---|---|---|---|
| January 27, 2006 | $382,764.37 | 1,896.69 | Citco Global Custody (NA) NV, Netherlands |

All $USD amounts are based on the exchange rate as of the date of the Redemption Payment. However, upon application of a different exchange rate, as may be required by applicable law, the amount of damages may be different.