```
                                                          Page 1
 1    UNITED STATES BANKRUPTCY COURT

 2    SOUTHERN DISTRICT OF NEW YORK

 3    Case No. 08-99000-cgm

 4    - - - - - - - - - - - - - - - - - - - - - - - - - x

 5    In the Matter of:

 6

 7    BERNARD L. MADOFF,

 8

 9            Debtor.

10    - - - - - - - - - - - - - - - - - - - - - - - - - x

11    Adv. Case No. 10-03635-cgm

12    - - - - - - - - - - - - - - - - - - - - - - - - - x

13    Fairfield Sentry Limited (In Liquidation) et al,

14                Plaintiff,

15            v.

16    Union Bancaire Privee, UBP SA et al,

17                Defendants.

18    - - - - - - - - - - - - - - - - - - - - - - - - - x

19    Adv. Case No. 10-03636-cgm

20    - - - - - - - - - - - - - - - - - - - - - - - - - x

21    Fairfield Sentry Limited (In Liquidation) et al,

22                Plaintiff,

23            v.

24    Union Bancaire Privee, UBP SA et al,

25                Defendants.
```

```
                                                   Page 2
 1    - - - - - - - - - - - - - - - - - - - - - - - - - x
 2    Adv. Case No. 10-04285-cgm
 3    - - - - - - - - - - - - - - - - - - - - - - - - - x
 4    IRVING H. PICARD, Trustee for the Substantively
 5    Consolidated SIPA Liquidation of Bernard L. Madoff
 6    Investment Securities LLC and the Chapter 7 Estate of
 7    Bernard L. Madoff,
 8                    Plaintiff,
 9            v.
10    UBS AG, UBS (Luxembourg) SA et al,
11                    Defendants.
12    - - - - - - - - - - - - - - - - - - - - - - - - - x
13    Adv. Case No. 10-05345-cgm
14    - - - - - - - - - - - - - - - - - - - - - - - - - x
15    IRVING H. PICARD, Trustee for the Substantively
16    Consolidated SIPA Liquidation of Bernard L. Madoff
17    Investment Securities LLC and the Chapter 7 Estate of
18    Bernard L. Madoff,
19                    Plaintiff,
20            v.
21    Citibank, N.A. et al,
22                    Defendants.
23    - - - - - - - - - - - - - - - - - - - - - - - - - x
24    Adv. Case No. 11-02572-cgm
25    - - - - - - - - - - - - - - - - - - - - - - - - - x
```

```
                                                                    Page 3
 1   IRVING H. PICARD, Trustee for the Substantively
 2   Consolidated SIPA Liquidation of Bernard L. Madoff
 3   Investment Securities LLC and the Chapter 7 Estate of
 4   Bernard L. Madoff,
 5                      Plaintiff,
 6              v.
 7   Korea Exchange Bank, Individually And As Trustee,
 8                      Defendants.
 9   - - - - - - - - - - - - - - - - - - - - - - - - - - x
10   Adv. Case No. 11-02573-cgm
11   - - - - - - - - - - - - - - - - - - - - - - - - - - x
12   IRVING H. PICARD, Trustee for the Substantively
13   Consolidated SIPA Liquidation of Bernard L. Madoff
14   Investment Securities LLC and the Chapter 7 Estate of
15   Bernard L. Madoff,
16                      Plaintiff,
17              v.
18   The Sumitomo Trust and Banking Co., Ltd.,
19                      Defendants.
20   - - - - - - - - - - - - - - - - - - - - - - - - - - x
21
22
23                  United States Bankruptcy Court
24                  One Bowling Green
25                  New York, NY  10004
```

Page 4

1                          September 14, 2022

2                          10:02 AM

3

4

5    B E F O R E :

6    HON CECELIA G. MORRIS

7    U.S. BANKRUPTCY JUDGE

8

9    ECRO:    UNKNOWN

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1   Adversary proceeding: 10-03635-cgm Fairfield Sentry Limited

2   (In Liquidation) et al v. Union Bancaire Privee, UBP SA et

3   al

4   Doc# 939 Notice of Hearing to consider the Letter Requesting

5   a Pre-Motion Discovery Conference Filed by David Elsberg on

6   behalf of Fairfield Sentry Limited (In Liquidation),

7   Fairfield Sigma Limited (In Liquidation), Kenneth Krys,

8   solely in his capacity as Foreign Representative and

9   Liquidator thereof, Greig Mitchell, solely in his capacity

10  as Foreign Representative and Liquidator thereof (related

11  document(s)938) filed by Clerk of Court, United States

12  Bankruptcy Court, SDNY. with hearing to be held on

13  10/19/2022 at 10:00 AM at Videoconference (ZoomGov) (CGM)

14

15  Doc. #938 Letter Requesting a Pre-Motion Discovery

16  Conference Filed by David Elsberg on behalf of Fairfield

17  Sentry Limited (In Liquidation), Fairfield Sigma Limited (In

18  Liquidation), Kenneth Krys, solely in his capacity as

19  Foreign Representative and Liquidator thereof, Greig

20  Mitchell, solely in his capacity as Foreign Representative

21  and Liquidator thereof. (Attachments: # 1 Exhibit A - Email

22  Correspondence (2022.05.06 2022.07.14) # 2 Exhibit B -

23  Plaintiffs' First Request for Production Of Documents to

24  Dexia BIL # 3 Exhibit C - Plaintiffs' Rule 30(b)(6) Notice

25  to Dexia BIL (2022.07.21) # 4 Exhibit D - Email

Page 6

1    Correspondence (2022.07.21 2022.08.05) # 5 Exhibit E –

2    Plaintiffs' Amended Rule 30(b)(6) Notice to Dexia BIL

3    (2022.07.28))(Elsberg, David)

4

5    Doc# 941 Notice of Hearing to consider the Letter Requesting

6    a Pre-Motion Discovery Conference Filed by Jeff E. Butler on

7    behalf of Dexia Banque International a Luxembourg (related

8    document(s)940) filed by Clerk of Court, United States

9    Bankruptcy Court, SDNY. with hearing to be held on 9/14/2022

10   at 10:00 AM at Videoconference (ZoomGov) (CGM)

11

12   Doc. #940 Letter Requesting a Pre-Motion Discovery

13   Conference Filed by Jeff E. Butler on behalf of Dexia Banque

14   International a Luxembourg. (Attachments: # 1 Exhibit 1,

15   Email from Nemetz # 2 Exhibit 2, Email from Butler # 3

16   Exhibit 3, Email from Nemetz # 4 Exhibit 4, Amended

17   Deposition Notice)(Butler, Jeff)

18

19   Adversary proceeding: 10-03636-cgm Fairfield Sentry Limited

20   ( In Liquidation) et al v. Union Bancaire Privee, UBP SA et

21   al Doc# 1005 Notice of Hearing to consider the Letter

22   Requesting a Pre-Motion Discovery Conference Filed by David

23   Elsberg on behalf of Fairfield Lambda Limited (In

24   Liquidation), Fairfield Sentry Limited (In Liquidation),

25   Fairfield Sigma Limited (In Liquidation), Greig Mitchell,

Page 7

1    solely in his capacity as Foreign Representative and

2    Liquidator thereof, Kenneth Krys, solely in his capacity as

3    Foreign Representative and Liquidator thereof. (related

4    document(s)1004) filed by Clerk of Court, United States

5    Bankruptcy Court, SDNY. with hearing to be held on

6    10/19/2022 at 10:00 AM at Videoconference (ZoomGov) (CGM)

7

8    Doc. #1004 Letter Requesting a Pre-Motion Discovery

9    Conference Filed by David Elsberg on behalf of Fairfield

10   Lambda Limited (In Liquidation), Fairfield Sentry Limited

11   (In Liquidation), Fairfield Sigma Limited (In Liquidation),

12   Greig Mitchell, solely in his capacity as Foreign

13   Representative and Liquidator thereof, Kenneth Krys, solely

14   in his capacity as Foreign Representative and Liquidator

15   thereof. (Attachments: # 1 Exhibit A - Email Correspondence

16   (2022.05.06 2022.07.14) # 2 Exhibit B - Plaintiffs' First

17   Request For Production Of Documents to Dexia BIL # 3 Exhibit

18   C - Plaintiffs' Rule 30(b)(6) Notice to Dexia BIL

19   (2022.07.21) # 4 Exhibit D - Email Correspondence

20   (2022.07.21 2022.08.05) # 5 Exhibit E - Plaintiffs' Amended

21   Rule 30(b)(6) Notice to Dexia BIL (2022.07.28))(Elsberg,

22   David)

23

24   Doc# 1007 Notice of Hearing to consider the Letter

25   Requesting a Pre-Motion Discovery Conference Filed by Jeff

Page 8

1    E. Butler on behalf of Dexia Banque International a

2    Luxembourg. (related document(s)1006) filed by Clerk of

3    Court, United States Bankruptcy Court, SDNY. with hearing to

4    be held on 9/14/2022 at 10:00 AM at Videoconference

5    (ZoomGov) (CGM)

6

7    Doc. #1006 Letter Requesting a Pre-Motion Discovery

8    Conference Filed by Jeff E. Butler on behalf of Dexia Banque

9    International a Luxembourg. (Attachments: # 1 Exhibit 1,

10   Email from Nemetz # 2 Exhibit 2, Email from Butler # 3

11   Exhibit 3, Email from Nemetz # 4 Exhibit 4, Amended

12   Deposition Notice)(Butler, Jeff)

13

14   Adversary proceeding: 10-04285-cgm Irving H. Picard, Trustee

15   for the Liquidation of B v. UBS AG, UBS (Luxembourg) SA et

16   al

17   Doc# 290 Motion to Dismiss Adversary Proceeding (Dismiss

18   Second Amended Complaint), filed by Anthony L. Paccione on

19   behalf of Access International Advisors LLC, Access

20   International Advisors Ltd., Access Management Luxembourg SA

21   (f/k/a Access International Advisors Luxembourg) SA) as

22   represented by its Liquidator Maitre Ferdinand Entringer,

23   Access Partners SA as represented by its Liquidator Maitre

24   Ferdinand Entringer, Claudine Magon de la Villehuchet (a/k/a

25   Claudine de la Villehuchet) in her capacity as Executrix

Page 9

1    under the Will of Thierry Magon de la Villehuchet (a/k/a

2    Rene Thierry de la Villehuchet), Claudine Magon de la

3    Villehuchet (a/k/a Claudine de la Villehuchet) individually

4    as the sole beneficiary under the Will of Thierry Magon de

5    la Villehuchet (a/k/a Rene Thierry de la Villehuchet),

6    Groupement Financier Ltd., Patrick Littaye.

7

8    Doc# 295 Motion to Dismiss Case filed by Cathy M. Liu on

9    behalf of Theodore Dumbauld.

10

11    Doc# 302 Motion to Dismiss Adversary Proceeding / Notice of

12    UBS Defendants Motion to Dismiss Second Amended Complaint

13    (related document(s)274) filed by Marshall R. King on behalf

14    of UBS AG, UBS EUROPE SE (f/k/a UBS (LUXEMBOURG) SA, UBS

15    Fund Services (Luxembourg) SA, UBS Third Party Management

16    Company SA. with hearing to be held on 9/14/2022 at 10:00 AM

17    at Videoconference (ZoomGov) (CGM) Responses due by

18    6/17/2022

19

20    Doc# 271 Notice of Adjournment of Hearing RE: Hearing to

21    consider the Letter to Chambers Requesting Addition of

22    Adversary Proceeding to Omnibus Hearing on January 19, 2022

23    Filed by Brett S. Moore on behalf of Luxalpha SICAV as

24    represented by its Liquidators Maitre Alain Rukavina and

25    Paul LaPlume (related document(s)269) filed by Clerk of

Page 10

1   Court, United States Bankruptcy Court, SDNY; hearing held

2   and adjourned to 6/15/2022 at 10:00 AM at Videoconference

3   (ZoomGov) (CGM).

4

5   Doc# 307 Opposition /Trustee's Memorandum of Law in

6   Opposition to Defendants' Motions to Dismiss the Second

7   Amended Complaint (related document(s)295, 296, 283, 290,

8   281) filed by Oren Warshavsky on behalf of Irving H. Picard,

9   Trustee for the Liquidation of Bernard L. Madoff Investment

10  Securities LLC, and Bernard L. Madoff.

11

12  Adversary proceeding: 10-05345-cgm Irving H. Picard, Esq.,

13  Trustee for the Substantive v. Citibank, N.A. et al

14  Doc# 222 Motion to Dismiss Adversary Proceeding filed by

15  Carmine Boccuzzi on behalf of Citibank, N.A., Citicorp North

16  America, Inc., Citigroup Global Markets Limited. with

17  hearing to be held on 9/7/2022 (check with court for

18  location) Responses due by 7/1/2022,

19

20  Doc# 231 Opposition /Trustee's Memorandum of Law in

21  Opposition to Defendants' Motion to Dismiss (related

22  document(s)222) filed by David J. Sheehan on behalf of

23  Irving H. Picard, Esq., Trustee for the Substantively

24  Consolidated SIPA Liquidation of Bernard L. Madoff

25  Investment Securities LLC, and the Estate of Bernard L.

```
                                                         Page 11
 1    Madoff.

 2

 3    Doc# 234 Reply Memorandum of Law in Support of Citi

 4    Defendants' Motion to Dismiss (related document(s)222) filed

 5    by Carmine Boccuzzi on behalf of Citibank, N.A., Citicorp

 6    North America, Inc., Citigroup Global Markets Limited.

 7

 8    Adversary proceeding: 11-02572-cgm Irving H. Picard, Trustee

 9    for the Liquidation of B v. Korea Exchange Bank,

10    Individually And As Trustee F

11    Doc# 140 Opposition /Trustee's Memorandum of Law in

12    Opposition to Defendant Korea Exchange Bank's Motion to

13    Dismiss the Complaint (related document(s)135) filed by Eric

14    R Fish on behalf of Irving H. Picard, Trustee for the

15    Liquidation of Bernard L. Madoff Investment Securities LLC,

16    and Bernard L. Madoff.

17

18    Doc# 145 Reply to Motion filed by Richard A. Cirillo on

19    behalf of Korea Exchange Bank, Individually and As Trustee

20    For Korea Global All Asset Trust I-1, And For Tams Rainbow

21    Trust III.

22

23    Doc# 144 Amended Motion to Dismiss Adversary Proceeding

24    filed by Richard A. Cirillo on behalf of Korea Exchange

25    Bank, Individually and As Trustee For Korea Global All Asset
```

```
                                                          Page 12
 1     Trust I-1, And For Tams Rainbow Trust III. with hearing to
 2     be held on 9/7/2022 at 10:00 AM at Videoconference (ZoomGov)
 3     (CGM) (Cirillo, Richard)
 4
 5     Adversary proceeding: 11-02573-cgm Irving H. Picard, Trustee
 6     for the Liquidation of B v. The Sumitomo Trust and Banking
 7     Co., Ltd.
 8
 9     Doc# 119 Stipulation and Order Signed on 5/5/2022 To Amend
10     Briefing Schedule And Adjourn Argument Date to 9/14/2022 at
11     10:00 AM at Videoconference (ZoomGov) (CGM)
12
13
14
15     Transcribed by:   Sonya Ledanski Hyde
16
17
18
19
20
21
22
23
24
25
```

```
                                                            Page 13

 1   A P P E A R A N C E S :

 2

 3   BAKER HOSTETLER LLP

 4        Attorney for U.S. Trustee

 5        45 Rockefeller Plaza

 6        New York, NY 10111

 7

 8   BY:  MICHELLE R. USITALO

 9        OREN WARSHAVSKY

10        JESSICA H. FERNANDEZ

11        VICTORIA L. STORK

12        ERIC R. FISH

13

14   GIBSON, DUNN CRUTCHER, LLP

15        Attorney for UBS Defendants

16        200 Park Avenue

17        New York, NY 10166

18

19   BY:  MARSHALL R. KING

20

21   CLIFFORD CHANCE US LLP

22        Attorney for Defendant, Banque International a

23        Luxembourg (BIL)

24        31 W 52nd ST

25        New York, NY 10019
```

```
                                                                    Page 14

 1

 2     BY:  JEFF BUTLER

 3

 4     SELENDY GAY ELSBERG PLLC

 5          Attorneys for Various Fairfield Entities

 6          1290 Avenue of the Americas

 7          New York, NY 10104

 8

 9     BY:  DAVID ELSBERG

10          AMY NEMETZ

11

12     CIRILLO LAW OFFICE

13          Attorney for Korea Exchange Bank

14          246 E 33rd St

15          New York, NY 10016

16

17     BY:  RICHARD A. CIRILLO

18

19     BECKER, GLYNN, MUFFLY, CHASSIN, HOSINSKI LLP

20          Attorney for The Sumitomo Trust and Banking Co., Ltd.

21          299 Park Avenue

22          New York, NY 10171

23

24     BY:  MICHAEL ZEB LANDSMAN

25
```

```
                                                              Page 15
 1

 2    KATTEN MUCHIN ROSENAMN LLP

 3         Attorneys for Access Defendants

 4         50 Rockefeller Plaza

 5         New York, NY 10020

 6

 7    BY: ANTHONY L. PACCIONE

 8

 9    SHER TREMONTE LLP

10         Attorney for Theodore Dumbauld

11         80 Broad Street

12         Suite 1301

13         New York, NY 10009

14

15    BY:  ROBERT KNUTS

16

17    CLEARY GOTTLIEB STEEN & HAMILTON LLP

18         Attorney for Citigroup Global Markets Limited, Citibank

19         NA, and Citicorp North America Inc.

20         One Liberty Plaza

21         New York, NY 10006

22

23    BY:  CARMINE BOCCUZZI

24

25
```

Page 16

1                      P R O C E E D I N G S

2              THE COURT:  Good morning, everyone.  I have a

3     letter requesting a discovery conference and this is in

4     Adversary Proceeding 10-03635 and 10-03636.  This is

5     Fairfield Sentry v. Union Bancaire Privee and Fairfield

6     Sentry v. Adler and Company Private Bank AG.  State your

7     name and affiliation.

8              MR. BUTLER:  Good morning, Your Honor.  It's Jeff

9     Butler from Clifford Chance, representing the Defendant --

10    one of the Defendants in this case, Bank International a

11    Luxembourg or BIL.

12             THE COURT:  Okay, hold on for me a minute.  Okay.

13    So, that's the union bank, is that what it is?

14             MR. BUTLER:  No, Your Honor.  There are dozens of

15    defendants in these two cases.  We're just one of the many.

16             THE COURT:  Okay.

17             MR. BUTLER:  And it's called in the caption Dexia

18    Banque International a Luxembourg, but the name was changed

19    many years ago to BIL.

20             THE COURT:  Hold on just a second.  Our recording

21    has not picked up, so you may have to repeat some

22    information.

23             MR. BUTLER:  Sure.

24             THE COURT:  But while they're doing that, tell me

25    which case number you're on.  03635?

Page 17

1                MR. BUTLER:  3635 and 3636, Your Honor.

2                THE COURT:  Oh, so you're on both?

3                MR. BUTLER:  We are Defendants in both of the

4       cases, correct.

5                THE COURT:  Okay.  Hold on just a second until we

6       find out about the sound.  We do have backup sound, so it's

7       not -- backup recordings, just so you know.  Hold on, let me

8       turn a light out.  Just a second.  Who would've thought two

9       years ago we'd be light and sound people?  Good grief.

10      Okay, we'll just keep going with what we've got because we

11      do have backup.

12               So, this is -- and who for Fairfield?

13               MR. ELSBERG:  Your Honor, this is David Elsberg

14      for the liquidators.  And Id' like to ask my associate, Amy

15      Nemetz, to introduce herself.  Because with your permission,

16      my associate Ms. Nemetz will be addressing the Court today.

17               THE COURT:  I am delighted to have always young

18      associates, so welcome.  State your name for the record,

19      please.

20               MS. NEMETZ:  Amy Nemetz for the liquidators, Your

21      Honor.

22               THE COURT:  Very good.  Now, I have some

23      questions, but let's go with what you all have to say to me

24      first.

25               MS. NEMETZ:  Certainly, Your Honor.

Page 18

1          MR. BUTLER:  Sure, Your Honor.

2          MS. NEMETZ:  Oh.  Which letters would you like the

3    parties to address first?  Because there are two.

4          THE COURT:  Okay.  All right.  You tell me.

5          MS. NEMETZ:  Jeff, would you mind if I go first?

6          MR. BUTLER:  Of course.  Please.

7          MS. NEMETZ:  Thank you.

8          THE COURT:  His name is Mr. Butler on the record.

9          MS. NEMETZ:  Yes, Your Honor.

10          THE COURT:  Okay.

11          MS. NEMETZ:  Your Honor, the liquidators

12    respectfully request that you compel counsel for Defendant

13    BIL, which is Banque International a Luxembourg, to explain

14    why relevant email communications were lost.  We only

15    recently learned that BIL has no electronically stored

16    communications.  The liquidators' document requests, which

17    were served in September 2021, explicitly asked for these

18    communications and we had two Rule 26(f) conferences with

19    BIL's counsel, on October 1st and October 14, 2021.  At no

20    point did BIL's counsel tell us that it did not have

21    custodial emails.

22          This spring, BIL said that it had substantially

23    completed its production of documents for jurisdictional

24    discovery.  That production was 74 pages of scanned hardcopy

25    files.  We asked, what about email discovery?

Page 19

```
 1              After following up on our proposed email search a

 2    number of times, after six weeks, BIL's counsel on the

 3    deadline for substantially completing jurisdictional

 4    discovery told us for the first time that BIL does not have

 5    access to emails.  We were surprised, Your Honor.  Dozens of

 6    other defendants in these actions, including Luxembourg

 7    entities like BIL, managed to preserve, search for and

 8    product many electronically stored communications.

 9              We asked BIL's counsel that same day, June 30th,

10    what happened to the emails and why weren't they preserved?

11    BIL's counsel did not respond to us.  As you can see in

12    Exhibits A and D to the liquidators' office 11th letter, we

13    asked BIL's counsel five separate times in writing on June

14    30th, July 12th, July 14th, July 28th and August 5th to just

15    tell us what happened to the emails.  Your Honor can also

16    see from those email chains that BIL's counsel either

17    ignored or sidestepped our requests.  They're simply

18    refusing to tell us the facts.

19              We also served a Rule 30(b)(6) notice so that we

20    could ask a BIL witness the same questions about document

21    preservation that BIL's counsel was refusing to answer.

22    BIL's counsel didn't serve written objections or responses

23    to the proposed deposition topics or meet and confer with us

24    about scheduling or logistics.  Instead, BIL is here today

25    seeking a protective order that would excuse it from having
```

Page 20

1    to disclose anything about document preservation.

2              Even after the Court set this hearing, we tried to

3    communicate with BIL's counsel and resolve this email issue.

4    On August 24th, we asked BIL's counsel if he had been in

5    touch with relevant custodians or anyone else at BIL who

6    might know of any other place where relevant email

7    communications were saved.  He said he didn't know.  He

8    promised he would get back to us a week later.  But as of

9    two weeks after our discussion on September 6th, he said he

10   still didn't know.

11             Perhaps BIL's counsel is willing and able to

12   provide this information today but until that happens, the

13   liquidators are stuck.  BIL's repeated stonewalling and

14   refusal to engage with us on these issues is, in our view,

15   inconsistent with its obligations under the federal rules of

16   civil procedure and with the standards of conduct that Your

17   Honor has explained are expected by parties appearing before

18   this Court, and the treatment that we are getting is causing

19   serious prejudice to the liquidators.

20             BIL's failure to preserve electronic

21   communications in the first place prejudices our ability to

22   respond to its motion to dismiss.  BIL has argued in that

23   motion that the liquidators failed to allege specific

24   contacts between it and the United States, but evidence of

25   those contacts is precisely what we are after.  The day-to-

Page 21

1    day emails, chats, meeting invitations, the paper trail that

2    should have been left behind showing that BIL directed its

3    activities to the United States.

4              In the Picard litigation, Your Honor recently held

5    that alleged email communications between a foreign Sitco

6    customer Defendant, on the one hand, and BLMIS and FGG and

7    the United States on the other was a relevant jurisdictional

8    contact.  That decision can be found at Adversary Proceeding

9    Number 12-1693 Docket 21830 at Page 7.

10             BIL's document production to date, however,

11   includes zero communications or diary entries of this type,

12   which the Court has held constitutes critical jurisdictional

13   evidence.  And that is despite the fact, in our view, that

14   Your Honor has repeated ordered that the liquidators need

15   discovery on these issues, an order which Judge Preska

16   recently affirmed in full.

17             Separately, BIL's refusal to disclose the

18   circumstances under which it lost these emails prejudices

19   the liquidators' ability to seek relief under Federal Rule

20   of Civil Procedure 37, which addresses potential spoliation.

21   Rule 37 is highly fact-specific.  It asks whether the

22   failure to preserve occurred when litigation was reasonably

23   foreseeable and whether the party took reasonable step under

24   the circumstances.  The relief is also highly fact-specific.

25   If evidence was destroyed intentionally, then the

Page 22

1    liquidators might be entitled to an adverse inference.  But

2    even if the evidence was destroyed accidentally, the

3    liquidators would be entitled to different curative relief

4    such as, for example, striking certain arguments from BIL's

5    motion to dismiss.

6              Under similar circumstances, other courts have

7    ordered disclosure of these facts.  A 2016 District of

8    Connection decision called Bagley v. Yale University at 318

9    F.R.D. 234 is very instructive.  There the court identified

10   specific factual questions related to litigation holds and

11   document retention policies, and then compelled the

12   defendant to provide information about its document

13   preservation efforts to the plaintiff so that the plaintiff

14   could evaluate its position and whether relief was necessary

15   under Rule 37.

16             That is precisely what the liquidators are seeking

17   Your Honor's assistance with today.  The point is we need

18   the facts about BIL's preservation efforts in order to

19   navigate this issue.  Only BIL has those facts, and BIL is

20   refusing to disclose that information to us and ultimately

21   to this Court.

22             Moving on to BIL's responses to our positions, BIL

23   has raised three main points, and I'll address each one in

24   turn.  First, BIL says that our spoliation concerns are

25   hypothetical.  They are not hypothetical, Your Honor.  BIL's

Page 23

1    employees engaged in email communications during the

2    relevant timeframe, and BIL's August 12th letter to this

3    Court says, "It does not have" those emails.  That is the

4    definition of potential spoliation.

5          Moreover, the limited facts that BIL has offered

6    about its document preservation efforts strongly suggests

7    that it did not act reasonably under the circumstances.  For

8    example, if you turn to Page 2 of Exhibit A that was

9    submitted with the liquidators' letter, Mr. Butler's July

10   12th email says that BIL started preserving evidence in late

11   2010.  Late 2010 was almost two years after the whole world

12   learned that BLMIS was fraud.  There is case law for the

13   proposition that revelation of a major fraud usually

14   triggers litigation and puts everyone potentially involved

15   on notice that they have to preserve relevant evidence, and

16   some of those cases are cited in Footnote 2 of our August

17   11th letter.

18          In our view, Your Honor, disclosure of the largest

19   Ponzi scheme in history, which included Fairfield Sentry as

20   a feeder fund, and we know that BIL redeemed over $50

21   million from Sentry alone, should have raised a very big

22   flag to BIL to keep everything related to BLMIS, including

23   emails.

24          Second, BIL argues that it has already produced

25   all of the relevant emails that existed by giving us its

Page 24

1      hardcopy transaction file.  The 74 pages in that transaction

2      file contain 25 emails.  They appear to be incomplete,

3      missing pages and attachments, and for obvious reasons, they

4      don't have metadata associated with them the way that

5      electronic discovery would.  So, we can't see, for example,

6      whether anyone was blind-copied on the communications.

7              More broadly, BIL cannot back up its assumption

8      that its employees printed every email that we've asked for

9      in discovery.  BIL's production doesn't have communications

10     with BLMIS, which the liquidators sought in Request Number

11     14, or communications about marketing and investment in the

12     funds, which the liquidators sought in Request Number 6.

13     BIL's counsel has given us no reason to believe that these

14     25 printed emails were the only communications ever

15     exchanged that could be relevant to personal jurisdiction

16     issues.

17             Third, BIL argues that the information we're

18     seeking about the preservation of evidence relevant to

19     personal jurisdiction is somehow outside the scope of

20     jurisdictional discovery.  Taken literally, BIL's argument

21     means that it could destroy all evidence of contacts with

22     the United States, file a motion to dismiss for lack of

23     personal jurisdiction and never have to disclose what

24     happened to that evidence until the case somehow reaches the

25     merits.  More simply, BIL is just wrong.  In our view, Your

Page 25

1    Honor has been very clear that the liquidators are entitled

2    to all discovery permissible under the Federal Rules of

3    Civil Procedure.  Rule 37 clearly encompasses the

4    information that we are asking for about document

5    preservation efforts.  If BIL requires yet another order

6    authorizing this discovery, however, we see no reason that

7    the Court cannot enter that today.

8          My final point, Your Honor, is to respond to BIL's

9    letter seeking a protective order.  Today, the liquidators

10   are not asking this Court to compel a Rule 30(b)(6)

11   deposition.  In our view, if Your Honor orders BIL's counsel

12   to answer our questions about document preservation, and if

13   he does so completely, both sides can possibly avoid taking

14   a 30(b)(6) deposition at all and everyone can avoid

15   litigating whether or not a protective order should be in

16   place.

17         For the record, the liquidators don't believe

18   BIL's request for a protective order has any merit.  First,

19   BIL failed to meet and confer with us about the scope of the

20   deposition we requested.  That violates the face of Rule

21   26(c) under which it is seeking a protective order, as well

22   as Local Rule 7007-1 and Your Honor's individual practices.

23   Second, BIL has made no attempt to show good cause in the

24   form of undue burden or expense from preparing a single

25   witness to testify on a limited number of topics.  Finally,

Page 26

1    the sole basis on which BIL seeks this protective order, its

2    scope argument, is nonsensical for the reasons I've already

3    explained.

4            In sum, the liquidators are seeking the Court's

5    intervention so that we all can determine what happened to

6    BIL's emails and resolve the resulting prejudice to the

7    liquidators.  We just want the facts, Your Honor.  We want

8    the facts about BIL's contacts with the United States so

9    that we can address personal jurisdiction, and we want the

10   facts about BIL's failure to preserve emails so that we can

11   address any potential spoliation issues and, if necessary,

12   seek additional relief from the Court.  At this point, I

13   would be happy to answer any questions that the Court has.

14           THE COURT:  I think you answered my questions

15   without my asking.  Mr. Butler?

16           MR. BUTLER:  Good morning, Your Honor.  First, a

17   little bit of background.  In this case there's only one

18   redemption that's at issue with respect to my client.  It's

19   a $3.9 million redemption that occurred in August of 2007.

20   It's not $50 million that's at issue in this case for my

21   client.

22           THE COURT:  I think she said 15, didn't she?

23           MS. NEMETZ:  I said 50, Your Honor.

24           THE COURT:  Oh, I'm sorry.  I apologize.  Okay.

25           MR. BUTLER:  The practice at my client, which is a

Page 27

1    bank in Luxembourg, was to keep all documents including

2    email and correspondence in transaction-specific files and

3    those files were clearly preserved for this redemption

4    because we've produced those files as well as the

5    transaction files for the preceding subscription, which was

6    $3.3 million.  And as Ms. Nemetz pointed out, there are

7    about 25 emails in those files, which is about, Your Honor,

8    what one would expect because this was an execution-only

9    transaction for BIL.  They were merely getting instructions

10   from a client and executing those instructions.  There was

11   not -- there's no reason to believe there would be a lot of

12   discussion about that, there's no reason to believe there

13   would be a lot of email traffic concerning that kind of

14   transaction.

15        So, as I said, we've produced the transaction

16   files, we've actually produced a total of about 500 pages of

17   documents for jurisdictional discovery.  In this motion --

18   and I thought this was the focus on this motion -- the

19   liquidators are seeking a broad Rule 30(b)(6) deposition

20   into document preservation efforts back at the time this

21   case was originally filed in late 2010.  Now, that kind of

22   deposition is relatively normal in merits discovery.  And if

23   this were merits discovery, I wouldn't be here before Your

24   Honor.  But this is jurisdictional discovery that is really

25   supposed to be focused on contacts between my client and the

Page 28

1    United States as they relate to the specific subject matter

2    at issue in this case, which is only one redemption in

3    August of 2007.

4           So, our position is that, number one, this type of

5    deposition is just not appropriate for jurisdictional

6    discovery because it's broadly inquiring into events that

7    occurred either in 2008, a year after the redemption, or in

8    2010 when this action --

9           THE COURT:  Mr. Butler, she -- I think Ms. Nemetz

10   was very clear.  Right now, she's not asking for that.

