```
                                                              Page 1

 1   UNITED STATES BANKRUPTCY COURT

 2   SOUTHERN DISTRICT OF NEW YORK

 3   Case No. 08-01789 (Substantively Consolidated SIPA)

 4   - - - - - - - - - - - - - - - - - - - - - - - - - - x

 5   In the Matter of:

 6

 7   BERNARD L. MADOFF INVESTMENT SECURITIES LLC,

 8            Debtor.

 9   - - - - - - - - - - - - - - - - - - - - - - - - - - x

10   Adv. Case No. 10-03635-cgm

11   - - - - - - - - - - - - - - - - - - - - - - - - - - x

12   FAIRFIELD SENTRY LIMITED (IN LIQUIDATION) et al.,

13                 Plaintiffs,

14            v.

15   UNION BANCAIRE PRIVEE, UBP SA et al.,

16                 Defendants.

17   - - - - - - - - - - - - - - - - - - - - - - - - - - x

18   Adv. Case No. 10-03636-cgm

19   - - - - - - - - - - - - - - - - - - - - - - - - - - x

20   FAIRFIELD SENTRY LIMITED (IN LIQUIDATION) et al.,

21                 Plaintiffs,

22            v.

23   UNION BANCAIRE PRIVEE, USP SA et al.,

24                 Defendants.

25   - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

Page 2

1   Adv. Case No. 11-02540-cgm

2   - - - - - - - - - - - - - - - - - - - - - - - - - - x

3   IRVING H. PICARD, TRUSTEE FOR THE LIQUIDATION OF BERNARD L.

4   MADOFF TRUST,

5                   Plaintiffs,

6           v.

7   LION GLOBAL INVESTORS LIMITED,

8                   Defendant.

9   - - - - - - - - - - - - - - - - - - - - - - - - - - x

10  Adv. Case No. 12-01194-CGM

11  - - - - - - - - - - - - - - - - - - - - - - - - - - x

12  IRVING H. PICARD, TRUSTEE FOR THE LIQUIDATION OF BERNARD L.

13  MADOFF TRUST,

14                  Plaintiffs,

15          v.

16  KOOKMIN BANK,

17                  Defendant.

18  - - - - - - - - - - - - - - - - - - - - - - - - - - x

19

20                  United States Bankruptcy Court

21                  355 Main Street

22                  Poughkeepsie, NY 12601

23

24                  October 19, 2022

25                  10:00 AM

Page 3

1   B E F O R E :

2   HON CECELIA G. MORRIS

3   U.S. BANKRUPTCY JUDGE

4

5   ECRO:   UNKNOWN

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1   HEARING re 10-03635-cgm Doc# 858 Notice of Adjournment of

2   Hearing RE: Pre Trial Conference; hearing not

3   held and adjourned to 10/19/2022 at 09:00 AM at

4   Videoconference (ZoomGov) (CGM)

5

6   HEARING re 10-03635-cgm Doc# 944 Notice of Adjournment of

7   Hearing RE: Hearing to consider the Letter Requesting a Pre-

8   Motion Discovery Conference Filed by David Elsberg on behalf

9   of Fairfield Sentry Limited (In Liquidation), Fairfield

10  Sigma Limited (In Liquidation), Kenneth Krys, solely in his

11  capacity as Foreign Representative and Liquidator thereof,

12  Greig Mitchell, solely in his capacity as Foreign

13  Representative and Liquidator thereof (related

14  document(s)938); hearing held and adjourned to 10/19/2022 at

15  10:00 AM at Videoconference (ZoomGov) (CGM) .

16

17  HEARING re 10-03635-cgm Doc# 945 Notice of Adjournment of

18  Hearing RE: Hearing to consider the Letter Requesting a Pre-

19  Motion Discovery Conference Filed by Jeff E. Butler on

20  behalf of Dexia Banque International a Luxembourg (related

21  document(s)940); hearing held and adjourned to 10/19/2022 at

22  10:00 AM at Videoconference (ZoomGov) (CGM) .

23

24

25

Page 5

1    HEARING re 10-03636-cgm Doc# 985 Notice of Adjournment of

2    Hearing re: Pre-Trial Conference; Hearing not held and

3    adjourned to 10/19/2022 at 10:00 AM at Videoconference

4    (ZoomGov) (CGM) (DuBois, Linda).

5

6    HEARING re 10-03636-cgm Doc# 1025 Notice of Adjournment of

7    Hearing RE: Hearing to consider the Letter Requesting a Pre-

8    Motion Discovery Conference Filed by David Elsberg on behalf

9    of Fairfield Lambda Limited (In Liquidation), Fairfield

10   Sentry Limited (In Liquidation), Fairfield Sigma Limited (In

11   Liquidation), Greig Mitchell, solely in his capacity as

12   Foreign Representative and Liquidator thereof, Kenneth Krys,

13   solely in his capacity as Foreign Representative and

14   Liquidator thereof. (related document(s)1004); hearing held

15   and adjourned to 10:00 AM at Videoconference (ZoomGov) (CGM)

16

17   HEARING re 10-03636-cgm Doc# 1026 Notice of Adjournment of

18   Hearing RE: Hearing to consider the Letter Requesting a Pre-

19   Motion Discovery Conference Filed by Jeff E. Butler on

20   behalf of Dexia Banque International a Luxembourg. (related

21   document(s)1006 ; hearing held and adjourned to 10/19/2022

22   at 10:00 AM at Videoconference (ZoomGov) (CGM).

23

24

25

Page 6

 1   HEARING re 11-02540-cgm Doc# 108 Motion to Dismiss Adversary

 2   Proceeding / Motion and Notice of Motion to Dismiss the LGI

 3   Complaint (Barak, Ehud)

 4

 5   HEARING re 11-02540-cgm Doc# 119 Opposition /Trustee's

 6   Memorandum of Law in Opposition to Defendant's Motion to

 7   Dismiss the Complaint (related document(s)108) filed by

 8   Robertson D. Beckerlegge on behalf of Irving H. Picard,

 9   Trustee for the Liquidation of Bernard L. Madoff Investment

10   Securities LLC, and Bernard L. Madoff.

11

12   HEARING re 11-02540-cgm Doc# 122 Reply to Motion / Defendant

13   Lion Global Investors Limiteds Reply in Further Support of

14   its Motion to Dismiss the Complaint (related document(s)108)

15   filed by Ehud Barak on behalf of Lion Global Investors

16   Limited.

17

18   HEARING re 12-01194-cgm Doc# 77 Motion to Dismiss Case filed

19   by Richard A. Cirillo on behalf of Kookmin Bank with hearing

20   to be held on 6/15/2022 at 10:00 AM at Videoconference

21   (ZoomGov) (CGM) Responses due by 5/6/2022,. (Attachments: #

22   1 Exhibit Complaint # 2 Exhibit Complaint Ex. A # 3 Exhibit

23   Exhibit to Complaint 1/5 # 4 Exhibit Exhibit to Complaint

24   2/5 # 5 Exhibit Exhibit to Complaint 3/5 # 6 Exhibit Exhibit

25   to Complaint 4/5 # 7 Exhibit Exhibit to Complaint 5/5 # 8

Page 7

1    Exhibit Ex. C to Complaint)

2

3    HEARING re 12-01194-cgm Doc# 92 Notice of Adjournment of

4    Hearing RE: Opposition /Trustees Memorandum of Law in

5    Opposition to Defendant Kookmin Banks Motion to Dismiss

6    (related document(s)77) filed by Eric R Fish on behalf of

7    Irving H. Picard, Trustee for the Liquidation of Bernard L.

8    Madoff Investment Securities LLC; hearing not held and

9    adjourned to 10/19/2022 at 10:00 AM at Videoconference

10   (ZoomGov) (CGM).

11

12   HEARING re 12-01194-cgm Doc# 93 Reply to Motion filed by

13   Richard A. Cirillo on behalf of Kookmin Bank.

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

Page 8

```
 1   A P P E A R A N C E S :

