Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 10-13164-cgm

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    FAIRFIELD SENTRY LIMITED AND NOMURA INTERNATIONAL PLC,

8            Debtors.

9    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

10   Adv. Case No. 10-03630-cgm

11   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12   FAIRFIELD SENTRY LIMITED (In Liquidation) et al.,

13             Plaintiff,

14         v.

15   HSBC SECURITIES SERVICES (LUXEMBOURG) SA et al.,

16             Defendants.

17   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

18   Adv. Case No. 10-03635-cgm

19   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

20   FAIRFIELD SENTRY LIMITED (In Liquidation) et al.,

21             Plaintiff,

22         v.

23   UNION BANCAIRE PRIVEE, UBP SA et al.,

24             Defendants.

25   - - - - - - - - - - - - - - - - - - - - - - - - - - - x



Page 2

1    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

2    Adv. Case No. 10-03636-cgm

3    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

4    FAIRFIELD SENTRY LIMITED (In Liquidation) et al.,

5                    Plaintiff,

6            v.

7    UNION BANCAIRE PRIVEE, UBP SA et al.,

8                    Defendants.

9    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

10                   United States Bankruptcy Court

11                   355 Main Street

12                   Poughkeepsie, NY 12601

13

14                   December 14, 2022

15                   10:00 AM

16

17

18

19

20

21   B E F O R E :

22   HON CECELIA G. MORRIS

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:   UNKNOWN

Page 3

1    Adversary proceeding: 10-03630-cgm Fairfield Sentry Limited

2    (In Liquidation) et al v. HSBC Securities Services

3    (Luxembourg) SA et al

4

5    Doc# 253 Notice of Hearing to consider Letter Requesting a

6    Pre-Motion Discovery Conference (related document(s)250)

7    Filed by David Elsberg on behalf of Fairfield Sentry Limited

8    (In Liquidation), Fairfield Sigma Limited (In Liquidation),

9    acting by and through the Foreign Representative thereof,

10   Kenneth Krys, solely in his capacity as Foreign

11   Representative and Liquidator thereof, Greig Mitchell,

12   solely in his capacity as Foreign Representative and

13   Liquidator thereof and Letter in Response to Request for

14   Pre-Motion Discovery Conference Filed by Michael C. Lambert

15   on behalf of Private Space Ltd.. (related document(s)252,

16   251) filed by Clerk of Court, United States Bankruptcy

17   Court, SDNY. with hearing to be held on 12/14/2022 at 10:00

18   AM at Videoconference (ZoomGov) (CGM)

19

20

21

22

23

24

25

Page 4

1    Doc. #250 Motion to File Under Seal Certain Exhibits to the

2    Pre-Motion Letter of David Elsberg filed by David Elsberg on

3    behalf of Fairfield Sentry Limited (In Liquidation),

4    Fairfield Sigma Limited (In Liquidation), acting by and

5    through the Foreign Representative thereof, Kenneth Krys,

6    solely in his capacity as Foreign Representative and

7    Liquidator thereof, Greig Mitchell, solely in his capacity

8    as Foreign Representative and Liquidator thereof.

9    (Attachments: # 1 Proposed Order) (Elsberg, David)

10

11   HEARING re Adversary proceeding: 10-03635-cgm Fairfield

12   Sentry Limited ( In Liquidation) et al v. Union Bancaire

13   Privee, UBP SA et al

14

15   Doc# 956 Notice of Adjournment of Hearing RE: Pre Trial

16   Conference; hearing held

17   and adjourned to 12/14/2022 at 10:00 AM at Videoconference

18   (ZoomGov) (CGM) .

19

20   HEARING re Adversary proceeding: 10-03636-cgm Fairfield

21   Sentry Limited (In Liquidation) et al v. Union Bancaire

22   Privee, UBP SA et al

23

24

25

1    Doc# 1037 Notice of Adjournment of Hearing RE: Pre Trial

2    Conference; hearing held and adjourned to 12/14/2022 at

3    10:00 AM at Videoconference (ZoomGov) (CGM) .

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

Page 6

```
 1   A P P E A R A N C E S :

 2

 3   SELENDY GAY ELSBERG PLLC

 4        Attorneys for Various Fairfield Entities

 5        1290 Avenue of the Americas, 17th Floor

 6        New York, NY 10104

 7

 8   BY:  DAVID ELSBERG

 9        JULIE  ROSE SINGER

10

11   GILMARTIN, POSTER SHAFTO LLP

12        Attorneys for Private Space Ltd.

13        845 Third Avenue, 18th Floor

14        New York, NY 10022

15

16   BY:  MICHAEL C. LAMBERT

17

18

19

20

21

22

23

24

25
```

Page 7

1                    P R O C E E D I N G S

2              THE COURT:  Good morning.  The first one I have on

3    the calendar is 10-03630 Fairfield Sentry Limited v. HSBC

4    Security Services and I know those names have changed.

5    State your name and affiliation.

6              MR. ELSBERG:  Good morning, Your Honor.  This is

7    David Elsberg for the liquidators, and here with me is my

8    colleague Julie Singer who is one of our associates and

9    today will be her first oral argument.

