# Exhibit 16

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 08-99000-cgm

4    - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    BERNARD L. MADOFF,

8

9              Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - x

11   Adv. Case No. 10-03635-cgm

12   - - - - - - - - - - - - - - - - - - - - - - - - - - x

13   Fairfield Sentry Limited (In Liquidation) et al,

14              Plaintiff,

15         v.

16   Union Bancaire Privee, UBP SA et al,

17              Defendants.

18   - - - - - - - - - - - - - - - - - - - - - - - - - - x

19   Adv. Case No. 10-03636-cgm

20   - - - - - - - - - - - - - - - - - - - - - - - - - - x

21   Fairfield Sentry Limited (In Liquidation) et al,

22              Plaintiff,

23         v.

24   Union Bancaire Privee, UBP SA et al,

25              Defendants.

Page 2

```
 1 - - - - - - - - - - - - - - - - - - - - - - - - - - - x
 2  Adv. Case No. 10-04285-cgm
 3 - - - - - - - - - - - - - - - - - - - - - - - - - - - x
 4  IRVING H. PICARD, Trustee for the Substantively
 5  Consolidated SIPA Liquidation of Bernard L. Madoff
 6  Investment Securities LLC and the Chapter 7 Estate of
 7  Bernard L. Madoff,
 8         Plaintiff,
 9    v.
10  UBS AG, UBS (Luxembourg) SA et al,
11         Defendants.
12 - - - - - - - - - - - - - - - - - - - - - - - - - - x
13  Adv. Case No. 10-05345-cgm
14 - - - - - - - - - - - - - - - - - - - - - - - - - - - x
15  IRVING H. PICARD, Trustee for the Substantively
16  Consolidated SIPA Liquidation of Bernard L. Madoff
17  Investment Securities LLC and the Chapter 7 Estate of
18  Bernard L. Madoff,
19         Plaintiff,
20    v.
21  Citibank, N.A. et al,
22         Defendants.
23 - - - - - - - - - - - - - - - - - - - - - - - - - - - x
24  Adv. Case No. 11-02572-cgm
25 - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

Page 3

```
 1  IRVING H. PICARD, Trustee for the Substantively
 2  Consolidated SIPA Liquidation of Bernard L. Madoff
 3  Investment Securities LLC and the Chapter 7 Estate of
 4  Bernard L. Madoff,
 5         Plaintiff,
 6    v.
 7  Korea Exchange Bank, Individually And As Trustee,
 8         Defendants.
 9 - - - - - - - - - - - - - - - - - - - - - - - - - - - x
10  Adv. Case No. 11-02573-cgm
11 - - - - - - - - - - - - - - - - - - - - - - - - - - - x
12  IRVING H. PICARD, Trustee for the Substantively
13  Consolidated SIPA Liquidation of Bernard L. Madoff
14  Investment Securities LLC and the Chapter 7 Estate of
15  Bernard L. Madoff,
16         Plaintiff,
17    v.
18  The Sumitomo Trust and Banking Co., Ltd.,
19         Defendants.
20 - - - - - - - - - - - - - - - - - - - - - - - - - - - x
21
22
23         United States Bankruptcy Court
24         One Bowling Green
25         New York, NY  10004
```

Page 4

```
 1         September 14, 2022
 2         10:02 AM
 3
 4
 5  B E F O R E :
 6  HON CECELIA G. MORRIS
 7  U.S. BANKRUPTCY JUDGE
 8
 9  ECRO:  UNKNOWN
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1  Adversary proceeding: 10-03635-cgm Fairfield Sentry Limited
 2  (In Liquidation) et al v. Union Bancaire Privee, UBP SA et
 3  al
 4  Doc# 939 Notice of Hearing to consider the Letter Requesting
 5  a Pre-Motion Discovery Conference Filed by David Elsberg on
 6  behalf of Fairfield Sentry Limited (In Liquidation),
 7  Fairfield Sigma Limited (In Liquidation), Kenneth Krys,
 8  solely in his capacity as Foreign Representative and
 9  Liquidator thereof, Greig Mitchell, solely in his capacity
10  as Foreign Representative and Liquidator thereof (related
11  document(s)938) filed by Clerk of Court, United States
12  Bankruptcy Court, SDNY. with hearing to be held on
13  10/19/2022 at 10:00 AM at Videoconference (ZoomGov) (CGM)
14
15  Doc. #938 Letter Requesting a Pre-Motion Discovery
16  Conference Filed by David Elsberg on behalf of Fairfield
17  Sentry Limited (In Liquidation), Fairfield Sigma Limited (In
18  Liquidation), Kenneth Krys, solely in his capacity as
19  Foreign Representative and Liquidator thereof, Greig
20  Mitchell, solely in his capacity as Foreign Representative
21  and Liquidator thereof. (Attachments: # 1 Exhibit A - Email
22  Correspondence (2022.05.06 2022.07.14) # 2 Exhibit B -
23  Plaintiffs' First Request for Production Of Documents to
24  Dexia BIL # 3 Exhibit C - Plaintiffs' Rule 30(b)(6) Notice
25  to Dexia BIL (2022.07.21) # 4 Exhibit D - Email
```

2 (Pages 2 - 5)

Page 6

1 Correspondence (2022.07.21 2022.08.05) # 5 Exhibit E -

2 Plaintiffs' Amended Rule 30(b)(6) Notice to Dexia BIL

3 (2022.07.28))(Elsberg, David)

4

5 Doc# 941 Notice of Hearing to consider the Letter Requesting

6 a Pre-Motion Discovery Conference Filed by Jeff E. Butler on

7 behalf of Dexia Banque International a Luxembourg (related

8 document(s)940) filed by Clerk of Court, United States

9 Bankruptcy Court, SDNY. with hearing to be held on 9/14/2022

10 at 10:00 AM at Videoconference (ZoomGov) (CGM)

11

12 Doc. #940 Letter Requesting a Pre-Motion Discovery

13 Conference Filed by Jeff E. Butler on behalf of Dexia Banque

14 International a Luxembourg. (Attachments: # 1 Exhibit 1,

15 Email from Nemetz # 2 Exhibit 2, Email from Butler # 3

16 Exhibit 3, Email from Nemetz # 4 Exhibit 4, Amended

17 Deposition Notice)(Butler, Jeff)

18

19 Adversary proceeding: 10-03636-cgm Fairfield Sentry Limited

20 ( In Liquidation) et al v. Union Bancaire Privee, UBP SA et

21 al Doc# 1005 Notice of Hearing to consider the Letter

22 Requesting a Pre-Motion Discovery Conference Filed by David

23 Elsberg on behalf of Fairfield Lambda Limited (In

24 Liquidation), Fairfield Sentry Limited (In Liquidation),

25 Fairfield Sigma Limited (In Liquidation), Greig Mitchell,

Page 7

1 solely in his capacity as Foreign Representative and

2 Liquidator thereof, Kenneth Krys, solely in his capacity as

3 Foreign Representative and Liquidator thereof. (related

4 document(s)1004) filed by Clerk of Court, United States

5 Bankruptcy Court, SDNY. with hearing to be held on

6 10/19/2022 at 10:00 AM at Videoconference (ZoomGov) (CGM)

7

8 Doc. #1004 Letter Requesting a Pre-Motion Discovery

9 Conference Filed by David Elsberg on behalf of Fairfield

10 Lambda Limited (In Liquidation), Fairfield Sentry Limited

11 (In Liquidation), Fairfield Sigma Limited (In Liquidation),

12 Greig Mitchell, solely in his capacity as Foreign

13 Representative and Liquidator thereof, Kenneth Krys, solely

14 in his capacity as Foreign Representative and Liquidator

15 thereof. (Attachments: # 1 Exhibit A - Email Correspondence

16 (2022.05.06 2022.07.14) # 2 Exhibit B - Plaintiffs' First

17 Request For Production Of Documents to Dexia BIL # 3 Exhibit

18 C - Plaintiffs' Rule 30(b)(6) Notice to Dexia BIL

19 (2022.07.21) # 4 Exhibit D - Email Correspondence

20 (2022.07.21 2022.08.05) # 5 Exhibit E - Plaintiffs' Amended

21 Rule 30(b)(6) Notice to Dexia BIL (2022.07.28))(Elsberg,

22 David)

23

24 Doc# 1007 Notice of Hearing to consider the Letter

25 Requesting a Pre-Motion Discovery Conference Filed by Jeff

Page 8

1 E. Butler on behalf of Dexia Banque International a

2 Luxembourg. (related document(s)1006) filed by Clerk of

3 Court, United States Bankruptcy Court, SDNY. with hearing to

4 be held on 9/14/2022 at 10:00 AM at Videoconference

5 (ZoomGov) (CGM)

6

7 Doc. #1006 Letter Requesting a Pre-Motion Discovery

8 Conference Filed by Jeff E. Butler on behalf of Dexia Banque

9 International a Luxembourg. (Attachments: # 1 Exhibit 1,

10 Email from Nemetz # 2 Exhibit 2, Email from Butler # 3

11 Exhibit 3, Email from Nemetz # 4 Exhibit 4, Amended

12 Deposition Notice)(Butler, Jeff)

13

14 Adversary proceeding: 10-04285-cgm Irving H. Picard, Trustee

15 for the Liquidation of B v. UBS AG, UBS (Luxembourg) SA et

16 al

17 Doc# 290 Motion to Dismiss Adversary Proceeding (Dismiss

18 Second Amended Complaint, filed by Anthony L. Paccione on

19 behalf of Access International Advisors LLC, Access

20 International Advisors Ltd., Access Management Luxembourg SA

21 (f/k/a Access International Advisors Luxembourg) SA) as

22 represented by its Liquidator Maitre Ferdinand Entringer,

23 Access Partners SA as represented by its Liquidator Maitre

24 Ferdinand Entringer, Claudine Magon de la Villehuchet (a/k/a

25 Claudine de la Villehuchet) in her capacity as Executrix

Page 9

1 under the Will of Thierry Magon de la Villehuchet (a/k/a

2 Rene Thierry de la Villehuchet), Claudine Magon de la

3 Villehuchet (a/k/a Claudine de la Villehuchet) individually

4 as the sole beneficiary under the Will of Thierry Magon de

5 la Villehuchet (a/k/a Rene Thierry de la Villehuchet),

6 Groupement Financier Ltd., Patrick Littaye.

7

8 Doc# 295 Motion to Dismiss Case filed by Cathy M. Liu on

9 behalf of Theodore Dumbauld.

10

11 Doc# 302 Motion to Dismiss Adversary Proceeding / Notice of

12 UBS Defendants Motion to Dismiss Second Amended Complaint

13 (related document(s)274) filed by Marshall R. King on behalf

14 of UBS AG, UBS EUROPE SE (f/k/a UBS (LUXEMBOURG) SA, UBS

15 Fund Services (Luxembourg) SA, UBS Third Party Management

16 Company SA. with hearing to be held on 9/14/2022 at 10:00 AM

17 at Videoconference (ZoomGov) (CGM) Responses due by

18 6/17/2022

19

20 Doc# 271 Notice of Adjournment of Hearing RE: Hearing to

21 consider the Letter to Chambers Requesting Addition of

22 Adversary Proceeding to Omnibus Hearing on January 19, 2022

23 Filed by Brett S. Moore on behalf of Luxalpha SICAV as

24 represented by its Liquidators Maitre Alain Rukavina and

25 Paul LaPlume (related document(s)269) filed by Clerk of

3 (Pages 6 - 9)

Page 10

1  Court, United States Bankruptcy Court, SDNY; hearing held

2  and adjourned to 6/15/2022 at 10:00 AM at Videoconference

3  (ZoomGov) (CGM).

4

5  Doc# 307 Opposition /Trustee's Memorandum of Law in

6  Opposition to Defendants' Motions to Dismiss the Second

7  Amended Complaint (related document(s)295, 296, 283, 290,

8  281) filed by Oren Warshavsky on behalf of Irving H. Picard,

9  Trustee for the Liquidation of Bernard L. Madoff Investment

10  Securities LLC, and Bernard L. Madoff.

11

12  Adversary proceeding: 10-05345-cgm Irving H. Picard, Esq.,

13  Trustee for the Substantive v. Citibank, N.A. et al

14  Doc# 222 Motion to Dismiss Adversary Proceeding filed by

15  Carmine Boccuzzi on behalf of Citibank, N.A., Citicorp North

16  America, Inc., Citigroup Global Markets Limited. with

17  hearing to be held on 9/7/2022 (check with court for

18  location) Responses due by 7/1/2022,

19

20  Doc# 231 Opposition /Trustee's Memorandum of Law in

21  Opposition to Defendants' Motion to Dismiss (related

22  document(s)222) filed by David J. Sheehan on behalf of

23  Irving H. Picard, Esq., Trustee for the Substantively

24  Consolidated SIPA Liquidation of Bernard L. Madoff

25  Investment Securities LLC, and the Estate of Bernard L.

Page 11

1  Madoff.

2

3  Doc# 234 Reply Memorandum of Law in Support of Citi

4  Defendants' Motion to Dismiss (related document(s)222) filed

5  by Carmine Boccuzzi on behalf of Citibank, N.A., Citicorp

6  North America, Inc., Citigroup Global Markets Limited.

7

8  Adversary proceeding: 11-02572-cgm Irving H. Picard, Trustee

9  for the Liquidation of B v. Korea Exchange Bank,

10  Individually And As Trustee F

11  Doc# 140 Opposition /Trustee's Memorandum of Law in

12  Opposition to Defendant Korea Exchange Bank's Motion to

13  Dismiss the Complaint (related document(s)135) filed by Eric

14  R Fish on behalf of Irving H. Picard, Trustee for the

15  Liquidation of Bernard L. Madoff Investment Securities LLC,

16  and Bernard L. Madoff.

17

18  Doc# 145 Reply to Motion filed by Richard A. Cirillo on

19  behalf of Korea Exchange Bank, Individually and As Trustee

20  For Korea Global All Asset Trust I-1, And For Tams Rainbow

21  Trust III.

22

23  Doc# 144 Amended Motion to Dismiss Adversary Proceeding

24  filed by Richard A. Cirillo on behalf of Korea Exchange

25  Bank, Individually and As Trustee For Korea Global All Asset

Page 12

1  Trust I-1, And For Tams Rainbow Trust III. with hearing to

2  be held on 9/7/2022 at 10:00 AM at Videoconference (ZoomGov)

3  (CGM) (Cirillo, Richard)

4

5  Adversary proceeding: 11-02573-cgm Irving H. Picard, Trustee

6  for the Liquidation of B v. The Sumitomo Trust and Banking

7  Co., Ltd.

8

9  Doc# 119 Stipulation and Order Signed on 5/5/2022 To Amend

10  Briefing Schedule And Adjourn Argument Date to 9/14/2022 at

11  10:00 AM at Videoconference (ZoomGov) (CGM)

12

13

14

15  Transcribed by:  Sonya Ledanski Hyde

16

17

18

19

20

21

22

23

24

25

Page 13

1  A P P E A R A N C E S :

2

3  BAKER HOSTETLER LLP

4      Attorney for U.S. Trustee

5      45 Rockefeller Plaza

6      New York, NY 10111

7

8  BY:  MICHELLE R. USITALO

9      OREN WARSHAVSKY

10      JESSICA H. FERNANDEZ

11      VICTORIA L. STORK

12      ERIC R. FISH

13

14  GIBSON, DUNN CRUTCHER, LLP

15      Attorney for UBS Defendants

16      200 Park Avenue

17      New York, NY 10166

18

19  BY:  MARSHALL R. KING

20

21  CLIFFORD CHANCE US LLP

22      Attorney for Defendant, Banque International a

23      Luxembourg (BIL)

24      31 W 52nd ST

25      New York, NY 10019

4 (Pages 10 - 13)

Page 14

```
1
2  BY: JEFF BUTLER
3
4  SELENDY GAY ELSBERG PLLC
5      Attorneys for Various Fairfield Entities
6      1290 Avenue of the Americas
7      New York, NY 10104
8
9  BY:  DAVID ELSBERG
10     AMY NEMETZ
11
12 CIRILLO LAW OFFICE
13     Attorney for Korea Exchange Bank
14     246 E 33rd St
15     New York, NY 10016
16
17 BY:  RICHARD A. CIRILLO
18
19 BECKER, GLYNN, MUFFLY, CHASSIN, HOSINSKI LLP
20     Attorney for The Sumitomo Trust and Banking Co., Ltd.
21     299 Park Avenue
22     New York, NY 10171
23
24 BY:  MICHAEL ZEB LANDSMAN
25
```

Page 15

```
1
2  KATTEN MUCHIN ROSENAMN LLP
3      Attorneys for Access Defendants
4      50 Rockefeller Plaza
5      New York, NY 10020
6
7  BY: ANTHONY L. PACCIONE
8
9  SHER TREMONTE LLP
10     Attorney for Theodore Dumbauld
11     80 Broad Street
12     Suite 1301
13     New York, NY 10009
14
15 BY:  ROBERT KNUTS
16
17 CLEARY GOTTLIEB STEEN & HAMILTON LLP
18     Attorney for Citigroup Global Markets Limited, Citibank
19     NA, and Citicorp North America Inc.
20     One Liberty Plaza
21     New York, NY 10006
22
23 BY: CARMINE BOCCUZZI
24
25
```

Page 16

```
1              P R O C E E D I N G S
2       THE COURT:  Good morning, everyone.  I have a
3  letter requesting a discovery conference and this is in
4  Adversary Proceeding 10-03635 and 10-03636.  This is
5  Fairfield Sentry v. Union Bancaire Privee and Fairfield
6  Sentry v. Adler and Company Private Bank AG.  State your
7  name and affiliation.
8       MR. BUTLER:  Good morning, Your Honor.  It's Jeff
9  Butler from Clifford Chance, representing the Defendant --
10 one of the Defendants in this case, Bank International a
11 Luxembourg or BIL.
12      THE COURT:  Okay, hold on for me a minute.  Okay.
13 So, that's the union bank, is that what it is?
14      MR. BUTLER:  No, Your Honor.  There are dozens of
15 defendants in these two cases.  We're just one of the many.
16      THE COURT:  Okay.
17      MR. BUTLER:  And it's called in the caption Dexia
18 Banque International a Luxembourg, but the name was changed
19 many years ago to BIL.
20      THE COURT:  Hold on just a second.  Our recording
21 has not picked up, so you may have to repeat some
22 information.
23      MR. BUTLER:  Sure.
24      THE COURT:  But while they're doing that, tell me
25 which case number you're on.  03635?
```

Page 17

```
1       MR. BUTLER:  3635 and 3636, Your Honor.
2       THE COURT:  Oh, so you're on both?
3       MR. BUTLER:  We are Defendants in both of the
4  cases, correct.
5       THE COURT:  Okay.  Hold on just a second until we
6  find out about the sound.  We do have backup sound, so it's
7  not -- backup recordings, just so you know.  Hold on, let me
8  turn a light out.  Just a second.  Who would've thought two
9  years ago we'd be light and sound people?  Good grief.
10 Okay, we'll just keep going with what we've got because we
11 do have backup.
12      So, this is -- and who for Fairfield?
13      MR. ELSBERG:  Your Honor, this is David Elsberg
14 for the liquidators.  And Id' like to ask my associate, Amy
15 Nemetz, to introduce herself.  Because with your permission,
16 my associate Ms. Nemetz will be addressing the Court today.
17      THE COURT:  I am delighted to have always young
18 associates, so welcome.  State your name for the record,
19 please.
20      MS. NEMETZ:  Amy Nemetz for the liquidators, Your
21 Honor.
22      THE COURT:  Very good.  Now, I have some
23 questions, but let's go with what you all have to say to me
24 first.
25      MS. NEMETZ:  Certainly, Your Honor.
```

5 (Pages 14 - 17)

Page 18

1    MR. BUTLER:  Sure, Your Honor.

2    MS. NEMETZ:  Oh.  Which letters would you like the

3  parties to address first?  Because there are two.

4    THE COURT:  Okay.  All right.  You tell me.

5    MS. NEMETZ:  Jeff, would you mind if I go first?

6    MR. BUTLER:  Of course.  Please.

7    MS. NEMETZ:  Thank you.

8    THE COURT:  His name is Mr. Butler on the record.

9    MS. NEMETZ:  Yes, Your Honor.

10    THE COURT:  Okay.

11    MS. NEMETZ:  Your Honor, the liquidators

12  respectfully request that you compel counsel for Defendant

13  BIL, which is Banque International a Luxembourg, to explain

14  why relevant email communications were lost.  We only

15  recently learned that BIL has no electronically stored

16  communications.  The liquidators' document requests, which

17  were served in September 2021, explicitly asked for these

18  communications and we had two Rule 26(f) conferences with

19  BIL's counsel, on October 1st and October 14, 2021.  At no

20  point did BIL's counsel tell us that it did not have

21  custodial emails.

22    This spring, BIL said that it had substantially

23  completed its production of documents for jurisdictional

24  discovery.  That production was 74 pages of scanned hardcopy

25  files.  We asked, what about email discovery?

Page 19

1    After following up on our proposed email search a

2  number of times, after six weeks, BIL's counsel on the

3  deadline for substantially completing jurisdictional

4  discovery told us for the first time that BIL does not have

5  access to emails.  We were surprised, Your Honor.  Dozens of

6  other defendants in these actions, including Luxembourg

7  entities like BIL, managed to preserve, search for and

8  product many electronically stored communications.

9    We asked BIL's counsel that same day, June 30th,

10  what happened to the emails and why weren't they preserved?

11  BIL's counsel did not respond to us.  As you can see in

12  Exhibits A and D to the liquidators' office 11th letter, we

13  asked BIL's counsel five separate times in writing on June

14  30th, July 12th, July 14th, July 28th and August 5th to just

15  tell us what happened to the emails.  Your Honor can also

16  see from those email chains that BIL's counsel either

17  ignored or sidestepped our requests.  They're simply

18  refusing to tell us the facts.

19    We also served a Rule 30(b)(6) notice so that we

20  could ask a BIL witness the same questions about document

21  preservation that BIL's counsel was refusing to answer.

22  BIL's counsel didn't serve written objections or responses

23  to the proposed deposition topics or meet and confer with us

24  about scheduling or logistics.  Instead, BIL is here today

25  seeking a protective order that would excuse it from having

Page 20

1  to disclose anything about document preservation.

2    Even after the Court set this hearing, we tried to

3  communicate with BIL's counsel and resolve this email issue.

4  On August 24th, we asked BIL's counsel if he had been in

5  touch with custodians or anyone else at BIL who

6  might know of any other place where relevant email

7  communications were saved.  He said he didn't know.  He

8  promised he would get back to us a week later.  But as of

9  two weeks after our discussion on September 6th, he said he

10  still didn't know.

11    Perhaps BIL's counsel is willing and able to

12  provide this information today but until that happens, the

13  liquidators are stuck.  BIL's repeated stonewalling and

14  refusal to engage with us on these issues is, in our view,

15  inconsistent with its obligations under the federal rules of

16  civil procedure and with the standards of conduct that Your

17  Honor has explained are expected by parties appearing before

18  this Court, and the treatment that we are getting is causing

19  serious prejudice to the liquidators.

20    BIL's failure to preserve electronic

21  communications in the first place prejudices our ability to

22  respond to its motion to dismiss.  BIL has argued in that

23  motion that the liquidators failed to allege specific

24  contacts between it and the United States, but evidence of

25  those contacts is precisely what we are after.  The day-to-

Page 21

1  day emails, chats, meeting invitations, the paper trail that

2  should have been left behind showing that BIL directed its

3  activities to the United States.

4    In the Picard litigation, Your Honor recently held

5  that alleged email communications between a foreign Sitco

6  customer Defendant, on the one hand, and BLMIS and FGG and

7  the United States on the other was a relevant jurisdictional

8  contact.  That decision can be found at Adversary Proceeding

9  Number 12-1693 Docket 21830 at Page 7.

10    BIL's document production to date, however,

11  includes zero communications or diary entries of this type,

12  which the Court has held constitutes critical jurisdictional

13  evidence.  And that is despite the fact, in our view, that

14  Your Honor has repeated ordered that the liquidators need

15  discovery on these issues, an order which Judge Preska

16  recently affirmed in full.

17    Separately, BIL's refusal to disclose the

18  circumstances under which it lost these emails prejudices

19  the liquidators' ability to seek relief under Federal Rule

20  of Civil Procedure 37, which addresses potential spoliation.

21  Rule 37 is highly fact-specific.  It asks whether the

22  failure to preserve occurred when litigation was reasonably

23  foreseeable and whether the party took reasonable step under

24  the circumstances.  The relief is also highly fact-specific.

25  If evidence was destroyed intentionally, then the

6 (Pages 18 - 21)

Page 22

1 liquidators might be entitled to an adverse inference. But
2 even if the evidence was destroyed accidentally, the
3 liquidators would be entitled to different curative relief
4 such as, for example, striking certain arguments from BIL's
5 motion to dismiss.
6       Under similar circumstances, other courts have
7 ordered disclosure of these facts. A 2016 District of
8 Connection decision called Bagley v. Yale University at 318
9 F.R.D. 234 is very instructive. There the court identified
10 specific factual questions related to litigation holds and
11 document retention policies, and then compelled the
12 defendant to provide information about its document
13 preservation efforts to the plaintiff so that the plaintiff
14 could evaluate its position and whether relief was necessary
15 under Rule 37.
16       That is precisely what the liquidators are seeking
17 Your Honor's assistance with today. The point is we need
18 the facts about BIL's preservation efforts in order to
19 navigate this issue. Only BIL has those facts, and BIL is
20 refusing to disclose that information to us and ultimately
21 to this Court.
22       Moving on to BIL's responses to our positions, BIL
23 has raised three main points, and I'll address each one in
24 turn. First, BIL says that our spoliation concerns are
25 hypothetical. They are not hypothetical, Your Honor. BIL's

Page 23

1 employees engaged in email communications during the
2 relevant timeframe, and BIL's August 12th letter to this
3 Court says, "It does not have" those emails. That is the
4 definition of potential spoliation.
5       Moreover, the limited facts that BIL has offered
6 about its document preservation efforts strongly suggests
7 that it did not act reasonably under the circumstances. For
8 example, if you turn to Page 2 of Exhibit A that was
9 submitted with the liquidators' letter, Mr. Butler's July
10 12th email says that BIL started preserving evidence in late
11 2010. Late 2010 was almost two years after the whole world
12 learned that BLMIS was fraud. There is case law for the
13 proposition that revelation of a major fraud usually
14 triggers litigation and puts everyone potentially involved
15 on notice that they have to preserve relevant evidence, and
16 some of those cases are cited in Footnote 2 of our August
17 11th letter.
18       In our view, Your Honor, disclosure of the largest
19 Ponzi scheme in history, which included Fairfield Sentry as
20 a feeder fund, and we know that BIL redeemed over $50
21 million from Sentry alone, should have raised a very big
22 flag to BIL to keep everything related to BLMIS, including
23 emails.
24       Second, BIL argues that it has already produced
25 all of the relevant emails that existed by giving us its

Page 24

1 hardcopy transaction file. The 74 pages in that transaction
2 file contain 25 emails. They appear to be incomplete,
3 missing pages and attachments, and for obvious reasons, they
4 don't have metadata associated with them the way that
5 electronic discovery would. So, we can't see, for example,
6 whether anyone was blind-copied on the communications.
7       More broadly, BIL cannot back up its assumption
8 that its employees printed every email that we've asked for
9 in discovery. BIL's production doesn't have communications
10 with BLMIS, which the liquidators sought in Request Number
11 14, or communications about marketing and investment in the
12 funds, which the liquidators sought in Request Number 6.
13 BIL's counsel has given us no reason to believe that these
14 25 printed emails were the only communications ever
15 exchanged that could be relevant to personal jurisdiction
16 issues.
17       Third, BIL argues that the information we're
18 seeking about the preservation of evidence relevant to
19 personal jurisdiction is somehow outside the scope of
20 jurisdictional discovery. Taken literally, BIL's argument
21 means that it could destroy all evidence of contacts with
22 the United States, file a motion to dismiss for lack of
23 personal jurisdiction and never have to disclose what
24 happened to that evidence until the case somehow reaches the
25 merits. More simply, BIL is just wrong. In our view, Your

Page 25

1 Honor has been very clear that the liquidators are entitled
2 to all discovery permissible under the Federal Rules of
3 Civil Procedure. Rule 37 clearly encompasses the
4 information that we are asking for about document
5 preservation efforts. If BIL requires yet another order
6 authorizing this discovery, however, we see no reason that
7 the Court cannot enter that today.
8       My final point, Your Honor, is to respond to BIL's
9 letter seeking a protective order. Today, the liquidators
10 are not asking this Court to compel a Rule 30(b)(6)
11 deposition. In our view, if Your Honor orders BIL's counsel
12 to answer our questions about document preservation, and if
13 he does so completely, both sides can possibly avoid taking
14 a 30(b)(6) deposition at all and everyone can avoid
15 litigating whether or not a protective order should be in
16 place.
17       For the record, the liquidators don't believe
18 BIL's request for a protective order has any merit. First,
19 BIL failed to meet and confer with us about the scope of the
20 deposition we requested. That violates the face of Rule
21 26(c) under which it is seeking a protective order, as well
22 as Local Rule 7007-1 and Your Honor's individual practices.
23 Second, BIL has made no attempt to show good cause in the
24 form of undue burden or expense from preparing a single
25 witness to testify on a limited number of topics. Finally,

7 (Pages 22 - 25)

Page 26

1  the sole basis on which BIL seeks this protective order, its
2  scope argument, is nonsensical for the reasons I've already
3  explained.
4       In sum, the liquidators are seeking the Court's
5  intervention so that we all can determine what happened to
6  BIL's emails and resolve the resulting prejudice to the
7  liquidators. We just want the facts, Your Honor. We want
8  the facts about BIL's contacts with the United States so
9  that we can address personal jurisdiction, and we want the
10 facts about BIL's failure to preserve emails so that we can
11 address any potential spoliation issues and, if necessary,
12 seek additional relief from the Court. At this point, I
13 would be happy to answer any questions that the Court has.
14      THE COURT: I think you answered my questions
15 without my asking. Mr. Butler?
16      MR. BUTLER: Good morning, Your Honor. First, a
17 little bit of background. In this case there's only one
18 redemption that's at issue with respect to my client. It's
19 a $3.9 million redemption that occurred in August of 2007.
20 It's not $50 million that's at issue in this case for my
21 client.
22      THE COURT: I think she said 15, didn't she?
23      MS. NEMETZ: I said 50, Your Honor.
24      THE COURT: Oh, I'm sorry. I apologize. Okay.
25      MR. BUTLER: The practice at my client, which is a

Page 27

1  bank in Luxembourg, was to keep all documents including
2  email and correspondence in transaction-specific files and
3  those files were clearly preserved for this redemption
4  because we've produced those files as well as the
5  transaction files for the preceding subscription, which was
6  $3.3 million. And as Ms. Nemetz pointed out, there are
7  about 25 emails in those files, which is about, Your Honor,
8  what one would expect because this was an execution-only
9  transaction for BIL. They were merely getting instructions
10 from a client and executing those instructions. There was
11 not -- there's no reason to believe there would be a lot of
12 discussion about that, there's no reason to believe there
13 would be a lot of email traffic concerning that kind of
14 transaction.
15      So, as I said, we've produced the transaction
16 files, we've actually produced a total of about 500 pages of
17 documents for jurisdictional discovery. In this motion --
18 and I thought this was the focus on this motion -- the
19 liquidators are seeking a broad Rule 30(b)(6) deposition
20 into document preservation efforts back at the time this
21 case was originally filed in late 2010. Now, that kind of
22 deposition is relatively normal in merits discovery. And if
23 this were merits discovery, I wouldn't be here before Your
24 Honor. But this is jurisdictional discovery that is really
25 supposed to be focused on contacts between my client and the

Page 28

1  United States as they relate to the specific subject matter
2  at issue in this case, which is only one redemption in
3  August of 2007.
4       So, our position is that, number one, this type of
5  deposition is just not appropriate for jurisdictional
6  discovery because it's broadly inquiring into events that
7  occurred either in 2008, a year after the redemption, or in
8  2010 when this action --
9       THE COURT: Mr. Butler, she -- I think Ms. Nemetz
10 was very clear. Right now, she's not asking for that.
11 She's asking for the email trail in order to be able to, if
12 necessarily, have that deposition. Am I correct, Ms.
13 Nemetz, or did I hear that wrong too?
14      MS. NEMETZ: That's partially correct, Your Honor.
15 We either need the email trail or, if the email trail was
16 not preserved, we need to understand the circumstances that
17 led to that.
18      THE COURT: Well, that's -- that might be for
19 another day.
20      MS. NEMETZ: Yeah.
21      THE COURT: Mr. Butler, go ahead.
22      MR. BUTLER: Well, my response to your question,
23 Your Honor, would be that we believe we have produced the
24 email trail that exists. We're not aware of a -- you know -
25 -

Page 29

1       THE COURT: Well, you produced hardcopy. Where's
2  the -- where's the data on those emails? You don't get it -
3  - you don't get it in hardcopy, Mr. Butler.
4       MR. BUTLER: Electronic -- we don't have --
5       THE COURT: And I know that.
6       MR. BUTLER: Yeah. I'm sorry, Your Honor, I
7  didn't --
8       THE COURT: Well, then if you don't have it, then
9  you do need a 30(b)(6). You do need somebody testifying to
10 where it is and what's going on. If you can't produce it,
11 then you need somebody testifying to it. You need a
12 deposition on it.
13      MR. BUTLER: Your Honor, we -- it is definitely
14 true that we don't have electronic copies of all the emails.
15 They were only stored in the equivalent of hardcopy form. I
16 mean, I think I disclosed that information to the
17 liquidator. They're aware of it. The -- and so, I mean, we
18 can't produce what we don't have, is my point.
19      THE COURT: Well, you say you can't produce what
20 you don't have. Then you have to have someone testify to
21 that, and the lawyer can't do that, is what you're also
22 saying.
23      MR. BUTLER: I fully agree that the lawyer can't
24 do that, and I appreciate that comment, Your Honor. I just
25 -- I don't think that it's appropriate in jurisdictional

8 (Pages 26 - 29)

Page 30

1 discovery, which is supposed to be narrow, to go off on a
2 frolic and detour about a possible spoliation argument when
3 there's not even a reason to believe that any significant
4 document is missing because of the nature of this case and
5 the nature of the transaction at issue.  It's a very simple
6 transaction, Your Honor.  You wouldn't expect there to be a
7 lot of email.
8        THE COURT:  Okay, but wait, Mr. Butler.  But, Ms.
9 Nemetz, you said that the emails were not complete.  Can you
10 give us an example?
11       MS. NEMETZ:  Yes, Your Honor.  There are emails
12 that BIL has produced in hardcopy where --
13       THE COURT:  Well, give us -- give us one example
14 so we can all understand what you're talking about.
15       MS. NEMETZ:  Yes.  Let me just bull up the Bates
16 Number so that I can be as specific as possible.
17       THE COURT:  Okay.
18       MS. NEMETZ:  So, one example is the document
19 produced at BIL005 through 007.  That's a printed email
20 chain that shows on its face that it attached scanned
21 hardcopy files to it.  It's not clear from the production
22 whether those attachments were also produced.
23       THE COURT:  Okay.  All right, Mr. Butler, that's -
24 - I -- where are those attachments to those emails?
25       MR. BUTLER:  That's an answer I don't have, Your

Page 31

1 Honor, and I don't think anyone -- that my client has an
2 answer to that.  We're talking about emails that were sent -
3 -
4        THE COURT:  You're talking to someone -- you're
5 talking to someone that's totally familiar with electronic
6 data.  So --
7        MR. BUTLER:  I understand, Your Honor.
8        THE COURT:  So, let's be clear about that.  I'm
9 sort of in a rock and a hard place, because when I listened
10 to Ms. Nemetz it was like, make sure that you have that
11 information too.  And then you're saying that information
12 doesn't exist.  So, then that does instantly equal having a
13 Rule 30(b)(6) deposition.  So --
14       MR. BUTLER:  Your Honor, respectfully, I don't
15 think there's any reason to believe that the kind of broad
16 email record that Ms. Nemetz is speculating about -- there's
17 no reason to believe it ever existed.
18       THE COURT:  If you've got an attachment to an
19 email, and that attachment has not been produced, and you've
20 produced the email without the attachment -- no, that's not
21 right.
22       MR. BUTLER:  Your Honor, that -- it was produced
23 in that form because that's how it was maintained in the
24 ordinary course in the files of my client.  Now, this
25 specific email, Your Honor, was not raised with me -- has

Page 32

1 not been raised with me before as a focus of the
2 liquidators' concern.  I would be happy to go back to my
3 client and see if there are additional searches that could
4 be performed to locate those specific attachments.
5        THE COURT:  Why didn't you do that before?  Why
6 are we -- when you -- when you had the Rule 26 obligation to
7 have done that before?
8        MR. BUTLER:  Your Honor, in the meet and confer
9 process where we were discussing the scope of documents that
10 we would produce, we were I think very clear about the scope
11 that we were willing to produce.  I never had a response
12 from Ms. Nemetz or anyone on the liquidators side saying, we
13 really think we need these particular attachments.  I don't
14 even know the content of that email that Ms. Nemetz just
15 cited to you --
16       THE COURT:  Of course you didn't, unless you had
17 it to begin with.  Okay, like I say, I'm sort of in a rock
18 and a hard place.  We have incomplete emails.  Ms. Nemetz,
19 Mr. Butler, meet in person.
20       MR. BUTLER:  Oh, happy to do that, Your Honor.
21       MS. NEMETZ:  Certainly, Your Honor.
22       THE COURT:  Meet in person, have your documents
23 there.  And I'm going to just kick the can down the road
24 because right now, what I'm going to demand is you meet the
25 requirements under Rule 26.  And that means you get

Page 33

1 metadata.  And I know they've got it.  You can't tell me a
2 bank doesn't have it.
3        That being said, I'll talk about the 36 -- the
4 30(b)(6) possibility on October 19th.  So, you all have got
5 time to get -- take a look at everything, go over line by
6 line whatever needs to be done, and then -- that's quick.
7 So, I'll need to know exactly what I'm ruling on at that
8 time but it will be the possibility of having the 30(b)(6).
9        Now, Ms. Nemetz, we're talking about jurisdiction
10 here and Mr. Butler's correct.  This is narrow.
11       MS. NEMETZ:  Yes, Your Honor.
12       THE COURT:  So -- and I'll tell you what I'm
13 looking for, Mr. Butler, is -- just as she said, those BCCs.
14 Who did those blind copies go to?  Are there any?  Are you
15 dealing with the United States on those blind copies?  They
16 need to really look at their material instead of just simply
17 saying, we don't have it.  That's insufficient for me at
18 this stage.
19       MS. NEMETZ:  Yes, Your Honor.  I appreciate your
20 guidance so far.  I just want to say that I'm happy to meet
21 and confer with Mr. Butler in person as many times as is
22 necessary to sort this out.  But so far, whenever we've
23 asked these questions -- for example, we asked him several
24 weeks ago whether he'd spoken to any of the relevant
25 custodians who sent these emails, and he said no.  And we

9 (Pages 30 - 33)

Page 34

1  still don't --

2      THE COURT: Mr. Butler, I want the names of people

3  you spoke to at the bank. I want the names of the people

4  that you're dealing with to make sure this is done.

5      For instance, if you called me and said, I need

6  something from the Court, I am going to have to call my IT

7  specialist. And I'm going to tell you, Mr. Butler, as my

8  lawyer, that I have to talk to that IT specialist to know

9  about it.

10     MR. BUTLER: Mm hmm.

11     THE COURT: I want you to have that chain in your

12 head when you do it.

13     MR. BUTLER: Certainly, Your Honor. I've already

14 discussed it --

15     THE COURT: I want a chain of custody from this

16 and I don't -- okay, you talked to the CEO. No, the CEO

17 doesn't have it. I know the CEO doesn't have it. Who is in

18 charge of IT? Who is the head of IT? Who is the one

19 responsible for retaining the documents? You get me a chain

20 of custody because you yourself cannot testify to that

21 information. And you know it and I know it.

22     MR. BUTLER: Agreed, Your Honor. And I will say I

23 haven't chased all that information down to date, although I

24 had many conversations with my client on this subject -- but

25 we can do more to get what you're requesting.

Page 35

1      THE COURT: Your client. Which client? Which

2  client? Did you talk to the IT guy? Did you talk to --

3      MR. BUTLER: Your Honor, I've spoken primarily to

4  the Legal Department of BIL.

5      THE COURT: Well, the Legal Department can't

6  testify to it either, and you know that and I know that.

7  Who's -- who's responsible for the chain of custody for the

8  information in that bank?

9      MR. BUTLER: I understand, Your Honor.

10     THE COURT: Come back and see me on October 19th.

11 You two talk, but you two talk in person. Where are you

12 all?

13     MR. BUTLER: I believe we're both in New York,

14 Your Honor.

15     THE COURT: Perfect.

16     MS. NEMETZ: I believe our offices are across the

17 street from each other, Your Honor.

18     THE COURT: That's even better. Yeah. But have

19 your list and remember we're concentrating on jurisdiction.

20 But, Mr. Butler, it's not the legal staff. That legal staff

21 better be talking to who's in charge of the documents and

22 telling you so.

23     MR. BUTLER: Yes, Your Honor, I understand, I

24 understand.

25     THE COURT: Excellent. I'm going to take a quick

Page 36

1  break. It'll only be about three minutes -- to turn the air

2  conditioning down.

3      MR. BUTLER: Thank you, Your Honor.

4      MS. NEMETZ: Thank you, Your Honor.

5      THE COURT: Thank you. Okay, we are now into the

6  contested matter. Let me get this one off my plate. Very

7  good. I believe the next one we have on the agenda is

8  basically 10-04285, Trustee for the BLMIS v. UBS AG, UBS

9  Luxembourg. Who else do we have on this one? Let me find

10 out. It's all the UBS entities, correct? State your name

11 and affiliation and make sure I'm correct.

12     MR. KING: Good morning, Your Honor. It's

13 Marshall King from Gibson Dunn & Crutcher on behalf of the

14 four UBS Defendants. And I can give you those names if

15 you'd like them.

16     THE COURT: Just put it on the record, please.

17     MR. KING: Sure. Sure. That's UBS AG, UBS EUROPE

18 SE, UBS Fund Services (Luxembourg) SA and UBS Third Party

19 Management Company SA.

20     THE COURT: Excellent, thank you.

21     MR. KING: And there are other Defendants as well,

22 as Your Honor noted, and I'm sure counsel will put their

23 appearance on as well.

24     THE COURT: Excellent.

25     MS. USITALO: Good morning, Your Honor. This is

Page 37

1  Michelle Usitalo of Baker Hostetler for the Trustee, Irving

2  Picard. I'm also here this morning with my colleagues, Mr.

3  Warshavsky, as well as Ms. Fernandez and Ms. Stork.

4      MR. PACCIONE: Your Honor, Anthony Paccione from

5  Katten Muchin Rosenamn, on behalf of the Access Defendants,

6  who I could read their names into the record if you'd like.

7      THE COURT: Let's do. Let's just make the record

8  clear.

9      MR. PACCIONE: Sure. So, the Access Defendants

10 that I'm referring to include Access International Advisory

11 LLC, Access International Advisors LTD, Access Management

12 Luxembourg SA, formerly known as Access International

13 Advisors (Luxembourg) SA, Access Partners SA, Patrick

14 Littaye, Claudine Magnon de la Villehuchet, whose name is in

15 the caption and I'm happy to spell it, if necessary.

16     THE COURT: No, I have it down. Thank you.

17     MR. PACCIONE: And Groupement Financier Ltd.

18     MR. KNUTS: Good morning, Your Honor. It's Robert

19 Knuts for Defendant Theodore Dumbauld.

20     THE COURT: And Mr. (indiscernible) has been

21 adjourned, correct?

22     MR. KING: That's correct, Your Honor.

23     THE COURT: And then we have Defendants in their

24 capacity as liquidators. Are they on the record today?

25     MR. KING: I don't believe they've moved to

10 (Pages 34 - 37)

Page 38

1 dismiss, Your Honor.

2       THE COURT: I don't believe they have either.

3 Exactly. I was just making sure. Thank you. Very good.

4 It is your (indiscernible) business.

5       MR. KING: Thank you, Your Honor. Again, it's

6 Marshall King from Gibson Dunn on behalf of the UBS

7 Defendants. This is a case in which the Trustee is seeking

8 to recover subsequent transfers that were made initially

9 through two foreign feeder funds. One called Luxalpha and

10 one called Groupement Financier.

11       I think as we discuss the issues of jurisdiction

12 this morning, I think it's important to clarify that the UBS

13 Defendants who are moving for dismissal on that basis are

14 not investors in BLMIS and they are not investors in those

15 foreign feeder funds. They are not alleged to have invested

16 any of their own money with Madoff, whether directly or

17 indirectly. Instead, we're talking about service providers

18 to foreign funds. Those foreign funds contracted with the

19 service providers under foreign law, under contracts

20 governed by foreign law, to provide services to those funds

21 in the foreign countries.

22       The Trustee claims there's jurisdiction here on

23 the theory that these service providers were providing the

24 scaffolding for investment activities by others -- by the

25 funds, not by the Defendants themselves. In essence, the

Page 39

1 Defendants, who are moving for personal jurisdiction

2 dismissal, were doing business with entities, that is, the

3 funds, that were transacting business in the United States

4 but they were not themselves transacting business in the

5 United States.

6       There are four UBS Defendants. Our motion for

7 personal jurisdiction -- for lack of personal jurisdiction

8 is on behalf of just three of those entities. The one we

9 have not moved on, I think it's important to just clarify,

10 is UBS Europe SE. It was formerly known as UBS Luxembourg

11 SA, and it's frequently referred to in the second amended

12 complaint here as UBS SA. That entity is alleged to have

13 acted as the custodian for Luxalpha and to have communicated

14 regularly with the Madoff entity, with BLMIS, by mail, by

15 fax, by telephone. It's alleged to have signed contract

16 with BLMIS on behalf of Luxalpha, to have opened an account

17 with BLMIS. It effectuated the subscriptions and received

18 redemptions on behalf of Luxalpha from Madoff.

19       As to the other three UBS Defendants, the ones who

20 we are moving on behalf of, there are no such allegations

21 about contacts with the United States. To the contrary,

22 again, they are foreign entities which performed services

23 abroad under contracts governed by foreign law and which

24 received payment for their services abroad. It's important,

25 I think, and the law requires that we focus on each of the

Page 40

1 Defendants individually to assess whether they have

2 purposely availed themselves of the privilege of doing

3 business in the United States and whether the claims in this

4 case arise out of or relate to those contacts.

5       If Your Honor would permit me, I have a series of

6 demonstratives that I hope will be helpful to Your Honor in

7 sorting through a whole list of acronyms and other names

8 here. And if I could share my screen, I'd appreciate

9 sharing some demonstratives this morning.

10       THE COURT: I think the host has to give you that

11 power, and I'm not the host.

12       MR. KING: Okay.

13       THE COURT: Earlier -- earlier I said, you know,

14 you'd have to talk to the IT staff.

15       MR. KING: Sure.

16       THE COURT: Well, you've got to talk to the IT

17 staff. I believe it can be done.

18       MR. KING: Okay. I did share a set of these with

19 counsel for the Trustee shortly before this morning's

20 hearing began, Your Honor.

21       THE COURT: Let's -- let me get permission. I

22 have to get permission to let you take the screen. So, give

23 us two seconds.

24       MS. USITALO: Your Honor?

25       THE COURT: Yes?

Page 41

1       MS. USITALO: This is Michelle Usitalo of Baker

2 Hostetler for the Trustee. I just wanted to emphasize the

3 shortly before the Trustee -- the shortly before the hearing

4 part of Mr. King's statement, and just note that the Trustee

5 had not yet had the opportunity to review any of these

6 demonstratives.

7       THE COURT: Okay, we'll go -- he's now shared. It

8 may be called kicking the can down the road again, but we'll

9 see. Okay, you are now the cohost.

10       MR. KING: Thank you, Your Honor. Let me see if I

11 can make this work. I know all the associates on my side

12 are panicked that I'm trying to do this myself.

13       THE COURT: I will tell you that would be exactly

14 what would happen here. The fact that they even let me

15 punch a button is called panic.

16       MR. KING: Okay, I think I have done it. Is Your

17 Honor seeing --

18       THE COURT: Perfectly. I see it.

19       MR. KING: Excellent.

20       THE COURT: Okay, you've got everybody here.

21 USBAG et al., okay.

22       MR. KING: Great. So, first, I wanted to speak

23 about Defendant UBS AG. UBS AG is a Swiss company

24 headquartered in Switzerland. It's alleged in the complaint

25 to have offices and activities in the United States but it's

11 (Pages 38 - 41)

Page 42

1 not alleged, nor could it be, to be subject to general
2 jurisdiction in the United States under the Daimler
3 decision, and there's no allegation that any of the United
4 States offices played any role in any way related to
5 Luxalpha or Groupement Financier.
6      It's alleged to have been a cosponsor and co-
7 promoter of Luxalpha but the complaint doesn't really
8 explain what those roles are, and it doesn't allege any
9 activity -- certainly not any U.S.-directed activity or
10 conduct by UBS AG. And, in fact, what the complaint alleges
11 -- and this is in Paragraph 162 -- is that the purpose of
12 having UBS AG as the cosponsor and co-promoter was to
13 satisfy certain Luxembourg and European regulatory
14 requirements. It had nothing to do with anything with the
15 United States.
16      The only conduct by UBS AG that is alleged in the
17 complaint is really in connection with what the complaint
18 says is another Madoff-related investment, that is no --
19 meaning, not Luxalpha and Not Groupement Financier. When
20 they tried unsuccessfully -- certain employees in London
21 tried unsuccessfully to conduct due diligence on Madoff and to
22 have a meeting with him. Apparently, the meeting never
23 happened and so there was no contact. Certainly no
24 jurisdictionally relevant contact that relates in any way to
25 the subsequent transfer claims at issue here.

Page 43

1      The last and only other potential argument the
2 Trustee has made about U.S.-directed conduct by UBS AG is
3 that UBS Luxembourg, which is that company I mentioned that
4 we are not moving to dismiss on behalf of -- at least not on
5 jurisdictional grounds -- maintained a bank account at a UBS
6 branch in the United States, and UBS Luxembourg used that
7 account to pass dollar-denominated transactions to and from
8 Madoff on behalf of Luxalpha.
9      It's not alleged that UBS AG initiated any of
10 those transfers. It's merely a bank at which someone else
11 used their account to make transfers in and out of that
12 account. I don't think that could be deemed purposeful
13 availment by the bank in all of the activities of their -- I
14 don't think there's any basis for arguing that a bank
15 purposely avails itself of all the transactional activities
16 that its customers engage in using bank accounts that are
17 maintained at that branch.
18      And, importantly, and I'll come back to this later
19 in my argument -- but the complaint, it's almost impossible
20 to make a determination as to UBS AG that any contact with
21 the United States -- any of these contacts relates to the
22 claim that is being brought here because the claim that is
23 being brought here is to recover subsequent transfers and
24 there is no allegation that UBS AG ever received a
25 subsequent transfer of money that originated at BLMIS. I'll

Page 44

1 come back to that in a bit when I discuss the failings of
2 the complaint on 12(b)(6) grounds. But it's relevant also
3 for jurisdictional purposes because the only way
4 jurisdiction, specific jurisdiction, could be deemed to
5 exist is if there is purposeful availment and U.S.-directed
6 conduct and that conduct relates to the claim at issue. And
7 we don't even know what the subsequent transfer is so it's
8 impossible to make that determination here as to UBS AG.
9      One other point about UBS AG that's addressed in
10 the briefs. The Trustee argues that UBS AG waived its right
11 to challenge personal jurisdiction because back in 2012,
12 when the Defendants first moved to dismiss the original
13 complaint, I believe, in this action, UBS AG did not include
14 a personal jurisdiction argument at that time. As I
15 mentioned, that occurred in 2012 at a time before the
16 Daimler decision, which was decided by the Supreme Court in
17 '14, and under governing Second Circuit law at that time,
18 UBS AG was subject to general jurisdiction in the United
19 States because it had -- even though it is a foreign
20 company, headquartered overseas, it had branches in the
21 United States. And under governing Second Circuit law at
22 the time, that was good enough for general jurisdiction.
23      As Your Honor knows, that has changed given the
24 Daimler decision which establishes that general jurisdiction
25 only exists -- or with rare exceptions, only exists in the

Page 45

1 place of incorporation or the principal place of business.
2 So, today, there is no general jurisdiction of UBS AG. And
3 the Second Circuit has held in similar circumstances in the
4 Gucci America case, 768 F.3d, 122 -- and I'll just -- I'll
5 read the quote. It's directly on point.
6      "A defendant does not waive a personal
7 jurisdiction argument if the argument that the Court lacked
8 jurisdiction over the defendant would have been directly
9 contrary to controlling precedent in this circuit." And
10 that is certainly true of what occurred at the time of that
11 very first motion to dismiss in this case. UBS AG would not
12 have had an argument to dismiss for lack of jurisdiction so
13 it can't be deemed to have waived that -- where it now does
14 have that argument and has asserted it at its first
15 opportunity.
16      Next company to talk about is UBS Fund Services
17 Limited, referred to in the complaint frequently as UBS FSL,
18 but I recognize that some of the abbreviations get a bit
19 confusing so I'll try and use the full name, Your Honor.
20 UBS Fund Services is a Luxembourg company headquartered in
21 Luxembourg. It's alleged to have been the administrator for
22 Luxalpha and Groupement Financier. And by that, the Trustee
23 claims that the entity was performing day-to-day accounting
24 functions, keeping the shareholder register, communicating
25 with investors, preparing financial statements, calculating

12 (Pages 42 - 45)

Page 46

1 the net asset value.  You know, the day-to-day
2 administrative services, as is hinted at by the name
3 administrator, for those funds.  But, importantly, all of
4 those activities occurred in Luxembourg.  None are alleged
5 to have occurred anywhere in the United States.
6        In the Trustee's opposition papers he cites a
7 single fax and four alleged phone calls with the United
8 States over a four-year period.  I will first say that the
9 phone call evidence that the Trustee has submitted -- and
10 that's at Exhibit 49 of the declaration that the Trustee
11 submitted with his opposition papers -- is probably not even
12 properly considered by Your Honor.  This is a chart, I
13 guess, that is headlined Log of Apparent Phone Calls between
14 BLMIS and UBS SA or UBS FSL.  It's purported to be
15 authenticated by a lawyer for the Trustee, for Mr. Picard.
16 I don't think it's appropriately considered on a motion to
17 dismiss.  It's not alleged in the complaint and I don't
18 think it is appropriately considered on a motion to dismiss
19 as -- as evidence of anything, honestly.  The lawyer who
20 purports to authenticate it authenticated it as a log of
21 apparent phone calls so they can't even assert that there
22 were.  But even assuming that four phone calls were placed,
23 if you total up the minutes, it's 13 minutes over four years
24 is alleged.  And there's nothing argued or presented that
25 would connect these phone calls to any of the subsequent

Page 47

1 transfers in this case, even if you considered these minimal
2 haphazard contact with the U.S.:  One fax and four phone
3 calls over a four-year period.
4        There is no allegation in this case of any
5 transfers of funds to or from the United States by Fund
6 Services Limited, no meetings in the United States are
7 alleged, no -- the Trustee, in his brief, relies on a case
8 called Kromer for the assertion of jurisdiction over a
9 foreign administrator of a foreign investment fund.  But in
10 Kromer, the fund at issue was created, managed and operated
11 in the United -- from the United States.  There were regular
12 calls and countless mailings by the defendant at issue, by
13 the administrator, with investors and others in the United
14 States.  And there is just nothing remotely like that
15 alleged about UBS Fund Services Limited.
16        Third, Your Honor -- sorry -- is Defendant UBS
17 Third Party Management Company, also a Luxembourg company,
18 also headquartered in Luxembourg.  It is alleged to have
19 been the portfolio manager for Luxalpha from mid-2006 to
20 late 2008.  But that's it on the allegations about UBS Third
21 Party Management Company.  There's no allegations of any
22 conduct, zero conduct at all by anyone at Third Party
23 Management Company, much less any that were directed at the
24 U.S.  There's, again, no transfers of funds by UBS Third
25 Party Management Company, either to the United States or

Page 48

1 from the United States, no meetings in the United States, no
2 communications alleged with the United States.  The Trustee,
3 in fact, alleges that UBS Third Party Management Company sat
4 passively and didn't do anything.  So, on that basis, there
5 can't be purposeful availment of the privilege of conducting
6 business in the United States.
7        Briefly, the Trustee does try to make an agency
8 argument alleging that UBS Luxembourg -- again, that's the
9 other Defendant that we are not moving on personal
10 jurisdiction grounds -- arguing that the U.S. contacts of
11 that entity should be attributed to Third Party Management
12 Company, allegedly because of an advisory committee that was
13 supposedly formed by UBS Luxembourg.  But nowhere in the
14 brief or in the complaint are there any allegations about
15 what that advisory committee did or whether it had any U.S.-
16 directed contacts, even if it could be attributable to Third
17 Party Management Company.
18        And, as we point out in our reply brief, the
19 theory that the Trustee has here seems to be backwards.
20 They are alleging that UBS Third Party Management Company
21 was the agent of UBS Luxembourg but yet they're trying to
22 attribute the conduct of the principal to the agent, and
23 that is not how agency jurisdiction works.  All of the
24 Trustee's jurisdictional arguments about these three
25 entities boil down to what I said at the beginning, which is

Page 49

1 the notion that doing business with an entity that does
2 business in the United States is a basis for jurisdiction;
3 not -- not based on the jurisdictional conduct -- conduct
4 and contacts of the defendants themselves.  And we think
5 that just stretches personal jurisdiction too far and that
6 the 12(b)(2) motion for lack of personal jurisdiction should
7 be granted.
8        Moving to the merits, Your Honor, I want to
9 address just a couple of items.  I'm not -- we've moved on
10 546(e) grounds.  Your Honor obviously has addressed that
11 topic in any number of decisions.  But there are some unique
12 pieces here that have not been decided in any prior
13 decision, including one important one, and that is the
14 question of whether the Trustee has adequately pled that the
15 fund Defendants -- the fund Defendants being Luxalpha and
16 Groupement Financier -- had actual knowledge that BLMIS was
17 not trading securities.
18        The Trustee concedes that 546(e) would -- is
19 otherwise applicable, that all the prerequisites for 546(e)
20 are met, but argues that he can avoid the safe harbor
21 because of the so-called actual knowledge exception.  So,
22 let's just focus for a moment on what that requires.  The
23 actual knowledge standard is an extraordinarily high
24 standard to meet.  It's a requirement of a subjective mental
25 state by the Defendant of "a high level of certainty and an

13 (Pages 46 - 49)

Page 50

1 absence of any substantial doubt" that BLMIS was not trading
2 securities. That comes from Judge Bernstein's Merkin
3 decision in 2014. It is not enough that the Defendant had a
4 strong suspicion of fraud; it is not enough -- certainly not
5 enough that there were red flags that should have put
6 someone on notice of the fraud. It -- it requires that the
7 Defendant basically conclude a high level of certainty and
8 no doubt that BLMIS was not trading securities.
9     If you look at the complaint here, that -- all
10 that the Trustee really pleads is red flags or suspicions.
11 These -- you know, these next few slides are just a series
12 of excerpts from the complaint, from the second amended
13 complaint here, which illustrates the most that the Trustee
14 has. You'll see that -- you know, it says things like there
15 are voices in the industry warning, there are serious
16 concerns, there is a fraud risk. That's in Paragraph 156.
17 On multiple occasions -- if you look at Paragraph 144, for
18 instance -- people are alleged to have identified "red
19 flags." You'll see serious concerns. You'll see skepticism
20 up in Paragraph 247. Skepticism. You'll see warning signs,
21 and you'll see people say that there is an opportunity for
22 fraud. That's up there in Paragraph 234. You can see in
23 232 on the right hand side again alleging major red flags.
24     All of -- what's missing from the second amended
25 complaint is any factual assertion that any of the

Page 51

1 Defendants subjectively believed with a high level of
2 certainty and no substantial doubt that Madoff was a Ponzi
3 scheme. And, to the contrary, what you see in the quotes --
4 all we've relied on here are quotes from the Trustee and the
5 complaint -- you'll see things like in Paragraph 155 on the
6 bottom right hand corner, here's a UBS employee noting that
7 Madoff is controversial. In this excerpt he notes that
8 there are some oddities, there are things that are odd or
9 different from the norm. The employee is unable to identify
10 counterparties or having trouble identifying counterparties
11 for Madoff. But what does it say? It says everything is
12 probably fine. And that obviously is not a high -- high
13 level of certainty that Madoff was committing fraud. That's
14 noting some problems but having doubts.
15     Elsewhere in the complaint -- and I think this is
16 really the Trustee's sort of -- the best and most -- their
17 best argument that anyone noticed wrongdoing at Madoff
18 concerns an investigation done by a consultant hired by
19 Access, a fellow named Cutler, who did some diligence, did
20 some digging and concluded -- and you see it in Paragraph
21 235 -- the strategy doesn't make sense. And what does he
22 say? He says, it's possible that these extremely sloppy
23 errors or serious omissions in tickets. That's the best
24 case. Arithmetic errors in the founder's strategy
25 description. So, even in the coup de grâce of the Trustee's

Page 52

1 argument, this Cutler investigation, he does not conclude
2 with a high level of certainty and a lack of doubt that
3 Madoff was not selling securities and was committing fraud.
4     I would say as you look at all of these and
5 consider them holistically, the allegations here don't even
6 approach the kind of allegations that the Trustee made in
7 the Merkin case that Judge Bernstein decided, where he held
8 that the Trustee had not -- had failed to plead actual
9 knowledge. He held they satisfied -- I believe he held they
10 satisfied the willful blindness test but that isn't enough.
11 He held they had failed to plead actual knowledge. The
12 complaint there included the same kind of allegations about
13 the impossibilities of Madoff's returns and concerns about
14 fraud, but the allegations there went even further. There
15 were people who were saying that there was some probability
16 that Madoff was a fraud and might be a Ponzi scheme. They
17 had quotes to that effect from the defendants there. And
18 even with those allegations, Judge Bernstein held that they
19 constituted, at most, a strong suspicion of fraud but not
20 the absence of doubt that's required for actual knowledge.
21     And so because the Trustee acknowledges the
22 applicability of Section 546(e) but has failed to plead
23 actual knowledge, that means that all of the transfers,
24 initial and subsequent, prior to two years before the filing
25 date are protected by the safe harbor and cannot be

Page 53

1 recovered.
2     Lastly, Your Honor -- last topic I want to mention
3 is insufficient allegations about -- about the existence of
4 subsequence transfers. The Trustee needs to plead -- this
5 is not a question that -- of simply difficulties the Trustee
6 will have in tracing the funds from Madoff through the
7 initial transferees to the subsequent transferees. It is
8 true he will have that problem when we come to it but there
9 are some glaring items that are simply impossibilities --
10 not difficulties -- impossibilities on the face of the
11 complaint that require dismissal of some of the transfers.
12 So, first -- I mentioned this at the beginning --
13 there is no allegation that UBS AG received any subsequent
14 transfer at all. In his opposition papers, the Trustee
15 concedes that he must allege the pathways of the transfers,
16 how they got from Madoff to the Defendant, and the who, when
17 and how much of the transfers are at issue. And the Trustee
18 tries to do this in Paragraph 3 -- Paragraphs 3 -- sorry --
19 333 through 337 of the second amended complaint.
20     And if you look at those paragraphs, you will see
21 that the Trustee includes a paragraph about each of the
22 Defendants in this case, except UBS AG. He articulates the
23 amounts he's seeking to recover and the pathways, or
24 attempts to allege them, as to every Defendant, but there is
25 no allegation in those paragraphs or anywhere else in the

14 (Pages 50 - 53)

Page 54

1  complaint about transfers to UBS AG.  And I would submit,
2  Your Honor, that this is not simply an oversight on the
3  Trustee's part.  I think it was a deliberate decision.  But,
4  of course, there are consequences to deliberate decisions.
5          And for that, Your Honor, I would point you to the
6  following:  Back in 2015, the Trustee moved for leave to
7  amend his complaint in this action, tendering a proposed
8  second amended complaint at that time.  And that is -- I'm
9  showing Your Honor -- on the left hand side of this screen.
10  It's Docket Entry 210 in this case.  And you'll see there,
11  the Trustee included a paragraph that said, based on the
12  Trustee's investigation to date, the UBS Defendants received
13  at least 97 million in subsequent transfers, including but
14  not limited to the following.  And it lists A, B, C and D.
15  UBS SA received this amount, UBS FSL received this amount,
16  UBS Third Party Management Company received this amount.
17  And here are the rough dates of those receipts.  And it
18  included a Paragraph D, UBS AG received at least 4.2 million
19  in recoverable subsequent transfers in the form of dividends
20  paid by UBS SA and UBS FSL, which were comprised in part of
21  fee amounts received from Luxalpha and Groupement Financier.
22          And so leaving aside for a moment the difficulties
23  and implausibility of ever proving tracing in that
24  circumstance, let's look at what the Trustee now alleges in
25  the operative complaint in this case.  And the corresponding

Page 55

1  paragraph is Paragraph 333, which I mentioned a few moments
2  ago, and that's on the right hand side here.  And what we've
3  done is run a red line of the currently operative complaint
4  against the proposed amended complaint that the Trustee
5  tendered a few years ago -- and you'll see most notably
6  Paragraph D is no longer in there, and there is nothing left
7  alleged anywhere in the second amended complaint that
8  replaces it.
9          So, as such, the Trustee has failed to plead even
10  the most basic requirements for a claim to recover
11  subsequent transfers under Section 550 and, at a minimum,
12  the claim against UBS AG needs to be dismissed, if not for
13  personal jurisdiction, then for failure to state a claim.
14          And the last point, Your Honor, again, based
15  solely on the allegations of the Trustee's complaint, a
16  significant portion of the subsequent transfers he seeks to
17  recover could not have originated with BLMIS.  So, you'll
18  note here that the Trustee alleges in 33(a) that UBS SA --
19  again, that's the acronym that's used for UBS Europe SE, now
20  known as UBS Europe SE -- received at least 32.8 million in
21  fees for serving as the official custodian and official
22  manager of Luxalpha from February 2004 to August 2006.
23          Okay, fine.  That's an effort to plead the
24  subsequent transfers as to UBS Europe.  But if you total up
25  all of the initial transfers that existed on or before

Page 56

1  August 2006 -- and this is pulled from Exhibit B of the
2  second amended complaint, Your Honor, where the Trustee
3  lists all of the transfers to and from Luxalpha and Groupe -
4  - well, Luxalpha in this instance -- purports to list all of
5  the initial transfers.  And if you total up all of the
6  initial transfers, you get -- as of the end of 2006 -- 16.2
7  million in initial transfers.  That means that it is
8  impossible that the 32 million that the Trustee seeks to
9  recover in subsequent transfers for that period could
10  possibly have been BLMIS customer property and initial
11  transfers.
12          Again, the Trustee, down the road in this case, if
13  it survives the deficiencies we've brought to your
14  attention, is going to have a bear of a time tying initial
15  transfers to subsequent transfers.  But I'm not making that
16  argument here today.  That, I grant you, can be for another
17  time.  What we're focused on in this portion of the argument
18  anyway is impossibilities, mathematical, physical
19  impossibilities that 32 million in funds could have been
20  subsequent transfers when only 16 million were initial
21  transfers.
22          So, at least to the extent of that -- of the
23  difference there, some $16 million, the complaint should be
24  dismissed, again, if not for all the other reasons we've set
25  forth in our papers.  And I will, for all the other

Page 57

1  arguments, rely on our papers, Your Honor, and I will -- I'm
2  happy to answer any questions or to allow the other
3  Defendants to address their issues.
4          THE COURT:  Not yet.  I'm -- I'm also considering
5  -- if you'll let go as cohost so we can get back?
6          MR. KING:  Oh, sure.  Well -- yeah.
7          THE COURT:  Yeah.  I don't know how.  Maybe she
8  takes it away from you.  I don't know what happens.
9          MR. KING:  Maybe so.  But I don't need to share
10  anymore, that's for sure.
11          THE COURT:  Ms. Usitalo, I want you to address the
12  UBS argument and then we'll go to the other arguments.  So -
13  -
14          MS. USITALO:  Understood, Your Honor.  Let me just
15  ask -- our plan here today had been for me to address the
16  issues on the 12(b)(6) points that are brought by all of the
17  Defendants.  And then my colleague, Ms. Stork, was going to
18  address UBS's jurisdiction arguments.  Would you --
19          THE COURT:  I want to address those jurisdiction
20  arguments right now because I, honestly, sort of lumped them
21  altogether.  And one of my questions was going to be explain
22  the corporate structure of UBS and how it fits in with
23  Access as you understand it.  And so, this argument sort of
24  bifurcates the argument.  So, is Ms. Fernandez going to
25  address this?

15 (Pages 54 - 57)

Page 58

1    MS. USITALO:  My colleague, Ms. Stork, is going to
2    address the UBS jurisdictional issues.
3    THE COURT:  Oh, I'm sorry.  Ms. Stork.
4    MS. USITALO:  So, I will turn it over to her.
5    THE COURT:  Yes, Ms. Stork.
6    MS. STORK:  Good morning, Your Honor.  Okay, I
7    think I fixed the audio.  My apologies there.  Good morning,
8    Your Honor.  I'm Victoria Stork, I'm an associate at Baker
9    Hostetler, counsel for the Trustee, Irving Picard.  I'm here
10   today to argue in opposition to the UBS Defendant's motion
11   to dismiss on personal jurisdiction.  As you are aware, the
12   Defendants have moved to dismiss, arguing a lack of personal
13   jurisdiction against the entities -- the three entities, UBS
14   AG, UBS Fund Services Luxembourg, which is often also
15   referred to as UBS FSL, and UBS Third Party Management,
16   often referred to in the papers as UBS TPM.  And, together,
17   I often refer to them as the UBS personal jurisdiction
18   Defendants.
19   Your Honor, I think it's important to discuss,
20   particularly after Mr. King's argument, that the standard on
21   a motion to dismiss looks at the Trustee's well-pleaded,
22   non-conclusory allegations and exhibits that are taken as
23   true, and all inferences are to be made in the Trustee's
24   favor.  And, Your Honor, as the Defendants have displayed in
25   Mr. King's demonstrate, they attempt to tease out each

Page 59

1    individual contact that's alleged by the Trustee in attempts
2    to rebut them on a one-by-one basis.  This is not
3    appropriate on a motion to dismiss standard.
4    The second amended complaint includes clear
5    allegations with demonstrate that the claims the Trustee
6    seeks to recover arise out of the UBS personal jurisdiction
7    Defendants' activities.  And the Trustee has asserted in the
8    second amended complaint and highlighted in his papers how
9    each of these Defendants engaged in business that's
10   purposefully directed towards the United States and are
11   subject to the jurisdiction of this Court.  And all of these
12   allegations are to be looked at in the totality of the
13   circumstances.  So, Mr. King's attempt to rebut each one of
14   them is incorrect at this point in time.
15   The -- and as I will identify by going through
16   each of the three entities, the Trustee has in a totality
17   asserted that each of these Defendants does -- he does
18   establish a prima face case of personal jurisdiction for
19   each of them.
20   It's also important to identify that the UBS
21   Defendants -- UBS AG, UBS Fund Services Luxembourg and UBS
22   Third Party Management -- while we aren't aware of any
23   individual investments that they made directly into BLMIS or
24   Luxalpha, they were service providers for Luxalpha and
25   Groupement.  And as service providers they were maintaining

Page 60

1    and carrying out activities on behalf of Luxalpha and
2    Groupement.  To make the argument that these entities were
3    not directing anything to New York I think is incorrect.
4    Each entity was an integral part of Luxalpha and Groupement.
5    Luxalpha and Groupement could not make investments into or
6    redemptions from BLMIS on its own.  It needed the UBS
7    Defendants in order to do this.  Without the UBS Defendants,
8    there would have been no investments, there would have been
9    no redemptions.  Luxalpha and Groupement would not have been
10   able to operate.  So, to say that they were just passively
11   carrying out functions internationally is incorrect.
12   Further, the argument that these entities were
13   international entities carrying out international contracts
14   with no contacts to New York is incorrect.  It does not
15   matter that these entities were not based in the state of
16   New York; what matters is that they were directing
17   activities to the forum.  The actions that they carried out
18   outside of the United States were directed into the forum,
19   and the impact and the injury to which the Trustee seeks to
20   recover funds occurred in New York.  The entities were not
21   purely international, and Your Honor, it is completely
22   reasonable the Defendants should be held into court
23   regarding their conscious role of directing, developing and
24   sending investments into BLMIS.
25   I'm going to go through each entity and go through

Page 61

1    the allegations that the Trustee has pled to determine -- to
2    show that we have shown in a totality of allegations that
3    there should be personal jurisdiction over each.  I'll start
4    with UBS Fund Services Luxembourg.  UBS Fund Services
5    Luxembourg acted as the administrator for both Luxalpha and
6    Groupement and was the management company and portfolio
7    manager for Luxalpha.  Additionally, UBS Fund Services
8    Luxembourg did serve as the registrar and transfer agent, as
9    we see in some of the Luxalpha documents.
10   They were responsible for keeping Luxalpha and
11   Groupement's accounting -- account records, reports,
12   financial statements and coordination with auditors, but
13   were also responsible for doing things like keeping register
14   of the shareholders, handling all subscriptions and
15   redemptions -- those subscriptions and redemptions which
16   were going to New York at BLMIS or coming from BLMIS in New
17   York.
18   UBS Fund Services Luxembourg did work with Access
19   on Luxalpha and Groupement's management supervision and
20   administration.  And actually in Luxalpha's answer, which it
21   has recently filed and this Court can take judicial notice,
22   Luxalpha admitted that -- and I'll quote; it's from
23   Paragraph 68 of Luxalpha's answer -- that "UBS Fund Services
24   Luxembourg worked closely with several of the Access
25   Defendants in the management, supervision and administration

16 (Pages 58 - 61)

Page 62

1 of Luxalpha." Further, they admitted that UBS Fund Services
2 Luxembourg was responsible for calculating Luxalpha's net
3 asset value based solely on the data that was provided by
4 BLMIS with no independent verification. This is data that
5 was coming directly from BLMIS that UBS Fund Services
6 Luxembourg was retrieving in order to carry out the
7 functions that they were required to carry out as the
8 administrator of Luxalpha.
9       UBS Fund Services Luxembourg employees attended
10 administrative meetings with Access to discover Luxalpha and
11 Groupement. They participated in calls and email exchanges
12 with Access employees. Mr. King did discuss the fax
13 communication and the telephone calls between BLMIS and UBS
14 Fund Services Luxembourg. The documents which the Trustee
15 asserted -- which the Trustee can properly assert on the
16 motion to dismiss based on personal jurisdiction are from
17 the BLMIS records. And as the Trustee has identified in his
18 papers, the Trustee does not have all of the records of
19 Luxalpha, or Groupement, or the UBS Defendants. So, these
20 are contacts that we are aware of that occurred and together
21 come to create the totality of the circumstances. And here
22 what we're seeing is that there numerous contacts where
23 someone at UBS Fund Services Luxembourg was reaching out to
24 someone at BLMIS directly, which is in New York. So, they
25 were directing contact directly into New York.

Page 63

1       Mr. King also discusses the fact that there's no
2 transfers or funds to or from the United States alleged.
3 The Trustee alleges that the UBS Defendants received
4 transfers from Luxalpha or Groupement in return for fees for
5 the services that they were providing. So, there were
6 transfers that came through to the UBS Defendants that were
7 originated from BLMIS.
8       All of the UBS Fund Services Luxembourg's actions
9 with respect to Luxalpha and Groupement show that the UBS
10 Fund Services Luxembourg's communicating, carrying out day-
11 to-day tasks in operation of the funds, and carrying out
12 tasks in furtherance of funneling investments through
13 Luxalpha and Groupement make a prima face case that UBS Fund
14 Services Luxembourg purposely availed itself of the New York
15 forum, and the totality of its contacts permit this Court to
16 exercise personal jurisdiction over it. Further, it's
17 completely reasonable that Fund Services Luxembourg would be
18 (indiscernible) to the Court when they were directing things
19 in and out of New York.
20       Secondly, UBS Third Party Management. Third Party
21 Management served as Luxalpha's management company from fall
22 of 2006 through to the exposure of the fraud in November of
23 2008. They deliberately engaged in investment activity with
24 BLMIS in New York and they earned substantial fees in
25 connection with those activities. Additionally -- and I can

Page 64

1 touch on this later when I talk about UBS AG -- there
2 weren't numerous UBS AG employees that were members of the
3 board of UBS Third Party Management. Third Party Management
4 was officially responsible for all of Luxalpha's investment
5 management decisions and, as we are aware, Luxalpha only
6 invested in BLMIS. So, all of those investment decisions
7 were into and out of New York in BLMIS. They received
8 management and performance fees tied to Luxalpha's
9 performance. And, like I just said, that performance was
10 all directed to and from New York at BLMIS.
11       From the inception of Luxalpha until fall of 2006,
12 UBS Luxembourg SA, which, as Mr. King stated, is now known
13 as UBS Europe SE, was Luxalpha's manager. And a management
14 company services agreement dated on September 22, 2006
15 transferred that responsibility of Luxalpha's manager to UBS
16 Third Party Management. On the same day, there was an
17 agreement for a constitution of an advisory committee, which
18 was signed and dated between UBS Third Party Management and
19 UBS Luxembourg SA.
20       Despite the switch in managers, UBS Luxembourg SA
21 was still participating alongside UBS Third Party Management
22 through this advisory agreement. Essentially, management by
23 UBS Third Party Management was directed and assisted by UBS
24 Luxembourg SA. All management decisions were directed --
25 were dictated by this advisory committee, and the advisory

Page 65

1 committee was formed and staffed with UBS Luxembourg SA
2 directors and Access principals.
3       Again, the Trustee's not privy to most of the
4 books, and records, and documents of the Defendants at this
5 time. However, the Trustee is aware that there was an
6 agreement between UBS Third Party Management and UBS
7 Luxembourg SA, which created the advisory committee; that
8 the advisory committee was tasked with making
9 recommendations in relation to the management and investment
10 policy and strategy of the Luxalpha fund, and the advisory
11 committee was staffed fully with UBS Luxembourg SA
12 employees.
13       The fact that Third Party Management was to carry
14 out its management duties under the advisement of an
15 advisory committee signals that Third Party Management and
16 UBS Luxembourg SA were working in concert. And the Trustee
17 argues that the jurisdictional contacts where UBS Luxembourg
18 SA is actively engaging with BLMIS and New York should be
19 considered for UBS Third Party Management as well.
20       Finally, I will discuss the contacts of UBS AG.
21 UBS AG served as Luxalpha's sponsor and promoter, and that
22 is a more integral role than Mr. King was letting on. This
23 isn't a case where UBS AG was simply behind the scenes
24 shuffling papers, signing documents. They actually stepped
25 in as a successor to BMP after BMP closed the Auriga Fund

17 (Pages 62 - 65)

Page 66

1  and did not want to be participating in the Luxalpha Fund.

2        UBS was aware from day one that the role of

3  sponsor and promoter for Luxalpha included things like

4  seeking out and funneling investments into BLMIS, and that

5  as it use its funds, the requirement of a sponsor and

6  promoter plays an important role of the creation, structure,

7  launch and management in the administration of the fund,

8  which the Trustee does allege in his second amended

9  complaint, Paragraph 166.

10       Under the applicable law and uses regulations, the

11 role of sponsor includes playing a role in the complete

12 oversight of the fund.  And, in practice, it's typically the

13 main shareholder of the management company or group entity

14 to which the main shareholder belongs.  And as I've

15 previously stated, UBS AG is -- did have multiple employees

16 that were on the board of directors of UBS Third Party

17 Management, which was the management company of Luxalpha.

18       Additionally, UBS AG was responsible for viewing

19 and approving options counterparties, as the Trustee alleged

20 in Paragraph 265 of his second amended complaint, and every

21 redemption from BLMIS came to UBS AG's Stanford branch to an

22 account for UBS Luxembourg SA.  As I previously -- all of

23 these things together on a totality of the circumstances

24 show that UBS AG was active and purposely directing

25 activities towards New York.

Page 67

1        Finally, one of the arguments that Mr. King and

2  the UBS Defendants make is that there's limitless

3  jurisdiction if we're hailing the UBS entities into court.

4  This is not what the Trustee is seeking.  We're not seeking

5  to cast a limitless dragnet against all entities.  We're not

6  seeking to bring in the custodians or the individuals who

7  are maintaining copiers at the UBS offices abroad.  The

8  Trustee is simply seeking to hold accountable the entities

9  that were vital to the harm that occurred here in New York.

10 They're not random.  They were essentially parties who

11 played vital roles.  Each of these entities were key players

12 who set up and serviced the defendant funds, Luxembourg and

13 Groupement, and they are entities who we have claims against

14 for taking fees from the defendant funds in exchange for the

15 work that they carried out, which were directed straight

16 into New York with the intention of investing with BLMIS.

17       In conclusion, Your Honor, we submit that the

18 Court does have personal jurisdiction over the UBS

19 Defendants, UBS AG, UBS Fund Services Luxembourg and UBS

20 Third Party Management, as alleged in the Trustee's second

21 amended complaint and highlighted in his opposition with the

22 company (indiscernible).  And at the very least, Your Honor,

23 the Trustee should be entitled to jurisdictional discovery.

24 Any questions I can answer for you, Your Honor?

25       THE COURT:  Give me a moment to absorb what you

Page 68

1  said.  Just let me think a second.

2        MS. STORK:  Absolutely.

3        THE COURT:  I'm trying to figure out what you're

4  saying about what monies what did they get.  Was this solely fees

5  for investment advising and custodial services?  Is that

6  what you -- or was it more?

7        MS. STORK:  My apologies, Your Honor.  Just give

8  me one quick second to think about this and get a good

9  answer for you.

10       THE COURT:  Sure.

11       MS. STORK:  My colleague, Ms. Usitalo will talk

12 more about that tracing, but what I can tell you is that the

13 allegations that we have are related to the information that

14 the Trustee has from contracts and documents where we're

15 seeing that there are monies that were being transferred for

16 the services that each of these entities were providing.

17       THE COURT:  And so that's what you're saying

18 jurisdiction is based on?

19       MS. STORK:  That's what our claims are based on,

20 yes.

21       THE COURT:  The Court will take a ten-minute

22 break.

23       MS. STORK:  Thank you, Your Honor.

24       THE COURT:  Or 15.  Let's make it a 15-minute

25 break.  Chambers.

Page 69

1        (Recess)

2        MR. KING:  Your Honor, you're on mute if you're

3  talking to us.

4        THE COURT:  Okay.  All right.  I think I need the

5  -- I need a question answered, Ms. Stork, and that is when,

6  what, where of the money to UBS?

7        MS. STORK:  Yes, Your Honor, one second.  Let me

8  just pull that information up right now.

9        THE COURT:  Am I off mute?

10       MS. STORK:  Yes, Your Honor.

11       THE COURT:  And that's UBS AG that I'm asking...

12       MS. USITALO:  Your Honor --

13       THE COURT:  Yes, ma'am, you're good.  I hear you.

14 State your name, though, for the record.

15       MS. USITALO:  Yes.  Michelle Usitalo, Baker

16 Hostetler for the Trustee.

17       THE COURT:  Okay, okay.

18       MS. USITALO:  And, Your Honor's question -- you

19 were clarifying that it goes to UBS AG?

20       THE COURT:  Right.  I'm not clarifying.  I need

21 you to clarify.

22       MS. USITALO:  I'm sorry.  No, I was clarifying the

23 question.  I'm sorry.

24       THE COURT:  Okay.

25       MS. USITALO:  Your Honor -- and I can clarify it

18 (Pages 66 - 69)

Page 70

1 for you. Because the Trustee does allege that UBS AG
2 received subsequent transfers as a service provider, and
3 that's in Paragraph 332 of the complaint where it says that
4 -- I am pulling it up --
5     THE COURT: Well, I have it right here, but okay.
6     MS. USITALO: Based on the Trustee's investigation
7 to date, the feeder fund Defendants subsequently transferred
8 some of the initial transfers to the Access Defendants and
9 the UBS Defendants, and UBS AG is included in that
10 definition, as payment for their alleged service of the
11 feeder funds. And, as Ms. Stork noted previously, Luxalpha
12 has filed an answer in this complaint and Luxalpha in that
13 answer has -- has admitted that -- that the UBS Defendants
14 received payment of fees for their alleged services, and
15 that includes UBS AG.
16     The Trustee has also alleged, as Ms. Stork noted,
17 that UBS AG is a sponsor and promoter and as a result,
18 received fees. And the Trustee has also alleged that --
19 that UBS AG is the parent company here. And the importance
20 of that allegation and that relationship is that UBS AG
21 would've received dividends from UBS SA. In the amount --
22 we don't have that yet because we don't have the books and
23 records of Luxalpha, of Groupement, or of the UBS entities.
24 So, that is -- that is where the Trustee has made the
25 allegations of UBS AG in his complaint, and we believe that

Page 71

1 these are allegations that are sufficient to put UBS AG on
2 notice of the Trustee's claim.
3     THE COURT: Very good. Very good. Anything else,
4 Ms. Stork or Ms. Usitalo?
5     MS. USITALO: Usitalo.
6     THE COURT: Usitalo, Usitalo. Anything else you
7 all wish to add at this point?
8     MS. STORK: No, Your Honor.
9     THE COURT: Mr. King, anything you want to rebut
10 on the UBS point?
11     MR. KING: Yeah. Just two quick things, Your
12 Honor.
13     Number one, just to address the paragraph that Ms.
14 Usitalo just pointed to, I mean, that's a classic conclusory
15 allegation without any factual detail. It does not say that
16 UBS AG in particular got any of the funds. Whereas you look
17 at Paragraphs 333 to 337, it goes into great attempts to go
18 into great detail about specific fees paid, dates and
19 amounts paid to the other defendants. It's just absent.
20 It's just a conclusory lumping in allegation that fails even
21 to even relate, Your Honor.
22     The second point just to mention on the
23 jurisdictional issues is I don't think Ms. Stork said
24 anything that I didn't say to Your Honor earlier, namely
25 these are three foreign entities that performed services for

Page 72

1 companies, for foreign companies that themselves invested in
2 the United States. Luxalpha and Groupement Financier
3 invested with Madoff, at least according to the allegations.
4     All that is alleged, whether you take it
5 individually or collectively and holistically as Ms. Stork
6 wants you to, is that these UBS defendants provided services
7 abroad to those entities that were doing business in the
8 U.S. And I think the question Your Honor will have to
9 answer is is that good enough to assert personal
10 jurisdiction over those defendants. And I submit that the
11 law doesn't permit that. Thank you.
12     THE COURT: Very good. Okay. Now where are we?
13 We had UBS. And now Access.
14     MR. PACCIONE: Yes, Your Honor. Anthony Paccione
15 on behalf of the Access defendants.
16     THE COURT: The Access defendants?
17     MR. PACCIONE: So I identified those defendants
18 earlier on.
19     THE COURT: You did. Then let's just say you
20 referred to them when you put your name on the record. And
21 then we can go from there.
22     MR. PACCIONE: That's correct, Your Honor. And so
23 I think for today's purposes, with the Court's permission,
24 we did move on behalf of the Access defendants on a number
25 of grounds. But I think for today, I just want to address

Page 73

1 the jurisdictional arguments given the confusion and some of
2 the questions that have arisen already. And those
3 jurisdictional arguments are only on a subset of the Access
4 defendants. And those include -- we referred to those
5 as the JMDs, the jurisdictional moving defendants in our
6 brief. But the three entities that I want to speak about
7 and try and clarify in terms of the rules that they serve
8 include Access International Advisors LTD, Access Management
9 Luxembourg SA, formerly known as Access International
10 Advisors Luxembourg SA, and Access Partners SA. And what
11 I'd like to --
12     THE COURT: Let me interrupt you.
13     MR. PACCIONE: Sure.
14     THE COURT: Because I will tell you I have
15 questions. And let me give you those questions. And you
16 don't have to answer them, but I want you to keep them in
17 mind. Okay?
18     How did the feeder funds work? Was the money paid
19 to UBS or directly to Luxalpha? The feeder funds are the
20 initial transferees. If so, how did they get their
21 knowledge, through Mr. Littaye or Mr. Villehuchet only, or
22 additional defendants? And you need to take me through
23 those as you give your presentation. Okay?
24     MR. PACCIONE: Okay, Your Honor. Let me start
25 with that very broadly. The feeder funds, the two separate

19 (Pages 70 - 73)

Page 74

1  feeder funds which include Groupement and Luxalpha are
2  foreign feeder funds. They were set up, one, Luxalpha as a
3  SICAV, S-i-c-a-v, and Groupement as an entity. Both, again,
4  offshore and foreign.
5       They're investors. The people giving the money
6  over to those funds are all foreign investors. And I'm not
7  sure that was clear from any of the prior presentations. So
8  we have foreign investors making investments into foreign
9  funds.
10      At that point, Your Honor, what happens and how
11 are those funds administered? The UBS entities have certain
12 roles. The access entities that I am about to speak about
13 have certain roles. These entities are all separate,
14 distinct corporate entities serving different functions.
15 Some are administrative, some are advisory, some are
16 management related, but they all serve different functions.
17 And the point I want to echo is --
18      THE COURT: Well, let me ask you one other
19 question then. Is there any evidence that they had any
20 money that was not BLMIS money?
21      MR. PACCIONE: Who is the they, Your Honor, in
22 that question?
23      THE COURT: All your feeder funds that you're
24 dealing with -- that you're representing.
25      MR. PACCIONE: So as to the feeder funds, they

Page 75

1  were to the best of my knowledge a hundred percent invested
2  in Madoff. As to those two feeder funds, as to Groupement
3  and Luxalpha. So I don't think there is a dispute about
4  that.
5       I do want to say this. That the business of
6  Access and all of the Access entities was not solely with
7  regard to those two feeder funds. The trustee admits in
8  their allegations and the complaint that Access' business
9  wasn't just Madoff. Access' business included 10 to 15
10 other funds as set forth in Mr. Littaye's affidavit that
11 were not Access related. And so they had other business
12 dealings. Those other business dealings with those other
13 funds basically operate out of the New York office. And a
14 separate entity called Access International Advisors LLC,
15 they were a Delaware LLC operating in New York dealing with
16 those other 10 to 15 other funds.
17      THE COURT: Were those funds segregated? Were the
18 funds from those entities segregated from BLMIS funds?
19      MR. PACCIONE: Yes. They are completely separate
20 funds with separate investors --
21      THE COURT: So they're easy to show then, or
22 relatively easy to show. Okay.
23      MR. PACCIONE: Yes, Your Honor. Okay. So let me
24 get to the point I think that's at the heart of the motion
25 on jurisdictional grounds, and that is dealing with the

Page 76

1  three Access entities that identify -- and I'll go through
2  each one of them specifically as to what they did. But like
3  the UBS entities, Your Honor, these were service providers,
4  providing services outside of the United States to funds
5  that were located outside of the United States to investors
6  that were located outside of the United States. They did
7  not -- they were not investors. These were service
8  providers collecting fees, which fees were paid outside of
9  the United States. And so these were completely foreign
10 entities providing foreign services and receiving fees.
11 Most of the fees if you look at the chart actually weren't
12 even directly from the feeder funds to the Access entities,
13 but they made their way through to UBS entities, who were
14 all foreign, and then turned over to Access to some degree.
15      So these were, again, purely foreign funds. Not
16 investors, who were simply collecting their fees for the
17 services that they rendered. So the question then becomes
18 what did each one of these three Access entities do and
19 where were they located?
20      I'm going to start with Access International
21 Advisors LTD. We'll call them Access LTD. That's a Bahamas
22 limited company with registered offices in the Bahamas.
23 They had their own bank accounts in the Bahamas, their own
24 separate board of directors acting outside of -- acting in
25 the Bahamas by resolution. They had their own separate

Page 77

1  ownership. This is a purely foreign firm. And this is what
2  the trustee alleges it did.
3       ATD -- according to its own -- I'm reading from
4  Page 22 of the Trustee's brief, Your Honor. It said AIA
5  LTD was required to keep the net assets of the funds under
6  surveillance and constant review and carry out reviews and
7  controls of the portfolio and served as Luxalpha's official
8  consultant and exclusive introducing agent for potential
9  investors in Luxalpha. And they quote to Paragraph 89 of
10 the second amended complaint.
11      Those service, Your Honor, dealing for example
12 with foreign investors are all rendered outside of the
13 United States. They do -- as to communications with the --
14 as for all of these entities, the three entities that I'm
15 about to talk about, of the 4.5 million documents that
16 Access produced to the trustee, they found a single fax from
17 AIA LTD that was sent to BLMIS in connection with requesting
18 that reports be sent to the New York office for Madoff. A
19 single fax. None of the phone calls or the purported phone
20 calls that are listed. A single fax out of 4.5 million
21 documents that Access produced. They have all of Madoff's
22 records, and they have records that UBS produced. From
23 those productions, this is the connection that they're
24 trying to hold this Bahamian company into the United States
25 on the basis of a single fax in connection with services,

Page 78

1 again, all rendered offshore.

2    So, Your Honor, turning then to the second entity

3 that I want to talk about. These are Luxembourg entities.

4 And that's Access Management Luxembourg SA. It was known as

5 Access International Advisors Luxembourg SA. For today's

6 purposes I think we can call them AIA Lux. And what AIA Lux

7 is alleged to have done is they had -- they served as

8 investment advisor under advisory agreements, the advisory

9 agreements governed under foreign law, signed and executed

10 outside of the United States. And they were to verify

11 investment policy was effectively implemented through the

12 review of trade tickets and advising or making

13 recommendations as necessary to Luxalpha's management

14 company.

15    So what that means is that at times some of the

16 Access entities weren't even advising the funds directly,

17 but rather were advising some of the UBS entities as

18 necessary. And so their role was even again further removed

19 from the United States. Again, not potentially even

20 demonstrating a purposeful availment of their willingness to

21 beholden to a court hearing in the United States.

22    That entity did not direct any investments to the

23 United States. It had no contacts with the forum. It could

24 not make decisions on behalf of the fund. And so as a

25 result, Your Honor, it never distributed or received funds

Page 79

1 on behalf of the investors of the funds. This was a

2 separate entity providing advisory services offshore. And

3 again, insufficient as a matter of law, Your Honor, as we

4 describe in our brief, to demonstrate that it too could be

5 beholden to the United States on jurisdictional grounds.

6    The third entity -- third and last -- I'm sure

7 you're thankful for that -- is Access Partners SA, which we

8 describe as AP Lux. It's a Luxembourg entity. It too

9 served as Luxalpha's investment advisor for a period of time

10 from February 2007 until it liquidated. It was also

11 designated as Groupement's investment advisor. And based on

12 the trustee's own allegations, AP Lux was responsible for

13 advising Luxalpha's portfolio managers, UBS, TPM, and AML --

14 so again, one step removed -- with regard to investment

15 recommendations. And it was -- AP Lux was entitled to

16 receive a portion of management and performance fees from

17 Luxalpha's portfolio manager, not Luxalpha directly. Again,

18 one step removed. And that just -- again, their own

19 allegations demonstrate that the monies did not flow

20 directly from the funds, but even from foreign UBS entities.

21    At some point, AP Lux was also a nominal advisor,

22 Groupement Financier, for which it received some fees as

23 well from Groupement's investment manager, not from

24 Luxalpha.

25    These contacts, Your Honor, unquestionably

Page 80

1 relationships between foreign entities and actions taken

2 wholly outside of the United States. They are not -- they

3 may have helped build the scaffolding for, as the trustee

4 said, for these foreign funds, but that construction work

5 was not done in the United States. It was all done outside

6 of the United States, either in the Bahamas or Luxembourg.

7 And there was no expectation that these entities who

8 received fees outside of the United States for these

9 services outside of the United States could behold into the

10 United States to return those fees for services that they

11 properly rendered.

12    That brings us to the -- so that ends the entity

13 discussion, and that brings us to an individual, Patrick

14 Littaye, who is an individual defendant. We do move on

15 behalf of Mr. Littaye to dismiss on jurisdiction of grounds.

16 Mr. Littaye is a French citizen. He resided either in

17 France or Belgium during the relevant period and operated in

18 various capacities. But his principal work was done outside

19 of the United States in Europe.

20    In order to bring Mr. Littaye into U.S.

21 jurisdiction, the trustee points to his ownership in some of

22 the Access entities and also the fact that he was a

23 corporate officer or director of some of the Access

24 entities. And, Your Honor, in our brief, we argue that the

25 ownership of some portions of entities is not sufficient for

Page 81

1 jurisdictional purposes unless the corporate veil is

2 pierced. And we go through great lengths to demonstrate

3 that these corporate entities observed all of their

4 formalities.

5    With regard to his role as a corporate officer,

6 the Court would not have jurisdiction over him as his role

7 as a corporate officer unless the corporation was acting as

8 his agent rather than vice versa where he is acting as agent

9 for a corporation. And so for those reasons, those two

10 prongs don't work.

11    So the trustee then asserts a third prong and a

12 third argument. And that is Mr. Littaye did attend meetings

13 in the United States from time to time in connection with

14 Access broadly speaking. Those meetings did take place in

15 New York.

16    Pursuant to Mr. Littaye's affidavit, those

17 meetings were sporadic. They dealt with the US-based

18 business -- I mentioned the 10 to 15 non-BLMIS funds -- and

19 were not related to work for the four Luxalpha or

20 Groupement. They certainly weren't related to subsequent

21 transfers that were made.

22    And so to the extent that Mr. Littaye had meetings

23 in New York, there is no sufficient demonstration that those

24 causes of action for subsequent transfers made to him, which

25 went from BLMIS to the feeder funds mostly through UBS to

21 (Pages 78 - 81)

Page 82

1 some of these other foreign Access entities and ultimately
2 to Mr. Littaye is insufficient to demonstrate jurisdiction
3 over him personally.
4         And I do -- I should mention for Mr. Littaye, he
5 also was not an investor, not an investor in either
6 Groupement or Luxalpha, but he was an investor in Madoff
7 through some other funds that's not alleged in the
8 complaint.  But in his affidavit, Mr. Littaye says how he
9 lost millions of dollars through that investment.  So to the
10 extent that people are trying to create Mr. Littaye as
11 having actual or any kind of knowledge, he wasn't very
12 successful since he lost millions of dollars in these other
13 investments with Madoff to everyone's shock and surprise
14 (indiscernible) went under.
15         The final point, Your Honor, that I think I need
16 to address in connection with jurisdiction is I think the
17 trustee recognizes the difficulty in proving jurisdiction on
18 an entity-by-entity basis, that the conduct is
19 extraterritorial and not sufficient to haul those folks into
20 the United States.
21         So what they have tried to do to get around that
22 is what I'll call, you know, to demonstrate that the
23 jurisdictional moving defendants were mere departments of
24 the Access New York entity, that they try and basically pull
25 away the corporate separateness of all of these entities.

Page 83

1         And, Your Honor, we went through a fair amount of
2 work to demonstrate how there was a distinct structure
3 between these entities.  For the Court's purposes, we
4 submitted exhibits which show charts.  And I think that's
5 the simplest way for the Court to see the difference between
6 these entities.  For Access  Limited, it's Exhibit 40 to Mr.
7 Littaye's affidavit.  For AML, it's Exhibit 19, and for AP
8 Lux, it's Exhibit 8.  And when you look at those exhibits --
9 and we did have the supporting proof behind those -- they
10 demonstrate a number of things that prove that there should
11 be no collective jurisdiction, a piercing of the corporate
12 veil so to speak.
13         Each one of those entities had their own separate
14 constituted board of directors that conducted their business
15 outside of the United States.  Each one of those entities
16 had offices in their respective jurisdictions, either in the
17 Bahamas or Luxemburg.  Each of those entities had separate
18 contracts with their own separate providers and bore their
19 own share of expenses.  They had independent and different
20 management teams, they had sperate bank accounts.  Each of
21 those entities were not financially dependent on Access LLC
22 because they all earned their own fees.
23         And so as a result, when you look at the caselaw,
24 Your Honor, as to common ownership, of which there was none
25 -- there was some overlap -- the trustee cannot establish,

Page 84

1 and I quote, "The nearly identical ownership interest that
2 must be found before one corporation can be considered a
3 mere department of the other."  And that's citing the Levant
4 Line case, 166 B.R. 221.
5         The ownership of Access LLC and AIA Inc. on the
6 one hand and the ownership of each of these other access
7 entities, the moving entities on the other, are neither
8 nearly identical nor do they have the degree of commonality
9 needed to satisfy a mere department showing.
10         There is also the financial interdependence that's
11 not existent, as I said before.  These entities operated
12 separately, had their own monies coming in, had their own
13 contracts with service providers, et cetera, going out.
14 They observed their corporate formalities.  Each one had
15 their own independent directors that did not overlap with
16 either AIA Inc. or AIA -- or Access LLC, the New York
17 entities.  And there is some executive overlap that did
18 exist.  But that's far below the mirror image symmetry
19 required to support mere department status.  And I'm quoting
20 from the Reers v. Deutsche Bahn AG, 320 F.Supp. 2d 140
21 (S.D.N.Y. 2004).
22         And then there's the final point that to try and
23 get mere department showing, as the trustee talks about the
24 joint marketing, that somehow there are portions of websites
25 which talks about access globally.  But the Courts have been

Page 85

1 pretty clear that showing the joint marketing in those
2 efforts and not segregating every corporate entity when
3 doing marketing is insufficient to demonstrate mere
4 department status.
5         And then finally there is arguments about agency
6 and that the foreign principal has to exercise some element
7 of control over the in-state agent.  But the trustee has
8 actually done the opposite and the trustee argues and claims
9 that each of the moving entities, the foreign entities, was
10 controlled by Access LLC or AIA Inc.  And I'm citing to the
11 opposition brief at Pages 9 to 14 and also Page 17.
12         And this U.S. agent supposedly did not have the
13 authority to contractually bind the foreign entities and the
14 agent was not primarily employed by the foreign defendant
15 and did not engage in similar services for these entities.
16 The services that were rendered, again, for Groupement and
17 financier and Luxalpha all took place outside of the United
18 States.
19         So, Your Honor, with that, I believe that on the
20 jurisdictional grounds, the claims against the foreign
21 service providers and Mr. Littaye individually should be
22 dismissed on the basis of lack of personal jurisdiction.
23         With that, Your Honor, I will rest on my papers
24 with regard to the other arguments.
25         THE COURT:  And who is doing rebuttal?

22 (Pages 82 - 85)

Page 86

1      MS. FERNANDEZ:  Good morning, Your Honor.  Jessica

2  Fernandez, associate of Baker Hostetler, counsel for

3  trustee, Irving Picard.

4      I will be arguing on behalf of the trustee in

5  opposition to the Access defendant's motion to dismiss for

6  lack of personal jurisdiction.  Defendants, Access

7  International Advisors Limited, Access Management Luxembourg

8  SA, Access Partners SA, and Patrick Littaye all moved for

9  lack of personal jurisdiction while Access International

10  Advisors LLC did not, as it is based in New York.

11      Defendants challenged the sufficiency and accuracy

12  of our allegations by trying to argue that the various

13  Access entities were actually separate and distinct.

14  Looking at the totality of the circumstances, by viewing the

15  pleading in the light most favorable to the Plaintiff, the

16  trustee has made a prima facie showing that jurisdiction

17  exists over defendants by sufficiently alleging that the

18  Access entities are subject to this Court's jurisdiction as

19  mere departments of Access International Advisors LLC and

20  Access International Advisors Inc., its predecessor, both

21  located in New York.

22      Defendants argue that the Trustee only points to

23  contacts among foreign entities and actions taken or

24  performed outside of the United States.  Their complaint

25  sufficiently alleges the contrary.  Littaye has had a long-

Page 87

1  lasting relationship with Madoff since 1985.  Stemming from

2  that relationship, Littaye and Villehuchet created a series

3  of investment companies, the Access defendants, which

4  operated as a single business entity.  And that same entity

5  created and serviced the funds, Luxalpha and Groupement

6  among others, to direct investments in BLMIS in New York.

7  The primary purpose of these entities was to receive fees

8  for servicing those funds.  To the extent they had any

9  corporate duties, they were performed by Access personnel in

10  New York because the Access entities were shell companies

11  with no regular employees.

12      There was an absence of formalities as well among

13  the entities.  One Access entity often acted on behalf of

14  another and the employees of Access entities performed work

15  across all the entities without regard of which entity

16  formally employed them.  Access and its employees also

17  commonly used collective names such as Access or AIA Group,

18  emphasizing their operation as a single business entity.

19      The trustee alleges the absence of formalities

20  amongst the Access entity stemmed from the entity's common

21  ownership with both Littaye and Villehuchet, who as we

22  alleged, completely or nearly completely owned, controlled,

23  or dominated the Access entities.  The Access entities were

24  present in New York through Access International Advisors

25  LLC and Access International Advisors Limited.

Page 88

1      This very same issue has actually been litigated

2  in this jurisdiction in SPV Osus Ltd. v. AIA LLC, an action

3  stemming from the Madoff fraud where Judge Rakoff found that

4  what plaintiff pleaded was enough to make a prima facie

5  showing of jurisdiction over the very same Access defendants

6  as they were mere departments of Access International

7  Advisors LLC and found that the requirement of common

8  ownership of these Access entities was satisfied.

9      Here, the trustee has adequately pled that the

10  Access entities were mere departments of Access New York.

11  Even if the Access entities are not viewed as mere

12  departments of Access International Advisors LLC and Access

13  International Advisors Inc., this Court should still

14  emphasize specific jurisdiction over each of the Access

15  defendants because they directed investments in BLMIS in New

16  York.

17      These Access entities created, marketed, promoted,

18  serviced the funds, and these entities did everything to

19  direct and create the opportunity for investments into

20  BLMIS.  The Access entities created numerous funds,

21  including Luxalpha and Groupement, and channeled over $2

22  billion into BLMIS through these funds.  It is undeniable

23  that Littaye and the Access entities directed investments

24  into BLMIS, received redemptions from BLMIS, and earned fees

25  for the services they provided to those funds such that they

Page 89

1  purposely availed themselves of the benefits of investing in

2  New York.

3      Mr. Paccione argues that the Access defendant had

4  other on-BLMIS business.  But what he omits to say is that

5  92 percent of Access revenue stemmed from BLMIS investment.

6      I will now turn to the specific allegations

7  against each Access entity to establish they directed

8  investments into BLMIS in New York.

9      As for Access International Advisors Limited, it

10  was Luxalpha's official consultant and exclusive introducing

11  agent.  It was also Groupement's investment manager,

12  operator, and investment advisor.  As investment manager,

13  Access International Advisors Limited was required to keep

14  the net assets of the funds under surveillance and constant

15  review, carry out reviews and controls of their portfolio.

16  The purpose of this entity was to be an offshore entity that

17  was a money box set up to receive fees on behalf of Access.

18      Mr. Paccione points out to a communication with

19  BLMIS and this entity.  That further undercuts the false

20  suggestion that New York Access entities were only involved

21  with non-Madoff funds.

22      As for Access Management Luxembourg SA, it was

23  nominally Luxalpha's portfolio manager.  It had to promote

24  the fund, solicited subscriptions, and receive

25  (indiscernible) redemptions.  It was also Luxalpha's

23 (Pages 86 - 89)

Page 90

1 portfolio advisor, advising UBS SA in connection with its
2 role as Luxalpha's portfolio manager.
3        As for Groupement and Groupement Levered, it acted
4 as its investment advisor.
5        Access Partners SA was the investment advisor to
6 Luxalpha.  It was also the nominal advisor of Groupement
7 Financier and Groupement Levered.  It was created to protect
8 Luxalpha and BLMIS from U.S. regulatory scrutiny at the
9 request of Madoff.  Each Access entity received fees for the
10 services they performed for the funds, and the trustee is
11 seeking those very same fees.
12        As to Littaye, the Trustee has sufficiently pled
13 that he had numerous substantive contacts with New York that
14 establish this Court's jurisdiction over him.  Mr. Paccione
15 again argues that Littaye's meetings in New York were
16 sporadic and not related to their feeder funds or BLMIS
17 investment.  (indiscernible) is a factual issue, and our
18 complaint sufficiently alleges the contrary.  As the trustee
19 alleged, Littaye made quarterly visits in New York to visit
20 Madoff.  He attended Access quarterly strategic meetings in
21 New York.  He made sure that he was the sole point of
22 contact between Access and Madoff.  He also closed down the
23 2006 Chris Cutler investigation in New York himself.  Any
24 issues, questions, or concerns regarding the several access
25 funds that maintain accounts with BLMIS were addressed by

Page 91

1 and had to be run through Littaye.  Littaye coordinated,
2 dominated, and controlled Access, serving as a director and
3 executor for all the Access entities and sat on the board of
4 directors of both Luxalpha and Groupement.
5        In isolation, these contacts would be sufficient
6 to support jurisdiction.  In their totality, they undeniably
7 establish that Littaye purposely directed his activities to
8 New York.
9        Judge Rakoff, again in SPV Osus, already found
10 that Littaye's quarterly meetings with Madoff in New York
11 and his efforts to shut down discussions of BLMIS
12 irregularities in a 2006 meeting in New York were more than
13 sufficient to make a prima facie case of jurisdiction over
14 Littaye.  The trustee alleges the same facts as well as
15 numerous others that support specific jurisdiction over
16 Littaye.  The trustee's underlying claims arise out of or
17 relate to Defendant's contacts as the trustee seeks to
18 recover the fees the Access defendants received for the
19 services provided to the funds for directing investment in
20 BLMIS in New York.
21        In conclusion, Your Honor, the Trustee has made a
22 prima facie showing of jurisdiction over each of the Access
23 defendants.  And at a minimum, the trustee is entitled to
24 jurisdictional discovery as the trustee has put forth a
25 reasonable basis for jurisdiction over defendants.

Page 92

1        I know that Mr. Paccione has gone into detail as
2 to the amount of documents produced to date.  And if Your
3 Honor would like me to get into that production, I can do
4 so.  And if not --
5        THE COURT:  Wait a second.  I would like a summary
6 of what you received.  There is one thing to have volume.
7 It's another thing to have detail.  So tell me what you've
8 got.
9        MS. FERNANDEZ:  Exactly, Your Honor.  Although
10 Access is throwing a high number of documents produced, they
11 only produced electronic documents from their New York
12 server.  And that included a lot of spam emails and non-
13 relevant documents.  That production also did not include
14 any paper documents nor the books and records of the other
15 Access entities.  And we have been in communication with
16 Access counsel regarding the production, and they let us
17 know that they had already preserved documents in Europe.
18 And to date we have not received those documents.
19        THE COURT:  Mr. Paccione also said something about
20 that Mr. Littaye was a loser.  Is he a net winner or is he a
21 net loser?  Do you know, Mr. Paccione, do you know?
22        MR. PACCIONE:  In his affidavit -- declaration
23 that he submitted, he declares that he was a net loser, Your
24 Honor.  But a net loser -- he invested, again, not through
25 Groupement or Luxalpha, but through another feeder fund.

Page 93

1        THE COURT:  But he has profits through his fees,
2 right?
3        MS. FERNANDEZ:  Yes, Your Honor.  And that's what
4 we alleged.
5        THE COURT:  Okay.  Rebuttal -- not just rebuttal,
6 but anything you want to add?
7        MR. PACCIONE:  Yes, Your Honor.  I have a couple
8 of points.  I just want to make sure that -- there was a
9 reference to -- and I want to focus on the Access entities
10 for a moment.  There was a reference to one of them
11 receiving subscriptions or dealing with subscriptions and
12 investments.  Your Honor, that's not dealing with the
13 redemptions, for example, from Madoff to the feeder funds.
14 Rather, these are the entities that interface with the
15 foreign investors in Groupement and Luxalpha.  So the
16 reference -- there is no allegation still, notwithstanding
17 what we just heard, not a single allegation of any conduct
18 by the three corporate entities that we've been talking
19 about that took place in the United States.  Not a single
20 one.
21        With regard to the SPV Osus decision that's been
22 bandied about, Your Honor, that was not a subsequent
23 transfer case.  It wasn't a bankruptcy case.  It was a tort
24 case.  The court -- the phrase that's being quoted was pure
25 dictum.  He did not rule on jurisdictional grounds on that

24 (Pages 90 - 93)

Page 94

1 particular point. He said in dictum given what I'm hearing,
2 there may be a need for discovery and a hearing on this
3 jurisdictional aspect. But again, that was a different
4 case, different claims, some different parties. And most
5 importantly, Your Honor, in that case, the plaintiffs did
6 not have access to the millions of documents that have been
7 produced to the trustee like here. And so Judge Rakoff, if
8 he was thinking about jurisdictional discovery, it was in
9 that context.
10      As to that document issue, Your Honor, there were
11 indeed 4.5 million documents. Because what we did was we
12 turned over -- my firm, before I took over this case, turned
13 over the entire server that was in the New York office. So
14 it was -- it did include junk email. But we said here, you
15 want it, you can have it. And we gave them everything. We
16 did make hard copies available. Notwithstanding what I
17 heard from counsel, those hard copies were actually scanned
18 and part of the production as based as what we know.
19      And in terms of other documents outside of the
20 United -- so if the trustee wanted to see what
21 communications were had from the foreign entities to the New
22 York office, they have the source of that. They have the
23 source because they have the entire New York server. There
24 is no need for jurisdiction to find who else -- what else
25 was sent directly to the New York office.

Page 95

1      To the extent that they want to see communications
2 directly to Madoff in New York, well, they have access to
3 that because they have tens of thousands of boxes, not to
4 mention scores of data from Madoff to also demonstrate what
5 contacts were made from Access Europe to Madoff directly.
6      So this notion that somehow there's jurisdictional
7 discovery that's needed really just doesn't fly, Your Honor.
8 They have everything that they need.
9      And it also undercuts, Your Honor, if they're
10 saying that the New York documents weren't sufficient, then
11 it sort of suggests that the New York entities weren't the
12 center of the universe for these foreign funds. If they
13 were, then they would have seen everything that they need to
14 see. This proves that the efforts and the energies and the
15 services that were provided and the monies received all took
16 place outside of New York and all took place offshore in
17 Europe, Your Honor. So as a result of that, I think our
18 jurisdictional arguments -- I think we could rest on our
19 papers.
20      One other point in terms of employees and shell
21 companies. There were references to that. I think we
22 disproved that in the underlying papers in terms of separate
23 directors, existing bank accounts, fees being earned. And
24 there are times -- and there's a case cited on Page 11,
25 Footnote 9, where sometimes employees at times perform work

Page 96

1 for other entities and had multiple email addresses. But
2 that's enough to disregard the corporate form. And that's
3 the (indiscernible) case on Page 11, Footnote 9.
4      So, Your Honor, unless the Court has any other
5 questions, we will rest.
6      THE COURT: Anything anyone wishes to add on the
7 Access, Littaye, and Villehuchet? Yes, ma'am.
8      MS. FERNANDEZ: Nothing from me, Your Honor.
9      THE COURT: Well then now we are at the motion to
10 dismiss by Theodore Dumbauld.
11      MR. KNUTS: Good afternoon, Your Honor. Again,
12 it's Robert Knuts from the Sher Tremonte firm for Defendant,
13 Theodore Dumbauld.
14      Unlike the prior arguments, I can say that Mr.
15 Dumbauld is fully subject to this Court's jurisdiction as an
16 American. In fact, a graduate of the Naval Academy. So I
17 won't be talking at all about jurisdiction.
18      THE COURT: Okay.
19      MR. KNUTS: In our papers, the motion to dismiss,
20 we presented several arguments in favor of that motion. I
21 want to focus my time today on one of those. And that is
22 the employee compensation issue.
23      At Page 29 of our moving brief, we quoted from a
24 case called Geltzer, which concluded that an officer or
25 employee who is the recipient of a salary from a company

Page 97

1 that received an allegedly fraudulent transfer is not
2 without more the subsequent transferee of the conveyance.
3      The trustee addressed this argument in their
4 opposition brief at Page 69 and essentially tries to rebut
5 that in three ways. I mean, first, the Trustee claims that
6 he is unable to confirm that the only money transfers made
7 to Mr. Dumbauld were in the form of employee or officer
8 compensation. But that --
9      THE COURT: Let me stop you right there, because
10 that was one of my questions. Have you given that brief to
11 the trustee?
12      MR. KNUTS: Well, back in the Rule 2004 days, we
13 turned over all the documents they asked for. I assumed
14 that on the server, the Access server it included, you know,
15 payroll documentation and everything --
16      THE COURT: But you didn't break it out yourself
17 and even make yourself aware of that. Basically where did
18 the money come from if it wasn't from BLMIS, that's...
19      MR. KNUTS: Well, as the trustee has alleged in
20 both the first amended complaint and the second amended
21 complaint and as Mr. Paccione mentioned earlier, Access in
22 New York had other services that they provided to clients
23 relating to completely unrelated funds. You know, it had
24 nothing to do with BLMIS. For example --
25      THE COURT: But you didn't break it out even for

25 (Pages 94 - 97)

Page 98

1 yourself.

2        MR. KNUTS:  In terms of -- well, first of all, by
3 the time this case started, Mr. Dumbauld had long left the
4 employment of Access.  And I have not had the ability to go
5 back into Access's payroll records to determine what
6 percentage of income related to BLMIS versus --

7        THE COURT:  Well, just so you know, because the
8 trustee has alleged that only five percent of that business
9 was not BLMIS.  So I was just curious if you did that for
10 your own sake or when you're making these arguments you too
11 have already done your own research on this.  And your
12 answer is no.

13        MR. KNUTS:  Without Access, I couldn't do the same
14 research that Mr. Paccione could do or others.  But I will
15 point out, Your Honor, that there have been -- the Trustee
16 has made different allegations about different time periods.

17        For example, in the first amended complaint, he
18 alleged during 2005 that Access's BLMIS revenue was only 61
19 percent of its total revenue.  And now in the second amended
20 complaint, it does say by 2008 that it had grown to 92
21 percent.  So it did vary over time.

22        THE COURT:  Yeah, but I was just asking for your
23 own sake, your arguments, if you'd looked.  Okay.
24 (indiscernible).

25        MR. KNUTS:  Sure.  Well, one thing I know for

Page 99

1 sure, Your Honor, and that is the amount of revenues that
2 were unrelated to BLMIS at Access more than covered the
3 monies paid to Ted Dumbauld.  That's absolutely for certain.
4 I mean, the total -- they had revenues in excess of the
5 $1.25 million that the trustee alleges was received by Mr.
6 Dumbauld during the relevant time period and could involve
7 subsequent transfers.  We know for sure that there was a lot
8 more money going through Access than that.  But --

9        THE COURT:  Of course he wasn't the only expense.
10 But that's another point.

11        MR. KNUTS:  Absolutely, Your Honor.  But what I
12 want to -- so a couple of things just turning back to this,
13 a little hint in saying he doesn't have the ability to
14 confirm that the only money received by Mr. Dumbauld was
15 compensation, employee compensation.  In fact, Paragraph 337
16 of the second amended complaint says that the $1.25 million
17 wasn't, you know, officer employee compensation.  So he
18 cannot say in his opposition papers something that's
19 inconsistent with the actual allegation in the second
20 amended complaint.  He's made the affirmative obligation
21 that it was compensation, and he should be stuck with that.
22 And actually, he is stuck with that because that's the
23 section (indiscernible).

24        The second argument that the trustee makes
25 concerning how he's not bound by the Geltzer case is that he

Page 100

1 argues that the second amended complaint includes
2 allegations that Mr. Dumbauld did not receive his
3 compensation in good faith.  But when you look at the
4 allegations that he relies on on Page 69 and you actually go
5 back and read those allegations that are in the second
6 amended complaint, you'll see there's no factual allegation
7 that Mr. Dumbauld ever acted in bad faith.  The factual
8 allegations concerning Mr. Dumbauld are he was given an
9 assignment to analyze Madoff trading, he performed that
10 assignment, he provided the results of his analysis to his
11 superiors at Access.  He was then told to get somebody else
12 to take a look at the analysis.  He did.  He found who the
13 trustee believes is extremely competent, Mr. Cutler, to
14 conduct another analysis.  And he then facilitated Mr.
15 Cutler to report those results to the people at Access, his
16 bosses.

17        There is nothing -- in every step of the way, Mr.
18 Dumbauld did the right thing.  He did the work honestly, he
19 reported honestly.  He described exactly what he learned.
20 Mr. Cutler, he did nothing to interfere with Mr. Cutler,
21 describing what Mr. Cutler learned.  You know, there's no
22 allegation in the second amended complaint that Mr. Dumbauld
23 as an individual had any authority to do anything else at
24 Access with that information.  And so in fact there is no
25 allegation in the second amended complaint that he acted in

Page 101

1 bad faith in some way at any point in time.

2        And then lastly, the trustee makes the argument
3 that it's unclear in some way whether the compensation that
4 Mr. Dumbauld received as an employee and officer of Access
5 was received "for value".  Because he says that that's
6 another ground for getting out from the Geltzer decision.
7 But again, there is nothing in the second amended complaint
8 that actually alleges that Mr. Dumbauld did not provide
9 value for that compensation.  It's just not there.  And
10 without an affirmative allegation saying that this was --
11 that services were provide for no value, you don't have a
12 claim.  It's just not the case that you can sort of say
13 there may be other issues here.  You know, you have to
14 actually affirmatively say that there's an issue in a
15 complaint in order to make a claim.

16        So I think the sum and substance of the Geltzer
17 argument about employee compensation is that you can in fact
18 under the right circumstances make specific -- as a trustee
19 make specific allegations to put an employee's compensation
20 in play as a subsequent transferee.  But if Your Honor were
21 to deny Mr. Dumbauld's motion to dismiss when there are no -
22 - those type of allegations don't actually exist in the
23 second amended complaint, then I think it could create a
24 really problematic precedent for future Ponzi cases and
25 future trustees.  You know, they would be encouraged to name

26 (Pages 98 - 101)

Page 102

1 other employees trying to claw back compensation just

2 because the compensation was received during a time period

3 when there was also initial transfers that could have flowed

4 downwind. And it's not going to be just the Ted Dumbaulds

5 of the world who are then subject to that kind of claim.

6       And so I would urge Your Honor to really hold the

7 trustee's obligation, you know, hold them to the obligation

8 that the Geltzer case said, which is if you've got actual

9 allegations, specific factual allegations of bad faith or no

10 value for the compensation, then okay, maybe you can tag an

11 employee with possibly getting his compensation clawed back.

12 But because that's not here, Your Honor should dismiss Ted

13 Dumbauld from this case.

14       I mean, if you look at the second amended

15 complaint on Page 83, they put together a chart showing all

16 the funds flows and everything else. And there's Ted

17 Dumbauld, floating somewhere on the page. You know, without

18 any lines drawn to him, anything, just because he received

19 compensation during a relevant time period. That's not what

20 a subsequent transferee case should be involving an

21 employee. And for the rest of our arguments, we'll rest on

22 what we put in our papers. Thank you.

23       THE COURT: Rebuttal? Yeah, you were on mute. We

24 didn't get your name.

25       MS. USITALO: Sorry about that. Michelle Usitalo,

Page 103

1 Baker Hostetler, for the trustee, Your Honor. And I am

2 responding to a few issues here under the arguments that the

3 defendants have made on the 12(b)(6) issues.

4       I can address first some of the arguments that

5 were just raised with respect to Mr. Dumbauld specifically

6 and then I will turn to some of those other --

7       THE COURT: Did you not do that when we were

8 having the argument earlier? I'm missing something here.

9       THE COURT: Yes. Sorry, Your Honor. No, I am

10 addressing -- so it was -- Mr. King addressed the issues of

11 the Trustee's allegations concerning actual knowledge and

12 also generally the issues of the sufficiency of the

13 Trustee's pleadings with respect to customer property for

14 each of the defendants. And I know that we've touched on

15 parts of the customer property issue already, but I did have

16 some further joinders that apply to all of the defendants --

17       THE COURT: Okay. I'm a little flummoxed because

18 I thought we addressed those at the time we were addressing

19 them.

20       MR. USITALO: Apologies, Your Honor --

21       THE COURT: You're going to do the lumping.

22       MR. USITALO: Well, that -- apologies, Your Honor.

23 As we were addressing the personal jurisdiction issue

24 specifically with respect to each defendant --

25       THE COURT: Okay, all right. But answer Mr. Knuts

Page 104

1 first.

2       MR. USITALO: Okay, I will do that. And I think

3 as Your Honor pointed out, the issues here too are the fact

4 that the Trustee has alleged in a plain statement in his

5 complaint, which is all that's required at this stage of the

6 litigation, that Mr. Dumbauld received the $1.2 million in

7 transfers. And we allege that it was at least that amount

8 in compensation. But to note, Mr. Dumbauld was also a

9 partner of Access LLC and he was also the chief investment

10 advisor. So there could be additional transfers there as

11 well as a result of fees that Access received and their LLC

12 received in their role.

13       But particularly too on the point with the fact

14 that it is compensation that is being alleged, we did allege

15 the more that Mr. Knuts was referring to. And I know he

16 characterized it in a certain way, but that's not what is

17 appropriate here. It's the Trustee's allegation that must

18 be taken as true and inferences made in his favor. And the

19 Trustee has alleged that when concerns were raised about

20 Madoff's trading activity that Mr. Dumbauld, as Access's

21 chief investment advisor, was asked to perform an analysis

22 of that trading activity, and he could not confirm that the

23 trading activity was taking place. And then when he was

24 asked to get a second opinion and they hired Mr. Chris

25 Cutler to perform a similar analysis, this resulted in Mr.

Page 105

1 Cutler coming to Mr. Dumbauld and telling him -- and this is

2 quoted in the trustee's complaint -- that if BLMIS were a

3 new investment, he would likely shove it out the door.

4       Mr. Dumbauld was also present at the meeting where

5 this analysis was presented to Littaye and Villehuchet. So

6 there is the more here that is required. And the trustee

7 doesn't have to prove those allegations at this point, just

8 merely allege that there is more to just Mr. Dumbauld being

9 an employee of Access. He was an integral part of Access

10 and he had the more that is required here.

11       THE COURT: Excellent. And I apologize to you

12 because I think I did basically let you reserve your

13 jurisdictional rebuttal. And I took a break instead of

14 listening to you. So I apologize.

15       MR. USITALO: No, that is no problem.

16       I will turn to the arguments that the defendants

17 have made with respect to 546(e) and the --

18       THE COURT: You're talking about UBS now, right?

19       MR. USITALO: I am talking about UBS because they

20 -- I'm sorry. UBS has made the arguments today, but --

21       THE COURT: Non-jurisdictional, right.

22       MR. USITALO: Non-jurisdictional, yes. All of the

23 parties have taken -- made the same arguments in their

24 papers as well as adopted the arguments of UBS. So I

25 believe it was Mr. King who was presenting those arguments

27 (Pages 102 - 105)

Page 106

1  today, but all of the Defendants participated.

2      THE COURT:  Okay.

3      MR. USITALO:  And since they didn't touch -- since

4  Mr. King didn't touch on the legal arguments of 546(e) and

5  Your Honor has already addressed those, we too will rely on

6  our papers in that respect.

7      But I do want to address the defendant's arguments

8  that the trustee has not adequately pled that Luxalpha and

9  Groupement, the initial transferees, have the requisite

10  actual knowledge that permits the trustee to pursue his

11  claims for avoiding transfers beyond the two years.

12      And I know it's been mentioned already, Your

13  Honor, but it's important again to emphasize that the

14  standard here is that the trustee's allegations must be

15  taken as true and all inferences made in his favor.  And

16  when that analysis is performed here, those inferences make

17  out a plausible claim.

18      And we've discussed it quite a bit here today, but

19  both Luxalpha and Groupement are groups that operated solely

20  through their agents.  And this includes the UBS defendants

21  and the Access defendants that were acting as directors and

22  service providers.  And the trustee has alleged that the

23  conduct and knowledge of those defendants should thus be

24  imputed to Luxalpha and Groupement.  And the trustee has

25  also pled in his allegations that Luxalpha and Groupement

Page 107

1  had actual knowledge that BLMIS and that the defendants knew

2  that BLMIS was operating a fraud and that Luxalpha and

3  Groupement's agents knew that Madoff could not be executing

4  all the securities transactions he reported.  Specifically,

5  Luxalpha and Groupement knew, the trustee alleges, that the

6  volume of options trades Madoff purported to execute on

7  their behalf was impossible and that Madoff lied about the

8  identify of his purported options counterparties and that

9  Luxalpha and Groupement knew that the returns BLMIS claimed

10  to produce were impossible given its stated trading strategy

11  and that Luxalpha and Groupement knew that BLMIS reported

12  trades as having been made at impossible times and prices

13  and that these funds' agents were aware of signs of fraud at

14  BLMIS and that Patrick Littaye actively impeded any inquiry

15  into the signs of fraud by quashing and deflecting

16  questions.  And the trustee alleges that Luxalpha and

17  Groupement's awareness of BLMIS' impossible trading activity

18  and performance, demonstrable awareness of the fraud and the

19  directors' and managers' deliberate actions to protect

20  Madoff established defendant's knowledge of fraud.  And the

21  trustee goes on at length in his complaint to provide

22  allegations in support of this.

23      And it's the trustee's position that all of those

24  allegations that filled all of our screens when Mr. King was

25  speaking amount to a totality of -- the totality of

Page 108

1  allegations that amount to actual knowledge.  And I note as

2  well that some of those allegations that were up on the

3  screen in those particular allegation callouts, there were

4  allegations that the trustee has alleged that the defendants

5  knew.  I noted those parts weren't highlighted, but they

6  were there.

7      And in going through the trustee's allegations, I

8  think we first must begin with the allegations that the UBS

9  and Access defendants deliberately deceived the Luxalpha --

10  sorry, the Luxembourg regulator, which was referred to as

11  the CSSF, by failing to disclose BLMIS' multiple roles in

12  the fund.  Luxalpha, as we noted, has filed their answer in

13  this proceeding.  And in its answer, Luxalpha admitted that

14  the purpose of the USITC's regulations is to protect against

15  fraud, and the UBS defendants and Access defendants set up a

16  structure for Luxalpha that was not in compliance with

17  USITC's regulations, and the Access defendants knew this.

18      And how do we know they knew?  Because the trustee

19  alleges that Access had originally operated (indiscernible)

20  another BLMIS feeder fund, with BNP Paribas acting as the

21  sponsor of the fund.  And in a meeting with Access, BNP said

22  that BLMIS' role as both custodian and investment advisor

23  was unconscionable, violated BNP's internal security rules,

24  and Luxembourg law.  And BNP proposed a path forward to

25  address these concerns and said they either needed to

Page 109

1  identify BLMIS to the CSSF or get real-time trading access

2  from Madoff.  Madoff said no, BNP said it would not go

3  forward, and (indiscernible) closed.  But Access moved on

4  and opened Luxalpha without missing a day of investment with

5  BLMIS.  And this time, UBS acted as its sponsor.

6      In deliberately deceiving the CSSF and not

7  identifying BLMIS' multiple roles for Luxalpha, the Access

8  and UBS defendants aren't overlooking laws and regulations

9  to make money; they are purposely circumventing laws meant

10  to prevent fraud, to expose people like Madoff.  And they

11  aren't overlooking; the trustee alleges they are lying.

12  Lying to the CSSF, withholding information to the SEC about

13  whether or not they acted as a counterparty to Madoff,

14  helping Madoff avoid SEC scrutiny by setting up an Access

15  entity that purportedly acted as an investment advisor.

16      But why tell these lies?  Why prevent Madoff from

17  being exposed?  Why go to such great length to perpetuate a

18  structure that allows fraud?  The inference that can be

19  drawn here is that they did it because they knew.  And this

20  knowledge belongs to the funds, Luxalpha and Groupement,

21  because it was their agents and their service providers that

22  told these lies and that took these actions.

23      The trustee alleges that UBS and Access both had

24  anti-fraud due diligence procedures in place.  Did BLMIS go

25  through these procedures?  The trustee alleges it did not.

28 (Pages 106 - 109)

Page 110

1  Why did it not?  The inference that can be drawn here is
2  because Luxalpha's service providers knew that BLMIS would
3  not pass.  Some due diligence occurred when someone raised a
4  flag about Madoff's trading.  And I mentioned this.  And it
5  was first Mr. Dumbauld as Access's chief investment officer
6  that reviewed the trading activity and confirmed that the
7  options trades purportedly being made by Madoff didn't
8  appear in the database as they should of.
9        Then Access hired Chris Cutler to perform that
10  analysis and other analysis, and he did perform that
11  analysis.  And as a result, Cutler recommended that Access
12  exit all investments with BLMIS.  And he shared the results
13  of his inquiry with Littaye and Villehuchet.  And what did
14  they do?  They cut Cutler's investigation short and
15  suppressed his findings.
16        Now, I know the defendants in their papers and in
17  their arguments today may offer alternative explanations for
18  these conducts or these statements.  But these explanations
19  are not relevant at this stage of litigation where it is the
20  trustee's allegations that must be taken as true.  And the
21  trustee alleges that Access and UBS defendants' conduct
22  reflects their knowledge of Madoff's fraud.
23        And to give an example, UBS takes the Trustee's
24  allegations of the knowledge of fraud and claims that these
25  allegations just plead that UBS had different risk

Page 111

1  tolerances.  Again, this explanation is irrelevant, but it
2  also opens the door for further questions.  Risk of what?
3  Risk that Madoff's fraud would be exposed?  UBS's argument
4  simply illuminates that perhaps UBS was willing to act as
5  Luxalpha and Groupement's service provider because the
6  potential for income was so great that it was worth it in
7  the event that Madoff's fraud was never exposed.  In fact,
8  the trustee alleges that this was UBS's very thinking.
9        Business is business was an instruction from a
10  Luxalpha director and UBS managing director.  We cannot
11  permit ourselves to lose $300 million.  Accept client.  The
12  plausible inference from this statement was not that they
13  didn't have actual knowledge of Madoff's fraud.  Instead,
14  that they didn't care if they did.  And in any event, it
15  presents a question of fact.
16        And defendants make a point about the trustee's
17  allegations of red flags.  But these allegations also serve
18  to support the trustee's allegation of actual knowledge.
19  The trustee does not list red flags in such a way that has
20  been found in other cases to be insufficient to plead actual
21  knowledge or willful blindness.  The complaint alleges
22  concrete examples of instances where the defendants
23  recognized these red flags and saw them for what they were;
24  evidence of trading that was impossible.
25        And as noted, neither Mr. Dumbauld nor Mr. Cutler

Page 112

1  confirmed that Madoff -- could confirm that Madoff was
2  making his options trades.  Both Mr. Cutler and UBS noted
3  that Madoff's strategy could not produce the returns
4  reported.  UBS identified out-of-range prices in a BLMIS
5  trade confirmation and Access knew that the appointment of
6  Friehling & Horowitz as BLMIS' auditor caused concern.  And
7  in response, Littaye gave the instruction, don't go further.
8        And with respect to counterparties, Chris Cutler
9  noted, "I just can't find the other side of the trade."  And
10  when a Swiss private bank directly asked Madof to identify
11  the counterparties, Madoff called Littaye with an
12  explanation that Littaye didn't understand and Villehuchet
13  asked the bank to stop contacting Madoff.
14        And when the SEC came to UBS in the U.S. and asked
15  if one of its affiliates was acting as one of Madoff's
16  counterparties, UBS told the SEC they would have to go ask
17  the affiliates themselves.
18        THE COURT:  I have a question.
19        MS. USITALO:  Sure.
20        THE COURT:  You keep talking about the UBS
21  affiliates.  Are you talking about SA, are you talking about
22  AG?  How are you -- link those for me.
23        MS. USITALO:  So with respect to the review of the
24  trading activity, it was UBS SA and the custodian and
25  administrator that were reviewing those statements and

Page 113

1  confirmations.  So it's different allegations for each.
2  There were instances where UBS AG was --
3        THE COURT:  I know there were.  But I have read
4  every word of your complaint.  And I want the answer to that
5  question.
6        MS. USITALO:  Which allegations we are alleging
7  that UBS SA had -- sorry, which UBS entity had which
8  knowledge?
9        THE COURT:  Exactly.
10        MS. USITALO:  Okay.  So it is in -- UBS SA is the
11  one that identified out-of-range trade prices in the BLMIS
12  trade confirmations.
13        THE COURT:  I want to just say something right
14  now.
15        MS. USITALO:  Okay.
16        THE COURT:  Every time you use UBS, please be
17  specific.
18        MS. USITALO:  Will do, Your Honor.  And I want to
19  then clarify to you when I am talking about that -- I had
20  made the statement that UBS noted Madoff strategy.  That was
21  UBS AG.
22        THE COURT:  Okay.
23        MS. USITALO:  And actually lastly, Your Honor, I
24  was just going to make -- to note that Luxalpha, with
25  respect to the counterparties, reported to its auditors that

29 (Pages 110 - 113)

Page 114

1 BLMIS' option counterparties were approved by UBS AG, even
2 though we know that could not be the case.
3        THE COURT:  Explain that then.
4        MS. USITALO:  Because there were no counterparties
5 to approve.
6        THE COURT:  Oh, okay.
7        MS. USITALO:  And, Your Honor, just in conclusion
8 with respect to actual knowledge, I think these allegations
9 that I've just been through taken together and viewed in the
10 light most favorable to the trustee satisfy the trustee's
11 burden of alleging actual knowledge and support the
12 trustee's ability to pursue claims to avoid the transfers
13 made to Luxalpha and Groupement beyond the two-year period.
14       And so I would like to finally just go and touch
15 on the arguments that the defendants have made with respect
16 to the trustee's allegations on the recovery under Section
17 550 of the subsequent transfers.  And at this stage what the
18 trustee must do to move beyond the pleading stage and
19 recover subsequent transfers from the defendants is to
20 provide the defendants with a short and plain statement of
21 the claim showing that the pleader is entitled to relief.
22 And the trustee has done so by alleging throughout the
23 second amended complaint that these defendants who acted in
24 various capacities as service providers to Luxalpha and
25 Groupement received subsequent transfers of BLMIS customer

Page 115

1 property as service provider fees.
2        THE COURT:  Again, you're lumping them all
3 together, correct?  You're not giving me which UBS we're
4 dealing with.
5        MS. USITALO:  In this instance, Your Honor, we are
6 alleging that each one of the UBS entities -- so that would
7 be UBS AG, UBS SA, UBS FSL, and UBS TPM all received fees as
8 service providers to Luxalpha and Groupement.  And I will
9 try -- I apologize --
10       THE COURT:  Make sure the record is clear.
11       MS. USITALO:  Okay.  As I believe Mr. Paccione
12 said earlier, there's really no dispute here that a hundred
13 percent of Groupement and Luxalpha's assets were invested
14 with BLMIS and Luxalpha also in its answer admits this and
15 admits that all of the UBS SA, UBS AG, UBS SFSL, and UBS TPM
16 and all of the Access defendants as the trustee has defined
17 them, AP Lux -- sorry, I have them all right here -- AIA
18 Limited, AIA -- I want to -- AIA LLC, Access International
19 Advisors Limited, and Patrick Littaye, Mr. Villehuchet, and
20 Mr. Dumbaull all received fees as directors and service
21 providers.
22       And what the Defendants are arguing here is that
23 the trustee has not linked the transfers from Luxalpha to
24 these defendants as originating as BLMIS customer property.
25 Each defendant has disputed this.  And UBS makes arguments -

Page 116

1 - UBS SA makes the argument that it tries to force the
2 trustee to perform a specific tracing exercise of linking
3 the initial transfers made to Luxalpha and then to UBS SA as
4 we saw with Mr. King on Mr. King's slide.  But that is not
5 what is required at the pleading stage.
6        In the complaint, the trustee need only show the
7 relevant pathways through which transfers were received.
8 And the trustee has certainly done that both in describing
9 the various roles held by each, detailing timeframes, and
10 identifying amounts received as service provider fees, and
11 quite literally, as has been pointed to a few times today,
12 in Paragraph 340, which we provide a chart that draws out
13 the pathways of transfers from BLMIS and on to each of the
14 defendants -- would you like me to go through each one as
15 represented in the chart, okay -- Each of the defendants
16 that were made by Luxalpha and Groupement.
17       And it's correct, as the defendants have pointed
18 out, that the allegations in this complaint are different
19 from some of the cases that have been recently before Your
20 Honor to require subsequent transfers from Fairfield Sentry.
21 And there's a reason for that.  In those cases, the trustee
22 received records from Fairfield Sentry's administrator,
23 Citco, which are the books and records of Fairfield Sentry
24 and which reflect the payments into and out of Fairfield
25 Sentry.

Page 117

1        We don't have that here.  We don't have a
2 production of all of the books and records of Luxalpha and
3 Groupement.  And yes, the trustee has received some
4 productions.  And in those, there were audited financial
5 statements, invoices, and fee agreements.  And it's from
6 those documents that the trustee was able to make the
7 allegations he did concerning the subsequent transfers.  But
8 those documents don't provide the details and they don't
9 provide the complete picture.
10       And as Your Honor has recently noted in the
11 decision in Picard v. Mayer, the trustee has made his
12 allegations here as an outsider to these transactions.  And
13 in some cases, these transactions are several layers deep.
14 And as Your Honor also recently held in Picard v. First Gulf
15 -- and I'll quote from the decision, "In order to determine
16 how Fairfield Sentry spent the billions of dollars it
17 received from BLMIS, this court would need to review
18 financial documents in order to trace the monies to all of
19 Fairfield Sentry's principals, insiders, creditors, and
20 customers.  Undoubtedly, the court will trace and calculate
21 how Fairfield Sentry spent its BLMIS funds at a later stage
22 of litigation.  At this stage, the trustee need only assert
23 allegations that make it seem plausible that defendant
24 received BLMIS monies."  And these are the very
25 circumstances that we have here with Luxalpha and

30 (Pages 114 - 117)

Page 118

1 Groupement.

2        It is not a case, like the defendants argue in
3 Picard v. Shapiro.  In that case, there were allegations
4 where the trustee made on information and believe that the
5 BLMIS accounts were funded by subsequent transfers without
6 more.  And there, the court found that the trustee didn't
7 give enough information to make the plausible inference that
8 these funds were BLMIS customer property.  But that's not
9 the case here, where the trustee has alleged the involvement
10 of all of the service providers in Luxalpha and Groupement
11 and that all of the service providers were paid fees as
12 service providers of Luxalpha and Groupement.  And as we've
13 previously noted, Luxalpha and Groupement's assets were
14 invested with BLMIS.  It was their only business and thus
15 the plausible inference can be made that these subsequent
16 transfers were BLMIS customer property.

17        And I know we got in earlier to the specific
18 allegations about UBS AG, and I pointed Your Honor to those
19 particular allegations.  And I believe in response, Mr. King
20 said that this may not even amount to the Rule 8 pleading
21 standard.  And that's not the case.  And we look to Picard
22 v. Chase.  And in that case, the court found that the
23 trustee's complaint met the Rule 8 standard by adequately
24 apprising the defendants there of the subsequent transfers
25 at issue where the complaint set out the initial transfers

Page 119

1 in Exhibit B to the complaint and then alleged, and this is
2 a quote, that "some or all of these transfers were
3 subsequently transferred to defendant Chase and/or other
4 defendants in the form of commissions or fees, transfers
5 from one account to another, or another means."  And that
6 was sufficient to apprise the defendants.

7        And as Your Honor -- and Your Honor cited to
8 Picard v. Chase in Picard v. Mayer.  And there was a similar
9 set of circumstances where there were various levels of
10 transfers.  And there Your Honor pointed to the quote from
11 Picard v. Chase where the moving defendants are a group of
12 interrelated individuals and entities and whether they
13 additionally received subsequent transfers of BLMIS funds
14 from one another is a question to which they and they alone
15 have the requisite information to respond.

16        And we have not received -- we do not have yet the
17 documents that we would need to identify these specific
18 subsequent transfers.  We do not have the books and records
19 from Luxalpha or Groupement or from the Access entities.  We
20 don't have bank statements from the defendants.  And these
21 are the documents that would assist the trustee and the
22 Court with figuring out how Luxalpha and Groupement paid
23 their agents and service providers.

24        And unless Your Honor has any questions, I have
25 nothing further.

Page 120

1        THE COURT:  Thank you.  Mr. King, I see that you
2 are off mute, so do you want to rebut?

3        MR. KING:  Yeah.  The hour is late and I will be
4 short, Your Honor.  Because --

5        THE COURT:  Where are you?  It's still pretty
6 early here.

7        MR. KING:  Fair enough.  I'm happy to go on and
8 on, but I don't think the 69 other people on this Zoom would
9 appreciate that.  So I will be very quick.

10        First thing.  On the issue of actual knowledge.
11 The one thing you didn't hear Ms. Usitalo speak about was
12 the standard of what one needs to show; a high level of
13 certainty and an absence of substantial doubt.  Everything
14 she said about knowing about impossibility of returns and
15 trading outside the daily close and inability to identify
16 counterparties was alleged in the Merkin case and the judge
17 there held that's not good enough.  At most it was willful
18 blindness.  He did find willful blindness, meaning a strong
19 suspicion but at least some doubt.  But he held that did not
20 constitute, even with all inferences in the favor of the
21 plaintiff -- the trustee here, same plaintiff -- an actual
22 knowledge that no securities were being traded.

23        I urge Your Honor to read the Merkin case, 515
24 B.R. 117.  And you'll see that the allegations --

25        THE COURT:  (indiscernible) I haven't read them

Page 121

1 all already

2        MR. KING:  I would urge you to reread the Merkin
3 case, Your Honor.  Because the allegations there are
4 equivalent in many respects and go beyond anything that's in
5 the current complaint.  And it just doesn't satisfy actual
6 knowledge.

7        On the subject of the subsequent transfers, I am
8 not demanding dollar-for-dollar tracing.  I get that that is
9 an issue for the most part to be decided later.  But on the
10 face of the complaint, it is impossible to have made $32
11 million in subsequent transfers when you've only received
12 $16 million in initial transfers.  They know the initial
13 transfers are only $16 million through 2006, and yet they
14 are claiming subsequent transfers through 2006 of $32
15 million.  That's not plausible.  That's not possible.  Math
16 doesn't allow that to happen.  And I have heard no
17 explanation --

18        THE COURT:  Let's just not be there yet, Mr. King.
19 I've heard your argument.

20        MR. KING:  Lastly, I've heard no explanation as to
21 what happened to that subparagraph D of the proposed second
22 amended complaint that was filed five -- longer than that
23 now, 2015, where there was an actual allegation about monies
24 received by UBS AG.  It's not in the current complaint.
25 It's gone.  And there is an allegation as to every other

31 (Pages 118 - 121)

Page 122

1 defendant. It is not enough just to parrot the language of
2 550 and say you got something, I am entitled to recover it.
3 You need some factual allegation under the Supreme Court
4 standards. That's all, Your Honor.
5      THE COURT: Okay. Anyone else wish to be heard?
6      MR. KNUTS: Your Honor, just briefly on
7 behalf of Mr. Dumbauld.
8      THE COURT: Sure.
9      MR. KNUTS: Counsel for the trustee spent part of
10 her time talking about how Mr. Dumbauld acted in good faith
11 and presented information that they are now using to try to
12 hold the Access defendants liable. It seems to me that you
13 cannot hold an employee liable for a return of compensation
14 just by attending a meeting, just by reporting accurately
15 the information that he developed to the people who could
16 make decisions at the company. And to hold otherwise, to
17 say that somehow there's an allegation --
18      THE COURT: That's called an affirmative defense.
19 Okay.
20      MR. KNUTS: No, the Geltzer case said it was not -
21 - in this context that it was not an affirmative defense.
22 So I would just ask Your Honor to see whether you agree with
23 that or not. Thank you.
24      THE COURT: Thank you. Anyone else wish to be
25 heard?

Page 123

1      Thank you, everyone. Interesting arguments.
2 Interesting. We will obviously get a written opinion. Or
3 two or three. I don't know how I'll put them together.
4 Okay, everyone. Have a great day. Be safe. Enjoy the
5 weather. Bye.
6      (Recess)
7      THE COURT: Apologize, everyone. I went to
8 chambers by basically sounding like I dismissed everyone.
9 And I was reminded that I did not dismiss everyone, that I
10 could go to chambers and talk, but I have other matters on.
11 So I apologize profusely to everyone that I did it in the
12 way that I did it. And chambers told me to leave them alone
13 and come back to you all. So, very good. Give me one
14 moment to get to where I am.
15      We are at 10-05358, Picard v. Citibank. And that
16 is -- yes, very good.
17      State your name and affiliation.
18      MR. CHARLEMAGNE: Good afternoon, Your Honor.
19 Chardaie Charlemagne on behalf of the trustee.
20      Good afternoon, Your Honor. Carmine Boccuzzi,
21 Cleary Gottlieb on behalf of Citigroup Global Markets
22 Limited, Citibank NA, and Citicorp North America Inc.
23      THE COURT: Very good. Just give me two minutes,
24 please. Because the last argument I had myself all
25 scattered with that complaint everywhere. So if you would

Page 124

1 just be patient with me.
2      Okay, I am now ready. This is -- Mr. Boccuzzi --
3 how do you?
4      MR. BOCCUZZI: Boccuzzi. Boccuzzi, Your Honor.
5      THE COURT: This is your motion to dismiss.
6      MR. BOCCUZZI: Yes. Thank you, Your Honor. One
7 thing. The docket number you said at the beginning, I'm not
8 sure --
9      THE COURT: I said adversary proceeding 10-3545.
10 Is that incorrect?
11      MR. BOCCUZZI: 10-05345.
12      THE COURT: Yeah. What happens is I left the zero
13 off. Sometimes people leave the zero off.
14      MR. BOCCUZZI: Okay. And then I just misheard the
15 numbers. Apologies.
16      THE COURT: Okay. I apologize. And I am glad you
17 -- I am so glad you clarified it for the record. So this is
18 Adversary Proceeding 10-05345.
19      MR. BOCCUZZI: Thank you, Your Honor.
20      THE COURT: Thank you.
21      MR. BOCCUZZI: This is the motion to dismiss
22 brought by the -- I'll call them them, when I refer to all
23 three of them, the Citi defendants. But the complaint here
24 is really two sets of claims; one by the trustee against
25 Citigroup Global Markets Limited, and I'll try to just refer

Page 125

1 to them as Citigroup Global Markets, and the other is a
2 claim against Citibank and Citicorp. And they are both
3 claims under Bankruptcy Code 550 as purported secondary
4 transferees. I think it might make sense just for purposes
5 of dividing it up to start with the claim against Citigroup
6 Global Markets. That claim arises out of two purported
7 secondary transfers totaling $100 million that allegedly
8 went from Madoff to the Fairfield Sentry fund and then on to
9 Citi Group Global Markets. The trustee originally --
10      THE COURT: Excuse me for interrupting.
11      MR. BOCCUZZI: Yes.
12      THE COURT: And that is -- you are saying it was a
13 swap, correct?
14      MR. BOCCUZZI: Yes, that involved a swap. I was
15 going to give some of that background, Your Honor, just to
16 set the table as it were. And that was exactly my next
17 point. The claim was originally $130 million. That was
18 comprised of three different transfers, one in 2005 and then
19 the ones that we're here about today in 2008. But the
20 district court in 2013 -- and that's at 505 B.R. 135 --
21 dismissed a $30 million transfer as a result of the
22 application of the 546(g) safe harbor. And that's the safe
23 harbor that protects or covers transfers in connection with
24 a swap agreement. And the swap agreement in this case --
25 and it's discussed in that opinion -- is one that was

32 (Pages 122 - 125)

Page 126

1 between Citigroup Global Markets and a fund that was named
2 Auriga. And what Auriga wanted via the swap was to have
3 leveraged exposure to the Fairfield fund. So the swap
4 agreement provided that Citigroup Global Markets would pay
5 or take money from Auriga -- from Auriga, yes, based on the
6 performance of the Fairfield Sentry fund. Citigroup itself
7 didn't want to have direct market exposure to the Fairfield
8 fund. That's not the point of these transactions. It
9 wanted to hedge that. So what it did was it bought shares
10 in the corresponding amount of the swap. And so if Auriga
11 wanted a return or money out of its swap, it would notify
12 Citigroup Global Markets. Citigroup Global Markets would
13 redeem the corresponding appropriate amount of shares from
14 the Fairfield fund and pay that over to Auriga. So it was a
15 very mechanical sort of process. Auriga says let's reduce
16 the size of the swap, Citibank does the calculation --
17 Citigroup Global Markets, excuse me -- and then redeems out.
18 And two such redemptions happened in 2008, and they are the
19 subject of the motion today and the current amended
20 complaint from the trustee. One was in April of 2008 for
21 $60 million and one was in November of 2008 for $40 million.
22     And our motion as to these claims -- I think I'll
23 just discuss the grounds of that and then we can move on to
24 the Citibank side of the complaint -- says that the
25 complaint as to Citigroup Global Markets should be dismissed

Page 127

1 in full. And what we're doing is basing it on the caselaw
2 and the reasoning set out in the concurrent by Judge Menashi
3 in the Citibank decision that went to the Second Circuit
4 where he questioned the underpinnings of the so-called Ponzi
5 scheme presumption --
6     THE COURT: But you're arguing a concurrence to
7 me, not the majority ruling?
8     MR. BOCCUZZI: Right. The majority acknowledges
9 that no one was challenging the Ponzi scheme presumption.
10 It didn't bless or accept the Ponzi scheme presumption. And
11 so, yes, it is a concurrence. So the concurrence cites, and
12 we cite in our brief, other cases that point out some of the
13 issues with the Ponzi scheme presumption. And an important
14 one is that there is of course no mention of the Ponzi
15 scheme presumption in the Bankruptcy Code. The Bankruptcy
16 Code trains on in Section 548 as well as the other avoidance
17 provisions the transfer itself; what was the intent? And
18 now we're talking about actual intent to hinder, delay,
19 defraud of the transfer at issue, and it doesn't look to
20 broader issues related to how the debtor was run or managed
21 or if it was a Ponzi scheme. The Bankruptcy Code doesn't
22 give out special rules for fraudulent conveyances in the
23 context of a Ponzi scheme. And here of course we are
24 dealing with primary transfers and alleged primary
25 transfers, because we also raise a tracing point as to the

Page 128

1 April 2008 transfer. But allegedly starting with Fairfield
2 -- from Madoff to Fairfield. And of course Fairfield was a
3 net loser. So we're not talking about illegitimate false
4 profits.
5     Your Honor in the Goodman case earlier this year
6 said of course there's no reason not to apply the Ponzi
7 scheme presumption in the context of a recipient of false
8 profits, fictitious profits. We don't have that here in
9 this case. We're dealing with the return of principal. And
10 so what we have then is at most a preference among creditors
11 as opposed to the squirreling away of assets to get them out
12 of the hands of creditors and keep them under some sort of
13 indirect or other dominion or control of the original
14 debtor.
15     And so we would say if you then look back to the
16 sort of usual badges of fraud analysis and you look and you
17 see that the transfers to Fairfield did not remain under any
18 sort of control with Madoff, there's no argument given that
19 it was just a return of principal, that there was inadequate
20 consideration. And so you just have a situation where,
21 again, they need to plead actual intent to hinder, delay,
22 defraud as to these transfers. And we just don't think that
23 the usual resort to the Ponzi scheme presumption should do
24 the trick.
25     And then as to the tracing point, our arguments as

Page 129

1 to tracing would not dispose of the entire case against
2 Citigroup Global Markets. Here we are really talking about
3 the $60 million transfer in April of 2008 from Fairfield to
4 Citi Global Markets. But again, if we look at the complaint
5 and we look at things that I believe Your Honor could take
6 judicial notice of, you see that the $60 million that came
7 in April of 2008. There was no recent transfer by Madoff to
8 Fairfield in that amount. You have to go back more than
9 three months to mid-January of 2008. At that time, there is
10 a transfer of $70 million. But in between that transfer and
11 the transfer to Citi from Fairfield, you have at least $141
12 million in other transfers going out from Fairfield. And we
13 just think given that it's just not plausible to say based
14 on that math that you can say the $60 million -- or there's
15 a plausible case here that the $60 million was in fact money
16 that came from Madoff as opposed to other subscribers into
17 the Fairfield funds.
18     So those are the two arguments that we think
19 warrant complete or at least partial dismissal of the claim
20 against CGML. And I'm happy either to take any questions,
21 Your Honor, or move on to the Citibank side unless you want
22 to go one at a time and have the trustee respond on
23 Citigroup Global Markets.
24     THE COURT: Go to the Citibank argument.
25     MR. BOCCUZZI: Okay. On the Citibank side, what

33 (Pages 126 - 129)

Page 130

1 we are dealing with here is a loan, a loan made in 2005 by
2 Citibank to what became known as the Prime Fund. That was
3 one of several funds managed by the Tremont Group and that
4 invested with Madoff.
5       In March of 2008, Tremonte and Prime, finding an
6 alternative lender, terminated that loan. So they
7 terminated the loan, and they paid back the $300 million.
8 In the period of the life of the loan, between June or so of
9 2005 and March 2008, Citibank received regularly scheduled
10 interest payments in the amount of around I think $40
11 million. And the trustee is seeking to claw back under
12 550(a) those interest payments as well as the $300 million
13 repayment.
14       We think that this claim should be dismissed. And
15 as to this -- this is point two in our brief -- we think the
16 Court can dismiss it because the sort of (indiscernible)
17 plus ultra fraudulent conveyance is depletion of the estate.
18 And if you look at what happened here -- and that's both in
19 the complaint that's against us, the incorporated by
20 reference complaint against Tremont, as well as a related
21 complaint involving ABN AMRO is that that repayment to us,
22 again, which was driven by Tremont and not Citi, was part of
23 one integrated transaction where $300 million came out of
24 the Madoff estate, but then a corresponding greater amount
25 went right back into the Madoff estate through another

Page 131

1 Tremont-managed fund.
2       And so our position is that -- and we cite cases
3 to this effect and I would refer Your Honor to the Ivy case
4 involving the entities that were buying steel. When you
5 have one integrated transaction like that where the -- at
6 the end of the day the debtor is left not depleted and in
7 fact having more money than the -- it's really not the
8 proper subject of a fraudulent conveyance/550 claim because
9 you don't have that initial depletion of the estate.
10      Again, the caselaw that we cite, the Gredd case
11 and other cases focuses on is their harm to the debtor that
12 resulted from the transfer. And given these facts that are
13 in the complaint and are judicially noticeable by Your
14 Honor, we think they're not.
15      And there's also -- that argument we think should
16 dispose of the entirety of the claim. There's also a
17 tracing argument again as with the portion of the claim
18 against Citigroup Global Markets. And in the context here,
19 we are talking about the attempt to claw back the interest
20 payments that were made to Citibank over the life of the
21 loan.
22      So, for example, there during the last 12 months
23 of 2005 when the allegation is that Citi received about $4.4
24 million in interest from the Prime fund, there were no
25 transfers in that period from Madoff to Prime. And again in

Page 132

1 2007 when there's about $18 million in interest flowing to
2 Citi, you don't see any initial transfers going on from the
3 debtor to Prime. So we think, again, in the absence of
4 that, there's just no plausible allegation of tracing. And
5 at the very least if Your Honor doesn't dismiss the entire
6 claim, those claims as to interest payments should be
7 dismissed for failure to plausibly allege an initial
8 transfer that passed on to us.
9       THE COURT: Very good. Ms. Charlemagne?
10      MS. CHARLEMAGNE: Thanks, Your Honor. Again,
11 Chardaie Charlamagne with Baker Hostetler on behalf of the
12 trustee.
13      Your Honor, defendants advance three main
14 arguments in their motion to dismiss. First, they argue
15 that the trustee has not alleged that BLMIS made the initial
16 transfers at issue here with the requisite intent to defraud
17 under Section 548(a)(1)(A) because, according to them, the
18 Ponzi scheme presumption should not establish such intent.
19      Second, they argue that there was no depletion of
20 the estate because someone else later invested other funds
21 in the Ponzi scheme through a separate account.
22      And third, they argue that some of the subsequent
23 transfers they received did not contain stolen customer
24 property.
25      These arguments are without merit. The trustee

Page 133

1 has alleged that the specific transfers at issue here were
2 made with actual intent to hinder, delay, or defraud as
3 required under Section 548(a)(1)(A) both by way of the Ponzi
4 scheme presumption and through badges of fraud. This and
5 other courts have repeatedly upheld the Ponzi scheme
6 presumption, found the same allegations made here sufficient
7 to satisfy Section 548(a)(1)(A), and repeatedly rejected
8 defendant's precise argument regarding customer property.
9 Defendants cite no binding precedent or authority in support
10 of their suggestion that the Court set aside its rulings in
11 this liquidation or well-established principles of law such
12 as the applicability of the Ponzi scheme presumption to a
13 Section 548(a)(1)(A) claim.
14      Instead, defendants grasps onto dicta and a
15 concurrence by Judge Menashi in the Citibank appeal arguing
16 without supporting authority that the Ponzi scheme
17 presumption should be set aside. This reliance on Judge
18 Menashi's concurrence is misplaced as I will discuss
19 shortly.
20      Defendant's argument provide no legal basis upon
21 which this Court may dismiss the trustee's claims based on
22 the facts in this case. I will address each of defendant's
23 argument in turn.
24      I would like to first take a few moments to talk
25 about why the trustee's allegations satisfies Section

34 (Pages 130 - 133)

Page 134

1  548(a)(1)(A).  Section 548(a)(1)(A) allows for the avoidance
2  of transfers made with actual intent to hinder, delay, or
3  defraud creditors.  Defendants argue that the trustee has
4  not alleged facts relating to the specific initial transfers
5  he seeks to avoid here.  Defendants are wrong.
6        The trustee has alleged that BLMIS made the
7  specific transfers at issue here to Prime Fund and Sentry
8  with actual intent to hinder, delay, or defraud its
9  creditors.  Specifically, the trustee alleges the following
10  facts.
11        The trustee alleges that BLMIS' IA business
12  operated as a fraud and Ponzi.  This is alleged at
13  Paragraphs 15, 62, and 66 of the complaint.  The trustee
14  alleges that BLMIS did not purchase or sell securities for
15  its IA business customers.  This is alleged at Paragraph 16
16  of the complaint.  Instead, BLMIS created false, backdated
17  trades for its IA business customer accounts beginning in
18  the early 1970s.  This is alleged at Paragraph 17 of the
19  complaint.  Thus, the IA business had no legitimate business
20  operations and produced no profits or earnings.  This is
21  alleged at Paragraphs 62 to 65 of the complaint.  And the
22  trustee also alleges that BLMIS comingled all of its
23  customer funds into a single account.  This account was used
24  to distribute funds to other customers, to make
25  distributions and payments for other customers, to benefit

Page 135

1  Madoff and his family personally, and to prop up Madoff's
2  proprietary trading business.  This is alleged at Paragraph
3  67 of the complaint.
4        In other words, BLMIS robbed Peter to pay Paul
5  using funds received from one set of customers to pay other
6  customers with no legitimate business operations or trading
7  taking place.
8        These allegations plausibly establish that BLMIS
9  operated a Ponzi scheme through its IA business.  The
10  trustee also alleges facts that plausibly establish that
11  BLMIS made the initial transfers at issue here to Sentry and
12  Prime Fund in furtherance of that Ponzi scheme.
13  Specifically the trustee alleges the following facts.
14        The trustee alleges that Sentry and Prime Fund
15  were IA business customers who invested substantially all of
16  their assets with BLMIS.  This is alleged at Paragraphs 5,
17  53, 172, and 181 of the complaint.  The trustee alleges that
18  BLMIS comingled all funds it received from Prime Fund and
19  Sentry with other customer funds in a single BLMIS account
20  which it used to maintain the Ponzi.  The comingled funds
21  were not used to trade securities, but were used to make
22  distributions or payments to other customers.  Again, this
23  is alleged at Paragraph 67 of the complaint.
24        The trustee alleges that the initial transfers at
25  issue here were made by BLMIS to Sentry and Prime Fund as IA

Page 136

1  business customers.  This is alleged at Paragraphs 3 through
2  4, 44 through 45, 164, and 177 of the complaint.  And the
3  trustee alleges that those transfers to Prime Fund and
4  Sentry were not comprised of proceeds of securities
5  transactions.  Rather, the initial transfers to Sentry and
6  Prime Fund which are at issue here were comprised of
7  customer property stolen from other customers.  This is
8  alleged at Paragraphs 1, 67, 164, and 177 of the complaint.
9  These allegations are sufficient to state a claim under
10  Section 548(a)(1)(A) with respect to the initial transfers
11  at issue here both by way of the Ponzi scheme presumption
12  and under the badges of fraud test.
13        I would like to now address Defendant's arguments
14  regarding the Ponzi scheme presumption.  This Court and
15  others inside and outside of this district have all held
16  that allegations such as those just mentioned are sufficient
17  to trigger the Ponzi scheme presumption.  As an initial
18  matter, defendant's argument that the Ponzi scheme
19  presumption is inconsistent with Section 548(a)(1)(A) is
20  without support or authority.  District courts within this
21  circuit have unanimously applied the Ponzi scheme
22  presumption as a matter of law to establish a debtor's
23  fraudulent intent as required under Section 548(a)(1)(A).
24  Every circuit court to consider the issue has similarly
25  applied the Ponzi scheme presumption as a matter of law.  In

Page 137

1  fact, defendants were unable to cite a single case anywhere
2  in this nation holding that the Ponzi scheme presumption is
3  inconsistent with the plain language of Section
4  548(a)(1)(A).  Instead, defendants base their argument that
5  the Ponzi scheme presumption is overbroad and inconsistent
6  with the text of Section 548(a)(1)(A) on dicta and a
7  concurring opinion.  But as the district court recently
8  held, notwithstanding Judge Menashi's concurrence, the Ponzi
9  scheme presumption remains the law of the circuit.  This is
10  in Sage Realty at 2022 WL 1125643.
11        Defendants take issue with the Ponzi scheme
12  presumption as a means of establishing fraudulent intent,
13  arguing that it is overbroad, inconsistent with the plain
14  langue of 548(a)(1)(A), and that the presumption is not in
15  the Bankruptcy Code.
16        First, the Ponzi scheme presumption is not
17  overbroad.  Defendants argue that the presumption is
18  overbroad because it allows the trustee to establish
19  fraudulent intent for any and every transfer BLMIS made.
20  But as just discussed and as set forth in our papers, the
21  Ponzi scheme presumption establishes fraudulent intent for
22  the specific initial transfers at issue here because those
23  transfers were made in furtherance of BLMIS' Ponzi scheme.
24  This is because with a Ponzi scheme, the investor pool is a
25  limited resource that will eventually run dry.  And as is

35 (Pages 134 - 137)

Page 138

1  the case with all Ponzi schemes, Madoff, the Ponzi scheme
2  operator, must have known all along from the very nature of
3  his activities that investors at the end of the line would
4  lose their money.  Thus, the only possible inference is that
5  the debtor here, Madoff, had the intent to hinder, delay, or
6  defraud future creditors because he must have known that
7  future creditors would not be paid.
8       Second, defendants argue that the Ponzi scheme
9  presumption is inconsistent with the plain language of
10  Section 548(a)(1)(A) simply because the presumption is not
11  explicitly defined in the Bankruptcy Code.
12       However, judicially-created presumptions are
13  regularly implemented by trial and appellate courts.
14  Indeed, presumptions typically serve to assist courts in
15  managing circumstances in which direct proof for one reason
16  or another is rendered difficult.  And courts regularly
17  accept judicially-crated presumptions arising out of
18  considerations of fairness, public policy, probability, as
19  well as judicial economy.
20       In Basic, Inc. v. Levinson, 485 U.S. 224, the
21  Supreme Court upheld a judicially-created presumption of
22  reliance based on the fraud on the market theory in a
23  securities case and specifically held that the presumption
24  was supported by common sense and probability.
25       Thus, in direct contradiction to Defendant's

Page 139

1  arguments, the Ponzi scheme presumption is not overbroad, it
2  is not inconsistent with the plain language of Section
3  548(a)(1)(A).  The presumption is well-founded and supported
4  by common sense and probability.  Again, the only possible
5  inference here is that Madoff intended to hinder, delay, or
6  defraud future creditors because he must have known that
7  future creditors would not be paid by the very nature of the
8  Ponzi scheme he created.  The Ponzi scheme presumption
9  presumes actual intent only where the transfers were made in
10  furtherance of the Ponzi scheme, as is the case with the
11  initial transfers at issue here.
12       And as just mentioned, the trustee alleges with
13  particularity that Madoff operated a Ponzi and that the
14  initial transfers to Prime Fund and Sentry were made in
15  furtherance of that Ponzi scheme.  This is sufficient to
16  allege fraudulent intent under the Ponzi scheme presumption.
17       Almost all the cases cited by the defendants in
18  support of their argument to sidestep the Ponzi scheme
19  presumption are constructive fraud cases.  And in the case
20  of Finn v. Alliance Bank, the court's ruling was based on
21  Minnesota state law which directly contradicts New York law
22  and is not binding in this district.  Defendants' reliance
23  on other cases is similarly misplaced.  Lustig v. Weiss,
24  (indiscernible), and In re Churchill Mortgage Investment
25  Corp. were cases that focused on whether the presumption

Page 140

1  establishes a lack of reasonably equivalent value as an
2  element of a constructive fraudulent conveyance claim.
3  Reasonably equivalent value is not an element of Section
4  548(a)(1)(A).
5       Defendants' reliance on Sharpe is also misplaced.
6  The Second Circuit has held Sharpe inapplicable to this
7  civil proceeding.  Sharpe involved a loan to the debtor and
8  no Ponzi scheme.  And Sharpe actually supports the trustee's
9  position here that the Ponzi scheme presumption is
10  appropriate because, unlike the initial transfer in Sharpe,
11  BLMIS made the initial transfers here in furtherance of its
12  fraud.
13       Moreover, Sharpe didn't dismiss an actual fraud
14  claim because it would result in an impermissible choice
15  between creditors that should be considered a preference.
16  It dismissed that claim because it found that the initial
17  transfer was not made in furtherance to or in connection
18  with the debtor's fraud.
19       Even if the court were to find for the first time
20  in this district that the Ponzi scheme presumption is
21  inapplicable to a Section 548(a)(1)(A) claim, contrary to
22  defendant's contentions, the trustee alleges multiple badges
23  of fraud which are sufficient to support a finding of
24  fraudulent intent with respect to the initial transfers at
25  issue here.  Specifically the trustee alleges the following.

Page 141

1       The trustee alleges that BLMIS' IA business was
2  not legitimate; it was a fraud and a Ponzi scheme.  And that
3  is alleged at Paragraphs 15 through 17, 62, and 66.
4       The trustee alleges that BLMIS concealed facts and
5  made false representations about the IA business.  That is
6  alleged at Paragraphs 59 through 60, 64 through 65.
7       The trustee also alleges that BLMIS comingled all
8  customer funds into a single account.  This is alleged at
9  Paragraph 67.  And the trustee alleges that BLMIS misused
10  investor funds and created false financial statements.  This
11  is alleged at Paragraph 17, 59 through 60, and 64 through
12  65.
13       These allegations have already been held to be
14  sufficient to support a badges of fraud theory of fraudulent
15  intent.  This can be found in SIPC v. BLMIS, 528 F.Supp.3d
16  219 (2021).  There, the court found that badges of fraud
17  such as those just discussed were sufficient to establish
18  fraudulent intent under a badges of fraud theory.
19       In conclusion, the trustee adequately alleges
20  fraudulent intent for the specific transfers at issue here
21  under either the Ponzi scheme presumption or a badges of
22  fraud theory.
23       Next I would like to address defendant's depletion
24  of the estate arguments.
25       Defendants challenge the trustee's power to avoid

36 (Pages 138 - 141)

Page 142

1 a $301 million transfer from Prime Fund to the defendants.
2 Their reasoning is that they were somehow parties to an
3 integrated transaction that did not deplete the estate.
4 This argument has no legal or factual basis. Before I
5 discuss the lack of any factual basis for defendant's
6 argument, I would like to discuss the fatal flaws in
7 defendant's legal argument.
8        Even if defendants were able to establish that
9 they reinvested the customer property they received into
10 another feeder fund, which they cannot, their argument would
11 still fail because the bankruptcy court has already rejected
12 defendant's reasoning in Picard v. Lustig at 568 B.R. 481.
13 This is not the first time this argument is before the
14 court. This is not even the first time this argument is
15 before the court in this very case.
16        Although the bankruptcy court did not decide this
17 issue the last time defendants raised it, at the hearing on
18 a previous motion, the bankruptcy court questioned why
19 defendant's depletion of the estate argument was not
20 foreclosed by the bankruptcy court's decision in Picard v.
21 Lustig. Defendants were unable to distinguish Lustig then
22 as can be seen in the hearing transcript, and they are not
23 able to distinguish is not, nor do they try to in their
24 motion papers.
25        Defendants did not even attempt to rebut the

Page 143

1 trustee's opposition brief concerning Lustig, and the Lustig
2 defendants were actually better situated to make this
3 argument because, unlike Citibank, the Lustig defendants
4 actually reinvested funds back into the BLMIS estate via a
5 different customer account. The Lustig defendants withdrew
6 fictitious profits from one BLMIS customer account and later
7 reinvested those funds into another BLMIS account through a
8 feeder fund.
9        In Lustig, the court declined to offset fictitious
10 profits in one BLMIS account against losses in a separate
11 BLMIS account, reasoning that the reinvestment is still a
12 separate transaction governed by whatever account agreements
13 the funds had with BLMIS.
14        This is the same situation here. Defendants are
15 trying to offset the transfers they received from Prime
16 Fund, a net winner, against Broad Market, a net loser.
17 Moreover, if the court found in Lustig that the same party
18 who took its money out and reinvested it back into Madoff
19 was unable to offset these transfers against each other, why
20 would Citibank be allowed to get a credit for another
21 party's investment? They should not.
22        Citibank and Citicorp are attempting to collapse
23 transactions across accounts and co-op this value. The
24 deposits that Citibank is attempting to co-op for themselves
25 have already been applied to the deposits in the Broad

Page 144

1 Market account.
2        Additionally, as noted in Lustig, Defendants'
3 proposition flies in the face of established Second Circuit
4 law on net equity in this case. In the Second Circuit's
5 decision upholding the trustee's net investment method of
6 determining net equity, the court held that each customer's
7 net equity should be calculated by crediting the amount of
8 cash deposited by the customer into his or her BLMIS account
9 less any amounts withdrawn from it.
10        Here, the deposits and withdrawals in Broad
11 Market's account form the basis of this account's net equity
12 just as the deposits and withdrawals in Prime Fund's BLMIS
13 account form the basis of this account's net equity. By
14 trying to combine transfers in unrelated transactions,
15 Defendants are requesting a second round of credits for the
16 deposits in Broad Market's account. This result would be
17 inequitable to all BLMIS customers, but --
18        THE COURT: Ms. Charlemagne, I'm sorry to
19 interrupt you, but I've got to interrupt you. Because I
20 don't remember this issue being addressed, and you said it
21 was. In Lustig?
22        MS. CHARLEMAGNE: It wasn't -- yes, in Lustig the
23 issue, the rationale was addressed in Lustig. So in Lustig,
24 they were also trying to do a similar thing. They were
25 trying to offset fictitious profits in one BLMIS account

Page 145

1 against losses in a separate --
2        THE COURT: But did you have another case rather
3 than Lustig?
4        MS. CHARLEMAGNE: No. Lustig was the only one I
5 referenced. I did reference that the Defendants had made
6 this very argument in this case before and even --
7        THE COURT: Okay. I did hear that, but somehow I
8 thought I was missing a cite.
9        MS. CHARLEMAGNE: No.
10        THE COURT: I heard Lustig and I heard maybe
11 argument before. Okay. Thank you. You clarified my brain.
12 Okay.
13        MS. CHARLEMAGNE: All right. So I am going back
14 to talking about the defendants and the net equity decision.
15        THE COURT: Okay.
16        MS. CHARLEMAGNE: So here the deposits and
17 withdrawals in Broad Market's account form the basis of this
18 account's net equity just as the deposits in Prime Funds
19 form the basis of that account's net equity. By trying to
20 combine the transfers, the defendants are requesting a
21 second round of credits. And this would be inequitable to
22 all BLMIS customers.
23        Defendants also entirely missed the point the
24 trustee makes about how the net equity calculations affected
25 the Tremont settlement agreement. The trustee is not

37 (Pages 142 - 145)

Page 146

1 arguing that Citibank is bound by the settlement. Rather,
2 the settlement accurately reflects the facts of the deposits
3 that defendants are now attempting to co-op for themselves.
4       Having discussed the legal deficiencies of
5 defendants arguments, I will now address why defendants'
6 argument has no factual basis.
7       Defendants are wrong on the law, but they are also
8 wrong on the facts. Defendants' arguments depends on this
9 Court exercising its equitable powers to collapse multiple,
10 unrelated transactions to find that there was an integrated
11 round trip transaction. There is no basis for this
12 argument. No funds went out and came back in from Citibank
13 or Prime Fund. They only came out.
14       As set forth in Exhibit E to the amended complaint
15 at ECF 214, Prime Fund did not return any of the $475
16 million it withdrew from its BLMIS IA account on March 25th,
17 2008. In fact, Prime Fund did not make any deposits to its
18 BLMIS IA account after receiving the initial transfers that
19 Defendants' claim did not deplete the estate.
20       The facts make it clear that the $301 million
21 received by defendants from Prime Fund is an interest of the
22 debtor and property that the trustee is permitted to avoid
23 and recover.
24       As background, the trustee's claims against
25 defendants arise from the receipt of subsequent transfers of

Page 147

1 stolen customer property from Prime Fund, which held Account
2 Number 1C1260 at BLMIS. The facts of this transaction are
3 simple; defendants received $301 million from Prime Fund.
4 This $301 million transfer from Prime Fund to Citibank and
5 Citicorp never returned to BLMIS or the BLMIS estate. Had
6 Prime Fund not received the initial transfer of $475 million
7 from BLMIS, it would have become part of the customer
8 property fund available to distribute pro rata to all
9 customers. This fact alone is sufficient to defeat
10 defendants depletion of the estate argument.
11       Indeed, in Bear Stearns v. Gredd, 275 B.R. 190, a
12 case heavily relied upon by the defendants, the court
13 concluded that Section 548(a)(1)(A) only permits at trustee
14 to avoid a transfer of an interest of the debtor and
15 property when but for the transfer such property interest
16 would have been available to at least one of the debtor's
17 creditors. This is precisely the case here. But for the
18 $475 million initial transfer from BLMIS to Prime Fund, $475
19 million, including the $301 million subsequently transferred
20 to defendants from Prime Fund would have been available to
21 at least one of BLMIS' creditors.
22       This brings me to the next fundamental point
23 regarding defendants' depletion argument. Section
24 548(a)(1)(A) of the Bankruptcy Code provides that a trustee
25 may avoid any transfer of an interest of the debtor in

Page 148

1 property that was made or incurred within one year before
2 the date of filing if the debtor made such a transfer with
3 actual intent to hinder, delay, or defraud.
4       Diminution or depletion of the estate arguments
5 are typically concerned with how one defines an interest of
6 the debtor. In other words, the issue discussed in Bear
7 Stearns was whether an interest of the debtor in property
8 referred only to property that would have been available for
9 the benefit of the debtor's creditors and/or property that
10 would have been part of the estate had it not been
11 transferred before the commencement of the bankruptcy
12 proceedings.
13       In Bear Stearns, the transfers sought by the
14 trustee were held to not be an interest of the debtor in
15 property because a federal law made it so that those funds
16 were never part of and could never be a part of the estate.
17 And thus, those funds were never available to satisfy any
18 obligations of the debtor.
19       Here, defendants cannot and do not argue that the
20 transfer at issue was not in interest of the debtor in
21 property because there is no question that the $301 million
22 they received would have been available for the benefit of
23 the debtor's creditors and was property that would have been
24 part of the estate had it not been transferred before the
25 commencement of the bankruptcy proceeding. This fact alone

Page 149

1 defeats defendant's depletion of the estate argument.
2       Additionally, the district court has already held
3 in Bear Stearns that depletion of the estate is not an
4 element of a Section 548(a)(1)(A) claim. It found that
5 defendants can raise this issue as an affirmative defense
6 and set forth three elements that defendants must plead and
7 prove to establish the defense. Defendants cannot, nor do
8 they even try to establish any of these elements. Rather,
9 rather than helping defendants, Bear Stearns further
10 bolsters the trustee's argument that these transfers to
11 Citibank and Citicorp depleted the estate.
12       The Southern District in Bear Stearns set forth a
13 three-element affirmative defense that the transferee bears
14 the burden of pleading and proving to establish that a
15 transfer did not deplete the estate. Specifically, the
16 transferee must prove that the transfer did not reduce the
17 (indiscernible) that would have been available to the
18 creditors. It didn't hinder, delay, or defraud any
19 creditors, and it did not have any other adverse impact on
20 any creditor or creditors generally.
21       The Bear Stearns court noted that if the
22 transferee succeeds in successfully making this affirmative
23 defense, the burden then shifts to the trustee to rebut the
24 transferee's showing. Whether the transferee has sustained
25 his ultimate burden of proof will be decided on the entire

38 (Pages 146 - 149)

Page 150

1 record before the court. Defendant does not address the
2 elements laid out by Bear Stearns, much less demonstrate
3 that they have established on the face of the complaint as
4 would be required to prevail on an affirmative defense on a
5 motion to dismiss.
6      The Bear Stearns court explained that creditors --
7      THE COURT: Ms. Charlemagne, do you have all of
8 this in your arguments already, or are you just reading what
9 you gave me?
10      MS. CHARLEMAGNE: I do have a lot of it already in
11 my argument. I can streamline it a bit.
12      THE COURT: Thank you. I would prefer for
13 everybody, if you've said it once, you don't need to say it
14 twice. But if you want to add, I'd like for you to add.
15 Not just give me what you've already given me.
16      MS. CHARLEMAGNE: Okay. I think most of these
17 arguments are in our papers.
18      THE COURT: They're mostly in your papers. And I
19 let you go on for a long time.
20      MS. CHARLEMAGNE: You did. And I appreciate that.
21 Okay. So I think what I'll do is I'll just quickly
22 distinguish Pereira, which is a case that they strongly rely
23 on for their depletion arguments. And then for the customer
24 property argument that they make, I will very briefly touch
25 on that and rest on our papers.

Page 151

1      THE COURT: Thank you.
2      MS. CHARLEMAGNE: And so for Pereira, I just
3 wanted to clarify that in Pereira, Pereira was in a
4 completely different procedural and factual posture than
5 this case here. It was a full record at summary judgement
6 and the defendants have not shown a single case successfully
7 applying this collapsing doctrine to defeat a Section
8 548(a)(1)(A) claim.
9      In Pereira, the agreements cross-referenced each
10 other. Both agreements were expressly conditioned on the
11 contemporaneous closing of the other transaction and payment
12 on both agreements was accomplished with a single wire
13 transfer.
14      Here, the defendants did not even explain which
15 agreements formed the supposedly integrated transactions.
16 They attempt to utilize an unrelated party's subsequent
17 transfer which held a wholly different BLMIS account as a
18 reason by BLMIS' transfers to Prime Fund did not deplete the
19 estate.
20      So defendants asked this Court to collapse
21 unrelated transactions between separate parties and to
22 ignore economic realities of fraudulent transfers in a plea
23 for equitable relief that has no basis in law or fact.
24      And for the customer property, I don't have
25 anything new to say. So, Your Honor, I will just rest on

Page 152

1 our papers for the argument there.
2      THE COURT: Thank you very much. Any quick
3 rebuttal, Mr. Boccuzzi?
4      MR. BOCCUZZI: Yes, if I might, Your Honor. Just
5 three points.
6      THE COURT: You know, I don't mind any points.
7 Just don't repeat what you've given me.
8      MR. BOCCUZZI: I'm not going to repeat. I'll just
9 -- it will be a true reply in terms of points raised by Ms.
10 Charlemagne.
11      Number one, on the Ponzi scheme presumption, the
12 red flags analysis that we heard from Your Honor was nothing
13 more than the allegations as to why Madoff was a Ponzi
14 scheme. We are not, as in many of the cases that the
15 trustee cites, saying that the Ponzi scheme presumption
16 shouldn't apply because there was no Ponzi scheme. We agree
17 there was a Ponzi scheme. What we're saying is that
18 accepting that there was a Ponzi Scheme shouldn't change the
19 rules of the game. And you still have to go transfer-by-
20 transfer. And we cite cases about the Ponzi scheme
21 transaction.
22      Going to these points on Page 15 of our opening
23 brief and also in the In re Churchill case there is the
24 quote, "The fact that the debtor's enterprise as a totality
25 is operated at a loss or in a manner that is fraudulent does

Page 153

1 not render actually or constructively fraudulent a
2 particular transaction which in and of itself is not
3 fraudulent in any respect." And we would say the return of
4 principal is that.
5      And then quickly on Lustig. On Lustig, the
6 argument is really based on what the trustee did vis-à-vis
7 certain customers as part of a settlement to which we were
8 not a party. So that's not binding on us. And importantly,
9 I think the analysis is exactly backwards. I don't think
10 we're arguing anything that would disrupt the net equity
11 rule. There's really two sides to the coin here. What is
12 what is the estate comprised of and what can the estate pull
13 back. And number two with the net equity, how do you divide
14 that up among customers, of which we are not, which also
15 distinguishes from the Lustig case.
16      And so we are saying here if you look at the pie
17 that was the debtors estate as it were and you look at these
18 transactions, there was no depletion of the estate given
19 that when the money came out, it went back in and then some
20 back into the estate. And so without that depletion, you
21 don't have a 548 claim.
22      THE COURT: Anything else either one of you wish
23 to add?
24      MS. CHARLEMAGNE: Nothing else from the trustee,
25 Your Honor.

39 (Pages 150 - 153)

Page 154

1      THE COURT: Very good. You will receive a written
2  opinion.
3      The Court needs to take about a five-minute break.
4      (Recess)
5      THE COURT: Very good. We are back on the record.
6  If you would just give me a moment.
7      And now we are at 11-02572, Picard v. Korea
8  Exchange Bank. State your name and affiliation.
9      MR. CIRILLO: Good afternoon, Your Honor.
10  Richard Cirillo. I guess the affiliation is Cirillo Law
11  Office. And I am appearing for the defendant, Korea
12  Exchange Bank.
13      MR. FISH: Good afternoon, Your Honor. This is
14  Eric Fish at Baker Hostetler on behalf of the Trustee.
15      THE COURT: Very good. Excuse me, let me get my -
16  - oh, that's the next one. Here we go. I have it now. And
17  it's your -- Mr. Cirillo, I believe you are the one on the
18  motion to dismiss.
19      MR. CIRILLO: I do indeed. And I appreciate Your
20  Honor's patience in waiting so long to get to my case.
21      THE COURT: Well, you notice I got a little
22  impatient just a minute ago when they were repeating what
23  they had already given me.
24      MR. CIRILLO: Well, on one occasion Your Honor
25  said that you were prepared to sit all day and therefore had

Page 155

1  brought snacks. I hope you had brought snacks today.
2      THE COURT: I did. I did. I did.
3      MR. CIRILLO: Okay. Well, I will proceed, Your
4  Honor, if I may.
5      THE COURT: Please.
6      MR. CIRILLO: Korea Exchange Bank is a Korean
7  bank, and it was trustee, as alleged in the complaint, of
8  two Korean investment trusts. The complaint does not allege
9  that KEB -- and I'll call Korea Exchange Bank KEB -- does
10  not allege it conducted any activities in the United States
11  in connection with Fairfield's shares.
12      I would like to cover three topics. One is
13  customer property, the second is the Fairfield complaint,
14  and the third is personal jurisdiction. And we'll be happy
15  to rest on the papers for our 546(e) position.
16      I have read carefully all the Court's decisions in
17  other subsequent transfer cases, and I am arguing this
18  motion because I believe the KEB complaint and the arguments
19  we are proposing to Your Honor are different from what has
20  been presented before. And those different arguments are
21  what I believe deserve dismissal of the KEB complaint in all
22  or in part either with prejudice or with leave to amend.
23      The first issue I would like to address is the
24  failure of the KEB complaint to allege that KEB received any
25  customer property. I think it's unquestioned that an

Page 156

1  essential element of the Plaintiff's claim is that the
2  defendant actually did receive customer property. If the
3  plaintiff does not allege that factually and plausibly the
4  complaint fails.
5      This complaint alleges in Exhibit B that -- and I
6  know everyone else is calling it BLMIS. I've always for 14
7  years called it BLMIS. And with Your Honor's permission I
8  would like to not have to retract my mind. So absent
9  objection, I will call it BLMIS here.
10      THE COURT: Mr. Fish, do you object?
11      MR. FISH: I have no objection as long as I can
12  call it BLMIS as I have been doing for the past 13 years or
13  so.
14      THE COURT: Okay.
15      MR. CIRILLO: Okay. Well, I have a year on you,
16  so I appreciate your concession.
17      THE COURT: Okay. Mr. Cirillo.
18      MR. CIRILLO: Yes. The complaint alleges --
19      THE COURT: Just so you know, for the transcriber
20  of this, would you please just say BLMIS when you're doing
21  it? I mean not you, the transcriber. I'm giving that
22  message to the person transcribing this. Okay.
23      MR. CIRILLO: Good, good.
24      The complaint alleges in Exhibit B that BLMIS
25  transferred $3 billion to Fairfield Sentry. In Exhibit C --

Page 157

1  and it alleges that in Exhibits C or CD and so forth to the
2  subsequent transfer complaints before Your Honor, they
3  alleged collectively that Fairfield transferred out $5
4  billion. The complaint does not in fact say that Fairfield
5  had no source of money other than BLMIS. And obviously if
6  it paid out $2 billion more than it got from BLMIS, it did
7  have another substantial source of money.
8      The exhibits in the subsequent transfer cases
9  except other than this one against KEB are before the court
10  and part of this case, and they need to be considered in
11  evaluating whether this complaint alleges the receipt of
12  customer property.
13      The first reason is, as the Court correctly held,
14  all the subsequent transfer actions are part of the same
15  case. In doing so, the Court cited Judge Fitzsimmons'
16  decision in In re In re Geiger, 446 B.R. 670 (Bankr. E.D.
17  Pa. 2010).
18      The second reason they are before the Court and in
19  this case are that the exhibits in each of the subsequent
20  transfer complaints are judicial admissions in the same case
21  and are binding on the plaintiff. The plaintiff cannot
22  escape or disavow those admissions. And for that, I would
23  cite Guadagno v. Wallack Ader Levithan Associates, 950 F.
24  Supp. 1258 (S.D.N.Y. 1997), which in turn cites a Seventh
25  Circuit decision.

40 (Pages 154 - 157)

Page 158

1  The third reason is that the court may take
2  judicial notice of those exhibits in the other subsequent
3  transfer cases and what the plaintiff says in those
4  exhibits.  The plaintiff admitted that judicial reference
5  may be taken of other complaints in the case in his
6  arguments about incorporating the Fairfield insider
7  complaint.
8  Therefore, the plaintiff has alleged that
9  Fairfield paid out money that did not come from BLMIS and
10  therefore is not customer property.  Someone got that $2
11  billion.  The complaint only said, in a conclusory, non-
12  factual, conjectural sense, that a portion of the
13  redemptions to KEB were customer property.  That allegation
14  is non-factual, it is not made on personal knowledge, and is
15  not entitled to credit.
16  The complaint also doesn't allege that the
17  redemptions did not or could not have come entirely from the
18  $2 billion.  He has not alleged, therefore, that it is more
19  than a possibility that KEB receive customer property from
20  the $3 billion of BLMIS transfers.
21  But he also admits in the allegations I've
22  referred to that it is equally possible that none of KEB's
23  $33 million of redemptions came from the $3 million, but
24  instead came from the $2 billion.
25  So because he hasn't pled that, h e has to rely on

Page 159

1  an inference in order to --
2  THE COURT:  Wait.  Explain the $2 billion to me
3  again.  What does that --
4  MR. CIRILLO:  I'm sorry, say that again?
5  THE COURT:  What is that $2 billion you just
6  talked about?
7  MR. CIRILLO:  Yes.  If you add up all of the
8  exhibits in all of the subsequent transfer complaints that
9  are before Your Honor that allege subsequent transfers to
10  subsequent transferees, they don't add up to $3 billion;
11  they add up to $5 billion.  And so the difference of what
12  Fairfield paid to the subsequent transferees is obviously
13  not customer property of BLMIS; it has to have come from
14  someplace else.
15  Up to this point, the argument has been made that
16  each complaint is different and the court judges on a
17  12(b)(6) motion judges what is in the four corners of the
18  complaint.  But because they are allegations and judicial
19  admissions in the same case and the Court can also take
20  judicial notice of what they say, that is why we are
21  entitled to argue that the Plaintiff has failed to tie the
22  $33 million of Fairfield's transfers to KEB to the $3
23  billion rather than the $2 billion.  And that because he
24  hasn't pleaded them other than in the conclusory statement
25  that a portion of them did, which has no factual support

Page 160

1  whatsoever in the complaint, and that is required, he needs
2  an inference to tie the $33 million to the $3 billion.  And
3  the inference is exactly what the Supreme Court's decisions
4  in the Twombly and Iqbal cases address.  That's exactly the
5  issue of what permits an inference.  And the court says
6  simply that the presentation of two equal possibilities does
7  not suffice to permit an inference.  And that is what we
8  have here; the possibility that the KEB transfers may have
9  come from the $3 billion and the possibility that they may
10  have come from the $2 billion.  If they come from the $3
11  billion, there is a possible liability.  If they come from
12  the $2 billion, there's no possible liability and the
13  complaint has to push that over the line from possible to
14  plausible.
15  Again, to emphasize how closely Twombly and Iqbal
16  dictate the result, Twombly was a Sherman Act Section 1 case
17  which require the plaintiffs as an essential element to
18  allege that the defendants acted at a competitive contract
19  combination or conspiracy, or to put it another way, they
20  acted in concerted action.
21  The complaint alleged factually that the
22  defendants reacted to the plaintiff's market conduct,
23  finding it to be a competitive threat.  The facts also
24  allege that the defendants all reacted in an identical or
25  very similar way to that.  The plaintiff asked the court to

Page 161

1  draw an inference that this uniform behavior was sufficient
2  to allege the essential element of a concerted action.
3  The court, however, pointed out that the same fact
4  that the defendants -- the same facts supported that the
5  defendants' identical behavior was not a result of concerted
6  action, but instead the independent business decisions of
7  each of the defendants, not a conspiratorial one, but each
8  one deciding to respond to the competitive threat in the
9  same way.
10  And so as in our case, the alleged facts presented
11  two equal possibilities, and the court said that isn't
12  sufficient and it dismissed the complaint.  That's where the
13  Twombly phrase that we so often hear, "Nudging from what is
14  possible or conceivable, but what is plausible" comes about.
15  The court held very clearly that an inference to
16  survive a 12(b)(6) motion must be reasonable, and must be
17  based on facts alleged in the complaint.  It said that if it
18  didn't, the allegation did not show entitlement to relief as
19  both 12(b)(6) and Rule 882 require.
20  Iqbal, two years later, held that Twombly applies
21  to all civil cases, including bankruptcy cases, by citing
22  Federal Rule of Civil Procedure 1.  And so in Iqbal, the
23  plaintiff had brought a Bivens constitutional discrimination
24  claim alleging that he was remanded to especially harsh jail
25  confinement because he practiced Islam and because he was a

41 (Pages 158 - 161)

Page 162

1 national of a Middle Eastern country. He claimed that he
2 was partially confined for religion and nationality. And
3 that in fact was possible on the factual allegations of the
4 complaint.
5     But the court pointed out that the government had
6 shown that Mr. Iqbal was confined or alleged that Mr. Iqbal
7 was confined in strict conditions because he was or he may
8 have been a combatant against the United States following
9 the September 11th catastrophe.
10     The court found that without factual allegations,
11 those two possibilities were equal and that without more
12 factual content, as the court called it, the complaint
13 failed to nudge the claim over the line from possible or
14 conceivable to plausible.
15     So these require two things. The Supreme Court
16 decisions require factual allegations to satisfy Rule
17 8(a)(2) and they require a factual basis underlying a
18 reasonable inference to satisfy 12(b)(6) if an inference is
19 needed to allege an indispensable element of a claim. There
20 are many cases that decisions that apply Twombly and Iqbal
21 as indeed they must because it is our controlling precedent.
22     Coming back to why it's relevant here. The
23 plaintiff alleges and admits that Fairfield made $5 billion
24 of transfers to subsequent transferees, but sent only $3
25 billion to its -- but BLMIS sent only $3 billion to

Page 163

1 Fairfield.
2     That is -- it is possible that the $3 billion was
3 the source of all or a portion of the KEB subsequent
4 transfers, but it is equally possible that the $2 billion
5 was the source. This, because it leaves two equal
6 possibilities that have no factual content to nudge them
7 across the line, requires dismissal.
8     Now, to tie up a few loose ends, this pleading
9 failure is not cured by the relevant pathways approach. The
10 relevant pathways cases require a showing through which -- a
11 showing by which the funds were transferred from BLMIS to in
12 this case KEB. And that's in the Picard v. Charles Ellerin
13 Revocable Trust case, WL 892514 *3 (Bankr. S.D.N.Y. March
14 14, 2012).
15     THE COURT: Let me ask you what you're adding to
16 your papers, Mr. Cirillo. Please add to them.
17     MR. CIRILLO: Well, Your Honor, the papers come in
18 in a sequence, and I am trying to tie them together in a way
19 that makes sense and also to address some issues that may
20 arise because there are prior decisions in subsequent
21 transferee cases that make statements such as that the
22 relevant pathways approaches is appropriate. And I am
23 saying that in this case at least, that there is no showing
24 of a relevant pathway because it doesn't show that the $33
25 million came from the $3 billion.

Page 164

1     Also, the vital statistics approach doesn't apply
2 because that requires the who, when, and how much. But in
3 this case, who sent the subsequent transfers and how much of
4 them purportedly came from BLMIS are not alleged, whereas in
5 other cases using those approaches there's always something
6 more, like ledger entries approximate in time or identical
7 in amount. I won't cite the cases because the citations are
8 in the brief.
9     This is also not a complicated exercise --
10     THE COURT: This is not your personal
11 jurisdiction. This is general.
12     MR. CIRILLO: No.
13     THE COURT: Okay.
14     MR. CIRILLO: This is the customer property issue.
15     THE COURT: Okay. All right.
16     MR. CIRILLO: I'm almost to the end of it. I just
17 want to also, because of comments in other decisions, say
18 that this is not an exercise that complicated matching of
19 dates and amounts that you have seen. It only takes the
20 factual allegations the plaintiff has made in his exhibits
21 and adds them up arithmetically.
22     Therefore, lacking the critical element of
23 customer property, I believe the complaint should be
24 dismissed under Rules 8(a)(2) and 12(b)(6).
25     Quickly on the incorporation of the Fairfield

Page 165

1 affiliates and insider complaint.
2     THE COURT: Let me just ask you a question though.
3 And I do want to ask this question. I think what you just
4 told me on that customer property argument, that sounded
5 like trial to me. It doesn't sound like a motion to
6 dismiss. So can you link that to a motion to dismiss for
7 me, please?
8     MR. CIRILLO: Yes. Because the complaint does not
9 allege an indispensable element of the cause of action,
10 which is an allegation, a factual --
11     THE COURT: So you're saying that every one of
12 these cases I should have dismissed, because everybody makes
13 that same argument. But you said no, no, you're different.
14 And how are you different?
15     MR. CIRILLO: Your Honor, I understand that Your
16 Honor has made that ruling in other cases.
17     THE COURT: Many times.
18     MR. CIRILLO: And it that the facts in the
19 complaint against KEB are different, firstly. And second, I
20 do believe that Your Honor was wrong in all those cases.
21 But that's not my --
22     THE COURT: But how? But how?
23     MR. CIRILLO: Because Your Honor may not have
24 evaluated the absence of any factual allegation that ties
25 the payments to the $3 billion of BLMIS money rather than to

42 (Pages 162 - 165)

Page 166

1 the equally-alleged, admitted -- judicially admitted $2

2 billion that Fairfield paid out that didn't come from BLMIS.

3 That's $2 billion of non-customer property being paid out.

4 There is $3 billion paid --

5        THE COURT:  But Mr. Cirillo, Fairfield didn't have

6 any other money.

7        MR. CIRILLO:  That's not true, Your Honor.  There

8 is no allegation to that effect, firstly.  At least in the

9 KEB complaint.  And secondly --

10        THE COURT:  (indiscernible).

11        MR. CIRILLO:  -- the plaintiff's own exhibits

12 prove that it had $2 billion of resources other than from

13 BLMIS.  I have not put in this because it is a pleading

14 motion, and it does show that there is the absence, the lack

15 of an indispensable element of the claim, but I haven't put

16 in the fact that there are allegations and concessions that

17 Fairfield was paying subsequent transfers out of newly-

18 received subscription money rather than passing it to BLMIS

19 and then having BLMIS pass it back to Fairfield for

20 Fairfield to pass back.  That money would not be as an

21 example that -- the plaintiff does not negate in the

22 pleadings in any fashion -- as an example of non-customer

23 property that is equally possible to have been the source of

24 the KEB payments.

25        That is why under the Supreme Court decisions it

Page 167

1 is crystal clear that the plaintiff has made no factual

2 allegations and in fact the only allegation is a bare bones

3 conclusory statement that a portion of the payments to KEB

4 came from BLMIS.  That is not acceptable under any 12(b)(6)

5 or 8(a)(2) pleadings standard.  And that is why, Your Honor,

6 I don't carry the water for any other defendant.  And

7 regrettably, I didn't get to argue as the first case, but I

8 don't believe that KEB should be disadvantaged because I am

9 briefing and arguing at this point rather than in the

10 beginning of the sequence.  And I believe these arguments

11 are soundly supported by a controlling precedent, and

12 therefore they should be considered very carefully and I

13 believe accepted.

14        So may I continue to the incorporation briefly?

15        THE COURT:  Please.

16        MR. CIRILLO:  Okay.  The court has held that the

17 Fairfield insider complaint may properly be incorporated

18 into the subsequent transfer complaints under Rule 10(c).

19        Forgive me for drinking, but I don't want to lose

20 my voice.

21        And the Court cited In re In re Geiger, 446 B.R.

22 670 (Bankr. E.D. Pa. 2010) for that point.  And indeed,

23 that's what Judge Fitzsimon did in that case.  But then

24 immediately in the next sentence after doing so, allowing

25 the incorporation, she then dismissed the complaint under

Page 168

1 Rule 8(a)(2) because the incorporation caused the complaint

2 not to be a short and plain statement.

3        KEB also based its motion on both Rules 10(c) and

4 8(a)(2).  And so while the incorporation may be permissible,

5 the short and plain statement is not accomplished, and

6 therefore the case is dismissible for that separate reason.

7 Courts have reached exactly the same position allowing

8 incorporation under 10(c) and then dismissing because the

9 incorporation made the complaint not a short and plain

10 statement.  One case, Davis v. Bifani, 2007 U.S. Dist. LEXIS

11 3800, and American Casein Company v. Geiger (In re Geiger)

12 446 B.R. 670 (E.D. Pa. 2010).  I am not certain I have that

13 court and date right, but I know it's the right case.  It's

14 cited correctly in the brief.

15        What am I asking for relief?  Certainly I am not

16 asking the Court to order the Plaintiff to type all of the

17 allegations of the Fairfield complaint into the KEB

18 complaint.  That wouldn't accomplish anything.  I certainly

19 see that.  But what the plaintiff does know, and only the

20 plaintiff knows, is and can quickly, inexpensively, and

21 without delaying the case put those paragraph numbers -- and

22 if less than a full paragraph, the sentence into a list and

23 we can put the list in the stipulated order.  That is more

24 efficient than a Rule 12(f) motion to strike the immaterial

25 parts of the KEB complaint that are incorporated into it.

Page 169

1        And I have to say that despite KEB's and my

2 involvement in the Madoff cases for -- well, 14 years and

3 KEB 11 years, I don't know and KEB doesn't know what the

4 plaintiff has in mind.  He has alleged hundreds of

5 paragraphs of allegations.  He has attached dozens of

6 exhibits, none of which are directed at KEB.  The KEB

7 complaint is the blueprint for this case if it goes forward.

8 And KEB and I are really entitled to know under Rule 8(a)(2)

9 a short, plain statement of what it is we are defending.

10 And we don't know that at this point.

11        If Your Honor permits, I will move to the personal

12 jurisdiction points, which --

13        THE COURT:  Please.

14        MR. CIRILLO:  -- are also important and also

15 should result in a dismissal of the complaint, whereas

16 obviously the incorporation point does not seek a dismissal;

17 it seeks less relief of having them give me a list.  All

18 right.

19        Personal jurisdiction.  All of the plaintiff's

20 allegations against -- involving KEB and personal

21 jurisdiction are in paragraphs 5 and 6 of the complaint.

22 Nine of the allegations in those paragraphs are purely

23 conclusory, conjectural, and statements of law, and the law

24 clearly bars them from consideration.

25        For the Court's convenience -- and I put the exact

43 (Pages 166 - 169)

Page 170

1 language of the allegation and the specific reason it cannot
2 be considered on this motion as an appropriate probative
3 allegation of jurisdiction in a chart at Pages 8 and 9 of
4 KEB's reply memorandum, which is ECF Docket 143 filed on
5 August 15 of this year.
6       Iqbal and Twombly that I have already discussed
7 say the factual matter is required to survive Rule 8012
8 motions, and it also says that a non-factual allegation, a
9 conjectural, speculative, conclusory legal opinion type of
10 allegation is not entitled to a presumption of truth.
11 That's very important because we hear all the time that the
12 plaintiffs are entitled to a presumption of the truths of
13 their allegations. But as the Supreme Court said many times
14 in those opinions, only if they are factual.
15       And the second thing is that they have to be
16 factual or they may not serve as a basis for a reasonable
17 inference of something else. And that again is in those
18 cases. And I would also cite In re Lyondell Chemical
19 Company, 543 B.R. 400, 411 (Bankr. S.D.N.Y. 2016), and
20 DirecTV Latin America, LLC v. Park 610, LLC, 691 F.Supp. 2d
21 405 (S.D.N.Y. 2010).
22       I am not going to discuss those conclusory
23 allegations further. There are four assertions on which the
24 plaintiff rests personal jurisdiction that are fact-based
25 but that do not result in any or all of their cases,

Page 171

1 individually or collectively, in jurisdiction.
2       First I will note that the plaintiff argued that
3 factual allegations aren't necessary on a motion to dismiss
4 for lack of jurisdiction. And that's just directly contrary
5 to what Twombly and Iqbal say. Iqbal in fact said the
6 pleadings that are no more than conclusions are not entitled
7 to assumption of truth. Well-pleaded allegations are
8 allowed the presumption of veracity and they are what are
9 necessary in determining if they plausibly rise to an
10 entitlement to relief. And in this case, plausible arise
11 the inference is what one makes of these four allegations in
12 terms of the personal jurisdiction contention; do they allow
13 an inference of jurisdiction?
14       In fact, the Supreme Court expressly rejected the
15 assertion that no facts are required in a footnote in which
16 it dismissed the defense's actual statement of that
17 position. It gave a long discussion of it. But it said in
18 summary Rule 8(a) contemplates the statement of
19 circumstances, occurrences, and events in support of the
20 claim presented and does not authorize a pleader's bare
21 (indiscernible) that he wants relief and is entitled to it.
22       And that was also the holding in a case Your Honor
23 cited in many of the prior opinions, Dorchester Financial
24 Securities Ind v. Banco BRJ SA, which is a Second Circuit
25 2013 decision at 722 F.3d at pages 84-85 where the court

Page 172

1 says, "Prior to discovery, a plaintiff challenged by a
2 jurisdiction testing motion may defeat the motion by
3 pleading good faith," and this is key, "legally sufficient
4 allegations of jurisdiction," and that a 12(b)(2) motion
5 "assumes the truth of the plaintiff's factual allegations
6 for purposes of the motion and challenges their
7 sufficiency."
8       So if there aren't factual allegations, and in
9 this case the plaintiff is looking for an inference, there
10 aren't factual allegations, there's no inference and no
11 factual allegations.
12       All right. Let me also before hitting the four
13 points put on the table exactly what minimum contact test
14 is. We all know that it's purposeful availment. But what
15 Hanson said is more than that. Chief Justice Warren said it
16 is essential in each case that there be some act by which
17 the defendant purposely avails itself of the privilege of
18 conducting activities within the forum state. Thus -- from
19 those activities conducted within the forum state, thus
20 invoking the benefits and protections of its law. And
21 that's cited to Justice Stone's opinion in International
22 Shoe, which is by contrast on the facts one in which there
23 were sufficient context with Florida -- I'm sorry,
24 sufficient context, whereas in Hanson there were not.
25       The first of the four allegations that have some

Page 173

1 factual foundation is that KEB received and read Fairfield's
2 2004 private placement memorandum. As Your Honor knows,
3 there was a whole series of Fairfield private placement
4 memoranda and they didn't all say the same thing. In fact,
5 after the SEC got on Madoff's tail and made him register as
6 an investment advisor in 2006, there was a lot more in his
7 private placement memorandums than there had been before.
8       And that's important because the plaintiff puts
9 the 2004 memorandum before the court as Exhibit 1 to Mr.
10 Fish's declaration. And what we find is that the exhibit
11 itself, which necessarily overrides the complaint's
12 mischaracterizations, shows that KEB could not have learned
13 from that document that BLMIS was managing Fairfield's
14 assets in New York and it could not have learned that
15 Fairfield's redemption payments came from BLMIS to the
16 extent they want -- well, came from BLMIS, period.
17       These are not only not stated in the one thing
18 that's factually alleged, the PPM, and it is therefore not
19 inferable from the PPM that KEB knew that the money it was
20 sending and the money it was receiving to and from Fairfield
21 was actually going to BLMIS and coming from BLMIS.
22       In fact, the only reference to BLMIS in the 2004
23 PPM is that BLMIS was a sub-custodian of Fairfield asset,
24 sub-custodian to Citco. It is a commonly-known industry
25 term that shows a sub-custodian is an entity that holds on

44 (Pages 170 - 173)

Page 174

1  to assets, but not an entity that invests or manages funds

2  for another.

3      In fact, the 2014 PPM says 17 times that the split

4  strike conversion strategy was being -- or that a company in

5  Bermuda with a Bermuda address was Fairfield's investment

6  manager and that it was overseeing Fairfield's strategy of

7  investment called the split strike conversion strategy.

8      The plaintiff points out that the PPM explains

9  that the split strike conversion strategy involved trading

10  by Fairfield in U.S. securities.  That's true, but it's

11  irrelevant under both Hanson v. Denckla and Walden V. Fiore,

12  which is at 571 U.S. 277, because there's no allegation that

13  KEB performed any of that trading.  And as the cases hold,

14  personal jurisdiction over a foreign defendant depends on

15  that foreign defendant's activity, not on the activity of

16  third parties.  That is a position the  Supreme Court has

17  stated both for commercial cases, as in Hanson, which

18  actually addressed the point, and also in Walden for tort

19  cases.

20      Therefore, while I do recognize that Judge

21  Lifland's 2012 BLI decision embraced a view that knowledge

22  by a defendant about what a third party would or wouldn't

23  do, or would or might do sufficed for jurisdiction, that

24  decision is in direct conflict with the Supreme Court's

25  prior decision in Hanson and also was effectively overruled

Page 175

1  by the Supreme Court's subsequent decision in 2014 by Walden

2  where the court said the relationship must arise out of

3  contacts that the defendant himself creates with the forum

4  state.  Due process limits on the adjudicative authority

5  principally protect the liberty of the non-resident

6  defendant, not the convenient of plaintiffs or third

7  parties.  We have consistently rejected attempts to satisfy

8  the defendant-focused minimum contacts inquiry by

9  demonstrating contacts between the plaintiff or third

10  parties and the forum state.  For that, the court cited

11  Hanson and three other Supreme Court cases.

12      Therefore, the argument -- and I know it's a very

13  initially attractive idea that tossing a seed and growing an

14  orchard may have been what some defendants did, not KEB.

15  But throwing -- knowing only and nothing more than that

16  Fairfield was executing its split strike conversion strategy

17  itself, or even if it knew it was by BLMIS, which it didn't,

18  is not a basis to support jurisdiction over KEB.

19      Moving on.  The second of the allegations that had

20  some foundation in fact -- in the allegations is that the

21  New York forum and New York governing law clauses and the

22  subscription agreements between KEB and Fairfield is itself

23  a relevant contact.  That's not true.

24      If you can hear the dogs in the background, Your

25  Honor, I have to admit, I got a memorandum saying this is

Page 176

1  Bring your Dogs to Work Day.  And so they are expressing

2  their views of my argument.

3      THE COURT:  Good or bad?

4      MR. CIRILLO:  I'll have to consult with them

5  later. But ultimately only your view counts.  All right.

6      Why are the forum and governing law clauses not

7  contacts with New York?  Let's look at the forum provision.

8      The forum provision is not an exclusive

9  jurisdiction provision.  All it says is that Fairfield may

10  drag KEB into New York court.  It does not say that KEB

11  can't sue in another court.  It does not say that Fairfield

12  Sentry can't sue in another court.  And of course they are

13  both foreign entities and other courts are available.  In

14  fact, Fairfield Sentry, Your Honor knows from the Migani

15  case, did sue subsequent transferees in BVI and did not

16  insist that that case proceed here.

17      So if anybody got the benefit or privilege of New

18  York forum, it was not KEB; it was Fairfield.  It did not

19  reflect any conducting of activity by KEB in New York.  If

20  KEB had sued in New York, that would have been a contact.

21  But it didn't.  And so that is not a sufficient basis.  The

22  forum clause is not a sufficient basis to say that it was a

23  contact by KEB in New York by which it was invoking benefits

24  or privileges of New York.

25      The governing law provision is also not a relevant

Page 177

1  contact.  A governing law provision in a contract is only a

2  rule for its interpretation and enforcement.  It does not --

3  citing it does not avail the person of a privilege or

4  benefit of conducting an activity in New York.  That's what

5  Hanson Denckla, all the other cases require.  The citing of

6  a governing law provision is a frame of reference for

7  litigation for the parties to negotiate and for arbitrators

8  to interpret the contract.

9      New York does not -- it makes New York law, it

10  doesn't own it.  It's not something that it can prevent

11  somebody from citing.  And citing it does not subject

12  someone to the jurisdiction of the court, of a New York

13  court simply because it wants to refer to that as the frame

14  of reference.  It's not a privilege of conducting activities

15  in New York.  Any decisions that say or imply otherwise

16  either are based on different facts than those are alleged

17  or they fail to apply the controlling Supreme Court law and

18  are therefore not viable precedents.

19      The third contact is that KEB filed proofs of

20  claim in the BLMIS bankruptcy.  And that's true.  But in

21  this case, it does not provide a basis for personal

22  jurisdiction.  When KEB filed those claims, the court did

23  indeed have personal jurisdiction over KEB to adjudicate its

24  claims against the -- KEB's claims against the BLMIS estate.

25  However, several years before the plaintiff filed this

45 (Pages 174 - 177)

Page 178

1 adversary proceeding, the plaintiff rejected KEB's claims in
2 the bankruptcy. At that point, the court's jurisdiction
3 over KEB based on the proofs of claims ended. The Court had
4 no longer a basis for jurisdiction. And the filing of the
5 adversary proceeding did not revive it.
6        The rationale for the rule that filing proofs of
7 claim subjects the filer to the court's jurisdiction in an
8 adversary proceeding is based specifically on the desire to
9 have both the claims and the adversary proceeding resolved
10 in a single case before a single judge. It is a judicial
11 convenience rule, and that allows the court to net the
12 outcomes of both parties prevail. However, that rationale
13 does not and cannot apply if the bankruptcy claim was
14 rejected before the adversary claim is filed. And as is
15 known, the presence or absence of jurisdiction is determined
16 at the moment the adversary proceeding is filed. And so at
17 the time that this case against KEB was filed, there was not
18 any proof of claim proceeding, proof of claim on file having
19 already been rejected.
20        I did not find a case on all fours, but I did find
21 relevant precedent, and that is cited and discussed and
22 quoted at some length in the briefs and in the memoranda.
23 Those cases look at the very analogous point of whether the
24 filing of a proof of claim or the unfiling of a proof of
25 claim permits the defendant in an adversary proceeding to

Page 179

1 have a jury trial of the adversary claim or does not permit
2 that. And it's based on whether equity jurisdiction exists
3 in the court because of the filing of the proof of claim in
4 the bk proceeding. And those cases are explored in great
5 depth in the original brief we filed, which is Docket 138,
6 filed on May 16th of this year, and Docket 145, filed on
7 August 15.
8        They hold that a jury trial right under equity
9 jurisdiction in an adversary proceeding is defeated by the
10 pendency of a bankruptcy court filing, citing the
11 conservation of resources theory. But they also say that if
12 the claim is properly withdrawn or was concluded, the former
13 claimant regarding his right or its right to the jury trial
14 in the adversary proceeding because the court's equity
15 jurisdiction had ended. And that's the situation that
16 applies here in the related context, what I believe is a
17 related context.
18        Therefore, the former proofs of claim filed by KEB
19 are also not relevant contacts and do not confer a basis for
20 jurisdiction under the minimum contact test.
21        The fourth and final factually-asserted alleged
22 contact is that KEB made and received share payments through
23 New York bank accounts. And I underscore the word through
24 rather than to because the allegation acknowledges that the
25 money was actually transferred, as the subscription

Page 180

1 agreement signed by Fairfield and KEB provide, was actually
2 transferred from KEB's account in Korea and to Fairfield's
3 account with Citco in Ireland and then in revers, from
4 Ireland to Korea. Those are the accounts designated in the
5 subscription agreements.
6        Personal jurisdiction, as I believe Your Honor has
7 said in some of the decisions, is determined by the law of
8 New York. That's what the Second Circuit said in the Licci
9 v. Lebanese Canadian Bank SAL, 732 F.3d 161 (2d Cir. 2013).
10 And indeed, in that case the Second Circuit questions the
11 New York Court of appeals in order to find out, ask it to
12 explain what the law of New York is on this point of when
13 bank accounts, use of bank accounts confer jurisdiction or a
14 contact for conferring jurisdiction over a foreign
15 plaintiff.
16        Because New York law governs, the New York Court
17 of Appeals decisions are definitive. They can't be ignored
18 or overridden by any other court. And there are three
19 specific cases that define the law in this area. Amigo v.
20 Marine Midland, 39 N.Y.2d 391, Licci v. Lebanese Canadian
21 Bank, 20 N.Y.3d 327 (2012), and Rushaid v. Pictet, 28 N.Y.3d
22 316 (2016). Another case cited, a recent appellate division
23 case, First Department cited in the briefs confirmed that
24 these three cases remain the law of New York.
25        So what do they hold? They hold that a non New

Page 181

1 York person's use of a New York account is not a relevant
2 contact for jurisdiction unless two conditions are met. One
3 condition is that the account -- the use of the account must
4 because integral to carrying out an illegal scheme.
5        The second condition is that the foreign user of
6 the account must have been an active participant in the
7 illegal scheme. Neither is alleged against KEB. And in
8 fact, there is not even an allegation that KEB was aware of
9 the Ponzi scheme, and it wasn't. All right.
10        In Licci, the illegal scheme was the financing of
11 international terrorism. In Rushaid it was an international
12 bribery and money laundering scheme. In both cases, the
13 defendant, the foreign defendant resisting jurisdiction was
14 an active participant, and in both cases the defendant
15 resisting jurisdiction was using it as an integral part to
16 carrying out the terrorism or bribery and money laundering
17 schemes.
18        The New York Court of Appeals recognizes that
19 trillions of dollars of ordinary commercial transactions,
20 innocent transactions pass through New York banks every day
21 on their way between foreign banks. The New York Court of
22 Appeals indicated no intention -- it did not indicate any
23 intention that its decisions would apply to ordinary
24 commercial transactions which would or at least could have a
25 serious chilling effect on that commerce if international

46 (Pages 178 - 181)

Page 182

1 parties were routinely exposed to personal jurisdiction in
2 New York, a place that many non-Americans would rather not
3 litigate.
4      Amigo, the first of the three cases -- and that is
5 the undergirding for the Licci and Rushaid cases, said the
6 use of a New York bank for international transactions could
7 not by itself constitute a relevant jurisdictional contact.
8 Licci and Rushaid, which came later, made an exception for
9 use of an account to accomplish wrongdoing.
10      The plaintiff argues in his opposition memorandum
11 that, well, BLMIS' Ponzi scheme was illegal and therefore he
12 has alleged facts bringing the case within the New York
13 exception.  That -- it is true that BLMIS' Ponzi scheme was
14 illegal, but it does not confer jurisdiction over KEB.  KEB
15 is not alleged to have known of the Ponzi scheme, certainly
16 not alleged to have been an active participant in the Ponzi
17 scheme.
18      Furthermore, even assuming BLMIS and Fairfield
19 were wrongdoers and their use of the New York banks was
20 integral to their scheme, what they do cannot be attributed
21 or imputed to KEB because of the decisions of the Supreme
22 Court in Hanson and Walden.  Only KEB's activities are
23 relevant to the minimum contacts analysis.
24      Therefore, KEB's innocent use of New York banks in
25 ordinary commercial payments flowing between an Irish and a

Page 183

1 Korean bank is not relevant to jurisdiction over KEB as a
2 matter of New York law established by New York courts.  If
3 other course have reached a different decision, it is of no
4 moment because only New York's court of appeals can
5 determine what New York's law is, and we know exactly what
6 its law is from the Amigo Farms, Licci, and Rushaid cases.
7      Finally, I acknowledge the totality of the
8 circumstances test for personal jurisdiction.  However,
9 parsing this between the generalized conclusory allegations,
10 the nine allegations in Pages 8 and 9 of the reply brief and
11 parsing these four contacts, not one of them is sufficient
12 as a contact, a relevant contact for jurisdiction.  And
13 therefore, they can't add up to a totality of minimum
14 contacts.  Adding a bunch of zeroes still leaves you with a
15 zero.
16      Even if the Court were inclined to find one of
17 them or two of them sufficient, the cases defining what the
18 totality of circumstances test is made it clear that it is a
19 robust evaluation of whether in their totality there is a
20 showing of doing business that takes advantage or privileges
21 of New York.  And those are not the case here.
22      And for that as my final citation, I will point
23 the Court to the Hill decision, Hill v. HSBC Bank PLC, 207
24 F.Supp. 3d 333 (S.D.N.Y. 2016), which was distinguished but
25 not rejected in the BNP decision that's often mentioned

Page 184

1 which says defendant's principal contrary authority, Hill v.
2 HSBC Bank, et cetera, is distinguishable, and then goes on
3 to distinguish that the BNC facts were strongly in favor of
4 jurisdiction, but the acuity of facts in Hill were not.
5      The plaintiff says that, well, BNC said the Hill
6 decision isn't relevant because it deals with Tremont.
7 That's just not the case.  It is relevant because of what
8 the district court held and the BNC court did not in any
9 fashion undermine the decision in Hill.
10      If I didn't cite BNP, it's SIPC v. Bernard L.
11 Madoff Investment Securities LLC, 594 B.R. 167 (Bankr.
12 S.D.N.Y. 2018)
13      With that, I will end.  Appreciate Your Honor's
14 great patience and hoping that I have persuaded you and the
15 two dogs and ask Your Honor to dismiss this action against
16 KEB under Rules 12(b)(6) and 8(a)(2).
17      THE COURT:  Very good.  Mr. Fish?
18      MR. FISH:  Thank you, Your Honor.  I will touch
19 briefly on the customer property and Fairfield complaint
20 incorporation by reference issues first.
21      As articulate as Mr. Cirillo was in making both of
22 those arguments, they are really the same ones that have
23 been made in all of the past subsequent transfer actions
24 that have filed motions to dismiss, and they're the same
25 arguments that have been rejected.

Page 185

1      So for the customer property issue, the trustee
2 has alleged the relevant pathways, including the transfers
3 from BLMIS to Fairfield Sentry, and then the transfers from
4 Fairfield Sentry to KEB.  The Exhibit B to the complaint
5 includes all of the transfers from BLMIS to Fairfield
6 Sentry.  And Exhibit C includes all 22 transfers from
7 Fairfield Sentry to KEB.  That's all that the trustee needs
8 to do at this point.  The trustee has alleged the relevant
9 pathways, including identifying each transfer by date and
10 amount from Fairfield Sentry.  And as I said, includes all
11 of the transfers from BLMIS to -- I'm sorry, from Fairfield
12 Sentry to KEB.
13      And on their face, the subsequent transfers at
14 issued looked to be transfers of customer property, as they
15 all took place after Fairfield Sentry's receipt of initial
16 transfers.  And I'll just read one quote from your prior --
17 Your Honor's prior decision --
18      THE COURT:  Before you go there, give me a second
19 to articulate a question.
20      MR. FISH:  Sure.
21      THE COURT:  Because if this is what I've heard --
22 these transfers aren't to KEB; they're combined, correct?
23      MR. FISH:  Well, Your Honor, Exhibit B --
24      THE COURT:  You have 20 transfers and these are in
25 Exhibit C.  And is that all to KEB?

47 (Pages 182 - 185)

Page 186

1    MR. FISH:  Those are all to KEB, Your Honor.  And
2    in fact --
3    THE COURT:  Explain it then to me.
4    MR. FISH:  Okay.  So Defendants in the case --
5    there was a defendant who has been since dismissed.  It was
6    Korea Investment Trust Company.  And Mr. Cirillo made an
7    argument in his briefing that it's not clear who received
8    the transfers because there were two separate defendants.
9    But there's really only one defendant left since the
10   dismissal of the management company.  And it's clear -- an
11   din fact, Mr. Cirillo didn't even argue that his clients,
12   KEB, did not receive the transfers, because they did.  All
13   of the transfers --
14   THE COURT:  So what you're saying is it was a
15   management company that got dismissed.
16   MR. FISH:  Correct.  And they were dismissed
17   because they didn't receive any transfers, or at least that
18   under further investigation we didn't see any.  They all
19   went to Korean Exchange Bank.
20   THE COURT:  Okay.
21   MR. FISH:  So -- and I think Mr. Cirillo would
22   acknowledge that his client received all the transfers.  And
23   so the argument really is that -- you know, he's making the
24   same argument that every other defendant has made, that the
25   trustee hasn't tied the transfers, the subsequent transfers

Page 187

1    to the initial transfers.  But I'll just -- in Multi
2    Strategy and Banque Syz Your Honor wrote, "The calculation
3    of Fairfield Sentry's customer property and what funds it
4    used to make redemption payments are issues of fact better
5    resolved at a later stage of litigation."
6    And I'll just leave the customer property issue
7    with that and I will move on to incorporation by reference
8    unless you have any additional questions.
9    THE COURT:  How much did KEB get?
10   MR. FISH:  Every transfer on Exhibit C -- and in
11   fact, you know, we could delete defendants on that exhibit
12   and just say KEB.  They got all of those transfers, $33
13   million.
14   THE COURT:  All right.  Go ahead.
15   MR. FISH:  Sure.  So the arguments regarding the
16   improper incorporation by reference of the Fairfield
17   Complaint, Rule Eight's requirement of a short and plain
18   statement have been repeatedly rejected by this Court.  And
19   for good reason.  Because, number one, the district court
20   has already found in consolidated proceedings that adopting
21   the initial transfer complaint by reference is sufficient.
22   This is the same action as the Fairfield action for purposes
23   of the bankruptcy court.  And there's no concern with
24   confusing or inconvenient results, and there's no prejudice
25   to KEB.  I mean, what the trustee is really doing in that

Page 188

1    one paragraph is alleging the avoidability of the initial
2    transfers.  And as I mentioned, this is the same issue that
3    Your Honor has ruled on in probably a dozen cases thus far,
4    and this case is no different.
5    So unless Your Honor has questions, I will move on
6    to personal jurisdiction.
7    THE COURT:  Please, move on.
8    MR. FISH:  Thank you.  So the totality of the
9    circumstances here shows that jurisdiction is more than
10   appropriate.  All of Mr. Cirillo's arguments, all of KEB's
11   arguments regarding the lack of jurisdiction, which are done
12   very piecemeal, are abutted by the trustee's allegations and
13   the arguments in the trustee's opposition.
14   First, KEB individually and as trustee purposely
15   availed itself of the privilege of conducting activities in
16   the U.S. and New York specifically.  The trustee alleges
17   that KEB invested in Fairfield Sentry to gain access to
18   BLMIS, which is a plausible allegation when taken together
19   with the allegation that 95 percent of Fairfield Sentry's
20   assets were invested with BLMIS.
21   Now, Mr. Cirillo gave us a good recitation of
22   Twombly and Iqbal and the standard of plausibility, but the
23   allegation in the complaint in Paragraph 5, that defendants
24   knowingly directed funds to be invested with New York-based
25   BLMIS through Fairfield Sentry, that's a factual assertion

Page 189

1    based on the allegation in Paragraph 2 that Fairfield Sentry
2    was a BLMIS feeder fund and had virtually all of its assets
3    invested in BLMIS.
4    It's therefore a reasonable inference to allege
5    that the purpose of investing in Fairfield Sentry was to
6    gain access to BLMIS.  It begs the question why else would
7    you invest in Fairfield Sentry if not to get to Madoff?
8    There wouldn't be any other reason.
9    And in fact, the Second Circuit has even opined in
10   the In re Picard case in 2019 when these investors chose to
11   buy into feeder funds that placed all or substantially all
12   of their assets with Madoff securities, they knew where
13   their money was going.  And Your Honor has also ruled in
14   past subsequent transfer cases that this allegation is
15   sufficient.
16   So the other issues that Mr. Cirillo has raised, I
17   will go through them in order as well.  He raised the issue
18   of the 2004 private placement memorandum and why that
19   private placement memorandum doesn't disclose that Madoff
20   was the manager of the fund.  And KEB focuses its papers on
21   references to BLMIS and Madoff in the PPM, but the PPM does
22   disclose that BLMIS holds 95 percent of the funds.  And it
23   also discusses the split strike strategy.  And there's
24   numerous references in that PPM, even if you didn't know it
25   was Madoff, which is not -- that's not plausible in itself.

48 (Pages 186 - 189)

Page 190

1 But even if you didn't, there's all sorts of references to
2 New York. The strategy was centered around U.S. securities
3 and buying S&P 100 stocks. Everything was in dollars, the
4 minimum investment and the initial offering price. The PPM
5 Fairfield Sentry maintained United States counsel. The PPM
6 discussed trading risks discussed in U.S. government
7 activities. It discussed Fairfield Sentry -- or I'm sorry,
8 Fairfield Greenwich Group, which was essentially the manager
9 of the fund, with its principal offices in New York. It
10 discussed Fairfield Sentry's intermediary bank in New York,
11 and it has a mention that legal matters in connection with
12 the offering have been passed upon for Fairfield Sentry in
13 the United States by counsel located in New York.
14      So the 2004 PPM, Mr. Cirillo tries to make a
15 distinction with the 2006 PPM. But even if you didn't know
16 that Madoff was running the show, you still had all sorts of
17 disclosures here.
18      THE COURT: Let me interrupt you a minute. You're
19 talking about that. Now, where is that located? What page
20 is that on?
21      MR. FISH: Sure, Your Honor. The 95 percent of
22 the assets under custody being held by BLMIS, that's
23 attached to my declaration as Exhibit 1. And that's on Page
24 15 of the private placement memorandum.
25      THE COURT: Okay. All right.

Page 191

1      MR. FISH: Okay. The strategy discussing the S&P
2 100 stocks and the split strike strategy, that's on Page 8.
3 And I think there may be some on Page 9. The minimum
4 investment and initial offering prices in U.S. dollars,
5 that's on Pages 1 and 10, I believe. Let's see. The U.S.
6 counsel, located in New York, it's located on VI. The
7 trading risks discussing the U.S. government activities,
8 that's on Page 16. The intermediary bank that's in the
9 United States, that's on Page 13. Fairfield Greenwich Group
10 FGG, maintaining its principal office in New York, that's on
11 Page 6. And the legal matters in connection with the
12 offering that had been passed upon in the United States by
13 counsel located in New York, that's on Page 22.
14      THE COURT: Okay.
15      MR. FISH: So I think there are a number of
16 disclosures. And again, why else would anyone invest in
17 Fairfield Sentry other than to invest with Madoff if it's 95
18 percent invested with Madoff? So the trustee's allegations
19 are more than plausible under any standard.
20      And next I will move to the customer claims that
21 Mr. Cirillo mentioned. But the trustee is not arguing that
22 the customer claims automatically confer personal
23 jurisdiction, but they do add to the totality of the
24 circumstances here, and they show that the investment with
25 Fairfield Sentry was a New York-based investment. And I

Page 192

1 believe the customer claim that Mr. Cirillo submits with his
2 declaration even says they are submitting a customer claim
3 as an indirect investor with BLMIS. And also KEB's
4 reasoning that even though they sought a benefit in the
5 bankruptcy court in this jurisdiction by filing a customer
6 claim, but there's no personal jurisdiction. It just seems
7 like a -- contrary. So, again, the trustee is not alleging
8 that these customer claims automately confer jurisdiction,
9 but they are a piece of the puzzle.
10      And next I will move to the subscription
11 agreements. And once again, the forum selection clause is
12 one more circumstance showing the New York-centric nature of
13 the investment, that KEB consented to being sued in New York
14 and the application of New York law. And like the customer
15 claimed, we're not arguing that this provision is binding or
16 automatically confers jurisdiction. Rather, it's one more
17 contact that shows that under the totality of the
18 circumstances --
19      THE COURT: What exhibit is that? Tell me what
20 exhibit that is.
21      MR. FISH: I'm sorry. The subscription
22 agreements. They are attached to Mr. Cirillo's declaration
23 as part of their customer claims. And the subscription
24 agreement -- there's three of them, I believe. And the
25 subscription agreement, there's three of them, I believe,

Page 193

1 and the first one starts on -- they're all together, so I'll
2 give you the ECF page number, if that's helpful to you. The
3 first one is on Page 10 of 48 of, I believe it's Exhibit A.
4 Let's see, the second one -- and all of these, I think Mr.
5 Cirillo will agree that these subscription agreements are --
6 say the same thing. The second one is on Page 32 of 48.
7 This is -- and I'll give you -- the Document Number is 137-
8 1. It's Exhibit A to Mr. Cirillo's declaration. And then,
9 the third customer subscription agreement is Page -- I
10 believe is 137-2, Exhibit B to the declaration. On Page 16
11 of 40 is where it starts.
12      And I can -- you know, I can give you the specific
13 pages of the -- well I can say that -- I can tell you that
14 the forum clause, the consent to New York jurisdiction is on
15 Page -- is Paragraph -- I believe it's Paragraph 19 of the
16 subscription agreements.
17      THE COURT: Okay.
18      MR. FISH: So, we're not alleging that -- or we're
19 not -- we're not arguing that the -- that these subscription
20 agreements, that the forum selection clause automatically
21 confer jurisdiction. But again, it's a piece of the puzzle,
22 and it shows that Korea Exchange Bank had multiple contacts
23 with the forum and purposely availed itself of the benefits
24 and the privileges of doing business in the United States,
25 specifically in New York.

49 (Pages 190 - 193)

Page 194

1     And, you know, these subscription agreements also
2 include the New York bank accounts as well.  Where to send -
3 - and in fact, this is where to send the redemptions.  And
4 we know that they did receive the redemptions.  And so, on
5 Pages -- Page 31 of 48 on Document 137-1, that's Exhibit A,
6 and then there's another one on Page 19 -- I'm sorry, 20 of
7 48 on Exhibit A.  And then, Exhibit B, Document 137-2,
8 there's another one.  It's less easy to read, but it does
9 say Deutsche Bank Trust Americas New York on all of them.
10 This is Page 26 of 40 on 137-2.  All of these subscription
11 agreements include a New York bank to receive redemptions.
12     Now, this document doesn't say that this is a
13 passthrough.  It says that's where the redemptions are to be
14 sent.  And that leads me to the bank account issue, that KEB
15 maintained a bank account in New York at Deutsche Bank
16 Americas, and that's where they received all of the
17 transfers, I believe.
18     THE COURT:  Do you happen to have the last four
19 numbers on that account, by any chance?
20     MR. FISH:  Let's see, it's --
21     THE COURT:  Not all of it.  I purposely don't want
22 all of them.
23     MR. FISH:  Yeah, 1033 I think is the account
24 number.
25     THE COURT:  The last four digits?

Page 195

1     MR. FISH:  Right.
2     THE COURT:  Okay.
3     MR. FISH:  And let me -- I just want to make sure
4 that it's the same account.  That's at least what it says on
5 the -- on the subscription agreement.  And I've also, Your
6 Honor, I've attached to my declaration some documents as
7 Exhibit 2 and 3, showing the requests for redemption.  And
8 they are to go to the same Deutsche Bank Trust Company
9 Americas account.  And I believe we've redacted the account
10 information from those.
11     THE COURT:  Okay.  Make sure you do.  All right.
12     MR. FISH:  But the documents do include -- so,
13 it's clear that KEB requested redemptions and received
14 redemptions in a New York bank account.  And this shows --
15 these documents show that the use of this account was
16 voluntary and that was an intent to use this account for
17 redemptions.  So, that's just to say that the transfers were
18 -- they purposely went through the New York bank account.
19     This is not a situation, as my able adversary has
20 argued, where the -- these bank accounts had nothing to do
21 with the transactions.  In fact, I mean, the Trustee is
22 alleging that the transfers at issue in this case, the very
23 transfers, the very subsequent transfers that the Trustee is
24 trying to recover, went through these New York bank
25 accounts.  This isn't like some of the cases that Mr.

Page 196

1 Cirillo pointed to, where a defendant was accused of
2 wrongdoing or terrorism, but this is a case where the
3 correspondent account was used for the purpose, really, of
4 which the Trustee is suing.
5     And there's also a case on point, or more on point
6 than the cases KEB cites, that I just want to bring to Your
7 Honor's attention.  We cite it in our opposition brief, but
8 it was just decided on May 22, and that's in the Arcapita
9 case.  And the District Court in that case affirmed personal
10 jurisdiction where the defendant in the commercial
11 transaction "designated a correspondent account in New York
12 to receive the fund transfers."  And even though the debtor
13 chose to use US dollars to effectuate the investment, the
14 Court said that the defendant "could have avoided the United
15 States entirely by routing placements through correspondent
16 accounts anywhere in the world."  And this is Bahrain
17 Islamic Bank versus Arcapita Bank.  It's 640 B.R. 604.
18     And similarly, KEB voluntarily used the Deutsche
19 Bank New York account to do business with Fairfield Sentry,
20 which by the way also used a New York account, which is
21 disclosed in the private placement memorandum, and nothing
22 was forcing KEB to do business with Fairfield Sentry.
23 Nothing was forcing them to use a New York bank account.
24 They voluntarily entered into these subscription agreements
25 and took these transfers and used a New York bank account to

Page 197

1 do it.  So, even though KEB says that they weren't doing
2 anything illegal or they may not have known of the fraud,
3 these correspondent accounts were part of the scheme, and
4 they received subsequent transfers of customer property.
5     So the -- Your Honor, the totality of the
6 circumstances shows that KEB purposely availed itself of the
7 privilege of conducting activities in the US, and New York
8 specifically.  Second, the Trustee's claims arise out of or
9 relate to KEB's conduct in the forum.  I don't think that's
10 a dispute.  And third, jurisdiction is reasonable under the
11 circumstances, for the same reasons Your Honor has
12 articulated in other subsequent transfer motions that have
13 come before you.  And the arguments that KEB makes in its
14 motion are similar to ones that have been rejected in more
15 than a dozen other motions so far.  There's no reason to
16 stray from these prior decisions, either factually or
17 legally, and KEB's arguments should similarly be rejected.
18     Thank you.  Unless you have any questions, I'll
19 rest, Your Honor.
20     THE COURT:  I think I had a few.  Mr. Cirillo,
21 any --
22     MR. CIRILLO:  Well, yes, Your Honor, I do have a
23 couple --
24     THE COURT:  Bullet-point rebuttals, please.
25     MR. CIRILLO:  I'm sorry, say again?

50 (Pages 194 - 197)

Page 198

1       THE COURT:  Bullet-point rebuttals, please.

2       MR. CIRILLO:  Yes, of course.  The purposely

3   availed point that my -- that Mr. Fish raised, that goes to

4   the issue that you have to know that BLMIS was behind

5   Fairfield, and there's no basis for that allegation -- for

6   that assertion, other than Mr. Fish's statement that why

7   else would one invest in Fairfield, except to get to

8   Plaintiffs.

9       Mr. Fish ranged far from the allegations in the

10  complaint, and I will only add this, that as Mr. Fish knows,

11  we have explained to him that KEB was only a -- only

12  executed the transactions that the manager, now dismissed,

13  ordered.  It had no obligation to know anything at all about

14  the investments, this or any of the other investments, as

15  Trustee.  So, it is pure conclusory speculation, contrary to

16  fact, that KEB knew.  And if it didn't know, and there's no

17  allegation other than conclusory allegation that it did, the

18  knowledge is not sufficient.  As I explained, my view is

19  that the BLI decision, whatever was in 2012, was effectively

20  overruled in 2014.

21      Mr. Fish refers to us knowing that KEB knew

22  that -- from the PPM that BLMIS held 95 percent of the

23  funds.  As I explained, being a custodian and holding funds

24  -- which many, many broker dealers do for other broker

25  dealers, and we know that Madoff or BLMIS was a registered

Page 199

1   broker dealer -- has nothing at all to do with whether it

2   knew that 95 percent of the funds were being invested in

3   BLMIS on a long-term basis.  It only tells them -- and

4   certainly does not tell them what Mr. Fish wants to draw

5   from it that KEB knew that BLMIS was behind Fairfield

6   Sentry.  There is no imputation.

7       All of the many things that Mr. Fish listed as New

8   York-centric events can't be imputed to KEB under Walden.

9   It is not part of the totality of circumstances; it is

10  irrelevant.  The fact that these accounts were passthroughs

11  in fact is alleged in Paragraph 5 of the complaint, which as

12  I said earlier, talks about -- it says wired funds to

13  Fairfield Sentry through a bank in New York and received

14  funds through its own bank account in New York.  Going back

15  to the basic documents that Mr. Fish has identified, Your

16  Honor, the subscription agreements, that's how you get money

17  from the account, the specified account in Korea to the

18  specified account in Ireland, and get it from the specified

19  account in Ireland to the specified account in New York.

20  Innocent, completely commercial transactions, which the

21  three New York Court of Appeals decisions clearly state will

22  not support jurisdiction if they are not by a participant in

23  an illegal scheme.

24      The reference to things that the customer claims

25  filed KEB say, like being an indirect investor in BLMIS,

Page 200

1   can't be things that they -- well, they are not things --

2   and there's no allegation they are things that BLMIS knew --

3   that KEB knew when it was investing and redeeming.  In fact,

4   those customer claims were filed long after, months after

5   the world knew.  From December 8, 2008, onward, we all

6   learned that BLMIS was behind Fairfield.  We didn't know it

7   until then, but in trying to participate as an indirect

8   investor, that it learned it was an indirect investor on

9   behalf of its trusts.  Of course it alleged what it would

10  need.  That doesn't have any evidentiary probity.

11      The broader issue is that you can't take a bunch

12  of zeroes and add up to more.  There is no puzzle to be

13  pieced together.  These are not pieces.  And the principal

14  argument that I heard several times is that these arguments

15  have already been made and rejected.  Your Honor, and I

16  discussed that at one point during my presentation, my

17  argument, and yes, I recognize that there have been

18  decisions that have made and -- on some of these arguments

19  that have been rejected.  However, we have seen over and

20  over again that courts can change their minds, and do change

21  their minds.  And we know that no progress is made in the

22  law unless it is viewed from new perspectives.

23      The perspectives that I have presented to Your

24  Honor are not perspectives that have been presented

25  previously.  I have been assiduous in keeping track of the

Page 201

1   filings and the arguments, and I think that whether or not a

2   prior decision has been made, it needs to be reviewed on the

3   facts of this complaint, on the cases that are cited in

4   these briefs, and on the actual content of the documents

5   that have been put before the Court in this and other cases

6   that are part of the same case.

7       That's what I have to say, and I thank you for

8   listening.

9       THE COURT:  Very good, Mr. Cirillo.  Mr. Fish, do

10  you have anything you wish to add?

11      MR. FISH:  Your Honor, I'll just add a few things

12  here.  It wasn't just me who said, why else would anyone

13  invest in Fairfield Sentry, if not for BLMIS, but the Second

14  Circuit said that in the in re: Picard case, 917 F.3d 85, on

15  Page 105 of that opinion.  As I said, when these investors

16  chose to buy into feeder funds that placed all, or

17  substantially all, of their assets with Madoff Securities,

18  they knew where their money was going.

19      THE COURT:  Okay.  We've heard you.

20      MR. FISH:  And Mr. Cirillo makes a -- made a

21  comment about KEB maybe not necessarily knowing about Madoff

22  and that they were getting instructions.  But that's, you

23  know, that's an issue for discovery, because you know, KEB

24  was investing on behalf of trusts.  And under New York law,

25  the trustee can't sue the trusts, they can only sue the

51 (Pages 198 - 201)

Page 202

1  trustee. That's why they sued KEB individually and as the
2  trustee of these three trusts.
3      And the subscription agreements specifically state
4  that if the subscriber is signing as a trustee or agent or
5  nominee or someone else, it still "agrees that the
6  representations and agreements herein are made by a
7  subscriber with respect to itself and the beneficial
8  shareholder." And that's the subscription agreements at
9  Paragraph 27. And KEB is very careful about not saying what
10 the intent of the trusts were, and we can only surmise as to
11 why.
12     THE COURT: Very good. We're not surmising today.
13     MR. FISH: Right. But I think it's -- the Trustee
14 has alleged sufficient facts to confer personal jurisdiction
15 in this court.
16     And also, I also wanted to just go back to
17 something that Mr. Cirillo mentioned about the Trustee not
18 needing to allege facts. That's not what we argued in our
19 opposition. In fact, we were citing a couple of Your
20 Honor's opinions in Bank Lombard Odier and Banca Carige,
21 where I think the quote was, "At the pre-discovery stage,
22 the allegations need not be factually supported." In other
23 words, this is not a summary judgment motion. This is a
24 motion to dismiss, and the Trustee has alleged sufficient
25 facts, both under Rule 12(b)(2) and 12(b)(6).

Page 203

1      And with that, Your Honor, I'll rest.
2      THE COURT: Thank you.
3      MR. CIRILLO: Your Honor, two words, or two
4  briefly --
5      THE COURT: You had your rebuttal, so quick. That
6  was his --
7      MR. CIRILLO: Well, I'm the movant, so he had his
8  -- this is our answer. First, Your Honor didn't
9  misunderstand Dorchester. Dorchester says you need facts
10 and factual allegations. It's the fact allegations that are
11 missing here, and that's what Dorchester said, and that's
12 what Your Honor cited in the part that Mr. Fish just quoted.
13     Secondly, why else would they invest? Well, the
14 Second Circuit didn't purport to know why KEB acted, and
15 Mr. Fish doesn't know why KEB acted. I mentioned the fact
16 it was a Trustee taking orders simply because he had
17 continually referenced the "why else would they invest"?
18 There are lots of reasons why these trusts would be there,
19 and the Court can't speculate about --
20     THE COURT: You've both been heard. You have both
21 been heard.
22     MR. CIRILLO: Good. I'm done; thank you.
23     THE COURT: 11-02573, Trustee Picard versus
24 Sumitomo Trust and Banking Company, state your name and
25 affiliation.

Page 204

1      MR. LANDSMAN: Good afternoon, Your Honor. My
2  name is Zeb Landsman, and I represent Sumitomo, and I'm with
3  the law firm of Becker, Glynn, Muffly, Chassin & Hosinski.
4      MR. SONG: And good afternoon, Your Honor, Brian
5  Song, Baker Hostetler, on behalf of the Trustee.
6      THE COURT: Very good. I believe this is your
7  motion to dismiss, Mr. Landsman.
8      MR. LANDSMAN: It is. Thank you, Your Honor. I
9  am going to be quick, less than 10 minutes, hopefully five,
10 if I can.
11     THE COURT: You're very kind to a judge that's
12 been sitting all day.
13     MR. LANDSMAN: You're welcome. I'm going to limit
14 my argument to just one of the points that I raised in the
15 motion, and that's Sumitomo's 8(a) argument.
16     Rule 8(a) is simple. It requires plaintiffs to
17 include a short, plain statement showing that the pleader is
18 entitled to relief. Here, in this case, the Trustee needs
19 to allege two things: one, that there was an initial
20 transfer from BLMIS to Sentry that is avoidable, and two,
21 that the Sentry -- that Sentry subsequently transferred
22 those funds to Sumitomo.
23     The Trustee certainly gave us fair notice of the
24 second drop. He clearly identified the subsequent transfer.
25 In Paragraph 40 in Exhibit D, he clearly alleges, simply and

Page 205

1  precisely, that $54,253,642 was transferred on October 16,
2  2007, from Sentry to Sumitomo. He did that perfectly. The
3  problem, Your Honor, is with the first prong.
4      Rather than identifying an initial transfer that
5  is avoidable, he simply attached a 77-page list of thousands
6  of transfers, totaling billions of dollars, spanning years.
7  That's his Exhibit C, and if you look on Page 6 of our
8  brief, I have a sample of that. It's as if a plaintiff,
9  Your Honor, brought a breach of contract claim and alleged
10 that the defendant failed to perform on a particular day.
11 But then, rather than identifying the contract that was
12 breached, he listed hundreds of contracts and simply said,
13 you breached one of those. Figure it out. Or, if I were
14 accused of running a red light on a particular day that's
15 identified, and then the complaint listed every intersection
16 in the city, I wouldn't be able to answer the complaint. I
17 wouldn't be able to prepare for trial.
18     In the red light example, I'd have to take
19 discovery on every traffic signal, seek thousands of records
20 from the cameras, seek out potential witnesses to prove the
21 plaintiff may have stated a claim, but it's also made it
22 impossible to prepare for trial. Sumitomo is in that
23 position. The Trustee will have to prove that there is an
24 initial transfer that is avoidable. We have the right to
25 seek discovery about that initial transfer to determine

52 (Pages 202 - 205)

Page 206

1 whether it really happened. He's given maybe documents, but
2 we get discovery on whether it really happened and whether
3 it is avoidable.
4        We have the right to craft a defense based on
5 which initial transfer the Trustee plans to use at trial,
6 and it's not too soon to require the Trustee to identify
7 one. We need to answer the complaint and start discovery
8 now. We need to gather evidence about the alleged initial
9 transfer now. But we can't.
10        Without more specifics from the Trustee, we'll
11 have to seek discovery about those hundreds of transactions
12 listed in Exhibit C. We'll have to show up at trial without
13 knowing which transaction constituted the alleged initial
14 one. We'll have to wait for trial for him to tell us
15 whether the initial transfer was within the two-year
16 lookback period or not. We don't know. And that's because
17 our subsequent transfer was within the two-year lookback
18 period, but he hasn't told us if the initial transfer was,
19 and that will affect our defense.
20        And it's particularly unfair here to keep Sumitomo
21 in the dark, because Sumitomo was a stranger to that initial
22 transfer. It has no direct knowledge of it. Unlike the
23 Chase case that they mentioned, all of that information is
24 with the Trustee and the records he has. We don't know
25 anything about the initial transfers because we weren't a

Page 207

1 party. It was between BLMIS, in whose shoes the Trustee
2 stands, and Sentry. And the Trustee has had access to that
3 information for years, yet he still refuses to identify the
4 basis for his claim that there was an initial transfer
5 that's avoidable.
6        The Trustee needs to comply with Rule 8(a), and
7 Sumitomo cannot answer the complaint or prepare for trial
8 unless he does. And that's why we respectfully request that
9 you dismiss the complaint and perhaps give him leave to
10 amend it, but dismiss the (indiscernible) so we can properly
11 answer it.
12        THE COURT: Thank you, Mr. Landsman. Mr. Song?
13        MR. SONG: Thank you, Your Honor. I will address
14 it briefly as well, as it has been a long day for all of us.
15        The Defendant's argument here is based on the
16 faulty premise that the Trustee is required, here at the
17 pleading stage, to identify and specify the exact initial
18 transfer to Fairfield Sentry, from which the subsequent
19 transfer to Sumitomo flowed. Defendant would thus create
20 some entirely new pleading burden, wherein the Trustee would
21 be required to essentially do a dollar-for-dollar tracing
22 analysis at the outset of the case.
23        This Court has already held that to plead a
24 subsequent transfer claim, the Trustee must allege facts
25 that support an inference that the funds at issue originated

Page 208

1 with the Debtor, which we have done that. No tracing
2 analysis is required, and the pleading burden is not so
3 onerous as to require a dollar-for-dollar accounting of the
4 exact funds at issue. That's because money is fungible,
5 Your Honor, and as, you know, Defendant here is claiming
6 that they won't know until trial, I think that's also a
7 misapprehension of what the burdens are here.
8        We are about to get into discovery, and I agree
9 with my -- with my adversary here that it is important to
10 get into these issues. But that is precisely what discovery
11 is for. And the Trustee's experts, once they've had the
12 opportunity to participate through discovery, will issue an
13 expert report, which will show the tracing and the flow of
14 funds from the initial -- from BLMIS to Fairfield Sentry and
15 to Sumitomo. They will not be surprised at trial. We will
16 have this throughout the discovery process.
17        This Court has already discussed and knows very
18 well that the Trustee only needs to plead the necessary
19 vital statistics, and we have done that, and that that is
20 all that is required, and that's what we have done.
21        Thanks, Your Honor.
22        THE COURT: Okay. Mr. Landsman or Mr. Song,
23 anything else you wish to add?
24        MR. LANDSMAN: Yes, just two quick replies to
25 that.

Page 209

1        THE COURT: Okay.
2        MR. LANDSMAN: He doesn't need any discovery from
3 us because we don't have any discovery on that question
4 about which is the initial transfer. We know nothing about
5 it. We got the subsequent transfer; we'll give him
6 discovery about that. But to identify the basis for his
7 entire claim, he needs no discovery from us.
8        So what he's saying is, we now need to go take
9 discovery on those hundreds of transfers and take
10 depositions on those hundreds of transfers, because he can't
11 even narrow it down to a smaller set. We're not asking him
12 for tracing. We're asking, just tell us what the initial
13 transfer was.
14        THE COURT: Okay. Understand. Anything else?
15        I thank everyone for their patience and your
16 kindness all day long. I hope that you have a lovely
17 evening. And you will receive a written opinion.
18        MR. LANDSMAN: Thank you, Your Honor.
19        MR. SONG: Thank you, Your Honor.
20        THE COURT: Thank you.
21
22
23        (Whereupon these proceedings were concluded at
24 3:54 PM)
25

53 (Pages 206 - 209)

Page 210

1           C E R T I F I C A T I O N

2

3       I, Sonya Ledanski Hyde, certified that the foregoing

4   transcript is a true and accurate record of the proceedings.

5

6   *Sonya L. Ledanski Hyde*

7

8   Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  September 19, 2022

Veritext Legal Solutions
212-267-6868                 www.veritext.com                 516-608-2400

10-03635-jpm    Doc 1000-11    Filed 01/20/23    Entered 01/20/23 21:43:50    Exhibit 16
- Sept. 14    2022 Status Conference Transcript    Pg 56 of 123

[& - 2]                                                                                          Page 1

**&**

**&**   15:17 36:13
  112:6 204:3

**0**

**007**   30:19
**03635**   16:25
**08-99000**   1:3

**1**

**1**   5:21 6:14,14
  7:15 8:9,9 11:20
  12:1 132:17
  133:3,7,13
  134:1,1 136:8
  136:10,19,23
  137:4,6,14
  138:10 139:3
  140:4,21 147:13
  147:24 149:4
  151:8 160:16
  161:22 173:9
  190:23 191:5
  193:8
**1.2**   104:6
**1.25**   99:5,16
**10**   75:9,16 81:18
  167:18 168:3,8
  191:5 193:3
  204:9
**10-03635**   1:11
  5:1 16:4
**10-03636**   1:19
  6:19 16:4
**10-04285**   2:2
  8:14 36:8
**10-05345**   2:13
  10:12 124:11,18
**10-05358**   123:15
**10-3545**   124:9

**10/19/2022**   5:13
  7:6
**100**   125:7 190:3
  191:2
**10004**   3:25
**10006**   15:21
**10009**   15:13
**10016**   14:15
**10019**   13:25
**10020**   15:5
**1004**   7:4,8
**1005**   6:21
**1006**   8:2,7
**1007**   7:24
**10104**   14:7
**10111**   13:6
**10166**   13:17
**10171**   14:22
**1033**   194:23
**105**   201:15
**10:00**   5:13 6:10
  7:6 8:4 9:16
  10:2 12:2,11
**10:02**   4:2
**11**   95:24 96:3
  169:3
**11-02572**   2:24
  11:8 154:7
**11-02573**   3:10
  12:5 203:23
**1125643**   137:10
**11501**   210:23
**117**   120:24
**119**   12:9
**11th**   19:12 23:17
  162:9
**12**   44:2 49:6
  57:16 103:3
  131:22 159:17
  161:16,19

**162:18 164:24
  167:4 168:24
  172:4 184:16
  202:25,25
**12-1693**   21:9
**12151**   210:6
**122**   45:4
**1258**   157:24
**1290**   14:6
**12th**   19:14 23:2
  23:10
**13**   46:23 156:12
  191:9
**130**   125:17
**1301**   15:12
**135**   11:13
  125:20
**137**   193:7
**137-1**   194:5
**137-2**   193:10
  194:7,10
**138**   179:5
**14**   4:1 18:19
  24:11 44:17
  85:11 156:6
  163:14 169:2
**140**   11:11 84:20
**141**   129:11
**143**   170:4
**144**   11:23 50:17
**145**   11:18 179:6
**14th**   19:14
**15**   26:22 68:24
  68:24 75:9,16
  81:18 134:13
  141:3 152:22
  170:5 179:7
  190:24
**155**   51:5

**156**   50:16
**16**   56:20,23
  121:12,13
  134:15 191:8
  193:10 205:1
**16.2**   56:6
**161**   180:9
**162**   42:11
**164**   136:2,8
**166**   66:9 84:4
**167**   184:11
**16th**   179:6
**17**   85:11 134:18
  141:3,11 174:3
**172**   135:17
**177**   136:2,8
**18**   132:1
**181**   135:17
**19**   9:22 83:7
  193:15 194:6
  210:25
**190**   147:11
**1970s**   134:18
**1985**   87:1
**1997**   157:24
**19th**   33:4 35:10
**1c1260**   147:2
**1st**   18:19

**2**

**2**   5:22 6:15,15
  7:16 8:10,10
  23:8,16 49:6
  88:21 157:6
  158:10,18,24
  159:2,5,23
  160:10,12
  162:17 163:4
  164:24 166:1,3
  166:12 167:5
  168:1,4 169:8

10-03635-jpm    Doc 1000-11    Filed 01/20/23    Entered 01/20/23 21:43:50    Exhibit 16
- Sept. 14   2022 Status Conference Transcript    Pg 57 of 123

**[2 - 3:54]**                                                                                          Page 2

172:4 184:16
189:1 195:7
202:25
**20**   180:21
185:24 194:6
**200**   13:16
**2004**   55:22
84:21 97:12
173:2,9,22
189:18 190:14
**2005**   98:18
125:18 130:1,9
131:23
**2006**   47:19
55:22 56:1,6
63:22 64:11,14
90:23 91:12
121:13,14 173:6
190:15
**2007**   26:19 28:3
79:10 132:1
168:10 205:2
**2008**   28:7 47:20
63:23 98:20
125:19 126:18
126:20,21 128:1
129:3,7,9 130:5
130:9 146:17
200:5
**2010**   23:11,11
27:21 28:8
157:17 167:22
168:12 170:21
**2012**   44:11,15
163:14 174:21
180:21 198:19
**2013**   125:20
171:25 180:9
**2014**   50:3 174:3
175:1 198:20

**2015**   54:6
121:23
**2016**   22:7
170:19 180:22
183:24
**2018**   184:12
**2019**   189:10
**2021**   18:17,19
141:16
**2022**   4:1 9:22
137:10 210:25
**2022.05.06**   5:22
7:16
**2022.07.14**   5:22
7:16
**2022.07.21**   5:25
6:1 7:19,20
**2022.07.28**   6:3
7:21
**2022.08.05**   6:1
7:20
**207**   183:23
**210**   54:10
**214**   146:15
**21830**   21:9
**219**   141:16
**22**   64:14 77:4
185:6 191:13
196:8
**221**   84:4
**222**   10:14,22
11:4
**224**   138:20
**231**   10:20
**232**   50:23
**234**   11:3 22:9
50:22
**235**   51:21
**246**   14:14

**247**   50:20
**24th**   20:4
**25**   24:2,14 27:7
**25th**   146:16
**26**   18:18 25:21
32:6,25 194:10
**265**   66:20
**269**   9:25
**27**   202:9
**271**   9:20
**274**   9:13
**275**   147:11
**277**   174:12
**28**   180:21
**281**   10:8
**283**   10:7
**28th**   19:14
**29**   96:23
**290**   8:17 10:7
**295**   9:8 10:7
**296**   10:7
**299**   14:21
**2d**   84:20 170:20
180:9

**3**

**3**   5:24 6:15,16
7:17 8:10,11
53:18,18 136:1
156:25 158:20
158:23 159:10
159:22 160:2,9
160:10 162:24
162:25 163:2,13
163:25 165:25
166:4 195:7
**3.3**   27:6
**3.9**   26:19
**30**   5:24 6:2 7:18
7:21 19:19
25:10,14 27:19

29:9 31:13 33:4
33:8 125:21
**300**   111:11
130:7,12,23
210:22
**301**   142:1
146:20 147:3,4
147:19 148:21
**302**   9:11
**307**   10:5
**30th**   19:9,14
**31**   13:24 194:5
**316**   180:22
**318**   22:8
**32**   56:8,19
121:10,14 193:6
**32.8**   55:20
**320**   84:20
**327**   180:21
**33**   55:18 158:23
159:22 160:2
163:24 187:12
**330**   210:21
**332**   70:3
**333**   53:19 55:1
71:17 183:24
**337**   53:19 71:17
99:15
**33rd**   14:14
**340**   116:12
**36**   33:3
**3635**   17:1
**3636**   17:1
**37**   21:20,21
22:15 25:3
**3800**   168:11
**39**   180:20
**391**   180:20
**3:54**   209:24

**3d** 183:24

**4**

**4** 5:25 6:16,16
7:19 8:11,11
136:2
**4.2** 54:18
**4.4** 131:23
**4.5** 77:15,20
94:11
**40** 83:6 126:21
130:10 193:11
194:10 204:25
**400** 170:19
**405** 170:21
**411** 170:19
**44** 136:2
**446** 157:16
167:21 168:12
**45** 13:5 136:2
**475** 146:15
147:6,18,18
**48** 193:3,6 194:5
194:7
**481** 142:12
**485** 138:20
**49** 46:10

**5**

**5** 6:1 7:20
135:16 157:3
159:11 162:23
169:21 188:23
199:11
**5/5/2022** 12:9
**50** 15:4 23:20
26:20,23
**500** 27:16
**505** 125:20
**515** 120:23

**528** 141:15
**52nd** 13:24
**53** 135:17
**54,253,642**
205:1
**543** 170:19
**546** 49:10,18,19
52:22 105:17
106:4 125:22
155:15
**548** 127:16
132:17 133:3,7
133:13 134:1,1
136:10,19,23
137:4,6,14
138:10 139:3
140:4,21 147:13
147:24 149:4
151:8 153:21
**550** 55:11
114:17 122:2
125:3 130:12
131:8
**568** 142:12
**571** 174:12
**59** 141:6,11
**594** 184:11
**5th** 19:14

**6**

**6** 5:24 6:2 7:18
7:21 19:19
24:12 25:10,14
27:19 29:9
31:13 33:4,8
44:2 57:16
103:3 159:17
161:16,19
162:18 164:24
167:4 169:21
184:16 191:11

202:25 205:7
**6/15/2022** 10:2
**6/17/2022** 9:18
**60** 126:21 129:3
129:6,14,15
141:6,11
**604** 196:17
**61** 98:18
**610** 170:20
**62** 134:13,21
141:3
**64** 141:6,11
**640** 196:17
**65** 134:21 141:6
141:12
**66** 134:13 141:3
**67** 135:3,23
136:8 141:9
**670** 157:16
167:22 168:12
**68** 61:23
**69** 97:4 100:4
120:8
**691** 170:20
**6th** 20:9

**7**

**7** 2:6,17 3:3,14
21:9
**7/1/2022** 10:18
**70** 129:10
**7007-1** 25:22
**722** 171:25
**732** 180:9
**74** 18:24 24:1
**768** 45:4
**77** 205:5

**8**

**8** 83:8 118:20,23
162:17 164:24

167:5 168:1,4
169:8 170:3
171:18 183:10
184:16 191:2
200:5 204:15,16
207:6
**80** 15:11
**8012** 170:7
**83** 102:15
**84-85** 171:25
**85** 201:14
**882** 161:19
**89** 77:9
**892514** 163:13

**9**

**9** 85:11 95:25
96:3 170:3
183:10 191:3
**9/14/2022** 6:9
8:4 9:16 12:10
**9/7/2022** 10:17
12:2
**917** 201:14
**92** 89:5 98:20
**938** 5:11,15
**939** 5:4
**940** 6:8,12
**941** 6:5
**95** 188:19
189:22 190:21
191:17 198:22
199:2
**950** 157:23
**97** 54:13

**a**

**abbreviations**
45:18
**ability** 20:21
21:19 98:4

10-03635-jpm    Doc 1000-11    Filed 01/20/23    Entered 01/20/23 21:43:50    Exhibit 16
- Sept. 14   2022 Status Conference Transcript    Pg 59 of 123

[ability - actively]                                                    Page 4

99:13 114:12
**able** 20:11 28:11
  60:10 117:6
  142:8,23 195:19
  205:16,17
**abn** 130:21
**abroad** 39:23,24
  67:7 72:7
**absence** 50:1
  52:20 87:12,19
  120:13 132:3
  165:24 166:14
  178:15
**absent** 71:19
  156:8
**absolutely** 68:2
  99:3,11
**absorb** 67:25
**abutted** 188:12
**academy** 96:16
**accept** 111:11
  127:10 138:17
**acceptable**
  167:4
**accepted** 167:13
**accepting**
  152:18
**access** 8:19,19
  8:20,21,23 15:3
  19:5 37:5,9,10
  37:11,11,12,13
  51:19 57:23
  61:18,24 62:10
  62:12 65:2 70:8
  72:13,15,16,24
  73:3,8,8,9,10
  74:12 75:6,6,8,9
  75:11,14 76:1
  76:12,14,18,20
  76:21 77:16,21

78:4,5,16 79:7
  80:22,23 81:14
  82:1,24 83:6,21
  84:5,6,16,25
  85:10 86:5,6,7,8
  86:9,13,18,19
  86:20 87:3,9,10
  87:13,14,16,17
  87:20,23,23,24
  87:25 88:5,6,8
  88:10,10,11,12
  88:12,14,17,20
  88:23 89:3,5,7,9
  89:13,17,20,22
  90:5,9,20,22,24
  91:2,3,18,22
  92:10,15,16
  93:9 94:6 95:2,5
  96:7 97:14,21
  98:4,13 99:2,8
  100:11,15,24
  101:4 104:9,11
  105:9,9 106:21
  108:9,15,17,19
  108:21 109:1,3
  109:7,14,23
  110:9,11,21
  112:5 115:16,18
  119:19 122:12
  188:17 189:6
  207:2
**access's** 98:5,18
  104:20 110:5
**accidentally**
  22:2
**accomplish**
  168:18 182:9
**accomplished**
  151:12 168:5

**account** 39:16
  43:5,7,11,12
  61:11 66:22
  119:5 132:21
  134:23,23
  135:19 141:8
  143:5,6,7,10,11
  143:12 144:1,8
  144:11,13,16,25
  145:17 146:16
  146:18 147:1
  151:17 180:2,3
  181:1,3,3,6
  182:9 194:14,15
  194:19,23 195:4
  195:9,9,14,15
  195:16,18 196:3
  196:11,19,20,23
  196:25 199:14
  199:17,17,18,19
  199:19
**account's**
  144:11,13
  145:18,19
**accountable**
  67:8
**accounting**
  45:23 61:11
  208:3
**accounts** 43:16
  76:23 83:20
  90:25 95:23
  118:5 134:17
  143:23 179:23
  180:4,13,13
  194:2 195:20,25
  196:16 197:3
  199:10
**accuracy** 86:11

**accurate** 210:4
**accurately**
  122:14 146:2
**accused** 196:1
  205:14
**acknowledge**
  183:7 186:22
**acknowledges**
  52:21 127:8
  179:24
**acronym** 55:19
**acronyms** 40:7
**act** 23:7 111:4
  160:16 172:16
**acted** 39:13 61:5
  87:13 90:3
  100:7,25 109:5
  109:13,15
  114:23 122:10
  160:18,20
  203:14,15
**acting** 76:24,24
  81:7,8 106:21
  108:20 112:15
**action** 28:8
  44:13 54:7
  81:24 88:2
  160:20 161:2,6
  165:9 184:15
  187:22,22
**actions** 19:6
  60:17 63:8 80:1
  86:23 107:19
  109:22 157:14
  184:23
**active** 66:24
  181:6,14 182:16
**actively** 65:18
  107:14

10-03635-jpm    Doc 1000-11    Filed 01/20/23    Entered 01/20/23 21:43:50    Exhibit 16
- Sept. 14    2022 Status Conference Transcript    Pg 60 of 123

[activities - affidavit]                                                        Page 5

**activities** 21:3
38:24 41:25
43:13,15 46:4
59:7 60:1,17
63:25 66:25
91:7 138:3
155:10 172:18
172:19 177:14
182:22 188:15
190:7 191:7
197:7
**activity** 42:9,9
63:23 104:20,22
104:23 107:17
110:6 112:24
174:15,15
176:19 177:4
**actual** 49:16,21
49:23 52:8,11
52:20,23 82:11
99:19 102:8
103:11 106:10
107:1 108:1
111:13,18,20
114:8,11 120:10
120:21 121:5,23
127:18 128:21
133:2 134:2,8
139:9 140:13
148:3 171:16
201:4
**acuity** 184:4
**add** 71:7 93:6
96:6 150:14,14
153:23 159:7,10
159:11 163:16
183:13 191:23
198:10 200:12
201:10,11
208:23

**adding** 163:15
183:14
**addition** 9:21
**additional** 26:12
32:3 73:22
104:10 187:8
**additionally**
61:7 63:25
66:18 119:13
144:2 149:2
**address** 18:3
22:23 26:9,11
49:9 57:3,11,15
57:18,19,25
58:2 71:13
72:25 82:16
103:4 106:7
108:25 133:22
136:13 141:23
146:5 150:1
155:23 160:4
163:19 174:5
207:13
**addressed** 44:9
49:10 90:25
97:3 103:10,18
106:5 144:20,23
174:18
**addresses** 21:20
96:1
**addressing**
17:16 103:10,18
103:23
**adds** 164:21
**adequately**
49:14 88:9
106:8 118:23
141:19
**ader** 157:23

**adjourn** 12:10
**adjourned** 10:2
37:21
**adjournment**
9:20
**adjudicate**
177:23
**adjudicative**
175:4
**adler** 16:6
**administered**
74:11
**administration**
61:20,25 66:7
**administrative**
46:2 60:21
62:10 74:15
**administrator**
45:21 46:3 47:9
47:13 61:5 62:8
112:25 116:22
**admissions**
157:20,22
159:19
**admit** 175:25
**admits** 75:7
115:14,15
158:21 162:23
**admitted** 61:22
62:1 70:13
108:13 158:4
166:1,1
**adopted** 105:24
**adopting** 187:20
**adv** 1:11,19 2:2
2:13,24 3:10
**advance** 132:13
**advantage**
183:20

**adversary** 5:1
6:19 8:14,17
9:11,22 10:12
10:14 11:8,23
12:5 16:4 21:8
124:9,18 178:1
178:5,8,9,14,16
178:25 179:1,9
179:14 195:19
208:9
**adverse** 22:1
149:19
**advisement**
65:14
**advising** 68:5
78:12,16,17
79:13 90:1
**advisor** 78:8
79:9,11,21
89:12 90:1,4,5,6
104:10,21
108:22 109:15
173:6
**advisors** 8:19,20
8:21 37:11,13
73:8,10 75:14
76:21 78:5 86:7
86:10,19,20
87:24,25 88:7
88:12,13 89:9
89:13 115:19
**advisory** 37:10
48:12,15 64:17
64:22,25,25
65:7,8,10,15
74:15 78:8,8
79:2
**affect** 206:19
**affidavit** 75:10
81:16 82:8 83:7

10-03635-jpm    Doc 1000-11    Filed 01/20/23    Entered 01/20/23 21:43:50    Exhibit 16
- Sept. 14    2022 Status Conference Transcript    Pg 61 of 123

[affidavit - alleged]    Page 6

92:22

**affiliates** 112:15
112:17,21 165:1

**affiliation** 16:7
36:11 123:17
154:8,10 203:25

**affirmative**
99:20 101:10
122:18,21 149:5
149:13,22 150:4

**affirmatively**
101:14

**affirmed** 21:16
196:9

**afternoon** 96:11
123:18,20 154:9
154:13 204:1,4

**ag** 2:10 8:15
9:14 16:6 36:8
36:17 41:23,23
42:10,12,16
43:2,9,20,24
44:8,9,10,13,18
45:2,11 53:13
53:22 54:1,18
55:12 58:14
59:21 64:1,2
65:20,21,23
66:15,18,24
67:19 69:11,19
70:1,9,15,17,19
70:20,25 71:1
71:16 84:20
112:22 113:2,21
114:1 115:7,15
118:18 121:24

**ag's** 66:21

**agency** 48:7,23
85:5

**agenda** 36:7

**agent** 48:21,22
61:8 77:8 81:8,8
85:7,12,14
89:11 202:4

**agents** 106:20
107:3,13 109:21
119:23

**ago** 16:19 17:9
33:24 55:2,5
154:22

**agree** 29:23
122:22 152:16
193:5 208:8

**agreed** 34:22

**agreement**
64:14,17,22
65:6 125:24,24
126:4 145:25
180:1 192:24,25
193:9 195:5

**agreements** 78:8
78:9 117:5
143:12 151:9,10
151:12,15
175:22 180:5
192:11,22 193:5
193:16,20 194:1
194:11 196:24
199:16 202:3,6
202:8

**agrees** 202:5

**ahead** 28:21
187:14

**aia** 77:4,17 78:6
78:6 84:5,16,16
85:10 87:17
88:2 115:17,18
115:18

**air** 36:1

**al** 1:13,16,21,24
2:10,21 5:2,3
6:20,21 8:16
10:13 41:21
47:17

**alain** 9:24

**allegation** 42:3
43:24 47:4
53:13,25 70:20
71:15,20 93:16
93:17 99:19
100:6,22,25
101:10 104:17
108:3 111:18
121:23,25 122:3
122:17 131:23
132:4 158:13
161:18 165:10
165:24 166:8
167:2 170:1,3,8
170:10 174:12
179:24 181:8
188:18,19,23
189:1,14 198:5
198:17,17 200:2

**allegations**
39:20 47:20,21
48:14 52:5,6,12
52:14,18 53:3
55:15 58:22
59:5,12 61:1,2
68:13 70:25
71:1 72:3 75:8
79:12,19 86:12
89:6 98:16
100:2,4,5,8
101:19,22 102:9
102:9 103:11
105:7 106:14,25

107:22,24 108:1
108:2,4,7,8
110:20,24,25
111:17,17 113:1
113:6 114:8,16
116:18 117:7,12
117:23 118:3,18
118:19 120:24
121:3 133:6,25
135:8 136:9,16
141:13 152:13
158:21 159:18
162:3,10,16
164:20 166:16
167:2 168:17
169:5,20,22
170:13,23 171:3
171:7,11 172:4
172:5,8,10,11
172:25 175:19
175:20 183:9,10
188:12 191:18
198:9 202:22
203:10,10

**allege** 20:23
42:8 53:15,24
66:8 70:1 104:7
104:14 105:8
132:7 139:16
155:8,10,24
156:3 158:16
159:9 160:18,24
161:2 162:19
165:9 189:4
202:18 204:19
207:24

**alleged** 21:5
38:15 39:12,15
41:24 42:1,6,16
43:9 45:21 46:4

46:7,17,24 47:7
47:15,18 48:2
50:18 55:7 59:1
63:2 66:19
67:20 70:10,14
70:16,18 72:4
78:7 82:7 87:22
90:19 93:4
97:19 98:8,18
104:4,14,19
106:22 108:4
118:9 119:1
120:16 127:24
132:15 133:1
134:4,6,12,15
134:18,21 135:2
135:16,23 136:1
136:8 141:3,6,8
141:11 155:7
157:3 158:8,18
160:21 161:10
161:17 162:6
164:4 166:1
169:4 173:18
177:16 179:21
181:7 182:12,15
182:16 185:2,8
199:11 200:9
202:14,24 205:9
206:8,13
**allegedly** 48:12
97:1 125:7
128:1
**alleges** 42:10
48:3 54:24
55:18 63:3 77:2
86:25 87:19
90:18 91:14
99:5 101:8
107:5,16 108:19

109:11,23,25
110:21 111:8,21
134:9,11,14,22
135:10,13,14,17
135:24 136:3
139:12 140:22
140:25 141:1,4
141:7,9,19
156:5,18,24
157:1,11 162:23
188:16 204:25
**alleging** 48:8,20
50:23 86:17
113:6 114:11,22
115:6 161:24
188:1 192:7
193:18 195:22
**alliance** 139:20
**allow** 57:2
121:16 171:12
**allowed** 143:20
171:8
**allowing** 167:24
168:7
**allows** 109:18
134:1 137:18
178:11
**alongside** 64:21
**alternative**
110:17 130:6
**altogether** 57:21
**amend** 12:9 54:7
155:22 207:10
**amended** 6:2,16
7:20 8:11,18
9:12 10:7 11:23
39:11 50:12,24
53:19 54:8 55:4
55:7 56:2 59:4,8
66:8,20 67:21

77:10 97:20,20
98:17,19 99:16
99:20 100:1,6
100:22,25 101:7
101:23 102:14
114:23 121:22
126:19 146:14
**america** 10:16
11:6 15:19 45:4
123:22 170:20
**american** 96:16
168:11
**americans** 182:2
**americas** 14:6
194:9,16 195:9
**amigo** 180:19
182:4 183:6
**aml** 79:13 83:7
**amount** 54:15
54:15,16 70:21
83:1 92:2 99:1
104:7 107:25
108:1 118:20
126:10,13 129:8
130:10,24 144:7
164:7 185:10
**amounts** 53:23
54:21 71:19
116:10 144:9
164:19
**amro** 130:21
**amy** 14:10 17:14
17:20
**analogous**
178:23
**analysis** 100:10
100:12,14
104:21,25 105:5
106:16 110:10
110:10,11

128:16 152:12
153:9 182:23
207:22 208:2
**analyze** 100:9
**answer** 19:21
25:12 26:13
30:25 31:2 57:2
61:20,23 67:24
68:9 70:12,13
72:9 73:16
98:12 103:25
108:12,13 113:4
115:14 203:8
205:16 206:7
207:7,11
**answered** 26:14
69:5
**anthony** 8:18
15:7 37:4 72:14
**anti** 109:24
**anybody** 176:17
**anymore** 57:10
**anyway** 56:18
**ap** 79:8,12,15,21
83:7 115:17
**apologies** 58:7
68:7 103:20,22
124:15
**apologize** 26:24
105:11,14 115:9
123:7,11 124:16
**apparent** 46:13
46:21
**apparently**
42:22
**appeal** 133:15
**appeals** 180:11
180:17 181:18
181:22 183:4
199:21

10-03635-jpm    Doc 1000-11    Filed 01/20/23    Entered 01/20/23 21:43:50    Exhibit 16
- Sept. 14   2022 Status Conference Transcript    Pg 63 of 123

[appear - assert]

Page 8

appear 24:2
  110:8
appearance
  36:23
appearing 20:17
  154:11
appellate 138:13
  180:22
applicability
  52:22 133:12
applicable 49:19
  66:10
application
  125:22 192:14
applied 136:21
  136:25 143:25
applies 161:20
  179:16
apply 103:16
  128:6 152:16
  162:20 164:1
  177:17 178:13
  181:23
applying 151:7
appointment
  112:5
appreciate
  29:24 33:19
  40:8 120:9
  150:20 154:19
  156:16 184:13
apprise 119:6
apprising
  118:24
approach 52:6
  163:9 164:1
approaches
  163:22 164:5
appropriate
  28:5 29:25 59:3

104:17 126:13
  140:10 163:22
  170:2 188:10
appropriately
  46:16,18
approve 114:5
approved 114:1
approving 66:19
approximate
  164:6
april 126:20
  128:1 129:3,7
arbitrators
  177:7
arcapita 196:8
  196:17
area 180:19
argue 58:10
  80:24 86:12,22
  118:2 132:14,19
  132:22 134:3
  137:17 138:8
  148:19 159:21
  167:7 186:11
argued 20:22
  46:24 171:2
  195:20 202:18
argues 23:24
  24:17 44:10
  49:20 65:17
  85:8 89:3 90:15
  100:1 182:10
arguing 43:14
  48:10 58:12
  86:4 115:22
  127:6 133:15
  137:13 146:1
  153:10 155:17
  167:9 191:21
  192:15 193:19

argument 12:10
  24:20 26:2 30:2
  43:1,19 44:14
  45:7,7,12,14
  48:8 51:17 52:1
  56:16,17 57:12
  57:23,24 58:20
  60:2,12 81:12
  97:3 99:24
  101:2,17 103:8
  111:3 116:1
  121:19 123:24
  128:18 129:24
  131:15,17 133:8
  133:20,23
  136:18 137:4
  139:18 142:4,6
  142:7,10,13,14
  142:19 143:3
  145:6,11 146:6
  146:12 147:10
  147:23 149:1,10
  150:11,24 152:1
  153:6 159:15
  165:4,13 175:12
  176:2 186:7,23
  186:24 200:14
  200:17 204:14
  204:15 207:15
arguments 22:4
  48:24 57:1,12
  57:18,20 67:1
  73:1,3 85:5,24
  95:18 96:14,20
  98:10,23 102:21
  103:2,4 105:16
  105:20,23,24,25
  106:4,7 110:17
  114:15 115:25
  123:1 128:25

129:18 132:14
  132:25 136:13
  139:1 141:24
  146:5,8 148:4
  150:8,17,23
  155:18,20 158:6
  167:10 184:22
  184:25 187:15
  188:10,11,13
  197:13,17
  200:14,18 201:1
arisen 73:2
arises 125:6
arising 138:17
arithmetic 51:24
arithmetically
  164:21
articulate
  184:21 185:19
articulated
  197:12
articulates
  53:22
aside 54:22
  133:10,17
asked 18:17,25
  19:9,13 20:4
  24:8 33:23,23
  97:13 104:21,24
  112:10,13,14
  151:20 160:25
asking 25:4,10
  26:15 28:10,11
  69:11 98:22
  168:15,16
  209:11,12
asks 21:21
aspect 94:3
assert 46:21
  62:15 72:9

10-03635-jpm   Doc 1000-11   Filed 01/20/23   Entered 01/20/23 21:43:50   Exhibit 16
- Sept. 14   2022 Status Conference Transcript   Pg 64 of 123

[assert - b]                                                                    Page 9

117:22
**asserted**  45:14
  59:7,17 62:15
  179:21
**assertion**  47:8
  50:25 171:15
  188:25 198:6
**assertions**
  170:23
**asserts**  81:11
**assess**  40:1
**asset**  11:20,25
  46:1 62:3
  173:23
**assets**  77:5
  89:14 115:13
  118:13 128:11
  135:16 173:14
  174:1 188:20
  189:2,12 190:22
  201:17
**assiduous**
  200:25
**assignment**
  100:9,10
**assist**  119:21
  138:14
**assistance**  22:17
**assisted**  64:23
**associate**  17:14
  17:16 58:8 86:2
**associated**  24:4
**associates**  17:18
  41:11 157:23
**assumed**  97:13
**assumes**  172:5
**assuming**  46:22
  182:18
**assumption**  24:7
  171:7

**atd**  77:3
**attached**  30:20
  169:5 190:23
  192:22 195:6
  205:5
**attachment**
  31:18,19,20
**attachments**
  5:21 6:14 7:15
  8:9 24:3 30:22
  30:24 32:4,13
**attempt**  25:23
  58:25 59:13
  131:19 142:25
  151:16
**attempting**
  143:22,24 146:3
**attempts**  53:24
  59:1 71:17
  175:7
**attend**  81:12
**attended**  62:9
  90:20
**attending**
  122:14
**attention**  56:14
  196:7
**attorney**  13:4,15
  13:22 14:13,20
  15:10,18
**attorneys**  14:5
  15:3
**attractive**
  175:13
**attributable**
  48:16
**attribute**  48:22
**attributed**  48:11
  182:20

**audio**  58:7
**audited**  117:4
**auditor**  112:6
**auditors**  61:12
  113:25
**august**  19:14
  20:4 23:2,16
  26:19 28:3
  55:22 56:1
  170:5 179:7
**auriga**  65:25
  126:2,2,5,5,10
  126:14,15
**authenticate**
  46:20
**authenticated**
  46:15,20
**authority**  85:13
  100:23 133:9,16
  136:20 175:4
  184:1
**authorize**
  171:20
**authorizing**  25:6
**automatedly**
  192:8
**automatically**
  191:22 192:16
  193:20
**avail**  177:3
**available**  94:16
  147:8,16,20
  148:8,17,22
  149:17 176:13
**availed**  40:2
  63:14 89:1
  188:15 193:23
  197:6 198:3
**availment**  43:13
  44:5 48:5 78:20

172:14
**avails**  43:15
  172:17
**avenue**  13:16
  14:6,21
**avoid**  25:13,14
  49:20 109:14
  114:12 134:5
  141:25 146:22
  147:14,25
**avoidability**
  188:1
**avoidable**
  204:20 205:5,24
  206:3 207:5
**avoidance**
  127:16 134:1
**avoided**  196:14
**avoiding**  106:11
**aware**  28:24
  29:17 58:11
  59:22 62:20
  64:5 65:5 66:2
  97:17 107:13
  181:8
**awareness**
  107:17,18

| b |
| --- |

**b**  4:5 5:22,24 6:2
  7:16,18,21 8:15
  11:9 12:6 19:19
  25:10,14 27:19
  29:9 31:13 33:4
  33:8 44:2 49:6
  54:14 56:1
  57:16 103:3
  119:1 156:5,24
  159:17 161:16
  161:19 162:18
  164:24 167:4

10-03635-jpm    Doc 1000-11    Filed 01/20/23    Entered 01/20/23 21:43:50    Exhibit 16
- Sept. 14    2022 Status Conference Transcript    Pg 65 of 123

[b - beginning]                                                                Page 10

172:4 184:16
185:4,23 193:10
194:7 202:25,25
**b.r.** 84:4 120:24
125:20 142:12
147:11 157:16
167:21 168:12
170:19 184:11
196:17
**back** 20:8 24:7
27:20 32:2
35:10 43:18
44:1,11 54:6
57:5 97:12 98:5
99:12 100:5
102:1,11 123:13
128:15 129:8
130:7,11,25
131:19 143:4,18
145:13 146:12
153:13,19,20
154:5 162:22
166:19,20
199:14 202:16
**backdated**
134:16
**background**
26:17 125:15
146:24 175:24
**backup** 17:6,7
17:11
**backwards**
48:19 153:9
**bad** 100:7 101:1
102:9 176:3
**badges** 128:16
133:4 136:12
140:22 141:14
141:16,18,21

**bagley** 22:8
**bahamas** 76:21
76:22,23,25
80:6 83:17
**bahamian** 77:24
**bahn** 84:20
**bahrain** 196:16
**baker** 13:3 37:1
41:1 58:8 69:15
86:2 103:1
132:11 154:14
204:5
**banca** 202:20
**bancaire** 1:16
1:24 5:2 6:20
16:5
**banco** 171:24
**bandied** 93:22
**bank** 3:7 11:9,19
11:25 14:13
16:6,10,13 27:1
33:2 34:3 35:8
43:5,10,13,14
43:16 76:23
83:20 95:23
112:10,13
119:20 139:20
154:8,12 155:6
155:7,9 179:23
180:9,13,13,21
182:6 183:1,23
184:2 186:19
190:10 191:8
193:22 194:2,9
194:11,14,15,15
195:8,14,18,20
195:24 196:17
196:17,19,23,25
199:13,14
202:20

**bank's** 11:12
**banking** 3:18
12:6 14:20
203:24
**bankr** 157:16
163:13 167:22
170:19 184:11
**bankruptcy** 1:1
3:23 4:7 5:12
6:9 7:5 8:3 10:1
93:23 125:3
127:15,15,21
137:15 138:11
142:11,16,18,20
147:24 148:11
148:25 161:21
177:20 178:2,13
179:10 187:23
192:5
**banks** 181:20,21
182:19,24
**banque** 6:7,13
8:1,8 13:22
16:18 18:13
187:2
**bare** 167:2
171:20
**bars** 169:24
**base** 137:4
**based** 49:3
54:11 55:14
60:15 62:3,16
68:18,19 70:6
79:11 81:17
86:10 94:18
126:5 129:13
133:21 138:22
139:20 153:6
161:17 168:3
170:24 177:16

178:3,8 179:2
188:24 189:1
191:25 206:4
207:15
**basic** 55:10
138:20 199:15
**basically** 36:8
50:7 75:13
82:24 97:17
105:12 123:8
**basing** 127:1
**basis** 26:1 38:13
43:14 48:4 49:2
59:2 77:25
82:18 85:22
91:25 133:20
142:4,5 144:11
144:13 145:17
145:19 146:6,11
151:23 162:17
170:16 175:18
176:21,22
177:21 178:4
179:19 198:5
199:3 207:4
209:6
**bates** 30:15
**bccs** 33:13
**bear** 56:14
147:11 148:6,13
149:3,9,12,21
150:2,6
**bears** 149:13
**becker** 14:19
204:3
**began** 40:20
**beginning** 48:25
53:12 124:7
134:17 167:10

begs 189:6
behalf 5:6,16 6:7
  6:13,23 7:9 8:1
  8:8,19 9:9,13,23
  10:8,15,22 11:5
  11:14,19,24
  36:13 37:5 38:6
  39:8,16,18,20
  43:4,8 60:1
  72:15,24 78:24
  79:1 80:15 86:4
  87:13 89:17
  107:7 122:7
  123:19,21
  132:11 154:14
  200:9 201:24
  204:5
behavior 161:1
  161:5
behold 80:9
beholden 78:21
  79:5
belgium 80:17
believe 24:13
  25:17 27:11,12
  28:23 30:3
  31:15,17 35:13
  35:16 36:7
  37:25 38:2
  40:17 44:13
  52:9 70:25
  85:19 105:25
  115:11 118:4,19
  129:5 154:17
  155:18,21
  164:23 165:20
  167:8,10,13
  179:16 180:6
  191:5 192:1,24
  192:25 193:3,10

193:15 194:17
  195:9 204:6
believed 51:1
believes 100:13
belongs 66:14
  109:20
beneficial 202:7
beneficiary 9:4
benefit 134:25
  148:9,22 176:17
  177:4 192:4
benefits 89:1
  172:20 176:23
  193:23
bermuda 174:5
  174:5
bernard 1:7 2:5
  2:7,16,18 3:2,4
  3:13,15 10:9,10
  10:24,25 11:15
  11:16 184:10
bernstein 52:7
  52:18
bernstein's 50:2
best 51:16,17,23
  75:1
better 35:18,21
  143:2 187:4
beyond 106:11
  114:13,18 121:4
bifani 168:10
bifurcates 57:24
big 23:21
bil 5:24,25 6:2
  7:17,18,21
  13:23 16:11,19
  18:13,15,22
  19:4,7,20,24
  20:5,22 21:2
  22:19,19,22,24

23:5,10,20,22
  23:24 24:7,17
  24:25 25:5,19
  25:23 26:1 27:9
  30:12 35:4
bil's 18:19,20
  19:2,9,11,13,16
  19:21,22 20:3,4
  20:11,13,20
  21:10,17 22:4
  22:18,22,25
  23:2 24:9,13,20
  25:8,11,18 26:6
  26:8,10
bil005 30:19
billion 88:22
  156:25 157:4,6
  158:11,18,20,24
  159:2,5,10,11
  159:23,23 160:2
  160:9,10,11,12
  162:23,25,25
  163:2,4,25
  165:25 166:2,3
  166:4,12
billions 117:16
  205:6
bind 85:13
binding 133:9
  139:22 153:8
  157:21 192:15
bit 26:17 44:1
  45:18 106:18
  150:11
bivens 161:23
bk 179:4
bless 127:10
bli 174:21
  198:19

blind 24:6 33:14
  33:15
blindness 52:10
  111:21 120:18
  120:18
blmis 21:6 23:12
  23:22 24:10
  36:8 38:14
  39:14,16,17
  43:25 46:14
  49:16 50:1,8
  55:17 56:10
  59:23 60:6,24
  61:16,16 62:4,5
  62:13,17,24
  63:7,24 64:6,7
  64:10 65:18
  66:4,21 67:16
  74:20 75:18
  77:17 81:18,25
  87:6 88:15,20
  88:22,24,24
  89:4,5,8,19 90:8
  90:16,25 91:11
  91:20 97:18,24
  98:6,9,18 99:2
  105:2 107:1,2,9
  107:11,14,17
  108:11,20,22
  109:1,5,7,24
  110:2,12 112:4
  112:6 113:11
  114:1,25 115:14
  115:24 116:13
  117:17,21,24
  118:5,8,14,16
  119:13 132:15
  134:6,11,14,16
  134:22 135:4,8
  135:11,16,18,19

10-03635-jpm   Doc 1000-11   Filed 01/20/23   Entered 01/20/23 21:43:50   Exhibit 16
- Sept. 14   2022 Status Conference Transcript   Pg 67 of 123

[blmis - butler]

Page 12

135:25 137:19
137:23 140:11
141:1,4,7,9,15
143:4,6,7,10,11
143:13 144:8,12
144:17,25
145:22 146:16
146:18 147:2,5
147:5,7,18,21
151:17,18 156:6
156:7,9,12,20
156:24 157:5,6
158:9,20 159:13
162:25 163:11
164:4 165:25
166:2,13,18,19
167:4 173:13,15
173:16,21,21,22
173:23 175:17
177:20,24
182:11,13,18
185:3,5,11
188:18,20,25
189:2,3,6,21,22
190:22 192:3
198:4,22,25
199:3,5,25
200:2,6 201:13
204:20 207:1
208:14
**blueprint** 169:7
**bmp** 65:25,25
**bnc** 184:3,5,8
**bnp** 108:20,21
108:24 109:2
183:25 184:10
**bnp's** 108:23
**board** 64:3
66:16 76:24
83:14 91:3

**boccuzzi** 10:15
11:5 15:23
123:20 124:2,4
124:4,4,6,11,14
124:19,21
125:11,14 127:8
129:25 152:3,4
152:8
**boil** 48:25
**bolsters** 149:10
**bones** 167:2
**books** 65:4
70:22 92:14
116:23 117:2
119:18
**bore** 83:18
**bosses** 100:16
**bottom** 51:6
**bought** 126:9
**bound** 99:25
146:1
**bowling** 3:24
**box** 89:17
**boxes** 95:3
**brain** 145:11
**branch** 43:6,17
66:21
**branches** 44:20
**breach** 205:9
**breached** 205:12
205:13
**break** 36:1
68:22,25 97:16
97:25 105:13
154:3
**brett** 9:23
**brian** 204:4
**bribery** 181:12
181:16

**brief** 47:7 48:14
48:18 73:6 77:4
79:4 80:24
85:11 96:23
97:4,10 127:12
130:15 143:1
152:23 164:8
168:14 179:5
183:10 196:7
205:8
**briefing** 12:10
167:9 186:7
**briefly** 48:7
122:6 150:24
167:14 184:19
203:4 207:14
**briefs** 44:10
178:22 180:23
201:4
**bring** 67:6 80:20
176:1 196:6
**bringing** 182:12
**brings** 80:12,13
147:22
**brj** 171:24
**broad** 15:11
27:19 31:15
143:16,25
144:10,16
145:17
**broader** 127:20
200:11
**broadly** 24:7
28:6 73:25
81:14
**broker** 198:24
198:24 199:1
**brought** 43:22
43:23 56:13
57:16 124:22

155:1,1 161:23
205:9
**build** 80:3
**bull** 30:15
**bullet** 197:24
198:1
**bunch** 183:14
200:11
**burden** 25:24
114:11 149:14
149:23,25
207:20 208:2
**burdens** 208:7
**business** 38:4
39:2,3,4 40:3
45:1 48:6 49:1,2
59:9 72:7 75:5,8
75:9,11,12
81:18 83:14
87:4,18 89:4
98:8 111:9,9
118:14 134:11
134:15,17,19,19
135:2,6,9,15
136:1 141:1,5
161:6 183:20
193:24 196:19
196:22
**butler** 6:6,13,15
6:17 8:1,8,10,12
14:2 16:8,9,14
16:17,23 17:1,3
18:1,6,8 26:15
26:16,25 28:9
28:21,22 29:3,4
29:6,13,23 30:8
30:23,25 31:7
31:14,22 32:8
32:19,20 33:13
33:21 34:2,7,10

[butler - causing]                                                                              Page 13

34:13,22 35:3,9
35:13,20,23
36:3
**butler's** 23:9
33:10
**button** 41:15
**buy** 189:11
201:16
**buying** 131:4
190:3
**bvi** 176:15
**bye** 123:5

**c**

**c** 5:24 7:18 13:1
16:1 25:21
54:14 74:3
156:25 157:1
167:18 168:3,8
185:6,25 187:10
205:7 206:12
210:1,1
**calculate** 117:20
**calculated** 144:7
**calculating**
45:25 62:2
**calculation**
126:16 187:2
**calculations**
145:24
**call** 34:6 46:9
76:21 78:6
82:22 124:22
155:9 156:9,12
**called** 16:17
22:8 34:5 38:9
38:10 41:8,15
47:8 49:21
75:14 96:24
112:11 122:18
127:4 156:7

162:12 174:7
**calling** 156:6
**callouts** 108:3
**calls** 46:7,13,21
46:22,25 47:3
47:12 62:11,13
77:19,20
**cameras** 205:20
**canadian** 180:9
180:20
**capacities** 80:18
114:24
**capacity** 5:8,9
5:18,20 7:1,2,12
7:14 8:25 37:24
**caption** 16:17
37:15
**care** 111:14
**careful** 202:9
**carefully** 155:16
167:12
**carige** 202:20
**carmine** 10:15
11:5 15:23
123:20
**carried** 60:17
67:15
**carry** 62:6,7
65:13 77:6
89:15 167:6
**carrying** 60:1,11
60:13 63:10,11
181:4,16
**case** 1:3,11,19
2:2,13,24 3:10
9:8 16:10,25
23:12 24:24
26:17,20 27:21
28:2 30:4 38:7
40:4 45:4,11

47:1,4,7 51:24
52:7 53:22
54:10,25 56:12
59:18 63:13
65:23 84:4
91:13 93:23,23
93:24 94:4,5,12
95:24 96:3,24
98:3 99:25
101:12 102:8,13
102:20 114:2
118:2,3,9,21,22
120:16,23 121:3
122:20 125:24
128:5,9 129:1
129:15 131:3,10
133:22 137:1
138:1,23 139:10
139:19 142:15
144:4 145:2,6
147:12,17
150:22 151:5,6
152:23 153:15
154:20 157:10
157:15,19,20
158:5 159:19
160:16 161:10
163:12,13,23
164:3 167:7,23
168:6,10,13,21
169:7 171:10,22
172:9,16 176:15
176:16 177:21
178:10,17,20
180:10,22,23
182:12 183:21
184:7 186:4
188:4 189:10
195:22 196:2,5
196:9,9 201:6

201:14 204:18
206:23 207:22
**casein** 168:11
**caselaw** 83:23
127:1 131:10
**cases** 16:15 17:4
23:16 101:24
111:20 116:19
116:21 117:13
127:12 131:2,11
139:17,19,23,25
152:14,20
155:17 157:8
158:3 160:4
161:21,21
162:20 163:10
163:21 164:5,7
165:12,16,20
169:2 170:18,25
174:13,17,19
175:11 177:5
178:23 179:4
180:19,24
181:12,14 182:4
182:5 183:6,17
188:3 189:14
195:25 196:6
201:3,5
**cash** 144:8
**cast** 67:5
**catastrophe**
162:9
**cathy** 9:8
**cause** 25:23
165:9
**caused** 112:6
168:1
**causes** 81:24
**causing** 20:18

10-03635-jpm    Doc 1000-11    Filed 01/20/23    Entered 01/20/23 21:43:50    Exhibit 16
- Sept. 14   2022 Status Conference Transcript    Pg 69 of 123

[cd - cited]                                                                    Page 14

**cd** 157:1
**cecelia** 4:6
**center** 95:12
**centered** 190:2
**centric** 192:12
199:8
**ceo** 34:16,16,17
**certain** 22:4
42:13,20 74:11
74:13 99:3
104:16 153:7
168:12
**certainly** 17:25
32:21 34:13
42:9,23 45:10
50:4 81:20
116:8 168:15,18
182:15 199:4
204:23
**certainty** 49:25
50:7 51:2,13
52:2 120:13
**certified** 210:3
**cetera** 84:13
184:2
**cgm** 1:3,11,19
2:2,13,24 3:10
5:1,13 6:10,19
7:6 8:5,14 9:17
10:3,12 11:8
12:3,5,11
**cgml** 129:20
**chain** 30:20
34:11,15,19
35:7
**chains** 19:16
**challenge** 44:11
141:25
**challenged**
86:11 172:1

**challenges** 172:6
**challenging**
127:9
**chambers** 9:21
68:25 123:8,10
123:12
**chance** 13:21
16:9 194:19
**change** 152:18
200:20,20
**changed** 16:18
44:23
**channeled** 88:21
**chapter** 2:6,17
3:3,14
**characterized**
104:16
**chardaie** 123:19
132:11
**charge** 34:18
35:21
**charlamagne**
132:11
**charlemagne**
123:18,19 132:9
132:10 144:18
144:22 145:4,9
145:13,16 150:7
150:10,16,20
151:2 152:10
153:24
**charles** 163:12
**chart** 46:12
76:11 102:15
116:12,15 170:3
**charts** 83:4
**chase** 118:22
119:3,8,11
206:23

**chased** 34:23
**chassin** 14:19
204:3
**chats** 21:1
**check** 10:17
**chemical** 170:18
**chief** 104:9,21
110:5 172:15
**chilling** 181:25
**choice** 140:14
**chose** 189:10
196:13 201:16
**chris** 90:23
104:24 110:9
112:8
**churchill** 139:24
152:23
**cir** 180:9
**circuit** 44:17,21
45:3,9 127:3
136:21,24 137:9
140:6 144:3
157:25 171:24
180:8,10 189:9
201:14 203:14
**circuit's** 144:4
**circumstance**
54:24 192:12
**circumstances**
21:18,24 22:6
23:7 28:16 45:3
59:13 62:21
66:23 86:14
101:18 117:25
119:9 138:15
171:19 183:8,18
188:9 191:24
192:18 197:6,11
199:9

**circumventing**
109:9
**cirillo** 11:18,24
12:3 14:12,17
154:9,10,10,17
154:19,24 155:3
155:6 156:15,17
156:18,23 159:4
159:7 163:16,17
164:12,14,16
165:8,15,18,23
166:5,7,11
167:16 169:14
176:4 184:21
186:6,11,21
188:21 189:16
190:14 191:21
192:1 193:5
196:1 197:20,22
197:25 198:2
201:9,20 202:17
203:3,7,22
**cirillo's** 188:10
192:22 193:8
**citation** 183:22
**citations** 164:7
**citco** 116:23
173:24 180:3
**cite** 127:12
131:2,10 133:9
137:1 145:8
152:20 157:23
164:7 170:18
184:10 196:7
**cited** 23:16
32:15 95:24
119:7 139:17
157:15 167:21
168:14 171:23
172:21 175:10

10-03635-jpm    Doc 1000-11    Filed 01/20/23    Entered 01/20/23 21:43:50    Exhibit 16
- Sept. 14   2022 Status Conference Transcript    Pg 70 of 123

[cited - combine]

Page 15

178:21 180:22
180:23 201:3
203:12
**cites** 46:6 127:11
152:15 157:24
196:6
**citi** 11:3 124:23
125:9 129:4,11
130:22 131:23
132:2
**citibank** 2:21
10:13,15 11:5
15:18 123:15,22
125:2 126:16,24
127:3 129:21,24
129:25 130:2,9
131:20 133:15
143:3,20,22,24
146:1,12 147:4
149:11
**citicorp** 10:15
11:5 15:19
123:22 125:2
143:22 147:5
149:11
**citigroup** 10:16
11:6 15:18
123:21 124:25
125:1,5 126:1,4
126:6,12,12,17
126:25 129:2,23
131:18
**citing** 84:3 85:10
161:21 177:3,5
177:11,11
179:10 202:19
**citizen** 80:16
**city** 205:16
**civil** 20:16 21:20
25:3 140:7

161:21,22
**claim** 43:22,22
44:6 55:10,12
55:13 71:2
101:12,15 102:5
106:17 114:21
125:2,5,6,17
129:19 130:14
131:8,16,17
132:6 133:13
136:9 140:2,14
140:16,21
146:19 149:4
151:8 153:21
156:1 161:24
162:13,19
166:15 171:20
177:20 178:7,13
178:14,18,18,24
178:25 179:1,3
179:12,18 192:1
192:2,6 205:9
205:21 207:4,24
209:7
**claimant** 179:13
**claimed** 107:9
162:1 192:15
**claiming** 121:14
208:5
**claims** 38:22
40:3 42:25
45:23 59:5
67:13 68:19
85:8,20 91:16
94:4 97:5
106:11 110:24
114:12 124:24
125:3 126:22
132:6 133:21
146:24 177:22

177:24,24 178:1
178:3,9 191:20
191:22 192:8,23
197:8 199:24
200:4
**clarified** 124:17
145:11
**clarify** 38:12
39:9 69:21,25
73:7 113:19
151:3
**clarifying** 69:19
69:20,22
**classic** 71:14
**claudine** 8:24,25
9:2,3 37:14
**clause** 176:22
192:11 193:14
193:20
**clauses** 175:21
176:6
**claw** 102:1
130:11 131:19
**clawed** 102:11
**clear** 25:1 28:10
30:21 31:8
32:10 37:8 59:4
74:7 85:1
115:10 146:20
167:1 183:18
186:7,10 195:13
**clearly** 25:3 27:3
161:15 169:24
199:21 204:24
204:25
**cleary** 15:17
123:21
**clerk** 5:11 6:8
7:4 8:2 9:25

**client** 26:18,21
26:25 27:10,25
31:1,24 32:3
34:24 35:1,1,2
111:11 186:22
**clients** 97:22
186:11
**clifford** 13:21
16:9
**close** 120:15
**closed** 65:25
90:22 109:3
**closely** 61:24
160:15
**closing** 151:11
**code** 125:3
127:15,16,21
137:15 138:11
147:24
**cohost** 41:9 57:5
**coin** 153:11
**collapse** 143:22
146:9 151:20
**collapsing** 151:7
**colleague** 57:17
58:1 68:11
**colleagues** 37:2
**collecting** 76:8
76:16
**collective** 83:11
87:17
**collectively** 72:5
157:3 171:1
**combatant**
162:8
**combination**
160:19
**combine** 144:14
145:20

10-03635-jpm    Doc 1000-11    Filed 01/20/23    Entered 01/20/23 21:43:50    Exhibit 16
- Sept. 14   2022 Status Conference Transcript    Pg 71 of 123

[combined - completely]                                                        Page 16

combined
  185:22
come   35:10
  43:18 44:1 53:8
  62:21 97:18
  123:13 158:9,17
  159:13 160:9,10
  160:10,11
  163:17 166:2
  197:13
comes   50:2
  161:14
coming   61:16
  62:5 84:12
  105:1 162:22
  173:21
comingled
  134:22 135:18
  135:20 141:7
commencement
  148:11,25
comment   29:24
  201:21
comments
  164:17
commerce
  181:25
commercial
  174:17 181:19
  181:24 182:25
  196:10 199:20
commissions
  119:4
committee   48:12
  48:15 64:17,25
  65:1,7,8,11,15
committing
  51:13 52:3
common   83:24
  87:20 88:7

138:24 139:4
commonality
  84:8
commonly   87:17
  173:24
communicate
  20:3
communicated
  39:13
communicating
  45:24 63:10
communication
  62:13 89:18
  92:15
communications
  18:14,16,18
  19:8 20:7,21
  21:5,11 23:1
  24:6,9,11,14
  48:2 77:13
  94:21 95:1
companies   72:1
  72:1 87:3,10
  95:21
company   9:16
  16:6 36:19
  41:23 43:3
  44:20 45:16,20
  47:17,17,21,23
  47:25 48:3,12
  48:17,20 54:16
  61:6 63:21
  64:14 66:13,17
  67:22 70:19
  76:22 77:24
  78:14 96:25
  122:16 168:11
  170:19 174:4
  186:6,10,15
  195:8 203:24

compel   18:12
  25:10
compelled   22:11
compensation
  96:22 97:8
  99:15,15,17,21
  100:3 101:3,9
  101:17,19 102:1
  102:2,10,11,19
  104:8,14 122:13
competent
  100:13
competitive
  160:18,23 161:8
complaint   8:18
  9:12 10:7 11:13
  39:12 41:24
  42:7,10,17,17
  43:19 44:2,13
  45:17 46:17
  48:14 50:9,12
  50:13,25 51:5
  51:15 52:12
  53:11,19 54:1,7
  54:8,25 55:3,4,7
  55:15 56:2,23
  59:4,8 66:9,20
  67:21 70:3,12
  70:25 75:8
  77:10 82:8
  86:24 90:18
  97:20,21 98:17
  98:20 99:16,20
  100:1,6,22,25
  101:7,15,23
  102:15 104:5
  105:2 107:21
  111:21 113:4
  114:23 116:6,18
  118:23,25 119:1

121:5,10,22,24
  123:25 124:23
  126:20,24,25
  129:4 130:19,20
  130:21 131:13
  134:13,16,19,21
  135:3,17,23
  136:2,8 146:14
  150:3 155:7,8
  155:13,18,21,24
  156:4,5,18,24
  157:4,11 158:7
  158:11,16
  159:16,18 160:1
  160:13,21
  161:12,17 162:4
  162:12 164:23
  165:1,8,19
  166:9 167:17,25
  168:1,9,17,18
  168:25 169:7,15
  169:21 184:19
  185:4 187:17,21
  188:23 198:10
  199:11 201:3
  205:15,16 206:7
  207:7,9
complaint's
  173:11
complaints
  157:2,20 158:5
  159:8 167:18
complete   30:9
  66:11 117:9
  129:19
completed   18:23
completely
  25:13 60:21
  63:17 75:19
  76:9 87:22,22

10-03635-jpm    Doc 1000-11    Filed 01/20/23    Entered 01/20/23 21:43:50    Exhibit 16
- Sept. 14    2022 Status Conference Transcript    Pg 72 of 123

[completely - constitute]                                                                    Page 17

97:23 151:4
199:20
**completing** 19:3
**compliance**
108:16
**complicated**
164:9,18
**comply** 207:6
**comprised** 54:20
125:18 136:4,6
153:12
**concealed** 141:4
**concedes** 49:18
53:15
**conceivable**
161:14 162:14
**concentrating**
35:19
**concern** 32:2
112:6 187:23
**concerned** 148:5
**concerning**
27:13 99:25
100:8 103:11
117:7 143:1
**concerns** 22:24
50:16,19 51:18
52:13 90:24
104:19 108:25
**concert** 65:16
**concerted**
160:20 161:2,5
**concession**
156:16
**concessions**
166:16
**conclude** 50:7
52:1
**concluded** 51:20
96:24 147:13

179:12 209:23
**conclusion**
67:17 91:21
114:7 141:19
**conclusions**
171:6
**conclusory**
58:22 71:14,20
158:11 159:24
167:3 169:23
170:9,22 183:9
198:15,17
**concrete** 111:22
**concurrence**
127:6,11,11
133:15,18 137:8
**concurrent**
127:2
**concurring**
137:7
**condition** 181:3
181:5
**conditioned**
151:10
**conditioning**
36:2
**conditions** 162:7
181:2
**conduct** 20:16
42:10,16,21
43:2 44:6,6
47:22,22 48:22
49:3,3 82:18
93:17 100:14
106:23 110:21
160:22 197:9
**conducted** 83:14
155:10 172:19
**conducting** 48:5
172:18 176:19

177:4,14 188:15
197:7
**conducts** 110:18
**confer** 19:23
25:19 32:8
33:21 179:19
180:13 182:14
191:22 192:8
193:21 202:14
**conference** 5:5
5:16 6:6,13,22
7:9,25 8:8 16:3
**conferences**
18:18
**conferring**
180:14
**confers** 192:16
**confined** 162:2,6
162:7
**confinement**
161:25
**confirm** 97:6
99:14 104:22
112:1
**confirmation**
112:5
**confirmations**
113:1,12
**confirmed** 110:6
112:1 180:23
**conflict** 174:24
**confusing** 45:19
187:24
**confusion** 73:1
**conjectural**
158:12 169:23
170:9
**connect** 46:25
**connection** 22:8
42:17 63:25

77:17,23,25
81:13 82:16
90:1 125:23
140:17 155:11
190:11 191:11
**conscious** 60:23
**consent** 193:14
**consented**
192:13
**consequences**
54:4
**conservation**
179:11
**consider** 5:4 6:5
6:21 7:24 9:21
52:5 136:24
**consideration**
128:20 169:24
**considerations**
138:18
**considered**
46:12,16,18
47:1 65:19 84:2
140:15 157:10
167:12 170:2
**considering** 57:4
**consistently**
175:7
**consolidated** 2:5
2:16 3:2,13
10:24 187:20
**conspiracy**
160:19
**conspiratorial**
161:7
**constant** 77:6
89:14
**constitute**
120:20 182:7

10-03635-jpm    Doc 1000-11    Filed 01/20/23    Entered 01/20/23 21:43:50    Exhibit 16
- Sept. 14    2022 Status Conference Transcript    Pg 73 of 123

[constituted - counsel]                                              Page 18

**constituted**
52:19 83:14
206:13
**constitutes**
21:12
**constitution**
64:17
**constitutional**
161:23
**construction**
80:4
**constructive**
139:19 140:2
**constructively**
153:1
**consult** 176:4
**consultant**
51:18 77:8
89:10
**contact** 21:8
42:23,24 43:20
47:2 59:1 62:25
90:22 172:13
175:23 176:20
176:23 177:1,19
179:20,22
180:14 181:2
182:7 183:12,12
192:17
**contacting**
112:13
**contacts** 20:24
20:25 24:21
26:8 27:25
39:21 40:4
43:21 48:10,16
49:4 60:14
62:20,22 63:15
65:17,20 78:23
79:25 86:23

90:13 91:5,17
95:5 175:3,8,9
176:7 179:19
182:23 183:11
183:14 193:22
**contain** 24:2
132:23
**contemplates**
171:18
**contemporane...**
151:11
**content** 32:14
162:12 163:6
201:4
**contention**
171:12
**contentions**
140:22
**contested** 36:6
**context** 94:9
122:21 127:23
128:7 131:18
172:23,24
179:16,17
**continually**
203:17
**continue** 167:14
**contract** 39:15
160:18 177:1,8
205:9,11
**contracted**
38:18
**contracts** 38:19
39:23 60:13
68:14 83:18
84:13 205:12
**contractually**
85:13
**contradiction**
138:25

**contradicts**
139:21
**contrary** 39:21
45:9 51:3 86:25
90:18 140:21
171:4 184:1
192:7 198:15
**contrast** 172:22
**control** 85:7
128:13,18
**controlled** 85:10
87:22 91:2
**controlling** 45:9
162:21 167:11
177:17
**controls** 77:7
89:15
**controversial**
51:7
**convenience**
169:25 178:11
**convenient**
175:6
**conversations**
34:24
**conversion**
174:4,7,9
175:16
**conveyance** 97:2
130:17 131:8
140:2
**conveyances**
127:22
**coordinated**
91:1
**coordination**
61:12
**copied** 24:6
**copiers** 67:7

**copies** 29:14
33:14,15 94:16
94:17
**corner** 51:6
**corners** 159:17
**corp** 139:25
**corporate** 57:22
74:14 80:23
81:1,3,5,7 82:25
83:11 84:14
85:2 87:9 93:18
96:2
**corporation**
81:7,9 84:2
**correct** 17:4
28:12,14 33:10
36:10,11 37:21
37:22 72:22
115:3 116:17
125:13 185:22
186:16
**correctly** 157:13
168:14
**correspondence**
5:22 6:1 7:15,19
27:2
**correspondent**
196:3,11,15
197:3
**corresponding**
54:25 126:10,13
130:24
**cosponsor** 42:6
42:12
**counsel** 18:12,19
18:20 19:2,9,11
19:13,16,21,22
20:3,4,11 24:13
25:11 36:22
40:19 58:9 86:2

10-03635-jpm   Doc 1000-11   Filed 01/20/23   Entered 01/20/23 21:43:50   Exhibit 16
- Sept. 14   2022 Status Conference Transcript   Pg 74 of 123

[counsel - covered]                                                          Page 19

| | | | |
|---|---|---|---|
| 92:16 94:17 | 31:4,8,18 32:5 | 122:3,5,8,18,24 | 179:10 180:11 |
| 122:9 190:5,13 | 32:16,22 33:12 | 123:7,23 124:5 | 180:16,18 |
| 191:6,13 | 34:2,6,11,15 | 124:9,12,16,20 | 181:18,21 |
| **counterparties** | 35:1,5,10,15,18 | 125:10,12,20 | 182:22 183:4,16 |
| 51:10,10 66:19 | 35:25 36:5,16 | 127:6 129:24 | 183:23 184:8,8 |
| 107:8 112:8,11 | 36:20,24 37:7 | 130:16 132:9 | 184:17 185:18 |
| 112:16 113:25 | 37:16,20,23 | 133:10,21 | 185:21,24 186:3 |
| 114:1,4 120:16 | 38:2 40:10,13 | 136:14,24 137:7 | 186:14,20 187:9 |
| **counterparty** | 40:16,21,25 | 138:21 140:19 | 187:14,18,19,23 |
| 109:13 | 41:7,13,18,20 | 141:16 142:11 | 188:7 190:18,25 |
| **countless** 47:12 | 44:16 45:7 57:4 | 142:14,15,16,18 | 191:14 192:5,19 |
| **countries** 38:21 | 57:7,11,19 58:3 | 143:9,17 144:6 | 193:17 194:18 |
| **country** 162:1 | 58:5 59:11 | 144:18 145:2,7 | 194:21,25 195:2 |
| 210:21 | 60:22 61:21 | 145:10,15 146:9 | 195:11 196:9,14 |
| **counts** 176:5 | 63:15,18 67:3 | 147:12 149:2,21 | 197:20,24 198:1 |
| **coup** 51:25 | 67:18,25 68:3 | 150:1,6,7,12,18 | 199:21 201:5,9 |
| **couple** 49:9 93:7 | 68:10,17,21,21 | 151:1,20 152:2 | 201:19 202:12 |
| 99:12 197:23 | 68:24 69:4,9,11 | 152:6 153:22 | 202:15 203:2,5 |
| 202:19 | 69:13,17,20,24 | 154:1,3,5,15,21 | 203:19,20,23 |
| **course** 18:6 | 70:5 71:3,6,9 | 155:2,5 156:10 | 204:6,11 207:12 |
| 31:24 32:16 | 72:12,16,19 | 156:14,17,19 | 207:23 208:17 |
| 54:4 99:9 | 73:12,14 74:18 | 157:9,13,15,18 | 208:22 209:1,14 |
| 127:14,23 128:2 | 74:23 75:17,21 | 158:1 159:2,5 | 209:20 |
| 128:6 176:12 | 78:21 81:6 83:5 | 159:16,19 160:5 | **court's** 26:4 |
| 183:3 198:2 | 85:25 88:13 | 160:25 161:3,11 | 72:23 83:3 |
| 200:9 | 92:5,19 93:1,5 | 161:15 162:5,10 | 86:18 90:14 |
| **court** 1:1 3:23 | 93:24 96:4,6,9 | 162:12,15 | 96:15 139:20 |
| 5:11,12 6:8,9 | 96:18 97:9,16 | 163:15 164:10 | 142:20 155:16 |
| 7:4,5 8:3,3 10:1 | 97:25 98:7,22 | 164:13,15 165:2 | 160:3 169:25 |
| 10:1,17 16:2,12 | 99:9 102:23 | 165:11,17,22 | 174:24 175:1 |
| 16:16,20,24 | 103:7,9,17,21 | 166:5,10,25 | 178:2,7 179:14 |
| 17:2,5,16,17,22 | 103:25 105:11 | 167:15,16,21 | **courts** 22:6 |
| 18:4,8,10 20:2 | 105:18,21 106:2 | 168:13,16 | 84:25 133:5 |
| 20:18 21:12 | 112:18,20 113:3 | 169:13 170:13 | 136:20 138:13 |
| 22:9,21 23:3 | 113:9,13,16,22 | 171:14,25 173:9 | 138:14,16 168:7 |
| 25:7,10 26:12 | 114:3,6 115:2 | 174:16 175:2,10 | 176:13 183:2 |
| 26:13,14,22,24 | 115:10 117:17 | 175:11 176:3,10 | 200:20 |
| 28:9,18,21 29:1 | 117:20 118:6,22 | 176:11,12 | **cover** 155:12 |
| 29:5,8,19 30:8 | 119:22 120:1,5 | 177:12,13,17,22 | **covered** 99:2 |
| 30:13,17,23 | 120:25 121:18 | 178:3,11 179:3 | |

10-03635-jpm    Doc 1000-11    Filed 01/20/23    Entered 01/20/23 21:43:50    Exhibit 16
- Sept. 14   2022 Status Conference Transcript    Pg 75 of 123

[covers - deceived]                                                        Page 20

covers 125:23
craft 206:4
crated 138:17
create 62:21
  82:10 88:19
  101:23 207:19
created 47:10
  65:7 87:2,5
  88:17,20 90:7
  134:16 138:12
  138:21 139:8
  141:10
creates 175:3
creation 66:6
credit 143:20
  158:15
crediting 144:7
creditor 149:20
creditors 117:19
  128:10,12 134:3
  134:9 138:6,7
  139:6,7 140:15
  147:17,21 148:9
  148:23 149:18
  149:19,20 150:6
credits 144:15
  145:21
critical 21:12
  164:22
cross 151:9
crutcher 13:14
  36:13
crystal 167:1
cssf 108:11
  109:1,6,12
curative 22:3
cured 163:9
curious 98:9
current 121:5
  121:24 126:19

currently 55:3
custodial 18:21
  68:5
custodian 39:13
  55:21 108:22
  112:24 173:23
  173:24,25
  198:23
custodians 20:5
  33:25 67:6
custody 34:15
  34:20 35:7
  190:22
customer 21:6
  56:10 103:13,15
  114:25 115:24
  118:8,16 132:23
  133:8 134:17,23
  135:19 136:7
  141:8 142:9
  143:5,6 144:8
  147:1,7 150:23
  151:24 155:13
  155:25 156:2
  157:12 158:10
  158:13,19
  159:13 164:14
  164:23 165:4
  166:3,22 184:19
  185:1,14 187:3
  187:6 191:20,22
  192:1,2,5,8,14
  192:23 193:9
  197:4 199:24
  200:4
customer's
  144:6
customers 43:16
  117:20 134:15
  134:24,25 135:5

135:6,15,22
136:1,7 144:17
145:22 147:9
153:7,14
cut 110:14
cutler 51:19
  52:1 90:23
  100:13,15,20,20
  100:21 104:25
  105:1 110:9,11
  111:25 112:2,8
cutler's 110:14

d

d 5:25 7:19 16:1
  19:12 54:14,18
  55:6 121:21
  204:25
daily 120:15
daimler 42:2
  44:16,24
dark 206:21
data 29:2 31:6
  62:3,4 95:4
database 110:8
date 12:10 21:10
  34:23 52:25
  54:12 70:7 92:2
  92:18 148:2
  168:13 185:9
  210:25
dated 64:14,18
dates 54:17
  71:18 164:19
david 5:5,16 6:3
  6:22 7:9,22
  10:22 14:9
  17:13
davis 168:10
day 19:9 20:25
  21:1 28:19

45:23,23 46:1,1
63:10,11 64:16
66:2 109:4
123:4 131:6
154:25 176:1
181:20 204:12
205:10,14
207:14 209:16
days 97:12
de 8:24,25 9:1,2
  9:2,3,4,5 37:14
  51:25
deadline 19:3
dealer 199:1
dealers 198:24
  198:25
dealing 33:15
  34:4 74:24
  75:15,25 77:11
  93:11,12 115:4
  127:24 128:9
  130:1
dealings 75:12
  75:12
deals 184:6
dealt 81:17
debtor 1:9
  127:20 128:14
  131:6,11 132:3
  138:5 140:7
  146:22 147:14
  147:25 148:2,6
  148:7,14,18,20
  196:12 208:1
debtor's 136:22
  140:18 147:16
  148:9,23 152:24
debtors 153:17
deceived 108:9

10-03635-jpm    Doc 1000-11    Filed 01/20/23    Entered 01/20/23 21:43:50    Exhibit 16
- Sept. 14    2022 Status Conference Transcript    Pg 76 of 123

[deceiving - defraud]                                              Page 21

deceiving 109:6
december 200:5
decide 142:16
decided 44:16
49:12 52:7
121:9 149:25
196:8
deciding 161:8
decision 21:8
22:8 42:3 44:16
44:24 49:13
50:3 54:3 93:21
101:6 117:11,15
127:3 142:20
144:5 145:14
157:16,25
171:25 174:21
174:24,25 175:1
183:3,23,25
184:6,9 185:17
198:19 201:2
decisions 49:11
54:4 64:5,6,24
78:24 122:16
155:16 160:3
161:6 162:16,20
163:20 164:17
166:25 177:15
180:7,17 181:23
182:21 197:16
199:21 200:18
declaration
46:10 92:22
173:10 190:23
192:2,22 193:8
193:10 195:6
declares 92:23
declined 143:9
deemed 43:12
44:4 45:13

deep 117:13
defeat 147:9
151:7 172:2
defeated 179:9
defeats 149:1
defendant 11:12
13:22 16:9
18:12 21:6
22:12 37:19
41:23 45:6,8
47:12,16 48:9
49:25 50:3,7
53:16,24 67:12
67:14 80:14
85:14 89:3
96:12 103:24
115:25 117:23
119:3 122:1
150:1 154:11
156:2 167:6
172:17 174:14
174:22 175:3,6
175:8 178:25
181:13,13,14
186:5,9,24
196:1,10,14
205:10 207:19
208:5
defendant's
58:10 86:5
91:17 106:7
107:20 133:8,20
133:22 136:13
136:18 138:25
140:22 141:23
142:5,7,12,19
149:1 174:15
184:1 207:15
defendants 1:17
1:25 2:11,22 3:8

3:19 9:12 10:6
10:21 11:4
13:15 15:3
16:10,15 17:3
19:6 36:14,21
37:5,9,23 38:7
38:13,25 39:1,6
39:19 40:1
44:12 49:4,15
49:15 51:1
52:17 53:22
54:12 57:3,17
58:12,18,24
59:7,9,17,21
60:7,7,22 61:25
62:19 63:3,6
65:4 67:2,19
70:7,8,9,13
71:19 72:6,10
72:15,16,17,24
73:4,5,22 82:23
86:6,11,17,22
87:3 88:5,15
91:18,23,25
103:3,14,16
105:16 106:1,20
106:21,23 107:1
108:4,9,15,15
108:17 109:8
110:16,21
111:16,22
114:15,19,20,23
115:16,22,24
116:14,15,17
118:2,24 119:4
119:6,11,20
122:12 124:23
132:13 133:9,14
134:3,5 137:1,4
137:11,17 138:8

139:17,22 140:5
141:25 142:1,8
142:17,21,25
143:2,3,5,14
144:2,15 145:5
145:14,20,23
146:3,5,5,7,8,19
146:21,25 147:3
147:10,12,20,23
148:19 149:5,6
149:7,9 151:6
151:14,20
160:18,22,24
161:4,5,7
175:14 186:4,8
187:11 188:23
defending 169:9
defense 122:18
122:21 149:5,7
149:13,23 150:4
206:4,19
defense's 171:16
deficiencies
56:13 146:4
define 180:19
defined 115:16
138:11
defines 148:5
defining 183:17
definitely 29:13
definition 23:4
70:10
definitive
180:17
deflecting
107:15
defraud 127:19
128:22 132:16
133:2 134:3,8
138:6 139:6

148:3 149:18
**degree** 76:14
  84:8
**delaware** 75:15
**delay** 127:18
  128:21 133:2
  134:2,8 138:5
  139:5 148:3
  149:18
**delaying** 168:21
**delete** 187:11
**deliberate** 54:3
  54:4 107:19
**deliberately**
  63:23 108:9
  109:6
**delighted** 17:17
**demand** 32:24
**demanding**
  121:8
**demonstrable**
  107:18
**demonstrate**
  58:25 59:5 79:4
  79:19 81:2 82:2
  82:22 83:2,10
  85:3 95:4 150:2
**demonstrating**
  78:20 175:9
**demonstration**
  81:23
**demonstratives**
  40:6,9 41:6
**denckla** 174:11
  177:5
**denominated**
  43:7
**deny** 101:21
**department**
  35:4,5 84:3,9,19

84:23 85:4
  180:23
**departments**
  82:23 86:19
  88:6,10,12
**dependent** 83:21
**depends** 146:8
  174:14
**deplete** 142:3
  146:19 149:15
  151:18
**depleted** 131:6
  149:11
**depletion** 130:17
  131:9 132:19
  141:23 142:19
  147:10,23 148:4
  149:1,3 150:23
  153:18,20
**deposited** 144:8
**deposition** 6:17
  8:12 19:23
  25:11,14,20
  27:19,22 28:5
  28:12 29:12
  31:13
**depositions**
  209:10
**deposits** 143:24
  143:25 144:10
  144:12,16
  145:16,18 146:2
  146:17
**depth** 179:5
**describe** 79:4,8
**described**
  100:19
**describing**
  100:21 116:8

**description**
  51:25
**deserve** 155:21
**designated**
  79:11 180:4
  196:11
**desire** 178:8
**despite** 21:13
  64:20 169:1
**destroy** 24:21
**destroyed** 21:25
  22:2
**detail** 71:15,18
  92:1,7
**detailing** 116:9
**details** 117:8
**determination**
  43:20 44:8
**determine** 26:5
  61:1 98:5
  117:15 183:5
  205:25
**determined**
  178:15 180:7
**determining**
  144:6 171:9
**detour** 30:2
**deutsche** 84:20
  194:9,15 195:8
  196:18
**developed**
  122:15
**developing**
  60:23
**dexia** 5:24,25
  6:2,7,13 7:17,18
  7:21 8:1,8 16:17
**diary** 21:11
**dicta** 133:14
  137:6

**dictate** 160:16
**dictated** 64:25
**dictum** 93:25
  94:1
**difference** 56:23
  83:5 159:11
**different** 22:3
  51:9 74:14,16
  83:19 94:3,4,4
  98:16,16 110:25
  113:1 116:18
  125:18 143:5
  151:4,17 155:19
  155:20 159:16
  165:13,14,19
  177:16 183:3
  188:4
**difficult** 138:16
**difficulties** 53:5
  53:10 54:22
**difficulty** 82:17
**digging** 51:20
**digits** 194:25
**diligence** 42:21
  51:19 109:24
  110:3
**diminution**
  148:4
**din** 186:11
**direct** 78:22
  87:6 88:19
  126:7 138:15,25
  174:24 206:22
**directed** 21:2
  42:9 43:2 44:5
  47:23 48:16
  59:10 60:18
  64:10,23,24
  67:15 88:15,23
  89:7 91:7 169:6

10-03635-jpm   Doc 1000-11   Filed 01/20/23   Entered 01/20/23 21:43:50   Exhibit 16
- Sept. 14   2022 Status Conference Transcript   Pg 78 of 123

[directed - doc]                                                        Page 23

188:24
**directing** 60:3
60:16,23 62:25
63:18 66:24
91:19
**directly** 38:16
45:5,8 59:23
62:5,24,25
73:19 76:12
78:16 79:17,20
94:25 95:2,5
112:10 139:21
171:4
**director** 80:23
91:2 111:10,10
**directors** 65:2
66:16 76:24
83:14 84:15
91:4 95:23
106:21 107:19
115:20
**directv** 170:20
**disadvantaged**
167:8
**disavow** 157:22
**disclose** 20:1
21:17 22:20
24:23 108:11
189:19,22
**disclosed** 29:16
196:21
**disclosure** 22:7
23:18
**disclosures**
190:17 191:16
**discover** 62:10
**discovery** 5:5,15
6:6,12,22 7:8,25
8:7 16:3 18:24
18:25 19:4

21:15 24:5,9,20
25:2,6 27:17,22
27:23,24 28:6
30:1 67:23
91:24 94:2,8
95:7 172:1
201:23 202:21
205:19,25 206:2
206:7,11 208:8
208:10,12,16
209:2,3,6,7,9
**discrimination**
161:23
**discuss** 38:11
44:1 58:19
62:12 65:20
126:23 133:18
142:5,6 170:22
**discussed** 34:14
106:18 125:25
137:20 141:17
146:4 148:6
170:6 178:21
190:6,6,7,10
200:16 208:17
**discusses** 63:1
189:23
**discussing** 32:9
191:1,7
**discussion** 20:9
27:12 80:13
171:17
**discussions**
91:11
**dismiss** 8:17,17
9:8,11,12 10:6
10:14,21 11:4
11:13,23 20:22
22:5 24:22 38:1
43:4 44:12

45:11,12 46:17
46:18 58:11,12
58:21 59:3
62:16 80:15
86:5 96:10,19
101:21 102:12
123:9 124:5,21
130:16 132:5,14
133:21 140:13
150:5 154:18
165:6,6 171:3
184:15,24
202:24 204:7
207:9,10
**dismissal** 38:13
39:2 53:11
129:19 155:21
163:7 169:15,16
186:10
**dismissed** 55:12
56:24 85:22
123:8 125:21
126:25 130:14
132:7 140:16
161:12 164:24
165:12 167:25
171:16 186:5,15
186:16 198:12
**dismissible**
168:6
**dismissing**
168:8
**displayed** 58:24
**dispose** 129:1
131:16
**disproved** 95:22
**dispute** 75:3
115:12 197:10
**disputed** 115:25

**disregard** 96:2
**disrupt** 153:10
**dist** 168:10
**distinct** 74:14
83:2 86:13
**distinction**
190:15
**distinguish**
142:21,23
150:22 184:3
**distinguishable**
184:2
**distinguished**
183:24
**distinguishes**
153:15
**distribute**
134:24 147:8
**distributed**
78:25
**distributions**
134:25 135:22
**district** 1:2 22:7
125:20 136:15
136:20 137:7
139:22 140:20
149:2,12 184:8
187:19 196:9
**divide** 153:13
**dividends** 54:19
70:21
**dividing** 125:5
**division** 180:22
**doc** 5:4,15 6:5
6:12,21 7:8,24
8:7,17 9:8,11,20
10:5,14,20 11:3
11:11,18,23
12:9

**docket** 21:9
54:10 124:7
170:4 179:5,6
**doctrine** 151:7
**document** 5:11
6:8 7:4 8:2 9:13
9:25 10:7,22
11:4,13 18:16
19:20 20:1
21:10 22:11,12
23:6 25:4,12
27:20 30:4,18
94:10 173:13
193:7 194:5,7
194:12
**documentation**
97:15
**documents** 5:23
7:17 18:23 27:1
27:17 32:9,22
34:19 35:21
61:9 62:14 65:4
65:24 68:14
77:15,21 92:2
92:10,11,13,14
92:17,18 94:6
94:11,19 95:10
97:13 117:6,8
117:18 119:17
119:21 195:6,12
195:15 199:15
201:4 206:1
**dogs** 175:24
176:1 184:15
**doing** 16:24 39:2
40:2 49:1 61:13
72:7 85:3,25
127:1 156:12,20
157:15 167:24
183:20 187:25

**193:24 197:1**
**dollar** 43:7
121:8,8 207:21
207:21 208:3,3
**dollars** 82:9,12
117:16 181:19
190:3 191:4
196:13 205:6
**dominated**
87:23 91:2
**dominion**
128:13
**door** 105:3
111:2
**dorchester**
171:23 203:9,9
203:11
**doubt** 50:1,8
51:2 52:2,20
120:13,19
**doubts** 51:14
**downwind** 102:4
**dozen** 188:3
197:15
**dozens** 16:14
19:5 169:5
**drag** 176:10
**dragnet** 67:5
**draw** 161:1
199:4
**drawn** 102:18
109:19 110:1
**draws** 116:12
**drinking** 167:19
**driven** 130:22
**drop** 204:24
**dry** 137:25
**due** 9:17 10:18
109:24 110:3
175:4

**dumbauld** 9:9
15:10 37:19
96:10,13,15
97:7 98:3 99:3,6
99:14 100:2,7,8
100:18,22 101:4
101:8 102:13,17
103:5 104:6,8
104:20 105:1,4
105:8 110:5
111:25 115:20
122:7,10
**dumbauld's**
101:21
**dumbaulds**
102:4
**dunn** 13:14
36:13 38:6
**duties** 65:14
87:9

---

**e**

**e** 4:5,5 6:1,6,13
7:20 8:1,8 13:1
13:1 14:14 16:1
16:1 49:10,18
49:19 52:22
105:17 106:4
146:14 155:15
158:25 210:1
**e.d.** 157:16
167:22 168:12
**earlier** 40:13,13
71:24 72:18
97:21 103:8
115:12 118:17
128:5 199:12
**early** 120:6
134:18
**earned** 63:24
83:22 88:24

**95:23**
**earnings** 134:20
**eastern** 162:1
**easy** 75:21,22
194:8
**ecf** 146:15 170:4
193:2
**echo** 74:17
**economic**
151:22
**economy** 138:19
**ecro** 4:9
**effect** 52:17
131:3 166:8
181:25
**effectively** 78:11
174:25 198:19
**effectuate**
196:13
**effectuated**
39:17
**efficient** 168:24
**effort** 55:23
**efforts** 22:13,18
23:6 25:5 27:20
85:2 91:11
95:14
**eight's** 187:17
**either** 19:16
28:7,15 35:6
38:2 47:25 80:6
80:16 82:5
83:16 84:16
108:25 129:20
141:21 153:22
155:22 177:16
197:16
**electronic** 20:20
24:5 29:4,14
31:5 92:11

10-03635-jpm    Doc 1000-11    Filed 01/20/23    Entered 01/20/23 21:43:50    Exhibit 16
- Sept. 14    2022 Status Conference Transcript    Pg 80 of 123

[electronically - equity]                                                    Page 25

**electronically**
18:15 19:8
**element** 85:6
140:2,3 149:4
149:13 156:1
160:17 161:2
162:19 164:22
165:9 166:15
**elements** 149:6
149:8 150:2
**ellerin** 163:12
**elsberg** 5:5,16
6:3,23 7:9,21
14:4,9 17:13,13
**email** 5:21,25
6:15,15,16 7:15
7:19 8:10,10,11
18:14,25 19:1
19:16 20:3,6
21:5 23:1,10
24:8 27:2,13
28:11,15,15,24
30:7,19 31:16
31:19,20,25
32:14 62:11
94:14 96:1
**emails** 18:21
19:5,10,15 21:1
21:18 23:3,23
23:25 24:2,14
26:6,10 27:7
29:2,14 30:9,11
30:24 31:2
32:18 33:25
92:12
**embraced**
174:21
**emphasize** 41:2
88:14 106:13
160:15

**emphasizing**
87:18
**employed** 85:14
87:16
**employee** 51:6,9
96:22,25 97:7
99:15,17 101:4
101:17 102:11
102:21 105:9
122:13
**employee's**
101:19
**employees** 23:1
24:8 42:20 62:9
62:12 64:2
65:12 66:15
87:11,14,16
95:20,25 102:1
**employment**
98:4
**encompasses**
25:3
**encouraged**
101:25
**ended** 178:3
179:15
**ends** 80:12
163:8
**energies** 95:14
**enforcement**
177:2
**engage** 20:14
43:16 85:15
**engaged** 23:1
59:9 63:23
**engaging** 65:18
**enjoy** 123:4
**enter** 25:7
**entered** 196:24

**enterprise**
152:24
**entire** 94:13,23
129:1 132:5
149:25 209:7
**entirely** 145:23
158:17 196:15
207:20
**entirety** 131:16
**entities** 14:5
19:7 36:10 39:2
39:8,22 48:25
58:13,13 59:16
60:2,12,13,15
60:20 67:3,5,8
67:11,13 68:16
70:23 71:25
72:7 73:6 74:11
74:12,13,14
75:6,18 76:1,3
76:10,12,13,18
77:14,14 78:3
78:16,17 79:20
80:1,7,22,24,25
81:3 82:1,25
83:3,6,13,15,17
83:21 84:7,7,11
84:17 85:9,9,13
85:15 86:13,18
86:23 87:7,10
87:13,14,15,23
87:23 88:8,10
88:11,17,18,20
88:23 89:20
91:3 92:15 93:9
93:14,18 94:21
95:11 96:1
115:6 119:12,19
131:4 176:13

**entitled** 22:1,3
25:1 67:23
79:15 91:23
114:21 122:2
158:15 159:21
169:8 170:10,12
171:6,21 204:18
**entitlement**
161:18 171:10
**entity** 39:12,14
45:23 48:11
49:1 60:4,25
66:13 74:3
75:14 78:2,22
79:2,6,8 80:12
82:18,18,24
85:2 87:4,4,13
87:15,18,20
89:7,16,16,19
90:9 109:15
113:7 173:25
174:1
**entity's** 87:20
**entries** 21:11
164:6
**entringer** 8:22
8:24
**entry** 54:10
**equal** 31:12
160:6 161:11
162:11 163:5
**equally** 158:22
163:4 166:1,23
**equitable** 146:9
151:23
**equity** 144:4,6,7
144:11,13
145:14,18,19,24
153:10,13 179:2
179:8,14

**equivalent** 29:15
121:4 140:1,3
**eric** 11:13 13:12
154:14
**errors** 51:23,24
**escape** 157:22
**especially**
161:24
**esq** 10:12,23
**essence** 38:25
**essential** 156:1
160:17 161:2
172:16
**essentially** 64:22
67:10 97:4
190:8 207:21
**establish** 59:18
83:25 89:7
90:14 91:7
132:18 135:8,10
136:22 137:18
141:17 142:8
149:7,8,14
**established**
107:20 133:11
144:3 150:3
183:2
**establishes**
44:24 137:21
140:1
**establishing**
137:12
**estate** 2:6,17 3:3
3:14 10:25
130:17,24,25
131:9 132:20
141:24 142:3,19
143:4 146:19
147:5,10 148:4
148:10,16,24

149:1,3,11,15
151:19 153:12
153:12,17,18,20
177:24
**et** 1:13,16,21,24
2:10,21 5:2,2
6:20,20 8:15
10:13 41:21
84:13 184:2
**europe** 9:14
36:17 39:10
55:19,20,24
64:13 80:19
92:17 95:5,17
**european** 42:13
**evaluate** 22:14
**evaluated**
165:24
**evaluating**
157:11
**evaluation**
183:19
**evening** 209:17
**event** 111:7,14
**events** 28:6
171:19 199:8
**eventually**
137:25
**everybody** 41:20
150:13 165:12
**everyone's**
82:13
**evidence** 20:24
21:13,25 22:2
23:10,15 24:18
24:21,24 46:9
46:19 74:19
111:24 206:8
**evidentiary**
200:10

**exact** 169:25
207:17 208:4
**exactly** 33:7
38:3 41:13 92:9
100:19 113:9
125:16 153:9
160:3,4 168:7
172:13 183:5
**example** 22:4
23:8 24:5 30:10
30:13,18 33:23
77:11 93:13
97:24 98:17
110:23 131:22
166:21,22
205:18
**examples** 111:22
**excellent** 35:25
36:20,24 41:19
105:11
**exception** 49:21
182:8,13
**exceptions** 44:25
**excerpt** 51:7
**excerpts** 50:12
**excess** 99:4
**exchange** 3:7
11:9,12,19,24
14:13 67:14
154:8,12 155:6
155:9 186:19
193:22
**exchanged**
24:15
**exchanges** 62:11
**exclusive** 77:8
89:10 176:8
**excuse** 19:25
125:10 126:17
154:15

**execute** 107:6
**executed** 78:9
198:12
**executing** 27:10
107:3 175:16
**execution** 27:8
**executive** 84:17
**executor** 91:3
**executrix** 8:25
**exercise** 63:16
85:6 116:2
164:9,18
**exercising** 146:9
**exhibit** 5:21,22
5:24,25 6:1,14
6:15,16,16 7:15
7:16,17,19,20
8:9,10,11,11
23:8 46:10 56:1
83:6,7,8 119:1
146:14 156:5,24
156:25 173:9,10
185:4,6,23,25
187:10,11
190:23 192:19
192:20 193:3,8
193:10 194:5,7
194:7 195:7
204:25 205:7
206:12
**exhibits** 19:12
58:22 83:4,8
157:1,8,19
158:2,4 159:8
164:20 166:11
169:6
**exist** 31:12 44:5
84:18 101:22
**existed** 23:25
31:17 55:25

10-03635-jpm   Doc 1000-11   Filed 01/20/23   Entered 01/20/23 21:43:50   Exhibit 16
- Sept. 14   2022 Status Conference Transcript   Pg 82 of 123

[existence - fairfield]                                                  Page 27

existence 53:3
existent 84:11
existing 95:23
exists 28:24
   44:25,25 86:17
   179:2
exit 110:12
expect 27:8 30:6
expectation 80:7
expected 20:17
expense 25:24
   99:9
expenses 83:19
expert 208:13
experts 208:11
explain 18:13
   42:8 57:21
   114:3 151:14
   159:2 180:12
   186:3
explained 20:17
   26:3 150:6
   198:11,18,23
explains 174:8
explanation
   111:1 112:12
   121:17,20
explanations
   110:17,18
explicitly 18:17
   138:11
explored 179:4
expose 109:10
exposed 109:17
   111:3,7 182:1
exposure 63:22
   126:3,7
expressing
   176:1

expressly 151:10
   171:14
extent 56:22
   81:22 82:10
   87:8 95:1
   173:16
extraordinarily
   49:23
extraterritorial
   82:19
extremely 51:22
   100:13

**f**

f 4:5 8:21 9:14
   11:10 18:18
   157:23 168:24
   210:1
f.3d 45:4 171:25
   180:9 201:14
f.r.d. 22:9
f.supp. 84:20
   170:20 183:24
f.supp.3d
   141:15
face 25:20 30:20
   53:10 59:18
   63:13 121:10
   144:3 150:3
   185:13
facie 86:16 88:4
   91:13,22
facilitated
   100:14
fact 21:13,21,24
   41:14 42:10
   48:3 63:1 65:13
   80:22 96:16
   99:15 100:24
   101:17 104:3,13
   111:7,15 129:15

131:7 137:1
146:17 147:9
148:25 151:23
152:24 157:4
161:3 162:3
166:16 167:2
170:24 171:5,14
173:4,22 174:3
175:20 176:14
181:8 186:2,11
187:4,11 189:9
194:3 195:21
198:16 199:10
199:11 200:3
202:19 203:10
203:15
facts 19:18 22:7
   22:18,19 23:5
   26:7,8,10 91:14
   131:12 133:22
   134:4,10 135:10
   135:13 141:4
   146:2,8,20
   147:2 160:23
   161:4,10,17
   165:18 171:15
   172:22 177:16
   182:12 184:3,4
   201:3 202:14,18
   202:25 203:9
   207:24
factual 22:10
   50:25 71:15
   90:17 100:6,7
   102:9 122:3
   142:4,5 146:6
   151:4 158:12,14
   159:25 162:3,10
   162:12,16,17
   163:6 164:20

165:10,24 167:1
170:7,8,14,16
171:3 172:5,8
172:10,11 173:1
188:25 203:10
factually 156:3
   160:21 173:18
   179:21 197:16
   202:22
fail 142:11
   177:17
failed 20:23
   25:19 52:8,11
   52:22 55:9
   159:21 162:13
   205:10
failing 108:11
failings 44:1
fails 71:20 156:4
failure 20:20
   21:22 26:10
   55:13 132:7
   155:24 163:9
fair 83:1 120:17
   204:23
fairfield 1:13,21
   5:1,6,7,16,17
   6:19,23,24,25
   7:9,10,11 14:5
   16:5,5 17:12
   23:19 116:20,22
   116:23,24
   117:16,19,21
   125:8 126:3,6,7
   126:14 128:1,2
   128:2,17 129:3
   129:8,11,12,17
   155:13 156:25
   157:3,4 158:6,9
   159:12 162:23

10-03635-jpm    Doc 1000-11    Filed 01/20/23    Entered 01/20/23 21:43:50    Exhibit 16
- Sept. 14    2022 Status Conference Transcript    Pg 83 of 123

[fairfield - first]                                                    Page 28

163:1 164:25
166:2,5,17,19
166:20 167:17
168:17 173:3,20
173:23 174:10
175:16,22 176:9
176:11,14,18
180:1 182:18
184:19 185:3,4
185:5,7,10,11
185:15 187:3,16
187:22 188:17
188:19,25 189:1
189:5,7 190:5,7
190:8,10,12
191:9,17,25
196:19,22 198:5
198:7 199:5,13
200:6 201:13
207:18 208:14
**fairfield's**
155:11 159:22
173:1,13,15
174:5,6 180:2
**fairness** 138:18
**faith** 100:3,7
101:1 102:9
122:10 172:3
**fall** 63:21 64:11
**false** 89:19
128:3,7 134:16
141:5,10
**familiar** 31:5
**family** 135:1
**far** 33:20,22
49:5 84:18
188:3 197:15
198:9
**farms** 183:6

**fashion** 166:22
184:9
**fatal** 142:6
**faulty** 207:16
**favor** 58:24
96:20 104:18
106:15 120:20
184:3
**favorable** 86:15
114:10
**fax** 39:15 46:7
47:2 62:12
77:16,19,20,25
**february** 55:22
79:10
**federal** 20:15
21:19 25:2
148:15 161:22
**fee** 54:21 117:5
**feeder** 23:20
38:9,15 70:7,11
73:18,19,25
74:1,2,23,25
75:2,7 76:12
81:25 90:16
92:25 93:13
108:20 142:10
143:8 189:2,11
201:16
**fees** 55:21 63:4
63:24 64:8
67:14 68:4
70:14,18 71:18
76:8,8,10,11,16
79:16,22 80:8
80:10 83:22
87:7 88:24
89:17 90:9,11
91:18 93:1
95:23 104:11

115:1,7,20
116:10 118:11
119:4
**fellow** 51:19
**ferdinand** 8:22
8:24
**fernandez** 13:10
37:3 57:24 86:1
86:2 92:9 93:3
96:8
**fgg** 21:6 191:10
**fictitious** 128:8
143:6,9 144:25
**figure** 68:3
205:13
**figuring** 119:22
**file** 24:1,2,22
178:18
**filed** 5:5,11,16
6:6,8,13,22 7:4
7:9,25 8:2,8,18
9:8,13,23,25
10:8,14,22 11:4
11:13,18,24
27:21 61:21
70:12 108:12
121:22 170:4
177:19,22,25
178:14,16,17
179:5,6,6,18
184:24 199:25
200:4
**filer** 178:7
**files** 18:25 27:2
27:3,4,5,7,16
30:21 31:24
**filing** 52:24
148:2 178:4,6
178:24 179:3,10
192:5

**filings** 201:1
**filled** 107:24
**final** 25:8 82:15
84:22 179:21
183:22
**finally** 25:25
65:20 67:1 85:5
114:14 183:7
**financial** 45:25
61:12 84:10
117:4,18 141:10
171:23
**financially**
83:21
**financier** 9:6
37:17 38:10
42:5,19 45:22
49:16 54:21
72:2 79:22
85:17 90:7
**financing**
181:10
**find** 17:6 36:9
94:24 112:9
120:18 140:19
146:10 173:10
178:20,20
180:11 183:16
**finding** 130:5
140:23 160:23
**findings** 110:15
**fine** 51:12 55:23
**finn** 139:20
**fiore** 174:11
**firm** 77:1 94:12
96:12 204:3
**first** 5:23 7:16
17:24 18:3,5
19:4 20:21
22:24 25:18

26:16 41:22
44:12 45:11,14
46:8 53:12 97:5
97:20 98:2,17
103:4 104:1
108:8 110:5
117:14 120:10
132:14 133:24
137:16 140:19
142:13,14
155:23 157:13
167:7 171:2
172:25 180:23
182:4 184:20
188:14 193:1,3
203:8 205:3
**firstly** 165:19
166:8
**fish** 11:14 13:12
154:13,14
156:10,11
184:17,18
185:20,23 186:1
186:4,16,21
187:10,15 188:8
190:21 191:1,15
192:21 193:18
194:20,23 195:1
195:3,12 198:3
198:9,10,21
199:4,7,15
201:9,11,20
202:13 203:12
203:15
**fish's** 173:10
198:6
**fits** 57:22
**fitzsimmons**
157:15

**fitzsimon** 167:23
**five** 19:13 98:8
121:22 154:3
204:9
**fixed** 58:7
**flag** 23:22 110:4
**flags** 50:5,10,19
50:23 111:17,19
111:23 152:12
**flaws** 142:6
**flies** 144:3
**floating** 102:17
**florida** 172:23
**flow** 79:19
208:13
**flowed** 102:3
207:19
**flowing** 132:1
182:25
**flows** 102:16
**flummoxed**
103:17
**fly** 95:7
**focus** 27:18 32:1
39:25 49:22
93:9 96:21
**focused** 27:25
56:17 139:25
175:8
**focuses** 131:11
189:20
**folks** 82:19
**following** 19:1
54:6,14 134:9
135:13 140:25
162:8
**footnote** 23:16
95:25 96:3
171:15

**force** 116:1
**forcing** 196:22
196:23
**foreclosed**
142:20
**foregoing** 210:3
**foreign** 5:8,10
5:19,20 7:1,3,12
7:14 21:5 38:9
38:15,18,18,19
38:20,21 39:22
39:23 44:19
47:9,9 71:25
72:1 74:2,4,6,8
74:8 76:9,10,14
76:15 77:1,12
78:9 79:20 80:1
80:4 82:1 85:6,9
85:13,14,20
86:23 93:15
94:21 95:12
174:14,15
176:13 180:14
181:5,13,21
**foreseeable**
21:23
**forgive** 167:19
**form** 25:24
29:15 31:23
54:19 96:2 97:7
119:4 144:11,13
145:17,19
**formalities** 81:4
84:14 87:12,19
**formally** 87:16
**formed** 48:13
65:1 151:15
**former** 179:12
179:18

**formerly** 37:12
39:10 73:9
**forth** 56:25
75:10 91:24
137:20 146:14
149:6,12 157:1
**forum** 60:17,18
63:15 78:23
172:18,19 175:3
175:10,21 176:6
176:7,8,18,22
192:11 193:14
193:20,23 197:9
**forward** 108:24
109:3 169:7
**found** 21:8
77:16 84:2 88:3
88:7 91:9
100:12 111:20
118:6,22 133:6
140:16 141:15
141:16 143:17
149:4 162:10
187:20
**foundation**
173:1 175:20
**founded** 139:3
**founder's** 51:24
**four** 36:14 39:6
46:7,8,22,23
47:2,3 81:19
159:17 170:23
171:11 172:12
172:25 183:11
194:18,25
**fours** 178:20
**fourth** 179:21
**frame** 177:6,13
**france** 80:17

10-03635-jpm   Doc 1000-11   Filed 01/20/23   Entered 01/20/23 21:43:50   Exhibit 16
- Sept. 14   2022 Status Conference Transcript   Pg 85 of 123

[fraud - give]                                                                                         Page 30

**fraud** 23:12,13
50:4,6,16,22
51:13 52:3,14
52:16,19 63:22
88:3 107:2,13
107:15,18,20
108:15 109:10
109:18,24
110:22,24 111:3
111:7,13 128:16
133:4 134:12
136:12 138:22
139:19 140:12
140:13,18,23
141:2,14,16,18
141:22 197:2
**fraudulent** 97:1
127:22 130:17
131:8 136:23
137:12,19,21
139:16 140:2,24
141:14,18,20
151:22 152:25
153:1,3
**french** 80:16
**frequently** 39:11
45:17
**friehling** 112:6
**frolic** 30:2
**fsl** 45:17 46:14
54:15,20 58:15
115:7
**full** 21:16 45:19
127:1 151:5
168:22
**fully** 29:23
65:11 96:15
**functions** 45:24
60:11 62:7
74:14,16

**fund** 9:15 23:20
36:18 45:16,20
47:5,9,10,15
49:15,15 58:14
59:21 61:4,4,7
61:18,23 62:1,5
62:9,14,23 63:8
63:10,13,17
65:10,25 66:1,7
66:12 67:19
70:7 78:24
89:24 92:25
108:12,20,21
125:8 126:1,3,6
126:8,14 130:2
131:1,24 134:7
135:12,14,18,25
136:3,6 139:14
142:1,10 143:8
143:16 146:13
146:15,17,21
147:1,3,4,6,8,18
147:20 151:18
189:2,20 190:9
196:12
**fund's** 144:12
**fundamental**
147:22
**funded** 118:5
**funds** 24:12 38:9
38:15,18,18,20
38:25 39:3 46:3
47:5,24 53:6
56:19 60:20
63:2,11 66:5
67:12,14 70:11
71:16 73:18,19
73:25 74:1,2,6,9
74:11,23,25
75:2,7,10,13,16

75:17,18,18,20
76:4,12,15 77:5
78:16,25 79:1
79:20 80:4
81:18,25 82:7
87:5,8 88:18,20
88:22,25 89:14
89:21 90:10,16
90:25 91:19
93:13 95:12
97:23 102:16
107:13 109:20
117:21 118:8
119:13 129:17
130:3 132:20
134:23,24 135:5
135:18,19,20
141:8,10 143:4
143:7,13 145:18
146:12 148:15
148:17 163:11
174:1 187:3
188:24 189:11
189:22 198:23
198:23 199:2,12
199:14 201:16
204:22 207:25
208:4,14
**fungible** 208:4
**funneling** 63:12
66:4
**further** 52:14
60:12 62:1
63:16 78:18
89:19 103:16
111:2 112:7
119:25 149:9
170:23 186:18
**furtherance**
63:12 135:12

137:23 139:10
139:15 140:11
140:17
**furthermore**
182:18
**future** 101:24,25
138:6,7 139:6,7

**g**

**g** 4:6 16:1
125:22
**gain** 188:17
189:6
**game** 152:19
**gather** 206:8
**gay** 14:4
**geiger** 157:16
167:21 168:11
168:11
**geltzer** 96:24
99:25 101:6,16
102:8 122:20
**general** 42:1
44:18,22,24
45:2 164:11
**generalized**
183:9
**generally** 103:12
149:20
**getting** 20:18
27:9 101:6
102:11 201:22
**gibson** 13:14
36:13 38:6
**give** 30:10,13,13
36:14 40:10,22
67:25 68:7
73:15,23 110:23
118:7 123:13,23
125:15 127:22
150:15 154:6

10-03635-jpm   Doc 1000-11   Filed 01/20/23   Entered 01/20/23 21:43:50   Exhibit 16
- Sept. 14   2022 Status Conference Transcript   Pg 86 of 123

[give - gucci]                                                                    Page 31

169:17 185:18
193:2,7,12
207:9 209:5
**given** 24:13
44:23 73:1 94:1
97:10 100:8
107:10 128:18
129:13 131:12
150:15 152:7
153:18 154:23
206:1
**giving** 23:25
74:5 115:3
156:21
**glad** 124:16,17
**glaring** 53:9
**global** 10:16
11:6,20,25
15:18 123:21
124:25 125:1,6
125:9 126:1,4
126:12,12,17,25
129:2,4,23
131:18
**globally** 84:25
**glynn** 14:19
204:3
**go** 17:23 18:5
28:21 30:1 32:2
33:5,14 41:7
57:5,12 60:25
60:25 71:17
72:21 76:1 81:2
98:4 100:4
109:2,17,24
112:7,16 114:14
116:14 120:7
121:4 123:10
129:8,22,24
150:19 152:19

154:16 185:18
187:14 189:17
195:8 202:16
209:8
**goes** 69:19 71:17
107:21 169:7
184:2 198:3
**going** 17:10
29:10 32:23,24
34:6,7 35:25
56:14 57:17,21
57:24 58:1
59:15 60:25
61:16 76:20
84:13 99:8
102:4 103:21
108:7 113:24
125:15 129:12
132:2 145:13
152:8,22 170:22
173:21 189:13
199:14 201:18
204:9,13
**good** 16:2,8 17:9
17:22 25:23
26:16 36:7,12
36:25 37:18
38:3 44:22 58:6
58:7 68:8 69:13
71:3,3 72:9,12
86:1 96:11
100:3 120:17
122:10 123:13
123:16,18,20,23
132:9 154:1,5,9
154:13,15
156:23,23 172:3
176:3 184:17
187:19 188:21
201:9 202:12

203:22 204:1,4
204:6
**goodman** 128:5
**gottlieb** 15:17
123:21
**governed** 38:20
39:23 78:9
143:12
**governing** 44:17
44:21 175:21
176:6,25 177:1
177:6
**government**
162:5 190:6
191:7
**governs** 180:16
**graduate** 96:16
**grant** 56:16
**granted** 49:7
**grasps** 133:14
**great** 41:22
71:17,18 81:2
109:17 111:6
123:4 179:4
184:14
**greater** 130:24
**gredd** 131:10
147:11
**green** 3:24
**greenwich** 190:8
191:9
**greig** 5:9,19 6:25
7:12
**grief** 17:9
**ground** 101:6
**grounds** 43:5
44:2 48:10
49:10 72:25
75:25 79:5
80:15 85:20

93:25 126:23
**group** 66:13
87:17 119:11
125:9 130:3
190:8 191:9
**groupe** 56:3
**groupement** 9:6
37:17 38:10
42:5,19 45:22
49:16 54:21
59:25 60:2,4,5,9
61:6 62:11,19
63:4,9,13 67:13
70:23 72:2 74:1
74:3 75:2 79:22
81:20 82:6
85:16 87:5
88:21 90:3,3,6,7
91:4 92:25
93:15 106:9,19
106:24,25 107:5
107:9,11 109:20
114:13,25 115:8
115:13 116:16
117:3 118:1,10
118:12 119:19
119:22
**groupement's**
61:11,19 79:11
79:23 89:11
107:3,17 111:5
118:13
**groups** 106:19
**growing** 175:13
**grown** 98:20
**grâce** 51:25
**guadagno**
157:23
**gucci** 45:4

guess 46:13
154:10
guidance 33:20
gulf 117:14
guy 35:2

**h**

h 2:4,15 3:1,12
8:14 10:8,12,23
11:8,14 12:5
13:10 158:25
hailing 67:3
hamilton 15:17
hand 21:6 50:23
51:6 54:9 55:2
84:6
handling 61:14
hands 128:12
hanson 172:15
172:24 174:11
174:17,25
175:11 177:5
182:22
haphazard 47:2
happen 41:14
121:16 194:18
happened 19:10
19:15 24:24
26:5 42:23
121:21 126:18
130:18 206:1,2
happens 20:12
57:8 74:10
124:12
happy 26:13
32:2,20 33:20
37:15 57:2
120:7 129:20
155:14
harbor 49:20
52:25 125:22,23

hard 31:9 32:18
94:16,17
hardcopy 18:24
24:1 29:1,3,15
30:12,21
harm 67:9
131:11
harsh 161:24
haul 82:19
head 34:12,18
headlined 46:13
headquartered
41:24 44:20
45:20 47:18
hear 28:13
69:13 120:11
145:7 161:13
170:11 175:24
heard 93:17
94:17 121:16,19
121:20 122:5,25
145:10,10
152:12 185:21
200:14 201:19
203:20,21
hearing 5:4,12
6:5,9,21 7:5,24
8:3 9:16,20,20
9:22 10:1,17
12:1 20:2 40:20
41:3 78:21 94:1
94:2 142:17,22
heart 75:24
heavily 147:12
hedge 126:9
held 5:12 6:9 7:5
8:4 9:16 10:1,17
12:2 21:4,12
45:3 52:7,9,9,11
52:18 60:22

116:9 117:14
120:17,19
136:15 137:8
138:23 140:6
141:13 144:6
147:1 148:14
149:2 151:17
157:13 161:15
161:20 167:16
184:8 190:22
198:22 207:23
helped 80:3
helpful 40:6
193:2
helping 109:14
149:9
high 49:23,25
50:7 51:1,12,12
52:2 92:10
120:12
highlighted 59:8
67:21 108:5
highly 21:21,24
hill 183:23,23
184:1,4,5,9
hinder 127:18
128:21 133:2
134:2,8 138:5
139:5 148:3
149:18
hint 99:13
hinted 46:2
hired 51:18
104:24 110:9
history 23:19
hitting 172:12
hmm 34:10
hold 16:12,20
17:5,7 67:8
77:24 102:6,7

122:12,13,16
174:13 179:8
180:25,25
holding 137:2
171:22 198:23
holds 22:10
173:25 189:22
holistically 52:5
72:5
hon 4:6
honestly 46:19
57:20 100:18,19
honor 16:8,14
17:1,13,21,25
18:1,9,11 19:5
19:15 20:17
21:4,14 22:25
23:18 25:1,8,11
26:7,16,23 27:7
27:24 28:14,23
29:6,13,24 30:6
30:11 31:1,7,14
31:22,25 32:8
32:20,21 33:11
33:19 34:13,22
35:3,9,14,17,23
36:3,4,12,22,25
37:4,18,22 38:1
38:5 40:5,6,20
40:24 41:10,17
44:23 45:19
46:12 47:16
49:8,10 53:2
54:2,5,9 55:14
56:2 57:1,14
58:6,8,19,24
60:21 67:17,22
67:24 68:7,23
69:2,7,10,12,25
71:8,12,21,24

10-03635-jpm    Doc 1000-11    Filed 01/20/23    Entered 01/20/23 21:43:50    Exhibit 16
- Sept. 14    2022 Status Conference Transcript    Pg 88 of 123

[honor - imputation]                                                          Page 33

72:8,14,22
73:24 74:10,21
75:23 76:3 77:4
77:11 78:2,25
79:3,25 80:24
82:15 83:1,24
85:19,23 86:1
91:21 92:3,9,24
93:3,7,12,22
94:5,10 95:7,9
95:17 96:4,8,11
98:15 99:1,11
101:20 102:6,12
103:1,9,20,22
104:3 106:5,13
113:18,23 114:7
115:5 116:20
117:10,14
118:18 119:7,7
119:10,24 120:4
120:23 121:3
122:4,6,22
123:18,20 124:4
124:6,19 125:15
128:5 129:5,21
131:3,14 132:5
132:10,13
151:25 152:4,12
153:25 154:9,13
154:24 155:4,19
157:2 159:9
163:17 165:15
165:16,20,23
166:7 167:5
169:11 171:22
173:2 175:25
176:14 180:6
184:15,18
185:23 186:1
187:2 188:3,5

189:13 190:21
195:6 197:5,11
197:19,22
199:16 200:15
200:24 201:11
203:1,3,8,12
204:1,4,8 205:3
205:9 207:13
208:5,21 209:18
209:19
**honor's** 22:17
25:22 69:18
154:20 156:7
184:13 185:17
196:7 202:20
**hope** 40:6 155:1
209:16
**hopefully** 204:9
**hoping** 184:14
**horowitz** 112:6
**hosinski** 14:19
204:3
**host** 40:10,11
**hostetler** 13:3
37:1 41:2 58:9
69:16 86:2
103:1 132:11
154:14 204:5
**hour** 120:3
**hsbc** 183:23
184:2
**hundred** 75:1
115:12
**hundreds** 169:4
205:12 206:11
209:9,10
**hyde** 12:15
210:3,8
**hypothetical**
22:25,25

**i**

**ia** 134:11,15,17
134:19 135:9,15
135:25 141:1,5
146:16,18
**idea** 175:13
**identical** 84:1,8
160:24 161:5
164:6
**identified** 22:9
50:18 62:17
72:17 112:4
113:11 199:15
204:24 205:15
**identify** 51:9
59:15,20 76:1
107:8 109:1
112:10 119:17
120:15 206:6
207:3,17 209:6
**identifying**
51:10 109:7
116:10 185:9
205:4,11
**ignore** 151:22
**ignored** 19:17
180:17
**iii** 11:21 12:1
**illegal** 181:4,7
181:10 182:11
182:14 197:2
199:23
**illegitimate**
128:3
**illuminates**
111:4
**illustrates** 50:13
**image** 84:18
**immaterial**
168:24

**immediately**
167:24
**impact** 60:19
149:19
**impatient**
154:22
**impeded** 107:14
**impermissible**
140:14
**implausibility**
54:23
**implemented**
78:11 138:13
**imply** 177:15
**importance**
70:19
**important** 38:12
39:9,24 49:13
58:19 59:20
66:6 106:13
127:13 169:14
170:11 173:8
208:9
**importantly**
43:18 46:3 94:5
153:8
**impossibilities**
52:13 53:9,10
56:18,19
**impossibility**
120:14
**impossible**
43:19 44:8 56:8
107:7,10,12,17
111:24 121:10
205:22
**improper**
187:16
**imputation**
199:6

imputed  106:24
  182:21 199:8
inability  120:15
inadequate
  128:19
inapplicable
  140:6,21
inception  64:11
inclined  183:16
include  37:10
  44:13 73:4,8
  74:1 92:13
  94:14 194:2,11
  195:12 204:17
included  23:19
  52:12 54:11,18
  66:3 70:9 75:9
  92:12 97:14
includes  21:11
  53:21 59:4
  66:11 70:15
  100:1 106:20
  185:5,6,10
including  19:6
  23:22 27:1
  49:13 54:13
  88:21 147:19
  161:21 185:2,9
income  98:6
  111:6
incomplete  24:2
  32:18
inconsistent
  20:15 99:19
  136:19 137:3,5
  137:13 138:9
  139:2
inconvenient
  187:24

incorporated
  130:19 167:17
  168:25
incorporating
  158:6
incorporation
  45:1 164:25
  167:14,25 168:1
  168:4,8,9
  169:16 184:20
  187:7,16
incorrect  59:14
  60:3,11,14
  124:10
incurred  148:1
ind  171:24
independent
  62:4 83:19
  84:15 161:6
indicate  181:22
indicated  181:22
indirect  128:13
  192:3 199:25
  200:7,8
indirectly  38:17
indiscernible
  37:20 38:4
  63:18 67:22
  82:14 89:25
  90:17 96:3
  98:24 99:23
  108:19 109:3
  120:25 130:16
  139:24 149:17
  166:10 171:21
  207:10
indispensable
  162:19 165:9
  166:15

individual  25:22
  59:1,23 80:13
  80:14 100:23
individually  3:7
  9:3 11:10,19,25
  40:1 72:5 85:21
  171:1 188:14
  202:1
individuals  67:6
  119:12
industry  50:15
  173:24
inequitable
  144:17 145:21
inexpensively
  168:20
inferable  173:19
inference  22:1
  109:18 110:1
  111:12 118:7,15
  138:4 139:5
  159:1 160:2,3,5
  160:7 161:1,15
  162:18,18
  170:17 171:11
  171:13 172:9,10
  189:4 207:25
inferences  58:23
  104:18 106:15
  106:16 120:20
information
  16:22 20:12
  22:12,20 24:17
  25:4 29:16
  31:11,11 34:21
  34:23 35:8
  68:13 69:8
  100:24 109:12
  118:4,7 119:15
  122:11,15

195:10 206:23
  207:3
initial  52:24
  53:7 55:25 56:5
  56:6,7,10,14,20
  70:8 73:20
  102:3 106:9
  116:3 118:25
  121:12,12 131:9
  132:2,7,15
  134:4 135:11,24
  136:5,10,17
  137:22 139:11
  139:14 140:10
  140:11,16,24
  146:18 147:6,18
  185:15 187:1,21
  188:1 190:4
  191:4 204:19
  205:4,24,25
  206:5,8,13,15
  206:18,21,25
  207:4,17 208:14
  209:4,12
initially  38:8
  175:13
initiated  43:9
injury  60:19
innocent  181:20
  182:24 199:20
inquiring  28:6
inquiry  107:14
  110:13 175:8
inside  136:15
insider  158:6
  165:1 167:17
insiders  117:19
insist  176:16
instance  34:5
  50:18 56:4

115:5
instances 111:22
113:2
instantly 31:12
instruction
111:9 112:7
instructions
27:9,10 201:22
instructive 22:9
insufficient
33:17 53:3 79:3
82:2 85:3
111:20
integral 60:4
65:22 105:9
181:4,15 182:20
integrated
130:23 131:5
142:3 146:10
151:15
intended 139:5
intent 127:17,18
128:21 132:16
132:18 133:2
134:2,8 136:23
137:12,19,21
138:5 139:9,16
140:24 141:15
141:18,20 148:3
195:16 202:10
intention 67:16
181:22,23
intentionally
21:25
interdependence
84:10
interest 84:1
130:10,12
131:19,24 132:1
132:6 146:21

147:14,15,25
148:5,7,14,20
interesting
123:1,2
interface 93:14
interfere 100:20
intermediary
190:10 191:8
internal 108:23
international
6:7,14 8:1,9,19
8:20,21 13:22
16:10,18 18:13
37:10,11,12
60:13,13 73:8,9
75:14 76:20
78:5 86:7,9,19
86:20 87:24,25
88:6,12,13 89:9
89:13 115:18
172:21 181:11
181:11,25 182:6
internationally
60:11
interpret 177:8
interpretation
177:2
interrelated
119:12
interrupt 73:12
144:19,19
190:18
interrupting
125:10
intersection
205:15
intervention
26:5
introduce 17:15

introducing
77:8 89:10
invest 189:7
191:16,17 198:7
201:13 203:13
203:17
invested 38:15
64:6 72:1,3 75:1
92:24 115:13
118:14 130:4
132:20 135:15
188:17,20,24
189:3 191:18
199:2
investigation
51:18 52:1
54:12 70:6
90:23 110:14
186:18
investing 67:16
89:1 189:5
200:3 201:24
investment 2:6
2:17 3:3,14 10:9
10:25 11:15
24:11 38:24
42:18 47:9
63:23 64:4,6
65:9 68:5 78:8
78:11 79:9,11
79:14,23 82:9
87:3 89:5,11,12
89:12 90:4,5,17
91:19 104:9,21
105:3 108:22
109:4,15 110:5
139:24 143:21
144:5 155:8
173:6 174:5,7
184:11 186:6

190:4 191:4,24
191:25 192:13
196:13
investments
59:23 60:5,8,24
63:12 66:4 74:8
78:22 82:13
87:6 88:15,19
88:23 89:8
93:12 110:12
198:14,14
investor 82:5,5,6
137:24 141:10
192:3 199:25
200:8,8
investors 38:14
38:14 45:25
47:13 74:5,6,8
75:20 76:5,7,16
77:9,12 79:1
93:15 138:3
189:10 201:15
invests 174:1
invitations 21:1
invoices 117:5
invoking 172:20
176:23
involve 99:6
involved 23:14
89:20 125:14
140:7 174:9
involvement
118:9 169:2
involving
102:20 130:21
131:4 169:20
iqbal 160:4,15
161:20,22 162:6
162:6,20 170:6
171:5,5 188:22

**ireland** 180:3,4
199:18,19
**irish** 182:25
**irregularities**
91:12
**irrelevant** 111:1
174:11 199:10
**irving** 2:4,15 3:1
3:12 8:14 10:8
10:12,23 11:8
11:14 12:5 37:1
58:9 86:3
**islam** 161:25
**islamic** 196:17
**isolation** 91:5
**issue** 20:3 22:19
26:18,20 28:2
30:5 42:25 44:6
47:10,12 53:17
88:1 90:17
94:10 96:22
101:14 103:15
103:23 118:25
120:10 121:9
127:19 132:16
133:1 134:7
135:11,25 136:6
136:11,24
137:11,22
139:11 140:25
141:20 142:17
144:20,23 148:6
148:20 149:5
155:23 160:5
164:14 185:1
187:6 188:2
189:17 194:14
195:22 198:4
200:11 201:23
207:25 208:4,12

**issued** 185:14
**issues** 20:14
21:15 24:16
26:11 38:11
57:3,16 58:2
71:23 90:24
101:13 103:2,3
103:10,12 104:3
127:13,20
163:19 184:20
187:4 189:16
208:10
**it'll** 36:1
**items** 49:9 53:9
**ivy** 131:3

**j**

**j** 10:22
**jail** 161:24
**january** 9:22
129:9
**jeff** 6:6,13,17
7:25 8:8,12 14:2
16:8 18:5
**jessica** 13:10
86:1
**jmds** 73:5
**joinders** 103:16
**joint** 84:24 85:1
**judge** 4:7 21:15
50:2 52:7,18
88:3 91:9 94:7
120:16 127:2
133:15,17 137:8
157:15 167:23
174:20 178:10
204:11
**judgement**
151:5
**judges** 159:16
159:17

**judgment**
202:23
**judicial** 61:21
129:6 138:19
157:20 158:2,4
159:18,20
178:10
**judicially**
131:13 138:12
138:17,21 166:1
**july** 19:14,14,14
23:9
**june** 19:9,13
130:8
**junk** 94:14
**jurisdiction**
24:15,19,23
26:9 33:9 35:19
38:11,22 39:1,7
39:7 42:2 44:4,4
44:11,14,18,22
44:24 45:2,7,8
45:12 47:8
48:10,23 49:2,5
49:6 55:13
57:18,19 58:11
58:13,17 59:6
59:11,18 61:3
62:16 63:16
67:3,18 68:18
72:10 80:15,21
81:6 82:2,16,17
83:11 85:22
86:6,9,16,18
88:2,5,14 90:14
91:6,13,15,22
91:25 94:24
96:15,17 103:23
155:14 164:11
169:12,19,21

170:3,24 171:1
171:4,12,13
172:2,4 174:14
174:23 175:18
176:9 177:12,22
177:23 178:2,4
178:7,15 179:2
179:9,15,20
180:6,13,14
181:2,13,15
182:1,14 183:1
183:8,12 184:4
188:6,9,11
191:23 192:5,6
192:8,16 193:14
193:21 196:10
197:10 199:22
202:14
**jurisdictional**
18:23 19:3 21:7
21:12 24:20
27:17,24 28:5
29:25 43:5 44:3
48:24 49:3 58:2
65:17 67:23
71:23 73:1,3,5
75:25 79:5 81:1
82:23 85:20
91:24 93:25
94:3,8 95:6,18
105:13,21,22
182:7
**jurisdictionally**
42:24
**jurisdictions**
83:16
**jury** 179:1,8,13
**justice** 172:15
172:21

10-03635-jpm Doc 1000-11 Filed 01/20/23 Entered 01/20/23 21:43:50 Exhibit 16 - Sept. 14 2022 Status Conference Transcript Pg 92 of 123

[k - korea] Page 37

| k | | | knowing 120:14 |
|---|---|---|---|
| k 8:21,24 9:1,3,5 9:14 | 180:2 182:22,24 188:10 192:3 197:9,17 | 109:19 110:2 112:5 173:19 175:17 189:12 | 175:15 198:21 201:21 206:13 |

k 8:21,24 9:1,3,5
9:14
katten 15:2 37:5
keb 155:9,9,18
155:21,24,24
157:9 158:13,19
159:22 160:8
163:3,12 165:19
166:9,24 167:3
167:8 168:3,17
168:25 169:3,3
169:6,6,8,20
173:1,12,19
174:13 175:14
175:18,22
176:10,10,18,19
176:20,23
177:19,22,23
178:3,17 179:18
179:22 180:1
181:7,8 182:14
182:14,21 183:1
184:16 185:4,7
185:12,22,25
186:1,12 187:9
187:12,25
188:14,17
189:20 192:13
194:14 195:13
196:6,18,22
197:1,6,13
198:11,16,21
199:5,8,25
200:3 201:21,23
202:1,9 203:14
203:15
keb's 158:22
169:1 170:4
177:24 178:1

180:2 182:22,24
188:10 192:3
197:9,17
keep 17:10
23:22 27:1
73:16 77:5
89:13 112:20
128:12 206:20
keeping 45:24
61:10,13 200:25
kenneth 5:7,18
7:2,13
key 67:11 172:3
kick 32:23
kicking 41:8
kind 27:13,21
31:15 52:6,12
82:11 102:5
204:11
kindness 209:16
king 9:13 13:19
36:12,13,17,21
37:22,25 38:5,6
40:12,15,18
41:10,16,19,22
57:6,9 62:12
63:1 64:12
65:22 67:1 69:2
71:9,11 103:10
105:25 106:4
107:24 116:4
118:19 120:1,3
120:7 121:2,18
121:20
king's 41:4
58:20,25 59:13
116:4
knew 107:1,3,5
107:9,11 108:5
108:17,18

109:19 110:2
112:5 173:19
175:17 189:12
198:16,21 199:2
199:5 200:2,3,5
201:18
know 17:7 20:6
20:7,10 23:20
28:24 29:5
32:14 33:1,7
34:8,17,21,21
35:6,6 40:13
41:11 44:7 46:1
50:11,14 57:7,8
82:22 92:1,17
92:21,21 94:18
97:14,23 98:7
98:25 99:7,17
100:21 101:13
101:25 102:7,17
103:14 104:15
106:12 108:18
110:16 113:3
114:2 118:17
121:12 123:3
152:6 156:6,19
168:13,19 169:3
169:3,8,10
172:14 175:12
183:5 186:23
187:11 189:24
190:15 193:12
194:1,4 198:4
198:13,16,25
200:6,21 201:23
201:23 203:14
203:15 206:16
206:24 208:5,6
209:4

knowing 120:14
175:15 198:21
201:21 206:13
knowingly
188:24
knowledge
49:16,21,23
52:9,11,20,23
73:21 75:1
82:11 103:11
106:10,23 107:1
107:20 108:1
109:20 110:22
110:24 111:13
111:18,21 113:8
114:8,11 120:10
120:22 121:6
158:14 174:21
198:18 206:22
known 37:12
39:10 55:20
64:12 73:9 78:4
130:2 138:2,6
139:6 173:24
178:15 182:15
197:2
knows 44:23
168:20 173:2
176:14 198:10
208:17
knuts 15:15
37:18,19 96:11
96:12,19 97:12
97:19 98:2,13
98:25 99:11
103:25 104:15
122:6,9,20
korea 3:7 11:9
11:12,19,20,24
11:25 14:13

10-03635-jpm   Doc 1000-11   Filed 01/20/23   Entered 01/20/23 21:43:50   Exhibit 16
- Sept. 14   2022 Status Conference Transcript   Pg 93 of 123

[korea - line]                                                                Page 38

154:7,11 155:6
155:9 180:2,4
186:6 193:22
199:17
**korean** 155:6,8
183:1 186:19
**kromer** 47:8,10
**krys** 5:7,18 7:2
7:13

**l**

**l** 1:7 2:5,7,16,18
3:2,4,13,15 8:18
10:9,10,24,25
11:15,16 13:11
15:7 184:10
**la** 8:24,25 9:1,2
9:2,3,5,5 37:14
**lack** 24:22 39:7
45:12 49:6 52:2
58:12 85:22
86:6,9 140:1
142:5 166:14
171:4 188:11
**lacked** 45:7
**lacking** 164:22
**laid** 150:2
**lambda** 6:23
7:10
**landsman** 14:24
204:1,2,7,8,13
207:12 208:22
208:24 209:2,18
**language** 122:1
137:3 138:9
139:2 170:1
**langue** 137:14
**laplume** 9:25
**largest** 23:18
**lasting** 87:1

**lastly** 53:2 101:2
113:23 121:20
**late** 23:10,11
27:21 47:20
120:3
**latin** 170:20
**launch** 66:7
**laundering**
181:12,16
**law** 10:5,20 11:3
11:11 14:12
23:12 38:19,20
39:23,25 44:17
44:21 66:10
72:11 78:9 79:3
108:24 133:11
136:22,25 137:9
139:21,21 144:4
146:7 148:15
151:23 154:10
169:23,23
172:20 175:21
176:6,25 177:1
177:6,9,17
180:7,12,16,19
180:24 183:2,5
183:6 192:14
200:22 201:24
204:3
**laws** 109:8,9
**lawyer** 29:21,23
34:8 46:15,19
**layers** 117:13
**leads** 194:14
**learned** 18:15
23:12 100:19,21
173:12,14 200:6
200:8
**leave** 54:6
123:12 124:13

155:22 187:6
207:9
**leaves** 163:5
183:14
**leaving** 54:22
**lebanese** 180:9
180:20
**led** 28:17
**ledanski** 12:15
210:3,8
**ledger** 164:6
**left** 21:2 54:9
98:3 124:12
131:6 186:9
**legal** 35:4,5,20
35:20 106:4
133:20 142:4,7
146:4 170:9
190:11 191:11
210:20
**legally** 172:3
197:17
**legitimate**
134:19 135:6
141:2
**lender** 130:6
**length** 107:21
109:17 178:22
**lengths** 81:2
**letter** 5:4,15 6:5
6:12,21 7:8,24
8:7 9:21 16:3
19:12 23:2,9,17
25:9
**letters** 18:2
**letting** 65:22
**levant** 84:3
**level** 49:25 50:7
51:1,13 52:2
120:12

**levels** 119:9
**leveraged** 126:3
**levered** 90:3,7
**levinson** 138:20
**levithan** 157:23
**lexis** 168:10
**liability** 160:11
160:12
**liable** 122:12,13
**liberty** 15:20
175:5
**licci** 180:8,20
181:10 182:5,8
183:6
**lied** 107:7
**lies** 109:16,22
**life** 130:8 131:20
**lifland's** 174:21
**light** 17:8,9
86:15 114:10
205:14,18
**limit** 204:13
**limited** 1:13,21
5:1,6,7,17,17
6:19,23,24,25
7:10,10,11
10:16 11:6
15:18 23:5
25:25 45:17
47:6,15 54:14
76:22 83:6 86:7
87:25 89:9,13
115:18,19
123:22 124:25
137:25
**limitless** 67:2,5
**limits** 175:4
**line** 33:5,6 55:3
84:4 138:3
160:13 162:13

10-03635-jpm    Doc 1000-11    Filed 01/20/23    Entered 01/20/23 21:43:50    Exhibit 16
- Sept. 14    2022 Status Conference Transcript    Pg 94 of 123

[line - luxalpha]                                                                                     Page 39

163:7

**lines**  102:18

**link**  112:22
165:6

**linked**  115:23

**linking**  116:2

**liquidated**  79:10

**liquidation**  1:13
1:21 2:5,16 3:2
3:13 5:2,6,7,17
5:18 6:20,24,24
6:25 7:10,11,11
8:15 10:9,24
11:9,15 12:6
133:11

**liquidator**  5:9
5:10,19,21 7:2,3
7:13,14 8:22,23
29:17

**liquidators**  9:24
17:14,20 18:11
18:16 19:12
20:13,19,23
21:14,19 22:1,3
22:16 23:9
24:10,12 25:1,9
25:17 26:4,7
27:19 32:2,12
37:24

**list**  35:19 40:7
56:4 111:19
168:22,23
169:17 205:5

**listed**  77:20
199:7 205:12,15
206:12

**listened**  31:9

**listening**  105:14
201:8

**lists**  54:14 56:3

**literally**  24:20
116:11

**litigate**  182:3

**litigated**  88:1

**litigating**  25:15

**litigation**  21:4
21:22 22:10
23:14 104:6
110:19 117:22
177:7 187:5

**littaye**  9:6 37:14
73:21 80:14,15
80:16,20 81:12
81:22 82:2,4,8
82:10 85:21
86:8,25 87:2,21
88:23 90:12,19
91:1,1,7,14,16
92:20 96:7
105:5 107:14
110:13 112:7,11
112:12 115:19

**littaye's**  75:10
81:16 83:7
90:15 91:10

**little**  26:17
99:13 103:17
154:21

**liu**  9:8

**llc**  2:6,17 3:3,14
8:19 10:10,25
11:15 37:11
75:14,15 83:21
84:5,16 85:10
86:10,19 87:25
88:2,7,12 104:9
104:11 115:18
170:20,20
184:11

**llp**  13:3,14,21
14:19 15:2,9,17

**loan**  130:1,1,6,7
130:8 131:21
140:7

**local**  25:22

**locate**  32:4

**located**  76:5,6
76:19 86:21
190:13,19 191:6
191:6,13

**location**  10:18

**log**  46:13,20

**logistics**  19:24

**lombard**  202:20

**london**  42:20

**long**  86:25 98:3
150:19 154:20
156:11 171:17
199:3 200:4
207:14 209:16

**longer**  55:6
121:22 178:4

**look**  33:5,16
50:9,17 52:4
53:20 54:24
71:16 76:11
83:8,23 100:3
100:12 102:14
118:21 127:19
128:15,16 129:4
129:5 130:18
153:16,17 176:7
178:23 205:7

**lookback**  206:16
206:17

**looked**  59:12
98:23 185:14

**looking**  33:13
86:14 172:9

**looks**  58:21

**loose**  163:8

**lose**  111:11
138:4 167:19

**loser**  92:20,21
92:23,24 128:3
143:16

**loss**  152:25

**losses**  143:10
145:1

**lost**  18:14 21:18
82:9,12

**lot**  27:11,13 30:7
92:12 99:7
150:10 173:6

**lots**  203:18

**lovely**  209:16

**lumped**  57:20

**lumping**  71:20
103:21 115:2

**lustig**  139:23
142:12,21,21
143:1,1,3,5,9,17
144:2,21,22,23
144:23 145:3,4
145:10 153:5,5
153:15

**lux**  78:6,6 79:8
79:12,15,21
83:8 115:17

**luxalpha**  9:23
38:9 39:13,16
39:18 42:5,7,19
43:8 45:22
47:19 49:15
54:21 55:22
56:3,4 59:24,24
60:1,4,5,9 61:5
61:7,9,10,19,22
62:1,8,10,19

10-03635-jpm    Doc 1000-11    Filed 01/20/23    Entered 01/20/23 21:43:50    Exhibit 16
- Sept. 14   2022 Status Conference Transcript    Pg 95 of 123

[luxalpha - march]                                                    Page 40

63:4,9,13 64:5
64:11 65:10
66:1,3,17 70:11
70:12,23 72:2
73:19 74:1,2
75:3 77:9 79:17
79:24 81:19
82:6 85:17 87:5
88:21 90:6,8
91:4 92:25
93:15 106:8,19
106:24,25 107:2
107:5,9,11,16
108:9,12,13,16
109:4,7,20
111:5,10 113:24
114:13,24 115:8
115:14,23 116:3
116:16 117:2,25
118:10,12,13
119:19,22
**luxalpha's**  61:20
61:23 62:2
63:21 64:4,8,13
64:15 65:21
77:7 78:13 79:9
79:13,17 89:10
89:23,25 90:2
110:2 115:13
**luxembourg**
2:10 6:7,14 8:2
8:9,15,20,21
9:14,15 13:23
16:11,18 18:13
19:6 27:1 36:9
36:18 37:12,13
39:10 42:13
43:3,6 45:20,21
46:4 47:17,18
48:8,13,21

58:14 59:21
61:4,5,8,18,24
62:2,6,9,14,23
63:14,17 64:12
64:19,20,24
65:1,7,11,16,17
66:22 67:12,19
73:9,10 78:3,4,5
79:8 80:6 83:17
86:7 89:22
108:10,24
**luxembourg's**
63:8,10
**lying**  109:11,12
**lyondell**  170:18

**m**

**m**  9:8
**ma'am**  69:13
96:7
**madof**  112:10
**madoff**  1:7 2:5,7
2:16,18 3:2,4,13
3:15 10:9,10,24
11:1,15,16
38:16 39:14,18
42:18,21 43:8
51:2,7,11,13,17
52:3,16 53:6,16
72:3 75:2,9
77:18 82:6,13
87:1 88:3 89:21
90:9,20,22
91:10 93:13
95:2,4,5 100:9
107:3,6,7,20
109:2,2,10,13
109:14,16 110:7
112:1,1,11,13
113:20 125:8
128:2,18 129:7

129:16 130:4,24
130:25 131:25
135:1 138:1,5
139:5,13 143:18
152:13 169:2
184:11 189:7,12
189:19,21,25
190:16 191:17
191:18 198:25
201:17,21
**madoff's**  52:13
77:21 104:20
110:4,22 111:3
111:7,13 112:3
112:15 135:1
173:5
**magnon**  37:14
**magon**  8:24 9:1
9:2,4
**mail**  39:14
**mailings**  47:12
**main**  22:23
66:13,14 132:13
**maintain**  90:25
135:20
**maintained**
31:23 43:5,17
190:5 194:15
**maintaining**
59:25 67:7
191:10
**maitre**  8:22,23
9:24
**major**  23:13
50:23
**majority**  127:7
127:8
**making**  38:3
56:15 65:8 74:8
78:12 98:10

112:2 149:22
184:21 186:23
**managed**  19:7
47:10 127:20
130:3 131:1
**management**
8:20 9:15 36:19
37:11 47:17,21
47:23,25 48:3
48:11,17,20
54:16 58:15
59:22 61:6,19
61:25 63:20,21
63:21 64:3,3,5,8
64:13,16,18,21
64:22,23,24
65:6,9,13,14,15
65:19 66:7,13
66:17,17 67:20
73:8 74:16 78:4
78:13 79:16
83:20 86:7
89:22 186:10,15
**manager**  47:19
55:22 61:7
64:13,15 79:17
79:23 89:11,12
89:23 90:2
174:6 189:20
190:8 198:12
**managers**  64:20
79:13 107:19
**manages**  174:1
**managing**
111:10 138:15
173:13
**manner**  152:25
**march**  130:5,9
146:16 163:13

marine  180:20
market  126:7
  138:22 143:16
  144:1 160:22
market's  144:11
  144:16 145:17
marketed  88:17
marketing  24:11
  84:24 85:1,3
markets  10:16
  11:6 15:18
  123:21 124:25
  125:1,6,9 126:1
  126:4,12,12,17
  126:25 129:2,4
  129:23 131:18
marshall  9:13
  13:19 36:13
  38:6
matching
  164:18
material  33:16
math  121:15
  129:14
mathematical
  56:18
matter  1:5 28:1
  36:6 60:15 79:3
  136:18,22,25
  170:7 183:2
matters  60:16
  123:10 190:11
  191:11
mayer  117:11
  119:8
mean  29:16,17
  71:14 97:5 99:4
  102:14 156:21
  187:25 195:21

meaning  42:19
  120:18
means  24:21
  32:25 52:23
  56:7 78:15
  119:5 137:12
meant  109:9
mechanical
  126:15
meet  19:23
  25:19 32:8,19
  32:22,24 33:20
  49:24
meeting  21:1
  42:22,22 91:12
  105:4 108:21
  122:14
meetings  47:6
  48:1 62:10
  81:12,14,17,22
  90:15,20 91:10
members  64:2
memoranda
  173:4 178:22
memorandum
  10:5,20 11:3,11
  170:4 173:2,9
  175:25 182:10
  189:18,19
  190:24 196:21
memorandums
  173:7
menashi  127:2
  133:15
menashi's
  133:18 137:8
mental  49:24
mention  53:2
  71:22 82:4 95:4
  127:14 190:11

mentioned  43:3
  44:15 53:12
  55:1 81:18
  97:21 106:12
  110:4 136:16
  139:12 183:25
  188:2 191:21
  202:17 203:15
  206:23
mere  82:23 84:3
  84:9,19,23 85:3
  86:19 88:6,10
  88:11
merely  27:9
  43:10 105:8
merit  25:18
  132:25
merits  24:25
  27:22,23 49:8
merkin  50:2
  52:7 120:16,23
  121:2
message  156:22
met  49:20
  118:23 181:2
metadata  24:4
  33:1
method  144:5
michael  14:24
michelle  13:8
  37:1 41:1 69:15
  102:25
mid  47:19 129:9
middle  162:1
midland  180:20
migani  176:14
million  23:21
  26:19,20 27:6
  54:13,18 55:20
  56:7,8,19,20,23

77:15,20 94:11
  99:5,16 104:6
  111:11 121:11
  121:12,13,15
  125:7,17,21
  126:21,21 129:3
  129:6,10,12,14
  129:15 130:7,11
  130:12,23
  131:24 132:1
  142:1 146:16,20
  147:3,4,6,18,19
  147:19 148:21
  158:23,23
  159:22 160:2
  163:25 187:13
millions  82:9,12
  94:6
mind  18:5 73:17
  152:6 156:8
  169:4
minds  200:20,21
mineola  210:23
minimal  47:1
minimum  55:11
  91:23 172:13
  175:8 179:20
  182:23 183:13
  190:4 191:3
minnesota
  139:21
minute  16:12
  68:21,24 154:3
  154:22 190:18
minutes  36:1
  46:23,23 123:23
  204:9
mirror  84:18
misapprehensi...
  208:7

10-03635-jpm   Doc 1000-11   Filed 01/20/23   Entered 01/20/23 21:43:50   Exhibit 16
- Sept. 14   2022 Status Conference Transcript   Pg 97 of 123

[mischaracterizations - need]                                    Page 42

mischaracteriz...
173:12
misheard
124:14
misplaced
133:18 139:23
140:5
missed   145:23
missing   24:3
30:4 50:24
103:8 109:4
145:8 203:11
misunderstand
203:9
misused   141:9
mitchell   5:9,20
6:25 7:12
mm   34:10
moment   49:22
54:22 67:25
93:10 123:14
154:6 178:16
183:4
moments   55:1
133:24
money   38:16
43:25 69:6
73:18 74:5,20
74:20 89:17
97:6,18 99:8,14
109:9 126:5,11
129:15 131:7
138:4 143:18
153:19 157:5,7
158:9 165:25
166:6,18,20
173:19,20
179:25 181:12
181:16 189:13
199:16 201:18

208:4
monies   68:4,15
79:19 84:12
95:15 99:3
117:18,24
121:23
months   129:9
131:22 200:4
moore   9:23
morning   16:2,8
26:16 36:12,25
37:2,18 38:12
40:9 58:6,7 86:1
morning's   40:19
morris   4:6
mortgage
139:24
motion   5:5,15
6:6,12,22 7:8,25
8:7,17 9:8,11,12
10:14,21 11:4
11:12,18,23
20:22,23 22:5
24:22 27:17,18
39:6 45:11
46:16,18 49:6
58:10,21 59:3
62:16 75:24
86:5 96:9,19,20
101:21 124:5,21
126:19,22
132:14 142:18
142:24 150:5
154:18 155:18
159:17 161:16
165:5,6 166:14
168:3,24 170:2
171:3 172:2,2,4
172:6 197:14
202:23,24 204:7

204:15
motions   10:6
170:8 184:24
197:12,15
movant   203:7
move   72:24
80:14 114:18
126:23 129:21
169:11 187:7
188:5,7 191:20
192:10
moved   37:25
39:9 44:12 49:9
54:6 58:12 86:8
109:3
moving   22:22
38:13 39:1,20
43:4 48:9 49:8
73:5 82:23 84:7
85:9 96:23
119:11 175:19
muchin   15:2
37:5
muffly   14:19
204:3
multi   187:1
multiple   50:17
66:15 96:1
108:11 109:7
140:22 146:9
193:22
mute   69:2,9
102:23 120:2

n

n   13:1 16:1
210:1
n.a.   2:21 10:13
10:15 11:5
n.y.2d   180:20

n.y.3d   180:21,21
name   16:7,18
17:18 18:8
36:10 37:14
45:19 46:2
69:14 72:20
101:25 102:24
123:17 154:8
203:24 204:2
named   51:19
126:1
names   34:2,3
36:14 37:6 40:7
87:17
narrow   30:1
33:10 209:11
nation   137:2
national   162:1
nationality
162:2
nature   30:4,5
138:2 139:7
192:12
naval   96:16
navigate   22:19
nearly   84:1,8
87:22
necessarily
28:12 173:11
201:21
necessary   22:14
26:11 33:22
37:15 78:13,18
171:3,9 208:18
need   21:14
22:17 28:15,16
29:9,9,11,11
32:13 33:7,16
34:5 57:9 69:4,5
69:20 73:22

10-03635-jpm    Doc 1000-11    Filed 01/20/23    Entered 01/20/23 21:43:50    Exhibit 16
- Sept. 14   2022 Status Conference Transcript    Pg 98 of 123

[need - numbers]

Page 43

82:15 94:2,24
95:8,13 116:6
117:17,22
119:17 122:3
128:21 150:13
157:10 200:10
202:22 203:9
206:7,8 209:2,8
**needed**  60:6
84:9 95:7
108:25 162:19
**needing**  202:18
**needs**  33:6 53:4
55:12 120:12
154:3 160:1
185:7 201:2
204:18 207:6
208:18 209:7
**negate**  166:21
**negotiate**  177:7
**neither**  84:7
111:25 181:7
**nemetz**  6:15,16
8:10,11 14:10
17:15,16,20,20
17:25 18:2,5,7,9
18:11 26:23
27:6 28:9,13,14
28:20 30:9,11
30:15,18 31:10
31:16 32:12,14
32:18,21 33:9
33:11,19 35:16
36:4
**net**  46:1 62:2
77:5 89:14
92:20,21,23,24
128:3 143:16,16
144:4,5,6,7,11
144:13 145:14

145:18,19,24
153:10,13
178:11
**never**  24:23
32:11 42:22
78:25 111:7
147:5 148:16,16
148:17
**new**  1:2 3:25
13:6,17,25 14:7
14:15,22 15:5
15:13,21 35:13
60:3,14,16,20
61:16,16 62:24
62:25 63:14,19
63:24 64:7,10
65:18 66:25
67:9,16 75:13
75:15 77:18
81:15,23 82:24
84:16 86:10,21
87:6,10,24
88:10,15 89:2,8
89:20 90:13,15
90:19,21,23
91:8,10,12,20
92:11 94:13,21
94:23,25 95:2
95:10,11,16
97:22 105:3
139:21 151:25
173:14 175:21
175:21 176:7,10
176:17,19,20,23
176:24 177:4,9
177:9,12,15
179:23 180:8,11
180:12,16,16,24
180:25 181:1,18
181:20,21 182:2

182:6,12,19,24
183:2,2,4,5,21
188:16,24 190:2
190:9,10,13
191:6,10,13,25
192:12,13,14
193:14,25 194:2
194:9,11,15
195:14,18,24
196:11,19,20,23
196:25 197:7
199:7,13,14,19
199:21 200:22
201:24 207:20
**newly**  166:17
**nine**  169:22
183:10
**nominal**  79:21
90:6
**nominally**  89:23
**nominee**  202:5
**non**  58:22 81:18
89:21 92:12
105:21,22
158:11,14 166:3
166:22 170:8
175:5 180:25
182:2
**nonsensical**  26:2
**norm**  51:9
**normal**  27:22
**north**  10:15 11:6
15:19 123:22
**notably**  55:5
**note**  41:4 55:18
104:8 108:1
113:24 171:2
**noted**  36:22
70:11,16 108:5
108:12 111:25

112:2,9 113:20
117:10 118:13
144:2 149:21
**notes**  51:7
**notice**  5:4,24 6:2
6:5,17,21 7:18
7:21,24 8:12
9:11,20 19:19
23:15 50:6
61:21 71:2
129:6 154:21
158:2 159:20
204:23
**noticeable**
131:13
**noticed**  51:17
**notify**  126:11
**noting**  51:6,14
**notion**  49:1 95:6
**notwithstanding**
93:16 94:16
137:8
**november**  63:22
126:21
**nudge**  162:13
163:6
**nudging**  161:13
**number**  16:25
19:2 21:9 24:10
24:12 25:25
28:4 30:16
49:11 71:13
72:24 83:10
92:10 124:7
147:2 152:11
153:13 187:19
191:15 193:2,7
194:24
**numbers**  124:15
168:21 194:19

10-03635-jpm    Doc 1000-11    Filed 01/20/23    Entered 01/20/23 21:43:50    Exhibit 16
- Sept. 14   2022 Status Conference Transcript    Pg 99 of 123

[numerous - opposition]                                                          Page 44

**numerous** 62:22
64:2 88:20
90:13 91:15
189:24
**ny** 3:25 13:6,17
13:25 14:7,15
14:22 15:5,13
15:21 210:23

---

**o**

**o** 4:5 16:1 210:1
**object** 156:10
**objection** 156:9
156:11
**objections** 19:22
**obligation** 32:6
99:20 102:7,7
198:13
**obligations**
20:15 148:18
**observed** 81:3
84:14
**obvious** 24:3
**obviously** 49:10
51:12 123:2
157:5 159:12
169:16
**occasion** 154:24
**occasions** 50:17
**occurred** 21:22
26:19 28:7
44:15 45:10
46:4,5 60:20
62:20 67:9
110:3
**occurrences**
171:19
**october** 18:19
18:19 33:4
35:10 205:1

**odd** 51:8
**oddities** 51:8
**odier** 202:20
**offer** 110:17
**offered** 23:5
**offering** 190:4
190:12 191:4,12
**office** 14:12
19:12 75:13
77:18 94:13,22
94:25 154:11
191:10
**officer** 80:23
81:5,7 96:24
97:7 99:17
101:4 110:5
**offices** 35:16
41:25 42:4 67:7
76:22 83:16
190:9
**official** 55:21,21
77:7 89:10
**officially** 64:4
**offset** 143:9,15
143:19 144:25
**offshore** 74:4
78:1 79:2 89:16
95:16
**oh** 17:2 18:2
26:24 32:20
57:6 58:3 114:6
154:16
**okay** 16:12,12
16:16 17:5,10
18:4,10 26:24
30:8,17,23
32:17 34:16
36:5 40:12,18
41:7,9,16,20,21
55:23 58:6 69:4

69:17,17,24
70:5 72:12
73:17,23,24
75:22,23 93:5
96:18 98:23
102:10 103:17
103:25 104:2
106:2 113:10,15
113:22 114:6
115:11 116:15
122:5,19 123:4
124:2,14,16
129:25 145:7,11
145:12,15
150:16,21 155:3
156:14,15,17,22
164:13,15
167:16 186:4,20
190:25 191:1,14
193:17 195:2,11
201:19 208:22
209:1,14
**old** 210:21
**omissions** 51:23
**omits** 89:4
**omnibus** 9:22
**once** 150:13
192:11 208:11
**onerous** 208:3
**ones** 39:19
125:19 184:22
197:14
**onward** 200:5
**op** 143:23,24
146:3
**opened** 39:16
109:4
**opening** 152:22
**opens** 111:2

**operate** 60:10
75:13
**operated** 47:10
80:17 84:11
87:4 106:19
108:19 134:12
135:9 139:13
152:25
**operating** 75:15
107:2
**operation** 63:11
87:18
**operations**
134:20 135:6
**operative** 54:25
55:3
**operator** 89:12
138:2
**opined** 189:9
**opinion** 104:24
123:2 125:25
137:7 154:2
170:9 172:21
201:15 209:17
**opinions** 170:14
171:23 202:20
**opportunity**
41:5 45:15
50:21 88:19
208:12
**opposed** 128:11
129:16
**opposite** 85:8
**opposition** 10:5
10:6,20,21
11:11,12 46:6
46:11 53:14
58:10 67:21
85:11 86:5 97:4
99:18 143:1

182:10 188:13
196:7 202:19
option   114:1
options   66:19
107:6,8 110:7
112:2
orchard   175:14
order   12:9 19:25
21:15 22:18
25:5,9,15,18,21
26:1 28:11 60:7
62:6 80:20
101:15 117:15
117:18 159:1
168:16,23
180:11 189:17
ordered   21:14
22:7 198:13
orders   25:11
203:16
ordinary   31:24
181:19,23
182:25
oren   10:8 13:9
original   44:12
128:13 179:5
originally   27:21
108:19 125:9,17
originated   43:25
55:17 63:7
207:25
originating
115:24
osus   88:2 91:9
93:21
outcomes
178:12
outset   207:22
outside   24:19
60:18 76:4,5,6,8

76:24 77:12
78:10 80:2,5,8,9
80:18 83:15
85:17 86:24
94:19 95:16
120:15 136:15
outsider   117:12
overbroad   137:5
137:13,17,18
139:1
overlap   83:25
84:15,17
overlooking
109:8,11
overridden
180:18
overrides
173:11
overruled
174:25 198:20
overseas   44:20
overseeing
174:6
oversight   54:2
66:12
owned   87:22
ownership   77:1
80:21,25 83:24
84:1,5,6 87:21
88:8

**p**

p   13:1,1 16:1
pa   157:17
167:22 168:12
paccione   8:18
15:7 37:4,9,17
72:14,14,17,22
73:13,24 74:21
74:25 75:19,23
89:3,18 90:14

92:1,19,21,22
93:7 97:21
98:14 115:11
page   21:9 23:8
77:4 85:11
95:24 96:3,23
97:4 100:4
102:15,17
152:22 190:19
190:23 191:2,3
191:8,9,11,13
193:2,3,6,9,10
193:15 194:5,6
194:10 201:15
205:5,7
pages   18:24 24:1
24:3 27:16
85:11 170:3
171:25 183:10
191:5 193:13
194:5
paid   54:20 71:18
71:19 73:18
76:8 99:3
118:11 119:22
130:7 138:7
139:7 157:6
158:9 159:12
166:2,3,4
panic   41:15
panicked   41:12
paper   21:1
92:14
papers   46:6,11
53:14 56:25
57:1 58:16 59:8
62:18 65:24
85:23 95:19,22
96:19 99:18
102:22 105:24

106:6 110:16
137:20 142:24
150:17,18,25
152:1 155:15
163:16,17
189:20
paragraph
42:11 50:16,17
50:20,22 51:5
51:20 53:18,21
54:11,18 55:1,1
55:6 61:23 66:9
66:20 70:3
71:13 77:9
99:15 116:12
134:15,18 135:2
135:23 141:9,11
168:21,22 188:1
188:23 189:1
193:15,15
199:11 202:9
204:25
paragraphs
53:18,20,25
71:17 134:13,21
135:16 136:1,8
141:3,6 169:5
169:21,22
parent   70:19
paribas   108:20
park   13:16
14:21 170:20
parrot   122:1
parsing   183:9
183:11
part   41:4 54:3
54:20 60:4
94:18 105:9
121:9 122:9
130:22 147:7

10-03635-jpm   Doc 1000-11   Filed 01/20/23   Entered 01/20/23 21:43:50   Exhibit 16
- Sept. 14   2022 Status Conference Transcript   Pg 101 of 123

[part - personal]                                                          Page 46

148:10,16,16,24
153:7 155:22
157:10,14
181:15 192:23
197:3 199:9
201:6 203:12
**partial** 129:19
**partially** 28:14
162:2
**participant**
181:6,14 182:16
199:22
**participate**
200:7 208:12
**participated**
62:11 106:1
**participating**
64:21 66:1
**particular** 32:13
71:16 94:1
108:3 118:19
153:2 205:10,14
**particularity**
139:13
**particularly**
58:20 104:13
206:20
**parties** 18:3
20:17 67:10
94:4 105:23
142:2 151:21
174:16 175:7,10
177:7 178:12
182:1
**partner** 104:9
**partners** 8:23
37:13 73:10
79:7 86:8 90:5
**parts** 103:15
108:5 168:25

**party** 9:15 21:23
36:18 47:17,21
47:22,25 48:3
48:11,17,20
54:16 58:15
59:22 63:20,20
64:3,3,16,18,21
64:23 65:6,13
65:15,19 66:16
67:20 143:17
153:8 174:22
207:1
**party's** 143:21
151:16
**pass** 43:7 110:3
166:19,20
181:20
**passed** 132:8
190:12 191:12
**passing** 166:18
**passively** 48:4
60:10
**passthrough**
194:13
**passthroughs**
199:10
**path** 108:24
**pathway** 163:24
**pathways** 53:15
53:23 116:7,13
163:9,10,22
185:2,9
**patience** 154:20
184:14 209:15
**patient** 124:1
**patrick** 9:6
37:13 80:13
86:8 107:14
115:19

**paul** 9:25 135:4
**pay** 126:4,14
135:4,5
**paying** 166:17
**payment** 39:24
70:10,14 151:11
**payments**
116:24 130:10
130:12 131:20
132:6 134:25
135:22 165:25
166:24 167:3
173:15 179:22
182:25 187:4
**payroll** 97:15
98:5
**pendency**
179:10
**people** 17:9 34:2
34:3 50:18,21
52:15 74:5
82:10 100:15
109:10 120:8
122:15 124:13
**percent** 75:1
89:5 98:8,19,21
115:13 188:19
189:22 190:21
191:18 198:22
199:2
**percentage** 98:6
**pereira** 150:22
151:2,3,3,9
**perfect** 35:15
**perfectly** 41:18
205:2
**perform** 95:25
104:21,25 110:9
110:10 116:2
205:10

**performance**
64:8,9,9 79:16
107:18 126:6
**performed** 32:4
39:22 71:25
86:24 87:9,14
90:10 100:9
106:16 174:13
**performing**
45:23
**period** 46:8 47:3
56:9 79:9 80:17
99:6 102:2,19
114:13 130:8
131:25 173:16
206:16,18
**periods** 98:16
**permissible** 25:2
168:4
**permission**
17:15 40:21,22
72:23 156:7
**permit** 40:5
63:15 72:11
111:11 160:7
179:1
**permits** 106:10
147:13 160:5
169:11 178:25
**permitted**
146:22
**perpetuate**
109:17
**person** 32:19,22
33:21 35:11
156:22 177:3
**person's** 181:1
**personal** 24:15
24:19,23 26:9
39:1,7,7 44:11

10-03635-jpm    Doc 1000-11    Filed 01/20/23    Entered 01/20/23 21:43:50    Exhibit 16
- Sept. 14    2022 Status Conference Transcript    Pg 102 of 123

[personal - pled]                                                                    Page 47

44:14 45:6 48:9
49:5,6 55:13
58:11,12,17
59:6,18 61:3
62:16 63:16
67:18 72:9
85:22 86:6,9
103:23 155:14
158:14 164:10
169:11,19,20
170:24 171:12
174:14 177:21
177:23 180:6
182:1 183:8
188:6 191:22
192:6 196:9
202:14
**personally** 82:3
135:1
**personnel** 87:9
**perspectives**
200:22,23,24
**persuaded**
184:14
**peter** 135:4
**phone** 46:7,9,13
46:21,22,25
47:2 77:19,19
**phrase** 93:24
161:13
**physical** 56:18
**picard** 2:4,15
3:1,12 8:14 10:8
10:12,23 11:8
11:14 12:5 21:4
37:2 46:15 58:9
86:3 117:11,14
118:3,21 119:8
119:8,11 123:15
142:12,20 154:7

163:12 189:10
201:14 203:23
**picked** 16:21
**pictet** 180:21
**picture** 117:9
**pie** 153:16
**piece** 192:9
193:21
**pieced** 200:13
**piecemeal**
188:12
**pieces** 49:12
200:13
**pierced** 81:2
**piercing** 83:11
**place** 20:6,21
25:16 31:9
32:18 45:1,1
81:14 85:17
93:19 95:16,16
104:23 109:24
135:7 182:2
185:15
**placed** 46:22
189:11 201:16
**placement** 173:2
173:3,7 189:18
189:19 190:24
196:21
**placements**
196:15
**plain** 104:4
114:20 137:3,13
138:9 139:2
168:2,5,9 169:9
187:17 204:17
**plaintiff** 1:14,22
2:8,19 3:5,16
22:13,13 86:15
88:4 120:21,21

156:3 157:21,21
158:3,4,8
159:21 160:25
161:23 162:23
164:20 166:21
167:1 168:16,19
168:20 169:4
170:24 171:2
172:1,9 173:8
174:8 175:9
177:25 178:1
180:15 182:10
184:5 205:8,21
**plaintiff's** 156:1
160:22 166:11
169:19 172:5
**plaintiffs** 5:23
5:24 6:2 7:16,18
7:20 94:5
160:17 170:12
175:6 198:8
204:16
**plan** 57:15
**plans** 206:5
**plate** 36:6
**plausibility**
188:22
**plausible** 106:17
111:12 117:23
118:7,15 121:15
129:13,15 132:4
160:14 161:14
162:14 171:10
188:18 189:25
191:19
**plausibly** 132:7
135:8,10 156:3
171:9
**play** 101:20

**played** 42:4
67:11
**players** 67:11
**playing** 66:11
**plays** 66:6
**plaza** 13:5 15:4
15:20
**plc** 183:23
**plea** 151:22
**plead** 52:8,11,22
53:4 55:9,23
110:25 111:20
128:21 149:6
207:23 208:18
**pleaded** 58:21
88:4 159:24
171:7
**pleader** 114:21
204:17
**pleader's** 171:20
**pleading** 86:15
114:18 116:5
118:20 149:14
163:8 166:13
172:3 207:17,20
208:2
**pleadings**
103:13 166:22
167:5 171:6
**pleads** 50:10
**please** 17:19
18:6 36:16
113:16 123:24
155:5 156:20
163:16 165:7
167:15 169:13
188:7 197:24
198:1
**pled** 49:14 61:1
88:9 90:12

106:8,25 158:25
**pllc** 14:4
**plus** 130:17
**pm** 209:24
**point** 18:20
22:17 25:8
26:12 29:18
44:9 45:5 48:18
54:5 55:14
59:14 71:7,10
71:22 74:10,17
75:24 79:21
82:15 84:22
90:21 94:1
95:20 98:15
99:10 101:1
104:13 105:7
111:16 125:17
126:8 127:12,25
128:25 130:15
145:23 147:22
159:15 167:9,22
169:10,16
174:18 178:2,23
180:12 183:22
185:8 196:5,5
197:24 198:1,3
200:16
**pointed** 27:6
71:14 104:3
116:11,17
118:18 119:10
161:3 162:5
196:1
**points** 22:23
57:16 80:21
86:22 89:18
93:8 152:5,6,9
152:22 169:12
172:13 174:8

204:14
**policies** 22:11
**policy** 65:10
78:11 138:18
**ponzi** 23:19 51:2
52:16 101:24
127:4,9,10,13
127:14,21,23
128:6,23 132:18
132:21 133:3,5
133:12,16
134:12 135:9,12
135:20 136:11
136:14,17,18,21
136:25 137:2,5
137:8,11,16,21
137:23,24 138:1
138:1,8 139:1,8
139:8,10,13,15
139:16,18 140:8
140:9,20 141:2
141:21 152:11
152:13,15,16,17
152:18,20 181:9
182:11,13,15,16
**pool** 137:24
**portfolio** 47:19
61:6 77:7 79:13
79:17 89:15,23
90:1,2
**portion** 55:16
56:17 79:16
131:17 158:12
159:25 163:3
167:3
**portions** 80:25
84:24
**position** 22:14
28:4 107:23
131:2 140:9

155:15 168:7
171:17 174:16
205:23
**positions** 22:22
**possibilities**
160:6 161:11
162:11 163:6
**possibility** 33:4
33:8 158:19
160:8,9
**possible** 30:2,16
51:22 121:15
138:4 139:4
158:22 160:11
160:12,13
161:14 162:3,13
163:2,4 166:23
**possibly** 25:13
56:10 102:11
**posture** 151:4
**potential** 21:20
23:4 26:11 43:1
77:8 111:6
205:20
**potentially**
23:14 78:19
**power** 40:11
141:25
**powers** 146:9
**ppm** 173:18,19
173:23 174:3,8
189:21,21,24
190:5,14,15
198:22
**practice** 26:25
66:12
**practiced**
161:25
**practices** 25:22

**pre** 5:5,15 6:6
6:12,22 7:8,25
8:7 202:21
**precedent** 45:9
101:24 133:9
162:21 167:11
178:21
**precedents**
177:18
**preceding** 27:5
**precise** 133:8
**precisely** 20:25
22:16 147:17
205:1 208:10
**predecessor**
86:20
**prefer** 150:12
**preference**
128:10 140:15
**prejudice** 20:19
26:6 155:22
187:24
**prejudices** 20:21
21:18
**premise** 207:16
**prepare** 205:17
205:22 207:7
**prepared** 154:25
**preparing** 25:24
45:25
**prerequisites**
49:19
**presence** 178:15
**present** 87:24
105:4
**presentation**
73:23 160:6
200:16
**presentations**
74:7

10-03635-jpm    Doc 1000-11    Filed 01/20/23    Entered 01/20/23 21:43:50    Exhibit 16
- Sept. 14    2022 Status Conference Transcript    Pg 104 of 123

[presented - produced]                                                Page 49

presented 46:24
96:20 105:5
122:11 155:20
161:10 171:20
200:23,24
presenting
105:25
presents 111:15
preservation
19:21 20:1
22:13,18 23:6
24:18 25:5,12
27:20
preserve 19:7
20:20 21:22
23:15 26:10
preserved 19:10
27:3 28:16
92:17
preserving
23:10
preska 21:15
presumes 139:9
presumption
127:5,9,10,13
127:15 128:7,23
132:18 133:4,6
133:12,17
136:11,14,17,19
136:22,25 137:2
137:5,9,12,14
137:16,17,21
138:9,10,21,23
139:1,3,8,16,19
139:25 140:9,20
141:21 152:11
152:15 170:10
170:12 171:8
presumptions
138:12,14,17

pretty 85:1
120:5
prevail 150:4
178:12
prevent 109:10
109:16 177:10
previous 142:18
previously 66:15
66:22 70:11
118:13 200:25
price 190:4
prices 107:12
112:4 113:11
191:4
prima 59:18
63:13 86:16
88:4 91:13,22
primarily 35:3
85:14
primary 87:7
127:24,24
prime 130:2,5
131:24,25 132:3
134:7 135:12,14
135:18,25 136:3
136:6 139:14
142:1 143:15
144:12 145:18
146:13,15,17,21
147:1,3,4,6,18
147:20 151:18
principal 45:1
48:22 80:18
85:6 128:9,19
153:4 184:1
190:9 191:10
200:13
principally
175:5

principals 65:2
117:19
principles
133:11
printed 24:8,14
30:19
prior 49:12
52:24 74:7
96:14 163:20
171:23 172:1
174:25 185:16
185:17 197:16
201:2
private 16:6
112:10 173:2,3
173:7 189:18,19
190:24 196:21
privee 1:16,24
5:2 6:20 16:5
privilege 40:2
48:5 172:17
176:17 177:3,14
188:15 197:7
privileges
176:24 183:20
193:24
privy 65:3
pro 147:8
probability
52:15 138:18,24
139:4
probably 46:11
51:12 188:3
probative 170:2
probity 200:10
problem 53:8
105:15 205:3
problematic
101:24

problems 51:14
procedural
151:4
procedure 20:16
21:20 25:3
161:22
procedures
109:24,25
proceed 155:3
176:16
proceeding 5:1
6:19 8:14,17
9:11,22 10:12
10:14 11:8,23
12:5 16:4 21:8
108:13 124:9,18
140:7 148:25
178:1,5,8,9,16
178:18,25 179:4
179:9,14
proceedings
148:12 187:20
209:23 210:4
proceeds 136:4
process 32:9
126:15 175:4
208:16
produce 29:10
29:18,19 32:10
32:11 107:10
112:3
produced 23:24
27:4,15,16
28:23 29:1
30:12,19,22
31:19,20,22
77:16,21,22
92:2,10,11 94:7
134:20

**product** 19:8
**production** 5:23
  7:17 18:23,24
  21:10 24:9
  30:21 92:3,13
  92:16 94:18
  117:2
**productions**
  77:23 117:4
**profits** 93:1
  128:4,8,8
  134:20 143:6,10
  144:25
**profusely**
  123:11
**progress** 200:21
**promised** 20:8
**promote** 89:23
**promoted** 88:17
**promoter** 42:7
  42:12 65:21
  66:3,6 70:17
**prong** 81:11
  205:3
**prongs** 81:10
**proof** 83:9
  138:15 149:25
  178:18,18,24,24
  179:3
**proofs** 177:19
  178:3,6 179:18
**prop** 135:1
**proper** 131:8
**properly** 46:12
  62:15 80:11
  167:17 179:12
  207:10
**property** 56:10
  103:13,15 115:1
  115:24 118:8,16

132:24 133:8
136:7 142:9
146:22 147:1,8
147:15,15 148:1
148:7,8,9,15,21
148:23 150:24
151:24 155:13
155:25 156:2
157:12 158:10
158:13,19
159:13 164:14
164:23 165:4
166:3,23 184:19
185:1,14 187:3
187:6 197:4
**proposed** 19:1
  19:23 54:7 55:4
  108:24 121:21
**proposing**
  155:19
**proposition**
  23:13 144:3
**proprietary**
  135:2
**protect** 90:7
  107:19 108:14
  175:5
**protected** 52:25
**protections**
  172:20
**protective** 19:25
  25:9,15,18,21
  26:1
**protects** 125:23
**prove** 83:10
  105:7 149:7,16
  166:12 205:20
  205:23
**proves** 95:14

**provide** 20:12
  22:12 38:20
  101:8,11 107:21
  114:20 116:12
  117:8,9 133:20
  177:21 180:1
**provided** 62:3
  72:6 88:25
  91:19 95:15
  97:22 100:10
  126:4
**provider** 70:2
  111:5 115:1
  116:10
**providers** 38:17
  38:19,23 59:24
  59:25 76:3,8
  83:18 84:13
  85:21 106:22
  109:21 110:2
  114:24 115:8,21
  118:10,11,12
  119:23
**provides** 147:24
**providing** 38:23
  63:5 68:16 76:4
  76:10 79:2
**proving** 54:23
  82:17 149:14
**provision** 176:7
  176:8,9,25
  177:1,6 192:15
**provisions**
  127:17
**public** 138:18
**pull** 69:8 82:24
  153:12
**pulled** 56:1
**pulling** 70:4

**punch** 41:15
**purchase** 134:14
**pure** 93:24
  198:15
**purely** 60:21
  76:15 77:1
  169:22
**purport** 203:14
**purported** 46:14
  77:19 107:6,8
  125:3,6
**purportedly**
  109:15 110:7
  164:4
**purports** 46:20
  56:4
**purpose** 42:11
  87:7 89:16
  108:14 189:5
  196:3
**purposeful**
  43:12 44:5 48:5
  78:20 172:14
**purposefully**
  59:10
**purposely** 40:2
  43:15 63:14
  66:24 89:1 91:7
  109:9 172:17
  188:14 193:23
  194:21 195:18
  197:6 198:2
**purposes** 44:3
  72:23 78:6 81:1
  83:3 125:4
  172:6 187:22
**pursuant** 81:16
**pursue** 106:10
  114:12

10-03635-jpm    Doc 1000-11    Filed 01/20/23    Entered 01/20/23 21:43:50    Exhibit 16
- Sept. 14    2022 Status Conference Transcript    Pg 106 of 123

[push - received]                                                    Page 51

push 160:13
put 36:16,22
  50:5 71:1 72:20
  91:24 101:19
  102:15,22 123:3
  160:19 166:13
  166:15 168:21
  168:23 169:25
  172:13 201:5
puts 23:14 173:8
puzzle 192:9
  193:21 200:12

**q**

quarterly 90:19
  90:20 91:10
quashing 107:15
question 28:22
  49:14 53:5 69:5
  69:18,23 72:8
  74:19,22 76:17
  111:15 112:18
  113:5 119:14
  148:21 165:2,3
  185:19 189:6
  209:3
questioned
  127:4 142:18
questions 17:23
  19:20 22:10
  25:12 26:13,14
  33:23 57:2,21
  67:24 73:2,15
  73:15 90:24
  96:5 97:10
  107:16 111:2
  119:24 129:20
  180:10 187:8
  188:5 197:18
quick 33:6 35:25
  68:8 71:11

120:9 152:2
  203:5 204:9
  208:24
quickly 150:21
  153:5 164:25
  168:20
quite 106:18
  116:11
quote 45:5 61:22
  77:9 84:1
  117:15 119:2,10
  152:24 185:16
  202:21
quoted 93:24
  96:23 105:2
  178:22 203:12
quotes 51:3,4
  52:17
quoting 84:19

**r**

r 4:5 9:13 11:14
  13:1,8,12,19
  16:1 210:1
rainbow 11:20
  12:1
raise 127:25
  149:5
raised 22:23
  23:21 31:25
  32:1 103:5
  104:19 110:3
  142:17 152:9
  189:16,17 198:3
  204:14
rakoff 88:3 91:9
  94:7
random 67:10
range 112:4
  113:11

ranged 198:9
rare 44:25
rata 147:8
rationale 144:23
  178:6,12
reached 168:7
  183:3
reaches 24:24
reaching 62:23
reacted 160:22
  160:24
read 37:6 45:5
  100:5 113:3
  120:23,25
  155:16 173:1
  185:16 194:8
reading 77:3
  150:8
ready 124:2
real 109:1
realities 151:22
really 27:24
  32:13 33:16
  42:7,17 50:10
  51:16 95:7
  101:24 102:6
  115:12 124:24
  129:2 131:7
  153:6,11 169:8
  184:22 186:9,23
  187:25 196:3
  206:1,2
realty 137:10
reason 24:13
  25:6 27:11,12
  30:3 31:15,17
  116:21 128:6
  138:15 151:18
  157:13,18 158:1
  168:6 170:1

187:19 189:8
  197:15
reasonable
  21:23 60:22
  63:17 91:25
  161:16 162:18
  170:16 189:4
  197:10
reasonably
  21:22 23:7
  140:1,3
reasoning 127:2
  142:2,12 143:11
  192:4
reasons 24:3
  26:2 56:24 81:9
  197:11 203:18
rebut 59:2,13
  71:9 97:4 120:2
  142:25 149:23
rebuttal 85:25
  93:5,5 102:23
  105:13 152:3
  203:5
rebuttals 197:24
  198:1
receipt 146:25
  157:11 185:15
receipts 54:17
receive 79:16
  87:7 89:17,24
  100:2 154:1
  156:2 158:19
  186:12,17 194:4
  194:11 196:12
  209:17
received 39:17
  39:24 43:24
  53:13 54:12,15
  54:15,16,18,21

10-03635-jpm   Doc 1000-11   Filed 01/20/23   Entered 01/20/23 21:43:50   Exhibit 16
- Sept. 14   2022 Status Conference Transcript   Pg 107 of 123

[received - reinvested]

Page 52

55:20 63:3 64:7
70:2,14,18,21
78:25 79:22
80:8 88:24 90:9
91:18 92:6,18
95:15 97:1 99:5
99:14 101:4,5
102:2,18 104:6
104:11,12
114:25 115:7,20
116:7,10,22
117:3,17,24
119:13,16
121:11,24 130:9
131:23 132:23
135:5,18 142:9
143:15 146:21
147:3,6 148:22
155:24 166:18
173:1 179:22
186:7,22 194:16
195:13 197:4
199:13
**receiving**   76:10
93:11 146:18
173:20
**recess**   69:1
123:6 154:4
**recipient**   96:25
128:7
**recitation**
188:21
**recognize**   45:18
174:20 200:17
**recognized**
111:23
**recognizes**   82:17
181:18
**recommendati...**
65:9 78:13

79:15
**recommended**
110:11
**record**   17:18
18:8 25:17
31:16 36:16
37:6,7,24 69:14
72:20 115:10
124:17 150:1
151:5 154:5
210:4
**recording**   16:20
**recordings**   17:7
**records**   61:11
62:17,18 65:4
70:23 77:22,22
92:14 98:5
116:22,23 117:2
119:18 205:19
206:24
**recover**   38:8
43:23 53:23
55:10,17 56:9
59:6 60:20
91:18 114:19
122:2 146:23
195:24
**recoverable**
54:19
**recovered**   53:1
**recovery**   114:16
**red**   50:5,10,18
50:23 55:3
111:17,19,23
152:12 205:14
205:18
**redacted**   195:9
**redeem**   126:13
**redeemed**   23:20

**redeeming**
200:3
**redeems**   126:17
**redemption**
26:18,19 27:3
28:2,7 66:21
173:15 187:4
195:7
**redemptions**
39:18 60:6,9
61:15,15 88:24
89:25 93:13
126:18 158:13
158:17,23 194:3
194:4,11,13
195:13,14,17
**reduce**   126:15
149:16
**reers**   84:20
**refer**   58:17
124:22,25 131:3
177:13
**reference**   93:9
93:10,16 130:20
145:5 158:4
173:22 177:6,14
184:20 187:7,16
187:21 199:24
**referenced**
145:5 151:9
203:17
**references**   95:21
189:21,24 190:1
**referred**   39:11
45:17 58:15,16
72:20 73:4
108:10 148:8
158:22
**referring**   37:10
104:15

**refers**   198:21
**reflect**   116:24
176:19
**reflects**   110:22
146:2
**refusal**   20:14
21:17
**refuses**   207:3
**refusing**   19:18
19:21 22:20
**regard**   75:7
79:14 81:5
85:24 87:15
93:21
**regarding**   60:23
90:24 92:16
133:8 136:14
147:23 179:13
187:15 188:11
**register**   45:24
61:13 173:5
**registered**   76:22
198:25
**registrar**   61:8
**regrettably**
167:7
**regular**   47:11
87:11
**regularly**   39:14
130:9 138:13,16
**regulations**
66:10 108:14,17
109:8
**regulator**
108:10
**regulatory**
42:13 90:8
**reinvested**   142:9
143:4,7,18

10-03635-jpm    Doc 1000-11    Filed 01/20/23    Entered 01/20/23 21:43:50    Exhibit 16
- Sept. 14    2022 Status Conference Transcript    Pg 108 of 123

[reinvestment - research]                                              Page 53

reinvestment
  143:11
rejected   133:7
  142:11 171:14
  175:7 178:1,14
  178:19 183:25
  184:25 187:18
  197:14,17
  200:15,19
relate   28:1 40:4
  71:21 91:17
  197:9
related   5:10 6:7
  7:3 8:2 9:13,25
  10:7,21 11:4,13
  22:10 23:22
  42:4,18 68:13
  74:16 75:11
  81:19,20 90:16
  98:6 127:20
  130:20 179:16
  179:17
relates   42:24
  43:21 44:6
relating   97:23
  134:4
relation   65:9
relationship
  70:20 87:1,2
  175:2
relationships
  80:1
relatively   27:22
  75:22
relevant   18:14
  20:5,6 21:7 23:2
  23:15,25 24:15
  24:18 33:24
  42:24 44:2
  80:17 92:13

99:6 102:19
  110:19 116:7
  162:22 163:9,10
  163:22,24
  175:23 176:25
  178:21 179:19
  181:1 182:7,23
  183:1,12 184:6
  184:7 185:2,8
reliance   133:17
  138:22 139:22
  140:5
relied   51:4
  147:12
relief   21:19,24
  22:3,14 26:12
  114:21 151:23
  161:18 168:15
  169:17 171:10
  171:21 204:18
relies   47:7 100:4
religion   162:2
rely   57:1 106:5
  150:22 158:25
remain   128:17
  180:24
remains   137:9
remanded
  161:24
remember   35:19
  144:20
reminded   123:9
remotely   47:14
removed   78:18
  79:14,18
render   153:1
rendered   76:17
  77:12 78:1
  80:11 85:16
  138:16

rene   9:2,5
repayment
  130:13,21
repeat   16:21
  152:7,8
repeated   20:13
  21:14
repeatedly
  133:5,7 187:18
repeating
  154:22
replaces   55:8
replies   208:24
reply   11:3,18
  48:18 152:9
  170:4 183:10
report   100:15
  208:13
reported   100:19
  107:4,11 112:4
  113:25
reporting
  122:14
reports   61:11
  77:18
represent   204:2
representations
  141:5 202:6
representative
  5:8,10,19,20 7:1
  7:3,13,14
represented
  8:22,23 9:24
  116:15
representing
  16:9 74:24
request   5:23
  7:17 18:12
  24:10,12 25:18
  90:9 207:8

requested   25:20
  195:13
requesting   5:4
  5:15 6:5,12,22
  7:8,25 8:7 9:21
  16:3 34:25
  77:17 144:15
  145:20
requests   18:16
  19:17 195:7
require   53:11
  116:20 160:17
  161:19 162:15
  162:16,17
  163:10 177:5
  206:6 208:3
required   52:20
  62:7 77:5 84:19
  89:13 104:5
  105:6,10 116:5
  133:3 136:23
  150:4 160:1
  170:7 171:15
  207:16,21 208:2
  208:20
requirement
  49:24 66:5 88:7
  187:17
requirements
  32:25 42:14
  55:10
requires   25:5
  39:25 49:22
  50:6 163:7
  164:2 204:16
requisite   106:9
  119:15 132:16
reread   121:2
research   98:11
  98:14

10-03635-jpm   Doc 1000-11   Filed 01/20/23   Entered 01/20/23 21:43:50   Exhibit 16
- Sept. 14   2022 Status Conference Transcript   Pg 109 of 123

[reserve - rule]                                                                Page 54

reserve 105:12
resided 80:16
resident 175:5
resisting 181:13
181:15
resolution 76:25
resolve 20:3
26:6
resolved 178:9
187:5
resort 128:23
resource 137:25
resources
166:12 179:11
respect 26:18
63:9 103:5,13
103:24 105:17
106:6 112:8,23
113:25 114:8,15
136:10 140:24
153:3 202:7
respectfully
18:12 31:14
207:8
respective 83:16
respects 121:4
respond 19:11
20:22 25:8
119:15 129:22
161:8
responding
103:2
response 28:22
32:11 112:7
118:19
responses 9:17
10:18 19:22
22:22
responsibility
64:15

responsible
34:19 35:7
61:10,13 62:2
64:4 66:18
79:12
rest 85:23 95:18
96:5 102:21,21
150:25 151:25
155:15 197:19
203:1
rests 170:24
result 70:17
78:25 83:23
95:17 104:11
110:11 125:21
140:14 144:16
160:16 161:5
169:15 170:25
resulted 104:25
131:12
resulting 26:6
results 100:10
100:15 110:12
187:24
retaining 34:19
retention 22:11
retract 156:8
retrieving 62:6
return 63:4
80:10 122:13
126:11 128:9,19
146:15 153:3
returned 147:5
returns 52:13
107:9 112:3
120:14
revelation 23:13
revenue 89:5
98:18,19

revenues 99:1,4
revers 180:3
review 41:5 77:6
78:12 89:15
112:23 117:17
reviewed 110:6
201:2
reviewing
112:25
reviews 77:6
89:15
revive 178:5
revocable
163:13
richard 11:18
11:24 12:3
14:17 154:10
right 18:4 28:10
30:23 31:21
32:24 44:10
50:23 51:6 55:2
57:20 69:4,8,20
70:5 93:2 97:9
100:18 101:18
103:25 105:18
105:21 113:13
115:17 127:8
130:25 145:13
164:15 168:13
168:13 169:18
172:12 176:5
179:8,13,13
181:9 187:14
190:25 195:1,11
202:13 205:24
206:4
rise 171:9
risk 50:16
110:25 111:2,3

risks 190:6
191:7
road 32:23 41:8
56:12 210:21
robbed 135:4
robert 15:15
37:18 96:12
robust 183:19
rock 31:9 32:17
rockefeller 13:5
15:4
role 42:4 60:23
65:22 66:2,6,11
66:11 78:18
81:5,6 90:2
104:12 108:22
roles 42:8 67:11
74:12,13 108:11
109:7 116:9
rosenamn 15:2
37:5
rough 54:17
round 144:15
145:21 146:11
routinely 182:1
routing 196:15
rukavina 9:24
rule 5:24 6:2
7:18,21 18:18
19:19 21:19,21
22:15 25:3,10
25:20,22 27:19
31:13 32:6,25
93:25 97:12
118:20,23
153:11 161:19
161:22 162:16
167:18 168:1,24
169:8 170:7
171:18 177:2

10-03635-jpm   Doc 1000-11   Filed 01/20/23   Entered 01/20/23 21:43:50   Exhibit 16
- Sept. 14   2022 Status Conference Transcript   Pg 110 of 123

[rule - second]                                                                Page 55

178:6,11 187:17
202:25 204:16
207:6
**ruled**   188:3
189:13
**rules**   20:15 25:2
73:7 108:23
127:22 152:19
164:24 168:3
184:16
**ruling**   33:7
127:7 139:20
165:16
**rulings**   133:10
**run**   55:3 91:1
127:20 137:25
**running**   190:16
205:14
**rushaid**   180:21
181:11 182:5,8
183:6

**s**

**s**   5:11 6:8 7:4
8:2 9:13,23,25
10:7,22 11:4,13
13:1 16:1 74:3
**s&p**   190:3 191:1
**s.d.n.y.**   84:21
157:24 163:13
170:19,21
183:24 184:12
**sa**   1:16,24 2:10
5:2 6:20 8:15,20
8:21,23 9:14,15
9:16 36:18,19
37:12,13,13
39:11,12 46:14
54:15,20 55:18
64:12,19,20,24
65:1,7,11,16,18

66:22 70:21
73:9,10,10 78:4
78:5 79:7 86:8,8
89:22 90:1,5
112:21,24 113:7
113:10 115:7,15
116:1,3 171:24
**safe**   49:20 52:25
123:4 125:22,22
**sage**   137:10
**sake**   98:10,23
**sal**   180:9
**salary**   96:25
**sample**   205:8
**sat**   48:3 91:3
**satisfied**   52:9,10
88:8
**satisfies**   133:25
**satisfy**   42:13
84:9 114:10
121:5 133:7
148:17 162:16
162:18 175:7
**saved**   20:7
**saw**   111:23
116:4
**saying**   29:22
31:11 32:12
33:17 52:15
68:4,17 95:10
99:13 101:10
125:12 152:15
152:17 153:16
163:23 165:11
175:25 186:14
202:9 209:8
**says**   22:24 23:3
23:10 42:18
50:14 51:11,22
70:3 82:8 99:16

101:5 126:15,24
158:3 160:5
170:8 172:1
174:3 176:9
184:1,5 192:2
194:13 195:4
197:1 199:12
203:9
**scaffolding**
38:24 80:3
**scanned**   18:24
30:20 94:17
**scattered**   123:25
**scenes**   65:23
**schedule**   12:10
**scheduled**   130:9
**scheduling**
19:24
**scheme**   23:19
51:3 52:16
127:5,9,10,13
127:15,21,23
128:7,23 132:18
132:21 133:4,5
133:12,16 135:9
135:12 136:11
136:14,17,18,21
136:25 137:2,5
137:9,11,16,21
137:23,24 138:1
138:8 139:1,8,8
139:10,15,16,18
140:8,9,20
141:2,21 152:11
152:14,15,16,17
152:18,20 181:4
181:7,9,10,12
182:11,13,15,17
182:20 197:3
199:23

**schemes**   138:1
181:17
**scope**   24:19
25:19 26:2 32:9
32:10
**scores**   95:4
**screen**   40:8,22
54:9 108:3
**screens**   107:24
**scrutiny**   90:8
109:14
**sdny**   5:12 6:9
7:5 8:3 10:1
**se**   9:14 36:18
39:10 55:19,20
64:13
**search**   19:1,7
**searches**   32:3
**sec**   109:12,14
112:14,16 173:5
**second**   8:18 9:12
10:6 16:20 17:5
17:8 23:24
25:23 39:11
44:17,21 45:3
50:12,24 53:19
54:8 55:7 56:2
59:4,8 66:8,20
67:20 68:1,8
69:7 71:22
77:10 78:2 92:5
97:20 98:19
99:16,19,24
100:1,5,22,25
101:7,23 102:14
104:24 114:23
121:21 127:3
132:19 138:8
140:6 144:3,4
144:15 145:21

10-03635-jpm   Doc 1000-11   Filed 01/20/23   Entered 01/20/23 21:43:50   Exhibit 16
- Sept. 14   2022 Status Conference Transcript   Pg 111 of 123

[second - service]                                                              Page 56

155:13 157:18
165:19 170:15
171:24 175:19
180:8,10 181:5
185:18 189:9
193:4,6 197:8
201:13 203:14
204:24
**secondary** 125:3
125:7
**secondly** 63:20
166:9 203:13
**seconds** 40:23
**section** 52:22
55:11 99:23
114:16 127:16
132:17 133:3,7
133:13,25 134:1
136:10,19,23
137:3,6 138:10
139:2 140:3,21
147:13,23 149:4
151:7 160:16
**securities** 2:6,17
3:3,14 10:10,25
11:15 49:17
50:2,8 52:3
107:4 120:22
134:14 135:21
136:4 138:23
171:24 174:10
184:11 189:12
190:2 201:17
**security** 108:23
**see** 19:11,16
24:5 25:6 32:3
35:10 41:9,10
41:18 50:14,19
50:19,20,21,22
51:3,5,20 53:20

54:10 55:5 61:9
83:5 94:20 95:1
95:14 100:6
120:1,24 122:22
128:17 129:6
132:2 168:19
186:18 191:5
193:4 194:20
**seed** 175:13
**seeing** 41:17
62:22 68:15
**seek** 21:19 26:12
169:16 205:19
205:20,25
206:11
**seeking** 19:25
22:16 24:18
25:9,21 26:4
27:19 38:7
53:23 66:4 67:4
67:4,6,8 90:11
130:11
**seeks** 26:1 55:16
56:8 59:6 60:19
91:17 134:5
169:17
**seen** 95:13
142:22 164:19
200:19
**segregated**
75:17,18
**segregating** 85:2
**selection** 192:11
193:20
**selendy** 14:4
**sell** 134:14
**selling** 52:3
**send** 194:2,3
**sending** 60:24
173:20

**sense** 51:21
125:4 138:24
139:4 158:12
163:19
**sent** 31:2 33:25
77:17,18 94:25
162:24,25 164:3
194:14
**sentence** 167:24
168:22
**sentry** 1:13,21
5:1,6,17 6:19,24
7:10 16:5,6
23:19,21 116:20
116:23,25
117:16,21 125:8
126:6 134:7
135:11,14,19,25
136:4,5 139:14
156:25 176:12
176:14 185:3,4
185:6,7,10,12
188:17,25 189:1
189:5,7 190:5,7
190:12 191:17
191:25 196:19
196:22 199:6,13
201:13 204:20
204:21,21 205:2
207:2,18 208:14
**sentry's** 116:22
117:19 185:15
187:3 188:19
190:10
**separate** 19:13
73:25 74:13
75:14,19,20
76:24,25 79:2
83:13,17,18
86:13 95:22

132:21 143:10
143:12 145:1
151:21 168:6
186:8
**separately** 21:17
84:12
**separateness**
82:25
**september** 4:1
18:17 20:9
64:14 162:9
210:25
**sequence** 163:18
167:10
**series** 40:5 50:11
87:2 173:3
**serious** 20:19
50:15,19 51:23
181:25
**serve** 19:22 61:8
73:7 74:16
111:17 138:14
170:16
**served** 18:17
19:19 63:21
65:21 77:7 78:7
79:9
**server** 92:12
94:13,23 97:14
97:14
**service** 38:17,19
38:23 59:24,25
70:2,10 76:3,7
77:11 84:13
85:21 106:22
109:21 110:2
111:5 114:24
115:1,8,20
116:10 118:10
118:11,12

10-03635-jpm   Doc 1000-11   Filed 01/20/23   Entered 01/20/23 21:43:50   Exhibit 16
- Sept. 14   2022 Status Conference Transcript   Pg 112 of 123

[service - situation]                                                   Page 57

119:23
serviced 67:12
87:5 88:18
services 9:15
36:18 38:20
39:22,24 45:16
45:20 46:2 47:6
47:15 58:14
59:21 61:4,4,7
61:18,23 62:1,5
62:9,14,23 63:5
63:8,10,14,17
64:14 67:19
68:5,16 70:14
71:25 72:6 76:4
76:10,17 77:25
79:2 80:9,10
85:15,16 88:25
90:10 91:19
95:15 97:22
101:11
servicing 87:8
serving 55:21
74:14 91:2
set 20:2 40:18
56:24 67:12
74:2 75:10
89:17 108:15
118:25 119:9
125:16 127:2
133:10,17 135:5
137:20 146:14
149:6,12 209:11
sets 124:24
setting 109:14
settlement
145:25 146:1,2
153:7
seventh 157:24

sfsl 115:15
shapiro 118:3
share 40:8,18
57:9 83:19
179:22
shared 41:7
110:12
shareholder
45:24 66:13,14
202:8
shareholders
61:14
shares 126:9,13
155:11
sharing 40:9
sharpe 140:5,6,7
140:8,10,13
sheehan 10:22
shell 87:10
95:20
sher 15:9 96:12
sherman 160:16
shifts 149:23
shock 82:13
shoe 172:22
shoes 207:1
short 110:14
114:20 120:4
168:2,5,9 169:9
187:17 204:17
shortly 40:19
41:3,3 133:19
shove 105:3
show 25:23 61:2
63:9 66:24
75:21,22 83:4
116:6 120:12
161:18 163:24
166:14 190:16
191:24 195:15

206:12 208:13
showing 21:2
54:9 84:9,23
85:1 86:16 88:5
91:22 102:15
114:21 149:24
163:10,11,23
183:20 192:12
195:7 204:17
shown 61:2
151:6 162:6
shows 30:20
173:12,25 188:9
192:17 193:22
195:14 197:6
shuffling 65:24
shut 91:11
sicav 9:23 74:3
side 32:12 41:11
50:23 54:9 55:2
112:9 126:24
129:21,25
sides 25:13
153:11
sidestep 139:18
sidestepped
19:17
sigma 5:7,17
6:25 7:11
signal 205:19
signals 65:15
signature 210:6
signed 12:9
39:15 64:18
78:9 180:1
significant 30:3
55:16
signing 65:24
202:4

signs 50:20
107:13,15
similar 22:6
45:3 85:15
104:25 119:8
144:24 160:25
197:14
similarly 136:24
139:23 196:18
197:17
simple 30:5
147:3 204:16
simplest 83:5
simply 19:17
24:25 33:16
53:5,9 54:2
65:23 67:8
76:16 111:4
138:10 160:6
177:13 203:16
204:25 205:5,12
single 25:24
46:7 77:16,19
77:20,25 87:4
87:18 93:17,19
134:23 135:19
137:1 141:8
151:6,12 178:10
178:10
sipa 2:5,16 3:2
3:13 10:24
sipc 141:15
184:10
sit 154:25
sitco 21:5
sitting 204:12
situated 143:2
situation 128:20
143:14 179:15
195:19

10-03635-jpm    Doc 1000-11    Filed 01/20/23    Entered 01/20/23 21:43:50    Exhibit 16
- Sept. 14    2022 Status Conference Transcript    Pg 113 of 123

[six - stated]                                                                    Page 58

six   19:2
size   126:16
skepticism
   50:19,20
slide   116:4
slides   50:11
sloppy   51:22
smaller   209:11
snacks   155:1,1
sole   9:4 26:1
   90:21
solely   5:8,9,18
   5:20 7:1,2,12,13
   55:15 62:3 68:4
   75:6 106:19
solicited   89:24
solutions   210:20
somebody   29:9
   29:11 100:11
   177:11
someplace
   159:14
song   204:4,5
   207:12,13
   208:22 209:19
sonya   12:15
   210:3,8
soon   206:6
sorry   26:24 29:6
   47:16 53:18
   58:3 69:22,23
   102:25 103:9
   105:20 108:10
   113:7 115:17
   144:18 159:4
   172:23 185:11
   190:7 192:21
   194:6 197:25
sort   31:9 32:17
   33:22 51:16

57:20,23 95:11
   101:12 126:15
   128:12,16,18
   130:16
sorting   40:7
sorts   190:1,16
sought   24:10,12
   148:13 192:4
sound   17:6,6,9
   165:5
sounded   165:4
sounding   123:8
soundly   167:11
source   94:22,23
   157:5,7 163:3,5
   166:23
southern   1:2
   149:12
spam   92:12
spanning   205:6
speak   41:22
   73:6 74:12
   83:12 120:11
speaking   81:14
   107:25
special   127:22
specialist   34:7,8
specific   20:23
   21:21,24 22:10
   27:2 28:1 30:16
   31:25 32:4 44:4
   71:18 88:14
   89:6 91:15
   101:18,19 102:9
   113:17 116:2
   118:17 119:17
   133:1 134:4,7
   137:22 141:20
   170:1 180:19
   193:12

specifically   76:2
   103:5,24 107:4
   134:9 135:13
   138:23 140:25
   149:15 178:8
   188:16 193:25
   197:8 202:3
specifics   206:10
specified   199:17
   199:18,18,19
specify   207:17
speculate   203:19
speculating
   31:16
speculation
   198:15
speculative
   170:9
spell   37:15
spent   117:16,21
   122:9
sperate   83:20
split   174:3,7,9
   175:16 189:23
   191:2
spoke   34:3
spoken   33:24
   35:3
spoliation   21:20
   22:24 23:4
   26:11 30:2
sponsor   65:21
   66:3,5,11 70:17
   108:21 109:5
sporadic   81:17
   90:16
spring   18:22
spv   88:2 91:9
   93:21

squirreling
   128:11
st   13:24 14:14
staff   35:20,20
   40:14,17
staffed   65:1,11
stage   33:18
   104:5 110:19
   114:17,18 116:5
   117:21,22 187:5
   202:21 207:17
standard   49:23
   49:24 58:20
   59:3 106:14
   118:21,23
   120:12 167:5
   188:22 191:19
standards   20:16
   122:4
stands   207:2
stanford   66:21
start   61:3 73:24
   76:20 125:5
   206:7
started   23:10
   98:3
starting   128:1
starts   193:1,11
state   16:6 17:18
   36:10 49:25
   55:13 60:15
   69:14 85:7
   123:17 136:9
   139:21 154:8
   172:18,19 175:4
   175:10 199:21
   202:3 203:24
stated   64:12
   66:15 107:10
   173:17 174:17

205:21
statement   41:4
104:4 111:12
113:20 114:20
159:24 167:3
168:2,5,10
169:9 171:16,18
187:18 198:6
204:17
statements
45:25 61:12
110:18 112:25
117:5 119:20
141:10 163:21
169:23
states   1:1 3:23
5:11 6:8 7:4 8:3
10:1 20:24 21:3
21:7 24:22 26:8
28:1 33:15 39:3
39:5,21 40:3
41:25 42:2,4,15
43:6,21 44:19
44:21 46:5,8
47:5,6,11,14,25
48:1,1,2,6 49:2
59:10 60:18
63:2 72:2 76:4,5
76:6,9 77:13,24
78:10,19,21,23
79:5 80:2,5,6,8
80:9,10,19
81:13 82:20
83:15 85:18
86:24 93:19
155:10 162:8
190:5,13 191:9
191:12 193:24
196:15

statistics   164:1
208:19
status   84:19
85:4
stearns   147:11
148:7,13 149:3
149:9,12,21
150:2,6
steel   131:4
steen   15:17
stemmed   87:20
89:5
stemming   87:1
88:3
step   21:23 79:14
79:18 100:17
stepped   65:24
stipulated
168:23
stipulation   12:9
stocks   190:3
191:2
stolen   132:23
136:7 147:1
stone's   172:21
stonewalling
20:13
stop   97:9 112:13
stored   18:15
19:8 29:15
stork   13:11 37:3
57:17 58:1,3,5,6
58:8 68:2,7,11
68:19,23 69:5,7
69:10 70:11,16
71:4,8,23 72:5
straight   67:15
stranger   206:21
strategic   90:20

strategy   51:21
51:24 65:10
107:10 112:3
113:20 174:4,6
174:7,9 175:16
187:2 189:23
190:2 191:1,2
stray   197:16
streamline
150:11
street   15:11
35:17
stretches   49:5
strict   162:7
strike   168:24
174:4,7,9
175:16 189:23
191:2
striking   22:4
strong   50:4
52:19 120:18
strongly   23:6
150:22 184:3
structure   57:22
66:6 83:2
108:16 109:18
stuck   20:13
99:21,22
sub   173:23,24
173:25
subject   28:1
34:24 42:1
44:18 59:11
86:18 96:15
102:5 121:7
126:19 131:8
177:11
subjective   49:24
subjectively
51:1

subjects   178:7
submit   54:1
67:17 72:10
submits   192:1
submitted   23:9
46:9,11 83:4
92:23
submitting
192:2
subparagraph
121:21
subscriber
202:4,7
subscribers
129:16
subscription
27:5 166:18
175:22 179:25
180:5 192:10,21
192:23,25 193:5
193:9,16,19
194:1,10 195:5
196:24 199:16
202:3,8
subscriptions
39:17 61:14,15
89:24 93:11,11
subsequence
53:4
subsequent   38:8
42:25 43:23,25
44:7 46:25
52:24 53:7,13
54:13,19 55:11
55:16,24 56:9
56:15,20 70:2
81:20,24 93:22
97:2 99:7
101:20 102:20
114:17,19,25

10-03635-jpm    Doc 1000-11    Filed 01/20/23    Entered 01/20/23 21:43:50    Exhibit 16
- Sept. 14    2022 Status Conference Transcript    Pg 115 of 123

[subsequent - syz]                                                     Page 60

116:20 117:7
118:5,15,24
119:13,18 121:7
121:11,14
132:22 146:25
151:16 155:17
157:2,8,14,19
158:2 159:8,9
159:10,12
162:24 163:3,20
164:3 166:17
167:18 175:1
176:15 184:23
185:13 186:25
189:14 195:23
197:4,12 204:24
206:17 207:18
207:24 209:5
**subsequently**
70:7 119:3
147:19 204:21
**subset** 73:3
**substance**
101:16
**substantial** 50:1
51:2 63:24
120:13 157:7
**substantially**
18:22 19:3
135:15 189:11
201:17
**substantive**
10:13 90:13
**substantively**
2:4,15 3:1,12
10:23
**succeeds** 149:22
**successful** 82:12
**successfully**
149:22 151:6

**successor** 65:25
**sue** 176:11,12,15
201:25,25
**sued** 176:20
192:13 202:1
**suffice** 160:7
**sufficed** 174:23
**sufficiency**
86:11 103:12
172:7
**sufficient** 71:1
80:25 81:23
82:19 91:5,13
95:10 119:6
133:6 136:9,16
139:15 140:23
141:14,17 147:9
161:1,12 172:3
172:23,24
176:21,22
183:11,17
187:21 189:15
198:18 202:14
202:24
**sufficiently**
86:17,25 90:12
90:18
**suggestion**
89:20 133:10
**suggests** 23:6
95:11
**suing** 196:4
**suite** 15:12
210:22
**sum** 26:4 101:16
**sumitomo** 3:18
12:6 14:20
203:24 204:2,22
205:2,22 206:20
206:21 207:7,19

208:15
**sumitomo's**
204:15
**summary** 92:5
151:5 171:18
202:23
**superiors**
100:11
**supervision**
61:19,25
**supp** 157:24
**support** 11:3
84:19 91:6,15
107:22 111:18
114:11 133:9
136:20 139:18
140:23 141:14
159:25 171:19
175:18 199:22
207:25
**supported**
138:24 139:3
161:4 167:11
202:22
**supporting** 83:9
133:16
**supports** 140:8
**supposed** 27:25
30:1
**supposedly**
48:13 85:12
151:15
**suppressed**
110:15
**supreme** 44:16
122:3 138:21
160:3 162:15
166:25 170:13
171:14 174:16
174:24 175:1,11

177:17 182:21
**sure** 16:23 18:1
31:10 34:4
36:11,17,17,22
37:9 38:3 40:15
57:6,10 68:10
73:13 74:7 79:6
90:21 93:8
98:25 99:1,7
112:19 115:10
122:8 124:8
185:20 187:15
190:21 195:3,11
**surmise** 202:10
**surmising**
202:12
**surprise** 82:13
**surprised** 19:5
208:15
**surveillance**
77:6 89:14
**survive** 161:16
170:7
**survives** 56:13
**suspicion** 50:4
52:19 120:19
**suspicions** 50:10
**sustained**
149:24
**swap** 125:13,14
125:24,24 126:2
126:3,10,11,16
**swiss** 41:23
112:10
**switch** 64:20
**switzerland**
41:24
**symmetry** 84:18
**syz** 187:2

10-03635-jpm   Doc 1000-11   Filed 01/20/23   Entered 01/20/23 21:43:50   Exhibit 16
- Sept. 14   2022 Status Conference Transcript   Pg 116 of 123

[t - think]                                                                    Page 61

| **t** |
| --- |

**t** 210:1,1
**table** 125:16
172:13
**tag** 102:10
**tail** 173:5
**take** 33:5 35:25
40:22 61:21
68:21 72:4
73:22 81:14
100:12 126:5
129:5,20 133:24
137:11 154:3
158:1 159:19
200:11 205:18
209:8,9
**taken** 24:20
58:22 80:1
86:23 104:18
105:23 106:15
110:20 114:9
158:5 188:18
**takes** 57:8
110:23 164:19
183:20
**talk** 33:3 34:8
35:2,2,11,11
40:14,16 45:16
64:1 68:11
77:15 78:3
123:10 133:24
**talked** 34:16
159:6
**talking** 30:14
31:2,4,5 33:9
35:21 38:17
69:3 93:18
96:17 105:18,19
112:20,21,21
113:19 122:10

127:18 128:3
129:2 131:19
145:14 190:19
**talks** 84:23,25
199:12
**tams** 11:20 12:1
**tasked** 65:8
**tasks** 63:11,12
**teams** 83:20
**tease** 58:25
**ted** 99:3 102:4
102:12,16
**telephone** 39:15
62:13
**tell** 16:24 18:4
18:20 19:15,18
33:1,12 34:7
41:13 68:12
73:14 92:7
109:16 192:19
193:13 199:4
206:14 209:12
**telling** 35:22
105:1
**tells** 199:3
**ten** 68:21
**tendered** 55:5
**tendering** 54:7
**tens** 95:3
**term** 173:25
199:3
**terminated**
130:6,7
**terms** 73:7
94:19 95:20,22
98:2 152:9
171:12
**terrorism**
181:11,16 196:2

**test** 52:10
136:12 172:13
179:20 183:8,18
**testify** 25:25
29:20 34:20
35:6
**testifying** 29:9
29:11
**testing** 172:2
**text** 137:6
**thank** 18:7 36:3
36:4,5,20 37:16
38:3,5 41:10
68:23 72:11
102:22 120:1
122:23,24 123:1
124:6,19,20
145:11 150:12
151:1 152:2
184:18 188:8
197:18 201:7
203:2,22 204:8
207:12,13
209:15,18,19,20
**thankful** 79:7
**thanks** 132:10
208:21
**theodore** 9:9
15:10 37:19
96:10,13
**theory** 38:23
48:19 138:22
141:14,18,22
179:11
**thereof** 5:9,10
5:19,21 7:2,3,13
7:15
**thierry** 9:1,2,4,5
**thing** 92:6,7
98:25 100:18

120:10,11 124:7
144:24 170:15
173:4,17 193:6
**things** 50:14
51:5,8 61:13
63:18 66:3,23
71:11 83:10
99:12 129:5
162:15 199:7,24
200:1,1,2
201:11 204:19
**think** 26:14,22
28:9 29:16,25
31:1,15 32:10
32:13 38:11,12
39:9,25 40:10
41:16 43:12,14
46:16,18 49:4
51:15 54:3 58:7
58:19 60:3 68:1
68:8 69:4 71:23
72:8,23,25 75:3
75:24 78:6
82:15,16 83:4
95:17,18,21
101:16,23 104:2
105:12 108:8
114:8 120:8
125:4 126:22
128:22 129:13
129:18 130:10
130:14,15
131:14,15 132:3
150:16,21 153:9
153:9 155:25
165:3 186:21
191:3,15 193:4
194:23 197:9,20
201:1 202:13,21
208:6

**thinking** 94:8
111:8
**third** 9:15 24:17
36:18 47:16,17
47:20,22,24
48:3,11,16,20
54:16 58:15
59:22 63:20,20
64:3,3,16,18,21
64:23 65:6,13
65:15,19 66:16
67:20 79:6,6
81:11,12 132:22
155:14 158:1
174:16,22 175:6
175:9 177:19
193:9 197:10
**thought** 17:8
27:18 103:18
145:8
**thousands** 95:3
205:5,19
**threat** 160:23
161:8
**three** 22:23 36:1
39:8,19 48:24
58:13 59:16
71:25 73:6 76:1
76:18 77:14
93:18 97:5
123:3 124:23
125:18 129:9
132:13 149:6,13
152:5 155:12
175:11 180:18
180:24 182:4
192:24,25
199:21 202:2
**throwing** 92:10
175:15

**tickets** 51:23
78:12
**tie** 159:21 160:2
163:8,18
**tied** 64:8 186:25
**ties** 165:24
**time** 19:4 27:20
33:5,8 44:14,15
44:17,22 45:10
54:8 56:14,17
59:14 65:5 79:9
81:13,13 96:21
98:3,16,21 99:6
101:1 102:2,19
103:18 109:1,5
113:16 122:10
129:9,22 140:19
142:13,14,17
150:19 164:6
170:11 178:17
**timeframe** 23:2
**timeframes**
116:9
**times** 19:2,13
33:21 78:15
95:24,25 107:12
116:11 165:17
170:13 174:3
200:14
**today** 17:16
19:24 20:12
22:17 25:7,9
37:24 45:2
56:16 57:15
58:10 72:25
96:21 105:20
106:1,18 110:17
116:11 125:19
126:19 155:1
202:12

**today's** 72:23
78:5
**told** 19:4 100:11
109:22 112:16
123:12 165:4
206:18
**tolerances** 111:1
**topic** 49:11 53:2
**topics** 19:23
25:25 155:12
**tort** 93:23
174:18
**tossing** 175:13
**total** 27:16
46:23 55:24
56:5 98:19 99:4
**totaling** 125:7
205:6
**totality** 59:12,16
61:2 62:21
63:15 66:23
86:14 91:6
107:25,25
152:24 183:7,13
183:18,19 188:8
191:23 192:17
197:5 199:9
**totally** 31:5
**touch** 20:5 64:1
106:3,4 114:14
150:24 184:18
**touched** 103:14
**tpm** 58:16 79:13
115:7,15
**trace** 117:18,20
**tracing** 53:6
54:23 68:12
116:2 121:8
127:25 128:25
129:1 131:17

132:4 207:21
208:1,13 209:12
**track** 200:25
**trade** 78:12
112:5,9 113:11
113:12 135:21
**traded** 120:22
**trades** 107:6,12
110:7 112:2
134:17
**trading** 49:17
50:1,8 100:9
104:20,22,23
107:10,17 109:1
110:4,6 111:24
112:24 120:15
135:2,6 174:9
174:13 190:6
191:7
**traffic** 27:13
205:19
**trail** 21:1 28:11
28:15,15,24
**trains** 127:16
**transacting** 39:3
39:4
**transaction** 24:1
24:1 27:2,5,9,14
27:15 30:5,6
130:23 131:5
142:3 143:12
146:11 147:2
151:11 152:21
153:2 196:11
206:13
**transactional**
43:15
**transactions**
43:7 107:4
117:12,13 126:8

10-03635-jpm    Doc 1000-11    Filed 01/20/23    Entered 01/20/23 21:43:50    Exhibit 16
- Sept. 14    2022 Status Conference Transcript    Pg 118 of 123

[transactions - trustee]                                                    Page 63

136:5 143:23
144:14 146:10
151:15,21
153:18 181:19
181:20,24 182:6
195:21 198:12
199:20 206:11
**transcribed**
12:15
**transcriber**
156:19,21
**transcribing**
156:22
**transcript**
142:22 210:4
**transfer** 42:25
43:25 44:7
53:14 61:8
93:23 97:1
125:21 127:17
127:19 128:1
129:3,7,10,10
129:11 131:12
132:8 137:19
140:10,17 142:1
147:4,6,14,15
147:18,25 148:2
148:20 149:15
149:16 151:13
151:17 152:19
152:20 155:17
157:2,8,14,20
158:3 159:8
167:18 184:23
185:9 187:10,21
189:14 197:12
204:20,24 205:4
205:24,25 206:5
206:9,15,17,18
206:22 207:4,18

207:19,24 209:4
209:5,13
**transferee** 97:2
101:20 102:20
149:13,16,22,24
163:21
**transferee's**
149:24
**transferees** 53:7
53:7 73:20
106:9 125:4
159:10,12
162:24 176:15
**transferred**
64:15 68:15
70:7 119:3
147:19 148:11
148:24 156:25
157:3 163:11
179:25 180:2
204:21 205:1
**transfers** 38:8
43:10,11,23
47:1,5,24 52:23
53:4,11,15,17
54:1,13,19
55:11,16,24,25
56:3,5,6,7,9,11
56:15,15,20,21
63:2,4,6 70:2,8
81:21,24 97:6
99:7 102:3
104:7,10 106:11
114:12,17,19,25
115:23 116:3,7
116:13,20 117:7
118:5,16,24,25
119:2,4,10,13
119:18 121:7,11
121:12,13,14

125:7,18,23
127:24,25
128:17,22
129:12 131:25
132:2,16,23
133:1 134:2,4,7
135:11,24 136:3
136:5,10 137:22
137:23 139:9,11
139:14 140:11
140:24 141:20
143:15,19
144:14 145:20
146:18,25
148:13 149:10
151:18,22
158:20 159:9,22
160:8 162:24
163:4 164:3
166:17 185:2,3
185:5,6,11,13
185:14,16,22,24
186:8,12,13,17
186:22,25,25
187:1,12 188:2
194:17 195:17
195:22,23,23
196:12,25 197:4
205:6 206:25
209:9,10
**treatment** 20:18
**tremont** 130:3
130:20,22 131:1
145:25 184:6
**tremonte** 15:9
96:12 130:5
**trial** 138:13
165:5 179:1,8
179:13 205:17
205:22 206:5,12

206:14 207:7
208:6,15
**trick** 128:24
**tried** 20:2 42:20
42:21 82:21
**tries** 53:18 97:4
116:1 190:14
**trigger** 136:17
**triggers** 23:14
**trillions** 181:19
**trip** 146:11
**trouble** 51:10
**true** 29:14 45:10
53:8 58:23
104:18 106:15
110:20 152:9
166:7 174:10
175:23 177:20
182:13 210:4
**trust** 3:18 11:20
11:21 12:1,1,6
14:20 163:13
186:6 194:9
195:8 203:24
**trustee** 2:4,15
3:1,7,12 8:14
10:9,13,23 11:8
11:10,14,19,25
12:5 13:4 36:8
37:1 38:7,22
40:19 41:2,3,4
43:2 44:10
45:22 46:9,10
46:15 47:7 48:2
48:7,19 49:14
49:18 50:10,13
51:4 52:6,8,21
53:4,5,14,17,21
54:6,11,24 55:4
55:9,18 56:2,8

10-03635-jpm    Doc 1000-11    Filed 01/20/23    Entered 01/20/23 21:43:50    Exhibit 16
- Sept. 14   2022 Status Conference Transcript    Pg 119 of 123

[trustee - ubs]                                                                    Page 64

56:12 58:9 59:1
59:5,7,16 60:19
61:1 62:14,15
62:17,18 63:3
65:5,16 66:8,19
67:4,8,23 68:14
69:16 70:1,16
70:18,24 75:7
77:2,16 80:3,21
81:11 82:17
83:25 84:23
85:7,8 86:3,4,16
86:22 87:19
88:9 90:10,12
90:18 91:14,17
91:21,23,24
94:7,20 97:3,5
97:11,19 98:8
98:15 99:5,24
100:13 101:2,18
103:1 104:4,19
105:6 106:8,10
106:22,24 107:5
107:16,21 108:4
108:18 109:11
109:23,25
110:21 111:8,19
114:10,18,22
115:16,23 116:2
116:6,8,21
117:3,6,11,22
118:4,6,9
119:21 120:21
122:9 123:19
124:24 125:9
126:20 129:22
130:11 132:12
132:15,25 134:3
134:6,9,11,13
134:22 135:10

135:13,14,17,24
136:3 137:18
139:12 140:22
140:25 141:1,4
141:7,9,19
145:24,25
146:22 147:13
147:24 148:14
149:23 152:15
153:6,24 154:14
155:7 185:1,7,8
186:25 187:25
188:14,16
191:21 192:7
195:21,23 196:4
198:15 201:25
202:1,2,4,13,17
202:24 203:16
203:23 204:5,18
204:23 205:23
206:5,6,10,24
207:1,2,6,16,20
207:24 208:18
**trustee's**  10:5,20
11:11 46:6
48:24 51:16,25
54:3,12 55:15
58:21,23 65:3
67:20 70:6 71:2
77:4 79:12
91:16 102:7
103:11,13
104:17 105:2
106:14 107:23
108:7 110:20,23
111:16,18
114:10,12,16
118:23 133:21
133:25 140:8
141:25 143:1

144:5 146:24
149:10 188:12
188:13 191:18
197:8 208:11
**trustees**  101:25
**trusts**  155:8
200:9 201:24,25
202:2,10 203:18
**truth**  170:10
171:7 172:5
**truths**  170:12
**try**  45:19 48:7
73:7 82:24
84:22 115:9
122:11 124:25
142:23 149:8
**trying**  41:12
48:21 68:3
77:24 82:10
86:12 102:1
143:15 144:14
144:24,25
145:19 163:18
195:24 200:7
**turn**  17:8 22:24
23:8 36:1 58:4
89:6 103:6
105:16 133:23
157:24
**turned**  76:14
94:12,12 97:13
**turning**  78:2
99:12
**twice**  150:14
**two**  16:15 17:8
18:3,18 20:9
23:11 35:11,11
38:9 40:23
52:24 71:11
73:25 75:2,7

81:9 106:11
114:13 123:3,23
124:24 125:6
126:18 129:18
130:15 153:11
153:13 155:8
160:6 161:11,20
162:11,15 163:5
181:2 183:17
184:15 186:8
203:3,3 204:19
204:20 206:15
206:17 208:24
**twombly**  160:4
160:15,16
161:13,20
162:20 170:6
171:5 188:22
**tying**  56:14
**type**  21:11 28:4
101:22 168:16
170:9
**typically**  66:12
138:14 148:5

**u**

**u.s.**  4:7 13:4
42:9 43:2 44:5
47:2,24 48:10
48:15 72:8
80:20 85:12
90:8 112:14
138:20 168:10
174:10,12
188:16 190:2,6
191:4,5,7
**ubp**  1:16,24 5:2
6:20
**ubs**  2:10,10 8:15
8:15 9:12,14,14
9:14,14,15

10-03635-jpm    Doc 1000-11    Filed 01/20/23    Entered 01/20/23 21:43:50    Exhibit 16
- Sept. 14    2022 Status Conference Transcript    Pg 120 of 123

[ubs - usitalo]                                                                    Page 65

13:15 36:8,8,10
36:14,17,17,18
36:18 38:6,12
39:6,10,10,12
39:19 41:23,23
42:10,12,16
43:2,3,5,6,9,20
43:24 44:8,9,10
44:13,18 45:2
45:11,16,17,20
46:14,14 47:15
47:16,20,24
48:3,8,13,20,21
51:6 53:13,22
54:1,12,15,15
54:16,18,20,20
55:12,18,19,20
55:24 57:12,22
58:2,10,13,14
58:15,15,16,17
59:6,20,21,21
59:21 60:6,7
61:4,4,7,18,23
62:1,5,9,13,19
62:23 63:3,6,8,9
63:13,20 64:1,2
64:3,12,13,15
64:18,19,20,21
64:23,23 65:1,6
65:6,11,16,17
65:19,20,21,23
66:2,15,16,18
66:21,22,24
67:2,3,7,18,19
67:19,19 69:6
69:11,19 70:1,9
70:9,13,15,17
70:19,20,21,23
70:25 71:1,10
71:16 72:6,13

73:19 74:11
76:3,13 77:22
78:17 79:13,20
81:25 90:1
105:18,19,20,24
106:20 108:8,15
109:5,8,23
110:21,23,25
111:4,10 112:2
112:4,14,16,20
112:24 113:2,7
113:7,10,16,20
113:21 114:1
115:3,6,7,7,7,7
115:15,15,15,15
115:25 116:1,3
118:18 121:24
**ubs's**   57:18
111:3,8
**ultimate**   149:25
**ultimately**   22:20
82:1 176:5
**ultra**   130:17
**unable**   51:9 97:6
137:1 142:21
143:19
**unanimously**
136:21
**unclear**   101:3
**unconscionable**
108:23
**undeniable**
88:22
**undeniably**   91:6
**undercuts**   89:19
95:9
**undergirding**
182:5
**underlying**
91:16 95:22

162:17
**undermine**
184:9
**underpinnings**
127:4
**underscore**
179:23
**understand**
28:16 30:14
31:7 35:9,23,24
57:23 112:12
165:15 209:14
**understood**
57:14
**undoubtedly**
117:20
**undue**   25:24
**unfair**   206:20
**unfiling**   178:24
**uniform**   161:1
**union**   1:16,24
5:2 6:20 16:5,13
**unique**   49:11
**united**   1:1 3:23
5:11 6:8 7:4 8:3
10:1 20:24 21:3
21:7 24:22 26:8
28:1 33:15 39:3
39:5,21 40:3
41:25 42:2,3,15
43:6,21 44:18
44:21 46:5,7
47:5,6,11,11,13
47:25 48:1,1,2,6
49:2 59:10
60:18 63:2 72:2
76:4,5,6,9 77:13
77:24 78:10,19
78:21,23 79:5
80:2,5,6,8,9,10

80:19 81:13
82:20 83:15
85:17 86:24
93:19 94:20
155:10 162:8
190:5,13 191:9
191:12 193:24
196:14
**universe**   95:12
**university**   22:8
**unknown**   4:9
**unquestionably**
79:25
**unquestioned**
155:25
**unrelated**   97:23
99:2 144:14
146:10 151:16
151:21
**unsuccessfully**
42:20,21
**upheld**   133:5
138:21
**upholding**   144:5
**urge**   102:6
120:23 121:2
**usbag**   41:21
**use**   45:19 66:5
113:16 180:13
181:1,3 182:6,9
182:19,24
195:15,16
196:13,23 206:5
**user**   181:5
**uses**   66:10
**usitalo**   13:8
36:25 37:1
40:24 41:1,1
57:11,14 58:1,4
68:11 69:12,15

10-03635-jpm    Doc 1000-11    Filed 01/20/23    Entered 01/20/23 21:43:50    Exhibit 16
- Sept. 14   2022 Status Conference Transcript    Pg 121 of 123

[usitalo - weiss]                                                          Page 66

69:15,18,22,25
70:6 71:4,5,5,6
71:6,14 102:25
102:25 103:20
103:22 104:2
105:15,19,22
106:3 112:19,23
113:6,10,15,18
113:23 114:4,7
115:5,11 120:11
usitc's   108:14,17
usual   128:16,23
usually   23:13
utilize   151:16

v

v   1:15,23 2:9,20
3:6,17 5:2 6:20
8:15 10:13 11:9
12:6 16:5,6 22:8
36:8 74:3 84:20
88:2 117:11,14
118:3,22 119:8
119:8,11 123:15
138:20 139:20
139:23 141:15
142:12,20
147:11 154:7
157:23 163:12
168:10,11
170:20 171:24
174:11,11 180:9
180:19,20,21
183:23 184:1,10
value   46:1 62:3
101:5,9,11
102:10 140:1,3
143:23
various   14:5
80:18 86:12
114:24 116:9

119:9
vary   98:21
veil   81:1 83:12
veracity   171:8
verification   62:4
verify   78:10
veritext   210:20
versa   81:8
versus   98:6
196:17 203:23
vi   191:6
viable   177:18
vice   81:8
victoria   13:11
58:8
videoconference
5:13 6:10 7:6
8:4 9:17 10:2
12:2,11
view   20:14
21:13 23:18
24:25 25:11
174:21 176:5
198:18
viewed   88:11
114:9 200:22
viewing   66:18
86:14
views   176:2
villehuchet   8:24
8:25 9:1,2,3,3,5
9:5 37:14 73:21
87:2,21 96:7
105:5 110:13
112:12 115:19
violated   108:23
violates   25:20
virtually   189:2
vis   153:6,6

visit   90:19
visits   90:19
vital   67:9,11
164:1 208:19
voice   167:20
voices   50:15
volume   92:6
107:6
voluntarily
196:18,24
voluntary
195:16

w

w   13:24
wait   30:8 92:5
159:2 206:14
waiting   154:20
waive   45:6
waived   44:10
45:13
walden   174:11
174:18 175:1
182:22 199:8
wallack   157:23
want   26:7,7,9
33:20 34:2,3,11
34:15 49:8 53:2
57:11,19 66:1
71:9 72:25 73:6
73:16 74:17
75:5 78:3 93:6,8
93:9 94:15 95:1
96:21 99:12
106:7 113:4,13
113:18 115:18
120:2 126:7
129:21 150:14
164:17 165:3
167:19 173:16
194:21 195:3

196:6
wanted   41:2,22
94:20 126:2,9
126:11 151:3
202:16
wants   72:6
171:21 177:13
199:4
warning   50:15
50:20
warrant   129:19
warren   172:15
warshavsky
10:8 13:9 37:3
water   167:6
way   24:4 42:4
42:24 44:3
76:13 83:5
100:17 101:1,3
104:16 111:19
123:12 133:3
136:11 160:19
160:25 161:9
163:18 181:21
196:20
ways   97:5
we've   17:10 24:8
27:4,15,16
33:22 49:9 51:4
55:2 56:13,24
93:18 103:14
106:18 118:12
195:9 201:19
weather   123:5
websites   84:24
week   20:8
weeks   19:2 20:9
33:24
weiss   139:23

**welcome** 17:18
204:13
**went** 52:14
81:25 82:14
83:1 123:7
125:8 127:3
130:25 146:12
153:19 186:19
195:18,24
**whatsoever**
160:1
**wholly** 80:2
151:17
**willful** 52:10
111:21 120:17
120:18
**willing** 20:11
32:11 111:4
**willingness**
78:20
**winner** 92:20
143:16
**wire** 151:12
**wired** 199:12
**wish** 71:7 122:5
122:24 153:22
201:10 208:23
**wishes** 96:6
**withdrawals**
144:10,12
145:17
**withdrawn**
144:9 179:12
**withdrew** 143:5
146:16
**withholding**
109:12
**witness** 19:20
25:25

**witnesses** 205:20
**wl** 137:10
163:13
**word** 113:4
179:23
**words** 135:4
148:6 202:23
203:3
**work** 41:11
61:18 67:15
73:18 80:4,18
81:10,19 83:2
87:14 95:25
100:18 176:1
**worked** 61:24
**working** 65:16
**works** 48:23
**world** 23:11
102:5 196:16
200:5
**worth** 111:6
**would've** 17:8
70:21
**writing** 19:13
**written** 19:22
123:2 154:1
209:17
**wrong** 24:25
28:13 134:5
146:7,8 165:20
**wrongdoers**
182:19
**wrongdoing**
51:17 182:9
196:2
**wrote** 187:2

**x**

**x** 1:4,10,12,18
1:20 2:1,3,12,14
2:23,25 3:9,11

3:20

**y**

**yale** 22:8
**yeah** 28:20 29:6
35:18 57:6,7
71:11 98:22
102:23 120:3
124:12 194:23
**year** 28:7 46:8
47:3 114:13
128:5 148:1
156:15 170:5
179:6 206:15,17
**years** 16:19 17:9
23:11 46:23
52:24 55:5
106:11 156:7,12
161:20 169:2,3
177:25 205:6
207:3
**york** 1:2 3:25
13:6,17,25 14:7
14:15,22 15:5
15:13,21 35:13
60:3,14,16,20
61:16,17 62:24
62:25 63:14,19
63:24 64:7,10
65:18 66:25
67:9,16 75:13
75:15 77:18
81:15,23 82:24
84:16 86:10,21
87:6,10,24
88:10,16 89:2,8
89:20 90:13,15
90:19,21,23
91:8,10,12,20
92:11 94:13,22
94:23,25 95:2

95:10,11,16
97:22 139:21
173:14 175:21
175:21 176:7,10
176:18,19,20,23
176:24 177:4,9
177:9,12,15
179:23 180:8,11
180:12,16,16,24
181:1,1,18,20
181:21 182:2,6
182:12,19,24
183:2,2,21
188:16,24 190:2
190:9,10,13
191:6,10,13,25
192:12,13,14
193:14,25 194:2
194:9,11,15
195:14,18,24
196:11,19,20,23
196:25 197:7
199:8,13,14,19
199:21 201:24
**york's** 183:4,5
**young** 17:17

**z**

**zeb** 14:24 204:2
**zero** 21:11 47:22
124:12,13
183:15
**zeroes** 183:14
200:12
**zoom** 120:8
**zoomgov** 5:13
6:10 7:6 8:5
9:17 10:3 12:2
12:11

**[à - à]**

| à |
|---|
| **à**    153:6 |