# Exhibit A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>FAIRFIELD SENTRY LIMITED, et al.,<br><br>            Debtor in Foreign<br>            Proceedings. | Chapter 15 Case<br><br>Case No. 10-13164 (CGM)<br><br>Jointly Administered |
| FAIRFIELD SENTRY LTD. (IN<br>LIQUIDATION), et al.,<br><br>            Plaintiffs,<br><br>            v.<br><br>ABN AMRO SCHWEIZ AG, et al.,<br><br>            Defendants. | Adv. Pro. No. 10-03635 (CGM) |
| FAIRFIELD SENTRY LTD. (IN<br>LIQUIDATION), et al.,<br><br>            Plaintiffs,<br><br>            v.<br><br>ABN AMRO SCHWEIZ AG, et al.,<br><br>            Defendants. | Adv. Pro. No. 10-03636 (CGM) |

## MEMORANDUM OF LAW IN SUPPORT OF THE LIQUIDATORS' MOTION FOR SANCTIONS UNDER RULE 37(e) AGAINST BANQUE INTERNATIONALE À LUXEMBOURG SA

Date: January 20, 2023

SELENDY GAY ELSBERG PLLC

David Elsberg
Maria Ginzburg
Jordan Goldstein
Lena Konanova
David S. Flugman
Joshua S. Margolin
1290 Avenue of the Americas
New York, New York 10104
Telephone: 212-390-9000

FILED UNDER
PENDING MOTION TO SEAL

-and-

BROWN RUDNICK LLP

David J. Molton
Marek P. Krzyzowski
Seven Times Square
New York, New York 10036
Telephone: 212-209-4800

FILED UNDER
PENDING MOTION TO SEAL

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND .......................................................................................................4

    A.    BIL Once Possessed ESI Relevant To Its Investment In The Fund .......................4

    B.    BIL Knew Immediately About The Collapse Of BLMIS And Related
        Litigation...............................................................................................8

    C.    BIL Failed To Take The Steps Necessary To Preserve ESI .................................10

    D.    BIL Did Not Take Reasonable Steps To Preserve The ESI Of Key
        Custodians...........................................................................................13

    E.    BIL Failed To Disclose Its Destruction of ESI to the Liquidators .......................16

LEGAL STANDARD...............................................................................................18

    A.    Elements Of A Spoliation Claim Under Rule 37(e) .............................................18

    B.    Sanctions To Remedy Prejudice Under Rule 37(e)(1) ........................................20

    C.    Adverse Inference For Spoliation With Intent To Deprive Under Rule
        37(e)(2) ...............................................................................................21

ARGUMENT...........................................................................................................22

I.    BIL's Spoliation Of ESI Under Rule 37(e)(1) Entitles The Liquidators To A
    Preclusion Order ................................................................................................22

    A.    BIL's Duty To Preserve ESI Was Triggered In December 2008 .........................22

    B.    BIL Failed To Take Reasonable Steps To Preserve ESI ......................................25

        1.    For 23 Months After It Should Have Anticipated Litigation, BIL
            Did Nothing To Preserve ESI ...................................................................25

        2.    Beginning In November 2010, BIL Unreasonably Relied On Its
            Employees To Implement Its Litigation Hold .........................................26

    C.    BIL's ESI Cannot Be Restored Or Replaced......................................................29

    D.    Because BIL's Spoliation Prejudices The Liquidators, The Court Should
        Issue An Order Precluding BIL From Making Certain Arguments Under
        Rule 37(e)(1)........................................................................................31

FILED UNDER
PENDING MOTION TO SEAL       i

1.      The Liquidators Are Prejudiced By BIL's Spoliation ...............................32

2.      To Remedy The Prejudice To The Liquidators, The Court Should
        Preclude BIL From Disputing Personal Jurisdiction On The
        Grounds That Certain Evidence Is Lacking................................................33

II.   Because BIL Destroyed ESI Through Its Conscious Dereliction Of Its Duty To
      Preserve, This Court Should Presume The Deleted ESI Would Have Been
      Unfavorable For BIL.........................................................................................35

      A.    BIL's Conscious Dereliction Of Its Duty To Preserve Demonstrates Its
            Intent To Deprive The Liquidators Of This Evidence ...........................36

      B.    The Court Should Grant The Liquidators An Adverse Inference........................38

CONCLUSION.............................................................................................................40

FILED UNDER
PENDING MOTION TO SEAL                    ii

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*4DD Holdings, LLC v. United States*,
   143 Fed. Cl. 118 (2019) ..................................................................................................36

*Ala. Aircraft Indus., Inc. v. Boeing Co.*,
   319 F.R.D. 730 (N.D. Ala. 2017).....................................................................................38

*Alexander Interactive, Inc. v. Adorama, Inc.*,
   2014 WL 12776440 (S.D.N.Y. 2014).................................................................19, 23, 25

*Bristol-Meyers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*,
   1997 WL 470115 (S.D.N.Y. Aug. 15, 1997).....................................................................24

*CAT3, LLC v. Black Lineage, Inc.*,
   164 F. Supp. 3d 488 (S.D.N.Y. 2016)..........................................................................20, 33

*CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*,
   2021 WL 4190628 (S.D.N.Y. Aug. 18, 2021)...............................................................18, 22

*Charlestown Cap. Advisors, LLC v. Acero Junction, Inc.*,
   337 F.R.D. 47 (S.D.N.Y. 2020) ................................................................................ *passim*

*Claredi Corp. v. SeeBeyond Tech. Corp.*,
   2010 WL 11579710 (E.D. Mo. Mar. 8, 2010) ..................................................................29

*Coan v. Dunne*,
   602 B.R. 429 (D. Conn. 2019) .....................................................................................19, 30

*ComLab Corp. v. Tire*,
   815 F. App'x 597 (2d Cir. 2020) .......................................................................................18

*CrossFit Inc. v. Nat'l Strength & Conditioning Ass'n*,
   2019 WL 6527951 (S.D. Cal. Dec. 4, 2019).........................................................26, 36, 37

*Doubleline Cap. LP v. Odebrecht Fin., Ltd.*,
   2021 WL 1191527 (S.D.N.Y. Mar. 30, 2021) ..................................................23, 24, 25, 33

*DVComm, LLC v. Hotwire Commc'ns, LLC*,
   2016 WL 6246824 (E.D. Pa. Feb. 3, 2016) ......................................................................39

*Europe v. Equinox Holdings, Inc.*,
   592 F. Supp. 3d 167 (S.D.N.Y. 2022)......................................................................19, 25, 27

*Fed. Trade Comm'n v. F&G Int'l Grp. Holdings, LLC*,
    339 F.R.D. 325 (S.D. Ga. 2021) ........................................................29

*Karsch v. Blink Health Ltd.*,
    2019 WL 2708125 (S.D.N.Y. June 20, 2019) ...............................20, 32

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
    341 F.R.D. 474 (S.D.N.Y. 2022) ......................................................28

*Kronisch v. United States*,
    150 F.3d 112 (2d Cir. 1998) ....................................................18, 21, 23

*Lokai Holdings LLC v. Twin Tiger USA LLC*,
    2018 WL 1512055 (S.D.N.Y. Mar. 12, 2018) ........................25, 26, 33

*Man Zhang v. City of N.Y.*,
    2019 WL 3936767 (S.D.N.Y. Aug. 20, 2019) ..................................32

*Moody v. CSX Transp., Inc.*,
    271 F. Supp. 3d 410 (W.D.N.Y. 2017) ........................................ *passim*

*Mule v. 3-D Bldg. & Constr. Mgmt. Corp.*,
    2021 WL 2788432 (E.D.N.Y. July 2, 2021) ................................ *passim*

*O'Berry v. Turner*,
    2016 WL 1700403 (M.D. Ga. Apr. 27, 2016) ........................30, 37, 39

*Ottoson v. SMBC Leasing & Fin., Inc.*,
    2017 WL 2992726 (S.D.N.Y. 2017) ..................................................37

*Ottoson, v. SMBC Leasing & Fin., Inc.*,
    268 F. Supp. 3d 570 (S.D.N.Y. 2017) ..............................................39

*In re Petters Co.*,
    606 B.R. 803 (Bankr. D. Minn. 2019) ....................................21, 36, 38

*Picard v. Banque Lombard Odier & Cie SA*,
    2022 WL 2387523 (Bankr. S.D.N.Y. June 30, 2022) ..........................6

*Picard v. Bureau of Labor Ins. (In re BLMIS)*,
    480 B.R. 501 (Bankr. S.D.N.Y. 2012) ................................................1

*Picard v. Meritz Fire & Marine Ins. Co. Ltd.*,
    2022 WL 3273044 (Bankr. S.D.N.Y. Aug. 10, 2022) ........................31

*Picard v. Parson Fin. Panama S.A.*,
    2022 WL 3094092 (Bankr. S.D.N.Y. Aug. 3, 2022) .......................6, 34

*Picard v. Union Sec. Inv. Tr. Co., Ltd.*,
   2022 WL 3572509 (Bankr. S.D.N.Y. Aug. 18, 2022) .............................................5, 6, 28, 31

*Schaffer v. Horizon Pharma PLC*,
   2018 WL 481883 (S.D.N.Y. Jan 18, 2018) .............................................................................23

*Sekisui Am. Corp. v. Hart*,
   945 F. Supp. 2d 494 (S.D.N.Y. 2013)....................................................................................39

*Skyline Steel, LLC v. PilePro, LLC*,
   101 F. Supp. 3d 394 (S.D.N.Y. 2015)....................................................................................19

*Taylor v. City of N.Y.*,
   293 F.R.D. 601 (S.D.N.Y. 2013) .......................................................................................19, 23

*United States v. DeFonte*,
   441 F.3d 92 (2d Cir. 2006)....................................................................................................24

*Voom Hd Holdings LLC v. Echostar Satellite L.L.C.*,
   2010 WL 8400073 ................................................................................................................24

*VOOM HD Holdings LLC v. EchoStar Satellite L.L.C.*,
   93 A.D.3d 33 (2012) .............................................................................................................24

*Zubulake v. UBS Warburg LLC*,
   229 F.R.D. 422 (S.D.N.Y. 2004) ................................................................................... *passim*

## Other Authorities

Fed. R. Bankr. P. 7037........................................................................................................................1

Fed. R. Civ. P. 11............................................................................................................................37

Fed. R. Civ.P. 26...........................................................................................................17, 21, 37, 38

Fed. R. Civ. P. 26(a) .............................................................................................................13, 14, 15

Fed. R. Civ. P. 26(f)........................................................................................................................16

Fed. R. Civ. P. 30(b)(6)...............................................................................................................4, 17

Fed. R. Civ. P. 37(e) ................................................................................................................ *passim*

Kenneth M. Krys and Greig Mitchell (the "Liquidators"), in their capacities as the duly appointed Liquidators and Foreign Representatives of Fairfield Sentry Limited (In Liquidation) ("Sentry"), Fairfield Sigma Limited (In Liquidation) ("Sigma"), and Fairfield Lambda Limited (In Liquidation) ("Lambda," and together with Sentry and Sigma, the "Funds" or the "Fairfield Funds"), in the above-captioned adversary proceedings, respectfully submit this memorandum of law in support of their motion for sanctions against Defendant Banque Internationale à Luxembourg SA (*f/k/a* Dexia Banque Internationale à Luxembourg) ("BIL") for spoliating evidence relevant to personal jurisdiction under Federal Rule of Civil Procedure 37(e), as made applicable here by Rule 7037 of the Federal Rules of Bankruptcy Procedure.

