# Exhibit B



## Planet Depos®
### We Make It *Happen*™

# Transcript of Herman Dewitte

**Date:** December 14, 2022
**Case:** Fairfield Sentry Ltd., et al. -v- ABN AMRO Schweiz AG, et al.

**Planet Depos**
**Phone:** 888-433-3767
**Fax:** 888-503-3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

Transcript of Herman Dewitte

December 14, 2022

## Page 1

```
 1
 2              UNITED STATES BANKRUPTCY COURT
 3             SOUTHERN DISTRICT OF NEW YORK
 4                    Chapter 15 Case
 5                Case No 10-13164(CGM)
 6                Jointly Aministered
 7   ----------------------------------------------
 8   In re:
     Fairfield Sentry Limited, et al.,
 9   Debtor in Foreign Proceedings.
10   ----------------------------------------------
11   Fairfield Sentry Ltd.(In
     Liquidation), et al.,
12            Plaintiffs,
     v.                        Adv Pro 10-03636(CGM)
13   ABN AMRO Schweiz AG, et al.,
             Defendants.
14   ----------------------------------------------
15   Fairfield Sentry Ltd.(In
     Liquidation), et al.,
16            Plaintiffs,
17   v.                        Adv Pro 10-03636(CGM)
18   ABN AMRO Schweiz AG, et al.,
             Defendants.
19   ----------------------------------------------
20        VIDEOTAPED DEPOSITION UPON ORAL
21              EXAMINATION OF
22               HERMAN DEWITTE
23        Wednesday, December 14, 2022
24               Luxembourg
25   Reported by: Christine Myerly
```

## Page 2

```
 1   Deposition of HERMAN DEWITTE
 2   held at the offices of:
 3            The City by Gingkgo
              Luxembourg, 2310
 4
 5   Pursuant to agreement, before Christine Myerly,
 6   Court Reporter
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1             A P P E A R A N C E S
 2   FOR PLAINTIFF:
 3            David S. Flugman
              Tony Russo
 4            Selendy Gay Elsberg
              1290 Avenue of the Americas
 5            New York, NY, 10104
 6
 7   FOR DEFENDANTS:
 8            Jeff E. Butler
              Clifford Chance
 9            31 West 52nd Street
              New York, NY, 10019
10
11   ALSO PRESENT:
12            Kenneth M. Krys(remote)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1   EXAMINATION
 2   By Mr. Flugman                            7
 3
 4            INDEX OF EXHIBITIS
 5    1  Amended (30)(6) Notice               7
 6    2  Herman Dewitte LinkedIn Profile      7
 7    3  BIL000001-74                       103
 8    4  ANWAR-C-ESI-00147641               119
 9    5  ANWAR-C-ESI-00602905-2911          123
10    6  ANWAR-C-CFSE-00798374-75           127
11    7  NYAG-E000149291-93                 129
12    8  NYAG-E000073073-77                 134
13    9  NYAG-E001203552-53                 139
14   10  BIL00521-529(French)               148
15   11  BIL000521-529(English)             148
16   12  BIL000530-532                      180
17   13  Bloomberg News(BN) 12/15/08        205
18   14  Bloomberg News(BN) 12/31/08        214
19   15  SECSEV3323285-86                   215
20   16  NY Times 11/16/22                  217
21   17  BIL000534-538(French)              231
22   18  BIL000534-538(English)             231
23   19  BIL000533                          244
24   20  Witness Handwritten Notes          267
25
```

Transcript of Herman Dewitte
December 14, 2022

---

**Page 5**

1

2

3          LUXEMBOURG - December 14, 2022

4                    9:30 a.m.

5                    --oOo--

6     HERMAN DEWITTE, Deponent herein, having been

7  first duly sworn on oath, was examined and testified

8  as follows:

---

**Page 6**

1          (On the record at 9:36 a.m.)

2          THE VIDEOGRAPHER:  Good morning.  Here

3  begins media one in the videotaped deposition of

4  Herman Dewitte in the matter of Fairfield Sentry

5  Limited, et al, versus ABN AMRO (Schweiz) AG, et

6  al., in the United States Bankruptcy Court, Southern

7  District of New York.  Case number 10-13164.

8          Today's date is December the 14th, 2022.

9  The time is 9:36 a.m.  The videographer today is

10 Wendy Viner on behalf of Planet Depos.  This

11 deposition is taking place at 14-16 Avenue Pasteur,

12 Luxembourg.

13          Could I ask counsel to identify themselves

14 and state whom they represent.

15          MR. FLUGMAN:  Good morning, David Flugman

16 from Selendy Gay Elsberg PLLC, along with my

17 colleague Tony Russo, representing the Fairfield

18 funds plaintiffs.

19          MR. BUTLER: Jeff Butler from Clifford

20 Chance, representing Banque Internationale

21 Luxembourg.

22          THE VIDEOGRAPHER:  Can I ask the Zoom

23 participants to state their name for the record,

24 please.

25          MR. BUTLER:  David, can you just identify

---

**Page 7**

1  on the record --

2          MR. FLUGMAN:  I can identify that I

3  believe our client, Kenneth Krys, one of the joint

4  liquidators of the Fairfield funds, is joining by

5  Zoom audio conference.

6          THE VIDEOGRAPHER:  Thank you.  Our court

7  reporter is Christine Myerly on behalf of Planet

8  Depos.  Could I ask the court reporter to please

9  swear in the witness, and we will proceed.

10         THE COURT REPORTER:  Will counsel please

11 stipulate that, in lieu of formally swearing in the

12 witness, the reporter will instead ask the witness

13 to acknowledge that their testimony will be true

14 under the penalties of perjury, that counsel will

15 not object to the admissibility of the transcript

16 based on proceeding in this way, and that the

17 witness has verified that he is, in fact, Herman

18 Dewitte?

19         MR. BUTLER:  Yes, I agree.

20         MR. FLUGMAN:  I agree.

21             (Witness was sworn.)

22    (Exhibits 1 and 2 marked for identification.)

23             EXAMINATION

24 BY MR. FLUGMAN:

25    Q    Good morning, Mr. Dewitte.  As I

---

**Page 8**

1  stated a moment ago, my name is David Flugman, I'm a

2  partner of the law firm Selendy Gay Elsberg in New

3  York.  Our firm, along with Brown Rudnick, represent

4  the joint liquidators of the Fairfield funds, one of

5  whom I believe is on the line with us today.

6          The funds are plaintiffs in a lawsuit that

7  was filed against Dexia Banque Internationale of

8  Luxembourg, which I understand is now referred to as

9  Banque Internationale of Luxembourg.

10         Throughout the course of the day today, I

11 am going to refer to the bank as BIL, I hope that is

12 okay with you.  To be clear, when I use the term BIL

13 today, I mean to include BIL in any predecessor

14 entity that may have gone by a different name.  Do

15 you understand that I mean to include -- so if the

16 bank was known as Dexia BIL at a certain point in

17 time, when I use the term BIL, I mean to include

18 that as well?

19    A    Okay.

20    Q    Just to confirm, you currently are

21 employed by BIL, correct?

22    A    Confirmed.

23    Q    Sir, have you ever provided

24 deposition testimony before?

25    A    No, I never have.

Q And have you ever testified in connection with a U.S. litigation?
**A No, I never have.**
Q Before we begin, I would like to go over a couple of the ground rules for today's deposition so we are all clear up front.
First, as you see to your immediate left, we have a court reporter, who is working hard to take down everything that we all say in the room during the deposition. It is important that you allow me to finish asking my question before you respond, and I of course will extend to you the same courtesy so that nobody is talking over one another and the court reporter can get a clean record. Is that okay?
**A Perfect.**
Q It is also important that you provide verbal answers to my questions. Again, the court reporter can't transcribe head nods or shakes. So please try to answer my questions verbally.
**A I understand.**
Q We are speaking English today. Are you fluent in the English language?
**A It is not my native language, but I think I can express myself with a reasonable level of understanding, yes.**

Q Are you comfortable -- you are comfortable testifying today in English with me?
**A Yes.**
Q If at some point during the day you don't understand a question that I ask, please tell me, and I will try my best to rephrase it so that you do understand it. That includes if I use a word in English that you might not be familiar with. Please tell me.
If you do answer my question without telling me that you don't understand it, I am going to assume that you have understood it, is that fair?
**A That is fair, yes.**
Q We are going to aim to take a break every hour or so. We will break longer for lunch. If you need to take a break at any other time during the course of the deposition, just tell me, and we will take a break. All I ask is that if I have a question pending on the table, that you answer that question, and then we will take a break. Okay?
**A Okay. Understood.**
Q During the course of the deposition, your counsel, Mr. Butler may object to

some of my questions for the record. But unless he instructs you not to answer my question, you still must answer it if you understand it. Do you understand?
**A I understand.**
Q Sir, are you currently taking any medication that might impact your memory or your ability to recall events or answer my questions today?
**A No.**
Q Is there anything else that might, in your opinion, impact your memory or ability to testify here today?
**A No.**
Q Is there any reason that you can't give your best, most accurate and complete testimony sitting here today?
**A No.**
Q There is one additional definition and term about which I want to be clear up front so that I make sure we are in agreement at the start.
We are going to be talking a lot today about electronically stored information, which I'll refer to as ESI. When I use that term, ESI, I mean it in the broadest sense to include electronic data

that is created, copied or stored in electronic form, even if it may exist in a hard copy someplace else.
That would include things like e-mails, their attachments, but also voice mails, recordings of phone calls, word processing documents like Word for Windows files or Word Perfect files, call logs, electronic scans of hard copy documents and electronic databases. Basically anything that exists in electronic form.
So, when I use the term ESI, please keep that in mind as you're answering my questions. If I have a specific question about a type of ESI, like an e-mail or a database, I will ask that specifically. But when I use that term ESI, please think of it in that broad sense.
MR. BUTLER: Let me just say for the record that ESI is not a word that normal people use in the ordinary course. Mr. Dewitte is not very familiar with the way that terms is used in court proceedings. So it may be helpful for clarity if you specify the type of electronic document you are speaking about in your questions. Just making a comment; of course you can ask whatever questions you want.

10-03635-jpm    Doc 1003-2    Filed 02/17/23    Entered 02/17/23 15:20:51    Exhibit B- Deposition Transcript    with redactions relating only to documents and    Pg 6 of 130

4 (13 to 16)

Transcript of Herman Dewitte

December 14, 2022

---

**13**

1  BY MR. FLUGMAN:
2      Q      Thank you.  What I was about to
3  say as well is, if you ever have a question about
4  what I mean when I use that term, if you are unsure
5  or if there is a distinction in your mind between an
6  e-mail and a database, for example, or an e-mail and
7  a document that's scanned into an electronic form,
8  please tell me, and I will do my best to clarify.
9          As I said, I will try and ask specific
10 questions as I go through the deposition if I mean a
11 specific type of ESI.  If I do use that term, I do
12 mean it in that broad sense.  If you have any
13 questions about that, please let me know.
14     A      Okay.
15     Q      Okay.
16        (Off the record discussion.)
17 BY MR. FLUGMAN:
18     Q      Let's take a look at what has been
19 marked as Exhibit 2, which is in your hands.  I will
20 represent to you that this is what we understand to
21 be a profile of you from LinkedIn.  The reason I've
22 showed it to you is hopefully we can use this to
23 walk through some of your background in a way that
24 will streamline the deposition.
25        The first question I have for you is,

**14**

1  turning to page 3 of the exhibit, where it lists
2  some of your employment history and education, can
3  you glance at that and just let me know if anything
4  there is inaccurate.
5        (Pause.)
6      A      There is one specific point I want
7  to highlight, is that in-house lawyer for Dexia from
8  November 2007 until March 2010, technically speaking
9  BIL was part of the Dexia group until 2012, and not
10 2010, just for your information.
11     Q      Okay.  While you were working in
12 the role -- first of all, I think you said 2007, did
13 you mean November 2002?
14     A      There is mentioned from November
15 2002 until 2010.
16     Q      Okay.
17     A      But BIL was part of the Dexia
18 group not until 2010, but until 2012.
19     Q      Okay.
20     A      A little bit above there is the
21 BIL logo, which might lead to confusion when BIL has
22 been sold to a third shareholder.
23     Q      I understand.  Throughout the time
24 period November 2002 to March 2010, was BIL part of
25 the Dexia group?

**15**

1      A      Yes.
2      Q      Okay.  And you currently hold the
3  title head of legal wealth management, is that
4  correct?
5      A      That is a correct, yes.
6      Q      And you have held that title from
7  March of 2010 to the present?
8      A      That is correct, yes.
9      Q      Can you describe for me, please,
10 what your responsibilities are in that role?
11     A      I am heading a four to five number
12 of lawyers team.  We are specialized in providing
13 service, legal service, to wealth management
14 clients.  That includes but is not limited to
15 granting loans to credit facilities, taking the
16 appropriate guarantees.
17        Secondly, investment services.  Investment
18 services, which has within Europe a very specific
19 definition, according to MiFIDs, which are European
20 directives implemented in each member state.
21        And thirdly, we supervise services, or
22 legal internal services, in relation to insurances,
23 because our bank is not only licensed as a bank, it
24 is also licensed as an insurance broker.
25     Q      So do I understand you correctly

**16**

1  that you function in this role as a lawyer within
2  the bank?
3      A      That is correct.  Yes.
4      Q      Do you serve in any business role,
5  or strictly a legal role?
6      A      Well, when you are an in-house
7  counsel, of course our main goal or the main purpose
8  of an in-house counsel is to make sure that
9  everything that is done within the bank is aligned
10 with the legal obligations of Luxembourg, or outside
11 of Luxembourg.  But we are also being paid to do
12 business.  So it has a kind of, well, double
13 function.  But our main goal of course is a legal
14 function, yes.
15     Q      Okay.  Let me be perhaps more
16 specific.  Do you in your job as head of legal
17 wealth management provide investment services to
18 clients, do you counsel clients on investments they
19 might make?
20     A      No.
21     Q      Who would you consider to be your
22 clients in your role?
23     A      As I said before, we have internal
24 clients of the bank, then we also have the end
25 clients of the bank.  So, our main clients are, of

Transcript of Herman Dewitte

5 (17 to 20)

December 14, 2022

17

1 course, the internal clients, but because our goal
2 or aim is to be efficient and to provide internal
3 services to our internal clients, they are happy
4 when their end clients are happy. So, basically we
5 have two kind of clients. I don't know if that is
6 understandable or not.
7      Q      I think I understand. Let me
8 clarify. As I understand it, you provide legal
9 advice to people working within the bank about their
10 jobs.
11      A      Correct.
12      Q      Do I understand you correctly that
13 you also provide legal advice to customers of the
14 bank?
15      A      Not directly to customers, no.
16 But they are involved in -- for instance, if we
17 structure and if we implement a credit file for a
18 client, so typically a German client who's acquiring
19 real estate in Spain, for instance, we will work on
20 the credit facilities, on the collateral, but we
21 will also work closely together -- so internally not
22 only with relationship manager, so the employee of
23 the bank, but also closely with the client himself,
24 especially if he has no outside counsel.
25      Q      The investment professionals to

18

1 whom you provide legal services who work within the
2 bank, do those include professionals who work with
3 clients in making investments in hedge funds?
4      A      We do have investment
5 professionals providing advice to -- depends on your
6 definition of hedge funds. I don't know if your
7 definition of hedge funds can be aligned with a
8 definition like not stock quoted assets?
9      Q      What about -- sorry.
10      A      Sorry, is that what you mean?
11      Q      I mean funds like the Fairfield
12 funds, so private funds that make investments in,
13 you know, funds of funds or other types of vehicles
14 like that. There are professionals in the bank who
15 work with private clients in making those
16 investments, right?
17      A      There are professionals within the
18 bank who are financial advisors, and they liaise
19 with clients in relation to their investment
20 appetite. These can include listed stock or
21 non-listed stock, yes.
22      Q      Would those be among the people to
23 whom you provide legal advice in your role as head
24 of legal wealth management?
25      A      That is correct, to the extent

19

1 that first of all we provide legal advice in
2 relation to investment services about the Luxembourg
3 regulations, first of all.
4           Secondly, in that specific area of advice,
5 our advice is very limited, because most of the time
6 we work on templates, advisory templates, which are
7 only exceptionally tailor-made. So our team will
8 never be involved in the choice of a specific stock
9 or -- it will only be in relation to the -- either
10 the interpretation of the Luxembourg law regulations
11 or European law regulations, which have been
12 implemented in Luxembourg as a member state. Either
13 templates.
14      Q      Okay. I understand. With respect
15 to the last part of your answer, I take it as part
16 of your job you are familiar with applicable
17 regulations that would govern the bank, such as the
18 Luxembourg regulations you just mentioned and the
19 European directives, is that right?
20      A      In relation to investment advice?
21      Q      Well, in relation to -- in
22 relation to regulations that govern the bank's
23 operations broadly, do you have familiarity with
24 that?
25      A      Broadly speaking, yes. But law,

20

1 as you probably know, is so broad, that our
2 competences are limited to the ones I mentioned
3 previously. And even in relation to those
4 competences, when we have to work in a specific
5 file, it is maybe that we ask outside counsel for
6 help.
7      Q      Do you have familiarity generally
8 with Luxembourg or European regulations on
9 preservation of information within the bank broadly?
10      A      It is not part of our scope of
11 competences within the bank, so it is something --
12 well, when internally I am being asked questions
13 about these kind of topics, I would typically refer
14 to internal other specialists.
15      Q      When you say it is not our
16 competence, are you referring to your group,
17 yourself and the four to five-lawyer team that you
18 described?
19      A      Exactly.
20      Q      Okay. So to whom would you go if
21 there was a question about preservation of documents
22 or electronic information within the bank?
23      A      Document preservation, I would
24 first go to compliance department, because in Europe
25 you have GDPR regulations, which are the global data

Transcript of Herman Dewitte

December 14, 2022

---

**21**

1  protection regulations; then afterwards I would go
2  and check with the person in charge of the policies,
3  of internal policies of the bank, what exists within
4  the bank as policies.
5      Q    And who is in charge of creating,
6  maintaining policies relating to archiving and
7  preservation of information within the bank?
8      A    Per policy, there is a policy
9  owner within the bank, so the archiving of documents
10  policy, there is a specific owner, and his name is
11  Gilles Wagener.
12      Q    What is Mr. Wagener's title?
13      A    Mr. Wagener's title -- he is
14  responsible for the archiving and documents
15  management of the bank.  This is one of his
16  competences, yes.
17      Q    Does he have a title within the
18  bank?
19      A    He has a title, but -- well, I
20  didn't check that in detail.
21      Q    Did you speak with Mr. Wagener in
22  connection with preparation for today's deposition?
23      A    Yes, we did.  I spoke to
24  Mr. Wagener together with Jeff Butler, our outside
25  counsel.  We spoke with him yesterday.

**22**

1      Q    Can you tell me how long you and
2  Mr. Wagener and Mr. Butler spoke?
3      A    It was roughly 30 minutes.
4      Q    Were there specific facts that you
5  learned from speaking with Mr. Wagener that are
6  relevant to your testimony here today?
7      MR. BUTLER:  Let me just caution you,
8  Mr. Dewitte, to only discuss factual information
9  which you may have learned from Mr. Wagener as
10  opposed to the communications themselves that we had
11  with him yesterday.  You can answer the question.
12      A    Basically, we exchanged about the
13  policy -- the internal policy applicable within the
14  bank of which he is the owner.
15      Q    And which policies are those?
16      A    These policies, they have been
17  provided to you, and they are entitled "Archive
18  Management of Documents."
19      Q    Okay.  I am sure we will talk
20  about those in a bit.  Has Mr. Wagener -- how long
21  has Mr. Wagener owned the archiving policies that
22  you just described?
23      A    As far as -- the initial policy
24  that was retrieved goes back to 2003.  He confirmed
25  yesterday that he was in charge of that policy for a

**23**

1  very long time, but he was not that specific to give
2  a specific date from which moment on he was in
3  charge of that policy or the archiving management in
4  general.
5      MR. BUTLER:  Let me just caution you
6  again.  I mean, that answer was fine, of course, but
7  you should try to avoid talking about the specific
8  conversation that we had with Mr. Wagener as opposed
9  to just providing the factual information that he
10  conveyed.  I understand that is a hard line to draw,
11  but we are going to try to draw that line during
12  this deposition.
13  BY MR. FLUGMAN:
14      Q    Was this the first time that --
15  yesterday's conversation, was that the first time
16  that you spoke with Mr. Wagener about the archiving
17  policies and document retention that we are here to
18  talk about today?
19      A    Yes.
20      Q    Do you know if anyone else at the
21  bank or representing the bank spoke to Mr. Wagener
22  previously?
23      A    In relation to this deposition?
24      Q    In relation to the issues about
25  document preservation at BIL during the period we

**24**

1  are here to talk about, 2000 to 2008 roughly?
2      A    To the best of my knowledge, no,
3  nobody else.
4      Q    Do you know whether Mr. Wagener
5  was the owner of these policies prior to 2008?
6      A    I do not have that information.
7  That is my understanding, that -- because he is in
8  charge of that department for as long I worked
9  within the bank.  And I know that the -- within the
10  bank and BIL in particular, the policies are being
11  drafted by -- not by legal, but by the operational
12  persons in charge of a specific domain of
13  competence.
14      Q    So let me understand that.  The
15  policies are drafted by nonlawyers, do I understand
16  that correctly?
17      A    That is correct, yes.
18      Q    Are policies reviewed by lawyers
19  before they are implemented?
20      A    It depends.  It depends of the
21  policy.  When they have to be reviewed by legal, it
22  is mentioned on the policy.  So the stakeholders,
23  there is an owner mentioned on the policy, and
24  stakeholders might be legal compliance or other
25  support functions which need to review these

December 14, 2022



**Page 25**

1 policies.
2    Q    Do you know whether the archiving
3 policy that dates back to 2003 was reviewed by a
4 lawyer within BIL or outside counsel before it was
5 implemented?
6    **A    Yes, that has been reviewed.**
7    Q    Do you know by whom it was
8 reviewed?
9    **A    I do not have that information,**
10 **no.**
11    Q    To whom do you report in your role
12 as head of legal wealth management?
13    **A    My direct report, his name is**
14 **Frederick Sudret, and he is the head of legal of**
15 **BIL.**
16    Q    Is there a general counsel of BIL
17 or is that the function that the gentleman you just
18 mentioned fills?
19    **A    There is a general counsel, and**
20 **direct report of Frederick Sudret, so he's plus one,**
21 **as we say. His name is Bernard Mommens, he's a**
22 **member of the executive committee, and he is general**
23 **counsel and secretary general of the bank.**
24    Q    Mr. Mommens still works at the
25 bank?

**Page 26**

1    **A    Mr. Mommens still works at the**
2 **bank, yes.**
3    Q    You have held the position of head
4 of legal wealth management for a span of about 12
5 years and 10 months, according to this printout,
6 since March of 2010. Has the nature of your job
7 responsibilities been the same throughout that
8 period or have they shifted over time?
9    **A    They are more or less the same.**
10    Q    Is there any way that you think
11 they differ that is material in your mind?
12    **A    It is more complex these days**
13 **than -- way more complex than 23 years ago.**
14    Q    Why is that?
15    **A    Because there are much more**
16 **regulations when I compare to when I started to**
17 **work. So, yes, it is more complex.**
18    Q    And before you were head of legal
19 wealth management, your profile lists you as
20 in-house lawyer between November of 2002 and March
21 of 2010. Can you describe for me what your job
22 responsibilities were during that time frame?
23    **A    They were more or less in line**
24 **what I am doing right now, except right now I have**
25 **the responsibility to manage a team. But**

**Page 27**

1 accountant-wise speaking, the accountant on the
2 files would be similar.
3    Q    Do you recall ever having provided
4 legal advice to any of the individuals working at
5 BIL who were involved with the Fairfield funds or
6 investments with Bernard Madoff?
7    MR. BUTLER: Object to the form of that
8 question. And you can answer that question yes or
9 no. Let's proceed cautiously because we are talking
10 about your legal advice.
11 BY MR. FLUGMAN:
12    Q    I should clarify, I am not asking
13 for what that advice may or may not have been, I am
14 just asking a yes-or-no question, did you provide,
15 in your memory, any legal advice to anyone within
16 the bank working on Fairfield or Madoff investments.
17    **A    You mean prior to 2008 or after**
18 **2008 or --**
19    Q    I mean it broadly. But if there
20 is a distinction in your mind, please tell me.
21    **A    Well, for me personally, and the**
22 **bank, was not aware about the fraud of Madoff before**
23 **December 2008. So, personally, I have been working**
24 **on the file only from the end of December 2008 on.**
25    Q    Okay. So just so I understand it,

**Page 28**

1 you don't recall providing advice while BIL was
2 investing with Fairfield or Madoff to any of the
3 professionals involved in those responsibilities?
4    **A    That is correct.**
5    Q    Am I correct in understanding that
6 you have worked at BIL since graduating from law
7 school in 2002?
8    **A    That is correct; if you don't take**
9 **into account Geneva or the year I spent in Paris**
10 **working for OT/Technology Corporation, yes.**
11    Q    I don't see that on this exhibit.
12 Is there a reference to that that I'm not focused
13 on?
14    **A    Well there is a reference, if you**
15 **say, well the University of Geneva, I did a masters**
16 **of business law there, which was a two years degree,**
17 **or two years time period. The first year were**
18 **theoretical lessons, and the second year was an**
19 **internship which was basically normally working**
20 **within a company.**
21    Q    I see that during the time you
22 were an in-house lawyer with Dexia you spent some
23 time in New York at Financial Security Assurance,
24 from 2006 to 2007. Can you tell me about what your
25 job responsibilities in that role entailed?

December 14, 2022

---

**29**

1    A    Job responsibilities was mainly
2    assisting in-house counsel in -- basically giving
3    them a hand in their day-to-day management of their
4    files.
5    Q    Did you have any exposure to U.S.
6    litigation when you were working in that role?
7    A    No.
8    Q    I see that you obtained a Master
9    of Law from University of Brussels before attending
10    the University of Geneva, is that right?
11    A    That is correct, yes.
12    Q    Sir, do you have any training in
13    information technology?
14    A    Absolutely not.
15    Q    Do you have any training or
16    experience with document preservation or archiving?
17    A    I have no specific training on
18    that, no.
19    Q    Have any of your responsibilities
20    at BIL included managing electronic information, or
21    ESI?
22    A    No.
23    Q    Have any of your responsibilities
24    at BIL included investigating the potential
25    destruction or deletion of electronically stored

---

**30**

1    information?
2    A    No.
3    Q    Have any of your responsibilities
4    at BIL involved monitoring or evaluating compliance
5    with litigation holds for U.S. litigation?
6    A    I'm sorry, could you repeat that
7    question, please.
8    Q    Of course. Have any of your
9    responsibilities at BIL involved monitoring or
10    evaluating compliance with litigation holds issued
11    in connection with U.S. litigation?
12    A    May I ask you to repeat it a third
13    time? I'm sorry for that, but I just want to be
14    sure that I correctly understand the question.
15    Q    Sure. Have any of your
16    responsibilities at BIL involved monitoring or
17    evaluating compliance with litigation holds issued
18    in connection with U.S. litigation?
19    A    Well, in 2010, litigation holds
20    has been -- has been issued or sent out to the bank,
21    yes.
22    Q    Were you involved in sending that
23    litigation hold out internally at the bank?
24    A    Personally, I was not.
25    Q    Were you personally involved with

---

**31**

1    any efforts to monitor compliance with that
2    litigation hold within the bank?
3    A    Personally, I was not, no.
4    Q    Have any of your responsibilities
5    at BIL involved monitoring or evaluating compliance
6    with Luxembourg regulatory requirements, or document
7    preservation or retention?
8    A    No.
9    Q    Have any of your responsibilities
10    at BIL involved monitoring or evaluating compliance
11    with the document preservation or retention
12    requirements of other countries like the United
13    States?
14    A    No.
15    Q    Do you personally have any prior
16    experience with U.S. litigation before this
17    deposition?
18    A    No.
19    MR. BUTLER: I just want to clarify. You
20    added "before this deposition" at the end of your
21    question. Maybe you should ask that question again
22    so he hears the whole question before he responds.
23    BY MR. FLUGMAN:
24    Q    Sure. What I am asking is, before
25    preparing for this deposition, had you had any

---

**32**

1    experience in your -- personal experience with U.S.
2    litigation?
3    A    No.
4    Q    You understand that you are here
5    today testifying as a corporate representative on
6    behalf of the bank, is that right?
7    A    Yes.
8    Q    And you understand that that means
9    that when you are answering my questions today, you
10    are answering based not just on what you have
11    personally seen or experienced, but based on the
12    information that was reasonably available to you on
13    the subject matters that are covered by the
14    deposition, do you understand that?
15    A    Understood, yes.
16    Q    Basically you are standing in
17    BIL's shoes today as you give deposition testimony,
18    do you understand?
19    A    Understood, yes.
20    Q    Do you know why you were selected
21    to testify as BIL's corporate representative?
22    MR. BUTLER: Objection. I will instruct
23    him not to answer that.
24    MR. FLUGMAN: It is just a yes-or-no
25    question. I'm not asking for the reason.

Transcript of Herman Dewitte
December 14, 2022

---

33

1    MR. BUTLER: I will let him answer the
2 yes-or-no question. Can you repeat the question.
3 Then, Mr. Dewitte, you can answer yes or no.
4 BY MR. FLUGMAN:
5    Q    Do you know why you were selected
6 to testify as BIL's corporate representative today?
7    A    Yes.
8    Q    Okay. When were you first
9 informed that you might need to testify as BIL's
10 corporate representative?
11    MR. BUTLER: Again, I will object on the
12 basis of potential privilege. But you can give a
13 date if you know it, or the approximate time, but
14 don't go into any of the substance of the
15 communications that you had about this deposition.
16    A    Approximately a couple weeks ago.
17 BY MR. FLUGMAN:
18    Q    Okay. Can you tell me who told
19 you that you -- who asked you to testify? Just the
20 person, I'm not asking for any substance of the
21 conversation.
22    A    Frederick Sudret, head of legal.
23    Q    Sir, you understand that today's
24 deposition is about certain topics that are related
25 to document preservation within the bank?

34

1    A    I understand, yes.
2    Q    Okay. Let's take a look at the
3 document in front of you that's been marked as
4 Exhibit 1, which is a copy of the notice of
5 deposition.
6    MR. BUTLER: I have a copy.
7 BY MR. FLUGMAN:
8    Q    First my question is, have you
9 seen this document before?
10    A    Yes, I have.
11    Q    If you can turn, please, sir, to
12 page 6 of the document, numbered page 6, where it
13 says, "List of topics of examination." Have you
14 reviewed the seven topics that appear on this list
15 on pages 6 and 7 of Exhibit 1?
16    A    Yes, I have reviewed these topics.
17    Q    And are you familiar with each of
18 the topics listed in Exhibit 1 on the list of topics
19 of examination?
20    MR. BUTLER: Objection to form. You can
21 answer.
22    A    Yes.
23 BY MR. FLUGMAN:
24    Q    How did you familiarize yourself
25 in order to testify about these topics today?

