1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 10-13164-cgm

4    - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    FAIRFIELD SENTRY LIMITED AND NOMURA INTERNATIONAL PLC,

8            Debtor.

9    - - - - - - - - - - - - - - - - - - - - - - - - - - x

10   Adv. Case No. 10-03626-cgm

11   - - - - - - - - - - - - - - - - - - - - - - - - - - x

12   FAIRFIELD SENTRY LIMITED (IN LIQUIDATION) et al.,

13                Plaintiffs,

14           v.

15   BGL BNP PARIBAS, S.A. et al.,

16                Defendants.

17   - - - - - - - - - - - - - - - - - - - - - - - - - - x

18   Adv. Case No. 10-03627-cgm

19   - - - - - - - - - - - - - - - - - - - - - - - - - - x

20   KRYS et al.,

21                Plaintiffs,

22           v.

23   BNP PARIBAS SECURITIES SERVICES LUXEMBOURG et al.,

24                Defendants.

25   - - - - - - - - - - - - - - - - - - - - - - - - - - x

1    Adv. Case No. 10-03635-cgm

2    - - - - - - - - - - - - - - - - - - - - - - - - - x

3    FAIRFIELD SENTRY LIMITED (IN LIQUIDATION) et al.,

4                   Plaintiffs,

5            v.

6    UNION BANCAIRE PRIVEE, UBP SA et al.,

7                   Defendants.

8    - - - - - - - - - - - - - - - - - - - - - - - - - x

9    Adv. Case No. 10-03636-cgm

10   - - - - - - - - - - - - - - - - - - - - - - - - - x

11   FAIRFIELD SENTRY LIMITED (IN LIQUIDATION) et al.,

12                   Plaintiffs,

13           v.

14   UNION BANCAIRE PRIVEE, UBP SA et al.,

15                   Defendants.

16   - - - - - - - - - - - - - - - - - - - - - - - - - x

17   Adv. Case No. 11-01579-cgm

18   - - - - - - - - - - - - - - - - - - - - - - - - - x

19   FAIRFIELD SENTRY LIMITED (IN LIQUIDATION) et al.,

20                   Plaintiffs,

21           v.

22   BNP PARIBAS SECURITIES NOMINEES LTD. et al.,

23                   Defendants.

24   - - - - - - - - - - - - - - - - - - - - - - - - - x

25



Page 3

1    Adv. Case No. 11-01617-cgm

2    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

3    FAIRFIELD SENTRY LIMITED (IN LIQUIDATION) et al.,

4                    Plaintiffs,

5            v.

6    FORTIS BANK SA/NV et al.,

7                    Defendants.

8    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

9

10                   United States Bankruptcy Court

11                   355 Main Street

12                   Poughkeepsie, NY 12601

13

14                   March 15, 2023

15                   2:00 PM

16

17

18

19

20

21   B E F O R E :

22   HON CECELIA G. MORRIS

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:   UNKNOWN

1    HEARING re 10-03626-cgm Doc# 163 Motion to File Under Seal

2    Motion for Sanctions and Certain Exhibits filed by

3    David Elsberg on behalf of Fairfield Sentry Limited (In

4    Liquidation), Fairfield Sigma Limited (In Liquidation),

5    Kenneth Krys, solely in his capacity as Foreign

6    Representative and Liquidator thereof, Greig Mitchell,

7    solely in his capacity as Foreign Representative and

8    Liquidator thereof.

9

10   HEARING re 10-03626-cgm Doc# 164 Joint Motion to File Under

11   Seal Brief in Opposition to Liquidators' Motion for

12   Sanctions and Certain Exhibits filed by Ari MacKinnon on

13   behalf of BGL BNP Paribas, S.A..

14

15   HEARING re 10-03626-cgm Doc# 165 Joint Motion to File Under

16   Seal Brief in Further Support of the Liquidators'

17   Motion for Sanctions (related document(s)163) filed by

18   Joshua S Margolin on behalf of Fairfield Sentry Limited (In

19   Liquidation), Fairfield Sigma Limited (In Liquidation),

20   Kenneth Krys, solely in his capacity as Foreign

21   Representative and Liquidator thereof, Greig Mitchell,

22   solely in his capacity as Foreign Representative and

23   Liquidator thereof.

24

25

Page 5

1    HEARING re 10-03627-cgm Doc# 243 Motion to File Under Seal

2    Motion for Sanctions and Certain Exhibits filed by Joshua S

3    Margolin on behalf of Fairfield Sentry Limited (In

4    Liquidation), Fairfield Sigma Limited (In Liquidation),

5    Kenneth Krys, solely in his capacity as Foreign

6    Representative and Liquidator thereof, Greig Mitchell,

7    solely in his capacity as Foreign Representative and

8    Liquidator thereof.

9

10   HEARING re 10-03627-cgm Doc# 244 Joint Motion to File Under

11   Seal Brief in Opposition to Liquidators' Motion for

12   Sanctions and Certain Exhibits filed by Ari MacKinnon on

13   behalf of BNP Paribas Securities Services Luxembourg.

14

15   HEARING re 10-03627-cgm Doc# 245 Joint Motion to File Under

16   Seal Brief in Further Support of the Liquidators'

17   Motion for Sanctions (related document(s)243) filed by

18   Joshua S Margolin on behalf of Fairfield Sentry Limited (In

19   Liquidation), Fairfield Sigma Limited (In Liquidation),

20   Kenneth Krys, solely in his capacity as Foreign

21   Representative and Liquidator thereof, Greig Mitchell,

22   solely in his capacity as Foreign Representative and

23   Liquidator thereof.

24

25

Page 6

1    HEARING re 10-03635-cgm Doc# 1001 Motion to File Under Seal

2    Motion for Sanctions (BNP SUISSE) and Certain Exhibits filed

3    by David Elsberg on behalf of Fairfield Sentry Limited ( In

4    Liquidation), Fairfield Sigma Limited (In Liquidation),

5    Kenneth Krys, solely in his capacity as Foreign

6    Representative and Liquidator thereof, Greig Mitchell,

7    solely in his capacity as Foreign Representative and

8    Liquidator thereof.

9

10   HEARING re 10-03635-cgm Doc# 987 Notice of Adjournment of

11   Hearing RE: Pre Trial Conference; hearing not held and

12   adjourned to 1/18/2023 at 10:00 AM at Videoconference

13   (ZoomGov) (CGM) .

14

15   HEARING re 10-03635-cgm Doc# 1006 Joint Motion to File Under

16   Seal Brief in Opposition to Liquidators' Motion for

17   Sanctions and Certain Exhibits filed by Ari MacKinnon on

18   behalf of BNP Paribas (Suisse) SA, BNP Paribas (Suisse) SA

19   Ex Fortis, BNP Paribas (Suisse) SA Private.

20

21   HEARING re 10-03635-cgm Doc# 1004 Memorandum of Law In

22   Opposition to Motion for Sanctions (related document(s)1000)

23   filed by Jeff E. Butler on behalf of Dexia Banque

24   International a Luxembourg.

25

Page 7

1    HEARING re 10-03635-cgm Doc# 1000 Motion to File Under Seal

2    Motion for Sanctions (BNP SUISSE) and Certain Exhibits filed

3    by David Elsberg on behalf of Fairfield Sentry Limited ( In

4    Liquidation), Fairfield Sigma Limited (In Liquidation),

5    Kenneth Krys, solely in his capacity as Foreign

6    Representative and Liquidator thereof, Greig Mitchell,

7    solely in his capacity as Foreign Representative and

8    Liquidator thereof.

9

10   HEARING re 10-03635-cgm Doc# 1008 Joint Motion to File Under

11   Seal Brief in Further Support of the Liquidators' Motion for

12   Sanctions (related document(s)1001) filed by Joshua S

13   Margolin on behalf of Fairfield Sentry Limited ( In

14   Liquidation), Fairfield Sigma Limited (In Liquidation),

15   Kenneth Krys, solely in his capacity as Foreign

16   Representative and Liquidator thereof, Greig Mitchell,

17   solely in his capacity as Foreign Representative and

18   Liquidator thereof.

19

20   HEARING re 10-03635-cgm Doc# 1007 Joint Motion to File Under

21   Seal Brief in Further Support of the Liquidators' Motion for

22   Sanctions (related document(s)1000) filed by David S.

23   Flugman on behalf of Fairfield Sentry Limited ( In

24   Liquidation), Fairfield Sigma Limited (In Liquidation),

25   Kenneth Krys, solely in his capacity as Foreign

Page 8

1    Representative and Liquidator thereof, Greig Mitchell,

2    solely in his capacity as Foreign Representative and

3    Liquidator thereof.

4

5    HEARING re 10-03636-cgm Doc# 1070 Notice of Adjournment of

6    Hearing RE: Pre Trial Conference; hearing not held and

7    adjourned to 1/18/2023 at 10:00 AM at Videoconference

8    (ZoomGov) (CGM) .

9

10   HEARING re 10-03636-cgm Doc# 1083 Motion to File Under Seal

11   Motion for Sanctions and Certain Exhibits filed by David

12   Elsberg on behalf of Fairfield Lambda Limited (In

13   Liquidation), Fairfield Sentry Limited (In Liquidation),

14   Fairfield Sigma Limited (In Liquidation), Greig Mitchell,

15   solely in his capacity as Foreign Representative and

16   Liquidator thereof, Kenneth Krys, solely in his capacity as

17   Foreign Representative and Liquidator thereof.

18

19   HEARING re 10-03636-cgm Doc# 1084 Motion to File Under Seal

20   Motion for Sanctions (BNP SUISSE) and Certain Exhibits filed

21   by David Elsberg on behalf of Fairfield Lambda Limited (In

22   Liquidation), Fairfield Sentry Limited (In Liquidation),

23   Fairfield Sigma Limited (In Liquidation), Greig Mitchell,

24   solely in his capacity as Foreign Representative and

25   Liquidator thereof, Kenneth Krys, solely in his capacity as

Page 9

1    Foreign Representative and Liquidator thereof.

2

3    HEARING re 10-03636-cgm Doc# 1093 Joint Motion to File Under

4    Seal Brief in Opposition to Liquidators' Motion for

5    Sanctions and Certain Exhibits filed by Ari MacKinnon on

6    behalf of BNP Paribas (Suisse) SA, BNP Paribas (Suisse) SA

7    Ex Fortis, BNP Paribas (Suisse) SA Private.

8

9    HEARING re 10-03636-cgm Doc# 1091 Memorandum of Law In

10   Opposition to Motion for Sanctions (related document(s)1083)

11   filed by Jeff E. Butler on behalf of Dexia Banque

12   International a Luxembourg.

13

14   HEARING re 10-03636-cgm Doc# 1094 Joint Motion to File Under

15   Seal Brief in Further Support of the Liquidators' Motion for

16   Sanctions (related document(s)1083) filed by David S.

17   Flugman on behalf of Fairfield Lambda Limited (In

18   Liquidation), Fairfield Sentry Limited (In Liquidation),

19   Fairfield Sigma Limited (In Liquidation), Greig Mitchell,

20   solely in his capacity as Foreign Representative and

21   Liquidator thereof, Kenneth Krys, solely in his capacity as

22   Foreign Representative and Liquidator thereof.

23

24

25

Page 10

1    HEARING re 10-03636-cgm Doc# 1095 Joint Motion to File Under

2    Seal Brief in Further Support of the Liquidators' Motion for

3    Sanctions (related document(s)1084) filed by Joshua S

4    Margolin on behalf of Fairfield Lambda Limited (In

5    Liquidation), Fairfield Sentry Limited (In Liquidation),

6    Fairfield Sigma Limited (In Liquidation), Greig Mitchell,

7    solely in his capacity as Foreign Representative and

8    Liquidator thereof, Kenneth Krys, solely in his capacity as

9    Foreign Representative and Liquidator thereof.

10

11   HEARING re 11-01579-cgm Doc# 154 Motion to File Under Seal

12   Motion for Sanctions and Certain Exhibits filed by David

13   Elsberg on behalf of Fairfield Sentry Limited (In

14   Liquidation), Fairfield Sigma Limited (In Liquidation),

15   Kenneth Krys, solely in his capacity as Foreign

16   Representative and Liquidator thereof, Greig Mitchell,

17   solely in his capacity as Foreign Representative and

18   Liquidator thereof.

19

20   HEARING re 11-01579-cgm Doc# 155 Joint Motion to File Under

21   Seal Brief in Opposition to Liquidators' Motion for

22   Sanctions and Certain Exhibits filed by Ari MacKinnon on

23   behalf of BNP Paribas Securities Nominees Ltd..

24

25

Page 11

1    HEARING re 11-01579-cgm Doc# 156 Joint Motion to File Under

2    Seal Brief in Further Support of the Liquidators' Motion for

3    Sanctions (related document(s)163) filed by Joshua S

4    Margolin on behalf of Fairfield Sentry Limited (In

5    Liquidation), Fairfield Sigma Limited (In Liquidation),

6    Kenneth Krys, solely in his capacity as Foreign

7    Representative and Liquidator thereof, Greig Mitchell,

8    solely in his capacity as Foreign Representative and

9    Liquidator thereof.

10

11   HEARING re 11-01617-cgm Doc# 150 Motion to File Under Seal

12   Motion for Sanctions and Certain Exhibits filed by

13   David Elsberg on behalf of Fairfield Sentry Limited (In

14   Liquidation), Kenneth Krys solely in his capacity as Foreign

15   Representative and Liquidator thereof, Greig Mitchell,

16   solely in his capacity as Foreign Representative and

17   Liquidator thereof.

18

19   HEARING re 11-01617-cgm Doc# 151 Joint Motion to File Under

20   Seal Brief in Opposition to Liquidators' Motion for

21   Sanctions and Certain Exhibits filed by Ari MacKinnon on

22   behalf of Fortis Bank SA/NV.

23

24

25

1   HEARING re 11-01617-cgm Doc# 152 Joint Motion to File Under

2   Seal Brief in Further Support of the Liquidators'

3   Motion for Sanctions (related document(s)150) filed by

4   Joshua S Margolin on behalf of Fairfield Sentry Limited (In

5   Liquidation), Kenneth Krys solely in his capacity as

6   Foreign Representative and Liquidator thereof, Greig

7   Mitchell, solely in his capacity as Foreign Representative

8   and Liquidator thereof.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

Page 13

1   A P P E A R A N C E S :

2

3   CIRILLO LAW OFFICE

4        Attorneys for National Bank of Kuwait

5        246 E 33rd Street, # 1

6        New York, NY 10016

7

8   BY:  RICHARD A. CIRILLO

9

10   FRIEDMAN KAPLAN SEILER ADELMAN LLP

11        Attorneys for Multi-Strategy Fund Limited

12        7 Times Square

13        New York, NY 10036

14

15   BY:  ROBERT J. LACK

16

17   CLEARY GOTTLIEB STEEN & HAMILTON LLP

18        Attorneys for HSBC & BNP Paribas

19        One Liberty Plaza

20        New York, NY 10006

21

22   BY:  DAVID SCHWARTZ

23        ARI MACKINNON

24

25

Page 14

```
 1    SELENDY GAY ELSBERG PLLC

 2         Attorneys for Fairfield and Fairfield Entities

 3         1290 Avenue of the Americas, 17th Floor

 4         New York, NY 10104

 5

 6    BY:  DAVID ELSBERG

 7         DAVID S. FLUGMAN

 8         YELENA KONANOVA

 9         VIVEK TATA

10

11    SHEARMAN STERLING LLP

12         Attorneys for BGL BNP Paribas, S.A.

13         599 Lexington Avenue

14         New York, NY 10022

15

16    BY:  RANDY LEWIS MARTIN

17

18    GILMARTIN, POSTER SHAFTO LLP

19         Attorneys for Private Space Ltd.

20         845 Third Avenue, 18th Floor

21         New York, NY 10022

22

23    BY:  MICHAEL C. LAMBERT

24

25
```

Page 15

1    CLIFFORD CHANCE US LLP

2         Attorneys for Banque Internationale a Luxembourg

3         31 West 52nd Street

4         New York, NY 10019

5

6    BY:  JEFF E. BUTLER

7

8    ALLEGAERT BERGER VOGEL LLP

9         Attorneys for Defendants

10        111 Broadway, 20th Floor

11        New York, NY 10006

12

13   BY:  JOHN S. CRAIG

14        BIANCA LIN

15        JOHN F. ZULACK

16        KATHERINE MUELLER

17        LAUREN J. PINCUS

18        DAVID A. SHAIMAN

19        CHARLES WELCOME

20

21   CHAFFETZ LINDSEY LLP

22        1700 Broadway

23        New York, NY 10019

24

25   BY:  ALEX WALSDORF

Page 16

1   SULLIVAN CROMWELL LLP

2        Attorneys for Bank J. Safra Sarasin AG

3        125 Broad Street

4        New York, NY 10004

5

6   BY:  ANDREW JOHN FINN

7        MARK MAKAR

8

9   WACHTELL, LIPTON, ROSEN KATZ

10       Attorneys for Banque Pictet Cie SA

11       51 West 52nd Street

12       New York, NY 10019

13

14  BY:  ANGELA K. HERRING

15       EMIL A. KLEINHAUS

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2              THE COURT:  Good morning.  I believe the -- what

3    we first have on the agenda are the Fairfield Sentry Limited

4    Adversary proceedings, and it's the Fairfield Sentry Limited

5    in the Chapter 15 case 10-13164, and then adversary

6    proceedings 10-03626, 10-03627, 10-03635, 10-03636, 11-

7    01579, 11-01617.  And please break them up in the way that

8    you need to break them up and let me know which you're

9    arguing.  State your name and affiliation.

10             MR. MARGOLIN:  Your Honor, this is Joshua Margolin

11   from Selendy Gay Elsberg on behalf of the Liquidators Ken

12   Krys and Greg Mitchell.

13             THE COURT:  We might want to start with the

14   spoilage ones first.

15             MR. MARGOLIN:  We agree, Your Honor.  We the

16   Defendants in the spoliation motions conferred before the

17   conference, and we agree that starting with those motions

18   makes the most sense.  And what we plan to do is start with

19   the BNP motions and proceed in a way that avoids redundancy

20   and repetition as much as possible.  And then once those

21   motions are complete, I will hand over to my partner David

22   Flugman, who will be handling the spoliation motion for

23   Banque Internationale A Luxembourg, which is 10-3635 and 10-

24   3636.

25             THE COURT:  Okay.  Very good.

1           MR. FLUGMAN:  And good morning, Your Honor. Just

2     for the record, David Flugman from Selendy Gay Elsberg also

3     for the Liquidators.

4           THE COURT:  You've got a major echo.  When you get

5     ready to argue, make sure you tell me which absolute case

6     we're dealing with at that moment so that we're not bouncing

7     around and I don't get lost.  Did one of them come off the

8     calendar?

9           MR. MARGOLIN:  I don't believe so, Your Honor.

10          THE COURT:  Okay.  Just curious.

11          MR. MARGOLIN:  Okay.  Well, once other counsel

12    make their introductions, we're happy to proceed with BNP.

13          THE COURT:  Are you testing it again?

14          MR. COOPER:  Your Honor, excuse me, this is Roger

15    Cooper.  I'm from Cleary Gottlieb on behalf of the

16    Defendants.  We're having a technical problem and --

17          THE COURT:  Sure.

18          MR. COOPER:  -- Mr. MacKinnon is going to argue.

19    The computer he's using lost the connection, so if we could

20    just have a minute before we start the argument to try to --

21          THE COURT:  I have my team.

22          MR. COOPER:  -- (indiscernible) the issue.

23          THE COURT:  And just so you know, I fought with

24    the printer all morning before you all got on.  I had a

25    printer that wouldn't print, so --

1              MR. COOPER:  Well, I hope you won.

2              THE COURT:  I had to call in help.

3              MR. COOPER:  There's no shame in getting

4      reinforcements.

