UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>FAIRFIELD SENTRY LIMITED, et al.,<br><br>        Debtor in Foreign Proceedings. | Chapter 15 Case<br><br>Case No. 10-13164 (CGM)<br><br>Jointly Administered |
| FAIRFIELD SENTRY LTD. (IN LIQUIDATION), et al.,<br><br>        Plaintiffs,<br><br>        v.<br><br>ABN AMRO Schweiz AG a/k/a AMRO (SWITZERLAND) AG, et al.,<br><br>        Defendants. | Adv. Pro. No. 10-03635 (CGM) |
| FAIRFIELD SENTRY LTD. (IN LIQUIDATION), et al.,<br><br>        Plaintiffs,<br><br>        v.<br><br>ABN AMRO Schweiz AG a/k/a AMRO (SWITZERLAND) AG, et al.,<br><br>        Defendants. | Adv. Pro. No. 10-3636 (CGM) |

## DECLARATION OF SARA K. JOYCE

**I, SARA K. JOYCE,** declare as follows:

1. Prior to my retirement in May 2015, I was the Managing Director, International Financial Institutions and Trade Finance of Bank of Montreal ("BMO") Financial Group. From 1998 to 2001, I managed BMO's international payment products, including oversight of its U.S. dollar payments clearing operations in New York. From 2001 until my retirement in 2015, I was responsible for managing BMO's global relationships with more than 1,200 international financial institutions to which BMO provided correspondent bank accounts, payments, trade finance and other banking services. I represented BMO on the board of directors of the Bankers Association for Finance and Trade ("BAFT"), the global industry association for

international transaction banking, for eight years, serving as Vice Chair of BAFT from 2014 until my retirement.

2. I have been asked to review the pleadings and other relevant materials in this case, and to provide my opinion on the extent to which foreign subscribers in Fairfield Sentry were required to utilize U.S.-based correspondent accounts to make subscription payments and/or receive redemption payments denominated in U.S. dollars.

## Qualifications

3. My pertinent education, training and experience are as follows.

4. Prior to my retirement in May 2015, I worked in corporate and international banking for approximately 35 years for both Canadian and Australian banks, having initially trained as a lawyer. Over the course of my career, I gained significant experience in correspondent banking,[1] in particular:

    a. Four years (1998-2001) managing the international wire payments clearing business, including the U.S. dollar correspondent payments clearing business, for BMO Financial Group. This included oversight responsibility for Harris Bank International Corporation ("HBIC"), our Edge Act indirect subsidiary in New York. HBIC cleared and settled U.S. dollar payments through the Clearing House Interbank Payments System ("CHIPS") of the New York Clearing House for the BMO Group entities and approximately 40 other international banks. In addition, I had product responsibility for payment and correspondent services offered in Canada in U.S. and Canadian dollars to international financial institutions. These products and services included correspondent accounts in U.S. or Canadian dollars, wire payments in those currencies, trade finance services, and cash letter services for the clearing of cheques and drafts.

    b. Fourteen years (2001-2015) managing BMO's correspondent banking and trade finance businesses. As Managing Director, International Financial Institutions and Trade Finance for BMO, I was responsible for managing our relationships with international financial institutions, which included oversight of BMO's correspondent bank managers and trade finance sales managers located in North and South America, the United Kingdom, the Middle East and Asia. BMO was a significant provider of correspondent banking services in Canada, ranking second in Canada in terms of the number of foreign bank customers maintaining correspondent accounts.

---

[1] As described further below, "correspondent banking" refers to the provision of services by one bank to another bank to facilitate the movement of funds, exchange of currencies, or settlement of obligations.

2

    c. Eight years (2007-2015), representing BMO as a Board Director, member of the Executive Committee, and finally Vice Chair, of the Bankers Association for Finance & Trade, the global transaction banking industry association. In that capacity, I worked with global bank members to help compile best practice guidelines for conducting anti-money laundering and "know your customer" due diligence for correspondent banks operating across multiple jurisdictions with different regulators.

5. Following my retirement in 2015, I was retained as an expert witness for the defense in *McDonald and Dickson v. TD Bank*, 2021 ONSC 3872, in which I was qualified by Judge J. Conway of the Ontario Superior Court of Justice as an expert in, *inter alia*, international and correspondent banking.

