**UNITED STATES BANKRUPTCY COURT**　　　　　　*FOR PUBLICATION*
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| Fairfield Sentry Limited, et al. | Case No. 10-13164 (JPM) |
| | (Jointly Administered) |
| Debtors in Foreign Proceedings. | |
| FAIRFIELD SENTRY LTD. (In Liquidation), et al., | |
| Plaintiffs, | |
| v. | Adv. Pro. No. 10-03635 (JPM) |
| ABN AMRO SCHWEIZ AG a/k/a AMRO (SWITZERLAND) AG, et al., | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS

*APPEARANCES:*

**GIBSON, DUNN & CRUTCHER LLP**
Attorneys for Defendant, UBS AG
200 Park Avenue
New York, New York 10166
By:　　Marshall R. King
　　　　Gabriel Herrmann

**BROWN RUDNICK LLP**
Attorneys for the Plaintiffs, Joint Liquidators
Seven Times Square
New York, NY 10036
By:　　Jeffrey L. Jonas
　　　　David J. Molton
　　　　Marek P. Krzyzowski

**JOHN P. MASTANDO III**
**UNITED STATES BANKRUPTCY JUDGE**

## I.    INTRODUCTION

Pending before the Court is the motion of UBS AG ("Defendant"), to dismiss the Fifth

Amended Complaint (the "Amended Complaint") for lack of personal jurisdiction.  Mot. to

Dismiss, ECF[1] No. 785.  The Court held a hearing on the Motion to Dismiss on May 3, 2024 (the

"Hearing").  For the reasons set forth herein, the Court DENIES the Defendant's Motion to

Dismiss.

## II.    JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157 and

the Amended Standing Order of Reference dated January 31, 2012 (Preska, C.J.).  This Court

previously concluded that it has subject matter jurisdiction over this and related actions.  *See In*

*re Fairfield Sentry Ltd.*, 2018 WL 3756343 (Bankr. S.D.N.Y. Aug. 6, 2018); *see also* Stip.

Order, ECF No. 519.  Personal jurisdiction is contested by the Defendant and will be discussed

below.

## III.    BACKGROUND

This adversary proceeding was filed on September 21, 2010.  Compl., ECF No. 8.

Kenneth M. Krys and Greig Mitchell (the "Liquidators"), in their capacities as the duly

appointed Liquidators and Foreign Representatives of Fairfield Sentry Limited (In Liquidation)

("Sentry"), Fairfield Sigma Limited (In Liquidation) ("Sigma," and with Sentry, the "Fairfield

Funds") filed the Amended Complaint on August 11, 2021.  Am. Compl., ECF No. 786.  Via the

Amended Complaint, the Liquidators seek the imposition of a constructive trust and recovery of

---

[1]    Citations to this Court's electronic docket refer to the docket of Adv. Pro. No. 10-03635-jpm unless
otherwise noted.

over $51.9 million in redemption payments made by Sentry and Sigma to various entities known

as the Citco Subscribers.  *Id.* ¶¶ 1–2, 197–98; *id.* Exs. A–B.[2]  Of that amount, Defendant

allegedly received $4,697,471.22[3] through a single redemption payment from its investment in

Sentry.  Opp'n at 1–2, 10 n.12 ECF No. 1075; Declaration of Joshua Margolin in Support of the

Liquidator's Opposition ("Margolin Decl.") Exs. 27, 34–42, ECF No. 1076 (Redemption

Records).

## A.  <u>The BLMIS Ponzi Scheme</u>

This adversary proceeding arises out of the decades-long effort to recover assets of the

Bernard L. Madoff Investment Securities LLC ("BLMIS") Ponzi scheme.[4]  Am. Compl. ¶ 1.

The Citco Subscribers allegedly invested, either for their own account or for the account of

others, into several funds —including Sentry and Sigma—that channeled investments into

BLMIS.  *Id.* ¶¶ 2, 5, 15.

Fairfield Sentry was a direct feeder fund in that it was established for the purpose of

bringing investors into BLMIS, thereby allowing Madoff's scheme to continue.  *Id.* ¶¶ 5; 125–

---

[2]      At the time of the filing of the Amended Complaint, the Plaintiffs made no specific allegations as to the exact amounts received by any of the beneficial shareholders.  With respect to UBS AG, the Amended Complaint states in relevant part that "[b]ased on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, UBS AG . . . ."  Am. Compl. ¶¶ 100–01.  The Amended Complaint alleges that several other defendants may have received redemption payments made to the Citco Subscribers.  *Id.* ¶¶ 33–104.  This opinion concerns only those payments that the Plaintiffs allege were paid to UBS AG.

[3]      Of that total U.S. Dollar amount, the Plaintiffs allege that UBS AG received "$4,697,471.22 of Sentry redemptions in Case No. 10-ap-03635."  Opp'n at 1–2 n.3, ECF No. 1075.  The Liquidators seek several million dollars more in redemption payments made to the Defendant in adversary proceeding 10-03636.  *Id.* ("UBS received $86,163,810.54 from Sentry, approximately €15,138,424.93 from Sigma, and CHF 1,314,115.24 from Lambda . . . .  The Liquidators seek $81,466,339.32 of UBS's Sentry redemptions in Case No. 10-ap-03636.  The Liquidators seek the remaining $4,697,471.22 of Sentry redemptions in Case No. 10-ap-03635.").  UBS AG filed a motion to dismiss the Plaintiff's complaint in adversary proceeding number 10-03636.  Mot. to Dismiss, Adv. Pro. No. 10-03636, ECF No. 850.  The Court addressed UBS AG's motion to dismiss that complaint in a separate opinion.  *See* Mem. Op. and Order, Adv. Pro. No. 10-03636, ECF No. 1361.

[4]      The Court will not recount all details concerning the Ponzi scheme perpetrated by Madoff.  Details of that scheme have been recounted by many courts.  *See, e.g.*, *In re Madoff*, 598 B.R. 102, 106 (S.D.N.Y. 2019), *aff'd* 818 F. App'x 48 (2d Cir. 2020).

26; *see also In re Picard*, 917 F.3d 85, 93 (2d Cir. 2019) ("A feeder fund is an entity that pools

money from numerous investors and then places it into a 'master fund' on their behalf. A master

fund—what Madoff Securities advertised its funds to be—pools investments from multiple

feeder funds and then invests the money.").  Fairfield Sigma, in contrast, was an indirect feeder

fund, established to facilitate investment in BLMIS through Fairfield Sentry for foreign

currencies. Am. Compl. ¶¶ 125–26.  BLMIS used investments from feeder funds, like the

Fairfield Funds, to satisfy redemption requests from other investors in the scheme. *Id.* ¶¶ 5–7,

13.  Without new investors, BLMIS would have been unable to make payments to those who

chose to withdraw their investments, and the scheme would have fallen apart. *Id.* ¶¶ 7–8, 12–14,

126.

The Amended Complaint alleges that investors received payments on account of their

shares in the Fairfield Funds based on a highly-inflated Net Asset Value ("NAV"). *Id.* ¶ 7.  The

Citco Subscribers and the beneficial shareholders were allegedly such investors. *Id.*  To

calculate the NAV, administrators used statements provided by BLMIS that showed "securities

and investments, or interests or rights in securities and investments, held by BLMIS for the

account of Sentry." *Id.* ¶ 128.  In fact, no securities were ever bought or sold by BLMIS for

Sentry, and none of the transactions on the statements ever occurred. *Id.* ¶ 129.  The money sent

to BLMIS by the Fairfield Funds for purchase of securities was instead used by Bernard Madoff

to pay other investors or was "misappropriated by Madoff for other unauthorized uses." *Id*.  The

NAVs were miscalculated, and redemption payments were made in excess of the true value of

the shares. *Id.* ¶ 131.  The Fairfield Funds were either insolvent when the redemption payments

were made or were made insolvent by those payments. *Id*.

UBS AG is an *Aktiengesellschaft*[5] "organized under Swiss company law, with registered offices in Zurich and Basel, Switzerland." Mem. L. at 2, ECF No. 786; *see also* Declaration of Raimund Roehrich ("Roehrich Decl.") ¶¶ 3–4, ECF No. 239.[6] UBS AG maintained branches in the United States, but its principal place of business was in Switzerland. Mem. L. at 2; Roehrich Decl. ¶ 3. The Amended Complaint identifies UBS AG New York and UBS AG Zurich as two separate entities. *See* Am. Compl. ¶¶ 100–01, ECF No. 620. In its motion to dismiss, Defendant states that UBS AG is a single entity. Mem. L. at 2, ECF No. 786. The Plaintiffs' opposition memorandum responds to the Defendant's motion assuming that UBS AG is a single entity and addresses the "claims against both UBS AG Zurich and UBS AG New York by reference to a single entity: UBS AG." Opp'n at 1 n.2, ECF No. 1075. The Court will likewise address UBS AG as a single entity.

