UNITED STATES BANKRUPTCY COURT       *FOR PUBLICATION*
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | Chapter 15 |
| Fairfield Sentry Limited, et al. | Case No. 10-13164 (JPM) |
|  | (Jointly Administered) |
| Debtors in Foreign Proceedings. | |
| FAIRFIELD SENTRY LTD. (In Liquidation), et al., | |
| Plaintiffs, | |
| v. | Adv. Pro. No. 10-03635 (JPM) |
| ABN AMRO SCHWEIZ AG a/k/a AMRO (SWITZERLAND) AG, et al., | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER DENYING
## DEFENDANT'S MOTION TO DISMISS

*APPEARANCES:*

**MCKOOL SMITH, P.C.**
*Attorneys for Defendant, Bank Julius Baer & Co. Ltd.*
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
By:    Eric B. Halper
       Hal M. Shimkoski


**BROWN RUDNICK LLP**
*Attorneys for the Plaintiffs, Joint Liquidators*
Seven Times Square
New York, NY 10036
By:    Jeffrey L. Jonas
       David J. Molton
       Marek P. Krzyzowski

**JOHN P. MASTANDO III**
**UNITED STATES BANKRUPTCY JUDGE**

## I.    INTRODUCTION

Pending before the Court is the motion of the Defendant, Bank Julius Baer & Co. Ltd.[1] ("BJB" or "Defendant"), to dismiss the Fifth Amended Complaint (the "Amended Complaint") for lack of personal jurisdiction.  Mot. to Dismiss, ECF[2] No. 757.  The Court held a hearing on the Motion to Dismiss on May 3, 2024 (the "Hearing").  For the reasons set forth herein, the Court DENIES the Defendant's Motion to Dismiss.

## II.    JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157 and the Amended Standing Order of Reference dated January 31, 2012 (Preska, C.J.).  This Court previously concluded that it has subject matter jurisdiction over this and related actions.  *See In re Fairfield Sentry Ltd.*, 2018 WL 3756343 (Bankr. S.D.N.Y. Aug. 6, 2018); *see also* Stip. Order, ECF No. 519.  Personal jurisdiction is contested by the Defendant and will be discussed below.

## III.    BACKGROUND

This adversary proceeding was filed on September 21, 2010.  *See* Cert. Order Transferring Case., ECF No. 1; Compl. ECF No. 8. Kenneth M. Krys and Greig Mitchell (the "Liquidators"), in their capacities as the duly appointed Liquidators of Fairfield Sentry Limited (In Liquidation) ("Sentry") and Fairfield Sigma Limited (In Liquidation) ("Sigma"), and as Foreign Representatives of the liquidation proceedings involving Sentry, Sigma, and Fairfield

---

[1]    BJB may also be known as "Bank Julius Baer & Co. AG per Switzerland's Central Business Name Index, https://www.zefix.ch/en/search/entity/list/firm/12616."  Opp'n at 6 n.10, ECF No. 1089.

[2]    Citations to this Court's electronic docket refer to the docket of Adv. Pro. No. 10-03635-jpm unless otherwise noted.

Lambda Limited (In Liquidation) ("Lambda" and, together with Sentry and Sigma, the "Fairfield

Funds") filed the Amended Complaint on August 12, 2021.  Am. Compl., ECF No. 620.  Via the

Amended Complaint, the Liquidators seek the imposition of a constructive trust and recovery of

over $51.9 million in redemption payments made by Sentry and Sigma to various entities known

as the Citco Subscribers.  *Id.* ¶¶ 1–2, 2197–98; *id.* Exs. A–B.[3]  Of that amount, Defendant

allegedly received over $22.7 million[4] through redemption payments from its investment in

Sentry and Sigma.  Opp'n at 1, ECF No. 1089; *see also* Declaration of Lena Konanova in

Support of the Liquidators' Opposition ("Konanova Decl.") Exs. 42–48, ECF No. 1090

(Redemption Records).

### A.  The BLMIS Ponzi Scheme

This adversary proceeding arises out of the decades-long effort to recover assets of the

Bernard L. Madoff Investment Securities LLC ("BLMIS") Ponzi scheme.[5]  Am. Compl. ¶ 1.

The Citco Subscribers allegedly invested, either for their own account or for the account of

others, into several funds —including Sentry, Sigma, and Lambda —that channeled investments

into BLMIS.  *Id.* ¶¶ 2, 5, 15.

---

[3]    At the time of the filing of the Amended Complaint, the Plaintiffs made no specific allegations as to the exact amounts received by any of the beneficial shareholders.  With respect to BJB, the Amended Complaint states in relevant part that "[b]ased on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Bank Julius Baer & Co. Ltd." Am. Compl. ¶ 41.  The Amended Complaint alleges that several other defendants may have received redemption payments made to the Citco Subscribers.  *Id.* ¶¶ 33–104.  This opinion concerns only those payments that the Plaintiffs allege were paid to BJB.

[4]    Of that total U.S. Dollar amount, the Plaintiffs allege that BJB "received approximately $7,797,143.61 from Sentry and approximately €11,566,289.93 from Sigma through the redemption payments at issue. [T]he Liquidators have applied the exchange rate as of the date of each redemption payment out of Sigma and calculated the dollar value of the Sigma redemptions to be approximately $14,942,662.96. This number may vary if the Court ultimately determines that a different exchange rate applies."  Opp'n at 1 n.2, ECF No. 1089.

[5]    The Court will not recount all details concerning the Ponzi scheme perpetrated by Madoff.  Details of that scheme have been recounted by many courts. *See, e.g.*, *In re Madoff*, 598 B.R. 102, 106 (S.D.N.Y. 2019), *aff'd* 818 F. App'x 48 (2d Cir. 2020).

Fairfield Sentry was a direct feeder fund in that it was established for the purpose of bringing investors into BLMIS, thereby allowing Madoff's scheme to continue. *Id.* ¶¶ 5; 125–26; *see also In re Picard*, 917 F.3d 85, 93 (2d Cir. 2019) ("A feeder fund is an entity that pools money from numerous investors and then places it into a 'master fund' on their behalf. A master fund—what Madoff Securities advertised its funds to be—pools investments from multiple feeder funds and then invests the money."). Fairfield Sigma, in contrast, was an indirect feeder funds, established to facilitate investment in BLMIS through Fairfield Sentry for foreign currencies. Am. Compl. ¶¶ 125–26. BLMIS used investments from feeder funds, like the Fairfield Funds, to satisfy redemption requests from other investors in the scheme. *Id.* ¶¶ 5–7, 13. Without new investors, BLMIS would have been unable to make payments to those who chose to withdraw their investments, and the scheme would have fallen apart. *Id.* ¶¶ 7–8, 12–14, 126.

The Amended Complaint alleges that investors received payments on account of their shares in the Fairfield Funds based on a highly-inflated Net Asset Value ("NAV"). *Id.* ¶ 7. The Citco Subscribers and the beneficial shareholders were allegedly such investors. *Id.* To calculate the NAV, administrators used statements provided by BLMIS that showed "securities and investments, or interests or rights in securities and investments, held by BLMIS for the account of Sentry." *Id.* ¶ 128. In fact, no securities were ever bought or sold by BLMIS for Sentry, and none of the transactions on the statements ever occurred. *Id.* ¶ 129. The money sent to BLMIS by the Fairfield Funds for purchase of securities was instead used by Bernard Madoff to pay other investors or was "misappropriated by Madoff for other unauthorized uses." *Id.* The NAVs were miscalculated, and redemption payments were made in excess of the true value of

the shares. *Id.* ¶ 131. The Fairfield Funds were either insolvent when the redemption payments
were made or were made insolvent by those payments. *Id.*

BJB is a "corporate entity organized under the laws of Switzerland" with a registered
address in Zurich, Switzerland. *Id.* ¶ 41. BJB allegedly invested into and redeemed shares of
Sentry and Sigma through Citco Bank Nederland N.V., Citco Bank Nederland N.V. Dublin
(together "Citco Bank"), Citco Global Custody N.V., and Citco Global Custody (N.A.) N.V.
(together "Citco Global Custody") (collectively, the "Citco Subscriber"). [6] Opp'n at 5–6, ECF
No. 1089. Citco Bank and Citco Global Custody were organized under the laws of either
Curaçao or the Netherlands. *See* Mem. L. at 6 n.10, ECF No. 760.

