**UNITED STATES BANKRUPTCY COURT**                    *FOR PUBLICATION*
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| Fairfield Sentry Limited, et al. | Case No. 10-13164 (JPM) |
| | (Jointly Administered) |
| Debtors in Foreign Proceedings. | |
| FAIRFIELD SENTRY LTD. (In Liquidation), et al., | |
| Plaintiffs, | |
| v. | Adv. Pro. No. 10-03635 (JPM) |
| ABN AMRO SCHWEIZ AG a/k/a AMRO (SWITZERLAND) AG, et al., | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTIONS TO DISMISS

*APPEARANCES:*

**CHAFFETZ LINDSEY LLP**
Attorneys for the Defendant, SIX SIS Ltd., f/k/a SIS SeganinterSettle AG
1700 Broadway, 33rd Floor
New York, NY 10019
By:    Andreas A. Frischknecht
       Lidia Helena Souza Rezende
       Erin E. Valentine

**BROWN RUDNICK LLP**
Attorneys for the Plaintiffs, Joint Liquidators
Seven Times Square
New York, NY 10036
By:    Jeffrey L. Jonas
       David J. Molton
       Danny Cameron Moxley

**JOHN P. MASTANDO III**
**UNITED STATES BANKRUPTCY JUDGE**

## I.    INTRODUCTION

Pending before the Court are the motions of SIX SIS Ltd., f/k/a SIS SegaIntersettle AG ("SIX SIS" or "Defendant," sued as SIS Seeganintersettle), to dismiss the Fifth Amended Complaint (the "Amended Complaint") for lack of personal jurisdiction.  Mot. to Dismiss, ECF[1] No. 770 & 774 (the "Motions").[2]  The parties did not request oral argument on the Motions, and instead informed the Court that they were resting on the papers.  *See Letter re: Status of Remaining Oral Arguments,* Ex. A, ECF No. 1142.  For the reasons set forth herein, the Court DENIES the Defendant's Motions to Dismiss.

## II.    JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157 and the Amended Standing Order of Reference dated January 31, 2012 (Preska, C.J.).  This Court previously concluded that it has subject matter jurisdiction over this and related actions.  *See In re Fairfield Sentry Ltd.*, 2018 WL 3756343 (Bankr. S.D.N.Y. Aug. 6, 2018) ("*Fairfield I*"); *see also* Stip. Order, ECF No. 431.  Personal jurisdiction is contested by the Defendant and will be discussed below.

---

[1]    Citations to this Court's electronic docket refer to the docket of Adv. Pro. No. 10-03635-jpm unless otherwise noted.

[2]    The Amended Complaint names the Defendant twice as two separate entities by listing the Defendant's current and former name — Six SIS Ltd. and SIS Seeganintersettle, respectively.  *See* Am. Compl. ¶¶ 94–95, ECF No. 620.  The Defendant responded to the Amended Complaint's separate allegations by filing two Motions, one under each name.  *See* SIX SIS Ltd.'s Motion to Dismiss, ECF No. 768; *see also* SIS Seeganintersettle's Motion to Dismiss, ECF No. 772.  The Defendant also filed two nearly identical memoranda of law, one in support of each Motion.  *See* SIX SIS Ltd.'s Mem. L., ECF No. 770; *see also* SIS Seeganintersettle's Mem. L., ECF No. 774.  For clarity purposes, the Court will only refer to the Defendant's memorandum of law filed under the name SIX SIS Ltd. (ECF No. 770) in its analysis.

### III.  BACKGROUND

This adversary proceeding was filed on September 21, 2010.  *See* Compl., ECF No. 8. Kenneth M. Krys and Greig Mitchell (the "Liquidators"), in their capacities as the duly appointed Liquidators and Foreign Representatives of Fairfield Sentry Limited (In Liquidation) ("Sentry"), Fairfield Sigma Limited (In Liquidation) ("Sigma"), and Fairfield Lambda Limited (In Liquidation) ("Lambda" and, together with Sentry and Sigma, the "Fairfield Funds") filed the Amended Complaint on August 11, 2021.  *See* Am. Compl., ECF No. 620.  Via the Amended Complaint, the Liquidators seek the imposition of a constructive trust and recovery of over $51 million in redemption payments made by Sentry, Sigma, and Lambda to various entities known as the Citco Subscribers.  *Id.* ¶¶ 1–2, 197–209; *id.* Exs. A–B.[3]  Of that amount, Defendant allegedly received over $32 million[4] through redemption payments from its investment in Sentry, Sigma, and Lambda.  Opp'n at 1–2, Adv. Pro. No. 10-03636, ECF No. 1143; Declaration of David S. Flugman in Support of the Liquidator's Opposition ("Flugman Declaration") Exs. 23–30, Adv. Pro. No. 10-03636, ECF No. 1144 (Redemption Records).[5]

---

[3]    At the time of the filing of the Amended Complaint, the Plaintiffs made no specific allegations as to the exact amounts received by any of the beneficial shareholders.  With respect to the Defendant, the Amended Complaint states in relevant part that "[b]ased on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Six SIS Ltd. . . ." Am. Compl. ¶ 95, ECF No. 620; *see also id.* ¶ 94.  The Amended Complaint alleges that several other defendants may have received redemption payments made to the Citco Subscribers.  *Id.* ¶¶ 33–104.  This opinion concerns only those payments that the Plaintiffs allege were paid to SIX SIS.

[4]    Of that total U.S. Dollar amount, the Plaintiffs allege that SIX SIS received "$20,235,640 from Sentry, approximately €9,615,293 from Sigma, and CHF 67,547 from Lambda . . . . [T]he Liquidators have applied the exchange rate as of the date of each redemption payment out of Sigma and Lambda and calculated the dollar value of those redemptions to be approximately $12,151,758 and $78,955, respectively.  This number may vary if the Court ultimately determines that a different exchange rate applies."  Opp'n at 1–2 n.3, Adv. Pro. No. 10-03636, ECF No. 1143.

[5]    The Liquidators did not file responses to the Defendant's Motions in this adversary proceeding.  However, the Liquidators' responses to the Motions can be found in a related adversary proceeding styled *Fairfield Sentry Ltd. v. ABN Amro Schweiz AG, et al.*, Adversary Proceeding No. 10-03636 (the "Related Adversary Action"), in which SIX SIS is also a defendant.

The Fifth Amended Complaint in the Related Adversary Action alleges substantially the same constructive trust claim against the Defendant as the Amended Complaint.  *See* Am. Compl. ¶¶ 197–209, ECF No. 620; *see also* Fifth Am. Compl. ¶¶ 205–216, Adv. Pro. No. 10-03636, ECF No. 679.  Similar to this action, SIX SIS also filed two motions to

## A. THE BLMIS PONZI SCHEME

This adversary proceeding arises out of the decades-long effort to recover assets of the Bernard L. Madoff Investment Securities LLC ("BLMIS") Ponzi scheme.[6]  *See* Am. Compl. ¶ 1. The Citco Subscribers allegedly invested, either for their own account or for the account of others, into several funds — including Sentry, Sigma, and Lambda — that channeled investments into BLMIS.  *Id.* ¶¶ 2, 5, 15.

Fairfield Sentry was a direct feeder fund in that it was established for the purpose of bringing investors into BLMIS, thereby allowing Madoff's scheme to continue.  *Id.* ¶¶ 5; 125–26; *see also In re Picard*, 917 F.3d 85, 93 (2d Cir. 2019) ("A feeder fund is an entity that pools money from numerous investors and then places it into a 'master fund' on their behalf. A master fund— what Madoff Securities advertised its funds to be—pools investments from multiple feeder funds and then invests the money.").  Fairfield Sigma and Lambda, in contrast, were indirect feeder funds, established to facilitate investment in BLMIS through Fairfield Sentry for foreign currencies.  *See* Am. Compl. ¶¶ 125–26.  BLMIS used investments from feeder funds, like the Fairfield Funds, to satisfy redemption requests from other investors in the scheme.  *Id.* ¶¶ 5–7, 13. Without new investors, BLMIS would have been unable to make payments to those who chose to withdraw their investments, and the scheme would have fallen apart.  *Id.* ¶¶ 7–8, 12–14, 126.

---

dismiss the amended complaint in the Related Adversary Action for lack of personal jurisdiction, and the memoranda of law supporting those motions are nearly identical to the ones supporting the Motions in this case.  *See* Mem. L., ECF No. 770; *see also* Mem. L., Adv. Pro. No. 10-03636, ECF No. 835.  The Liquidators responded to the Defendant's motions in the Related Adversary Action by had filing an opposition.  *See* Opp'n, Adv. Pro. No. 10-03636, ECF No. 1143.  The Defendant subsequently filed a reply to the opposition in the Related Adversary Action, and that reply is identical to the one filed in this proceeding.  *See* Reply, ECF No. 1122; *see also* Reply, Adv. Pro. No. 10-03636, ECF No. 1285.  Therefore, the Court will incorporate into its analysis here the Plaintiffs' opposition (and any declarations in support of that opposition) from the Related Adversary Action.

[6]     The Court will not recount all details concerning the Ponzi scheme perpetrated by Madoff.  Details of that scheme have been recounted by many courts.  *See, e.g.*, *In re Madoff*, 598 B.R. 102, 106 (S.D.N.Y. 2019), *aff'd* 818 F. App'x 48 (2d Cir. 2020).

