UNITED STATES BANKRUPTCY COURT                    *FOR PUBLICATION*

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 15 |
| Fairfield Sentry Limited, et al. | Case No. 10-13164 (JPM) |
| | (Jointly Administered) |
| Debtors in Foreign Proceedings. | |
| FAIRFIELD SENTRY LTD. (In Liquidation), et al., | |
| Plaintiffs, | |
| v. | Adv. Pro. No. 10-03635 (JPM) |
| ABN AMRO SCHWEIZ AG a/k/a AMRO (SWITZERLAND) AG, et al., | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS

*APPEARANCES:*

**CLIFFORD CHANCE US LLP**
Attorneys for the Defendant, Banque Internationale à Luxembourg SA, f/k/a Dexia Banque Internationale à Luxembourg SA
Two Manhattan West
New York, NY 10001
By:    Jeff E. Butler

**BROWN RUDNICK LLP**
Attorneys for the Plaintiffs, Joint Liquidators
Seven Times Square
New York, NY 10036
By:    Jeffrey L. Jonas
       David J. Molton
       Danny Cameron Moxley

**JOHN P. MASTANDO III**
**UNITED STATES BANKRUPTCY JUDGE**

## I.    INTRODUCTION

Pending before the Court is the motion of Banque Internationale à Luxembourg SA , f/k/a

Dexia Banque Internationale à Luxembourg SA[1] ("BIL" or "Defendant"), to dismiss the Fifth

Amended Complaint (the "Amended Complaint" or "Am. Compl.") for lack of personal

jurisdiction.  Mot. to Dismiss, ECF[2] No. 690 (the "Motion").  The parties did not request oral

argument on the Motion, and instead indicated that they were resting on the papers.  *See Letter re:*

*Status of Remaining Oral Arguments,* Ex. A, ECF No. 1142.  For the reasons set forth herein, the

Court DENIES the Defendant's Motion to Dismiss.

## II.    JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157 and the

Amended Standing Order of Reference dated January 31, 2012 (Preska, C.J.).  This Court

previously concluded that it has subject matter jurisdiction over this and related actions.  *See In re*

*Fairfield Sentry Ltd.*, 2018 WL 3756343 (Bankr. S.D.N.Y. Aug. 6, 2018) ("*Fairfield I*"); *see also*

Stip. Order, ECF No. 431.  Personal jurisdiction is contested by the Defendant and will be

discussed below.

---

[1]        Certain documents referenced in the parties' filings in connection with this Motion referred to BIL by its former name.

[2]        Citations to this Court's electronic docket refer to the docket of Adv. Pro. No. 10-03635-jpm unless otherwise noted.

## III.    BACKGROUND

This adversary proceeding was filed on September 21, 2010.  *See Amended Complaint Against All Defendants* (the "Complaint" or "Compl."), ECF No. 8.  Kenneth M. Krys and Greig Mitchell (the "Liquidators"), in their capacities as the duly appointed Liquidators and Foreign Representatives of Fairfield Sentry Limited (In Liquidation) ("Sentry"), Fairfield Sigma Limited (In Liquidation) ("Sigma"), and Fairfield Lambda Limited (In Liquidation) ("Lambda" and, together with Sentry and Sigma, the "Fairfield Funds" or "Funds") filed the Amended Complaint on August 11, 2021.  *See* Am. Compl., ECF No. 620.  Via the Amended Complaint, the Liquidators seek the imposition of a constructive trust and recovery of over $51 million in redemption payments made by Sentry, Sigma, and Lambda to various entities known as the Citco Subscribers. *Id.* ¶¶ 1–2, 197–209; *id.* Exs. A–B.[3]  Of that amount, Defendant allegedly received over $5.5 million through redemption payments from its investment in Sentry.  *Memorandum of Law in Opposition to Dexia Banque Internationale à Luxembourg SA's Motion to Dismiss* (the "Opposition" or "Opp'n"), ECF No. 1082; *see also Declaration of David S. Flugman in Support of the Liquidator's Opposition to Defendant Dexia Banque Internationale à Luxembourg SA's Motion to Dismiss* ("Flugman Decl.") Exs. 1, 11–13, 18–19, ECF No. 1083 (Redemption Records).

---

[3]    At the time of the filing of the Amended Complaint, the Plaintiffs made no specific allegations as to the exact amounts received by any of the beneficial shareholders.  With respect to the Defendant, the Amended Complaint states in relevant part that "[b]ased on Fund records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated with the Beneficial Shareholder, Dexia Banque International A Luxembourg. . . ."  Am. Compl. ¶ 65, ECF No. 620.  The Amended Complaint alleges that several other defendants may have received redemption payments made to the Citco Subscribers.  *Id.* ¶¶ 33–104.  This opinion concerns only those payments that the Plaintiffs allege were paid to BIL.

A.  **THE BLMIS PONZI SCHEME**

This adversary proceeding arises out of the decades-long effort to recover assets of the Bernard L. Madoff Investment Securities LLC ("BLMIS") Ponzi scheme.[4]  *See* Am. Compl. ¶ 1, ECF No. 620.  The Citco Subscribers allegedly invested, either for their own account or for the account of others, into several funds — including Sentry, Sigma, and Lambda — that channeled investments into BLMIS.  *Id.* ¶¶ 2, 5, 15.

Fairfield Sentry was a direct feeder fund in that it was established for the purpose of bringing investors into BLMIS, thereby allowing Madoff's scheme to continue.  *Id.* ¶¶ 5; 125–26; *see also In re Picard*, 917 F.3d 85, 93 (2d Cir. 2019) ("A feeder fund is an entity that pools money from numerous investors and then places it into a 'master fund' on their behalf. A master fund— what Madoff Securities advertised its funds to be—pools investments from multiple feeder funds and then invests the money.").  Fairfield Sigma and Lambda, in contrast, were indirect feeder funds, established to facilitate investment in BLMIS through Fairfield Sentry for foreign currencies.  *See* Am. Compl. ¶¶ 125–26.  BLMIS used investments from feeder funds, like the Fairfield Funds, to satisfy redemption requests from other investors in the scheme.  *Id.* ¶¶ 5–7, 13. Without new investors, BLMIS would have been unable to make payments to those who chose to withdraw their investments, and the scheme would have fallen apart.  *Id.* ¶¶ 7–8, 12–14, 126.

The Amended Complaint alleges that investors received payments on account of their shares in the Fairfield Funds based on a highly-inflated Net Asset Value ("NAV").  *Id.* ¶ 7.  The Citco Subscribers and the beneficial shareholders were allegedly such investors.  *Id.*  To calculate the NAV, administrators used statements provided by BLMIS that showed "securities and

---

[4]    The Court will not recount all details concerning the Ponzi scheme perpetrated by Madoff.  Details of that scheme have been recounted by many courts.  *See, e.g.*, *In re Madoff*, 598 B.R. 102, 106 (S.D.N.Y. 2019), *aff'd* 818 F. App'x 48 (2d Cir. 2020).

investments, or interests or rights in securities and investments, held by BLMIS for the account of Sentry." *Id.* ¶ 128.  In fact, no securities were ever bought or sold by BLMIS for Sentry, and none of the transactions on the statements ever occurred.  *Id.* ¶ 129.  The money sent to BLMIS by the Fairfield Funds for purchase of securities was instead used by Bernard Madoff to pay other investors or was "misappropriated by Madoff for other unauthorized uses." *Id.*  The NAVs were miscalculated, and redemption payments were made in excess of the true value of the shares.  *Id.* ¶ 130.  The Fairfield Funds were either insolvent when the redemption payments were made or were made insolvent by those payments.  *Id.*

BIL is organized under the laws of Luxembourg with a registered address in Luxembourg, Luxembourg.  *Id.* ¶ 60.  BIL allegedly invested into and redeemed shares of the Fairfield Funds through "several companies within the Citco corporate family."  Opp'n at 7, ECF No. 1082. Investments into the Funds were registered in the name of Citco Global Custody N.V. or Citco Global Custody (N.A.) N.V. (together, "<u>Citco Global Custody</u>").  *Id.*  Citco Bank Nederland N.V. Dublin Branch ("<u>Citco Bank Dublin Branch</u>") and Citco Banking Corporation N.V. (together with Citco Bank Dublin Branch, "<u>Citco Bank</u>") allegedly carried out subscriptions and redemptions on behalf of BIL and other investors.  *Id.*  Citco Global Custody and Citco Banks (collectively, the "<u>Citco Subscriber</u>")[5] served as the subscriber of record for BIL's shares of the Fairfield Funds.  *Id.* The Citco Subscriber was organized under the laws of either Curaçao or the Netherlands.  *See Memorandum of Law in Support of Dexia Banque International à Luxembourg's Motion to*

---

[5]    The Court will refer to the "Citco Subscriber" in this opinion as it is defined by the Plaintiffs in their opposition memorandum.  *See* Opp'n at 2, ECF No. 1082.  The Amended Complaint refers to the "Citco Record Subscribers" and the "Citco Subscribers."  *See* Am. Compl. ¶ 8, ECF No. 620.  The Citco Record Subscribers is defined therein to include CGC NA.  *Id.*  The Citco Subscribers is defined in the Amended Complaint to include the Citco Record Subscriber and Citco Bank.  *Id.*  The Citco Record Subscriber allegedly acted as "agents of and nominees for the Citco Banks" and received approximately $51 million of redemption payments for beneficial shareholders.  *Id.* The Citco Subscribers allegedly were agents of BIL and other defendants in this adversary proceeding with respect to investments in the Fairfield Funds.  *See id.*

*Dismiss for Lack of Personal Jurisdiction* (the "Memorandum of Law" or "Mem. L.") at 6 n.8, ECF No. 691 (citing Am. Compl. ¶¶ 32–34, *Fairfield Sentry Limited (In Liquidation) v. Citco Global Custody N.V.*, Adv. Pro. No. 19-01122, ECF. No. 19).