11   She's asking for the email trail in order to be able to, if

12   necessarily, have that deposition.  Am I correct, Ms.

13   Nemetz, or did I hear that wrong too?

14          MS. NEMETZ:  That's partially correct, Your Honor.

15   We either need the email trail or, if the email trail was

16   not preserved, we need to understand the circumstances that

17   led to that.

18          THE COURT:  Well, that's -- that might be for

19   another day.

20          MS. NEMETZ:  Yeah.

21          THE COURT:  Mr. Butler, go ahead.

22          MR. BUTLER:  Well, my response to your question,

23   Your Honor, would be that we believe we have produced the

24   email trail that exists.  We're not aware of a -- you know -

25   -

Page 29

1          THE COURT:  Well, you produced hardcopy.  Where's

2     the -- where's the data on those emails?  You don't get it -

3     - you don't get it in hardcopy, Mr. Butler.

4          MR. BUTLER:  Electronic -- we don't have --

5          THE COURT:  And I know that.

6          MR. BUTLER:  Yeah.  I'm sorry, Your Honor, I

7     didn't --

8          THE COURT:  Well, then if you don't have it, then

9     you do need a 30(b)(6).  You do need somebody testifying to

10    where it is and what's going on.  If you can't produce it,

11    then you need somebody testifying to it.  You need a

12    deposition on it.

13         MR. BUTLER:  Your Honor, we -- it is definitely

14    true that we don't have electronic copies of all the emails.

15    They were only stored in the equivalent of hardcopy form.  I

16    mean, I think I disclosed that information to the

17    liquidator.  They're aware of it.  The -- and so, I mean, we

18    can't produce what we don't have, is my point.

19         THE COURT:  Well, you say you can't produce what

20    you don't have.  Then you have to have someone testify to

21    that, and the lawyer can't do that, is what you're also

22    saying.

23         MR. BUTLER:  I fully agree that the lawyer can't

24    do that, and I appreciate that comment, Your Honor.  I just

25    -- I don't think that it's appropriate in jurisdictional

Page 30

1    discovery, which is supposed to be narrow, to go off on a

2    frolic and detour about a possible spoliation argument when

3    there's not even a reason to believe that any significant

4    document is missing because of the nature of this case and

5    the nature of the transaction at issue.  It's a very simple

6    transaction, Your Honor.  You wouldn't expect there to be a

7    lot of email.

8              THE COURT:  Okay, but wait, Mr. Butler.  But, Ms.

9    Nemetz, you said that the emails were not complete.  Can you

10   give us an example?

11             MS. NEMETZ:  Yes, Your Honor.  There are emails

12   that BIL has produced in hardcopy where --

13             THE COURT:  Well, give us -- give us one example

14   so we can all understand what you're talking about.

15             MS. NEMETZ:  Yes.  Let me just bull up the Bates

16   Number so that I can be as specific as possible.

17             THE COURT:  Okay.

18             MS. NEMETZ:  So, one example is the document

19   produced at BIL005 through 007.  That's a printed email

20   chain that shows on its face that it attached scanned

21   hardcopy files to it.  It's not clear from the production

22   whether those attachments were also produced.

23             THE COURT:  Okay.  All right, Mr. Butler, that's -

24   - I -- where are those attachments to those emails?

25             MR. BUTLER:  That's an answer I don't have, Your

Veritext Legal Solutions
212-267-6868            www.veritext.com            516-608-2400

Page 31

1    Honor, and I don't think anyone -- that my client has an

2    answer to that.  We're talking about emails that were sent -

3    -

4              THE COURT:  You're talking to someone -- you're

5    talking to someone that's totally familiar with electronic

6    data.  So --

7              MR. BUTLER:  I understand, Your Honor.

8              THE COURT:  So, let's be clear about that.  I'm

9    sort of in a rock and a hard place, because when I listened

10   to Ms. Nemetz it was like, make sure that you have that

11   information too.  And then you're saying that information

12   doesn't exist.  So, then that does instantly equal having a

13   Rule 30(b)(6) deposition.  So --

14             MR. BUTLER:  Your Honor, respectfully, I don't

15   think there's any reason to believe that the kind of broad

16   email record that Ms. Nemetz is speculating about -- there's

17   no reason to believe it ever existed.

18             THE COURT:  If you've got an attachment to an

19   email, and that attachment has not been produced, and you've

20   produced the email without the attachment -- no, that's not

21   right.

22             MR. BUTLER:  Your Honor, that -- it was produced

23   in that form because that's how it was maintained in the

24   ordinary course in the files of my client.  Now, this

25   specific email, Your Honor, was not raised with me -- has

Page 32

1    not been raised with me before as a focus of the

2    liquidators' concern.  I would be happy to go back to my

3    client and see if there are additional searches that could

4    be performed to locate those specific attachments.

5              THE COURT:  Why didn't you do that before?  Why

6    are we -- when you -- when you had the Rule 26 obligation to

7    have done that before?

8              MR. BUTLER:  Your Honor, in the meet and confer

9    process where we were discussing the scope of documents that

10   we would produce, we were I think very clear about the scope

11   that we were willing to produce.  I never had a response

12   from Ms. Nemetz or anyone on the liquidators side saying, we

13   really think we need these particular attachments.  I don't

14   even know the content of that email that Ms. Nemetz just

15   cited to you --

16             THE COURT:  Of course you didn't, unless you had

17   it to begin with.  Okay, like I say, I'm sort of in a rock

18   and a hard place.  We have incomplete emails.  Ms. Nemetz,

19   Mr. Butler, meet in person.

20             MR. BUTLER:  Oh, happy to do that, Your Honor.

21             MS. NEMETZ:  Certainly, Your Honor.

22             THE COURT:  Meet in person, have your documents

23   there.  And I'm going to just kick the can down the road

24   because right now, what I'm going to demand is you meet the

25   requirements under Rule 26.  And that means you get

Page 33

1   metadata.  And I know they've got it.  You can't tell me a

2   bank doesn't have it.

3            That being said, I'll talk about the 36 -- the

4   30(b)(6) possibility on October 19th.  So, you all have got

5   time to get -- take a look at everything, go over line by

6   line whatever needs to be done, and then -- that's quick.

7   So, I'll need to know exactly what I'm ruling on at that

8   time but it will be the possibility of having the 30(b)(6).

9            Now, Ms. Nemetz, we're talking about jurisdiction

10  here and Mr. Butler's correct.  This is narrow.

11           MS. NEMETZ:  Yes, Your Honor.

12           THE COURT:  So -- and I'll tell you what I'm

13  looking for, Mr. Butler, is -- just as she said, those BCCs.

14  Who did those blind copies go to?  Are there any?  Are you

15  dealing with the United States on those blind copies?  They

16  need to really look at their material instead of just simply

17  saying, we don't have it.  That's insufficient for me at

18  this stage.

19           MS. NEMETZ:  Yes, Your Honor.  I appreciate your

20  guidance so far.  I just want to say that I'm happy to meet

21  and confer with Mr. Butler in person as many times as is

22  necessary to sort this out.  But so far, whenever we've

23  asked these questions -- for example, we asked him several

24  weeks ago whether he'd spoken to any of the relevant

25  custodians who sent these emails, and he said no.  And we

Page 34

1   still don't --

2           THE COURT:  Mr. Butler, I want the names of people

3   you spoke to at the bank.  I want the names of the people

4   that you're dealing with to make sure this is done.

5           For instance, if you called me and said, I need

6   something from the Court, I am going to have to call my IT

7   specialist.  And I'm going to tell you, Mr. Butler, as my

8   lawyer, that I have to talk to that IT specialist to know

9   about it.

10          MR. BUTLER:  Mm hmm.

11          THE COURT:  I want you to have that chain in your

12   head when you do it.

13          MR. BUTLER:  Certainly, Your Honor.  I've already

14   discussed it --

15          THE COURT:  I want a chain of custody from this

16   and I don't -- okay, you talked to the CEO.  No, the CEO

17   doesn't have it.  I know the CEO doesn't have it.  Who is in

18   charge of IT?  Who is the head of IT?  Who is the one

19   responsible for retaining the documents?  You get me a chain

20   of custody because you yourself cannot testify to that

21   information.  And you know it and I know it.

22          MR. BUTLER:  Agreed, Your Honor.  And I will say I

23   haven't chased all that information down to date, although I

24   had many conversations with my client on this subject -- but

25   we can do more to get what you're requesting.

Page 35

1              THE COURT:  Your client.  Which client?  Which

2    client?  Did you talk to the IT guy?  Did you talk to --

3              MR. BUTLER:  Your Honor, I've spoken primarily to

4    the Legal Department of BIL.

5              THE COURT:  Well, the Legal Department can't

6    testify to it either, and you know that and I know that.

7    Who's -- who's responsible for the chain of custody for the

8    information in that bank?

9              MR. BUTLER:  I understand, Your Honor.

10             THE COURT:  Come back and see me on October 19th.

11   You two talk, but you two talk in person.  Where are you

12   all?

13             MR. BUTLER:  I believe we're both in New York,

14   Your Honor.

15             THE COURT:  Perfect.

16             MS. NEMETZ:  I believe our offices are across the

17   street from each other, Your Honor.

18             THE COURT:  That's even better.  Yeah.  But have

19   your list and remember we're concentrating on jurisdiction.

20   But, Mr. Butler, it's not the legal staff.  That legal staff

21   better be talking to who's in charge of the documents and

22   telling you so.

23             MR. BUTLER:  Yes, Your Honor, I understand, I

24   understand.

25             THE COURT:  Excellent.  I'm going to take a quick

Page 36

1    break.  It'll only be about three minutes -- to turn the air

2    conditioning down.

3              MR. BUTLER:  Thank you, Your Honor.

4              MS. NEMETZ:  Thank you, Your Honor.

5              THE COURT:  Thank you.  Okay, we are now into the

6    contested matter.  Let me get this one off my plate.  Very

7    good.  I believe the next one we have on the agenda is

8    basically 10-04285, Trustee for the BLMIS v. UBS AG, UBS

9    Luxembourg.  Who else do we have on this one?  Let me find

10   out.  It's all the UBS entities, correct?  State your name

11   and affiliation and make sure I'm correct.

12             MR. KING:  Good morning, Your Honor.  It's

13   Marshall King from Gibson Dunn & Crutcher on behalf of the

14   four UBS Defendants.  And I can give you those names if

15   you'd like them.

16             THE COURT:  Just put it on the record, please.

17             MR. KING:  Sure.  Sure.  That's UBS AG, UBS EUROPE

18   SE, UBS Fund Services (Luxembourg) SA and UBS Third Party

19   Management Company SA.

20             THE COURT:  Excellent, thank you.

21             MR. KING:  And there are other Defendants as well,

22   as Your Honor noted, and I'm sure counsel will put their

23   appearance on as well.

24             THE COURT:  Excellent.

25             MS. USITALO:  Good morning, Your Honor.  This is

Page 37

1   Michelle Usitalo of Baker Hostetler for the Trustee, Irving

2   Picard.  I'm also here this morning with my colleagues, Mr.

3   Warshavsky, as well as Ms. Fernandez and Ms. Stork.

4          MR. PACCIONE:  Your Honor, Anthony Paccione from

5   Katten Muchin Rosenamn, on behalf of the Access Defendants,

6   who I could read their names into the record if you'd like.

7          THE COURT:  Let's do.  Let's just make the record

8   clear.

9          MR. PACCIONE:  Sure.  So, the Access Defendants

10  that I'm referring to include Access International Advisory

11  LLC, Access International Advisors LTD, Access Management

12  Luxembourg SA, formerly known as Access International

13  Advisors (Luxembourg) SA, Access Partners SA, Patrick

14  Littaye, Claudine Magnon de la Villehuchet, whose name is in

15  the caption and I'm happy to spell it, if necessary.

16         THE COURT:  No, I have it down.  Thank you.

17         MR. PACCIONE:  And Groupement Financier Ltd.

18         MR. KNUTS:  Good morning, Your Honor.  It's Robert

19  Knuts for Defendant Theodore Dumbauld.

20         THE COURT:  And Mr. (indiscernible) has been

21  adjourned, correct?

22         MR. KING:  That's correct, Your Honor.

23         THE COURT:  And then we have Defendants in their

24  capacity as liquidators.  Are they on the record today?

25         MR. KING:  I don't believe they've moved to

Page 38

1    dismiss, Your Honor.

2              THE COURT:  I don't believe they have either.

3    Exactly.  I was just making sure.  Thank you.  Very good.

4    It is your (indiscernible) business.

5              MR. KING:  Thank you, Your Honor.  Again, it's

6    Marshall King from Gibson Dunn on behalf of the UBS

7    Defendants.  This is a case in which the Trustee is seeking

8    to recover subsequent transfers that were made initially

9    through two foreign feeder funds.  One called Luxalpha and

10   one called Groupement Financier.

11             I think as we discuss the issues of jurisdiction

12   this morning, I think it's important to clarify that the UBS

13   Defendants who are moving for dismissal on that basis are

14   not investors in BLMIS and they are not investors in those

15   foreign feeder funds.  They are not alleged to have invested

16   any of their own money with Madoff, whether directly or

17   indirectly.  Instead, we're talking about service providers

18   to foreign funds.  Those foreign funds contracted with the

19   service providers under foreign law, under contracts

20   governed by foreign law, to provide services to those funds

21   in the foreign countries.

22             The Trustee claims there's jurisdiction here on

23   the theory that these service providers were providing the

24   scaffolding for investment activities by others -- by the

25   funds, not by the Defendants themselves.  In essence, the

Page 39

1    Defendants, who are moving for personal jurisdiction

2    dismissal, were doing business with entities, that is, the

3    funds, that were transacting business in the United States

4    but they were not themselves transacting business in the

5    United States.

6            There are four UBS Defendants.  Our motion for

7    personal jurisdiction -- for lack of personal jurisdiction

8    is on behalf of just three of those entities.  The one we

9    have not moved on, I think it's important to just clarify,

10   is UBS Europe SE.  It was formerly known as UBS Luxembourg

11   SA, and it's frequently referred to in the second amended

12   complaint here as UBS SA.  That entity is alleged to have

13   acted as the custodian for Luxalpha and to have communicated

14   regularly with the Madoff entity, with BLMIS, by mail, by

15   fax, by telephone.  It's alleged to have signed contract

16   with BLMIS on behalf of Luxalpha, to have opened an account

17   with BLMIS.  It effectuated the subscriptions and received

18   redemptions on behalf of Luxalpha from Madoff.

19           As to the other three UBS Defendants, the ones who

20   we are moving on behalf of, there are no such allegations

21   about contacts with the United States.  To the contrary,

22   again, they are foreign entities which performed services

23   abroad under contracts governed by foreign law and which

24   received payment for their services abroad.  It's important,

25   I think, and the law requires that we focus on each of the

Page 40

1    Defendants individually to assess whether they have

2    purposely availed themselves of the privilege of doing

3    business in the United States and whether the claims in this

4    case arise out of or relate to those contacts.

5            If Your Honor would permit me, I have a series of

6    demonstratives that I hope will be helpful to Your Honor in

7    sorting through a whole list of acronyms and other names

8    here.  And if I could share my screen, I'd appreciate

9    sharing some demonstratives this morning.

10           THE COURT:  I think the host has to give you that

11   power, and I'm not the host.

12           MR. KING:  Okay.

13           THE COURT:  Earlier -- earlier I said, you know,

14   you'd have to talk to the IT staff.

15           MR. KING:  Sure.

16           THE COURT:  Well, you've got to talk to the IT

17   staff.  I believe it can be done.

18           MR. KING:  Okay.  I did share a set of these with

19   counsel for the Trustee shortly before this morning's

20   hearing began, Your Honor.

21           THE COURT:  Let's -- let me get permission.  I

22   have to get permission to let you take the screen.  So, give

23   us two seconds.

24           MS. USITALO:  Your Honor?

25           THE COURT:  Yes?

Page 41

1          MS. USITALO:  This is Michelle Usitalo of Baker

2     Hostetler for the Trustee.  I just wanted to emphasize the

3     shortly before the Trustee -- the shortly before the hearing

4     part of Mr. King's statement, and just note that the Trustee

5     had not yet had the opportunity to review any of these

6     demonstratives.

7          THE COURT:  Okay, we'll go -- he's now shared.  It

8     may be called kicking the can down the road again, but we'll

9     see.  Okay, you are now the cohost.

10         MR. KING:  Thank you, Your Honor.  Let me see if I

11    can make this work.  I know all the associates on my side

12    are panicked that I'm trying to do this myself.

13         THE COURT:  I will tell you that would be exactly

14    what would happen here.  The fact that they even let me

15    punch a button is called panic.

16         MR. KING:  Okay, I think I have done it.  Is Your

17    Honor seeing --

18         THE COURT:  Perfectly.  I see it.

19         MR. KING:  Excellent.

20         THE COURT:  Okay, you've got everybody here.

21    USBAG et al., okay.

22         MR. KING:  Great.  So, first, I wanted to speak

23    about Defendant UBS AG.  UBS AG is a Swiss company

24    headquartered in Switzerland.  It's alleged in the complaint

25    to have offices and activities in the United States but it's

Page 42

```
 1   not alleged, nor could it be, to be subject to general

 2   jurisdiction in the United States under the Daimler

 3   decision, and there's no allegation that any of the United

 4   States offices played any role in any way related to

 5   Luxalpha or Groupement Financier.

 6           It's alleged to have been a cosponsor and co-

 7   promoter of Luxalpha but the complaint doesn't really

 8   explain what those roles are, and it doesn't allege any

 9   activity -- certainly not any U.S.-directed activity or

10   conduct by UBS AG.  And, in fact, what the complaint alleges

11   -- and this is in Paragraph 162 -- is that the purpose of

12   having UBS AG as the cosponsor and co-promoter was to

13   satisfy certain Luxembourg and European regulatory

14   requirements.  It had nothing to do with anything with the

15   United States.

16           The only conduct by UBS AG that is alleged in the

17   complaint is really in connection with what the complaint

18   says is another Madoff-related investment, that is no --

19   meaning, not Luxalpha and Not Groupement Financier.  When

20   they tried unsuccessfully -- certain employees in London

21   tried unsuccessfully to conduct diligence on Madoff and to

22   have a meeting with him.  Apparently, the meeting never

23   happened and so there was no contact.  Certainly no

24   jurisdictionally relevant contact that relates in any way to

25   the subsequent transfer claims at issue here.
```

Page 43

1              The last and only other potential argument the

2    Trustee has made about U.S.-directed conduct by UBS AG is

3    that UBS Luxembourg, which is that company I mentioned that

4    we are not moving to dismiss on behalf of -- at least not on

5    jurisdictional grounds -- maintained a bank account at a UBS

6    branch in the United States, and UBS Luxembourg used that

7    account to pass dollar-denominated transactions to and from

8    Madoff on behalf of Luxalpha.

9              It's not alleged that UBS AG initiated any of

10   those transfers.  It's merely a bank at which someone else

11   used their account to make transfers in and out of that

12   account.  I don't think that could be deemed purposeful

13   availment by the bank in all of the activities of their -- I

14   don't think there's any basis for arguing that a bank

15   purposely avails itself of all the transactional activities

16   that its customers engage in using bank accounts that are

17   maintained at that branch.

18             And, importantly, and I'll come back to this later

19   in my argument -- but the complaint, it's almost impossible

20   to make a determination as to UBS AG that any contact with

21   the United States -- any of these contacts relates to the

22   claim that is being brought here because the claim that is

23   being brought here is to recover subsequent transfers and

24   there is no allegation that UBS AG ever received a

25   subsequent transfer of money that originated at BLMIS.  I'll

Page 44

1    come back to that in a bit when I discuss the failings of

2    the complaint on 12(b)(6) grounds.  But it's relevant also

3    for jurisdictional purposes because the only way

4    jurisdiction, specific jurisdiction, could be deemed to

5    exist is if there is purposeful availment and U.S.-directed

6    conduct and that conduct relates to the claim at issue.  And

7    we don't even know what the subsequent transfer is so it's

8    impossible to make that determination here as to UBS AG.

9            One other point about UBS AG that's addressed in

10    the briefs.  The Trustee argues that UBS AG waived its right

11    to challenge personal jurisdiction because back in 2012,

12    when the Defendants first moved to dismiss the original

13    complaint, I believe, in this action, UBS AG did not include

14    a personal jurisdiction argument at that time.  As I

15    mentioned, that occurred in 2012 at a time before the

16    Daimler decision, which was decided by the Supreme Court in

17    '14, and under governing Second Circuit law at that time,

18    UBS AG was subject to general jurisdiction in the United

19    States because it had -- even though it is a foreign

20    company, headquartered overseas, it had branches in the

21    United States.  And under governing Second Circuit law at

22    the time, that was good enough for general jurisdiction.

23            As Your Honor knows, that has changed given the

24    Daimler decision which establishes that general jurisdiction

25    only exists -- or with rare exceptions, only exists in the

Page 45

 1    place of incorporation or the principal place of business.

 2    So, today, there is no general jurisdiction of UBS AG.  And

 3    the Second Circuit has held in similar circumstances in the

 4    Gucci America case, 768 F.3d, 122 -- and I'll just -- I'll

 5    read the quote.  It's directly on point.

 6              "A defendant does not waive a personal

 7    jurisdiction argument if the argument that the Court lacked

 8    jurisdiction over the defendant would have been directly

 9    contrary to controlling precedent in this circuit."  And

10    that is certainly true of what occurred at the time of that

11    very first motion to dismiss in this case.  UBS AG would not

12    have had an argument to dismiss for lack of jurisdiction so

13    it can't be deemed to have waived that -- where it now does

14    have that argument and has asserted it at its first

15    opportunity.

16              Next company to talk about is UBS Fund Services

17    Limited, referred to in the complaint frequently as UBS FSL,

18    but I recognize that some of the abbreviations get a bit

19    confusing so I'll try and use the full name, Your Honor.

20    UBS Fund Services is a Luxembourg company headquartered in

21    Luxembourg.  It's alleged to have been the administrator for

22    Luxalpha and Groupement Financier.  And by that, the Trustee

23    claims that the entity was performing day-to-day accounting

24    functions, keeping the shareholder register, communicating

25    with investors, preparing financial statements, calculating

Page 46

1    the net asset value.  You know, the day-to-day

2    administrative services, as is hinted at by the name

3    administrator, for those funds.  But, importantly, all of

4    those activities occurred in Luxembourg.  None are alleged

5    to have occurred anywhere in the United States.

6            In the Trustee's opposition papers he cites a

7    single fax and four alleged phone calls with the United

8    States over a four-year period.  I will first say that the

9    phone call evidence that the Trustee has submitted -- and

10   that's at Exhibit 49 of the declaration that the Trustee

11   submitted with his opposition papers -- is probably not even

12   properly considered by Your Honor.  This is a chart, I

13   guess, that is headlined Log of Apparent Phone Calls between

14   BLMIS and UBS SA or UBS FSL.  It's purported to be

15   authenticated by a lawyer for the Trustee, for Mr. Picard.

16   I don't think it's appropriately considered on a motion to

17   dismiss.  It's not alleged in the complaint and I don't

18   think it is appropriately considered on a motion to dismiss

19   as -- as evidence of anything, honestly.  The lawyer who

20   purports to authenticate it authenticated it as a log of

21   apparent phone calls so they can't even assert that there

22   were.  But even assuming that four phone calls were placed,

23   if you total up the minutes, it's 13 minutes over four years

24   is alleged.  And there's nothing argued or presented that

25   would connect these phone calls to any of the subsequent

Page 47

1    transfers in this case, even if you considered these minimal

2    haphazard contact with the U.S.:  One fax and four phone

3    calls over a four-year period.

4              There is no allegation in this case of any

5    transfers of funds to or from the United States by Fund

6    Services Limited, no meetings in the United States are

7    alleged, no -- the Trustee, in his brief, relies on a case

8    called Kromer for the assertion of jurisdiction over a

9    foreign administrator of a foreign investment fund.  But in

10   Kromer, the fund at issue was created, managed and operated

11   in the United -- from the United States.  There were regular

12   calls and countless mailings by the defendant at issue, by

13   the administrator, with investors and others in the United

14   States.  And there is just nothing remotely like that

15   alleged about UBS Fund Services Limited.

16              Third, Your Honor -- sorry -- is Defendant UBS

17   Third Party Management Company, also al Luxembourg company,

18   also headquartered in Luxembourg.  It is alleged to have

19   been the portfolio manager for Luxalpha from mid-2006 to

20   late 2008.  But that's it on the allegations about UBS Third

21   Party Management Company.  There's no allegations of any

22   conduct, zero conduct at all by anyone at Third Party

23   Management Company, much less any that were directed at the

24   U.S.  There's, again, no transfers of funds by UBS Third

25   Party Management Company, either to the United States or

Page 48

1    from the United States, no meetings in the United States, no

2    communications alleged with the United States.  The Trustee,

3    in fact, alleges that UBS Third Party Management Company sat

4    passively and didn't do anything.  So, on that basis, there

5    can't be purposeful availment of the privilege of conducting

6    business in the United States.

7           Briefly, the Trustee does try to make an agency

8    argument alleging that UBS Luxembourg -- again, that's the

9    other Defendant that we are not moving on personal

10   jurisdiction grounds -- arguing that the U.S. contacts of

11   that entity should be attributed to Third Party Management

12   Company, allegedly because of an advisory committee that was

13   supposedly formed by UBS Luxembourg.  But nowhere in the

14   brief or in the complaint are there any allegations about

15   what that advisory committee did or whether it had any U.S.-

16   directed contacts, even if it could be attributable to Third

17   Party Management Company.

18          And, as we point out in our reply brief, the

19   theory that the Trustee has here seems to be backwards.

20   They are alleging that UBS Third Party Management Company

21   was the agent of UBS Luxembourg but yet they're trying to

22   attribute the conduct of the principal to the agent, and

23   that is not how agency jurisdiction works.  All of the

24   Trustee's jurisdictional arguments about these three

25   entities boil down to what I said at the beginning, which is

Page 49

1    the notion that doing business with an entity that does

2    business in the United States is a basis for jurisdiction;

3    not -- not based on the jurisdictional conduct -- conduct

4    and contacts of the defendants themselves.  And we think

5    that just stretches personal jurisdiction too far and that

6    the 12(b)(2) motion for lack of personal jurisdiction should

7    be granted.

8           Moving to the merits, Your Honor, I want to

9    address just a couple of items.  I'm not -- we've moved on

10   546(e) grounds.  Your Honor obviously has addressed that

11   topic in any number of decisions.  But there are some unique

12   pieces here that have not been decided in any prior

13   decision, including one important one, and that is the

14   question of whether the Trustee has adequately pled that the

15   fund Defendants -- the fund Defendants being Luxalpha and

16   Groupement Financier -- had actual knowledge that BLMIS was

17   not trading securities.

18          The Trustee concedes that 546(e) would -- is

19   otherwise applicable, that all the prerequisites for 546(e)

20   are met, but argues that he can avoid the safe harbor

21   because of the so-called actual knowledge exception.  So,

22   let's just focus for a moment on what that requires.  The

23   actual knowledge standard is an extraordinarily high

24   standard to meet.  It's a requirement of a subjective mental

25   state by the Defendant of "a high level of certainty and an

Page 50

1    absence of any substantial doubt" that BLMIS was not trading

2    securities.  That comes from Judge Bernstein's Merkin

3    decision in 2014.  It is not enough that the Defendant had a

4    strong suspicion of fraud; it is not enough -- certainly not

5    enough that there were red flags that should have put

6    someone on notice of the fraud.  It -- it requires that the

7    Defendant basically conclude a high level of certainty and

8    no doubt that BLMIS was not trading securities.

9              If you look at the complaint here, that -- all

10   that the Trustee really pleads is red flags or suspicions.

11   These -- you know, these next few slides are just a series

12   of excerpts from the complaint, from the second amended

13   complaint here, which illustrates the most that the Trustee

14   has.  You'll see that -- you know, it says things like there

15   are voices in the industry warning, there are serious

16   concerns, there is a fraud risk.  That's in Paragraph 156.

17   On multiple occasions -- if you look at Paragraph 144, for

18   instance -- people are alleged to have identified "red

19   flags."  You'll see serious concerns.  You'll see skepticism

20   up in Paragraph 247.  Skepticism.  You'll see warning signs,

21   and you'll see people say that there is an opportunity for

22   fraud.  That's up there in Paragraph 234.  You can see in

23   232 on the right hand side again alleging major red flags.

24             All of -- what's missing from the second amended

25   complaint is any factual assertion that any of the

Page 51

```
 1   Defendants subjectively believed with a high level of
 2   certainty and no substantial doubt that Madoff was a Ponzi
 3   scheme.  And, to the contrary, what you see in the quotes --
 4   all we've relied on here are quotes from the Trustee and the
 5   complaint -- you'll see things like in Paragraph 155 on the
 6   bottom right hand corner, here's a UBS employee noting that
 7   Madoff is controversial.  In this excerpt he notes that
 8   there are some oddities, there are things that are odd or
 9   different from the norm.  The employee is unable to identify
10   counterparties or having trouble identifying counterparties
11   for Madoff.  But what does it say?  It says everything is
12   probably fine.  And that obviously is not a high -- high
13   level of certainty that Madoff was committing fraud.  That's
14   noting some problems but having doubts.
15           Elsewhere in the complaint -- and I think this is
16   really the Trustee's sort of -- the best and most -- their
17   best argument that anyone noticed wrongdoing at Madoff
18   concerns an investigation done by a consultant hired by
19   Access, a fellow named Cutler, who did some diligence, did
20   some digging and concluded -- and you see it in Paragraph
21   235 -- the strategy doesn't make sense.  And what does he
22   say?  He says, it's possible that these are extremely sloppy
23   errors or serious omissions in tickets.  That's the best
24   case.  Arithmetic errors in the founder's strategy
25   description.  So, even in the coup de grâce of the Trustee's
```

Page 52

1    argument, this Cutler investigation, he does not conclude

2    with a high level of certainty and a lack of doubt that

3    Madoff was not selling securities and was committing fraud.

4          I would say as you look at all of these and

5    consider them holistically, the allegations here don't even

6    approach the kind of allegations that the Trustee made in

7    the Merkin case that Judge Bernstein decided, where he held

8    that the Trustee had not -- had failed to plead actual

9    knowledge.  He held they satisfied -- I believe he held they

10   satisfied the willful blindness test but that isn't enough.

11   He held they had failed to plead actual knowledge.  The

12   complaint there included the same kind of allegations about

13   the impossibilities of Madoff's returns and concerns about

14   fraud, but the allegations there went even further.  There

15   were people who were saying that there was some probability

16   that Madoff was a fraud and might be a Ponzi scheme.  They

17   had quotes to that effect from the defendants there.  And

18   even with those allegations, Judge Bernstein held that they

19   constituted, at most, a strong suspicion of fraud but not

20   the absence of doubt that's required for actual knowledge.

21          And so because the Trustee acknowledges the

22   applicability of Section 546(e) but has failed to plead

23   actual knowledge, that means that all of the transfers,

24   initial and subsequent, prior to two years before the filing

25   date are protected by the safe harbor and cannot be

Page 53

1      recovered.

2              Lastly, Your Honor -- last topic I want to mention

3      is insufficient allegations about -- about the existence of

4      subsequence transfers.  The Trustee needs to plead -- this

5      is not a question that -- of simply difficulties the Trustee

6      will have in tracing the funds from Madoff through the

7      initial transferees to the subsequent transferees.  It is

8      true he will have that problem when we come to it but there

9      are some glaring items that are simply impossibilities --

10     not difficulties -- impossibilities on the face of the

11     complaint that require dismissal of some of the transfers.

12             So, first -- I mentioned this at the beginning --

13     there is no allegation that UBS AG received any subsequent

14     transfer at all.  In his opposition papers, the Trustee

15     concedes that he must allege the pathways of the transfers,

16     how they got from Madoff to the Defendant, and the who, when

17     and how much of the transfers are at issue.  And the Trustee

18     tries to do this in Paragraph 3 -- Paragraphs 3 -- sorry --

19     333 through 337 of the second amended complaint.