 2

 3   CIRILLO LAW OFFICE

 4        Attorneys for Kookmin Bank

 5        246 East 33rd Street

 6        New York, NY 10016

 7

 8   BY:  RICHARD A. CIRILLO

 9

10   Selendy Gay Elsberg PLLC

11        Attorneys for Fairfield and Various Fairfield Entities

12        1290 Avenue of the Americas, 17th Floor

13        New York, NY 10104

14

15   CLIFFORD CHANCE US LLP

16        Attorneys for Banque Internationale a Luxembourg

17        31 West 52nd Street

18        New York, NY 10019

19

20   BY:  JEFF E. BUTLER

21

22

23

24

25
```

Page 9

1   PROSKAUER ROSE LLP

2        Attorneys for Lion Global Investors Limited

3        11 Times Square

4        New York, NY 10036

5

6   BY:  RUSSELL T. GORKIN

7

8   BAKER HOSTETLER LLP

9        Attorneys for the Trustee

10        45 Rockefeller Plaza

11        New York, NY 10111

12

13   BY:  ROBERTSON D. BECKERLEGGE

14        ERIC R. FISH

15

16   ALSO PRESENT TELEPHONICALLY:

17   CARTER BRYCE BENSON

18   DAVID W. PARHAM

19   KAYLA HARAN

20   DOUGLAS A. KELLNER

21   HEATHER LAMBERG

22   MARK MAKAR

23   DANIEL SHAMAH

24   MARK G. HANCHET

25   CHRISTOPHER J. HOUPT

Page 10

1    ARI MACKINNON

2    LISA M. SCHWEITZER

3    DAVID EISBERG

4    DAVID S. FLUGMAN

5    STEVEN FROOT

6    CAITLYN HOLUTA

7    THOMAS S. KESSLER

8    JOSHUA S. MARGOLIN

9    AMY NEMETZ

10   JENNA C. SMITH

11   JOHN F. ZULACK

12   JOHN S. CRAIG

13   BIANA LIN

14   LAUREN J. PINCUS

15   JOHN F. ZULACK

16   GARY A. WOODFIELD

17   ROBERT J. LACK

18   RANDY LEWIS MARTIN

19   LAURA TAVERAS

20   MARCELLA OLIVER

21   DAVID PARHAM

22   ANDREW VILLACASTIN

23   KEVIN C. KELLY

24   JAIME B. LEGGETT

25   RICARDO SABATER

Page 11

1   UDAY GORREPATI

2   ERIC HALPER

3   KAYLA HARAN

4   ANGELA K. HERRING

5   NICHOLAS ICKOVIC

6   PAUL KANELLOPOULOS

7   RONALD KROCK

8   NORDEA FOLKE BERNDOTTES

9   MEREDITH GEORGE

10   KENNETH KRYS

11   GREIG MITCHELL

12   NOWELL BAMBERGER

13   JONATHAN CROSS

14   CHRISTINE DEVITO

15   JUSTIN P. DUDA

16   ROXANNE EASTES

17   ROSA J. EVERGREEN

18   ABIGAIL GOTTER-NUGENT

19   KEVIN A. GUERKE

20   ERIC HALPER

21   JOSEPH M. KAY

22   KEVIN C. KELLY

23   CHRISTOPHER M. LAMBE

24   ADAM M. LEVY

25   MATTHEW B. LUNN

Page 12

1    MARK MCKEEFREY

2    MICHAEL S. NEIBURG

3    HENRY SEIJI NEWMAN

4    JEFFREY A. ROSENTHAL

5    NICOLE SERRATORE

6    ELLIOT STEVENS

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 13

                    P R O C E E D I N G S

1

2            THE COURT:  Good morning, everyone.  Excuse me.

3    It's the fall allergy season.  The first one I have on today

4    is the two adversary proceedings in Fairfield.  Adversary

5    Proceeding 10-03635, Fairfield Sentry v. Union Bancaire

6    Privee, UBP SA et al, and 10-03636, Fairfield Sentry Limited

7    et al v. Adler and Co., Privatbank AG, et al.

8            State your name and affiliation.

9            MR. ELSBERG:  This is David Elsberg from Selendy

10   Gay Elsberg representing the liquidators, Your Honor.  And

11   with me is my associate, Amy Nemetz.

12           MS. NEMETZ:  Good morning, Your Honor.

13           THE COURT:  Good morning.

14           MR. BUTLER:  Good morning, Your Honor.  I'm not

15   sure which of the various defendants is at issue here, but I

16   am one of them.  It's Jeff Butler from Clifford Chance

17   representing one of the defendants --

18           THE COURT:  Which one?

19           MR. BUTLER:  Banque International Luxembourg.

20           THE COURT:  Banque International Luxembourg.  That

21   one is Ms. Elsberg?  That one is which one.

22           MR. ELSBERG:  Your Honor, Amy Nemetz is going to

23   be handling this conference.

24           THE COURT:  Just let me know which one.  That's

25   all I need to know.

Page 14

1           MR. ELSBERG:  It should just be BIL.

2           THE COURT:  Okay.  Give me a second.  Which

3    adversary proceeding?  Give me the number.

4           MS. NEMETZ:  Your Honor, it's 10-3635 and 10-3636.

5           THE COURT:  Okay.  I already said that.

6           MS. NEMETZ:  Yes.

7           THE COURT:  And Mr. Butler -- and he said he

8    didn't know which one he was dealing with.  So which one is

9    he dealing with?

10          MR. BUTLER:  I'm sorry, Your Honor.  There are

11   numerous defendants in that case, and I'm not familiar if

12   there might be other disputes arising from the same two

13   matters.  I am here to speak about the proposed 30(b)(6)

14   deposition that the liquidators are seeking on the subject

15   of document retention.  We discussed this at the last

16   conference, and Your Honor put in --

17          THE COURT:  So you're on both of them.  That's

18   correct.  And it's for -- and you're representing

19   Luxembourg.  Okay.  I did not understand when you said you

20   didn't know what you were dealing with.

21          MR. BUTLER:  My apologies, Your Honor.

22          THE COURT:  If you don't, I don't.

23          MR. BUTLER:  With such a large group, I never know

24   exactly what matter is up, Your Honor.  And so I apologize.

25          THE COURT:  Okay.  This is the only matter we have

Page 15

1    today.  The only matter we really have is basically -- and

2    you wrote a letter asking for a discovery conference,

3    ordered a meet and greet.  And you're in jurisdictional

4    discovery.  This is jurisdictional discovery.  So -- and you

5    -- and from what I've been reported is that you don't have

6    searchable email boxes.

7           So we are here today because, Ms. Nemetz, you are

8    the one that needs a Rule 30-whatever number, someone from

9    the company to testify or to -- deposition, correct?

10          MS. NEMETZ:  That's correct, Your Honor.  We also

11   asked that BIL produce a very limited scope of documents

12   relevant to the spoliation issues in our Rule 30(b)(6)

13   notice.  BIL has also asked this Court to grant them a

14   protective order against the deposition, which we believe

15   should be denied.

16          And then finally, the liquidators would like leave

17   to move under Rule 37 for remedies related to the spoliation

18   issue once the deposition is completed.

19          THE COURT:  Okay.  So that's your request today.

20   It's a very simple, straightforward request.  And, Mr.

21   Butler, your response to basically --

22          MR. BUTLER:  Our position is essentially since the

23   last conference, we've had two in-person meet and confers

24   with Ms. Nemetz and her colleagues that have focused on what

25   documents are available in the bank that may be relevant to

Page 16

1    the issue of personal jurisdiction.

2            And to be honest, we have identified some

3    additional documents.  Those discussions are ongoing.  In my

4    mind, they're not complete yet.  We certainly haven't

5    refused to produce any of the pockets of documents that

6    we've identified that may be relevant.  So this is really

7    not an issue about document production as it relates to

8    records available within the bank concerning the one

9    redemption that is at issue in the case.  I think that we've

10   had very civil and productive conversations about that, and

11   we have been very open, we believe, about what documents

12   exist that may be relevant to the issue of personal

13   jurisdiction.

14           This 30(b)(6) request -- and our motion for

15   protective order is just the flip side of that.  We're

16   trying to not have that 30(b)(6) deposition at this time.

17   We think it's really a different issue.  It's an attempt to

18   build a spoliation case against the bank, arguing that we

19   did not do things back in 2008 or 2010 that we should have

20   done.  In my mind, that is more of a merits discovery issue.

21   It may be appropriate to do this type of deposition at some

22   point in the case.  But during this phase of limited

23   personal jurisdiction discovery, it really is a bridge too

24   far, especially when we are being as cooperative as we can,

25   we think, with producing the documents that continue to

Page 17

1    exist within the bank relating to the issue of personal

2    jurisdiction.

3           And that's not an insignificant number of

4    documents, Your Honor.  It doesn't include everything that

5    the liquidator would like to have, but it does include hard

6    copies of emails, which is the way the bank kept emails back

7    at that time.  I was a different era, Your Honor.

8    Everything was done by facsimile.  And to keep records

9    within the bank, they just printed out copies of emails and

10   put them in a file, which has been retained and has been

11   produced to the liquidators.

12          There are various other documents that are

13   available like the account statements relating to this

14   redemption, the agreements with the particular customer on

15   whose behalf the bank made this redemption.  All of those

16   are available for production.  And, frankly, once we produce

17   those, we will have completed not only personal jurisdiction

18   discovery, but pretty much all the discovery in terms of

19   documents that the bank will be able to provide in this

20   case.

21          So under those circumstances, we do not think a

22   Rule 30(b)(6) deposition concerning what was done after this

23   case was filed to preserve and collect documents is

24   necessary or appropriate, and it should await a decision

25   from this Court on whether there is personal jurisdiction

Page 18

1    before that kind of discovery proceeds.

2              THE COURT:  Okay.  Ms. Nemetz, what discovery have

3    you already received?

4              MS. NEMETZ:  So we have received a limited hard

5    copy packet of emails that, as Mr. Butler stated, were

6    printed off at various points in time and preserved.  And

7    we've also received additional --

8              THE COURT:  I'm going to stop you right there.

9              MS. NEMETZ:  Yes.

10             THE COURT:  Limited is an editorial word.  So how

11   can you say it's limited?  Tell me what you really mean.

12             MS. NEMETZ:  So there are a few dozen emails that

13   were produced in hard copy by BIL.  The liquidators have

14   subsequently located separate email communications that were

15   produced by third parties that show relevant individuals at

16   BIL not only engaging in additional emails that BIL did not

17   produce, but they are key emails with individuals at FGG

18   trying to get their contact information or they involve

19   relevant individuals at the bank receiving, offering

20   memoranda, or other diligence materials.

21             And BIL, based on what we know to date, which I

22   can explain to Your Honor if you would like, didn't even try

23   to preserve that information.  So we know that what they've

24   given us is only a subset of what once existed.

25             MR. BUTLER:  Your Honor, if I may just respond to

Page 19

1   those two emails.  I received copies of those emails for the

2   first time last night.  They have not been provided

3   previously, despite having a number of in-person meet and

4   confers on this topic.

5           I respectfully disagree based on my examination of

6   them.  One of the emails has nothing to do with the

7   redemption at issue in this case.  The other one I believe,

8   at least large portions of it, was part of the file that we

9   produced in hard copy form.  So it's consistent with what I

10  understand from interviews and discussions with my clients

11  and the people involved that the practice was to print off

12  key emails -- this was back in 2007, Your Honor, so many,

13  many years ago --  and keep them in the back office file

14  which has been provided to the liquidators.

15          THE COURT:  Okay.  This is all still seemingly

16  personal jurisdiction to me, and it seems that you're

17  minimizing when you have BCC copies from other entities.

18  Okay.  All right.  What else?

19          MS. NEMETZ:  So, Your Honor, based on the

20  discussions that we have had with Mr. Butler to date, we do

21  know some information about BIL's practices.  And those

22  practices indicate that significant electronic evidence was

23  not preserved by the bank.  So we know that BIL didn't even

24  issue a litigation hold related to the Fairfield funds until

25  November 2010.  We know that BIL employees, including the

Page 20

1    ones who did actually receive the litigation hold, were

2    permitted to freely delete information from the bank's

3    systems even after the hold was issued.  We know that BIL

4    took no steps at an institutional level to save down

5    relevant information --

6              THE COURT:  Okay.  Now we're talking about

7    personal jurisdiction.  And you're saying that these emails

8    go to personal jurisdiction.

9              MS. NEMETZ:  Absolutely, Your Honor.

10             THE COURT:  Okay.

11             MS. NEMETZ:  There were -- we know that there was

12   evidence relevant to personal jurisdiction.  We've provided

13   Mr. Butler with examples of what we have been able to cobble

14   together from third parties that would demonstrate the

15   context between BIL and the United States.  So the

16   information existed and there's no question that BIL failed

17   to keep it.

18             MR. BUTLER:  Your Honor, respectfully, that's pure

19   speculation.

20             THE COURT:  If you would wait, Mr. Butler.  Let me

21   ask her a question.

22             And this is whether they directed their intentions

23   to New York on their -- on what they were doing?

24             MS. NEMETZ:  Yes, Your Honor.

25             THE COURT:  With respect to United States.  Yeah.

Page 21

1            MS. NEMETZ:  Right.  So the two emails that we

2    found, one of them shows one of the six employees at the

3    bank that BIL has identified to be relevant to this

4    redemption in this case.  She sends an email to Citco asking

5    for the contact information of two individuals at FGG,

6    Fairfield Greenwich Group, which was the manager of the

7    funds.  She gets that contact --

8            THE COURT:  And you got this through Citco.  How

9    did you get this information?

10           MS. NEMETZ:  Correct.  It was produced in another

11    litigation involving Citco, and I believe that we received

12    that document production.

13           THE COURT:  Okay.  Okay.  Now then, Mr. Butler,

14    what do you have to say?

15           MR. BUTLER:  Well, with respect to that specific

16    email, which I saw for the first time this morning, it's a

17    2006 email.  So it does not relate to the 2007 redemption at

18    issue in this case.  And it's important to understand I

19    guess a bit of background.

20            There's one redemption that's at issue in this

21    case.  The Fairfield liquidators also sued my client, Dexia

22    BIL, in another case for redemptions that they made not

23    through Citco, but directly in their own name.  And there

24    were a number of transactions that fit into that category,

25    but that separate case has been dismissed with prejudice.

Page 22

1   And that dismissal has been affirmed now at least once on

2   appeal.  So those redemptions are not at issue in this case.

3   And we have from the beginning of discovery in this case

4   drawn a line between documents that relate to the particular

5   redemption in this case and redemptions that were made in --

6   the other redemptions --

7           THE COURT:  I think that's for me to decide.

8           MR. BUTLER:  -- as part of that other case that

9   has been dismissed.

10          THE COURT:  I think that's for me to decide, Mr.

11  Butler, about the --

12          MR. BUTLER:  Well, Your Honor, that may be the

13  case.  But I think it would require a motion from the

14  liquidators, which we haven't even discussed --

15          THE COURT:  Okay, then we can file a motion.

16  That's exactly where I am today.

17          MR. BUTLER:  Okay.

18          THE COURT:  I'm going to permit the liquidators to

19  file a 37(a) motion for an order compelling discovery or

20  disclosure.  So then you can look at it.

21          MS. NEMETZ:  Your Honor, so to clarify, I'm not

22  sure that Mr. Butler can state as a factual matter --

23          THE COURT:  I can't, either.  You filed your

24  motion.

25          MS. NEMETZ:  Right.  So this is why we need a

```
                                                      Page 23
 1   30(b)(6) deposition, Your Honor.  Because we need someone to

 2   tell us what was kept, why, whether BIL acted reasonably

 3   under the circumstances.

 4            THE COURT:  I agree.

 5            MS. NEMETZ:  I think Mr. Butler has confirmed that

 6   there is nothing left in his client's possession for us to

 7   compel discovery of.  He doesn't have anything else.

 8            MR. BUTLER:  I would say we've produced everything

 9   that exists, but I agree --

10            THE COURT:  I hear you, Mr. Butler.  But you don't

11   have somebody from the company telling them that.  So I

12   don't need you testifying to this.  I need you -- that's --

13   I need a 30(b)(6) motion and I need a 37(a) motion.  Let's

14   get this moving along.  Run the motions.  I'll answer when

15   you get there.  You lay it out for Mr. Butler.

16            MS. NEMETZ:  Okay.  So,  Your Honor, to clarify --

17            THE COURT:  I'll give you both --

18            MS. NEMETZ:  I'm sorry?

19            THE COURT:  I'll give you both -- I'll let you

20   file both motions.  Let's move it.