10             MS. SINGER:  Good morning, Your Honor.

11             THE COURT:  Good morning.

12             MR. LAMBERT:  Good morning, Your Honor.  This is

13   Michael C. Lambert representing the defendant Private Space

14   Limited in matter 10-03630.

15             THE COURT:  Just for you all's benefit, discovery

16   disputes, no judge likes, but this much paper for -- and

17   that doesn't include the stuff that's under seal because I

18   don't print the stuff that's under seal, so you may begin,

19   Lambert -- I mean, miss -- I'm sorry, your name again?

20             MS. SINGER:  Julie Singer for the joint

21   liquidators, Kenneth Krys and Greig Mitchell.  Good morning,

22   Your Honor.

23             THE COURT:  Good morning.

24             MS. SINGER:  On this motion, we're asking the

25   Court to compel defendant Private Space Limited to produce

Page 8

1    emails relevant to personal jurisdiction so that we can use

2    them in opposing Private Space's motion to dismiss.

3    Private Space's counsel already reviewed these emails and

4    the emails are relevant and responsive, but Private Space is

5    sitting on them refusing to hand them over.  Until recently,

6    Private Space had not produced a single email to the joint

7    liquidators.

8            THE COURT:  Let me interrupt you just, Ms. Singer,

9    for one question.  Why do you think those emails that you

10   found are responsive?

11           MS. SINGER:  For a few reasons, Your Honor.  I'd

12   be happy to jump to that point.

13           THE COURT:  Yeah, do, please.

14           MS. SINGER:  Private Space claims that these are

15   not responsive because our discovery requests are narrow.

16   Your Honor, that is simply incorrect.  Taking a step back

17   for a moment, Private Space is refusing to produce emails

18   because it says a request did not cover emails about its

19   Fairfield investments.  Your Honor, these investments are at

20   the heart of the case and at the heart of personal

21   jurisdiction.  It's implausible that the liquidators'

22   requests don't cover this.

23           Dozens of defendants received the same or similar

24   requests and not one has produced emails -- excuse me, not

25   one has refused to produce emails on this extreme and quite

1    bizarre position.  In fact, our September 14, 2021 discovery

2    request saw broad jurisdictional discovery with a focus on

3    investment rationale.  I'll point to a handful of examples

4    from our request for production.

5            The first request sought documents and

6    communications "concerning any decision made by Private

7    Space to subscribe in Sentry rather than a different fund."

8    And that's Exhibit A which is Docket 251-1.  RFP 2 sought

9    documents and communications concerning Private Space's use

10   of U.S. correspondent banks to affect subscriptions in and

11   receive redemptions from Sentry.  And RFPs 6 and 15 sought

12   documents and communications exchanged with HSSL regarding

13   HSSL's "actual or potential subscription to shares of the

14   funds and regarding the funds BLMIS, other BLMIS feeder

15   funds, or your subscriptions therein."

16           Your Honor, we know from Private Space's responses

17   and objections that Private Space took a broad reading of

18   these requests.  For example, Private Space described RFP 1

19   by saying "On its face, it seeks the production of every

20   document and communication that is in any way related to the

21   fact that PSL made a decision to subscribe in Sentry, a fact

22   that is undisputed."

23           That's what they wrote.  Private Space stated that

24   this request was broad and covered documents and

25   communications related to the fact that Private Space made a

Page 10

1    decision to subscribe in Sentry.  On top of that, the

2    objection does not say Private Space won't produce any

3    emails.  It does not specify which categories of documents

4    it would and would not produce.  Now Private Space changed

5    its tune and says the requests are too narrow and that's why

6    it won't produce emails.

7              Your Honor, the RNOs were the time to state

8    Private Space's understanding of the request and it did so.

9    It said the request was broad and that it and it would not -

10   - it did not say that it would withhold emails.  Private

11   Space cannot play fast and loose with the requirements of

12   the federal rules.  As Your Honor has made clear, Rule 34

13   requires parties to object with specificity.  Because

14   Private Space did not comply with the rules, it cannot come

15   back later with a post talk excuse for failing to produce

16   emails.

17             Your Honor if I may, I'd like to jump back and

18   tell you a little bit about why the emails are also relevant

19   in addition to responsive.

20             THE COURT:  Okay.  And anything you put in your

21   exhibits, you're going to have to specify exactly where they

22   are because candidly I did not read everything that came out

23   of the Court.  So you need to --

24             MS. SINGER:  Sure, Your Honor.

25             THE COURT:  -- say.  If you're going to refer to

Page 11

1    something, you need to say I'm referring to this and you

2    will find it at Paragraph X, Y, Z, whatever it is.

3              MS. SINGER:  Yes, Your Honor.  When we pushed back

4    on Private Space assertion that not a single email, not one,

5    was responsive or relevant.  Private Space took the

6    extremely unorthodox step of producing what they called a

7    representative sample, and that's in their letter they say

8    that, Docket 251-4 at Page 4 and they also described it that

9    way in their November 3rd email communication.