## PRELIMINARY STATEMENT

This Court should sanction BIL for spoliating evidence directly related to the personal jurisdiction inquiry currently pending before the Court. Although BIL learned of the collapse of Bernard L. Madoff Investment Securities LLC ("BLMIS") immediately—recognizing it was "one of the most important frauds in the economic history of the planet [E]arth"—BIL took no steps to collect and preserve ESI related to the Fairfield Funds for nearly two years. When BIL distributed the single litigation hold in connection with this case in November 2010, it was manifestly inadequate: several custodians did not get it at all, and for those who did, BIL did not follow up with them to collect and preserve ESI. BIL never suspended any employee's—including hold recipients'—ability to permanently delete ESI. And so, for more than a decade after it undisputedly knew of this litigation, relevant ESI was deleted in the ordinary course. To take but one example, in late 2021, after it had received the Liquidators' jurisdictional discovery requests in this action and while this Court was presiding over these cases, BIL deleted the entire email inbox of a key custodian who had received the litigation hold.

There is no question that ESI relevant to this case once existed. The Liquidators know from documents obtained from third parties that BIL once possessed ESI, including emails seeking and obtaining diligence on the Funds from the Funds' administrator, Citco Fund Services ("Citco"), and emails communicating with the Funds' investment manager, Fairfield Greenwich Group ("FGG"), regarding investments in the Funds, ██████████████████████████. Nor is there any doubt that this ESI would still exist had BIL not disregarded its duty to preserve that ESI after the duty arose. But this ESI no longer exists because BIL deleted it. Now, BIL has only incomplete, printed copies of certain emails that lack metadata, blind carbon copies ("BCCs"), and attachments that would have been available had BIL properly preserved relevant ESI, as it was required to do under the law of this Circuit.

BIL's preservation failures began the day after the revelation of Madoff's fraud and continued even after this Court allowed discovery to proceed in mid-2021. BIL immediately learned of the Madoff collapse, and because of its "huge" exposure through four non-Fairfield BLMIS feeder-funds, it took steps to preserve information relating to those funds shortly thereafter. After contacting counsel within days of the BLMIS collapse, BIL created a "Madoff Task Force" that began collecting and preserving documents and ESI relating to these other funds—but that task force did nothing with respect to Sentry. Instead, BIL waited 23 months (until November 2010) before attempting any steps to preserve ESI for its investment in Sentry even though it should have reasonably anticipated litigation at the time of the Madoff collapse.

In November 2010, BIL circulated the one litigation hold it ever circulated with respect to Fairfield—but it was both too little and too late. Despite its employees having little-to-no familiarity with litigation holds, BIL took no institutional steps to preserve ESI, instead relying entirely on those employees to implement the litigation hold, with no assurances that the recipients

understood or had even read the hold. Its counsel did not familiarize itself with potential sources of information or BIL's data retention systems. No one conducted employee interviews to determine who should receive the hold and, as a result, two key custodians never received it. And despite the litigation hold █████████████████████████████████████████████████ █████████████████████████████████████, when BIL attempted to collect information responsive to the Liquidators' jurisdictional discovery requests.

There is no question that had BIL acted to preserve ESI in December 2008 when it reasonably was on notice—or even in November 2010, when it did in fact send out a litigation hold—ESI from relevant custodians during the relevant time period would be available today. BIL's document preservation policy, ██████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████. Moreover, BIL's third-party IT vendor maintained a journaling service for BIL that automatically captured and preserved every email sent to and received from anyone outside the bank for a period of ten years. Had BIL acted even in 2010— well within the ten-year retention period—to preserve this ESI, it would still exist today. But BIL did not suspend its policy of deleting all ESI from departing employees' accounts within six months after their departure and it never suspended the automatic deletion of the journaled emails for relevant custodians. As a result, by the time the Liquidators were permitted to serve discovery requests on BIL in 2021, BIL had no ESI from the relevant time period to produce—because it had all been destroyed.

The Liquidators seek two forms of relief from this Court. *First*, because the Liquidators are prejudiced by BIL's spoliation of ESI documenting jurisdictional contacts between BIL and the United States, the Liquidators seek an order precluding BIL from making certain arguments

under Rule 37(e)(1). BIL (i) was obligated to preserve ESI in anticipation of this litigation, (ii) destroyed ESI because it failed to take reasonable preservation steps, and (iii) cannot restore or replace that destroyed ESI. Thus, this Court should enter an order under Federal Rule 37(e)(1) precluding BIL from arguing that this Court cannot exercise personal jurisdiction in this case in the absence of the very evidence of jurisdictional contacts that BIL destroyed.

*Second*, BIL's conscious dereliction of its known duties to preserve documents warrants an adverse inference under Federal Rule 37(e)(2). Despite retaining sophisticated counsel to address its exposure to other Madoff feeder funds, BIL ignored well-established duties to preserve ESI related to the Fairfield Funds at virtually every step—even after hiring U.S. counsel and after receiving the Liquidators' jurisdictional discovery requests. For other Madoff feeder-funds, BIL acted quickly to preserve ESI by, for example, creating a "Madoff Task Force" and asking it to centrally collect documents and information; BIL chose not to take those steps for Fairfield. BIL's conscious dereliction of its basic preservation obligations, combined with a lack of any plausible explanation for how such a significant amount of ESI was deleted across multiple custodians— continuing for years after BIL became aware of this litigation—demonstrates its intent. As such, the Court should further exercise its broad discretionary powers under Rule 37(e)(2) and, as the finder of fact in deciding BIL's pending motion to dismiss for lack of personal jurisdiction, presume that the substance of the deleted ESI would have demonstrated jurisdictional contacts between BIL and the United States in connection with the transactions at issue, supporting the Liquidators' position that the Court can properly exercise personal jurisdiction in this case.

## **BACKGROUND**

### A.    **BIL Once Possessed ESI Relevant To Its Investment In The Fund**

BIL was no small player within the BLMIS ecosystem; BIL had hundreds of millions of dollars of exposure to BLMIS, through multiple feeder funds, Ex. 1 (transcript of Rule 30(b)(6)

deposition of BIL) ("Tr.") at 40:3-10,[1] including several, like Rafale Partners, Inc., and Blue Star

Funds, that it actively marketed to its customers. *Id.* 40:21-41:2. BIL also placed an investment in

BLMIS feeder-fund Sentry through Citco. *See* Ex. 2 (documents reflecting BIL's "transaction file"

for its Sentry investment) at -020, -003.

BIL does not contest the fact that it once possessed ESI relevant to the subscription and

redemption at issue in this case. *See* Tr. 111:7-10; 117:9-14. Indeed, the hard copy set of documents

that BIL has characterized as the "transaction file" for the at-issue redemption contains printed

portions of emails making this clear. *See Id.* 126:17-22. This partial email record reflects

█████████████████████████████████████████████████████████████████

████████████████████. *Id* 105:9-23, 108:15-23. As BIL acknowledges, however, the

transaction file is incomplete: when printing the emails that went into this file, key custodians in

this case did not print entire threads or attachments. *See id.* 11:7-13, 89:19-23, 117:9-14 ("Q. I

think we talked a little bit about the fact that these files are not complete because they were printed

in the way that whomever assembled the document chose to print them, is that right? A. Yes."),

118:14-119:6. Although BIL does not know for certain today how precisely this file was compiled

(and could not identify any policies that would have governed its compilation), it believes that

employees would have printed documents (or portions thereof)—at their discretion—to preserve

at the time of the transaction. *Id.* 106:17-23, 108:24-109:16; 117:21-23. As such, BIL's production

does not include all attachments or any metadata or BCC information—let alone a full set of

relevant emails. *See id.* 113:18-114:12.

---

[1] Unless otherwise specified, all exhibits refer to those attached to the Declaration of David S.
Flugman, being filed contemporaneously with this brief.

BIL's failure to preserve ESI relevant to this case extends beyond its haphazard collection of hard copy files. The Liquidators have obtained some evidence from third parties showing that BIL employees regularly used email to communicate about ██████████████, *see id.* 146:19-147:7, including to solicit and receive, on multiple occasions, ███████████ ████. *See* Exs. 3 (██████████████████████████████████████ ██████████████████████), 3-1 (████████████████████████████████), 4 (█████ ██████████████████████████████████████████████████), 4-1, 4-2. ████████████████████████████████████████████████ ████████████████████████████████████████████████████. Ex. 3-1 at -667. Additionally, a key custodian in this case ███████████████ ████████████████████████████████████████████████ ███████████████████████████████. *See* Ex. 5 (█████████████ ██████████████████████████████████████), Ex. 6 (████████████ ████████████████████████████████████████████████ ████). The Liquidators even obtained from third parties a more complete version of one email chain that BIL itself produced from its hard copy "transaction file." Tr. 125:7-16. ████ ████████████████████████████████████████████████████ ██████████████████████████. Recent decisions by this Court confirm that these sorts of communications are directly relevant to the jurisdictional inquiry.[2] Had BIL preserved the

---

[2] *See, e.g., Picard v. Banque Lombard Odier & Cie SA*, 2022 WL 2387523, at *3 (Bankr. S.D.N.Y. June 30, 2022) (citing receipt of Sentry offering memoranda and knowledge from those memoranda that FGG "was required to invest no less than 95% of the fund's assets through BLMIS" as evidence of purposeful availment); *Picard v. Union Sec. Inv. Tr. Co., Ltd.*, 2022 WL 3572509, at *3-4 (Bankr. S.D.N.Y. Aug. 18, 2022) (citing diligence-related emails between FGG in the United States as evidence of jurisdictional contacts); *Picard v. Parson Fin. Panama S.A.*, 2022 WL 3094092, at *3-4 (Bankr. S.D.N.Y. Aug. 3, 2022) (citing communication with FGG

inboxes from its employees that worked on the at-issue investment, these emails and the documents attached to them would still be available today. *Id.* 147:21-148:8.