35

1    A    Well, I have reviewed internal
2 files within the legal department, first of all.
3 Secondly, discussed with Jeff Butler, our outside
4 counsel, these different topics. And thirdly, I
5 have made together with Jeff Butler interviews of
6 certain BIL employees and also certain persons
7 outside the scope of BIL.
8    Q    Which internal files did you
9 review in order to testify here today?
10    A    Physical files, physical binders,
11 and electronically available data on my file server,
12 or my file server available within the legal
13 department.
14    Q    And what documents were contained
15 in those physical binders that you reviewed?
16    A    Can you please be a little more
17 specific about what documents? Do you mean -- yes.
18    Q    What categories of documents did
19 you review in these physical binders in order to
20 prepare yourself to testify here today?
21    A    Okay. Categories like e-mail or
22 physical documents or binders, is that what you
23 mean?
24    Q    I am trying to understand what
25 actual documents you looked at. For example, did

36

1 you look at policies, did you look at communications
2 from the relevant time period? What do you recall
3 about what you reviewed from a documents perspective
4 in terms of the internal files you mentioned a
5 moment ago?
6    A    Okay. Thank you. So, they
7 include internal policies, include e-mail exchanges,
8 and also documents attached to those e-mail
9 exchanges; as well as physical files available in
10 our team or available at the inspection team.
11    Q    Were the e-mail exchanges that you
12 reviewed in electronic form when you reviewed them?
13    A    Yes. Electronic form, and also
14 printed out into the binders, yes.
15    Q    Do you recall what time period the
16 e-mail exchanges you reviewed were from?
17    A    Could you please rephrase that?
18    Q    Sure. Did you review e-mail
19 exchanges that predate 2009?
20    A    Yes.
21    Q    Were those e-mail exchanges in
22 electronic form or in hard copy form?
23    A    Both.
24    Q    What e-mails do you recall
25 reviewing that were in electronic form that predate

Transcript of Herman Dewitte

December 14, 2022

---

**Page 37**

1  2009?
2      A      For instance, if you ask me for an
3  example, the moment when BIL discovered about the
4  Madoff fraud, which was in -- by means of press
5  reports, which we learned at the time in
6  December 12th. So for instance, these kind of
7  e-mails I have reviewed in order to prepare myself
8  to topic number 2.
9      Q      That is helpful. If I understand
10  you correctly, BIL learned of the Madoff fraud
11  December 12, 2008?
12      A      That is correct.
13      Q      And do you recall whose e-mails
14  you reviewed in order to familiarize yourself with
15  that fact in connection with your preparation for
16  the deposition today?
17      A      Yes.
18      Q      Whose e-mails were they?
19      A      Several persons. There was for
20  instance one e-mail sent from Bernard Mommens to --
21  addressed to several employees of the bank by
22  informing them that a task force has been --
23      MR. BUTLER: Let me just pause there. It
24  is fine to mention the names of people who sent
25  e-mails that you reviewed if they were privileged,

---

**Page 38**

1  but you shouldn't go into the content of the
2  e-mails, except very general descriptions of the
3  content.
4      A      Okay. So if I rephrase, a
5  specific e-mail I have in mind was being sent by
6  Bernard Mommens to several senior executives of the
7  bank in relation to an action plan to be
8  implemented.
9      Q      And you reviewed this e-mail in
10  electronic form in preparation for your deposition
11  today?
12      A      That is correct, yes.
13      Q      Do you recall who in the bank
14  received Mr. Mommens' e-mail?
15      A      Yes. There was for instance the
16  head of legal at that time, Jean-Marc van Oldeneel,
17  he was one of the addressees of that e-mail.
18      Q      Do you recall any other
19  addressees, sitting here today?
20      A      Also the -- no. That is the
21  main -- that was the main addressee.
22      Q      Okay. You mentioned that the
23  e-mail discussed setting up a task force to respond
24  to the Madoff fraud, is that correct?
25      A      It depends on the definition to

---

**Page 39**

1  respond, but yes --
2      MR. BUTLER: Let me just object to that.
3  So, that is not exactly what he said. It is getting
4  into the content of that e-mail, which was between
5  lawyers within the bank at the time. So we just
6  need to go very cautiously.
7  BY MR. FLUGMAN:
8      Q      I am not trying to mischaracterize
9  your words. I thought you said task force. Can you
10  tell me what the purpose of the task force you
11  mentioned was?
12      A      The bank was not aware about the
13  fraud of Madoff and discovered it at December 12th
14  at that time. And I also have reviewed a press
15  release of the Securities and Exchange Commission,
16  which was also circulated within the bank. This
17  specific press release reports that Bernard Madoff
18  had 17 billion of assets under management at the
19  beginning of 2008, and most probably which was one
20  of the most important frauds in the economic history
21  of the planet earth, so it was huge.
22      So the aim or the goal or the intention of
23  this task force was to check to what extent the bank
24  would potentially be exposed to this fraud.
25      Q      Were you involved with that task

---

**Page 40**

1  force at the time?
2      A      Yes.
3      Q      Do you recall -- when you say to
4  what extent the bank would be potentially exposed,
5  can you tell me what you mean by that?
6      A      Yes. Sure. Well, important to
7  know is that the bank granted some loans to several
8  feeder funds ultimately invested in Madoff; four, to
9  be exact, with a total exposure at the time of
10  discovery of the Madoff fraud of $220 million US.
11      In parallel, out of these four feeder
12  funds, two of them the bank actively commercialized
13  parts of the shares of these feeder funds. In other
14  words, for a small to medium bank like BIL, this
15  exposure was huge.
16      And so it was important that the entire
17  bank was aligned with what needed to be undertaken
18  on credit side, on client side, on the insurance
19  side, on the communication with the regulator. It
20  was an important file for the bank at the time, yes.
21      Q      Can you recall which feeder funds
22  the bank made loans to, that you just referenced in
23  your answer?
24      A      Yes, I can.
25      Q      Which ones were they?

---

December 14, 2022

41

```
1        A      Rafale Partners, Inc., Blue Star
2    Funds, Mianda and Mount Capital Funds.
3        Q      Sir, do you know whether any of
4    those funds are based in the United States?
5        A      I know that it is not the case.
6    These feeder funds are incorporated either in BVI or
7    the Cayman Islands.
8        Q      All four of those funds?
9        A      Yes.
10       Q      Do you know whether any of the
11   four funds you mentioned have investment managers
12   who are based in the United States?
13       MR. BUTLER:  Let me just object to the
14   question as outside the scope of the deposition
15   topics.  You can answer if you know.  Mr. Dewitte is
16   not prepared to give -- for this deposition to give
17   details about these matters.  If he knows, he can
18   answer the question.
19       A      I don't recall.  It should be
20   mentioned I guess in the prospectus of these funds,
21   but I didn't prepare that information for this
22   deposition.
23   BY MR. FLUGMAN:
24       Q      Do you know whether, as part of
25   the task force that you are describing, the bank
```

42

```
1    considered whether it might have claims against any
2    of the managers of the four funds that you just
3    mentioned?
4        MR. BUTLER:  I just object.  I don't see
5    how the witness could answer that question without
6    going into legal advice that was considered at the
7    time.  So I will instruct him not to answer.
8        I guess as a yes-or-no question, if you
9    know the answer, I would allow it.  Maybe we can
10   reread the question.
11   BY MR. FLUGMAN:
12       Q      That's what I'm asking at the
13   moment.  Do you know whether the task force
14   considered if BIL had claims against the four funds
15   that you just mentioned or their service
16   professionals, like investment managers?
17       A      I don't recall.
18       Q      Okay.  You understand also that
19   BIL had exposure to the Madoff Ponzi scheme through
20   investments in Fairfield, correct?
21       A      I understand today, is that what
22   your question is?
23       Q      First, you understand today?
24       A      I understand today, yes.
25       Q      Did you understand that in 2008
```

43

```
1    after the fraud was discovered?
2        A      No.  Because at the time, the
3    Fairfield funds were not on the topic list of the
4    bank.  Why -- I'm sorry.
5        Q      Why --
6        MR. BUTLER:  I don't think you should go
7    into why as a matter of privilege.  Why don't you
8    stop there.
9    BY MR. FLUGMAN:
10       Q      You are aware, though, sir, that
11   BIL had made investments in the Fairfield funds
12   prior to 2008?
13       A      That is correct, yes.
14       Q      And you are aware that the
15   Fairfield funds were incorporated in the British
16   Virgin Islands?
17       A      Yes.
18       Q      You are aware that the Fairfield
19   funds investment manager, Fairfield Greenwich Group,
20   was based in the United States?
21       A      Yes.
22       Q      Do you understand also that Mount
23   Capital is a Madoff feeder fund?
24       A      Yes.
25       Q      As is Blue Star fund?
```

44

```
1        A      Yes.
2        Q      And do you understand that Blue
3    Star invested into Fairfield as well?
4        A      Partially, yes.
5        Q      Okay.  You mentioned reviewing
6    e-mails in electronic form.  Can you recall, in
7    preparation for your deposition today, whether you
8    reviewed any other e-mails in electronic form that
9    predate the discovery of the Madoff fraud in
10   December of 2008?
11       A      No.
12       Q      No, you can't recall, or no, you
13   didn't review any?
14       A      Can you repeat the question?
15       Q      Sure.  Did you review any e-mails
16   in electronic form in preparation for today's
17   deposition that predate December of 2008 when the
18   Madoff fraud was discovered by BIL?
19       A      No.
20       Q      You also mentioned that in
21   preparation for your testimony here today you
22   interviewed certain individuals.  Can you please
23   tell me the names of the people with whom you spoke
24   in preparation for the deposition today?
25       A      Sure.  The first one you already
```

Transcript of Herman Dewitte

December 14, 2022

---

**45**

1  have his name, it's Gilles Wagener, we referred to
2  him previously.
3      Second person I have spoken to is Aurore
4  Moutte.
5      Q    Can you repeat that?
6      A    Aurore, you spell that
7  A-U-R-O-R-E, and Moutte, M-O-U-T-T-E; as well as
8  Michelle Albert; as well as William Goehry,
9  G-O-E-H-R-Y; as well as Nicholas Vaisse,
10 V-A-I-S-S-E; as well as Maria Totaro; as well as
11 Marie-Anne Salentiny, S-A-L-E-N-T-I-N-Y.
12     You asked for the BIL employees we
13 interviewed but also for other persons?
14     Q    I asked for all persons.  But let
15 me ask before we get to that.  Are the seven
16 individuals you mentioned in the list you just gave
17 us, are those all people who are currently employed
18 by BIL?
19     A    That is correct, yes.
20     Q    Before we get to the others, we
21 talked about Mr. Wagener and his role.  Can you
22 describe Aurore Moutte -- first of all, is that a
23 woman or a man?
24     A    It is a woman, yes.
25     Q    Can you please tell me

**46**

1  Ms. Moutte's role at the bank is?
2      A    She is heading the team in charge
3  of the policies of the bank, so the rules and
4  policies of the bank.
5      Q    Do you know how long she has held
6  that position?
7      A    I don't have that exact
8  information available; for a couple of years.
9      Q    Do you know whether she held that
10 position prior to 2009?
11     A    I don't have that information.
12     Q    Okay.  Can you discuss the factual
13 information that you discussed with Ms. Moutte?
14     MR. BUTLER:  Object to the question and
15 instruct the witness not to answer on the ground of
16 privilege.
17     MR. FLUGMAN:  I have asked for the facts
18 that he learned from Ms. Moutte.  How is that
19 privileged?
20     MR. BUTLER:  Can I hear that question
21 again?
22       (Court reporter read back.)
23     MR. BUTLER:  With the clarification that
24 the question is do you remember what factual -- can
25 you relay what factual information she communicated,

**47**

1  I am okay with that question.  Limit your answer to
2  the factual information that you may have learned
3  from Ms. Moutte as opposed to the content of the
4  discussion we had with her.
5  BY MR. FLUGMAN:
6      Q    With that clarification, do you
7  understand my question?
8      A    Could you please repeat it?
9      Q    Sure.  Can you tell me the factual
10 information that you discussed with Ms. Moutte in
11 preparation for your testimony today?
12     A    We discussed policies in relation
13 to documents, management and archiving.
14     Q    Did the policies that you
15 discussed with Ms. Moutte relate to the time period
16 prior to 2009?
17     A    Yes.
18     Q    And which policies did you discuss
19 with Ms. Moutte that applied prior to 2009?
20     A    Archive management, document
21 archive management.
22     Q    Any others that you recall?
23     A    That was the main policy.
24     Q    Is that the policy that you
25 mentioned earlier that dates from 2003?

**48**

1      A    That is correct, yes.
2      Q    Michelle Albert I believe is the
3  next name you mentioned.  What is Mr. Albert's role
4  at the bank?
5      A    He is an inspection officer.  He
6  is a member of the inspection team.
7      Q    Could you describe what that is?
8      A    Inspection team is in charge of
9  very specific files; for instance, they would be
10 involved if there is internal fraud or potentially
11 an external fraud, compared to the internal audits.
12     Internal audit has a more follow-up
13 function in the business, whereas inspection team
14 would really be looking at unusual occurrences of
15 the business of the bank.  They are also in charge
16 of liaising with the -- in French it's called the
17 (French), which I presume in the United States would
18 be the district attorney.  But I am not sure about
19 that.
20     Q    Prosecutorial -- government actor?
21     A    Yes.
22     Q    Do you know whether Mr. Albert was
23 involved as an inspection officer during the time
24 that the Madoff fraud was discovered in 2008?
25     A    Yes.

Transcript of Herman Dewitte

December 14, 2022

49

1    Q    Was Mr. Albert -- strike that.
2    Can you tell me the factual information
3    that you learned by speaking with Mr. Albert in
4    preparation for today's deposition?
5    **A    Yes. Mr. Albert, he confirmed to**
6    **us that he has seized physical documents, he has**
7    **identified physical documents and has stored them in**
8    **a safe place in the archives of the inspection**
9    **department.**
10    Q    Do you know which physical
11    documents Mr. Albert is referring to?
12    **A    Yes. These are the physical**
13    **binders in relation to Rafale, Blue Star, basically**
14    **the feeder funds I have just mentioned to you to**
15    **which the bank had its main exposure at the time we**
16    **discovered the Madoff fraud.**
17    Q    Do you know whether the physical
18    documents that Mr. Albert seized or took possession
19    of included documents relating to the Fairfield
20    funds?
21    **A    I know that that is not the case.**
22    Q    He did not take documents related
23    to the Fairfield funds?
24    **A    Correct.**
25    Q    Do you know when Mr. Albert took

50

1    the physical documents relating to the other funds
2    that you mentioned?
3    **A    Shortly after the discovery of the**
4    **Madoff fraud, so that would have been in early 2009.**
5    Q    Okay. And you mentioned physical
6    documents. Do you know whether Mr. Albert took
7    possession of any electronic documents at that time?
8    **A    I know he didn't.**
9    Q    He did not?
10    **A    He did not. Sorry.**
11    Q    Do you know whether anybody took
12    possession of physical documents relating to the
13    Fairfield funds after the discovery of the Madoff
14    fraud?
15    **A    At a certain point in time, the**
16    **legal department took copies of the subscription and**
17    **redemption orders in relation to the Fairfield**
18    **funds.**
19    Q    Do you recall when that was?
20    **A    It was shortly after we have**
21    **received the summons with notice, so the -- that we**
22    **were -- we received the notification by the**
23    **liquidator of Fairfield.**
24    Q    Do you recall when that was?
25    **A    The exact date that we received --**

51

1    **are you referring to the first question mentioned --**
2    Q    I am just asking --
3    **A    -- in the examination or --**
4    Q    I am just picking up on the answer
5    you just gave, which is that the legal department
6    took copies of the subscription and redemption
7    orders relating to the Fairfield funds when it
8    received the summons and notification.
9    **A    Shortly after that.**
10    Q    So I am asking do you recall when
11    that was.
12    MR. BUTLER: The problem is that he
13    described two different events. He is asking you
14    which event are you asking about. Two things
15    happened.
16    BY MR. FLUGMAN:
17    Q    Let me break it down. When did,
18    in your recollection, BIL receive the summons and
19    notice relating to the lawsuit involving the
20    Fairfield funds in the United States?
21    **A    It was August 30, 2010.**
22    Q    Do I understand your testimony to
23    be that after that point in time, somebody from the
24    legal department collected physical copies of the
25    subscription and redemption orders relating to the

52

1    Fairfield funds?
2    **A    Made copies, yes, that is correct.**
3    Q    Was that the first time that
4    somebody in the bank had collected information
5    relating to the Fairfield funds?
6    **A    That is correct. To the best of**
7    **my knowledge, yes.**
8    Q    To be clear, it didn't -- the bank
9    did not collect any information relating to the
10    Fairfield funds in early 2009 when it collected
11    information about the other four funds that you
12    mentioned earlier?
13    **A    Correct.**
14    Q    Going back to your list of people,
15    William Goehry, can you tell me please what
16    Mr. Goehry's role at the bank is?
17    **A    He is heading inspection**
18    **department, so he is the team head. He is the boss,**
19    **basically, of Michelle Albert.**
20    Q    And did you -- strike that.
21    What factual information did you learn
22    relating to your deposition testimony today from
23    Mr. Goehry?
24    **A    Well --**
25    MR. BUTLER: Again I will caution the

Transcript of Herman Dewitte

December 14, 2022

14 (53 to 56)

**53**

1  witness. It is a little bit difficult because he
2  asked about the discussion with him as opposed to
3  the factual information. I understand that is one
4  way to do it. But you should not talk about what
5  was discussed during your meeting with Mr. Goehry,
6  but only testify about facts that you may have
7  learned from that meeting, if you can separate the
8  facts from the discussion.
9  **A    Okay. Thank you. Well, I didn't**
10 **learn any facts from that meeting because he was not**
11 **working at inspection department at the time when**
12 **they were involved in the collection of these**
13 **physical documents.**
14 **BY MR. FLUGMAN:**
15     Q    Okay. Mr. Vaisse, the next
16 person, what is his role?
17 **A    He is the head of data protection,**
18 **rule team. He is heading a small team, two or three**
19 **persons, making sure that the bank is aligned with**
20 **the GDPR, global data protection rules.**
21     Q    Do his responsibilities extend
22 beyond GDPR, in your understanding?
23 **A    To the best of my knowledge, no.**
24     Q    Same question, if you can tell me
25 any facts relevant to your testimony here today that

**54**

1  you learned from your discussions with Mr. Vaisse in
2  preparation?
3  **A    Well, the factual information we**
4  **wanted to get from him is in relation to**
5  **electronically available e-mails from certain**
6  **employees, BIL employees, existing or former BIL**
7  **employees. That was the -- the main purpose or main**
8  **goal of the discussion.**
9     Q    So I understand it, is what you
10 are saying that you spoke with Mr. Vaisse about
11 whether electronically stored information, including
12 e-mails, were available from certain BIL employees,
13 current and former, from the pre-2009 time frame?
14    MR. BUTLER: Can I get that question
15 again.
16     (Court reporter read back.)
17    MR. BUTLER: That is getting kind of
18 specific about what exactly he discussed with
19 Mr. Vaisse. You can answer generally what the topic
20 of discussion was with Mr. Vaisse, but we are not
21 going to go into exactly what was said during that
22 conversation.
23 BY MR. FLUGMAN:
24     Q    Do you need me to repeat the
25 question?

**55**

1    MR. BUTLER: With that clarification.
2  BY MR. FLUGMAN:
3     Q    Did you discuss with Mr. Vaisse
4  whether electronically storing information,
5  including e-mails, was available from the pre-2009
6  time frame for certain BIL employees?
7     A    Yes.
8    MR. BUTLER: You can answer that yes or
9  no. Very well.
10 BY MR. FLUGMAN:
11     Q    Do you recall which BIL employees
12 you discussed with Mr. Vaisse?
13 **A    Mainly Maria Totaro, previously**
14 **mentioned, and Marie-Anne Salentiny.**
15     Q    Does BIL have electronically
16 stored information, including e-mails, for either
17 Ms. Salentiny or Ms. Totaro, from the pre-2009 time
18 frame?
19 **A    No.**
20     Q    Do you recall discussing any other
21 current or former BIL employees' electronically
22 stored information with Mr. Vaisse?
23 **A    I'm sorry, could you repeat the**
24 **question, please?**
25     Q    Let me phrase it a different way.

**56**

1  Besides Ms. Salentiny and Ms. Totaro, were there any
2  other former or current BIL employees that you
3  discussed with Mr. Vaisse?
4  **A    Yes.**
5     Q    Which employees?
6  **A    Marie Claire Meyers and Gianni**
7  **Baldinucci.**
8     Q    Did you inquire about the
9  availability of electronically stored information,
10 including e-mails, for Mr. Baldinucci and Marie
11 Claire Meyers --
12 **A    Meyers, let me spell it.**
13 **M-E-Y-E-R-S.**
14 **I'm sorry, could you repeat.**
15     Q    Yes. Did you inquire about
16 whether electronically stored information, including
17 e-mails, is available to BIL from Mr. Baldinucci and
18 Ms. Meyers from the pre-2009 time frame?
19 **A    Yes, we did inquire.**
20     Q    Does BIL have access to any
21 electronically stored information from Ms. Meyers or
22 Mr. Baldinucci from pre-2009?
23 **A    No.**
24     Q    We spoke about Ms. Totaro, you
25 indicated that you spoke to her in connection with

10-03635-jpm    Doc 1003-2    Filed 02/17/23    Entered 02/17/23 15:20:51    Exhibit B-
Deposition Transcript    with redactions relating only to documents and    Pg 17 of 130

Transcript of Herman Dewitte    15 (57 to 60)

December 14, 2022

**57**

1  preparation for the deposition. First, what is
2  Ms. Totaro's role at the bank?
3      **A      At the time when the facts**
4  **occurred in relation to the actions, and even today,**
5  **she's working in the execution desk of the trading**
6  **markets.**
7      Q      Could you describe what that
8  means?
9      **A      Basically her role, or the role**
10 **generally of the execution desk, is that they --**
11 **they prepare the redemption and the subscription**
12 **orders in relation to the transfer agents.**
13     Q      Do you understand that Ms. Totaro
14 was involved in the subscription and redemption in
15 the Fairfield fund that is at issue here?
16     **A      Yes.**
17     Q      Did you speak with Ms. Totaro
18 about whether she used e-mail to communicate in
19 relation to the subscriptions and redemptions at
20 issue here?
21     MR. BUTLER: Again, hold on. I object and
22 instruct the witness not to answer. You are going
23 into the discussion as opposed to just asking a
24 factual question. If you ask the factual question
25 we can get past my objection.

**58**

1  BY MR. FLUGMAN:
2      Q      Sure. With that clarification,
3  did Ms. Totaro use e-mail to communicate with
4  respect to investments in the Fairfield funds?
5      **A      Trade confirmations were done on**
6  **paper, everything was done on paper, which was**
7  **scanned afterwards into physical binders, copies.**
8  **And there were some internal e-mail exchanges as**
9  **well, yes.**
10     **And so -- I'm sorry, could you strike**
11 **that, please? Sorry.**
12     MR. BUTLER: Let me just state for the
13 record, I didn't want to interrupt the witness'
14 answer, but I think that falls outside the scope of
15 these topics. He is not testifying as a spokesman
16 for the bank on sort of what happened when the
17 redemption was made, but, you know, you can ask his
18 memory or his knowledge.
19 BY MR. FLUGMAN:
20     Q      We can figure that out later.
21 What I want to know, and I think you said yes, is,
22 did Ms. Totaro use e-mail to communicate with
23 respect to investments in the Fairfield funds?
24     MR. BUTLER: Again, I object that it's
25 outside the scope of the topics, but Mr. Dewitte, if

**59**

1  you know that information you can answer.
2      **A      I don't know.**
3  BY MR. FLUGMAN:
4      Q      Did you -- strike that.
5      Ms. Totaro had access to e-mail during the
6  pre-2009 period, correct?
7      **A      Correct.**
8      Q      Do you have any reason to believe
9  that she didn't use e-mail in the course of her job
10 functions at BIL during that time period?
11     **A      I have no reason to believe that**
12 **she did not use it.**
13     Q      And just to be clear, you spoke
14 with Ms. Totaro in preparation for the deposition
15 today, and following that conversation you don't
16 know whether she used e-mail to communicate with
17 respect to the Fairfield funds?
18     **A      That is correct.**
19     Q      Do you know whether she used
20 e-mail to communicate with respect to the specific
21 subscription and redemption at issue in this case?
22     **A      I don't know.**
23     Q      Was part of Ms. Totaro's job
24 function to communicate with people outside the
25 bank?

**60**

1      **A      Yes.**
2      Q      And was part of Ms. Totaro's job
3  function with respect to the Fairfield funds, and
4  the specific redemption and subscription at issue in
5  this case, to communicate with Citco?
6      MR. BUTLER: Again, I'll object that's
7  outside the scope. It's a very specific question.
8  You can answer.
9      MR. FLUGMAN: Disagree, but we can take
10 that up later.
11 BY MR. FLUGMAN:
12     Q      If you know the answer to the
13 question, please answer.
14     **A      I don't know.**
15     MR. BUTLER: Which topic are you on at
16 this point?
17     MR. FLUGMAN: I think it relates to 6.
18 But in any case, we have the witness' answer. We
19 can continue.
20 BY MR. FLUGMAN:
21     Q      You also indicated you spoke with
22 Ms. Salentiny?
23     **A      Correct.**
24     Q      Remind me, please, what is her job
25 function at the bank?

Transcript of Herman Dewitte

December 14, 2022

61

1    A    Today she is working in
2    administration function, which is called Kes, but at
3    the time she was also -- at the time of the relevant
4    facts at hand, in relation to the action, she was
5    also working at the transaction desk, execution
6    desk. So she was at the time a colleague of Maria
7    Totaro.
8    Q    Were her job functions at the
9    time -- and by -- to put some more specificity on
10   it, 2005 to 2008 similar to the ones that you
11   described with respect to Ms. Totaro?
12   A    I think so, yes.
13   Q    Did Ms. Salentiny have access to
14   e-mail during that time period?
15   A    Yes.
16   Q    Did Ms. Salentiny communicate
17   internally or externally with respect to the
18   Fairfield funds by e-mail?
19   A    To the best of my knowledge -- I
20   don't have the answer to that question.
21   Q    How long roughly did you speak
22   with Ms. Salentiny in preparation for the
23   deposition?
24   A    Roughly it would be around 30
25   minutes.

62

1    Q    Sitting here today you don't have
2    any reason to doubt that she would have used e-mail,
3    correct?
4    A    I -- I don't know.
5    Q    Okay.
6    A    I don't know.
7    Q    If that is your answer, then we
8    will move on.
9        MR. BUTLER: David, would this be a good
10   time for a break? We have been going for almost an
11   hour and a half now.
12       MR. FLUGMAN: Happy to take a break.
13       MR. BUTLER: If you're in the middle of
14   something I don't want to interrupt you.
15       MR. FLUGMAN: I was just about to ask --
16   this is a good time for a break.
17       THE VIDEOGRAPHER: Going off the record.
18   The time is 10:58 a.m.
19       (Off the record.)
20       THE VIDEOGRAPHER: We are back on the
21   record. The time is 11:10 a.m.
22
23   BY MR. FLUGMAN:
24   Q    Mr. Dewitte, before the break we
25   were talking about individuals with whom you spoke

63

1    in preparation for today's deposition. I believe
2    everyone we have covered so far is a current BIL
3    employee. But you also mentioned that you spoke
4    with some former BIL employees. Could you please
5    give me the list of those people.
6    A    Yes. I have spoken to Mary Claire
7    Meyers, Johnny Baldinucci and Benny Reiter, but
8    Benny is his nickname, do you say that?
9    Q    Yes.
10   A    His official name is Gannot, so
11   spelled G-A-N-N-O-T, I think so.
12   Q    Anyone else besides those three
13   individuals?
14   A    As being former BIL employees, no.
15   Q    Is there anyone else that you
16   spoke to besides the seven people who are current
17   BIL employees and three former employees that you
18   just mentioned, other than counsel, with respect to
19   your preparation today?
20   A    Yes.
21   Q    Who are those people?
22   A    Two employees from Kyndryl. And
23   Kyndryl, you spell that K-Y-N-D-R-Y-L.
24   Q    Do you remember those individuals'
25   names?

64

1    A    Yes. Malcolm Holm and Christoph
2    Pelletot. Pelletot, you would spell that like
3    P-E-L-L-E-T-O-T, if my memory is correct.
4    Q    What role does Kyndryl play with
5    respect to BIL?
6    A    Kyndryl is -- basically it's a
7    spin-off of IBM. And Kyndryl is taking care of
8    BIL's e-mail servers.
9    Q    How long has Kyndryl provided that
10   service to BIL?
11   A    I don't have the exact date --
12   basically I don't have that information. But as
13   long as I am aware of and working for the bank, IBM,
14   later on Kyndryl, always has been the service
15   provider to the bank.
16   Q    Is that true before 2009, that
17   either IBM or Kyndryl was providing this service to
18   BIL?
19   A    I don't have the exact
20   information, so I cannot confirm or infirm that, do
21   you say that, infirm? No?
22   Q    I am not sure what you mean by
23   "infirm," but --
24   A    I cannot say yes or no.
25   Q    Infer, perhaps?

Transcript of Herman Dewitte

December 14, 2022

---

**Page 65**

1    A    Infer?

2    Q    I don't want to put words in your

3  mouth. When you say provides services to BIL, can

4  you tell me at a general level what services Kyndryl

5  provides?

6    A    Well, in relation to the e-mail

7  inboxes of employees, they host the server, I think

8  so. And they manage the e-mail service of

9  employees.

10    Q    Do you know whether Kyndryl or IBM

11  provided that service before 2009 for BIL?

12    A    I don't have that level of

13  information.

14    Q    Did you speak with Mr. Holm and

15  Mr. Pelletot separately or together?

16    A    Spoke with them together, with --

17  yeah, we spoke with them together.

18    Q    When did that conversation take

19  place?

20    A    Couple weeks ago, before the --

21  before today.

22    Q    Was that conversation the only

23  conversation that you had with Mr. Holm and

24  Mr. Pelletot about the subject matter of today's

25  deposition?

---

**Page 66**

1    A    That was the only conversation.

2  There were some -- to be exhaustive, there were some

3  e-mail exchanges afterwards, yes.

4    Q    What facts did you learn from

5  speaking with Mr. Holm and Mr. Pelletot with respect

6  to today's deposition?

7    A    Well, the facts we learned is that

8  Kyndryl provides two specific services to the bank,

9  which is important for the case at hand. The first

10  one is the mail journaling server and the second one

11  is the exchange server.

12    So, the mail journaling server, that

13  relates to incoming and outgoing external mail

14  traffic for BIL employees from ten years ago until

15  now. So this is the service they are providing

16  today.

17    And the second one is in relation to the

18  exchange server, which means active mailboxes for

19  existing employees or for disconnected mailboxes;

20  so, in other words, employees who left the bank six

21  months -- until six months ago. I don't know if

22  that is clear. So, they are able to retrieve active

23  mailboxes of existing employees or former employees

24  to the extent that they only have left six months

25  ago. Is that clear enough?

---

**Page 67**

1    Q    I will have a couple questions.

2  But let me ask first about the mail journaling

3  service that you mentioned. Can you describe the

4  process by which that mail journaling process

5  occurred?