5              THE COURT:  Thank you for that because I spent too

6      much time before I did call in help.  I got stubborn.  It's

7      like I can fix this, and no, no, I couldn't.  And it was

8      nothing.  Of course it was nothing, but --

9              MR. COOPER:  We won't tell anyone.  Don't worry.

10             MR. MACKINNON:  Hi, Your Honor.  This is Ari

11     MacKinnon from Cleary and Gottlieb.  I'm going to take my

12     partner's computer and use it because it seems to be working

13     just fine.  And I'm going to change the name.

14             THE COURT:  You're very, very clear to us.

15             MR. MACKINNON:  Okay.  Excellent.  Thank you very

16     much for your indulgence.  I'm going to change the name as

17     it appears because it's showing Jack Massey.  I'll change it

18     to Ari MacKinnon.

19             MR. BUTLER:  Your Honor, just to complete the

20     record, my name's Jeff Butler from Clifford Chance

21     representing Banque Internationale A Luxembourg when we get

22     to that portion of the program.

23             THE COURT:  Okay.  Right now we're on -- tell me

24     what adversary proceeding number we're dealing with right

25     now.

Page 20

1             MR. MARGOLIN:  So, Your Honor, we're going to

2     start with the five spoliation motions --

3             THE COURT:  Right.

4             MR. MARGOLIN:  -- against the BNP Defendants.  And

5     just so the record is clear --

6             THE COURT:  Yes.

7             MR. MARGOLIN:  -- the first is BNP Paribas Suisse,

8     which is 10-3635.  The second is BGL BNP Paribas, S.A.,

9     which is 10-3626.  The third is BNP Paribas Securities

10    Services Luxembourg, which we'll refer to as SSL, which is

11    10-3627.  The next is BNP Paribas Securities Nominees

12    Limited, which is 11-1579.  And the final BNP motion is BNP

13    Paribas Fortis, which 11-1617.

14            THE COURT:  Thank you.  I really want this record

15    clear on this for everyone's sake.  Okay.

16            MR. MARGOLIN:  Of course.  And Your Honor, our

17    intention is to address issues that are global and kind of

18    uniform across these Defendants together and of course call

19    out the specific details for each Defendant as we proceed to

20    the argument.  And so --

21            THE COURT:  Perfect.

22            MR. MARGOLIN:  -- with your permission, I'd like

23    to proceed.

24            THE COURT:  Very good.  Please go forward.  And

25    everyone, before you begin any talk, make sure you restate

1    your name for the record so that, again, we have a very

2    clear record.  Thank you.

3            MR. MARGOLIN:  Okay.  Well, just so the record is

4    clear, this is Joshua Margolin from Selendy Gay Elsberg on

5    behalf of the Liquidators Ken Krys and Greg Mitchell.  Your

6    Honor, we do not make these motions lightly.  They're the

7    result of months of effort to uncover what happened to PNB's

8    ESI.  The Liquidators here seek both a preclusion order and

9    an adverse inference because what we discovered, BNP's

10   spoliation, directly prejudices the Liquidators' ability to

11   respond to BNP's arguments that these cases should be

12   dismissed because BNP lacked jurisdictional contacts.

13           As you might recall from the fall, we wrote the

14   court with what appeared to be evidence of significant

15   spoliation.  First, across all five BNP entities that we're

16   moving on today, they have produced a total of seven emails.

17   And second, emails obtained from third parties demonstrate

18   that the BNP entities had lost correspondence reflecting

19   jurisdictional contacts, including emails with U.S.

20   entities, correspondence concerning diligence of the funds

21   and Madoff, and even emails reflecting a visit to New York

22   to meet with the Fairfield-Greenwich Group, the funds

23   investment manager.

24           So consistent with Your Honor's prior guidance, we

25   took 30(b)(6) depositions, and that discovery revealed why

1    this ESI was lost.  BNP's categorical disregard of its

2    obligation to preserve evidence across each of these

3    actions.  Across each of these five Defendants, there were

4    multiple failures on the most elementary preservation

5    obligations.  In each case, and that means all five of the

6    BNP entities, there was an inexcusable delay before setting

7    a litigation hold, whether measured from BLMIS' collapse and

8    that each Defendant concedes notice of or measured from when

9    each parties concedes notice of the cases at issue.

10          For BNP Swiss, it sent the litigation hold 28

11   months after BLMIS' collapse and nine months after it

12   concedes knowledge of this case.  For BGL BNP, it sent a

13   litigation hold 20 months after the collapse and two months

14   after notice of this case, but that litigation hold was sent

15   to one relevant custodian.  It was not until 30 months after

16   BLMIS' collapse and nearly a year after it was aware of this

17   litigation that the remaining 34 employees that BGL BNP have

18   deemed most likely to have relevant information received the

19   litigation hold.

20          BNP SSL waited two years after the collapse and

21   seven months after notice of this suit before sending a

22   litigation hold.  Sec. Nom. waited five years after collapse

23   and two years after notice of this suit before sending a

24   litigation hold.  And BNP Fortis waited 28 months after the

25   collapse.

1          Even when a litigation hold was sent, each

2     Defendant improperly relied on the implementation of that

3     litigation hold purely on its own employees with no

4     supervision, no guidance, and no follow-up.  The 30(b)(6)

5     testimony across all Defendants was crystal clear.  Each BNP

6     entity did nothing more than send a litigation hold.  This

7     is directly contrary to Zubulake, which has been black-

8     letter law in this circuit since 2004, and makes plain that

9     simply sending a litigation hold is insufficient.  This is

10    not a set-it-and-forget-it scenario.

11         That is unreasonable.  Zubulake makes clear that

12    it is unreasonable to expect compliance with a litigation

13    hold without active supervision and follow up, yet no

14    Defendant engaged in that behavior.  In many instances, the

15    litigation hold was not even sent to custodians that the BNP

16    Defendants now concede are most likely to have possessed

17    relevant information.  For BNP Suisse and BNP Sec. Nom., a

18    litigation hold was never sent to a single custodian

19    identified by those parties as potentially possessing

20    relevant information.

21         For BNP SSL, only 2 of 31 custodians identified as

22    likely to have relevant information ever received a

23    litigation hold.  For BGL BNP, as I said, only one custodian

24    received the initial litigation hold, and it was another

25    year for the remaining 34 custodians to receive any notice

Page 24

1    that they should be preserving documents.  There's also no

2    evidence that there was any attempt to interview any of

3    these custodians to understand how they stored information,

4    where relevant information might be, or to remind them of

5    the litigation hold and their continued obligations to

6    preserve.  That, too, runs afoul of the clear language in

7    Zubulake.

8            Your Honor, as soon as a party reasonably

9    anticipates litigation, it must suspend routine document

10   retention and destruction policies.  It must change its

11   policies to take account of the litigation hold, yet not a

12   single BNP Defendant suspended document destruction

13   policies, including an employee's ability to delete emails

14   at will.  It's impossible to know how many emails were lost

15   as a result of this failure, but that failure is

16   inexcusable.

17           For BNP Suisse, this led to the loss of CDs

18   containing the emails of 22 relevant custodians, as well as

19   the loss of a hard drive also potentially containing

20   relevant emails.  BNP Suisse had a policy of creating CDs

21   upon an employee's departure containing those employee's

22   emails, and BNP Suisse has a policy that it maintains those

23   CDs for ten years, at which point they are destroyed.  In

24   fact, the policy required two copies of each CD, one

25   maintained by the IT Department, one maintained by the HR

Page 25

1    Department.  Yet the CDs for these 22 custodians cannot be

2    found, and there is no explanation for where they are other

3    than that they were destroyed at the 10-year mark pursuant

4    to this policy.

5              Your Honor, we asked when the first time BNP

6    Suisse looked for these CDs, and the deponent told us that

7    the only search that she was aware of was in 2022 in

8    connection with personal jurisdiction discovery.  The same

9    is true for the hard drive.  The only time the witness could

10   testify that this was ever even looked for was in 2022 in

11   connection with discovery for personal jurisdiction.

12             In BGL BNP's case, it never suspended a policy to

13   delete departing employees' emails within 90 days or its

14   policy to delete external email archives within 10 years.

15   BNP SSL kept in place until 2015 a policy that deleted email

16   archives for departing employees one month after departure.

17   And it's important to recognize here, Your Honor, the

18   timeline we're talking about.  This is all after notice of

19   this litigation, after each Defendant concedes that they

20   were aware of this litigation, these policies were not

21   suspended, they were active, and they were destroying

22   information.  For BNP Sec. Nom., it actually instituted a

23   10-year deletion policy in 2013, and its own 30(b)(6)

24   witness testified that this policy was responsible for

25   custodial emails being deleted as late as 2018.  In fact --

Page 26

```
 1                THE COURT:  I'm going to ask a favor of you.

 2                MR. MARGOLIN:  Please.

 3                THE COURT:  To make the record clear, Sec. Nom. is

 4     what?  And if --

 5                MR. MARGOLIN:  I apologize.

 6                THE COURT:  -- any one of you make the arguments,

 7     make sure you make it clear which one you're talking about.

 8                MR. MARGOLIN:  Yes, and I'm sorry for the

 9     confusion.  Sec. Nom. --

10                THE COURT:  Yeah, you all are -- don't consolidate

11     things.  Just say what they are.

12                MR. MARGOLIN:  Okay.  BNP Sec. Nom. for the record

13     is BNP Paribas Securities Nominees Limited --

14                THE COURT:  I could figure that out, but --

15                MR. MARGOLIN:  Okay.

16                THE COURT:  -- you need to say it for the record.

17                MR. MARGOLIN:  I will.  I apologize, Your Honor.

18                THE COURT:  Same thing with Swiss.  Say it for the

19     record.

20                MR. MARGOLIN:  I will.

21                THE COURT:  It may take a little bit more time,

22     but we're going to be clear.

23                MR. MARGOLIN:  I'm happy to do so.

24                THE COURT:  Thank you.

25                MR. MARGOLIN:  Your Honor, with respect to these
```

Page 27

1    deletion policies, Cleary counsel for the BNP Defendants was

2    updating its narrative about the various preservation and

3    disruption policies up through depositions in some cases

4    with Selendy Gay Elsberg receiving new information the

5    morning of depositions.  This reflects not just a failure to

6    identify information to preserve, but a failure to

7    understand the policies that could impact preservation.

8    Again, under Zubulake, the parties and counsel have an

9    obligation at the time the duty arises to preserve to have

10   conducted this investigation and know this information.

11            It is unacceptable to be in 2022 and still

12   discovery allegedly new information about these policies and

13   where documents are stored and what happens with them.  But

14   Your Honor, the failures do not stop at the distribution and

15   implementation of litigation holds and the failure to

16   suspend policies.  Not a single Defendant centrally

17   collected email correspondence in order to preserve it.  And

18   in the case of BNP Paribas Suisse, it actually asks the

19   individual email custodians for whom it managed to have

20   email to run their own email searches without any

21   supervision, a practice that is routinely frowned upon by

22   courts.

23            Another notable example comes from BGL BNP

24   Paribas.  In that case, BGL became the majority stakeholder

25   of BNPPL, which is the entity that invested in the funds, in

Page 28

1    February 2010.  And BNPPL's business activities were

2    transferred to BGL BNP no later than October 2010.  At this

3    point in time between February and October, there is no

4    dispute that these entities were not aware of BLIMS'

5    collapse, and that they became aware of this litigation.

6    Yet BGL BNP has no idea what happened to BNPPL's ESI.  The

7    30(b)(6) witness testified, "All I can say is we don't know

8    what happened to the emails, right?  We don't know if they

9    were deleted in the ordinary course.  We don't know if the

10   BNPPL emails were transferred to BGL."

11          The answer is clear.  Either BGL failed to obtain

12   ESI from BNPPL, which was a corporate affiliate at the time

13   and is now lost, or it obtained this information, and it has

14   been destroyed due to BGL's own acts.  Another entity, BNP

15   Paribas Fortis, actually conducted a 2022 audit of its

16   litigation hold and refused to disclose the facts discovered

17   to the Court, the liquidators, or even its own 30(b)(6)

18   witness claiming this information is privileged.  This is

19   plainly improper.

20          The law is clear that the underlying facts that

21   would've been discovered by this audit are not protected by

22   privilege, and that the 30(b)(6) witness should've

23   investigated these facts and been armed with this

24   information rather than being intentionally shielded from

25   it, especially here where this is the exact information that

1   was called for by the deposition notice served upon BNP

2   Paribas Fortis.  But we don't need the results, Your Honor,

3   as the implication of the attempt to hide the audit is

4   clear.  The audit reveals spoliation.  And all the while

5   each entity was represented by highly sophisticated counsel

6   at Cleary Gottlieb, who is here today, and who is no doubt

7   well-versed in the appropriate and necessary steps to

8   preserve ESI, yet they failed.

9          And as a result of this conduct, BGL BNP Paribas

10  and BNP Paribas Securities Nominees Limited were both unable

11  to identify any ESI for the relevant custodians in the

12  relevant period.  BNP Paribas Suisse produced no emails from

13  the relevant period.  BNP Paribas Securities Services

14  Luxembourg produced just five emails, and BNP Paribas Fortis

15  produced just two emails and three attachments.

16         BNP and Cleary have offered no explanation for

17  their failure to meet the basic well-established

18  requirements for preserving documents.  In fact, and kind of

19  insultingly, they dismissed this litany of errors as

20  "quibbles" or "ticky tacky complaints".  And in fact,

21  they're anything but.  They are the fundamentals of document

22  preservation.  BNP's explanation for what happened to these

23  documents holds no water.

24         All of the BNP Defendants designated a single

25  30(b)(6) witness to represent them during the 30(b)(6)

1    deposition.  That 30(b)(6) witness for each deposition was

2    unable to offer any factual explanation for the near

3    complete absence of ESI available and produced in this case.

4    She had not spoken to a single relevant custodian about

5    their document preservation practices or about their

6    document destruction practices.  She could not explain what

7    happened to any of the missing ESI, so that is the BNP

8    Defendant's testimony.  They just don't know, and that is an

9    unacceptable state of affairs.

10             And in their briefing, the only explanation they

11   could must was that all of the missing ESI was deleted in

12   the ordinary course of business before they realized they

13   had a duty to preserve it.  This is an explanation they

14   offer uniformly across five BNP Defendants.  And what

15   they're doing is they're asking Your Honor to believe that

16   virtually all custodians across these five entities all

17   happened to deleted virtually all Fairfield related ESI

18   before they were on notice of the litigation.

19             Frankly, I mean, this would be an amazing

20   coincidence, and the Court shouldn't credit it.  This

21   explanation also lacks any basis in the record.  BNP did not

22   speak to the relevant custodians.  It did not investigate

23   their deletion practices, and so has no basis to guess at

24   when or under circumstances its ESI was destroyed.

25   Moreover, this explanation ignores what the record does

1    clearly support and what is the only plausible explanation

2    here, that substantial ESI was lost due to deliberate

3    action, or in most cases inaction, by the BNP Defendants.

4    At worst, BNP's explanation suggests a coordinated attempt

5    to destroy evidence across a corporate family.

6         Your Honor, in instances of spoliation as here,

7    Rule 37(e) provides for relief for prejudiced parties like

8    the Liquidators.  First, under that rule, the Liquidators

9    have shown that the BNP Defendants were reasonably on notice

10   of potential litigation with the collapse of BLMIS in 2008.

11   It's an objective standard, and we know that the BNP

12   Defendants were immediately on notice of the collapse of

13   BLMIS in 2008, that they had money in Sentry, and that they

14   knew money and Sentry meant money and BLMIS.  The question

15   then is whether a sophisticated financial institution in the

16   position of these Defendants would've reasonably foreseen

17   the prospect for litigation in the wake of the collapse of

18   the largest Ponzi scheme in history.

19        We think this is an easy question, Your Honor, and

20   the answer is yes.  And it's exactly the type of incident

21   which tends to trigger litigation and put individuals on

22   notice.  BNP makes two arguments for why it had no reason to

23   be on notice of litigation -- the potential for litigation

24   in 2008.  First, it argues that a foreign entity would have

25   no reason to anticipate litigation in the United States and

Page 32

1    its attendants' document preservation obligations.  And

2    second, because almost all of the entities were only

3    executing trades, it had no reason to anticipate that it

4    would be subject to sue.  But those arguments are circular,

5    and they depend entirely on the ESI that each BNP entity has

6    spoliated.

7           The ESI that's now missing would show precisely

8    what BNP knew about the funds' connection to the United

9    States and would show the precise role that BNP played in

10   those investments, but that information has been destroyed.

11   Moreover, and as discussed in our briefs, the limited

12   evidence that Liquidators have obtained from third parties

13   demonstrates that the BNP entities were seeking and

14   obtaining diligence on the funds, which really puts the lie

15   to the suggestion that they were merely executing trades.

16          Second, under the rule, the Liquidators have shown

17   that the BNP Defendants did not take reasonable steps to

18   preserve documents even after they concede notice of these

19   cases.  And Your Honor, I'm not going to go through each

20   example I went through above, but reasonable steps means

21   more than just refraining from destroying evidence.  It

22   means taking affirmative steps to avoid spoliation of

23   relevant evidence.  And again, Zubulake makes that clear.

24   Yet here, none of the steps that Zubulake demands were

25   followed, and they simply have no answer for their failures,

Page 33

1    which I've already again discussed at length.

2            Third, under the rule, the Liquidators have shown

3    that the ESI that BNP spoliated cannot be restored or

4    replaced.  It's true the Liquidators have obtained some

5    documents from third parties, but where as here third party

6    documents replace some, but no one can say how much of the

7    missing ESI, courts find that third party productions did

8    not restore or replace missing ESI.  You'll probably hear

9    from the BNP Defendants that third party documents do

10   replace the ESI that they destroyed.

11           First, it's inequitable to leave the Liquidators

12   at the whim of whatever third parties happen to have saved.

13   But more importantly, the BNP Defendants have no support for

14   the proposition that these third party documents completely

15   fill the gap that they created by spoliation.  We asked in

16   every deposition and every last time the BNP witnesses --

17   witness could not say who was emailing, how often they were

18   emailing, what the content of the emails were, or who they

19   were emailing with.  So they can ever say and they are not

20   in the position to say that the third party productions

21   replace what they themselves destroyed, nor do the third

22   party productions provide any substitute for the almost

23   total lack of internal email correspondence and meta data

24   that BNP continues to possess.

25           In a normal case, Your Honor, we would look for

1   gaps in the BNP productions to see what was missing and what

2   gaps third parties could fill in.  Here, we can't do that.

3   BNP's wholesale spoliation has robbed the Liquidators and

4   the Court of the ability to do that type of analysis, and

5   that should not benefit them.  Your Honor, the BNP

6   Defendant's spoliation has plainly prejudiced the

7   Liquidators.  The courts ask in addressing prejudice is that

8   the evidence plausibly suggests that spoliated ESI could

9   support the Movant's case, and we submit that we have made

10  that showing.

11          The BNP Defendants have submitted motions to

12  dismiss on personal jurisdiction grounds arguing that the

13  Liquidators have insufficiently alleged that the BNP

14  Defendants had relevant contacts with the United States.

15  But the spoliation here was so total that neither party, not

16  the Liquidators and not BNP, can say with any certainty the

17  whole universe of what documents existed.  But emails

18  obtained from third parties show that each BNP Defendant was

19  engaged in jurisdictionally relevant contacts.  These

20  documents, which are attached to our moving papers,

21  plausibly suggest that the spoliated documents would show

22  the existence of more contacts with the United States, which

23  are now lost.

24          The Liquidators are entitled to relief now because

25  otherwise Liquidators would be forced to respond to BNP's

Page 35

1    arguments on personal jurisdiction on an uneven playing

2    field that BNP itself created.  BNP argues that there is

3    insufficient evidence of jurisdictional contacts.  That is

4    an overt attempt to take advantage of their own spoliation.

5    Having destroyed the evidence, they should not be permitted

6    to benefit by arguing about what emails that no longer

7    exist, would have shown, would have said, or what the volume

8    of them may have been.