6. Attached as Exhibit 1 is a true and correct copy of my curriculum vitae.

7. I have been compensated for my services at a rate of $400 per hour. My compensation is in no way contingent upon any opinions I provide in this matter.

## Materials Reviewed

8. I have examined the following documents supplied by the Plaintiffs' attorney:

    a. The Fifth Amended Complaint in 10-3635 (Dkt. 620) and 10-3636 (Dkt. 679), filed August 11, 2021 and August 12, 2021, respectively;

    b. Bank Julius Baer & Co. Ltd.'s ("BJB") Memorandum of Law in 10-3635 (Dkt. 760) and 10-3636 (Dkt. 827), filed October 29, 2021;

    c. Fairfield Sentry's Articles of Association;

    d. Subscription agreements [REDACTED] by Citco Global Custody NV on behalf of BJB for shares in Fairfield Sentry, as well as other subscription-related materials;

    e. Redemption-related materials, including [REDACTED]

    f. The Liquidators' Memorandum of Law in Opposition to BJB's Motion to Dismiss.

9. In addition, in preparing this declaration, I have also conducted independent research of my own, as necessary, citing relevant sources in the text of this declaration.

3

## Summary of Opinion

10. Based on my knowledge of international correspondent banking as both a provider and buyer of correspondent bank account and payment services in various currencies, and over fifteen years of industry experience in this field, I conclude:

    a. Foreign subscribers in Fairfield Sentry were not required to make use of U.S.-based correspondent accounts to send their subscription payments to Fairfield Sentry, or to receive redemption payments from Fairfield Sentry.

    b. The fact that Fairfield Sentry was a U.S.-dollar denominated investment fund did not preclude the foreign subscribers from making use of a correspondent account denominated in U.S. dollars but located *outside* the U.S. to make or receive payments. Similarly, the fact that Fairfield Sentry directed subscribers to wire their subscription payments to Fairfield's own U.S. dollar account located in the U.S. did not preclude the foreign subscribers from utilizing a correspondent account outside the U.S. to initiate the payment.

    c. While factors of convenience, cost and country risk may have caused a foreign subscriber to choose to use a U.S.-based correspondent account, other correspondent account options in U.S. dollars were widely and readily available during the period in question.

## Analysis

### A. Question Posed

11. Whether foreign subscribers in Fairfield Sentry were required to utilize U.S.-based correspondent accounts to send their subscription payments to and receive redemption payments from Fairfield Sentry in light of the fact that (1) Fairfield Sentry was a U.S.-dollar denominated fund or (2) Fairfield Sentry directed subscribers to wire their subscription payments to the Fund's U.S. account.

### B. Relevant Period

12. I have assumed that the Relevant Period is the period of operation of the Fairfield Sentry Funds from their incorporation in 1990 in the British Virgin Islands to December 2008, when the Complaint indicates that the Ponzi scheme at BLMIS was exposed and the Fairfield Sentry Fund ceased issuance of shares.

### C. Definition and Purpose of Correspondent Banking

13. Correspondent banking is the provision of services by one bank (the "correspondent") to another bank (the "respondent") to facilitate the movement of funds, exchange of currencies, or settlement of obligations. Any bank which facilitates payments and transfers beyond its geographic borders for its clients or

4

accepts or makes deposits outside of its home jurisdiction or currency requires the services of a correspondent bank.[2]

14. The nature or purpose of such cross-border payments and transfers may vary widely depending on the business model of the respondent bank and the nature and needs of its client base. Accordingly, a correspondent may offer the respondent a wide range of products and services, including, for example, cash management services, trade finance services, investment and brokerage transactions, securities custody accounts, etc.

15. A correspondent bank account is referred to as either a "vostro" (meaning "yours") or "nostro" (meaning "ours") account, depending on whether the reference is made from the perspective of the correspondent or the respondent:

    a. The correspondent who provides the client with correspondent banking services refers to the account as a *vostro account*, as in, "Your money that is deposited in an account at our bank."

    b. The respondent—*i.e.*, the client who employs the correspondent banking services—refers to the account as a *nostro account*, as in, "Our money that is deposited in an account at your bank."