UBS AG allegedly invested into and redeemed shares of the Fairfield Funds through "several companies within the Citco corporate family." Opp'n at 5, ECF No. 1075. Investments into the Funds were registered in the name of either Citco Global Custody N.V. or Citco Global Custody (N.A.) N.V. (together, "Citco Global Custody"). *Id.* at 6. Citco Bank Nederland N.V. Dublin Branch ("Citco Bank Dublin Branch") and Citco Banking Corporation N.V. (together, "Citco Bank") allegedly carried out subscriptions and redemptions on behalf of UBS AG and

---

[5]    The Court notes that an *Aktiengesellschaft* is defined in Article 620 of the Swiss Code of Obligations, in its English translation, as a "company in which one or more persons or commercial enterprises participate. It is liable for its obligations to the extent of the company's assets." Schweizerisches Zivilgesetzbuch [ZGB] Fünfter Teil: Obligationenrecht [Swiss Civil Law, Part Five: The Code of Obligations] (1911), *as amended by* No. 1 of the FA of 19 June 2020, SECHSUNDZWANZIGSTER TITEL: DIE AKTIENGESELLSCHAFT [Twenty-Sixth Title: The Company Limited by Shares], Art. 620 (Switz.). An English translation of The Code of Obligations can be found on the Swiss Confederation's online platform for federal law at https://www.fedlex.admin.ch/eli/cc/ 27/317_321_377/en. The English translation of the Code of Obligations is archived at https://perma.cc/GTM2-W37D.

[6]    Mr. Roehrich identifies himself in his January 2017 declaration in opposition to the Plaintiffs motion for leave to amend and in support of UBS AG's prior motion to dismiss as the "Head of Corporate Legal of UBS AG." Roehrich Decl. ¶ 1.

other investors.  *Id.*  Citco Global Custody and Citco Bank (collectively, the "Citco Subscriber")[7]

served as the subscriber of record for UBS AG's shares of the Fairfield Funds.  *Id.*  The Citco

Subscriber was organized under the laws of either Curaçao or the Netherlands.  Mem. L. at 7

n.11, ECF No. 786 (citing Am. Compl. ¶¶ 32–34, *Fairfield Sentry Limited (In Liquidation) v.*

*Citco Global Custody N.V.*, Adv. Pro. No. 19-01122, ECF. No. 19).

UBS AG invested in the Fairfield Funds as early as 1999 via the Citco Subscriber.  Opp'n

at 5.  UBS AG opened an account at Citco Bank in order to invest in the Fairfield Funds.  *Id.* at

9.  UBS AG allegedly retained the Citco Subscriber as its agent when it entered into brokerage

and custody agreements (the "B&C Agreements") as early as February 2005.  *Id.*; *see* Margolin

Decl. Ex. 13, ECF No. 1076 (February 10, 2003, B&C Agreement between UBS AG New York

Branch and Citco Banking Corporation N.V. and Citco Global Custody (N.A.) N.V.; *see also*

Margolin Decl. Ex. 12 (April 29, 2005, B&C Agreement between UBS AG and Citco Bank

Dublin Branch and Citco Global Custody N.V.).  The 2005 B&C Agreement authorized Citco

Bank to provide "Brokerage Services," defined to include "the effecting of transactions of and/or

relating to the purchase and sale of and dealing in Securities in the name of and for the account

of UBS AG," or of Citco Banking Corporation N.V. or Citco Global Custody (N.A.) N.V., or

"any nominee for the account of [UBS AG]," and "any services ancillary thereto as set out in this

Agreement."  Margolin Ex. 13 at -310.

---

[7]     The Court will refer to the "Citco Subscriber" in this opinion as it is defined by the Plaintiffs in their
opposition memorandum.  The Amended Complaint refers to the "Citco Record Subscribers" and the "Citco
Subscribers."  *See* Am. Compl. ¶ 8.  The "Citco Record Subscriber" is defined therein as CGC NA.  *Id.*  The "Citco
Subscribers" are defined in the Amended Complaint to include the Citco Record Subscriber, CGC NA, and the Citco
Banks; i.e. "Citco Bank Nederland N.V., Citco Bank Nederland N.V. Dublin Branch (a wholly owned subsidiary of
Citco Bank Nederland N.V.) or the Citco Banking Corporation N.V."  *Id.*  The Citco Record Subscriber and the
Citco Banks are allegedly to have acted as agents of the Defendant with respect to the brokerage and custody
agreements and investments in the Fairfield Funds.  *Id.*

From 1999 through December 2008, UBS AG allegedly subscribed through the Citco

Subscriber for nearly 200,000 shares of the Fairfield Funds. Opp'n at 3; *see also* Margolin Decl.

Exs. 15–17, 19–20, 46–54 (Subscription Records). UBS AG, through the Citco Subscriber,

redeemed over $108 million worth of shares in the Fairfield Funds from September 2005 through

November 2008. Opp'n at 14; *see also* Margolin Decl. Exs. 34–42 (Redemption Records).[8] At

the directions and instructions of the Citco Subscriber, as the purported agent for UBS AG,

"some . . . of the Redemption Payments were received at . . . designated United States-based

bank accounts." Am. Compl. ¶ 133, ECF No. 620.

Bernard Madoff was arrested for alleged violations of federal securities laws on

December 11, 2008. Am. Compl. ¶ 185. The United States Attorney brought criminal charges

against him, alleging that Madoff ran a Ponzi scheme. *Id.* On December 11, 2008, the Securities

Exchange Commission filed an action in the Southern District of New York to halt the continued

offerings of securities. *Id.* ¶ 186. In March 2009, Madoff pleaded guilty to criminal charges

against him and confessed to operating a Ponzi scheme and fabricating statements and trade

confirmations. *Id.* ¶¶ 187–89. Madoff was sentenced to 150 years in federal prison and died in

April 2021. *Id.* ¶ 189.

The Amended Complaint alleges that the Citco Subscribers, including the purported

agent of UBS AG, "had knowledge of the Madoff fraud, and therefore knowledge that the Net

Asset Value was inflated" when the redemption payments were made. *Id.* ¶ 209. The Amended

Complaint further asserts that, while receiving redemption payments, the Citco Subscribers

"uncovered multiple additional indicia that Madoff was engaged in some form of fraud" but

"turned a blind eye, [and] accept[ed] millions of dollars while willfully ignoring or, at the very

---

[8]    In addition to these redemption payments, UBS AG allegedly received fees from the clients on whose
behalf it invested. Opp'n at 14.

least, recklessly disregarding the truth in clear violation of the law of the British Virgin Islands . . . ." *Id.* ¶¶ 8, 201. These indicia included verification that there was no "independent confirmation that BLMIS-held assets even existed," Madoff's failure to segregate duties, and BLMIS's "employing an implausibly small auditing firm" rather than a reliable auditor. *Id.* In the face of red flags such as these, the Citco Subscribers and other Citco entities purportedly "quietly reduced [their] own exposure to BLMIS through the Funds, and significantly increase[ed] [their] Custodian fees to offset the risk." *Id.* ¶ 201.

**B.** **The Prior Litigation and Procedural History**

The Fairfield Funds were put into liquidation in the BVI in 2009. *Id.* ¶¶ 26–28. The BVI court issued orders appointing the foreign representatives, Kenneth Krys and Greig Mitchell, as liquidators of the Fairfield Funds. *Id.* ¶ 28. Pursuant to the appointment order of the BVI court,[9] the "Foreign Representatives are responsible for all aspects of the Funds' business, including protecting, realizing, and distributing assets for the Funds' estates." *Id.* ¶ 195. The Liquidators commenced actions in the BVI against a number of investors who had redeemed shares of the Fairfield Funds before the collapse of the scheme. Mem. L. at 4, ECF No. 786; *Fairfield Sentry Ltd. v. Citibank, N.A. London*, 630 F. Supp. 3d 463, 475 (S.D.N.Y. 2022); *see also Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*, 596 B.R. 275, 284 (Bankr. S.D.N.Y. 2018) ("*Fairfield II*").

The Liquidators filed petitions in this Court in June 2010 under Chapter 15 of the Bankruptcy Code, seeking recognition of the BVI proceedings as foreign main proceedings. Am. Compl. ¶ 29, ECF No. 620. This Court granted that recognition on July 22, 2010. *Id.* All

---

[9]    The order was issued by the "Commercial Division of the Eastern Caribbean High Court of Justice." *See* Am. Compl. at 1.

cases filed by the Plaintiffs were administratively consolidated before this Court in November

2010.  *See* Consolidation Order, Adv. Pro. No. 10-03496, ECF No. 25.