BJB invested in Sentry as early as 2001 via the Citco Subscriber, which is alleged to have
facilitated investments in the Fairfield Funds for numerous shareholders in this proceeding.
Opp'n at 6. BJB opened an account at Citco Bank to "provide brokerage services." *Id.* at 9;
Konanova Decl. Ex. 7 at -046–47, ECF No. 1090 (October 2000 Brokerage and Custody
Agreement between Defendant, Citco Bank Nederland N.V. and Citco Global Custody N.V.)
(the "B&C Agreement"). These services included, among others, the "effecting of transactions
of and/or relating to the purchase and sale of and dealing in Securities in the name of" either
BJB, Citco Bank, Citco Global Custody, or "any nominee for the account of [BJB]" and "any
services ancillary thereto as set out in" the B&C Agreement. *Id.* at -046. The B&C Agreement
further empowered and obligated the Citco Subscriber, "when instructed to do so by [BJB] . . . to
make settlement of transactions undertaken by or for [BJB]" and to "deliver[] or receiv[e] the

---

[6]      The Plaintiffs' opposition memorandum describes these Citco entities as a single collective entity, defined
as the "Citco Subscriber." Opp'n at 6, ECF No. 1089. The Amended Complaint refers to the "Citco Subscribers," a
term that is defined to include both Citco Bank and Citco Global Custody, as relevant to this motion, and other Citco
banking and custody entities. *See* Am. Compl. ¶ 8 (defining the Citco Subscribers to include Citco Global Custody
NV, Citco Global Custody (NA) NV, Citco Fund Services (BVI), Citco Fund Services (Europe) BV, Citco Bank
Nederland N.V., Citco Bank Nederland N.V. Dublin Branch (a wholly owned subsidiary of Citco Bank Nederland
N.V.), the Citco Banking Corporation N.V.).

Securities or other assets of [BJB] and mak[e] or receiv[e] payments for the account of [BJB]."
*Id.* at -050.  The B&C required Citco Bank, after receiving an order from BJB, to issue an order
confirmation containing the "[f]ull name of the Fund," "[s]ecurities [i]dentification," "[a]mount/
currency/approx. no. of shares" to be purchased or sold, and the "Bank's reference."  *Id.* at -059–
60.  BJB is alleged to have retained the Citco Subscriber as its agent by October 2000 when BJB
and the Citco Subscriber entered into this B&C Agreement.  Opp'n at 9.

From January 1998 through June 2007, BJB allegedly subscribed through the Citco
Subscriber for 20,053.06 shares of Sentry and 82,629.92 shares of Sigma.  Opp'n at 3; *see also*
Konanova Decl. Exs. 38–39 (Subscription Records).  BJB, through the Citco Subscriber,
redeemed a total of $22,739,806.57 through 33 redemptions from Sentry and 9 redemptions from
Sigma from March 2005 through August 2008.  Opp'n at 12; *see also* Konanova Decl. Exs. 46–
47.  In addition to these redemption payments, BJB allegedly received fees from the clients on
whose behalf it invested.  Opp'n at 12–13.  At the directions and instructions of the Citco
Subscriber, as the alleged agent of BJB , "some . . . of the Redemption Payments were received
at . . . designated United States-based bank accounts."  Am. Compl. ¶ 141.

Bernard Madoff was arrested for alleged violations of federal securities laws on
December 11, 2008.  Am. Compl. ¶ 193.  The United States Attorney brought criminal charges
against him, alleging that Madoff ran a Ponzi scheme.  *Id*.  On December 11, 2008, the Securities
Exchange Commission filed an action in the Southern District of New York to halt the continued
offerings of securities.  *Id.* ¶ 194.  In March 2009, Madoff pleaded guilty to criminal charges
against him and confessed to operating a Ponzi scheme and fabricating statements and trade
confirmations.  *Id.* ¶¶ 195–96.  Madoff was sentenced to 150 years in federal prison and died in
April 2021.  *Id.* ¶ 197.

5

The Amended Complaint alleges that the Citco Subscribers, including the purported agents of BJB, "had knowledge of the Madoff fraud, and therefore knowledge that the Net Asset Value was inflated" when the redemption payments were made. *Id.* ¶ 209. The Amended Complaint further asserts that, while receiving redemption payments, the Citco Subscribers "uncovered multiple additional indicia that Madoff was engaged in some form of fraud" but "turned a blind eye, [and] accept[ed] millions of dollars while willfully ignoring or, at the very least, recklessly disregarding the truth in clear violation of the law of the British Virgin Islands . . . ." *Id.* ¶¶ 8, 209. These indicia included verification that there was no "independent confirmation that BLMIS-held assets even existed," Madoff's failure to segregate duties, and BLMIS's "employing an implausibly small auditing firm" rather than a reliable auditor. *Id.* ¶¶ 9, 209. In the face of red flags such as these, the Citco Subscribers and other Citco entities purportedly "quietly reduced [their] own exposure to BLMIS through the Funds, and significantly increasing its Custodian fees to offset the risk." *Id.* ¶ 209.

## B. <u>The Prior Litigation and Procedural History</u>

The Fairfield Funds were put into liquidation in the BVI in 2009. *Id.* ¶¶ 26–29. The BVI court issued orders appointing the foreign representatives, Kenneth Krys and Greig Mitchell, as liquidators of the Fairfield Funds. *Id.* ¶ 29. Pursuant to the appointment order of the BVI court,[7] the "Foreign Representatives are responsible for all aspects of the Funds' business, including protecting, realizing, and distributing assets for the Funds' estates." *Id.* ¶ 203. The Liquidators commenced actions in the BVI against a number of investors who had redeemed shares of the Fairfield Funds before the collapse of the scheme. Mem. L. at 4, ECF No. 760; *Fairfield Sentry Ltd. v. Citibank, N.A. London*, 630 F. Supp. 3d 463, 475 (S.D.N.Y. 2022); *see also Fairfield*

---

[7]    The order was issued by the "Commercial Division of the Eastern Caribbean High Court of Justice." *See* Am. Compl. at 1.

*Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*, 596 B.R. 275, 284 (Bankr. S.D.N.Y. 2018) ("*Fairfield II*").

The Liquidators filed petitions in this Court in June 2010 under Chapter 15 of the Bankruptcy Code, seeking recognition of the BVI proceedings as foreign main proceedings. Am. Compl. ¶ 29, ECF No. 620. This Court granted that recognition on July 22, 2010. *Id.* All cases filed by the Plaintiffs were administratively consolidated before this Court in November 2010. *See* Consolidation Order, Adv. Pro. No. 10-03496, ECF No. 25.

The Plaintiffs asserted multiple causes of action in those consolidated adversary proceedings including, *inter alia*, mistaken payment and constructive trust.[8] Compl. ¶¶ 34–88, ECF No. 8; *see also* 630 F. Supp. 3d at 479. In October 2011, this Court stayed the U.S. proceedings pending resolution of the BVI proceedings. *See* Am. Order Staying Redeemer Actions, Adv. Pro. No. 10-03496, ECF No. 418.; *In re Fairfield Sentry Ltd.*, 2018 WL 3756343, at *3 (Bankr. S.D.N.Y. Aug. 6, 2018).

In April 2014, the Privy Council affirmed dismissal of the Plaintiffs' BVI law claims for restitution based on mistaken payment. *Fairfield Sentry Ltd. (In Liquidation ) v. Migani*, [2014] UKPC 9 ("*Migani* ").[9] The Privy Council held that the Plaintiffs' claims for restitution in the BVI to recover redemption payments arising out of transactions governed by the Funds' Articles of Association are governed by BVI law. *Id.* ¶ 17. The Plaintiffs' claims to recover redemption payments thus depended on whether Sentry was bound to make those payments under the "true

---

[8]    Other causes of action included unjust enrichment, money had and received, unfair preferences under BVI's Insolvent Act § 245, undervalue transactions under the Insolvent Act § 246, breach of contract, and breach of the implied covenant of good faith and fair dealing. *Fairfield Sentry Ltd. v. Citibank, N.A. London*, 630 F. Supp. 3d at 463, (S.D.N.Y. 2022).

[9]    *Migani* is available at https://www.jcpc.uk/cases/docs/jcpc-2012-0061-judgment.pdf and, without numbered paragraphs, on the Westlaw database at *Fairfield Sentry Ltd (In Liquidation) v Migani*, 2014 WL 1219748.

NAV per share, ascertained in the light of information which subsequently became available about Madoff's frauds, or . . . the NAV per share which was determined by the Directors at the time of redemption." *Id.* ¶ 19.  The Privy Council concluded that the NAV had to be definitively determined at the time of the subscription or redemption. *Id.* ¶ 21.  The redemption payments made under the NAV were thus not subject to restitution and the payee was not unjustly enriched by receiving funds, even if the amount was mistaken. *Id.* ¶¶ 18–19.