The Amended Complaint alleges that investors received payments on account of their shares in the Fairfield Funds based on a highly-inflated Net Asset Value ("NAV").  *Id.* ¶ 7.  The Citco Subscribers and the beneficial shareholders were allegedly such investors.  *Id.*  To calculate the NAV, administrators used statements provided by BLMIS that showed "securities and investments, or interests or rights in securities and investments, held by BLMIS for the account of Sentry."  *Id.* ¶ 128.  In fact, no securities were ever bought or sold by BLMIS for Sentry, and none of the transactions on the statements ever occurred.  *Id.* ¶ 129.  The money sent to BLMIS by the Fairfield Funds for purchase of securities was instead used by Bernard Madoff to pay other investors or was "misappropriated by Madoff for other unauthorized uses."  *Id.*  The NAVs were miscalculated, and redemption payments were made in excess of the true value of the shares.  *Id.* ¶ 130.  The Fairfield Funds were either insolvent when the redemption payments were made or were made insolvent by those payments.  *Id.*

SIX SIS is organized under the laws of Switzerland with a registered address in Olten, Switzerland.  *Id.* ¶¶ 94–95.  SIX SIS allegedly invested into and redeemed shares of the Fairfield Funds through "several companies within the Citco corporate family."  Opp'n at 6 , Adv. Pro. No. 10-03636, ECF No. 1143.  Investments into the Funds were registered in the name of Citco Global Custody N.V. ("Citco Global Custody").  *Id.*  Citco Bank Nederland N.V. Dublin Branch ("Citco Bank Dublin Branch") and Citco Banking Corporation N.V. (together with Citco Bank Dublin Branch, "Citco Banks") allegedly carried out subscriptions and redemptions on behalf of SIX SIS and other investors.  *Id.*  Citco Global Custody and Citco Banks (collectively, the "Citco Subscriber")[7] served as the subscriber of record for SIX SIS's shares of the Fairfield Funds.  *Id.*

---

[7]    The Court will refer to the "Citco Subscriber" in this opinion as it is defined by the Plaintiffs in their opposition memorandum in the Related Adversary Action.  The Amended Complaint refers to the "Citco Record Subscriber" and the "Citco Subscribers."  *See* Am. Compl. ¶ 8, ECF No. 620.  The Citco Record Subscriber is defined therein to include CGC NA.  *Id.*  The Citco Subscribers is defined in the Amended Complaint to include the Citco

The Citco Subscriber was organized under the laws of either Curaçao or the Netherlands.  Mem.

L. at 6 n.10, ECF No. 770 (citing Am. Compl. ¶¶ 32–34, *Fairfield Sentry Limited (In Liquidation)*

*v. Citco Global Custody N.V.*, Adv. Pro. No. 19-01122, ECF. No. 19).

SIX SIS invested in the Fairfield Funds as early as 1997 via the "Citco Subscriber."  Opp'n

at 7.  SIX SIS opened an account at Citco Banks in order to invest in the Fairfield Funds.  *Id.* at 9.

SIX SIS allegedly retained the Citco Subscriber as its agent when it entered into a brokerage and

custody agreement (the "<u>B&C Agreement</u>") as early as November 1999.  *Id.*; *see* Flugman Decl.

Ex. 11, Adv. Pro. No. 10-03636, ECF No. 1144 (November 19, 1999, B&C Agreement between

SIS SegaInterSettle AG and Citco Bank Nederland N.V. and Citco Global Custody N.V.).  The

B&C Agreement authorized Citco Banks to provide "Brokerage Services," defined to include "the

effecting of transactions of and/or relating to the purchase and sale of and dealing in Securities in

the name and for the account of [SIX SIS]," or of Citco Bank Nederland N.V. or Citco Global

Custody N.V., or "any nominee for the account of [SIX SIS]," and "any services ancillary thereto

as set out in this Agreement."  Flugman Ex. 11 at -963.

From 1997 through December 2007, SIX SIS allegedly subscribed through the Citco

Subscriber for nearly 281,868 shares of the Fairfield Funds.  *See* Opp'n at 3; *see also* Flugman

Decl. Exs. 3–5 (Subscription Records).  SIX SIS, through the Citco Subscriber, redeemed

approximately $32,588,559.24 worth of shares in the Fairfield Funds from April 2004 through

November 2008.  *See* Opp'n at 12; *see also* Flugman Decl. Exs. 23–30 (Redemption Records).  At

the directions and instructions of the Citco Subscriber, as the purported agent for SIX SIS, "some

---

Record Subscriber and Citco Banks.  *Id.*  The Citco Record Subscriber allegedly acted as "agents of and nominees for
the Citco Banks" and received approximately $51 million of redemption payments for beneficial shareholders.  *Id.*
The Citco Subscribers allegedly were agents of SIX SIS and other defendants in this adversary proceeding with respect
to investments in the Fairfield Funds.  *See id.*

. . . of the Redemption Payments were received at . . . designated United States-based bank accounts." Am. Compl. ¶ 133, ECF No. 620.

Bernard Madoff was arrested for alleged violations of federal securities laws on December 11, 2008. *See* Am. Compl. ¶ 185. The United States Attorney brought criminal charges against him, alleging that Madoff ran a Ponzi scheme. *Id.* On December 11, 2008, the Securities Exchange Commission filed an action in the Southern District of New York to halt the continued offerings of securities. *Id.* ¶ 186. In March 2009, Madoff pleaded guilty to criminal charges against him and confessed to operating a Ponzi scheme and fabricating statements and trade confirmations. *Id.* ¶¶ 187–88. Madoff was sentenced to 150 years in federal prison and died in April 2021. *Id.* ¶ 189.

The Amended Complaint alleges that the Citco Subscribers, including the purported agent of SIX SIS, "had knowledge of the Madoff fraud, and therefore knowledge that the Net Asset Value was inflated" when the redemption payments were made. *Id.* ¶ 201. The Amended Complaint further asserts that, while receiving redemption payments, the Citco Subscribers "uncovered multiple additional indicia that Madoff was engaged in some form of fraud" but "turned a blind eye, [and] accept[ed] millions of dollars while willfully ignoring or, at the very least, recklessly disregarding the truth in clear violation of the law of the British Virgin Islands . . . ." *Id.* ¶¶ 8, 201. These indicia included verification that there was no "independent confirmation that BLMIS-held assets even existed," Madoff's failure to segregate duties, and BLMIS's "employing an implausibly small auditing firm" rather than a reliable auditor. *Id.* ¶¶ 9, 201. In the face of red flags such as these, the Citco Subscribers and other Citco entities purportedly "quietly reduced [their] own exposure to BLMIS through the Funds, and significantly increase[ed] [their] Custodian fees to offset the risk." *Id.* ¶ 201.

B. **THE PRIOR LITIGATION AND PROCEDURAL HISTORY**

The Fairfield Funds were put into liquidation in the BVI in 2009. *Id.* ¶¶ 26–28. The BVI court issued orders appointing the foreign representatives, Kenneth Krys and Greig Mitchell, as liquidators of the Fairfield Funds. *Id.* ¶ 28. Pursuant to the appointment order of the BVI court,[8] the "Foreign Representatives are responsible for all aspects of the Funds' business, including protecting, realizing, and distributing assets for the Funds' estates." *Id.* ¶ 195. The Liquidators commenced actions in the BVI against a number of investors who had redeemed shares of the Fairfield Funds before the collapse of the scheme. *See* Mem. L. at 4, ECF No. 770; *Fairfield Sentry Ltd. v. Citibank, N.A. London*, 630 F. Supp. 3d 463, 475 (S.D.N.Y. 2022); *see also Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*, 596 B.R. 275, 284 (Bankr. S.D.N.Y. 2018) ("*Fairfield II*").

The Liquidators filed petitions in this Court in June 2010 under Chapter 15 of the Bankruptcy Code, seeking recognition of the BVI proceedings as foreign main proceedings. *See* Am. Compl. ¶ 29, ECF No. 620. This Court granted that recognition on July 22, 2010. *Id.* All cases filed by the Plaintiffs were administratively consolidated before this Court in November 2010. *See* Consolidation Order, Adv. Pro. No. 10-03496, ECF No. 25.

The Plaintiffs asserted multiple causes of action in those consolidated adversary proceedings including, *inter alia*, mistaken payment and constructive trust.[9] *See* Compl. ¶¶ 34–83, ECF No. 8; *see also* 630 F. Supp. 3d at 479. In October 2011, this Court stayed the U.S.

---

[8]    The order was issued by the "Commercial Division of the Eastern Caribbean High Court of Justice." *See* Am. Compl. at 1.

[9]    Other causes of action included unjust enrichment, money had and received, unfair preferences under BVI's Insolvent Act § 245, undervalue transactions under the Insolvent Act § 246, breach of contract, and breach of the implied covenant of good faith and fair dealing. *Fairfield Sentry Ltd. v. Citibank, N.A. London*, 630 F. Supp. 3d at 463 (S.D.N.Y. 2022).

proceedings pending resolution of the BVI proceedings. *See* Am. Order Staying Redeemer Actions, Adv. Pro. No. 10-03496, ECF No. 418.; *Fairfield I*, 2018 WL 3756343 at *3.

In April 2014, the Privy Council affirmed dismissal of the Plaintiffs' BVI law claims for restitution based on mistaken payment. *Fairfield Sentry Ltd. (In Liquidation) v. Migani*, [2014] UKPC 9 ("*Migani* ").[10]  The Privy Council held that the Plaintiffs' claims for restitution in the BVI to recover redemption payments arising out of transactions governed by the Funds' Articles of Association are governed by BVI law. *Id.* ¶ 17.  The Plaintiffs' claims to recover redemption payments thus depended on whether Sentry was bound to make those payments under the "true NAV per share, ascertained in the light of information which subsequently became available about Madoff's frauds, or . . . the NAV per share which was determined by the Directors at the time of redemption." *Id.* ¶ 19.  The Privy Council concluded that the NAV had to be definitively determined at the time of the subscription or redemption. *Id.* ¶ 21.  The redemption payments made under the NAV were thus not subject to restitution and the payee was not unjustly enriched by receiving funds, even if the amount was mistaken. *Id.* ¶¶ 18–19.

After *Migani* was issued, the Plaintiffs allegedly obtained evidence of bad faith of Citco, the Fairfield Fund's administrator, when it issued redemption certificates. *See Fairfield I*, 2018 WL 3756343, at *5–6.  Plaintiffs moved to amend the complaint, seeking to add allegations that Citco lacked good faith when it issued certificates for redemptions and was aware that the NAV was inflated at the time. *See id.* at *6.  The Plaintiffs argued that the certificates would not be binding under the Funds' Articles if they were not issued in good faith. *Id.*

---

[10]    *Migani* is available at https://www.jcpc.uk/cases/docs/jcpc-2012-0061-judgment.pdf and, without numbered paragraphs, on the Westlaw database at *Fairfield Sentry Ltd (In Liquidation) v Migani*, 2014 WL 1219748.