BIL directly invested in the Fairfield Funds as early as 2001. Opp'n at 8. In February 2004, BIL opened an account at Citco Bank in order to invest in the Fairfield Funds. *Id.* at 10; *see* Flugman Decl. Ex. 8, ECF No. 1083 (February 19, 2004 Master Custodian Agreement between Dexia Banque Internationale A Luxembourg S.A. and Citco Bank Dublin Branch and Citco Global Custody N.V.). Further, BIL allegedly retained the Citco Subscriber as its agent when it entered into a brokerage and custody agreement (the "B&C Agreement") as early as May 2007. Opp'n at 10; *see* Flugman Decl. Ex. 9 (May 29, 2007, B&C Agreement between Dexia Banque Internationale A Luxembourg S.A. and Citco Bank Dublin Branch and Citco Global Custody N.V.). The B&C Agreement authorized Citco Banks to provide "Brokerage Services," defined to include "the effecting of transactions of and/or relating to the purchase and sale of and dealing in Securities in the name and for the account of [BIL]," or of Citco Bank Dublin Branch or Citco Global Custody N.V., or "any nominee for the account of [BIL]," and "any services ancillary thereto as set out in this Agreement." Flugman Decl. Ex. 9 at -062.

From March 2004 through April 2005, BIL allegedly subscribed through the Citco Subscriber for a total of 4,658.46 shares of Sentry. *See* Opp'n at 8; *see also* Flugman Decl. Exs. 2–3 (Subscription Records). BIL, through the Citco Subscriber, redeemed approximately $5,537,189.75 worth of Sentry shares from April 2005 through August 2007 (such period, the "Redemption Period"). *See* Opp'n at 13; *see also* Flugman Decl. Exs. 1, 11–13, 18–19 (Redemption Records). At the directions and instructions of the Citco Subscriber, as the purported

5

agent for BIL, "some . . . of the Redemption Payments were received at . . . designated United States-based bank accounts." Am. Compl. ¶ 133.

Bernard Madoff was arrested for alleged violations of federal securities laws on December 11, 2008. *See id.* ¶ 185. The United States Attorney brought criminal charges against him, alleging that Madoff ran a Ponzi scheme. *Id.* On December 11, 2008, the Securities Exchange Commission filed an action in the Southern District of New York to halt the continued offerings of securities. *Id.* ¶ 186. In March 2009, Madoff pleaded guilty to criminal charges against him and confessed to operating a Ponzi scheme and fabricating statements and trade confirmations. *Id.* ¶¶ 187–88. Madoff was sentenced to 150 years in federal prison and died in April 2021. *Id.* ¶ 189.

The Amended Complaint alleges that the Citco Subscribers, including the purported agent of BIL, "had knowledge of the Madoff fraud, and therefore knowledge that the Net Asset Value was inflated" when the redemption payments were made. *Id.* ¶ 201. The Amended Complaint further asserts that, while receiving redemption payments, the Citco Subscribers "uncovered multiple additional indicia that Madoff was engaged in some form of fraud" but "turned a blind eye, [and] accept[ed] millions of dollars while willfully ignoring or, at the very least, recklessly disregarding the truth in clear violation of the law of the British Virgin Islands . . . ." *Id.* ¶¶ 8, 201. These indicia included verification that there was no "independent confirmation that BLMIS-held assets even existed," Madoff's failure to segregate duties, and BLMIS's "employing an implausibly small auditing firm" rather than a reliable auditor. *Id.* ¶¶ 9, 201. In the face of red flags such as these, the Citco Subscribers and other Citco entities purportedly "quietly reduced [their] own exposure to BLMIS through the Funds, and significantly increase[ed] [their] Custodian fees to offset the risk." *Id.* ¶ 201.

### B.  THE PRIOR LITIGATION AND PROCEDURAL HISTORY

The Fairfield Funds were put into liquidation in the BVI in 2009.  Am. Compl. ¶¶ 26–28, ECF No. 620.  The BVI court issued orders appointing the foreign representatives, Kenneth Krys and Greig Mitchell, as liquidators of the Fairfield Funds.  *Id.* ¶ 28.  Pursuant to the appointment order of the BVI court,[6] the "Foreign Representatives are responsible for all aspects of the Funds' business, including protecting, realizing, and distributing assets for the Funds' estates."  *Id.* ¶ 195.  The Liquidators commenced actions in the BVI against a number of investors who had redeemed shares of the Fairfield Funds before the collapse of the scheme.  *See* Mem. L. at 4, ECF No. 691; *Fairfield Sentry Ltd. v. Citibank, N.A. London*, 630 F. Supp. 3d 463, 475 (S.D.N.Y. 2022); *see also Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*, 596 B.R. 275, 284 (Bankr. S.D.N.Y. 2018) ("*Fairfield II*").

The Liquidators filed petitions in this Court in June 2010 under Chapter 15 of the Bankruptcy Code, seeking recognition of the BVI proceedings as foreign main proceedings.  *See* Am. Compl. ¶ 29, ECF No. 620.  This Court granted that recognition on July 22, 2010.  *Id.*  All cases filed by the Plaintiffs were administratively consolidated before this Court in November 2010.  *See* Consolidation Order, Adv. Pro. No. 10-03496, ECF No. 25.

The Plaintiffs asserted multiple causes of action in those consolidated adversary proceedings including, *inter alia*, mistaken payment and constructive trust.[7]  *See* Compl. ¶¶ 34–83, ECF No. 8; *see also* 630 F. Supp. 3d at 479.  In October 2011, this Court stayed the U.S.

---

[6]    The order was issued by the "Commercial Division of the Eastern Caribbean High Court of Justice."  *See* Am. Compl. at 1.

[7]    Other causes of action included unjust enrichment, money had and received, unfair preferences under BVI's Insolvent Act § 245, undervalue transactions under the Insolvent Act § 246, breach of contract, and breach of the implied covenant of good faith and fair dealing.  *Fairfield Sentry Ltd. v. Citibank, N.A. London*, 630 F. Supp. 3d at 463 (S.D.N.Y. 2022).

proceedings pending resolution of the BVI proceedings.  *See* Am. Order Staying Redeemer Actions, Adv. Pro. No. 10-03496, ECF No. 418.; *Fairfield I*, 2018 WL 3756343 at *3.

In April 2014, the Privy Council affirmed dismissal of the Plaintiffs' BVI law claims for restitution based on mistaken payment.  *Fairfield Sentry Ltd. (In Liquidation) v. Migani*, [2014] UKPC 9 ("*Migani* ").[8]  The Privy Council held that the Plaintiffs' claims for restitution in the BVI to recover redemption payments arising out of transactions governed by the Funds' Articles of Association are governed by BVI law.  *Id.* ¶ 17.  The Plaintiffs' claims to recover redemption payments thus depended on whether Sentry was bound to make those payments under the "true NAV per share, ascertained in the light of information which subsequently became available about Madoff's frauds, or . . . the NAV per share which was determined by the Directors at the time of redemption."  *Id.* ¶ 19.  The Privy Council concluded that the NAV had to be definitively determined at the time of the subscription or redemption.  *Id.* ¶ 21.  The redemption payments made under the NAV were thus not subject to restitution and the payee was not unjustly enriched by receiving funds, even if the amount was mistaken.  *Id.* ¶¶ 18–19.

After *Migani* was issued, the Plaintiffs allegedly obtained evidence of bad faith of Citco, the Fairfield Fund's administrator, when it issued redemption certificates.  *See Fairfield I*, 2018 WL 3756343, at *5–6.  Plaintiffs moved to amend the complaint, seeking to add allegations that Citco lacked good faith when it issued certificates for redemptions and was aware that the NAV was inflated at the time.  *See id.* at *6.  The Plaintiffs argued that the certificates would not be binding under the Funds' Articles if they were not issued in good faith.  *Id.*

---

[8]    *Migani* is available at https://jcpc.uk/uploads/jcpc_2012_0061_judgment_416722c30e.pdf and, without numbered paragraphs, on Westlaw at *Fairfield Sentry Ltd (In Liquidation) v. Migani*, 2014 WL 1219748 (UKPC, Apr. 16, 2014).