20             And if you look at those paragraphs, you will see

21     that the Trustee includes a paragraph about each of the

22     Defendants in this case, except UBS AG.  He articulates the

23     amounts he's seeking to recover and the pathways, or

24     attempts to allege them, as to every Defendant, but there is

25     no allegation in those paragraphs or anywhere else in the

Page 54

1    complaint about transfers to UBS AG.  And I would submit,

2    Your Honor, that this is not simply an oversight on the

3    Trustee's part.  I think it was a deliberate decision.  But,

4    of course, there are consequences to deliberate decisions.

5         And for that, Your Honor, I would point you to the

6    following:  Back in 2015, the Trustee moved for leave to

7    amend his complaint in this action, tendering a proposed

8    second amended complaint at that time.  And that is -- I'm

9    showing Your Honor -- on the left hand side of this screen.

10   It's Docket Entry 210 in this case.  And you'll see there,

11   the Trustee included a paragraph that said, based on the

12   Trustee's investigation to date, the UBS Defendants received

13   at least 97 million in subsequent transfers, including but

14   not limited to the following.  And it lists A, B, C and D.

15   UBS SA received this amount, UBS FSL received this amount,

16   UBS Third Party Management Company received this amount.

17   And here are the rough dates of those receipts.  And it

18   included a Paragraph D, UBS AG received at least 4.2 million

19   in recoverable subsequent transfers in the form of dividends

20   paid by UBS SA and UBS FSL, which were comprised in part of

21   fee amounts received from Luxalpha and Groupement Financier.

22        And so leaving aside for a moment the difficulties

23   and implausibility of ever proving tracing in that

24   circumstance, let's look at what the Trustee now alleges in

25   the operative complaint in this case.  And the corresponding

Page 55

1    paragraph is Paragraph 333, which I mentioned a few moments

2    ago, and that's on the right hand side here.  And what we've

3    done is run a red line of the currently operative complaint

4    against the proposed amended complaint that the Trustee

5    tendered a few years ago -- and you'll see most notably

6    Paragraph D is no longer in there, and there is nothing else

7    alleged anywhere in the second amended complaint that

8    replaces it.

9             So, as such, the Trustee has failed to plead even

10   the most basic requirements for a claim to recover

11   subsequent transfers under Section 550 and, at a minimum,

12   the claim against UBS AG needs to be dismissed, if not for

13   personal jurisdiction, then for failure to state a claim.

14             And the last point, Your Honor, again, based

15   solely on the allegations of the Trustee's complaint, a

16   significant portion of the subsequent transfers he seeks to

17   recover could not have originated with BLMIS.  So, you'll

18   note here that the Trustee alleges in 33(a) that UBS SA --

19   again, that's the acronym that's used for UBS Europe SE, now

20   known as UBS Europe SE -- received at least 32.8 million in

21   fees for serving as the official custodian and official

22   manager of Luxalpha from February 2004 to August 2006.

23             Okay, fine.  That's an effort to plead the

24   subsequent transfers as to UBS Europe.  But if you total up

25   all of the initial transfers that existed on or before

Page 56

1    August 2006 -- and this is pulled from Exhibit B of the

2    second amended complaint, Your Honor, where the Trustee

3    lists all of the transfers to and from Luxalpha and Groupe -

4    - well, Luxalpha in this instance -- purports to list all of

5    the initial transfers.  And if you total up all of the

6    initial transfers, you get -- as of the end of 2006 -- 16.2

7    million in initial transfers.  That means that it is

8    impossible that the 32 million that the Trustee seeks to

9    recover in subsequent transfers for that period could

10   possibly have been BLMIS customer property and initial

11   transfers.

12          Again, the Trustee, down the road in this case, if

13   it survives the deficiencies we've brought to your

14   attention, is going to have a bear of a time tying initial

15   transfers to subsequent transfers.  But I'm not making that

16   argument here today.  That, I grant you, can be for another

17   time.  What we're focused on in this portion of the argument

18   anyway is impossibilities, mathematical, physical

19   impossibilities that 32 million in funds could have been

20   subsequent transfers when only 16 million were initial

21   transfers.

22          So, at least to the extent of that -- of the

23   difference there, some $16 million, the complaint should be

24   dismissed, again, if not for all the other reasons we've set

25   forth in our papers.  And I will, for all the other

Page 57

1    arguments, rely on our papers, Your Honor, and I will -- I'm

2    happy to answer any questions or to allow the other

3    Defendants to address their issues.

4            THE COURT:  Not yet.  I'm -- I'm also considering

5    -- if you'll let go as cohost so we can get back?

6            MR. KING:  Oh, sure.  Well -- yeah.

7            THE COURT:  Yeah.  I don't know how.  Maybe she

8    takes it away from you.  I don't know what happens.

9            MR. KING:  Maybe so.  But I don't need to share

10   anymore, that's for sure.

11           THE COURT:  Ms. Usitalo, I want you to address the

12   UBS argument and then we'll go to the other arguments.  So -

13   -

14           MS. USITALO:  Understood, Your Honor.  Let me just

15   ask -- our plan here today had been for me to address the

16   issues on the 12(b)(6) points that are brought by all of the

17   Defendants.  And then my colleague, Ms. Stork, was going to

18   address UBS's jurisdiction arguments.  Would you --

19           THE COURT:  I want to address those jurisdiction

20   arguments right now because I, honestly, sort of lumped them

21   altogether.  And one of my questions was going to be explain

22   the corporate structure of UBS and how it fits in with

23   Access as you understand it.  And so, this argument sort of

24   bifurcates the argument.  So, is Ms. Fernandez going to

25   address this?

Page 58

1           MS. USITALO:  My colleague, Ms. Stork, is going to

2     address the UBS jurisdictional issues.

3           THE COURT:  Oh, I'm sorry.  Ms. Stork.

4           MS. USITALO:  So, I will turn it over to her.

5           THE COURT:  Yes, Ms. Stork.

6           MS. STORK:  Good morning, Your Honor.  Okay, I

7     think I fixed the audio.  My apologies there.  Good morning,

8     Your Honor.  I'm Victoria Stork, I'm an associate at Baker

9     Hostetler, counsel for the Trustee, Irving Picard.  I'm here

10    today to argue in opposition to the UBS Defendant's motion

11    to dismiss on personal jurisdiction.  As you are aware, the

12    Defendants have moved to dismiss, arguing a lack of personal

13    jurisdiction against the entities -- the three entities, UBS

14    AG, UBS Fund Services Luxembourg, which is often also

15    referred to as UBS FSL, and UBS Third Party Management,

16    often referred to in the papers as UBS TPM.  And, together,

17    I often refer to them as the UBS personal jurisdiction

18    Defendants.

19           Your Honor, I think it's important to discuss,

20    particularly after Mr. King's argument, that the standard on

21    a motion to dismiss looks at the Trustee's well-pleaded,

22    non-conclusory allegations and exhibits that are taken as

23    true, and all inferences are to be made in the Trustee's

24    favor.  And, Your Honor, as the Defendants have displayed in

25    Mr. King's demonstrate, they attempt to tease out each

Page 59

1    individual contact that's alleged by the Trustee in attempts

2    to rebut them on a one-by-one basis.  This is not

3    appropriate on a motion to dismiss standard.

4            The second amended complaint includes clear

5    allegations with demonstrate that the claims the Trustee

6    seeks to recover arise out of the UBS personal jurisdiction

7    Defendants' activities.  And the Trustee has asserted in the

8    second amended complaint and highlighted in his papers how

9    each of these Defendants engaged in business that's

10   purposefully directed towards the United States and are

11   subject to the jurisdiction of this Court.  And all of these

12   allegations are to be looked at in the totality of the

13   circumstances.  So, Mr. King's attempt to rebut each one of

14   them is incorrect at this point in time.

15           The -- and as I will identify by going through

16   each of the three entities, the Trustee has in a totality

17   asserted that each of these Defendants does -- he does

18   establish a prima face case of personal jurisdiction for

19   each of them.

20           It's also important to identify that the UBS

21   Defendants -- UBS AG, UBS Fund Services Luxembourg and UBS

22   Third Party Management -- while we aren't aware of any

23   individual investments that they made directly into BLMIS or

24   Luxalpha, they were service providers for Luxalpha and

25   Groupement.  And as service providers they were maintaining

Page 60

1    and carrying out activities on behalf of Luxalpha and

2    Groupement.  To make the argument that these entities were

3    not directing anything to New York I think is incorrect.

4    Each entity was an integral part of Luxalpha and Groupement.

5    Luxalpha and Groupement could not make investments into or

6    redemptions from BLMIS on its own.  It needed the UBS

7    Defendants in order to do this.  Without the UBS Defendants,

8    there would have been no investments, there would have been

9    no redemptions.  Luxalpha and Groupement would not have been

10   able to operate.  So, to say that they were just passively

11   carrying out functions internationally is incorrect.

12           Further, the argument that these entities were

13   international entities carrying out international contracts

14   with no contacts to New York is incorrect.  It does not

15   matter that these entities were not based in the state of

16   New York; what matters is that they were directing

17   activities to the forum.  The actions that they carried out

18   outside of the United States were directed into the forum,

19   and the impact and the injury to which the Trustee seeks to

20   recover funds occurred in New York.  The entities were not

21   purely administrative and, Your Honor, it is completely

22   reasonable the Defendants should be held into court

23   regarding their conscious role of directing, developing and

24   sending investments into BLMIS.

25           I'm going to go through each entity and go through

Page 61

1      the allegations that the Trustee has pled to determine -- to

2      show that we have shown in a totality of allegations that

3      there should be personal jurisdiction over each.  I'll start

4      with UBS Fund Services Luxembourg.  UBS Fund Services

5      Luxembourg acted as the administrator for both Luxalpha and

6      Groupement and was the management company and portfolio

7      manager for Luxalpha.  Additionally, UBS Fund Services

8      Luxembourg did serve as the registrar and transfer agent, as

9      we see in some of the Luxalpha documents.

10              They were responsible for keeping Luxalpha and

11     Groupement's accounting -- account records, reports,

12     financial statements and coordination with auditors, but

13     were also responsible for doing things like keeping register

14     of the shareholders, handling all subscriptions and

15     redemptions -- those subscriptions and redemptions which

16     were going to New York at BLMIS or coming from BLMIS in New

17     York.

18              UBS Fund Services Luxembourg did work with Access

19     on Luxalpha and Groupement's management supervision and

20     administration.  And actually in Luxalpha's answer, which it

21     has recently filed and this Court can take judicial notice,

22     Luxalpha admitted that -- and I'll quote; it's from

23     Paragraph 68 of Luxalpha's answer -- that "UBS Fund Services

24     Luxembourg worked closely with several of the Access

25     Defendants in the management, supervision and administration

Page 62

1    of Luxalpha."  Further, they admitted that UBS Fund Services

2    Luxembourg was responsible for calculating Luxalpha's net

3    asset value based solely on the data that was provided by

4    BLMIS with no independent verification.  This is data that

5    was coming directly from BLMIS that UBS Fund Services

6    Luxembourg was retrieving in order to carry out the

7    functions that they were required to carry out as the

8    administrator of Luxalpha.

9            UBS Fund Services Luxembourg employees attended

10   administrative meetings with Access to discover Luxalpha and

11   Groupement.  They participated in calls and email exchanges

12   with Access employees.  Mr. King did discuss the fax

13   communication and the telephone calls between BLMIS and UBS

14   Fund Services Luxembourg.  The documents which the Trustee

15   asserted -- which the Trustee can properly assert on the

16   motion to dismiss based on personal jurisdiction are from

17   the BLMIS records.  And as the Trustee has identified in his

18   papers, the Trustee does not have all of the records of

19   Luxalpha, or Groupement, or the UBS Defendants.  So, these

20   are contacts that we are aware of that occurred and together

21   come to create the totality of the circumstances.  And here

22   what we're seeing is that there numerous contacts where

23   someone at UBS Fund Services Luxembourg was reaching out to

24   someone at BLMIS directly, which is in New York.  So, they

25   were directing contact directly into New York.

Page 63

1           Mr. King also discusses the fact that there's no

2      transfers or funds to or from the United States alleged.

3      The Trustee alleges that the UBS Defendants received

4      transfers from Luxalpha or Groupement in return for fees for

5      the services that they were providing.  So, there were

6      transfers that came through to the UBS Defendants that were

7      originated from BLMIS.

8           All of the UBS Fund Services Luxembourg's actions

9      with respect to Luxalpha and Groupement show that the UBS

10     Fund Services Luxembourg's communicating, carrying out day-

11     to-day tasks in operation of the funds, and carrying out

12     tasks in furtherance of funneling investments through

13     Luxalpha and Groupement make a prima face case that UBS Fund

14     Services Luxembourg purposely availed itself of the New York

15     forum, and the totality of its contacts permit this Court to

16     exercise personal jurisdiction over it.  Further, it's

17     completely reasonable that Fund Services Luxembourg would be

18     (indiscernible) to the Court when they were directing things

19     in and out of New York.

20          Secondly, UBS Third Party Management.  Third Party

21     Management served as Luxalpha's management company from fall

22     of 2006 through to the exposure of the fraud in November of

23     2008.  They deliberately engaged in investment activity with

24     BLMIS in New York and they earned substantial fees in

25     connection with those activities.  Additionally -- and I can

Page 64

1    touch on this later when I talk about UBS AG -- there

2    weren't numerous UBS AG employees that were members of the

3    board of UBS Third Party Management.  Third Party Management

4    was officially responsible for all of Luxalpha's investment

5    management decisions and, as we are aware, Luxalpha only

6    invested in BLMIS.  So, all of those investment decisions

7    were into and out of New York in BLMIS.  They received

8    management and performance fees tied to Luxalpha's

9    performance.  And, like I just said, that performance was

10   all directed to and from New York at BLMIS.

11          From the inception of Luxalpha until fall of 2006,

12   UBS Luxembourg SA, which, as Mr. King stated, is now known

13   as UBS Europe SE, was Luxalpha's manager.  And a management

14   company services agreement dated on September 22, 2006

15   transferred that responsibility of Luxalpha's manager to UBS

16   Third Party Management.  On the same day, there was an

17   agreement for a constitution of an advisory committee, which

18   was signed and dated between UBS Third Party Management and

19   UBS Luxembourg SA.

20          Despite the switch in managers, UBS Luxembourg SA

21   was still participating alongside UBS Third Party Management

22   through this advisory agreement.  Essentially, management by

23   UBS Third Party Management was directed and assisted by UBS

24   Luxembourg SA.  All management decisions were directed --

25   were dictated by this advisory committee, and the advisory

Page 65

1    committee was formed and staffed with UBS Luxembourg SA

2    directors and Access principals.

3              Again, the Trustee's not privy to most of the

4    books, and records, and documents of the Defendants at this

5    time.  However, the Trustee is aware that there was an

6    agreement between UBS Third Party Management and UBS

7    Luxembourg SA, which created the advisory committee; that

8    the advisory committee was tasked with making

9    recommendations in relation to the management and investment

10   policy and strategy of the Luxalpha fund, and the advisory

11   committee was staffed fully with UBS Luxembourg SA

12   employees.

13             The fact that Third Party Management was to carry

14   out its management duties under the advisement of an

15   advisory committee signals that Third Party Management and

16   UBS Luxembourg SA were working in concert.  And the Trustee

17   argues that the jurisdictional contacts where UBS Luxembourg

18   SA is actively engaging with BLMIS and New York should be

19   considered for UBS Third Party Management as well.

20             Finally, I will discuss the contacts of UBS AG.

21   UBS AG served as Luxalpha's sponsor and promoter, and that

22   is a more integral role than Mr. King was letting on.  This

23   isn't a case where UBS AG was simply behind the scenes

24   shuffling papers, signing documents.  They actually stepped

25   in as a successor to BMP after BMP closed the Auriga Fund

Page 66

1      and did not want to be participating in the Luxalpha Fund.

2              UBS was aware from day one that the role of

3      sponsor and promoter for Luxalpha included things like

4      seeking out and funneling investments into BLMIS, and that

5      as it use its funds, the requirement of a sponsor and

6      promoter plays an important role of the creation, structure,

7      launch and management in the administration of the fund,

8      which the Trustee does allege in his second amended

9      complaint, Paragraph 166.

10             Under the applicable law and uses regulations, the

11     role of sponsor includes playing a role in the complete

12     oversight of the fund.  And, in practice, it's typically the

13     main shareholder of the management company or group entity

14     to which the main shareholder belongs.  And as I've

15     previously stated, UBS AG is -- did have multiple employees

16     that were on the board of directors of UBS Third Party

17     Management, which was the management company of Luxalpha.

18             Additionally, UBS AG was responsible for viewing

19     and approving options counterparties, as the Trustee alleged

20     in Paragraph 265 of his second amended complaint, and every

21     redemption from BLMIS came to UBS AG's Stanford branch to an

22     account for UBS Luxembourg SA.  As I previously -- all of

23     these things together on a totality of the circumstances

24     show that UBS AG was active and purposely directing

25     activities towards New York.

Page 67

1              Finally, one of the arguments that Mr. King and

2     the UBS Defendants make is that there's limitless

3     jurisdiction if we're hailing the UBS entities into court.

4     This is not what the Trustee is seeking.  We're not seeking

5     to cast a limitless dragnet against all entities.  We're not

6     seeking to bring in the custodians or the individuals who

7     are maintaining copiers at the UBS offices abroad.  The

8     Trustee is simply seeking to hold accountable the entities

9     that were vital to the harm that occurred here in New York.

10    They're not random.  They were essentially parties who

11    played vital roles.  Each of these entities were key players

12    who set up and serviced the defendant funds, Luxembourg and

13    Groupement, and they are entities who we have claims against

14    for taking fees from the defendant funds in exchange for the

15    work that they carried out, which were directed straight

16    into New York with the intention of investing with BLMIS.

17             In conclusion, Your Honor, we submit that the

18    Court does have personal jurisdiction over the UBS

19    Defendants, UBS AG, UBS Fund Services Luxembourg and UBS

20    Third Party Management, as alleged in the Trustee's second

21    amended complaint and highlighted in his opposition with the

22    company (indiscernible).  And at the very least, Your Honor,

23    the Trustee should be entitled to jurisdictional discovery.

24    Any questions I can answer for you, Your Honor?

25             THE COURT:  Give me a moment to absorb what you

Page 68

 1   said.  Just let me think a second.

 2              MS. STORK:  Absolutely.

 3              THE COURT:  I'm trying to figure out what you're

 4   saying about what monies did they get.  Was this solely fees

 5   for investment advising and custodial services?  Is that

 6   what you -- or was it more?

 7              MS. STORK:  My apologies, Your Honor.  Just give

 8   me one quick second to think about this and get a good

 9   answer for you.

10              THE COURT:  Sure.

11              MS. STORK:  My colleague, Ms. Usitalo will talk

12   more about that tracing, but what I can tell you is that the

13   allegations that we have are related to the information that

14   the Trustee has from contracts and documents where we're

15   seeing that there are monies that were being transferred for

16   the services that each of these entities were providing.

17              THE COURT:  And so that's what you're saying

18   jurisdiction is based on?

19              MS. STORK:  That's what our claims are based on,

20   yes.

21              THE COURT:  The Court will take a ten-minute

22   break.

23              MS. STORK:  Thank you, Your Honor.

24              THE COURT:  Or 15.  Let's make it a 15-minute

25   break.  Chambers.

```
                                                              Page 69
 1              (Recess)

 2              MR. KING:  Your Honor, you're on mute if you're

 3   talking to us.

 4              THE COURT:  Okay.  All right.  I think I need the

 5   -- I need a question answered, Ms. Stork, and that is when,

 6   what, where of the money to UBS?

 7              MS. STORK:  Yes, Your Honor, one second.  Let me

 8   just pull that information up right now.

 9              THE COURT:  Am I off mute?

10              MS. STORK:  Yes, Your Honor.

11              THE COURT:  And that's UBS AG that I'm asking...

12              MS. USITALO:  Your Honor --

13              THE COURT:  Yes, ma'am, you're good.  I hear you.

14   State your name, though, for the record.

15              MS. USITALO:  Yes.  Michelle Usitalo, Baker

16   Hostetler for the Trustee.

17              THE COURT:  Okay, okay.

18              MS. USITALO:  And, Your Honor's question -- you

19   were clarifying that it goes to UBS AG?

20              THE COURT:  Right.  I'm not clarifying.  I need

21   you to clarify.

22              MS. USITALO:  I'm sorry.  No, I was clarifying the

23   question.  I'm sorry.

24              THE COURT:  Okay.

25              MS. USITALO:  Your Honor -- and I can clarify it
```

Page 70

1    for you.  Because the Trustee does allege that UBS AG

2    received subsequent transfers as a service provider, and

3    that's in Paragraph 332 of the complaint where it says that

4    -- I am pulling it up --

5            THE COURT:  Well, I have it right here, but okay.

6            MS. USITALO:  Based on the Trustee's investigation

7    to date, the feeder fund Defendants subsequently transferred

8    some of the initial transfers to the Access Defendants and

9    the UBS Defendants, and UBS AG is included in that

10   definition, as payment for their alleged service of the

11   feeder funds.  And, as Ms. Stork noted previously, Luxalpha

12   has filed an answer in this complaint and Luxalpha in that

13   answer has -- has admitted that -- that the UBS Defendants

14   received payment of fees for their alleged services, and

15   that includes UBS AG.

16           The Trustee has also alleged, as Ms. Stork noted,

17   that UBS AG is a sponsor and promoter and as a result,

18   received fees.  And the Trustee has also alleged that --

19   that UBS AG is the parent company here.  And the importance

20   of that allegation and that relationship is that UBS AG

21   would've received dividends from UBS SA.  In the amount --

22   we don't have that yet because we don't have the books and

23   records of Luxalpha, of Groupement, or of the UBS entities.

24   So, that is -- that is where the Trustee has made the

25   allegations of UBS AG in his complaint, and we believe that

Page 71

1    these are allegations that are sufficient to put UBS AG on

2    notice of the Trustee's claim.

3            THE COURT:  Very good.  Very good.  Anything else,

4    Ms. Stork or Ms. Usitalo?

5            MS. USITALO:  Usitalo.

6            THE COURT:  Usitalo, Usitalo.  Anything else you

7    all wish to add at this point?

8            MS. STORK:  No, Your Honor.

9            THE COURT:  Mr. King, anything you want to rebut

10   on the UBS point?

11           MR. KING:  Yeah.  Just two quick things, Your

12   Honor.

13           Number one, just to address the paragraph that Ms.

14   Usitalo just pointed to, I mean, that's a classic conclusory

15   allegation without any factual detail.  It does not say that

16   UBS AG in particular got any of the funds.  Whereas you look

17   at Paragraphs 333 to 337, it goes into great attempts to go

18   into great detail about specific fees paid, dates and

19   amounts paid to the other defendants.  It's just absent.

20   It's just a conclusory lumping in allegation that fails even

21   to even relate, Your Honor.

22           The second point just to mention on the

23   jurisdictional issues is I don't think Ms. Stork said

24   anything that I didn't say to Your Honor earlier, namely

25   these are three foreign entities that performed services for

Page 72

1     companies, for foreign companies that themselves invested in

2     the United States.  Luxalpha and Groupement Financier

3     invested with Madoff, at least according to the allegations.

4             All that is alleged, whether you take it

5     individually or collectively and holistically as Ms. Stork

6     wants you to, is that these UBS defendants provided services

7     abroad to those entities that were doing business in the

8     U.S.  And I think the question Your Honor will have to

9     answer is is that good enough to assert personal

10    jurisdiction over those defendants.  And I submit that the

11    law doesn't permit that.  Thank you.

12            THE COURT:  Very good.  Okay.  Now where are we?

13    We had UBS.  And now Access.

14            MR. PACCIONE:  Yes, Your Honor.  Anthony Paccione

15    on behalf of the Access defendants.

16            THE COURT:  The Access defendants?

17            MR. PACCIONE:  So I identified those defendants

18    earlier on.

19            THE COURT:  You did.  Then let's just say you

20    referred to them when you put your name on the record.  And

21    then we can go from there.

22            MR. PACCIONE:  That's correct, Your Honor.  And so

23    I think for today's purposes, with the Court's permission,

24    we did move on behalf of the Access defendants on a number

25    of grounds.  But I think for today, I just want to address

Page 73

```
 1   the jurisdictional arguments given the confusion and some of
 2   the questions that have arisen already.  And those
 3   jurisdictional arguments are only on a subset of the Access
 4   defendants.  And those include -- and we referred to those
 5   as the JMDs, the jurisdictional moving defendants in our
 6   brief.  But the three entities that I want to speak about
 7   and try and clarify in terms of the rules that they serve
 8   include Access International Advisors LTD, Access Management
 9   Luxembourg SA, formerly known as Access International
10   Advisors Luxembourg SA, and Access Partners SA.  And what
11   I'd like to --
12              THE COURT:  Let me interrupt you.
13              MR. PACCIONE:  Sure.
14              THE COURT:  Because I will tell you I have
15   questions.  And let me give you those questions.  And you
16   don't have to answer them, but I want you to keep them in
17   mind.  Okay?
18              How did the feeder funds work?  Was the money paid
19   to UBS or directly to Luxalpha?  The feeder funds are the
20   initial transferees.  If so, how did they get their
21   knowledge, through Mr. Littaye or Mr. Villehuchet only, or
22   additional defendants?  And you need to take me through
23   those as you give your presentation.  Okay?
24              MR. PACCIONE:  Okay, Your Honor.  Let me start
25   with that very broadly.  The feeder funds, the two separate
```

Page 74

1    feeder funds which include Groupement and Luxalpha are

2    foreign feeder funds.  They were set up, one, Luxalpha as a

3    SICAV, S-i-c-a-v, and Groupement as an entity.  Both, again,

4    offshore and foreign.

5              They're investors.  The people giving the money

6    over to those funds are all foreign investors.  And I'm not

7    sure that was clear from any of the prior presentations.  So

8    we have foreign investors making investments into foreign

9    funds.

10              At that point, Your Honor, what happens and how

11    are those funds administered?  The UBS entities have certain

12    roles.  The access entities that I am about to speak about

13    have certain roles.  These entities are all separate,

14    distinct corporate entities serving different functions.

15    Some are administrative, some are advisory, some are

16    management related, but they all serve different functions.

17    And the point I want to echo is --

18              THE COURT:  Well, let me ask you one other

19    question then.  Is there any evidence that they had any

20    money that was not BLMIS money?

21              MR. PACCIONE:  Who is the they, Your Honor, in

22    that question?

23              THE COURT:  All your feeder funds that you're

24    dealing with -- that you're representing.

25              MR. PACCIONE:  So as to the feeder funds, they

Page 75

1    were to the best of my knowledge a hundred percent invested

2    in Madoff.  As to those two feeder funds, as to Groupement

3    and Luxalpha.  So I don't think there is a dispute about

4    that.

5            I do want to say this.  That the business of

6    Access and all of the Access entities was not solely with

7    regard to those two feeder funds.  The trustee admits in

8    their allegations and the complaint that Access' business

9    wasn't just Madoff.  Access' business included 10 to 15

10   other funds as set forth in Mr. Littaye's affidavit that

11   were not Access related.  And so they had other business

12   dealings.  Those other business dealings with those other

13   funds basically operate out of the New York office.  And a

14   separate entity called Access International Advisors LLC,

15   they were a Delaware LLC operating in New York dealing with

16   those other 10 to 15 other funds.

17           THE COURT:  Were those funds segregated?  Were the

18   funds from those entities segregated from BLMIS funds?

19           MR. PACCIONE:  Yes.  They are completely separate

20   funds with separate investors --

21           THE COURT:  So they're easy to show then, or

22   relatively easy to show.  Okay.

23           MR. PACCIONE:  Yes, Your Honor.  Okay.  So let me

24   get to the point I think that's at the heart of the motion

25   on jurisdictional grounds, and that is dealing with the

Page 76

1     three Access entities that identify -- and I'll go through

2     each one of them specifically as to what they did.  But like

3     the UBS entities, Your Honor, these were service providers,

4     providing services outside of the United States to funds

5     that were located outside of the United States to investors

6     that were located outside of the United States.  They did

7     not -- they were not investors.  These were service

8     providers collecting fees, which fees were paid outside of

9     the United States.  And so these were completely foreign

10    entities providing foreign services and receiving fees.

11    Most of the fees if you look at the chart actually weren't

12    even directly from the feeder funds to the Access entities,

13    but they made their way through to UBS entities, who were

14    all foreign, and then turned over to Access to some degree.

15          So these were, again, purely foreign funds.  Not

16    investors, who were simply collecting their fees for the

17    services that they rendered.  So the question then becomes

18    what did each one of these three Access entities do and

19    where were they located?

20          I'm going to start with Access International

21    Advisors LTD.  We'll call them Access LTD.  That's a Bahamas

22    limited company with registered offices in the Bahamas.

23    They had their own bank accounts in the Bahamas, their own

24    separate board of directors acting outside of -- acting in

25    the Bahamas by resolution.  They had their own separate

Page 77

1    ownership.  This is a purely foreign firm.  And this is what

2    the trustee alleges it did.

3              ATD -- according to its own -- I'm reading from

4    Page 22 of the  Trustee's brief, Your Honor.  It said AIA

5    LTD was required to keep the net assets of the funds under

6    surveillance and constant review and carry out reviews and

7    controls the portfolio and served as Luxalpha's official

8    consultant and exclusive introducing agent for potential

9    investors in Luxalpha.  And they quote to Paragraph 89 of

10   the second amended complaint.

11             Those service, Your Honor, dealing for example

12   with foreign investors are all rendered outside of the

13   United States.  They do -- as to communications with the --

14   as for all of these entities, the three entities that I'm

15   about to talk about, of the 4.5 million documents that

16   Access produced to the trustee, they found a single fax from

17   AIA LTD that was sent to BLMIS in connection with requesting

18   that reports be sent to the New York office for Madoff.  A

19   single fax.  None of the phone calls or the purported phone

20   calls that are listed.  A single fax out of 4.5 million

21   documents that Access produced.  They have all of Madoff's

22   records, and they have records that UBS produced.  From

23   those productions, this is the connection that they're

24   trying to hold this Bahamian company into the United States

25   on the basis of a single fax in connection with services,

Page 78

1    again, all rendered offshore.

2              So, Your Honor, turning then to the second entity

3    that I want to talk about.  These are Luxembourg entities.

4    And that's Access Management Luxembourg SA.  It was known as

5    Access International Advisors Luxembourg SA.  For today's

6    purposes I think we can call them AIA Lux.  And what AIA Lux

7    is alleged to have done is they had -- they served as

8    investment advisor under advisory agreements, the advisory

9    agreements governed under foreign law, signed and executed

10   outside of the United States.  And they were to verify

11   investment policy was effectively implemented through the

12   review of trade tickets and advising or making

13   recommendations as necessary to Luxalpha's management

14   company.

15             So what that means is that at times some of the

16   Access entities weren't even advising the funds directly,

17   but rather were advising some of the UBS entities as

18   necessary.  And so their role was even again further removed

19   from the United States.  Again, not potentially even

20   demonstrating a purposeful availment of their willingness to

21   beholden to a court hearing in the United States.

22             That entity did not direct any investments to the

23   United States.  It had no contacts with the forum.  It could

24   not make decisions on behalf of the fund.  And so as a

25   result, Your Honor, it never distributed or received funds

Page 79

1    on behalf of the investors of the funds.  This was a

2    separate entity providing advisory services offshore.  And

3    again, insufficient as a matter of law, Your Honor, as we

4    describe in our brief, to demonstrate that it too could be

5    beholden to the United States on jurisdictional grounds.

6            The third entity -- third and last -- I'm sure

7    you're thankful for that -- is Access Partners SA, which we

8    describe as AP Lux.  It's a Luxembourg entity.  It too

9    served as Luxalpha's investment advisor for a period of time

10   from February 2007 until it liquidated.  It was also

11   designated as Groupement's investment advisor.  And based on

12   the trustee's own allegations, AP Lux was responsible for

13   advising Luxalpha's portfolio managers, UBS, TPM, and AML --

14   so again, one step removed -- with regard to investment

15   recommendations.  And it was -- AP Lux was entitled to

16   receive a portion of management and performance fees from

17   Luxalpha's portfolio manager, not Luxalpha directly.  Again,

18   one step removed.  And that just -- again, their own

19   allegations demonstrate that the monies did not flow

20   directly from the funds, but even from foreign UBS entities.