21            MS. NEMETZ:  Okay.  Thank you very much, y h.

22            THE COURT:  (indiscernible) isn't really a motion.

23   Okay.

24            MR. BUTLER:  I understand, Your Honor.  So we'll -

25   - they'll file the motions.  We'll get an opportunity to
```

Page 24

 1   respond, and we'll go from there.

 2             THE COURT:  Not on the 30(b)(6).  I don't think

 3   you have to have a motion on 30(b)(6).  You just have --

 4             MR. BUTLER:  Okay.  Then we'll proceed with the

 5   30(b)(6) deposition and the liquidator can decide what to do

 6   on a Rule 37 motion.

 7             THE COURT:  Exactly.

 8             MR. BUTLER:  Understood, Your Honor.  Crystal

 9   clear.

10             MS. NEMETZ:  And, Your Honor, we also asked that

11   the Court impose a deadline by which the document production

12   and deposition take place just so that we can keep this

13   moving.  I think you proposed October 31st.

14             THE COURT:  You know I like to move it.  So how

15   quickly?

16             MR. BUTLER:  Your Honor, the challenge with the

17   30(b)(6) is I have to prepare a witness in Luxembourg.

18   They're quite unfamiliar with this procedure.  So I would

19   request --

20             THE COURT:  Well, you've had a lot of time to talk

21   to them.  You've been asking them for these -- it's been

22   months.

23             MR. BUTLER:  True.

24             THE COURT:  So it seems to me preparing a witness

25   isn't going to take that long.  You just need the CIO or

Page 25

1   somebody at a higher rank that can tell you what went on and

2   can put their hands on stuff.

3            MR. BUTLER:  And that person, y h, after more than

4   ten years, is going to have to do a certain amount of their

5   own investigation in order to do a proper job --

6            THE COURT:  It sounds to me like you haven't asked

7   them before then if that's what you're saying, Mr. Butler.

8   And I don't think you want to say that to me.

9            MR. BUTLER:  I did not mean to give that

10  impression.  There's been a lot of work done by me --

11           THE COURT:  You did give that impression.  You did

12  give that impression.

13           MR. BUTLER:  I am sorry, Your Honor, if I did give

14  that impression.

15           THE COURT:  Okay.

16           MR. BUTLER:  Your Honor, I respectfully request

17  that we do this within a month, but that --

18           THE COURT:  Okay.  Come back and talk to me --

19  come back and tell me what you all are doing on December the

20  145th.

21           MR. BUTLER:  Thank you, Your Honor.

22           THE COURT:  And I think you should have had the

23  depositions before -- or try to have them before November

24  the 15th.  Let's move this along.

25           MR. BUTLER:  Thank you, Your Honor.  We'll get

Page 26

1    that done.

2            THE COURT:  Thank you.  Anything else on

3    Fairfield?

4            MS. NEMETZ:  Your Honor, I just want to clarify

5    that --

6            THE COURT:  Sure.  We're going to move fast.

7    We're going to move fast.

8            MS. NEMETZ:  Thank you.  So Mr. Butler and BIL are

9    going to produce the documents requested in our 30(b)(6)

10   notice, which go to the issues that we need to discuss and

11   the eventual motion we will file.

12           THE COURT:  In 21 days they're going to produce

13   them.  (indiscernible) tell you who you are going to depose,

14   and it may take a little more than 21 days for that to

15   happen, but you will know who you are going to depose and

16   who you are going to be talking to.

17           MS. NEMETZ:  Thank you, Your Honor.

18           THE COURT:  Mr. Butler has now reassured me that

19   he has been talking to the company and he knows what's going

20   on in the company.  So I've been reassured of that on the

21   record.

22           MS. NEMETZ:  And so we'll do the deposition by

23   November 15th.

24           THE COURT:  I don't know that you'll get the

25   deposition by November 15th.  You'll get the information and

Page 27

1    you'll get who is going to be at the deposition, and you

2    will be able to schedule it.

3            MS. NEMETZ:  Okay.  I appreciate that, Your Honor.

4            THE COURT: So I would love to have it done by

5    November the 15th, but that's pushing for all of you to be

6    in Luxembourg and back from Luxembourg and have the

7    information you need in order to do a deposition.  But you

8    all are going to report back to me on December the 14th just

9    to give me an update on what's going on.

10           MR. BUTLER:  Thank you, Your Honor.

11           MS. NEMETZ:  Thank you, Your Honor.

12           MR. ELSBERG:  Thank you, Your Honor.

13           THE COURT:  And that's a long time.  Thank you.

14    Very good.  Now then I am into -- thank you, everyone, on

15    Fairfield.

16           Now we're into 11-02540, Picard v. Lion Global

17    Investors Limited.  State your name and affiliation.

18           MR. GORKIN:  Good morning, Your Honor.  Russell

19    Gorkin from Proskauer Rose on behalf of the Defendant, Lion

20    Global Investors Limited, which I will refer to today during

21    my presentation as LGI as we did in our papers.

22           MR. BECKERLEGGE:  Good morning, Your Honor.  Rob

23    Beckerlegge from Baker and Hostetler for the Trustee.

24           THE COURT:  Very good.  This is your motion to

25    dismiss, Mr. Gorkin.

Page 28

1           MR. GORKIN:  Yes.  Thank you, Your Honor.

2           As you know, last week we wrote to the Court along

3    with Mr. Beckerlegge to let you know that the parties do not

4    intend to spend time today arguing any grounds for dismissal

5    that are not unique to LGI and which the Court has already

6    addressed in the context of other proceedings where the

7    issues are essentially identical.

8           But LGI was not willing to enter into a

9    stipulation to forego oral argument altogether, as several

10   other defendants have done, because to our knowledge no

11   other defendant in any other adversary proceeding faces a

12   situation remotely like the one LGI does here.

13          And the situation I am referring to is that the

14   Trustee's filed a complaint asserting certain jurisdictional

15   allegations to LGI but has now admitted that none of the

16   essential allegations needed to find jurisdiction over LGI

17   are actually true.  None of them.

18          And so I want to walk through each of those

19   disavowed allegations in a moment and we'll address the

20   significance of what the Trustee is now attempting to do in

21   his opposition brief.

22          But before going there, I want to just briefly

23   touch on another issue that's lurking in the background

24   because it's important.  And that issue is the fact that the

25   Trustee filed his complaint more than 11 years ago,

Page 29

1    something the adversary proceeding number provides a stark

2    reminder of each time an ECF notification is filed.  And

3    what that means is that LGI has been subject to these

4    proceedings for the past 11 years which have gone up and

5    down the federal court system while the Trustee has known

6    all along that the allegations he asserted and which were

7    necessary for this Court or any American court to exert

8    jurisdiction over LGI were false.

9            Now, fortunately, LGI has been able to somewhat

10   manage the time and resources devoted to this matter because

11   other defendants over whom personal jurisdiction this Court

12   has found to exist and who did subscribe to and buy shares

13   in Fairfield Sentry have mostly taken the lead on addressing

14   issues common to all defendants when your predecessors

15   decided to bifurcate common issues like comity and extra-

16   territoriality and address those first before turning to

17   Defendant's specific arguments.

18           But this case was remanded for Defendant's

19   specific proceedings on October 27th, 2020, almost exactly

20   two years ago.  And since then, the Trustee has not once

21   sought to amend his complaint to remedy what he has long

22   known are false allegations.  And when LGI filed its motion

23   to dismiss back in April, six months ago, explicitly drawing

24   the Trustee's attention to the false allegations asserted in

25   his complaint, he still did not seek to amend his complaint

Page 30

1    as he could have done under Federal Rule of Procedure

2    15(a)(1)(B), made applicable by Federal Rule of Bankruptcy

3    Procedure 7015.  Instead, the Trustee filed an opposition

4    brief agreeing with LGI that the allegations he had asserted

5    against it were false, but arguing that the falsity of those

6    allegations apparently doesn't matter because he has a whole

7    other set of allegations based on the conduct of other

8    entities, none of which are so much as even mentioned

9    anywhere in the complaint.

10           Now, as we explained in our reply brief, the

11   Trustee is wrong legally.  And I'll tell you why in a

12   moment.  But even if this Court were to disagree with my

13   argument as to why his new contentions are still legally

14   insufficient, as a matter of procedure, how can this case

15   possibly move forward unless and until the Trustee makes a

16   motion to amend his complaint.

17           LGI obviously must answer allegations set forth in

18   a complaint, not a brief.  But the Trustee has admitted all

19   of his critical allegations are false.  And if this case

20   ever were to move into the discovery phase, how could either

21   party determine whether document requests satisfy relevance

22   requirements if the operative allegations the trustee

23   intends to rely upon have not yet even been set out in a

24   short and plain statement as the federal rules require?

25           So I think all of that is relevant background when

Page 31

1    thinking about how this motion needs to be adjudicated,

2    which I'll come back to at the end of my presentation.  But

3    right now what I want to do is turn to what's alleged in the

4    complaint and what the Trustee has disavowed.  Because the

5    starting point for a motion to dismiss a complaint is of

6    course the complaint itself.

7            Now, all of the Trustee's jurisdictional

8    allegations are set forth in Paragraph 7 of this complaint.

9    And the first allegation he levies there is that LGI

10   "knowingly directed funds to be invested with New York-based

11   BLMIS through Fairfield Sentry."  But the Trustee has

12   disavowed that allegation and admitted that LGI did not in

13   fact direct any funds to be invested with New York-based

14   BLMIS.  And we see that right off the bat on the very first

15   page of the Trustee's opposition brief where he writes,

16   StrautsLion24x06 Asset Management, not LGI, "Straights Lion

17   Asset Management is the entity that made the investment in

18   Sentry."  And we see that again at Page 11 of his opposition

19   brief where he writes, and I quote, "Straits Lion's

20   intentional investment with BLMIS in New York through a

21   known BLMIS feeder fund establishes personal jurisdiction."

22           But as you know, Straits Lion is not the defendant

23   here, LGI is.  And that's the entity over whom the Trustee

24   needed to plead a prima facie case of jurisdiction.

25           Now, the second allegation the Trustee asserted in

Page 32

1   Paragraph 7 of his complaint is that, "By directing its

2   investment through Fairfield Greenwich Group, Defendant,

3   Lion Global, accepted the rights, benefits, and privileges

4   of conducting business and/or transactions in the United

5   States."

6           But again, as just shown, the Trustee has

7   disavowed this allegation, too.  And he does so even more

8   specifically at Page 16 of his opposition brief when he

9   writes, and I quote, "When Straights Lion first invested in

10  Sentry, it was aware that FGG conducted key operations from

11  its New York office."

12          Next, the Trustee alleges in Paragraph 7, "Upon

13  information and belief, Defendant Lion Global entered into a

14  subscription agreement with Fairfield Sentry providing for

15  New York jurisdiction."  This too the Trustee has admitted

16  is false.  At Pages 6 and 8 he writes, "Straits Lion

17  subscribed $50 million into Sentry in March and April of

18  2005."

19          Fourth, the Trustee alleges in Paragraph 7 of his

20  complaint that LGI "Sent a copy of the subscription

21  agreement to FGG's New York Office and wired funds through a

22  bank in New York."  But LGI did not send a subscription

23  agreement to FGG's New York office or wire funds through a

24  bank in New York, as the Trustee admits at Page 8 of his

25  opposition brief where he writes, "The Trustee is in

Page 33

1    possession of records establishing that Straits Lion made

2    subscription payments into Sentry."  And that, "Straits Lion

3    placed a total of $50 million into Sentry in multiple

4    subscription agreements between March and April of 2005."

5            If the Trustee alleged that LGI "Communicated by

6    email and telephone with Fairfield Sentry account

7    representatives located in Fairfield Greenwich Group's New

8    York City office and traveled to Fairfield Greenwich Group's

9    New York City office to meet with Fairfield Sentry account

10   representatives."

11           But at Page 16 of his brief, he admits that LGI

12   did no such thing, writing, "Straits Lion, through its

13   personnel, traveled to New York in July of 2004 to meet with

14   FGG at FGG's New York headquarters.  Straits Lion

15   participated in 12 days' worth of meetings with FGG with

16   multiple Straits Lion executives in attendance.  FGG and

17   Straits Lions personnel spent a significant amount of time

18   together."

19           And it continues on Page 17, writing, "Mr. Tong

20   Foo Cheong of Straits Lion communicated with Mr. Blum of FGG

21   in New York."  And that there were "Additional

22   communications between Straits Lion and FGG personnel."

23           So in other words, according to the Trustee,

24   Straits Lion, a separate legal entity, not LGI, the

25   Defendant in this action, established contacts with New

Page 34

1    York.

2            Now, the Trustee attempts to reconcile his

3    admissions that LGI has not itself made any contacts with

4    the United States or New York by grouping it into the "Lion

5    Family" of entities.  And you see that right on the first

6    page of his brief.  He writes, "This Lion family of entities

7    and successors, including Defendant, purposely availed

8    themselves of New York law by engaging with the Fairfield

9    Greenwich Group in New York to not only invest in Sentry,

10   but also to establish a joint venture to sell FGG products,

11   including Sentry, in Asia."

12           But even if this statement had been asserted as an

13   allegation in his complaint, which it was not, it would

14   still not establish jurisdiction over LGI because group

15   pleading is not permitted and jurisdiction must be

16   established over each individual defendant.  And the Trustee

17   has disclaimed any argument that any of the other Lion

18   Family's member's contacts with New York, which are all he

19   talks about, can be attributed to LGI.  The Trustee makes

20   this explicit at Page 14 of his opposition brief, writing,

21   "He is not alleging jurisdiction exists over LGI due to

22   alter ego liability, imputation, or happenstance."

23           So the hodgepodge of contentions that the Trustee

24   now throw out in his opposition brief about other Lion

25   Family members and whether employees of Straits Lion also

Page 35

1   might have later worked at LGI at some point and all the

2   rest are all legally irrelevant according to the Trustee

3   himself.

4           In fact, in case there was any doubt that the

5   Trustee has not established a prima facie case of

6   jurisdiction over LGI based on his complaint, he leaves no

7   doubt when he writes, and I quote, "Here, Straits Lion --"

8   not LGI, "Straits Lion knowingly and purposefully directed

9   activity into New York."

10          Now, the only allegation asserted in Paragraph 7

11   that the Trustee arguably still stands by is that LGI

12   "Knowingly received transfers from BLMIS by withdrawing

13   money from Fairfield Sentry."

14          Now, as an initial matter, that's just factually

15   wrong.  James Peng, LGI's COO, submitted a sworn declaration

16   and testified in Paragraph 8 therein that LGI "was not a

17   party, either as principal or as agent for others, to the

18   transactions that are the subject of the complaint."  That,

19   "LGI has never been a member or shareholder in Sentry and

20   that LGI neither was, nor is a party to the Sentry

21   subscription or redemptions agreements and never received,

22   either as principal or agent, the alleged transfers

23   Plaintiff seeks to recover in this adversary proceeding."

24          But second, and even more importantly, even in

25   some other alternate universe where that allegation actually

Page 36

1   was true, that is the only jurisdictional allegation the

2   Trustee has left, and it is a legally insufficient basis for

3   asserting jurisdiction over LGI.

4        Now, the United States Supreme Court made that

5   crystal clear in the Helicopteros case.  That's 466 U.S.

6   408, 416, which we cite in our opening brief, where it held

7   that a foreign defendant's receipt of funds was "of

8   negligible significance" and did not suffice to establish

9   personal jurisdiction.

10       Now, I understand in a totality of circumstances,

11  that might be relevant.  But as I just explained, there are

12  no other allegations here.  And standing alone, it's of

13  negligible significance.

14       Now, I haven't read every decision in the related

15  proceedings that this Court has issued so far, I'll admit.

16  But I am unaware of this Court finding personal jurisdiction

17  based only on the mere receipt of funds and the Trustee has

18  not cited any decision of this Court or any others where

19  that would suffice, either.

20       Now, at Page 16 of his opposition brief, he does

21  suggest that this Court's opinion in Picard v. BNP Paribas

22  provides that withdrawal of funds from Sentry alone would be

23  a sufficient basis to establish jurisdiction over a

24  defendant.  That's not a genuine or faithful reading of that

25  case.  And that's apparent from the face of it.  There, all

Page 37