10             The sample was just nine emails, nine out of

11   hundreds that it said it reviewed.  Private Space later

12   referred to this as a random sample of email.  That's Docket

13   252, Page 3.  That isn't how discovery is supposed to work

14   under the federal rules.  A party doesn't get to cherry pick

15   or choose at random a tiny fraction of relevant responsive

16   emails to produce and hold back the rest.

17             The default under the federal rules is that you

18   produce all responsive, relevant, nonprivileged documents

19   kept in the ordinary course, full stop.  Instead, Private

20   Space produced a 17-page scanned PDF that consisted of nine

21   emails.  That PDF does not have any metadata and it includes

22   an incomplete set of attachments.  This is despite Your

23   Honor's instructions in prior hearings that defendants

24   needed to produce both metadata and attachments.  We

25   submitted that document that Private Space gave us as

Page 12

1    Exhibit E to our letter and that's Docket 251-5.

2            Private Space is still refusing to produce the

3    rest of its relevant responsive emails.  Your Honor, this is

4    simply not permissible, especially given your prior rulings

5    on the relevance of emails for showing jurisdiction.  In

6    June, Your Honor decided a motion to dismiss in one of the

7    BLMIS Trustee actions because the defendant allegedly

8    "communicated with FGG employees located in New York via

9    mail and email."  That's Picard v. Bank Lombard Odier, 2022

10   Westlaw 2387523.

11           The joint liquidators are entitled to see all

12   responsive and relevant emails, not just the ones that the

13   defendant cherry picks for us to see.  I'd like to discuss

14   Private Space's scan PDF to get into more detail why the

15   emails are relevant.  I'll touch on just a couple examples,

16   and because Private Space marked these emails confidential,

17   I'll describe them at a high level of generality.

18           The first is a March 29th, 2004 email.  It's at

19   Page 12 of the PDF which is Exhibit E, Docket 251-6.  The

20   Bait Stamp is PSL-0401.  This email shows that Private Space

21   purposely availed itself of the U.S. securities market

22   because it was intending to invest in that market through

23   Sentry and BLMIS.  The email is from an employee of the

24   fund's former manager FGG to a Private Space custodian.

25           It attaches an investment profile for Fairfield

Page 13

1    Sentry and describes Sentry's strong performance due to the

2    split-strike conversion strategy.

3              Your Honor, the split-strike conversion strategy

4    was synonymous in the industry with Bernie Madoff.  Emails

5    like this one show that when Private Space subscribed in

6    Sentry, it knew its money was to be invested in the U.S.

7    securities market through Bernie Madoff and that fact

8    supports jurisdiction under the Picard v. Bureau of Labor

9    Insurance case.  That's 480 B.R. 501 which Your Honor has

10   cited in numerous recent decisions.

11             Judge Lifland's decision held that "A party

12   purposely avails itself of the benefits and protections of

13   New York laws by knowing, intending, and contemplating that

14   the substantial majority of funds invested in Fairfield

15   Sentry would be transferred to BLMIS in New York to be

16   invested in New York security market."

17             The second example I'd like to look at is a

18   February 13th, 2007 email which you can see at Page 4 of

19   that PDF.  Again, that's Exhibit E, Docket 251-6.  And this

20   one is Bates stamped PSL-0393.  This one shows direct

21   contact between FGG in the U.S. and Private Space.  It

22   reflects a communication from an FGG employee from what

23   appears to be a U.S.-based email address based on the

24   context of the email.

25             I'd like to move to another related issue.  Even

Page 14

1   if Private Space were allowed to produce only a

2   representative sample, and it is not, there's another big

3   problem with Private Space's sampling approach.  The sample

4   is not representative.  It is under inclusive and we know

5   that because third parties produced emails involving Private

6   Space that Private Space did not produce to us themselves;

7   and these types of emails are not represented in Private

8   Space's sample.

9           Your Honor, we filed an example under seal as

10  Exhibit F to our letter.  That's Docket 251-61 and the Bates

11  stamp there is Anwar CFSE-00742917.  I want to stress that

12  this is a Private Space email that Private Space did not

13  produce.  It's a March 30th, 2005 communication from one of

14  Private Space's custodians to the record holder, HSSL.

15          The email refers to a call Private Space had with

16  Fairfield and includes a question about a Fairfield

17  subscription.  It shows that Private Space directed HSSL to

18  act on its behalf with respect to its Sentry investments,

19  and as a communication with HSSL it should have been

20  produced.  Counsel claims that the email is utterly

21  irrelevant because it dealt with what he describes as a

22  glitch or question about completion of the transaction.

23  That's Docket 252-5.

24          But Private Space does not get to withhold emails

25  from discovery just because it thinks they're mundane.

Page 15

1    Sometimes the most mundane emails can be the most relevant

2    to personal jurisdiction.  There are many more emails.  We

3    produced another 80 or so on November 11th.  Counsel

4    completely ignores those emails in his letter response.

5    They show Private Space contacting FGG employees in the

6    United States concerning their investments.

7              They also support an inference that Private Space

8    knew its subscriptions were being directed to BLMIS for

9    investment in the United States.  These other emails show

10   that Private Space's representative production is not at all

11   representative.  Your Honor, like Exhibit F, these emails

12   were stamped by the producing parties as confidential and

13   we'd be happy to provide them under seal at your request.