Because BIL failed to take reasonable steps to preserve information relevant to this litigation, it is impossible to know the full extent of the ESI that once existed but no longer does. The relevant emails produced by BIL or obtained from third parties likely represent only the tip of the iceberg of relevant communications that once existed in BIL's possession. For example, BIL's corporate representative testified that the bank's "relationship managers" would have had communications with the underlying client about placing the investment at issue in this case. *See id.* 98:8-23 (explaining that the relationship manager is responsible for communicating with an underlying client). Such communications could have included emails and phone calls, *id.* 79:15-80:13, 184:13-19; both of which BIL would have preserved in the ordinary course as a matter of corporate policy, *see id.* 157:18-22, 181:15-19, and both of which have the potential to demonstrate relevant jurisdictional contacts. *See, e.g., supra* n.2. But BIL does not today have any preserved ESI for (among others) Gianni Baldinucci, the relationship manager for the client whose investment is at issue in this litigation. *See* Tr. 79:18-21 (noting Baldinucci had contact with the underlying client), 56:20-23 (noting that BIL has no access to ESI for either of the relationship managers for the at-issue investment). Remarkably, after Mr. Baldinucci left BIL in the middle of 2021, all of Mr. Baldinucci's ESI was destroyed pursuant to standard BIL policy—even though Mr. Baldinucci had received a litigation hold in 2010 directing him to preserve ESI relating to this investment, all of which should have been available at that time. *See id.* 86:13-19, 261:16-22.

---

in the United States about subscriptions in/redemptions from the Funds as evidence of jurisdictional contacts).

### B.    BIL Knew Immediately About The Collapse Of BLMIS And Related Litigation

On December 11, 2008, Bernard Madoff was arrested and confessed that BLMIS was a Ponzi scheme. Fifth Am. Compl. (Dkt. 679) ¶ 193.[3] Sentry, a BLMIS "feeder-fund," suspended its operations shortly after the BLMIS fraud became public. *Id.* ¶¶ 133, 198.

BIL learned of Madoff's arrest and the "catastrophic" collapse of BLMIS in mid-December 2008 as events unfolded. *See* Tr. 201:1-3. BIL considered the collapse of BLMIS to be a "huge shock" to the financial world and "one of the most important frauds in the economic history of the planet [E]arth." *Id.* 39:12-24, 200:23-201:8. It was also a significant shock to BIL's operations: because "the bank granted some loans to several feeder funds ultimately invested in Madoff," it had a "total exposure at the time of discovery of the Madoff fraud of $220 million." *Id.* 40:7-10. "For a small to medium bank like BIL, this exposure was huge." *Id.* 40:13-15. ████████████ ████████████████████████████████████████. *Id.* 193:16-18. It quickly set up a "Madoff Task Force" to address this exposure from four Madoff feeder funds—but not the Fairfield Funds (the "<u>Non-Fairfield Feeder Funds</u>").[4] *Id.* 226:22-24, 38:22-39:1. At this time, BIL received global financial news, including from the Securities and Exchange Commission and Bloomberg, *see id.* 39:14-16, 213:17-23, keeping it abreast of developments, including news coverage from Bloomberg on December 31, 2008 discussing the high probability of clawback litigation. *Id.* 214:17-215:14; *see* Ex. 7 (December 31, 2008 Bloomberg article discussing potential

---

[3] Unless otherwise specified, docket citations refer to filings in Adv. Pro. No. 10-03636 (CGM).

[4] The Non-Fairfield Funds were BLMIS feeder-funds Rafale Partners, Inc., Blue Star Funds, Mianda, and Mount Capital Funds. *Id.* 41:1-2. BIL ███████████████████████████████ ████████████████████████████████████ *Id.* 194:10-17. For Fairfield, unlike these funds, BIL ███████████████████████████████. *Id.* 195:3-6.

for clawback litigation). By February 2009, BIL was also aware that the net asset value (NAV)
calculation for Sentry had been suspended. Tr. 216:20-23; *see* Ex. 8.

Within days after Madoff's crimes came to light, BIL contacted counsel at Clifford Chance
in Luxembourg regarding its exposure to Madoff. Tr. 211:15-25. After consulting with counsel, in
early 2009, the Madoff Task Force began collecting information concerning the Non-Fairfield
Feeder Funds from BIL employees in order to preserve it. *See id.* 225:4-11. BIL's corporate
representative, who was a member of the Madoff Task Force at the time, *id.* 39:25-40:2, confirmed
that "[o]ne of the objectives of that task force was that an inspection team was mandated to collect
physical documents and to store them in a safe place, locked physically by the inspection team."
*Id.* 219:4-8. But BIL took no such actions with respect to BIL's investments in the Funds, including
the investment at issue in this litigation, at that time. *Id.* 219:4-13. Nevertheless, BIL has all but
confirmed it discussed potential Fairfield litigation at this time: as early as December 15, 2008,
BIL had privileged communications about potential claims against FGG, *id.* 209:13-18, as early
as December 31, 2008, BIL had privileged communications about potential BLMIS clawback
litigation, *see id.* 215:15-21, and as early as February 5, 2009, BIL had privileged communications
about potential litigation regarding FGG and the Fairfield Funds. *Id.* 216:24-217:6.

Beginning on April 23, 2009, the Liquidators were appointed to recover redemption
payments that were made before Madoff's fraud was exposed and equitably redistribute them to
the Funds' shareholders. Fifth Am. Compl. ¶ 29. The Liquidators filed this litigation against BIL
in New York State Supreme Court on April 20, 2010. *See* Summons with Notice, NY Sup. Ct.,
Index No. 650316/2010 (Dkt. 1). The Liquidators effectuated service on BIL by mail of a notice
and summons describing its claims on June 18, 2010, *see* Affidavit of Service, NY Sup. Ct., Index

No. 650316/2010 (Dkt. 2), and BIL concedes that it actually received and was aware of that notice

and summons (and this litigation) no later than August 30, 2010. Tr. 51:17-21.

### C.    BIL Failed To Take The Steps Necessary To Preserve ESI

In the wake of the BLMIS collapse, rather than collect ESI—as it had in connection with

the Non-Fairfield Feeder Funds, *id.* 227:21-228:2—BIL took no action with respect to Fairfield

for 21 months. *See id.* 219:9-13. It was only in September of 2010 that BIL made its first attempt

to collect any information relevant to this lawsuit. At that time, a key custodian sent in-house

counsel a so-called "transaction file" for the at-issue investment, composed of hard copy

documents (including limited emails) compiled by employees contemporaneously with the

transactions. *Id.* 126:16-22, 106:17-23, 254:17-255:12; *see* Ex. 9 (BIL privilege log reflecting

receipt of the transaction file by counsel in September 2010). Had BIL reviewed its own transaction

file at this time, which contained portions of emails from key custodians then-employed by the

bank, it would have known to collect and preserve relevant ESI from these individuals, *see* Tr.

108:15-18; *see generally* Ex. 2; but it made no effort to do so. As a result, BIL failed not only to

collect this information, but failed to even send two key individuals a litigation hold. *See* Tr.

240:16-24.

It was not until October 2010 that BIL finally contacted U.S. counsel at Clifford Chance,

U.S. LLP ("Clifford Chance"). The following month, advised by Clifford Chance, BIL distributed

a litigation hold with respect to Fairfield. *See id.* 242:14-1, 230:19-24, 231:12-16; Ex. 10

(November 25, 2010 litigation hold memorandum). While the Madoff Task Force that previously

had been established to manage the bank's liability as to the Non-Fairfield Feeder Funds was

tasked with identifying BIL employees that may have been involved with the Sentry investments,

no such interviews with BIL employees ever took place. Tr. 258:7-16; 260:4-10, 260:16-18 ("I

don't recall an interview at that time with the employees in relation to this selection process.").

Both the litigation hold, dated November 25, 2010, and the email attaching the hold, dated

November 26, 2010, ███████████████████████████████████████████████████████

███████. *See* Exs. 10, 12 (September 9, 2022 email forwarding BIL's document retention

notice) 12-1 (an original French language version of Ex. 12). The litigation hold ███████

████████████████████████████████████████████████████████████████████████

████████████████████████████████ Ex. 10. The litigation hold concluded by stating

████████████████████████████████████████████████████████████████████████

████████████████████████ *Id.*

Despite this language, BIL did not follow-up on this hold until the middle of 2022, when

BIL's lawyers sought to collect information responsive to the Liquidators' discovery requests.

Tr. 249:13-18. In the intervening eleven years, no member of BIL's legal team ever contacted

anyone who had received the litigation hold notice to ensure that potentially relevant information

had been properly preserved, *id.* 250:16-20, let alone to collect such information (including ESI)

for preservation in a central, secure location—like the collection BIL's Madoff Task Force had

undertaken with respect to BIL's investments in the Non-Fairfield Feeder Funds.[5] *See id.* 219:4-8

(describing central collection of physical documents for Non-Fairfield Feeder Funds); 226:25-

228:12 (describing collection of ESI for Non-Fairfield Feeder Funds).

Instead, BIL relied entirely on individual employees to set aside whatever information the

particular employee believed would be covered by the scope of the hold. *See* Ex. 10, Tr. 248:12-

16. BIL chose to do this despite the fact that BIL and its employees had little to no experience with

litigation holds. Tr. 242:18-243:12. The litigation hold did not ███████████████████████

---

[5] It appears that the only documents collected at the time relating to the investment at issue in this
case was the hard copy "transaction file" that was collected in September 2010, before the litigation
hold was issued. Ex. 9.

FILED UNDER
PENDING MOTION TO SEAL                11

██████████████. *Id.* 251:7-10. Nor did BIL ever ask any of the recipients whether they had

complied with the instructions, *id.* 251:11-14, or ever reissue or remind anyone as to the existence

of this litigation hold until 2022. *Id.* 235:6-236:2.

Moreover, even though the email attaching the litigation hold disclosed ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████ Ex. 12 at -538 (emphasis added), BIL took no such

measures—in fact, "no specific steps were taken" at all. *See* Tr. 240:21-24, 241:8-13. BIL never

sent the litigation hold to its IT department. *See id.* 259:18-23 (litigation hold was sent to line

employees), 263:13-15 (litigation hold was sent to no one else). Nor did BIL suspend deletion

permission for its employees or its policy of destroying an employee's ESI six months after they

left the bank. *See id.* 85:1-22. Indeed, this practice continued even if an employee had received the

litigation hold and even after this Court permitted discovery in this case to proceed. *See id.* 86:4-

19, 261:16-22.