6    A    Could you please define "process"?

7    Q    Sure. Yes. What is involved in

8  the mail journaling? What sorts -- what e-mails are

9  journaled as part of the process that you described

10  a moment ago that Kyndryl provides for the bank?

11    A    Okay. According to my

12  understanding, following the discussion we had with

13  them, and afterwards this was drafted in an e-mail,

14  otherwise -- because it is quite technical

15  information. They confirmed that this relates to

16  incoming and outgoing external e-mail traffic, so

17  incoming e-mails and outgoing e-mails.

18    Q    As I understand it, if an e-mail

19  was sent to somebody by a BIL employee to somebody

20  outside the bank --

21    A    Exactly.

22    Q    -- that e-mail would be captured

23  by the journal?

24    A    Correct. That is my

25  understanding.

---

**Page 68**

1    Q    And the same would apply to an

2  inbound e-mail from someone external e-mailing

3  someone within the bank?

4    A    That is my understanding as well,

5  yes.

6    Q    Is it your understanding that that

7  journaling would take place automatically?

8    A    Automatically meaning --

9    Q    Meaning that the individual BIL

10  employee who sent or received that e-mail, did they

11  need to take any additional steps to have that

12  e-mail journaled, or was it an automatic function?

13    A    According to my understanding, it

14  is an automatic function.

15    Q    And I believe you said that the

16  journaling was kept for ten years?

17    A    That is correct, yes.

18    Q    Do you know whether Kyndryl was

19  providing this service to the bank in 2018?

20    A    That is information that I didn't

21  check. To the best of my knowledge, I think so.

22    Q    Okay. I guess I have the same

23  question with respect to 2015. Do you think that

24  Kyndryl was providing -- strike that.

25    Do you know whether Kyndryl provided mail

---

69

1 journaling services to BIL in 2015?
2     A    I have the same reply for you as I
3 provided previously. It is not a specific answer --
4 question. It is not a specific question we phrased.
5 But according to my understanding, as they have been
6 providing -- working with them for as long as I
7 know, should be.
8     Q    Just to be clear, you have been at
9 the bank since 2002, correct?
10    A    Exactly.
11    Q    In your experience, either Kyndryl
12 or IBM was providing this type of service to the
13 bank throughout your tenure?
14    A    This is the first -- as I told you
15 before, I was never involved in any litigation. So,
16 it is the first time that I need to check this
17 information. So --
18    Q    Okay. That is fair. And again,
19 the journaling, as you understand it, was kept for
20 ten years, correct?
21    A    Yes. And only ten years.
22    Q    So in assuming Kyndryl was
23 providing services to BIL in 2015, Kyndryl should
24 have had a record of all e-mails sent externally and
25 received from outside the bank dating back to 2005,

70

1 correct?
2     A    If your assumption is correct,
3 then your deduction is correct as well. I follow
4 your reasoning.
5     Q    So the answer would be yes to my
6 question?
7     A    The answer would be yes to your
8 question.
9     Q    And the same thing in 2018,
10 assuming Kyndryl was providing e-mail journaling
11 services to BIL, there would be a journal of all
12 e-mails external from the bank and internal to the
13 bank that existed back to 2008?
14    MR. BUTLER: Objection to form. You can
15 answer the question.
16    A    Yes.
17 BY MR. FLUGMAN:
18    Q    Turning to the other individuals
19 that you mentioned, Ms. Meyers, Marie-Claire --
20    A    Yes.
21    Q    -- what was her function at the
22 bank before she retired?
23    A    Relationship manager.
24    Q    Can you briefly describe what
25 would be entailed in that position?

71

1     A    Relationship manager holds the
2 direct contact with the clients, meaning the
3 ultimate clients of the bank, not the internal
4 clients, but the ultimate clients; being the account
5 holders and/or the beneficial owners, in case the
6 account holder would be a legal entity.
7     Q    Do I understand that she would be
8 communicating with people outside of BIL as part of
9 her job?
10    A    That is correct, yes.
11    Q    And the people with whom she would
12 be communicating would be customers of the bank?
13    A    Exactly.
14    Q    Those customers would include
15 entities or individuals that worked with investment
16 professionals at the bank to make investments in
17 funds and stocks and the things you mentioned
18 earlier?
19    A    Yes, with a little nuance, if you
20 say that in English, that Marie-Claire Meyers was a
21 member of the wealth management business line, and
22 they only have contact with private clients, meaning
23 that they do not have any -- or not supposed to have
24 any contacts or direct contacts with, let's say,
25 investment managers or -- yes, institutional

72

1 counterparts.
2     Q    So would Ms. Meyers communicate
3 with anyone internal? Who in the bank would
4 Ms. Meyers communicate with in respect to her job?
5     A    All sorts of departments and
6 people. It is -- their job is -- well, their main
7 point of contact externally is the end client, of
8 course, then they have to liaise internally with
9 different other departments to make sure that the
10 end client is being serviced.
11    For instance, in case a client wants to
12 make an investment, she has to liaise with -- the
13 relationship manager, doesn't matter whether it is
14 Marie-Claire Meyers or somebody else, but the
15 relationship manager has to liaise with the
16 professionals or the other employees having this
17 specific competence.
18    Q    Sir, do you understand that
19 Ms. Meyers was involved in the subscription and
20 redemption that's at issue in this case?
21    A    I understand, yes.
22    Q    And that she is one of the
23 individuals that BIL has disclosed to the
24 liquidators as having relevant information with
25 respect to this case?

December 14, 2022

73

1      A      I understand, yes.
2      Q      And in -- as part of her job, you
3  would expect Ms. Meyers to have had communications
4  with people outside the bank?
5      A      Absolutely, yes.
6      Q      That would include the underlying
7  client who subscribed and redeemed for shares in
8  Fairfield that is at issue in this case?
9      A      That is correct, yes.
10     Q      Did Ms. Meyers use e-mail to
11  communicate with her clients at that time, at the
12  relevant time frame, 2005 to 2008?
13     A      Yes, she did.  Can I -- not
14  rephrase, but bring an additional piece of
15  information?  Before the break you were also asking
16  questions in relation to -- I don't remember if it
17  was Maria Totaro or Marie-Anne Salentiny, whether
18  they used e-mails externally.
19          And I was hesitating.  The reason why was
20  that when I started to work at the bank, mainly for
21  banking secrecy reasons not everybody had access to
22  send e-mails outside of the bank.  Because -- well,
23  Article 41 of the law of '93 in relation to banking
24  secrecy is something important for Luxembourg
25  professionals.  This is the reason why I was

74

1  hesitating at the time, just for your information.
2      Q      And did you speak with counsel
3  about that correction during the break;
4  clarification, I should say?
5          MR. BUTLER:  I will object to the question
6  about discussion with counsel during the break.  You
7  can answer that yes or no as a general topic.
8      A      Yes.
9  BY MR. FLUGMAN:
10     Q      Okay.  Thank you.  I appreciate
11  the clarification.  We will get back to that in a
12  moment.
13          I want to go back to Ms. Meyers and her
14  e-mail communications with the underlying client who
15  subscribed for and redeemed shares in the Fairfield
16  funds at issue in this case.  Do you agree with me
17  that the subscription that was made in the Fairfield
18  funds that relates to the redemption at issue in
19  this case occurred in 2005?
20     A      I agree.
21     Q      Do you also understand that the
22  redemption for that underlying client occurred in
23  2007?
24     A      I understand.
25     Q      Do you agree with me?

75

1      A      Yes.  The question you told me, do
2  you understand.  So I agree and understand.
3      Q      Do you understand -- do you have
4  an independent basis that you know that those are
5  the correct dates?
6          MR. BUTLER:  Are you asking him was he
7  involved in those events or --
8          MR. FLUGMAN:  I'm asking if he knows that
9  the subscription that is at issue in this case
10  occurred in 2005, and that the redemption that
11  occurred that is at issue in this case occurred in
12  2007.
13     A      In preparation of the -- of this
14  deposition, I reviewed certain internal legal files,
15  or internal files in the legal department, and part
16  of that were the subscription and redemption forms,
17  which have been produced, as well as the account
18  statements of the client, of the underlying client.
19  BY MR. FLUGMAN:
20     Q      Just to be clear, I think we are
21  on the same page, but do you agree with me that the
22  subscription that is at issue here was made in 2005
23  and the redemption that is at issue here in this
24  case was made in 2007?
25     A      I agree with you.

76

1      Q      So my question is -- and you
2  already told me that Ms. Meyers communicated with
3  the underlying client by e-mail with respect to
4  those two events, the subscription in 2005 and the
5  redemption in 2007.
6          MR. BUTLER:  Objection to form.  You can
7  answer.
8      A      The subscription, yes.  We have a
9  copy of these e-mail exchanges.  And the redemption,
10  I don't recall.
11  BY MR. FLUGMAN:
12     Q      The copy that you referred to,
13  that is a hard copy, paper copy, correct?
14     A      Correct, yes.
15     Q      Just to clarify, the e-mail, at
16  least on the subscription side that was sent between
17  Ms. Meyers and the customer, that would have been an
18  e-mail that was external to the bank, correct?
19     A      Correct, yes.
20     Q      And so that e-mail, assuming that
21  Kyndryl or IBM was providing the mail journaling
22  services you described earlier in 2005, would have
23  existed on the journaling platform until 2015, would
24  you agree with me?
25     A      I agree with you.

Transcript of Herman Dewitte

December 14, 2022

**77**

1    Q    If Ms. Meyers had communicated
2 with the external customer at the time of redemption
3 in 2007, that e-mail would have resided on the mail
4 journaling platform until 2017, would you agree with
5 me?
6    A    Yes.
7    Q    Do you know whether Ms. Meyers had
8 communications with other external parties relating
9 to the subscription and redemption at issue in this
10 case?
11    A    I am not aware of that
12 information.
13    Q    Do you know whether she ever
14 communicated with Citco, the funds administrator?
15    A    Marie-Claire Meyers, I don't have
16 that information.
17    Q    Okay. Do you know whether she
18 communicated with anybody at Fairfield Greenwich
19 Group, the funds investment manager, with respect to
20 the subscription and redemption at issue here?
21    A    I don't have that information
22 either.
23    Q    How long did you speak with
24 Ms. Meyers in preparation for the deposition today?
25    MR. BUTLER: Object to the form of the

**78**

1 question. You can answer.
2    A    I didn't meet her in person, it
3 was on the phone, 15, 20 minutes roughly.
4 BY MR. FLUGMAN:
5    Q    Do you recall when that
6 conversation took place?
7    A    Couple of weeks ago, before today.
8    Q    Mr. Baldinucci, what was his role
9 before he left the bank?
10    A    Before he retired? Both are
11 retired.
12    Q    Yes, I understand.
13    A    His role, he was heading the team
14 of relationship managers at that time. That was the
15 team dedicating to journal-based clients, if my
16 memory is correct. So, basically he was the boss of
17 Marie Claire.
18    Q    Did Mr. Baldinucci communicate
19 with the underlying client who made the subscription
20 and redemption in the Fairfield funds that is at
21 issue in this case?
22    A    Are you asking if he communicated
23 with the client in relation to the subscriptions or
24 redemptions, or are you asking if Mr. Baldinucci had
25 contact with the clients, generally speaking?

**79**

1    Q    Let's start with the general
2 question and then we can go to the specific.
3    A    Mr. Baldinucci, when I told him
4 the name of the client, initially he told me he
5 didn't know the name of the client. He was not
6 aware; after which I called Marie Claire Meyers.
7 Because the name of the client, the account holder
8 is a legal entity, and so the name of the legal
9 entity did not ring a bell.
10    For banking secrecy reasons, of course, I
11 don't know. I didn't check to what extent he was
12 entitled to have this information, but for banking
13 secrecy reasons, I did not give the name of the
14 ultimate beneficial owner.
15    When I called afterwards Marie Claire
16 Meyers, she told me that Mr. Baldinucci, he met and
17 he had contact with the client on an occasional
18 basis. So I called again Mr. Baldinucci, and then I
19 gave the name of the beneficial owner and he
20 confirmed that he did -- he had some occasional
21 contacts with the client. But he was not managing
22 the relationship of the accounts.
23    Q    How did Mr. Baldinucci have
24 contact with the underlying client, with in-person
25 meetings, phone calls, e-mails, do you know?

**80**

1    A    Phone calls, and he told me
2 that --
3    MR. BUTLER: I know it is hard to do. Try
4 to avoid talking about what he specifically told you
5 as opposed to just providing the information that
6 you learned. In other words, your answer doesn't
7 need to take the form of what words were spoken
8 during your privileged conversation with this former
9 employee, but you can provide the factual
10 information you learned.
11    A    Okay. Thank you. He talked with
12 the client over the phone and he met him in his
13 place.
14 BY MR. FLUGMAN:
15    Q    When you say his place, do you
16 mean the client's location?
17    A    Yes, sorry, the client's location.
18    Q    Did Mr. Baldinucci use e-mail to
19 communicate with this client?
20    A    We didn't go into that detail.
21    Q    So you didn't ask that question?
22    MR. BUTLER: Just a second. Let's get
23 away from the conversation, and you can say whether
24 you know the answer to the factual question, did he
25 use e-mail, yes or no.

December 14, 2022

---

**81**

1  BY MR. FLUGMAN:
2      Q      The question is specifically did
3  he use e-mail to communicate with the underlying
4  client we have been discussing?
5      A      I don't have that information.
6      MR. BUTLER: I'll just say for the record,
7  I know there is a very general topic 6 on document
8  retention and destruction, but it does not seek
9  information on this level of detail. Accordingly,
10 Mr. Dewitte knows the information and I'm happy to
11 let him answer the questions about things that he
12 knows, but he has not been prepared to convey all
13 the information about what Mr. Baldinucci knows or
14 what Ms. Meyers may know. I just want to state that
15 for the record.
16     MR. FLUGMAN: And I will state for the
17 record that I think the e-mail practices and use of
18 the six custodians that were disclosed in the Rule
19 26A disclosures is at the heart of what we are
20 talking about. We don't have to agree on that here,
21 we can take that up later. I appreciate
22 Mr. Dewitte's --
23     MR. BUTLER: I just want it to be clear
24 that he hasn't been prepared to talk about this
25 level of detail as a representative of the bank.

---

**82**

1  But he does have information that I am happy to
2  allow him to provide to you.
3  BY MR. FLUGMAN:
4      Q      Do you know, did Mr. Baldinucci
5  use e-mail to communicate with others in the bank
6  during the time period 2005 to 2008?
7      A      **That is not something I checked,**
8  **but I presume so.**
9      Q      You don't have any reason to doubt
10 that he used it?
11     A      **Yes.**
12     Q      And he would be one of the people
13 that had access to e-mail at the bank?
14     A      **Yes.**
15     Q      Finally you mentioned Benny or
16 Jeannot Reiter. Please remind me, what was
17 Mr. Reiter's role?
18     A      **He was working at the back office**
19 **at the -- he is also retired today, the three**
20 **persons I mentioned are retired. And he was working**
21 **at the back office at the time, back office of**
22 **securities, the securities department.**
23     Q      So with respect to the
24 subscription and redemption that's at issue in this
25 case, can you describe Mr. Reiter's role?

---

**83**

1      A      **Well, basically, Mr. Reiter's role**
2  **as being a member of the back office, their role is**
3  **to make sure that the trade is appropriately being**
4  **booked in the system of the bank, first of all.**
5      **Secondly, they keep also in their archives**
6  **the physical binders, the physical documents. It is**
7  **also Benny Reiter who handed over the redemption and**
8  **subscription files.**
9      Q      In the course of Mr. Reiter's
10 responsibilities at the bank, did he communicate
11 externally with anybody?
12     A      **I don't have that information.**
13     Q      He did communicate internally with
14 people like Ms. Meyers, Mr. Baldinucci and others,
15 is that correct?
16     A      **That is correct, yes.**
17     Q      Do you know whether those
18 communications took place over e-mail?
19     A      **Yes. Internal, yes.**
20     Q      Yes, they did take place over
21 e-mail?
22     A      **Yes, they did take place over**
23 **e-mail.**
24     Q      That is true for time frame before
25 2009?

---

**84**

1      A      **I don't have that information. I**
2  **know I communicated with him through e-mail also**
3  **after 2009.**
4      Q      Do you have any reason to doubt
5  that Mr. Reiter didn't use e-mail to communicate
6  internally in the bank in the 2005, 2008 time frame?
7      A      **No, I don't have any reason to**
8  **doubt that.**
9      Q      He would be somebody who had
10 access to e-mail?
11     A      **Internally, yes; externally, I**
12 **don't know.**
13     Q      Going back to the second service
14 that you mentioned Kyndryl provided, or IBM
15 potentially before that, the exchange service, do I
16 understand correctly that e-mails -- the exchange
17 service they provided hosted the e-mail accounts for
18 BIL employees?
19     A      **That is my understanding, yes.**
20     Q      I believe you said that they
21 hosted the active mailboxes and also some former
22 employees' accounts, is that correct?
23     A      **That is correct, to the extent for**
24 **the former employees that they have left the bank**
25 **within six months.**

85

1    Q    Do I understand you correctly that
2 when an employee retires or leaves the bank for
3 whatever reason, the service would keep the last six
4 months of e-mails, is that correct?
5    A    **That is correct, yes.**
6    Q    Then after that six months, that
7 account would be deleted?
8    A    **Technically, I don't know whether**
9 **it is deleted or not.  In any case, we do not have**
10 **any access anymore.  To my understanding, it does**
11 **not exist anymore, yes.**
12    Q    Just to be clear, the bank would
13 only have access to a retired or former employee's
14 e-mail account for six months after that employee
15 leaves the bank, correct?
16    A    **That is correct, yes.**
17    Q    After that six months, the bank
18 would no longer have access to the electronically
19 stored information in that former employee's
20 account, correct?
21    A    **That is correct, yes.  That has**
22 **been confirmed by Kyndryl, yes.**
23    Q    Mr. Baldinucci is a former
24 employee, I think you said, correct?
25    A    **That is correct, yes.**

86

1    Q    What year did he leave the bank?
2    A    **He left the bank mid last year, if**
3 **my memory is correct.**
4    Q    Sorry.  Mr. Baldinucci retired
5 from BIL in the middle of 2021, correct?
6    A    **Yes.  But -- yes.**
7    Q    And we are now in December of
8 2022, which is certainly more than six years (sic)
9 into 2022, are Mr. Baldinucci's e-mails still
10 available to BIL?
11    A    **Could you repeat the question,**
12 **please?**
13    Q    Are Mr. Baldinucci's e-mails still
14 available to BIL today?
15    A    **No.**
16    Q    Is that because his e-mail account
17 is -- it is more than six months after
18 Mr. Baldinucci left the bank?
19    A    **Yes.  Yes.**
20    Q    Ms. Meyers, also a former
21 employee, do you recall when she left the bank?
22    A    **Already a couple of years ago.  It**
23 **is definitely prior to that six months period we**
24 **just discussed.**
25    Q    Okay.  She left the bank sometime

87

1 after 2009 or 2010?
2    A    **I would say three years, three to**
3 **four years ago.**
4    Q    So 2018 or 2019?
5    A    **Roughly, yes.**
6    Q    Roughly.  Again, her e-mail
7 account no longer exists because we are more than
8 six months after she left the bank, correct?
9    A    **Yes.**
10    Q    And sitting here today, the bank
11 has no ESI available to it from Ms. Meyers?
12    A    **Correct.**
13    Q    The same question with respect to
14 Mr. Baldinucci, right, the bank has no ESI, sitting
15 here today, relating to Mr. Baldinucci?
16    A    **As I defined previously, is much**
17 **broader than only e-mails.  But yes, there are no --**
18 **checks have been performed in relation to their**
19 **e-mail inboxes, but I also have asked to colleagues**
20 **who are still working in the same team if any**
21 **information could be retrieved on common available**
22 **servers; so not inboxes, but servers of the**
23 **department.**
24    Q    And is there information?
25    A    **No.  It is an exercise that is has**

88

1 **been performed --**
2    Q    I understand.  I appreciate the
3 clarification.  Just to be clear, sitting here
4 today, the bank could not access any e-mails sent or
5 received by Mr. Baldinucci during his tenure at the
6 bank?
7    A    **Correct.**
8    Q    Mr. Reiter, when did he leave the
9 bank?
10    A    **Also a couple years ago, same time**
11 **period.**
12    Q    Again, 2018, 2019?
13    A    **Yes, roughly speaking.  I don't**
14 **have the exact dates in mind, but yes.**
15    Q    Again, sitting here today, his
16 e-mail account is not available to the bank because
17 it is more than six months after he left the bank?
18    A    **Same reason applies as for Gianni**
19 **Baldinucci and Marie Claire Meyers, yes.**
20    Q    There is one other person that is
21 on -- that has been disclosed to us as potentially
22 having relevant information in the case, and that's
23 Chantal Reyter?
24    A    **Yes.**
25    Q    Did you speak with Ms. Reyter in

Transcript of Herman Dewitte
December 14, 2022



89

1  preparation for the deposition today?
2       A    No, I did not.
3       Q    Is there a reason why not?
4       MR. BUTLER:  Objection.  Instruct the
5  witness not to answer.
6  BY MR. FLUGMAN:
7       Q    Ms. Reyter is a former employee of
8  the bank, is that right?
9       A    That is correct, yes.
10      Q    Do you know what role Ms. Reyter
11 held before she retired?
12      A    Her name was also mentioned in
13 some of the documents which we have provided.
14      Q    Do you know when Ms. Reyter left
15 BIL?
16      A    Also couple years ago.
17      Q    So again, roughly 2018, 2019?
18      A    Possibly, yes.
19      Q    And is there any electronically
20 stored information from Ms. Reyter's e-mail account
21 that is available to the bank today?
22      A    No.  Same reason applies as for
23 the persons retired.
24      Q    Because after six months the bank
25 no longer has access to any of that information?

90

1       A    Yes.
2       Q    Is there anybody that you asked to
3  speak to in connection with your preparation that
4  refused to speak to you?  Again, just a yes or no
5  question.
6       A    No.
7       Q    We mentioned a third category of
8  preparation was discussions with your counsel, with
9  Mr. Butler.  I will preface this by saying I am not
10 asking for anything you talked about with
11 Mr. Butler.  But can you tell me when you met with
12 Mr. Butler in preparation for the deposition today?
13      A    We met on Monday morning.
14      Q    For approximately how long?
15      A    For a couple of hours.  And we met
16 as well yesterday, also for a couple of hours.
17      Q    Was anyone present in the room
18 besides you and Mr. Butler during those meetings?
19      A    Besides from certain of the
20 persons I mentioned previously, and a certain point
21 of time an employee bringing coffee and water, no.
22      Q    Okay.  There were a couple of
23 documents that your counsel produced to us this
24 morning that I understand you reviewed in connection
25 with your preparation for the deposition on Monday.

91

1       I will just state for the record that those are
2  documents that are responsive to request number 4 in
3  our amended notice of deposition which is in the
4  record as Exhibit 1.
5       MR. BUTLER:  Let me state for the record I
6  disagree with that.  Those are not covered by your
7  document requests.  They were only provided
8  because -- they were not requested specifically in
9  your document request, they were only provided
10 because they were used on Monday to prepare
11 Mr. Dewitte.
12      MR. FLUGMAN:  I appreciate that
13 clarification and also appreciate if you don't
14 interrupt me while stating my position, then you can
15 state yours.
16      MR. BUTLER:  I'm sorry, I thought you were
17 finished.
18      MR. FLUGMAN:  I was not.  We think they
19 are clearly called for by the request number 4,
20 because they are materials that Mr. Dewitte used to
21 prepare for the deposition today.  They were
22 requested on Monday and they were requested three
23 times yesterday and were not produced until this
24 morning.
25      And two of the documents that were

92

1  produced are in French.  So we are going to do the
2  best we can with them.  I want to ask you just some
3  basic questions.  We may need to come back to this
4  later.
5  BY MR. FLUGMAN:
6       Q    My first question is, there was
7  one document that was produced to us which is
8  entitled, ███████████████████████
9  █████████████████████████████████████
10 ██████  Do you remember reviewing that document?
11      A    Yes.
12      Q    And what facts did you learn from
13 your review of that document that relate to your
14 deposition testimony here today?
15      A    Not much, to be honest.  Because
16 it is a policy that ███████████████████████
17 ██████████████████████████████████████████
18 ██████████████████████████████████████████
19 ██████████████████████████████████████████
20 ████████████████
21      Q    And the other two policies which
22 were in French, accepting clients' instructions,
23 which is a loose translation from the French, and
24 also what I understand to ███████████████████████
25 ████████, similar question, did you learn any

Transcript of Herman Dewitte

December 14, 2022

24 (93 to 96)

93

1  facts from reviewing those two policies that relate
2  to your testimony today?
3      A      Not really, no, not of any
4  relevance.
5      Q      I want to talk a little bit about
6  the structure of BIL. You mentioned earlier that
7  BIL at one point was a member of the Dexia group,
8  and I believe you said that BIL was divested or spun
9  off from Dexia in roughly 2012, do I understand that
10  correctly.
11      A      That is correct. Dexia -- sorry,
12  BIL has been sold by Dexia in 2012. That is
13  correct, yes.
14      Q      Prior to 2012, BIL was part of the
15  Dexia group?
16      A      Correct.
17      Q      Is that true for the entire time
18  period after 2000 until the divestiture in 2012?
19      A      Yes.
20      Q      During that time period, did BIL
21  have a parent company?
22      MR. BUTLER: Objection to form. Which
23  time period are you asking about?
24  BY MR. FLUGMAN:
25      Q      2000 to 2012, before the

94

1  divestiture.
2      A      Are you asking BIL being -- yes,
3  the parent company was Dexia Holding. You are
4  asking for the shareholder --
5      Q      Yes, I am asking who the parent
6  company of BIL was.
7      A      Of Dexia BIL was Dexia, yes.
8      Q      Did -- at that time, did BIL's
9  officers and directors report up into anyone at
10  Dexia Holdings?
11      A      That is correct, yes. There was
12  a -- I don't know if you can title it a functional
13  reporting.
14      Q      Okay. Did BIL's legal department
15  report into anyone at Dexia Holdings?
16      A      Yes.
17      Q      To whom did the BIL legal
18  department report?
19      A      It was the secretary general of
20  the Dexia Holding group, his name was at the time
21  Olivier van Heerstraeten, if my memory is correct.
22  Sorry, so van Heerstraeten is spelled V-A-N, space,
23  and I'm not 100 percent sure, but
24  H-E-E-R-S-T-R-A-E-T-E-N.
25      Q      At the relevant time period, did

95

1  BIL's information technology department report into
2  anybody at Dexia Holdings?
3      A      I don't have that level of
4  information available, neither did I check it. I
5  can assume they did, yes.
6      Q      Okay. BIL had an integration
7  technology group at that time?
8      A      I'm sorry?
9      Q      BIL did have an information
10  technology group at the time?
11      A      What do you mean by information
12  technology?
13      Q      A group of people who handled
14  electronic information, archiving, storage, that
15  sort of thing.
16      A      Yes.
17      Q      All right. I think we discussed
18  this, but did BIL at the time period before 2009,
19  2000 to 2009, invest on its own behalf or on behalf
20  of underlying clients?
21      A      Is my understanding correct that
22  you are asking did BIL invest on its own behalf
23  or -- and of its clients?
24      Q      Let me ask a better question. Did
25  BIL make investments on behalf of underlying clients

96

1  in funds and similar investment vehicles?
2      A      Yes.
3      Q      Were any of BIL's clients on
4  behalf -- on whose behalf it made investments
5  located in the United States?
6      A      At that time period?
7      Q      In the 2000 to 2009 time period,
8  yes.
9      A      It is possible. I don't have that
10  level of information.
11      Q      Is there any restriction in your
12  knowledge that would prevent a U.S. investor from
13  doing business with BIL?
14      A      Today it is quite complicated, but
15  at the time, I don't know. Today there is a
16  specific rule not to invest in -- with American
17  clients, yes.
18      Q      It is possible that clients at the
19  bank existed in the United States at the pre-2009
20  time frame?
21      A      It is a possibility, which I
22  didn't check.
23      Q      Okay. I think we may have talked
24  about this, but can you tell me what departments or
25  job functions at BIL were responsible for

December 14, 2022

**97**

1 communicating with the clients who were interested
2 in investing in the Fairfield funds?
3    A    Well, I think it is important to
4 get something straight. Contrary to the feeder
5 funds which I named previously, Rafale and Blue Star
6 fund, which bank actively commercialized. BIL never
7 actively commercialized Fairfield feeder funds as
8 part of that.
9        So we only acted on an execution only
10 basis, meaning that it is true that you say it was
11 the bank -- the investments were made on behalf of
12 the bank, meaning that technically it is the bank
13 that will be mentioned into the shareholder's
14 register of the specific funds as a nominee.
15       But, contrary to the other funds, we acted
16 only in relation to Fairfield feeder funds upon an
17 execution only basis, which means that it was never
18 on our short list of investment advice. Basically
19 it was a fund that was picked up by certain clients
20 and specifically asked the bank to invest.
21    Q    I understand that. My question is,
22 though, is, the bank did make investments in
23 Fairfield on behalf of underlying customers, you
24 will agree with me?
25    A    That is correct, yes.

**98**

1    Q    Including the subscription and
2 redemption that is at issue in this case, correct?
3    A    That is correct.
4    Q    And there are also others not at
5 issue in this case where BIL also made investments
6 in Fairfield.
7    A    That is correct.
8    Q    Who in the bank would have
9 communicated with those underlying clients? What
10 types of people, not necessarily specific names.
11    A    So your question is who was
12 liaising with these underlying --
13    Q    Yes.
14    A    -- clients in relation to
15 Fairfield funds?
16    Q    Yes.
17    A    Typically the relationship
18 manager. Because there is nobody of the investment
19 advice involved, or the discretionary portfolio
20 management involved. So it can only be -- because
21 it is execution only -- the relationship manager,
22 who acted upon the request -- specific request of
23 the clients.
24    Q    And what types of people at the
25 bank were responsible for communicating with Citco,

**99**

1 the funds administrator, with respect to the
2 Fairfield investments?
3    A    In relation to Citco, that would
4 be the back offices, in relation to the subscription
5 and the transfer -- subscription and redemption
6 forms, or the execution desk I mentioned earlier
7 before, for which Maria Totaro and Marie Anne
8 Salentiny were working.
9    Q    What departments or people at BIL
10 were responsible for maintaining documents related
11 to investments in the Fairfield funds?
12    A    Your question is quite broad, with
13 documents in relation to. There can be -- can you
14 be more specific or --
15       Client-related documentation, the account
16 opening forms of a client who invests in Fairfield,
17 would that be part of --
18    Q    Yes. Who would maintain those
19 records?
20    A    Well, all client-related
21 documentation is being stored internally in a tool
22 that is called Documentum, and you can find that
23 name in one of the procedures we have, so there are
24 document archiving procedure, which is the main tool
25 the bank uses to store information in relation to

**100**

1 clients.
2    Q    Who determines what documentation
3 goes into the Documentum system?
4    A    It is mentioned in the policy.
5    Q    Do you recall independently?
6    A    Yes. Typically account opening
7 forms, the investment profile, to the extent there
8 is one available, because that depends on -- I mean,
9 applicable regulation, the transfer orders. So, all
10 client-related documentation in relation to an
11 account.
12       MR. FLUGMAN: We have been going for
13 awhile. We will take a short break. Before we do
14 break, just a couple questions.
15       I see that you have a handwritten piece of
16 paper in front of you that you have been referring
17 to through the course of the deposition with respect
18 to some names and dates and the like.
19    Q    Are you using that piece of paper
20 in order to aid your testimony here today to be able
21 to remember facts?
22    A    Yes.
23       MR. FLUGMAN: We will ask for a copy of
24 the document that Mr. Dewitte is using to be
25 produced to us during the break.