9         BNP curiously argues that the relief that we're

10   seeking here is premature and that the Court should postpone

11   a decision until after an ultimate decision on personal

12   jurisdiction is made, and that's simply wrong.  The

13   Liquidators have the right to marshal the strongest evidence

14   and make the strongest arguments that they can to oppose the

15   personal jurisdiction motion to dismiss.  The BNP spoliation

16   has prevented that, and so a ruling on the spoliation motion

17   now is required.

18        Your Honor, in light of all this, the Liquidators

19   respectfully request two forms of relief.  First, our

20   preclusion orders under Rule 37(e)(1), we ask that Your

21   Honor prevent the BNP Defendants from making any argument

22   about the content or volume of communications that they have

23   spoliated.  Just to give an example, this would prevent BNP

24   from claiming that they never communicated with FTG.  It

25   would prevent them from claiming it only communicated with

Page 36

1    FTG infrequently.  It would prevent BNP from making any

2    claim about the contents of spoliated emails with FTG.

3    That's just an example.

4            A preclusion order will remedy some but not all of

5    the prejudice the Liquidators have suffered because the

6    Liquidators are still subject to the whim of what they have

7    been able to obtain from third parties.  Accordingly, we

8    also seek an adverse inference under Rule 37(e)(2).  The

9    massive failure across each BNP entity here demonstrates

10   something more than mistake or unreasonable conduct.  It

11   demonstrates a conscious dereliction of known duties to

12   preserve.  Repeated conscious dereliction of known duties to

13   preserve.  And the BNP Defendants, not a single one of them,

14   have any explanation for their conduct, nor have they

15   offered one.

16           In these scenarios, courts may enter an adverse

17   inference to sanction this kind of conduct in litigation and

18   to restore the parties to their positions they would've been

19   in but for spoliators' conduct.  Our request, accordingly,

20   is that the Court presume that the ESI that the BNP

21   Defendants deleted would've supported personal jurisdiction.

22   Specifically, the Liquidators seek as a sanction an

23   inference that the spoliated evidence would've been

24   favorable to the liquidators in establishing personal

25   jurisdiction.

1              The Liquidators ask the Court to infer that the

2     spoliated evidence would've shown that the BNP Defendants

3     intentionally invested in the funds knowing they were feeder

4     funds to United States based BLMIS.  We ask for an adverse

5     inference that the BNP Defendants communicated about and

6     utilized U.S. correspondent bank accounts to invest in the

7     funds.  On the whole, we are seeking an adverse inference

8     that the spoliated documents would have reflected the BNP

9     Defendants' purposeful and knowing availment of U.S.

10    jurisdiction.

11              An adverse inference, Your Honor, is the only form

12    of relief that will fully redress the prejudice from BNP's

13    spoliation.  Without it, because of their destruction of

14    documents, the Liquidators are limited to the documents they

15    were able to obtain from third parties.  An adverse

16    inference here fairly levels the playing field by letting

17    the Court assume that the destroyed documents would've

18    supported a finding of jurisdiction.  This inference is

19    appropriate given the decade-long conscious disregard that

20    each BNP Defendant had for its preservation obligations,

21    which are so clear under the law.

22              Your Honor, with that, I am open for questions.

23    And not, I'm happy to hand the microphone over to Mr.

24    MacKinnon.

25              THE COURT:  Very good.  Pass the microphone.  I

Page 38

1      have no questions.

2                MR. MACKINNON:  Good morning, Your Honor.  Thank

3      you very much.  My name's Ari MacKinnon.  I'm a partner at

4      Cleary Gottlieb Steen and Hamilton appearing on behalf of

5      the five BNPP entities.  That's BNPP Fortis, BNPP 2S

6      Luxembourg, BNPP Securities Nominees, BNPP Suisse, and BGL

7      BNPP.  To avoid unnecessary repetition, I'm going to follow

8      Mr. Margolin a bit and begin my presentation by discussing

9      some overarching points that are common to the five BNPP

10     entities, and then I'd like to conclude by discussion some

11     points that are specific to each of them.

12                And obviously, Your Honor, very happy to take any

13     questions that you may have.  Your Honor, we take very

14     seriously our discovery obligations to this Court and to our

15     counterparty.  We acknowledge that there were issues with

16     the document preservation processes followed in some of

17     these cases, and I intend to get into that later on in my

18     presentation.  But the Liquidators still have a hefty burden

19     to carry --

20                THE COURT:  Let me just ask you one question then.

21                MR. MACKINNON:  Yes, please.

22                THE COURT:  Which one of these was the evidence of

23     what they were looking for found?  Name one.

24                MR. MACKINNON:  BNPP Fortis.  For example, I'd be

25     happy to start right there.

1          THE COURT:  Please do.

2          MR. MACKINNON:  If you'd like.  Okay.  So I'll

3    turn to BNPP Fortis just to start my presentation.  So the

4    Liquidators filed their complaint against BNPP Fortis on

5    March 4, 2011.  BNPP Fortis received notice of that

6    complaint on March 18, 2011 approximately two weeks later.

7    The record reflects that shortly after the filing of the

8    complaint, Fortis collected transactional data, subscription

9    agreements, redemption agreements, and other such materials

10   that could be located at the time, and sent those materials

11   along to Cleary Gottlieb in April about three weeks after

12   receiving notice of the complaint.

13          Fortis also took steps to identify individuals who

14   might possess relevant information and to send them a

15   Document Hold Notice that covered not only transactional

16   data, but all forms of ESI, including emails.  That notice

17   went out on April 11, 2011.  That's three weeks after

18   receiving notice of the complaint.  The Document Hold Notice

19   clearly instructed employees to preserve and not to destroy

20   all documents related in any way to BLMIS, Madoff, or to

21   Fairfield.

22          In response to the circulation of that hold, BNPP

23   Fortis in-house counsel learned that relevant documents

24   might be located in a shared network space, sort of a shared

25   electronic folder, and in hard copy boxes.  That shared

Page 40

1    network space and those hard copy boxes have been preserved

2    to the present day.  In addition to being instructed that

3    they were not to destroy any relevant documents, including

4    emails, if and when any of the recipients of the Hold Notice

5    left Fortis, if and when they left, their email boxes were

6    imaged.  The full contents of their email boxes were imaged.

7    So they were told not to destroy, and then when they left

8    and all of our key custodians from Fortis left, their email

9    boxes were imaged at the time that they departed.  Those

10   images too have been retained to the present day.

11        In addition, Fortis retained the images of email

12   boxes taken from two other potentially relevant individuals,

13   images that were taken in 2008 and in 2009 in connection

14   with another potential litigation.  Those email inboxes or

15   images from 2008 and '09 have also been retained to the

16   present day.  Those email inboxes, the ones I've mentioned,

17   were searched in connection with the Liquidators'

18   jurisdictional discovery, and there were 340 hits on the

19   search of the emails that were retained.

20        Because this is jurisdictional discovery, what

21   constitutes a responsive document is narrower.  It relates

22   to contacts with New York.  Two emails were produced, as Mr.

23   Margolin noted, from that review, along with three

24   attachments.  In addition to that, there were 143 additional

25   documents deemed responsive that were also sent along.  We

Page 41

1    think that under the circumstances those steps are

2    reasonable as we've indicated in our papers for Fortis.  And

3    we've, you know, also argued that at the very least, those

4    steps are not indicative of the sort of intent to deprive

5    that Mr. Margolin has noted.

6          If there was an intent to deprive, Fortis doesn't

7    gather all the transactional document, preserve the shared

8    network space, preserve the hard copies, send the hold

9    notice to the right people three weeks after it gets notice

10   of the litigation, and then search the email files.  So that

11   would be one example, Your Honor.

12         THE COURT:  Okay.  So just let me then address

13   something.  The Liquidators --

14         MR. MACKINNON:  Please.

15         THE COURT:  -- have asked the question or said

16   that they have emails indicating that they -- there are more

17   relevant emails that haven't been preserved.

18         MR. MACKINNON:  That's --

19         THE COURT:  So how --

20         MR. MACKINNON:  That's correct.

21         THE COURT:  -- can that be?

22         MR. MACKINNON:  So the emails that they've cited

23   from Fortis, a number of them are from 2004, 2005, 2006.

24   Fortis received notice of the complaints in this case in

25   2011.  We don't know when the emails that Mr. Margolin has

Page 42

1    referenced from 2004, '05, and '06 were deleted.  We've been

2    -- we've looked into it, but we've been unable to identify

3    when that happened, but the deletion could've occurred at

4    any time between 2004, '05, and '06 when the emails were

5    created, and 2011 at a later -- when the Defendant received

6    notice of the complaint.

7              THE COURT:  Well, then let me just ask you a

8    question.  Why then didn't you have someone that could

9    possibly testify that was there in 2011 or at least go

10   through those steps?

11             MR. MACKINNON:  Well, we did have --

12             THE COURT:  You're the one that chose the person

13   to be deposed.

14             MR. MACKINNON:  And the person who was deposed

15   spoke to in-house counsel, spoke to a business person who

16   was around during the period of time --

17             THE COURT:  Did they speak to IT for God's sake?

18             MR. MACKINNON:  Spoke to IT as well.  Yeah, spoke

19   to IT as well, and IT relayed that there were tight volume

20   restrictions on the amount of emails that could be retained

21   by employees at the time.  This was in early 2000s.  It was

22   not unusual to have volume restrictions.

23             THE COURT:  Well, then why didn't you present IT

24   to be deposed?

25             MR. MACKINNON:  We presented a witness that we

1    thought could bring together all the different elements.

2    There are IT elements.  They're also specific elements on

3    how litigation holds in the work and the like, and business

4    elements.  So we presented --

5                THE COURT:  Okay.  And then where's the report

6    that shows each person you spoke to and what they said?

7    You're the one that set it up.  Where is it?

8                MR. MACKINNON:  We have prepared and produced

9    summaries of the interviews that were conducted by the Rule

10   30(b)(6) witness, so there are summaries of her interviews

11   with IT personnel, summaries of her interviews with in-house

12   counsel, and summaries of her interview with the business

13   personnel as well.

14               What the Liquidator says -- the Liquidators say we

15   have withheld is a privileged document that was prepared in

16   2022 at the request of counsel looking into the document

17   issues.  That's the document that has been withheld from

18   production, but we have prepared and produced the

19   Liquidators' summaries of the interviews that were done by

20   the 30(b)(6) witness.  That's not just for Fortis, but for

21   all of the entities.  For all of the entities --

22               THE COURT:  But you're basically telling me that

23   the Defendant doesn't know about the 2004 emails or not

24   because they never checked until 2022.  And you have a

25   litigation hold a long time ago.  I know you sent a form

Page 44

1   letter.  You're a good firm.  You sent the letter, say save

2   this stuff, and then they had sent you some of it.  So you

3   know it's there.  So I'm not understanding this.

4           MR. MACKINNON:  Well, the documents from 2004,

5   '05, or '06, we directed employees not to destroy any

6   documents that they --

7           THE COURT:  I --

8           MR. MACKINNON:  -- may have had in 2011.

9           THE COURT:  I assumed you did.

10          MR. MACKINNON:  Right.  In 2011.

11          THE COURT:  I assumed you did.

12          MR. MACKINNON:  It is the Liquidators' burden to

13  show that documents were destroyed after the duty to

14  preserve --

15          THE COURT:  No, it's not.  It's your burden to

16  produce them.

17          MR. MACKINNON:  The case law --

18          THE COURT:  And I have shown it.  Don't cross me

19  here.

20          MR. MACKINNON:  I don't intend to cross you, but

21  the burden is in Pension Committee set forth --

22          THE COURT:  You're blaming the Liquidators for

23  emails that they don't have.  They gave us the emails they

24  had.  They showed it to you.

25          MR. MACKINNON:  I don't intend to blame the

1    Liquidators, Your Honor.  I'm not blaming them for not --

2    for putting forward emails.  I'm simply saying that they

3    haven't proven those emails were destroyed after the duty to

4    preserve attached, and that's the burden.  The -- there's a

5    burden to prove that the destruction happened after there

6    was a duty to preserve the emails.  I'm not sure if I'm

7    explaining that --

8              THE COURT:  No, you're not, but keep going.

9              MR. MACKINNON:  So --

10              THE COURT:  I'm listening to you.

11              MR. MACKINNON:  So the --

12              THE COURT:  We know all that.  We already know all

13    of what you just said, so keep going.

14              MR. MACKINNON:  Okay.  So as I was going to

15    mention, we have three points that I wanted to focus on

16    during my presentation today.  The first relates to an issue

17    that were just discussing, which is that the Liquidators

18    have failed to show that irreplaceable ESI was destroyed

19    after the burden or the duty to preserve attached.  I think

20    we've already covered that.

21              The second is the question of prejudice, and that

22    was the focus of our -- of a lot of our briefing.  We think

23    they failed to show prejudice at this stage.  And third, the

24    Liquidators have failed to show an intent to deprive, and

25    they need to show an intent to deprive to be entitled to the

Page 46

1    most severe sanctions under Rule 37(e)(2).  We've also

2    argued, Your Honor, that we think the motions here are

3    premature in the sense that we don't have a fully developed

4    factual record.  We've searched far and wide, and I'm sure

5    the Liquidators have as well, and we've not found any cases

6    imposing sanctions under 37(e) at the jurisdictional

7    discovery case.

8              THE COURT:  Okay.  I have a question for you, and

9    I have --

10             MR. MACKINNON:  Please.

11             THE COURT:  -- something to say about this.  You

12   haven't shown that you didn't have the 2004 emails at the

13   time the duty attached.  You're talking about --

14             MR. MACKINNON:  Yes.

15             THE COURT:  -- the time the duty attached, and

16   that is the issue here.  So --

17             MR. MACKINNON:  That's the issue, yes.

18             THE COURT:  -- what lesser sanctions would be

19   appropriate than what he asked for?

20             MR. MACKINNON:  So we've thought about that.

21   Obviously we don't think any sanctions are appropriate, but

22   I think it's (indiscernible).

23             THE COURT:  Well, there was no one to explain why

24   they're not here, so nobody actually explained that in all

25   the documents I have between you and him.  So what lesser

Page 47

1    sanctions do you think might be appropriate?

2            MR. MACKINNON:  So in the case law, we have seen

3    sanctions in a case we cite in our briefs Cohen v. Dunne, a

4    District of Connecticut case.  One of the sanctions imposed

5    there and in other cases as well is preventing the non-

6    moving party, in that case -- in this case the BNPP

7    Defendants, from challenging the authenticity of evidence

8    that has been submitted by the other -- or obtained from

9    third parties challenging the authenticity of these emails

10   from Citco or Fairfield-Greenwich Group USA.  That's a

11   sanction we've seen in some of the case law.

12           Another sanction that we see in the case law that

13   you might consider would be what I call the sort of total

14   mix of the information sanction.  A number of courts say

15   that the decision maker, which in this case is Your Honor,

16   is permitted to take into consideration that alleged

17   spoliation as part of the total mix of information on the

18   relevant question.  Here that question is jurisdiction.

19           We would submit that there's no reason for a

20   preclusion order in this particular case when it's Your

21   Honor who's going to be making the decision on the personal

22   jurisdiction issue.  We don't think Your Honor needs the

23   benefit of such a preclusion order.  You can weigh the

24   different arguments and evidence that have been presented

25   and reach your own judgment.

Page 48

1          The same really goes for the adverse inference,

2     which we don't think's appropriate because we don't think

3     there's been an intent to deprive.  But those are the sorts

4     of instructions that you would ordinarily see go to a jury

5     where the jury needs to get guidance on how it should be

6     weighing or not weighing the different evidence presented by

7     the parties.  So those two sorts of sanctions, no challenge

8     to authenticity, total mix of the information are sanctions

9     that we have seen in a lot of the case law that we think

10    would be far more proportionate to what the Liquidators

11    claim has happened here.

12          Some of the preclusion orders that they're

13    seeking, for example, a preclusion order saying that we

14    can't argue there was no due diligence done.  There's just

15    nothing in the emails for four of the five entities, nothing

16    in any of the ESI that suggests that diligence would've been

17    done.  And we have presented evidence that diligence wasn't

18    done by these entities, by four of the five.  For Fortis,

19    there was diligence.  There was diligence, and there's no

20    dispute about that.  The documents reflect that.

21          But for four of the five, all they were -- what

22    they were doing was executing transactions on the behalf of

23    their clients and the testimony of our 30(b)(6) witnesses or

24    witness demonstrates or indicates that they were not engaged

25    in diligence.  We don't think that that preclusion order

Page 49

1    would be proportionate or tailored to the sorts of evidence

2    that the Liquidators have been -- have presented.

3            And just on the adverse inference point, I mean, I

4    would just emphasize that there is a very high burden that

5    they have to meet to get an adverse inference.  They have to

6    show an intent to deprive, which is a specific intent to

7    deprive them of evidence in this case.  We would submit

8    they've not that burden.  The cases that find an intent to

9    deprive are very different from these cases.

10           In re Peters, I won't go through the fact -- the

11   facts of it now.  It's in our papers.  It's a case where you

12   had a party violating multiple discovery orders, selecting

13   specific documents that -- destroying data -- excuse me,

14   destroying backup tapes after having been ordered by a court

15   to retain them.  Another thing about those intent-to-deprive

16   cases is that they almost always involve a clear showing of

17   motive and dishonesty, and that's what the court in In re

18   Peters relied upon.  Found motive, dishonesty, and repeated

19   misconduct.

20           The same goes for the Mule case, which is another

21   adverse inference or intent-to-deprive case where there was

22   a clear motive.  The court found that the single most

23   important document in the case had been destroyed and

24   imposed an adverse inference in that case because there were

25   past discovery abuses as well.  So we don't think the

Page 50

1   adverse inference is appropriate given the high standard.

2   And also the fact that that standard needs to be me by clear

3   and convincing evidence.

4           THE COURT:  Keep talking.

5           MR. MACKINNON:  Okay.  So look, I think we've

6   covered a lot of the points that I wanted to make.  I think

7   we've covered -- from our perspective, the preservation

8   record with respect to Fortis shows efforts to preserve.

9   Maybe I'll spend just a moment on the prejudice point if

10  you'll indulge me because the prejudice point is another

11  important one.  And also I'd like to spend a moment on when

12  the duty to preserve attached because Mr. Margolin mentioned

13  that it should've arisen in December of 2008.  And to our

14  mind, the duty to preserve attaches when the litigations are

15  filed.

16          In that regard, I don't think there's any dispute

17  between the parties that the duty attaches when it's

18  reasonably foreseeable that there will be litigation.  As

19  we've explained in our papers, it wasn't reasonably

20  foreseeable to these BNPP entities that they'd be sued until

21  the suit was filed, which in some cases that was 2010, in

22  other cases 2011.  Why is that?  The four -- go ahead, Your

23  Honor.

24          THE COURT:  I'm getting the impression, though,

25  that nothing was ever preserved.  Ever.  So even if it

1    attached yesterday, you have nothing, and that's what's

2    bothering me.  Because you know, I look at my emails and I

3    know what's in there.  And -- but my IT people can tell me

4    that -- and you're only saying that you found these two or

5    three emails in the attachments to them in all the stuff

6    that went through these companies.

7                    MR. MACKINNON:  For --

8                    THE COURT:  Because you spoiled them.  Let's be

9    honest about that.  Okay.