### D.  Correspondent Banking Products and Services

16. At its core, a correspondent banking relationship involves the opening by the correspondent bank of a vostro account on its books for the respondent bank, from which the respondent may issue and receive wire payments, and issue and redeem bank drafts drawn on the account.

17. Correspondent banking accounts are demand deposit accounts: funds may be withdrawn without advance notice, *i.e.*, on demand, by the respondent. As such, the correspondent generally pays no interest on any deposit balances maintained or pays only limited interest on balances within pre-agreed ranges.

18. Correspondent banking services are considered "fee-based" since activity is priced at a flat fee per transaction. The standard fees are established by the correspondent bank's issuance of standard terms and conditions, which in the absence of a negotiated contractual arrangement, apply to all correspondent accounts. The correspondent bank earns revenue from both the value of the free balances in the account and the fees charged to the respondent for transaction activity across the account. Since correspondent banking services generally do not involve the

---

[2] Interbank deposits were originally established in the U.S. in the early 1800s as a means of redeeming bank notes outside of a bank's own geographic area.

19. extension of credit facilities, they do not require any significant allocation of bank capital against potential credit losses, and so can be very profitable.

20. Most respondents also need to clear cheques and drafts deposited by their customers which are drawn on banks in the correspondent's home country or currency. These paper items are typically assembled into a bundle, called the cash letter, which is sent to the correspondent on a daily or weekly basis, depending on volume and value. The correspondent submits the paper items into the domestic cheque clearing system and credits the respondent's account with the proceeds.

### E. Availability of U.S.-Dollar Correspondent Accounts Outside the United States

20. Correspondent accounts are usually denominated in the domestic currency of the correspondent bank. If another currency, such as the U.S. dollar, Euro, Pound Sterling or Chinese Renminbi, is widely accepted in settlement of interbank, commercial or retail transactions in the correspondent bank's country, however, the respondent bank can and often will request to open a second account in the alternative currency.

21. For this reason, given the widespread use of U.S. dollars as a global settlement currency for business transactions, many respondent banks have U.S.-dollar correspondent accounts available to them in countries outside the United States, such as the United Kingdom, Hong Kong, Canada, France, Germany, Lebanon, etc.

22. Banks offering U.S.-dollar correspondent banking services outside of the United States can pay or receive U.S. dollars through their vostro accounts on behalf of their respondent bank clients in one of two ways: by making a direct payment via the U.S. clearing system, or by effecting an in-house transfer or correspondent bank transfer, which avoids the U.S. dollar clearing system.[3]

23. *Direct Clearing*: Many foreign correspondents chose to offer correspondent accounts in U.S. dollars out of their foreign headquarters using existing multicurrency clearing solutions; most notably, direct clearing[4] via the New York based Clearing House Interbank Payments System ("CHIPS").[5]

---

[3] The Clearing House, *CHIPS Public Disclosure of Legal, Governance, Risk Management, and Operating Framework* 46 n.164 (June 2022). *See also* Edmund M.A. Kwaw, *The Law and Practice for Offshore Banking and Finance* 25-28 (1996).

[4] Clearing refers to the transfer and confirmation of payment information between the payor and payee. Settling refers to the actual transfer of funds between the payor and payee.

[5] CHIPS is the primary U.S. clearing house utilized to settle U.S. dollar payments between international banks on a netted basis. By netting debits and credits across transactions each day,

    a. During the Relevant Period, several global banks offering multi-currency correspondent banking services were direct clearers in U.S. dollars as members of CHIPS.[6] As a direct clearer in the U.S. payment system, these banks were able to process U.S. dollar payments for customers who maintained U.S. dollar correspondent accounts with them, and these banks could do so without utilizing their own U.S.-dollar denominated correspondent account within the U.S.

    b. In addition to CHIPS, several countries also maintained local clearing and settlement systems for U.S. dollar paper and electronic items during the Relevant Period, including Japan, Hong Kong, Lebanon, and the Philippines, in order to be able to settle U.S. dollars between domestic participants during local business hours. In Hong Kong, for example, the Clearing House Automated Transfer System ("CHATS") launched U.S. dollar settlement in 2000, with HSBC as its settlement bank.