The Plaintiffs asserted multiple causes of action in those consolidated adversary

proceedings including, *inter alia*, mistaken payment and constructive trust.[10]  First Am. Compl.

¶¶ 34–88, ECF No. 8; *see also* 630 F. Supp. 3d at 479.  In October 2011, this Court stayed the

U.S. proceedings pending resolution of the BVI proceedings.  *See* Am. Order Staying Redeemer

Actions, Adv. Pro. No. 10-03496, ECF No. 418.; *In re Fairfield Sentry Ltd.*, 2018 WL 3756343,

at *3 (Bankr. S.D.N.Y. Aug. 6, 2018).

In April 2014, the Privy Council affirmed dismissal of the Plaintiffs' BVI law claims for

restitution based on mistaken payment.  *Fairfield Sentry Ltd. (In Liquidation ) v. Migani*, [2014]

UKPC 9 ("*Migani* ").[11]  The Privy Council held that the Plaintiffs' claims for restitution in the

BVI to recover redemption payments arising out of transactions governed by the Funds' Articles

of Association are governed by BVI law.  *Id.* ¶ 17.  The Plaintiffs' claims to recover redemption

payments thus depended on whether Sentry was bound to make those payments under the "true

NAV per share, ascertained in the light of information which subsequently became available

about Madoff's frauds, or . . . the NAV per share which was determined by the Directors at the

time of redemption."  *Id.* ¶ 19.  The Privy Council concluded that the NAV had to be definitively

determined at the time of the subscription or redemption.  *Id.* ¶ 21.  The redemption payments

---

[10]      Other causes of action included unjust enrichment, money had and received, unfair preferences under BVI's
Insolvent Act § 245, undervalue transactions under the Insolvent Act § 246, breach of contract, and breach of the
implied covenant of good faith and fair dealing.  *Fairfield Sentry Ltd. v. Citibank, N.A. London*, 630 F. Supp. 3d at
463, (S.D.N.Y. 2022).

[11]      *Migani* is available at https://www.jcpc.uk/cases/docs/jcpc-2012-0061-judgment.pdf and, without
numbered paragraphs, on the Westlaw database at *Fairfield Sentry Ltd (In Liquidation) v Migani*, 2014 WL
1219748.

made under the NAV were thus not subject to restitution and the payee was not unjustly enriched by receiving funds, even if the amount was mistaken. *Id.* ¶¶ 18–19.

After *Migani* was issued, the Plaintiffs allegedly obtained evidence of bad faith of Citco, the Fairfield Fund's administrator, when it issued redemption certificates. *See In re Fairfield Sentry Ltd.*, No. 10-13164 (SMB), 2018 WL 3756343, at *5–6 (Bankr. S.D.N.Y. Aug. 6, 2018). Plaintiffs moved to amend the complaint, seeking to add allegations that Citco lacked good faith when it issued certificates for redemptions and was aware that the NAV was inflated at the time. *See id.* at *6. The Plaintiffs argued that the certificates would not be binding under the Funds' Articles if they were not issued in good faith. *Id.*

In December 2018, this Court found that the Plaintiffs could allege bad faith on behalf of Citco in the U.S. proceedings and could seek recovery of the redemption payments only "where a Defendant knew the NAV was inflated at the time of redemption." *Fairfield II*, 596 B.R. at 295. Of the common law claims, the Court allowed only the Plaintiffs' claims for constructive trust against the so-called "Knowledge Defendants" to proceed. *Id.* at 301 ("The suggestion that the subsequent disclosure of facts indicating that the valuation was made in bad faith vitiates the contract and requires restitution lacks support. The only exception concerns the Knowledge Defendants that received redemption payments with the knowledge that the NAV was wrong. In those circumstances, the Liquidators may seek to impose a constructive trust."). In December 2020, this Court ruled that § 546(e) bars Plaintiffs' BVI avoidance claims to recover unfair preferences and undervalue transactions. *In re Fairfield Sentry Ltd.*, 2020 WL 7345988, at *1 (Dec. 14, 2020) ("*Fairfield III*").

Following these decisions, only the constructive trust claims survived. *Id.*; *In re Fairfield Sentry Ltd.*, No. 10-13164 (SMB), 2021 WL 771677, at *1 (Bankr. S.D.N.Y. Feb. 23, 2021)

("*Fairfield IV*"), *aff'd*, 630 F. Supp. 3d 463 (2022).  The Liquidators filed a further motion to

amend the complaints against the Knowledge Defendants.  Mot. to Amend, ECF No. 560; Mot.

to Amend, Adv. Pro. No. 10-03496, ECF No. 3737.  On August 5, 2021, this Court granted the

motion to amend the complaint and lifted the stay of the redeemer actions.  Order Granting Mot.

to Amend, ECF No. 617; Order Lifting Stay of Redeemer Actions, ECF No. 616.

### C.  <u>The Pending Motion</u>

The Amended Complaint seeks the imposition of a constructive trust on the redemption

payments received from the Fairfield Funds.  Am. Compl. ¶ 197, ECF No. 620.  The Amended

Complaint alleges that Defendant's purported agent, the Citco Subscriber, had knowledge of the

fraud at BLMIS and therefore knowledge that the NAV was inflated.  *Id.* ¶ 201.  "By reason of

their receipt of some or all of the Redemption Payments, the Beneficial Shareholders have been

unjustly enriched to the detriment of the [Fairfield] Funds and other shareholders and creditors of

the Funds." [12]  *Id.* ¶ 206.

Under BVI law, "lack of good faith, *i.e.* bad faith, includes wrongdoing by one who acts

recklessly as well as one who acts with actual knowledge that he is acting wrongfully or willfully

blinds himself to that fact."  *Id.* ¶ 198 (citing 596 B.R. at 293).  As this Court previously found:

> To establish a constructive trust claim under English law, which would apply in the
> BVI, 'the plaintiff must show, first, a disposal of his assets in breach of fiduciary
> duty; second, the beneficial receipt by the defendant of assets which are traceable
> as representing the assets of the plaintiff; and third, knowledge on the part of the
> defendant that the assets he received are traceable to a breach of fiduciary duty.'

*In re Fairfield Sentry Ltd.*, 2021 WL 771677 (Bankr. S.D.N.Y. Feb. 23, 2021) (quoting *El Ajou*

*v. Dollar Land Holdings Ltd.* [1994] 2 All E.R. 685, 700).

---

[12]    As stated *supra*, footnote 2, the Amended Complaint alleges that several other defendants may have
received redemption payments made to the Citco Subscribers.  *Id.* ¶¶ 33–104.

The Amended Complaint alleges that the defendants, including UBS AG as a beneficial shareholder of certain accounts, purposefully availed themselves of the laws of the United States and the State of New York by "investing money with the Funds, and knowing and intending that the Funds would invest substantially all of that money in New York-based BLMIS." Am. Compl. ¶ 20, ECF No. 620.

The parties engaged in personal jurisdiction discovery between September 2021 and August 2022. *See* Scheduling Order, ECF No. 654; Second Am. Scheduling Order, ECF No. 917. Merits document and expert discovery is ongoing in this case. *See* Twelfth Am. Scheduling Order, ECF No. 1144.

Defendant has moved to dismiss the Amended Complaint for lack of personal jurisdiction, arguing that the Amended Complaint has not sufficiently alleged minimum contacts with the forum to establish personal jurisdiction over Defendant and that exercising personal jurisdiction would be unreasonable. *See* Mem. L. at 2–4, 19, ECF No. 786.