After *Migani* was issued, the Plaintiffs allegedly obtained evidence of bad faith of Citco, the Fairfield Fund's administrator, when it issued redemption certificates. *See In re Fairfield Sentry Ltd.*, No. 10-13164 (SMB), 2018 WL 3756343, at \*5–6 (Bankr. S.D.N.Y. Aug. 6, 2018).  Plaintiffs moved to amend the complaint, seeking to add allegations that Citco lacked good faith when it issued certificates for redemptions and was aware that the NAV was inflated at the time. *See id.* at \*6.  The Plaintiffs argued that the certificates would not be binding under the Funds' Articles if they were not issued in good faith. *Id.*

In December 2018, this Court found that the Plaintiffs could allege bad faith on behalf of Citco in the U.S. proceedings and could seek recovery of the redemption payments only "where a Defendant knew the NAV was inflated at the time of redemption." *Fairfield II*, 596 B.R. at 295.  Of the common law claims, the Court allowed only the Plaintiffs' claims for constructive trust against the so-called "Knowledge Defendants" to proceed. *Id.* at 301 ("The suggestion that the subsequent disclosure of facts indicating that the valuation was made in bad faith vitiates the contract and requires restitution lacks support. The only exception concerns the Knowledge Defendants that received redemption payments with the knowledge that the NAV was wrong. In those circumstances, the Liquidators may seek to impose a constructive trust.").  In December 2020, this Court ruled that § 546(e) bars Plaintiffs' BVI avoidance claims to recover unfair

preferences and undervalue transactions. *In re Fairfield Sentry Ltd.*, 2020 WL 7345988, at *1

(Dec. 14, 2020) ("*Fairfield III*").

Following these decisions, only the constructive trust claims survived. *Id.*; *In re Fairfield Sentry Ltd.*, No. 10-13164 (SMB), 2021 WL 771677, at *1 (Bankr. S.D.N.Y. Feb. 23, 2021) ("*Fairfield IV*"), *aff'd*, 630 F. Supp. 3d 463 (2022). The Liquidators filed a further motion to amend the complaints against the Knowledge Defendants. Mot. to Amend, ECF No. 560; Mot. to Amend, Adv. Pro. No. 10-03496, ECF No. 3737. On August 5, 2021, this Court granted the motion to amend the complaint and lifted the stay of the redeemer actions. Order Granting Mot. to Amend, ECF No. 617; Order Lifting Stay of Redeemer Actions, ECF No. 616.

## C.  **The Pending Motion**

The Amended Complaint seeks the imposition of a constructive trust on the redemption payments received from the Fairfield Funds. Am. Compl. ¶ 197, ECF No. 620. The Amended Complaint alleges that Defendant's purported agent, the Citco Subscriber, had knowledge of the fraud at BLMIS and therefore knowledge that the NAV was inflated. *Id.* ¶ 201. "By reason of their receipt of some or all of the Redemption Payments, the Beneficial Shareholders have been unjustly enriched to the detriment of the [Fairfield] Funds and other shareholders and creditors of the Funds." [10] *Id.* ¶ 206.

Under BVI law, "lack of good faith, *i.e.* bad faith, includes wrongdoing by one who acts recklessly as well as one who acts with actual knowledge that he is acting wrongfully or willfully blinds himself to that fact." *Id.* ¶ 198 (citing 596 B.R. at 293). As this Court previously found:

> To establish a constructive trust claim under English law, which would apply in the BVI, 'the plaintiff must show, first, a disposal of his assets in breach of fiduciary duty; second, the beneficial receipt by the defendant of assets which are traceable

---

[10]    As stated *supra*, footnote 3, the Amended Complaint alleges that several other defendants may have received redemption payments made to the Citco Subscribers. *Id.* ¶¶ 33–104.

as representing the assets of the plaintiff; and third, knowledge on the part of the
defendant that the assets he received are traceable to a breach of fiduciary duty.'

*In re Fairfield Sentry Ltd.*, 2021 WL 771677 (Bankr. S.D.N.Y. Feb. 23, 2021) (quoting *El Ajou*

*v. Dollar Land Holdings Ltd.* [1994] 2 All E.R. 685, 700).

The Amended Complaint alleges that the defendants, including BJB as a beneficial

shareholder of certain accounts, purposefully availed themselves of the laws of the United States

and the State of New York by "investing money with the Funds, and knowing and intending that

the Funds would invest substantially all of that money in New York-based BLMIS."  Am.

Compl. ¶ 20, ECF No. 620.

The parties engaged in personal jurisdiction discovery between September 2021 and

August 2022.  *See* Scheduling Order, ECF No. 654; Second Am. Scheduling Order, ECF No.

917.  Merits document and expert discovery is ongoing in this case.  *See* Twelth Am. Scheduling

Order, ECF No. 1144.

Defendant has moved to dismiss the Amended Complaint for lack of personal

jurisdiction, arguing that the Amended Complaint has not sufficiently alleged minimum contacts

with the forum to establish personal jurisdiction over Defendant and that exercising personal

jurisdiction would be unreasonable.  *See* Mem. L. at 1–4, 19, ECF No. 76.

The Liquidators filed an opposition to the Motion and submitted the declarations of Lena

Konanova and Sara Joyce in support of their opposition.  Opp'n, ECF No. 1089; Konanova

Decl., ECF No. 1090; Declaration of Sara Joyce ("Joyce Decl."), ECF No. 1091.[11]  The

---

[11]    Pursuant to various orders of this Court, portions of certain filings and supporting documents were filed
under seal.  At the Hearing on the motion, the Court gave the parties the opportunity to withdraw from the record
any previously-sealed materials that the party did not want to be cited, quoted, or otherwise referenced in the
opinion.  Hr'g Tr. 12:5–17, ECF No. 1153.  None of the parties in this matter requested information withdrawn.  The
Court will nevertheless refrain from referring to any bank account numbers or names of individual employees,
named only in sealed documents, in full.

Liquidators argue that exercising jurisdiction over Defendant would be reasonable and that

Defendant's contacts with the United States, through its own actions and those of its purported

agent, in knowingly and intentionally investing in Sentry, using U.S. correspondent accounts to

invest in and receive payments from Sentry, and conducting other business activities support

personal jurisdiction.  Opp'n at 2–5, ECF No. 1089.  Defendant filed a reply memorandum on

August 24, 2023.  Reply, ECF No. 1129.  This Court reviewed the above filings and held a

hearing on the Motion on May 3, 2024.  *See* Hr'g Tr., ECF No. 1153.[12]

## IV.    DISCUSSION

### A.  The Law of Personal Jurisdiction

In order to subject a defendant to personal jurisdiction in the United States, due process

requires that the defendant have sufficient minimum contacts with the forum in which the

defendant is sued "'such that the maintenance of the suit does not offend traditional notions of

fair play and substantial justice.'"  *Picard v. Bureau of Labor Ins.* (*In re BLMIS*), 480 B.R. 501,

516 (Bankr. S.D.N.Y. 2012) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

"In adversary proceedings, courts must determine whether the defendant has minimum contacts

with the United States, rather than with the forum state."  *Picard v. Fairfield Greenwich Grp.* (*In

re Fairfield Sentry Ltd.)*, 627 B.R. 546, 565 n.13 (Bankr. S.D.N.Y. 2021) (citing *In re Lehman*

---

[12]    The Court held hearings on May 3, 2024, on the motions to dismiss of multiple entities in this and in related adversary proceedings.  While this memorandum opinion concerns only the motion to dismiss of BJB in adversary proceeding No. 10-03635, the facts and arguments relevant to this motion and the motion of BJB in adversary proceeding No. 10-03636 overlap well enough that Counsel presented arguments concurrently.  Hr'g Tr. 84:25–85:7 ("We represent Bank Julius Baer in two actions.  Again, it's Adversary Proceeding 10-3635 and 10-3636. The allegations in those two actions are virtually identical. And for the purposes of these motion, I think we can treat them the same. I think my adversary will likely agree with that. And so for purposes of that, we're going to treat this as one collective.").  Furthermore, both parties filed memoranda of law that explicitly labeled the documents as applying to both adversary proceedings 10-03635 and 10-03636.  *See* Opp'n, 10-03636 ECF No. 1190 and 10-03635 ECF No. 1089 (including both adversary proceeding numbers in the caption); *see also* Reply, 10-03636 ECF No. 1292, Adv. Pro No. 10-03635 ECF 1129 ("This Memorandum of Law is related to the Following Adversary Proceeding: 10-03635 10-03636").  Notwithstanding the parties' choice of argument, the Court will address the motions to dismiss of BJB in these two adversary proceedings in separate opinions.

*Bros. Holdings Inc.*, 535 B.R. 608, 619 (Bankr. S.D.N.Y. 2015)).  "When jurisdiction is satisfied

through Bankruptcy Rule 7004,[13] a bankruptcy court need not address its state's long-arm

statute."  *Id.* n.12; *see also Owens-Illinois, Inc. v. Rapid Am. Corp. (In re Celotex Corp.)*, 124

F.3d 619, 630 (4th Cir. 1997).

An analysis of minimum contacts "focuses on the relationship among the defendant, the

forum, and the litigation," a relationship that "must arise out of contacts that the defendant

himself creates with the forum State."  *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (quotations

omitted).  There are three conditions necessary for the Court to exercise specific jurisdiction[14]

over the non-resident defendant:

> First, the defendant must have purposefully availed itself of the privilege of
> conducting activities within the forum State or have purposefully directed its
> conduct into the forum State.  Second, the plaintiff's claim must arise out of or relate
> to the defendant's forum conduct.  Finally, the exercise of jurisdiction must be
> reasonable under the circumstances.