In December 2018, this Court found that the Plaintiffs could allege bad faith on behalf of Citco in the U.S. proceedings and could seek recovery of the redemption payments only "where a Defendant knew the NAV was inflated at the time of redemption." *Fairfield II*, 596 B.R. at 295. Of the common law claims, the Court allowed only the Plaintiffs' claims for constructive trust against the so-called "Knowledge Defendants" to proceed. *Id.* at 301 ("The suggestion that the subsequent disclosure of facts indicating that the valuation was made in bad faith vitiates the contract and requires restitution lacks support. The only exception concerns the Knowledge Defendants that received redemption payments with the knowledge that the NAV was wrong. In those circumstances, the Liquidators may seek to impose a constructive trust."). In December 2020, this Court ruled that § 546(e) bars Plaintiffs' BVI avoidance claims to recover unfair preferences and undervalue transactions. *In re Fairfield Sentry Ltd.*, 2020 WL 7345988, at *1 (Dec. 14, 2020) ("*Fairfield III*").

Following these decisions, only the constructive trust claims survived. *Id.*; *In re Fairfield Sentry Ltd.*, No. 10-13164 (SMB), 2021 WL 771677, at *1 (Bankr. S.D.N.Y. Feb. 23, 2021) ("*Fairfield IV*"), *aff'd*, 630 F. Supp. 3d 463 (2022). The Liquidators filed a further motion to amend the complaints against the Knowledge Defendants. *See* Mot. to Amend, ECF No. 560; Mot. to Amend, Adv. Pro. No. 10-03496, ECF No. 3737. On August 5, 2021, this Court granted the motion to amend the complaint and lifted the stay of the redeemer actions. *See* Order Granting Mot. to Amend, ECF No. 617; Order Lifting Stay of Redeemer Actions, ECF No. 616.

## C.  **THE PENDING MOTIONS**

The Amended Complaint seeks the imposition of a constructive trust on the redemption payments received from the Fairfield Funds.  *See* Am. Compl. ¶ 197, ECF No. 620.  The Amended Complaint alleges that Defendant's purported agent, the Citco Subscriber, had knowledge of the fraud at BLMIS and therefore knowledge that the NAV was inflated.  *Id.* ¶ 201.  "By reason of their receipt of some or all of the Redemption Payments, the Beneficial Shareholders have been unjustly enriched to the detriment of the [Fairfield] Funds and other shareholders and creditors of the Funds."[11]  *Id.* ¶ 205–06.

Under BVI law, "lack of good faith, *i.e.* bad faith, includes wrongdoing by one who acts recklessly as well as one who acts with actual knowledge that he is acting wrongfully or willfully blinds himself to that fact."  *Id.* ¶ 198 (citing 596 B.R. at 293).  As this Court previously found:

> To establish a constructive trust claim under English law, which would apply in the BVI, 'the plaintiff must show, first, a disposal of his assets in breach of fiduciary duty; second, the beneficial receipt by the defendant of assets which are traceable as representing the assets of the plaintiff; and third, knowledge on the part of the defendant that the assets he received are traceable to a breach of fiduciary duty.'

*In re Fairfield Sentry Ltd.*, 2021 WL 771677 (Bankr. S.D.N.Y. Feb. 23, 2021) (quoting *El Ajou v. Dollar Land Holdings Ltd.* [1994] 2 All E.R. 685, 700).

The Amended Complaint alleges that the defendants, including SIX SIS as a beneficial shareholder of certain accounts, purposefully availed themselves of the laws of the United States and the State of New York by "investing money with the Funds, and knowing and intending that the Funds would invest substantially all of that money in New York-based BLMIS."  Am. Compl. ¶ 20, ECF No. 620.

---

[11]    As stated *supra*, footnote 2, the Amended Complaint alleges that several other defendants may have received redemption payments made to the Citco Subscribers.  Am. Compl. ¶¶ 33–104, ECF No. 620.

The parties engaged in personal jurisdiction discovery between September 2021 and August 2022. *See* Scheduling Order, ECF No. 654; Second Am. Scheduling Order, ECF No. 917. Merits document and expert discovery is ongoing in this case. *See* Eleventh Am. Scheduling Order, ECF No. 1141; Twelfth Am. Scheduling Order, ECF No. 1144.

Defendant has moved to dismiss the Amended Complaint for lack of personal jurisdiction, arguing that the Amended Complaint has not sufficiently alleged minimum contacts with the forum to establish personal jurisdiction over Defendant and that exercising personal jurisdiction would be unreasonable. *See* Mem. L. at 2–4; 19, ECF No. 770.

The Liquidators did not file a response to SIX SIS's Motions in this adversary proceeding. However, as noted *supra*, Section (III), n. 5, the Court incorporates into the record the Liquidators' opposition to SIX SIS's motions to dismiss the Related Adversary Action, as those motions to dismiss are nearly identical to the Motions. *See* Opp'n, Adv. Pro. No. 10-03636, ECF No. 1143. The Liquidators submitted the declarations of David S. Flugman and Sara Joyce in support of their opposition, declarations which the Court also incorporates into the record here. *See* Flugman Decl., Adv. Pro. No. 10-03636, ECF No. 1144; Declaration of Sara Joyce ("Joyce Declaration"), Adv. Pro. No. 10-03636, ECF No. 1145.[12] The Liquidators argue that exercising jurisdiction over Defendant would be reasonable and that Defendant's contacts with the United States, through its own actions and those of its purported agent, in knowingly and intentionally investing in the Fairfield Funds, using U.S. correspondent accounts to invest in and receive payments from Sentry, and conducting other business activities support personal jurisdiction. *See* Opp'n at 2–5. Defendant filed a reply memorandum on August 16, 2023. *See* Reply, ECF No. 1122. As noted

---

[12]    Pursuant to various orders of this Court, portions of certain filings and supporting documents were filed under seal. For the analysis in this opinion, the Court will refrain from referring to any bank account numbers or names of individual employees, named only in sealed documents, in full.

*supra*, Part (I), the parties did not request oral arguments in connection with the Motions. *See Letter re: Status of Remaining Oral Arguments,* Ex. A, ECF No. 1142. In considering the Defendant's Motions, the Court has reviewed the above filings, all other relevant submissions, and the record as a whole.

## IV.    DISCUSSION

### A. THE LAW OF PERSONAL JURISDICTION

In order to subject a defendant to personal jurisdiction in the United States, due process requires that the defendant have sufficient minimum contacts with the forum in which the defendant is sued "'such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Picard v. Bureau of Labor Ins. (In re BLMIS*), 480 B.R. 501, 516 (Bankr. S.D.N.Y. 2012) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "In adversary proceedings, courts must determine whether the defendant has minimum contacts with the United States, rather than with the forum state." *Picard v. Fairfield Greenwich Grp. (In re Fairfield Sentry Ltd.)*, 627 B.R. 546, 565 n.13 (Bankr. S.D.N.Y. 2021) (citing *In re Lehman Bros. Holdings Inc.*, 535 B.R. 608, 619 (Bankr. S.D.N.Y. 2015)). "When jurisdiction is satisfied through Bankruptcy Rule 7004,[13] a bankruptcy court need not address its state's long-arm statute." *Id.* n.12; *see also Owens-Illinois, Inc. v. Rapid Am. Corp. (In re Celotex Corp.)*, 124 F.3d 619, 630 (4th Cir. 1997).

An analysis of minimum contacts "focuses on the relationship among the defendant, the forum, and the litigation," a relationship that "must arise out of contacts that the defendant himself creates with the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (quotations omitted).

---

[13]    "The summons and complaint and all other process except a subpoena may be served anywhere in the United States." Fed. R. Bankr. P. 7004(d). A bankruptcy court may exercise personal jurisdiction over a defendant served under Rule 7004(d) "[i]f the exercise of jurisdiction is consistent with the Constitution and the laws of the United States." Fed. R. Bankr. P. 7004(f).

There are three conditions necessary for the Court to exercise specific jurisdiction[14] over the non-resident defendant:

> First, the defendant must have purposefully availed itself of the privilege of conducting activities within the forum State or have purposefully directed its conduct into the forum State. Second, the plaintiff's claim must arise out of or relate to the defendant's forum conduct. Finally, the exercise of jurisdiction must be reasonable under the circumstances.

*U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 150 (2d Cir. 2019) (internal quotation marks and citations omitted).

To survive a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure Rule 12(b)(2), the Plaintiffs "must make a prima facie showing that jurisdiction exists." *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 342 (2d Cir. 2018) (quoting *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34–35 (2d Cir. 2010)). A trial court has considerable procedural leeway when addressing a pretrial dismissal motion under Rule 12(b)(2). *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013).

A showing sufficient to defeat a defendant's challenge to personal jurisdiction "varies depending on the procedural posture of the litigation." *Id.* (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). Following discovery, "the plaintiff's prima facie showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant." *Ball*, 902 F.2d at 197. "In response to a post-jurisdictional discovery Rule 12(b)(2) motion, 'the plaintiff need

---

[14]    Courts recognize "two types of personal jurisdiction: general and specific jurisdiction. A state court may exercise general jurisdiction only when a defendant is 'essentially at home' in the State." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 352, 141 S. Ct. 1017, 1019, 209 L. Ed. 2d 225 (2021) (quoting *Goodyear Dunlop Tires Operations, S. A v. Brown*, 564 U.S 915, 919, 131 S. Ct. 2846, 180 L. Ed. 2d 796 (2011)). The Plaintiffs do not allege that the Court has general jurisdiction over Defendant. *See* Reply at 3, ECF No. 1122 ("It is undisputed that SIX SIS is not subject to general jurisdiction in New York."); Opp'n at 3, Adv. Pro. No. 10-03636, ECF No. 1143 (arguing that the Court's specific jurisdiction is founded on Defendant's contacts with the forum that relate to the claims at issue).

persuade the court only that its factual allegations constitute a prima facie showing of jurisdiction.'" *Averbach v. Cairo Amman Bank*, No. 19-CV-0004-GHW-KHP, 2023 WL 5016884, at *4 (S.D.N.Y. June 30, 2023) (quoting *Dorchester Fin. Sec.*, 722 F.3d at 85). "Now that jurisdictional discovery is complete, Plaintiffs' burden is different, but it is not heavy." *Averbach ,* 2023 WL 5016884, at *6 (citing *Dorchester Fin. Sec.*, 722 F.3d at 85). "Plaintiffs need only show that their prima facie showing of jurisdiction is factually supported." *Id.* at *6. When considering a motion to dismiss before or after jurisdictional discovery has taken place, "the court must 'construe the pleadings and affidavits in the light most favorable to plaintiffs,' and resolve all doubts, including factual disputes, in the plaintiff's favor." *Id.* at *4 (quoting *Ball*, 902 F.2d at 197).