In December 2018, this Court found that the Plaintiffs could allege bad faith on behalf of Citco in the U.S. proceedings and could seek recovery of the redemption payments only "where a Defendant knew the NAV was inflated at the time of redemption." *Fairfield II*, 596 B.R. at 295. Of the common law claims, the Court allowed only the Plaintiffs' claims for constructive trust against the so-called "Knowledge Defendants" to proceed. *Id.* at 301 ("The suggestion that the subsequent disclosure of facts indicating that the valuation was made in bad faith vitiates the contract and requires restitution lacks support. The only exception concerns the Knowledge Defendants that received redemption payments with the knowledge that the NAV was wrong. In those circumstances, the Liquidators may seek to impose a constructive trust."). In December 2020, this Court ruled that § 546(e) bars Plaintiffs' BVI avoidance claims to recover unfair preferences and undervalue transactions. *In re Fairfield Sentry Ltd.*, 2020 WL 7345988, at *1 (Dec. 14, 2020) ("*Fairfield III*").

Following these decisions, only the constructive trust claims survived. *Id.*; *In re Fairfield Sentry Ltd.*, No. 10-13164 (SMB), 2021 WL 771677, at *1 (Bankr. S.D.N.Y. Feb. 23, 2021) ("*Fairfield IV*"), *aff'd*, 630 F. Supp. 3d 463 (2022). The Liquidators filed a further motion to amend the complaints against the Knowledge Defendants. *See* Mot. to Amend, ECF No. 560; Mot. to Amend, Adv. Pro. No. 10-03496, ECF No. 3737. On August 5, 2021, this Court granted the motion to amend the complaint and lifted the stay of the redeemer actions. *See* Order Granting Mot. to Amend, ECF No. 617; Order Lifting Stay of Redeemer Actions, ECF No. 616.

### C. **THE PENDING MOTIONS**

The Amended Complaint seeks the imposition of a constructive trust on the redemption payments received from the Fairfield Funds. *See* Am. Compl. ¶ 197, ECF No. 620. The Amended Complaint alleges that Defendant's purported agent, the Citco Subscriber, had knowledge of the fraud at BLMIS and therefore knowledge that the NAV was inflated. *Id.* ¶ 201. "By reason of

their receipt of some or all of the Redemption Payments, the Beneficial Shareholders have been unjustly enriched to the detriment of the [Fairfield] Funds and other shareholders and creditors of the Funds." [9] *Id.* ¶ 205–06.

Under BVI law, "lack of good faith, *i.e.* bad faith, includes wrongdoing by one who acts recklessly as well as one who acts with actual knowledge that he is acting wrongfully or willfully blinds himself to that fact." *Id.* ¶ 198 (citing *Fairfield II*, 596 B.R. at 293). As this Court previously found:

> To establish a constructive trust claim under English law, which would apply in the BVI, 'the plaintiff must show, first, a disposal of his assets in breach of fiduciary duty; second, the beneficial receipt by the defendant of assets which are traceable as representing the assets of the plaintiff; and third, knowledge on the part of the defendant that the assets he received are traceable to a breach of fiduciary duty.'

*Fairfield IV*, 2021 WL 771677, at *3 (quoting *El Ajou v. Dollar Land Holdings Ltd.* [1994] 2 All E.R. 685, 700).

The Amended Complaint alleges that the defendants, including BIL as a beneficial shareholder of certain accounts, purposefully availed themselves of the laws of the United States and the State of New York by "investing money with the Funds, and knowing and intending that the Funds would invest substantially all of that money in New York-based BLMIS." Am. Compl. ¶ 20, ECF No. 620.

The parties engaged in personal jurisdiction discovery between September 2021 and August 2022. *See* Scheduling Order, ECF No. 654; Second Am. Scheduling Order, ECF No. 917. Due to alleged spoilation of evidence, Plaintiffs filed a motion for sanctions on January 20, 2023. Motion for Sanctions, ECF No. 1000. After briefing and oral argument on March 15, 2023, the

---

[9]    As stated *supra*, footnote 3, the Amended Complaint alleges that several other defendants may have received redemption payments made to the Citco Subscribers. Am. Compl. ¶¶ 30–104, ECF No. 620.

Court "concluded that (i) Defendant spoliated evidence in violation of Federal Rule of Civil Procedure 37(e) as made applicable here by Federal Rule of Bankruptcy Procedure 7037; (ii) Defendant acted with intent in doing so; and (iii) such spoliation has prejudiced the Liquidators." *Order Granting Motion for Sanctions under Rule 37(e) Against Banque Internationale à Luxembourg SA* (the "Spoilation Order") at 2, ECF No. 1011. The Court entered an adverse inference against Defendant "that any spoliated evidence would have been favorable to the Liquidators in establishing personal jurisdiction." *Id.*

Defendant has moved to dismiss the Amended Complaint for lack of personal jurisdiction, arguing that the Amended Complaint has not sufficiently alleged minimum contacts with the forum to establish personal jurisdiction over Defendant and that exercising personal jurisdiction would be unreasonable. *See* Mem. L. at 1–3; 18–19, ECF No. 691.

The Liquidators filed an opposition to the Motions and submitted the declarations of David S. Flugman and Sara K. Joyce in support of their opposition. *See* Opp'n, ECF No. 1082; Flugman Decl., ECF No. 1083; *Declaration of Sara K. Joyce* ("Joyce Decl."), ECF No. 1084.[10] The Liquidators argue that exercising jurisdiction over Defendant would be reasonable and that Defendant's contacts with the United States, through its own actions and those of its purported agent, in knowingly and intentionally investing in the Fairfield Funds, using U.S. correspondent accounts to invest in and receive payments from Sentry, and conducting other business activities support personal jurisdiction. *See* Opp'n at 2–5. Defendant filed a reply memorandum on July 31, 2023. *See Reply Memorandum in Support of Motion to Dismiss by Banque Internationale à*

---

[10]    Pursuant to various orders of this Court, portions of certain filings and supporting documents were filed under seal. For the analysis in this opinion, the Court will refrain from referring to any bank account numbers or names of individual employees, named only in sealed documents, in full.

*Luxembourg SA* (the "Reply"), ECF No. 1119.  In considering the Defendant's Motions, the Court

has reviewed the above filings, all other relevant submissions, and the record as a whole.

## IV.   DISCUSSION

### A.  THE LAW OF PERSONAL JURISDICTION

In order to subject a defendant to personal jurisdiction in the United States, due process

requires that the defendant have sufficient minimum contacts with the forum in which the

defendant is sued "'such that the maintenance of the suit does not offend traditional notions of fair

play and substantial justice.'"  *Picard v. Bureau of Labor Ins.* (*In re BLMIS*), 480 B.R. 501, 516

(Bankr. S.D.N.Y. 2012) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  "In

adversary proceedings, courts must determine whether the defendant has minimum contacts with

the United States, rather than with the forum state."  *Picard v. Fairfield Greenwich Grp. (In re

Fairfield Sentry Ltd.)*, 627 B.R. 546, 565 n.13 (Bankr. S.D.N.Y. 2021) (citing *In re Lehman Bros.

Holdings Inc.*, 535 B.R. 608, 619 (Bankr. S.D.N.Y. 2015)).  "When jurisdiction is satisfied through

Bankruptcy Rule 7004,[11] a bankruptcy court need not address its state's long-arm statute."  *Id.*

n.12; *see also Owens-Illinois, Inc. v. Rapid Am. Corp. (In re Celotex Corp.)*, 124 F.3d 619, 630

(4th Cir. 1997).

An analysis of minimum contacts "focuses on the relationship among the defendant, the

forum, and the litigation," a relationship that "must arise out of contacts that the defendant himself

creates with the forum State."  *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (quotations omitted).

---

[11]     "The summons and complaint and all other process except a subpoena may be served anywhere in the United
States." Fed. R. Bankr. P. 7004(d).  A bankruptcy court may exercise personal jurisdiction over a defendant served
under Rule 7004(d) "[i]f the exercise of jurisdiction is consistent with the Constitution and the laws of the United
States." Fed. R. Bankr. P. 7004(f).

There are three conditions necessary for the Court to exercise specific jurisdiction[12] over the non-resident defendant:

> First, the defendant must have purposefully availed itself of the privilege of conducting activities within the forum State or have purposefully directed its conduct into the forum State.  Second, the plaintiff's claim must arise out of or relate to the defendant's forum conduct.  Finally, the exercise of jurisdiction must be reasonable under the circumstances.

*U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 150 (2d Cir. 2019) (internal quotation marks and citations omitted).

To survive a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure Rule 12(b)(2), the Plaintiffs "must make a prima facie showing that jurisdiction exists." *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 342 (2d Cir. 2018) (quoting *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34–35 (2d Cir. 2010)).  A trial court has considerable procedural leeway when addressing a pretrial dismissal motion under Rule 12(b)(2).  *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013).