21           At some point, AP Lux was also a nominal advisor,

22   Groupement Financier, for which it received some fees as

23   well from Groupement's investment manager, not from

24   Luxalpha.

25           These contacts, Your Honor, unquestionably

Page 80

1      relationships between foreign entities and actions taken

2      wholly outside of the United States.  They are not -- they

3      may have helped build the scaffolding for, as the trustee

4      said, for these foreign funds, but that construction work

5      was not done in the United States.  It was all done outside

6      of the United States, either in the Bahamas or Luxembourg.

7      And there was no expectation that these entities who

8      received fees outside of the United States for these

9      services outside of the United States could behold into the

10     United States to return those fees for services that they

11     properly rendered.

12            That brings us to the -- so that ends the entity

13     discussion, and that brings us to an individual, Patrick

14     Littaye, who is an individual defendant.  We do move on

15     behalf of Mr. Littaye to dismiss on jurisdiction of grounds.

16     Mr. Littaye is a French citizen.  He resided either in

17     France or Belgium during the relevant period and operated in

18     various capacities.  But his principal work was done outside

19     of the United States in Europe.

20            In order to bring Mr. Littaye into U.S.

21     jurisdiction, the trustee points to his ownership in some of

22     the Access entities and also the fact that he was a

23     corporate officer or director of some of the Access

24     entities.  And, Your Honor, in our brief, we argue that the

25     ownership of some portions of entities is not sufficient for

Page 81

1    jurisdictional purposes unless the corporate veil is

2    pierced.  And we go through great lengths to demonstrate

3    that these corporate entities observed all of their

4    formalities.

5            With regard to his role as a corporate officer,

6    the Court would not have jurisdiction over him as his role

7    as a corporate officer unless the corporation was acting as

8    his agent rather than vice versa where he is acting as agent

9    for a corporation.  And so for those reasons, those two

10   prongs don't work.

11           So the trustee then asserts a third prong and a

12   third argument.  And that is Mr. Littaye did attend meetings

13   in the United States from time to time in connection with

14   Access broadly speaking.  Those meetings did take place in

15   New York.

16           Pursuant to Mr. Littaye's affidavit, those

17   meetings were sporadic.  They dealt with the US-based

18   business -- I mentioned the 10 to 15 non-BLMIS funds -- and

19   were not related to work for the four Luxalpha or

20   Groupement.  They certainly weren't related to subsequent

21   transfers that were made.

22           And so to the extent that Mr. Littaye had meetings

23   in New York, there is no sufficient demonstration that those

24   causes of action for subsequent transfers made to him, which

25   went from BLMIS to the feeder funds mostly through UBS to

Page 82

1   some of these other foreign Access entities and ultimately

2   to Mr. Littaye is insufficient to demonstrate jurisdiction

3   over him personally.

4          And I do -- I should mention for Mr. Littaye, he

5   also was not an investor, not an investor in either

6   Groupement or Luxalpha, but he was an investor in Madoff

7   through some other funds that's not alleged in the

8   complaint.  But in his affidavit, Mr. Littaye says how he

9   lost millions of dollars through that investment.  So to the

10  extent that people are trying to create Mr. Littaye as

11  having actual or any kind of knowledge, he wasn't very

12  successful since he lost millions of dollars in these other

13  investments with Madoff to everyone's shock and surprise

14  (indiscernible) went under.

15         The final point, Your Honor, that I think I need

16  to address in connection with jurisdiction is I think the

17  trustee recognizes the difficulty in proving jurisdiction on

18  an entity-by-entity basis, that the conduct is

19  extraterritorial and not sufficient to haul those folks into

20  the United States.

21         So what they have tried to do to get around that

22  is what I'll call, you know, to demonstrate that the

23  jurisdictional moving defendants were mere departments of

24  the Access New York entity, that they try and basically pull

25  away the corporate separateness of all of these entities.

Page 83

1              And, Your Honor, we went through a fair amount of

2      work to demonstrate how there was a distinct structure

3      between these entities.  For the Court's purposes, we

4      submitted exhibits which show charts.  And I think that's

5      the simplest way for the Court to see the difference between

6      these entities.  For Access  Limited, it's Exhibit 40 to Mr.

7      Littaye's affidavit.  For AML, it's Exhibit 19, and for AP

8      Lux, it's Exhibit 8.  And when you look at those exhibits --

9      and we did have the supporting proof behind those -- they

10     demonstrate a number of things that prove that there should

11     be no collective jurisdiction, a piercing of the corporate

12     veil so to speak.

13             Each one of those entities had their own separate

14     constituted board of directors that conducted their business

15     outside of the United States.  Each one of those entities

16     had offices in their respective jurisdictions, either in the

17     Bahamas or Luxembourg.  Each of those entities had separate

18     contracts with their own separate providers and bore their

19     own share of expenses.  They had independent and different

20     management teams, they had sperate bank accounts.  Each of

21     those entities were not financially dependent on Access LLC

22     because they all earned their own fees.

23             And so as a result, when you look at the caselaw,

24     Your Honor, as to common ownership, of which there was none

25     -- there was some overlap -- the trustee cannot establish,

Page 84

1    and I quote, "The nearly identical ownership interest that

2    must be found before one corporation can be considered a

3    mere department of the other."  And that's citing the Levant

4    Line case, 166 B.R. 221.

5            The ownership of Access LLC and AIA Inc. on the

6    one hand and the ownership of each of these other access

7    entities, the moving entities on the other, are neither

8    nearly identical nor do they have the degree of commonality

9    needed to satisfy a mere department showing.

10           There is also the financial interdependence that's

11   not existent, as I said before.  These entities operated

12   separately, had their own monies coming in, had their own

13   contracts with service providers, et cetera, going out.

14   They observed their corporate formalities.  Each one had

15   their own independent directors that did not overlap with

16   either AIA Inc. or AIA -- or Access LLC, the New York

17   entities.  And there is some executive overlap that did

18   exist.  But that's far below the mirror image symmetry

19   required to support mere department status.  And I'm quoting

20   from the Reers v. Deutsche Bahn AG, 320 F.Supp. 2d 140

21   (S.D.N.Y. 2004).

22           And then there's the final point that to try and

23   get mere department showing, as the trustee talks about the

24   joint marketing, that somehow there are portions of websites

25   which talks about access globally.  But the Courts have been

Page 85

1    pretty clear that showing the joint marketing in those

2    efforts and not segregating every corporate entity when

3    doing marketing is insufficient to demonstrate mere

4    department status.

5              And then finally there is arguments about agency

6    and that the foreign principal has to exercise some element

7    of control over the in-state agent.  But the trustee has

8    actually done the opposite and the trustee argues and claims

9    that each of the moving entities, the foreign entities, was

10   controlled by Access LLC or AIA Inc.  And I'm citing to the

11   opposition brief at Pages 9 to 14 and also Page 17.

12             And this U.S. agent supposedly did not have the

13   authority to contractually bind the foreign entities and the

14   agent was not primarily employed by the foreign defendant

15   and did not engage in similar services for these entities.

16   The services that were rendered, again, for Groupement and

17   financier and Luxalpha all took place outside of the United

18   States.

19             So, Your Honor, with that, I believe that on the

20   jurisdictional grounds, the claims against the foreign

21   service providers and Mr. Littaye individually should be

22   dismissed on the basis of lack of personal jurisdiction.

23             With that, Your Honor, I will rest on my papers

24   with regard to the other arguments.

25             THE COURT:  And who is doing rebuttal?

Page 86

```
 1              MS. FERNANDEZ:  Good morning, Your Honor.  Jessica

 2    Fernandez, associate of Baker Hostetler, counsel for

 3    trustee, Irving Picard.

 4              I will be arguing on behalf of the trustee in

 5    opposition to the Access defendant's motion to dismiss for

 6    lack of personal jurisdiction.  Defendants, Access

 7    International Advisors Limited, Access Management Luxembourg

 8    SA, Access Partners SA, and Patrick Littaye all moved for

 9    lack of personal jurisdiction while Access International

10    Advisors LLC did not, as it is based in New York.

11              Defendants challenged the sufficiency and accuracy

12    of our allegations by trying to argue that the various

13    Access entities were actually separate and distinct.

14    Looking at the totality of the circumstances, by viewing the

15    pleading in the light most favorable to the Plaintiff, the

16    trustee has made a prima facie showing that jurisdiction

17    exists over defendants by sufficiently alleging that the

18    Access entities are subject to this Court's jurisdiction as

19    mere departments of Access International Advisors LLC and

20    Access International Advisors Inc., its predecessor, both

21    located in New York.

22              Defendants argue that the Trustee only points to

23    contacts among foreign entities and actions taken or

24    performed outside of the United States.  Their complaint

25    sufficiently alleges the contrary.  Littaye has had a long-
```

Page 87

1    lasting relationship with Madoff since 1985.  Stemming from

2    that relationship, Littaye and Villehuchet created a series

3    of investment companies, the Access defendants, which

4    operated as a single business entity.  And that same entity

5    created and serviced the funds, Luxalpha and Groupement

6    among others, to direct investments in BLMIS in New York.

7    The primary purpose of these entities was to receive fees

8    for servicing those funds.  To the extent they had any

9    corporate duties, they were performed by Access personnel in

10   New York because the Access entities were shell companies

11   with no regular employees.

12          There was an absence of formalities as well among

13   the entities.  One Access entity often acted on behalf of

14   another and the employees of Access entities performed work

15   across all the entities without regard of which entity

16   formally employed them.  Access and its employees also

17   commonly used collective names such as Access or AIA Group,

18   emphasizing their operation as a single business entity.

19          The trustee alleges the absence of formalities

20   amongst the Access entity stemmed from the entity's common

21   ownership with both Littaye and Villehuchet, who as we

22   alleged, completely or nearly completely owned, controlled,

23   or dominated the Access entities.  The Access entities were

24   present in New York through Access International Advisors

25   LLC and Access International Advisors Limited.

Page 88

1         This very same issue has actually been litigated

2    in this jurisdiction in SPV Osus Ltd. v. AIA LLC, an action

3    stemming from the Madoff fraud where Judge Rakoff found that

4    what plaintiff pleaded was enough to make a prima facie

5    showing of jurisdiction over the very same Access defendants

6    as they were mere departments of Access International

7    Advisors LLC and found that the requirement of common

8    ownership of these Access entities was satisfied.

9         Here, the trustee has adequately pled that the

10   Access entities were mere departments of Access New York.

11   Even if the Access entities are not viewed as mere

12   departments of Access International Advisors LLC and Access

13   International Advisors Inc., this Court should still

14   emphasize specific jurisdiction over each of the Access

15   defendants because they directed investments in BLMIS in New

16   York.

17         These Access entities created, marketed, promoted,

18   serviced the funds, and these entities did everything to

19   direct and create the opportunity for investments into

20   BLMIS.  The Access entities created numerous funds,

21   including Luxalpha and Groupement, and channeled over $2

22   billion into BLMIS through these funds.  It is undeniable

23   that Littaye and the Access entities directed investments

24   into BLMIS, received redemptions from BLMIS, and earned fees

25   for the services they provided to those funds such that they

Page 89
1    purposely availed themselves of the benefits of investing in

2    New York.

3            Mr. Paccione argues that the Access defendant had

4    other on-BLMIS business.  But what he omits to say is that

5    92 percent of Access revenue stemmed from BLMIS investment.

6            I will now turn to the specific allegations

7    against each Access entity to establish they directed

8    investments into BLMIS in New York.

9            As for Access International Advisors Limited, it

10   was Luxalpha's official consultant and exclusive introducing

11   agent.  It was also Groupement's investment manager,

12   operator, and investment advisor.  As investment manager,

13   Access International Advisors Limited was required to keep

14   the net assets of the funds under surveillance and constant

15   review, carry out reviews and controls of their portfolio.

16   The purpose of this entity was to be an offshore entity that

17   was a money box set up to receive fees on behalf of Access.

18           Mr. Paccione points out to a communication with

19   BLMIS and this entity.  That further undercuts the false

20   suggestion that New York Access entities were only involved

21   with non-Madoff funds.

22           As for Access Management Luxembourg SA, it was

23   nominally Luxalpha's portfolio manager.  It had to promote

24   the fund, solicited subscriptions, and receive

25   (indiscernible) redemptions.  It was also Luxalpha's

Page 90

```
 1    portfolio advisor, advising UBS SA in connection with its

 2    role as Luxalpha's portfolio manager.

 3            As for Groupement and Groupement Levered, it acted

 4    as its investment advisor.

 5            Access Partners SA was the investment advisor to

 6    Luxalpha.  It was also the nominal advisor of Groupement

 7    Financier and Groupement Levered.  It was created to protect

 8    Luxalpha and BLMIS from U.S. regulatory scrutiny at the

 9    request of Madoff.  Each Access entity received fees for the

10    services they performed for the funds, and the trustee is

11    seeking those very same fees.

12            As to Littaye, the Trustee has sufficiently pled

13    that he had numerous substantive contacts with New York that

14    establish this Court's jurisdiction over him.  Mr. Paccione

15    again argues that Littaye's meetings in New York were

16    sporadic and not related to their feeder funds or BLMIS

17    investment.  (indiscernible) is a factual issue, and our

18    complaint sufficiently alleges the contrary.  As the trustee

19    alleged, Littaye made quarterly visits in New York to visit

20    Madoff.  He attended Access quarterly strategic meetings in

21    New York.  He made sure that he was the sole point of

22    contact between Access and Madoff.  He also closed down the

23    2006 Chris Cutler investigation in New York himself.  Any

24    issues, questions, or concerns regarding the several access

25    funds that maintain accounts with BLMIS were addressed by
```

Page 91

1    and had to be run through Littaye.  Littaye coordinated,

2    dominated, and controlled Access, serving as a director and

3    executor for all the Access entities and sat on the board of

4    directors of both Luxalpha and Groupement.

5              In isolation, these contacts would be sufficient

6    to support jurisdiction.  In their totality, they undeniably

7    establish that Littaye purposely directed his activities to

8    New York.

9              Judge Rakoff, again in SPV Osus, already found

10   that Littaye's quarterly meetings with Madoff in New York

11   and his efforts to shut down discussions of BLMIS

12   irregularities in a 2006 meeting in New York were more than

13   sufficient to make a prima facie case of jurisdiction over

14   Littaye.  The trustee alleges the same facts as well as

15   numerous others that support specific jurisdiction over

16   Littaye.  The trustee's underlying claims arise out of or

17   relate to Defendant's contacts as the trustee seeks to

18   recover the fees the Access defendants received for the

19   services provided to the funds for directing investment in

20   BLMIS in New York.

21             In conclusion, Your Honor, the Trustee has made a

22   prima facie showing of jurisdiction over each of the Access

23   defendants.  And at a minimum, the trustee is entitled to

24   jurisdictional discovery as the trustee has put forth a

25   reasonable basis for jurisdiction over defendants.

Page 92

1           I know that Mr. Paccione has gone into detail as

2    to the amount of documents produced to date.  And if Your

3    Honor would like me to get into that production, I can do

4    so.  And if not --

5           THE COURT:  Wait a second.  I would like a summary

6    of what you received.  There is one thing to have volume.

7    It's another thing to have detail.  So tell me what you've

8    got.

9           MS. FERNANDEZ:  Exactly, Your Honor.  Although

10   Access is throwing a high number of documents produced, they

11   only produced electronic documents from their New York

12   server.  And that included a lot of spam emails and non-

13   relevant documents.  That production also did not include

14   any paper documents nor the books and records of the other

15   Access entities.  And we have been in communication with

16   Access counsel regarding the production, and they let us

17   know that they had already preserved documents in Europe.

18   And to date we have not received those documents.

19          THE COURT:  Mr. Paccione also said something about

20   that Mr. Littaye was a loser.  Is he a net winner or is he a

21   net loser?  Do you know, Mr. Paccione, do you know?

22          MR. PACCIONE:  In his affidavit -- declaration

23   that he submitted, he declares that he was a net loser, Your

24   Honor.  But a net loser -- he invested, again, not through

25   Groupement or Luxalpha, but through another feeder fund.

Page 93

1              THE COURT:  But he has profits through his fees,

2      right?

3              MS. FERNANDEZ:  Yes, Your Honor.  And that's what

4      we alleged.

5              THE COURT:  Okay.  Rebuttal -- not just rebuttal,

6      but anything you want to add?

7              MR. PACCIONE:  Yes, Your Honor.  I have a couple

8      of points.  I just want to make sure that -- there was a

9      reference to -- and I want to focus on the Access entities

10     for a moment.  There was a reference to one of them

11     receiving subscriptions or dealing with subscriptions and

12     investments.  Your Honor, that's not dealing with the

13     redemptions, for example, from Madoff to the feeder funds.

14     Rather, these are the entities that interface with the

15     foreign investors in Groupement and Luxalpha.  So the

16     reference -- there is no allegation still, notwithstanding

17     what we just heard, not a single allegation of any conduct

18     by the three corporate entities that we've been talking

19     about that took place in the United States.  Not a single

20     one.

21             With regard to the SPV Osus decision that's been

22     bandied about, Your Honor, that was not a subsequent

23     transfer case.  It wasn't a bankruptcy case.  It was a tort

24     case.  The court -- the phrase that's being quoted was pure

25     dictum.  He did not rule on jurisdictional grounds on that

Page 94

1    particular point.  He said in dictum given what I'm hearing,

2    there may be a need for discovery and a hearing on this

3    jurisdictional aspect.  But again, that was a different

4    case, different claims, some different parties.  And most

5    importantly, Your Honor, in that case, the plaintiffs did

6    not have access to the millions of documents that have been

7    produced to the trustee like here.  And so Judge Rakoff, if

8    he was thinking about jurisdictional discovery, it was in

9    that context.

10            As to that document issue, Your Honor, there were

11    indeed 4.5 million documents.  Because what we did was we

12    turned over -- my firm, before I took over this case, turned

13    over the entire server that was in the New York office.  So

14    it was -- it did include junk email.  But we said here, you

15    want it, you can have it.  And we gave them everything.  We

16    did make hard copies available.  Notwithstanding what I

17    heard from counsel, those hard copies were actually scanned

18    and part of the production as based as what we know.

19            And in terms of other documents outside of the

20    United -- so if the trustee wanted to see what

21    communications were had from the foreign entities to the New

22    York office, they have the source of that.  They have the

23    source because they have the entire New York server.  There

24    is no need for jurisdiction to find who else -- what else

25    was sent directly to the New York office.

Veritext Legal Solutions
212-267-6868            www.veritext.com            516-608-2400

Page 95

1           To the extent that they want to see communications

2     directly to Madoff in New York, well, they have access to

3     that because they have tens of thousands of boxes, not to

4     mention scores of data from Madoff to also demonstrate what

5     contacts were made from Access Europe to Madoff directly.

6           So this notion that somehow there's jurisdictional

7     discovery that's needed really just doesn't fly, Your Honor.

8     They have everything that they need.

9           And it also undercuts, Your Honor, if they're

10    saying that the New York documents weren't sufficient, then

11    it sort of suggests that the New York entities weren't the

12    center of the universe for these foreign funds.  If they

13    were, then they would have seen everything that they need to

14    see.  This proves that the efforts and the energies and the

15    services that were provided and the monies received all took

16    place outside of New York and all took place offshore in

17    Europe, Your Honor.  So as a result of that, I think our

18    jurisdictional arguments -- I think we could rest on our

19    papers.

20          One other point in terms of employees and shell

21    companies.  There were references to that.  I think we

22    disproved that in the underlying papers in terms of separate

23    directors, existing bank accounts, fees being earned.  And

24    there are times -- and there's a case cited on Page 11,

25    Footnote 9, where sometimes employees at times perform work

Page 96

1    for other entities and had multiple email addresses.  But

2    that's enough to disregard the corporate form.  And that's

3    the (indiscernible) case on Page 11, Footnote 9.

4              So, Your Honor, unless the Court has any other

5    questions, we will rest.

6              THE COURT:  Anything anyone wishes to add on the

7    Access, Littaye, and Villehuchet?  Yes, ma'am.

8              MS. FERNANDEZ:  Nothing from me, Your Honor.

9              THE COURT:  Well then now we are at the motion to

10   dismiss by Theodore Dumbauld.

11             MR. KNUTS:  Good afternoon, Your Honor.  Again,

12   it's Robert Knuts from the Sher Tremonte firm for Defendant,

13   Theodore Dumbauld.

14             Unlike the prior arguments, I can say that Mr.

15   Dumbauld is fully subject to this Court's jurisdiction as an

16   American.  In fact, a graduate of the Naval Academy.  So I

17   won't be talking at all about jurisdiction.

18             THE COURT:  Okay.

19             MR. KNUTS:  In our papers, the motion to dismiss,

20   we presented several arguments in favor of that motion.  I

21   want to focus my time today on one of those.  And that is

22   the employee compensation issue.

23             At Page 29 of our moving brief, we quoted from a

24   case called Geltzer, which concluded that an officer or

25   employee who is the recipient of a salary from a company

Page 97

1      that received an allegedly fraudulent transfer is not

2      without more the subsequent transferee of the conveyance.

3                The trustee addressed this argument in their

4      opposition brief at Page 69 and essentially tries to rebut

5      that in three ways.  I mean, first, the Trustee claims that

6      he is unable to confirm that the only money transfers made

7      to Mr. Dumbauld were in the form of employee or officer

8      compensation.  But that --

9                THE COURT:  Let me stop you right there, because

10     that was one of my questions.  Have you given that brief to

11     the trustee?

12               MR. KNUTS:  Well, back in the Rule 2004 days, we

13     turned over all the documents they asked for.  I assumed

14     that on the server, the Access server it included, you know,

15     payroll documentation and everything --

16               THE COURT:  But you didn't break it out yourself

17     and even make yourself aware of that.  Basically where did

18     the money come from if it wasn't from BLMIS, that's...

19               MR. KNUTS:  Well, as the trustee has alleged in

20     both the first amended complaint and the second amended

21     complaint and as Mr. Paccione mentioned earlier, Access in

22     New York had other services that they provided to clients

23     relating to completely unrelated funds.  You know, it had

24     nothing to do with BLMIS.  For example --

25               THE COURT:  But you didn't break it out even for

```
                                                              Page 98
 1    yourself.

 2              MR. KNUTS:  In terms of -- well, first of all, by

 3    the time this case started, Mr. Dumbauld had long left the

 4    employment of Access.  And I have not had the ability to go

 5    back into Access's payroll records to determine what

 6    percentage of income related to BLMIS versus --

 7              THE COURT:  Well, just so you know, because the

 8    trustee has alleged that only five percent of that business

 9    was not BLMIS.  So I was just curious if you did that for

10    your own sake or when you're making these arguments you too

11    have already done your own research on this.  And your

12    answer is no.

13              MR. KNUTS:  Without Access, I couldn't do the same

14    research that Mr. Paccione could do or others.  But I will

15    point out, Your Honor, that there have been -- the Trustee

16    has made different allegations about different time periods.

17              For example, in the first amended complaint, he

18    alleged during 2005 that Access's BLMIS revenue was only 61

19    percent of its total revenue.  And now in the second amended

20    complaint, it does say by 2008 that it had grown to 92

21    percent.  So it did vary over time.

22              THE COURT:  Yeah, but I was just asking for your

23    own sake, your arguments, if you'd looked.  Okay.

24    (indiscernible).

25              MR. KNUTS:  Sure.  Well, one thing I know for
```

Page 99

1    sure, Your Honor, and that is the amount of revenues that

2    were unrelated to BLMIS at Access more than covered the

3    monies paid to Ted Dumbauld.  That's absolutely for certain.

4    I mean, the total -- they had revenues in excess of the

5    $1.25 million that the trustee alleges was received by Mr.

6    Dumbauld during the relevant time period and could involve

7    subsequent transfers.  We know for sure that there was a lot

8    more money going through Access than that.  But --

9              THE COURT:  Of course he wasn't the only expense.

10   But that's another point.

11             MR. KNUTS:  Absolutely, Your Honor.  But what I

12   want to -- so a couple of things just turning back to this,

13   a little hint in saying he doesn't have the ability to

14   confirm that the only money received by Mr. Dumbauld was

15   compensation, employee compensation.  In fact, Paragraph 337

16   of the second amended complaint says that the $1.25 million

17   wasn't, you know, officer employee compensation.  So he

18   cannot say in his opposition papers something that's

19   inconsistent with the actual allegation in the second

20   amended complaint.  He's made the affirmative obligation

21   that it was compensation, and he should be stuck with that.

22   And actually, he is stuck with that because that's the

23   section (indiscernible).

24             The second argument that the trustee makes

25   concerning how he's not bound by the Geltzer case is that he

Page 100

1    argues that the second amended complaint includes

2    allegations that Mr. Dumbauld did not receive his

3    compensation in good faith.  But when you look at the

4    allegations that he relies on on Page 69 and you actually go

5    back and read those allegations that are in the second

6    amended complaint, you'll see there's no factual allegation

7    that Mr. Dumbauld ever acted in bad faith.  The factual

8    allegations concerning Mr. Dumbauld are he was given an

9    assignment to analyze Madoff trading, he performed that

10   assignment, he provided the results of his analysis to his

11   superiors at Access.  He was then told to get somebody else

12   to take a look at the analysis.  He did.  He found who the

13   trustee believes is extremely competent, Mr. Cutler, to

14   conduct another analysis.  And he then facilitated Mr.

15   Cutler to report those results to the people at Access, his

16   bosses.

17           There is nothing -- in every step of the way, Mr.

18   Dumbauld did the right thing.  He did the work honestly, he

19   reported honestly.  He described exactly what he learned.

20   Mr. Cutler, he did nothing to interfere with Mr. Cutler,

21   describing what Mr. Cutler learned.  You know, there's no

22   allegation in the second amended complaint that Mr. Dumbauld

23   as an individual had any authority to do anything else at

24   Access with that information.  And so in fact there is no

25   allegation in the second amended complaint that he acted in

Page 101

1    bad faith in some way at any point in time.

2              And then lastly, the trustee makes the argument

3    that it's unclear in some way whether the compensation that

4    Mr. Dumbauld received as an employee and officer of Access

5    was received "for value".  Because he says that that's

6    another ground for getting out from the Geltzer decision.

7    But again, there is nothing in the second amended complaint

8    that actually alleges that Mr. Dumbauld did not provide

9    value for that compensation.  It's just not there.  And

10   without an affirmative allegation saying that this was --

11   that services were provide for no value, you don't have a

12   claim.  It's just not the case that you can sort of say

13   there may be other issues here.  You know, you have to

14   actually affirmatively say that there's an issue in a

15   complaint in order to make a claim.

16             So I think the sum and substance of the Geltzer

17   argument about employee compensation is that you can in fact

18   under the right circumstances make specific -- as a trustee

19   make specific allegations to put an employee's compensation

20   in play as a subsequent transferee.  But if Your Honor were

21   to deny Mr. Dumbauld's motion to dismiss when there are no -

22   - those type of allegations don't actually exist in the

23   second amended complaint, then I think it could create a

24   really problematic precedent for future Ponzi cases and

25   future trustees.  You know, they would be encouraged to name

Page 102

1    other employees trying to claw back compensation just

2    because the compensation was received during a time period

3    when there was also initial transfers that could have flowed

4    downwind.  And it's not going to be just the Ted Dumbaulds

5    of the world who are then subject to that kind of claim.

6             And so I would urge Your Honor to really hold the

7    trustee's obligation, you know, hold them to the obligation

8    that the Geltzer case said, which is if you've got actual

9    allegations, specific factual allegations of bad faith or no

10   value for the compensation, then okay, maybe you can tag an

11   employee with possibly getting his compensation clawed back.

12   But because that's not here, Your Honor should dismiss Ted

13   Dumbauld from this case.

14             I mean, if you look at the second amended

15   complaint on Page 83, they put together a chart showing all

16   the funds flows and everything else.  And there's Ted

17   Dumbauld, floating somewhere on the page.  You know, without

18   any lines drawn to him, anything, just because he received

19   compensation during a relevant time period.  That's not what

20   a subsequent transferee case should be involving an

21   employee.  And for the rest of our arguments, we'll rest on

22   what we put in our papers.  Thank you.

23             THE COURT:  Rebuttal?  Yeah, you were on mute.  We

24   didn't get your name.

25             MS. USITALO:  Sorry about that.  Michelle Usitalo,

```
                                                              Page 103
 1   Baker Hostetler, for the trustee, Your Honor.  And I am
 2   responding to a few issues here under the arguments that the
 3   defendants have made on the 12(b)(6) issues.
 4           I can address first some of the arguments that
 5   were just raised with respect to Mr. Dumbauld specifically
 6   and then I will turn to some of those other --
 7           THE COURT:  Did you not do that when we were
 8   having the argument earlier?  I'm missing something here.
 9           THE COURT:  Yes.  Sorry, Your Honor.  No, I am
10   addressing -- so it was -- Mr. King addressed the issues of
11   the Trustee's allegations concerning actual knowledge and
12   also generally the issues of the sufficiency of the
13   Trustee's pleadings with respect to customer property for
14   each of the defendants.  And I know that we've touched on
15   parts of the customer property issue already, but I did have
16   some further joinders that apply to all of the defendants --
17           THE COURT:  Okay.  I'm a little flummoxed because
18   I thought we addressed those at the time we were addressing
19   them.
20           MR. USITALO:  Apologies, Your Honor --
21           THE COURT:  You're going to do the lumping.
22           MR. USITALO:  Well, that -- apologies, Your Honor.
23   As we were addressing the personal jurisdiction issue
24   specifically with respect to each defendant --
25           THE COURT:  Okay, all right.  But answer Mr. Knuts
```

```
                                                           Page 104
 1    first.

 2              MR. USITALO:  Okay, I will do that.  And I think

 3    as Your Honor pointed out, the issues here too are the fact

 4    that the Trustee has alleged in a plain statement in his

 5    complaint, which is all that's required at this stage of the

 6    litigation, that Mr. Dumbauld received the $1.2 million in

 7    transfers.  And we allege that it was at least that amount

 8    in compensation.  But to note, Mr. Dumbauld was also a

 9    partner of Access LLC and he was also the chief investment

10    advisor.  So there could be additional transfers there as

11    well as a result of fees that Access received and their LLC

12    received in their role.

13              But particularly too on the point with the fact

14    that it is compensation that is being alleged, we did allege

15    the more that Mr. Knuts was referring to.  And I know he

16    characterized it in a certain way, but that's not what is

17    appropriate here.  It's the Trustee's allegation that must

18    be taken as true and inferences made in his favor.  And the

19    Trustee has alleged that when concerns were raised about

20    Madoff's trading activity that Mr. Dumbauld, as Access's

21    chief investment advisor, was asked to perform an analysis

22    of that trading activity, and he could not confirm that the

23    trading activity was taking place.  And then when he was

24    asked to get a second opinion and they hired Mr. Chris

25    Cutler to perform a similar analysis, this resulted in Mr.
```

Page 105

1    Cutler coming to Mr. Dumbauld and telling him -- and this is

2    quoted in the trustee's complaint -- that if BLMIS were a

3    new investment, he would likely shove it out the door.

4            Mr. Dumbauld was also present at the meeting where

5    this analysis was presented to Littaye and Villehuchet.  So

6    there is the more here that is required.  And the trustee

7    doesn't have to prove those allegations at this point, just

8    merely allege that there is more to just Mr. Dumbauld being

9    an employee of Access.  He was an integral part of Access

10   and he had the more that is required here.

11           THE COURT:  Excellent.  And I apologize to you

12   because I think I did basically let you reserve your

13   jurisdictional rebuttal.  And I took a break instead of

14   listening to you.  So I apologize.

15           MR. USITALO:  No, that is no problem.

16           I will turn to the arguments that the defendants

17   have made with respect to 546(e) and the --

18           THE COURT:  You're talking about UBS now, right?

19           MR. USITALO:  I am talking about UBS because they

20   -- I'm sorry.  UBS has made the arguments today, but --

21           THE COURT:  Non-jurisdictional, right.

22           MR. USITALO:  Non-jurisdictional, yes.  All of the

23   parties have taken -- made the same arguments in their

24   papers as well as adopted the arguments of UBS.  So I

25   believe it was Mr. King who was presenting those arguments

Page 106

1     today, but all of the Defendants participated.

2             THE COURT:  Okay.

3             MR. USITALO:  And since they didn't touch -- since

4     Mr. King didn't touch on the legal arguments of 546(e) and

5     Your Honor has already addressed those, we too will rely on

6     our papers in that respect.

7             But I do want to address the defendant's arguments

8     that the trustee has not adequately pled that Luxalpha and

9     Groupement, the initial transferees, have the requisite

10    actual knowledge that permits the trustee to pursue his

11    claims for avoiding transfers beyond the two years.