1   of the Defendant's main offices and employees in New York

2   and conducted business with regard to the transaction at

3   issue through those New York-based employees and offices.

4            That's not the case.  LGI has never had an office

5   or other place of business or employee located in the United

6   States, as Mr. Peng testified at Paragraph 6 of his

7   declaration, and the Trustee does not contend otherwise.

8            Unlike all of the other cases this Court has

9   adjudicated and found personal jurisdiction to exist thus

10  far, there is simply no allegation sufficient to exert

11  jurisdiction over the Defendant here.

12           For example, in the published Multi-Strategy

13  decision, that's 0881789 ECF Number 21729 at Pages 6 to 8,

14  this Court found jurisdiction existed because the Trustee

15  devoted over five pages to the Defendant's specific contacts

16  with New York.  Here, we have one paragraph and the Trustee

17  has expressly disavowed the crucial jurisdictional

18  allegations contained therein.

19           Likewise, in Bank Hapoalim, Adversary Proceeding

20  12-01216 at *7, this Court wrote, "In response to the motion

21  to dismiss, the Trustee provided the subscription agreements

22  entered into by the Defendants, "And on that basis concluded

23  altogether the subscription agreements combined the

24  Trustee's allegations are sufficient to constitute a prima

25  facie showing of jurisdiction."

Page 38

1          Here, the Trustee admits LGI did not enter into

2     any subscription agreements.  Instead, he contends that

3     Straits Lion did.  A unlike in Hapoalim, he has not even

4     submitted any of those subscription agreements, either.

5          And one last example is Bank Syz.  That's

6     Adversary Proceeding 11-2149.  In that case, the Trustee

7     alleged that the named defendant maintained its own account

8     directly at BLMIS and even filed a customer claim in the

9     SIPA proceeding, voluntarily and purposefully availing

10     itself of New York's and the United States' laws with

11     respect to BLMIS funds.  None of that has happened here, and

12     the Trustee does not contend otherwise.  So we know that the

13     complaint does not establish jurisdiction over LGI.

14          Now, in connection with his opposition brief, the

15     trustee filed a declaration through Mr. Beckerlegge,

16     attaching some exhibits.  And LGI recognizes that a

17     Plaintiff may submit affidavits and supporting materials

18     containing an averment of facts that, if credited, would

19     suffice to establish jurisdiction over the Defendant.

20          So what are the relevant averment of facts that

21     the Trustee has asserted through those materials to

22     establish jurisdiction over the Defendant, LGI?  He submits

23     a printout of a website page stating that Straits Lion

24     merged in 2008 with another entity, OCBC Asset Management,

25     to form what became LGI and argues that as a result, there

Page 39

1    is a successor liability basis to assert jurisdiction over

2    LGI.

3         Now, first, the Trustee's contention that LGI was

4    created in 2008 as a result of the merger between Straits

5    Lion and another entity is demonstrably untrue.  And that is

6    not only proven by the certificates of incorporation and

7    name changes attached as Exhibits A and B to Mr. Peng's

8    declaration, which establishes that LGI was incorporated in

9    1986, but from the very exhibit the Trustee cites to,

10   Exhibit 17 to Mr. Beckerlegge's declaration, which states in

11   the very first sentence that LGI was "established in

12   Singapore in 1986."

13        So all of the affidavits and supporting materials

14   before the Court show that LGI was a separate, independent

15   entity that was operating and doing its own thing in 2005

16   while Straits Lion, which the Trustee acknowledges was

17   formed in 1996, was allegedly doing all of the other things

18   the Trustee writes about now in his brief.  And again, the

19   Trustee has affirmatively and explicitly stated he is not

20   arguing jurisdiction exists under an alter ego or imputation

21   theory.

22        But even if we were to assume for the sake of

23   argument that the Trustee's contention that those two

24   entities merged to form LGI was true, which it's not, it

25   doesn't even matter for present purposes because the Trustee

Page 40

1    has failed to make a prima facie showing that that fact

2    provides this Court with a legal basis to establish

3    jurisdiction over LGI.  And that is because the

4    determination as to whether Straits Lion's alleged contacts

5    with the forum can be attributed to LGI under a successor

6    liability theory is a question governed by Singaporean law.

7    And the Trustee has not put any Singaporean legal expert

8    before this Court from which it can make a determination as

9    to the significance of the fact the Trustee has now

10   asserted.  That is not only established by the Energy

11   Intelligence Group Incorporated v. Cowen case cited at Page

12   10 of LGI's reply brief, but by the Trustee's own legal

13   authority.

14           Indeed, the only case the Trustee cites in support

15   of its successor jurisdiction argument is In re Motors

16   Liquidation Company, 565 B.R. 275 from this Court in 2017.

17   And that's Page 22 of his opposition.  And that case also

18   shows that whether jurisdiction may be asserted based on a

19   predecessor's contacts and whether they may be imputed to a

20   successor corporation depends entirely on foreign law.

21           Indeed, the court there made a preliminary finding

22   that Austrian law provided a basis for it to conclude that

23   the Austrian defendant could be hailed into court based on

24   its predecessor's jurisdictional contacts and therefore felt

25   comfortable moving the case forward.  And that was

Page 41

1   particularly true because the defendant there, the Austrian

2   defendant there did not move to dismiss on successor

3   liability grounds --

4           THE COURT:  Do you have some Singapore law on

5   this, Mr. Gorkin?  Are you -- isn't this a Singapore --

6   isn't this a Singapore --

7           MR. GORKIN:  Yes, I'm -- correct.

8           THE COURT:  So tell me Singaporean.  Don't tell me

9   Austrian.  Tell me Singapore.

10          MR. GORKIN:  Absolutely, Your Honor.  And --

11          THE COURT:  Before we argue that, argue the

12  jurisdiction in which this is supposedly held.  So, okay.

13          MR. GORKIN:  Exactly.  And so the point, Your

14  Honor, is that Mr. Beckerlegge and the Trustee has alleged

15  that LGI is a successor corporation.  Even if that fact is

16  true, needs to go one step further to show the legal

17  significance of that fact to this Court.  And the only way

18  to do that is through Singaporean law.  And he hasn't done

19  that.

20          THE COURT:  And you haven't brought it up, either.

21  Okay.  Keep going.

22          MR. GORKIN:  And that's a fair point.  But I want

23  to address that next.

24          And so what the In re Motors case shows us is two

25  things.  First, that the Trustee had to submit Singaporean

Page 42

1   law to enable the Court to at least make a preliminary

2   finding that Singaporean law would support this Court's

3   exercise of jurisdiction over LGI based on successor

4   liability theory just as the plaintiff in In re Motors

5   needed to submit Austrian law to enable the court in that

6   case to make such a finding.  It's the trustee's burden.

7   The Trustee did not do that here, and so he failed to carry

8   his burden.

9           But second, the In re Motors case demonstrates why

10  Plaintiffs are required to actually set forth the facts and

11  bases for the liabilities they are claiming in a complaint

12  and not an opposition brief.  Because the plaintiff in In re

13  Motors followed this foundational procedural rule applicable

14  to all plaintiffs, the defendant was afforded full and fair

15  notice of the grounds from which the Plaintiff was asserting

16  to hold it liable, namely successor liability.

17          Now, the Austrian defendant ultimately decided not

18  to move to dismiss based on those grounds, presumably

19  because of what Austrian law provided.  But here, the

20  Trustee has not pleaded successor liability, meaning LGI did

21  not have an opportunity to move to dismiss on those 12(b)(6)

22  grounds.  And remarkably, the Trustee asserted in his

23  opposition brief that "LGI did not argue in its motion that

24  it was not a successor-in-interest to Straits Lion."

25          But as we explained at Page 10 of our reply, of

Page 43

1    course we did not make that argument.  The Trustee had not

2    made any such allegations.  Straits Lion was not even

3    mentioned once in the complaint.

4           So where does all of this leave us?  Well, for the

5    reasons discussed, the Trustee has failed to allege in his

6    complaint a prima facie case of jurisdiction over LGI.  And

7    now he has also failed to aver facts that are sufficient to

8    carry his burden to show that there is a prima facie case of

9    jurisdiction over LGI.

10          Now, the Trustee has asked for jurisdictional

11   discovery, but that's not appropriate here.  He has

12   disavowed all of the facts necessary for jurisdiction that

13   he initially asserted in his complaint.  And even if we were

14   to pretend his merger of facts were correct, he has not

15   established a prima facie case under the law.  So there is

16   no disputed fact that if proven would show that jurisdiction

17   exists.

18          And so at the outset, as I said, if anything is to

19   happen here, the first thing must be that the Trustee seek

20   leave to file an amended complaint.  The Trustee is

21   obligated to set forth a short and plain statement alleging

22   facts in a formal pleading, not a brief, that he contends

23   subjects LGI to liability.  He has not done that.

24          And as I said earlier, if this action were to move

25   forward, how could LGI even answer a complaint when the

Page 44

1    Trustee has admitted that all of its critical allegations,

2    such as that LGI entered into a subscription agreement, he

3    has admitted those are false.  LGI cannot respond to a

4    brief.

5            Coming back though to the fact that this

6    proceeding was filed 11 years ago.  We respectfully submit

7    that moving forward in this manner under these circumstances

8    would not be proper and the complaint should be dismissed

9    with prejudice.

10           The Trustee has had in his possession custody or

11   control all of the documents he has now belatedly attached

12   to Mr. Beckerlegge's declaration years later.  And how do we

13   know this?  In Paragraph 40 of his complaint, the Trustee

14   discusses the settlement he entered into with Fairfield

15   Sentry.  And so that settlement agreement is incorporated

16   into it by reference.  LGI attached that agreement as

17   Exhibit 6 to Mr. (indiscernible) declaration, which was

18   filed in support of LGI's motion to dismiss.  And pursuant

19   to that agreement, the Trustee has had access to all of

20   Sentry's books and records as of June 2011, two months

21   before this action was even filed, and has maintained access

22   ever since.

23           So what does that mean?  That means the Trustee

24   could have and should have sought to amend his complaint

25   sometime over the past 11 years.  There is no reason why it

Page 45

1   could not have done so.  LGI has been hauled into this court

2   and other American courts in these proceedings in violation

3   of the Constitution for 11 years and counting and has

4   already filed its motion to dismiss, a memorandum of law, a

5   reply memorandum of law.  And we are appearing here at this

6   argument based on the allegations the Trustee stood by up

7   until the eleventh hour when he had completely disavowed

8   them and pulled out a whole alternative set of allegations.

9         It's not equitable or reasonable under these

10  circumstances where the Trustee has sat on his hands and

11  these documents and allegations all of this time and permit

12  him a redo.  Thank you.

13        THE COURT:  Thank you.  Mr. Beckerlegge?

14        MR. BECKERLEGGE:  Good morning, Your Honor.  Thank

15  you.  Rob Beckerlegge from Baker and Hostetler for the

16  Trustee.

17        I want to try to focus this issue -- focus this

18  argument as much as I possibly can, and I want to tick off a

19  few of the things that Mr. Gorkin just mentioned,

20  specifically about all of the documents.

21        The Trustee, despite what Mr. Gorkin has said, has

22  never had and probably never will have all of the relevant

23  documents.  So the Trustee has not sat on his hands.  That

24  is an argument that has been made and failed by numerous

25  other defendants that have come before Lion.

Page 46

1          Additionally, I want to take issue with the use of

2    Mr. Gorkin's vernacular both today and in his brief.  He

3    repeatedly says that the Trustee has disavowed allegations

4    or that what we allege we now claim is false or that we

5    admit certain things.

6          I don't believe any of those things to be true or

7    accurate, and I do not believe any of those things were

8    in our opposition brief.  And so I do take issue that that

9    is their stance, that the Trustee has admitted or disavowed

10   anything.  The Trustee stands by what he has said and what

11   he has written.

12         I do think that we can focus the issue as much as

13   possible by looking at some of the documents that were

14   submitted attached to my declaration in opposition to their

15   motion.  Perhaps the most important exhibit, the most

16   telling exhibit, is Exhibit 5 to my declaration.  That is a

17   Citco document.  That is not the Trustee's document, that is

18   not Fairfield's document.  That is a document from Sentry's

19   administrator reflecting that Lion Global received the

20   redemptions from Sentry in July of 2005.

21         And more specifically if we look at some of the

22   other exhibits attached to my declaration, in Exhibit 1, it

23   acknowledges that Lion Global was formed in 2005.  More

24   specifically, we can look at Mr. (indiscernible) email in

25   Exhibit 14 where he acknowledges that $50 million

Page 47

1   subscription.  And his bio, which is attached as Exhibit 6,

2   reflects that he was employed by Lion Global Investors from

3   2001 through 2009.  So all of these documents support that

4   Lion Global received the redemptions and is the property

5   party in 2005.

6          And so with those documents alone, we believe we

7   have named the proper party.

8          What Mr. Gorkin seems to be arguing is that -- is

9   not so much a personal jurisdiction issue, but more of

10  whether we've named the proper party.  The information

11  available to the Trustee indicates such that it was the

12  proper party.  Excuse me, that Lion Global was the proper

13  party.

14         In terms of the evolution of the Lion entities,

15  Your Honor, as we understand it -- you've heard a number of

16  references from Mr. Gorkin today to Straits Lion Asset

17  Management.  As we understand it, Your Honor, Straits Lion

18  Asset Management became Lion Capital and subsequently was

19  renamed Lion Global.  So while I do not know Mr. Gorkin's

20  position on Singaporean law, based on our -- based on the

21  documents available to the Trustee, that is what we were

22  going on.

23         And also Exhibits aside, I want to draw your

24  attention to two additional things.  What the argument

25  really boils down to is are there unresolved questions of

Page 48

1   fact.  And there absolutely are unresolved questions of

2   fact.

3           Now, as you heard Mr. Gorkin say -- I believe he

4   quoted his own briefing -- that Lion Global "Never received

5   as principal or agent the alleged transfers."  I don't know

6   exactly what "as principal or agent" means, but it sounds

7   like very carefully-chosen lawyerese to try to avoid

8   liability.  And more specifically, it flies directly in the

9   face of Exhibit 5, reflecting the Citco documents which

10  reflect that the redemptions were paid to Lion Global.

11          And also I want to draw your attention, Your

12  Honor, to Page 4 of their reply.  They seem to get into the

13  world of hypotheticals at that point and imply that Lion

14  Global may have been a conduit and it may have received

15  transfers on behalf of other entities.  That sounds very

16  much like the mere conduit affirmative defense, which is

17  inappropriately raised on a motion to dismiss, is fact-

18  intensive, and certainly leaves open a number of factual

19  questions.

20          Again, I don't know what the phrase "might have

21  received transfers on behalf of other entities" means

22  exactly or how Defendants mean it.  But it certainly sounds

23  like a factual issue to be explored.

24          So given the allegations that we are not -- that

25  the Trustee does not walk away from, given the allegations

Page 49

1    that the Trustee does not disavow or otherwise now say is

2    false, coupled with the exhibits attached to my declaration,

3    which support a finding of personal jurisdiction, it's the

4    Trustee's position that personal jurisdiction overlying

5    global is reasonable.

6            As for the Defendant's arguments, again, it seems

7    more a question of fact and less a fact of personal

8    jurisdiction.  And there are simply too many open questions

9    to be resolved at this time.

10            With that, Your Honor, as indicated in our joint

11   letter, the Trustee rests on the balance of his arguments

12   unless Your Honor has any questions.

13            THE COURT:  Mr. Gorkin, do you have anything you

14   wish to add?

15            MR. GORKIN:  Yes.  Thank you, Your Honor.

16            And so first I'll address where Mr. Beckerlegge

17   began, which is Exhibit 5.  That, as Mr. Beckerlegge said,

18   at most shows receipt.  Now, again, we disagree with that as

19   a factual matter.  But we understand.  We are willing to

20   concede for the purposes of this motion when you have to

21   construe everything in favor of the  Trustee.  Even assuming

22   that's true, receipt is not a sufficient basis to assert

23   personal jurisdiction, as I said.

24            Now, Mr. Beckerlegge referred to other exhibits

25   that he attached to his declaration as well.  I addressed

Page 50