14             I expect that Private Space will tell us there are

15   two other reasons why it should not have to produce emails,

16   one, that a stipulation would suffice as a replacement for

17   documents, and two, that it would be burdensome to produce

18   the emails.  Each should be rejected.  I'll address them in

19   turn.

20             First, a stipulation is unworkable.  In order for

21   a stipulation to work as a substitute for document

22   discovery, it would need to include details about the

23   defendant's decision making in making its investment and the

24   nature of defendant's contacts.  Counsel had the opportunity

25   to proceed by a stipulation of this sort earlier this year.

Page 16

1    When defendants including Private Space raised the idea of a

2    stipulation, we in good faith prepared a draft stipulation

3    for their consideration in April.  Counsel rejected our

4    stipulation and sent us a counter proposal in June that

5    stripped out all the detailed language we proposed.

6           Private Space's proposal doesn't offer nearly the

7    level of detail required to be an appropriate substitute for

8    document discovery.  The liquidators have the burden to

9    establish jurisdiction and Private Space can't just

10   unilaterally decide what information we can and can't have

11   to build our argument and rebut theirs.

12          Further, there's no efficiency to be gained by

13   further negotiating a stipulation at this point.  We think

14   it would be much more productive if the parties were simply

15   to go about with productions.  Private Space has already

16   reviewed these documents and can produce them.  That's more

17   efficient than trying to bridge a gap between two polar

18   opposite stipulations.

19          Next, I'll address the issue of burden.  I expect

20   counsel will say that his client shouldn't have to undertake

21   the burden of producing these emails, but counsel has

22   already reviewed all of the emails we are seeking.  The bulk

23   of the work here is done.  Now the emails have been sitting

24   with Private Space for over a month since they were

25   reviewed.  Counsel says he may need to redact some of those

Page 17

1    emails to comply with foreign law or data privacy rules but

2    redacting several hundred emails is a routine part of

3    document discovery and doesn't create an undue burden.

4              In summary, Your Honor, producing emails is part

5    of modern discovery.  Private Space's representative or

6    random sample does not suffice under the federal rules.

7    Your Honor, we respectfully ask you to compel Private Space

8    to produce all of the emails along with metadata and

9    attachments.  I'm happy to answer any questions Your Honor

10   may have.

11             THE COURT:  You answered the question that I had.

12             MS. SINGER:  Thank you.

13             THE COURT:  And Mr. Lambert, as I go to you, I

14   have a question to ask you as you begin your argument.

15             MR. LAMBERT:  Sure, Your Honor --

16             THE COURT:  No, I'll wait until the end.  Okay.

17   Go ahead.

18             MR. LAMBERT:  Did you have a question for me to

19   start, Your Honor?

20             THE COURT:  No, I'll ask it after.

21             MR. LAMBERT:  Okay.  Thank you, Your Honor.

22   Michael C. Lambert for defendant Private Space Limited.

23   It's very clear from Ms. Singer's presentation that the

24   liquidators' position is fundamentally that they are

25   entitled to see all emails from private -- that Private

Page 18

1    Space received or sent that have anything to do with

2    Fairfield.  That is simply not the case.

3             The starting point, Your Honor, is the federal

4    rules of civil procedure, specifically Rule 34, and the

5    question there is what have they actually requested?  Number

6    two is, the second starting point is Your Honor's order of

7    November 2021 allowing jurisdictional discovery to proceed

8    and only jurisdictional discovery to proceed.  Private Space

9    objected in its formal responses to the existing document

10   request.

11            THE COURT:  I want you to point to one page on

12   that 17 -- on those 17 pages that is about jurisdiction.

13            MR. LAMBERT:  Which 17 --

14            THE COURT:  It's about -- that you gave them in

15   discovery.

16            MR. LAMBERT:  I'm sorry, Your Honor.  What was

17   your question?  What 17 --

18            THE COURT:  Never mind.  Go ahead and argue.  Go

19   ahead and argue.  I'm sorry I interrupted you.

20            MR. LAMBERT:  Okay, no.  No problem, Your Honor.

21   And in our response to their document request which is

22   Exhibit A to my letter to the Court on this current dispute,

23   Docket 252, we expressly objected to proceeding on merits

24   discovery.  Private Space engaged in broad searches.  We

25   have not refused our priority to reproduce -- to produce any

Page 19

1    emails.  We in fact searched for responsive and relevant

2    emails and we found none that are responsive.  Now the

3    background to this dispute, Your Honor, is that Private

4    Space served its response to the existing document request

5    back in February.

6           After we served our responses to their discovery

7    requests, both document and interrogatories, we engaged in

8    some extensive back and forth with liquidators' counsel

9    which took several months and ended in June.  The last

10   correspondence was a letter that I sent to them on June the

11   3rd which was the same letter that contained our counter

12   proposed stipulation.  We never received a response from the

13   liquidators.