Though BIL failed to collect any ESI for this litigation, BIL cannot dispute that relevant

ESI about these investments was in BIL's custody or control through the end of 2017—over nine

years after BLMIS collapsed and seven years after BIL issued its litigation hold. During the

relevant period and after the BLMIS collapse, BIL had two ordinary course safeguards in place to

ensure that BIL had relevant ESI well after 2010. *First*, BIL had a ████████ document retention

policy, *see* Exs. 11 (BIL's ████████████████████ policy), 11-1 (original French

language version of Ex. 12), requiring ████████████████████████████████████

████████████████████████████████████████████████████████████████

████. Tr. 161:21-162:1; *see* Ex. 11. *Second*, BIL employed a third party—first IBM, and then its

successor, Kyndryl—to provide an automatic "journaling" of email traffic between BIL employees and anyone external to the bank throughout the relevant period. Tr. 64:9-15, 69:5-10 (noting that IBM and then Kyndryl have provided this service since approximately 2002). This process was automatic: all external emails would be preserved for ten years, and then deleted after the expiration of this period. *Id.* 66:4-68:17 (describing journaling mechanics). It was also separate from an employee's active inbox, meaning that if an employee had deleted an email from their inbox, it would be available in the journal. *See id.* 66:17-25 (noting that exchange server was separate from journalling server). Pursuant to this feature, BIL's vendor would have maintained all external emails sent regarding the subscription and redemption at issue here at the time they were made in 2005 and 2007, respectively, for ten years—meaning they would have been available until 2015 and 2017, respectively. *See id.* 69:22-70:16. But because BIL never turned off the ten-year deletion of back-ups, those emails were deleted from the journals after ten years, and none of them exist today. *See id.* 69:18-21 (noting journals were kept for ten years "[a]nd only ten years").

D.    **BIL Did Not Take Reasonable Steps To Preserve The ESI Of Key Custodians**

On October 11, 2022, BIL identified six key custodians who may have discoverable information relating to this case. As of today, BIL has no ESI for these custodians from the relevant time period.

| Custodian | Current/Former Employee? | Received Litigation Hold? | ESI Available from Relevant Period? |
|---|---|---|---|
| Gianni Baldinucci[6] | Former employee | Yes | **No** |
| Chantal May-Reyter | Former employee | **No** | **No** |
| Marie-Claire Meyers | Former employee | Yes | **No** |
| Jeannot ("Benny") Reiter | Former employee | Yes | **No** |

---

[6] Misidentified in BIL's Amended Rule 26(a) disclosures as "Gianni Baldanucci."

| Custodian | Current/Former Employee? | Received Litigation Hold? | ESI Available from Relevant Period? |
|---|---|---|---|
| Marie-Anne Salentiny[7] | Current employee | **No** | **No** |
| Maria Totaro[8] | Current employee | Yes | **No** |

*See* Ex. 13 (BIL's Rule Amended 26(a) Disclosures, dated October 11, 2022); *see also* Ex. 14 (BIL's Initial Rule 26(a) Disclosures, dated October 28, 2021).

The litigation hold BIL distributed in November 2010 went to only four of the six individuals that BIL now submits were likely to have had relevant information: neither Chantal May-Reyter nor Marie-Anne Salentiny received the litigation hold and, thus, neither Ms. May-Reyter nor Ms. Salentiny were ever directed to preserve information potentially relevant to this litigation. *See* Ex. 12, Tr. 266:4-15. The transaction file that BIL collected before it issued the November 2010 litigation hold, however, contains portions of emails from both Ms. May-Reyter's and Ms. Salentiny's email accounts. Tr. 264:1-11; 266:16-22, *see, e.g.,* Ex. 2 at -041-44; -021, -027. Had BIL's legal department looked through the 74 pages of the transaction file at the time it was collected, it would have been clear that both Ms. May-Reyter and Ms. Salentiny communicated by email with respect to the transaction at issue here. Today, BIL possesses no ESI from the relevant time period for either Ms. May-Reyter or Ms. Salentiny. *See* Tr. 267:3-11.

Despite issuing the litigation hold in 2010, BIL never suspended two critical policies which led to the deletion of email. *First*, BIL never suspended its IT vendor's ten-year journal policy, by which all external communications from BIL were preserved for ten years and then deleted.

---

[7] Misidentified in BIL's Amended Rule 26(a) disclosures as "Marie-Ann Salentiny."

[8] Misidentified in BIL's Amended Rule 26(a) disclosures as "Mario Totaro."

FILED UNDER
PENDING MOTION TO SEAL                14

*Id.* 69:18-21. As a result, relevant ESI was deleted through 2017, notwithstanding the litigation

hold BIL claims to have implemented in 2010. *See id.* 69:22-70:16.

　　*Second*, BIL never suspended its policy of destroying the ESI for individuals who retired

from or otherwise left the bank within six months of their departure. *See id.* 85:1-22. BIL admits

that all four of the former employees in BIL's Amended Rule 26(a) disclosures were likely to have

engaged in relevant email communications and that this ESI was subsequently destroyed:

- Ms. Meyers was a wealth management employee who was involved the subscription and redemption at issue in this case and was the "main point of contact" for the underlying client. *Id.* 71:19-73:13, 76:2-10 ("Q. [. . .] Ms. Meyers communicated with the underlying client by e-mail with respect to those two events, the subscription in 2005 and the redemption in 2007? [. . .] A. The subscription, yes. We have a copy of those e-mail exchanges."). Ms. Meyers left BIL in approximately 2018 or 2019 and BIL deleted all her ESI within six months of her departure. *Id.* 87:6-12.

- Mr. Reiter, a "back office" employee responsible for executing the at-issue investment, likewise used email in connection with the at-issue transactions. *Id.* 83:1-19; *see, e.g.,* Ex. 2 at -005-07, -021. He left the bank in roughly 2018 or 2019, and BIL deleted his ESI within six months of his departure. *Id.* 88:8-19.

- Ms. May-Reyter was another BIL employee who engaged in email communications in connection with the at-issue transactions. Tr. 264:1-11; *see, e.g.*, BIL041-044. Ms. May Reyter left the bank in approximately 2018 or 2019. *See id.* 89:14-18. As such, to the extent Ms. May- Reyter had not already deleted relevant emails (because she did not receive a litigation hold), BIL deleted her ESI six months after she left the bank. *See id.* 89:19-90:1.

- Mr. Baldinucci, the client relationship manager, had communications with the underlying client and would have had access to email during the relevant time period. *See id.* 79:18-80:13, 82:4-14. He retired from BIL in the middle of 2021. *Id.* 82:4-14, 86:1-6. BIL deleted his emails and ESI six months after he left the bank. *Id.* 86:7-19. This deletion was months after the Court re-opened discovery in this matter and long after the Liquidators had served their jurisdictional discovery requests on BIL seeking ESI on September 14, 2021. *See* Ex. 15 (Pls.' First Request for Production of Documents to BIL).

Thus, even if those employees who received the litigation hold had followed its instructions and

saved relevant ESI locally, BIL subsequently destroyed that ESI by failing to suspend the above-

referenced policies. And all the while, employees—even those who received the litigation hold—

remained free to delete ESI at their discretion. *See* Dkt. 1035 at 2.

The one BIL employee who both received the litigation hold and did not depart the bank,

Maria Totaro, was also involved in the at-issue subscription and redemption as part of the bank's

"execution desk." Tr. 57:7-16. Ms. Totaro engaged in relevant email communications produced

from BIL's hard copy transaction file. *Id.* 115:19-116:22. Had these communications been

preserved in ESI form, BIL concedes that information missing from Ms. Totaro's printed emails

could have been preserved, such as attachments, metadata, and BCCs. *Id.* 113:18-114:12. Since

the only known way for employee communications to be deleted from an active inbox is if that

employee selected them for deletion, *id.* 175:9-14, BIL has no explanation for the missing ESI

aside from Ms. Totaro's selection of Fairfield-related ESI from her inbox for deletion.

### E.      BIL Failed To Disclose Its Destruction of ESI to the Liquidators

Since the Court allowed discovery to proceed in this matter in July 2021, BIL has not been

forthcoming about its failure to preserve ESI. As reflected in the letters filed by the Liquidators on

August 11, 2022, and October 17, 2022—as well the colloquy at status conferences with the Court

on September 14, 2022, and October 19, 2022—BIL repeatedly has refused to answer basic

questions about its preservation and deletion practices. *See generally* Dkt. 1004, Dkt. 1035; Exs.

16 (Sept. 14, 2022 Hr'g Tr.), 17 (Oct. 19, 2022 Hr'g Tr.).

These issues began with the joint Rule 26(f) conferences on October 1, 2021 and October

12, 2021. At both conferences, BIL was obligated—but failed—to disclose the absence of relevant

ESI. *See* Fed. R. Civ. P. 26(f). On October 28, 2021, BIL served initial disclosures, which objected

to providing any responsive information whatsoever (including identifying any individuals likely

to have relevant information) and omitted the fact that BIL had lost ESI from the relevant time

period—or, perhaps most importantly—that BIL was *just about to* delete potentially relevant ESI from key custodian Mr. Baldinucci. Ex. 14.

After BIL produced its "transaction file" to the Liquidators, it became clear from the incomplete hard copy emails within that file that BIL had not produced all relevant information that should have been in its possession. The Liquidators then sought to meet and confer with Clifford Chance about searching for relevant ESI; the parties did so on May 25, 2022, but without any indication from counsel that BIL possessed no relevant ESI. *See* Dkt. 1004-1 at 10. Despite repeated requests, BIL first informed the Liquidators on June 30, 2022 that it "does not have access" to custodial emails from 2008 or earlier. *Id.* at 4-5. Despite repeated follow-ups, BIL would still not respond to straightforward, simple questions regarding what happened to its ESI. *See id.* For instance, it was not until August 2022 that BIL disclosed that email inboxes from the relevant time period were not just inaccessible, but had not been preserved at all. Dkt. 1004-4 at 2-3.

Even after the Court held a conference on BIL's refusals to cooperate in discovery and ordered the parties to meet and confer in person, BIL still was not forthcoming. Counsel could not or would not explain what happened to missing attachments, where BIL's metadata was, who may have been blind-copied on relevant emails, and whether BIL's policy to delete the ESI of former employees was suspended for recipients of the litigation hold (which it was not)–all of which BIL had a duty to disclose under Rule 26. Ex. 16 at 31:18-32:7, 32:22-33:2, 33:12-18; *see* Dkt. 1035. As such, on October 19, 2022, the Court ordered BIL to comply with the Liquidators' Amended Rule 30(b)(6) deposition notice, dated July 28, 2022. Ex. 17 at 24:4-7; *see* Ex. 18 (Pls.' Amended Notice of Rule 30(b)(6) Deposition). On December 14, 2022, the Liquidators deposed BIL's corporate representative, Herman Dewitte, in Luxembourg.

## **LEGAL STANDARD**

Federal Rule of Civil Procedure 37 grants the Court broad discretion to impose sanctions upon a party who "fails to preserve evidence when it has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *ComLab Corp. v. Tire*, 815 F. App'x 597, 600 (2d Cir. 2020) (citation omitted). Preservation of ESI, such as email data, is specifically governed by Rule 37(e), as amended in 2015. Once a court finds that the moving party has established the elements of a spoliation claim under Rule 37(e) generally, it may impose sanctions under Rule 37(e)(1) (when the moving party is prejudiced by the spoliation) and/or Rule 37(e)(2) (when the spoliating party acted with intent to deprive future litigants of the evidence). "[T]he applicable sanction should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." *ComLab*, 815 F. App'x at 601 (citation omitted).