10-03635-jpm    Doc 1003-2    Filed 02/17/23    Entered 02/17/23 15:20:51    Exhibit B-Deposition Transcript    with redactions relating only to documents and    Pg 28 of 130

26 (101 to 104)

Transcript of Herman Dewitte

December 14, 2022

---

**101**

1    MR. BUTLER: Sure. Okay. If you want to
2 make a copy, that is fine.
3    MR. FLUGMAN: Let's go off the record.
4    THE VIDEOGRAPHER: We're going off the
5 record. The time is 12:05 p.m.
6    (Off the record.)
7    THE VIDEOGRAPHER: We are back on the
8 record. The time is 12:19 p.m.
9 BY MR. FLUGMAN:
10    Q    Mr. Dewitte, before the break we
11 were talking a bit about the Documentum system, I
12 believe that is what it was called. Were there
13 documents relating to the transaction at issue in
14 this case saved to the Documentum system?
15    A    No.
16    Sorry. Could you rephrase that, please?
17 Just repeat the question.
18    Q    I'm happy to ask it again. I
19 think you said that there were certain types of
20 documents that were saved to the Documentum system,
21 and those included account opening statements, and
22 transaction records, is that true as well?
23    A    Exactly, yes.
24    Q    What I am asking is, did the bank
25 save documents relating to the subscription and

**102**

1 redemption that's at issue in this case to that
2 system at any point?
3    A    No. It did not.
4    Q    Okay. Did the bank save any
5 documents relating to the underlying client who was
6 involved in the subscription and redemption in this
7 case to that system?
8    A    Meaning account opening forms
9 or --
10    Q    Informing relating -- any
11 information relating to that client.
12    A    Yes. Yes.
13    Q    Does the bank still have that
14 information in its control?
15    A    Yes.
16    Q    Is that information that is stored
17 in physical form or electronic form?
18    A    It is -- it is electronically
19 available, so it is an electronic tool in which
20 documents are being stored, physical documents or --
21 yes, client-related documents are being stored.
22    Q    Is there any information relating
23 to the Fairfield funds stored in the underlying
24 clients filed in the Documentum system?
25    A    No.

**103**

1    Q    Okay. I believe we talked about
2 this earlier, but BIL, sitting here today, has no
3 e-mails from 2008 and prior, is that right?
4    A    That is correct.
5    MR. BUTLER: Objection to form. You can
6 answer.
7 BY MR. FLUGMAN:
8    Q    Did you say that was correct?
9    A    That is correct, yes.
10    (Exhibit 3 marked for identification.)
11 BY MR. FLUGMAN:
12    Q    So, Exhibit 3 is a set of
13 documents that was produced to us by the bank in
14 connection with this litigation. Just to point out,
15 so you know, at the very bottom right-hand corner
16 there is a legend that says BIL with a number, that
17 is called a Bates stamp in American litigation, and
18 that indicates the party that produced the
19 information.
20    This is a set of documents that are
21 numbered BIL 1 through 74. I am just going to ask
22 you to flip through it, you do not have to look at
23 every page, but my question is going to be first
24 whether you have seen this collection of documents
25 before?

**104**

1    A    Yes, I did.
2    Q    Did you review this set of
3 documents in preparation for the deposition today?
4    A    Yes.
5    Q    Do you have an understanding of
6 what this set of documents is?
7    A    Roughly, yes.
8    Q    What is that, sir?
9    A    Well, these are the -- this is a
10 copy of the binder that has been handed over by
11 Benny Reiter a couple years ago. This is an
12 abstract of a copy of that binder.
13    Q    Mr. Reiter turned this over to --
14 to whom did he turn it over, do you know?
15    A    I don't have that exact
16 information available. Somebody in the legal
17 department.
18    Q    And I believe you said that
19 Mr. Reiter turned this over a couple of years ago,
20 is that right?
21    A    Yes. Yes. In 2010.
22    Q    In 2010. Is this -- is this the
23 set of documents that you had referred to earlier
24 that you said was collected after August of 2010
25 when BIL received the notice and summons in the

10-03635-jpm    Doc 1003-2    Filed 02/17/23    Entered 02/17/23 15:20:51    Exhibit B-
Deposition Transcript    with redactions relating only to documents and    Pg 29 of 130
Transcript of Herman Dewitte
December 14, 2022

27 (105 to 108)

105

1 Fairfield case?
2       A    Correct.
3       Q    Do you know how this set of
4 materials was assembled?
5       A    Well, this is information -- I
6 mean this document contains the subscription and
7 redemption forms which the execution desk and the
8 back office had been working.
9       Q    Right. I understand that. You
10 will also see, as you look through this or perhaps
11 from your review, there are e-mails contained in
12 this set of materials. I should say for the record
13 this was produced to us in hard copy, and it is our
14 understanding that at the time this was produced to
15 the liquidators in this litigation, it existed only
16 in hard copy, is that your understanding as well?
17      A    At the time it was produced to
18 you, it only existed in hard copy, yes.
19      Q    When this set of materials was
20 collected in 2010, did BIL print copies of the
21 e-mails that are contained in this exhibit from its
22 electronic servers?
23      A    That is my understanding, yes.
24      Q    So the e-mails -- the first one I
25 believe appears at page 5 of the exhibit, that

106

1 appears to be an e-mail exchange between ▮▮▮▮
2 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
3       Is it your understanding that in 2010 --
4 August of 2010, when you said this e-mail included, that
5 somebody printed a copy of this e-mail and included
6 it in the hard copy materials?
7       A    Could you repeat that, please.
8       Q    Yes, of course. I am using this
9 as an example. My understanding, based on your
10 testimony, is that when this hard copy set of
11 materials was created in August or 2010 or soon
12 thereafter, that this was printed from an e-mail
13 account?
14      A    Okay. I have to -- thank you for
15 that. I have to rectify that this was -- well, this
16 kind of documents are not specifically assembled
17 shortly after 2000 -- August of 2010. These
18 documents, physical documents, they exist when
19 subscription and redemption takes place. These
20 documents are being kept physically in the
21 appropriate departments, and at the end of a trade
22 confirmation they are being stored in their
23 archives.
24      So what has been done for this exercise is
25 that the physical binder has been taken out of the

107

1       archiving of the back office, I have requested a
2 copy of that and a copy has been produced to you.
3       Q    Okay.
4       A    I am not -- do you understand my
5 nuance?
6       Q    I think so. Let me try and
7 clarify. This set of documents that's Bates stamped
8 BIL 1 through 74, did this exist in hard copy form
9 in this complete set before August of 2010?
10      A    Yes. That is my understanding,
11 yes.
12      Q    Does that include the e-mails that
13 are contained within this --
14      A    Yes.
15      Q    -- as well as the subscription and
16 redemption forms?
17      A    That is correct. That is my
18 understanding, yes.
19      Q    Who decided which documents to
20 include in this set of information at the time that
21 it was created?
22      A    I don't have that information.
23 Normally when a trade is being booked, all
24 information -- important information relating to
25 that trade should be documented.

108

1       Q    Is it your testimony that the
2 information that's contained in Exhibit 3 fits that
3 description?
4       A    To the best of my knowledge, yes.
5       Q    How was this file maintained at
6 the time that it was created?
7       A    It is physical paper work,
8 physical documents. The redemption and
9 subscription, you may see for instance in this
10 Exhibit 3 on page 3, or on page 13, I presume, even
11 more on 14 and 15, at the time the redemptions and
12 subscriptions were confirmed and requested through
13 fax. So everything was made by means of paper work,
14 or a lot was being done by paper work.
15      Q    You would agree with me, though,
16 that there are many e-mails contained in this
17 exhibit, correct?
18      A    Absolutely. Absolutely.
19      Q    And those e-mails are from
20 people -- from and to people inside BIL to people
21 outside the bank, including Citco, the funds
22 administrator?
23      A    Yes.
24      Q    Do you know the process for
25 selecting which e-mails were printed off and

10-03635-jpm    Doc 1003-2    Filed 02/17/23    Entered 02/17/23 15:20:51    Exhibit B-Deposition Transcript    with redactions relating only to documents and    Pg 30 of 130

Transcript of Herman Dewitte

28 (109 to 112)

December 14, 2022



**109**

1 included in this file at the time this document was
2 created?
3 **A      No. I am not aware of any**
4 **specific process in relation to printing out which**
5 **e-mail should be printed out or which one, no. But**
6 **I assume that all relevant e-mails should be**
7 **stored -- or are supposed to be stored in this**
8 **binder -- or these documents.**
9      Q      What is that assumption based on?
10 **A      Well, this is a Fairfield**
11 **investment. I also had a look on the Rafale and**
12 **Blue Star investments for which we have similar**
13 **binders, including also e-mail exchanges. So, it is**
14 **not a -- the fact that e-mails are printed out and**
15 **stored in physical files, that is not a surprise for**
16 **me. If your question relates to what extent are we**
17 **sure that it is exhaustive, we will never have the**
18 **answer to that.**
19      Q      And we will go into this, but you
20 will agree with me that many of the e-mails
21 contained in this hard copy file that was produced
22 to us are incomplete, in that they don't contain the
23 entire e-mail chain, correct?
24 **A      I'm not sure if I share your**
25 **opinion. If I look at the first e-mail chain, that**

**110**

1 **seems to be complete.**
2      Q      Flip to page 41 of the exhibit.
3 Are you there, sir?
4 **A      Yes. Sorry.**
5      Q      Okay. This appears to be a
6 printout of an e-mail between ▮▮▮▮▮▮▮ who
7 you will recall was one of the individuals that was
8 disclosed as having relevant information in this
9 case, who was an employee of BIL, ▮▮▮▮▮▮▮
10 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Citco who
11 is the fund's administrator, dated July 18, 2007.
12 And if you look down the page it appears that there
13 is a top e-mail that appears to be complete and the
14 bottom e-mail appears to be cut off, do you agree
15 with me?
16 **A      Yes.**
17      Q      Would you also agree with me, if
18 you look in the attachments line at the top of the
19 chain, you see that there is an indication that
20 there is a PDF that was attached to this e-mail?
21 Would you agree with me that that attachment was not
22 produced, not printed off?
23 **A      Well, we don't have the**
24 **information.**
25      Q      If you flip to the next page of

**111**

1 the exhibit, I will represent that these were
2 produced to us as they were kept in the ordinary
3 course of business, at least that's the
4 representation by your counsel. The next page, BIL
5 42, appears to be a new e-mail, is that right?
6 **A      That is right.**
7      Q      So you would agree with me that
8 the attachment to the e-mail on page BIL 41 was not
9 produced?
10 **A      Yes.**
11      Q      That is because it wasn't printed
12 off at the time?
13 **A      Yes.**
14      Q      In 2010 when Mr. Reiter handed
15 this set of documents over to whomever in the bank
16 he handed it off, did BIL have access to this
17 e-mail? Could it have gone to the electronic copy
18 of the e-mail and printed off?
19 **A      Could you repeat that question,**
20 **please.**
21      Q      Sure. In August of 2010 or so,
22 when you testified that Mr. Reiter turned this set
23 of documents over to whomever in the bank he gave it
24 to, this set existed in paper copy, right?
25 **A      Yes.**

**112**

1      Q      Did a copy of this e-mail also
2 exist electronically at the bank at that time, three
3 years later?
4 **A      I don't have that information.**
5 **Because it will depend to what extent the persons**
6 **involved have kept that e-mail, yes or no.**
7      Q      Do you have any reason to believe
8 that Ms. Reyter deleted her copy of this e-mail
9 after 2007?
10 **A      I don't know. I don't know.**
11      Q      Turning back to page 5 of this
12 exhibit, which is the e-mail exchange between
13 ▮▮▮▮▮▮▮▮▮▮▮ that we talked about a
14 moment ago. You will agree with me that there are
15 three attachments that appear at the top of the
16 page, do you see that, sir?
17 **A      Yes.**
18      MR. BUTLER: Sorry, what page?
19      MR. FLUGMAN: Page 5 of the exhibit.
20 BY MR. FLUGMAN:
21      Q      If you flip to page 8 of the
22 exhibit, that appears to be a new e-mail chain,
23 correct?
24 **A      Correct.**
25      Q      You will agree with me that the

Transcript of Herman Dewitte

December 14, 2022



113

1    three attachments to this e-mail that begins on
2    BIL 5 were not printed off, correct?
3        A    Seems so, yes.
4        Q    And therefore were not produced in
5    this case?
6        A    Yes.
7        Q    And in fact, the e-mail exchange
8    that begins on page 8 of the exhibit appears to be a
9    similar e-mail, similar chain also attaching three
10   attachments, and none of those appear to have been
11   produced, correct?
12       A    Correct.
13       Q    Do you know why the attachments to
14   these e-mails were not printed off at the time that
15   this set of documents was created?
16       A    No. I don't know. I don't have
17   that information.
18       Q    You will agree with me that if
19   electronic versions of these e-mails existed at the
20   time that BIL collected this information, that those
21   attachments could have been preserved?
22       A    That is a possibility, yes.
23       Q    And you also agree with me that if
24   the incomplete chains of e-mails that we looked at a
25   moment ago on pages 41 and 42 of the exhibit had

114

1    existed in electronic form at the time that BIL
2    collected information, that we would be able to see
3    the full chain?
4        A    Yes.
5        Q    We would also be able to see the
6    metadata that accompanied those e-mails, correct?
7        A    Correct.
8        Q    So we would be able to see, for
9    example, if someone was blind copied on an e-mail,
10   that wouldn't reflect in a printed version of the
11   e-mail, correct?
12       A    Correct.
13       Q    And looking through this exhibit,
14   you will agree with me that Ms. Reyter appears in
15   several e-mails, correct, ███████████████?
16       A    Page 41?
17       Q    Yes, on page 41, that is an e-mail
18   ███████████████, correct?
19       A    Correct, yes.
20       Q    And the same is true of ███████?
21       Q    And I believe the same is true of
22   ██████?
23
24       A    Correct.
25       Q    And these e-mails are between

115

1    ██████████████████████ do you see
2    that?
3        A    Yes.
4        Q    Which is an external communication
5    from the bank?
6        A    Yes.
7        Q    And Citco again was the
8    administrator of the funds, you agree?
9        A    Yes.
10       Q    And Ms. Salentiny also appears in
11   several e-mails in this exhibit, and I'll just
12   direct you to ██████.
13       A    She was copied --
14       Q    She was ████████████████.
15   Looks like this e-mail was actually produced from
16   Ms. Salentiny's inbox, because of her name at the
17   top, you see that?
18       A    Yes.
19       Q    The same is true of the e-mail
20   chain at page 27 of the exhibit. This one was
21   produced from Totaro's e-mail box, but █████████████
22   ██████, do you agree with me?
23       A    I'm sorry, could you repeat that,
24   please.
25       Q    Of course. Just confirming that

116

1    again this is another example on page 27 of the
2    exhibit of an e-mail that was received by
3    Ms. Salentiny.
4        A    Correct. Printed out Maria
5    Totaro.
6        Q    Yes, printed from Ms. Totaro's
7    e-mail box, and also copied on this e-mail is
8    Ms. Totaro and it's sent from Marie Claire Meyers,
9    correct?
10       A    (Witness nodding.)
11       Q    This is example of an e-mail that
12   was sent among internal people at the bank, correct?
13       A    Correct. Yes.
14       Q    And again, there appear to be some
15   attachments here noted at the top, which were not
16   printed off, correct?
17       A    Correct. Yes.
18       Q    These e-mails that appear in this
19   document, ██████████████████████
20   ████████████████ you would agree with me
21   that these are communications that constitute files
22   relating to the Fairfield funds?
23       A    Yes.
24       Q    And is that why they were printed
25   off and included in this document?

10-03635-jpm    Doc 1003-2    Filed 02/17/23    Entered 02/17/23 15:20:51    Exhibit B-
Deposition Transcript    with redactions relating only to documents and    Pg 32 of 130

Transcript of Herman Dewitte

December 14, 2022

30 (117 to 120)

117

1    A    Well, they were printed out in the
2 document because it is part of the subscription and
3 redemption process, which happens to be for this
4 deposition in relation to Fairfield, yes.
5    Q    All the documents in this
6 Exhibit 3 relate to a subscription and redemption of
7 the Fairfield funds?
8    A    Yes.
9    Q    I think we talked a little bit
10 about the fact that these files are not complete
11 because they were printed in the way that whomever
12 assembled the document chose to print them, is that
13 right?
14    A    Yes.
15    Q    Again, do you know the -- do you
16 know the person or the role at the bank that would
17 have decided which documents to print off, including
18 which e-mails to include in this set of documents?
19    A    No, I don't have that information
20 available. No.
21    Q    Is there any policy or procedure
22 that governs that process at the bank?
23    A    Not that I am aware of, no.
24    Q    Was it typical practice at the
25 bank for printing off subscription, redemption

118

1 communications like the ones that appear in
2 Exhibit 3 and assembling them in this way?
3    A    Well, I don't know to what extent
4 in this way -- I mean, "this way," what you define
5 under that. But according to my understanding, the
6 execution desk, the persons we just referred to and
7 printed out these e-mails, they were working at the
8 same execution desk. They were liaising with Citco,
9 and they have printed out all the redemption and
10 subscription documents. Some of them are e-mails,
11 some of them are faxes, some were automatically
12 generated -- the fax system that was automatically
13 pre-generated, yes.
14    Q    Somebody made a conscious decision
15 to assemble this set of documentation relating to
16 this subscription and redemption at issue here,
17 correct?
18    A    I don't know if it is a personal
19 decision. For me, it was part of, according to my
20 understanding, of the procedures that were in place
21 at that time within that team, because all their
22 similar subscriptions and redemptions have the same
23 content.
24    Q    What I mean is somebody decided
25 which e-mails to print and include in this document,

119

1 and somebody made a decision to not print
2 attachments, right?
3    A    Correct.
4    Q    Somebody made a decision to
5 include only part of the e-mail chains, correct?
6    A    Correct.
7    (Exhibit 4 marked for identification.)
8 BY MR. FLUGMAN:
9    Q    So, Mr. Dewitte, we have handed
10 you an exhibit marked as Exhibit 4. It is a
11 document that was not produced by BIL, instead it
12 was produced in another litigation involving the
13 Fairfield funds and produced by a party in that
14 litigation, as you will know by that Bates stamp on
15 the bottom right-hand corner ████████████████████
16 ███████████████████████████████████████
17    I will ask you first if you have ever seen
18 this document before?
19    A    No.
20    Q    So, I will represent to you that
21 the liquidators obtained this document from the
22 parties in the Anwar litigation, and it appears to
23 be an e-mail ███████████████████████████
24 ██████████████████████████████████████
25 ██████████████████████████████████████

120

1 ██████████████████████████████████
2 ██████████████████████████████████
3 ██████████████████████████████████
4 ██████████████████████████████████
5 ████████████████ do you see that?
6    A    Yes, I see that.
7    Q    And if you flip the page, the
8 first e-mail in the chain is an e-mail from
9 ████████████████████████████, do you
10 see that?
11    A    Yes.
12    Q    And ███████████████████████
13 ██████████████████████████████████
14 ██████████████████████████████ do
15 you see that?
16    A    Yes.
17    Q    If you flip to the front page, the
18 first page of the exhibit, you will see that that is
19 ████████████████████    And if you look on the
20 attachments line you will agree with me that it
21 indicates that ██████████████████████████
22 ██████████████████████████████████████
23 █████████ do you agree with me?
24    A    I agree with you. It is not
25 attached, but it is mentioned as attachment.

10-03635-jpm    Doc 1003-2    Filed 02/17/23    Entered 02/17/23 15:20:51    Exhibit B-
Deposition Transcript    with redactions relating only to documents and    Pg 33 of 130

Transcript of Herman Dewitte

December 14, 2022

31 (121 to 124)

121

1    Q    That is true. Do you have an
2  understanding as to why BIL didn't produce a copy of
3  this e-mail?
4         MR. BUTLER: Objection to form. And I
5  think I will let you answer this question. But if
6  you are going into sort of the decision making in
7  response to your document requests, I don't think
8  that is an appropriate area of inquiry, it would be
9  privileged and work product.
10       On reflection, I think I will instruct the
11  witness not to answer. The way the question is
12  phrased, I think it goes into the decision making of
13  attorneys representing BIL in responding to your
14  document requests.
15 BY MR. FLUGMAN:
16       Q    Sir, do you know, does BIL
17  currently possess a copy of this e-mail?
18       A    As I told you before, this is the
19  first time I have seen this. So the answer to your
20  question is no.
21       Q    No, you don't know, or no, BIL
22  doesn't have a copy?
23       A    I have never seen it, so, for me
24  BIL does not have a copy.
25       Q    The only BIL employee contained on

122

1  this particular e-mail chain is Ms. Salentiny,
2  correct?
3       A    Correct.
4       Q    I think you testified earlier that
5  BIL does not have any electronically stored
6  information from Ms. Salentiny, correct?
7       A    Absolutely. That is what she
8  confirmed and that is what she checked afterwards,
9  yes.
10       Q    Sir, are you familiar with what an
11  offer in memorandum is generally?
12       A    Generally, yes.
13       Q    Would you agree with me that an
14  offer in memorandum is typically provided by a fund
15  or funds investment manager to describe the strategy
16  of the fund and its investment fee system and things
17  like that?
18       A    Yes, I agree.
19       Q    Would you agree with me that
20  potential investors in a fund are often provided a
21  copy of the offer in memorandum before making a
22  decision as to whether to invest?
23       A    I agree.
24       Q    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
25  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

123

1  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
2  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
3  ▮▮▮▮▮▮▮▮▮▮▮
4       A    Sorry, could you repeat that,
5  please.
6       Q    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
7  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
8  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
9  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
10  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
11  ▮▮▮▮▮▮▮
12       A    I agree.
13       (Exhibit 5 marked for identification.)
14 BY MR. FLUGMAN:
15       Q    Mr. Dewitte, this is another
16  e-mail that was produced in that same litigation in
17  New York, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
18  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  It
19  is a multipage document. Feel free to flip through
20  it, if you would like.
21       I would like you to also take out
22  Exhibit 3, which is the big document, and if you
23  could turn back to page 41 of that exhibit, sir,
24  have the two side by side.
25       A    Okay.

124

1       Q    So if you notice the new exhibit,
2  Exhibit 5, the -- not the very top e-mail, but the
3  second e-mail there, from ▮▮▮▮▮▮▮▮▮▮▮
4  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
5  ▮▮▮▮▮▮▮▮▮▮▮  do you agree?
6       A    I am checking.
7       Q    Take your time.
8       A    Yes.
9       Q    And if you look at page 41 of
10  Exhibit 3, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
11  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
12  ▮▮▮▮▮▮▮▮  If you compare that back to the
13  e-mail chain on Exhibit 50, you will --
14       A    Exhibit 5?
15       Q    I' sorry, Exhibit 5. It was tab
16  50 in my book. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
17  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
18  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
19  do you see?
20       A    Yes.
21       Q    And you will see that there is
22  more to that e-mail from ▮▮▮▮▮▮▮▮▮▮▮
23  ▮▮▮▮▮  than appears on page 41 of Exhibit 3,
24  correct?
25       A    Correct. Yes.

10-03635-jpm   Doc 1003-2   Filed 02/17/23   Entered 02/17/23 15:20:51   Exhibit B-
Deposition Transcript   with redactions relating only to documents and   Pg 34 of 130

Transcript of Herman Dewitte

32 (125 to 128)

December 14, 2022



125

1    Q     In fact, the e-mail chain in
2  Exhibit 5 goes on for several more pages,
3  ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
4  that predate or precede the e-mails that are on the
5  printed version of Exhibit 3, do you agree?
6    A     I agree.
7    Q     You will also agree with me that
8  there is an e-mail at the very top of the chain from
9  ▉▉▉▉▉▉▉▉▉▉▉▉▉  that is a subsequent e-mail to
10 the one that appears on page 41 of Exhibit 3,
11 correct?
12   A     Subsequent, what do you mean?
13   Q     It is a response to the e-mail
14 that appears at the top of page 41 of Exhibit 3, do
15 you agree?
16   A     I agree.
17   Q     In that e-mail, ▉▉▉▉▉▉▉▉▉
18 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
19 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
20 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
21 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
22   A     It appears to be, but we don't
23 have the attachment.
24   Q     Exactly.  If BIL had had an
25 electronic copy of this e-mail in its possession

126

1  when the documents were collected in 2010, we would
2  have a copy of that attachment, right?
3    A     Right.
4    Q     But BIL didn't try -- didn't, in
5  2010 when it was turning over documents relating to
6  Fairfield, access an electronic copy of this e-mail
7  and get the attachment, correct?
8    A     Correct.
9    Q     You will agree with me that this
10 Exhibit 5 and this e-mail chain is ▉▉▉▉▉▉▉▉▉
11 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
12   A     Well, I didn't go through all the
13 previous -- the earlier e-mail exchanges, but it
14 appears to be so.  Because you reference the same
15 subject, they seem identical, yes.
16   Q     We can go through it.  I am happy
17 to.  The e-mails that were -- you will agree with me
18 that the e-mails that are on page 1 of Exhibit 5 are
19 contained within the larger Exhibit 3 that is the
20 transaction file that was assembled relating to this
21 specific transaction, right?
22   A     Right.
23   Q     So you will agree with me that
24 this is the complete e-mail chai ▉▉▉▉▉▉▉▉▉
25 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

127

1  ▉▉▉▉▉▉▉▉▉▉▉▉▉▉  That was a poorly
2  worded question.
3         MR. BUTLER:  Let me state for the record.
4  A lot of these documents, especially ones that don't
5  come from the files of BIL, the witness has been
6  prepared to testify on the topic 6, which is
7  general, not about specific e-mails and not about
8  specific e-mails that are not within the possession,
9  custody and control of BIL.
10        So you can answer, but I just want to
11 state that objection and make it clear for the
12 record.  He is not a spokesman for the bank on this
13 question or many of the preceding questions.
14        MR. FLUGMAN:  We can have a discussion
15 about that afterwards.
16 BY MR. FLUGMAN:
17   Q     My, though, question is, this
18 Exhibit 5 that is in front of yo ▉▉▉▉▉▉▉▉▉
19 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉  you will
20 agree?
21   A     I agree.
22        (Exhibit 6 marked for identification.)
23 BY MR. FLUGMAN:
24   Q     The court reporter has just handed
25 you another document, again ▉▉▉▉▉▉▉▉▉▉▉

128

1  ▉▉▉▉▉▉  you will note from the Bates stamp at
2  the bottom.  This is another e-mail -- appears to be
3  another e-mail exchange between this time
4  ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
5  ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
6  ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
7  ▉▉▉▉▉▉▉▉▉▉▉▉▉
8         Again, if you flip to the bottom e-mail,
9  the last e-mail in the chain, do you see that
10 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
11 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
12 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉  Do you see that on the
13 exhibit?
14   A     Yes.
15   Q     If you flip to the first page of
16 the exhibit, you will see that the individual from
17 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
18 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
19 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
20 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉  Do you see that?
21   A     Yes.
22   Q     I will represent to you that
23 fggus.com was the domain name for the Fairfield
24 Greenwich Group, which was the Fairfield funds
25 investment manager.

10-03635-jpm   Doc 1003-2   Filed 02/17/23   Entered 02/17/23 15:20:51   Exhibit B-
Deposition Transcript   with redactions relating only to documents and   Pg 35 of 130

Transcript of Herman Dewitte

33 (129 to 132)

December 14, 2022



Page 129

1    Do you agree with me that this e-mail
2  appears to show that ████████████████████
3  ████████████████████████████████████████
4     **A**  ████████████████████████████
5  ████████████████████████████████████████████
6  ████████████████████████████████████████████
7  ████████████████████
8     Q    Okay. That is fair. ████████████
9  ████████████████████████████████████████████
10 ████████████████████████████████████████████
11 ████████████████████
12    **A    Yes.**
13    Q    Are you aware -- I think we talked
14 about this earlier -- that Fairfield Greenwich Group
15 is located in the United States?
16    **A    I think you said that at the**
17 **beginning.**
18    Q    Do you agree with me?
19    **A    Yes.**
20    (Exhibit 7 marked for identification.)
21 BY MR. FLUGMAN:
22    Q    This is another e-mail exchange
23 that was obtained by the liquidators, and it is from
24 a different source. You will see it doesn't have ████
25 ████████████████  it is from a different source.

Page 130

1  Again, appears to be an e-mail exchange numbering
2  three pages involving various -- at least involving
3  ████████████████████████████████████████████
4  ████████████████████████████████████████████
5  ████████████████████████████████████████████
6  ████████████████████████████████████████████
7  ████████████████████████████████████████████
8  ████████████████████████████████████████████
9  ████████████████████████████████████████████
10 ████████████████████  do you see that?
11    **A    I am checking their e-mails.**
12    Q    Take your time.
13    **A    Yes.**
14    Q    ████████████████████████████████
15 ████████████████████████████████████████████
16 ████████████████████████████████████████████
17 ████████████████████████████████████████████
18 ████████
19    MR. BUTLER: Objection to form.
20 Mr. Dewitte has never seen this document, the same
21 is true for the previous exhibits, and he certainly
22 been prepared to say anything about these documents
23 which are not even within the possession of --
24 actually, I don't know if they are in the possession
25 of BIL, because they don't relate to this case.