10                   MR. MACKINNON:  For Fortis, there's 340 search

11   term hits, not two.  There's two that have been produced at

12   this stage.  Again, just level set.  We're at jurisdictional

13   discovery.  We haven't produced everything that's relevant

14   --

15                   THE COURT:  I understand.

16                   MR. MACKINNON:  -- to the merits of the case,

17   right?  So there's 340 search term hits.  For 2S -- for BNPP

18   Luxembourg, there's 800, right?  Five have been produced

19   because, again, we're at jurisdictional discovery.  So the

20   numbers are a bit different.  There's --

21                   THE COURT:  So you're also -- so your emails on

22   communication with Sentry and everybody else because it was

23   a foreign entity, you just didn't say all the contacts to be

24   made showing that you have jurisdiction by making the

25   contact.

```
 1                MR. MACKINNON:  Well, I think as we've argued in

 2     our papers, we don't think there's any reason to believe

 3     there were a lot of contacts between -- relating to

 4     Fairfield.  The nature of these businesses, they're

 5     execution only.  It's not like that -- these entities were

 6     not providing advice to clients saying you should invest in

 7     Fairfield.  They weren't providing -- they weren't doing

 8     diligence on Fairfield.  Four of the five entities, all they

 9     did was execute transactions.

10                THE COURT:  But we already know the Liquidators

11     have some.  They've already been produced.  You've seen

12     those.

13                MR. MACKINNON:  The Liquidators have produced a

14     handful of --

15                THE COURT:  Well --

16                MR. MACKINNON:  -- emails.

17                THE COURT:  -- but that shows that it happens.

18                MR. MACKINNON:  It shows that it happened on

19     occasion.  And what we would say is most of those emails,

20     nearly all of them, have nothing to do with the United

21     States.

22                THE COURT:  But you can't say there aren't any

23     because some have already been produced from the other side.

24                MR. MACKINNON:  But I'm not saying there aren't

25     any.  It's their burden to prove that emails were destroyed.
```

Page 53

1    There -- the case (indiscernible) --

2            THE COURT:  You said they were destroyed.  Your

3    30(b)(6) witness said they were destroyed.

4            MR. MACKINNON:  Our 30(b)(6) witness said we don't

5    have these emails, the ones that the Liquidators have put

6    forward.  That is correct.  We don't -- we have not retained

7    those emails that the Liquidators have identified.  We do

8    not have any --

9            THE COURT:  So it's pretty obvious that we can't

10   say that they weren't preserved.

11           MR. MACKINNON:  We can't say they were not

12   preserved, but we can't say when they were destroyed.  They

13   have --

14           THE COURT:  I'm telling you --

15           MR. MACKINNON:  Yes.

16           THE COURT:  -- a company like BPN -- BNP cannot

17   tell you when they had a destruction of their emails?  That

18   is unconscionable to me given what I live in, in this world,

19   and theirs is more important than probably mine because I've

20   got 2,400 copies, and mine are all public record.

21           MR. MACKINNON:  Yeah.  I mean, I think --

22           THE COURT:  I mean, this is just -- I'm sorry to

23   get off on this, but this is just not logical talking.

24           MR. MACKINNON:  Okay.  I see -- the other -- the

25   only -- the other issue I would mention is that the record

Page 54

1    reflects that the transactions in question, the Fairfield

2    redemptions and subscriptions, were generally carried out by

3    facsimile, not by email.  So you've got clients who were

4    doing execution-only business where they're executing

5    transactions on behalf of clients, and you've got the record

6    reflecting that that was generally conducted via facsimile.

7    As Your Honor mentioned, there are some emails.  The

8    Liquidators have put forward those emails, but we don't

9    think there were many.  We don't have any reason to believe

10   there were many emails were related to Fairfield given the

11   nature of the business that these different entities were

12   invested -- or engaged in.

13            And I guess the other piece I would say is that on

14   the prejudice point, when you're looking at the prejudice --

15   when you're thinking about the prejudice point on

16   jurisdiction, the question is really whether these emails

17   are probative or relevant to jurisdiction.  Right.  There is

18   a later phase of the case that there will be different

19   questions that are asked, but this phase of the case when

20   you're trying to determine prejudice, prejudice needs to be

21   found -- can be found only if the emails in question were

22   relevant.  And in this case, they have to be relevant, that

23   is probative on the jurisdictional question.

24            THE COURT:  But you can't say in all that you've

25   discussed and all the witnesses that you've put together

Page 55

1    that these were not destroyed after -- during the times

2    we're talking about, that the -- in fact, we know they've

3    been destroyed.

4           MR. MACKINNON:  We know that they -- we know they

5    don't exist.  We don't know when they were destroyed.  And

6    on that question, we've looked into it.  We can't find a

7    technological solution to figuring out exactly when these

8    particular emails were lost.

9           THE COURT:  All right.

10          MR. MACKINNON:  That's the state of the record.

11   And maybe I would just conclude by addressing the -- a

12   couple of points, but addressing the Liquidators' argument

13   about timing and when this all should be decided.  Our view

14   is that the best sequencing for this question would be for

15   the Liquidators to put in their opposition brief to our

16   personal jurisdiction motion.

17          THE COURT:  We're not there.  Just keep moving

18   because there -- if there wasn't a hole, then the

19   Liquidators couldn't get this evidence.  Let's just

20   concentrate on this.  You're giving me a remedy, and I'm not

21   ready for a remedy on that yet.

22          MR. MACKINNON:  Okay.  Yeah, I was just -- okay.

23   That's fine.  I wasn't trying to give a remedy.  I was just

24   --

25          THE COURT:  You've already said that earlier.

1                    MR. MACKINNON:  That --

2                    THE COURT:  Or your papers have said that, so I'm

3        aware.

4                    MR. MACKINNON:  Okay.  That-- that's fine.  The

5        other point that I wanted to mention is just this idea of

6        when the duty to preserve attached --

7                    THE COURT:  Mm-hmm.

8                    MR. MACKINNON:  -- 2008 versus 2010 or '11.

9                    THE COURT:  Now, that's important.  Right.  Okay.

10                    MR. MACKINNON:  Okay.  And the Liquidators have

11        cited in that regard the -- a case called Odebrecht or

12        DoubleLine v. Odebrecht, which is a case that they've cited

13        for the general proposition that large frauds often engender

14        litigation, right?  And so when BLMIS -- when it's revealed

15        that BLMIS is a large fraud in December of 2008, that

16        should've put folks on notice that there be a litigation.

17        To our mind, Odebrecht is distinguishable.  There, the

18        company that itself had engaged in the -- or allegedly

19        engaged in the massive fraud, that's the Brazilian company

20        Odebrecht, was found to -- you know, should've expected that

21        there would be litigation.

22                    The analog here is that BLMIS, once it's revealed

23        that BLMIS is a big fraud in December of 2008, should've

24        expected that there would be litigation related to BLMIS.

25        But here, our clients are differently situated from

Page 57

1   Odebrecht.  Our clients have invested in a fund on behalf of

2   their clients, and that fund is invested in BLMIS.  So we

3   don't think that Odebrecht and cases like it that speak of

4   massive frauds engendering -- often engendering litigation

5   would've put our clients on notice that they were going to

6   be sued in 2008.  We think that happens with the filing of

7   the litigations in December -- excuse me, in 2010 and in

8   2011.  I think we're --

9              THE COURT:  Well, let me interrupt you.  Didn't

10  the --

11             MR. MACKINNON:  Please do.

12             THE COURT:  -- Liquidators, don't they have

13  evidence already that BNP issued a warning to all of the BNP

14  entities that they were involved in the Madoff Ponzi scheme?

15             MR. MACKINNON:  So BNPP --

16             THE COURT:  And that was in 2008.

17             MR. MACKINNON:  The parent entity revealed or

18  issued a press release indicating that one of its businesses

19  or business lines had exposure to Madoff and had lost

20  hundreds of millions of dollars as a result of Madoff.

21  These particular entities that we're talking about are not

22  the parent entity.  See, what's missing here -- there are

23  three other Liquidators' lawsuits against other BNPP

24  entities.  They are not before you on spoliation issues,

25  right?

1                So this idea that there is some massive BNPP-wide

2       conspiracy, three of the eight are not here.  There's a

3       reason they're not here, right?  We don't have to go into

4       that, but there's not some sort of massive BNPP conspiracy

5       here.  The entities we're talking about here are very -- are

6       totally separate entities from the parent entity, and

7       they're conducting very different business from what the

8       parent entity was conducting in that press release.  They're

9       working with private --

10               THE COURT:  Was that a press release, or was that

11      sent to all their entities?

12               MR. MACKINNON:  That was a press release by BNPP.

13      It was a --

14               THE COURT:  Okay.

15               MR. MACKINNON:  -- it was a --

16               THE COURT:  All right.

17               MR. MACKINNON:  -- press release that BNPP issued.

18      And what it announced was that BNPP had lost hundreds of

19      millions of dollars in connection with a separate business

20      line.  But again, that's the parent entity.  These entities

21      that we're talking about here are separate entities, two of

22      them located in Luxembourg, obviously you know in

23      Switzerland, another in Jersey that performed --

24               THE COURT:  Didn't BNP admit that they should've

25      known from that point and should've not destroyed anything?

1              MR. MACKINNON:  Well, I think it depends on which

2      BNP, right?  I mean, these are separate entities that we're

3      talking about here that had a very limited exposure to

4      Fairfield.  And their limited exposure to Fairfield was

5      essentially clients saying I want to invest in Fairfield,

6      can you help me do that, and them executing a transaction.

7      You know, not advising --

8              THE COURT:  I didn't -- I can't ask you this

9      question, but of course what's hanging out here in my mind

10     is they didn't -- you mean I didn't pick up the phone and

11     call Cleary?  I mean, that is -- that does not deserve an

12     answer.

13             MR. MACKINNON:  Okay, but I just -- I think it is

14     important to -- and it's -- we speak sort of loosely of

15     BNPP, and I do as well, but in this particular case it's

16     important to sort of bear in mind the distinctions between

17     the different BNPPs and the different kinds of businesses

18     that they had.  I mean, I think we don't have to belabor the

19     point here because we discuss it in our papers, but these

20     particular entities had a very different kind of business

21     that they -- that had exposure to Fairfield.  It was

22     essentially clients just, you know, saying I'd like to

23     invest in Fairfield, can you help me with that.

24             And as a result, the amounts in controversy in

25     these cases we're talking about are different from the

Page 60

1    larger BNPP case.  At least with respect to Securities

2    Nominees, with respect to BGL BNPP.  These are sort of

3    exposures that have to do with private wealth management

4    clients, as we discuss in our papers, saying can you, you

5    know, buy me -- I want to buy some Fairfield, can you help

6    me do that, and then just an execution.  And so I know it's

7    speculation.  It sounds like speculation, but when the

8    Liquidators say there's been -- we've lost a massive amounts

9    of email, we've talked to our clients.

10          And our 30(b) -- we've talked to the business

11   folks, we've talked to the IT personnel, as has our 30(b)(6)

12   witness, and the response we've gotten is what emails.  I

13   mean, I know we can't prove it today.  We can't prove it

14   today, but what emails are you expecting to find?  We get a

15   call or a fax --

16          THE COURT:  Okay, but here's a question I can ask

17   you.

18          MR. MACKINNON:  Yep.  Please.

19          THE COURT:  And I'm almost sure it's not attorney-

20   client privilege in any way.  What exact date did you send

21   them the letter that they need to retain their documents?

22          MR. MACKINNON:  It depends -- it varies with the

23   different entities.  If you'll indulge me, I can give you

24   the exact dates.  Hold on one sec.  I'm sorry, Your Honor.

25          THE COURT:  That's fine.

Page 61

1              MR. MACKINNON:  So let me talk about 2S -- BNPP 2S

2    Luxembourg.

3              THE COURT:  Okay.

4              MR. MACKINNON:  We have -- actually my -- January

5    10, 2011; January 20, 2011; and May 31, 2011 are three

6    different holds.  As the Liquidators noted, the first two

7    say preserve anything related in any way to BLMIS or to

8    Madoff.  And the third on May 31, 2011 says preserve

9    anything related in any way to BLMIS, Madoff, or Fairfield.

10             THE COURT:  Okay.  And so if you said preserve it,

11   there at least should be preserving all the emails from

12   2002.

13             MR. MACKINNON:  To the extent that the --

14             THE COURT:  Because you told them to put the hold

15   on, on in 2011.

16             MR. MACKINNON:  Yeah.  To the extent that they had

17   emails at that point in time, that's correct.

18             THE COURT:  But we have -- there are no emails

19   from 2002 produced under the 10-year retention policy --

20             MR. MACKINNON:  No --

21             THE COURT:  -- is what you're telling me.

22             MR. MACKINNON:  -- 2S Luxembourg has produced

23   emails.  They produced five emails, so they have some

24   emails, and they had -- when we did the (indiscernible) --

25             THE COURT:  They're only -- you're telling me only

Page 62

1    one entity and only those five documents.

2            MR. MACKINNON:  No.  For that one entity, we ran

3    search terms.  There were 800 search term hits from the

4    relevant time period.  Five of them were responsive to the

5    document requests.  So it's 800 were preserved from that

6    time forward.  I think I went over the Fortis timeline,

7    which is, you know, March 18.  They get notice of the

8    complaint and then they send the Hold Notice April 11, 2011.

9    So from that point forward, April 11, 2011, there should be

10   no deletion of any emails then -- that then exist -- then

11   existing, you know, that relate to Fairfield.  And that

12   whole notice specifically references BLMIS, Madoff, or

13   Fairfield.

14           THE COURT:  But they had a 10-year retention

15   policy, and that's even without a litigation hold.  So that

16   should've been there -- those -- all those emails should've

17   been there already, and then the litigation hold should've

18   kept them.

19           MR. MACKINNON:  Yeah.  So it's not really a 10-

20   year retention policy.  I think the policy Mr. Margolin was

21   referring to is probably better stated a 10-year deletion

22   policy; that emails are deleted after 10 years, not that

23   they have to be retained for 10 years.  So there were --

24           THE COURT:  And so you should've had all those

25   from 2002.  They should've had all those because it

Page 63

1    shouldn't have been deleted.

2              MR. MACKINNON:  No.  No, the policy was that

3    employees had to delete emails to stay within their volume

4    limits.  They had no obligation to retain emails for 10

5    years.  There was no policy that said employees must retain

6    for 10 years.  I think when we're using --

7              THE COURT:  Have you ever tried to delete one of

8    your emails?  Really delete it?  Yeah, exactly.

9              MR. MACKINNON:  Yeah.

10             THE COURT:  Okay.  Go right ahead.  Keep --

11             MR. MACKINNON:  No, it was a 10-year deletion

12   policy, which means that after 10 years, to the extent that

13   there was such a policy, the emails were deleted.  But

14   employees regularly -- before the litigation hold went out,

15   the record reflects that employees regularly had to delete

16   emails to stay within their volume limits.  They had very

17   strict volume limits.

18             And the emails were not backed up.  So for -- I

19   don't know if it's helpful, but for BGL BNPP, in terms of

20   the Hold Notices, they go out August 2010, January 2011, May

21   2011, and June 2011.  And the first two are BLMIS or Madoff,

22   the last two reference BLMIS, Madoff, or Fairfield.  And so

23   yes, anything that was in the possession of BGL BNPP as of

24   that point in time that had not previously been deleted was

25   subject to retention.

1          Suisse, the hold goes out, the first one in May

2     2011, and then BNPP Securities Nominees, the hold was sent

3     out too late.  It was in October 2013.  And so -- I mean,

4     maybe I'll just -- unless Your Honor has any further

5     questions, I can just wrap up and just --

6          THE COURT:  Please.

7          MR. MACKINNON:  I can just say that I -- the key

8     points from our perspective are prejudice.  They -- at this

9     point in time, there is no basis to find that they've been

10    prejudiced by the loss of ESI because the emails that

11    they've cited do not show jurisdictionally relevant contact.

12    We can have a different prejudice discussion I think at a

13    later point when we're talking about merits, but the

14    prejudice here is related to jurisdiction.

15         And then we would just say no, no intent to

16    deprive. The intent to deprive cases are very different,

17    involve much more egregious conduct.  Usually it's repeated

18    discovery failures, and usually there's a clear showing of

19    motive that we don't see in this case.  And I would wrap it

20    up there unless you have any other questions.

21         THE COURT:  I do not.  Thank you.

22         MR. MACKINNON:  Thank you very much, Judge.

23         THE COURT:  Thank you.

24         MR. MARGOLIN:  Your Honor, may I make a couple of

25    brief responses?

1           THE COURT:  Certainly.

2           MR. MARGOLIN:  Thank you.  I think it's really

3    significant to understand what Mr. MacKinnon did not address

4    in his presentation, right?  And this is the same as their

5    opposition brief here.  There's no explanation offered for

6    the delay in sending litigation holds.  There's no

7    explanation offered for sending litigation holds to anything

8    but the full set of custodians that should've received them.

9    There's no explanation here for not suspending deletion

10   policies.  There's no explanation for not knowing what

11   happened to ESI when there was a corporate merger.

12           And that's incredibly telling, but what we did

13   hear from Mr. MacKinnon I think is generously described as

14   attorney testimony, and in many instances goes well beyond

15   what their own 30(b)(6) witness was able to testify.  They

16   have perpetuated this myth that these entities were

17   "execution only".  And I addressed in my opening statement

18   here that that is not supported by the minimal documents

19   that we found.  And the only way to demonstrate that would

20   be to look at the spoliated materials.

21           This myth of execution only, it is false, and it

22   is a fabrication.  And if you take a look at who Ms. Getvan,

23   the 30(b)(6) witness, spoke to, to make this understanding

24   that that's how the business operated, in most instances

25   people that she spoke to, she either didn't know if they

Page 66

1    were at the business in the relevant period, or

2    affirmatively knew that they weren't.  She spoke to very few

3    percipient witnesses.  In fact, if you take a look at the

4    testimony summaries that Mr. MacKinnon and Cleary provided

5    before each deposition, they reflect a number of

6    conversations that the witness herself said she couldn't

7    make.  So these are conversations that Mr. MacKinnon and his

8    team had with various witnesses at different BNP entities

9    that Ms. Getvan didn't even attend.

10            And so what we have really heard again is Mr.

11   MacKinnon's I think very generous spin on the facts here,

12   and the record does not support it.  And this myth of

13   execution only is key to the argument that they should not

14   have been on notice in 2008, and that somehow they're

15   different from the party in DoubleLine, but that's just not

16   the case.

17            What we are talking about here are entities that

18   withdrew, they redeemed funds from the biggest Ponzi scheme

19   in history, and these are sophisticated financial entities.

20   And what their counsel is saying is that despite taking

21   money directly from those -- from the funds, they should not

22   have been on notice of the potential for litigation despite

23   a press release, which Your Honor properly points out that

24   noted the risk to BNP that they should not have been on

25   notice.  That's not credible, and we shouldn't believe it.

1              I think my final point here is on the argument

2      that Mr. MacKinnon made on intent.  What the law requires

3      here is that we demonstrate a conscious disregard.  And what

4      he said is we don't think that they've shown a repeated

5      discovery failures.  I think the record here shows anything

6      but.  Each one of these five entities committed serial

7      failures in preserving documents, and there is not a single

8      explanation that Mr. MacKinnon or Cleary or BNP or the

9      30(b)(6) witness or anybody else they'd like to conjure has

10     offered for any of that, and that's the record that we have

11     right now.  And we think that that justifies not just a

12     preclusion order, but an adverse inference.  I have nothing

13     further, Your Honor.

14              THE COURT:  Thank you.  Anyone else wish to be

15     heard?  Yes, sir.

16              MR. MACKINNON:  No, Your Honor.  Thank you very

17     much.

18              THE COURT:  Okay.  We're going to take a -- let's

19     take a two-hour break and we'll come back same Zoom, same

20     everything.  So just come back then.

21              MR. MARGOLIN:  So Your Honor, to be clear, 1:15?

22              THE COURT:  That's perfect.  Thank you.

23              MR. MARGOLIN:  And that's going to be for the BIL

24     argument?  Just so I can coordinate with my colleagues.

25              THE COURT:  Oh, I got -- I forgot that one.  Okay.

Page 68

1    Hold me -- all right.  Time out.  Everybody on that, we're

2    going to come back in two hours.  Let's go to the other one.

3    What case are we calling now?

4              MR. MARGOLIN:  I'm going to turn it over to my

5    colleague David Flugman.

6              THE COURT:  And I apologize for being focused on

7    one issue.

8              MR. MARGOLIN:  Not at all.

9              THE COURT:  Because it was fun.

10             MR. FLUGMAN:  Your Honor, can you hear me clearly?

11             THE COURT:  Not really.  You've still got that

12   echo.