24. *Correspondent Bank Transfers*: Many large banks have extensive correspondent networks, including accounts with their U.S. branches, subsidiaries, and/or agents, and can execute payment instructions using in-house or correspondent bank transfers that do not go through CHIPS or any other clearing system.[7] Foreign correspondent banks could utilize that network to process U.S. dollar transactions flowing through vostro accounts located outside of the U.S.

    a. An in-house transfer is the transfer of funds between accounts held at the same bank. Where, for example, two respondents, Bank A and Bank B, both maintain vostro accounts with a bank outside the US, and Bank A (the payor) receives a claim for payment from Bank B (the payee), the foreign bank may debit the account of Bank A and credit the account of Bank B.

---

CHIPS provides an efficient means of both clearing and settling large interbank transfers. Final settlement of net positions is made through accounts at the Federal Reserve Bank of New York.

[6] To qualify for CHIPS membership, a foreign bank participant must have a U.S. branch or office which is subject to U.S. federal or state banking regulations. Rule 19, CHIPS Rules and Administrative Procedures, https://www.theclearinghouse.org/payment-systems/CHIPS. A foreign bank participant may be permitted to maintain its primary or back up computer facilities outside the U.S., subject to several qualitative conditions and to final approval by the CEO of The Clearing House. Rule 7, CHIPS Rules and Administrative Procedures, https://www.theclearinghouse.org/payment-systems/CHIPS. At least one Canadian bank, Scotiabank, maintained their USD payment processing operations and computer facilities in Toronto under this exemption during the Relevant Period.

[7] The Clearing House, *CHIPS Public Disclosure of Legal, Governance, Risk Management, and Operating Framework* 46 n.164 (June 2022).

    b. A correspondent bank transfer may be required to facilitate the transfer from payor to payee where Bank A and Bank B do not maintain accounts at the same foreign bank. If the originating foreign bank holds sufficient U.S. dollars in their correspondent account with the receiving bank, it will debit the account it holds for Bank A (the payor) and send a transfer message instructing the receiving bank to make the payment to the account of Bank B (the payee) on its books. Under this method, the respondent bank's payment transactions are "nested" within the overall payment activity flowing through the correspondent bank's own network of correspondent accounts, which in turn will clear and settle the transaction.

    c. In the context of a U.S. dollar transaction flowing from a U.S. account to a foreign correspondent account, for example, the receiving bank holding the vostro account to which payment is being made, would receive the funds via a transfer from its U.S. correspondent bank. The ultimate recipient of the transfer (*i.e.*, the respondent), however, would not itself hold a correspondent account within the U.S. in this situation.

25. During the Relevant Period, several correspondent banks offered U.S. dollar-correspondent accounts located outside of the U.S., utilizing one or some combination of both methods described above.[8] For example:

    a. Toronto Dominion Bank ("<u>TD Bank</u>") offered U.S. dollar correspondent accounts out of Toronto to select international banks during the Relevant Period. TD Bank was a direct member in CHIPS, and also maintained an extensive network of correspondent accounts with various U.S. banks.

    b. If a respondent with a correspondent account at TD Bank had a customer who was redeeming shares in Fairfield Sentry, the wire payment instructions would have been to credit the respondent's correspondent account at TD Bank in Toronto directly, for further credit to the customer.

    c. If Citco Bank Dublin Branch itself maintained a U.S. dollar account with TD Bank, the payment could be completed through an in-house transfer at TD Bank in Toronto. Alternatively, if they maintained sufficient funds in

---

[8] Some foreign bank participants in CHIPS used their direct U.S. dollar clearing capability only for their own bank's high-value treasury payments in USD, including those flowing through U.S. dollar correspondent accounts. These are direct bank-to-bank obligations and have a high priority because they are time-sensitive. Other U.S. dollar payment flows, including retail and commercial payments to third parties and U.S. dollar cheques of customers and respondent banks, were often completed through the foreign bank's network of U.S. correspondent accounts. This allowed them to negotiate volume discounts with their U.S. correspondents for their payments and paper items and take advantage of specialized payment products and rebates offered by their U.S. bank correspondents on commercial flows.

8

  an account in U.S. dollars with another Canadian or international bank, the payment could be completed as a correspondent bank transfer in the manner described in ¶ 24(b).

  d. Lastly, the redemption payment could be initiated by Citco Bank Dublin from Sentry's account at HSBC U.S. and made directly to TD Bank in Toronto via CHIPS.