The Liquidators filed an opposition to the Motion and submitted the declarations of Joshua Margolin and Sara Joyce in support of their opposition. Opp'n, ECF No. 1075; Margolin Decl., ECF No. 1076; Declaration of Sara Joyce ("Joyce Decl."), ECF No. 1077.[13] The Liquidators argue that exercising jurisdiction over Defendant would be reasonable and that Defendant's contacts with the United States, through its own actions and those of its purported agent, in knowingly and intentionally investing in the Fairfield Funds, using U.S. correspondent accounts to receive payments from Sentry, and conducting other business activities support

---

[13] Pursuant to various orders of this Court, portions of certain filings and supporting documents were filed under seal. At the Hearing on the motion, the Court gave the parties the opportunity to withdraw from the record any previously-sealed materials that the party did not want to be cited, quoted, or otherwise referenced in the opinion. Hr'g Tr. 12:5–17, ECF No. 1153. None of the parties in this matter requested information withdrawn. The Court will nevertheless refrain from referring to any bank account numbers or names of individual employees, named only in sealed documents, in full.

personal jurisdiction. Opp'n at 2–5, ECF No. 1075. Defendant filed a reply memorandum on

July 11, 2023. Reply, ECF No. 1115. This Court reviewed the above filings and held a hearing

on the Motion on May 3, 2024. *See* Hr'g Tr., ECF No. 1153.[14]

## IV.    **DISCUSSION**

### A.  **The Law of Personal Jurisdiction**

In order to subject a defendant to personal jurisdiction in the United States, due process

requires that the defendant have sufficient minimum contacts with the forum in which the

defendant is sued "'such that the maintenance of the suit does not offend traditional notions of

fair play and substantial justice.'" *Picard v. Bureau of Labor Ins.* (*In re BLMIS*), 480 B.R. 501,

516 (Bankr. S.D.N.Y. 2012) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

"In adversary proceedings, courts must determine whether the defendant has minimum contacts

with the United States, rather than with the forum state." *Picard v. Fairfield Greenwich Grp. (In*

*re Fairfield Sentry Ltd.)*, 627 B.R. 546, 565 n.13 (Bankr. S.D.N.Y. 2021) (citing *In re Lehman*

*Bros. Holdings Inc.*, 535 B.R. 608, 619 (Bankr. S.D.N.Y. 2015)). "When jurisdiction is satisfied

through Bankruptcy Rule 7004,[15] a bankruptcy court need not address its state's long-arm

statute." *Id.* n.12; *see also Owens-Illinois, Inc. v. Rapid Am. Corp. (In re Celotex Corp.)*, 124

F.3d 619, 630 (4th Cir. 1997).

---

[14]     The Court held hearings on May 3, 2024, on the motions to dismiss of multiple entities, including that of
UBS Jersey, an entity represented by the same counsel as the Defendant, UBS AG. UBS Jersey's and UBS AG's
factual backgrounds and motions are similar, and Counsel presented arguments with respect to both UBS entities
concurrently. Hr'g Tr. 78:23–79:5 ("There's two UBS entities. There's AG and Jersey. . . . the relevant facts and
law are similar to those relating to UBS AG [as they are to UBS Jersey]"). References to "UBS" without further
designation made at the hearing and quoted in this opinion apply to both UBS entities. However, the Court has
addressed the motion to dismiss of UBS Jersey in a separate opinion. *See* Mem. Op. and Order, Adv. Pro. No. 10-
03636, ECF No. 1359.

[15]     "The summons and complaint and all other process except a subpoena may be served anywhere in the
United States." Fed. R. Bankr. P. 7004(d). A bankruptcy court may exercise personal jurisdiction over a defendant
served under Rule 7004(d) "[i]f the exercise of jurisdiction is consistent with the Constitution and the laws of the
United States." Fed. R. Bankr. P. 7004(f).

An analysis of minimum contacts "focuses on the relationship among the defendant, the forum, and the litigation," a relationship that "must arise out of contacts that the defendant himself creates with the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (quotations omitted). There are three conditions necessary for the Court to exercise specific jurisdiction[16] over the non-resident defendant:

> First, the defendant must have purposefully availed itself of the privilege of conducting activities within the forum State or have purposefully directed its conduct into the forum State. Second, the plaintiff's claim must arise out of or relate to the defendant's forum conduct. Finally, the exercise of jurisdiction must be reasonable under the circumstances.

*U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 150 (2d Cir. 2019) (internal quotation marks and citations omitted).

To survive a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure Rule 12(b)(2), the Plaintiffs "must make a prima facie showing that jurisdiction exists." *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 342 (2d Cir. 2018) (quoting *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34–35 (2d Cir. 2010)). A trial court has considerable procedural leeway when addressing a pretrial dismissal motion under Rule 12(b)(2). *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013).

A showing sufficient to defeat a defendant's challenge to personal jurisdiction "varies depending on the procedural posture of the litigation." *Id.* (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). Following discovery, "the plaintiff's prima

---

[16]    Courts recognize "two types of personal jurisdiction: general and specific jurisdiction. A state court may exercise general jurisdiction only when a defendant is 'essentially at home' in the State." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 352, 141 S. Ct. 1017, 1019, 209 L. Ed. 2d 225 (2021) (quoting *Goodyear Dunlop Tires Operations, S. A v. Brown*, 564 U.S 915, 919, 131 S. Ct. 2846, 180 L. Ed. 2d 796 (2011)). The Plaintiffs do not allege that the Court has general jurisdiction over Defendant. *See* Mem. L. at 10–11, ECF No. 786 ("The Liquidators do not not—and credibly could not—assert that this Court has general jurisdiction over a foreign entity such as UBS, a Swiss bank that is not 'at home' in the United States, and so Plaintiffs must plead facts supporting the exercise of specific jurisdiction over UBS."); Opp'n at 3 (arguing that the Court's specific jurisdiction is founded on Defendant's contacts with the forum that relate to the claims at issue).

facie showing, necessary to defeat a jurisdiction testing motion, must include an averment of

facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant."

*Ball*, 902 F.2d at 197. "In response to a post-jurisdictional discovery Rule 12(b)(2) motion, 'the

plaintiff need persuade the court only that its factual allegations constitute a prima facie showing

of jurisdiction.'" *Averbach v. Cairo Amman Bank*, No. 19-CV-0004-GHW-KHP, 2023 WL

5016884, at *4 (S.D.N.Y. June 30, 2023) (quoting *Dorchester Fin. Sec.*, 722 F.3d at 85). "Now

that jurisdictional discovery is complete, Plaintiffs' burden is different, but it is not heavy."

*Averbach*, 2023 WL 5016884, at *6 (citing 722 F.3d at 85). "Plaintiffs need only show that

their prima facie showing of jurisdiction is factually supported." *Id.* at *6. When considering a

motion to dismiss before or after jurisdictional discovery has taken place, "the court must

'construe the pleadings and affidavits in the light most favorable to plaintiffs,' and resolve all

doubts, including factual disputes, in the plaintiff's favor." *Id.* at *4 (quoting *Ball*, 902 F.2d at

197).

**B. <u>Analysis of Purposeful Availment</u>**

"[M]inimum contacts necessary to support [specific] jurisdiction exist where the

defendant purposefully availed itself of the privilege of doing business in the forum and could

foresee being haled into court there." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68,

82 (2d Cir. 2018) (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161,

170 (2d Cir. 2013)). For specific personal jurisdiction, "'[c]ourts typically require that the

plaintiff show some sort of causal relationship between a defendant's U.S. contacts and the

episode in suit,' and the plaintiff's claim must in some way 'arise from the defendant's purposeful

contacts with the forum.'" *Charles Schwab Corp.*, 883 F.3d at 84 (quoting *Waldman v. Palestine

Liberation Org.*, 835 F.3d 317, 341, 343 (2d Cir. 2016)). "Although a defendant's contacts with

the forum state may be 'intertwined with [its] transactions or interactions with the plaintiff or

other parties . . . [,] a defendant's relationship with a . . . third party, standing alone, is an

insufficient basis for jurisdiction.'" *U.S. Bank Nat'l Ass'n*, 916 F.3d at 150 (quoting *Walden*,

571 U.S. at 134) (alteration in original). "It is insufficient to rely on a defendant's random,

fortuitous, or attenuated contacts or on the unilateral activity of a plaintiff with the forum to

establish specific jurisdiction." *Id.*

UBS AG asserts that the "Liquidators recently confirmed that the Redemption Payments

transpired entirely outside of the United States in their opening appellate brief to the District

Court challenging certain of Judge Bernstein's holdings in *Fairfield I*, *Fairfield II*, and *Fairfield

III*." Mem. L. at 15–16, ECF No. 786. The Plaintiffs argued before the District Court, that

"every relevant component of the transactions at issue here occurred outside the territorial

jurisdiction of the United States." *Id.* at 16; *see also* Pls.-Appellants' Opening Br. for Second

Round Appeal at 24, *Fairfield Sentry Ltd. v. Citibank NA London*, No. 19-cv-3911 (S.D.N.Y.

July 21, 2021), ECF No. 440 (the "Opening Brief"). The Plaintiffs' Opening Brief concerned the

extraterritorial application of the § 546(e)[17] safe harbor. *See* Opening Brief at 24 (arguing that

the "Bankruptcy Court erred in holding that Section 546(e)'s safe harbor could apply

extraterritorially to shield from avoidance settled securities transactions that occurred exclusively

outside the United States.").

As another bankruptcy court in this district has stated, the "tests for personal jurisdiction

and extraterritoriality are not the same." *Spizz v. Goldfarb Seligman & Co. (In re Ampal-Am.*

---

[17]    Section 546(e) of the Bankruptcy Code prohibits a trustee from avoiding a transfer that is a margin payment
or settlement payment "made by or to (or for the benefit of) a commodity broker, forward contract merchant,
stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or
to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial
participant, or securities clearing agency, in connection with a securities contract. . . ." 11 U.S.C. § 546(e). "By its
terms, the safe harbor is a defense to the avoidance of the *initial* transfer." *Picard v. BNP Paribas S.A. (In re
BLMIS)*, 594 B.R. 167, 197 (Bankr. S.D.N.Y. 2018) (emphasis in original).