*U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 150 (2d Cir. 2019) (internal quotation

marks and citations omitted).

To survive a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule

of Civil Procedure Rule 12(b)(2), the Plaintiffs "must make a prima facie showing that

jurisdiction exists."  *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 342 (2d Cir. 2018) (quoting

---

[13]     "The summons and complaint and all other process except a subpoena may be served anywhere in the United States."  Fed. R. Bankr. P. 7004(d).  A bankruptcy court may exercise personal jurisdiction over a defendant served under Rule 7004(d) "[i]f the exercise of jurisdiction is consistent with the Constitution and the laws of the United States."  Fed. R. Bankr. P. 7004(f).

[14]     Courts recognize "two types of personal jurisdiction: general and specific jurisdiction.  A state court may exercise general jurisdiction only when a defendant is 'essentially at home' in the State."  *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 352, 141 S. Ct. 1017, 1019, 209 L. Ed. 2d 225 (2021) (quoting *Goodyear Dunlop Tires Operations, S. A v. Brown*, 564 U.S 915, 919, 131 S. Ct. 2846, 180 L. Ed. 2d 796 (2011)).  The Plaintiffs do not allege that the Court has general jurisdiction over Defendant.  *See* Reply at 5, ECF No. 1292 (arguing that the Plaintiffs fail to "establish BJB's minimum contacts for specific personal jurisdiction . . ."); Opp'n at 2–3 (arguing that the Court's specific jurisdiction is founded on Defendant's contacts with the forum that relate to the claims at issue).

*Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34–35 (2d Cir. 2010)).  A trial court has

considerable procedural leeway when addressing a pretrial dismissal motion under Rule 12(b)(2).

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013).

A showing sufficient to defeat a defendant's challenge to personal jurisdiction "varies

depending on the procedural posture of the litigation." *Id.* (quoting *Ball v. Metallurgie Hoboken-*

*Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)).  Following discovery, "the plaintiff's prima

facie showing, necessary to defeat a jurisdiction testing motion, must include an averment of

facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant."

*Ball*, 902 F.2d at 197.  "In response to a post-jurisdictional discovery Rule 12(b)(2) motion, 'the

plaintiff need persuade the court only that its factual allegations constitute a prima facie showing

of jurisdiction.'" *Averbach v. Cairo Amman Bank*, No. 19-CV-0004-GHW-KHP, 2023 WL

5016884, at *4 (S.D.N.Y. June 30, 2023) (quoting *Dorchester Fin. Sec.*, 722 F.3d at 85).  "Now

that jurisdictional discovery is complete, Plaintiffs' burden is different, but it is not heavy."

*Averbach*, 2023 WL 5016884, at *6 (citing 722 F.3d at 85).  "Plaintiffs need only show that

their prima facie showing of jurisdiction is factually supported." *Id.* at *6.  When considering a

motion to dismiss before or after jurisdictional discovery has taken place, "the court must

'construe the pleadings and affidavits in the light most favorable to plaintiffs,' and resolve all

doubts, including factual disputes, in the plaintiff's favor." *Id.* at *4 (quoting *Ball*, 902 F.2d at

197).

**B.  Analysis of Purposeful Availment**

"[M]inimum contacts necessary to support [specific] jurisdiction exist where the

defendant purposefully availed itself of the privilege of doing business in the forum and could

foresee being haled into court there." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68,

82 (2d Cir. 2018) (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161,

170 (2d Cir. 2013)).  For specific personal jurisdiction, "'[c]ourts typically require that the

plaintiff show some sort of causal relationship between a defendant's U.S. contacts and the

episode in suit,' and the plaintiff's claim must in some way 'arise from the defendant's purposeful

contacts with the forum.'"  *Charles Schwab Corp.*, 883 F.3d at 84 (quoting *Waldman v. Palestine

Liberation Org.*, 835 F.3d 317, 341, 343 (2d Cir. 2016)).  "Although a defendant's contacts with

the forum state may be 'intertwined with [its] transactions or interactions with the plaintiff or

other parties . . . [,] a defendant's relationship with a . . . third party, standing alone, is an

insufficient basis for jurisdiction.'"  *U.S. Bank Nat'l Ass'n*, 916 F.3d at 150 (quoting *Walden*,

571 U.S. at 134) (alteration in original).  "It is insufficient to rely on a defendant's random,

fortuitous, or attenuated contacts or on the unilateral activity of a plaintiff with the forum to

establish specific jurisdiction."  *Id.*

BJB asserts that the "Liquidators affirmatively represented to the District Court that all

Redemption Payments to Citco's Brokerage Customers (including BJB) occurred outside the

United States . . . ."  Mem. L. at 16, ECF No. 760.  Plaintiffs argued before the District Court that

"every relevant component of the transactions at issue here occurred outside the territorial

jurisdiction of the United States."  *Id.* at 3; *see also* Pls.-Appellants' Opening Br. for Second

Round Appeal at 24, *Fairfield Sentry Ltd. v. Citibank NA London*, No. 19-cv-3911 (S.D.N.Y.

July 21, 2021), ECF No. 440 (the "Opening Brief").  The Plaintiffs' Opening Brief concerned the

extraterritorial application of the § 546(e)[15] safe harbor.  *See* Opening Brief at 24 (arguing that

---

[15]    Section 546(e) of the Bankruptcy Code prohibits a trustee from avoiding a transfer that is a margin payment or settlement payment "made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract. . . ." 11 U.S.C. § 546(e).  "By its terms, the safe harbor is a defense to the avoidance of the *initial* transfer."  *Picard v. BNP Paribas S.A. (In re BLMIS)*, 594 B.R. 167, 197 (Bankr. S.D.N.Y. 2018) (emphasis in original).

the "Bankruptcy Court erred in holding that Section 546(e)'s safe harbor could apply

extraterritorially to shield from avoidance settled securities transactions that occurred exclusively

outside the United States.").

   As another bankruptcy court in this district has stated, the "tests for personal jurisdiction

and extraterritoriality are not the same." *Spizz v. Goldfarb Seligman & Co. (In re Ampal-Am.

Israel Corp.)*, 562 B.R. 601, 613 n.14 (Bankr. S.D.N.Y. 2017).   In *Spizz*, the bankruptcy court

was able to simultaneously find that the "[t]ransfer was not domestic, and hence, cannot be

avoided" under § 547, while also clarifying that by "attend[ing] meetings in New York around

the time of, and apparently in conjunction with, the commencement of the chapter 11 case," a

defendant may be "subject to specific personal jurisdiction." *Id.* at 613–14.

   By arguing in the District Court that the redemption transfers were foreign for purposes

of extraterritoriality, Plaintiffs did not preclude arguing that there were contacts with the forum

for purposes of personal jurisdiction.   To determine whether a transaction is foreign or domestic

for analyzing extraterritoriality issues for federal statutes, courts look at whether the "conduct

relevant to the statute's focus occurred in the United States." *RJR Nabisco, Inc. v. European

Cmty.*, 579 U.S. 325, 326, 136 S. Ct. 2090, 2094, 195 L. Ed. 2d 476 (2016).   To determine

whether personal jurisdiction is appropriate, however, courts analyze a defendant's contacts with

the forum "under a totality of the circumstances test." *Licci*, 732 F.3d at 170 (citing *Best Van

Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007)).

   The Plaintiffs allege that Citco acted as an agent of the Defendant with respect to its

investments with the Fairfield Funds.   *See* Opp'n at 3, ECF No. 1089.   Many of the jurisdictional

contacts that the Plaintiffs refer to rely on this agency relationship.   *Id.*   The Defendant argues

that the "Citco Subscribers' knowledge and actions should be imputed to the *Funds*, not BJB."

Reply at 8, ECF No. 1129 (emphasis in original).  BJB states that the "Funds and Citco

Subscribers arranged and executed the transactions" and that the "alleged acquiescence does not

constitute purposive behavior" required to establish jurisdiction.  *Id.* at 11.  This Court has

already found that "the Funds were customers of Citco Bank who acted as their agents in

connection with the securities contracts pursuant to which the redemption payments were made

. . . ." *In re Fairfield Sentry Ltd.*, Adv. Proc. No. 10-03496 (SMB), 2020 WL 7345988, at *7

(Bankr. S.D.N.Y. Dec. 14, 2020).  BJB further argues that the "relevant transactions" would fail

to support jurisdiction, even if the Court were to impute them to BJB.  Reply at 8, ECF No. 1129.

The Court will first analyze whether the Citco Subscriber's actions should be imputed to BJB

before examining whether the allegations support jurisdiction.