## B. <u>ANALYSIS OF PURPOSEFUL AVAILMENT</u>

"[M]inimum contacts necessary to support [specific] jurisdiction exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 82 (2d Cir. 2018) (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013) ("*Licci IV*")). For specific personal jurisdiction, "'[c]ourts typically require that the plaintiff show some sort of causal relationship between a defendant's U.S. contacts and the episode in suit,' and the plaintiff's claim must in some way 'arise from the defendant's purposeful contacts with the forum.'" *Charles Schwab Corp.*, 883 F.3d at 84 (quoting *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 341, 343 (2d Cir. 2016)). "Although a defendant's contacts with the forum state may be 'intertwined with [its] transactions or interactions with the plaintiff or other parties . . . [,] a defendant's relationship with a . . . third party, standing alone, is an insufficient basis for jurisdiction.'" *U.S. Bank Nat'l Ass'n*, 916 F.3d at 150 (quoting *Walden*, 571 U.S. at 134) (alteration in original). "It is insufficient to rely on a defendant's random, fortuitous, or attenuated

contacts or on the unilateral activity of a plaintiff with the forum to establish specific jurisdiction." *Id.*

SIX SIS asserts that the "Liquidators recently confirmed that the Redemption Payments were entirely outside of the United States in their opening appellate brief to the District Court challenging certain of Judge Bernstein's holdings in *Fairfield I*, *Fairfield II*, and *Fairfield III*." Mem. L. at 15, ECF No. 770. The Plaintiffs argued before the District Court, that "every relevant component of the transactions at issue here occurred outside the territorial jurisdiction of the United States." *Id.* at 16; *see also* Pls.-Appellants' Opening Br. for Second Round Appeal at 24, *Fairfield Sentry Ltd. v. Citibank NA London*, No. 19-cv-3911 (S.D.N.Y. July 21, 2021), ECF No. 440 (the "Opening Brief"). The Plaintiffs' Opening Brief concerned the extraterritorial application of the § 546(e)[15] safe harbor. *See* Opening Brief at 24 (arguing that the "Bankruptcy Court erred in holding that Section 546(e)'s safe harbor could apply extraterritorially to shield from avoidance settled securities transactions that occurred exclusively outside the United States.").

As another bankruptcy court in this District has stated, the "tests for personal jurisdiction and extraterritoriality are not the same." *Spizz v. Goldfarb Seligman & Co. (In re Ampal-Am. Israel Corp.)*, 562 B.R. 601, 613 n.14 (Bankr. S.D.N.Y. 2017). In *Spizz*, the bankruptcy court was able to simultaneously find that the "[t]ransfer was not domestic, and hence, cannot be avoided" under § 547, while also clarifying that by "attend[ing] meetings in New York around the time of,

---

[15]    Section 546(e) of the Bankruptcy Code prohibits a trustee from avoiding a transfer that is a margin payment or settlement payment "made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract. . . ." 11 U.S.C. § 546(e). "By its terms, the safe harbor is a defense to the avoidance of the *initial* transfer." *Picard v. BNP Paribas S.A. (In re BLMIS)*, 594 B.R. 167, 197 (Bankr. S.D.N.Y. 2018) (emphasis in original).

and apparently in conjunction with, the commencement of the chapter 11 case," a defendant may be "subject to specific personal jurisdiction." *Id.* at 613–14.

By arguing in the District Court that the redemption transfers were foreign for purposes of extraterritoriality, Plaintiffs did not preclude arguing that there were contacts with the forum for purposes of personal jurisdiction. To determine whether a transaction is foreign or domestic for analyzing extraterritoriality issues for federal statutes, courts look at whether the "conduct relevant to the statute's focus occurred in the United States." *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 326, 136 S. Ct. 2090, 2094, 195 L. Ed. 2d 476 (2016). To determine whether personal jurisdiction is appropriate, however, courts analyze a defendant's contacts with the forum "under a totality of the circumstances test." *Licci IV*, 732 F.3d at 170 (citing *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007)).

Further, the Second Circuit has made clear that courts evaluating a motion to dismiss for lack of personal jurisdiction "will not draw 'argumentative inferences' in the plaintiff's favor." *Robinson v. Overseas Mil. Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994) (quoting *Atlantic Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 198 (2d Cir. 1992) (citing, in turn, *Norton v. Larney*, 266 U.S. 511, 515, 45 S. Ct. 145, 147, 69 L. Ed. 413 (1925))). If allegations sufficient to sustain a court's exercise of personal jurisdiction do not "appear by the allegations of the bill or complaint, the trial court, upon having its attention called to the defect or upon discovering it, must dismiss the case, unless the jurisdictional facts be supplied by amendment." *Norton v. Larney*, 266 U.S. at 515–16. The Court will "however, construe jurisdictional allegations liberally and take as true uncontroverted factual allegations." *Robinson v. Overseas Mil. Sales Corp.*, 21 F.3d at 507 (citing *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 411, 106 S. Ct. 1922, 1923–24, 90 L. Ed. 2d 413 (1986); *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683,

1686, 40 L. Ed. 2d 90 (1974); *IUE AFL–CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1052 (2d

Cir. 1993)).  Moreover, where there exist "conflicting affidavits, all factual disputes are resolved

in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the

contrary presentation by the moving party." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d at

673    (quoting    *Seetransport    Wiking    Trader    Schiffarhtsgesellschaft    MBH    &    Co.,*

*Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 580 (2d Cir. 1993))

(quotation marks omitted in original).

### 1.  Defendant's Use of Correspondent Accounts via Its Alleged Agents

Defendant initially argues that "[n]one of [the Redemption Payments] is alleged to have

occurred in the [United States]."  Reply at 14, ECF No. 1122.  SIX SIS believes that the Plaintiffs'

own allegations show that "every single Redemption Payment was paid to an offshore bank [and]

is therefore foreign to the United States."  Mem. L. at 11, ECF No. 770.  SIX SIS points to the

B&C Agreement, which required it and all other beneficial shareholders to "maintain bank

accounts with the Citco Banks outside of the United States, into which all Redemption payments

were deposited."  *Id.* at 7–8 (emphasis omitted).  SIX SIS further points to an exhibit attached to

the Amended Complaint that states that the redemption payments at issue here were made to a

bank account labeled "Citco Global Custody (NA) NV, *Netherlands*."  *Id.* at 9–10 (emphasis in

original).  SIX SIS also believes that the Liquidators "cannot allege that the Redemption Payments

were paid at bank accounts based in the United States" because "the Redemption Payments

occurred, by design, entirely outside the United States."  *See id.* at 14.

The Plaintiffs then point to the choice and use of correspondent accounts by SIX SIS and

its alleged agent as sufficient to establish minimum contacts with the United States. [16]  Opp'n at

---

[16]        The use of correspondent accounts concerns only the transfers that originated from Sentry.  *See* Opp'n at 27
n. 21, Adv. Pro. No. 10-03636, ECF No. 1143 ("[w]hile SIX SIS and its agent did not designate a U.S. correspondent

27–32, Adv. Pro. No. 10-03636, ECF No. 1143.  "Correspondent accounts are accounts in domestic banks held in the name of foreign financial institutions" that are used "to effect dollar transactions."  *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 56 n.3 (2d Cir. 2012) (quoting *Sigmoil Res., N.V. v. Pan Ocean Oil Corp. (Nigeria)*, 234 A.D.2d 103, 104, 650 N.Y.S.2d 726, 727 (1st Dept 1996)).  Plaintiffs allege that SIX SIS, through the Citco Subscriber, its purported agent, deliberately selected and repeatedly used U.S. correspondent accounts to effectuate the redemption payments that form the harms for which Plaintiffs seek redress.  *See* Opp'n at 27–32.

The Plaintiffs suggest that the first step to redeem a share of Sentry was for SIX SIS to submit a redemption request to the Citco Shareholder.  *See* Opp'n at 11.  The Citco Subscriber from whom SIX SIS requested redemptions would then submit a request on SIX SIS's behalf to the investment manager of Sentry, the Fairfield Greenwich Group ("FGG").  *See id.*; *see, e.g.*, Flugman Decl. Ex. 20 at -543 (September 29, 2005, Citco Banks redemption request to FGG for redemption of 20.03 shares of Sentry).  The redemption request that the Citco Subscriber sent to FGG would state the bank and account to which the Citco Subscriber requested FGG send the redemption payments.  *See, e.g.*, Flugman Decl. Ex. 21 at -044 ("The Shares should be registered . . . in the name of: CITCO GLOBAL CUSTODY NV – CASH. . . .WE REQUEST YOU TO WIRE THE REDEMPTION PROCEEDS IN USD TO THE . . . ACCOUNT . . . OF CITCO BANK NEDERLAND N.V. WITH HSBC BANK USA 452 FIFTH AVENUE NEW YORK, NY 10018 UNITED STATES . . . .").

---

account for SIX SIS's redemption of its Sigma and Lambda shares, SIX SIS is still subject to jurisdiction with respect to those transactions, [as detailed in arguments concerning the Defendant's investment in the Fairfield Funds and other business activity in and directed at the United States]").  The investments in Sigma and Lambda were in Euros and Swiss Francs, respectively, not U.S. dollars, and therefore did not require the use of U.S. correspondent accounts.  *See* Am. Compl. ¶ 125, ECF No. 620; *see also* Opp'n at 5 ("Sentry transferred its proceeds directly to BLMIS in New York, while Sigma and Lambda, established for Euro- and Swiss-Franc-denominated investments, transferred proceeds to Sentry.").