A showing sufficient to defeat a defendant's challenge to personal jurisdiction "varies depending on the procedural posture of the litigation." *Id.* (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)).  Following discovery, "the plaintiff's prima facie showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant." *Ball*, 902 F.2d at 197.  "In response to a post-jurisdictional discovery Rule 12(b)(2) motion, 'the plaintiff need persuade the court only that its factual allegations constitute a prima facie showing of

---

[12]    Courts recognize "two types of personal jurisdiction: general and specific jurisdiction.  A state court may exercise general jurisdiction only when a defendant is 'essentially at home' in the State." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 352, 141 S. Ct. 1017, 1019, 209 L. Ed. 2d 225 (2021) (quoting *Goodyear Dunlop Tires Operations, S. A v. Brown*, 564 U.S 915, 919, 131 S. Ct. 2846, 180 L. Ed. 2d 796 (2011)).  The Plaintiffs do not allege that the Court has general jurisdiction over Defendant. *See* Opp'n at 3, ECF No. 1082 (arguing that the Court's specific jurisdiction is founded on Defendant's contacts with the forum that relate to the claims at issue).

jurisdiction.'"   *Averbach v. Cairo Amman Bank*, No. 19-CV-0004-GHW-KHP, 2023 WL
5016884, at *4 (S.D.N.Y. June 30, 2023) (quoting *Dorchester Fin. Sec.*, 722 F.3d at 85).   "Now
that jurisdictional discovery is complete, Plaintiffs' burden is different, but it is not heavy."
*Averbach* , 2023 WL 5016884, at *6 (citing *Dorchester Fin. Sec.*, 722 F.3d at 85).   "Plaintiffs need
only show that their prima facie showing of jurisdiction is factually supported."   *Id.* at *6.   When
considering a motion to dismiss before or after jurisdictional discovery has taken place, "the court
must 'construe the pleadings and affidavits in the light most favorable to plaintiffs,' and resolve
all doubts, including factual disputes, in the plaintiff's favor."   *Id.* at *4 (quoting *Ball*, 902 F.2d at
197).   Further, pursuant to the Spoliation Order, this Court will make "an adverse inference…
against [the] Defendant that any spoliated evidence would have been favorable to the Liquidators
in establishing personal jurisdiction…."   Spoliation Order, ECF No. 1011.

## B. <u>ANALYSIS OF PURPOSEFUL AVAILMENT</u>

"[M]inimum contacts necessary to support [specific] jurisdiction exist where the defendant
purposefully availed itself of the privilege of doing business in the forum and could foresee being
haled into court there."   *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 82 (2d Cir.
2018) (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir.
2013) ("*Licci IV*")).   For specific personal jurisdiction, "'[c]ourts typically require that the plaintiff
show some sort of causal relationship between a defendant's U.S. contacts and the episode in suit,'
and the plaintiff's claim must in some way 'arise from the defendant's purposeful contacts with the
forum.'"   *Charles Schwab Corp.*, 883 F.3d at 84 (quoting *Waldman v. Palestine Liberation Org.*,
835 F.3d 317, 341, 343 (2d Cir. 2016)).   "Although a defendant's contacts with the forum state
may be 'intertwined with [its] transactions or interactions with the plaintiff or other parties . . . [,]
a defendant's relationship with a . . . third party, standing alone, is an insufficient basis for
jurisdiction.'"   *U.S. Bank Nat'l Ass'n*, 916 F.3d at 150 (quoting *Walden*, 571 U.S. at 134)

(alteration in original).  "It is insufficient to rely on a defendant's random, fortuitous, or attenuated contacts or on the unilateral activity of a plaintiff with the forum to establish specific jurisdiction." *Id.*

BIL asserts that the "Liquidators recently confirmed that the Redemption Payments were entirely outside of the United States in their opening appellate brief to the District Court challenging certain of Judge Bernstein's holdings in *Fairfield I*, *Fairfield II*, and *Fairfield III*." Mem. L. at 15, ECF No. 691.  The Plaintiffs argued before the District Court that "every relevant component of the transactions at issue here occurred outside the territorial jurisdiction of the United States." *Id.*; *see also Plaintiffs-Appellants' Opening Brief for Second Round Appeal* at 24, *Fairfield Sentry Ltd. v. Citibank NA London*, No. 19-cv-3911 (S.D.N.Y. July 21, 2021), ECF No. 440 (the "Opening Brief").  The Plaintiffs' Opening Brief concerned the extraterritorial application of the § 546(e)[13] safe harbor.  *See* Opening Brief at 24 (arguing that the "Bankruptcy Court erred in holding that Section 546(e)'s safe harbor could apply extraterritorially to shield from avoidance settled securities transactions that occurred exclusively outside the United States").

As another bankruptcy court in this District has stated, the "tests for personal jurisdiction and extraterritoriality are not the same."  *Spizz v. Goldfarb Seligman & Co. (In re Ampal-Am. Israel Corp.)*, 562 B.R. 601, 613 n.14 (Bankr. S.D.N.Y. 2017).  In *Spizz*, the bankruptcy court was able to simultaneously find that the "[t]ransfer was not domestic, and hence, cannot be avoided" under § 547, while also clarifying that by "attend[ing] meetings in New York around the time of,

---

[13]    Section 546(e) of the Bankruptcy Code prohibits a trustee from avoiding a transfer that is a margin payment or settlement payment "made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract. . . ."  11 U.S.C. § 546(e).  "By its terms, the safe harbor is a defense to the avoidance of the *initial* transfer."  *Picard v. BNP Paribas S.A. (In re BLMIS)*, 594 B.R. 167, 197 (Bankr. S.D.N.Y. 2018) (emphasis in original).

and apparently in conjunction with, the commencement of the chapter 11 case," a defendant may be "subject to specific personal jurisdiction." *Id.* at 613–14.

By arguing in the District Court that the redemption transfers were foreign for purposes of extraterritoriality, Plaintiffs did not preclude arguing that there were contacts with the forum for purposes of personal jurisdiction. To determine whether a transaction is foreign or domestic for analyzing extraterritoriality issues for federal statutes, courts look at whether the "conduct relevant to the statute's focus occurred in the United States." *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 326, 136 S. Ct. 2090, 2094, 195 L. Ed. 2d 476 (2016). To determine whether personal jurisdiction is appropriate, however, courts analyze a defendant's contacts with the forum "under a totality of the circumstances test." *Licci IV*, 732 F.3d at 170 (citing *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007)).

Here, the Plaintiffs advance three arguments in support of their assertion that Defendant has sufficient minimum contacts to establish personal jurisdiction. Opp'n at 16, ECF No. 1082. First, Plaintiffs claim that BIL "purposefully availed itself of the United States by intentionally investing in BLMIS feeder funds Sentry with the express intention of profiting from BLMIS's investments in the U.S. securities market…." *Id.* Second, Plaintiffs assert that BIL used New York bank accounts to effectuate its investments into and redemptions from Sentry. *Id.* Third, Plaintiffs argue that BIL conducted other related business in the United States. *Id.* The Court finds that each of the first and second arguments are independently sufficient to satisfy the first prong of the test for specific jurisdiction. The third argument alone is insufficient; however, it provides incremental support under the totality of the circumstances. Thus, overall, the purposeful availment element of the test for personal jurisdiction is met.

### 1. **Defendant's Investment in BLMIS Feeder Funds**

The Plaintiffs argue that "[t]he evidence presented by the Liquidators makes clear that BIL

intentionally invested in BLMIS feeder fund Sentry knowing that it was designed to subsequently

invest that money in New York-based BLMIS." Opp'n at 21, ECF No. 1082. The Plaintiffs rely

on *Picard v. Bureau of Labor and Insurance*, 480 B.R. 501 (Bank. S.D.N.Y. 2012) ("*BLI*") and

subsequent cases for the proposition that parties avail themselves of the benefit of New York law

when they invest in feeder funds knowing the ultimate destination is BLMIS in New York. Opp'n

at 21–24. The Plaintiffs highlight that the Citco Subscriber affirmed that BIL  received and read

the Sentry Private Placement Memorandum ("PPM") when the Citco Subscriber signed the

subscription agreement on BIL's behalf. *Id.* at 24, n.18; Flugman Decl. Ex. 21 at -643, ECF No.

1083 ("Subscriber has received and read a copy of the [PPM]"). Additionally, the Plaintiffs note

that the Defendant "periodically sought PPMs from [the Citco Subscriber]." Opp'n at 9; *see*

Flugman Decl. Ex. 6 (email from a BIL employee to a Citco Fund Services (Europe) B.V.[14]

employee "urgently" requesting "the latest prospectus for [Sentry]" — a request which the Citco

Fund Services employee responded to by sending over a Private Placement Memorandum dated

July 1, 2003 (such memorandum, the "July 2003 Memorandum")). The Liquidators also argue

that these PPMs made clear that substantially all the assets of Sentry were controlled by the U.S.-

based BLMIS. *See* Opp'n at 9; *see also* Flugman Decl. Ex. 6 at -659, -667 (July 2003

Memorandum). Next, due to the spoliation of evidence, Plaintiffs ask the Court to infer that

destroyed evidence includes email communications between certain BIL employees and BIL

---

[14]    Citco Fund Services (Europe) B.V. was an entity related to the Citco Subscriber, and was Sentry's fund
administrator. *See* Opp'n. at 7, ECF No. 1082.

customers that would have reflected "BIL's knowledge and intent that money invested in Sentry would be placed with BLMIS in New York." Opp'n at 9–10.