12            And I know it's been mentioned already, Your

13    Honor, but it's important again to emphasize that the

14    standard here is that the trustee's allegations must be

15    taken as true and all inferences made in his favor.  And

16    when that analysis is performed here, those inferences make

17    out a plausible claim.

18            And we've discussed it quite a bit here today, but

19    both Luxalpha and Groupement are groups that operated solely

20    through their agents.  And this includes the UBS defendants

21    and the Access defendants that were acting as directors and

22    service providers.  And the trustee has alleged that the

23    conduct and knowledge of those defendants should thus be

24    imputed to Luxalpha and Groupement.  And the trustee has

25    also pled in his allegations that Luxalpha and Groupement

Page 107

1    had actual knowledge that BLMIS and that the defendants knew

2    that BLMIS was operating a fraud and that Luxalpha and

3    Groupement's agents knew that Madoff could not be executing

4    all the securities transactions he reported.  Specifically,

5    Luxalpha and Groupement knew, the trustee alleges, that the

6    volume of options trades Madoff purported to execute on

7    their behalf was impossible and that Madoff lied about the

8    identify of his purported options counterparties and that

9    Luxalpha and Groupement knew that the returns BLMIS claimed

10   to produce were impossible given its stated trading strategy

11   and that Luxalpha and Groupement knew that BLMIS reported

12   trades as having been made at impossible times and prices

13   and that these funds' agents were aware of signs of fraud at

14   BLMIS and that Patrick Littaye actively impeded any inquiry

15   into the signs of fraud by quashing and deflecting

16   questions.  And the trustee alleges that Luxalpha and

17   Groupement's awareness of BLMIS' impossible trading activity

18   and performance, demonstrable awareness of the fraud and the

19   directors' and managers' deliberate actions to protect

20   Madoff established defendant's knowledge of fraud.  And the

21   trustee goes on at length in his complaint to provide

22   allegations in support of this.

23           And it's the trustee's position that all of those

24   allegations that filled all of our screens when Mr. King was

25   speaking amount to a totality of -- the totality of

Page 108

1    allegations that amount to actual knowledge.  And I note as

2    well that some of those allegations that were up on the

3    screen in those particular allegation callouts, there were

4    allegations that the trustee has alleged that the defendants

5    knew.  I noted those parts weren't highlighted, but they

6    were there.

7           And in going through the trustee's allegations, I

8    think we first must begin with the allegations that the UBS

9    and Access defendants deliberately deceived the Luxalpha --

10   sorry, the Luxembourg regulator, which was referred to as

11   the CSSF, by failing to disclose BLMIS' multiple roles in

12   the fund.  Luxalpha, as we noted, has filed their answer in

13   this proceeding.  And in its answer, Luxalpha admitted that

14   the purpose of the USITC's regulations is to protect against

15   fraud, and the UBS defendants and Access defendants set up a

16   structure for Luxalpha that was not in compliance with

17   USITC's regulations, and the Access defendants knew this.

18          And how do we know they knew?  Because the trustee

19   alleges that Access had originally operated (indiscernible)

20   another BLMIS feeder fund, with BNP Paribas acting as the

21   sponsor of the fund.  And in a meeting with Access, BNP said

22   that BLMIS' role as both custodian and investment advisor

23   was unconscionable, violated BNP's internal security rules,

24   and Luxembourg law.  And BNP proposed a path forward to

25   address these concerns and said they either needed to

Page 109

1    identify BLMIS to the CSSF or get real-time trading access

2    from Madoff.  Madoff said no, BNP said it would not go

3    forward, and (indiscernible) closed.  But Access moved on

4    and opened Luxalpha without missing a day of investment with

5    BLMIS.  And this time, UBS acted as its sponsor.

6            In deliberately deceiving the CSSF and not

7    identifying BLMIS' multiple roles for Luxalpha, the Access

8    and UBS defendants aren't overlooking laws and regulations

9    to make money; they are purposely circumventing laws meant

10   to prevent fraud, to expose people like Madoff.  And they

11   aren't overlooking; the trustee alleges they are lying.

12   Lying to the CSSF, withholding information to the SEC about

13   whether or not they acted as a counterparty to Madoff,

14   helping Madoff avoid SEC scrutiny by setting up an Access

15   entity that purportedly acted as an investment advisor.

16           But why tell these lies?  Why prevent Madoff from

17   being exposed?  Why go to such great length to perpetuate a

18   structure that allows fraud?  The inference that can be

19   drawn here is that they did it because they knew.  And this

20   knowledge belongs to the funds, Luxalpha and Groupement,

21   because it was their agents and their service providers that

22   told these lies and that took these actions.

23           The trustee alleges that UBS and Access both had

24   anti-fraud due diligence procedures in place.  Did BLMIS go

25   through these procedures?  The trustee alleges it did not.

Page 110

1    Why did it not?  The inference that can be drawn here is

2    because Luxalpha's service providers knew that BLMIS would

3    not pass.  Some due diligence occurred when someone raised a

4    flag about Madoff's trading.  And I mentioned this.  And it

5    was first Mr. Dumbauld as Access's chief investment officer

6    that reviewed the trading activity and confirmed that the

7    options trades purportedly being made by Madoff didn't

8    appear in the database as they should of.

9           Then Access hired Chris Cutler to perform that

10   analysis and other analysis, and he did perform that

11   analysis.  And as a result, Cutler recommended that Access

12   exit all investments with BLMIS.  And he shared the results

13   of his inquiry with Littaye and Villehuchet.  And what did

14   they do?  They cut Cutler's investigation short and

15   suppressed his findings.

16          Now, I know the defendants in their papers and in

17   their arguments today may offer alternative explanations for

18   these conducts or these statements.  But these explanations

19   are not relevant at this stage of litigation where it is the

20   trustee's allegations that must be taken as true.  And the

21   trustee alleges that Access and UBS defendants' conduct

22   reflects their knowledge of Madoff's fraud.

23          And to give an example, UBS takes the Trustee's

24   allegations of the knowledge of fraud and claims that these

25   allegations just plead that UBS had different risk

Page 111

1    tolerances. Again, this explanation is irrelevant, but it

2    also opens the door for further questions.  Risk of what?

3    Risk that Madoff's fraud would be exposed?  UBS's argument

4    simply illuminates that perhaps UBS was willing to act as

5    Luxalpha and Groupement's service provider because the

6    potential for income was so great that it was worth it in

7    the event that Madoff's fraud was never exposed.  In fact,

8    the trustee alleges that this was UBS's very thinking.

9            Business is business was an instruction from a

10   Luxalpha director and UBS managing director.  We cannot

11   permit ourselves to lose $300 million.  Accept client.  The

12   plausible inference from this statement was not that they

13   didn't have actual knowledge of Madoff's fraud.  Instead,

14   that they didn't care if they did.  And in any event, it

15   presents a question of fact.

16           And defendants make a point about the trustee's

17   allegations of red flags.  But these allegations also serve

18   to support the trustee's allegation of actual knowledge.

19   The trustee does not list red flags in such a way that has

20   been found in other cases to be insufficient to plead actual

21   knowledge or willful blindness.  The complaint alleges

22   concrete examples of instances where the defendants

23   recognized these red flags and saw them for what they were;

24   evidence of trading that was impossible.

25           And as noted, neither Mr. Dumbauld nor Mr. Cutler

Page 112

1    confirmed that Madoff -- could confirm that Madoff was

2    making his options trades.  Both Mr. Cutler and UBS noted

3    that Madoff's strategy could not produce the returns

4    reported.  UBS identified out-of-range prices in a BLMIS

5    trade confirmation and Access knew that the appointment of

6    Friehling & Horowitz as BLMIS' auditor caused concern.  And

7    in response, Littaye gave the instruction, don't go further.

8            And with respect to counterparties, Chris Cutler

9    noted, "I just can't find the other side of the trade."  And

10   when a Swiss private bank directly asked Madof to identify

11   the counterparties, Madoff called Littaye with an

12   explanation that Littaye didn't understand and Villehuchet

13   asked the bank to stop contacting Madoff.

14           And when the SEC came to UBS in the U.S. and asked

15   if one of its affiliates was acting as one of Madoff's

16   counterparties, UBS told the SEC they would have to go ask

17   the affiliates themselves.

18           THE COURT:  I have a question.

19           MS. USITALO:  Sure.

20           THE COURT:  You keep talking about the UBS

21   affiliates.  Are you talking about SA, are you talking about

22   AG?  How are you -- link those for me.

23           MS. USITALO:  So with respect to the review of the

24   trading activity, it was UBS SA and the custodian and

25   administrator that were reviewing those statements and

Page 113

1    confirmations.  So it's different allegations for each.

2    There were instances where UBS AG was --

3              THE COURT:  I know there were.  But I have read

4    every word of your complaint.  And I want the answer to that

5    question.

6              MS. USITALO:  Which allegations we are alleging

7    that UBS SA had -- sorry, which UBS entity had which

8    knowledge?

9              THE COURT:  Exactly.

10             MS. USITALO:  Okay.  So it is in -- UBS SA is the

11   one that identified out-of-range trade prices in the BLMIS

12   trade confirmations.

13             THE COURT:  I want to just say something right

14   now.

15             MS. USITALO:  Okay.

16             THE COURT:  Every time you use UBS, please be

17   specific.

18             MS. USITALO:  Will do, Your Honor.  And I want to

19   then clarify to you when I am talking about that -- I had

20   made the statement that UBS noted Madoff strategy.  That was

21   UBS AG.

22             THE COURT:  Okay.

23             MS. USITALO:  And actually lastly, Your Honor, I

24   was just going to make -- to note that Luxalpha, with

25   respect to the counterparties, reported to its auditors that

Page 114

1   BLMIS' option counterparties were approved by UBS AG, even

2   though we know that could not be the case.

3              THE COURT:  Explain that then.

4              MS. USITALO:  Because there were no counterparties

5   to approve.

6              THE COURT:  Oh, okay.

7              MS. USITALO:  And, Your Honor, just in conclusion

8   with respect to actual knowledge, I think these allegations

9   that I've just been through taken together and viewed in the

10  light most favorable to the trustee satisfy the trustee's

11  burden of alleging actual knowledge and support the

12  trustee's ability to pursue claims to avoid the transfers

13  made to Luxalpha and Groupement beyond the two-year period.

14             And so I would like to finally just go and touch

15  on the arguments that the defendants have made with respect

16  to the trustee's allegations on the recovery under Section

17  550 of the subsequent transfers.  And at this stage what the

18  trustee must do to move beyond the pleading stage and

19  recover subsequent transfers from the defendants is to

20  provide the defendants with a short and plain statement of

21  the claim showing that the pleader is entitled to relief.

22  And the trustee has done so by alleging throughout the

23  second amended complaint that these defendants who acted in

24  various capacities as service providers to Luxalpha and

25  Groupement received subsequent transfers of BLMIS customer

Page 115

1    property as service provider fees.

2                THE COURT:  Again, you're lumping them all

3    together, correct?  You're not giving me which UBS we're

4    dealing with.

5                MS. USITALO:  In this instance, Your Honor, we are

6    alleging that each one of the UBS entities -- so that would

7    be UBS AG, UBS SA, UBS FSL, and UBS TPM all received fees as

8    service providers to Luxalpha and Groupement.  And I will

9    try -- I apologize --

10               THE COURT:  Make sure the record is clear.

11               MS. USITALO:  Okay.  As I believe Mr. Paccione

12   said earlier, there's really no dispute here that a hundred

13   percent of Groupement and Luxalpha's assets were invested

14   with BLMIS and Luxalpha also in its answer admits this and

15   admits that all of the UBS SA, UBS AG, UBS SFSL, and UBS TPM

16   and all of the Access defendants as the trustee has defined

17   them, AP Lux -- sorry, I have them all right here -- AIA

18   Limited, AIA -- I want to -- AIA LLC, Access International

19   Advisors Limited, and Patrick Littaye, Mr. Villehuchet, and

20   Mr. Dumbauld all received fees as directors and service

21   providers.

22               And what the Defendants are arguing here is that

23   the trustee has not linked the transfers from Luxalpha to

24   these defendants as originating as BLMIS customer property.

25   Each defendant has disputed this.  And UBS makes arguments -

Page 116

1   - UBS SA makes the argument that it tries to force the

2   trustee to perform a specific tracing exercise of linking

3   the initial transfers made to Luxalpha and then to UBS SA as

4   we saw with Mr. King on Mr. King's slide.  But that is not

5   what is required at the pleading stage.

6           In the complaint, the trustee need only show the

7   relevant pathways through which transfers were received.

8   And the trustee has certainly done that both in describing

9   the various roles held by each, detailing timeframes, and

10  identifying amounts received as service provider fees, and

11  quite literally, as has been pointed to a few times today,

12  in Paragraph 340, which we provide a chart that draws out

13  the pathways of transfers from BLMIS and on to each of the

14  defendants -- would you like me to go through each one as

15  represented in the chart, okay --  Each of the defendants

16  that were made by Luxalpha and Groupement.

17          And it's correct, as the defendants have pointed

18  out, that the allegations in this complaint are different

19  from some of the cases that have been recently before Your

20  Honor to require subsequent transfers from Fairfield Sentry.

21  And there's a reason for that.  In those cases, the trustee

22  received records from Fairfield Sentry's administrator,

23  Citco, which are the books and records of Fairfield Sentry

24  and which reflect the payments into and out of Fairfield

25  Sentry.

Page 117

1            We don't have that here.  We don't have a

2    production of all of the books and records of Luxalpha and

3    Groupement.  And yes, the trustee has received some

4    productions.  And in those, there were audited financial

5    statements, invoices, and fee agreements.  And it's from

6    those documents that the trustee was able to make the

7    allegations he did concerning the subsequent transfers.  But

8    those documents don't provide the details and they don't

9    provide the complete picture.

10           And as Your Honor has recently noted in the

11   decision in Picard v. Mayer, the trustee has made his

12   allegations here as an outsider to these transactions.  And

13   in some cases, these transactions are several layers deep.

14   And as Your Honor also recently held in Picard v. First Gulf

15   -- and I'll quote from the decision, "In order to determine

16   how Fairfield Sentry spent the billions of dollars it

17   received from BLMIS, this court would need to review

18   financial documents in order to trace the monies to all of

19   Fairfield Sentry's principals, insiders, creditors, and

20   customers.  Undoubtedly, the court will trace and calculate

21   how Fairfield Sentry spent its BLMIS funds at a later stage

22   of litigation.  At this stage, the trustee need only assert

23   allegations that make it seem plausible that defendant

24   received BLMIS monies."  And these are the very

25   circumstances that we have here with Luxalpha and

Page 118

1    Groupement.

2            It is not a case, like the defendants argue in

3    Picard v. Shapiro.  In that case, there were allegations

4    where the trustee made on information and believe that the

5    BLMIS accounts were funded by subsequent transfers without

6    more.  And there, the court found that the trustee didn't

7    give enough information to make the plausible inference that

8    these funds were BLMIS customer property.  But that's not

9    the case here, where the trustee has alleged the involvement

10   of all of the service providers in Luxalpha and Groupement

11   and that all of the service providers were paid fees as

12   service providers of Luxalpha and Groupement.  And as we've

13   previously noted, Luxalpha and Groupement's assets were

14   invested with BLMIS.  It was their only business and thus

15   the plausible inference can be made that these subsequent

16   transfers were BLMIS customer property.

17           And I know we got in earlier to the specific

18   allegations about UBS AG, and I pointed Your Honor to those

19   particular allegations.  And I believe in response, Mr. King

20   said that this may not even amount to the Rule 8 pleading

21   standard.  And that's not the case.  And we look to Picard

22   v. Chase.  And in that case, the court found that the

23   trustee's complaint met the Rule 8 standard by adequately

24   apprising the defendants there of the subsequent transfers

25   at issue where the complaint set out the initial transfers

Page 119

1    in Exhibit B to the complaint and then alleged, and this is

2    a quote, that "some or all of these transfers were

3    subsequently transferred to defendant Chase and/or other

4    defendants in the form of commissions or fees, transfers

5    from one account to another, or another means."  And that

6    was sufficient to apprise the defendants.

7            And as Your Honor -- and Your Honor cited to

8    Picard v. Chase in Picard v. Mayer.  And there was a similar

9    set of circumstances where there were various levels of

10    transfers.  And there Your Honor pointed to the quote from

11    Picard v. Chase where the moving defendants are a group of

12    interrelated individuals and entities and whether they

13    additionally received subsequent transfers of BLMIS funds

14    from one another is a question to which they and they alone

15    have the requisite information to respond.

16            And we have not received -- we do not have yet the

17    documents that we would need to identify these specific

18    subsequent transfers.  We do not have the books and records

19    from Luxalpha or Groupement or from the Access entities.  We

20    don't have bank statements from the defendants.  And these

21    are the documents that would assist the trustee and the

22    Court with figuring out how Luxalpha and Groupement paid

23    their agents and service providers.

24            And unless Your Honor has any questions, I have

25    nothing further.

```
                                                              Page 120
 1              THE COURT:  Thank you.  Mr. King, I see that you
 2     are off mute, so do you want to rebut?
 3              MR. KING:  Yeah.  The hour is late and I will be
 4     short, Your Honor.  Because --
 5              THE COURT:  Where are you?  It's still pretty
 6     early here.
 7              MR. KING:  Fair enough.  I'm happy to go on and
 8     on, but I don't think the 69 other people on this Zoom would
 9     appreciate that.  So I will be very quick.
10              First thing.  On the issue of actual knowledge.
11     The one thing you didn't hear Ms. Usitalo speak about was
12     the standard of what one needs to show; a high level of
13     certainty and an absence of substantial doubt.  Everything
14     she said about knowing about impossibility of returns and
15     trading outside the daily close and inability to identify
16     counterparties was alleged in the Merkin case and the judge
17     there held that's not good enough.  At most it was willful
18     blindness.  He did find willful blindness, meaning a strong
19     suspicion but at least some doubt.  But he held that did not
20     constitute, even with all inferences in the favor of the
21     plaintiff -- the trustee here, same plaintiff -- an actual
22     knowledge that no securities were being traded.
23              I urge Your Honor to read the Merkin case, 515
24     B.R. 117.  And you'll see that the allegations --
25              THE COURT:  (indiscernible) I haven't read them
```

```
                                                                      Page 121
 1    all already

 2            MR. KING:  I would urge you to reread the Merkin

 3    case, Your Honor.  Because the allegations there are

 4    equivalent in many respects and go beyond anything that's in

 5    the current complaint.  And it just doesn't satisfy actual

 6    knowledge.

 7            On the subject of the subsequent transfers, I am

 8    not demanding dollar-for-dollar tracing.  I get that that is

 9    an issue for the most part to be decided later.  But on the

10    face of the complaint, it is impossible to have made $32

11    million in subsequent transfers when you've only received

12    $16 million in initial transfers.  They know the initial

13    transfers are only $16 million through 2006, and yet they

14    are claiming subsequent transfers through 2006 of $32

15    million.  That's not plausible.  That's not possible.  Math

16    doesn't allow that to happen.  And I have heard no

17    explanation --

18            THE COURT:  Let's just not be there yet, Mr. King.

19    I've heard your argument.

20            MR. KING:  Lastly, I've heard no explanation as to

21    what happened to that subparagraph D of the proposed second

22    amended complaint that was filed five -- longer than that

23    now, 2015, where there was an actual allegation about monies

24    received by UBS AG.  It's not in the current complaint.

25    It's gone.  And there is an allegation as to every other
```

Page 122

1    defendant.  It is not enough just to parrot the language of

2    550 and say you got something, I am entitled to recover it.

3    You need some factual allegation under the Supreme Court

4    standards.  That's all, Your Honor.

5              THE COURT:  Okay.  Anyone else wish to be heard?

6              MR. KNUTS:  Your Honor, just briefly on

7        behalf of Mr. Dumbauld.

8              THE COURT:  Sure.

9              MR. KNUTS:  Counsel for the trustee spent part of

10   her time talking about how Mr. Dumbauld acted in good faith

11   and presented information that they are now using to try to

12   hold the Access defendants liable.  It seems to me that you

13   cannot hold an employee liable for a return of compensation

14   just by attending a meeting, just by reporting accurately

15   the information that he developed to the people who could

16   make decisions at the company.  And to hold otherwise, to

17   say that somehow there's an allegation --

18             THE COURT:  That's called an affirmative defense.

19   Okay.

20             MR. KNUTS:  No, the Geltzer case said it was not -

21   - in this context that it was not an affirmative defense.

22   So I would just ask Your Honor to see whether you agree with

23   that or not.  Thank you.

24             THE COURT:  Thank you.  Anyone else wish to be

25   heard?

Page 123

1          Thank you, everyone.  Interesting arguments.

2    Interesting.  We will obviously get a written opinion.  Or

3    two or three.  I don't know how I'll put them together.

4    Okay, everyone.  Have a great day.  Be safe.  Enjoy the

5    weather.  Bye.

6          (Recess)

7          THE COURT:  Apologize, everyone.  I went to

8    chambers by basically sounding like I dismissed everyone.

9    And I was reminded that I did not dismiss everyone, that I

10   could go to chambers and talk, but I have other matters on.

11   So I apologize profusely to everyone that I did it in the

12   way that I did it.  And chambers told me to leave them alone

13   and come back to you all.  So, very good.  Give me one

14   moment to get to where I am.

15         We are at 10-05358, Picard v. Citibank.  And that

16   is -- yes, very good.

17         State your name and affiliation.

18         MR. CHARLEMAGNE:  Good afternoon, Your Honor.

19   Chardaie Charlemagne on behalf of the trustee.

20         Good afternoon, Your Honor.  Carmine Boccuzzi,

21   Cleary Gottlieb on behalf of Citigroup Global Markets

22   Limited, Citibank NA, and Citicorp North America Inc.

23         THE COURT:  Very good.  Just give me two minutes,

24   please.  Because the last argument I had myself all

25   scattered with that complaint everywhere.  So if you would

Page 124

 1    just be patient with me.

 2              Okay, I am now ready.  This is -- Mr. Boccuzzi --

 3    how do you?

 4              MR. BOCCUZZI:  Boccuzzi.  Boccuzzi, Your Honor.

 5              THE COURT:  This is your motion to dismiss.

 6              MR. BOCCUZZI:  Yes.  Thank you, Your Honor.  One

 7    thing.  The docket number you said at the beginning, I'm not

 8    sure --

 9              THE COURT:  I said adversary proceeding 10-3545.

10    Is that incorrect?

11              MR. BOCCUZZI:  10-05345.

12              THE COURT:  Yeah.  What happens is I left the zero

13    off.  Sometimes people leave the zero off.

14              MR. BOCCUZZI:  Okay.  And then I just misheard the

15    numbers.  Apologies.

16              THE COURT:  Okay.  I apologize.  And I am glad you

17    -- I am so glad you clarified it for the record.  So this is

18    Adversary Proceeding 10-05345.

19              MR. BOCCUZZI:  Thank you, Your Honor.

20              THE COURT:  Thank you.

21              MR. BOCCUZZI:  This is the motion to dismiss

22    brought by the -- I'll call them the, when I refer to all

23    three of them, the Citi defendants.  But the complaint here

24    is really two sets of claims; one by the trustee against

25    Citigroup Global Markets Limited, and I'll try to just refer

Page 125

1    to them as Citigroup Global Markets, and the other is a

2    claim against Citibank and Citicorp.  And they are both

3    claims under Bankruptcy Code 550 as purported secondary

4    transferees.  I think it might make sense just for purposes

5    of dividing it up to start with the claim against Citigroup

6    Global Markets.  That claim arises out of two purported

7    secondary transfers totaling $100 million that allegedly

8    went from Madoff to the Fairfield Sentry fund and then on to

9    Citi Group Global Markets.  The trustee originally --

10            THE COURT:  Excuse me for interrupting.

11            MR. BOCCUZZI:  Yes.

12            THE COURT:  And that is -- you are saying it was a

13   swap, correct?

14            MR. BOCCUZZI:  Yes, that involved a swap.  I was

15   going to give some of that background, Your Honor, just to

16   set the table as it were.  And that was exactly my next

17   point.  The claim was originally $130 million.  That was

18   comprised of three different transfers, one in 2005 and then

19   the ones that we're here about today in 2008.  But the

20   district court in 2013 -- and that's at 505 B.R. 135 --

21   dismissed a $30 million transfer as a result of the

22   application of the 546(g) safe harbor.  And that's the safe

23   harbor that protects or covers transfers in connection with

24   a swap agreement.  And the swap agreement in this case --

25   and it's discussed in that opinion -- is one that was

Page 126

1     between Citigroup Global Markets and a fund that was named

2     Auriga.  And what Auriga wanted via the swap was to have

3     leveraged exposure to the Fairfield fund.  So the swap

4     agreement provided that Citigroup Global Markets would pay

5     or take money from Auriga -- from Auriga,  yes, based on the

6     performance of the Fairfield Sentry fund.  Citigroup itself

7     didn't want to have direct market exposure to the Fairfield

8     fund.  That's not the point of these transactions.  It

9     wanted to hedge that.  So what it did was it bought shares

10    in the corresponding amount of the swap.  And so if Auriga

11    wanted a return or money out of its swap, it would notify

12    Citigroup Global Markets.  Citigroup Global Markets would

13    redeem the corresponding appropriate amount of shares from

14    the Fairfield fund and pay that over to Auriga.  So it was a

15    very mechanical sort of process.  Auriga says let's reduce

16    the size of the swap, Citibank does the calculation --

17    Citigroup Global Markets, excuse me -- and then redeems out.

18    And two such redemptions happened in 2008, and they are the

19    subject of the motion today and the current amended

20    complaint from the trustee.  One was in April of 2008 for

21    $60 million and one was in November of 2008 for $40 million.

22            And our motion as to these claims -- I think I'll

23    just discuss the grounds of that and then we can move on to

24    the Citibank side of the complaint -- says that the

25    complaint as to Citigroup Global Markets should be dismissed

Page 127

1   in full.  And what we're doing is basing it on the caselaw

2   and the reasoning set out in the concurrent by Judge Menashi

3   in the Citibank decision that went to the Second Circuit

4   where he questioned the underpinnings of the so-called Ponzi

5   scheme presumption --

6              THE COURT:  But you're arguing a concurrence to

7   me, not the majority ruling?

8              MR. BOCCUZZI:  Right.  The majority acknowledges

9   that no one was challenging the Ponzi scheme presumption.

10  It didn't bless or accept the Ponzi scheme presumption.  And

11  so, yes, it is a concurrence.  So the concurrence cites, and

12  we cite in our brief, other cases that point out some of the

13  issues with the Ponzi scheme presumption.  And an important

14  one is that there is of course no mention of the Ponzi

15  scheme presumption in the Bankruptcy Code.  The Bankruptcy

16  Code trains on in Section 548 as well as the other avoidance

17  provisions the transfer itself; what was the intent?  And

18  now we're talking about actual intent to hinder, delay,

19  defraud of the transfer at issue, and it doesn't look to

20  broader issues related to how the debtor was run or managed

21  or if it was a Ponzi scheme.  The Bankruptcy Code doesn't

22  give out special rules for fraudulent conveyances in the

23  context of a Ponzi scheme.  And here of course we are

24  dealing with primary transfers and alleged primary

25  transfers, because we also raise a tracing point as to the

Page 128

1    April 2008 transfer.  But allegedly starting with Fairfield

2    -- from Madoff to Fairfield.  And of course Fairfield was a

3    net loser.  So we're not talking about illegitimate false

4    profits.

5            Your Honor in the Goodman case earlier this year

6    said of course there's no reason not to apply the Ponzi

7    scheme presumption in the context of a recipient of false

8    profits, fictitious profits.  We don't have that here in

9    this case.  We're dealing with the return of principal.  And

10   so what we have then is at most a preference among creditors

11   as opposed to the squirreling away of assets to get them out

12   of the hands of creditors and keep them under some sort of

13   indirect or other dominion or control of the original

14   debtor.

15           And so we would say if you then look back to the

16   sort of usual badges of fraud analysis and you look and you

17   see that the transfers to Fairfield did not remain under any

18   sort of control with Madoff, there's no argument given that

19   it was just a return of principal, that there was inadequate

20   consideration.  And so you just have a situation where,

21   again, they need to plead actual intent to hinder, delay,

22   defraud as to these transfers.  And we just don't think that

23   the usual resort to the Ponzi scheme presumption should do

24   the trick.

25           And then as to the tracing point, our arguments as

Page 129

```
 1   to tracing would not dispose of the entire case against

 2   Citigroup Global Markets.  Here we are really talking about

 3   the $60 million transfer in April of 2008 from Fairfield to

 4   Citi Global Markets.  But again, if we look at the complaint

 5   and we look at things that I believe Your Honor could take

 6   judicial notice of, you see that the $60 million that came

 7   in April of 2008.  There was no recent transfer by Madoff to

 8   Fairfield in that amount.  You have to go back more than

 9   three months to mid-January of 2008.  At that time, there is

10   a transfer of $70 million.  But in between that transfer and

11   the transfer to Citi from Fairfield, you have at least $141

12   million in other transfers going out from Fairfield.  And we

13   just think given that it's just not plausible to say based

14   on that math that you can say the $60 million -- or there's

15   a plausible case here that the $60 million was in fact money

16   that came from Madoff as opposed to other subscribers into

17   the Fairfield funds.

18            So those are the two arguments that we think

19   warrant complete or at least partial dismissal of the claim

20   against CGML.  And I'm happy either to take any questions,

21   Your Honor, or move on to the Citibank side unless you want

22   to go one at a time and have the trustee respond on

23   Citigroup Global Markets.

24            THE COURT:  Go to the Citibank argument.

25            MR. BOCCUZZI:  Okay.  On the Citibank side, what
```

Page 130

1    we are dealing with here is a loan, a loan made in 2005 by

2    Citibank to what became known as the Prime Fund.  That was

3    one of several funds managed by the Tremont Group and that

4    invested with Madoff.

5           In March of 2008, Tremonte and Prime, finding an

6    alternative lender, terminated that loan.  So they

7    terminated the loan, and they paid back the $300 million.

8    In the period of the life of the loan, between June or so of

9    2005 and March 2008, Citibank received regularly scheduled

10   interest payments in the amount of around I think $40

11   million.  And the trustee is seeking to claw back under

12   550(a) those interest payments as well as the $300 million

13   repayment.

14          We think that this claim should be dismissed.  And

15   as to this -- this is point two in our brief -- we think the

16   Court can dismiss it because the sort of (indiscernible)

17   plus ultra fraudulent conveyance is depletion of the estate.

18   And if you look at what happened here -- and that's both in

19   the complaint that's against us, the incorporated by

20   reference complaint against Tremont, as well as a related

21   complaint involving ABN AMRO is that that repayment to us,

22   again, which was driven by Tremont and not Citi, was part of

23   one integrated transaction where $300 million came out of

24   the Madoff estate, but then a corresponding greater amount

25   went right back into the Madoff estate through another

Page 131

1    Tremont-managed fund.

2              And so our position is that -- and we cite cases

3    to this effect and I would refer Your Honor to the Ivy case

4    involving the entities that were buying steel.  When you

5    have one integrated transaction like that where the -- at

6    the end of the day the debtor is left not depleted and in

7    fact having more money than the -- it's really not the

8    proper subject of a fraudulent conveyance/550 claim because

9    you don't have that initial depletion of the estate.

10             Again, the caselaw that we cite, the Gredd case

11   and other cases focuses on is their harm to the debtor that

12   resulted from the transfer.  And given these facts that are

13   in the complaint and are judicially noticeable by Your

14   Honor, we think they're not.

15             And there's also -- that argument we think should

16   dispose of the entirety of the claim.  There's also a

17   tracing argument again as with the portion of the claim

18   against Citigroup Global Markets.  And in the context here,

19   we are talking about the attempt to claw back the interest

20   payments that were made to Citibank over the life of the

21   loan.