```
 1   all of those in my presentation.  All of those are about
 2   Straits Lion's contacts with New York.  The Trustee has -- I
 3   read from the opposition brief.  You'll take a look
 4   yourself.  There's a record of this proceeding explicitly
 5   state he's not claiming alter ego or imputation.  And so the
 6   sole issue here, the sole basis, what the Trustee is
 7   asserting now, belatedly, not in his complaint, never giving
 8   us an opportunity to move on 12(b)(6) grounds to dismiss on
 9   successor liability, because he pulled this out in his
10   opposition brief, is that there's a family of entities where
11   there's successor liability.  But again, it was his burden
12   then to introduce Singaporean law as the plaintiff did in In
13   re Motors where even there the defendant did not even move
14   to dismiss on that basis, yet the court still -- the
15   plaintiff still had to put in Austrian law and the court
16   still had to make that preliminary finding that Austrian law
17   would permit jurisdiction to move the case forward.
18            And so, quite frankly, there is nothing here
19   requiring discovery.  Because even assuming all of the
20   things that the Trustee now just says in his opposition
21   brief -- not his complaint -- but even assuming what he says
22   in his opposition brief are true, there is still just
23   nothing here to establish jurisdiction over LGI.
24            THE COURT:  Mr. Beckerlegge, let me just ask --
25   well, go ahead.  Respond.
```

```
                                                      Page 51
 1              MR. BECKERLEGGE:  Sure.  Your Honor, if I might

 2   add one additional thing.  I think one thing that has to be

 3   kept in mind here is there is an evolution of the

 4   relationship between Lion and Fairfield.  They had a joint

 5   venture together.  They formed it in 2004.  Now, those

 6   contacts that were -- and there was an extensive meeting in

 7   New York.  They developed an immense understanding of the

 8   way Fairfield --

 9              THE COURT:  Do me a favor, which Lion?  You said

10   Lion and you said --

11              MR. BECKERLEGGE:  In 2004, based on what we know

12   of, it looks like Straits Lion Asset Management employees

13   came to New York in 2004 for meetings with Fairfield.

14   Ultimately they formed a joint venture with a different name

15   that incorporated both Fairfield and Lion.