14          In the beginning of October, fully eight months

15   after we produced our documents in February was the first

16   time that the liquidators raised this question about the

17   lack of any emails in our production.  And the reason for

18   the lack of emails is not because we refused to search for

19   them, it is that we found none that were responsive to the

20   actual requests that were set forth in the liquidators' Rule

21   34 request or that were -- and/or that were relevant to

22   jurisdiction.

23          Among the documents that we produced back in

24   February -- again, ten months ago at this point -- were the

25   custodian agreement we had with our custodian HSBC Security

Page 20

1   Services Luxembourg, the various subscription agreements as

2   well as the transactional documents pursuant to which

3   Private Space actually invested in Sentry and Sigma.  We did

4   that through HSSL as our custodian.

5           Those documents included the instructions to HSSL

6   to subscribe and or redeem, the instructions that that HSSL

7   then passed on to the funds agent Citco to effectuate the

8   subscriptions or redemptions, and then the related

9   confirmations.  And I want to point out to Your Honor that

10  all of those transactions were conducted via fax, not email,

11  and there is no dispute whatsoever as to the fact, the

12  number, the amount, and the timing of any of Private Space's

13  investments in Sentry or Sigma.

14          Once they raised this issue of the lack of any

15  emails in our production, we engaged in a series of meet and

16  confers during October and early November, and during the

17  course of those meet and confers, I agreed that we would

18  again review the emails that we had found the first time out

19  and there were several hundred of them that we found that

20  related in some form to Fairfield -- our investment in

21  Fairfield, even though we concluded that none were

22  responsive to any of the actual requests that the

23  liquidators sent to Private Space.

24          And we also conducted -- you know, we looked at

25  the issue again, and again we found no responsive emails and

Page 21

1    what we did produce -- now I'll get to the question of the

2    samples that Ms. Singer referred to -- we are not taking the

3    position that samples are -- suffice, that we shouldn't have

4    to produce all of the emails because we produced some

5    samples.  We produce the samples so they could see for

6    themselves that the emails that we found were in fact

7    nonresponsive and irrelevant to jurisdiction.

8          Now, let me divide these emails that we found in

9    the samples into two buckets because they relate to two

10   different aspects of the case.  One of them is we found over

11   a hundred what I call weekly and monthly reports that

12   Fairfield Greenwich Group emailed to all of their customers.

13   These were simply -- and these were some of the samples we

14   sent them.  They were basically one- or two-page documents

15   which did nothing more than list the net asset value at the

16   time, the month to date performance of the particular fund

17   and the year-to-date performance of the particular fund.

18          Could we produce all several hundred?  Sure we

19   could, but there's no point to doing it because they're not

20   responsive to any outstanding document request.  Ms. Singer

21   pointed out that some of those emails may have emanated from

22   a Fairfield Greenwich email address in the United States.

23   Well, I submit that getting an email from an address in the

24   United States does not subject the recipient of that email

25   to jurisdiction.

Page 22

1            As for the split, the reference in those emails to

2    this split-strike conversion, yes, it was clearly known to

3    anyone in this business that that was a reference to BLMIS

4    and we in fact have offered to stipulate that at the time we

5    made our initial investments in Fairfield, we knew that it

6    was Fairfield's intention to reinvest the bulk of its money

7    in BLMIS.

8            I mean, that's one of the two jurisdictional

9    predicates that is set forth in Paragraph 20 of the fourth

10   amended complaint against Private Space Limited, but we

11   submit that that's an irrelevant consideration and that is

12   not a proper jurisdictional predicate for holding Private

13   Space in, just because we invested in a British Virgin

14   Islands fund that was going to reinvest its own money in

15   BLMIS, which was New York based.

16           So again, we produced the samples, not because

17   they were responsive, we think that that takes care of our

18   discovery burden; we contend that those samples of these

19   weekly and monthly reports which are irrelevant and

20   unresponsive to any of their requests, including the one

21   request that Ms. Singer referred to which is documents which

22   would, which would relate to decision that Private Space

23   made to subscribe to Sentry rather than a different fund.

24   Different fund is defined in their document request as Sigma

25   or Lambda, and none of those documents reflect why we

Page 23

1    invested in Sentry as opposed to Sigma.

2          The next bucket of documents, Your Honor, are any

3    emails that might have passed between Private Space and its

4    custodian, HSSL.  Now again, the searches that we undertook

5    were broad enough that they would have picked up any emails

6    between HSSL and Private Space.  The first thing that Your

7    Honor needs to be aware of is that HSSL acted solely as a

8    custodian for Private Space.  It made subscriptions or

9    redemptions on behalf of Private Space only when expressly

10   instructed to do so by Private Space.

11         It was not an investment advisor to Private Space

12   and had no input into Private Space's investment decisions.

13   That -- we swore to that in an answer to one of the

14   liquidators' interrogatories and in particular Interrogatory

15   No. 12, which is attached as Exhibit B to my letter to the

16   Court, Docket 252.  The only emails between HSSL and Private

17   Space that we found relating to Fairfield involved routine

18   statements of the numerous investments that HSSL was holding

19   for Private Space that HSSL regularly emailed to Private

20   Space, other than a few, you know, back office recordkeeping

21   emails typical of any custodian relationship.