### A.    Elements Of A Spoliation Claim Under Rule 37(e)

Rule 37(e) permits a court to impose sanctions if ESI (1) "should have been preserved in the anticipation or conduct of litigation"; (2) was "lost because a party failed to take reasonable steps to preserve it"; and (3) "cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e). As the party seeking spoliation sanctions, the Liquidators bear the burden of establishing these three elements by a preponderance of the evidence. *CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*, 2021 WL 4190628, at *13 (S.D.N.Y. Aug. 18, 2021).

With respect to the first element, "[t]he duty to preserve arises, not when litigation is certain, but rather when it is reasonably foreseeable." *Mule v. 3-D Bldg. & Constr. Mgmt. Corp.*, 2021 WL 2788432, at *8 (E.D.N.Y. July 2, 2021) (citation omitted); *see also Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998). This is "an objective standard, asking not whether the party in fact reasonably foresaw litigation, but whether a reasonable party in the same factual

circumstances would have reasonably foreseen litigation." *Alexander Interactive, Inc. v. Adorama, Inc.*, 2014 WL 12776440, at *3 (S.D.N.Y. 2014) (citation omitted). The duty to preserve "attach[es] as soon as the triggering incident occurs and prior to when a claim is filed." *See Taylor v. City of N.Y.*, 293 F.R.D. 601, 610 (S.D.N.Y. 2013).

As to the second element, taking "reasonable steps to preserve" "requires a litigant to do more than refrain from intentionally destroying relevant evidence; the litigant must also take affirmative steps to prevent inadvertent spoliation." *Europe v. Equinox Holdings, Inc.*, 592 F. Supp. 3d 167, 177 (S.D.N.Y. 2022) (quoting *Skyline Steel, LLC v. PilePro, LLC*, 101 F. Supp. 3d 394, 408 (S.D.N.Y. 2015)). "It is *not* sufficient to notify all employees of a litigation hold and expect that the party will then retain and produce all relevant information." *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 432 (S.D.N.Y. 2004) ("*Zubulake V*") (emphasis in original). Rather, a party "must identify all sources of potentially relevant evidence and implement a 'litigation hold' [by] suspending any routine document destruction or other processes involved in the ordinary course of business that might result in the destruction of potentially relevant evidence." *Skyline Steel*, 101 F. Supp. 3d 394, 408 (S.D.N.Y. 2015). "Where a party fails to timely institute a formal litigation hold . . . the Court can conclude that it did not undertake reasonable steps to preserve ESI." *Europe*, 592 F. Supp. 3d at 177.

Finally, as to the third element, demonstrating that evidence cannot be "restored or replaced" within the meaning of Rule 37(e) essentially requires the movant to show some appreciable prejudice flowing from the spoliating party's misconduct. *See Coan v. Dunne*, 602 B.R. 429, 439-40 (D. Conn. 2019). The fact that some missing discovery could be obtained from third parties does not "restore or replace ESI" for purposes of Rule 37(e) but "merely turns the question of prejudice [on the movant] from one of *kind* to one of *degree*." *See id.* at 440 (emphasis

in original). Email communications cannot be "replaced" as long as "some—and no one can say

how many—were not [recovered]." *Zubulake V*, 229 F.R.D. at 429.

### B.    Sanctions To Remedy Prejudice Under Rule 37(e)(1)

Courts may impose sanctions under Rule 37(e)(1) where the moving party has established

each of the foregoing three elements and can demonstrate that it has been prejudiced by the

spoliation of evidence. Rule 37(e), as amended, "does not place a burden of proving or disproving

prejudice on one party or the other . . . . The rule leaves judges with discretion to determine how

best to assess prejudice in particular cases." Fed. R. Civ. P. 37(e) advisory committee's note to

2015 amendment. Courts in the Second Circuit have found that "prejudice is better judged by the

preponderance [of the evidence] standard." *See CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp.

3d 488, 499 (S.D.N.Y. 2016) (collecting cases).

The types of sanctions available under such circumstances may include "serious measures,

such as forbidding the party that failed to preserve information from putting on certain evidence,

permitting the parties to present evidence and argument to the jury regarding the loss of

information, or giving the jury instructions to assist in its evaluation of such evidence or

argument." *Charlestown Cap. Advisors, LLC v. Acero Junction, Inc.*, 337 F.R.D. 47, 68 (S.D.N.Y.

2020) (citation omitted); *see also* Fed. R. Civ. P. 37(e) advisory committee's note to 2015

amendment (explaining that Rule 37(e)(1) sanctions may include "forbidding the party that failed

to preserve information from putting on certain evidence . . . ."). Such measures are particularly

warranted when sanctions "serve to enforce compliance with the discovery rules and maintain a

credible deterrent to potential violators." *Charlestown*, 337 F.R.D. at 68. In assessing prejudice for

these purposes, the movant need not establish the loss of a "smoking gun." *Karsch v. Blink Health

Ltd.,* 2019 WL 2708125, at *21 (S.D.N.Y. June 20, 2019).

### C.    Adverse Inference For Spoliation With Intent To Deprive Under Rule 37(e)(2)

If a court concludes that the spoliating party "acted with the intent to deprive another party of the information's use in the litigation" it may impose more severe sanctions, including but not limited to presuming the lost information was unfavorable to the spoliating party, dismissing the action, or entering a default judgment against the spoliating party. Fed. R. Civ. P. 37(e)(2). An order for an adverse inference is based on the "commonsensical proposition that the drawing of an adverse inference against parties who destroy evidence will deter such destruction, and will properly place the risk of an erroneous judgment on the party that wrongfully created the risk." *Kronisch v. United States*, 150 F.3d at 126 (2d Cir. 1998) (cleaned up). In addition, an adverse inference can serve to "restor[e] the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." *Id.*

Because "intent is rarely proved by direct evidence," courts "have substantial leeway to determine intent through consideration of circumstantial evidence, witness credibility, motives of the witnesses in a particular case, and other factors. In considering these factors, courts may look to how the party acted throughout litigation and during discovery disputes, including whether there is a credible explanation for the party's failure to preserve relevant ESI." *In re Petters Co.*, 606 B.R. 803, 827 (Bankr. D. Minn. 2019) (cleaned up). "An intent to deprive can be found either from a conscious act of destruction or a conscious dereliction of a known duty to preserve electronic data." *Mule*, 2021 WL 2788432, at *12. Repeated failure of Rule 26 obligations can also "evince intentionality." *Moody v. CSX Transp., Inc.*, 271 F. Supp. 3d 410, 432 (W.D.N.Y. 2017).

Although the party seeking spoliation sanctions has the burden of proving the spoliating party acted with the intent under Rule 37(e)(2), courts in the Southern District of New York "are divided on the level of proof required to show intent, with some courts using a 'preponderance of

the evidence' standard, and others applying a 'clear and convincing' standard." *CBF Industria*,
2021 WL 4190628, at *18 (collecting cases). The facts here satisfy either standard and, as such,
an adverse inference is warranted.

## ARGUMENT

The Court should sanction BIL because it destroyed ESI that it had a duty to preserve and
because BIL's conduct has severely prejudiced the Liquidators. Because BIL's spoliation directly
hinders the Liquidators' ability to put forward evidence demonstrating BIL's contacts with the
United States, the Court should preclude BIL from arguing that this Court cannot exercise personal
jurisdiction in the absence of such evidence. Without such an order, BIL will benefit from its own
preservation failures. And because BIL did not lose ESI by mere mistake, but rather consciously
avoided known duties to preserve, the Court should also find BIL acted with the intent to deprive
the Liquidators of evidence and conclude that the ESI BIL destroyed would have demonstrated
contacts between BIL and the United States, and therefore would have favored the Liquidators in
establishing personal jurisdiction over BIL.

## I.   BIL's Spoliation Of ESI Under Rule 37(e)(1) Entitles The Liquidators To A Preclusion Order

The Court should find that BIL spoliated evidence. As noted above, spoliation occurs when
(1) a party has a duty to preserve evidence, (2) the party loses the evidence because of its failure
to take reasonable steps to preserve it, and (3) the evidence cannot be restored or replaced through
additional discovery. Fed. R. Civ. P. 37(e). Each element is met here.

### A.   BIL's Duty To Preserve ESI Was Triggered In December 2008

Parties must take reasonable steps to preserve evidence once they are on notice of potential
litigation. Fed. R. Civ. P. 37(e). BIL argues that it had no obligation to preserve documents until
it was on actual notice of this litigation, which it concedes was no later than August 30, 2010.

FILED UNDER
PENDING MOTION TO SEAL          22

Tr. 204:19-205:3. But as a matter of law, "[t]he duty to preserve arises, not when litigation is

certain, but rather when it is reasonably foreseeable." *Mule*, 2021 WL 2788432, at *8; *see also*

*Kronisch v. United States*, 150 F.3d at 126. That is an objective analysis. *See Alexander*, 2014 WL

12776440, at *3. Courts have imposed a duty to preserve evidence when disputes with interested

parties or catastrophic incidents render future litigation reasonably foreseeable. When the

triggering event is sufficiently dramatic and likely to give rise to legal disputes, the duty "attach[es]

as soon as the triggering incident occurs and prior to when a claim is filed." *Taylor*, 293 F.R.D. at

610. Major criminal schemes are "the types of incidents [that] tend to trigger litigation."

*Doubleline Cap. LP v. Odebrecht Fin., Ltd.*, 2021 WL 1191527, at *6 (S.D.N.Y. Mar. 30, 2021)

(citing *Taylor*, 293 F.R.D. at 610).

　　　　BIL's duty to preserve ESI related to Sentry and BLMIS was triggered in December 2008

when it was reported widely that BLMIS was a Ponzi scheme and when BIL admittedly was aware

of BLMIS's collapse. Tr. 39:12-21. Madoff's fraud is exactly the sort of event that courts have

found places parties on notice that litigation is likely, thus triggering the duty to preserve evidence.

For example, in *Doubleline* the court found that "[l]arge-scale criminal bribery schemes . . .

implicat[ing] issuers of equity or debt securities" was one of the "'types of incidents [that] tend to

trigger litigation.'" 2021 WL 1191527, at *6. As the court noted, and as BIL should have known,

"[w]hen such [criminal financial] schemes are revealed, . . . litigation is seldom far behind." *Id.*;

*see also Schaffer v. Horizon Pharma PLC*, 2018 WL 481883, at *2 (S.D.N.Y. Jan 18, 2018) (noting

securities fraud lawsuits were "perhaps inevitable" after "an increase in negative media attention"

and "an investigation by the Department of Justice in late 2015 and early 2016 led to a steep decline

in the price" of the company's stock). As in *Doubleline*, BIL knew that one of its investments was

tied to a criminal scheme, which BIL described as a "huge shock" to the financial world.

*Id.* 200:23-201:8. And, as in *Doubleline*, BIL should have known that litigation would follow that scheme's collapse, thus triggering its duty to preserve evidence.