Page 131

1    I just want to make it clear on the
2  record, he is not prepared to be a spokesman on what
3  an e-mail he has never seen before says. But you
4  can answer the question.
5    MR. FLUGMAN: I'll just state for the
6  record that at least the previous exhibit actually
7  was provided to counsel previously. Whether or not
8  you prepared by it, that is not my call. And I am
9  just -- I understand --
10    MR. BUTLER: I have seen this document
11 myself. But Mr. Dewitte has not. This is referring
12 to Exhibit 6. I just want to make it clear. This
13 is a 30(b)(6) deposition, he is here as a spokesman
14 for the bank on particular topics, and I just need
15 to be clear about what he can be a spokesman for the
16 bank on and what he cannot be a spokesman for the
17 bank on.
18    MR. FLUGMAN: I understand.
19    MR. BUTLER: He cannot be a spokesman on
20 what a document we have never seen before says.
21    MR. FLUGMAN: Well, that is an issue
22 between us to sort out.
23 BY MR. FLUGMAN:
24    Q    What I want to ask is, ████████████
25 Ms. Salentiny is the BIL person ████████████████

Page 132

1  ████████  on this e-mail, correct?
2     **A    Correct.**
3     Q    And we established earlier that
4  the bank no longer has Ms. Salentiny's e-mails,
5  correct?
6     **A    Correct.**
7     Q    So this e-mail is not currently in
8  the possession of BIL.
9     **A    Correct.**
10    MR. BUTLER: I want object to the form of
11 that question. Let me just state objection to form.
12 BY MR. FLUGMAN:
13    Q    If you look on page 2 of the
14 exhibit, Mr. Dewitte, I am just asking if it
15 appears -- you will agree with me that ████████████
16 ████████████████████████████████████████████
17 ████████████████████████████  do you
18 see that?
19    **A    Can I go first through the e-mail?**
20    Q    Please. Take your time.
21    (Pause.)
22    **A    Thank you.**
23    Q    Of course. My question was, ██████
24 ████████████████████████████████████████████
25 ████████████████████████████████████████████

10-03635-jpm   Doc 1003-2   Filed 02/17/23   Entered 02/17/23 15:20:51   Exhibit B-
Deposition Transcript   with redactions relating only to documents and   Pg 36 of 130

Transcript of Herman Dewitte

34 (133 to 136)

December 14, 2022



133

1 ███████████████████████████
2 ██████████████ correct?
3     A     She refers to a specific
4 subscription, yes.
5     Q     And she also says in the middle of
6 the e-mail that's on page 2 of the exhibit that -- I
7 will quote ████████████████████████
8 ████████████████████████████████
9 ██████████████████████████
10 ██████████ o you see that?
11    A     Yes, I see that.
12    Q     ██████████ goes on to say tha█
13 ████████████████████████████████
14 ████████████████████████████████
15 ██████████████████████ Do you see that?
16    A     Yes.
17    Q     It is clear from this e-mail that
18 the fund that is being discussed is Fairfield.
19    A     Yes.  Correct.
20    Q     And again, if BIL had preserved
21 the ESI, the e-mails that were in Ms. Salentiny's
22 account, this document would still be in BIL's
23 control, correct?
24         MR. BUTLER:  Objection to form.
25 BY MR. FLUGMAN:

134

1     Q     You can answer.
2     A     Yes.
3         (Exhibit 8 marked for identification.)
4 BY MR. FLUGMAN:
5     Q     You will see, sir, this is another
6 e-mail exchange that was obtained by the liquidators
7 from that same source, the last e-mail we looked at.
8 If you flip through the e-mail chain, and take your
9 time, if you need to, I will just note that the last
10 e-mail in the chain, which appears at the bottom of
11 page 3 of the exhibit, subject line is█████████
12 ████████████████████ Do you see that,
13 sir?
14    A     I'm sorry, you're on which page?
15    Q     Page 3 of the exhibit.  At the
16 middle of the page, below the dotted line, there's
17 an e-mail that was sent from ████████████ do
18 ████████████████████████████████
19 you see that?
20    A     Yes.
21    Q     Do you see that the subject line
22 of that e-mail is ███████████████████
23 ████
24    A     (Witness nodding.)
25    Q     You understand that ███████

135

1 ██████████ refers to BIL?
2     A     I am not sure.  The reason why I
3 am not sure is because -- first of all, I have never
4 seen this e-mail before.  But a speed read of this
5 e-mail learns that they are referring that people
6 attending to this meeting is ██████████████
7 ████████████████████████████████
8 ██████████████████
9         Perhaps you are aware of that, but Dexia
10 at that time had its own investment vehicle, which
11 was entitled -- today it is called Candra, it's part
12 of the New York Life group, if my memory is correct.
13 Previously it was called Dexia Asset Management.
14 So, the people -- first person, █████████
15 ██████ I know for sure that he has been working for
16 Dexia Asset Management for a very long time.  And
17 the two other persons referring, I never heard of
18 them, which I would have if they would have been
19 part of the BIL Luxembourg group.
20    Q     ████████████████████████
21 ██████████ what was the relationship between BIL and
22 the Dexia Asset Management that you just mentioned?
23    A     Dexia Asset Management was an
24 independent asset manager investing the Dexia --
25 well, it was acting as an independent asset manager

136

1 for Dexia-related funds.  So, BIL and Dexia Asset
2 Management at that time, and always have been, by
3 the way, were two separate legal entities.
4     Q     At the time were both of those
5 entities part of the Dexia group?
6     A     Yes, that is correct.
7     Q     My understanding, based on
8 publicly available information, is that BIL -- let
9 me rephrase my question.
10        My understanding, based on publicly
11 available information, was that in the time frame of
12 at least 2010, BIL owned 51 percent of Dexia Asset
13 Management Luxembourg.  Does that comport with your
14 understanding of the relationship?
15    A     That is possible.  That is a
16 possible.  I didn't check the shareholdership of
17 Dexia Asset Management before this deposition, but
18 having worked with them previously, they were
19 100 percent independent, a separate legal entity
20 with their own board of directors, et cetera.  And
21 ████████████ at the time he was
22 ████████████████ for Dexia Asset Management.
23    Q     Was there sharing of information
24 learned about potential investments ██████████
25 ██████████████ between Dexia Asset Management

10-03635-jpm    Doc 1003-2    Filed 02/17/23    Entered 02/17/23 15:20:51    Exhibit B-
Deposition Transcript    with redactions relating only to documents and    Pg 37 of 130

35 (137 to 140)

Transcript of Herman Dewitte

December 14, 2022



137

1  and BIL?
2      MR. BUTLER: I'll object that we're way
3  outside the scope of any of these deposition topics.
4  But you can answer the question.
5      **A      Can you rephrase the question. I**
6  **am not sure I got the scope of the question.**
7  **BY MR. FLUGMAN:**
8      Q      Of course. Let me rephrase. If
9  somebody worked who for Dexia Asset Management, ▇
10 ▇▇▇▇▇▇▇ had performed due diligence on a
11 potential investment that somebody at BIL wanted to
12 invest in, could the relationship manager or the
13 person at BIL who was discussing that potential
14 investment with an underlying BIL client, access
15 that diligence that was performed by Dexia Asset
16 Management?
17     MR. BUTLER: Same objection.
18     **A      I don't have that information.**
19 **BY MR. FLUGMAN:**
20     Q      Do you have any reason to believe
21 that they wouldn't be able to access that?
22     MR. BUTLER: Same is objection. He
23 doesn't know.
24     MR. FLUGMAN: I am asking the question.
25 He can answer it as he --

138

1      MR. BUTLER: It's a misleading question
2  based on his previous answer, but go ahead.
3      MR. FLUGMAN: I'm asking whether he has
4  any reason to doubt that someone at BIL could access
5  information gathered by Dexia Asset Management,
6  which is, I understand, an independent entity but
7  part of the Dexia group of families.
8      MR. BUTLER: Same objection.
9      **A      I don't have that degree of**
10 **information, so I cannot answer to that topic.**
11 **BY MR. FLUGMAN:**
12     Q      You will agree with me that at
13 least this e-mail suggests ▇▇▇▇▇▇▇▇▇▇
14 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
15 ▇▇▇▇▇▇▇▇▇▇▇▇
16     MR. BUTLER: Just object as outside the
17 scope. You're asking the witness what an e-mail he
18 has never seen before that did not belong to BIL
19 suggests. That is not within the scope of this
20 30(b)(6).
21 BY MR. FLUGMAN:
22     Q      I believe you shook your head yes.
23 Was your answer to the question yes?
24     MR. BUTLER: You can answer.
25     **A      Yes. Of course. It seems to be**

139

1  **tha** ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
2  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
3      (Exhibit 9 marked for identification.)
4  BY MR. FLUGMAN:
5      Q      Again, this is a subsequent e-mail
6  from that same source that involves the same people
7  from the e-mail we just looked at. And of course
8  you should take a look at it as much as you would
9  like.
10     It appears to be an e-mail from somebody ▇
11 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
12 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
13 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
14 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
15 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
16 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
17 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
18 ▇▇▇▇▇▇▇▇
19     MR. BUTLER: Same objection I made before.
20     **A      Sorry, just reading --**
21 **BY MR. FLUGMAN:**
22     Q      Sure.
23     **A      Okay.**
24     Q      So, again, my question, ▇▇▇▇▇▇▇
25 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

140

1  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
2  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
3  ▇▇▇▇
4      **A      Yes, and I want to highlight that**
5  **indeed the references of the e-mails confirms**
6  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
7  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇
8      Q      Right. I understand that. We
9  don't know whether anyone from Dexia Asset
10 Management shared any ▇▇▇▇▇▇▇▇▇▇▇▇▇▇
11 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
12 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
13 correct?
14     **A      I don't have that information.**
15 **Because the appendixes are not present either.**
16     Q      We don't have, for example, ▇▇▇
17 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
18 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
19 correct?
20     **A      That is correct. Well, as I told**
21 **you before, I never heard of the names of these**
22 **people before. I know** ▇▇▇▇▇▇▇ **personally,**
23 **because today he is --** ▇▇▇▇▇▇▇▇▇▇▇▇
24 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
25 ▇▇▇▇▇▇▇ **And after his long career at Dexia**

10-03635-jpm   Doc 1003-2   Filed 02/17/23   Entered 02/17/23 15:20:51   Exhibit B-
Deposition Transcript   with redactions relating only to documents and   Pg 38 of 130
Transcript of Herman Dewitte
December 14, 2022

36 (141 to 144)

141

1  Asset Managemen█████████████████
2  ███████████████████ This is why
3  I spotted this.  But the other person, I don't know
4  them and I never seen this e-mail before.
5      Q    I understand that.  My question is
6  really, the reason that -- strike that.
7      If BIL still had access to e-mails from
8  this time period from Mr. Baldinucci, Ms. Reyter,
9  Ms. Salentiny and the others we've discussed that
10  have had information relating to Fairfield, we would
11  be able to see if there were communications between
12  anyone at Dexia Asset Management and those
13  individuals at BIL, right?
14      MR. BUTLER:  Objection to form.  You can
15  answer.
16      A    I am not sure to the extent that
17  the -- as I told you before, contrary to Blue Star
18  or Rafale Partners, Inc., these feeder funds, this
19  one was never looked into by BIL.  It was only
20  execution only based.  So our clients have picked
21  these funds for which we of course invested as
22  nominee.
23  BY MR. FLUGMAN:
24      Q    We did see an example a couple
25  exhibits ago of ███████████████████████

142

1  ██████████████████████ correct?
2      A    Sure, yes.
3      Q    We just don't know whether a
4  similar e-mail might exist between Ms. Salentiny or
5  anyone else at BIL with this team
6  ██████████████████████ correct?
7      A    Sure.
8      Q    Had those individuals' e-mail
9  accounts been preserved we would have been able to
10  check?
11      A    If your reasoning -- perhaps I am
12  not supposed to argue with you, but if your
13  reasoning was correct, then █████████████████
14  █████████████████████████████████████
15  █████████████████████████████████████
16  █████████████████████████████████████
17  █████████████████████████████████████
18  Perhaps I am wrong, but I cannot confirm.  We don't
19  know.
20      Q    Sir, respectfully, that wasn't
21  answering any of my questions.  You will agree --
22      MR. BUTLER:  I think he answered it at the
23  beginning.  But you don't have to add any
24  argumentation to the response.
25  BY MR. FLUGMAN:

143

1      Q    Sir, all I'm asking is, this
2  e-mail appears to confirm that individuals from
3  Dexia Asset Management ███████ --
4      (Reporter clarification.)
5      MR. FLUGMAN:  This e-mail, Exhibit 9, does
6  appear to confirm tha█████████████████████████
7  ███████████████████████████████████████████
8  ███████████████████████████████████████████
9  ███████████████████████ right?
10      A    Yes.  That appears to be so, yes.
11      Q    And it also appears tha██████████████
12  ███████████████████████████████████████████
13  ███████████████████████████████████████████
14  ███████████████████ correct?
15      A    Correct.
16      Q    Those documents are referenced in
17  the middle of page 1 of the exhibit, correct?
18      A    Correct.  And of the second page
19  as well.
20      Q    Right.  It references the
21  attachments at the bottom, correct?
22      A    Correct.
23      Q    And at least those attachments
24  appear █████████████████████████████████████
25  █████████████ correct?

144

1      A    Correct.  Yes.
2      Q    Do you know whether other entities
3  within the Dexia family offered similar execution
4  only services to its clients like BIL did with
5  respect to the subscription and redemption at issue
6  in this case?
7      A    Are you asking to me if other
8  banks within the Dexia group at the time had
9  invested with their clients in Fairfield?
10      Q    Yes.
11      MR. BUTLER:  I'll just object as outside
12  the scope.  You can answer.
13      A    I don't have that information.
14  BY MR. FLUGMAN:
15      Q    Forgive me if you have testified
16  to this, but did Dexia Asset Management have its own
17  clients that it was marketing funds like the
18  Fairfield funds to?
19      A    It depends on your definition of
20  "own clients."
21      Q    Let me ask a different question.
22  Do you have an understanding as to why Dexia Asset
23  Management would ███████████████████████████████
24  ███████████████████████████████████████████████
25      MR. BUTLER:  Outside the scope.  You can

Transcript of Herman Dewitte

December 14, 2022



145

1  answer.
2      A  [redacted]
3  [redacted]
4  [redacted]
5  [redacted]
6  [redacted]
7  BY MR. FLUGMAN:
8      Q    On whose behalf would they be
9  [redacted]
10     A    I am less familiar with external
11 asset manager, how they function, but I presume that
12 they have their own investment strategy, and they
13 potentially might have clients, I don't know,
14 [redacted]
15 [redacted]
16     Q  [redacted]
17 [redacted]
18 [redacted]
19     MR. BUTLER:  Objection.  Outside the
20 scope.  You can answer.
21     A    Well, at the time Dexia Asset
22 Management was the asset manager of the funds, all
23 of the funds of the Dexia funds.  So in that
24 capacity, not only -- well, BIL clients invested in
25 these funds, their funds, but also potentially

146

1  clients of other BIL entities in the funds being
2  managed by Dexia Asset Management.
3      Q    So to answer my question, I take
4  it that your answer to my question is
5  [redacted]
6  [redacted]
7  [redacted]
8  [redacted] ight be
9  considering making, is that fair?
10     MR. BUTLER:  Objection, outside the scope,
11 mischaracterizes his testimony.  But you can answer.
12     A    Again, I am not a specialist in
13 external asset management.  I presume that your
14 assumption should be correct.  If I would be working
15 for an asset manager, I would be doing the same
16 description of what you just did.  But I cannot
17 confirm that.
18 BY MR. FLUGMAN:
19     Q    Just to recap the couple of
20 exhibits we have looked at, we have seen examples of
21 people at BIL [redacted]
22 [redacted] correct?
23     A    Correct.
24     Q  [redacted]
25 [redacted]  You have to answer verbally.

147

1      A    Correct.  Sorry.
2      Q  [redacted]
3  correct?
4      A    Yes.
5      Q  [redacted]
6  [redacted] correct?
7      A    Yes.
8      Q  [redacted]
9  [redacted] correct?
10     A  [redacted]  I
11 don't recall seeing that, [redacted]
12     Q    You will agree that the e-mails we
13 looked at are a subset of the e-mails that BIL once
14 had that involved Fairfield, right?
15     A    I'm sorry, could you --
16     Q    We didn't look at every e-mail
17 that someone at BIL sent or received related to the
18 Fairfield funds, correct?
19     A    No.  We didn't go through all the
20 documents which is part of Exhibit, for instance, 3.
21     Q    And so if -- we have seen several
22 individuals who we have talked about today,
23 Ms. Reiter, Ms. Salentiny, M. Meyers, show up in
24 these e-mails, and -- from this relevant time
25 period, 2005 to 2008, right?

148

1      A    Correct.  Yes.
2      Q    And had the e-mail inboxes or
3  e-mail accounts of those individuals been preserved
4  at the time, we would have access to those e-mails
5  today, correct?
6      MR. BUTLER:  Objection to form.  You can
7  answer.
8      A    Yes.
9      MR. FLUGMAN:  This is a good time to break
10 for lunch.
11     THE VIDEOGRAPHER:  We are going off the
12 record.  The time is 1:31 p.m.
13     (Off the record.)
14     THE VIDEOGRAPHER:  We are back on the
15 record.  The time is 2:30 p.m.
16   (Exhibits 10 and 11 marked for identification.)
17 BY MR. FLUGMAN:
18     Q    Mr. Dewitte, the court reporter
19 has handed you Exhibits 10 and 11.  I will represent
20 to you that Exhibit 10 is a document that was
21 produced by your counsel to us in connection with
22 this deposition, and it is in French.  Exhibit 11 is
23 an English translation of that document that we had
24 a service perform for us.
25     If you flip to the back of Exhibit 11, you

10-03635-jpm    Doc 1003-2    Filed 02/17/23    Entered 02/17/23 15:20:51    Exhibit B-
Deposition Transcript    with redactions relating only to documents and    Pg 40 of 130

38 (149 to 152)

Transcript of Herman Dewitte
December 14, 2022



149

1  will notice -- in the English language version, you
2  will notice that there is a certificate of the
3  translation from the translation service.
4       I am going to be working from the English
5  language version, but I invite you to keep the
6  French language version in front of you as well. If
7  you have any issue with the translation or you think
8  something is not correctly stated in the English
9  version, please tell me, otherwise I will assume
10 that it is an accurate translation. Is that okay
11 with you?
12     A    Perfect.
13     Q    Very good. So this document is
14 Bates stamped BIL 000521. It appears to be an
15 archive management policy ██████████ do
16 you agree?
17     A    Yes.
18     Q    This document you recognize?
19     A    Yes. Just give me a minute,
20 please.
21     Q    Of course.
22          (Pause.)
23     A    Yes.
24     Q    And was this the ████ policy that
25 you mentioned in your testimony earlier today?

150

1      A    Exactly, yes.
2      Q    Did you review this document in
3  connection with your preparation for today's
4  deposition?
5      A    Yes.
6      Q    My first question is, this
7  document ████████ To your knowledge, was
8  there any written policy in place at the bank prior
9  to ████ that governed the subject matter of this
10 policy?
11     A    I don't have that information.
12     Q    This policy that you have as
13 Exhibits 10 and 11 came into effect on ████
14 ████ correct?
15     A    Correct. Well, the dates of the
16 policy. We can assume that it is in force around
17 that date, yes.
18     Q    If not on that precise date, then
19 you would believe on or about that date?
20     A    Exactly, yes.
21     Q    I will represent to you that we
22 have -- we will look at it in a moment -- another
23 policy ████████████████████████
24 ████████████████████████████
25

151

1      So my question to you is, are you in
2  agreement that this policy we are looking at in
3  Exhibits 10 and 11 governed throughout the time
4  frame ████████████████
5      A    Yes.
6      Q    Directing your attention to the
7  bottom of the first page of the exhibit, it says
8  that ████████████████████████████
9  ████████ is that correct?
10     A    That is correct, yes.
11     Q    ████████████████████
12 right?
13     A    Correct, yes.
14     Q    And just for my information ████
15 ████████████████████████████████
16 ████████████ were they all part of the
17 same bank, BIL?
18     A    From a legal point of view, there
19 is no difference. In certain countries, for
20 instance Switzerland, there might be a difference.
21 ████████████████████████████ but it's
22 not the case for Luxembourg, or in any case not for
23 BIL.
24     Q    You will see later in that same
25 paragraph that this policy sets forth ████████

152

1  ████████████████████████████████
2  ████████████ correct?
3      A    That is correct, yes.
4      Q    Do you have a -- an understanding
5  as to why ████ is in quotes in that sentence?
6      A    No, is the short answer. The long
7  answer would be -- but it's only a guess, I'm not
8  supposed to guess here, is that ████████████
9  ████████████████ But I don't know,
10 because I didn't draft this policy and I was not
11 part of reviewing it from a legal point of view as
12 well.
13     Q    If you don't know, you don't know.
14     A    I don't know.
15     Q    Let's look at page 2 of the
16 policy. I am focused now on section 2.1, ████
17 ████████████████████ do you see
18 that section?
19     A    Yes.
20     Q    Section 2.1.1 sets forth some
21 ████████████████████████████ do you
22 see that?
23     A    Yes.
24     Q    So in the second paragraph,
25 beginning, ████████████████ do you see that?



Page 153

1    A    In the second paragraph?
2    Q    Second paragraph, under section
3   2.1.1, it says,
4    A    I'll take the English version as
5   well, it will be easier.  Yes, I see that.
6    Q    And it says that
7
8          o you see that?
9    A    Yes.
10    Q    It says that documents
11
12          correct?
13    A    That is correct, yes.
14    Q    There is nothing in this section
15   2.1.1 that limits it
16                                            ,
17   correct?
18    A    Distinction is not made.
19    Q    In fact, I think we talked a
20   moment ago, this policy is specifically designed to
21
22   right?
23    A    Yes.
24    Q    So, when BIL or individuals at BIL
25   communicated with clients, underlying customers of

Page 154

1   the bank, about executing investments, how would
2   those be characterized with reference to this
3   section of the policy?
4
5    A
6
7    Q    Okay.  And what about if -- when
8   somebody at BIL communicated with a fund
9   administrator like Citco, how would that be
10   characterized,
11    A    That is a good question.  It is a
12   good question.  I don't have the answer to that.  I
13   should do -- I don't have the answer to that.
14    Q    Okay.  I think the distinction
15   that you made with respect to
16
17          Would you agree with me that a fund
18   administrator is a type of investment professional?
19    A    Yes.  But then it has to be
20   checked in accordance with the law to an extent it
21   would be seen as a professional in accordance with
22   this definition under the code of commerce.
23    Q    Okay.  So would you agree with me
24   that communications with a fund administrator like
25   Citco would qualify as either

Page 155

1          and you are just not sure which?
2    A    Yes.
3    Q    So under this policy, I'm looking
4   specifically at section 2.1.1,
5
6
7                                      is that
8   right?
9    A    That is right, yes.
10    Q    And then                          do
11                                            do
12   you see that?
13    A    Yes.
14    Q    And that sets fort
15
16
17
18
19
20
21
22          Do you see that?
23    A    Yes.
24    Q    You can consult the translation as
25   you like.  I was quoting directly from our

Page 156

1   translated copy.
2    A    Yes.
3    Q    Would you agree with me that for
4
5
6
7
8          right?
9    A    Could you repeat that, please?
10    Q    Yes, what I am asking is
11
12
13
14
15
16                                            do
17   you agree?
18    A    That is what is written in there,
19   yes.
20    Q    For example, if a letter had been
21   sent by someone at BIL to somebody at Citco, for
22   example, in April of 2005, then under this policy,
23   that letter, in whichever form it existed,
24
25

10-03635-jpm   Doc 1003-2   Filed 02/17/23   Entered 02/17/23 15:20:51   Exhibit B-
Deposition Transcript   with redactions relating only to documents and   Pg 42 of 130

Transcript of Herman Dewitte
40 (157 to 160)

December 14, 2022



**Page 157**

1    A    <span>████████████</span>
2    Q
3    And you would agree with me that -- strike
4    that.
5    Throughout this document, BIL <span>████</span>
6    <span>██████████████████████</span>
7    <span>██████████</span> correct?
**8    A    That is correct, yes, that's the**
**9    retention period.**
10    Q    That is -- sorry.
**11    A    The retention period of documents,**
**12    yes.**
13    Q    Is it fair to say that as a
14    general matter, BIL's policy was to <span>████</span>
15    <span>████████████████████████████</span>
16    <span>████████████████</span>
**17    A    Could you repeat that, please?**
18    Q    Sure.  Is it fair to say that as a
19    general matter, BIL's policy was to <span>████</span>
20    <span>████████████████████████████</span>
21    <span>██████████</span>
**22    A    Yes.**
23    Q    Are you aware of any other
24    applicable policies that would recommend that BIL
25    <span>████████████████</span>

**Page 158**

1    A    To the best of my knowledge, no.
2    Q    So <span>██</span>
3    <span>████████████████████████</span>
4    <span>████████████████████████</span>
5    <span>████████████████████████</span>
6    <span>████████████████████████</span>
7    <span>████████████████████████</span>
8    <span>████████████████████████</span>
9    <span>████████████████████████</span>
10    correct?
**11    A    I am not sure** <span>████</span>
**12    <span>████████████████████████</span>**
**13    <span>████████████████████████</span>**
**14    <span>████████████████████████</span>**
**15    <span>████████</span> I am not sure.**
16    Q    I thought a moment ago you
17    testified that <span>██</span>
18    <span>████████████████████████</span>
19    <span>████████</span> did I understand you
20    correctly?
**21    A    True, to the extent that it leads**
**22    to a purchase order, you know, that investment is**
**23    ultimately made.  I am not sure to what extent all**
**24    communication in relation to clients is being**
**25    covered by this policy.**

**Page 159**

1    Q    You would agree with me that <span>████</span>
2    <span>████████████████████████</span>
3    <span>████████████████████████</span>
4    <span>████████████</span>
**5    A    Exactly, yes.  Typically the**
**6    communications -- sorry.**
7    Q    <span>████████</span>
8    <span>████████████████████████</span>
9    <span>████████████████████████</span>
10    <span>████████</span> do you see that?
**11    A    Where are you referring to now?**
12    Q    Sure.  I'm referring to -- in
13    paragraph -- the second paragraph under section
14    2.1.1, where it discusses <span>████</span>
15    <span>████████████████████████</span>
16    <span>████</span> do you see that?
**17    A    And you are now in section --**
18    Q    2.1.1, paragraph 2.
19    <span>████████████████████████</span>
20    <span>████████████████████████</span>
21    <span>████</span> do you see that?
**22    A    Okay, yes.**
23    Q    The very last -- the end of the
24    second line says, quote, <span>████</span>
25    <span>████████████████████████</span>

**Page 160**

1    <span>████████</span> right?
**2    A    <span>████████████</span> yes.**
3    Q    <span>████████████</span>
4    <span>████████</span> correct?
**5    A    <span>████████████</span>**
**6    <span>████████</span> es.**
7    Q    And those documents -- supporting
8    documents relating to the bank's transactions for
9    its customers, do you agree?
**10    A    Yes.  To the extent it is**
**11    important information in relation to a client, yes.**
12    Q    So my question is, if there were
13    communications, <span>████</span>
14    <span>████████████████████████</span>
15    <span>████</span> those would be covered by section 2.1.1,
16    correct?
**17    A    If these are** <span>████</span>
**18    <span>████████</span> yes, I agree with you.  But if**
**19    <span>████████████████████████</span>**
**20    <span>████████████████████████</span>**
**21    <span>████████████████████████</span>**
**22    <span>████████████</span>**
23    Q    Can you point to me somewhere in
24    this section where it makes that distinction?
**25    A    It does not.**

Transcript of Herman Dewitte

December 14, 2022



41 (161 to 164)

161

1    Q    So, again --
2    **A    But on the other hand,**
3    ███████████████████████████
4    Q    I think we can agree that
5    ███████████████████████████
6    ███████████████████████████
7    ███████████████████████████
8    ███████████████████████████
9    ███████████████████████████
10   ███████████████████████████
11   **A    ███████████████████**
12   ███████████████████████
13   Q    ███████████████████
14   ███████████████████████
15   **A    ███████████████████**
16   ███████████████████████
17   ███████████████████████
18   Q    Okay.  Let's be more concrete.
19 The transaction at issue in this case actually
20 occurred, right, both the subscription and the
21 redemption. ████████████████████████
22   ███████████████████████████
23   ███████████████████████████
24   ███████████████████ under the
25 terms of this policy, correct?

162

1    **A    Yes.**
2    Q    Okay.  Later on in the policy
3 there is a discussion ████████████  I
4 believe that begins on page 5, section 3.  Do you
5 see that, sir?
6    **A    Yes.  I'm sorry.  I'm looking at**
7 **both procedures at the same time.**
8    Q    I understand.  Please take your
9 time looking at both, because I recognize that you
10 have the two versions in front of you.
11   Can you describe for me what ████████
12   ███████████████████████████
13   **A    Well,** ████████████████████
14   ███████████████████████████
15   ███████████████████████████
16   ███████████████████████████
17   Q    Do you know whether each BIL
18 department ███████████████████████
19   ███████████████████████████
20   **A    I don't have the information that**
21 **all departments have implemented** ██████████
22   ██████████████████
23   Q    The policy does, though, apply to
24 ███████████████████████ correct, we covered
25 that earlier?

163

1    **A    Yes.**
2    Q    Do you know whether the department
3 responsible for the transaction at issue in this
4 case, the investments -- investment -- the
5 subscription and redemption from Sentry, do you know
6 whether that department had ████████████████
7    **A    I don't have that information.**
8    Q    One of the purposes of ███████████
9    ███████████████████████████
10   ███████████████████████████
11   ███████████████████████████
12   **A    I'm sorry, which number --**
13   Q    If ████████████████████████
14   ███████████████████████
15   **A    3-point --**
16   Q    1.1.
17   **A    Okay.**
18   Q    If you look at -- I'm looking
19 again at the English translation, before the
20 indented bullets, do you see there is a series of
21 bullets on that page?  Right above that, I'm quoting
22 from the policy, English translation, ████████████
23   ███████████████████████████
24   ███████████████████████████
25   ███████████████████ Do you see

164

1 that?
2    **A    Yes.**
3    Q    So, ██████████████████████
4    ███████████████████████████
5    ███████████████████████████
6    ███████████████████████████
7    **A    Could you rephrase that, please.**
8    Q    Sure.  Do you know -- ███████████
9    ███████████████████████████
10   ███████████████████████████
11   ███████████████████████████
12   ███████████████████████████
13   **A    It refers to in this policy, for**
14 **sure, but then on the other hand there are other**
15 **regulations potentially to be taken into account,**
16 **typically GDPR.  I don't know to what extent this**
17 **has been taken into account,** ████████████████
18   ███████████████████████  **I know for sure**
19 **it was not taken from -- it did not exist at that**
20 **time.**
21   Q    Would you agree with me that when
22 assessing how to ████████████████ under this
23 policy, to the extent that other regulations like
24 the GDPR that you just mentioned apply, the bank
25 would need to examine the applicable policies and

10-03635-jpm    Doc 1003-2    Filed 02/17/23    Entered 02/17/23 15:20:51    Exhibit B-Deposition Transcript    with redactions relating only to documents and    Pg 44 of 130

Transcript of Herman Dewitte

42 (165 to 168)

December 14, 2022



**165**

1   regulations and comply with the most stringent of
2   them?
3      **A**   **Yes.**
4      Q   If the GDPR provided that
5   documents of a certain kind needed to be kept for
6   more than ten years, then the bank would hold the
7   documents for more than ten years, correct?
8      **A**   **In theory, yes. In practice, I**
9   **know the GDPR obliges service providers to keep data**
10   **for a certain point of time and only for a certain**
11   **point of time, and I know for sure that a lot of**
12   **data -- all service providers, well, they have**
13   **difficulties in complying with that obligation.**
14      Q   Can I direct your attention on
15   that point to page 3 of this policy. It is the top
16   sentence on that page.
17
18
19
20      The first sentence of page 3 of the
21   exhibit says, and I'm quoting,
22
23
24
25

**166**

1
2
3      So you will agree with me that if a
4   document is covered by this policy,
5
6      correct?
7      **A**   **Yes.**
8      Q   It is possible that another
9   provision of law might call for a longer
10   preservation period, correct? Is that a yes?
11      **A**   **Yes. Sorry.**
12      Q   But at a minimum under this policy
13
14      **A**   **Yes.**
15      Q   With respect to -- going back to
16   section 3.1
17
18
19
20
21
22      **A**
23      Q
24
25      **A**   **No.**

**167**

1      Q   In practice,
2
3
4      MR. BUTLER: Let me just object. The
5   topic is policies, and not practices. This witness
6   is not prepared to testify or has not been prepared
7   to testify about all the practices within the bank.
8   With that objection, you can answer.
9      **A**   **I don't have the answer. As I**
10   **referred to earlier, the GDPR, certain kinds of**
11   **information needs to be destroyed at a certain point**
12   **of time. Whether or not that the bank is not ready**
13   **from on operational point of view, this is something**
14   **that has been checked previously with Nicholas**
15   **Vaisse, the person I referred to earlier, which he**
16   **confirms doing with his preparation meeting.**
17      Q
18
19
20
21
22      MR. BUTLER: Objection to form. You can
23   answer.
24      **A**   **I don't have that knowledge. Not**
25   **that I am aware of, no.**

**168**

1   **BY MR. FLUGMAN:**
2      Q
3
4
5      **A**   **Yes.**
6      Q
7
8
9
10
11
12      **A**   **That is correct.**
13      Q   Speaking more broadly with respect
14   to policies at BIL, including this one, can you
15   describe how BIL enforced compliance with
16   retention -- with the retention and deletion
17   policies at the bank?
18      MR. BUTLER: Again, I'll just object that
19   that is outside the scope of the policies. You can
20   answer, if you can.
21      **A**   **Is my understanding correct that**
22   **your question relates to if I have any knowledge**
23   **about how -- how compliant -- how these procedures**
24   **or policies are being followed up or checked upon?**
25   **BY MR. FLUGMAN:**

Transcript of Herman Dewitte
December 14, 2022

169

1    Q    Yes, so let's make the question
2  more specific. Let's talk about this policy. After
3  this policy was issued ████ what did BIL do to
4  ensure that employees at the bank were following the
5  policy?
6    A    **I don't have that information.**
7    Q    Do you know whether employees at
8  BIL received training on how to use this policy?
9    A    **I don't have that information.**
10    Q    Do you know whether new employees
11 when they joined the bank were made aware of this
12 policy?
13    A    **I know that employees within BIL**
14 **have to follow several trainings in relation to**
15 **different topics. I don't have the information, but**
16 **it seems logical to me that persons treating -- or**
17 **relationship managers treating with clients and**
18 **handling these kinds of documents in relation to**
19 **archiving, are being trained or at least have to**
20 **familiarize themselves with these policies.**
21    Q    You don't know for sure one way or
22 the other?
23    A    **Correct.**
24    Q    Is there somebody that you could
25 talk to within BIL who would know that?