13             MR. FLUGMAN:  Okay, Your Honor.  I'm going to

14   switch to my partner's computer.

15             THE COURT:  Would you please?

16             MR. FLUGMAN:  Your Honor, can you hear me clearly

17   now?

18             THE COURT:  Yes, please.

19             MR. FLUGMAN:  Thank you.  Thank you.

20             THE COURT:  Hold on.  Let me find the case number

21   on this one.  What you've got is -- your partner's

22   microphone is making an echo.  At least that's what IT's

23   telling me when you're in the other room.  This is 10-3635

24   (indiscernible).

25             MR. FLUGMAN:  Yes, Your Honor.  And 10-3636.  The

1    two are consolidated.

2              THE COURT:  Thank you so much.  Now then, move

3    forward.  And those are Fairfield Sentry Liquidation v. ABN

4    AMRO Suisse AG and Fairfield Sentry ABN AMRO Suisse AG, two

5    different cases.  Very good.  Thank you very much.  And I

6    apologize.  State your name and affiliation.

7              MR. FLUGMAN:  No problem, Your Honor.  Good

8    morning.  My name is David Flugman.  I am from Selendy Gay

9    Elsberg on behalf of the Liquidators Ken Krys and Greg

10   Mitchell.

11             THE COURT:  (Indiscernible).

12             MR. FLUGMAN:  I will be addressing the

13   Liquidators' Motion for Rule 37(e) Sanctions against Banque

14   Internationale A Luxembourg, who I will refer to this

15   morning as BIL.  Your Honor, you just heard my colleague Mr.

16   Margolin lay out the many legal failings that support

17   sanctions against the BNP entities.  As I will detail for

18   the Court now, the deposition testimony that the Liquidators

19   obtained from BIL establishes that BIL committed most, if

20   not all, of the same types of failings.

21             And Your Honor, in a moment, I will walk the Court

22   through the undisputed facts, but there are two things that

23   I'd like to highlight for the Court right up front.  As of

24   today, BIL has no electronically stored information relevant

25   to the redemption the Liquidators are seeking to recover

1    here.  And second, BIL continued to destroy electronically

2    stored information belonging to relevant custodians

3    throughout the time that this case has been pending,

4    including for one key custodian in late 2021 after the

5    Liquidators served their discovery requests and while Your

6    Honor was presiding over these cases.

7            Your Honor, these facts are quite troubling, and

8    they warrant sanctions in this case in the same two forms

9    that the Liquidators are seeking against the BNP entities.

10   They warrant a preclusion order because the Liquidators have

11   been prejudiced by BIL's spoliation of evidence bearing

12   directly on their jurisdictional contacts with the United

13   States, and they also warrant an adverse inference in the

14   form described by my colleague the facts show that BIL has

15   acted with a conscious disregard towards its preservation

16   obligations that amount to an intent to deprive the

17   Liquidators of the evidence that it spoliated.

18           Your Honor, there are a dozen key facts here that

19   are undisputed that more than support the awarding of

20   sanctions in this case against BIL.  First, BIL knew that

21   Madoff collapsed in December 2008, and it immediately sought

22   legal counsel in the aftermath.  Second, BIL created what it

23   describes as a "Madoff task force" shortly thereafter for

24   the purpose of collecting and safeguarding information at

25   the bank relating to several of BIL's investments in Madoff

Page 71

1    feeder funds, but not Fairfield.

2            Third, BIL concedes that it was on actual notice

3    of these lawsuits no later than August 30, 2010.  Fourth, at

4    the time of the redemption at issue here, which was in 2007,

5    and at the time BIL actually knew about these lawsuits in

6    2010, BIL had two document retention policies in place that

7    would've preserved all relevant emails and other electronic

8    communications for 10 years.  It had a policy directing its

9    employees to preserve all documents relating to commercial

10   transactions like the one here for 10 years.  Meaning, that

11   each individual should've been keeping those documents, and

12   they would've been available under ordinary circumstances

13   until 2017.

14           And Your Honor, we attached a copy of that policy

15   as Exhibit 11 to my declaration submitted in support of the

16   Liquidators' motion.  BIL also had a separate policy of

17   automatically saving copies of every email sent to or

18   received from a third party.  Meaning, the copies would've

19   been available until 2017 under ordinary circumstances and

20   could've been preserved longer if BIL had acted.  And BIL

21   concedes this at Page 17 of their opposition brief.

22           Fifth, Your Honor, in September 2010, BIL

23   collected the hard copy transaction file, that's its term,

24   for the redemption at issue.  And Your Honor may recall

25   we've discussed that file with Your Honor before at a

Page 72

1    conference in September.  We attached that transcript as

2    Exhibit 16 to my declaration.  And Your Honor, the

3    transaction file, as Your Honor may recall, is a collection

4    of printed emails, many of which are incomplete, and other

5    documents relating to the redemption at issue that were

6    created at the time.

7              Sixth, in November 2010, nearly four months after

8    BIL concedes that it was on actual notice of these lawsuits,

9    and after consulting with U.S. counsel, BIL sent its one and

10   only litigation hold directing recipients to preserve all

11   hard copy and electronic documents relating to Fairfield.

12             THE COURT:  Give me that exact date again, please.

13             MR. FLUGMAN:  That was sent on November 26, 2010,

14   Your Honor.

15             THE COURT:  Thank you.

16             MR. FLUGMAN:  Seventh, neither BIL nor its counsel

17   interviewed anybody at the bank to determine who should

18   receive the hold notice.  Eighth, of the six individuals BIL

19   has identified in its Rule 26(a) disclosures as having -- as

20   being likely to have information relevant to this case, two

21   of them, fully one-third, never received the hold, and thus,

22   they never received any direction to save relevant

23   information.

24             Ninth, BIL never followed up with any of the

25   people who did receive the hold to ensure they were

Page 73

1    complying or to actually collect documents.  After BIL sent

2    the hold in November of 2010, the first time BIL attempted

3    to collect documents relating to these cases from anyone was

4    in mid-2022 over 11 years later.  Tenth, BIL took no steps

5    at the institutional level, at the bank level, to ensure

6    that documents were being preserved, such as suspending end-

7    users' ability to delete emails.  Instead, the bank shifted

8    the entire burden on complying with the hold onto the

9    individuals, individuals who were unfamiliar with litigation

10   holds.

11          Eleventh, BIL never suspended its policy of

12   deleting all electronically stored information for employees

13   who left the bank, and it did that within six months of

14   their departure.  And this is critically important, Your

15   Honor, because this policy was followed for three former

16   employees who were listed in the Rule 26(a) disclosures who

17   received the litigation hold but later left the bank.  BIL

18   deleted all of their electronic data, including one --

19   including the data for one key custodian, a gentleman by the

20   name of Gianni Baldinucci, B-A-L-D-I-N-U-C-C-I, who was the

21   relationship manager for the customer whose transaction is

22   at issue here.  And BIL did that, as I mentioned earlier, in

23   late 2021, six months after he left while Your Honor was

24   presiding over this case.

25          And twelfth, as I stated at the outset, BIL has no

Page 74

1     electronic information in its possession today that is

2     relevant to this case.  Your Honor, these facts are clear in

3     the record, and they are egregious.  Under any read of the

4     case law, which my colleague Mr. Margolin laid out, and

5     which is equally applicable here, BIL's conduct merits

6     sanctions.  The record here shows clearly that BIL was under

7     a duty to preserve electronically stored information, that

8     it failed to take reasonable preservation steps to do so,

9     and that the loss data cannot be restored or replaced.

10          Now, Your Honor, BIL does not even attempt to

11    argue in its papers that its preservation steps were

12    reasonable.  Instead, it focuses argument on the first and

13    the third elements of the test.  I'm going to address those

14    arguments in turn, and BIL's -- these arguments, as Your

15    Honor will see, border on the absurd and should be rejected.

16          On the duty to preserve, Your Honor, BIL makes two

17    arguments in its brief.  First, they argue that even though

18    they admit having actual knowledge of this lawsuit in August

19    of 2010, that they were not sufficiently on notice of the

20    specific redemption at issue to trigger a duty to preserve.

21    And in fact, they said they didn't have that specific

22    information until very recently.

23          Your Honor, that is not the law.  All that the law

24    requires is that a party be reasonably on notice that

25    materials may be relevant to future litigation or future

Page 75

1     discovery requests.  And requiring the level of specificity

2     that BIL suggests would neuter the duty to preserve.  And

3     those duties have been clear since the Zubulake case in

4     2003.  We also cited a case CBF Industria in our papers from

5     2021 making that clear.

6          But Your Honor, even if this was the standard,

7     even if they needed knowledge of the specific redemption at

8     issue, there are two key facts in the record that will allow

9     Your Honor to easily dispose of this argument.  In January

10    of 2021, the Liquidators filed an amended complaint in this

11    action that specifies the exact redemption date amount and

12    number of shares corresponding to the redemption that is at

13    issue.

14         And Your Honor, as I mentioned earlier, in

15    September of 2010, just a few weeks after admits it learned

16    of this lawsuit, BIL actually collected the transaction file

17    in hard copy for the specific redemption that's at issue.

18    Had it looked at the file when it collected it, it would've

19    known exactly which individuals were involved, and it

20    could've acted to preserve information.  So what more could

21    BIL possibly have needed?  Or more to the legal standard,

22    what more would any reasonable party in BIL's position have

23    needed?

24         Your Honor, the other argument BIL makes about the

25    duty to preserve goes to scope.  They argue that preserving

Page 76

1    electronically stored information in this case was not

2    "proportional to the needs of the case".  And that's in

3    Pages 12 to 14 of their opposition brief.  Your Honor, as a

4    matter of law, they're wrong.  Courts in this circuit are

5    clear that parties should preserve all relevant documents

6    that are "reasonably likely to be requested in discovery".

7    That's from the Zubulake case.

8            But Your Honor, again, as a matter of fact, we can

9    look to what BIL did to show that this just a latter day

10   excuse.  We can know that because BIL's litigation hold,

11   which we attached at Exhibit 10 to our -- to my declaration,

12   specifically directed recipients to preserve electronically

13   stored information.  Your Honor can look at that exhibit for

14   yourself, and you can see it in black and white.  So it's

15   clear at the time that BIL understood that preserving ESI

16   was important and was called for in this case.  The problem

17   was it just actually failed to preserve the ESI.  Any of it.

18           So Your Honor, turning to the third element

19   whether the ESI could be restored or replaced, the answer

20   is, no, it cannot.  And Your Honor, it bears repeating this

21   is not a situation where just one or two custodians' files

22   are missing and the bank could look to other relevant

23   individuals' files in the organization for replacements.

24   No.  Here, all of the ESI for all of the relevant custodians

25   is gone with no back-ups.

1            So how does BIL respond to this?  By attempting to

2     draw a line between external and internal communications and

3     making arguments about both.  But Your Honor, the

4     distinction that BIL tries to draw here is one that is

5     false, and ultimately one without a difference.  I'd like to

6     start with external emails, Your Honor, those between people

7     inside the bank and third parties.

8            Now, BIL concedes that these types of documents

9     once existed, and that they would've been available to

10    produce until at least 2017 had they been preserved.  And of

11    course, Your Honor, BIL has to concede this as we have,

12    albeit incomplete, examples of emails like this in the hard

13    copy transaction file.  And Your Honor, we've attached the

14    entire hard copy transaction file as Exhibit 2 to my

15    declaration, and there are examples in there of third party

16    emails, external emails.

17           So how does BIL respond?  They say that there's no

18    prejudice to the Liquidators because the emails can simply

19    be replaced by going to third parties.  Very similar

20    argument to the one that BNP made.  And Your Honor, BIL

21    points to the fact that the Liquidators have located some

22    versions of some communications, including some more

23    complete versions of the printed emails found in the

24    transaction file.  And they say this is evidence that

25    discovery is replaceable, and that's in their opposition

Page 78

1   brief at Page 18.

2          Your Honor, as an initial matter, none of the meta

3   data, like BCCs, attachments, and forwards that would

4   accompany BIL's copies of these emails, are obtainable from

5   third parties.  And Your Honor has already recognized at

6   previous hearings relating to this Defendant that meta data

7   like this is important and should be preserved.  But

8   moreover, BIL's argument fails again on the law.  The fact

9   that the Liquidators have obtained some emails from third

10  parties does not remedy the prejudice they have suffered

11  here.  It's simply as the court in the Cohen v. Dunne case

12  we cite in our brief terms the question of "one of kind to

13  one of degree".

14          Your Honor, no one can tell sitting here today

15  that substantially all of the relevant emails could be

16  replaced from third parties, parties who may not have

17  preserved those emails.  But Your Honor, with respect to the

18  internal emails, emails between and among people within the

19  bank, which are some often of the most probative emails or

20  information in discovery, BIL concedes that they can't be

21  replaced by going to third parties, of course.  And BIL also

22  has confirmed that there are no backup tapes or other

23  sources at the bank from which they can be restored.

24          So, BIL simply asks the Court to believe that

25  there were no internal emails for it to preserve when the

Page 79

1    duty attaches.  But here, Your Honor, BIL can't get its

2    story straight, and its brief is contradictory.  In one

3    place in its brief at Pages 12 to 13, BIL claims that it

4    would've been to burdensome to preserve ESI for this case.

5    And Your Honor, they don't say it outright, but what they

6    must mean is internal emails because external emails were

7    being automatically preserved on a 10-year policy without

8    any action being taken by anyone at the bank.

9           But Your Honor, for purposes of trying to avoid

10   the conclusion that all of the internal electronically

11   stored information has been lost, BIL asks the Court to

12   believe that no internal emails in any of the six relevant

13   custodians' accounts remained, existed, and could've been

14   preserved when the duty to do so arose.  That's at Pages 16

15   to 17 of their brief.

16          Your Honor, this is a completely implausible

17   argument, and we know that from the testimony.  We know

18   from the deposition testimony and BIL's partial transaction

19   file that its employees had access to and actually email

20   throughout the relevant time period.  We know that BIL

21   employees used emails to communicate among themselves.

22   We've attached -- there are examples of internal emails

23   among people at the bank that were included in the printed

24   transaction file attached as Exhibit 2 to my declaration.

25          We know from the deposition testimony that BIL's

1   document preservation policy required emails relating to

2   clients and commercial transactions like the one here to be

3   saved for 10 years.  And Your Honor, despite the fact that

4   BIL's corporate representative spoke to most of the relevant

5   custodians before his testimony, he didn't actually ask them

6   or know whether they deleted their internal emails between

7   2007 and 2010, which would've been, by the way, a violation

8   of BIL's document retention policy.

9          So Your Honor, BIL asks this Court to speculate

10  and then to resolve any doubts on that speculation in its

11  favor.  Your Honor, the record her provides ample evidence

12  supporting the more plausible explanation as to why no

13  internal emails currently exist at the bank, and that's not

14  because six people independently deleted all their emails,

15  but rather because BIL failed to act when it was duty bound

16  to preserve information.  In other words, because BIL

17  spoliated.

18         So Your Honor, having established the three

19  elements of a spoliation claim under Rule 37, the only

20  remaining question for Your Honor is what form of relief to

21  award.  And as I noted at the outset, the Liquidators are

22  seeking two forms of relief.  First, a preclusion order

23  preventing BIL from pointing to a lack of evidence in

24  support of its personal jurisdiction motion.  Your Honor,

25  here the only argument BIL makes is that, well, the

Page 81

1    Liquidators haven't suffered prejudice because there's no

2    reason to believe that a significant amount of relevant

3    information had been lost.  And that's at Pages 19 to 20 of

4    their opposition brief.

5            But Your Honor, you need look no further than the

6    incomplete hodge podge of printed emails that BIL concedes

7    are relevant to this case to conclude that relevant ESI was

8    lost.  Not just meta data like BCCs, forwards, and

9    attachments, which are important, but entire portions of

10   emails and an unknown quantity of communications and

11   electronic records.

12           We've got some of them from third parties, but as

13   one case described it, there's no reason to believe that

14   that's not just the tip of the proverbial iceberg.  And Your

15   Honor, this evidence more than satisfies the Liquidators'

16   burden to show that the destroyed evidence "plausibly

17   suggests that the ESI would support their case".  That's

18   from the (Indiscernible) case we cite in our papers from

19   2019.

20           Your Honor, the second form of relief that we're

21   seeking here is for an adverse inference that the spoliated

22   ESI would've been favorable to the Liquidators in

23   establishing personal jurisdiction over BIL.  And Your

24   Honor, I reiterate a point that my colleague made at the

25   outset of his presentation, which is that we recognize that

Page 82

1    an adverse inference is a serious remedy, and it's one that

2    we do not likely come to the court requesting.  But Your

3    Honor, we think the factual record here is egregious.  And

4    the prejudice that the Liquidators have suffered is

5    palpable.  Let me give you just one example.

6            We attached as Exhibits 19 and 20 to my

7    declaration in support of the Liquidators' motion email

8    chains that were obtained from a third party demonstrating

9    that affiliates of BIL actually travelled to New York in

10   2005 to meet with the Fairfield-Greenwich Group, the funds

11   investment manager, and received diligence and other

12   materials about Fairfield.  Did those people who visited FGG

13   in New York share what they learned about Fairfield with

14   people at BIL?  BIL's corporate representative said it was

15   possible, but couldn't say.

16           But Your Honor, this is the very point.  We don't

17   know because all of the internal records at BIL have been

18   destroyed.  And these are exactly the kind of documents that

19   go to the heart of jurisdiction, which is the issue, of

20   course, presently before the Court.  So Your Honor, what is

21   BIL's response on this?  The lone argument is that it took

22   what it describes as "significant steps" to preserve ESI,

23   and that those steps are inconsistent with an intent on

24   BIL's part to deprive the Liquidators of the spoliated

25   information.

Page 83

1          Your Honor, respectfully, this argument is just

2     not credible.  BIL took no steps, let along significant

3     steps, to preserve ESI apart from distributing one

4     litigation hold to some custodians years after the duty to

5     preserve attached that fails virtually every requirement for

6     litigation holds set down in Zubulake and its progeny, black

7     letter law in this circuit for nearly two decades.

8          Instead, Your Honor, it is clear from the record

9     that BIL knew it had a duty to preserve, knew that that duty

10    extended to electronic information, had capable U.S. counsel

11    advising it, and still failed to take any reasonable steps

12    to safeguard information that BIL subsequently destroyed.

13    Indeed, BIL took affirmative steps along the way, including

14    by choosing not to include Fairfield in its Madoff task

15    force, and by choosing to destroy electronic data for

16    departing key custodians as recently as 2021 that evidence

17    an intent to deprive.

18          Your Honor, the law does not require absolute

19    proof of intent or an adverse inference by direct evidence.

20    Circumstantial evidence of a "conscious dereliction of a

21    known duty" will suffice.  And that's from the Mule case we

22    cite in our papers.  Your Honor, this record more than meets

23    that standard.  It's for these reasons the Liquidators

24    respectfully request that the Court grant the relief set

25    forth in our motion, and I'm happy to answer any questions

Page 84

1      the Court may have.

2              THE COURT:  Very good.  Rebuttal or response?

3              MR. BUTLER:  It's Jeff Butler from Clifford Chance

4      representing Banque Internationale A Luxembourg.  A lot of

5      the points that I would want to make are covered in our

6      brief and have been covered by Mr. MacKinnon, so I'll just

7      briefly cover a few points that I want to emphasize.  First,

8      I'll ask the Court to focus on what information has actually

9      been lost in this case.  And you know, there's a lot of

10     discussion about ESI generally, but here we're talking about

11     emails.  And it's important to bear in mind that the content

12     of most of the relevant emails has not been lost here

13     because the emails themselves were preserved in hard copy

14     form in the bank's transactional files.

15             THE COURT:  Yeah, but you don't have the meta data

16     and all -- and who all they went to.

17             MR. BUTLER:  Correct, Your Honor.  Correct, Your

18     Honor, but that's what we're talking about here, the meta

19     data, not the --

20             THE COURT:  Yes.

21             MR. BUTLER:  -- content of the emails themselves.

22     And so that becomes relevant, especially when you get to --

23             THE COURT:  But you don't even know necessarily

24     who the copies are to.  So that's -- yeah.  Okay.  Keep

25     talking.