26. Contemporary reports confirm the wide availability of U.S. dollar correspondent accounts outside of the U.S. during the Relevant Period, including with offshore banks presenting a very high risk of money laundering and financial crime. For example, *Correspondent Banking: A Gateway for Money Laundering*,[9] the 2001 report of the Minority Staff of the Permanent Subcommittee on Investigations of the Committee on Governmental Affairs of the United States Senate (the "2001 PSI Report"), reviewed specific instances of money laundering effected through correspondent banks in the U.S in the 1980s and 1990s. Using these case studies, the 2001 PSI Report highlighted weaknesses in existing correspondent banking practices in the U.S. In several of the case studies, it was noted that even where a U.S.-based bank had closed the correspondent account of a foreign bank over fraud or money laundering concerns, the foreign bank was easily able to continue transacting business in the U.S. by opening an offshore USD account with another foreign bank that itself had correspondent relationships in the U.S..[10]

27. Moreover, many large European banks actively promoted one-stop multicurrency clearing solutions to their correspondent banks during the Relevant Period, including Union Bank of Switzerland, Raffeisen Bank, Barclays, etc. These services continue to be marketed widely. A quick search of the current Barclays website under financial institutions, for example, yields information on a Global Currency Clearing account for financial institutions, allowing them to make payments in over 120 currencies from an account in the UK, and accessing Barclays' "extensive global network of selected correspondent banks … to reach over 2,000 beneficiary banks quickly and directly."[11]

---

[9] Committee on Governmental Affairs of the United States Senate, *Correspondent Banking: A Gateway for Money Laundering* (Mar. 2001), https://www.hsgac.senate.gov/imo/media/doc/REPORT-Correspondent%20Banking%20Report%20(March%202001).pdf.

[10] *Id.* at 343-349.

[11] *Payment Solutions - Financial Institutions and FinTechs*, Barclays (last visited Dec. 10, 2022), https://www.barclayscorporate.com/solutions/corporate-banking-solutions/cash-management-solutions/payment-solutions-fi-and-fintechs.

**F. Factors Influencing Choice of Correspondent Account**

28. Several factors influence a bank's decision to open and maintain a correspondent bank account in a foreign currency with another bank. Operating policy, including cost and efficiency issues, reciprocity, customer needs and risk management concerns may all influence where a correspondent account is held, how many accounts are maintained in that currency, how payment flows, and deposits are allocated between various accounts.

29. *Operating Policy*:

    a. Where a banking group has an affiliate member which is a direct member of the local payment system and can provide clearing and settlement services on a competitive basis to other members of the group, all members of the banking group are usually strongly encouraged to maintain their correspondent accounts with the affiliate.

    b. This operational policy is driven largely by profitability and processing efficiency—concentration of all group payment activity with the affiliate clearer increases processing value and volumes, lowering the cost per transaction, and buttresses the clearer's overall market share within the payment system, *e.g.*, CHIPS, a key criterion in attracting new correspondent clients. It is more difficult for the affiliate to sign up new clients if its own affiliates are not using its services. Concentration of all intra-group payments also allows for greater processing efficiencies and reduces costs to the users since payments between group members can be affected faster and more cheaply via book transfer across the direct clearer's accounts.

30. *Reciprocity and Co-operation*:

    a. Given the choice, most respondent banks would choose to open their account in a foreign currency with an established domestic bank who is a direct member of the payment system, is able to support the needs of the respondent's customers and is also able to direct some reciprocal business to the respondent in his home market. Often, in this situation, the two banks maintain accounts with each other in their respective domestic currencies, and endeavor to ensure a fair balance of reciprocal business flows.

    b. In many cases, however, there is such a disparity in size or credit quality or business model (*e.g.*, retail/commercial bank vs private wealth management bank) that reciprocity is not a significant factor in the account decision.