*Israel Corp.)*, 562 B.R. 601, 613 n.14 (Bankr. S.D.N.Y. 2017). In *Spizz*, the bankruptcy court

was able to simultaneously find that the "[t]ransfer was not domestic, and hence, cannot be

avoided" under § 547, while also clarifying that by "attend[ing] meetings in New York around

the time of, and apparently in conjunction with, the commencement of the chapter 11 case," a

defendant may be "subject to specific personal jurisdiction." *Id.* at 613–14.

By arguing in the District Court that the redemption transfers were foreign for purposes

of extraterritoriality, Plaintiffs did not preclude arguing that there were contacts with the forum

for purposes of personal jurisdiction. To determine whether a transaction is foreign or domestic

for analyzing extraterritoriality issues for federal statutes, courts look at whether the "conduct

relevant to the statute's focus occurred in the United States." *RJR Nabisco, Inc. v. European

Cmty.*, 579 U.S. 325, 326, 136 S. Ct. 2090, 2094, 195 L. Ed. 2d 476 (2016). To determine

whether personal jurisdiction is appropriate, however, courts analyze a defendant's contacts with

the forum "under a totality of the circumstances test." *Licci*, 732 F.3d at 170 (citing *Best Van

Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007)).

### 1. <u>Defendant's Use of Correspondent Accounts</u>

The Plaintiffs point to the choice and use of correspondent accounts by UBS AG and its

agent[18] as sufficient to establish minimum contacts with the United States. Opp'n at 29–34, ECF

No. 1075. "Correspondent accounts are accounts in domestic banks held in the name of foreign

financial institutions" that are used "to effect dollar transactions." *Licci ex rel. Licci v. Lebanese

Canadian Bank, SAL*, 673 F.3d 50, 56 n.3 (2d Cir. 2012) (quoting *Sigmoil Res., N.V. v. Pan*

---

[18]    The Defendant does not "dispute that Citco's jurisdictional contacts can be imputed to UBS with[in] the
scope of their agency . . . ." Hr'g Tr. 82:4–6, ECF No. 1153. Defendant believes that the Complaint inappropriately
imputes the Fairfield Funds' own contacts to UBS AG "in the absence of an agency relationship and alter ego
relationship, a department relationship, something like that." *Id.* 82:18–20. Whether the Plaintiffs impute the
Fairfield Funds' own contacts to the Defendant will be discussed *infra*, Section IV.B.2.

*Ocean Oil Corp. (Nigeria)*, 234 A.D.2d 103, 104, 650 N.Y.S.2d 726, 727 (1st Dept 1996)).

Plaintiffs allege that UBS AG, through the Citco Subscriber, its purported agent, deliberately

selected and repeatedly used U.S. correspondent accounts to effectuate the redemption payments

that form the harms for which Plaintiffs seek redress.  Opp'n at 29–30, ECF No. 1075.

Defendant argues that "all or nearly all the Redemption Payments at issue here occurred

*abroad*."  Reply at 11, ECF No. 115 (emphasis in original).  UBS AG believes that the Plaintiffs'

own allegations show that "the Redemption Payments were paid to accounts outside the United

States . . . ."  Mem. L. at 13, ECF No. 786.  UBS AG points to the B&C Agreement, which

required it and all other beneficial shareholders to "maintain bank accounts with the Citco Banks

outside of the United States, into which all Redemption payments were deposited."  *Id.* at 7.

UBS AG further points to an exhibit attached to the Amended Complaint which states that the

redemption payments at issue here were made to a bank account labeled "Citco Global Custody

(NA) NV, *Netherlands*."  Mem. L. at 9 (emphasis in original).  UBS AG believes that the

redemption records produced to the Liquidators in jurisdictional discovery confirms this, where

"[o]ut of over 100 redemptions in the record, all but approximately fifteen have corresponding

Requests, and only seven Requests reflect routing of Redemption Payments to a New York

account. The rest indicate that the relevant Sentry Redemption Payments were sent directly to

Citco Global Custody NA NV's or Citco Global Custody NV's accounts at Citco Bank

Nederland NV Dublin Branch."  Reply at 13 (citing Margolin Decl. Ex. 35 at -536, -817, ECF

No. 1076).

The first step to redeem a share of Sentry was for UBS AG to submit a redemption

request to the Citco Subscriber.  Opp'n at 13, ECF No. 1075; *see, e.g.,* Margolin Decl. Ex. 22 at

-651 (June 28, 2007, CitcoFundsNet[19] confirmation of UBS AG's request to redeem 221.16

shares of Sentry).  The Citco Subscriber from whom UBS AG requested redemptions would then

submit a request on UBS AG's  behalf to the investment manager of Sentry, the Fairfield

Greenwich Group ("FGG").  Opp'n at 13; *see, e.g.,* Margolin Decl. Ex. 23 at -398 (August 26,

2005, Citco Bank redemption request to FGG for redemption of 311.69 shares of Sentry); *see*

*also id.* Ex. 24 at -343 (Citco Bank confirmation to UBS AG of UBS AG's August 25, 2005,

order for redemption of 311.69 shares of Sentry).  The redemption request that the Citco

Subscriber sent to FGG would state the bank and account to which the Citco Subscriber

requested FGG send the redemption payments.  *See, e.g.,* Margolin Decl. Ex. 23 at -398 ("The

Shares should be registered . . . in the name of: CITCO GLOBAL CUSTODY NV REF UBS AG

ZURICH . . . .WE REQUEST YOU TO WIRE THE REDEMPTION PROCEEDS IN USD TO

THE . . . ACCOUNT . . . OF CITCO BANK NEDERLAND N.V. WITH HSBC BANK USA

452 FIFTH AVENUE NEW YORK, NY 10018 UNITED STATES . . . .").

The Plaintiffs have submitted evidence showing the Citco Subscriber, on behalf of

Defendant, repeatedly instructed redemptions of Sentry shares be sent to an account in the

United States.  *See id.* Ex. 34 at -817 (Confirmation of Order Received for 29.56 shares of Sentry

delivered to HSBC Bank USA in New York with settlement date of October 31, 2005); *id.* at

-409 (record of redemption request of 29.562 shares of Sentry as valued on September 30, 2005,

to be sent to Citco Bank's account at HSBC Bank USA in New York); *see also id.* Exs. 35–37

(Redemption Records for 2006 through 2008).

---

[19]    The Liquidators describe CitcoFundsNet as "an online platform provided by the Citco Subscriber."  Opp'n
at 10, ECF No. 1075.  The April 2005 B&C Agreement with Citco Bank and Citco Global Custody states that
pursuant to that agreement, UBS AG "desires to access and use the Citco Funds Net . . . to receive information on
Securities . . . ."  Margolin Decl. Ex. 12 at -363, ECF No. 1076.

Plaintiffs acknowledge that "[c]ertain other transaction documents, such as Requests for Wire Transfer Payment, related to UBS's redemption payments suggest that Sentry might have sent some of UBS's redemption payments directly to the Citco Subscriber's account at Citco Bank." Opp'n at 14 n.15, ECF No. 1075. Plaintiffs ask that any "ambiguity in the documentary evidence should be resolved in the Liquidators' favor." *Id.* UBS AG replies that "a court may not 'draw argumentative inferences in [a] plaintiff's favor' at this stage." Reply at 15, ECF No. 1115 (quoting *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013)).

The Second Circuit has made clear that a court evaluating a motion to dismiss for lack of jurisdiction "will not draw 'argumentative inferences' in the plaintiff's favor." *Robinson v. Overseas Mil. Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994) (quoting *Atlantic Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 198 (2d Cir.1992) (citing, in turn, *Norton v. Larney*, 266 U.S. 511, 515, 45 S. Ct. 145, 147, 69 L. Ed. 413 (1925))). If allegations sufficient to sustain a court's exercise of jurisdiction do not "appear by the allegations of the bill or complaint, the trial court, upon having its attention called to the defect or upon discovering it, must dismiss the case, unless the jurisdictional facts be supplied by amendment. *Norton v. Larney*, 266 U.S. at 515–16. The Court will "however, construe jurisdictional allegations liberally and take as true uncontroverted factual allegations." *Robinson v. Overseas Mil. Sales Corp.*, 21 F.3d at 507 (citing *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 411, 106 S. Ct. 1922, 1923–24, 90 L. Ed. 2d 413 (1986); *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683, 1686, 40 L. Ed. 2d 90 (1974); *IUE AFL–CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1052 (2d Cir. 1993)). Furthermore, where there exist "conflicting affidavits, all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party." *In re Terrorist Attacks on Sept.*

19

*11, 2001*, 714 F.3d at 673 (quoting *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 580 (2d Cir. 1993)) (quotation marks omitted in original).  Thus, while the Court will not infer support for Plaintiffs' arguments notwithstanding contrary allegations or a lack of allegations, it is appropriate to resolve factual disputes in their favor.