### 1.  <u>Whether the Citco Subscriber Acted as an Agent of BJB for Purposes of Personal Jurisdiction</u>

A defendant "can purposefully avail itself of a forum by directing its agents . . . to take

action there." *Daimler AG v. Bauman*, 571 U.S. 117, 135 n.13 (2014).  In the absence of a

formal agency relationship, the Court may impute an agent's conduct within or aimed at the

forum to the principal based on "the realities of the relationship in question rather than the

formalities of agency law." *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 366 (2d Cir. 1986).

Even a defendant that "indirectly transacts financial instruments in a forum may have

purposefully availed itself of the forum if the transactions were effected by the defendant's

agent." *In re Eur. Gov't Bonds Antitrust Litig.,* 2020 WL 4273811, at *6 (S.D.N.Y. July 23,

2020).

The Court must determine whether the alleged activities of the Citco Subscriber should,

for the purposes of establishing specific personal jurisdiction in this Court, be imputed to BJB.

The Liquidators assert that the Court should "impute the Citco Subscriber's knowledge and

forum-directed activities to BJB in resolving the instant motion." Opp'n at 17, ECF No. 1089.

Conversely, BJB argues that the Citco Subscriber was an agent of the Fairfield Funds, to the

necessary exclusion of BJB, during the relevant period. Reply at 8, ECF No. 1129 (arguing that

the "Citco Subscribers' knowledge and actions should be imputed to the *Funds*, not BJB" as this

Court "has already held that Citco Bank . . . was the *Funds'* agent in the alleged transactions").

      "To establish an agency relationship for jurisdictional purposes, plaintiffs must show that

the alleged agent acted in [the forum] for the benefit of, with the knowledge and consent of, and

under some control by, the nonresident principal." *Hau Yin To v. HSBC Holdings, PLC*, 700 F.

App'x 66, 68 (2d Cir. 2017) (citing *Grove Press, Inc. v. Angleton*, 649 F.2d 121, 122 (2d Cir.

2018)). The Plaintiffs argue that the Citco Subscriber's conduct satisfies all three prongs of this

test, given that "(1) the Citco Subscriber's conduct in investing in the Funds was taken on behalf

and for the benefit of BJB; (2) the Citco Subscriber acted at the direction and under the control of

BJB; and (3) the Citco Subscriber acted pursuant to BJB's knowledge and consent. Opp'n at 17,

ECF No. 1089 (citing *In re Eur. Gov't Bonds Antitrust Litig.*, 2020 WL 4273811, at *6).

      The Second Circuit has explained that a principal might not be charged with the acts of

an agent when that agent, "though ostensibly acting in the business of the principal, is really

committing a fraud for his own benefit, he is acting outside the scope of his agency, and it would

therefore be most unjust to charge the principal with knowledge of it." *Wight v. BankAmerica

Corp.*, 219 F.3d 79, 87 (2d Cir. 2000) (quoting *Munroe v. Harriman*, 85 F.2d 493, 495 (2d Cir.

1936)). This exception is narrow in that the Court may still charge the principal with "the acts

and knowledge of an agent as long as the agent in some respect served the principal or, stated

differently, unless the agent 'totally abandoned' the principal's interests and 'acted entirely for

his own or another's purpose.'" *In re Parmalat Sec. Litig.*, 684 F. Supp. 2d at 472 (finding that

although the agent committed fraud "during his term of employment . . .  he did it solely to

benefit himself" and that the benefit to his employer was "immaterial because [employer] was

the victim of [the agent]'s fraud.").

### a. <u>Whether the Citco Subscriber's Conduct was Performed on Behalf and for the Benefit of BJB</u>

In order to establish an agency relationship for purposes of personal jurisdiction, "the

plaintiff must show that the alleged agent acts 'for the benefit of' . . . the non-resident principal .

. . ." *In re Welspun Litig.*, No. 16 CV 6792 (VB), 2019 WL 2174089, at *7 (S.D.N.Y. May 20,

2019) (quoting *GEM Advisors, Inc. v. Corporacion Sidenor, S.A.*, 667 F. Supp. 2d 308, 318

(S.D.N.Y. 2009)); *see also CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 366 (2d Cir. 1986)).

The Plaintiffs argue that the "on behalf/benefit of prong is satisfied when an agent's activities

open the principal to financial gain."  Opp'n at 17, ECF No. 1190 (citing *In re Sumitomo Copper

Litig.*, 120 F. Supp. 2d at 336 (finding defendants benefited from agent's trading activities which

could result in gain if financially successful); *GEM Advisors, Inc., S.A.*, 667 F. Supp. 2d at 319

(finding benefit where defendant "stood to benefit" from the alleged agent's "actions and

contracts by receiving some or all of the sale price")).

BJB subscribed for shares in the Fairfield Funds through the Citco Subscriber to profit by

indirectly investing in BLMIS.  Opp'n at 18.  Through the activities of its agent, the Citco

Subscriber, BJB could obtain financial gain.  *Id*.  The Plaintiffs point to a private placement

memorandum of the Fairfield Funds that explained that the Fairfield Funds would seek to "obtain

capital appreciation of its assets principally through the utilization of a nontraditional options

trading strategy described as 'split strike conversion,'" which would be "implemented by

Bernard L. Madoff Investment Securities LLC . . . through accounts maintained by the Fund at

that firm."  Opp'n at 18 (quoting Kononova Decl. Ex. 29, ECF No. 1090).  BJB was the

beneficial owner of the shares of Sentry and Sigma that the Citco Subscriber subscribed to

pursuant to BJB's orders. Opp'n at 18. the Citco Subscriber's activity in relation to investing in

the Funds opened BJB, as principal, to financial gain. The Plaintiffs' allegations and supporting

documents sufficiently demonstrate that the Citco Subscriber—in implementing the subscription

and redemption decisions—acted on behalf of and for the benefit of BJB in the forum. Even if

this court were to accept that the Citco Subscriber performed certain services on behalf of the

Funds related to these transactions,[16] there are no allegations that those services were made

contrary to or while abandoning the services allegedly performed on behalf of BJB.

### b. Whether BJB Both Exercised Control Over and Was Aware of and Consented to the Citco Subscriber's Activities

To assert an agency relationship, the principal must have exercised "some control" over

the purported agent. *Scholastic, Inc. v. Stouffer*, 2000 WL 1154252, at *5 (S.D.N.Y. Aug. 14,

2000). For the purposes of personal jurisdiction analysis, this control prong is satisfied when the

principal has "[an] ability . . . to influence [the agent's] acts or decisions by virtue of the parties'

respective roles." *Id.* (citing *Cutco Indus. v. Naughton*, 806 F.2d 361, 366 (2d Cir. 1986)).

Control means the "actual exercise of control." *Hau Yin To v. HSBC Holdings, PLC*, 700 F.

App'x 66, 68 (2d Cir. 2017). However, absolute control by the principal is not necessary.

*Maersk, Inc. v. Neewra, Inc.*, 554 F. Supp. 2d 424, 442 (S.D.N.Y. 2008). The knowledge and

consent prong is satisfied when the principal is apprised of the agent's activities. *See Struna v.

Leonardi*, 626 F. Supp. 3d 657, 664 (S.D.N.Y. 2022). Because certain of the same facts in this

case bear on "knowledge and consent" and "control," the two questions may be considered

---

[16]    In 2020, this Court found that the Fairfield Funds "were customers of Citco Bank who acted as their agents in connection with the securities contracts pursuant to which the redemption payments were made . . . ." 2020 WL 7345988 at *7. The Court did not find that any Citco entity acted solely an agent of the Fairfield Funds. Nor has BJB explained how a finding that a Citco entity acted as an agent of the Fairfield Funds precludes a finding that the Citco Subscriber's actions on behalf of and for the benefit of BJB, with the consent of BJB, may be imputed to BJB.

simultaneously.  *See Karabu Corp. v. Gitner*, 16 F. Supp. 2d 319, 326 n.6 (S.D.N.Y. 1998) ("The

same considerations which lead this Court to conclude that the plaintiffs have not satisfied the

'control' prong of *Kreutter,* indicate that plaintiffs also have not satisfied the 'knowledge' and

'consent' prongs of the agency test."); *Branham v. ISI Alarms, Inc.,* No. 12-CV-1012 (ARR)

(MDG), 2013 WL 4710588, at *7 (E.D.N.Y. Aug. 30, 2013).

Knowledge and consent of the principal have been found where an agent forwarded

information to the principal (*Sec. Ins. Co. of Hartford v. ITA Textiles Corp.*, 2000 WL 1576879,

at *2–4 (S.D.N.Y. Oct. 23, 2000)), where the complaint asserts that the principal received a

policy procured by its agent with a "New York forum selection clause that [the principal] knew

or should have known was included" (*Pilkington N. Am., Inc. v. Mitsui Sumitomo Ins. Co. of

Am.*, 2021 WL 2000371, at *9 (S.D.N.Y. May 19, 2021)), and where the principal is alleged to

have done nothing after having received a cease-and-desist letter aside from forwarding the letter

to counsel.  *Branham*, 2013 WL 4710588, at *7.