18

The Plaintiffs have submitted evidence showing the Citco Subscriber, on behalf of Defendant, repeatedly instructed redemptions of Sentry shares be sent to an account in the United States.  *See id.* (record of redemption request of 34.67 shares of Sentry as valued on January 30, 2004, to be sent to Citco Bank's account at HSBC Bank USA in New York); *id.* Ex. 22 at -638 (Confirmation of Order Received for 300 shares of Sentry delivered to HSBC Bank USA in New York with settlement date of October 1, 2007); *see also id.* Exs. 23–24 (Redemption Records for 2004 through 2007).

In its Reply, SIX SIS further argues that the Citco Subscriber was not its agents, and the Citco Subscriber's jurisdictional contacts may not be imputed to the Defendant.  *See* Reply at 9–14.  Specifically, SIX SIS argues that the Citco Subscriber was the Fairfield Funds' agent, and that SIX SIS did not deliberately direct the Citco Subscriber to use U.S.-based correspondent accounts for subscription and redemption payments.  *See id.* at 9–10.  Instead, the Defendant alleges that the Citco Subscriber routinely used U.S.-based correspondent accounts "for *all* redemptions from Fairfield Sentry…"  *Id.* at 10 (emphasis in original).

### a.  <u>Whether the Citco Subscriber Were SIX SIS's Agents</u>

The Court will first address the Defendant's argument that the Citco Subscriber was not an agent of SIX SIS because it was an agent of the Fairfield Funds.  The Defendant cited the Court's ruling in *Fairfield III*, 2020 WL 7345988 at *7 that "the Funds were customers of Citco Bank," and that Citco Banks "acted as their agents in connection with the securities contracts [related to] the redemption payments …" as support for this argument.  *See* Reply at 10, ECF No. 1122 ("[T]his Court has already determined that Citco Bank Dublin acted as the [Fairfield] Funds' agent … [and] [o]n that basis alone, the Liquidators' allegations fail as a matter of law.").  Although the Plaintiffs did not respond to this argument, the Court will address this issue here.

19

SIX SIS apparently assumed that a party cannot be agents of multiple parties. Under this argument, SIX SIS asserts that, because the Court had found that the Citco Subscriber was the Funds' agent in facilitating the redemption payments, the Citco Subscriber could not simultaneously be an agent of other parties in the same transactions. The Court disagrees. Indeed, the Court had already rejected this argument in a prior opinion denying another defendant's motion to dismiss this adversary proceeding. *See In re Fairfield Sentry Ltd.*, 665 B.R. 1, 16–17 (Bankr. S.D.N.Y. 2024). Many courts have long recognized that, where two principals to the same transaction do not have conflicting interests, a third-party may serve as an agent for both principals. *See, e.g., 99 Commercial Street, Inc. v. Goldberg*, 811 F.Supp. 900 (S.D.N.Y. 1993) (holding that an escrow agent can act as agent to both parties); *see also Knudson v. Weeks*, 394 F.Supp. 963 (W.D. Okla. 1975) (holding that an agent may act as an agent for both parties to the same transaction where the interest of two principals are not conflicting). Accordingly, the Court's holding in *Fairfield III* establishing the agency relationship between the Funds and the Citco Subscriber does not necessarily bar the Plaintiffs' allegation the Citco Subscriber served as SIX SIS's agent with respect to the redemption payments.

The Court also disagrees with the Defendant's alternative argument that SIX SIS could not have established an agency relationship with the Citco Subscriber that warrants the Court's exercising of personal jurisdiction over the Defendant. SIX SIS argues that it lacked jurisdictional contacts through its alleged agent, the Citco Subscriber, because SIX SIS did not deliberately direct the Citco Subscriber to use U.S.-based correspondent accounts. *See* Reply at 10–11 ("[U.S.-based] correspondent accounts were used for all redemptions from Fairfield Sentry through Citco Bank Dublin…. Such routine use of a correspondent bank account in the ordinary course … cannot confer jurisdiction over SIX SIS…."). However, the Plaintiffs have shown here that the Defendant

20

was able to use a foreign-based or a U.S.-based correspondent bank account for its redemption requests.    *See* Flugman Decl. Exs. 23–24, 36, Adv. Pro. No. 10-03636, ECF No. 1144 (Redemption Records); *see also* Joyce Decl. at 5–9, Adv. Pro. No. 10-03636, ECF No. 1145.; *id.* at 11 ("[S]ubscription agreements for Fairfield Sentry . . . do not contain any requirement that the subscriber utilize a U.S. account to send subscription payments or receive redemption payments."); *id.* at 12 ("Neither the fact that Fairfield Sentry was a U.S.-dollar denominated fund, nor the fact that the subscription agreement instructed subscribers to wire their subscription payments to Sentry's U.S. account, nor the fact that Sentry made redemption payments from its own U.S. account would have prevented a subscriber from making subscription payments from and directing redemption payments to a U.S. dollar account located outside the U.S."); *id.* at 12–13 ("The U.S. dollar was in wide circulation outside the U.S. during the Relevant Period, and many other payment options were widely available and easily accessible during the Relevant Period. To the extent that a foreign subscriber chose a U.S.-based correspondent account to effectuate their payments, it was generally for reasons of its own convenience or financial benefit.").  The Plaintiffs thus allege that the Defendant, by failing affirmatively to select a foreign-based correspondent account for its Sentry redemption payments, consented to the Citco Subscriber's use of a U.S.-based correspondent account, and purposefully availed itself to the forum.  *See* Opp'n. at 28–29, Adv. Pro. No. 10-03636, ECF No. 1143.  SIX SIS did not respond to these declarations provided by the Liquidators, and did not submit any other evidence in support of this argument.  *See* Reply at 10. Because the weight of the evidence shows clear support for the Liquidators' factual allegations, the Court finds that the Plaintiffs have submitted sufficient evidence that the Citco Subscriber was the Defendant's agent with respect to the Fairfield Funds redemption transactions.

### b.  Whether SIX SIS's Alleged Use of Correspondent Accounts Through Its Agent Was Incidental

SIX SIS next argues that any use of correspondent accounts that may have occurred was incidental and insufficiently related to the harm for which the plaintiffs seek redress.  *See* Reply at 10–12, ECF No. 1122 ("[The Plaintiffs do not allege that] Citco Bank Dublin [Branch] provided any unlawful banking services in the [United States], or that Citco Bank Dublin [Branch]'s ministerial use of a U.S. correspondent account was integral to the alleged illegal conduct … that gives rise to the Liquidators' claims.").  In support of this argument, the Defendant also cites a footnote in the District Court's unpublished opinion in *Hau Yin To v. HSBC Holding, PLC*, 2017 WL 816136 (S.D.N.Y. March 1, 2017).  The District Court noted in that footnote that the "wiring of funds through New York" by certain foreign defendants — fund custodians that facilitated the fund transfers between BLMIS and its feeder funds — were "passive" and "incidental" because they were "not specifically directed by [the defendants] to facilitate the [BLMIS] Ponzi scheme."  *See id.* at *7, n. 6.

The Second Circuit has determined that allegations of a "foreign bank's repeated use of a correspondent account in New York on behalf of a client . . . show purposeful availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States."  *Licci IV*, 732 F.3d 161, 168 (2d Cir. 2013) (quoting *Licci v. Lebanese Canadian Bank*, 20 N.Y.3d 327, 339, 984 N.E.2d 893, 900 (2012)); *see also Spetner*, 70 F.4th at 640 ("[A] defendant foreign bank's 'repeated use of a correspondent account in New York on behalf of a client . . . can constitute transacting business for purposes of § 302(a)(1), even if the defendant has no other contacts with

22

the forum.").[17]  A course of dealing can be established through as little as "14 currency exchange transactions between" two foreign entities made to a New York bank.  *See Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 325 (2016).

Here, the Defendant's reply arguments may point to a factual issue in the currently-available evidence, which may present an issue for the Plaintiffs at a later stage of these proceedings.  However, the Court will, notwithstanding the Defendant's contrary presentation, resolve the factual dispute in favor of the Plaintiffs for purposes of evaluating a motion to dismiss for lack of personal jurisdiction.

First, unlike the plaintiffs in *Hau Yin To*, the Liquidators do not allege that the Defendant, through its alleged agents, used U.S.-based correspondent accounts to facilitate the BLMIS Ponzi scheme.  Instead, the Liquidators are seeking the imposition of a constructive trust on numerous parties — including the Defendant — because they, through their alleged agents, requested and received redemption payments while knowing that the NAV was inflated.  *See* Am. Comp. ¶¶ 205–216, ECF No. 620.  Therefore, the Defendant's use of a U.S.-based correspondent account through its alleged agent for receiving redemption payments is an integral part of the Liquidators' claim.  Second, as noted *supra*, Part (IV)(B)(1)(a), the Plaintiffs have shown that the Defendant had the option to use a foreign correspondent account for its redemption requests, but instead used U.S.-based correspondent account through its alleged agent.  *See* Flugman Decl. Exs. 23–24, 36, Adv. Pro. No. 10-03636, ECF No. 1144 (Redemption Records); *see also* Joyce Decl. at 5–9, 11–13, Adv. Pro. No. 10-03636, ECF No. 1145.

---

[17]     Section 302(a)(1), New York's long-arm statute, "authorizes personal jurisdiction over a foreign defendant for causes of action that arise out of 'transact[ing] any business within the state,' whether in person or through an agent."  70 F.4th at 640 (quoting C.P.L.R. § 302(a)(1)).

The Plaintiffs allege that Defendant received 87 redemption payments from Sentry that the Citco Subscriber requested to be sent to a correspondent account at HSBC USA ("HBUS").  *See* Opp'n at 12–13, Adv. Pro. No. 10-03636, ECF No. 1143.  The Plaintiffs also support their allegations with certain redemption requests and order confirmations that correspond to certain redemption payments.  *See* Flugman Decl. Exs. 23–25 (Redemption Records).