The Defendant argues that these allegations are "jurisdictionally irrelevant." Mem. L. at 16, ECF No. 691. The Defendant contends that under *Walden*, "knowledge that [Sentry] would invest some of [Sentry's] own money with BLMIS in New York is insufficient as a matter of law to support jurisdiction." *Id.* at 17 (citing *Walden v. Fiore*, 571 U.S. 277 (2014)). Further, the Defendant argues that the case here can be distinguished from the circumstances in *BLI*. Specifically, the Defendant argues:

> The *BLI* decision was based on assumption that…redemption payments by BLI were funded from corresponding payments from BLMIS to [Sentry]…. Here, however, the Liquidators have not presented evidence that redemption payments to [the Defendant] were funded from corresponding payments from BLMIS.

Reply at 6, ECF No. 1119; *see also BLI*, 480 B.R. at 513. Moreover, the Defendant also argues that *BLI* is distinguishable because that case concerned an avoidance action pursuant to the Bankruptcy Code, while the present case involves a constructive trust claim under BVI law. *Id.*

Here, the Court agrees with the Plaintiffs that *BLI* provides strong support. In *BLI*, as here, the defendant invested "millions of dollars in Fairfield Sentry with the specific purpose of having funds invested in BLMIS in New York…." *BLI*, 480 B.R. 501, 517. Contrary to the Defendant's assertion, jurisdiction did not turn on the nature of the claim. *See id.* Rather, in *BLI,* the court held it had personal jurisdiction because the defendant knew — due to its diligence and review of PPMs — that 95% of its funds would enter the New York securities market. *See id.*

The Court therefore reaches a similar conclusion. The available evidence combined with adverse inferences drawn pursuant to the Spoilation Order show that BIL knew it directed its investment towards BLMIS in New York. As the Liquidators noted in their Opposition, BIL, through its alleged agent, acknowledged receipt of a PPM in the July 2003 Memorandum. *See*

Opp'n at 12; Flugman Decl. Ex. 6 at -659.  Indeed, the July 2003 Memorandum indicates that

BLMIS held "approximately 95% of [Sentry]'s assets under custody," and that Sentry's fund

manager only had discretion to allocate "a portion of the Fund's assets (never to exceed, in the

aggregate, 5% of the Fund's Net Asset Value…) to alternative investment opportunities…."

Flugman Decl. Ex. 6 at -659, -667.  Additionally, Pursuant to the Spoilation Order, the Court finds

it appropriate to infer that the spoliated evidence contained information favorable to establishing

personal jurisdiction.  *See* Spoilation Order, ECF No. 1011.  Specifically, the Court infers that the

deleted electronically stored information included certain email communications between BIL

employees and BIL customers concerning Sentry subscriptions and redemptions.  *See* Opp'n at 5–

7.  The Court also infers that such emails referenced key provisions of the PPMs available in

evidence, showing approximately 95% of the funds would arrive in the U.S.  *See* Flugman Decl.

Ex. 6 at -659, -667 (July 2003 Memorandum); *see also id.* Ex. 7 at -928, -934 (October 2004 PPM).

Similarly, BIL's diligence would indicate their investment's ultimate destination was New York.

*See* Spoilation Order; *see also* Flugman Decl. Ex. 6 at -642 (BIL email request for the latest Sentry

PPM).  Ultimately, BIL's use of an intermediary Feeder Fund does not make its contacts any less

purposeful under these circumstances.  Together, the PPM and diligence support that BNP's

investment in the Funds was a clear directive to invest in New York-based BLMIS.

In addition to *BLI*, *Walden* also provides support for the Plaintiffs.  In *Walden*, the Supreme

Court found that a defendant "formed no jurisdictionally relevant contacts" with the forum state

of Nevada as "[p]etitioner never traveled to, conducted activities within, contacted anyone in, or

sent anything or anyone to Nevada."  *Walden*, 571 U.S. at 289.  The Supreme Court further stated

that it is impermissible to allow the "plaintiff's contacts with the defendant and forum to drive the

jurisdictional analysis."  Here, the Defendant's contacts, not the Plaintiffs' contacts, drive the

jurisdictional analysis. BIL knowingly sent millions of dollars to New York. *See* Opp'n at 3; *see also* Flugman Decl. Exs. 3, 10, 24 (Sentry Subscription Records). Moreover, the Defendant did not invest with a manager who had limitless discretion to allocate capital in global securities markets. Indeed, the situation here is the exact opposite — BIL invested millions in the Funds that had contractual obligations to allocate the capital in the United States. *See* Flugman Decl. Ex. 6 at -659, -667 (July 2003 Memorandum); *see also id.* Ex. 7 at -928, -934 (October 2004 PPM). These actions go beyond "knowledge of an indirect connection to New York[,]" and are purposeful direction of conduct into the forum state and thus sufficient to meet the first requirement of specific jurisdiction. *See Walden*, 571 U.S. at 286 ("[I]t is [] insufficient to rely on a defendant's random fortuitous, or attenuated contacts or on the unilateral activity of a plaintiff [for the exercise of personal jurisdiction] over an out-of-state [defendant].") (internal quotation marks omitted).

## 2. Defendant's Use of Correspondent Accounts

Separately, the Plaintiffs argue that BIL's "intentional use of U.S. correspondent accounts … to subscribe for shares in Sentry and receive each of the at-issue redemption payments also supports the exercise of jurisdiction." Opp'n at 31, ECF No. 1082. "Correspondent accounts are accounts in domestic banks held in the name of foreign financial institutions" that are used "to effect dollar transactions." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 56 n.3 (2d Cir. 2012) (quoting *Sigmoil Res., N.V. v. Pan Ocean Oil Corp. (Nigeria)*, 234 A.D.2d 103, 104, 650 N.Y.S.2d 726, 727 (1st Dept 1996)). Citing *Licci IV*, 732 F.3d at 171, the Plaintiffs assert that Defendant's use of a correspondent bank account supports jurisdiction because it was deliberate, recurring, and related to the harm at issue. *See* Opp'n at 31–36.

First, as to deliberateness, Plaintiffs contend that BIL chose the Citco Subscriber's U.S. correspondent account for both subscription and redemption payments. *See* Flugman Decl. Ex. 10 at -013 (Trade Confirmation dated April 15, 2025, indicating that the Citco Subscriber had

processed BIL's subscription request for approximately $3.3 million worth of Sentry shares), ECF No. 1083; *see also id.* Ex. 1 (Redemption requests and their corresponding Confirmations of Order Received noting that the redemption payments would be sent to the Citco Subscriber's correspondent account at HSBC Bank USA ("HBUS"), New York.  Additionally, according to the Plaintiffs, the Defendant's choice to use Sentry's U.S. correspondent account for subscription payments also supports personal jurisdiction under *Off. Comm. of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank* ("*Arcapita I*"), 549 B.R. 56, 68-69, 70 n.18 (S.D.N.Y. 2016).  Opp'n. at 35; see also Flugman Decl. Ex. 24 at -176, -177 (Sentry Subscription Record noting that BIL's $5,000,000 subscription payment went through Sentry's correspondent account at HBUS in New York).

Second, as to the recurring element of *Licci IV*, Plaintiffs show that the Citco Subscriber, while acting on BIL's behalf, had facilitated multiple Sentry subscription and redemption transactions through Citco Bank's correspondent account at HBUS.  *See* Opp'n at 34–35.  Specifically, the Liquidators contend that the Citco Subscriber sent BIL's $3,318,000.00 subscription payment to Sentry using Citco Bank's U.S. correspondent account.  *Id.* at 34.  The Plaintiffs also note that the Citco Subscriber "received two redemption payments from Sentry … totaling $5,537,189.75 over two years through its U.S. account."  *Id.* at 34–35.; *see also* Flugman Decl. Exs. 1, 11–13, 18–19 (Redemption Records).  Based on precedent regarding correspondent bank use, Plaintiffs argue that BIL's recurring correspondent bank transactions, including through its agent, are sufficient for jurisdiction.  Opp'n at 34–35 (citing *Arcapita I*, 549 B.R. at 70, n.18; *Schansman v. Sberbank of Russia PJSC*, 565 F. Supp. 3d 405, 414 (S.D.N.Y. 2021); *Averbach v. Cairo Amman Bank*, 2020 WL 486860, at *5 (S.D.N.Y. Jan. 21, 2020)).

Finally, for the third element of *Licci IV* — the contacts' relation to the harm — Plaintiffs argue that BIL's "use of U.S. accounts is sufficiently related to the Liquidators' claims seeking to recover Sentry redemption payments." Opp'n at 35. To succeed on their constructive trust claim, the Plaintiffs must demonstrate that BIL received inflated redemption payments. *See id.* at 35–36. The Plaintiffs argue, therefore, that BIL "accomplished the wrongs for which the Liquidators seek redress using the New York banking system to buy shares and obtain the redemption payments for those shares the Liquidators seek to claw back. That is enough to establish jurisdiction as to those redemptions." *Id.* at 36.