22             So, for example, there during the last 12 months

23   of 2005 when the allegation is that Citi received about $4.4

24   million in interest from the Prime fund, there were no

25   transfers in that period from Madoff to Prime.  And again in

```
                                                              Page 132
  1    2007 when there's about $18 million in interest flowing to

  2    Citi, you don't see any initial transfers going on from the

  3    debtor to Prime.  So we think, again, in the absence of

  4    that, there's just no plausible allegation of tracing.  And

  5    at the very least if Your Honor doesn't dismiss the entire

  6    claim, those claims as to interest payments should be

  7    dismissed for failure to plausibly allege an initial

  8    transfer that passed on to us.

  9              THE COURT:  Very good. Ms. Charlemagne?

 10              MS. CHARLEMAGNE:  Thanks, Your Honor.  Again,

 11    Chardaie Charlamagne with Baker Hostetler on behalf of the

 12    trustee.

 13              Your Honor, defendants advance three main

 14    arguments in their motion to dismiss.  First, they argue

 15    that the trustee has not alleged that BLMIS made the initial

 16    transfers at issue here with the requisite intent to defraud

 17    under Section 548(a)(1)(A) because, according to them, the

 18    Ponzi scheme presumption should not establish such intent.

 19              Second, they argue that there was no depletion of

 20    the estate because someone else later invested other funds

 21    in the Ponzi scheme through a separate account.

 22              And third, they argue that some of the subsequent

 23    transfers they received did not contain stolen customer

 24    property.

 25              These arguments are without merit.  The trustee
```

Page 133

1    has alleged that the specific transfers at issue here were

2    made with actual intent to hinder, delay, or defraud as

3    required under Section 548(a)(1)(A) both by way of the Ponzi

4    scheme presumption and through badges of fraud.  This and

5    other courts have repeatedly upheld the Ponzi scheme

6    presumption, found the same allegations made here sufficient

7    to satisfy Section 548(a)(1)(A), and repeatedly rejected

8    defendant's precise argument regarding customer property.

9    Defendants cite no binding precedent or authority in support

10    of their suggestion that the Court set aside its rulings in

11    this liquidation or well-established principles of law such

12    as the applicability of the Ponzi scheme presumption to a

13    Section 548(a)(1)(A) claim.

14            Instead, defendants grasps onto dicta and a

15    concurrence by Judge Menashi in the Citibank appeal arguing

16    without supporting authority that the Ponzi scheme

17    presumption should be set aside.  This reliance on Judge

18    Menashi's concurrence is misplaced as I will discuss

19    shortly.

20            Defendant's argument provide no legal basis upon

21    which this Court may dismiss the trustee's claims based on

22    the facts in this case.  I will address each of defendant's

23    argument in turn.

24            I would like to first take a few moments to talk

25    about why the trustee's allegations satisfies Section

Page 134

1    548(a)(1)(A).  Section 548(a)(1)(A) allows for the avoidance

2    of transfers made with actual intent to hinder, delay, or

3    defraud creditors.  Defendants argue that the trustee has

4    not alleged facts relating to the specific initial transfers

5    he seeks to avoid here.  Defendants are wrong.

6         The trustee has alleged that BLMIS made the

7    specific transfers at issue here to Prime Fund and Sentry

8    with actual intent to hinder, delay, or defraud its

9    creditors.  Specifically, the trustee alleges the following

10   facts.

11        The trustee alleges that BLMIS' IA business

12   operated as a fraud and Ponzi.  This is alleged at

13   Paragraphs 15, 62, and 66 of the complaint.  The trustee

14   alleges that BLMIS did not purchase or sell securities for

15   its IA business customers.  This is alleged at Paragraph 16

16   of the complaint.  Instead, BLMIS created false, backdated

17   trades for its IA business customer accounts beginning in

18   the early 1970s.  This is alleged at Paragraph 17 of the

19   complaint.  Thus, the IA business had no legitimate business

20   operations and produced no profits or earnings.  This is

21   alleged at Paragraphs 62 to 65 of the complaint.  And the

22   trustee also alleges that BLMIS comingled all of its

23   customer funds into a single account.  This account was used

24   to distribute funds to other customers, to make

25   distributions and payments for other customers, to benefit

Page 135

1    Madoff and his family personally, and to prop up Madoff's

2    proprietary trading business.  This is alleged at Paragraph

3    67 of the complaint.

4            In other words, BLMIS robbed Peter to pay Paul

5    using funds received from one set of customers to pay other

6    customers with no legitimate business operations or trading

7    taking place.

8            These allegations plausibly establish that BLMIS

9    operated a Ponzi scheme through its IA business.  The

10   trustee also alleges facts that plausibly establish that

11   BLMIS made the initial transfers at issue here to Sentry and

12   Prime Fund in furtherance of that Ponzi scheme.

13   Specifically the trustee alleges the following facts.

14           The trustee alleges that Sentry and Prime Fund

15   were IA business customers who invested substantially all of

16   their assets with BLMIS.  This is alleged at Paragraphs 5,

17   53, 172, and 181 of the complaint.  The trustee alleges that

18   BLMIS comingled all funds it received from Prime Fund and

19   Sentry with other customer funds in a single BLMIS account

20   which it used to maintain the Ponzi.  The comingled funds

21   were not used to trade securities, but were used to make

22   distributions or payments to other customers.  Again, this

23   is alleged at Paragraph 67 of the complaint.

24           The trustee alleges that the initial transfers at

25   issue here were made by BLMIS to Sentry and Prime Fund as IA

Page 136

 1    business customers.  This is alleged at Paragraphs 3 through

 2    4, 44 through 45, 164, and 177 of the complaint.  And the

 3    trustee alleges that those transfers to Prime Fund and

 4    Sentry were not comprised of proceeds of securities

 5    transactions.  Rather, the initial transfers to Sentry and

 6    Prime Fund which are at issue here were comprised of

 7    customer property stolen from other customers.  This is

 8    alleged at Paragraphs 1, 67, 164, and 177 of the complaint.

 9    These allegations are sufficient to state a claim under

10    Section 548(a)(1)(A) with respect to the initial transfers

11    at issue here both by way of the Ponzi scheme presumption

12    and under the badges of fraud test.

13            I would like to now address Defendant's arguments

14    regarding the Ponzi scheme presumption.  This Court and

15    others inside and outside of this district have all held

16    that allegations such as those just mentioned are sufficient

17    to trigger the Ponzi scheme presumption.  As an initial

18    matter, defendant's argument that the Ponzi scheme

19    presumption is inconsistent with Section 548(a)(1)(A) is

20    without support or authority.  District courts within this

21    circuit have unanimously applied the Ponzi scheme

22    presumption as a matter of law to establish a debtor's

23    fraudulent intent as required under Section 548(a)(1)(A).

24    Every circuit court to consider the issue has similarly

25    applied the Ponzi scheme presumption as a matter of law.  In

Page 137

1    fact, defendants were unable to cite a single case anywhere

2    in this nation holding that the Ponzi scheme presumption is

3    inconsistent with the plain language of Section

4    548(a)(1)(A).  Instead, defendants base their argument that

5    the Ponzi scheme presumption is overbroad and inconsistent

6    with the text of Section 548(a)(1)(A) on dicta and a

7    concurring opinion.  But as the district court recently

8    held, notwithstanding Judge Menashi's concurrence, the Ponzi

9    scheme presumption remains the law of the circuit.  This is

10   in Sage Realty at 2022 WL 1125643.

11          Defendants take issue with the Ponzi scheme

12   presumption as a means of establishing fraudulent intent,

13   arguing that it is overbroad, inconsistent with the plain

14   langue of 548(a)(1)(A), and that the presumption is not in

15   the Bankruptcy Code.

16          First, the Ponzi scheme presumption is not

17   overbroad.  Defendants argue that the presumption is

18   overbroad because it allows the trustee to establish

19   fraudulent intent for any and every transfer BLMIS made.

20   But as just discussed and as set forth in our papers, the

21   Ponzi scheme presumption establishes fraudulent intent for

22   the specific initial transfers at issue here because those

23   transfers were made in furtherance of BLMIS' Ponzi scheme.

24   This is because with a Ponzi scheme, the investor pool is a

25   limited resource that will eventually run dry.  And as is

Page 138

```
 1    the case with all Ponzi schemes, Madoff, the Ponzi scheme

 2    operator, must have known all along from the very nature of

 3    his activities that investors at the end of the line would

 4    lose their money.  Thus, the only possible inference is that

 5    the debtor here, Madoff, had the intent to hinder, delay, or

 6    defraud future creditors because he must have known that

 7    future creditors would not be paid.

 8              Second, defendants argue that the Ponzi scheme

 9    presumption is inconsistent with the plain language of

10    Section 548(a)(1)(A) simply because the presumption is not

11    explicitly defined in the Bankruptcy Code.

12              However, judicially-created presumptions are

13    regularly implemented by trial and appellate courts.

14    Indeed, presumptions typically serve to assist courts in

15    managing circumstances in which direct proof for one reason

16    or another is rendered difficult.  And courts regularly

17    accept judicially-crated presumptions arising out of

18    considerations of fairness, public policy, probability, as

19    well as judicial economy.

20              In Basic, Inc. v. Levinson, 485 U.S. 224, the

21    Supreme Court upheld a judicially-created presumption of

22    reliance based on the fraud on the market theory in a

23    securities case and specifically held that the presumption

24    was supported by common sense and probability.

25              Thus, in direct contradiction to Defendant's
```

Page 139

1    arguments, the Ponzi scheme presumption is not overbroad, it

2    is not inconsistent with the plain language of Section

3    548(a)(1)(A).  The presumption is well-founded and supported

4    by common sense and probability.  Again, the only possible

5    inference here is that Madoff intended to hinder, delay, or

6    defraud future creditors because he must have known that

7    future creditors would not be paid by the very nature of the

8    Ponzi scheme he created.  The Ponzi scheme presumption

9    presumes actual intent only where the transfers were made in

10   furtherance of the Ponzi scheme, as is the case with the

11   initial transfers at issue here.

12           And as just mentioned, the trustee alleges with

13   particularity that Madoff operated a Ponzi and that the

14   initial transfers to Prime Fund and Sentry were made in

15   furtherance of that Ponzi scheme.  This is sufficient to

16   allege fraudulent intent under the Ponzi scheme presumption.

17           Almost all the cases cited by the defendants in

18   support of their argument to sidestep the Ponzi scheme

19   presumption are constructive fraud cases.  And in the case

20   of Finn v. Alliance Bank, the court's ruling was based on

21   Minnesota state law which directly contradicts New York law

22   and is not binding in this district.  Defendants' reliance

23   on other cases is similarly misplaced.  Lustig v. Weiss,

24   (indiscernible), and In re Churchill Mortgage Investment

25   Corp. were cases that focused on whether the presumption

Page 140

1    establishes a lack of reasonably equivalent value as an

2    element of a constructive fraudulent conveyance claim.

3    Reasonably equivalent value is not an element of Section

4    548(a)(1)(A).

5           Defendants' reliance on Sharpe is also misplaced.

6    The Second Circuit has held Sharpe inapplicable to this

7    civil proceeding.  Sharpe involved a loan to the debtor and

8    no Ponzi scheme.  And Sharpe actually supports the trustee's

9    position here that the Ponzi scheme presumption is

10   appropriate because, unlike the initial transfer in Sharpe,

11   BLMIS made the initial transfers here in furtherance of its

12   fraud.

13          Moreover, Sharpe didn't dismiss an actual fraud

14   claim because it would result in an impermissible choice

15   between creditors that should be considered a preference.

16   It dismissed that claim because it found that the initial

17   transfer was not made in furtherance to or in connection

18   with the debtor's fraud.

19          Even if the court were to find for the first time

20   in this district that the Ponzi scheme presumption is

21   inapplicable to a Section 548(a)(1)(A) claim, contrary to

22   defendant's contentions, the trustee alleges multiple badges

23   of fraud which are sufficient to support a finding of

24   fraudulent intent with respect to the initial transfers at

25   issue here.  Specifically the trustee alleges the following.

Page 141

1          The trustee alleges that BLMIS' IA business was

2    not legitimate; it was a fraud and a Ponzi scheme.  And that

3    is alleged at Paragraphs 15 through 17, 62, and 66.

4          The trustee alleges that BLMIS concealed facts and

5    made false representations about the IA business.  That is

6    alleged at Paragraphs 59 through 60, 64 through 65.

7          The trustee also alleges that BLMIS comingled all

8    customer funds into a single account.  This is alleged at

9    Paragraph 67.  And the trustee alleges that BLMIS misused

10   investor funds and created false financial statements.  This

11   is alleged at Paragraph 17, 59 through 60, and 64 through

12   65.

13         These allegations have already been held to be

14   sufficient to support a badges of fraud theory of fraudulent

15   intent.  This can be found in SIPC v. BLMIS, 528 F.Supp.3d

16   219 (2021).  There, the court found that badges of fraud

17   such as those just discussed were sufficient to establish

18   fraudulent intent under a badges of fraud theory.

19         In conclusion, the trustee adequately alleges

20   fraudulent intent for the specific transfers at issue here

21   under either the Ponzi scheme presumption or a badges of

22   fraud theory.

23         Next I would like to address defendant's depletion

24   of the estate arguments.

25         Defendants challenge the trustee's power to avoid

Page 142

1    a $301 million transfer from Prime Fund to the defendants.

2    Their reasoning is that they were somehow parties to an

3    integrated transaction that did not deplete the estate.

4    This argument has no legal or factual basis.  Before I

5    discuss the lack of any factual basis for defendant's

6    argument, I would like to discuss the fatal flaws in

7    defendant's legal argument.

8          Even if defendants were able to establish that

9    they reinvested the customer property they received into

10   another feeder fund, which they cannot, their argument would

11   still fail because the bankruptcy court has already rejected

12   defendant's reasoning in Picard v. Lustig at 568 B.R. 481.

13   This is not the first time this argument is before the

14   court.  This is not even the first time this argument is

15   before the court in this very case.

16         Although the bankruptcy court did not decide this

17   issue the last time defendants raised it, at the hearing on

18   a previous motion, the bankruptcy court questioned why

19   defendant's depletion of the estate argument was not

20   foreclosed by the bankruptcy court's decision in Picard v.

21   Lustig.  Defendants were unable to distinguish Lustig then

22   as can be seen in the hearing transcript, and they are not

23   able to distinguish is not, nor do they try to in their

24   motion papers.

25         Defendants did not even attempt to rebut the

Page 143

1    trustee's opposition brief concerning Lustig, and the Lustig

2    defendants were actually better situated to make this

3    argument because, unlike Citibank, the Lustig defendants

4    actually reinvested funds back into the BLMIS estate via a

5    different customer account.  The Lustig defendants withdrew

6    fictitious profits from one BLMIS customer account and later

7    reinvested those funds into another BLMIS account through a

8    feeder fund.

9            In Lustig, the court declined to offset fictitious

10   profits in one BLMIS account against losses in a separate

11   BLMIS account, reasoning that the reinvestment is still a

12   separate transaction governed by whatever account agreements

13   the funds had with BLMIS.

14           This is the same situation here.  Defendants are

15   trying to offset the transfers they received from Prime

16   Fund, a net winner, against Broad Market, a net loser.

17   Moreover, if the court found in Lustig that the same party

18   who took its money out and reinvested it back into Madoff

19   was unable to offset these transfers against each other, why

20   would Citibank be allowed to get a credit for another

21   party's investment?  They should not.

22           Citibank and Citicorp are attempting to collapse

23   transactions across accounts and co-op this value.  The

24   deposits that Citibank is attempting to co-op for themselves

25   have already been applied to the deposits in the Broad

Page 144

1    Market account.

2              Additionally, as noted in Lustig, Defendants'

3    proposition flies in the face of established Second Circuit

4    law on net equity in this case.  In the Second Circuit's

5    decision upholding the trustee's net investment method of

6    determining net equity, the court held that each customer's

7    net equity should be calculated by crediting the amount of

8    cash deposited by the customer into his or her BLMIS account

9    less any amounts withdrawn from it.

10             Here, the deposits and withdrawals in Broad

11   Market's account form the basis of this account's net equity

12   just as the deposits and withdrawals in Prime Fund's BLMIS

13   account form the basis of this account's net equity.  By

14   trying to combine transfers in unrelated transactions,

15   Defendants are requesting a second round of credits for the

16   deposits in Broad Market's account.  This result would be

17   inequitable to all BLMIS customers, but --

18             THE COURT:  Ms. Charlemagne, I'm sorry to

19   interrupt you, but I've got to interrupt you.  Because I

20   don't remember this issue being addressed, and you said it

21   was.  In Lustig?

22             MS. CHARLEMAGNE:  It wasn't -- yes, in Lustig the

23   issue, the rationale was addressed in Lustig.  So in Lustig,

24   they were also trying to do a similar thing.  They were

25   trying to offset fictitious profits in one BLMIS account

Page 145

1    against losses in a separate --

2              THE COURT:  But did you have another case rather

3    than Lustig?

4              MS. CHARLEMAGNE:  No.  Lustig was the only one I

5    referenced.  I did reference that the Defendants had made

6    this very argument in this case before and even --

7              THE COURT:  Okay.  I did hear that, but somehow I

8    thought I was missing a cite.

9              MS. CHARLEMAGNE:  No.

10             THE COURT:  I heard Lustig and I heard maybe

11   argument before.  Okay.  Thank you.  You clarified my brain.

12   Okay.

13             MS. CHARLEMAGNE:  All right.  So I am going back

14   to talking about the defendants and the net equity decision.

15             THE COURT:  Okay.

16             MS. CHARLEMAGNE:  So here the deposits and

17   withdrawals in Broad Market's account form the basis of this

18   account's net equity just as the deposits in Prime Funds

19   form the basis of that account's net equity.  By trying to

20   combine the transfers, the defendants are requesting a

21   second round of credits.  And this would be inequitable to

22   all BLMIS customers.

23             Defendants also entirely missed the point the

24   trustee makes about how the net equity calculations affected

25   the Tremont settlement agreement.  The trustee is not

Page 146

1    arguing that Citibank is bound by the settlement.  Rather,

2    the settlement accurately reflects the facts of the deposits

3    that defendants are now attempting to co-op for themselves.

4            Having discussed the legal deficiencies of

5    defendants arguments, I will now address why defendants'

6    argument has no factual basis.

7            Defendants are wrong on the law, but they are also

8    wrong on the facts.  Defendants' arguments depends on this

9    Court exercising its equitable powers to collapse multiple,

10   unrelated transactions to find that there was an integrated

11   round trip transaction.  There is no basis for this

12   argument.  No funds went out and came back in from Citibank

13   or Prime Fund.  They only came out.

14           As set forth in Exhibit E to the amended complaint

15   at ECF 214, Prime Fund did not return any of the $475

16   million it withdrew from its BLMIS IA account on March 25th,

17   2008.  In fact, Prime Fund did not make any deposits to its

18   BLMIS IA account after receiving the initial transfers that

19   Defendants' claim did not deplete the estate.

20           The facts make it clear that the $301 million

21   received by defendants from Prime Fund is an interest of the

22   debtor and property that the trustee is permitted to avoid

23   and recover.

24           As background, the trustee's claims against

25   defendants arise from the receipt of subsequent transfers of

Page 147

1    stolen customer property from Prime Fund, which held Account

2    Number 1C1260 at BLMIS.  The facts of this transaction are

3    simple; defendants received $301 million from Prime Fund.

4    This $301 million transfer from Prime Fund to Citibank and

5    Citicorp never returned to BLMIS or the BLMIS estate.  Had

6    Prime Fund not received the initial transfer of $475 million

7    from BLMIS, it would have become part of the customer

8    property fund available to distribute pro rata to all

9    customers.  This fact alone is sufficient to defeat

10    defendants depletion of the estate argument.

11          Indeed, in Bear Stearns v. Gredd, 275 B.R. 190, a

12    case heavily relied upon by the defendants, the court

13    concluded that Section 548(a)(1)(A) only permits at trustee

14    to avoid a transfer of an interest of the debtor and

15    property when but for the transfer such property interest

16    would have been available to at least one of the debtor's

17    creditors.  This is precisely the case here.  But for the

18    $475 million initial transfer from BLMIS to Prime Fund, $475

19    million, including the $301 million subsequently transferred

20    to defendants from Prime Fund would have been available to

21    at least one of BLMIS' creditors.

22          This brings me to the next fundamental point

23    regarding defendants' depletion argument.  Section

24    548(a)(1)(A) of the Bankruptcy Code provides that a trustee

25    may avoid any transfer of an interest of the debtor in

Page 148

1    property that was made or incurred within one year before

2    the date of filing if the debtor made such a transfer with

3    actual intent to hinder, delay, or defraud.

4            Diminution or depletion of the estate arguments

5    are typically concerned with how one defines an interest of

6    the debtor.  In other words, the issue discussed in Bear

7    Stearns was whether an interest of the debtor in property

8    referred only to property that would have been available for

9    the benefit of the debtor's creditors and/or property that

10   would have been part of the estate had it not been

11   transferred before the commencement of the bankruptcy

12   proceedings.

13           In Bear Stearns, the transfers sought by the

14   trustee were held to not be an interest of the debtor in

15   property because a federal law made it so that those funds

16   were never part of and could never be a part of the estate.

17   And thus, those funds were never available to satisfy any

18   obligations of the debtor.

19           Here, defendants cannot and do not argue that the

20   transfer at issue was not in interest of the debtor in

21   property because there is no question that the $301 million

22   they received would have been available for the benefit of

23   the debtor's creditors and was property that would have been

24   part of the estate had it not been transferred before the

25   commencement of the bankruptcy proceeding.  This fact alone

Page 149

1    defeats defendant's depletion of the estate argument.

2            Additionally, the district court has already held

3    in Bear Stearns that depletion of the estate is not an

4    element of a Section 548(a)(1)(A) claim.  It found that

5    defendants can raise this issue as an affirmative defense

6    and set forth three elements that defendants must plead and

7    prove to establish the defense.  Defendants cannot, nor do

8    they even try to establish any of these elements.  Rather,

9    rather than helping defendants, Bear Stearns further

10   bolsters the trustee's argument that these transfers to

11   Citibank and Citicorp depleted the estate.

12           The Southern District in Bear Stearns set forth a

13   three-element affirmative defense that the transferee bears

14   the burden of pleading and proving to establish that a

15   transfer did not deplete the estate.  Specifically, the

16   transferee must prove that the transfer did not reduce the

17   (indiscernible) that would have been available to the

18   creditors.  It didn't hinder, delay, or defraud any

19   creditors, and it did not have any other adverse impact on

20   any creditor or creditors generally.

21           The Bear Stearns court noted that if the

22   transferee succeeds in successfully making this affirmative

23   defense, the burden then shifts to the trustee to rebut the

24   transferee's showing.  Whether the transferee has sustained

25   his ultimate burden of proof will be decided on the entire

Page 150

1   record before the court.  Defendant does not address the

2   elements laid out by Bear Stearns, much less demonstrate

3   that they have established on the face of the complaint as

4   would be required to prevail on an affirmative defense on a

5   motion to dismiss.

6           The Bear Stearns court explained that creditors --

7           THE COURT:  Ms. Charlemagne, do you have all of

8   this in your arguments already, or are you just reading what

9   you gave me?

10           MS. CHARLEMAGNE:  I do have a lot of it already in

11   my argument.  I can streamline it a bit.

12           THE COURT:  Thank you.  I would prefer for

13   everybody, if you've said it once, you don't need to say it

14   twice.  But if you want to add, I'd like for you to add.

15   Not just give me what you've already given me.

16           MS. CHARLEMAGNE:  Okay.  I think most of these

17   arguments are in our papers.

18           THE COURT:  They're mostly in your papers.  And I

19   let you go on for a long time.

20           MS. CHARLEMAGNE:  You did.  And I appreciate that.

21   Okay.  So I think what I'll do is I'll just quickly

22   distinguish Pereira, which is a case that they strongly rely

23   on for their depletion arguments.  And then for the customer

24   property argument that they make, I will very briefly touch

25   on that and rest on our papers.

Page 151

1            THE COURT:  Thank you.

2            MS. CHARLEMAGNE:  And so for Pereira, I just

3    wanted to clarify that in Pereira, Pereira was in a

4    completely different procedural and factual posture than

5    this case here.  It was a full record at summary judgement

6    and the defendants have not shown a single case successfully

7    applying this collapsing doctrine to defeat a Section

8    548(a)(1)(A) claim.

9            In Pereira, the agreements cross-referenced each

10   other.  Both agreements were expressly conditioned on the

11   contemporaneous closing of the other transaction and payment

12   on both agreements was accomplished with a single wire

13   transfer.

14           Here, the defendants did not even explain which

15   agreements formed the supposedly integrated transactions.

16   They attempt to utilize an unrelated party's subsequent

17   transfer which held a wholly different BLMIS account as a

18   reason by BLMIS' transfers to Prime Fund did not deplete the

19   estate.

20           So defendants asked this Court to collapse

21   unrelated transactions between separate parties and to

22   ignore economic realities of fraudulent transfers in a plea

23   for equitable relief that has no basis in law or fact.

24           And for the customer property, I don't have

25   anything new to say.  So, Your Honor, I will just rest on

Page 152

1    our papers for the argument there.

2              THE COURT:  Thank you very much.  Any quick

3    rebuttal, Mr. Boccuzzi?

4              MR. BOCCUZZI:  Yes, if I might, Your Honor.  Just

5    three points.

6              THE COURT:  You know, I don't mind any points.

7    Just don't repeat what you've given me.

8              MR. BOCCUZZI:  I'm not going to repeat.  I'll just

9    -- it will be a true reply in terms of points raised by Ms.

10   Charlemagne.

11             Number one, on the Ponzi scheme presumption, the

12   red flags analysis that we heard from Your Honor was nothing

13   more than the allegations as to why Madoff was a Ponzi

14   scheme.  We are not, as in many of the cases that the

15   trustee cites, saying that the Ponzi scheme presumption

16   shouldn't apply because there was no Ponzi scheme.  We agree

17   there was a Ponzi scheme.  What we're saying is that

18   accepting that there was a Ponzi Scheme shouldn't change the

19   rules of the game.  And you still have to go transfer-by-

20   transfer.  And we cite cases about the Ponzi scheme

21   transaction.

22             Going to these points on Page 15 of our opening

23   brief and also in the In re Churchill case there is the

24   quote, "The fact that the debtor's enterprise as a totality

25   is operated at a loss or in a manner that is fraudulent does

Page 153

1    not render actually or constructively fraudulent a

2    particular transaction which in and of itself is not

3    fraudulent in any respect."  And we would say the return of

4    principal is that.

5          And then quickly on Lustig.  On Lustig, the

6    argument is really based on what the trustee did vis-à-vis

7    certain customers as part of a settlement to which we were

8    not a party.  So that's not binding on us.  And importantly,

9    I think the analysis is exactly backwards.  I don't think

10   we're arguing anything that would disrupt the net equity

11   rule.  There's really two sides to the coin here.  What is

12   what is the estate comprised of and what can the estate pull

13   back.  And number two with the net equity, how do you divide

14   that up among customers, of which we are not, which also

15   distinguishes from the Lustig case.

16          And so we are saying here if you look at the pie

17   that was the debtors estate as it were and you look at these

18   transactions, there was no depletion of the estate given

19   that when the money came out, it went back in and then some

20   back into the estate.  And so without that depletion, you

21   don't have a 548 claim.

22          THE COURT:  Anything else either one of you wish

23   to add?

24          MS. CHARLEMAGNE:  Nothing else from the trustee,

25   Your Honor.

```
                                                            Page 154
 1            THE COURT:  Very good.  You will receive a written

 2    opinion.

 3            The Court needs to take about a five-minute break.

 4            (Recess)

 5            THE COURT:  Very good.  We are back on the record.

 6    If you would just give me a moment.

 7            And now we are at 11-02572, Picard v. Korea

 8    Exchange Bank.  State your name and affiliation.

 9            MR. CIRILLO:  Good afternoon, Your Honor.

10    Richard Cirillo.  I guess the affiliation is Cirillo Law

11    Office.  And I am appearing for the defendant, Korea

12    Exchange Bank.

13            MR. FISH:  Good afternoon, Your Honor.  This is

14    Eric Fish at Baker Hostetler on behalf of the Trustee.

15            THE COURT:  Very good.  Excuse me, let me get my -

16    - oh, that's the next one.  Here we go.  I have it now.  And

17    it's your -- Mr. Cirillo, I believe you are the one on the

18    motion to dismiss.

19            MR. CIRILLO:  I do indeed.  And I appreciate Your

20    Honor's patience in waiting so long to get to my case.

21            THE COURT:  Well, you notice I got a little

22    impatient just a minute ago when they were repeating what

23    they had already given me.

24            MR. CIRILLO:  Well, on one occasion Your Honor

25    said that you were prepared to sit all day and therefore had
```

Page 155

1     brought snacks.  I hope you had brought snacks today.

2              THE COURT:  I did.  I did.  I did.

3              MR. CIRILLO:  Okay.  Well, I will proceed, Your

4     Honor, if I may.

5              THE COURT:  Please.

6              MR. CIRILLO:  Korea Exchange Bank is a Korean

7     bank, and it was trustee, as alleged in the complaint, of

8     two Korean investment trusts.  The complaint does not allege

9     that KEB -- and I'll call Korea Exchange Bank KEB -- does

10    not allege it conducted any activities in the United States

11    in connection with Fairfield's shares.

12              I would like to cover three topics.  One is

13    customer property, the second is the Fairfield complaint,

14    and the third is personal jurisdiction.  And we'll be happy

15    to rest on the papers for our 546(e) position.

16              I have read carefully all the Court's decisions in

17    other subsequent transfer cases, and I am arguing this

18    motion because I believe the KEB complaint and the arguments

19    we are proposing to Your Honor are different from what has

20    been presented before.  And those different arguments are

21    what I believe deserve dismissal of the KEB complaint in all

22    or in part either with prejudice or with leave to amend.

23              The first issue I would like to address is the

24    failure of the KEB complaint to allege that KEB received any

25    customer property.  I think it's unquestioned that an

Page 156

1    essential element of the Plaintiff's claim is that the

2    defendant actually did receive customer property.  If the

3    plaintiff does not allege that factually and plausibly the

4    complaint fails.

5            This complaint alleges in Exhibit B that -- and I

6    know everyone else is calling it BLMIS.  I've always for 14

7    years called it BLMIS.  And with Your Honor's permission I

8    would like to not have to retract my mind.  So absent

9    objection, I will call it BLMIS here.

10            THE COURT:  Mr. Fish, do you object?

11            MR. FISH:  I have no objection as long as I can

12   call it BLMIS as I have been doing for the past 13 years or

13   so.

14            THE COURT:  Okay.

15            MR. CIRILLO:  Okay.  Well, I have a year on you,

16   so I appreciate your concession.

17            THE COURT:  Okay.  Mr. Cirillo.

18            MR. CIRILLO:  Yes.  The complaint alleges --

19            THE COURT:  Just so you know, for the transcriber

20   of this, would you please just say BLMIS when you're doing

21   it?  I mean not you, the transcriber.  I'm giving that

22   message to the person transcribing this.  Okay.

23            MR. CIRILLO:  Good, good.

24            The complaint alleges in Exhibit B that BLMIS

25   transferred $3 billion to Fairfield Sentry.  In Exhibit C --

Page 157

1   and it alleges that in Exhibits C or CD and so forth to the

2   subsequent transfer complaints before Your Honor, they

3   alleged collectively that Fairfield transferred out $5

4   billion.  The complaint does not in fact say that Fairfield

5   had no source of money other than BLMIS.  And obviously if

6   it paid out $2 billion more than it got from BLMIS, it did

7   have another substantial source of money.

8           The exhibits in the subsequent transfer cases

9   except other than this one against KEB are before the court

10  and part of this case, and they need to be considered in

11  evaluating whether this complaint alleges the receipt of

12  customer property.

13          The first reason is, as the Court correctly held,

14  all the subsequent transfer actions are part of the same

15  case.  In doing so, the Court cited Judge Fitzsimmons'

16  decision in In re In re Geiger, 446 B.R. 670 (Bankr. E.D.

17  Pa. 2010).

18          The second reason they are before the Court and in

19  this case are that the exhibits in each of the subsequent

20  transfer complaints are judicial admissions in the same case

21  and are binding on the plaintiff.  The plaintiff cannot

22  escape or disavow those admissions.  And for that, I would

23  cite Guadagno v. Wallack Ader Levithan Associates, 950 F.

24  Supp. 1258 (S.D.N.Y. 1997), which in turn cites a Seventh

25  Circuit decision.

Page 158

1           The third reason is that the court may take

2    judicial notice of those exhibits in the other subsequent

3    transfer cases and what the plaintiff says in those

4    exhibits.  The plaintiff admitted that judicial reference

5    may be taken of other complaints in the case in his

6    arguments about incorporating the Fairfield insider

7    complaint.

8           Therefore, the plaintiff has alleged that

9    Fairfield paid out money that did not come from BLMIS and

10   therefore is not customer property.  Someone got that $2

11   billion.  The complaint only said, in a conclusory, non-

12   factual, conjectural sense, that a portion of the

13   redemptions to KEB were customer property.  That allegation

14   is non-factual, it is not made on personal knowledge, and is

15   not entitled to credit.