16              THE COURT:  Which Lion again?  Straits Lion or...

17              MR. BECKERLEGGE:  Straits Lion.  Yes, Your Honor.

18              THE COURT:  Or Lion Global?  Okay.

19              MR. BECKERLEGGE:  Straits Lion.

20              THE COURT:  I have a question for you, Mr.

21   Beckerlegge.  And that is I just want you to comment on

22   Paragraph 7 of the complaint.  And that says, "In this case,

23   the trustee has alleged legal sufficient allegation of

24   jurisdiction simply by stating that the Debtor knowingly

25   directed funds to be invested with New York-based BLMIS
```

Page 52

1   through Fairfield Sentry.  This allegation alone is

2   sufficient to establish a prima facie showing of

3   jurisdiction over the Defendant in the pre-discovery stage

4   of litigation.

5           Now, of course you probably took that from some of

6   my opinions.  But...

7           MR. BECKERLEGGE:  Yes, Your Honor.

8           THE COURT:  And that isn't -- and the complaint

9   said, "Directed funds to be invested with the New York-based

10  BLMIS through Fairfield Sentry and knowingly received

11  transfer of customer property from BLMIS through withdrawals

12  from Fairfield Sentry."  That's -- explain which the

13  Defendant was in that -- tell me about this.

14          MR. BECKERLEGGE:  Your Honor, based on -- in terms

15  of that, we believe that Lion Global received the

16  redemptions because of the Citco document at Exhibit --

17  attached as Exhibit 5.  Also because of -- from their own

18  parent company's website, we believe Lion Global existed in

19  2005.

20          THE COURT:  Okay.  You're sort of mixing me up

21  with the names.

22          MR. BECKERLEGGE:  Sure.  Let me --

23          THE COURT:  Yeah.  Try to clarify it for me.

24          MR. BECKERLEGGE:  Sure.  Your Honor, we don't

25  dispute that Straits Lion Asset Management seems to have

Page 53

1   been the one behind the investment in 2005, March and April.

2   And that's reflected in Exhibits 3 and 4.  But in terms of

3   the redemptions in July, we believe that those redemptions

4   were received by Lion Global.  Based on the documentation, I

5   don't think that's a terribly controversial statement.

6   That's the information the Trustee has to go on.  And Mr.

7   Gorkin is saying it was received by Straits Lion Asset

8   Management and the Trustee needs to amend --

9           THE COURT:  So how are we getting personal

10   jurisdiction?

11           MR. BECKERLEGGE:  Over Lion Global?

12           THE COURT:  Yes.

13           MR. BECKERLEGGE:  Because Straits Lion Asset

14   Management became Lion Capital, which was subsequently

15   renamed Lion Global.  So they are all one and the same.

16           THE COURT:  So you're going back to that same

17   argument of successor liability that Mr. Gorkin talks about.

18           MR. BECKERLEGGE:  We do, Your Honor.  We have no

19   other information to go on.  You know, despite Mr. Gorkin

20   and a number of other defendants' representations that the

21   Trustee has everything and this case has been kicking around

22   for over a decade, the reality is the Trustee does not have

23   everything and only has the information that he has.

24           THE COURT:  So what you really need is discovery

25   on this is that you're saying to me.

Page 54

1            MR. BECKERLEGGE:  We certainly could have

2    discovery on this issue, Your Honor.  Discovery would

3    probably then lead to -- I think what Mr. Gorkin was seeking

4    is a motion for amended complaint.  So discovery coupled

5    with motion practice.  That's a yes, Your Honor.

6            THE COURT:  I'm going into chambers.  We'll take a

7    recess.

8            MR. BECKERLEGGE:  Thank you, Your Honor.

9            (Recess)

10           THE COURT:  We are back.  Mr. Gorkin -- I don't

11   see Mr. Beckerlegge.  There you are.

12           Anything else you all wish to add?

13           MR. GORKIN:  I would just like to add one thing,

14   Judge Morris, which is just to clarify what LGI is

15   requesting here.  Because I think it wasn't exactly accurate

16   the way that Mr. Beckerlegge put it, which is first and

17   foremost, we think that the complaint should be dismissed

18   with prejudice.  But secondarily, as I said several times,

19   if the Court is not inclined to do that, the Trustee really

20   has to make a motion for leave to amend his complaint and to

21   set out what he is actually alleging in the complaint and

22   that there is no basis to go to discovery before that

23   happens because there's no way to determine the relevance of

24   any discovery.

25           And as I explained during my argument, there is no

Page 55

1   fact that, quote, unquote, if proven would then provide the

2   Court a basis for determining that personal jurisdiction

3   exists.  We've already said assume, for instance, that what

4   he says in his opposition brief is correct, that LGI is a

5   successor, there's still no legal basis to do it.  So what

6   fact is he going to uncover that would then allow this Court

7   to make a conclusion?  There's still no law, no basis upon

8   which the Court could assess the significance of that fact.

9           THE COURT:  I believe you've already argued that,

10  Mr. Beckerlegge.  Do you have anything else you wish to add?

11          MR. BECKERLEGGE:  I do.  The only thing I would

12  add, Your Honor, is that as far as we know, Straits Lion

13  Asset Management was dissolved.  So discovery would be

14  interesting in terms of -- and we'd have to think through

15  what that discovery would look like.  But we would

16  anticipate that Lion Global employees would be answering for

17  Straits Lion Asset Management.

18          And also I should add that on that Citco document

19  and Exhibit 5, the addresses are exactly the same.  You've

20  got continuity of addresses, you've got continuity of

21  employees.  And I know Mr. Gorkin just took himself off of

22  mute, so I know he wants to respond to that.  But the

23  reality is we believe Lion Global was the proper party.

24          THE COURT:  Only if you want to add something new,

25  Mr. Gorkin.

Page 56

```
 1            MR. GORKIN:  I'll just talk about Exhibit 5 very

 2   briefly, which is that is a 2009 document.  The alleged

 3   transfers into Fairfield Sentry happened in March and April

 4   of 2005 and the redemption happened in July 2005.  Now, the

 5   Trustee, in Exhibits 3 and 4, has submitted the

 6   contemporaneous 2005 documents for going in, but not for

 7   coming out.  And that's simply implausible or impossible

 8   that the 2009 document saying Lion Global Investors is the

 9   entity that received it, because we've submitted

10   certificates of incorporation and name changes from the

11   official government agency in Singapore --

12            THE COURT:  You're repeating yourself.

13            MR. GORKIN:  (indiscernible) until 2008.  And this

14   happened in 2005.

15            THE COURT:  You repeated yourself.  And I've heard

16   you.  So the Federal Rules of Civil Procedure 25(b)(1)

17   states in relevant part, "Parties may obtain discovery

18   regarding any matter not privileged which is relevant to the

19   subject matter involved in the pending action.  The

20   discovery is not limited to the merits of the case.  For

21   example, where issues arise as to jurisdiction or venue.

22   Discovery is available to ascertain the facts bearing on the

23   issue."  That's Oppenheimer Fund v. Sanders, United States

24   Supreme Court, 437 U.S. 340.

25            And the Second Circuit has stated, "A plaintiff
```

Page 57

1    may obtain discovery in connection with issues related to

2    the court's jurisdiction.  A court should take care to give

3    the plaintiff ample opportunity to secure and present

4    evidence relevant to the existence of jurisdiction."  Haber

5    V. United States, 823 F.3d 746.  "If a plaintiff presents

6    factual allegations that suggest with reasonable

7    particularity the possible existence of the requisite

8    contacts between the parties in the forum state, the

9    plaintiff's right to conduct jurisdictional discovery must

10   be sustained."  And there is more in that.

11          From what I've heard today, it's reasonable that

12   we have discovery on this issue.  I think I need a

13   scheduling order on what you all are going to do, when and

14   how on discovery.  Get together, come back and talk with me

15   on November the 16th with your discovery scheduling order

16   and tell me what you are progressing on.  Very good.

17          MR. BECKERLEGGE:  Thank you, Your Honor.

18          THE COURT:  Thank you.

19          MR. GORKIN:  Thank you, Your Honor.

20          THE COURT:  12-01194, Irving Picard, Trustee,

21   Liquidation of Bernie L. Madoff Investment Securities LLC v.

22   Kookmin Bank.  State your name and affiliation.

23          MR. CIRILLO:  Good morning, Your Honor.  Richard

24   Cirillo of Cirillo Law Office for Kookmin Bank.

25          MR. FISH:  Good morning, Your Honor.  Eric Fish,

Page 58

1    Baker Hostetler, on behalf of the Trustee, Irving Picard.

2              THE COURT:  I'm sorry, I accidentally put myself

3    on mute.

4              Mr. Cirillo, it's your motion.

5              MR. CIRILLO:  Thank you, Your Honor.  I imagine

6    you're wondering why I'm here arguing these points after so

7    many arguments and decisions.  The reasons are that -- and

8    I'll call Kookmin Bank KB.

9              KB is a Korean bank.  It bought Fairfield shares

10   in 2004 and redeemed them in 2005 and early 2006.  The

11   complaint against KB is demonstrably different from those

12   against some of the other defendants in which the plaintiff

13   has made factual allegations that are sufficient under Rule

14   8A as interpreted by the Supreme Court.  It is very unfair

15   to hail KB in court --

16             THE COURT:  Let me -- I don't want to cut you off,

17   but I want you to focus on something.  It seems to me that

18   you have a little bit of a new argument concerning customer

19   property and that there is -- and you even state that

20   there's an obvious alternative explanation.  Do you want to

21   give that to me?

22             MR. CIRILLO:  Yes, Your Honor.  The obvious

23   alternative -- and let me preface that by saying that the

24   courts require that the plaintiff address obvious

25   alternative explanations for a phenomenon that they want to

Page 59

 1    --

 2            THE COURT:  And let me ask you one other question

 3    before you begin.  Is that not what you argued in another

 4    case in front of me?  I just want to be clear.

 5            MR. CIRILLO:  Yes, it is.  But perhaps I didn't --

 6    and that was the Korea Exchange Bank case.  And I want to

 7    deal with the possibility that I wasn't sufficiently clear

 8    in my explanation.

 9            THE COURT:  Actually, you were very clear, Mr.

10    Cirillo.

11            MR. CIRILLO:  Well, Your Honor --

12            THE COURT:  Just to be clear, you were very clear.

13            MR. CIRILLO:  Well, I want to argue two points if

14    Your Honor will hear me.  One is the personal jurisdiction

15    point, which I think is different for KB.  And the other, I

16    want to underscore a point about the customer property issue

17    that I may not have been as clear on.  And I understand that

18    this presumes on Your Honor's time.  From my point of view,

19    I need to make the best case for each of my clients.  And

20    while I can't overly presume on the Court's time or presume

21    at all on the Court's time, I think that the ability to make

22    the case for each client is part of the process.

23            If Your Honor wants me not to argue the case, then

24    that's a different issue.

25            THE COURT:  I never cut somebody off completely.

```
                                                            Page 60
1    I just want you to know you've been heard.  You were heard

2    before, and you're heard again.  I will let you talk.  I'm

3    not the Supreme Court.  I don't necessarily hit a buzzer,

4    but I will hit a buzzer if you repeat yourself in the same

5    case.  So that's...

6             MR. CIRILLO:  I understand that.  And I appreciate

7    Your Honor's indulgence.

8             On personal jurisdiction, unlike most of the

9    defendants, KB put in a detailed deposition executed on the

10   company's behalf by its officer, Hyung Park.  Why did it do

11   so?  It wants the Court to understand exactly why the

12   plaintiff is relying on speculative, non-factual

13   allegations.  It wants to show that even a minimal Rule 11

14   pre-suit inquiry could have provided -- would have shown

15   that there is no basis for jurisdiction.  But mainly to

16   explode the notion that the Plaintiff's allegations are

17   factual as required by Rule 8(a) and not non-factual.  And

18   that is specific to this case.

19            The requirement of factual rather than other

20   allegations is exactly what Twombly and Iqbal held and many

21   other cases that say that the Court disregards conclusory,

22   speculative, and legal assertions.