22         Now Ms. Singer pointed out that we don't get to

23   choose just because they're trivial.  No, we don't get to

24   choose, but we also have no obligation to respond to

25   nonexistent requests.  The only request that I submit is

Page 24

1    even remotely responsive, remotely relevant here, is request

2    number two in their document request which reads, "Documents

3    and communications concerning your use of U.S. correspondent

4    banks to effect subscriptions in and receive redemptions

5    from Sentry, including but not limited to those concerning

6    the purpose of using U.S. correspondent banks."

7            Now, if there were any emails between HSSL and

8    Private Space relating to the use of a U.S. correspondent

9    bank, would they be relevant and should they be produced?

10   The answer is of course yes.  But we found no such emails

11   and nor did we expect to find any such emails, for the

12   simple reason that the need for a U.S. correspondent bank to

13   play a role when transactions are made using U.S. dollars

14   was well known to Private Space and did not require

15   communications on the subject with HSSL.

16           Furthermore, under the terms of its custodian

17   agreement with HSSL, which again we produced back in

18   February, the choice of correspondent banks in whatever

19   currency was solely the responsibility of HSSL.

20   Furthermore, the documents that Private Space did produce

21   back in February -- again almost 10 months ago -- explicitly

22   show that a U.S. correspondent bank was in fact designated

23   in Private Space's Sentry subscription agreements and in the

24   fact subscription transaction documents themselves that we

25   produced back in February.

Page 25

1              In short, the lack of any relevant and responsive

2    emails between Private Space and HSSL, its custodian, is

3    neither surprising nor suspicious.  It is undisputed and

4    already amply documented in our February document production

5    that a U.S. correspondent bank was in fact used to

6    effectuate transactions involving Private Space's investment

7    in Sentry.  Now if you go to these again, I want to turn

8    back to the other set of documents that we found relating to

9    HSSL and these were every week or every month and I think

10   sometimes it was weekly, sometimes it was monthly.

11             HSSL as our custodian would send us emails listing

12   all the positions they were holding for us.  Private Space

13   had extensive holdings in other funds and other investments

14   that had nothing to do with Fairfield.  These reports simply

15   list the various positions that HSSL were holding.  They

16   were sent by email.  We did send them two of the sample

17   cover emails.  Most of these emails have multiple

18   attachments having nothing whatsoever to do with HSSL.  All

19   they do is list the price of which we paid the stock and

20   what it was current valued at.

21             There's no qualitative analysis whatsoever

22   performed by HSSL and that's why I said that if we had to

23   produce these documents which were irrelevant, all they do

24   is list what our holdings were in Sentry or Sigma at any

25   given point in time and that's not in dispute.  If you look

Page 26

1    at our discovery responses, our interrogatory answers,

2    there's no dispute as to the timing of our investments, our

3    multiple investments in the Sentry and Sigma, how much they

4    were, when they were -- when they were made, and when they

5    were redeemed.

6            So it's an incredibly burdensome exercise to think

7    that we should have to produce hundreds of these periodic

8    position statements which 95 percent of them relate to other

9    holdings of Private Space.  So the answer to that is that we

10   found no responsive emails between Private Space and HSSL

11   that are responsive to any of the specific requests that

12   liquidators served on us.

13           Now let me turn to the one -- the point that Ms.

14   Singer made about third parties producing emails that -- in

15   which custodians of Private Space were involved that we did

16   not produce.  She referred to one that's attached to their

17   submission to the Court.  I think it's Docket 251, which is

18   an email from one of our custodians and what that email

19   simply does is that with respect to one of these

20   transactions in which we invested in Sentry -- again, we

21   produced all of the actual transaction documents which were

22   done by fax -- apparently, someone from Private Space got a

23   call from someone at Fairfield and saying that, you know, we

24   didn't get the money yet.

25           So we sent our custodian who made the investment

Page 27

1    on our behalf, said we just got this request.  We thought

2    the money had been invested and they did a -- sent a follow

3    up email to Fairfield Greenwich Group and they got the

4    glitch straightened out.  That document is not responsive to

5    any document request.  None of the emails in that chain have

6    U.S. addresses in them and so the fact that we didn't

7    produce them as not responsive that we withheld anything

8    that's relevant.

9             The fact that that investment was made and

10   confirmed is, documented in the fax documents that we

11   produced to the liquidators back in February.  So to sum up,

12   Your Honor, again, we produced our documents in good faith

13   back in February.  Eight months later, they apparently

14   noticed for the first time there were no emails.  The reason

15   for there was no emails is that we in good faith found that

16   there was none that were responsive to any of their requests

17   or that otherwise related to the jurisdictional issue, which

18   is the sole focus of the discovery that we're conducting at

19   the moment.  I'd be glad to answer any questions Your Honor

20   may have.

21             THE COURT:  I don't have them yet.  Ms. Singer,

22   you wish to add something?