BIL's position that it did not become aware of the potential for litigation until the Liquidators filed this litigation is wholly incredible. BIL immediately went to work after it became aware of the BLMIS collapse on December 12, 2008, by (i) creating an internal Madoff Task Force, (ii) engaging counsel, and (iii) collecting and preserving both ESI and hard copy documents relating to several BLMIS feeder funds, but not Fairfield. *See id.* 38:22-39:24, 213:24-214:3, 219:3-8, 227:21-228:20. BIL's assertion that it did not anticipate litigation is also undermined by its counsel's direction to its corporate representative not to testify about whether BIL contemplated (i) potential clawback suits by the BLMIS Trustee, (ii) litigation against FGG, and (iii) lawsuits involving FGG or the Fairfield Funds between December 2008 and February 2009 on the basis of work product and attorney-client privilege. *See id.* 202:12-24, 209:13-18; 215:15-21; 216:24-217:6.[9] Thus, it is plainly apparent not only that BIL reasonably expected litigation relating to BLMIS investments shortly after the Ponzi scheme was uncovered, but also knew it had to take concrete steps to preserve information relating to its BLMIS investments.

---

[9] BIL's assertion of a work product and privilege objections to these questions regarding its anticipation of litigation belies the fact that BIL was, in fact, anticipating litigation and discussing legal risks at this time. *See Voom Hd Holdings LLC v. Echostar Satellite L.L.C.,* 2010 WL 8400073 at (N.Y. Sup. Ct. Nov. 03, 2010) *aff'd VOOM HD Holdings LLC v. EchoStar Satellite L.L.C.*, 93 A.D.3d 33 (2012) (holding that party's claim of work product privilege before the filing of the complaint demonstrates it reasonably anticipated litigation at that time, triggering the duty to preserve documents). Put otherwise, unless BIL was in fact anticipating litigation, there would be no basis for asserting the privilege. *See Bristol-Meyers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*, 1997 WL 470115, at *3 (S.D.N.Y. Aug. 15, 1997) ("The work product doctrine [ . . . ] requires that the documents involved must have been prepared 'in anticipation of litigation'"); *cf. United States v. DeFonte*, 441 F.3d 92, 96 (2d Cir. 2006) (holding that there must have been an actual communication between client and attorney for a valid claim of attorney-client privilege).

Finally, even if BIL did not in fact anticipate litigation in December 2008, that is of no moment because the standard for when the duty to preserve arises is an objective one. Here, the duty for BIL to preserve potentially relevant information still arose in at that time because BIL should have been reasonably expected litigation arising from an event it recognized was "one of the most important frauds in the economic history of the planet [E]arth." *Id.* 39:12-14; *see also Alexander*, 2014 WL 12776440, at *3.

### B.    BIL Failed To Take Reasonable Steps To Preserve ESI

Once the duty to preserve attaches, a party must take reasonable steps to preserve evidence related to the subject matter of the litigation. Fed. R. Civ. P. 37(e). BIL failed to do so regardless of when BIL's duty to preserve arose—both when it reasonably should have anticipated litigation after BLMIS collapsed in December 2008 and after it had actual knowledge of this litigation by, at the latest, August 2010.

### 1.    For 23 Months After It Should Have Anticipated Litigation, BIL Did Nothing To Preserve ESI

BIL's 23-month delay in issuing a litigation hold in an attempt to preserve relevant ESI from the time it should have reasonably anticipated litigation in December 2008—and the nearly four-month delay from the time it admits it was aware of this lawsuit in August 2010—are both *per se* unreasonable. Courts frequently have held that delayed implementation of a litigation hold demonstrates a failure to take reasonable steps to preserve evidence. *Europe*, 592 F. Supp. 3d at 177 ("Where a party fails to timely institute a formal litigation hold . . . the Court can conclude that it did not undertake reasonable steps to preserve ESI." (citation omitted)).

Courts in this Circuit have found that a delay of even a few months constitutes an unreasonable delay in preserving relevant evidence. For instance, the court in *Lokai Holdings LLC v. Twin Tiger USA LLC* concluded that a party failed to take reasonable preservation steps when it

waited eight months to implement counsel's advice to recover deleted emails and archive existing ones and "continued, for an additional month, their habit of deleting emails to accommodate storage limits," 2018 WL 1512055, at *11 (S.D.N.Y. Mar. 12, 2018); *see also CrossFit Inc. v. Nat'l Strength & Conditioning Ass'n*, 2019 WL 6527951, at *8 (S.D. Cal. Dec. 4, 2019) (finding party failed to take reasonable steps to preserve evidence when it did not institute any written litigation hold and failed to modify its Microsoft Exchange default settings until four years after the inception of the lawsuit, and not until years after many earlier triggers).

Here, BIL's obligation to preserve was triggered in December 2008. There is no dispute that BIL did nothing to attempt to preserve ESI in connection with this litigation at that time or any time for 23 months until, in November 2010, it issued a single litigation hold to some but not all relevant custodians—but then engaged in follow-up to actually collect ESI (or any other evidence). BIL's delay of 23 months in acting to preserve relevant ESI is nearly triple the length of the delay held to be unreasonable in *Lokai*. 2018 WL 1512055, at *11. Even after receiving notice of this litigation in August of 2010, it was nearly four months until BIL issued its litigation hold. BIL therefore failed to take reasonable steps to preserve evidence after its obligation to do so arose in December 2008.

### 2. Beginning In November 2010, BIL Unreasonably Relied On Its Employees To Implement Its Litigation Hold

BIL finally issued a litigation hold to employees in November 2010, but both the hold itself and the implementation of the hold were woefully inadequate and, therefore, unreasonable. BIL, and its U.S. counsel at Clifford Chance independently failed to comply with their discovery obligations in multiple, independent ways.

Issuing a hold notice, alone, is insufficient; "[o]nce the duty to preserve is triggered, the preservation obligation requires a litigant to do more than refrain from intentionally destroying

relevant evidence; the litigant must also take affirmative steps to prevent inadvertent spoliation." *Europe*, 592 F. Supp. 3d at 177 (sanctioning defendant for failure to take reasonable steps to prevent spoliation by not, *inter alia*, "identifying all sources of potentially relevant evidence and implementing a litigation hold suspending any routine document destruction or other processes involved in the ordinary course of business that might result in the destruction of potentially relevant evidence" when litigation was reasonably anticipated (citation omitted)). BIL took no such affirmative steps.

*First*, BIL and Clifford Chance failed to locate and collect relevant information. "Once a 'litigation hold' is in place, a party and her counsel must make certain that all sources of potentially relevant information are identified. To do this, counsel must become fully familiar with her client's document retention policies, as well as the client's data retention architecture." *Zubulake V,* 229. F.R.D. at 432. "Counsel must take affirmative steps to monitor compliance so that all sources of discoverable information are identified and searched." *Id.* (recommending that, as soon as litigation is anticipated, counsel "run a system-wide keyword search [and] then preserve a copy of each 'hit' for future review once discovery begins"). These steps are necessary for a litigation hold to be "put in place," instead of "just put down on paper." *Charlestown*, 337 F.R.D. at 62. Counsel failed to take these basic steps. Most obviously, despite the obligation that "counsel must become fully familiar with her client's document retention policies," *Zubulake V*, 229 F.R.D. at 432, Clifford Chance did not know of (or intentionally left in place) BIL's policy of destroying employee ESI six months after their departure, nor did it suspend the deletion (after ten years) of employees' journaled emails. Finally, neither BIL nor Clifford Chance actually collected documents after issuing the litigation hold. Tr. 249:13-18.

Compounding this failure, BIL and Clifford Chance did not identify one-third of the appropriate custodians to which to send the litigation hold. Contrary to the requirements of *Zubulake V*, there is no evidence that BIL implemented an interview process to identify the "key players" who should receive the hold. *See* 229 F.R.D. at 432; *id.* 260:11-20. If, for instance, BIL or Clifford Chance had reviewed the paper "transaction file" that was retrieved from its archives for this litigation in September 2010, *see id.* 106:14-107:18, Ex. 9; they would have known that BIL employees Ms. May-Reyter and Ms. Salentiny, who BIL concedes authored and/or received several of BIL's (partial) emails in its transaction file, should have received the hold. *See* Tr. 264:1-11, 266:16-267:15; *see also* Ex. 13 (identifying May-Reyter and Salentiny as potentially relevant custodians). Courts in this Circuit have sanctioned parties for failing to notify even a small percentage of the spoliating party's custodians. *See, e.g.*, *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 341 F.R.D. 474, 503-04 (S.D.N.Y. 2022) (issuing sanctions where a party failed to issue a litigation hold to just six individuals comprising just 11% of its potential custodians). As in *Keurig*, this failure is more than enough to support a finding of spoliation.

*Second*, BIL impermissibly shifted all responsibility for preserving potentially relevant information to the bank employees who received the hold notice. Since at least 2004—long before the Madoff collapse—it has been black-letter law in this Circuit that "it is *not* sufficient to notify all employees of a litigation hold and expect that the party will then retain and produce all relevant information." *Zubulake V*, 229 F.R.D. at 432 (emphasis in original). BIL and Clifford Chance did not take steps to implement the litigation hold aside from sending it to employees; remarkably,

██████████████████████████████████████████████████████

████████████████████████, no such steps ever were taken. *See* Ex. 12, Tr. 240:16-22, 241:8-13. BIL did not, for instance, notify IT of the litigation hold, suspend employee deletion

permissions, or change retention policies. Instead, BIL and Clifford Chance shifted the burden entirely to the recipient employees—employees who had little to no experience with litigation holds, *id.* 242:18-243:12—without confirming receipt or understanding of the instructions. *Id.* 251:7-14. Courts regularly conclude that this misplaced reliance is unreasonable. *See id.*; *Claredi Corp. v. SeeBeyond Tech. Corp.*, 2010 WL 11579710, at *5-6 (E.D. Mo. Mar. 8, 2010) (holding reliance on "custodian self-collection" insufficient); *Fed. Trade Comm'n v. F&G Int'l Grp. Holdings, LLC,* 339 F.R.D. 325, 332 (S.D. Ga. 2021) (finding spoliation where defendant did not have a preservation policy and deleted emails on an ad hoc basis).

*Third*, BIL failed in its duty to monitor compliance with the litigation hold. *Zubulake V*, 229 F.R.D. at 433 ("[T]he notion of a 'duty to preserve' connotes an ongoing obligation."). The law requires that BIL "periodically re-issue[] [the litigation hold] so that new employees are aware of it, and so that it is fresh in the minds of all employees" and "periodically remind[] [the key players] that the preservation duty is still in place." *Id.* at 434. BIL circulated the litigation hold only once, on November 26, 2010, and it never subsequently distributed it or reminded employees of their obligations to comply. *Id.* 234:9-22. Incredibly, BIL continued to allow recipients of the hold to delete emails at their discretion, *see* Dkt. 1035 at 2, and continued to allow its vendor to delete relevant, journaled emails. *See id.* 69:18-70:16. Even after receiving the Liquidators' jurisdictional discovery requests in September 2021, BIL deleted all the ESI belonging to a key custodian who had received the hold. *See* Ex. 15; Tr. 86:4-19, 261:16-22.