170

1    A    **Yes. The owner of the policy.**
2    Q    Who was the owner of this policy
3  we have been discussing in Exhibits 10 and 11.
4    A    **Gilles Wagener, a person we**
5  **referred to earlier.**
6    Q    You did speak with Mr. Wagener in
7  preparation for the deposition today, correct?
8    A    **That is correct. Yes.**
9    Q    Did BIL maintain any records or
10 logs identifying when documents, either electronic
11 or hard copy covered by this policy, were destroyed
12 by the bank?
13    A    **I don't have that information.**
14    Q    Have you ever seen such a log or
15 record?
16    A    **No.**
17    Q    I want to talk a little bit about
18 the e-mail system at BIL. Is that something you are
19 familiar with based on your preparation for today's
20 deposition?
21    MR. BUTLER: Let me just object. It is
22 not -- the general topic of the e-mail system at BIL
23 is not one of the topics. We didn't make him,
24 Mr. Dewitte, the master of all details. But he uses
25 the system himself and can probably answer some of

171

1  your questions. With that objection, you can
2  answer.
3    A    **I can only rephrase what**
4  **Mr. Butler just told you, I can share my personal**
5  **experience in relation to use of e-mails.**
6  BY MR. FLUGMAN:
7    Q    I will try to be more specific
8  with my question. I am referring to the use of
9  e-mails as it relates to topic 5, which relates to
10 document retention, preservation and destruction
11 and/or deletion policies in the normal course of
12 business. My questions about e-mail are intended to
13 be relative to that topic.
14    I think you testified earlier today that
15 you had seen these topics and you are prepared to
16 testify about them, correct?
17    A    **Yes.**
18    Q    I am focusing on the 2000 to 2008
19 time frame. Actually, I will extend it to 2010 to
20 be comprehensive.
21    MR. BUTLER: Only a ten-year time period?
22
23 BY MR. FLUGMAN:
24    Q    Only. Were there any size
25 limitations on individual employees' e-mail accounts

172

1  at BIL during that time frame?
2    MR. BUTLER: Objection to form. That is
3  not a policy as such. But if you know the answer,
4  you can respond. This witness is not prepared to
5  testify about all the details of how the e-mail
6  system worked more than ten years ago. If he knows
7  the answer, he can respond.
8    A    **Could you repeat the question,**
9  **please?**
10 BY MR. FLUGMAN:
11    Q    Do you know whether there was any
12 limitation on the size of an e-mail account for an
13 employee at the bank?
14    A    **If my memory is correct, at a**
15 **certain point of time, yes. Because that was the**
16 **reason why we have been asked -- and I'm just**
17 **talking my personal experience. We have been asked**
18 **to archive with one specific period in time as much**
19 **e-mails as possible in order to be obliged to double**
20 **the increase of the inbox at each time.**
21    Q    Do you recall when that was?
22    A    **It was probably the time period**
23 **you are referring to.**
24    Q    So as Mr. Butler pointed out, it's
25 a relatively large time period. Do you have a more

December 14, 2022

173

1  specific recollection of when that request was made?
2      A      I am sorry, I don't have a more
3  specific recollection in time. It is already more
4  than ten years ago.
5      Q      Do you think it was when you were
6  in your current position as head of wealth
7  management legal?
8      A      I prefer not guessing, so I prefer
9  saying that I don't have the information.
10     Q      But you think it was more than ten
11 years ago?
12     A      Yes.
13     Q      Could individual employees at BIL
14 delete e-mails if they chose to?
15     A      Yes.
16     Q      If an individual employee at BIL
17 chose to delete an e-mail from his or her user
18 account, was there a back-up copy or redundant copy
19 saved somewhere on BIL's servers?
20     A      I don't have any direct
21 confirmation for that. I can only make a deduction
22 with the information that Kyndryl has provided to us
23 a couple of weeks ago, but that would be a
24 deduction.
25     Q      So you don't know one way or the

174

1  other?
2      A      Well, Kyndryl confirmed to us that
3  no -- in relation to the active mailboxes, no
4  back-up or archives are possible. But that would be
5  just assumptions. I prefer that is not being taken
6  into account as an answer.
7      Q      Are you aware of any mass purges
8  of e-mails --
9      A      Sorry, what?
10     Q      A large scale deletion of e-mails
11 from individual users' accounts at the bank?
12     A      To the best of my knowledge, no.
13     Q      If a user did not choose to delete
14 an e-mail him or herself, was there any automatic
15 deletion of e-mails for an individual account?
16     A      Besides what Kyndryl has informed
17 us, I don't have any other information available.
18     Q      You don't know of any policy of
19 automatic deletion of e-mails, correct?
20     A      That is correct.
21     Q      For that relevant time period,
22 2000 to 2010, correct?
23     A      Yes, correct.
24     Q      So, just to be clear, the only way
25 that an e-mail would not have remained in an

175

1  employee's e-mail account would be if that
2  individual e-mail (sic) chose to delete that e-mail
3  him or herself, correct?
4      MR. BUTLER: Objection to form. You can
5  answer. Also outside the scope. But you can
6  answer, if you know.
7  BY MR. FLUGMAN:
8      Q      Let me rephrase the question, just
9  to be clear. The only way that an e-mail would not
10 remain in a BIL employee's e-mail account would be
11 if that individual employee chose to delete it, is
12 that your understanding?
13     A      Without being expert, that is my
14 understanding.
15     Q      Were there individuals within BIL
16 who had the ability to permanently delete electronic
17 information or electronically stored information
18 from the servers at BIL?
19     A      I'm sorry, could you repeat that?
20     Q      Sure. Were there individuals
21 within BIL who had access to the servers where
22 electronically stored information for employees at
23 the bank was stored?
24     A      People who had access to the
25 servers?

176

1      Q      Server. We talked this morning
2  about Kyndryl at some point hosting e-mail servers
3  for individual BIL employee. My question is, were
4  there people during this time period, 2000 to 2010,
5  within BIL who had access rights to the servers
6  where information was stored at a higher level than
7  individual e-mail accounts?
8      MR. BUTLER: Object as being outside the
9  scope. If you know, you can answer.
10     A      I don't have that information, but
11 I presume so.
12     May I ask if you could re-read not this
13 question, but the previous one asked in relation to
14 the deletion of e-mails? If my understanding was
15 correct that the only way that an e-mail of an
16 individual could be deleted -- or disappeared was by
17 deleting it, was that your question -- previous
18 question?
19 BY MR. FLUGMAN:
20     Q      Are you confused about the answer
21 you gave or --
22     A      No. The question as such. I'm
23 sorry for that.
24     Q      We can go back to that later. My
25 question --



**177**

1     MR. BUTLER: Just ask -- are you concerned
2 that your answer may not have been correct?
3     A    Yes.
4 BY MR. FLUGMAN:
5     Q    What is your concern? Why do you
6 think the answer you gave was incorrect?
7     **A    I am not sure that I well**
8 **understood the question.**
9     Q    So my question was, you testified
10 a couple questions ago that you are not aware of any
11 automatic deletion function at the bank for e-mails.
12    **A    Yes.**
13    Q    So, my question was, the way a
14 that -- sorry.
15    My question is, the only way that an
16 e-mail would be deleted from an individual user's
17 account would be if that user decided to delete the
18 e-mail, correct?
19    **A    Yes. Then I agree with your**
20 **reasoning. But I think that answer is not correct.**
21 **Because I don't know. If an automatic deletion at a**
22 **certain point of time has been involved, I don't**
23 **have that information. I cannot say with certainty**
24 **to what extent if an e-mail in an inbox of an**
25 **employee does not exist anymore, if that was through**

**178**

1 **its proper hands or by a third party.**
2     Q    Do you, sitting here today, have
3 knowledge of any policy at BIL that provides for
4 automatic deletion of e-mails?
5     **A    No.**
6     Q    Are you aware in your personal
7 experience at the bank of any of your e-mails being
8 automatically deleted?
9     **A    No. But I have a quite organized**
10 **archiving of my proper e-mails.**
11    Q    Are you aware of any time during
12 your tenure at the bank where e-mails were deleted
13 from your account without you deleting them?
14    **A    No. But I know that at a certain**
15 **point of time in the past, certain actions needed to**
16 **be performed by employees in order to be able to**
17 **have access to certain e-mails at a certain point of**
18 **time.**
19    Q    I appreciate it. That is not the
20 answer to my question. My question is, are you
21 aware of any instance in which e-mails were
22 automatically deleted from employees at BIL's e-mail
23 accounts?
24    **A    I don't have that information.**
25    Q    If counsel has represented to us

**179**

1 in the past, in connection with this case, that
2 there was no automatic deletion at BIL, would you
3 have any reason to doubt that representation sitting
4 here today?
5     **A    No.**
6     MR. BUTLER: I'll just object to that. I
7 think you are referring to my statement. I am not
8 sure I told you that. I am sure I don't know
9 whether there could have ever been an automatic
10 deletion of some kind at BIL, for the record.
11    MR. FLUGMAN: For the record, we do
12 understand that that was the representation you made
13 to us. But regardless, the witness' testimony --
14    MR. BUTLER: Maybe at some point you can
15 take my deposition on that point, but not today.
16    **A    We don't know. That's the bottom**
17 **line of the answer. We don't have the information.**
18 BY MR. FLUGMAN:
19    Q    You know of no policy at the bank
20 that provides for automatic deletion, correct?
21    **A    That is correct.**
22    Q    I would like to talk now about
23 electronic files other than e-mails at the bank.
24 So, by that I mean PDF files, Word files,
25 PowerPoints, things like that. Do you understand

**180**

1 what I am referring to generally?
2     **A    I understand, yes.**
3     Q    Were there any limitations during
4 the time period 2000 to 2010, on which individuals
5 at BIL could create electronic data -- documents?
6     **A    To the best of my knowledge, not.**
7     (Pause.)
8     THE VIDEOGRAPHER: We are going off the
9 record. The time is 3:19 p.m.
10    (Off the record.)
11    (Exhibit 12 marked for identification.)
12    THE VIDEOGRAPHER: We are back on the
13 record. The time is 3:33 p.m.
14 BY MR. FLUGMAN:
15    Q    Mr. Dewitte, the court reporter
16 has handed you a document that's been marked as
17 Exhibit 12. It is a document that was produced by
18 BIL in connection with this deposition. You will
19 see at the bottom it is stamped BIL 000530. It was
20 produced to us in English. It is entitled,
21 ███████████████████████████████████
22 ███████████████████████████████████
23 ███████████    Do you see that?
24    **A    Yes.**
25    Q    You will see that the policy

10-03635-jpm    Doc 1003-2    Filed 02/17/23    Entered 02/17/23 15:20:51    Exhibit B-
Deposition Transcript    with redactions relating only to documents and    Pg 48 of 130

Transcript of Herman Dewitte

December 14, 2022

46 (181 to 184)



181

1  appears to be dated ███████████ do you
2  agree?
3      A    I agree.
4      Q    Is this a document you are
5  familiar with?
6      A    Yes.
7      Q    Is it one that you viewed in
8  connection with preparation for today's deposition?
9      A    Yes.
10     Q    As an initial matter, would you
11  agree with me that the client of BIL that is
12  involved in the transactions at issue in this case
13  is a private banking client?
14     A    That is correct, yes.
15     Q    Would you agree with me, then,
16  tha ████████████████████████████
17  ████████████████████████████
18  █████████
19     A    That is correct.  Yes.
20     Q    Was there a written policy at BIL
21  regarding ███████████████████████
22  ███████████████████████
23  ███████████
24     A    Not that I am aware of.
25     Q    Are you aware of BIL ████████

182

1  ████████████ absent such a policy before
2  ████████████
3      A    I don't have any information on
4  that.
5      Q    You just don't know one way or
6  another?
7      A    No, I don't know.
8      Q    At least as of ████████████
9  however, BIL regularly ████████████
10 ████████████████████████ is
11  that correct?
12     A    That is correct, yes.
13     Q    If I could direct your attention
14  to paragraph 1, section 1, which is entitled,
15  ████████████████████████████
16  ████████████████████████████
17  ████████████████████████████
18  ████████████████████████████
19  ██  Do you see that?
20     A    I see that, yes.
21     Q    Is it your understanding that BIL
22  in fact ████████████████████████
23  ████████████████████████
24
25     A    That information is correct to the

183

1  extent that the appropriate device is being used,
2  yes.
3      Q    Can you explain what you mean by
4  that?
5      A    ████████████████████████████
6  ████████████████████████████
7  ████████████████████████████
8  ████████████████████████████
9  ████████████████████
10     Q    ████████
11  ████████████████████████████
12  ████████████████████████████
13  ████████████████████████████
14  ████████████████████████████
15     A    ████████████████████████████
16  ████████████████████████████
17  ████████████████████████████
18     Q    The previous sentence I read
19  states that ████████████████████████
20  ████████████████
21     A    That is what is mentioned, yes.
22     Q    Do you have any reason to doubt
23  that that is not the case?
24     A    No.  The reason why I am saying
25  that is that ████████████████████████

184

1  ████████████████████  Personally I have
2  never used it.  So, this is why I am making this
3  side comment.
4      Q    I understand.  You're not a --
5  correct me if I am wrong, but I believe your
6  testimony earlier was that you ████████████
7  ████████████████████████████
8  ████████ correct?
9      A    That is correct.  It happens on an
10  occasional basis, ████████████████████████
11  ████████████████████  and therefore we
12  are not equipped to do so.
13     Q    By contrast, a relationship
14  manager, like Mr. Baldinucci or -- is it Ms. Reyter?
15     A    Meyers.
16     Q    Ms. Meyers -- they would be
17  regularly communicating with customers of the bank,
18  correct?
19     A    Yes, correct.
20     Q    So, under this policy, ████████
21  ████████████████████████████
22  ████████████████████████████
23  ████████████████████████████
24  correct?
25     A    ████████████████████

December 14, 2022



185

3    Q    Do you have any reason to doubt
4  that Mr. Baldinucci
5
6    A    Well, all relationship managers,
16    Q    I understand that.  And I
17  recognize that people
18
19
20    A    I didn't check, but I think we can
21  reasonably assume that is the case, yes.
22    Q    And just to be clear, the purpose
23  of this policy which is stated in the introduction,

186

1                correct?
2    A    That is the intention, or the
3  policy is designed to protect the interest of the
4  bank, yes.
5    Q    That is the spirit of the policy,
6  would you agree?
7    A    Exactly, yes.
8    Q    It says that in order to
9  prevent -- I'm reading in the third sentence under
10  introduction,
11
12
13  Do you see that?
14    A    Yes.
15    Q    So you would agree with me that a
16
17
18
19
20    A

187

2    Q    Let's set that aside,
10  correct?
11    A    Correct.
12    Q    Who at BIL was in charge of
13  maintaining
14
15    A    Can you please define
16                                    From an IT
17  perspective?
18    Q    Let me ask it this way.
19
20
21
22
23
24    A    Okay.  I think that -- I don't
25  know who has the end responsibility of that.  But I

188

1  know that operational risk management within the
2  bank, there is a team dedicated to operational risk
3  management,
4
5    Q    Okay.  And what distinction are
6  you drawing between that person or persons and the
7  end responsibilities?
8    A
9
10
11
12
13
14
15
16    Q
17
18    A    I am not sure whether it is
19  mentioned in this policy,
20
21                is being mentioned.
22    Q    I think that was one of the
23  policies that was produced this morning to us.
24    A    That is possible.
25    Q    That is a document that you looked

Transcript of Herman Dewitte

December 14, 2022



189

1  at in connection with preparation for your testimony
2  today?
3      A      Exactly.
4      Q      Do you have any reason to believe
5  that the retention period under this policy,
6  Exhibit 12, was less than ten years?
7      A      No.
8      Q      Looking back on page 1 of the
9  policy again, sir, the sentence after the one I read
10 before
11
12
13     A      Yes.
14     Q      Is it true, reviewing that
15 paragraph and the one that follows it -- and if you
16 need a moment, please go ahead.  My question is, is
17 it true, based on your understanding of the policy
18
19
20     A      The way I read this sentence --
21 this paragraph,
22
23
24     Q      And -- sorry.
25     A

190

1
2
3
4
5      Q      In that instance, the BIL employee
6
7
8
9  correct?
10     A      That is my understanding of the
11 policy, yes, without having used personally the
12 device.
13     Q      That is what the policy says,
14 though?
15     A      Yes.
16     Q      You would agree with me,
17
18
19
20
21
22     A      Could you rephrase that, please,
23 or repeat the question?
24     Q      Sure.
25

191

1
2
3
4
5
6
7
8      A      Absolutely, because it is both in
9  the interest of the bank and of the relationship
10 manager, yes.
11     Q      On page 2 of the policy, if you
12 see under section 2, where it says,
13 do you see that, sire?
14     A      Yes.
15     Q      It says, and I'm quoting,
16
17
18
19
20              o you see that?
21     A      Yes.
22     Q      So, would this be the group within
23 BIL that was responsible for ensuring that the
24
25     A      I cannot confirm.  I don't have

192

1  any information on that specific topic.
2      Q      Who within the bank would?
3      A      I presume the team -- operational
4  risk management team who are
5
6      Q      Sorry if you answered this before.
7  Do you have any reason to believe that
8
9
10     A      I don't have that information.
11     Q      Okay.
12
13
14
15     A      To the extent that they are used
16 with the appropriate device.
17     Q      Yes. So
18
19
20              pursuant to this policy,
21 would you agree?
22     A      Yes.
23     Q      I believe you said earlier that
24 BIL was aware of the Madoff fraud the day after it
25 occurred in December of 2008, correct?

10-03635-jpm    Doc 1003-2    Filed 02/17/23    Entered 02/17/23 15:20:51    Exhibit B-
Deposition Transcript    with redactions relating only to documents and    Pg 51 of 130
Transcript of Herman Dewitte
49 (193 to 196)

December 14, 2022



**Page 193**

1  A  That is correct, December 12th,
2 yes.
3  Q  Are you aware of relationship
4 managers and other investment professionals at BIL
5 having conversations with customers after that
6 announcement was made about investments in Madoff
7 feeder funds such as at Fairfield?
8  MR. BUTLER: I'll just object. It is
9 outside of the scope. But you can answer, if you
10 know.
11  A
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 194**

1
2
3
4
5
6
7
8  Q
9
10  A
11
12
13
14
15
16
17
18  Q
19
20  A
21
22
23
24  Q
25  A

**Page 195**

1
2
3
4
5
6
7  Q  Sir, you realize that -- we talked
8 earlier, I think, that Blue Star was invested into
9 Fairfield, correct?
10  A  Blue Star was invested into
11 Fairfield?
12  Q  I think we talked about that
13 earlier today. Do you have knowledge of that?
14  A  No. The only knowledge I have was
15 that -- well, Blue Star was invested in Madoff
16 personally, but also in other funds completely not
17 related.
18  Q  Part of the diligence you are
19 talking about, at least with respect to Rafale and
20 Blue Star involved diligencing Madoff, is that
21 right?
22  A  I'm sorry?
23  Q  As part of the diligence you just
24 referenced with respect to Rafale and Blue Star,
25 that involved diligence on Madoff and BLMIS, is that

**Page 196**

1 right?
2  A  In relation to these feeder funds,
3 these two specific ones, yes.
4  Q  You knew, or BIL knew that moneys
5 placed with those feeder funds would eventually be
6 placed with Madoff, correct?
7  MR. BUTLER: Objection to form. Outside
8 the scope. You can answer if you know.
9  A  Yes.
10 BY MR. FLUGMAN:
11  Q  BIL also knew that investments in
12 Fairfield would eventually be placed with Madoff?
13  A  I don't have this information
14 because BIL was not actively involved in the
15 commercialization. BIL did not grant any loans to
16 Fairfield and did not actively commercialize these
17 funds. So there was no due diligence made of the
18 feeder funds of Fairfield.
19  Q  BIL did make investments in
20 Fairfield, though, on behalf of its underlying
21 customers, you would agree?
22  A  That is correct, yes.
23  Q  Those investments extend beyond
24 the ones at issue in this case, correct?
25  A  What do you mean these investments

December 14, 2022



197

1 extend beyond --
2    Q    There was more than the one
3 subscription and redemption that's at issue in this
4 case, BIL invested in Fairfield on behalf of other
5 customers besides the one that's at issue in this
6 case, correct?
7    A    That is correct.
8    Q    We looked at e-mails earlier where
9 individuals from BIL ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
10 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
11 ▮▮▮ orrect?
12    A    We saw one ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
13 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ yes.
14    Q    So the answer to my question is
15 yes?
16    A    Well, for me --
17 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
18 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
19 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
20 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
21 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
22 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
23    Q    Sir, I am not asking that
24 question.
25    A    Sorry.

198

1    Q    My question is, we saw ▮▮▮▮▮▮
2 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
3 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
4 correct?
5    A    That is correct, yes.
6    Q    I just want to clarify one point.
7 When you say commercialization, what do you mean by
8 that? I want to be precise to what you are
9 referring to.
10    A    That means it is in the short list
11 of the advisory teams within the bank.
12    Q    What does that mean?
13    A    It means that at the time -- we
14 are talking before MiFIDs, the financial investments
15 directive in Europe which was implemented after
16 basically the subprimes which came over to Europe.
17    What is important to know is that when a
18 specific fund or an asset has been short-listed by
19 the advisory teams, then the wealth management
20 relationship managers, they have commercial
21 objectives. The bank is not -- is supposed to make
22 money. So, the bank selects, makes a due diligence
23 on certain stock, listed or not, in which it thinks
24 it can have a good return, which also can make some
25 profit for the bank.

199

1    So, typically Rafale and Blue Star were
2 listed on that advisory -- on the list of stock of
3 that advisory team.
4    Q    Do you recall when Rafale and Blue
5 Star were added to that list at BIL?
6    A    For several years between 2000 --
7 I don't have exact dates, but it would be a range of
8 several years between 2004 or 2006, or 2003 and 2008
9 even, I mean, up to the discovery of the Madoff
10 fraud. Even if -- you might recall in 2008, the
11 liquidity was less and less and less, so less people
12 were investing, especially in hedge funds.
13    Q    Right. After 2008, did -- in your
14 knowledge, did BIL ever experience any major IT
15 system malfunctions?
16    A    Not -- to the best of my
17 knowledge, not, even if now the bank is changing our
18 core banking system, but no.
19    Q    You don't recall any instance
20 where a huge amount of data was lost by the bank,
21 you don't recall any instance where there was a
22 large loss of data?
23    A    No. Like all banks or like all
24 service providers, we have sometimes IT issues.
25    Q    But nothing -- no large scale loss

200

1 of information at the bank after 2008, in your
2 knowledge?
3    A    Not that I am aware of.
4    Q    Mr. Dewitte, we spoke a couple of
5 times of BIL's learning of Madoff's fraud in -- I
6 think you said December 12, 2008.
7    A    Yes.
8    Q    How did BIL learn of the fraud?
9 Was it from news reports, or how did BIL first learn
10 that Madoff had been arrested and that his whole
11 scheme had collapsed?
12    A    It was from news reports.
13    Q    I take it that the bank has access
14 to and uses major news outlets like Bloomberg and
15 Reuters and New York Times, Wall Street Journal?
16    A    Yes. I am not sure to what
17 extent. We have a subscription to Wall Street
18 Journal, for instance, but I know that we have
19 Bloomberg, we have CNN in our trading market,
20 because we have our own trading market. From the
21 moment that this news has been released, we were
22 aware of that.
23    Q    You would agree with me it was a
24 pretty big shock in the financial world when Madoff
25 was discovered?

December 14, 2022

---

**201**

1    A    **It was a huge shock, yes.**

2    Q    Catastrophic even?

3    A    **Exactly. The first numbers I have**

4 **in mind are 50 billion U.S. dollars, even really**

5 **before -- I mentioned before the second press**

6 **release of December 11 mentioned, if my memory is**

7 **correct, $17 billion of assets under management at**

8 **the beginning of 2008.**

9    Q    At the time that BIL learned of

10 the Madoff collapse, or shortly thereafter, did BIL

11 contemplate that the feeder funds we have been

12 talking about that invested into Madoff would also

13 collapse?

14    MR. BUTLER: Objection to form. I don't

15 think I can let that question go in that form. It

16 goes to the mental impressions of people in the

17 bank, and of course Mr. Dewitte as a lawyer. In

18 terms of what was contemplated by BIL in terms of

19 legal exposure, I think that gets into privileged

20 question. So I instruct the witness not to answer.

21    MR. FLUGMAN: First of all, I'm not yet

22 asking about the substance or about legal exposure.

23 I am just asking whether the witness contemplated

24 that the feeder funds would also collapse. I think

25 that goes directly to when the bank had potential

---

**202**

1 notice of the claims that are at issue here, and I

2 think that is squarely within bounds in terms of the

3 topics of the deposition and is not protected by

4 privilege.

5    MR. BUTLER: Whether the bank contemplated

6 the collapse of the feeder funds -- I am not sure I

7 remember your question clearly, but I think if it is

8 limited to whether the bank -- people within the

9 bank contemplated the collapse of Fairfield, I think

10 that would be okay. If you want to ask it that way.

11 BY MR. FLUGMAN:

12    Q    Let me ask the question again. In

13 or around December of 2008, after Madoff's fraud was

14 exposed, did BIL contemplate that the Madoff feeder

15 funds like Fairfield would also collapse?

16    MR. BUTLER: I just have a problem with

17 the question still. This is outside the scope of

18 the 30(b)(6). So I think you can only ask

19 Mr. Dewitte that question in his personal capacity.

20    Again, it is going into the mental

21 impressions of lawyers at that time. I don't think

22 he can answer that question without getting involved

23 in privilege and/or work product. So I instruct the

24 witness not to answer.

25    MR. FLUGMAN: For the record, I disagree

---

**203**

1 that it is not covered by the 30(b)(6) notice. I

2 think it is squarely covered by topic 2. Again, I

3 am asking for facts relative to when the bank was or

4 was not on notice of the claims in this case.

5    MR. BUTLER: That is it. You are asking

6 about the claims in this case by proxy. That goes

7 to whether the legal department anticipated the

8 claims in this case. And I think that is work

9 product, mental impressions of lawyers representing

10 banks concerning litigation, concerning this

11 specific litigation risk. If you limit it to --

12 that is my problem with the question.

13    MR. FLUGMAN: That is exactly the point of

14 the topic. The point of --

15    MR. BUTLER: The topic is -- which topic

16 are you talking --

17    MR. FLUGMAN: 2.

18    MR. BUTLER: Topic 2 is notice that BLMIS

19 has been placed into liquidation. He's answered

20 that question.

21    MR. FLUGMAN: And what actions if any you

22 took to preserve information regarding your or your

23 client's exposure --

24    MR. BUTLER: You haven't asked about what

25 steps -- well, he has testified about steps that

---

**204**

1 were taken to preserve information at that time.

2 You can ask him questions about that. But that is

3 different from asking what the bank, quote, end

4 quote, contemplated at that time. He has no way of

5 knowing what other people contemplated.

6    Anyway, the bank's contemplation is not

7 part of this. It is notice and steps to preserve.

8 He can testify in concrete terms about what steps

9 were taken to preserve documents at that time. I

10 think that is very different from what you are

11 asking now.

12    MR. FLUGMAN: Let's go off the record.

13    THE VIDEOGRAPHER: We are going off the

14 record. The time is 4:07 p.m.

15    (Off the record.)

16    THE VIDEOGRAPHER: We are back on the

17 record. The time is 4:20 p.m.

18 BY MR. FLUGMAN:

19    Q    Mr. Dewitte, I want to go back to

20 a question you had answered earlier today and just

21 make sure I understand it. I believe you testified

22 earlier that BIL learned about the Fairfield

23 litigation in August of 2010 when it received the

24 notice and summons, is that correct?

25    A    **That is correct, August 30th, yes.**

---

205

1    Q    And that BIL did not contemplate
2  litigation regarding Fairfield before then?
3    **A    That is correct, yes.**
4        MR. BUTLER: Let's just go slowly when we
5  are talking about BIL contemplated. He answered the
6  question. I have the same issue with these
7  contemplation questions. They necessarily implicate
8  the thoughts of the legal department of BIL.
9        In terms of notice, which comes from
10 outside, that is fair game; in terms of actions
11 taken by the bank, that is fair game. But I am
12 going to object to questions about contemplations of
13 lawyers within the bank.
14       (Exhibit 13 marked for identification.)
15 BY MR. FLUGMAN:
16   Q    Before we get to this, I just want
17 to clarify, that last question I asked that
18 Mr. Butler had objected to, you had answered yes,
19 correct that BIL hadn't contemplated litigation
20 before August of 2010?
21       MR. BUTLER: I'm not going to let you
22 answer the question again. The record will speak
23 for itself. If he didn't answer the question, I
24 object and instruct the witness not to answer. But
25 I think he did. I think you have your record.