1          MR. BUTLER:  I understand.  You're absolutely

2     correct, Your Honor.  We're not saying that nothing was

3     lost.  We're saying that it's a relatively limited set of

4     electronic information, and there's a lot of other

5     information that has been produced and is available for

6     production in the case.  Next I want to talk about the

7     timing and the scope --

8          THE COURT:  Excuse me.  You said is available for

9     production.  It wasn't produced?

10         MR. BUTLER:  In some cases there's information

11    that has not been produced, Your Honor, because we're in

12    jurisdictional discovery, and we've only produced documents

13    relating to the --

14         THE COURT:  Well, we're talking about

15    jurisdictional discovery.  That's what this is all about.

16         MR. BUTLER:  Correct, Your Honor, but we haven't

17    produced for example every single document within the bank

18    relating to the Fairfield funds.  That's because it's only

19    (indiscernible) --

20         THE COURT:  So you've made a determination that

21    anything you've looked at is not on point for

22    jurisdictional.  Is that what you're saying?

23         MR. BUTLER:  What we're saying is that there are

24    some other -- there are, for example, other redemption from

25    the Fairfield funds that are not at issue in this particular

Page 86

1    Citco case, and not everything has been produced because we

2    have focused on this particular redemption for purposes of

3    jurisdictional discovery.  So yes, Your Honor, we have

4    produced a lot of documents relating to this specific

5    transaction.  There are potentially additional documents

6    available to produce when we get into full, you know,

7    discovery in this case.  And there's a lot of information

8    that was not lost.

9            I mean -- and Your Honor, let me just make this

10   point.  I mean, this is a case about clawing back a

11   particular redemption that occurred in August of 2007.  And

12   when you think about, well, what would be the most relevant

13   information for a case like this, it wouldn't necessarily be

14   the meta data of emails or people who were involved.  I

15   mean, first and foremost, it would be the data relating to

16   the transaction itself, which has all been preserved.

17           And again, I'm not trying to say that we shouldn't

18   have preserved the meta data, Your Honor.  I'm just trying

19   to suggest that the meta data at issue on this motion is

20   only a, you know, portion of the potentially relevant

21   materials in this case, and it's relevant that a lot of the

22   other potentially relevant materials have been produced.

23           Let me go onto the timing and the scope of the

24   duty to preserve, and Mr. MacKinnon talked about this.  I

25   think it's -- it would be swimming against the vast majority

1   of precedent in the Southern District to hold that the duty

2   arose before BIL was on notice of the particular case.  So

3   we would submit that the duty could not have arisen, that no

4   duty arose before August 30, 2010, which is when BIL first

5   had notice that the state court version of this case had

6   been filed.  But even then, Your Honor, for purposes --

7              THE COURT:  Well, even then, it's going to look

8   back 10 years or whatever.

9              MR. BUTLER:  Well, it depends -- this motion

10  depends on what existed at the time the duty to preserve

11  arose.

12             THE COURT:  Okay.

13             MR. BUTLER:  That's why the Court would need to

14  make a finding.  We say it's no earlier than August 30th,

15  but it could be later than August 30th as well, Your Honor.

16  Because it's not just that the duty to preserve is an on-

17  and-off switch that you either have the duty to preserve

18  everything or the duty to preserve nothing.  There's the

19  concept of the scope of the duty to preserve that is in the

20  cases under Rule 37(e).

21             So the Court has to make a finding not only of the

22  timing, but also what did the duty extend to.  And the

23  Advisory Committee notes of Rule 37(e) warn against using

24  hindsight to establish what the scope would've been.  And

25  they indicate that it's possible that a duty to preserve

Page 88

1    exists, but the scope of that duty may be unclear.  And if

2    the scope of the duty is unclear, then the Liquidators or

3    moving party cannot meet their burden of showing that the

4    scope included the particular ESI that is at issue in the

5    motion.

6              And that's what we're trying to suggest here.  And

7    the reason that the scope of the duty to preserve was

8    unclear back in late 2010 is because the initial pleadings

9    in the case were very vague about the particular redemption

10   that involved BIL.  And even when the Liquidators listed all

11   the redemptions in the amended complaint filed in the 10-

12   3636 action in January of 2011, bear in mind that there were

13   80 different Defendants in that case, and there were more

14   than 1,500 redemption payments alleged.  And there was no

15   connection made in that complaint between the particular

16   redemptions and the individual Defendants.

17             So -- and that's the 3636 case, Your Honor.  In

18   the 3635 case, there was a similar situation, but none of

19   the redemptions correlated to anything that BIL had done,

20   and the Liquidators concede that at this point.  They don't

21   have any claim under the 3635 case even though they've kept

22   BIL in that case and kept BIL as a Defendant in that case.

23             So it's a small point, Your Honor, but I'm just

24   trying -- the Court, in order to impose sanctions, is going

25   to need to make certain factual findings.  One of them is

1    the timing of the duty to preserve, and another is the scope

2    of the duty to preserve.  And because of the ambiguity of

3    the pleadings that were filed by the Liquidator, we believe

4    it's difficult to make a finding that the scope of the duty

5    to preserve included the particular meta data that we're

6    talking about on this motion.

7         Now, one might argue that that's a little unfair

8    to the Liquidators because it makes them difficult to win a

9    motion like this.  But bear in mind, the Liquidators decided

10   what to include in their complaints.  They made the decision

11   to be ambiguous about what was at issue for BIL in this

12   case.  And they should not be rewarded for being ambiguous

13   by getting a broader duty to preserve.  And that's one

14   aspect of the reply brief that I wanted to address

15   specifically, which is the suggestion that, hey, it may not

16   have been clear -- this is in the reply brief of the

17   Liquidators.  I think it's at Page 7 in the last line of the

18   carryover paragraph.  There's a suggestion that, hey, if it

19   was unclear what transaction was at issue, then BIL

20   should've preserved everything or all the --

21        THE COURT:  Okay.  When did you start representing

22   this client?  Just what's your date on this?  I just want to

23   know that.

24        MR. BUTLER:  For me -- for my firm, Your Honor,

25   they started advising BIL on these issues shortly after the

1    collapse of BLMIS.

2            THE COURT:  Okay.  And did your firm not realize

3    the kind of evidence you might need for personal

4    jurisdiction?

5            MR. BUTLER:  Well, Your Honor, I'd rather not go

6    into what my firm and particularly the Luxembourg office of

7    Clifford Chance might've known.  I can tell you my personal

8    involvement in the case and the New York involvement in the

9    case did not come until much later.  It was around October

10   --

11           THE COURT:  All I can say is we've got a

12   sophisticated client, we've got a sophisticated lawyer or

13   lawyers and clients.  And I am sure -- I don't even -- I'm

14   going to editorialize right here.  I know your firm well.  I

15   know a lot of people in your firm well, and I know them well

16   enough to know they're saying you've got to do this.  And

17   did no one think about meta data?  I mean, I'm just -- you

18   don't have to answer that.  I've already got the answer to

19   that.

20           MR. BUTLER:  Thank you, Your Honor.  Let me move

21   on.

22           THE COURT:  Because it just seems unimaginable to

23   me.  I'll just say that.

24           MR. BUTLER:  Your Honor, and I'll leave it at

25   that, but I will (indiscernible) --

Page 91

1              THE COURT:  You need to because I'm --

2              MR. BUTLER:  -- the scope of the duty to preserve

3       is evaluated based on the content of the pleadings, not

4       based on the excellence or lack of excellence of the lawyers

5       involved.  And the pleadings in this case are not

6       (indiscernible) --

7              THE COURT:  This is jurisdiction we're talking

8       about here, and the pleadings in this case is on

9       jurisdiction.  And you don't have to say preserve the meta

10      data.  That's not what the rules say.  They say preserve the

11      electronic.  It's a simple scope.  We're not out in the

12      world here.

13             MR. BUTLER:  Respectfully, Your Honor, I disagree

14      because it's not an all-or-nothing proposition.  It's not

15      that we had a duty to preserve all the ESI for everyone in

16      the BIL organization because this case was filed.  We -- if

17      we had a duty, it was only to preserve ESI from specific

18      individuals who were involved in the transaction at issue.

19      And because the transaction at issue was not made clear from

20      the pleadings --

21             THE COURT:  It doesn't have to be a transaction at

22      issue.  It's any of the stuff that was emailed between BLMIS

23      and Fairfield.  That's -- you're narrowing the scope, and I

24      don't think your scope needs to be narrow.

25             MR. BUTLER:  I understand, Your Honor, and you may

Page 92

1     reach a different conclusion.  We're just trying to make the

2     point that in our view the scope should be crafted according

3     to what's in the pleadings.  And therefore, there's at least

4     a possibility that the pleadings are --

5               THE COURT:  Why not craft the scope to what's in

6     the code and the rules?  Let's just be serious here.

7               MR. BUTLER:  I understand your point, Your Honor.

8     Let me move on.

9               THE COURT:  Thank you.

10              MR. BUTLER:  the -- I think the point of prejudice

11    was covered.  I mean, clearly some ESI was lost.  Clearly

12    this meta data is not available, and the Court has the

13    difficult challenge of deciding how that might have

14    prejudiced the Liquidators given that the rule under (e)(1)

15    is clear that the remedy can only be sufficient to cure the

16    prejudice that might exist.

17              But I want to go onto (e)(2) and the intent

18    element of Rule 37(e) because I think that's very important

19    here.  And it's important not only because some remedies are

20    explicitly being sought under (e)(2), but because even the

21    remedies that are sought under (e)(1) here, these preclusion

22    remedies, come dangerously close to the type of remedies

23    that are at issue under (e)(2).  And I don't think it's

24    obvious that the remedies that the Liquidators are proposing

25    under (e)(1) are actually available absent a finding of

Page 93

1   intent to deprive under (e)(2).

2          There's not a clear distinction drawn in the rule

3   between precluding a party from making an argument and

4   presuming a fact to be true.  And if it -- if the Court

5   enters a ruling --

6          THE COURT:  They're not asking us to find intent.

7   That's not been there.  So...

8          MR. BUTLER:  Well, let me go onto the --

9          THE COURT:  Oh, they are.  Excuse me.  I'm all

10  right.

11         MR. BUTLER:  Yeah --

12         THE COURT:  You're asking us to find intent.

13  Okay.

14         MR. BUTLER:  Yeah, they are, Your Honor.  And I

15  just --

16         THE COURT:  I agree.

17         MR. BUTLER:  -- (indiscernible) on that.

18         THE COURT:  I said it wrong.

19         MR. BUTLER:  Okay.  Because the intent element is

20  by design, one that is meant to be difficult to establish.

21  I mean, Rule 37(e) was working a significant change in the

22  case law, and it's clear that the intent requires not only

23  an intent to delete the information, the electronic

24  information, but a specific intent to deprive a litigant of

25  the use of that information in a particular case.

1          And there are very few cases that have found that

2     this intent element had been satisfied.  And usually they're

3     -- they arise in cases where the electronic information

4     that's been deleted is a clear and central importance in the

5     overall case.  So you see that for example in the Moody

6     case, which is a personal injury case arising from a railway

7     accident.  And the ESI at issue was the event recorder for

8     the train in question.  And the court said that there's no

9     question that the lost evidence was highly relevant, if not

10    the most relevant, information in the case.

11          And similarly, in the Mule v. 3-D Building case

12    from the Eastern District of New York, you know, that was a

13    case where it was about enforcement of an arbitral award

14    over a defunct company.  And the information that was lost

15    was the -- all the accounting information for that company,

16    which would show things like where payments went and where

17    the money went that might be relevant to the case.

18          THE COURT:  That's relevant to this case, don't

19    you think?

20          MR. BUTLER:  No, Your Honor, because --

21          THE COURT:  Where the money went isn't?

22          MR. BUTLER:  -- we're talking about the meta data.

23    We're talking about the meta data from emails where we know

24    the content of the emails.  And I don't think -- personally,

25    I don't think anyone would've said looking at this case, a

Page 95

1    clawback action for one redemption in 2007, that meta data

2    for a -- from emails would be particularly important or

3    dispositive in a case like this.  That's the point that I'm

4    trying to make.  And the fact is that many other cases,

5    particularly cases in the Southern District, which have been

6    cited in the papers, where the court has found that there's

7    not sufficient evidence of intent, they arose in situations

8    where maybe there was repeated conduct, maybe there was

9    egregious conduct, maybe there was negligence, or even gross

10   negligence.  But the courts have found that the information

11   at issue is not so important that an inference can be drawn.

12           THE COURT:  So all the carbon copies, all the CCs

13   and everything, that's not -- you're saying that's not

14   important either?

15           MR. BUTLER:  There's no --

16           THE COURT:  I mean, you're saying that.

17           MR. BUTLER:  There's no reason to think that it'd

18   be particularly important, Your Honor.  I mean, there are a

19   lot of cases where meta data doesn't --

20           THE COURT:  It's not -- you're saying that, but we

21   don't have it to know that.  Okay.  Go ahead.

22           MR. BUTLER:  And I think if there's a presumption

23   that we have to show -- I mean, it's our burden to show that

24   these would not be relevant in the case, I agree with Your

25   Honor we probably would lose that motion here.  But that's

1    not the law.  The law is that the Liquidators have the

2    burden to show an intent to deprive, and they have to show

3    that by clear and convincing evidence.  And what I'm arguing

4    is that the nature of the lost information here is not such

5    that the Court can easily conclude that it was deleted for

6    the specific purpose of depriving the Liquidators of it in

7    this case.

8              And it also would make no sense that BIL preserved

9    so much other information like the content of the most

10   relevant emails, and the transactions files, and the

11   transaction-related information if they were really trying

12   to deprive the Liquidators of relevant information.  And

13   it's for that reason, Your Honor, we're not saying that

14   everything was done perfectly in this case, but I do think

15   what was done was a matter of at most negligence and not

16   intent.  And there certainly was not an intent, or there's

17   not evidence of intent in this case, to deprive the

18   Liquidators of this meta data because of its perceived

19   significance in this case.

20             THE COURT:  Well, then I have a question to ask

21   you, the same question I asked Mr. MacKinnon.  What's the

22   appropriate remedy then in your mind?

23             MR. BUTLER:  Well, Your Honor, I don't have --

24             THE COURT:  There needs to be a remedy, because it

25   ain't there.

Page 97

1          MR. BUTLER:  I'm sorry, Your Honor?

2          THE COURT:  Never mind.  Go ahead.

3          MR. BUTLER:  Oh, I was just going to say I don't

4     have a clear answer.  I think Mr. MacKinnon's suggestions

5     are good ones.  I think certainly the Liquidators -- I think

6     certainly the Court can establish that meta data has been

7     lost, and perhaps some other specific attachments or

8     portions of emails has been lost.  And certainly the

9     Liquidators can argue, as they're doing already, that that

10    might have some probative significance in the case.  I think

11    those are reasonable remedies.

12         THE COURT:  We're talking about jurisdiction here.

13    We're not talking about the rest of (indiscernible).

14         MR. BUTLER:  I also think it would be appropriate

15    for the Court -- if the Court is inclined to find the first

16    four elements of Rule 37(e), it would be appropriate for the

17    Court to defer the issue of further sanctions to see if it

18    might -- if there might be more --

19         THE COURT:  Oh, no.  We're moving this case along.

20    It's been here since 2010.

21         MR. BUTLER:  I understand.

22         THE COURT:  2011.

23         MR. BUTLER:  I'm not saying that no ruling should

24    be made today, Your Honor.

25         THE COURT:  I hear you.

1          MR. BUTLER:  I'm just saying that another remedy

2    would be to keep the possibility of future remedies open for

3    the future.

4          THE COURT:  Yes.  Anything else anybody wishes to

5    add?

6          MR. FLUGMAN:  Your Honor, may I make a few points

7    in rebuttal to Mr. Butler?

8          THE COURT:  Certainly.

9          MR. FLUGMAN:  So Your Honor, I'd like to start

10   where Mr. Butler started to kind of chip away a little bit

11   at the end of his presentation, which is the idea that all

12   that's been lost here is meta data.  It most certainly is

13   not.

14         THE COURT:  (Indiscernible).

15         MR. FLUGMAN:  Right?  So just to be clear, the

16   transaction file, which was created in 2007 by printing off

17   portions of documents that people at the time thought might

18   be relevant for one purpose, does not answer the question of

19   what relevant information should've been preserved.  And if

20   you look, Your Honor, in Exhibit 2 to my declaration, which

21   lays out the -- which is the entire transaction file, you

22   will see portions of emails that are clearly cut off,

23   attachments that are missing, and other -- you know, other

24   portions of things that have not been preserved, let alone

25   the fact that we have shown emails that are just lost at BIL

1    that we have obtained from third parties, which show

2    jurisdictionally relevant contacts, such as receipt and

3    requesting of offering memoranda from Fairfield Sentry.

4              Those are attached as Exhibits 3 and 4 to my

5    declaration, correspondence with FGG, that's at Exhibit 5

6    and Exhibit 8 of my declaration, and the potential visit by

7    Dexia Asset Management to New York that I mentioned in my

8    presentation earlier at Exhibits 19 and 20.  So I just don't

9    think there's any way that Mr. Butler can say that all

10   that's been lost is meta data.

11             With respect to the scope of duty point, I don't

12   think this bears a lot of time because I laid it out in my

13   opening presentation, but Your Honor, Mr. Butler pointed out

14   a comment by the working group and the Advisory Committee

15   that says you shouldn't look at this with hindsight.  I

16   couldn't agree more.  You can look at exactly what BIL did

17   at the time, which is collect the transaction file within

18   weeks after receiving the complaint that merely stated the

19   nature of this -- or the summons -- notice and summons,

20   rather, that merely stated the nature of this action, and

21   from that transaction file could've easily identified the

22   people who were involved and preserved their information.

23             And then with respect to the amended complaint

24   filed in January 2011, the fact that there were many

25   transactions listed I don't think is a panacea here.  BIL

Page 100

1    had the information about its Fairfield transactions and

2    easily could've identified what was at issue in those cases.

3    So I think the scope of duty doesn't hold much water.  I

4    think the proper place to look is in the litigation hold

5    itself, which is broad as it should've been.  The only

6    problem is they didn't actually preserve the data.

7              Your Honor, with respect to the 3635 action,

8    briefly, we have not conceded we don't have a claim in that

9    case.  We've sued BIL in that case in good faith, and that

10   case is -- has a personal jurisdiction motion filed by BIL

11   in it, and we are going to be responding to that in course.

12   And finally, on the point about 37(e)(2) and intent, what I

13   heard Mr. Butler say is that, you know, you basically need

14   to show direct evidence of intent.  That is not the law.

15   There are many cases that we have cited in our papers

16   elucidating the proposition that you can show intent for a

17   37(e)(2) remedy by circumstantial evidence.

18             The Moody case, the Mule case, the Petters case,

19   and again, I remind the Court where I began, which is this

20   is not a case where there are gaps here and there where

21   content can be recreated by going to other custodians.  This

22   is a case where there is no ESI available at all.  And I

23   just -- I'm somewhat flabbergasted by the idea that Mr.

24   Butler can say that all of the relevant content has been

25   preserved in the one transaction file that we have.  And in

Page 101

1    reality, there is no way to know the scope of what was lost,

2    although we do have some ideas from what we have in the

3    record.  And unless Your Honor has anymore questions, I'll

4    rest.

5              THE COURT:  I do not.  Does anyone else wish to be

6    heard?

7              MR. BUTLER:  No, Your Honor.  Thank you very much.

8              THE COURT:  Adjournment time is now delayed until

9    2:30.  We will reconvene at 2:30 same Zoom, same number,

10   same passcode.

11             MR. BUTLER:  Thank you, Your Honor.

12             THE COURT:  Thank you.  Chambers.

13             (Recess)

14             THE COURT:  Good afternoon.  The only thing I have

15   to add before I read the opinion, because we're going to put

16   an opinion on the record today, so we're going to -- I'm

17   doing a bench ruling, does anyone have anything they wish to

18   add?  Thirty seconds or less.  I hear no takers on it.