31. *Nostro Risk*:

    a. A bank which is considered systemically important by regulators must demonstrate to its regulator and to its internal credit and operational risk

10

      management that it has viable back-up arrangements in place to clear payments in major currencies should its primary clearer experience operational failure or rapidly deteriorating credit risk.

  b. Recognition of this "nostro account" risk increased sharply after the operational failures experienced by some banks during the launch of the Euro in 1999, in the weeks following the 9/11 World Trade Centre bombing in 2001, and during the banking crisis in 2008. It became apparent that an operational failure or credit default by a correspondent clearer could give rise to very significant credit risks for its respondent depositors.

  c. In most cases, this was addressed by establishing nostro risk limits for each currency, opening a second correspondent account with another provider, and testing it regularly with a small flow of transactions. Arrangements were also put in place to sweep out account balances which rose above nostro risk limits.

32. *Reconciliation Risk*:

  a. In many banks, including BMO, there was a strong preference for separating interbank treasury flows (FX, money market loans, etc. due to or from other banks, usually in large amounts, for which the accounts must be reconciled quickly at end of day to identify any potential defaults) from commercial payments related to the bank's customers, for which account reconciliation might take much longer. At a minimum, separate bank accounts were required, and in many cases the preference was to use different correspondent banks for the treasury payments to reduce the risk of funds being credited to the wrong accounts in error, and to increase transparency over the internal cost allocation of the accounts on a user pay basis.

33. *Customer Needs*:

  a. Banks often open additional correspondent accounts in various currencies to accommodate the needs of valued customers. I have seen situations, for example, where an additional account is opened with a specific bank to accommodate a customer's loan repayments to a government export financing agency, or to accommodate draws under a multi-year letter of credit or guarantee for a customer with an overseas supplier, or to facilitate securities trading by a client with a particular exchange or international firm. In geographically larger countries, such as the U.S. or Germany, it may be necessary to have more than one provider or account to cover the whole region adequately if there is a high volume of paper items or of retail and commercial payments to beneficiaries located outside the money centres. Where a bank offers offshore investment products to its clients, it may choose to utilize correspondent accounts in offshore banking centres in order to better protect the customer's privacy.

11

34. For these reasons, it is rare in my experience for a bank of any significant size to maintain only a single account or single provider in a major currency such as the USD or the Euro. While most of the activity might be concentrated in one or two accounts, there are almost always other accounts in major currencies available for use if needed.

**G. Applicability to Fairfield Sentry Transactions**

35. I have reviewed subscription agreements for Fairfield Sentry and confirm that

36. Specifically:

    a.

    b.

37. Neither the fact that Fairfield Sentry was a U.S.-dollar denominated fund, 

    would have prevented a subscriber from making subscription payments from and directing redemption payments to a U.S. dollar account located outside the U.S. Under either the direct clearing or the correspondent bank transfer approach described above, a foreign correspondent bank could have sent subscription payments to and received redemption payments from Fairfield Sentry during the Relevant Period.

38. Under the direct clearing approach described above, a subscriber's foreign correspondent bank could send the subscription payments via CHIPS, for example, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. Likewise, ▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ to the subscriber's designated foreign correspondent account via CHIPS, with no need for the subscriber to have its own correspondent account in the U.S.

39. Under the correspondent bank transfer approach described above, a subscriber's foreign correspondent bank could send the subscription payments via the foreign correspondent bank's own network of correspondent banking relationships in the

12

U.S., ████████████████████████. Likewise, ████████████████ ████████████████████ to the subscriber's designated foreign correspondent account, which would be processed via the *foreign correspondent bank's* own correspondent bank network in the U.S.

40. In both scenarios described above, the correspondent banking services are provided to the subscriber by a foreign bank, not a U.S. bank.

## Conclusion

41. Foreign subscribers in Fairfield Sentry were not required to use a U.S.-based correspondent account to deliver subscription payments to Fairfield Sentry, or to receive redemption payments. The U.S. dollar was in wide circulation outside the U.S. during the Relevant Period, and many other payment options were widely available and easily accessible during the Relevant Period. To the extent that a foreign subscriber chose a U.S.-based correspondent account to effectuate their payments, it was generally for reasons of its own convenience or financial benefit.

42. The fact that Fairfield Sentry was a U.S.-dollar denominated investment fund did not preclude the foreign subscribers from making use of a correspondent account denominated in U.S. dollars but located outside the U.S. to make or receive payments. ████████████████████████████████████████████████ did not preclude the foreign subscribers from utilizing a correspondent account outside the U.S. to initiate the payment.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 11, 2023.

_Sara K. Joyce_
SARA K. JOYCE