The Plaintiffs allege that Defendant received 134 redemption payments from Sentry that the Citco Subscriber requested to be sent to a correspondent account at HSBC USA.[20]  Opp'n at 14, ECF No. 1075; Margolin Decl. Exs. 34–37, ECF No. 1076.  The Plaintiffs support approximately 120 of those 134 payments with "corresponding Requests, and only seven Requests reflect routing of Redemption Payments to a New York account."  Reply at 13, ECF No. 1115.  The remaining requests, UBS AG argues, "indicate that the relevant Sentry Redemption Payments were sent directly to Citco Global Custody NA NV's or Citco Global Custody NV's accounts at Citco Bank Nederland NV Dublin Branch."  *Id.*; *see also* Hr'g Tr. 74:2–4 ("[T]he redemptions in many instances are not alleged to have and the evidence seems to confirm did not pass through the United States.").

While some records of redemption requests may "indicate" that a payment was sent directly from Sentry to Citco Bank Nederland NV Dublin Branch in Dublin, Ireland, other records from this same exhibit show requests seeking payments to be made to correspondent accounts in New York or confirmations of orders received at those accounts.  *Compare* Margolin Decl. Ex. 35 at -155203, ECF No, 1076 ("Request for Wire Transfer Payment" dated September

---

[20]    The Liquidators seek payments made to Defendant in this adversary proceeding "derived from shares that UBS received in a single transfer in March 2005 . . . ."  Opp'n at 10 n. 12.  At times, the Liquidators and UBS AG have treated the alleged use of correspondent accounts for redemptions sought in this proceeding and in adversary proceeding 10-03636 together.  *See, e.g.*, Hr'g Tr. 73:10–21, 75:4–20.  However, whether or not the Court considers the redemption payments made to correspondent accounts in adversary proceeding 10-03636, as explained *infra* pp. 23–25, the deliberate nature of the use of a correspondent account matters.

13, 2006, for 2,649.82 shares of Sentry worth $3,100,290.99 to be made to Citco Bank

Nederland N.V. Dublin Branch with an address listed in Dublin, Ireland), *with id.* at -618414

August 16, 2006, request for redemption of 2,649.827 shares Sentry to be made to "HSBC

BANK USA . . . NEW YORK, NY . . . UNITED STATES OF AMERICA") *and id.* at -618413

("Confirmation of Order Received" for redemption of 2,649.82 shares of Sentry at "HSBC

BANK USA . . . New York, NY . . . USA").

The Defendant's reply and oral arguments may point to an ambiguity in the available

evidence, which may present a difficulty for the Plaintiffs at a later stage of these proceedings.

However, the Court will, notwithstanding the Defendant's contrary presentation, resolve the

factual dispute in favor of the plaintiffs for purposes of evaluating a motion to dismiss for lack of

personal jurisdiction.

The Plaintiffs have shown that the Defendant was able to use a foreign-based or a U.S.-

based correspondent bank account for its redemption requests and, through its alleged agent,

chose the latter. *See* Margolin Decl. Exs. 34–37, ECF No. 1076 (Redemption Records); *see also*

Joyce Decl. at 6–9, ECF No. 1077.; *id.* at 12 ("[S]ubscription agreements for Fairfield Sentry . . .

do not contain any requirement that the subscriber utilize a U.S. account to send subscription

payments or receive redemption payments."); *id.* ("Neither the fact that Fairfield Sentry was a

U.S.-dollar denominated fund, nor the fact that the subscription agreement instructed subscribers

to wire their subscription payments to Sentry's U.S. account, nor the fact that Sentry made

redemption payments from its own U.S. account would have prevented a subscriber from making

subscription payments from and directing redemption payments to a U.S. dollar account located

outside the U.S."); *id.* at 13 ("The U.S. dollar was in wide circulation outside the U.S. during the

Relevant Period, and many other payment options were widely available and easily accessible

during the Relevant Period. To the extent that a foreign subscriber chose a U.S.-based correspondent account to effectuate their payments, it was generally for reasons of its own convenience or financial benefit.").

This was no passive endeavor; the Plaintiffs allege that UBS AG and the Citco Subscriber "*frequently* used U.S. correspondent accounts in transacting with Sentry." Opp'n at 32, ECF No. 1075 (emphasis in original). Defendant did so repeatedly, authorizing its agent to use U.S.-based accounts 134 times. *Id.*; *see also id.* at 2 n.3. Defendant, through its agent, selected and used a correspondent account at HSBC Bank USA in New York to receive the relevant redemption payments from Sentry sought here. *Id.* at 32; Margolin Decl. Exs. 34–37 (Redemption Records). UBS AG accomplished the conduct at the heart of the Liquidators' claims through its use of U.S.-based accounts. The Second Circuit has found the selection and repeated use of in-forum correspondent accounts to perpetrate the alleged violations supports a finding of sufficient minimum contacts. *Licci ex rel Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 171 (2d Cir. 2013).

UBS AG argues that any use of correspondent accounts that may have occurred was incidental and insufficiently related to the harm for which the plaintiffs seek redress. Reply at 16–17, ECF No. 1115. The Second Circuit has determined that allegations of a "foreign bank's repeated use of a correspondent account in New York on behalf of a client . . . show purposeful availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168 (2d Cir. 2013) (quoting *Licci v. Lebanese Canadian Bank*, 20 N.Y.3d 327, 339, 984 N.E.2d 893, 900 (2012)); *see also Spetner*, 70 F.4th at 640 ("[A] defendant foreign bank's 'repeated use of a

correspondent account in New York on behalf of a client . . . can constitute transacting business

for purposes of § 302(a)(1), even if the defendant has no other contacts with the forum.").[21]  A

course of dealing can be established through as little as "14 currency exchange transactions

between" two foreign entities made to a New York bank.  *Al Rushaid*, 28 N.Y.3d at 325.

The Liquidators' allegations and supporting documentation show the Defendant's use of

U.S.-based accounts for the redemption at issue.  *See* Opp'n at 12, 32–33; *see also* Margolin

Decl. Ex. 27; *id.* Exs. 34–37 (Redemption Records).  The redemption forms show that

Defendant's purported agent, the Citco Subscriber, designated the U.S.-based correspondent

bank, to which Sentry accordingly sent the relevant payments.  The intentional and repeated use

of New York-based correspondent accounts, while foreign options existed, demonstrates

Defendant's purposeful availment of the banking system of the United States.

UBS AG argues that there can be no allegation of repeated "recurring" usage where

"each redemption is its own claim."  Reply at 15, ECF No. 1115.  UBS AG relies in part on

*Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167 (Bankr. S.D.N.Y. 2018) and *Taormina

v. Thrifty Car Rental*, No. 16-CV-3255 (VEC), 2016 WL 7392214 (S.D.N.Y. Dec. 21, 2016) to

argue that the Plaintiffs must independently establish the Court's exercise of jurisdiction over

each of the redemption payments.  Mem. L. at 11, ECF No. 786; Reply at 15; 594 B.R. at 190

("Each transfer is a separate claim, . . . and the Trustee must establish the court's jurisdiction

with respect to each claim asserted."); 2016 WL 7392214, at *3 ("Because specific jurisdiction is

claim-specific, a court must have specific jurisdiction over each of the Plaintiff's claims."); *see

also Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004) ("A plaintiff must

---

[21]    Section 302(a)(1), New York's long-arm statute, "authorizes personal jurisdiction over a foreign defendant for causes of action that arise out of 'transact[ing] any business within the state,' whether in person or through an agent."  70 F.4th at 640 (quoting C.P.L.R. § 302(a)(1)).

establish the court's jurisdiction with respect to each claim asserted."). Under Defendant's arguments, since the pertinent issue concerns "a single use with respect to any given claim," Plaintiffs would not be able to show repeated use of an account. Hr'g Tr. 74:1–2, ECF No. 1153; *see also* Hr'g Tr. at 72:25–73:3 ("[I]f each redemption is a separate claim, we're not talking about repeated uses of the wires, we're talking about single uses of the [wires]").