The Liquidators argue that BJB exercised significant control over the Citco Subscriber's

subscription and redemption-related activities and had knowledge of and consented to those

activities such that BJB was the principal with respect to those transactions and exercised the

requisite control over the Citco Subscriber as its agent.  Opp'n at 18, ECF No. 1089.  BJB

entered into a custodian agreement with the Citco Subscriber in October 2000, pursuant to which

BJB appointed the Citco Subscriber to act as custodian for its investments.  *Id.* at 9; Kononova

Decl. Ex. 7 at -046–47, ECF No. 1090.  Under this agreement, the Citco Subscriber could

execute subscriptions and redemptions only upon receipt of specific instructions from BJB.

Kononova Decl. Ex. 7 at -053–54, -059–60.  The custodian agreement also required the Citco

Subscriber to issue preliminary and final order confirmations to BJB and to issue a "pre-advice"

statement for each subscription or redemption.  *Id.* at -059–60.  Based on the foregoing and the

lack of allegations that BJB objected to these actions or instructed the Citco Subscriber to act

differently, the Plaintiffs have sufficiently alleged BJB's consent to the Citco Subscriber's

actions.  Having found that it is appropriate to consider the conduct of the Citco Subscriber along

with the allegations of BJB's direct actions, the Court will examine the sufficiency of the alleged

contacts.

### 2.  **Defendant's Use of Correspondent Accounts**

The Plaintiffs point to BJB's choice of correspondent accounts, through its agent, as

sufficient to establish minimum contacts with the United States.  Opp'n at 28–35, ECF No. 1089.

"Correspondent accounts are accounts in domestic banks held in the name of foreign financial

institutions" that are used "to effect dollar transactions."  *Licci ex rel. Licci v. Lebanese*

*Canadian Bank, SAL*, 673 F.3d 50, 56 n.3 (2d Cir. 2012) (quoting *Sigmoil Res., N.V. v. Pan*

*Ocean Oil Corp. (Nigeria)*, 234 A.D.2d 103, 104, 650 N.Y.S.2d 726, 727 (1st Dept 1996)).

Plaintiffs allege that BJB, through the Citco Subscriber, its purported agent, deliberately selected

and used U.S. correspondent accounts at the Citco Subscriber's U.S. correspondent account at

HSBC Bank USA, N.A. ("HBUS") to effectuate the redemption payments that form the harms

for which Plaintiffs seek redress.[17]  Opp'n at 12, 30, ECF No. 1089.

---

[17]    The use of correspondent accounts concerns only the transfers that originated from Sentry.  Opp'n at 1 n.2,
ECF No. 1089 ("BJB received approximately $7,797,143.61 from Sentry and approximately €11,566,289.93 from
Sigma through the redemption payments at issue."); *id.* at 31 ("BJB and the Citco Subscriber repeatedly utilized
U.S. correspondent . . .when investing in and receiving redemption payments *from Sentry*.") (emphasis added).  The
investments in Sigma were in Euros, not U.S. dollars, and therefore did not require the use of U.S. correspondent
accounts.  Am. Compl. ¶¶ 133–34, ; *see also* Opp'n at 5 ("Sentry transferred its proceeds directly to BLMIS in New
York, while Sigma, established for Euro-denominated investments, transferred proceeds to Sentry."); *see also id.* at
28 n.18 ("While BJB and its agent did not designate a U.S. correspondent account for BJB's redemption of Sigma
shares, BJB is still subject to jurisdiction with respect to those transactions as detailed in [arguments concerning
BJB's investment in the Fairfield Funds and other business activity in and directed at the United States]").

Here, the Plaintiffs have shown that the Defendant was able to use either a foreign-based or a U.S.-based correspondent bank account for its redemption requests and, through its alleged agent, chose the latter. *See* Kononova Decl. Ex. 5, ECF No. 1090 (Sentry Confirmation of Order Received to redeem 50.27 shares of Sentry at HSBC Bank USA in New York); *see also id.* Ex. 43 (Sentry Confirmations of Orders Received); *see also* Joyce Decl. at 6–9, ECF No. 1091.; *id.* at 12 ("[S]ubscription agreements for Fairfield Sentry . . . do not contain any requirement that the subscriber utilize a U.S. account to send subscription payments or receive redemption payments."); *id.* ("Neither the fact that Fairfield Sentry was a U.S.-dollar denominated fund, nor the fact that the subscription agreement instructed subscribers to wire their subscription payments to Sentry's U.S. account, nor the fact that Sentry made redemption payments from its own U.S. account would have prevented a subscriber from making subscription payments from and directing redemption payments to a U.S. dollar account located outside the U.S."); *id.* at 13 ("The U.S. dollar was in wide circulation outside the U.S. during the Relevant Period, and many other payment options were widely available and easily accessible during the Relevant Period. To the extent that a foreign subscriber chose a U.S.-based correspondent account to effectuate their payments, it was generally for reasons of its own convenience or financial benefit.").

This was no passive endeavor; the Plaintiffs allege that Defendant "and its agent *frequently* used U.S. correspondent accounts in transacting with Sentry." Opp'n at 31, ECF No. 1089 (emphasis in original). Defendant did so repeatedly, using U.S.-based correspondent accounts at least fourteen times to make over $2.5 million of subscription payments. Opp'n at 3. Defendant's agent selected and used its correspondent account at HSBC Bank USA in New York to receive twenty-four redemption payments worth $7,797,143.61 in total from Sentry. *Id.*; Konanova Decl. Ex. 43 at (Sentry Confirmations of Orders Received). The Defendant actively

selected the correspondent account as a means of moving redemption funds through New York. *See* Joyce Decl. at 8–9, ECF No. 1091 (listing multiple "correspondent banks offer[ing] U.S. dollar correspondent accounts located outside of the U.S." during the relevant period). Defendant was free to designate an account of its choice, inside the United States or outside, to effectuate transfers and chose one based in the U.S. to receive redemption payments. *See id.* at 10–12 ("Factors Influencing Choice of Correspondent Account").

BJB, through its agent, accomplished the conduct at the heart of the Liquidators' claims regarding payments from Sentry through its use of the U.S.-based correspondent accounts. The Second Circuit has found the selection and repeated use of in-forum correspondent accounts to perpetrate the alleged violations supports a finding of sufficient minimum contacts. *Licci ex rel Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 171 (2d Cir. 2013); *id.* at 168 (quoting *Licci v. Lebanese Canadian Bank*, 20 N.Y.3d 327, 339, 984 N.E.2d 893, 900 (N.Y. 2012) ("[A] foreign bank's repeated use of a correspondent account in New York on behalf of a client . . . show purposeful availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States."); *see also Spetner*, 70 F.4th at 640 ("[A] defendant foreign bank's 'repeated use of a correspondent account in New York on behalf of a client . . . can constitute transacting business for purposes of § 302(a)(1), even if the defendant has no other contacts with the forum."). [18] A course of dealing can be established through as little as "14 currency exchange transactions between" two foreign entities made through a New York bank. *Al Rushaid*, 28 N.Y.3d at 325.

---

[18]    Section 302(a)(1), New York's long-arm statute, "authorizes personal jurisdiction over a foreign defendant for causes of action that arise out of 'transact[ing] any business within the state,' whether in person or through an agent." 70 F.4th at 640 (quoting C.P.L.R. § 302(a)(1)).

The Liquidators have provided support for the allegation that the Citco Subscriber, acting

as agent of the Defendant, chose to use a correspondent account in New York to receive

payments from Sentry.  *See* Opp'n at 12, ECF No. 1089.  While foreign options existed, the

redemption forms show that Defendant selected and used a U.S.-based correspondent bank

receive payments from Sentry.  BJB's repeated receipt of millions of dollars of redemption

payments for its investments in Sentry through U.S. correspondent accounts demonstrates its

purposeful availment of the banking system of New York and the United States.

### 3.  Defendant's Business Contacts with the Forum

The Liquidators assert that BJB "intentionally invested in BLMIS feeder funds Sentry

and Sigma knowing that the Funds were designed to subsequently invest that money in New

York-based BLMIS.  BJB is subject to this Court's jurisdiction with respect to its Sentry and

Sigma redemptions as a result of that conduct."  Opp'n at 20, ECF No. 1089.  Defendant

describes the allegations concerning Defendant's subscription payments into the Fairfield Funds

for the purpose of investing in BLMIS as the unilateral activity of a third-party, which Defendant

argues is not appropriate to consider under *Helicopteros Nacionales de Colombia, S.A. v. Hall*,

466 U.S. 408, 417 (1984).  Mem. L. at 16, ECF No. 760; *see also* Reply at 6, ECF No. 1129

("[T]hese third party contacts between the Funds and BLMIS cannot establish personal

jurisdiction over BJB . . . [T]he Funds' own investment activity cannot serve as a jurisdictional

contact.")