While some records of redemption requests may "indicate" that a payment was sent directly from Sentry to Citco Bank Dublin Branch in Dublin, Ireland, other records from related exhibits show requests seeking payments to be made to correspondent accounts in New York or confirmations of orders received at those accounts.  *Compare* Flugman Decl. Ex. 25 at LIQ-00304545 ("Request for Wire Transfer Payment" dated November 15, 2005, for 35 shares of Sentry worth $38,011.14 to be made to Citco Bank Nederland N.V. Dublin Branch with an address listed in Dublin, Ireland); *id.* Ex. 23 at ESI-00572551 (September 30, 2005, request bearing the same transaction reference number for redemption of 35 shares of Sentry to be made to "HSBC BANK USA . . . NEW YORK, NY . . . UNITED STATES OF AMERICA"); *id.* at Ex. 24 at LIQ-00304547 (October 3, 2005, "Confirmation of Order Received" bearing the same transaction reference number for redemption of 35 shares of Sentry at "HSBC BANK USA … NEW YORK … USA").

Indeed, this was no passive endeavor; the Plaintiffs allege that SIX SIS and the Citco Subscriber "*frequently* used U.S. correspondent accounts in transacting with Sentry."  Opp'n at 30 (emphasis in original).  Defendant did so repeatedly, allegedly authorizing its agent to use U.S.-based accounts for 43 subscription payments and 87 redemption payments, eventually redeeming approximately $20.35 million.  *Id.* at 4, 28; *see also id.* at 1 n.3.  Plaintiffs allege that Defendant, through its alleged agent, selected and used a correspondent account at HBUS in New York to

24

receive those 87 redemption payments from Sentry. *Id.* at 12–13, 28; Flugman Decl. Exs. 23–25 (Sentry Redemption Records). SIX SIS accomplished the conduct at the heart of the Liquidators' claims through the use of U.S.-based accounts. The Second Circuit has found the selection and repeated use of in-forum correspondent accounts to perpetrate the alleged violations supports a finding of sufficient minimum contacts. *Licci IV*, 732 F.3d at 171.

The Liquidators' allegations and evidence show the Defendant's use of U.S.-based accounts for dozens of subscription and redemption payments over nearly a four-year period. *See* Opp'n at 12, 28; *see also* Flugman Decl. Ex. 23–25 (Sentry Redemption Records). The redemption forms show that Defendant's purported agent, the Citco Subscriber, designated the U.S.-based correspondent bank, to which Sentry accordingly sent the relevant payments. *See* Flugman Decl. Ex. 23–25 (Sentry Redemption Records). The repeated use of New York-based correspondent account, while foreign options existed, demonstrates Defendant's purposeful availment of the banking system of the United States.

SIX SIS also argues that "each transaction involving Redemption Payments is its own claim[,]" and the Liquidators have failed establish the Court's jurisdiction over the Defendant for "each individual Redemption Payment[.]" *See* Mem. L. at 11, ECF No. 770. SIX SIS relies on *Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167 (Bankr. S.D.N.Y. 2018) to argue that the Plaintiffs must independently establish the Court's exercise of jurisdiction over each of the redemption payments. Mem. L. at 11 (citing *BLMIS*, 594 B.R. at 190 ("Each transfer is a separate claim, . . . and the Trustee must establish the court's jurisdiction with respect to each claim asserted.")). The Defendant's arguments seemingly suggest that, since the pertinent issue concerns separate claims, the Plaintiffs would not be able to show repeated use of an account for any individual transfer.

However, it is not the quantity of transactions, standing by itself, that the Court considers in the jurisdictional analysis. The Second Circuit explained in *Licci IV* that "both the frequency and deliberate nature" of a defendant's use of correspondent accounts determines whether the conduct shows purposeful availment. *Licci IV*, 732 F.3d at 168; *id.* at 171 ( "[Defendant] deliberately chose to process the many . . . wire transfers through AmEx in New York . . . . *Moreover*, [defendant]'s use of a correspondent account in New York to accomplish its dollar-denominated wire transfers was recurring.") (emphasis added). The number of repeated uses of a U.S. account is relevant to the jurisdictional analysis either to show the deliberate nature of that use or in conjunction with the deliberate nature of that use. *See id.* This Court has already stated that a single deliberate selection and use of a U.S.-based account can sufficiently demonstrate a defendant's purposeful availment of the banking system of New York and the United States. *See Fairfield Sentry Ltd. v. BNP Paribas Sec. Servs. (In re Fairfield Sentry Ltd.)*, Adv. Pro. No. 10-03627 (JPM), 2024 WL 3024512, at *10 (Bankr. S.D.N.Y. June 14, 2024).

Further, the Second Circuit has stated that a court may consider contacts that "may not have directly given rise to the plaintiff's cause of action, [but] certainly 'relate to' it. *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 128 (2d Cir. 2002) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473–74 (1985)). The repeated uses of a U.S.-based correspondent account by the Defendant may underlie separate claims; the uses also relate to each other.

The Liquidators have provided support for the allegation that Defendant, through its agent, chose to use a U.S. correspondent account to receive a payment from Sentry. *See* Opp'n at 19; Flugman Decl. Ex. 23–25 (Sentry Redemption Records); *see also* Joyce Decl. at 5–9, 11–13 (demonstrating the availability of foreign banks during the relevant period). The redemption forms

26

show that Defendant's alleged agent designated the U.S.-based correspondent bank account, to which Sentry accordingly sent the relevant payment.  *See, e.g.*, Flugman Decl. Ex. 23 at -949.  SIX SIS is alleged to have received over $20.35 million through these transactions, demonstrating its purposeful availment of the banking system of New York and the United States.  Defendant chose to use New York-based accounts while foreign options existed.

### 2.  Defendant's Business Contacts with the Forum

The Liquidators assert that SIX SIS, through its alleged agent, "intentionally invested in BLMIS feeder funds Sentry, Sigma, and Lambda knowing that the Funds were designed to subsequently invest that money in New York-based BLMIS . . . . SIX SIS is subject to this Court's jurisdiction with respect to its redemptions."  Opp'n at 20, Adv. Pro. No. 10-03636, ECF No. 1143.  Defendant describes the Liquidators' allegations that the Citco Subscriber made subscription payments on behalf of beneficial shareholders such as SIX SIS while knowing that those payments would be invested in BLMIS in New York as the unilateral activity of a third-party, which Defendant argues is not appropriate to consider under *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984).  *See* Mem. L. at 16–17, ECF No. 770.

In *Helicopteros*, the Supreme Court found that "mere purchases, even if occurring at regular intervals, are not enough to warrant a State's assertion of in personam jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions."  *Helicopteros*, 466 U.S. at 418.  The Supreme Court found that "one trip" to the forum "for the purpose of negotiating the transportation-services contract … cannot be described or regarded as a contact of a 'continuous and systematic' nature …."  *Id.* at 416.  The Liquidators, however, have described more substantial contacts here.

The Liquidators point to the documents given to SIX SIS's agent, the Citco Subscriber, by FGG, prior to and during the period when SIX SIS subscribed to Sentry.  Opp'n at 7 (citing

Flugman Decl. Exs. 6–9, Adv. Pro. No. 10-03636, ECF No. 1144).  Among these documents, a Sentry Private Placement Memorandum from October 1, 2004 (the "October 2004 Memorandum") describes the central role BLMIS played in the Fairfield Funds' investment strategy in a section labeled "BANK AND CUSTODIAN."  Flugman Decl. Ex. 10 at -108, ECF No. 1144 ("Bernard L. Madoff Investment Securities LLC … serves as a sub-custodian for certain assets of the Fund."). Further, the October 2004 Memorandum also made clear that substantially all the assets of Sentry were controlled by the U.S.-based BLMIS.  *See id*. Ex. 10 at -103 ("The Manager, in its sole and exclusive discretion, may allocate a portion of the Fund's assets (never to exceed, in the aggregate, 5% of the Fund's Net Asset Value at the time of investment) to alternative investment opportunities other than its "split strike conversion" investments); *see also id.* Ex. 10 at -109 ("Currently BLM has approximately 95% of the Fund's assets under custody.").  The October 2004 Memorandum also explained that investing in Sentry would require a wire transfer of funds to Sentry's account at HBUS in New York.  *See id.* Ex. 10 at -107.

SIX SIS counters that the Liquidators inappropriately inferred from the Citco Subscriber's receipt of certain investment documents — including the October 2004 Memorandum — that (i) SIX SIS also received those documents, and (ii) SIX SIS thus had knowledge that the investments were directed to the U.S.-based BLMIS.  *See* Reply at 7–8, ECF No. 1122.  The Defendant argues that "[n]othing in the record suggests that *SIX SIS* ever received the Fairfield documents, let alone that it knowingly or intentionally directed investments to the United States based on the information in those documents…" (emphasis in original).  *Id.* at 8.  Specifically, the Defendant contends that certain of the Plaintiffs' exhibits containing emails that allegedly show SIX SIS's receipt of the investment documents addressed a different party, UBS Panama, and that SIX SIS's

28

client had later forwarded such emails to the Defendant. [18]  *See id.* at 5–8; *see also* Flugman Decl.

Exs. 6–7, 9 (Sentry Investment Email Exchanges).  According to SIX SIS, such emails "merely

illustrate the ministerial role that SIX SIS played as a financial intermediary in settling transactions

of behalf of its clients."  *Id.* at 6.

While the parties present conflicting factual allegations on this issue, the Court finds it

appropriate, for the purpose of the Motions, to resolve this factual dispute in the Plaintiffs' favor,

as they have submitted sufficient evidence that SIX SIS may have received the Sentry investment

documents.  Here, the Court finds it significant that the Defendant does not contest its investment

in the Funds, and that it was in possession of the emails to which the Sentry investment documents

were attached.  Indeed, if such facts were "credited by the ultimate trier of fact, [those facts] would

suffice to establish jurisdiction over the defendant."  *Terrorist Attacks on September 11, 2001*, 714

F.3d at 673 (quoting *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir.2010)).

These documents show that Defendant, through its agent, was aware at the time that its investments

in Sentry was effectively an investment in BLMIS in New York.  Therefore, SIX SIS, through its

agent, executed subscriptions into the Fairfield Funds with this knowledge.