In response, BIL counters that their use of U.S-based bank accounts was not a "deliberate act of BIL." Reply at 7, ECF No. 1119. BIL contends that, like all other Sentry redemptions that went through Citco Bank Dublin Branch, it was "merely a matter of routine that [the Citco Subscriber's U.S.-based correspondent] accounts [were] used for the redemptions involving BIL." *Id.* Further, BIL also argues that the use of "New York correspondent accounts [was not] integral—or even meaningfully significant—to the Liquidators' constructive trust claim under BVI law." *Id.* at 8. Thus, BIL argues, because BIL's use of U.S. correspondent accounts is not "integral to the wrongful conduct … the alleged use of such accounts is not relevant to personal jurisdiction." *Id.*

### a. Whether the Defendant's Use of U.S.-Based Correspondent Accounts Was Deliberate and Recurring

The Second Circuit has held that "the selection and repeated use of New York's banking system, as an instrument for accomplishing the alleged wrongs for which the plaintiffs seek redress, constitutes purposeful availment…." *Licci IV*, 732 F.3d at 171 (cleaned up). Further, the Second Circuit clarified that, "[s]o long as this in-forum activity sufficiently reflects the defendant's 'purposeful availment' of the privilege of carrying on its activities here, minimum

22

contacts are established, even if the effects of the defendant's entire course of conduct are felt elsewhere." *Id.* at 173. Thus, a foreign bank's repeated use of a U.S. correspondent account to achieve the wrong complained of satisfied the minimum contacts requirement. *Id.*

Like the defendant in *Licci IV*, BIL's use of U.S. correspondent accounts was deliberate. Specifically, the evidence shows that BIL, through its agent, actively selected U.S. accounts to receive the redemption payments. *See* Flugman Decl. Exs. 11, 13, ECF No. 1083 (Redemption Requests). Defendant's argument that Sentry chose the currency misses the point. Here, the Plaintiffs have shown that the Defendant was able to use either a foreign-based or a U.S.-based correspondent bank account for its redemption requests and, through its alleged agent, chose the latter. *See* Margolin Decl. Ex. 1 at -971 (Sentry Confirmation of Order Received to redeem 3,162.32 shares of Sentry at HBUS in New York); *see also* Opp'n at 33 n. 22, ECF No. 1082 ("[T]he Second Circuit has recognized that, '[i]n light of the widespread acceptance and availability of U.S. currency, [a foreign bank] could have . . . processed U.S.-dollar-denominated wire transfers . . . through correspondent accounts anywhere in the world.'") (quoting *Licci IV*, 732 F.3d at 171.); *see also* Joyce Decl. at 6–9, ECF No. 1084.; *id.* at 12 ("[S]ubscription agreements for Fairfield Sentry . . . do not contain any requirement that the subscriber utilize a U.S. account to send subscription payments or receive redemption payments."); *id.* ("Neither the fact that Fairfield Sentry was a U.S.-dollar denominated fund, nor the fact that the subscription agreement instructed subscribers to wire their subscription payments to Sentry's U.S. account, nor the fact that Sentry made redemption payments from its own U.S. account would have prevented a subscriber from making subscription payments from and directing redemption payments to a U.S. dollar account located outside the U.S."); *id.* at 13 ("The U.S. dollar was in wide circulation outside the U.S. during the Relevant Period, and many other payment options were widely

available and easily accessible during the Relevant Period. To the extent that a foreign subscriber

chose a U.S.-based correspondent account to effectuate their payments, it was generally for reasons

of its own convenience or financial benefit.").

Further, BIL used the U.S.-based correspondent accounts repeatedly. The Second Circuit

has found that the selection and repeated use of in-forum correspondent accounts to perpetrate the

alleged violations supports a finding of sufficient minimum contacts. *Licci IV*, 732 F.3d at 171;

*id.* at 168 ("[A] foreign bank's repeated use of a correspondent account in New York on behalf of

a client . . . show[s] purposeful availment of New York's dependable and transparent banking

system, the dollar as a stable and fungible currency, and the predictable jurisdictional and

commercial law of New York and the United States.") (quoting *Licci v. Lebanese Canadian Bank*,

20 N.Y.3d 327, 339, 984 N.E.2d 893, 900 (N.Y. 2012)). Here, the Liquidators have presented

evidence — which the Defendant does not dispute — that BIL used U.S. correspondent accounts

to facilitate at least one Sentry subscription payment in April 2005, and two Sentry redemption

payments during the Redemption Period. *See* Flugman Decl. Ex. 10 at -013 (April 2005

Subscription Confirmation); *see also id.* Exs. 1, 11–13, 18–19 (Redemption Records). The

Defendant's repeated use of its alleged agent's U.S. correspondent account is also sufficient to

meet the "recurring" prong of the *Licci IV* test.

The Liquidators have provided support for the allegation that the Citco Subscriber, acting

as agent of the Defendant, chose to use a correspondent account in New York to receive payments

from Sentry. *See* Opp'n at 12. While foreign options existed, the redemption forms show that

Defendant, through its agent, selected and used a U.S.-based correspondent bank account to

receive payments from Sentry. BIL's repeated receipt of millions of dollars of redemption

payments for its investments in Sentry through a U.S. correspondent account demonstrates its purposeful availment of the banking system of New York and the United States.

### b. Whether the Defendant's Use of U.S.-Based Correspondent Account Relates to the Harm Alleged By the Liquidators

Having found that BIL's use of a U.S.-based correspondent account was deliberate and recurring, the Court now turns to the third *Licci IV* factor — relatedness to the harm. To satisfy this factor, the suit must "arise out of *or relate to* the defendant's contacts with the forum." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 141 S. Ct. 1017, 1026 (2021) (emphasis in original). "[P]roof that a plaintiff's claim came about because of the defendant's in-state conduct" is not required. *Id.* at 1027. Instead, a court need only find "an affiliation between the forum and the underlying controversy." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011); *Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 190 (Bankr. S.D.N.Y. 2018) ("Where the defendant's contacts with the jurisdiction that relate to the cause of action are more substantial, however, it is not unreasonable to say that the defendant is subject to personal jurisdiction even though the acts within the state are not the proximate cause of the plaintiff's injury.") (internal quotations omitted). This Circuit has "found that a claim arises out of forum contacts when defendant's allegedly culpable conduct involves at least in part financial transactions that touch the forum." *U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 151 (2d Cir. 2019).

Plaintiffs' constructive trust claim has three elements: (1) a disposal of the Plaintiffs' assets in breach of fiduciary duty; (2) the beneficial receipt of the assets by the Defendant; and (3) that the Defendant has knowledge it received the assets via a breach of fiduciary duty. *Fairfield IV*, 2021 WL 771677, at *3 (quoting *El Ajou v. Dollar Land Holdings Ltd.* [1994] 2 All E.R. 685, 700); *see also supra*, Part (III)(C).

25

Plaintiffs make four arguments as to why Defendant's contacts relate to the constructive trust claim.  First, Plaintiffs argue that Defendant's initial investment relates to the ultimate redemption because "[w]ithout the subscriptions, BIL would have had no shares to redeem and could not have received the redemption payments to which its subscriptions gave rise."  Opp'n at 27, ECF No. 1082.  Second, the subscription agreement's forum-selection and choice of law clauses "gave rise to the redemption payments at issue."  *Id.* at 28–29.  Third, BNP's "due-diligence-related activity would have contributed to its knowledge that the NAVs were inaccurate—a core element of the Liquidators constructive trust claims."  *Id.* at 31.  Fourth, Plaintiffs argue that Defendant's use of correspondent bank accounts relates to their claim because "BIL accomplished the wrongs for which the Liquidators seek redress using the New York banking system to buy shares and obtain the resulting Sentry redemption payments that the Liquidators seek to claw back."  *Id.* at 36.

BNP counters that the claim "does not arise from or have a substantial relationship to the use of New York bank accounts."  Reply at 8, ECF No. 1119.  The Defendant further argues that the constructive trust claim cannot "arise[] out of or relate[] to the use of New York correspondent accounts[,]" because "[the] claim against BIL would be exactly the same even if no New York bank account had been used…."  *Id.*  (citing *Spetner v. Palestine Investment Bank*, 70 F.4th 632, 645–646 (2d Cir. 2023)).

The Court disagrees with the Defendant's narrow interpretation of "relates to."  Indeed, the Second Circuit's holding in *Spetner* does not support the Defendant's argument, as the Second Circuit addressed whether the plaintiffs' allegations were sufficient:

> Where the cause of action entails the unlawful provision of banking services of which the wire transfers are a part, allegations of the defendant bank's repeated, international execution of U.S.-dollar-denominated wire transfers on behalf of its clients in order to support terrorist activity are sufficient for jurisdiction.  Plaintiffs

sufficiently allege facts to support the conclusion that New York was integral to the wrongful conduct.

*Spetner*, 70 F.4th at 645–646 (quoting *Licci IV*, 732 F.3d at 171) (internal quotation marks omitted).  Here, the Plaintiffs' correspondent bank argument is more than sufficient to meet this second prong.  *See* Opp'n at 27–28.  A constructive trust claim requires showing receipt of the assets.  *See Fairfield IV*, 2021 WL 771677.  The use of a U.S. correspondent bank account shows receipt of assets.  That receipt is "at the heart of this cause of action" because "[t]he receipt of the funds in New York is precisely… the activity that the cause of action seeks to have voided." *Arcapita I*, 549 B.R. at 69.  Defendant's attempt to distinguish this case fails because this BIL action occurred inside the U.S. and relates to the constructive trust claim.