16           The complaint also doesn't allege that the

17   redemptions did not or could not have come entirely from the

18   $2 billion.  He has not alleged, therefore, that it is more

19   than a possibility that KEB receive customer property from

20   the $3 billion of BLMIS transfers.

21           But he also admits in the allegations I've

22   referred to that it is equally possible that none of KEB's

23   $33 million of redemptions came from the $3 million, but

24   instead came from the $2 billion.

25           So because he hasn't pled that, h e has to rely on

Page 159

1    an inference in order to --

2              THE COURT:  Wait.  Explain the $2 billion to me

3    again.  What does that --

4              MR. CIRILLO:  I'm sorry, say that again?

5              THE COURT:  What is that $2 billion you just

6    talked about?

7              MR. CIRILLO:  Yes.  If you add up all of the

8    exhibits in all of the subsequent transfer complaints that

9    are before Your Honor that allege subsequent transfers to

10   subsequent transferees, they don't add up to $3 billion;

11   they add up to $5 billion.  And so the difference of what

12   Fairfield paid to the subsequent transferees is obviously

13   not customer property of BLMIS; it has to have come from

14   someplace else.

15             Up to this point, the argument has been made that

16   each complaint is different and the court judges on a

17   12(b)(6) motion judges what is in the four corners of the

18   complaint.  But because they are allegations and judicial

19   admissions in the same case and the Court can also take

20   judicial notice of what they say, that is why we are

21   entitled to argue that the Plaintiff has failed to tie the

22   $33 million of Fairfield's transfers to KEB to the $3

23   billion rather than the $2 billion.  And that because he

24   hasn't pleaded them other than in the conclusory statement

25   that a portion of them did, which has no factual support

Page 160

1    whatsoever in the complaint, and that is required, he needs

2    an inference to tie the $33 million to the $3 billion.  And

3    the inference is exactly what the Supreme Court's decisions

4    in the Twombly and Iqbal cases address.  That's exactly the

5    issue of what permits an inference.  And the court says

6    simply that the presentation of two equal possibilities does

7    not suffice to permit an inference.  And that is what we

8    have here; the possibility that the KEB transfers may have

9    come from the $3 billion and the possibility that they may

10   have come from the $2 billion.  If they come from the $3

11   billion, there is a possible liability.  If they come from

12   the $2 billion, there's no possible liability and the

13   complaint has to push that over the line from possible to

14   plausible.

15          Again, to emphasize how closely Twombly and Iqbal

16   dictate the result, Twombly was a Sherman Act Section 1 case

17   which require the plaintiffs as an essential element to

18   allege that the defendants acted at a competitive contract

19   combination or conspiracy, or to put it another way, they

20   acted in concerted action.

21          The complaint alleged factually that the

22   defendants reacted to the plaintiff's market conduct,

23   finding it to be a competitive threat.  The facts also

24   allege that the defendants all reacted in an identical or

25   very similar way to that.  The plaintiff asked the court to

Page 161

1   draw an inference that this uniform behavior was sufficient

2   to allege the essential element of a concerted action.

3           The court, however, pointed out that the same fact

4   that the defendants -- the same facts supported that the

5   defendants' identical behavior was not a result of concerted

6   action, but instead the independent business decisions of

7   each of the defendants, not a conspiratorial one, but each

8   one deciding to respond to the competitive threat in the

9   same way.

10          And so as in our case, the alleged facts presented

11  two equal possibilities, and the court said that isn't

12  sufficient and it dismissed the complaint.  That's where the

13  Twombly phrase that we so often hear, "Nudging from what is

14  possible or conceivable, but what is plausible" comes about.

15          The court held very clearly that an inference to

16  survive a 12(b)(6) motion must be reasonable, and must be

17  based on facts alleged in the complaint.  It said that if it

18  didn't, the allegation did not show entitlement to relief as

19  both 12(b)(6) and Rule 882 require.

20          Iqbal, two years later, held that Twombly applies

21  to all civil cases, including bankruptcy cases, by citing

22  Federal Rule of Civil Procedure 1.  And so in Iqbal, the

23  plaintiff had brought a Bivens constitutional discrimination

24  claim alleging that he was remanded to especially harsh jail

25  confinement because he practiced Islam and because he was a

Page 162

1    national of a Middle Eastern country.  He claimed that he

2    was partially confined for religion and nationality.  And

3    that in fact was possible on the factual allegations of the

4    complaint.

5            But the court pointed out that the government had

6    shown that Mr. Iqbal was confined or alleged that Mr. Iqbal

7    was confined in strict conditions because he was or he may

8    have been a combatant against the United States following

9    the September 11th catastrophe.

10           The court found that without factual allegations,

11   those two possibilities were equal and that without more

12   factual content, as the court called it, the complaint

13   failed to nudge the claim over the line from possible or

14   conceivable to plausible.

15           So these require two things.  The Supreme Court

16   decisions require factual allegations to satisfy Rule

17   8(a)(2) and they require a factual basis underlying a

18   reasonable inference to satisfy 12(b)(6) if an inference is

19   needed to allege an indispensable element of a claim.  There

20   are many cases that decisions that apply Twombly and Iqbal

21   as indeed they must because it is our controlling precedent.

22           Coming back to why it's relevant here.  The

23   plaintiff alleges and admits that Fairfield made $5 billion

24   of transfers to subsequent transferees, but sent only $3

25   billion to its -- but BLMIS sent only $3 billion to

Page 163

```
 1    Fairfield.

 2            That is -- it is possible that the $3 billion was

 3    the source of all or a portion of the KEB subsequent

 4    transfers, but it is equally possible that the $2 billion

 5    was the source.  This, because it leaves two equal

 6    possibilities that have no factual content to nudge them

 7    across the line, requires dismissal.

 8            Now, to tie up a few loose ends, this pleading

 9    failure is not cured by the relevant pathways approach.  The

10    relevant pathways cases require a showing through which -- a

11    showing by which the funds were transferred from BLMIS to in

12    this case KEB.  And that's in the Picard v. Charles Ellerin

13    Revocable Trust case, WL 892514 *3 (Bankr. S.D.N.Y. March

14    14, 2012).

15            THE COURT:  Let me ask you what you're adding to

16    your papers, Mr. Cirillo.  Please add to them.

17            MR. CIRILLO:  Well, Your Honor, the papers come in

18    in a sequence, and I am trying to tie them together in a way

19    that makes sense and also to address some issues that may

20    arise because there are prior decisions in subsequent

21    transferee cases that make statements such as that the

22    relevant pathways approaches is appropriate.  And I am

23    saying that in this case at least, that there is no showing

24    of a relevant pathway because it doesn't show that the $33

25    million came from the $3 billion.
```

Page 164

1              Also, the vital statistics approach doesn't apply

2      because that requires the who, when, and how much.  But in

3      this case, who sent the subsequent transfers and how much of

4      them purportedly came from BLMIS are not alleged, whereas in

5      other cases using those approaches there's always something

6      more, like ledger entries approximate in time or identical

7      in amount.  I won't cite the cases because the citations are

8      in the brief.

9              This is also not a complicated exercise --

10             THE COURT:  This is not your personal

11      jurisdiction.  This is general.

12             MR. CIRILLO:  No.

13             THE COURT:  Okay.

14             MR. CIRILLO:  This is the customer property issue.

15             THE COURT:  Okay.  All right.

16             MR. CIRILLO:  I'm almost to the end of it.  I just

17      want to also, because of comments in other decisions, say

18      that this is not an exercise that complicated matching of

19      dates and amounts that you have seen.  It only takes the

20      factual allegations the plaintiff has made in his exhibits

21      and adds them up arithmetically.

22             Therefore, lacking the critical element of

23      customer property, I believe the complaint should be

24      dismissed under Rules 8(a)(2) and 12(b)(6).

25             Quickly on the incorporation of the Fairfield

                                                                          Page 165

1    affiliates and insider complaint.

2              THE COURT:  Let me just ask you a question though.

3    And I do want to ask this question.  I think what you just

4    told me on that customer property argument, that sounded

5    like trial to me.  It doesn't sound like a motion to

6    dismiss.  So can you link that to a motion to dismiss for

7    me, please?

8              MR. CIRILLO:  Yes.  Because the complaint does not

9    allege an indispensable element of the cause of action,

10   which is an allegation, a factual --

11             THE COURT:  So you're saying that every one of

12   these cases I should have dismissed, because everybody makes

13   that same argument.  But you said no, no, you're different.

14   And how are you different?

15             MR. CIRILLO:  Your Honor, I understand that Your

16   Honor has made that ruling in other cases.

17             THE COURT:  Many times.

18             MR. CIRILLO:  And it that the facts in the

19   complaint against KEB are different, firstly.  And second, I

20   do believe that Your Honor was wrong in all those cases.

21   But that's not my --

22             THE COURT:  But how? But how?

23             MR. CIRILLO:  Because Your Honor may not have

24   evaluated the absence of any factual allegation that ties

25   the payments to the $3 billion of BLMIS money rather than to

Page 166

1    the equally-alleged, admitted -- judicially admitted $2

2    billion that Fairfield paid out that didn't come from BLMIS.

3    That's $2 billion of non-customer property being paid out.

4    There is $3 billion paid --

5                THE COURT:  But Mr. Cirillo, Fairfield didn't have

6    any other money.

7                MR. CIRILLO:  That's not true, Your Honor.  There

8    is no allegation to that effect, firstly.  At least in the

9    KEB complaint.  And secondly --

10               THE COURT:  (indiscernible).

11               MR. CIRILLO:  -- the plaintiff's own exhibits

12   prove that it had $2 billion of resources other than from

13   BLMIS.  I have not put in this because it is a pleading

14   motion, and it does show that there is the absence, the lack

15   of an indispensable element of the claim, but I haven't put

16   in the fact that there are allegations and concessions that

17   Fairfield was paying subsequent transfers out of newly-

18   received subscription money rather than passing it to BLMIS

19   and then having BLMIS pass it back to Fairfield for

20   Fairfield to pass back.  That money would not be as an

21   example that -- the plaintiff does not negate in the

22   pleadings in any fashion -- as an example of non-customer

23   property that is equally possible to have been the source of

24   the KEB payments.

25               That is why under the Supreme Court decisions it

Page 167

1    is crystal clear that the plaintiff has made no factual

2    allegations and in fact the only allegation is a bare bones

3    conclusory statement that a portion of the payments to KEB

4    came from BLMIS.  That is not acceptable under any 12(b)(6)

5    or 8(a)(2) pleadings standard.  And that is why, Your Honor,

6    I don't carry the water for any other defendant.  And

7    regrettably, I didn't get to argue as the first case, but I

8    don't believe that KEB should be disadvantaged because I am

9    briefing and arguing at this point rather than in the

10   beginning of the sequence.  And I believe these arguments

11   are soundly supported by a controlling precedent, and

12   therefore they should be considered very carefully and I

13   believe accepted.

14           So may I continue to the incorporation briefly?

15           THE COURT:  Please.

16           MR. CIRILLO:  Okay.  The court has held that the

17   Fairfield insider complaint may properly be incorporated

18   into the subsequent transfer complaints under Rule 10(c).

19           Forgive me for drinking, but I don't want to lose

20   my voice.

21           And the Court cited In re In re Geiger, 446 B.R.

22   670 (Bankr. E.D. Pa. 2010) for that point.  And indeed,

23   that's what Judge Fitzsimon did in that case.  But then

24   immediately in the next sentence after doing so, allowing

25   the incorporation, she then dismissed the complaint under

Page 168

1    Rule 8(a)(2) because the incorporation caused the complaint

2    not to be a short and plain statement.

3            KEB also based its motion on both Rules 10(c) and

4    8(a)(2).  And so while the incorporation may be permissible,

5    the short and plain statement is not accomplished, and

6    therefore the case is dismissible for that separate reason.

7    Courts have reached exactly the same position allowing

8    incorporation under 10(c) and then dismissing because the

9    incorporation made the complaint not a short and plain

10   statement.  One case, Davis v. Bifani, 2007 U.S. Dist. LEXIS

11   3800, and American Casein Company v. Geiger (In re Geiger)

12   446 B.R. 670 (E.D. Pa. 2010).  I am not certain I have that

13   court and date right, but I know it's the right case.  It's

14   cited correctly in the brief.

15           What am I asking for relief?  Certainly I am not

16   asking the Court to order the Plaintiff to type all of the

17   allegations of the Fairfield complaint into the KEB

18   complaint.  That wouldn't accomplish anything.  I certainly

19   see that.  But what the plaintiff does know, and only the

20   plaintiff knows, is and can quickly, inexpensively, and

21   without delaying the case put those paragraph numbers -- and

22   if less than a full paragraph, the sentence into a list and

23   we can put the list in the stipulated order.  That is more

24   efficient than a Rule 12(f) motion to strike the immaterial

25   parts of the KEB complaint that are incorporated into it.

Page 169

1                And I have to say that despite KEB's and my

2       involvement in the Madoff cases for -- well, 14 years and

3       KEB 11 years, I don't know and KEB doesn't know what the

4       plaintiff has in mind.  He has alleged hundreds of

5       paragraphs of allegations.  He has attached dozens of

6       exhibits, none of which are directed at KEB.  The KEB

7       complaint is the blueprint for this case if it goes forward.

8       And KEB and I are really entitled to know under Rule 8(a)(2)

9       a short, plain statement of what it is we are defending.

10      And we don't know that at this point.

11               If Your Honor permits, I will move to the personal

12      jurisdiction points, which --

13               THE COURT:  Please.

14               MR. CIRILLO:  -- are also important and also

15      should result in a dismissal of the complaint, whereas

16      obviously the incorporation point does not seek a dismissal;

17      it seeks less relief of having them give me a list.  All

18      right.

19               Personal jurisdiction.  All of the plaintiff's

20      allegations against -- involving KEB and personal

21      jurisdiction are in paragraphs 5 and 6 of the complaint.

22      Nine of the allegations in those paragraphs are purely

23      conclusory, conjectural, and statements of law, and the law

24      clearly bars them from consideration.

25               For the Court's convenience -- and I put the exact

Page 170

1    language of the allegation and the specific reason it cannot

2    be considered on this motion as an appropriate probative

3    allegation of jurisdiction in a chart at Pages 8 and 9 of

4    KEB's reply memorandum, which is ECF Docket 143 filed on

5    August 15 of this year.

6           Iqbal and Twombly that I have already discussed

7    say the factual matter is required to survive Rule 8012

8    motions, and it also says that a non-factual allegation, a

9    conjectural, speculative, conclusory legal opinion type of

10   allegation is not entitled to a presumption of truth.

11   That's very important because we hear all the time that the

12   plaintiffs are entitled to a presumption of the truths of

13   their allegations.  But as the Supreme Court said many times

14   in those opinions, only if they are factual.

15           And the second thing is that they have to be

16   factual or they may not serve as a basis for a reasonable

17   inference of something else.  And that again is in those

18   cases.  And I would also cite In re Lyondell Chemical

19   Company, 543 B.R. 400, 411 (Bankr. S.D.N.Y. 2016), and

20   DirecTV Latin America, LLC v. Park 610, LLC, 691 F.Supp. 2d

21   405 (S.D.N.Y. 2010).

22           I am not going to discuss those conclusory

23   allegations further.  There are four assertions on which the

24   plaintiff rests personal jurisdiction that are fact-based

25   but that do not result in any or all of their cases,

Page 171

1    individually or collectively, in jurisdiction.

2           First I will note that the plaintiff argued that

3    factual allegations aren't necessary on a motion to dismiss

4    for lack of jurisdiction.  And that's just directly contrary

5    to what Twombly and Iqbal say.  Iqbal in fact said the

6    pleadings that are no more than conclusions are not entitled

7    to assumption of truth.  Well-pleaded allegations are

8    allowed the presumption of veracity and they are what are

9    necessary in determining if they plausibly rise to an

10   entitlement to relief.  And in this case, plausible arise

11   the inference is what one makes of these four allegations in

12   terms of the personal jurisdiction contention; do they allow

13   an inference of jurisdiction?

14          In fact, the Supreme Court expressly rejected the

15   assertion that no facts are required in a footnote in which

16   it dismissed the defense's actual statement of that

17   position.  It gave a long discussion of it.  But it said in

18   summary Rule 8(a) contemplates the statement of

19   circumstances, occurrences, and events in support of the

20   claim presented and does not authorize a pleader's bare

21   (indiscernible) that he wants relief and is entitled to it.

22          And that was also the holding in a case Your Honor

23   cited in many of the prior opinions, Dorchester Financial

24   Securities Ind v. Banco BRJ SA, which is a Second Circuit

25   2013 decision at 722 F.3d at pages 84-85 where the court

Page 172

1    says, "Prior to discovery, a plaintiff challenged by a

2    jurisdiction testing motion may defeat the motion by

3    pleading good faith," and this is key, "legally sufficient

4    allegations of jurisdiction," and that a 12(b)(2) motion

5    "assumes the truth of the plaintiff's factual allegations

6    for purposes of the motion and challenges their

7    sufficiency."

8            So if there aren't factual allegations, and in

9    this case the plaintiff is looking for an inference, there

10   aren't factual allegations, there's no inference and no

11   factual allegations.

12           All right.  Let me also before hitting the four

13   points put on the table exactly what minimum contact test

14   is.  We all know that it's purposeful availment.  But what

15   Hanson said is more than that.  Chief Justice Warren said it

16   is essential in each case that there be some act by which

17   the defendant purposely avails itself of the privilege of

18   conducting activities within the forum state.  Thus -- from

19   those activities conducted within the forum state, thus

20   invoking the benefits and protections of its law.  And

21   that's cited to Justice Stone's opinion in International

22   Shoe, which is by contrast on the facts one in which there

23   were sufficient context with Florida -- I'm sorry,

24   sufficient context, whereas in Hanson there were not.

25           The first of the four allegations that have some

Page 173

1    factual foundation is that KEB received and read Fairfield's

2    2004 private placement memorandum.  As Your Honor knows,

3    there was a whole series of Fairfield private placement

4    memoranda and they didn't all say the same thing.  In fact,

5    after the SEC got on Madoff's tail and made him register as

6    an investment advisor in 2006, there was a lot more in his

7    private placement memorandums than there had been before.

8            And that's important because the plaintiff puts

9    the 2004 memorandum before the court as Exhibit 1 to Mr.

10   Fish's declaration.  And what we find is that the exhibit

11   itself, which necessarily overrides the complaint's

12   mischaracterizations, shows that KEB could not have learned

13   from that document that BLMIS was managing Fairfield's

14   assets in New York and it could not have learned that

15   Fairfield's redemption payments came from BLMIS to the

16   extent they want -- well, came from BLMIS, period.

17           These are not only not stated in the one thing

18   that's factually alleged, the PPM, and it is therefore not

19   inferable from the PPM that KEB knew that the money it was

20   sending and the money it was receiving to and from Fairfield

21   was actually going to BLMIS and coming from BLMIS.

22           In fact, the only reference to BLMIS in the 2004

23   PPM is that BLMIS was a sub-custodian of Fairfield asset,

24   sub-custodian to Citco.  It is a commonly-known industry

25   term that shows a sub-custodian is an entity that holds on

Page 174

1    to assets, but not an entity that invests or manages funds

2    for another.

3           In fact, the 2014 PPM says 17 times that the split

4    strike conversion strategy was being -- or that a company in

5    Bermuda with a Bermuda address was Fairfield's investment

6    manager and that it was overseeing Fairfield's strategy of

7    investment called the split strike conversion strategy.

8           The plaintiff points out that the PPM explains

9    that the split strike conversion strategy involved trading

10   by Fairfield in U.S. securities.  That's true, but it's

11   irrelevant under both Hanson v. Denckla and Walden V. Fiore,

12   which is at 571 U.S. 277, because there's no allegation that

13   KEB performed any of that trading.  And as the cases hold,

14   personal jurisdiction over a foreign defendant depends on

15   that foreign defendant's activity, not on the activity of

16   third parties.  That is a position the  Supreme Court has

17   stated both for commercial cases, as in Hanson, which

18   actually addressed the point, and also in Walden for tort

19   cases.

20          Therefore, while I do recognize that Judge

21   Lifland's 2012 BLI decision embraced a view that knowledge

22   by a defendant about what a third party would or wouldn't

23   do, or would or might do sufficed for jurisdiction, that

24   decision is in direct conflict with the Supreme Court's

25   prior decision in Hanson and also was effectively overruled

```
                                                              Page 175
 1    by the Supreme Court's subsequent decision in 2014 by Walden
 2    where the court said the relationship must arise out of
 3    contacts that the defendant himself creates with the forum
 4    state.  Due process limits on the adjudicative authority
 5    principally protect the liberty of the non-resident
 6    defendant, not the convenient of plaintiffs or third
 7    parties.  We have consistently rejected attempts to satisfy
 8    the defendant-focused minimum contacts inquiry by
 9    demonstrating contacts between the plaintiff or third
10    parties and the forum state.  For that, the court cited
11    Hanson and three other Supreme Court cases.
12            Therefore, the argument -- and I know it's a very
13    initially attractive idea that tossing a seed and growing an
14    orchard may have been what some defendants did, not KEB.
15    But throwing -- knowing only and nothing more than that
16    Fairfield was executing its split strike conversion strategy
17    itself, or even if it knew it was by BLMIS, which it didn't,
18    is not a basis to support jurisdiction over KEB.
19            Moving on.  The second of the allegations that had
20    some foundation in fact -- in the allegations is that the
21    New York forum and New York governing law clauses and the
22    subscription agreements between KEB and Fairfield is itself
23    a relevant contact.  That's not true.
24            If you can hear the dogs in the background, Your
25    Honor, I have to admit, I got a memorandum saying this is
```

Page 176

1    Bring your Dogs to Work Day.  And so they are expressing

2    their views of my argument.

3              THE COURT:  Good or bad?

4              MR. CIRILLO:  I'll have to consult with them

5    later.  But ultimately only your view counts.  All right.

6              Why are the forum and governing law clauses not

7    contacts with New York?  Let's look at the forum provision.

8              The forum provision is not an exclusive

9    jurisdiction provision.  All it says is that Fairfield may

10   drag KEB into New York court.  It does not say that KEB

11   can't sue in another court.  It does not say that Fairfield

12   Sentry can't sue in another court.  And of course they are

13   both foreign entities and other courts are available.  In

14   fact, Fairfield Sentry, Your Honor knows from the Migani

15   case, did sue subsequent transferees in BVI and did not

16   insist that that case proceed here.

17             So if anybody got the benefit or privilege of New

18   York forum, it was not KEB; it was Fairfield.  It did not

19   reflect any conducting of activity by KEB in New York.  If

20   KEB had sued in New York, that would have been a contact.

21   But it didn't.  And so that is not a sufficient basis.  The

22   forum clause is not a sufficient basis to say that it was a

23   contact by KEB in New York by which it was invoking benefits

24   or privileges of New York.

25             The governing law provision is also not a relevant

Page 177

1    contact.  A governing law provision in a contract is only a

2    rule for its interpretation and enforcement.  It does not --

3    citing it does not avail the person of a privilege or

4    benefit of conducting an activity in New York.  That's what

5    Hanson Denckla, all the other cases require.  The citing of

6    a governing law provision is a frame of reference for

7    litigation for the parties to negotiate and for arbitrators

8    to interpret the contract.

9            New York does not -- it makes New York law, it

10   doesn't own it.  It's not something that it can prevent

11   somebody from citing.  And citing it does not subject

12   someone to the jurisdiction of the court, of a New York

13   court simply because it wants to refer to that as the frame

14   of reference.  It's not a privilege of conducting activities

15   in New York.  Any decisions that say or imply otherwise

16   either are based on different facts than those are alleged

17   or they fail to apply the controlling Supreme Court law and

18   are therefore not viable precedents.

19           The third contact is that KEB filed proofs of

20   claim in the BLMIS bankruptcy.  And that's true.  But in

21   this case, it does not provide a basis for personal

22   jurisdiction.  When KEB filed those claims, the court did

23   indeed have personal jurisdiction over KEB to adjudicate its

24   claims against the -- KEB's claims against the BLMIS estate.

25   However, several years before the plaintiff filed this

Page 178

1    adversary proceeding, the plaintiff rejected KEB's claims in

2    the bankruptcy.  At that point, the court's jurisdiction

3    over KEB based on the proofs of claims ended.  The Court had

4    no longer a basis for jurisdiction.  And the filing of the

5    adversary proceeding did not revive it.

6            The rationale for the rule that filing proofs of

7    claim subjects the filer to the court's jurisdiction in an

8    adversary proceeding is based specifically on the desire to

9    have both the claims and the adversary proceeding resolved

10   in a single case before a single judge.  It is a judicial

11   convenience rule, and that allows the court to net the

12   outcomes of both parties prevail.  However, that rationale

13   does not and cannot apply if the bankruptcy claim was

14   rejected before the adversary claim is filed.  And as is

15   known, the presence or absence of jurisdiction is determined

16   at the moment the adversary proceeding is filed.  And so at

17   the time that this case against KEB was filed, there was not

18   any proof of claim proceeding, proof of claim on file having

19   already been rejected.

20           I did not find a case on all fours, but I did find

21   relevant precedent, and that is cited and discussed and

22   quoted at some length in the briefs and in the memoranda.

23   Those cases look at the very analogous point of whether the

24   filing of a proof of claim or the unfiling of a proof of

25   claim permits the defendant in an adversary proceeding to

Page 179

1    have a jury trial of the adversary claim or does not permit

2    that.  And it's based on whether equity jurisdiction exists

3    in the court because of the filing of the proof of claim in

4    the bk proceeding.  And those cases are explored in great

5    depth in the original brief we filed, which is Docket 138,

6    filed on May 16th of this year, and Docket 145, filed on

7    August 15.

8            They hold that a jury trial right under equity

9    jurisdiction in an adversary proceeding is defeated by the

10   pendency of a bankruptcy court filing, citing the

11   conservation of resources theory.  But they also say that if

12   the claim is properly withdrawn or was concluded, the former

13   claimant regarding his right or its right to the jury trial

14   in the adversary proceeding because the court's equity

15   jurisdiction had ended.  And that's the situation that

16   applies here in the related context, what I believe is a

17   related context.

18           Therefore, the former proofs of claim filed by KEB

19   are also not relevant contacts and do not confer a basis for

20   jurisdiction under the minimum contact test.

21           The fourth and final factually-asserted alleged

22   contact is that KEB made and received share payments through

23   New York bank accounts.  And I underscore the word through

24   rather than to because the allegation acknowledges that the

25   money was actually transferred, as the subscription

Page 180

1     agreement signed by Fairfield and KEB provide, was actually

2     transferred from KEB's account in Korea and to Fairfield's

3     account with Citco in Ireland and then in revers, from

4     Ireland to Korea.  Those are the accounts designated in the

5     subscription agreements.

6              Personal jurisdiction, as I believe Your Honor has

7     said in some of the decisions, is determined by the law of

8     New York.  That's what the Second Circuit said in the Licci

9     v. Lebanese Canadian Bank SAL, 732 F.3d 161 (2d Cir. 2013).

10    And indeed, in that case the Second Circuit questions the

11    New York Court of appeals in order to find out, ask it to

12    explain what the law of New York is on this point of when

13    bank accounts, use of bank accounts confer jurisdiction or a

14    contact for conferring jurisdiction over a foreign

15    plaintiff.

16              Because New York law governs, the New York Court

17    of Appeals decisions are definitive.  They can't be ignored

18    or overridden by any other court.  And there are three

19    specific cases that define the law in this area.  Amigo v.

20    Marine Midland, 39 N.Y.2d 391, Licci v. Lebanese Canadian

21    Bank, 20 N.Y.3d 327 (2012), and Rushaid v. Pictet, 28 N.Y.3d

22    316 (2016).  Another case cited, a recent appellate division

23    case, First Department cited in the briefs confirmed that

24    these three cases remain the law of New York.

25              So what do they hold?  They hold that a non New

Page 181

1    York person's use of a New York account is not a relevant

2    contact for jurisdiction unless two conditions are met.  One

3    condition is that the account -- the use of the account must

4    because integral to carrying out an illegal scheme.

5           The second condition is that the foreign user of

6    the account must have been an active participant in the

7    illegal scheme.  Neither is alleged against KEB.  And in

8    fact, there is not even an allegation that KEB was aware of

9    the Ponzi scheme, and it wasn't.  All right.

10          In Licci, the illegal scheme was the financing of

11   international terrorism.  In Rushaid it was an international

12   bribery and money laundering scheme.  In both cases, the

13   defendant, the foreign defendant resisting jurisdiction was

14   an active participant, and in both cases the defendant

15   resisting jurisdiction was using it as an integral part to

16   carrying out the terrorism or bribery and money laundering

17   schemes.

18          The New York Court of Appeals recognizes that

19   trillions of dollars of ordinary commercial transactions,

20   innocent transactions pass through New York banks every day

21   on their way between foreign banks.  The New York Court of

22   Appeals indicated no intention -- it did not indicate any

23   intention that its decisions would apply to ordinary

24   commercial transactions which would or at least could have a

25   serious chilling effect on that commerce if international

Page 182

1    parties were routinely exposed to personal jurisdiction in

2    New York, a place that many non-Americans would rather not

3    litigate.

4           Amigo, the first of the three cases -- and that is

5    the undergirding for the Licci and Rushaid cases, said the

6    use of a New York bank for international transactions could

7    not by itself constitute a relevant jurisdictional contact.

8    Licci and Rushaid, which came later, made an exception for

9    use of an account to accomplish wrongdoing.

10          The plaintiff argues in his opposition memorandum

11   that, well, BLMIS' Ponzi scheme was illegal and therefore he

12   has alleged facts bringing the case within the New York

13   exception.  That -- it is true that BLMIS' Ponzi scheme was

14   illegal, but it does not confer jurisdiction over KEB.  KEB

15   is not alleged to have known of the Ponzi scheme, certainly

16   not alleged to have been an active participant in the Ponzi

17   scheme.

18          Furthermore, even assuming BLMIS and Fairfield

19   were wrongdoers and their use of the New York banks was

20   integral to their scheme, what they do cannot be attributed

21   or imputed to KEB because of the decisions of the Supreme

22   Court in Hanson and Walden.  Only KEB's activities are

23   relevant to the minimum contacts analysis.

24          Therefore, KEB's innocent use of New York banks in

25   ordinary commercial payments flowing between an Irish and a

Page 183

1      Korean bank is not relevant to jurisdiction over KEB as a

2      matter of New York law established by New York courts.  If

3      other course have reached a different decision, it is of no

4      moment because only New York's court of appeals can

5      determine what New York's law is, and we know exactly what

6      its law is from the Amigo Farms, Licci, and Rushaid cases.

7               Finally, I acknowledge the totality of the

8      circumstances test for personal jurisdiction.  However,

9      parsing this between the generalized conclusory allegations,

10     the nine allegations in Pages 8 and 9 of the reply brief and

11     parsing these four contacts, not one of them is sufficient

12     as a contact, a relevant contact for jurisdiction.  And

13     therefore, they can't add up to a totality of minimum

14     contacts.  Adding a bunch of zeroes still leaves you with a

15     zero.

16              Even if the Court were inclined to find one of

17     them or two of them sufficient, the cases defining what the

18     totality of circumstances test is made it clear that it is a

19     robust evaluation of whether in their totality there is a

20     showing of doing business that takes advantage or privileges

21     of New York.  And those are not the case here.

22              And for that as my final citation, I will point

23     the Court to the Hill decision, Hill v. HSBC Bank PLC, 207

24     F.Supp. 3d 333 (S.D.N.Y. 2016), which was distinguished but

25     not rejected in the BNP decision that's often mentioned

Page 184

1    which says defendant's principal contrary authority, Hill v.

2    HSBC Bank, et cetera, is distinguishable, and then goes on

3    to distinguish that the BNC facts were strongly in favor of

4    jurisdiction, but the acuity of facts in Hill were not.

5            The plaintiff says that, well, BNC said the Hill

6    decision isn't relevant because it deals with Tremont.

7    That's just not the case.  It is relevant because of what

8    the district court held and the BNC court did not in any

9    fashion undermine the decision in Hill.