23            The KB complaint insofar as one of the key

24   allegations, if not the key allegation, it uses cookie-

25   cutter language.  It is pretty much verbatim tying into
```

Page 61

1    Judge Lifland's metaphor in BLI about knowingly tossing a

2    seed and collecting the fruit.

3            In BLI, however, Judge Lifland was very explicit

4    that the defendant have knowledge, be alleged to have

5    knowledge of BLMIS's role in New York in the investment.

6    And to underscore that, at 480 B.R. 517, he says, "BLI

7    invested tens of millions of dollars in Fairfield Sentry,"

8    and here's the key part, "with the specific purpose of

9    having funds invested in BLMIS in New York."  Without

10   knowledge, you can't have a specific purpose.

11           He also said, same page, "BLI purposely availed

12   itself of knowing, intending, and contemplating that the

13   substantial majority of funds (indiscernible) in Fairfield

14   Sentry would be transferred to BLMIS in New York."

15   Obviously those key aspects of BLI would not apply and the

16   metaphor would not apply if there was not a sufficient

17   allegation of knowledge.  It is that specific factual

18   allegations that are missing from the KB complaint.

19           In the BLI case, the judge pointed to -- Judge

20   Lifland pointed to hard facts that were alleged.  And

21   specifically that BLI hired Union Securities to conduct due

22   diligence and that on BLI's behalf, Union Securities learned

23   that Fairfield Sentry, and I quote, "Strategy is executed by

24   BLMIS", that the private placement memorandum provided to

25   Union Securities highlighted BLMIS's central role in

Page 62

1    Fairfield Sentry's investment strategy, and that the PPM

2    explicitly stated that Fairfield was required to invest at

3    least 95 percent of its assets in the split strike

4    conversation strategy utilized and controlled by BLMIS in

5    New York.

6            The PPM that Judge Lifland cited was the 2006

7    version.  For purposes of this motion, Mr. Fish and I agreed

8    that KB allegedly received and read the 2004 version, which

9    is very different.  And we'll see in a moment why that

10   difference is crucial.

11           The Park declaration explains why KB did not know

12   that BLMIS and Madoff were involved.  And it gives two

13   reasons.  One is it did not need to know those facts or

14   anything about Fairfield Sentry in order to carry out its

15   limited job.  The second was that there is nothing in the

16   2004 PPM, which is an exhibit to the Park declaration, or

17   anything else KB allegedly received.  Why is that relevant?

18   The Plaintiff argues that knowledge is alleged because it is

19   plausible that KB would have that knowledge as though

20   everybody had that knowledge.  He uses these exact words.

21   He says, "The Defendant makes the implausible claim that it

22   did not know that BLMIS or Bernie Madoff had anything to do

23   with Fairfield or its shares."  That's Page 13 of the

24   opposition memorandum.

25           This exposes that -- this exposes that the

Page 63

1   allegation knowledge is not a factual allegation, but

2   conjecture because it's based on the notion that the

3   allegation of knowledge is that non-knowledge is

4   implausible.

5          Common experience, our experience shows that it is

6   not implausible to limit our knowledge to what we need to

7   know to get through our job and our lives.  Lack of

8   knowledge is not implausible.  For example, we know that

9   bond traders rely heavily or exclusively on bonds ratings

10  and market prices without investigating what the issuer does

11  or with whom it is associated.  It's not necessary to know.

12  And I don't want to be cute, but the list of things that

13  people don't know because they don't need to know is

14  somewhat surprising.  And these are all from randomized

15  surveys from Pew Research or the National Science Foundation

16  or Fifth Third Bank.  These are randomized surveys, show

17  that a quarter of Americans believe that the polio vaccine

18  was --

19          THE COURT:  I don't think we can rule on that, and

20  I don't think that's relevant to your argument.

21          MR. CIRILLO:  Well, okay.  I won't go through

22  them.

23          THE COURT:  Stay with relevance.

24          MR. CIRILLO:  What is relevant to the argument is

25  that people don't know things that other people assert they

Page 64

1    know or should know.

2            So what does the complaint actually say?  It says

3    KB knowingly directed funds to be invested with New York-

4    based BLMIS through Fairfield Sentry and knowingly received

5    subsequent transfers from BLMIS by withdrawing money from

6    Fairfield Sentry.  There are no facts to support that

7    alleged in the complaint, just the word knowingly --

8            THE COURT:  Okay, but that is alleged and that's -

9    - we are at alleged stage.  We are not at fact stage.

10   That's trial stage.

11           MR. CIRILLO:  No, Your Honor.  I'm sorry.  I have

12   to disagree.  That's exactly what the difference between

13   Rule 8(a) and saying something that is conjectural,

14   speculative, and a non-factual allegation.  The Supreme

15   Court went through this over and over again in Twombly and

16   Iqbal.  And I cite them because they are the Supreme Court.

17   I could cite a hundred other cases that say just saying it's

18   so doesn't make it a factual allegation that shows the

19   Plaintiff is entitled to relief.  If that were the case, if

20   it were sufficient just that the plaintiff said it --

21           THE COURT:  Mr. Cirillo, that's --

22           MR. CIRILLO:  (indiscernible) plaintiff could say

23   anything --

24           THE COURT:  I must have misspoke.  Because all we

25   care about is that the Trustee alleges that they knew and

Page 65

1    that they have facts to support that.  Now, then you move on

2    to whatever you want to say.  I'll stay out of your --

3            MR. CIRILLO:  Well, again, Your Honor, I disagree

4    with that statement of the law.

5            THE COURT:  Okay.  Okay.

6            MR. CIRILLO:  It is not sufficient under the

7    Supreme Court, Second Circuit, Southern District and

8    bankruptcy court law to simply say knowingly.  Judge Lifland

9    in BLI had specific facts.  In the Dorchester case that Your

10   Honor cites, the Court had a specific fact.  And that

11   specific fact -- and it discusses it over and over again --

12   that specific fact was the plaintiff alleged that the

13   defendant had signed a consent to New York jurisdiction.

14   The defendant said, well, that's a fraudulent document.  And

15   the court said, well, I can't rule on that on this motion,

16   but it is a factual allegation.  And the word "knowing" or

17   "knowingly" is not a factual allegation.  And if I can't

18   persuade the Court of that difference between a conclusory,

19   unsupported allegation, then I really should stop.  Because

20   the second point is similar.  And that is that the only

21   possible factual support for the word knowing or

22   knowledgeable or knowingly is that KB received the 2004 PPM.

23   That PPM is in the record.  It doesn't say anything about

24   BLMIS or Madoff being involved in trading or executing the

25   strategy.

Page 66

1          To the contrary, it says 17 times that a Bermudian

2    company in Hamilton, Bermuda did that.  It doesn't mention

3    Madoff at all.  It mentions BLMIS only as a sub-custodian.

4    That has nothing to do with trading or managing the strategy

5    of trading.  It says nothing at all about KB having any

6    awareness that BLMIS or Madoff had any involvement.  And as

7    the Park declaration -- well, Exhibit 1 is that PPM which

8    Your Honor can refer to.  But nothing in it supports -- or

9    the word knowingly.  And therefore, there is no knowing and

10   no factual allegation required, as required by the Supreme

11   Court.

12          One of the other things.  I've argued to Your

13   Honor and I still adhere to the view that the use of

14   correspondent banks cannot be a basis for jurisdiction

15   alone.  That's Amigo Foods, the Court of Appeals in New York

16   said that.  They cannot be used as a basis of personal

17   jurisdiction unless the plaintiff alleges factually that the

18   defendant that he seeks jurisdiction over both actively

19   participated in an illegal scheme and that the account was

20   indispensable to carrying it out.  That's what Licci and Al

21   Rushaid said in the -- by the New York Court of Appeals,

22   including the Licci decision of the Second Circuit following

23   the New York Court of Appeals answering its certified

24   question.

25          Neither of these elements is sufficient in itself,

Page 67

1   nor is it sufficient in a totality of circumstances.  I

2   could give an example, but I think that would overly presume

3   on the Court's time.

4           The Plaintiff says that that KB executed a

5   subscription agreement and that its execution of the

6   subscription agreement was a purposeful availment of the

7   privileges of New York.  Well, that just isn't the case on

8   the document itself, which is Park Exhibit 2 and Fish

9   Exhibits 2 and 3.  The document does not say that KB may

10  bring an action against Fairfield in New York.  It doesn't

11  say that either Fairfield or KB must bring an action.  It is

12  not an exclusive jurisdiction provision.  It merely says

13  that if KB sues Fairfield with respect to an issue that is

14  not before the Court -- that is the purchase of shares.  But

15  if it does, Fairfield has the right to drag it back into New

16  York court.  That's all it says.

17          That is not KB's purposeful availment of New York

18  Jurisdiction.  If it's anybody's, it's Fairfield's

19  purposeful jurisdiction of New York.  It is not at all clear

20  that Fairfield would use that option to bring it back.  And

21  as Your Honor knows, it sued some of the defendants in the

22  BVI rather than in New York, not even itself taking

23  advantage of its own availment of the New York

24  (indiscernible).

25          The Plaintiff says that reading the PPM, one would

Page 68

1   know that the split strike conversation strategy involved

2   New York securities, U.S. securities.  That isn't a relevant

3   contact.  It was not KB that was involved in U.S.

4   securities, it was BVI, a BVI company, Fairfield.  It was

5   not relevant any more than it's relevant where car parts

6   were manufactured if you buy the car in Korea.  There is no

7   allegation and it is not a fact that Fairfield was a

8   subsidiary or controlled by KB.  KB was at most a record

9   shareholder of Fairfield Sentry.  Therefore, Walden --

10  Walden v. Fiore, Supreme Court, precludes relying on a third

11  party's actions in connection with a personal jurisdiction

12  decision on a long arm situation such as this.  It just is

13  not a relevant contact under the Supreme Court cases.  To

14  say otherwise by the Plaintiff is just ipse dixit.  It is

15  not a factual allegation.

16          All right, turning to the customer property.  And

17  I know I did not persuade you the last time.  And as I said,

18  I may have been unclear.  But I would like to use this

19  example to illustrate what I'm talking about.

20          Suppose a plaintiff has a bank account.  And

21  suppose a defendant makes a payment to a third party.  The

22  bank account is what BLMIS has, the payment to the third

23  party is BLMIS's payment to Fairfield.

24          Now the plaintiff sues the defendant.  The

25  complaint alleges --

Page 69