23             MS. SINGER:  Just a few points, Your Honor.  One

24   is that several of counsel's arguments go to the

25   significance of the email contacts.  He can address these in

Page 28

1    the briefing after he's produced the documents to us.  And

2    again, we're not saying that mere receipt of an email is

3    always sufficient, but these emails contain information to

4    support jurisdiction like references to BLMIS.  Counsel

5    admits that the emails and the sample discussed the split-

6    strike strategy and that that was synonymous with Bernie

7    Madoff.

8            As I discussed in going through the examples,

9    that's a very important fact for personal jurisdiction under

10   the BLI case --

11           THE COURT:  Can you point me -- can you point me

12   to the emails that you have that say that?

13           MS. SINGER:  Sure.  So the email that discusses

14   the split-strike strategy that I referred to, that's Exhibit

15   E, which is Docket 251-6.  And the Bates number there is

16   PSL-0401, PSL-0403.  Again, that's synonymous with Bernie

17   Madoff and it's an important fact to establish personal

18   jurisdiction under Picard v. the Bureau of Labor Insurance

19   case.

20           I'd also like to go back to RFP 1.  The time to

21   object or to state an understanding of that RFP was in the

22   R&O.  I want to stress again, counsel read that RFP broadly.

23   He did not say he was taking a narrow view and would produce

24   no emails in response.  In addition, counsel talks about

25   email correspondence with HSSL.  That was also requested in

1    the RFPs, RFP 6 and RFP 15.

2           In addition, it's not just that these emails are

3    about wire transfers and confirmation.  Things like due

4    diligence, getting information about the investments.  These

5    all go to personal jurisdiction, not just straightforward

6    transaction receipts wire transfer requests, or

7    confirmations.

8           I'd be happy to answer any questions Your Honor

9    has.

10          THE COURT:  Mr. Lambert, any quick rebuttal on

11   that?

12          MR. LAMBERT:  Just briefly.  I couldn't disagree

13   more with what Ms. Singer said about Request No. 16 and

14   Request No. 15 as requesting emails between us and HSSL.

15   Yes, if there were emails that were otherwise responsive to

16   that, you know, we would have produced them.  But if you

17   look, it's very clear to me that we have no emails that we

18   have found that are responsive either to Request No. 6 or

19   No. 15.

20          And with respect to the email that refers to the

21   split-strike conversion, these were standardized reports.

22   It's a box grid in these reports that went out from FGG to

23   its customers.  As I said before, they weren't, you know,

24   tailored or customized.  They don't appear to be tailored or

25   customized to Private Space.  It's just a box and it says --

Page 30

1   I have a hard time reading the copy I have, but the

2   reference to split-strike conversion is simply a statement

3   that the investment strategy is "split-strike conversion."

4          That same box appears in each and every one of

5   these weekly and monthly reports.  There's no added value.

6   It's just a reference to split-strike conversion.  You know,

7   we contend that that this document is not responsive even if

8   it came from a U.S. email address because, you know, the --

9   getting an email, as I said before, getting a -- being a

10  recipient of an email and even if it did emanate from a US

11  email address, which I'm not too sure is the case, I mean

12  most of -- you know, all of our basically Private Space's

13  contacts were with FGG people who are based in Europe.

14          So even if they used an FGG U.S. email address to

15  send these reports out, I submit that that doesn't subject

16  the recipient of these reports to U.S. jurisdiction because

17  they received an email from a U.S. address and I think

18  that's all I have Your Honor.

19          THE COURT:  Very good.  I'm going to take a break.

20  Chambers.

21          (Recess)

22          MS. SINGER:  Your Honor, I think you're on mute.

23          THE COURT:  And I just got yelled at by everybody

24  else.  So federal rules of civil -- what I was going to say

25  is I basically just want to have a conversation.  But the

Page 31

1    first thing is I want to put the law out so we know what

2    we're dealing with.

3              "Unless otherwise limited by Court order" -- Mr.

4    Lambert, are you on with us?

5              MR. LAMBERT:  Yes I am, Your Honor.

6              THE COURT:  Okay.  I just didn't see you.

7              MR. LAMBERT:  (indiscernible).

8              THE COURT:  "Parties may obtain discovery

9    regarding any nonprivileged matter that is relevant to any

10   party's claim or defense and proportional to the needs of

11   the case considering the importance of the issues at stake

12   in the action, the amount and cost, the party's relative

13   access to the relevant information and the party's

14   resources, the importance of discovery in resolving the

15   issues, whether the burden or expense of the proposed

16   discovery outweighs its likely benefit.  Information within

17   the scope of discovery need not be admissible in evidence to

18   be discoverable."

19             Okay.  So there are a couple -- I see that there

20   are two things going on and you all correct me if I'm wrong.

21   It's first those summaries of the trades of Fairfield and

22   you gave them three representative samples.  Is that true,

23   Mr. Lambert?

24             MR. LAMBERT:  I'm sorry, Your Honor.  I gave them

25   samples of the types of emails that we found, okay --

1           THE COURT:  I'm not looking at the -- I'm not

2     talking about the emails right now.  I'm talking about those

3     three that are from Marco or (indiscernible).