### C.    BIL's ESI Cannot Be Restored Or Replaced

There is no dispute that that BIL once possessed relevant ESI that cannot be restored or replaced. BIL has confirmed that it has no ESI from the relevant period for any of the key custodians; there is nothing more in its possession to search. *See supra* Background § D, Tr. 267:3-15.

FILED UNDER
PENDING MOTION TO SEAL             29

Neither BIL's partial email record nor third-party productions can restore or replace missing ESI. As this Court has recognized, hard copy printouts of emails, like those contained in BIL's "transaction file," are incomplete. Ex. 16 at 29:1-5; *see also* Tr. 114:5-7 (if BIL had preserved electronic versions of communications, metadata would be available). And as BIL has itself confirmed, its production is missing more than just metadata: it is missing complete email conversations, attachments, and BCCs. Tr. 112:8-113:12, 113:23-114:12; *cf. O'Berry v. Turner*, 2016 WL 1700403, at *3 (M.D. Ga. Apr. 27, 2016) (finding spoliation where party unreasonably printed a single paper copy of a document where ESI was available to preserve). The fact that the Liquidators have obtained some emails from third parties does not remedy the prejudice to the Liquidators because those productions do not "restore or replace" BIL's ESI within the meaning of Rule 37(e), particularly when it is uncertain how much more ESI is missing. *See Coan*, 602 B.R. at 440 (noting that a movant's recovery of an unknown percentage of emails from third parties "merely turns the question of prejudice [on movant] from one of *kind* to one of *degree*" and imposing sanctions where it was "plausible to conclude that the emails received from third parties are but the tip of a proverbial iceberg") (emphasis in original).

BIL's corporate representative could not even testify about the extent of the communications BIL employees had about the Funds, *see, e.g.*, *id.* 77:7-22, let alone confirm that third party discovery had somehow—despite being limited to emails that third parties happened to retain in connection with other litigations—captured all relevant *external* communications that BIL employees deleted. *See, e.g., Zubulake V*, 229 F.R.D. at 429 (imposing sanctions despite some e-mails being recovered because "some—and no one can say how many—were not [recovered]"). Moreover, it is impossible for third-party productions to replace BIL *internal* communications regarding Sentry or the metadata that would be available with the original ESI. For instance, BIL

may have engaged in internal communications regarding diligence [10] : BIL's corporate

representative conceded that BIL may have received diligence from a BIL-affiliate's visit ██████

in the United States. *See id.* 140:8-15 ("Q. We don't know whether anyone from Dexia Asset

Management shared any of the materials they learned from their meeting with ████████████████

████ with anyone at BIL who was involved with Fairfield, correct? A I don't have that

information. Because the appendixes are not present either."), 145:16-146:14; Exs. 19 (██████

████████████████████████████████████████████████), 20 (██████████████

████████████████████████████████), 21 (██████████████████████████

████████████████).[11] Therefore, ESI that BIL destroyed cannot be restored or replaced.

### D.    Because BIL's Spoliation Prejudices The Liquidators, The Court Should Issue An Order Precluding BIL From Making Certain Arguments Under Rule 37(e)(1)

Once the Court concludes that spoliation has occurred, Rule 37(e)(1) authorizes the Court

to order sanctions to remedy the prejudice faced by the Liquidators. Here, the Liquidators are

prejudiced in responding to BIL's motion to dismiss for lack of personal jurisdiction, which hinges

on the assertion that the Liquidators lack evidence demonstrating sufficient contacts between BIL

and the United States. Having deprived the Liquidators of this very evidence by spoliating it, the

---

[10] Such internal communications would also be jurisdictionally relevant. *See, e.g.*, *Picard v. Union Sec. Inv. Tr. Co., Ltd.*, 2022 WL 3572509, at *4 (Bankr. S.D.N.Y. Aug. 18, 2022) (finding personal jurisdiction in part because "[d]efendants intentionally tossed a seed from abroad to take root and grow as a new tree in the Madoff money orchard in the United States and reap the benefits therefrom") (quoting *Picard v. Bureau of Labor Ins. (In re BLMIS)*, 480 B.R. 501, 506 (Bankr. S.D.N.Y. 2012).

[11] Such a visit, if it occurred on behalf of BIL, would be highly relevant to the jurisdictional inquiry. *See Picard v. Meritz Fire & Marine Ins. Co. Ltd.*, 2022 WL 3273044, at *3-4 (Bankr. S.D.N.Y. Aug. 10, 2022) (citing meetings in the United States with a purpose related to investing in the Funds as evidence of jurisdictional contacts).

Court should preclude BIL from making arguments based on a lack of contacts in its motion to dismiss for lack of personal jurisdiction.[12]

### 1.    The Liquidators Are Prejudiced By BIL's Spoliation

BIL's spoliation prejudices the Liquidators by depriving them of evidence that could be used in responding to BIL's pending motion to dismiss for lack of personal jurisdiction. *See generally* BIL Mem. of Law in Support of Its Mot. to Dismiss for Lack of Personal Jurisdiction, Dkt. 755 (the "<u>Motion</u>" or "<u>Mot.</u>").

Rule 37(e) "does not place a burden of proving or disproving prejudice on one party or the other," and instead "leaves judges with discretion to determine how best to assess prejudice in particular cases." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. Moreover, "an evaluation of prejudice from the loss of information necessarily includes an evaluation of the information's importance in the litigation." *Id.* Courts generally require the moving party to "adduce sufficient evidence from which a reasonable trier of fact could infer that the destroyed . . . evidence would have been favorable to its case," *Man Zhang v. City of N.Y.*, 2019 WL 3936767, at *6 (S.D.N.Y. Aug. 20, 2019), but the movant need not establish the loss of a "smoking gun," *Karsch,* 2019 WL 2708125, at *21; *see also Moody*, 271 F. Supp. 3d at 432 (holding movant established prejudice by making "plausible, concrete suggestions as to what [the destroyed] evidence might have been" (citation omitted)).

BIL agrees that personal jurisdiction in this case turns on the extent of its contacts with the United States in connection with BLMIS and Sentry. *See, e.g.*, Mot. at 18 (arguing that the Liquidators failed to allege sufficient contacts with the United States to satisfy due process). In

---

[12] The Liquidators may face additional prejudice from BIL's spoliation following the jurisdictional phase of this case and reserve their rights to seek additional sanctions to remedy such prejudice in the future.

assessing whether it can exercise personal jurisdiction over foreign banks invested in Sentry, this Court has previously emphasized the importance of similar email evidence, including emails containing fund documents, due diligence, and investment-related trips to the United States—all of which were reflected in partial, third-party discovery. *See supra* Background § A, n.2. Had BIL properly preserved this ESI, the Liquidators would have been able to rely upon such evidence in support of their arguments in favor of personal jurisdiction. BIL's destruction of that evidence thus directly prejudices the Liquidators' ability to respond to BIL's jurisdictional arguments. *See Doubleline*, 2021 WL 1191527, at *7 (finding prejudice because the spoliated evidence "would be helpful to [the moving parties] in connection with establishing several elements of their [. . . ] claims"); *Lokai*, 2018 WL 1512055, at *12.

The fact that the Liquidators have been able to obtain some discovery from third parties that BIL should have preserved itself does not remedy this prejudice. These third-party emails cannot restore or replace the ESI that BIL has spoliated. *See supra* Argument § I.C; *see also CAT3*, 164 F. Supp. 3d at 497 (noting that in some circumstances a case may be "weaker when it cannot present the overwhelming quantity of evidence it otherwise would have to support its case" (citation omitted)). Had BIL acted reasonably, these potentially relevant communications that were once in BIL's possession, custody, or control would have been available to the Liquidators.

### 2. To Remedy The Prejudice To The Liquidators, The Court Should Preclude BIL From Disputing Personal Jurisdiction On The Grounds That Certain Evidence Is Lacking

To remedy this prejudice to the Liquidators, this Court should preclude BIL from making arguments that capitalize on its own unlawful failure to preserve evidence. *Cf. Charlestown*, 337 F.R.D. at 68 (precluding defendants from arguing that emails were not received based on their own

failure to discover them and permitting plaintiff "to present evidence to the finder of fact regarding the loss of [defendant's] emails").[13]

BIL's motion to dismiss for lack of personal jurisdiction is premised on its presumed lack of U.S. contacts. *See* Mot. at 3 (arguing that the Liquidators fail to show "any contacts" with the United States); Mot. at 5 (asserting that New York is a "forum with no connection to the redemption transactions at issue"); Mot. at 18 ("As demonstrated above, Citco's Brokerage Customers had no contacts whatsoever with the United States related to the Liquidators remaining claim."). The BIL-related email correspondence that the Liquidators have obtained from third parties demonstrates that ESI would have undermined this claim. For example, the Liquidators have email correspondence reflecting ██████████████████████████████████ ████████████████████████████ that would confirm BIL's knowledge of the fact that an investment in Sentry would be transferred to BLMIS in New York. *See supra* Background § A; *id.* n.2. BIL cannot dispute that it possessed—and then failed to preserve and thereby destroyed—at least some of this ESI. *See* Tr. 131:24-132:9 (acknowledging that a third-party email was addressed to a BIL custodian and is no longer in BIL's possession).

It is unfair for BIL to now argue that this Court cannot exercise personal jurisdiction over it because BIL purportedly did not purposefully direct actions towards New York, Mot. at 21, when—as made clear by third-party productions—██████████████████████████████████████ ████. *See* Ex. 5; *see also Parson Fin. Panama S.A.*, 2022 WL 3094092, at *3-4 (citing

---

[13] Courts also have granted monetary sanctions for fees and costs associated with, *inter alia* "(1) having to seek relief from the Court with respect to discovery not initially provided in response to Plaintiffs' discovery requests; (2) for subpoenas on third parties necessitated by Defendants' actions; and (3) bringing the instant motion for sanctions." *Mule*, 2021 WL 2788432, at *17. The Liquidators reserve their right to seek monetary sanctions to remedy the prejudice of pursuing these motions for sanctions and investigating BIL's destruction of ESI.

FILED UNDER
PENDING MOTION TO SEAL                34

communication with FGG in the United States about subscriptions in/redemptions from the Funds

as evidence of jurisdictional contacts). Again, this ESI is likely just a fraction of the relevant ESI

that was once in BIL's possession, but BIL precluded discovery of such evidence when it failed to

preserve ESI from the relevant period. The only way to truly test BIL's arguments would be to

examine a full record of its jurisdictional contacts and communications, but that full record does

not exist because BIL destroyed it.

Absent the preclusion order the Liquidators seek, BIL—a significant banking institution

with sophisticated counsel—will benefit from spoliating its own evidence. Thus, a serious

measure, such as a preclusion order, is appropriate. *See Charlestown*, 337 F.R.D. at 68 (noting that

such sanctions can also serve to enforce compliance with the discovery rules and maintain a

credible deterrent to potential violators).