206

1    **A    May I add something?**
2        MR. BUTLER: No. Just answer his
3  questions.
4  BY MR. FLUGMAN:
5    Q    Let's look at the exhibit in front
6  of you, sir. I will represent to you that this is a
7  news story from the Bloomberg news wire that we
8  pulled off recently from a publicly available
9  source. It is a document that -- a news article
10 that was published on December 15, 2008, entitled,
11 "Fairfield Sent Madoff $7.3 Billion as Funds Took
12 Fees." Do you see that, sir?
13   **A    Yes.**
14   Q    Looking at the opening -- the
15 second paragraph, where it says the 7.3 billion
16 dollar Fairfield Sentry funds -- do you see that?
17   **A    Yes.**
18   Q    -- states that it invested solely
19 with Madoff, taking a cut of one percent of assets
20 and 20 percent of gains, do you see that, sir?
21   **A    Yes, sir.**
22   Q    Later, in the next paragraph, at
23 the end of that paragraph is a quote from somebody
24 named Brad Alford at Alpha Capital Management in
25 Atlanta, and he's quoted as saying, "It is the job

207

1  of these funds of funds to be doing due diligence.
2  That is why they get paid." Do you see that?
3    **A    Yes, sir.**
4    Q    On the next page of the document,
5  page 2, do you see halfway down the page there's a
6  heading that says, "Due Diligence"?
7    **A    Yes, sir.**
8    Q    It says that -- the article says
9  that "They," referring to funds of funds, "are
10 supposed to conduct ongoing due diligence to avoid
11 frauds or other dangers such as managers straying
12 from their core investment strategy."
13       It goes on to say, "Fairfield Greenwich is
14 the biggest loser to emerge so far from the Madoff
15 scandal." And you will recall from earlier,
16 Fairfield Greenwich Group was the Fairfield funds
17 investment manager, do you remember that?
18       MR. BUTLER: You told him that.
19 BY MR. FLUGMAN:
20   Q    Yes. You agree with me that we
21 discussed that earlier?
22   **A    Yes.**
23   Q    Do you generally agree that it is
24 incumbent upon investment managers to diligence
25 potential investments?

208

1        MR. BUTLER: Objection. I'll instruct the
2  witness not to answer. You're asking for his
3  general agreement about things in a press release?
4        MR. FLUGMAN: What's the basis of your
5  instruction not to answer?
6        MR. BUTLER: He is a lawyer, so his ideas
7  about things relevant to this case are clearly
8  covered by work product. Things he knows are
9  generally informed by privileged communications.
10 You can't just ask him free-floating questions about
11 what he believes in this deposition. If it is tied
12 directly to a topic and he is prepared to testify as
13 a representative of the bank, that is a different
14 things. But this general question about what he
15 believes doesn't fall into that category.
16       MR. FLUGMAN: There is a distinction
17 between whether it relates to a topic and whether
18 it's privileged. Are you asserting that the
19 question I asked is calling for privileged
20 information?
21       MR. BUTLER: Let me hear the question
22 again. Yes, I was, but I could be wrong about that.
23 I've made mistakes before. So can I hear it again.
24       (Court reporter read back.)
25       MR. BUTLER: I stand by my instruction not

10-03635-jpm    Doc 1003-2    Filed 02/17/23    Entered 02/17/23 15:20:51    Exhibit B-
Deposition Transcript    with redactions relating only to documents and    Pg 55 of 130
Transcript of Herman Dewitte
December 14, 2022

53 (209 to 212)

209

1  to answer. You are really asking for Mr. Dewitte's
2  opinion as a lawyer for BIL on that topic. It is a
3  request for legal advice, not just a request about
4  legal advice. You're asking for his legal opinion,
5  and that is off limits.
6  BY MR. FLUGMAN:
7      Q      At the time of this article,
8  December 15, 2008, did BIL contemplate potentially
9  bringing claims against Fairfield Greenwich Group?
10      MR. BUTLER: Hold on. Don't answer that.
11  Let me hear it again, please.
12          (Court reporter read back.)
13      MR. BUTLER: I stand by my instruction not
14  to answer. The contemplation of future claims is
15  clearly within the work product protection and
16  Mr. Dewitte would only know about the contemplation
17  of future claims from his privileged discussions
18  within the bank.
19  BY MR. FLUGMAN:
20      Q      Next page of the article, under
21  the heading "Bank Fees." The final paragraph of
22  that section quotes a lawyer named Scott Berman at a
23  firm called Friedman Kaplan in New York, and reports
24  that Mr. Berman had gotten numerous calls from
25  investors who had money with feeder funds such as

210

1  Fairfield Greenwich and Treemont, and that he plans
2  to investigate whether these funds failed to do due
3  diligence or if they invested in ways that were
4  contrary to what they told investors. That is a
5  quote from the article.
6      At the time of this article did BIL
7  contact Mr. Berman regarding such potential claims.
8      MR. BUTLER: Object that that is outside
9  the scope of the topic. But if you know, you can
10  answer the question.
11      **A      So around December 15 did BIL**
12  **contact --**
13      Q      A lawyer named Scott Berman.
14      **A      Not that I am aware of, no.**
15      Q      In or around December 15, 2008,
16  did BIL contact any U.S. lawyer with respect to
17  Madoff exposure?
18      **A      Not directly, no.**
19      Q      Did BIL contact any U.S. lawyer
20  indirectly with respect to potential Madoff
21  exposure?
22      **A      BIL contacted Luxembourg counsel**
23  **after it discovered the Madoff fraud.**
24      Q      Do you understand that Luxembourg
25  counsel contacted U.S. counsel on behalf of BIL at

211

1  that time relating to Madoff exposure?
2      **A      Later on, yes.**
3      Q      When?
4      **A      It was afterwards. It was -- I**
5  **don't have the specific time frame in mind. It was**
6  **later on.**
7      Q      Was it in early 2009?
8      **A      It was even later on, it was in**
9  **September 2010 that we were in close contact.**
10      Q      Sorry, is your testimony that the
11  first time BIL contacted or somebody acting on
12  behalf of BIL contacted U.S. counsel was
13  September 2010?
14      **A      Yes.**
15      Q      With respect to -- to be clear, I
16  am not talking solely about this case, I'm talking
17  about BIL's potential exposure to Madoff generally.
18  Is it your testimony that the first time BIL or
19  somebody on BIL's behalf contacted U.S. counsel to
20  advise on the question of BIL's potential exposure
21  to Madoff was September 2010?
22      **A      In December 16th already BIL**
23  **contacted Clifford Chance Luxembourg. It is only**
24  **afterwards that it was because of Clifford Chance**
25  **Luxembourg that Clifford Chance U.S. was contacted.**

212

1  **But it was not straight afterwards. It was a while**
2  **afterwards.**
3      Q      So I understand, your testimony is
4  that you are not aware of Clifford Chance United
5  States being consulted by BIL before September of
6  2010 in connection with Madoff generally?
7      **A      According to my review, it was --**
8  **which is written on my notes here, September 2010,**
9  **yes.**
10      Q      What -- whom did you consult in
11  order to learn that fact for today's deposition?
12      **A      I reviewed internal files of the**
13  **legal department.**
14      Q      Do you know whether Clifford
15  Chance Luxembourg reached out to Clifford Chance in
16  the United States with respect to potential exposure
17  by BIL to the Madoff scandal one way or the other?
18      **A      Yes, there has been some**
19  **communication on that, yes.**
20      Q      When was the first communication?
21      **A      I don't have the exact date in**
22  **mind.**
23      Q      Was it in December of 2008?
24      **A      It was later on.**
25      Q      Was it in the first half of 2009?

10-03635-jpm    Doc 1003-2    Filed 02/17/23    Entered 02/17/23 15:20:51    Exhibit B-
Deposition Transcript    with redactions relating only to documents and    Pg 56 of 130

Transcript of Herman Dewitte

December 14, 2022

54 (213 to 216)

213

1   A   It was a couple of months later.
2   Q   Couple months later than what?
3   A   Than December 2008.
4   Q   Sometime in the first quarter of
5   2009?
6   A   That is possible, yes.
7       MR. BUTLER: Can we take a break? I need
8   to check the information. I want to make sure the
9   correct information is conveyed. This is one of the
10  topics on the 30(b)(6) notice. I want to make sure
11  the witness has the information correct.
12      THE VIDEOGRAPHER: We are going off the
13  record. The time is 4:33 p.m.
14      (Off the record.)
15      THE VIDEOGRAPHER: We are back on the
16  record. Time is 4:38 p.m.
17      MR. BUTLER: Because this is a 30(b)(6)
18  witness and this is testimony on behalf of the bank,
19  I have some obligation to make sure the information
20  provided is correct, particularly as it relates to
21  my law firm and my involvement in the case. So
22  Mr. Dewitte would like to clarify a point from the
23  previous question.
24  A   So, the bank had direct
25  communication with Clifford Chance Luxembourg from

214

1   December 16th onwards. BIL had direct communication
2   with Clifford Chance Newark, and Jeff Butler in
3   particular, from October 2010 onwards.
4       It could be that in the meantime in 2009
5   there had been communication between Clifford Chance
6   Luxembourg and Clifford Chance New York.
7   Q   When you said December 16th
8   onwards, you meant December 16, 2008?
9   A   Yes.
10  Q   Just for clarification.
11      Sitting here today, your understanding of
12  the first time that BIL communicated with Clifford
13  Chance U.S. was October of 2010?
14  A   That is correct, yes.
15      (Exhibit 14 marked for identification.)
16  BY MR. FLUGMAN:
17  Q   Mr. Dewitte, the court reporter
18  has handed you Exhibit 14, which is a Bloomberg
19  article that we printed from the internet a couple
20  of weeks ago, dated December 31st, 2008. And you
21  testified earlier I think that the bank has access
22  to Bloomberg, correct?
23  A   Correct.
24  Q   The title of this article, which
25  again, was published at the end of 2008, is, quote,

215

1   "The Madoff case could reel in former investors,"
2   closed quote.
3       In paragraph 2, the second sentence reads,
4   quote, "Under federal law, the trustee in the case,"
5   which is relating to a different bankruptcy
6   hearing -- a bankruptcy case, rather, "can sue
7   former investors to force them to return their
8   profits in principal, a process known as a
9   clawback."
10      The article goes on to compare that to the
11  Madoff case and discusses how the trustee in the
12  Madoff case might similarly assert clawbacks against
13  former investors. You can review the article, I can
14  represent to you that is what it says.
15      My question is simple, on or about the
16  date of this article, which was December 31st, 2008,
17  did BIL have concerns that BLMIS would sue BIL in a
18  clawback action for return of redemptions made from
19  BLMIS?
20      MR. BUTLER: My objection is simple as
21  well. I instruct the witness not to answer.
22      (Exhibit 15 marked for identification.)
23  BY MR. FLUGMAN:
24  Q   This is an e-mail I am showing you
25  marked as Exhibit 15. It was an e-mail obtained by

216



1   the liquidators from another source, the Bates
2   number at the bottom of the page confirms that.
3   This appears to be an e-mail between ▮▮▮▮▮▮▮▮▮
4   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
5
6   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
7
8   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
9
10
11
12  ▮▮▮▮▮▮▮▮▮▮▮
13
14  A   Yes.
15  Q   You will see that in the second
16  sentence of that opening paragraph on the bottom
17  e-mail, it says, quote ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
18  ▮▮▮▮  Do you see that?
19  A   Yes.
20  Q   Would you agree with me that at
21  least as of ▮▮▮▮ 2009, BIL was aware that
22  Fairfield Sentry had suspended its NAV?
23  A   Yes.
24  Q   Again, in ▮▮▮▮▮▮ 2009,
25  ▮▮▮▮▮▮▮ did BIL contemplate any

10-03635-jpm   Doc 1003-2   Filed 02/17/23   Entered 02/17/23 15:20:51   Exhibit B-
Deposition Transcript   with redactions relating only to documents and   Pg 57 of 130
Transcript of Herman Dewitte
December 14, 2022

55 (217 to 220)

217

1  litigation involving Fairfield Greenwich Group or
2  the Fairfield funds?
3        MR. BUTLER:  Objection.  I can make this
4  objection all day if I need to, but I instruct the
5  witness not to answer on contemplated specific
6  litigation exposure in this case.
7        (Exhibit 16 marked for identification.)
8  BY MR. FLUGMAN:
9        Q      This is Exhibit 16, an article
10 printed from the New York Times recently, but that
11 appeared in the New York Times on July 21st, 2009.
12 It is entitled -- the headline, "Judge Approves
13 Liquidation of Madoff Feeder Funds."  Do you see
14 that, sir?
15       A      Yes, sir.
16       Q      The opening line in the article
17 states, quote, "A judge in BVI has approved the
18 liquidation of the Fairfield Sentry funds which were
19 the largest conduits for cash flowing into the hands
20 of Bernard L. Madoff and his global Ponzi scheme."
21 Do you see that?
22       A      Yes, sir.
23       Q      Was BIL aware in July of 2009 that
24 Fairfield Sentry had been placed into liquidation?
25       MR. BUTLER:  Object to form.  Outside the

218

1  scope.  But you can answer if you know.
2        A      I don't have that information
3  available, if at that specific moment, July 2009,
4  BIL was aware about that fact.
5  BY MR. FLUGMAN:
6        Q      You will agree with me that fact
7  of the liquidation of Fairfield Sentry was publicly
8  reported at that time?
9        A      Yes.
10       Q      And that certainly BIL had access
11 to the New York Times?
12       A      Printed online, so, yes.
13       Q      I am aware that BIL issued a
14 litigation hold notice that we will talk about in a
15 moment in November of 2010.  I am focusing my
16 question on the period before that time.
17       So, in the period between when BIL learned
18 of the BLMIS collapse and the liquidation of
19 Fairfield, from that point in time up until the
20 issuance of the litigation hold in December of 2010,
21 did BIL take any steps to segregate or preserve
22 information related to its investments with BLMIS or
23 Fairfield?
24       A      Well, after review of internal
25 files of the legal department, discussions with

219

1  Jeff, and the interview we made with Michelle Albert
2  we referred to earlier today; and for your
3  information I was also earlier referring to a task
4  force that was set up.  One of the objectives of
5  that task force was that an inspection team was
6  mandated to collect physical documents and to store
7  them in a safe place, locked physically by the
8  inspection team.
9        Q      And I think you testified earlier
10 that no collection of documents relating to
11 Fairfield took place until August of 2010, is that
12 right?
13       A      That is correct.  If I can
14 continue, so the collection of documents we are
15 talking over here, so after the collapse of Madoff,
16 after December 2008, was in relation to the feeder
17 funds Rafale Partners, Inc. and Blue Star funds.
18       Q      I understand.  The four you
19 discussed earlier?
20       A      Exactly.  That was the attention
21 point of the bank, because we granted credit and
22 loans to these feeder funds and we had to handle a
23 lot of client complaints.
24       Q      I understand.
25       MR. BUTLER:  Just a second.  The witness

220

1  is answering your question.  Please don't interrupt
2  him.  You are asking him to retestify about things
3  he testified previously.  Now he is answering your
4  question.
5        MR. FLUGMAN:  My question was --
6        MR. BUTLER:  Hold on.  Let him finish his
7  answer.
8        MR. FLUGMAN:  My question was just to
9  confirm that no collection of documents related to
10 Fairfield took place until August of 2010.  That was
11 my question.  That is a yes-or-no question.
12       MR. BUTLER:  You should have clarified it
13 was a yes-or-no question when you asked it.  Why
14 don't you ask him a yes-or-no question.
15 BY MR. FLUGMAN:
16       Q      Sir, do I understand your
17 testimony correctly that no documents relating to
18 the Fairfield funds were collected at BIL before
19 August of 2010?
20       A      Can I say more than yes or no?
21       Q      Can you answer the question yes or
22 no first?
23       A      Well, no specific documents
24 were -- can you repeat the question, please.
25       Q      Sure.  I thought that this was

10-03635-jpm    Doc 1003-2    Filed 02/17/23    Entered 02/17/23 15:20:51    Exhibit B-
Deposition Transcript    with redactions relating only to documents and    Pg 58 of 130
Transcript of Herman Dewitte
December 14, 2022

56 (221 to 224)

221

1  clear before, perhaps it was not. I understood your
2  earlier testimony --
3      MR. BUTLER: We don't need any commentary.
4  BY MR. FLUGMAN:
5      Q    I understand from your earlier
6  testimony that the first time the bank collected
7  information relating to the Fairfield funds was
8  after the bank received the summons and notice in
9  August of 2010, is that correct?
10     A    Correct, we took copies of the
11 available information which was previously already
12 collected in the ordinary course of business. That
13 is what I also wanted to make.
14     Q    I understand. When BIL collected
15 the information relating to the four feeder funds
16 that BIL commercialized in early --
17     A    Two of them.
18     Q    Only two of them, Rafale and Blue
19 Star?
20     A    Exactly. We granted credits to
21 four, but only two of the four we commercialized.
22     Q    But did you collect documents in
23 early 2009 with respect to all four or just the two
24 that BIL commercialized?
25     A    They were the four main -- the

222

1  four feeder funds.
2      Q    Did the collection of documents
3  with respect to those four feeder funds in early
4  2009 include the collection of any electronic
5  documents?
6      A    No.
7      Q    Does that include e-mails as well,
8  BIL did not collect any e-mails from relevant
9  custodians related to those four feeder funds at
10 that time?
11     A    That is correct. It was not in
12 the scope of -- no. Sorry.
13     Q    After BIL learned about the BLMIS
14 collapse, did BIL assign any employees the task of
15 monitoring news about the Madoff investigation and
16 prosecution?
17     MR. BUTLER: Objection. Outside the
18 scope. But he can answer.
19     A    BIL and Dexia at the time had its
20 own press department, can you say that? It is a
21 communication department. They were following up
22 closely about the Madoff case in general or other
23 information, yes.
24 BY MR. FLUGMAN:
25     Q    As part of that attention, did

223

1  anybody, either in that department or elsewhere in
2  BIL, monitor litigation that the Madoff trustee was
3  filing in New York?
4      A    Not that I am aware of, no.
5      Q    After the BLMIS collapse in
6  December of 2008, did BIL consider suspending or
7  changing any of its document retention policies?
8      MR. BUTLER: Hold on a second. Let me
9  think about that one. I think it is okay. Let me
10 hear the question again.
11     (Court reporter read back.)
12     A    Not that I am aware of, no.
13 BY MR. FLUGMAN:
14     Q    This is again a yes or no, I'm not
15 asking for the substance of any conversations. Did
16 any attorney advise BIL on document collection or
17 preservation in or around December 2008 after the
18 Madoff collapse became public?
19     MR. BUTLER: I don't think I can allow
20 that. It is going into substance of requests
21 specifically of advice. Asking when law firms were
22 retained is not privileged and fairly within the
23 scope. But asking about when particular advice may
24 have been given I think goes a step too far. I
25 instruct the witness with not to answer as phrased.

224

1      MR. FLUGMAN: For the record I disagree.
2  I think that information is the kind of information
3  that would be routinely included in a privilege log
4  at that level of generality.
5      MR. BUTLER: I hear you, it is pretty
6  general. I think it is pretty close. I think it is
7  close but I think it is over the line. I think I
8  will allow a question about did -- when the bank
9  might have consulted lawyers on the general topic of
10 document preservation. Maybe I would allow it in
11 that form.
12 BY MR. FLUGMAN:
13     Q    Let's start there. Mr. Dewitte,
14 when did BIL first consult lawyers with respect to
15 document preservation and collection obligations as
16 it relates to Madoff and BLMIS?
17     MR. BUTLER: That's fine. You can answer
18 the question, if you know.
19     A    I don't have any specific memory
20 about this topic.
21 BY MR. FLUGMAN:
22     Q    Do you know if that occurred in
23 2008 after December 12th?
24     A    Well, after the Madoff collapse,
25 it was the intention or the purpose of the bank to

December 14, 2022

225

1 protect documents, regardless of any external advice
2 we received at the time.
3    Q    Perhaps let me ask it this way.
4 You testified that the bank collected certain
5 information with respect to the four feeder funds
6 sometime in early 2009, is that correct?
7    A    Yes.
8    Q    So prior to doing that document
9 collection, had BIL consulted with lawyers regarding
10 document preservation and collection obligations?
11    A    Not that I am aware of, no.
12    Q    Do you know whether BIL was
13 already -- let me rephrase.
14    Was BIL familiar with U.S. litigation
15 prior to December of 2008?
16    A    Not to the best of my knowledge,
17 no.
18    Q    Do you know whether BIL had been a
19 party to any U.S. litigation prior to December of
20 2008?
21    A    Again, to the best of my
22 knowledge, no.
23    Q    Was any electronically stored
24 information relating to BIL's Madoff exposure
25 collected at any point in 2009?

226

1    A    Sorry, could you repeat that
2 again.
3    Q    Sure. Was any electronically
4 stored information relating to BIL's Madoff exposure
5 collected at any point in 2009?
6    A    You are asking if any information
7 in relation to BLMIS has been stored in 2009?
8    Q    Let me ask it a different way.
9    A    Sorry for that.
10    Q    That's okay. In 2009, did BIL
11 collect any e-mails or other electronically stored
12 information from anyone in the bank relating to
13 Madoff, BLMIS or feeder funds that invested with
14 Madoff?
15    A    Well, electronic information or
16 information in general?
17    Q    I'm focused specifically on
18 electronic information, but broadly. So e-mails or
19 other forms of electronic information.
20    A    Well, electronic information --
21 personally I have stored electronic information
22 available -- I mean exchange of e-mails between
23 employees of the bank following the set-up of this
24 Madoff task force, yes.
25    Q    So my question, though, was, did

227

1 BIL actually collect any electronically stored
2 information, including e-mails from anyone at the
3 bank, as part of an effort to preserve documents
4 related to Madoff, BLMIS or feeder funds that
5 invested in Madoff?
6    A    Yes, there has been an effort to
7 collect information. For instance, the notice to
8 shareholders, which has been issued by the different
9 feeder funds, these have been collected.
10    Q    Were those collected in electronic
11 form in 2009?
12    A    Some of these are available in
13 electronic form, yes.
14    Q    Are you aware of any individuals
15 at BIL whose ESI, including e-mails, were available
16 for collection in 2009?
17    A    In 2009 we have asked different
18 people working on the Madoff file, in relation to
19 feeder funds I mentioned previously, to provide
20 information they had to the legal departments.
21    Q    Sorry, I don't mean to ask my
22 question again. I'm just not sure I got an answer
23 to the question. Are you aware of any ESI being
24 collected in 2009 from anyone as it relates to
25 Madoff, BLMIS or any feeder fund that invested in

228

1 Madoff?
2    A    Yes, there has been ESI collected.
3    Q    What ESI was collected?
4    A    For instance, the -- in 2009 the
5 perspective of the different feeder funds, or as I
6 told you before, the general information notices to
7 shareholders, so this kind of information that has
8 been collected.
9    Q    Am I correct in understanding that
10 that information relates to the four feeder funds we
11 have been discussing here today?
12    A    Yes.
13    Q    I am also correct in understanding
14 that there was no collection of ESI or
15 electronically stored information with respect to
16 Fairfield during 2009?
17    A    That is correct, yes.
18    Q    That is also true for 2010,
19 correct?
20    A    That is correct, yes.
21    Q    I would like to focus specifically
22 on Fairfield. When did BIL first become aware that
23 the Fairfield liquidators were filing lawsuits to
24 recover moneys that had been paid out to investors
25 in the Fairfield funds?

Transcript of Herman Dewitte

December 14, 2022



229

1    A    So you are referring to the first
2  topic of this examination?
3    Q    Well, a little bit broader than
4  that. It relates to 1 and 3, I believe. What I am
5  asking is, I think you testified that you first
6  received this of this litigation in August of 2010
7  when you received the summons and complaint, do I
8  understand that correctly?
9    A    That is correct, yes.
10    MR. BUTLER: Just to clarify, summons with
11  notice, as you know is quite a different thing from
12  a complaint.
13    MR. FLUGMAN: I think I was clear in my
14  question.
15    MR. BUTLER: You said summons and
16  complaint. The complaint wasn't received until much
17  later.
18  BY MR. FLUGMAN:
19    Q    I apologize.
20    My question now is, before that time, did
21  BIL know that the Fairfield liquidators were
22  initiating lawsuits in the United States against
23  shareholders in those funds?
24    MR. BUTLER: Object. It is outside the
25  scope. But you can answer the question.

230

1    A    No. It was not on the radar of
2  BIL at the time.
3  BY MR. FLUGMAN:
4    Q    Sir, I would like to focus now on
5  the hold notice that was sent out on November 25th,
6  2010.
7    One question before we get there with
8  respect to the complaint in the action. When did
9  BIL first receive a copy of the complaint in this
10  action?
11    MR. BUTLER: Objection. Outside the
12  scope. But you can answer, if you know.
13    A    So, the summons with notice, we
14  received electronical information on August 30th, we
15  received original one on September 22nd, if my
16  memory is correct, and then the official complaint
17  followed later. Yes.
18  BY MR. FLUGMAN:
19    Q    Okay. Going back to the
20  litigation hold notice. Sir, were you aware on or
21  about November 25, 2010 that this -- that a
22  litigation hold notice was sent out to employees at
23  BIL with respect to the Fairfield litigation?
24    A    I was aware of that, yes.
25    Q    Were you involved in the decision

231

1  making process as to the issuance of that litigation
2  hold notice?
3    A    Personally, I was not involved.
4    Q    Who at the bank was?
5    A    The former head of legal,
6  Jean-Marc van Oldeneel, and one of my former
7  colleagues working in my team, Fabrice Dispo[sic].
8    Q    Anyone else you can recall being
9  involved in the decision?
10    A    Bernard Mommens, the secretary
11  general and general counsel.
12    Q    Do you recall whether outside
13  counsel was involved in the decision to issue the
14  litigation hold notice?
15    A    Jeff Butler, our outside counsel,
16  was involved.
17    (Exhibit 17 and 18 marked for identification.)
18  BY MR. FLUGMAN:
19    Q    The court reporter is going to
20  hand you two exhibits, 17 and 18, again a French and
21  English version of a document that was produced by
22  BIL in the original French that we translated using
23  the same service, and a certificate of the accuracy
24  of the translation is appended to the end of the
25  English language version.

232

1    MR. BUTLER: Can you tell me which is
2  which. Exhibit 16 is English or French?
3    MR. FLUGMAN: Exhibit 17 is the French,
4  Exhibit 18 is the English.
5  BY MR. FLUGMAN:
6    Q    Like we did earlier, with respect
7  to the policy, please feel free to keep both copies
8  in front of you. Refer to whichever version you
9  like. I will work off the English version. If
10  there is any discrepancy in your mind in the
11  translation, please point that out to me. If you
12  don't, I will assume that the translation is
13  accurate.
14    A    Thank you.
15    Q    First, do you recognize this
16  document as an e-mail
17
18
19
20    A    Yes, sir.
21    Q
22
23
24
25

Transcript of Herman Dewitte

December 14, 2022



233

1    A
2
3    Q
4    A
5    Q      That makes sense.  It says that
6  the e-mail was sent from
7
8
9
10
11    A      That is my assumption.  Indeed
12  they were not copying the e-mail, so I have asked
13  the current assistant of Bernard Mommens to provide
14  me with the addresses of this e-mail.
15    Q      When did you ask for those
16  addresses to be provided to you?
17    A      Quite recently.
18
19    Q                     Did bank -- did the
20  bank have the original electronic version of this
21  e-mail with
22                     in its possession when you inquired
23  about the hold recently?
24    A      I have it in my records, yes.
25  Electronically available, yes.

234

1    Q      You said you had that in your own
2  personal e-mail records?
3    A      In the archiving system of our
4  legal team, yes.
5    Q      I am correct in understanding that
6  this original                     e-mail attached
7                     correct?
8    A      That is correct, yes.
9    Q      Was this e-mail the only e-mail
10  that sent out that                     to anyone
11  at BIL?
12    A      Yes, that is correct.
13    Q      Was there ever a subsequent
14
15
16    A      No.
17    Q      Was there ever,
18
19
20
21
22    A      To the best of my knowledge, no.
23    Q      Are you aware of
24
25

235

1    A      Let me rephrase that.  It is
2  possible that --
3    Q      Your last question?
4    A      What I just told you.
5    Q      Maybe I will ask the question
6  again.  My question was, was there
7
8
9
10
11    A      I am just thinking -- mainly not,
12  but I am thinking about not in relation to the
13  decision, but in relation to the production of
14  documents in June or in -- of this year when I was
15  reaching out to certain of -- to the bank, and I
16  referred to them.
17
18
19
20
21    Q      I understand.  I appreciate that.
22           Aside from that potential e-mail you may
23  have sent
24
25

236

1
2    A      Correct, yes.
3    Q      I want focus on the language in
4                     e-mail, if I could.  I'm reading at the
5  bottom of 535, where
6
7
8
9    A      This one?
10    Q      Yes.
11    A      You are referring to the English
12  version?
13    Q      I am.  You can feel free to look
14  at either.
15           MR. BUTLER:  The English version I have,
16  the Bates numbers don't correspond to the French
17  version that we produced, BIL 537.  You can't see
18  that.
19           MR. FLUGMAN:  I think you are right.
20           MR. BUTLER:  I just want to state for the
21  record there's some ambiguity between the French and
22  the translation in terms of Bates numbers.
23           MR. FLUGMAN:  To be clear, I think we're
24  all on the same page, but I am referring to
25

10-03635-jpm   Doc 1003-2   Filed 02/17/23   Entered 02/17/23 15:20:51   Exhibit B-
Deposition Transcript   with redactions relating only to documents and   Pg 62 of 130

60 (237 to 240)

Transcript of Herman Dewitte

December 14, 2022



237

1 [redacted]
2 BY MR. FLUGMAN:
3     Q [redacted]
4 [redacted]
5 [redacted]
6 [redacted]
7 [redacted]
8 [redacted]
9     A     Yes.
10     Q     So it is clear that this e-mail is
11 [redacted]
12     A     Yes.
13     Q     If we go to the next page, which
14 is the back of the blank page at the top,
15 [redacted]
16 [redacted]
17 [redacted]
18 [redacted]
19 [redacted]
20 [redacted]     Do you see that?
21     A     Yes.
22     Q     I should say for the record, this
23 case is one of the cases that was [redacted]
24 [redacted]
25     I'm focused on the next line, where [redacted]

238

1 [redacted]
2 [redacted]
3 [redacted]
4 [redacted]
5 [redacted]
6 [redacted]
7     MR. BUTLER:  Just objection to form.  You
8 seem to be asking specifically about U.S. attorney
9 advice.  I will instruct the witness not to answer.
10 We have been directed to produce this notice, but we
11 have not waived privilege with respect to anything
12 outside of this notice.
13     MR. FLUGMAN:  Disagree about that.  But
14 let me ask the question a different way.
15 BY MR. FLUGMAN:
16     Q     What internal measures at the bank
17 level did BIL take in November of 2010 in connection
18 with the litigation hold notice that was issued?
19     A     One of the steps was collecting of
20 the physical papers, the Fairfield redemptions and
21 subscriptions, taking copies of that.  There was a
22 lot of steps.
23     Q     Did that -- I thought your
24 testimony was that those documents had been
25 collected in August of 2010.  Were there additional

239

1 documents collected in November of 2010 relating to
2 Fairfield?
3     A     August would have been difficult
4 because we learned about that -- I mean, we served
5 the summons with notice on August 30th, so it was
6 later on.  I don't have the exact dates in place.
7     Q     So beyond collecting those
8 physical documents, what additional steps if any did
9 BIL take at the bank level to preserve and collect
10 documents?
11     MR. BUTLER:  Can you clarify what topic we
12 are under now?  I don't think one of the topics was
13 all steps taken.  I think this witness is aware, so
14 I don't really have objection to the question.
15 Topic 3 is just about the notice of the holds
16 themselves and the contents, which you have.
17     MR. FLUGMAN:  It's clearly encompassed by
18 topic 7 and arguably also at topic 6.
19     MR. BUTLER:  No, not 7, that has to do
20 with the search for documents in response to your
21 document request, as I interpret it, specifically
22 your May 31, 2022 request, not to events in 2010.
23 Anyway, I will let the witness answer the
24 question.  I am not sure the witness has been
25 prepared to talk about everything that was done to

240

1 preserve documents in November of 2010.  I think he
2 is probably as prepared as anyone to talk about
3 that.
4     MR. FLUGMAN:  For the record, I think
5 these questions are absolutely covered by topic 7.
6 The collection of e-mails in response to our
7 document request is illustrative as including but
8 not limited to, and the efforts that the bank took
9 in connection with placing its litigation hold and
10 implementing it I think is at the very core of the
11 deposition today.
12 So I am glad that the witness is prepared
13 to testify about that.  Again, I put the question to
14 the witness.
15 BY MR. FLUGMAN:
16     Q     What steps were taken at the bank
17 level, beyond the collection of the physical
18 documents you mentioned a moment ago, to preserve
19 information that is -- was potentially relevant to
20 this case?
21     A     Well, no specific steps were taken
22 besides [redacted]
23 [redacted]
24 [redacted]
25 [redacted]

10-03635-jpm    Doc 1003-2    Filed 02/17/23    Entered 02/17/23 15:20:51    Exhibit B-
Deposition Transcript    with redactions relating only to documents and    Pg 63 of 130

61 (241 to 244)

Transcript of Herman Dewitte

December 14, 2022



241

1 ███████████████████████
2 ████████
3 █████████████████████████████████
4 ██████████████████████████████
5 ███████████
6     Q     Okay. We will look at the actual
7 litigation hold notice in a moment.
8       Beyond sending out the litigation hold
9 notice and the collection of physical documents you
10 mentioned, did the bank take any other steps at the
11 bank level in order to preserve potentially relevant
12 information to this case?
13     A    **To the best of my knowledge, no.**
14     Q    Did the bank -- let me rephrase.
15       So as I understand your testimony, the
16 bank did not, for example, institute a preservation
17 of e-mails at the server level in November of 2010,
18 is that right?
19     A    **That is correct, yes.**
20     Q    And so that -- sorry.
21       The e-mail goes on to say ████
22 ████ do you see that in the middle of that
23 second paragraph on the page?
24     A    **Yes.**
25     Q    ██████████████████

242

1 ██████████████████████████
2 █████████████████████████████
3 ███████████████████
4 ████████████████████████████████
5     A    **Yes.**
6     Q    And he goes on saying that
7 counsel, I believe he is referring to ████████
8 ████████████████████████████
9 ████████████████████████████
10 ████████████████████████████
11 ████████████████████████████
12 ████████████ Do you see that?
13     A    **Yes, sir.**
14     Q    Is it fair to say that the
15 litigation hold notice was issued because it was
16 recommended by U.S. counsel to issue it?
17     A    **That is correct, yes.**
18     Q    Is this the only litigation hold
19 notice that had -- let me ask it a different way.
20       Had BIL ever issued a litigation hold
21 notice like the one attached to this e-mail before
22 this one?
23     MR. BUTLER: Object to form. Are you
24 talking about for this case or for other cases?
25     MR. FLUGMAN: In any circumstance.