19   Okay.

20             First, I just want to be very clear.  Today's

21   ruling is primarily based on all the filed pleadings with

22   the accompanying exhibits.  That being said, I think all of

23   you were articulate, and I tried to pay very close attention

24   to what you were saying even though I interrupted you a bit.

25   But I still paid close attention to what you were saying.

Page 102

1              And we're in Fairfield Sentry v. BGL BNP Paribas

2    SA, and that's 10-03626, Fairfield Sentry v. BNP Paribas

3    Security Services Luxembourg 10-03627.  And I know we have

4    two separate issues on -- or two separate Defendants on

5    Fairfield Sentry Liquidation ABN AMRO Suisse AG, 10-03635;

6    Fairfield ABN AMRO Suisse AG, 10-03636; Fairfield v. BNP

7    Paribas Securities Nominees, 11-01579; Fairfield Sentry BNP

8    Paribas Fortis, 11-01617.  For the record, would you please

9    again put your name on the record since this is a little bit

10   separate from the other one?  Anybody?  Everybody?

11              MR. MARGOLIN:  Your Honor, this is Joshua Margolin

12   from Selendy Gay Elsberg on behalf of the Liquidators Ken

13   Krys and Greg Mitchell.

14              MR. MACKINNON:  And Your Honor, this is Ari

15   MacKinnon at Cleary Gottlieb Steen and Hamilton on behalf of

16   the BNPP entities that you mentioned.

17              THE COURT:  You're on mute, Mr. -- I'm not calling

18   your name.

19              MR. FLUGMAN:  Your Honor, can you hear me?

20              THE COURT:  Yeah.  You're still on mute.  I can't

21   hear you.

22              MR. ELSBERG:  Your Honor, this is David Elsberg.

23   My colleague's name is David Flugman whose volume is not

24   working right now.

25              THE COURT:  Okay.  Thank you.  That's the computer

Page 103

1    that -- I see the background that you all are in the same

2    room.  Very good.  And Mr. Butler?

3              MR. BUTLER:  Your Honor, it's Jeff Butler from

4    Clifford Chance representing Banque Internationale A

5    Luxembourg in the 10-3635 and 10-3636 actions.

6              THE COURT:  Thank you.  Okay.  The Liquidators

7    have filed motions against the Defendants seeking sanctions

8    for spoliation of evidence relating to personal

9    jurisdiction, an issue which is currently pending before

10   this Court.  Different reasons are asserted against

11   different Defendants.

12             First, I want to address the motion to seal.  The

13   parties have made a joint request to seal the motions and

14   response papers.  The motions for sanctions contain

15   documents designated as confidential by third parties under

16   the protective orders.  Pursuant to the protective orders,

17   the deposition transcript is presumably treated as

18   confidential for the latter of a period of 30 days after a

19   final transcript of the deposition in the action is received

20   by counsel of each of the parties or the date by which any

21   review by the witness and statement of changes to this

22   transcript are to be completed under the applicable rules.

23   And of course, you can extend that by agreement.

24             The period during which the deposition transcript

25   was to be treated as presumptively confidential expired on

Page 104

1    January the 23, 2023 without either party designating any

2    portion of the transcript confidential.  The Court is

3    granting the Motion to Seal the Sanctions Motions Exhibit

4    and Responses for a period of two years.  That being said, I

5    will advise you that none of the Court's decision will be

6    redacted or sealed, and it may refer to the evidence

7    provided if necessary to divide this spoliation motion.  So

8    I grant that.

9               10-03626 BGL BNP Paribas, S.A.  In February of

10   2010, BGL BNP became the major stakeholder in BNP Paribas

11   Luxembourg -- and like you, I like to put in abbreviations,

12   but I'll try to say Luxembourg at least -- BNPP Luxe, which

13   received 1.8 million from Sentry and Sigma, and those were

14   the funds.  In June of 2010, the Liquidators sued BGL BNP to

15   claw back redemption payments made to BNPP Luxembourg from

16   the funds.  In October of 2010, BNPP Luxembourg transferred

17   its business activities to BGL BNP Paribas, and BGL BNP does

18   not possess any electronically stored information referred

19   to the parties of electronically stored information.  You

20   did that in your papers from the relevant period.

21              I will tell you all I just got sick a while ago,

22   so I'm going to be slow.  So just be patient with me.

23              The Liquidators argue that BGL BNP failed to

24   preserve this electronically stored information from BNPP

25   Luxembourg either at the time of transfer or some later

Page 105

1    time.  In their motion, the Liquidators argue that they were

2    aware of certain electronic stored information that is

3    relevant to personal jurisdiction from third party

4    discovery, and that includes a BNPP Luxembourg employee

5    emailed Sysco Fund Services, the funds administrator, on

6    September the 12th, 2006 instructing it to wire BNPP

7    Luxembourg's redemption payments to BNPP Luxembourg's U.S.

8    correspondent account at BNP Paribas New York.

9          Citco Funds Services emailed BNPP Luxe employees

10   Sentry's private placement memorandum, which explained U.S.

11   base BLMIS acted as custodian of Sentry's assets and had

12   approximately 95 percent of Sentry's assets under its

13   custody.  These emails could not be produced by BGL BNP in

14   their searches.  Liquidators claim this demonstrates a

15   failure to preserve.

16         Liquidators also argue that BGL BNP and BNPP

17   Luxembourg knew that BLMIS' collapse at least as early --

18   knew about BLMIS' collapse as -- at least as early as

19   December the 14th, 2008 when their parent company BNP

20   Paribas Group published a press release referring --

21   referencing the Madoff fraud and stating that many BNP

22   entities were exposed to this fraud through their trading

23   business.  The Liquidators provided evidence that the

24   Defendant believes "that it has probably become common

25   knowledge that the SEC had charged Madoff with running a

1    Ponzi scheme on or around the date of the press release."

2          The Liquidators also provided evidence that BGL

3    BNP retained Cleary to represent it on July 2, 2010 in this

4    liquidation proceeding.  No liquidation hold regarding BNPP

5    Luxembourg's investments with the funds was issued until

6    August the 24th, 2010 when one employee was advised.  BGL

7    BNP also issued a litigation hold to in-house counsel and

8    limited non-legal employees -- and to limited non-legal

9    employees on January the 10th 2011, and another only to in-

10   house counsel on May the 25th, 2011.  Other than the one

11   employee who had received the August 24, 2010 hold, neither

12   the January 10, 2011 nor the May 25, 2011 hold reached

13   additional employees among the 35 employees that BGL BNP

14   determined to be the most likely to possess relevant

15   information.

16          According to the motion, 34 out of the 35

17   employees that BGL BNP determined were most likely to

18   possess relevance evidence received no litigation hold to

19   preserve documents until May or June 2011, almost three

20   years after the BLMIS collapse and a full year after BGL BNP

21   was sued in this action.

22          Additionally, none of the litigation holds

23   specified what documents employees should save as

24   potentially relevant.  BGL BNP never audited compliance with

25   the holds, never imaged electronically stored information

Page 107

1    possessed by the hold recipients, and never supervised

2    employees' attempt to comply with the hold instructions.

3    The Liquidators also argued that there were no preservation

4    policies for emails, and instead, employees had discretion

5    over what emails were saved or deleted.  Once deleted,

6    emails were lost permanently.  When employees left BGL BNP,

7    their email accounts were disposed of within 90 days and any

8    archived emails, as in archived by the employees, were

9    deleted after 10 years.  The 10-year deletion policy is a

10   companywide policy at BGL BNP for corporate email.  The

11   policy was never suspended.

12           The Liquidators also argue that BGL BNP failed to

13   disclose that there was no electronic information storage

14   policy in place until December of 2022 despite there having

15   been a Rule 26(f) hearing before this Court on October the

16   5th, 2021 over a year earlier.  They also argue that the

17   witness Ms. Stephanie (Indiscernible), who had -- I don't

18   think I pronounced that right -- who was deposed regarding

19   the company's corporate policies on electronic retention,

20   was completely unfamiliar with the company's policy and was

21   unsure why she was the designated person.

22           She's a lawyer at BNP Paribas RCC in New York, and

23   was designated for all five Rule 30(b)(6) depositions taken

24   of the BNP Paribas Defendants in the U.S. Redeemer action,

25   and all five of those are European entities.  Ms. Getvan

Page 108

1    appeared at the deposition completely unprepared to

2    establish a chain of custody over electronically stored

3    information relevant to this litigation, and I will quote

4    from her deposition.  "All I can say is we don't know what

5    happened to the emails, right?  We don't know if they were

6    deleted in the ordinary course of business.  We don't know

7    if the BNL emails were transferred to BNPPL, and we don't

8    know if the BNPPL emails were transferred to BGL BNP.  We

9    just don't know."

10          In opposition to the motion, BGL BNP argues that

11   the Liquidators have not been prejudiced by the lack of

12   evidence in prosecuting its case.  Ironically, in the same

13   breath BGL BNP argues that the Liquidators lack evidence

14   that BGL BNP possess relevant electronically stored

15   information at the time that duty to preserve arose.

16   Defendants argue that sanctions sought by the Liquidators

17   are not proportionate to the harm, that they did not

18   purposely fail to preserve evidence, and the sanctions were

19   not appropriate before discovery on the merit has even taken

20   place.

21          10-03627 BPL Securities Services Luxembourg.

22   Liquidators have requested that the Court sanctions BPL

23   Paribas Securities Services Luxembourg for similar reasons.

24   Liquidators state that no emails were preserved for 15 of

25   the 31 potential custodians identified in BPL SLL for the

Page 109

1    relevant period in question.  That's 2002 through 2008.  And

2    from the 16 custodians that did have archived email and of

3    an unknown quantity, no relevant emails were found unless --

4    these were the ones where you said you found 800, correct,

5    and only five were relevant, Mr. Butler?  I just want to

6    make sure the record's correct.

7              MR. MACKINNON:  That was me, Your Honor.  Correct.

8    It was 800 search term --

9              THE COURT:  Oh, I'm sorry.

10             MR. MACKINNON:  Mr. MacKinnon, yeah, but --

11             THE COURT:  Thank you.

12             MR. MACKINNON:  -- 800 search term hits.

13             THE COURT:  Thank you.  These five emails were

14   received within a 25-day period from August the 28th to

15   September the 21st, 2007.  BNP SSL did not have a litigation

16   hold until two years after Madoff's scheme was revealed, and

17   seven months after this adversary proceeding was filed.

18   That litigation hold was distributed to only 2 of 31

19   individuals identified as custodians.  BNP SSL allegedly

20   never followed up with the employees about the hold, never

21   collected emails for preservation, and never disabled any

22   employees' ability to delete emails.

23             The BNP SSL corporate representative was unable to

24   answer any questions regarding the retention policy at the

25   deposition.  Liquidators point out that Defendants' U.S.

Page 110

1    counsel was also derelict in not directing its client to

2    preserve electronic data for litigation.  Defendants argue

3    that the Liquidators are not prejudiced by the lack of, that

4    BNP SSL did not know it had to preserve evidence during the

5    relevant timeframe from 2002 to 2008, and that they produced

6    five electric emails demonstrating that they did preserve

7    emails.  They also argued that they provided many hard

8    copies of evidence that has been turned over.

9           10-03636, and this is the 06 -- wait a minute.

10   That's this one.  That is the ANB AMRO Suisse AG, am I

11   correct?  And it has two Defendants, and this is one of

12   them.  The Liquidators argue that BNP Paribas Suisse, and

13   that's also BNP Paribas Suisse SA Private BNP Suisse failed

14   to preserve disks.  BNP Suisse has used the terms CD, CD-

15   ROMs, and DVDs to refer to the disk on which the former

16   employees' emails were imaged containing the emails of

17   departing employees 10 years after their creation.  BNP

18   Suisse admits that it received a hard drive of electronic

19   information for employees of Fortis Suisse, which it is

20   unable to locate.

21          Based on this, Liquidators argue that BNP Suisse

22   has spoliation 22 out of the 27 former employees on its

23   custodian list.  Liquidators know from third-party discovery

24   that BNP Suisse once had electronically stored information,

25   including emails documenting activities relevant to the

Page 111

1    personal jurisdiction inquiry, like emails two New York

2    based FGG.  Those electronic communicatios no longer exist,

3    and as a result, BNP Suisse has produced no emails in this

4    litigation.  BNP Suisse argues that it produced all evidence

5    relevant to personal jurisdiction, including 1,453 pages of

6    responsive documents consisting of account statements, NAV

7    statements, subscription agreements, cash transfers, trade

8    requests and tickets, trade confirmations, faxes regarding

9    redemption in Fairfield.

10         BNP Suisse argues that Liquidators have failed to

11   prove that the evidence was lost or destroyed after the duty

12   to preserve it attached.  It argues that it took substantial

13   steps to preserve documents relating to the subscriptions

14   and redemption at issue, including sending documents to

15   outside counsel for safekeeping and preserving digital

16   repositories of client account information, and retaining

17   disks of emails of former employees.  BNP Suisse also argues

18   that the Liquidators are not prejudiced by the lack of

19   evidence, and the Liquidators' requested sanction is the

20   harshest available sanctions.

21         11-01579 BNP Securities Nominee.  Liquidators

22   bring a motion seeking sanctions against BNP Securities

23   Nominee Limited, also known as Carrier Holdings Limited LCAM

24   BNP Sit. Nom. as referred to earlier in the arguments for

25   spoliation.  According to the motion, all email data is in

Page 112

1   the -- in its possession was destroyed pursuant to its 10-

2   year retention policy.  BNP Securities Nominees has no

3   employees and no email system of its own.  Instead, it acted

4   through its affiliate BNP Securities Services of New Jersey

5   who was the administrator for the investment fund.  On

6   October -- in October 2013, BNP Securities Nominee sent a

7   litigation hold to two people, neither of whom were

8   custodian or likely to have possessed relevant information

9   for this case.  The hold stated that all normal document

10  retention policies were being suspended.  They were never

11  suspended.

12          As early as 2008, BNP New Jersey had instructed

13  employees to preserve documents, including emails for 10

14  years at which point they could manually delete them in

15  2013, long after BNP Securities Nominee had actual notice of

16  this litigation.  BNP New Jersey installed a new system that

17  automatically deleted emails 10 years after they were sent

18  or received.  No employee of BNP New Jersey was ever advised

19  not to manually delete emails, and BNP New Jersey never

20  modified its automatic deletion policies.

21          The Liquidators know from third-party documents

22  that BNP Securities Nominee and BNP New Jersey once

23  possessed emails documenting activities directly relevant to

24  this jurisdictional inquiry.  BNP Securities Nominee opposes

25  the motion.  It argues that the subscription at issue in

1    this complaint were entered into when the Royal Bank of

2    Scotland International, RBS, was the nominee.  BNP

3    Securities Nominee did not exist at the time the

4    subscription agreements were entered.  It acquired the BRBS

5    business line in June of 2007, and did not acquire the

6    Legacy emails of RBS employees who transferred to BNP

7    Securities Nominee.

8            There are two redemptions in question here that

9    occurred in November 2007 when BNP Securities Nominee was

10   the acting nominee.  It argues that there have been no

11   emails generated regarding those redemptions, and there was

12   no basis to determine that BNP Securities Nominee possessed

13   the information at the time that the duty to preserve

14   attached.  It argues that these emails might have been

15   deleted prior to the complaint being filed in this action or

16   prior to 2008.

17           11-016 -- excuse me.  I keep saying New Jersey.

18   That is my mistake.  It is just Jersey.  It has been brought

19   to my attention, and I apologize for the error.

20           This is Fairfield v. BNP Fortis.  Liquidators seek

21   sanctions for spoliation against Fortis Bank SA/NV also

22   known as BNP Paribas Fortis.  Until March 2022, Fortis

23   employees were able to delete any evidence related to this

24   case without oversight.  This is true for employees who were

25   -- previously received a litigation hold in 2011.  That

Page 114

1    litigation hold stated that normal retention policies were

2    suspended, but in practice nothing changes.  Fortis has

3    turned over two emails and three attachments in relation to

4    the jurisdictional inquiry in this case.  Neither of the

5    emails are from a time when Fortis invested in Sentry.

6           Liquidators have emails from third parties that

7    indicate that they have more relevant emails that have not

8    been preserved.  Those emails show Fortis had done diligence

9    on Sentry and Bernie L. Madoff Securities, LLC, and visited

10   Sentry's investment manager Fairfield-Greenwich Group in New

11   York.  Fortis allegedly audited its litigation hold earlier

12   this year, and therefore knows when the documents were

13   deleted.  That has not been presented to me, and it refuses

14   to provide the outcome of this audit to the Liquidators.

15          Fortis waited more than 28 months after the

16   revelation of Madoff's fraud from December 2008 to April

17   2011 to issue its first litigation hold in relation to BLMIS

18   or Sentry.  When the hold was finally circulated, BNP Fortis

19   improperly relied on the recipients to implement the hold

20   with no assurance that the recipients had read the hold or

21   would comply.  No follow-up and no attempt to collect any of

22   the electronic stored information those employees might have

23   possessed.  The Liquidators argue that Fortis knew how to

24   preserve electronic data for litigation.  It has -- it had

25   previously imaged -- backed up the live email inboxes of

Page 115

1    employees in anticipation of other litigation, but chose not

2    to do so here.

3              Fortis had no automatic deletion policies or any

4    accidental data loss.  As such, the Liquidators argue that

5    the loss of data was intentional.  Fortis opposes the

6    motion.  It makes the same arguments as the other Defendants

7    have, including that there was no evidence as to whether the

8    information was deleted prior to its duty to preserve

9    arising.  Fortis argues that it took substantial steps to

10   preserve documents related to this litigation.  It has

11   preserved hard copies of the images in the email boxes of

12   five employees who departed Fortis.  Fortis also argues that

13   the lack of evidence does not prejudice the Liquidators.

14             Rule 37(e) of the Federal Rules of Civil Procedure

15   governs a party's failure to preserve electronically stored

16   information.  Rule 37(e) states if electronically stored

17   information that should've been preserved in the anticipated

18   or conduct of litigation is lost because a party failed to

19   take reasonable steps to preserve it, and it cannot be

20   restored or replaced through additional discovery, the court

21   upon finding -- one, upon finding prejudice to another party

22   from the loss of the information may order measures no

23   greater than necessary to cure the prejudice; or two, only

24   upon finding that the party in acted with the intent to

25   deprive another party of the informations used in the

1   litigation may, A, presume that the lost information was

2   unfavorable to the party; B, presume the information was

3   unfavorable to the party -- I left out the jury part -- and

4   C, dismiss the action or enter a default.

5          It is clear from the evidence presented with these

6   motions that the Defendants have failed to preserve emails.

7   "It is not sufficient to notify all employees of a

8   litigation hold and expect the party will retain and produce

9   all relevant information."  That's Zubulake v. UBS Warburg

10  LLC, 229 F.R.D. 422 (S.D.N.Y. 2004).  Rather, a party "must

11  identify all sources of potential relevant evidence and

12  implement a litigation hold by suspending any routine

13  document destruction or other process involved in the

14  ordinary course of business that might result in the

15  destruction of potentially relevant evidence."  Skyline

16  Steel, LLC v. PilePro, LLC, 101 F. Supp. 3d 394 (S.D.N.Y.

17  2015).

18         Again, "Where a party fails to timely institute a

19  formal litigation hold, the court can conclude that it did

20  not undertake reasonable steps to preserve electronically

21  stored information."  Europe v. Equinox Holdings, Inc., 592

22  F. Supp. 3d 167 (S.D.N.Y. 2022).  The Liquidators ask this

23  Court to preclude the Defendants from disputing personal

24  jurisdiction on the basis of emails.  While a court has

25  broad discretion in crafting a sanctions for spoliation of

Page 117

1    evidence, the sanctions, and I again quote, "Should be

2    designed to, one, deter parties from engaging in spoliation;

3    two, place the risk of an erroneous judgment on the party

4    who wrongfully created the risk; and three, restore the

5    prejudiced party to the same position it would have been in

6    absent the wrong destruction of evidence by the opposing

7    party."  That's West v. Goodyear Tire and Rubber, 167 F.3d

8    776 (2nd Circuit 1999).