However, it is not the quantity of transactions, standing by itself, that the Court considers in the jurisdictional analysis. The Second Circuit explained in *Licci*, 732 F.3d 161, that "both the frequency and deliberate nature" of a defendant's use of correspondent accounts determines whether the conduct shows purposeful availment. *Licci*, 732 F.3d at 168; *id.* at 171 ( "[Defendant] deliberately chose to process the many . . . wire transfers through AmEx in New York . . . . *Moreover*, [defendant]'s use of a correspondent account in New York to accomplish its dollar-denominated wire transfers was recurring.") (emphasis added). The number of repeated uses of a U.S. account is relevant to the jurisdictional analysis either to show the deliberate nature of that use or in conjunction with the deliberate nature of that use. *See id.* This Court has already stated that a single deliberate selection and use of a U.S.-based account can sufficiently demonstrate a defendant's purposeful availment of the banking system of New York and the United States. *See Fairfield Sentry Ltd. v. BNP Paribas Sec. Servs. (In re Fairfield Sentry Ltd.)*, Adv. Pro. No. 10-03627 (JPM), 2024 WL 3024512, at *10 (Bankr. S.D.N.Y. June 14, 2024).

Furthermore, the Second Circuit has stated that a court may consider contacts that "may not have directly given rise to the plaintiff's cause of action, [but] certainly 'relate to' it. *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 128 (2d Cir. 2002) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473–74 (1985)). The repeated uses of a U.S.-

based correspondent account by the Defendant may underlie separate claims; the uses also relate to each other.

The Liquidators have provided support for the allegation that Defendant chose to use a U.S. correspondent account to receive a payment from Sentry.  Opp'n at 12–14, ECF No. 1075; Molton Decl. Ex. 34–37, ECF No. 1076 (Redemption Records); *see also* Joyce Decl. 8–9, ECF No. 1077 (demonstrating the availability of foreign banks during the relevant period).  The redemption forms show that Defendant, through its agent, designated the U.S.-based correspondent bank, to which Sentry accordingly sent payments.  UBS AG is alleged to have received over $85 million through these transactions and over $4.6 million through this action, demonstrating its purposeful availment of the banking system of New York and the United States.  Defendant chose to use New York-based accounts while foreign options existed.

**2.  <u>Defendant's Business Contacts with the Forum</u>**

UBS AG states that while the subscription agreements[22] contain forum selection clauses specifying New York for claims relating to subscriptions, there is no similar clause subjecting any party to jurisdiction in New York for claims relating to redemptions.  Reply at 5, ECF No. 1115.  The Defendant argues that the "absence of such clauses relating to redemptions shows the parties intent *not* to subject themselves to jurisdiction in New York for purposes *other than* subscriptions."  *Id.* (emphasis in original).

In August 2018, this Court held that it does not have personal jurisdiction over certain defendants due to subscription agreements that provided for consent to jurisdiction in New York

---

[22]    The Liquidators have stated that the payments sought in this adversary proceeding "derived from shares which UBS received in a single transfer in March 2005, not from an original subscription. As a result, the arguments in this section related to UBS's use of correspondent accounts on the *subscription* side do not apply to UBS in Case No. 10-ap-03635."  Opp'n at 29 n. 18 (emphasis in original).  The Court will nevertheless address the Defendant's arguments, raised in this adversary proceeding, concerning the lack of a forum selection clause in the subscription agreements.

for claims "with respect to [the Subscription] Agreement and the Fund." *In re Fairfield Sentry Ltd.*, 2018 WL 3756343, at *11 (Bankr. S.D.N.Y. Aug. 6, 2018). The Liquidators here rely on the subscription agreements and private placement memoranda not to show consent to jurisdiction, but to show that when Defendant invested in Sentry it did so knowing that it would avail itself of the benefits and protections of New York. Opp'n at 22–27, ECF No. 1075. The absence of any similar clauses in redemption documents does not invalidate the import of the forum selection clauses for these purposes. The subscription agreements, signed by the Citco Subscriber[23] as an agent of UBS AG, in this way, support the Plaintiffs' showing of contacts with the forum. *See* Margolin Decl. Exs. 17–19, ECF No. 1076 (Long Form Subscription Agreements).

The Plaintiffs have supplied further documents received in jurisdictional discovery to support the allegations of contacts. Exhibits show UBS AG "engaged in regular and extensive communications with FGG in the United States to prepare for, make, and maintain its investments in the Funds." Opp'n at 7, ECF No. 1075; Margolin Decl. Ex. at -442 (November 2006 email from FGG employee with "fggus.com" email address to UBS employee with "ubs.com" email address stating that the former would "get the enclosed [attachments related to redemption orders from the Fairfield Funds] into the correct hands in New York, and . . . will come back to [the UBS employee] as soon as possible with an answer"); *id.* Ex. 5 (June 2007 email between UBS employees and FGG employees discussing investments into and redemptions from Sentry); *id.* Ex. 6 (August 2008 email from UBS employee to FGG employee

---

[23]    The long form subscription agreement with the Fairfield Funds produced by UBS AG in discovery was signed by Citco Bank and registered the shares in the name of "CITCO GLOBAL CUSTODY NV REF UBS AG ZURICH." Margolin Decl. Ex. 17 at -980; Ex. 18 at -778; Ex. 19 at -043. Short form subscription agreements identified Citco Global Custody with reference to UBS AG as the subscriber and the entity in whose name the shares were to be registered. *See, e.g., id.* Ex. 43 at -489.

requesting and receiving Sentry offering memo, factsheet, marketing presentation, and excel document, because "[o]ne of [UBS's]'s clients is interested to have exposure to Madoff . . .").

Furthermore, the Plaintiffs have presented documents showing that UBS employees met with FGG "on at least three occasions with the specific purpose of discussing investments in the Fairfield Funds."  Opp'n at 7; Margolin Decl. Ex. 7 (email describing a "meeting at UBS (NY)" with an employee of UBS which was "prompted by" a UBS employee "of [the] UBS Miami office" related to "recent redemptions from our clients" and planning to discuss information on the Fairfield Funds); *id.* Ex. 8 (April 2008 email between FGG employees with "fggus.com" email addresses discussing a meeting in New York with "some guys from UBS international interested in hearing about our risk platform as it relates to Sentry"); *id.* Ex. 9 (email from UBS employee to FGG US employee following July 2008 meeting and thanking the latter for "[t]aking the time to teach us more about Fairfield Sentry [a]nd the Madoff Strategy. We all thought the presenta[t]ion and Q&A was very enlightening").

These documents demonstrate more than mere purchases or a one-time visit to the forum. The Liquidators have demonstrated facts supporting continuous and systemic contacts with the forum.  UBS AG argues that the timing of the supporting documents is relevant to whether they support jurisdiction.  Hr'g Tr. 80:2–81:6 ("You can't sum all of these meetings and emails up and just pretend like it's one monolith . . . [T]iming would be relevant. But also if we look at the nature of the meetings themselves, you can see . . . [A] general meeting that occurs in 2003 that says, hey, this one individual from UBS is coming to New York . . . does not show that this specific redemption is at issue here.").  While some of UBS AG's investments in the Fairfield Funds may predate certain meetings, the information allegedly gained by Defendant was not entirely new taking into consideration the information contained in the private placement

memoranda. *See, e.g.* Margolin Decl. Ex. 11 (October 2004 Sentry Private Placement Memorandum). The meetings themselves describe clarifications and additional information. *See, e.g. id.* Ex. 9 (email from UBS employee thanking Fairfield Greenwich Group employee for teaching UBS employees *more* about the Fairfield Funds and Madoff).

Defendant argues that the Plaintiffs' allegations amount to "mere knowledge that Sentry would invest money it raised in the BVI with BLMIS in New York," which it states is "insufficient as a matter of law to support jurisdiction" under *Walden v. Fiore*, 571 U.S. 277 (2014). Mem. L. at 12–13, ECF No. 786. In *Walden*, the Supreme Court found that a defendant "formed no jurisdictionally relevant contacts" with the forum state of Nevada as "[p]etitioner never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada." *Walden*, 571 U.S. at 289. The Supreme Court further stated that it is impermissible to allow the "plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis." *Id.* As the Supreme Court explained, the "plaintiff cannot be the only link between the defendant and the forum," and "the defendant's conduct . . . must form the necessary connection with the forum State." *Id.* at 285. Nevertheless, personal jurisdiction may be found even where a "defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties." *Id.* at 286.

The Plaintiffs' allegations and supporting evidence of intentional investments into BLMIS in New York and selection and use of U.S.-based correspondent accounts, as described above, demonstrate that UBS AG took affirmative actions on its own apart from the conduct of the Plaintiffs. The Liquidators have shown that the Defendant knew and intended that, by investing in the Funds, Defendant's money would enter into U.S.-based BLMIS. Opp'n. at 7.