In *Helicopteros*, the Supreme Court found that "mere purchases, even if occurring at

regular intervals, are not enough to warrant a State's assertion of in personam jurisdiction over a

nonresident corporation in a cause of action not related to those purchase transactions."

*Helicopteros*, 466 U.S. at 418.  The Supreme Court found that "one trip" to the forum "for the

purpose of negotiating the transportation-services contract . . . cannot be described or regarded as a contact of a 'continuous and systematic' nature . . . ." *Id.* at 416. The Liquidators, however, have described more substantial contacts here.

First, the Liquidators point to the documents given to BJB by the Fairfield Funds' U.S.-based manager, the Fairfield Greenwich Group ("FGG"), after BJB communicated about the possibility of subscribing in the Fairfield Funds. Opp'n at 4, 7–9, 22–24, ECF No. 1089. Documents that BJB received "made clear that the main purpose of the Funds' existence was to invest in BLMIS, a New York-based broker dealer registered in the U.S." *Id.* at 7–8; *see also* Konanova Decl. Ex. 11 at 6, July 2000 Sentry Information Memorandum, ECF No. 1090 (describing the business objective of the company as "seek[ing] to achieve capital appreciation of its assets by allocating its assets to an account at Bernard L. Madoff Investment Securities . . . a registered broker-dealer in New York, which employs an options trading strategy described as 'split strike conversion'"); *id.* at 18 ("The services of Messrs. Tucker and Noel and Bernard L. Madoff Investment Securities are essential to the continued operations of the Manager. If any of their services were no longer available, their absence would have an adverse impact upon an investment in the Company. The manager has delegated all investment management duties to Bernard L. Madoff Investment Securities."); *id.* Ex 29, Email with February 2006 Sigma Private Placement Memorandum (The Manager, as the investment manager of FSL, may in its sole and exclusive discretion allocate a portion of [Sentry]'s assets (never to exceed, in the aggregate, 5% of [Sentry]'s assets at the time of investment) to alternative investment opportunities other than FSL. (the 'Non-SSC Investments').").  These documents show that Defendant was aware at the time that its investments in the Fairfield Funds were effectively investments in BLMIS in New York.  BJB, through its agent, the Citco Subscriber, executed subscriptions into Sentry with this

knowledge.  *See id.* Ex. 6 (September 2002 Sentry Subscription Agreement); *see also id.* Ex. 25

(2003 Sentry Subscription Agreement); *see also id.* Ex. 37 (2003 through 2007 Short-Form

Subscription Agreements).[19]

     In August 2018, this Court held that it does not have personal jurisdiction over certain

defendants due to subscription agreements that provided for consent to jurisdiction in New York

for claims "with respect to [the Subscription] Agreement and the Fund."  *In re Fairfield Sentry*

*Ltd.*, 2018 WL 3756343, at *11 (Bankr. S.D.N.Y. Aug. 6, 2018).  The Liquidators here rely on

the subscription agreements and private placement memoranda not to show consent, but to show

that when Defendant invested in Sentry it did so knowing that it would avail itself of the benefits

and protections of New York.  Opp'n at 15–20, ECF No. 1089.  The subscription agreements,

signed by BJB's agent, in this way, support the Plaintiffs' showing of contacts with the forum.

     The Plaintiffs have supplied further support for the allegations of contacts.  Exhibits

indicate that BJB was informed of the relationship between the Fairfield Funds and BLMIS in

New York through due diligence performed by BJB, its affiliate, and its alleged agent, during the

relevant period.  Opp'n at 23–26; Konanova Decl. Exs. 13–14 (May 2007 email from FGG

employee with a "fgg.us" email address to a BJB employee with a "juliusbaer.com" email

address, in which is attached tearsheets of Fairfield Sentry and Fairfield Sigma explaining the

role of BLMIS in response to a prior phone conversation); *id.* Ex. 19 (internal BJB email

discussing the risks involved with investments in Fairfield Sentry stating that it is "a bit

intransparent [sic] to understand fully how they work as I heard from other sources," attaching

information on Sentry and BLMIS's role, and suggesting investing in a different fund).

---

[19]    The Plaintiffs note that they did not obtain the long form subscription agreement that governed the relevant
redemption payments here through jurisdictional discovery.  Opp'n at 10, ECF No. 1089.  The allegations made with
respect to those subscription agreements are supported instead by later subscription agreements.

Furthermore, BJB's affiliate, BJB Management had in-person meetings with Madoff in New York. Opp'n at 24, ECF No. 1089.

BJB argues that allegations concerning the knowledge BJB may have gained from its affiliate, BJB Management, are "purely speculative," that "[n]one of the transactions at issue were conducted by or on behalf of BJB New York," and that the "Liquidators cite no evidence that any information was shared between affiliates." Reply at 3, ECF No. 1129. While the Court "will not draw 'argumentative inferences' in the plaintiff's favor," (*Robinson v. Overseas Mil. Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994) (quoting *Atlantic Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 198 (2d Cir. 1992) (citing, in turn, *Norton v. Larney*, 266 U.S. 511, 515, 45 S. Ct. 145, 147, 69 L. Ed. 413 (1925)))), the Court will "construe jurisdictional allegations liberally and take as true uncontroverted factual allegations." *Robinson v. Overseas Mil. Sales Corp.*, 21 F.3d at 507 (citing *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 411, 106 S. Ct. 1922, 1923–24, 90 L. Ed. 2d 413 (1986); *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683, 1686, 40 L. Ed. 2d 90 (1974); *IUE AFL–CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1052 (2d Cir. 1993)). While allegations of BJB and its affiliate sharing knowledge concerning Madoff gained through meetings in New York may be unproven, they are nevertheless uncontroverted. In any case, they suffice to meet the Plaintiffs' burden at this stage in the litigation. *See Averbach v. Cairo Amman Bank*, No. 19-CV-0004-GHW-KHP, 2023 WL 5016884, at *6 (S.D.N.Y. June 30, 2023); *see Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990). This Court finds that the allegations and documentation provided by the Plaintiffs through jurisdictional discovery, taken together, sufficiently demonstrate facts supporting continuous and systemic contacts with the forum.

**4. Whether the Defendant's Contacts are Otherwise Appropriate to Support the Court's Exercise of Personal Jurisdiction**

The Court will address BJB's remaining arguments that the alleged contacts are not jurisdictionally relevant under Supreme Court precedent. Mem. L. at 12, 17–18, ECF No. 760. Defendant argues that the Plaintiffs' allegations amount to "mere knowledge that Sentry would invest money it raised in the BVI with BLMIS in New York," which it states is "insufficient as a matter of law to support jurisdiction" under *Walden v. Fiore*, 571 U.S. 277 (2014). *Id.*

In *Walden*, the Supreme Court found that a defendant "formed no jurisdictionally relevant contacts" with the forum state of Nevada as "[p]etitioner never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada." *Walden*, 571 U.S. at 289. The Supreme Court further stated that it is impermissible to allow the "plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis." *Id.* As the Supreme Court explained, the "plaintiff cannot be the only link between the defendant and the forum," and "the defendant's conduct . . . must form the necessary connection with the forum State." *Id.* at 285. Nevertheless, personal jurisdiction may be found even where a "defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties." *Id.* at 286.

The Plaintiffs' allegations and supporting evidence of intentional investments into BLMIS in New York, selection and use of U.S.-based correspondent accounts, possible interactions with Madoff as described above, demonstrate that BJB took affirmative actions on its own apart from the conduct of the Plaintiffs. *See* Opp'n at 20–27, ECF No. 1089. The Liquidators have shown that the Defendant knew and intended that, by investing in the Funds, Defendant's money would enter into U.S.-based BLMIS. *Id.* at 30–31; *see also* Kononova Decl. Ex. 11, ECF No. 1090 (July 2000 Sentry Information Memorandum).

This certainty can be found in the Fairfield Funds' contractual obligation to invest at least 95% of the money they received in U.S.-based BLMIS.  *See* Konanova Decl. Ex. 29. at -768 ("The Investment Manager, in its sole and exclusive discretion, may allocate a portion of the Fund's assets (never to exceed, in the aggregate, 5% of the Fund's Net Asset Value, measured at the time of investment) to alternative investment opportunities other than its 'split strike conversion' investments . . . .").  Moreover, the Plaintiffs have alleged that the Defendant, through its agent, conducted due diligence investigations and benefited from the materials that it received from FGG which confirmed the investments would be made with BLMIS in New York.  Opp'n at 23–24, ECF No. 1089.