---

[18]     SIX SIS argues that the email exchanges attached in the Plaintiffs' Flugman Declaration Exhibits 7 & 9 were
sent from FGG to UBS in connection with "an investment for $65,000 … on behalf of UBS Panama," and do not
support the Liquidators' argument that SIX SIS had received the Sentry investment documents.  *See* Reply at 7–8,
ECF No. 1122 (quoting Flugman Decl. Ex. 9, Adv. Pro. No. 10-03636, ECF No. 1144).  However, SIX SIS does not
deny that it had received these emails, as it previously produced heavily redacted versions of these emails to the
Liquidators during jurisdictional discovery, and the Liquidators attached those redacted emails as Exhibit 6 to the
Flugman Declaration.  *See* Flugman Decl. ¶ 10 ("Attached Exhibit 6 is a true and correct copy with annotations …
email exchanges between Fairfield Greenwich Group and Defendant between February 3 and March 7, 2005, which
were produced to the Liquidators in redacted form by Defendant.…"); *see also id.* at Ex. 6.

Notwithstanding the heavy redactions, a comparison of the time stamps and contents between the emails attached in
Flugman Declaration Exhibits 6 and Exhibits 7 & 9 show that they are the same emails. *Compare* Flugman Decl. Ex.
6 at SIX-0000047 & SIX-0000048 (redacted email with Sentry investment document attachments dated February 3,
2005, 10:53 AM, listing numerous FGG funds available for investments); *id.* Ex. 9 at FG-05476085 & FG-05476085
(unredacted email bearing the same time stamp and identical information concerning the numerous FGG funds).

SIX SIS also states that while the subscription agreements contain forum selection clauses specifying New York for claims relating to subscriptions, there is no similar clause subjecting any party to jurisdiction in New York for claims relating to redemptions. *See* Mem. L. at 5–6, ECF No. 770. The Defendant cites the Court's August 2018 *Fairfield I* opinion, which held that the Court lacks personal jurisdiction over certain defendants because the subscription agreements' forum selection clause only provided consent to jurisdiction in New York for claims "with respect to [the Subscription] Agreement and the Fund," and the redemption value dispute did not fall within that category of claims. *Fairfield I*, 2018 WL 3756343, at *11. However, the Liquidators here rely on the subscription agreements and private placement memorandum not to show consent to jurisdiction, but to show that when Defendant invested in Sentry it did so knowing that it would avail itself of the benefits and protections of New York. Opp'n at 20–26, Adv. Pro. No. 10-03636, ECF No. 1143. The absence of any similar clauses in redemption documents does not invalidate the import of the forum selection clauses for these purposes. The subscription agreements, signed between August 2000 and April 2005 by the Citco Subscriber[19] as an alleged agent of SIX SIS, in this way, support the Plaintiffs' showing of contacts with the forum. *See* Flugman Decl. Ex. 14 (Sigma Long Form Subscription Agreement); *Id.* Ex. 15 (Sentry Short Form Subscription Agreement); *Id.* Ex. 16 (Lambda Share Application)[20].

The Plaintiffs have supplied further documents received in jurisdictional discovery to support the allegations of contacts. Exhibits show SIX SIS "engaged in direct communications

---

[19]    The subscription agreements with the Fairfield Funds produced by non-parties Citco Fund Services and Citco Record Holders in discovery were signed by Citco Banks and registered the shares in the name of "CITCO GLOBAL CUSTODY N.V. CASH." *See* Flugman Decl. Ex. 14 at -382, Adv. Pro. No. 10-03636, ECF No. 1144; *Id.* Ex. 15 at -694, *Id.* Ex. 16 at -877. The Defendant does not contest the fact that the Citco Subscriber entered into the subscription agreement with the Fairfield Funds on SIX SIS's behalf, and only argues that SIX SIS was not a party to the subscription agreements. *See* Mem. L. at 5–6, ECF No. 770.

[20]    Subscription agreements with respect to Lambda shares are referred to as "share application[s]." *See* Opp'n at 10, Adv. Pro. No. 10-03636, ECF No. 1143.

with FGG US in February 2005 … concerning investment in the Funds."  Opp'n at 33; Flugman

Decl. Ex. 6 at -050 (February 2005 emails between a FGG employee with "fgges.com" email

address to a SIX SIS employee with "sisclear.com" email address seeking confirmation of a

$65,000 subscription in Sentry").   The Defendant again disputes the significance of these

documents with respect to the issue of SIX SIS's jurisdictional contacts. *See, e.g.*, Reply at 6, ECF

No. 1122 ("[t]he receipt of two emails from a U.S. contact in connection with SIX SIS's custodial

duties plainly cannot support a finding of jurisdiction.") (citing Burger King Corp., 471 U.S. at

475.).  However, resolving factual disputes in the Plaintiffs favor in these circumstances, the Court

finds SIX SIS's numerous subscription agreements through its agent with the Fairfield Funds, and

the email correspondences between the Defendant and FGG, collectively demonstrate that the

Defendant's jurisdictional contacts were more than mere purchases or a one-time visit to the forum.

The Liquidators have demonstrated facts supporting continuous and systemic contacts with the

forum.

Defendant also argues that the Plaintiffs' allegations that "knowledge that the [Fairfield]

Funds would invest some of their own money with BLMIS in New York is insufficient as a matter

of law to support jurisdiction" under *Walden v. Fiore*, 571 U.S. 277 (2014).  Mem. L. at 17–18.

In *Walden*, the Supreme Court found that a defendant "formed no jurisdictionally relevant

contacts" with the forum state of Nevada as "[p]etitioner never traveled to, conducted activities

within, contacted anyone in, or sent anything or anyone to Nevada."  *Walden*, 571 U.S. at 289.

The Supreme Court further stated that it is impermissible to allow the "plaintiff's contacts with the

defendant and forum to drive the jurisdictional analysis."  *Id.*  As the Supreme Court explained,

the "plaintiff cannot be the only link between the defendant and the forum," and "the defendant's

conduct . . . must form the necessary connection with the forum State."  *Id.* at 285.  Nevertheless,

31

personal jurisdiction may be found even where a "defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties." *Id.* at 286.

The Plaintiffs' allegations and supporting evidence of intentional investments into BLMIS in New York and selection and use of U.S.-based correspondent accounts, as described above, demonstrate that SIX SIS took affirmative actions on its own apart from the conduct of the Plaintiffs. The Liquidators have shown that the Defendant knew and intended that, by investing in the Funds, Defendant's money would enter into U.S.-based BLMIS. Opp'n. at 7. Defendant benefited from the materials that it received from FGG which confirmed the investments would be made with BLMIS in New York. *See id.*

The Court thus finds that Defendant's selection and use of U.S. correspondent accounts and communications concerning investments with BLMIS in New York support the Court's exercise of jurisdiction over the claims for receiving redemption payments from the Fairfield Funds with the knowledge that the NAV was wrong. The contacts are not random, isolated, or fortuitous. The contacts demonstrate SIX SIS's purposeful activities aimed at New York in order to effectuate transfers from the Fairfield Funds. The Plaintiffs have thus provided facts that sufficiently support a prima facie showing of jurisdiction over the Defendant.

C. **WHETHER THE CLAIM ARISES OUT OF OR RELATES TO THE DEFENDANT'S FORUM CONDUCT**

The suit must "arise out of *or relate to* the defendant's contacts with the forum." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 362, 141 S. Ct. 1017, 1026, 209 L. Ed. 2d 225 (2021) (emphasis in original). "[P]roof that a plaintiff's claim came about because of the defendant's in-state conduct" is not required. *Id.* at 1027. Instead, a court need only find "an affiliation between the forum and the underlying controversy." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011); *Picard v. BNP Paribas S.A. (In re BLMIS)*,

594 B.R. 167, 190 (Bankr. S.D.N.Y. 2018) ("Where the defendant's contacts with the jurisdiction that relate to the cause of action are more substantial, however, it is not unreasonable to say that the defendant is subject to personal jurisdiction even though the acts within the state are not the proximate cause of the plaintiff's injury.") (internal quotations omitted).

Defendant argues that the Liquidators' claims do not arise out of or relate to subscriptions or SIX SIS's alleged decision to invest in the Funds. Reply at 14–15, ECF No. 1122; *see also* Mem. L. at 17, ECF No. 770 (arguing that the claims relate to and arise out of the calculation of the NAV by Citco Fund Services and the redemption payments made on the basis of those calculations ). However, the Liquidators seek imposition of a constructive trust on funds received with knowledge that the NAV was inflated. *See* Am. Compl. ¶¶ 165–66, 206–09, ECF No. 620. The issue of knowledge of the inflated NAV is inextricably tied to the Defendant's investments with New York-based BLMIS. The allegations are directly related to Defendant's investment activities with BLMIS through the Fairfield Funds. *Id.* ¶¶ 165–66. The Defendant's contacts with the United States, both directly and via its alleged agent, and in communications with the Fairfield Funds, form a "sufficiently close link" between the defendant, the forum and the litigation concerning Defendant's activities in the forum. *See MSP Recovery Claims, Series LLC v. Takeda Pharm. Am., Inc.*, 2021 WL 4461773, at *3 (S.D.N.Y. Sept. 29, 2021) (citing *Ford Motor Co.*, 141 S. Ct. at 1032).

## D.  <u>WHETHER ASSERTION OF PERSONAL JURISDICTION IS REASONABLE</u>

If a defendant has sufficient minimum contacts, the Court must then ask "whether the assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial justice'—that is, whether it is reasonable under the circumstances of the particular case." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129 (2d Cir. 2002) (quoting *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996)); *see also Burger*

*King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985). Where a plaintiff "makes the threshold showing of the minimum contacts required for [exercising personal jurisdiction], a defendant must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *MSP Recovery Claims, Series LLC*, 2021 WL 4461773, at *3 (quoting *Bank Brussels Lambert*, 305 F.3d at 129). Factors the Court will consider include the burden on the defendant, the interests of the forum in adjudicating the case, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the states in furthering fundamental substantive social policies. *See Bank Brussels Lambert*, 305 F.3d at 129.