Further, the issue of knowledge of the inflated NAV, required for the constructive trust claim, is inextricably tied to the Defendant's investments with New York-based BLMIS.  The allegations are directly related to Defendant's investment activities with BLMIS through Sentry. *See* Am. Compl. ¶¶ 165–66, ECF No. 620.  The Defendant's contacts with the United States, in investing in, and receiving redemptions from, the Fairfield Funds, form a "sufficiently close link" between the defendant, the forum and the litigation concerning Defendant's activities in the forum. *See MSP Recovery Claims, Series LLC v. Takeda Pharm. Am., Inc.*, 2021 WL 4461773, at *3 (S.D.N.Y. Sept. 29, 2021) (quoting *Ford Motor Co.*, 141 S. Ct. at 1032).  Accordingly, the Court finds that BIL's use of an U.S.-based correspondent account to facilitate Sentry redemption payments was sufficiently related to the harm alleged by the Liquidators.

### 3.  **Defendant's Business Contacts with the Forum**

Plaintiffs allege that BIL's "additional U.S.-oriented business activity also supports the exercise of jurisdiction here."  Opp'n at 28, ECF No. 1082.  First, Plaintiffs argue the subscription agreements' designation of New York as the dispute resolution forum support the exercise of

jurisdiction. *Id.* Second, Plaintiffs also allege that "BIL engaged in due diligence aimed at the United States in connection with its [Sentry subscriptions,]" including directly communicating with Sentry's U.S.-based manager — the Fairfield Greenwich Group ("FGG") — in New York. *Id.* at 29. The Liquidators argue that BIL's Sentry subscription-related due diligence activities in the United States also support the Court's exercise of jurisdiction here. *See id.* Third, the Plaintiffs advocate for additional inferences due to the destruction of evidence. *Id.* Specifically, the Plaintiffs ask this Court to infer, pursuant to the Spoilation Order, that BIL engaged in diligence-related activities similar to defendants in other BLMIS actions. *Id.* at 30. Plaintiffs argue that these contacts relate to their claims because diligence would contribute to Defendant's "knowledge that the NAVs were inaccurate—a core element of the Liquidators' constructive trust claims." *Id.* at 31.

In response, Defendant argues that BIL's alleged business contacts cannot create jurisdiction because they "do not relate to the two redemption payments at issue…." Reply at 9, ECF No. 1119. First, BIL disputes the Liquidators' argument that the Sentry subscription agreement contains a New York forum selection clause. *See id.* Moreover, the Defendant argues that the subscription agreement is irrelevant because the two redemption payments at issue predate the subscription agreement. *See id.* ("The subscription agreement is dated July 3, 2007… [while] the subscriptions related to the redemption payments at issue took place in March 2004 and March 2005."). Second, the Defendant argues that the Liquidators' alleged evidence "does not indicate [] due diligence took place … or involve[] direct communications with anyone in the United States." Specifically, BIL argued that the alleged evidence — including certain internal memorandum, presentation, and email correspondence — either concerned a different investment vehicle, or was prepared after the redemption payments had been finalized. *See id.* at 10–11.

Finally, the Defendant also opposes Plaintiffs' request for the Court to infer evidence of diligence and other communications. *See id.* at 11.

Here, the Court concludes the additional business contacts alone do not support jurisdiction. But these contacts still provide incremental support because the Court evaluates "the quality and nature of the defendant's contacts… under a totality of the circumstances test." *Licci IV*, 732 F.3d at 170 (citations omitted).

First, the Court disagrees with the Defendant that the 2007 subscription agreement does not contain a New York forum selection clause. In a section captioned "New York Courts," the subscription agreement explicitly states that "[BIL] agrees that any suit, action or proceeding [] with respect to this Agreement and the Fund may be brought in New York." Flugman Decl. Ex. 21 at -645, ECF No. 1083. In *Fairfield I*, Judge Bernstein held the forum selection clause did not confer personal jurisdiction. 2018 WL 3756343, at *12. That holding, however, does not make the clause irrelevant. A contract's choice of law clause can still carry weight when considering if a defendant has purposefully availed itself of the benefits of a jurisdiction. *Burger King Corp. v Rudzewicz*, 471 US 462, 482 (1985) (explaining a choice of law provision can establish jurisdiction in conjunction with other evidence). Nonetheless, the Court finds that such clause does not seem to provide strong support for jurisdiction here. This subscription agreement was executed on July 4, 2007 — approximately two weeks before BIL made its final Sentry redemption request on July 17, 2007. *See* Flugman Decl. Ex. 21 (July 2007 Long Form Sentry Subscription Agreement); *see also id.* Ex. 1 (July 2007 Sentry Redemption Records). Although the Defendant received its July 2007 Sentry redemption after it executed this subscription agreement, BIL had subscribed in the Sentry shares associated with that redemption at least two years prior, in March 2004 and March 2005. *See* Reply at 9; *see also* Flugman Decl. Exs. 2–3 (Subscription Records). Considering the

timing here, the Court does not find the subscription agreement's forum selection clause materially

relevant to the Plaintiffs' argument that BIL invested in Sentry knowing that it would "invoke the

benefits and protections of New York law." Opp'n at 28–29. Accordingly, for the purpose of the

two redemption payments at issue, the New York forum selection clause does not show BIL's

intent to do business in the U.S.

Second, the Court finds that BIL's alleged business contact in the currently available

evidence provide only limited support for jurisdiction. Specifically, to the extent that the alleged

due diligence evidence postdates the two redemption payments at issue, the Court again finds that

they do not provide support for jurisdiction. *See* Flugman Decl. Ex. 4 at -087–-101 (February

2008 presentation on Sentry's investment performance and risks). Further, for the purpose of

analyzing BIL's business contacts with New York, the Court also finds that records of due

diligence communications that do not involve U.S.-based parties do not provide support for

jurisdiction. *See id.* Exs. 6, 7 (emails between BIL, Citco Fund Services, and Citco Bank Dublin

Branch in which BIL requested Sentry PPMs). As for BIL's email communications with FGG

New York concerning a $200,000 Sentry subscription, the Court disagrees with the Defendant's

argument that such records are not sufficiently related to BIL's two redemption payments at issue

to support jurisdiction. *See* Reply at 11. While the communications with FGG New York are not

directly related to the two redemption payments at issue, they were nonetheless part of the

Defendant's forum activities in connection with BIL's Sentry investments. *See* Opp'n. at 22–23.

Indeed, in the email sent to FGG New York, a BIL employee explicitly acknowledged that "[BIL]

is investing on a regular basis into [funds managed by FGG,]" and that as of August 11, 2006,

"[BIL's] current holding in [Sentry] is 4 Mio. USD." Flugman Decl. Ex. 17. This

acknowledgment shows that BIL was aware that its Sentry investments were ultimately headed to

New York. Therefore, these alleged contacts provide some additional support for exercising personal jurisdiction in this matter.

However, regarding the parties' third argument concerning adverse inferences, the Court finds it appropriate to infer under the Spoliation Order that BIL engaged in due diligence with U.S.-based entities in connection with the two redemption payments at issue. Indeed, the Spoliation Order allows the Court to draw an adverse inference that "any spoliated evidence would have been favorable" to the Plaintiffs. Spoliation Order at 2, ECF No. 1011. Here, the Liquidators have provided evidence that BIL's affiliate, Dexia Asset Management ("Dexia AM"), "traveled from Luxembourg to visit FGG in New York." Opp'n at 30; *see also* Flugman Decl. Ex. 27 (FGG internal email thread discussing the "visit of Dexia Luxembourg to New York"); *id.* Ex. 28 (email from an FGG employee in New York to three Dexia AM employees thanking them for "[visiting] our New York offices today, June 09, 2005."). Moreover, BIL has conceded that Dexia AM may have performed "diligence on investments that customers of banks within the Dexia family, including BIL, might [have considered] making." Flugman Decl. Ex. 29, 146:3-17; *see also* Opp'n. at 30. The Court has already inferred that the electronically stored information deleted by BIL included email communications concerning Sentry subscriptions and redemptions. *See supra*, Part (IV)(B)(1). And considering the evidence on Dexia AM's due diligence activities in New York, the Court infers that the spoliated evidence could have shown that BIL had business contacts in New York that would support the exercise of jurisdiction here. Yet, like the other communications, these inferred contacts would have minimal impact on the personal jurisdiction analysis. The Court declines to make any further inferences pursuant to the Spoliation Order at this time.

## C. **WHETHER ASSERTION OF PERSONAL JURISDICTION IS REASONABLE**

If a defendant has sufficient minimum contacts, the Court must then ask "whether the assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial justice'—that is, whether it is reasonable under the circumstances of the particular case." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,* 305 F.3d 120, 129 (2d Cir. 2002) (quoting *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996)); *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985).   Where a plaintiff "makes the threshold showing of the minimum contacts required for [exercising personal jurisdiction], a defendant must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable."  *MSP Recovery Claims, Series LLC*, 2021 WL 4461773, at *3 (quoting *Bank Brussels Lambert*, 305 F.3d at 129).  Factors the Court will consider include the burden on the defendant, the interests of the forum in adjudicating the case, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the states in furthering fundamental substantive social policies.  *See Bank Brussels Lambert*, 305 F.3d at 129.