10           If I didn't cite BNP, it's SIPC v. Bernard L.

11   Madoff Investment Securities LLC, 594 B.R. 167 (Bankr.

12   S.D.N.Y. 2018)

13           With that, I will end.  Appreciate Your Honor's

14   great patience and hoping that I have persuaded you and the

15   two dogs and ask Your Honor to dismiss this action against

16   KEB under Rules 12(b)(6) and 8(a)(2).

17           THE COURT:  Very good.  Mr. Fish?

18           MR. FISH:  Thank you, Your Honor.  I will touch

19   briefly on the customer property and Fairfield complaint

20   incorporation by reference issues first.

21           As articulate as Mr. Cirillo was in making both of

22   those arguments, they are really the same ones that have

23   been made in all of the past subsequent transfer actions

24   that have filed motions to dismiss, and they're the same

25   arguments that have been rejected.

Page 185

```
 1              So for the customer property issue, the trustee

 2    has alleged the relevant pathways, including the transfers

 3    from BLMIS to Fairfield Sentry, and then the transfers from

 4    Fairfield Sentry to KEB.  The Exhibit B to the complaint

 5    includes all of the transfers from BLMIS to Fairfield

 6    Sentry.  And Exhibit C includes all 22 transfers from

 7    Fairfield Sentry to KEB.  That's all that the trustee needs

 8    to do at this point.  The trustee has alleged the relevant

 9    pathways, including identifying each transfer by date and

10    amount from Fairfield Sentry.  And as I said, includes all

11    of the transfers from BLMIS to -- I'm sorry, from Fairfield

12    Sentry to KEB.

13              And on their face, the subsequent transfers at

14    issued looked to be transfers of customer property, as they

15    all took place after Fairfield Sentry's receipt of initial

16    transfers.  And I'll just read one quote from your prior --

17    Your Honor's prior decision --

18              THE COURT:  Before you go there, give me a second

19    to articulate a question.

20              MR. FISH:  Sure.

21              THE COURT:  Because if this is what I've heard --

22    these transfers aren't to KEB; they're combined, correct?

23              MR. FISH:  Well, Your Honor, Exhibit B --

24              THE COURT:  You have 20 transfers and these are in

25    Exhibit C.  And is that all to KEB?
```

```
                                                          Page 186
 1              MR. FISH:  Those are all to KEB, Your Honor.  And
 2      in fact --
 3              THE COURT:  Explain it then to me.
 4              MR. FISH:  Okay.  So Defendants in the case --
 5      there was a defendant who has been since dismissed.  It was
 6      Korea Investment Trust Company.  And Mr. Cirillo made an
 7      argument in his briefing that it's not clear who received
 8      the transfers because there were two separate defendants.
 9      But there's really only one defendant left since the
10      dismissal of the management company.  And it's clear -- an
11      din fact, Mr. Cirillo didn't even argue that his clients,
12      KEB, did not receive the transfers, because they did.  All
13      of the transfers --
14              THE COURT:  So what you're saying is it was a
15      management company that got dismissed.
16              MR. FISH:  Correct.  And they were dismissed
17      because they didn't receive any transfers, or at least that
18      under further investigation we didn't see any.  They all
19      went to Korean Exchange Bank.
20              THE COURT:  Okay.
21              MR. FISH:  So -- and I think Mr. Cirillo would
22      acknowledge that his client received all the transfers.  And
23      so the argument really is that -- you know, he's making the
24      same argument that every other defendant has made, that the
25      trustee hasn't tied the transfers, the subsequent transfers
```

```
                                                              Page 187
 1    to the initial transfers.  But I'll just -- in Multi

 2    Strategy and Banque Syz Your Honor wrote, "The calculation

 3    of Fairfield Sentry's customer property and what funds it

 4    used to make redemption payments are issues of fact better

 5    resolved at a later stage of litigation."

 6              And I'll just leave the customer property issue

 7    with that and I will move on to incorporation by reference

 8    unless you have any additional questions.

 9              THE COURT:  How much did KEB get?

10              MR. FISH:  Every transfer on Exhibit C -- and in

11    fact, you know, we could delete defendants on that exhibit

12    and just say KEB.  They got all of those transfers, $33

13    million.

14              THE COURT:  All right.  Go ahead.

15              MR. FISH:  Sure.  So the arguments regarding the

16    improper incorporation by reference of the Fairfield

17    Complaint, Rule Eight's requirement of a short and plain

18    statement have been repeatedly rejected by this Court.  And

19    for good reason.  Because, number one, the district court

20    has already found in consolidated proceedings that adopting

21    the initial transfer complaint by reference is sufficient.

22    This is the same action as the Fairfield action for purposes

23    of the bankruptcy court.  And there's no concern with

24    confusing or inconvenient results, and there's no prejudice

25    to KEB.  I mean, what the trustee is really doing in that
```

Page 188

1    one paragraph is alleging the avoidability of the initial

2    transfers.  And as I mentioned, this is the same issue that

3    Your Honor has ruled on in probably a dozen cases thus far,

4    and this case is no different.

5              So unless Your Honor has questions, I will move on

6    to personal jurisdiction.

7              THE COURT:  Please, move on.

8              MR. FISH:  Thank you.  So the totality of the

9    circumstances here shows that jurisdiction is more than

10   appropriate.  All of Mr. Cirillo's arguments, all of KEB's

11   arguments regarding the lack of jurisdiction, which are done

12   very piecemeal, are abutted by the trustee's allegations and

13   the arguments in the trustee's opposition.

14             First, KEB individually and as trustee purposely

15   availed itself of the privilege of conducting activities in

16   the U.S. and New York specifically.  The trustee alleges

17   that KEB invested in Fairfield Sentry to gain access to

18   BLMIS, which is a plausible allegation when taken together

19   with the allegation that 95 percent of Fairfield Sentry's

20   assets were invested with BLMIS.

21             Now, Mr. Cirillo gave us a good recitation of

22   Twombly and Iqbal and the standard of plausibility, but the

23   allegation in the complaint in Paragraph 5, that defendants

24   knowingly directed funds to be invested with New York-based

25   BLMIS through Fairfield Sentry, that's a factual assertion

Page 189

1    based on the allegation in Paragraph 2 that Fairfield Sentry

2    was a BLMIS feeder fund and had virtually all of its assets

3    invested in BLMIS.

4            It's therefore a reasonable inference to allege

5    that the purpose of investing in Fairfield Sentry was to

6    gain access to BLMIS.  It begs the question why else would

7    you invest in Fairfield Sentry if not to get to Madoff?

8    There wouldn't be any other reason.

9            And in fact, the Second Circuit has even opined in

10   the In re Picard case in 2019 when these investors chose to

11   buy into feeder funds that placed all or substantially all

12   of their assets with Madoff securities, they knew where

13   their money was going.  And Your Honor has also ruled in

14   past subsequent transfer cases that this allegation is

15   sufficient.

16           So the other issues that Mr. Cirillo has raised, I

17   will go through them in order as well.  He raised the issue

18   of the 2004 private placement memorandum and why that

19   private placement memorandum doesn't disclose that Madoff

20   was the manager of the fund.  And KEB focuses its papers on

21   references to BLMIS and Madoff in the PPM, but the PPM does

22   disclose that BLMIS holds 95 percent of the funds.  And it

23   also discusses the split strike strategy.  And there's

24   numerous references in that PPM, even if you didn't know it

25   was Madoff, which is not -- that's not plausible in itself.

```
                                                                      Page 190
 1    But even if you didn't, there's all sorts of references to

 2    New York.  The strategy was centered around U.S. securities

 3    and buying S&P 100 stocks.  Everything was in dollars, the

 4    minimum investment and the initial offering price.

 5    Fairfield Sentry maintained United States counsel.  The PPM

 6    discussed trading risks discussed in U.S. government

 7    activities.  It discussed Fairfield Sentry -- or I'm sorry,

 8    Fairfield Greenwich Group, which was essentially the manager

 9    of the fund, with its principal offices in New York.  It

10    discussed Fairfield Sentry's intermediary bank in New York,

11    and it has a mention that legal matters in connection with

12    the offering have been passed upon for Fairfield Sentry in

13    the United States by counsel located in New York.

14            So the 2004 PPM, Mr. Cirillo tries to make a

15    distinction with the 2006 PPM. But even if you didn't know

16    that Madoff was running the show, you still had all sorts of

17    disclosures here.

18            THE COURT:  Let me interrupt you a minute.  You're

19    talking about that.  Now, where is that located?  What page

20    is that on?

21            MR. FISH:  Sure, Your Honor.  The 95 percent of

22    the assets under custody being held by BLMIS, that's

23    attached to my declaration as Exhibit 1.  And that's on Page

24    15 of the private placement memorandum.

25            THE COURT:  Okay.  All right.
```

Page 191

1              MR. FISH:  Okay.  The strategy discussing the S&P

2    100 stocks and the split strike strategy, that's on Page 8.

3    And I think there may be some on Page 9.  The minimum

4    investment and initial offering prices in U.S. dollars,

5    that's on Pages 1 and 10, I believe.  Let's see.  The U.S.

6    counsel, located in New York, it's located on VI.  The

7    trading risks discussing the U.S. government activities,

8    that's on Page 16.  The intermediary bank that's in the

9    United States, that's on Page 13. Fairfield Greenwich Group

10   FGG, maintaining its principal office in New York, that's on

11   Page 6.  And the legal matters in connection with the

12   offering that had been passed upon in the United States by

13   counsel located in New York, that's on Page 22.

14              THE COURT:  Okay.

15              MR. FISH:  So I think there are a number of

16   disclosures.  And again, why else would anyone invest in

17   Fairfield Sentry other than to invest with Madoff if it's 95

18   percent invested with Madoff?  So the trustee's allegations

19   are more than plausible under any standard.

20              And next I will move to the customer claims that

21   Mr. Cirillo mentioned.  But the trustee is not arguing that

22   the customer claims automatically confer personal

23   jurisdiction, but they do add to the totality of the

24   circumstances here, and they show that the investment with

25   Fairfield Sentry was a New York-based investment.  And I

Page 192

```
 1   believe the customer claim that Mr. Cirillo submits with his

 2   declaration even says they are submitting a customer claim

 3   as an indirect investor with BLMIS.  And also KEB's

 4   reasoning that even though they sought a benefit in the

 5   bankruptcy court in this jurisdiction by filing a customer

 6   claim, but there's no personal jurisdiction.  It just seems

 7   like a -- contrary.  So, again, the trustee is not alleging

 8   that these customer claims automatedly confer jurisdiction,

 9   but they are a piece of the puzzle.

10           And next I will move to the subscription

11   agreements.  And once again, the forum selection clause is

12   one more circumstance showing the New York-centric nature of

13   the investment, that KEB consented to being sued in New York

14   and the application of New York law.  And like the customer

15   claimed, we're not arguing that this provision is binding or

16   automatically confers jurisdiction.  Rather, it's one more

17   contact that shows that under the totality of the

18   circumstances --

19           THE COURT:  What exhibit is that?  Tell me what

20   exhibit that is.

21           MR. FISH:  I'm sorry.  The subscription

22   agreements.  They are attached to Mr. Cirillo's declaration

23   as part of their customer claims.  And the subscription

24   agreement -- there's three of them, I believe.  And the

25   subscription agreement, there's three of them, I believe,
```

Page 193

1    and the first one starts on -- they're all together, so I'll

2    give you the ECF page number, if that's helpful to you.  The

3    first one is on Page 10 of 48 of, I believe it's Exhibit A.

4    Let's see, the second one -- and all of these, I think Mr.

5    Cirillo will agree that these subscription agreements are --

6    say the same thing.  The second one is on Page 32 of 48.

7    This is -- and I'll give you -- the Document Number is 137-

8    1.  It's Exhibit A to Mr. Cirillo's declaration.  And then,

9    the third customer subscription agreement is Page -- I

10   believe is 137-2, Exhibit B to the declaration.  On Page 16

11   of 40 is where it starts.

12            And I can -- you know, I can give you the specific

13   pages of the -- well I can say that -- I can tell you that

14   the forum clause, the consent to New York jurisdiction is on

15   Page -- is Paragraph -- I believe it's Paragraph 19 of the

16   subscription agreements.

17            THE COURT:  Okay.

18            MR. FISH:  So, we're not alleging that -- or we're

19   not -- we're not arguing that the -- that these subscription

20   agreements, that the forum selection clause automatically

21   confer jurisdiction.  But again, it's a piece of the puzzle,

22   and it shows that Korea Exchange Bank had multiple contacts

23   with the forum and purposely availed itself of the benefits

24   and the privileges of doing business in the United States,

25   specifically in New York.

Page 194

1              And, you know, these subscription agreements also

2      include the New York bank accounts as well.  Where to send -

3      - and in fact, this is where to send the redemptions.  And

4      we know that they did receive the redemptions.  And so, on

5      Pages -- Page 31 of 48 on Document 137-1, that's Exhibit A,

6      and then there's another one on Page 19 -- I'm sorry, 20 of

7      48 on Exhibit A.  And then, Exhibit B, Document 137-2,

8      there's another one.  It's less easy to read, but it does

9      say Deutsche Bank Trust Americas New York on all of them.

10     This is Page 26 of 40 on 137-2.  All of these subscription

11     agreements include a New York bank to receive redemptions.

12             Now, this document doesn't say that this is a

13     passthrough.  It says that's where the redemptions are to be

14     sent.  And that leads me to the bank account issue, that KEB

15     maintained a bank account in New York at Deutsche Bank

16     Americas, and that's where they received all of the

17     transfers, I believe.

18             THE COURT:  Do you happen to have the last four

19     numbers on that account, by any chance?

20             MR. FISH:  Let's see, it's --

21             THE COURT:  Not all of it.  I purposely don't want

22     all of them.

23             MR. FISH:  Yeah, 1033 I think is the account

24     number.

25             THE COURT:  The last four digits?

Page 195

1              MR. FISH:  Right.

2              THE COURT:  Okay.

3              MR. FISH:  And let me -- I just want to make sure

4     that it's the same account.  That's at least what it says on

5     the -- on the subscription agreement.  And I've also, Your

6     Honor, I've attached to my declaration some documents as

7     Exhibit 2 and 3, showing the requests for redemption.  And

8     they are to go to the same Deutsche Bank Trust Company

9     Americas account.  And I believe we've redacted the account

10    information from those.

11             THE COURT:  Okay.  Make sure you do.  All right.

12             MR. FISH:  But the documents do include -- so,

13    it's clear that KEB requested redemptions and received

14    redemptions in a New York bank account.  And this shows --

15    these documents show that the use of this account was

16    voluntary and there was an intent to use this account for

17    redemptions.  So, that's just to say that the transfers were

18    -- they purposely went through the New York bank account.

19             This is not a situation, as my able adversary has

20    argued, where the -- these bank accounts had nothing to do

21    with the transactions.  In fact, I mean, the Trustee is

22    alleging that the transfers at issue in this case, the very

23    transfers, the very subsequent transfers that the Trustee is

24    trying to recover, went through these New York bank

25    accounts.  This isn't like some of the cases that Mr.

```
                                                               Page 196
 1    Cirillo pointed to, where a defendant was accused of
 2    wrongdoing or terrorism, but this is a case where the
 3    correspondent account was used for the purpose, really, of
 4    which the Trustee is suing.
 5              And there's also a case on point, or more on point
 6    than the cases KEB cites, that I just want to bring to Your
 7    Honor's attention.  We cite it in our opposition brief, but
 8    it was just decided on May 22, and that's in the Arcapita
 9    case.  And the District Court in that case affirmed personal
10    jurisdiction where the defendant in the commercial
11    transaction "designated a correspondent account in New York
12    to receive the fund transfers."  And even though the debtor
13    chose to use US dollars to effectuate the investment, the
14    Court said that the defendant "could have avoided the United
15    States entirely by routing placements through correspondent
16    accounts anywhere in the world."  And this is Bahrain
17    Islamic Bank versus Arcapita Bank.  It's 640 B.R. 604.
18              And similarly, KEB voluntarily used the Deutsche
19    Bank New York account to do business with Fairfield Sentry,
20    which by the way also used a New York account, which is
21    disclosed in the private placement memorandum.  And nothing
22    was forcing KEB to do business with Fairfield Sentry.
23    Nothing was forcing them to use a New York bank account.
24    They voluntarily entered into these subscription agreements
25    and took these transfers and used a New York bank account to
```

Page 197

1   do it.  So, even though KEB says that they weren't doing

2   anything illegal or they may not have known of the fraud,

3   these correspondent accounts were part of the scheme, and

4   they received subsequent transfers of customer property.

5          So the -- Your Honor, the totality of the

6   circumstances shows that KEB purposely availed itself of the

7   privilege of conducting activities in the US, and New York

8   specifically.  Second, the Trustee's claims arise out of or

9   relate to KEB's conduct in the forum.  I don't think that's

10   a dispute.  And third, jurisdiction is reasonable under the

11   circumstances, for the same reasons Your Honor has

12   articulated in other subsequent transfer motions that have

13   come before you.  And the arguments that KEB makes in its

14   motion are similar to ones that have been rejected in more

15   than a dozen other motions so far.  There's no reason to

16   stray from these prior decisions, either factually or

17   legally, and KEB's arguments should similarly be rejected.

18          Thank you.  Unless you have any questions, I'll

19   rest, Your Honor.

20          THE COURT:  I think I had a few.  Mr. Cirillo,

21   any --

22          MR. CIRILLO:  Well, yes, Your Honor, I do have a

23   couple --

24          THE COURT:  Bullet-point rebuttals, please.

25          MR. CIRILLO:  I'm sorry, say again?

```
                                                               Page 198
 1              THE COURT:  Bullet-point rebuttals, please.
 2              MR. CIRILLO:  Yes, of course.  The purposely
 3    availed point that my -- that Mr. Fish raised, that goes to
 4    the issue that you have to know that BLMIS was behind
 5    Fairfield, and there's no basis for that allegation -- for
 6    that assertion, other than Mr. Fish's statement that why
 7    else would one invest in Fairfield, except to get to
 8    Plaintiffs.
 9              Mr. Fish ranged far from the allegations in the
10    complaint, and I will only add this, that as Mr. Fish knows,
11    we have explained to him that KEB was only a -- only
12    executed the transactions that the manager, now dismissed,
13    ordered.  It had no obligation to know anything at all about
14    the investments, this or any of the other investments, as
15    Trustee.  So, it is pure conclusory speculation, contrary to
16    fact, that KEB knew.  And if it didn't know, and there's no
17    allegation other than conclusory allegation that it did, the
18    knowledge is not sufficient.  As I explained, my view is
19    that the BLI decision, whatever was in 2012, was effectively
20    overruled in 2014.
21              Mr. Fish refers to us knowing that KEB knew
22    that -- from the PPM that BLMIS held 95 percent of the
23    funds.  As I explained, being a custodian and holding funds
24    -- which many, many broker dealers do for other broker
25    dealers, and we know that Madoff or BLMIS was a registered
```

Page 199

1    broker dealer -- has nothing at all to do with whether it

2    knew that 95 percent of the funds were being invested in

3    BLMIS on a long-term basis.  It only tells them -- and

4    certainly does not tell them what Mr. Fish wants to draw

5    from it that KEB knew that BLMIS was behind Fairfield

6    Sentry.  There is no imputation.

7           All of the many things that Mr. Fish listed as New

8    York-centric events can't be imputed to KEB under Walden.

9    It is not part of the totality of circumstances; it is

10   irrelevant.  The fact that these accounts were passthroughs

11   in fact is alleged in Paragraph 5 of the complaint, which as

12   I said earlier, talks about -- it says wired funds to

13   Fairfield Sentry through a bank in New York and received

14   funds through its own bank account in New York.  Going back

15   to the basic documents that Mr. Fish has identified, Your

16   Honor, the subscription agreements, that's how you get money

17   from the account, the specified account in Korea to the

18   specified account in Ireland, and get it from the specified

19   account in Ireland to the specified account in New York.

20   Innocent, completely commercial transactions, which the

21   three New York Court of Appeals decisions clearly state will

22   not support jurisdiction if they are not by a participant in

23   an illegal scheme.

24          The reference to things that the customer claims

25   filed KEB say, like being an indirect investor in BLMIS,

Page 200

1    can't be things that they -- well, they are not things --

2    and there's no allegation they are things that BLMIS knew --

3    that KEB knew when it was investing and redeeming.  In fact,

4    those customer claims were filed long after, months after

5    the world knew.  From December 8, 2008, onward, we all

6    learned that BLMIS was behind Fairfield.  We didn't know it

7    until then, but in trying to participate as an indirect

8    investor, that it learned it was an indirect investor on

9    behalf of its trusts.  Of course it alleged what it would

10   need.  That doesn't have any evidentiary probity.

11          The broader issue is that you can't take a bunch

12   of zeroes and add up to more.  There is no puzzle to be

13   pieced together.  These are not pieces.  And the principal

14   argument that I heard several times is that these arguments

15   have already been made and rejected.  Your Honor, and I

16   discussed that at one point during my presentation, my

17   argument, and yes, I recognize that there have been

18   decisions that have made and -- on some of these arguments

19   that have been rejected.  However, we have seen over and

20   over again that courts can change their minds, and do change

21   their minds.  And we know that no progress is made in the

22   law unless it is viewed from new perspectives.

23          The perspectives that I have presented to Your

24   Honor are not perspectives that have been presented

25   previously.  I have been assiduous in keeping track of the

Page 201

1    filings and the arguments, and I think that whether or not a

2    prior decision has been made, it needs to be reviewed on the

3    facts of this complaint, on the cases that are cited in

4    these briefs, and on the actual content of the documents

5    that have been put before the Court in this and other cases

6    that are part of the same case.

7            That's what I have to say, and I thank you for

8    listening.

9            THE COURT:  Very good, Mr. Cirillo.  Mr. Fish, do

10   you have anything you wish to add?

11           MR. FISH:  Your Honor, I'll just add a few things

12   here.  It wasn't just me who said, why else would anyone

13   invest in Fairfield Sentry, if not for BLMIS, but the Second

14   Circuit said that in the in re: Picard case, 917 F.3d 85, on

15   Page 105 of that opinion.  As I said, when these investors

16   chose to buy into feeder funds that placed all, or

17   substantially all, of their assets with Madoff Securities,

18   they knew where their money was going.

19           THE COURT:  Okay.  We've heard you.

20           MR. FISH:  And Mr. Cirillo makes a -- made a

21   comment about KEB maybe not necessarily knowing about Madoff

22   and that they were getting instructions.  But that's, you

23   know, that's an issue for discovery, because you know, KEB

24   was investing on behalf of trusts.  And under New York law,

25   the trustee can't sue the trusts, they can only sue the

Page 202

1    trustee.  That's why they sued KEB individually and as the

2    trustee of these three trusts.

3            And the subscription agreements specifically state

4    that if the subscriber is signing as a trustee or agent or

5    nominee or someone else, it still "agrees that the

6    representations and agreements herein are made by a

7    subscriber with respect to itself and the beneficial

8    shareholder."  And that's the subscription agreements at

9    Paragraph 27.  And KEB is very careful about not saying what

10   the intent of the trusts were, and we can only surmise as to

11   why.

12           THE COURT:  Very good.  We're not surmising today.

13           MR. FISH:  Right.  But I think it's -- the Trustee

14   has alleged sufficient facts to confer personal jurisdiction

15   in this court.

16           And also, I also wanted to just go back to

17   something that Mr. Cirillo mentioned about the Trustee not

18   needing to allege facts.  That's not what we argued in our

19   opposition.  In fact, we were citing a couple of Your

20   Honor's opinions in Bank Lombard Odier and Banca Carige,

21   where I think the quote was, "At the pre-discovery stage,

22   the allegations need not be factually supported."  In other

23   words, this is not a summary judgment motion.  This is a

24   motion to dismiss, and the Trustee has alleged sufficient

25   facts, both under Rule 12(b)(2) and 12(b)(6).

```
                                                              Page 203

  1              And with that, Your Honor, I'll rest.

  2              THE COURT:  Thank you.

  3              MR. CIRILLO:  Your Honor, two words, or two

  4     briefly --

  5              THE COURT:  You had your rebuttal, so quick.  That

  6     was his --

  7              MR. CIRILLO:  Well, I'm the movant, so he had his

  8     -- this is our answer.  First, Your Honor didn't

  9     misunderstand Dorchester.  Dorchester says you need facts

 10     and factual allegations.  It's the fact allegations that are

 11     missing here, and that's what Dorchester said, and that's

 12     what Your Honor cited in the part that Mr. Fish just quoted.

 13              Secondly, why else would they invest?  Well, the

 14     Second Circuit didn't purport to know why KEB acted, and

 15     Mr. Fish doesn't know why KEB acted.  I mentioned the fact

 16     it was a Trustee taking orders simply because he had

 17     continually referenced the "why else would they invest"?

 18     There are lots of reasons why these trusts would be there,

 19     and the Court can't speculate about --

 20              THE COURT:  You've both been heard.  You have both

 21     been heard.

 22              MR. CIRILLO:  Good.  I'm done; thank you.

 23              THE COURT:  11-02573, Trustee Picard versus

 24     Sumitomo Trust and Banking Company, state your name and

 25     affiliation.
```

Page 204

1           MR. LANDSMAN:  Good afternoon, Your Honor.  My

2    name is Zeb Landsman, and I represent Sumitomo, and I'm with

3    the law firm of Becker, Glynn, Muffly, Chassin & Hosinski.

4           MR. SONG:  And good afternoon, Your Honor, Brian

5    Song, Baker Hostetler, on behalf of the Trustee.

6           THE COURT:  Very good.  I believe this is your

7    motion to dismiss, Mr. Landsman.

8           MR. LANDSMAN:  It is.  Thank you, Your Honor.  I

9    am going to be quick, less than 10 minutes, hopefully five,

10   if I can.

11          THE COURT:  You're very kind to a judge that's

12   been sitting all day.

13          MR. LANDSMAN:  You're welcome.  I'm going to limit

14   my argument to just one of the points that I raised in the

15   motion, and that's Sumitomo's 8(a) argument.

16          Rule 8(a) is simple.  It requires plaintiffs to

17   include a short, plain statement showing that the pleader is

18   entitled to relief.  Here, in this case, the Trustee needs

19   to allege two things:  one, that there was an initial

20   transfer from BLMIS to Sentry that is avoidable, and two,

21   that the Sentry -- that Sentry subsequently transferred

22   those funds to Sumitomo.

23          The Trustee certainly gave us fair notice of the

24   second drop.  He clearly identified the subsequent transfer.

25   In Paragraph 40 in Exhibit D, he clearly alleges, simply and

Page 205

1    precisely, that $54,253,642 was transferred on October 16,

2    2007, from Sentry to Sumitomo.  He did that perfectly.  The

3    problem, Your Honor, is with the first prong.

4           Rather than identifying an initial transfer that

5    is avoidable, he simply attached a 77-page list of thousands

6    of transfers, totaling billions of dollars, spanning years.

7    That's his Exhibit C, and if you look on Page 6 of our

8    brief, I have a sample of that.  It's as if a plaintiff,

9    Your Honor, brought a breach of contract claim and alleged

10   that the defendant failed to perform on a particular day.

11   But then, rather than identifying the contract that was

12   breached, he listed hundreds of contracts and simply said,

13   you breached one of those.  Figure it out.  Or, if I were

14   accused of running a red light on a particular day that's

15   identified, and then the complaint listed every intersection

16   in the city, I wouldn't be able to answer the complaint.  I

17   wouldn't be able to prepare for trial.

18          In the red light example, I'd have to take

19   discovery on every traffic signal, seek thousands of records

20   from the cameras, seek out potential witnesses to prove the

21   plaintiff may have stated a claim, but it's also made it

22   impossible to prepare for trial.  Sumitomo is in that

23   position.  The Trustee will have to prove that there is an

24   initial transfer that is avoidable.  We have the right to

25   seek discovery about that initial transfer to determine

Page 206

1    whether it really happened.  He's given maybe documents, but

2    we get discovery on whether it really happened and whether

3    it is avoidable.

4          We have the right to craft a defense based on

5    which initial transfer the Trustee plans to use at trial,

6    and it's not too soon to require the Trustee to identify

7    one.  We need to answer the complaint and start discovery

8    now.  We need to gather evidence about the alleged initial

9    transfer now.  But we can't.

10         Without more specifics from the Trustee, we'll

11   have to seek discovery about those hundreds of transactions

12   listed in Exhibit C.  We'll have to show up at trial without

13   knowing which transaction constituted the alleged initial

14   one.  We'll have to wait for trial for him to tell us

15   whether the initial transfer was within the two-year

16   lookback period or not.  We don't know.  And that's because

17   our subsequent transfer was within the two-year lookback

18   period, but he hasn't told us if the initial transfer was,

19   and that will affect our defense.

20         And it's particularly unfair here to keep Sumitomo

21   in the dark, because Sumitomo was a stranger to that initial

22   transfer.  It has no direct knowledge of it.  Unlike the

23   Chase case that they mentioned, all of that information is

24   with the Trustee and the records he has.  We don't know

25   anything about the initial transfers because we weren't a

```
                                                           Page 207
 1   party.  It was between BLMIS, in whose shoes the Trustee

 2   stands, and Sentry.  And the Trustee has had access to that

 3   information for years, yet he still refuses to identify the

 4   basis for his claim that there was an initial transfer

 5   that's avoidable.

 6           The Trustee needs to comply with Rule 8(a), and

 7   Sumitomo cannot answer the complaint or prepare for trial

 8   unless he does.  And that's why we respectfully request that

 9   you dismiss the complaint and perhaps give him leave to

10   amend it, but dismiss the (indiscernible) so we can properly

11   answer it.

12           THE COURT:  Thank you, Mr. Landsman.  Mr. Song?

13           MR. SONG:  Thank you, Your Honor.  I will address

14   it briefly as well, as it has been a long day for all of us.

15           The Defendant's argument here is based on the

16   faulty premise that the Trustee is required, here at the

17   pleading stage, to identify and specify the exact initial

18   transfer to Fairfield Sentry, from which the subsequent

19   transfer to Sumitomo flowed.  Defendant would thus create

20   some entirely new pleading burden, wherein the Trustee would

21   be required to essentially do a dollar-for-dollar tracing

22   analysis at the outset of the case.

23           This Court has already held that to plead a

24   subsequent transfer claim, the Trustee must allege facts

25   that support an inference that the funds at issue originated
```

Page 208

1    with the Debtor, which we have done that.  No tracing

2    analysis is required, and the pleading burden is not so

3    onerous as to require a dollar-for-dollar accounting of the

4    exact funds at issue.  That's because money is fungible,

5    Your Honor, and as, you know, Defendant here is claiming

6    that they won't know until trial, I think that's also a

7    misapprehension of what the burdens are here.

8              We are about to get into discovery, and I agree

9    with my -- with my adversary here that it is important to

10   get into these issues.  But that is precisely what discovery

11   is for.  And the Trustee's experts, once they've had the

12   opportunity to participate through discovery, will issue an

13   expert report, which will show the tracing and the flow of

14   funds from the initial -- from BLMIS to Fairfield Sentry and

15   to Sumitomo.  They will not be surprised at trial.  We will

16   have this throughout the discovery process.

17             This Court has already discussed and knows very

18   well that the Trustee only needs to plead the necessary

19   vital statistics, and we have done that, and that that is

20   all that is required, and that's what we have done.

21             Thanks, Your Honor.

22             THE COURT:  Okay.  Mr. Landsman or Mr. Song,

23   anything else you wish to add?

24             MR. LANDSMAN:  Yes, just two quick replies to

25   that.

```
                                                        Page 209
 1              THE COURT:  Okay.

 2              MR. LANDSMAN:  He doesn't need any discovery from

 3    us because we don't have any discovery on that question

 4    about which is the initial transfer.  We know nothing about

 5    it.  We got the subsequent transfer; we'll give him

 6    discovery about that.  But to identify the basis for his

 7    entire claim, he needs no discovery from us.

 8              So what he's saying is, we now need to go take

 9    discovery on those hundreds of transfers and take

10    depositions on those hundreds of transfers, because he can't

11    even narrow it down to a smaller set.  We're not asking him

12    for tracing.  We're asking, just tell us what the initial

13    transfer was.

14              THE COURT:  Okay.  Understand.  Anything else?

15              I thank everyone for their patience and your

16    kindness all day long.  I hope that you have a lovely

17    evening.  And you will receive a written opinion.

18              MR. LANDSMAN:  Thank you, Your Honor.

19              MR. SONG:  Thank you, Your Honor.

20              THE COURT:  Thank you.

21

22

23              (Whereupon these proceedings were concluded at

24    3:54 PM)

25
```

Page 210

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    Sonya M. Ledanski Hyde

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  September 19, 2022