```
 1              THE COURT:  Would you just stick to the facts
 2     instead of --
 3              MR. CIRILLO:  These are the facts.  These are the
 4     facts --
 5              THE COURT:  You keep saying suppose.
 6              MR. CIRILLO:  These are the facts abstracted.
 7     Because what the Plaintiff is alleging is that the payment
 8     to the third party either came from the Plaintiff's bank
 9     account or it came from another source.  That's what the
10     Plaintiff in my example said, and that's exactly what the
11     Trustee is saying in the case against KB.
12              These are two equal possibilities.  Therefore, one
13     is not more plausible than the other.  Neither enjoys an
14     inference of plausibility.  The complaint says they are two
15     even-steven possibilities.  Why is that the case?  As Your
16     Honor has held, this is one big case.  All of the adversary
17     proceedings are part of it.  As Your Honor knows, the
18     Plaintiff has made judicial admissions in this case in the
19     form of its other complaints in this case where they allege
20     a much greater amount of money being paid out by Fairfield
21     than being paid by BLMIS to Fairfield.  That means that
22     either the Defendant, KB here, got its money from BLMIS, or
23     it got its money from another source.  And this is --
24              THE COURT:  But this is the same argument you had
25     before about -- okay.  It's the same argument you --
```

Page 70

1          MR. CIRILLO:  Well, yeah.  It doesn't make what I

2    said before incorrect.  I just want to be sure for KB that I

3    have made my position clear and I've made a record of my

4    position.

5          THE COURT:  Okay.

6          MR. CIRILLO:  So I would ask Your Honor to read

7    Twombly and Iqbal for a thousand-one-hundred times.  I know

8    you've read it many times before.  They dismissed the

9    actions before them.  They are exactly on point with this

10   argument about KB.  And they dismissed the complaints before

11   them, and I asked the Court to dismiss the KB complaint.

12          I rest on my opening and reply brief for the other

13   points that we raised for dismissal.  Thank you.

14          THE COURT:  Thank you very much.  Yes, sir, Mr.

15   Fish.

16          MR. FISH:  Good morning, Your Honor.  I plan to

17   spend most of my time on the personal jurisdiction issue.

18   But I just want to touch briefly  on the customer property

19   issue that Mr. Cirillo was just talking about first.  And

20   I'll just say there's nothing about the allegations

21   regarding Kookmin Bank's receipt of customer property in

22   this case that's different from the other cases in which his

23   argument has been rejected.  The trustee's allege the

24   relevant pathways in Exhibits B and C to the complaint.  In

25   fact, Exhibit C includes more than 30 transfers from

Page 71

1    Fairfield Sentry to Kookmin Bank.  Nothing more is required

2    at this time.  So unless Your Honor has any questions, I

3    will move on to personal jurisdiction.

4              THE COURT:  I do not.  Thank you.

5              MR. FISH:  So the totality of the circumstances

6    shows that personal jurisdiction is more than appropriate

7    here.  All of Kookmin Bank's arguments regarding the lack of

8    jurisdiction are rebutted by the Trustee's allegations and

9    arguments in the Trustee's opposition.  And Kookmin Bank's

10   arguments have been rejected by this Court in previous

11   subsequent transfer cases before Your Honor.

12             First, the Trustee has properly alleged that

13   Kookmin Bank purposefully availed itself of the privileges

14   of conducting activities in the U.S. and New York

15   specifically.  The Trustee alleges that Kookmin Bank

16   invested in Fairfield Sentry to gain access to BLMIS, which

17   is a plausible allegation when taken together with the

18   allegation that 95 percent of Fairfield Sentry's assets were

19   invested in BLMIS.  And again, as Mr. Cirillo mentioned,

20   this is a similar allegation that's been accepted by the

21   Court in other cases.  And although they have a declaration

22   -- I'll touch on that briefly in a few minutes.  But it's

23   undisputed that -- you know, whether they new or not that it

24   was Madoff -- and it seems implausible that they didn't.

25   But whether they knew or not, it's undisputed that Kookmin

Page 72

1    Bank used a New York bank account to receive transfers, the

2    very transfers that at issue in this case, and also had one

3    subscription agreement where they used a New York bank

4    account to pay the subscription fees or to pay into

5    Fairfield Sentry.

6            Second, it's not disputed that Kookmin Bank signed

7    a subscription agreement.  In fact, they signed three of

8    them agreeing to jurisdiction in New York and the

9    application of New York law.  And third, it's not disputed

10   that Kookmin Bank received a private placement memorandum

11   outlining the New York-centric nature of the investment and

12   the funds being custodied with Madoff.  In fact, they refer

13   to the same PPM, private placement memorandum, that Mr.

14   Cirillo discussed in the Korea Exchange Bank case.  It's the

15   same one that he's bringing forward to the Court here.

16           So these contacts are not random, gratuitous, or

17   attenuated.  And the Trustee's allegations are not

18   conclusory.  Rather, the Trustee has made a prima facie

19   showing of purposeful availment.  And as in other cases,

20   these claims arise out of or relate to Kookmin Bank's

21   conduct in the forum and it's reasonable to confer

22   jurisdiction under the circumstances.

23           And the arguments that Kookmin Bank makes in its

24   motion are the same or similar to the other motions before

25   Your Honor.  And there's really no reason to stray from

Page 73

1   prior opinions -- prior decisions, either factually or

2   legally.  And Kookmin Bank's arguments should similarly be

3   rejected.

4           So I want to just touch briefly on this

5   declaration that Kookmin Bank submitted because it rebuts

6   the complaint allegations that the -- that Kookmin Bank

7   purposefully invested in Fairfield Sentry to get to BLMIS.

8   But Kookmin Bank's argument is implausible in light of

9   BLMIS's Central role in the investment and the fact that

10  they argue in their papers that they were investing as a

11  trustee for various trusts.  And notably, they don't say

12  anything in their papers about the intention of the trustee

13  -- of the trust, I should say.  It was clearly to invest

14  with BLMIS through Sentry.  And under New York Law, as we

15  note in our opposition in Footnote 3, the Trustee of a trust

16  is responsible -- and in fact under New York Law the trustee

17  is the proper party to sue.  And beyond that, the

18  subscription agreements, the three subscription agreements

19  also specifically state that if a subscriber is signing as a

20  trustee or agent or nominee or for somebody else, it "agrees

21  that the representations and agreements herein are made by

22  subscriber with respect to itself and the beneficial

23  shareholder."

24          So in any event, the statement that Kookmin Bank

25  placed money into Fairfield Sentry without knowing the true

Page 74

1    purpose of the investment is implausible in light of the

2    Second Circuit's opinion in In re Picard.  And I'll quote it

3    again as I did in the Korea Exchange Bank argument.  When

4    these investors chose to buy into feeder funds that placed

5    all or substantially all of their assets with Madoff

6    Securities, they knew where their money was going.  And

7    that's 917 F.3d 85, 105 (2d Cir. 2019).

8           So I also want to talk about the declaration

9    itself.  Because the declaration that's submitted, it's

10   incomplete and unreliable.  And notably, the declaration is

11   not made on personal knowledge of the facts.  In fact, it's

12   made on personal knowledge "as informed by review of KB

13   corporate records and discussions with KB personnel."  And

14   that's in Paragraph 1 of the declaration.

15          In other words, the declaration appears to be

16   based on Mr. Park's internal investigation as opposed to

17   personal knowledge.  And that might be why there are a

18   couple of errors in the declaration.  For one, they only

19   attach one of the subscription agreements.  And although the

20   form is similar to others, the banking information for one

21   of the declarations that I submit in my declaration shows

22   that at least one subscription agreement uses a New York

23   bank account to both subscribe and redeem shares from

24   Fairfield Sentry.  And that's not noted in the declaration.

25          And number two, the October 2004 private placement

Page 75

1    memorandum attached to the Park declaration can't be the one

2    that Kookmin Bank actually received when it signed the

3    subscription agreements because that PPM is dated after the

4    time the subscription agreements were signed in April of

5    2004.

6          So I know Mr. Cirillo said that we agreed that

7    this would be the PPM, but I don't necessarily agree that

8    that would be the PPM that they received.  Perhaps some of

9    the language might be the same, but the Trustee doesn't know

10   what PPM -- what private placement memorandum that Kookmin

11   Bank actually received, because it had to have been one that

12   came before the one that Mr. Park attaches to his

13   declaration.  But regardless, as a mentioned before,

14   regardless of the declaration, even  if it's all true, you

15   can't get past the New York bank accounts.  All three

16   subscriptions -- all three subscription agreements, at issue

17   listed Deutsche Bank Trust Company, America's Bank Account

18   for the receipt of redemption payments.  And Exhibits 4, 5

19   and 6 to my declaration also show that Kookmin Bank used

20   these bank accounts to receive the transfers at issue.

21   Those are examples of the transfers that went into those

22   accounts.  And in fact the Trustee is a aware of at least 30

23   transfers that went from Fairfield Centuries HSBC account in

24   New York to Kookmin Banks, Deutsche Bank account in New

25   York.  And as I mentioned before, one of the subscription

Page 76

1    agreements uses the New York bank account to subscribe into

2    Fairfield Century.

3         So the circumstances surrounding Kookmin Bank's

4    use of the New York accounts show why Liche and Case is

5    conferring jurisdiction based on the use of correspondent

6    accounts is applicable here.  And also Mr. Cirilo doesn't

7    mention the recent Arcapita case, which Your Honor cited in

8    your Korea Exchange Bank case, which it -- this is not a

9    case involving terrorism or, you know, the unlawfulness that

10   Mr. Cirillo suggests is necessary; rather it was a case in

11   which the designated correspondent account was used to

12   receive fund transfers from the debtor.  And although the

13   debtor chose to use US dollars to effectuate the investment,

14   the defendant "could have avoided the United States entirely

15   by routing placements through correspondent accounts

16   anywhere in the world".  And that's 640 BR at Page 618.

17   This is Bahrain Islamic Bank v Arcapita Bank 640 BR 604, May

18   22, 2022.

19        And so the same can be said here that Kookmin bank

20   entered into agreements with Fairfield Century in which they

21   used the  New York bank accounts.  Kookmin Bank chose to

22   enter into these agreements.  They didn't have to, but they

23   chose to and they used New York bank accounts for this.  And

24   I'll just quote, Your Honor's language in the Korea Exchange

25   Bank case and this is the Westlaw version, which is 2022 WL

Page 77

1   4371908 at Page *4, where defendant chooses to use the

2   United States bank accounts to receive funds exercising

3   personal jurisdiction for the defendant for causes of action

4   relating to those transfers is constitutional.

5          So -- and going back to the PPM, the Private

6   Placement Memorandum, even if the October 2004 PPM is the

7   only one that they saw or it seems to be the only one that

8   they have found in their investigation, even though we

9   believe they must have gotten one before that; there's

10  plenty of information in that PPM showing that this is a New

11  York Centric Investment, and it does mention BLMIS and

12  again, it's the same one from the Korea Exchange Bank case.

13  And you know, on Page 15 of the PPM, currently, BLM has

14  approximately 95 percent of the funds assets under custody.

15         On Page 8, it discusses the split strike

16  conversion strategy and the purchase of S&P stocks.  Page 1

17  and 10, it talks about the initial investment and initial

18  offering price in US dollars.  Page 20, maintains assets in

19  US dollars.  Then VNAV is determined in US dollars.  There's

20  a mention of US counsel located in New York.  There's a

21  mention of trade risks involving US Government activities on

22  Page 16.  There's a mention of legal matters having been

23  passed in the United States by counsel in New York.  That's

24  at Page 33.  So, even if -- even if Kookmin Bank is accurate

25  in saying they had no idea this was Madoff, the October 2004

Page 78

1    PPM, and even if that's the one that they had, again, it's

2    questionable, but it's more than sufficient information to

3    show that they understood Fairfield Century to be a New York

4    based investment and the Madoff held almost all of the

5    assets.

6            And finally, the subscription agreements, Your

7    Honor.  They have the form selection clause and it's one

8    more contact, again we're not saying that this form

9    selection clause automatically confers jurisdiction, but

10   it's one more contact that shows this was a New York based

11   investment and that Kookmin Bank knowingly invested in a New

12   York based fund.  And not only that, but it also shows that

13   it would be fair to confer jurisdiction in this case.  They

14   agreed to the form selection clause in their -- in their

15   subscription agreements.  And so under the totality of the

16   circumstances, Your Honor, the jurisdiction here, there's

17   plenty of contacts, it's fair and there's not much different

18   here than in any other cases other than a questionable

19   declaration.  But even if that declaration is accepted,

20   there's -- there's still jurisdiction here.  And unless,

21   Your Honor, has any questions for me, I'll --

22            THE COURT:  I do not.  Mr. Cirillo, anything you

23   wish to add?

24            MR. CIRILLO:  Yes, a few things.  The Mr. Fish

25   says we can't get past the New York correspondent accounts.

Page 79

1    We appear to have a disagreement over whether the law of the

2    State of New York does or doesn't limit the jurisdictional

3    significance of New York bank accounts.  The Second Circuit

4    made clear in Liche that New York law applies and that's the

5    Touchstone and the Court of Appeals -- the New York Court of

6    Appeals has never backed off the notion that it has to be an

7    active participant in an illegal transaction. And the reason

8    is otherwise in innocent transactions that occur daily and

9    trillions of dollars would then suddenly be suddenly sucked

10   into New York courts by jurisdiction, which is not

11   appropriate or constitutional.  The -- indeed it is such a

12   mindless decision to designate a New York correspondent

13   account that it is advantageous.  It is trivial.  It is

14   irrelevant.

15           The referent -- the only reference in the PPM, and

16   I'm a little surprised because Mr. Fish and I agreed that

17   whatever, and it's in the brief, that whatever document PPM

18   is referenced in the subscription agreement and assuming

19   that, in fact, that was received, that the contents -- we

20   agreed the contents were no different -- for the purposes of

21   this motion, were no different from the October 2004.  And

22   so to argue -- to put -- to cast doubt that there might have

23   been more is excluded on this motion.  And the only

24   reference in that to blame us and there was no reference to

25   Madoff, is as a sub custodian of assets.  And a custodian is

Page 80

1    just like the bank that has safety deposit boxes that people

2    put assets in.  It has no active role in how those assets

3    arise and so knowing someone is a sub custodian is of no

4    value in knowing who is executing transactions.

5          As to the probity of the Park declaration, the

6    basis for Ms. Park's knowledge is exactly the same as in a

7    30b6 deposition.  People don't know, certainly after 18

8    years, individually, what happened in a corporation like

9    Kookmin Bank.  So how do they testify?  They learn from

10   records and from people what they can and provide the

11   testimony in that fashion.  There's nothing wrong with that

12   and the supposed errors that Mr. Fish said are not errors at

13   all, and they're not inconsistent at all with the

14   declaration.

15         The recitation about the declaration that Mr. Fish

16   gave significantly omits the fact that as a Trustee under

17   Korean law, the -- the only role that the Trustee had was to

18   execute transactions.  He doesn't make any reference to the

19   asset manager who did all of the decision making on what to

20   buy, what to sell, when to buy, when to sell.  That is

21   crucial and New York law, in fact, does not apply as to

22   whether a beneficial owner or an asset manager can be sued.

23   In fact it is New York law at (indiscernible) includes the

24   choice of law, provisions of law, and in this case they

25   point to Korean law, and therefore to argue that under New

Page 81

1    York law, they couldn't have sued the beneficial owners or

2    the asset manager is simply wrong.

3              Other than that, Your Honor, I rest on what I said

4    earlier.  I think, Your Honor, gets it and I need to

5    persuade, Your Honor, to take a different course from the

6    course you've taken on these two points in the past.  I

7    recognize that that is an uphill battle and I hope that Your

8    Honor, will consider these arguments as good faith based,

9    and based on a solid grounding of controlling law from the

10   United States Supreme Court, Second Circuit and the New York

11   Court of Appeals.  That's all I have, thanks.

12             THE COURT:  Very good.  Mr. Fish, any quick

13   answer?

14             MR. FISH:  Sure.  Just a couple of minor points

15   because I don't want Mr. Cirillo to be upset with me about

16   the Private Placement Memorandum issue.  As I said during

17   the argument, we don't know what PPM Kookmin Bank received,

18   but you know, I told Mr. Cirillo, that we can assume for the

19   sake of the argument that they received this October 2004

20   PPM and that if they received an earlier one, perhaps the

21   language may have been similar.  But again, we don't know

22   what they received and I think that's the point.  But

23   regardless of which one they received; I think the 2004

24   version that they submit in their papers is sufficient.

25   Also there -- Your Honor, there's no argument in the papers

Page 82

1    regarding the use of Korean Law.  You know, I think that's a

2    red herring.  I think that's -- that maybe, perhaps that's

3    an issue more appropriate for discovery and Kookmin Bank's

4    role in the investment is obviously a fact question and we

5    can explore that during discovery as well.  And that's all I

6    have to say, Your Honor.

7              THE COURT:  Very good.  You will obviously receive

8    a written opinion.

9              MR. CIRILLO:  Thank you.

10             MR. FISH:  Thank you, Your Honor.

11             MR. CIRILLO:  Appreciate it, Your Honor.

12             THE COURT:  Thank you.  Chambers.

13             (Whereupon these proceedings were concluded at

14   11:53 AM)

15

16

17

18

19

20

21

22

23

24

25

Page 83

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  October 21, 2022