4           MR. LAMBERT:  Those -- well, those are emails.

5     Those are emails --

6           THE COURT:  I understand they're emails but

7     they're the -- they're representative of the trades.  That

8     was the key word in the phrase, of the trades.

9           MR. LAMBERT:  No, they're not, Your Honor.

10    They're basically just weekly reports as to how the funds

11    were doing with respect to any of the specific investments.

12          THE COURT:  Okay.  All right.  All right.  No

13    matter, you're using -- I agree with you.  They're

14    statements.  Okay.  I don't need full ten years of

15    statements and neither do they, but I need more than three,

16    and so do they and you need more of a -- if you're going to

17    do a representative sampling, we need a real representative

18    sampling.

19          And if Marco (indiscernible) I never pronounce his

20    name right -- changes, we need a sample of when those

21    change.  So go out, you all can stipulate whatever.  You

22    don't need every week, every month for ten years but you

23    need more than three.  And it seems to me, you all can talk

24    and get that straightened out.

25          Now then let's go to the emails that were

Page 33

1    discovered that then we're not produced by you.  And I think

2    they're -- began the Judith Sterling ones in March of 2005

3    that were found in other documents that were produced by

4    other people.  If this was in response to investing in

5    Fairfield, those are critical.  So I need those also, any

6    emails like that from your client's email database including

7    all the data behind it.

8              Now, does that cover everything that's in

9    controversy today?

10             MR. LAMBERT:  Yeah, but Your Honor, just on that

11   last point, in investing in Fairfield, I mean the documents

12   pursuant to which our client invested in Fairfield were

13   conducted by fax.  We produced those documents back in

14   February.

15             THE COURT:  Okay.  Have those been produced and do

16   you have them?  And are there any emails in connection with,

17   for instance, the Judith Selene or whatever her last name

18   is, March of 2005 emails that talk about investing in

19   Fairfield?

20             MR. LAMBERT:  I don't believe so, but I can

21   certainly double check.  I mean the answer is that email,

22   that one email we're talking about was simply apparently

23   they didn't get the money when we thought they got the money

24   and we sent an email to HSSL, say, would you follow up on

25   this because you told us the investment was done.  I mean

Page 34

1    the fact that that investment was done is confirmed by the

2    emails --

3              THE COURT:  Then we want it from your client's

4    database, not from somebody else's database.

5              MR. LAMBERT:  Right, but that --

6              THE COURT:  -- someone else --

7              MR. LAMBERT:  I understand.  If there are any

8    other emails that relate to our investments, certainly can

9    make another search, Your Honor.

10             THE COURT:  Very good.  Now then.  Okay.  Ms.

11   Singer --

12             MS. SINGER:  Your Honor, to address your question

13   --

14             THE COURT:  Yes.

15             MS. SINGER:  To address your question as to

16   whether this covers everything, if I understand you

17   correctly, you're saying that for the reports we need to get

18   more and for all other emails that are just --

19             THE COURT:  -- don't want ten years of them, but

20   you want enough that gives a true representative sampling

21   and three is not enough for ten years.

22             MS. SINGER:  And for emails that are distinct from

23   that, we need all of them.  Is that your --

24             THE COURT:  Anything that talks about response to

25   investing in Fairfield, if there are any emails whatsoever,

1     they need to be produced.  Now, Mr. Lambert, I'm not going

2     to allow them to file a motion to compel yet, but I am going

3     to, if these things are not produced.  And if there's any

4     question, Mr. Lambert, you can give it to us in camera and

5     we can make a decision.

6          MR. LAMBERT:  Give it to you in what?

7          THE COURT:  In camera.

8          MR. LAMBERT:  Okay.

9          THE COURT:  So when do you want to come back and

10    report to me again?  February -- January the 18th?  That's a

11    month.  No, let's do February 15th.

12          MS. SINGER:  We propose as soon as is convenient

13    for Your Honor so that we can get the --

14          THE COURT:  Well, January the 18th is convenient.

15    All this is convenient.  I have a -- this is the day I set

16    aside for all of this.  Your Honor, I have no objection to

17    reporting back to Your Honor by that January date you gave

18    us.

19          THE COURT:  Okay.  And if you have any -- if you

20    have any question, you can just give it to Court in camera

21    and we'll take a look at it.

22          MR. LAMBERT:  What was that date again in January,

23    Your Honor?

24          THE COURT:  Eighteenth.  And I'm sorry, my

25    computer seems to be having a little bit of a delay, Mr.

Page 36

1    Lambert.

2            MR. LAMBERT:  Yes.  And it's also coming back very

3    staticky for some reason, but I can hear Your Honor.

4            THE COURT:  Very good.  Okay and --

5            MS. SINGER:  Thank you, Your Honor.

6            THE COURT:  Very good.  Thank you.

7

8            (Whereupon these proceedings were concluded at

9    11:20 AM)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 37

```
 1                 C E R T I F I C A T I O N

 2

 3       I, Sonya Ledanski Hyde, certified that the foregoing

 4   transcript is a true and accurate record of the proceedings.

 5

 6

 7

 8   Sonya Ledanski Hyde

 9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  December 21, 2022
```