Therefore, to address the prejudice the Liquidators face in responding to BIL's motion to

dismiss, the Court should preclude BIL from arguing:

(a)    that it did not communicate internally or externally about its investments in the Funds via email, including but not limited to (i) communications regarding its use of correspondent accounts and (ii) communications with U.S.-based entities or individuals;

(b)    that such communications did not include diligence on the Funds, the Funds' investment strategy, and/or BLMIS; and,

(c)    that such communications are limited to the volume or frequency that the Liquidators can demonstrate by use of evidence produced by third parties.

## II.    Because BIL Destroyed ESI Through Its Conscious Dereliction Of Its Duty To Preserve, This Court Should Presume The Deleted ESI Would Have Been Unfavorable For BIL

Rule 37(e) calls for courts to consider additional sanctions where evidence indicates that

the spoliating party acted with the intent to deprive litigants of the future use of the destroyed ESI.

Fed. R. Civ. P. 37(e)(2). In these instances, a court may impose additional sanctions, including

granting an adverse inference that presumes the content of spoliated evidence would have been unfavorable to the spoliating party. Here, the weight the of evidence indicates that BIL consciously avoided known duties to preserve ESI, resulting in its destruction. As such, the Court should presume that the content of this lost evidence would have been favorable to the Liquidators in establishing personal jurisdiction over BIL.

### A.      BIL's Conscious Dereliction Of Its Duty To Preserve Demonstrates Its Intent To Deprive The Liquidators Of This Evidence

Courts have discretion to determine what actions are sufficient to demonstrate "intent" under Rule 37(e)(2). *See, e.g.*, *4DD Holdings, LLC v. United States*, 143 Fed. Cl. 118, 133 (2019) (citing trial court decisions that interpret the intent requirement as "showing of anything from bad faith to irresponsible behavior that lacks any other explanation than intent to deprive"). Because "intent is rarely proved by direct evidence," courts can make this determination through "consideration of circumstantial evidence, witness credibility, motives of the witnesses in a particular case, and other factors." *In re Petters*, 606 B.R. at 827 (citation omitted); *see also Mule*, 2021 WL 2788432, at *12 (noting that "[a] court may infer that a party acted with an intent to deprive on the basis of circumstantial evidence").

Specifically, courts often infer a spoliating party's intent to deprive an adversary of relevant evidence from its "conscious dereliction of a known duty to preserve electronic data." *Mule*, 2021 WL 2788432, at *12 (citation omitted); *see, e.g.*, *Moody*, 271 F. Supp. 3d at 430-32 (inferring intent because circumstantial evidence suggested the spoliating party repeatedly failed over a period of years to confirm the data it had a duty to preserve had been properly preserved on a centralized data vault); *CrossFit, Inc.*, 2019 WL 6527951, at *9-12 (finding intent where a party with a known duty to preserve evidence, *inter alia*, did not implement a litigation hold for four years despite having notice that the documents were potentially relevant to litigation and allowed

its employees to continuously delete presumptively relevant documents); *see also Ottoson v. SMBC Leasing & Fin., Inc.*, 2017 WL 2992726, at *8-11 (S.D.N.Y. 2017) (finding that intentional failure to take steps necessary to preserve relevant evidence "satisfies the requisite level of intent required by Federal Rule of Civil Procedure 37(e)") (collecting cases).

BIL's repeated and egregious discovery failures demonstrate its "conscious dereliction of a known duty to preserve." *Mule*, 2021 WL 2788431, at *12; *see also Moody*, 271 F. Supp. 3d at 426–27 ("[D]efendants' repeated failure over a period of years to confirm that the data had been properly preserved despite its ongoing and affirmative Rule 11 and Rule 26 obligations . . . is so stunningly derelict as to evince intentionality."). *First*, despite being well aware of the likelihood of litigation with respect to the Non-Fairfield Feeder Funds, almost immediately contacting legal counsel, and collecting ESI for those funds, BIL failed to take any steps to preserve ESI in connection with Fairfield for 23 months after BLMIS collapsed, at which point it issued an inadequate litigation hold and took no additional steps to collect or preserve ESI. *See supra* Background § C, D; *CrossFit, Inc.*, 2019 WL 6527951, at *9-12. *Second*, when BIL and Clifford Chance issued the litigation hold, they did not review BIL's own transaction file (which already had been collected) to identify the key custodians, resulting in two of the six not receiving any litigation hold. *See supra* Background §§ C, D. *Third*, despite the fact that this litigation file obviously contained only a partial record of "many" emails, Tr. 108:15-18, and recognizing when it circulated its litigation hold that it was important to preserve both physical *and* electronic documents at that time, *id.* 243:20-25, BIL chose not to collect ESI from relevant custodians, including the complete versions of the previously-printed emails, as it had done for the Non-Fairfield Feeder Funds. *Id.* 249:6-18; *see O'Berry*, 2016 WL 1700403, at *4 (finding intent to deprive because "it is simply irresponsible to print a single paper copy of information that one had

a duty to preserve under Fed. R. Civ. P. 26"). *Fourth*, BIL and Clifford Chance failed to familiarize

themselves with BIL's retention and deletion practices. As a result, they did not stop the purging

of relevant, journaled emails in 2015 and 2017, and either did not know about or decided to leave

in place their practice of deleting employee ESI after departing the bank for years, even if the

custodian had received a litigation hold in this litigation—leading to the destruction of all ESI of

a majority of key custodians, as recently as late 2021. *See supra* Background §§ C, D.

Moreover, alongside its inexplicable failure to take reasonable steps to *preserve* evidence,

BIL has no explanation for the *deletion* of evidence from its two current employees (one of whom

received the 2010 litigation hold). Courts have inferred an intent to deprive from circumstantial

evidence based on the lack of any credible alternative explanation that did not involve that party's

bad faith. *See Moody*, 271 F. Supp. 3d. at 431-32; *see also Mule*, 2021 WL 2788432, at *12

(finding intent to deprive where circumstantial evidence in favor of intentional deletion was "not

credibly refuted or contested"); *Ala. Aircraft Indus., Inc. v. Boeing Co.*, 319 F.R.D. 730, 746 (N.D.

Ala. 2017) (finding intent to deprive where litigation hold required that responsive information be

removed from computers and sent to legal department, and two employees complied with that hold

with respect to their own computers, but destroyed information on a third employee's computer

with no explanation); *In re Petters*, 606 B.R. at 827 (holding most logical conclusion in the

circumstances was that defendant had intentionally destroyed ESI, since it was not destroyed as

part of a standard retention and destruction policy) (internal citations omitted).

### B.    The Court Should Grant The Liquidators An Adverse Inference

Where a spoliating party acted with an intent to deprive litigants of the use of the destroyed

ESI, Rule 37(e)(2) authorizes courts to presume the contents of that ESI were unfavorable to the

spoliating party. Fed. R. Civ. P. 37(e)(2). "An adverse inference instruction is imposed to

ameliorate any prejudice to the innocent party by filling the evidentiary gap created by the party

that destroyed evidence." *Ottoson, v. SMBC Leasing & Fin., Inc.,* 268 F. Supp. 3d 570, 584 (S.D.N.Y. 2017) (granting adverse inference instruction after finding the spoliating party intentionally deprived moving party of useful ESI based on "both direct and circumstantial evidence," including third-party production of emails that the spoliating party should have possessed) (citing *Orbit One Commc'ns, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 438 n.12 (S.D.N.Y. 2010)); *see also Sekisui Am. Corp. v. Hart*, 945 F. Supp. 2d 494, 510 (S.D.N.Y. 2013) (finding intent and instructing jury that it may adopt the presumption that the lost evidence would have been favorable to the moving party); *O'Berry*, 2016 WL 1700403, at *4-5 (instructing the jury to presume that the lost information was unfavorable to the spoliating party after finding the "irresponsible and shiftless behavior can only lead to one conclusion—that [the spoliating party] acted with the intent to deprive Plaintiff of the use of this information at trial").

Here, the record supports this form of sanctions against BIL because, for nearly two years following the collapse of BLMIS, it made intentional choices that led to the destruction of relevant evidence. This Court should not allow BIL both to escape its responsibility as a party to litigation to preserve evidence and to profit from its spoliation by allowing BIL to argue that its Motion should be granted because of a lack of the very same evidence it destroyed. An adverse inference is a proper remedy because it is the only way to ensure that BIL cannot capitalize upon its conscious dereliction of known duties. *See DVComm, LLC v. Hotwire Commc'ns, LLC*, 2016 WL 6246824, at *8 (E.D. Pa. Feb. 3, 2016) (granting adverse inference where "[s]ignificant potential for abuse exists if we do not [ . . . ] instruct the jury as to an adverse inference" and "[a]ny less significant sanction would not deter this conduct"). Because BIL acted with an intent to deprive, the Court should presume that the ESI which BIL destroyed would have been favorable to the Liquidators in establishing personal jurisdiction over BIL.

## **CONCLUSION**

The Liquidators respectfully request that the Court find that (1) BIL spoliated ESI, (2) that

such spoliation causes prejudice to the Liquidators, and (3) that BIL acted with intent, and that the

Court therefore:

(a)     Preclude BIL from arguing that it did not communicate internally or externally
about its investments in the Funds via email, including but not limited to (i)
communications regarding its use of correspondent accounts and (ii)
communications with U.S.-based entities or individuals;

(b)     Preclude BIL from arguing that such communications did not include diligence on
the Funds, the Funds' investment strategy, and/or BLMIS;

(c)     Preclude BIL from arguing that such communications are limited to the volume or
frequency that the Liquidators can demonstrate by use of evidence produced by
third parties; and,

(d)     Presume that ESI which BIL destroyed would have been favorable to the
Liquidators in establishing personal jurisdiction over BIL.

Dated:    New York, New York                Respectfully submitted,
          January 20, 2023

                                            SELENDY GAY ELSBERG PLLC

                                    By:     /s/          David S. Flugman
                                            David Elsberg
                                            Maria Ginzburg
                                            Jordan Goldstein
                                            Lena Konanova
                                            David S. Flugman
                                            Joshua S. Margolin
                                            1290 Avenue of the Americas
                                            New York, New York 10104
                                            Telephone: 212-390-9000
                                            delsberg@selendygay.com
                                            mginzburg@selendygay.com
                                            jgoldstein@selendygay.com
                                            lkonanova@selendygay.com
                                            dflugman@selendygay.com
                                            jmargolin@selendygay.com

                                            -and-

                                            BROWN RUDNICK LLP

                                            David J. Molton
                                            Marek P. Krzyzowski
                                            Seven Times Square
                                            New York, New York 10036
                                            Telephone: 212-209-4800
                                            dmolton@brownrudnick.com
                                            mkrzyzowski@brownrudnick.com

                                            *Attorneys for Plaintiffs Joint Liquidators*

FILED UNDER
PENDING MOTION TO SEAL            41