243

1     MR. BUTLER: Then I object as outside the
2 scope. But you can answer, if you know.
3     A    **To the best of my knowledge, no,**
4 **but I am not in charge of the litigation department**
5 **of the bank, so I am not most appropriate person to**
6 **answer that question.**
7 **BY MR. FLUGMAN:**
8     Q    You are not aware of any --
9     A    **I am not.**
10     Q    -- such notice having been issued
11 in a different litigation?
12     A    **Yes.**
13     Q    And the e-mail ██████████████
14 ████████████████████████████████
15 █████████████████████████
16     A    **That is correct.**
17     Q    ████████████████████████
18 █████████████████████████████████
19     A    **That is my understanding, yes.**
20     Q    It is fair to say that at this
21 point in time, ████████ when this e-mail
22 was sent, BIL recognized that it was important to
23 preserve and collect both electronic and physical
24 documents, correct?
25     A    **Yes.**

244

1     Q    Let's take a look at the actual
2 litigation hold now.
3     (Exhibit 19 marked for identification.)
4 BY MR. FLUGMAN:
5     Q    Sir, the court reporter has handed
6 you Exhibit 19. Do you recognize this document as
7 the litigation hold that was appended to
8 ████████ e-mail we were just looking at?
9     A    **Yes, sir.**
10     Q    The hold appears to be ████
11 █████████████ Can you remind me who that
12 was at the time?
13     A    **His title is mentioned at the**
14 **bottom of the document, but I can repeat.** ███████
15 ██████████████████████████
16     Q    ██████████████████████
17 ████████████
18     A    **Yes. Exactly.**
19     Q    █████████████████████
20 ████████████
21     A    **At the time -- he didn't change**
22 **his position, so at the time he was -- and today**
23 **still i**█████████████████████
24 ████
25     Q    The purpose of this litigation



245

1  hold -- let me ask it this way.
2      Do you understand what the purpose of this
3  litigation hold was?
4      **A    I think so, yes.**
5      Q    Can you tell me what your
6  understanding is, please, sir?
7      **A    My understanding is that this memo**
8  **has several purposes; first of all, to make certain**
9  **employees, selected employees aware about important**
10 **information they should know about. So, the fact**
11 **that they have received important information, to**
12 **inform them, first of all, about the Fairfield**
13 **proceedings.**
14     **Secondly, also to inform**
15
16     **And thirdly, it is mentioned**
17
18
19     Q    Focusing on the first paragraph of
20 the litigation hold notice, reading from the second
21 sentence, it says on the fourth line
22             do you see that?
23     **A    Yes, sir.**
24     Q
25

246

1
2
3
4            do you see that?
5      **A    Yes, sir.**
6      Q    It goes on,
7
8
9          id I read that correctly?
10     **A    I think so. It is not my native**
11 **language.**
12     Q    Taking it in pieces,
13
14
15
16
17                        is that fair?
18     MR. BUTLER: I have a problem with that
19 one. This document says what it says. We can all
20 read it. You are asking now about the beliefs of
21 the bank as it relates to this particular litigation
22 after it was filed. I am going to instruct the
23 witness not to answer on that.
24     I am not going to let you go into -- you
25 can read what is on the document. But in terms of

247

1  other beliefs or understandings that the bank had
2  about pending -- this pending lawsuit, that is
3  clearly work product. Because it's Mr. Dewitte it
4  is protected by attorney/client privilege. That is
5  the basis of my instruction.
6  BY MR. FLUGMAN:
7      Q    We can move on.
8
9
10     **A    Yes.**
11     Q    If you look in the next paragraph,
12 paragraph refers to
13
14             you agree?
15     **A    Yes, I agree.**
16     Q    It also
17
18                        do you see that?
19     **A    Yes, sir.**
20     Q    So the notice is intended to
21                        you would
22
23 agree?
24     **A    I agree.**
25     Q    You would also agree, sir, that

248

1  the instruction in this paragraph is
2
3
4          greed?
5      **A    Yes, sir.**
6      Q    And then the
7
8
9
10 would you agree?
11     **A    Yes, sir.**
12     Q    So the litigation hold i
13
14                        is that
15
16 correct?
17     **A    Yes.**
18     Q    The e-mail -- sorry, the hold
19 notice goes on
20
21
22
23             do you see that?
24     **A    Yes, sir.**
25     Q    You would agree with me that

December 14, 2022



249

1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
2 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
3 ▮▮▮▮▮▮▮▮ right?
4       A       It is drafted so broadly. Yes.
5 That is the intention, yes.
6       Q       The final paragraph of the hold
7 notice states, I am quoting again, ▮▮▮▮▮
8 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
9 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
10 ▮▮▮▮▮▮▮▮▮▮▮
11 You see that sentence there?
12       A       Yes, sir.
13       Q       Did ▮▮▮▮▮▮▮▮▮▮▮▮
14 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
15 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
16 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
17 ▮▮▮▮▮▮▮▮▮▮▮
18       A       No, sir.
19       Q       I'm sorry, did you --
20       A       I said no, sir.
21       Q       Thank you.
22       A       ▮▮▮▮▮▮▮▮▮▮▮▮▮
23       Q       ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
24 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
25 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

250

1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
2 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
3       A       ▮▮▮▮
4 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
5       Q       Was that part of -- was that the
6 e-mail -- let me rephrase.
7       Was that the communications we talked
8 about a little while ago, the middle of 2022?
9       A       Yes.
10       Q       Was that for collection of
11 documents that are -- were potentially responsive to
12 the liquidator's document requests?
13       A       Yes.
14       Q       Just so I am clear, besides
15 that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
16 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
17 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
18 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
19 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
20       A       No.
21       Q       ▮▮▮▮▮▮▮▮▮▮▮
22 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
23 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
24 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
25 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

251

1       MR. BUTLER:  I need to hear that question
2 again, please.
3       (Court reporter read back.)
4       MR. BUTLER:  You can answer yes or no.
5       A       No.
6 BY MR. FLUGMAN:
7       Q       The hold notice at Exhibit 19 does
8 not ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ does it?
9       A       No, I don't think so.  I don't
10 think so, no.
11       Q       The hold notice at Exhibit 19
12 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
13 ▮▮▮▮▮▮▮▮▮▮▮ does it?
14       A       No.
15       Q       Did BIL train any of the
16 recipients of the litigation hold on how to comply?
17       A       I'm sorry, could you -- BIL
18 train --
19       Q       Let me ask the question again.
20 Did anybody at BIL train or assist the BIL employees
21 who had received this e-mail on how to comply with
22 ▮▮▮▮▮▮▮▮▮▮▮ contained in the notice?
23       A       Well, not specifically each one of
24 them, but several members -- several persons
25 mentioned as had received were member of the private

252

1 executive committee of the bank, either they had
2 senior positions with the bank.  So they were given
3 the importance of this topic also in 2000 -- at the
4 time.  They were aware about the importance of it.
5       I didn't check the specific points, but
6 each team has its team meetings and each department
7 has department meetings.  So, the meta file is being
8 discussed and reported to the management board on a
9 regular basis.  Once an important fact occurred,
10 discussed at that level, that information is always
11 downstreamed in the management meetings of the
12 underlying teams.
13       So all team members -- the team members
14 which are included in this e-mail have been informed
15 about the importance of it.
16       Q       So just to clarify that so I
17 understand your testimony, are you say saying that
18 after this litigation hold notice was sent out in
19 late November of 2010 that all of the recipients of
20 the notice were instructed as to the importance of
21 the notice in some meeting or other verbal format?
22       A       No.  What I was trying to say, I
23 apologize if I didn't express myself clearly enough,
24 is that important topics within the bank are being
25 discussed on the level of the management board.

10-03635-jpm    Doc 1003-2    Filed 02/17/23    Entered 02/17/23 15:20:51    Exhibit B-
Deposition Transcript    with redactions relating only to documents and    Pg 66 of 130

Transcript of Herman Dewitte

64 (253 to 256)

December 14, 2022



253

1    Each management board member or executive committee
2    member has its own business line and its own
3    management team; during which the topics of the
4    management board are being discussed.
5        This typically should have been an
6    important topic which should have been downstreamed
7    to the underlying teams. I didn't check to what
8    extent that effectively has been performed. But I
9    don't want to make the impression that this
10    information was just passed along like that without
11    any assistance to the other -- to the addressees.
12        Q    Sir, can I ask, sitting here
13    today, do you know that this topic was discussed in
14    any of the management meetings, downstream meetings
15    you just referenced in your answer?
16        A    It is information that I didn't
17    check, no.
18        Q    So the answer to my question is
19    no, correct?
20        A    Correct.
21        Q    Let's turn back to the e-mail that
22    attached the litigation hold notice. Before we get
23    to that point, the physical collection of documents
24    that you obtained from Benny Reiter that we talked
25    about earlier today --

254

1        A    Copies of these.
2        Q    Copies, right, of the documents
3    you got from Mr. Reiter, do I understand your
4    testimony correctly that that occurred sometime
5    after August 30th of 2010?
6        A    I didn't check the exact date.
7        Q    Do you think it was shortly after
8    then?
9        A    I didn't check the exact date.
10        Q    Do you know whether that
11    information was collected before this litigation
12    hold was sent?
13        A    Again, I didn't check the exact
14    date.
15        Q    Presumably Mr. Reiter would know
16    that, or could you ask Mr. Reiter that information?
17        A    Well, to be transparent, he is
18    retired for several years. So I talked to him about
19    the Madoff file and the Fairfield case in
20    particular, and he didn't have any memory at all
21    about what happened. This happened a long time ago.
22    Mr. Reiter retired also a long time ago. I have the
23    e-mail exchanges in my archives.
24        Q    Sorry. Which e-mail exchanges are
25    you referring to?

255

1        A    We exchanged e-mails with him in
2    relation to the documents, when there would be --
3    when we would be able to get them to get copies.
4        Q    So -- just is so I understand, you
5    think that there are e-mails that you have in your
6    possession -- not in the room, but in your files, of
7    exchanges with Mr. Reiter at the time you were
8    collecting these documents from him, is that
9    correct?
10        A    If my memory is correct, yes.
11        MR. FLUGMAN:  We'll make a request for
12    production of those documents.
13        MR. BUTLER:  Those are documents we
14    produced to you. What difference does it make when
15    they were collected precisely? But you can make the
16    request.
17        MR. FLUGMAN:  We can talk about it after
18    the deposition.
19    BY MR. FLUGMAN:
20        Q    Just so I understand the timeline
21    again, and I'm sorry if I am asking a question I
22    have asked, between November 25, 2010, when the
23    litigation hold notice went out, and middle of 2022,
24    when you testified that you had helped collect
25    documents related to the liquidator's document

256

1    requests, did BIL collect any documents relating to
2    the Fairfield funds from the recipients of the
3    litigation hold notice?
4        A    Some BIL employees replied to this
5    request.
6        Q    Did they reply by sending e-mails?
7        A    Yes, to this ████████████████
8        Q    Sorry. Were those e-mails -- were
9    they sending underlying e-mails relating to the
10    topic of the litigation hold notice, or were they
11    just communicating with the legal department by
12    e-mail about the litigation hold notice?
13        A    No. It was following up on this
14    document retention notice.
15        Q    Asking questions about the notice
16    or --
17        A    No. There was one employee, she
18    provided general information letter issued by the
19    Fairfield liquidator which was in her possession.
20    She told us, this might be of interest to you.
21        Q    And where is that letter stored
22    now?
23        A    It is stored in our -- well,
24    archiving server of our team.
25        Q    Do you remember which person that

December 14, 2022



**257**

1  was that sent that e-mail?
2  **A    Yes, it was -- it was Sandy**
3  **Goergen, on the same date of the -- that memo was**
4  **sent out.**
5  Q
6  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓  Is it fair to say that
7  in November of 2010 when she sent that e-mail ▓▓▓
8  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓  that
9  Ms. Goergen had electronically stored information
10  relating to the Fairfield funds?
11  **A    Yes.**
12  Q    Let's go back to the e-mail
13  itself. I am focused now on the first couple pages
14  of the e-mail. ▓▓▓▓▓▓▓▓▓▓▓
15  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
16  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
17  **A    Yes.**
18  Q    I haven't counted myself and I
19  won't ask you to do that, but the list of names ▓▓▓
20  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓  Is that an
21  accurate representation?
22  **A    It depends on the type, the size**
23  **of the letters you use.**
24  Q    In the version -- the printed
25  version in front of you, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

**258**

1  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓  am I
2  correct?
3  **A    Yes.**
4  Q ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
5  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
6  **A    Yes.**
7  Q    Who was responsible within BIL for
8  selecting the individuals who received the
9  litigation hold notice in November of 2010?
10  **A    That was done together between**
11  **certain people of the task force, the Madoff task**
12  **force, that certain persons, BIL employees have been**
13  **selected because either they had -- they were part**
14  **of the front office, direct contact with the**
15  **clients, either working in the back offices or**
16  **middle offices in the back.**
17  Q    And my next question may be
18  answered in whole or in part by the answer you just
19  gave, but can you describe the criteria that the
20  person or persons responsible for selecting the
21  recipients used when determining who in the bank
22  should get the notice and who should not?
23  **A    The criteria?**
24  MR. BUTLER: Hold on a second. The
25  witness went into that area, but it was not

**259**

1  responsive to your question. So I didn't get a
2  chance to object.
3  I don't think I am going to allow the
4  witness to testify about -- apart from the content
5  of who was sent, the thinking and the strategy that
6  went behind that. As it relates to this particular
7  litigation, I think it is work product and off
8  limits.
9  Very generally I am happy to have the
10  witness talk about who is included in this list, if
11  you want to ask the question that way, I think that
12  would be more appropriate. But if you are asking
13  about the mental impressions of the lawyer who
14  helped come up with this list, that is off limits.
15  So as phrased I will instruct the witness
16  not to answer.
17 BY MR. FLUGMAN:
18  Q    Let's try and separate that out,
19  then. What types of people within BIL were selected
20  to receive the litigation hold notice that was
21  attached to this e-mail in 2010?
22  **A    Okay. Front office, middle office**
23  **and back office people.**
24  Q    And as that relates to all of the
25  investments in the Fairfield funds that BIL handled?

**260**

1  **A    What do you mean by all of the**
2  **investments made by -- could you please clarify your**
3  **question, please?**
4  Q    There are lots of front office,
5  middle office and back office, I presume, at BIL.
6  What I am just trying to understand is all of the
7  people who received this litigation hold notice
8  received it because they potentially had information
9  relevant to the Fairfield funds, correct?
10  **A    Correct. Makes sense.**
11  Q    Did the task force or whomever was
12  responsible for selecting this group of people to
13  receive the litigation hold notice interview anyone
14  at BIL as part of their process of selecting these
15  individuals?
16  **A    I don't recall an interview at**
17  **that time with the employees in relation to this**
18  **selection process took place. However, at the time**
19  **what occurred was the identification of the clients**
20  **being invested in Fairfield.**
21  Q    And by that you mean which
22  customers of the bank had investments in Fairfield
23  through BIL?
24  **A    Exactly. So when you see into**
25  **which basic contract the client was invested, you**

Transcript of Herman Dewitte
December 14, 2022

66 (261 to 264)

261

1  can see who is the client advisor responsible for
2  that client.
3       So by means of that reasoning, you can
4  select the front office. For instance, you will see
5  that Gianni Baldinucci is mentioned in the scope of
6  these e-mails. On the other hand, the middle office
7  and the back office, it is much broader because you
8  cannot select a particular person that has been
9  involved yes or no.
10       This is the reason why I didn't go through
11  details with you with all these names, but you will
12  only find, to the best of my understanding, limited
13  number of names of front office people and a much
14  larger number of names of back office related
15  people.
16       Q    So, you mentioned Mr. Baldinucci,
17  whom we talked about earlier. Mr. Baldinucci did
18  receive the litigation hold in November of 2010,
19  correct?
20       A    ████████████████████████████
21  ███████████████████████████████████████████
22  █████████
23       Q    Do you have any reason to doubt
24  that Mr. Baldinucci received the litigation hold
25  notice?

262

1       A    I'm sorry?
2       Q    I said do you have any reason to
3  doubt that Mr. Baldinucci received the notice?
4       A    No. ████████████████
5       Q    Do you know whether Mr. Baldinucci
6  complied with the notice by identifying and setting
7  aside any files he had relating to the funds?
8       A    Well, one of the -- in relation to
9  point 7 of the list of topics of the examination,
10  one of the topics covered was that I asked existing
11  colleagues within that team to what extent any
12  information in relation to this particular client or
13  Fairfield in general was available, still available
14  within that team, either in physical form or
15  electronical form.
16       Q    I understand that, sir. My
17  question is just a little different. What I am
18  asking for is, do you know whether at the time
19  Mr. Baldinucci received the litigation hold notice
20  in November of 2010, whether he did in fact identify
21  and set aside hard copy and electronic documents
22  that he had relating to investments in the Fairfield
23  funds?
24       A    I don't know.
25       Q    Do you know whether Ms. Reyter

263

1  received the litigation hold?
2       A    I didn't go through all the names,
3  to be honest. I just --
4       Q    I think you will see, if you look
5  at the names on the litigation hold, and I'm happy
6  to provide you the opportunity to do so if you like,
7  that her name does not appear in this list. I think
8  you testified earlier that this was the only --
9  everyone who received the litigation hold in
10  November of 2010 would be listed on this list of
11  recipients, correct?
12       A    Correct, yes.
13       Q    And there was no subsequent e-mail
14  to additional people attaching the litigation hold?
15       A    No.
16       Q    Do you have an understanding as to
17  why Ms. Reyter did not receive the litigation hold?
18       A    Well, the selection process -- I
19  was not personally involved in that. I only
20  reviewed some e-mails in relation to that selection
21  process.
22       Q    So again my question, do you have
23  an understanding sitting here today as to why
24  Ms. May Reyter did not receive the litigation hold?
25       A    No.

264

1       Q    You will agree with me that
2  earlier today we saw several e-mails ██████████
3  ████████████████████████████████████████
4  ████████████████████████████████████████
5       ████████ orrect?
6       A    ████████████████████████████████
7  ██████████████████████████████████████████████
8  yes.
9       Q    ███████████████████████████████
10  █████████████
11       A    Correct. Yes.
12       Q    With respect to Mr. Reiter, he did
13  receive the litigation hold, is that right?
14       A    I didn't check that. I think so,
15  because his name was mentioned as Jeannot.
16       MR. FLUGMAN: Let's take a quick break now
17  and we will come back and wrap up.
18       MR. BUTLER: Okay. With that stipulation,
19  I agree.
20       THE VIDEOGRAPHER: We are going off the
21  record. Time is 5:57 p.m.
22       (Off the record.)
23       THE VIDEOGRAPHER: We are back on the
24  record. The time is 6:11 p.m.
25  BY MR. FLUGMAN:



Transcript of Herman Dewitte
December 14, 2022



265

1       Q       During the break, Mr. Dewitte, we
2  took a look at the list of recipients on the last
3  exhibit that we were referring to, the e-mail from
4  Mr. Mommens.  I thought just to be clear about the
5  people included in BIL's disclosures about which
6  custodians had relevant information, if I can
7  address your attention to -- on the first page, the
8  second line from the bottom on the left, ▮▮▮▮▮
9  ▮▮▮▮▮▮▮▮▮▮▮▮
10      A       Yes.
11      Q       Flipping the page, ▮▮▮▮▮▮▮▮▮
12  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
13      A       Yes, sir.
14      Q       ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
15  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
16  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
17  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
18      A       Yes, sir.
19      Q       Finally, on the third page of the
20  document, about halfway down that list of names,
21  ▮▮▮▮▮▮▮▮▮▮▮▮
22      A       Yes, sir.
23      Q       So you will agree with me that
24  each of Mr. Reiter, Ms. Totaro, Ms. Meyers and
25  Mr. Baldinucci received a copy of the litigation

266

1  hold notice that was attached to Mr. Mommens'
2  November 25, 2010 e-mail, correct?
3      A       I confirm.
4      Q       I think we already spoke about
5  Ms. Reyter not being on this list, and again, you
6  can take as much time as you like to look at it.
7      A       Ms. --
8      Q       Ms. Chantal Reyter.  The other
9  name that was disclosed to us as having relevant
10  information is Ms. Salentiny, and she does not
11  appear in this list of names in this exhibit,
12  meaning that she did not receive the litigation
13  hold, would you agree?
14      A       If she was not on the list, she
15  did not receive, correct.
16      Q       You will agree with me that like
17  Ms. Reyter, earlier in the deposition today we
18  reviewed e-mails ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
19  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
20  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ you will
21  agree?
22      A       That is correct.
23      Q       And so you will agree with me that
24  Ms. Salentiny, like Ms. Reyter, did at one point
25  have ▮▮▮▮▮▮ e-mails ▮▮▮▮▮▮▮▮▮▮▮

267

1  correct?
2      A       Yes.
3      Q       And to be clear, sitting here
4  today, BIL does not have any ESI including e-mails
5  from Ms. Salentiny or Ms. Reyter, correct?
6      A       Does not have any e-mails from --
7      Q       From Ms. Salentiny or Ms. Reyter's
8  e-mail accounts from the --
9      A       Pre- ---
10      Q       For the pre-2009 period?
11      A       Exactly, yes.
12      Q       And the same is true for
13  Mr. Baldinucci, Ms. Totaro, Mr. Reiter an
14  Ms. Meyers?
15      A       At relevant time period, yes.
16      MR. FLUGMAN:  That is all we have.
17      MR. BUTLER:  I have no questions myself.
18  We are finished.
19      MR. FLUGMAN:  Thank you very much for your
20  time.
21      THE VIDEOGRAPHER:  This concludes the
22  deposition.  We are going off the record.  The time
23  is 6:15 p.m.
24      (Exhibit 20 marked for identification.)
25      (Off the record.)

268

1       ACKNOWLEDGMENT OF DEPONENT
2
3
4       I, Herman Dewitte, do hereby
5  acknowledge that I have read and examined the
6  foregoing testimony, and the same is a true, correct
7  and complete transcription of the testimony given by
8  me and any corrections appear on the attached Errata
9  sheet signed by me.
10
11
12
13
14  _____    _____
15    (DATE)              (SIGNATURE)
16
17
18
19
20
21
22
23
24
25

Transcript of Herman Dewitte

December 14, 2022

269

1       CERTIFICATE OF COURT REPORTER
2       I, Christine Myerly, do hereby certify that
3   I took the stenotype notes of the foregoing
4   deposition and that the transcript thereof is a true
5   and accurate record transcribed to the best of my
6   skill and ability.
7       I further certify that I am neither
8   counsel for, related to, nor employed by any of
9   the parties to the action in which this deposition
10  was taken, and that I am not a relative or
11  employee of any attorney or counsel employed by
12  the parties hereto, nor financially or otherwise
13  interested in the outcome of the action.
14      Dated this 22nd day of December, 2022.
15
16
17
18
19
20
21
22
23
24  _____
25  Christine Myerly

Transcript of Herman Dewitte
December 14, 2022                                                    69



Transcript of Herman Dewitte
December 14, 2022                                                  70



Transcript of Herman Dewitte
December 14, 2022                                                        71



Transcript of Herman Dewitte
December 14, 2022                                                72



Transcript of Herman Dewitte
December 14, 2022                                                    73



Transcript of Herman Dewitte
December 14, 2022                                                                74



Transcript of Herman Dewitte
December 14, 2022                                                    75



Transcript of Herman Dewitte
December 14, 2022



Transcript of Herman Dewitte
December 14, 2022                                                    77



Transcript of Herman Dewitte
December 14, 2022                                                    78



10-03635-jpm    Doc 1003-2    Filed 02/17/23    Entered 02/17/23 15:20:51    Exhibit B-
Deposition Transcript    with redactions relating only to documents and    Pg 81 of 130

Transcript of Herman Dewitte
December 14, 2022                                                        79



Transcript of Herman Dewitte
December 14, 2022                                                            80



Transcript of Herman Dewitte
December 14, 2022                                        81



Transcript of Herman Dewitte
December 14, 2022                                                    82



Transcript of Herman Dewitte
December 14, 2022                                                    83



Transcript of Herman Dewitte
December 14, 2022                                                                84



Transcript of Herman Dewitte
December 14, 2022                                              85



Transcript of Herman Dewitte
December 14, 2022                                                86



Transcript of Herman Dewitte
December 14, 2022                                                         87



Transcript of Herman Dewitte
December 14, 2022                                                            88



Transcript of Herman Dewitte
December 14, 2022                                                                89



Transcript of Herman Dewitte
December 14, 2022                                                        90



10-03635-jpm    Doc 1003-2    Filed 02/17/23    Entered 02/17/23 15:20:51    Exhibit B-
Deposition Transcript    with redactions relating only to documents and    Pg 93 of 130

Transcript of Herman Dewitte
December 14, 2022                                                                    91



Transcript of Herman Dewitte
December 14, 2022                                                    92



Transcript of Herman Dewitte
December 14, 2022



Transcript of Herman Dewitte
December 14, 2022                                                                94



Transcript of Herman Dewitte
December 14, 2022                                          95



10-03635-jpm    Doc 1003-2    Filed 02/17/23    Entered 02/17/23 15:20:51    Exhibit B-
Deposition Transcript    with redactions relating only to documents and    Pg 98 of 130

Transcript of Herman Dewitte
December 14, 2022                                                        96



Transcript of Herman Dewitte
December 14, 2022                                              97



10-03635-jpm    Doc 1003-2    Filed 02/17/23    Entered 02/17/23 15:20:51    Exhibit B-
Deposition Transcript    with redactions relating only to documents and    Pg 100 of 130

Transcript of Herman Dewitte
December 14, 2022                                                                98



Transcript of Herman Dewitte
December 14, 2022                                                99



Transcript of Herman Dewitte
December 14, 2022



Transcript of Herman Dewitte
December 14, 2022                                                      101



Transcript of Herman Dewitte
December 14, 2022                                                    102



Transcript of Herman Dewitte
December 14, 2022



Transcript of Herman Dewitte
December 14, 2022                                        104



Transcript of Herman Dewitte
December 14, 2022                                                    105



Transcript of Herman Dewitte
December 14, 2022                                                    106



Transcript of Herman Dewitte
December 14, 2022                                    107



Transcript of Herman Dewitte
December 14, 2022                                                    108



Transcript of Herman Dewitte
December 14, 2022                                                                    109



Transcript of Herman Dewitte
December 14, 2022                                                    110



Transcript of Herman Dewitte
December 14, 2022                                                                111



Transcript of Herman Dewitte
December 14, 2022                                                                112



Transcript of Herman Dewitte
December 14, 2022                                                                113



Transcript of Herman Dewitte
December 14, 2022                                                    114



Transcript of Herman Dewitte
December 14, 2022                                                    115



10-03635-jpm    Doc 1003-2    Filed 02/17/23    Entered 02/17/23 15:20:51    Exhibit B-
Deposition Transcript    with redactions relating only to documents and    Pg 118 of 130

Transcript of Herman Dewitte
December 14, 2022                                                      116



Transcript of Herman Dewitte
December 14, 2022                                           117



Transcript of Herman Dewitte
December 14, 2022                                                    118



Transcript of Herman Dewitte
December 14, 2022                                                119



Transcript of Herman Dewitte
December 14, 2022

120



Transcript of Herman Dewitte
December 14, 2022                                                                121



Transcript of Herman Dewitte
December 14, 2022                                    122



Transcript of Herman Dewitte
December 14, 2022                                               123



Transcript of Herman Dewitte
December 14, 2022                                                                                    124



Transcript of Herman Dewitte
December 14, 2022



Transcript of Herman Dewitte
December 14, 2022                                                                    126



Transcript of Herman Dewitte
December 14, 2022                                                    127



Transcript of Herman Dewitte
December 14, 2022