9          Precluding the Defendants from disputing personal

10   jurisdiction is entirely akin to a default judgment being

11   entered against them on this issue.  The Second Circuit has

12   stated that dismissal of an action should only be imposed

13   where there is a showing of willfulness, bad faith, or fault

14   on the part of the sanctioned party.  Absent these, the

15   courts are encouraged to craft sanctions such as instructing

16   a jury that certain fact is found precluding a party from

17   introducing evidence on a particular issue or preventing a

18   witness from testifying about the spoliation evidence.

19          It is well-established and a longstanding

20   principle of law that a party's intentional destruction of

21   evidence relevant to proof of an issue at trial can support

22   an inference that the evidence would have been unfavorable

23   to the party for its destruction.  And that is a quote from

24   Kronish v. United States, 150 F.3d 112 (2nd Cir. 1998).

25          And again I quote, "In order for an adverse

Page 118

1      inference to arise from the destruction of the evidence, the

2      party having control over the evidence must have had an

3      obligation to preserve it at the time it was destroyed.

4      This obligation to preserve evidence arises when the party

5      has noticed that the evidence is relevant to litigation,

6      most commonly when the suit has already been filed providing

7      the parties responsible for the destruction -- providing the

8      party responsible for the destruction with express notice,

9      but also on occasion of other circumstances.  As for

10     example, when a party should have known that the evidence

11     may be relevant to future litigation."  And that is from

12     Kronish, and that is a quote.

13             Another quote from the same source, "Once a court

14     has concluded that the party was under an obligation to

15     preserve the evidence that it destroyed, it must then

16     consider whether the evidence was intentionally destroyed

17     and the likely contents of that evidence."  And that's --

18     again I quote, "Intent is really proven by direct evidence."

19     As such -- and that's the end of that quote, and begin, as

20     such courts have "substantial leeway to determine intent

21     through consideration of circumstantial evidence, witness

22     credibility, motives of the witness in a particular case,

23     and other factors.  In considering these factors, courts may

24     look to how the party acted throughout the litigation and

25     during discovery disputes, including whether there is a

Page 119

1    credible explanation of the parties' failure to preserve

2    relevant electronically stored information."  In re Petters

3    Company, 606 B.R. 803 (Bankr. D. Minn. 2019).

4              Resisting the urge to say something about your

5    30(b)(6) witness, of course the Court cannot hold the

6    prejudiced party too strict a standard regarding the likely

7    outcomes of the destroyed evidence as doing so would

8    "subvert the prophylactic and punitive purpose of the

9    adverse inference, and would allow parties who have

10   intentionally destroyed evidence to profit from that

11   destruction."

12             The Second Circuit has stated, "The level of proof

13   that will suffice to support an inference in favor of the

14   innocent party on a particular issue must be less than the

15   amount that would suffice to survive summary judgment on

16   that issue.  Otherwise, innocent parties meant to benefit

17   from the adverse inference against offending parties would

18   receive no benefit at all having been deprived of the

19   evidence that may have been crucial to making their case,

20   yet being held to precisely the same standard of proof

21   before they may present their case to a jury."  And that's

22   back to the Petters case.

23             The Liquidators are only seeking to preclude the

24   Defendants from entering evidence of what was in the emails,

25   and this remedy is more than fair.  Here the Liquidators

Page 120

1    have met their burden of demonstrating they've been

2    prejudiced by the loss of the evidence.  The Liquidators

3    have provided copies of emails that they received from third

4    parties demonstrating there at least some relevant

5    information that has been lost.  They have also met their

6    burden of demonstrating that the lost evidence in question

7    likely would have contained relevant evidence regarding

8    personal jurisdiction because the emails that they have

9    obtained from third parties are relevant to the issue.  It

10   is possible that additional similar or more relevant

11   information existed and was lost.

12          As to the Defendant's duty to preserve, it is

13   clear that they were all on notice of their duty to preserve

14   at least as early as when this case was filed though the

15   case can be made to say their duty to preserve arose at the

16   time that Bernie Madoff was arrested.  Even if the duty did

17   not arise until these complaints were filed against them,

18   the Liquidators have provided evidence that the Defendants

19   utterly failed to preserve their electronic stored data.

20   Defendants admit to not implementing proper procedures, not

21   following up on the preservation policies, and permitting

22   employees to delete emails at will.

23          Defendants argue that the Liquidators cannot prove

24   when the electronic data was destroyed, but such an argument

25   only demonstrates that the Defendants themselves lacked the

1    knowledge because of their own failure to preserve evidence.

2    If Defendants had properly exercised their duty to preserve

3    under Rule 37, the Defendants would have been able to

4    provide this Court with proof of what was in existence when

5    the litigation holds were put in place.  Indeed, this Court

6    instructed some of the Defendants to provide a witness to

7    testify to the storage policies in place at the companies.

8    This would've been the Defendants' opportunity to show the

9    Court and the Liquidators what policy they had implemented

10   at the time their duty arose.

11        At the deposition in this case, their witness

12   could've testified to what the company did in order to

13   preserve documents, and could've testified to whether any

14   emails were in existence at the time the litigation

15   commenced.  Instead, and this is after reading the

16   transcript of the 30(b)(6) witness, Defendants chose to

17   provide a witness who was completely incapable of speaking

18   to each of these companies separately and distinct data

19   retention policies.  Allowing such a witness to testify

20   demonstrates that the Defendants likely had no person who

21   could testify to their litigation hold and data retention

22   policies because no policies were never put into place, were

23   never properly enforced, or some combination of the two.

24        It is clear to the Court that the Defendants have

25   utterly failed to demonstrate that they properly preserved

Page 122

1    their electronic data.  Defendants argued that they

2    preserved non-electronic data and provided Defendants with

3    the same.  Rule 37 governs only electronically stored

4    information.  As to whether the loss was intentional, "An

5    intent to deprive can be found either from a conscious act

6    of destruction or a conscious dereliction of known duty to

7    preserve electronic data."  Mule v. 3-D Building and

8    Construction Management Corp., 2021 W.L. 2788432 (E.D.N.Y.

9    2001).  The Liquidators have proved Defendants' conscious

10   dereliction of duty to preserve.

11          The Court grants the Liquidators Motion to

12   Sanction Debtors.  The Court is restoring the Liquidators to

13   the same position they would have been without the spoilage.

14   In the proposed order, attorneys for the Liquidators, the

15   motion is granted.  The Defendant is precluded from arguing

16   any time in these cases that, A, or one, whatever you want

17   to do -- A, it did not communicate internally or externally

18   about its investments in the funds via email, including but

19   not limited to -- and I have this as an "I" --

20   communications regarding its use of correspondent accounts;

21   and II, communications with U.S.-based entities or

22   individuals.

23          And then B, such communications did not include

24   diligence on the funds, the funds investment strategy,

25   and/or Bernie L. Madoff's Investment Securities, LLC; and C,

Page 123

1    such communications are limited to the volume or frequency

2    that the Liquidators can demonstrate by use of evidence

3    produced by third parties.  And then three, an adverse

4    inference is entered against the Defendants that the

5    spoilage evidence would have been favorable to Liquidators

6    in establishing personal jurisdiction over the Defendants;

7    and four, this order is without prejudice to the

8    Liquidators' ability to seek additional sanctions at the

9    jurisdictional phase of this case to remedy the prejudice

10   calls by Defendants' spoliation.

11            Now to the other BIX Defendants in Adversary

12   Proceeding 10-03635 and 10-03636.  The Liquidators argued

13   that Banque Internationale Luxembourg SA Dexia Banque

14   International a Luxembourg, or BIL, was argued immediately

15   learned of Madoff's collapse took steps to preserve

16   information relating to those funds shortly thereafter.

17   After contacting counsel within days of the BLMIS collapse,

18   BIL created a Madoff task force that began collecting and

19   preserving documents and electronically stored information

20   relating to non-Fairfield feeder funds, but it never

21   preserved documents with respect to Fairfield Sentry.

22            Instead, it waited 23 months until November of

23   2010 before preserving any electronically stored information

24   regarding its investment in Fairfield Sentry.  In November

25   2010, one litigation hold was circulated as to Fairfield,

Page 124

1    but no institutional steps were taken to preserve evidence.

2    Counsel did not familiarize itself with the data retention

3    system.  No employee interviews were conducted to determine

4    who should receive a litigation hold, and as a result, two

5    key employees never received the hold.  No one ever followed

6    up to collect the electronic information on the hold until

7    2022 when BIL attempted to collect the discovery in response

8    to the personal jurisdiction issue.

9            The Liquidators argue that BIL acted in 2010 to

10   preserve evidence -- if BIL acted in 2010 to preserve

11   evidence, it would all be available today because its policy

12   was to retain electronic information for a period of 10

13   years.  Thus, the 2002 through 2008 information should not

14   have been deleted in 2010 when the litigation hold went into

15   effect.  BIL opposes the motion.  They admit the data was

16   not preserved, but argue that no duty to preserve arose

17   until August the 30th, 2010, and that the scope of the duty

18   to preserve was unclear.

19           They argue that they did not have enough

20   information to focus on a single redemption at issue in this

21   case -- on the single redemption at issue in this case.

22   Again we go back to Rule 37.  37(e) of the Federal Rule of

23   Civil Procedure governs a party's failure to preserve

24   electronically stored information.  37(e) states if

25   electronically stored information that should have been

Page 125

1   preserved in the anticipation or conduct of litigation is

2   lost because a party failed to take reasonable steps to

3   preserve it and it cannot be restored or replaced through

4   additional discovery, the court, upon finding prejudice to

5   another party from the loss of the information, may order

6   measures no greater than necessary to cure the prejudice or

7   only upon finding the party acted with the intent to deprive

8   another party of the information used in the litigation may,

9   A, presume that the lost information was unfavorable to the

10  party; B -- and I skipped the first part -- must presume the

11  information was unfavorable to the party; and C, dismiss the

12  action or enter a default judgment.

13         It is clear from the evidence presented BIL failed

14  to preserve electronically stored information.  BIL admits

15  that it did not place a litigation hold on its server, and

16  as such, external emails from 2007 were deleted in 2017

17  almost seven years after its duty to preserve arose.  As to

18  electronic stored information on internal emails, BIL has

19  not provided any reasonable explanation for why it failed to

20  preserve this data, just that emails were deleted in the

21  matter of course.  Had BIL acted under its duty to preserve

22  by changing its policies to prevent employees from deleting

23  emails, it would be very easy to demonstrate to the Court

24  what emails were in existence at the time the duty arose.

25         BIL also admits that it failed to preserve meta

Page 126

1   data on all of its email communications, including CC and

2   BCC.  This type of data is a significant -- is of

3   significant importance in a case like this one where the

4   Liquidators have shown BIL's intention to invest in the

5   United States.  In a similar case, BCCs and CCs have been

6   used to demonstrate the Defendants were in direct

7   communication with the Fairfield-Greenwich Group or BLMIS

8   about the redemptions in question, both of which are located

9   in New York.  These emails cannot be restored or replaced,

10   and it is not clear what has been lost.

11        As to the scope of what needed to be preserved is

12   relevant information.  The types of emails necessary to make

13   a showing of personal jurisdiction are not different than

14   the emails that would be relevant to any other litigation

15   associated with these kind of claw-back cases.  All emails

16   regarding are to and from Fairfield and BLMIS at a minimum

17   should've been preserved.  It is reasonable for BIL to have

18   expected their communications with or about their

19   investments in Fairfield and BLMIS to be relevant to any

20   litigation that may arise.  Jurisdictional evidence is not

21   different.

22        AS to whether litigation over a specific

23   redemption was foreseeable, of course it was.  Claw-backs

24   actions are common, and as such, evidence as all redemptions

25   should've been preserved.  "It is not sufficient to notify

Page 127

1    employees of a litigation hold and expect that the party

2    will retain and produce all relevant information."  Zubulake

3    v. UBS Warburg, 229 F.R.D. 422.  Rather, a party "must

4    identify all sources of potential relevant evidence and

5    supplement a litigation -- and implement a litigation hold

6    by suspending any routine document destruction or other

7    processes involved in the ordinary course of business that

8    might result in the destruction of potentially relevant

9    evidence."  Skyline Steel, LLC v. PilePro, LLC, 101 F.Supp.

10   3d 394 (S.D.N.Y. 2015).

11           "Where a party fails to timely institute a formal

12   litigation hold, the court can conclude that it did not

13   undertake reasonable steps to preserve electronically stored

14   information."  Europe v. Equinox Holding, 592 F.Supp. 3d 167

15   (S.D.N.Y. 2022).  It is clear from the evidence presented

16   today that no reasonable steps were taken to preserve this

17   data.  While the Court has broad discretion in crafting of

18   sanctions for spoliation of evidence, the sanctions "should

19   be designed to deter parties from engaging in spoliation:

20   two, place the risk of erroneous judgment on the party who

21   wrongfully created the risk; and three, restore the

22   prejudiced party to the same position it would've been in

23   absence of the wrongful destruction of the evidence by the

24   opposing party."  West v. Goodyear Tire and Rubber, 167 F.3d

25   776 (2nd Cir. 1999).

Page 128

1           The Second Circuit has stated that dismissal of an

2    action would only be imposed where there was a showing of

3    willfulness, bad faith, or fault over part of the sanctioned

4    party.  Absent these, the courts are encouraged to craft

5    sanctions such as instructing the jury that a certain fact

6    is found precluding a party from introducing evidence on a

7    particular issue or preventing a witness from testifying

8    about spoliation evidence.  "It is well-established and a

9    longstanding principle of law that a party's intention

10   destruction of evidence relevant to proof of an issue at

11   trial can support an inference that the evidence would've

12   been unfavorable to the party responsible for its

13   destruction."  Kronish v. United States, 150 F.3d 112 (2nd

14   Cir. 1998).

15           In order for an adverse interest to arrive from

16   the destruction of evidence, the parties -- the party having

17   control over the evidence must have had an obligation to

18   preserve it at the time it was destroyed.  This obligation

19   to preserve evidence arises when the party has notice that

20   the evidence is relevant to litigation.  Most commonly when

21   the suit has already been filed providing the party

22   responsible with the destruction with express notice, but

23   also on occasion in other circumstances.  As for example,

24   when a party should've known that the evidence may be

25   relevant to future litigation.

Page 129

1          "Once a court has concluded that the party was

2     under an obligation to preserve the evidence that was

3     destroyed, it must then consider whether the evidence was

4     intentionally destroyed or the likely contents of that

5     evidence."  Again, that's a quote from the Second Circuit.

6     Intent is rarely proved by direct evidence.  As such, courts

7     have "substantial leeway to determine intent through

8     consideration of circumstantial evidence, witness

9     credibility, motives of the witness in a particular case,

10    and other factors.  In considering these factors, courts may

11    look to how a party acted throughout the litigation, during

12    discovery disputes, including whether there is a credible

13    explanation for the party's failure to preserve relevant

14    electronically stored information."  In re Petters Company,

15    606 B.R. 803 (Bankr. D. Minn. 2019).

16          Of course, the court cannot hold the prejudiced

17    party to too strict a standard regarding the likely contents

18    of destroyed evidence as doing so "would subvert the

19    prophylactic and punitive purpose of the adverse inference

20    and would allow parties who have intentionally destroyed

21    evidence to profit from that destruction."  The Second

22    Circuit has stated that the level of proof that will suffice

23    to support an inference in favor of the innocent party on a

24    particular issue must be less than the amount that would

25    suffice to survive summary judgment on that issue.

Page 130

1           Otherwise, innocent parties meant to benefit from

2     the adverse inference against offending parties would

3     receive no benefit at all having been deprived of the

4     evidence that may have been crucial to making their case,

5     and yet being held to precisely the same standard of proof

6     before they may present their case to a jury.  And that's

7     continuing from Petters.  Here, the Liquidators have met

8     their burden of demonstrating that they have been prejudiced

9     by the loss of evidence.  The Liquidators have provided

10    copies of emails that they received from third parties

11    demonstrating that there is at least some relevant

12    information that has been lost.

13          They have also met their burden of demonstrating

14    that the lost evidence in question would likely have

15    contained relevant evidence regarding personal jurisdiction

16    because the emails have been obtained from third parties are

17    relevant in -- to this issue.  It is possible that

18    additional similar or more relevant emails existed and were

19    lost.

20          As to the Defendants' duty to preserve, it is

21    clear that they were all on notice of their duty to preserve

22    at least as early as when these cases were filed though the

23    case can be made to say their duty to preserve arose at the

24    time Madoff was arrested.  Even if the duty did not arise

25    until these complaints were filed against them, the

Page 131

1   Liquidators have provided evidence that the Defendants

2   utterly failed to preserve their electronically stored data.

3   Defendants admit to not implementing proper procedures, not

4   following up on any preservation policies, and permitting

5   employees to delete emails at will.  Defendants argue that

6   the Liquidators cannot prove when the electronic data was

7   destroyed, but such an argument only demonstrates that the

8   Defendants themselves lacked the knowledge because of their

9   own failure to preserve evidence.

10          If the Defendants had properly exercised their

11  duty to preserve under Rule 37, the Defendants would have

12  been more able to provide this Court with the proof of what

13  was in existence when the litigation hold was put in place.

14  As to whether the loss was intentional, "an intent to

15  deprive can be found either from the conscious act of

16  destruction or a conscious dereliction of known duty to

17  preserve electronic data."  Mule v. 3-D Building

18  Construction Management Corp., 2021 W.L. 2788432 (E.D.N.Y.

19  July 2, 2021).

20          The Liquidators have proved Defendants' conscious

21  dereliction of duty to preserve.  The Court grants the

22  Liquidators' Motion to Sanction Banque Internationale A

23  Luxembourg.  The Court is restoring the liquidation -- is

24  restoring the Liquidators to the same position they would've

25  been without the spoilage.  The order -- submit an order,

Page 132

1    and the order should show that the motion is granted, should

2    state the motion is granted.  It is now therefore and hereby

3    ordered that the motion is granted; that, two, the Defendant

4    is precluded from arguing at any time during the litigation

5    of this case that, A, it did not communicate internally or

6    externally about its investments in the funds via email,

7    included but not limited to communications regarding its use

8    of correspondence actions accounts -- correspondent

9    accounts; and two, communications with U.S.-based entities

10   or individuals.

11           B, such communications did not include diligence

12   on the funds, the funds investment strategy, or Bernie L.

13   Madoff Securities Investments, LLC, and such communications

14   are limited to the volume or frequency that the Liquidators

15   can demonstrate by use of evidence produced by third

16   parties.  Three, an adverse inference is entered against

17   Defendants that any spoilage evidence would have been

18   favorable to Liquidators in establishing personal

19   jurisdiction over the Defendant; and four, this order is

20   without prejudice to the Liquidators whose ability to seek

21   additional sanctions at the jurisdictional phase of this

22   case to remedy the prejudice caused by the Defendants'

23   spoliation.  Submit an order.

24           Thank you very much, and I apologize for

25   stumbling.

1            MR. MARGOLIN:  Thank you very much, Your Honor.

2            MR. MACKINNON:  Thank you, Your Honor.

3            THE COURT:  Have a good day.

4            MR. BUTLER:  Thank you, Your Honor.

5            MR. FLUGMAN:  Thank you, Your Honor.

6            THE COURT:  Chambers.

7            (Whereupon these proceedings were concluded)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        I N D E X

2

3                         RULINGS

4                                           Page      Line

5    Motion to Seal the Sanctions Motions

6    Exhibit and Responses, GRANTED            104        3

7    Liquidators' Motion to Sanction Debtors,

8    GRANTED                                   122       12

9    Liquidators' Motion to Sanction Banque

10   Internationale A Luxembourg, GRANTED      131       22

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 135

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  March 21, 2023