Defendant benefited from the materials that it received from FGG which confirmed the investments would be made with BLMIS in New York.  *See id.*

The Court thus finds that Defendant's selection and use of a U.S. correspondent account through its agent and due diligence concerning investments with BLMIS in New York support the Court's exercise of jurisdiction over the claims for receiving redemption payments from the Fairfield Funds with the knowledge that the NAV was wrong.  The contacts are not random, isolated, or fortuitous.  The contacts demonstrate UBS AG's purposeful activities aimed at New York in order to effectuate transfers from Sentry.  The Plaintiffs have thus provided facts that sufficiently support a prima facie showing of jurisdiction over the Defendant.

### C.  Whether the Claim Arises Out of or Relates to the Defendant's Forum Conduct

The suit must "arise out of *or relate to* the defendant's contacts with the forum."  *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 362, 141 S. Ct. 1017, 1026, 209 L. Ed. 2d 225 (2021) (emphasis in original).  "[P]roof that a plaintiff's claim came about because of the defendant's in-state conduct" is not required.  *Id.* at 362.  Instead, a  court need only find "an affiliation between the forum and the underlying controversy."  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011); *Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 190 (Bankr. S.D.N.Y. 2018) ("Where the defendant's contacts with the jurisdiction that relate to the cause of action are more substantial, however, it is not unreasonable to say that the defendant is subject to personal jurisdiction even though the acts within the state are not the proximate cause of the plaintiff's injury.") (internal quotations omitted).

Defendant argues that "even if subscription payments went through U.S. correspondent accounts, it would make no jurisdictional difference here because the Liquidators' claims do not arise out of or relate to subscriptions or UBS AG's alleged decision to invest in the Funds."

Reply at 9, ECF No. 1115; *see also* Mem. L. at 17, ECF No. 786 (arguing that the claims relate

to and arise out of the calculation of the NAV by Citco Fund Services and the redemption

payments made on the basis of those calculations).  However, the Liquidators seek imposition of

a constructive trust on funds received with knowledge that the NAV was inflated.  Am. Compl.

¶¶ 165–66, 198–99, ECF No. 620.  The issue of knowledge of the inflated NAV is inextricably

tied to the Defendant's investments with New York-based BLMIS.  The allegations are directly

related to Defendant's investment activities with BLMIS through the Fairfield Funds.  *Id.* ¶¶

165–66.  The Defendant's contacts with the United States, in investing in and in communications

with the Fairfield Funds, form a "sufficiently close link" between the defendant, the forum and

the litigation concerning Defendant's activities in the forum.  *See MSP Recovery Claims, Series

LLC v. Takeda Pharm. Am., Inc.*, 2021 WL 4461773, at *3 (S.D.N.Y. Sept. 29, 2021) (citing

*Ford Motor Co.*, 141 S. Ct. at 1032).

### D. <u>Whether Assertion of Personal Jurisdiction is Reasonable</u>

If a defendant has sufficient minimum contacts, the Court must then ask "whether the

assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial

justice'—that is, whether it is reasonable under the circumstances of the particular case."  *Bank

Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129 (2d Cir. 2002) (quoting

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996)); *see also Burger

King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985).  Where a plaintiff "makes the threshold

showing of the minimum contacts required for [exercising personal jurisdiction], a defendant

must present a compelling case that the presence of some other considerations would render

jurisdiction unreasonable."  *MSP Recovery Claims, Series LLC*, 2021 WL 4461773, at *3

(quoting *Bank Brussels Lambert*, 305 F.3d at 129).  Factors the Court will consider include the

burden on the defendant, the interests of the forum in adjudicating the case, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the states in furthering fundamental substantive social policies.  305 F.3d at 129.

The Defendant argues that "[t]he United States has a minimal (if any) interest in this litigation, which involves only foreign-law claims asserted as between exclusively foreign parties relating to assets located overseas and business transacted overseas by investment Funds organized under foreign law."  Mem. L. at 20, ECF No. 786 (citing *In re Fairfield Sentry Ltd.*, 458 B.R. 665, 682 (S.D.N.Y. 2011) (Preska, C.J.)).  UBS AG further argues that litigating here would impose a burden as "the evidence and witnesses are located abroad, and language barriers and evidentiary-access issues persist."  Reply at 20, ECF No. 1115.  Defendant suggests that a "desire to engage in forum shopping" may be the reason for litigating the claims in this Court, as it may be more reasonable to litigate BVI-law claims with non-U.S. litigants in the BVI.  Mem. L. at 20–21.

Defendant's reliance on *In re Fairfield Sentry Ltd.*, 458 B.R. 665, is misplaced.  In that case, the District Court determined whether the proceeding was core or non-core; it did not determine whether adjudication or jurisdiction in the United States was reasonable.  *See id.* at 675.  The Defendant has demonstrated that this Court's exercise of jurisdiction over it may impose a minimal burden in terms of requiring it to "traverse the distance" to the forum.  However, "[e]ven if forcing the defendant to litigate in a forum relatively distant from its home base were found to be a burden, the argument would provide defendant only weak support, if any, because the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago."  *Chloé v. Queen Bee of Beverly Hills, LLC*,

616 F.3d 158, 173 (2d Cir. 2010); *see also In re Platinum & Palladium Antitrust Litig.*, 61 F.4th

242, 273 (2d Cir. 2023).  Furthermore, UBS AG is represented by U.S. Counsel and the United

States has a strong interest in ensuring the integrity of its financial systems.

UBS AG argues that its potential "burden in litigating here is high, including because

UBS is a bank subject to Swiss privacy and bank-secrecy laws, and discovery in a U.S. litigation

of documents concerning the redemption payments at issue here would potentially expose UBS

to civil and criminal liability."  Mem. L. at 20 (citing "[s]uch laws [as] Articles 162, 271, and

273 of the Swiss Criminal Code, Article 47 of the Swiss Federal Act on Banks and Savings

Banks, Article 328b of the Swiss Code of Obligations, the Swiss Federal Act on Data Protection

of June 19, 1992, and related ordinances and regulations"); *see also* Reply at 19 ("[T]he

possibility of discovery-derived civil or criminal liability is at odds with a personal jurisdiction

requirement that recognizes and protects an individual liberty interest." (internal quotation marks

omitted)).

In 2012, this Court granted in part and denied in part a motion seeking relief as to the

order staying the action and seeking expedited initial disclosures on certain beneficial holders.

S*ee* Bench Ruling, Adv. Pro. No. 10-03496, ECF No. 799 (the "July 2012 Bench Ruling").  The

Court stated in that ruling that it was "hard-pressed to find any compelling United States' interest

in mandating discovery here *at this juncture* of the pending litigation."  *Id.* (emphasis added).

Although the defendants before this Court in 2012 were able to describe "the strong and

undeniable interest of many nations in enforcing their banking secrecy laws" and "significant

bank customer confidentiality laws of no fewer than 30 countries, attested to by numerous

declarations of foreign law experts and letters submitted by foreign governments that could have

been implicated or broken by complying with the Court's prior order, UBS AG now describes a

potential exposure to liability and presents a list of Swiss laws in a footnote.  *See* Mem. L. at 20–21.  This Court lifted the stay and required the Defendant to proceed to discovery in 2021.  Order Lifting Stay, ECF No. 616; Scheduling Order, ECF No. 666.  The July 2012 Bench Ruling shows that this Court can alleviate specific burdens identified by a defendant.  The mere potential for exposure to unspecified liability is not a burden that renders exercise of jurisdiction unreasonable.

Defendant has alleged that other forums may be able to hear the claims.  What it has not done is demonstrate how this forum would fail to provide effective relief.  *See MSP Recovery Claims, Series LLC*, 2021 WL 4461773, at *3.  Defendant does not explain what interest is impaired by precluding adjudication in another forum or why that interest outweighs other factors in favor of exercising jurisdiction.  *See In re Bernard L. Madoff Inv. Sec. LLC*, No. 22 CIV. 6561 (LGS), 2023 WL 395225, at *6 (S.D.N.Y. Jan. 25, 2023).  The Defendant has not established that the Court's exercise of personal jurisdiction over it would be unreasonable.  The Court thus finds that exercising jurisdiction over the Defendant is reasonable and comports with "traditional notions of fair play and substantial justice . . . ."  *See Int'l Shoe*, 326 U.S. at 316, 66 S. Ct. 154.

## V.  <u>CONCLUSION</u>

For the foregoing reasons, the Court DENIES the Defendant's Motion to Dismiss the

Amended Complaint.  The Liquidators shall submit a proposed order consistent with the findings

in this decision in accordance with Local Bankruptcy Rule 9074-1(a).

**IT IS SO ORDERED.**


Dated: September 18, 2024
       New York, New York

/s/ John P. Mastando III
THE HONORABLE JOHN P. MASTANDO III
UNITED STATES BANKRUPTCY JUDGE