Defendant has argued before this Court that all allegations and support presented by the Plaintiffs following jurisdictional discovery "should be disregarded" and that this Court should instead "rule [on the motion] on the pleadings."  *See* Hr'g Tr. 89:16–19, ECF No. 1153.  Defendant believes that "there never was a proper predicate in this case, unlike some of the others, for the jurisdictional discovery that was allowed" and thus allowing that process to proceed was "an improper use of jurisdictional discovery."  The Court ordered discovery on personal jurisdiction in 2021.  Scheduling Order, ECF No. 654.  The Court considered the appropriateness of personal jurisdiction in these adversary proceedings three years ago.  *See* Hr'g Tr. 9:12–21, Adv. Pro. No. 10-03496, ECF No. 3882.  The Court will not return to arguments it considered and ruled on years ago.

The Court thus finds that Defendant's selection and use, through its agent, of U.S. correspondent accounts, due diligence, and communications with FGG concerning investments with BLMIS in New York support the Court's exercise of jurisdiction over the claims for receiving redemption payments from the Fairfield Funds with the knowledge that the NAV was

wrong.  The contacts are not random, isolated, or fortuitous.  The contacts demonstrate BJB's

purposeful activities aimed at New York in order to effectuate transfers from Sentry.  The

Plaintiffs have thus provided allegations and supporting documentation that sufficiently support

a prima facie showing of jurisdiction over the Defendant.

### C.  Whether the Claim Arises Out of or Relates to the Defendant's Forum Conduct

The suit must "arise out of *or relate to* the defendant's contacts with the forum."  *Ford*

*Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 362, 141 S. Ct. 1017, 1026, 209 L.

Ed. 2d 225 (2021) (emphasis in original).  "[P]roof that a plaintiff's claim came about because of

the defendant's in-state conduct" is not required.  *Id.* at 1027.  Instead, a court need only find

"an affiliation between the forum and the underlying controversy."  *Goodyear Dunlop Tires*

*Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011); *Picard v. BNP Paribas S.A.* (*In re BLMIS*),

594 B.R. 167, 190 (Bankr. S.D.N.Y. 2018) ("Where the defendant's contacts with the

jurisdiction that relate to the cause of action are more substantial, however, it is not unreasonable

to say that the defendant is subject to personal jurisdiction even though the acts within the state

are not the proximate cause of the plaintiff's injury.") (internal quotations omitted).

Defendant argues that the claims are "wholly unrelated to the Funds' investments in, or

redemptions from BLMIS."  Mem. L. at 12, ECF No. 760.  However, the Liquidators seek

imposition of a constructive trust on funds received with knowledge that the NAV was inflated.

Am. Compl. ¶¶ 165–66, 197–209 No. 620.  The issue of knowledge of the inflated NAV is

inextricably tied to the Defendant's investments with New York-based BLMIS.  The allegations

are directly related to Defendant's investment activities with BLMIS through the Fairfield Funds.

*Id.* ¶ 165–66.  The Defendant's contacts with the United States, in investing in, in

communications with, and redemptions from the Fairfield Funds, form a "sufficiently close link"

between the defendant, the forum and the litigation concerning Defendant's activities in the

forum. *See MSP Recovery Claims, Series LLC v. Takeda Pharm. Am., Inc.*, 2021 WL 4461773,

at *3 (S.D.N.Y. Sept. 29, 2021) (quoting *Ford Motor Co.*, 141 S. Ct. at 1032).

### D.  Whether Assertion of Personal Jurisdiction is Reasonable

If a defendant has sufficient minimum contacts, the Court must then ask "whether the

assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial

justice'—that is, whether it is reasonable under the circumstances of the particular case." *Bank*

*Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129 (2d Cir. 2002) (quoting

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996)); *see also Burger*

*King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985).  Where the plaintiff "makes the threshold

showing of the minimum contacts required for [exercising personal jurisdiction], a defendant

must present a compelling case that the presence of some other considerations would render

jurisdiction unreasonable." *MSP Recovery Claims, Series LLC*, 2021 WL 4461773, at *3

(quoting *Bank Brussels Lambert*, 305 F.3d at 129).  Factors the Court will consider include the

burden on the defendant, the interests of the forum in adjudicating the case, the plaintiff's

interest in obtaining convenient and effective relief, the interstate judicial system's interest in

obtaining the most efficient resolution of controversies, and the shared interest of the states in

furthering fundamental substantive social policies.  305 F.3d at 129.

The Defendant argues that "the interests of the United States in this dispute are at best

minimal. This is an 'ancillary' Chapter 15 case in which the Court is acting 'to aid foreign

jurisdictions in administering bankruptcies . . . ."  Reply at 14, ECF No. 1129 (citing *In re*

*Fairfield Sentry Ltd.*, 458 B.R. 665, 686 (S.D.N.Y. 2011) (Preska, C.J.)).

Defendant's reliance on *In re Fairfield Sentry Ltd.*, 458 B.R. 665, is misplaced.  In that case, the District Court determined whether the proceeding was core or non-core; it did not determine whether adjudication or jurisdiction in the United States was reasonable.  *See id.* at 675.  Further, the Court has already found that it has subject matter jurisdiction over these proceedings.  *See In re Fairfield Sentry Ltd.*, 2018 WL 3756343, at *8 (Bankr. S.D.N.Y. Aug. 6, 2018).  Chapter 15 allows for recognition of Sentry's foreign main proceeding.  11 U.S.C. § 1501(a) ("The purpose of this chapter is to incorporate the Model Law on Cross-Border Insolvency so as to provide effective mechanisms for dealing with cases of cross-border insolvency . . . ."); *id.* § 1504 ("A case under this chapter is commenced by the filing of a petition for recognition of a foreign proceeding under section 1515.").  Defendant correctly states that cases brought under Chapter 15 are ancillary to foreign proceedings.  *In re Fairfield Sentry Ltd.*, 2018 WL 3756343, at *2.  The ancillary character of such cases does not necessarily mean that the United States has minimal interest in the dispute.

Defendant argues that the "location of the losses and the alleged wrongdoing are both foreign" and that "there is nothing convenient about this forum for *any* of the parties."  Reply at 14, ECF No. 1129.  BJB suggests that the Liquidators are merely trying to get a "second bite at the apple in any alternative forum of their choosing."  *Id.* at 14–15.  BJB believes that the burden is thus high, as the "witnesses and evidence in this action are all overseas, and merits discovery could expose BB to civil and criminal liability under Swiss foreign secrecy and privacy laws."  *Id.* at 15.

In 2012, this Court granted in part and denied in part a motion seeking relief as to the order staying the action and seeking expedited initial disclosures on certain beneficial holders.  *See* Bench Ruling, Adv. Pro. No. 10-03496, ECF No. 799 (the "July 2012 Bench Ruling").  The

Court stated in that ruling that it was "hard-pressed to find any compelling United States' interest in mandating discovery here *at this juncture* of the pending litigation." *Id.* (emphasis added). Although the defendants before this Court in 2012 were able to describe "the strong and undeniable interest of many nations in enforcing their banking secrecy laws" and "significant bank customer confidentiality laws of no fewer than 30 countries, attested to by numerous declarations of foreign law experts and letters submitted by foreign governments" that could have been implicated or broken by complying with the Court's prior order, BJB now describes a potential exposure to liability and presents a list of Swiss laws in a footnote. *Id.*; Reply at 15, ECF No. 1129.  This Court lifted the stay and required the Defendant to proceed to discovery in 2021.  Order Lifting Stay, ECF No. 616.  The July 2012 Bench Ruling shows that this Court can alleviate specific burdens identified by a defendant.  The mere potential for exposure to unspecified liability is not a burden that renders exercise of jurisdiction unreasonable.

The Defendant has demonstrated that this Court's exercise of jurisdiction over it may impose a minimal burden in terms of requiring it to "traverse the distance" to the forum. However, "[e]ven if forcing the defendant to litigate in a forum relatively distant from its home base were found to be a burden, the argument would provide defendant only weak support, if any, because the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago." *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 173 (2d Cir. 2010); *see also In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 273 (2d Cir. 2023).  The Defendant has not established that the Court's exercise of personal jurisdiction over it would be unreasonable.  Furthermore, BJB is represented by U.S. Counsel and the United States has a strong interest in ensuring the integrity of its financial systems.  The Court thus finds that exercising jurisdiction over the Defendant is reasonable and comports with

"traditional notions of fair play and substantial justice . . . ."  *See Int'l Shoe*, 326 U.S. at 316, 66

S. Ct. 154.

## V.  <u>CONCLUSION</u>

For the foregoing reasons, the Court DENIES the Defendant's Motion to Dismiss the

Amended Complaint.  The Liquidators shall submit a proposed order consistent with the findings

in this decision in accordance with Local Bankruptcy Rule 9074-1(a).

**IT IS SO ORDERED.**

Dated: September 24, 2024
       New York, New York

/s/ John P. Mastando III _____
THE HONORABLE JOHN P. MASTANDO III
UNITED STATES BANKRUPTCY JUDGE