The Defendant argue that the *Bank Brussels Lambert* factors "weigh decisively against a finding of reasonableness [basis for the exercise of jurisdiction]." Reply at 16, ECF No. 1122. First, the Defendant argues that the Court's exercising of jurisdiction over them here would impose on it a burden "disproportionate to the nominal administrative fees—a mere $125 per transaction— that it earned in its ministerial role." *Id.* Specifically, SIX SIS emphasizes the foreign nature of its transactions with the Fairfield Funds, and argues that the discovery of potentially relevant evidence in foreign jurisdictions would implicate numerous Swiss privacy and bank-secrecy laws. *See Id.* at 16–17. ("[A]ll relevant evidence would be located in foreign jurisdictions and would implicate foreign law… [including the] Swiss Financial Market Infrastructures Act [], Swiss Data Protection Act, and the Swiss Criminal Code, each of which regulates disclosure."). SIX SIS further argues that potential violation of these Swiss privacy and bank-secrecy laws would "put SIX SIS at risk of criminal sanctions for complying with discovery demands." *Id.* at 17.

The Court recognizes that the Defendant's compliance with certain merits discovery requests may impose on them certain potential burdens and liabilities under Swiss law. Indeed, in

2012, the Court granted in part and denied in part a motion seeking relief as to the order staying the action and seeking expedited initial disclosures from certain beneficial holders based on similar considerations. *See* Bench Ruling, Adv. Pro. No. 10-03496, ECF No. 799 (the "July 2012 Bench Ruling"). (emphasis added). The defendants before this Court in 2012 were able to describe "the strong and undeniable interest of many nations in enforcing their banking secrecy laws" and "significant bank customer confidentiality laws of no fewer than 30 countries, attested to by numerous declarations of foreign law experts and letters submitted by foreign governments" that could have been implicated or broken by complying with the Court's prior order. *See id.* at 2. As a result, the Court stated in the July 2012 Bench Ruling that it was "hard-pressed to find any compelling United States' interest in mandating discovery here *at this juncture* of the pending litigation." *Id.* at 2–3 (emphasis added). The July 2012 Bench Ruling shows that this Court can alleviate specific burdens identified by a defendant when needed. Here, the circumstances are different: SIX SIS describes a potential exposure to liability and presents a list of Swiss laws in passing, but did not sufficiently identify any specific liabilities that may arise if it complies with merits discovery requests (which also can be addressed separately in discovery). *See* Reply at 20–21. The mere potential for exposure to unspecified liability is not a burden that renders exercise of jurisdiction unreasonable. Therefore, having found that the Defendant, either directly or through its agents, knowingly invested in the U.S. financial market, repeatedly used U.S.-based correspondent accounts, and conducted due diligence in New York, the Court finds it reasonable to exercise jurisdiction over the Defendant under the first *Bank Brussels Lambert* factor.

Second, the Defendant argues that "[the United States'] interest [in adjudicating this dispute] is considerably diminished [because] the parties are foreign and foreign law applies." *Id.* at 17. (quoting *Asahi Metal Industry Co. v. Superior Court of California*, 480 U.S. 102, 114 (1987))

(internal quotation marks omitted); (also citing *Sherwin-Williams Co. v. C.V.*, 2016 WL 354898 at *5 (S.D.N.Y. Jan. 28, 2016) (finding that the forum "whose laws govern the parties' agreement [] is undoubtedly the most suitable forum for settling contested issues of [that forum's] laws.")).  The Defendant also argues that the ancillary character of the main Chapter 15 proceeding shows the foreign nature of the pending dispute, which in turn supporting its position.  The main proceeding this adversary action stemmed from is an 'ancillary' Chapter 15 case in which the Court is acting 'to aid foreign jurisdictions in administering bankruptcies . . .'  *See In re Fairfield Sentry Ltd.*, 458 B.R. 665, 686 (S.D.N.Y. 2011) (Preska, C.J.)).  But the ancillary character of Chapter 15 cases does not necessarily mean that the United States has minimal interest in the dispute.  Indeed, courts have recognized that the United States has a strong interest in ensuring the integrity of its financial systems, and the Court has repeatedly emphasized such interest in other adversary actions related to the BLMIS Ponzi scheme.  *See Licci IV*, 732 F.3d at 174 ("[T]he United States[] and New York [have an] interest in monitoring banks and banking activity to ensure that its system is not used as an instrument in support of terrorism, money laundering, or other nefarious ends."); *see also In re Fairfield Sentry Ltd.*, 658 B.R. 257, 277 (Bankr. S.D.N.Y. 2024); *In re Fairfield Sentry Ltd.*, 657 B.R. 1, 23 (Bankr. S.D.N.Y. 2024).  As the Liquidators noted, the core of their case here arises from the Defendant's alleged investments into the United States' financial market via BLMIS.  Such investments played a key role in facilitating Madoff's Ponzi scheme, and considering the United States' interest in monitoring its banking system, the Court disagrees with the Defendant that the United States' interest in adjudicating this dispute is "minimal."  *See* Reply at 17.

Third, SIX SIS briefly argues that the "Liquidators of a BVI fund have no reasonable interest" in litigating this dispute in the United States "beyond the Liquidators' apparent desire to avoid further adverse court rulings in the BVI." *Id.* at 18.  However, the Court is unconvinced that

36

the Defendant's allegation concerning the Liquidators' alleged intent in litigating this dispute is relevant here.  Indeed, while examining this factor in *Bank Brussels Lambert*, the Second Circuit explicitly noted that "[t]he third [factor] implicate[s] the ease of access to evidence and the convenience of witnesses[.]"  *Bank Brussels Lambert*, 305 F.3d at 130.  Here, the Defendant presumes but fails to establish that the Plaintiffs have no legitimate interest in obtaining relief in the United States — especially considering that this dispute stems from a Chapter 15 proceeding that has intimate connections to the New York-based BLMIS Ponzi scheme.  What the Defendant have not done is demonstrate how this forum would fail to provide effective relief.  *See MSP Recovery Claims, Series LLC*, 2021 WL 4461773, at \*3.  SIX SIS does not explain what interest is impaired by precluding adjudication in another forum or why that interest outweighs other factors in favor of exercising jurisdiction.  *See In re Bernard L. Madoff Inv. Sec. LLC*, No. 22 CIV. 6561 (LGS), 2023 WL 395225, at \*6 (S.D.N.Y. Jan. 25, 2023).

Fourth, the Defendant argues that "the efficient administration of justice [] weighs against the Liquidators … [because they] do not claim that relevant witnesses or evidence are located in the United States."  Reply at 19 (citing *Met. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 574 (2d Cir. 1996)).  However, with respect to this argument, the Court has previously noted that "[e]ven if forcing the defendant to litigate in a forum relatively distant from its home base were found to be a burden, the argument would provide defendant only weak support, if any, because the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago."  *See, e.g.*, *In re Fairfield Sentry Ltd.*, 658 B.R. at 277 (quoting *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 173 (2d Cir. 2010)) (also citing *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 273 (2d Cir. 2023)); *see also In re Fairfield Sentry Ltd.*, 657 B.R. at 23.  Although relevant evidence and witnesses may be located

outside of the United States, the Defendant have not identified any specific challenges with "obtaining an efficient resolution" here.  Indeed, Courts in this District have recognized that "[a] Court's retention of jurisdiction over [an] action would undoubtedly provide the fastest and most practical means of resolving [the] dispute [where] [t]he Court is already intimately familiar with the parties, facts, and legal issues."  *Gucci Am., Inc. v. Weixing Li*, 135 F.Supp.3d 87, 100 (S.D.N.Y. 2015)).  Considering the Court's familiarity with this case and the lack of evidence that the parties' litigation of the dispute here would hinder an "efficient resolution," the Court finds that the fourth *Bank Brussels Lambert* factor does not favor declining jurisdiction over this adversary action.

Finally, SIX SIS also argues that this case does not implicate the United States' substantive social policies.  The Defendant opposes the Liquidators' argument that "this case implicates the United States' policy of ensuring that its financial system is not used for unlawful purposes," and argues that such policy is irrelevant here because the Liquidator's claim "does not center on the use of the United States financial system."  Reply at 19.  Further, the Defendant also argues that its position is supported by the fact that SIX SIS did not "reap profits from BLMIS and the U.S. securities market[,]" as it was a custodian that executed transactions for a nominal fee and on its clients' behalf.  *See id.* at 19–20.  The Court disagrees with the Defendant.  As noted above, the United States has a strong interest in ensuring the integrity of its financial systems.  Although the Liquidators do not allege that the Defendant used the financial system for unlawful purposes, the core of this proceeding concerns the fact that SIX SIS, via its agents, knowingly invested into the Fairfield Funds — transactions which played an integral part in the BLMIS Ponzi scheme.  Since the BLMIS Ponzi scheme is precisely the type of unlawful uses of the financial system that the United States has an interest in safeguarding against, the Court finds that this dispute does

implicate the United States' substantive social policies. Moreover, the alleged fact that SIX SIS only received nominal fees in executing the numerous transactions with the Fairfield Funds does not affect the Court's conclusion. For the fifth *Bank Brussels Lambert* factor, the relevant consideration is whether exercising jurisdiction over this adversary action furthers fundamental substantive social policies of the United States, and if doing so would erode any shared social policies. Having found that this action implicates the United States' substantive social policy interests, and because the Defendant does not allege that litigating this dispute here would erode any shared social policies, the Court finds that the last *Bank Brussels Lambert* factor also favors exercising jurisdiction over this action. The Defendant has not established that the Court's exercise of personal jurisdiction over them would be unreasonable. The Court thus finds that exercising jurisdiction over the Defendant is reasonable and comports with "traditional notions of fair play and substantial justice . . . ." *See Int'l Shoe*, 326 U.S. at 316, 66 S. Ct. 154.

## V.    CONCLUSION

For the foregoing reasons, the Court DENIES the Defendant's Motions to Dismiss the Amended Complaint. The Liquidators shall submit a proposed order consistent with the findings in this decision in accordance with Local Bankruptcy Rule 9074-1.

**IT IS SO ORDERED.**


Dated: March 28, 2025
New York, New York                        /S/ John P. Mastando III_____
                                          THE HONORABLE JOHN P. MASTANDO III
                                          UNITED STATES BANKRUPTCY JUDGE