The Defendant argue that the *Bank Brussels Lambert* factors "weigh decisively against the exercise of personal jurisdiction over BIL...."  *See* Reply at 13, ECF No. 1119.  First, the Defendant argues that the Court's exercising of jurisdiction over them here would impose on it "a significant burden [by requiring it] to defend a case in federal court in New York."  *Id.*  Specifically, BIL emphasizes the fact that it has no offices or employees in the United States, and argues that litigating this dispute here "[has] been expensive and burdensome for BIL...."  *See id.*  However, the Second Circuit had already rejected a similar argument while evaluating this factor in *Bank Brussel Lambert*.  Finding that the defendant there — a law firm in Puerto Rico — maintained and frequently used of an apartment in New York for business purposes, and that the defendant earned

sizable revenue from its international clients, the Second Circuit disagreed that "the exercise of jurisdiction by New York will impose an undue burden on the [defendant]…." *Bank Brussel Lambert*, 305 F.3d at 129. Further, the Second Circuit also noted that "[e]ven if forcing the defendant to litigate in a forum relatively distant from its home base were found to be a burden, the argument would provide defendant only weak support, if any, because the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago." *Id.* at 129–130. Therefore, having found that the Defendant, through its agents, knowingly invested in the U.S. financial market, repeatedly used U.S.-based correspondent accounts, and conducted due diligence in New York, the Court finds it reasonable to exercise jurisdiction over the Defendant under the first *Bank Brussels Lambert* factor.

Second, the Defendant argues that "[the United States] has virtually no interest in resolving the remaining [constructive trust] claim…." Reply at 13. BIL alleges that "[b]ecause the parties are foreigners, this Court automatically has a diminished interest in resolving the dispute." *Id.* at 17. (citing *Paulo v. Agence France-Presse*, 2023 WL 2873257, at *29 (S.D.N.Y. Jan. 19, 2023). Further, BIL also contends that because the only remaining claim is "an equitable claim under BVI law… this Court's interests in resolving the dispute are minimal at best." *Id.* at 13–14 (citing *Sherwin-Williams Co. v. C.V.*, 2016 WL 354898 at *5 (S.D.N.Y. Jan. 28, 2016) (finding that New York has no interest in adjudicating a case where neither parties was a citizen of New York and the claims arose out of a contract governed by Mexican law).

The Court disagrees with BIL's argument here. Indeed, courts have recognized that the United States has a strong interest in ensuring the integrity of its financial systems. *See, e.g., Licci IV*, 732 F.3d at 174 ("[T]he United States[] and New York [have an] interest in monitoring banks and banking activity to ensure that its system is not used as an instrument in support of terrorism,

33

money laundering, or other nefarious ends."). Moreover, this Court has also repeatedly emphasized such interest in other adversary actions related to the BLMIS Ponzi scheme. *See Fairfield Sentry Ltd. (In Liquidation), et al. v. HSBC Securities Services (Luxembourg) S.A., et al.* (*In re Fairfield Sentry Ltd.*), 658 B.R. 257, 277 (Bankr. S.D.N.Y. 2024); *see also Fairfield Sentry Ltd. (In Liquidation), et al. v. UBS Europe SE, Luxembourg Branch, et al.* (*In re Fairfield Sentry Ltd.*), 657 B.R. 1, 23 (Bankr. S.D.N.Y. 2024). As the Liquidators noted, the core of their case here arises from the Defendant's alleged investments into the United States' financial market via BLMIS. Opp'n at 35–36, ECF No. 1082. Such investments played a key role in facilitating Madoff's Ponzi scheme, and considering the United States' interest in monitoring its banking system, the Court finds that the United States' interest in adjudicating this dispute is far from "minimal." *See* Reply at 13–14.

Third, BIL argues that the Plaintiffs have not sufficiently explained "why [New York] is the most convenient and efficient forum available[,]" and contends that "[t]he most suitable forum is normally the forum whose laws govern the dispute. *Id.* at 14 (citing *Sherwin-Williams*, 2016 WL 354898, at *5). Moreover, BIL also contends that "[w]here there is no showing that the [p]laintiffs are residents of the United States or that it would be more convenient for any [p]laintiff to litigate in the United States rather than another country," the third *Bank Brussels Lambert* factor would weigh in the Defendant's favor. *Id.* (quoting *Porina v. Marward Shipping Co.*, 2006 WL 2465819 (S.D.N.Y. Aug. 24, 2006) (internal quotation marks omitted). The Defendant also argues that the Liquidators could have "pursued this claim either in the BVI or … Luxembourg" with more efficiency. Reply at 14. Here, the Court finds that the third *Bank Brussels Lambert* factor does not seem to support exercising personal jurisdiction. The Second Circuit had explicitly noted that "[t]he third [factor] implicate[s] the ease of access to evidence and the convenience of

witnesses[.]" *Bank Brussels Lambert*, 305 F.3d at 130. Since the Liquidators are not U.S.-based, and the relevant evidence and witnesses are likely located outside of the United States, this factor weighs in the Defendant's favor. However, as the Court discussed *supra*, Part (III)(A), this dispute stems from a Chapter 15 proceeding that has intimate connections to the New York-based BLMIS Ponzi scheme. Therefore, notwithstanding any inconveniences with litigating this dispute in the United States, the Plaintiffs could have legitimate interests in obtaining relief here. Additionally, the Defendant has not demonstrated how this forum would fail to provide effective relief. *See MSP Recovery Claims, Series LLC*, 2021 WL 4461773, at *3. Accordingly, although the third *Bank Brussels Lambert* factor appears to weigh in the Defendant's favor, it only provides limited support to the Defendant's argument that assertion of personal jurisdiction here is unreasonable.

Fourth, the Defendant argues that the efficient administration of justice "weighs against the exercise of personal jurisdiction" because "the Liquidators do not claim that relevant witnesses or evidence are located in the United States[, and] the locus of the alleged wrongful acts is Europe." Reply at 14–15 (citing *Met. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 574 (2d Cir. 1996)). Although certain relevant evidence and witnesses may be located outside of the United States, the Court also notes that BIL has not identified any specific challenges with "obtaining an efficient resolution" here. Indeed, Courts in this District have recognized that "[a] Court's retention of jurisdiction over [an] action would undoubtedly provide the fastest and most practical means of resolving [the] dispute [where] [t]he Court is already intimately familiar with the parties, facts, and legal issues." *Gucci Am., Inc. v. Weixing Li*, 135 F.Supp.3d 87, 100 (S.D.N.Y. 2015)). Considering the Court's familiarity with this case and the lack of evidence that the parties' litigation of the dispute here would hinder an "efficient resolution," the Court finds that the fourth *Bank Brussels Lambert* factor does not favor declining jurisdiction over this adversary action.

Finally, BIL also argues that this case does not implicate the United States' substantive social policies. *See* Reply at 15. The Defendant opposes the Liquidators' argument that this case implicates the United States' policy of "ensuring that its financial system is not used for unlawful purposes," and argues that such policy is irrelevant here because the Liquidator's claim "does not center on the use of the United States financial system." *Id.*; *see also* Opp'n at 40. The Court disagrees with the Defendant here. As noted above, the United States has a strong interest in ensuring the integrity of its financial systems. Although the Liquidators do not allege that the Defendant used the financial system for unlawful purposes, the core of this proceeding concerns the fact that BIL, via its agents, knowingly invested into the Fairfield Funds — transactions which played an integral part in the BLMIS Ponzi scheme. Since the BLMIS Ponzi scheme is precisely the type of unlawful uses of the financial system that the United States has an interest in safeguarding against, the Court finds that this dispute does implicate the United States' substantive social policies. For the fifth *Bank Brussels Lambert* factor, the relevant consideration is whether exercising jurisdiction over this adversary action furthers fundamental substantive social policies of the United States, and if doing so would erode any shared social policies. Having found that this action implicates the United States' substantive social policy interests, and because the Defendant does not allege that litigating this dispute here would erode any shared social policies, the Court finds that the last *Bank Brussels Lambert* factor also favors exercising jurisdiction over this action.

Because the majority of the five *Bank Brussels Lambert* factors favor exercising personal jurisdiction, the Defendant has not established that the Court's exercise of personal jurisdiction over them would be unreasonable. The Court thus finds that exercising jurisdiction over the

Defendant is reasonable and comports with "traditional notions of fair play and substantial justice

. . . ." *See Int'l Shoe*, 326 U.S. at 316, 66 S. Ct. 154.

## V.  <u>CONCLUSION</u>

For the foregoing reasons, the Court DENIES the Defendant's Motions to Dismiss the

Amended Complaint.  The Liquidators shall submit a proposed order consistent with the findings

in this decision in accordance with Local Bankruptcy Rule 9074-1.

**IT IS SO ORDERED.**


Dated: June 3, 2025
New York, New York                     /S/ John P. Mastando III
                                       THE HONORABLE JOHN P. MASTANDO III
                                       UNITED STATES BANKRUPTCY JUDGE